The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| WOLFIRE GAMES, LLC, William Herbert and Daniel Escobar, individually and on behalf of all others similarly situated,<br><br>                  Plaintiffs,<br><br>   v.<br><br>VALVE CORPORATION,<br><br>                  Defendant. | Case No. 2:21-cv-00563-JCC |
| SEAN COLVIN, EVERETT STEPHENS, RYAN LALLY, SUSANN DAVIS, and HOPE MARCHIONDA, individually and on behalf of all others similarly situated,<br><br>                  Plaintiffs,<br><br>   v.<br><br>VALVE CORPORATION,<br><br>                  Defendant. | Case No. 2:21-cv-00650-JCC<br><br>**DEFENDANT VALVE CORPORATION'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**NOTE ON MOTION CALENDAR:** September 17, 2021 |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS .................................................................................. 3

III.   ARGUMENT ...................................................................................................... 6

       A.     LEGAL STANDARD ............................................................................... 6

       B.     PLAINTIFFS FAIL TO ALLEGE THAT VALVE'S CONDUCT IN ITS
              FREE STEAM KEYS PROGRAM VIOLATES THE ANTITRUST
              LAWS ....................................................................................................... 6

       C.     PLAINTIFFS' CLAIM THAT VALVE APPLIES THE ALLEGED
              PMFN TO SALES NOT INVOLVING STEAM KEYS FAILS TO
              ALLEGE INJURY TO COMPETITION ................................................. 9

       D.     PLAINTIFFS FAIL TO ALLEGE ANTITRUST INJURY ............................... 12

              1.     PLAINTIFFS MUST PLAUSIBLY ALLEGE ANTITRUST
                     INJURY ....................................................................................... 12

              2.     PLAINTIFFS PREDICATE THEIR ALLEGED INJURY ON
                     VALVE'S PRICE BEING SUPRACOMPETITIVE .............................. 12

              3.     PLAINTIFFS' MARKET ALLEGATIONS RENDER
                     SUPRACOMPETITIVE PRICING IMPLAUSIBLE.............................. 13

              4.     OTHER ALLEGATIONS DO NOT CURE THE IMPLAUSIBLE
                     SUPRACOMPETITIVE PRICE......................................................... 16

              5.     PLAINTIFFS' ALLEGED NON-PRICE ANTITRUST INJURIES
                     ARE ALSO IMPLAUSIBLE............................................................. 18

       E.     PLAINTIFFS' SHERMAN ACT SECTION 1 CLAIM AND SECTION 2
              CLAIMS BASED ON SEPARATE PRODUCT MARKETS FOR
              GAMES AND GAMING PLATFORMS FAIL FOR LACK OF A
              FACIALLY SUSTAINABLE MARKET DEFINITION ................................... 19

              1.     PLAINTIFFS' SEPARATE-PRODUCTS ALLEGATIONS ARE
                     IMPLAUSIBLE UNDER THE MODERN INTEGRATION TEST
                     THE D.C. AND NINTH CIRCUITS APPLY ......................................... 20

              2.     PLAINTIFFS' SEPARATE-PRODUCTS ALLEGATIONS ARE
                     IMPLAUSIBLE UNDER THE OLDER JEFFERSON PARISH
                     CONSUMER DEMAND TEST .......................................................... 22

       F.     PLAINTIFFS' STATE CPA CLAIM FALLS WITH THEIR FEDERAL
              ANTITRUST CLAIMS ............................................................................ 24

IV.    CONCLUSION.................................................................................................. 24

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - i

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Adelphia Supply USA*,
    2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017)..........................................................................16

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ...........................................................................................7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................................6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................................6

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
    483 F. Supp. 3d 38 (D. Mass. 2020) ...............................................................................13

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ...........................................................................................16

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)...........................................................................................................14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)...........................................................................................................11

*Dominguez v. UAL Corp.*,
    666 F.3d 1359 (D.C. Cir. 2012) .......................................................................................18

*Epic Games, Inc. v. Apple Inc.*,
    493 F. Supp. 3d 817 (N.D. Cal. 2020) .............................................................20, 21, 22, 23

*Fed. Trade Comm'n v. Facebook, Inc.*,
    2021 WL 2643627 (D.D.C. June 28, 2021) ...............................................................3, 14

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .....................................................................................7, 8, 19

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) .............................................................................18

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
    852 F. Supp. 2d 1171 (N.D. Cal. 2012) .............................................................................7

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - ii

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*GMA Cover Corp. v. Saab Barracuda LLC,*
  2012 WL 642739 (E.D. Mich. Feb. 8, 2012) ............................................................16

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.,*
  423 F.3d 374 (3d Cir. 2005) ......................................................................................16

*Hicks v. PGA Tour, Inc.,*
  897 F.3d 1109 (9th Cir. 2018) ...............................................................................6, 19

*In re IBM Peripheral EDP Devices Antitrust Litig.,*
  481 F. Supp. 965 (N.D. Cal. 1979) ...........................................................................16

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.,*
  797 F.3d 538 (8th Cir. 2015) .......................................................................................6

*Intel Corp. v. Fortress Inv. Grp. LLC,*
  2021 WL 51727 (N.D. Cal. Jan. 6, 2021) .................................................................13

*In re Intuniv Antitrust Litig.,*
  496 F. Supp. 3d 639 (D. Mass. 2020) ........................................................................17

*Jefferson Parish Hospital District No. 2 v. Hyde,*
  466 U.S. 2 (1984) .......................................................................................................22

*Kartell v. Blue Shield of Mass.,*
  749 F.2d 922 (1st Cir. 1984) ......................................................................................11

*Leegin Creative Leather Prods. v. PSKS, Inc.,*
  551 U.S. 877 (2007) ....................................................................................................11

*Lubic v. Fid. Nat. Fin., Inc.,*
  2009 WL 2160777 (W.D. Wash. July 20, 2009) .......................................................24

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ....................................................................................................10

*Metronet Servs. Corp. v. Qwest Corp.,*
  2001 WL 765167 (W.D. Wash. Apr. 16, 2001) .........................................................17

*In re Musical Instruments and Equipment Antitrust Litig.,*
  798 F.3d 1186 (9th Cir. 2015) ...................................................................................10

*In re NCAA I-A Walk-On Football Players Litig.,*
  2006 WL 1207915 (W.D. Wash. May 3, 2006) .........................................................12

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - iii

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

<u>**TABLE OF AUTHORITIES**</u>
(*continued*)

**Page(s)**

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ...........................................................20

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
  779 F.3d 1036 (9th Cir. 2015) .............................................................7

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,
  883 F.2d 1101 (1st Cir. 1989) .........................................................2, 11

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
  797 F.2d 370 (7th Cir. 1986) ...........................................................8, 9

*PBTM LLC v. Football Nw., LLC*,
  2021 WL 37648 (W.D. Wash. Jan. 5, 2021)........................................24

*Pool Water Products v. Olin Corp.*,
  258 F.3d 1024 (9th Cir. 2001) ...........................................................12

*Power Analytics Corp. v. Operation Tech., Inc.*,
  820 F. App'x 1005 (Fed. Cir. 2020) ....................................................18

*Principe v. McDonald's Corp.*,
  631 F.2d 303 (4th Cir. 1980) .............................................................21

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) .............................................................12

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
  532 F.3d 963 (9th Cir. 2008) ........................................................21, 22

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ..........................................12, 15, 16, 19

*Subsolutions Inc. v. Doctor's Assocs., Inc.*,
  2001 WL 1860382 (D. Conn. Apr. 6, 2001)........................................23

*Top Rank, Inc. v. Haymon*,
  2015 WL 9948936 (C.D. Cal. Oct. 16, 2015)......................................13

*United States v. Microsoft Corp.*,
  147 F.3d 935 (D.C. Cir. 1998)....................................................20, 21, 22

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)..............................................................23

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - iv

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

# TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*Will v. Comprehensive Accounting Corp.*,
 776 F.2d 665 (7th Cir. 1985) ..................................................................................................21

**Statutes**

RCW 19.86.920 ..................................................................................................................................24

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

1  **I.   INTRODUCTION**

2        On June 23, 2021, Valve moved to compel the seven individual Plaintiffs to arbitrate

3  their claims as agreed in the Steam Subscriber Agreement, and to stay the claims of Wolfire

4  Games, the sole game-developer Plaintiff, until the arbitration concludes.  Dkt. # 35.  Since Rule

5  12 motions are now due, Valve moves under Rule 12(b)(6) to dismiss Wolfire Games' claims

6  because they do not state claims upon which relief can be granted under the antitrust laws or the

7  Washington CPA.  But the Court need not consider this motion now if it stays Wolfire's claims.

8        If the Court decides to consider Wolfire Games' claims now, it should dismiss them

9  because the Consolidated Amended Complaint ("CAC") (Dkt. # 34) fails to allege the most basic

10  elements of an antitrust case, or a Consumer Protection Act ("CPA") case based on the same

11  alleged conduct.

12        First, Plaintiffs fail to allege anything unlawful about Valve's "Steam Keys" program.

13  Steam Keys are code numbers that allow Steam-enabled games to be used on Steam even if they

14  were bought somewhere else.  Valve gives Steam Keys to developers for free.  Developers can

15  then sell them at retail stores or online to gamers who, for example, see a game on a store shelf

16  or on another online game store and want to buy it.  The gamer buys the Steam Key from the

17  developer, logs into Steam, enters the code, and downloads and plays the game on Steam using

18  Valve's infrastructure just as if the game was purchased on Steam—all without anyone paying

19  Valve anything.  Plaintiffs allege Valve's Steam Key Rules and Guidelines violate the antitrust

20  laws because they ask developers who want to take advantage of Steam's features and popularity

21  for free to treat Steam customers fairly by setting their prices for Steam-enabled games on Steam

22  as low as they charge for those same games when sold elsewhere using Steam Keys.  Plaintiffs

23  say this request is anticompetitive.  But Valve has no duty under antitrust law to allow

24  developers to use free Steam Keys to undersell prices for the games they sell on Steam—or to

25  provide Steam Keys *at all*.

26        Second, Plaintiffs claim Valve imposes the same pricing requirement—which they dub a

"Platform-Most-Favored-Nations Clause or "PMFN"—on non-Steam-enabled games developers

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 1

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

sell in stores or websites without using Steam Keys.  But the only factual allegation that Valve ever did this consists of a single anecdote of Valve allegedly telling one unnamed developer it shouldn't give a non-Steam-enabled game free on Discord's competing platform if it charges Steam users $5 for the Steam-enabled version of that game on Steam.  CAC ¶¶ 193, 246.  The remaining allegations merely point to developers setting the same prices for a few games on multiple platforms, *id*. ¶ 209, when games (or any product) selling for the same price at multiple stores is commonplace, *id*. ¶¶ 207, 208, 212.  Plaintiffs fail to plead any facts that Valve was involved in those pricing decisions.  And Valve's alleged PMFN asks developers to give Steam customers the *lowest* available price for a game.  Seeking the best price for your customers is not harm to competition; it *is* competition.  *See, e.g.*, *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1113 (1st Cir. 1989) (upholding Blue Cross's "Prudent Buyer" policy under which it paid lowest price physicians charged any insurer).

Third, Wolfire claims injury from paying Valve an allegedly supracompetitive 30% commission on games it sold to consumers on Steam.  But it alleges no facts from which the Court could plausibly infer that Valve's 30% commission (reduced at larger sales volumes) is above the competitive level.  This dooms the CAC.  On the contrary, Valve, an innovator that created Steam as a platform for playing video games in 2003 and, to create an integrated customer experience, offered games for purchase starting in 2004, CAC ¶¶ 51, 54, set the 30% rate at the beginning, at a time of "vibrant competition" for PC digital game distribution, *id*. ¶ 46. In other words, 30% was a competitive price from the beginning, was still so nearly a decade later in 2013, when Steam allegedly became "dominant," *id*. ¶ 97, and nothing is alleged to have happened since then to make it supracompetitive.  Plaintiffs can muster only a generalization that economics predicts Valve's 30% commission should have decreased over time.  *Id*. ¶ 55.  But they allege no facts from which the Court could plausibly infer that Valve's commission is supracompetitive.  In fact, 30% has become the "industry standard," *id*. ¶ 282, while Valve has faced competition from some of the largest companies in the industry, including Microsoft, Epic

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 2

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

1   Games, and Amazon ("one of the biggest challenges yet to Steam"), *id*. ¶¶, 249–51, 252, 252

2   n.116, 259 n.126.  A competitive price does not cause antitrust injury.

3          Fourth, Plaintiffs fail to define a facially sustainable antitrust market—the area in which

4   the product at issue effectively competes—a threshold step in any antitrust case.  They allege that

5   Valve unlawfully tied game sales to its PC gaming platform, or used its supposed monopoly (or

6   attempted monopoly) in PC gaming platforms to stifle competition in game sales, but those

7   theories apply only if games and the platforms on which they are played are separate products

8   that compete in separate markets.  In fact, they are elements of a single, integrated product or

9   service (Steam) that competes in a single market.

10          Plaintiffs saw this coming and pled alternatively in their Fifth and Sixth claims that

11   Steam, viewed as an "integrated whole," *id*. ¶ 133, competes in a single market for gaming

12   platforms that include game sales and playing, but say Valve monopolized or attempted to

13   monopolize that single market.  Putting aside the success stories of competitors, *id*. ¶¶ 237 n.98,

14   242 n.104, 259 n.126, those counts fail to state a claim because, like all of the others, they fail to

15   allege antitrust injury (that Valve's 30% commission is supracompetitive) or that Valve engaged

16   in unlawful conduct with Steam Keys or caused harm to competition by allegedly enforcing the

17   same pricing policy (the alleged PMFN) against one developer for a non-Steam-enabled game.

18          Finally, Plaintiffs' allegations of Steam's 75% market share are devoid of any factual

19   support, which alone justifies dismissal.  *See Fed. Trade Comm'n v. Facebook, Inc.*, 2021 WL

20   2643627, at *2, *13–14 (D.D.C. June 28, 2021).  Hence no market power, essential to their

21   claims.

22          These fundamental defects in Plaintiffs' complaint warrant dismissal.

23   II.    **STATEMENT OF FACTS**

24          Valve develops and distributes video games and content for use on PCs.  CAC ¶ 23.

25   Valve also operates Steam, *id.,* an integrated, online gaming platform that includes (1) an online

26   store, where users can purchase, among other things, video games to play on the platform, and

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 3

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

(2) features game players value such as matching them with other persons wanting to play, tracking achievements, communicating with others through chat and social networking, updating games, and maintaining a library to store games.  CAC ¶¶ 80, 94, 101.

Third-party game developers—not Valve—produce the overwhelming majority of games customers buy and play on Steam.  CAC ¶¶ 5, 15, 54.  Game developers set their own prices and discounts on Steam.  CAC ¶ 212.  Valve sells their games to players on Steam at these prices and sends developers the revenue, less Valve's commission, sales tax, and refunds.

In operating Steam, Valve competes with other companies' gaming platforms where users can buy and play games, communicate with each other, store their games, and use additional features.  Gamers are able to choose from the "multiple PC Desktop Gaming Platforms available, including Steam, E[lectronic] A[rts] Origin, Epic Games Store, and Ubisoft Connect," CAC ¶¶ 69, 118, 235–39, 254–62, along with Itch.io, CAC ¶ 108 n.33, CD Projekt's GOG.com, CAC ¶ 212, Discord's vertically integrated platform, CAC ¶ 242, Microsoft's store platform, CAC ¶¶ 249–51, Amazon's platform, CAC ¶ 252 n.116 (now called Prime Gaming, https://gaming.amazon.com), and Activision Blizzard's platform, CAC ¶ 295 n.170.

Since launching Steam in 2003, CAC ¶ 49, Valve has offered it to game players for free. Plaintiffs disingenuously omit this fact, which the Court must glean from their allegations of what Valve does charge for—selling games on Steam.  Valve earns revenue to pay for Steam— for the servers and other infrastructure all over the world to enable players to access their Steam accounts to buy and play games, for customer service agents, for employees who add features to make it more popular with customers and developers, and other Steam expenses—by charging a commission when game developers sell games to players on Steam.  CAC ¶¶ 12 n.5, 122–23.

Valve charges game developers 30% of the game's price (except 0% for those sold via Steam Keys), but games that sell over $10 million pay only 25% and games that reach $50 million pay only 20%.  CAC ¶ 6 n.3.  Once again, Plaintiffs disingenuously paper over these substantial volume reductions Valve made in 2018, alleging that Valve charges 30% for "nearly

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 4

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

all" the games it sells on Steam, CAC ¶ 55, and belittling them as "facial changes … that are not real changes at all … just prettied up by some PR."  CAC ¶ 293.  Yet games that sell more than $10 million or $50 million generate enormous revenue and reducing commissions on that revenue is hardly a "facial change[] … prettied up by some PR."  But it makes no difference for this motion, so Valve proceeds as if Plaintiffs' characterization were true.

Plaintiffs denigrate Valve as a "middleman between publishers and gamers," CAC ¶ 18, that "devotes only a small percentage of its revenue to maintaining and improving the Steam Store," CAC ¶ 19.  But again, Plaintiffs fail to inform the Court that Valve offers Steam for free, and earns the revenue it takes to operate the platform from selling games on Steam.  And the CAC makes clear that the Steam platform is far more than a middleman, but offers real value to gamers and developers.  CAC ¶¶ 83, 112.  Indeed, gamers allegedly prize Steam so much that Epic's offering popular games exclusively on its Epic Games Store platform "caused backlash" and "calls for boycotts" from gamers forced to "wait for a Steam-enabled release or use a PC Desktop Gaming Platform they do not prefer."  CAC ¶¶ 86, 260.  An angry user called Epic's action in buying exclusive rights to Borderlands 3 "very anti consumer."  CAC ¶ 86.  Gamers "want to use the PC Desktop Gaming Platform of their choice."  CAC ¶ 85.

Plaintiffs concede that Steam was born of innovation and spunk in a vigorously competitive market.  In 2004, Valve developed a "blockbuster hit" game—Half-Life 2—and decided to sell it on, and enable it to be played only on, its year-old Steam platform.  CAC ¶¶ 51–52.  This decision, made at a time of "vibrant competition" between digital game distributors, CAC ¶ 46, caused Steam to grow "and ultimately provided Valve with a massive incumbency advantage …."  CAC ¶ 53.  But Steam did not become "dominant" until 2013.  CAC ¶ 97.  Valve charged its 30% commission—now the industry standard, CAC ¶ 282—from Steam's beginning when it had zero market share, and hence no power to charge anything but a competitive price, and maintained it until reducing it in 2018 for high-selling games.  CAC ¶ 6 n.3.  These facts lay out the opposite of a supracompetitive commission.

III.     **ARGUMENT**

    A.     **Legal Standard**

      "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation marks omitted).  "Applying this standard is a context-specific task that requires drawing on judicial experience and common sense." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018) (quotation marks omitted).

      This is especially true in antitrust.  "[I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (citation omitted).  Consequently, "the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage …." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (quotation marks omitted).

    B.     **Plaintiffs Fail to Allege That Valve's Conduct in its Free Steam Keys Program Violates the Antitrust Laws.**

      Plaintiffs claim Valve uses Steam Keys to stifle competition in their alleged PC Desktop Game Distribution and Gaming Platform markets.  CAC ¶ 146.  But Plaintiffs allege no unlawful conduct in Valve's creation and granting of Steam Keys to developers.  On the contrary, Steam Keys are a *free* accommodation to game developers enabling them to supply Steam access with games they sell or give away outside of Steam, and pay nothing to Valve.  Valve has no obligation to distribute Steam Keys, let alone to allow developers to use Steam Keys to undercut their Steam prices in other stores.  Valve's guideline that developers offer customers buying their games on Steam as good a price as offered elsewhere via Steam Keys prevents developers from

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 6

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

free-riding on Valve's investment in Steam.  The antitrust laws impose no obligation on Valve to facilitate competition with itself.  "'Competitors are not required to engage in a lovefest.'"  *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) (quoting *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016)); *see also Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1184 (N.D. Cal. 2012) (defendant "has no duty to license its technology to foster competition or to give away its technology for others to clone").

As Valve's website explains, "Steam keys are meant to be *a convenient tool for game developers to sell their game on other stores and at retail.  Steam keys are free* and can be activated by customers on Steam to grant a license to a product." https://partner.steamgames.com/doc/features/keys (*cited at* CAC ¶ 12 n.5) (emphasis added).[1] When a gamer activates a Steam Key on Steam, "Valve provides the same free bandwidth and services to customers activating a Steam key that it provides to customers buying a license on Steam." *Id.*[2]  Steam Keys enable developers, outside Steam, to deliver their games along with Steam services to their customers and pay Valve nothing.  That gives developers a free way to sell (or give away) a reasonable number of copies of their Steam-enabled games.

Plaintiffs nevertheless try to paint Steam Keys as a means for Valve to keep its alleged monopolies in PC gaming platforms and game distribution—through a PMFN.  CAC ¶¶ 184, 198–200.  Plaintiffs claim Valve "controls the distribution of any Steam-enabled games outside of the Steam Store through the 'Steam Keys' program," CAC ¶ 163, by limiting the number of Steam Keys and requiring developers to sell games on Steam as cheaply as elsewhere, *id.* ¶ 164.

But consider how Steam Keys work.  A developer might request a few thousand free

---

[1]     The Court may "consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading."  *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043 (9th Cir. 2015) (brackets in original) (quotations and citation omitted).

[2]     While Plaintiffs allege that Valve is "tying the Steam Gaming Platform to the Steam Store," CAC ¶ 341, that claim is inconsistent with their admission that Steam Keys "provide[] an *additional alternative* to game publishers for selling Steam-enabled games," *id.* ¶ 145 (emphasis added)—an alternative that doesn't require *any* purchase on Steam at all.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 7

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

Steam Keys and pack them in retail boxes.  A gamer may buy the game in a retail store.  The box would contain only a Steam Key card with code numbers to let the gamer download and play the game on Steam.  The developer gets an opportunity to sell Steam-enabled games in, say, brick-and-mortar stores or its own online store, or give free copies to reviewers, yet *pay Valve nothing*.

Plaintiffs' allegations that Valve's Steam Key rules amount to an unlawful PMFN fail for the straightforward reason that Valve, which created and owns Steam, has no *duty* under the antitrust laws to create a method (here, Steam Keys) for game developers to sell Steam-enabled games in stores that compete with Steam.  The Ninth Circuit recently set out this basic principle in *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) (citations omitted):

> As the Supreme Court has repeatedly emphasized, there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals[.]'  Likewise, "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'  "This is because the antitrust laws, including the Sherman Act, "were enacted for 'the protection of competition, not competitors.'"

The Seventh Circuit likewise refused to impose such duties in *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986) (Posner, J.).  There, Western Union decided to exit leasing of telex equipment to its customers, and offered them the option of purchasing their in-place equipment or acquiring compatible telex equipment from other suppliers, including Olympia.  *Id.* at 372–73.  Western Union helpfully compiled a list of compatible suppliers.  *Id.*  But Western Union later reconsidered and decided to push sales of its in-place equipment, and stopped referring customers out.  *Id.* at 373.

Faced with plummeting sales after Western Union changed course, Olympia sued, alleging monopolization and attempted monopolization under section 2 of the Sherman Act and breach of contract.  On appeal, the Seventh Circuit rejected Olympia's claims because notwithstanding Western Union's initial steps to promote Olympia's and other equipment competitors' sales, the antitrust laws imposed no duty on Western Union to enable competition:

> Today it is clear that a firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or by otherwise pulling its competitive punches …. A

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 8

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1
      monopolist has no duty to reduce its prices in order to help consumers,
      and no duty to extend a helping hand to new entrants ....

2
*Olympia*, 797 F.2d at 375-76 (citations omitted).

3
      Plaintiffs rely on a screenshot of a message from Valve to a developer showing that

4
Valve may limit the number of free Steam Keys it hands out if the developer's request greatly

5
exceeds its sales on Steam.  CAC ¶ 167 ("For example, say you've sold a few thousand copies

6
on Steam but have requested / activated 500K keys, then we are going to take a deeper look at

7
your games, your sales, your costs, etc.").  But in light of Plaintiffs' allegation of a grey market

8
"wherein *Steam Key resellers* or fraudsters sell Steam-enabled games without permission of the

9
publisher," *id.* ¶ 150 (emphasis added), Valve plainly has a legitimate business interest in

10
policing uncontrolled acquisition of Steam Keys out of proportion to developers' needs.

11
      More importantly, Valve had no *duty* to introduce Steam Keys and facilitate "an

12
additional alternative to game publishers for selling Steam-enabled games."  CAC ¶ 145.  Nor

13
does Valve have a duty to continue offering them, to grant them in unlimited numbers, or allow

14
developers to use them to sell Steam-enabled games in other stores cheaper than on Steam.

15
Steam Key guidelines prevent developers from eroding large quantities of sales on Steam, which

16
Valve bears 100% of the expense of creating and maintaining, yet provides to users for free.

17
Developers need not request Steam Keys, but are asked to follow the Steam Key guidelines if

18
they do.  This is no unlawful PMFN.

19
     **C.**    **Plaintiffs' Claim That Valve Applies the Alleged PMFN to Sales Not Involving Steam Keys Fails to Allege Injury to Competition.**

20
      Plaintiffs seek to extend their Steam Keys pricing theory to non-Steam-enabled games by

21
claiming Valve violates antitrust rules by applying an alleged PMFN against developers who

22
price their games enabled for competing platforms lower than on Steam in sales having nothing

23
to do with Steam Keys.  Plaintiffs quote a tweet from Tim Sweeney, CEO of Epic, the "leading

24
alternative to" Steam, CAC ¶ 254, asserting that "Valve can simply say 'no'" if a "'developer

25
wishes to sell their game for a lower price on Epic Games store than Steam,'" *id.* ¶¶ 11, 187.  But

26
Mr. Sweeney's tweet is no fact.  Indeed, one of his Twitter followers called out his

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 9

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1   "disingenuous" assertion: "That clause only applies to steam KEYS sold elsewhere, not to

2   something like a game being sold at the Epic store." *Id.* ¶ 11 n.4 (reply at 2).

3          Plaintiffs' sole factual allegation consists of an anecdote of Valve allegedly telling one

4   unnamed developer it should not sell its game on Steam for $5 but give away free a version

5   enabled for Discord's gaming platform.  CAC ¶¶ 193, 246.  But this one anecdote fails to allege

6   market-wide enforcement or plausibly lead to any effect on competition.

7          Plaintiffs also list, of the tens of thousands of available games, sixteen where prices were

8   the same in two or three different stores including Steam.  They also allege that three developers,

9   when changing prices for six games, kept the prices the same on Steam and another outlet.  But

10  Plaintiffs allege *no facts* that Valve had a hand in this pricing.  These developers may have made

11  the common-sense choice to sell their games at the same price in different stores.

12         It has long been the law that conduct as consistent with competition as with an

13  anticompetitive restraint is not actionable under the antitrust laws, *Matsushita Elec. Indus. Co.,*

14  *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), even if it results from "conscious

15  parallelism" among competitors, *see, e.g.*, *In re Musical Instruments and Equipment Antitrust*

16  *Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015).  And conscious parallelism, which originates in

17  Section 1 conspiracy cases, doesn't even come into play here, where the price changes Plaintiffs

18  describe are—given the absence of any allegations of Valve's involvement—independent

19  decisions by sellers to price their games the same on different platforms.

20         Plaintiffs' failure to make plausible allegations relating to Valve's alleged use of a PMFN

21  is easily shown.  First, the only factual allegation of Valve involving itself in the pricing of a

22  non-Steam version of a game is the Discord anecdote noted above.  CAC ¶¶ 193, 246.  It

23  concerned one developer out of thousands, *see* CAC ¶ 45 (alleging "[t]housands of publishers"

24  already in the 1990s), and did not involve pricing but giving away a free game as a promotion.

25  Plaintiffs would have the Court implausibly infer that enforcing the alleged "Valve PMFN,"

26  against this developer harmed Discord and also *multiple* developers and gamers.  *Id.* ¶ 193; *see*

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 10

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

*also id.* ¶ 246 (repeating unsupported allegation that "publishers could not steer gamers to Discord").  At most, Plaintiffs allege injury to a competitor, not *competition*, without which they fail to allege Valve violated antitrust laws.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).

Second, what's missing from Plaintiffs' narrative about the sixteen games priced the same is any factual allegation that Valve enforced the alleged PMFN or did anything at all to affect, let alone coerce, the developers to sell at the same prices in two stores.  CAC ¶¶ 207–08. Plaintiffs' allegation of a "differential in commissions" on the six games in paragraph 208— without a factual allegation that Valve determined the developers' prices on the Epic Games Store or Steam—is no more than an observation that the developer set its price the same although its costs may have varied between stores.  It's no more plausible that the level prices resulted from anticompetitive conduct than from the developers' desire to set one market-wide price, conduct that, after *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007), would be unobjectionable even if the developer demanded it of a reseller.

Plaintiffs do no better in paragraph 212, where they bullet six allegedly identical price changes for games that happened close in time on Steam and another store, involving games from three developers.  Again, Plaintiffs never allege that Valve coerced the changes; Plaintiffs allege no facts that Valve was involved at all.  As with the sixteen games in paragraphs 207–08, it is at least as plausible that the three developers decided to set the same price in different stores.

Finally, most-favored-nations clauses, even if Valve had one, need not be anticompetitive—they aim to *lower* prices.  In *Ocean State*, Blue Cross paid physicians the lowest price they charged any insurer.  The First Circuit ruled this did not violate the Sherman Act, affirming the district court's view, "'it would seem silly to argue that a policy to pay the same amount for the same service is anticompetitive, even on the part of one who has market power.  This, it would seem, is what competition should be all about.'"  883 F.2d at 1110 (quoting 692 F. Supp. 52, 71 (D.R.I. 1988)).  *See also Kartell v. Blue Shield of Mass.,* 749 F.2d

922, 929 (1st Cir. 1984), where Blue Cross lawfully barred physicians from "balance billing" patients.  Here, Plaintiffs' conclusion that the alleged PMFN is "anticompetitive," CAC ¶ 4, rests on no facts alleging harm to competition.  That alone dooms their claims.

### D. **Plaintiffs Fail to Allege Antitrust Injury.**

#### 1. *Plaintiffs must plausibly allege antitrust injury.*

All private antitrust claims require antitrust injury, *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995), and a plaintiff who fails to adequately plead antitrust injury lacks standing, *Somers v. Apple, Inc.*, 729 F.3d 953, 964 n.5 (9th Cir. 2013); *see also In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *14 (W.D. Wash. May 3, 2006) ("Plaintiffs can obtain no remedy without proving antitrust injury.") (Coughenour, J.).

#### 2. *Plaintiffs predicate their alleged injury on Valve's price being supracompetitive.*

Plaintiffs premise their alleged injury entirely on Valve's 30% commission, CAC ¶¶ 7, 9, 13, 16, 54, 55, 191, 202, 205, 210, 256, 270, 272, 275, 277, 279, 282, 283, which it allegedly charges on "nearly every sale" on Steam, ¶¶ 2, 4, 6, 15, 22, 23, 169, 240.  Wolfire is allegedly injured by paying that commission.  *Id.* ¶ 24.  Valve's commission allegedly inflates Steam game prices.  *Id.* ¶ 2 ("Valve's bloated commission makes games more expensive for consumers to buy.").  Thus, as alleged, all harm to Plaintiffs and the proposed class flows from Valve's commission.  *See, e.g.*, *id.* ¶ 307 ("Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Valve.  Specifically, Valve's wrongdoing caused class members to pay inflated prices to Valve.  Publishers paid an inflated commission directly to Valve, and gamers paid inflated retail prices directly to Valve.").[3]

But to sound in antitrust, Plaintiffs' injury must flow from aspects of Valve's conduct that harm competition, *see Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir.

---

[3]     *See also* CAC ¶ 268 ("Gamers overpay when they buy their games from Valve directly, and publishers overpay when Valve extracts its commission before giving the publisher the proceeds"); ¶ 311 ("Valve's excessive commissions harm both sets of class members."); ¶¶ 302–03 (limiting proposed class and subclasses to those who purchased or sold games on Steam).

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 12

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

2001) ("If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury."), so Plaintiffs allege (as they must) that Valve's commission is supracompetitive, CAC ¶¶ 2, 3, 13, 16, 17, 24, 206, 268, 277, 283, 285. "Claiming that prices are supra-competitive is a legal conclusion rather than a fact, however, and must be supported by specific factual allegations." *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 59 (D. Mass. 2020). Thus, Plaintiffs must allege facts supporting an inference that Valve's commission is supracompetitive. *See Intel Corp. v. Fortress Inv. Grp. LLC*, 2021 WL 51727, at *14–16 (N.D. Cal. Jan. 6, 2021) (dismissing antitrust claims where allegations "arguably suggest that supracompetitive pricing is possible; however, *Twombly* and *Iqbal* require plausibility and not just possibility"); *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *8–9 (C.D. Cal. Oct. 16, 2015) (dismissing antitrust claims where plaintiff "fail[ed] to allege any evidentiary facts plausibly suggesting […] supracompetitive prices").

### 3. *Plaintiffs' market allegations render supracompetitive pricing implausible.*

Plaintiffs claim that Valve uses its alleged dominance to charge a supracompetitive commission. CAC ¶ 2 ("Valve uses its dominance over PC game distribution to impose a 30% commission on nearly every sale made through its store. This commission far exceeds what would prevail in a competitive market."). But factually, Plaintiffs allege that "for nearly twenty years, Valve has maintained its 30% fee for nearly all games sold." *Id.* ¶ 55.[4] Steam launched in 2003, CAC ¶¶ 49, 54, at which point "*vibrant competition*" existed for PC game digital distribution, ¶ 46 (emphasis added). But Valve allegedly did not become "dominant" until 2013. CAC ¶ 97. This means Valve allegedly charged that same 30% for *nine years* before becoming dominant, beginning when competition was "vibrant" and when Valve had zero market share (apart from selling its own games). These factual allegations make it implausible that 30% is supracompetitive and that Valve can charge it only because of its alleged dominance.

---

[4]   Plaintiffs further allege that Steam was the "first [to] develop[] the 30% store commission," before even Apple took up the practice. CAC ¶ 282.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 13

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

1    Other factual allegations render Plaintiffs' theory even less plausible.  As alleged, "[30%]

2 has become the industry standard" store commission rate.  CAC ¶ 282.  Valve has neither raised

3 nor lowered[5] its 30% commission for nearly two decades, during which it went from zero to an

4 alleged 75% market share, *e.g.*, CAC ¶¶ 1, 133, and the industry saw substantial growth in both

5 output and demand, ¶¶ 57, 74, 98, 99, 110–11, 121.  While "in a concentrated market, the

6 occurrence of a price *increase* does not in itself permit a rational inference of […]

7 supracompetitive pricing," *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S.

8 209, 237 (1993) (emphasis added), Plaintiffs fail to allege even that for nearly twenty years.

9    And Plaintiffs' assertions of Valve's 75% market share in *both* PC Desktop Gaming

10 Platforms *and* PC Desktop Game Distribution, CAC ¶¶ 318–20, lack any *factual* allegations.  In

11 *Facebook*, 2021 WL 2643627, at *2, the court recently dismissed an antitrust complaint because

12 "the FTC's inability to offer any indication of the metric(s) or method(s) it used to calculate

13 Facebook's market share renders its vague '60%-plus' assertion too speculative and conclusory

14 to go forward."  That failing alone is sufficient for dismissal for lack of market power needed to

15 charge a supracompetitive price, especially when the alleged tying market, PC Desktop Gaming

16 Platforms, CAC ¶¶ 175, 319, is also "no ordinary or intuitive market" but, as in *Facebook*, one

17 that involves free services as well as a range of services beyond game-play—such as game

18 storage, social networking, and an "achievement system" and game-modification community,

19 CAC ¶ 230—so that measurement of market share is not at all intuitive and where Plaintiffs

20 provide no indication how they measured it.[6]  *See Facebook*, 2021 WL 2643627, at *1, *13–14.

21    Plaintiffs allege that Valve has faced competition, "some by the most sophisticated and

---

22 [5]   In 2018, Valve reduced its commission for the largest-selling games, CAC ¶ 6 n.3, but
23 allegedly those were "facial changes […] that are not real changes at all," ¶ 293.  Evidence
would show that these 2018 changes materially dropped Valve's commission (not to speak of
24 Valve's zero commission on Steam Keys sales), and that Valve's continual investment in new
features has reduced the quality-adjusted commission considerably, but, for this motion, we
25 accept Plaintiffs' allegation that these "are not real changes at all."

26 [6]   In a tying case, market power must be shown in the tying market, making Plaintiffs'
failure to allege facts supporting their assertion Valve has 75% in gaming platforms especially
egregious.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 14

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

largest gaming and technology companies in the world," CAC ¶ 20, including (1) "a variety of alternative distributors charg[ing] lower commissions," *id.* ¶ 136; (2) an eight-year campaign by Electronic Arts that amassed a fifty-million user base, ¶¶ 118, 235, 237; (3) Microsoft's rival store-platform—launched before Steam allegedly became dominant, ¶¶ 97, 249, and competing to this day, ¶ 277; and (4) Epic, the "leading alternative" platform-competitor, launched in 2018 and willing to give away tons of free games (749 million games in 2020), ¶¶ 254–55, 257, 261– 62, 264. Epic boasts that games sold exclusively on its platform meet or exceed their projected Steam revenue. *Id.* ¶ 259 n.126. These facts make it implausible that the "industry standard" 30% Valve has charged during nearly twenty years of intense competition is supracompetitive.

　　The Ninth Circuit ruled on this very issue under indistinguishable facts. *Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013). Somers brought antitrust claims based on Apple's purported monopoly of digital music sales. *Id.* at 956. Under her "overcharge theory," Somers alleged that Apple was able to charge supracompetitive prices for digital music by thwarting competitors with its anticompetitive conduct. *Id.* at 964. But the Ninth Circuit affirmed dismissal of Somers' overcharge claims because the market facts rendered her overcharge theory implausible. *Id.* at 964–66. Apple had allegedly charged the same price (99 cents per song) since it entered the market—both before and after it obtained a monopoly—and never changed that price, even after a large seller (Amazon) entered the market. *Id.* at 964. These alleged market facts rendered implausible Somers' overcharge theory, warranting dismissal of her antitrust claims. *Id.*

　　Just as in *Somers*, Plaintiffs' theory of harm is that Valve would be forced to lower its commission but for its dominance and anticompetitive conduct. CAC ¶¶ 2, 13. And Plaintiffs' market allegations, detailed above, are even less consistent with supracompetitive pricing than those in *Somers*. *Compare Somers*, 729 F.3d at 964 (alleging Apple had always charged the same price, including for one year before obtaining a monopoly), *with* CAC ¶¶ 51, 54–55, 97 (alleging Valve has charged the same price for nearly twenty years, including nine years before becoming "dominant"). Plaintiffs' factual market allegations render implausible their theory that

Valve's 30% commission is supracompetitive, warranting dismissal. *Somers*, 729 F.3d at 964; *see also Abbott Labs. v. Adelphia Supply USA*, 2017 WL 5992355, at *7 (E.D.N.Y. Aug. 10, 2017) (dismissing antitrust claims because allegations that price had stayed the same before and after competitor exclusion rendered implausible theory that unlawful conduct affected price).

        4.      *Other allegations do not cure the implausible supracompetitive price.*

Plaintiffs may try to sidestep *Somers* with other allegations, but they don't save the CAC.

First, Plaintiffs may argue that some competitors charge less than Valve, CAC ¶¶ 3, 14, 136, 192, 256, 277, making it plausible that 30% is supracompetitive. The Ninth Circuit rejected that argument in *Somers*. 729 F.3d at 965–66 ("[T]he bare allegation that Real Networks charged a lower introductory price [49 cents compared to Apple's 99 cents] does not mean that Apple charged supracompetitive prices when such variations in pricing exist even in competitive markets"). Here, the market allegedly regards Steam as superior, CAC ¶ 110 ("'[Steam is] where the players are'"); ¶ 86 (describing gamer backlash when Epic did not release Borderlands 3 on Steam), which is consistent with Valve's ability to fairly command higher prices, *see Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Competitive markets are characterized by both price and quality competition, and a firm's comparatively high price may simply reflect a superior product."); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) ("Generally you must pay more for higher quality.").

Second, Plaintiffs may argue their allegations that Valve's commission far exceeds its costs, *e.g.*, CAC ¶ 277, render their overcharge theory plausible. But a firm's relative costs do not determine whether its price is competitive. *See GMA Cover Corp. v. Saab Barracuda LLC*, 2012 WL 642739, at *8 (E.D. Mich. Feb. 8, 2012) ("GMA argues […] SBLLC's ceiling price is substantially above its costs. This, however, is not the relevant inquiry. The pertinent question is whether the ceiling price is a supracompetitive price."); *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 981 (N.D. Cal. 1979) ("[T]he inference that a defendant that

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 16

enjoys healthy profits only does so because of an unhealthy market structure is not a strong one."). Plaintiffs do not allege Valve's costs are lower than when it set its 30% commission—amidst "vibrant competition." CAC ¶ 46. But they do allege that software development has high fixed costs and "close to zero" marginal cost, *id.* ¶¶ 111, 284, which undermines any inference of supracompetitive prices from current costs. *See In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 659 (D. Mass. 2020) ("'[I]n the market for a product with high fixed costs, […] evidence that prices routinely exceed marginal costs may not necessarily be evidence that prices are supracompetitive, because even competitive prices may exceed marginal cost.'"). Virtually every game developer has high fixed costs and "close to zero" marginal cost, so nearly all game prices, including Wolfire's, would be supracompetitive if pricing above marginal cost made them so.

Third, Plaintiffs may point to their allegation that "economics" predicts Valve's price should have dropped. CAC ¶ 55 ("Under competition, economics predicts that pricing should approach cost, and therefore Valve's 30% commission should have decreased dramatically over time."). But that oversimplified prediction ignores a host of relevant factors, including Steam's quality and the price-*increasing* effect of rising demand. *See Metronet Servs. Corp. v. Qwest Corp.*, 2001 WL 765167, at *6 n.4 (W.D. Wash. Apr. 16, 2001) (Coughenour, J.) ("According to standard price theory, prices increase as output decreases and demand rises."). Plaintiffs allege just that for PC games, CAC ¶ 100 (steady increase in digital distribution since 2009); ¶ 74 (PC game market up 4.8% by May 2020); ¶ 98 (surging demand since pandemic), and for Steam, ¶ 57 (dramatic increase in usage from 2017 to 2020), ¶ 99 (surging since pandemic). Plaintiffs allege an evolving gaming landscape, *e.g.*, CAC ¶ 96 ("This digital distribution model for PC Desktop Games is a relatively new phenomenon."), particularly ill-suited to drawing inferences from overly simplified economics. *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020) ("We decline to ascribe antitrust liability in these dynamic and rapidly changing technology markets without clearer proof of anticompetitive effect."). Alleging a

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 17

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1  supracompetitive price requires facts, not vague predictions.

2       5.  *Plaintiffs' alleged non-price antitrust injuries are also implausible*.

3    Alternatively, Plaintiffs may attempt to shift the inquiry away from pricing altogether and

4  to their allegations of non-price injury.  *E.g.*, CAC ¶ 316 ("Valve has inflicted antitrust injury by

5  [...] reduc[ing] output and quality.").  But all alleged non-price harms—output, quality,

6  innovation, choice—rest on Plaintiffs' conclusion that Valve's commission is supracompetitive:

7    &bull;  "Valve's supracompetitive 30% tax has also reduced output in the
    relevant markets."  CAC ¶ 283;

8    &bull;  "Valve's imposition of its supracompetitive tax suppresses
    innovation and output across the industry [. . .].  Forced to pay

9      Valve's exorbitant tax, game publishers have fewer resources to
    invest in creating new games."  *Id.* ¶ 17;

10   &bull;  "Valve's bloated commission [. . .] suppress[es] sales volumes and
    revenues for game publishers.  And with Valve extracting so much

11     revenue from its middleman role, quality and innovation in the
    industry suffer."  *Id.* ¶ 2 (footnote omitted);

12

13   &bull;  "In order to afford Valve's 30% commission, game publishers
    must charge higher prices to consumers and have fewer resources

14     for innovation and creation. Game quality and choice suffers as a
    result, and gamers are injured by paying higher retail prices for

15     fewer and lower-quality games. Competition, output, and
    innovation are suppressed."  *Id.* ¶ 22.

16 Predicating these harms on the notion that Valve's commission is supracompetitive

17 impermissibly "piles speculation atop speculation."  *Dominguez v. UAL Corp.*, 666 F.3d 1359,

18 1364 (D.C. Cir. 2012) (vacating judgment for lack of standing based on speculative injury).

19   Conspicuously absent from the CAC are any alleged *facts* of reduced output, quality,

20 innovation, or choice, making Plaintiffs' allegations of non-price harms conclusory.  *See Power*

21 *Analytics Corp. v. Operation Tech., Inc.*, 820 F. App'x 1005, 1019–20 (Fed. Cir. 2020) (rejecting

22 as conclusory allegations of reduced output, stifled innovation, and customer choice and

23 accordingly dismissing antitrust claims for failure to plead antitrust injury); *Feitelson v. Google*

24 *Inc.*, 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015) ("Plaintiffs' allegations of hypothetical loss of

25 consumer choice and innovation are entirely too conclusory and speculative.").  Tellingly, the

26 facts that are alleged show an *increase* in these non-price metrics.  CAC ¶¶ 57, 121 (games

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 18

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

available on Steam increased from just 7 in 2004 to more than 45,000 in 2020); ¶ 99 (21.4%

increase in games purchased in 2020).[7]  And Plaintiffs give examples of developers choosing

other platforms over Steam for their revenue-sharing terms.  CAC ¶¶ 108 n.33, 259 n.126, 274.

Plaintiffs stake their claims on their conclusion that Valve's commission is

supracompetitive, but their factual allegations render that conclusion implausible.  *Somers*, 729

F.3d at 694–96.  Plaintiffs thus fail to allege antitrust injury, *id.*, lack standing, *id.* at 964 n.5, and

have no basis for damages, *id.* at 695, warranting dismissal of all claims on this basis alone.

### E.  Plaintiffs' Sherman Act Section 1 Claim and Section 2 Claims Based on Separate Product Markets for Games and Gaming Platforms Fail for Lack of a Facially Sustainable Market Definition.

"A threshold step in any antitrust case is to accurately define the relevant market, which

refers to the area of effective competition."  *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d

974, 992 (9th Cir. 2020) (quotation marks omitted).  "A complaint may be dismissed under Rule

12(b)(6) if the complaint's relevant market definition is facially unsustainable."  *Hicks v. PGA

Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (quotation marks omitted).  Here, Plaintiffs'

Section 1 tying (Seventh claim) and Section 2 monopolization and attempted monopolization

claims (First to Fourth claims) based on allegations that the Steam Store is a product separate

from the Steam Gaming Platform fail because those products are a single, integrated product—

Steam—under antitrust law, rendering Plaintiffs' market definitions facially unsustainable

"The relevant market must include both a geographic market and a product market."  *Id.*

Because any product market "must encompass *the product at issue* as well as all economic

substitutes for the product," *id.* (emphasis added) (quotation marks omitted), a proper product

definition must be established before the threshold market analysis can be undertaken.  This

requirement governs Section 1 and 2 claims as "[t]he 'relevant market' and 'market power'

requirements apply identically under the two different sections of the [Sherman] Act …."

---

[7]     *See also supra* at 17 (detailing allegations of increased demand; because Plaintiffs allege
that software has minimal marginal cost of replication, CAC ¶ 111, and that Valve has minimal
variable costs, ¶ 280, output and demand are closely related in these markets).

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 19

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1    *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008).

2            *1.*       *Plaintiffs' separate-products allegations are implausible under the*
     *modern integration test the D.C. and Ninth Circuits apply.*

3            In determining whether products are separate in novel technological contexts, courts

4    apply a "narrow and deferential" integration test that finds a single, integrated product if it (1)

5    combines functionalities in a way users could not, and (2) provides "some technological value"

6    through the integration.  *See United States v. Microsoft Corp.*, 147 F.3d 935, 949, 950 (D.C. Cir.

7    1998) ("*Microsoft II*").  This test was created in *Microsoft II* when the D.C. Circuit considered

8    whether Microsoft had violated an anti-tying consent decree in bundling Internet Explorer with

9    Windows 95.  *Id.* at 939.  The first prong (combining functionalities) could be satisfied through a

10   "physical or technological interlinkage that the customer cannot perform."  *Id.* at 949 (quotation

11   marks omitted).  Microsoft had made such a showing because "if Microsoft presented [others]

12   with an operating system and a stand-alone browser application, rather than with the

13   interpenetrating design of Windows 95 and IE 4, the [others] could not combine them in the way

14   in which Microsoft has integrated IE 4 into Windows 95."  *Id.* at 952.

15           Deferring judicial scrutiny in favor of product design and innovation, the court observed

16   the second prong (value) was met if "there is a plausible claim that [the integration] brings some

17   advantage."  *Id.* at 950.  It found Microsoft "clearly met the burden" by showing advantages of

18   the integrated design, *id.* at 950–51, and thus could offer its integrated product.  *See id.* at 952.

19           Courts in the Ninth Circuit have applied the integration test to new technology through

20   analogy to franchise cases.  In *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817 (N.D. Cal.

21   2020), the court determined (at the preliminary injunction stage) that Epic had not shown likely

22   success on the merits of a tying claim alleging that "Apple ties the iOS app distribution

23   'product,' over which Apple has economic power, to a separate 'product' of the IAP [in-app

24   purchase] system."  *Id.* at 832, 842.  Specifically, the court held that "Epic Games has not yet

25   shown that the IAP system is a separate and distinct service from iOS app distribution sufficient

26   to constitute a 'tie' under antitrust law":

> Where the allegedly tied product is an essential ingredient of the overall "method of business" with customers, courts view them as one product not as two tied together. *Rick-Mik [Enterprises, Inc. v. Equilon Enterprises LLC]*, 532 F.3d [963] at 974 (9th Cir. 2008) (quoting *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 670 n.1 (7th Cir. 1985)). That is especially true where the allegedly separate products have always been integrated. *See id.* at 975. As the Ninth Circuit has recognized, payment processing can be part of a single integrated product. *See id.* at 974 ("The franchise and the method of processing credit transactions are not separate products, but part of a single product (the franchise).").

*Id.* at 842. The court noted *Microsoft II* "lays out the general requirements for an integrated service." *Id.* at 844 n.27. Ruling against Epic, it stated, "The IAP system appears to have been created, in part, to capture the value of a developer being on the digital shelf of the App Store which is owed to Apple—either on the initial download, or in subsequent IAPs." *Id.* at 843.

Because franchises, like digital platforms,[8] "almost by definition, necessarily consist of 'bundled' and related products or services," *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 974 (9th Cir. 2008), the *Epic* court's reliance on franchise cases makes sense. In *Rick-Mik*, the Ninth Circuit found a single, integrated product and affirmed dismissal:

> With franchises, "the proper inquiry is … whether [the allegedly tied products] are integral components of the business method being franchised. Where the challenged aggregation is an essential ingredient of the franchised system's formula for success, there is but a single product and no tie in exists as a matter of law."

*Id.* (quoting *Principe v. McDonald's Corp.*, 631 F.2d 303, 309 (4th Cir. 1980)). This fits nicely with *Microsoft II*. If a combination of functionalities is an ingredient of a business's "formula for success," it has (1) combined functionalities in a way others cannot (that is why it is part of the formula), and (2) provided consumers with a benefit through that combination (that is why the formula is successful). In other words, businesses may provide an integrated product or service that combines functionalities and provides value to consumers, especially when the integration is part of the business's formula for success, without unlawful tying.

Plaintiffs' description of Steam easily satisfies this test. First, Valve combined the functionalities of game sales and game playability through Steam in a manner others cannot

---

[8]     Plaintiffs' sources draw this parallel. CAC ¶ 78 n.17 ("a platform is a business model").

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 21

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

because only Valve controls Steam.  As stated in *Microsoft II*, this is simply a "physical or technological interlinkage that the customer cannot perform."  *Microsoft II*, 147 F.3d at 949 (quotation marks omitted).  Competing "vertically integrated" platforms "that offer both platform and store components," do likewise.  CAC ¶ 133; *see also id*. ¶¶ 236, 242, 249–54.

Second, it is more than plausible that Valve's bundling of game sales with platform services provides value.  Gamers can buy and play Steam-enabled games in a secure, one-stop-shopping and support experience, *see* CAC ¶¶ 19, 50, 287, without the trouble, transaction costs, or security risks of visiting a separate store and buying a game separate from the platform on which it is played (all the more important given the "grey market" allegations, *id*. ¶¶ 149–50).

If, as *Rick-Mik* and *Epic* recognized, "payment processing can be part of a single integrated product," game sales (which include payment processing) can do the same.  Especially when Steam added game sales to create its "formula for success" in 2004, when only a year old, *id*. ¶¶ 49, 51, in a world of "vibrant competition" among digital game distributors, *id*. ¶ 46.

2.   *Plaintiffs' separate-products allegations are implausible under the older Jefferson Parish consumer demand test*.

Understanding the obstacles they face under the integration test, Plaintiffs may try to convince the Court to apply an older test, which focuses on consumer demand.  In *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 24 (1984), the Court concluded that "two distinguishable services" were involved in an alleged tying arrangement between hospital services (the tying product) and anesthesiological services (the tied product).  "[T]he answer to the question whether one or two products are involved turns … on the character of the demand for the two items."  *Id*. at 19.  The question boiled down to whether there was "a sufficient demand for the purchase of anesthesiological services separate from hospital services to identify a distinct product market in which it is efficient to offer anesthesiological services separately from hospital services."  *Id*. at 21–22.  Relevant considerations include "whether, when given a choice, consumers purchase the tied good from the tying good maker, or from other firms," and "firm behaviors, for instance a single product is apparent if competitive firms always bundle the

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 22

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1    tying and tied goods together." *Epic Games*, 493 F. Supp. 3d at 841 (quotation marks omitted).

2        There are good reasons not to apply the consumer demand test here.  Later in *Microsoft*,

3    the court identified the older consumer demand test's awkward fit with platform software.  *See*

4    *United States v. Microsoft Corp.*, 253 F.3d 34, 89 (D.C. Cir. 2001) ("*Microsoft III*") ("In fact

5    there is merit to Microsoft's broader argument that *Jefferson Parish*'s consumer demand test

6    would chill innovation to the detriment of consumers by preventing firms from integrating into

7    their products new functionality previously provided by standalone products—and hence, by

8    definition, subject to separate consumer demand." (quotation marks omitted)).  Because the

9    "direct consumer demand and indirect industry custom inquiries are, as a general matter,

10   backward-looking and therefore systematically poor proxies for overall efficiency in the

11   presence of new and innovative integration," the test "may not give newly integrated products a

12   fair shake."  *Id.*

13       But Plaintiffs would be no better off with the consumer demand test.  They acknowledge

14   in their alternative market definition that consumers demand a single, integrated service that

15   includes buying and playing games.  *See* CAC ¶ 133.  In Plaintiffs' implausible two-market

16   world, "[p]roduct offerings in the PC Desktop Game Distribution Market do not include services

17   associated with the PC Desktop Gaming Platform Market, including (1) the ability to play

18   purchased games …."  *Id.* ¶ 101.  Upending common sense, Plaintiffs ask this Court to recognize

19   consumer demand for games no one can play.  No consumers need a Steam-enabled game unless

20   they can play it on Steam.  (And no consumers need Steam unless they have a Steam-enabled

21   game for it.)  *See Subsolutions Inc. v. Doctor's Assocs., Inc.*, 2001 WL 1860382, at *6 (D. Conn.

22   Apr. 6, 2001) (ruling that plaintiffs had not satisfied the preliminary injunction standard for

23   separate products on a claim alleging a tie between Subway franchises and Subway point-of-sale

24   systems; "a franchisee would *never* have a need for the highly specific POS system, tailored

25   exclusively for Subway franchises, if that person did not own a Subway franchise.").  Not even

26   Plaintiffs believe in their splintered demand theory.  *See* CAC ¶ 90 ("Thus, as a practical matter,

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 23

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

few games are played today on the PC without a PC Desktop Gaming Platform.").

It makes sense, then, that Valve's rivals have long competed by selling games with their platform services—another indicator of a single product. *See id.* ¶¶ 20, 231, 252 n.116 (Amazon); ¶ 236 (Electronic Arts); ¶ 242 (Discord); ¶ 250 (Microsoft); ¶ 254 (Epic Games); ¶ 295 n.170 (Activision Blizzard). And when other stores sell Steam-enabled games, they do so by selling a Steam Key, which combines the game sale with platform access. *See id.* ¶ 102. Even Valve's rivals recognize demand for a packaged service of games *plus* gaming platform access.

### F.   <u>Plaintiffs' State CPA Claim Falls With Their Federal Antitrust Claims</u>.

Plaintiffs base their CPA claim, CAC ¶¶ 386–92, on their federal antitrust claims. *See id.* ¶ 387 ("The claims alleged above constitute unfair methods of competition under Washington State law"). "The [CPA] is modeled after federal antitrust statutes." *Lubic v. Fid. Nat. Fin., Inc.*, 2009 WL 2160777, at *5 (W.D. Wash. July 20, 2009). "The state legislature has decreed that courts interpreting the CPA are to be guided by final decisions of the federal courts … interpreting the various federal statutes dealing with the same or similar matters." *Id.* (quotation marks omitted); *see also* RCW 19.86.920. Courts routinely dismiss CPA claims along with federal antitrust claims. *See Lubic*, 2009 WL 2160777, at *5 (dismissing CPA claims for the same reasons as Sherman Act Section 1 claims); *see also PBTM LLC v. Football Nw., LLC*, 2021 WL 37648, at *11 (W.D. Wash. Jan. 5, 2021) ("The Court's analysis of PBTM's federal antitrust claims extends to its state law claims under the WCPA, which are patterned after Sections 1 and 2 of the Sherman Antitrust Act."). This Court should too.

## IV.   <u>CONCLUSION</u>

Plaintiffs fail to allege unlawful conduct, antitrust injury, market power, or facially sustainable antitrust markets for two separate products. Rather, they attack a popular integrated service consumers value in a competitive market. The Court should grant the motion and dismiss Plaintiff Wolfire's claims, if it does not stay them pending arbitration.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 24

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

DATED this 26th day of July, 2021.

FOX ROTHSCHILD LLP

s/ Gavin W. Skok
Gavin W. Skok, WSBA #29766
Laura P. Hansen, WSBA #48669
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
Telephone:      206.624.3600
Facsimile:      206.389.1708
E-mail:         gskok@foxrothschild.com
                lhansen@foxrothschild.com

MONTGOMERY McCRACKEN WALKER &
RHOADS LLP

s/ Charles B. Casper
Charles B. Casper, *admitted pro hac vice*
1735 Market Street, 21st Floor
Philadelphia, PA  19103
Telephone:      215.772.1500
Email:          ccasper@mmwr.com

FOX ROTHSCHILD LLP

s/ Kristen W. Broz
Kristen W. Broz, *admitted pro hac vice*
1030 15th Street, N.W., Suite 380 East
Washington, DC  20005
Telephone:      202.431.3100
E-mail:         kbroz@foxrothschild.com

*Attorneys for Defendant*

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 25

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

1

## **CERTIFICATE OF SERVICE**

2

3        I certify that I am a secretary at the law firm of Fox Rothschild LLP in Seattle,

4   Washington.  I am a U.S. citizen over the age of eighteen years and not a party to the within

5   cause.  On the date shown below, I caused to be served a true and correct copy of the foregoing

6   on counsel of record for all other parties to this action as indicated below:

7                                    **Service List**

8

9   Alicia Cobb                                 ☐ Via US Mail
    QUINN EMANUEL URQUHART & SULLIVAN LLP        ☐ Via Messenger
10  1109 First Avenue, Suite 210                 ☒ Via CM/ECF / Email
    Seattle, WA  98101                           ☐ Via over-night delivery
11  Ph. 206-905-7000
    Fax 206-905-7100
12  Email: aliciacobb@quinnemanuel.com

13  A. Owen Glist
    Ankur Kapoor
14  Jeffrey I. Shinder
    CONSTANTINE CANNON LLP
15  335 Madison Ave., 9th Floor
    New York, NY  10017
16  Ph. 212-350-2776
    Fax 212-350-2701
17  Email: oglist@constantinecannon.com
    akapoor@constantinecannon.com
18  jshinder@constantinecannon.com

19

20  Adam Wolfson
    QUINN EMANUEL URQUHART & SULLIVAN LLP
21  865 S. Figueroa St., 10th Floor
    Los Angeles, CA  90017
22  Ph. 213-443-3000
    Email: adamwolfson@quinnemanuel.com
23

24  Charles Stevens
    QUINN EMANUEL URQUHART & SULLIVAN LLP
25  50 California St., 22nd Floor
    San Francisco, CA  94111
26  Ph. 415-875-6600
    Email: charliestevens@quinnemanuel.com

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 26

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

David Golden
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., 22nd Floor
Washington, DC  20004
Ph. 202-204-4527
Email: dgolden@constantinecannon.com

David Du LeRay
Steig David Olson
Shane Seppinni
QUINN EMANUEL URQYHART & SULLIVAN
51 Madison Ave., 22nd Floor
New York, NY  10010
Ph. 212-849-7630
Email: davidleray@quinnemanuel.com
steigolson@quinnemanuel.com
shaneseppinni@quinnemanuel.com

Kenneth J. Rubin
Timothy B. McGranor
Kara M. Mundy
VORYS SATER SEYMOUR & PEASE
52 E. Gay St.
PO Box 1008
Columbus, OH  43215
Ph. 614-464-6400
Email: kjrubin@vorys.com
tbmcgranor@vorys.com
kmmundy@vorys.com

*Attorneys for Plaintiffs*

I declare under penalty of perjury under the laws of the State of Washington that the

foregoing is true and correct.

EXECUTED this 26th day of July, 2021, in Tacoma, Washington.

Courtney R. Brooks

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS - (2:21-CV-00563-JCC) - 27

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600