1

HON. JOHN C. COUGHENOUR

2

3

4

5

6

7

8

9 **UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

10

11 | Wolfire Games, LLC, Sean Colvin, Susann
Davis, Daniel Escobar, William Herbert, Ryan
12 | Lally, Hope Marchionda, Everett Stephens,
individually and on behalf of all others
13 | similarly situated,

14              Plaintiffs,

15     v.

16 Valve Corporation,

17          Defendant.

Case No. 2:21-cv-00563-JCC

**PLAINTIFFS' OPPOSITION TO**
**DEFENDANT VALVE CORPORATION'S**
**MOTION TO DISMISS PLAINTIFFS'**
**CONSOLIDATED AMENDED CLASS**
**ACTION COMPLAINT**

**NOTE ON MOTION CALENDAR:**
September 17, 2021

**ORAL ARGUMENT REQUESTED**

18

19

20

21

22

23

24

25

26

27

28

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1

2

## <u>TABLE OF CONTENTS</u>

**Page**

3   I.    PRELIMINARY STATEMENT .................................................................................1

4   II.   BACKGROUND .................................................................................................3

5   III.  LEGAL STANDARD .........................................................................................6

6   IV.   ARGUMENT ....................................................................................................7

7         A.   Plaintiffs Do Not Allege A Refusal-To-Deal Claim—They Allege *Forced*
               *Dealing* ..................................................................................................7

8

9         B.   Plaintiffs Plausibly Allege Illegal Tying ...............................................8

10             1.   Plaintiffs Sufficiently Plead Separate Products Under *Jefferson*
                    *Parish*'s Purchaser-Demand Test ....................................................9

11             2.   Valve Asks This Court to Apply the Wrong Standard ..................11

12        C.   Plaintiffs Plausibly Allege That Valve Illegally Imposes A PMFN Clause
               To Inflate Price Of Non-Steam-Enabled Games Sold Through Competing
13             Store Fronts ...........................................................................................13

14        D.   Plaintiffs Have Adequately Alleged Antitrust Injury ...........................17

15             1.   Plaintiffs Plausibly Allege Valve Charges a Supracompetitive
                    Commission ....................................................................................18

16

17             2.   Valve's Ability to Price Above Cost Indicates Supracompetitive
                    Pricing ...........................................................................................19

18             3.   Valve's Supracompetitive Pricing Does Not Reflect Superior
                    Quality ...........................................................................................20

19

20             4.   That Valve Has Always Charged a 30% Commission Does Not
                    Undermine The Plausibility of Plaintiffs' Allegations ..................21

21             5.   Plaintiffs Allege Market Power Sufficient to Charge
                    Supracompetitive Prices ................................................................22

22

23             6.   Valve's Conduct Reduced Output and Stifled Innovation ............23

24        E.   Plaintiffs' Washington CPA Claim Should Also Stand .........................24

25   V.    CONCLUSION .................................................................................................24

26

27

28

OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563

ii

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Abbott Laboratories v. Adelphia Supply USA*,
   2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017) ........................................................ 22

*Aetna Inc. v. Blue Cross Blue Shield of Michigan*,
   2012 WL 2184568 (E.D. Mich. June 14, 2012) ...................................................... 6

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*,
   190 F.3d 1051 (9th Cir. 1999) ............................................................................. 18

*Bio-Rad Laboratories, Inc. v. 10X Genomics, Inc.*,
   483 F. Supp. 3d 38 (D. Mass. 2020) ..................................................................... 18

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
   65 F.3d 1406 (7th Cir. 1995) ............................................................................... 20

*Bombardier Inc. v. Mitsubishi Aircraft Corp.*,
   383 F. Supp. 3d 1169 (W.D. Wash. 2019) ............................................................ 6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ........................................................................................... 16

*CollegeNET, Inc. v. Common Application, Inc.*,
   355 F. Supp. 3d 926 (D. Or. 2018) ....................................................... 10, 11, 18

*CollegeNET, Inc. v. Common Application, Inc.*,
   711 F. App'x 405 (9th Cir. 2017) ....................................................................... 20

*Cost Mgt. Services, Inc. v. Washington Nat. Gas Co.*,
   99 F.3d 937 (9th Cir. 1996) ............................................................................... 23

*Dominguez v. UAL Corp.*,
   666 F.3d 1359 (D.C. Cir. 2012) ......................................................................... 23

*Eastman Kodak Co v. Image Tech. Servs.*,
   504 U.S. 451 (1992) ....................................................................................... 9, 16

*Epic Games, Inc. v. Apple Inc.*,
   493 F. Supp. 3d 817 (N.D. Cal. 2020) ...................................................... 11, 12, 13

*Erie Cty., Ohio v. Morton Salt, Inc.*,
   702 F.3d 860 (6th Cir. 2012) .............................................................................. 16

*Federal Trade Commission v. Facebook, Inc.*,
   2021 WL 2643627 (D.D.C. June 28, 2021) ..................................................... 22, 23

OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563

iii

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

*Federal Trade Commission v. Qualcomm, Inc.*,
    969 F.3d 974 (9th Cir. 2020) ................................................................................. 7, 13, 20

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ............................................................................ 24

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
    852 F. Supp. 2d 1171 (N.D. Cal. 2012) ................................................................. 7, 12, 17, 18

*GMA Cover Corp. v. Saab Barracuda LLC*,
    2012 WL 642739 (E.D. Mich. Feb. 8, 2012) ...................................................................... 19

*Hairston v. Pac.-10 Conf.*,
    893 F. Supp. 1485 (W.D. Wash. 1994) ............................................................................ 24

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
    423 F.3d 374 (3d Cir. 2005) ...................................................................................... 20

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) .................................................................................... 13

*Ill. Tool Works v. Indep. Ink.*,
    547 U.S. 28 (2006) ........................................................................................... 7, 11

*In re Aggrenox Antitrust Litig.*,
    199 F. Supp. 3d 662 (D. Conn. 2016) ............................................................................ 19

*In re Aggrenox Antitrust Litig.*,
    94 F. Supp. 3d 224 (D. Conn. 2015) ............................................................................... 8

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    738 F. Supp. 2d 1011 (N.D. Cal 2010) ........................................................................... 15

*In re Dynamic Random Access Memory Indirect Purchaser Litig.*,
    2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) ..................................................................... 16

*In re Fresh & Process Potatoes Antitrust Litigation*,
    834 F.Supp.2d 1141 (D. Idaho 2011) ............................................................................. 16

*In re IBM Peripheral EDP Devices Antitrust Litig.*,
    481 F. Supp. 965 (N.D. Cal. 1979) ............................................................................... 19

*In re Intuniv Antitrust Litig.*,
    496 F. Supp. 3d 639 (D. Mass. 2020) ............................................................................ 20

*In re Musical Instruments and Equipment Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .................................................................................... 16

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ..................................................................................... 6

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

*Intel Corp. v. Fortress Inv. Group LLC*,
    511 F. Supp. 3d 1006 (N.D. Cal. 2021) ............................................................... 19

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................................. 7, 9, 11, 12

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ............................................................................. 15

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    127 S.Ct. 2705, 2717 (2007) .............................................................................. 17

*Metronet Servs. Corp., Metronet Telemanagement Corp. v. Qwest Corp.*,
    2001 WL 765167 (W.D. Wash. Apr. 16, 2001) ................................................. 20

*Murphy v. Bus. Cards Tomorrow, Inc.*,
    854 F.2d 1202 (9th Cir. 1988) ............................................................................. 7

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of U. of Oklahoma*,
    468 U.S. 85 (1984) .............................................................................................. 24

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    141 S. Ct. 2141 (2021) .......................................................................... 3, 4, 5, 6, 21

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ..................................................................... 13, 23

*Nicolosi Distributing, Inc. v. BMW of N. Am.*,
    2011 WL 1483424 (N.D. Cal. 2011) .................................................................. 11

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) ............................................................................... 7

*Oracle Am., Inc. v. Terix Computer Co., Inc.*,
    2014 WL 5847532 (N.D. Cal. Nov. 7, 2014) .................................................... 19

*Osborn v. Visa Inc.*,
    797 F.3d 1057 (D.C. Cir. 2015) ......................................................................... 14

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*,
    268 F. Supp. 3d 1071 (C.D. Cal. 2017) ............................................................... 9

*Lorain J. Co. v. United States*,
    342 U.S. 143 (1951) ........................................................................................... 14

*Power Analytics Corp. v. Operation Tech., Inc.*,
    820 F. App'x 1005 (Fed. Cir. 2020) .................................................................. 23

*Principe v. McDonald's Corp.*,
    631 F.2d 303 (4th Cir. 1980) ............................................................................. 13

OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563

v

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

*RealPage, Inc. v. Yardi Sys., Inc.*,
    852 F. Supp. 2d 1215 (C.D. Cal. 2012) ............................................................ 23

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................................ 23

*Rick-Mik Enterp., Inc. v. Equilon Enterp. LLC*,
    532 F.3d 963 (9th Cir. 2008) ........................................................... 10, 11, 13

*Sgro v. Danone Waters of N. Am., Inc.*,
    532 F.3d 940 (9th Cir. 2008) ............................................................................ 15

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ............................................................................ 6

*Teradata Corp. v. SAP SE*,
    2018 WL 6528009 (N.D. Cal. Dec. 12, 2018) ............................................. 10, 12

*Top Rank, Inc. v. Haymon*,
    2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ............................................. 18, 19

*Tucker v. Apple Computer, Inc.*,
    493 F. Supp. 2d 1090 (N.D. Cal. 2006) ........................................................... 17

*United States v. Delta Dental of R.I.*,
    943 F. Supp. 2d 172 (D.R.I. 1996) ............................................................. 15, 17

*United States v. Microsoft Corp.*,
    147 F.3d 935, 950 (D.C. Cir. 1998) ............................................................. 9, 12

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..................................................................... 11, 12

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ..................................................................... 3, 14, 19

*Will v. Comprehensive Accounting Corp.*,
    776 F.2d 665 (7th Cir. 1985) ............................................................................ 13

**<u>Statutory Authorities</u>**

Rev. Code Wash. §19.86 ............................................................................................... 24

Opp. to Mot. to Dismiss
Case No. Case No. 2:21-cv-563          vi

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

Plaintiffs Wolfire Games, LLC, Sean Colvin, Susann Davis, Daniel Escobar, William Herbert, Ryan Lally, Hope Marchionda, and Everett Stephens ("Plaintiffs") submit this opposition to Defendant Valve Corporation's ("Valve") motion to dismiss (Dkt. 37) ("Mot.").

## I.   PRELIMINARY STATEMENT

Valve charges game publishers 30% of nearly all game sales on its Steam Store; the highest commission in the industry. Charging a high commission is not itself a problem, but it becomes one when Valve uses its market power to prevent competition from rival storefronts that would force it to reduce that commission, thereby leading to lower prices for game publishers and purchasers alike. Plaintiffs allege that Valve does so through a dual-pronged scheme. First, Valve engages in tying by requiring game publishers to sell their games in Valve's Steam Store if they want access to Valve's dominant Steam Gaming Platform. Second, Valve imposes a Platform Most-Favored-Nations Clause ("Valve PMFN") on game publishers, inhibiting their ability to sell games at lower prices through rival storefronts. Together, Valve's anticompetitive acts protect its dominance and ensure Valve can continue to collect its 30% tax on nearly every computer game sale in the nation. Dkt. No. 34, Consolidated Amended Complaint ("CAC") ¶ 4. Valve's Motion fails to grapple with the substance of Plaintiffs' claims, and instead attacks several straw men.

*First*, Valve claims it has "no duty under antitrust law to allow developers to use free Steam Keys to undersell prices for the games they sell on Steam—or to provide Steam Keys at all." Mot. at 1. That argument misses the mark. Plaintiffs do not seek to impose an antitrust duty on Valve to provide Steam Keys; Valve already provides them voluntarily, to expand the Steam Gaming Platform's reach and dominance. *See* CAC ¶¶ 52-53, 58. The problem is that Valve enforces "Steam Key Rules" to insist publishers not sell their games through other storefronts for less than they do on the Steam Store, even for versions of their games meant for other, non-Steam platforms. This sort of price restraint imposed by a monopolist is subject to antitrust scrutiny under Sections 1 and 2 of the Sherman Act, because it prevents rival PC Game Distributors from competing with Valve on price and quality. Moreover, that Steam Keys even exist shows that, contrary to Valve's assertions, its Steam Store and Gaming Platform are separate services; if they were in fact one, there would be no need for Valve to provide Steam Keys (*i.e.*, the ability to sell

1

Steam Gaming Platform-enabled games elsewhere) at all.

*Second*, in an oblique attack on Plaintiffs' tying theory, Valve suggests Plaintiffs fail to allege a "facially sustainable antitrust market" because Valve offers a "single, integrated product." Mot. at 3. But this argument disregards the CAC's factual allegations that Valve offers two separate services—a PC Desktop Gaming Platform and PC Desktop Game Distribution service. CAC ¶¶ 137-160. There is separate consumer demand for each type of service, the two services were historically separate, and rivals compete against one of the products but not the other. *Id.* These allegations are sufficient to plead that, under Supreme Court precedent, the services are in separate markets; indeed, Valve's own cases allow similar claims to proceed to *trial*. Valve tries to avoid Plaintiffs' factual allegations by inventing a legal standard that supposedly applies to "novel technological concepts." Mot. at 20. But, as detailed below, that is not the law. Regardless, Plaintiffs do allege an alternative market consisting of a single, integrated product. CAC ¶¶ 132-134.

*Third*, Valve tries to downplay the CAC's allegations of the implementation and effects of Valve's PMFN clause, by mischaracterizing them as a "single anecdote." Mot. at 2. That "anecdote" is in fact a *direct quote* from Valve personnel setting forth Valve's *company policy* in a way that directly supports Plaintiffs' allegations: "*We* basically see any selling of the game on PC, Steam key or not, as a part of the same shared PC market- so even if you weren't using Steam keys, *we'd just choose to stop selling a game if it was always running discounts of 75% off on one store but 50% off on ours. . .*" CAC ¶ 195 (emphases added). Furthermore, the "anecdote" is one of just several pieces of evidence supporting the PMFN's long and continued existence. *See e.g.*, *id.* ¶ 201. Such unequivocal statements from Valve employees support Plaintiffs' allegation that Valve's PMFN applies broadly across the PC Desktop Game Distribution market. And the CAC further includes pages of allegations demonstrating Valve's imposition of the PMFN clause on publishers. *Id.* ¶¶ 184-205. Valve provides no reason to discount those allegations.

*Fourth*, Valve claims Plaintiffs fail to allege antitrust injury, and specifically that they "allege no facts from which the Court could plausibly infer that Valve's 30% commission . . . is above the competitive level." Mot. at 2, 12-18. In doing so, Valve suggests that the Court should

OPP. TO MOT. TO DISMISS
CASE NO. CASE No. 2:21-CV-563

2

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

not consider the prices Valve charges, the costs it incurs, or the profit it makes. Mot. at 2, 16-17. But those are the very economic facts that are most probative of supracompetitive outcomes, and are what Plaintiffs alleged extensively. CAC ¶¶ 2, 4, 8-22, 55, 72, 76, 92, 106, 124, 131, 206-227, 269-272, 277-280, 286, 304. Economics and law are clear—a competitive market is one where prices approach cost,[1] and the fact that Valve is able to sustainably price above any reasonable measure of cost for nearly two decades is more than sufficient to allege supracompetitive pricing. *See*, *e.g.*, *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 61 (2d Cir. 2019) (holding that evidence of inflated profits could support a jury finding of competitive harm). And in any event, the CAC also alleges that Valve's conduct reduced output and quality, CAC ¶¶ 17, 283-89—other factors also constituting antitrust injury.

Valve also argues that because it has *always* charged a 30% commission, that must be a competitive price today. Mot. at 2-3, 12-15. But, as the Supreme Court recently explained again, antitrust analysis focuses on market realities, and when market realities change over time, then the analysis of those practices must keep up. *See Nat'l Collegiate Athletic Assn. v. Alston*, 141 S. Ct. 2141, 2158, 2166 (2021). The CAC alleges at length why, in light of current market realities, Valve's 30% commission is well above the level that would prevail in a competitive market.

This Court should deny Valve's Motion.

## II.   BACKGROUND

Valve is a game developer, publisher, and digital distribution company that operates a PC Desktop Gaming Platform (the "Steam Gaming Platform") and a PC Desktop Game Distributor (the "Steam Store"). CAC ¶ 23. Valve competes in two distinct economic markets: the market for PC Desktop Gaming Platforms (technology platforms that provide gamers with ancillary gaming services, in which the Steam Gaming Platform competes), and the market for PC Desktop Game Distribution (intermediation of sales between publishers and gamers, in which the Steam Store competes). *Id.* ¶¶ 59-61, 80, 83, 84, 95-96, 98, 135, 137-141.

---

[1]   In using the term "cost," Plaintiffs include all relevant measures of cost, such as marginal cost and/or average variable cost. As discussed below, Valve's prices far exceed any such measure.

OPP. TO MOT. TO DISMISS
CASE NO. Case No. 2:21-CV-563

3

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

In 2003, Valve launched the Steam Gaming Platform, which was then focused on providing patches and updates for games Valve had developed. *Id.* ¶ 49. Gamers would purchase Steam-enabled games from other distributors (GameStop, BestBuy), and add those games to the Steam Gaming Platform on their personal computer. *Id.* The distribution service and the Gaming Platform were thus completely separate products, purchased from separate companies. *Id.* ¶ 50.

Valve did not launch its Steam Store until 2004, when it released its new game, Half-Life 2. *Id.* ¶ 51. At the time, the Steam Store *only* sold Valve-published games. *Id.* ¶ 54. Consumers could purchase Steam-enabled copies of Half-Life 2 from either the Steam Store or from other storefronts, but could only *play* them on the Steam Gaming Platform. *Id.* ¶¶ 51-53. By forcing gamers to play its hit Half-Life 2 only through the Steam Gaming Platform, Valve obtained a massive incumbency advantage in the market for PC Desktop Gaming Platforms. *Id.* ¶¶ 53, 229. The Steam Store eventually began selling games published by third-party game developers, and went from selling seven games in 2004 to over 45,000 games by 2021. *Id.* ¶ 57. With nearly all of those sales, Valve kept a 30% cut. *Id.* ¶¶ 54-55, 57.

Today, Valve dominates and possesses monopoly power in both the market for PC Desktop Gaming Platforms and the market for PC Desktop Game Distribution. *Id.* ¶¶ 107-131. The vast majority of all PC Desktop Games are played on the Steam Gaming Platform—by 2020, Valve had reached new highs of *120.4 million active users per month. Id.* ¶¶ 99, 110, 133. Selling games enabled for the Steam Gaming Platform is therefore imperative for game developers. *Id.* ¶¶ 5-6, 9, 108, 130. Likewise, Valve has also become the dominant *distributor* of PC Desktop Games, with at least 75% market share. *Id.* ¶ 126. Because digital distribution is now by far the most prevalent form of distribution of PC Desktop Games, Valve's Steam Store is not only the largest digital distributor, but also the largest PC Desktop Game distributor overall. *Id.* ¶ 131.

Valve maintains its dominance in these markets and thwarts effective competition by engaging in a dual-pronged anticompetitive scheme. *First*, Valve ties together the use of its Steam Gaming Platform—by far the largest PC Desktop Gaming Platform where gamers can connect with other gamers—to its Steam Store. *Id.* ¶¶ 4-5, 135-183. As discussed above, given the dominance of Valve's Steam Gaming Platform, PC game publishers consider it essential for their

OPP. TO MOT. TO DISMISS
CASE NO. Case No. 2:21-CV-563

4

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  games to be compatible with that platform in order to reach most potential customers. Valve

2  requires that if publishers wish to sell a game that is enabled for the Steam Gaming Platform, they

3  must offer that game for sale through the Steam Store *and* agree to Valve's 30% commission on

4  those sales. *Id.* ¶¶ 5-6, 9, 161-163.[2]

5          *Second*, Valve imposes the Valve PMFN, which mandates that if a game is sold through

6  the Steam Store—as all Steam-enabled games must be, and where they are subject to the inflated

7  30% commission—a game publisher cannot sell that game at a lower price in any other store. *Id.*

8  ¶¶ 8, 9-12, 186-188, 195-201, 203. Although Valve suggests in its Motion that the PMFN applies

9  only to sales of so-called "Steam Keys" (essentially Steam-enabled copies of games sold by third

10 parties)—in fact Plaintiffs allege that Valve also applies the PMFN to third-party sales of games

11 that are *not* Steam-enabled. *Id.* ¶¶ 189, 192-201, 203.

12         As an illustrative example, if a publisher develops GAME ONE, that publisher will almost

13 certainly need to market a version of GAME ONE enabled for the Steam Gaming Platform, given

14 that platform's dominance. *Id.* ¶ 9. But under the tie described above, Valve requires that the game

15 be sold in the Steam Store, where it will be subject to a 30% commission. *Id.* Publishers must set

16 the price high enough on the Steam Store to account for that inflated commission. *Id.* Although

17 Valve may allow a small number of Steam-enabled copies of GAME ONE to be sold by other

18 stores (via Steam Keys), Valve's PMFN requires that those copies be priced as high or higher than

19 copies sold on the Steam Store—even if the other store charges a lower commission that would

20

21 _____

[2]   To the extent Valve permits *any* sales of Steam-enabled games through other storefronts, Valve
22 polices those sales to make sure they do not threaten the dominance of the Steam Store. *Id.* ¶¶ 7,
   163-168. For example, Valve allows publishers to sell a limited number of Steam-enabled games
23 through other storefronts by using "Steam Keys." *Id.* ¶ 12, 164-168. Steam Keys are alpha-
   numeric codes that publishers can request in limited quantities from Valve, to be sold by third
24 parties (such as GameStop). Consumers can then purchase these Steam Key codes from these
   third-party storefronts, and enter the code into the Steam Gaming Platform in order to access a
25 digital copy of the game within the Platform. *Id.* ¶¶ 102, 143. But Valve limits the number of
   Steam-enabled game sales it permits outside the Steam Store, and if too many copies are sold
26 outside the Steam Store Valve may threaten to remove that game from the Steam Store entirely.
   *Id.* ¶ 7, 164-168. Accordingly, a publisher who wishes to sell a game that is enabled for the Steam
27 Gaming Platform must agree that the vast majority of its sales will be through the Steam Store,
   where Valve takes a 30% cut. *Id.* ¶¶ 7, 169.
28

allow for lower consumer prices. *Id.* ¶¶ 9-10. And Valve further applies its PMFN to copies of GAME ONE that are *not* Steam-enabled and *not* sold through the Steam Store, even though they are enabled for play on an entirely different gaming platform. *Id.* ¶ 10.

Valve's tie and PMFN mean that other game stores cannot meaningfully compete with Valve by charging publishers lower commissions, because those publishers cannot sell games for lower prices through those other stores and therefore cannot drive purchaser volume to that store (which, even with a lower sale price, would yield the publisher more money due to the lower commission and higher sales volume). *Id.* ¶¶ 190-191. Because Valve artificially blocks such competition through its tie and PMFN, it is able to maintain its 30% commission—even though that commission greatly exceeds the costs of providing digital distribution for PC Games. *Id.* ¶¶ 268, 277 (noting other stores' 10 to 12% commissions).

Valve's founder has admitted Steam is "tremendously profitable." *Id.* ¶ 269. The Steam Store clears approximately $7.5 billion in game sales annually, meaning Valve receives about $2 billion or more annually in Steam Store commissions on game sales. *Id.* ¶¶ 18, 269-270. With roughly 350 employees, Valve makes over $5 million profit annually *per employee* from Steam Store game sales alone, making it, by that metric, one of the most profitable companies in the world. *Id.* ¶¶ 18, 269-270. These profits far exceed what would occur in a competitive market, because Valve immunizes itself from competition. *Id.* ¶¶ 17, 271-272.

## III.   LEGAL STANDARD

At the motion to dismiss phase, courts "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019). "If there are two alternative explanations [of the facts alleged], one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1181 (W.D. Wash. 2019) (quoting the same); *see also Aetna Inc. v. Blue Cross Blue Shield of Michigan*, 2012 WL 2184568, at *3-4 (E.D. Mich. June 14, 2012) (denying motion to dismiss claims based on MFN, and holding that plaintiff sufficiently

pleaded antitrust injury by alleging that defendant's contracts caused inflated prices to competitors and customers).

## IV.     ARGUMENT

### A.     Plaintiffs Do Not Allege A Refusal-To-Deal Claim—They Allege *Forced Dealing*

Valve's first argument is that it "has no *duty* under the antitrust laws" to offer Steam Keys that enable use of the Steam Gaming Platform, citing cases where antitrust plaintiffs sought to compel the defendants to deal with their rivals. Mot. at 8. Plaintiffs do not plead refusal-to-deal claims. Plaintiffs are not Valve's competitors; they are direct purchasers of Valve's services that wish to deal with Valve's competitors rather than Valve (or, at least, make purchases in a world free from Valve's competitive restraints). And contrary to Valve's assertions, Plaintiffs do not allege Valve has an "obligation to distribute Steam Keys." Mot. at 6. Valve already distributes them voluntarily, and Plaintiffs do not pursue a "positive" duty to deal claim. *See Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375-76 (7th Cir. 1986) (cited in Mot. at 8-9).

As set forth above, Plaintiffs allege that Valve has engaged in unlawful tying and price restraints. Tying is "forc[ing] the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Ill. Tool Works v. Indep. Ink, Inc.*, 547 U.S. 28, 34-35 (2006) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)).[3] Put differently, tying is forced dealing and thus the *opposite* of a refusal to deal. None of Valve's cited cases (Mot. at 7-8) address similar claims. *See Federal Trade Commission v. Qualcomm, Inc.*, 969 F.3d 974, 993-96 (9th Cir. 2020) (vacating injunction following trial in a refusal-to-license case); *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1183-86 (N.D. Cal. 2012) (denying motion to dismiss monopolization claim, but disregarding effect of refusal to license software); *Olympia*, 797 F.2d at 375-76 (reversing a trial verdict in a case premised on a refusal to promote rivals' products).

---

[3]   *Accord Murphy v. Bus. Cards Tomorrow, Inc.*, 854 F.2d 1202, 1204 (9th Cir. 1988) ("The essence of an antitrust tying violation is . . . the use by the seller of its 'leverage' 'to force a purchaser to do something that he would not do in a competitive market.'").

OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563

7

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   Valve also misses the mark when describing Steam Keys and their role in Plaintiffs'

2   claims. Contrary to Valve's assertions, Plaintiffs do not allege Valve has an "obligation to

3   distribute Steam Keys." Mot. at 6. As discussed further below, *infra* pgs. 10-11, Steam Keys,

4   which allow consumers and publishers to utilize alternative distributors while obtaining access to

5   the Steam Gaming Platform, demonstrate conclusively that Valve offers two separate products—

6   the Steam Gaming Platform and the Steam Store—which are offered in two separate relevant

7   markets. CAC ¶ 102. Moreover, the fact that Valve voluntarily distributes Steam Keys shows that

8   doing so *benefits* Valve, because it grows the Steam Gaming Platform's user base and further

9   entrenches Valve's power in PC Desktop Gaming Platforms. *Id.* ¶¶ 108, 120, 260.

10   Valve further claims that Plaintiffs allege that "Valve's Steam Key rules amount to an

11   unlawful PMFN." Mot. at 8. That is another strawman argument. The CAC does not allege that

12   Valve's Steam Key rules constitute a PMFN *with respect to Steam Key sales in isolation*. Rather,

13   the CAC alleges that Valve applies what are nominally "Steam Key" rules to *all* game sales,

14   Steam Keys or otherwise. CAC ¶¶ 195-97. Thus, the Steam Key rules do not only apply if

15   developers "request Steam Keys." Mot. at 9. Rather, Valve applies the PMFN to *all* game sales,

16   even if the developer *does not* request Steam Keys, and even if the game is *not* enabled for the

17   Steam Gaming Platform but is instead enabled for play on a competitor's gaming platform.[4]

18   **B.      Plaintiffs Plausibly Allege Illegal Tying**

19   Under Ninth Circuit law, a plaintiff alleging unlawful tying must show "(1) that the

20   defendant tied together the sale of two distinct products or services; (2) that the defendant

21   possesses enough economic power in the tying product market to coerce its customers into

22

23   [4]   Valve misleadingly implies that it provides its Steam Gaming Platform "to users for free." Mot.
at 9, 4-5. As an initial matter, this is irrelevant. The claims in this case center on supracompetitive

24   prices on the Steam Store and its rival storefronts, stemming from Valve's anticompetitive
restraints in the PC Desktop Game Distribution market. In any event, the CAC clearly alleges that

25   the Steam Gaming Platform involves an exchange of consideration, rendering Valve's argument
wrong as a matter of fact as well. CAC ¶¶ 6, 24-31, 52-54, 57, 76, 99, 102, 128, 130, 143, 148; *see*

26   *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 242 (D. Conn. 2015) ("distinction between
transfers of money and transfers of things that are worth money" is "distinction without a

27   difference" for "antitrust scrutiny").

28

purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1083 (C.D. Cal. 2017). Here, the CAC plausibly alleges all three of these elements: (1) Valve ties its Steam Gaming Platform to its Steam Store; (2) Valve possesses market power in the tying market (PC Desktop Gaming Platforms) sufficient to coerce customers into purchasing its Steam Store product; and (3) the tie affects roughly 75% of the tied market (PC Desktop Game Distribution) given Valve's market share. CAC ¶¶ 135-83.[5]

Valve styles its argument as one about a "facially sustainable market definition," but in reality Valve argues that the Steam Gaming Platform and Steam Store "are a single, integrated product," and not two separate products. Mot. at 19-22 (citing *United States v. Microsoft Corp.*, 147 F.3d 935, 949, 950 (D.C. Cir. 1998) ("*Microsoft II*")). Valve's argument fails for the reasons set forth below. However, even assuming Valve's argument has merit—which it does not— Plaintiffs plead an alternative "relevant market for PC Desktop Game Transaction Platforms, which encompasses the services and products offered by both components of Steam," and allege that Valve has market and monopoly power in this alternative market. CAC ¶¶ 132-134. Plaintiffs' alternative single market is the same market that Valve claims exists. Thus, Valve's complaints about Plaintiffs' market definition do not provide a basis for dismissal of the CAC.

### 1. Plaintiffs Sufficiently Plead Separate Products Under *Jefferson Parish*'s Purchaser-Demand Test

The first element of any tying claim is that the "defendant tied together the sale of two distinct products or services." *Packaging Sys.*, 268 F. Supp. 3d at 1083. The Supreme Court has explained that the "answer to the question whether one or two products are involved depends "on the character of the demand for the two items," and whether there are two products "that were distinguishable in the eyes of the buyers," *i.e.*, the purchaser-demand test. *Jefferson Parish*, 466 U.S. at 19; *Eastman Kodak Co v. Image Tech. Servs.*, 504 U.S. 451, 462-63 (1992) ("there must be

---

[5] Tying is only one of Plaintiffs' liability theories. CAC ¶¶ 184-227, 349-376, 386-392. Their other theories do not require alleging "separate" products.

OPP. TO MOT. TO DISMISS
CASE NO. Case No. 2:21-CV-563

9

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

sufficient consumer demand so that it is efficient for a firm to provide" the two products "separately"). At the motion to dismiss stage, this analysis involves looking at allegations of both direct and indirect evidence of demand, including whether consumers, when given the choice, would purchase the tied good from another firm (*i.e.*, direct evidence), and whether competitors for the tying product that do not have monopoly power always bundle the goods together (*i.e.*, indirect evidence). *See*, *e.g.*, *Rick-Mik Enterp., Inc. v. Equilon Enterp. LLC*, 532 F.3d 963, 975 (9th Cir. 2008).

Here, Plaintiffs plead both "direct and indirect evidence of consumer demand for the tied product separate from the tying product," sufficient to defeat Valve's motion to dismiss. *Id*. The CAC alleges distinct purchaser demand for the Gaming Platform and Distribution products. CAC ¶¶ 51-53, 137-160, 304-305. The CAC specifically articulates how consumers and developers have enthusiastically demanded alternative distribution mechanisms to the Steam Store, like the Humble Bundle, when they are available. *Id.* ¶¶ 137, 151-60. Other developers, even major ones like Ubisoft, affirmatively try to evade Valve's monopolization scheme by selling games through other channels, like Uplay and the Epic Game Store, showing demand for alternatives to the Steam Store. *Id.* ¶¶ 294-299. Further, Valve originally operated the Steam Gaming Platform without a Steam Store; consumers could purchase Steam-enabled games from a variety of distributors, but could only play them on the Steam Gaming Platform. *Id.* ¶¶ 50-53, 139-140. A version of this still exists; the Steam Keys program allows other game distributors—including Valve's rivals—to sell limited quantities of Steam-enabled games. *Id.* ¶¶ 102, 142-160. And rival PC Desktop Game Distribution services are often *not* similarly bundled with a gaming platform. *Id.* ¶¶ 47, 102, 104, 127, 137, 141, 143, 151-57. The CAC's factual allegations about consumer and publisher demand for two products are more than sufficient to plausibly allege separate products. *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 954-955 (D. Or. 2018) (complaint plausibly satisfied purchaser-demand test where plaintiff alleged that not all consumers who purchase the tying product also purchase the tied product, and that not all competitors provide both products); *Teradata Corp. v. SAP SE*, 2018 WL 6528009, at *12-13 (N.D. Cal. Dec. 12, 2018) (plaintiff sufficiently alleged distinct product markets where they alleged that the two products had distinct

10

functions, that selling the products together was not necessary, and that the products had been sold separately in the past); *Nicolosi Distributing, Inc. v. BMW of N. Am.*, 2011 WL 1483424, at *3 (N.D. Cal. 2011) (complaint plausibly satisfied purchaser-demand test where it alleged two distinct markets had existed in the past).

Valve's only Rule 12(b)(6) citation in support of its argument is *Rick-Mik*. Mot. at 21-22. However, in that case, the Ninth Circuit applied a context-specific inquiry to franchises because "[f]ranchises, almost by definition, necessarily consist of 'bundled' and related products or services—not separate products." *Rick-Mik*, 532 F.3d at 974. This case does not involve franchises. And Plaintiffs' allegations make clear that PC Desktop Game Distribution providers most often do *not* bundle a PC Desktop Gaming Platform as well, indicating the fundamental differences between the markets at issue here and the franchises at issue in *Rick-Mik*. CAC ¶¶ 102, 104, 127, 137, 141, 143, 151-57.

### 2. Valve Asks This Court to Apply the Wrong Standard

*Jefferson Parish* is not "old" law, as Valve claims, *see* Mot. 22-24; it *is* the law. The Supreme Court, for example, endorsed *Jefferson Parish*'s consumer-demand test in 2006—five years *after* the *Microsoft* cases Valve cites, at Mot. 23. *See Ill. Tool Works*, 547 U.S. at 34-35, 46. And the Ninth Circuit has continuously applied that test through the present, even in cases Valve cites. *See, e.g., Rick-Mik*, 532 F.3d at 975 ("the 'purchaser demand' test of *Jefferson Parish* 'examines direct and indirect evidence of consumer demand for the tied product separate from the tying product'") (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 86 (D.C. Cir. 2001) ("*Microsoft III*")); *see also CollegeNet*, 355 F. Supp. 3d at 954-955 (applying *Jefferson Parish* test to college application services in 2018); *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 841, 844 (N.D. Cal. 2020) (applying "purchaser demand test" to iOS app distribution and Apple's in-app purchase ("IAP") service).

Attempting to avoid the *Jefferson Parish* test, Valve incorrectly claims a different legal test applies in "novel technological contexts," citing *Microsoft II*. Mot. at 20. *Microsoft II*, decided on a motion for preliminary injunction, addressed *only* whether Microsoft's technological bundling violated its then-existing consent decree with the DOJ, which was a question of contract

OPP. TO MOT. TO DISMISS
CASE NO. Case No. 2:21-CV-563

11

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

interpretation. *Microsoft II*, 147 F.3d at 946; *Microsoft III*, 253 F.3d at 47, 92. The D.C. Circuit explained its contract interpretation was "consistent with tying law" ***because it did not contradict the purchaser-demand test***. *Microsoft II*, 147 F.3d at 950. And in both *Microsoft II* and the subsequent *Microsoft III* decision, the D.C. Circuit "made clear that the '***antitrust question is of course distinct***.'" *Microsoft III*, 253 F.3d at 92 (quoting *Microsoft II*, 147 F.3d at 950 n.14) (emphasis added); *see also Teradata*, 2018 WL 6528009, at \*13 (*Microsoft II* interpreted an "antitrust consent decree, and left open '[w]hether or not this is the appropriate test for antitrust law generally . . .'").

The D.C. Circuit also made clear that the fact of technological integration is a question inappropriate for resolution without full discovery. *Microsoft III*, 253 F.3d at 92 (quoting *Microsoft II*, 147 F.3d at 952) ("caution[ing] that our conclusion that IE and Windows 95 were integrated was 'subject to reexamination on a more complete record'").[6] Moreover, whether a technical integration is procompetitive or anticompetitive goes to the weight of a defendant's procompetitive justifications, which should not be analyzed at the Rule 12(b)(6) stage. *Free FreeHand*, 852 F. Supp. 2d at 1182 (cited in Mot. at 7); *Microsoft III*, 253 F.3d at 95 (defendant "may of course offer procompetitive justifications, and it is plaintiffs' burden to show that the anticompetitive effect of the conduct outweighs its benefit"). The *Microsoft* cases do not discard the purchaser-demand test.

Valve also relies on *Epic*, 493 F. Supp. 3d 817, in which the district court found that the plaintiff had not proffered sufficient evidence of separate demand to justify a preliminary injunction. But *Epic* supports *denying* Valve's motion. Although the district court denied Epic Games' motion for a preliminary injunction, it applied the *Jefferson Parish* test and held that "a more fully developed record could plausibly show demand for a separate product." *See id.* at 844.

---

[6]  In *Microsoft III*, the D.C. Circuit examined a full trial record and found that Internet Explorer and Windows 98 were integrated. But the court expressly disclaimed that it was providing a generally applicable rule for tying claims involving integrated software.  253 F.3d at 96 ("Our judgment regarding the comparative merits of the per se rule and the rule of reason is confined to the tying arrangement before us . . . we have no present basis for finding the per se rule inapplicable to software markets generally.").

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

The *Epic* court also found Epic's rule-of-reason claim should proceed, noting there were competing inferences about whether Apple integrating the App Store and its IAP service unreasonably restrained competition (similar to what Plaintiffs allege here). *Id.* at 844-845. Finally, the *Epic* court noted that evidence that the two alleged products were previously separate (like Plaintiffs allege here, *see* CAC ¶¶ 48-54, 139-140) would have supported a separateness inference. *Epic*, 493 F. Supp. 3d at 843.[7]

Valve's other cited cases are inapposite. *See Qualcomm*, 969 F.3d 974 (not a tying case, but a refusal-to-deal case on appeal after a full bench trial); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018) (affirming dismissal because plaintiffs failed to allege a plausible tied market, not for failure to allege separate products); *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) (reversing dismissal of tying claims; separate products not at issue); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, (7th Cir. 1985) (finding after discovery and a full trial that franchising—not at issue here—is a single unitary product); *Principe v. McDonald's Corp.*, 631 F.2d 303 (4th Cir. 1980) (same).

### C.   Plaintiffs Plausibly Allege That Valve Illegally Imposes A PMFN Clause To Inflate Price Of Non-Steam-Enabled Games Sold Through Competing Store Fronts

Valve's argument regarding Plaintiffs' PMFN allegations, like its other arguments, confuses the Rule 12(b)(6) pleadings standard with standards for satisfying a plaintiff's ultimate burden of proof. Plaintiffs have plausibly alleged that Valve's PMFN applies both to sales of Steam Keys—that is, the limited number of sales of Steam-enabled games sold outside of the Steam Store—as well as to sales of non-Steam-enabled games (which necessarily occur outside of the Steam Store); *i.e.*, that Valve imposes a PMFN on *all* of publishers' game sales, which inhibits publishers' ability to sell their games to consumers at lower prices through rival storefronts. CAC ¶¶ 4, 8, 12, 14-15, 147, 184-188, 194-197, 200-203; *see also id.* ¶¶ 192-194 (explaining how

---

[7]   Valve claims the *Epic* court "applied the integration test to new technology through analogy to franchise cases," such as *Rick-Mik*. Mot. at 20-21. But the *Epic* court noted only that both cases involved payment processing—it did not draw broad analogies between technology platforms and franchises generally. *See Epic*, 493 F. Supp. 3d at 842.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  Valve blocked competition from the Discord Store and other publishers). That, in turn, inhibits

2  rival storefronts' ability to compete with the Steam Store, both for consumers and for publishers

3  by offering publishers lower commissions, because other stores' incentive to offer lower

4  commissions is undermined without the ability to obtain greater sales. *Id.* ¶ 13.

5      Valve's suppression of price competition causes anticompetitive harm, *id.* ¶¶ 206-211,

6  214-216, 219, 226-227, and, indeed, is a well-documented anticompetitive effect of PMFN

7  clauses, *id.* ¶¶ 214-227. This restraint, in turn, harms both game publishers and game purchasers,

8  who are denied the benefits of price competition between the Steam Store and other PC Desktop

9  Game Distributors. *See Lorain J. Co. v. United States*, 342 U.S. 143, 152 (1951) (a must-have

10 newspaper could not block advertisers from utilizing the services of a rival radio station).[8] Given

11 Plaintiffs' extensive factual allegations, Valve is simply incorrect that they fail to "make plausible

12 allegations relating to Valve's alleged use of a PMFN" and that the anticompetitive nature of the

13 PMFN "rests on no facts alleging harm to competition." Mot. at 10, 12.

14      Valve, at most, raises factual disputes that cannot be resolved at the pleading stage. As

15 noted, Valve attempts to cast Plaintiffs' allegations that the PMFN was applied to games that were

16 not Steam-enabled as a "single anecdote." Mot. at 2. But the relevant Valve employee was

17 speaking on behalf of the company when he explained "*We* basically see any selling of the game

18 on PC, Steam key or not, as a part of the same shared PC market- so even if you weren't using

19 Steam keys, *we'd* just choose to stop selling a game if it was always running discounts of 75% off

20 on one store but 50% off on ours. . . ." CAC ¶ 195 (emphases added). Moreover, Plaintiffs

21 specifically allege that "Valve interprets its PMFN to mandate that" publishers cannot sell non-

22 Steam-enabled games "in other stores for a cheaper price," *id.* ¶ 10, that Valve "explicitly requires

23 that publishers agree that games sold elsewhere must be sold 'in a similar way to how you sell

24

25  ─────────────────────
    [8]   *See also Osborn v. Visa Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015) (upholding Section 1 and 2

26 claims at pleadings stage, where plaintiffs alleged that dominant ATM networks' rules preventing
   ATM operators from offering lower access fee prices to consumers that used rival networks

27 harmed competition by precluding price competition); *US Airways*, 938 F.3d at 51 (holding a new
   trial should proceed on remand to evaluate the "full content" provisions of Sabre, which together

28 constitute a PMFN).

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   your game on Steam'" and "interprets this language to encompass price parity, forcing game

2   publishers to charge the inflated Steam Store price across the marketplace, on all game sales, ***even***

3   ***sales of games that are not enabled for the Steam Gaming Platform***," *id.* ¶ 12 (emphasis added).

4        Similarly, Valve's attempt to dispute the accuracy of some of Plaintiffs' allegations—

5   which are based on statements by Tim Sweeney, the CEO of Epic (Valve's most prominent recent

6   competitor)—is likewise misplaced. Mr. Sweeney identifies the exact competitive harm Plaintiffs

7   complain of in the CAC: "Steam has veto power over prices, so if a multi-store developer wishes

8   to sell their game for a lower price on the Epic games store than Steam, then: 1) Valve can simply

9   say no." CAC ¶ 11. Valve disputes the accuracy of the substance Mr. Sweeney's statement (Mot.

10  at 9) ("But Mr. Sweeney's tweet is no fact"), but Valve's arguments are inappropriate at the

11  pleadings stage because they raise contested factual issues that cannot be resolved now. *See In re*

12  *Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1022 (N.D. Cal 2010) (finding

13  that plaintiffs allegations plausibly suggested participation in alleged conspiracies and that

14  defendants' arguments for dismissal "rely upon arguments more appropriate at the summary-

15  judgment state of these proceedings . . . ."); *United States v. Delta Dental of R.I.*, 943 F. Supp. 2d

16  172, 177 (D.R.I. 1996) (finding irrelevant at the motion to dismiss stage the legitimacy of the

17  defendant's justifications or explanations for the implementation of the MFN). That Plaintiffs

18  cited to Mr. Sweeney's tweet in the CAC does not mean that Valve can use a random internet

19  user's *response* to that tweet (Mot. at 10) to dispute the accuracy of Plaintiffs' allegation. *Khoja v.*

20  *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) ("it is improper to assume the truth

21  of an incorporated document if such assumptions only serve to dispute facts stated in a well-

22  pleaded complaint.  This admonition is, of course, consistent with the prohibition against resolving

23  factual disputes at the pleading stage."); *see also Sgro v. Danone Waters of N. Am., Inc.*, 532 F.3d

24  940, 943 n.1 (9th Cir. 2008) (refusing to interpret incorporated disability plan documents to

25  contradict plaintiff's pleaded facts).

26        Valve's reliance on *Matsushita* to argue that "conduct as consistent with competition as

27  with an anticompetitive restraint is not actionable under antitrust laws," Mot. at 10, is misplaced.

28  *Matsushita*—like nearly *all* of the other cases Valve relies upon—was decided on a motion for

OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563

15

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

summary judgment. In *Matsushita*, the Supreme Court assessed circumstantial evidence of a horizontal conspiracy, and held simply that "the nonmoving party's inferences [must] be reasonable in order to reach the jury." *Eastman Kodak*, 504 U.S. at 468 (discussing *Matsushita*). But even at the summary judgment stage, plaintiffs may rely on "ambiguous evidence to prove its claim," and the existence of a conspiracy need be only a "reasonable inference that the jury could draw from that evidence; it need not be the ***sole*** inference." *Publ'n Paper*, 60 F.3d at 63. In any event, "there is no authority . . . for extending the [*Matsushita*] standard to the pleading stage." *Erie Cty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012); *see also In re Fresh & Process Potatoes Antitrust Litigation*, 834 F.Supp.2d 1141, 1174 (D. Idaho 2011) (noting plaintiffs "need not allege facts that fully exclude [independent action]" and that if plaintiffs allege strong circumstantial evidence of conspiracy, there is less of a need to allege facts negating independent reason for defendant's conduct); *In re Dynamic Random Access Memory Indirect Purchaser Litig.*, 2020 WL 8459279, at *5 (N.D. Cal. Nov. 24, 2020) ("The inference of a conspiracy need not be more plausible than an inference of independent conduct." ); *In re Musical Instruments and Equipment Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (noting that the factual allegations need not exclude the possibility of independent conduct, only to suggest facts inconsistent with such conduct).[9]

Valve's citation to *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) (Mot. at 11) is also off-base. Plaintiffs do not claim that injury to a competitor, as opposed to injury to competition, is itself actionable. Plaintiffs include allegations about the impact of Valve's conduct on Discord ***because that conduct ultimately harmed publishers and game purchasers by depriving them of competitive options***. CAC ¶ 194 ("Publishers were unable to reap the benefit of Discord's lower commissions. Gamers were denied the ability to purchase the game for a lower retail price"). That is the essence of harm to competition.

---

[9]   Indeed, publishers have a strong incentive to steer customers to the store with the lowest commission. Given the big difference between the commissions on the Epic Game Store (for example) and the Steam Store, a developer can earn more selling on Epic at lower prices. And the way to steer customers to low-commission stores is to price lower at that store. Yet publishers price uniformly. Such uniform pricing is consistent with an enforced PMFN.

Opp. to Mot. to Dismiss
Case No. Case No. 2:21-CV-563

16

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

Finally, Valve cites two non-PMFN summary-judgment opinions from the 1980s—*Ocean State* and *Kartell*—to argue that most-favored-nations clauses "***need not be*** anticompetitive." Mot. at 11 (emphasis added). But even if MFN clauses are *sometimes* not anticompetitive, that does not mean that all MFN cases should be dismissed as a matter of law at the pleading stage. *See Delta Dental*, 943 F. Supp. 2d at 176-178 (distinguishing *Kartell* and *Ocean State* while denying defendant's motion to dismiss antitrust case involving MFN clause).

That is especially true given the key differences between ***platform*** MFNs and traditional MFNs. As the *Delta Dental* court observed, the holding in *Kartell* flowed in large part from "the First Circuit's reliance on the concept that [the insurer] was acting as a purchaser when it purchased, on behalf of its enrollees, services from doctors at the lowest possible prices." 943 F. Supp. 2d at 177. Here, Valve does not purchase goods and services from publishers on behalf of its subscribers; rather, it provides a gaming platform to gamers, as well as a storefront for publishers and gamers as a way of facilitating a transaction between them and, in doing so, collects a commission. The PMFN blocks storefront rivals from winning any such transactions by competing on price, and thus does not ensure the direct purchasers receive *the lowest* price, but rather the *highest*. Ample economic theory, *see* CAC ¶¶ 214-227, case law, *see supra* pgs. 14-17, and actual consumer behavior, *see* CAC ¶¶ 228-274, plausibly support the notion that the PMFN clause at issue here is anticompetitive.[10]

### D.   Plaintiffs Have Adequately Alleged Antitrust Injury

To satisfy the antitrust injury requirement, Plaintiffs must allege "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful,

---

[10]   Valve also claims certain procompetitive justifications for its PMFN, such as preventing "developers from free riding on Valve's investment in Steam." Mot. at 6-9. But the Supreme Court has instructed courts evaluating vertical price restraints "to be diligent in eliminating their anticompetitive uses," especially those restraints instigated by a "dominant retailer" that prevent other retailers "from charging lower prices." *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 127 S.Ct. 2705, 2719, 2717 (2007). And as Valve's own cited authority holds, "the existence of valid business reasons in antitrust cases is generally a question of fact not appropriate for resolution at the motion to dismiss stage." *Free FreeHand*, 852 F. Supp. 2d at 1182 (citing *Tucker v. Apple Computer, Inc.,* 493 F. Supp. 2d 1090, 1101 (N.D. Cal. 2006) (internal citations omitted) (cited in Mot. at 7).

OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563

17

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999).

Valve's antitrust injury arguments focus on the second factor—whether Plaintiffs plausibly allege Valve's conduct caused personal injury. *See* Mot. at 12-13. Paying supracompetitive prices and suffering reduced output and decreased quality are all cognizable antitrust injuries. *See CollegeNet*, 355 F. Supp. 3d at 948. Here, Plaintiffs suffered, and continue to suffer, all three.

### 1.   Plaintiffs Plausibly Allege Valve Charges a Supracompetitive Commission

Valve agrees that Plaintiffs have alleged Valve's 30% commission constitutes antitrust injury if set at a supracompetitive level, and also that Plaintiffs have alleged the commission is supracompetitive. Mot. at 12-13. Thus, Valve's argument is limited to one narrow issue—whether Plaintiffs' allegations that Valve's commission is supracompetitive are *plausible*, or merely constitute a legal conclusion. Mot. at 13.

In the CAC, Plaintiffs explain in great detail how Valve's commissions are significantly above cost, CAC ¶¶ 244, 256, 277, 280, and significantly above the commissions charged by its rivals, CAC ¶¶ 192, 244, 256, 277. With roughly 350 employees, Valve's per-employee profit from the storefront alone is over $5 million, making Valve, by that metric, one of the most profitable companies in the world. CAC ¶ 18. Plaintiffs have also explained how this supracompetitive pricing directly ties to Valve's anticompetitive conduct—through the tie and Valve's PMFN. CAC ¶¶ 135-227. These allegations are more than sufficient. *See, e.g.*, *Free FreeHand*, 852 F. Supp. 2d at 1185 (plaintiffs pled antitrust injury by claiming Adobe's anticompetitive conduct has injured them by allowing Adobe to charge plaintiffs supracompetitive prices for illustrator).

This case is therefore unlike *Bio-Rad Laboratories, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38 (D. Mass. 2020), cited by Valve (Mot. at 13), where the plaintiff did not "allege with specificity how the prices Bio-Rad charges for licensing are actually supracompetitive within the DSCP market" and did not connect the supracompetitive pricing to Plaintiffs' theory of injury. 483 F. Supp. 3d at 59-60. *Top Rank, Inc. v. Haymon*, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015), and

OPP. TO MOT. TO DISMISS
CASE NO. Case No. 2:21-CV-563

18

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

*Intel Corp. v. Fortress Inv. Group LLC*, 511 F. Supp. 3d 1006 (N.D. Cal. 2021), are distinguishable for the same reasons. In *Top Rank*, the plaintiff did not adequately allege injury where the plaintiff claimed defendant engaged in exclusionary contracts, but did not plead a single instance of harmful exclusionary conduct. *See* 2015 WL 9948936 at *9-12. In *Intel*, the plaintiff could not provide information regarding royalties received in confidential settlements. 511 F. Supp. 3d at 1027 ("[w]hile Plaintiffs express frustration in their inability to access more specifics because the settlements between Uniloc and those companies are confidential, that does not exempt them from the specificity requirements of *Twombly and Iqbal*.").

### 2.   Valve's Ability to Price Above Cost Indicates Supracompetitive Pricing

Valve cannot dispute that Plaintiffs have sufficiently alleged Valve prices significantly above costs. Valve nonetheless suggests these allegations should be ignored, claiming that "a firm's relative costs do not determine whether its price is competitive." Mot. at 16.

But ample legal authorities recognize that prices in a competitive market are expected to move toward costs, and that prices which are substantially *greater* than costs are supracompetitive.[11] Indeed, modern authorities make clear that supracompetitive profits *can* be a cognizable basis for a finding of supracompetitive prices. *See*, *e.g.*, *US Airways*, 938 F.3d at 61 (discussing analysis of supracompetitive profits in the context of analyzing supracompetitive pricing). Valve's cases that say otherwise (Mot. at 16) are inapposite.[12]

---

[11]   *See Oracle Am., Inc. v. Terix Computer Co., Inc.*, 2014 WL 5847532, at *5 (N.D. Cal. Nov. 7, 2014) ("[Defendant]'s alleged unique position to supply updates and firmware could permit [Defendant] to maximize its profit at a point on a sloping downward demand curve substantially above marginal cost—an indication of market power."); *Ind. Fed'n of Dentists*, 476 U.S. at 459 (social welfare is maximized when goods and services are provided "at a price approximating the marginal cost of providing them"); *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 667 (D. Conn. 2016) ("prices in a competitive market will tend . . . toward marginal cost, so prices substantially above that cost are supracompetitive by definition"); Areeda ¶ 503 (market power is defined as the ability to "profitably raise price above marginal cost").

[12]   In *GMA Cover Corp. v. Saab Barracuda LLC,* 2012 WL 642739, at *2, *8 (E.D. Mich. Feb. 8, 2012) (holding that where contracts established a ceiling price—not present here—the defendant "would not be able to charge a supracompetitive price."); *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 981 (N.D. Cal. 1979) (dismissing case where IBM's profitability was trending "generally downward" indicating that "the monopolist's grip is

OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563

19

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   Nor does *In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 659 (D. Mass. 2020), support

2   Valve's argument; quite the opposite. Mot. at 17. That summary-judgment decision found a

3   dispute of material fact on supracompetitive pricing—and therefore *allowed the claims to proceed*

4   *to trial*—because, although evidence of high fixed costs "may not *necessarily* be evidence that

5   prices are supracompetitive" (emphasis added), high profit margins for extended time periods

6   (such as what Valve has enjoyed for nearly 20 years, *see* CAC ¶¶ 17-19, 55, 125, 269-271),

7   certainly provide the inference of such supracompetitive pricing. 496 F. Supp. 3d at 659. Valve is

8   free at some point to argue that its extreme profits do not indicate supracompetitive pricing, but it

9   will need to do so in the face of evidence that no other Steam Store competitor makes anywhere

10   near such high profit margins, despite offering better-quality services.

11   ### 3.   Valve's Supracompetitive Pricing Does Not Reflect Superior Quality

12   Valve claims its "ability to fairly command higher prices" reflects that the "market

13   allegedly regards Steam as superior." Mot. at 16. At best, Valve's argument presents a disputed

14   factual issue inappropriate for resolution at the pleadings stage.[13] Even Valve's authorities—***none***

15   of which were on motions to dismiss—indicate this is so. For example, *Harrison Aire, Inc. v.*

16   *Aerostar Int'l, Inc.*, 423 F.3d 374, 384 (3d Cir. 2005), affirmed a summary-judgment decision on a

17   complete discovery record, and *Blue Cross & Blue Shield United of Wisconsin v. Marshfield*

18   *Clinic*, 65 F.3d 1406, 1408 (7th Cir. 1995), reviewed a trial verdict handed down after a two-week

19   jury trial. Valve will be free to develop its evidence on this score during discovery and at trial—it

---

20   weakening"—a trend that does not apply here); *Metronet Servs. Corp., Metronet Telemanagement*

21   *Corp. v. Qwest Corp.*, 2001 WL 765167, at *6 (W.D. Wash. Apr. 16, 2001) (summary-judgment

22   decision, finding defendant was unable to control prices, including due to obstacles presented by

23   the Telecom Act and the Washington Utilities and Transportation Commission, issues not present

       here); *Qualcomm*, 969 F.3d 974 (reviewing a jury verdict, and saying nothing about what

       allegations are sufficient at pleadings stage).

24   [13]   *See, e.g.*, *CollegeNET, Inc. v. Common Application, Inc.*, 711 F. App'x 405, 407 (9th Cir.

25   2017) (explaining that "additional factual development" may support Defendants' case but the

       "district court erred" in resolving factual disputes while deciding the motion to dismiss because

26   "[a]t this preliminary stage in the proceedings, it is sufficient that [plaintiff] alleged [defendant]

       limited . . . choice, decreased scope and services and price competition . . . and foreclosed rivals

27   from entry to the market, thereby reducing overall market satisfaction 'by leaving one dominant

28   provider offering inferior products and services.'").

OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563

20

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

cannot absolve itself of liability at this phase by presenting its own factual counterarguments.

Nonetheless, Valve's arguments fail. Plaintiffs have explained why the Steam Store and Steam Gaming Platform are of *lower* quality than competitive offerings, negating any inference that Valve's supracompetitive commissions indicate its services are high quality. CAC ¶¶ 286-290. At a bare minimum, it is thus plausible that Valve's supracompetitive pricing flows from its anticompetitive conduct rather than its self-alleged higher quality.

### 4. That Valve Has Always Charged a 30% Commission Does Not Undermine The Plausibility of Plaintiffs' Allegations

Relying on *Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013), Valve claims that because the Steam Store's 30% commission was set at its 2004 launch, it must have been a competitive price over time, and today. Mot. at 2, 15-16, 19.

As an initial matter, since *Somers* was decided the Supreme Court has clarified that market realities can change, and that anticompetitive conduct should be assessed during the relevant time period—not as of the time when a restraint was initially put in place. *See Nat'l Collegiate Athletic Assn. v. Alston*, 141 S. Ct. 2141, 2158 (2021) ("Whether an antitrust violation exists necessarily depends on a careful analysis of market realities . . . [i]f those market realities change, so may the legal analysis . . . [w]hen it comes to college sports, there can be little doubt that the market realities have changed significantly since 1984").

Nor was *Somers* decided on "indistinguishable facts," as Valve claims. Mot. at 15. *First*, Valve's pricing has never been subject to true competition. While there was nascent digital distribution competition when Valve first entered the relevant markets, Plaintiffs allege that Valve was not constrained by that competition, explaining that "[t]hrough these practices, Valve did what smaller publishers (Stardock) or non-publishers (GameStop and Direct2Drive) could not do—use a blockbuster hit to force its gaming platform onto the market." CAC ¶ 52; *see also id.* ¶ 229. In short, Valve's 30% commission has *always* been supracompetitive, even when it first entered the market by strong-arming publishers and consumers into using the Steam Gaming Platform. *Second*, Valve *never* faced effective competition from a "large seller," as the plaintiff did in *Somers*. Plaintiffs allege in painstaking detail how "[w]ell-established companies with

OPP. TO MOT. TO DISMISS
CASE NO. Case No. 2:21-CV-563

21

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

strong financial backing, such as EA, Microsoft, and Amazon, have put substantial time and effort into trying to dent the Steam Gaming Platform's dominance," yet, "have largely failed." *Id.* ¶¶ 127, 230-231, 249-265. This is not a case, as in *Somers*, where Valve's pricing has been the same "irrespective of the absence or presence of a competitor"—there has *never* been a meaningful competitor to Valve. 729 F.3d 953 at 964; *see also*, *e.g.*, CAC ¶¶ 230, 245, 264. *Third*, unlike *Somers*, where the plaintiff failed to allege a "price reduction" after the emergence of a "large seller," Plaintiffs here allege that after EGS made minor inroads into the market, Valve *did* at least facially lower its pricing. *Id.* ¶ 6 n. 3 (explaining that Valve implemented lower commissions for higher earning games). Valve concedes this point in its motion. Mot. at n. 5.[14]

### 5. Plaintiffs Allege Market Power Sufficient to Charge Supracompetitive Prices

Valve also argues that Plaintiffs have not sufficiently alleged market power, and that they therefore also must not have alleged supracompetitive pricing. Mot. at 14. In support, Valve relies on *Federal Trade Commission v. Facebook, Inc.*, 2021 WL 2643627 (D.D.C. June 28, 2021). That case, however, involved a complaint with conclusory allegations of market share and market power. *Id.* at *1. The FTC defined a "Personal Social Networking (PSN) Services" market, alleged in a bare-bones manner that Facebook's market share "exceeds 60%," and did not "offer any indication of the metric(s) or method(s) it used to calculate Facebook's market share." *Id.* at 1-2, *12-14. Notably, the *Facebook* court observed that such an allegation in a "more traditional goods market" (like the markets for PC Desktop Game Distribution and PC Desktop Gaming Platforms here) might suffice, since a court could "reasonably infer that market share was measured by revenue, units sold, or some other typical metric." *Id*. at *1. The court also noted that the FTC had failed to allege what other types of firms were in the relevant market. 2021 WL 2643627, at *1,

---

[14]   *Abbott Laboratories v. Adelphia Supply USA*, 2017 WL 5992355, at *7 (E.D.N.Y. Aug. 10, 2017), is distinguishable on a similar basis. There, the plaintiff alleged the anticompetitive conduct began on a date certain, and admitted the market was competitive before that date. *Id.* at *7. Thus there was a clean "before" and "after" period that could be used to ascertain the impact of the alleged anticompetitive conduct. Here, by contrast, there is no competitive "before" to compare with a supracompetitive "after"—there is only supracompetitive pricing the whole time.

Opp. to Mot. to Dismiss
Case No. Case No. 2:21-CV-563

22

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1    *12-14.

2           Plaintiffs, meanwhile, offer exactly such metrics, *see* CAC ¶¶ 93-100, 124, 133, and,

3    unlike the FTC, allege what other types of firms were in the relevant markets, *see id.* ¶¶ 249-65. In

4    such circumstances, a court should deny a motion to dismiss. *See*, *e.g.*, *RealPage, Inc. v. Yardi*

5    *Sys.*, Inc., 852 F. Supp. 2d 1215, 1227 (C.D. Cal. 2012) (finding RealPage's allegations were

6    sufficient to make a finding of market power for tying arrangement by pleading "with some

7    particularity two discrete examples in which Yardi has wielded its economic advantage in its

8    Voyager software to the competitive detriment to the RealPage Cloud"); *Cost Mgt. Services, Inc.*

9    *v. Washington Nat. Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996) (finding market share allegations

10   "sufficient to survive a motion to dismiss."); *see also Newcal*, 513 F.3d at 1052 (holding "the

11   existence or non-existence of [] market power is a factual question" and the [r]esolution of the

12   market power question on a Rule 12(b)(6) motion is therefore inappropriate . . ."). The *Facebook*

13   Court did not reject any specific factual allegations or calculations of the type Plaintiffs provide

14   here. Thus, Valve's only case does not help it.[15]

15                          **6.      Valve's Conduct Reduced Output and Stifled Innovation**

16          Valve claims that Plaintiffs' non-price harms "rest" on Plaintiffs' allegations of

17   supracompetitive pricing. Mot at 18. In fact, Plaintiffs make numerous allegations that Valve's

18   conduct caused a reduction in output and stifled innovation, *see* CAC ¶¶ 22, 148-149, 159, 283-

19   289 (explaining how Valve operates low quality products including a lack of investment in the

20   Steam Store). Valve's authorities (Mot. at 18) are distinguishable. *Dominguez v. UAL Corp.*, 666

21   F.3d 1359, 1360 (D.C. Cir. 2012), is a summary-judgment decision issued after full discovery.

22   *Power Analytics Corp. v. Operation Tech., Inc.*, 820 F. App'x 1005, 1019-20 (Fed. Cir. 2020), is a

23   competitor suit where the Plaintiff did not allege conduct was competition-reducing. And in

24

25   [15]   Regardless, the Ninth Circuit has found that attempt-related antitrust claims require lower
     market share than what was alleged in *Facebook* and what Plaintiffs allege against Valve. *Rebel*
26   *Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("[T]he minimum showing of
     market share required in an attempt case is a lower quantum than the minimum showing required
27   in an actual monopolization case . . . . [Defendants]'s market share of 44 percent is sufficient as a
     matter of law . . .").
28

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1   *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015), the plaintiffs were "at least one

2   step removed from the preclusive effect of the MADAs that are at the core of Plaintiffs' antitrust

3   claims." 80 F. Supp. 3d at 1029. Here, the class members are direct purchasers from Valve and

4   therefore directly impacted by the loss of quality and innovation. CAC ¶ 304.

5        Valve also points to absolute trends in output, claiming "the facts that are alleged show an

6   increase in these non-price metrics." Mot. at 18-19. But what matters is whether real world output

7   is higher than ***but-for world*** output—not whether ***real world*** output is trending upwards. *Nat'l*

8   *Collegiate Athletic Ass'n v. Bd. of Regents of U. of Oklahoma*, 468 U.S. 85, 106-107 (1984)

9   (explaining that the relevant inquiry is whether output was lower than it "would otherwise be" in

10   the but-for world).

11        **E.   Plaintiffs' Washington CPA Claim Should Also Stand**

12        State law instructs courts to "be guided by" cases "interpreting the various federal statutes"

13   when "deciding whether conduct restrains or monopolizes trade or commerce" under the

14   Washington Consumer Protection Act ("CPA"). Wash. Rev. Code Ann. §19.86.920.  As a result,

15   because Plaintiffs' Sherman Act claims survive, so must their claims under the Washington CPA.

16   *See*, *e.g.*, *Hairston v. Pac.-10 Conf.*, 893 F. Supp. 1485, 1493 (W.D. Wash. 1994) (denying motion

17   to dismiss CPA claims because the "player" plaintiffs established antitrust standing under the

18   Sherman Act and the CPA is "the state equivalent of the Sherman Act").

19   **V.   CONCLUSION**

20        For the foregoing reasons, Plaintiffs respectfully request that the Court deny Valve's

21   Motion to Dismiss in its entirety.  In the alternative, if Valve's Motion to Dismiss is granted,

22   Plaintiffs request leave to amend the CAC.

23

24

25

26

27

28

OPP. TO MOT. TO DISMISS
CASE NO. CASE No. 2:21-CV-563

24

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    DATED: August 30, 2021

2

3                                                          By     */s/ Alicia Cobb*
                                                                Alicia Cobb, WSBA # 48685
4                                                               QUINN EMANUEL URQUHART &
                                                                SULLIVAN, LLP
5                                                               1109 First Avenue, Suite 210
                                                                Seattle, WA 98101
6                                                               Telephone: (206) 905-7000
                                                                Fax: (206) 905-7100
7                                                               Email: aliciacobb@quinnemanuel.com

8
                                                                Steig D. Olson (*pro hac vice*)
9                                                               David D. LeRay (*pro hac vice*)
                                                                Shane Seppinni (*pro hac vice*)
10                                                              QUINN EMANUEL URQUHART &
                                                                SULLIVAN, LLP
11                                                              51 Madison Avenue, 22nd Floor
12                                                              New York, NY 10010
                                                                Telephone: (212) 849-7000
13                                                              Fax: (212) 849-2100
                                                                Email: steigolson@quinnemanuel.com
14
                                                                Adam B. Wolfson (*pro hac vice*)
15                                                              QUINN EMANUEL URQUHART &
                                                                SULLIVAN, LLP
16                                                              865 South Figueroa Street, 10th Floor
17                                                              Los Angeles, CA 90017-2543
                                                                Telephone: (213) 443-3000
18                                                              Fax: (213) 443-3100
                                                                Email: adamwolfson@quinnemanuel.com
19

20                                                              Charles B. Stevens (*pro hac vice*)
                                                                QUINN EMANUEL URQUHART &
21                                                              SULLIVAN, LLP
22                                                              50 California Street, 22nd Floor
                                                                San Francisco, CA 94111
23                                                              Telephone: (415) 875-6600
                                                                Fax: (415) 875-6700
24                                                              Email: charliestevens@quinnemanuel.com

25
                                                                *Attorneys for Daniel Escobar, William Herbert,*
26                                                              *and the class.*

27

28

1  David D. Golden (*pro hac vice*)

2  Wyatt Fore (*pro hac vice forthcoming*)
CONSTANTINE CANNON LLP
1001 Pennsylvania Avenue, NW, Suite 1300N

3  Washington, DC 20004
Telephone: (202) 204-3500

4  Fax: (202) 204-3501
Email: dgolden@constantinecannon.com

5

6  A. Owen Glist (*pro hac vice*)
Ankur Kapoor (*pro hac vice*)

7  Jeffrey I. Shinder (*pro hac vice*)
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor

8  New York, NY 10017
Telephone: (212) 350-2700

9  Fax: (212) 350-2701
Email: akapoor@constantinecannon.com

10

11

12

13  *Attorneys for Wolfire Games, LLC and the class.*

14

Thomas N. McCormick (*pro hac vice*)
VORYS, SATER, SEYMOUR AND PEASE LLP
4675 MacArthur Court
Suite 700
Newport Beach, CA 92660
Telephone: (949) 526-7903
Fax: (949) 526-7901
Email: tnmccormick@vorys.com

Kenneth J. Rubin (*pro hac vice*)
Timothy B. McGranor (*pro hac vice*)
Kara M. Mundy (*pro hac vice*)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, OH 43216-1008
Telephone: (614) 464-6350
Fax: (614) 719-6350
Email: kjrubin@vorys.com
tbmcgranor@vorys.com
kmmundy@vorys.com

*Attorneys for Sean Colvin, Susann Davis, Daniel Ryan Lally, Hope Marchionda, Everett Stephens, and the class.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Opp. to Mot. to Dismiss
Case No. Case No. 2:21-CV-563

26

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1

## CERTIFICATE OF SERVICE

2

     I hereby certify that on August 30, 2021, I caused a true and correct copy of the foregoing

3

to be filed in this Court's CM/ECF system, which sent notification of such filing to counsel of

4

record.

5

     DATED August 30, 2021

6

7

8

                                       */s/ Alicia Cobb*

9

                                       Alicia Cobb, WSBA #48685

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563

27

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000