The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| WOLFIRE GAMES, LLC, William Herbert and Daniel Escobar, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VALVE CORPORATION,<br><br>Defendant. | Case No. 2:21-cv-00563-JCC |
| SEAN COLVIN, EVERETT STEPHENS, RYAN LALLY, SUSANN DAVIS, and HOPE MARCHIONDA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VALVE CORPORATION,<br><br>Defendant. | Case No. 2:21-cv-00650-JCC<br><br>**REPLY IN SUPPORT OF DEFENDANT VALVE CORPORATION'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**NOTE ON MOTION CALENDAR: September 17, 2021** |

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

**TABLE OF CONTENTS**

I. ARGUMENT ........ 1

A. PLAINTIFFS FAIL TO ALLEGE ANTITRUST INJURY. ........ 1

1. PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE VALVE'S COMMISSION IS SUPRACOMPETITIVE. ........ 1

a. PLAINTIFFS FAIL TO DISTINGUISH *SOMERS V. APPLE, INC.* ........ 1

b. OTHER ALLEGATIONS DO NOT PLAUSIBLY ALLEGE SUPRACOMPETITIVE PRICING. ........ 2

2. PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED A MONOPOLISTIC MARKET SHARE. ........ 5

3. PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED NONPRICE HARMS. ........ 6

B. PLAINTIFFS FAIL TO ALLEGE VALVE'S STEAM KEY GUIDELINES VIOLATE ANTITRUST LAW. ........ 7

C. PLAINTIFFS' CLAIM THAT VALVE APPLIES THE ALLEGED "PMFN" TO SALES NOT INVOLVING STEAM KEYS FAILS TO ALLEGE INJURY TO COMPETITION. ........ 8

D. PLAINTIFFS' TYING AND MONOPOLIZATION CLAIMS BASED ON SEPARATE MARKETS FAIL FOR LACK OF PLAUSIBLE ALLEGATIONS THAT STEAM COMPRISES SEPARATE PRODUCTS. ........ 9

E. PLAINTIFFS' STATE CPA CLAIM FALLS WITH THEIR FEDERAL ANTITRUST CLAIMS. ........ 12

II. CONCLUSION ........ 12

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ....................8

*In re Aggrenox Antitrust Litig.*,
199 F. Supp. 3d 662 (D. Conn. 2016) ....................3

*Apple Inc. v. Psystar Corp.*,
673 F. Supp. 2d 926 (N.D. Cal. 2009) ....................4

*Arcesium, LLC v. Advent Software, Inc.*,
2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) ....................6

*Bd. of Regents v. N.C.A.A.*,
546 F. Supp. 1276 (W.D. Okla. 1982), *aff'd in part, remanded in part*, 707 F.2d 1147 (10th Cir. 1983), *aff'd*, 468 U.S. 85 (1984) ....................3

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) ....................5

*In re Brand Name Prescription Drugs Antitrust Litig.*,
288 F.3d 1028 (7th Cir. 2002) ....................3

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ....................7

*CollegeNET, Inc. v. Common Application, Inc.*,
355 F. Supp. 3d 926 (D. Or. 2018) ....................12

*Epic Games, Inc. v. Apple, Inc.*,
493 F. Supp. 3d 817 (N.D. Cal. 2020) ....................10, 11, 12

*F.T.C. v. Facebook, Inc.*,
2021 WL 2643627 (D.D.C. June 28, 2021) ....................5, 6

*F.T.C. v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986) ....................3

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
852 F. Supp. 2d 1171 (N.D. Cal. 2012) ....................1

*High Tech. Careers v. San Jose Mercury News*,
1995 WL 115480 (N.D. Cal. Mar. 14, 1995), *aff'd*, 94 F.3d 651 (9th Cir. 1996) ....................5

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

*Hilton v. Children's Hosp. San Diego*,
315 F. App'x 607 (9th Cir. 2008) ....................6

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
547 U.S. 28 (2006)....................11

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)....................9, 11, 12

*Laurence J. Gordon, Inc. v. Brandt, Inc.*,
554 F. Supp. 1144 (W.D. Wash. 1983)....................4

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)....................6

*N.C.A.A. v. Alston*,
141 S. Ct. 2141 (2021)....................1

*N.C.A.A. v. Bd. of Regents*,
468 U.S. 85 (1984)....................1

*Nicolosi Distributing, Inc. v. BMW of N. Am.*,
2011 WL 1483424 (N.D. Cal. 2011) ....................12

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
797 F.2d 370 (7th Cir. 1986) ....................8

*Oracle Am., Inc. v. Terix Computer Co.*,
2014 WL 5847532 (N.D. Cal. Nov. 7, 2014) ....................3

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ....................4

*Rick-Mik Enterp., Inc. v. Equilon Enterp. LLC*,
532 F.3d 963 (9th Cir. 2008) ....................9, 10, 11, 12

*Safeway Inc. v. Abbott Labs.*,
761 F. Supp. 2d 874 (N.D. Cal. 2011) ....................3

*Somers v. Apple, Inc.*,
2010 WL 11485481 (N.D. Cal. Dec. 21, 2010)....................5

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) ....................1, 2, 6

*Terradata Corp v. SAP SE*,
2018 WL 6528009 (N.D. Cal. 2018) ....................12

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
875 F.2d 1369 (9th Cir. 1989) ....................2

*U.S. v. Gomez*,
807 F. Supp. 2d 1134 (S.D. Fla. 2011) ....................3

*U.S. v. Microsoft Corp.*,
147 F.3d 935 (D.C. Cir. 1998) ("*Microsoft II*")....................4, 11, 12

*U.S. v. Syufy Enters.*,
903 F.2d 659 (9th Cir. 1990) ....................2, 3

*US Airways, Inc. v. Sabre Holdings Corp.*,
938 F.3d 43 (2d Cir. 2019)....................3, 5

*Warner v. Tinder Inc.*,
105 F. Supp. 3d 1083 (C.D. Cal. 2015) ....................5

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

Plaintiffs' Opposition (Dkt. #54) ("Opp.") does not refute the deficiencies in the Consolidated Amended Complaint ("CAC") raised in Valve's Motion to Dismiss (Dkt. #37) ("Mot.").

## I. ARGUMENT

### A. Plaintiffs Fail to Allege Antitrust Injury.

Plaintiffs argue they have plausibly alleged antitrust injury with implausible positions their own allegations contradict. Opp. at 17–24. They do not dispute the legal principles Valve cited, Mot. at 12–19, instead trying to distinguish the cases on factual or procedural grounds.

#### *1. Plaintiffs fail to plausibly allege Valve's commission is supracompetitive.*

As Valve explained, Plaintiffs allege that Valve has charged its now "industry standard" 30% commission for "nearly twenty years," beginning at a period of "vibrant competition," for nine years before becoming "dominant," and in the face of numerous large competitors up to the present. MTD at 13–15. Thus, under *Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013), Plaintiffs have not plausibly alleged that commission to be supracompetitive. Mot. at 15–16.[1, 2]

##### a. Plaintiffs fail to distinguish *Somers v. Apple, Inc.*

Plaintiffs try to distinguish that controlling authority by implausibly claiming Valve's commission has "*always* been supracompetitive" because Valve never faced "true," "effective," or "meaningful" competition. Opp. at 21–22 (emphasis in original). First, they downplay their allegation that Valve set that commission during "vibrant competition" (¶ 46[3]), and now claim that "Valve was not constrained by that competition" because it "'use[d] a blockbuster hit to force its gaming platform onto the market,'" something "'smaller publishers […] or non-publishers […] could not do.'" Opp. at 21 (quoting ¶ 52). But the CAC alleges nothing unique

---

[1] The lone case Plaintiffs cite finding supracompetitive prices were plausibly alleged, *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171 (N.D. Cal. 2012) (cited in Opp. at 18), is of no use here. There the defendant increased prices 50% in three years, *id.* at 1180, while Plaintiffs allege Valve has charged the same price "for nearly twenty years," ¶ 55.

[2] Plaintiffs attempt to discredit *Somers* by quoting a general proposition about changing market realities from *N.C.A.A. v. Alston*, 141 S. Ct. 2141, 2158 (2021), unrelated to antitrust injury and made solely to distance itself from dicta found in its earlier decision of *N.C.A.A. v. Bd. of Regents*, 468 U.S. 85 (1984). Opp. at 21. Regardless, Plaintiffs do not even argue a change in market realities; to the contrary, they argue that Valve's commission "has *always* been supracompetitive." *Id.*

[3] Paragraph references are to the CAC (Dkt. #34).

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

about Valve's "hit" game, Half-Life 2 (*see* ¶¶ 51–52), that would advantage Valve over the many other publishers of popular games, *see* ¶ 48 (listing *a dozen* games "comparable" to Half-Life 2's predecessor). Thus, when Valve launched Steam, it faced actual competition from other distributors, ¶¶ 50–51, and potential competition from all other popular game publishers, who could have used their hits to drive players onto their platforms, just as Valve allegedly did. *See Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (noting the "field of competition" includes actual and potential competitors). This refutes any inference Valve's commission was noncompetitive when Valve first set it and held zero market share.

Second, Plaintiffs claim Steam's commission remained supracompetitive despite many large competitors through the years (detailed at Mot. at 14–15, including the same "large seller" in *Somers*—Amazon, ¶ 252) because allegedly those competitors "largely failed." Opp. at 22. But "the nature of competition is to make winners and losers," *U.S. v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990), so that allegation is fully consistent with ongoing competition. *Somers* thus rested on the "emergence" and "presence"—not success—of a large competitor, *see Somers*, 729 F.3d at 964, and Plaintiffs have not distinguished their allegations from its holding.

Third, Plaintiffs claim that "after [Epic] made minor inroads into the market, Valve did at least facially lower its pricing," whereas in *Somers*, there was no price drop. Opp. at 22. But the CAC contradicts that claim: Valve allegedly enacted new volume discounts for high-selling games months before Epic even launched its store. *See* ¶¶ 6 n.3, 264. And Plaintiffs allege those volume discounts "are not real changes at all" because they do not apply to "the vast bulk of games," so "Valve is essentially charging the exact same commission as always." ¶ 293.

b. <u>Other allegations do not plausibly allege supracompetitive pricing.</u>

Failing to distinguish *Somers*, Plaintiffs argue they have plausibly alleged that Valve's commission is supracompetitive because it is "significantly above [Valve's] costs," and "ample legal authorities recognize that prices in a competitive market are expected to move toward costs, and [therefore] prices which are substantially *greater* than costs are supracompetitive." Opp. at

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

19 (emphasis in original). But that simplistic theory does not hold in Plaintiffs' alleged market.

First, Plaintiffs' authorities all concern *marginal* cost, *id.* at 19 n.11, yet they allege gaming platforms' and developers' marginal costs are "close to zero," ¶ 111, and Valve's are "minimal," ¶ 280. This means Plaintiffs' marginal cost theory is inapplicable. *See Bd. of Regents v. N.C.A.A.*, 546 F. Supp. 1276, 1319 (W.D. Okla. 1982) ("[C]ollege football is an exception to [the rule analyzing competitive pricing using marginal costs because] the marginal cost of producing a football game for television is practically nil."), *aff'd in part, remanded in part*, 707 F.2d 1147 (10th Cir. 1983), *aff'd*, 468 U.S. 85 (1984).[4] Under that view, Valve should be charging almost nothing and every developer has supracompetitive prices, which makes no sense. *See Syufy Enters.*, 903 F.2d at 663 ("[A]ntitrust cases … must make economic sense.").

Correspondingly, Plaintiffs' supracompetitive pricing authorities concern technologically stagnant markets, where competitive prices may indeed tend to move towards marginal costs. *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 60 (2d Cir. 2019) ("[N]o new competitors have entered the technologically stagnant GDS market in some thirty years."); *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 663 (D. Conn. 2016) (market encompassed patent-expired drug and its generic equivalents).[5] But Plaintiffs allege the opposite kind of market, characterized by perpetual innovation and new entrants. *See* ¶ 17 ("Innovation is the engine of the video game industry."), ¶ 66 (alleging separate "'high end'" PC game market within the gaming universe allowing players to "always keep up with the latest tech"), ¶¶ 235–65 (new entrants); *see also U.S. v. Gomez*, 807 F. Supp. 2d 1134, 1149–50 & n.16 (S.D. Fla. 2011)

---

[4] *See also In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028, 1031 (7th Cir. 2002) ("[P]rice equal to marginal cost would not be compensatory" for products with "heavy fixed costs."); *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011) ("That all boosted market participants priced above average marginal cost precludes any inference that such pricing reflected Abbott's monopoly power.").

[5] Plaintiffs' other authorities did not consider supracompetitive pricing evidence. *See F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (applying rule of reason to horizontal agreement to withhold service by comparison to price fixing); *Oracle Am., Inc. v. Terix Computer Co.*, 2014 WL 5847532, at *5 (N.D. Cal. Nov. 7, 2014) (finding adequately pled derivative aftermarket which "could permit" pricing "substantially above marginal cost").

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

(describing persistent trend of "continually advancing technology and computing capabilities").

Yet Plaintiffs ignore this crucial difference. Their traditional manufacturing-economics argument is nonsensical here because software is fundamentally different, ¶ 277 (Platform fixed costs "become negligible at a large scale."), generating "increasing returns to scale," *U.S. v. Microsoft Corp.*, 147 F.3d 935, 939 (D.C. Cir. 1998) ("*Microsoft II*") ("[B]ecause most of the costs of software lie in the design, marginal production costs are negligible. Production of additional units appears likely to lower average costs indefinitely."). In software then, profit margin therefore increases with volume. *Id*. This economic characteristic of software also means Plaintiffs' allegations comparing Steam's competitors' prices to their costs without considering their platform volume show nothing. *See* ¶¶ 244, 256, 277. And whatever competitors may say about prices and costs, Epic is allegedly losing hundreds of millions of dollars charging a lower commission, ¶ 264, and Discord's platform is now defunct, ¶ 245.

The flip side to pricing above costs is, of course, profit. Plaintiffs thus argue that Valve's profits, characterized as "extreme," imply that its commission is supracompetitive. Opp. at 20. But Plaintiffs cite no case finding allegations of high profits sufficient to plead supracompetitive prices or to support market power (which can be established by supracompetitive prices plus restricted output, *see Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)). This is likely because, in the Ninth Circuit, "[m]any courts have disparaged the evidentiary value of high profits to indicate monopoly power. After all, high profits may be indicative of a variety of factors other than a monopoly power, such as an extraordinary market, operating efficiency, or high-quality management." *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 926, 931 (N.D. Cal. 2009) (citations omitted); *see also Laurence J. Gordon, Inc. v. Brandt, Inc.*, 554 F. Supp. 1144, 1156 (W.D. Wash. 1983) (Coughenour, J.) ("[P]rofit evidence is often misleading and inconclusive, and high profits can demonstrate defendant's superior product or reputation.").

Profit allegations thus generally have little value; Plaintiffs' profit allegations have none. The CAC alleges only the overall size of Valve's profits (and the irrelevant metric of profit per

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

employee). ¶¶ 2, 18, 269, 270. But Steam is allegedly the world's largest PC gaming platform, ¶ 5, so large profits standing alone indicate nothing. No allegations compare Steam's fixed costs, marginal costs, marginal profit, or even overall profit to comparable companies. *See High Tech. Careers v. San Jose Mercury News*, 1995 WL 115480, at *3 (N.D. Cal. Mar. 14, 1995) ("The resulting lack of specificity and comparability undermined any probative value HTC's evidence [of profits] might have otherwise had."), *aff'd*, 94 F.3d 651 (9th Cir. 1996); *cf. US Airways, Inc.*, 938 F.3d at 61 (defendant's profitability assessed by comparison to comparable companies).

Plaintiffs also argue Valve's assertion that its prices reflect superior quality is "a disputed factual issue inappropriate … at the pleadings stage." Opp. at 20. Not so. Valve cited only to Plaintiffs' own allegations that the market as a whole regards Steam as superior, Mot. at 16, which are far more probative of quality than Plaintiffs' criticisms of particular Steam features. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286–87 (2d Cir. 1979) (comparison of specific features "has little meaning" to product quality, which "can only be inferred from the reaction of the market"). No allegations contradict this alleged market view, *see* ¶ 260 ("back-lash from gamers" forced to use platform "they do not prefer" (Epic) over one they do prefer (Steam)), and the features Valve added to Steam over time, ¶¶ 56, 247, mean its quality adjusted price has declined. Thus, "at best" the CAC is fatally contradictory on this point. *See Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1098 (C.D. Cal. 2015) ("[A]llegations are inherently contradictory, which warrants dismissal."); *Somers v. Apple, Inc.*, 2010 WL 11485481, at *6 (N.D. Cal. Dec. 21, 2010) (antitrust injury not alleged from contradictory factual allegations).

*2. Plaintiffs have not plausibly alleged a monopolistic market share.*

Plaintiffs claim their bare allegations that Valve has a 75% market share, ¶¶ 1, 320, should escape the dismissal the FTC suffered in *F.T.C. v. Facebook, Inc.*, 2021 WL 2643627, at *1 (D.D.C. June 28, 2021), for its "unsupported" "60%-plus" assertion because Plaintiffs include the measuring metrics lacking in *Facebook*. Opp. at 23. But the allegations they cite, ¶¶ 93–100, 124, 133, contain no metrics measuring a market share of 75%—or any percentage. They

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

allege numbers of users, first-time purchasers, playtime hours, games purchased, and payments to creators, but nothing about Valve's *share*. And the numbers (without shares) for purchases are only for the alleged game distribution market. *See* ¶ 124. Plaintiffs allege the game platform market share "coincides" with the distribution market share because platforms sell most games played on them, ¶ 133, but that sheds no light on market share because (i) no metrics are alleged for game share, and (ii) Epic, "the leading alternative" to Steam, ¶ 254, gives away millions of games for free, ¶ 257. Alleging a market share but not how it was calculated warrants dismissal in a technology platform monopolization case. *Facebook, Inc.*, 2021 WL 2643627, at *12–14.

*3. Plaintiffs have not plausibly alleged nonprice harms.*

Plaintiffs argue they allege antitrust injury apart from price by "a reduction in output and stifled innovation," Opp. at 23, but ignore their allegations predicating those harms on supra-competitive pricing, quoted in Valve's Motion at page 18. Most of the allegations they point to relate to Steam's quality, Opp. at 23 (citing ¶¶ 148–49, 286–89). Those allegations are not plausibly alleged, *see* page 5, *supra*, and are contradicted by allegations Steam's *improved* quality, ¶¶ 56, 122–23, 247. They also do not plausibly flow from that which allegedly makes Valve's conduct unlawful (required for antitrust injury, *see Somers*, 729 F.3d at 963):

- Steam's automatic algorithm that helps customers discover games and its open forum, ¶¶ 286, 289, reflect its democratic approach to Steam, *see* ¶ 291, with a correspondingly large community and game selection, ¶ 57;
- The quality of Steam Keys, ¶¶ 148–49, reflects their purpose as a free accommodation, Mot. at 6–9, and to restrain "increase[d] output" (*i.e.*, free-riding abuse), ¶ 159; and
- Valve's "cybersecurity vulnerabilities," ¶ 288, resemble those of most large businesses.[6]

Moreover, these allegations do not speak to the correct inquiry: "quality in the market *as a whole*." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) (emphasis added); *see also Hilton v. Children's Hosp. San Diego*, 315 F. App'x 607, 609 (9th Cir. 2008) ("a decline in marketwide quality"); *Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446, at *7 (S.D.N.Y. Mar. 31, 2021) ("[A] plaintiff cannot simply plead that its

[6] Another allegation claims inferior "infrastructure and support" but offers no facts. ¶ 287.

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

products are superior; […] [but] must plead facts that show how the quality of products in the market as a whole will decline.").[7]

Plaintiffs are correct in theory that output should be compared to a "but-for world." Opp. at 24. But "[s]uch a counterfactual proposition is difficult to prove in the best of circumstances." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993). Indeed, Plaintiffs allege rapidly expanding output, *see* Mot. at 18–19, and cite no factual allegations that output would be higher in a "but-for world," *see Brooke Grp.*, 509 U.S. at 233 ("[No] reasonable inference output would have been greater" for period when "output expanded at a rapid rate.").

**B. <u>Plaintiffs Fail to Allege Valve's Steam Key Guidelines Violate Antitrust Law</u>.**

Plaintiffs concede Valve has no duty to provide Steam Keys. Opp. at 7 (stating Plaintiffs are not alleging a refusal-to-deal claim). That means Valve is within its rights to limit the number of free Steam Keys it gives developers. Those limits deter developers and others from free-riding, without paying Valve a commission, on its creation and maintenance of Steam—the gaming platform that all Steam-enabled games use whether the game is bought on Steam or via a Steam Key obtained from a developer or a retail outlet. Those limits also deter fraud.

Plaintiffs now downplay their Steam Keys allegations as incidental to what they call a Platform-Most-Favored-Nations Clause or "PMFN," relegating their discussion of Steam Keys to scattered remarks wrongly claiming their sale means distribution and platforms are separate product markets—an independent reason for dismissal that doesn't rescue Plaintiffs from their failure to allege anticompetitive conduct here. Opp. at 1–2, 8. Plaintiffs cannot have it so easy, as the alleged limits on Steam Keys were the crux of their allegations of anticompetitive conduct. *See, e.g.*, ¶¶ 146–47, 163–69, 184, 198–200. And Plaintiffs' argument does not even mention Steam Keys' alleged security issues, ¶¶ 149–150, implicitly admitting those don't aid Plaintiffs.

One can see why Plaintiffs now walk away from their Steam Keys allegations. Valve

[7] Plaintiffs' cited allegations apart from Steam's quality fare no better: Paragraph 159 absurdly alleges "output" would increase if Valve gave away more free Keys, and the remaining allegations are either conclusory (¶ 22) or predicated on supracompetitive pricing (¶¶ 283–85).

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

cited *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986), to show it had no duty to distribute Steam Keys in the first place. Mot. at 8. Plaintiffs cite *Olympia* when they admit they aren't pleading refusal-to-deal claims. Opp. at 7. That is an important concession, abandoning their allegation that Valve's limitation on the number of Steam Keys suppressed competition with game sales on Steam. *See* Opp. at 5 & n.2, 13–14.

"[T]here is only a duty not to refrain from dealing where *the only conceivable rationale or purpose* is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (emphasis added) (internal quotations omitted). Even if Valve had such a duty—and Plaintiffs concede it does not—the Steam Keys guidelines' objectives of deterring free-riding and fraud would take their claims out of the rule of *Aerotec*. Plaintiffs leave unsaid *Olympia*'s core teaching: with no obligation to set up the Steam Keys program, Valve has no duty to provide Steam Keys to promote competition with itself. Mot. at 8–9.

**C. <u>Plaintiffs' Claim that Valve Applies the Alleged "PMFN" to Sales Not Involving Steam Keys Fails to Allege Injury to Competition</u>.**

Plaintiffs do no better with their allegations regarding games not enabled for Steam. Plaintiffs' sole factual allegation claiming Valve applies Steam Keys guidelines to regulate prices of non-Steam enabled games was an anecdote in which an unnamed Valve employee informed an unidentified developer that charging $5 for a game on Steam, while giving it away for free on Discord's platform, wasn't allowed. Mot. at 2, 10 (citing ¶¶ 193, 246). Plaintiffs did not allege whether this incident had any effect on the unidentified developer—or on competition.

Trying to amplify the anecdote, Plaintiffs now mischaracterize the CAC, claiming what was allegedly said to the developer was part of an exchange with a "relevant Valve employee [who] was speaking on behalf of the company." Opp. at 14 (citing ¶ 195). But paragraph 195 has nothing to do with the Discord giveaway story; rather, it alleges that someone at Valve, also unidentified, responded to "one inquiry from a game publisher" about permanent "discounts" on non-Steam stores to the detriment of Steam customers who would, in the hypothetical, pay twice

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

as much as purchasers on other platforms—including purchasers who bought a Steam Key Valve gave that developer for free. *See* ¶ 195 (referring to sales by vendors of PC games, "Steam key or not," who were "always running discounts of 75% off on one store but 50% off on ours").[8] Nothing in paragraph 195 alleges that Valve applied this hypothetical to anyone or that it had any connection to Plaintiffs' anecdote about Discord. Again, no effect on competition is alleged.

Valve showed that Plaintiffs' sole anecdote, ¶¶ 193, 246, of enforcing the PMFN on non-Steam platforms was too thin to support proceeding with an antitrust class action. Mot. at 9–12. It does not somehow acquire substance by falsely claiming the statement in ¶ 195 is part of it.

### D. Plaintiffs' Tying and Monopolization Claims Based on Separate Markets Fail for Lack of Plausible Allegations that Steam Comprises Separate Products.

Plaintiffs concede that "[t]he first element of any tying claim is that the defendant tied together the sale of two distinct products or services." Opp. at 9 (quotation omitted). But the facts alleged describe the integrated service known as Steam, where customers acquire and play games. Plaintiffs shrug off the rulings finding a single integrated product in analogous cases—including on a motion to dismiss in *Rick-Mik Enterp., Inc. v. Equilon Enterp. LLC*, 532 F.3d 963, 974 (9th Cir. 2008)—and cling to *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984), where the court found hospital surgical services and anesthesiology to be separate. Opp. at 9–13.

Before and after *Jefferson Parish*, courts have refused to apply its test woodenly, as Plaintiffs propose, to highly integrated products such as franchises and technology platforms. And *Rick-Mik*, where the court affirmed dismissal because a gas station franchise and credit card processing were one integrated product, is not "context-specific … to franchises" as Plaintiffs claim, Opp. at 11, as technology platforms, like franchises, "necessarily consist of 'bundled' and related products or services—not separate products." *Rick-Mik*, 532 F.3d at 974. The Steam platform and Steam-enabled games to be played on it are no less integrated than gas stations and credit card processing. All but conceding integration, Plaintiffs twice remind the court that they "allege an alternative market consisting of a single, integrated product." Opp. at 2; *see also* at 9.

---

[8] If the non-Steam platform had a 75% discount on a $10 game, the end price would be $2.50. If the discount on Steam was 50%, the Steam price would be double, or $5.00.

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

Last year, in a dispute over Epic's video games sold on Apple's mobile-phone and tablet platforms, a district court followed *Rick-Mik* in finding Epic had not shown that Apple's in-game payment system was a distinct product from the platform. *Epic Games, Inc. v. Apple, Inc.*, 493 F. Supp. 3d 817, 842–44 (N.D. Cal. 2020). If *Rick-Mik* were "context specific" to franchises, the *Epic* court would not have followed it or its integration test, but it did: "Where the allegedly tied product is an essential ingredient of the overall 'method of business' with customers, courts view them as one product, not two tied together. … This is especially true where the allegedly separate products have always been integrated." *Id*. at 842 (quoting *Rick-Mik*, 532 F.3d at 974).

Here, selling Steam-enabled games on Steam is just as much an "essential ingredient" of Valve's "overall 'method of business' with customers," *id*., not only for customer convenience and support, but also because Valve charges customers nothing for Steam, earning its revenue from developers on their game sales. Mot. at 4. Plaintiffs attempt to obscure this by alleging Valve originally operated Steam without selling games on it, Opp. at 10, but ignore their allegation that when Steam began, only Valve's games could be played there, ¶ 49. Valve could thus pay to develop and operate Steam, free to users, from its game proceeds no matter where they were sold. But Valve soon opened Steam to other developers' games and, from the beginning, charged them a commission for games they chose to sell, ¶ 54, providing the revenue from which Valve expanded Steam to handle the ever-rising number of developers' games and users who play them. Competing platforms where users can play games also sell them and charge a commission. *See, e.g.*, ¶ 277 (Epic, Microsoft, and Discord), ¶ 236 (Electronic Arts' Origin).

Indeed, the only way a developer could sell a Steam-enabled game apart from Steam is via a free Steam Key. *See* ¶ 142. But Valve has never charged anyone for a Steam Key, so game sales have always been integrated into Steam as an "essential part" of Valve's method of business, making Steam an integrated product under the Ninth Circuit's *Rick-Mik* test.

Plaintiffs seek to escape this clear integration by arguing that Valve "misleadingly implies" the Steam platform is free. Opp. at 8 n.4. But their footnote is at war with their

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

allegations of separate game and platform markets, because the twenty paragraphs Plaintiffs cite all discuss game purchases, not an "exchange of consideration" for platform access. If buying a game provides access to the platform necessary to play it, Plaintiffs' citations just establish that games and the Steam platform are an integrated pair. Valve's free provision of Steam for playing Steam-enabled games is not "irrelevant"—it is crucial to understanding why Plaintiffs' allegations of two separate product markets is implausibly unmoored from reality.

Plaintiffs are also far off base in claiming the integration test in *Rick-Mik*, *Microsoft II*, and *Epic* is the "wrong standard." Opp. at 11. First, they claim "the Ninth Circuit has continuously applied [*Jefferson Parish*'s purchaser-demand] test through the present," *id.*, but omit crucial context: *Rick-Mik* applied that test only *as an alternative* after first finding an integrated product. 532 F.3d at 975 ("There are also no separate products under […] *Jefferson Parish*.").

Plaintiffs' assertion that the Supreme Court "endorsed *Jefferson Parish*'s consumer demand test in [*Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)]" is no more candid. Opp. at 11. Plaintiffs fail to disclose that *Illinois Tool Works* abrogated *Jefferson Parish*'s statement that in a tying case a patent is presumed to give a seller who holds it market power in the patented product. 547 U.S. at 31. Whether products were separate or integrated was not before the Court. *See id.* It did accept *Jefferson Parish*'s explanation of "the essential characteristic of an invalid tying arrangement," *id.* at 34–35, but, contrary to Plaintiffs' claim, no "endorsement" of *Jefferson Parish*'s consumer-demand test can be found in that opinion.

And the *Epic* court, faced (as here) with a software platform for games, was thus free to begin with *Jefferson Parish*, *Rick-Mik*, and other tying cases, but turned first to *Rick-Mik*'s integration test drawn from franchising when applying the law. *Epic*, 493 F. Supp. 3d at 842. Like *Rick-Mik*, it then considered whether "separate demand" existed for in-game purchasing services apart from the platform's "integrated service" and suggested a way to analyze these claims: "Commentators have suggested that separate demand is a 'threshold requirement' …, following which defendant may show that the products are nevertheless a single product due to

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

their being an 'integrated service.' … [*Microsoft II*] lays out the general requirements for an integrated service." *Id*. at 843–84 & n.27. Thus, Plaintiffs offer no reason for this Court not to follow *Rick-Mik*, *Microsoft II*, and *Epic* in applying the integration test here.[9]

Valve showed (and Plaintiffs have not disputed) that under the integration test, Steam is an integrated platform for buying and playing games, and has been so since first opening to third-party developers shortly after 2004. Mot. at 20–22. Under the alternative *Jefferson Parish* purchaser-demand test, the Steam platform and game sales are one integrated product. *Id.* at 22–24. Valve has never created a separate paid channel for purchasing Steam-enabled games apart from Steam—just free Steam Keys given to developers as an accommodation. Alleging that developers would like Steam Keys without limit so they can free ride on Valve's continuing investment or that consumers would like to buy games via Steam Keys—where Valve charges no commission—at a lower price than on Steam and get the same free ride, fails to allege purchaser demand for a separate product. It just alleges that any purchaser would choose the same product or service at a lower price. *See Epic*, 493 F. Supp. 3d at 843 ("It is not surprising that some customers would choose competing payment services if they provided lower prices offered only because of this non-payment [*i.e.*, "avoiding Apple's 30%"]. This does not evidence separate demand for payment processing services …. Epic Games' argument is no more than a collateral attack on Apple's App Store model, not a demonstration of separate demand.").

### E. Plaintiffs' State CPA Claim Falls With Their Federal Antitrust Claims.

Plaintiffs agree with Valve that this claim rises or falls with their Sherman Act claims. Opp. at 24; Mot. at 24. Because the federal claims fail, Mot. at 6–24, so should the CPA claim.

## II. CONCLUSION

For these reasons, Valve respectfully seeks dismissal of the CAC with prejudice.

---

9 The district courts they cite do nothing to cast doubt on that test. *See CollegeNET, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 954 (D. Or. 2018) (integration test not raised or discussed); *Terradata Corp v. SAP SE*, 2018 WL 6528009, *13 (N.D. Cal. 2018) (insufficiently alleging integration: "Assuming the court could apply the *Microsoft* [*II*] analysis consistent with antitrust law generally, it is arguable whether there are allegations that the … products are integrated."); *Nicolosi Distributing, Inc. v. BMW of N. Am.*, 2011 WL 1483424, *3 (N.D. Cal. 2011) (first applying *Rick-Mik* integration test, then the "alternative purchaser-demand test").

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

DATED this 17th day of September, 2021.

FOX ROTHSCHILD LLP

*s/ Gavin W. Skok*
Gavin W. Skok, WSBA #29766
Laura P. Hansen, WSBA #48669
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
Telephone: 206.624.3600
Facsimile: 206.389.1708
E-mail: gskok@foxrothschild.com
lhansen@foxrothschild.com

MONTGOMERY McCRACKEN WALKER & RHOADS LLP

*s/ Charles B. Casper*
Charles B. Casper, *admitted pro hac vice*
1735 Market Street, 21st Floor
Philadelphia, PA 19103
Telephone: 215.772.1500
Email: ccasper@mmwr.com

*Attorneys for Defendant*

REPLY ISO DEFENDANT VALVE CORPORATION'S MOTION TO DISMISS - (2:21-CV-00563-JCC) - 13

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

## CERTIFICATE OF SERVICE

I certify that I am a secretary at the law firm of Fox Rothschild LLP in Seattle, Washington. I am a U.S. citizen over the age of eighteen years and not a party to the within cause. On the date shown below, I caused to be served a true and correct copy of the foregoing on counsel of record for all other parties to this action as indicated below:

### Service List

Alicia Cobb
QUINN EMANUEL URQUHART & SULLIVAN LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Ph. 206-905-7000
Fax 206-905-7100
Email: aliciacobb@quinnemanuel.com

☐ Via US Mail
☐ Via Messenger
☒ Via CM/ECF / Email
☐ Via over-night delivery

A. Owen Glist
Ankur Kapoor
Jeffrey I. Shinder
CONSTANTINE CANNON LLP
335 Madison Ave., 9th Floor
New York, NY 10017
Ph. 212-350-2776
Fax 212-350-2701
Email: oglist@constantinecannon.com
akapoor@constantinecannon.com
jshinder@constantinecannon.com

Adam Wolfson
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Ph. 213-443-3000
Email: adamwolfson@quinnemanuel.com

Charles Stevens
QUINN EMANUEL URQUHART & SULLIVAN LLP
50 California St., 22nd Floor
San Francisco, CA 94111
Ph. 415-875-6600
Email: charliestevens@quinnemanuel.com

David Golden
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., 22nd Floor
Washington, DC 20004
Ph. 202-204-4527
Email: dgolden@constantinecannon.com

David Du LeRay
Steig David Olson
Shane Seppinni
QUINN EMANUEL URQYHART & SULLIVAN
51 Madison Ave., 22nd Floor
New York, NY 10010
Ph. 212-849-7630
Email: davidleray@quinnemanuel.com
steigolson@quinnemanuel.com
shaneseppinni@quinnemanuel.com

Kenneth J. Rubin
Timothy B. McGranor
Kara M. Mundy
VORYS SATER SEYMOUR & PEASE
52 E. Gay St.
PO Box 1008
Columbus, OH 43215
Ph. 614-464-6400
Email: kjrubin@vorys.com
tbmcgranor@vorys.com
kmmundy@vorys.com

*Attorneys for Plaintiffs*

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

EXECUTED this 17th day of September, 2021, in Tacoma, Washington.

Courtney R. Brooks

REPLY ISO DEFENDANT VALVE CORPORATION'S MOTION TO DISMISS - (2:21-CV-00563-JCC) - 15

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600