THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WOLFIRE GAMES, LLC, SEAN COLVIN, SUSANN DAVIS, DANIEL ESCOBAR, WILLIAM HERBERT, RYAN LALLY, HOPE MARCHIONDA, and EVERETT STEPHENS, individually and on behalf of all others similarly situated, | CASE NO. C21-0563-JCC<br><br>ORDER |
| Plaintiffs, | |
| v. | |
| VALVE CORPORATION, | |
| Defendant. | |

This matter comes before the Court on Defendant's motion to dismiss (Dkt. No. 37). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part the motion for the reasons described below.

I.      BACKGROUND

Plaintiff Wolfire Games, LLC alleges, in a Consolidated Amended Class Action Complaint ("CAC"), that Defendant utilizes anticompetitive practices and its monopoly power to force Wolfire and similarly situated personal computer ("PC") desktop game publishers to pay Defendant supracompetitive fees for the sale of their games. (*See generally* Dkt. No. 34.) The

ORDER
C21-0563-JCC
PAGE - 1

1    CAC also contains allegations and claims for relief from game consumers. (*Id.*) However, the

2    Court already granted Defendant's motion to compel arbitration of those claims pursuant to

3    Defendant's Steam Subscriber Agreement. (*See* Dkt. No. 66 at 5.)

4         Defendant operates a PC desktop gaming platform (the "Steam Platform") and a retail

5    electronic game store (the "Steam Store"). (Dkt. No. 34 at 10, 14–17.) Wolfire asserts, through

6    the CAC, that Defendant forces game publishers to sell their games through the Steam Store,

7    which results in anti-competitive injury to Wolfire and similarly situated game publishers. (*See*

8    *generally id.*) According to the CAC, Defendant initially created the Steam Platform to facilitate

9    the delivery of patches and updates for its own games. (*Id.* at 14.) Defendant later launched the

10   Steam Store. (*Id.* at 15) At the time, it sold its own games through the Steam Store, which could

11   only be played on the Steam Platform. (*Id.*) This is because PC desktop games are generally not

12   compatible across platforms due to the "unique functionality" of each platform. (*Id.* at 24.)

13        At some point, Defendant opened up the Steam Platform to third-party game publishers.

14   (*Id.* at 15.) However, like Defendant's own games, those third-party games, if compatible with

15   the Steam Platform, were generally not compatible with other platforms. (*Id.*) Also, like

16   Defendant's own games, absent the limited use of Steam Keys,[1] those games had to be

17   purchased through the Steam Store. (*Id.*) Defendant does not charge a direct fee for consumers'

18   use of the Steam Platform or its hosting of a third-party publishers' games. (*See generally id.*)

19   Instead, it generates revenue through a fee that it charges for each third-party game sold in the

20   Steam Store and for in-app purchases. (*Id.* at 24, 28, 78.) Defendant initially set the fee at 30%

21   but now provides limited discounts to high-volume developers and/or publishers. (*Id.* at 5.)

22        The initial appeal of the Steam Platform to game consumers was the ability to maintain

23   and update their game libraries in one location, regardless of which device they use to access the

24   game. (*Id.*) However, over time, Defendant added more functionality to the platform. (*Id.* at 5,

25   _____

26        [1] These are alpha-numeric codes that provide the holder with access to a digital version of a publisher's game within the Steam Platform. (Dkt. No. 34 at 30.)

ORDER
C21-0563-JCC
PAGE - 2

16.) This included social networking features and other services, including a game achievement tracking service. (*Id.* at 5, 16.) Based in part on this increased functionality, demand for the platform steadily rose. (*Id.*) Today, the "vast majority of all PC [d]esktop [g]ames are played [] on the Steam Gaming Platform." (*Id.* at 32.) As a result, Steam compatibility is considered to be a "must-have." (*Id.*)

According to the CAC, Defendant uses this market dominance to unlawfully tie Steam Store sales to use of its Steam Platform and to impose price controls through contractual provisions and coercion. (*See generally id.*) The CAC asserts that these practices violate Sections 1 and 2 of the Sherman Act as well as the Washington Consumer Protection Act ("CPA"). (*Id.*) Defendant moves to dismiss, at least with respect to Wolfire, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 37.) It argues, *inter alia*, that CAC's tying claims are not supportable, given the integrated platform and distribution market described in the CAC, and that the CAC fails to allege facts supporting an antitrust injury. (*See generally id.*)

## II.   DISCUSSION

### A.   Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2011), *see* Fed. R. Civ. P. 12(b)(6). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (internal quotation marks and citation omitted); *see Shroyer v. New Cingular Wireless Serv., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In reviewing such a motion, the Court accepts the truth of the facts alleged and draws all reasonable inferences from those facts in a plaintiff's favor. *Al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009). However, allegations must cross "the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 677. To do so, the complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* As a result, a "pleading that offers

1   'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not

2   do.'" *Id.* at 678 (quoting *Bell A. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

3       **B.      Relevant Market**

4       According to the CAC, by 2020, Defendant reported 45,000 Steam-compatible games

5   and 120 million monthly active Steam Platform users. (Dkt. No. 34 at 16.) The Steam Store,

6   where those games are generally purchased, presently accounts for 75% of the $10 billion[2] PC

7   desktop game market. (*Id.* at 8.)

8       "A threshold step in any antitrust case is to accurately define the relevant market." *Fed.*

9   *Trade Commn. v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). Here, the CAC presents

10  two different market theories. (Dkt. No. 34 at 32–39.) Under the first, the Steam Platform and

11  Steam Store operate in separate markets: a PC desktop platform market and a PC desktop game

12  transaction market. (*Id.* at 32–38.) Under the second, they operate as a single product in an

13  integrated game transaction platform market. (*Id.* at 38–39.) This distinction matters—only a

14  separate market theory would support the CAC's causes of action based on tying claims. (*See id.*

15  at 89–92.)

16      In defining the relevant market, Wolfire and Defendant debate the import of *Jefferson*

17  *Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984). (*See* Dkt. Nos. 57 at 28–30, 54 at 15–19, 57

18  at 14–15.) In *Jefferson Parish*, the Court articulated a consumer demand test to assess tying

19  allegations. If separate independent consumer demand exists for tied products, then the markets

20  encompassing those products are separate; otherwise, they are not. *See* 466 U.S. at 19–20.

21  Defendant takes issue with the application of *Jefferson Parish's* consumer demand standard,

22  arguing that it is inappropriate in a case such as this involving "novel technological contexts."

23  (Dkt. No. 37 at 26.) Defendant suggests this Court rely on *Rick-Mik Enterp., Inc. v. Equilon*

24  *Enterp. LLC*, 532 F.3d 963 (9th Cir. 2008). (*See* Dkt. No. 37 at 27.) In *Rick-Mik*, the Ninth

25

26      [2] This figure excludes the $20 billion market for in-app purchases of primarily free to
    play games, *i.e.*, those games that do not charge an up-front fee. (*Id.* at 4.)

1    Circuit found that the consumer demand test did not apply when the allegedly tied product "is an

2    essential ingredient of the overall 'method of business' with customers." *Epic Games, Inc. v.*

3    *Apple Inc.*, 493 F. Supp. 3d 817, 842 (N.D. Cal. 2020) (quoting *Rick-Mik Enterp., Inc.*, 532 F.3d

4    at 974).

5            The Court need not weigh in on the debate because, under either standard, the CAC's

6    allegations do not support Wolfire's contention that the game platform and game transaction

7    markets are, in fact, separate. According to the CAC, games developed for a particular platform

8    cannot be played on another platform and, with limited exceptions, game platforms generally do

9    not charge for their use; instead, they generate revenue to support the platform through the sale

10   of platform-compatible games and in-app purchases. (Dkt. No. 34 at 64, 69–74, 78, 84.) Granted,

11   Steam-enabled games can be purchased on a limited basis elsewhere. (*Id.* at 30.) But those games

12   are of no value unless the publisher includes a Steam Key, which Defendant provides at no

13   charge and only serves to allow the game to be played on the Steam Platform. (*Id.*) Therefore,

14   under either *Jefferson Parish*'s consumer demand standard or *Rick-Mik*'s essential ingredient

15   standard, the CAC's allegations suggest that the Steam Platform and Steam Store are a single

16   product within the integrated game platform and transaction market.

17       **C.    Antitrust Injury**

18           To support an antitrust claim, a plaintiff must allege "(1) unlawful conduct, (2) causing

19   an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that

20   is of the type the antitrust laws were intended to prevent." *Am. Ad Mgt., Inc. v. Gen. Tel. Co. of*

21   *California*, 190 F.3d 1051, 1055 (9th Cir. 1999). Defendant's motion to dismiss focuses on the

22   CAC's failure to establish the second element. The CAC asserts that Defendant's utilization of

23   its monopoly power and platform most-favored-nation provision[3] injures Wolfire through its

24

25           [3] According to Defendant's publishing rules, if it finds that publishers are selling Steam-
     enabled games through third-party distribution channels at terms less favorable than what can be
26   found at the Steam Store, Defendant may stop providing that publisher with Steam Keys or take
     other punitive action, including the termination of the publisher's game on the Steam Store. (Dkt.

1   payment of Defendant's supracompetitive fee. (Dkt. No. 34 at 60–63.) It further asserts that

2   Defendant's coercive conduct reduces output and stifles competition in the marketplace,

3   resulting in fewer, lower quality games as well as other ancillary anti-competitive effects. (*Id.* at

4   79–82.)

5          Turning to the issue of a supracompetitive fee—according to the CAC, Defendant's fees

6   far exceed what it could charge in a competitive marketplace. For support, it describes

7   Defendant's cost structure and the (lower) fees charged by some of its competitors. (*Id.* at 67, 71,

8   77, 79.) But as the CAC also indicates, Defendant has always charged the same fee to game

9   publishers—30%.[4] This began not long after 2001, when the PC desktop game "digital

10  distribution" market was in a "fledgling stage," yet Defendant did not become "dominant" in the

11  market until 2013. (*Id.* at 14, 28.)

12         Plaintiff's allegations are not meaningfully different from *Sommers v. Apple*, where the

13  Ninth Circuit found implausible the allegation that Apple's 99 cent music download fee was

14  supracompetitive. *See* 729 F.3d 953, 964–65 (9th Cir. 2013). There, as here, the price remained

15  the same throughout, even during periods of intense competition in the marketplace. (*See* Dkt.

16  No. 34 at 63–74.) While Wolfire suggests that a reliance on *Sommers* ignores the Supreme

17  Court's discussion of evolving "market realities," (*see* Dkt. No. 54 at 27 (quoting *Natl.*

18  *Collegiate Athletic Assn. v. Alston*, 141 S. Ct. 2141, 2158 (2021)), the CAC does not support this

19  assertion. The market reality, at least as plead in the CAC, is that, in spite of Defendant's

20  "supracompetitive" fee, others who charge less have failed, even though they had significant

21  resources at their disposal. (Dkt. No. 34 at 63–74.) Therefore, it would appear that the market

22  _____

23  No. 34 at 51–57.) This is described in the CAC as a platform most-favored-nation ("PMFN")
    requirement. (*Id.*) The CAC alleges that Defendant's stated purpose for the PMFN, to ensure that

24  Steam customers get the best deal possible, is pretextual. (*Id.* at 56–57.) Defendant's ultimate
    goal is really to control prices of all PC desktop games—not just those sold through the Steam

25  Store—and, in doing so, to maximize game sales through the Steam Store. (*Id.* at 57.)

26         [4] The CAC also indicates that Defendant recently began to offer volume discounts. (*See*
    Dkt. No. 34 at 5.) If anything, this cuts against the CAC's anti-competitive claims.

reality, at least as plead, is that Defendant's fee is commensurate with the Steam Platform's value to game publishers.[5]

The CAC also asserts that Defendant's coercive practices result in non-price antitrust injuries, namely a reduction in output and quality. (*Id.* at 88.) But the CAC lacks allegations supporting this assertion. (*See generally id.*) If anything, the facts provided by the CAC, at least with respect to output, suggest the opposite—a consistent increase in the number of games available in the market and on the Steam Platform. (*See id.* at 16, 29.) Moreover, as discussed above, to the extent that this injury is predicated on Wolfire's payment of Defendant's allegedly supracompetitive fee, (*see id.* at 4, 8–9, 79 (describing knock-on anti-competitive harms resulting from Defendant's allegedly inflated price)), it is not adequately plead. And finally, the CAC does not provide facts describing how Wolfire directly suffered from an alleged reduction in output and/or quality. *See Am. Ad Mgt., Inc.*, 190 F.3d at 1055 (requiring "injury to the plaintiff"). Instead, it only addresses the impact on the industry. (*See* Dkt. No. 34 at 88.)

In addition, the CAC describes other harms arising from Defendant's practices, namely cybersecurity issues and a failure to police game consumers' inappropriate behavior. (*See id.* at 80–81.) But it does not describe how those harms "flow[] from that which makes the conduct unlawful" or are "the type the antitrust laws [a]re intended to prevent." *Am. Ad Mgt., Inc.*, 190 F.3d at 1055.

To summarize: While the CAC provides a viable alternative market to support its Sherman Act and CPA causes of action—the integrated game platform and transaction market—

---

[5] According to the CAC, Defendant provides publishers access to a loyal and substantial consumer base. (*See id.* at 16, 34–33 (describing Steam Platform's favored features), 25–26, 72–73 (describing the backlash from Steam game consumers against competitors who choose to not release a game on Steam), 32–33 (indicating that publishers use the Steam Platform because they "want to be where the players are.").

1    it does not articulate sufficient facts to plausibly allege an antitrust injury based on that market.

2    Accordingly, the CAC fails to state a claim upon which relief can be granted.

3    **III.   CONCLUSION**

4        For the foregoing reasons, Defendant's motion to dismiss (Dkt. No. 37) is GRANTED in

5    part and DENIED in part. Wolfire's causes of action in the CAC are DISMISSED without

6    prejudice and with leave to amend.[6] Wolfire may file a second amended complaint, addressing

7    the infirmities described above, as well as any other changes it elects to make, within thirty (30)

8    days of this order.

9

10        DATED this 19th day of November 2021.

11

12

13

14                        John C. Coughenour

                         UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

---

25        [6] Wolfire seeks leave to amend. (*See* Dkt. No. 54 at 30.) Pursuant to Federal Rule of Civil

26    Procedure 15(a)(2), the Court GRANTS this request. *See Krainski v. Nev. ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 972 (9th Cir. 2010).