1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hon. John C. Coughenour

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

Wolfire Games, LLC, Sean Colvin, Susann
Davis, Daniel Escobar, William Herbert, Ryan
Lally, Hope Marchionda, Everett Stephens,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

Valve Corporation,

Defendant.

CASE NO. 2:21-CV-563

**SECOND AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel.: (206) 905-7000

# **TABLE OF CONTENTS**

OVERVIEW OF THE ACTION ................................................................................................ 1

PARTIES ................................................................................................................................... 7

JURISDICTION AND VENUE ................................................................................................ 9

FACTUAL ALLEGATIONS .................................................................................................. 10

I.    Background ..................................................................................................................... 10

    A.    Valve—A PC Desktop Game Publisher Turned Gaming Platform Monopolist .............. 13

II.    Relevant Markets ........................................................................................................... 19

    A.    The Distinctiveness of PC Desktop Games ................................................... 20

    B.    The Market for PC Desktop Gaming Platforms ............................................ 26

    C.    The Market for PC Desktop Game Distribution ........................................... 30

III.    Valve Possesses Monopoly Power In The Relevant Markets ............................................. 35

    A.    The Steam Gaming Platform Is Dominant in the PC Desktop Gaming Platform Market 35

    B.    The Steam Store Is Dominant in the PC Desktop Game Distribution Market ................ 40

    C.    The Combined Steam Product Is Dominant in the Alternative PC Desktop Game Transaction Platform Market ........................................................................ 41

IV.    Steam Has Unlawfully Monopolized the Relevant Markets ............................................... 42

    A.    Valve Has Tied the PC Desktop Gaming Platforms Market to the PC Desktop Game Distribution Market ................................................................ 42

        1.    The Steam Gaming Platform and the Steam Store Constitute Two Separate Products 43

        2.    Valve Coerces Publishers into Using the Steam Store ................................... 49

        3.    Valve's Tie Causes Anticompetitive Harm .................................................. 52

    B.    Valve Imposes the Valve PMFN on Publishers ............................................ 55

        1.    Valve Imposes the PMFN Through Written and Unwritten Rules .............................. 55

        2.    The Valve PMFN Suppresses Price Competition Across the Industry ........................ 61

        3.    The Valve PMFN Imposes Anticompetitive Harm .................................... 65

V.    Attempts at Entry Into the Relevant Markets Have Failed because of Valve's Anticompetitive Restraints ............................................................................................................ 68

    A.    Electronic Arts ........................................................................................... 70

    B.    Discord ....................................................................................................... 72

    C.    Microsoft, Amazon, Google ...................................................................... 74

    D.    Epic Game Store ........................................................................................ 76

VI.    Valve's Anticompetitive Practices Directly Harm Both Game Publishers and Game Purchasers ..................................................................................................................... 79

CLASS ACTION ALLEGATIONS ........................................................................................ 91

INTERSTATE TRADE AND COMMERCE .......................................................................... 94

CAUSES OF ACTION ........................................................................................................... 96

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE. CASE NO. 2:21-CV-563

ii

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

PRAYER FOR RELIEF ........................................................................................................ 103

JURY DEMAND ................................................................................................................ 104

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

iii

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

Plaintiffs Wolfire Games, LLC, Sean Colvin, Susann Davis, Daniel Escobar, William Herbert, Ryan Lally, Hope Marchionda, and Everett Stephens ("Plaintiffs") bring this action against Valve Corporation under federal and state antitrust laws and state unfair competition laws, seeking public injunctive relief and damages, and allege as follows:

**<u>OVERVIEW OF THE ACTION</u>**

1.    Video games are a vital part of American culture and industry.  Many millions of Americans play video games, creating hundreds of thousands of skilled jobs across the country with a focus on computer science, artistry, and innovation.  Personal Computer ("PC") games, a subset of video games, alone generate at least $30 billion worldwide annually.  Of that sum, approximately 75% flows through a single company, Defendant Valve Corporation ("Valve").

2.    Valve's online game store, the "Steam Store," dominates the distribution of PC games.  And Valve uses its dominance over PC game distribution to impose and anticompetitively maintain a 30% commission on nearly every sale made through its store.  This commission far exceeds what would prevail in a competitive market and yields Valve billions of dollars in annual profits.  Valve's bloated commission makes games more expensive for consumers to buy, while suppressing sales volumes and revenues for game publishers.[1]  And with Valve extracting so much revenue from its middle-man role, quality and innovation in the industry suffer.

3.    Valve has been able to keep its commission fees at supracompetitive levels for years by actively suppressing competition to protect its market dominance.  Many other game stores have tried in recent years to compete by charging lower fees to game publishers, in the range of 10-15%, but they have all failed to achieve significant market share because of the anticompetitive restraints imposed by Valve, as alleged herein.  In short, although the costs of game distribution have only continued to go down over the years, and conditions in the market have developed over recent years in ways that should facilitate the emergence of truly viable

---

[1]  In the PC Desktop Game industry, the "developer" is typically the entity that creates the game while the entity that markets the game is typically referred to as the game "publisher."  Sometimes a single company undertakes both of these functions.  While both terms are used throughout this Complaint interchangeably, the proposed class includes publishers as the entities that directly pay commissions to Valve.

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1   competitors to Valve's Steam Store at much lower cost, Valve has kept a stranglehold over the

2   market that has prevented real competition and kept prices high, thus harming competition at a

3   fundamental level and Plaintiffs at an individual level.

4        4.      The conditions under which Valve initially established its 30% commission

5   reflected fundamentally different market conditions from today.  Specifically, when digital

6   distribution began to take hold, most game sellers were brick-and-mortar distributors that had very

7   substantial costs associated with brick-and-mortar distribution, including real estate, labor,

8   processing, and inventory costs.  These brick-and-mortar distributors typically made razor-thin

9   margins and therefore charged commissions to game publishers (and prices to consumers) that

10  reflected those built-in substantial costs; typically, around 30%.

11       5.      Digital distributors had far lower costs.  When Valve first started charging its 30%

12  commission, it was primarily competing with entities that had to cover extensive costs that digital

13  distributors of PC Desktop Games did not (and do not) face.

14       6.      Basic economics and real-world experience, however, holds that, in a competitive

15  market, after this first-mover period, the entry of other rivals with an electronic distribution model

16  like the Steam Store would have quickly forced Valve's commission levels down to competitive

17  levels by competing on price (*i.e.*, by charging lower commissions).  Indeed, in this later period,

18  that is exactly what multiple rivals tried to do.  But they failed because Valve blocked them from

19  truly competing on price through the anticompetitive conduct detailed herein.  This was so even

20  while the costs of distribution continued to decrease.  Thus, the environment in which Valve

21  initially set its 30% commission does not reflect market realities today nor the cost structures of

22  digital distribution, and has never been free of Valve's substantial market power.  And, because of

23  the restraints detailed herein, Valve has been able to perpetuate the 30% commission rate that

24  arose to cover substantial brick-and-mortar distribution costs that are long since a thing of the past.

25       7.      Valve has for years maintained its dominance and thwarted effective competition

26  by engaging in two separate but related anticompetitive acts.  First, Valve ties together the use of

27  its gaming platform to its store, requiring game publishers to sell their games in Valve's store if

28  they want access to the "Steam" Gaming Platform, which is Valve's PC Desktop Gaming

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

2

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

Platform.[2]  Second, Valve imposes a Platform Most-Favored-Nations Clause (the "Valve PMFN") on game publishers, which inhibits the ability of publishers to sell their games at lower prices to consumers through rival storefronts.  Together, these anticompetitive acts protect Valve's dominance in the relevant markets and ensure Valve can continue to collect its 30% tax on nearly every sale of computer games in the United States.

8.     Valve's tie works as follows.  Valve knows that for PC games to succeed they must, with rare exceptions, be compatible with the Steam Gaming Platform.  The Steam Gaming Platform provides a software environment where gamers can maintain their library of games, connect with other gamers for social networking and multiplayer gaming, and access other ancillary services like the tracking of gaming achievements.  The Steam Gaming Platform is by far the largest PC Desktop Gaming Platform in the United States (and the world), and PC game publishers consider it essential for their games to be compatible with the Steam Gaming Platform in order to reach the vast majority of their potential customers.

9.     But if a game publisher wants to sell a game that is enabled for the Steam Gaming Platform, Valve mandates by contract that the publisher list the game for sale in the Steam Store, where it is subject to Valve's 30% commission on nearly every sale.[3]  Game publishers have no ability to avoid this arrangement by, for example, selling games enabled for the Steam Gaming Platform only through other distributors.  Valve prohibits that competitive option.

10.     To the extent Valve allows a publisher to make any sales of Steam-enabled games through other storefronts at all, Valve polices such sales with a heavy hand, ensuring they do not constitute a threat to Valve's dominance.  For example, if Valve learns that a publisher is selling a

---

[2]   While gamers, publishers, and industry insiders sometimes colloquially refer to Steam as a single product, there are in fact two separate components to Steam—the Steam *Gaming Platform* (where games are played) and the Steam *Store* (where games are bought and sold).

[3]   Before October 1, 2018, Valve charged a 30% commission fee on all game sales.  As of October 1, 2018, Valve has three tiers for its commission fee: 30% on all of a game's earnings under $10 million; 25% on all of a game's earnings between $10 million and $50 million; and 20% on all of a game's earnings over $50 million.  This change is largely superficial, however, and the vast majority of sales to consumers through the Steam Store remain at the 30% commission rate.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

3

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

substantial number of Steam-enabled games through competing stores, Valve will threaten that publisher with punishment which can include having their game removed from the Steam platform entirely.  Valve's tie thus ensures that any publisher seeking access to the Steam Gaming Platform must agree that the vast majority of its digital game sales will be through the Steam Store, where Valve takes its 30% cut.

11.     In addition, Valve uses its PMFN to control the prices of games sold in the Steam Store and in *other stores*.  Valve's PMFN mandates that a game publisher cannot sell games that are for sale in the Steam Store at lower prices in any other store, and Valve even applies that price-parity restriction to game versions that are not enabled for the Steam Gaming Platform.

12.     To illustrate how the PMFN works, consider a game publisher who develops a game called "GAME ONE."  Given Valve's dominance, that publisher will almost certainly need to market a version of the game that is enabled for the Steam Gaming Platform in order for it to be commercially viable.  Pursuant to the tie, Valve then requires that the game be sold in the Steam Store, where the publisher must set its price high enough to account for Valve's 30% commission. Valve might allow the publisher to sell a small volume of Steam-enabled games outside of the Steam Store, but requires that they be sold at prices higher or equal to the Steam Store price.

13.     And it does not stop there.  Suppose the game publisher also develops a version of GAME ONE that is not enabled for the Steam Gaming Platform and will not be sold in the Steam Store.  Valve interprets its PMFN to mandate that the publisher cannot sell *that version* in other stores for a cheaper price, even when the competing store has a much lower commission.  Valve thus prevents the game publisher from selling at a lower price on the alternative store, even when the publisher profitably could do so, and thus effectively blocks all price competition.

14.     As explained by the founder and CEO of Epic Games ("Epic"), one company that has tried to compete against Valve, "Steam has veto power over prices, so if a multi-store

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

4

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

developer wishes to sell their game for a lower price on the Epic Games store than Steam, then…
Valve can simply say 'no.'"[4]

15.     Valve makes game publishers agree to the PMFN as a requirement to access the
Steam Gaming Platform.  Valve explicitly requires that publishers agree that games sold elsewhere
must be sold "in a similar way to how you sell your game on Steam."[5]  And Valve interprets this
language to encompass price parity, forcing game publishers to charge the inflated Steam Store
price across the marketplace, on *all* game sales, even sales of games that are not enabled for the
Steam Gaming Platform.

16.     Valve's PMFN harms the entire industry by removing the ability of competitive
forces to drive lower commissions and lower prices.  Absent Valve's PMFN, competitive forces
would put downward pressure on Valve's bloated 30% commission due to game publishers selling
games for less on stores that charge lower commissions.  Those competitive pressures would force
Valve to lower its commission in an effort to compete on price with its rivals.  That would
promote competition and lead to overall lower prices, benefiting game publishers and consumers
alike.  But Valve's anticompetitive PMFN blocks these benefits from occurring.

17.     Because of Valve's tie and its PMFN, other competing game stores cannot drive
volume to their stores by charging lower commissions, as Valve prevents game publishers from
selling their games for less on those stores.  While several game stores have tried to compete with
Valve by charging lower commissions, those efforts have failed to make a dent in the Steam
Store's market share because publishers using those distributors had to charge the same inflated
prices they set on the Steam Store.

18.     Similarly, publishers cannot discipline Valve's excessive commissions by steering
gamers to lower-commission storefronts with lower retail prices.  Thus, publishers reluctantly
market their games primarily through the dominant Steam Store where, year after year, Valve

---

[4]  Tim Sweeney (@TimSweeneyEpic), TWITTER (Jan. 30, 2019, 9:29 AM),
https://twitter.com/timsweeneyepic/status/1090663312814157824?lang=en.

[5]  *Steamworks Documentation, Steam Keys*, STEAMWORKS,
https://partner.steamgames.com/doc/features/keys (last visited Dec. 20, 2021).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563                                        5

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

continues to take its 30% fee on nearly every sale.  No wonder that a former Valve employee described the Steam Store as a "virtual printing press" that imposes a "30% tax on an entire industry."[6]

19.     Relatedly, Valve also mandates that publishers use its "Steam Wallet" for any in-game purchases.  Specifically, Valve requires that: "For any in-game purchases, you'll need to use the microtransaction API so Steam customers can only make purchases from the Steam Wallet." When publishers comply and use Valve's microtransaction system, they again must pay Valve's 30% supracompetitive commission.

20.     Valve's anticompetitive scheme has been wildly successful.  It has cemented Valve's dominance and its ability to extract supracompetitive profits, with no end in sight. Innovation is the engine of the video game industry, but Valve's imposition of its supracompetitive tax suppresses innovation and output across the industry while elevating the prices of PC Desktop Games.  Forced to pay Valve's exorbitant tax, game publishers have fewer resources to invest in creating new games and must charge higher prices than they would in a competitive market.

21.     The global market for PC Desktop Games is worth approximately $30 billion annually, about $20 billion of which is revenue from in-app purchases made primarily in "free to play" games and $10 billion of which is revenue from upfront purchases.  With the Steam Store's 75% share, that means approximately $7.5 billion in upfront sales occur through the Steam Store per year, and Valve receives about $2 billion or more per year from Steam Store commissions largely just for serving as a middleman between publishers and gamers.  With roughly 350 employees, Valve's per-employee profit from the storefront alone is over $5 million, making Valve, by that metric, one of the most profitable companies in the world.[7]

---

[6]  Andrew McMahon, *Former Valve Employee Says Steam Was Killing PC Gaming, Epic Games Is Saving It*, TWINFINITE (Apr. 8, 2019), https://twinfinite.net/2019/04/former-valve-employee-says-steam-was-killing-pc-gaming-epic-games-is-saving-it/.

[7]  As a private corporation, Valve does not make its financial statements publicly available.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

6

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

22.     These are astonishing figures for Valve's limited middleman role, and these sustained inflated profits reflect that competition is not working as it should.  Meanwhile, Valve devotes only a small percentage of its revenue to maintaining and improving the Steam Store, and dedicates very few employees to that effort.

23.     Ultimately, the only way for game publishers to avoid Valve's anticompetitive scheme is to avoid the Steam Gaming Platform altogether, and not sign any agreements or contracts with Valve.  But time and time again, when publishers or other market participants have tried to create or utilize alternative PC Desktop Gaming Platforms, they have failed to obtain sufficient scale to challenge Valve because of Valve's dominance and anticompetitive restraints.  These failed efforts include some by the most sophisticated and largest gaming and technology companies in the world, such as Electronic Arts ("EA"), Microsoft, Amazon, and Epic.

24.     The failure of these deep-pocketed companies to challenge Valve in this space demonstrates that Valve's monopoly power in both the PC Desktop Gaming Platform (through the Steam Gaming Platform) and PC Desktop Game Distribution (through the Steam Store) markets is durable and virtually impossible to overcome given the conduct challenged in this action.

25.     At bottom, Valve's scheme imposes a bloated tax on the PC Desktop Gaming industry.  Valve forces game publishers to use the Steam Store and give Valve 30% of nearly every sale if they want to gain access to the Steam Gaming Platform—access they need to sell their games.  To afford Valve's 30% commission, game publishers must charge higher prices to consumers and have fewer resources for innovation and creation.  Game quality and choice suffers as a result, and gamers are injured by paying higher retail prices for fewer and lower-quality games.  Competition, output, and innovation are suppressed, in ways that can never be fully redressed by damages alone.  Thus, in addition to damages, injunctive relief removing Valve's anticompetitive provisions is necessary to bring competition to the market and benefit the public.

**PARTIES**

26.     Defendant Valve Corporation is a Washington Corporation with a principal place of business at 10400 NE 4th ST, Suite 1400, Bellevue, Washington, 98004-5174.  Valve, an American video game developer, publisher, and digital distribution company, operates a PC

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

7

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   Desktop Gaming Platform (the "Steam Gaming Platform") and a PC Desktop Game Distributor

2   (the "Steam Store").  As discussed herein, the Steam Store imposes an anticompetitive

3   commission of 30% on nearly every computer game sold.

4         27.   Plaintiff Wolfire Games, LLC ("Wolfire Games") is a video game publisher

5   headquartered in San Francisco, California.  Wolfire Games has entered into Steam Distribution

6   Agreements with Valve to make Wolfire Games' PC Desktop Games compatible with the Steam

7   Gaming Platform, and to sell its PC Desktop Games through the Steam Store.  As a result of

8   Defendant's anticompetitive practices, Wolfire Games has paid supracompetitive commissions to

9   Valve for each sale of its PC Desktop Games through the Steam Store and been subject to reduced

10   output and quality in the distribution of its games through the Steam Store.

11         28.   Plaintiff William Herbert is a resident of Florida.  Mr. Herbert has purchased PC

12   Desktop Games through the Steam Store.  As a result of Defendant's anticompetitive practices,

13   Mr. Herbert has paid supracompetitive prices for PC Desktop Games.

14         29.   Plaintiff Sean Colvin is a resident of Carlsbad, California.  Mr. Colvin has

15   purchased PC Desktop Games through the Steam Store.  As a result of Defendant's

16   anticompetitive practices, Mr. Colvin has paid supracompetitive prices for PC Desktop Games.

17         30.   Plaintiff Susann Davis is a resident of Bowling Green, Kentucky.  Ms. Davis has not

18   agreed to the Steam Subscriber Agreement.  Ms. Davis has purchased PC Desktop Games through

19   the Steam Store for her minor child, who has his own Steam account.  As a result of Defendant's

20   anticompetitive practices, Ms. Davis has paid supracompetitive prices for PC Desktop Games.

21         31.   Plaintiff Daniel Escobar is a resident of New York, New York.  Mr. Escobar has

22   purchased PC Desktop Games through the Steam Store.  As a result of Defendant's

23   anticompetitive practices, Mr. Escobar has paid supracompetitive prices for PC Desktop Games.

24         32.   Plaintiff Ryan Lally is a resident of San Diego, California.  Mr. Lally has purchased

25   PC Desktop Games through the Steam Store.  As a result of Defendant's anticompetitive practices,

26   Mr. Lally has paid supracompetitive prices for PC Desktop Games.

27         33.   Plaintiff Hope Marchionda is a resident of Bowling Green, Kentucky.  Ms.

28   Marchionda has not agreed to the Steam Subscriber Agreement.  Ms. Marchionda has purchased

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

8

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

PC Desktop Games through the Steam Store for her minor child, who has his own Steam account. As a result of Defendant's anticompetitive practices, Ms. Marchionda has paid supracompetitive prices for PC Desktop Games.

34.     Plaintiff Everett Stephens is a resident of Cincinnati, Ohio.  Mr. Stephens has purchased PC Desktop Games through the Steam Store.  As a result of Defendant's anticompetitive practices, Mr. Stephens has paid supracompetitive prices for PC Desktop Games.

### JURISDICTION AND VENUE

35.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Valve for the injuries to Plaintiffs and the Class, alleged herein, arising from Valve's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs also assert claims under Washington's Consumer Protection Act, RCW 19.86, seeking treble damages and injunctive relief under RCW 19.86.090.

36.     The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a).  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

37.     This Court has personal jurisdiction over Valve because Valve's headquarters are located in Bellevue, Washington.  Valve has engaged in sufficient minimum contacts with the United States and has purposefully availed itself of the benefits and protections of both United States and Washington law such that the exercise of jurisdiction over Valve would comport with due process.

38.     Valve also is subject to personal jurisdiction because, either directly or through its agents or affiliates, Valve transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action.

39.     Additionally, the Court has jurisdiction over Valve because its principal place of business is in Washington State.

40.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 because Valve is found in and transacts business in this District.

41.     Venue also is proper pursuant to 28 U.S.C. § 1391(b), (c), and (d) because, during the relevant period, Valve resided, transacted business, was found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

## FACTUAL ALLEGATIONS

### I.      BACKGROUND

42.     A video game is an electronic game that can be played on a computing device, such as a PC, gaming console, smartphone, or tablet.  As of 2021, there are roughly 3 billion video game players worldwide.

43.     Video games are subcategorized by the type of device on which gamers play them, including computer games (*e.g.*, PC games), console games (*e.g.*, PlayStation or Xbox games), and mobile games (*e.g.*, games played primarily on smartphones or tablets).  Any game developed for a particular type of device will only work for that type of device (*e.g.*, a PC game will work only on a PC), and, as detailed below, different versions of PC games are often also created for specific PC Desktop Gaming Platforms, like the Steam Gaming Platform.

44.     PC Desktop Games are video games that are downloaded and installed onto a PC device.  Although such games vary in size, scope, type, and features, they all involve the ability to load the game directly from the user's computer and then allow the user to play the game from that computer.  All require installation on the user's PC to work, and all save data on the user's PC, both for the purposes of running the game, as well as for saving game progress or preferences (such as control schemes, sound and video preferences, etc.).

45.     PC Desktop Games are almost as old as PCs themselves.  PCs first came to prominence in the 1980s and, at that time, numerous game publishers released games for this new type of computing device.  As PCs' popularity grew, so, too, did the popularity of PC Desktop

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

10

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

Games.  In 2020, the revenue from the worldwide PC Desktop Gaming Market was at least $30 billion.

46.     For most of the history of the PC Desktop Game industry, due to technology limitations, gamers purchased most PC Desktop Games at brick-and-mortar locations.  When users purchased such games, they received physical media, such as a CD-ROM, that could be brought home and installed on their computers.

47.     Brick and mortar retailers had and have substantial costs that are not incurred by digital retailers. They need to pay for real estate, shipping, inventory management, personnel, and other costs inherent to operating real-world stores. Brick and mortar retailers also have very thin profit margins. For example, Walmart's "net margin"—which is the ratio of net profit divided by revenue—is a mere 1.4% over the last 10 years[8] That means for every $100 in product that Walmart sells, only $1.40 of that is retained as profit for the company, with the rest going to employees, real estate, and the like.  Brick-and-mortar retailers have thus historically charged higher commissions for video game publishers who make their games available at the retailer; typically, around 30%.  But a brick-and-mortar retailer like Walmart does not get to keep anywhere near the full (or even a substantial amount) of its 30% commission as profit—it needs to pay for employees, utilities, real estate, inventory, and the like.

48.     In contrast, digital distributors of PC Desktop Games have substantially lower costs; several orders of magnitude cheaper.  That discrepancy, coupled with the convenience of buying and then downloading even huge PC Desktop Games at home due to increased internet speeds, opened the possibility for disruption by digital distributors. Digital distributors could avoid the vast majority of costs that brick-and-mortar retailers must incur as a fundamental aspect of their business model, thus making substantially more profits on PC Desktop Game sales than brick-and-mortar stores. And, in a competitive market absent the restraints imposed by Valve, these factors should have delivered far lower commissions and prices.

---

8   Table displaying *Competitive Comparison Data*, GURUFOCUS.COM, https://www.gurufocus.com/term/netmargin/WMT/Net-Margin-Percentage/Walmart%20Inc (last visited Dec. 20, 2021)..

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

49.     As technology improved, digital distribution slowly took hold beginning in the 1980s and 1990s.  One of the first examples came in 1983 with the GameLine service for the Atari 2600, developed by Control Video Corporation ("CVC").  GameLine allowed users to rent and download games over telephone lines.  CVC gradually expanded the services it provided and became America Online ("AOL") in 1991.

50.     AOL launched with several games, including Neverwinter Nights, an online multiplayer game based on Dungeons & Dragons.  Thousands of publishers sold games and other software online through AOL, in the form of demos or Shareware (*i.e.*, software available for free but with a fee requested for continued use).  Often publishers would distribute the full product online, but lock some functionality behind a registration code, which could be purchased directly from the developer.  Other times they distributed a demo version of the product, and provided instructions for the consumer to purchase the full product.

51.     In the early 2000s, AOL was in decline, and there was a void in the market for digital distribution of games on PC.  Many competitors rushed to fill this void, including Amazon, GameStop, Microsoft, EA, IGN, GOG, Direct2Drive, Stardock, and others.  Publishers normally sold their products directly to consumers via their own website, and used these other services to provide additional convenience for users who wanted a more store-like experience.  One of the earliest digital distribution platforms was Stardock Central, which was released in 2001.  In this fledgling stage of digital distribution in the overall distribution market, there was vibrant competition between these digital distributors, although their relative costs were much higher than they are today, the distribution model was not yet adopted on a widespread basis, internet speeds still needed to improve to make downloading such large files truly viable, and none had yet grown to substantial size.  As detailed below, however, once Valve released the Steam Store in 2004, it quickly devised a way to stifle competition and gain market power by forcing consumers of its then-coveted games (most prominently, Half-Life 2) to install and use the Steam Gaming Platform, which then operated as the means by which Valve quickly obtained and then anticompetitively maintained market power.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

12

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

52.     When games are purchased digitally consumers can download the game directly to their PC.  There is no need to visit a physical distribution outlet or obtain physical media for the game.  Today, the substantial majority of PC Desktop Game sales are digital, and made through digital distributors (of which the Valve Steam Store is the undisputed dominant player).

**A.     Valve—A PC Desktop Game Publisher Turned Gaming Platform Monopolist**

53.     Valve was founded in 1996 by former Microsoft employees and originally operated solely as a company that developed video games.  Valve's first game was the critically acclaimed PC Desktop Game, Half-Life, in 1998, which could be purchased at stores like GameStop and was playable on personal computers without any gaming platform.  It was one of the most notable games released that year, comparable to other 1998 titles like Metal Gear Solid, Zelda: Ocarina of Time, Pokemon Red & Blue, Fallout 2, Baldur's Gate, Rainbow Six, Starcraft, Tribes, Myth 2, House of the Dead, Castlevania: Symphony of the Night, and Thief: The Dark Project.  After Half-Life became hugely popular, Valve published other popular games such as Counter-Strike.

54.     Prior to the introduction of the Steam Gaming Platform, Valve games that featured online multiplayer capabilities, such as Half-Life and Counter-Strike, used the third-party World Opponent Network ("WON").  WON was created by Sierra, the original publisher of Half-Life and other PC games. In 2001, Valve acquired WON and its 1.5 million user base.  Valve continued to operate WON for Half-Life, Counter-Strike, and other Sierra-published PC games as it began to develop the Steam Gaming Platform.

55.     In 2003, Valve launched the Steam Gaming Platform which, at the time, centered primarily on providing a patch and update process for Valve-developed games.  Patches fix flaws, or "bugs," in a game's software after initial release, while updates often incorporate new functionality or content into the game.  Prior to introducing the Steam Gaming Platform, Valve had difficulty with providing patches and updates for its games, which created problems for Valve because its games often involved an online multiplayer component that required the various copies of games that users owned to interact with each other.  Because users often obtained different versions of the games (*e.g.*, v1, v1.1, v1.2, etc.), they could have compatibility problems which

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

13

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  would prevent them from playing together.  The Steam Gaming Platform provided a central

2  location for Valve customers to receive those software updates and keep their games up to date.

3       56.     There was no store component to Steam at launch, and Steam was functionally only

4  a PC Desktop Gaming Platform.  Thus, computer gamers would purchase their computer games

5  from other distributors like GameStop or BestBuy and then add purchased games to the Steam

6  Gaming Platform on their PC.  Distribution and Gaming Platform were thus completely separate

7  processes and products.

8       57.     Valve launched the distribution component of Steam when Valve released its

9  blockbuster hit Half-Life 2 in 2004.  At release, consumers could buy Half-Life 2 from any of the

10  traditional brick and mortar sources, but for the first time consumers could also buy Half-Life 2

11  through the new Steam storefront.

12       58.     Although consumers could *buy* Half-Life 2 from a variety of distributors, they

13  could only *play* it using the Steam Gaming Platform as the PC Desktop Gaming Platform.  Users

14  that purchased the game using traditional distribution channels were provided with codes they

15  could submit to the Steam Gaming Platform to add Half-Life 2 to their libraries, along with an

16  installer for the Steam Gaming Platform so the Steam Gaming Platform could be readily installed

17  on their PCs.  In 2004, Valve also shut down WON and forced all WON users to download and

18  install the Steam Gaming Platform for multiplayer functionality, even gamers who had purchased

19  Half-Life and Counter-Strike years before the introduction of the Steam Gaming Platform.

20  Through these practices, Valve did what smaller publishers (Stardock) or non-publishers

21  (GameStop and Direct2Drive) could not do—use a blockbuster hit and its control of a popular

22  multiplayer service to force its gaming platform onto the market.

23       59.     This meant that the Steam Gaming Platform instantly became a must-have platform

24  in the market for PC Desktop Gaming Platforms. Consumers had no choice but to use Valve's new

25  platform to play the blockbuster hit Half-Life 2 and continue to play other popular Valve and non-

26  Valve PC games online. The small PC Desktop Gaming Platforms that had eked out a position in

27  the market hosting lesser-known games quickly fell to the wayside, as they could not similarly

28  compel consumers to use their own PC Desktop Gaming Platforms or stores.

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

14

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

60.     Indeed, Valve required all players to log into Valve's servers through Steam to run Half-Life 2 at all, even if they bought a physical copy.  Consumers could not access the game unless they created an account on Valve's servers with their personal information, permanently locked their purchased key to that account, and allowed Valve to track all activity within the game and add or remove files on their PC at will.  After Valve forced gamers to use the Steam Gaming Platform to play Half-Life 2 and all other Valve games, the Steam Gaming Platform grew and ultimately provided Valve with a massive incumbency advantage and contributed to its dominance in the market for PC Desktop Gaming Platforms.

61.     At launch, customers could only buy Valve-published games on Steam.  Moreover, it is notable that the Steam Gaming Platform initially launched *without* the Steam Store, because the store side of the platform was not critical to the Gaming Platform's nature; most people who initially installed and used the Steam Gaming Platform, for example, did so because it was included in a physical copy of a PC Desktop Game they purchased from a brick-and-mortar store. The initial launch of Steam as a PC Desktop Gaming Platform *without* a separate store thus demonstrates that the Steam Store is not an essential ingredient of Valve's overall method of business with customers; it is a way for Valve to make additional profits—one that it shifted to instead of game development over the years, because it was so much more profitable.  But Valve eventually became a full-fledged distributor of PC Desktop Games when it began distributing games developed and published by third parties, such as Rag Doll Kung Fu and Darwinia.  Valve kept a 30% portion of the revenue paid by purchasers for sales of these third-party games, functioning as the digital equivalent of a physical distributor.

62.     By roughly 2005, Valve was thus well positioned as the market leader in an industry at the cusp of transition—digital distribution was in its fledgling stages but had obvious advantages (including significant cost advantages) over legacy brick-and-mortar distribution.  And Valve was able to strong-arm consumers into using its PC Desktop Gaming Platform not on the merits of its platform, but rather by compelling consumers to use its platform just to play Valve's then-marquee games. The only threat Valve faced at that time was the prospect of rival platforms

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

15

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1  or distributors coming on to the scene and disrupting Valve's monopoly position.  But, as detailed

2  herein, Valve blocked that from happening through anticompetitive conduct.

3      63.     Economics instructs that supracompetitive prices are those that are priced

4  substantially above marginal cost.[9]  Physical retailers maintained a roughly 30% commission at

5  the time Valve launched Steam, because that commission reflected the substantial costs that brick-

6  and-mortar retailers must bear, including the significant costs of real estate.  But the cost structures

7  of a physical brick-and-mortar retailer and a digital retailer are vastly different. Valve was not a

8  physical retailer that had meaningful real estate, personnel, or inventory costs.  Its variable costs of

9  digital distribution were and are near $0.  That means that the 30% commission it charged at the

10  time, and now, is nearly pure profit.  In a competitive market, absent Valve's restraints, economics

11  provides that the commissions charged after the advent of digital distribution would decrease to

12  reflect the far lower costs of that distribution format.

13      64.     The fact that physical retailers charged 30% and Valve did the same thus does not

14  indicate Valve's 30% commission was a competitive rate, much less that it remains one today.

15  The economically correct inference is that Valve's ability to capture the cost differences between

16  brick-and-mortar retail and digital retail as profit should have been a transitory, temporary

17  economic profit that should dissipate over time in a well-functioning competitive market.

18  Examples of this phenomenon abound.

19      65.     Consider, for example, the introduction of generic pharmaceuticals.  In the United

20  States, the first generic entrant that successfully files a substantially complete ANDA

21  ("abbreviated new drug application") with the FDA gains legal exclusivity to sell generics (a

22

23

24  _____

25  [9]   *See* DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION 137
    (2d ed. 1994) ("Whenever a firm can influence the price it receives for its product, the firm is said
26  to have *monopoly power* (sometimes called *market power*). The terms *monopoly power* and
    *market power* are used interchangeably to mean the ability to profitably set price above
27  competitive levels (marginal cost) . . . .").

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE No. 2:21-CV-563

16

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   monopoly) for six months.[10] The so-called "initial generic monopolist" often is able to set prices at

2   20%-30% higher than long-run marginal costs, but prices "steadily decline with an increase in the

3   number of producers."[11]  Thus while the first-mover is able to enjoy an initial artificial advantage

4   conferred by statute, when competition comes on the scene, prices come down.

5       66.      More generally, one paper discussing this phenomenon explains that a "typical

6   pattern" for a new industry/product is "to have an initial phase in which a small number of firms

7   each earn significant profits, followed by a phase in which rapid entry of new firms leads to

8   increased competition and dissipation of some of those profits."[12]  Another paper explains a

9   typical economic pattern is for "a young industry" to be populated "by a few small firms" that

10  command "a high price."[13]  But eventually "entry then expands the number of firms and each

11  produces more, the combined effect being to raise output dramatically and lower price."[14]

12      67.      Valve has denied publishers and gamers these economic benefits.  Through its

13  anticompetitive conduct, as detailed below, Valve has blocked the following "phase in which rapid

14  entry of new firms leads to increased competition and dissipation of some of those profits."  As

15  discussed below, while many digital competitors have tried to enter the market, Valve has blocked

16  meaningful competition, and maintained its very high prices and profits, to the detriment of game

17  publishers and consumers.

18      68.      As noted, economics predicts that pricing should approach cost as rivals in a

19  competitive market will continue to undercut each other until the market reflects a competitive

20  level of profit, and therefore Valve's 30% commission should have decreased dramatically over

---

10   Zachary Brennan, *180-Day Exclusivity for Generics: FDA Releases Draft Guidance*, RAPS (Jan, 12, 2017), https://www.raps.org/regulatory-focus%E2%84%A2/news-articles/2017/1/180-day-exclusivity-for-generics-fda-releases-draft-guidance.

11   David Reiffen & Michael R.Ward, *Generic Drug Industry Dynamics*, 87 REV. ECON. & STAT. 37 (2005).

12   *Id.*

13   Jovanovic & MacDonald, *The Life Cycle of a Competitive Industry*, 102 J. POL. ECON. 322 (1994).

14   *Id.*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

17

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   time.  Yet, for nearly twenty years, Valve has maintained its 30% fee for nearly all games sold

2   through the Steam Store, demonstrating that the market for PC Desktop Game Distribution is not

3   competitive.  Valve's 30% commission was thus supracompetitive at launch, but, more

4   importantly, is even more supracompetitive today because Valve has prevented competitors from

5   competing on price through its anticompetitive restraints, even though its own costs have

6   decreased over the years, and its would-be competitors' costs have similarly decreased while they

7   have tried in many different forms to compete with Valve on price (but failed due to its continuing

8   monopoly power and anticompetitive restraints).

9        69.     Simply put, Valve's anticompetitive scheme enables it to charge brick-and-mortar

10  prices in a digital world.  As a result, it reaps windfall profits at astronomical levels, and game

11  publishers and consumers suffer.

12       70.     Over time, Valve added some limited features to the Steam Gaming Platform that

13  further increased the network effects on the Steam Gaming Platform, helping to cement Valve's

14  dominance in the PC Desktop Gaming Platform Market.  These included social networking

15  features, communities of game "modders," and an achievement system where gamers could track

16  their progress on games.  Today, gamers with Steam Gaming Platform accounts can create a social

17  network of friends and teammates that any game on the platform can access.  This means that

18  gamers do not need to search for their friends each and every time they purchase a new computer

19  game or want to play a game they already own with friends; they can log on to the Steam Gaming

20  Platform and can see who is online or invite friends through the platform to join them in a game.

21       71.     In 2017, the Steam Gaming Platform reported 67 million monthly active users.[15]

22  By 2020, the Steam Gaming Platform reported 120 million monthly active users, 62.6 million

23  _____

24  [15]  Taylor Soper, *Valve reveals Steam's monthly active user count and game sales by region*,

25  GEEKWIRE (Aug. 3, 2017), https://www.geekwire.com/2017/valve-reveals-steams-monthly-
    active-user-count-game-sales-region/.  "Monthly active users" refers to the number of unique

26  customers who interacted with a product or service of a company within a month.  Monthly active
    users is a key industry performance indicator that measures online user engagement, used by

27  internet businesses, including social networking, online gaming, and mobile app companies.  *See*
    *What Are Monthly Active Users (MAU)?,* CORP. FIN. INS.,

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563                                                    18

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

daily active users, 24.8 million peak concurrent users, and 2.6 million per month first-time purchasers.[16]  The Steam Gaming Platform grew from offering seven games in 2004 to over 45,000 by 2021.[17]

72.     In addition, the Steam Store and Steam Gaming Platform give Valve direct access to private business information of almost every competing development studio, including who bought their games, when customers played them, who they played them with, what they said to each other while playing, which regions the players live in, when the publishers accessed their financial information, and much more.  Through the Steam Keys program, discussed further below, Valve also has accumulated detailed internal information about the operations of competing storefronts.  Valve shares virtually none of this data with publishers who sell their games on the Steam Store, even in aggregated and anonymized form.

## II.     RELEVANT MARKETS

73.     In addition to publishing its own PC Desktop Games, Valve competes in two distinct relevant economic markets—the market for PC Desktop Gaming Platforms and the market for PC Desktop Game Distribution.

74.     In the market for PC Desktop Gaming Platforms, competing platforms provide a local and online space where gamers can play, maintain, communicate with other gamers, and track progress and achievements on their PC Desktop Games.

75.     In the market for PC Desktop Game Distribution, distributors intermediate transactions between game publishers and gamers, allowing gamers to purchase PC Desktop Games and allowing publishers to sell PC Desktop Games.

---

https://corporatefinanceinstitute.com/resources/knowledge/ecommerce-saas/monthly-active-users-mau/ (last visited Dec. 20, 2021).

[16]   Rich Stanton, *Steam had 120 million monthly users in 2020*, PC GAMER (Jan. 13, 2021), https://www.pcgamer.com/steam-had-120-million-monthly-users-in-2020/.

[17]   Rich Stanton, *Steam had 120 million monthly users in 2020*, PC GAMER (Jan. 13, 2021), https://www.pcgamer.com/steam-had-120-million-monthly-users-in-2020/.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

**A.      The Distinctiveness of PC Desktop Games**

76.      Both relevant markets have their contours defined by PC Desktop Games.[18]  PC Desktop Games are a distinct set of video games that are not interchangeable with other types of video games, including console games and mobile games.

77.      Video games are generally developed for specific hardware systems, like PCs or consoles.  Versions or editions of video games that are designed for specific hardware systems do not function on alternative hardware systems.  For example, a PC Desktop version of a game will not function on the PlayStation.  Game developers and publishers incur costs when trying to port their games from one hardware system to the other, including development costs, organizational costs, and quality-control costs.

78.      Nonetheless, some publishers develop different versions of the same game for different hardware systems.  But even for games that are implemented across multiple hardware systems, the hardware-specific versions of those games are not interchangeable, meaning an Xbox version of a particular game is not interchangeable with a PC version of that same game, for several reasons.  First, gamers make deliberate choices about which hardware systems to utilize, and once that choice is made, they remain on that platform because of lock-in effects.  For example, a gamer that owns an Xbox along with several Xbox accessories such as controllers cannot use the PlayStation edition of a game without duplicating all of their hardware purchases.  In this regard, a major advantage and differentiator for the PC as a hardware system is that most people have access to a PC already, and therefore there are no additional hardware costs required for gameplay.

79.      Second, even for gamers who already own multiple hardware systems—like gamers that own both a PC and an Xbox—versions of the same game are not interchangeable, because different hardware systems offer different functionality and features.  Relative to consoles, PCs offer more immersive and customizable control options for gamers.  PC Desktop

---

[18]   The use of "PC Desktop" herein does not draw a distinction between portable laptop computers and non-portable personal computers.  All PC devices are considered Desktops for purposes of this Complaint.

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

20

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

gamers can plug in the equivalent of a console controller and use that for gaming purposes, but they also can use a keyboard and mouse, joystick, and numerous other types of controls.  By contrast, console gamers can only use the console manufacturer's controllers, or authorized third-party controllers.  Flexibility in controller type is one reason that many gamers choose PC Desktop gaming over console gaming.

80.     Because of their power and flexibility, PC games are considered the "high end" of the broader gaming universe, with consoles at the next level down, and mobile gaming at the very low end of the broader universe.  As an industry analyst explains, "PC gaming offers a seriously high-level of customization, which is a driving force behind its popularity.  You can build a PC to fit a wide range of budgets and needs.  A PC also is upgradeable so you can always keep up with the latest tech or even start smaller and build over time."[19]

81.     Conversely, "[m]ost games on a mobile device are going to be smaller and much-less graphically intense than a PC or console version" and "[a]lthough consoles aren't as powerful as high-end gaming PCs, they are cheaper to purchase."[20]

82.     In the modern era, gaming systems also typically feature gaming platforms, which are software systems that allow gamers to readily access and play their library of digital games.  Gaming platforms also allow users to access ancillary services that enhance their gaming experience, such as through social networking, achievement tracking, and the ability to obtain digital goods for their games and their platform account.

83.     Console hardware systems, for example, a PlayStation, provide a single pre-installed gaming platform on the console.  For PCs, as detailed further below, there are multiple PC Desktop Gaming Platforms available, including Steam, EA Origin, Epic Games Store, and Ubisoft Connect.  Unlike console hardware systems, gamers can install multiple PC Desktop Gaming Platforms on their PCs if so desired.

---

[19]  Tony Brown: *Mobile vs. PC vs. Console Gaming: Which Is Best?*, GAMSPACE.COM  (Aug. 5, 2020), https://www.gamespace.com/all-articles/news/mobile-vs-pc-vs-console-gaming-which-is-best/.

[20]  *Id.*

84.     Gamers experience lock-in effects from the use of specific gaming platforms. Gamers develop large game libraries on the platforms of their choice, along with social networks and other features.  This makes it less likely the gamer will switch platforms or view versions of games enabled for different platforms as interchangeable.  A gamer who has an extensive list of friends on the Steam Gaming Platform along with a large library of games is less likely to purchase the Xbox edition of the game, even if she owns an alternative platform like the Xbox.

85.     Moreover, games that allow online multiplayer gaming do not always allow the players on each platform to game together across different hardware systems or different gaming platforms.  For example, a game released on both PC Desktop and PlayStation does not necessarily allow the PC Desktop gamers to play with the PlayStation gamers.  The same is true across PC Desktop Gaming Platforms like the Steam Gaming Platform and the Epic Games Store (the "EGS Platform").  While both platforms utilize PC hardware, it is still not guaranteed that multiplayer functionality will work across platforms.  Therefore, if a gamer has built a large social network on a specific gaming platform, she may lose the ability to enjoy multiplayer games with others in her social network if she switches gaming platforms.

86.     For all of those various reasons, PC Desktop Games are not reasonably interchangeable with other types of games.  Standard economic tests confirm this conclusion.  A hypothetical monopolist in the PC Desktop Games market—*i.e.*, a hypothetical company that was the sole publisher of PC Desktop Games—could profitably impose a small but significant and non-transitory increase in quality-adjusted price ("SSNIP") that, because of the lock-in effects and other factors above, would not cause gamers to switch away from PC Desktop Games in sufficient numbers to make the price increase unprofitable.  For example, if a game cost $49.99 on PC and console, a 5% SSNIP by a hypothetical monopolist of PC Desktop Games would push the game's price up to $52.50 on the PC.  For the reasons discussed above, a sufficient number of PC Desktop gamers would not switch away from the PC to a console system so as to make the price increase unprofitable to the hypothetical monopolist of PC Desktop Games.  The price increase in this instance would generally not lead the vast majority of gamers to purchase the game on a console instead, because the slight increase would not outweigh the reasons the gamer wanted it on PC in

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

22

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    the first place.  Moreover, if gamers did not already own a console, they will not spend the

2    hundreds of dollars for a new console just to buy the console version of the game due to the PC

3    version price increase.

4        87.    Consistent with these economic realities, industry participants and analysts

5    typically consider PC Desktop Games as a distinct product category from both console and mobile

6    games.[21]  Epic, for example, recently stated in court filings that its main competitor for the

7    distribution of PC Desktop Games is Valve; *not* general game distributors like GameStop.

8        88.    As another example, in the below market summary, the website NewZoo breaks the

9    Global Games market into three categories: PC Games (including both Desktop and non-Desktop,

10   *e.g.*, browser-based, PC Games), Console games, and Mobile games:[22]

---

21   Editorial Team, *Segmenting The Video Game Market 101*, DFC Intelligence (May 7, 2019),
https://www.dfcint.com/dossier/segmenting-video-game-market/; *Market Analysis Report,
Gaming Market Size, Share & Trends Analysis Report By Device (Console, Mobile, Computer),
By Type (Online, Offline), By Region (North America, Europe, APAC, LATAM, MEA), And
Segment Forecasts, 2018 – 2025*, Grand View Research (Jan. 2018),
https://www.grandviewresearch.com/industry-analysis/gaming-industry.

22   Tom Wijman, *The World's 2.7 Billion Gamers Will Spend $159.3 Billion on Games in 2020;
The Market Will Surpass $200 Billion by 2023*, Newzoo (May 8, 2020),
https://newzoo.com/insights/articles/newzoo-games-market-numbers-revenues-and-audience-2020-2023/.  This analysis also subdivides the $36.9 billion PC Games Market into a $33.9 billion
"Boxed/Downloaded PC Games" market (a.k.a. PC Desktop Games) and a $3 billion "Browser
PC Games" market, which as mentioned below, is trending downwards and primarily competes
against Mobile Games.

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000







89. Another category of games at the very low end of the broader gaming universe is browser games playable on websites like Facebook and others. Before mobile devices and games grew in popularity, browser-based games like Farmville were a popular way to enjoy low-fidelity social games. Given the limited technical capabilities web browsers have historically provided, these browser-based games were largely "casual" games meant to cater to a broad audience. Although these browser-based games were technically run from PCs, they were not installed on the user's machine, were limited by the capabilities of internet browser interfaces, and were inferior to mobile games in that such browser-based games traditionally tethered the gamer to the PC itself, preventing gamers from squeezing in a short session while, for example, waiting for the bus on their mobile device. As smartphones gained in popularity starting in 2007, web browser game developers shifted more and more resources to mobile gaming. Today, although web browser games still exist, they are much rarer than before and primarily compete with mobile games. The "Desktop" in the title "PC Desktop Games" excludes web browser games, even though those games are sometimes played while using a PC.

90. Valve also emphasized the distinctions between the different types of gaming markets in a response to a third-party subpoena in an antitrust case between Epic and Apple

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

24

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

pending in the Northern District of California.[23]  There, Valve made the following admissions regarding the definition of the relevant product market:

- "Valve is a privately held company with approximately 350 employees that develops PC video games.  Valve does not make or sell phones, tablets, or video games for mobile devices, or otherwise compete in the mobile market.  Valve also operates Steam, an online platform that lets users purchase and play PC games on their laptops and desktops.  Steam users cannot buy or use mobile apps on Steam."  Valve Letter Brief at 5.

- "Apple, Google and Samsung compete with each other in the mobile app market.  Valve does not compete in that market.  The Court already recognized the relevant market must include the product at issue.  (Case No. 20-cv-05640-YGR) (Dkt. 118 at 12) (citation omitted).  Apple argues the relevant market could be so broad as to include any video game available through any channel, but gives no evidence this might actually be true.  Indeed, the Court noted there is 'little evidence' iOS users owned multiple devices and changed from one to another in response to price changes.  *Id.* at 17 n.19."  Valve Letter Brief at 6–7.

91.     Valve made these statements to maintain that it should not be subject to discovery in the *Epic* case because it was not participating in the same relevant market as the two litigants. Valve's concession that the mobile market and PC games market are different markets holds true for the console market as well.  Valve does not sell, market, or compete in the market for game-console games.

---

[23]  *See, e.g.*, February 18, 2021 Joint Letter Brief Regarding Apple's Subpoena to Non-Party Valve Corporation, *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR, (N.D. Cal. Feb. 18, 2021) ECF No. 346 (the "Valve Letter Brief").

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

25

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

**B.**     **The Market for PC Desktop Gaming Platforms**

92.     A technology platform is a product or service that "creates value by facilitating exchanges between two or more interdependent groups, usually consumers and producers."[24] Technology platforms "create communities and markets with network effects that allow users to interact and transact."[25]

93.     Technology platforms play a major role in the nation's economy, and due to their strong network effects, can often yield immense power and influence for the companies that control them.  As the Majority Staff Report published by the House of Representatives Subcommittee on Antitrust explains, technology platform providers can act as gatekeepers over key channels of distribution, allowing incumbent platforms to "pick winners and losers throughout our economy."[26]  Such platforms can "wield tremendous power" by "charging exorbitant fees, imposing oppressive contract terms, and extracting valuable data from the people and businesses that rely on them."[27]  In many cases, the Digital Markets Report explains that the competitive process in platform markets shifts from "competition in the market to competition *for* the market."[28]

94.     A "PC Desktop Gaming Platform" is a type of technology platform that performs several functions while connecting PC Desktop Gamers and PC Desktop Publishers.  First, a PC Desktop Gaming Platform provides a centralized location for gamers to maintain a library of digital games, regardless of how those games were purchased.  Second, the platform allows users

---

[24]   Alex Moazed, *Platform Business Model – Definition – What is it? –Explanation*, APPLICO, https://www.applicoinc.com/blog/what-is-a-platform-business-model/ (last visited Dec. 20, 2021).

[25]   *Id.*

[26]   Majority Staff Report and Recommendations, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, *Investigation of Competition in Digital Markets* (Oct. 6, 2020) https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519 ("Digital Markets Report") at 6.

[27]   *Id.*

[28]   *Id.* at 37 (*citing* CHICAGO BOOTH STIGLER CTR. FOR THE STUDY OF ECON. & STATE, STIGLER CMTE. ON DIG. PLATFORMS 9 (2019)) (emphasis added).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

26

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   to access ancillary services such as social networking, achievement tracking, and the ability to

2   obtain digital goods for their games and their platform account.  As noted, Valve's offering in the

3   market for PC Desktop Gaming Platforms is the Steam Gaming Platform.

4   95.   Given the unique functionality each PC Desktop Gaming Platform provides and the

5   lack of interoperability between PC Desktop Gaming Platforms, a game publisher must make

6   platform-specific versions of its games.  For example, a publisher may make a version of its game

7   that is enabled for the Steam Gaming Platform and a separate version of its game that is enabled

8   for the platform component of the "EGS Platform."  Publishers generally want to publish game

9   versions for multiple gaming platforms so they can reach a broad swath of their target audience on

10  the other "side" of the platforms—gamers themselves.  Stated differently, publisher demand for

11  gaming platforms is largely, if not entirely, derivative of consumer demand for the platform.

12  96.   But creating alternative versions of games is costly, as shown by the presence of

13  publishers that publish their games solely for the Steam Gaming Platform.  Publishers must often

14  write platform-specific code that makes it costly to publish their games simultaneously on multiple

15  platforms.  As a result, games are often published for use on particular platforms in order to

16  leverage platform-specific features like multiplayer, automatic updates, and social networking.

17  97.   Gamers want to participate in gaming platforms so they can maintain their library

18  of games, conveniently access previously purchased software, and access ancillary services

19  available on the platform, including social networking.  Gamers also want the ability to change

20  hardware systems, such as a new computer, while maintaining access to their library of games.

21  Finally, gamers want the ability to install or remove local copies of games while maintaining

22  access to their digital copies.

23  98.   Due to PC Desktop Gaming Platforms' network effects, gamers also face switching

24  costs when considering the use of alternative PC Desktop Gaming Platforms or the use of other

25  gaming systems generally.  Switching away from a PC Desktop Gaming Platform involves

26  forgoing many of the benefits and features that gamers find desirable on the platform, including

27  their pre-existing social network and access to all of their other games already on the platform.

28  Switching to alternative gaming systems outside of the market for PC Desktop Gaming Platforms

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

27

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   (such as consoles) also involves substantial upfront investment in new hardware, including the

2   console itself and a set of controllers, and the costs of purchasing games (including console

3   versions of any previously-purchased games).

4          99.     That is demonstrated through evidence about the behavior of PC Desktop gamers

5   and how they interact with PC Desktop Gaming Platforms.  If a PC Desktop Gaming Platform

6   obtains an exclusive sales contract with a game publisher, gamers using other PC Desktop Gaming

7   Platforms often react negatively, because they want to use the PC Desktop Gaming Platform of

8   their choice.

9          100.    The exclusive release of Borderlands 3 as enabled for the EGS Platform (and not

10   for the Steam Gaming Platform), for example, triggered a backlash among some gamers, with

11   reactions including "calls for boycotts, Youtube rants, conspiracy theories and review bombing."[29]

12   One user started a petition on the "r/gaming" online Reddit community—a group with over 30

13   million members.  That user argued, "We can't just let Epic Games keep buying out exclusives to

14   their [expletive] launcher.  This is very anti consumer and it is literally epic paying millions to 2k

15   [Borderlands 3's publisher] just to [expletive] over us the buyers.  I really suggest everyone on pc

16   to boycott the game until it releases on steam so Epic does not get any of our money."[30]  If

17   consumers viewed the use of various PC Desktop Gaming Platforms as interchangeable, there

18   would be no objection or protest to the exclusive launch of a game as enabled for a particular PC

19   Desktop Gaming Platform.

20          101.    PC Desktop Gaming Platforms are also not interchangeable with other gaming

21   systems that utilize non-PC hardware, including smartphones (mobile games) or console systems.

22   As discussed above, Valve admitted to and emphasized this distinction in its Letter Brief

---

[29]  Dave Thier, *Rage Over Borderlands 3's Epic Games' Store Exclusivity Is More Legitimate Than It Seems,* FORBES (Apr. 8, 2019), https://www.forbes.com/sites/davidthier/2019/04/08/rage-over-borderlands-3s-epic-games-store-exclusivity-is-more-legitimate-than-it-seems/?sh=46028b247b50.

[30]  u/Mattmo831, *Can we please boycott Borderlands 3 and the Epic Games Store*, REDDIT (Apr. 3, 2019, 6:14 PM), https://www.reddit.com/r/gaming/comments/b8xswj/can_we_please_boycott_borderlands_3_and_the_epic/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

28

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    responding to a third-party subpoena in the case *Epic vs. Apple*, where Valve explained: "Valve

2    does not compete in the mobile app market at issue," "Valve does not make or sell phones, tablets,

3    or video games for mobile devices, or otherwise compete in the mobile market," and "Steam users

4    cannot buy or use mobile apps on Steam."[31]

5        102.    PC Desktop Gaming Platforms also are not reasonably interchangeable with other

6    types of technology platforms (as defined above) because only PC Desktop Gaming Platforms

7    focus on and are designed around PC Desktop Gaming.  Users seek out and use PC Desktop

8    Gaming Platforms primarily for PC Desktop Gaming, and they do not view other types of

9    technology platforms as a substitute for the services PC Desktop Gaming Platforms provide.

10       103.    For example, although Facebook allows for some online gaming, the types of

11   games available on Facebook are limited in type and scope, and the Facebook platform is used

12   primarily for social networking and social media purposes.  Although PC Desktop Gaming

13   Platforms have social networking functionality, that functionality is meant to facilitate and add to

14   a PC Desktop Gaming experience rather than act as the main purpose the user accesses the

15   platform in the first place.

16       104.    The use of a game on a particular PC Desktop Gaming Platform also is not

17   interchangeable with the use of a game on a PC without a PC Desktop Gaming Platform.  Due to

18   the features provided by PC Desktop Gaming Platforms, publishers only distribute games that are

19   enabled for PC Desktop Gaming Platforms to meet the demands of their customers, to ensure

20   Digital Rights Management protocols are followed, and to provide a mechanism to deliver updates

21   and patches to gamers.  Thus, as a practical matter, few games are played today on the PC without

22   a PC Desktop Gaming Platform.

23       105.    As an economic matter, PC Desktop Gaming Platforms are distinct from the PC as

24   a platform.  The PC is itself a platform that connects publishers of PC software to PC users,

25   generally using PC operating systems like Windows, macOS, or Linux.  But PC Desktop Gaming

26   Platforms are functionally platforms within the PC platform—the PC Desktop Gaming Platforms

27

28   [31]   Valve Letter Brief at 5, 7.

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1   themselves create network effects between PC Desktop Game Publishers and PC Desktop Gamers

2   within the PC platform, and provide ancillary services like social networking connecting to

3   gaming that would not be available on the PC without a PC Desktop Gaming Platform.

4         106.    There is little cross elasticity of demand between the use of PC Desktop Gaming

5   Platforms and the use of other gaming platforms.  A hypothetical monopolist in the PC Desktop

6   Gaming Platform Market could profitably impose a small but significant and non-transitory

7   increase in price ("SSNIP"), or lower quality by a small but significant and non-transitory amount,

8   that, because of the lock-in effects and other factors above, would not cause a sufficient number of

9   gamers or publishers to switch away from the use of PC Desktop Gaming Platforms to render the

10   SSNIP unprofitable to the hypothetical monopolist.

11         **C.**       **The Market for PC Desktop Game Distribution**

12         107.    The "PC Desktop Game Distribution" market encompasses distributors of PC

13   Desktop Games.  PC Desktop Game Distributors intermediate transactions between publishers and

14   gamers.[32]  They compete to attract game publishers to sell through their storefronts, and also

15   compete to attract gamers to their storefronts to purchase those PC Desktop Games.  The global

16   market for PC Desktop Game Distribution is worth at least $10 billion annually.[33]  Publisher

17   demand for game distribution is largely, if not entirely, derivative of consumer demand for

18   distribution.

19         108.    Valve is a competitor in the PC Desktop Game Distribution Market through the

20   Steam Store.  The Steam Store sells PC Desktop Games that are enabled for the Steam Gaming

21   Platform.

22

23   ───────────────────────

24   [32]  Publishers and gamers also engage in "microtransactions," or "in-app purchases" in connection
with PC Desktop Games.  Such transactions are not part of the PC Desktop Game Distribution

25   Market because they are not part of the initial video game sale by a publisher to a gamer.  Valve
also extracts an anticompetitive 30% commission from PC Desktop Game microtransactions.

26   [33]  *2020 Year In Review*, SUPERDATA 8, https://www.digitalmusicnews.com/wp-

27   content/uploads/2021/01/SuperData2020YearinReview.pdf (including $6.7 billion "Premium PC"
and $3.7 billion "Pay-to-play PC" but excluding $22.7 billion in "Free-to-play PC"

28   microtransaction revenue).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

30

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

109.     Competitors in this market include both online and brick-and-mortar distributors. As noted above, however, most distribution of PC Desktop Games today occurs digitally via the internet.  One market commentator, for example, recently noted that, "If you're playing on PC, then you probably know that the physical market for games has [all] but disappeared."[34]

110.     This digital distribution model for PC Desktop Games is a relatively new phenomenon.  Widespread digital distribution of PC Desktop Games did not begin in earnest until the 2000s.  Prior to the 2000s, brick-and-mortar distributors such as Best Buy and GameStop dominated the market for PC Desktop Game Distribution.

111.     As discussed above, there were several smaller PC digital game distributors in the early 2000s.  But, faced with Valve's quickly-obtained dominance and ability to compel gamers and publishers to the Steam Gaming Platform, those rival distributors were unable to materially gain a foothold in the market and quickly folded.  For example, early online distributor Stardock was eventually purchased by GameStop in 2011.  But by 2013, the Steam Store had become dominant, after seven straight years of more than doubling its annual sales volume.[35]

112.     The trend toward digital distribution for PC Desktop Games accelerated dramatically as a result of the global pandemic.  Data published in January 2021 indicates that many consumers were increasingly spending their time at home playing video games.[36]  For example, at the beginning of the pandemic in March 2020, Steam saw its concurrent user count

---

[34]  Graham 'Peter' van der Made: *digital vs. physical games price* (June 21, 2017), https://it.inceconsulting.com/qy1wa/8ac80a-digital-vs-physical-games-price.

[35]  Kartik Mudgal, *Valve releases PR; Steam userbase doubles in 2011, Big picture mode coming soon*, GAMINGBOLT.COM  (Jan. 6, 2012), http://gamingbolt.com/valve-releases-pr-steam-userbase-doubles-in-2011-big-picture-mode-coming-soon.

[36]  J. Clement, Increase in video game sales during the coronavirus (COVID-19) pandemic worldwide as of March 2020, STATISTA (Jan. 29, 2021), https://www.statista.com/statistics/1109977/video-game-sales-covid/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

31

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

surge to what was then an all-time high of over 20 million gamers,[37] and the demand for digital distribution of PC Desktop Games has only grown since then.

113.    According to Valve:

While Steam was already seeing significant growth in 2020 before COVID-19 lockdowns, video game playtime surged when people started staying home, dramatically increasing the number of customers buying and playing games . . . . This has led to new highs for monthly active users (120.4 million), daily active users (62.6 million), peak concurrent users (24.8 million), first-time purchasers (2.6 million per month), hours of playtime (31.3 billion hours), and the number of games purchased (21.4% increase over 2019).[38]

---

[37]  Noah Smith, *The giants of the video game industry have thrived in the pandemic.  Can the success continue?,* WASH. POST (May 12, 2020), https://www.washingtonpost.com/video-games/2020/05/12/video-game-industry-coronavirus/.

[38]  *Steam - 2020 Year in Review*, STEAMWORKS (Jan. 13, 2021), https://store.steampowered.com/news/group/4145017/view/2961646623386540826.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

32

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

114.     The below diagram underscores how prevalent digital distribution of PC Desktop Games has become, rising from 20% of PC game sales in 2009 to 83% of PC game sales in 2018:[39]



115.     The PC Desktop Game Distribution Market is distinct from the PC Desktop Gaming Platform Market.  Product offerings in the PC Desktop Game Distribution Market do not include services associated with the PC Desktop Gaming Platform Market, including (1) the ability to play purchased games, (2) the ability to automatically maintain the game and ensure updates are applied, (3) the ability to track achievements and other milestones in the game and advertise such achievements to others, or (4) the ability to social network with others using games.

116.     Valve's "Steam Keys" program also demonstrates that linking the Steam Store to the Steam Gaming Platform is not an essential ingredient of Valve's business strategy.  It is possible to allow any PC Desktop Game Distributor, including Valve's rivals, to sell games that can be played on the Steam Gaming Platform.  Steam Keys are alpha-numeric codes that can be

---

[39] *Breakdown of U.S. computer and video game sales from 2009 to 2017, by delivery format*, STATISTA (Jan. 29, 2021), https://www.statista.com/statistics/190225/digital-and-physical-game-sales-in-the-us-since-2009/#:~:text=In%202018%2C%20a%20record%2083,is%20immediately%20ready%20to%20play.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

33

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  purchased from a third party, which can then be submitted to the Steam Gaming Platform to

2  access a digital copy of the purchased game within the Steam Gaming Platform.  These Steam

3  Keys are sold by rival distributors, including Amazon, GameStop, and Green Man Gaming.  When

4  a gamer purchases a Steam Key from a rival distributor, they can open the Steam Gaming

5  Platform software on their PC and submit the code to add the game in question to their Steam

6  Gaming Platform library—as if they had purchased the game from the Steam Store.  Every sale of

7  a Steam Key occurs through a non-Valve distributor, showing PC Desktop Game Distribution

8  occurs in a separate market from the PC Desktop Gaming Platforms Market.

9      117.    Moreover, the PC as a hardware system is not a purely "closed" system like those

10  offered in the video game console market, as demonstrated by the variety of PC Desktop Gaming

11  Platforms available for use by consumers.

12      118.    Many competitors have offerings in only one of the two relevant markets.

13  Distributors like Green Man Gaming or GameStop do not offer PC Desktop Gaming Platforms,

14  but instead market digital versions of games that can be played on PC Desktop Gaming Platforms

15  other companies operate.  And as discussed below, when EA launched its Origin PC Desktop

16  Gaming Platform, it encouraged distribution of Origin-enabled games through many non-EA

17  distributors, including Amazon, Impulse, and Direct2Drive.

18      119.    For the reasons discussed above, PC Desktop Games are not reasonably

19  interchangeable with other categories of games.  Distribution of PC Desktop Games is therefore

20  not reasonably interchangeable with distribution of other categories of games.  Thus, there is not a

21  significant positive cross elasticity of demand between the distribution of PC Desktop Games and

22  the distribution of other types of video games such as console or mobile games.

23      120.    A hypothetical monopolist in the PC Desktop Game Distribution Market could

24  profitably impose a small but significant and non-transitory increase in price ("SSNIP") that,

25  because of the lock-in effects and other factors above, would not cause an unprofitable number of

26  gamers or publishers to switch their desired format of games (for example, to console or mobile)

27  and therefore switch away from the PC Desktop Game Distribution Market.

28

# III.   VALVE POSSESSES MONOPOLY POWER IN THE RELEVANT MARKETS

121.   As discussed above, separate relevant markets exist for PC Desktop Gaming Platforms and PC Desktop Game Distribution.  The PC Desktop Gaming Platform Market is where games are updated and played.  The PC Desktop Game Distribution Market is where games are bought and sold.  Valve enjoys a dominant market position in both of these relevant markets, with market and monopoly power in each.

## A.   The Steam Gaming Platform Is Dominant in the PC Desktop Gaming Platform Market

122.   Publishers need to market games that are enabled for the Steam Gaming Platform to ensure they can reach their consumers, providing Valve with immense market power in the PC Desktop Gaming Platform Market.  Due to its large market share and user base, game publishers generally consider the Steam Gaming Platform a must-have.  As put by one game publisher, "As a developer, it's scary to have one entrenched company dominating all of PC games since we are completely at Valve's mercy."[40]

123.   According to a long-time Valve employee, "Valve was really all about controlling the flow of an entertaining experience.  Having your hand on that knob, deciding when to turn it up, turn it down."  Thus, the company's name, "Valve," was a "compelling metaphor."[41]

124.   The vast majority of all PC Desktop Games are played today on the Steam Gaming Platform.  As explained by an EA executive, PC game publishers "want to be where the players are," which in the case of PC Desktop Games means the Steam Gaming Platform.[42]  During the

---

[40]   Nick Statt, *Epic vs. Steam: The Console War Reimagined On The PC*, THE VERGE (Apr. 16, 2019), https://www.theverge.com/2019/4/16/18334865/epic-games-store-versus-steam-valve-pc-gaming-console-war-reimagined.

[41]   Youtube.com, "Icons: Valve and Half-Life" (June 9, 2008), https://youtu.be/HUmbVRuT4wo?t=131.

[42]   Chaim Gartenberg, *EA games are returning to Steam along with the EA Access subscription service*, THE VERGE (Oct. 29, 2019), https://www.theverge.com/2019/10/29/20937055/ea-games-steam-access-subscription-service-pc-storefront-jedi-fallen-order-sales.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

35

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

COVID-19 pandemic, for example, there were more than 22 million users on the Steam Gaming Platform in a single day, and over 6.2 million gamers playing games at the same time.[43]

125.     The PC Desktop Gaming Platform Market has many barriers to entry that reinforce Valve's dominance and monopoly power in the market for PC Desktop Gaming Platforms.  These barriers are typical of technology platforms generally.  As discussed in the Digital Markets Report, typical barriers to entry for technology platforms include network effects,[44] switching costs,[45] the accumulation of data,[46] and economies of scale and scope.[47]  All of these barriers to entry apply to the PC Desktop Gaming Platform Market in general, and to the Steam Gaming Platform in particular.  According to a former Valve employee, "in the Internet age, software has close to zero cost of replication and massive network effects, so there's a positive feedback spiral that means that the first mover dominates."[48]

126.     The Steam Gaming Platform connects gamers to gamers and gamers to publishers. As more gamers engage with the Steam Gaming Platform, its value increases for both gamers (direct network effects through the ability of gamers to find others to play games with and to develop a more robust social network) and publishers (indirect network effects through access to more gamers).  In turn, more publishers on the Steam Gaming Platform increases its value for gamers (further indirect network effects).

---

[43]   James Batchelor, *Record number of Steam users online during coronavirus outbreak,* GAMESINDUSTRY.BIZ (Mar. 16, 2020), https://www.gamesindustry.biz/articles/2020-03-16-record-number-of-steam-users-online-during-coronavirus-outbreak.

[44]   Digital Markets Report at 40.

[45]   *Id.* at 41.

[46]   *Id.* at 42-44.

[47]   *Id.* at 45.

[48] Michael Abrash, *Valve: How I Got Here, What It's Like, and What I'm Doing*, RAMBLINGS IN VALVE TIME (Apr. 13, 2012), https://web.archive.org/web/20140328192642/http://blogs.valvesoftware.com/abrash/valve-how-i-got-here-what-its-like-and-what-im-doing-2/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

36

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

127.    Moreover, "[i]n many cases, large technology firms can maintain market power in part because it is not easy for users to switch away from the incumbent's technology."[49]  While it is possible to "multi-home" on PC Desktop Computers by installing multiple gaming platforms, the Steam Gaming Platform creates strong lock-in effects through a user's game library and data in the form of achievements and social connections.

128.    As noted, Valve collects detailed data on game usage, game preferences, social networks, and other facets of its Steam Gaming Platform.  These data collection practices enhance Valve's market power.  The accumulation of such data "can serve as another powerful barrier to entry for firms in the digital economy" and "data-rich accumulation is self-reinforcing."[50]  As explained by the American Bar Association's Antitrust Law Section:

> Big data and data analytics can create and amplify feedback effects.  For example, more people using a product can mean that more data, and more diverse data, will be collected, allowing the company to both improve its products as well as potentially identify and offer new ones.  This in turn can attract more customers, leading to a positive feedback loop, helping a company to grow and potentially dominate the market.  Indeed, data-driven markets may "tip towards one or two products or platforms."[51]

129.    Valve also gains access to, and utilizes, detailed information about its competitors' businesses.  Valve is the gatekeeper for the Steam Gaming Platform, and sets the terms and conditions on which its game-publisher rivals can access the Steam Store and the Steam Gaming Platform.  This allows Valve to favor or punish specific games or publishers, or change the rules when Valve feels threatened in any way by specific game publishers or rivals in the markets for PC Desktop Gaming Platforms and PC Desktop Game Distribution.  It is not unusual for games developed by insider friends or relatives of Valve employees to mysteriously have much greater visibility on the store than those by outsiders.  Valve can also refuse to feature games that it

---

[49]  *Id.*

[50]  *Id.* at 42.

[51]  American Bar Association's Antitrust Law Section, *Artificial Intelligence & Machine Learning: Emerging Legal and Self-Regulatory Considerations*, ABA (Sep. 30, 2019) https://www.americanbar.org/content/dam/aba/administrative/antitrust_law/comments/october-2019/clean-antitrust-ai-report-pt1-093019.pdf ("ABA Big Data Report") at 30 (citing ALLEN GRUNES & MAURICE STUCKE, BIG DATA & COMPETITION POLICY  163 (2016)).

considers threatening, or otherwise punish such games and reduce their visibility on the Steam Store.

130.     Valve's ability to function as a gatekeeper distorts competition because its rivals must weigh the risks of retaliation.  As owner of the Steam Store, which is the primary means of access to the Steam Gaming Platform for publishers, Valve has further gatekeeping power over its rivals and the market as a whole.  Valve has unlimited power to promote Valve's own games on the store.  Valve can add demonstration ("demo") versions of its games directly to every consumer's library, and ensure its own games are at the top of sale queues presented to users. Valve also monitors point-of-sale transactions and microtransactions for its competitors' games.

131.     Valve further has the ability to reject games from its store at any moment, even after they have launched.  Valve has retroactively removed games that consumers have already bought, deleting them from their hard drive.  Valve has removed games because they offend the sensibilities of a specific reviewer, even if they would have been accepted by a different one.  This can also give governments power over business in other countries.  For example, the Steam Store in China has banned all but 53 of the 21,131 games available internationally, and the Steam Store worldwide has refused to publish video games like "Liberate Hong Kong."

132.     Even the largest publishers in the world consider the Steam Gaming Platform a must-have, and their experience demonstrates that creating a rival PC Desktop Gaming Platform is virtually impossible given Valve's dominance and anticompetitive conduct.  EA is a major publisher of games, earning $5.5 billion in gaming revenue per year.[52]  As detailed below, EA spent approximately eight years on a business strategy to grow its own PC Desktop Gaming Platform, Origin, by mandating that all games published by EA be played on the Origin Platform. Despite its commercial success as a publisher, EA was unable to get its PC Desktop Gaming

---

[52]   Top 10 Biggest Video Game Companies in the World, ALL TOP EVERYTHING, https://www.alltopeverything.com/top-10-biggest-video-game-companies/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

38

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  Platform off the ground.  In 2019, EA abandoned its PC Desktop Gaming Platform strategy and
2  again began selling its games enabled for the Steam Gaming Platform.[53]

3      133.    As detailed below in Section V, other large game publishers that similarly engaged
4  in strategies to avoid the Steam Gaming Platform, including Microsoft, Humble Publishing, and
5  Epic, likewise failed to develop a robust commercial strategy away from the Steam Gaming
6  Platform.

7      134.    Very few PC games have found success outside of the Steam Gaming Platform,
8  and such games typically require a long history of recognition and success before they can attempt
9  to thrive without the Steam Gaming Platform.  For example, League of Legends was released in
10  2009, before the Steam Gaming Platform had cemented its hold on the PC Desktop Gaming
11  Platform Market.  Riot, the publisher of League of Legends, was able to circumvent Valve's
12  dominance, but only because League of Legends has such a large, entrenched, and longtime user
13  base that is willing to use Riot's League of Legends' launcher (essentially a rival platform) instead
14  of the Steam Gaming Platform.

15      135.    Such games are rare—the Steam Store has over 45,000 games available[54]—
16  whereas the number of PC Desktop Game franchises that can avoid the Steam Gaming Platform
17  entirely can be counted on two hands.

18      136.    Valve has also increased its monopoly power through the sale and facilitation of
19  ancillary services on the Steam Gaming Platform.  For example, Valve runs a "Steam Workshop,"
20  which it describes as a "central hub of player-created content and tools to publish, organize, and
21  download that content into your games."[55]

22      137.    Participants on the Steam Gaming Platform can create digital goods and
23  modifications in the Steam Workshop that can be sold to other gamers.  By creating a marketplace

24

25  [53]  Gartenberg, *supra* note 35.

26  [54]  *See* Steamspy, *supra* note 10.

27  [55]  *Steam Workshop, About Workshop*, VALVE,
    https://steamcommunity.com/workshop/workshopsubmitinfo/#:~:text=The%20Steam%20Worksh
28  op%20is%20a,that%20content%20into%20your%20games.

for these digital goods, Valve creates another aspect of the Steam Gaming Platform that keeps users and publishers tied to the platform.  And this marketplace provides ancillary revenue for Valve.  When digital goods are sold through the Steam Workshop, Valve collects 75% of the sale price, leaving 25% for the creator.[56]

138.     Valve has bragged about how much money it pays such creators of digital goods, claiming it paid more than $57 million to Steam Workshop creators.[57]  But the $57 million in payments to creators implies Valve made $171 million in profit merely by inserting itself as a middleman between the innovative good creators and their customers.[58]  This highlights Valve's ability to extract supracompetitive profits through its market dominance.

139.     Valve's market power in the market for PC Desktop Gaming Platforms also is demonstrated by the anticompetitive effects detailed throughout this Complaint.  As described herein, Valve's conduct has led to supracompetitive prices in the market for PC Desktop Game Distribution and a reduction in market-wide output (in terms of quality, innovation, and choice) in both relevant markets.

**B.       The Steam Store Is Dominant in the PC Desktop Game Distribution Market**

140.     As discussed above, the Steam Gaming Platform is the dominant *platform* where gamers maintain and play their PC Desktop Games.  Because it mandates the use of its Steam Store if publishers want access to the Steam Gaming Platform, Valve has also become the dominant *distributor* of PC Desktop Games, with at least 75% market share.

141.     Today, there are several competitors that attempt to compete with Valve's Steam Store in the PC Desktop Game Distribution Market.  These potential competitors include Amazon, GameStop, Walmart, Target, and a number of smaller online storefronts, like Green Man Gaming and Humble Bundle.

---

[56]  Tim Colwill, *Valve is not your friend, and Steam is not healthy for gaming*, POLYGON (May 16, 2017), https://www.polygon.com/2017/5/16/15622366/valve-gabe-newell-sales-origin-destructive.

[57]  *Id.*

[58]  *Id.*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

40

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

142.     In practice, however, when these distributors sell a PC Desktop Game, they are typically selling a "Steam Key" version of the game—a digital "key" that allows the customer to download and maintain the game through the Steam Gaming Platform.  Even though such sales are for PC Desktop Games enabled for the Steam Gaming Platform, they are a small share of the market.

143.     As detailed herein, because of Valve's anticompetitive restrictions, gamers cannot reap any benefits by shopping at rival distributors, which explains why Valve's market share of the PC Desktop Game Distribution Market remains over 75% notwithstanding other potential competitors in the distribution market.

144.     Valve knows the Steam Gaming Platform is a must-have for game publishers, and takes advantage of that fact by providing access to the Steam Gaming Platform only if game publishers also utilize Valve's Steam Store.  Thus, because the Steam Gaming Platform is a must-have, Valve unlawfully ties access to the Steam Gaming Platform by forcing publishers also to use the Steam *Store*—even though the Steam Store does not offer unique marketing or distribution features.  This gives Valve a gatekeeper role, allowing Valve to wield extreme power over publishers of PC Desktop Games.  Valve can establish terms and conditions that publishers have to comply with, including excessive commissions and the anticompetitive restraints detailed below.

145.     And because digital distribution is now by far the most dominant form of distribution of PC Desktop Games, Valve's Steam Store is not only the largest digital distributor but is also the largest PC Desktop Game distributor.  Given its unassailable dominance, Valve has the ability to increase prices and reduce output in the PC Desktop Game Distribution Market, *i.e.*, monopoly power—a power it has abused, as discussed below.

**C.     The Combined Steam Product Is Dominant in the Alternative PC Desktop Game Transaction Platform Market**

146.     Valve has market power even if the relevant market is defined in an alternative fashion.  Plaintiffs allege that there exist separate relevant markets for PC Desktop Game Distribution and PC Desktop Gaming Platforms.  Valve may argue that there instead exists a

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

41

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

single relevant market for PC Desktop Game Transaction Platforms, which encompasses the services and products offered by both components of Steam (the Steam Gaming Platform and the Steam Store).  But even under that alternative relevant market definition, Valve still has market and monopoly power.

147.    In the alternative relevant market for PC Desktop Game Transaction Platforms, Valve competes against other vertically integrated PC Desktop Game Transaction Platforms that offer both platform and store components, including the Epic Games Store.  Because PC Desktop Game Transaction Platforms in this alternative market offer the vast majority of associated distribution through the platform's own storefront, the market share of such platforms coincides with the market share of the platforms in the market for PC Desktop Game Distribution. Therefore, Valve's Steam Platform viewed as an integrated whole similarly has an approximately 75% market share.

148.    Accordingly, even under the view that there is a single relevant market, Valve possesses monopoly power and its conduct has caused substantial anticompetitive effects, for the same reasons discussed above in the context of the markets for PC Desktop Gaming Platforms and PC Desktop Game Distribution.

## IV.    STEAM HAS UNLAWFULLY MONOPOLIZED THE RELEVANT MARKETS

### A.    Valve Has Tied the PC Desktop Gaming Platforms Market to the PC Desktop Game Distribution Market

149.    As detailed above, Valve competes in two separate but related relevant economic markets—the market for PC Desktop Game Distribution, where games are bought and sold, and the market for PC Desktop Gaming Platforms, where games are played.

150.    As alleged below, Valve has tied these two markets together in an anticompetitive manner.  Through this tie, Valve has leveraged the fact that the Steam Gaming Platform is a "must have" platform in order to monopolize the separate, but related, market for PC Desktop Game Distribution.  Because of the conduct alleged herein, game publishers have no choice but to utilize Valve's storefront—the Steam Store—as their primary means for distributing games, even though

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

42

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

a variety of alternative distributors charge lower commissions and could allow game publishers to make higher revenues by selling more games at lower prices to consumers.

### 1. *The Steam Gaming Platform and the Steam Store Constitute Two Separate Products*

151.   Consistent with the relevant market discussion above, the Steam Gaming Platform and the Steam Store constitute two separate products competing in two distinct economic relevant markets.  This is true for several reasons: (1) historical industry practices show the products are offered in distinct economic markets; (2) Valve's provision of Steam Keys shows non-Valve sales of Steam-enabled games are not only possible, but actually occur in the real world to a limited degree; and (3) Valve allowed competition in the distribution market from Humble Bundle, before terminating that competition without legitimate procompetitive justification.

152.   The CEO of Valve, Gabe Newell, has also admitted the two products are separate. According to Newell, the Steam Gaming Platform is really "just a whole bunch of servers and a whole bunch of network bandwidth" and Valve could readily build a "network API" to its platform rather than control "distribution" as an "artificial bottleneck" for the industry.[59]  Newell also explained that the Steam Gaming Platform could be a "back end" where "anybody will be able to create a store" that could connect to the Steam Gaming Platform.[60]

### (a) *Historical and Current Industry Practices Show the Products Are Distinct*

153.   The facts are evident from the history of Valve and PC Desktop Game Distribution. As discussed above, before Half-Life 2 was released, Valve operated Steam without a Distribution component at all, and its function was solely as a PC Desktop Gaming Platform.  That Steam had only one component at the time shows that the two components that exist today are separate and distinct.

---

[59]  Gabe Newell, *Reflections of a Video Game Maker*, YOUTUBE (Jan. 31, 2013), https://www.youtube.com/watch?v=t8QEOBgLBQU&t=2619s.

[60]  *Id.*

43

154.     Valve's practices during the launch of Half-Life 2 also show the two products—PC Desktop Game Distribution and PC Desktop Gaming Platforms—are distinct.  Consumers could purchase Half-Life 2 from a variety of traditional distributors, including brick and mortar retailers.  While the only gaming platform Valve allowed was the Steam Gaming Platform, Valve allowed, and encouraged, a variety of distributors to sell Half-Life 2.

155.     Many consumers access some of the same services provided by platforms (*e.g.*, social networking) independent of the purchase of a game.  Prior to Steam's dominance, gamers would often purchase games and then engage in social networking through other platforms.  Similarly, today, several platforms exist that do not offer games for sale and do not compete in the PC Desktop Game Distribution market but provide many of the same services provided other platforms that also distribute games, like Steam.  For example, Discord, a popular social networking platform for gamers (indeed many Steam users prefer and use Discord's platform services over Steam's), does not compete in the PC Desktop Game Distribution market.[61]  Similarly, Twitch, a popular video game streaming service (acquired by Amazon in 2014), offers social networking services for gamers but does not distribute games.  The existence and popularity of these platform services-only providers demonstrates that there is distinct consumer demand for the services offered in the Relevant Markets.

156.     Many consumers access distribution services through platforms with limited platform services, like the ability to automatically download updates for games or the maintenance of a centralized library of games, independent of platforms that offer other ancillary services like social networking.  For example, many consumers access games and updates through "launchers," including through a launcher provided by Riot, the publisher of League of Legends.  That some consumers demand or prefer to access games through these limited-service platforms supports a conclusion that there is separate and distinct demand for platform and distribution services.

---

[61] As discussed below, Discord briefly entered the PC Desktop Game Distribution market before Valve successfully blocked Discord's discounted-commission model by leveraging Valve's PMFN.  Discord remains very popular with consumers as a platform-only service provider.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

157.     Also, consumers do not view gaming platforms as interchangeable, including those offering distribution services.  Although digital distribution services are largely undifferentiated (except with respect to price), there is demonstrated consumer preference for specific platforms, including in the case of exclusive agreements between platforms and publishers and consumer negative reaction to those arrangements (as discussed above).  That consumers do not readily and happily switch between platforms in the case of these exclusives and purchase games from another less preferred platform with identical or near-identical distribution capabilities supports a conclusion that consumer demand for platform services and distribution services is distinct.

158.     Finally, as discussed above, there are a variety of distributors, including both digital and brick-and-mortar, that do not possess vertically connected gaming platforms.  That such distributors exist and possess material market share shows there is consumer demand for distribution options that is distinct from consumer demand for gaming platforms.

### (b)     *Valve Allowed, and Then Blocked, Competition from Rival Distributors*

159.     The distinction between the two products is also demonstrated by Valve's "Steam Key" program.  In the real world today, not all sales of Steam-enabled games occur through the Valve storefront.  Some sales of Steam-enabled games are sales of Steam Keys.

160.     As noted, Steam Keys are alpha-numeric codes that can be submitted to the Steam Gaming Platform to access a digital copy of the purchased game within the Steam Gaming Platform.  Steam Keys are sold by rival distributors including Amazon, GameStop, and Green Man Gaming.  When a gamer purchases a Steam Key from a rival distributor, they can open the Steam Gaming Platform software on their PC and submit the code to add the game in question to their Steam Gaming Platform library.

161.     Steam Key sales demonstrate there exists consumer demand for PC Desktop Game Distribution of Steam-enabled games that is separate from consumer demand for the Steam Gaming Platform, because otherwise no Steam Keys would be sold.  In the absence of Valve's anticompetitive conduct, if the distribution market were competitive there would exist even *more*

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

45

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1  consumer demand for other distribution options, because rival distributors would have an effective

2  means of competing against the Steam Store.

3        162.    The Steam Key system as a general matter does not break the tie between the

4  Steam Gaming Platform and the Steam Store—it just provides an *additional* alternative to game

5  publishers for selling Steam-enabled games.  This is analogous to how Microsoft mandated that

6  Internet Explorer be distributed with Windows in the 1990s, but also allowed the consumer to

7  install alternative browsers like Netscape Navigator.[62]

8        163.    While allowing Steam Key distribution to thrive would not break Valve's illegal

9  tie, doing so would at least ameliorate some of the anticompetitive effects caused by the tie.  Rival

10  distributors could engage in at least some competition against the Steam Store, even if the Steam

11  Store had the inherent advantage of forcing all publishers to offer their games there.  But as

12  discussed below, Valve did not even allow this modest competition to occur.  Instead, it relegated

13  the Steam Key system to a low-quality alternative that provides no meaningful benefits to

14  publishers or gamers and thus used it to buttress the anticompetitive effects of Valve's PMFN.

15        164.    Valve's PMFN—discussed further below—ensures that publishers cannot offer

16  gamers better deals through any rival Steam Key distributors.  Instead, publishers must set the

17  same price for Steam Keys on other distribution outlets that they set in the Steam Store.  This

18  ensures Steam Key distributors cannot meaningfully compete on price against the Steam Store,

19  protecting Valve's dominance.

20        165.    Beyond controlling price, Valve also ensures that Steam Keys are distributed using

21  a low-quality and not secure method, including for Wolfire's games, which prevents meaningful

22  competition even on non-price dimensions.  A Steam Key consists of a string of 15 letters and

23  numbers, such as "P77LR-8VFW0-MZ5G3," which when entered into the Steam Gaming

24  Platform, grants the user access to the corresponding product.  A granted Steam Key Request

25

26  ───────────────

[62]  Microsoft was subject to significant antitrust scrutiny over its tie between Windows and

27  Internet Explorer.  *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 95 (D.C. Cir. 2001)
(holding that, on remand, Microsoft could be liable under the Rule of Reason standard for its tie of

28  Windows and Internet Explorer).

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

46

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

results in a text file filled with Steam Keys.  The publisher can then send this file to a store that in turn offers those Steam Keys to customers, so the customers can enable their purchased games on the Steam Gaming Platform.

166.     This system is low quality and insecure.  At any stage of this process, a bad actor with access to this text file can copy or remove some or all of these Steam Keys, and resell them without compensating the publisher.  The bad actor can even sell the same Steam Key multiple times, and the Steam Key will only work for the first player who adds it to her personal Steam account.  The publisher also faces the risk that when it sells a Steam Key, it is selling to a reseller outside of the publisher's control.  Relatedly, a Steam Key purchaser faces the risk that she is not buying a valid *bona fide* key, but is instead sold a fraudulent key that will not add the game to her Steam Gaming Platform library.

167.     These flaws have created a "grey" market wherein Steam Key resellers or fraudsters sell Steam-enabled games without permission of the publisher.  As the price of second-hand Steam Keys is generally lower, the value of first-hand sales from the publisher lessens as well.  These harms make it so publishers are wary about using Steam Keys at all, let alone at scale.

168.     Humble Bundle is an organization that originally offered "bundles" in which customers would pay whatever price they want in order to purchase multiple games at once.  Users could choose how much of their payment they wanted to direct to each publisher, or to a charity of their choice.  This option proved very popular with both customers and publishers, selling hundreds of thousands of bundles in each event, and transferring millions of dollars to publishers and charities.  After the initial "Humble Indie Bundle" event in 2010, Humble Bundle began organizing similar events of increasing scale and frequency.  In total, Humble Bundle charitable donations have added up to over $197 million.

169.     Due to the prevalence of the Steam Gaming Platform, customers requested that Humble Bundle include Steam Keys in their events for convenience, and Humble Bundle complied.  But the security flaws in Steam Keys caused problems.  Customers often only associated some of the Steam Keys in the bundle to their personal Steam accounts, and had other Steam Keys left over.  Because they are just strings of text, customers could easily resell keys that

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

47

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

they did not want, which were pushed to the grey market. This made publishers reluctant to participate in Humble Bundle events, because the publishers lost control over the price and distribution of their Steam Keys, which undercut the value of their products.

170.    Humble Bundle solved this problem by working with Valve to create a direct integration between the Humble Bundle store and the Steam Gaming Platform. Humble Bundle customers would purchase a bundle, and then choose whether to download the games directly, or to link the games to a specific Steam account. If the customer chose the latter, the integration would automatically add all of the games to the customer's Steam account for use in the Steam Gaming Platform.

171.    Sales of these games were guaranteed to be legitimate, because Valve added the games directly to the gamer's Steam account on the Steam Gaming Platform. Because Steam Keys were never directly exposed, this system was more secure.

172.    Humble Bundle's sales increased, in large part because publishers no longer feared their Steam Keys would end up in the grey market. This growth further shows that there exists consumer demand from both publishers and gamers for distribution of Steam-enabled games outside of the Steam Store, therefore showing the Steam Store and the Steam Gaming Platform are two separate products.

173.    But after Humble Bundle's distribution of Steam-enabled games began to scale, Valve abruptly removed the secure integration between Humble Bundle and the Steam Gaming Platform. As a result, Humble Bundle had no choice but to resume selling Steam Keys that are not secure.

174.    After Valve terminated the direct integration, Humble Bundle's sales growth declined. The grey market returned in force, and publishers became more reluctant to participate in Humble Bundle events, decreasing the quantity and quality of products available to Humble Bundle customers. Humble Bundle has since switched the majority of its business to publishing games, which are sold in the Steam Store, and to subscription-based sales.

175.    There is no legitimate technical or other justification for Valve cutting off the direct integration that it had previously made available to Humble Bundle. Valve's termination of

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

48

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    Humble Bundle's keyless integration with the Steam Platform can be explained only by

2    anticompetitive motive—Valve terminated this integration with its Steam Platform because its

3    Steam Store offering faced increased competition.

4         176.    Valve's reversal caused significant harm to publishers and consumers, because it

5    increased the growth of the grey market and made even the limited Steam Key sales that take

6    place today insecure and unreliable.  Providing additional distribution options for the Steam

7    Gaming Platform, like the Humble Bundle, would be in the economic self-interest of Valve in the

8    absence of its anticompetitive tying strategy.  Doing so would help grow the Steam Gaming

9    Platform by attracting publishers and gamers, and therefore increase output.

10        177.    Valve's rivals in the market for PC Desktop Gaming Platforms, including Ubisoft

11   and Epic Games, offer similar "keyless" distribution programs.  For example, the Epic Games

12   Store ("EGS") Platform began offering keyless integration with other game stores so that an EGS-

13   enabled game purchased on a third-party game store is instantly loaded into a gamer's EGS

14   library, thereby allowing publishers to avoid the risks inherent to key-based distribution models.[63]

15   The presence of keyless distribution programs on other platforms is further proof that distinct

16   competition in the two markets is possible and there exists consumer demand for separate

17   distribution options.

18        **2.**    *Valve Coerces Publishers into Using the Steam Store*

19        178.    Valve requires that publishers wishing to market Steam-enabled games sign up as a

20   Steamworks Partner with Valve.  Doing so allows game publishers to create custom computer

21   code needed to work with the Steam Gaming Platform, including software to configure patches for

22   customers, Steam's digital rights management scheme, and other features of the Steam Gaming

23

24   ————————————

25   [63]   *Development Update: Self-Refund, Keyless Partner Integration and Changes to Ownership Authorization*, EPIC GAMES (May 18, 2020), https://www.epicgames.com/store/en-US/news/development-update-self-refund-keyless-partner-integration-and-changes-to-ownership-authorization ("Players will no longer need to take additional steps to redeem a key which often includes exchanging 20-digit redemption codes.  Instead, this provides more confidence knowing a purchase is coming from a legitimate source and that it is directly attributed to your linked Epic Games account.").

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE No. 2:21-CV-563

49

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    Platform.

2         179.    But Valve also requires the game publisher to list its games for sale on the Steam

3    Store.  As explained in Valve's Release Process, all Steam-enabled games published for use on the

4    platform must be configured for immediate listing in the Steam Store.  After a game publisher

5    clicks "Release App" to Steam, a number of actions occur, including "publishing the store

6    package," which means that Valve makes the game available for purchase in its Steam Store.[64]

7         180.    By Valve rule, therefore, the game publisher must sell its game through the Steam

8    Store.  This itself constitutes an anticompetitive tie, because the publisher *must* list its games in the

9    Steam Store if it wants its games to be enabled for the Steam Gaming Platform.  But Valve goes a

10   step further, and also controls the distribution of any Steam-enabled games outside of the Steam

11   Store through the "Steam Keys" program.

12        181.    As discussed above, Steam Keys provide a mechanism for publishers of Steam-

13   enabled games to market some of their games on non-Steam storefronts.  But Valve keeps Steam

14   Key sales limited in scope and imposes anticompetitive restraints on publishers' ability to offer

15   their Steam-enabled games for less on competing stores.  Through this conduct, Valve extends its

16   tie beyond merely requiring listing in the Steam Store, and prevents non-Valve distributors of

17   Steam-enabled games from achieving scale by competing on price.

18        182.    As Valve states in its developer policy document, "If we detect that you have

19   requested an extreme number of keys and you aren't offering Steam customers a good value, we

20   may deny your request."[65]  Valve also tells game publishers that "Steam keys cannot be sold on

21   other sites *unless the product is also available for purchase on Steam at no higher a price than is*

22   *offered on any other service or website*."[66]

23

24   _____

25   [64]   *Steamworks Documentation: Release Process*, STEAMWORKS,
     https://partner.steamgames.com/doc/store/releasing.

26   [65]   *Steamworks Documentation, Features, Steam Keys*, STEAMWORKS,
     https://partner.steamgames.com/doc/features/key.

27

28   [66]   *Id.*  (emphasis added).  Valve does allow discounts on other storefronts provided the publisher
     gives "a comparable offer to Steam customers within a reasonable amount of time."  *Id.*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563                                50

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

183.     Valve gives itself full discretion to enforce its rules in a way that restrains price competition.  Valve does not specify what "extreme number" means, nor does Valve define "a good value."  But Valve has used its power to enforce these provisions against game publishers that have attempted to use Steam Keys to drive price competition.

184.     For example, in a Steamworks Development thread from August 2017, a Valve employee told a game publisher that Valve denies access to Steam Keys (*i.e.*, it denies access to the Steam Gaming Platform) "***because you're offering cheaper options off Steam***."  A screenshot of the message appears below:



185.     Because Valve requires that (1) every Steam-enabled game must be listed in the Steam Store and (2) a game publisher's use of Steam Keys must be limited to a small percentage of sales at no lower price, Valve effectively mandates that all game publishers sell the vast majority of their Steam-enabled games through the Steam Store.  Any publisher that does not abide by this requirement is subject to discipline by Valve.

186.     Through these rules, Valve has economically coerced game publishers into paying Valve excessive 30% commissions on nearly every game sale they make.  Because the Steam Gaming Platform is a must-have, game publishers cannot avoid the Steam Store and must list their games in the Steam Store.  And even if a publisher attempts to distribute Steam-enabled games through other outlets, it must abide by Valve's restrictive rules, including the Valve PMFN.

187.     In addition, unlike other distributors, which freely sell multiple versions of games designed for different platforms, Valve does not sell games enabled for other gaming platforms in the Steam Store.  As discussed below, for example, when EA attempted to launch its own PC Desktop Gaming Platform Origin, Valve refused to sell Origin-enabled versions of games through

1   the Steam Store.  At the time, EA explained: "At present, there is only one download service

2   [Steam] that will not allow this relationship. . . [The Steam Store] has imposed a set of business

3   terms for developers hoping to sell content on that service—many of which are not imposed by

4   other online game services."[67]

### 3.   *Valve's Tie Causes Anticompetitive Harm*

6   188.   Tying of the type Valve imposes has well-recognized anticompetitive effects.  As

7   explained by one antitrust scholar, "Tying by a firm with tying market power typically does

8   increase monopoly profits.  It also usually harms consumer welfare absent offsetting

9   efficiencies."[68]

10   189.   *First*, tying can increase market power in the tied market (here PC Desktop Game

11   Distribution).[69]  This "tied" market effect has been explained using the following example:

> For example, suppose that a restaurant in the only hotel on a resort island competes with
> local restaurants.  If the hotel requires its guests to eat their meals at the hotel restaurant,
> then there may be fewer local restaurants as a consequence of the reduced patronage.
> Local residents will then have fewer alternatives, with the result that more of them may
> decide to frequent the hotel restaurant.  In this case, tying can be profitable because it
> reduces competition in the tied market.[70]

17   190.   Economic models show that tying can be a means of excluding potential

18   competitors from entering the tied market at all.[71]  A firm with market power can use tying to

---

[67]   Wesley Yin-Poole, *Why you can't buy Crysis 2 from Steam*, Euro-Gamer  (July 7, 2011),
https://www.eurogamer.net/articles/2011-07-07-why-you-cant-buy-crysis-2-from-steam.

[68]   Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit
Theory*, 123 Harv. L. Rev. 397, 435(2009) ("Elhauge Paper"); *see also* Einer Elhauge,
*Rehabilitating Jefferson Parish: Why Ties without a Substantial Foreclosure Share Should Not Be
Per Se Legal*, 80 Antitrust L. J. 463 (2016).

[69]   *Id.*at 410-14..

[70]   Dennis W. Carlton & Michael Waldman, *The Strategic Use of Tying to Preserve and Create
Market Power in Evolving Industries*, 33 RAND J. Econ. 194, 195(2002).

[71]   E.g., Michael D. Whinston, *Tying, Foreclosure, and Exclusion*, 80 Am. Econ. Rev. 837, 855
(1990).

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

discourage potential competitors from making investments and pursuing innovations.[72]  Tying can be a means by which a firm can defend its monopoly status without even making the effort to price goods at a lower level.[73]

191.    Applied here, Valve's tie gives it an automatic and anticompetitive advantage in the distribution market, as publishers have no choice but to use the Steam Store.  Through this advantage, Valve has achieved a 75% share in the tied market for PC Desktop Game Distribution, even though its store includes high commissions and a non-differentiated feature set.  Potential rivals to the Steam Store are competing for only the remaining 25% share of the market, and face the reality that most of their sales must be games enabled for the Steam Platform, which is controlled by their principal rival in the distribution market, Valve.

192.    *Second*, tying can increase market power in the tying market (here PC Desktop Gaming Platforms).[74]  Potential entrants challenging Valve's Steam Gaming Platform must essentially enter both the Distribution and Gaming Platform markets simultaneously, facing Valve's joint power in both markets.  If the tie were broken, the Steam Gaming Platform would face competitive pressure from rival distributors that could vertically integrate into the Gaming Platform market, and/or "platform only" rivals that would connect to a variety of distributors (including, potentially, their own distribution outlets).

193.    Platform entry is inhibited by the stark reality that 75% of all PC Desktop Game sales occur through the dominant platform's own storefront, creating an immense barrier to entry for potential entrants.  As explained by antitrust scholars, "a firm that is currently a monopolist in its primary market can use tying of complementary product to preserve its monopoly position by deterring future entry into the primary market."[75]  That is precisely what Valve is doing here.

---

[72]  Jay Pil Choi & Christodoulos Stefanadis, *Tying, Investment, and the Dynamic Leverage Theory*, 32 RAND J. ECON.  52, 65 (2001).

[73]  Barry Nalebuff, *Bundling as an Entry Barrier*, 119 Q. J. ECON. 159 (2004)

[74]  Elhauge, *supra* note 69, at 410.

[75]  Carlton &Waldman, *supra* note 62 at 194.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

53

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

194.     There are numerous examples of technology platforms that have separate, and unconstrained, distribution markets.  The benefits for consumers, and publishers, in these platform markets are enormous, as the distribution options are often plentiful and the distribution costs are either low or sometimes free.

195.     The Windows operating system, for example, has long been distinct from the distribution of Windows-enabled software.  Consumers can buy Windows-enabled software through a variety of websites and physical brick-and-mortar retailers without paying a commission to Microsoft.  The same is true for the macOS operating system on Apple computers.

196.     Similarly, the Java SE Platform allows programmers to create software that can be used on any device where the Java Platform is installed.  Java-enabled software is sold in a freely competitive market through many distributors which are too numerous to count.  The owner of Java, Oracle, does not insist every Java-enabled program must be sold through an "Oracle Store" where it can extract a 30% fee.

197.     Internet browsers like Chrome are also platforms that allow website publishers to connect with internet users.  Websites are not delivered to customers through distribution outlets, but instead internet browsers allow website publishers and website users to directly connect. Users do not have to purchase websites through the "Chrome Store" or the "Internet Explorer Store" and pay an excessive 30% commission.  Instead, they can freely access websites directly using the URL interface embedded in all of the major web browsers.

198.     These examples show platforms with open distribution models are the rule, not the exception.  Moreover, other instances of a closed platform attempting to monopolize the related distribution market are facing increased antitrust scrutiny.  Apple, for example, is subject to numerous antitrust lawsuits over its practice of tying its mobile devices to its distribution methods (the Apple App Store).[76]

---

[76] *E.g. In re Apple iPhone Antitrust Litigation*, Case No. C 11-06714, N.D. Cal.; *Cameron et al v. Apple Inc.*, Case No. 5:19-cv-03074, N.D. Cal.; *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640, N.D. Cal.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

54

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

199.    Indeed, while Apple was under investigation for antitrust issues by Congress, one reporter noted that "Apple's App Store antitrust questions will be uncomfortable for Valve" because while "Lawmakers came for the App Store," they "could've been discussing Steam."[77]

200.    Similarly, Sony, which previously allowed a competitive distribution market for digital game downloads, recently terminated competition in that market via fiat.[78]  Sony is now subject to antitrust lawsuits over that policy change.[79]

**B.    Valve Imposes the Valve PMFN on Publishers**

201.    To further cement its dominance, Valve imposes a Platform MFN on game publishers that list games in the Steam Store (the "Valve PMFN").  Like PMFNs generally, the Valve PMFN compels publishers to sell their games at the Steam Store price (or higher) in *all* distribution channels, even distribution channels that do not involve connection to or enablement for the Steam Gaming Platform.

### 1.    *Valve Imposes the PMFN Through Written and Unwritten Rules*

202.    The specific form and language of the Valve PMFN has changed over time, and encompasses both written and unwritten rules enforced by Valve against publishers.  The one constant is Valve's enforcement of pricing parity across the market.

203.    In its publisher documentation, Valve makes explicit that "*Initial pricing as well as proposed pricing adjustments will be reviewed by Valve* and are usually processed within one or two business days."[80]  Valve uses the Valve PMFN to review pricing of game publishers who sell

---

[77]  Jess Conditt, *Apple's App Store antitrust questions will be uncomfortable for Valve*, ENGADGET (July 29, 2020), https://www.engadget.com/apple-google-valve-steam-antitrust-hearings-app-store-221442066.html.

[78]  Nick Statt, *Sony confirms it will stop letting GameStop and other retailers sell PS4 download codes*, THE VERGE (Mar. 25, 2019), https://www.theverge.com/2019/3/25/18281538/sony-playstation-4-gamestop-stop-selling-game-download-codes-retailers.

[79]  *E.g. Cendejas v. Sony Interactive Entertainment LLC,* Case No. 3:21-cv-03447, N.D. Cal.

[80]  *Steamworks Documentation, Store Presence, Pricing,* STEAMWORKS, https://partner.steamgames.com/doc/store/pricing.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

55

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   Steam-enabled games, even when they are selling versions of games that are enabled for non-

2   Steam Gaming Platforms.

3   204.   As explained by the founder and CEO of Epic Tim Sweeney, "Steam has veto

4   power over prices, so if a multi-store developer wishes to sell their game for a lower price on the

5   Epic Games store than Steam, then: 1.) Valve can simply say 'no.'"[81]  Mr. Sweeney also observed

6   that "the only way for creators to pass savings onto gamers is by avoiding the dominant store [e.g.,

7   the Steam platform]."[82]

8   205.   Through the Valve PMFN, Valve gains the ability to control—including through

9   punishment and threats—publishers who attempt to steer customers to alternative PC Desktop

10   Game Distribution options.  If publishers do not abide by Valve's mandates, they risk losing

11   access to the Steam Gaming Platform altogether, which would be devastating to their businesses.

12   206.   Through the Valve PMFN, Valve distorts competition over not only Steam-enabled

13   versions of PC Desktop Games, but *all* PC Desktop Games.  And this distortion occurs in *both* of

14   the relevant markets—the PC Desktop Gaming Platform Market and the PC Desktop Game

15   Distribution Market.

16   207.   The best way for rival PC Desktop Gaming Platforms like the EGS Platform to

17   make inroads against the Steam Gaming Platform would be to grow usage on their platforms by

18   both gamers and publishers.  One potential way to do so would be to steer gamers and publishers

19   to the platform using price, encouraging additional platform growth by connecting to distributors

20   charging lower commissions to publishers and gamers.

21   208.   But through the Valve PMFN, Valve has the ability to control publishers' retail

22   prices and set a benchmark price for the market.  Thus, even if a rival platform is charging

23   commissions lower than Valve's 30% commission, gamers will not switch platforms because they

24

25

26   _____

27   [81]   Sweeney, *supra* note 4.

28   [82]   Tim Sweeney (@tTimSweeneyEpic), Twitter (Feb. 2, 2019, 12:30 PM),
     https://twitter.com/TimSweeneyEpic/status/1091750761392979968.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563                                    56

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  receive little or no price benefit as publishers cannot sustain lower retail prices on competing

2  platforms.

3          209.    Valve enforced the Valve PMFN, for example, to block competition from the

4  Discord Store.  As detailed below, Discord launched a competitor to the Steam Store that charged

5  only a 10% commission.  As Discord offered a much lower price, some publishers wanted to steer

6  customers to Discord, where the publisher could charge a lower price to the customer while

7  growing its own revenue.

8          210.    In late 2018, for example, one publisher had been selling its game on the Steam

9  Store for $5, but launched its game on the Discord Store (enabled for Discord's gaming platform)

10 for free.  Valve detected that the publisher was charging different prices on the two storefronts,

11 and told the publisher that offering its game for a lower price on Discord violated the Valve

12 PMFN.  Valve insisted the publisher renegotiate its deal with Discord and ensure that gamers

13 buying the Discord version pay the same price as gamers buying the Steam version.

14         211.    Valve's enforcement of the Valve PMFN harmed Discord, publishers, and gamers.

15 Discord was unable to use price to grow its share of the market.  Publishers were unable to reap

16 the benefit of Discord's lower commissions.  Gamers were denied the ability to purchase the game

17 for a lower retail price.

18         212.    Valve also has a set of explicit written rules in its publisher documentation that

19 govern pricing.  While these rules nominally apply only to Steam Keys, Valve has made clear to

20 publishers that in fact these rules apply to *all* sales, Steam Keys or otherwise.  In response to one

21 inquiry from a game publisher, for example, Valve explained: "We basically see any selling of the

22 game on PC, Steam key or not, as a part of the same shared PC market- so even if you weren't

23 using Steam keys, *we'd just choose to stop selling a game if it was always running discounts of*

24 *75% off on one store but 50% off on ours. . . .*"

25

26

27

28

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

213.    Thus, Valve mandates to publishers that "You should use keys to sell your game on other stores in a *similar way to how you sell your game on Steam.*"[83]  Valve interprets its "similar way" language to include a price-parity requirement, and has cracked down on publishers that offer a better deal on competitive storefronts by excluding (or threatening to exclude) them from the Steam Gaming Platform.

214.    A prior version of this language read: "You are welcome to generate keys for resale with other retailers, including your own website.  However, *your product must also be available for sale on Steam.  If you are hoping to receive exposure to Steam customers, the price on Steam will have to match prices elsewhere.*"[84]  In other words, Valve told game developers that they would be punished by losing "exposure to Steam customers" if they did not have equal prices across all distributors.

---

[83]  *Documentation, Steam Key Rules and Guidelines*, STEAMWORKS, https://partner.steamgames.com/doc/features/keys.

[84]  *Steamworks Documentation, Steam Key Rules and Guidelines*, STEAMWORKS (dated Sept. 1, 2017), https://web.archive.org/web/20170901192842/https://partner.steamgames.com/doc/features/keys.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

215.    Publishers are reminded of these restrictions whenever they request Steam Keys. A copy of the "prompt" screen for publishers requesting keys appears below:



216.    Thus, in order to receive any Steam Keys, Valve requires game publishers to agree that "*I understand that I need to sell my game on other stores in a similar way to how I am selling my game on Steam*" and that "*I agree that I am not giving Steam customers a worse deal.*" The publisher must also agree that "*I understand that while it's OK to run a discount on different stores at different times, I agree to give the same offer to Steam customers within a reasonable amount of time.*" Again, as discussed above, Valve enforces these rules against publishers not only for Steam Key games, but for *all* games.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

59

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

217.     Valve also explicitly tells publishers that Valve enforces this provision to "*avoid a situation where customers get a worse offer on the Steam store.*"[85]  Put another way, Valve uses this restriction to prevent gamers from getting a better deal anywhere other than on the Steam Store.  Thus, rival distributors have no meaningful way to attract publisher customers and take away share from Valve, because the Valve PMFN blocks their efforts to compete on price by charging lower commissions.

218.     Steamworks Development is a forum where publishers can interact with Valve employees.  On this forum, when one publisher asked Valve about the "rules regarding distributing/selling a game outside of steam" in a thread called "Patreon and steam keys" dated July 2, 2017, "TomG" of Valve explained how the policing system works.  As he explained, "*The biggest takeaway is, don't disadvantage Steam customers*.  For instance, it wouldn't be fair to sell your DLC [downloadable content] for $10 on Steam if you're selling it for $5 or giving it as a reward for $5 donations.  We would ask that Steam customers get that lower $5 price as well."

219.     Again, this "fairness" rationale is pretextual, because if customers receive lower prices elsewhere, they are better off.  It is Valve's imposition of a 30% tax across the industry that is unfair and anticompetitive.  Consumers suffer from Valve's blocking of price competition so it can sustain an exorbitant 30% commission and avoid price competition.

220.     TomG also explained to another game publisher that the publisher should "[t]hink critically about how your decisions might affect Steam customers, and Valve.  If *the offer you're making fundamentally disadvantages someone who bought your game on Steam*, it's probably not a great thing for us or our customers (even if you don't find a specific rule describing precisely that scenario)."  In that same thread, TomG responded to a question by stating: "*we usually choose not to sell games if they're being sold on our store at a price notably higher than other stores.  That is, we'd want to get that lower base price as well, or not sell the game at all.*"

---

[85]  Steamworks Documentation, Steam Key Rules and Guidelines, STEAMWORKS, https://partner.steamgames.com/doc/features/keys.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

60

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

221. Wolfire has been subject to Valve's threats to enforce its PMFN. On December 3, 2018, for example, a Steam account manager, Tom Giardino, told Wolfire's owner that it would delist any games available for sale at a lower price elsewhere, whether or not using Steam keys. As a result of Valve's enforcement of its PMFN, Wolfire has not offered its games for a lower price than what appears on Steam with other sellers. Had Wolfire been able to discount its consumer price with other sellers, as discussed below it would have sold more games at a lower price (and a higher profit) for Wolfire. Valve's PMFN blocks Wolfire and other developers from selling their games at the output-maximizing and profit-maximizing price, as dictated by the economic forces of supply and demand.

222. A Valve employee told another developer that if he "brought a particular other game of [his] to Steam, it would need to be equivalently priced. This was regardless of whether the non-[S]team version use Steam technology[,] [i.e.], a completely standalone version would have to be the same price as the Steam version."

223. Because Valve controls the flow of games through the Steam Gaming Platform, it can exercise this power to coerce publishers and gamers that dare purchase games through alternative distribution venues. Gamers and publishers can achieve no meaningful benefit from using alternative distribution venues for Steam-enabled games under Valve's rules, and publishers face grave threats to their businesses if they incur Valve's wrath.

224. Valve has gone so far as to prevent publishers from *telling* consumers about its 30% fee. While publishers can advertise alternative storefronts, publishers cannot disclose to gamers the amount of the commission Valve collects. This prevents even soft non-price steering to stores where the publisher may be able to collect a higher proportion of revenue on the sale of Steam Keys, like the Humble Store.

### 2. *The Valve PMFN Suppresses Price Competition Across the Industry*

225. The impact of the Valve PMFN is evident in game prices across platforms. It would be in the economic self-interest of a publisher to sell its games for lower retail prices through lower-commission distributors. If another distributor charges a lower commission, the

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

61

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  publisher could lower prices on the rival distributor, steering customers towards the rival

2  distributor, or compel Valve to lower Valve's own supracompetitive commissions.

3      226.    In actuality, however, prices are remarkably consistent across distributors and PC

4  Desktop Gaming Platforms, regardless of each distributor's commission.  A central reason for this

5  price consistency is that Valve has enforced the Valve PMFN against publishers that have tried to

6  price lower through other distributors, even when those publishers are selling games for use on

7  other PC Desktop Gaming Platforms, like the EGS Platform.  For example, the following chart

8  shows prices as gathered from the Steam Store, the Epic Games Store, and GameStop websites on

9  April 16, 2021.

| Game Title | Price on Steam | Price on Epic Games Store | Price on GameStop |
|---|---|---|---|
| Scarlet Hood and the Wicked Wood | $14.99 | $14.99 | N/A |
| Control | $29.99 | $29.99 | N/A |
| Doom VFR | $29.99 | N/A | $29.99 |
| Prey (2017) | $29.99 | N/A | $29.99 |
| Red Dead Redemption 2 | $ 59.99 | $59.99 | $59.99 |
| Final Fantasy XIV Online: Complete Edition | $ 59.98 | N/A | $59.99 |
| Disco Elysium | $39.99 | $39.99 | N/A |
| Outriders | $59.99 | $59.99 | $59.99 |
| Before Your Eyes | $9.99 | $9.99 | N/A |
| Biomutant | $59.99 | $59.99 | N/A |

23      227.    The games on the below list were also offered for the same price on Epic and

24  Steam, despite the differential in commissions, on January 7, 2021:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

62

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

| Game Title | Price on Steam | Price on Epic Games Store |
|---|---|---|
| **The Outer Worlds** | $59.99 | $59.99 |
| **Borderlands 3** | $59.99 | $59.99 |
| **Remnant: From the Ashes** | $39.99 | $39.99 |
| **Surviving Mars** | $29.99 | $29.99 |
| **Amnesia: Rebirth** | $29.99 | $29.99 |
| **Oxygen Not Included** | $24.99 | $24.99 |

228. Pricing games in a uniform manner across platforms with different commissions goes against the economic self-interest of game publishers, who could earn more profit by charging lower retail prices on lower-commission platforms. The explanation for this continuing behavior is the Valve PMFN and Valve's other anticompetitive conduct.

229. As mentioned above, Valve's monopolistic conduct prevents rival storefronts from increasing volume on their storefronts by offering lower commission fees—because the PC game must be priced at the same level to consumers regardless of the commission the game developer pays. Thus, game developers cannot take advantage of the lower commission levels on other platforms. The following chart illustrates how the Valve PMFN prevents price competition:

| | Steam | Rival Platform |
|---|---|---|
| Commission % | 30% | 12% |
| Sale $ to Consumer | $10.00 | $8.00 |
| Developer Income | $7.00 | $7.04 |

230. Thus, at a 12% commission, a game developer could lower its price by 20% and still earn more profit. And, of course, consumers would benefit through lower prices. This pricing scheme is blocked by Valve's PMFN.

231. There are also many real-world examples of game publishers acting in accordance with the Valve PMFN. Specifically, when publishers increase their prices on the Steam Store, they also raise their prices on other storefronts:

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel.: (206) 905-7000

- On December 1, 2020, Ubisoft increased the price of its game "Far Cry 4" from $8.99 (the list price it was selling for on Steam and Epic) to $29.99 on the Steam Store. Consistent with the Valve PMFN, two days later, Ubisoft raised the price of Far Cry 4 to $29.99 on Epic as well. Games sold through the EGS Store are not enabled for the Steam Gaming Platform and do not use Steam Keys.

- On March 26, 2020, Ubisoft increased the price of its game "Far Cry New Dawn" from $15.99 to $39.99 on the Steam Store, when Ubisoft's own storefront, Uplay, sold the game at $16.00. Consistent with the Valve PMFN, thirteen days later, Ubisoft increased the price of this game to $39.99 on Uplay. Games sold on Uplay are not enabled for the Steam Gaming Platform and do not use Steam Keys.

- On January 5, 2021, Ubisoft increased the price of its game "Steep" from $5.99 to $29.99 on the Steam Store. Consistent with the Valve PMFN, ten days later, Ubisoft increased the price on Uplay to $29.99 as well.

- On January 5, 2021, Ubisoft increased the price of its game "I Am Alive" from $3.74 to $14.99 on the Steam Store, when the price on Uplay was $3.75. Consistent with the Valve PMFN, nine days later, Ubisoft raised the price of "I Am Alive" to $14.99 on Uplay as well.

- On January 18, 2021, CD Projekt set the price of its game "The Witcher 3: Wild Hunt" at $39.99 on the Steam Store but $11.99 on GOG. Consistent with the Valve PMFN, seven days later, CD Projekt increased the price of this game to $39.99 on GOG. The version of the Witcher 3: Wild Hunt sold on GOG is not enabled for the Steam Gaming Platform and does not use Steam Keys.

- On March 29, 2021, Devolver increased the price of its game "Carrion" from $13.39 (the list price it was selling for on Steam and GOG) to $19.99 on the Steam Store. Consistent with the Valve PMFN, six days later, Devolver increased the price of this game to $19.99 on GOG. The version of Devolver sold on GOG is not enabled for the Steam Gaming Platform and does not use Steam Keys.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

64

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

232.     Valve has also threatened publishers that offered lower prices on other platforms, insisting that customers using the Steam Store should get a similar deal or else Valve may remove the publisher's games from the Steam Gaming Platform altogether.  Because of Valve's pressure tactics, publishers were forced to revise their deals with other storefronts, harming both gamers and the publishers themselves.

### 3.     *The Valve PMFN Imposes Anticompetitive Harm*

233.     There are well-known anticompetitive effects that can result from the imposition of MFN clauses by companies with durable market power.[86]  MFN provisions mandate that suppliers provide equally favorable terms to the company imposing the MFN as granted to any of its rivals.

234.     Platform MFNs (or "PMFNs") occur when an online platform requires that providers using its platform not offer their products or services at a lower price on other platforms. Economists increasingly recognize that Platform MFNs in particular can harm competition by "keeping prices high and discouraging the entry of new platform rivals."[87]  Platform MFNs guarantee that other platforms cannot charge a "lower final price, not because the focal platform has worked to ensure that it has the lowest cost, but rather because it has contracted for competitors' prices to be no lower."[88]

235.     By deploying the Valve PMFN, Valve can ensure that the retail prices set in the Steam Store are equal to or better than the prices offered in any rival distributor's storefront. Thus, the Valve PMFN gives Valve the ability to prevent price competition from rival storefronts.

236.     Platform MFNs disincentivize sellers (here, game publishers) from offering low prices in any channel, because discounts must be offered to all buyers.[89]

237.     Platform MFNs also create artificial barriers to market entry:

---

[86]   *See generally* Steven C. Salop & Fiona Scott Morton, *Developing an Administrable MFN Enforcement Policy*, 27 Antitrust ABA No. 2 15, 18 (Spring 2013).

[87]   Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*, 127 Yale L.J. 2176, 2201 (May 2018) ("Baker I").

[88]   *Id.* at 2178.

[89]   *Id.* at 2179.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

65

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

[S]uppose an entrant wishes to gain customers by charging a lower price (perhaps because it has no established brand name or installed base). It can profitably sell at a low price by undertaking selective contracting with suppliers willing to offer a discount in exchange for more volume or other favorable terms. If those suppliers also supply the incumbent, however, an MFN imposed by the incumbent would require the supplier to charge the same price to the entrant. This parity undermines the entrant's business model by preventing it from making an attractive offer to customers. The symmetry that MFNs impose on the marketplace thus can prevent new competition that would lower prices.[90]

238.    Here, the Valve PMFN prevents "outbreaks of competition" because Valve requires any game publishers selling through the Steam Store to "set the same price on a rival's or entrant's platform. This parity may undermine the discount . . . business model by preventing it from making attractive offers to" both game publishers and gamers.[91]

239.    When a company imposes a PMFN prohibiting lower prices on other platforms, that provision "serves to suppress competition on the crucial dimension of price[,]" and keeps new entrants from undercutting the dominant platform's commission, and, but for the PMFN, driving consumers to the rival platform.[92]

240.    "Platform MFNs with greater scope and duration would be expected to have stronger anticompetitive effects."[93] Because of the vast number of game developers selling through the Steam Store, and who are therefore subject to the Valve PMFN, discount platforms are unable to compete. Game developers are unwilling to price at a lower level, because they must do so across all platforms, and therefore gain no price benefit for themselves from lower-commission storefronts.[94]

---

[90]  *Id.* at 2180.

[91]  *Id.* at 2181– 82.

[92]  Benjamin Edelman & Julian Wright, *Price Restrictions in Multi-sided Platforms: Practices and Responses*, 10 COMPETITION POL'Y INT'L 86 (Jan. 30, 2015).

[93]  Baker I at 2182.

[94]  *Id.*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

66

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

241.    Economic modeling demonstrates that when a dominant platform requires its sellers to agree to a PMFN, (a) there are higher platform fees; (b) there are higher retail prices; and (c) firms with lower-cost models are discouraged from entry.[95]

242.    As shown in the Boik & Courts model, for example, a lower price entrant (such as Discord, discussed herein) cannot successfully enter because the PMFN does not allow the entrant to lower prices to attract both sellers and consumers.[96]

243.    Additionally, MFNs "tend to raise industry prices" because they "kill a retailer's incentives to compete in the terms of trade that it offers suppliers.  The reason is that a retailer who raises the commission it charges . . . knows that the price set through its store will not increase relative to that at other stores. . . . This means that suppliers cannot asymmetrically adjust their prices to divert demand towards retailers offering more attractive contractual terms."[97]

244.    MFNs thus "harm competition by assisting an incumbent in foreclosing the entry or expansion of rivals."[98]  MFNs harm competition "by making it impossible for a dominant incumbent firm's rivals, including entrants, to bargain . . . for a low price."[99]

245.    Real world examples show that, when PMFNs are banned, prices to consumers fall.[100]  The leading hotel-booking site in the EU responded to an MFN ban by introducing quality

---

[95]  Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & ECON. 105, 113–29 (Feb. 2016).

[96]  *See also, e.g.*, Amelia Fletcher & Morten Hviid, Broad Retail Price MFN Clauses: Are They RPM "At Its Worst"?, 81 Antitrust L.J. 1, 74 (2016) ("[MFNs] can restrict entry at the retail level. Specifically, they can disadvantage potential retail competitors with low-end business models by eliminating such an entrant's ability to win customers away from the incumbent through cutting its own margin and offering lower prices.").

[97]  Justin P. Johnson, *The Agency Model and MFN Clauses*, REV. ECON. STUD., 1153–54 (Jan. 2017).

[98]  Jonathan B. Baker & Judith A. Chevalier, *The Competitive Consequences of Most-Favored-Nation Provisions*, 27 ANTITRUST MAG. 24 (Spring 2013) ("Baker II").

[99]  *Id.*

[100]  Andrea Mantovani, et al., *The Dynamics of Online Hotel Prices and the EU Booking.com Case*, NET Institute Working Paper No. 17-04 (2017) at 2, http://ssrn.com/abstract_id=3049339 [http://perma.cc/W9K9-Y546].

1 improvements to the service it provided,[101] suggesting online platform competition increased

2 when Platform MFNs were banned.

3       246.    As discussed herein, Valve's PMFN (a) raises prices to consumers, (b) prevents

4 rival platforms from competing on price, (c) discourages new entry by a low-commission-charging

5 platform, and (d) suppresses output by game developers (including Wolfire).

6 **V.     ATTEMPTS AT ENTRY INTO THE RELEVANT MARKETS HAVE FAILED
BECAUSE OF VALVE'S ANTICOMPETITIVE RESTRAINTS**
7

8       247.    As discussed above, the only meaningful way for game publishers and gamers to

9 avoid Valve's anticompetitive scheme is to avoid using the Steam Gaming Platform at all.

10 Unfortunately, however, there are no economically viable alternatives to the Steam Gaming

11 Platform, and publishers therefore largely view the Steam Gaming Platform as a must-have.

12       248.    That is not for lack of trying.  Many sophisticated and well-established companies,

13 including technology giants and leading game publishers, have tried to create alternative PC

14 Desktop Gaming Platforms to rival the Steam Gaming Platform.  But by forcing gamers to use the

15 Steam Gaming Platform to play its popular Half-Life 2 game in the mid-2000s, Valve secured a

16 massive incumbency advantage in PC Desktop Gaming Platforms that is virtually impossible to

17 overcome given the anticompetitive restraints that Valve utilizes to protect its market power.

18 These anticompetitive restraints have existed and been enforced by Valve prior to achieving

19 dominance in the market for PC Desktop Game Distribution and are still enforced by Valve today.

20       249.    The failure of these rivals is not because Valve's product is high quality and

21 reflective of consumer choice.  As explained herein, all of them attempted to compete against

22 Valve—in a period in which it continuously held (and still holds) monopoly power over the

23 market—with platforms that offered equivalent or better functionality and features, while charging

24 a lower commission.  But that competition on quality and price did *not* lead to an uptick in market

25 share nor a reduction in Valve's commission, as economics would predict—these rivals were

26 thwarted by Valve's anticompetitive practices described in this complaint.

27 _____

28 [101]  *See id.* at 6 tbl.1.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

68

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

250.     Any potential competitor against the Steam Gaming Platform in the PC Desktop Gaming Platform Market needs to overcome the Steam Gaming Platform's immense network effects caused by extensive game libraries already purchased by players, the social networking features on the Steam Gaming Platform, the achievement system embedded into the Steam Gaming Platform, and the game modification ("modding") community that exists on the Steam Gaming Platform.  Rivals would need to convince gamers and publishers to abandon all of these features and the benefits of the world's largest PC desktop gaming community to leave Steam and instead join them.  When those advantages are combined with Valve's illegal conduct, it is virtually impossible for a rival to create a commercially viable competitor to the Steam Gaming Platform.

251.     Well-established companies with strong financial backing, such as EA, Microsoft, and Amazon, have put substantial time and effort into trying to dent the Steam Gaming Platform's dominance.  They were unable, however, to meaningfully compete because of Valve's anticompetitive actions described herein.  Valve's restraints prevented them from achieving a foothold in either the platform or distribution markets in isolation, forcing them to attempt vertically integrated entry, which is much harder than entering either market on its own.  And Valve's PMFN blocked them from competing on price.  Even though many of these would-be rivals attempted to undercut Valve's commissions in an attempt to draw meaningful numbers of consumers to their offerings, they could not steer customers to their rival platforms with lower prices because of Valve's PMFN.

252.     The failure of these companies to meaningfully compete against the Steam Gaming Platform shows it is virtually impossible as an economic matter to do so.  The Steam Gaming Platform has well-cemented dominance in the PC Desktop Gaming Platform Market, and given its unique and strong network effects, that is unlikely to change.  These advantages are reinforced by Valve's anticompetitive conduct discussed above, as Valve retaliates against game publishers and other platforms that try to introduce competition, thus preventing any meaningful competition that would lead to lower commissions in the Steam Store.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

69

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

253.     Valve's enforcement of the PMFN prevents publishers from discounting on rivals' platforms, blocking competition for consumers that could put downward pressure on Valve's supracompetitive 30% commission to publishers and preventing new entrants from achieving the scale necessary to meaningfully challenge Valve's dominance.

254.     Valve's nearly insurmountable advantages in the market for PC Desktop Gaming Platforms ensure that it is also well positioned to maintain its dominance in PC Desktop Game Distribution as well.  Valve's monopolization scheme means that if a publisher wants to utilize the must-have Steam Gaming Platform, the publisher must also use Valve's Steam Store.  Thus, Valve's market power derived from the Steam Gaming Platform extends into market power for the Steam Store as well.

255.     This is true even though PC Desktop Game Distribution by itself does not have significant barriers to entry or other plausible economic justifications for why a single company should be able to achieve a 75% share on the merits in the presence of numerous potential competitors.  To the contrary, Valve's market power in PC Desktop Game Distribution is caused by the anticompetitive conduct discussed herein.

256.     Valve's anticompetitive restraints have insulated it from competition, including on price.  As a result, Valve has not been forced to lower its supracompetitive prices to publishers despite these challenges from other companies.  Because of the anticompetitive restraints utilized by Valve, these companies' challenges have not resulted in meaningful competition that could discipline Valve's supracompetitive prices.

**A.     Electronic Arts**

257.     Electronic Arts Inc. ("EA") tried, and failed, to enter the PC Desktop Gaming Platform Market.  EA is an American video game company headquartered in Redwood City, California, and is the second-largest gaming company in the Americas and Europe.  A publicly traded company, EA currently maintains a $41.73 billion market capitalization.[102]

---

[102]  *Quotes, Stocks, EA Overview*, MARKETWATCH
https://www.marketwatch.com/investing/stock/ea.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

70

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

258.    On June 3, 2011, EA attempted to enter the relevant markets with a vertically integrated Platform/Distribution product named "Origin."  Similar to the Steam Gaming Platform, Origin was designed to be a "direct-to-consumer gaming platform" where gamers could download and maintain their Origin-enabled games.[103]  Although Origin originally offered only EA developed games, EA soon after announced releases from other major publishers, including Warner Bros., THQ, and Capcom Entertainment, Inc.[104]

259.    Contemporaneous news articles described how the Origin Platform "presents the biggest threat to Steam's dominance yet . . . ."[105]  Origin achieved a user base of more than 50 million total registered users, and EA was well positioned to have a viable gaming platform given its marquee titles including SimCity, The Sims, and Battlefield 3.[106]

260.    To help get Origin off the ground, EA initially mandated that all EA games would need to use the Origin Platform, even if purchased through alternative distributors.  As a result of that strategy, EA withdrew its games from the Steam Store, which does not allow publishers to sell versions of games created for other platforms.  While other distributors like GameStop were happy to sell Origin-enabled versions of games, Valve would not do so through its Steam Store.  EA explained, "At present, there is only one download service [Steam] that will not allow this relationship. . . . Steam has imposed a set of business terms for developers hoping to sell content on that service—many of which are not imposed by other game services."[107]

---

[103]   Press Release, *EA Launches Origin*, https://s22.q4cdn.com/894350492/files/doc_news/archive/582630.pdf.

[104]   Press Release, *Origin Expands to Offer Games from Major Publishers,* https://s22.q4cdn.com/894350492/files/doc_news/archive/618584.pdf.

[105]   Fred Dutton, *Steam vs. Origin: Is Competition Good for Gamers?*, EUROGAMER, (Dec 19, 2011), https://www.eurogamer.net/articles/2011-08-30-steam-vs-origin-is-competition-good-for-gamers-article.

[106]   Chris Pereira, *EA Boss Addresses Virtual Reality's "Dork Factor," Origin Vs. Steam*, GAMESPOT (June 30, 2014), https://www.gamespot.com/articles/ea-boss-addresses-virtual-reality-s-dork-factor-origin-vs-steam/1100-6420827/.

[107]   Wesley Yin-Poole, *Why you can't buy Crysis 2 from Steam*, EUROGAMER (July 7, 2011), https://www.eurogamer.net/articles/2011-07-07-why-you-cant-buy-crysis-2-from-steam.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

261.    EA sold its own games outside of the Steam Store until 2019, when EA announced a return to the Steam Gaming Platform because "[EA] want[s] to be where the players are."[108]  As one article put it, "It has been a long and largely fruitless road for Origin, EA's PC gaming client that it had planned on building into a rival of Valve's Steam.  What was originally supposed to have been the chief antagonist to Steam in the ongoing PC gaming platform wars instead is best described as a failure to launch."[109]

262.    Valve's conduct thus relegated EA to being yet another publisher paying the bloated 30% tax Valve imposes on nearly every game sold through the Steam Store.

**B.    Discord**

263.    Released in 2015, Discord serves as another example of a failed attempt to compete in the relevant markets against the Steam Gaming Platform and Steam Store.  Discord is an application that offers text messaging, voice, and video calling for gamers to communicate with friends while playing a game.[110]  Discord has experienced rapid growth since it launched, reporting 8.9 million daily users in 2017 and 100 million daily users in 2020.[111]

264.    In August 2018, Discord attempted to enter the relevant markets through a vertically integrated offering.  At the time, a media intelligence company purportedly called Discord the "biggest threat [Steam's] faced in years."[112]

---

[108]    Chaim Gartenberg, *EA games are returning to Steam along with the EA Access subscription service*, THE VERGE (Oct. 29, 2019), https://www.theverge.com/2019/10/29/20937055/ea-games-steam-access-subscription-service-pc-storefront-jedi-fallen-order-sales.

[109]    Timothy Geigner, *EA To Rebrand Its Origin Platform As It Bows Out Of The PC Gaming Platform Wars,* TECHDIRT(Sep. 16, 2020), https://www.techdirt.com/articles/20200916/09394245318/ea-to-rebrand-origin-platform-as-it-bows-out-pc-gaming-platform-wars.shtml.

[110]    Kaylee Fagan, *Everything you need to know about Discord, the app that over 250 million gamers around the world are using to talk to each other*, INSIDER (Oct. 12, 2020), https://www.businessinsider.com/how-to-use-discord-the-messaging-app-for-gamers-2018-5.

[111]    *Id.*

[112]    Stefanie Fogel, *SuperData: Discord Is a 'Major Threat' To Steam*, VARIETY (July 2, 2018), https://variety.com/2018/gaming/news/superdata-discord-vs-steam-1202863853/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

72

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

265.    With a large user base already registered in Discord for voice communications and social networking, Discord appeared to be a formidable competitor to Valve.  Discord enticed gamers and publishers with attractive offerings, such as exclusive periods of curated games being offered for free.[113]  Just a few months after the initial release, further enticing developers, Discord announced that all developers—regardless of size—could self-publish games.

266.    Even more significant, Discord announced a 90/10 revenue split.  Publishers would pay just a 10% commission—that is, one-third of the size of Valve's.[114]  When Discord announced its new initiative, it openly questioned, "Why does it cost 30% to distribute games?"[115]  Discord concluded that it "[t]urns out, it does not cost 30% to distribute games in 2018."[116]  Discord settled on 10% because it "covers [its] operating costs," but also added, "we'll explore lowering it by optimizing our tech and making things more efficient."[117]

267.    Despite its massive user base and a pro-developer and pro-consumer approach, Discord never gained traction.  By early 2019, Discord started "downscaling" its efforts in favor of a model where gamers would gain access to a pool of games for a monthly fee, a service called Nitro.[118]  By October 2019, Discord announced the Nitro offering would be shut down.[119]

---

[113]   *Discord Store Global Beta Is Live!*, DISCORD (blog) (Oct. 16, 2018), https://blog.discord.com/discord-store-global-beta-is-live-38bfd044d648.

[114]   *Why not 90/10?*, DISCORD (blog) (Dec. 14, 2018), https://blog.discord.com/why-not-90-10-3761ebef4eab; Austen Goslin, *In the race to beat Steam, the Discord Store just made a huge move*, POLYGON (Dec. 14, 2018), https://www.polygon.com/2018/12/14/18140790/discord-store-self-publishing-revenue-split.

[115]   *Why not 90/10?*, DISCORD (Dec. 14, 2018), https://blog.discord.com/why-not-90-10-3761ebef4eab.

[116]   *Id.*

[117]   *Id.*

[118]   James Batchelor, *Discord Game Store refocuses on Nitro subscription, devs can now sell games directly,* GAMEINDUSTRY.BIZ, (Mar. 14, 2019), https://www.gamesindustry.biz/articles/2019-03-14-discord-game-store-refocuses-on-nitro-subscription-as-servers-allow-devs-to-sell-games-directly.

[119]   *What's Coming for Nitro*, DISCORD (Sep. 12, 2019), https://blog.discord.com/whats-coming-for-nitro-a732ddc4b5b1.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

73

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

268.     As mentioned above, Discord's failure was largely caused by Valve's anticompetitive conduct.  When game developers released on Discord to take advantage of Discord's lower commission structure, Valve would reach out to the game developer for violating Valve's parity pricing requirements, chilling the game developer's ability to do business with Discord.  Discord's low-commission strategy was unable to drive volume to the Discord store, because publishers could not steer gamers to Discord.

269.     As a result, Discord was unable to achieve the scale necessary in the distribution of games to challenge Valve's monopoly and discipline its supracompetitive prices.  Without the ability to simultaneously attract publishers with higher profits and gamers with lower prices, Discord failed, and Valve's supracompetitive 30% commission went unchallenged.

270.     Despite Discord's failure to enter the relevant markets, Valve recognized a nascent threat on the horizon.  As Discord was increasingly gaining influence and power as a communications tool for gamers, Valve began copying Discord's features one-by-one in Steam. For example, Valve introduced "Steam Chat," which provides a friends list, secure voice chat, and group channels.  A reporter for Business Insider put it succinctly: "The update takes many cues from Discord, including a suspiciously similar user interface" that looks "almost exactly the same."[120]

271.     As pointed out in the Digital Markets Report, dominant digital platforms often surveil "other businesses to identify potential rivals, and have ultimately bought out, copied, or cut off their competitive threats."[121]  After first using its anticompetitive restraints to block it from succeeding, that is exactly what Valve did to Discord.

**C.     Microsoft, Amazon, Google**

272.     In 2012, Microsoft released the Microsoft Store (formerly known as Windows Store) as its digital distribution platform, including for PC Desktop Games.  Unlike other stores,

---

[120]   Sean Wolfe, *The new and improved Steam Chat is here to take on Discord — here's how the two apps compare*, BUSINESS INSIDER (Jul. 28, 2018), https://www.businessinsider.com/steam-chat-update-vs-discord-2018-7.

[121]   Digital Markets Report at 6.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

74

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  Microsoft merged its other distribution channels into a single storefront, including games

2  operating on both Windows, and its video game console, Xbox.  The creation of a cross-console

3  storefront later enabled a cross-platform capability (PC to Xbox), such that a Microsoft Store user

4  can move between game play between consoles without needing to purchase the game on the

5  separate devices (Xbox Play Anywhere).  In turn, the Windows Store could become a "near-

6  omnipresent digital storefront, giving Microsoft a captive audience for its library of software, and

7  not coincidentally acts as a challenge to Steam's market dominance."[122]  Microsoft also leveraged

8  its dominance of the Windows operating system by having its store pre-installed on Windows-

9  based PCs.

10       273.  To grow its share of the PC Desktop Gaming Platform Market, Microsoft began

11  distributing many PC games published by Microsoft or its subsidiaries exclusively through the

12  Microsoft Store.  This included Sea of Thieves, Age of Empires, and Microsoft Flight Simulator.

13       274.  Despite these efforts, Microsoft was unable to grow its share of either the PC

14  Desktop Gaming Platform Market or the PC Desktop Game Distribution Market to commercially

15  viable levels.  Microsoft has since retreated from this strategy, and in May 2019, Microsoft

16  announced it would bring more games to the Steam Gaming Platform.  As an insider remarked on

17  Microsoft's surrender to the Steam Gaming Platform, Microsoft "has given up entirely on that

18  vision . . . to dethrone Steam."[123]

19

20

21

22

23

---

24  [122]  Thomas Wilde, *After battling Microsoft in video games for years, Valve's Steam is on a

25  collision course with Apple*, GEEKWIRE (May 28, 2018), https://www.geekwire.com/2018/valve-
3/.

26  [123]  Nick Statt, *Microsoft will distribute more Xbox titles through Steam and finally support

27  Win32 games*, THE VERGE (May 30, 2019),
https://www.theverge.com/2019/5/30/18645250/microsoft-xbox-game-studios-publishing-valve-

28  steam-32-bit-windows.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

275.    Amazon, through the Twitch Store, opened a joint platform/storefront in April 2017, heralded as "one of the biggest challenges yet to Steam."[124]  It was shuttered 18 months later.[125]

276.    Google also launched a competitive offering, Google Stadia, meant to be "the future of gaming."[126]  Yet a February 26, 2021 article announced it has "absolutely crumbled under expectations."[127]

### D.    Epic Game Store

277.    The Epic Game Store ("EGS") is a vertically integrated Platform/Store offered by games publisher Epic.  It is currently the leading alternative to the Steam Gaming Platform, but, even after pouring an enormous amount of money into its efforts to compete, Epic has been unable to make significant inroads into the Steam Gaming Platform's dominance.

278.    Epic is behind the gaming phenomenon, Fortnite, which earned over $4 billion between its launch in September 2017 and the summer of 2019.[128]  Fortnite's user base gave Epic a strong foundation from which to launch its PC Desktop Game Distribution storefront, which Epic started because, as its CEO explained, "Stores extract an enormous portion of game industry profits and are ripe for disruption."[129]  As a prominent game publisher, Epic wanted to avoid paying third parties excessive commissions, and also to bring about a low-commission model for game publishers generally.

---

[124]   Rich McCormick, *Twitch will start selling games and giving its streamers a cut,* The Verge (Feb. 27, 2017), https://www.theverge.com/2017/2/27/14748896/twitch-sell-games-streamers-cut.

[125]   Bryon Rose, *Twitch Game Store Shutting Down After November 27,* GameRevolution (Nov. 16, 2018), https://www.gamerevolution.com/news/458393-twitch-game-store-shutting-down.

[126]   Ian Sherr, *Google Stadia wants to be the future of gaming. So do Microsoft, Sony and Amazon,* CNET (Dec. 17, 2019), https://www.cnet.com/news/google-stadia-wants-to-be-the-future-of-gaming-so-do-microsoft-sony-and-amazon/.

[127]   Cade Onder, *Damning Google Stadia Report Reveals Why It's Failing,* Screen Rant  (Feb. 26, 2021), https://screenrant.com/google-stadia-damning-report-failing/.

[128]   Jason M. Bailey, *Fortnite Maker Wants to Sell More Games, and Build a Platform to Do It,* N.Y. Times (Aug. 27, 2019), https://www.nytimes.com/2019/08/27/business/steam-epic-games-store.html.

[129]   *Id.*

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

76

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

279.    To attract publishers to its new storefront, Epic offered publishers a much lower commission than the Steam Store: 12% instead of Valve's 30%.  As Epic recently stated in court filings, "Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS."[130]  Thus, like Discord found with its own 10% commission, Epic determined that a 12% commission was more than sufficient to cover its costs for creating and maintaining a PC Desktop Game Distribution storefront, and—at least, in a competitive market unaffected by anticompetitive restraints—allow it to go toe-to-toe with Valve.

280.    To attract gamers to its new platform, Epic began giving away large volumes of games for free through its storefront.  In 2020 alone, Epic reported that users claimed more than 749 million copies of free games through the EGS.[131]

281.    Publishers welcomed the competition EGS brought to the market.  As one independent game publisher explained, this competition was a "very good thing for the industry."[132]  The CEO of Paradox Interactive explained that this competition will "benefit both players and game publishers."[133]

282.    EGS has also deployed a strategy wherein it gives publishers "some combination of marketing commitments, development funding, or revenue guarantees" in exchange for a promise to not release their games on any alternative platforms during a preset exclusivity window.  Epic

---

[130]   Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc., *Epic Games, Inc. v. Apple, Inc.*, 4:20-cv-05640-YGR (N.D. Cal. April 7, 2021), ECF. No. 407 at p. 134, https://cand.uscourts.gov/wp-content/uploads/cases-of-interest/epic-games-v-apple/Epic-Games-20-cv-05640-YGR-Dkt-407-Epic-Games-Proposed-Findings-of-Facts-and-Conclusions-of-Law.pdf.

[131]   Epic Games Store 2020 Year in Review, EPIC (Jan. 28, 2021), https://www.epicgames.com/store/en-US/news/epic-games-store-2020-year-in-review.

[132]   Jeremy Peel & Rachel Watts, *Rami Ismail: "We're seeing Steam bleed…that's a very good thing for the industry,"* PCGAMES (Mar. 20, 2019), https://www.pcgamesn.com/rami-ismail-interview.

[133]   Tomas Franzese, *Paradox Interactive CEO Thinks Competition from Epic Games Store Will "Benefit Both Players and Game Publishers"*, DUALSHOCKERS (Nov. 12, 2019), https://www.dualshockers.com/epic-games-store-benefits-players-paradox-interactive/.

has deployed this strategy for high-profile games, including Borderlands 3.[134]  Notwithstanding this strategy, Borderlands 3 has since been released through the Steam Store and is enjoying commercial success there.[135]

283.    Epic obtains this exclusivity in order to compete with the Steam Gaming Platform; by doing so, it draws in users wanting the most popular new games and can kick-start network effects on the EGS Platform.  But the "exclusives" strategy has caused backlash from gamers who are irritated they need to either wait for a Steam-enabled release or use a PC Desktop Gaming Platform they do not prefer.  As one article explains, "Poaching titles from Steam isn't the best of practices, especially when such an immense amount of backlash is received from fans far and wide."[136]  Despite the frustrations Epic's strategy created, it helped spur growth for the EGS Platform.

284.    But, even with these aggressive tactics, the EGS Store has been unable to move a significant share of the PC Desktop Game Distribution Market away from Valve and the Steam Store.  Analyzing 2019 figures, one industry analyst explained that, despite its dogged efforts, EGS likely had a market share "a little above 2%" and that "Epic games paid more than their market share to get that market share.  They spent $880M for revenue of $680M."[137]

285.    The 2020 figures are roughly similar to those reported in 2019.  The most recent year-in-review report for the EGS shows that PC desktop gamers spent $700 million on the EGS, which includes approximately $435 million in sales from Epic's proprietary games.[138]  And EGS

---

[134]  Kyle Orland, *Borderlands 3 is the next big Epic Games Store exclusive*, ARS TECHNICA (Apr. 3, 2019), https://arstechnica.com/gaming/2019/04/borderlands-3-is-the-next-big-epic-game-store-exclusive/.

[135]  Rana Muneeb, *Borderlands 3 Is Doing Well On Steam Despite Epic Store Exclusivity*, SEGMENTNEXT (Oct. 28, 2020), https://segmentnext.com/2020/03/17/borderlands-3-steam-epic-store/.

[136]  Ryan Epps, *Epic Games Store Exclusivity Was A Mistake For Borderlands 3*, THE GAMER (Sep. 18, 2019), https://www.thegamer.com/borderlands-3-epic-games-store-mistake/.

[137]  Avihay Hermon, *Epic Games Store, behind the numbers*, MEDIUM (Feb. 6, 2020), https://medium.com/@h.avihay/epic-games-store-behind-the-numbers-fe7ddef4e00c.

[138]  Epic Games Store 2020 Year in Review, EPIC GAMES (Jan. 28, 2021), https://www.epicgames.com/store/en-US/news/epic-games-store-2020-year-in-review.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE No. 2:21-CV-563

78

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  ended up giving away product valued at $2.4 billion while only earning $700 million through its

2  storefront.[139]

3       286.   As the PC Desktop Game Distribution Market is roughly $36 billion (including

4  microtransactions), Epic's market share is only around 1.9%, even after roughly two years of

5  aggressive and well-funded competition against the Steam Store.

6       287.   As explained by one industry analyst, "Two years and four months after its

7  inception on December 4, 2018, the Epic Games Store hasn't done much for its parent company

8  aside from being one of its biggest money losers.  This is according to court documents shared by

9  a ResetEra user, which reveal that the fledgling Steam competitor had cost Epic Games

10  approximately $181 million and $273 million in losses in 2019 and 2020, respectively."[140]

11       288.   EGS is therefore yet another example of how even a well-funded publisher with a

12  huge user base cannot put a dent in the Steam Store's market share.

13       289.   Valve's anticompetitive conduct is a major reason for EGS's failure. Because of

14  Valve's PMFN, other publishers on EGS cannot discount their prices below those offered on

15  Steam, preventing Epic from attracting users and building market share.  Due to fear of retaliation

16  from Valve, a publisher's only method of avoiding the PMFN is dropping Steam entirely.  But as

17  detailed herein, that is not an economically viable strategy, and therefore publishers have no

18  choice but to comply with the PMFN. The result is that Epic's lower commission structure cannot

19  discipline Valve's supracompetitive 30% commission.

20  **VI.   VALVE'S ANTICOMPETITIVE PRACTICES DIRECTLY HARM BOTH GAME
        PUBLISHERS AND GAME PURCHASERS**

21

22       290.   The goal of the antitrust laws is "to protect the process of competition for the

23  benefit of consumers, making sure there are strong incentives for businesses to operate efficiently,

24

---

25  [139]  *Id.*

26  [140]  Tsing Mui, *Epic Games Store Faces at Least $330 Million in Unrecouped Costs, Won't Be
27  Profitable until 2023 at Earliest*, FPS REVIEW (April 9, 2021),
   https://www.thefpsreview.com/2021/04/09/epic-games-store-faces-at-least-330-million-in-
28  unrecouped-costs-wont-be-profitable-until-2023-at-earliest/.

keep prices down, and keep quality up."[141]  The Sherman Act is a "comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade."  *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958).  "[T]he policy unequivocally laid down by the Act is competition."  *Id.*

291.    Valve's anticompetitive conduct, including its tie of the Steam Gaming Platform to the Steam Store along with its Valve PMFN, has blocked price competition and inhibited the ability of rival stores and platforms to function in a freely competitive market.  This has allowed Valve to maintain its dominance in both the PC Desktop Gaming Platform market and the PC Desktop Game Distribution Market, harming both publishers and gamers that use the Steam Gaming Platform and the Steam Store.

292.    By blocking competition, Valve's conduct has directly led to gamers and publishers overpaying, allowing Valve to extract a supracompetitive cut of every game sale that far exceeds the costs Valve bears.  Gamers overpay when they buy their games from Valve directly, and publishers overpay when Valve extracts its commission before giving the publisher the proceeds.

293.    Valve's founder has admitted that Steam is a "tremendously profitable" endeavor.[142]  On a per-employee basis, Valve is perhaps the most profitable company in the world, outpacing tech giants like Apple.[143]  By 2015, Valve earned more than $2 billion per year in profit, which is more than $5 million per employee.[144]

294.    Today, it makes even more than that.  As discussed above, the market for PC Desktop Game Distribution is worth about $10 billion excluding microtransactions worldwide, and Steam sells around 75% of those games.  Valve therefore earns roughly 30% of $7.5 billion

---

[141]  *The Antitrust Laws*, FTC, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/antitrust-laws (last accessed June 10, 2021).

[142]  Oliver Chiang, *Valve And Steam Worth Billions*, FORBES (Feb. 15, 2011), https://www.forbes.com/sites/oliverchiang/2011/02/15/valve-and-steam-worth-billions/?sh=71e1de5d33f4.

[143]  *Id.*

[144]  Matthew Ball & Jacob Navok, *Epic Games Primer (Pts II+III): Epic Games Store & Epic Games Publishing*, MATTHEWBALL.VC (May 18, 2020), https://www.matthewball.vc/all/epicprimer2.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   per year in commissions, or over $2 billion annually in the storefront alone—all for acting as a

2   middleman between gamers and publishers.  Counting microtransactions and other services, Valve

3   makes even more.

4          295.    These profit levels far exceed what would occur in a competitive market.  Valve

5   maintains them through the anticompetitive means described above, coming at the expense of the

6   publishers who create the games and the gamers who play them.

7          296.    A survey of game publishers confirms that the Valve 30% commission is excessive.

8   When asked "Do you think that Steam, in its current form, justifies a 30% cut of your game's

9   revenue?", only 6% of publishers thought the Steam commission was justified.[145]  Executive

10  Fredrik Wester of Paradox Interactive, the publisher of Cities: Skylines and Surviving Mars,

11  described the 30% fee as "outrageous," stating "I think the platform holders are taking too much

12  money.  Everyone in the press here, just quote me on that."[146]  As explained by Tim Sweeney, the

13  CEO and founder of publisher Epic Games, "The 30% store tax usually exceeds the entire profits

14  of the developer who built the game that's sold."[147]

15         297.    The 30% figure overstates how much revenue publishers receive on a net basis.

16  Valve first takes 10-20% to cover taxes and payment card-related chargebacks, lowering

17  publishers' revenue below 70%.  Publishers typically net only about 50-60% of sales made

18  through the Steam Store, even though they are the entities that take the entrepreneurial risk and are

19  responsible for developing and bringing the game to market in the first place.

20         298.    Consumers are harmed as well by the higher prices that result.  In 2019, for

21  example, game publisher Deep Silver sold its game Metro Exodus on Steam for $60.  It then

22

23  ───────────────────

24  [145]   Ben Kuchera, *Does Valve deserve Steam's 30 percent cut? Many developers say no*,
       POLYGON (Jan. 24, 2019), https://www.polygon.com/2019/1/24/18196154/steam-developers-

25  revenue-epic-games-store (citing Game Developers Conference, *State of the Game Industry 2019*,
       https://reg.gdconf.com/gdc-state-of-game-industry-2019).

26  [146]   Kyle Orland, *Paradox exec: Steam's 30% fee is "outrageous"*, ARS TECHNICA (July 1,

27  2019), https://arstechnica.com/gaming/2019/07/paradox-exec-steams-30-percent-fee-is-
       outrageous/.

28  [147]   *Id.*

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  began an exclusive contract with Epic at the retail price of $50 through the EGS Store for the

2  EGS-enabled version of its game, withdrawing the Steam-enabled version from the Steam

3  Store.[148]  This strategy made Deep Silver better off, as it would collect 88% of $50, or $44, when

4  selling through the EGS Store—rather than 70% of $60, or $42, on Steam.  And it made

5  consumers better off from a price perspective, as they would pay $50 rather than $60.[149]  Deep

6  Silver's strategy shows how a significant portion of the benefits from competition in the PC

7  Desktop Gaming Digital Distribution Market would flow to consumers, and both publishers and

8  gamers would be better off.

9       299.  Another example underscoring how removing Valve's anticompetitive restraints

10  would benefit both publishers and gamers is found in the Fortnite strategy Epic Games deployed

11  on the iPhone.  Like Steam, Apple charges a 30% commission on every game sale and every in-

12  app transaction purchase on the iPhone.[150]  To avoid this anticompetitive fee, Epic Games

13  introduced an alternative payment method that would give a 20% discount on all purchases

14  through Epic's new payment method.[151]  Epic explained that this strategy was a "competitive

15  alternative" to Apple which "enabled Epic to pass along its cost savings."[152]  This real-world

16  example demonstrates how publishers will steer consumers to lower-cost options for purchases if

17  they are able to do so, passing on a portion of cost savings to consumers.

18

19

20

---

21  [148]  Kyle Orland, *Metro Exodus comes to Steam after a year of Epic Games Store exclusivity*, ARS
22  TECHNICA (Feb. 7, 2020), https://arstechnica.com/gaming/2020/02/epic-games-store-snags-metro-
exodus-away-from-steam/.

23  [149]  Valve has since added language to its publisher agreements that inhibit strategies like the one
24  Deep Silver employed with Metro Exodus.

25  [150]  Apple's control over iPhone app sales and the 30% commission it charges for distributing
those apps is currently the subject of multiple antitrust lawsuits in the Northern District of
26  California (including an appeal to the Ninth Circuit).

27  [151]  Complaint for Injunctive Relief, *Epic Games Inc. v. Apple Inc.*, 4:20-cv-05640-YGR (N.D.
Cal. Aug. 13, 2020), ECF No. 1 ("Epic Complaint"), pp. 6-7.

28  [152]  *Id.*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

82

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

300.     As another example, when EA brought its game collection back to Steam after abandoning its exclusive Origin strategy, EA raised prices.[153]  The Mass Effect Collection, for example, went from £23 to £30, an increase of roughly 30%.[154]  This shows that when publishers sell through the Steam Store, they are forced to raise prices to gamers in order to pay for Valve's excessive commissions.

301.     The 30% commission Valve charges is supracompetitive, greatly exceeding the costs of providing digital distribution for PC Games.  As noted, the EGS Store charges only a 12% commission to publishers.  Epic recently stated in court filings that "Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS."  In an interview given shortly after EGS opened, Tim Sweeney, CEO of Epic, stated that "[f]ixed costs of developing and supporting the platform become negligible at a large scale.  In our analysis, stores charging 30 per cent are marking up their costs by 300 to 400 per cent," and that stores could be profitable earning a 12% commission.[155]  Discord's competitive service charged publishers only 10%, because "it doesn't cost 30% to distribute games."[156]  Microsoft has also recently announced it is lowering the commission it charges on PC Desktop Games to 12% in the Microsoft Store.[157]

302.     While connected to a different platform, the iPhone, the Apple App Store is also analogous to the Steam Store in that it is a product that provides a means for gamers to purchase

---

[153]  Alex Gervas, *EA's return to Steam brings higher prices*, THE COURIER (Feb. 20, 2020), https://www.thecourieronline.co.uk/prices-increase-for-ea-games-in-steam/.

[154]  *Id.*

[155]  Seth Barton, *New Epic Games Store Takes on Steam with just 12% revenue share – Time Sweeney answers our questions*, MCV/DEVELOP (Dec. 4, 2018), https://www.mcvuk.com/development-news/new-epic-games-store-takes-on-steam-with-just-12-revenue-share-tim-sweeney-answers-our-questions/.

[156]  Ali Jones, *Discord's store offers devs 90% revenue because "it doesn't cost 30% to distribute games,"* PC GAMES (Dec. 14, 2018), https://www.pcgamesn.com/discord-store-revenue-split.

[157]  Tom Warren, *Microsoft shakes up PC gaming by reducing Windows store cut to just 12 percent*, THE VERGE (Apr. 29, 2021), https://www.theverge.com/2021/4/29/22409285/microsoft-store-cut-windows-pc-games-12-percent.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

83

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    games and a means for publishers to sell their games, for games enabled for a specific platform.

2    Like Valve's costs relating to the Steam Store, Apple's costs relating to the App Store primarily

3    involve the distribution of digital applications to user devices.

4        303.     Apple, like Valve, charges a 30% commission for every sale in the store and for

5    every in-app purchase.  In the *Epic v. Apple* case, Epic's accounting expert Ned Barnes analyzed

6    Apple's profit margins in the App Store, and testified that Apple's operating margin was 77.8% in

7    2019,[158] implying Apple could cover its costs with a commission of 6.66% (22.2% of 30%).

8    Epic's economist David Evans concluded Apple's store profits were "vastly higher" than other

9    online distributors like eBay, Etsy, and Alibaba.[159]

10       304.     Regulators and governments are increasingly skeptical of business models like the

11    one Valve employs with the Steam Gaming Platform and the Steam Store, in part because their

12    operating costs are so much lower than the commission they charge would suggest.[160]  As former

13    Apple App Store executive, Phillip Shoemaker, told the New York Times, "30 percent is way too

14    much," and the App Store "should [charge] closer to" 3% given Apple's relatively minimal

15    variable costs for processing App sales.[161]  Valve's variable costs are similarly minimal.

16       305.     The practice of extracting 30% of every software sale associated with the

17    underlying platform is one of the principal bases for a Congressional investigation into Apple's

18    and other large technology companies' monopolistic and anticompetitive practices.  The Digital

19    Markets Report concluded there were serious competition problems with such businesses.

---

[158]  Kim Lyons, *Epic-backed expert says Apple's app store profit is as high as 78 percent*, The Verge (May 1, 2021), https://www.theverge.com/2021/5/1/22414402/epic-expert-apple-app-store-fortnite-court-profit.

[159]  Maria Dinzeo, *Economist Targets Apple's Alleged Anti-Competitive Conduct*, Courthouse News (May 10, 2021), https://www.courthousenews.com/economist-targets-apples-alleged-anti-competitive-conduct/.

[160]  Jess Conditt, *Apple's App Store antitrust questions will be uncomfortable for Valve*, ENGADGET (July 29, 2020), https://www.engadget.com/apple-google-valve-steam-antitrust-hearings-app-store-221442066.html.

[161]  Jack Nicas, *How Apple's 30% App Store Cut Became a Boon and a Headache*, N.Y. TIMES (Aug. 14, 2020), https://www.nytimes.com/2020/08/14/technology/apple-app-store-epic-games-fortnite.html.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

84

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

306.    For example, the Digital Markets Report begins by stating that "numerous businesses described how dominant platforms exploit their gatekeeper power to dictate terms and extract concessions that no one would reasonably consent to in a competitive market . . . . [T]heir dependence on these gatekeepers to access users and markets requires concessions and demands that carry significant economic harm, but that are 'the cost of doing business.'"[162]   As discussed above, while the report claims "Apple established its 30% commission on paid apps in 2009 with the introduction of the App Store, and that rate has become the industry standard,"[163] it was in fact Steam that first developed the 30% store commission.

307.    Valve's 30% commission has **never** been subject to competition by rivals in a competitive market.  At the time the Steam Gaming Platform was launched, most game distribution occurred at brick-and-mortar retailers like Walmart, GameStop, and Best Buy.  While Valve was competing against these retailers in a sense, it had a massive and indisputable cost advantage in that Valve did not have to pay for real estate, salaries, packaging, shipping, and the other substantial costs that brick-and-mortar retailers face.  These brick-and-mortar retailers could not meaningfully compete against Valve by lowering their own commissions, because doing so would put them out of business.

308.    Only other **digital** distributors could meaningfully apply competitive pressure to Valve's excessive commissions.  Many have tried, but they have failed because Valve's anticompetitive conduct has blocked them.  That means Valve's 30% commission was never subject to intensive competition, and the fact that Valve's commission has not budged shows the extent of its antitrust violation—if the market reflected competitive forces, Valve's commission should have significantly decreased to levels approaching cost, and the variable costs of digital distribution are near zero.  That Valve has been able to keep the same price for nearly fifteen years in a market that has matured and seen multiple entrants try to compete on price and quality (but

---

[162]   Digital Markets Report at 11.

[163]   *Id*. at 98.

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel.: (206) 905-7000

1   failed due to Valve's anticompetitive restraints) is further evidence this has never been a

2   competitive market.

3          309.    Valve's supracompetitive 30% tax has also reduced output in the relevant markets.

4   With competition, Valve's commissions would be lower, and there would be lower retail prices

5   available to gamers.  At lower prices, gamers would purchase more games, increasing output.

6          310.    Valve's anticompetitive conduct also decreases output by decreasing the number of

7   additional games that would be sold in the market absent Valve's conduct.  Publishers (including

8   Wolfire) must undertake a cost/benefit analysis to determine whether the largely fixed costs of

9   game development could be recouped through sales to gamers.  If publishers made more revenue

10  per sale (as they would be able to do if commissions were more competitive), then they could

11  develop more games and, by virtue of that expanded development, there would be greater quantity

12  and variety of games in the marketplace.  Likewise, as discussed above, if commissions were

13  competitive, publishers would earn higher revenues while simultaneously selling their games at

14  lower prices to consumers.  In a world where commissions were competitive, increased publisher

15  profit combined with lower consumer prices would increase output beyond what it historically had

16  been.

17         311.    Valve's conduct has also decreased quality in the market.  Because of Valve's

18  exorbitant fees, publishers have attempted a number of workaround strategies that have led to

19  consumer backlash.  If Valve charged competitive commissions, the economic incentive to attempt

20  such strategies would decrease, benefitting publishers and consumers.

21         312.    Because Valve enjoys such strategic advantages in the relevant markets, it also

22  does not provide a competitive level of quality to publishers, including Wolfire, in terms of the

23  Steam Store because it does not need to do so in order to compete.  Valve prioritizes which games

24  are shown to potential customers using an automatic algorithm, presumably to save costs, that can

25  unfairly harm publishers trying to get visibility for their products.  This automatic approach also

26  puts a strong emphasis on discounting, which causes publishers to artificially inflate their list

27  prices on the Steam Store.  Valve has few, if any, dedicated marketing staff to help publishers

28  market their games.  Publishers must do their own marketing and are thus forced to market Steam

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

86

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

by driving their customers toward the Steam Store.  If the market for PC Desktop Game Distribution were competitive, Valve would be forced to offer a competitive level of quality in its store as well, benefiting both publishers and gamers.

313.    Valve's conduct harms quality in other ways.  Valve reinvests a miniscule portion of its revenue into improving and maintaining the Steam Store, with very few personnel allocated to Steam Store business development, customer support, and engineering.  Competing stores generally offer superior infrastructure and support, despite their much smaller market share.

314.    Valve's lack of investment in the Steam Platform has allowed cybersecurity vulnerabilities to proliferate for years, endangering consumers and gamers alike.  For example, in 2011, hackers stole "information about Steam transactions between 2004 and 2008" that contained "names, email addresses, encrypted billing addresses and encrypted credit card information," which forced Valve CEO Gabe Newell to advise Steam Platform users to "watch your credit activity and statements."[164]  By 2015, 77,000 Steam user accounts were being "hijacked and pillaged each month."[165]  And by 2016, a cottage industry of "Steam Stealer" malware had developed that allowed criminals around the world to defraud Steam users, transforming the Steam Platform "into the devil's playground."[166]  In 2019, Valve agreed to fix a "zero-day" security flaw that had potentially exposed tens of millions of Steam users' computers to hackers, but only after Valve had been publicly pressured to do so.[167]  Later than same year, Valve halted trading and selling of digital items for one video game because "nearly all key purchases that end

---

[164] Message from Gabe to Steam Community, VALVE (Feb. 10, 2012), https://store.steampowered.com/oldnews/7323.

[165] *Steam, Security and Trading,* VALVE (Dec. 9, 2015), https://store.steampowered.com/oldnews/19618.

[166] *Steam Stealers*, KASPERSKY LAB (Mar. 2016), https://media.kasperskycontenthub.com/wp-content/uploads/sites/43/2018/03/07191212/Steam_Stealers_research_ENG.pdf.

[167] Caitlin Cimpanu, *Researcher publishes second Steam zero day after getting banned on Valve's bug bounty program*, ZDNET (Aug. 21, 2019), https://www.zdnet.com/article/researcher-publishes-second-steam-zero-day-after-getting-banned-on-valves-bug-bounty-program/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

87

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   up being traded or sold on the marketplace are believed to be fraud-sourced" by "worldwide fraud

2   networks" engaged in money laundering.[168]

3        315.   This lack of investment can also be seen in Valve's inadequate moderation of the

4   Steam Community.  Valve maintains a section titled "Family Friendly," but this section includes

5   Steam reviews and message boards that often contain foul language and ethnic slurs.  For

6   example, regarding the family-friendly dollhouse game "The Sims 4," Valve's forum contains a

7   guide titled "How to fry a kid in The Sims."[169]  The Anti-Defamation League has written a report

8   indicating that 23% of Steam users report being exposed to "extremist white supremacist

9   ideology," and that 75% of players of Valve games DOTA 2 and Counter-Strike have experienced

10  harassment.[170]

11       316.   Valve's lack of moderation in the Steam Community has also created a venue for

12  retaliation against Steam competitors.  For example, intimidation of publishers (and their

13  employees) that do business with EGS is so frequent in the "Epic Games Sucks" forum that

14  volunteer moderators—not Valve employees—ask members to "Keep it civil," including

15  refraining from making "death threats," engaging in "continuous harassment," "advocat[ing] or

16  promot[ing] piracy," and "brigading,"[171] "whereby huge numbers of users from one of the

17  Internet's cesspits are sent to downvote, post terrible reviews or simply fill content pages with

18  bile."[172]

19

20  [168] *Key Change*, VALVE (Oct. 28, 2019), https://blog.counter-strike.net/index.php/2019/10/26113/

21  ("Account theft has been around since Steam began, but with the introduction of Steam Trading, the problem has increased twenty-fold as the number one complaint from our users.").

22  [169] Huhuhu, Sims 4 Guides on *How to fry a kid in The Sims*, VALVE(Apr. 17, 2021),

23  https://steamcommunity.com/sharedfiles/filedetails/?id=2460422496.

24  [170] *This is Not a Game: How Steam Harbors Extremists*, ADL.ORG, https://www.adl.org/steamextremism.

25  [171] *Steam, Epic Games Sucks*, VALVE

26  https://steamcommunity.com/groups/EpicGamesSucks/discussions/0/1607148447810769910/.

27  [172] *Steam's turned toxic, and Valve doesn't care*, GAMESINDUSTRY.BIZ, (May 6, 2016), https://www.gamesindustry.biz/articles/2016-05-06-steams-turned-toxic-and-valve-doesnt-care

28  ("The problem is this; Steam is almost entirely unmoderated, and Valve makes pretty much zero

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

88

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1      317.    Valve has explicitly disclaimed responsibility for moderating offensive game

2   content on the Steam Store.  In 2018, Valve announced that "we've decided that the right approach

3   is to allow everything onto the Steam Store, except for things that we decide are illegal, or straight

4   up trolling."[173]  In 2019, Valve allowed "Rape Day" to be published on the Steam Store, which

5   enabled gamers to "verbally harass, kill, and rape women as you choose to progress the story," and

6   only removed the game after widespread public outcry.[174]  The National Center on Sexual

7   Exploitation has regularly denounced Valve, including its ineffective parental controls on the

8   Steam Store.[175]

9      318.    Epic CEO Tim Sweeney has stated that if Steam did not charge such a highly

10  inflated commission, "Epic would hastily organize a retreat from exclusives (while honoring our

11  partner commitments) and consider putting our own games on Steam," which would be a

12  "glorious moment in the history of PC gaming, and would have a sweeping impact on other

13  platforms for generations to come."[176]

14     319.    Instead, Valve announced facial changes to its pricing structure that are not real

15  changes at all, because they only reduce the marginal commission for the most successful games,

16  and then only if a publisher sells more than preset amounts of a single game in a year.  In reality,

17  the vast bulk of games do not sell anywhere near the levels needed to trigger the lower marginal

18

19

20  effort to reign in any behavior on its platform that isn't outright illegal.  As a consequence, it's
    open season for the worst behaviors and tactics of the Internet's reactionary malcontents - the
21  weapon of choice being brigading . . .")

22  [173] *Who Gets To Be On The Steam Store*, VALVE (June 6, 2018),
23  https://steamcommunity.com/games/593110/announcements/detail/1666776116200553082.

24  [174] Patricia Hernandez, *Steam game about raping women will test Valve's hands-off approach*,
    POLYGON (Mar. 4, 2019), https://www.polygon.com/2019/3/4/18249916/rape-day-steam-valve.

25  [175] The National Center on Sexual Exploitation, *Steam "Family View" Safety Features Fail to
    Protect Kids from Rape Video Games*, NCSE (Feb. 3, 2020),
26  https://endsexualexploitation.org/articles/steam-family-view-safety-features-fail-to-protect-kids-
    from-rape-video-games/.

27  [176]  Tim Sweeney (@TimSweeneyEpic), Twitter (Apr. 24, 2019, 6:05 PM),
28  https://twitter.com/timsweeneyepic/status/1121218551342350336?lang=en.

1   commissions in Valve's new structure, meaning that Valve is essentially charging the exact same

2   commissions as always, just prettied up by some PR.

3   320. While the vast majority of game publishers consider the Steam Gaming Platform a

4   must-have, one of the few that has partially escaped Steam's orbit in the real world is Ubisoft.

5   Over the last three years, Ubisoft, a publicly traded company, averaged €1.76 billion in "Net

6   Bookings" (*i.e.*, "sales").[177]  Given its size and number of blockbuster hits, Ubisoft is one of the

7   few game publishers that could feasibly avoid the Steam Gaming Platform for some of its titles

8   and not go out of business.  Ubisoft's partial no-Steam strategy is fairly new and could very well

9   fail, but in the interim provides a useful picture of how publishers would react to the removal of

10  Valve's anticompetitive conduct from the market.

11  321. "For Years, Ubisoft released blockbuster titles like Assassin's Creed and Splinter

12  Cell on Steam."[178]  However, according to Ubisoft's vice president for partnerships and revenue,

13  Chris Early, Ubisoft "decided not to sell the sequel to its hit game Tom Clancy's The Division on

14  [Steam] because Valve would not modify its revenue-sharing model"[179]  Ubisoft sold this hit PC

15  game on Epic and its own platform.[180]

16  322. Ubisoft has selectively engaged in the same strategy for a few other marquee

17  games, while maintaining a large library of games on the Steam Store.  For the games where

18  Ubisoft continues to sell in the Steam Store, as mentioned above, Ubisoft generally abides by the

19  PMFN.

20  323. On the other hand, for games that are *not* available on the Steam Store—and thus

21  games where Ubisoft is not subject to the Valve PMFN—there are examples where Ubisoft passed

---

[177]   Ubisoft, Investor Center, Key Figures
https://staticctf.akamaized.net/8aefmxkxpxwl/JdRZ01IK6RqlqhbMmjVvV/e4c8b942be090b6c1cb6d7035b1ec825/Ubisoftkeyfiguressept302020_tcm99-28749_tcm99-196733-32.xlsx (last accessed June 10, 2021).

[178]   Jason M. Bailey, *Fortnite Maker Wants to Sell More Games, and Build a Platform to Do It*, N.Y. Times, (Aug. 27, 2019, Updated Aug. 13, 2020),
https://www.nytimes.com/2019/08/27/business/steam-epic-games-store.html.

[179]   *Id*.

[180]   *Id*.

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

90

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

on commissions savings to consumers, at least temporarily.  Specifically, Ubisoft pays an implicit 0% commission when selling through Uplay, and a 12% commission when selling through the Epic Game Store.  At times, Ubisoft has offered lower prices through Uplay than through the Epic Game Store, showing that publishers would pass on savings from lower commissions to consumers to some degree.

324.    For example, on January 28, 2021, Ubisoft discounted its PC game "Assassin's Creed Valhalla" from $59.99 (the list price it was selling for on Uplay and Epic) to $49.79 on its Uplay platform, but did not discount the game on the Epic Game Store.  Ubisoft again discounted this game on February 11, 2021, to $44.99 on its Uplay platform, while discounting the game to $49.79 on the Epic platform.

325.    As another example, again on January 28, 2021, Ubisoft discounted its PC game "Watch Dogs: Legion" from $59.99 (the list price it was selling for on Uplay and Epic) to $40.19 on its Uplay platform.  Ubisoft again discounted this game on February 17, 2021, to $35.99 on its Uplay platform, while discounting the game to $40.19 on the Epic platform.

326.    Consumers and publishers in the relevant markets have been denied the benefits of price competition that would similarly lead to lower prices (and commissions for publishers) on alternative storefronts.

327.    If Valve did not block price competition for Steam-enabled games, gamers and publishers would be able to have a high-quality platform *while also* enjoying the benefits of price competition in the distribution market.  That would improve quality for gamers and publishers (including Wolfire) alike, all while lowering prices for everyone.

## CLASS ACTION ALLEGATIONS

328.    Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), as representatives of a Class defined as follows:

> All persons and entities who, directly or through an agent, purchased or sold a PC game on the Steam Store in the United States and its territories from January 28, 2017 through the present (the "Class Period").  Excluded from the Class are Defendant and its employees, parents, and subsidiaries.

329.    The proposed Class can also be broken out into the following subclasses:

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

91

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

A Sub-Class of Non-Subscriber game purchasers:

All game purchasers who (a) are not Steam Gaming Platform users, and thus have not agreed to the Steam Subscriber Agreement, and (b) have purchased PC games on the Steam Store in the United States and its territories for others at any time during the Class Period.  Excluded from the Class are Defendant and its employees, parents, and subsidiaries.

A Sub-Class of game purchasers:

All persons and entities who, directly or through an agent, purchased a PC game on the Steam Store in the United States and its territories during the Class Period.  Excluded from the Class are Defendant and its employees, parents, and subsidiaries.

A Sub-Class of game publishers:

All persons and entities who, directly or through an agent, sold a PC game on the Steam Store in the United States and its territories during the Class Period.  Excluded from the Class are Defendant and its employees, parents, and subsidiaries.

330.    Both buyers (typically gamers) and sellers (publishers) are direct purchasers from Valve.  When a gamer makes a purchase through the Steam Store, the gamer buys the game from Valve, paying the full retail price to Valve directly.  There is no intermediary in the distribution chain between Valve and the consumer.  Gamers are the immediate buyers from Valve, the Defendant in this antitrust case, and pay overcharges caused by inflated store commissions directly to Valve.

331.    Publishers are also direct purchasers of Valve's services in the PC Desktop Gaming Digital Distribution Market, and they directly pay Valve's exorbitant commission fees.  Valve's commission is taken from publishers before they receive funding from sales made through the Steam Store.  Valve's contracts with publishers state the terms and conditions under which the publisher sells games through the Steam Store, including the commission schedule that the publisher will pay.

332.    **Numerosity**.  Members of the Class (and each Sub-Class) are so numerous that joinder is impracticable.  Plaintiffs do not know the exact size of the Class (and each Sub-Class)

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

92

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1    but believe that there are at least millions of class members geographically dispersed throughout

2    the United States.

3            333.    **Typicality**.  Plaintiffs' claims are typical of the claims of the members of the Class.

4    Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Valve.

5    Specifically, Valve's wrongdoing caused class members to pay inflated prices to Valve.

6    Publishers paid an inflated commission directly to Valve, and gamers paid inflated retail prices

7    directly to Valve.

8            334.    Plaintiffs representing the alleged Sub-Classes also have claims that are typical of

9    the claims of the corresponding Sub-Classes.  The members of the Non-Subscriber game

10   purchasers Sub-Class all paid inflated retail prices directly to Valve.  The members of the Game

11   purchasers Sub-Class all paid inflated retail prices directly to Valve.  The members of the Game

12   publishers Sub-Class all paid an inflated commission to Valve on every sale.

13           335.    Plaintiffs will fairly and adequately protect and represent the interests of the Class,

14   and the representatives of each Sub-Class will fairly and adequately protect and represent the

15   interests of each Sub-Class.  The interests of Plaintiffs are coincident with, and not antagonistic to,

16   those of the Class (and each Sub-Class).  Accordingly, by proving their own claims, Plaintiffs will

17   prove other class members' claims as well.

18           336.    **Adequacy of Representation**.  Plaintiffs are represented by counsel who are

19   experienced and competent in the prosecution of class action antitrust litigation.  Plaintiffs and

20   their counsel have the necessary financial resources to adequately and vigorously litigate this class

21   action.  Plaintiffs can and will fairly and adequately represent the interests of the Class (and each

22   Sub-Class)  and have no interests that are adverse to, conflict with, or are antagonistic to the

23   interests of the Class (and each Sub-Class).

24           337.    There is an alignment of interests, and no conflict of interest, between gamers and

25   publishers that use Steam's services in the relevant markets.  Valve's excessive commissions harm

26   both sets of class members.  Both sets of class members would benefit from robust competition in

27   the relevant markets, and from reforming Valve's illegal practices through injunctive relief.

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

93

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

338.   **Commonality**.  There are questions of law and fact common to the Class (and each Sub-Class), which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

- whether there exist relevant markets for PC Desktop Gaming Platforms and PC Desktop Game Distribution, or an alternative relevant market for PC Desktop Game Transaction Platforms;
- whether Valve possesses market power in the relevant markets;
- whether Valve's mandate that game publishers sell the vast majority of Steam-enabled games through the Steam store is anticompetitive;
- whether the Valve PMFN is anticompetitive; and
- whether Valve's conduct has led to supracompetitive prices, reduced output, or reduced quality in the relevant markets.

339.   The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

340.   This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible.  The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impracticable for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## INTERSTATE TRADE AND COMMERCE

341.   Valve's conduct has taken place in and affected the continuous flow of interstate trade and commerce of the United States, in that, *inter alia*:  Valve has provided PC Desktop Game distribution throughout the United States; Valve has used instrumentalities of interstate commerce to provide PC Desktop Game distribution throughout the United States; in furtherance of the anticompetitive scheme alleged herein, Valve employees have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and the anticompetitive scheme alleged herein has affected billions of dollars of commerce.

1    342.    Valve has inflicted antitrust injury by causing publishers, including Wolfire, and

2  gamers to pay supracompetitive prices and to experience reduced output and quality in the relevant

3  markets.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

95

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Sherman Act Section 2—Monopolization of the PC Desktop Game Distribution Market (15 U.S.C. § 2)

343.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

344.    Valve has monopoly power in the relevant market for PC Desktop Gaming Platforms.

345.    Valve has used its monopoly power in PC Desktop Gaming Platforms in an exclusionary and anticompetitive manner to monopolize the relevant market for PC Desktop Game Distribution.

346.    Valve has 75% or more market share in each of the relevant markets, and there are substantial barriers to new entry in each relevant market.  Valve has the power to control prices or exclude competition in the relevant markets.

347.    Valve has willfully acquired and maintained monopoly power in the relevant markets, by means of exclusionary and anticompetitive conduct, including but not limited to market-wide price controls, coercion of disloyal publishers, and tying, as alleged herein.

348.    The Steam Gaming Platform and Steam Store are two separate products.

349.    Publishers that would like to publish games enabled for the Steam Gaming Platform must list their games through the Steam Store, and are coerced into doing so by contract. This constitutes an illegal tie between the Steam Gaming Platform and the Steam Store, as publishers cannot avoid the Steam Store if they want access to the Steam Gaming Platform.

350.    Through the Valve PMFN, Valve has coerced publishers into agreeing to offer prices at the same price across all PC Desktop Game Distributors, regardless of whether competing distributors charge a lower commission or otherwise charge lower prices than Valve.

351.    Valve's threats and coercion have impeded competitors' ability to attract more publishers and gamers to their PC Desktop Game Distribution outlets.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

96

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1     352.    Valve's conduct is not justified, because its conduct does not enhance overall

2  efficiency or make the relevant markets more efficient.

3     353.    Valve's conduct has had a substantial effect on interstate commerce.

4     354.    Plaintiffs and all those in the Class[181] have been or will be injured in their property

5  as a result of Valve's conduct.

6     355.    Plaintiffs and all those in the Class have suffered and will suffer injury of the type

7  that the antitrust laws were intended to prevent.  Plaintiffs have been and will be injured by the

8  harm to competition as a result of Valve's conduct.

9

**SECOND CAUSE OF ACTION**

10

**Sherman Act Section 2—Attempted Monopolization of the PC Desktop Game Distribution
Market (15 U.S.C. § 2)**

11

12     356.    The foregoing paragraphs are incorporated by reference as though fully set forth

13  herein.

14     357.    In the relevant markets for PC Desktop Gaming Platforms and PC Desktop Game

15  Distribution, Valve has engaged in exclusionary and anticompetitive conduct, including but not

16  limited to market-wide price controls, coercion of disloyal publishers, and tying, as alleged herein.

17     358.    Valve's conduct has had substantial anticompetitive effects in the relevant markets

18  for PC Desktop Gaming Platforms and PC Desktop Game Distribution.

19     359.    Valve's conduct has no legitimate business purpose or procompetitive effect.

20     360.    Valve has engaged in that conduct with the specific intent of monopolizing the

21  relevant markets for PC Desktop Gaming Platforms and PC Desktop Game Distribution.

22     361.    Valve has engaged in that conduct with a dangerous probability of monopolizing

23  each of the relevant markets.

24     362.    Valve's conduct has had a substantial effect on interstate commerce.

25

26

27

---

[181]  The use of the word "Class" in each of these counts applies to both the omnibus Class and the

28  alleged Subclasses.

97

363.     Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

364.     Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

## THIRD CAUSE OF ACTION

### Sherman Act Section 2—Monopolization of the PC Desktop Gaming Platform Market (15 U.S.C. § 2)

365.     The foregoing paragraphs are incorporated by reference as though fully set forth herein.

366.     Valve has willfully acquired and maintained monopoly power in the relevant market for PC Desktop Gaming Platforms, by means of exclusionary and anticompetitive conduct, including but not limited to market-wide price controls, coercion of disloyal publishers, and blocking competitive strategies, as alleged herein.

367.     By tying the Steam Gaming Platform to the Steam Store, Valve has inhibited the ability of rival gaming platforms to compete against the Steam Gaming Platform.  Valve's tie therefore further cements and protects its dominance of the PC Desktop Gaming Platform Market.

368.     Valve has coerced publishers into agreeing to offer prices at the same price across all PC Desktop Game Distributors, regardless of whether competing distributors charge a lower commission or otherwise charge lower prices than Valve.

369.     Valve's threats and coercion have impeded competitors' ability to attract more publishers and gamers to their PC Desktop Game Platforms.

370.     Through the Valve PMFN Valve has coerced publishers into listing their games for higher prices market-wide, even for versions of PC Desktop Games not enabled for the Steam Gaming Platform, else face exclusion from the Steam Store and Steam Gaming Platform.

371.     Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant markets more efficient.

372.     Valve's conduct has had a substantial effect on interstate commerce.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

98

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

373.   Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

374.   Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

## FOURTH CAUSE OF ACTION

### Sherman Act Section 2—Attempted Monopolization of the PC Desktop Gaming Platform Market (15 U.S.C. § 2)

375.   The foregoing paragraphs are incorporated by reference as though fully set forth herein.

376.   In the relevant market for PC Desktop Gaming Platforms, Valve has engaged in exclusionary, and anticompetitive conduct, including but not limited to market-wide price controls, coercion of disloyal publishers, as alleged herein.

377.   Valve's conduct has had an anticompetitive effect in the relevant market for PC Desktop Gaming Platforms.

378.   Valve's conduct has no legitimate business purpose or procompetitive effect.

379.   Valve has engaged in that conduct with the specific intent of monopolizing the relevant market for PC Desktop Gaming Platforms.

380.   Valve has engaged in that conduct with a dangerous probability of monopolizing the relevant market for PC Desktop Gaming Platforms.

381.   Valve's conduct has had a substantial effect on interstate commerce.

382.   Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

383.   Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

99

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

**FIFTH CAUSE OF ACTION**

**Sherman Act Section 2—Monopolization of the Alternative PC Desktop Game Transaction Platforms Market**
**(15 U.S.C. § 2)**

384.     The foregoing paragraphs are incorporated by reference as though fully set forth herein.

385.     In the alternative to the first and third causes of action, Valve has willfully acquired and maintained monopoly power in the alternative relevant market for PC Desktop Game Transaction Platforms, by means of exclusionary, and anticompetitive conduct, including but not limited to market-wide price controls, coercion of disloyal publishers, and blocking competitive strategies, as alleged herein.

386.     Through the Valve PMFN Valve has coerced publishers into agreeing to offer their games at the same price across all PC Desktop Game Transaction Platforms, regardless of whether competing transaction platforms charge a lower commission or otherwise charge lower prices than Valve.

387.     Valve's threats and coercion have impeded competitors' ability to attract more publishers and gamers to their PC Desktop Game Transaction Platforms.

388.     In the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete.  Such competition would in turn lower prices on Valve's own PC Desktop Game Transaction Platform, benefitting consumers and publishers that utilized Valve's PC Desktop Game Transaction Platform.

389.     Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant markets more efficient.

390.     Valve's conduct has had a substantial effect on interstate commerce.

391.     Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

392.     Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

100

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

## SIXTH CAUSE OF ACTION

### Sherman Act Section 2—Attempted Monopolization of the Alternative PC Desktop Game Transaction Platforms Market (15 U.S.C. § 2)

393.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

394.    In the alternative to the second and fourth causes of action, in the alternative relevant market for PC Desktop Game Transaction Platforms, Valve has engaged in exclusionary, and anticompetitive conduct, including but not limited to market-wide price controls, coercion of disloyal publishers, as alleged herein.

395.    Valve's conduct has had an anticompetitive effect in the alternative relevant market for PC Desktop Game Transaction Platforms.

396.    Valve's conduct has no legitimate business purpose or procompetitive effect.

397.    Valve has engaged in that conduct with the specific intent of monopolizing the alternative relevant market for PC Desktop Game Transaction Platforms.

398.    Valve has engaged in that conduct with a dangerous probability of monopolizing the alternative relevant market for PC Desktop Game Transaction Platforms.

399.    In the absence of the Valve PMFN, rivals in the PC Desktop Game Transaction Platforms market would charge lower prices and force Valve to compete.  Such competition would in turn lower prices on Valve's own PC Desktop Game Transaction Platform, benefitting consumers and publishers that utilized Valve's PC Desktop Game Transaction Platform.

400.    Valve's conduct has had a substantial effect on interstate commerce.

401.    Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

402.    Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

101

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

**SEVENTH CAUSE OF ACTION**

**Sherman Act Section 1—Unreasonable Restraints of Trade (15 U.S.C. § 1)**

403.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

404.    As alleged above, through its contractual agreements with game publishers, Valve has induced or coerced various publishers to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain market power in the relevant markets for PC Desktop Gaming Platforms and PC Desktop Game Distribution.

405.    Valve's contractual agreements with game publishers illegally tie the Steam Gaming Platform and the Steam Store, as those agreements ensure publishers cannot avoid the Steam Store if they want access to the Steam Gaming Platform.

406.    Valve's conduct has had an anticompetitive effect in the relevant markets for PC Desktop Gaming Platforms and PC Desktop Game Distribution, as well as the alternative relative market for PC Desktop Game Transaction Platforms.

407.    Valve's conduct has no legitimate business purpose or procompetitive effect.

408.    There are less restrictive alternatives to the restraints Valve imposed.

409.    Valve's conduct has had a substantial effect on interstate commerce.

410.    Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

411.    Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

**EIGHTH CAUSE OF ACTION**

**Washington State Consumer Protection Act RCW 19.86**

412.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

102

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1      413.   The claims alleged above constitute unfair methods of competition under

2  Washington State law provisions 19.86.020, 19.86.040, and 19.86.030.

3      414.   Valve is engaged in unfair and deceptive practices in commerce, which affect the

4  public interest and cause injury to business and property.

5      415.   Valve's contracts, combinations, or conspiracies with game publishers are

6  anticompetitive restraints that have the purpose and effect of fixing and inflating prices in the

7  relevant markets.

8      416.   The contracts, combinations, or conspiracies at issue are in restraint of trade.

9      417.   Valve's monopolization and attempted monopolization have the purpose and effect

10  of fixing and inflating prices in the relevant markets.

11      418.   As such, class members are entitled to damages and an injunction under Revised

12  Code of Washington 19.86.090.

13      **<ins>PRAYER FOR RELIEF</ins>**

14      *<ins>Wherefore, Plaintiffs request the following relief:</ins>*

15      (a)   Injunctive relief benefiting the class and the public, including a permanent

16  injunction barring Valve's unlawful restraints;

17      (b)   Damages in an amount to be determined;

18      (c)   Treble damages;

19      (d)   Attorneys' fees;

20      (e)   Costs;

21      (f)   Pre-judgment and post-judgment interest at the maximum rate permitted

22  under the law;

23      (g)   Punitive damages; and

24      (h)   Declaratory relief, including but not limited to a declaration and judgment

25  that Valve's conduct alleged in the Complaint violates the laws alleged in the Complaint; and

26  Such other and further relief as the Court deems proper and just.

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

103

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

DATED:  December 20, 2021

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

104

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1

2

By   */s/ Alicia Cobb*

3                      Alicia Cobb, WSBA # 48685

4                      QUINN EMANUEL URQUHART &
SULLIVAN, LLP

5                      1109 First Avenue, Suite 210
Seattle, WA 98101

6                      Telephone: (206) 905-7000
Fax:  (206) 905-7100

7                      Email: aliciacobb@quinnemanuel.com

8

9                      Steig D. Olson (*pro hac vice*)
David D. LeRay (*pro hac vice*)

10                    Shane Seppinni (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP

11

12                    51 Madison Avenue, 22nd Floor
New York, NY 10010

13                    Telephone: (212) 849-7000
Fax:  (212) 849-2100

14                    Email: steigolson@quinnemanuel.com

15                    Adam B. Wolfson (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP

16

17                    865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

18                    Telephone: (213) 443-3000
Fax:  (213) 443-3100

19                    Email: adamwolfson@quinnemanuel.com

20                    Charles B. Stevens (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP

21

22                    50 California Street, 22nd Floor
San Francisco, CA 94111

23                    Telephone: (415) 875-6600
Fax:  (415) 875-6700

24                    Email: charliestevens@quinnemanuel.com

25

26                    *Attorneys for Daniel Escobar, William Herbert,
and the class.*

27

28

Second Amended Consolidated Class Action Complaint
Case No. Case No. 2:21-CV-563

105

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1   David D. Golden (*pro hac vice*)
    CONSTANTINE CANNON LLP
2   1001 Pennsylvania Avenue, NW, Suite 1300N
    Washington, DC 20004
3   Telephone: (202) 204-3500
    Fax:  (202) 204-3501
4   Email: dgolden@constantinecannon.com

5   A. Owen Glist (*pro hac vice*)
    Ankur Kapoor (*pro hac vice*)
6   Jeffrey I. Shinder (*pro hac vice*)
    CONSTANTINE CANNON LLP
7   335 Madison Avenue, 9th Floor
    New York, NY 10017
8   Telephone: (212) 350-2700
    Fax:  (212) 350-2701
9   Email: akapoor@constantinecannon.com

Thomas N. McCormick (*pro hac vice*)
VORYS, SATER, SEYMOUR AND PEASE LLP
4675 MacArthur Court
Suite 700
Newport Beach, CA 92660
Telephone: (949) 526-7903
Fax: (949) 526-7901
Email: tnmccormick@vorys.com

Kenneth J. Rubin (*pro hac vice*)
Timothy B. McGranor (*pro hac vice*)
Kara M. Mundy (*pro hac vice*)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, OH 43216-1008
Telephone: (614) 464-6350
Fax: (614) 719-6350
Email: kjrubin@vorys.com
tbmcgranor@vorys.com
kmmundy@vorys.com

*Attorneys for Wolfire Games, LLC and the class.*

*Attorneys for Sean Colvin, Susann Davis, Daniel Ryan Lally, Hope Marchionda, Everett Stephens, and the class.*

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

106

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on December 20, 2021, I caused a true and correct copy of the

3

foregoing to be filed in this Court's CM/ECF system, which sent notification of such filing to

4

counsel of record.

5

DATED December 20, 2021.

6

7

8

*/s/ Alicia Cobb*
Alicia Cobb, WSBA #48685

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CASE NO. 2:21-CV-563

107

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000