The Honorable John C. Coughenour

1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9        FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

10

| | |
|---|---|
| Wolfire Games, LLC, Sean Colvin, Susann Davis, Daniel Escobar, William Herbert, Ryan Lally, Hope Marchionda, Everett Stephens, individually and on behalf of all others similarly situated,<br><br>                                        Plaintiffs,<br><br>        v.<br><br>Valve Corporation,<br><br>                                        Defendant. | Case No. 2:21-cv-00563-JCC<br><br>**DEFENDANT VALVE CORPORATION'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**NOTE ON MOTION CALENDAR: APRIL 8, 2022** |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

DEFENDANT VALVE CORPORATION'S MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT  - (2:21-CV-00872-JCC)

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS ......................................................................................4

III.  ARGUMENT ..........................................................................................................5

    A.  LEGAL STANDARD..................................................................................5

    B.  WOLFIRE'S ANTITRUST CLAIMS BASED ON SEPARATE
       PRODUCT MARKETS FOR GAMES AND GAMING PLATFORMS
       FAIL FOR LACK OF A FACIALLY SUSTAINABLE MARKET
       DEFINITION ...............................................................................................6

          1.  STEAM IS A SINGLE PRODUCT UNDER THE RICK-
              MIK ESSENTIAL INGREDIENT STANDARD. ............7

          2.  STEAM IS A SINGLE PRODUCT UNDER THE
              JEFFERSON PARISH CONSUMER DEMAND
              STANDARD...................................................................9

    C.  WOLFIRE AGAIN FAILS TO ALLEGE ANTITRUST INJURY ..........11

          1.  WOLFIRE'S STEAM KEYS ALLEGATIONS DO NOT
              PLEAD ANTITRUST INJURY. ...................................11

          2.  WOLFIRE'S MARKET ALLEGATIONS RENDER
              SUPRACOMPETITIVE PRICING IMPLAUSIBLE. ....12

          3.  WOLFIRE'S OUTPUT AND QUALITY
              ALLEGATIONS DO NOT PLEAD ANTITRUST
              INJURY. .......................................................................19

IV.  CONCLUSION......................................................................................................23

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' AMENDED CLASS ACTION
COMPLAINT – (2:21-CV-00872-JCC) - i

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                                 **Page(s)**

3   *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
4       836 F.3d 1171 (9th Cir. 2016) ...............................................................................11

*Bell Atl. Corp. v. Twombly*,
5       550 U.S. 544 (2007) ..................................................................................................5

6   *Ebner v. Fresh, Inc.*,
7       838 F.3d 958 (9th Cir. 2016) .................................................................................2, 3

8   *F.T.C. v. Actavis, Inc.*,
        570 U.S. 136 (2013) ................................................................................................17
9
*Fed. Trade Comm'n v. Qualcomm Inc.*,
10      969 F.3d 974 (9th Cir. 2020) ...................................................................................5

11  *Hicks v. PGA Tour, Inc.*,
12      897 F.3d 1109 (9th Cir. 2018) .................................................................................5

13  *In re Intuniv Antitrust Litig.*,
        496 F. Supp. 3d 639 (D. Mass. 2020) ...............................................................16, 20
14
*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
15      466 U.S. 2 (1984) ......................................................................................................6

16  *Leegin Creative Leather Prods. v. PSKS, Inc.*,
17      551 U.S. 877 (2007).................................................................................................21

18  *In re NCAA I-A Walk-On Football Players Litig.*,
19      2006 WL 1207915 (W.D. Wash. May 3, 2006)......................................................10

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
20      51 F.3d 1421 (9th Cir. 1995) ..................................................................................10

21  *Rick-Mik Enterp., Inc. v. Equilon Enterp. LLC*,
22      532 F.3d 963 (9th Cir. 2008) ....................................................................................6

23  *New York ex rel. Schneiderman v. Actavis PLC*,
        787 F.3d 638 (2d Cir. 2015)....................................................................................17
24
*Somers v. Apple, Inc.*,
25      729 F.3d 953 (9th Cir. 2013) .........................................................................*passim*

26  *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
        875 F.2d 1369 (9th Cir. 1989) ................................................................................13

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) ii

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)............................................................................................................5

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - iii

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

## I.   **INTRODUCTION**

In its Order granting Valve's first motion to dismiss, the Court enumerated the defects of Wolfire Games' Consolidated Amended Class Action Complaint ("CAC").[1]

First, the Court held that Wolfire's antitrust tying claims were insufficiently pled because they relied on an implausible definition of the relevant market. Order (Dkt. # 67) at 4–5. In the CAC, Wolfire tried to establish that Steam, Valve's online gaming platform, combines two separate products operating in two separate markets—a "desktop platform market" and a "PC desktop game transaction market." *Id.* The Court found this theory implausible based on Wolfire's allegations, concluding that Steam is a single product in an integrated game platform and transaction market. *Id.*

Second, the Court rejected Wolfire's contention that Valve's 30% commission was supracompetitive. Order at 6–7. The Court found that Valve had allegedly charged this same commission from the beginning, "even during periods of intense competition," and that companies with "significant resources" that charged less for their services had floundered. *Id.* In other words, Valve charged the same commission before and after it allegedly acquired a monopoly and maintained this commission in the face of competition. *Id.* Under *Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013), such a commission is not supracompetitive.

Third, the Court concluded that Wolfire failed to allege non-price antitrust injuries in output or quality. Order at 7. "If anything, the facts provided by the CAC, at least with respect to output, suggest the opposite—a consistent increase in the number of games available in the market and on the Steam Platform"—and fail to plausibly articulate how Wolfire directly suffered or how any developer was harmed by unlawful antitrust conduct. Order at 7.

---

[1] Wolfire filed its Complaint with seven individual game players, but the Court granted Valve's motion to compel arbitration of the individuals' claims under Valve's Steam Subscriber Agreement. *See* Order (Dkt. # 66) at 5.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC)  1

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1    Having been granted leave to amend, Wolfire filed a Second Amended Consolidated

2    Complaint ("SAC"). But Wolfire's SAC fails to cure the defects the Court identified. It, too,

3    should be dismissed, this time with prejudice.

4    First, the SAC still fails to plausibly bisect Steam into two products operating in separate

5    antitrust markets. On the contrary, Wolfire again alleges that games "developed for a particular

6    platform cannot be played on another platform and, with limited exceptions, game platforms do

7    not charge for their use … but generate revenue to support the platform" by selling compatible

8    games and in-app purchases. Order at 5 (citing CAC at pages 64, 69–74, 78, 84); *see, e.g.*, SAC

9    ¶¶ 272–73, 277–79, 282, 303, 323. And while "Steam-enabled games can be purchased on a

10   limited basis elsewhere," this can be done only through Steam Keys that Valve provides at no

11   charge, which "only serve[] to allow the game to be played on the Steam Platform." Order at 5

12   (citing CAC at page 30); *see, e.g.*, SAC ¶ 116. These facts make Steam a single product under

13   any legal standard.

14   Second, the SAC still fails to plausibly allege that Steam's 30% commission is supracom-

15   petitive. Again, Wolfire concedes that Valve set its commission at the beginning and has main-

16   tained it for decades, including during periods of "vibrant competition" against such companies

17   as Amazon, GameStop, and Microsoft. SAC ¶ 51. As a matter of law, Valve's commission is

18   therefore not supracompetitive. Wolfire's new allegations, which offer specious analogies to

19   Walmart's business model and generic drug sales, cannot overcome this fundamental failing.

20   Third, the alleged non-price injuries in output or quality are no better pled than before.

21   Wolfire once again implausibly alleges that Valve has some sort of secret, unwritten Steam Keys

22   policy causing Valve to enforce the Steam Key Guidelines contrary to their terms as part of an

23   alleged platform-most-favored-nation ("PMFN") requirement. *Id.* ¶¶ 13, 15, 212. Wolfire now

24   asserts that Valve's enforcement of its Steam Key Guidelines prevented it from having "sold

25   more games at a lower price" on other platforms. *Id.* ¶ 221. But the Guidelines merely ask

26   developers to give Steam customers as good a deal as they give customers who buy the same

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 2

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1   games elsewhere via Steam Keys. *Id*. ¶¶ 212, 216–17. Wolfire suggests the Guidelines require

2   non-Steam-enabled games to have the same price as well, but that's simply not true, and no facts

3   plausibly support the suggestion. The SAC adds allegations of two one-on-one exchanges with

4   Valve employees—one with Wolfire and another with an unidentified developer—about pricing

5   of non-Steam-enabled games, but leaves out the other developer's game, price, platform, or store

6   this alleged shadow policy supposedly affected. *Id*. ¶¶ 221, 222. Even if the SAC plausibly

7   alleged that Valve had such a shadow policy, the SAC does not say how Valve could have

8   communicated it market-wide to thousands of developers through one-on-one exchanges such as

9   these. And, limited to two developers, this account falls far short of plausibly alleging antitrust

10  injury to competition.

11       Moreover, the SAC still alleges "a consistent increase in the number of games available

12  in the market and on the Steam Platform." Order at 7 (citing CAC at pages 16, 29); *see* SAC ¶¶

13  71, 114. Indeed, Wolfire admits that Steam "grew from offering seven games in 2004 to over

14  45,000 by 2021," SAC ¶ 71—just as it alleged before, CAC ¶ 57. This continues to suggest "the

15  opposite" of a reduction in output. Order at 7. In response to the Court's finding that "the CAC

16  does not describe facts describing how Wolfire directly suffered from an alleged reduction in

17  output and/or quality," Order at 7, the SAC adds "(including Wolfire)" to old allegations that

18  Valve "suppresses output by game developers," SAC ¶ 246, and "does not provide a competitive

19  level of quality to publishers," *id*. ¶ 312. Such perfunctory additions add no facts. The Court

20  explicitly rejected the old allegations as inadequately pled, Order at 7; the new ones remain so.

21       In short, none of Wolfire's revisions in the SAC should change the Court's decision.

22  Wolfire has twice failed to allege unlawful antitrust conduct or antitrust injury—thrice counting

23  the original complaint Wolfire amended before Valve responded. It does not deserve another

24  chance. Leave to amend should be denied when amendment would be futile, *Ebner v. Fresh,*

25  *Inc.*, 838 F.3d 958, 968 (9th Cir. 2016), and yet another amendment here would plainly be an

26  exercise in futility.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 3

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

130078785

## II.   STATEMENT OF FACTS

Valve develops and distributes video games and content for use on PCs. SAC ¶ 26. Valve also operates Steam, *id.*, an integrated, online gaming platform that includes (1) an online store, where users can purchase, among other things, video games to play on the platform, and (2) use many features game players value such as matching them with other persons wanting to play, tracking achievements, communicating with others through chat and social networking, updating games, and maintaining a library to store games. *Id.* ¶¶ 55, 71, 108. Since its launch in 2003, *id.* ¶ 55, Steam has been tremendously successful, and currently hosts over 45,000 games with 120 million monthly active users. *Id.* ¶¶ 71, 135.

Third-party game developers produce the overwhelming majority of games that customers buy and play on Steam, *id.* ¶¶ 124, 134, and they set their own prices, *id.* ¶ 231. Valve sells their games to players on Steam at these prices and sends developers the revenue, less Valve's commission, sales tax, and refunds. *Id.* ¶ 297. Valve also provides developers with free Steam Keys, which enable players to play games they purchased elsewhere on Steam "as if they had purchased the game" there. *Id.* ¶ 116. Valve gives Steam Keys to developers, who may give them to reviewers or sell them on their own websites or stores or through "rival distributors including Amazon and GameStop," and Valve earns no commission on those game sales. *Id.* ¶ 160. But in return Valve asks developers not to disadvantage Steam customers by offering them a worse deal than customers buying Steam Keys outside of Steam. *Id.* ¶ 137 n.56.

Valve offers Steam to game players for free, a fact stated on the face of Valve's *Steamworks Documentation* for Steam Keys—a document Wolfire relies on and cites in the SAC. *See* https://partner.steamgames.com/doc/features/keys (cited in SAC ¶¶ 15 n.5, 213 n.83, 217 n.85) ("Valve provides … free bandwidth and services to customers activating a Steam key … [and] to customers buying a license on Steam") (emphasis added). Valve earns revenue to pay for Steam—for the servers and other infrastructure all over the world to enable players to access their Steam accounts to buy and play games, for customer service agents, for employees who add

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 4

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

features to make it more popular with customers and developers, and other Steam expenses—by charging a commission when game developers sell games to players on Steam. *Id*. ¶¶ 15 n.5, 137. Specifically, Valve charges game developers 30% of the game's price (except 0% for those sold via Steam Keys), but as of October 1, 2018 offers discounts to games that sell over $10 million (25% commission) and games that reach $50 million (20% commission). *Id*. ¶ 9 n.3.

The SAC makes clear that the Steam platform is far more than a "middleman," *id*. ¶ 138, but offers real value to gamers and developers. *Id*. ¶¶ 97, 126. Indeed, gamers allegedly prize Steam so much that Epic's offering popular games exclusively on its Epic Game Store platform "caused backlash" and "calls for boycotts" from gamers forced to "wait for a Steam-enabled release or use a PC Desktop Gaming Platform they do not prefer." *Id*. ¶¶ 100, 283. An angry user called Epic's action in buying exclusive rights to Borderlands 3 "very anti consumer." *Id*. ¶ 100. Gamers "want to use the PC Desktop Gaming Platform of their choice." *Id*. ¶ 99.

Steam was born of innovation and entrepreneurship in a vigorously competitive market. In 2004, Valve developed a "blockbuster hit" game—Half-Life 2—and decided to sell it on, and enable it to be played only on, its year-old Steam platform. *Id*. ¶¶ 57–58. This decision, made at a time of "vibrant competition" between digital game distributors, *id*. ¶ 51, caused Steam to grow, *id*. ¶ 60. But Steam did not become "dominant" until 2013. *Id*. ¶ 111. Valve charged its 30% commission—alleged to be the industry standard, *id*. ¶ 306—from Steam's beginning when it had zero market share, and hence no power to charge anything but a competitive price, and maintained it until reducing it in 2018 for high-selling games. *Id*. ¶ 9, n.3.

The Court dismissed Wolfire's prior Complaint for failure to state an antitrust claim. Although Wolfire amended its pleading, the essential facts and legal theories remain the same.

## III.   ARGUMENT

### A.   Legal Standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 5

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation marks omitted). "Applying this standard is a context-specific task that requires drawing on judicial experience and common sense." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018) (quotation marks omitted).

This is especially true in antitrust. "[I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (citation omitted). Consequently, "the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage …." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (quotation marks omitted).

**B.**   **Wolfire's Antitrust Claims Based on Separate Product Markets for Games and Gaming Platforms Fail for Lack of a Facially Sustainable Market Definition**

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to the area of effective competition." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quotation marks omitted). "A complaint may be dismissed under Rule 12(b)(6) if the complaint's relevant market definition is facially unsustainable." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (quotation marks omitted). As the Court noted, "the CAC present[ed] two different market theories. Under the first, the Steam Platform and the Steam Store operate in separate markets: a PC desktop platform market and a PC desktop game transaction market. Under the second, they operate as a single product in an integrated transaction platform market." Order at 4.

The Court observed that "[t]his distinction matters—only a separate market theory would support the CAC's causes of action based on tying claims." Order at 4 (citations omitted). The

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 6

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

Court then concluded that "under either *Jefferson Parish's* consumer demand standard or *Rick-Mik's* essential ingredient standard, the CAC's allegations suggest that the Steam Platform and Steam Store are a single product within the integrated game platform and transaction market." Order at 5; *see Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19–25 (1984); *Rick-Mik Enterp., Inc. v. Equilon Enterp. LLC*, 532 F.3d 963, 974 (9th Cir. 2008).

Wolfire added a few paragraphs to the SAC to try to escape the Court's ruling, but they make no substantive difference because the SAC continues to allege the facts the Court found dispositive under either standard: "[G]ames developed for a particular platform cannot be played on another platform and, with limited exceptions, game platforms generally do not charge for their use; instead, they generate revenue to support the platform through the sale of platform-compatible games and in-app purchases." Order at 5. Steam-enabled games "can be purchased on a limited basis elsewhere. But those games are of no value unless the publisher includes a Steam Key, which Defendant provides at no charge and serves to allow the game to be played on the Steam Platform." *Id.* (citations omitted).

1.  *Steam is a Single Product under the Rick-Mik Essential Ingredient Standard*.

Wolfire adds two sentences to SAC ¶ 61 (formerly CAC ¶ 54) alleging that (i) because Steam launched as a platform for playing (Valve) games without a store, and most initial Steam users therefore got Steam because it was included in a physical copy of a game they bought from a brick-and-mortar store, so a store must not be an "essential ingredient" of Valve's success, and (ii) Valve shifted its focus toward Steam and away from "game development over the years because [Steam] was so much more profitable." SAC ¶ 61.

Wolfire previously alleged that "[t]here was no store component to Steam at launch," CAC ¶ 50, so the SAC's factual addition merely states the logical result of launching Steam without, at first, the ability to sell games online—users got Steam access in a box when they bought a Steam-enabled Valve game from a brick-and-mortar store. SAC ¶ 56. This supports the

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 7

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1    Court's decision that "the Steam Platform and Steam Store are a single product within the

2    integrated game platform and transaction market," Order at 5, by showing that the supposedly

3    separate Steam features (games and a platform for playing them) were joined at birth, with "most

4    people" getting them both in the same box for the price of the game alone. SAC ¶ 61.

5          When Valve decided to open Steam to other developers, it kept Steam free to users and

6    instead charged developers 30% for games they sold on Steam. SAC ¶ 61, CAC ¶ 54.[2] Steam

7    eventually grew to 120 million monthly active users. SAC ¶ 71, CAC ¶ 57. Wolfire's conclusion

8    that game sales, which pay for Steam, Order at 2, are not essential to Valve's success lacks any

9    credibility.

10         Wolfire then turns to Steam Keys to conclude, again implausibly, that "Valve's 'Steam

11   Keys' program also demonstrates that linking the Steam Store to the Steam Gaming Platform is

12   not an essential ingredient of Valve's business strategy." SAC ¶ 116. But the existence of Steam

13   Keys says nothing about whether including game sales in Steam is an "essential ingredient" in

14   Valve's strategy, for three reasons:

15         First, Wolfire concedes that only a small minority of Steam-enabled games are sold via

16   Steam Keys, undermining any inferences about how Steam Keys bear on what are the "essential

17   ingredients" of Valve's strategy. SAC ¶ 185 ("game publishers sell the vast majority of their

18   Steam-enabled games through the Steam Store").

19         Second, and crucially, as the Court observed, Valve uses the revenue it earns from game

20   sales on Steam (in contrast to free Steam Keys, from which Valve earns no revenue) to fund

21   development of the Steam platform on which users play games, and a platform for playing is of

22   course an "essential," indeed central, component of Valve's business model. *See* Order at 5.

23         Third, the Court already rejected Wolfire's allegation that "[t]he PC Desktop Game

24   Distribution Market is distinct from the PC Desktop Gaming Platform Market." CAC ¶ 101,

---

[2] Citing the SAC and CAC side-by-side means the allegation appears in both the current Second
Amended Consolidated Complaint and the dismissed Consolidated Amended Complaint.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 8

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

SAC ¶ 115; Order at 5 ("the CAC's allegations do not support Wolfire's contention that the game platform and game transaction markets are, in fact, separate"; "under either *Jefferson Parish*'s consumer demand standard or *Rick-Mik*'s essential ingredient standard, the CAC's allegations suggest that the Steam Platform and Steam Store are a single product within the integrated game platform and transaction market"). Steam Keys don't undermine the essential connection between selling and playing games on Steam.

> 2. *Steam is a Single Product Under the Jefferson Parish Consumer Demand Standard.*

Wolfire also adds four paragraphs, SAC ¶¶ 155–58, arguing that various competitors' offerings reveal distinct demand for games and platforms, so the Court should reverse its finding that Wolfire alleged "a single product within the integrated game platform and transaction market." Order at 5. But most of the facts alleged already appeared in the CAC, where the Court concluded they were not evidence of separate demand. *Id.*

- Amazon's Twitch, "a popular video game streaming service, … offers social networking services for gamers but does not distribute games." SAC ¶ 155. Wolfire previously called (and still calls) Twitch "one of the biggest challenges yet to Steam," when, in 2017, it sold games. CAC ¶ 252. These allegations remain. SAC ¶ 275.

- "Discord, a popular social networking platform for gamers" does not sell games. SAC ¶ 155. Wolfire previously alleged that Discord "offers text messaging, voice, and video calling for gamers," CAC ¶ 241, and in 2018 began to sell games in a "vertically integrated offering," calling it "the biggest threat [Steam's] faced in years." CAC ¶ 242. These allegations remain. SAC ¶¶ 263, 264.

- Riot not only publishes the popular game League of Legends but also, like other companies, offers a "launcher," a "limited-service platform[]" for gamers to maintain a central library of games and automatically update them. SAC ¶ 156.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 9

Fox Rothschild LLP
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

130078785

Wolfire previously described Riot and its launcher as a successful Steam competitor, "(essentially a rival platform)," CAC ¶ 120, and still does, SAC ¶ 134.

- Consumers "do not view gaming platforms as interchangeable, including those offering distribution services," negatively react to exclusives, and "do not readily and happily switch between platforms" or purchase games from a "less preferred platform." SAC ¶ 157. Nothing is new here, as Wolfire previously alleged that gamers prefer the platform "of their choice" to one they may have with an exclusive. CAC ¶¶ 70, 85, 86, 260 (alleged again at SAC ¶¶ 84, 99, 100, 283).

None of these restated facts undercuts the factual allegations that led the Court to rule that Wolfire alleged Steam to be "a single product within the integrated game platform and transaction market." Order at 5. Indeed, these paragraphs in the SAC, realleging facts from the CAC, establish that Amazon's Twitch, Discord, and Riot all combined games and services into integrated offerings—the opposite of Wolfire's contention—and that Riot still does. Wolfire's new "conclusion that consumer demand for platform services and distribution services is distinct," SAC ¶ 157, and similar conclusory sentences at the end of SAC ¶¶ 155 & 156, are implausible in light of the dispositive facts the Court cited above that make Steam a single integrated product.

Revealing a lack of confidence in its separate-markets theory, Wolfire continues to hedge its bets by alleging, alternatively, a "single relevant market" in which Steam is "an integrated whole"—the only market the Court found plausibly alleged. SAC ¶¶ 146–48, CAC ¶¶ 132–34. The Court should once again rule that Wolfire's allegations do not support its separate distribution and game markets theory and dismiss Wolfire's Section 1 tying (Seventh) claim, and the monopolization and attempted monopolization (First to Fourth) claims to the extent they are based on Wolfire's separate-markets theory. Its separate market definitions are facially unsustainable.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 10

130078785

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

C.    <u>**Wolfire Again Fails to Allege Antitrust Injury**</u>

All private antitrust claims require antitrust injury, *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995), and a plaintiff who fails to adequately plead antitrust injury lacks standing, *Somers v. Apple, Inc.*, 729 F.3d 953, 964 n.5 (9th Cir. 2013); *see also In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *14 (W.D. Wash. May 3, 2006) ("Plaintiffs can obtain *no* remedy without proving antitrust injury.") (Coughenour, J.).

In its Order, the Court ruled that Wolfire failed to allege antitrust injury—injury that "flow[s] from that which makes the conduct unlawful" or is "the type the antitrust laws [a]re intended to prevent." Order at 7 (citing *Am. Ad Mgt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999)). The Court ruled that Wolfire's allegation that Valve charged an alleged "supracompetitive fee," 30% subject to volume discounts, failed under *Somers v. Apple, Inc.*, 729 F.3d 953, 964–65 (9th Cir. 2013), because the fee had been the same long before any anticompetitive conduct was alleged. Order at 6. And the Court rejected Wolfire's allegations of "non-price antitrust injuries, namely a reduction in output and quality," because "[i]f anything, the facts provided by the CAC, at least with respect to output, suggest the opposite—a consistent increase in the number of games available in the market and on the Steam Platform." *Id.* at 7 (citing CAC at pages 16, 29). Nothing in Wolfire's new allegations changes the Court's conclusion that output is expanding.

1.    *Wolfire's Steam Keys Allegations Do Not Plead Antitrust Injury.*

Although Wolfire had a lot to say about Valve's Steam Keys program in the CAC, the Court's rulings of no antitrust injury did not depend on those allegations, and it's easy to see why. In its Opposition to Valve's Motion to Dismiss, Wolfire conceded that Valve had no legal duty to distribute Steam Keys at all. Opp. (Dkt. # 54) at 7. Wolfire makes no allegation to the contrary in the SAC, nor does it argue that "the only conceivable rationale or purpose" of Steam Keys "is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 11

130078785

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

Cir. 2016). The Court recognized this principle when dismissing the complaint in the *Dark Catt* case, Order (Dkt. # 56) at 6, and it applies equally here.

In fact, Wolfire adds hardly anything new about Steam Keys, and nothing to change the outcome. Nothing Wolfire adds about Steam Keys in the SAC alleges antitrust injury.

2. <u>Wolfire's Market Allegations Render Supracompetitive Pricing<br>Implausible.</u>

The SAC alleges no new facts to change the Court's ruling that Wolfire did not plausibly allege Valve's 30% commission to be supracompetitive. As before, "Plaintiff's allegations are not meaningfully different from *Somers v. Apple*, where the Ninth Circuit found implausible the allegation that Apple's 99 cent music download fee was supracompetitive." Order at 6. The facts alleged in the CAC that led the Court to that conclusion are unchanged:

- "Defendant has always charged the same fee to game publishers—30%," less recent volume discounts which "cut[] against the CAC's anti-competitive claims."

- The 30% fee "began not long after 2001, when the PC desktop 'digital distribution' market was in a 'fledging stage,' yet Defendant did not become 'dominant' in the market until 2013."

Order at 6 & n.4 (quotations and citations omitted).

The SAC continues to allege that Valve launched Steam amidst "vibrant competition," SAC ¶ 51, CAC ¶ 46 in 2003, SAC ¶ 55, CAC ¶ 49, and maintained the 30% commission "for nearly twenty years," SAC ¶ 68, CAC ¶ 55. Competition since then has been no less intense from "deep-pocketed" game publishers and companies that offer platforms competing with Steam, SAC ¶ 23–24, CAC ¶ 20–21, including Epic Game Store, "a vertically integrated Platform/Store offered by games publisher Epic" and "the leading alternative" to Steam, SAC ¶ 277, CAC ¶ 254; Electronic Arts, "a major publisher of games earning $5.5 billion in gaming revenue per year" with "a $41.73 billion market capitalization," SAC ¶¶ 132, 257, CAC ¶¶ 118, 235; "[w]ell-established companies with strong financial backing, such as EA, Microsoft, and Amazon," SAC

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 12

130078785

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

¶ 251, CAC ¶ 231; Google, SAC ¶ 276, CAC ¶ 253; Ubisoft, SAC ¶ 177, CAC ¶ 160; "Discord[,] the 'biggest threat [Steam's] faced in years,'" SAC ¶ 264, CAC ¶ 242; and retailers such as GameStop, Walmart, Target and smaller online storefronts like Green Man Gaming and Humble Bundle, SAC ¶ 141, CAC ¶ 127. For twenty years, Valve has faced competition from "the most sophisticated and largest gaming and technology companies in the world." SAC ¶ 23, CAC ¶ 20.

In the face of this competition, by 2009 Steam had not yet allegedly "cemented its hold" against competing gaming platforms. SAC ¶ 134, CAC ¶ 120. As the Court observed, Steam allegedly "did not become 'dominant' in the market until 2013," Order at 6; SAC ¶ 111, CAC ¶ 97, a decade after its creation in 2003, yet still charged the same alleged "industry standard" 30% it set at the beginning. SAC ¶ 306, CAC ¶ 282. Wolfire's allegations remain "not meaningfully different from *Somers v. Apple* …." Order at 6.

Seeking to take its case outside *Somers*, Wolfire adds the implausible conclusions that "Valve's 30% commission was … supracompetitive at launch," SAC ¶ 68, and "was never subject to intensive competition," SAC ¶ 308. That is no different from its argument before that 30% has "*always* been supracompetitive" because Valve never faced "true," "effective," or "meaningful" competition. Opp. (Dkt. # 54) at 21–22 (emphasis in original). But as Wolfire conceded, there was "vibrant competition" in those years, including from "Amazon, GameStop, Microsoft, EA, IGN, GOG, Direct2Drive, Stardock, and others" that "rushed to fill the void" in digital distribution in the early 2000s, SAC ¶ 51, CAC ¶ 46. Wolfire adds conclusions that Valve "quickly obtained and then anticompetitively maintained market power," and that "[b]y roughly 2005, Valve was thus well positioned as the market leader in an industry at the cusp of transition" to digital distribution. SAC ¶¶ 51, 62, 111. But Somers alleged the same thing: "shortly after" releasing iTunes in 2003, Apple acquired 70% of the market for digital songs, 99% for portable players, and a monopoly in both by 2004. *Somers*, 729 F.3d at 958. The Ninth Circuit nonetheless ruled that Somers failed to plausibly allege that Apple's 99-cent price was

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 13

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1  supracompetitive, as it remained the same before and after Apple allegedly obtained a monopoly.

2  *Id*. at 964.

3       Wolfire goes on to argue that Steam "instantly became a must-have platform" because

4  consumers "had no choice but to use [it] to play the blockbuster hit Half-Life 2 and continue to

5  play other popular Valve and non-Valve PC games online." SAC ¶ 59. Small platforms "quickly

6  fell to the wayside, as they could not similarly compel consumers to use their own" platforms or

7  stores. *Id.* Little is new here because Wolfire previously alleged that "[a]fter Valve forced

8  gamers to use [Steam] to play Half-Life 2 and other Valve games, [Steam] grew and ultimately

9  provided Valve with a massive incumbency advantage and contributed to its dominance in the

10  market" for PC games. CAC ¶ 53.

11       Wolfire adds, "These anticompetitive restraints have existed and been enforced by Valve

12  prior to achieving dominance," SAC ¶ 248, but Somers likewise alleged that Apple began to

13  encrypt songs and issue software updates to block rival stores at the beginning, *Somers*, 729 F.3d

14  at 957–58. And both the SAC and CAC allege that a dozen games from competitors released in

15  1998 alone were "comparable to" Half-Life 2's predecessor, Half-Life. SAC ¶ 53, CAC ¶ 48.

16  Thus when Valve launched Steam it faced actual competition from other distributors including

17  Amazon, GameStop, Best Buy, Microsoft, and EA, SAC ¶¶ 51, 56, CAC ¶¶ 46, 50, and potential

18  competition from all other popular game publishers, who could have used their hits to drive

19  players onto their platforms just as Valve allegedly did. *See Thurman Indus., Inc. v. Pay 'N Pak*

20  *Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) ("field of competition" includes actual and

21  potential competitors). The alleged facts contradict Wolfire's allegation that "the environment in

22  which Valve initially set its 30% commission … has never been free of Valve's substantial

23  market power." SAC ¶ 6.

24       The only new factual allegations are that in 2001, Valve allegedly acquired the World

25  Opponent Network ("WON"), on which multiplayer games like Valve's Half-Life and Counter-

26  Strike, and Sierra-published PC games, could be played; it had a user base of 1.5 million. SAC ¶

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 14
130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

54. In 2004, Valve allegedly "shut down WON and forced all WON users to install the Steam Gaming Platform for multiplayer functionality …." SAC ¶ 58. But the SAC alleges no improper conduct causing antitrust injury in this acquisition. Wolfire argues that Valve "forced" consumers who wanted to play Half-Life 2 and other multiplayer games on WON to use Steam. *Id.* ¶ 58. But Steam is free to users, so the SAC does not plausibly allege that Wolfire (which does not allege it had even been founded then), or anyone, was injured if, as alleged, WON users had to migrate to Steam to continue playing Valve- and Sierra-published games on WON with others. Wolfire's allegation that "even gamers who had purchased Half-Life and Counter-Strike years before" had to migrate to Steam in 2004 to continue to use multiplayer features thus alleges no improper conduct or injury to consumers or Wolfire. *Id.* ¶ 58. And no one asserts that the market for computer games is anything but intensely competitive, then or now. Any consumer buying a new game in 2004 or later who did not prefer Steam could buy games from a growing multitude of publishers and play them in whatever way and on whatever platforms the publisher arranged.

Finally, the new allegations about WON include no facts showing monopoly power in any market when Steam launched and began charging 30%—not the total number of multiplayer gamers to which WON's alleged 1.5 million user base could be compared, the number of multiplayer games available on Steam and competing platforms in 2004, barriers to entry, or anything else. Acquiring WON and migrating its users to Steam did not somehow make 30% supracompetitive in 2004.

Wolfire also alleges that "[p]hysical retailers maintained a roughly 30% commission at the time Valve launched Steam," which covers their "substantial costs" for things like real estate, shipping, inventory, management, and personnel. SAC ¶ 63. Ignoring the cost of building, maintaining, and operating a worldwide platform like Steam, Wolfire alleges that digital distributors "have substantially lower costs; several orders of magnitude cheaper," SAC ¶¶ 47–48, so they should charge less than 30%.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 15

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

130078785

1    Again, little is new here because Wolfire previously called Valve's 30% commission "a

2  bloated tax," CAC ¶ 22, that "greatly exceed[s] the costs of providing digital distribution for PC

3  Games" and "far exceeds the costs Valve bears" and that "Valve's variable costs are …

4  minimal," like Apple's, which also charges the "industry standard" 30%, CAC ¶¶ 268, 277, 280,

5  282. Wolfire added some detail about what distribution costs brick-and-mortar stores incur but

6  adding a few details about the costs companies selling a wide variety of products and services

7  from physical stores bear does not make *Somers* any less controlling.

8    Wolfire then reiterates its economic argument with a broad generalization that allegedly

9  lower digital distribution costs should have forced Valve's 30% commission down, SAC ¶¶ 6,

10  63–64, an argument it made before, CAC ¶ 55 ("Under competition, economics predicts that

11  pricing should approach cost, and therefore Valve's 30% commission should have decreased

12  dramatically over time."). Wolfire now compares Steam not only to Walmart but also to a

13  regulated generic pharmaceutical supplier whose price declines when its six-month statutory

14  monopoly expires and bioequivalent generic drugs enter the market. SAC ¶¶ 65–67. None of this

15  takes Wolfire's case out of *Somers*.

16    The Court already considered alleged costs when dismissing Wolfire's previous com-

17  plaint. It noted, just before finding Wolfire's allegations "not meaningfully different" from

18  Somers', that the CAC "describe[d] Defendant's cost structure and the (lower) fees charged by

19  some of its competitors." Order at 6. The SAC's irrelevant additional detail about those costs and

20  false analogies to Walmart and generic drugs should not lead the Court to change its ruling.

21    First, like the CAC, the SAC compares only Valve's *game distribution costs* to brick and

22  mortar stores'. *See* SAC ¶ 6 ("brick-and-mortar distribution costs"); SAC ¶ 48 ("digital

23  distributors of PC Desktop Games have substantially lower costs"); SAC ¶ 3 ("game

24  distribution" costs; CAC ¶ 277 ("costs of providing digital distribution for PC Games"). The

25  SAC and CAC completely ignore Valve's costs of developing, operating, maintaining, and

26  improving Steam to serve 120 million monthly active users around the globe, SAC ¶ 71, CAC

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 16

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

¶ 57, and provide the features and services that made demand for Steam steadily rise, as the Court noted, Order at 2–3. The new details concern only game distribution costs, ignoring the expense of creating and running the platform on which they are played.

Second, as before, in an industry like software development that has high fixed costs and allegedly "close to zero" marginal costs, SAC ¶¶ 125, 310, CAC ¶¶ 111, 284, one cannot infer supracompetitive prices from current costs. *See In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 659 (D. Mass. 2020) ("'[I]n the market for a product with high fixed costs, […] evidence that prices routinely exceed marginal costs may not necessarily be evidence that prices are supracompetitive, because even competitive prices may exceed marginal cost.'"). Virtually every game developer has high fixed costs and "close to zero" marginal costs, so nearly all game prices, including Wolfire's, would be falsely condemned as supracompetitive if pricing above marginal cost alone made them so. The high fixed costs are recovered by selling the games.

Third, while asserting that Valve is profitable, Wolfire does not allege Valve's profit margin. On its face, the SAC's allegation that Walmart's profit margin is 1.4% thus adds nothing with respect to Valve. SAC ¶ 47. Not only that, but Walmart's and Valve's businesses are not alleged to compare in any meaningful way. Walmart sells a huge range of goods, identical copies (or substitutes) of which can be obtained from Amazon, Target, and a host of other retailers. By contrast, Steam provides a specialized service to users—a platform on which to purchase and play multiplayer games.

Moreover, customers of Walmart's brick-and-mortar stores travel to a store, select their goods from what's on the shelves, and take them home, where they use those goods without further support from Walmart save for returns, warranty, or other customer-service issues. By contrast, Steam customers remain in their homes, select games online, and play them online using Steam's service all the while. SAC ¶¶ 2, 59, CAC ¶¶ 2, 56. And buying a game on Steam begins rather than ends Valve's work with its customers. Gamers do not log into Steam merely to purchase games; to the contrary, Steam is where they play the games they purchase, track their

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 17

130078785

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

game progress, store and retrieve games from their digital library, and keep their games updated with the latest developer releases. SAC ¶¶ 8, 55, 70, CAC ¶¶ 5, 49, 56. Steam also allows them to connect and play with other Steam users around the world, interact with them using Steam's chat, and create social networks accessible across all games on the platform. SAC ¶¶ 8, 70, 250, 270, CAC ¶¶ 5, 56, 230, 247. To enable this, Valve must develop the software, acquire the hardware, and pay for workers who create, deploy, support, and maintain this service 24/7 for, on average, 120 million monthly active users. *See* SAC ¶¶ 8, 71, CAC ¶¶ 5, 57. Wolfire alleges nothing to enable the Court to compare these costs to Walmart's or any other brick-and-mortar retailer's.

Finally, Wolfire's comparison of Steam to generic pharmaceutical suppliers that enjoy a statutory monopoly for six months adds no facts to rescue its supracompetitive pricing claim. Generic pharmaceuticals are bioequivalent substitutes for the incumbent patented product. *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 142 (2013) (generic drugs are bioequivalent to the pioneer drug product); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 643 n.3 (2d Cir. 2015) ("Generic drugs 'are copies of brand-name drugs and are the same as those brand name drugs in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use.'") (citation omitted). But their development costs are low because they can copy the pioneer's formula disclosed in the patent to offer the same medicine at a fraction of the cost. Wolfire ignores Valve's costs for Steam.

If Steam were like a generic pharmaceutical, users would not care whether they used Steam or a competitor's service. They would not care if a new game appeared exclusively on Epic Game Service, Riot, or any other platform, contrary to what Wolfire alleges. SAC ¶¶ 134, 156. But as alleged, Steam users plainly value Steam over competing services. Not only has it grown, but gamers "want to use the PC Desktop Gaming Platform of their choice," SAC ¶ 99, CAC ¶ 85, rather than one "they do not prefer." SAC ¶ 283, CAC ¶ 260.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 18

130078785

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

As before, "it would appear that the market reality, at least as plead, is that Defendant's fee is commensurate with the Steam Platform's value to game publishers." Order at 6–7. Valve set its fee at launch, years before 2009 when it allegedly had not yet "cemented its hold," SAC ¶ 134, and 2013 when it allegedly became "dominant," SAC ¶ 111. Under *Somers*, Valve's commission cannot be supracompetitive. The Court should once again rule that Wolfire has not plausibly alleged antitrust injury from paying an allegedly supracompetitive commission.

3.      *Wolfire's Output and Quality Allegations Do Not Plead Antitrust Injury.*

The Court also ruled that Wolfire failed to plead a "reduction in output and/or quality." Order at 7 (citing *Am. Ad Mgt., Inc.*, 190 F.3d at 1055; Compl. at 88). To the contrary, the Court observed, "If anything, the facts provided by the CAC, at least with respect to output, suggest the opposite—a consistent increase in the number of games available in the market and on the Steam Platform." *Id.*

Wolfire now asserts that Valve's enforcement of the Steam Key Guidelines prevented it from having "sold more games at a lower price" on other platforms. SAC ¶ 221. This still fails to allege antitrust injury. First, this theory misconstrues the Guidelines. Wolfire concedes this fact in paragraph 212 of the SAC, stating that Valve's "rules nominally apply only to Steam Keys"— but the limitation is explicit, as the citation to the provision in footnote 85 establishes. And Wolfire misleadingly argues that Valve "explicitly requires that publishers agree that games sold elsewhere must be sold 'in a similar way to how you sell your game on Steam.'" SAC ¶¶ 15, 213, 217 (quoting Steam Key Guidelines); CAC ¶ 12. But that asks developers to do no more than "treat Steam customers no worse than customers buying Steam keys outside of Steam." https://partner.steamgames.com/doc/features/keys. In short, the provision applies only to Steam-enabled games, sold via Steam Keys. Wolfire's suggestion that this provision supports a broader price constraint flatly contradicts this plain meaning.[3]

---

[3] Finally, Valve's "prompt" when a developer *requests Steam Keys,* noting that developers "agree that [they are] not giving Steam customers a worse deal," merely requires them to affirm

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 19

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

130078785

Second, Wolfire doesn't plausibly allege that Valve actually enforced its alleged—and unpublished—PMFN, the alleged combination of Steam Key Guidelines and SDA provisions, against itself or others. Rather, Wolfire cites a single exchange between it and a Valve employee and claims that it "has not offered its games for a lower price than what appears on Steam with other sellers." SAC ¶ 221. It then cites another exchange between an unidentified Valve employee and developer. SAC ¶ 222. But Wolfire does not allege any facts that Valve took any action to prevent it or the other developer from selling any non-Steam-enabled game on whatever terms it wanted. Further, the SAC fails to allege the other developer's game, platform, store, time, or price—or anything that would enable the Court to plausibly infer that these two exchanges with Valve employees amount to Valve's disseminating and enforcing an unwritten rule across Steam (and its other, over 45,000 games) that contradicts Steam's published Steam Key Guidelines. It is simply implausible that this unwritten contradictory enforcement policy was communicated, one-by-one, to the thousands of publishers selling Steam-enabled games.

Even if Wolfire had properly pled such an enforcement scheme to misconstrue and enforce, developer by developer, the Steam Key Guidelines (which it did not), the theory would run into intractable problems. First, the SAC offers nothing about any resulting harm aside from the wholly speculative allegation that the price Wolfire charged on other platforms was not "the output-maximizing and profit-maximizing price." SAC ¶ 221. Wolfire fails to add any examples of *its own* prices, before or after the alleged exchange, to show whether it kept the same prices across platforms. And the allegation regarding its output- or profit-maximizing pricing, along with the two conclusory sentences added to paragraph 310 (which was paragraph 284 in the CAC)—that output would increase if commissions were competitive and game prices were lower—just echo Wolfire's previously dismissed attempt to tie non-price harms to Valve's allegedly supracompetitive commission. *See* SAC ¶ 150 (conclusory allegation that "lower

their commitment to the Steam Key Guidelines' terms. *See* SAC ¶¶ 215–16, CAC ¶¶ 198–99.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 20

130078785

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

commissions … could allow game publishers to make higher revenue by selling more games at lower prices to consumers"), CAC ¶ 136 (same). But the Court has already rejected this argument in the CAC, finding that "to the extent [non-price] injury is predicated Wolfire's payment of Defendant's allegedly supracompetitive fee … it is not adequately plead." Order at 7.

Equally important, Wolfire's assertion that it would have sold more in the absence of Valve's alleged PMFN fails to establish *antitrust* injury. Even if true, the allegation would show only that one seller, Wolfire, sustained a "reduction in output," whereas the Court has already determined that on a market-wide basis no such reduction was alleged. In other words, the SAC makes no plausible allegations that the supposed policy was communicated, let alone enforced, market-wide. To the contrary, "[i]f anything, the facts provided by the CAC, at least with respect to output, suggest the opposite—a consistent increase in the number of games available in the market and on the Steam Platform." Order at 7. Wolfire has not alleged injury to competition, where the market has seen *increased* output.

Other allegations from the CAC are simply reiterated here, but these still fail to allege that Valve injured *competition*—that it affected some consequential share of game sales in the market. For example, to show what some other sellers charged on Steam and competing platforms, Wolfire transferred *verbatim* retail prices for sixteen games (of the tens of thousands available on Steam) from the CAC to the SAC. SAC ¶¶ 226–31, CAC ¶¶ 207–212. None are new. Wolfire still alleges no facts that Valve had a hand in this pricing, and these developers may well have made the common-sense choice to sell their games at the same price in different stores. And Wolfire's allegation of a "differential in commissions," SAC ¶ 227, CAC ¶ 208, between Steam and Epic Game Service on six other games sold for the same price on both stores does not allege that anticompetitive conduct on Valve's part caused the developers to set their prices the same even though their costs may have varied between stores. It's no more plausible that the level retail prices resulted from anticompetitive conduct than from the developers' desire to set one market-wide price, conduct that, after *Leegin Creative Leather Prods. v. PSKS, Inc.*,

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 21

130078785

**Fox Rothschild LLP**
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

551 U.S. 877 (2007), would be unobjectionable even if the developer demanded it of a reseller. And the level prices don't make it plausible that without the alleged restraint, prices on the other platforms would be lower because of lower commissions there.

Wolfire also repeats the same two quotations from blog posts written by "TomG" about not disadvantaging Steam customers. SAC ¶¶ 218–20; CAC ¶¶ 201–03. But the first is about pricing of separate downloadable content after first acquiring the game, which is nowhere else discussed in Wolfire's pleading. SAC ¶ 218. The second is perfectly in line with the fundamental principle in the Steam Key Guidelines to avoid disadvantaging "someone who bought your game on Steam." SAC ¶ 220. Such statements summarizing Valve's terms do not provide facts suffi-cient to allege anticompetitive behavior.

The SAC mostly repeats the rest of its output and quality allegations from the CAC word-for-word, adding only Wolfire's name. For example, where the CAC alleged that Valve "sup-presses output by game developers," the SAC alleges that Valve "suppresses output by game developers (including Wolfire)." SAC ¶ 246, CAC ¶ 227. Where the CAC alleged that "Valve does not provide a competitive level of quality to publishers," the SAC added that "Valve does not provide a competitive level of quality to publishers, including Wolfire." SAC ¶ 312, CAC ¶ 286; *see also* SAC ¶ 310, CAC ¶ 284 ("including Wolfire"). These perfunctory additions add no substantive facts that should lead the Court to a different result.

At bottom, the facts the Court found dispositive when resolving the last motion to dismiss remain true here: "[i]f anything, the facts provided by the CAC, at least with respect to output, suggest the opposite—a consistent increase in the number of games available in the market and on the Steam Platform." Order at 7. There are no plausible antitrust harms to output and quality alleged.

//

//

//

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 22

130078785

Fox Rothschild LLP
1001 Fourth Avenue, Suite 4500
Seattle, WA 98154
206.624.3600

1  **IV.**   **CONCLUSION**

2       The Court dismissed the CAC because Wolfire failed to allege unlawful antitrust conduct

3  causing antitrust injury. Wolfire does no better in the SAC. Its tying claims require two products

4  sold in separate antitrust markets, but Wolfire, as before, alleges facts that show Steam is a single

5  product competing in an integrated game platform and transaction market. Wolfire claims to

6  have been injured by paying Valve's allegedly supracompetitive 30% commission, but 30% here

7  cannot be supracompetitive as a matter of law because it was set before Valve allegedly had a

8  monopoly and was maintained during competition. Those facts, which bring it within *Somers v.*

9  *Apple*, remain in the SAC.

10       Nor does Wolfire cure its failure to allege a PMFN, or non-price injury from alleged

11  reductions in output or quality. The reduction in output purportedly comes from Valve employ-

12  ees telling Wolfire and another developer they could not sell games anywhere for a lower price

13  than on Steam, even non-Steam-enabled versions. Such a statement, implausibly, would be

14  contrary to published Steam Key Guidelines that restrict Steam-enabled versions alone. But even

15  if made, Wolfire does not allege facts that the statement was made to or affected enough of the

16  market to constitute antitrust injury to competition—just these two developers. And the output of

17  games market-wide allegedly has soared. Finally, the SAC contains no new allegations about

18  reduced quality. The SAC makes no new allegations that can save it from dismissal once again.

19       Wolfire has twice failed to allege unlawful antitrust conduct or antitrust injury—thrice

20  counting its original complaint amended before Valve responded. It does not deserve another

21  chance.

22       //

23       //

24       //

25       //

26       //

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 23

130078785

**FOX ROTHSCHILD LLP**
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

1   DATED this 28th day of January, 2022.

2                                          FOX ROTHSCHILD LLP

3

4                                          s/ Gavin W. Skok
                                           Gavin W. Skok, WSBA #29766
5                                          Laura P. Hansen, WSBA #48669
                                           1001 Fourth Avenue, Suite 4500
6                                          Seattle, WA 98154
                                           Telephone:    206.624.3600
7                                          Facsimile:    206.389.1708
                                           E-mail:       gskok@foxrothschild.com
8                                                        lhansen@foxrothschild.com

9

10                                         MONTGOMERY McCRACKEN WALKER &
                                           RHOADS LLP
11

12                                         s/ Charles B. Casper
13                                         Charles B. Casper, admitted pro hac vice
                                           1735 Market Street, 21st Floor
14                                         Philadelphia, PA  19103
                                           Telephone:    215.772.1500
15                                         Facsimile:    215.772.7620
                                           Email:        ccasper@mmwr.com
16

17                                         Attorneys for Defendant

18

19

20

21

22

23

24

25

26

DEFENDANT VALVE CORPORATION'S MOTION TO                          **FOX ROTHSCHILD LLP**
DISMISS SECOND AMENDED CLASS ACTION                             1001 FOURTH AVENUE, SUITE 4500
COMPLAINT - (2:21-CV-00563-JCC) - 24                                      SEATTLE, WA 98154
                                                                            206.624.3600

130078785

1

## CERTIFICATE OF SERVICE

2

I certify that I am a secretary at the law firm of Fox Rothschild LLP in Seattle,

3

4

Washington.  I am a U.S. citizen over the age of eighteen years and not a party to the within

cause.  On the date shown below, I caused to be served a true and correct copy of the foregoing

5

on counsel of record for all other parties to this action as indicated below:

6

| Service List | |
|---|---|
| Alicia Cobb<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>1109 First Avenue, Suite 210<br>Seattle, WA  98101<br>Ph. 206-905-7000<br>Fax 206-905-7100<br>Email: aliciacobb@quinnemanuel.com | ☐ Via US Mail<br>☐ Via Messenger<br>☒ Via CM/ECF / Email<br>☐ Via over-night delivery |
| A. Owen Glist<br>Ankur Kapoor<br>Jeffrey I. Shinder<br>CONSTANTINE CANNON LLP<br>335 Madison Ave., 9th Floor<br>New York, NY  10017<br>Ph. 212-350-2776<br>Fax 212-350-2701<br>Email: oglist@constantinecannon.com<br>akapoor@constantinecannon.com<br>jshinder@constantinecannon.com | |
| Adam Wolfson<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>865 S. Figueroa St., 10th Floor<br>Los Angeles, CA  90017<br>Ph. 213-443-3000<br>Email: adamwolfson@quinnemanuel.com | |
| Charles Stevens<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>50 California St., 22nd Floor<br>San Francisco, CA  94111<br>Ph. 415-875-6600<br>Email: charliestevens@quinnemanuel.com | |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 25

130078785

David Golden
Justin Fore
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., 22nd Floor
Washington, DC  20004
Ph. 202-204-4527
Email: dgolden@constantinecannon.com
wfore@constantinecannon.com

David Du LeRay
Steig David Olson
Shane Seppinni
QUINN EMANUEL URQYHART & SULLIVAN
51 Madison Ave., 22nd Floor
New York, NY  10010
Ph. 212-849-7630
Email: davidleray@quinnemanuel.com
steigolson@quinnemanuel.com
shaneseppinni@quinnemanuel.com

Kenneth J. Rubin
Timothy B. McGranor
Kara M. Mundy
VORYS SATER SEYMOUR & PEASE
52 E. Gay St.
PO Box 1008
Columbus, OH  43215
Ph. 614-464-6400
Email: kjrubin@vorys.com
tbmcgranor@vorys.com
kmmundy@vorys.com

*Attorneys for Plaintiffs*

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

EXECUTED this 28th day of January, 2022, in Seattle, Washington.

Courtney R. Brooks

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - (2:21-CV-00563-JCC) - 26

FOX ROTHSCHILD LLP
1001 FOURTH AVENUE, SUITE 4500
SEATTLE, WA 98154
206.624.3600

130078785