1

2

3

4

5

6

7

8

9

10

HON. JOHN C. COUGHENOUR

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

11

12

13

14

15

16

17

18

Wolfire Games, LLC, Sean Colvin, Susann Davis, Daniel Escobar, William Herbert, Ryan Lally, Hope Marchionda, Everett Stephens, individually and on behalf of all others similarly situated,

          Plaintiffs,

   v.

Valve Corporation,

        Defendant.

Case No. 2:21-cv-00563-JCC

**PLAINTIFFS' OPPOSITION TO DEFENDANT VALVE CORPORATION'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**NOTE ON MOTION CALENDAR:**
April 8, 2022

**ORAL ARGUMENT REQUESTED**

19

20

21

22

23

24

25

26

27

28

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

**TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ................................................................................1

II.  BACKGROUND ...................................................................................................4

    A.   Valve Provides Service in Two Separate Markets .......................................4

    B.   Valve Obtains Market Power, and Then Anticompetitively Maintains and Grows That Power ......................................................................................6

III. LEGAL STANDARD ...........................................................................................8

IV.  ARGUMENT ......................................................................................................9

    A.   Plaintiffs Have Plausibly Pled Separate Product Markets for PC Desktop Gaming Platforms and PC Game Distribution ..............................................9

        1.   Plaintiffs Adequately Allege Separate Products Under *Jefferson Parish*'s Consumer Demand Test ..............................................................9

        2.   Valve Asks the Court to Apply the Incorrect Legal Standard.....................11

    B.   Plaintiffs Have Adequately Alleged Antitrust Injury .............................13

        1.   Plaintiffs' Steam Key Allegations Adequately Plead Antitrust Injury.........13

        2.   Plaintiffs Adequately Allege Valve's Commission Is Supracompetitive .....................................................................................16

            (a)   Somers Is Inapplicable ..................................................................17

                (i)   Valve originally set its commission in a market dominated by brick-and-mortar stores that have much higher costs...................................................................18

                (ii)  After Valve obtained monopoly power, it never lost that power or ceased its anticompetitive conduct.................19

            (b)   Valve's Fact-Bound Arguments Justifying Its 30% Commission Ignore the SAC's Allegations and Cite to Facts Outside the SAC ........................................................................20

V.   CONCLUSION ..................................................................................................24

WOLFIRE OPP. TO MOT. TO DISMISS SAC
CASE NO. Case No. 2:21-CV-563-JCC

i

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1

## <u>TABLE OF AUTHORITIES</u>

2

3 **Cases**

*Aetna Inc. v. Blue Cross Blue Shield of Michigan*,
4    2012 WL 2184568 (E.D. Mich. June 14, 2012) ....................................................... 8

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
5    190 F.3d 1051 (9th Cir. 1999) ....................................................................................... 13

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
6    2018 WL 3730165 (N.D.N.Y. Aug. 6, 2018) ............................................................... 11

7 *Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................................................... 16

8 *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ......................................................................................... 24

9 *Bombardier Inc. v. Mitsubishi Aircraft Corp.*,
    383 F. Supp. 3d 1169 (W.D. Wash. 2019) .................................................................. 8

10 *Cascade Health Solutions v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ......................................................................................... 20

11 *CollegeNet, Inc. v. Common Application, Inc.*,
    355 F. Supp. 3d 926 (D.Or. 2018) ................................................................... 10, 11, 13

12

13 *Eastman Kodak Co. v. Image Tech. Servs.*,
    903 F.2d 612 (9th Cir. 1990) ......................................................................................... 10

14 *Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ....................................................................................................... 11

15 *Epic Games, Inc. v. Apple Inc.*,
    2021 WL 4128925 (N.D. Cal. Sept. 10, 2021) ............................................................ 23

16 *Epic Games, Inc. v. Apple, Inc.*,
    493 F. Supp. 3d 817 (N.D. Cal. 2020) ........................................................................ 12

17 *Free FreeHand Corp. v. Adobe Systems Inc.*,
    852 F.Supp.2d 1171 (N.D.Cal., 2012) ........................................................................ 13

18 *FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ......................................................................................... 23

19 *Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ......................................................................................................... 12

20 *In re Glumetza Antitrust Litig.*,
    2021 WL 1817092 (N.D. Cal. May 6, 2021) ............................................................... 20

21 *In re Intuniv Antitrust Litig.*,
22    496 F. Supp. 3d 639 (D. Mass. 2020) .................................................................. 21, 22

23 *In re Juul Labs, Inc., Antitrust Litig.*,
    2021 WL 3675208 (N.D. Cal. Aug. 19, 2021) ............................................................ 18

24 *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ................................................................................ *passim*

25 *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    990 F. Supp. 2d 996 (N.D. Cal. 2013) ........................................................................ 21

26 *In re Se. Milk Antitrust Litig.*,
    739 F.3d 262 (6th Cir. 2014) .................................................................................. *passim*

27 *Jefferson Parish Hospital District No. 2 v. Hyde*,
    466 U.S. 2 (1984) ............................................................................................... 9, 10, 12

28

WOLFIRE OPP. TO MOT. TO DISMISS SAC
CASE NO. CASE NO. 2:21-CV-563-JCC

ii

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

*Klein v. Facebook, Inc.*,
 2022 WL 141561 (N.D. Cal. Jan. 14, 2022) ......................................................... 10

*Landers v. Quality Commc'ns., Inc.*,
 771 F.3d 638 (9th Cir. 2015) ................................................................................ 16

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
 551 U.S. 877 (2007) ............................................................................................... 24

*Lorain J. Co. v. United States*,
 342 U.S. 143 (1951) ............................................................................................... 14

*Nat'l Collegiate Athletic Ass'n v. Alston*,
 141 S.Ct. 2141 (2021) ........................................................................................... 19

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of U. of Oklahoma*,
 468 U.S. 85 (1984) ................................................................................................. 23

*Osborn v. Visa, Inc.*,
 797 F.3d 1057 (D.C. Cir. 2015) ............................................................................ 14

*Rick-Mik Enterprise, Inc. v. Equilon Enterprise, LLC*,
 532 F.3d 963 (9th Cir. 2008) .......................................................................... 11, 12

*RideApp, Inc. v. Lyft, Inc.*,
 2019 WL 7834759 (N.D. Cal. Aug. 15, 2019) ..................................................... 21

*Somers v. Apple, Inc.*,
 729 F.3d 953 (9th Cir. 2013) ......................................................................... *passim*

*Starr v. Baca*,
 652 F.3d 1202 (9th Cir. 2011) ......................................................................... 8, 16

*Surgical Instrument Serv. Co. v. Intuitive Surgical, Inc.*,
 -- F. Supp. 3d --, 2021 WL 5474898 (N.D. Cal. Nov. 23, 2021) ............... 10, 11, 12

*Teradata Corp. v. SAP SE*,
 2018 WL 6528009 (N.D. Cal. Dec. 12, 2018) ............................................. 10, 11, 12

*United States v. Apple*,
 791 F.3d 290 (2d Cir. 2015) .................................................................................. 24

*United States v. Microsoft*,
 147 F.3d 935 (D.C. Cir. 1998) .............................................................................. 12

*United States v. Microsoft Corp.*,
 253 F.3d 34 (D.C. Cir. 2001) .......................................................................... 10, 12, 13

*US Airways, Inc. v. Sabre Holdings Corp.*,
 938 F.3d 43 (2d Cir. 2019) .............................................................................. 14, 17

WOLFIRE OPP. TO MOT. TO DISMISS SAC
CASE NO. CASE NO. 2:21-CV-563-JCC

iii

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

Plaintiffs Wolfire Games, LLC ("Wolfire"), Sean Colvin, Susan Davis, Daniel Escobar, William Herbert, Ryan Lally, Hope Marchionda, and Everett Stephens ("Plaintiffs") submit this opposition to Defendant Valve Corporation's ("Valve") Motion to Dismiss Plaintiffs' Second Amended Consolidated Class Action Complaint (Dkt. 74) ("Mot.").

## I.  PRELIMINARY STATEMENT

In granting Valve's first Motion to Dismiss, this Court identified certain areas in which the Court believed Plaintiffs' allegations were sufficient, and others where the Court viewed the allegations as needing additional support. With Plaintiffs' Second Amended Complaint ("SAC"), Plaintiffs have responded by providing additional allegations establishing how Valve has engaged in a two-pronged strategy to maintain monopoly power in the market for PC Desktop Game Distribution and how Valve's conduct has harmed competition. Specifically, Valve does so by: (a) tying together the use of its dominant PC Desktop Gaming Platform with its Steam Store—which the amended allegations make clear are services that exist in two separate markets, even though Valve has integrated them together—and (b) by enforcing a Platform Most-Favored Nation Clause ("PMFN") that denies publishers and consumers the benefits of price competition between rival game distributors and the Steam Store. Valve's anticompetitive restraints have allowed it to maintain its 30% commission, when competitive forces would otherwise have driven that commission down to lower levels. In turn, Valve's ability to demand its supracompetitive commission injures Plaintiffs in the form of supracompetitive prices and injures competition overall in the form of lower output and diminished quality.

Plaintiffs' allegations of Valve's scheme and the competitive harm it causes are robustly supported by specific factual allegations and accepted economic principles. Under established antitrust law, these allegations plausibly establish that Valve has engaged in anticompetitive conduct and that Plaintiffs have suffered antitrust injury. As detailed below, it is well-recognized that a monopolist's imposition of tying and of a PMFN clause have anticompetitive effects. And Plaintiffs—who are the direct purchasers of Valve's services and who allegedly paid supracompetitive prices as a result of Valve's anticompetitive conduct—plainly allege an injury of the type the antitrust laws were intended to prevent. At this stage of the proceedings, Valve's

WOLFIRE OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563-JCC

1

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   motion must be denied.

2      *First*, Plaintiffs' allegations demonstrate that, under the Supreme Court's "consumer

3   demand" test laid out in *Jefferson Parish*, the market for PC Desktop Game Distribution is

4   plausibly distinct from the market for PC Desktop Gaming Platforms. The SAC alleges that there

5   is distinct consumer demand for game distribution because consumers *can and do in fact* purchase

6   games through distribution channels other than the Steam Store or a PC Desktop Gaming

7   Platform. In fact, Valve originally launched as a PC Desktop Gaming Platform only—with no

8   store capabilities—demonstrating that the products are distinct. And the fact that Valve later

9   integrated game distribution with game playing on its platform (through the tie challenged in this

10  case) is legally irrelevant under this test. Moreover, to this day, Valve allows consumers to

11  purchase Steam-enabled games through *other* distribution channels (such as GameStop) to a

12  limited degree by using Steam Keys. That Valve allows this to happen demonstrates that even

13  Valve recognizes there is distinct consumer demand for game distribution.

14     *Second*, Plaintiffs adequately allege that Valve's tie and PMFN inflict antitrust injury—

15  that is, injuries of the type the antitrust laws are meant to address. Plaintiffs allege that Valve's

16  restraints force publishers of Steam-enabled games to sell their games through the Steam Store

17  (and thus pay Valve's inflated commission), while preventing them from selling those games

18  through other storefronts for *less* than they do in the Steam Store. Plaintiffs further allege that

19  while Valve's written agreement only mentions applying this policy to Steam Key sales, in

20  practice Valve extends the policy to *all* games, and *all* sales, whether or not they involve Steam

21  Keys, and whether or not they even involve sales of Steam-enabled games. As a result, publishers

22  have not listed their games for lower prices in other storefronts, inhibiting price competition.

23     Here, Valve tries to argue against the facts as alleged, even going so far as to assert it is not

24  true that Valve has a PMFN that applies beyond Steam Key sales. But the SAC's allegations in

25  this regard are well supported and plausible. In support of these allegations, Plaintiffs have

26  specifically quoted and identified—even without the benefit of discovery—times when Valve

27  personnel have specifically communicated this policy to publishers on a forum where publishers

28  interact with and learn from Valve employees. At a later stage, Valve can seek to prove that the

Wolfire Opp. to Mot. to Dismiss
Case No. Case No. 2:21-CV-563-JCC

2

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

policies conveyed by its own personnel were false. But at *this stage*, Valve's denials cannot suffice, especially when they contradict the words of their very own personnel.

*Third*, Plaintiffs have added allegations of antitrust injury to specifically demonstrate how this case is different from the situation addressed by the Ninth Circuit in *Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013). In *Somers*, the Ninth Circuit held that Apple's prices for music downloads were not supracompetitive because they stayed the same even after the plaintiffs alleged that Apple stopped engaging in anticompetitive conduct. *Id.* Here, *Somers* does not apply because Valve has never stopped engaging in the alleged anticompetitive conduct.

Valve tries to turn *Somers* on its head, by arguing that its 30% commission is immune from antitrust scrutiny for all time, no matter what Valve does to block competition, because Valve *originally* set its commission at 30% when it began operating. But Plaintiffs now explain in the SAC why the *Somers* proposition does not work in reverse: At Valve's launch, its rivals were primarily brick-and-mortar stores. Unlike Valve, they had substantial costs to cover like real estate and sales personnel, resulting in a 30% commission. Valve, as a digital distributor with significant cost advantages over brick-and-mortar retailers, had no need at that time to compete substantially on price. The 30% commissions it charged during the earlier period when brick-and-mortar stores were dominant was substantially above its costs and was not reflective of the expected competitive level for commissions when the market later came to be dominated by lower-cost digital distribution. As the world turned digital, competition should have driven the 30% commission down to levels closer to cost. As the SAC explains, however, that did not occur because of Valve's restraints. The SAC's allegations are consistent with basic economics and are, at the very least, plausible at this stage. Meanwhile, Valve's contrary proposition—that its 30% commission is forever immune from antitrust scrutiny because it was not unlawful when it was first adopted— cannot be accepted.

To rebut these basic economic principles, Valve is forced to impermissibly inject its own account of contested facts. Valve argues, for example, that it does in fact have high fixed costs that would warrant maintaining a 30% commission. But such assertions are inherently factual (not to mention dubious), and the Court cannot accept them at this stage, under the legal standards

Wolfire Opp. to Mot. to Dismiss
Case No. Case No. 2:21-CV-563-JCC

3

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

applying to Valve's Rule 12(b)(6) motion. *See, e.g., In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019) (in reviewing a 12(b)(6) motion to dismiss, the Ninth Circuit "take[s] all allegations of material fact as true and construe[s] them in the light most favorable to the nonmoving party") (internal quotation marks and citation omitted).

*Finally*, Plaintiffs have also adequately alleged that Valve's conduct has harmed competition as measured in decreased output and quality. Valve points out that PC Desktop Game Distribution has increased in *absolute terms*, but this is both unsurprising and irrelevant. Populations have grown and technology has exploded over the past decade, so it is no surprise that many digital goods have grown in absolute terms. The antitrust laws recognize that the relevant question is, instead, whether output would plausibly have grown even more absent the restraints. And the SAC answers that question in the affirmative: without Valve's inflated prices, and its blocking of price competition, publishers could have sold more games at lower prices. Valve's restraint blocked that from happening, and Plaintiffs and competition overall suffered as a result.

Once again, Valve argues otherwise by ignoring Plaintiffs' allegations, injecting its own "facts" outside the SAC, and asking this Court to make factual determinations in its favor. Such arguments, which are impermissible at this stage, only highlight that the SAC now, after addressing the Court's order, contains allegations sufficient to plead its claims. Valve's motion to dismiss must be denied.

## II.   BACKGROUND

### A.   Valve Provides Services in Two Separate Markets

Valve is a game developer, publisher, and distributor. Valve provides two distinct services, which it has integrated together: a PC Desktop Gaming Platform (the "Steam Gaming Platform") and a PC Desktop Game Distributor (the "Steam Store"). SAC ¶ 26. The Steam Gaming Platform competes in the market for PC Desktop Gaming Platforms, which encompasses technology platforms serving as a central library for game storage, as well as social networking functions, achievement tracking, and maintenance of in-game and account-specific digital goods. *Id.* ¶¶ 73-75, 94, 97-98, 149, 151-52. The Steam Store competes in the market for PC Desktop Game Distribution, in which PC games are sold to consumers. *Id.* ¶¶ 107-08.

WOLFIRE OPP. TO MOT. TO DISMISS
CASE NO. Case No. 2:21-CV-563-JCC

4

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

The markets for PC Desktop Gaming Platforms and PC Desktop Game Distribution are distinct. *Id.* ¶¶ 62-64, 73-75, 108-10, 112, 151-52. First and foremost, the markets serve different purposes. Sellers in the PC Desktop Game Distribution market provide consumers with ways to **obtain** PC Desktop Games. *Id.* ¶¶ 107-10. In contrast, sellers in the PC Desktop Gaming Platform market provide a variety of services to consumers who have *already obtained* PC Desktop Games. Such services include the ability to (1) play purchased games in a centralized location, (2) automatically maintain games and ensure updates are applied, (3) track achievements and other milestones in games, and advertise such achievements to others, and (4) social network with other gamers. *Id.* ¶ 115. Further underscoring their separate nature is that many PC Desktop Gaming Platforms do not provide PC Desktop Game Distribution. For example, brick-and-mortar stores (like GameStop) operate in the PC Desktop Game Distribution market, but do not offer a PC Desktop Gaming Platform. *Id.* ¶¶ 157-58. Similarly, the Steam Gaming Platform itself initially did not contain a store function, *id.* ¶¶ 55-57; and, even today, Steam-enabled games can be sold at other stores—stores without a PC Desktop Gaming Platform—through use of Steam Keys, *id.* ¶¶ 159-61.[1]

Valve contends that these two types of services are in a single market because Valve and certain other companies choose to *integrate* both a gaming platform and a store into a broader platform. But Valve identifies no allegations suggesting that consumers will only look to integrated gaming platform/stores; nor can it. The SAC alleges that consumers look for the lowest prices for PC Desktop Games and will purchase their games (including games enabled for a specific PC Desktop Gaming platform) from whomever offers the lowest price. *Id.* ¶¶ 116-18, 157.

---

[1] Steam Keys are alphanumeric codes publishers can request in limited quantities from Valve, to be sold by third parties (such as GameStop). Consumers can then purchase these codes from these third parties and enter the code into the Steam Gaming Platform to access a digital copy of the game within Steam. *Id.* ¶¶ 120, 161. But if too many copies are sold outside Steam, Valve threatens to remove that game from the Steam Store. *Id.* ¶¶ 10, 182-86. Accordingly, a publisher who wishes to sell a game enabled for the Steam Gaming Platform must agree that the vast majority of its sales will be through the Steam Store, where Valve takes a 30% cut. *Id.* ¶¶ 10, 187.

Wolfire Opp. to Mot. to Dismiss
Case No. Case No. 2:21-cv-563-JCC                    5

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

**B.     Valve Obtains Market Power, and Then Anticompetitively Maintains and Grows That Power**

When the Steam Gaming Platform launched in 2003, Valve operated in the PC Desktop Gaming Platform market—it did not distribute games. *Id.* ¶¶ 55-56. In 2004, Valve entered the PC Desktop Game Distribution market with the launch of the Steam Store. *Id.* ¶ 57. That launch coincided with two other actions, each of which gave Valve market power. First, Valve tied the playing of a seminal single-player PC Desktop Game, Half-Life 2, to the Steam Gaming Platform, making it incompatible to play through any other means. *Id.* ¶¶ 57-61. Second, Valve shut down the World Opponent Network ("WON"), an online gaming service it acquired in 2001 that facilitated playing multiplayer games. *Id.* ¶¶ 54, 58-59. Valve then required gamers to download the Steam Gaming Platform in order to play popular multiplayer games such as Counter-Strike. *Id.* ¶ 58. Because of its market power, Valve was able to price supracompetitively—substantially above its own costs—since the Steam Store's launch. *Id.* ¶¶ 4, 47-48, 61-65.

Valve dominates both the PC Desktop Gaming Platform and PC Desktop Game Distribution markets. *Id.* ¶¶ 121-48. The Steam Gaming Platform has 120.4 million active users per month. *Id.* ¶¶ 112-13. Game developers such as Wolfire are economically compelled to develop games compatible with the Steam Gaming Platform. *Id.* ¶¶ 8-9, 12, 122-24, 144, 221-22. Consequently, Valve has also become the dominant PC Desktop Game distributor, with at least 75% market share. *Id.* ¶¶ 1, 21, 140, 143, 147, 191, 193, 255, 294.

Valve has employed a two-pronged anticompetitive scheme to protect its dominance and block price competition that would otherwise drive its 30% commission down. *First*, Valve requires game publishers that make games compatible with the Steam Gaming Platform to sell those games through the Steam Store, even if also listed for sale elsewhere. *Id.* ¶¶ 8-9, 178-80. This is a tie. Because virtually every PC Desktop gamer uses the Steam Gaming Platform—and publishers therefore must make games that are compatible with the Steam Gaming Platform— Valve's tie effectively requires game publishers to sell their games through the Steam Store. *Id.* ¶¶ 8-10, 112-13, 124, 147, 178-79. Valve permits publishers to include "Steam Keys" with games purchased through other distributors, *id.* ¶¶ 72, 116, 142, 159-77, but *limits* the use of Steam Keys,

1  and thus the market-wide output of games sold, in order to drive increased volume to the Steam

2  Store,[2] *id.* ¶¶ 10, 116, 181-85.

3      *Second*, Valve mandates that games sold by *other distributors* cannot be priced lower than

4  those sold through the Steam Store. *Id.* ¶¶ 11-19, 202-06. This policy—the PMFN—also applies to

5  Steam Keys. *Id.* ¶ 212. Valve has enforced its PMFN against game publishers, including against

6  Wolfire. *Id.* ¶¶ 221-22. Valve's enforcement of the Valve PMFN blocks rival stores, like the

7  Discord Store, from competing on price. *Id.* ¶¶ 209-18.

8      Valve's two-pronged anticompetitive strategy allows Valve to maintain its dominance and

9  to charge a supracompetitive 30% commission on nearly every sale made through the Steam Store.

10 *Id.* ¶¶ 2, 9, 18. Valve set this commission at the launch of the Steam Store, when Valve and other

11 fledgling digital distributors' primary competitors were brick-and-mortar retailers, which charged

12 30% commissions due to their substantially higher costs. *Id.* ¶¶ 2-6, 46-48, 61-69. Online

13 platforms, such as the Steam Store, enjoy substantial cost advantages over their brick-and-mortar

14 competitors. So, while Valve set its commission at the same level as brick-and-mortar stores, it

15 has enjoyed supracompetitive profits given its very small variable costs. *Id.* ¶¶ 4-6, 47-52, 62-64.

16     In 2013, digital distribution surpassed brick-and-mortar stores as the dominant form of

17 distribution for PC Desktop Games. *Id.* ¶ 114. Digital distributors gained prominence and

18 competition from them would have driven down Valve's commission, benefiting publishers and

19 gamers alike. But Valve's PMFN blocks this procompetitive price competition. *Id.* ¶¶ 202-11.

20 Even when other digital distributors have offered lower commissions in order to attract game

21 publishers to their stores, Valve's PMFN prevents publishers from offering lower *prices to*

22 *consumers* on those other stores than on the Steam Store. *Id.* ¶¶ 225-32. Therefore, consumers

23 have no incentive to buy games from other stores, stymying other stores' attempts to compete on

24 commission pricing. *Id.* ¶¶ 257-62 (discussing EA), 263-71 (Discord), 272-76 (Microsoft, Amazon

25 and Google), 277-89 (Epic Games). This harm is entirely consistent with the body of economic

26 literature, finding that PMFNs cause anticompetitive harm. *Id.* ¶¶ 233-46.

27

28   [2]  Valve's Steam Key system likewise reduces product quality. *Id.* ¶¶ 165-77.

Wolfire Opp. to Mot. to Dismiss
Case No. Case No. 2:21-CV-563-JCC

7

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1      In competitive markets, first-movers such as Valve often enjoy temporary monopoly

2  power, during which they extract supracompetitive profits before new entrants compete down the

3  price. *Id.* ¶ 66. For instance, the FDA grants a limited exclusivity period for the first generic

4  pharmaceutical manufacturer to file an application for generic approval; those first-movers

5  typically set prices 20-30% above marginal cost. *Id.* ¶ 65. But when the exclusivity period ends,

6  prices quickly decrease to a competitive equilibrium. *Id.* ¶¶ 65-66.

7      So it should have been with Valve. Valve originally set its 30% commission in competition

8  with brick-and-mortar stores, who have massively higher costs than a digital distributor like

9  Valve. *Id.* ¶¶ 307-08. And when Valve's tying and PMFN began preventing price competition in

10 digital distribution from lowering that 30% commission, it became anticompetitive (by 2013 at the

11 latest, when Valve had firmly established market power and digital distribution became

12 dominant). From that point forward, by maintaining the illegal scheme described herein, Valve

13 denied consumers and publishers the benefits of price competition across stores. *Id.* ¶¶ 67-69.

14 Gamers, publishers, and competitors have all been injured, while Valve has enjoyed

15 supracompetitive profits. *Id.* ¶¶ 20-22, 293-306.

16 ## III.   LEGAL STANDARD

17      When considering a motion to dismiss, the court must "take all allegations of material fact

18 as true and construe them in the light most favorable to the nonmoving party." *In re Nat'l Football*

19 *League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019) (internal quotation

20 marks and citation omitted). "[P]laintiff's complaint survives a motion to dismiss under Rule

21 12(b)(6)" in cases where "there are two alternative explanations [of the facts alleged], one

22 advanced by defendant and the other advanced by plaintiff, both of which are plausible." *Starr v.*

23 *Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F.

24 Supp. 3d 1169, 1181 (W.D. Wash. 2019) (quoting the same); *see also Aetna Inc. v. Blue Cross*

25 *Blue Shield of Michigan*, 2012 WL 2184568, at *3-4 (E.D. Mich. June 14, 2012) (denying motion

26 to dismiss claims based on MFN, and holding that plaintiff sufficiently pleaded antitrust injury by

27 alleging that defendant's contracts caused inflated prices to competitors and customers).

28

WOLFIRE OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563-JCC

8

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

IV.    **ARGUMENT**

    A.    **Plaintiffs Have Plausibly Pled Separate Product Markets for PC Desktop Gaming Platforms and PC Game Distribution**

Valve argues that PC game distributors and PC game-playing platforms together are a single product. But this argument fails in light of the substantial new allegations included in the SAC. And in any event, Plaintiffs also plead an alternative "relevant market for PC Desktop Game Transaction Platforms, which encompasses the services and products offered by both components of Steam," SAC ¶¶ 146-48—the market that Valve claims exists, and which this Court has already held constitutes a "viable alternative market," Nov. 18, 2021 Order ("Order"), Dkt. No. 67, at 7. Accordingly, Valve's challenges to Plaintiffs' tying allegations do not provide a basis for dismissal of the SAC.[3]

        1.    **Plaintiffs Adequately Allege Separate Products Under *Jefferson Parish*'s Consumer Demand Test**

In considering the existence of separate products, courts apply the "consumer demand" test from *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984). As this Court previously recognized, "[i]n *Jefferson Parish*, the [Supreme] Court articulated a consumer demand test to assess tying allegations. If separate independent consumer demand exists for tied products, then the markets encompassing those products are separate; otherwise, they are not." Order at 4 (citing *Jefferson Parish*, 466 U.S. at 19-20). That test turns on whether consumers have a separate demand for the allegedly separate products—*not* on whether the defendant has chosen to make the products functionally or technologically integrated. *Jefferson Parish*, 466 U.S. at 20 ("[W]hether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items."); *see also* Brief for the United States of America as Amicus Curiae, *Epic Games, Inc. v. Apple Inc.*, Nos. 21-16506 & 21-16695 (9th Cir., Jan. 27, 2022) (explaining that the district court in *Epic* erred because it did not properly apply the *Jefferson Parish* consumer demand test, and instead the court had "'focused on functionality'—in

---

[3] Valve again styles its argument as one about a "facially sustainable market definition," but in reality, Valve argues that the Steam Gaming Platform and Steam Store are "a single product" under a tying analysis. Mot. at 6-10.

WOLFIRE OPP. TO MOT. TO DISMISS
CASE NO. Case No. 2:21-CV-563-JCC

9

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

particular, IAP's 'integration' into the 'full suite of services offered by iOS and the App Store'—and claimed it was 'irrelevant' that there was a potential market for component services.") at pp. 32-35; *Klein v. Facebook, Inc.*, 2022 WL 141561, at *14 (N.D. Cal. Jan. 14, 2022) (finding that social media services were a distinct product market even while they were free to use, in exchange for only the user's data and exposure to advertising). Indeed, distinct markets can exist even for jointly consumed products. *Eastman Kodak Co. v. Image Tech. Servs.*, 903 F.2d 612, 615-16 (9th Cir. 1990) ("That products must be used together does not eliminate the possibility that they form distinct markets."); *see also United States v. Microsoft Corp.* ("*Microsoft III*"), 253 F.3d 34, 60 (D.C. Cir. 2001) (en banc) (discussing the relationship between the distinct browser and operating system markets).

On a motion to dismiss, a plaintiff need only offer allegations to plausibly support the existence of separate product markets based on distinct consumer demand, considering factors including whether consumers, if given the choice, would purchase the tied goods from another firm, and whether competitors for the tying products that do not have monopoly power always bundle the goods together. *See*, *e.g.*, *Surgical Instrument Serv. Co. v. Intuitive Surgical, Inc.*, -- F. Supp. 3d --, 2021 WL 5474898, at *3-5 (N.D. Cal. Nov. 23, 2021) (holding plausibility established when plaintiff alleged there existed "evidence of consumer demand" for products in the tied market); *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 954-55 (D.Or. 2018) (complaint plausibly satisfied purchaser-demand test where plaintiff alleged that not all consumers who purchase the tying product also purchase the tied product, and that not all competitors provide both products); *Teradata Corp. v. SAP SE*, 2018 WL 6528009, at *12-13 (N.D. Cal. Dec. 12, 2018) (plaintiff sufficiently alleged distinct product markets where they alleged that the two products had distinct functions, that selling the products together was not necessary, and that the products had been sold separately in the past).

The SAC meets this standard. Plaintiffs allege that there exists consumer demand for the sale of games that is separate from demand for platforms that enable enhanced game play.

*First*, the SAC alleges that some consumers purchase games directly from game developers and from brick-and-mortar retail channels—historically, the primary means of

Wolfire Opp. to Mot. to Dismiss
Case No. Case No. 2:21-CV-563-JCC

10

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

distribution. SAC ¶¶ 156, 158 ("Many consumers access distribution services through platforms with limited platform services . . ."); *id.* ¶¶ 46, 114, 158 (showing brick-and-mortar distribution share at 17% in 2018); *id.* ¶¶ 231, 323-25 (PC Desktop Game sales through Uplay, which does not have PC Desktop Gaming Platform). That consumers do in fact purchase PC Desktop Games from distribution channels separate from their PC Desktop Gaming Platforms, and vice versa, is a clear demonstration of distinct demand for Gaming Platforms and Game Distribution. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462-63 (1992) (distinct products where "[a]t least some consumers would purchase" separately).

*Second*, the SAC alleges that Valve itself recognizes this separate consumer demand for distribution. Specifically, through the Steam Keys program, Valve provides a limited way for consumers to purchase Steam-enabled games through channels other than the Steam Store. *See* SAC ¶¶ 116, 151, 159-77; *see CollegeNet*, 355 F. Supp. 3d at 954-55 (complaint plausibly satisfied purchaser-demand test where plaintiff alleged that not all consumers who purchase the tying product also purchase the tied product, and that not all competitors provide both products).

*Third*, Valve's historical practices further demonstrate that there is distinct consumer demand for the two products. Valve initially launched the Steam Gaming Platform *without* the Steam Store; at its launch, the Steam Gaming Platform's users purchased their PC Desktop Games at brick-and-mortar stores, or from other distribution channels—*not* from Steam. SAC ¶¶ 56, 61; *see AngioDynamics, Inc. v. C.R. Bard, Inc.*, 2018 WL 3730165, at *7 (N.D.N.Y. Aug. 6, 2018) (denying motion to dismiss where tied product was "historically sold on a standalone basis"). Because Plaintiffs have adequately alleged separate relevant markets, the Court should deny Valve's motion on this basis. *See Surgical Instrument Serv.,* 2021 WL 5474898, at *3-5; *CollegeNet*, 355 F. Supp. 3d at 954-55; *Teradata*, 2018 WL 6528009, at *12-13.

### 2.     Valve Asks the Court to Apply the Incorrect Legal Standard

Valve invites this Court to commit reversible legal error by applying Valve's so-called "essential ingredient standard," citing to *Rick-Mik Enterprise, Inc. v. Equilon Enterprise, LLC*, 532 F.3d 963, 974 (9th Cir. 2008). Valve argues that, under *Rick-Mik*, the Court can conclude that tying distribution and gaming services together is lawful *simply because that is Valve's business*

WOLFIRE OPP. TO MOT. TO DISMISS
CASE NO. Case No. 2:21-CV-563-JCC

11

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

*model*. Mot. at 7-9 (asserting that "Steam features (games and a platform for playing them) were joined at birth" and are therefore "essential" to Valve's "strategy"). But Valve's logic is circular, and its argument conflicts with Ninth Circuit precedent.

*First*, *Rick-Mik* acknowledged *Jefferson Parish*'s consumer-demand test, *Rick-Mik*, 532 F.3d at 975 (describing the purchaser demand test of *Jefferson Parish*), recognizing that test is binding precedent that has been repeatedly endorsed by the Supreme Court, *see, e.g., Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, at 34-35, 46 (2006); *see also Epic Games, Inc. v. Apple, Inc.*, 493 F. Supp. 3d 817, 841 844 (N.D. Cal. 2020) (applying "purchaser demand test" to iOS app distribution and Apple's in-app purchase service).

*Second*, to the extent the *Rick-Mik* court applied any different standard—what Valve refers to as the "essential ingredient standard," Mot. at 7-8—it described the standard applicable to *franchises* (not at issue here), because "*[f]ranchises,* almost by definition, necessarily consist of 'bundled' and related products or services—not separate products," and so "*[w]ith franchises*, the proper inquiry is whether the allegedly tied products are integral components of the business method being franchised," 532 F.3d at 974 (emphasis added) (internal punctuation omitted); *see also Surgical Instrument*, 2021 WL 5474898, at *4 (noting *Rick-Mik*'s logic is limited to franchise-related antitrust disputes). Thus, not only is *Rick-Mik* inapplicable here, but the allegations in the SAC are contrary to the facts underlying the logic of *Rick-Mik*. As alleged in the SAC, the two separate products are *not* "almost by definition" bundled; rather, they can be offered separately and often are. SAC ¶¶ 134, 155-58. *Rick-Mik* is inapposite.

To the extent Valve attempts to raise the issue on reply, the "essential ingredient" standard does not apply generally in "novel technological contexts," as Valve claimed in its original motion to dismiss. Dkt. No. 37, at 20. As discussed in Plaintiffs' opposition to that original motion, Dkt. No. 54, at 11-13, the decision in *United States v. Microsoft* ("*Microsoft II*"), 147 F.3d 935 (D.C. Cir. 1998), cited by Valve as the origin of that standard, addressed only whether Microsoft's technological bundling violated a consent decree—a question of contract which that and other courts have recognized was distinct from an antitrust analysis. *Id.* at 950; *Microsoft III*, 253 F.3d at 92 (quoting *Microsoft II*); *Teradata*, 2018 WL 6528009, at *13. Those cases did not announce a

WOLFIRE OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563-JCC

12

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

different antitrust standard applicable to technological tying cases. *Microsoft III*, 253 F.3d at 96.

*Microsoft III* noted only that technological ties might properly be evaluated under the rule of

reason—a determination requiring a factual record and therefore inappropriate for resolution at the

motion to dismiss stage. *Id.* at 92 (quoting *Microsoft II*), *id.* at 95; *Free FreeHand Corp. v. Adobe*

*Systems Inc*., 852 F.Supp.2d 1171, 1182 (N.D.Cal. 2012).

Given Valve's unlawful distribution monopoly, the vast majority of games are purchased

through the Steam Store. But Valve's monopolies in both the market for PC Desktop Game

Distribution and the market for PC Desktop Gaming Platforms are not bases for concluding that

there is a single product market. Indeed, a court's reliance on evidence that two product markets

are linked by a dominant defendant "could perversely immunize the worst-case scenario of a

successful tie" and "should not preclude an inquiry into a tie . . . by a monopolist" in both markets.

*See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶1745d1 (4th ed. 2020).[4]

## B.    Plaintiffs Have Adequately Alleged Antitrust Injury

To satisfy the antitrust injury requirement, Plaintiffs must plausibly allege "(1) unlawful

conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct

unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt.,*

*Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999). Paying supracompetitive prices,

and suffering reduced output and decreased quality, are both cognizable antitrust injuries. *See*

*CollegeNet¸* 355 F. Supp. 3d at 948. Here, Plaintiffs have plausibly alleged all three.

### 1.    Plaintiffs' Steam Key Allegations Adequately Plead Antitrust Injury

Valve misconstrues Plaintiffs' allegations regarding Steam Keys. Mot. at 11-12. As

explained previously, Valve allows publishers to sell a limited number of Steam-enabled games

through other storefronts by using "Steam Keys." SAC ¶¶ 159-61. Valve claims that Plaintiffs

"conceded" that Valve "had no legal duty to distribute Steam Keys at all." Mot. at 11. But that fact

is no "concession," nor is it of any legal or practical import, because Plaintiffs do not seek to

---

[4]   Valve claims Plaintiffs' "conclusion" is that "game sales . . . are not essential to Valve's
success." Mot. at 8. This is a red herring. Plaintiffs do not claim game sales are unrelated to
"Valve's success"; Plaintiffs challenge Valve's anticompetitive practices in making sales.

WOLFIRE OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563-JCC

13

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   impose an antitrust duty on Valve to *provide* Steam Keys; Valve already provides them

2   voluntarily (on a limited basis) in order to expand the Steam Gaming Platform's reach and

3   dominance. *See* SAC ¶¶ 116, 122.

4          Instead, Plaintiffs allege that Valve enforces its PMFN to prohibit publishers from selling

5   their games through other storefronts for less than they do on the Steam Store, SAC ¶ 164, both

6   for Steam Key-enabled versions *and* for versions of their games meant for other, non-Steam

7   platforms, SAC ¶¶ 180, 212-16. Valve applies the PMFN to *all* game sales, which mandates that if

8   a game is sold through the Steam Store—as all Steam-enabled games must be—a game publisher

9   cannot sell that game at a lower price in any other store—even if the developer does not request

10  Steam Keys.[5] *Id.* This conduct violates the antitrust laws because it prevents rival PC Game

11  Distributors from competing with Valve on price and quality. *See Lorain J. Co. v. United States*,

12  342 U.S. 143, 152 (1951) (a must-have newspaper could not block advertisers from utilizing the

13  services of a rival radio station); *Osborn v. Visa, Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015)

14  (upholding Section 1 and 2 claims at pleadings stage, where plaintiffs alleged that dominant ATM

15  networks' rules preventing ATM operators from offering lower access fee prices to consumers that

16  used rival networks harmed competition by precluding price competition); *US Airways, Inc. v.*

17  *Sabre Holdings Corp.*, 938 F.3d 43, 51 (2d Cir. 2019) (holding a new trial should proceed on

18  remand to evaluate the "full content" provisions of Sabre, which together constitute a PMFN).

19         In its first Motion to Dismiss, Valve attempted to downplay the CAC's allegations of the

20  implementation and effects of Valve's PMFN clause by mischaracterizing them as a "single

21  anecdote." Dkt. 37, Mot. to Dismiss Am. Compl. at 2. Having abandoned that (incorrect) claim,

22  now in just a single sentence, Valve summarily concludes that, "Wolfire doesn't plausibly allege

23  that Valve actually enforced its alleged—and unpublished—PMFN, the alleged combination of

24  Steam Key Guidelines and SDA provisions, against itself or others." Mot. at 20.

25

26  ―――――――――――――――
    [5] Valve continues to argue that it is simply asking developers "to do no more than 'treat Steam
27  customers no worse than customers buying Steam keys outside of Steam.'" Mot. at 19. Valve's
    point is irrelevant to Plaintiffs' argument, though, as the Valve PMFN clause applies to *all*
28  developers, regardless of whether Steam Keys are involved.

WOLFIRE OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563-JCC

14

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

But this is precisely the type of factual dispute that shows the Court must deny Valve's motion to dismiss. Valve will have a full opportunity to develop factual evidence in discovery that it never enforced the Valve PMFN and then it can present its arguments to the jury. What Valve cannot do is have the entire case dismissed because it has its own perspective on the facts underlying Plaintiffs' plausible allegations.

Indeed, the SAC makes numerous allegations evidencing the Valve PMFN's long and continued existence. *First*, the "anecdote" dismissed by Valve is a *direct quote from Valve personnel* setting forth Valve's company policy in direct support of Plaintiffs' allegations: "We basically see any selling of the game on PC, Steam key or not, as a part of the same shared PC market—so even if you weren't using Steam keys, we'd just choose to stop selling a game if it was always running discounts of 75% off on one store but 50% off on ours . . .." SAC ¶ 212. *Second*, in another example, a Valve employee explained how the PMFN worked: "The biggest takeaway is, don't disadvantage Steam customers. For instance, it wouldn't be fair to sell your DLC [downloadable content] for $10 on Steam if you're selling it for $5 or giving it as a reward for $5 donations. We would ask that Steam customers get that lower $5 price as well." *Id.* ¶¶ 218, 220.[6] *Third*, a Valve employee told another developer that if he "brought a particular other game of [his] to Steam, it would need to be equivalently priced. This was regardless of whether the non-[S]team version use Steam technology[,] [i.e.] a completely standalone version would have to be the same price as the Steam version." *Id.* ¶ 222.

In addition to these statements by Valve of its PMFN policy, Plaintiffs also allege facts to show how Wolfire itself has been subject to Valve's coercive threats to enforce its PMFN. On December 3, 2018, a Steam account manager told Wolfire's owner that Valve would delist any games available for sale at a lower price elsewhere, whether or not those games were sold using Steam Keys. *Id.* ¶ 221. And as a direct result of Valve's threatened enforcement of this PMFN,

---

[6]  Valve dismisses these allegations as simply "blog posts written by 'TomG,'" and summarily claims that they are "do not provide facts sufficient to allege anticompetitive behavior." Mot. at 22. The "blog" referenced is Steamworks Development, which Plaintiffs have explained "is a forum where publishers can interact with Valve employees," and "TomG" is a Valve employee explaining Valve's policies. SAC ¶¶ 218, 220.

Wolfire Opp. to Mot. to Dismiss
Case No. Case No. 2:21-CV-563-JCC

15

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1  Wolfire has not offered its games for a lower price than what appears on Steam with other sellers.

2  *Id.* Valve attempts to rebut this by describing the allegations as relating to "a single exchange"

3  between Valve and Wolfire, Mot. at 20 (citing SAC ¶ 221), but as outlined above, Plaintiffs have

4  provided numerous examples—even without yet having the benefit of discovery—to support

5  Plaintiffs' allegation that Valve's PMFN applies broadly across the PC Desktop Game

6  Distribution market. *See, e.g.*, *Landers v. Quality Commc'ns., Inc.*, 771 F.3d 638, 641 (9th Cir.

7  2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 at 678 (2009) ("A claim for relief is plausible on its

8  face 'when the plaintiff pleads factual content that allows the court to draw the reasonable

9  inference that the defendant is liable for the misconduct alleged.'").[7]

10        In short, while Valve claims that Plaintiffs "concede" that the Valve PMFN "nominally

11  appl[ies] only to Steam Keys," and invites this Court to make a factual determination that the

12  policy is so limited, Mot. at 19, in fact Plaintiffs plausibly allege that Valve itself has described its

13  *actual practice and policy* is to broadly apply the PMFN to all games, even though the *written*

14  policy does not do so on its own. SAC ¶¶ 212-17. A decision dismissing the SAC on the basis that

15  the PMFN "applies *only* to Steam-enabled games sold via Steam Keys," as Valve would have this

16  Court do, would be contrary to Rule 12(b)(6), which requires this Court to accept Plaintiffs'

17  allegations to the contrary. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (requiring, at the

18  motion to dismiss stage, that the Court accept plaintiffs' well-pled allegations over defendants'

19  contrary assertions). Valve will be free at later stages to try to show that the statements about its

20  policies by its own personnel were false, but that argument cannot be credited now.

21        **2.**    **Plaintiffs Adequately Allege Valve's Commission Is Supracompetitive**

22        Valve charges a 30% commission on nearly every game sale made in the Steam Store. This

23  fee is supracompetitive because it far exceeds Valve's variable costs (which are effectively zero)

24

25  [7]  Valve also claims that Wolfire failed to add any examples of its own prices, before or after the alleged exchange, to show whether it kept the same prices across platforms. Mot. at 20. But

26  Plaintiffs' point is that it was not *able* to choose its own price as a result of Valve's anticompetitive conduct; there is no price comparison to share. That developers have no choice but

27  to match Steam's pricing is demonstrated in the SAC with numerous examples of what some other

28  sellers charged on Steam and competing Platforms. SAC ¶¶ 226-31.

Wolfire Opp. to Mot. to Dismiss
Case No. Case No. 2:21-CV-563-JCC       16       QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

and far exceeds what would prevail in a competitive market. Courts recognize that a measure of supracompetitive pricing is whether the price is well "above a firm's marginal cost"—*In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014). Moreover, Valve's supracompetitive pricing is also demonstrated by the supracompetitive profit levels it makes every year. SAC ¶¶ 19-21; *cf. US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d at 61-62 (evidence of non-competitive profit margins can support a jury finding of competitive harm). These allegations are fully sufficient at this stage and, indeed, it would be unfair to demand more before discovery has even commenced.

In response, Valve relies on *Somers v. Apple*, 729 F.3d 953 (9th Cir. 2013) to argue that Plaintiffs have not plausibly alleged Valve's 30% commission is supracompetitive. Mot. at 12-19. Valve fundamentally misapplies *Somers*, ignores the SAC's well-plead allegations, and relies on "facts" that do not appear in the SAC. Valve's argument thus fails.

### (a)       Somers Is Inapplicable

*Somers* involved an allegedly anticompetitive scheme by Apple to monopolize music download markets. 729 F.3d at 956. The plaintiffs alleged that, when Apple launched an online music store in 2003 accessible only through iTunes, purchasers could only play the music on Apple products, like iPods. Apple sold those music files for $0.99. *Id.* at 957. The plaintiffs alleged that Apple obtained a monopoly in the music downloads market by 2004, and that Apple maintained its monopoly through the use of software updates preventing competitors from selling audio files compatible with iPods and preventing iPod owners from playing music they downloaded from other companies. *Id.* at 959. The *Somers* plaintiffs alleged that, if Apple had not engaged in the anticompetitive conduct, Apple would have been forced by competitive forces to reduce its download prices. *Id.* at 964.

Critically, however, the *Somers* plaintiffs also alleged that Amazon emerged as a successful competitor by 2008, and that Apple lost its monopoly power and lost its ability to charge supracompetitive prices. The plaintiffs specifically alleged that Apple *ceased* the allegedly anticompetitive conduct altogether in March 2009. Nevertheless, Apple's prices remained the same even after it lost its monopoly power and stopped its anticompetitive conduct. *Id.* at 959,

WOLFIRE OPP. TO MOT. TO DISMISS
CASE NO. Case No. 2:21-CV-563-JCC

17

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

964. In light of those allegations, the Ninth Circuit held that the plaintiffs' theory that Apple had overcharged consumers was not plausible. *Id.* at 964.

This case is different. Here, the SAC makes clear that the period in which Valve set its original commission level cannot be considered a competitive benchmark for all time because Valve's competitors were brick-and-mortar retailers with substantial real-world costs that Valve and other digital distributors did not have. Economic principles dictate that, as the market moved more to the digital realms, costs and prices would have decreased through competition. Moreover, unlike the situation with Apple in *Somers*, Valve has never lost its monopoly power, nor ceased its anticompetitive conduct. There is thus "nothing on the face of the CACs – or in facts appropriately judicially noticeable that are not subject to dispute – that undermines plaintiffs' theories." *In re Juul Labs, Inc., Antitrust Litig.*, 2021 WL 3675208, at *17 (N.D. Cal. Aug. 19, 2021). Accordingly, *Somers* is inapposite.

> (i)   Valve originally set its commission in a market dominated by brick-and-mortar stores that have much higher costs

The SAC alleges that, "[f]or most of the history of the PC Desktop Game industry … gamers purchased most PC Desktop Games at brick-and-mortar locations." SAC ¶ 46. Unlike digital distributors, brick-and-mortar distributors incur high recurring costs, "including real estate, labor, processing, and inventory," and they make "razor-thin margins," which requires them to charge commissions to game publishers (and prices to consumers) that reflect those substantial costs. *Id.* ¶¶ 4, 47. It was in this environment that Valve originally set its 30% commission, which allowed it to enjoy supracompetitive profits because it had no need at that point to compete on price—Valve's main competitors all charged 30% or more. *Id.* ¶¶ 5, 48, 57, 62. Other PC Desktop Game digital distributors that first began in this same early period (2003-2004) similarly competed primarily against brick-and-mortar stores. *Id.*

But as alleged in the SAC, digital distribution eventually became the dominant form of PC Desktop Game distribution by 2013. *Id.* ¶¶ 49, 114. That is also the point by which Valve obtained monopoly power, because it was by far the largest digital PC Desktop Game distributor at the time. *See id.* When PC Desktop Game Distribution shifted primarily to digital distribution,

WOLFIRE OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563-JCC

18

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

economics predicts that price competition among digital distributors *should have* pushed Valve's commission lower, to more closely approximate its variable costs. *Id.* ¶¶ 6, 63-65, 68.

Thus, unlike the pricing in *Somers*, Valve's imposition of a 30% commission at launch—at a time when its competitors were largely brick-and-mortar stores with more substantial costs—does not reflect the expected competitive level for commissions in a market later dominated by digital PC Desktop Game distribution. When market realities change, so too must the antitrust analysis. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S.Ct. 2141, 2158, 2166 (2021). Valve's motion fails to address these market changes highlighted in the SAC's new allegations, and asks this Court to ignore them entirely or improperly to resolve factual issues against Plaintiffs.

        (ii)     <u>After Valve obtained monopoly power, it never lost that power or ceased its anticompetitive conduct</u>

Another core difference between this case and *Somers* is that the SAC does not allege Valve ever *lost* its monopoly power or *ceased its anticompetitive conduct* while maintaining the same pricing. To the contrary, while Valve strains to argue that Valve has faced "intense" competition throughout the relevant time period—quoting incomplete snippets from the SAC and taking allegations out of context, Mot. at 12-15—the SAC makes very clear that Valve's would-be competitors *failed* to threaten Valve's market share or its monopoly power *because of Valve's anticompetitive conduct*. These failed competitors include Microsoft, SAC ¶¶ 272-74, Amazon, *id.* ¶ 275, Discord, *id.* ¶¶ 263-69, 209-11, 242, *id.* at p. 83 n. 61, and Epic, which has been estimated to have only about 2% of the market despite substantial attempts to compete with Steam, *id.* ¶¶ 284, 288. Unlike Apple in *Somers*, the SAC is explicit that Valve thwarted these efforts through anticompetitive conduct. *Id.* ¶¶ 247-56.

Also, unlike *Somers*, Valve has never ceased its anticompetitive conduct—that conduct continues to this day. Valve's maintenance of its 30% commission is therefore no indication of what commission it would charge in the absence of its anticompetitive conduct.

In short, because the SAC alleges multiple facts indicating why Valve's 30% commission does not reflect a pricing level that would prevail in a competitive market after the shift to digital distribution, *Somers*' logic does not apply here. Valve's arguments to the contrary ask this Court

Wolfire Opp. to Mot. to Dismiss
Case No. Case No. 2:21-CV-563-JCC

19

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1   to rewrite the SAC into something it is not. For these and the reasons discussed more fully above,

2   Plaintiffs have therefore adequately alleged antitrust injury. *See In re Glumetza Antitrust Litig.*,

3   2021 WL 1817092, at *12 (N.D. Cal. May 6, 2021) ("This certainly counts as a valid antitrust

4   injury; 'price cutting is a practice the antitrust laws aim to promote.'") (quoting *Cascade Health*

5   *Solutions v. PeaceHealth*, 515 F.3d 883, 896 (9th Cir. 2008)).[8]

6                   **(b)      Valve's Fact-Bound Arguments Justifying Its 30% Commission
                              Ignore the SAC's Allegations and Cite to Facts Outside the SAC**
7

8           In a further attempt to justify its 30% commission, Valve ignores the SAC's allegations,

9   argues that its interpretation of various facts should control, and references "facts" outside the

10  SAC that Plaintiffs contest. Mot. at 15-18. None of these arguments should be given any weight.

11          *First*, Valve argues that, despite the SAC's well-pled allegations about the more substantial

12  costs associated with brick-and-mortar game distribution, SAC ¶¶ 47-49, the Court should

13  nevertheless conclude that Valve's own costs are comparable and therefore justify a similar

14  commission, *see* Mot. at 15-16. This argument violates the Rule 12(b)(6) standard. The SAC

15  explains that Valve's costs are negligible as compared to the costs involved in brick-and-mortar

16  retail. *See id.* ¶ 301 (quoting Epic CEO Tim Sweeney stating that "[f]ixed costs of developing and

17  supporting the platform became negligible at a large scale. In our analysis, stores charging 30

18  percent are marking up their costs by 300 to 400 percent"), ¶¶ 4-6, 46-48, 61-64, 69, 307

19  (discussing the substantial cost advantages of digital distribution over traditional brick-and-mortar

20  stores)). Furthermore, the SAC states that Valve remarkably requires only 350 employees to

21  service some 120 million gamers and makes a profit of $5 million per employee, *id.* ¶¶ 21, 71, 90,

22  293; that other fledgling entrants into the market have charged a much lower 10-12% commission

23  precisely because a much lower commission is sufficient to cover digital distribution and platform

24

---

25  [8]   As the SAC alleges, after Steam faced a sliver of competition from Epic Games Store, it

26  nominally lowered pricing on a fraction of sales, showing that meaningful competition would
    discipline Valve's 30% rate. The SAC makes clear that the purported change—applicable only to

27  the rare games which earn over $10 million—was essentially window dressing and "the vast
    majority of sales to consumers through the Steam Store remain at the 30% commission rate."

28  Valve's move did not actually change price competition.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

maintenance costs while still permitting investments and innovation, *id.* ¶¶ 209, 266, 279, 301; and that economic experts have found that platforms such as these can cover their costs with a commission of merely 6.66%, far less than Valve's 30%, *id.* ¶ 303. Put simply, the SAC explains in detail that "[d]igital distributors could avoid the vast majority of the costs that brick-and-mortar retailers must incur as a fundamental aspect of their business model, thus making substantially more profits on PC Desktop Game sales than brick-and-mortar stores." *Id.* ¶ 48. Valve cannot invoke extrinsic facts to dismiss the SAC—especially when those extrinsic "facts" are highly dubious based on the well-pled factual allegations already in the complaint. *See, e.g., RideApp, Inc. v. Lyft, Inc.*, 2019 WL 7834759, at *3 (N.D. Cal. Aug. 15, 2019) (explaining "such extrinsic evidence may not be considered on a motion to dismiss"); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 990 F. Supp. 2d 996, 1005 (N.D. Cal. 2013) (defendant's contentions are "intrinsically factual, contrary to plaintiffs' pleading and inappropriate for resolution at the motion to dismiss stage.") (quotation omitted).[9]

   *Second*, Valve argues that "software development" industries have high fixed costs and "'close to zero' marginal costs," meaning that one cannot infer Valve imposed supracompetitive pricing based upon a comparison of its prices (*i.e.*, the 30% commission) and Valve's costs. Mot. at 17. Again, these are at most highly contested economic arguments that cannot be resolved in Valve's favor at this stage. Valve cites two SAC paragraphs for this argument, *see* Mot. at 17 (citing SAC ¶¶ 125, 310), but neither actually supports Valve's factual assertions. To the contrary, the first explains that there are substantial barriers to entry in these markets due to *network effects*, not fixed costs. SAC ¶ 125. The second explains how *publishers—i.e.*, Valve's customers—have "*largely* fixed costs." *Id.* ¶ 310 (emphasis added). That does not mean *Valve* has "high" fixed costs; it means that the majority of *publishers'* costs occur up front rather than later, when they sell more games. Valve's motivation for this misleading argument is revealed by its citation to *In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639 (D. Mass. 2020), which states that prices above

_____

[9]  If Valve's arguments here held water, it would not be one of the most profitable companies *in the world*. *Id.* ¶¶ 21, 293.

Wolfire Opp. to Mot. to Dismiss
Case No. Case No. 2:21-CV-563-JCC

21

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

marginal costs *may* not be supracompetitive in industries with high fixed costs. But that summary judgment decision actually supports Plaintiffs, not Valve, because the evidence there showed very high profit margins, leading the court to conclude there was a genuine dispute of material fact on supracompetitive pricing, despite the industry at issue having very high fixed costs. *Id.* at 659. Here, Valve asks this Court to make a determination at the motion to dismiss stage that there *could be no supracompetitive pricing as a matter of law*, even though Valve is alleged to have very high profit margins.

   *Third*, Valve takes issue with Plaintiffs' comparison of its profitability with the profitability of brick-and-mortar stores, such as Walmart. Mot. at 17-18. Valve argues that Walmart's costs are not comparable to Valve because Walmart sells "a huge range of goods, identical copies (or substitutes) of which can be obtained from … a host of other retailers," that "customers of Walmart's brick-and-mortar stores travel to a store, select their goods from what's on the shelves, and take them home, where they use those goods without further support form Walmart save for returns, warranty, or other customer-service issues," whereas Valve must offer some different continuing support to its customers by maintaining its platform. Mot. at 17.

   None of these supposed "facts" are alleged in the SAC. Rather, the SAC's well-pled allegations *contradict* Valve's arguments. The SAC alleges that the majority of the Steam Gaming Platform and the Steam Store operate on an automated basis, requiring merely 350 employees to serve 120 million gamers and thousands of game publishers, SAC ¶¶ 21, 71, 90, 113, 312, and that Valve neglects its platform in favor of cost savings, resulting in harm to quality and innovation, *see infra* § IV.B.3; SAC ¶ 314 (discussing Valve's lack of investment in cybersecurity), ¶ 315 (discussing Valve's lack of investment in moderation, permitting the proliferation of white supremacists on the platforms), ¶ 317 (discussing Valve's lack of investment in policing publishers, and Valve's sale of games promoting sexual assault). Valve's insistence that it provides costly customer support that is comparable to or more than Walmart's costs cannot be credited at this stage, where this Court must construe the SAC's allegations in the light most favorable to Plaintiffs. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019).

### 3. Plaintiffs Adequately Allege That Output Has Been Restricted and Quality Has Suffered as a Result of Valve's Conduct

In addition to supracompetitive pricing, discussed *supra* at Sec. IV.B.2, Plaintiffs also allege throughout the SAC that Valve's anticompetitive restraints have suppressed output and led to lower quality products in the relevant markets. SAC ¶¶ 10, 25, 326-32; *see also id.* ¶¶ 166-67, 177, 327-32 (explaining how Valve operates low quality products including a lack of investment in the Steam Store). It is well established that "reduced output, increased prices, or decreased quality in the relevant market" is sufficient to show an antitrust injury. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020). Nonetheless, Valve presents several arguments that claim Plaintiffs' output and quality allegations are implausible. These arguments fail.

*First*, Valve argues that the increase in *absolute output* observed in the real world shows its conduct must not be anticompetitive. Mot. at 19; *see also* Mot. at 1, 3, 11, 21, 22. But the relevant inquiry is whether output would have been ***even higher*** absent Valve's conduct. *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of U. of Oklahoma*, 468 U.S. 85, 106-107 (1984) (explaining that the relevant inquiry is whether output was lower than it "would otherwise be" in the but-for world); *Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925, at *66-67 (N.D. Cal. Sept. 10, 2021) (noting that although output had "exploded by 1200%," when looking at decreased output "what is needed is a comparison of output in a 'but-for' world without the challenged restrictions"). That is exactly what Plaintiffs allege. If Valve had not anticompetitively maintained its supracompetitive pricing, *output would have been greater*. SAC ¶¶ 257-89, 309-10.

*Second*, Valve continues to rely on its own unsupported factual contentions, which as described above are contradicted by the well-pleaded allegations of the SAC, that the Steam Keys Rules apply only to Steam-enabled games, sold via Steam Keys. Mot. at 19. But, as explained above, this is a factual dispute that cannot be resolved at the motion to dismiss phase.

*Third*, Valve claims there are no plausible allegations of enforcement. Mot. at 20. According to Valve, the allegations "show only that one seller, Wolfire, sustained a 'reduction in output,' whereas the Court has already determined that on a market-wide basis no reduction was alleged." *Id.* at 21. The Court, however, has made no such ruling. And the SAC does in fact allege

Wolfire Opp. to Mot. to Dismiss
Case No. Case No. 2:21-CV-563-JCC

23

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

that output in a world without Valve's anticompetitive rules would have been greater than output in the actual world, SAC ¶¶ 309-10—the legally relevant measure of output. As discussed in detail above, the SAC alleges numerous examples of Valve communicating the broad policy to publishers, even before Plaintiffs have taken any discovery. SAC ¶¶ 203-27. Valve provides no valid reason to discount those allegations.

*Fourth*, Valve claims Plaintiffs "allege[s] no facts that Valve had a hand" in developers' pricing decisions, and that "developers may well have made the common-sense choice to sell their games at the same price in different stores." Mot. at 21. This is another alternative narrative that creates yet another genuine factual dispute to be resolved in discovery and at trial—Valve admits this when it explains its own version of the facts is "no more plausible" than Plaintiffs' allegations. Mot. at 21. Plaintiffs have alleged that Valve's Steam Key Policies and PMFN *require* developers to set their pricing at the same level. SAC ¶¶ 201-24. Under Plaintiffs' well-plead allegations, Valve thus has "a hand" in every publisher's price if they want their game to be sold on Steam; and due to Steam's monopolistic market share, that is essentially a foregone conclusion. *Id.*

Valve also claims its alternative narrative renders Plaintiffs' allegations implausible under *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007). Mot. at 21-22. But *Leegin* merely establishes that vertical resale-price maintenance should be assessed under the rule of reason, rather than the *per se* framework—it does not give a free pass at the motion to dismiss phase to monopolists who have plausibly engaged in anticompetitive conduct. *See United States v. Apple*, 791 F.3d 290, 320 (2d Cir. 2015) (quoting *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (the Court would be "breaking no new ground in concluding that MFNs . . . can be 'misused to anticompetitive ends in some cases.'").

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Valve's Motion in its entirety. In the alternative, if Valve's Motion to Dismiss is granted, Plaintiffs request leave to amend the SAC.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  DATED: March 11, 2022

2

3                                            By    /s/ Alicia Cobb
                                                Alicia Cobb, WSBA # 48685
4                                               QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP
5                                               1109 First Avenue, Suite 210
                                                Seattle, WA 98101
6                                               Telephone: (206) 905-7000
                                                Fax: (206) 905-7100
7                                               Email: aliciacobb@quinnemanuel.com

8
                                                Steig D. Olson (*pro hac vice*)
9                                               David D. LeRay (*pro hac vice*)
                                                Shane Seppinni (*pro hac vice*)
10                                              QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP
11                                              51 Madison Avenue, 22nd Floor
                                                New York, NY 10010
12                                              Telephone: (212) 849-7000
                                                Fax: (212) 849-2100
13                                              Email: steigolson@quinnemanuel.com

14
                                                Adam B. Wolfson (*pro hac vice*)
15                                              QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP
16                                              865 South Figueroa Street, 10th Floor
                                                Los Angeles, CA 90017-2543
17                                              Telephone: (213) 443-3000
                                                Fax: (213) 443-3100
18                                              Email: adamwolfson@quinnemanuel.com

19
                                                Charles B. Stevens (*pro hac vice*)
20                                              QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP
21                                              50 California Street, 22nd Floor
                                                San Francisco, CA 94111
22                                              Telephone: (415) 875-6600
                                                Fax: (415) 875-6700
23                                              Email: charliestevens@quinnemanuel.com

24
                                                *Attorneys for Daniel Escobar, William Herbert,*
25                                              *and the class.*

26

27

28

| | | |
|---|---|---|
| 1 | David D. Golden (*pro hac vice*) | Thomas N. McCormick (*pro hac vice*) |
| 2 | Wyatt Fore (*pro hac vice forthcoming*)<br>CONSTANTINE CANNON LLP | VORYS, SATER, SEYMOUR AND PEASE LLP<br>4675 MacArthur Court |
| | 1001 Pennsylvania Avenue, NW, Suite 1300N | Suite 700 |
| 3 | Washington, DC 20004 | Newport Beach, CA 92660 |
| | Telephone: (202) 204-3500 | Telephone: (949) 526-7903 |
| 4 | Fax: (202) 204-3501 | Fax: (949) 526-7901 |
| | Email: dgolden@constantinecannon.com | Email: tnmccormick@vorys.com |
| 5 | | |
| | A. Owen Glist (*pro hac vice*) | |
| 6 | Ankur Kapoor (*pro hac vice*) | Kenneth J. Rubin (*pro hac vice*) |
| | Jeffrey I. Shinder (*pro hac vice*) | Timothy B. McGranor (*pro hac vice*) |
| 7 | CONSTANTINE CANNON LLP | Kara M. Mundy (*pro hac vice*) |
| | 335 Madison Avenue, 9th Floor | VORYS, SATER, SEYMOUR AND PEASE LLP |
| 8 | New York, NY 10017 | 52 East Gay Street |
| | Telephone: (212) 350-2700 | Columbus, OH 43216-1008 |
| 9 | Fax: (212) 350-2701 | Telephone: (614) 464-6350 |
| | Email: akapoor@constantinecannon.com | Fax: (614) 719-6350 |
| 10 | | Email: kjrubin@vorys.com |
| 11 | | tbmcgranor@vorys.com |
| | | kmmundy@vorys.com |
| 12 | | |
| 13 | *Attorneys for Wolfire Games, LLC and the* | *Attorneys for Sean Colvin, Susann Davis, Daniel* |
| 14 | *class.* | *Ryan Lally, Hope Marchionda, Everett Stephens,*<br>*and the class.* |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

1

## **CERTIFICATE OF SERVICE**

2         I hereby certify that on March 11, 2022, I caused a true and correct copy of the foregoing

3  to be filed via email to filing@wawd.uscourts.gov, and to be sent to counsel of record via email, in

4  compliance with this Court's procedures in the case of an outage of the CM/ECF system.

5         DATED March 11, 2022

6

7

8                                         */s/ Alicia Cobb*
                                          Alicia Cobb, WSBA #48685
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOLFIRE OPP. TO MOT. TO DISMISS
CASE NO. CASE NO. 2:21-CV-563-JCC                    27

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000