THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WOLFIRE GAMES, LLC, SEAN COLVIN, SUSANN DAVIS, DANIEL ESCOBAR, WILLIAM HERBERT, RYAN LALLY, HOPE MARCHIONDA, and EVERETT STEPHENS, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>         v.<br><br>VALVE CORPORATION,<br><br>                    Defendant. | CASE NO. C21-0563-JCC<br><br>ORDER |

This matter comes before the Court on Defendant's motion to dismiss Plaintiffs' second amended consolidated class action complaint ("SAC") (Dkt. No. 74). Having thoroughly considered the briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part the motion for the reasons described below.

## I.    BACKGROUND

The Court previously dismissed Plaintiff Wolfire Games, LLC's Sherman Act and Washington Consumer Protection Act claims, as alleged in Plaintiffs' amended class action complaint ("CAC"). (*See* Dkt. No. 67 at 8.) In doing so, it summarized the CAC's allegations, (*see id.* at 1–3), and will not repeat them here. The Court dismissed the complaint after

ORDER
C21-0563-JCC
PAGE - 1

1  concluding that the CAC failed to plausibly allege that game publishers suffer price and non-

2  price-based injury from Defendant's antitrust conduct. (*Id.* at 5–8.) The Court also found that the

3  CAC did not support Wolfire's preferred market theory—that the Steam Store and Steam

4  Platform are separate products offered in separate markets, which Defendant unlawfully ties. (*Id.*

5  at 4–5.) However, the Court granted Plaintiffs leave to amend, (*id.* at 8), and they have done just

6  that. (*See* Dkt. No. 68.) The SAC does not provide new causes of action or completely new

7  factual allegations; rather, it provides additional context to the CAC's allegations. (*Compare*

8  Dkt. No. 34 at 12–88 (factual allegations contained in the CAC), *with* Dkt. No. 68 at 13–98

9  (factual allegations contained in the SAC).)

10     Wolfire contends that these additional facts bolster the following arguments: (a) the

11  Steam Store and Steam Platform are distinct products which operate in distinct product markets

12  (which Defendant unlawfully ties), (b) Defendant unlawfully imposes an anticompetitive

13  platform most-favored-nations ("PMFN") requirement on game publishers, (c) Plaintiffs'

14  resulting price-based injuries are distinguishable from those rejected by the Ninth Circuit in

15  *Somers*,[1] and (d) Plaintiffs plausibly allege non-price-based injuries in the form of reduced game

16  output and quality. (*See* Dkt. No. 76 at 13–28.) Defendant again moves to dismiss, arguing that

17  Plaintiffs' claims are no more plausible now than before. (*See generally* Dkt. No. 74).

18  **II.    DISCUSSION**

19         **A.    Legal Standard**

20         To support an antitrust claim, a plaintiff must allege "(1) unlawful conduct, (2) causing

21  an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that

22  is of the type the antitrust laws were intended to prevent." *Am. Ad Mgt., Inc. v. Gen. Tel. Co. of*

23  *California*, 190 F.3d 1051, 1055 (9th Cir. 1999). A defendant may move for dismissal of an

24  antitrust complaint, like any other, when a plaintiff "fails to state a claim upon which relief can

25  be granted." Fed. R. Civ. P. 12(b)(6). To survive such a motion, the complaint must contain

26         [1] *Somers v. Apple*, 729 F.3d 953 (9th Cir. 2013).

sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 678. To do so, a plaintiff must provide grounds for entitlement to relief that amount to more than labels and conclusions or a formulaic recitation of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Although the court must accept as true a complaint's well-pleaded facts, conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper Rule 12(b)(6) motion. *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Finally, dismissal under Rule 12(b)(6) "can [also] be based on the lack of a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

### B.    Relevant Market

Plaintiffs' first through fourth causes of action rest on the theory that the Steam Platform and Steam Store operate in separate markets, while Plaintiffs' fifth through eighth causes of action rest on the theory that Defendant competes in a single, integrated game platform and transaction market.[2] (Dkt. No. 68 at 99–106.) Defendant argues that Plaintiffs' separate market theory is facially unsustainable. (Dkt. No. 74 at 10–14.) For the reasons outlined below, the Court agrees.

"Plaintiffs must plead a relevant market to state an antitrust claim under the Sherman Act unless they assert a per se claim." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120–21 (9th Cir. 2018). A facially plausible product market is one that "encompass[es] the product at issue as well as all economic substitutes for the product." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038,

---

[2] Plaintiffs' seventh cause of action incorporates both theories. (Dkt. No. 68 at 105.)

1045 (9th Cir. 2008). The relevant market should be broad enough to "reflect[] commercial

realities." *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966). For instance, in *Grinnell*,

the Supreme Court held that the defendant's "central station service business," a suite of security

services including fire alarms, waterflow alarms, and burglar alarms, competed in a single

relevant market. *Id.* at 571. The Court reasoned that the "cluster" of security services comprised

a "single basic service" that competed against similarly clustered forms of property protection.

*Id.* at 572–73. This was so even though customers could purchase the subsidiary services

separately—it was enough that competitors "recognize[d] that to compete effectively, they must

offer all or nearly all types of service." *Id.* at 572.

Here, the commercial realities alleged in the SAC undercut Plaintiffs' separate market

theory. Plaintiffs allege, for example, that a "commercially viable competitor" in the platform

market would "need to convince gamers and publishers to abandon all of [Steam's social

networking, library management, achievement tracking, and other] features." (Dkt. No. 68 at 72.)

But Plaintiffs' facts go on to show that commercial viability for a platform is possible only when

it generates revenue from a linked game store. (*See, e.g.*, *id.* at 73–81 (describing how EA,

Discord, Microsoft, and Epic all linked platforms to stores through vertical integration and/or

game store "exclusives").) Plaintiffs do not allege that any game platform charges a direct fee for

its use. (*See generally id.*) Put another way, Plaintiffs allege no "economic substitute[]" for

Steam that does not finance its platform through game store purchases. *Newcal*, 513 F.3d at

1045. Therefore, Plaintiffs' separate market theory is facially implausible.

Because the first through fourth causes of action in the SAC rest on this facially

implausible market theory, they are DISMISSED. Plaintiff's seventh cause of action is also

DISMISSED to the extent it relies on separate product markets.

## C.    Tying

Plaintiffs' seventh cause of action also rests, in part, on an allegation that Defendant

illegally ties the Steam Platform to the Steam Store. (Dkt. No. 68 at 105.) In addition to pleading

the existence of separate markets, plaintiffs bringing tying claims must also plausibly allege that the defendant "link[ed] [the] two distinct markets for products that were distinguishable in the eyes of buyers." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984). Said another way, "[t]here must be 'a sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market. . . .'" *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 975 (9th Cir. 2008) (quoting *Jefferson Par.*, 466 U.S. at 21) (alterations in original).

This Court previously dismissed Plaintiffs' tying claims because they failed to plausibly allege that the Steam Store and Steam Platform were separate in the eyes of the relevant consumer—game publishers. (Dkt. No. 67 at 5.) In the SAC, Plaintiffs add only that some end-users prefer to use other platforms for "some of the same services provided by platforms" like social networking and game updates. (Dkt. No. 68 at 47.) They make no allegation that publishers prefer (or would hypothetically prefer absent Defendant's conduct) a freestanding platform for "local and online space[s] where gamers can play, maintain, communicate with other gamers, and track progress and achievements." (*Id.* at 22 (defining its proposed platform-only market); *see also id.* at 29 (defining "game platform" as "a type of technology platform that *performs several functions* while connecting [gamers to publishers].") (emphasis added).) The SAC defines platforms as multi-functional products, but newly alleges only that certain functions garner independent demand. These facts add nothing to the analysis.

Given the lack of allegations supporting a demand for fully functional gaming platforms *distinct* from game stores, the SAC, like the CAC, fails to plausibly allege that the Steam Store and Steam Platform are two separate products.[3] And on this basis, the SAC fails to state an antitrust violation based on tying.

---

[3] The Court again declines to weigh in on the relative import of *Rick-Mik*, 532 F.3d 975, and *Jefferson Parish*, 466 U.S. 2. (*See* Dkt. No. 67 at 5.)

ORDER
C21-0563-JCC
PAGE - 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**D.     Antitrust Conduct**

Putting aside the trying allegations, the CAC also alleged that Defendant utilizes a PMFN regime to support its anticompetitive objectives. (*See* Dkt. No. 34 at 51.) Defendant previously argued that this regime, as applied to non-Steam-enabled games, does not amount to *plausible* antitrust conduct, though, because the CAC's supporting allegations were anecdotal and threadbare. (*See* Dkt. No. 37 at 15–18.) The Court did not address the argument[4] because it concluded that the CAC's failure to allege antitrust injury was dispositive. (*See* Dkt. No. 67 at 5–8.) But, as described below, *see infra* Part II.E., the SAC plausibly alleges injury. Therefore, the Court must consider the adequacy of the SAC's PMFN allegations.

Most-favored-nations restraints, such as those allegedly utilized by Defendant, are unlawful if used to further anticompetitive goals. *See, e.g.*, *U.S. v. Apple, Inc.*, 791 F.3d 290, 305 (2d. Cir. 2015); *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 609–12 (N.D. Cal. 2020); *Blue Cross & Blue Shield of Ohio v. Bingaman*, 1996 WL 677094, slip op. at 4 (N.D. Ohio 1996). And, according to the SAC, Defendant imposes a PMFN regime to non-Steam-enabled games to "prevent price competition from rival storefronts," resulting in higher prices for those games and less competition in the broader PC game distribution market. (Dkt. No. 68 at 68; *see id.* at 69–94.)

Defendant allegedly enforces this regime through a combination of written and unwritten rules. (*Id.* at 58–64.) According to the SAC, Defendant relies on provisions within Steamworks Documentation to impose conditions on how non-Steam-enabled games are sold and priced. (*Id.* at 8, 58–61.) Defendant also threatens game publishers with punitive action, including removal of their Steam-enabled games, if they sell non-Steam-enabled versions of those games at lower prices. For example, a Steam account manager informed Plaintiff Wolfire that "it would delist any games available for sale at a lower price elsewhere, *whether or not using Steam keys*." (*Id.* at

---

[4] Although the Court did acknowledge the existence of the PMFN allegations. (*See* Dkt. No. 67 at 6 n.3.)

64 (emphasis added).) And if the SAC is to be believed, this experience is not unique to Wolfire. (*See id.* at 63.)

These allegations are sufficient to plausibly allege unlawful conduct. No more is required to survive Defendant's Rule 12(b)(6) motion. *See Iqbal*, 556 U.S. at 678; *see Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (court must consider the "entire factual context" when considering a Rule 12(b)(6) motion).

**E.    Injury**

The Court previously indicated that, based on its interpretation of the holding in *Somers*, 729 F.3d at 964–65, an unlawful antitrust injury predicated on the payment of a supracompetitive fee cannot be plausibly alleged if that fee remains the same when a defendant did and did not have market power. (Dkt. No. 67 at 6.) And according to the CAC, with the exception of certain recent volume discounts, Defendant always charged the same fee to game publishers, including when the PC desktop game "digital distribution" market was in a "fledgling stage," even though Defendant did not become "dominant" in the market until 2013. (Dkt. No. 34 at 14, 28.) On this basis, the Court found that Defendant's allegedly supracompetitive fees could not result in price-based antitrust injury. (*See* Dkt. No. 67 at 6–7.)

But the SAC provides needed context. According to the SAC, Defendant acquired the World Opponent Network gaming platform in 2001 and shut it down a few years later, forcing gamers onto the Steam Platform, making Steam "instantly . . . a must-have platform." (Dkt. No. 68 at 16–17.) This denotes market power earlier on than described in the CAC. And while both complaints indicate that, in those early days, Defendant was competing against brick-and-mortar game distributors, the SAC makes it clear that Defendant did not need market power to charge a fee well above its cost structure because those brick-and-mortar competitors had a far higher cost structure. (*Compare* Dkt. No. 34 at 13, 28, *with* Dkt. No. 68 at 5, 14, 19, 88.)

Therefore, based on the allegations contained in the SAC, the Court now concludes that *Somers* is not controlling. Absent that limitation, Plaintiffs plausibly allege price-based injury.

1    Accordingly, the Court need not consider the adequacy of the SAC's allegations regarding non-

2    price harms.

3    **III.    CONCLUSION**

4           For the foregoing reasons, Defendant's motion to dismiss the SAC (Dkt. No. 74) is

5    GRANTED in part and DENIED in part. The first through fourth causes of action and the

6    portion of the seventh cause of action predicated on separate markets and illegal tying are

7    DISMISSED with prejudice, as further amendment would appear futile.[5] The remaining claims

8    survive.

9

10          DATED this 6th day of May 2022.

11

12

13                                                      _____

14                                                      John C. Coughenour
                                                        UNITED STATES DISTRICT JUDGE
15

16

17

18

19    _____

20          [5] To the extent that the pleadings can be cured by the allegation of additional facts, a
      plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. Northern Cal.*
21    *Collection Serv.*, Inc., 911 F.2d 242, 247 (9th Cir. 1990). However, a court need not provide
      further leave where "it is clear that the complaint could not be saved by amendment." *Livid*
22    *Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005); *see also Griggs*
      *v. Pace Am. Group, Inc.*, 170 F.3d 877, 879 (9th Cir.1999) (the court's discretion in denying
23    leave to amend is particularly broad when it previously granted leave to amend). The claims
      dismissed here are all based on the existence of separate markets, and Plaintiffs have twice failed
24    to adequately plead that separate markets exist. (*See generally* Dkt. Nos. 34, 68.) Because
      Plaintiffs have been unable to cure their defective claims based on separate markets and tying,
25    and it appears clear to the Court that further amendment would be futile, the claims are dismissed
      with prejudice and without further leave to amend.
26

ORDER
C21-0563-JCC
PAGE - 8