# EXHIBIT 20

# REDACTED

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

---

| | |
|---|---|
| | ) Case No. |
| IN RE VALVE ANTITRUST LITIGATION | ) 2:21-cv-00563-JCC |
| | ) |

---

VIDEO-RECORDED DEPOSITION UPON ORAL

EXAMINATION OF

CHRISTOPHER SCHENCK

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

---

9:03 A.M.

DECEMBER 8, 2023

701 FIFTH AVENUE, SUITE 5100

SEATTLE, WASHINGTON

REPORTED BY: CARLA R. WALLAT, CRR, RPR

WA CCR 2578, OR CSR 16-0443, CA CSR 14423

important to Valve to have Section 2.4 in its SDAs with partners?

A. Right. That was your question.

Q. Do you not know why it's important to Valve to have Section 2.4 in its SDAs with partners?

A. That section was added to the contract before I started at Valve. I don't know the genesis of that contract -- that section.

Q. But it's still in Valve's SDAs, correct?

A. It is in the current standard version of the SDA.

Q. Okay. And do you know why it's important to Valve that it's in there?

A. I've already answered that question three times. And I'm going to stay with my prior answers.

Q. What are the business reasons and justifications for Section 2.4 of the SDA?

A. I -- as I have said multiple times, that section was added to the contract before I started at Valve. I do not know the genesis of it.

Q. You looked at Bates number 943. There appears to be an email from you to Square Enix copying others on Friday, October 2nd, 2020.

Do you see that?

A. There's the email header for an email around

that time frame.

Q. Okay. You see that, where you're -- where you're sending an email to Square Enix on Friday, October 2nd, 2020?

A. That's what it looks like.

Q. Okay. And the contents of the email is on the next page, Bates stamp 944, correct?

A. Okay.

Do you see that?

A. I think you read that right.

Q. Okay. Was that an accurate statement at the time that you wrote it?

A. I'm sure that at the time I thought it was an accurate statement.

Q. Okay. Is it an accurate statement today?

A. I have not worked on every distribution agreement we've done in recent years. As I mentioned earlier, I've been focused on other things recently. I

don't -- I don't know the answer to that.
Q. Well, had you worked on every distribution agreement prior to your email in which you state that [redacted]
MR. CASPER: Object to the form of the question.
A. I don't know that I had worked on every single one.
Q. (BY MS. MUNDY) Okay. So it would seem that you could make that statement without having worked on every single SDA, correct?
MR. CASPER: I object to the form of the question.
A. Yeah, sorry, can you ask that again?
Q. (BY MS. MUNDY) Yeah. I mean, I asked you if the statement you make in your email on October 2nd, 2020, [redacted]

[redacted]

Q. Okay. Putting aside the origin or the genesis of the DLC provision in Section 2.4, do you know why it is in the contracts today?

A. I have never had that conversation, no.

Q. You've never had the conversation about why that provision is in the SDA -- SDAs that Valve is entering into with its partners, is that your testimony?

A. I'm not -- I might have misunderstood your prior question. I don't -- I've had conversations about that clause.

But -- can you ask your earlier question again?

Q. Yeah.

Putting aside the origin or genesis of the provision, do you know why it is in Valve's contracts today?

MR. CASPER: I would object on the basis of the attorney-client privilege to the extent you're asking for internal -- internal conversations that include the giving of legal advice by Mr. Schenck to Valve employees -- or receiving of information from Valve employees in order to enable Mr. Schenck to give legal advice. And I would instruct him not to answer if -- if his answer would reveal that -- those privileged communications.

A. Yeah, I -- it's been there since before I started at Valve. I don't know that I can answer it -- beyond that without going into attorney-client communications.

[redacted]

