# EXHIBIT 80

PUBLIC VERSION
(PREVIOUSLY FILED UNDER SEAL AT ECF 182-80)



# Class Action Litigation

Major companies regularly turn to us to defend and prosecute class actions throughout the United States. Our partners have defended more than 1000 of them.

**No hold-ups:** According to *The Lawyer* 2017, Quinn Emanuel is the country's top business trial firm which significantly contributes to our outstanding results in class actions. Our lawyers have the respect of courts and opposing counsel, and our willingness to try even the most difficult case tells opposing counsel litigating against us will not be business as usual. Among other benefits, this means the plaintiffs' bar knows it cannot rely on the inevitable strike-suit settlement.

**Experienced lawyers:** Our class action bench is deep. More than half our partners regularly represent clients in class actions. We have extensive knowledge of the procedural and litigation dynamics unique to class actions, as well as expertise in the underlying substantive areas of the law. We also have established productive working relationships with the plaintiffs' class action bar, which pay dividends in terms of limiting discovery and other litigation disputes, as well as at the settlement table.

We have represented clients in class actions in virtually every discipline and dozens of jurisdictions. Our expertise includes:

- Antitrust
- Consumer Fraud
- Data Privacy & Security
- False Advertising
- Financial Markets
- Product Liability
- RICO Claims
- Securities Fraud
- Toxic Tort
- Unfair Competition
- Wage-and-Hour Claims

Our class action experience spans almost every major industry, including high-tech electronics, banking and financial services, oil and gas, entertainment, telecommunications, medical services, defense contracting, insurance, toy and game manufacturing, and sharing economy companies. Our lawyers have litigated class actions involving everything from computer hardware to Formula One racing, home-equity loans to bullet-proof vests, and credit cards to fuel economy.

**Exit strategies:** We know a class action can quickly become a tool for litigation extortion. Effective defense requires early identification of our client's optimal exit strategy. We are particularly proud of our track record resolving class actions at modest expense to our clients—whether through an outright

quinn emanuel urquhart & sullivan, llp

Attorney Advertising. Prior results do not guarantee a similar outcome.

win or a sensible business-savvy settlement.  In several instances, we have persuaded plaintiffs' counsel to drop cases altogether after providing informal discovery.  We have resolved other cases on very favorable terms through mediation before any discovery or certification proceedings.  And we have a strong track record getting cases dismissed on early motions.

**We also represent plaintiffs:** We are equally effective prosecuting class actions.  We have achieved excellent results—including ten-figure recoveries—on behalf of plaintiffs alleging a variety of state and federal class claims including antitrust violations, RICO, and unfair business practices.  Because we work both sides of the class action aisle, we thoroughly understand the strategic decisions that inform winning strategies.

The significance, size, complexity, diversity, and number of our class action representations led *Law360* to select Quinn Emanuel  as a "Class Action Practice Group of the Year" in 2015, one of only five selected from among nearly 550 nominations.  We describe below class actions we defended or prosecuted.

RECENT REPRESENTATIONS:

*Antitrust*

- We represent a plaintiff class of FX platform customers against an FX trading platform company (Currenex) and certain market makers (State Street, Goldman Sachs, and HC Technologies).  Plaintiffs allege that Currenex conspired to give superpriority privileges to the market makers, ensuring that their orders were unfairly prioritized over normal customers, resulting damages to other users of the Currenex platform.  On May 19, 2023, the Court largely denied Defendants' motion to dismiss the case—leaving intact Plaintiffs' core claims including based on theories of fraud, antitrust, and RICO violations.

- We represent **a proposed class of 46 million consumers** seeking damages in the amount of at least £14 billion from Mastercard, arising from its unlawful anticompetitive interchange fees.

- Quinn Emanuel is co-lead counsel in an antitrust class action against major banks that act as re-marketing agents of "VRDOs"—variable rate, tax-exempt bonds.  The complaint alleges that, rather than re-market the bonds at the lowest possible rate, the banks acted jointly to keep rates artificially high.  The complaint was based on an independent investigation led by Quinn Emanuel, which resulted in confidential facts learned from industry insiders and economic analyses showing that VRDO rates were inflated.  In June 2022, Judge Jesse Furman of the Southern District of New York upheld the antitrust claims in their entirety, and the parties are now briefing class certification issues.

- Quinn Emanuel represents several public and private pension and investment funds as co-lead counsel on behalf of the class who entered into stock loan transactions with six major banks that serve as prime brokers of stock loans. Plaintiffs allege that the six defendants conspired to overcharge investors and wrongfully control the $1.7 trillion **stock loan market**, obstructing competition that would benefit both stock lenders and borrowers. In August 2018, Judge Katherine Polk Failla denied the defendants' motions to dismiss in their entirety.  On June 30, 2022, Magistrate Judge Sarah Cave recommended certification of the proposed class.

- We recovered settlements of over $150 million as co-lead counsel for a class of investors, including numerous hedge funds, related to alleged manipulation of the benchmark price for gold known as the "**London Gold Fix**." This massive class action in the Southern District of New York was brought against a group of banks for their involvement in manipulating the gold market. The Defendants were Deutsche Bank, HSBC, The Bank of Nova Scotia, Barclays Bank plc, HSBC Bank plc, Société Générale SA, and UBS.

- We obtained settlements of over $500 million against the defendants in our ISDAfix case, which concerned the rigging of a financial benchmark used to determine the settlement value of certain financial derivatives. The case was brought on behalf of investors such as insurance companies, pension funds, hedge funds, and other sophisticated actors. Quinn Emanuel built the case from the ground-up after noticing anomalies in the data, before the government even acted. The successful settlement and then certification of the class was the result of years of dogged, groundbreaking work. We had to find traders explicitly admitting they were interested in manipulating the benchmark. We then had to match that admission to can actual trade by the right person, at the right time, in the right direction. We then had to demonstrate we could show that those acts damaged class members, some of whom may have only traded hours or even days later. The Court said that this was the "the most complicated case" he ever faced, and that he could "not really imagine" how much more complicated "it would have been if I didn't have counsel who had done as admirable a job in briefing it and arguing it as" we did.

- Quinn Emanuel filed an antitrust class action in the Southern District of New York, alleging a wide-ranging anticompetitive and fraudulent scheme on one of the largest foreign exchange platforms, **Currenex**. Our firm built the claims from scratch after an extensive pre-complaint investigation, and our case eventually attracted XTX Markets Limited, one of the world's largest FX traders, to join us as a named Plaintiff. Our operative complaint alleges that in operating its FX trading platform, Currenex conspired to give superpriority privileges to certain market makers, including State Street (Currenex's parent company), Goldman Sachs, HC Technologies, and John Doe Defendants. These privileges ensured that the market makers' orders were matched ahead of others regardless of when the orders were submitted, resulting in increased spreads, reduced competition, and potentially billions of dollars of damages to other users of the Currenex exchange.

- We represented **Samsung** in two price-fixing class actions, brought by direct and indirect purchasers of NAND flash memory. Although classes had been certified in similar cases in the same district, we successfully defeated class certification in both actions, causing the direct purchaser representative to agree to voluntary dismissal.

- We obtained an important victory in the U.S. Supreme Court on behalf of a **plaintiff class of consumers** challenging price-fixing of ATM access fees by Visa, MasterCard, and the big banks. The Supreme Court had previously granted the defendants' petition for certiorari from a D.C. Circuit decision upholding the complaint on a motion to dismiss. After we filed our merits brief as co-lead counsel for the plaintiffs, the Supreme Court dismissed the defendants' petition as improvidently granted, finding that the defendants' arguments were inconsistent with the question on which the Court had originally granted certiorari. This effectively upholds the D.C. Circuit decision in our favor.

- We represented **FIFA** in an antitrust class action in which plaintiffs alleged that FIFA and its co-defendants engaged in a conspiracy to force individuals who wished to attend the 2014 World Cup, the world's most elite soccer event, to purchase costlier hospitality packages instead of face-value tickets in order to drive up profits. Hundreds of millions of dollars was at stake. In less than a year, we got this action dismissed for lack of subject matter jurisdiction.

- As court-appointed co-lead counsel for direct purchaser plaintiffs in *In re Flexible Polyurethane Foam Antitrust Litigation* (N.D. Ohio), we won certification of a **national class of direct purchasers of polyurethane foam**, defeated the defendants' effort to have the certification decision reversed on appeal, and defeated those same defendants' motions for summary judgment. As a result of this representation, we achieved $430 million in settlements for the class from nine different defendants.

- We represented **DIRECTV** in two separate consumer class actions in which the plaintiffs sued DIRECTV, the NBA, and the NHL, alleging various antitrust violations, including vertical and horizontal price fixing, monopolization, and illegal restraint of trade, arising from the sale and distribution of DIRECTV's NBA League Pass and DIRECTV's NHL Center Ice Programming Packages. The Southern District of California dismissed all claims with prejudice.

- We defended **IBM** in a series of federal class action antitrust claims related to the market for Static Random Access Memory.

- We represent **JBS USA**, one of the largest meat producers in the U.S., in two significant antitrust MDLs proceeding in the District of Minnesota. Specifically, we are defending JBS USA in multiple cases alleging that pork packers conspired to limit the supply of hogs and pork and thereby raise pork prices in the United States. In 2019, the Court dismissed the complaints with leave to amend, but then largely denied the second round of motions to dismiss in 2020. Quinn Emanuel then negotiated favorable "ice-breaker" settlements with all three proposed classes, which were significantly more favorable than the other settlements that the class plaintiffs later reached with a different defendant. We are continuing to defend JBS in the lawsuits filed by direct action plaintiffs, including major retail chains that purchased pork from the Defendants.

- We are also defending various JBS companies in a separate MDL alleging that beef packers conspired to limit the slaughter of beef, thereby raising prices in the United States. In 2020, the Court dismissed the complaints with leave to amend. In 2021, the Court denied the second round of motions to dismiss the federal antitrust claims but granted the motions to dismiss certain state law claims. Quinn Emanuel then negotiated a favorable "ice-breaker" settlement with the direct purchaser class. We are continuing to defend JBS in the remaining class actions and against lawsuits filed by direct action plaintiffs.

- We represented **JBL Professional**, a subsidiary of Harman Professional, in a putative class action alleging conspiracy and antitrust violations of the Sherman Act based on allegations that JBL conspired with numerous other defendants to unlawfully exclude the plaintiff, a small music equipment manufacturer, from the market to help a larger supplier. Following motions to dismiss, plaintiff agreed to settle the case on terms favorable to our client.

- We represent plaintiff **Somerset Industries, Inc.** in an antitrust class action brought by direct purchasers of eggs and egg products, alleging a nationwide price-fixing scheme by major egg producers and processors. Plaintiffs have asserted federal antitrust claims under the Sherman Act.

- We acted as co-lead counsel for plaintiffs in a class action antitrust case against Comdata Corporation, the largest provider of payment cards for truck fleets to purchase fuel and other services in connection with the long-haul transportation of freight. We obtained a $130 million settlement and prospective relief on behalf of a plaintiff class of **independent truck stops** that compete with national chains in selling fuel to trucking companies. The lawsuit was brought under Sections 1 and 2 of the Sherman Act and challenged exclusionary conduct by Comdata that enhanced and perpetuated its monopoly position.

- We achieved a $1.8 billion settlement in an antitrust lawsuit against over ten major financial institutions regarding their monopolization of the **credit default swaps market**.

- We have been appointed lead counsel, progressed past motion to dismiss, and secured settlements worth $60 million in ***In re: Commodity Exchange, Inc., Gold Futures and Options Trading Litigation***, an antitrust class action alleging manipulation of the "London PM Gold Fix" and thereby, the price of gold derivatives worldwide.

*RICO Violations*

- We represented **Trafigura**, one of the world's largest commodity trading companies, in a major class action lawsuit alleging that Puerto Rico's government-owned power utility, the Puerto Rico Electric Power Authority (PREPA), and some of the world's largest oil suppliers perpetuated a massive fuel oil fraud. The lawsuit, which was filed in U.S. District Court in Puerto Rico, alleges that officials at PREPA accepted bribes and kickbacks from fuel oil suppliers in exchange for PREPA's agreement to accept and pay for millions of barrels of fuel oil that did not meet contract specifications. The complaint further alleges that the defendants conspired with a number of laboratories in order to falsify test results and fraudulently certify the fuel oil as compliant. Plaintiffs are seeking billions in compensatory and punitive damages. We obtained a full dismissal at the pleading stage, saving our client from costly litigation and bringing its liability to zero.

- We represented **DIRECTV** in a notable victory when the Ninth Circuit Court of Appeals affirmed the dismissal of all claims asserted against DIRECTV in a RICO class action lawsuit. The unanimous opinion established that the *Noerr-Pennington* doctrine protects pre-litigation demand letters, even those that allegedly constitute extortion, mail fraud or other RICO predicate acts.

- We represented **a leading mutual fund client** and two of its executives in the defense of federal class action claims seeking treble and punitive damages under RICO. The claims maintained that investments by mutual funds in the publicly-traded stock of allegedly illegal gambling businesses amounted to RICO violations. We persuaded the federal district court to dismiss the action with prejudice on an initial motion to dismiss and obtained affirmance of the dismissal by the Second Circuit.

- We represent insurer, **National General Insurance Co.**, in thirteen putative class actions which have been consolidated into a MDL in the Central District of California. The consolidated class action complaint seeks treble damages under RICO and asserts various fraud, unjust enrichment, and state statutory claims contending that hundreds of thousands of Wells Fargo auto loan borrowers were improperly charged for collateral protection insurance they did not need.

### *Consumer Fraud/Unfair Practices*

- We represented **Suffolk University** in a putative class action brought by students demanding refunds of tuition and fees as a result of the university's transition to remote instruction in response to the global COVID-19 pandemic and related government directives. After obtaining a denial of plaintiffs' motion to certify a class, we then successfully obtained a denial of plaintiffs' petition before the First Circuit to appeal the denial of certification. In a decisive victory for our client, the case has been administratively closed and the matter, even if reopened, cannot proceed as a class action. Significantly, the district Court reasoned that, in light of the Rule 23(b)(3) superiority requirement, "this Court simply cannot conclude that class action treatment is either 'superior' or more just than the available alternatives." This provides a crucial precedent for other universities facing similar tuition and refund putative class actions, hundreds of which have been filed nationwide.

- We represented the **University of Rhode Island** in a putative class action brought by students demanding refunds of tuition and fees as a result of URI's transition to remote instruction in response to the global COVID-19 pandemic and related government directives. After obtaining the dismissal of plaintiffs' claims with respect to tuition, we then successfully dispatched with their remaining claims for student fee refunds on summary judgment. In a complete victory for our client, the Court has entered judgment for URI.

- We obtained a decisive victory on behalf of Johnson & Wales University, **the University of Rhode Island**, and **Roger Williams University** in COVID-19 refund class actions, defeating all of plaintiffs' claims for tuition refunds. The District Court of Rhode Island granted our motion to dismiss in substantial part, dismissing breach of contract claims for tuition refunds, as well as all claims for unjust enrichment, conversion, and money had and received asserted against our clients, substantially narrowing the claims which may otherwise have posed an existential threat to many universities. The court permitted only a modest sliver of plaintiffs' claims to proceed—"breach of contract claims for fee payments" to universities, which constitute a fraction of the dollar amount at stake.

- We achieved a total victory for our client, **Express Scripts**, in defeating a putative ERISA class action. The plaintiffs alleged that Express Scripts and other pharmacy benefit managers (PBMs) had caused hundreds of thousands of individuals to pay too much for the prescription drug EpiPen because of the rebates Express Scripts and other PBMs negotiated with the drug manufacturer, Mylan. We won a complete denial of class certification from the federal district court in Minnesota in August 2020. When the plaintiffs petitioned for an appeal, we persuaded the U.S. Court of Appeals for the Eighth Circuit to deny the petition in near-record time.

Afterwards, we reached a favorable settlement with plaintiffs, who voluntarily dismissed their claims with prejudice.

- We represented the **Official Committee of Consumer Creditors in the chapter 11 bankruptcy of Ditech Holding Corporation**.  As part of the representation, we objected to the Debtors' chapter 11 plan, which sought to sell their mortgage businesses for over $1.8 billion, because it did not sufficiently protect the rights of consumer borrowers.  After a two-day contested confirmation hearing and several weeks of deliberations, the Court issued a 132-page opinion denying the Debtors' plan, holding that it did not satisfy the bankruptcy law's requirements when it came to our constituency.  See *In re Ditech Holding Corporation*, Case No. 19-10412 (JLG), 2019 WL 4073378, (Bankr. S.D.N.Y. 2019).  After the ruling, Quinn Emanuel negotiated a favorable settlement, incorporated in an amended chapter 11 plan ultimately approved by the Court, ensuring significant recoveries and providing for historically unprecedented protections for consumer borrowers in connection with the sale, including the appointment of a Consumer Representative to reconcile consumer claims, the preservation of borrowers' recoupment rights and defenses, and an affirmative obligation for the Debtors and purchasers of the businesses to correct any borrower accounts that were misstated or otherwise incorrect.

- Quinn Emanuel achieved a significant victory for its client **Hyundai** by successfully petitioning the Ninth Circuit en banc to overturn an unfavorable ruling by the initial panel.  Quinn Emanuel represented Hyundai in multi-district class action litigation that was resolved at the district court through a class settlement.  After a Ninth Circuit panel issued a decision overturning the district court's approval of the class settlement, we successfully petitioned the Ninth Circuit for rehearing en banc.  The en banc court affirmed the district court's approval of the settlement allowing the nationwide resolution to move forward.

- QE successfully defended **Mattel, Inc.** in Section 17200 and consumer fraud class action suit filed in Madison County, Illinois -- an unprecedented result in what has been described by the U.S. Chamber of Commerce as the nation's class action "hell hole."  Plaintiffs had sought upwards of $200 million in profits disgorgement, along with injunctive relief prohibiting certain BARBIE marketing practices and forcing public disclosure of Mattel's proprietary information.  As a result of class decertification, and with a summary judgment motion pending, plaintiffs settled for nominal amount.

- We also successfully defended **Mattel, Inc.** in another, separate putative class action filed in Madison County, Illinois.  In this suit, plaintiffs challenged as unfair and unlawful certain marketing practices concerning TYCO products.  QE defeated class certification, and the case was dismissed.

- QE represented **Hyundai Motor America, Inc.** and a number of Virginia-based Hyundai dealerships in an appeal in three consumer class and mass actions arising from facts relating to the Environmental Protection Agency's imposition of civil fines on Hyundai for asserted Clean Air Act violations involving the method used to calculate vehicle mileage estimates for Elantra model years for 2011-2013.  The district court had dismissed all but one claim based on pleading deficiencies, preemption principles, and failure to exhaust procedural prerequisites to suit.  On appeal, QE obtained a written decision affirming that order in full.  The appeal panel dismissed

one of the three cases on jurisdictional grounds.  As to the remaining two, it held that plaintiffs had waived their objection to the ruling that the complaints failed to meet the pleading-sufficiency requirements of Twombly and Iqbal by failing to challenge that basis for dismissal in their brief.  Further, the panel held that the district court permissibly declined to grant leave to amend the pleadings, given plaintiffs' repeated failures to amend the complaint or to state how they would cure their pleading deficiencies if granted leave again.

- We defended **Colgate Palmolive** in a series of class actions in New Hampshire federal court that contended Softsoap Antibacterial Hand Soap efficacy claims are false and misleading.  The suits also contended Colgate implicitly represents that Softsoap Antibacterial Hand Soap provides benefits over soap without antibacterial qualities.  With the cases approaching the class certification stage, Quinn Emanuel negotiated an injunctive relief settlement that involved no compensation to the massive purported class that was seeking potentially a billion dollars in damages.

- Despite billions of dollars of exposure and seven years of litigation, we ended multi-district class actions attacking the health benefits claims of a key **Coca-Cola** brand, vitaminwater®, without any compensation to class members.  The stakes were particularly high because plaintiffs sought an injunction that would force a change of the well-established vitaminwater® brand name.  These actions were initially consolidated in the Eastern District of New York but were then remanded to their original jurisdictions for purposes of ruling on class certification.  Quinn Emanuel defeated class certification in the lead case as to all claims for monetary relief.  Following this significant certification denial win, the other previously-consolidated actions were settled for injunctive relief only.

- We represented **Uber Technologies, Inc.** in a case involving allegedly unauthorized transportation service under New Mexico State law.  We defeated plaintiffs' request for a preliminary injunction and secured a dismissal of plaintiffs' claim on a pleading motion.

- We represented **Pfizer Inc.** in a class action challenging the efficacy of its highly successful antidepressant, Zoloft.  Plaintiff claimed she had taken the medication for three years but it had not worked.  She sought the return of all monies paid by everyone in California who had taken Zoloft since it was approved in 1991.  On August 29, 2014, Judge Lucy Koh of the Northern District of California granted Pfizer's motion to dismiss with prejudice.

- We took over representation of **Barnes & Noble** in a class action alleging that the bookseller had breached contracts and engaged in consumer deception when it took orders for 250,000 Hewlett Packard TouchPads during a few hours on August 12, 2011 and then was unable to deliver them.  The prior firm that handled the case for more than three years had obtained a series of bad rulings against Barnes & Noble.  Within six months, we reversed the direction of the case, developed significant new facts, and obtained a dismissal with prejudice from plaintiff.

- We represented **HotChalk**, a provider of administrative services for online educational institutions in a consumer class action brought by two former students of an online university, both of whom received Masters Degrees in Education.  Despite the fact that they had matriculated and obtained degrees, which they were using to advance their professional careers, plaintiffs claimed that they, and every member of their putative class, should be refunded their

full tuition because HotChalk allegedly had cold-called them, and had failed to reveal its role in the online university. They alleged claims under the Arizona Consumer Protection Act and the Arizona Consumer Fraud Act. The Northern District of California granted our motion to dismiss, giving plaintiffs leave to amend. After plaintiffs filed their amended complaint, we filed a renewed motion to dismiss. Just days before the hearing, plaintiffs offered to settle the case and ultimately gave HotChalk a dismissal with prejudice in return for $35,000.

- We represented **ADT Security Services** in a national class action challenging a variety of the provisions in ADT's customer contracts. ADT faced hundreds of millions of dollars in total exposure. After winning substantial victories at summary judgment and a ruling that plaintiffs forfeited the right to move for class certification, we settled plaintiffs' individual claims for a nominal sum.

- We obtained a complete victory for **IBM**, which had been named as a defendant in a series of state and federal class actions arising out of the loss of nine data tapes belonging to IBM's client, Health Net, Inc. Based on a California statute, known as the Confidentiality of Medical Information Act, which was alleged to allow certain damages without proof of injury, plaintiffs sought approximately $2 billion in damages. After the cases were consolidated in the Eastern District of California, Quinn Emanuel filed a motion to dismiss the consolidated cases on standing grounds. During the months that the motion was pending, Quinn Emanuel also staved off discovery by convincing the court that requiring IBM to engage in discovery before its motion to dismiss was decided would be a miscarriage of justice.

- We represented **Sprint Nextel** in numerous consumer class and representative actions. Allegations ran the gamut of consumer claims, including inadequate disclosures, unlawful fees, and unlawful business practices under various federal and/or state laws around the country. We repeatedly defeated class certification, obtained summary adjudication, and obtained numerous dismissals for nominal consideration after litigation revealed the defects in plaintiffs' class claims. Most recently, we defended our client against a series of litigations around the country pertaining to early termination fees in term contracts. In one of the very few class actions to actually proceed to a jury trial, we obtained a jury verdict in favor of Sprint against consumers seeking more than $220 million.

- We represented **Toyota Motor Sales USA, Inc.** in two separate putative class actions alleging that Scion xBs and Toyota FJ Cruisers suffered from defects that caused their windshields to have a dangerous propensity to crack under circumstances that would not cause non-defective windshields to crack. Plaintiff alleged causes of action for, *inter alia*, violation of California's Unfair Competition Law and the California Consumer Legal Remedies Act, and breach of express warranty. We obtained favorable settlements in both cases, with the FJ settlement following an outright dismissal of the class allegations through early dispositive motions. We also previously represented Toyota Motor Corporation in a national class action in federal court alleging various false advertising, product liability and unfair competition claims involving allegedly defective Lexus vehicles, and obtained, by early dispositive motions, an outright dismissal.

- We secured two significant wins for **Epson America** and **Seiko Epson Corporation** in a class action alleging a variety of unfair consumer practices under California's Unfair Competition Law

and Consumer Legal Remedies Act. Quinn Emanuel whittled plaintiffs' case down to claims based on only two theories. First, plaintiffs contended Epson wrongfully failed to inform consumers that its products were somehow "less efficient" than other manufacturers' printers. Quinn Emanuel successfully obtained a summary judgment ruling rejecting this novel theory. Plaintiffs' second theory, based on a purportedly misleading affirmative description of a product feature, was defeated at class certification. The firm won unanimous affirmances by the Ninth Circuit of both decisions.

- We represented **Electronic Arts** in two consumer class action cases in the Northern District of California, involving claims under California's Consumer Legal Remedies Act, California's Unfair Competition Law, and the Copyright Act relating to DRM (digital rights management) technology in the video game maker's products. The cases were resolved at a very early stage with no monetary relief to the class.

- We represented **Harley-Davidson** in a putative class action arising from the loss of a laptop computer containing customers' personal information, alleging negligence, breach of warranty, breach of contract, unjust enrichment, fraud and negligent misrepresentation, prima facie tort and violations of New York false-advertising and deceptive-practices statutes. The Southern District of New York granted our motion to dismiss all claims.

- We represented **Intuit** in three separate class actions alleging various contract and tort theories, as well as claims of unfair competition under various California consumer protection statutes (including the Consumer Legal Remedies Act and Unfair Competition Law) relating to Intuit's decision to impose a discontinuation ("sunsetting") policy on older versions of its best-selling Quicken and QuickBooks product lines. Before class certification, we filed motions to dismiss based largely on defenses arising under California common law defenses and Intuit's end-user license agreements. The court dismissed all claims with prejudice.

- We represented **DIRECTV**, obtaining a grant of certiorari from the United States Supreme Court on the propriety of class-wide arbitration under the Federal Arbitration Act, reversing the California Court of Appeal. On remand from the United States Supreme Court, the California Court of Appeal held for the first time in a published decision that whether an arbitration agreement governed by the FAA permits class-wide arbitration must be determined by the arbitrator, not the courts, reversing long-standing decisions under California law.

- On behalf of our client **Washington Mutual Insurance Services**, we defeated class certification in a purported 23-state consumer class action.

- On behalf of our client **Time, Inc.**, we obtained summary judgment in a nationwide class action challenging an allegedly fraudulent magazine promotion.

- We represented **Mitsubishi Corporation** in nationwide class action involving allegations of unfair competition and fraud arising from the sale and marketing of high-definition television sets. We successfully moved for summary judgment, resulting in dismissal of all claims.

- We represented **Associated Materials, Inc.** and **Gentek Building Products** in a series of nine class actions claiming their steel siding products had failed and asserting claims for breach of warranty and associated claims.  The cases were consolidated in the Northern District of Ohio.  We successfully staved off formal discovery in the early stages of the case and eventually invited the many plaintiffs' firms to participate in a relatively early mediation.  We conducted the mediation after limited informal discovery and without any depositions being taken.  The mediation resulted in a modest settlement which principally consisted of our clients making some adjustments to their warranty program.  Our clients did not put money into a common fund or otherwise make monetary payments to the class members.

- We represented a **national wireless service provider** in a nationwide class action alleging violations of consumer credit statutes.  Plaintiffs sought more than $1.5 billion in damages.  After we defeated plaintiffs' motion for class certification, the case quickly settled for a nominal sum.

- We represented a **waste disposal and recycling company** in a California class action brought by all customers in a Southern California city, seeking more than $30 million in damages.  Our demurrer was sustained without leave to amend.

- We represented **a class of nearly 3,000 restaurants and restaurateurs** that charged Reward Network with usury and unfair business practices. After two and a half years of hard-fought litigation, we obtained a settlement of $64 million for the class members.

*Product Liability/Personal Injury*

- We obtained a complete appellate victory for **Southern California Gas Co. ("SoCalGas")** in one of the year's most-watched business cases in the California Supreme Court.  In a unanimous decision, the court reaffirmed that California follows the economic loss rule, which holds that plaintiffs may not recover in negligence for purely economic losses caused by harm to third parties.  The decision required dismissal of actions against SoCalGas for indirect economic harms to local businesses allegedly suffered when local residents relocated temporarily after a gas leak.  The decision clarifies California tort law and eliminates the potential threat of billions of dollars in liability against California businesses for purely economic harm in mass disaster cases.

- Quinn Emanuel represents the **University of Southern California** in more than 50 individual and class action lawsuits in state and federal courts arising from allegations that Dr. George Tyndall, a former gynecologist in the student health center, engaged in misconduct while examining student patients.  The litigation involves more than 500 plaintiffs and approximately 16,000 putative class members.  In October 2018, we negotiated a settlement in principle of the federal class actions for $215 million, subject to court approval.  The remaining litigation is ongoing.

- We represented **Vintage Pharmaceuticals LLC** and related entities in products liability litigation over propoxyphene, a prescription pain medication that the FDA requested be withdrawn from the market in 2010.  We were instrumental in obtaining an en banc ruling by the Ninth Circuit holding that a petition to coordinate some 1,700 claims in California state

court gave rise to removal under the "mass action" provisions of the Class Action Fairness Act, in a decision that will shape the future course of all pharmaceutical products liability litigation in California and elsewhere.

- We served as lead counsel to **Chartis** in the multi-district litigation and several related class actions involving thousands of claims related to defective Chinese manufactured drywall, as well as in litigation seeking compensation from the Chinese and German manufacturers of the defective products.

- We represented **The Home Depot** in a consumer class action and defeated a request for a preliminary injunction and class certification in a federal court action seeking to enjoin The Home Depot from nationwide sales of an allegedly dangerous consumer product.

- We represented major real estate developers, including **KB Home, Dell Webb** and others, in numerous construction defect class actions and actions seeking recovery for personal injuries allegedly caused by defects or mold and related injuries.

- We represented **San Diego Gas & Electric Company** and its ultimate parent, **Sempra Energy**, in litigation arising from the October 2007 San Diego wildfires, including two putative class actions each potentially including as many as 500,000 San Diego County residents and seeking billions of dollars in damages. After convincing the trial court to deny class certification in both cases, we obtained two unanimous decisions affirming the trial court from the California Court of Appeal.

*Securities/Financial Litigation*

- The firm obtained a complete appellate victory in the U.S. Court of Appeals for the Second Circuit for our clients **Mickey Gooch** and **Colin Heffron**, former Chairman and CEO of interdealer broker GFI Group. In a unanimous decision, the Second Circuit affirmed the district court's summary judgment ruling dismissing a Rule 10b-5 securities fraud case against our clients. The court held that no reasonable investor would have relied, in making an investment decision, on the general statement in a press release that a proposed deal represented "a singular and unique opportunity to return value." The decision brought a decisive end to a long-running case against our clients, and reaffirmed that "vague and indefinite expressions of corporate enthusiasm" are no basis for securities fraud class actions.

- We successfully represented **E\*TRADE Financial Corporation and E\*TRADE Securities LLC**, along with the former and current CEOs of E\*TRADE Financial, in obtaining the dismissal of a putative class action bringing claims under Sections 10(b) and 20(a) of the Securities and Exchange Act and having that dismissal affirmed by the Court of Appeals for the Second Circuit. The action challenged E\*TRADE's order routing practices, and alleged that E\*TRADE earned tens of millions of dollars in "Payment for Order Flow" by prioritizing its receipt of rebates over the quality of execution provided to its customers, thereby violating E\*TRADE's duty of best execution. The Court granted our motion to dismiss all claims against all defendants on January 22, 2018. On October 26, 2018, the Second Circuit affirmed dismissal in a summary order. The dismissal and affirmance were significant because two of E\*TRADE's competitors (Charles Schwab and Ameritrade) failed to secure dismissal of nearly identical suits

brought by the same plaintiffs' counsel, and one of those two cases (Ameritrade) has since been certified as a class action.

- We have been appointed lead counsel in **In Re: Chicago Board Options Exchange Volatility Index Manipulation Antitrust Ligitation**, a class action involving claims against CBOE and unknown trader defendants under Section 19(b) of the Securities Exchange Act, and alleging manipulation of the multi-billion dollar market for volatility derivatives.

- We represented **Charles Schwab & Co.** and its related entities in two class actions related to two popular mutual funds that suffered substantial losses during the credit crisis of 2007-2008. Plaintiffs claimed Schwab violated a broad variety of state and federal securities and unfair competition statutes, and also alleged common law claims. We filed motions to dismiss the class actions and achieved dismissals with prejudice in both actions.

- We represented several **Charles Schwab-related entities and individuals** in a shareholder derivative suit and securities class action related to the Schwab YieldPlus Fund. Pursuant to the recommendation of a special litigation committee, we moved for, and obtained, dismissal of the derivative and class action claims on summary judgment. The judgment was affirmed on appeal.

- We successfully defeated class certification in an action claiming **East West Bank** aided and abetted fraud and breach of fiduciary duty by a bank customer.

- We represented the lead defendant and former director of **Peregrine Systems, Inc.** in defending against claims by putative classes of federal plaintiffs, two state-court lawsuits by groups of investors, and claims by the Peregrine Litigation Trust, which sought more than $2 billion from Peregrine's directors, officers, and others, arising from the company's $500 million financial restatement. We obtained summary judgment in one state-court action and dismissals with prejudice in two other cases, leading to a favorable settlement of all federal class claims.

- We represented **Terayon Communications Systems** and its various officers and directors in the defense of several shareholder class and derivative actions. Retained only shortly before trial, we successfully resolved the matters after summary judgment argument and expert discovery.

- We obtained the dismissal with prejudice of a nationwide class action against **Chartis Insurance Group** brought by investors in Bernard Madoff's Ponzi scheme who demanded their insurers compensate them for their loss of fictitious profits.

- We represented **AOL Time Warner** in the Homestore.com securities class action alleging financial statement fraud. All claims were dismissed and the dismissal was affirmed on appeal.

- We have represented numerous corporations, directors, and officers in securities class actions and shareholder derivative litigation alleging improper revenue recognition, stock option backdating, or other forms of accounting fraud, obtaining complete dismissals for several clients, including **GE Capital**; the chairman and founder of **E-Universe**; the chairman and founder of **Ariba, Inc.**, and **PricewaterhouseCoopers**.

- We represented **Hughes Electronics** in securities litigation arising from the failed Hughes-Echostar merger; all claims were dismissed and the dismissal was affirmed on appeal.

- We represented **VeriSign, Inc.** in a suit brought by a leading securities class-action plaintiffs' firm alleging violations of Section 10(b) and 20(a) of the Exchange Act. Specifically, plaintiff alleged that VeriSign misrepresented the likelihood that the Department of Commerce would approve the renewal of VeriSign's key contract with the Internet Corporation for Assigned Names and Numbers (ICANN), and that VeriSign made certain false financial projections. We went on the offensive by filing an immediate motion to dismiss prior to appointment of lead plaintiff and by challenging plaintiff's use of investigators to interview VeriSign's former employees. Within a matter of months, we persuaded plaintiff to abandon the case and voluntarily dismiss its claims with prejudice.

- We represented **Pitney Bowes Inc. and two of its officers** in the District of Connecticut in a securities fraud class action alleging misstatements and omissions relating to the company's third-quarter and full-year 2012 revenue and earnings projections. We obtained dismissal of all claims, with prejudice, after taking over the case from previous counsel.

- We represented **a major investment bank** in the *In re AIG Securities Litigation*, and forced the plaintiffs to withdraw a multi-billion dollar securities class action upon threat of our motion to dismiss.

- We represented **a global specialty rice company** in a case brought by a putative class of investors alleging violations of the Securities and Exchange Acts. The investors' claims were based on unfounded allegations in short-seller reports that the company had filed fraudulent financial statements with the U.S. Securities and Exchange Commission and committed other corporate malfeasance. We obtained dismissal without prejudice of the investors' second amended complaint with leave to amend and, when the investors failed to meet the deadline to amend, complete dismissal of the case for failure to prosecute and failure to comply with a court order.

- We represented two affiliates of **Elliott Management** in a $300 million-plus shareholder class action in New Jersey state court arising from the 2006 take-private merger of Metrologic Instruments. Elliott was a minority shareholder in Metrologic at the time of the merger and rolled over its stake in the company to the post-merger entity. Plaintiffs alleged that Elliott (among other defendants) breached fiduciary duties that it purportedly owed to plaintiffs. Quinn Emanuel took over the case from prior counsel after New Jersey's Appellate Division reversed the trial court's dismissal of Elliott from the case on summary judgment. Within a few months we (i) successfully moved to strike plaintiffs' jury demand; (ii) identified an alternative path to summary judgment and quickly filed a renewed motion for summary judgment; and (iii) moved to reopen expert discovery to enable us to supplement the expert record before trial. Shortly thereafter, we reached a settlement on very favorable terms.

*Wage and Hour*

- We have been appointed co-lead interim class counsel on behalf of a class of engineers and other skilled workers in a class action alleging a "no poach" conspiracy among several aerospace

firms designed to depress the wages of their workers.  The action is pending in the District of Connecticut.  The defendants are Raytheon Technologies subsidiary Pratt & Whitney, QuEST Global Services-NA Inc., Belcan Engineering Group, Agilis Engineering Inc., Cyient Inc. Parametric Solutions Inc., and several individual defendants.

- We assumed representation of **Wedbush** in a wage class action in Orange County Superior Court in which a class was certified against the company.  Shortly after being retained, we persuaded the court to allow the company to assert a new primary defense.  Summary judgment motions involving the new defense are pending.

- We represent **Day & Zimmerman** and its subsidiary **SOC LLC** in an employment class action brought by former employees who worked as armed guards in Iraq under SOC's contract with the Department of Defense.  Quinn Emanuel has defended against class counsel's claims that the guards' schedule working in a war zone exceeded the expectations they had when they signed up.

- We currently represent **iQor** in FLSA and state law overtime and other wage and hour claims in federal court in Minnesota.  We were retained after the company had a nationwide FLSA class conditionally certified against it. We obtained decertification of a substantial portion of that FLSA case, and defeated entirely plaintiffs' motion to certify under FRCP 23 various state law claims for straight time and overtime under the laws of nine separate states.  Combined, these wins reduced our clients' potential exposure by about 90 percent.

- We successfully defended **Barnes & Noble** in two separate wage and overtime class actions involving different groups of employees, one in federal court and one in California state court, alleging failures to provide meal breaks and rest breaks and failures to pay overtime.  We defeated class certification in its entirety in both cases.

- We represented **Computer Sciences Corporation** in a 27,000-employee nationwide Fair Labor Standards Act and state law overtime class action.  The case settled on terms that resulted in an average payout of less than $1,000 per class member—a number several times lower than the typical per-class member settlement in such cases.

- We represented **Home Savings** in an overtime class action concerning nearly 2,000 account representatives.  The firm negotiated a $1.5 million settlement, one of the lowest settlements in California history for comparable claims and class size.

- We represented **Computer Sciences Corporation** in a purported nationwide overtime class action on behalf of computer consultants.  After providing informal discovery to plaintiff's counsel, we persuaded the plaintiff to drop the class-action allegations and resolve the remaining individual claim.

- We represented **Washington Mutual Bank** in a wage and hour class action alleging improper deductions from employee wages.  Before answering the Complaint, we developed a novel federal preemption defense to the claims based on laws governing the financial stability of federally regulated lending institutions.  Upon being served with a draft demurrer raising this preemption defense, the plaintiff dismissed his case.

- We obtained a favorable settlement for **Coca-Cola Enterprises Inc.** in a coverage dispute regarding coverage for a wage and hour class action in which the insurer had denied coverage under its employment practices liability insurance policy.

*Other*

- We represented **Barrick Gold of North America, Inc., the Board of Directors of Barrick Gold of North America, Inc., and Barrick U.S. Subsidiaries Benefits Committee** in a class action filed by two former Barrick Gold employees in which they alleged that Defendants breached the fiduciary duties of loyalty and prudence in violation of ERISA by purportedly failing to, among other things, investigate and select lower cost alternative investment options for the plan and monitor or control the plan's recordkeeping expenses. In the Summer of 2020, Quinn Emanuel filed a motion to dismiss Plaintiffs' complaint, arguing that Plaintiffs' claim that the plan's investment options were more expensive than allegedly similar investments was inaccurate. Plaintiffs were not only making comparisons between dissimilar investment options, but they were also citing incorrect plan expense ratios that, when corrected, showed that the plan's investment options were actual cheaper than the ones Plaintiffs cited as examples of "prudent" investment choices. The plan documents also proved that the plan administrator had acted prudently, renegotiating recordkeeping fees 17 times with the recordkeeper and consistently lowering the fees. The Court agreed and dismissed Plaintiffs' Amended Complaint with prejudice.

- We represented **Stripe** and **PayPal** in a case involving claims under California's Unruh Civil Rights Act and obtained dismissal on the pleadings. Plaintiff Blair Gladwin is a federally licensed firearms dealer. He sued Stripe and PayPal (along with Square in a companion case) alleging that these payment processing companies were violating his civil rights because they have restrictions against using their services to process payments for weapons and ammunition. Gladwin alleged that under the Unruh Act, his occupation as a firearms dealer was a protected personal characteristic and that the defendant companies were discriminating against him and other firearms dealers on the basis of that occupation by preventing them from using the defendants' services to process payments for firearms. On demurrer, Quinn Emanuel scored a major victory for Stripe and PayPal by convincing the court that facially neutral restrictions like those of the defendant companies -- which apply equally to all people -- are encouraged by the Unruh Act, not prohibited by it, and that the companies' policies were supported by reasonable business decisions and were therefore not arbitrary. After allowing the plaintiff multiple opportunities to amend his pleading to attempt to cure it, the superior court dismissed the case with prejudice.

- We represent a class of residents in the **New York City Housing Authority** ("NYCHA") in a class-action lawsuit over NYCHA's failure to adequately remediate mold in public housing, which has deleterious health effects on all residents, but particularly on those with asthma or other respiratory disorders. On November 29, 2018, Judge William H. Pauley III of the U.S. District Court for the Southern District of New York approved a revised and significantly more stringent consent decree with NYCHA, after NYCHA had repeatedly breached the prior consent decree in place since 2013. The new consent decree represents a meaningful step forward for ameliorating conditions for tens (if not hundreds) of thousands of NYCHA residents. Quinn Emanuel attorneys and other class counsel will continue to represent NYCHA

residents in enforcing the revised consent decree and helping to ensure NYCHA complies with its obligation to provide fair and adequate housing to each of its residents.

- Quinn Emanuel and its co-counsel achieved a landmark civil rights settlement with **The City of New York and the New York Police Department**.  The City and the NYPD agreed to pay up to $75 million to resolve claims that as a result of NYPD quotas, New York City police officers issued nearly 900,000 criminal summonses without probable cause in violation of the Constitution.  The settlement agreement also sets forth a series of significant steps that the City has taken since the start of the litigation, or will be taking going forward, to address quota policy and other matters raised in the lawsuit.



## Antitrust & Competition

**A Leader in Antitrust and Competition Disputes, on Both Sides of the "v.":** Quinn Emanuel has one of the world's leading antitrust practices, with unique experience, capabilities, and resources to successfully represent both plaintiffs and defendants in antitrust and competition disputes in the U.S. and abroad. When representing antitrust plaintiffs, we have recovered billions of dollars in both class actions and representations of plaintiffs in private litigation and "opt-out" cases. In 2015 alone, we recovered over $2.5 billion for antitrust plaintiffs. Courts frequently appoint Quinn Emanuel to serve as lead or co-lead plaintiffs' counsel in some of the most significant antitrust class actions, and leading corporations have turned to Quinn Emanuel for the pursuit of antitrust damages and injunctive relief. On the defense side, we have achieved victories for companies, in a range of industries, accused of antitrust and competition law violations. We have won dismissals by motion, and we have negotiated excellent settlements for our clients, including several settlements not requiring any monetary payment. But we are also a firm with the genuine ability to take antitrust cases to trial, and we have done so with frequent success, including a defense jury verdict for our client Micron in a multi-billion-dollar case that was perhaps the most significant U.S. antitrust jury trial of the past decade.

We find that our experience, stature, and relationships in the plaintiffs' antitrust bar help us provide the most effective representation on the defense side and vice versa. We can bring to bear our unique insight into the plaintiffs' and defendants' bar. We know the strategies they employ. We know their approaches to settlement.

Quinn Emanuel's antitrust practice is not comprised of general litigators who know a bit about competition law or antitrust transactional lawyers who have done a bit of litigation. Our antitrust lawyers are accomplished courtroom advocates with a deep understanding of competition law.

The *Global Competition Review* named our antitrust and competition practice among the "25 Global Elite 2023,' and number five in their list of the world's top 10 competition litigation practices. In 2012 and 2015, *Law360* recognized our antitrust practice as one of the top five in the U.S. *The Recorder* selected Quinn Emanuel as one of the "Leading Antitrust Litigation Departments of the Year 2015."

**A Truly Global Network for Antitrust and Competition Matters:** Quinn Emanuel is at the forefront of antitrust and competition matters that are increasingly complex and often multi-jurisdictional. Global antitrust issues require a global strategy. Quinn Emanuel's worldwide resources – from the United States to Europe, the United Kingdom, the Asia-Pacific and Australia – enable us to execute comprehensive global strategies, taking account of the differences of national laws, efficiently because we do so as a single law firm.

- **Brussels:** Quinn Emanuel's rapidly expanding, multilingual and diverse Brussels office focuses primarily on complex antitrust/competition law related disputes and investigations involving the European Commission, the EFTA Surveillance Authority, the EU national competition authorities, and associated litigation (whether before the EU Courts in Luxembourg or in the member states). Having been involved in many of the major investigations of the last 30 years, the team has particular expertise in handling multi-jurisdictional and EU cartel investigations

Attorney Advertising. Prior results do not guarantee a similar outcome.

and associated litigation, abuse of dominance claims, state aid, mergers and joint ventures, and matters relating to cross-border trade/EU internal market issues.  There is a particular focus on high-tech, IP related matters, especially those involving standard essential patents, pharma, and transportation.

- **London:**  Quinn Emanuel has become a go-to firm for the range of contentious competition law services, acting on both sides of competition law disputes, as well as providing advice and representation in respect of investigations involving the European Commission and national competition authorities – including launching the first mass consumer collective action in the UK's new Competition Appeal Tribunal. Our London office is particularly active in follow-on claims arising from cartels in the technology and financial services sectors.

- **Germany:**  Our German antitrust team has broad experience in litigation and investigations, representing clients before courts and regulators (including the European Commission, the German Federal Cartel Office and the German Financial Supervisory Authority).  This expertise covers all aspects of German and European competition law, including abuse of dominance cases – with particular experience at the intersection of IP and competition law.  Our German team recently helped a major U.S.-based corporation with business in Germany recover just under €40 million from companies that had participated in an international cartel.

- **Asia-Pacific:**  Our competition practice draws on the experienced and well-connected lawyers in Quinn Emanuel's offices in Hong Kong, Tokyo, and Australia.

**Antitrust and Competition Matters Across A Full Range of Industries:**  Quinn Emanuel has achieved success in both cartel and monopolization/abuse of dominance matters across a broad range of industries and businesses.  The firm has broken ground in competition and market manipulation cases involving the **financial services industry**, developing major collusion claims against the world's largest banks – often without the benefit of regulatory settlements or criminal guilty pleas.  The $1.87 billion settlement the firm achieved in the credit default swaps antitrust case is one of the largest in antitrust history.  And in the ISDAfix antitrust case, the firm negotiated more than $500 million in settlements.

Quinn Emanuel has experience and achieved major victories in the full range of industries.  Examples of those successes include:

- **Manufacturing.** The firm won over $430 million in settlements in the Polyurethane Foam Antitrust Litigation; the firm has secured over $400 million in settlements for a major U.S. manufacturer that was the victim of a worldwide bid-rigging cartel; and, on the defense side, the firm obtained a dismissal for **Mattel** of a monopolization suit brought by a competitor seeking $3 billion in alleged damages;

- **Agriculture.** The firm has played a lead role in securing over $100 million in settlements in the Egg Products Antitrust Litigation, and the firm obtained groundbreaking class certification and recovery in bankruptcy court in the Tomato Products Antitrust Litigation;

- **Pharma.** The firm obtained dismissal of all claims against Gilead in an antitrust suit brought by a generic pharmaceutical manufacturer;

- **Transportation.** The firm serves as court-appointed co-lead counsel in the pending major class action alleging collusion by the major U.S. railroads in connection with their freight fuel surcharge program;

- **Securities-related businesses.** The firm secured voluntary dismissal of all claims against client Rabobank, without any payment, in the multi-district antitrust litigation concerning municipal derivatives;
- **Product distribution.** The firm secured dismissal of all claims against client Honeywell by a disgruntled former distributor of Honeywell fire safety systems for office buildings;
- **Technology products.** The firm won perhaps the most significant antitrust jury trial of recent years, defeating Rambus' multi-billion dollar claims against our client **Micron**; the firm won voluntary dismissal of all claims against client IBM, without any payment, in multidistrict antitrust litigation alleging collusion in the sale of SRAM memory chips; and the firm, on behalf of client Samsung, defeated class certification in two price-fixing actions brought by direct and indirect purchasers of NAND flash memory;
- **Sports.** The firm secured dismissal of antitrust claims against our client **FIFA, the world soccer organization,** alleging that FIFA engaged in a conspiracy to force individuals who wished to attend the 2014 World Cup to purchase more-expensive hospitality packages instead of face-value tickets; the firm won summary judgment on behalf of clients **Haymon Sports** and its CEO, **Alan Haymon**, the prominent boxing manager, in a $300 million antitrust lawsuit by Oscar De La Hoya and his Golden Boy promotion companies; and the firm defended Madison Square Garden and the New York Rangers in an antitrust case alleging that the NHL and other parties conspired to inflate prices for television and internet broadcast of NHL games.
- **Energy, Oil & Gasoline.** The firm currently represents Vitol Inc., the American subsidiary of the world's largest independent energy trader, in defense of antitrust lawsuits brought by the California Attorney General and more than a dozen consumer class actions related to trading in the California gasoline spot market.

**Intersection of Antitrust and Intellectual Property:**  We have been pioneers in dealing with issues at the intersection of intellectual property and competition. We have represented clients in some of the most significant IP cases in history, including recently what the press has called "the Smart Phone Wars." As a direct result, Quinn Emanuel has been at the cutting edge of disputes involving standard setting, FRAND commitments, monopolization of newly developed technologies and related patent abuse, ITC proceedings, and transnational antitrust enforcement. Our lawyers have also worked with intellectual property rights owners in protecting their rights in the face of competition and free movement claims in the EU and in front of national competition authorities and courts. We also have significant expertise in the application of competition law to the pharmaceutical sector and in the numerous EU and UK "pay for delay" patent settlement competition law infringement cases.

**Intersection of Antitrust and Bankruptcy:**  We have pioneered antitrust and competition claims against companies that declare bankruptcy. Working with our market leading bankruptcy disputes practice, Quinn Emanuel has been at the forefront of pursuing plaintiffs' rights against competition law infringers that subsequently declare bankruptcy. By bringing together teams comprising our antitrust and bankruptcy lawyers, we obtained a pioneering certification of a class of antitrust claimants in U.S. bankruptcy court, and through negotiation with the bankruptcy trustee arranged for the class to receive a portion of the proceeds awarded to creditors in the bankruptcy proceedings. We also recently won an important ruling that a party emerging from bankruptcy could be jointly and severally liable for the damages caused by an antitrust conspiracy (even during the period prior to bankruptcy) based on post-bankruptcy participation in the conspiracy.

**Investigations:**  We understand the importance of investigations and the consequences that follow in terms of civil claims.  Competition investigations and the resultant decisions and plea agreements often spawn multiple civil damages actions, particularly in the U.S. and Europe. The damages exposure in these civil claims can often be far greater than the financial penalties imposed by the competition authorities. Accordingly, companies making an immunity or leniency application and/or facing a competition authority investigation need advisers who can not only effectively advise on the global risks and benefits of making an immunity or leniency application, and defend the investigation, but also prepare the company for any subsequent litigation and how to manage the process strategically from start to finish. Quinn Emanuel is perfectly positioned to handle both of those critical roles.

Our lawyers have represented clients in both civil and criminal antitrust investigations initiated by the Department of Justice, the FTC, the CFTC in the U.S. and DG Comp in the EU, Competition and Markets Authority in the UK and its equivalent in other countries. We have over 20 former U.S. federal prosecutors, many with extensive experience in antitrust-related matters. One of our partners has served as National Co-Chair of the American Bar Association's Criminal Antitrust Committee. Lawyers in our European offices have been involved in some of the most significant investigations by the European Commission and national competition authorities.

We believe our firm's disputes-only model gives our clients an advantage as compared to companies that are represented by other firms in contested investigations. Many full-service firms consider their relationships with the competition authorities an asset – particularly when those firms are regularly representing companies in transactions such as mergers and acquisitions. These firms are understandably not keen on compromising their relationships. But it is often critical to take tough stands with the authorities in competition investigations. We are fully committed to aggressively protecting our clients' positions in negotiations with the authorities, who know we will go to trial or appeal if a reasonable outcome cannot be reached.

**Pursuing Competition Claims with the Authorities:**  We also regularly represent clients who are the victims of anticompetitive conduct before the competition authorities (especially the European Commission). We know how to persuade the authorities to investigate such conduct. We know how to communicate with the Department of Justice, the European Commission, and EU national competition authority lawyers when appropriate.

**Our Team Leaders:**  Our antitrust & competition practice is Co-Chaired by **Mike Bonanno**, **John Potter** (a Fellow in the American College of Trial Lawyers and described by Chambers USA as ""extraordinarily talented," a "great strategic thinker," and "an outstanding trial lawyer"), **Sami Rashid** (ranked by *Legal 500 USA* for Antitrust Litigation in both the Plaintiff and Defense categories), and **Kate Vernon** (described as "very impressive" by *Chambers and Partners* and that "she has a strong reputation among market commentators for her ability to handle complex claims").

**Trevor Soames**, managing partner of our Brussels office, has long been recognized commentators as one of a handful of leading Brussels players in competition law.  In addition to the accolades Trevor has received for his competition work generally, Trevor repeatedly has been identified by *Euromoney* as one of the top 20 aviation lawyers in the world and ranked #1 in Belgium in Global Competition Review's *International Who's Who of Aviation Lawyers*. **Stephen Mavroghenis** of the Brussels office has been ranked as a leading competition lawyer by *Global Competition Review*, *Chambers*, *Legal 500*, and the *International Who's Who of Competition Lawyers*.  Global Competition Review named Stephen in 2012 as one of its "40 under 40" of the world's brightest young antitrust lawyers.  Brussels office

partner **Miguel Rato** was a member of the team that won the Legal Business award for Competition Team of the Year in 2010. From May 2004 to November 2005, Miguel worked as a Référendaire (Clerk) at the General Court of the European Union (EGC) in Luxembourg. Miguel also lectures on EU competition law and intellectual property at the Brussels School of Competition.

**Rüdiger Lahme** spearheads our competition practice in Germany. Rüdiger is regularly singled out in legal rankings. Germany's leading ranking, the *JUVE* Handbuch (Handbook), consistently ranks him as "often recommended" for conflict resolution, saying he is "one of Germany's best antitrust litigators" (Handbook 2021/2022), an "extremely clever strategist in antitrust litigation" (Handbook 2020/2021) and he and his team are praised as "exceptionally committed, hands-on and knowledgeable" (Handbook 2022/2023). The *Handelsblatt* Research Institute named him one of Germany's "most renowned" litigation lawyers in the *Wirtschaftswoche* Ranking 2022 after surveying more than 1650 lawyers from 146 law firms. In the *Who's Who Legal* Commercial Litigation Report 2022, he is "singled out by peers as a "brilliant litigator" who "fights fierce and smart," particularly when it comes to antitrust cases." GCR has consistently recognized him and *Who's Who Legal* as a "Future Leader Competition" since 2018 and a "Leading Lawyer Competition" since 2022. In 2023, Who's Who Legal ranked Rüdiger as a National Leader in Competition litigation in Germany. *Handelsblatt* has consistently included him in its listing of Germany's *Best Lawyers* for Antitrust and Competition Law, International Arbitration, and Dispute Resolution in Germany since 2019. *Legal 500* summarises in its 2022 rankings for Germany: "Quinn Emanuel Urquhart & Sullivan, LLP's antitrust practice let by Rüdiger Lahme, demonstrates particularly strengths in major cartel proceedings, where it acts for both defendants and claimants."

London based competition litigation partner and Co-Chair of the firm's UK Competition practice, **Lambros Kilaniotis**, practices in all aspects of EU and UK competition law. He has considerable experience in contentious competition matters such as market investigations, abuse of dominance and cartel investigations (including dawn raids) and competition litigation. He has been described as "a fantastic lawyer who is excellent with clients and particularly strong in competition litigation" by *Who's Who Legal* and as "very engaging and on top of the law" and that "he is very personable, wants to do right by his client and produces solid work." by *Chambers and Partners*. *Legal 500 UK* comments that "he really stands out as a great competition litigator. He is charming, diligent and pragmatic – willing to go the extra mile for his clients and really fight their corner." **Leo Kitchen**, is noted as a highly experienced adviser, with recent highlights including major multi-jurisdictional cartel damages claims in the financial services sector. Leo has been recognized by *Legal 500 UK* in both their competition and banking litigation rankings, including being named as a Rising Star for Banking Litigation: Investment & Retail for three consecutive years, and as a Next Generation Partner in their most recent, 2023 rankings.

**Dan Brockett** was named by *Law360* as an antitrust "MVP" in 2015 and named a "Litigation Trailblazer" by the *National Law Journal in 2016*. *ALM Magazine* also listed Dan as one of the New York area's Top Rated Lawyers. *Law360* selected New York partner **Steig Olson** as a rising star in competition law in 2014. New York partner **Manisha M. Sheth** returned to the firm after serving as the Executive Deputy Attorney General for the Economic Justice Division at the Office of the New York Attorney General, where she oversaw every antitrust investigation, enforcement proceeding, and settlement for the State of New York. On the West Coast, **Adam Wolfson** has been ranked by *Legal 500 USA* as a recommended lawyer for antitrust litigation and **Kevin Teruya** has been named a "Top Antitrust Lawyer" by the Daily Journal, selected as one of the Selected as one of the „500 Leading Plaintiff Financial Lawyers in Commercial Litigation, especially Antitrust" by *Lawdragon*, and has also been listed as a „Super Lawyer" for Antitrust Litigation by *Super Lawyers*. Seattle managing partner **Alicia**

**Cobb** focuses on complex commercial litigation, with particular experience in antitrust and class action litigation in New York, Washington state, and Washington, D.C.

## RECENT REPRESENTATIONS

Quinn Emanuel has achieved extraordinary successes when representing corporate defendants in complex, high-stakes, antitrust and competition disputes:

- We successfully represented **IPCom** in defending against a claim for damages brought by Deutsche Telekom alleging anti-competitive discrimination following a patent license agreement concluded by the parties in 2013. The Court of Appeal affirmed the District Court's decision to dismiss the complaint, upholding the distribution of risk contractually agreed upon by the parties.

- We represent **a class of VRDO issuers** alleging collusion in the VRDO market. We obtained class certification on September 21, 2023 with the class seeking classwide damages of over $4 billion before trebling.

- We represent **Slack** and **Salesforce** in the European Commission's investigation of the Complaint alleging that Microsoft was abusing its dominant market position by engaging in unlawful anti-competitive behaviour regarding Teams.

- We represent a plaintiff class of FX platform customers against an FX trading platform company (Currenex) and certain market makers (State Street, Goldman Sachs, and HC Technologies). Plaintiffs allege that Currenex conspired to give superpriority privileges to the market makers, ensuring that their orders were unfairly prioritized over normal customers, resulting damages to other users of the Currenex platform.  On May 19, 2023, the Court largely denied Defendants' motion to dismiss the case—leaving intact Plaintiffs' core claims including based on theories of fraud, antitrust, and RICO violations.

- Quinn Emanuel represents **IQVIA Inc.** and **IMS Software Services, Ltd.** ("IQVIA") against Veeva Systems Inc. ("Veeva") in a closely-watched dispute at the intersection of antitrust and intellectual property law.  The parties compete in the provision of data and software offerings to pharmaceutical companies.   In January 2017, IQVIA brought claims against Veeva for misappropriation/misuse of trade secrets in the District of New Jersey.  Veeva counterclaimed, alleging that IQVIA's refusal share its intellectual property with Veeva was an antitrust violation. In a second closely related lawsuit, IQVIA sought a declaration that declining to expand Veeva's access was not unlawful under the antitrust laws, while Veeva claimed that IQVIA's refusal was part of a campaign to monopolize various software markets.  The parties have engaged in years of discovery and are now nearly finished with expert depositions, with the next phase being summary judgment and trial.

- We represented **SalMar ASA and Scottish Sea Farms Ltd**. ("SSF") in direct and indirect purchaser antitrust class actions in the Southern District of Florida alleging that a group of salmon producers conspired to fix prices for salmon products, as well as in a parallel DOJ antitrust investigation.  We convinced both the direct and indirect purchaser plaintiffs to dismiss SSF as a defendant, with no monetary payment.  We then negotiated settlements for SalMar resolving both

the direct and indirect purchaser claims, which were approved in September 2022 and February 2023, respectively.  The DOJ also closed its investigation earlier this year.

- We represented **Citadel Securities** in a multi-district litigation involving a purported conspiracy to restrict trading in "meme stocks" such as GameStop and AMC as part of an alleged anticompetitive agreement in violation of Section 1 of the Sherman Act.  Following several rounds of motion to dismiss briefing and amended complaints, Chief Judge Altonaga of the Southern District of Florida granted Citadel Securities' motion to dismiss with prejudice, finding that Plaintiffs failed to plausibly allege either the existence of an agreement to restrict trade or any unreasonable restraint of trade.

- We represented **Entergy Mississippi and affiliates** in defending a suit by the Mississippi Attorney General alleging that these Defendants intentionally purchased electricity from their own allegedly expensive power plants rather than from allegedly cheaper third-party sources, allegedly harming Entergy Mississippi's customers by forcing them to pay higher electricity rates.  We assembled a factual defense that Entergy Mississippi and its affiliates needed to use their power plants to provide flexible electricity to match fluctuating demand for electricity, and that the third-party plants did not offer or provide the requisite flexibility.  But we won summary judgment on the legal ground that this case is effectively a challenge to decisions made under standards set forth in the Entergy System Agreement, which is a federal tariff approved by the Federal Energy Regulatory Commission, and the violation of which is within the exclusive jurisdiction of that agency rather than any federal or state court.

- The firm represented **Express Scripts** in a breach of contract and antitrust action in the Eastern District of Missouri in connection with Express Scripts' termination of compounding pharmacies from its network.  Plaintiffs sought over $120M in damages. This was only the second case that Express Scripts took to trial in the history of the company—in the first case, Quinn Emanuel obtained a jury verdict in Express Scripts' favor.  In the lead-up to trial, Quinn Emanuel moved for and obtained what were effectively case-terminating sanctions for Plaintiffs' discovery violations; the Court awarded Express Scripts $360,000 in monetary sanctions, struck Plaintiffs' damages expert, and invited supplemental summary judgment briefing.  Four days before the start of trial, the Court granted summary judgment in Express Scripts' favor on all of Plaintiffs' claims to be tried and held that Plaintiffs were liable on Express Scripts' counterclaims, leaving only the amount of Express Scripts' damages for the jury to decide.  Following the Court's decision and during jury selection, Plaintiffs agreed to a $20M consent judgment, the full amount of damages sought by Express Scripts.  This completed a string of victories that QE obtained for Express Scripts in five antitrust cases after taking over their defense from prior counsel.

- In March 2022, Express Scripts retained Quinn Emanuel to replace its prior counsel and act as its nationwide counsel in dozens of opioids cases brought by counties and municipalities in federal and state courts across the country, including the federal MDL in Ohio presided over by Judge Polster.  These cases generally allege that various entities in the pharmaceutical sectors—including manufacturers, distributors, pharmacies, and pharmacy benefits managers (like Express Scripts)—created a public nuisance through the oversupply of prescription opioids. Among dozens of other cases, a case filed by Jefferson County, Missouri in Missouri state court is in active discovery. Fact discovery and expert discovery are scheduled to conclude in 2023, followed by dispositive motions and (if necessary) a trial in 2024. If the case proceeds to a trial in Jefferson County, it will be the first opioids trial involving claims against pharmacy benefit managers.

- We represented **Google, Alphabet, and several of its senior executives** in a case involving 13 claims, including RICO violations, securities fraud, antitrust, and breach of contract, arising out of plaintiff's termination from Google's AdSense program.  The case was originally filed in New York, where plaintiffs reside, and we first successfully moved to transfer the case to California.  We then moved to dismiss the case for failure to join the real party in interest, which the Court granted without prejudice.  Once the amended complaint came in, we immediately moved to dismiss on statute of limitations grounds, arguing plaintiffs did not get the benefit of tolling or relation back.  The Court agreed, granting our motion with prejudice.

- We achieved a favorable settlement for our clients **Yan Li, Hua Zhong, Zhenzhe Kou, and Eric Huo**, ending a lawsuit brought by plaintiffs UCAR Inc. and UCAR Technology (USA) Inc., alleging trade secret misappropriation, breach of contract, breach of fiduciary duty, and violations of the computer fraud and abuse act.

- We successfully represented **CDC** as an intervenor in a case centering on the time limitation of Cartel Damages Claims. Under a statute only repealed in 2005, cartel damages claims were subject to a 10 year limitation period that expired regardless of the (potential) plaintiff's knowledge about its claim. This long-stop limitation period was inherently unfair as cartels are typically covert operations where injured parties lack actionable insights. Accordingly, the German parliament repealed that long-stop date in 2005 introducing a law, under which limitation periods are tolled during the pendency of cartel investigations by the competent authorities (at EU or national level). The question now answered in the affirmative by the German Supreme Court was whether the new tolling statute applied to cartel damages claims that were unexpired when the tolling statute took effect. Relying on century-old precedents, the Court found that all unexpired claims are vulnerable to subsequent statute of limitations changes. The German Supreme Court's ruling will apply to dozens of cartels, sometimes dating back to the early 2000s.

- We represented sofa manufacturer **Sofa Brands International Limited** and four of its subsidiaries in a claim for damages against Carpenter and Vita following-on from the European Commission's settlement decision establishing a cartel in the market for the supply of polyurethane foam (a key component of sofas) that sought to coordinate prices and allocate customers. The claim was resolved at a very early stage without the need for protracted litigation.

- We defended **Haymon Sports** and its CEO, **Alan Haymon**, the most prominent boxing manager in the sport today, in a $300 million antitrust lawsuit by Oscar De La Hoya and his Golden Boy promotion companies.  The plaintiffs alleged that Haymon attempted to monopolize the market for promotion of Championship-Caliber Boxers through a "tie-out" clause in their management contracts, as well as a series of exclusive contracts with free network television and basic cable networks.  On summary judgment, we demonstrated to the Court that Golden Boy's claims were factually and legally meritless, and the Court agreed, dismissing all antitrust claims with prejudice and throwing the case out.

- We successfully represented **a market leading online travel** agency against a contracting partner asserting various abuse of dominance claims.

8

- We represented **FIFA** in a federal antitrust class action whereby plaintiffs alleged that FIFA and its co-defendants engaged in a conspiracy to force individuals who wished to attend the 2014 World Cup to purchase more-expensive hospitality packages instead of face-value tickets in order to drive up profits. At stake was not only hundreds of millions of dollars, but also FIFA's reputation as the leader of the World Cup, the world's most elite soccer event. In less than a year, not only did we get this action kicked out of court for lack of subject matter jurisdiction, but the court issued a scathing opinion finding that "plaintiffs engaged in a number of questionable actions," and stating that "a competent attorney" would not have brought this action.

- We represented client **J.G. Wentworth** in a case involving the acquisition of its largest competitor, Peach Holdings, LLC, in 2011. The plaintiff, a competitor in the structured settlement market, alleged that the acquisition resulted in an illegal monopoly and that J.G. Wentworth's subsequent use of Google AdWords to advertise both J.G. Wentworth and Peachtree to consumers was anticompetitive because it excluded other competitors from appearing in the most coveted positions on search engine results pages, diverted sales from other competitors, reduced the vigor of the competitive process, and caused consumer confusion as to the joint ownership of the two brands. The plaintiff also alleged claims of false advertising under the Lanham Act and unfair competition under California law. The Honorable Beverly Reid O'Connell, Central District of California, twice gave the plaintiff leave to amend before dismissing all claims with prejudice on the pleadings.

- We represented **Despegar.com** in a false advertising lawsuit brought by American Airlines. Just before initiating suit, American withdrew its tickets from all of Despegar's websites throughout the world. In addition to mounting a vigorous defense against American's claims, we brought an antitrust counterclaim on behalf of Despegar's U.S.-based subsidiary relating to American's anticompetitive air fare distribution scheme. On the eve of depositions we obtained a favorable settlement agreement which paved the way for Despegar to resume selling American tickets.

- We represented **TransWeb** in the defense of patent infringement claims asserted by 3M and the pursuit of antitrust claims against 3M. After a two-and-half-week trial, we obtained a unanimous jury verdict that 3M's asserted patent claims were invalid, not infringed, and (in an advisory capacity) unenforceable due to inequitable conduct. The jury also found that 3M violated the antitrust laws by attempting to enforce fraudulently obtained patents against TransWeb and awarded lost profits and attorneys' fees as antitrust damages, resulting in an approximately $26 million judgment. The district court subsequently adopted the jury's advisory verdict that 3M had committed inequitable conduct rendering the asserted patents unenforceable. On appeal by 3M, the Federal Circuit issued a unanimous and precedential decision affirming the judgments entered below, including specifically the finding of inequitable conduct before the Patent and Trademark Office and the award of trebled attorneys' fees as antitrust damages pursuant to the *Walker Process* fraud claim.

- We represented **DIRECTV** in obtaining summary judgment on antitrust claims under the Cartwright Act brought by Basic Your Best Buy, a terminated retailer. Summary judgment was affirmed on appeal. The Plaintiff alleged that DIRECTV entered into a horizontal conspiracy with its other retailers through coercion not to bid on Basic's sales leads so that DIRECTV could acquire them at a below market price. We successfully argued that DIRECTV's restrictions on its retailers were vertical restraints on intrabrand competition subject to the rule of reason and that Basic could not establish essential elements to prove its claim, including an anticompetitive purpose or effect, a relevant market, or antitrust injury. The Court of Appeal affirmed.

- We represented **DIRECTV** in a case brought by Exclaim Marketing involving unfair and deceptive trade practices and cross-claims for trademark infringement.  After a seven-day jury trial and post-trial briefing, we not only obtained a complete defensive victory for DIRECTV, but also won substantial damages and a sweeping nationwide permanent injunction against Exclaim.

- We won perhaps the most significant antitrust jury trial of recent years, defeating Rambus' multibillion dollar claims against our client **Micron,** even after Micron had pleaded guilty to antitrust violations.

- We obtained a dismissal for **Mattel** of a Sherman Act suit brought by a competitor seeking $3 billion in alleged damages.

- We successfully represented **Honeywell International** in defense of federal antitrust claims that it conspired with certain distributors to foreclose competition in the market for distribution of Honeywell fire safety systems for office buildings. We obtained a dismissal of all claims on the first motion to dismiss, having earlier won a stay of all discovery pending a ruling on the motion to dismiss.

- We successfully represented **IBM** in defense of price-fixing class action claims related to the market for Static Random Access Memory, and persuaded the class action plaintiffs to drop IBM as a defendant with prejudice.

- We successfully persuaded plaintiffs to voluntarily dismiss the claims against **Rabobank**, in the federal multidistrict Municipal Derivatives antitrust litigation – and secured this relief without any monetary payment and before any substantial discovery.

- We successfully persuaded plaintiffs to drop our client as a defendant in any antitrust class action alleging price-fixing among the manufacturers of gypsum.

- In the ***In re Flash Memory Antitrust Litigation* (N.D. Cal.)**, we represented **Samsung** in two price-fixing class actions, brought by direct and indirect purchasers of NAND flash memory. Although classes had been certified in similar cases in the same district, we successfully defeated class certification motions in both actions, causing the direct purchaser representative to agree to a voluntary dismissal of all claims.

- We successfully represented **Shell Oil Products** in defense of antitrust claims by gas station owners alleging discrimination in wholesale prices of gasoline.  Following a four-week jury trial, we obtained judgment in Shell's favor.

- We successfully represented **DIRECTV** in defense of two consumer class actions, with the court granting motions to dismiss all claims.

- We obtained a complete defense verdict in a four-week antitrust jury trial in the Southern District of New York, where over $250 million in damages was sought.

10

- We represented **Madison Square Garden** and **The New York Rangers** in defense of federal class action antitrust claims that the National Hockey League, regional sports networks, along with Comcast and DIRECTV, conspired to inflate prices for television and internet broadcast of NHL hockey games.

- We currently advise and represent a truck company in respect of potential claims that may arise from the European Commission's investigation into alleged anti-competitive conduct in the truck market.

- We represent **Daimler AG** and its **Mercedes-Benz** subsidiaries in *In re German Automotive Antitrust Litigation* (N.D. Cal.), in which we convinced the district court to dismiss with prejudice a putative multi-billion dollar antitrust class action. That decision was then affirmed by the Ninth Circuit.

- We represent **Express Scripts**, one of the largest pharmacy benefit managers in the United States, in five antitrust matters in the Eastern District of Missouri. As part of the services that it provides to health plan sponsors in the processing and payment of prescription drug claims, Express Scripts works to reduce fraud, waste, and abuse in the delivery of prescription medications by investigating, auditing and, where necessary, removing retail pharmacies from its approved network pursuant to certain contractual provisions. Plaintiffs—independent specialty and compounding pharmacies located throughout the United States, and current or former members of Express Scripts' retail pharmacy network—allege that Express Scripts conspired with other major pharmacy benefit managers to boycott and eventually eliminate the competition, and thereby steer patients to Express Scripts' own specialty and compounding pharmacies, in violation of Acts 1 and 2 of the Sherman Antitrust Act as well as state antitrust laws in New Jersey, Texas, Virginia, and elsewhere.

Quinn Emanuel is also a powerhouse on the claimant side, including serving as court-appointed lead plaintiffs' counsel in some of the most significant U.S. and U.K. antitrust disputes:

- We represented **a class of investors** in sovereign, supranational, and agency (SSA) bonds against a group of 11 banks regarding manipulation of the SSA bond market. Even before discovery began, Plaintiffs had already obtained hundreds of electronic chat transcripts among the conspirators, documents that revealed a blatant conspiracy in the market for SSA bonds. Rather than competing with each other for the purchase and sale of SSA bonds to investors and to each other, the defendant banks and their traders openly shared their sensitive pricing information, agreed to fix prices at certain levels, and often revealed their customers' trading histories and quote requests, their positions and trading strategies, and inside information on the pricing and demand for SSA bonds. Three banks settled (Bank of America, Deutsche Bank, and HSBC) for a total of $95.5 million .

- We recently secured an important strategic victory for our client **Daimler AG** in an interlocutory hearing in the Roll-On, Roll-Off maritime shipping services cartel case. The Defendants applied to have nine out of the 14 years of Daimler's claim struck out, or alternatively stayed pending a preliminary reference to the Court of Justice. While the High Court did make a reference to the Court of Justice, the Defendants were unsuccessful on their main strategic aims of narrowing the claim or slowing it down, with Daimler resisting both strike out and stay, ensuring the case will proceed with no delay and with the entire duration of the claim intact.

- We obtained the first collective proceedings order from the U.K. Competition Appeal Tribunal for **a proposed class of 46 million consumers** seeking damages in the amount of at least £14 billion from Mastercard, following protracted challenges to class certification status that were heard by the Tribunal, the English Court of Appeal, and the U.K. Supreme Court.

- We recently brought an action in the U.K. Competition Appeal Tribunal against **Meta** for a proposed class of **44 million Facebook users**, seeking damages of at least £2.3 billion arising from Facebook's dominance and control of its users' valuable and extensive personal data.

- We have been appointed Co-Lead Consumer Class Counsel in a first-of-its kind antitrust class action against Facebook. The consumer plaintiffs allege that Facebook acquired and then maintained monopoly power by deceiving the market about its data collection and use practices, resulting in artificially suppressed compensation for the consumer plaintiffs' data. The parties recently completed fact discovery and have begun expert discovery.

- In late 2022, we along with co-counsel filed a complaint against two major pesticides manufacturers, Syngenta and Corteva. The complaint alleges that the manufacturers' respective "loyalty" programs violate federal and state antitrust laws. In early 2023, we were appointed co-lead counsel after a leadership battle that involved many different firms vying for roles in the set of actions that had been consolidated before the same judge.

- Based on a months-long pre-filing investigation, we filed a complaint alleging that some of the world's largest banks conspired to thwart competition and boycott innovative trading platforms in the IRS market. The lawsuit survived a motion to dismiss, and yielded extensive discovery, including millions of documents and over 100 depositions. Plaintiffs have moved to certify a proposed class of IRS investors, and their motion is backed by opinions from two world-renowned experts and hundreds of evidentiary exhibits.

- We have secured important interlocutory victories for our clients, Allianz, Brevan Howard and other significant investment management firms, in the U.K. Competition Appeal Tribunal in litigation against multiple global banks relating to claims that those banks colluded to manipulate the foreign exchange market between 2003 and 2013.

- We obtained settlements of over $500 million against the defendants in our ISDAfix case, which concerned the rigging of a financial benchmark used to determine the settlement value of certain financial derivatives. The case was brought on behalf of investors such as insurance companies, pension funds, hedge funds, and other sophisticated actors. We built the case from the ground-up after noticing anomalies in the data, before the government even acted. The successful settlement and then certification of the class was the result of years of dogged, groundbreaking work. We had to find traders explicitly admitting they were interested in manipulating the benchmark. We then had to match that admission to can actual trade by the right person, at the right time, in the right direction. We then had to demonstrate we could show that those acts damaged class members, some of whom may have only traded hours or even days later. The Court said that this was the "the most complicated case" he ever faced, and that he could "not really imagine" how much more complicated "it would have been if I didn't have counsel who had done as admirable a job in briefing it and arguing it as" we did.

- We obtained a preliminary injunction in the Southern District of New York for **trueEX**, LLC, a fintech start-up platform for execution of interest rate swaps. The injunction blocks the defendant MarkitSERV, a unit of IHS Markit, from terminating the parties' services agreement pending determination of the action. Although MarkitSERV had a contractual right to terminate the agreement, we filed a complaint against MarkitSERV, asserting a monopolization claim under Section 2 of the Sherman Act based on MarkitSERV's unilateral refusal to deal with trueEX. We alleged that MarkitSERV was a monopolist in the market for post-trade swap services and that MarkitSERV could not terminate our client if its motive was to harm competition. The Court agreed, and entered the preliminary injunction preventing MarkitSERV from barring TrueEx's access to certain of MarkitSERV's technology and software. This victory is notable both because Section 2 claims based on a defendant's unilateral refusal to deal with a rival are very challenging following the Supreme Court's decision in *Verizon v. Trinko*, and because, without injunctive relief, trueEX would have faced the prospect of a shutdown, leaving almost 60 people unemployed. Discovery is now underway with a trial scheduled for March 2018.

- We obtained an important victory in the U.S. Supreme Court on behalf of a **plaintiff class of consumers** challenging price-fixing of ATM access fees by Visa, MasterCard, and the big banks. The Supreme Court had previously granted the defendants' petition for certiorari from a D.C. Circuit decision upholding the complaint on a motion to dismiss. After we filed our merits brief as co-lead counsel for the plaintiffs, the Supreme Court dismissed the defendants' petition as improvidently granted, finding that the defendants' arguments were inconsistent with the question on which the Court had originally granted certiorari. This effectively upholds the D.C. Circuit decision in our favor.

- Quinn Emanuel filed complaints on behalf of over 40 major corporations beginning in the fall of 2019, all alleging that the four major U.S. railroads – **CSX**, **Union Pacific**, **BNSF** and **Norfolk Southern** – conspired to use fuel surcharges as a means to raise rail freight rates. These cases were initiated in 2019 after class certification was denied in the original MDL litigation where Quinn Emanuel served as co-lead counsel for the proposed class (*In re Rail Freight Surcharge Antitrust Litigation*). Although class certification was denied, the Court noted that there was "strong evidence of conspiracy." The newly-filed cases have been consolidated into a new MDL (*In re Rail Freight Surcharge Antitrust Litigation II*). Stephen Neuwirth of Quinn Emanuel was appointed co-liaison counsel for all 100+ plaintiffs in that MDL. Quinn Emanuel also continues to represent certain named plaintiffs in the original MDL. In 2022, Quinn Emanuel achieved a significant victory when the D.C. Circuit largely affirmed the district court's denial of railroads' motion to exclude from trial a broad range of evidence demonstrating their collusion.

- We recovered settlements of over $150 million as co-lead counsel for a class of investors, including numerous hedge funds, related to alleged manipulation of the benchmark price for gold known as the "**London Gold Fix**." This massive class action in the Southern District of New York was brought against a group of banks for their involvement in manipulating the gold market. The Defendants were Deutsche Bank, HSBC, The Bank of Nova Scotia, Barclays Bank plc, HSBC Bank plc, Société Générale SA, and UBS.

- Quinn Emanuel was appointed as co-lead in the *In re Interest Rate Swaps Antitrust Litigation* **(S.D.N.Y.)**, where the court cited, among other things, Quinn Emanuel's "impressive records of

experience and success," "deep knowledge" of class action law, procedure, and antitrust law, and a "commitment to dedicating its resources to representing the interests of the class." This high-profile case against a dozen international banks and several co-conspirators challenges anticompetitive conduct in the market for interest rate swaps. In June 2017, the court issued an order denying in part and granting in part Defendants' motion to dismiss, finding that the case had pled a plausible conspiracy for the time period of 2012 onwards. Well over 100 depositions were taken during fact discovery. Plaintiffs have moved for class certification, and the case remains ongoing.

- We represented numerous major asset managers, hedge funds, pension funds, and other institutional investors—over 1,300 entities in total—in their claims that multiple banks manipulated FX prices, benchmarks, and bid-ask spreads. Our clients, including **Allianz Global Investors**, **BlackRock, Brevan Howard**, and **PIMCO**, opted out of a related class action, and our investigation allowed them to file their own complaint with more than 90 pages of original allegations, showing how the banks should be liable for a conspiracy much broader than being pursued in the class action. Following several judicial rulings in our clients' favour, including an English Court of Appeal judgment, the proceedings were settled by the parties on a global basis pursuant to the terms of a confidential settlement agreement. The claims were subsequently withdrawn in May 2023.

- Quinn Emanuel represents several public and private pension and investment funds as co-lead counsel on behalf of the class who entered into stock loan transactions with six major banks that serve as prime brokers of stock loans. Plaintiffs allege that the six defendants conspired to overcharge investors and wrongfully control the $1.7 trillion **stock loan market**, obstructing competition that would benefit both stock lenders and borrowers. In August 2018, Judge Katherine Polk Failla denied the defendants' motions to dismiss in their entirety. On June 30, 2022, Magistrate Judge Sarah Cave recommended certification of the proposed class. In the meantime, in mid-2023 we settled with all of the bank defendants except Bank of America. The total settlement value is $581 million plus several important market and structural reforms of the kind rarely seen in private settlements (as opposed to settlements with the DOJ or SEC). The structural reforms are likely to be valued in excess of an additional $100 million.

- We filed an antitrust class action on behalf of **Amazon consumers** attacking Amazon's MFN provisions, which require third-party sellers on Amazon's platform to not offer their products for less elsewhere. We have self-ordered case leadership, with QE in a two-firm Executive Committee. The Court denied Amazon's motion to dismiss, and the parties are currently engaged in fact discovery.

- We filed a class action against Live Nation and Ticketmaster on behalf of consumers, alleging Live Nation and Ticketmaster unlawfully monopolized, attempted to monopolize, and restrained trade in the markets for primary and secondary ticketing services in the United States from 2010 to the present. This builds on our earlier action against Live Nation and Ticketmaster on behalf of Songkick (a competitor), where we defeated Live Nation and Ticketmaster's motion for summary judgment – an unprecedented result – and obtained a $110M settlement on the eve of trial. On August 10, 2023, we defeated Live Nation and Ticketmaster's motion to compel arbitration – another unprecedented result – based on a finding that Live Nation and Ticketmaster's updated Terms of Use selecting a new arbitration provider (New Era ADR) with new arbitration procedures

is extremely procedurally unconscionable and also substantively unconscionable, allowing the class action to proceed in federal court. We understand this is the first and only time in the past decade that plaintiffs have been able to circumvent Live Nation and Ticketmaster's arbitration provisions.

- We are one of four proposed co-lead counsel representing **a putative class of game publishers** in an antitrust class action against, Valve, which provides Steam, long the most dominant PC desktop gaming platform, to the public. Valve imposes various price restraints on PC desktop games throughout the U.S., which prevents publishers from promoting competition that would lower Valve's 30% commission for PC game sales, and pushes up consumer prices. Our lawsuit seeks damages for game publishers. The Court denied Valve's motion to dismiss, and the parties have begun discovery.

- We represented **LIV Golf and certain professional golfers** in a litigation against the PGA Tour. Plaintiffs sued the PGA Tour for antitrust violations based on the Tour's efforts to exclude LIV from elite professional golf event markets. The Tour counterclaimed for intentional interference with contracts. Trial was set for May 2024. On June 6, 2023, the Tour and the Public Investment Fund announced an agreement to grow the game of golf. As part of the game-changing agreement, LIV and the Tour stipulated to voluntary dismissal of their claims, and the LIV players can reapply for membership with the Tour. On June 20, the Court approved the stipulation.

- Quinn Emanuel is co-lead counsel in an **antitrust class action against major banks that act as re-marketing agents of "VRDOs"**—variable rate, tax-exempt bonds. The complaint alleges that, rather than re-market the bonds at the lowest possible rate, the banks acted jointly to keep rates artificially high. The complaint was based on an independent investigation led by Quinn Emanuel, which resulted in confidential facts learned from industry insiders and economic analyses showing that VRDO rates were inflated. In June 2022, Judge Jesse Furman of the Southern District of New York upheld the antitrust claims in their entirety, and the parties are now briefing class certification.

- Quinn Emanuel filed an antitrust class action in the Southern District of New York, alleging a wide-ranging anticompetitive and fraudulent scheme on one of the largest foreign exchange platforms, **Currenex**. Our firm built the claims from scratch after an extensive pre-complaint investigation, and our case eventually attracted XTX Markets Limited, one of the world's largest FX traders, to join us as a named Plaintiff. Our operative complaint alleges that in operating its FX trading platform, Currenex conspired to give superpriority privileges to certain market makers, including State Street (Currenex's parent company), Goldman Sachs, HC Technologies, and John Doe Defendants. These privileges ensured that the market makers' orders were matched ahead of others regardless of when the orders were submitted, resulting in increased spreads, reduced competition, and potentially billions of dollars of damages to other users of the Currenex exchange.

- We represented **Salix Capital U.S. Inc.**, and were appointed lead counsel for a class of investors in credit default swaps ("CDS"), including pension funds, university endowment funds, hedge funds, insurance companies, corporate treasuries, fiduciary and depository institutions, small banks, and money managers. The defendants were twelve major Wall Street banks, including Bank of America, Goldman Sachs, and JPMorgan, as well as Markit, a financial services firm, and the International Swaps and Derivatives Association ("ISDA"). The case involved allegations that the banks, Markit,

and ISDA, engaged in a multi-year conspiracy to limit transparency and boycott exchange trading in the market for CDS. We achieved a **historic settlement of over $1.86 billion plus injunctive relief**, one of the largest private antitrust settlements in history. The settlement is particularly noteworthy because two separate governmental investigations—by the Department of Justice and the European Commission—failed to result in any penalties for any of the defendants.

- Acting for **The Home Depot**, we had a central role in persuading the Second Circuit to overturn a $7.25 billion class-action settlement in an antitrust suit against Visa and MasterCard arising out of wrongfully inflated credit card swipe fees. In exchange for the cash payment and certain injunctive relief, the settlement required more than 12 million merchants to release *all* current and future claims against Visa and MasterCard—without permitting merchants to opt out of that release. The district court approved the settlement, but we persuaded the Second Circuit that the class had been inadequately represented in violation of Fed. R. Civ. P. 23(a)(4) and that the settlement violated class members' due process rights because the relief was insufficient and merchants were unable to opt out of the release. Quinn Emanuel is now pursuing an opt-out suit (seeking damages) against Visa and Mastercard for The Home Depot.

- We represent **Intuit** in an opt out case against Visa and Mastercard in connection with the *Interchange Fee Antitrust Litigation*. The complaint includes claims for both Intuit's direct merchant sales and also the transactions it facilitated as an Independent Sales Organization and Payment Facilitator. In those roles, Intuit directly paid interchange fees on billions of dollars of transactions, and therefore has antitrust standing, even though it did not sell merchandise to consumers for certain transactions.

- We have been appointed co-lead interim class counsel on behalf of **a class of engineers and other skilled workers** in a class action alleging a "no poach" conspiracy among several aerospace firms designed to depress the wages of their workers. The action is pending in the District of Connecticut. The defendants are Raytheon Technologies subsidiary Pratt & Whitney, QuEST Global Services-NA Inc., Belcan Engineering Group, Agilis Engineering Inc., Cyient Inc. Parametric Solutions Inc., and several individual defendants. In January 2023, the Court denied Defendants' motions to dismiss. The case is now proceeding in discovery.

- We represent a putative class of dentists suing Delta Dental Insurance Company and the myriad "Delta Dental" entities. Plaintiffs allege that Delta Dental restricts competition and engages in price fixing. Plaintiffs seek to recover billions from the insurance companies, to the benefit of dentists and patients nationwide. We are co-lead of the executive committee leading the case.

- We represent **JBS USA**, one of the largest meat producers in the U.S., in two significant antitrust MDLs proceeding in the District of Minnesota. Specifically, we are defending JBS USA in multiple cases alleging that pork packers conspired to limit the supply of hogs and pork and thereby raise pork prices in the United States. In 2019, the Court dismissed the complaints with leave to amend, but then largely denied the second round of motions to dismiss in 2020. Quinn Emanuel then negotiated favorable "ice-breaker" settlements with all three proposed classes, which were significantly more favorable than the other settlements that the class plaintiffs later reached with a different defendant. We are continuing to defend JBS in the lawsuits filed by direct action plaintiffs, including major retail chains that purchased pork from the Defendants.

- We are also defending various **JBS** companies in a separate MDL alleging that beef packers conspired to limit the slaughter of beef, thereby raising prices in the United States. In 2020, the Court dismissed the complaints with leave to amend. In 2021, the Court denied the second round of motions to dismiss the federal antitrust claims but granted the motions to dismiss certain state law claims. Quinn Emanuel then negotiated a favorable "ice-breaker" settlement with the direct purchaser class. We are continuing to defend JBS in the remaining class actions and against lawsuits filed by direct action plaintiffs.

- We represent **JBS** company Pilgrim's Pride in connection with an antitrust lawsuit in which Plaintiffs allege that Pilgrim's Pride their co-conspirators conspired to fix, raise, maintain, and stabilize the price of broilers chicken (i.e., chicken bread and raised for meat production), beginning at least as early as January 1, 2008. We defeated one of Plaintiffs' primary claims in summary judgment. Pilgrim's Pride has settled with all class and Direct Action Plaintiffs except one, Associated Wholesale Grocers. A jury trial for the remaining claims along with dozens of other plaintiffs and defendants will begin September 12, 2023 and is estimated to go until mid-December 2023.

- As court-appointed co-lead counsel for direct purchaser plaintiffs in ***In re Flexible Polyurethane Foam Antitrust Litigation* (N.D. Ohio)**, we won certification of a national class of direct purchasers, defeated the defendants' effort to have the certification decision reversed on appeal, and defeated those same defendants' motions for summary judgment. As a result of this representation, we **achieved over $430 million in settlements** for the class from nine different defendants. We have also successfully pursued claims on behalf of bedding companies in the English courts against the polyurethane foam cartelists, successfully resolving the claims without needing to serve proceedings.

- We were retained by **Samsung** after its claim that Panasonic had conspired with Toshiba and SanDisk to fix prices (through a licensing entity called SD-3C) for the right to manufacture or sell secure digital (SD) memory cards was dismissed by the district court dismissed on statute of limitations grounds. On appeal, Quinn Emanuel obtained a unanimous reversal in the Ninth Circuit, which issued a significant antitrust precedent applying the "continuing conspiracy" doctrine to the antitrust statute of limitations for the first time since 1997. The Ninth Circuit decision clarified that the continuing conspiracy doctrine remains a powerful vehicle for bringing complaints against long-running anticompetitive conduct. Following remand, Samsung filed an amended complaint, and the district court denied Panasonic and SD-3C's motion to dismiss. The parties subsequently settled on confidential terms.

- We **achieved a settlement for $130 million** plus even more valuable non-monetary relief (in the form for prospective changes to the defendants' practices) in ***Universal Delaware v. Comdata Corporation* (E.D. Pa.)**, concerning alleged monopolization and anticompetitive collusion in the markets for the truck fleet credit cards used at highway truck stops. We served as court-appointed co-lead counsel for a proposed class of over 4,000 independent truck stops. Defendants included Comdata (the leading issuer of trucker fleet payment cards) and three national truck stop chains.

17

- We are playing a major role representing plaintiffs in the pending ***In re Egg Products Antitrust Litigation*** **(E.D. Pa.)**, which alleges that defendant egg producers conspired to reduce the supply of eggs (and thereby raise egg prices) under the guise of "animal welfare." Quinn Emanuel presented the principal argument in opposition to the defendants' motions to dismiss, served as lead courtroom counsel for plaintiffs during a successful two-day evidentiary hearing on class certification, led the successful opposition to defendants' petition to appeal the class certification ruling to the Third Circuit, had principal responsibility for briefing and arguing in court against Michael Foods' motion for summary judgment, which the Court denied. Following that denial, the firm helped to achieve a $75 million settlement from Michael Foods. The total recoveries to date exceed $130 million.

- We are court-appointed co-lead plaintiffs' counsel in ***Four In One Company, Inc., et al. v. S.K. Foods, L.P., et al.*** **(E.D. Cal.)**, an class action concerning price fixing in the market for processed tomato products. The firm achieved **a ground-breaking settlement in bankruptcy court** that ensures a settlement class, certified by the bankruptcy court, will now be able to maximize its recovery from debtor SK Foods. The firm has also settled with the two other defendants for a total of **$6.4 million**.

- We advise and represent **a major international automobile company** in respect of its global claims arising from the auto parts cartels. The cartels in the auto parts sector are the most wide ranging ever to be investigated in a single sector, with authorities in the US, EU, Brazil, Canada, Japan, South Korea, Australia and South Africa investigating suppliers of car parts.

We have also acted in some of the most significant matters at the cutting edge intersection of antitrust and intellectual property law, including the emerging issues related to standards setting and licensing abuses, geo-blocking, pay for delay patent settlement agreements, and licensing of IP rights including sports broadcasting rights:

- We represented **a global telecommunications company**, the world's largest manufacturer of mobile cellular handsets, in a case against Qualcomm before the European Commission, in which our client alleged that Qualcomm's licensing practices were anticompetitive. This was related to various other matters we handled against Qualcomm, in what was probably the largest intellectual property dispute in the world. We achieved a global settlement for our client on the eve of trial.

- In 2011, we secured final victory for our client **IBM** in ***International Business Machines Corp. v. Platform Solutions, Inc.*** **(S.D.N.Y.),** when opponent T3 Technologies voluntarily dismissed its pending appeal of IBM's summary judgment win. The case involved IBM's intellectual property surrounding its core mainframe computer business, but a key focus of the litigation was the defendants' antitrust counterclaims, which accused IBM of monopolizing the mainframe computer technology market. Defendants demanded that IBM be forced to license its mainframe technology. In November 2007, T3 Technologies intervened in the case, accusing IBM of excluding T3 from the market by refusing to license IBM's technology to T3's suppliers. After IBM and Platform solutions settled their claims on favorable terms for IBM in 2008, T3 continued to pursue its antitrust counterclaims. In 2009, the court granted IBM's summary judgment motion against T3. T3 appealed, and the firm presented oral argument to the Second Circuit in October 2010. T3 voluntarily dismissed its appeal.

- We represented **Avery Dennison** in an antitrust case against 3M, asserting claims regarding (i) 3M's monopolization of markets for retroreflective sheeting used in highway signage, and (ii) 3M's anticompetitive practices before a standards-setting committee and in connection with bidding on contracts to supply sheeting to government agencies. The case settled on confidential terms.

- In *EcoDisc Technology AG v. DVD Format/Logo Licensing Corporation et al.*, we won a significant ruling dismissing all claims against our client **The DVD Forum**. The court held that a trademark licensor's cease and desist notices to licensees were protected activity under the Noerr-Pennington Doctrine. The case also held that the activities of a Tokyo-based international standards organization did not provide a sufficient basis for establishing personal jurisdiction to pursue antitrust and false advertising claims in the United States.

- We acted for **Qualcomm Inc** as intervener in *Unwired Planet International Ltd and anor v Huawei Technologies (UK) Co Ltd and anor*, the leading judgment given by the U.K. Supreme Court on matters relating to Standard Essential Patents and Fair, Reasonable and Non-Discriminatory terms.

# Quinn Emanuel Tops BTI Fearsome Foursome 2023

Threats and needs change with every step to the next normal. Clients not only assess the nature of the case — but who is making the argument on the other side. These are the firms striking the utmost fear into the hearts of seasoned general counsel and legal decision makers. The BTI Fearsome Foursome are the firms clients tell us they least want to see on the other side of the table in litigation because they are relentless, cunning, aggressive, very smart, and play to win — and win big.

Quinn Emanuel earns the coveted number 1 spot among the BTI Fearsome Foursome for the 3rd time in the last 4 years. This elite group of firms also includes Jones Day, Kirkland & Ellis, and Skadden.

Of the 46 law firms clients don't want to litigate against — 4 standout as most Fearsome. Congratulations to The BTI Fearsome Foursome of 2023 for their intense approach and fierce tactics in today's ever evolving, complex, and dynamic litigation market.

## Quinn Emanuel

### Jones Day

### Kirkland & Ellis

### Skadden



**The fine print:** We asked more than 350 general counsel and in-house litigation heads which law firms they would least like to see as opposing counsel. The majority of clients named, unaided, the law firm members of The BTI Fearsome Foursome. The remainder selected other firms, listed here as the BTI Awesome Opponents and Standouts.



bticonsulting.com | +1.617.439.0333 | ©2022 The BTI Consulting Group, Inc All rights reserved.

# The BTI Awesome Opponents:
# The Most Feared Law Firms in Litigation

## Awesome Opponents

- Anderson Kill
- Covington
- Cravath
- Dentons
- Gibson Dunn
- Hueston Hennigan
- Husch Blackwell
- Jackson Walker

- Latham & Watkins
- Littler
- Manatt
- Mintz
- Paul Hastings
- Slaughter and May
- Susman Godfrey
- Weil



**The fine print:** We asked more than 350 general counsel and in-house litigation heads which law firms they would least like to see as opposing counsel. The majority of clients named, unaided, the law firm members of The BTI Fearsome Foursome. The remainder selected other firms, listed here as the BTI Awesome Opponents and Standouts.

# The BTI Intimidating Opponents:
# The Most Feared Law Firms in Litigation

## Intimidating Opponents

- Arnold & Porter
- BakerHostetler
- Ballard Spahr
- Berliner Corcoran & Rowe
- Bernstein Litowitz Berger & Grossmann
- Bohm Law Group
- Cleary Gottlieb
- Dechert
- DLA Piper
- Dowd Bennett
- Duane Morris
- Finnegan
- Foley Hoag
- Goodwin

- Gordon & Rees
- Goulston & Storrs
- Jackson Lewis
- Kaplan Hecker & Fink
- Pillsbury
- Robinson+Cole
- Sidley
- Wachtell Lipton
- White & Case
- Wiley
- WilmerHale
- Winston & Strawn



**The fine print:** We asked more than 350 general counsel and in-house litigation heads which law firms they would least like to see as opposing counsel. The majority of clients named, unaided, the law firm members of The BTI Fearsome Foursome. The remainder selected other firms, listed here as the BTI Awesome Opponents and Standouts.



# The 46 Firms Most Feared in Litigation —
# The BTI Fearsome Foursome 2023

Uncertainty and fear are often linked.

With uncertainty as the dominant theme — The BTI Fearsome Foursome stand out more than they ever have. Undaunted by the unknown — their innate move is to rely on their resolve.

Top legal decision makers single out 46 firms they don't want to see on the other side of the table in litigation. We found 5 reasons:

1. **VALOROUS**
   Bringing great courage in the face of high risk, danger, and uncharted waters. They relish the challenge and opportunity.

2. **SAVVY AND SUPER SMART**
   Thinking quickly, spotting patterns, able to decipher and launch multiple strategies, and can bring together all they learn as they go.

3. **ENERGIZED**
   The fight brings out more energy. Increased challenge breathes new vitality into the Fearsome Foursome.

4. **MOBILIZED**
   Acting expeditiously — swift but thought out. Always with the right resources. The ability to think on their feet helps makes this happen.

5. **UNABATING**
   The Fearsome Foursome just don't give up.

Congratulations to Quinn Emanuel for earning the coveted number 1 spot in the BTI Fearsome Foursome and the other 45 most feared firms of 2023 for their intense approach and fierce tactics in today's ever-evolving, complex, and changing litigation market.

bticonsulting.com | +1.617.439.0333 | ©2022 The BTI Consulting Group, Inc All rights reserved.

# Our Methodology and Approach

## INDEPENDENT, UNBIASED RESEARCH, BASED SOLELY ON CLIENT FEEDBACK

### Survey Participant Demographics

| | |
|---|---|
| **Interviews** | More than **350** in-depth telephone interviews |
| **Time Frame** | Conducted between **March 2022** and **August 2022** |
| **Incentives** | Respondents receive a complimentary report of benchmarks and metrics |

### Legal Decision Makers Responsible for Litigation

- Head of Litigation
- Chief and Vice President of Litigation
- General Counsel/Chief Legal Officer
- Direct report to General Counsel

### Organizations with Highest Levels of Legal Spending



$23.9 billion — Average Revenue

$13.6 billion — Median Revenue

### Representative of more than 15 Industry Segments

- Banking
- Chemicals
- Consumer Goods
- Energy
- Financial Services
- Food & Agricultural
- Health Care
- High Tech
- Insurance
- Manufacturing
- Pharmaceuticals
- Professional Services
- Retail Trade
- Real Estate
- Telecom
- Transportation
- Utilities
- Wholesale Trade

*BTI Litigation Outlook 2023 is based solely on in-depth telephone interviews with leading legal decision makers. This comprehensive analysis trends data from more than 20,000 corporate counsel client interviews conducted over the span of 21 years.*

*This research is independent and unbiased —no law firm or organization other than BTI sponsors this study.*

*Each year, BTI reaches out to a strategically designed group of top legal decision makers at large organizations with $1 billion or more in revenue. We target the decision makers in the industries who spend the most on legal affairs as well as thought leaders and innovative Chief Legal Officers. Our survey also includes Chief Legal Operating Officers and business executives who hire and influence the selection and hiring of law firms.*

*Participants are granted confidentiality at the individual and organizational level.*

**BTI** CONSULTING GROUP

bticonsulting.com | +1.617.439.0333 | ©2022 The BTI Consulting Group, Inc All rights reserved.

# Questions? Comments?



## Michael B. Rynowecer, President

For questions, research inquiries, and information on BTI's client feedback programs, market insight research, seminars, training, or workshops, please contact us via email or by calling **+1 617 439 0333**.

**mrynowecer@bticonsulting.com**

Visit Us
**bticonsulting.com**

Subscribe to BTI's Blog
**The Mad Clientist**

Follow BTI Consulting

![ALM | LAW.COM]

# THE AMERICAN LAWYER

## Ready to Fight, Ready to Win: Quinn Emanuel Awarded Litigation Department of the Year

**By Sarah Tincher-Numbers**
November 16, 2023

At Quinn Emanuel Urquhart & Sullivan, the last two years have been marked by a slew of impressive litigation feats across numerous legal arenas. But if you ask them, that's nothing but standard procedure for the largest litigation-only firm in the Am Law 100.

"We're known as a firm that tries a lot of cases," says name partner John Quinn. "Typically we have at least one case in trial, and often more than one case in trial somewhere in the world every single day of the week. So, we're known as a firm that actually goes into courtrooms and tries cases to arbitrators, to juries, to judges."

### 'Feats of Trial Bravura'

For lawyers at Quinn Emanuel, 2023 started with a bang in the form of an "astonishing" set of back-to-back defense verdicts for Elon Musk and Tesla.

"These were cases that many people said couldn't be won," says name partner Kathleen Sullivan, who worked on both cases.

At the end of 2022, a Quinn Emanuel team led by partners Alex Spiro, Andrew Rossman and Bill Price was retained to take over Musk's defense in a putative class action lawsuit over a tweet Musk sent in August 2018 announcing a potential deal to take Tesla private at $420 a share: "Funding secured."

The odds were stacked against them from the beginning. U.S. District Senior Judge Edward Chen of the Northern District of California had already granted summary judgment on the class action that Musk "recklessly" made false representations about taking Tesla private, with plaintiffs claiming $12 billion in investor losses as a result of the tweet.

But, after less than three hours of deliberations, a federal jury in San Francisco in February found Musk and Tesla



From left to right: Jennifer Barrett, John Quinn, Michael Carlinsky, Silpa Maruri, Kathleen Sullivan, and Manisha M. Sheth. New York partners at Quinn Emanuel.

*Photo: Ryland West/ALM*

weren't liable for investor losses in the wake of the tweets.

According to global co-managing partner Bill Burck, this case exemplifies the way Quinn Emanuel operates in the courtroom.

"We are a firm that really believes that trials are where you find the truth, and Alex Spiro is a kind of disciple of that view. And because he believes trials are where you find the truth, he doesn't really like to prepare the witness about every single thing he's going to ask," Burck says, recalling a particular moment from the trial.

"We call Elon Musk to the stand, and Alex does his direct, and he asks him, 'What was your childhood like in South Africa?' It took Elon Musk totally by surprise. He just became very quiet, and he said, 'Not good.' And Alex moved on. He didn't dwell on it," Burck recalls. "That was a moment where Elon Musk, arguably the world's richest man, was humanized for the jury. And it took a master trial lawyer to figure out that that's something he could accomplish at that moment."

Just a few weeks later, it was time for Quinn Emanuel to defend Tesla in a racial discrimination case before the Northern District of California.

The firm was initially brought on to defend Tesla in post-trial motions and appeal in October 2021, just days after Owen Diaz, a former contract worker at the Tesla factory in Fremont, California, had won a $137 million verdict over racial discrimination and harassment. After Sullivan made the case to U.S. District Judge William Orrick III to lower the award, Orrick found that the damages figure was "excessive," giving Diaz the option of accepting $15 million or retrying the damages portion of the case. Diaz in June 2022 opted for a new trial on damages, turning to a trial team led by Spiro and partner Asher Griffin.

"We came in, as we often do, after a disastrous verdict that another firm has suffered for our clients," says Sullivan.

After a five-day trial and about a day of deliberations, jurors in April awarded Diaz just 2.3% of the earlier award—$175,000 for economic losses and $3 million in punitive damages.

"Basically, it was like 'Groundhog Day,'" Sullivan recalls. "The evidence was all the same, and no new witnesses could be called, but the trial team succeeded in impeaching the case that had been put on a first trial. And the damages came back at 98% lower than in the first trial.

"Those were two astonishing feats of just trial bravura," Sullivan says of the Musk and Tesla cases. "And not just courtroom skill, but the ability of our teams to prepare the witnesses, to game out all of the legal and appellate angles that you need, both in the trial court and to preserve things on appeal."

### Expansive Portfolio

In addition to the Tesla cases, and numerous other litigation feats, Quinn Emanuel managed to nail down a $1.84 billion settlement for Ambac with Bank of America five weeks into a jury trial, convinced a jury to acquit iTalk Global CEO Jie Zhao in the "Varsity Blues" prosecutions, won an intellectual property case for The Broad Institute against several universities before the U.S. Patent Trial and Appeal Board over its entitlement to foundational patents on a revolutionary genome editing breakthrough, and stopped 3M from halting the largest multidistrict litigation in U.S. history via bankruptcy, paving the way for hundreds of thousands of lawsuits to move forward on behalf of U.S. service members who claim the company's

combat arms earplugs were defective and led to hearing damage.

Sullivan notes that the 3M litigation, in particular, is a prime example of what she says "illustrates something very important about our firm, which is that we devote a lot of resources to cases that we think are righteous cases. We have a lot of very big dollar-value cases, and then we have some cases we pursue partly because we are quite sure it's the right thing to do."

The firm is also currently acting on behalf of Ukraine in inter-state proceedings against the Russian Federation before the European Court of Human Rights.

Beyond the outcome of the trial itself, Quinn says, "Perhaps the more important function is making sure that the historical account of what transpired here, the atrocities that were committed in Ukraine by Russians, are documented and there's a historical record of it."

### 'Unmatched'

While some might argue that a litigation-only model is risky, the firm remains confident in its focus, using its reputation to build a stellar portfolio of clients across the globe as it continues to build a world-class firm of expert trial and appellate lawyers worldwide.

"When clients hire us, they're hiring us because we've got a tremendous amount of experience and a skill set that really is unmatched in almost all the areas of litigation that are out there," Burck says. "You don't hire Quinn Emanuel to send the message that we're going to settle this case, you hire Quinn Emanuel because you're going to fight. And the goal is to win.

"I think that helps us a lot, being litigation-only, because we don't have anybody else that looks like us," Burck adds.

And that doesn't just apply to attracting clients. According to name partner John Quinn, "It's all about the talent."

"We've made it a deliberate project to try to know the best talent everywhere. And when we find somebody who you have a lot of respect for in the marketplace … we're not bashful about reaching out to them and recruiting them," Quinn says. "The other side of that, of course, is trying to recruit the best and brightest out of the best law schools around the world."

Looking ahead, the firm is showing no signs of slowing down its global growth trajectory anytime soon. As Quinn puts it: "The Quinn Emanuel project continues." The firm, which recently extended its operations to Abu Dhabi, in October announced plans to open in Singapore.

Reprinted with permission from the November 16, 2023 edition of the THE AMERICAN LAWYER © 2023 ALM Global Properties, LLC. All rights reserved. Further duplication without permission is prohibited, contact 877-256-2472 or asset-and-logo-licensing@alm.com. # TAL-11172023-52453



Page Printed From:
https://www.law.com/litigationdaily/2023/08/25/litigators-of-the-week-in-antitrust-case-against-big-banks-quinn-and-cohen-milstein-land-a-499m-settlement-and-market-changes/



NOT FOR REPRINT

Q&A

## Litigators of the Week: In Antitrust Case Against Big Banks, Quinn and Cohen Milstein Land a $499M Settlement and Market Changes

The settlement announced this week with multiple banks over claims they colluded to prop up fees in the stock lending market comes after an earlier $81 million deal with Credit Suisse affiliates.

August 25, 2023 at 07:30 AM

Financial Services and Banking



**Ross Todd**
Editor/columnist



The stock lending market—where hedge funds seek out big institutional shareholders for a temporary transfer of stock so they can make short-selling bets—is ludicrously large.

Like $1.72 trillion dollars large.

That's trillion with a T.

According to institutional investors represented by **Quinn Emanuel Urquhart & Sullivan** and **Cohen Milstein Sellers & Toll**, it's a market that big banks attempted to keep opaque—eschewing modern electronic trading protocols—in order to prop up their own fees. This week after six years of antitrust litigation a team led by **Daniel Brockett** and **Steig Olson** of Quinn Emanuel and **Michael Eisenkraft** of Cohen Milstein secured a proposed $499 million settlement with banks Goldman Sachs, Morgan Stanley, JPMorgan and UBS, as well as EquiLend, the company the plaintiffs claimed the banks formed to corner the securities lending market and prop up the fees they could charge there. The settlement, which comes after an earlier $81 million proposed deal with Credit Suisse, includes forward-looking measures meant to promote competition in the market—a rarity in antitrust settlements involving only private plaintiffs.

**Lit Daily: Who are your clients and what was at stake?**

Michael Eisenkraft: Our clients—the Iowa Public Employees' Retirement System, the Los Angeles County Employees Retirement System, the Orange County Employees Retirement System, the Sonoma County Employees Retirement Association, and Torus Capital LLC—are institutional investors who care about the health and fairness of the financial markets. This case is a class action where plaintiffs claim that the prime brokers (some of the world's biggest investment banks) who dominated the $1.7 trillion stock lending market colluded to boycott new entrants into that market and prevent its modernization.

What was at stake was whether the allegedly collusive behavior of the banks and the stagnant status quo in this critical market would remain unchallenged. Thanks to our clients, who were brave and principled enough to stand up for other investors—they did not. We believe this settlement will provide well-deserved compensation to investors for the supracompetive spreads they paid to the prime broker defendants when lending and/or borrowing shares and hopefully speed the long overdue modernization of the stock lending market by preventing future collusion amongst the prime broker defendants and EquiLend.

### How did this matter come to you and your firms? Where did you learn what was going on in this market?

Daniel Brockett: My expertise is antitrust litigation involving the financial markets. We know from prior cases that the major banks (prime brokers) dominate most of these markets and have made collective efforts to squash new entrants offering platforms and other technology. We saw this in the credit default swaps case and in the interest rate swaps cases—both cases in which the banks are alleged to have boycotted new electronic platforms with all-to-all trading protocols.

We therefore naturally trained our sights on the multi-trillion-dollar stock lending market. We spent over a year fully investigating the industry, eventually filing an extremely detailed complaint that easily survived defendants' motion to dismiss.

### Who was on the team and how have you divided the work?

Brockett: We had stellar teams from both firms and divided the work based on availability and expertise. At QE, in addition to Olson and myself, our partner **Sascha Rand** was instrumental in finding the right experts from MIT and working with them for years to develop workable class cert and damages models. Partner **Jeremy Andersen** oversaw the drafting of the settlement agreement and preliminary approval papers. We also were fortunate to have some of QE's finest young associates, including **David LeRay, Nic Siebert, Avi Grunfeld** and **Max Meadows**, all of whom wrote briefs, drafted expert reports, took depositions, and generally played key roles in the case.

### What were the key hurdles to getting this class certified and how did you overcome them before the magistrate judge here?

Stieg Olson: Defendants argued that class certification should not be granted because only a small number of traders would have actually traded on the platforms that were blocked by the conspiracy. We had to show that the conspiracy caused harm that was felt market-wide and harmed even those investors that would not have traded on the platforms for whatever reason. To explain this, we had to put together a series of important economic principles about financial markets, dating back to seminal, Nobel prize-winning work from the 1970s about the effect of search costs on the prices of financial instruments. We spent weeks honing our presentation to the court, making it simpler and clearer on every turn. By the end, we found a way to distill the complex economics into an explanation of why the conspiracy harmed all investors that was easy to follow and very difficult for the defendants to respond to.

### So, besides the dollars involved, the settlement lays out some forward-looking relief in terms of industry reforms designed to prevent future bank collusion and market abuse in the stock loan industry. Is there a good way to describe what those reforms are in a way a layman like me might understand?

Eisenkraft: Yes, I think the best way to understand it might be to go back to childhood. Imagine a block where the neighborhood bullies have a private clubhouse where they plot domination of the neighborhood, free from adult supervision. Here, the plaintiffs argued that, in the stock lending neighborhood, that private clubhouse was EquiLend. Plaintiffs believe that these reforms make it far harder for the prime broker defendants (the neighborhood bullies) to use the EquiLend clubhouse to collude. It does this in a number of ways—including by mandating the rotation of independent antitrust counsel and the presence of that counsel at meetings, establishing a code of conduct, and limiting permissible information sharing—all backed by the authority of a federal district court (ie., the adult supervision).

**Your claims against Bank of America remain pending. What comes next on that front?**

Brockett: The court will first decide whether to accept the magistrate's recommendation to certify the class. Once class cert is determined, there may be some supplemental discovery by both sides, followed by summary judgment motions. The case will eventually be tried to a jury.

**What lessons do you hope that the settling banks take from this litigation?**

Brockett: The banks need to root out this type of behavior and put it behind them. The consequences have been costly and embarrassing. They cannot control this market forever, and the time has come to open it to new technologies, new ways of trading, and new players.

Olson: I'm not counting on these banks learning any lessons. But in general, powerful, entrenched interests should not be allowed to block competition from innovative new entrants.

Eisenkraft: That investors (and their counsel) have the resources and courage to stand up and fight when wronged. This litigation claimed that the dominant market players in stock lending illegally engaged in a group boycott. Pressing that claim required standing up to those dominant market players and the armies of lawyers they retained to defend themselves and their position. Investors and their counsel successfully did that here and will do so again if defendants engage in any illegal shenanigans in any corner of the financial markets.

**What will you remember most about this matter?**

Brockett: How truly shocking the evidence of collusion was. Also, how defendants' arrogant expert was caught lying at deposition, and how easy it was to impeach defendants' senior executives at deposition with their own emails and writings.

Eisenkraft: The team bonds COVID built. We were in the middle of what ended up being more than 100 depositions when the world froze due to the advent of COVID. Successfully prosecuting a complex antitrust case against the world's biggest investment banks and the multiple armies of lawyers they hire is difficult enough in the best of circumstances, but we had to do it in a world where the usual methods of getting facts—sitting in a conference room asking a deponent questions—was suddenly impossible and we were forced to innovate on the fly. So, we did, pioneering virtual depositions, putting together first-of-their-kind discovery protocols, and doing it all from makeshift home offices. We had an incredible team of lawyers on this case from both lead firms, and successfully working together under these circumstances forged deep links of teamwork and trust.

Olson: Like Michael, I remember being in the early stages of discovery when COVID hit. After pausing the case for a few weeks, we decided we had no choice but to press ahead and figure it out, and we ended up taking some of the earliest virtual depositions of that era. But I also remember taking one of the first depositions in the case, when they were still in person, and we were lucky enough to have an honest witness who basically admitted to the conspiracy.

NOT FOR REPRINT

Copyright © 2024 ALM Global, LLC. All Rights Reserved.

Case 2:21-cv-00693-RSM Document 294-89 Filed 03/16/24 Page 54 of 160

1          THE HONORABLE RICARDO S. MARTINEZ

2

3

4

5

6

7                UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON
8                       AT SEATTLE

9

10   ELIZABETH DE COSTER *et al.*, on behalf of
     themselves and all others similarly situated,

11                                                     Case No. 2:21-cv-00693-RSM
     Plaintiffs,
12                                                     ORDER GRANTING MOTION FOR
     v.                                                APPOINTMENT OF INTERIM CO-
13                                                     LEAD CLASS COUNSEL AND
     AMAZON.COM, INC., a Delaware                      PLAINTIFFS' EXECUTIVE
14   corporation,                                      COMMITTEE

15   Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING
MOTION TO APPOINT LEADERSHIP
CASE NO. 2:21-cv-00693-RSM



Now before the Court is the plaintiffs' Unopposed Motion for Appointment of Interim Co-Lead Class Counsel and Plaintiffs' Executive Committee for the Proposed Class.

This motion relates to antitrust cases brought by and on behalf of consumers who purchased from Defendant Amazon's retail platform and were harmed by Amazon's anticompetitive conduct.

The Court concludes that Hagens Berman Sobol Shapiro LLP and Keller Lenkner LLC should be appointed, and are hereby appointed, as Interim Co-Lead Class Counsel, and that Quinn Emanuel Urquhart & Sullivan, LLP and Keller Rohrback L.L.P. should be appointed, and are hereby appointed, as members of a Plaintiffs' Executive Committee. The Court concludes that such appointments will aid in achieving efficiency and economy in what is likely to be expensive and complicated litigation, and that such appointments will enhance fairness to all parties concerned, as well as the proposed classes.

In reaching these conclusions, the Court has carefully reviewed the motion and its accompanying submissions, including the declarations and attachments submitted on behalf of the appointed firms, and has also considered the factors outlined in Rule 23(g) of the Federal Rules of Civil Procedure and other authority cited by the plaintiffs. The plaintiffs' submissions demonstrate that the appointed firms satisfy the requirements of Rule 23(g) for appointment as interim lead class counsel. These include the work counsel have done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; counsel's knowledge of the applicable law; and the resources that counsel have available and will commit to representing the class.

IT IS SO ORDERED.

DATED this 16th day of July, 2021.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER GRANTING
MOTION TO APPOINT LEADERSHIP - 1
CASE NO. 2:21-cv-00693-RSM

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
206.623.7292 206.623.0594 FAX

DC5ECREC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE:  CREDIT DEFAULT SWAPS
ANTITRUST LITIGATION and other
related cases,

                                    13 MD 2476(DLC)


------------------------------x

                                    December 5, 2013

                                    1:57 p.m.


Before:

                    HON. DENISE COTE,

                                    District Judge

                    APPEARANCES

ENTWISTLE & CAPPUCCI
     Attorneys for Movant CDS Institutional Investor Group and
     Plaintiffs
BY:  ANDREW J. ENTWISTLE
     ARTHUR V. NEALON

KAPLAN FOX & KILSHEIMER
     Attorneys for Plaintiffs
BY:  ROBERT KAPLAN
     GREGORY K. ARENSON
     MATTHEW McCAHILL

MILBERG
     Attorneys for Plaintiffs
BY:  ARIANA J. TADLER
     PEGGY J. WEDGWORTH
     PAUL F. NOVAK

HAGENS BERMAN SOBOL SHAPIRO, LLP
     Attorneys for Plaintiffs
BY:  JASON A. ZWEIG

DC5ECREC

1                    A P P E A R A N C E S (continued)

2   LABATON SUCHAROW
         Attorneys for Plaintiffs Essex Regional Retirement System
3   BY:  GREGORY S. ASCIOLLA

4   MOTLEY RICE
         Attorneys for Plaintiffs Landesbank Baden-Wurttemberg
5        Asset Management Investmentgesellschaft mbH
    BY:  MICHAEL M. BUCHMAN
6
    LOVELL STEWART HALEBIAN JACOBSON
7        Attorneys for Plaintiffs Landesbank Baden-Wurttemberg
         Asset Management Investmentgesellschaft mbH
8   BY:  IAN STOLL

9   PEARSON SIMON & WARSHAW
         Attorneys for Plaintiffs LACERA
10  BY:  BRUCE L. SIMON
         GEORGE S. TREVOR
11
    THE LAWRENCE LAW FIRM
12       Attorneys for Plaintiffs LACERA
    BY:  JEFFREY W. LAWRENCE
13
    GOODIN MACBRIDE SQUERI DAY & LAMPREY, LLP
14       Attorneys for Plaintiffs LACERA
    BY:  WAYNE T. LAMPREY
15
    KOREIN TILLERY, LLC
16       Attorneys for Plaintiffs MF Global Capital
    BY:  George A. Zelcs
17
    QUINN EMANUEL URQUHART & SULLIVAN, LLP
18       Attorneys for Plaintiffs Salix Capital US Inc.
    BY:  DANIEL L. BROCKETT
19       STEIG D. OLSON

20  HAUSFELD LLP
         Attorneys for Plaintiffs Salix Capital
21  BY:  William Butterfield
         Reena A. Gambhir
22
    BERNSTEIN LIEBHARD
23       Attorneys for Plaintiffs Salix Capital
    BY:  STANLEY D. BERNSTEIN
24       RONALD J. ARANOFF

25

Case 2:11-cv-00562-JCC Document 204-20 Filed 03/13/24 Page 59 of 160
Case 1:13-md-02476-DLC Document 244 Filed 03/13/23 Page 59 of 160          3
DC5ECREC

```
 1                    A P P E A R A N C E S  (continued)

 2    SCOTT & SCOTT
              Attorneys for Plaintiff Sheet Metal Workers Local No. 33
 3            Cleveland District Pension Plan
      BY:  CHRISTOPHER BURKE
 4         MAX SCHWARTZ

 5    FREED KANNER LONDON & MILLEN
              Attorneys for Plaintiff Sheet Metal Workers Local No. 33
 6            Cleveland District Pension Plan
      BY:  MICHAEL J. FREED
 7
      ROBINS KAPLAN MILLER & CIERSI, LLP
 8            Attorneys for Plaintiff Sheet Metal Workers Local No. 33
              Cleveland District Pension Plan
 9    BY:  THOMAS J. UNDLIN

10    ROBBINS GELLER RUDMAN & DOWN, LLP
              Attorneys for Plaintiff Illinois SURS
11    BY:  PATRICK J. COUGHLIN
           DAVID W. MITCHELL
12
      KOREIN TILLERY LLC
13            Attorneys for Plaintiff Unipension
      BY:  GEORGE A. ZELCS
14
      COHEN MILSTEIN SELLERS & TOLL, PLLC
15            Attorneys for Plaintiff Unipension
      BY:  DAVID A. SMALL
16         DAVID A. YOUNG

17    BERGER & MONTAGUE, PC
              Attorneys for Plaintiff Unipension
18    BY:  RUTHANNE GORDON

19    FINE KAPLAN & BLACK, RPC
              Attorneys for Plaintiff Unipension
20    BY:  ROBERTA D. LIEBENBERG

21    ALLEN & OVERY, LLP
              Attorneys for Defendant BNP Paribas SA
22    BY:  DAVID ESSEKS
           BRIAN A. DE HAAN
23         M. ELAINE JOHNSTON

24    DAVIS POLK & WARDWELL LLP
              Attorneys for Defendant Unipension Bank of America
25    BY:  ROBERT F. WISE
           ARTHUR J. BURKE
```

DC5ECREC

1                    A P P E A R A N C E S (continued)

2    ALLEN & OVERY LLP
          Attorneys for Defendant Barclays Bank
3    BY:  MICHAEL S. FELDBERG
          TODD S. FISHMAN
4
     SIDLEY AUSTIN LLP
5         Attorneys for Defendant Citigroup
     BY:  BENJAMIN R. NAGIN
6         DAVID F. GRAHAM

7    HOGAN & LOVELLS LLP
          Attorneys for Defendant Credit Suisse Group AG
8    BY:  BENJAMIN F. HOLT
          JOHN R. ROBERTSON
9
     JONES DAY
10        Attorneys for Defendant Deutsche Bank AG
     BY:  PAULA W. RENDER
11
     WINSTON & STRAWN LLP
12        Attorneys for Defendant Goldman Sachs
     BY:  ROBERT Y. SPERLING
13        ELIZABETH P. PAPEZ

14   SULLIVAN & CROMWELL
          Attorneys for Defendant Goldman Sachs
15   BY:  RICHARD C. PEPPERMAN

16   MAYER BROWN, LLP
          Attorneys for Defendant HSBC
17   BY:  ANDREW S. MAROVITZ
          MICHAEL O. WARE
18
     SKADDEN ARPS SLATE MEAGHER & FLOM
19        Attorneys for Defendants JP Morgan Chase
     BY:  PETER E. GREENE
20        PATRICK J. FITZGERALD

21   PROSKAUER ROSE LLP
          Attorneys for Defendant Markit
22   BY:  COLIN R. KASS
          ALAN R. KUSINITZ
23

24

25

DC5ECREC

```
1                    A P P E A R A N C E S (continued)

2   CRAVATH SWAINE & MOORE, LLP
         Attorneys for Defendant Morgan Stanley
3   BY:  EVAN R. CHESLER
         DANIEL SLIFKIN
4        MICHAEL A. PASKIN
         VANESSA A. LAVELY
5
    SIMPSON THACHER & BARTLETT, LLP
6        Attorneys for Defendant The International Swaps &
         Derivatives Association
7   BY:  THOMAS C. RICE
         ANDREW CATTELL
8
    CADWALADER WICKERSHAM & TAFT, LLP
9         Attorneys for Defendant Royal Bank of Scotland PLC
    BY:  CHARLES F. RULE
10        JOSEPH J. BIAL

11  KATTEN MUCHIN ROSENMAN LLP
         Attorneys for Defendant UBS
12  BY:  DAVID C. BOHAN
         JAMES J. CALDER
13
    JOSEPH HAGE AARONSON LLC
14       Attorneys for Interested Party Quinn Emanuel Urquhart &
         Sullivan, LLP
15  BY:  GREGORY P. JOSEPH
         GREGORY O. TUTTLE
16

17

18

19

20

21

22

23

24

25
```

DC5ECREC

1              (In open court)

2              THE DEPUTY CLERK:  The matter of In Re: Credit Default

3      Swaps Antitrust Litigation.

4              I'm going to take appearances beginning for

5      appearances for the plaintiffs.  For movant CDS Institutional

6      Investor Group, please state your name for the record.

7              MR. ENTWISTLE:  Andrew Entwistle, your Honor.

8              MR. KAPLAN:  Robert Kaplan, Kaplan Fox & Kilsheimer?

9      Yes.

10             THE COURT:  Thank you.

11             MR. ENTWISTLE:  And also with us today we've got

12     Ariana Tadler and Peggy Wedgworth and Paul Novak from the

13     Milberg firm, and Jason Zweig from Hagens Berman.  And from my

14     firm, Arthur Nealon and Robert Cappucci, and representatives

15     from two of our clients, the Delta Group and the Value Recovery

16     Fund.

17             THE COURT:  Thank you.

18             MR. ENTWISTLE:  Thank you, your Honor.

19             THE COURT:  For Essex Regional?

20             MR. ASCIOLLA:  Greg Asciolla, Labaton Sucharow, your

21     Honor.

22             THE COURT:  Thank you.

23             For Landesbank Baden-Wurttemberg?

24             MR. BUCHMAN:  Michael Buchman for Motley Rice, your

25     Honor.

DC5ECREC

| | |
|---|---|
| 1 | THE COURT:  For Los Angeles County Retirement |
| 2 | Association? |
| 3 | MR. SIMON:  Bruce Simon, your Honor, Pearson, Simon & |
| 4 | Warshaw.  And I have with me George Trevor from my office; |
| 5 | Wayne Lamprey, my cocounsel; Jeff Lawrence, my cocounsel; and |
| 6 | Mike Herrera, who's senior staff counsel for the retirement |
| 7 | fund. |
| 8 | THE COURT:  Excuse me one second.  I don't think he's |
| 9 | on this list.  H-E-R-R? |
| 10 | MR. SIMON:  E-R-A. |
| 11 | THE COURT:  Thank you. |
| 12 | For MF Global. |
| 13 | MR. ZELCS:  George Zelcs from Korein Tillery firm. |
| 14 | THE COURT:  For Salix? |
| 15 | MR. BROCKETT:  Dan Brockett and Steve Olson of Quinn |
| 16 | Emanuel. |
| 17 | MR. BERNSTEIN:  Stanley Bernstein and Robert Aranoff |
| 18 | for Bernstein Liebhard. |
| 19 | MR. BUTTERFIELD:  William Butterfield, Reena Gambhir |
| 20 | from Hausfeld. |
| 21 | THE COURT:  Thank you. |
| 22 | For Sheet Metal Workers? |
| 23 | MR. BURKE:  Good afternoon, your Honor.  Chris Burke |
| 24 | from Scott & Scott.  With me is my associate, Max Schwartz, as |
| 25 | well Tom Undlin from Robins Kaplan, and Mike Freed from Freed |

DC5ECREC

1    Kanner.

2            THE COURT:  Thank you.

3            For State University Retirement System of Illinois?

4            MR. COUGHLIN:  Patrick Coughlin, Robbins Geller, for

5    David Mitchell, my partner in the courtroom, for Illinois SURS.

6            THE COURT:  For Unipension?

7            MR. ZELCS:  George Zelcs from Korein Tillery, your

8    Honor.

9            MR. SMALL:  And Daniel Small from Cohen Milstein.  And

10   with me is David Young from my firm.

11           THE COURT:  Anyone else for this client?  I have on

12   the list Roberta Liebenberg?

13           MS. LIEBENBERG:  Yes, your Honor, Roberta Liebenberg,

14   Fine, Kaplan & Black, Philadelphia.

15           THE COURT:  Also for this client?

16           MS. GORDON:  Ruthanne Gordon for Berger & Weinstein.

17           THE COURT:  Any other appearances by plaintiffs'

18   counsel?

19           Let's go to defense counsel.

20           MR. STOLL:  Ian Stoll, Lovell Stewart Halebian

21   Jacobson for Landesbank Asset Management.

22           THE COURT:  So that's on page two, for anyone who's

23   following.

24           Any other appearance by plaintiffs' counsel?

25           For BNP Paribas S.A, Brian Esseks and Brian de Haan

DC5ECREC

 1    from Allen & Overy.

 2              THE COURT:  For Bank of America?

 3              MR. WISE:  Yes, your Honor.  Robert Wise with Davis

 4    Polk.  And I have with me Arthur Burke and Jeremy Adler.

 5              THE COURT:  For Barclays?

 6              MR. FELDBERG:  Your Honor, Michael Feldberg from

 7    Allen & Overy.  Todd Fishman and Elaine Johnston are with me.

 8              THE COURT:  From Credit Suisse?

 9              MR. HOLT:  Benjamin Holt from Hogan & Lovells, and

10    Robert Robertson from Hogan & Lovells.

11              THE COURT:  For Deutsche Bank?

12              MS. RENDER:  Paula Render from Jones Day.

13              MR. STEPHENS:  Eric Stephens, also from Jones Day.

14              THE COURT:  For Goldman Sachs?

15              MR. SPERLING:  Robert Sperling, Winston & Strawn, your

16    Honor.  With me are Elizabeth Papez and Richard Pepperman and

17    Bradley Smith from Sullivan & Cromwell.

18              THE COURT:  Thank you.

19              For HSBC?

20              MR. MAROVITZ:  Andy Marovitz and Mike Ware from Mayer

21    Brown.

22              THE COURT:  For Chase?

23              MR. FITZGERALD:  Pat Fitzgerald from Skadden Arps,

24    with my partner Peter Greene.

25              THE COURT:  For Markit?

Case 2:21-cv-00563-JCC Document 204-80 Filed 02/13/24 Page 66 of 160
Case 1:11-md-02476-DLC Document 244 Filed 12/12/13 Page 10 of 57    10
DC5ECREC

1          MR. KASS:  Colin Kass, Alan Kusinitz for Proskauer

2     Rose.

3          THE COURT:  For Morgan Stanley?

4          MR. CHESLER:  Good afternoon, your Honor.  Evan

5     Chesler from Cravath, Swaine & Moore.  I have Daniel Slifkin,

6     Michael Paskin and Vanessa Lavely.

7          THE COURT:  For ISDA?

8          MR. RICE:  Good afternoon, your Honor.  Tom Rice,

9     Simpson, Thacher & Bartlett.  And I have my partner, Andrew

10    Cattell, from my firm.

11         THE COURT:  For Royal Bank of Scotland?

12         MR. RULE:  Good afternoon, your Honor.  Charles F.

13    Rule, Joseph Bial, Cadwalader, Wickersham & Taft.

14         THE COURT:  For UBS.

15         MR. BOHAN:  Good afternoon, your Honor.  David Bohan

16    and Jim Calder from the Katten Muchin firm.

17         THE COURT:  Okay.  I have an appearance by Mr. Joseph

18    and Mr. Tuttle for Quinn Emanuel.  Am I reading that right on

19    the appearance sheet?

20         MR. JOSEPH:  Yes, your Honor.  That's simply on the

21    disqualification motion that's been filed by us.

22         THE COURT:  Thank you.  By ISDA, I-S-D-A.

23         Anyone else to list their appearance?

24         MR. GRAHAM:  Yes, your Honor.  David Graham and

25    Benjamin Nagin of Sidley Austin on behalf of Citi.  I think we

Case 2:21-cv-00563-JCC   Document 204-80   Filed 02/13/24   Page 67 of 160
Case 1:13-md-02476-DLC   Document 244   Filed 12/12/13   Page 17 of 57      11
DC5ECREC

 1    got skipped in the course of the list.

 2              THE COURT:  I am so sorry.

 3              MR. GRAHAM:  I thought it was good news and we were

 4    out of the case.

 5              THE COURT:  Just a trifle premature, but hope rests

 6    eternal.

 7              Did I miss anyone else?  Anyone else who wishes to be

 8    place an appearance on the record?

 9              Thank you all for being here.  I know, Mr. Rice, that

10    you're here as a courtesy to the court and your colleagues, and

11    I think this may be true for some others, too, who missed plane

12    connections and are standing in for others.  And I thank you

13    very much.

14              And this is our initial conference in these cases, and

15    let me tell you what I hope to achieve today.  I want to, if

16    possible, choose lead plaintiff and their counsel; set a

17    schedule for the initial phase of the case; and describe the

18    procedures that will govern at least some of the litigation

19    before me.  Some of these are more complex tasks than others.

20    And I think we really need to make some progress in the lead

21    counsel issue before we can accomplish much in the way of the

22    other two agenda issues.  And, of course, counsel, you may have

23    other things that you would like to accomplish today, and if

24    you do, I'll certainly give you an opportunity to be heard and,

25    if possible, to accommodate your requests.

Case 2:21-cv-005637-JCS Document 204-80 Filed 02/13/24 Page 68 of 160 12
Case 1:13-md-02476-DLC Document 244 Filed 12/13/24 Page 12 of 57
DC5ECREC

1         Quinn Emanuel seems to have the great privilege of

2    being the plaintiffs who are most under attack with a variety

3    of motions and oppositions filed.  And as I think through these

4    issues, one of the things that would be helpful for me to know

5    right out of the box is whether or not there is any other

6    plaintiff's law firm that would not want to serve as cocounsel

7    for Quinn, if I choose Quinn as counsel for the class but

8    decide that more than one law firm should be representing the

9    class.  Is there any plaintiff's law firm that would like to

10   withdraw from consideration in that circumstance?

11        Not hearing any, that is helpful as guidance as we

12   move through this process.

13        One of the great responsibilities of a court in

14   managing a class action litigation or putative class action

15   litigation is the selection of the lead plaintiff or plaintiffs

16   and lead counsel or multiple lead counsel, cocounsel.  And I

17   feel this responsibility in a way to be the voice of the absent

18   class members.  There are lots of class members here who have

19   counsel speaking on their behalf today, and I feel the Court's

20   role in -- to some significant degree is to think about the

21   absent class members and who will best represent their

22   interests in this litigation.

23        I want to choose counsel that is supremely qualified

24   and capable of giving the best representation to the entire

25   class.  In making that decision, I'll be thinking about a

Case 2:21-cv-00563-JCS Document 204-80 Filed 02/13/24 Page 69 of 160    13
Case 1:13-md-02476-DLC Document 244 Filed 12/12/13 Page 19 of 57
DC5ECREC

1    firm's reputation and experience in connection with the matters

2    at issue in this litigation.  I'll be thinking about its

3    staffing and resources, its ability to conduct litigation of

4    this scale, with these kinds of deep pocketed defendants, and

5    making a judgment about which law firm can prosecute the action

6    with the greatest energy.

7             I also need to be thinking about who has the

8    sophistication and the legal analysis, who's able to manage

9    discovery efficiently, who would be a potent and yet wise

10   member of a settlement conference or negotiation and, if

11   necessary, if trials are in our future together, one or more,

12   able to try the case effectively and defend any result on

13   appeal or argue for its reversal, if they've lost.

14            In making these judgments, I must say, who was the

15   first to file a litigation doesn't have particular sway, I

16   think.  As the Third Circuit observed in something you folks

17   have submitted to me, speed is a poor surrogate for determining

18   the best counsel.

19            As we all know, the pleadings that we have before us

20   will be superseded by an amended consolidated complaint.  And

21   indeed, part of the task this afternoon will be to set a

22   schedule for amendment of pleadings and for any motion practice

23   that may attack that complaint.  So certainly who was first to

24   the ballgame is an interesting factor to consider but not

25   determinative.

DC5ECREC

1          There are three attacks made on Quinn being the

2     representative of the class here.  And, of course, as I sort

3     through these attacks, I have to be making a judgment as well

4     about whether any of these attacks are principally made for

5     tactical reasons as opposed to because they have genuine merit.

6     So I'm going to take these three attacks, and let me just list

7     them, and then we'll take them separately one at a time.

8          One attack has to do with Salix Capital and whether

9     the assignment of a cause of action is effective.  Another one

10    has to do with Quinn's concurrent representation of Morgan

11    Stanley in other litigation.  And another one has to do with

12    its -- or a member of the firm's, Mr. Cunningham's, prior

13    representation of ISDA or ISDA.

14         So I'm going to give anybody a chance who wants to

15    speak on each of these topics.  I don't need to hear from

16    anyone.  I've read the papers.  I've thought about it.  I've

17    looked I think at the standard of law that applies, but I want

18    to give everyone an opportunity to be heard so I can make the

19    best informed decision possible.

20         So we're going to start with the issue of the

21    effectiveness of the assignment, which has to do with the

22    ability of Salix Capital to be a lead plaintiff.  Salix, as I

23    understand it, owns claims that were assigned by FrontPoint,

24    and FrontPoint was previously owned by defendant Morgan

25    Stanley.

Case 2:21-cv-00567-CCL Document 204-80 Filed 02/12/24 Page 71 of 160    15
Case 1:13-md-02476-DLC Document 244 Filed 12/12/13 Page 15 of 37
DC5ECREC

1          Scott & Scott has offered a declaration by Craig

2    Wolson on this.  I have a declaration from Stephen Green --

3    that's P-H-E-N -- submitted on behalf of Quinn in this

4    connection.

5          Does anyone wish to be heard orally with respect to

6    this issue?

7          MR. COUGHLIN:  Your Honor, Patrick Coughlin on behalf

8    of Robbins Geller.  I'm with the Scott & Scott group.

9          Just to put it into context, we had reached out to

10   Quinn Emanuel earlier, and this issue we were aware of but we

11   felt if we joined with them, that we would take care of the

12   first two issues.  And when I say "the first two issues," the

13   Salix issue of the assignment, because we had other plaintiffs,

14   Illinois SURS, as a plaintiff.  Doesn't have an assignment

15   issue.  They've bought their own CDSs.

16         The second issue with Morgan Stanley, we again thought

17   if there were other law firms involved, and it wasn't just them

18   alone, that we could take care of that issue.  That's really

19   the way we thought about it then, and that's why we reached out

20   to them.

21         Then the third issue that came up is the ISDA issue.

22   And that concerned us because we don't know where that goes

23   down the road.  If your Honor, though, however, felt that that

24   was not a disqualifying issue -- that's why we sat silent and

25   we would work with Quinn Emanuel, if your Honor thought that

Case 2:21-cv-005637-JCS Document 204-80 Filed 02/13/24 Page 72 of 160    16
Case 1:13-md-02476-DLC Document 244 Filed 12/13/24 Page 16 of 57
DC5ECREC

1    was not a debilitating conflict with Cunningham.  So that's

2    really the way we thought about it and are thinking about it,

3    and that's why we're silent on these issues right now.

4              THE COURT:  Good.  Thank you.  And I agree, as a

5    practical matter, whoever is lead counsel may desire to have

6    more than one lead plaintiff.  So...

7              MR. COUGHLIN:  That's correct, your Honor.

8              THE COURT:  You know, as counsel points out, and as

9    I'm sure many in this room have already considered, that's not

10   a novel thought.

11             So does anyone else wish to be heard on that first

12   issue; that is, the ability of Salix to take an assigned claim

13   and assert that it is properly a member of this class?

14             MR. BROCKETT:  Dan Brockett, your Honor, from Quinn

15   Emanuel.  The issue of the assignment has to do with whether

16   the ISDA master agreement that governs these derivative

17   transactions, whether the assignment can be made.  There's a

18   provision that requires the permission of the counterparty --

19             THE COURT:  Section 7.

20             MR. BROCKETT:  Section 7, exactly.  The argument is

21   being made that that section prohibits not only the assignment

22   of the rights and duties under the contract, but also causes of

23   action like antitrust causes of action.  We obviously think it

24   doesn't.  We have submitted the declaration of someone who is

25   part of the drafting of the ISDA master agreement who says

Case 2:21-cv-00563-JCC Document 204-80 Filed 02/13/24 Page 73 of 160    17
Case 1:13-md-02476-DLC Document 244 Filed 12/12/13 Page 17 of 37
DC5ECREC

1    absolutely not antitrust claims.  Causes of action of this kind

2    are freely assignable.  The declaration that has been put in by

3    the other plaintiff's firm is from the gentleman who is not

4    part of the ISDA process and is just giving his own legal

5    interpretation.

6            Now, as to the second point that Mr. Coughlin raises,

7    I just want to say there was an agreement in this case until

8    the night before lead counsel applications had to be filed.

9    And it was Mr. Coughlin's firm and my firm, and we were going

10   to add Mr. Scott's firm or Mr. Zelcs's firm, subject to further

11   discussion, but there was an agreement that Quinn Emanuel and

12   Robbins Geller would handle this.  Then Simpson Thacher sent a

13   letter at 5:00 on the evening before lead counsel applications

14   were due and sent it to all counsel.  Didn't contact us or

15   discuss the issue with us first, just sent it to all counsel.

16   That caused a reshifting of the alliances that had up to that

17   point been agreed upon.

18           So I just want the Court to know that background.  So

19   with respect to the assignment issue, that's all I have to say.

20           MR. BURKE:  If I could just speak to the background

21   for just a second, your Honor, Chris Burke of Scott & Scott.  I

22   mean, if we're going to go back to Quinn Emanuel reaching out

23   to Scott & Scott and Mr. Coughlin at Robbins Geller, Quinn

24   Emanuel reached out to us prior to their filing of the

25   complaint.

DC5ECREC

```
 1            THE COURT:  You know what, I want everybody to put
 2    anything they want on the record, but let me just give you an
 3    overview of the procedure we're going to follow, because what
 4    I'm going to do is work through these conflict issues, make a
 5    choice about lead plaintiff and then take a break.  And
 6    depending on the choices I've made and the decisions I've made
 7    at that point, everybody is going to have a chance to be heard
 8    again, okay?  So feel free to speak now, but this is not your
 9    last chance to be heard.
10            MR. BURKE:  And it was at that point in time that we
11    actually raised the issue concerning Salix and Morgan Stanley,
12    so we raised that very early.  They knew we were concerned.
13    Mr. Coughlin is right, we thought we could work through it.  It
14    was the ISDA issue that became the tipping point for us.
15            So that's all I wanted to say, your Honor.
16            THE COURT:  Thank you so much.
17            Anyone else wish to be heard on this very first issue,
18    the effectiveness of an assignment?
19            MR. ENTWISTLE:  Your Honor, Andrew Entwistle for the
20    CDS Institutional Investor Group.
21            On the assignment issue specifically, we just wanted
22    to make one or two quick observations.  We've got two of our
23    three clients did take assignments here.  One as a successor in
24    interest, the Value Recovery Fund, and one through acquisition.
25            But in this circumstance here, what's clear is that
```

DC5ECREC

1    they've conflated the assignability of the underlying

2    obligations in the agreements and the assignability of claims

3    that arise at law or otherwise independent of the underlying

4    agreement such as the antitrust claims here.  And I think in

5    the first instance --

6              THE COURT:  I'm sorry.  Who's done that and how?

7              MR. ENTWISTLE:  The motion, if you will, that was made

8    by the Chicago group, the Scott & Scott group, and the

9    affidavit by Mr. Wolson has really sort of conflated those two

10   issues, and as a fundamental matter.  I think that

11   Mr. Brockett's point is correct.  It's well settled in this

12   circuit under the *Cordis* case and others that antitrust claims

13   are freely assignable; they're assigned in almost every case

14   and at one level or another.  This case should be no different.

15   And the fact that ISDA agreements are present don't speak to

16   that issue in any rational way.

17              I'd also note that this circuit has dealt with

18   language that's very similar to the language in the ISDA

19   agreement in the context of arbitration type agreements, which

20   obviously are given very broad construction.  But even in those

21   cases the courts have said this arising out of type of language

22   will only relate to the performance of the underlying agreement

23   and not to claims that may arise out of but are not directly

24   related to the underlying performance.  And if your Honor needs

25   cites, I can give you cites for that.  But I think it's

Case 2:21-cv-00562-JCS Document 204-80 Filed 02/13/24 Page 76 of 160
Case 1:13-md-02476-DLC Document 244 Filed 12/13/13 Page 20 of 57    20

DC5ECREC

1    important to note that they're just wrong on the law on this

2    issue.  I also think --

3              THE COURT:  That Scott & Scott is?

4              MR. ENTWISTLE:  Yes.  And I think it's an attack that

5    is both premature and one that is -- one questions in the

6    context of these applications when it could have very broad

7    bearing on the class at large and not just to a potential

8    applicant here.

9              But, again, I think the law in the Second Circuit is

10   so clear that we don't need to even ever get into issues of

11   intent of what the drafters of the ISDA agreements may have

12   intended at the time.

13             So other than that, I've got nothing on the

14   assignability issue.  Thank you.

15             MR. SIMON:  Your Honor, LACERA, Bruce Simon

16   representing them.

17             We have not chosen to get involved in these

18   discussions and arguments about these issues.  We've chosen to

19   try to do this on the merits, and we've spoken with each of the

20   counsel and their clients about LACERA, the fact that they are

21   the largest public pension plan and how they would join with

22   each of them potentially to help run this case, and we still

23   stand ready to do that.

24             THE COURT:  Thank you so much.  Okay.

25             MR. CHESLER:  Your Honor, I'm sorry.  Evan Chesler for

Case 2:21-cv-00563-JCC   Document 204-80   Filed 02/13/24   Page 77 of 160
Case 1:13-md-02476-DLC   Document 244   Filed 12/12/13   Page 21 of 37        21
DC5ECREC

1    Morgan Stanley.  I apologize for my voice, your Honor.  THE

2    lesson I learned is not to kiss your grandson when he's

3    sneezing, but I'll try to be heard.

4            Your Honor, I should just say that there is a

5    potential underlying issue, and that is whether or not

6    FrontPoint, which was once owned by my client, can, in fact,

7    bring whatever claims ultimately appear in the amended

8    consolidated complaint.  That is apparently quite a complicated

9    question of parsing through various corporate agreements that

10   related to that disposition.

11           So I don't have a position today since the claims have

12   not yet been pled in a controlling pleading, nor have we had

13   the opportunity to do that analysis.  But I don't want there

14   later to be a suggestion that we waived anything by not

15   pointing out that that's an underlying issue that doesn't go to

16   the ISDA questions that counsel have been talking about.  It

17   goes to the underlying corporate question, which we haven't yet

18   had the opportunity to parse our way through.

19           THE COURT:  Thank you.

20           MR. ENTWISTLE:  Your Honor, if I may, just one

21   observation.  The issue that Mr. Chesler just raised would, of

22   course, if it relates at all, only relate to FrontPoint,

23   that -- an assignment by FrontPoint.  It wouldn't go to the

24   larger issue of the assignability of antitrust claims generally

25   for other members of the class, including value recovery and

DC5ECREC

 1     fund distribution only.

 2              MR. CHESLER:  Your Honor, I agree.  We agree with

 3     that.

 4              THE COURT:  Thank you.

 5              So just circling back to a comment at the beginning of

 6     this portion of our discussion, I really don't think that this

 7     is a controlling issue about who should be lead counsel because

 8     there can be more than one lead plaintiff.  I'm not sure that I

 9     know at this point who lead plaintiff is going to be.  And

10     there may be a lot of good reasons to have more than one lead

11     plaintiff.

12              But in any event, addressing based solely on the

13     record that's before me and not knowing anything about the

14     issues Mr. Chesler raises, but addressing solely the argument

15     made about Section 7 of ISDA, I find Mr. Wolson's analysis not

16     careful or illuminating.  I found it an odd argument for

17     plaintiff's counsel to make on behalf of a potential class

18     member.  And I found that the analysis presented by Mr. Green

19     on this issue to be persuasive.

20              Essentially a straightforward reading of Section 7

21     just doesn't touch upon this issue.  The effectiveness of an

22     assignment of a cause of action after the underlying

23     transaction has closed is a separate issue from the matters

24     discussed in Section 7.  Section 7 addresses the transferring

25     or assigning of an interest in or obligation under any

DC5ECREC

 1    outstanding transaction or the ISDA agreement itself.  So I

 2    don't find this a disqualifying issue in considering Quinn's

 3    application.

 4            Let's turn to the concurrent representation issue;

 5    that is, Quinn currently represents Morgan Stanley in other

 6    litigation and, if chosen as class counsel here, it would, I

 7    assume, continue to see Morgan Stanley as a defendant in these

 8    actions in any amended pleadings.  And, again, this is an issue

 9    which is perhaps not terribly helpful, because this can be

10    cured, I think, essentially by having cocounsel for the class,

11    to the extent that there is any issue.  But nonetheless, it's

12    been raised, again by Scott & Scott, and I want to make sure

13    that we address it at this preliminary point.

14            So does anyone wish to be heard on this issue?

15            MR. BURKE:  Your Honor, Chris Burke from Scott &

16    Scott.  We would stand on our papers, your Honor.

17            THE COURT:  Thank you very much.

18            So I've tried to think about this issue in a practical

19    sense.  I mean, we have waivers here.  Everyone realizes that.

20    So the argument is a more subtle one, and the submissions by

21    Professor Steven -- this time it's a V -- Lubet?

22            MR. BURKE:  Lubet.

23            THE COURT:  L-U-B-E-T, are addressed to whether or not

24    Quinn may sort of unconsciously bend over one way or the other

25    to act favorably or unfavorably towards Morgan Stanley,

DC5ECREC

1    particularly in settlement discussions; and essentially, that

2    this Court in the review of any settlement agreement at a

3    fairness hearing would be unable to detect or discern that

4    there had been this bias that inured to the detriment of the

5    class.

6           And I tried to think about it in terms of the various

7    stages of the litigation.  I don't think there's much of a risk

8    here in discovery.  There are multiple banks being sued here on

9    essentially the same theory, multiple defendants.  I can't

10   imagine that the demands made at Morgan Stanley in the

11   discovery process are going to be materially different than the

12   demands made by the other defendants.  I've thought about it in

13   terms of the motion practice, the motion to dismiss or summary

14   judgment motion.  Again, I think the arguments on behalf of

15   defendants frequently in these cases are overlapping.  And if

16   they're strong and meritorious, they're made by more than one

17   defendant.  And so I don't think any inherent or implicit bias

18   is going to affect motion practice much.

19          Settlement discussions, I don't even think there's a

20   great risk in settlement discussions.  Often the settlement

21   discussions, when there are multiple defendants, I think take

22   place in the context of the settlement with the range of

23   defendants.  And they differ either by who's first in the door

24   or last in the door or who has the most powerful evidence

25   against them or the weakest evidence.  And, again, there is the

DC5ECREC

1    fairness hearing process, where I get to ask if anybody seems

2    to be taking it easy on Morgan Stanley, why that isn't so.

3           So that leaves us examinations during a deposition,

4    when cocounsel for the defendants would probably be as

5    observing and able to make a judgment about whether somebody is

6    taking it easy on Morgan Stanley or at trial, when there's a

7    Morgan Stanley witness on the stand and, you know, I don't

8    think this is a significant risk is my judgment as I play it

9    out.  But, again, at the end of the day it's one that's cured

10   by having cocounsel for the class.  And that cocounsel can make

11   sure that part of their agenda is to look at the issues of

12   Morgan Stanley with particular care and focus.

13          So that takes us to the objection made by ISDA through

14   its November 15th motion to disqualify Quinn from serving as

15   counsel to Salix, or really to the class generally in an action

16   which is doubling to be a defendant because there is a partner

17   at Quinn, Mr. Cunningham, who was once corporate counsel for

18   ISDA some years ago but nonetheless a very intimate, important

19   working relationship in which I have to presume there was a

20   substantial exchange of confidential information and advice

21   given by Mr. Cunningham of importance to his client, and that

22   he continues to this day to have privileged information of

23   importance to ISDA.

24          And so I have an expert declaration of November 22nd

25   from Roy Simon that was submitted by Robbins Geller.  I have an

DC5ECREC

 1    expert declaration of November 25th from Bruce Green, a Fordham

 2    law school professor, and a declaration of November 25th from

 3    Mr. Cunningham.  And of course I have papers from the parties

 4    generally addressed to this.

 5         I see some friends and colleagues, or former

 6    colleagues, and still friends, in the courtroom.  And I should

 7    say that Mr. Green was a colleague of mine at the US Attorney's

 8    Office.  And indeed, I cotaught with him a professional

 9    responsibility course at Columbia Law School for a couple of

10    years, long time ago.  And I see him still occasionally at

11    professional events.  So he's someone I know personally.

12         So does anyone wish to be heard with respect to this

13    third issue?

14         MR. RICE:  Your Honor, Tom Rice.  I won't get into the

15    merits of the motion.  Your Honor knows better than I do I

16    think at this stage, but I did want to address the question of

17    tactics, because it is something that is relevant to a

18    disqualification motion, as well as to these objections to lead

19    counsel.

20         And here, your Honor, as I understand it -- and,

21    again, I have not personally been involved -- what we attempted

22    to do on behalf of our client was make our objection as soon as

23    we could, frankly, to avoid being accused of tactics; to wait,

24    for example, by waiting until after motions for lead plaintiffs

25    and lead counsels or coalitions were filed.  And we did just

DC5ECREC

1    that.  Ideally we would have done it sooner than 5:00 p.m. the

2    day before, but that's the earliest that we were ready to do

3    it.

4             This is not a tactical motion.  As your Honor knows

5    from your own experience, my firm is regularly adverse to Quinn

6    Emanuel.  We're happy to meet them in the field of litigation,

7    and we do that on a regular basis.  And our client as well, you

8    know, would in ordinary circumstances have been happy to.  But

9    it was because of Mr. Cunningham's close and long relationship

10   and representation of his that they felt compelled, and still

11   compelled, to make this motion.

12            THE COURT:  Good.  Thank you.

13            Anyone else wish to be heard?

14            MR. JOSEPH:  Your Honor, Gregory Joseph for Quinn

15   Emanuel.  There's a sentence in the reply brief of ISDA that I

16   think merits particular attention.  It's at the top of page

17   three.  It's document 196.  It says ISDA --

18            THE COURT:  Excuse me one second.

19            MR. JOSEPH:  Sure, your Honor.

20            THE COURT:  Which page?

21            MR. JOSEPH:  Page three at the top, document 196, the

22   reply.  It's the first full sentence beginning at the end of

23   the first line.  It says ISDA reiterates that it does not doubt

24   the intentions or veracity of Mr. Cunningham or Quinn Emanuel.

25   That has particular salience here because we've submitted

DC5ECREC

1    declarations for more than 20 Quinn Emanuel lawyers, everybody

2    who's recorded time on the case, demonstrating that

3    Mr. Cunningham never shared any information of ISDA, that no

4    one at Quinn Emanuel ever sought any information, confidential

5    information of ISDA; that Mr. Cunningham's entire role on the

6    case was something less than five hours of general discussions

7    on the complexity of the CDS market and public sources of

8    information; and that from the beginning the firm was focused

9    on the fact that he could have nothing to do with anything

10   adverse to ISDA.  So he had nothing to do with any allegations

11   relating to ISDA.

12        So we've submitted to your Honor as Exhibit 1 to the

13   Tuttle declaration a chart showing that every single allegation

14   relating to ISDA is derived from public sources.  We have

15   submitted an electronic audit of every Quinn Emanuel document

16   showing he never accessed, much less drafted or commented on

17   it.  So he has been isolated from ISDA throughout this process.

18   He's been completely disengaged from the case since it went

19   into suit.

20        And it's true, he was their go-to outside counsel for

21   a substantial period of time.  It's also true that nothing he

22   did has been shown to have any common factual elements; the

23   same or identical, or nearly identical, according to the

24   *Government of India* case.  They've identified only three

25   things.  Antitrust, he is not an antitrust lawyer.  He passed

Case 2:21-cv-00563-JCC Document 204-80 Filed 02/13/24 Page 85 of 160
Case 1:13-md-02476-DLC Document 244 Filed 12/12/13 Page 25 of 57    29
DC5ECREC

1    on memos from Cravath partners.

2         On licensing, they say he was involved in licensing

3    the pricing of ISDA pricing information, but there's no

4    allegation in any complaint about the licensing of ISDA pricing

5    information.  And they say he drafted the master agreement, but

6    I dare say there's not a lawyer in this room that hasn't

7    litigated the master agreement.  And there are scores of

8    derivatives lawyers that could have given the same advice he

9    did.  And if there's no substantial relationship, which there

10   is not under the *Evans* test and the *Government of India* test,

11   there's no imputation.

12        But even if there were, it's a rebuttable presumption

13   under *Hempstead*, and it's been rebutted.  They don't doubt the

14   veracity of the declaration.

15        So, your Honor, I won't go any further.  I get carried

16   a way a little bit about this, but the firm is not fairly under

17   attack in this particular case.  He was a corporate lawyer, not

18   even a litigator, when he represented them.  There's no

19   playbook he could possibly have learned.  There wasn't even

20   litigation against the firm.

21        Thank you, your Honor.

22        MR. RICE:  Your Honor, just briefly in response.

23        Obviously the sentence that Mr. Joseph read to you is

24   one we made advertently and stand by in terms of the no

25   doubting the veracity of the individuals or of the firm.  The

DC5ECREC

1    problem, it's clear in our -- that we've tried to lay out in

2    our paper is that this is a lawyer who has intimate knowledge

3    of the client that we think is substantially related.  He works

4    side by side, we've shown, day in and day out with the lawyers

5    who are handling this case.  And despite the best of

6    intentions, we think there can be and there has been no

7    assurance that privileged information inadvertently wouldn't be

8    used in this case.  And that is the principal basis for our

9    motion.

10            MR. COUGHLIN:  Your Honor, Patrick Coughlin from

11   Robbins Geller.

12            We filed the Roy Simon declaration.  We want to be

13   clear, when we filed that, we didn't join in the

14   disqualification motion.  We were not seeking to disqualify

15   him.  These issues were raised, as Mr. Brockett says, literally

16   at the last minute, when we had agreed to work together and you

17   had already addressed the first two issues.  ISDA made the

18   claim that this raised issues that were directly at issue in

19   the litigation, and we didn't really have time to examine that,

20   answer that, because of the timing of how it happened.  And I

21   talked to Mr. Brockett, and we were sorry that we -- I had to

22   go to my client and talk to him that night.  And it was late.

23   I did get it at 2:00, because I was on the West Coast when I

24   got it.

25            And we talked about it, and we didn't feel we could go

Case 2:21-cv-00563-JCC Document 204-80 Filed 03/12/24 Page 87 of 160
Case 1:13-md-02476-DLC Document 244 Filed 12/12/13 Page 31 of 57   31
DC5ECREC

```
 1    forward without more knowledge.  And the reason that we didn't
 2    feel we could go forward is we thought in these other things,
 3    you can air it with other counsel and you may well -- first of
 4    all, you may find it's not a problem here, that Mr. Cunningham,
 5    does not affect him.  And that would be great to start the
 6    litigation and to have a finding like that.
 7            When we said we couldn't do the deal, it's because
 8    what we didn't want to happen is what has happened in a number
 9    of these cases, is that everybody that is leading the team on
10    the litigation is disqualified; not only the firm has that, and
11    that I couldn't take the chance with Illinois SURS as my
12    client.  In other words, this has to be cleared up first.  And
13    as your Honor asked, you asked all three questions, if they're
14    all three cleared up, no, we have no problem working with Quinn
15    Emanuel.
16            THE COURT:  Well, this is an interesting issue that
17    probably affects every lawyer in this courtroom.
18            You've all had clients, important clients, that you've
19    done a lot of intense work with.  And some of you have gone to
20    different law firms, the clients haven't gone with you.  And
21    what are the rules of the road here?  What are your ethical
22    obligations?
23            I did a Curcio hearing this morning, lasted about an
24    hour and a half, in a criminal case with a successive
25    representation issue.  Criminal defense lawyer who had
```

DC5ECREC

1    represented a cooperating client, pled guilty and cooperated

2    some years ago.  No names are being used so I can just talk

3    about it in the most theoretical way.

4           Passage of time, has a new client, and may have some

5    very adverse information about the first client.  Is that a

6    conflict that will bar that lawyer from having the second

7    client?  It's a very important issue, not just in civil

8    litigation.  And thankfully, we have some guidance.

9    Thankfully, we don't have to just make an off-the-cuff judgment

10   about these things on the fly.

11          We're very fortunate here that the Second Circuit has

12   spoken at length in two decisions that have already been

13   referred to, *Hempstead Video* and *Government of India*.

14          So ISDA did not submit an expert report.  I'm not

15   saying they needed to.  I don't want to suggest that at all.

16   But Robbins Geller did from a Mr. Simon, Roy Simon.

17          I felt the analysis was extraordinarily weak.  There

18   was no real analysis of the substantial relationship test when

19   applied to the CDS litigation and Mr. Cunningham's prior

20   representation of ISDA.  The focus was on the Salix LIBOR

21   litigation and whether a substantial relationship exists there.

22   But that litigation is not before me, and there's no motion to

23   disqualify in that, that I'm aware of.

24          And then part of the analysis was counting the

25   mentions in a complaint of the standard industry agreement.  I

Case 2:21-cv-00563-JCC Document 204-80 Filed 02/13/24 Page 89 of 160
Case 1:13-md-02476-DLC Document 244 Filed 12/12/13 Page 39 of 57    33
DC5ECREC

1    mean, I don't think that sheds much light either on the

2    substantial relationship between the issues in these

3    litigations or the issues between the prior representation and

4    this litigation.

5         Mr. Simon does endorse, as a general matter, the use

6    of ethical screens, but he finds it insufficient here because

7    Mr. Cunningham works in the same office as the attorneys in the

8    CDS litigation; that he works in the same department as those

9    lawyers; and indeed, they share responsibility for another

10   piece of litigation, the LIBOR litigation and, therefore, can

11   be expected to work day in and day out with each other on that

12   litigation.  So that was Mr. Simon's analysis.

13        Then I had a submission from Professor Green.  In

14   contrast, it was careful and analytical, thorough, and I found

15   persuasive.  So let me give you my analysis.

16        The first issue when we're addressing a case of

17   successive representation is whether Mr. Cunningham personally

18   must be disqualified from representing the class in order to

19   protect ISDA's confidential information.  That's our starting

20   point.

21        Now, it's undisputed that ISDA is a former client of

22   Mr. Cunningham's, and that he has privileged information from

23   them or from it because of that prior representation.  I'm

24   going to assume for purposes of this analysis that he has

25   relevant privileged information.  There's been no showing about

DC5ECREC

1    that, but I'm just going to assume it.

2              There's still another element before Mr. Cunningham

3    would be disqualified from personally representing the class in

4    this case, and that would be a requirement of a showing of a

5    substantial relationship between the matters on which he

6    represented ISDA and the issues in this litigation in which

7    Quinn is seeking to represent the class.

8              The only careful analysis of that prong of the test

9    was done by Quinn and its expert.  And there was no showing of

10   a substantial relationship in that analysis.  And I've read the

11   parties' submissions on this, and no effective rebuttal of that

12   analysis, nothing that gives me pause.  Neither ISDA nor

13   Robbins Geller's expert has shown that the issues are identical

14   or essentially the same, as required by *Government of India*, or

15   that indeed, they're in the same ballpark in a general way.

16             I reject the playbook rationale which is argued in the

17   paper, in the papers before me.  And I expect most counsel here

18   would be horrified if I adopted that test.  But even reliance

19   on that rationale would not suggest that Mr. Cunningham should

20   be disqualified here.  He was a corporate lawyer, not a

21   litigator.  His representation of ISDA ended years ago.  He

22   never assisted ISDA in litigation like this such that he could

23   have been said to get special insight into its confidential

24   strategies in defending against this litigation.

25             So I do not find that Mr. Cunningham has a

Case 2:21-cv-00563-JCS Document 204-80 Filed 02/13/24 Page 91 of 160 35
Case 1:13-md-02476-DLC Document 244 Filed 12/13/13 Page 35 of 57
DC5ECREC

disqualifying conflict. But even if I did find he had a
disqualifying conflict, that would not end the issue. He is
not seeking to act as class counsel here. If he had a
conflict, it would be imputed to his partners, to his current
law firm, but that only creates, as we know, a rebuttable
presumption that Mr. Cunningham would share ISDA client
confidences with the Quinn attorneys in this litigation.
That's the issue.

I have representations by Mr. Cunningham, no reason to
doubt them -- and, indeed, I appreciate the Simpson brief.
They're not casting aspersions on his character, the character
of anyone at issue here. And I understand these are important
issues. I appreciate that they're being fleshed out at an
early point in this litigation so they can be off the table,
and so I thank you for raising them.

But the screen as defined here and described in the
papers here is certainly sufficient to rebut the presumption.
I have no reason to believe that Mr. Cunningham has already
shared any privileged information received from ISDA. A formal
screen has now been erected. I am confident it will work as
counsel intended it to work. I expect every law firm in this
courtroom has ethical screens that have been erected from time
to time. Indeed, you may have them erected right now, and you
trust that they work well. They perform an important function,
particularly with the mobility of lawyers in this day and age.

Case 2:21-cv-005637-CSL Document 204-80 Filed 02/13/24 Page 92 of 160    36
Case 1:13-md-02476-DLC Document 244 Filed 12/12/13 Page 36 of 57
DC5ECREC

1          I also find it very unlikely that Mr. Cunningham has

2    any confidential information that will be material to this

3    litigation.  But in any event, that's not guiding my view.

4          *Hempstead Video* exhorts a Court to examine with care

5    the substance of the relationship under review and the

6    procedures that are put in place.  This requires careful

7    examination, and I've tried to give it that careful

8    examination.  I am conscious of the fact that the imputation

9    doctrine can't interfere with the selection of the best counsel

10   for the class, or in other situations for a party, and can be

11   an occasion for abusive motions.  So I do not find Quinn to be

12   disqualified.

13         So let's turn to the substance of the applications for

14   lead counsel.  I've read those.  I've made my charts.  I've

15   gone on the Internet and looked up your firm's websites.  I

16   should disclose that.  I didn't do anything else, but I tried

17   to make a judgment about, actually, where were your main

18   offices located?  Was it in San Diego or in Connecticut?  And

19   actually, how important is antitrust to your practice

20   generally, day in, day out?  So I think I owe you full

21   disclosure of what I've done.  So besides reading your papers,

22   I did look at the firm websites.

23         We've been at this a while already.  I'm happy to give

24   everybody a chance to be heard further, but what I think I

25   would suggest is that I make a judgment here with respect to

DC5ECREC

 1    who I think should be lead counsel for the class and take a

 2    break; because whoever I choose, I'm going to ask them to give

 3    me a recommendation, though I will make the final decision here

 4    as to who should be cocounsel.  I'm unlikely to appoint more

 5    than one law firm to be cocounsel.  I'm not saying I won't be

 6    open to more than one, but I'm unlikely to appoint more than

 7    one.

 8             So any objection to me proceeding that way?

 9             I do find that Quinn has made the strongest

10    application here to be lead counsel for the class.  It has

11    several advantages in making the case, as I have analyzed it as

12    the firm who will best represent the class.  It's the only

13    single firm with the expertise and resources to handle this

14    litigation without assistance essentially; not that that's how

15    I'm going to proceed.

16             And many of you have made reference to this in your

17    papers, that I do have a preference to have one law firm, if

18    possible.  I had exceptions on occasion, but I think there are

19    enormous efficiencies for the class of having a single law firm

20    that really makes the commitment to the case, to devote the

21    resources and the tactical or strategic thinking that's

22    important to the litigation.  And that symbolization of command

23    and control is of enormous benefit to the class.

24             So it has a track record, a knowledge of the CDS

25    market and antitrust litigation.  It's well equipped with trial

DC5ECREC

1    lawyers who can actually go into court and try a case.  It has

2    run massive discovery cases by itself essentially.  And it has

3    extraordinary strengths with respect to appellate litigation.

4         Now, the things I'm going to list next are not

5    determinative, but I think they're helpful.  I think its

6    damages model that it's developed at this stage, not that it

7    won't be defined or altered, is the most sophisticated one to

8    date.  It has European offices.  It has a substantial New York

9    presence.  It's familiar with litigating against these very

10   banks.  It's familiar with litigating in this courthouse.

11   Those are unique strengths that it has, but they add to the

12   strength of its application.

13        So as I analyzed it, if I had thought there was a

14   significant issue, even a close question on any of these

15   conflict issues, I wouldn't be appointing them.  I would not

16   burden the class with that problem.  But I don't find that any

17   of the conflict issues that have been raised present any risk

18   here.

19        So I could go through my analysis of the other three

20   groups that have made presentations to me to be appointed, but

21   I don't think, unless somebody wants me to, that that's

22   helpful.  So what I'm going to propose now is that we take a

23   ten-minute recess.  And this will give Quinn and other

24   plaintiffs' counsel an opportunity to discuss -- and I will

25   want to hear from Quinn first, if there is going to be a

DC5ECREC

1    partner -- and I wanted to have at least one partner -- who

2    that partner should be.

3              Thank you.  And I am prepared to pick the partner from

4    my study so far.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DC5BCREC2                    Conference

1        THE COURT:  I'll take a report from Quinn Emanuel.

2        MR. BROCKETT:  Good afternoon.  This is Dan Brockett

3   from Quinn Emanuel.

4        Well, your Honor, obviously there are many excellent

5   law firms, may tier one, antitrust law firms that are vying for

6   lead counsel in this case.  But in thinking through it, it's my

7   judgment that the firm that would add the most depth, have a

8   quality plan, would be the Robbins Geller firm.  Even though

9   the lead plaintiff is in San Diego, it's a firm that has

10  substantial resources like Quinn does.  You have 13 different

11  banks here, all represented by major firms.  So I think my

12  first choice would be Robbins Geller.

13       Secondly, I think Mr. Simon's firm has really good

14  quality antitrust lawyers.  Our California offices have worked

15  with them and think very highly of them.  Mr. Simon also has a

16  very strong plaintiff.  So I think if I had to rank them, those

17  would be the first two.

18       I want to also say I think Mr. Entwistle's firm is

19  very qualified, a lot of lawyers in New York, and good solid

20  antitrust experience.

21       THE COURT:  Since you know these names with so much

22  more ease than I do, when you say Mr. Simon's firm, to whom are

23  you referring to?

24       MR. BROCKETT:  Bruce Simon of Pearson Simon.

25       MR. SIMON:  Pearson Simon.

1              MR. BROCKETT:  LACERA's counsel, your Honor.

2              THE COURT:  Thank you.

3              (Pause)

4              THE COURT:  Sorry.  I'm working through my notes.

5    Forgive me for a moment.

6              So Robbins Geller brings Illinois SURS with it and

7    Pearson Simon brings LACERA.

8              MR. BROCKETT:  Yes, that's correct, your Honor.

9              And in thinking about this, antitrust cases unlike

10   cases under the PSLRA, once lead counsel is chosen, then any

11   number of plaintiffs can go into the amended consolidated

12   complaint.  But in thinking through this, I was mindful and

13   gave lots of weight to the law firms that I think had

14   good-quality plaintiffs; in particular, ones that are not

15   taking an assignment of claims like Salix is.

16             THE COURT:  I suppose I shouldn't-- in my analysis

17   before today's conference, I think I've learned, among other

18   things, that Robbins Geller has about two hundred lawyers.

19   Its principal offices are in San Diego.  It has a presence in

20   Melville, New York, and of course is in other cities as well.

21             And Pearson Simon, as I understand it, is a 12-lawyer

22   firm in L.A.

23             MR. SIMON:  San Francisco as well, your Honor.

24             THE COURT:  Thank you.

25             MR. SIMON:  Would your Honor consider a suggestion?

DC5BCREC2                    Conference

1    Even though I know you have a rule that wants to keep it lean

2    and mean, as we like to be as well, obviously given the size of

3    our firm, I've worked with both of these firms.  I've tried a

4    case with Pat's office.  We tried it out of their San Diego

5    office, Pioneer Mortgage, where I lived in their office for a

6    while to a successful verdict.  It was a banking case.

7            In the three cases that Mr. Brockett has listed in his

8    resume, plaintiffs' antitrust actions, I'm in all three of

9    those with him.  Supported him in one of those, the Polyfoam

10   case.

11           It would be an excellent working group.  When you said

12   somebody with antitrust experience, that's what I live and

13   breathe.  That's what I've been doing the past 20 years.  I

14   won't belabor it, but I've got the energy, I've got the

15   leadership ability.  Any judge you call where I've been

16   appointed lead will tell you that the case went smoothly in

17   their courtroom.  And because we had 12 attorneys --

18           THE COURT:  Well, I'd love that, but no guarantees

19   here.

20           MR. SIMON:  Right.  And since we have 12 attorneys,

21   what you're going to be getting is me.  And when you get me,

22   you're going to get my ability to strategize the case and

23   you're not going to get duplicative effort because we can't

24   pile a bunch of bodies on the case.

25           And sometimes you know the size of the firm means

DC5BCREC2                     Conference

1   efficiency.  LACERA has 150,000 members.  We went through a

2   request for proposal process amongst probably against some of

3   the firms that are even in this room.  Even though those are

4   not class members, those are people who want to see justice

5   done and speak to LACERA about who they should choose, they

6   chose us because of our antitrust experience, our judgment, our

7   ability to lead other cases.

8              And even though we're not from New York, I come here a

9   lot.  I spoke at the New York Antitrust State Bar at the

10  invitation of Labaton just a few months ago.  We do cases all

11  over the United States.  Our most recent case, which we tried,

12  was a $473 million result, where the class got the net proceeds

13  back 100 percent.

14             And we would do a great job for the class.  We

15  wouldn't duplicate effort.  And we could do it with

16  Mr. Coughlin and Mr. Brockett.

17             THE COURT:  In how many cases are you functioning as

18  lead counsel on?

19             MR. SIMON:  I have one other where I'm lead counsel.

20  In fact, we have a motion to dismiss tomorrow.  It's the

21  Batteries Antitrust Litigation in front of Judge Gonzalez

22  Rogers in the Northern District of California.  I've got one

23  where I'm the head of a steering committee, and I've got

24  another where I am also lead counsel.  And I'm lead counsel

25  with Hagens Berman.  It's a privacy case out in San Francisco

Case 2:21-cv-00562-76-DLC Document 204-20 Filed 03/13/14 Page 100 of 160
Case 4:13-md-02476-DLC Document 280 Filed 03/12/13 Page 44 of 57    44
DC5BCREC2                        Conference

1   as well.

2         All of those cases are in different stages, and I have

3   the time to do this case.  When you asked about energy, I've

4   been with a small firm for my entire career and I've got the

5   energy.  I fight hard.  I think anybody in this room will tell

6   you I'm there.  I'll be there at every hearing I'll be there

7   for you and the Court and your staff.

8         I would really request that LACERA be given a chance

9   to be at the table with these two fine gentlemen.

10        THE COURT:  Okay.  Well, I appreciate that and I

11  think I should give Robbins Geller an opportunity to be heard

12  too.

13        MR. COUGHLIN:  Thank you, your Honor.  Patrick

14  Coughlin from Robbins Geller.  People have been talking about

15  their antitrust experience and other experience.  I haven't

16  heard as much about trial experience.

17        I started off in the U.S. Attorney's Office -- well, I

18  started off in the Department of Justice, but then the U.S.

19  Attorney's Office in D.C. for a number of years and then out in

20  the Southern District of California.

21        In the mid-'80s I tried the largest RICO case I think

22  the government had ever tried up until that time, the *United*

23  *States v. Brown*.  It was a large RICO case, 12 defendants.  It

24  went on for six and a half months, the trial did.

25        I tried the first murder-for-hire trial in federal

 1    court in the Southern District of California.  I probably tried

 2    more class cases than anybody here.  I've worked on the largest

 3    antitrust cases, the Interchange case across the way with Judge

 4    Gleeson that we just presented a settlement, $7.2 billion.  I

 5    was the lead trial lawyer in Enron, the securities case, $7.2

 6    billion.

 7          So I've litigated against these same bank defendants

 8    in Enron and in two large antitrust cases.  The Interchange

 9    case, all the same or many of the same defendants, and a

10    currency conversion case where we covered $336 million.  So we

11    have a breadth of experience.

12          Your Honor, these cases -- we took four hundred

13    depositions in Interchange.  We took nearly that many in Enron.

14          THE COURT:  I hope to avoid that.

15          MR. COUGHLIN:  We hope to avoid it, too, but we spent

16    between $30 and $50 million out-of-pocket.  These are expensive

17    cases against some well-heeled defendants.  I think our two

18    firms bring the best resources and efficiency.

19          And, frankly, I also have been talking to Mr. Simon

20    and that's why both Mr. Brockett and I, we know we're pushing

21    the limit in bending the rules, but we'd like you to consider

22    the three.

23          MR. SIMON:  Thank you.

24          Your Honor, one last point.  Our clients, Illinois

25    SURS and LACERA, the clients have talked to each other several

DC5BCREC2                          Conference

1    times and wanted to see if we could try to work together,

2    because they bring enormous resources into the case as well.

3    So we have talked about working together.  And it's our

4    clients' desire that we could work together.

5            So I know you don't like three, and I know I'm

6    probably pushing your limits, but it would work in this case, I

7    believe, and it would work very well.  And I appreciate your

8    consideration.

9            THE COURT:  Thank you very much.

10           Well, I have two choices here:  To reflect on this or

11   to make a decision now.

12           I have to say the expert declarations submitted by

13   Robbins Geller from Mr. Simon does not speak strongly in favor

14   of this appointment.  I expect better for the class.

15           MR. COUGHLIN:  I accept that, your Honor, and I'll

16   certainly do better.  As we put it in, we just wanted to raise

17   the point so that it was raised as a threshold matter.  But

18   you're right, there's no excuse to lacking at any time.

19           MR. ENTWISTLE:  Your Honor, may I be heard just

20   briefly?

21           THE COURT:  Yes.

22           MR. ENTWISTLE:  Mr. Brockett also mentioned our firm,

23   as you know, and we had originally put forward to the Court a

24   suggestion -- again, recognizing your Honor's preferences

25   here -- for a single lead.  But, again, also recognizing that

Case 2:21-cv-00562-JEC Document 204-20 Filed 03/13/24 Page 103 of 160    47
Case 1:13-md-02476-DLC Document 280 Filed 03/13/13 Page 47 of 51
DC5BCREC2                        Conference

 1    in this case, where it's fairly unique, the defendants have the
 2    benefit of 15 to 20 major law firms who will be collaborating
 3    and coordinating and bring a tremendous amount of resources to
 4    bear.
 5            And so we had made the suggestion in our papers to you
 6    that this was a case where it would be appropriate to depart
 7    from the rule potentially to have multiple firms as long as
 8    there was strong leadership.  We had suggested that we act as
 9    liaison.  I think you get the same strong leadership with
10    Mr. Brockett and with Quinn acting in that capacity.  We've
11    supported them throughout.
12            I do think that it is an issue of judgment when we
13    look at what comes to the class.  And in our case certainly not
14    only did we, as we investigated the case, observe that the
15    center of gravity really was here in New York, and come to New
16    York with the first case that was filed in New York, even
17    though there were cases already filed in Chicago, but we've
18    also sort of supported the process throughout.
19            We did a very early analysis of these issues.  We took
20    the view in our papers, as you know, that having a conflict
21    counsel, the kind of structure we proposed, would really sort
22    of solve the issues that were being raised related to Morgan
23    Stanley and relating to ISDA should the Court have found that
24    there were issues there.
25            Our clients obviously include the Delta funds that

 1     purchased directly, as well as Value Recovery, which is a

 2     successor in interest, and then one which has an assignment.

 3     So we sort of bring that combination.

 4             And obviously your Honor is familiar with sort of the

 5     work that we've done in this and other courts, both as defense

 6     counsel and as plaintiffs' counsel in a wide variety of areas,

 7     both antitrust and securities to great benefit.

 8             And I would respectfully submit that when you do look

 9     at the issues, as Mr. Brockett mentioned, we would be one of

10     the firms that they would work with.  It was also we were

11     really the only firm mentioned in his papers, obviously in a

12     slightly different context, as a firm to work with there while

13     he was under attack by the Chicago group.

14             And so we would ask that your Honor also consider our

15     firm in that context as well and our clients.

16             Thank you.

17             THE COURT:  Okay.  So why am I not disposed to have

18     more than one firm?  Because ultimately at the end of the

19     day -- and this entire litigation may be dismissed on a motion

20     to dismiss and be over, I understand.  But many cases move into

21     discovery and many cases result in some settlements at least;

22     some go to trial.

23             And I'm at a fairness hearing and I'm approving a

24     settlement, or not, or raising questions, and then there's the

25     attorneys' fees application.

Case 2:11-cv-00562-JCC-DLB Document 204-20 Filed 03/13/24 Page 105 of 160   49
Case 1:13-md-02476-DLC Document 2280 Filed 03/13/23 Page 49 of 51
DC5BCREC2                    Conference

1          And throughout this whole process of supervising

2     litigation, when there are multiple firms, the inefficiencies

3     are extreme.  I prefer to choose one law firm that can give the

4     class good representation, the best representation possible,

5     and that can run a case efficiently.

6          I appreciate that there are other issues here,

7     including client relationships, that may dictate having more

8     than one lead counsel and may dictate which firm is chosen as

9     co-counsel.  These are things that it's hard for a Court to

10    judge.  But I'm going to reflect on this more.  We're going to

11    move on.  I'm going to treat Quinn as lead counsel.  I'm not

12    going to sit on this a long time.  And we'll move on to the

13    rest of our agenda with Quinn as counsel for the class.

14         In making this decision with respect to the other two

15    candidates that have been identified, Pearson Simon and Robbins

16    Geller, whether I appoint one as co-counsel or both as

17    co-counsel, I would like a further submission from Quinn about

18    how the process would be structured in a way that would work

19    efficiently for the class and be of benefit to the class and

20    not just mean that we have a top-heavy structure here with

21    significant partnership input from co-counsel when what you

22    really need is a few people making the strategic decisions and

23    then lots of boots on the ground executing them.

24         So how long would it take for you to make that kind of

25    submission of a proposal here?

Case 2:21-cv-00562-76-DL Document 204-20   Filed 03/13/24   Page 106 of 160   50
Case 1:13-md-02476-DLC Document 280   Filed 03/13/13   Page 50 of 51
DC5BCREC2                    Conference

```
1        MR. BROCKETT:  Seven days?

2        THE COURT:  Great.  Thank you.

3        So let's move on to the schedule.  Is there a desire

4   to file a consolidated amended complaint for the class?

5        MR. OLSON:  Good afternoon, your Honor.  Steve Olson

6   from Quinn Emanuel.  Yes, there is, your Honor.  We would like

7   to do that.  We think we could do it relatively promptly.  We

8   had had some discussions with the defendants about a schedule

9   which we would propose to your Honor.  We can be flexible

10  within what we propose, but, yes, we would like to do that.

11       THE COURT:  And what schedule are you thinking of?

12       MR. OLSON:  Well, what we had talked about and reached

13  consensus with defendants is outlined in a November 19th letter

14  on the letterhead of Berman & Montague, which is a plaintiffs'

15  firm, that we collectively passed with reporting this to your

16  Honor.  And we had proposed that the consolidated amended

17  complaint would be filed within 45 days of the lead counsel

18  selection.

19       THE COURT:  I'm happy to give you to the end of

20  January.  I say that in part because we're moving into the

21  holiday period.

22       MR. OLSON:  Yes, thank you.

23       THE COURT:  January 31st.

24       And I would like -- customarily in this courthouse, as

25  you know, motion practice-- well, first of all, no answer would
```

DC5BCREC2                    Conference

1    be due until roughly February 21st.  But roughly motion

2    practice in the ordinary kind of motion is two weeks for

3    opposition, a week for reply.  I'm not suggesting that will

4    apply here.  But knowing -- expecting, at least -- a motion to

5    dismiss, I'm going to propose March 14th with opposition April

6    11th and reply April 25th.

7            Does that work for everyone?

8            MR. SIMON:  Yes, your Honor.

9            THE COURT:  Good.  Hearing no objection, thank you.

10           I would like a volunteer from defense counsel to serve

11   as our liaison counsel.  This is just to mean that my chambers

12   can make one phone call to a plaintiffs' firm and one phone

13   call to a defense firm for scheduling purposes, not for

14   anything substantive.

15           MR. CHESLER:  I'm sorry, your Honor, I was slow in

16   getting up.  May I ask, make one request with respect to the

17   schedule?  And that is that your Honor consider extending the

18   reply --

19           THE COURT:  Excuse me.  Is this Mr. Chesler speaking?

20           MR. CHESLER:  Yes, I'm sorry, your Honor.  Evan

21   Chesler for Morgan Stanley.  But I'm speaking on behalf of the

22   defendants to save time here, your Honor, at the moment.

23           May I ask that you consider giving us a bit more time

24   for the reply brief?  Given what we expect will be-- since we

25   haven't --

DC5BCREC2                         Conference

 1              THE COURT:  May 2nd.

 2              MR. CHESLER:  Thank you, your Honor.

 3              THE COURT:  You're welcome.

 4              Okay.  So I need a volunteer or would like a volunteer

 5    as liaison counsel for the defendants to assist my chambers.

 6    And if you can't figure out who the volunteer is today, you

 7    could write me tomorrow with some unhappy candidate.

 8              MR. CHESLER:  Your Honor, may we take up your

 9    invitation to do it within 24 hours?

10              THE COURT:  Sure.

11              MR. CHESLER:  Thank you.

12              THE COURT:  Thank you, Mr. Chesler.

13              I mean, I would love to hear today more about the

14    substance of the case actually, but that may be premature.  I

15    don't know if there's any defense counsel able today to explain

16    to me whether or not they believe there is a basis for a

17    successful motion to dismiss that would eliminate the entire

18    action.  And if nobody's prepared to address that, that's fine.

19    But without that presentation, I'm going to assume that I

20    should continue discussing the case -- and I had no

21    volunteers -- in terms of what might happen if the case is not

22    completely dismissed.

23              So while I'm working hard in addressing your motion

24    practice and trying to figure out whether the complaint

25    survives the motion to dismiss, I would like counsel to start

1    conferring with each other so that if it does survive a motion

2    to dismiss, we can hit the ground running.  I'd like you to be

3    working on a confidentiality order.  I'd like you to be working

4    on ECF protocols and talking about the structuring of

5    electronic discovery here.

6           I'd like you to be thinking creatively about ways to

7    limit discovery so that everyone gets the core discovery they

8    need and no one is imposed upon, your clients aren't imposed

9    upon by burdensome discovery that's unnecessary to reach the

10   merits of the case and permit you to either prosecute or defend

11   effectively.

12          I would probably be scheduling a conference for

13   roughly two weeks after I deny that, a motion to dismiss, in

14   whole or in part.  If I grant the motion to dismiss, I won't

15   schedule a conference.  But I would like you to come to that

16   conference then with a lot of work done and hopefully

17   submitting something to me in writing before the conference

18   that describes areas in which you have agreement and areas in

19   which you have disagreement so that we could use that

20   conference in an effective way to structure the discovery

21   process through document discovery and through deposition

22   discovery.

23          Whether we schedule more at that initial conference,

24   I don't know.  I just don't know enough about the merits of

25   this case.  I don't really know enough to make a judgment here

1    in any way that could be helpful to you about how to manage

2    this case.  I mean, each case is unique.  It has its own

3    contours and demands.  There will be efficiencies, I hope,

4    which we can identify that are unique to this case; other

5    things that are just complexities that we can't get away from

6    and just have to grapple with.

7            How do you communicate with chambers?  Thankfully, the

8    Southern District of New York now permits you to file letters

9    electronically.  Don't send me a letter any longer than two

10   pages.  I don't want counsel's time engaged with letter

11   writing.  Any letter bringing a dispute to my attention should

12   represent that you've met and conferred with your adversary and

13   been unable to resolve the issue.

14           So I want to make sure that everybody has conferred

15   first in good faith, been unable to resolve it, and then write

16   me a letter no longer than two pages.  I will or won't wait for

17   a responsive letter.  I'll schedule a phone conference if it

18   seems an issue that could be dealt with quickly; if it's a more

19   complex issue, I'll probably have a conference in court.

20           One of the things I'm going to want to talk with

21   counsel about at that initial conference, besides structuring

22   discovery and talking about whether any limitations should be

23   imposed on discovery here that are appropriate for this set of

24   cases, is settlement.  Whether you want to go before a judicial

25   officer in this court, whether you want me to find one of my

DC5BCREC2                              Conference

 1    colleagues, one of my Article III colleagues to supervise

 2    settlement discussions, whether you're going to engage in

 3    outside mediation, and when such conversations would be

 4    fruitful.  In some cases they're fruitful early; in some cases

 5    you need a lot of discovery and before then it's a waste of

 6    time.  You would know this better than I, but that's one of the

 7    issues that I want to talk about at that first conference.

 8            Obviously if there are any ways in which my chambers

 9    could be of assistance to counsel, I'd invite you to let me

10    know.

11            Okay.  We've gone through my agenda.

12            Is there anything that plaintiffs' counsel wishes to

13    raise today before we break?

14            MR. BROCKETT:  Nothing from Quinn, your Honor.

15            THE COURT:  Okay.  Any defense counsel have an issue?

16            Yes, Mr. Chesler.

17            MR. CHESLER:  Thank you, your Honor.  Just with

18    respect to the motion, if there is to be a motion to dismiss,

19    may we have your Honor's direction as to the length of the

20    papers?  Since we have so many defendants, what form and how

21    many pages are we talking about, whether we each should be

22    submitting separate motions or perhaps one motion on common

23    issues and separate papers on noncommon issues.  We just need

24    to get guidance from the Court, your Honor.

25            THE COURT:  Thank you.  Very good topic.  I

DC5BCREC2                          Conference

 1    customarily grant requests for lengthy briefs.  It's probably

 2    not in my interest to tell you that, but I don't think long and

 3    hard about it; I just grant it.  So if you make a request for a

 4    lengthy brief, unless there's some particular reason not to, I

 5    will be granting it.

 6          I don't know the issues in this case.  I don't know if

 7    they lend themselves to one master brief.  That, of course,

 8    would be of enormous benefit to me.  I think we manage paper

 9    well in chambers, but to the extent that you can reduce the

10    burden on our lives, we appreciate that.  So I don't know if

11    there are issues that aren't common to the defendants here.  I

12    just don't know.

13          MR. CHESLER:  May I make a suggestion, your Honor?

14    When we receive the amended and consolidated complaint -- which

15    apparently will be due, I guess, January 31st -- may we then

16    promptly thereafter submit a no-longer-than-two-page letter to

17    the Court with a request with respect to the briefing?  Because

18    then we'll actually have the pleading at which any such motion

19    would be directed.

20          THE COURT:  Great.  And that will give us all a heads

21    up about the structure of the motion practice going forward.

22    That would be very helpful.

23          MR. CHESLER:  Thank you, your Honor.

24          THE COURT:  Any other defense counsel with a request

25    or suggestion?

1            All right.  Thank you so much for your assistance this

2    afternoon.

3            (Adjourned)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____7/22/2014____
```

------------------------------------------------------X

|  |  |
|---|---|
| : |  |
| : | MEMORANDUM ORDER |
| : |  |
| : | 14-CV-1459 (VEC), 14-CV-1634 (VEC), |
| IN RE: GOLD FIXING ANTITRUST AND | 14-CV-1638 (VEC), 14-CV-1642 (VEC), |
| COMMODITY EXCHANGE ACT | 14-CV-1644 (VEC), 14-CV-1701 (VEC), |
| LITIGATION.[1] | 14-CV-1707 (VEC), 14-CV-1964 (VEC), |
| : | 14-CV-2102 (VEC), 14-CV-2108 (VEC), |
| : | 14-CV-2124 (VEC), 14-CV-2134 (VEC), |
| : | 14-CV-2135 (VEC), 14-CV-2213 (VEC), |
| : | 14-CV-2214 (VEC), 14-CV-2310 (VEC), |
| : | 14-CV-2391 (VEC), 14-CV-2550 (VEC), |
| : | 14-CV-2807 (VEC), 14-CV-2851 (VEC), |
| : | 14-CV-2917 (VEC), 14-CV-2948 (VEC), |
| : | 14-CV-3006 (VEC), 14-CV-3111 (VEC), |
| : | 14-CV-4095 (VEC), 14-CV-5135 (VEC), |
| : | 14-CV-5153 (VEC) |

------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

In general,[2] Plaintiffs in these cases bring claims under the Commodity Exchange Act

("CEA"), 7 U.S.C. § 1 *et seq.*, antitrust claims under Section 1 of the Sherman Act, 15 U.S.C.

§ 1, and claims for unjust enrichment.  On June 16, 2014, the Court concluded that it would

appoint interim class counsel for a single putative class.  Familiarity with that memorandum

order is assumed.  Five applications for appointment were then submitted on behalf of the

following law firms:  (1) a joint application from Lovell Stewart Halebian Jacobson LLP

("Lovell") and Hausfeld LLP; (2) a joint application from Robbins Geller Rudman & Dowd LLP

("Robbins Geller") and Susman Godfrey LLP; (3) a joint application from Quinn Emanuel

Urquhart & Sullivan, LLP ("Quinn Emanuel") and Berger & Montague, P.C.; (4) an application

from Bernstein Liebhard LLP; and (5) an application from Cafferty Clobes Meriwether &

---

[1] This caption is for convenience and brevity only.  The above-listed cases have not been consolidated, though the
Court is aware of the pending referral to the Judicial Panel on Multidistrict Litigation.

[2] The structure of the legal claims in each of the above cases differs to some degree, but all claims are based on
largely the same core factual allegations.

Sprengel LLP ("Cafferty Clobes") seeking a joint appointment with one or both of Lovell and Hausfeld. For the reasons that follow, the Court concludes that the team of Quinn Emanuel and Berger & Montague would best serve the interests of the class.

## DISCUSSION

Before analyzing the merits of the pending applications, the Court first notes its appreciation for the Lovell-Hausfeld team's compliance with the page limits set at the May 5, 2014 hearing and set forth in the Court's May 28, 2014 order. The same cannot be said for the Quinn-Berger team and the Robbins-Susman team. Their submissions included cases beyond the limitations set by the Court and upon which the Court does not rely. The Court further does not rely upon the Quinn-Berger team's additional promotional materials submitted in contravention of this Court's directions. All counsel are cautioned to submit all future materials in accordance with the Court's orders, including the Court's Individual Practices, as well as any applicable page limits.

Under Rule 23(g)(3) of the Federal Rules of Civil Procedure, the Court "may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action." With twenty-seven lawsuits presently filed in this district challenging Defendants' conduct, interim class counsel is necessary to coordinate efficiently the competing claims and plaintiff groups. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MD-2262, 2011 WL 5980198, at *2 (S.D.N.Y. Nov. 29, 2011) ("The designation of interim class counsel is especially encouraged in cases . . . where there are multiple, overlapping class actions that require extensive pretrial coordination.").

In general, "[c]andidates for interim class counsel are evaluated under the same rubric as potential counsel for certified classes." *Deangelis v. Corzine*, 286 F.R.D. 220, 223 (S.D.N.Y. 2012) (citing *In re Crude Oil Commodity Futures Litig.*, No. 11-CV-3600, 2012 WL 569195, at

2

*1 (S.D.N.Y. Feb. 14, 2012)).  Thus, the Court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).  The Court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).  Where, as here, "more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class."  Fed. R. Civ. P. 23(g)(2).

After examining the competing applications, the Court concludes that all applicants have conducted sufficient work in investigating potential claims against Defendants, have adequate experience handling class actions, and possess sufficient knowledge of the applicable law.  But given that the putative class is challenging the conduct of five major banking institutions over a period of at least ten years, successful prosecution of this litigation will require a massive commitment of resources from interim class counsel.  In that regard, the Court is not persuaded that Cafferty Clobes or Bernstein Liebhard have the resources necessary to represent the putative class in litigation of this scale.  Both of these firms applied individually, but at just ten and twenty-four attorneys, respectively, neither firm can provide the same level of service in this case as the other applicants.  The Court therefore concludes that only the Lovell-Hausfeld, Quinn-Berger, and Robbins-Susman teams are adequate under Rule 23(g)(1)(A)'s rubric.

The Court must then consider which of these three groups is "best able to represent the interests of the class."  Fed. R. Civ. P. 23(g)(2).  With just forty-two attorneys between the two firms, the resources available to the Lovell-Hausfeld team are more limited in comparison with the Quinn-Berger and Robbins-Susman teams.  These limitations are magnified given the

number of other major class actions to which the Lovell-Hausfeld team is presently committed. But these constraints are also somewhat mitigated by this team's ability to partner with other law firms representing plaintiffs in at least eighteen of the related actions filed in this case. While this arrangement gives the Lovell-Hausfeld team the resources to meet the requirements of Rule 23(g)(1)(A)(iv), such a multi-firm structure would not represent the class as efficiently as a smaller group of law firms. Coordinating activity among these firms, about whose qualifications the Court knows very little, would prove unnecessarily costly to the putative class.

This conclusion leaves the joint applications from the Quinn-Berger and Robbins-Susman teams. Representing approximately 700 combined attorneys firmwide for the Quinn-Berger team and approximately 300 combined attorneys firmwide for the Robbins-Susman team, these applicants can marshal significant resources in support of the putative class. Both teams also describe in detail their respective in-house document hosting and review capabilities, which will result in additional savings for the putative class. And although both teams consist of at least some attorneys who are committed to other large class actions, the Court does not expect that these assignments will have a detrimental effect on the prosecution of the litigation here. Further, given this case's size and complexity the Court finds that the hourly rates of the proposed attorneys are generally reasonable. Those rates are also largely consistent with the hourly rates of the other applicants.

Three additional factors persuade the Court, however, that the team of Quinn Emanuel and Berger & Montague will best represent the putative class. First, the Quinn-Berger team's more creative approach in tying its requested attorneys' fees to the size of any common fund weighs in its favor. The proposed structure more effectively aligns counsels' incentives with those of the putative class.

Second, geographical considerations support the selection of the Quinn-Berger team over the Robbins-Susman team.  With the exception of one associate, all of the Quinn Emanuel attorneys are based out of New York.  And Berger & Montague's attorneys are located in nearby Philadelphia.  By contrast, the two Susman Godfrey partners with the most experience are based out of Los Angeles.  Only two Susman Godfrey attorneys, one associate and one partner, are based out of New York.  And Robbins Geller's team is for the most part located in San Diego.  If the MDL Panel decides that these cases should be consolidated in the Southern District of New York, this litigation will be more efficient with more attorneys located in or near New York.

Finally, London Gold Market Fixing Ltd. and two of its five members are headquartered in London.  The Court thus expects that at least some discovery will take place in London.  Quinn Emanuel's twenty-seven London attorneys compared with no London presence for either Robbins Geller or Susman Godfrey will likely save costs for the putative class.  In light of this litigation's scope, the resources available to the Quinn-Berger team, the location of their attorneys, and the proposed structure of their future requests for attorneys' fees if they are successful, the Court concludes that the Quinn-Berger team is best able to represent the putative class.

## CONCLUSION

For these reasons, the Court appoints Quinn Emanuel and Berger & Montague as interim class co-counsel.  The Clerk of Court is directed to close the following open motions:  ECF Nos. 20 and 21 in *Maher v. Bank of Nova Scotia*, No. 14-CV-1459; ECF No. 21 in *AIS Capital Mgmt., L.P. v. Bank of Nova Scotia*, No. 14-CV-1642; ECF No. 17 in *Moran v. Bank of Nova Scotia*, No. 14-CV-2213; ECF No. 12 in *Citra Trading Corp. v. Bank of Nova Scotia*, No. 14-CV-2214; and ECF No. 32 in *Alaska Elec. Pension Fund v. Bank of Nova Scotia*, No. 14-CV-2391.  The

stay previously entered on May 6, 2014 remains in effect pending the MDL Panel's decision as to whether these cases shall be consolidated before this Court.


**SO ORDERED.**


**Date:  July 22, 2014**
      **New York, New York**
                                        **VALERIE CAPRONI**
                                          **United States District Judge**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                       :

CITY OF PHILADELPHIA et al.,               :
                                       :

                Plaintiffs,         :

                                       :             19-CV-1608 (JMF)

        -v-                      :

                                       :         OPINION AND ORDER

BANK OF AMERICA CORPORATION et al.,   :
                                       :

             Defendants.     :

                                       :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In these consolidated putative class actions, Plaintiffs — the City of Philadelphia

("Philadelphia"), the Mayor and City Council of Baltimore ("Baltimore"), and the Board of

Directors of the San Diego Association of Governments, Acting as the San Diego Regional

Transportation Commission ("SANDAG") — bring antitrust and contract claims against eight

banks (collectively, the "Banks" or "Defendants"), alleging that, between 2008 and 2016, they

conspired to fix the interest rates for a type of bond called Variable Rate Demand Obligations

("VRDOs").[1]  Now pending are Plaintiffs motion, pursuant to Rule 23 of the Federal Rules of

Civil Procedure, for class certification and Defendants' motions, pursuant to Rule 702 of the

Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), to

preclude some or all of the testimony of two experts upon whom Plaintiffs rely in seeking class

certification.  Defendants raise forceful arguments in opposition to Plaintiffs' experts but, as the

Court will explain, they are not ultimately a basis for preclusion.  That goes a long way toward

---

[1]     The Defendant Banks are Bank of America, Barclays, Citigroup, Goldman Sachs,
JPMorgan Chase, Morgan Stanley, the Royal Bank of Canada, and Wells Fargo.  In addition,
Plaintiffs sue various parents, affiliates, subsidiaries, predecessors, and successors of the
Defendant Banks.

resolving Plaintiffs' motion for class certification as well because Defendants' primary — albeit not only — argument in opposition to Plaintiffs' motion rests on their *Daubert* motions. Accordingly, and for the reasons that follow, Defendants' motions to preclude are denied and Plaintiffs' motion for class certification is granted.

## BACKGROUND

As the Court explained in prior Opinions, *see, e.g.*, *City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 521-25 (S.D.N.Y. 2020), familiarity with which is presumed, VRDOs are bonds issued by municipalities and other public or charitable entities, such as schools, hospitals, and community organizations, to raise funds for operating expenses, infrastructure projects, and public services. Am. Compl. ¶¶ 2, 63. They are issued on a long-term basis but have short-term interest rates that are reset on a periodic basis, typically weekly. *Id*. ¶¶ 3, 64, 72-73. In order to attract investors, VRDOs have a "built-in 'put' feature that allows investors to redeem the bond at any periodic reset date at face value" — that is, at "par" — plus any accrued interest. *Id*. ¶ 3. That makes them a "low-risk and high-liquidity investment." *Id.*

To manage VRDOs, issuers like Plaintiffs contract with a bank that acts as a remarketing agent ("RMA"). *Id*. ¶ 4; *see*, *e.g.*, ECF Nos. 125-4, 125-5, 125-6, 233-2 (examples of remarketing agreements between Plaintiffs and Defendants). Under a typical remarketing agreement, an RMA has two primary responsibilities. First, on each reset date, the RMA is required to reset the VRDO's interest rate at the lowest rate possible that would permit the bond to trade at par. Am. Compl. ¶ 4. Second, when an existing investor exercises the "put" option on the bond, thereby tendering the bond to the RMA, the RMA is required to remarket the VRDO to other investors at the lowest possible rate. *Id.* If the RMA cannot find another investor for the VRDO, the obligation to purchase the tendered bond generally falls on a letter-of-credit provider,

frequently the RMA itself. *Id.* Importantly, if an RMA cannot deliver low rates, the bond issuer has the right to replace the RMA with another one who can. *Id.* ¶ 5. Thus, in a properly functioning market, RMAs compete against each other for issuers' business by actively working to set the best — that is, the lowest — possible rates for their issuer customers. *Id.*

In 2019, Plaintiffs brought this action alleging that Defendants — who together serve as RMAs for the vast majority of the VRDO market, *id.* ¶ 69 — actively conspired *not* to compete against each other in the market for remarketing services, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and contractual and fiduciary duties under different state laws. *Id.* ¶ 96. According to Plaintiffs, Defendants worked together in two ways to keep VRDO interest rates artificially high between February 1, 2008, and November 30, 2015 (the "Class Period"). *Id.* ¶ 97. First, employees "from the top to the bottom of [Defendants'] VRDO operations . . . communicated regarding proprietary information such as VRDO inventory and planned changes to 'base rates' for VRDOs . . . regularly, almost daily, using the telephone, in-person meetings, Bloomberg messaging technology, and third-party intermediaries." *Id.* ¶ 96. Second, Defendants channeled prospective rate information through third-party pricing services such as J.J. Kenny Drake Inc. *Id.* ¶ 112. Plaintiffs claim that the inflated rates helped Defendants keep the VRDOs off their own books, *id.* ¶ 109, and benefitted Defendants' money market funds, which were the predominant holders of VRDOs, *id.* ¶ 97.

In prior Opinions, the Court granted in part and denied in part two motions to dismiss Plaintiffs' claims. The net result was that Plaintiffs' federal antitrust claims survived, along with their state-law claims for breach of contract and breach of fiduciary duty as to some Defendants. *See City of Philadelphia*, 498 F. Supp. 3d at 539; *City of Philadelphia v. Bank of Am. Corp.*, 609

F. Supp. 3d 269, 275 (S.D.N.Y. 2022).  Following discovery, Plaintiffs now move, pursuant to

Rule 23, for certification of the following class:

> All persons and entities who directly paid interest expenses on VRDOs that had
> interest rates reset on a weekly or daily basis pursuant to remarketing agreements
> with Defendants at any point from February 1, 2008 through November 30,
> 2015 . . . [e]xclud[ing] . . . Defendants and their employees, affiliates, parents,
> subsidiaries, and co-conspirators, and the United States government.

ECF No. 368, ("Pls.' Class Cert. Mem."), at 3.  Plaintiffs also seek certification of the following

sub-class:

> All persons and entities who were party to a remarketing agreement with any
> Counterparty Defendant that applies to VRDOs that had interest rates reset on a
> weekly or daily basis at any point from February 1, 2008 through November 30,
> 2015 . . . . [e]xclud[ing] . . . Defendants and their employees, affiliates, parents,
> subsidiaries, and co-conspirators, and the United States government.

*Id.* (cleaned up).  In support of their motion, Plaintiffs rely heavily on the testimony of two

experts, Dr. William Schwert, *see* ECF No. 369-1 ("Schwert Rep."), and Dr. Rosa Abrantes-

Metz, *see* ECF No. 369-2 ("Abrantes-Metz Rep.").[2]  *See* Pls.' Class Cert. Mem. 19-34.

Defendants move, pursuant to Rule 702 and *Daubert*, to preclude some or all of the testimony of

Plaintiffs' experts and, in part on that basis, oppose Plaintiffs' motion for class certification.  *See*

ECF No. 386.  On August 1, 2023, the Court held oral argument on the motions.  *See* ECF No.

454 ("Oral Arg. Tr.").

## DISCUSSION

The standards governing class certification are well established.  The party seeking

certification must demonstrate by a preponderance of the evidence that all the requirements of

Rule 23 have been met.  *See Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013).

---

[2]        An unredacted copy of Dr. Schwert's report is currently sealed.  *See* ECF No. 364-1
("Unredacted Schwert Rep.").

That means, first, satisfying the "four threshold requirements of Rule 23(a) — numerosity, commonality, typicality, and adequacy of representation." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013). On top of those requirements, the Second Circuit has "recognized an implied requirement of ascertainability." *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (internal quotation marks omitted). If those threshold requirements are met, the moving party must also "demonstrate through evidentiary proof that the class satisfies at least one of the three provisions for certification found in Rule 23(b)." *U.S. Foodservice*, 729 F.3d at 117 (internal quotation marks omitted). Here, Plaintiffs seek certification under Rule 23(b)(3), which means that they "must establish: (1) predominance — that the questions of law or fact common to the class members predominate over any questions affecting only individual members; and (2) superiority — that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* (internal quotation marks omitted). In evaluating whether the moving party has met its burden, the Court must engage in a "rigorous analysis," in which it is permitted to "probe behind the pleadings before coming to rest on the certification question." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

The only Rule 23 requirement that Defendants contest in this case is predominance. Oral Arg. Tr. 4. Whether Plaintiffs satisfy that requirement turns largely — albeit, as discussed below, not entirely — on whether their expert models on class-wide impact are admissible. Thus, the Court will begin with Defendants' motions to preclude those models.

## A. Defendants' *Daubert* Motions

The admissibility of expert testimony is generally governed by Rule 702 of the Federal Rules of Evidence, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert*, the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597; *see also Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case.").

That said, neither the Supreme Court nor the Second Circuit has definitively resolved "whether and to what extent *Daubert* applies at the class certification stage." *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393 (S.D.N.Y. 2018); *accord U.S. Foodservice*, 729 F.3d at 129; *cf. In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker."). District courts in this Circuit regularly subject expert testimony at the class certification stage to *Daubert*, but they limit the inquiry at that stage to "whether or not the expert reports are admissible to establish the requirements of Rule 23. In other words, the question is not whether a jury at trial should be permitted to rely on the expert's report to find facts as to liability, but rather whether the Court may utilize it in deciding whether the requisites of Rule 23 have been met." *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086 (JMF), 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013) (cleaned up); *accord In re*

*Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 28-29 (S.D.N.Y. 2020); *Bowling v. Johnson & Johnson*, No. 17-CV-3982 (AJN), 2019 WL 1760162, at *7 (S.D.N.Y. Apr. 22, 2019) (Nathan, J.); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 429 (S.D.N.Y. 2019); *In re LIBOR-Based Fin. Instr. Antitrust Litig.*, 299 F. Supp. 3d 430, 470 (S.D.N.Y. 2018) ("*LIBOR VII*"). Accordingly, the Court "here applies a *Daubert* analysis to the extent that [Defendants] seek to exclude testimony relevant to the pending class certification motion." *Aluminum Warehousing*, 336 F.R.D. at 29.

As noted, Defendants challenge the testimony, in whole or in part, of Plaintiffs' two experts, Dr. Schwert and Dr. Abrantes-Metz. ECF No. 399 ("Defs.' *Daubert* Mem."), at 1-4. Defendants do not contest the experts' qualifications. *See* Oral Arg. Tr. 63. Instead, they contest their methodologies and conclusions, arguing that Dr. Schwert fails to account for key factors and relies on false assumptions (among other things), *see* Defs.' *Daubert* Mem. 7-19, and that Dr. Abrantes-Metz fails to establish causation, *see id.* at 20-25. The Court will address each expert in turn.

### 1. Dr. William Schwert

In his expert report, Dr. Schwert offers two different regression models that Plaintiffs rely on to measure class-wide impact and damages — a multiple dummy variable model and a backcasting model. *See generally* Schwert Rep. ¶¶ 39-47.[3] A regression analysis "is a statistical tool used to determine the relationship between an unknown variable (the 'dependent' variable) and one or more 'independent' variables that are thought to impact the dependent variable." *In*

---

[3] Dr. Schwert also ran a third type of regression: a single dummy variable model. Schwert Rep. ¶¶ 58-62. But Plaintiffs do not rely on this model in their class certification motion, and Defendants therefore do not challenge it under *Daubert*. Accordingly, the Court need not and does not address it.

*re Urethane Antitrust Litig.*, 768 F.3d 1245, 1260 (10th Cir. 2014). "If a regression model uses appropriate independent or explanatory variables, it can test and isolate the extent to which the actual prices paid by plaintiffs are higher because of a defendant's collusive behavior." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 671 (9th Cir. 2022) (cleaned up). As Dr. Schwert describes it, a regression model can be used to "isolate the effect of an alleged conspiracy on prices by comparing prices during a conspiracy period to prices during a non-conspiracy period after controlling for the effects on price of relevant non-conspiratorial factors." Schwert Rep. ¶ 43.

For his first regression analysis, Dr. Schwert utilizes a multiple dummy variable model. Such a model "uses data from both the conspiracy and non-conspiracy periods to estimate the relation between price, non-conspiratorial economic factors, and a . . . number of dummy variables[] for the conspiracy period." *Id.* Each dummy variable represents a separate time period during the alleged conspiracy and "measures the average effect of the conspiracy" during that period. *Id.* ¶ 45.[4] Importantly, this "allows for the effect of the conspiracy to vary over time." *Id.* A backcasting model (which is sometimes referred to as a prediction model), on the other hand, "uses data from only a non-conspiratorial period to estimate the relation between price and non-conspiratorial economic factors." *Id.* ¶ 43. Based on this relation, the model can be used to predict "what prices *would have been* during the conspiracy period but-for the existence of the conspiracy." *Id.* The difference between the actual price and the predicted "but-for" price at any point in time is the isolated effect of the conspiracy on the price. *See id.* ¶ 46.

---

[4]     To quote Schwert's explanation: "For example, for an alleged conspiracy that lasted one year, a model could be estimated with 52 weekly dummy variables; each dummy variable would measure the effect of the conspiracy during the week corresponding to that dummy variable (*i.e.*, the week in which the dummy variable has the value one)." Schwert Rep. ¶ 45.

Dr. Schwert defines the non-conspiracy period as beginning in December 2015, when the Securities and Exchange Commission began investigating Defendants for the practices at issue here, and ending in December 2020, the last month for which Defendants produced data. *Id.* ¶ 48. To capture the macro- and micro-economic factors that affect VRDO rates, he uses nine explanatory variables. They include two systemic variables, a "commercial paper premium" and a "municipal bond premium," to account for the general default risk in the economy and seven idiosyncratic variables that are VRDO-specific and account for individual VRDO features. *Id.* ¶¶ 51-52.[5] The results of Dr. Schwert's analyses are stark: The multiple dummy variable model estimates, with statistical significance, that 99.3% of weekly-reset VRDOs and 98.8% of daily-reset VRDOs were reset during a week with inflated rates. Unredacted Schwert Rep. ¶ 69 n.90; *see also* Schwert Rep. ¶¶ 65 n.85, 68 n.88. That is, *virtually all* VRDOs had their rates inflated at least once during the conspiracy period. Similarly, the backcasting model estimates that 99.4% of weekly-reset VRDOs and 99.5% of daily-reset VRDOs were reset during a week with inflated rates. Unredacted Schwert Rep. ¶ 74.

Defendants lodge several objections to Dr. Schwert that, they claim, render his models fundamentally flawed. First and foremost, they argue that Dr. Schwert failed to account for the effects of lawful factors that influenced VRDO rates, including extreme macroeconomic conditions (namely, the Financial Crisis and the European Sovereign Debt Crisis), changes in the supply and demand of VRDOs, and changes in VRDO inventory levels. *See* Defs.' *Daubert* Mem. 7-14. Next, they argue that Dr. Schwert was wrong to include the "commercial paper premium" and "municipal bond premium" variables in his models. *Id.* at 19-20. And,

---

[5] Specifically, the idiosyncratic variables are a VRDO's (1) federal tax status; (2) alternate minimum tax status; (3) issuer state; (4) initial notional amount; (5) general obligation bond status; (6) long-term ratings; and (7) short-term ratings. *See* Schwert Rep. ¶ 52.

interspersed throughout their objections, they claim that Dr. Schwert's models are unreliable and should be excluded because they generate false positives and mask VRDOs that were never reset to inflated rates. *See id.* at 7-20; *see also* Oral Arg. Tr. 27-29.

Before the Court turns to these arguments, a few background principles warrant mention. First, regression models are routinely used — and accepted — in antitrust cases. *See, e.g., Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 677 ("In antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members."); *see also, e.g., id.* n.23 (collecting cases); *accord In re Urethane Antitrust Litig.*, 768 F.3d at 1259-61. Second, no complex model is perfect. At the end of the day, a regression model is meant to generate *estimates* for what the modeler is attempting to measure. As a result, disputes about the accuracy of a model often go to weight, not admissibility. *See, e.g., Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 61-62 (2d Cir. 2020) (summary order); *see also, e.g., Chen-Oster v. Goldman, Sachs & Co.*, No. 10-CV-6950 (AT), 2022 WL 814074, at *12 (S.D.N.Y. Mar. 17, 2022). As long as a model is not "so incomplete as to be inadmissible as irrelevant," *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986) (Brennan, J., concurring in part and joined by all members of the Court); does what it claims to do; and is supported by reasoned and sound methodological choices, it will generally survive a *Daubert* challenge. *See, e.g., Dial Corp. v. News Corp.*, 314 F.R.D. 108, 115 (S.D.N.Y. 2015). Put differently, "[t]he real question" is whether Plaintiffs "have established a *workable multiple regression equation*, not whether [their] model actually works." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009) (emphasis added).

In light of these principles, Defendants' arguments fall short. As noted, Defendants first contend that Dr. Schwert "ignore[s] a series of factors unrelated to the alleged conspiracy that had a major impact on VRDO rates." Defs.' *Daubert* Mem. 7. Most notably, they claim that his models do not account for the Financial Crisis and European Sovereign Debt Crisis and, thus, confuse the effects of these two crises on VRDO rates for an alleged conspiracy to inflate rates. *See id.* at 2, 7-11; *see also* ECF No. 397 ("Defs.' Class Cert. Opp'n"), at 2-5. But, as Plaintiffs explain, Dr. Schwert *did* account for these macroeconomic conditions in his regressions — by using the commercial paper premium and municipal bond premium variables. *See* Pls.' *Daubert* Opp'n 7-8; *see also* ECF No. 428-2 ("Schwert Reply"), ¶¶ 10-12 (explaining that both systemic explanatory variables spiked during the Financial Crisis). To be sure, Defendants point to a few examples of when the VRDO market sharply diverged from the commercial paper and municipal bond markets during the Financial Crisis. *See* Oral Arg. Tr. 31-35. But even if Defendants are correct that Dr. Schwert's explanatory variables do not perfectly capture the effects of the Financial Crisis, the objection boils down to an argument over which reasonable economists can (and apparently do) differ. Such squabbles are more appropriately resolved later in the litigation. *See, e.g.*, *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016) ("[A]lthough expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." (internal quotation marks omitted)); *Daubert*, 509 U.S. at 596 (noting that "the traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion,

but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.").

Defendants further argue that "the relationship between VRDO, commercial paper, and long-term municipal bond rates is unstable" and that this instability undermines Dr. Schwert's core premise that the three rates have a fixed relationship. Defs.' *Daubert* Mem. 17-19; *see also* Oral Arg. Tr. 31-35. But Dr. Schwert explains that his regression does *not* depend on such a relationship. *See* Schwert Reply ¶¶ 29-30. Instead, he shows that the precise relationship between commercial paper and municipal bond rates does not affect the predicted VRDO rates. *See id.* ¶¶ 31-33. That is sufficient, at this stage, to allay any concerns about whether his model is "workable." *Dial Corp.*, 314 F.R.D. at 115.

Defendants also claim that Dr. Schwert's models are flawed because he accounts for neither the supply and demand of VRDOs nor VRDO inventory levels. *See* Defs.' *Daubert* Mem. 11-17. Dr. Schwerts counters that he accounted for the former through his two systemic explanatory variables. *See* Schwert Reply ¶ 48. Defendants contend that these two variables do not accurately capture VRDO supply and demand levels, but this is merely another good faith dispute over discretionary modeling decisions that is more appropriately resolved at the merits stage of the litigation. As for inventory levels, Dr. Schwert provides a reasonable explanation for why he chose not to include them as an explanatory variable: because they would introduce errors. *See id.* ¶ 53. And in any event, a regression model need not include every possible explanatory variable for it to be deemed reliable. *See, e.g.*, *Kurtz*, 818 F. App'x at 62.

Finally, Defendants disagree with Dr. Schwert's use of the commercial paper premium and municipal bond premium explanatory variables. *See* Defs.' Daubert Mem. 19-20. But Dr. Schwert's inclusion of these variables is not "methodologically unsound." *Id.* at 19. To begin,

Defendants argue that the Financial Crisis uniquely affected VRDOs in a way that was not reflected in the commercial paper market because the Federal Reserve directly intervened in that market. *See* Oral Arg. Tr. 31-35. According to Dr. Schwert, however, the Federal Reserve's intervention reduced commercial paper rates rather than *premiums*, which effectively track "the 'general default risk' in the economy even if an individual liquidity provider is downgraded." Schwert Reply ¶ 96 & n.136. Defendants further argue that Dr. Schwert's selection of a long-term, rather than short-term, municipal bond variable is designed to "ratchet up his damages estimates." Defs.' *Daubert* Mem. 20. Again, however, Dr. Schwert counters that Defendants' model "that replaces [his] municipal bond premium variable with a short-term version" has its own problems, such as "produc[ing] damages that make no economic sense." Schwert Reply ¶ 94. Furthermore, as Plaintiffs explained during oral argument, Dr. Schwert chose a long-term municipal bond index because he wanted to capture systemic risk in the economy, not idiosyncratic VRDO-specific risk. *See* Oral Arg. Tr. 42-43. At this stage, Dr. Schwert's explanations of why his selection of the long-term variable is a "workable methodology" are sufficient. *Dial Corp.*, 314 F.R.D. at 115.

In short, this is not a case where the plaintiffs' models "offer no means of controlling for the effects of economic events and business developments." *LIBOR VII*, 299 F. Supp. 3d at 487. Instead, Dr. Schwert controlled for various external factors that could influence VRDO rates, and he grounded his models in well-supported, reasoned methodology. Although Defendants have forceful, perhaps even meritorious, disagreements with Dr. Schwert regarding his variable selection and model specification, that is not enough to reject his models at this stage. *See Kurtz*, 818 F. App'x at 62 (affirming a decision to admit a regression model even though the model

"fail[ed] to consider some arguably significant variables" because such failures "affect the analysis' probativeness, not its admissibility" (internal quotation marks omitted)).

In addition to the foregoing objections, Defendants claim that Dr. Schwert's models generate false positives. *See, e.g.*, Defs.' *Daubert* Mem. 10-11, 15-16; Defs.' Class Cert. Opp'n 23-26; Oral Arg. Tr. 27-29.[6] False positives can indeed be fatal to a model. *See, e.g.*, *Aluminum Warehousing*, 336 F.R.D. at 49 (explaining that a model is "flawed" and may "result in denial of class certification" if it "yields false positives"); *In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*Rail I*"), 725 F.3d 244, 253-55 (D.C. Cir. 2013) (vacating class certification after finding that the plaintiffs' model was "prone to false positives"). But Defendants here do not point to evidence of systemic false positives produced by Dr. Schwert's models. In other words, to the extent Defendants identify false positives at all, their objection does not undermine the workability of Dr. Schwert's models and goes, once again, to weight, not admissibility.

Defendants assert that Dr. Schwert's models find rate inflation before the conspiracy is alleged to have started. *See* Defs.' *Daubert* Mem. 11 ("Dr. Schwert's models also manufacture false estimates of 'rate inflation' outside the alleged conspiracy period following the 9/11 terrorist attacks, the 'dotcom' bubble burst of the early 2000s, and during periods of very low interest rates."); *see also* Oral Arg. Tr. 29, 37-38. This argument, however, is misleading on two fronts. First, Dr. Schwert does not state that there was no rate inflation prior to what he treats as the conspiracy period; instead, his assumption (consistent with Plaintiffs' claim) is that "the alleged conspiracy began *no later than* February 2008, not that it began *in* February 2008." Schwert Reply ¶ 63 (emphases added). That is, Defendants may well have been conspiring to

---

[6]      Although Defendants primarily raise these arguments in their opposition to class certification, not in their *Daubert* motion, the Court addresses them here.

inflate VRDO rates before the Class Period.  Thus, "there is no basis to conclude that any finding

of inflation in the years prior to 2008 is a 'false' positive."  *Id.*; *see also* ECF No. 427 ("Pls.'

Class Cert. Reply"), at 7-8.  Second, the "false positives" that Defendants identify were not

generated by Dr. Schwert's models, but by modified versions of Dr. Schwert's models put

forward by Defendants' rebuttal expert, Dr. Glenn Hubbard.  *See* Schwert Reply ¶¶ 54-62; *see

also* Pls.' *Daubert* Opp'n 9.  Defendants cite, and the Court has found, no case where a court

looked beyond a model itself to determine whether the model generated false positives.  *Accord

Rail I*, 725 F.3d at 250-52.

Defendants also claim that Dr. Schwert's models generate false positives when

Defendants held a high inventory of VRDOs.  *See* Defs.' Class Cert. Opp'n 23-24.  But as

Plaintiffs correctly note, Defendants "offer no reason why these positives are false."  Pls.' Class

Cert. Reply 8.  Instead, Defendants' argument on this point is essentially that it is "economically

nonsensical" for VRDO rates to be inflated when investors are unwilling to buy them.  Defs.'

Class Cert. Opp'n 24; *see also* Oral Arg. Tr. 30-31.  Defendants highlighted a number of these

supposed false positives during oral argument.  *See* Oral Arg. Tr. 27-29.  Plaintiffs, however,

offered reasonable explanations of why these potentially cherry-picked examples were

misleading snapshots in time and might not genuinely represent false positives.  *See id.* at 53-55.

Defendants' strongest argument on this front pertains to March 2020, the onset of the

COVID-19 pandemic.  *See id.* at 28-29.  Notably, Dr. Schwert himself effectively concedes that

his model generates false positives for that month.  *See* Schwert Reply ¶ 64 ("[*E*]*xcept for March

2020*, my model predicts no systemic rate inflation during the rest of 2020 . . . ." (emphasis

added)); *see also* Pls.' *Daubert* Opp'n 10 ("Schwert's model predicts no systemic rate inflation

except for March 2020 . . . ."); Oral Arg. Tr. 19-20 (Plaintiffs' counsel acknowledging that Dr.

Schwert's model went "haywire" for March 2020). Defendants' point is even more compelling because the Federal Reserve intervened in the VRDO market April 2020, when Dr. Schwert's models stop predicting systemic rate inflation. *See* Oral Arg. Tr. 28-29. But the point does not doom Dr. Schwert's models. The four weeks in March 2020 account for less than 1% of the total conspiracy and non-conspiracy time period. Defendants do not cite, and the Court has not found, any cases in which a court has thrown out a model because it generated a miniscule number of false positives *wholly outside* of the alleged conspiracy period.

Finally, Defendants argue that Dr. Schwert's models "rely on aggregated averages that mask the existence of unharmed class members." Defs.' Class Cert. Opp'n 26-27. But Defendants' argument misses the mark. There is no requirement in the Second Circuit that *all* putative class members be injured. "District courts in this and other Circuits have held that a class may be certified so long as a *de minimis* number of class members were uninjured or, conversely, virtually all class members were injured." *In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 17 (E.D.N.Y. 2020) (internal quotation marks omitted). Although there is no bright-line definition of "de minimis" in this context, Dr. Schwert's estimate that less than 2% of VRDOs never had an inflated rate clearly falls within its boundaries. *See id.* at 17-18 (explaining that the consensus of what qualifies as "de minimis" hovers around 5% to 6% and collecting cases); *see also, e.g.*, *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 563 (S.D.N.Y. 2021). In arguing otherwise, Defendants once again rely on Dr. Hubbard's *modified* versions of Dr. Schwert's models to show significantly higher "non-injury" rates. *See* Pls.' Class Cert. Reply 9. But again, Defendants do not cite, and the Court has not found, any case in which a court looked at something other than a model itself to determine whether the model impermissibly masked uninjured plaintiffs.

In conclusion, although Defendants raise any number of forceful arguments in response to Dr. Schwert's analysis, they are not enough to exclude his models at this stage of the litigation. Accordingly, their *Daubert* motion with respect to him must be and is denied.

## 2. Dr. Rosa Abrantes-Metz

As noted, Defendants also challenge Plaintiffs' second expert, Dr. Abrantes-Metz. In her report, Dr. Abrantes-Metz offers two studies to prove class-wide impact — a qualitative market-structure analysis and a rate study. *See generally* Abrantes-Metz Rep. ¶¶ 58-188. In the former, Dr. Abrantes-Metz analyzes six different factors that characterize the VRDO industry and concludes that "a conspiracy [among Defendants] to increase VRDO rates would be effective . . . [and] that Defendants had a readily available mechanism for effectuating that conspiracy: coordination on their base rates." *Id.* ¶ 130; *see also id.* ¶¶ 123-129. Notably, "[s]imilar market analyses have been accepted by courts as a source of common evidence of impact." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG), 2014 WL 7882100, at *48 (E.D.N.Y. Oct. 15, 2014), *adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015); *see also In re Blood Reagents Antitrust Litig.*, No. 09-MD-2081, 2015 WL 6123211, at *31 (E.D. Pa. Oct. 19, 2015) (explaining that "[m]any courts have accepted market-structure analyses in finding predominance with respect to antitrust impact" and collecting cases).

Dr. Abrantes-Metz's rate study includes both qualitative and quantitative components. The qualitative component examines the record to determine how Defendants calculated their VRDO reset rates and concludes that they did so nearly uniformly "by reference to a base rate." Abrantes-Metz Rep. ¶¶ 132, 151. The quantitative component uses regression models to test whether the base rates and VRDO rates are correlated. *Id.* ¶¶ 152-59. This analysis shows both that "each Defendants' base rate correlates tightly, positively, and in a statistically significant

fashion, with the VRDO rates charged to class members," *id.* ¶ 185, and that "there is a strong co-movement between [] base rates among Defendants," *id.* ¶ 187. This leads Dr. Abrantes-Metz to conclude that "Defendants set base rates consistent with one another, directionally, and that a conspiracy to inflate VRDO interest rates implemented, in part, by coordinating on base rates had a common and class-wide impact on the VRDO rates charged to class members." *Id.* ¶ 188. This sort of rate study is also commonly accepted by courts in antitrust price-fixing cases. *See, e.g.*, *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 671, 676.

Defendants raise several challenges to Dr. Abrantes-Metz's models, but they are swiftly rejected. First, Defendants attack the rate study for not controlling for macroeconomic factors, using aggregated averages, and failing to include daily-reset VRDOs. *See* Defs.' *Daubert* Mem. 21-22, 25; Defs.' Class Cert. Opp'n 32-34. But as Plaintiffs point out, Dr. Abrantes-Metz addresses all of these criticisms in her reply report and concludes that they do not change her analyses. *See* Pls.' *Daubert* Opp'n 22-24; *see also* ECF No. 428-3 ("Abrantes-Metz Reply"), ¶¶ 45-50 (macroeconomic factors), 61-62 (aggregated averages), 67-75 (daily-reset VRDOs). Next, Defendants argue that their rate-setters did not uniformly base VRDO reset rates on base rates. *See* Defs.' *Daubert* Mem. 23-24. But this is merely a disagreement with Dr. Abrantes-Metz's interpretation of the record. *See* Pls.' *Daubert* Opp'n 21 ("In the end, [Defendants'] arguments are not methodological, but rather boil down to a disagreement about what the factual record reflects."). There is ample evidence in the record that Defendants referenced base rates when setting VRDO rates, *see, e.g.*, Pls.' Class Cert. Mem. 6-12; Pls.' *Daubert* Opp'n 18-19 & n.22, so Dr. Abrantes-Metz's interpretations and conclusions are plausible, if not reasonable. Accordingly, this challenge fails. *See also, e.g.*, *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126 (ALC), 2020 WL 5849142, at *18 (S.D.N.Y. Sept. 30, 2020); *Sumotext Corp.*

*v. Zoove, Inc.*, No. 16-CV-1370, 2020 WL 533006, at *11 (N.D. Cal. Feb. 3, 2020). Finally, Defendants argue that Dr. Abrantes-Metz "ignores important aspects of the market structure that undermine her conclusion that the alleged conspiracy would have been effective." Defs.' Class Cert. Opp'n 31. In reality, though, Defendants implicitly concede that Dr. Abrantes-Metz considered the relevant factors; they merely argue that she misinterpreted the factors. *See* Pls.' Class Cert. Reply 10-11. Given Dr. Abrantes-Metz's thorough and reasoned responses to Defendants' criticisms, *see id.*, the Court is satisfied that her models are "theoretically capable of evidencing a common impact, and [her] factual analysis [] actually do[es] so," *Air Cargo Shipping Servs.*, 2014 WL 7882100 at *48.

Accordingly, Defendants' challenge to Dr. Abrantes-Metz also fails.

## B. Plaintiffs' Class Certification Motion

The Court turns then to Plaintiffs' class certification motion. As noted, Defendants contest only one of the Rule 23 requirements: predominance. The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997). More specifically, it "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up). To demonstrate predominance, the plaintiff must demonstrate that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (internal quotation marks omitted). Significantly,

if that standard is met, "the action may be considered proper under Rule 23(b)(3) even though
other important matters will have to be tried separately, such as damages or some affirmative
defenses peculiar to some individual class members." *Id.* (internal quotation marks omitted); *see*
*Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405-08 (2d Cir. 2015) (reaffirming the "well-
established" principle "that the fact that damages may have to be ascertained on an individual
basis is not sufficient to defeat class certification under Rule 23(b)(3)" (internal quotation marks
omitted)); *Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010) ("Rule 23(b)(3) requires that
common questions predominate, not that the action include only common questions.").

Significantly, Defendants do not dispute that whether they engaged in collusion is an
important question common to all class members. *See* Oral Arg. Tr. 4-5. That is for good
reason. The predominance requirement is "'a test readily met in certain cases alleging . . .
violations of the antitrust laws.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91, 108 (2d Cir. 2007) (quoting *Amchem Prods., Inc.*, 521 U.S. at 625). In this case,
Defendants acknowledge that VRDO rates "behaved during [the Class Period] in a way that is
different from all other comparable financial instruments." Oral Arg. Tr. 15, *see* Defs.' *Daubert*
Mem. 8. Therefore, the primary dispute is over *why* — specifically, over whether the rates did
so because Defendants conspired in violation of the Sherman Act or whether they did so for
some other reason, such as the Financial Crisis. *See, e.g.*, Defs.' *Daubert* Mem. 8. The answer
to that question turns on whether Defendants' conduct "stem[med] from independent decision or
from an agreement, tacit or express," rather than on the actions of individual Plaintiffs. *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 553 (2007). Thus, as in *In re GSE Bonds Antitrust Litig.*, 414
F. Supp. 3d 686 (S.D.N.Y. 2019), it is likely that "[P]laintiffs' primary claim concerning [the]
existence and scope of the alleged conspiracy to fix [interest rates] can be established by

20

common evidence such as the [] communications and deposition testimony of [Defendants' rate-setters]." *Id.* at 701; *see also Air Cargo Shipping Servs.*, No. 06-MD-1175, 2014 WL 7882100, at *37-38 (S.D.N.Y. Oct. 15, 2014).

Defendants instead focus their fire on whether Plaintiffs "can prove, through common evidence, that all class members were in fact *injured* by the alleged conspiracy." *Rail I*, 725 F.3d at 252 (emphasis added); *see also* Oral Arg. Tr. 4-5 (defense counsel stating that Defendants "agree that the existence of the alleged conspiracy is a common question" but "do not agree that the *effects* of the alleged conspiracy is a common question" (emphasis added)); *see generally In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619, 623 (D.C. Cir. 2019) ("*Rail II*") ("To establish liability under section 4 [of the Clayton Act], each plaintiff must prove not only an antitrust violation, but also an injury to its business or property and a causal relation between the two."). Defendants' principal arguments on that score rest on their *Daubert* motion. *See* Def. Class Cert. Opp'n. 18-33. The denial of that motion thus weighs heavily in favor of granting Plaintiffs' class certification motion. *See, e.g.*, *Tyson Foods*, 577 U.S. at 459 ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury."). That does not end the analysis, however, as Defendants make four other arguments in opposition to Plaintiffs' motion for class certification: first, that even if Plaintiffs' expert testimony is admissible, resolution of their claims will require individualized inquiries, *see* Defs.' Class Cert. Opp'n 14-18; second, that proof of injury and damages will require individualized inquiries into synthetic fixed rate transactions, *see id.* at 35-43; third, that proof of class membership and antitrust standing will require individualized inquiries to determine the direct payors of interest on VRDOs given the prevalence of "conduit" issuances, *see id.* at 43-45;

and fourth, that individualized inquiries will be necessary to determine if class members' claims are timely, *see id.* at 45-49. The Court will address each of these arguments in turn.

### 1. Individualized Inquiries

Defendants' "main argument" against class certification is that "individual fact-specific showing of no rate inflation . . . would occur thousands of times for thousands of VRDOs" should the Court grant Plaintiffs' motion. Oral Arg. Tr. 6-8; *see also* Defs.' Class Cert. Opp'n 14-18. According to Defendants, rate-setters considered each VRDO's "credit quality, inventory levels, historical performance, notional size, tax status, and industry sector" in making individualized judgments about the appropriate rate. Defs.' Class Cert. Opp'n 14. They argue that, as a result, "[a]ll of these differentiating factors must be individually examined to determine whether the rates that were set on any given VRDO are fully explained by the specific circumstances of that particular bond." *Id.* at 15.

For the most part, however, this argument falls with Defendants' *Daubert* motion. *Cf.* Defs.' Class Cert. Opp'n 12-32 (tying argument to criticism of Dr. Schwert's and Dr. Abrantes-Metz's expert reports). Plaintiffs submitted Dr. Schwert's and Dr. Abrantes-Metz's testimony to establish the existence of class-wide injury. The Court's acceptance of their testimony therefore undermines Defendants' arguments about individualized adjudication. Of course, it remains an open question "whether, assuming Plaintiffs paid supra-competitive [interest], that payment was *caused* by" Defendants' allegedly anti-competitive behavior, as opposed to the other factors emphasized by Defendants. *Dial Corp.*, 314 F.R.D. at 120. Whatever the answer to this question may be, however, it is a *common* question. As the Supreme Court has put it: "When, as here, the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity — an alleged failure of proof as to . . . the plaintiffs' cause of action —

22

courts should engage that question as a matter of summary judgment, not class certification."
*Tyson Foods*, 577 U.S. at 457 (cleaned up).

To be sure, the Court may indeed have to "make individualized inquiries with respect to some of the plaintiffs." *Brown v. Kelly*, 609 F.3d at 483. But this "does not render certification inappropriate," as "Rule 23(b)(3) requires that common questions predominate, not that the action include only common questions." *Id.* at 484; *In re Asacol Antitrust Litig.*, 907 F.3d 42, 52 (1st Cir. 2018) ("A class may be certified notwithstanding the need to adjudicate individual issues so long as the proposed adjudication will be both administratively feasible and protective of defendants' Seventh Amendment and due process rights." (internal quotation marks omitted)). The Supreme Court's decision in *Tyson Foods* is especially instructive. *See* 577 U.S. at 454-55. There, meat processing workers sought to recover overtime pay for time spent donning and doffing their protective gear. The defendants argued that, because "each employee must prove that the amount of time spent donning and doffing" pushed into overtime hours, "these necessarily person-specific inquiries into individual work time predominate[d] over the common questions raised by [the plaintiffs'] claims, making class certification improper." *Id.* at 454. The Supreme Court disagreed and held that class certification was appropriate because "each class member could have relied on [the plaintiffs' representative] sample to establish liability if he or she had brought an individual action." *Id.* at 455. The same is true here. Even if Defendants are correct that VRDO rate-setting was an individualized process involving multiple factors, each class member could rely on Dr. Schwert's and Dr. Abrantes-Metz's testimony to support a finding of antitrust liability in a hypothetical individual action. That is sufficient at this stage.

Defendants' arguments to the contrary rest heavily on *Rail II*, *Asacol*, and *Aluminum Warehousing*, *see* Defs.' Class Cert. Opp'n 12-13, but all three cases are distinguishable. In *Rail*

*II*, the plaintiffs' own model indicated that 2,037 putative class members, or 12.7% of the proposed class, were uninjured. 934 F.3d at 624-25. In *Asacol*, "the reports of both sides' experts" made clear that "approximately ten percent of class members had not been injured by [the defendant's] allegedly anticompetitive conduct." 907 F.3d at 46-47; *see id.* at 53 ("[T]his is a case in which any class member may be uninjured, and there are apparently thousands who in fact suffered no injury. The need to identify those individuals will predominate and render an adjudication unmanageable."). Here, by contrast, Dr. Schwert found that, "[o]verall, 99.3% of VRDOs had at least one reset in a week where Defendants were inflating VRDO reset rates." Pls.' Class Cert. Mem. at 21. And Defendants offer no counter-estimate of how many individualized inquiries would be required. Thus, the record here is a far cry from the records in *Rail II* and *Asacol*. *See Cyclosporine Opthalmic Emulsion*, 335 F.R.D. at 17-18 (explaining that the consensus of what a "de minimis" percentage of uninjured members is hovers around 5% to 6% and collecting cases). "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014).

*Aluminum Warehousing* is similarly distinguishable. There, the plaintiffs' case for class certification was impaired by "non-uniform . . . views" by class members and expert models that the court refused to accept due to a "range of significant methodological infirmities." 336 F.R.D. at 50, 63. Accordingly, Judge Engelmayer concluded that the plaintiffs "lack[ed] common proof of antitrust injury caused by the alleged conspiracy" and that injury would be "provable only via individualized inquiries keyed to each particular purchaser." *Id.* at 63. Here, as discussed, the Court has accepted Plaintiffs' expert testimony as common proof of antitrust injury. Defendants' reliance on *Aluminum Warehousing* is therefore inapposite for reasons the Court has already

discussed at length. *See, e.g.*, *Tyson Foods*, 577 U.S. at 459 ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury.").

### 2. Synthetic Fixed Rate Transactions

Next, Defendants argue that "intensive individualized analysis is necessary to determine which class members, if any, would have been harmed by VRDO rate inflation in light of their synthetic fixed rate structures." Defs.' Class Cert. Opp'n 36. A synthetic fixed rate transaction insulates the issuer from fluctuations in the VRDO rate by combining a VRDO bond with one or more interest swaps. ECF No. 398-2 ("Chalmers Rep."), ¶ 151. In essence, the issuer generally agrees to pay the swap counterparty a fixed interest rate, and the swap counterparty pays the VRDO issuer a variable or floating rate — called the "floating rate leg" — that is intended to correspond to the VRDO's variable interest rate. *Id.* ¶¶ 151, 156. The floating rate leg is generally one of: a "cost of funds swap," a "SIFMA swap," or a "LIBOR swap." *Id.* ¶ 156. In a cost of funds swap, the rate the issuer receives is equivalent to the VRDO rate it pays out to the VRDO investor. *Id.* In a SIFMA swap, the rate is tied to the SIFMA Index, "an index calculated based on an average of eligible weekly VRDO rates." *Id.*; *see also id.* n.251 (defining the SIFMA Index). Finally, a LIBOR swap, as the name suggests, pegs the rate to a set percentage of LIBOR. *Id.* ¶ 156.

Relying on *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR V*"), No. 11-MDL-2262 (NRB), 2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015) — in which Judge Buchwald dismissed the claims of a plaintiff whose swap agreements "definitely show[ed] that [it] was never exposed to fluctuations in [the allegedly rigged LIBOR rate] at all," *id.* at *22 — Defendants argue that because some Plaintiffs "entered into VRDOs as inseparable components of 'synthetic fixed rate transactions,'" a number of Plaintiffs never paid "inflated" VRDO rates

and therefore suffered no injury, Defs.' Class Cert. Opp'n at 35-38.  More to the point, Defendants contend that "identify[ing] unharmed class members . . . would [result in the] need to engage in thousands of time-intensive, individualized analyses of each VRDO's bond documents to determine whether it was issued as part of a synthetic fixed rate transaction," thus defeating predominance.  *Id.* at 36; *see also* Oral Arg. Tr. 77-78.

There is some force to Defendants' argument, but it is not enough to tip the balance away from a finding of predominance.  No doubt, some individualized swap-related questions — for example, which VRDOs were part of synthetic fixed rate transactions (especially "cost of fund" swaps that perfectly eliminate any exposure to changes in the VRDO rate), when the individual VRDO was issued and when the swap was entered, and whether the issuer was completely hedged against VRDO rate inflation — will have to be addressed at some point in the litigation. *See* Defs.' Class Cert. Opp'n 36-38; *see also* Chalmers Rep. ¶¶ 219-20.   But Defendants have not come close to identifying which or how many class members were never exposed to interest overcharges on account of their participation in swaps.  And their vague observation that "many issuers" entered into synthetic fixed rate transactions, Defs.' Class Cert. Opp'n at 35, without more, is not enough to overcome Plaintiffs' expert testimony establishing the existence of class-wide injury.  This necessarily pushes any swap-related questions into the merits stage and makes them inseparable from the damages inquiry.  And as noted, "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)."  *Roach*, 778 F.3d at 405 (internal quotation marks omitted)).

Ironically, Judge Buchwald's subsequent opinion in *LIBOR VII* is especially instructive. Like Defendants here, the defendants there cited Judge Buchwald's opinion in *LIBOR V* in opposing class certification.  *See LIBOR VII*, 299 F. Supp. 3d at 592.  Notably, Judge Buchwald

agreed with the defendants that swaps, unlike the "series of purchases like the pharmaceuticals at issue" in *In re Nexium Antitrust Litigation*, 777 F.3d 9 (1st Cir. 2015), may constitute a single transaction, such that corresponding offsets would necessarily inform whether or not there was antitrust injury. *Id.* at 593-94. Even so, she granted the plaintiffs' class certification motion, explaining that, *even if* "[the court] accepted [the] defendants' definition [of injury], . . . . [t]he considerations that underlie this determination of 'injury,' including issues of absorption and netting, are otherwise identical to the determination of damages." *Id.* at 595. That analysis rings even truer here, as Defendants fail to chip away at predominance with even a ballpark estimate of how many class members are likely to be uninjured on account of their participation in swaps, let alone by making a "definitive show[ing]" of no injury for a particular plaintiff. *LIBOR V*, 2015 WL 6696407, at *22. Thus, "any class member-specific question of fact relating to injury will be reducible to corresponding questions of fact relating to damages." *Id.* at 595. It follows that Defendants' argument is not sufficient, at this stage, to defeat class certification.[7]

### 3. Conduit Issuances

Defendants' next argument, that individualized inquiries will be necessary to determine class membership and antitrust standing given the prevalence of "conduit issuances" — that is,

---

[7]      In light of the foregoing, the Court need not and does not reach Plaintiffs' argument that Defendants' unitary-transaction theory is foreclosed by the Supreme Court's decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). In *Hanover Shoe*, the Court held that a buyer who raises his prices to consumers in response to an illegal price overcharge by a supplier is still entitled to damages from the supplier, even though the buyer may have "passed on" the overcharge and "maintain[ed] his profit level." *Id.* at 489. The offset Defendants identify here is arguably of a different nature — one that they allege occurred *in the same transaction*. *Cf. LIBOR VII*, 299 F. Supp. 3d at 594 ("We are skeptical that . . . exclusion of recoupment attributable to a distant second-order effect should extend to later savings attributable to the same or related transaction." (internal quotation marks omitted)). Moreover, even if VRDOs and swaps should not be considered parts of one transaction, any offset from a swap would still have been "passed on" horizontally, not vertically.

issuances in which a government unit issues bonds on behalf of a third party — is more easily dispatched. Defs.' Class Cert. Opp'n 43-44; *see also* Chalmers Rep. ¶¶ 261-62. At bottom, the argument is an administrative feasibility argument dressed up in predominance clothing. Essentially, Defendants argue that it would be difficult and "intensive" to identify the direct payor in the case of each VRDO. Defs.' Class Cert. Opp'n 44. But in a recent case where, like Defendants here, a party argued that class certification was inappropriate because "the dispute over which entity was the direct payor for any given transaction will lead to hundreds of thousands of mini trials," the Second Circuit held that "[that] argument rests on a faulty premise" because "[r]equiring administrative feasibility is neither compelled by precedent nor consistent with Rule 23." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 717 (2d Cir. 2023) (internal quotation marks omitted). Ascertaining the direct payor on a VRDO may not be as easy as Plaintiffs make it out to be, *see* Oral Arg. Tr. 95-96, but Defendants "do not contend that identifying the direct payor for each transaction is impossible," *Fikes Wholesale, Inc.*, 62 F.4th at 717. Accordingly, Defendants' "ascertainability argument must fail." *Id.*

### 4. Timeliness

Finally, Defendants argue that individualized inquiries will be required to determine which class members' antitrust claims are timely. *See* Defs.' Class Cert. Opp'n 45-48. Plaintiffs counter that the question of fraudulent concealment — which turns on whether Defendants took affirmative steps to prevent Plaintiffs' discovery of the conspiracy or whether the conspiracy itself was inherently self-concealing — is a common question that predominates over any individual question regarding the knowledge or diligence of individual class members. *See* Pls.' Class Cert. Mem. 37-40. The weight of authority is firmly on Plaintiffs' side. *See, e.g.*, *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 520 (S.D.N.Y. 1996) ("Courts have

overwhelmingly held that, even when the issue of fraudulent concealment involves both common and individual questions, the common question of whether Defendants successfully concealed the existence of the alleged conspiracy predominates over any individual questions regarding the knowledge or diligence of individual plaintiffs." (citing cases)); *see also, e.g.*, *Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*, 368 F. Supp. 3d 681, 707 (S.D.N.Y. 2019)*; In re London Silver Fixing, Ltd., Antitrust Litig*., 332 F. Supp. 3d 885, 913 (S.D.N.Y. 2018); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 134 (S.D.N.Y. 2014); *Pub. Emps.' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97, 116 (S.D.N.Y. 2011).

 To be sure, most of these cases arise in the securities-fraud context, not the antitrust context. But the differences in relevant analysis notwithstanding, *compare In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-CV-7789 (LGS), 2016 WL 5108131, at *15 (S.D.N.Y. Sept. 20, 2016) (antitrust), *with Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361-62 (2d Cir. 2013) (securities), Defendants fail to explain why the arguments they press here could not be tabled or organized in the way that these cases contemplated. For example, Defendants argue that *qui tam* actions "filed in at least California, New York, Illinois, and Massachusetts . . . should have caused a reasonably diligent class member to investigate the possibility of improper rate inflation." Defs.' Class Cert. Opp'n at 47. Whether that is true, however, may be a common question in itself. *Pub. Emps.' Ret. Sys. of Mississippi*, 277 F.R.D. at 116 ("If . . . civil complaints attached as exhibits to Defendants' moving papers were sufficient, either singly or in combination, to place a reasonable investor on inquiry notice of Defendants' . . . violations, then the claims of all class members are time-barred [and] [t]his is the very definition of generalized proof."). And in any event, if individualized inquiry proves to be necessary, "Rule 23 gives the

29

district court flexibility to certify subclasses as the case progresses and as the nature of the proof to be developed at trial becomes clear." *U.S. Foodservice*, 729 F.3d at 129 (quoting *Marisol A. v. Giuliani,* 126 F.3d 372, 379 (2d Cir.1997)).[8]  The same is true with respect to Defendants' claim that the jury in this case would "need to consider individualized evidence that some class members were on inquiry notice because they closely monitored the performance of the VRDO rates." Defs.' Class Cert. Opp'n 48.  Defendants offer no reason why the Court could not certify subclasses — perhaps of class members who had the necessary "tools and information" and of those who did not, *id.* — later in the litigation.  *See In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 116 (S.D.N.Y. 2010) ("To the extent . . . potential defenses could present some individual issues, there are many ways in which this Court can deal with those issues when they arise.").

In short, a statute-of-limitations "defense may arise and may affect different class members differently." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001).  But this occurrence "does not compel a finding that individual issues predominate over common ones." *Id.* (internal quotation marks omitted).

### 5.  Class and Sub-Class Definitions and Class Counsel

In sum, the Court finds that Plaintiffs satisfy the predominance requirement of Rule 23(b)(3).  As noted, Defendants do not dispute that Plaintiffs also satisfy the requirements of Rule 23(a) and the "superiority" requirement of Rule 23(b)(3).  Oral Arg. Tr. 4.  The Court

---

[8]      Notably, Defendants appear to agree that those on actual notice can be (or have already been) easily identified.  *See, e.g.*, Defs.' Class Cert. Opp'n 47 (noting that "third-party discovery confirmed that class members — including SANDAG — were on notice of [the qui tam] cases before February 21, 2015").  And as noted above, "[t]hat the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton*, 573 U.S. at 276.

therefore grants Plaintiffs' motion to certify a nationwide Class composed of all persons and entities who directly paid interest expenses on VRDOs that had interest rates reset on a weekly or daily basis pursuant to remarketing agreements with Defendants at any point from February 1, 2008 through November 30, 2015, excluding Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, and the United States government.  The parties agree that Plaintiffs' request for certification of the Class and certification of a Contract Sub-Class "rise and fall together."  Oral Arg. Tr. 100.  It therefore follows that the Court also grants Plaintiffs' request to certify a Contract Sub-Class composed of all persons and entities who were party to a remarketing agreement with any Counterparty Defendant that applies to VRDOs that had interest rates reset on a weekly or daily basis at any point from February 1, 2008 through November 30, 2015, excluding Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, and the United States government.  Finally, the Court also grants Plaintiffs' motion to appoint Quinn Emanuel Urquhart & Sullivan, LLP; Wollmuth Maher & Deutsch LLP; and Susman Godfrey LLP as class counsel.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED and Defendants' motion to preclude Dr. Schwert and Dr. Abrantes-Metz is DENIED.

No later than **two weeks from the date of this Opinion and Order**, Plaintiffs shall file a proposed order consistent with this Opinion and Order and prescribing procedures by which class members will be provided notice and an opportunity to opt out of the class.  By the **same date**, Plaintiffs shall file a letter brief addressing why their proposals for notice and opting out are consistent with the requirements of Rule 23 and due process.

One housekeeping matter remains.  In several prior Orders, the Court granted the parties permission to file documents temporarily under seal.  *See* ECF No. 372, 401, 434, 446.  Both parties filed documents under seal in connection with their respective motions.  *See, e.g.*, ECF Nos. 363-64, 366, 370-71, 387-91, 393-96, 398, 404, 411-14, 423-25, 429-30, 433, 435, 443-44. It is well established that filings that are "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents" to which a presumption in favor of public access attaches.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  Significantly, assessment of whether the presumption in favor of public access is overcome must be made on a document-by-document basis.  *See, e.g.*, *Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019).  And the mere fact that information is subject to a confidentiality agreement between litigants is not a valid basis to overcome that presumption.  *See, e.g.*, *United States v. Wells Fargo Bank N.A.*, No. 12-CV-7527 (JMF), 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015) (citing cases).  In light of this Opinion and Order, and to facilitate the Court's review of the parties' requests, the parties shall, **no later than two weeks from the date of this Opinion and Order**, submit a joint letter with a single chart listing each and every document that any party (or third party) believes should remain under seal or in redacted form with a hyperlinked reference to the docket number of the document; the party (or third party) who seeks to keep the document under seal; a *succinct* (i.e., two- or three-word) justification for the request; and a hyperlinked reference to any prior letter-motion that addresses the document.  For the sake of completeness, the parties should include in this chart any document that the Court has already determined should be kept under seal permanently and include a hyperlinked reference to the Court's prior ruling in the chart.  To the extent that the parties (and, as relevant, third parties) agree that a document previously filed under seal or in redacted form can or should be filed

32

publicly, the parties should include that in the letter, with a hyperlinked reference to the relevant document.

The Clerk of Court is directed to terminate ECF Nos. 362 and 386.


SO ORDERED.

Dated: September 21, 2023
       New York, New York

_____
JESSE M. FURMAN
United States District Judge

Ib86alah

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
3    ALASKA ELECTRICAL PENSION
     FUND, *et al.*,
4
                    Plaintiffs,              New York, N.Y.
5
                    v.                       14 Civ. 7126 (JMF)
6
     BANK OF AMERICA CORP. *et al.*,
7
                    Defendants.
8
     ------------------------------x
9
                                             November 9, 2018
10                                           4:00 p.m.
11   Before:
12                        HON. JESSE M. FURMAN,
13                                           District Judge
14
15                            APPEARANCES
16
     QUINN EMANUEL
17        Attorneys for Plaintiffs
     BY:  DANIEL BROCKETT
18        JEREMY ANDERSEN
          MARC L. GREENWALD
19        PATRICK COUGHLIN
          -and-
20   SCOTT & SCOTT, LLP
     BY:  JULIE KEARNS
21        -and-
     ROBBINS GELLER RUDMAN & DOWD LLP
22   BY:  DAVID W. MITCHELL
23   RICHARDS KIBBE & ORBE LLP
          Attorneys for Defendant ICAP
24   BY:  SHARI BRANDT
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Ib86alah

1    million.  That is not much of a premium.  You can say, Well,

2    that is a high percentage and the percentage looks like it

3    doesn't line up with the rest of the cases.  Well, asking for

4    $140 million fee on a $90 million investment in a very risky

5    antitrust case of this kind and achieving the result that we

6    did is not unreasonable at all, your Honor.  I think that is

7    the bottom line.

8         THE COURT:  Agreed.  Although my task isn't to decide

9    what is not unreasonable.  My task is to decide what

10   reasonable.  We started with the proposition that there is a

11   range of reasonableness.  I take it you would have to concede,

12   for example I will just pick a number, and don't read to much

13   into it, if I were to say 25 percent, I assume you would have

14   to concede that that is not unreasonable as well?

15        MR. BROCKETT:  I would be disappointed, but I would

16   have to say it is reasonable.

17        THE COURT:  I didn't even ask you to say it was

18   reasonable.  I asked you to concede it was unreasonable.

19        MR. BROCKETT:  Not reasonable.  There is a range of

20   reasonableness or not unreasonableness.  Yes, 25 percent would

21   fall into that range.

22        THE COURT:  One other data point.  I gather in the end

23   LIBOR and TIBOR cases, Judge Daniels awarded 23.8 percent fee.

24   Some of these documents are a little hard to makes heads or

25   tails of; but is that correct and why is that not a benchmark

Ib86alah

1    to be used here?

2             MR. BROCKETT:  I am not familiar with the details of

3    that case.  I really cannot comment on it.  I am happy to look

4    and submit a letter to you.  I don't think that is one of the

5    cases we looked at as a relevant comparison.

6             THE COURT:  What about the recent fee award in the

7    LIBOR case before Judge Buchwald?  I take it that was for

8    18 percent, but I also gather it was an interim award.

9             MR. BROCKETT:  Those cases are given eight factors.

10   We think those were relatively low fee awards.  There was lots

11   of government findings in those cases that they benefited from.

12   I think the risk in the LIBOR cases were a lot lower than the

13   risk in this case particularly because you had to certify a

14   benchmark class on an up and down situation.  So I think the

15   risk was different.  I think that the result and the outcome

16   was different on a relative basis as well.

17            THE COURT:  I think that exhausts the questions I have

18   on this front.  I don't know if anyone wishes to say anything

19   or be heard.

20            MR. BROCKETT:  Let me think if there is anything else.

21            The only other point that I don't think is a legal

22   point put just an equitable point.  I think the Court will

23   recall that we voluntarily deferred any fee at the last hearing

24   and so I just remind the Court that we have been cooperative.

25            THE COURT:  I think you voluntarily agreed to after I

Ib86alah

1    entered an order that suggested that I might propose it.

2            MR. BROCKETT:  I don't think so.  Actually, your

3    Honor, I came to the podium and I told you right at the outset

4    of the hearing that I had good news for you.

5            THE COURT:  I understand, but it was good news because

6    you -- well, anyway.  I will leave it at that.

7            Does anyone wish to be heard at the back table?  I

8    know you have less than a dog in this particular fight or

9    matter.  I am not sure fight is the right word.

10           Let me say first of all I will withhold entry final

11   judgment until I get the letter tomorrow by noon to make sure

12   you are all on the same page on that front so I don't prejudice

13   any entities' rights unjustifiably.

14           In the meantime, I will reserve judgment on the fee

15   application.  Let me say I am not intimating any view how I

16   will come out.  I do agree that counsel did an extraordinary

17   job here.  This was I think it is fair to say probably the most

18   complicated case I have had since I have been on the bench.

19   That is close to seven years at this point.  I have had it much

20   of that seven years.  The point still stands.  I cannot really

21   imagine how complicated it would have been if I didn't have

22   counsel who had done as admirable job in briefing it and

23   arguing as you have done.  You have in my view done an

24   extraordinary service to the class.  In that regard you

25   certainly deserve to be well compensated whether that is the

Ib86alah

1   precise amount that you have asked for or some amount less than

2   that.  I don't know.  I reserve judgment.  You will hear from

3   me on that.  Whatever I do on that front, I do want you to, and

4   don't want to be misunderstood, know that I think you have done

5   an extraordinary job and deserve thanks and commendation for

6   that.

7            With that we're adjourned.  Have a good day.

8                                -o-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25