# EXHIBIT A

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| IN RE VALVE ANTITRUST LITIGATION | Case No. 2:21-cv-00563-JCC |
|---|---|
| | **MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CO-LEAD CLASS COUNSEL** |
| | **NOTE ON MOTION CALENDAR: July 12, 2024** |
| | **FILED UNDER SEAL** |

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 4

    A.    As An Early Mover In The Market For Digital PC Game Distribution, Steam Attained A Dominant Position ........................................................... 4

    B.    To Maintain Its Monopoly, Valve Implemented A PMFN Policy Requiring Publishers Ensure Content And Price Parity Across Competing Distribution Platforms ................................................................................. 6

    C.    Valve Enforced Its PMFN Policy Against Publishers Across The Industry ........... 9

    D.    Valve Has Maintained Its High Commission While Blocking Competitive Threats ......................................................................................... 13

LEGAL STANDARDS ......................................................................................................... 17

ARGUMENT ...................................................................................................................... 17

I.     THE PROPOSED CLASS SATISFIES RULE 23(A) ................................................... 17

II.    COMMON QUESTIONS PREDOMINATE UNDER RULE 23(B)(3) ............................ 19

    A.    Common Evidence Establishes The Relevant Market And Valve's Monopoly Power In That Market ................................................................. 21

    B.    Common Evidence Regarding Anticompetitive Harm In The Relevant Market .................................................................................................. 22

    C.    Common Evidence Shows That All Or Virtually All Class Members Suffered Antitrust Injury ........................................................................... 24

    D.    Plaintiffs' Model Is Capable Of Calculating Class-wide Damages ..................... 28

III.   RESOLVING THE DISPUTE AS A CLASS ACTION IS SUPERIOR TO ANY ALTERNATIVE ............................................................................................... 29

IV.   THE COURT SHOULD APPOINT PLAINTIFFS' REQUESTED COUNSEL ................. 30

CONCLUSION ................................................................................................................... 30

MOT. FOR CLASS CERT.
CASE NO. 2:21-CV-00563-JCC

i

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ........................................................................... 30

*Amchem Prodts., Inc. v. Windsor*,
  521 U.S. 591 (1997) ...................................................................................................... 18, 20, 29

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ........................................................................................................ 4, 17, 20

*Austin v. McNamara*,
  979 F.2d 728 (9th Cir. 1992) ................................................................................................... 20

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  9 F.4th 1102 (9th Cir. 2021) .................................................................................................... 22

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) ........................................................................................... 29

*Castro v. Sanofi Pasteur Inc.*,
  134 F. Supp. 3d 820 (D.N.J. 2015) .......................................................................................... 21

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ............................................................................................................. 28, 29

*Dial Corp. v. News Corp.*,
  314 F.R.D. 108 (S.D.N.Y. 2015) ............................................................................................. 30

*In re Domestic Drywall Antitrust Litig.*,
  322 F.R.D. 188 (E.D. Pa. 2017) ............................................................................................... 30

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  2006 WL 1530166 (N.D. Cal. June 5, 2006) ...................................................................... 24, 27

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ................................................................................... 20, 22, 23, 24

*Fed. Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ............................................................................................. 20, 22

*Giuliano v. Sandisk Corp.*,
  2015 WL 10890654 (N.D. Cal. May 14, 2015) ....................................................................... 21

MOT. FOR CLASS CERT.
CASE NO. 2:21-CV-00563-JCC

ii

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

*In re Glumetza Antitrust Litig.*,
336 F.R.D. 468 (N.D. Cal. 2020) ..........................................................22, 28

*Golob Sons v. Schaake Packing Co.*,
93 Wash. 2d 257 (Wash. 1980) ....................................................................21

*In re High-Tech Emp. Antitrust Litig.*,
289 F.R.D. 555 (N.D. Cal. 2013) .................................................................29

*In re High-Tech Emp. Antitrust Litig.*,
985 F. Supp. 2d 1167 (N.D. Cal. 2013) ..................................................20, 22

*Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*,
2022 WL 2829880 (S.D.N.Y. June 30, 2022) ..............................................27

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) .....................................................................................28

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) ......................................................................17

*Johnson v. Spider Staging Corp.*,
87 Wash.2d 577 (1976) .................................................................................21

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) ......................................................................18

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ...........................................................................24

*Ochoa v. McDonald's Corp.*,
2016 WL 3648550 (N.D. Cal. July 7, 2016) ................................................17

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir.) (2022) .................................................................17, 20

*In re Processed Egg Prod. Antitrust Litig.*,
312 F.R.D. 171 (E.D. Pa. 2015) ...................................................................23

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
335 F.R.D. 1 (E.D.N.Y. 2020) ......................................................................27

*Ruiz Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) ......................................................................20

*Sidibe v. Sutter Health*,
333 F.R.D. 463 (N.D. Cal. 2019) ..................................................................18

Mot. for Class Cert.
Case No. 2:21-cv-00563-JCC

iii

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) .................................................................................. 18

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
    421 F. Supp. 3d 12 (E.D. Pa. 2019), *aff'd*, 967 F.3d 264 (3d Cir. 2020) ................................ 24

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    622 F. Supp. 3d 22 (E.D. Pa. 2022) ........................................................................ 22

*In re Tableware Antitrust Litig.*,
    241 F.R.D. 644 (N.D. Cal. 2007) ............................................................................ 18

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010) ............................................................................ 19

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) .............................................................................. 17, 20, 28

*U.S. v. Apple, Inc.*,
    791 F.3d 290 (2d. Cir. 2015) ................................................................................... 1

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ..................................................................................... 23

### Statutes

Fed. R. Civ. P. 23 ................................................................................................... *passim*

### Other Authorities

Andre Boik & Kenneth S. Corts, <u>The Effects of Most-Favored-Nation Clauses on
    Competition and Entry</u>, 59 J.L. & Econ. 105, 105 (2016) ........................................... 25

Mot. for Class Cert.
Case No. 2:21-cv-00563-JCC

iv

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1  Plaintiffs Wolfire Games, LLC; Dark Catt Studios Holdings, Inc.; and Dark Catt Studios

2  Interactive LLC respectfully move for class certification pursuant to Fed. R. Civ. P. 23(b)(3).

3  **PRELIMINARY STATEMENT**

4  As this Court has recognized, "[m]ost-favored-nations restraints, such as those allegedly

5  utilized by Defendant, are unlawful if used to further anticompetitive goals." Dkt. 80 at 6 (citing

6  *U.S. v. Apple, Inc.*, 791 F.3d 290, 305 (2d. Cir. 2015)). As detailed below, with the benefit of a

7  developed discovery record, Plaintiffs now have abundant common evidence that Defendant

8  Valve Corporation ("Valve") does, in fact, use most-favored-nations restraints to block

9  competition and maintain its monopoly. The common evidence further shows that, as a result of

10  these restraints, Valve has been able to charge supracompetitive commissions to *every* member

11  of the proposed class, which consists of entities who paid a commission to Valve in connection

12  with the sale or use of a game on the Steam platform on or after January 28, 2017. Plaintiffs now

13  ask this Court to certify this class pursuant to Rule 23(b)(3), because Plaintiffs can prove *all*

14  aspects of their claims on a class-wide basis, and because the issues common to the class easily

15  predominate over any individualized ones.

16  Video games were historically sold at brick-and-mortar retailers, which entailed high

17  inventory, shipment, and overhead costs. In the early 2000s, Valve saw an opportunity to

18  distribute games more cheaply online. Valve originally built the Steam platform to distribute its

19  own games, but after recognizing it could also use Steam to sell and distribute *all* PC games,

20  Valve launched the Steam Store in 2005. Soon thereafter, Valve began to dominate the market

21  for PC game distribution.

22  Valve recognized, however, that its success could be threatened by other platforms,

23  which could compete to attract video game publishers by charging them commissions far lower

24  than the 30% commission (or "revenue share") that Valve charged. Valve did not want to lose

25  either its dominant position or the inflated profits resulting from its 30% commission. Valve,

26  therefore, implemented and enforced a "platform most-favored-nations" policy ("PMFN

27  Policy"), to block such competition. Valve's PMFN Policy, which remains in effect today,

28

MOT. FOR CLASS CERT.
CASE NO. 2:21-CV-00563-JCC

1

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

prevents any publisher that sells its game on Steam—and given Valve's dominance, nearly all publishers must sell on Steam to survive—from (a) providing additional game content on another platform that it does not make available on Steam (content parity); or (b) selling a game for a lower price on another platform (price parity).  By design, Valve's PMFN Policy blocks the exact ways that other platforms would compete with Valve in a well-functioning market (*i.e.*, on content and price).

Absent Valve's PMFN Policy, if a competing platform set a lower commission (*e.g.*, 12%) for sales on its platform, publishers would be incentivized to use that platform because they could keep more of the revenue from each sale, while also lowering the retail prices charged to consumers.  Consumers would be able to buy more games at lower prices, and those lower-priced games could also have enhanced content (like extra game levels).  Facing this type of competition, Valve would have to respond by lowering its own commission.  More competitive commissions would thus prevail across the market.  This result would be a win/win for everyone—except Valve. ████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████  ██████████████████████

████████████████████████████████████████████████████████

████  Ex. 3 (Newell Ex. 362) at '022 (emphasis added).

Valve's PMFN Policy blocks Valve from having to face competition from better and lower-priced alternatives.  Rival platforms cannot gain market share by charging publishers lower commissions because, even when they do, Valve's PMFN Policy blocks publishers from offering lower prices, or superior content, on those competing platforms, removing the incentive for consumers to purchase games on those platforms.  The marketplace experience has proven this time and again.  Numerous platforms have tried to compete with Valve by setting lower commissions or providing differentiated content that would benefit both game publishers and consumers, but Valve's PMFN Policy has blocked them ***all*** from succeeding.  As a result, Valve has dominated the market for twenty years without having to compete on price.  All the while,

MOT. FOR CLASS CERT.
CASE NO. 2:21-CV-00563-JCC

2

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  Valve maintains its 30% monopoly tax, reaping billions in profits by stifling competition.

2  Valve's profits far exceed what would prevail in a competitive market. ██████████████

3  ████████  ██████████████  ████████████████  ████████  ████████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████  Ex. 4 (VALVE_ANT_0058963) at '963-965 (emphasis added).

7       Valve makes game publishers aware of its PMFN Policy, and threatens and punishes

8  those who violate it.  When a publisher does not comply, Valve typically begins a "conversation"

9  with the publisher, where Valve often threatens to drop the game from Steam if the publisher

10  does not fall in line.  Valve can also threaten to punish a publisher by making its games less

11  visible to consumers on Steam, starving the publisher of revenue.  Because Steam is a must-have

12  distribution platform for publishers, given that Valve has squashed all competitive threats,

13  publishers have no viable option but to comply with Valve's PMFN Policy.  Game publishers—

14  the proposed class members here—are thus left with no option but to pay an inflated commission

15  to Valve of 30% in connection with every game sold on Steam.[1]

16       At trial, Plaintiffs will rely on the testimony of Dr. Steven Schwartz, an expert economist,

17  and Prof. Joost Rietveld, an industry expert, to prove that Valve's conduct harms every class

18  member every time they pay this inflated commission to Valve.  In his report, Dr. Schwartz

19  explains how common evidence and analyses can be used to prove Valve's market power and to

20  demonstrate how Valve has used its PMFN Policy to harm competition by imposing

21  supracompetitive commissions on all class members.  Among other things, Dr. Schwartz has

22  constructed a series of rigorous economic models, grounded in the leading economic literature

23  about PMFN policies, to demonstrate how Valve's PMFN Policy imposes higher commissions

24  than would prevail in a competitive market.  Dr. Schwartz also shows how he can use these same

25

26  [1]  In late 2018, Valve modified the revenue share agreement to three tiers as follows:  Valve takes 30% on all of a
    game's earnings under $10 million; 25% on all of a game's earnings between $10 million and $50 million; and 20%

27  on all of a game's earnings over $50 million.  Schwartz Rpt. ¶44.  All games except the very largest are subject to
    the 30% commission on every sale.  *Id.*

28

economic models to calculate both class-wide and individual damages.  Prof. Rietveld, who is recognized as one of the leading researchers in the video game industry, explains how Dr. Schwartz's methodologies and conclusions are consistent with the dynamics of the PC gaming industry.

Based on the work of these experts, and a robust discovery record full of ample common evidence that supports each and every aspect of Plaintiffs' claims, Plaintiffs now move under Rule 23(b)(3) for the Court to certify the following class:

> All persons or entities who, directly or through an agent, paid a commission to Valve in connection with the sale or use of a game on the Steam platform on or after January 28, 2017, and continuing through the present until the effects of its scheme are eliminated (the "Class Period"), and where either (1) the person or entity was based in the United States and its territories or (2) the game was purchased or acquired by a United States-based consumer during the Class Period. Excluded from the Class are (a) Defendant, its parents, subsidiaries, affiliate entities, and employees, and (b) the Court and its personnel.

Dkt. 127 ¶375.[2]

Because Plaintiffs satisfy every applicable requirement of Rule 23, a class action is clearly the method "best suited to adjudication of the controversy fairly and efficiently." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013).[3]  Accordingly, this Court should certify the proposed class.

## FACTUAL BACKGROUND

### A.   As An Early Mover In The Market For Digital PC Game Distribution, Steam Attained A Dominant Position

PC game publishers—the class members—sell PC games to consumers.  Ex. 1 ("Schwartz Rpt.") ¶¶23-28.  Through the 1990s and into the start of the new millennium, PC game publishers primarily distributed PC games via physical media, such as floppy disks or

---

[2]   Consistent with federal antitrust law, this definition limits class membership to entities that (i) directly paid a supracompetitive commission to Valve, and (ii) are harmed by Valve, a U.S.-based entity.  This definition excludes foreign entities that exclusively sold games to foreign consumers.

[3]   Unless otherwise stated, internal citations and quotation marks are omitted.

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

4

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

CD-ROMs, and consumers would typically buy PC games at brick-and-mortar retailers.  *Id*. ¶¶17-22; Ex. 2 ("Rietveld Rpt.") ¶25.

Valve started out as a PC game developer.  Rietveld Rpt. ¶18.  Before launching Steam, Valve developed two successful computer games (Half-Life and Counter-Strike), which by 2002 had an average of 3.4 billion player minutes per month.  *See* Schwartz Rpt. ¶31.  Valve developed Steam to update and maintain those games.  Ex. 5 (Lynch Tr.) at 31-33.  In 2003, Valve forced its entire user base of 2-3 million players to install and use Steam when they purchased the blockbuster sequel to Half-Life, Half-Life 2.  *See* Schwartz Rpt. ¶¶32-33; Rietveld Rpt. ¶¶122-126.

But Valve realized that Steam need not be limited to Valve's own games.  Rather, it could be used to distribute ***all*** PC games via the internet, at a fraction of the cost of traditional brick-and-mortar distribution.  Schwartz Rpt. ¶¶19-22, 34-35; Rietveld Rpt. ¶¶26, 38-39.  But while Valve had lower costs than traditional distributors, it set a ***price*** roughly equal to those distributors (*i.e.*, 30%).[4]  Schwartz Rpt. ¶¶42-43.  By earning revenue roughly equal to traditional distributors, but at much lower cost, Valve earned significantly more profit per sale than brick-and-mortar retailers.  *Id*. ¶¶17-22, 43, 145-149.

Steam became a must-have platform for consumers from nearly the moment it launched.  *Id*. ¶¶31-33.  By 2007, most major publishers were distributing their PC games on Steam, including publishers such as Epic, Atari, Activision, Eidos, 2K, Ubisoft, Sega, THQ, Bethesda, and Electronic Arts ("EA").  *See id*. ¶34.  ██████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████.  *Id*. ¶¶130-134.

---

[4] ████████████████████████████████████████████████.  Ex. 79 (Lynch 30(b)(6) Tr.) at 100 (███ ███████████████████████████████████);  *see, e.g.*, Ex. 7 (VALVE_ANT_0019722) at '724; Ex. 8 (VALVE_ANT_0042738) at '741; Ex. 9 (VALVE_ANT_0038381) at '384; Ex. 10 (VALVE_ANT_0019732) at '735; Ex. 11 (VALVE_ANT_0040316) at '319 ████████████████████████  These commissions were also set in a period when Valve exercised market power, *see* Schwartz Rpt. ¶42, and likely reflect Valve's experimentation with finding the optimal monopoly price for its platform.

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

5

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    While Valve set its 30% commission in line with existing brick-and-mortar retailers, it

2  had an immense competitive advantage over those retailers, because Steam's costs were

3  significantly lower than brick-and-mortar retail channels. *Id.* ¶74. ███████████████

4  ████████████████████████████     ██████████████████, *id.*

5  ¶353, and Valve's primary rival—Epic—observed that a 12% commission could more than

6  cover the costs of an online distribution platform, *id.* ¶149; Ex. 6 (EPIC_VALVE_0000004) at

7  '004 (noting Epic "should be able to not lose money" in running Epic Games Store "EGS" with a

8  10% commission).[5]  In a well-functioning competitive market, Valve would not have been able

9  to maintain its commission level for decades ████████████████████████████.

10   ██████████████████████     ████████████████████████

11  ██████████████████████████    Schwartz Rpt. ¶148, D-5,

12  D-8. ████████████████████████████████████████

13  ██████████ *id.* ¶148; Ex. 4 (VALVE_ANT_0058963) at '963-964 (████████████████

14  ████████████████████████████████████████

15  **B.    To Maintain Its Monopoly, Valve Implemented A PMFN Policy Requiring**
16  **Publishers Ensure Content And Price Parity Across Competing Distribution Platforms**

17    Valve has maintained its monopoly—and protects its bloated 30% commission—through

18  its PMFN Policy, which requires both content and price parity.  Valve enforced its PMFN Policy

19  through the "Steam Business Team," one of Valve's "cabals,"[6] throughout the class period.

20    Valve sets forth its content parity requirement in its Steam Distribution Agreements

21  ("SDAs"), which Valve requires all Steam publishers to sign.  Specifically, the SDAs call for

---

[5]  *See also* Ex. 12 (EPIC_VALVE_0000001) at '001 (Epic determining the "Final Platform Splits" to be "88/12" based on financial model); Ex. 13 (EPIC_VALVE_0000391) at '391 (Epic analyzing the costs of EGS and showing a 12% commission will be profitable); Ex. 14 (EPIC_VALVE_0000058) at '059 (noting that EGS would still be profitable with a 12% commission); Ex. 15 (Lynch Ex. 135) at '654-655 (Tim Sweeney informing Valve EGS would be launched with a 12% commission); Ex. 16 (VALVE_ANT_1244411) at '411 (Tim Sweeney noting the "fully loaded cost of distributing a >$25 game in North America and Western Europe is under 7% of gross").

[6]  A "cabal" is Valve "shorthand for a team or a product group."  Ex. 17 (Giardino Tr.) at 179.

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC
6
QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

"material parity" between the "downloadable content" (or "DLC") that a publisher offers on Steam and the same game sold through other channels:

> **2.4  DLC [Downloadable Content].**  If Company distributes the Application through any other (non-Steam) distribution channel, and if Company distributes any material DLC for the Application through that other channel, *it will deliver the DLC to Valve at the same time such that Steam Account Owners will receive comparable DLC with customers acquiring the Application through other channels*.  Company is free to offer special and unique promotional content through other distribution channels, *provided that material parity is maintained between Steam Account Owners and users of other distribution channels* who make a comparable investment in the Application and the associated DLC.

Ex. 18 (Gerber Ex. 98) at '371 (emphases added).  The SDA also requires that publishers agree to make content available on Steam no later than it is available on another store.  *Id.*  In effect, Valve's content parity requirement means that the version of a game offered for sale on Steam must be "as good as" any version offered for sale through any competing store.  Ex. 19 (Gerber Tr.) at 45-46, 59-60; *see also* Ex. 20 (Schenck Tr.) at 167-68 ███████████████████████ ████████████████████████████████

Valve also mandates price parity.  Valve has communicated this aspect of its PMFN Policy in various ways over time.  Schwartz Rpt. ¶¶150-167.  For example, Valve expressly requires publishers requesting Steam Keys to agree to price parity—not only for sales of Steam Keys, but for all game sales.[7]  Specifically, Valve requires publishers to agree to the following two commitments:

> I understand that I need to sell my game on other stores in a similar way to how I am selling my game on Steam. I agree that I am not giving Steam customers a worse deal.

> I understand that while it's OK to run a discount on different stores at different times, I agree to give the same offer to Steam customers within a reasonable amount of time.

---

[7]  Steam Keys are codes that customers purchase outside of Steam (including at other online stores and at retail stores), which they can activate to play games on Steam.  Schwartz Rpt. ¶¶45-47.

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

7

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    Ex. 21 (Giardino Ex. 186) at '087. ████████████████████████

2    █████████████████████████████████████████████████████████████

3    ████    Schwartz Rpt. ¶158.

4        At the motion to dismiss stage, Valve represented to the Court that the PMFN Policy

5 either did not exist at all, or that it applied only to the sale of Steam Keys. Dkt. 74 at 3 ("Wolfire

6 suggests the Guidelines require non-Steam-enabled games to have the same price as well, ***but***

7 ***that's simply not true***") (emphasis added), *id.* at 19 ("Wolfire's suggestion that this provision

8 supports a broader price constraint flatly contradicts this plain meaning."); Dkt. 79 at 11-12 ("***No***

9 ***one has ever seen this shadow policy*** . . . . In short, Wolfire's claims regarding this alleged policy

10 are ***thoroughly fanciful***.") (emphases added). Valve likely made these representations because it

11 is aware that its PMFN Policy raises serious questions under the antitrust laws. ████████████

12 ██████████████████████████████████████████████████████████████████

13 ████████████████████████████████████ █ ████████████████████

14 ████    Ex. 22 (Newell Ex. 352) at '963.

15        The common evidence shows, however, that Valve's representations were unequivocally

16 false. In fact, the PMFN Policy is central to Valve's business model, and applies across ***all***

17 transactions on the Steam platform. That is why, for example, Valve sent publishers an

18 announcement instructing them to generally "make sure that you're not disadvantaging Steam

19 customers" when setting game prices on Steam. Ex. 23 (Giardino Ex. 188) at '240. Moreover,

20 the record is replete with common evidence that Valve regularly confirmed to publishers in no

21 uncertain terms that its PMFN Policy (including pricing parity specifically) applies in equal force

22 regardless of whether Steam Keys are involved. █████████████████████████

23 ███████████████████████████████████████████████████████████

24 ███████████████████████████████████████████████

25 ███████████████████████████████████████████████████

26 ████████    ██████████    Ex. 24 (Powers 30(b)(6) Ex. 55) at '921 (emphases added); *see*

27 *also, e.g.*, Ex. 25 (Butlin Ex. 120) at '353 █████████████████████████

28

1  ██████; Ex. 26 (VALVE_ANT_1204851 at '851-52 ███████████████

2  ███████████████████████████████████████████████████████

3  █████████  ████████  Ex. 27 (MSFT_VALVE_000000555) at '556-657 (Microsoft

4  employee asking "does Steam require price parity?" and another responding "Yes – they

5  absolutely do. . . . Its [sic] not formally listed in documentation in Steamworks, but always

6  addressed in-person.").

7       Many (many) more examples abound.  *See, e.g.*, Ex. 28 (VALVE_ANT_2602243) at

8  '243 ████████████████████████████████████████

9  ███████████████████████  ████████████████

10  ███████ (emphasis added); Ex. 21 (Giardino Ex. 186) at '087 ███

11  ███████████████████████████████████████████

12  ████████████████; Ex. 29 (Kroll Ex. 304) at '440 ("We do not take any revenue share

13  from non-Steam sales, whether you're selling a Steam key or not.  We do ask that the pricing is

14  fair - in other words, you shouldn't sell your product on Steam for $10 and then sell it on another

15  storefront for $5."); Ex. 30 (Giardino Ex. 178) at '439 ██████████████████

16  ████████████████████████████) (emphasis added);

17  Ex. 31 (Newell Ex. 353) at '439 ████████████████████

18  ████████████) (emphasis added); Ex. 32 (Giardino Ex. 195) at '887 ███

19  ████████████████████████████████████████

20  █████████████████████████████████████████

21  █████████████████████").

22       Any claim by Valve to the contrary lacks credibility and cannot be reconciled with the

23  abundant evidence on this common issue.

24  **C.    Valve Enforced Its PMFN Policy Against Publishers Across The Industry**

25       In addition to laying out its content and pricing parity requirements directly in rules and

26  guidelines, Valve also seized every opportunity to continuously remind publishers about its

27  PMFN Policy. ████████████████████████████████████

28

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

9

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ███████   Ex. 33 (Powers 30(b)(6) Tr.) at 57, 64-68; *see also* Ex. 27

4 (MSFT_VALVE_000000555) at '556 (stating that Valve "always addressed" its PMFN Policy

5 "in-person" with publishers). █████████████████████████   ██████████

6 █████████.  *See, e.g.*, Ex. 34 (Butlin Ex. 131) at '289 ("█████████████████████

7 ████████████████████████████████████████████████████

8 █████████████").  If these "conversations" and "reminders" were not enough to stop the

9 violations, Valve took more punitive measures.

10      Valve has punished publishers for violating its PMFN Policy by delisting (or threatening

11 to delist) a publisher's game from Steam altogether. ███████████   ████████████

12 █████████████████████████████████████████████████████████

13 ██████████████████████   Ex. 35 (Malone Ex. 248) at '684. ██████████

14 ███████████████████████   ████████████████████████

15 ██████   *Id.*   ████████████████████████████████████████████

16 ████████████████████████████████████.  *Id.*  In other words,

17 Valve directly blocked price competition. ███████████████████████████

18 ██████████████████████████████████████████

19 █████████████████████████████████.  Ex. 36 (Gerber Ex. 107) at

20 '883-84. █████████████████████████████████████

21 ████████████████████████.  Ex. 37 (Blue Ex. 86) at '912-13.

22   ████████████████████████████████

23 ████████████████████████████████████

24 █████████████████████████████████████████

25 ████████████████████████   ██████████████████████

26 █████████████████████   Ex. 38 (Schenck Ex. 385) at '943. ████████████

27 █████████████████████████████████████

28

Mot. for Class Cert.
Case No. 2:21-cv-00563-JCC

10

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000





.” *Id.*

. *Id.* at '942.

.

*Id.* at '936.

Again, the common evidence here is overwhelming. Time and again, Valve threatened game publishers with delisting their games if they did not comply with Valve's PMFN Policy. *See, e.g.,* Ex. 39 (Ruymen Ex. 1) at '483 ( Ex. 40 (Giardino Ex. 196) at '521 ); Ex. 41 (VALVE_ANT_0048944) at '944 ( ); Ex. 42 (VALVE_ANT_1207052) at '054 ("Once the price on Steam matches the price elsewhere, we'll be ready to release the game!"); Ex. 43 (Malone Ex. 249) at '343 Ex. 44 (VALVE_ANT_0340706) at '709 ); Ex. 45 (VALVE_ANT_0051718) at '718 ( "); Ex. 46 (Gerber Ex. 101) at '289-290 ( ); Ex 30 (Giardino Ex. 178) at '439 ( ); Ex 47 (Giardino Ex. 191) at '819 (telling a self-described "tiny

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

11

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  company" that "if you wanted to disadvantage Steam customers by charging them a higher price,

2  we would opt to not sell your game on our store").

3         In addition to delisting, Valve enforced its PMFN Policy by reducing (or threatening to

4  reduce) the visibility of publishers' games on the Steam platform, thereby hindering their ability

5  to make sales.

6  

7  ████████ Ex. 48 (Powers 30(b)(6) Ex. 60) at '129.

8  

9  

10  ████ *Id.* at '128.

11  ████ *Id.* at '127. This conduct was common and

12  persistent. Ex. 49 (Malone Ex. 245) at '157 (

13  

14  

15  Ex. 50 (Ruymen Ex. 9) at '254-256 (

16  

17  ████ ); Ex. 51 (VALVE_ANT_1193238) at '241 (

18  ████ ); Ex. 52 (Newell Ex. 346) at '932 (

19  

20  

21  

22         During discovery, Valve unconvincingly claimed that the multitude of emails enforcing

23  its PMFN Policy each constituted nothing more than one-off deviations from Valve's actual

24  policies. Again, this claim is simply incredible.

25  

26  ████ *See*, *e.g.*, Ex. 53 (Powers Ex. 45) at '489 (

27  ████ "); Ex 54 (Giardino Ex. 194)

28

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

12

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

at '191 █████████████████████████████████████████████████

████████████ █████████); Ex 32 (Giardino Ex. 195) at '887 (███████████████

████); Ex. 24 (Powers 30(b)(6) Ex. 55) at '922 █████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████) (emphasis

added); Ex. 55 (Kroll Ex. 305) at '865 ███████████████████████

███████████████████████████ ██████████████████████████████████

██████████████ (emphasis added); Ex. 56 (VALVE_ANT_0262762) at '763 ██████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████); Ex. 57 (VALVE_ANT_1220449) at '456 ████████████████ ████████

██████████████████████████████████████████████ (emphasis

added); Ex. 50 (Ruymen Ex. 9) at '255 ██████████████ █████████████

█████████████████████████████████████ (emphasis added); Ex. 58

(Giardino Ex. 189) at '426 (Steam Business Team member Tom Giardino suggested he might get

Valve's parity rules "tattooed on [his] back like it's the Declaration of Independence").

**D.    Valve Has Maintained Its High Commission While Blocking Competitive Threats**

The harmful effects of Valve's PMFN Policy can be seen in how Valve has blocked

competition from rivals.  Although several major game publishers have attempted to leverage

their size to launch digital PC game stores, *see* Rietveld Rpt. ¶43, each attempt has failed to

make material inroads that would check Valve's monopoly power.

<u>EA & Origin.</u>  EA is a major PC game publisher and developer that explored a variety of

ways to avoid Valve's 30% commission.  Valve's PMFN Policy has blocked each attempt.

Rietveld Rpt. ¶¶92, 96-97, 223; *see also* Schwartz Rpt. ¶¶215-217.

EA first attempted to avoid Valve's commission by using an alternative, cheaper payment

method for in-game purchases made on Steam.  In-game purchases (also called "in-game

content," "in-app purchases," "IAPs," "downloadable content," or "micro-transactions") are

1  purchases of content within a game, rather than the purchase of a game itself, Rietveld Rpt.

2  ¶¶117-121, and they are also subject to Valve's 30% commission.  Schwartz Rpt. ¶¶42-44, 215.

3  ████████████████████████████████████████████████████████████

4  ██████████████████████████████████  Ex. 59 (Lynch Ex. 138) at '478.  ████████████

5  ██████████████████████████████████████████████████████████████████

6  ████████████████████████████  Ex. 59 (Lynch Ex. 138) at '478.

7        EA next attempted to launch the Origin PC game store in June 2011, as a competitor to

8  Steam.  To jumpstart Origin's user base, EA began publishing its new titles on Origin and other

9  distribution platforms, which also avoided paying Steam's commission.  Rietveld Rpt. ¶¶96-97;

10 Schwartz Rpt. ¶216.  In October 2011, EA also began publishing third-party games, including

11 games from major publishers such as Capcom.  Rietveld Rpt. ¶¶92, 96-97.  But Valve's PMFN

12 Policy meant that publishers could not offer their games for lower prices on Origin than they did

13 on Steam, so consumers had little incentive to use Origin.  As a result, publishers' and

14 consumers' adoption of Origin was minimal.  Schwartz Rpt. ¶¶216-217; Rietveld Rpt. ¶96-97.

15 EA ultimately surrendered, announcing it would bring its games back to Steam in 2019.  Ex. 60

16 (VALVE_ANT_0059430) at '430.  Origin withered and ultimately died, Rietveld Rpt. ¶¶96-97;

17 Schwartz Rpt. ¶¶216-217.

18        Ubisoft & Uplay/Uconnect.  ██████████████████████████████  ███████████

19 ████████████████████████  Ex. 61 (Malone Tr.) at 44.  Ubisoft attempted to self-

20 distribute through its own platform, Uplay, launching in 2012.  Rietveld Rpt. ¶¶94-95; Schwartz

21 Rpt. ¶¶213-214.  ████████████████████████████████████████████

22 ██████████████████████████  Ex. 62 (Malone Ex. 263) at '128.  ███████████████

23 ████████████████████████████████  ██████████████████████████████

24 ██████████████████████████████████████

25 Ex. 63 (Lynch Ex. 141) at '961-962.  ████████████████████████████

26 ██████████████████████████████████████████

27

28

1   ███████████ *Id.* ███████████████████████████████████████

2   █████████████████████ Ex. 64 (Malone Ex. 261) at '197.

3   ██████████████████████████████████████████████████████████

4   ███████████████ *see* Ex. 65 (Lo Ex. 379) at '247, ████████████ *see* Ex. 66

5   (Lynch Ex. 143) at '988 (██████████████████████████████████████████

6   ██████).  As a result, Ubisoft launched Division 2 solely on Uplay and EGS.  Rietveld Rpt. ¶94.

7   Ultimately, this strategy failed and Division 2 is now available on Steam.  *See id.*

8        Epic & EGS.  Epic began development of EGS around June 2018.  *See* Ex. 67

9   (EPIC_VALVE_0000338) at '338.  Epic planned to leverage its first-party games—specifically

10   Fortnite—to build an instant customer base for EGS.  *Id.* at '340-342; Ex. 14

11   (EPIC_VALVE_0000058) at '058 (Tim Sweeney Q&A noting the launching of EGS was

12   prompted by Fortnite bringing in PC gamers).  The cost to run EGS was sufficiently low that

13   Epic could charge publishers a 12% commission, less than half of Valve's.  Ex. 68

14   (EPIC_VALVE_0000007) at '007.

15        On November 26, 2018, Epic CEO Tim Sweeney privately informed Valve CEO Gabe

16   Newell that he planned to launch EGS at a 12% commission, because major tech monopolists

17   were extracting obscene commissions and their "antitrust practices" were facing legal scrutiny.

18   Ex. 15 (Lynch Ex. 135) at '654-655.  Sweeney urged Newell and Valve to "improve Steam

19   economics for all," because "store competition leads to better rates for all developers."  *Id.* at

20   '655.  EGS launched with, and continues to offer, a host of financial benefits to publishers.

21   Rietveld Rpt. ¶88.  Epic's announcement of EGS spurred a brief outbreak of competition in the

22   market.  Schwartz Rpt. ¶302-313.  Epic found initial success, securing an exclusive deal with

23   Ubisoft to publish Division 2.  Rietveld Rpt. ¶¶94, 156, 170-171.

24        But, because of Valve's PMFN policy, EGS has been unable to gain market share.  ████

25   ██████████████████████████████████████████████████████████████

26   ██████████████████████████ Schwartz Report, Attachment E-1.  Given this low

27   share, it has yet to become profitable.  Rietveld Rpt. ¶89.  The vast majority of its formerly

28

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

15

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    EGS-exclusive content is now available on Steam, reflecting Steam's immense market power.

2    Schwartz Rpt. ¶¶213, 310.  Because Valve's PMFN Policy precludes publishers from

3    differentiating content offered on Steam and EGS, publishers have little incentive to offer games

4    on EGS and consumers have little incentive to use the platform.  Rietveld Rpt. ¶¶168-225.  Put

5    simply, Epic cannot break the Steam monopoly, even though it offers a commission *less than*

6    *half* of Valve's, because Valve's PMFN Policy prevents Epic from competing on prices charged

7    to consumers for games sold on both EGS and Steam.  Schwartz Rpt. ¶¶302-313.

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮  Ex. 51 (VALVE_ANT_1193238) at '240-241.  ▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   *Id.* at '239.

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Ex. 61 (Malone Tr.) at 212.

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮.  Ex. 69 (Lynch Ex. 134) at '674 (▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 70

20   (VALVE_ANT_0471786) at '188 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮);

21   Schwartz Rpt. ¶308.  The new tiered structure was intended to keep publishers within Steam's

22   orbit.  Ex. 5 (Lynch Tr.) at 101-02 (agreeing that one of Valve's goals in implementing the tiered

23   structure was to "bring back certain developers or publishers who had stopped publishing games

24   on Steam").  As Plaintiffs' experts demonstrate, this small change by Valve illustrates that,

25   without the PMFN Policy, full competition would lead to much more significant reductions in

26   Valve's commission, benefiting game publishers and consumers across the market.  Schwartz

27   Rpt. ¶¶302-313.

28

<u>**LEGAL STANDARDS**</u>

First, under Rule 23(a), Plaintiffs must show that there are "questions of law or fact common to the class," and the requirements of "numerosity, typicality and adequacy of representation" are also met. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir.) (2022). Second, Plaintiffs must show, by a "preponderance of evidence," that the class fits into one of three categories of Rule 23(b). *Id*. at 665. To certify a class under Rule 23(b)(3), Plaintiffs must show "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

While the Court's "class certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, . . . [m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 465-66. "[P]laintiffs have carried their burden of satisfying the Rule 23(b)(3) requirements as to [a] common question of law or fact" if their "evidence 'could have sustained a reasonable jury finding' on the merits of [that] common question." *Olean*, 31 F.4th at 667 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016)).

<u>**ARGUMENT**</u>

**I.     THE PROPOSED CLASS SATISFIES RULE 23(A)**

***The Class is Sufficiently Numerous.*** The proposed class consists of at least 31,824 members and easily satisfies Rule 23(a)(1)'s numerosity requirement. Schwartz Rpt. ¶399; *Ochoa v. McDonald's Corp.*, 2016 WL 3648550, at *4 (N.D. Cal. July 7, 2016) ("40 or more members" is sufficient).

***Common Questions of Law and Fact Exist.*** To satisfy commonality, "even a single common question will do." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014). "Rule 23(a)(2)'s commonality requirement is subsumed under, or superseded by, the more

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

17

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  stringent Rule 23(b)(3) requirement that questions common to the class predominate over other

2  questions." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997).  As set forth in detail in

3  § II *infra*, numerous common issues of law and fact that are central to Plaintiffs' claims exist,

4  including questions of (1) market definition and market power, (2) anticompetitive conduct and

5  effects, (3) class-wide injury, and (4) damages, and those common issues predominate in this

6  case.

7       ***The Named Plaintiffs' Claims are Typical of the Class.***  Rule 23(a)(3) requires that "the

8  claims or defenses of the representative parties are typical of the claims or defenses of the class."

9  Fed. R. Civ. P. 23(a)(3).  "[This] requirement is permissive, such that representative claims are

10  typical if they are reasonably coextensive with those of absent class members; they need not be

11  substantially identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017).

12  Typicality is "established by plaintiffs and all class members alleging the same antitrust violation

13  by the defendants," and may be satisfied even if there is a disparity in the damages claimed by

14  representative parties and other class members.  *In re Tableware Antitrust Litig.*, 241 F.R.D. 644,

15  649 (N.D. Cal. 2007).  Here, the named Plaintiffs are typical because, like all other proposed

16  class members, they paid commissions to Steam and suffered an antitrust injury when they did

17  so.  *See Sidibe v. Sutter Health*, 333 F.R.D. 463, 486-87 (N.D. Cal. 2019) (finding typicality in

18  an antitrust case because "the overarching gravamen of the plaintiffs' claims is [the defendant's]

19  alleged anticompetitive" conduct).

20       ***Named Plaintiffs Will Adequately Represent the Class.***  Rule 23(a)(4) requires that "the

21  representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P.

22  23(a)(4).  This requirement is satisfied if the representative plaintiffs have no conflicts of interest

23  with class members and they and their counsel will vigorously prosecute the action on behalf of

24  the class.  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).  Named Plaintiffs readily

25  meet these requirements.  There is no intra-class conflict, as all class members share a common

26  interest in recovery of their supracompetitive commissions paid to Valve, and both named

27  Plaintiffs have vigorously prosecuted the action and will continue to do so.

28

1        Wolfire is a game publisher that sold five titles on Steam, including the popular game

2   Overgrowth. *See* Ex. 71 (*Wolfire Games*, STEAM, https://store.steampowered.com/franchise/

3   wolfire/ (last visited Feb. 7, 2024)).  Wolfire brought this lawsuit because "gamers and game

4   developers are being harmed by Valve's conduct" and "most developers have little or no choice

5   but to sell on Steam and do as they're told by Valve."  Ex. 72 (Rosen Ex. 73) at 1.  Wolfire

6   helped counsel develop the first-to-file Complaint in this district, and has continued to provide

7   valuable industry knowledge and insights to litigate this matter.

8        Dark Catt is a game publisher that sold one title on Steam, Djinni & Thaco: Trial by

9   Spire.  Valve removed Dark Catt's game from Steam without prior notice, asserting that certain

10  game reviews amounted to review manipulation, which has effectively ended Dark Catt's ability

11  to sell games because "not being on Steam means you're not going to make any money in the PC

12  market."  Ex. 73 (Owens Tr.) 371.  Dark Catt brought this lawsuit to "make sure that no game

13  company ever goes through what we went through" in being closed out of the PC game

14  distribution market.  Ex. 74 (Robb Tr.) 287-88.  As explained by Dark Catt's CEO: "if Steam

15  doesn't want to do business with us, fine, I accept that.  But I want to be able to go down the

16  street and be able to sell my game and be able to go to their competitor.  But there is no

17  competition in the marketplace."  *Id.* at 287-88.  Like Wolfire, Dark Catt has provided valuable

18  industry knowledge to counsel.

19       The named Plaintiffs have each responded to Valve's voluminous document requests,

20  produced thousands of documents from their files, and prepared and sat for nine depositions,

21  collectively.  Their commitment to the litigation and their discovery obligations further

22  demonstrates their adequacy.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583,

23  595 (N.D. Cal. 2010).

24  **II.   COMMON QUESTIONS PREDOMINATE UNDER RULE 23(B)(3)**

25       Rule 23(b)(3) requires that "questions of law or fact common to class members

26  predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).

27  "Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."

28

MOT. FOR CLASS CERT.
CASE NO. 2:21-CV-00563-JCC
19
QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

*Amchem*, 521 U.S. at 625.  "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."  *Olean*, 31 F.4th at 661.  "Predominance is not . . . a matter of nose-counting," *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016), and certification "may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately," *Tyson*, 577 U.S. at 453.  To establish predominance, Plaintiffs need only show that "*questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the Class."  *Amgen*, 568 U.S. at 459 (emphasis in original).

Analysis of predominance under Rule 23(b)(3) begins with the elements of the underlying cause of action.  Plaintiffs will establish, with common evidence: (1) a violation of antitrust law (both Section 1 and Section 2 of the Sherman Act); (2) injury or impact resulting from those violations; and (3) damages.  *See In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1183 (N.D. Cal. 2013).  More specifically, Plaintiffs' principal claim arises under Section 2 of the Sherman Act, which requires proof that (a) Valve possesses monopoly power in a relevant market; (b) Valve willfully acquired or maintained that power; and (c) Valve's conduct resulted in antitrust injury.  *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020).

As to Section 1 of the Sherman Act, challenging Valve's imposition of its PMFN Policy, that claim requires proof of: "(1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (i.e., 'antitrust injury')."  *Austin v. McNamara*, 979 F.2d 728, 738 (9th Cir. 1992).  In assessing either the Section 1 or the Section 2 claims here, a court will look to a Rule of Reason analysis to determine the restraint's "actual effect" on competition.  *See, e.g., Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023).

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

20

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

As detailed below, Plaintiffs can show the elements of both their Section 1 and Section 2 claims using common evidence.  Accordingly, common issues predominate over any individual ones.[8]

## A.    Common Evidence Establishes The Relevant Market And Valve's Monopoly Power In That Market

*First*, the relevant market inquiry, and all evidence related to it, is necessarily common to the class and will not vary based on which class member is asserting an antitrust claim.  *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 846 (D.N.J. 2015) ("Defining the relevant market focuses on common data, expert analysis, and economic tests; such proof generally does not vary by class member.").  Plaintiffs' economist, Dr. Schwartz, has explained why common economic principles warrant treating third-party digital PC game distribution platforms as a distinct relevant market, and common evidence supports his conclusions.  Schwartz Rpt. ¶48-116; *see also* Rietveld Rpt. ¶¶49-82.

*Second*, Valve's "market power is capable of being proved at trial through common evidence."  *Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *17 (N.D. Cal. May 14, 2015).  As the first major mover in the digital PC game distribution market, Valve achieved monopoly power relatively soon after the Steam Store's launch.  Schwartz Rpt. ¶¶17-22, 32-36, 121-149.  Steam became a must-have platform across the industry, given the advantages of digital distribution (such as avoiding physical packaging costs or the need to visit a brick-and-mortar retailer in person).  *Id.* ¶¶17-22, 67, 69-77.  ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████    *Id.*

---

8   Because common evidence supports Plaintiffs' Sherman Act claims, common evidence also supports Plaintiffs' claims under the Washington Consumer Protection Act ("WCPA"), which "closely parallels federal antitrust laws." *Golob Sons v. Schaake Packing Co.*, 93 Wash. 2d 257, 259 (Wash. 1980).  Under Washington's choice-of-law rules, Plaintiffs are entitled to proceed under the WCPA because, as determined by the applicable Restatement factors, Washington is the state with the "most significant relationship" to this action:  Valve is based and incorporated in Washington, Valve injured Plaintiffs by creating and enforcing the PMFN Policy from Washington, and Valve's relationship with Plaintiffs is centered in Washington—the state where Valve develops and services Steam, and the state specified in choice-of-law and choice-of-forum provisions in Valve's standard SDA (*e.g.*, Ex. 75 (Giardino Ex. 199) at '461).  *See Johnson v. Spider Staging Corp.*, 87 Wash.2d 577, 580-81 (1976).

¶¶130 134, Attachment E-1.  And there is ample direct and indirect evidence of Valve's market power.  *See Supra* Factual Background § D; *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021) ("Market power is the ability to raise prices above those that would be charged in a competitive market.").

**B.    Common Evidence Regarding Anticompetitive Harm In The Relevant Market**

In addition, the common evidence detailed above shows that Valve requires publishers to agree to a PMFN Policy, encompassing both price and content parity.  *Supra* Factual Background; *see also In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d at 1187-91 (N.D. Cal. 2013).  Common evidence also demonstrates that Valve uses its PMFN Policy to maintain its dominant position in the market for third-party digital PC game distribution platforms.  *See In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020) (Section 2 claims "readily lend themselves to common evidence" because "defendants' use and maintenance of monopoly power, as opposed to individual plaintiff's conduct, drives the claim."); *see also* Schwartz Rpt. ¶¶150-196.

Moreover, applying a Rule of Reason framework to each of their claims, *see Epic Games*, 67 F.4th at 998; *Qualcomm*, 969 F.3d at 991, Plaintiffs will show that Valve's PMFN Policy "has a substantial anticompetitive effect that harms consumers" in market for third-party digital distribution of PC games via platforms, *Epic Games*, 67 F.4th at 983.  Plaintiffs can make this showing either "directly or indirectly."  *Id*.  Under either approach, Plaintiffs can make their showing using common evidence.  *Cf. In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 46-49 (E.D. Pa. 2022) (denying defendant's summary judgment motion where class plaintiffs adduced common direct and indirect evidence of anticompetitive effects).

To demonstrate anticompetitive effects directly, "the plaintiff must provide proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market."  *Epic Games*, 67 F.4th at 983.  Common direct evidence of

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

22

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

anticompetitive effects supports a finding of predominance.  *See In re Processed Egg Prod.*

*Antitrust Litig.*, 312 F.R.D. 171, 183 (E.D. Pa. 2015).

As discussed above, Valve's 30% commission far exceeds the competitive level (17.7%),

which is direct evidence of anticompetitive effects.  *Epic Games*, 67 F.4th at 984 ("A

supracompetitive price is simply a price above competitive levels."); *see also US Airways, Inc. v.*

*Sabre Holdings Corp.*, 938 F.3d 43, 61-63 (2d Cir. 2019) (evidence of supracompetitive pricing

sufficient to sustain a jury verdict on competitive effects); Schwartz Rpt. ¶377.  Valve's

excessive profits, *Id.* ¶¶135-149, are further direct evidence of supracompetitive pricing, *US*

*Airways*, 938 F.3d at 61, 63 (in discussing a "mountain of evidence" supporting anticompetitive

effects, citing expert testimony that the Defendant's profits were "very, very, very high").

Dr. Schwartz also explains how Valve's conduct has suppressed overall output in the

relevant market.  As a matter of basic economics, when game prices to consumers are higher

than competitive levels, consumers will buy fewer games.  *Id.* ¶129.  Additionally, Valve's

conduct diminishes PC desktop game variety, and accordingly limits consumer choice.  *Id.*

¶¶232-236.

Dr. Schwartz also demonstrates how Valve's conduct leads to reduced quality.  *Id.*

¶¶220-240.  Because it faces virtually no competition, Valve does not significantly invest in

improving the Steam platform.  Ex. 33 (Powers 30(b)(6) Tr.) at 37-38 ("Q. Are there reasons

why Steam users might be willing to pay a higher price on Steam for the same game?  A. Not

really."); Ex. 76 (Johnson Ex. 27) at '458 (█████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████).  For example, Valve regularly

disrupts gamers using Steam by taking Steam down for "planned weekly downtime

maintenance."  Ex. 77 (Boyd Tr.) at 67.  Valve has not even bothered to assess whether or how it

could maintain Steam without subjecting customers to disruptive downtimes.  *Id.* at 69-70.  In a

but-for world without Valve's PMFN Policy, Valve would face more competition and would be

compelled to improve the quality of its platform.  Schwartz Rpt. ¶240.

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

23

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

Antitrust plaintiffs can also demonstrate anticompetitive effects indirectly, which requires "some evidence" that the defendant used "market power to harm competition." *Epic Games*, 67 F.4th at 983. This inquiry need not be "extensive" or "highly technical"—it is "sufficient that the plaintiff prove the defendant's conduct, as matter of economic theory, harms competition." *Id*. One form of such indirect evidence is "excluding would-be competitors that would offer differentiated products," *id*. at 983-84, while other forms may include, for example, increased prices, reduced output or quality, or reduced consumer choice, as discussed above, *see e.g.*, *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018).

Plaintiffs have ample indirect evidence of anticompetitive effects. Relying purely on common evidence, Dr. Schwartz concludes that Valve has monopoly power. *Supra* § II.A. Further, Plaintiffs have adduced ample evidence of would-be competitors whose attempts to enter the market failed or are failing. *Supra* Factual Background. This common evidence likewise supports a predominance finding. *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 32-33 (E.D. Pa. 2019), *aff'd*, 967 F.3d 264 (3d Cir. 2020) (certifying class where theory of injury was that "[a]bsent [the defendant]'s actions, the generic Suboxone tablets would theoretically have entered the market and competed with" the defendant).

## C.   Common Evidence Shows That All Or Virtually All Class Members Suffered Antitrust Injury

Antitrust impact "is the 'fact of damage' that results from a violation of the antitrust laws." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166 at *7 (N.D. Cal. June 5, 2006). Plaintiffs can show with common evidence that Defendants' anticompetitive conduct had class-wide impact. To do so, Plaintiffs will rely principally on the work of Dr. Schwartz, an economist with expertise in industrial economics and platform competition.

Proof of class-wide impact flows directly from some basic economic facts about the market. As Dr. Schwartz explains: "All major platforms that digitally distribute third-party PC games, including Valve, impose a standardized pricing structure on all publishers, typically a

MOT. FOR CLASS CERT.
CASE NO. 2:21-CV-00563-JCC

24

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

fixed commission." Schwartz Rpt. ¶242.  In Valve's case, Valve sets its commission structure in the SDA that applies to *all* Valve publishers.  *Id*.  Given this uniform pricing policy, if Plaintiffs are capable of showing that the default commission rate would decrease to some degree because of price competition if Valve did not have a PMFN Policy, then it readily follows that *all* class members would benefit by being able to pay the new, lower default commission rate.  *Id*. ■

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████.  *Id*. ¶¶315-319.

Given these economic facts, Dr. Schwartz can show class-wide impact by demonstrating the default commission rate Valve charges would decrease in a but-for world free of Valve's PMFN Policy.  *Id*. ¶¶241-244.  He does so in three distinct but complementary ways.

*First*, Dr. Schwartz constructs and applies economic models of platform competition that show that Valve's PMFN Policy has both short- and long-term harmful effects on *all* class members.  He begins by constructing a Platform Competition Model, derived from a model found in the relevant economic literature, the Boik-Corts model, which demonstrates that "PMFN clauses typically raise platform fees and retail prices and curtail entry or skew positioning decisions by potential entrants pursuing low-end business models."  *Id*. ¶245; Ex. 78 (Andre Boik & Kenneth S. Corts, The Effects of Most-Favored-Nation Clauses on Competition and Entry, 59 J.L. & Econ. 105, 105 (2016)).  Dr. Schwartz adapts that model to the facts and circumstances of this case as his Platform Competition Model by using empirical estimates for the model's inputs to study what would happen when Valve's PMFN Policy is removed. Schwartz Rpt. ¶¶272-281.  His model demonstrates that, if a competing platform entered the market and Valve did not have a PMFN Policy, the competing platform would have a much

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

25

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

lower commission and Valve would respond by lowering its own commission.  At the same time, retail prices overall would decrease, leading to more games being sold in the market:



Schwartz Rpt. ¶274-276.  These results are compelling evidence that Valve's PMFN Policy is causing both supracompetitive prices and reduced output. ▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id*. ▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬ *Id*.

But Dr. Schwartz does not stop there.  As he explains, the results of this model depict the short-term competition caused by one platform's entry in the absence of the PMFN Policy.  *Id*. ¶¶250, 279-280.  To compete against this new platform (and others), Valve would need to lower its commission even more, or risk a significant loss of market share.  *Id*. ¶279.  That lowering would quickly lead to *all* commissions in the market being set at a competitive equilibrium.  *Id*. ¶¶279, 334.  To model that equilibrium, Dr. Schwartz constructs his Landes-Posner model,

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

26

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

which uses well-recognized literature to estimate what commission would prevail in a competitive market, but for Valve's illegal conduct. *Id.* ¶332-340. Dr. Schwartz shows that in this competitive equilibrium, Steam's but-for commission would be just 17.7%. *Id.* ¶377. These results thus confirm that all class members were harmed by paying significantly higher prices (commissions) to Valve because of its PMFN Policy. In sum, Dr. Schwartz's results show Valve's PMFN Policy "leads to higher platform fees, deters entry by rivals, and increases consumer prices." *Id.* ¶243. These results are common evidence that all class members can rely upon at trial to prove that they have experienced some amount of harm from Valve's PMFN Policy. *See, e.g., Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*, 2022 WL 2829880, at *25 (S.D.N.Y. June 30, 2022) (accepting use of economic analytical model to show class-wide impact).

**Second**, Dr. Schwartz confirms this result by using the well-accepted yardstick approach, which analyzes the commissions that occur in reasonably comparable platform markets. *See In re DRAM Antitrust Litig.*, 2006 WL 1530166, at *8-10 (accepting "yardstick" approach for showing class-wide impact); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 25 n.31 (E.D.N.Y. 2020) (accepting "use in this case of a market yardstick to show class-wide impact in the but-for world"). He considers online retail marketplaces and online vacation home rentals as potential benchmarks for his yardstick approach. Schwartz Rpt. ¶¶282-301. He finds that the yardstick approach ultimately indicates "the market but-for commission rate would be between 15% and 20%" in the market for third-party digital PC game distribution via platforms. *Id.* ¶301. Dr. Schwartz concludes that all the benchmark markets lead to a singular conclusion—that Valve's PMFN Policy causes supracompetitive commissions. *Id.* ¶¶282-301

**Third**, Dr. Schwartz looks to the limited empirical evidence of impact available in **this** market, such as the attempted entry of EGS and other platforms. As mentioned above, when EGS entered the market, Valve responded by lowering its commission from a fixed 30% rate to a tiered system that provides slightly lower commissions once games hit certain thresholds.

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

27

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  Dr. Schwartz explains that Valve's response empirically demonstrates Valve's commission for

2  Steam is sensitive to the presence and degree of competition.  *Id.* ¶¶302-313.

3  　　　But as Dr. Schwartz explains, "[i]n the but-for world, where there was no PMFN, Steam

4  would have likely faced a more expansive competitive threat and likely much earlier than Epic's

5  entrance." *Id.* ¶309.  Valve's competitive response would likewise be stronger, and its

6  commissions lower.  Recognizing that economics predicts price approaches cost under

7  competitive conditions, he analyzes the relevant costs in the industry to determine a lower bound

8  for but-for commissions.  *Id.* ¶311.  He finds that "a 12% (or lower) take-rate would be

9  sustainable" for platforms in the relevant market like Valve.  *Id.* ¶312.  Based on an analysis of

10  Valve's real-world costs, Dr. Schwartz shows empirically that matching Epic's 12% commission

11  rate would be profitable for Steam.  *Id.* ¶313.  This empirical analysis thus confirms that, in the

12  but-for world, Valve would charge lower commissions to all class members—and demonstrates

13  that Dr. Schwartz' 17.7% but-for commission used to estimate damages is conservative.  Once

14  again, each class member could rely on this empirical showing to prove impact at trial.  *Tyson*,

15  577 U.S. at 458 (assessing empirical evidence of class-wide impact based on "whether the

16  sample at issue could have been used to establish liability in an individual action").

17  **D.    Plaintiffs' Model Is Capable Of Calculating Class-wide Damages**

18  　　　A "putative class must establish that damages are susceptible of measurement across the

19  entire class." *In re Glumetza Antitrust Litig.*, 336 F.R.D. at 479.  "Antitrust plaintiffs may satisfy

20  the predominance requirement by using a model that estimates the damages attributable to the

21  antitrust injury, even if more individualized determinations are needed later to allocate damages

22  among class members." *Id.*  The calculation of damages is a low bar and "need not be exact."

23  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).  The Supreme Court recognizes that

24  "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation

25  would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co. v.*

26  *Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981).

27

28

Mot. for Class Cert.
Case No. 2:21-cv-00563-JCC

28

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1    Dr. Schwartz bases damages on the competitive equilibrium predicted by his

2  Landes-Posner model, which predicts that Valve's weighted-average commission in the but-for

3  world will be 17.7%.  Schwartz Rpt. ¶377.  ████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████████

6  ██████████████████  *Id*. ¶¶400-402.  Dr. Schwartz then assesses how much of this commission

7  reduction would be passed down to consumers in the form of lower retail prices for PC games.

8  ████████████████████████████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████  *Id*. ¶¶379-397.

10  He then offsets damages by this percentage.  *Id*. ¶402.

11    Dr. Schwartz's methodology arrives not only at an aggregate damages figure

12  ████████████████████████),  but can also derive individual damages awards for each class

13  member.  *Id*. ¶¶406-410.  Dr. Schwartz's methodology is repeatable and can be expanded to

14  encompass later years when Valve produces additional transactional data during merits discovery

15  or prior to trial.  *Id*. ¶400.  His methodology easily passes muster at this stage.  *See In re High-*

16  *Tech Emp. Antitrust Litig.*, 289 F.R.D. 555 (N.D. Cal. 2013) ("'calculations need not be exact'")

17  (quoting *Comcast*, 569 U.S. at 35).  Indeed, it is substantially ***more*** robust than the minimal

18  requirement, at this stage, of providing an aggregate damages figure.  *See In re Cardizem CD*

19  *Antitrust Litig.*, 200 F.R.D. 297, 324 (E.D. Mich. 2001).

20  **III.  RESOLVING THE DISPUTE AS A CLASS ACTION IS SUPERIOR TO ANY**
   **ALTERNATIVE**

21

22    Finally, class certification is far superior to any alternative method for adjudicating this

23  case.  *See* Fed. R. Civ. P. 23(b)(3).  *First*, as the Supreme Court has recognized, a "core" purpose

24  of class actions is "to overcome the problem that small recoveries do not provide the incentive

25  for any individual to bring a solo action."  *Amchem Prods.*, 521 U.S. at 617.  That purpose is

26  clearly served for a case of this scale and complexity, where prosecuting these claims requires

27  many millions of dollars.  *Second*, while superiority might be lessened based on "the extent of

28

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

29

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

any independent litigation already begun by class members," *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 200 (E.D. Pa. 2017), no class members have brought independent litigation here. *Third*, "class-wide litigation of common issues will reduce litigation costs and promote judicial efficiency." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 121 (S.D.N.Y. 2015). *Fourth*, no inherent difficulties undermine the maintenance of this case as a class action.

## IV.    THE COURT SHOULD APPOINT PLAINTIFFS' REQUESTED COUNSEL

Finally, Plaintiffs request the appointment of Quinn Emanuel Urquhart & Sullivan, LLP, Constantine Cannon LLP, Lockridge Grindal Nauen P.L.L.P., and Wilson Sonsini Goodrich & Rosati, P.C. to serve as Co-Lead Class Counsel.

Rule 23(g)(1)(A) identifies four factors used to determine lead counsel: "the work counsel has done;" "counsel's experience;" "knowledge of the applicable law;" and the "resources that counsel will commit." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *66 (E.D.N.Y. Oct. 15, 2014); *see also* Fed. R. Civ. P. 23(g)(1)(B). Each factor favors these top-tier firms' appointment. They bring extensive expertise in antitrust class actions, have worked efficiently and effectively to investigate and prosecute this case, and have already committed tens of thousands of hours and many millions of dollars investigating, developing, and litigating this matter. As discussed in the attached firm resumes, the firms have ably litigated and served as lead class counsel in many major antitrust actions nationwide, recovered billions of dollars in antitrust and other cases, and received awards recognizing the quality of their work. Exs. 80-83. They have also done a tremendous amount of work in this case, taking over twenty depositions and developing the robust evidentiary record supporting this motion. They have also worked well with Executive Committee member Vorys, Sater, Seymour & Pease, LLP, whose firm resume is also attached. Ex. 84. Accordingly, they meet all the requirements for appointment as Class Counsel.

## <u>CONCLUSION</u>

Plaintiffs respectfully request that the Court certify the proposed class, appoint the named Plaintiffs as class representatives, and appoint Co-Lead Class Counsel.

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

30

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

DATED:        February 8, 2024                     Respectfully submitted,

/s/ Alicia Cobb                                    /s/ Stephanie L. Jensen

Alicia Cobb, WSBA #48685                           Stephanie L. Jensen, WSBA #42042
QUINN EMANUEL URQUHART &                           Tyre L. Tindall, WSBA #56357
SULLIVAN, LLP                                       WILSON SONSINI GOODRICH &
1109 First Avenue, Suite 210                        ROSATI P.C.
Seattle, Washington 98101                          701 Fifth Avenue, Suite 5100
Phone (206) 905-7000                               Seattle, WA 98104-7036
Fax (206) 905-7100                                 Phone (206) 883-2500
aliciacobb@quinnemanuel.com                        Fax (866) 974-7329
                                                   sjensen@wsgr.com
Steig D. Olson (*pro hac vice*)                    ttindall@wsgr.com
David LeRay (*pro hac vice*)
Nic V. Siebert (*pro hac vice*)                    Kenneth R. O'Rourke (*pro hac vice*)
Andrew Faisman (*pro hac vice*)                    Allison B. Smith (*pro hac vice*)
QUINN EMANUEL URQUHART &                           WILSON SONSINI GOODRICH &
SULLIVAN, LLP                                       ROSATI, P.C.
51 Madison Avenue                                  1700 K Street, NW, Suite 500
New York, New York 10010                           Washington, DC 20006
Phone (212) 849-7231                               Phone (202) 973-8800
Fax (212) 849-7100                                 Fax (866) 974-7329
steigolson@quinnemanuel.com                        korourke@wsgr.com
davidleray@quinnemanuel.com                        allison.smith@wsgr.com
nicolassiebert@quinnemanuel.com
andrewfaisman@quinnemanuel.com                     W. Joseph Bruckner (*pro hac vice*)
                                                   Joseph C. Bourne (*pro hac vice*)
Adam Wolfson (*pro hac vice*)                      Laura M. Matson (*pro hac vice*)
QUINN EMANUEL URQUHART &                           LOCKRIDGE GRINDAL NAUEN P.L.L.P.
SULLIVAN, LLP                                       100 Washington Avenue S, Suite 2200
865 S. Figueroa St., 10th Floor                    Minneapolis, MN 55401
Los Angeles, California 90017                       Phone (612) 339-6900
Phone (213) 443-3285| Fax (213) 443-3100           Fax (612) 339-0981
adamwolfson@quinnemanuel.com                       wjbruckner@locklaw.com
                                                   jcbourne@locklaw.com
Charles Stevens (*pro hac vice*)                   lmmatson@locklaw.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP                                       Kyle Pozan (*pro hac vice*)
50 California St., 22nd Floor                       LOCKRIDGE GRINDAL NAUEN P.L.L.P.
San Francisco, CA 94111                             1165 N. Clark Street, Suite 700
Phone (415) 875-6600                               Chicago, IL 60610
Fax (415) 875-6700                                 Phone (612) 339-6900
charliestevens@quinnemanuel.com                    Fax (612) 339-0981
                                                   kjpozan@locklaw.com
Ankur Kapoor (*pro hac vice*)
Noah Brecker-Redd *(pro hac vice)*                 *Interim Co-Lead Counsel*
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017
Phone (212) 350-2700
Fax (212) 350-2701
akapoor@constantinecannon.com
nbrecker-redd@constantinecannon.com

J. Wyatt Fore (*pro hac vic*e)
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., NW, Suite 1300N
Washington, D.C. 20004
Phone (202) 204-4527
Fax (202) 204-3501
wfore@constantinecannon.com

*Interim Co-Lead Counsel*

Kenneth J. Rubin (*pro hac vice*)
Timothy B. McGranor (*pro hac vice*)
Kara M. Mundy (*pro hac vice*)
Douglas R. Matthews (*pro hac vice*)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215
Phone (614) 464-6400
Fax (614) 719-4796
kjrubin@vorys.com
tbmcgranor@vorys.com
kmmundy@vorys.com
drmatthews@vorys.com

Thomas N. McCormick (*pro hac vice*)
VORYS, SATER, SEYMOUR AND PEASE LLP
4675 MacArthur Court, Suite 700
Newport Beach, California 92660
Phone (949) 526-7903 | Fax (949) 383-2384
tnmccormick@vorys.com

*Executive Committee Member*

MOT. FOR CLASS CERT.
CASE NO. 2:21-cv-00563-JCC

32

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

**WORD COUNT CERTIFICATION**

I certify that this memorandum contains 10,896 words, in compliance with the stipulated motion so ordered by the Court at Dkt. 178.

DATED:  February 8, 2024

*/s/ Alicia Cobb*

Alicia Cobb, WSBA #48685

Mot. for Class Cert.
Case No. 2:21-cv-00563-JCC

33

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

DATED:  February 8, 2024

_/s/ Alicia Cobb_
Alicia Cobb, WSBA #48685

Mot. for Class Cert.
Case No. 2:21-cv-00563-JCC

34

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000