# EXHIBIT Q

# EXHIBIT 19

# FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1                  UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF WASHINGTON

3                         AT SEATTLE

4    _____

5    In Re:                      )

                                 )

6                                ) No. 2:21-cv-00563-JCC

     VALVE ANTITRUST LITIGATION    )

7                                )

     _____

8

9      VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

10                       KASSIDY GERBER

11   _____

12

13     *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

14

15                         9:05 A.M.

16                  THURSDAY, OCTOBER 5, 2023

17                701 FIFTH AVENUE, SUITE 5100

18                    SEATTLE, WASHINGTON

19

20

21

22

23   Reported by:  Tami Lynn Vondran, CRR, RMR, CCR/CSR

24   WA CCR #2157; OR CSR #20-0477; CA CSR #14435

25

```
 1    have you had any kind of training on any topic that you

 2    understood to relate to antitrust?

 3              MR. SKOK:  And, again, Ms. Gerber, to the

 4    extent you can answer this without disclosing

 5    attorney-client communications, you may.  But to the

 6    extent that he's asking you about the content of

 7    communications you've had with lawyers, that's

 8    attorney-client privilege, so please don't disclose

 9    that.

10              THE WITNESS:  Okay.

11        Q.  (BY MR. O'ROURKE)  So it's a yes-or-no

12    question.  Either you've had the training or you have

13    not.

14              MR. SKOK:  Well, to the extent that she's had

15    those communications with lawyers, you're asking about

16    the substance of those attorney-client communications.

17              That's the type of communication that I'm

18    instructing you not to answer.

19              THE WITNESS:  Okay.

20        Q.  (BY MR. O'ROURKE)  Your answer?

21        A.  I'm not going to answer.

22        Q.  You're refusing to answer?

23        A.  Yes.

24              MR. SKOK:  Well, she's been instructed not to

25    answer.  I think she's following counsel's instructions.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. O'ROURKE:  So just so we're very clear,

2     Mr. Skok --

3          MR. SKOK:  Skok, please.  Skok.

4          MR. O'ROURKE:  Skok.  Thank you.

5          MR. SKOK:  Thank you.

6          MR. O'ROURKE:  You -- the position you're

7     taking now in instructing the witness not to answer is,

8     I am not permitted to ask an employee of Valve whether

9     or not that employee has had compliance training on

10    antitrust?

11         MR. SKOK:  No.  The question is asking for the

12    substance of what kind of training she may have had by

13    counsel.  To the extent there's a training by counsel,

14    that would disclose the substance of attorney-client

15    communications.  The instruction is not to answer in a

16    way that discloses the substance of attorney-client

17    communications.  I did tell the witness if she can

18    answer otherwise, then she's free to.

19         Q.   (BY MR. O'ROURKE)  My question is:  Have

20    you -- during the time you've worked at Valve, about 11

21    and a half years, have you had training on antitrust

22    compliance?

23         MR. SKOK:  And the same instructions,

24    Ms. Gerber.

25         Q.   (BY MR. O'ROURKE)  You need to answer.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 45

```
 1        A.    No.   I'm not answering.
 2              MR. SCHENCK:   Why don't we take a break, see
 3    if we can figure this out.
 4              MR. SKOK:   Yeah.   It's probably a good time
 5    for a break to consult on some of these issues --
 6              MR. O'ROURKE:   Take a break.
 7              MR. SKOK:   -- as well as we've been going
 8    about an hour.
 9              THE VIDEOGRAPHER:   The time is 9:56 a.m.   And
10    we're going off the record.
11              (Brief break taken.)
12              THE VIDEOGRAPHER:   The time is 10:09 a.m.   And
13    we're back on the record.
14        Q.    (BY MR. O'ROURKE)   Ms. Gerber, during the time
15    you've worked at Valve, did Valve have a policy to
16    require material parity for things sold on the Steam
17    store?
18              MR. SKOK:   Object to the form.
19        A.    I would not describe what we do as a policy,
20    but in practice, we ask that partners have material
21    parity for their games on Steam between other PC
22    versions.
23        Q.    (BY MR. O'ROURKE)   What does "material parity"
24    mean in this context?
25        A.    It means the game you offer on Steam has to be
```

```
 1    comparable, as good as any other version -- any other PC

 2    versions.

 3         Q.   And when you say "as good as," does that mean

 4    it has to have the same DLC?

 5         A.   Yes.

 6         Q.   And the same content for the -- in other

 7    words, you can't have some additional play time on the

 8    version that's sold outside of Steam?

 9         A.   The -- having additional play time that's not

10    available on Steam, but is available on another PC

11    store, would be a -- would be a, I think, in my opinion,

12    violation of material parity, yeah.

13         Q.   What about price, if the price was different

14    on the other PC store?

15              MR. SKOK:  Object to the form.

16         A.   It depends on why and when.

17         Q.   (BY MR. O'ROURKE)  What do you mean?

18         A.   I mean, if a game is on sale at a different

19    time than it's on sale on Steam, like, we don't -- it's

20    not a problem.  So it's -- it depends on how it's -- it

21    depends -- there's a lot of -- it's a case-by-case

22    thing.  And it's not always -- like, it doesn't always

23    have to be the same price on Steam that it is elsewhere.

24         Q.   When is the price of a game that's being sold

25    on another PC's online store a problem with Steam's
```

```
                                                 Page 47
 1   material parity practice?

 2             MR. SKOK:  Object to the form.

 3        A.   It's a case-by-case thing.  You'd have to give

 4   me a more specific example.  I mean...

 5        Q.   (BY MR. O'ROURKE)  And let me back up a

 6   minute.

 7             You said, a little bit ago, that you would

 8   characterize the material parity requirement as a

 9   practice, not a policy --

10             MR. SKOK:  Object to the form.

11        Q.   (BY MR. O'ROURKE)  -- correct?

12        A.   I guess I don't really know what you mean by

13   "policy."  But in general, I don't feel like we have a

14   lot of policies.  That sounds kind of bureaucratic to

15   me.  So I don't like the word "policy."

16             But it's like in practice we -- if we know

17   about a better version of a game or a -- something that

18   customers might want in the version of the game on Steam

19   that's not available, we would approach a partner about

20   it.

21        Q.   And so in your mind, what's the difference

22   between a policy and a practice if in either case you're

23   going to the developer when you see that they are

24   offering a version of the game on another PC online

25   store that does not meet material parity?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 48

```
 1        A.   A policy sounds more official, like you
 2   have -- I don't know, it just sounds more official.  But
 3   I guess I'd ask you to tell me what the difference is,
 4   because I don't really know.
 5        Q.   Well, isn't it the case that you have told a
 6   developer that "Steam's policy has always been to
 7   require material parity for things we sell on the Steam
 8   Store"?
 9        A.   I don't know.  Maybe.  I don't remember.  Are
10   you telling -- do you have something that says I said
11   that?  I don't remember saying that.
12        Q.   I do --
13        A.   Okay.
14        Q.   -- but we'll get to the document in a moment.
15   I'm not trying to --
16        A.   Apparently I did use the word "policy," then.
17   I don't know.
18        Q.   That's why I'm trying to understand your
19   distinction, if there is one, between "policy" and
20   "practice" in terms of Steam and your business
21   development colleagues enforcing this material parity
22   requirement.
23             MR. SKOK:  Object to the form.
24        Q.   (BY MR. O'ROURKE)  What's the difference?
25             MR. SKOK:  Object to the form.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 57

1          Q.   So I'm just trying to understand the

2    distinction between the two situations, where in both

3    cases a Steam customer is buying the game and then, in

4    this situation, learning that it's for sale at a lower

5    price, why does it matter if the lower price is on Steam

6    or the lower price is on another online store?

7          A.   Can you repeat the question.

8          Q.   Sure.

9               What's the distinction between a Steam

10   customer who buys on Steam two days before a sale on

11   Steam, versus the Steam customer who buys on Steam and

12   then learns two days later the same game is for sale at

13   a lower price on a different store?

14         A.   I don't -- I don't think there is a

15   distinction.  I think that's -- I don't have an issue

16   with that.

17         Q.   But yet if the game is for sale on Steam at

18   one price, and it's also being sold on a different

19   online store at a lower price, Steam does have a problem

20   with that?

21         A.   Not always --

22              MR. SKOK:  Object to the form.

23              Go ahead.

24         A.   Not always, no.

25         Q.   (BY MR. O'ROURKE)  But sometimes it does?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 58

1      A.   It's case by case, yeah.

2      Q.   Is there something in the SDA that requires

3   the developer to sell a game at the same price on -- let

4   me rephrase that.

5           Is there a requirement -- where is there a

6   requirement -- where is there a requirement that a

7   developer sell a game on Steam at a price that's in

8   parity with what it's selling for that same game on a

9   different online store?

10     A.   I don't know the SDA front to back, so I don't

11   know.

12     Q.   But you work with SDAs all the time?

13     A.   Sure.

14     Q.   And you're not aware of a requirement in the

15   SDAs that Steam has that requires developers to sell

16   their games at a price in parity with what they're

17   selling on Steam?

18           MR. SKOK:  Object to the form.

19     A.   No.

20     Q.   (BY MR. O'ROURKE)  Are you aware of a

21   requirement in any other way, Steam documentation, that

22   a developer must sell its game on Steam at a price

23   that's in parity with what it sells the same game for on

24   a different online store?

25     A.   No.

Page 59

1      Q.   So why does Steam have a provision in the SDAs

2    that requires DLC to be on parity but doesn't require

3    the price to be on parity, yet Steam, at least at times,

4    takes action against a developer who doesn't have a

5    price parity?

6           MR. SKOK:   Object to the form.

7           Also, Ms. Gerber, to the extent you've had

8    communications with counsel about this issue, those

9    would be attorney-client privileged, and instruct you

10   not to disclose those.

11          If you can answer otherwise, please do.

12     A.   Can you repeat the question.

13          MR. O'ROURKE:   Can we have it read back,

14   please.

15          (Last question read back.)

16     A.   So I feel like there were two questions there.

17   Why does Steam have a -- sorry.  Can you read it again.

18          (Last question read back.)

19     A.   That's a big question.  I don't know.  You're

20   asking why does Steam have a parity.

21          So we have a parity clause in our SDA because

22   we don't want to have a worse version of the game, we

23   want to make sure that the thing that we're offering on

24   Steam is as good as any other PC version that's

25   available out there.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 60

```
 1              So that's why we have the parity clause.

 2         Q.   (BY MR. O'ROURKE)  Okay.  And why don't you

 3    have a price parity clause when, at least at times, you

 4    enforce price parity against developers who are selling

 5    a game at a lower price at a different store?

 6              MR. SKOK:  Object to the form.

 7              Also, to the extent that this calls for a

 8    disclosure of attorney-client communications, those

 9    would be privileged.  Please do not disclose those.

10              If you can answer otherwise, please do.

11         A.   We don't have a price parity clause because we

12    think it's -- we understand that developers are going to

13    run promotions on other channels at different times, and

14    so we don't require that they always run them on Steam

15    when they're -- when they, you know, want to run one on

16    their own platform or on a different, you know,

17    platform's sale event, or something like that.

18              So that's why we don't require parity for

19    price.

20         Q.   (BY MR. O'ROURKE)  But you take down their

21    preorders if they're not in material parity on price.

22              You've done that?

23         A.   Yes.

24         Q.   It's not based on the SDA?

25         A.   No.  It's based on -- it's based on a
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 61

```
1    brand-new game that we're asking customers to pay full

2    price for before the game's even available.  And so, you

3    know, we think that -- we want to make sure that's a

4    good offer.

5         Q.   You've worked at Steam for over 11 and a half

6    years.  Can you point to anything in any Steam

7    documentation that requires developers to sell a game

8    with -- on price parity with what they're selling the

9    same game on Steam?

10            MR. SKOK:  Objection.  Asked and answered.

11        A.   I'd have to -- I'd have to -- I don't have any

12   of our documentation memorized, so I don't know.

13        Q.   (BY MR. O'ROURKE)  Okay.  As you sit here,

14   having worked as an account manager for at least nine

15   and -- nine-plus years, you can't think of any

16   documentation that Steam has that would obligate a

17   developer to sell its game on another platform in parity

18   in price with what it sells the game -- same game on

19   Steam; correct?

20            MR. SKOK:  Objection.  Asked and answered.

21        A.   I'm not -- I don't have our documentation

22   memorized, so no.

23        Q.   (BY MR. O'ROURKE)  Is it fair to say that

24   during the time you've worked at Valve, there's a rule

25   of thumb that you ask that anything that a developer
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                                Page 62
 1    offers through other retailers are also available to

 2    Steam customers?

 3         A.    Yeah, that's -- that's accurate.

 4         Q.    And has that been accurate for the entire time

 5    you've been at Valve, about 11 and a half years?

 6         A.    Probably, yeah.  I can't remember a time when

 7    it wasn't that way.

 8         Q.    And how did you learn that that was a

 9    requirement or a rule of thumb --

10         A.    I don't remember.

11         Q.    -- at Valve?

12         A.    I don't remember.

13         Q.    You learned that working in business

14    development with your coworkers?

15         A.    Probably, yeah.

16         Q.    And where did you learn that you need to make

17    sure customers who come to purchase games from Steam

18    aren't being offered a worse product than what's offered

19    elsewhere?

20         A.    Where did I learn?

21         Q.    Yes.

22         A.    Can you ask again.

23         Q.    Sure.

24               I'll ask it this way -- different question.

25               Is it fair to say that in your experience
```