THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE VALVE ANTITRUST LITIGATION

No. 2:21-cv-00563-JCC

**DEFENDANT VALVE CORPORATION'S CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**ORAL ARGUMENT REQUESTED**

**FILED UNDER SEAL**

## I. INTRODUCTION

The stunningly diverse class of video game publishers Plaintiffs seek to represent includes tens of thousands of individuals and companies that have sold games on Steam. It includes hobbyists and publicly traded companies, experienced publishers with game development budgets that dwarf those of most major Hollywood films and rookie shoestring operations. It includes publishers who have stayed in near-constant contact with Valve for

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 1

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

years and developers who once received a check in the mail from their publisher, never dealing directly with Valve at all.  It includes publishers of games offered for free and publishers of games sold for well over a hundred dollars, publishers of games consisting of a repetitive, simple task and publishers of games containing richly detailed universes that take hundreds of hours to fully explore.

Plaintiffs have no common evidence Valve has injured members of this proposed class. Plaintiffs' claims hinge on the allegation that Valve maintains a platform-most-favored-nation policy ("PMFN") to block competition and buttress its allegedly dominant position in the market.  *See* Mot. 1.  According to Plaintiffs, the PMFN has two components:  (1) the "content parity" component prevents a publisher who sells games on Steam from "providing additional game content on another platform that it does not make available on Steam;" and (2) the "price parity" component prevents publishers who sell games on Steam from selling a game for a lower price on another platform."  Mot. 2.

Plaintiffs' broad content parity component does not exist.  Valve has only a narrow "material parity" provision in its Steam Distribution Agreement ("SDA"), which applies to downloadable content ("DLC") and explicitly encourages publishers to offer exclusive DLC on other platforms.  It asks only that the publisher offer comparable DLC to Steam customers. This Court has already expressed skepticism that Valve's DLC provision could constitute anticompetitive conduct.

The price parity component of the alleged PMFN is a fantasy.  The closest Plaintiffs come to even identifying it is by pointing to an online form outlining Valve's expectations for only those publishers who choose to take advantage of Valve's Steam Keys, expectations this Court has ruled cannot represent unlawful antitrust conduct so long as they are motivated by valid business reasons.  Plaintiffs' evidence does not come close to establishing the existence

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 2

1  of an unlawful policy, and the evidence they offer is far from common to all members of the

2  proposed class.

3     What the evidence *does* establish is that this case contains a confounding number of

4  individual issues that would need to be addressed at trial.  The evidence shows different

5  members of the proposed class had different understandings and experiences of the conduct

6  Plaintiffs allege adds up to a price parity requirement (many had no understanding of it at all).

7  The evidence shows different publishers benefit to different extents from Steam's features.  And

8  the evidence shows different members of the proposed class are subject to different effective

9  revenue share rates—rates Plaintiffs lack the data to reliably calculate.

10    Plaintiffs' expert economist Steven Schwartz attempts to fill this absence of common

11 evidence with unjustified assumptions.  Valve's expert economists, Professors Lesley Chiou

12 and Ashley Langer, demonstrate Schwartz's analyses are fundamentally and fatally flawed.

13    Rule 23 "imposes stringent requirements for [class] certification that in practice exclude

14 most claims[.]"  *American Express Co. v. Italian Colors Restaurant, 570* U.S. 228, 234 (2013).

15 Plaintiffs' claims, like most, have no place in a class action.  Because Plaintiffs have failed to

16 satisfy Rule 23's requirements to identify common questions of law and fact and demonstrate

17 that common questions predominate, the Court should deny Plaintiffs' motion to certify the

18 proposed class.

## II. FACTUAL BACKGROUND

### A.  Valve Innovates Its Way To Success

20    Over many years of continuous innovation, Steam has transformed the way people

21 around the world distribute and play video games.  Before Steam, someone who wanted to get

22 their hands on the latest game would have to go outside, get on their bike, and get to a mall

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 3

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

store like FuncoLand.  Ex. 3 (Owens Dep.) 57:9-23.[1]  There, if the game happened to be in stock, they would purchase a cardboard box containing a floppy disc or CD.  *Id.* 33:3-10.  With limited space for storage and display, physical stores could hold only so much, so on any given day a gamer might go home empty-handed and disappointed.  Ex. 4 (Lynch Dep.) 35:20-36:7.  The brick-and-mortar model had other drawbacks.  *Id.*  If a CD had an error or the game had a bug, it was difficult to solve the problem.  *Id.* 36:15-19.  Managing returns was complicated and costly.  *Id.* 36:8-14.  To update a game, the gamer would have to contact the publisher, then wait for a separate disc to show up in the mail, hopefully intact and functional.  Ex. 3 185:7-12.

Digital distribution was long seen as "software's promised land."  Ex. 5 (VALVE_ANT_1163411).  It would eliminate the costs associated with burning CDs, printing manuals, getting everything on a truck to a warehouse, then another truck to a store, and then managing inventory.  *Id.*  It would provide a more immediate connection to gamers, facilitating direct feedback developers could use to make their games better.  *Id.*  Developers could have more control over marketing, and they would no longer need to invest in a team of salespeople to pitch games to retail chains.  *Id.* at '412.

Through hard work, creativity, and competitive gumption, Gabe Newell and a handful of like-minded innovators were among the first to reach this promised land.  Newell started Valve with the money he made as an early employee at Microsoft, where he witnessed the emergence of the modern Internet and recognized its possibilities.  Ex. 6 (Newell Dep.) 173:24-174:21; Ex. 7 (VALVE_ANT_0294661).  Initial attempts at digital distribution required gamers to spend an unacceptable amount of time downloading entire games before beginning play, but Valve developed Steam to instantly distribute games via a broadband connection.  Ex. 3 72:4-

---

[1] Citations to "Ex. __" are to exhibits to the Declaration of Blake Marks-Dias in Support of Defendant Valve Corporation's Opposition to Plaintiffs' Motion for Class Certification and Valve's Motion to Exclude Testimony of Steven Schwartz, Ph.D.

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 4

15.  Steam also kept all players' versions of a game in sync.  This eliminated many of the frustrations of traditional retail, and it also made gaming an entirely new kind of social experience.  Ex. 8 (Troyer Dep.) 29:16-30:21.  A multiplayer game distributed through Steam could be played with friends and family scattered around the globe.  *Id.*  Steam wasn't the original digital distribution platform—competitors TryGames, Stardock Central, and platforms for the games Everquest and Final Fantasy were earlier—and it was far from popular at launch, but Steam was the first gaming platform to get digital distribution right.  Ex. 9 (VALVE_ANT_2325138) at '148-'149; Ex. 1  ¶¶67 ("Chiou"); Dkt. 182-2 ¶26 ("Rietveld"); Dkt. 182-1 ¶19 ("Schwartz").

Steam also brought great democratization to game publishing.  Ex. 10 (Murray Dep.) 22:22-23:2.  Before Steam, it was difficult for small, independent developers ("indies") to find success on their own.  *Id.* 20:21-21:16.  Priced out of retail distribution, indies had to set up a free-standing website, somehow drive traffic to it, and manage knotty issues like piracy, updates, and multiplayer game functionality all alone on a puny budget.  *Id.* 21:21-22:9.  Steam made it possible for indies to self-publish and immediately reach a wide audience for the first time.[2] *Id.* 23:3-10.

**B.  Plaintiffs' Market Definition is Incoherent**

From its inception, Steam faced fierce competition from established brick-and-mortar retailers, from consoles made by Sony, Microsoft, and Nintendo, and from digital distributors.  Ex. 11 (VALVE_ANT_1221790) at 30; Chiou ¶67, 111-128, 133.  By 2004, Steam was competing not only with digital distributors TryGames, Stardock, and platforms for Everquest

---

[2] Today, the barriers to entry are much lower. It is now possible for publishers of all sizes to operate a successful first-party game distribution platform. *See* Chiou ¶¶74-75.

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 5

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

and Final Fantasy, but with new market entrant Direct2Drive.[3]   Ex. 12 (VALVE_ANT_2809556).   A few years later, Gamers Gate, Digital River, Games for Windows—Live, Impulse, YummyGames, GameTap, Boonty, and GameStop joined the scrum.   Ex. 13 (VALVE_ANT_0311252); Rietveld ¶84.   As digital publishing grew, digital competitors entered, including Epic Games, Ubisoft, Electronic Arts, Activision Blizzard, CDProjekt, itch.io, Discord, Amazon, Green Man Gaming, and Humble Bundle.   Chiou ¶¶67, 71, 77.   Because players have always had plenty of options for where to buy and play games, Valve had to fight for its life from the very beginning.

Plaintiffs tell a story about Valve winning the jackpot in 2004 with its hit game Half-Life 2 and resting on its laurels the next two decades.   Mot. 5.   Everything about this story is a distortion, starting with its premise.   Valve initially distributed only its own games on Steam, and while the popularity of Half-Life 2 certainly drew players to the platform, the game was far from a singular sensation.   World of Warcraft, The Sims 2, Doom 3, and *89 other games* all sold more units than Half-Life 2 in 2004.   Chiou ¶62 n.127.   Half-Life 2 was nowhere near successful enough to give Valve the kind of instant market power Plaintiffs claim it did.   *Id.*[4]

But Half-Life 2, like all of Valve's games before or since, was groundbreaking, and it helped Valve continue to slowly build a devoted following.   As a former Dark Catt programmer

[3] A formidable adversary, Direct2Drive was owned by IGN Entertainment, a media conglomerate Rupert Murdoch bought for $650 million in 2005. Chiou ¶67 n.144.

[4] The Court dismissed an earlier Wolfire complaint for lack of antitrust injury because Valve allegedly did not become "dominant" until 2013. Dkt. 67 at 6-7. Plaintiffs now baselessly allege that the other key to Valve's "instant" market power was acquiring and shutting down the World Opponent Network ("WON") with 1.5-million users. Dkt. 127 ¶¶47, 51. With no evidence Valve ever owned WON, Plaintiffs dropped this from their brief, though it lingers in Plaintiffs' expert reports. Schwartz ¶31; Rietveld ¶125. But Schwartz testified he had no idea what WON was. Ex. 14 (Schwartz Dep.) 179:23-180:4. A 2005 agreement Plaintiffs don't mention between Valve and its publisher Sierra Entertainment shows Sierra, not Valve, owned WON. Johnson Decl. ¶¶6-10 & Ex. 1 thereto (VALVE_ANT_2711606 at '630) ("Sierra's WON.net"). "Valve never acquired or owned WON." *Id.* ¶10.

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 6

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

puts it, "The games that [Valve] make[s] are a constant inspiration for me, primarily because every time they put something out […] it's innovative.  It's new.  It's fresh.  It shows what you can do with what you have."  Ex. 8 24:1-22.  Valve brought this same penchant for "push[ing] the envelope" of technology to its work on Steam, which helped it hold its own even as it began facing competition from enormously powerful companies like Microsoft, Google, Amazon, and Tencent.  *Id.*; Chiou ¶¶71, 77-78.  Newell explained that "Steam was originally a set of features that would allow us to better serve the customers of our online games, […]  Then, like everything else at Valve, the team kept iterating to build what it has become today.  And we're continuing to build upon it."  Ex. 7 (VALVE_ANT_0294661) at '663.

Plaintiffs claim Valve commands between ▮ and ▮ percent of the market for third-party digital PC game distribution, numbers they engineer by arbitrarily excluding first-party game distribution, console gaming, brick-and-mortar stores, multi-game subscriptions, and cloud gaming platforms.  Chiou ¶¶18.a, 81-133.  Because Plaintiffs fail to appropriately address these economically significant substitutes for Steam, their market definition is incoherent.  *Id.* ¶¶143-147.  No one in the industry defines the market the way Plaintiffs do.  *Id.* ¶103.

**C.  Partners' Effective Revenue Share Rates Present Individualized Issues**

When Valve first began distributing third-party games through Steam, it generally gave publishers ▮ percent of the purchase price of their games, retaining ▮ percent to cover expenses including "billing, getting the product to customers, updating customers[,] and supporting those customers."  Ex. 15 (VALVE_ANT_2793689).  ▮ percent was much more than the ▮ percent publishers were accustomed to capturing when they sold through traditional retailers.  Rietveld ¶37.  It was also much more than publishers typically retained distributing through other fledging digital distributors at the time.  *See, e.g.*, Ex. 16 (VALVE_ANT_2641345).  Through negotiations with publishers who sell their games on

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 7

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Steam ("partners") and in response to competition, Valve settled into a rhythm of retaining a 30 percent nominal revenue share from most partners when it distributed their games. *See* Rietveld ¶126.

This rhythm was by no means insensitive to competitive pressures. By 2018, Valve saw the need to make another major adjustment to its revenue share. Ex. 17 (VALVE_ANT_2533068) at '069. Some large publishers were choosing to distribute their most popular games exclusively through their own stores. *Id.* at '069. Competitors like the Epic Games Store ("Epic"), launched just after Valve's change, showed a willingness to operate at a loss to lure more publishers to their stores. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 932-33 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded*, 67 F.4th 946 (9th Cir. 2023) ("The evidence is also undisputed that [Epic's] 88/12 commission is a below-cost price and the store is expected to operate at a loss for many years at this rate."). With the goals of attracting new games to Steam, retaining existing games, rewarding publishers for taking big risks, incentivizing the promotion of sales on Steam, and increasing user engagement, Valve decided to pay publishers an additional revenue share for high-performing games. Ex. 4 243:25-244:7; Ex. 18 (Lynch 30(b)(6) Dep.) 111:11-115:9. Since 2018, a publisher receives 75 percent for a game generating between $10 million and $50 million on Steam, and 80 percent for a game generating over $50 million, with Valve retaining only 25 and 20 percent, respectively. Publishers of all sizes are eligible to qualify for this additional revenue share. Ex. 4 97:20-98:11.

Plaintiffs attempt to minimize the significance of this seismic shift by relegating its details to a footnote in their brief. Mot. 3 n.1. For rhetorical purposes, they prefer to rail against Valve's "30% monopoly tax." Mot. 3. The problem with this strategy is that it disregards reality. Inconveniently for Plaintiffs, the new revenue share tiers Valve introduced represented,

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 8

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

by 2022, a ▆▆▆▆▆▆ transfer from Valve to qualifying publishers and shrunk Valve's average nominal revenue share to just ▆▆ percent.  Chiou ¶¶ 155, 364.a.  Plaintiffs argue that if only it were forced to compete fair and square, "Valve would have to respond by lowering its commission."  Mot. 2.  And so it has.

Plaintiffs also ignore the impact of Valve's Steam Keys—a major source of publisher's income—on individual publishers' revenue shares.  Steam Keys are alphanumeric codes that allow users to activate and play a game on Steam.  Ex. 19 (Valve's Supp. Ans. Int. 14 (July 5, 2023)).  Valve provides them to publishers in good standing for free.  *Id.*  Steam Keys let publishers sell Steam versions of their games on their own websites or through non-Steam distribution channels.  *Id.*  Since Valve does not charge for Steam Keys, Steam publishers keep 100 percent of the proceeds they generate by selling games using Steam Keys (unless they choose to split that revenue with developers, Steam Key resellers, or other distributors).  *Id.*  Gamers who obtain Steam Keys gain full access to the Steam version of the game just like gamers who purchase their games directly from Steam.  Chiou ¶¶18.c, 156.

Developing and maintaining Steam is decidedly not free for Valve, so to discourage free-riding and fraud, Valve considers each Steam Key request on a case-by-case basis and limits the number of Steam Keys it gives away.[5]  Chiou ¶193 n.355; Marks-Dias Decl. Ex. 19 (Answer to Int. 14).  Valve also sometimes declines to issue Steam Keys to partners who use them to disadvantage Steam customers by undercutting the price they charge for the same game on Steam.  *Id.*  This Court ruled the limits Valve imposes on Steam Keys are not unlawful antitrust conduct if they are motivated by valid business reasons.  *Dark Catt Studios Holdings,*

---

[5] Valve gives out up to 5,000 free Steam Keys for every game released on Steam, even if that game never sells a copy on Steam.  All subsequent Steam Key requests are reviewed on a case-by-case basis.  Chiou ¶193 n.355.

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 9

*Inc. v. Valve Corp.*, No. C21-0872-JCC, Dkt. No. 56, 2021 WL 5415222, at *2 (W.D. Wash. Nov. 19, 2021).

As Professor Chiou explains, the value of Steam Keys to publishers and the amount publishers receive from their sales must be taken into account to accurately calculate Valve's effective revenue share. Chiou ¶¶154-168 & Ex. 6. Publishers vary enormously in their use of Steam Keys, with █ percent (according to Schwartz) having at least one Steam Key activation, others never distributing games via Steam Key, and others distributing millions of copies of their games via Steam Key, resulting in an effective revenue share range likely spanning near zero to 30 percent. *Id.* ¶172; Schwartz ¶ 158 n.441. But Valve has no data on the revenue publishers receive from selling Steam Keys or the prices at which individual Steam Keys were sold. Chiou ¶¶18.c, 149, 159. While some publishers may have data on Steam Key sales of their games, others don't. *See, e.g.*, Ex. 20 (D. Rosen 30(b)(6) Dep.) 182:23-183:10; 184:10-185:3 (testifying that Plaintiff Wolfire does not maintain records of its Steam Key sales through Steam Key reseller Humble Bundle). Some partners sell many more games via Steam Keys than they do on Steam, while for others, the ratio is reversed. Chiou ¶ 186-191. Accordingly, Valve's revenue share rate—the linchpin of Plaintiffs' claims—is itself an individualized issue for each publisher, one Plaintiffs will be unable to establish with common proof.

**D. The Value of Steam's Features to Particular Publishers Raises Individualized Issues**

As a self-funded company, Valve earned the trust of gamers and developers over many years by building a feature-rich platform at a pace it could sustain with its own funds. To succeed as a two-sided platform, Valve needed to carefully cultivate an environment that is attractive to both gamers and publishers—constant vigilance is required to maintain the right balance between both groups. In Plaintiffs' but-for world where Steam has far fewer gamers and weaker network effects, Steam would be less valuable to publishers. Ex. 2 ¶133 ("Langer").

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 10

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1       Plaintiffs claim that Valve "does not significantly invest in improving the Steam

2   platform." Mot. 23. This flies in the face of thousands of documents and hours of deposition

3   testimony indicating just the opposite. *See, e.g.*, Ex. 21 (DJ Powers 30(b)(6) Dep.) 118:16-19

4   ("We take the margin that we get and reinvest it into the platform to keep making it better for

5   both [gamers and publishers].") Plaintiffs seem to assume that Valve's level of investment in

6   improving Steam affects all class members in a common fashion when, again, this issue has

7   widely varying implications for different class members. A publisher of a single-player game,

8   for example, would not be impacted by alleged deficiencies in Steam's matchmaking function.

9   Not every publisher uses all of Steam's many features, and publishers do not all derive the same

10  value from the features they do use. Chiou ¶230-254. As Schwartz concedes, Steam "has from

11  time to time added features to the platform. Whether those features are of value … to a

12  particular developer, whether they enhance the … experience for the developer is unclear." Ex.

13  14 (Schwartz Dep.) 249:19-250:4.

14      The very documents Plaintiffs cite in support of their claim that Valve does not invest

15  in Steam show Valve working tirelessly to make the platform the best possible version of itself.

16  Plaintiffs' Ex. 76 ("We have to keep making sure that the experience is amazing and valuable

17  to launch and play games through the Steam client"). Plaintiffs fault Valve because it "disrupts

18  gamers … by taking Steam down for 'planned weekly downtime maintenance.'" Mot. 23. But

19  this weekly downtime is when Valve adds new features to Steam and updates Steam's software

20  and hardware. Ex. 22 (Boyd Dep.) 66-72. Over the years, in response to sustained competition,

21  Valve has steadily introduced new features that make Steam an ever more attractive place for

22  developers to distribute their games and for gamers to buy them. These features include voice

23  and text chat, friend lists, recommendations, achievements, and a variety of pre-release game

24  testing options. Ex. 8 30-54. They include Community Hubs, where gamers can engage with

25

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 11

developers and with each other. *Id.* 45-46. They include the Steam Workshop, where gamers can create and share new content for their favorite games. Ex. 10 16:23-17:8. "Content discovery on Steam is really best in class." Ex. 23 (Fossa 30(b)(6) Dep.) 25:19-20. Steam's user reviews are considered so trustworthy and instructive that even gamers who plan to buy a game from a different store consult Steam reviews before making the investment. Ex. 10 34:1-35:5. Many of these features are "woefully absent" from competitors' stores. Ex. 8 61:11-16. Professor Chiou shows that Steam "is more feature rich than competitor platforms," and that industry reviews routinely laud it as the best. Chiou ¶¶203 & Ex. 12 (quoting reviews), 204-229. While Valve has led the field in introducing many features, it has also introduced features in response to actions taken by competitors. Chiou ¶¶209, 221 & Ex. 14.

Plaintiffs claim that Valve's many competitors have failed to acquire market share because of Valve's alleged anticompetitive conduct, but there are obvious alternative explanations for these platforms' failures. Mot. 13-16. The evidence shows that Valve's many competitors maintain platforms that are dramatically, demonstrably inferior to Steam. These platforms' deficiencies influence publishers' decisions about where to distribute their games to varying degrees. *See, e.g.*, Ex. ███████ ("Steam has options that ███ does not."); ██ ██ ████████████████████████████████████████████████████████████ ████████ █████████████████ ; Ex. ███████████████ (noting that ███ store lacks many of Steam's features); Chiou Ex. 14. ████ ███████████████ ████████████████████████████████████████████ ████████████████ ███████████ . Valve's efforts have made Steam a superior product that inspires intense loyalty in its customer and developer base. *See* Ex. ████████ (noting that "a large group of people would prefer to play" games on Steam); Ex. 25 (VALVE_ANT_1853845) at '845-846 (consumers in online forum discussing which game service is best enthusing "Steam rules! Not

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 12

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

only for variety but for dirt cheap prices as well[,]" "Gotta agree with that[,]" "Steam, no contest[,]" "As if there was any doubt[,]" "Steam:  Three Cheers for the Best Digital Distribution Service Ever Made!").  Valve welcomes competition on quality and price, and prefers to have to prove its own worth.  Ex. 26 (VALVE_ANT_0060429) (Epic CEO Tim Sweeney calls Valve "assholes."  Gabe Newell responds:  "We think competition is great for customers and partners.").

**E.  No Common Evidence Supports Plaintiffs' Claim That Valve Has an Unlawful PMFN**

Ignoring the gulf in quality between Steam and its competitors, Plaintiffs claim that Valve owes its success to a PMFN that has both content and price components.  Mot. 1-3.

**1.    Plaintiffs misrepresent Valve's content parity expectation**

The broad content parity requirement described by Plaintiffs does not exist.  There is a "specific material content parity" provision in § 2.4 of the SDA.  Ex. 21 82:25-83:1; Ex. 27 (Gerber Dep. Ex. 98).  This provision applies only to DLC.  The provision explicitly blesses publishers who wish to offer "special and unique promotional content through other distribution channels."  It asks only that those publishers also offer Steam customers "comparable" DLC. "[T]he reason is so that Steam customers, if they invest in the Steam version of the game, don't feel like they're missing out on any content … They can have different content as long as [Steam has] content that is materially the same in the view of the customers."  Ex. 28 113:19-114:25. This Court dismissed Plaintiff Dark Catt's claims arising out of the SDA's "material parity" provision, noting that because "exclusive offerings are common in the industry," it seemed "implausible that such [content parity] agreements could constitute anti-competitive conduct." *See Dark Catt*, Dkt. 56, at *3.  But even if the DLC parity provision could constitute anticompetitive conduct, it would raise individualized issues unsuitable to class-wide

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 13

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

disposition—where some publishers sell no DLC for their games at all, others have built their entire business model on DLC revenue.  Langer ¶52; Chiou ¶52-53, 79.

### 2.     Valve has no price parity requirement

According to Plaintiffs, the price parity component of Valve's alleged PMFN prevents any publisher that sells its game on Steam from selling a game for a lower price on another platform.  Mot. 2.  But "Valve does not have a policy or practice of dictating prices to third-party software developers on other platforms."  Ex. 6 14:7-8.

Plaintiffs claim that Valve communicates its alleged price parity policy in a couple of ways.  They rip from its context the language accompanying boxes Valve asked some partners to check when requesting Steam Keys and attempt to make that language apply to games not distributed via Steam Key.  Mot. 7.  This checkbox language closely parallels the language in Valve's Steam Key Rules and Guidelines, which are even more explicit about only applying only to Steam Keys.  The checkbox language is directly preceded by words, "Before completing your *key request*, please review and agree that you understand the following" (emphasis added).  Schwartz admits that publishers encounter the checkbox language only when requesting Steam Keys, but speciously asserts that "it is a fair reading by a careful developer" that the language "extends beyond Steam keys."  Ex. 14 206:21-207:2.  That Schwartz feels compelled to swaddle this assertion in caveats like "fair" and "careful" gives him away.

Schwartz has not, of course, identified any class-wide evidence that all or even most publishers disregard critical context and read the checkbox language against the grain the way he wants them to.  In fact, Schwartz asserts only ▇ percent of publishers checked these boxes, which were incorporated into the Steam Key request process in April 2018, well over a year into the class period.  Schwartz ¶158 n.441; Rietveld ¶200. And Schwartz is not, obviously, an expert in contract interpretation or human psychology.  *Aguilar v. Int'l Longshoremen's Union*

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 14

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (discarding expert testimony because what "almost anyone reading" certain instructions would conclude is a "matter of law for the court's determination"). If anything, Schwartz's testimony serves to establish only that whether publishers ever saw the checkbox language and, if so, how they interpreted it are issues that will require individualized inquiry.

Plaintiffs have also identified a small number of email conversations in which a Valve employee discusses a notable discrepancy between a game's price on Steam and in other stores with the game's publisher. Mot. 8-9. Plaintiffs neglect to mention that such conversations are exceedingly rare. Ex. 21 65:10-13 ("it's rare [to have such a conversation] because we have tens of thousands of games on Steam. Publishers set their own prices on Steam. We just don't run into the issue very often."). Plaintiffs claim that Valve initiates such conversations routinely, when in fact it has done so sporadically, only when the price of a game in another store is lower "[i]n a *significant* way, not real close," and only when it happens to be brought to a Valve employee's attention. *Id.* 66:7-14 (emphasis added).

Plaintiffs characterize this meager evidence of a parity policy as "common" when in fact it illustrates the broad range of individualized issues that would need to be addressed at trial. In their brief, Plaintiffs cite just eight email exchanges showing that Valve has ever removed or threatened to remove a game from Steam because a publisher listed a non-Steam-Key game at a lower price. To put things in perspective, Valve produced hundreds of thousands of emails in this case and there are over 90,000 games available on Steam. Most of Plaintiffs' eight emails involve games sold in a single country (██████) long ago. Plaintiffs' Ex. 35, 39, 41, 44, 45. The only emails that do not fall outside the statute of limitations period involved one game that was restored to Steam after being taken down for fewer than three days. Plaintiffs' Ex. 36, 37.

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 15

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Most of the other emails Plaintiffs cite relate to marketing, Steam Keys, SDA § 2.4's content parity clause for DLC, or general internal discussions about pricing.  These examples indicate that a few members of the proposed class of 32,000 (1) learned of what Plaintiffs claim amounts to a price parity requirement at different times, (2) heard different things about the contours of the alleged price parity requirement, (3) reacted to the alleged price parity requirement in different ways, and (4) were subject to different "enforcement" mechanisms.  They do not indicate any class-wide awareness or enforcement of a price parity requirement.

This is because Valve does not actually have a price parity requirement.  The emails show that, a few times over the course of over a decade, Valve employees were a little overzealous in advocating to get the best deal possible for Steam customers and chose their words poorly.  In an example Plaintiffs point to, Valve employee Tom Giardino advocates for Steam customers by writing to a publisher:

> [W]e wouldn't be OK with selling games on Steam if they are available at better prices on other stores, even if they don't use Steam keys.  If you wanted to sell a non-Steam version of your game for $10 at retail and $20 on Steam, we'd ask to get that same lower price or just stop selling the game on Steam if we couldn't treat our customers fairly.

Plaintiffs' Ex. 21 at '087.  In his deposition, Mr. Giardino explained that this was "a poor choice of words and doesn't accurately reflect, as far as I know, something we actually do on the store," Ex. 29 (Giardino Dep.) 159:17-19.  Stopping the sale of a game on Steam because of a price difference, he noted, was "not a consequence or outcome that I recall actually happening." *Id.* 157:15-16.  As Valve CEO Gabe Newell testified when confronted with a similar email from Mr. Giardino:  "I would not have sent this […] I do not think this is consistent with our policies and practices." Ex. 6 119:17-21.  Plaintiffs ignore this context.

Plaintiffs also ignore testimony from longtime industry participants—publishers that have never heard of Valve's alleged price parity requirement.  *See, e.g.,* ████████████

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 16

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

("Valve has never implied any requirements around price parity."); █████████ (stating that alleged Valve price parity requirement "does not exist."); █████████ (stating that Valve is a "trusted advisor" on pricing issues, but is "laid-back about how we, as a developer, want to do."); Ex. 30 (Rietveld Dep.) 56:13-16 (no "awareness" of any Valve PMFN while Strategic Manager of publisher Two Tribes) & Ex. 33 (Rietveld Dep. Ex. 3).

The emails Plaintiffs cite show isolated deviations from Valve's policy that had a negligible effect on publishers' understanding of Valve's pricing policies. They are not proof of class-wide impact.

To the extent some publishers have rough consistency in their pricing across platforms, there are obvious alternative explanations. Publishers "try to price consistently across platforms" to meet "[c]onsumer expectations" and out of a desire to "be[] fair to consumers." Ex. 10 37:7-15. As ████████ put it, "subscribe to ███████, buy it on console, buy it on PC, buy it at our store, buy it on Steam or somewhere else. … [W]e want that price to always be consistent. Because if we don't, we'll have quite a bit of backlash. … [W]e think about customer sentiment in our business." ██████████.

## F. The Proposed Class is Too Heterogenous to Certify

The great diversity of the proposed class raises a vast number of individualized issues that would need to be navigated at trial. Proposed class member Ubisoft is a world-famous, publicly traded French company with a market cap of nearly three billion dollars. Johnson Decl. ¶17. It publishes games for PCs and consoles. *Id.* Ubisoft currently distributes over one hundred games spanning multiple genres on Steam. Ubisoft's games are also available on its

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 17

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

own platform and through its subscription service. *Id.* Less than ███ percent of the Ubisoft games played on Steam are sold via Steam Key. *Id.*

Towards the other end of the spectrum is James Leakos, who has released just one game on Steam. *Id.* ¶18. His hand-drawn Artemis: God—Queen of the Hunt has sold about ███ copies on Steam since its 2019 debut. But Leakos has distributed over ███ copies via Steam Key. *Id.*

Proposed class member Facepunch Studios is a mid-sized game studio with about 75 employees. *Id.* ¶19. Facepunch makes Garry's Mod, a multiplayer game that allows users to create their own adventures for themselves and others. *Id.* Garry's Mod features characters and other intellectual property from Valve games, and as such █████████████████ ███████████████████████████ *Id.* Garry's Mod is available only on Steam and makes use of many Steam features, including Steam Workshop, Steam Cloud, Valve Anti-Cheat, Steam Achievements, and Steam Trading Cards. *Id.*

Proposed class members Slavic Magic, a developer, and Hooded Horse, a publisher, joined forces to create the medieval strategy game Manor Lords, which is sold on, *inter alia*, Steam, the Epic Games Store, GOG.com, and Microsoft's PC Game Pass subscription service. *Id.* ¶20. Neither Plaintiffs nor Valve know anything about the contractual relationship between Slavic Magic and Hooded Horse, how they handle pricing decisions, split revenue, or handle expenses for Manor Lords.

Because Plaintiffs have not proved that common questions of law and fact are present, much less predominant, the Court should deny Plaintiffs' motion.

### III. LEGAL STANDARDS

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27 at 33

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 18

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

(2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)).  To justify a departure from that rule, a party moving to certify a class "must affirmatively demonstrate" compliance with Rule 23.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Rule 23 "does not set forth a mere pleading standard."  *Id.*  Rather, the moving party must be prepared to prove that there are common questions of law or fact, as well as sufficiently numerous parties, typicality of claims or defenses, and adequacy of representation.  A common question is one that "is capable of classwide resolution"—in other words, "its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 564 U.S. at 350.  Individual questions, by contrast, require each class member "to present evidence that varies from member to member."  *Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217, 1222 (9th Cir. 2024) (quoting *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

The moving party must also satisfy Rule 23(b) with evidentiary proof.  *See id.*  Plaintiffs move to certify a class under Rule 23(b)(3), an "adventuresome innovation" designed for situations in which "class-action treatment is not as clearly called for."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 592, 615 (1997).  Rule 23(b)(3) requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Predominance is not met where "individualized questions would have to be resolved through a series of mini-trials."  *Miles*, 89 F.4th at 1226.

Plaintiffs cannot satisfy their obligations under Rule 23(a) and (b)(3), because they have failed to prove that even one of the essential elements of their antitrust claim—(i) antitrust violation, (ii) antitrust injury, and (iii) measurable damages, *Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665-66 (9th Cir. 2022)—can be resolved by common evidence.

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 19

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

## IV. ARGUMENT

2

### A.  PLAINTIFFS CANNOT DEMONSTRATE WITH COMMON PROOF THAT A PRICE PARITY REQUIREMENT EXISTS

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

The alleged price parity requirement is a patchwork of individualized "evidence" stitched together to try to keep Plaintiffs' case from falling apart.  Most MFNs are "contractual provision[s] that require[] one party to give the other the best terms that it makes available to any competitor." *U.S. v. Apple, Inc.*, 791 F.3d 290, 304 (2d Cir. 2015).  Plaintiffs sometimes refer to the price parity requirement as a something Valve "requires publishers to agree to." Mot. 22.  They call the price parity requirement a "Policy," but identify no contract terms requiring price parity.[6]  The only standard language Plaintiffs identify is the checkbox language less than ██ percent of proposed class members have encountered when applying for Steam Keys.  Mot. 7; Schwartz ¶158, n. 441.  Which publishers were even confronted with the checkbox language?  Which of them actually read it?  How did they interpret it?  And what, if anything, did they do in response to it?  Throw in Plaintiffs' scattered, contradictory emails between Valve and a handful of publishers and the individualized questions only multiply.  Whether Plaintiffs believe the alleged price parity requirement is a "Policy" that Valve "implemented and enforced," Mot. 1, or a contract term that Valve "requires publishers to agree to," Mot. 22, they lack common evidence to prove it exists.

18

19

20

At class certification, courts require plaintiffs to prove that the allegedly unlawful material terms are uniform and their enforcement is consistent—regardless of whether those are contract or policy terms.  As the Ninth Circuit recently explained, even when an explicit written

21

22

23

24

---

[6] That distinguishes this case from other pending cases raising "price parity" claims, which point to contract provisions. *See, e.g.*, *Frame-Wilson v. Amazon.com, Inc.*, 2:20-cv-00424-RAJ (W.D. Wash.), Dkt. 55, Second Am. Compl. ¶14 (citing contractual "Price Parity" requirement); *Davitashvili v. Grubhub Inc.*, 1:20-cv-03000-LAK-JW (S.D.N.Y.), Dkt. 28, Amend. Compl. ¶¶57, 60, 61 (citing contractual language from specific "no price competition clauses").

25

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 20

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

policy exists, predominance is not met where the defendant enforced the challenged policy only sporadically or inconsistently.  *Miles*, 89 F.4th at 1224; *see also Wal-Mart Stores, Inc.*, 564 U.S. at 358 ("120 affidavits reporting experiences of discrimination—about 1 for every 12,500 class members—relating to only some 235 out of Wal-Mart's 3,400 stores" was insufficient common proof of nationwide policy).  A sporadically enforced contract term likewise cannot be certified.  *Conrad v. Jimmy John's Franchise, LLC,* 2021 WL 3268339, at *9 (S.D. Ill. Jul. 30, 2021) (finding no common evidence of no-poach conspiracy where relevant provisions in franchise agreements were infrequently enforced).

Similarly, "the existence of the conflicting policies … which existed over different time periods, and which were applied differently … negates Plaintiffs' claims of uniformity." *In re: AutoZone, Inc., Wage & Hour Employment Practices Litig.,* No. 3:10-MD-02159-CRB, 2016 WL 6834138, at * 2 (N.D. Cal. Nov. 21, 2016), *aff'd,* 789 F. App'x 9 (9th Cir. 2019).  A class may not be certified if its members were subject to conflicting or inconsistent agreements with different terms, *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1171-80 (11th Cir. 2010), or agreements for which "individualized extrinsic evidence bears heavily on the interpretation of the class members' agreements." *Id.* at 1176-77; *see also Abbit v. ING USA Annuity*, 2015 WL 7272220, at *9 (S.D. Cal. Nov. 16, 2015) (finding no common evidence where interpretation of standard contract language "require[d] extrinsic evidence and individualized determinations as to [class members'] knowledge and understanding of this contract language.").

Plaintiffs rely on cases in which evidence of an agreement was obvious and uniform. *See In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1187-91 (N.D. Cal. 2013) (no-poach agreements based on voluminous correspondence between company executives, including CEOs, expressly agreeing to similar arrangements); *In re Glumetza Antitrust Litig.*,

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 21

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

336 F.R.D. 468, 473 (N.D. Cal. 2020) (formal agreement establishing pay-for-delay scheme). No such uniformity is present here.

Valve's uniform agreements and guidelines—the SDA and the Steam Keys Rules and Guidelines—do not contain the alleged price parity requirement.  And the checkbox language— which merely summarizes the Steam Key Rules and Guidelines—is not common evidence of the alleged price parity requirement.

Context matters.  Publishers encounter the succinct, summary checkbox language only when applying for Steam Keys.  The corresponding, more exhaustive language of the Steam Key Rules and Guidelines, part of the Steam Key Documentation referenced throughout the Steam Key request process, has never applied to anything but Steam Keys, as the title "*Steam Key* Rules and Guidelines" (emphasis added) makes blindingly obvious.  The checkbox language is simply a distillation of the Steam Key Rules and Guidelines.  Peterson Decl. ¶¶9-10 & Ex. 3.  Plaintiffs fail to disclose that the Steam Key Rules and Guidelines explicitly limit the applicability of the checkbox language about "not giving Steam customers a worse deal" to Steam Keys.  The version of the Steam Key Rules and Guidelines released concurrently with the introduction of the checkbox language reads, "***You should use keys*** to sell your game on other stores in a similar way to how you sell your game on Steam." *Id*. Ex. 4. (emphasis added).

Plaintiffs argue that, despite this text and context, all publishers believe they are signing up for the alleged price parity requirement when they check a box agreeing to not give Steam customers a "worse deal" when selling their game on other stores using Steam Keys.  Plaintiffs could establish this counterintuitive interpretation only with extrinsic evidence to resolve what "sell my game on other stores" means to each publisher that encountered the checkbox language.  This would require publisher-specific evidence of the parties' communications,

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 22

1   understandings, and actions.  Plaintiffs have no common proof that Valve has or enforces the

2   alleged price parity requirement.

3          Consider, for example, the complexities involved in assessing whether Valve engaged

4   in anticompetitive conduct vis-à-vis just one publisher— ███████ .  Plaintiffs cite an internal

5   ███████ email as evidence that Valve requires price parity.  *See* Mot. 9.  They omit deposition

6   testimony about the email that indicates the opposite.  ███████████ (explaining that author

7   of email mixed up price with product parity and "was speaking specifically to product parity

8   but not price parity […] Steam does not require price parity.").  Another ███████ employee

9   also testified that no price parity policy exists.  ███████████ .  Even determining whether

10  ███████ believed Valve had a price parity requirement in the first place will require a

11  factfinder to evaluate these pieces of evidence, weigh their relative credibility, and come to an

12  individualized conclusion.  All of this will have to happen before even broaching the issues of

13  enforcement or anticompetitive effect.  Rule 23 is designed to avoid precisely this scenario.

14  **B.  THE STATUTE OF LIMITATIONS RAISES INDIVIDUALIZED ISSUES
    DEFEATING PREDOMINANCE**

15         Courts in the Ninth Circuit have long recognized that defenses like the statute of

16  limitations can bar class certification in certain cases.  *See, e.g. Bushbeck v. Chi. Title Ins. Co.*,

17  2011 WL 13100725, at *13-14 (W.D. Wash. Aug. 15, 2011); *O'Connor v. Boeing N. American,

18  Inc.*, 197 F.R.D. 404, 410-14 (C.D. Cal. 2000).  This is such a case.

19  The Clayton Act, 15 U.S.C. § 15B, sets a four-year statute of limitations for antitrust claims.

20  In defining their proposed class as those who "paid a commission to Valve in connection with

21  the sale … of a game on the Steam platform on or after January 28, 2017," Plaintiffs seem to

22  assume that each sale allegedly impacted by Valve's alleged price parity requirement restarts

23  the clock.  Not so.  The statute of limitations begins running when "the harm is determinable."

24  *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1204 (9th Cir. 2014).

25

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 23

Here, because Valve's alleged price parity requirement is not memorialized in any standard, written contract, the statute of limitations would begin to run for each publisher no later than when Plaintiffs claim Valve communicated its alleged price parity requirement to that publisher and the publisher changed its course. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338-39 (1971) (antitrust claims accrue when "defendant commits an act that injures a plaintiff's business"). If the accrual date is to be measured from when a proposed class member encountered the contested checkbox language, the Court will need to consider individualized evidence to determine how the class members who encountered the checkbox language interpreted it. The analysis gets even harder if the accrual date is measured from when a proposed class member received one of the few emails from Valve communicating the alleged price parity requirement. Six of the eight emails Plaintiffs cite in their brief as evidence that Valve removed or threatened to remove a game from Steam because its publisher failed to comply with a non-Steam-Key-related price parity policy predate January 28, 2017. Plaintiffs' Ex. 35, 39, 41, 42, 44, 45.

These proposed class members' accrual dates cannot be discerned in "one stroke," *see Wal-Mart*, 564 U.S. at 350; rather, individualized inquiry will be required to determine which of their claims are time-barred. That, in turn, might require testimony from the thousands of potential class members as to when each learned of the alleged price parity requirement and was forced to price a game differently, if ever. That testimony might have to be compared to each publisher's individual email communications with Valve. And it would ultimately require the factfinder to weigh the evidence and resolve any discrepancies.

The "continuing violation" doctrine cannot save Plaintiffs' stale claims. "When a plaintiff alleges a continuing violation of the law, an overt act is required to restart the statute of limitations and the statute of limitations runs from the last overt act." *Eichman v. Fotomat*

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 24

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*Corp.*, 880 F.2d 149, 160 (9th Cir. 1989). An overt act must (1) be new and independent, not a mere reaffirmation of a previous act, and (2) inflict new and accumulating injury on the plaintiff. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997). The "passive receipt of profits from an illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations." *Eichman*, 880 F.2d at 160; *see also SaurikIT, LLC v. Apple Inc.*, 2022 WL 1768845, at \*3 (N.D. Cal. May 26, 2022), *aff'd*, 2023 WL 8946200 (9th Cir. Dec. 14, 2023) (rejecting plaintiffs' argument that "every time Apple sales [sic] a product to some third party or operate[s] its business on a daily basis restarts the statute of limitations period" as one that "effectively swallows the statute of limitations rule" and "is not supported by the case law"). Where a plaintiff alleges that a platform exacted supracompetitive fees under the platform's contractual PMFN, the Second Circuit has agreed with the Ninth Circuit's *Eichman* decision, holding that "each supracompetitive price charged" under a PMFN "was not an overt act of its own, but a manifestation of the prior overt act of entering into the [] contract." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019).

Accordingly, Valve's monthly retention of an allegedly supracompetitive revenue share from publishers would not be sufficient for claim accrual purposes or to constitute an overt act to toll the statute of limitations. Instead, after determining each class member's accrual dates, similarly individualized evidence, including developer-specific communications, testimony, and individual game pricing data, would have to be pieced together to assess if an overt act occurred and when. *See* Mot. 8-9, 11-13. And an appropriate ruling could only be made on a publisher-by-publisher basis, because what Valve said privately to one publisher cannot "restart the statutory clock" for another. *See SaurikIT*, 2022 WL 1768845 at \*3 (imposition of an anticompetitive contract term against one party does not restart statute of limitations for parties with similar provisions in separate contracts).

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 25

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Because such individualized, fact-intensive determinations would overwhelm common ones, class certification is inappropriate.[7]

## C.   PLAINTIFFS CANNOT PROVE ANTICOMPETITIVE EFFECT WITH COMMON PROOF

Plaintiffs mechanically invoke the usual outcomes courts look for in antitrust cases—higher prices, reduced output, and reduced quality.  But these alleged "anticompetitive effects" could only be caused by Valve's alleged price parity requirement if it actually deterred individual publishers from selling their games in other stores for less than they do on Steam. Mot. 2.  The record reflects that this fundamental causal connection cannot be made with common proof for at least four reasons.  Plaintiffs' motion fails to show otherwise.

*First*, industry data show that many publishers sell games at lower prices on other platforms, even while others price their games the same on Steam and other platforms.  Chiou ¶¶18.f, 279-284, 287-297 & Exs. 19-21.  For example, 31 percent of games available on both Steam and Epic are priced at least five percent lower on Epic.  *Id.* ¶292; *see also id.* Ex. 19 (percentages of games sold on fifteen platforms at prices at least 5 percent lower than on Steam). The Steam-enabled versions of proposed class members' games are frequently priced lower when sold by Steam Key resellers than they are on Steam.  *Id.* ¶293.  The impact of the alleged price parity requirement on pricing could only be determined on a game-by-game basis.

Schwartz assumes that Valve's alleged price parity requirement is responsible for any equivalently priced games on and off Steam, but as he conceded in his deposition, he has not

---

[7] No other tolling doctrines applies.  For example, the discovery rule does not apply to antitrust claims.  *In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-med-2670, 2017 WL 35571, at * 14 (S.D. Cal. Jan. 3, 2017) (citing *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012)).  Plaintiffs cannot prove "fraudulent concealment" because Plaintiffs haven't pleaded its elements with particularity—nor could they plausibly allege that Valve concealed price parity requirements when they claim they were "forced to agree" to them. *Conmar Corp. v. Mitsui & Co. (U.S.A), Inc.*, 858 F. 2d 499, 502 (9th Cir. 1988).

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 26

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

even attempted to empirically assess whether games are actually priced equivalently across platforms. Ex. 14 35:19–36:10. He does not consider alternate explanations for equivalent pricing. Chiou ¶334-335. Nor does he consider, for example, whether behemoths like Ubisoft and freelancers like James Leakos deploy different pricing strategies.

**Second**, contrary to Plaintiffs' assumptions, publishers testified that they set equivalent prices for good, common-sense business reasons: "Consumer expectation, but also being fair to the consumers[,]" ▮▮▮▮▮ avoiding "backlash" from consumers seeing a game priced inconsistently, ▮▮▮▮▮; *see also* Chiou ¶334 (citing article observing that some publishers preferred to offer the same prices across platforms); Ex. 20 222:18-25 (Wolfire CEO testifying Wolfire set same price for game across stores). Schwartz does not account for this possibility. He does not account for consumers in *any* of his models, despite acknowledging the two-sidedness of the market. *See Daubert* Mot.

**Third**, it is essential to know which equivalently priced games are Steam Key sales and, for those, which are priced equivalently because their publishers are simply abiding by the Steam Key Rules and Guidelines. Because they made no effort to evaluate the actual prices of games in the real world, Plaintiffs do not account for those equivalently priced sales, yet they must be eliminated from any assessment of whether any claimed price parity requirement for non-Steam-enabled games had a "substantial anticompetitive effect." Because Valve does not know what prices publishers charged for Steam Keys, or whether they were sold in a store in Plaintiffs' market, evidence from individual publishers will be needed to conduct this assessment.

**Fourth**, a publisher that set the same price on and off Steam but had no knowledge of Valve's alleged price parity requirement cannot have done so in order to comply with that alleged requirement. Plaintiffs have no common evidence of such collective knowledge. It

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 27

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    cannot be inferred from the few individual emails Plaintiffs cite.  It does not appear in the SDA

2    or Steam Keys Rules and Guidelines.  Nor can it be inferred from the contested checkbox

3    language, which at least ██ percent of the proposed class has never even seen.

4            For these reasons, evidence unique to individual publishers is required to determine

5    whether Valve's alleged price parity requirement had a substantial anticompetitive effect on

6    any given publisher, whether that publisher's pricing decisions had nothing to do with Valve's

7    alleged price parity requirement, or something in between.

8    **D.    PLAINTIFFS CANNOT PROVE ANTITRUST INJURY WITH COMMON PROOF**

9            To meet their predominance burden under Rule 23(b)(3), Plaintiffs must prove that

10   antitrust impact is "capable of being established through a common body of evidence,

11   applicable to the whole class."  *Olean*, 31 F.4th at 666.  Predominance is not met where some

12   members of the class are uninjured and determining whether others were similarly uninjured

13   would require "class-member-by-class member adjudication of the issue."  *Van v. LLR, Inc.*, 61

14   F.4th 1053 (9th Cir. 2023) (vacating certification of class seeking damages based on tax

15   overcharge paid on 72,373 transactions where defendant provided evidence that 18 of those

16   transactions were not impacted by the overcharge).  Plaintiffs have not met this burden.

17       **1.    Because they ignore Steam Keys, Plaintiffs cannot prove class members'
18             effective revenue share rates—and thus either injury or damages—with
19             common evidence.**

20           Valve, Schwartz, and the Ninth Circuit agree:  the relevant number for antitrust analysis

21   is the *effective* revenue share a platform retains, not the headline revenue share rate.  *See*

22   Schwartz ¶298 (where "the rate structure is tiered, … the *effective* take rate is actually lower

23   than the rate listed") (emphasis added); *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898,

24   992 n.460 (N.D. Cal. 2021) ("the use of a 30% [headline] commission by other platforms is not

25   dispositive" where "those platforms ha[d] a different business model" under which "their

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 28

1   effective rates [we]re below 30%"), *aff'd in part, rev'd in part on other grounds*, 67 F.4th 946,

2   985 (9th Cir. 2023) (approving trial court's use of "effective" revenue share).  Real-world harm

3   to plaintiffs is required to demonstrate antitrust injury—"harm to the 'market' as an abstract

4   entity" is insufficient.  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 n.8 (1990).

5          Schwartz puts Valve's effective revenue share at ███ (averaged 1/28/2017-

6   12/31/2022), but this calculation ignores sales of Steam Keys, a major source of revenue for

7   publishers.  Schwartz ¶352; Ex. 14 187:4-188:25; *see also Epic Games*, 559 F. Supp. 3d at 992

8   (exclusion of certain apps from a commission obligation amounts to a "reduced price offered

9   to developers of those apps").  Particularly because Schwartz includes Steam Key resellers like

10  Humble Bundle in his market, his inattention to this revenue shows that his methodology is

11  unreliable.  *See Daubert* Motion at 12-13.  When Steam Key sales revenue is taken into account,

12  many proposed class members likely paid effective revenue share rates below the 17.7%

13  Schwartz considers competitive, and many more proposed class members likely paid less than

14  the ███ "as is" revenue share rate he uses to calculate damages. Chiou Ex. 6, ¶175, Ex. 9.

15  This is a profound error that vitiates both Plaintiffs' injury allegations and their damages

16  calculations.

17         Determining the effective revenue share rate paid by each member of the proposed class

18  will require "class member by class member adjudication of the issue," *Van*, 61 F.4th at 1067,

19  and individualized evidence that neither Valve nor Plaintiffs have.  *See* Chiou ¶¶18.c, 148-151,

20  154-157.  The record is silent on the number of Steam Keys each publisher actually sold, where

21  they were sold, or the price at which they were sold.  Without this information for each

22  publisher, it is impossible to calculate what publishers earned by selling Steam Keys on an

23  individual basis, let alone on a class-wide basis.  Accordingly, it is impossible to determine

24  whether any particular publisher's revenue share rate was supracompetitive.

25

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 29

1    Uncovering this data will not be easy.  Even after extensive discovery, including

2    depositions of the named Plaintiffs and their employees, there is insufficient evidence in the

3    record to determine even Wolfire's effective revenue share rate because Wolfire itself does not

4    know the prices it charged for its own games distributed via Steam Keys.  Ex. 20 182:23-183:3,

5    184:4-185:3.

6    Schwartz does not consider the sale of Steam games through Steam Key sales because

7    they aren't "transaction[s] that occurred on Steam."  Ex. 14 187:17-22.  But Plaintiffs' case

8    turns on whether Valve's effective revenue share is too high.  Income from Steam Key sales is

9    a component of the revenue publishers receive through their relationship with Valve, so it must

10    be taken into account when measuring effective revenue share.  Chiou ¶¶18.c, 149, 156.  As

11    Schwartz agrees, a publisher's proceeds from Steam Key sales "changes the effective revenue

12    share" because, "[a]s the mix of sales changes between sales on Steam and sales through Steam

13    keys, the revenue to the publisher changes."  Ex. 14 189:18-190:6.

14    A model that fails to account for effective revenue share cannot serve as common

15    evidence of injury supporting class certification.  Determining whether and to what extent Valve

16    collected an effective revenue share of more than 17.7% from particular class members will

17    inevitably devolve into tens of thousands of individualized inquiries.

18    **2.    Schwartz's own analysis shows that some publishers have suffered no injury because they passed through 100% or more of the alleged overcharge.**

19

20    Plaintiffs concede, by reducing their damages based on a pass-through analysis, that

21    whether and to what degree Valve's allegedly anticompetitive conduct had a negative impact

22    on class members depends on each class member's independent pricing decisions.  Schwartz

23    posits that, in the but-for world, "game publishers should ordinarily respond to a decrease in

24    [revenue share] by decreasing their game price."  Schwartz ¶379.  "[T]he remaining portion"—

25

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 30

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*i.e.*, the part that is not passed through—"reflects the actual harm to publishers." *Id.* ¶402. Accordingly, if "game publishers pass-through 100% (or more) of the [revenue share savings]," they suffer no injury. Schwartz ¶379. Schwartz brushes that possibility aside, however, because it's "highly unlikely to begin with and is a proposition for which there is no evidence." *Id.*

Yet the limited data set Schwartz uses to calculate his average pass-through rate reveals the opposite: ■ *percent of the 124 games he investigated passed through 100 percent or more of their cost savings*. Langer ¶¶114-116. By Schwartz's own logic, the publishers of these games suffer no anticompetitive injury. *See* Schwartz ¶379.

These data do not of course support a generalized inference that ■ percent of the class is uninjured, as the 124 games Schwartz considered (out of 90,000 on Steam, or 0.14 percent, Langer ¶105) are "explicitly not a random sample." Ex. 14 226:25-227:19. But even this unrepresentative sample reveals that determining which proposed class members have been injured would require individualized inquiry. And one need not look far to find another example: Wolfire affirmed that any revenue share savings it received "would all get passed through to customers." Ex. 20 265:17-266:3.

Schwartz's pass-through analysis also shows that publishers make independent, individualized pricing decisions governed by a great "variety of factors"—including consumer demand, the effects of competition, and "other real-world market considerations, such as network effects." Schwartz ¶ 382. Actual pricing changes within his 124-game sample reflect the great diversity of publisher pricing strategies—■ percent passed through *no* cost savings, while ■ percent passed on various amounts between the extremes of zero and 100 percent. Langer ¶114 & Ex. 2. Establishing whether and to what extent members of the proposed class passed through the alleged overcharge will require "class-member-by-class-member

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 31

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

adjudication of the issue," rendering class certification inappropriate here. *Van*, 61 F.4th at 1067.

### 3. Plaintiffs fail to account for the fact that any claimed "overcharge" must be offset by individualized benefits publishers received.

Any assessment of an antitrust plaintiff's claimed injury must take into account costs and benefits that would be different in the but-for world. *Hanover Shoe, Inc. v. United Shoe Manufacturing Corp.*, 392 U.S. 481, 504 (1968). The Ninth Circuit explains this "*Hanover Shoe* offset" as follows:

> [I]n order to put a plaintiff in the position it would have been, absent the defendant's antitrust violation, the plaintiff's gross recovery for the antitrust violation must be reduced by any benefits that plaintiff would not have received had there been no anticompetitive conduct by the defendant[.]

*Los Angeles Memorial Coliseum Comm. v. Nat. Football League*, 791 F.2d 1356, 1366 (9th Cir. 1986) (value of expansion opportunity Oakland Raiders obtained by moving to Los Angeles should be offset against lost profits the team incurred by the league's anticompetitive restraint on team's relocating).

Schwartz says Steam Keys do not "matter for purposes of [his] analysis[,]" Ex. 14 191:10-11, because he is narrowly focused on whether Valve "overcharges" publishers for sales on Steam. Even if the Court were to accept this narrow focus for purposes of assessing effective revenue share, antitrust causation law (*i.e.,* the *Hanover Shoe* offset) requires that a benefit publishers received in connection with alleged anticompetitive conduct be taken as an offset in determining whether class members suffered a "net injury" as a result of Valve's alleged price parity requirement. Plaintiffs have not done so.

In *Siegel v. Chicken Delight, Inc.*, the Ninth Circuit held that the district court erred in determining that all class members had been injured by a tying arrangement requiring franchisees to purchase supplies from the defendant when the defendant did not charge

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 32

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

franchisees for the use of its trademark. 448 F.2d 43, 52-53 (9th Cir. 1971). The Ninth Circuit concluded that any claimed overcharge on the supplies must be offset by the reasonable value of the trademark. *Id.*.

Steam Keys are analogous to the *Chicken Delight* trademark. Members of the proposed class receive a substantial benefit when they sell their games on other stores using Steam Keys. Without paying Valve a dime, they can provide their customers with valuable access to the Steam version of their game and all the Steam features it uses. In Plaintiffs' but-for world there might still be Steam Keys, but Valve could not restrict publishers' pricing of them.

Accordingly, an appropriate assessment of each class member's alleged injury must offset any claimed "overcharge" by the value of the Steam Keys each class member sold during the class period. This offset will vary widely and, for many class members, likely nullify any alleged "overcharge" they paid to Valve. Langer ¶¶97-100.

Again, Valve has no way of knowing what offset price publishers charged for their Steam-enabled games on other stores using Steam Keys. Accordingly, the only way to assess the value of this offsetting benefit for each publisher who sold Steam Keys would be to obtain this pricing information from the publisher. It cannot be done with common proof.

## E.   PLAINTIFFS CANNOT ESTABLISH CLASS-WIDE DAMAGES WITH COMMON EVIDENCE

Plaintiffs have not met their burden of demonstrating that their damages are susceptible to measurement across the entire class for purposes of Rule 23(b)(3). As discussed more fully in Valve's *Daubert* motion, Schwartz's analysis leads to "nonsensical results" and relies on "unsupported assumptions" that mask the highly individualized inquiry that will be needed to calculate any individual class member's damages. *Olean*, 31 F.4th at 666 n.9.

*First, Schwartz's pass-through analysis is incapable of estimating damages with class-wide proof.* Instead, he offers an "average" pass-through rate that improperly masks, rather

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 33

than accounts for, essential individualized issues (including, through applying his method, the presence of uninjured class members). *Daubert* Mot. 13-15. Schwartz's pass-through analysis does not satisfy Plaintiffs' obligation to devise a method capable of estimating damages on a class-wide basis. *See In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020). "[C]ourts have rejected the use of averaging in calculating passthrough rates where experts have not shown the sound methodological steps through which they calculated their averages." *Sidibe v. Sutter Health*, 333 F.R.D. 463, 495 (N.D. Cal. 2019). This Court should do the same.

 *Second, Schwartz's model fails to capture individualized consumer choice.* Schwartz assumes that consumers would respond identically to changes in prices regardless of the product. But reality shows this is not true. Langer ¶¶107-110. Devoted followers of highly popular games tend to be less resistant to changes in prices than purchasers of lower budget, less popular games. *Id.* (comparing ███████████, a very popular ███████ game, with the less celebrated ████████████). *Id.* ¶110-11. *See also* Ex. 31 (Uy Dep.) 188:22-189:10. As Professor Langer explains, "By ignoring differences in consumer behavior, Dr. Schwartz fails to model the economic behavior at the heart of Plaintiffs' theory of harm." Langer ¶21.

 *Third, Schwartz's model fails to capture other individualized preferences of class members for various platforms.* Each publisher chooses which games to publish, where to offer those games for sale, what prices to charge, and how to advertise those games based on a unique constellation of factors to which Schwartz closes his eyes. Langer ¶¶21-22, 89-94. Accordingly, the impact of the but-for world on these publishers would vary. That means each publisher's damages would depend, *inter alia*, on the different revenue shares of the platforms they chose in the but-for world. *Id.* ¶91. Schwartz does not even attempt to account for these differences in preferences. *Id.* ¶¶89-94.

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 34

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*Fourth, Schwartz's model fails to capture the two-sided nature of the Steam platform.* Steam is a place where publishers meet consumers to sell their games.  Some of Steam's features—like marketing—are especially valuable to publishers.  Some of its features—like its friend lists—are especially valuable to consumers.  Others—like Steam Keys—are valuable to both sides.  Though Valve does not charge consumers to use Steam, it must consider both publishers and consumers in setting its revenue share.  While Schwartz acknowledges that Steam is a two-sided platform, he incorrectly chooses to analyze it as a one-sided platform, in direct violation of *Ohio v. American Express Co.*, 585 U.S. 529 (2018).  Schwartz ¶332.  *See Daubert* Mot. at 3-6.

*Fifth, Schwartz's but-for world is built on unjustified assumptions and methods.*  To determine Valve's market share in his but-for world, an essential input to his damage model, Schwartz calculates Valve's percentage of the sales of its own and seven other publishers' games on Steam between 2008 and 2012.  He assumes that Valve's sales of its own games on Steam from 2008 to 2012 predict Valve's third-party game distribution market share a decade later.  This assumption is "not supported by any empirical or theoretical evidence."  Langer ¶¶27, 78-84, 121-122.  Schwartz could cite no peer-reviewed literature supporting his use of this assumption or his method, no prior use, and no way to test their reliability.  Ex. 14 92:3-94:8.; *see Daubert* Mot. 11-12.

## V. CONCLUSION

Valve respectfully requests that the Court deny Plaintiffs' motion for class certification.

DATED this 17th day of May, 2024.

I certify that this memorandum contains 10,987 words, in compliance with the Local Civil Rules.

*s/ Blake Marks-Dias*
Blake Marks-Dias, WSBA No. 28169

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

2

3

4

Eric A. Lindberg, WSBA No. 43593
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, WA  98104
(206) 625-8600 Phone
(206) 625-0900 Fax
bmarksdias@corrcronin.com
elindberg@corrcronin.com

5

6

7

8

Kristen Ward Broz (*pro hac vice*)
FOX ROTHSCHILD LLP
2020 K. St. NW, Ste. 500
Washington, DC 20006
Telephone (202) 794-1220
Fax (202) 461-3102
kbroz@foxrothschild.com

9

10

11

12

Nathan M Buchter (*pro hac vice*)
FOX ROTHSCHILD LLP
2000 Market Street STE 20TH FL
Philadelphia, PA 19103
Telephone (215) 299-3010
nbuchter@foxrothschild.com

13

14

15

16

17

18

19

Charles B. Casper (*pro hac vice*)
Peter Breslauer *(pro hac vice)*
Robert E. Day *(pro hac vice)*
Jessica Rizzo *(pro hac vice)*
MONTGOMERY McCRACKEN WALKER
& RHOADS LLP
1735 Market Street, 21st Floor
Philadelphia, PA 19103
Telephone (215) 772-1500
ccasper@mmwr.com
pbreslauer@mmwr.com
rday@mmwr.com
jrizzo@mmwr.com

20

*Attorneys for Defendant Valve Corporation*

21

22

23

24

25

DEFENDANT VALVE CORP.'S CORRECTED OPPOSITION
TO PLAINTIFFS' MOT. FOR CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC – 36