THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| IN RE VALVE ANTITRUST LITIGATION | No. 2:21-cv-00563-JCC<br><br>**VALVE CORPORATION'S MOTION TO EXCLUDE TESTIMONY OF STEVEN SCHWARTZ, PH.D.**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**NOTE ON MOTION CALENDAR: AUGUST 12, 2024**<br><br>**FILED UNDER SEAL** |
|---|---|

The proposed expert testimony of Steven Schwartz, Ph.D. ("Schwartz") [Dkt. 182-1][1] should be excluded for failure to satisfy the requirements of Fed. R. Evid. 702. His opinions, essential to Plaintiffs' class certification motion, that common evidence can (i) establish class-wide impact from Valve's alleged platform most favored nation ("PMFN") policy and (ii)

[1] Schwartz's Report is Ex. 1 to the Cobb Declaration in Support of Plaintiffs' Motion for Class Certification.

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

calculate damages in a formulaic way, *see* Schwartz ¶¶12.i, 243, rest on assumptions and a damages model so lacking in principles and methods that they should not be admitted into evidence. Specifically:

(a) Schwartz's opinions on market share, anticompetitive effects, antitrust impact, and damages should be excluded because he analyzes those issues by looking only at one side of a two-sided platform. Under *Ohio v. American Express Co.*, 585 U.S. 529 (2018) ("*Amex*"), a two-sided transaction platform must be analyzed to include both sides. Schwartz admits Steam is a two-sided platform facilitating transactions between gamers and publishers but analyzes Steam as one-sided, serving only publishers. Schwartz ¶¶57, 332-340. This methodology is incorrect as a matter of law.

(b) His opinion that common proof shows that Valve's alleged PMFN caused anticompetitive effects should be excluded because there is too great an analytical gap between the evidence he cites to support Plaintiffs' allegation of a PMFN pricing policy—the Steam Keys request form, plus a collection of sporadic emails—and any demonstrable effect on competition. Schwartz did no analysis on the actual impact of the supposed PMFN. His opinion instead relies on his own view of how class members would interpret the Steam Keys request form (despite evidence that some class members have never heard of Valve's alleged pricing PMFN). Such an opinion is not a proper subject of expert testimony.

(c) Schwartz's opinion on Valve's market share in the but-for world is crucial to his damages model. Schwartz ¶¶345-349, 370-376. But that opinion is speculative, does not fit the facts of this case, and is not the product of any principles or methods.

(d) His opinions that Valve charged publishers a supracompetitive revenue share rate and his calculation of a ██ real-world effective rate—opinions Plaintiffs assert as common proof of impact and damages—should be excluded because (i) he omits publishers' revenue

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

from sales of Steam games via Steam Keys and thereby artificially inflates his results; and (ii) any reliable calculation requires information about publishers' Steam Key revenues that only individual class members have (and some, like Wolfire Games, do not have complete records).

(e) Finally, Schwartz's opinion that all publishers would, in his but-for world, uniformly pass through revenue share reductions by reducing game prices by the same percentage—essential for proving impact and damages class-wide—should be excluded because his methodology (i) fails to account for many factors that influence pass-through rates and would affect different publishers and gamers differently; and (ii) relies on a tiny sample of 124 games in a way that masks uninjured publishers.

**LEGAL STANDARD**

Under Rule 702, Plaintiffs must prove that Schwartz's opinions are based on sufficient facts and reflect reliable application of accepted methods and principles. *U.S. v. Hermanek,* 289 F.3d 1076, 1093-94 (9th Cir. 2002). Opinions are precluded when "connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997), or when based upon "subjective belief[,]" "unsupported speculation," *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590-91 (1993), or assumptions "not sufficiently founded on facts," *Guidroz-Brault v. Missouri Pac. R.R. Co.,* 254 F.3d 825, 831 (9th Cir. 2001). A *Daubert* challenge may be made at the class certification stage because plaintiffs must use admissible evidence to make the required Rule 23 showings. *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 & n.7 (9th Cir. 2022).

**ARGUMENT**

**A. Schwartz Impermissibly Analyzes Steam as a One-Sided Platform.**

In *Amex*, the Supreme Court recognized that "[t]wo-sided platforms differ from traditional markets in important ways." 585 U.S. at 535. "[A] two-sided platform offers

VALVE CORPORATION'S MOTION TO EXCLUDE
TESTIMONY OF STEVEN SCHWARTZ, PH.D.
CASE NO. 2:21-cv-00563-JCC – 3

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

different products or services to two different groups who both depend on the platform to intermediate between them. … [T]wo-sided platforms often exhibit what economists call 'indirect network effects'[:] … the value of the two-sided platform to one group of participants depends on how many members of a different group participate." *Id.* Schwartz acknowledges, as he must, that Steam is a two-sided platform that facilitates transactions between the two sides: publishers and gamers. Schwartz ¶¶30, 57-58.

*Amex* held that all two-sided transaction platforms ***must*** be analyzed in a way that includes both sides. 585 U.S. at 535, 544-46; *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 56-57 (2d Cir. 2019). Schwartz does not do that. Instead, he argues that Steam should be analyzed as a one-sided platform. *See* Schwartz ¶¶332-340, 344. This is incorrect as a matter of law. *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 2022 WL 15053250, at *23-25, *37-38, *53 (E.D.N.Y. Oct. 26, 2022) (excluding expert opinions that two-sided transaction platform could be analyzed as one-sided); *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2012 WL 2571332, at *7 (N.D. Cal. Jun. 30, 2012) (excluding expert opinion that is "contrary to law").

*Amex* involved claims that anti-steering provisions in American Express's contracts with merchants who accepted its credit cards allowed it to charge merchants supracompetitive fees. 585 U.S. at 533-34, 538-40. The Supreme Court faulted the plaintiffs and the trial court for improperly analyzing only one side of the two-sided transaction platform the case presented. *Id.* at 547-52; *accord PLS.com, LLC v. Nat'l Assoc. of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022) (*Amex* requires considering effects on both sides of a platform).

*Amex* explained the importance of the indirect network effects that characterize two-sided platforms:

> Sometimes indirect network effects require two-sided platforms

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

> to charge one side much more than the other. For two-sided platforms, "'the [relative] price structure matters, and platforms must design it so as to bring both sides on board.'" The optimal price might require charging the side with more elastic demand a below-cost (or even negative) price.

585 U.S. at 536 (citations omitted, but citing, *inter alia*, economists Rochet and Tirole). Any analysis that attempts to show anticompetitive effects by looking only at the fees Amex charges merchants "wrongly focuses on only one side of the two-sided credit-card market." *Id*. at 547.

This is precisely what Schwartz "wrongly" does here. He analyzes Valve's market share, competitive effects, antitrust impact, and damages by looking at only one side of Steam (the publishers' side). Schwartz ¶¶246, 332-340, 344, 379. His methodology focuses solely on the price Valve charges publishers and ignores the features and membership benefits Valve provides Steam account holders as incentives and rewards for using its platform to purchase games. Ex. 2 (Langer) ¶¶119-135 (*e.g.*, ¶122: Schwartz "ignore[es] documented network effects.").[2]

The Supreme Court did not limit the need to consider both sides of a two-sided transaction platform to any specific circumstances. It held that two-sided transaction platforms like Steam ***must*** be analyzed by accounting for both sides. 585 U.S. at 545 ("[T]wo-sided transaction platforms, like the credit card market, are different. … To optimize sales, the network must find the balance of pricing that encourages the greatest number of matches between cardholders and merchants."); *see also US Airways*, 938 F.3d at 56-57, 59 (expert's theory that airline booking platform was one-sided because, in his view, it lacked indirect network effects was "wrong as a matter of law").

Schwartz's Platform Competition Model predicts that in the but-for world, Valve would

[2] Citations to "Ex. __" are to exhibits to the Declaration of Blake Marks-Dias in Support of Defendant Valve Corporation's Opposition to Plaintiffs' Motion for Class Certification and Valve's Motion to Exclude Testimony of Steven Schwartz, Ph.D.

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

sell nearly 200 million fewer games and its profits would plunge by about [REDACTED] from 2017 to 2021. Schwartz ¶¶272-277 & Table 3 (modified by errata sheet) & Figure 5. Such an enormous drop in the number of consumer transactions on Steam would have network effects on both sides of the platform—making Steam much less valuable to both publishers and gamers. Ex. 2 (Langer) ¶133. By limiting his inquiry to Valve's pricing to publishers, Schwartz's approach does not and cannot capture any of these indirect network effects.

His arguments for analyzing Steam as one-sided, based on two articles by economists, Schwartz ¶¶335-337 ("Per Rochet and Tirole, Steam's pricing model is one-sided"), 338, 344, are unreliable. Rochet and Tirole plainly state that the "video game market is a typical two-sided one." Ex. 32 (Rochet and Tirole (2003)), at 1015. Schwartz's explanations for why Steam can be analyzed as one-sided are mere *ipse dixit*.[3]

To put it bluntly, per the Supreme Court in *Amex*, Schwartz's one-sided approach is wrong as a matter of law. It cannot be helpful.

### B. Schwartz's Opinion That Valve's Alleged PMFN Has Caused Anticompetitive Effects Is Unreliable Because There is Too Great an Analytical Gap Between the Evidence Plaintiffs Claim Supports the Existence of a PMFN and Any Demonstrable Effect on Competition

Schwartz bases much of his report on the assertion that Valve has a PMFN price requirement that prohibits publishers on Steam from offering the same game at a lower price elsewhere. Schwartz ¶¶150-192, 197-281.

There is, however, no PMFN pricing provision in the Steam Distribution Agreement ("SDA") publishers sign to sell their games on Steam. Schwartz nonetheless asserts that Valve has a price parity requirement because:

[3] Professor Langer explains (Ex. 2 ¶¶123-134) that Schwartz's assertion that the structure of Steam's pricing to each side of the platform does not matter misreads the academic literature and mischaracterizes the video game industry.

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

    (a) he believes any "careful" developer requesting Steam Keys would interpret the Steam Keys request form as requiring the developer, as a condition of receiving the Steam Keys, to commit not to sell ***any*** game (not just Steam Key games) at a lower price elsewhere, and

(b) he reviewed some 41 emails between Valve employees and a small number of publishers in which the Valve employee expressed some displeasure that the publisher was offering a particular game at a lower price elsewhere.

Schwartz ¶¶157-67, 173-92; Ex. 14 (Schwartz Dep.) 197:24-210:9. He did not, however, study actual prices to see if games are priced equivalently across platforms, let alone determine whether any equivalent pricing is due to an alleged PMFN. *Id*. 35:19-36:16.

Rule 702(b) requires that expert testimony be "based on sufficient facts or data." In *Joiner*, the Supreme Court explained:

> Trained experts commonly extrapolate from existing data. **But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.** A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

522 U.S. at 146 (emphasis added).

Schwartz's opinion that Valve imposes a PMFN price requirement that prevents publishers from discounting their games elsewhere and thereby deters other platforms from competing with Steam suffers from the type of analytical gap between data and opinion that Rule 702(b) bars. It fares no better under Rule 702(a) and (c) requiring "specialized knowledge" and that the opinion be the "product of reliable principles and methods."

The emails Schwartz cites span 13 years—2009 to 2022—most well before the class period and went to 26 of the over 32,000 proposed class members. Schwartz ¶¶157-67, 173-

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

92; Ex. 1 (Chiou) ¶28. The Steam Keys request form he interprets would be seen by more publishers, but only at the last of a six-step process for requesting Steam Keys. Every step includes a hyperlinked invitation to "View Steam Key Documentation," including the Steam Key Rules and Guidelines—which since the request form debuted in April 2018 have made it clear that the checkboxes on the form relate to Steam Keys. *See* Declaration of Erik Peterson ¶¶8-12.

Nothing in Schwartz's report provides any method a jury could employ to decide on a class-wide basis that all publishers saw or subjectively understood these materials the way Schwartz suggests, especially considering publishers' testimony—including Prof. Rietveld's testimony about when he was a publisher's Strategic Manager—that they never heard of Valve imposing any restriction on game prices on other stores when not using Steam Keys. Ex. 30 (Rietveld Dep.) 56:13-16, Ex. 33 (Rietveld Exhibit 3) (no "awareness" of any Valve PMFN while at Two Tribes); ("Valve has never implied any requirements around price parity."); (alleged Valve PMFN "does not exist.").

Rather, Schwartz says, "I think the best that we can do is draw reasonable inferences about what conclusions would be drawn based on the plain language of the document." Ex. 14 (Schwartz Dep.) 209:23-210:3 (discussing request form). But that's Schwartz substituting his judgment for the jury's, not an expert opinion based on "specialized knowledge" and "sufficient facts and data" that is the "product of reliable principles and methods."

Schwartz's opinion on how the Steam Keys request form should be interpreted is not a proper subject of expert testimony. *See Aguillar v. International Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (district court properly excluded expert opinion that "almost anybody reading these [application] instructions … would conclude that a definite

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

promise had been made").

Schwartz limits his inquiry to the Steam Keys request form and a few emails. ***He does not examine any real-world pricing data to see if publishers actually sell games elsewhere for the same price as on Steam***. Ex. 14 (Schwartz Dep.) 35:19-36:16. Had he looked, he would know that while many publishers sell games for the same price off Steam, many, including large ones, frequently sell games at lower average prices elsewhere. Ex. 1 (Chiou) ¶¶287-297, Chiou Exhibits 19-21. For example, Professor Chiou notes that 31% of games available on both Steam and the Epic Game Store ("EGS") had an average price on EGS at least 5 percent ***lower*** than the average price on Steam. Chiou Exhibit 21; *see also* Chiou Exhibit 19 (games sold on fifteen platforms at average prices at least 5% lower than on Steam).

Moreover, Schwartz assumes that equivalent pricing on and off Steam is caused by a PMFN deterring publishers from selling their games for a lower price elsewhere. This assumption of causation is not based on ***any*** real-world data and is not a reliable application of ***any*** principles or methods. It is not merely a matter of how much weight Schwartz's opinion is given. Rather, an expert opinion that fails to consider alternate causes for an alleged effect or injury may be excluded as unsupported by adequate data. *Clausen v. M/V New Carissa,* 339 F.3d 1049, 1058 (9th Cir. 2003); *Divero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997). Nothing in Schwartz's report suggests that he considered other reasons for setting the same price elsewhere—indeed he ignored evidence from publishers (cited below).

Since the SDA contains no contractual pricing provision, it cannot be assumed, as Schwartz does, that a publisher who set the same price elsewhere did so because of a supposed Valve requirement. In fact, publishers testified about setting equivalent prices for business reasons: "Consumer expectation, but also being fair to the consumers." Ex. 1 (Chiou) ¶334 (citing article showing publishers preferring to set the same price

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

across different platforms with different revenue shares). As publisher [REDACTED] put it, "subscribe to [REDACTED] buy it on console, buy it on PC, buy it at our store, buy it on Steam or somewhere else … ***[W]e want that price to always be consistent. Because if we don't, we'll have quite a bit of backlash***…." [REDACTED] (emphasis added). Plaintiff Wolfire set the same price on multiple platforms when the price was "common" for a particular type of game. Ex. 20 (Wolfire 30(b)(6)) 222:5-25. And, of course, a publisher who set the same price, but had no knowledge of the alleged PMFN, cannot have been caused to do anything by the supposed PMFN.

In the face of contradictory industry data he does not examine, and alternate causes he does not consider, Schwartz's extrapolation from the Steam Keys request form and scattered emails to his conclusion that Valve has a pricing PMFN that has caused anticompetitive effects is unreliable and inadmissible.

### C. Schwartz's Opinion on Valve's But-For Market Share is Speculative and Lacks Any Factual Basis

Schwartz's opinion that Valve's market share in the but-for world would be [REDACTED] should be excluded because it lacks any factual basis and leaps the type of analytical gap that is not permitted in expert testimony.

In ¶¶370-376, Schwartz presents his "method for determining Steam's but-for market share." He begins, and ends, with a single, general assertion: "Successful games can drive platform adoption and ultimately platform success." Schwartz ¶371. He then selects the eight publishers (including Valve) who had the most revenue ***from selling their games on Steam*** between 2008 and 2012 and who, around or after 2012, began to operate distribution platforms. He determines those publishers' relative share of those 2008-2012 sales on Steam and declares that Valve would have its same market share, and competing platforms would have the same

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

aggregate market share, among distribution platforms ***selling many publishers' games up to more than a decade later***. *Id*. ¶¶373-374, Figure 6.

This is absurd. It fails Rule 702's requirements that expert testimony be "based on sufficient facts or data" and "the product of reliable principles and methods." A court should not admit "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" or where "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner,* 522 U.S. at 146. *Accord Carbrera v. Cordis Corp.*, 134 F.3d 1418, 1422-23 (9th Cir. 1998) (upholding exclusion when expert could neither cite any research supporting his opinion nor identify any peer-reviewed literature justifying his approach).

First, Schwartz's but-for market share opinion is an "apples to oranges" assertion that Valve's sales of its own games on Steam in 2008-2012 predict its market share selling all publishers' games starting many years later in 2017. He offers no empirical support and no reliable principles or methods for his assertion that one has any correlation to the other. Ex. 2 (Langer) ¶121. He is unaware of any peer-reviewed economic literature that supports his novel method of divining Valve's but-for market share. Ex. 14 (Schwartz Dep.) 88:5-93:15.

Second, he has no basis to assume that over a decade of competition, Valve's market share among the sellers of third-party games would remain fixed at the same rate as its 2008-2012 share of its own games' sales on Steam. The notion that nothing happened between 2012 and 2022 that could disturb Valve's supposed constant [REDACTED] market share involves "too great an analytical gap." *Joiner,* 522 U.S. at 146.

Third, Schwartz repeatedly insists that, despite the way he derived Valve's [REDACTED] but-for market share, he does not know "and it doesn't matter" what the other publishers' but-for market shares would be because "[w]hat matters is the [REDACTED] percent for Valve." Ex. 14 (Schwartz Dep.) 99:21-110:2. Nor does it matter to him whether there were seven other

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

competitors in the but-for world, or fewer or more than seven, or even who they were—because "[w]hat matters substantively is that Valve will have roughly thirty percent[.]" *Id.* 108:8-10. This is not a reliable methodology. It is a way to get to a desired result.

Fourth, the reliability of Schwartz's single metric for determining but-for market share—sales of one's own games on Steam nearly a decade before the class period—is belied by his own report. In a non sequitur, Schwartz explains (¶376), "[B]ecause other factors likely also contribute to platform success, *e.g.*, the user experience, social features, discovery tools, etc., I adopt Valve's [REDACTED] share of revenues on Steam as Steam's but-for market share." Acknowledging that "other factors" matter, but doing nothing to account for them, shows that Schwartz's "method" is unreliable.

### D. Schwartz's Opinion that Valve Charged a Supracompetitive Revenue Share Is Unreliable and Lacks Factual Basis.

Schwartz endeavors to supply common evidence for Plaintiffs' allegation that Valve charges every publisher a supracompetitive revenue share with his opinions that (1) the ***competitive*** rate is 17.1%; and (2) Valve's ***supracompetitive*** rate is [REDACTED]. Schwartz ¶¶352, 377.

Schwartz focuses on Steam's headline revenue share rate, but **"*effective*"** rate is the proper metric. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985 (9th Cir. 2023) (district court "reasonably based its supracompetitive-price finding on *effective* commission rates instead of headline rates"). As common sense dictates and Professor Chiou explains, the proper method for calculating effective revenue share is:

$$\frac{\text{Valve's portion of publisher's Steam revenues}}{\text{Publisher's revenue from sales on Steam} + \textbf{Publisher's revenue from Steam key sales}}$$

Ex. 1 (Chiou) ¶157. Schwartz's "effective" rate calculation simply combines Valve's tiered

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

headline rates and omits the revenue publishers received from selling Steam Keys—presumably because only individual investigation could determine what each publishers' Steam Key revenue was.

Schwartz's failure to include revenue from Steam Keys in his calculations makes his methodology of calculating effective revenue share unreliable. *See* Valve's Opposition to Plaintiffs' Motion for Class Certification, at 28-29 (showing why effective revenue share rate cannot be determined with common proof).

### E. Schwartz's Opinion on Pass-Through Should Be Excluded Because It Ignores Evidence That Pass-Through Rates Vary Widely and Masks Uninjured Class Members

After calculating the "overcharge" in Valve's revenue share rate, Schwartz reduces the claimed overcharge by 20% or 25% because, he concludes, developers would pass through 20-25% of the lower revenue share to purchasers by lowering game prices. Schwartz ¶¶379-397. He asserts that the only circumstance in which a publisher would suffer no injury would be if the publisher:

> pass[ed]-through 100% (or more) of the commission savings, ***which is highly unlikely to begin with and is a proposition for which there is no evidence[.]***

*Id*. ¶379 (emphasis added). This conflicts with the testimony of Wolfire Games, whose representative said it would pass on "all" savings from lower commission rates to customers. Ex. 20 (Wolfire 30(b)(6)) 265:17-266:3.

Schwartz's opinion on uniform pass-through should be excluded because it does not reflect a reliable application of principles or methods. He acknowledges that many factors influence pass-through rates: "These include … the slope of the demand curve, the shape of the demand curve, the slope of the supply curve, and the degree of market competition." Schwartz ¶382. Other "real-world market considerations" also affect a seller's pass-through

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

rate, "such as network effects, and real-world market frictions …." *Id.*

Despite acknowledging (¶382) that "pass-through rates can range widely," Schwartz calculates a single, 20-25% pass-through rate to be applied to every publisher. He arrives at his narrow pass-through range by calculating the average price of a sample of 124 games before and after those games qualified for Valve's 25% revenue share in 2018, and then calculating the average and the median of those average price changes. *Id.* ¶¶390-396.[4]

Schwartz admitted that this small sample of 124 games is not representative of games proposed class members published. Ex. 14 (Schwartz Dep.) 226:25–227:19. He also avoided the "outliers" in his sample—by choosing to use the median of his 124 average pass-through rates. Schwartz ¶¶394-396. But the "outliers" here are games for which the publisher passed on significantly more of the rate reduction than what Schwartz's averages and median suggest.

The permissibility of samples and averages "turns on … the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016). Courts permit averages only when they do not mask broad ranges of results or hide individualized injury. *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020). But that is what Schwartz's uniform pass-through opinion does. His method hides the "outliers" and masks publishers who, ***in his own sample***, suffered no injury from the alleged PMFN. Professor Langer plotted the pass-through rates of the 124 games in Schwartz's model, and for ***28 of them***, the publisher lowered its price by 100% or more of the revenue share reduction. Ex. 2 (Langer) ¶114, Langer Exhibit 2.

This circumstance—that Schwartz's sample contains significant uninjured class

[4] From the [redacted] games that qualified for the 25% rate, he eliminates [redacted] for various reasons, Schwartz ¶¶392-393, and does his averaging calculation on the remaining 124.

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

members hidden by his assumed uniform pass-through opinion—shows why his opinion is unreliable. Despite asserting that pass-through of 100% or more is "highly unlikely" and claiming "no evidence" of it, his own sample of 124 games shows that the publishers of 28 of them did just that: they (like Wolfire Games said it would do) passed through 100% or more of the rate reduction Schwartz uses to conclude that all publishers would pass through only 20-25% of the alleged "overcharge."

Schwartz's uniform pass-through opinion should be excluded.

I certify that this memorandum contains 4,194 words, in compliance with the Local Civil Rules.

DATED this 17th day of May, 2024.

*s/ Blake Marks-Dias*
Blake Marks-Dias, WSBA No. 28169
Eric A. Lindberg, WSBA No. 43593
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, WA 98104
(206) 625-8600 Phone
(206) 625-0900 Fax
bmarksdias@corrcronin.com
elindberg@corrcronin.com

Kristen Ward Broz (*pro hac vice*)
FOX ROTHSCHILD LLP
2020 K. St. NW, Ste. 500
Washington, DC 20006
Telephone (202) 794-1220
Fax (202) 461-3102
kbroz@foxrothschild.com

Nathan M Buchter *(pro hac vice)*
FOX ROTHSCHILD LLP
2000 Market Street STE 20TH FL
Philadelphia, PA 19103
Telephone (215) 299-3010
nbuchter@foxrothschild.com

VALVE CORPORATION'S MOTION TO EXCLUDE TESTIMONY OF STEVEN SCHWARTZ, PH.D.
CASE NO. 2:21-cv-00563-JCC – 15

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Charles B. Casper *(pro hac vice)*
Peter Breslauer *(pro hac vice)*
Robert E. Day *(pro hac vice)*
Jessica Rizzo *(pro hac vice)*
MONTGOMERY McCRACKEN WALKER & RHOADS LLP
1735 Market Street, 21st Floor
Philadelphia, PA 19103
Telephone (215) 772-1500
ccasper@mmwr.com
pbreslauer@mmwr.com
rday@mmwr.com
jrizzo@mmwr.com

*Attorneys for Defendant Valve Corporation*

VALVE CORPORATION'S MOTION TO EXCLUDE TESTIMONY OF STEVEN SCHWARTZ, PH.D.
CASE NO. 2:21-cv-00563-JCC – 16

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**CERTIFICATE OF SERVICE**

I hereby certify that on May __, 2024 I caused the foregoing document to be served via ECF on all counsel of record.

*s/ Monica Dawson*
Monica Dawson

VALVE CORPORATION'S MOTION TO EXCLUDE TESTIMONY OF STEVEN SCHWARTZ, PH.D.
CASE NO. 2:21-cv-00563-JCC – 17

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900