# EXHIBIT 29

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

In Re:                              )
                                    )
                                    ) No. 2:21-cv-00563-JCC
VALVE ANTITRUST LITIGATION          )
                                    )
_____

VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

THOMAS GIARDINO

_____

*** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

9:04 A.M.

THURSDAY, NOVEMBER 2, 2023

701 FIFTH AVENUE, SUITE 5100

SEATTLE, WASHINGTON

Reported by:  Tami Lynn Vondran, CRR, RMR, CCR/CSR

WA CCR #2157; OR CSR #20-0477; CA CSR #14435

Job Number 6276475

```
                                                            Page 2

 1                    A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4            ADAM B. WOLFSON
              Quinn Emanuel Urquhart & Sullivan LLP
 5            865 South Figueroa Street, 10th Floor
              Los Angeles, California 90017
 6            213.443.3000
              adamwolfson@quinnemanuel.com
 7
              ANDREW FAISMAN
 8            Quinn Emanuel Urquhart & Sullivan, LLP
              51 Madison Avenue, 22nd Floor
 9            New York, New York 10010
              212.849.7000
10            andrewfaisman@quinnemanuel.com
11            JORDANNE STEINER   -   Via Zoom
              Wilson Sonsini Goodrich & Rosati
12            1700 K Street Northwest, Fifth Floor
              Washington, DC 20006
13            202.973.8800
              jordanne.miller@wsgr.com
14
              SARAH LUNDBERG   -   Via Zoom
15            Lockridge Grindal Nauen P.L.L.P.
              100 Washington Avenue South, Suite 2200
16            Minneapolis, Minnesota 55401
              612.339.6900
17            smlundberg@locklaw.com
18    FOR THE DEFENDANT:
19            CHARLES CASPER
              Montgomery McCracken
20            1735 Market Street, 21st Floor
              Philadelphia, Pennsylvania 19103
21            215.772.7223
              ccasper@mmwr.com
22
23    ALSO PRESENT:
24            LORI TALBOTT, Videographer
              CHRIS SCHENCK, Valve in-house counsel
25            PEGGY OLDENBURG, Concierge   -   Via Zoom
```

```
                                                            Page 3
 1                        I N D E X
 2    EXAMINATION BY:                                    PAGE:LINE
 3       Mr. Wolfson .................................9: 2
 4       (Afternoon Session) Mr. Wolfson ..........163:10
 5
 6
 7
 8
 9    EXHIBITS FOR IDENTIFICATION                          MARKED
10    Exhibit 178   Email Exchange from Tom Giardino, ..30:15
11                  dated 3/14/18, VALVE_ANT_0263439
12    Exhibit 179   Email Exchange from Tom Giardino, ..42: 7
13                  dated 4/19/19, VALVE_ANT_0265435
14    Exhibit 180   Email Exchange from Tom Giardino, ..64:16
15                  dated 5/23/17, VALVE_ANT_0598921
16    Exhibit 181   Email Exchange from Izumi ..........90:12
17                  Chunovic, dated 9/21/18,
18                  VALVE_ANT_1191414
19    Exhibit 182   Email Exchange from DJ Powers, .....98:13
20                  dated 2/15/18, VALVE_ANT_1186878
21    Exhibit 183   Email Exchange from Tom    .........103:12
22                  Giardino, dated 12/6/19,
23                  VALVE_ANT_1198639
24    Exhibit 184   Email Exchange from Jon Pile, .....128:22
25                  dated 7/26/17, VALVE_ANT_2966472
```

1  stop selling the game on Steam if we couldn't treat our
2  customers fairly."
3           Your words again?
4      A.   Yes, that's right.
5      Q.   Now, was it just poor choices of words to tell
6  this publisher that you would just stop selling the game
7  on Steam if they sold it for lower elsewhere?
8      A.   I think I expressed to Markus that we'd ask to
9  get that same lower price, and that -- that's the
10 outcome we're hoping for.  We would like that lower
11 price on our store as well.
12     Q.   And if they didn't, you would say "or just
13 stop selling the game on Steam."
14          That was the consequence; right?
15     A.   That's not a consequence or outcome that I
16 recall actually happening.
17     Q.   But it's one you threatened here, isn't it?
18     A.   No.  I disagree.
19     Q.   Okay.  So when you were -- when your words to
20 this publisher are that if they sold it for lower, Steam
21 would just -- Valve would just stop selling the game on
22 Steam, your testimony to this jury is that that's not
23 some kind of implicit threat?
24     A.   No.  I don't believe that's a threat.
25     Q.   All right.  And then Mr. Heinsohn says, "We

Page 159

1       But in reality, no, I don't -- I'm not aware
2   of times that we've stopped selling games altogether.
3       Q.   Okay.  What you're telling Mr. Heinsohn, when
4   he's asking specifically about the Steam key guidelines
5   that they have to commit to, those various
6   understandings, is that -- what you've said is, "We've
7   often opted not to promote games or stop selling them
8   altogether if we aren't able to get fair treatment for
9   our users"; right?
10      A.   I can read back the email again if that's
11  helpful.  I'm not sure what you're asking.
12      Q.   Well, I'm saying that, once again -- or I'm
13  asking, once again, you have indicated to a publisher
14  that Valve's practice -- often practice is, among other
15  things, to not -- to stop selling a game if they're sold
16  for less elsewhere; right?
17      A.   Yeah.  As I've said before, it's a poor choice
18  of words and doesn't accurately reflect, as far as I
19  know, something we actually do on the store.
20      Q.   Okay.
21      A.   It is important to us to offer -- try to give
22  our customers a good price.  But it's poorly phrased by
23  me.
24      Q.   It's poorly phrased because it's -- well,
25  never mind.