# EXHIBIT 24

# REDACTED

```
1              UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE
2

3   IN RE VALVE ANTITRUST        ) Case No.

4   LITIGATION                   ) 2:21-cv-00563-JCC

5                                )

6

7         VIDEO-RECORDED 30(B)(6) DEPOSITION

8              UPON ORAL EXAMINATION OF

9                MICROSOFT CORPORATION

10                 AARON GREENBERG

11                    VIA ZOOM

12     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14                    9:05 A.M.

15                JANUARY 30, 2024

16     WITNESS LOCATED IN:  SEATTLE, WASHINGTON

17

18

19

20

21

22

23

24   REPORTED BY:  BETSY E. DECATER, RPR, CCR 3109

25
```

Case 2:21-cv-00563-JCC   Document 322-24   Filed 07/17/24   Page 3 of 9

Aaron Greenberg                                                    2

```
 1                    A P P E A R A N C E S
 2
 3
     FOR THE PLAINTIFFS:
 4      ANKUR KAPOOR
        NOAH BRECKER-REDD
 5      Constantine Cannon, LLP
        335 Madison Avenue
 6      9th Floor
        New York, New York 10017
 7      (212) 350-2748
        akapoor@constantinecannon.com
 8      nbrecker-redd@constantinecannon.com
 9
10   FOR THE DEFENDANTS:
        BLAKE MARKS-DIAS
11      Corr Cronin, LLP
        1015 2nd Avenue
12      Floor 10
        Seattle, Washington 98104
13      (206) 625-8600
        bmarksdias@corrcronin.com
14
15
16    FOR MICROSOFT CORPORATION/WITNESS:
        DAVID P. CHIAPPETTA
17      Perkins Coie
        505 Howard Street
18      Suite 1000
        San Francisco, California 94105
19      (415) 344-7056
        dchiappetta@perkinscoie.com
20
21   ALSO PRESENT:    EDWARD BURKE, Videographer
                      PEGGY OLDENBURG - CONCIERGE
22
23
24
25
```

```
                          I N D E X

 EXAMINATION BY:                              PAGE(S)

    MR. KAPOOR                                5, 41
    MR. MARKS-DIAS                            32, 44




 EXHIBITS FOR IDENTIFICATION                  PAGE


 Exhibit 435  Subpoena to Testify              9

 Exhibit 436  E-Mail Chain
              (MSFT VALVE 1-15)               13

 Exhibit 437  E-Mail Chain
              (MSFT VALVE 555-557)            33
```

1   Q.  "But the Steam publishing agreement historically
2   has required product and price parity."  Did Mr.
3   Sheffer -- I'm sorry, did Mr. Schwab tell you what he
4   meant by that statement?
5   A.  Yes.  I asked Mr. Schwab about this statement,
6   and he said that the way that he wrote this was not
7   accurate and that he was speaking specifically to
8   product parity but not price parity and he was mistaken,
9   that the policy was Steam does not require price parity.
10  Q.  Did Mr. Schwab tell you that -- that Valve
11  requires price parity as well but it's not in the Steam
12  distribution agreement, the publishing agreement?
13  A.  No, he did not.
14  Q.  Then he continues, "When I looked at pre Age:DE a
15  few years ago," what -- what is -- I'm sorry.  He says,
16  "When I looked at it pre Age:DE a few years ago," what
17  is Age:DE?
18  A.  That's Age of Empire so Definitive Edition.  So I
19  believe he's referring to the time before we launched
20  that game.
21  Q.  He says, "Before launching that game, I found
22  that we could sell at any price we wanted before Steam
23  release, but once we released on Steam we needed to give
24  Steam price parity to our other digital channels."
25      When you talked to him to prepare for this

1   deposition, what, if anything, did he say about that
2   statement?
3       A.  He told me that this was something that he wrote
4   in 2019 trying to recall from memory something from 2015
5   and that he got it wrong.  He said that it actually
6   wasn't in the agreement, implied or unimplied, counter
7   to what's in this e-mail.
8       Q.  Did he recall whether or not the -- the price of
9   Age of Empire's Definitive Edition had in fact been the
10  same on the Microsoft Store as it was on Steam?
11      A.  We didn't talk about the pricing for that
12  specific product.
13      Q.  What else do you recall about your discussion
14  with Mr. Schwab concerning price parity between Steam
15  and the Microsoft Store?
16      A.  Just it was consistent with other people that I
17  spoke to that while there's an expectation for product
18  parity our agreement and other conversations we've had
19  with Valve has never implied any requirements around
20  price parity.
21      Q.  You can put the document aside.  Thank you.
22          MR. KAPOOR:  Noah, if you could put up, I
23  guess it's Tab 4, please, which for the record is
24  another e-mail chain, bears the Bates stamp
25  MSFT VALVE 000000555 through 557.

1   can -- that people can share comments and notes about
2   particular games.  If we have events or new content
3   coming for an existing franchise, there's ways to do
4   that.  And then prior to a game releasing, people can
5   like follow or wish-list a game in advance of it coming
6   out, which is helpful for us to know what the interest
7   is of a game before it releases.
8   [REDACTED]
9   [REDACTED]
10  [REDACTED]
11  [REDACTED]
12  [REDACTED]
13  [REDACTED]
14  [REDACTED]
15  [REDACTED]
16  [REDACTED]
17  [REDACTED]
18  [REDACTED]
19  [REDACTED]
20  [REDACTED]
21      Q.  (BY MR. MARKS-DIAS)  Epic, as I understand, has
22  exclusivity requirements?
23          MR. CHIAPPETTA:  Objection; lack of
24  foundation.
25      Q.  (BY MR. MARKS-DIAS)  If you know.

1   to Steam -- to Valve under its current Steam
2   Distribution Agreement?
3           MR. CHIAPPETTA:  Objection; vague.  Counsel,
4   you're talking about first-party perspective?
5           MR. KAPOOR:  Yes.
6       A.  I don't work on the commission rates or our
7   master list with Steam, but my understanding is that
8   it's 30 percent.
9           MR. KAPOOR:  Those are all the questions I
10  think I have.
11                  FURTHER EXAMINATION
12  BY MR. MARKS-DIAS:
13      Q.  Mr. Greenberg, when you were talking about
14  pricing games consistently across all platforms and you
15  said one -- one of the reasons or the main reason you do
16  that is that's because that's what customers want; is
17  that right?
18      A.  That's correct.
19      Q.  Are you familiar with the concept of buyer
20  regret, where a customer buys a game in one place and
21  they see that it was a lot cheaper somewhere else,
22  they're upset about that?
23      A.  Absolutely, yes.
24      Q.  And is that kind of what you're driving at in
25  terms of what customers want with games generally priced

1   consistently across platforms?
2              MR. KAPOOR:  Objection to form; foundation.
3        A.  Yeah.  We're very intentional about trying to
4   have the right price for the product and to meet
5   customers' expectations and ultimately then we want our
6   pricing to be consistent and give customers choice
7   whether they buy the game, subscribe to Game Pass, buy
8   it on console, buy it on PC, buy it at our store, buy it
9   on Steam or somewhere else.  We try to give customers
10  choice.  But when they do buy a game from us, we want
11  that price to always be consistent.  Because if we
12  don't, we'll have quite a bit of backlash.  And gamers
13  are quite vocal on social media and what have you.  So,
14  you know, it just would not be smart for us because we
15  think about customer sentiment in our business.
16       Q.  Okay.  Thank you.
17              MR. KAPOOR:  Nothing further.
18              MR. CHIAPPETTA:  Before we go off the
19  record -- are we still on?
20              VIDEOGRAPHER:  Yes.
21              MR. CHIAPPETTA:  I just want to designate
22  the transcript of the deposition in its entirety
23  including all exhibits as highly confidential outside
24  counsel only under the protective order in this case.
25  I'm sorry, attorneys' eyes only under the protective