# Plaintiffs' Reply in Support of Motion for Class Certification

# (Dkt. No. 315)

# REDACTED

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE VALVE ANTITRUST LITIGATION

Case No. 2:21-cv-00563-JCC

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

**NOTE ON MOTION CALENDAR: July 12, 2014**

**ORAL ARGUMENT REQUESTED**

**FILED UNDER SEAL**

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

## <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION .................................................................................................1

II. PLAINTIFFS SATISFY EACH ELEMENT OF RULE 23(A) .........................3

III. COMMON QUESTIONS PREDOMINATE UNDER RULE 23(B)(3) ............4

    A.    Valve's Relevant Market Challenges Present Common Questions ........4

    B.    Plaintiffs Present Common Evidence of Valve's PMFN Policy ............4

    C.    Plaintiffs Present Common Evidence of the PMFN Policy's Anticompetitive Effects .................................................................................8

    D.    Valve's "Effective Revenue Share" Arguments Fail ..............................8

    E.    Valve's "Alternative Explanations" Also Raise Common Questions ..................11

    F.    Plaintiffs Have Common Evidence of Class-Wide Antitrust Impact ..................11

    G.    Plaintiffs Have Common Evidence of Class-Wide Damages ................................13

    H.    Valve's Statute of Limitations Arguments Also Raise Common Questions .........14

IV. CONCLUSION .................................................................................................16

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC

i

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ................................................................................................. 1

*Cameron v. E. M. Adams & Co.*,
   547 F.2d 473 (9th Cir. 1976) ................................................................................ 15

*Castro v. Sanofi Pasteur Inc.*,
   134 F. Supp. 3d 820 (D.N.J. 2015) ....................................................................... 4

*Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co.*,
   111 F.3d 1427 (9th Cir. 1996) .............................................................................. 14

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ............................................................................................... 13

*Conrad v. Jimmy John's Franchise, LLC*,
   2021 WL 3268339 (S.D. Ill. Jul 30, 2021) ........................................................... 7

*Dark Catt Studios Holdings, Inc. v. Valve Corp.*,
   2022 WL 1443677 (W.D. Wash. May 6, 2022) ..................................................... 5

*Dibb v. Allianceone Receivables Mgmt., Inc.*,
   2015 WL 8970778 (W.D. Wash. Dec. 16, 2015) ................................................. 15

*Eichman v. Fotomat Corp.*,
   880 F.2d 149, 160 (9th Cir. 1989) ........................................................................ 15

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ................................................................................. 10

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   245 F. Supp. 258 (M.D. Pa. 1965) ....................................................................... 14

*High-Tech Employee Antitrust Litigation*
   985 F. Supp. 2d 1167, 1172, 1196-97 (N.D. Cal. 2013) ........................................ 7

*In re Glumetza Antitrust Litig.*,
   336 F.R.D. 468 (N.D. Cal. 2020) ..................................................................... 9, 13

*In re Live Concert Antitrust Litig.*,
   247 F.R.D. 98 (C.D. Cal. 2007) ............................................................................. 4

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC

ii

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  2021 WL 509988 (S.D.N.Y. Feb. 11, 2021) ........................................................... 9

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015) ........................................................................................ 9

*In re Reformulated Gasoline (RFG) Antitrust & Pat. Litig.*,
  2007 WL 8056980 (C.D. Cal. Mar. 27, 2007) ....................................................... 12

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) ............................................................................................... 13

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ................................................................................................... 10

*Jiminez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) ................................................................................. 3

*Laurence J. Gordon, Inc. v. Brandt, Inc.*,
  554 F. Supp. 1144 (W.D. Wash. 1983) .................................................................. 13

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
  791 F.2d 1356 (9th Cir. 1986) .......................................................................... 10, 11

*McDonough v. Toys R Us, Inc.*,
  638 F. Supp. 2d 461 (E.D. Pa. 2009) ..................................................................... 10

*Miles v. Kirkland's Stores, Inc.*,
  89 F.4th 1217, 1224-25 (9th Cir. 2024) ................................................................... 6

*Ohio v. American Express*,
  585 U.S. 529 (2018) ............................................................................................... 14

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) .............................................................................. 7, 13

*Pace Indus., Inc. v. Three Phoenix Co.*,
  813 F.2d 234 (9th Cir. 1987) ................................................................................. 14

*Samsung Elecs. Co., Ltd. v. Panasonic Corp.*,
  747 F.3d 1199 (9th Cir. 2014) ............................................................................... 14

*SaurikIT LLC v. Apple Inc.*,
  2022 WL 1768845 (N.D. Cal. May 26, 2022) ........................................................ 15

*Sidibe v. Sutter Health*,
  333 F.R.D. 495 (N.D. Cal. 2019) ........................................................................... 13

*Siegel v. Chicken Delight, Inc.*,
  448 F.2d 43 (9th Cir. 1971) ................................................................. 10

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43, 69 (2d Cir. 2019) ............................................................. 15

*Van v. LLR, Inc.*,
  61 F.4th 1053 (9th Cir. 2023) ............................................................... 12

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338, 342, 355, 358 (2011) ....................................................... 7

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321, 338 (1971) ..................................................................... 15

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC

iv

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

## I.    INTRODUCTION

Plaintiffs' opening brief and the Schwartz Report detail the abundant evidence, common to the proposed class, demonstrating that Valve uses its PMFN Policy to suppress competition and maintain its monopoly in the market for third-party digital PC game distribution platforms. Common evidence further shows that Valve's suppression of competition enables it to charge supracompetitive commissions to each publisher in the proposed class, causing class-wide injury and damages. Class certification is therefore warranted.

"The focus of Rule 23(b)(3) is on the predominance of common *questions*." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Rather than dispute the predominance of common questions, Valve's opposition offers a grab-bag of disjointed arguments about the questions themselves—demonstrating the predominance of common issues.

*First*, Valve contests Plaintiffs' definition of the relevant market and argues that Valve lacks monopoly power. Opp. 5-7. But this dispute raises a common question, and all of Valve's evidence is common, *id.*, as is Plaintiffs', Mot. 21-22.

*Second*, Valve denies it has a PMFN Policy. Opp. 2, 13-17, 20-23. But Valve sets forth its PMFN Policy in its standard form contracts, Mot. 6-8, and in extensive communications with publishers, *id.* at 8-13. And while Valve now argues its price-parity requirement applies only to Steam Key sales, its own employees said the exact opposite:

> Do-able: Sell the same content and make sure the price on Steam is competitive with where it's being sold anywhere else (***using keys or not***, in a bundle or not). Not doable: Sell the content to another store at a better price than Steam customers get (***using keys or not***, in a bundle or not).[1]

Valve's effort to rewrite history by characterizing its admissions as "overzealous" employees using a "poor choice of words" (Opp. 16) is unpersuasive. In any case, Valve's revisionist history at most raises another common question.

---

[1]    Dkt. 182-24 at '921 (emphasis added).

*Third*, Valve argues that Plaintiffs must analyze each class member's "different understandings" of Valve's PMFN Policy. Opp. 3, 20-23. There is no need for this inquiry here. Dr. Schwartz has explained that Valve's enforcement of its PMFN Policy, which included direct enforcement against many large publishers of popular games, was sufficient to suppress competition from rival platforms who could have otherwise undercut Valve's pricing. Ex. 91 (Mar. 21, 2024 Corrected Version of the Feb. 8, 2024 Schwartz Report) (hereinafter "Schwartz Rpt.") Schwartz Rpt. ¶¶154-167, 174-196.[2] Valve was thereby able to maintain supracompetitive commissions set on a ***class-wide basis*** via a uniform policy embedded in form contracts. *See also* Ex. 85 (Schwartz Reply Report dated July 12, 2024, hereinafter "Schwartz Reply") ¶21. Thus, Valve's supracompetitive commission harmed all proposed class members in the same manner, whether or not they knew about the PMFN Policy.

Plaintiffs' common evidence of class-wide harm now includes the testimony of Valve's own economic experts. Valve's expert testified that, without Valve's PMFN Policy (*i.e.*, in the "but-for" world), all proposed class members would "have more choices" about where to distribute games, because more "platforms would come" into the market, each offering "different combinations of prices and features." Ex. 89 (Chiou Tr.) 245:16-246:19. Those hallmarks of a competitive market would benefit *all* class members. Dr. Schwartz performed a series of rigorous analyses that prove this same point: in a marketplace freed of Valve's PMFN Policy, all class members would benefit from more competition from more platforms over price and PC game features. *See* Schwartz Rpt. ¶¶241-331. Plaintiffs are thus more than capable of proving class-wide harm.

*Fourth*, Valve invents an artificial measurement of "effective revenue share" to falsely suggest some class members benefit from its PMFN Policy. Opp. 7-10, 28-30. This construct has no basis in fact or law.

---

[2] "Ex. __" refers to the exhibits attached to the July 12, 2024 Declaration of Alicia Cobb in Further Support of Plaintiffs' Motion for Class Certification. Exhibits to the February 8, 2024 Cobb Declaration and May 17, 2024 Marks-Dias Declaration are identified by their docket numbers.

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC

2

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

*Fifth*, Valve claims there are "alternative explanations" for its supracompetitive commission. Opp. 12-13. Again, this argument raises common questions and will be resolved by class-wide evidence, by comparing Plaintiffs' economic and documentary evidence to Valve's.

*Sixth*, Valve posits that it did not harm publishers because publishers would pass through any alleged overcharge to consumers. Opp. 30-32. That is incorrect, as Dr. Schwartz has shown that both publishers and consumers bear the burden of the overcharge. Moreover, any dispute over how the overcharge is allocated between publishers and consumers is a common one that will be resolved by economic evidence common to the class.

*Seventh*, Valve argues that individualized inquiries are necessary to calculate damages. Opp. 33-35. Valve is wrong. But, even if Valve were correct, individualized damages issues do not defeat class certification.

*Eighth*, Valve claims that its statute-of-limitations defense raises individualized issues that defeat predominance. Opp. 23-25. In fact, that defense presents another common question that will be resolved by common proof about the timing and effect of ***Valve's*** overt acts taken in furtherance of its efforts to block competition. And in any event differences in the application of statutes of limitations defenses are not a basis to deny certification.

At bottom, Valve has done nothing to undermine Plaintiffs' showing that common issues predominate and that Plaintiffs can prove each element of their case on a class-wide basis. Indeed, many of Valve's own arguments just confirm the centrality of common questions to this lawsuit. Thus, class certification is warranted.

## II.    PLAINTIFFS SATISFY EACH ELEMENT OF RULE 23(A)

Plaintiffs satisfy each element of Rule 23(a). Mot. 17-19. Valve does not contest numerosity, typicality, or adequacy of representation. The only element Valve claims to contest is commonality. Opp. 3, 17-19. Valve's argument fails. For purposes of certifying a class "a single common question" will suffice. *Jiminez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014). Here, there are dozens. Mot. 21-29.

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-cv-00563-JCC

3

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

### III.    COMMON QUESTIONS PREDOMINATE UNDER RULE 23(B)(3)

Valve's own arguments confirm that all the central disputes in this case are common to the proposed class and capable of resolution by common evidence.

#### A.    Valve's Relevant Market Challenges Present Common Questions

Valve disputes Plaintiffs' definition of the relevant market. Opp. 5-7. But this dispute fundamentally raises common economic questions, *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 131 (C.D. Cal. 2007); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 846 (D.N.J. 2015), as shown in part by the common evidence Valve cites, Opp. 5-7. Valve's challenge also lacks merit. Dr. Schwartz defined the relevant market by applying the well-accepted hypothetical monopolist test and considering *Brown Shoe* factors. Schwartz Rpt. ¶¶48-120. Valve claims Dr. Schwartz "arbitrarily" excludes "economically significant substitutes." Opp. 7. But Dr. Schwartz's well-reasoned economic analysis was not arbitrary. Schwartz Reply ¶¶55-88. And Valve's own economist does not agree with Valve that the substitutes supposedly overlooked by Dr. Schwartz are actually economic substitutes. Ex. 89 (Chiou Tr.) at 41:19-43:10.

#### B.    Plaintiffs Present Common Evidence of Valve's PMFN Policy

Plaintiffs' opening brief detailed overwhelming common evidence of the existence and enforcement of Valve's PMFN Policy. Valve spells out its PMFN Policy in form contracts, Mot. 6-8, and Valve employees repeatedly explained that its price and content parity requirements applied to *all* sales, not just Steam Keys, Mot. 8-13.

Incredibly, Valve argues that "no common evidence supports Plaintiffs' claim that Valve has an unlawful PMFN." Opp. 13-17; *see also id.* 19-23. This defense is common to the class, but it also fails. To obscure the fact that Valve's employees contemporaneously made clear Valve does, in fact, have a PMFN Policy, Valve vaguely blames them for being "overzealous" and using "poor" word choices. Opp. 16. But Valve cannot point to any ***contemporaneous*** evidence created in the ordinary course of business in which Valve said it did not have this PMFN Policy. Nor can Valve identify contemporaneous evidence where Valve employees

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC

4

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

questioned the existence of such a policy or suggested that enforcing the policy would violate company policy.

Valve contends that its only parity requirements are in the Steam Distribution Agreement ("SDA") and apply only to downloadable content ("DLC") for games (game add-ons). Opp. 13. Valve's own witnesses testified otherwise. *E.g.*, Dkt. 182-33 63:6-17 (testifying that Valve's SDA has a content-parity policy); Ex. 92, Lynch 30(b)(1) Dep. at 226:5-21 (same). Moreover, the SDA expressly requires that material content parity be maintained for DLC ***and the games themselves***. SDA § 2.4, Dkt. 182-18 ("material parity" must be maintained "between Steam Account Owners and users of other distribution channels who make a comparable investment ***in the Application and*** the associated DLC") (emphasis added).[3]

Valve argues that "even if the DLC parity provision could constitute anticompetitive conduct, it would raise individualized issues" depending on whether a publisher sold DLC. Opp. 13. Valve misses the mark. Its content-parity provision harmed class members by blocking the ability of rival platforms to differentiate, thus protecting Valve's ability to charge inflated commissions to all class members—even those who did not sell DLC. Schwartz Rpt. ¶¶171-72; Rietveld Reply §IV. Class members were injured by the higher commissions Valve was able to impose on a class-wide basis by blocking competition.[4]

As to Valve's price parity policy, Valve disputes its existence by citing testimony from ███████████████, and Prof. Rietveld (from his time at publisher Two Tribes), supposedly saying they were not aware of Valve's price parity policy. Opp. 16-17, 22-23. But the ████ ████ testimony does not even mention price parity. Dkt. 233-10 at 37:7-38:23. And the ████████ employee responsible for ████████ Steam relationship stated in a contemporaneous

---

[3] Language Valve spins as "encourag[ing] publishers to offer exclusive DLC on other platforms," Opp. 2, in fact says: "Company is free to offer special and unique promotional content through other distribution channels, ***provided that material parity is maintained*** between Steam Account Owners and users of other distribution channels." SDA § 2.4, Dkt. 182-18 (emphasis added).

[4] Valve asserts that Plaintiff Dark Catt's original claims arising out of the SDA's "material parity" provision were dismissed by this Court. Opp. 13. But the Court ***denied*** Valve's motion to dismiss Dark Catt's amended complaint, *Dark Catt Studios Holdings, Inc. v. Valve Corp.*, 2022 WL 1443677, at *2-3 (W.D. Wash. May 6, 2022).

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC

5

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

email that Steam "absolutely" requires "price parity." Dkt. 182-27 at '556-657. Finally, Rietveld had little involvement in pricing at Two Tribes, *see* Ex. 93 (Rietveld Tr.) at 46:18-23, so had no reason to know about the price-parity requirement while there. Even where Valve's expert identifies publishers who appear to be genuinely unaware of the PMFN Policy, she cites evidence of Valve enforcing parity. *See* Dkt. 233-1 (Chiou Rpt.) ¶313.

Valve claims Plaintiffs "identify no contract terms requiring price parity," Opp. 20, but Valve expressly requires all class members seeking a Steam Key to commit to price parity for *all* sales on non-Steam platforms. Mot. 6-7. Valve claims "less than ▮ percent" of class members made that commitment, Opp. 14, 20, but those ▮ accounted for ▮ of Steam Store revenue. Schwartz Reply ¶¶182. Moreover, Valve employees told publishers to follow its parity rules regardless of what particular contracts said. *See, e.g.*, Dkt. 182-40 at '521 ("we aren't interested in doing business with somebody if they give Steam customers bad treatment on price or content, *regardless of what's in the agreement*") (emphasis added).

Valve also claims Plaintiffs must show its PMFN enforcement was "uniform" and "consistent" to show predominance. Opp. 20. Not so. Plaintiffs must only be able to show that enforcement was sufficient to limit competition from rival platforms. As Dr. Schwartz explains, "Valve's PMFN Policy enforcement has reduced *platform* competition," and "limits the ability of rival platforms to compete effectively with Steam." Schwartz Rpt. ¶¶320-21. Valve enforced the Policy against "large publishers such as ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮." *Id.* Those publishers alone "take a major portion of the available commerce off the market for alternative platforms, depriving those alternative platforms of the volume they would need to succeed against Valve." *Id.* ¶321; Schwartz Reply ¶¶18-21, 41-54.

Ignoring the impact on rival platforms, Valve cites inapposite employment cases, Opp. 20, where, unlike here, each plaintiff must show that the policy in question was directly applied to their employment. In *Miles v. Kirkland's Stores, Inc.*, the plaintiffs challenged a "bag check policy" that applied while the employees were "off-the-clock." 89 F.4th 1217, 1224-25 (9th Cir. 2024). An employee was harmed only if they were not paid while their own bag was checked. *Id.*

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC

6

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    By contrast, Valve's PMFN Policy blocked competition from rival platforms, harming publishers

2    market-wide. Proving this economic result does not require each Plaintiff to prove that Valve

3    enforced the policy directly against them. Schwartz Rpt. ¶321; Schwartz Reply ¶¶18-21.

4        *High-Tech Employee Antitrust Litigation* is instructive. That court certified a class of

5    employees harmed by an "interconnected web of express bilateral [no-poach] agreements." 985

6    F. Supp. 2d 1167, 1172 (N.D. Cal. 2013) (cited in Mot. 20, 22). While not all individual class

7    members were direct victims of blocked recruitment efforts, the enforcement of those

8    agreements against some class members harmed competition and thus depressed wages for all.

9    *Id.* at 1196-97. Similarly, ***all*** class members here suffered economic harm from Valve's PMFN

10   Policy because it limited competition from lower-priced platforms.

11       Valve also cites wage-and-hour and contract cases to argue predominance is undermined

12   if challenged policies are "applied differently" to various class members. Opp. 21. This again

13   misses the mark—Valve's PMFN Policy results in inflated commissions imposed class-wide; all

14   Plaintiffs are harmed regardless of how or when Valve enforced the PMFN Policy against

15   specific class members. Schwartz Rpt. ¶321; Schwartz Reply ¶¶18-21.[5]

16       Valve also cites *Wal-Mart Stores, Inc. v. Dukes*, where the plaintiffs alleged employment

17   discrimination but lacked evidence of any discriminatory policy at all. 564 U.S. 338, 358 (2011).

18   This was especially a problem because the local managers at each of Wal–Mart's 3,400 stores

19   had discretion over employment matters for the 1.5 million employees in the proposed class. *Id.*

20   at 342, 355. Here, all class members were harmed by a PMFN Policy that Valve put in its core

21   agreements and enforced via the Steam business team from Valve's single U.S. office. Ex. 94

22   (Gerber 30(b)(1) Dep.) at 62:16-66:25.[6]

23

24   [5] Valve also suggests the class is "too heterogeneous" because it contains publishers of different sizes. Opp. 17-18.
     That is irrelevant. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677-78 (9th Cir.

25   2022) (holding "individualized differences among those class members" are irrelevant when the antitrust violations
     plausibly led to higher prices for all).

26   [6] Similarly inapposite is *Conrad v. Jimmy John's Franchise, LLC*, 2021 WL 3268339, at *1-2, 9 (S.D. Ill. Jul 30,
     2021) (cited in Opp. 20-21), in which 800 "individual franchisees—not Jimmy John's—determine[d]" the

27   employees' compensation. That court also excluded the economist's testimony under *Daubert* due to a "systemic
     failure" in the model, which meant the Plaintiffs lacked a methodology to show class-wide impact. *Id.* at *9.

28

PLS.' REPLY ISO CLASS CERTIFICATION         7         QUINN EMANUEL URQUHART & SULLIVAN
CASE NO. 2:21-CV-00563-JCC                                1109 FIRST AVENUE, SUITE 210
                                                   SEATTLE, WASHINGTON 98101
                                                   TEL: (206) 905-7000

### C.    Plaintiffs Present Common Evidence of the PMFN Policy's Anticompetitive Effects

Valve claims Plaintiffs lack evidence that the PMFN Policy "deterred individual publishers from selling their games in other stores for less than they do on Steam." Opp. 26. But there is ample evidence of the impact of Valve's PMFN Policy on rival platforms. For example, when Valve detected that "large publishers of popular games such as ███████████████ ███████████ and others" had games available on other platforms with better pricing or superior content, Valve forced them to eliminate any such differentiation, starving those platforms of the ability to grow by competing on price or game features. Schwartz Reply ¶¶18-21. For example, ████████ wanted to sell a new version of its blockbuster game ███████ ███ only on its ████████ platform, but Valve threatened to remove all versions of the game from Steam if it did so, forcing ████████ to delist the new version from███████ Dkt. 182-46.

Valve also claims that "industry data" disprove the existence of the price-parity requirement, Opp. 26, and that Dr. Schwartz should have considered "alternate explanations for equivalent pricing," *id.* These are slight variations on Valve's argument denying the existence of the PMFN Policy, which at most raise a common dispute. *See supra* 4-7; *infra* 8-11.

And Valve's contention that, to precisely quantify the PMFN Policy's scope through a pricing study, "it is essential to know which equivalently priced games are Steam Key sales," Opp. 27, is similarly off base. Because there is sufficient economic evidence in the record that Valve's PMFN policy has harmed platform competition, the type of impractical empirical pricing study proposed by Valve is unnecessary. Schwartz Reply ¶¶18-21.

### D.    Valve's "Effective Revenue Share" Arguments Fail

Valve claims that something it calls game publishers' "effective revenue share rates" presents individualized issues. Opp. 7-10; *see also id.* at 28-33. Valve invented the concept of "effective revenue share rates" for this litigation, and Valve's arguments that this artificial concept raises individualized issues fail factually and legally.

Factually, no class member pays an "effective revenue share" on any Steam Store transaction. Rather, publishers pay **commissions** for Steam sales, set on a class-wide basis by

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC

8

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

Valve's SDA, and Valve kept those **commissions** inflated through its PMFN Policy. Schwartz Reply ¶¶175-79. To manufacture an artificially lower and more variable "effective revenue share," Valve's expert purports to average the commissions paid on Steam transactions (~30%) with an assumed 0% commission for each publishers' sales of games on other platforms using Steam Keys. Schwartz Reply ¶173.

That approach is nonsensical. Although Valve may not charge publishers for Steam Keys transactions, the **other platforms** do charge a commission for those sales. So, it makes no sense to assume a 0% commission on Steam Key sales. This nonsensical assumption leads to absurd results. As Valve's economist Dr. Chiou admitted, her formula and opinions implausibly imply that switching from a world where all platforms charge a commission of 30% to one where all platforms charge a commission of 20% is somehow **worse** for game publishers. Schwartz Reply ¶¶212; Ex. 89 (Chiou Tr.) at 224:15-225:12 (testifying her "effective revenue share rate changes from 15 percent to 20 percent" between the two scenarios, implying the publisher is worse off, while also agreeing the "actual revenue share number" is lower).

Valve's arguments also fail legally. Valve's effective revenue share argument suggests that to calculate impact (the fact of injury) and damages (the quantum of injury), Plaintiffs must offset or net out the supposed benefits of receiving Steam Keys (for non-Steam transactions) from the harm Plaintiffs suffered by paying higher commissions (on Steam transactions). But the law does not require such offsetting or netting in antitrust cases.

"[A]ntitrust injury occurs the moment the purchaser incurs an overcharge, **whether or not that injury is later offset**." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 481 (N.D. Cal. 2020) (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015)) (emphasis added); *see also In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 509988, at *21 (S.D.N.Y. Feb. 11, 2021) (same). Thus, class members suffered antitrust impact when they paid an inflated commission on even **one** Steam transaction, no matter how many Steam Key sales they made on **other** platforms. Valve's claim that "it is impossible" to ascertain injury because the parties lack sufficient Steam Key data, Opp. 10, 29, 33, is thus a straw man fallacy.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    Valve cites no contrary case. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023),

2 did not endorse offsetting or netting. Instead, it discussed "effective commission rate" only to

3 reject Apple's attempt to justify its 30% commission by comparing that to its competitors' ***listed***

4 rates rather than their ***actual*** rates (as they often discounted down to lower prices). *Epic*, 67 F.4th

5 at 985. Valve's "effective revenue share" does not reflect any ***actual*** rates publishers pay—it is a

6 made-up formula that improperly purports to offset commissions paid to Valve by assuming

7 publishers pay no commission for Steam Key sales when they, in fact, do (just to a different

8 platform than Valve).

9    As to damages, Valve argues that Plaintiffs must subtract from their overcharge damages

10 the "value" of any other benefits Valve provided. Opp. 32-33. As Valve's own authority

11 explains, Opp. 31, antitrust damages must be reduced only by "***benefits that would not have***

12 ***been received by the plaintiff had there been no violation***." *Los Angeles Mem'l Coliseum*

13 *Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1370 (9th Cir. 1986) (emphasis added). To

14 offset Plaintiffs' damages, Valve would have to show that it would not have provided Steam

15 Keys in the absence of Valve's PMFN Policy. *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d

16 461, 476 (E.D. Pa. 2009) (rejecting damages-offset argument because defendants' services to

17 customers would have remained the same even absent the anticompetitive conduct). Valve

18 cannot make that showing. Valve's provision of Steam Keys does not require it to impose the

19 PMFN Policy.[7] Indeed, in a more competitive market without its PMFN Policy, Valve would

20 have every incentive to continue to provide Steam Keys. Schwartz Reply ¶¶180-85.[8]

21    Finally, Valve argues that Plaintiffs must individually calculate the value of Steam's

22 other features to each publisher, and offset those other features as well. Opp. 10-11. Again, to

23

---

24  [7]  Further, Valve provides Steam Keys in the real world even while denying the PMFN Policy exists.

25  [8]  Valve cites *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), abrogated by *Jefferson Par. Hosp. Dist.*
*No. 2 v. Hyde*, 466 U.S. 2 (1984), an inapposite tying case that is no longer good law. *Chicken Delight* concerned a
26 tie between the "free" license of a trademark and the forced purchase of cooking equipment. 448 F.2d at 46-47. Any
damages associated with the forced purchase of equipment thus needed to be offset by the free trademark, because
27 both were included in the same arrangement. *Id.* at 52. As noted, however, Valve cannot show that it only offers
Steam Keys to class members because they agree to follow its PMFN Policy.

28

require that a damages calculation offset the other Steam features, Valve must show those features constitute a "benefit[] that would not have been received" without the challenged PMFN Policy. *Los Angeles Mem'l Coliseum*, 791 F.2d at 1370. Valve has not done so, and as Dr. Schwartz explains, Valve would have an economic incentive to ***increase*** its features under competition, not remove them. Schwartz Reply ¶¶214-17.

### E.    Valve's "Alternative Explanations" Raise Common Questions

Valve claims that its modest competitive response to the launch of the Epic Games Store in 2018 proves that individual issues will predominate. Opp. 7-8. Valve's arguments about its response to Epic only support class certification—Valve's discussion is based on common evidence and concerns class-wide changes Valve made to its commission structure.

Moreover, Dr. Chiou admitted that this small change in Valve's commission structure "benefits all users" of Steam. Chiou Rpt. ¶364 (explaining the new revenue tier system of Steam). That Valve made a change that benefited all class members in the face of modest competition severely limited by its PMFN Policy just proves that competition works to benefit all class members. Mot. 27-28; Schwartz Rpt. §7.4. In a fully competitive marketplace, *i.e.*, absent Valve's PMFN Policy, Valve would face much more competition, benefiting all class members even more. Schwartz Rpt. ¶¶312-13.

Valve argues that it invests in its platform. Opp. 11. But Valve makes approximately ██ ██ in profit per year, with gross margins over ██. Schwartz Rpt.¶¶146-48. Valve clearly does not "take the margin [it] get[s] and reinvest it into the platform." Opp. 11. In any case, Valve's argument about its own investments only confirms that ***common*** issues predominate. Similarly, Valve's argument that "there are obvious alternative explanations" for why other platforms have failed, Opp. 12, highlights that the core disputes in this case are common and will be resolved through common evidence.

### F.    Plaintiffs Have Common Evidence of Class-Wide Antitrust Impact

Plaintiffs establish antitrust impact through Dr. Schwartz's three distinct but complementary approaches, which show that Valve's commissions are set at supracompetitive

1    levels. Mot. 25-28. Dr. Schwartz further explains that the economic harm flowing from Valve's

2    PMFN Policy harms both publishers and consumers. Schwartz Rpt. ¶¶220. Specifically, he

3    calculates that approximately ███ of the overcharge damages are imposed on publishers (*i.e.*,

4    class members). Schwartz Rpt. ¶¶396-97. He reaches that conclusion by analyzing natural

5    experiments which, as Valve's own expert admits, is a well-accepted economic methodology.

6    Schwartz Reply ¶¶233-51; Ex. 88 (Langer Tr.) at 203:15-204:9.

7         Valve argues that Dr. Schwartz's calculation of how Valve's overcharge is allocated

8    between publishers and consumers creates individualized issues.[9] Opp. 30-32. Valve is wrong.

9    Dr. Schwartz's allocation methodology has no bearing on Plaintiffs' ability to show the *fact* of

10   antitrust injury. Schwartz Reply ¶¶174, 178, 252-58. So long as class members suffer from *some*

11   degree of overcharge (which they all did), they are injured. Antitrust injury concerns the "fact"

12   rather than "quantum" of damage. *In re Reformulated Gasoline (RFG) Antitrust & Pat. Litig.*,

13   2007 WL 8056980, at *7 (C.D. Cal. Mar. 27, 2007) (rejecting "individualized inquiries"

14   argument as relating to "the quantum of damages, not the fact of injury") (quotation omitted).

15        Valve's reliance on *Van v. LLR, Inc.*, 61 F.4th 1053 (9th Cir. 2023), is misplaced. Opp.

16   31-32. *LLR* showed that retailer discounts left certain class members *entirely* uninjured. *LLR*, 61

17   F.4th at 1069. Here, *all* class members experienced at least *some* injury. That is because even if a

18   game publisher dropped its game price by literally 100% (or more) of Valve's overcharge, a

19   dubious proposition, that publisher would still be harmed because it would sell more games at

20   the lower price in the but-for world. Schwartz Reply ¶¶255-58.

21        Valve also claims certain data points reflect publishers passing through "100% or more of

22   the [publisher's] cost savings." Opp. 30-31. But in doing so, Valve violates basic principles of

23   statistics, Schwartz Reply ¶¶235-38, and merely captures one-off discrepancies—like a game

24   going on sale shortly before a revenue-tier change occurs, and thus wrongly attributing the

25   impact of the sale to the impact of the revenue-tier change, *id.* ¶¶239-43.

26

27   [9]   Valve's arguments that Schwartz's analysis does not account for Steam Keys and does not offset benefits publishers receive from Steam are addressed above. *See supra* 8-11.

28

### G.     Plaintiffs Have Common Evidence of Class-Wide Damages

Valve argues that various damages issues may require individual inquiries. Even if Valve were correct that there are individualized damages issues—and it is not—that would not undermine class certification. The Ninth Circuit has held that "a district court is not precluded from certifying a class even if plaintiffs may have to prove individualized damages at trial." *Olean*, 31 F.4th at 669.

Moreover, "[p]roof of damages is not a difficult standard under the antitrust laws." *Laurence J. Gordon, Inc. v. Brandt, Inc.*, 554 F. Supp. 1144, 1159 (W.D. Wash. 1983). Antitrust class action plaintiffs need only be able to "estimate" class-wide damages. *In re Glumetza*, 336 F.R.D. at 479. "Calculations need not be exact." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). "The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981).

**Damages Allocation ("Pass-through").** Valve's challenge to Dr. Schwartz's damages allocation across the platform, Opp. 33-34, rehashes "no averaging" arguments the Ninth Circuit expressly rejects. *See Olean*, 31 F.4th at 677 ("To the extent that the Tuna Suppliers argue that pooled regression models involve improper 'averaging assumptions' and therefore are inherently unreliable when used to analyze complex markets, we disagree."). Valve's own authority *Sutter Health* explains that "antitrust cases have recognized the use of averaging in calculating passthrough rates where experts have shown the sound methodological steps through which they calculated their averages." 333 F.R.D. at 495. Dr. Schwartz did just that. Schwartz Rpt. ¶¶379-397; *see also Daubert* Opp. 11-12. Valve's argument that some consumers are less price sensitive than others, Opp. 34, fails for the same reason.

**Publisher Preferences.** Valve argues that publishers value a suite of services—not just price—and that dictates the extent of publishers' damages. Opp. 34. But non-price factors have no bearing on damages because the but-for world would involve at least the same, if not more,

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC

13

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  such services—***and*** more competition on price. Ex. 89 (Chiou Tr.) at 245:16-246:19; Schwartz

2  Reply ¶¶214-17.

3      **Two-Sided Analysis.** Valve incorrectly asserts that Dr. Schwartz's damages model is

4  exclusively one-sided. Opp. 35. In fact, Dr. Schwartz considered the effects of Valve's conduct

5  on both sides of its platform throughout his report including by showing how both publishers and

6  consumers are harmed. *See* Schwartz Rpt. ¶¶30, 57, 207, 284, 288, 292, 332, 335-36, 344. The

7  model relies on the same economic underpinnings as the Supreme Court's decision in *Ohio v.*

8  *American Express*, 585 U.S. 529, 535-37 (2018); *see also Daubert* Opp. 2-4.

9      **But-For Market Share.** Valve claims that Dr. Schwartz's but-for market share

10  calculation is unsupported. Opp. 35. But Valve's expert agrees that Dr. Schwartz's

11  methodology—inferring that a publisher's successful game could help jumpstart a platform—is

12  supported. Ex. 88 (Langer Tr.) at 221:6-12; *see also Daubert* Opp. 9-10.

13      **H.   Valve's Statute of Limitations Arguments Also Raise Common Questions**

14      Valve contends the statute of limitations raises individualized issues defeating

15  predominance. Opp. 23. However, Valve's statute-of-limitations defenses just highlight more

16  common issues that support class certification.

17      The continuing-violation doctrine provides that the limitations period runs from the "last

18  overt act" by the defendant that inflicts "new and accumulating" injury. *Pace Indus., Inc. v.*

19  *Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987). Here, Plaintiffs can prove that all class

20  member claims are timely because common evidence establishes that Valve continued to engage

21  in overt acts to block competition from rival platforms beyond January 28, 2017 (four years prior

22  to filing), including by enforcing price and content parity after that date.[10] Valve also continued

23  to contractually (and anticompetitively) impose the PMFN Policy on publishers seeking Steam

24  Keys, as well as publishers releasing games on Steam for the first time.[11] Dr. Schwartz identifies

25  _____

26  [10]  *Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444-45 (9th Cir. 1996); *Pace*, 813 F.2d at 237; *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1204 (9th Cir. 2014).

27  [11]  *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 245 F. Supp. 258, 264-65 (M.D. Pa. 1965), *vacated on other grounds*, 377 F.2d 776 (3d Cir. 1967), *aff'd in relevant part*, 392 U.S. 481, 502 n.15 (1968) (imposing "substantially uniform" anticompetitive contracts on plaintiff customer for 42 years was a new overt act each time);

28

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC
    14
QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    many such overt acts. *See, e.g.*, Schwartz Rpt. ¶186 n.503 (May 2019); *id.* ¶187 n.505 (July

2    2018); *id.* ¶191 (September 2018). Because those acts limited platform competition within the

3    limitations period, they harmed class members. *Supra* 8-9.

4        Valve's authorities do not hold otherwise. *US Airways, Inc. v. Sabre Holdings Corp.*,

5    (Opp. 25), is inapposite as Plaintiffs are not simply claiming Valve passively collecting "each

6    supracompetitive price" is an "overt act." 938 F.3d 43, 69 (2d Cir. 2019). Rather, Valve actively

7    enforced its PMFN Policy within the limitations period. *Eichman v. Fotomat Corp.*, is inapposite

8    for the same reason, and in fact supports Plaintiffs' position. 880 F.2d 149, 160 (9th Cir. 1989)

9    ("***the active enforcement of an illegal contract*** may constitute an overt act which will restart the

10   statute of limitations") (emphasis added).

11       Similarly, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, does not support Valve's

12   arguments because, as Valve points out, it states the clock resets when the "defendant commits

13   an act that injures a plaintiff's business." 401 U.S. 321, 338 (1971). Valve says this happens

14   when "Valve communicated its alleged price parity requirement to that publisher and the

15   publisher changed its course," Opp. 24, but each PMFN Policy enforcement is an "act that

16   injures" ***all*** Plaintiffs under *Zenith*, as those enforcement acts harm platform competition and

17   thus allow Valve to impose inflated prices across the market.[12]

18       Regardless, even if Valve's arguments had merit—and they do not—"[c]ourts have been

19   nearly unanimous in holding that possible differences in the application of a statute of limitations

20   to individual class members…does not preclude certification of a class action…" *Dibb v.*

21   *Allianceone Receivables Mgmt., Inc.*, 2015 WL 8970778, at *8 (W.D. Wash. Dec. 16, 2015); *see*

22   *also Cameron v. E. M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976).

23

24

25   _____
     *Samsung*, 747 F.3d at 1204 (new anticompetitive contract on same subject matter was a new overt act, even if it
26   "was merely a restatement" of an earlier contract).

27   [12]  Valve also cites *SaurikIT LLC v. Apple Inc.*, 2022 WL 1768845, at *3 (N.D. Cal. May 26, 2022), but that case
     did not involve overcharges to purchasers from the alleged monopolist. Rather, it was a competitor action involving
     "mere reaffirmations" of Apple's earlier exclusion of that single competitor. *Id.* at *2.

28

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC

15

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

## IV.    CONCLUSION

For these reasons and the reasons in Plaintiffs' motion, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Class Certification.

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC

16

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

DATED:       July 12, 2024                    Respectfully submitted,

*/s/ Alicia Cobb*                             */s/ Stephanie L. Jensen*

Alicia Cobb, WSBA #48685                      Stephanie L. Jensen, WSBA #42042
QUINN EMANUEL URQUHART &                      Tyre L. Tindall, WSBA #56357
SULLIVAN, LLP                                 WILSON SONSINI GOODRICH &
1109 First Avenue, Suite 210                  ROSATI P.C.
Seattle, Washington 98101                     701 Fifth Avenue, Suite 5100
Phone (206) 905-7000                          Seattle, WA 98104-7036
Fax (206) 905-7100                            Phone (206) 883-2500
aliciacobb@quinnemanuel.com                   Fax (866) 974-7329
                                              sjensen@wsgr.com
Steig D. Olson (*pro hac vice*)               ttindall@wsgr.com
David LeRay (*pro hac vice*)
Nic V. Siebert (*pro hac vice*)               Kenneth R. O'Rourke (*pro hac vice*)
Andrew Faisman (*pro hac vice*)               Jordanne M. Steiner (*pro hac vice*)
QUINN EMANUEL URQUHART &                      WILSON SONSINI GOODRICH &
SULLIVAN, LLP                                 ROSATI, P.C.
51 Madison Avenue                             1700 K Street, NW, Suite 500
New York, New York 10010                      Washington, DC 20006
Phone (212) 849-7231                          Phone (202) 973-8800
Fax (212) 849-7100                            Fax (866) 974-7329
steigolson@quinnemanuel.com                   korourke@wsgr.com
davidleray@quinnemanuel.com                   jordanne.miller@wsgr.com
nicolassiebert@quinnemanuel.com
andrewfaisman@quinnemanuel.com                W. Joseph Bruckner (*pro hac vice*)
                                              Joseph C. Bourne (*pro hac vice*)
Adam Wolfson (*pro hac vice*)                 Laura M. Matson (*pro hac vice*)
QUINN EMANUEL URQUHART &                      LOCKRIDGE GRINDAL NAUEN P.L.L.P.
SULLIVAN, LLP                                 100 Washington Avenue S, Suite 2200
865 S. Figueroa St., 10th Floor               Minneapolis, MN 55401
Los Angeles, California 90017                 Phone (612) 339-6900
Phone (213) 443-3285| Fax (213) 443-3100      Fax (612) 339-0981
adamwolfson@quinnemanuel.com                  wjbruckner@locklaw.com
                                              jcbourne@locklaw.com
Ankur Kapoor (*pro hac vice*)                 lmmatson@locklaw.com
Noah Brecker-Redd (*pro hac vice*)
CONSTANTINE CANNON LLP                        Kyle Pozan (*pro hac vice*)
6 East 43rd St., 26th Floor                   LOCKRIDGE GRINDAL NAUEN P.L.L.P.
New York, NY 10017                            1165 N. Clark Street, Suite 700
Phone (212) 350-2700                          Chicago, IL 60610
Fax (212) 350-2701                            Phone (612) 339-6900
akapoor@constantinecannon.com                 Fax (612) 339-0981
nbrecker-redd@constantinecannon.com           kjpozan@locklaw.com

J. Wyatt Fore (*pro hac vice*)                *Interim Co-Lead Counsel*
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., NW, Suite 1300N
Washington, D.C. 20004
Phone (202) 204-4527| Fax (202) 204-3501
wfore@constantinecannon.com

*Interim Co-Lead Counsel*

PLS.' REPLY ISO CLASS CERTIFICATION                17
CASE NO. 2:21-CV-00563-JCC

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kenneth J. Rubin (*pro hac vice*)
Timothy B. McGranor (*pro hac vice*)
Kara M. Mundy (*pro hac vice*)
Douglas R. Matthews (*pro hac vice*)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215
Phone (614) 464-6400
Fax (614) 719-4796
kjrubin@vorys.com
tbmcgranor@vorys.com
kmmundy@vorys.com
drmatthews@vorys.com

Thomas N. McCormick (*pro hac vice*)
VORYS, SATER, SEYMOUR AND PEASE LLP
4675 MacArthur Court, Suite 700
Newport Beach, California 92660
Phone (949) 526-7903 | Fax (949) 383-2384
tnmccormick@vorys.com

*Executive Committee Member*

PLS.' REPLY ISO CLASS CERTIFICATION
CASE NO. 2:21-CV-00563-JCC

18

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

## **LCR 7 CERTIFICATION**

I certify that this memorandum contains 5,495 words, in compliance with the 5,500-word limit set forth in Dkt. 178.

DATED: July 12, 2024

                                        */s/ Alicia Cobb*
                                        Alicia Cobb, WSBA #48685

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on July 12, 2024, I caused a true and correct copy of the foregoing to

3   be served on counsel for Valve via email and preliminarily filed under seal in this Court's CM/ECF

4   system.

5

6      DATED: July 12, 2024

7                                                          _/s/ Alicia Cobb_
                                                            Alicia Cobb, WSBA #48685

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28