# Exhibit 88 to the Cobb Declaration

# (Dkt. No. 316-4)

# REDACTED

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4

                              )
5     In Re:                  )
                              )
6                             )
                              ) Case No.2:21-cv-00563-JCC
7     VALVE ANTITRUST LITIGATION  )
                              )
8     _____  )
                              )
9

10

11

          *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

12

13            Video-Recorded Deposition of

14                 ASHLEY LANGER, Ph.D.

15

                     June 21, 2024
16                    9:13 a.m.

17          3800 West Starr Pass Boulevard

                  Tucson, Arizona

18

19

20

21

22

23

24    REPORTED BY:  RICHAEL M. SILVIA, RMR, CRR, CRCR

                 Arizona CR No. 51017

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 111

1       Q.    I think so.

2             And let me also ask this:  So the -- and I'm

3    not saying you have no basis for it, but the 30 percent

4    headline revenue share in your Exhibit 3, that is an

5    assumption you are introducing, not one that you

6    imported from Dr. Schwartz's report.  Would you agree?

7             MR. CASPER:  I -- I object to the form of the

8    question.

9       A.    I feel like I've answered it, but it seems

10   like you feel I haven't.

11            Let me just say that Dr. Schwartz's damages

12   estimate is the -- is generated with, taking as one

13   input, a Steam revenue share in the current world, his

14   predictions of what a Steam revenue share would be in a

15   but-for world, given his assumptions and his model.

16   And yet in the real world, we see a lot of different

17   revenue shares, including 10 percent and 30 percent.

18            I'm not making an assumption to say that

19   there's an affirmative -- you know, that that's -- the

20   30 percent is right or that 10 percent is right.  All

21   I'm saying in this exhibit is that those are things

22   that we -- Dr. Schwartz and I agree are observed in the

23   real world.

24            We don't know from his model what happens in

25   the but-for world, and so if you don't know what

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 112

1    happens in the but-for world, these are things that
2    could happen.  And so all I'm saying is because he
3    hasn't specified it the way economists specify choices
4    in markets, it could be anything in this gray range.
5         Q.   (BY MR. LERAY)  Okay.  And -- okay.  I
6    understand what you're saying.
7              And so let me ask it -- a question this way:
8    You would agree that the 10 percent and 30 percent
9    data -- data points we see in Exhibit 3 are coming from
10   the real world, correct?
11        A.   I agree that those 10 percent and 30 percent
12   are coming from the real world, yes.
13        Q.   Okay.  And Exhibit 3 is porting those numbers
14   over from the real world into the but-for world,
15   correct?
16        A.   Exhibit 3 is pulling those numbers and,
17   implicitly with the gray shading, any number in between
18   into the but-for world, yes.
19        Q.   Okay.  But you're not offering an opinion
20   that the 30 percent or the 10 percent number will
21   actually occur in the but-for world, correct?
22        A.   I'm not making any affirmative opinions in
23   this report about what will occur in the but-for world.
24             I am saying that Dr. Schwartz's model does
25   not meet the standards of what economists use to model

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 113

1    but-for worlds where actors in the model are making

2    choices between different potential options.  He has

3    only specified in his but-for world what happens on

4    Steam, not what happens with the choices.

5        Q.    Okay.  And in Exhibit 3 for the data points

6    below the blue graph, those are data points where a

7    publisher voluntarily pays a higher headline rate

8    relative to the but-for Steam rate predicted by

9    Dr. Schwartz, correct?

10       A.    I'm just trying to unpack the question.

11       Q.    Sure.

12       A.    Sorry.  Could you or the court reporter read

13   it back.

14       Q.    I'm happy to read it back.  So --

15       A.    Okay.  Thank you.

16       Q.    -- for the data points below the blue line in

17   your graph, those are data points where a publisher

18   voluntarily pays a higher headline rate relative to the

19   but-for Steam rate, correct?

20            MR. CASPER:  I object to the form of the

21   question.

22       A.    Okay.  So I believe -- I'm not sure I have

23   the colors worked out great.  I think you mean below

24   Dr. Schwartz's -- the line that's labeled as

25   Dr. Schwartz's --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 114

1        Q.   (BY MR. LERAY)   Correct?

2        A.   -- damages estimate?

3        Q.   Yes.

4        A.   Okay.

5        Q.   Yeah.

6        A.   So the gray area below Dr. Schwartz's damages

7    estimate, those are indicating publishers who

8    are -- you know, so as we said repeatedly, ▮

9    percentage points of Dr. Schwartz's market substitute

10   from Steam to somewhere else.

11       Q.   Yeah.

12       A.   The question is:  Where do they substitute

13   to?  Dr. Schwartz ends up with a Steam but-for revenue

14   share in his model, which I can go find, but I'm not

15   going to for the moment.

16            These are choices made by the publishers to

17   substitute to platforms that, for whatever reason, are

18   economically rational choices for them to make where

19   they are paying higher revenue shares than they -- than

20   Dr. Schwartz is assuming they would pay in his but-for.

21            So because those revenue shares in

22   Dr. Schwartz's model depend on the tiers and everything

23   else -- I can't tell you a precise number for each

24   publisher without going into the data.  But for each of

25   these publishers, it is true that they are choosing to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 115

1  pay a somewhat -- somewhat, slightly, substantially,

2  depends on where in the gray you are, higher revenue

3  share potentially because they're getting something

4  better than they would get if they stayed on Steam in

5  his but-for world.

6      Q.   Okay.  But you would agree that they would

7  only pay a higher revenue share if it was economically

8  rational to do so, as you just testified to, perhaps

9  because they're getting something better than they

10 would get if they stayed on Steam, right?

11     A.   Yes.  I believe you're reading back some of

12 my testimony from just now.

13          So, yes, in the but-for world, Steam is a

14 different platform.  They were offering different

15 revenue shares as -- you know, in Dr. Schwartz's

16 but-for world, Steam is offering different revenue

17 shares.  It has different numbers of consumers, all of

18 those things.

19          Other things will change in response to that

20 in the industry.  Other platforms will change their

21 offerings and, perhaps, change their revenue shares,

22 and publishers may make different decisions --

23 actually, have to make different decisions given how

24 he's structured the change.  And they are substituting

25 to something that's economically rational for them.

Page 116

1      Q.    Okay.  Can you turn to paragraph 119.

2            THE DEPONENT:  Yes.  Let me get it.

3            Okay.  Just one moment and I'll read it.

4            (Deponent perused document.)

5      A.    Okay.  I'm there.

6      Q.    (BY MR. LERAY)  Okay.  In paragraph 119, you

7   claim that Schwartz is modeling the industry as

8   one-sided.  Do you see that?

9      A.    Yes.

10     Q.    Okay.  Is it your opinion that a platform

11  setting a price to only one side is a one-sided

12  platform?

13     A.    No.  So let me be very clear about what my

14  opinion is.

15     Q.    Sure.

16     A.    Dr. Schwartz and I agree that this

17  industry -- these platforms are two-sided, and yet he

18  is modeling the industry as one-sided.  And he relies

19  on a series of assumptions that come from the

20  literature and argues that he can model a two-sided

21  industry as one-sided.

22            And my opinion is that that -- those

23  assumptions don't hold in this industry, and he cannot.

24     Q.    Okay.  So when -- when you say "he is

25  modeling the industry as one-sided," you're referring

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 117

1    to his use of one-sided agency pricing in the damages

2    model, correct?

3        A.    Yes.   Here we're in the section of my report

4    talking about the damages model, and I'm talking about

5    his model being a model of pricing between the platform

6    and the publisher, not a model of the price set to the

7    customers, the end purchasers, let's call them.  And so

8    that makes it one-sided.

9        Q.    Okay.  Would you agree that Dr. Schwartz

10   cites two-sided platform economics literature

11   throughout his report?

12       A.    I agree, in particular, that here he is

13   citing two papers by the same set of coauthors, Rochet

14   and Tirole, in order to argue that he can model a

15   two-sided industry as one-sided, if that's what you're

16   asking.

17       Q.    Well, I'm asking more generally.  Throughout

18   his report, he cites two-sided economics literature for

19   his relevant market, for his platform competition

20   model, et cetera, correct?

21       A.    I agree that Dr. Schwartz is citing

22   literature on two-sided markets in various places in

23   his report, yes.

24       Q.    And you agree that Schwartz opines that Steam

25   is, in fact, a two-sided platform, correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 187

1    price increase, one penny, would lead to zero sales.

2         Q.   Okay.  And would you agree that there's no

3    evidence suggesting that's -- any game in this industry

4    has perfectly elastic demand?

5         A.   Again, I'm not forming an affirmative model

6    here, and my assignment is to analyze Dr. Schwartz's

7    model.  That doesn't require me forming an opinion

8    about whether anyone has perfectly elastic demand.

9         Q.   Well, would you agree that as a matter of

10   economic common sense there's no games that are subject

11   to perfectly elastic demand in this industry?

12        A.    I'm hesitating because that one is somewhat

13   less clear than the alternative, than the inelastic

14   demand.  A small price increase leading to zero sales,

15   I don't know.  There are games that are quote/unquote

16   sold for zero price, that are free.  So I -- I don't

17   know.  I can't tell you an answer on that one.

18        Q.   Okay.  And would you agree that the more

19   elastic demand a game has, the higher degree of

20   pass-through there would be?

21        A.    That depends.  That depends explicitly -- as

22   I said to start out, pass-through is a complicated

23   object.  It is not just a function of the elasticity of

24   demand, so it depends.

25        Q.    How about -- would you agree that more

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 188

1    elastic demand -- the more elastic demand a game has,

2    the higher degree of pass-through there would be all

3    else equal?

4         A.    Just thinking through cases so...

5              (Pause in the proceedings.)

6         A.    As has been my answer to some of your other

7    questions about all else equal, we have to think about

8    pass-through as an equilibrium object.

9              And so I haven't formed an opinion about what

10   equilibrium objects look like in but-for worlds or what

11   would change in elasticity of demand here.  So I can't

12   give you a definitive answer.

13        Q.    (BY MR. LERAY)  Okay.  What are the factors

14   that would influence pass-through other than price

15   elasticity of demand?

16        A.    So price elasticity of supply is a key one.

17   Importantly, how a publisher's, in this example,

18   willingness to provide goods changes as their marginal

19   costs change.  It's one way to think about what the

20   price elasticity of supply is.  Or -- sorry.  Let me

21   correct that.

22             How a publisher's willingness to produce

23   goods changes as its price, its sales price changes is

24   the correct statement.  So that's price elasticity of

25   supply, and also the structure of competition, which

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 189

1    can be very multifaceted.

2              So all of those things will affect

3    pass-through.

4         Q.    Okay.

5         A.    So that means not just my own game's price

6    elasticity of demand and my own price elasticity of

7    supply but also those of my rivals, those of other

8    customers, what's going on in the platform.  All of

9    those things will enter.

10        Q.    Earlier today we talked about how -- well,

11   you've offered opinions that game publishers are

12   profitable, right?

13        A.    I have offered opinions that game publishers

14   have positive long-run economic profits as a whole, as

15   evidenced by the lack of substantial entry -- or

16   sorry -- substantial exit in this market, in this

17   industry and the evidence we talked about in that

18   footnote and elsewhere in my report.

19        Q.    So would you agree then that game publishers

20   do not operate in a perfectly competitive market as

21   economists use the term?

22        A.    As economists use the term "perfect

23   competition," it implies zero long-run economic

24   profits.  And so let me say that zero long-run economic

25   profits mean that firms stay in the industry.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 190

1          So -- so this is not part of my assignment,

2     and I would want to think about whether I could rule

3     out perfect competition.  It would depend on a bunch of

4     assumptions that I haven't thought through because

5     they're not part of my assignment.

6          Q.   Okay.  Would you agree that if pass-through

7     is anything above zero -- or I'm sorry -- anything less

8     than 100 percent, then the publisher is harmed by at

9     least epsilon?

10          MR. CASPER:  Object to the form of the

11     question.  Are -- are you assuming that there are

12     damages that have been proven.

13          MR. LERAY:  Correct.  Yeah.

14          Q.   (BY MR. LERAY)  I'm asking you -- so assuming

15     that there's been an overcharge demonstrated in the

16     case, would you agree that if pass-through is anything

17     less than 100 percent, the publisher is harmed to at

18     least some degree?

19          A.   That depends.  I -- I -- as we've said,

20     overcharge is about dollars of -- paid in terms of

21     revenue share.  What matters are profits and sales and

22     quality of the platform and all of those things.

23          And so you need to specify more for me to be

24     able to tell you whether pass-through of less than

25     100 percent is leading to harm for every class member.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 191

1      Q.   Okay.  Let me see if I can ask it in a way

2   that satisfies that.  Let me think.

3           So assuming that we've already accounted for

4   profits and sales and quality of the platform and all

5   of those things and the jury determines that there was

6   an overcharge, would you agree that the publisher

7   incurred at least a portion of that overcharge provided

8   pass-through is less than 100 percent?

9      A.   So I believe you're saying that the Court has

10   determined there was an overcharge conditional on --

11   what did you say?  Quality?

12      Q.   Yeah.  So there's been a determination after

13   accounting for all of the quality factors and others

14   that you testified to.  So let's say we're at the

15   damages phase.  I don't want to use a legal

16   terminology, but essentially, liability has already

17   been determined.  There is an overcharge.  My question

18   is, would you agree that if pass-through is less than

19   100 percent, the publisher bears at least some of the

20   harm from that overcharge?

21      A.   Let me just think about the hypothetical for

22   a moment.

23           So how -- the pass-through has to be

24   accurately measured.  And so that would require -- my

25   opinion in this case is that that would require

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 192

1    individual inquiry to accurately capture a pass-through

2    rate.

3             If we conducted individual inquiry into this

4    publisher -- this particular publisher's pass-through

5    rates and found that it was less than 100 percent and

6    that all of the other criteria I'm laying out in the

7    report about all -- you know, all of my other concerns

8    about how we should accurately capture -- well, I'm

9    not -- my -- in my report, I'm saying that Dr. Schwartz

10   has not met all those other standards.  But you're

11   telling me in this hypothetical that somehow they were

12   met.  Then there would be some harm to that particular

13   publisher, but that would not tell me that there is

14   harm to all publishers.

15       Q.   Understood.  Have you identified any

16   scenarios in this case where it's your view that there

17   would be 100 percent pass-through of the overcharge to

18   a consumer?

19       A.   I believe we have a deposition where a

20   potential class member is testifying to 100 percent

21   pass-through.  I believe that's a Wolfire deposition.

22       Q.   I think I know what you're talking about.

23   Let me see if I can find that too.

24             MR. CASPER:  Page 54 in Footnote 136.

25             MR. LERAY:  Yeah.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 193

1        A.   Okay.  So in Footnote 136, this is a named

2   plaintiff, Wolfire Games.  This is the 30(b)(6)

3   deposition of David Rosen.

4             The question is:  What is the pricing

5   experiment you're referring to?

6             Answer:  Passing on all of the savings from

7   various commission rates onto customers.

8             Question:  Would Wolfire in that scenario,

9   keep any of the, as you put it, commission rate

10  savings?

11            Mr. Golden:  Objection to form.

12            The witness:  No.

13            By Mr. Skok, Question:  It would all get

14  passed through to customers?

15            Answer:  Yes.

16       Q.   (BY MR. LERAY)  Are you adopting the

17  testimony of this fact witness to be true as an

18  economic matter?

19       A.   No.  I am using this as evidence that there

20  are lots of different economic outcomes that are

21  possible and that Dr. Schwartz has not considered some

22  economic outcomes that people have testified might

23  occur in this industry.

24       Q.   Would you agree that to reach 100 percent

25  pass-through, the game would have to be subject to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 194

1   perfect competition in the economic sense?

2       A.    No.  Explicitly, this is an example where

3   there are all sorts of things in the real world that

4   may lead to various pass-through rates of zero percent

5   or 100 percent that are not perfect elasticity or

6   imperfect -- or perfectly elastic or perfectly

7   inelastic, perfect competition; that in the real world,

8   publishers may care about perceptions from customers,

9   things like that, that make passing through changes in

10  costs 100 percent economically optimal for them.

11      Q.    Now, in Footnote 136, you say, "This example"

12  may -- "might be realistic for many publishers."

13          Do you see that?

14      A.    I do see that.

15      Q.    You're inferring that results from this one

16  deposition snippet of David Rosen of Wolfire, correct?

17      A.    The sentence says, "This example might be

18  realistic for many publishers."  Here's an example.

19  This is providing an economic force, this perceptions

20  of customers, that may make firms want to do this,

21  publishers want to do this.  I stick by that sentence.

22      Q.    Okay.  Have you conducted any economic

23  studies about how often publishers would pass through

24  100 percent of any cost savings to consumers?

25      A.    So I haven't, but Dr. Schwartz has.  So if we

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 200

1    percent demonstrate the unreliability of this empirical

2    strategy, right?

3         A.    That is what I say.

4         Q.    Okay.  So are you expecting that his

5    empirical strategy would result in pass-through rates

6    between zero and 100 percent?

7         A.    If he had written down a model of imperfect

8    competition that generated different pass-through --

9    you know, pass-through rates, for some reason, above

10   100 percent or below zero percent, then having an

11   empirical strategy that supports that would be -- would

12   make sense.

13             Here, he doesn't have that.  He has no model

14   of consumer choices, consumer substitution, which would

15   lead to consumer price elasticity of demand.  And he

16   has a very limited model of the relationship between

17   the platform and the publisher.  And his empirical

18   strategy is generating these incredibly varied

19   pass-through rates.  They're all over the place as

20   shown in Exhibit 2 on page 56.

21             And if he had a valid empirical strategy,

22   either that wouldn't happen or he would have a model

23   that supports it, and he has neither.  So it's -- he's

24   stuck.  It doesn't make sense.

25        Q.    Okay.  Are you offering the opinion that his

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 201

1    model of pass-through assumes perfect competition?

2        A.   His empirical model of pass-through

3    assumes -- makes some heroic assumptions.  It assumes

4    that he's using somewhat of a before-after empirical

5    strategy where it's before or after the -- the game

6    hits a revenue share -- sorry -- a revenue threshold to

7    trigger a lower revenue share.  In order to do that, it

8    needs to be the case that nothing else changes in the

9    before period relative to the after period.

10            He's also assuming that these 124 games are

11   representative of the industry as a whole, of the

12   90,000 games of the industry.  They are not, and he

13   says in his deposition that they are not.

14            And then on top of that, he's assuming that

15   he can take the median pass-through rate from these 124

16   pass-through rates that he estimates and use it in this

17   case.

18            He's not assuming perfect competition, but

19   there are some heroic and, I think, unreliable

20   assumptions there, and those are leading to unreliable

21   estimates.

22       Q.   Yeah.  Are the assumptions you view as

23   unreliable -- what are those unreliable assumptions?

24       A.   So I just explained some assumptions.  Let me

25   explain why it's not just me who would find those

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 202

1    unreliable, why these are not up to economic standards.

2         He is taking a before and after around a

3    point when a video game hits a certain revenue

4    threshold.  This revenue -- this is in the time when

5    Valve has decided to introduce revenue tiers in

6    response to changing conditions in the industry.

7         And he's using a year before and a year after

8    a game hits this revenue cutoff.  Those are often --

9    those are occurring after -- late 2018, so into 2019.

10   We all know that 2020 was a really different year.

11   COVID hit.  Lots of things happened in 2020, and that's

12   his after.

13        Beyond that, video games, as they age, they

14   are often offered at lower prices.  So taking a year

15   before or a year after a game hits some revenue

16   threshold doesn't make economic sense to compare the

17   prices before and after and say that's only an effect

18   of hitting that threshold.  That's just one of the

19   assumptions.

20        A second assumption is that these 124 games

21   can represent the entire class of 90,000 games.  These

22   are 124 games that sold at least $10 million worth of

23   revenue of Steam.  There are so many small games on

24   Steam that are never going to hit $10 million of

25   revenue, and to say that what these 124 games do

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 203

1   represent those games, doesn't make economic sense.

2           Additionally, he then goes to a pass-through

3   rate of 20 or 25 percent, which he takes as a median

4   from these 124 games.  We see in my Exhibit 2 that for

5   those 124 games, pass-through rates, as estimated with

6   Dr. Schwartz's unreliable methodology, range from

7   negative 200 percent to almost positive 200 percent.

8           And, in fact, there are only -- let me be

9   precise, four games or 3.2 percent of the minuscule

10  percentage of the total number of games on Steam that

11  actually had pass-through rates as estimated by

12  Dr. Schwartz is between 20 and 25 percent.  Yet he's

13  going to apply those numbers class-wide.  That doesn't

14  make economic sense.

15      Q.   Okay.  Have you heard of the economic concept

16  of a natural experiment?

17      A.   I have.

18      Q.   Okay.  What is a natural experiment?

19      A.   So, in fact, my -- one of my committee

20  members in graduate school just won a Nobel Prize for

21  this, David Card.  He -- he used an example of the

22  Mariel boat lift as a way to think about how

23  immigration affects natives' wages.

24          And so the idea in any natural experiment is

25  to try to use an event, ideally one that happens

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 204

1    randomly and where nothing else changes that's imposed

2    from the outside.  So, for instance, in that context,

3    he was arguing that, you know, Castro leading to a

4    large number of Cubans leaving Cuba was not related to

5    demand for labor in Miami in that period.

6              And you can then -- if it meets certain

7    assumptions about things being similar, you can use a

8    natural experiment to recover the impact of a change on

9    outcomes in a market.

10        Q.    Okay.  Would you agree that the introduction

11   of Valve's tier system constitutes a natural

12   experiment?

13        A.    No.

14        Q.    Why not?

15        A.    So in a natural experiment, you need to

16   assume that nothing else differs other than this thing

17   that you're looking at.  Explicitly, as I've explained,

18   lots of things are changing in this environment, in

19   this industry when the revenue share -- revenue

20   threshold is met for these games to have a lower

21   revenue share.

22              First of all, Steam is introducing this

23   revenue share policy in response to changing market

24   conditions.

25              Secondly, there are changing things going on

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 205

1    such as COVID, such as changes in demand, such as

2    changes in the industry that you need to take into

3    account.

4            Third, there are changes in the product's

5    life-cycle.  We could go on and on.

6            The point here is that you need to -- to have

7    an accurate natural experiment that reflects the actual

8    pass-through, you need to meet certain assumptions.

9    And they're not met here, and they're explicitly not

10   met with a year of data before and a year of data

11   after.  Dr. Schwartz isn't showing that they're met

12   because he can't.

13       Q.   Would you agree that to conduct a natural

14   experiment there needs to be a change, an event?

15            MR. CASPER:  Objection, asked and answered.

16            MR. LERAY:  Sure.

17       A.   Yeah.  I've -- I've said that.

18       Q.   (BY MR. LERAY)  Okay.  Are you aware of any

19   other revenue share changes in the record other than

20   introduction of Valve's revenue tiers?

21       A.   I am not aware of any changes that Valve made

22   to the revenue share of Steam, and yet that does not

23   rule out that one could not recover estimates of

24   pass-through in a reasonable way.  But I am not aware

25   of any -- any other revenue share changes that Valve

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 206

1     made.

2           Q.    Understood.  And you do not -- I'm pretty

3     sure I know the answer.

4                 You do not offer an opinion about a superior

5     way to estimate revenue share other than the approach

6     Dr. Schwartz opines on in his report?

7           A.    As I said, it's not part of my assignment.

8           Q.    Okay.

9           A.    I do not.

10          Q.    Are you familiar with the concept of

11    focal-point pricing?

12          A.    I am familiar with the concept.

13          Q.    Okay.  And what is focal-point pricing?

14          A.    Let me get to the right part of my report.

15    Just one moment.

16          Q.    Sure.

17          A.    So focal-point pricing, in the context of my

18    report, refers to the idea that publishers may want to

19    offer similar prices because customers may be

20    concerned, upset, something when they see the same game

21    offered at different prices.

22          Q.    Okay.  I actually had in mind a different

23    idea of focal-point pricing.

24                So as Schwartz -- Schwartz offers opinions

25    about it, he explains that publishers may have a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 207

1    tendency to stick to certain prices, like 59.99 or

2    9.99.

3              Are you familiar with -- with that definition

4    of focal-point pricing?

5         A.   So that's not a part of Dr. Schwartz's report

6    that I was assigned to respond to.  That's not

7    something that I'm providing opinions on.

8         Q.   Okay.  So you have no critiques to offer

9    about Schwartz's focal-point pricing analysis?

10        A.   I am not a -- my assignment was not to

11   respond to Dr. Schwartz's focal-point price analysis,

12   no.

13             MR. LERAY:  Okay.  All right.  I would

14   propose let's take a break.

15             THE VIDEOGRAPHER:  All right.  We're going to

16   be going off the record.  The time is now 4:29.

17             (Recess taken from 4:29 p.m. to 4:49 p.m.)

18             THE VIDEOGRAPHER:  We are back on the record.

19   The time is now 4:49.

20        Q.   (BY MR. LERAY)  Professor Langer, what are

21   Steam keys?

22        A.   Steam keys are a way for Steam to allow

23   publishers to make transactions off of Steam that

24   consumers can -- where the consumers can purchase a

25   game off of Steam and redeem a code on Steam and use it

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 218

```
 1              So, explicitly, as I said before, in
 2   Exhibit 4, the blue solid and dashed lines that you're
 3   referring to refer to redemptions and issuances of
 4   Steam keys being the same in the as-is and but-for
 5   worlds.  I'm not saying that that's a reliable
 6   assumption here for understanding harm or damages.  We
 7   are referring to Dr. Schwartz's damages model in this
 8   section of my report.
 9              And so I have made some assumptions here that
10   I think demonstrate that Steam keys matter.  Here, in
11   fact, I'm assuming that they stay the same.  I'm not
12   saying that that's a reliable assumption for exactly
13   the reasons I've explained before, massive change in
14   market share.  It's hard -- you know, we need to
15   understand, as economists, how things are going to
16   change in the market, including Steam keys.
17      Q.   (BY MR. LERAY)  Yeah.  Setting aside
18   reliability for a moment, would you agree that under
19   the blue alternative assumptions you put into
20   Exhibit 4, all class members are harmed?
21              MR. CASPER:  Object to the form of the
22   question.
23      A.   I'm not going to put aside reliability.
24   Reliability is -- is part of my assignment.
25   Understanding the reliability of Dr. Schwartz's
```

Page 219

1    estimates is what I'm trying to do here, and what I'm

2    demonstrating in this image in this exhibit is that

3    making alternative assumptions about Steam keys can

4    lead to negative damages or a zero on this harm,

5    zero-one.

6              It can lead to, as I say in paragraph 154

7    where we started, up to 13,242 publishers in my

8    approximations being worse off in the but-for world, so

9    who are not harmed and, in fact, would be harmed in

10   Dr. Schwartz's but-for.

11             I am not putting these forward as affirmative

12   estimates of any damages or harm.

13        Q.   (BY MR. LERAY)  The 13,242 publishers'

14   result, is that associated with the red line?

15        A.   I believe that is associated with the red

16   solid line.

17        Q.   Okay.  So have you heard of the single

18   overcharge rule?

19             MR. CASPER:  Object to the form of the

20   question.  Are you referring to an economic rule or a

21   legal rule?

22        Q.   (BY MR. LERAY)  Do you understand the

23   question?

24        A.   I don't.

25        Q.   Okay.  Have you ever heard of a legal concept

Page 220

1    of a single overcharge rule?

2        A.    I'm not sure whether I have, but I'm here as

3    an economics expert.

4        Q.    Okay.  The revenue share paid on a specific

5    Steam store transaction is pursuant to the SDA,

6    correct?

7        A.    Sorry.  Say that one more time.

8        Q.    Sure.  The revenue share paid on a specific

9    Steam store transaction is set pursuant to the SDA,

10   correct?

11       A.    I -- that's not part of my assignment to know

12   precisely where it's coming from.  It's not part of my

13   assignment.

14       Q.    Sure.  I'll remove the word "pursuant."

15             Would you agree that the revenue share paid

16   on a specific Steam store transaction is determined

17   based on Valve's tier system?

18       A.    I don't know.  You might want to rephrase.

19       Q.    Okay.  Would you agree that the revenue share

20   a publisher must pay to Valve in connection with a

21   Steam store transaction is determined based on Valve's

22   tier system?

23       A.    I think it depends.

24       Q.    Okay.  What does it depend on?

25       A.    Well, there was no tiered system before 2018.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 221

1          Q.    Okay.  Fair point.

2                Would you agree that before Valve introduced

3    the tiered system in 2018 publishers paid a 30 percent

4    revenue share to Valve in connection with the Steam

5    store transactions?

6          A.    I believe again it depends.

7          Q.    And what does it depend on?

8          A.    I believe that Dr. Riet- -- I'm sorry.  I

9    don't know how to pronounce his name -- Rietveld said

10   that the 30 percent revenue share only came into being

11   in 2000 -- approximately 2011.

12         Q.    Okay.  From 2011 to 2018, would you agree

13   that publishers paid a 30 percent revenue share to

14   Valve in connection with Steam store transactions?

15         A.    It's not part of my assignment to know

16   whether that's 100 percent true.

17         Q.    Okay.  Is it your first order of

18   understanding?

19                MR. CASPER:  Object to the form of the

20   question.

21         A.    I'm just looking at where I quote Professor

22   Rietveld.

23         Q.    (BY MR. LERAY)  Sure.

24         A.    So Professor Rietveld is quoted in my report

25   on page 124.

Page 222

1      Q.    Okay.

2      A.    Says, It was not until in or around 2011 that

3   Valve began to execute most of its developer agreements

4   at a 70/30 revenue share.  So most -- I can go with

5   most developer agreements at a 70/30 revenue share.

6      Q.    Okay.  Can you turn to page 59 of your

7   report.  In paragraph 59, you say that --

8      A.    Sorry.  Paragraph 59 or page 59?

9      Q.    Paragraph 59, page 27.  Sorry.

10     A.    Sorry.  I'm not there.

11           (Deponent perused document.)

12     A.    Okay.  I'm there.

13     Q.    (BY MR. LERAY)  Okay.  You say that this

14  means that for games -- games consumers purchase on

15  Steam, Valve pays 70 percent of net revenue to the

16  publisher, right?

17     A.    Explicitly, that sentence says that Steam,

18  along with many of its competitors, has headline

19  revenue share rate -- has a headline revenue share rate

20  of 30 percent.  This means that for games consumers

21  purchase on Steam, Valve pays 70 percent of net

22  revenues to publishers.

23     Q.    So that's true?

24     A.    So headline publisher -- yes, I'm happy with

25  that statement.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 223

1      Q.   Okay.  Well, you say that Valve pays
2    70 percent of net revenue to the publisher, right?
3      A.   As a headline revenue share.
4      Q.   In the second sentence, there's no reference
5    to headline revenue share, correct?
6      A.   In the context of that paragraph, that's what
7    that's saying, that headline revenue share is paying
8    70 percent of net revenue to the publisher.
9      Q.   Okay.
10      A.   Explicitly at the top of the next page, I
11    say, "Throughout my report, I refer to Steam's
12    30 percent revenue share rate as its, quote, headline
13    revenue share rate."
14      Q.   Okay.  And you distinguish headline revenue
15    share rate from the -- the tiered system that was
16    introduced in 2018, right?
17      A.   I say that when I'm considering the
18    additional revenue share tiers, I refer to nominal
19    revenue share rates, et cetera, as -- as is in that
20    paragraph.
21      Q.   Okay.  So before the revenue share tiers were
22    introduced, Valve had a 30 percent revenue share,
23    correct?
24      A.   A 30 percent headline revenue share.  I agree
25    with -- as I wrote.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 224

1      Q.   Okay.  And the volume of Steam keys a
2  publisher use -- uses in the real world does not affect
3  its revenue share rate paid on a Steam store
4  transaction, correct?
5      A.   It affects its effective revenue share rate.
6      Q.   Okay.
7      A.   It affects the share of its revenue that it
8  earned -- that it, the publisher, earned via Steam that
9  it pays to Valve.
10     Q.   And is that true for a specific transaction
11  in the Steam store?
12          MR. CASPER:  I object to the form of the
13  question.
14     A.   I guess that depends on what we mean by
15  transaction.  If a consumer redeems a Steam key on
16  Steam, that is a type of transaction.  There's no
17  revenue share paid on that transaction.
18     Q.   (BY MR. LERAY)  Okay.  Yeah.
19     A.   If --
20     Q.   Yeah.  I agree that there's other types of
21  transactions.  I'm talking about a transaction in the
22  Steam store.  For such a transaction, the revenue share
23  was 30 percent before the tiered system was introduced
24  and then subject to the tiered system after that,
25  right?