# EXHIBIT 6

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 2 of 42

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
——————————————————————

|  |  |  |
|---|---|---|
| | : | |
| Zaiger LLC, | : | **INDEX NO.:** |
| Plaintiff, | : | |
| | : | |
| V. | : | **AFFIDAVIT OF** |
| | : | **WILLIAM BUCHER** |
| Bucher Law PLLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |

——————————————————————

**STATE OF _____}**

　　　　　　　　　　　　**ss:**

**COUNTY OF _____}**

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 3 of 42

I, William Bucher, declare as follows:

1.  I am an attorney admitted to practice in New York.

2.  I earned my bachelor's degree from Washington University in St. Louis, where I graduated *summa cum laude*. I earned my law degree from University of Chicago Law School, where I also graduated with honors.

3.  I am currently the principal of Bucher Law PLLC. I was recently terminated from my employment at Zaiger LLC, where I worked from August 15, 2022 to February 28, 2023. I have personal knowledge of the facts stated below, and would competently testify to these facts.

### How I Came To Build A Mass Arbitration Practice At Zaiger LLC

4.  For most of my professional career, and prior to Zaiger LLC, I worked for two large Amlaw 100 law firms, Debevoise & Plimpton and Fenwick & West, handling complex litigation matters, including antitrust, copyright, trademark, and data privacy claims.

5.  At Fenwick & West, my employer immediately prior to Zaiger LLC, I was exposed to the concept of bringing thousands of identical claims in arbitration at once against a single defendant. My practice at Fenwick & West focused on defending such mass arbitrations.

6.  Prior to joining Zaiger LLC, I was part of a mass arbitration team that litigated over 70,000 consumer arbitrations, of which most were settled. Our team litigated approximately 160 consumer arbitrations that were won by a merits decision or withdrawal with prejudice by the opposing side prior to a final merits decision. I appeared before arbitrators approximately fifty times, authored hundreds of documents including final merits briefs, and spent thousands of hours working on the cases. To date, I have never lost a consumer arbitration.

2

Case 2:21-cv-00563-JNW  Document 374-6  Filed 10/04/24  Page 4 of 42

7.     As I continued to obtain success on behalf of corporate clients, however, I began to feel as though I was on the wrong side.  In particular, where corporate conduct causes harm to hundreds of thousands, if not millions, of consumers the normal method by which these consumers may receive justice is through class actions.  There, one or more class representatives can represent the interests of a class of consumers and obtain a recovery for all.  This was an efficient method of adjudicating these cases, particularly where the dollar values of each individual injury are low relative to the potential cost of litigation.  But businesses have stymied the class action device by making consumers–often through terms and conditions in a website–enter into mandatory arbitration clauses that not only required each individual consumer to file their dispute in arbitration and not a court of law, but prevented these claims to be resolved in any kind of class or consolidated basis and required each to be litigated on an individual basis.

8.     I began to see mass arbitration as a means of leveling the playing field once again. A skilled and well-resourced mass arbitration firm can represent tens of thousands of individual consumers in filed arbitrations and either negotiate a settlement for all of its clients or, if the defendant was unwilling to settle, litigate each of these arbitrations individually in a manner that was cost-effective given the common issues to all consumers.

9.     Further, I had ideas of how tens of thousands of claimants could be retained, kept up to date, and managed on separate arbitration cases with similar factual theories, by leveraging technology in new ways.  In other words, from what I had observed of mass arbitration firms, I thought I may be able to do it better and therefore provide greater value to those consumers in need of representation.

10.     On January 7, 2022, I had a telephone call with Jeff Zaiger, the principal of Zaiger LLC, about potentially building a mass arbitration practice at Zaiger LLC.  I viewed Zaiger LLC

Case 2:21-cv-00563-JNW Document 374-6 Filed 10/04/24 Page 5 of 42

as an attractive place to build a mass arbitration practice, in part, because Mr. Zaiger represented that he could not only offer me the infrastructure and resources of an existing firm to build my practice but that he had a close relationship with Black Diamond Capital Management LLC ("Black Diamond") as a potential source of funding mass arbitration cases. Mass arbitration cases are very capital intensive for a plaintiff because they must have the resources to file initial arbitration filing fees for tens of thousands of consumers. This means millions must be spent at the outset of a case, and without the funding to file the cases, a mass arbitration strategy cannot get off the ground.

11.     Mr. Zaiger explained that Zaiger LLC had historically worked exclusively for Black Diamond, its managed funds, portfolio companies, affiliates, investment partners, employees, and spouses of its founders. But Mr. Zaiger also expressed that he was looking to expand the firm's practice and was interested in the concept of mass arbitrations.

12.     On Jan 16, 2022, I sent Mr. Zaiger a six-page proposal outlining the mass arbitration strategy I was proposing to start at Zaiger LLC.

13.     On April 26, 2022, Mr. Zaiger, Ethan Auerbach ("Auerbach") of Black Diamond, and I met to discuss the mass arbitration strategy and my joining Zaiger LLC to lead it.

14.     With the help of Mr. Zaiger, I created a final slide deck outlining my mass arbitration proposal ("Mass Arbitration Slide Deck") on June 6, 2022. A true and correct copy of the Mass Arbitration Slide Deck is attached hereto as **Exhibit A**. That slide deck contemplated bringing a mass arbitration against Valve for their anti-competitive pricing restraints (the "Steam Mass Arbitration"). The Steam Mass Arbitration was the first mass arbitration strategy that I proposed to Jeff Zaiger that the new mass arbitration practice at Zaiger LLC could pursue. Mr.

Zaiger told me that he would be sending the Mass Arbitration Slide Deck to Black Diamond for consideration.

15.     On July 26, 2022, Mr. Zaiger sent me an offer of employment (the "Original Employment Offer"). A true and correct copy of the Original Employment Offer is attached hereto as **Exhibit B**. The Original Employment Offer stated that I was being hired to "lead the Firm's development and pursuit of mass arbitration strategies (the 'Strategies')." The Original Employment Offer specified in Section 1(b) that I would receive "a percentage of Z LLC's recovery from any cases brought pursuant to the Strategies commensurate with any percentage to be paid to Jeff Zaiger." The language was structured to give Mr. Zaiger and I co-equal shares to account for the fact that Zaiger LLC received only 40% of any recovery in contingent fees and to allow for the possibility that Zaiger LLC might enter into funding arrangements or otherwise that would require it to share a percentage of its contingent fees with others. But given that Mr. Zaiger owned 100% of Zaiger LLC, both Mr. Zaiger and I agreed that the contract was being worded in this manner to reflect that we would split any contingent fees realized by Zaiger LLC on a 50/50 basis. The Original Employment Offer specified that I would be an "at will" employee, and it provided: "the Firm may end your employment at any time for any or no reason."

16.     Although the economic terms of the Original Employment Offer were consistent with what I had discussed with Mr. Zaiger, I was wary. In particular, I wanted insurance that Zaiger LLC would not act in bad faith by hiring me, having me build the needed systems to manage a large volume of clients, then fire me and not compensate me for my work on the Mass Arbitration Strategies. I expressed my concerns to Mr. Zaiger and asked to revise the offer to ensure that I was fairly compensated if I built a mass arbitration practice at Zaiger LLC.

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 7 of 42

17.     Mr. Zaiger and I agreed that the employment agreement would be revised to state:

"(i) if the Firm terminates your employment, without cause, you will be entitled to compensation

outlined in Section 1(b) for services rendered and work performed on cases pursued pursuant to

the Strategies while employed, on a *quantum meruit* basis, even if applicable revenue is received

from such cases after termination."  The revised agreement also included a provision that required

good faith negotiation over my compensation under Section 1(b) in the event of any termination.

The revised language stated "that good faith discussions regarding resolution of any payment of

compensation outlined in Compensation Section 1(b) shall occur in the event of either party

terminating employment."  An offer of employment with the revised language was executed on

July 27, 2022.  A true and correct copy of the revised and final employment agreement is attached

as **Exhibit C**.

18.     I started my employment at Zaiger LLC on August 15, 2022.

19.     On or around August 16, 2022, Black Diamond entered into an agreement to

provide seed funding to Zaiger, LLC for the mass arbitration strategies in the amount of $500,000

(the "Seed Funding Agreement.").  Mr. Zaiger showed me the agreement.

20.     Within two weeks, I launched a website that was dedicated to recruiting clients to

participate in a mass arbitration against Valve Corporation ("Valve") based on allegations that it

acted as an illegal monopoly in the PC gaming market. (I am a frequent speaker at the Game

Developers Conference, chair of the Digital Games and New Media chapter of the American Bar

Association, a member of the Video Game Bar Association, and a long-time user of Valve's

product, Steam, myself – so this seemed like a natural fit despite the fact that – to my knowledge,

neither of the other lawyers at Zaiger LLC had experience with mass arbitrations, cases related to

video games, or the Steam product.)  Within a month of starting, I created and ran the firm's first

6

advertising campaign. I identified needed software service providers to set up the system I envisioned. I integrated these systems to recruit clients, ultimately totaling in the tens of thousands. While technically complex, the result was the creation of a simple system for potential claimants to determine if they were eligible to file a claim, to retain Zaiger LLC and me as their lawyers, and for clients to communicate with Zaiger LLC and me. Clients could respond to any email or text they received and receive in-person answers from a Zaiger LLC employee, usually myself. Clients could also receive updates and view their documents through a web portal, enabling confidential communications to be delivered securely to the relevant claimants.

21.     The system I set up was wildly successful. The Seed Funding Agreement and Mass Arbitration Slide Deck estimated that it would take approximately a year to get the software infrastructure set up and manage mass arbitration claims. Within weeks of starting at Zaiger LLC, however, I set up the infrastructure to run mass arbitration campaigns, including advertising campaigns for potential clients, screening of clients for eligibility, sending them a custom retainer based on the preferences the client expressed at intake, digitally signing and filing the retainer, setting up a web portal that clients could ask questions and contact their attorneys through, and spent hundreds of hours communicating with clients. By the end of November 2022, my advertising campaign had recruited over 20,000 Steam Mass Arbitration clients to bring arbitrations against Valve. Whereas the Mass Arbitration Slide Deck had anticipated that it might cost up to $150 to recruit each client, the advertising campaign that I created recruited the initial 20,000 Steam Mass Arbitration clients for less than $7 each. By the time of my later departure from Zaiger LLC, I had spent nearly 1300 hours – over 95% of my time – on the specific Valve arbitration and the mass arbitration strategies. This resulted in approximately 48,000 clients deciding to retain me (and the Zaiger Defendants) as counsel for an arbitration against Valve.

Based on my knowledge and observations of the work put in by all attorneys during my time at Zaiger LLC, it is my understanding that my work on the Valve case dwarfed the contributions of the firm's other two attorneys, in both raw hours worked and percentage of total work hours dedicated to the Valve arbitration.

22.     My image and name were an integral part of the process by which Zaiger LLC acquired consumer clients for the Steam Mass Arbitrations. I was the only attorney who appeared in the video advertisements potential mass arbitration clients saw. After clicking on an advertisement, potential clients were taken to a website where they could complete a form to determine if they were eligible. The website where clients completed claims forms 1) included a photo of Mr. Zaiger and me, 2) stated: "Jeffrey Zaiger, nine-time 'Super Lawyer' and 'New York Rising Star,' has teamed up with Will Bucher, chair of the American Bar Association's Digital Games and New Media Committee and Video Game Bar Association member to bring these antitrust claims against Valve. Together, we will negotiate, and if necessary litigate, your claim" and 3) contained a 90-second video, in which I, without another attorney, explained the legal merits of the case against Valve. Every single eligible client received an email from "William Ward Bucher IV" noting that I was "Admitted to Practice in New York" inviting them to "review and sign our retainer agreement" and noting "Once you sign the retainer agreement, we can get started on your claim and obtaining compensation for you." No other attorneys were mentioned in this email. A true and correct copy of one instance of this email, sent to client Michael Schultz, who later forwarded it back to me[1], is attached hereto as **Exhibit D**. I was also specifically named first in the retainer agreement clients received. A true and correct copy of Michael Schultz's signed

---

[1] Mr. Schultz has expressly (in writing) waived privilege as to the communications with Zaiger LLC that are cited in this declaration.

version of this retainer agreement is attached hereto as **Exhibit E**. When clients completed the claims form and were eligible, they received a text message from "Will," not Mr. Zaiger or any other attorney.  Tens of thousands of email communications were sent to clients bearing my name in the signature.  A case update posted in January 2023 consisted of a video in which I, alone, explained the status of the case. Press articles regarding the case mentioned me and not any other lawyer.  True and correct copies of such articles, each downloaded on March 31, 2023 and published about four weeks earlier, are attached hereto as **Exhibit F** and **Exhibit G**.  When clients or potential clients had concerns about the legitimacy of Zaiger LLC as bona fide law firm that could take clients in the Steam Mass Arbitration, it was Zaiger LLC's policy to direct those clients to my LinkedIn page.   Dozens, if not hundreds, of clients were directed to do so.  Every single one of the clients retained prior to my departure receive at least one communication from "Will," "Bucher," or "William Ward Bucher IV."  For the vast majority of these clients, I was the only attorney identified in any email or text they received from Zaiger LLC prior to February 28, 2023.  Undoubtedly most, if not all, of these clients reasonably viewed me as their attorney.

23.     By mid-October 2022, it became clear the mass arbitration strategy would be successful, and additional funding would be needed for the Steam Mass Arbitration cases.

24.     In mid-October 2022, Mr. Zaiger also revealed to me that Black Diamond Capital had not been disbursing funds under the Seed Funding Agreement and that Mr. Zaiger has been paying costs from his own funds.

**Black Diamond Agrees To Fund The Steam Mass Arbitration Cases**

25.     On October 28, 2022, Mr. Auerbach, Mr. Zaiger, and one of Black Diamond's two General Counsels, Adam Tarken ("Tarken"), and I reached an agreement for Black Diamond's funding of the Steam Mass Arbitration cases and drafted a funding agreement ("October 28

9

Funding Agreement"), to which I was a party. The October 28 Funding Agreement contemplated the continued "employment of Bucher to lead the Firm's pursuit of the Strategies" and gave Black Diamond a four-year exclusivity period over similar mass arbitrations.

26. Mr. Zaiger and I signed the October 28 Funding Agreement on that day. Mr. Auerbach stated that he was ready to sign but needed to call Steve Deckoff, Black Diamond's CEO, to confirm Steve Deckoff didn't want to review before Mr. Auerbach signed.

27. Also on October 28, Zaiger LLC and I entered into a Partnership and Compensation Agreement. The Partnership and Compensation Agreement stated "WHEREAS, Jeffrey Zaiger and Bucher intend to organize as a partnership between themselves and, at Judd Linden's option, Judd Linden, to ensure the continued commitment of themselves to the Strategies and ensure fair compensation for all involved." The Partnership and Compensation Agreement further stated, "WHEREAS, Jeffrey Zaiger and Bucher intend compensation in the partnership to reflect that in Bucher's current employment agreement," The Partnership and Compensation Agreement specified that "Jeffrey Zaiger and Z LLC commit to compensate me, regardless of employment status, with a payout or percentage of any recovery from the Strategies equal to any percentage, payout, or allocation due to Jeffrey Zaiger from the Strategies, or one-half the profit earned by Z LLC from the Strategies, whichever is greater." A true and correct copy of this agreement is attached as **Exhibit H**.

28. Mr. Zaiger told me that he had had a discussion with Mr. Decker, and that Mr. Deckoff offered his oral agreement to fund the mass arbitrations on the same substantive terms as listed in the October 28 Funding Agreement, to which I was a party. Auerbach and Zaiger requested that I begin distributing offers of funding to new arbitration clients. I expressed concern

regarding making offers to clients without a signed written agreement in place, Zaiger assured me that there was agreement with Black Diamond and it was just a matter of papering the agreement.

### Black Diamond Reneges

29.     In November 2022, Mr. Zaiger told me that Mr. Deckoff had begun expressing that he wanted substantive changes to the terms of October 28 Funding Agreement and that Black Diamond would no longer honor the oral agreement.  According to Mr. Zaiger, Mr. Deckoff said that he wanted Black Diamond to receive a higher percentage return than was contemplated in the October 28 Funding Agreement.

30.     Throughout November 2022, Mr. Zaiger relayed that Black Diamond continued to refuse to dispense amounts due under the $500,000 Seed Funding Agreement and was demanding that a new funding agreement would be negotiated to replace the October agreements before Black Diamond would honor its commitments under the Seed Funding Agreement.

### Black Diamond Makes Unacceptable Demands, And I Anger Them

31.     In the first week of January 2023, Sam Goldfarb, Mr. Zaiger, Mr. Deckoff, and I had a meeting concerning funding the cases.  Mr. Goldfarb was Black Diamond's other General counsel.  During that meeting, Mr. Deckoff proposed taking an equity interest in the Steam Mass Arbitration cases of 60% of fees otherwise owed to Zaiger LLC in its fee agreements with its Steam Mass Arbitration clients as compensation for the investment in the cases, plus repayment of the amount spent by Black Diamond with interest.

32.     Mr. Deckoff said his funding was contingent on Zaiger LLC agreeing, in advance, to drop the mass arbitrations and abandon the Steam Mass Arbitration clients if Valve paid its own filing fees in arbitration. Given the total amount of Valve's potential fees, which would total hundreds of millions, in Mr. Deckoff's view if Valve did not immediately settle the case upon

11

notice that the Steam Mass Arbitration clients had paid their filing fees that suggested they were prepared to defend the individual arbitrations on the merits.  Mr. Deckoff said that any litigation of the cases in that situation would be fruitless and that he was uninterested in paying for it.

33.    I could not stay silent at the demand for a premeditated breach of the duties we owed our clients.  I stated that the provisions that Mr. Deckoff and Black Diamond were demanding posed serious ethical concerns.  I stated that as lawyers, Zaiger LLC and I couldn't take on cases we had no intention of pursuing and that a premeditated intention to abandon the Steam Mass Arbitration clients unless there was a quick settlement would be improper.  I further stated that though Valve may have a strong incentive to settle quickly, we had to be prepared to litigate each of these individual consumer arbitrations if Valve was unwilling to settle.  Mr. Zaiger agreed and stated that he was "a lawyer, not a snake oil salesman" and that he could not ethically take on cases he was unwilling to actually litigate.

34.    During the conversation, Mr. Deckoff stated: "Well whatever your ethical obligations, I'm sure there is some amount of money that would let you forget about them."  He further stated that he went into finance, not law, because was unconcerned with ethics and that he wasn't going to invest the millions of dollars needed unless he controlled the venture.

35.    At this point, I expressed concerns about the level of control Black Diamond was contemplating taking in the mass arbitration cases.

36.    Mr. Deckoff stated that Black Diamond had to control the arbitrations because otherwise absent an early settlement the litigation could go on for years and Black Diamond was not interested in investing in years of litigation.

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 14 of 42

37.     I also observed that under the ethics rules a non-recourse, high interest loan was less concerning than the equity style investment Mr. Deckoff was proposing, and that the deal would be better structured that way.

38.     Mr. Deckoff stated that he was not interested in receiving only interest for his investment and that his demands were final.

39.     When Mr. Zaiger and I would attempt to propose alternative structures Mr. Deckoff stated and that his terms were non-negotiable. At one point, when I tried to propose an alternative structure, Mr. Deckoff immediately and loudly started repeating "no" in a child-like voice such that no one could hear what I was saying.

40.     During the meeting, Mr. Deckoff at times seemed noticeably frustrated or angry at the statements I was making about Black Diamond's demands to control the litigation, the ethical concerns associated with Black Diamond's demands, the lawyers' duties to their Steam Mass Arbitration clients, and the undesirable economics of Black Diamond's proposal.

41.     The week following the meeting, Mr. Zaiger expressed to me that I should have "cowered more" when meeting with Mr. Deckoff because he was billionaire accustomed to people doing what he says.  I was taken aback by this statement and stated that neither I, nor my tens of thousands of clients, would be well served by "cowering" to anyone.  I noted that "We're plaintiffs' lawyers now. We're in the business of suing billionaires. I'm not going to cower before Steve or Gabe [the CEO of Valve] if they don't offer our clients a fair deal."

**Mr. Zaiger And I Locate Alternative Funding**

42.     Given that Black Diamond had apparently reneged on its October agreement and wanted to impose unacceptable conditions on funding, Mr. Zaiger and I discussed exploring other funding options.

13

43.     In January 2023, Mr. Zaiger and I obtained three term sheets from potential funders other than Black Diamond offering to fund the Steam Mass Arbitration.  The best offer Zaiger LLC received was an offer from an alternative funder (the "Alternative Funder") for eight figures in funding as a non-recourse loan, repaid with interest depending on how long the case took to resolve and with no equity interest in the recovery.

44.     Upon receiving the offer from Alternative Funder, Mr. Zaiger told me that he intended to share it with Black Diamond and see if Black Diamond was willing to match it.  Over the coming days, Mr. Zaiger said that he had called and emailed Black Diamond many times but had received no response on whether they would match the funding terms and that he had told them that Zaiger LLC must receive Black Diamond's decision by January 22, 2023.

45.     By January 22, Mr. Zaiger confirmed that Black Diamond had not responded.  On January 23, Zaiger LLC executed a term sheet with the Alternative Funder.

**Black Diamond Discovers That We Are Seeking Alternative Funding And Decides That I Am To Blame.**

46.     On February 8, 2023, Mr. Zaiger called me.  Mr. Zaiger told me that on the prior day, Mounir Nahas, Black Diamond's Chief Operating Officer, came into Mr. Zaiger's office and seemed enraged that Zaiger LLC had accepted funding on the Steam Mass Arbitration cases from a source other than Black Diamond.  Mr. Zaiger said that Mr. Nahas expressed anger that Mr. Zaiger would be doing any work that didn't directly profit Black Diamond and stated that there "would be consequences" for Zaiger LLC if Zaiger LLC proceeded to get funding from the Alternative Funder.  According to Mr. Zaiger, Mr. Nahas confirmed that these "consequences" included that Black Diamond would withdraw all of its work from Zaiger LLC.  Mr. Zaiger also

stated that Mr. Nahas expressed anger at me, said that I was the cause of Zaiger LLC straying from Black Diamond, and demanded that I no longer be allowed to come into Zaiger LLC's offices.

47.    Mr. Zaiger told me that given Mr. Nahas's comments, Mr. Zaiger feared losing Black Diamond's business.  Mr. Zaiger further stated that because Black Diamond was responsible for all of his current income, he couldn't survive if he lost their business. He also told me that his $1.2 million in savings was being managed by Black Diamond, that Black Diamond was asserting a supposed right to withhold that money if Zaiger stopped doing work for them, and that he was unwilling to risk losing that savings under any circumstances.  He said that everything possible had to be done to salvage the relationship with Black Diamond and that Zaiger LLC had to take a funding deal with Black Diamond to save the business relationship.  Mr. Zaiger also barred me coming into the office during working hours, because he said that he feared it would anger Mr. Deckoff and Mr. Nahas.

48.    I expressed my concern that Black Diamond had already reneged on the October funding agreement and had never paid the full amount of the Seed Funding Agreement.  This raised serious questions whether Black Diamond would enter into any future funding agreement or honor it, putting the claims of the Steam Mass Arbitration clients at risk.

49.    I further noted Mr. Deckoff's condition to funding that Zaiger LLC agree that the Steam Mass Arbitration clients be abandoned if Valve paid its initial filing fee.  I reminded Mr. Zaiger of his ethical duties and that it was impermissible to let one Zaiger LLC client, Black Diamond, who was not part of the Steam Mass Arbitration, dictate the cases of the tens of thousands of Steam Mass Arbitration clients.

50.    Mr. Zaiger responded that even if Zaiger LLC did want to act against Black Diamond's wishes, it would be very difficult to disentangle from Black Diamond because of Zaiger

LLC's complete dependence on Black Diamond. Mr. Zaiger noted that Zaiger LLC shared a bookkeeper, accounting, and human resources staff with Black Diamond. Mr. Zaiger noted that Black Diamond owned the building in which Zaiger LLC's office was located and that Zaiger LLC shared an office with Black Diamond and would need to locate new office space.

51.     I then expressed concerns that Black Diamond might ask Mr. Zaiger to terminate me. Mr. Zaiger replied that he wouldn't fire me and noted that even if I was terminated for some reason, we had a contract that would protect me.

52.     On Feb. 24 or 25, 2023, Mr. Zaiger asked me to come into the office on Sunday, Feb. 26, 2023. On Feb. 26, I walked into Mr. Zaiger's office, where Mr. Zaiger was having a speaker phone conversation with Mr. Deckoff.

53.     Mr. Zaiger did not notify Mr. Deckoff that I had entered the office or was listening to the conversation. Mr. Zaiger and Mr. Deckoff were discussing Mr. Deckoff's repeated demands Mr. Zaiger terminate my employment. Jeff asked: "Steve, what is wrong with Will?" Mr. Deckoff replied: "He's a fucking a loser. I know you think this is your golden ticket, but trust me, you'll regret it if you keep working with Will." Mr. Zaiger stated: "I need Will to run these cases." Mr. Deckoff responded: "If you need Will to run these cases, you're a shit lawyer Jeff."

54.     During the call, Mr. Zaiger stated: "Steve, I have ethical obligations to my clients I can't just ignore." Mr. Deckoff responded: "Fire Will, and you, me, and an ethics lawyer will sit down to figure out the ethics issues." Mr. Zaiger also stated: "I have a contract with Will. What am I supposed to do about that?" Mr. Deckoff replied: "Contracts are meant to be broken, Jeff."

55.     Following the call, Zaiger and I spoke and he expressed to me that he was very concerned that Black Diamond would terminate its business with Zaiger LLC. Zaiger told me that he needed to go to the bank the next morning because the firm didn't have a bank account that

wasn't controlled by Black Diamond. He explained that the accounts were in Zaiger LLC's name, but that Black Diamond staff could move money into and out of the account. Zaiger also told me that he didn't know that our keycards would work "after tomorrow," so that it was best to take anything I needed from the office. At Zaiger's request, I gathered my physical and digital files from the office. Zaiger instructed me to use an external hard drive from his office to bring home any data that I might need. Among the files I took home was a list of signed clients as of January 18, 2023, which I had previously downloaded in the ordinary course of my work on the cases.

56.     The morning of Feb. 27, 2023, Jeff Zaiger and Judd Linden, the only other attorney at Zaiger LLC, surprised me at my apartment around 9:30 AM, arriving unannounced.  Mr. Zaiger explained that Black Diamond had renewed its threat to stop doing business with Zaiger LLC if Zaiger LLC accepted funding from another source.  He also explained that Black Diamond had also threatened to sue Zaiger LLC if Zaiger LLC accepted funding from another source. Mr. Zaiger expressed that given these threats, Zaiger LLC had to meet Black Diamond's demands.

57.     I responded that Mr. Zaiger was placing his personal interests above those of his Steam Mass Arbitration clients, a violation of his ethical duties.  I noted that the Alternative Funder was ready to sign the final eight-figure deal that day.  I expressed ethical concerns about Zaiger LLC not finalizing the deal to fund their 48,000 clients without another viable offer on the table, since those clients expected to have their filing fees funded, which would total $3,600,000.

58.     Mr. Zaiger responded that under no circumstances could he afford to lose Black Diamond as a client.

59.     Following the February 27, 2023, meeting, I had serious concerns about Mr. Zaiger's ability to carry out his ethical obligations to clients.  I was concerned that Black Diamond completely controlled Zaiger LLC and Mr. Zaiger, and that if Black Diamond continued to demand

it, Mr. Zaiger would terminate my employment regardless of what was best for the 48,000 Steam Mass Arbitration clients. Given that I was the architect of the mass arbitration strategies and the only attorney at Zaiger LLC with consumer or mass arbitration experience, my absence would leave the Steam Mass Arbitration clients without competent representation. I was also concerned that, given the complete financial control and dominion Black Diamond had over Zaiger LLC and Mr. Zaiger, Black Diamond would gain *de facto* control over important legal decisions in the Steam Mass Arbitration cases, including whether or not those cases should proceed (or the clients abandoned) if Valve paid its filing fees. I was also concerned that Mr. Zaiger might terminate all 48,000 Steam Mass Arbitration clients if Black Diamond demanded he do so and refocus the firm on doing only work for Black Diamond.

### Mr. Zaiger "Loses [His] Mind"

60.     The evening of February 27, 2023, Mr. Zaiger informed me that the next morning, February 28, Mr. Deckoff, Mr. Nahas and Mr. Goldfarb would be holding a meeting to decide how they were going to direct Jeff Zaiger to handle "the situation" with the Steam Mass Arbitration cases. Mr. Zaiger stated he would call me after the meeting to inform me of Black Diamond's decision.

61.     On February 28, during the day, I tried to reach Mr. Zaiger by phone numerous times to receive an update on his discussions with Black Diamond but Mr. Zaiger refused my calls.

62.     Through the afternoon, Jeff Zaiger sent me erratic and alarming text messages: At 12:28 PM–"I'm kicking and screaming, Will … see your calling"; At 3:16 PM–"Three words: losing my mind"; At 4:47 PM "Will: I'm fighting for my life today – please give me a fucking beat." True and correct copies of these text messages are attached as **Exhibit I**.

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 20 of 42

63.     I did not take texts that Mr. Zaiger was "losing my mind" lightly.  Mr. Zaiger seemed completely under Black Diamond's control, Black Diamond cared nothing for the Steam Mass Arbitration clients, and Mr. Zaiger's communications led me to fear that he would do something rash.

### I Try To Protect The Steam Mass Arbitration Clients

64.     I further concluded that my termination was imminent.  I understood that I had an independent ethical duty to notify the 48,000 Steam Mass Arbitration clients that I would no longer be their lawyer at Zaiger LLC, that I remained willing to represent them, and the means by which they could make an informed choice to switch counsel.

65.     I therefore promptly took steps to safeguard my client's interests, to preserve the status quo until it was clear what was going on, and to give Mr. Zaiger a "cooling off" period before making any irreversible decisions with the Steam Mass Arbitration client database.

66.     I attempted to download a list of clients and their contact information from the Leverage Law CRM software platform I had set up for the clients.  My attempt to download the list was unsuccessful.  So I contacted Jeff Wettstein ("Wettstein"), the Chief Technology Officer of the CRM software platform for assistance.  I did not receive an immediate response from Mr. Wettstein.

67.     I temporarily adjusted Mr. Zaiger's administrative privileges on the CRM software platform to prevent Mr. Zaiger from taking any massive and irreversible actions without a cooling off period.  Following these changes, Mr. Zaiger still had full access to the system.  Mr. Zaiger could still read and send emails to clients, review files, create documents, send texts, send documents, review client upload, answer client questions, and even terminate clients.  I temporarily ensured that Mr. Zaiger could no longer take mass actions, such as terminating all clients or

19

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 21 of 42

deleting all data, without first contacting me or Mr. Wettstein, while Jeff Zaiger was "losing [his] mind."

## Zaiger LLC Terminates Me Without Cause

68.     Mr. Zaiger continued to refuse my calls throughout the evening.  At 8:00 PM on that evening, Mr. Zaiger called me.  Mr. Zaiger said he fought for me but had to terminate me. He also stated: "You get quantum meruit and that's it."  I asked Mr. Zaiger to come over to my apartment to discuss my termination.  Mr. Zaiger and Mr. Linden arrived shortly afterwards that evening at my apartment.  Mr. Zaiger stated that he'd spent all day pleading with Goldfarb, Nahas, and Deckoff to try and keep me at the firm, highlighting my necessary expertise on mass arbitration matters.  Mr. Zaiger said it was an impossible situation, where he couldn't get funding from Black Diamond without firing me and couldn't get funding from the Alternative Funder without being sued by Black Diamond.  And, in any event, Mr. Zaiger reiterated that given his reliance on Black Diamond's business, he could not go against their wishes.

69.     I expressed that I accomplished exactly what I set out to accomplish and had provided exemplary service to Zaiger LLC.  Mr. Zaiger agreed that I had, and confirmed that my termination was not for cause and through no fault of my own.  Mr. Zaiger stated that the personalities just got "crosswise" with Black Diamond, "they are pissed at you," and that the reason for my termination "was just a personality clash, and not with me."

70.     I asked if my termination was effective immediately.  Mr. Zaiger confirmed Black Diamond insisted I be fired and that he had to take steps immediately to terminate me otherwise he risked Black Diamond's ire.  He further stated that Black Diamond controlled Zaiger LLC's email servers and that I would likely be cut off from Zaiger LLC email shortly, if I hadn't been already.

71.     Mr. Zaiger and Mr. Linden left my apartment at the end of the conversation.

72.     Later in the evening of February 28, Mr. Zaiger called me, angry, and stated that I had locked him out of the CRM software for the Steam Mass Arbitration clients.  I responded that I had not locked Mr. Zaiger out of the system but had temporarily suspended his ability to make irrevocable global changes to the database, stated that all access would be restored, and suggested we discuss any other concerns in the morning.

**Zaiger LLC Purports To Terminate Me A Second Time, This Time "With Cause"**

73.     Mr. Zaiger arrived at my apartment building around 11:30 AM on March 1, 2023, and delivered a letter purporting to terminate me "for cause."  The letter stated that I had changed Mr. Zaiger's access settings to that CRM software and that I had made an "unusual" request of Mr. Wettstein for his assistance in downloading client data.  At approximately 1:00 PM that day, I provided Zaiger LLC with all passwords needed to manage the advertising accounts, website, and other software and systems I had set up during my time at Zaiger LLC.

**Zaiger LLC Continues To Use My Name And Likeness To Solicit Steam Mass Arbitration Clients**

74.     Zaiger LLC had full control over the advertising and websites as of no later than 2:00 PM on March 1, 2023.  Following my termination, Zaiger LLC continued to run video advertisements on YouTube and Instagram that featured me, representing that I was a lawyer at Zaiger LLC, and inviting potential clients to see if they were eligible to file a claim.  It took days following my departure before references to myself were removed from the steamclaims.com homepage, which is what a user sees if they directly go to the website created to recruit clients. But even once references were removed from the homepage, for weeks following my departure,

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 23 of 42

subdomains of steamclaims.com continued to feature photos of and a video of myself explaining the legal merits of the Valve case.

75.    Further, for weeks following my departure, subdomains of steamclaims.com, including steamclaims.com/file and steamclaims.com/max, continued to note "Jeffrey Zaiger, nine-time 'Super Lawyer' and 'New York Rising Star,' has teamed up with Bucher, chair of the American Bar Association's Digital Games and New Media Committee and Video Game Bar Association member to bring these antitrust claims against Valve. Together, we will negotiate, and if necessary litigate, your claim." When Zaiger LLC ran advertisements on Google Search, clients were directed to steamclaims.com/file and were not directed to steamclaims.com. As a result, following my departure, potential clients who clicked on an advertisement on Google were led to a page that told potential clients that I would be handling their case.

76.    Zaiger LLC knew how to, and did, make adjustments to the homepage steamclaims.com. But Zaiger LLC left the subdomains, to which potential clients are actually directed, with references to myself. Potential clients who are eligible receive an email with instructions on how to sign the retainer agreement. Following my termination, that email continued to include my signature block. Potential clients who are eligible to file a claim receive a reminder text message if they have not completed their retainer agreement.

77.    Following my termination, I expressed my preference to Zaiger LLC and Mr. Zaiger to continue serving the clients jointly through a co-counsel relationship. I reasoned that my continued involvement would serve the best interests of the clients.

**Zaiger LLC Sends A Unilateral Message To The Steam Mass Arbitration Clients That Fails To Provide Them Required Notice And Deprives Them Of An Informed Choice Of Counsel**

22

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 24 of 42

78.     While I was under the impression that Zaiger LLC was considering a co-counsel relationship, on March 25, 2023, Zaiger LLC unilaterally sent an email to clients informing them of a new, separate, co-counsel relationship which only briefly noted that I was no longer representing them.  The communication included no information on how to contact me, my new firm, my willingness to continue to represent the clients, or their right to make a choice as to whom to retain as counsel.  A true and correct copy of the substance of this communication is attached as **Exhibit J**.

### I Request That Zaiger LLC Provide Me A Complete List Of Steam Mass Arbitration Clients And Zaiger LLC Refuses

79.     Upon reviewing this unilateral message to the 48,000 Steam Mass Arbitration clients, on March 26, 2023, I requested from Zaiger LLC a complete list of all the Steam Mass Arbitration clients so I could fulfil my duty to notify clients that I had moved firms, was willing to still represent them, and give them a choice between retaining me as lead counsel at my new firm, remaining with Zaiger LLC, or choosing new counsel entirely.  I also stated that I needed the list so that I could run conflicts checks in connection with seeking employment with another firm or in my continued practice of law.  A true and correct copy of my letter is attached as **Exhibit K**.

80.     Zaiger LLC responded on March 29 and refused to provide me with a contact list of the Steam Mass Arbitration.  A true and correct copy of this response is attached as **Exhibit L**.

### I Use A Partial List In My Possession To Discharge My Ethical Duty To Provide Notice To At Least Those Clients I Can Reach

81.     Using the January 18, 2023, client list, I have been fulfilling my ethical obligation to provide my clients notice of my departure and allow them to make an informed choice regarding representation.  I sent a message to Steam Mass Arbitration clients on this list that: 1) I was no

23

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 25 of 42

longer at Zaiger LLC; 2) I was continuing my practice of law and was willing and able to continue representing them; 3) they could choose to remain with Zaiger LLC or they could choose to continue working with me.  My message also gave clients a polling button that allowed clients to make the necessary ballot election to decide who would represent them going forward.  A true and correct copy of my message is attached as **Exhibit M**.

82.     For those clients that requested further information, I responded to their inquiries.

83.     At the same time I began fulfilling my ethical obligation to provide my clients notice of my departure to the client whose contact information I had, I also brought legal action in the Federal Court of the District of Connecticut to secure a court order to ensure the remaining clients received notice I was no longer at Zaiger LLC, that I was continuing my practice of law and was willing and able to continue representing them, and that they could choose to remain with Zaiger LLC or they could choose to continue working with me.

84.     As of the date of this declaration, over 10,000 Steam Mass Arbitration clients have indicated through digital ballot that they wish to work with me rather than Zaiger LLC and signed agreements transferring their case to Bucher Law PLLC.

85.     On April 14, 2023, I emailed Mr. Zaiger the names of the over 9,000 that had conveyed their wish that I represent them rather than Zaiger LLC, and asked that Mr. Zaiger transfer those client files to me.  A true and correct copy of my email is attached as **Exhibit N**.

86.     On April 18, 2023, my attorney, David Siegel, received a letter from counsel for Zaiger LLC, stating that Zaiger LLC was not in a position to comply with my request.  The letter, among other things, accused me of making unilateral "misleading representations to the firm's clients" regarding their choice of counsel.  A true and correct copy of this email is attached as **Exhibit O.** Mr. Siegel responded to counsel for Zaiger LLC's counsel later that day by email,

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 26 of 42

pointing out that it was Zaiger LLC who first unilaterally communicated with the clients regarding Mr. Bucher's departure on March 25, 2023 and that Mr. Schwartz's letter of March 29, 2023 stated that Zaiger LLC was expressly unwilling to provide the clients the information needed to make an informed choice of counsel. A true and correct copy of this email from Mr. Siegel, which he shared with me, is attached as **Exhibit P**. After Mr. Siegel asked whether Zaiger LLC was willing to agree on a neutral, joint communication to all clients retained prior to my departure who haven't received a unilateral communication from Bucher Law PLLC, Zaiger LLC's counsel refused.

87.     Jeff Zaiger and Judd Linden continued to unilaterally contact clients on this matter. A true and correct copy of one example of this email, which a client contacted by Zaiger and Linden forwarded to me, is attached as **Exhibit Q**.

88.     My counsel and counsel for Zaiger LLC continued to correspond from April 21 up until the filing of this Motion for Preliminary Injunction.  Zaiger and I agreed to *try* to send neutral, joint communication to some number of clients, but continued to disagree regarding the content of these communications and as to which clients this message should be sent. In the meantime, the Zaiger Defendants also initially refused to turn over files for most of the approximately 10,000 clients who had already elected to continue with me as their lawyer *and* had provided a written instruction that the Zaiger Defendants release their file to me. A true and correct copy of the April 25, 2023, letter from counsel for the Zaiger Defendants to Mr. Siegel refusing to turn over these files, which Mr. Siegel then shared with me, is attached hereto as **Exhibit R**.   On April 26, 2023, in an effort to sort out the issue of client notification procedure and language, and to entertain the idea of broader settlement discussion, the Zaiger Defendants and I reached a standstill agreement that prevented both sides from making filings in the District of Connecticut or the Steam Mass Arbitrations, and prevented both sides from initiating further communications with the clients in

question.  Although the Zaiger Defendants still refused to transfer files for *all* of the clients who had signed instructions to transfer, once the standstill was in place, the Zaiger Defendants did transfer approximately 90% of the files in question.

89.     In May, under the threat of a pending Preliminary Injunction action in the case in District of Connecticut, Zaiger LLC agreed to send a joint communication to the approximately 14,000 clients who had not been informed of their choice of counsel.

90. Zaiger LLC now demands I cease all contact with my former clients, including hundreds who have indicated that they want to continue their case with me but haven't yet executed the needed transfer documents and those who have not yet made a ballot election to either stay with Zaiger LLC or continue their case with me.

91. I have offered, and remain willing, to work out a follow-up email to clients who are undecided that is either delivered jointly or is delivered by Bucher Law PLLC but attempts to resolve Zaiger LLC's perceived concerns. Zaiger LLC has expressed no interest in such cooperation, instead now seeking emergency relief in a different court than where this dispute is already pending.

I declare under penalty of perjury that the foregoing is true and correct.

By: _____

William Bucher

# Exhibit A

# MASS ARBITRATION STRATEGY AND INVESTMENT OPPORTUNITY

CONFIDENTIAL
PRESENTATION

1

# Mass Arbitration: Background

- In 2011, the Supreme Court held that contracts requiring mandatory arbitration and prohibiting class relief were permissible, provided they are not unconscionable.  This ruling was reaffirmed in a 2013 decision.

- Many companies incorporated such clauses into their agreements believing it minimized exposure given the damages generally at stake for individual claimants.

- In an effort to avoid being deemed unconscionable, arbitration clauses adopted by companies seeking to avoid class actions routinely require the Company to pay all arbitration fees, limit circumstances where the Company can recover attorneys' fees, and allow the consumer to choose the manner of arbitration.

- Most arbitration providers — including the American Arbitration Association ("AAA") — charge a minimum of approximately $3,000 a case.

2

# Use of Mass Arbitration

- Over the past few years, a handful of firms — led by Keller Lenkner (now Keller Postman) — have weaponized consumer and employer arbitration clauses with favorable terms by aggregating thousands of claims through targeted advertising campaigns.

- Aggregating claims makes entrance fee to just defend prohibitively expensive and the vast majority of such fees are non-refundable under recent precedent.

- For example, if 75,000 demands for arbitration are filed with the AAA, the Company has 30-days to pay a largely non-refundable fee of $225 million as the cost of admission.

- Claimants' counsel will offer a settlement slightly less than the AAA charge — $2,900 per claim or so — attempting to induce a quick resolution.

3

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 32 of 42

# The Technique and Typical Results

- In a mass arbitration against Uber, Keller Postman brought ~60k claims claiming drivers were misclassified as contractors rather than employees.

- Uber's challenge to paying AAA fees was unsuccessful, requiring Uber to pay the ~$180 million upfront if it wished to defend the claims.

- With an upcoming IPO, Uber declined to engage in protracted litigation and settled the ~60k claims early for $146mm.

- Uber Eats was targeted in the past two years and sought to enjoin the AAA from requiring what it called "astronomical" fees. A New York appeals court recently denied the challenge finding that "[Uber] made the business decision to preclude class, collective, or representative claims in its arbitration agreement with consumers and AAA's fees are directly attributable to those decisions."

- In another case, Judge Breyer stated to Intuit "You knew what the rules of arbitration were. You knew all these things. And you elected to go to arbitration. . . . you are being hoisted by your own petard."

4

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 33 of 42

# Lifecycle of Investment

- **<u>Stage 1</u> - Infrastructure:** $500,000 for software development, advertising and agreement templates, ethics opinions, hardware, marketing and survey consultants, and claim identification.

- **<u>Stage 2</u> - Client Recruitment:** $2 to $150 advertising cost per client to recruit. Estimated spend of $3.75 million to recruit 75,000 clients at $50 an acquisition.

- **<u>Stage 3</u> - Filing Cases:** Filing cost of $25,000 plus $50.02 a case, for an estimated filing cost of $3,776,500. (Never expended if an early settlement can be reached.)

- **<u>Stage 4</u> - Active Arbitration:** Zaiger LLC litigates the first 20 cases, developing templates and models for use on additional cases. $12,000 a case after that to hire contract attorneys managed by Zaiger LLC to litigate disputes using templates and strategies. Most completed arbitrations seen to-date is 160, so total cost likely less than $1.7 million

5

# Target and Claim Identification

- **<u>Active Approach</u>:** Identifying 25 to 50 ripe targets, monitor news, and brainstorm claims.

  Identifying favorable arbitration terms including guaranteed refund of $50 filing fee, use of the AAA as an arbitration provider, application of California law, and language that suggests non-mutual collateral estoppel would apply.

  Ideal targets: (1) have valuation of ~$10 billion – high enough so they aren't judgment proof and can settle for hundreds of millions of dollars, but low enough that $200 million+ in arbitration fees creates an existential crisis forcing a quick settlement; and (2) a likely IPO or potential acquisition that will make carrying litigation risk unpalatable.

- **<u>Automated/Passive Supplemental Approach</u>:** Monitor court dockets for motions to compel class actions to arbitration, and copycat existing legal theories with potentially better advertising approach.

6

# Example Target: Valve Corporation

- Valve is an $11 billion company that dominates the market for digital PC game sales. Valve has over a billion customers with accounts. Valve's arbitration is administered by the AAA and specifies all filing fees will be reimbursed for claims under $10,000.

- In April 2021, game developers and consumers filed a putative class action claiming antitrust violations against Valve in the U.S District Court for the Western District of Washington.

- On October 25, 2021, Judge John Coughenor compelled the consumer claims to arbitration while retaining the developer claims. On May 5, 2022, Judge Coughenor denied (in part) Valve's motion to dismiss the developer plaintiffs' antitrust claims.

- If the proposed infrastructure were in place, today, we could immediately begin recruiting claimants to pursue the claims a federal judge has now ruled are well plead and potentially viable but for which *a billion* customers have been compelled to arbitration.

# New Merits-Based Approach

- The legal principles of non-mutual collateral estoppel prevent a company from relitigating a legal issue they have previously and unsuccessfully argued in another forum.

- This puts a company facing an arbitration in a situation where prevailing on the relevant legal issue is critical the first time it is argued, as a failure to prevail in that first case opens the door to preclusion in later cases.

- Rather than filing tens of thousands of cases at once, as is Keller's practice, a plaintiffs' firm could locate the strongest plaintiff from its pool, and file that case, and only that case, first.

- If that first, handpicked claim succeeds, all legal and factual issues that were inherent to the defendant should be resolved against them with respect to all other litigations, massively increasing the potential settlement value.

8

# Potential Returns

- Based on estimated costs of bundling claims, the initial Uber case would have cost Black Diamond ~$6.5 million and returned $43.8 million in less than a year (574% ROI).

- We believe a merits-based leverage approach — which can be implemented flexibly if a particularly strong claim presents itself — increases potential for even higher returns.

**Assumptions**:

> There is a 50% chance of winning the first case.
> The expected win, if there is one, is for a $10,000 judgment.
> A loss results in an average of a 25% reduction in claim settlement value.

- That results in an expected settlement value of $427.7 million. Black Diamond's recovery for funding at 30% would be ~$128.3 million (1874% ROI on $6.5 million investment).

9

Case 2:21-cv-00563-JNW   Document 374-6   Filed 10/04/24   Page 38 of 42

# Stage 1 Infrastructure Calculations

- **Will Bucher Fixed Compensation:** $150,000/year.

- **Software Engineer:** Est. $20,000/month full-time cost for 3 months, followed by $10,000/month part-time cost thereafter. $150,000 first-year spend.

- **Ethics Opinion/Consulting:** Est. $25,000 first-year ($700/hour as needed thereafter).

- **Marketing Part-time Employee or Consultant:** Est. $50,000/year.

- **Survey Design Consulting:** Est. $25,000/year.

- **Paralegal Support:** Managing claims dockets and answering calls. Possible need to scale up and hire additional support as clients are recruited. Est. $50,000 first-year spend.

- **Hardware and Software**: Computer hardware, Bloomberg and PACER alerts, additional Westlaw seat(s). Est. $8,000/yearly, plus $2,000 in hardware expenses year-one.

# Stage 2 Client Recruitment Calculations

- Most difficult to predict because it would vary per case based on the claim and how common users of the relevant product or service were.

- Present estimates are based on the following:

  - A Partner at a Bay Area law firm specializing in plaintiffs-side mass employment litigation —  who has handled more than 60,000 employment arbitrations — said costs were between $2 and $150 a case, depending on the pool of plaintiffs and the case.

  - In "Bitter End" litigation, attorneys at Keller took the position that their lawyer group would be losing money if they accepted any settlement below $675 a case. Based on their retainer agreement, Troxel LLC, who was responsible for bundling the claims, received 4% of the settlement value. That implies an acquisition cost of no more than $27 a claim.

  - Facebook advertising costs around $1.00 per click. If it takes an average of two clicked-on ads to recruit a plaintiff, that's $2.00 a claim. If it takes 150 ads, that's $150.

11

FILED: NEW YORK COUNTY CLERK 05/09/2023 04:25 PM
NYSCEF DOC. NO. 32

INDEX NO. 154124/2023
RECEIVED NYSCEF: 05/09/2023

# Stage 3 Filing Calculations

- **AAA Fees:** $100 a case for the first 500 cases, than $50 a case. Functional cost of $50 a case plus $25,000.

- **Zaiger LLC Server Costs:** $0.02 a client in server expenses to maintain client database and case files.

# Stage 4 Active Arbitrations Calculations

- In the "Bitter End" litigation, 160 cases were litigated to a conclusion. That is most cases ever fully litigated in a mass arbitration based on the 9 examples we are aware of. Plaintiffs' requests for fees in those arbitrations showed that Quinn Emanuel spent between 80 and 160 hours litigating each case. That litigation was surprisingly bespoke, with every briefing including one or more new, revised, or redacted arguments.

- If a Zaiger LLC target engages in a "Bitter End" strategy, the first 20 cases could be litigated by the Firm creating templates for use on additional cases. We expect a contract attorney working off Zaiger LLC prepared templates could litigate a case in 80 hours.

- We estimate that contract attorneys of sufficient caliber to arbitrate individual cases charge $100 to $125/hour. A performance bonus of $2000 for successful arbitrations could also be used to incentivize quality and results.

- Staffing with contract attorneys comes out to between $8,000 and $12,000 a case. Given the most completed arbitrations seen to date is 160, total cost is likely less than $1.7 million. There is flexibility in how we could "staff up" if needed too.

13

# Uber Settlement Calculations

- **Costs**: $50 recruitment (assumed) and $50 filing for 60,000 claims, plus $500,000 infrastructure costs. Total costs $6.5 million
- Settlement of $146 million. Hypothetical 30% return to Black Diamond of $43.8 million. Profit of $37.3 million. (574% ROI in less than a year).
- Merits Approach Assumptions:
  - 50% chance of winning the first claim;
  - A win on the first claim increases the settlement value of each claim by $10,000;
    - For 60,000 claims, that's a $600 million increase in total settlement value.
  - A loss on the first claim reduces the settlement value of each remaining claim by 0% to 50%, depending on how the arbitrator rules and on what grounds, with an average reduction of 25%. The reduction is the result of <u>perceptions</u> by a defendant of likely liability, not due to the creation of precedent. Plaintiffs are <u>not</u> bound by outcome, so there is little, if any, formal legal risk from the loss.
- Predicted, merits based outcome: spend $6,500,000. Upon a win, settlement value would increase to $746 million. Upon a loss, the settlement value would shift to an average of $109.5 million. That results in an expected settlement value of $427.75 million.
- 30% of $427.75 million is $128.325 million. $121.825 million profit (1874% ROI).

14