1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

HON. JAMAL N. WHITEHEAD

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

IN RE VALVE ANTITRUST LITIGATION

Case No. 2:21-cv-00563-JNW

**DECLARATION OF KENNETH J. RUBIN IN SUPPORT OF CONSUMER PLAINTIFFS' REPLY TO MOTION TO CONSOLIDATE AND APPOINT VORYS, SATER, SEYMOUR AND PEASE LLP AS INTERIM LEAD CLASS COUNSEL**

NOTE ON MOTION CALENDAR: October 25, 2024

DECL. OF KENNETH J. RUBIN IN SUPPORT OF REPLY TO CONSUMER PLAINTIFFS' MOTION TO CONSOLIDATE AND APPOINT LEADERSHIP Case No. 2:21-cv-00563-JNW

VORYS, SATER, SEYMOUR AND PEASE LLP 52 East Gay Street Columbus, OH  43215 Tel: (614) 464-6400

I, Kenneth J. Rubin, declare:

1.      I am a partner at Vorys, Sater, Seymour and Pease LLP ("Vorys") and serve as lead counsel for Plaintiffs Sean Colvin, Susann Davis, Hope Marchionda, and Everett Stephens and the putative class ("Consumer Plaintiffs") in the case captioned *In re Valve Antitrust Litigation*, Case No. 2:21-cv-00563-JNW.

2.      I respectfully submit this declaration in support of the Consumer Plaintiffs' Reply in Support of Motion to Consolidate and Appoint Vorys, Sater, Seymour and Pease LLP As Interim Lead Class Counsel.  I have been actively involved in this action, am familiar with the proceedings, and have personal knowledge of the matters stated herein.

3.      Following Valve's motion to stay the Consumer Plaintiffs' case and compel arbitration, Vorys continued representing consumers in arbitration throughout the stay, but promptly returned to this Court seeking to lift the stay after Valve amended its Steam Subscriber Agreement ("SSA") removing the mandatory arbitration clause.

4.      Hagens/Bucher argue that Vorys' role as executive committee member for the Developer Plaintiffs precludes it from serving as class counsel for consumers.  But consumers and developers have the same theory—Valve's anticompetitive conduct harms both sides of the two-sided Steam platform with every transaction.

5.      From 2019 to 2021, Vorys' efforts were solely on behalf of consumers.  Vorys has always represented consumers and has carried out this representation in the appropriate forums.

6.      After this Court granted Valve's motion to compel arbitration, holding the issue of arbitrability was for an arbitrator (ECF 66), Vorys sought that determination in arbitration.  Indeed, in an April 19, 2024, letter to the American Arbitration Association, Vorys wrote: "At least one Individual Claimant intends to raise the issue of unconscionability and resulting unenforceability of the arbitration clause, and a decision on this issue will affect each individual Claimant's obligation to arbitrate their disputes with Valve."

7.      As soon as Valve amended the SSA, Vorys moved to lift the stay.  Vorys, unlike Hagens/Bucher, is not currently representing anyone in arbitration, having returned to this Court

DECL. OF KENNETH J. RUBIN IN SUPPORT OF
REPLY TO CONSUMER PLAINTIFFS' MOTION TO
CONSOLIDATE AND APPOINT LEADERSHIP - 1
Case No. 2:24-cv-01218-JNW

VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, OH  43215
Tel: (614) 464-6400

to pursue consumers' claims.

8.    Vorys attorneys have spent over 6,000 hours litigating and an additional 2,000 hours on arbitration.  As Hagens/Bucher admit, they have spent 4,000 hours "pursuing consumer claims in arbitration," not litigation.  Additionally, Vorys' executive committee work benefits consumers.  This is a two-sided platform case where both sides of the platform allege harm from the same conduct. Vorys' participation in discovery applies directly to consumers' claims, given that consumers and developers have the same legal and factual theories.

9.    Parts of Hagens and Bucher's Class Action Complaint repeat—word for word— allegations from the Consolidated Amended Class Action Complaint in *In re Valve Antitrust Litigation* authored by Vorys and co-counsel.  I have reviewed the *Elliott* Complaint.  Attached hereto as Exhibit A-1 is a table that provides forty examples of the *Elliott* Complaint parroting the exact (or almost exact) same language used in the *In re Valve Antitrust Litigation* Amended Complaint.  Exhibit A-1 is a true and accurate comparison of the statements in the Consolidated Amended Class Action Complaint in *In re Valve Antitrust Litigation* and in the Class Action Complaint in *Elliott et al. v. Valve Corp.*

10.    Vorys has experience and knowledge directly relevant to the instant case.  Indeed, Vorys has litigated antitrust claims on behalf of plaintiffs in the two-sided platform context for over a decade.  And Vorys' experience handling plaintiff- and defense-side class action litigation gives it a well-rounded and unique perspective on this case.  At base, Vorys has been involved *in this case* for over three years, and it has extensive knowledge of the applicable law and significant experience handling the claims asserted here.

DECL. OF KENNETH J. RUBIN IN SUPPORT OF
REPLY TO CONSUMER PLAINTIFFS' MOTION TO
CONSOLIDATE AND APPOINT LEADERSHIP - 2
Case No. 2:24-cv-01218-JNW

VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, OH  43215
Tel: (614) 464-6400

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25th day of October, 2024 in Columbus, Ohio.

By: _____

Kenneth J. Rubin

DECL. OF KENNETH J. RUBIN IN SUPPORT OF
REPLY TO CONSUMER PLAINTIFFS' MOTION TO
CONSOLIDATE AND APPOINT LEADERSHIP - 3
Case No. 2:24-cv-01218-JNW

VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, OH  43215
Tel: (614) 464-6400

# EXHIBIT A-1

| **Language[1] from Consolidated Amended Class Action Complaint (ECF No. 34) in *In re Valve Antitrust Litigation* (Case No. 2:21-cv-00563-JNW)** | **Language from Class Action Complaint (ECF No. 1) in *Elliott et al. v. Valve Corp.* (Case No. 2:24-cv-01218-JNW)** |
|---|---|
| The trend toward digital distribution for PC Desktop Games accelerated dramatically as a result of the global pandemic. Data published in January 2021 indicates that many consumers were increasingly spending their time at home playing video games. ¶ 98. | The trend toward digital distribution for PC games accelerated dramatically as a result of the global pandemic. Data published in January 2021 indicates that many consumers were increasingly spending their time at home playing PC games. ¶ 56. |
| For example, at the beginning of the pandemic in March 2020, Steam saw its concurrent user count surge to what was then an all-time high of over 20 million gamers, and the demand for digital distribution of PC Desktop Games has only grown since then. ¶ 98. | For example, at the beginning of the pandemic in March 2020, Steam saw its concurrent user count surge to what was then an all-time high of over 20 million gamers, and the demand for distribution of PC games has only grown since then. ¶ 56. |
| A hypothetical monopolist in the PC Desktop Game Distribution Market could profitably impose a small but significant and non-transitory increase in price ("SSNIP") that, because of the lock-in effects and other factors above, would not cause an unprofitable number of gamers or publishers to switch their desired format of games (for example, to console or mobile) and therefore switch away from the PC Desktop Game Distribution Market. ¶ 106. | A hypothetical monopolist in the PC Game Distribution market could profitably impose a small but significant and non-transitory increase in price ("SSNIP") that, because of the factors addressed above, would not cause an unprofitable number of gamers or publishers to switch their desired format of games (for example, to console or mobile) and therefore switch away from the PC Game Distribution market. ¶ 60. |
| Economic modeling demonstrates that when a dominant platform requires its sellers to agree to a PMFN, (a) there are higher platform fees; (b) there are higher retail prices; and (c) firms with lower-cost models are discouraged from entry. As shown in the Boik & Corts model, for example, a lower price entrant (such as Discord, discussed herein) cannot successfully enter because the PMFN does not allow the entrant to lower | Economic modeling demonstrates that when a dominant platform requires its sellers to agree to a PMFN, (a) there are higher platform fees; (b) there are higher retail prices; and (c) firms with lower-cost models are discouraged from entry. As shown in the Boik & Corts model, for example, a lower price entrant (such as Discord, discussed herein) cannot successfully enter because the PMFN does not allow the entrant to lower |

---

[1] In-text footnote numbers were omitted from the language included in the table.

| | |
|---|---|
| prices to attract both sellers and consumers. ¶¶ 222–23. | prices to attract both consumers and publishers. ¶ 114. |
| Real world examples show that, when PMFNs are banned, prices to consumers fall. The leading hotel-booking site in the EU responded to an MFN ban by introducing quality improvements to the service it provided, suggesting online platform competition increased when Platform MFNs were banned. ¶ 226. | Real world examples show that, when PMFNs are banned, prices to consumers fall. The leading hotel-booking site in the EU responded to an MFN ban by introducing quality improvements to the service it provided, suggesting online platform competition increased when PMFNs were banned. ¶ 117. |
| The impact of the Valve PMFN is evident in game prices across platforms. It would be in the economic self-interest of a publisher to sell its games for lower retail prices through lower-commission distributors. If another distributor charges a lower commission, the publisher could lower prices on the rival distributor, steering customers towards the rival distributor, or compel Valve to lower Valve's own supracompetitive commissions. ¶ 206. | The impact of Valve's PMFN is evident in game prices across platforms. It would be in the economic self-interest of a publisher to sell its games for lower retail prices through lower-commission distributors. If another distributor charges a lower commission, the publisher could lower prices on the rival distributor, steering customers towards the rival distributor, or compel Valve to lower Valve's own supracompetitive commissions. ¶ 118. |
| Amazon, through the Twitch Store, opened a joint platform/storefront in April 2017, heralded as "one of the biggest challenges yet to Steam." It was shuttered 18 months later. Google also launched a competitive offering, Google Stadia, meant to be "the future of gaming." Yet a February 26, 2021 article announced it has "absolutely crumbled under expectations. ¶¶ 252–53. | Amazon, through the Twitch Store, opened a joint platform/storefront in April 2017, heralded as "one of the biggest challenges yet to Steam." It was shuttered 18 months later. Google also launched a competitive offering, Google Stadia, meant to be "the future of gaming." Yet a February 26, 2021 article announced it has "absolutely crumbled under expectations. ¶¶ 133–34. |
| Valve has explicitly disclaimed responsibility for moderating offensive game content on the Steam Store. In 2018, Valve announced that "we've decided that the right approach is to allow everything onto the Steam Store, except for things that we decide are illegal, or straight up trolling." In 2019, Valve allowed "Rape Day" to be published on the Steam Store, which enabled gamers to "verbally harass, kill, and rape women as you choose to progress the story," and only removed the game after widespread public outcry. The National Center on Sexual Exploitation has regularly denounced Valve, | Valve has also explicitly disclaimed responsibility for moderating offensive game content on the Steam Store. In 2018, Valve announced that "we've decided that the right approach is to allow everything onto the Steam Store, except for things that we decide are illegal, or straight up trolling." In 2019, Valve allowed "Rape Day" to be published on the Steam Store, which enabled gamers to "verbally harass, kill, and rape women as you choose to progress the story," and only removed the game after widespread public outcry. The National Center on Sexual Exploitation has regularly denounced Valve, |

| | |
|---|---|
| including its ineffective parental controls on the Steam Store. ¶ 291. | including its ineffective parental controls on the Steam Store. ¶ 145. |
| Valve competes in two distinct relevant economic markets—the market for PC Desktop Gaming Platforms and the market for PC Desktop Game Distribution. ¶ 59. | Valve competes in two distinct product markets: (1) the PC Game Distribution market, and (2) the PC In-Game Payment Processing market. ¶ 40. |
| Valve also emphasized the distinctions between the different types of gaming markets in a response to a third-party subpoena in an antitrust case between Epic and Apple pending in the Northern District of California. ¶ 76. | Valve also emphasized the distinctions between the different types of gaming markets in a response to a third-party subpoena in an antitrust case between Epic and Apple in the Northern District of California. ¶ 49. |
| Valve's concession that the mobile market and PC games market are different markets holds true for the console market as well. Valve does not sell, market, or compete in the market for game-console games. ¶ 77. | Valve's concession that the mobile market and PC games market are different markets holds true for the console market as well. Valve does not sell, market, or compete in the market for console games. ¶ 50. |
| Valve is a competitor in the PC Desktop Game Distribution Market through the Steam Store. The Steam Store sells PC Desktop Games that are enabled for the Steam Gaming Platform. ¶ 94. | Valve is a competitor in the PC Game Distribution market through the Steam Store. The Steam Store sells PC games that are enabled for the Steam Gaming Platform. ¶ 53. |
| For the reasons discussed above, PC Desktop Games are not reasonably interchangeable with other categories of games. Distribution of PC Desktop Games is therefore not reasonably interchangeable with distribution of other categories of games. Thus, there is not a significant positive cross elasticity of demand between the distribution of PC Desktop Games and the distribution of other types of video games such as console or mobile games. ¶ 105. | For the reasons discussed above, PC games are not reasonably interchangeable with other categories of games. Distribution of PC games is therefore not reasonably interchangeable with distribution of other categories of games. There is not a significant positive cross elasticity of demand between the distribution of PC games and the distribution of other types of video games such as console or mobile games. ¶ 59. |
| Due to its large market share and user base, game publishers generally consider the Steam Gaming Platform a must-have. As put by one game publisher, "As a developer, it's scary to have one entrenched company | Due to its large market share and user base, game publishers generally consider Steam a must-have. As put by one game publisher, "As a developer, it's scary to have one entrenched company dominating all of PC |

3

| | |
|---|---|
| dominating all of PC games since we are completely at Valve's mercy." ¶ 108. | games since we are completely at Valve's mercy." ¶ 71. |
| The vast majority of all PC Desktop Games are played today on the Steam Gaming Platform. As explained by an EA executive, PC game publishers "want to be where the players are," which in the case of PC Desktop Games means the Steam Gaming Platform. During the COVID-19 pandemic, for example, there were more than 22 million users on the Steam Gaming Platform in a single day, and over 6.2 million gamers playing games at the same time. ¶ 110. | The vast majority of all PC games are played today on Steam. As explained by an EA executive, PC game publishers "want to be where the players are," which in the case of PC games means Steam. During the COVID-19 pandemic, for example, there were more than 22 million users on the Steam Gaming Platform in a single day, and over 6.2 million gamers playing games at the same time. ¶ 72. |
| Very few PC games have found success outside of the Steam Gaming Platform, and such games typically require a long history of recognition and success before they can attempt to thrive without the Steam Gaming Platform. ¶ 120. | Very few PC games have found success outside of Steam, and such games typically require a long history of recognition and success before they can attempt to thrive without distribution through the Steam Store. ¶ 73. |
| Such games are rare—the Steam Store has over 45,000 games available—whereas the number of PC Desktop Game franchises that can avoid the Steam Gaming Platform entirely can be counted on two hands. ¶ 121. | Such games are rare—the Steam Store has over 70,000 games available whereas the number of PC game franchises that can avoid Steam entirely can be counted on two hands. ¶ 73. |
| Given its unassailable dominance, Valve has the ability to increase prices and reduce output in the PC Desktop Game Distribution Market, *i.e.*, monopoly power. ¶ 131. | Given its unassailable dominance, Valve has the ability to increase prices and reduce output in both relevant markets, *i.e.*, monopoly power. ¶ 76. |
| To further cement its dominance, Valve imposes a Platform MFN on game publishers that list games in the Steam Store (the "Valve PMFN"). Like PMFNs generally, the Valve PMFN compels publishers to sell their games at the Steam Store price (or higher) in *all* distribution channels, even distribution channels that do not involve connection to or enablement for the Steam Gaming Platform. ¶ 184. | To insulate itself from competition, Valve has imposed a PMFN on game publishers who list their games in the Steam Store. Like PMFNs generally, Valve's PMFN compels publishers to sell their games and in-game product at the Steam Store price (or higher) in all distribution channels, including distribution channels that are not connected to Steam, and distribution channels that offer more favorable pricing (i.e., fees substantially below Valve's 30% tax). ¶ 87. |

| | |
|---|---|
| Through the Valve PMFN, Valve gains the ability to control—including through punishment and threats—publishers who attempt to steer customers to alternative PC Desktop Game Distribution options. If publishers do not abide by Valve's mandates, they risk losing access to the Steam Gaming Platform altogether, which would be devastating to their businesses. ¶ 188. | With the PMFN, Valve controls—including through punishment and threats—publishers who attempt to use pricing incentives (i.e., discounts) to steer customers to alternative distribution channels for PC games and in-game products. If publishers do not abide by Valve's mandates, they risk losing access to the Steam platform altogether, which can be devastating given that most PC gamers use Steam. ¶ 90. |
| Again, as discussed above, Valve enforces these rules against publishers not only for Steam Key games, but for *all* games. ¶ 199. | Again, as discussed above, Valve enforces these rules against publishers not only for Steam Key games, but for all games. ¶ 97. |
| Valve also explicitly tells publishers that Valve enforces this provision to "*avoid a situation where customers get a worse offer on the Steam store.*" Put another way, Valve uses this restriction to prevent gamers from getting a better deal anywhere other than on the Steam Store. ¶ 200. | Valve also tells publishers that Valve enforces this provision to "*avoid a situation where customers get a worse offer on the Steam store.*" Put another way, Valve uses its PMFN to prevent gamers from getting a better deal from any Steam Store competitors. ¶ 98. |
| Steamworks Development is a forum where publishers can interact with Valve employees. On this forum, when one publisher asked Valve about the "rules regarding distributing/selling a game outside of steam" in a thread called "Patreon and steam keys" dated July 2, 2017, "TomG" of Valve explained how the policing system works. As he explained, "*The biggest takeaway is, don't disadvantage Steam customers.* For instance, it wouldn't be fair to sell your DLC [downloadable content] for $10 on Steam if you're selling it for $5 or giving it as a reward for $5 donations. We would ask that Steam customers get that lower $5 price as well." ¶ 201. | Steamworks Development is a forum where publishers interact with Valve employees. On this forum, when one publisher asked Valve about the "rules regarding distributing/selling a game outside of steam" in a thread called "Patreon and steam keys" dated July 2, 2017, "TomG" of Valve explained how the policing system works: "*The biggest takeaway is, don't disadvantage Steam customers.* For instance, it wouldn't be fair to sell your DLC [downloadable content] for $10 on Steam if you're selling it for $5 or giving it as a reward for $5 donations. We would ask that Steam customers get that lower $5 price as well." ¶ 99. |
| TomG also explained to another game publisher that the publisher should "[t]hink critically about how your decisions might affect Steam customers, and Valve. If *the offer you're making fundamentally disadvantages someone who bought your* | The same "TomG" also explained to another game publisher that the publisher should "[t]hink critically about how your decisions might affect Steam customers, and Valve. *If the offer you're making fundamentally disadvantages someone who bought your* |

| | |
|---|---|
| *game on Steam*, it's probably not a great thing for us or our customers (even if you don't find a specific rule describing precisely that scenario)." In that same thread, TomG responded to a question by stating: "*we usually choose not to sell games if they're being sold on our store at a price notably higher than other stores. That is, we'd want to get that lower base price as well, or not sell the game at all.*" ¶ 203. | *game on Steam*, it's probably not a great thing for us or our customers (even if you don't find a specific rule describing precisely that scenario)." In that same thread, TomG responded to a question by stating: "*we usually choose not to sell games if they're being sold on our store at a price notably higher than other stores. That is, we'd want to get that lower base price as well, or not sell the game at all.*" ¶ 101. |
| Valve has gone so far as to prevent publishers from *telling* consumers about its 30% fee. While publishers can advertise alternative storefronts, publishers cannot disclose to gamers the amount of the commission Valve collects. This prevents even soft non-price steering to stores where the publisher may be able to collect a higher proportion of revenue on the sale of Steam Keys, like the Humble Store. ¶ 205. | Valve has gone so far as to prevent publishers from telling consumers about its 30% fee. While publishers can advertise alternative storefronts, publishers cannot disclose to gamers the amount of the commission Valve collects. This prevents even more subtle price steering to stores where the publisher may be able to collect a better revenue share. ¶ 103. |
| There are well-known anticompetitive effects that can result from the imposition of MFN clauses by companies with durable market power. MFN provisions mandate that suppliers provide equally favorable terms to the company imposing the MFN as granted to any of its rivals. ¶ 214. | There are well-known anticompetitive effects that result from the imposition of MFN clauses by companies with market power, including higher prices to consumers. MFN provisions mandate that suppliers provide equally favorable terms to the company imposing the MFN as granted to any of its rivals. ¶ 108. |
| Platform MFNs (or "PMFNs") occur when an online platform requires that providers using its platform not offer their products or services at a lower price on other platforms. Economists increasingly recognize that Platform MFNs in particular can harm competition by "keeping prices high and discouraging the entry of new platform rivals." Platform MFNs guarantee that other platforms cannot charge a "lower final price, not because the focal platform has worked to ensure that it has the lowest cost, but rather because it has contracted for competitors' prices to be no lower." ¶ 215. | Platform MFNs (or "PMFNs") are MFNs imposed by platforms. They require that providers using the platform not offer their products or services at a lower price on other platforms. Economists increasingly recognize that PMFNs in particular can harm competition and consumers by "keeping prices high and discouraging the entry of new platform rivals." PMFNs guarantee that other platforms cannot charge a "lower final price, not because the focal platform has worked to ensure that it has the lowest cost, but rather because it has contracted for competitors' prices to be no lower." ¶ 109. |
| By deploying the Valve PMFN, Valve can ensure that the retail prices set in the Steam | By imposing a PMFN, Valve ensures that the retail prices set in the Steam Store are equal |

| | |
|---|---|
| Store are equal to or better than the prices offered in any rival distributor's storefront. Thus, the Valve PMFN gives Valve the ability to prevent price competition from rival storefronts. ¶ 216. | to or better than the prices offered in any rival distributor's storefront. Thus, Valve's PMFN gives Valve the ability to prevent price competition from rival storefronts. ¶ 110. |
| Platform MFNs disincentivize sellers (here, game publishers) from offering low prices in any channel, because discounts must be offered to all buyers. ¶ 217. | PMFNs disincentivize sellers (here, game publishers) from offering low prices in any channel, because discounts must be offered to all buyers. ¶ 111. |
| When a company imposes a PMFN prohibiting lower prices on other platforms, that provision "serves to suppress competition on the crucial dimension of price[,]" and keeps new entrants from undercutting the dominant platform's commission, and, but for the PMFN, driving consumers to the rival platform. ¶ 220. | When a company imposes a PMFN prohibiting lower prices on other platforms, that provision "serves to suppress competition on the crucial dimension of price[,]" and keeps new entrants from undercutting the dominant platform's commission, and, but for the PMFN, driving consumers to the rival platform. ¶ 113. |
| Additionally, MFNs "tend to raise industry prices" because they "kill a retailer's incentives to compete in the terms of trade that it offers suppliers. The reason is that a retailer who raises the commission it charges . . . knows that the price set through its store will not increase relative to that at other stores. . . . This means that suppliers cannot asymmetrically adjust their prices to divert demand towards retailers offering more attractive contractual terms." ¶ 224. | Additionally, PMFNs "tend to raise industry prices" because they "kill a retailer's incentives to compete in the terms of trade that it offers suppliers. The reason is that a retailer who raises the commission it charges . . . knows that the price set through its store will not increase relative to that at other stores. . . . This means that suppliers cannot asymmetrically adjust their prices to divert demand towards retailers offering more attractive contractual terms." ¶ 115. |
| MFNs thus "harm competition by assisting an incumbent in foreclosing the entry or expansion of rivals." MFNs harm competition "by making it impossible for a dominant incumbent firm's rivals, including entrants, to bargain . . . for a low price." ¶ 225. | PMFNs thus "harm competition by assisting an incumbent in foreclosing the entry or expansion of rivals." PMFNs harm competition "by making it impossible for a dominant incumbent firm's rivals, including entrants, to bargain . . . for a low price." ¶ 116. |
| Discord is an application that offers text messaging, voice, and video calling for gamers to communicate with friends while playing a game. Discord has experienced rapid growth since it launched, reporting 8.9 | Discord is an application that offers text messaging, voice, and video calling for gamers to communicate with friends while playing a game. Discord experienced rapid growth after launching in 2015, reporting 8.9 |

| | |
|---|---|
| million daily users in 2017 and 100 million daily users in 2020. ¶ 241. | million daily users in 2017 and 100 million daily users in 2020. ¶ 125. |
| Despite its massive user base and a pro-developer and pro-consumer approach, Discord never gained traction. By early 2019, Discord started "downscaling" its efforts in favor of a model where gamers would gain access to a pool of games for a monthly fee, a service called Nitro. By October 2019, Discord announced the Nitro offering would be shut down. ¶ 245. | Despite all these factors, Discord never gained traction. By early 2019, Discord started "downscaling" its efforts in favor of a model where gamers would gain access to a pool of games for a monthly fee, a service called Nitro. By October 2019, Discord announced the Nitro offering would be shut down. ¶ 128. |
| Microsoft has since retreated from this strategy, and in May 2019, Microsoft announced it would bring more games to the Steam Gaming Platform. As an insider remarked on Microsoft's surrender to the Steam Gaming Platform, Microsoft "has given up entirely on that vision . . . to dethrone Steam." ¶ 251. | Notably, in May 2019, Microsoft announced that it would bring more games to Steam. As an insider remarked on Microsoft's surrender, Microsoft "has given up entirely on that vision . . . to dethrone Steam." ¶ 132. |
| To attract publishers to its new storefront, Epic offered publishers a much lower commission than the Steam Store: 12% instead of Valve's 30%. As Epic recently stated in court filings, "Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS."122 Thus, like Discord found with its own 10% commission, Epic determined that a 12% commission was more than sufficient to cover its costs for creating and maintaining a PC Desktop Game Distribution storefront . . . . ¶ 256. | To attract publishers to its new storefront, Epic offered a much lower commission than the Steam Store: 12% instead of Valve's 30%. As Epic has stated in court documents, "Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS." Thus, like Discord found with its own 10% commission, Epic determined that a 12% commission was more than sufficient to cover costs and sustain profits needed to reinvest to innovate its storefront. ¶ 137. |
| But, even with these aggressive tactics, the EGS Store has been unable to move a significant share of the PC Desktop Game Distribution Market away from Valve and the Steam Store. Analyzing 2019 figures, one industry analyst explained that, despite its dogged efforts, EGS likely had a market share "a little above 2%" . . . . ¶ 261. | But, even with these aggressive tactics, the EGS Store has been unable to move a significant share of the market away from Valve. Analyzing 2019 figures, one industry analyst explained that, despite its dogged efforts, EGS likely had a market share "a little above 2%." ¶ 138. |

| | |
|---|---|
| Valve's anticompetitive conduct, including its tie of the Steam Gaming Platform to the Steam Store along with its Valve PMFN, has blocked price competition and inhibited the ability of rival stores and platforms to function in a freely competitive market. This has allowed Valve to maintain its dominance in both the PC Desktop Gaming Platform market and the PC Desktop Game Distribution Market . . . . ¶ 267. | Valve's PMFN and tying arrangement have blocked price competition and inhibited the ability of rival stores and platforms to function in a freely competitive market. This has allowed Valve to maintain its dominance in the relevant markets . . . . ¶ 141. |
| For example, in 2011, hackers stole "information about Steam transactions between 2004 and 2008" that contained "names, email addresses, encrypted billing addresses and encrypted credit card information," which forced Valve CEO Gabe Newell to advise Steam Platform users to "watch your credit activity and statements." By 2015, 77,000 Steam user accounts were being "hijacked and pillaged each month." And by 2016, a cottage industry of "Steam Stealer" malware had developed that allowed criminals the world to defraud Steam users, transforming the Steam Platform "into the devil's playground." In 2019, Valve agreed to fix a "zero-day" security flaw that had potentially exposed tens of millions of Steam users' computers to hackers, but only after Valve had been publicly pressured to do so. Later than same year, Valve halted trading and selling of digital items for one video game because "nearly all key purchases that end up being traded or sold on the marketplace are believed to be fraud-sourced" by "worldwide fraud networks" engaged in money laundering. ¶ 288. | By way of example, in 2011 hackers stole "information about Steam transactions between 2004 and 2008" that contained "names, email addresses, encrypted billing addresses and encrypted credit card information," which forced Valve CEO Gabe Newell to advise Steam Platform users to "watch your credit activity and statements." By 2015, 77,000 Steam user accounts were being "hijacked and pillaged each month." And by 2016, a cottage industry of "Steam Stealer" malware had developed that allowed criminals the world to defraud Steam users, transforming the Steam Platform "into the devil's playground." In 2019, Valve agreed to fix a "zero-day" security flaw that had potentially exposed tens of millions of Steam users' computers to hackers, but only after Valve had been publicly pressured to do so. Later than same year, Valve halted trading and selling of digital items for one video game because "nearly all key purchases that end up being traded or sold on the marketplace are believed to be fraud-sourced" by "worldwide fraud networks" engaged in money laundering. ¶ 144. |
| When a gamer makes a purchase through the Steam Store, the gamer buys the game from Valve, paying the full retail price to Valve directly. There is no intermediary in the distribution chain between Valve and the consumer. Gamers are the immediate buyers from Valve, the Defendant in this antitrust case, and pay overcharges caused by inflated store commissions directly to Valve. ¶ 304. | When a gamer makes a purchase through the Steam Store, the gamer buys the game from Valve, paying the full retail price to Valve directly. There is no intermediary in the distribution chain between Valve and the consumer. Similarly, when a gamer uses a Steam Wallet to make an in-app purchase, that gamer pays Valve to complete the transaction. Gamers are the immediate buyers from Valve, the Defendant in this antitrust case, and pay overcharges caused by |

| | inflated commissions directly to Valve. ¶ 169. |
|---|---|