UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

*In re* VALVE ANTITRUST LITIGATION

CASE NO. 2:21-cv-00563-JNW

ORDER

## 1. INTRODUCTION

This matter comes before the Court on Plaintiff Wolfire Games, LLC, Dark Catt Studios Holdings, Inc., and Dark Catt Studio Interactive LLC's (together, "Plaintiffs") motion for class certification and the appointment of class counsel, Dkt. No. 256[1], and Defendant Valve Corporation's motion to exclude expert testimony, Dkt. No. 321[2]. The Court has considered the papers submitted in support of and opposition to the motions, and being otherwise fully informed, finds oral argument

---

[1] This document contains Court-approved redactions. *See* Dkt. Nos. 198, 236, 237 (motion to seal and resulting order). A sealed, unredacted version is located at Docket Number 181.

[2] This document also contains Court-approved redactions. *See* Dkt. Nos. 294, 330, 331 (motion to seal and resulting order). A sealed, unredacted version is located at Docket Number 232.

unnecessary. For the reasons stated below, the Court GRANTS Plaintiffs' motion for class certification and DENIES Valve's motion to exclude.

## 2.  BACKGROUND

### 2.1  Valve is the uncontroverted market leader in digital PC game distribution.[3]

Video games are big business. Early in their history, PC games were distributed on physical media and purchased at brick-and-mortar retail locations, but now they're distributed digitally. Valve, through its Steam Store and Steam platform (collectively, "Steam"), is the largest distributor in the world, offering over 50,000 titles for sale and play. *See, e.g.*, Dkt. No. 127 ¶ 52. Valve started out developing its own games, *id.* ¶¶ 46–54, but it is no longer primarily a developer. *Id.* It leaves this task to others, ranging from small independent developers to large-scale developers ("AAA" studios) like Electronic Arts and Epic Games. *Id.* ¶¶ 24, 136, 298, 355, 358. Valve then sells and distributes those games to end users through its Steam platform and provides other game-related services. *Id.* ¶¶ 2, 3.

From the end-users' perspective, the process works like this: A gamer creates a Steam account and buys a video game through the Steam Store.[4] *Id.* ¶¶ 11, 16, 40, 49. The gamer then downloads the game, uses Steam to launch it on their computer,

---

[3] These facts are from Plaintiffs' Consolidated Second Amended Class Action Complaint ("SAC") and are largely uncontested. *Compare* Dkt. Nos. 127 at 4–42 (SAC), *with* Dkt. Nos. 37 at 9–11 (Valve's motion to dismiss prior complaint containing similar allegations), 74 at 8–9 (second motion to dismiss), 319 at 1–5 (Valve's brief opposing class certification).

[4] In limited instances, the gamer may instead acquire a game's Steam Key—a unique alphanumeric code which Valve generates at no charge and provides to gaming companies—either for a fee or for free through a promotion. The Court discusses Steam Keys in more detail below.

and begins play. *Id.* As they play, Steam provides various features, including multi-player functionality, in-game downloadable content ("DLC"), access to a gaming community, and the streamlined delivery of technical updates. *See, e.g., id.* ¶¶ 48, 55, 236. Based on the availability and performance of these features, Steam has a large and loyal following. *See id.* ¶¶ 103, 136, 138. Given Steam's popularity, many gamers have developed their game libraries, over years, on Steam's platform. *See id.*

With few exceptions, Valve does not charge gamers for Steam—instead, developers and publishers foot the bill through a commission for each game sold via the Steam Store.[5] *See id.* ¶ 9. Valve initially set its commission rate at 30 percent and held it steady for years. *Id.* It now offers discounts for the best-selling games, reducing the commission to as little as 20 percent. *Id.* ¶ 89 n.29. Game companies, in turn, set the price for their games—whether that be $5.99 or $59.99—Valve remits this amount, less its commission and fees. *See id.* ¶ 4. Regardless of the price and resulting commission paid to Valve, it is the game company that decides how much of the commission to pass on to the gamer. *See, e.g.,* ¶ 328.

## 2.2 Plaintiffs allege Valve imposes a Platform Most Favored Nations policy, which gives rise to this antitrust lawsuit.

Plaintiffs allege that Valve requires content and price parity for any game it distributes; this means Valve will not sell or support a game if a game company sells it for less or offers a better version of it elsewhere. *See, e.g., id.* ¶¶ 159, 164, 179, 195. Plaintiffs call this a Platform Most Favored Nations ("PMFN") Policy. *Id.*

---

[5] "Developer" and "publisher" carry different meanings within the PC gaming industry but Plaintiffs use the terms interchangeably in the SAC. *See* Dkt. No. 127 at 4 n.1.

¶¶ 154–84. Plaintiffs argue Valve implements the PMFN Policy to maintain its market control. *Id.* ¶¶ 156–94. And Plaintiffs contend its effect is clear and largely consistent: the industry knows that if you undercut Steam you pay for it. *See, e.g.*, *id.* ¶¶ 83–90, 165–84, 198–205.

If a game company violates the PMFN Policy, Valve may start with a simple conversation. *See, e.g.*, *id.* ¶¶ 208–09. From there it turns to more punitive measures. Valve is known to remove violating games from its in-platform marketing efforts and, sometimes, delist them from the Steam Store altogether. *See, e.g.*, *id.* ¶¶ 146, 194, 195, 210, 202, 219, 233–36. Even AAA studios are not immune. *See id.* ¶ 136. Given the breadth of Steam's gamer base, ostensibly all game companies rely on Steam and cannot afford to lose access to its customers. *Id.*

Plaintiffs assert that Valve's PMFN Policy has the following anti-competitive impacts, among others: (1) Steam earns a supracompetitive commission, (2) game companies cannot compete between distribution platforms, and (3) rival platforms cannot succeed. *Id.* ¶¶ 258–374. This harms consumers and game companies alike by increasing consumers' prices and reducing publishers' profits (among other anticompetitive ills). *Id.* Plaintiffs assert this violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 *et seq.*, and Washington's Consumer Protection Act ("CPA"), RCW 19.86 *et seq. Id.* ¶¶ 389–436. Plaintiffs seek class-wide remedies and propose a class encompassing the following:

> All persons or entities who, directly or through an agent, paid a commission to Valve in connection with the sale or use of a game on the Steam platform on or after January 28, 2017, and continuing through the present until the effects of its scheme are eliminated (the "Class Period"), and where either (1) the person or entity was based in the

United States and its territories or (2) the game was purchased or acquired by a United States-based consumer during the Class Period. Excluded from the Class are (a) Defendant, its parents, subsidiaries, affiliate entities, and employees, and (b) the Court and its personnel.

*Id.* ¶ 375.

Valve strongly denies all but a few of Plaintiffs' allegations. *See, e.g.*, Dkt. No. 128 ¶¶ 154–84.

### 3.    DISCUSSION

### 3.1    Valve's motion to exclude Plaintiffs' expert's testimony.

Because Plaintiffs' motion for class certification relies heavily upon the work of their expert Steven Schwartz, Ph.D., the Court addresses Valve's *Daubert* motion to exclude before turning to class certification.

According to Dr. Schwartz, Valve is the largest PC video game distributor in the world. Its market share exceeds that of all other platforms *combined*. *See* Dkt. Nos. 182-1, 343 ¶ 130.[6] While Valve largely reached this position through competitive practices, Dr. Schwartz concludes that it maintains its dominance through its PMFN Policy. Dkt. No. 343 ¶¶ 130–72. And without the PMFN—that is, in a "but-for world"—competitive pressures would drive Valve's market share down, forcing it to reduce its commission structure to maintain *any* market share. *Id.* ¶¶ 274, 279, 375, 377. Valve contends Dr. Schwartz's opinion is based on faulty methods and improper assumptions and thus does not satisfy Rule 702's admission standards. *See generally* Dkt. No. 321. On this basis, it moves to exclude. *Id.*

---

[6] Docket Number 182-1 is a sealed unredacted version of Docket Number 343. *See* Dkt. Nos. 294, 330, 330-1 (motion to seal and resulting order).

1    "Rule 702 of the Federal Rules of Evidence tasks a district judge with

2    'ensuring that an expert's testimony both rests on a reliable foundation and is

3    relevant to the task at hand.'" *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044,

4    1055 (9th Cir. 2024) (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024

5    (9th Cir. 2022)). The district court has "broad discretion" in rendering such

6    evidentiary rulings. *Id.* (quoting *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d

7    1060, 1065 (9th Cir. 2017)).

8        Rule 702 guides the Court's discretion. Opinion testimony from an expert is

9    allowed if: (1) their scientific, technical, or other specialized knowledge will help the

10   trier of fact to understand the evidence or determine a fact in issue; (2) the

11   testimony is based on sufficient facts or data; (3) the testimony is the product of

12   reliable principles and methods; and (4) they have reliably applied the principles

13   and methods to the facts of the case. FED. R. EVID. 702. The rule is to be construed

14   liberally. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). And the

15   resulting "inquiry is a flexible one," with a focus on principles and methods, rather

16   than conclusions reached. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595

17   (1993).

18       Valve challenges Dr. Schwartz's methodology, not his qualifications, arguing:

19   (a) Dr. Schwartz applied an incorrect method as matter of law by analyzing Valve

20   as a one-sided rather than two-sided platform; (b) Dr. Schwartz assumed a PMFN

21   price parity requirement without sufficient evidence, *i.e.*, the analytical gap

22   between his opinion and the evidence is too great; (c) he impermissibly speculated

23   when determining Valve's but-for market share; (d) his analysis is incomplete in

that it ignores the import of Steam Keys; and (e) his passthrough determination is methodologically unsound. Dkt. No. 321 at 2–3.

The Court takes each argument in turn.

### 3.1.1     Dr. Schwartz accounts for Steam as a two-sided platform.

According to Dr. Schwartz, a platform "facilitates interaction between two or more groups of users, like consumers and producers." Dkt. No. 343 ¶ 30. It can be one-sided or two-sided. *Id.* A platform is one-sided if it "connects groups of users directly to people like them," and it is two-sided if it "connects two or more different groups in a . . . virtual space." *Id.* Two-sided platforms often "exhibit network effects," where "the product or platform's value changes as the number of users of that product or platform changes." *Id.*

According to Valve, *Ohio v. Am. Exp. Co.*, 585 U.S. 529 (2018) ("*AMEX*")*,* the network effects of antitrust conduct involving a two-sided platform must be analyzed on a two-sided basis. Dkt. No. 321 at 3–4. Valve argues that Dr. Schwartz, by utilizing his Platform Competition Model ("PCM") to deduce solely the reduced commission game developers and publishers would pay in a but-for world (without a similar analysis of consumer effects), *see* Dkt. No. 343 ¶¶ 272–77, applied an incorrect methodology as a matter of law. Dkt. No. 321 at 3–6. This critique is not persuasive.

In *AMEX*, the district court permanently enjoined American Express ("Amex") from engaging in anticompetitive conduct that allegedly drove inflated merchant fees (*i.e.*, the service fee charged to a merchant for a credit card sale). *See United States v. Am. Exp. Co.*, 88 F. Supp. 3d 143, 199, 238–39 (E.D.N.Y. 2015). The

Second Circuit reversed and the Supreme Court affirmed. *See Ohio v. Amex*, 585 U.S. at 552, *aff'g*, 838 F.3d 179 (2d Cir. 2016). In so doing, the Supreme Court held that a credit card is, ostensibly, a two-sided platform with merchants on one side and consumers on the other. *Id.* at 535. And that both sides of a card's network effects—increased value to cardholders when more merchants accept it and increased value to merchants when more cardholders use it—must be accounted for. *Id.*

As Dr. Schwartz explains, his PCM utilized sales commissions as a proxy for antitrust injury in quantifying class-wide damages because this reflects Valve's historic pricing practice[7]— an agency model imposing a one-sided charge. *See* Dkt. Nos. 343 ¶¶ 338–40, 348-1 ¶¶ 146–52. The PCM is not intended to model a complete but-for world. *See* Dkt. No. 348-1 ¶¶ 146, 208–10. Indeed, it is one of three models Dr. Schwartz utilized to assess antitrust impact(s). *See* Dkt. No. 343 ¶¶ 284–95, 302–13. He also employed a yardstick approach, comparing the PC game delivery platform to those for online retail and vacation home rentals, and an empirical analysis of existing market data. *Id.* Both approaches address consumer impacts. *Id.* Also worth noting—Dr. Schwartz's method is based on the same Landes and Posner research that the Supreme Court relied on in *Amex. Compare id.* ¶¶ 334–37, *with Amex*, 585 U.S. at 535–36.

---

[7] On reply, Valve offers Steam's "community market" as an example of a transaction where consumers pay fees. Dkt. No. 363 at 6. But that market occurs solely between consumers, *i.e.*, on one side of the platform. *See* Dkt. No. 383-1 ¶ 27. Dr. Schwartz did not err in ignoring it.

### 3.1.2    The analytical gap between antitrust injury and common proof is *not* large.

Dr. Schwartz's opinion is, necessarily, predicated on the existence of Valve's PMFN Policy. *See* Dkt. No. 343 ¶¶ 154, 197. Valve suggests that his report cites insufficient common facts or data to support its existence, at least with respect to the alleged price parity component. Dkt. No. 321 at 6–10. Thus, there is too great an "analytical gap" between Dr. Schwartz's ultimate opinion and common proof. *Id.* at 7 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Or put differently, Dr. Schwartz relies on unreasonable inferences and assumptions not supported by common proof. *Id.* at 7–9. The critique in inapt.

Valve allegedly cloaks its PMFN Policy to guard against antitrust actions. *See* Dkt. No. 182-22 at 2. Therefore, Dr. Schwartz set about deducing its existence and Valve's enforcement efforts. *See* Dkt. No. 343 ¶¶ 154–96. He provides evidence supporting his reasoning, citing to (1) contractual terms that video game companies agree to before receiving Steam Keys, which suggest a price parity requirement;[8] (2) examples of one-on-one communications between Valve and video game companies explicitly describing the requirement;[9] and (3) a variety of other messaging,

---

[8] Those terms require, among other things, that game companies sell their games "'[i]n other stores in a similar way to how I am selling my game on Steam,'" and that discounts they offer outside the Steam Store be offered to "'Steam customers within a reasonable amount of time.'" Dkt. No. 343 ¶ 157 (quoting Steam Key Guidelines).

[9] This includes communications from Valve that "'the price on Steam [must be] competitive with where it's being sold elsewhere'" and that Valve "'wouldn't be OK with selling games on Steam if they are available at better prices on other stores, even if they didn't use Steam keys.'" Dkt. No. 343 ¶ 158, 160 (quoting emails produced at VALVE_ANT_0598921, 0605087).

including internal communications at Valve and other game companies, suggesting the same. *Id.* ¶¶ 157–67. This is common evidence of the varied ways that Valve allegedly communicates its PMFN Policy. Valve may disagree with the conclusions Dr. Schwartz's derived from this information and it may even offer countervailing evidence, but Valve cannot render Dr. Schwartz's opinion unsound under Rule 702 simply by advancing a contrary position.

Expert testimony need only be "based on *sufficient* facts or data." FED. R. EVID. 702(b) (emphasis added); *see Bosley v. DePuy Synthes Sales Inc.*, No. C21-1683-MLP, 2023 WL 6038010, at *4 (W.D. Wash. Sept. 15, 2023) (finding that challenged expert did more than "baldly state" a conclusion) (citing *United States. v. W.R. Grace*, 455 F. Supp. 2d 1148, 1152 (D. Mont. 2006)). "[A]n expert [may] rely on hypothetical facts that are supported by the evidence." FED. R. EVID. 702 advisory committee's notes to 2000 amendments. Rule 702(b) "is not intended to authorize a trial court to exclude an expert's testimony on the ground that [it] believes one version of the facts and not the other." *Bosley*, 2023 WL 6038010, at *4 (internal quotation omitted).

Valve, in making its analytical gap argument, takes an overly exacting view of Rule 702's requirements. Dr. Schwartz provides common evidence of the varied ways in which Valve establishes its PMFN expectation. Whether that evidence and Dr. Schwartz's conclusions deserve credence is an inquiry for a different day.

### 3.1.3   Dr. Schwartz's but-for market share approach satisfies Rule 702.

In support of his opinion about class-wide injury, Dr. Schwartz concludes

that, in a but-for world, Valve would hold a ███[10] percent share of the PC video game distribution market, rather than the roughly ██ percent share it holds now. Dkt. Nos. 182-1, 343 ¶¶ 130, 375. In reaching these figures, Dr. Schwartz relies on Valve's share of Steam Store game sales between 2008–2012. *Id.* Valve contends this is untethered to an analytical base and thus produces a mere speculative conclusion. Dkt. No. 321 at 10–12. Valve questions why Dr. Schwartz would assume that the market as it existed in the Steam Store between 2008–2012, when Valve sold a significant amount of its own games, is relevant today when Valve mostly sells others' games. *Id.*

The purpose of Dr. Schwartz's analysis is not to estimate market share at a temporal point but at a circumstantial one: A mature competitive PC game distribution market "where the alleged [antitrust] conduct never took place" and presumably where Valve lacks the market power it holds today, ostensibly forcing third-party game companies to sell through the Steam Store. Dkt. No. 348-1 ¶ 227. In this competitive market, Valve would be relegated to generating revenue mostly from the sale of its own games.

According to Dr. Schwartz, because this market does not currently exist, he is left with no choice but to use the closest historic analogue. *See* Dkt. Nos. 343 ¶ 302, 348-1 ¶ 227. Before 2008, not all large developers and publishers distributed their games on Steam. Dkt. No. 343 ¶¶ 302, 375. And after 2012, some distributed their

---

[10] Valve is not a publicly traded company and therefore has no external reporting obligation for proprietary information. So this redaction, like others, is necessary to maintain the confidentiality of Valve's business information. *See, e.g.*, Dkt. Nos. 95, 159, 169, 236, 237, 330, 331 (protective orders and orders granting motions to seal).

titles through their own platform(s). *Id.* Therefore, Dr. Schwartz focuses on Steam Store sales between these two points because this is when the largest game developers and publishers—Valve included—sold their games primarily through the Steam Store. *See id.* ¶¶ 332–410.

Ultimately, Dr. Schwartz's resulting opinion may be incorrect. But that is not the standard for admissibility. And for Rule 23 purposes, he need only provide a reliable method to establish the existence of antitrust impact and injury, and then show that class-wide damages are susceptible to common proof. *See Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1026–27 (9th Cir. 2024). His "calculations need not be exact." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). They need only provide "some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations." *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982). Dr. Schwartz's market share estimate, as utilized in his but-for analysis, however limited it might be in predicting real world outcomes, meets this standard.

### 3.1.4    Steam Key activity is irrelevant to Dr. Schwartz's opinions.

Dr. Schwartz also concludes that Valve's commission on Steam Store sales in a competitive market would be ███ percent, rather than the ███ it recently averaged.[11] Dkt. Nos. 182-1, 343 ¶¶ 352, 377. Dr. Schwartz did not factor in Steam

---

[11] Dr. Schwartz determined this by averaging the overall commission rate on Steam Store sales from the beginning of the proposed class period, January 28, 2017, through December 31, 2022. *See, e.g.*, Dkt. No. 343 ¶¶ 36, 82, 308, 334, 352, 400. Presumably, data beyond 2022 was unavailable to Dr. Schwartz. According to Valve's expert, though, its average rate is slightly lower, averaging ███ percent. Dkt. No. 233-1 ¶ 155.

Keys in determining these amounts. *See* Dkt. No. 343 ¶¶ 332–410. Valve contends this is error. Dkt. No. 321 at 12–13.

Steam Keys are unique alphanumeric codes used to access Steam-enabled games, which Valve provides to video game companies to distribute as they see fit. Dkt. No. 343 ¶¶ 45–47. Steam Keys allow gamers to access Steam-enabled games without purchasing them through the Steam Store. *Id.* Sometimes game companies give Steam Keys away; sometimes they charge. *Id.* ¶ 45. This varies by video game and game company, as does the number of Keys which Valve provides at its discretion. *Id.* ¶ 46. According to Dr. Schwartz, Valve makes Steam Keys available to protect its market position and bring new customers into Steam. *Id.* ¶ 47.

To assess antitrust impact and injury, Valve suggests that Steam's commission rate must include the revenue it generates on *all* Steam-enabled games, including those distributed outside the Steam Store through Steam Keys. *See* Dkt. Nos. 321 at 12–13, 363 at 3–5. If true, this would mean Valve's effective commission rate is much lower than Dr. Schwartz's calculation. *Id.* But this ignores the fact that Valve utilizes a revenue share model, with Steam Store sales as the driver. It is through this mechanism that Valve allegedly exacts its antitrust toll from the putative class. *See* Dkt. No. 343 ¶¶ 332–410.

In addition, Valve's argument skates over antitrust netting requirements. Dr. Schwartz surmises that in a competitive market, Valve would continue to provide Steam Keys. Dkt. No. 348-1 ¶¶ 180–85. If anything, to maintain its competitive position, Valve would need to provide more Keys than it does now. *See* Dkt. No. 383-1 ¶ 16. This means that there is no legal basis to net the savings

provided to the putative class through Steam Keys (sales commissions *not* paid) against Valve's allegedly inflated Steam Store commissions. *See Los Angeles Meml. Coliseum Commn. v. Nat'l Football League*, 791 F.2d 1356, 1370 (9th Cir. 1986) (in determining antitrust damages, plaintiffs need not net savings they would incur regardless of the antitrust conduct against the harm associated with that conduct); *see also In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 480 (N.D. Cal. 2020) (the antitrust impact is determined at the time of overcharge—later savings are irrelevant) (citing *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968)). Again, according to Dr. Schwartz, Valve would provide Keys irrespective of whether it charged inflated commissions. *See* Dkt. No. 348-1 ¶¶ 180–85.

### 3.1.5    Dr. Schwartz's passthrough approach satisfies Rule 702.

For purposes of determining class-wide antitrust impact and injury, Dr. Schwartz estimated what portion of the savings from a reduced (*i.e.*, competitive) commission a video game company might pass through to game consumers. *See* Dkt. No. 343 ¶¶ 379–97. If they were to pass through all of it, there would be no antitrust impact or injury.

Because a competitive market does not presently exist, Dr. Schwartz compared the prices certain companies charged on a selection of Steam Store games before and after Valve adopted its present volume discount policy. *Id.* From this information, Dr. Schwartz could see how much savings those companies passed on to consumers. What he found was, on average, they passed through ███ percent of their savings. Dkt. Nos. 182-1, 343 ¶ 397. Dr. Schwartz then used this figure to gauge the impact and injury Valve's alleged antitrust conduct caused publishers.

Dkt. No. 343 ¶¶ 379–97.

Valve challenges the statistical method Dr. Schwartz used to select games for his analysis, focusing on the sample size and his practice of removing outliers. Dkt. No. 321 at 13–15. But as Dr. Schwartz explains, companies are highly likely to retain at least a portion of their savings. *See* Dkt. No. 348-1 ¶ 253–54. He applied an average passthrough, negating the need for individualized inquiry about antitrust impact and injury. *Id.*

This type of sampling largely fits what other courts have permitted in a similar context. *See, e.g.*, *In re Broiler Chicken Grower Antitrust Litig. (No. II),* No. 6:20-MD-02977-RJS-CMR, 2024 WL 2117359, at *18 (E.D. Okla. May 8, 2024); *In re Takata Airbag Prod. Liab. Litig.*, No. 15-MD-02599-MORENO, 2022 WL 4594123, at *5 (S.D. Fla. July 19, 2022). So this Court considers it to be generally accepted. Statistical averaging is a "generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir. 2022).

In summary, Dr. Schwartz's methods are reliable and within the norms for admission, as provided by Rule 702. At bottom, Valve's critiques go to the weight of the evidence, rather than admissibility. *See Apple iPod iTunes Antitrust Litig.*, No. 05-cv-0037-YGR, 2014 WL 4809288, at *4 (N.D. Cal. Sept. 26, 2014).

## 3.2    Plaintiffs' motion for Class Certification.

Plaintiffs move to certify a class of game companies (or persons) who paid a

1    commission to Valve to sell their games on Steam from January 2017 through

2    present. *See generally* Dkt. No. 256.

3        To certify a class action under Rule 23, Plaintiffs must show (1) the class is so

4    numerous that joinder is impracticable, (2) there are common questions of law or

5    fact, (3) the claims or defenses of the representatives are typical of those of the

6    class, and (4) the representatives will fairly and adequately protect the interests of

7    absent class members. FED. R. CIV. P. 23(a); *see Mazza v. Am. Honda Motor Co.*, 666

8    F.3d 581, 588 (9th Cir. 2012). If the Rule 23(a) requirements are met, the proposed

9    class must also satisfy at least one of the three requirements found in Rule 23(b).

10   Plaintiffs seeks to certify a (b)(3) class. To do so, they must establish that "questions

11   of law or fact common to the class members predominate over any questions

12   affecting only individual members, and that a class action is superior to other

13   available methods for fairly and efficiently adjudicating the controversy." FED. R.

14   CIV. P. 23(b)(3).

15       The decision to certify a class is within the Court's discretion. *Vinole v.*

16   *Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009). In determining

17   whether Plaintiffs have carried their burden by a preponderance of the evidence,

18   the Court must conduct a "rigorous analysis." *Gen. Tel. Co. of Sw. v. Falcon*, 457

19   U.S. 147, 161 (1982). This inquiry may "entail some overlap with the merits" but

20   only if it overlaps with the Rule 23 requirements. *Ellis v. Costco Wholesale Corp.*,

21   657 F.3d 970, 981 (9th Cir. 2011).

22       In opposing certification, Valve objects to Plaintiffs' market definition; it also

23   attacks whether Plaintiffs have shown sufficient Rule 23(b)(3) commonality and

predominance. *See* Dkt. No. 319 at 6–36. None of Valve's critiques, however, are enough to defeat certification.

### 3.2.1    Plaintiffs present a cogent market.

Plaintiffs allege that Valve, through Steam, holds and maintains monopoly power in the PC video game digital distribution market. *See, e.g.*, Dkt. No. 127 ¶ 52. Valve suggests Plaintiffs' market definition is "incoherent" because it excludes other game forms (such as console and mobile games) and other distribution methods (such as brick-and-mortar stores, cloud gaming, and multi-game subscription models). Dkt. No. 319 at 6–8. But Plaintiffs present significant evidence supporting their market definition. *See, e.g.*, Dkt. Nos. 257 ¶¶ 21–121, 343 ¶¶ 16–28 (Professor Joost Rietveld, Ph.D. and Dr. Schwartz's expert reports). To be sure, Valve presents countervailing evidence, Dkt. No. 344 ¶¶ 22–57, 84–133, but it is simply not convincing.

As Plaintiffs' experts make clear, downloaded PC games are materially distinct from other forms. This is based on the purchase and game play experience (such as the hardware inputs and outputs, the computing capacity of the PC itself, the opportunities for game customization, the lack of latency that downloaded games offer, and the game play experience). *See, e.g.*, Dkt. No. 257 ¶¶ 49–61, 66–82, 104, 108, 109, 116–21. This matches both the regulatory view and even Valve's, as it has outlined in other venues. *Id.* ¶¶ 63, 65.

### 3.2.2    Numerosity, typicality, adequacy, and superiority are satisfied.

Valve does not contest that Plaintiffs satisfy numerosity, typicality, adequacy

of representation, or superiority. *See generally* Dkt. No. 319 at 21–36. Nor would it appear that Valve reasonably could.

As to numerosity, "[w]here the exact size of the class is unknown, but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *In re Abbott Laboratories Norvir Anti-Tr. Litig.*, No. C 04-1511 CW, 2007 WL 1689899, at *6 (N.D. Cal. June 11, 2007) (internal quotation omitted). "[I]n general, a class include[ing] at least 40 members" is sufficient. *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010); *see also Troy v. Kehe Food Distrib., Inc.*, 276 F.R.D. 642, 652 (W.D. Wash. 2011) (certifying a class of 43 to 54 workers). Plaintiffs submit unrebutted evidence that the proposed class consists of thousands of game developers or publishers. Dkt. Nos. 182-1, 343 ¶ 399. This is enough to satisfy numerosity.

As to typicality, at issue is "whether other members have the same or similar injury, whether the action is based on conduct not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984 (cleaned up). In the antitrust context, typicality is established when "all class members allege the same antitrust violation." *In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 295 (N.D. Cal. 2018) (citing *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1181 (N.D. Cal. 2013)); *see* Joseph McLaughlin, Typicality—Application of typicality requirement to particular cases— Antitrust, McLaughlin on Class Actions: Law and Practice § 4:21 (20th ed. 2023). Here, the alleged antitrust conduct—imposition of an alleged PMFN—is the same for each member of the putative class. *See* Dkt. Nos. 127 ¶¶ 156–388, 343 ¶¶ 150–

240. Typicality is satisfied.

As to adequacy of representation, the Court examines whether the named plaintiffs and their counsel have any conflicts of interest with other class members and whether they will prosecute the action vigorously on behalf of the class. *Ellis*, 657 F.3d at 985. This requires "an absence of antagonism between representatives and absentees and a sharing of interest between representatives and absentees." *Id.* (cleaned up). The Court knows of no such antagonism, nor has Valve suggested any. *See generally* Dkt. No. 319 at 21–36. And as Plaintiffs explain, Wolfire and Dark Catt both share a common injury as putative class members (allegedly inflated commissions). *See* Dkt. No. 256 at 23–24. Wolfire and Dark Catt will adequately represent their game company peers.

As for superiority, the Court must find that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). When undertaking this inquiry, the Court considers (1) the interest of individuals within the class in controlling their own litigation, (2) the extent and nature of any pending litigation commenced by or against the class involving the same issues, (3) the convenience and desirability of concentrating the litigation in a particular forum, and (4) the manageability of the class action. *See* Fed. R. Civ. P. 23(b)(3)(A)–(D); *Zinzer v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001). This analysis must "focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Id.*

Given the complexity of the legal and evidentiary issues raised in this

consolidated suit, resolving them in a uniform manner through a class action is superior to resolving them through individual suit(s). Moreover, this is the most appropriate forum to do so. Valve admits that its headquarters is within this district. *See* Dkt. No. 128 ¶ 34. And while individual gamers have filed additional suits against Valve in this district,[12] this does not defeat the notion that a class action remains a superior vehicle for resolving the claims presented here, and if anything, supports this notion. The Court reserves judgment, for now, on whether further consolidation is warranted.

### 3.2.3    Valve's attacks on commonality and predominance are unpersuasive.

Commonality requires that the "class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke." *Mazza*, 666 F.3d at 588 (internal citation omitted). The key inquiry is not whether a plaintiff has raised common questions but whether "class treatment will generate common *answers* apt to drive the resolution of the litigation." *Abdullah v. United States Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (emphasis in original) (internal citation omitted). Every question of law or fact need not be common to the class. Rather, all Rule 23(a)(2) requires is "a single significant question of law or fact." *Id.* (internal citation omitted). The existence of "shared legal issues with divergent factual

---

[12] *See Elliott v. Valve Corp.*, Case No. 2:24-cv-1218-JNW, Dkt. No. 1 (W.D. Wash August 9, 2024) (putative antitrust class action brought by individuals who successfully challenged the enforceability of Valve's gamer arbitration provision); *Hepler et al. v. Valve Corp.*, No. 2:24-cv-01735-JNW (W.D. Wash.), and *Drake et al. v. Valve Corp.*, No. 2:24-cv-01743-MLP (W.D. Wash.).

predicates is sufficient, as is a common core of salient facts coupled with disparate

legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th

Cir. 1998) (amended).

Predominance "tests whether a proposed class is sufficiently cohesive to

warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S.

591, 615–16 (1997) (cleaned up). This inquiry presumes the existence of common

factual or legal issues required under Rule 23(a)'s "commonality" element and

instead "focuses on the relationship between the common and individual issues."

*Hanlon*, 150 F.3d at 1023. "When common questions present a significant aspect of

the case and they can be resolved for all members of the class in a single

adjudication, there is a clear justification for handling the dispute on a

representative rather than on an individual basis." *Id.*

In attacking commonality and predominance, Valve takes a buckshot

approach. *See generally* Dkt. No. 319. Its specific arguments include the following:

(a) Plaintiffs cannot establish the existence of a PMFN Policy through common

evidence; (b) alleged antitrust impact, injury, and damages are too particularized to

allow for class treatment; and (c) the statute of limitations presents sufficient

individualized issues to preclude a predominance finding. *Id.* at 8–36. As described

below, none of Valve's arguments are compelling.

a.  Plaintiffs present common evidence of a PMFN Policy.

Valve admits that its standard distribution agreement requires content

parity; but it contends this only applies to DLC, not applications (*i.e.*, games). Dkt.

No. 242 at 14–15. According to the agreement, game companies that sell games

within and outside Steam, and who also distribute DLC for that game, must maintain "material parity" between their Steam and non-Steam customers. Dkt. No. 182-18[13] at 6. Frankly, this provision is not a model of clarity, as its meaning is open to interpretation. But Plaintiffs present Rule 30(b)(6) testimony suggesting that Valve understands it to require content parity in all instances, not just for DLC. *See* Dkt. No. 182-33[14] at 15. This is common proof of a content parity requirement.

As to price parity, as mentioned above, *see supra* Part 3.1.2, Plaintiffs present evidence that Valve communicates this portion of the PMFN Policy in a roundabout manner and through various means. *See* Dkt. No. 343 ¶¶ 157–67. They include certain contract terms associated with providing Steam Keys, one-off discussions with game companies, and various messages in industry forums. *Id.* All this contributes to a common industry understanding of Valve's price-parity expectation. *See* Dkt. Nos. 343 ¶ 320, 348-1 ¶¶ 18–21. This is sufficient, under the rule of reason,[15] to establish common evidence of a price parity expectation that drives

---

[13] Docket 182-18 is a sealed unredacted version of Docket Number 204-18. *See* Dkt. Nos. 198, 236, 237 (motion to seal and resulting order).

[14] Docket Number 182-33 is a sealed unredacted version of Docket Number 204-33. *See* Dkt. Nos. 198, 236, 237 (motion to seal and resulting order).

[15] The rule of reason is a burden-shifting framework used to gauge whether non-per se anticompetitive conduct violates the Sherman Act. *See Amex*, 585 U.S. at 541–42. While the rule of reason is mainly a merits determination, it applies with equal force in assessing whether an antitrust case satisfies Rule 23. *See, e.g.*, *In re Beer Distrib. Antitrust Litig.*, 188 F.R.D. 557, 563 (N.D. Cal. 1999); *Kamakahi v. Am. Socy. for Reprod. Med.*, 305 F.R.D. 164, 174 (N.D. Cal. 2015). It thus implicates issues of commonality and predominance.

common market behavior. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974

(9th Cir. 2023); *see In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d at

1172 (discussing the notion of industrywide or "common impact[s]").

      b.  <u>Common issues drive the inquiry about antitrust impact, injury, and</u>
<u>damages.</u>

As to the antitrust impact of Valve's supposed PMFN Policy, Valve provides a

litany of challenges to Plaintiffs' theories. They include examples of games selling

for less off Steam and testimony from game companies explaining why they prefer

keeping their game prices uniform across platforms (*i.e.*, to meet consumer

expectations). *See* Dkt. No. 319 at 27–28 (citing Dkt. Nos. 322-10 at 18, 322-24 at 9,

344 ¶¶ 287–97). None of this defeats predominance. Rather, this evidence raises

common questions about the class-wide response to Valve's alleged PMFN

expectation, an issue which predominates over any individualized questions. *See*

*Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013) ("the

focus of Rule 23(b)(3) is on the predominance of common *questions*") (emphasis in

original).

Concerning antitrust injury, Valve contends that Plaintiffs cannot "meet

their predominance burden" to "prove that antitrust impact is 'capable of being

established through a common body of evidence, applicable to the whole class.'" Dkt.

No. 319 at 29 (citing *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 666). In

support, Valve makes the same arguments it did in moving to exclude

Dr. Schwartz's testimony: (a) the import of Steam Keys cannot be ignored, (b)

Plaintiffs have no means of accurately determining pass through, and (c) any

antitrust overcharge must be offset by the benefits received. *See id.* at 29–34. Those arguments are no more persuasive for purposes of Rule 23(b)(3) than they were for purposes of Rule 702. *See supra* Part 3.1.4–3.1.5. Through Dr. Schwartz's testimony, Plaintiffs establish a common antitrust injury: inflated Steam Store commissions that all class members must pay. *See* Dkt. Nos. 343 ¶¶ 241–397; 348-1 ¶¶ 160–95; 383-1 ¶¶ 9–14, 29–34.

Finally, as to antitrust damages, Valve suggests Plaintiffs cannot measure them across the entire class. *See* Dkt. No. 319 at 34–36. In support, it repeats the methodological challenges raised against Dr. Schwartz's testimony. *Compare id.*; *with* Dkt. No. 321 at 3–6, 12–15. As before, those arguments fail here. At this stage, Plaintiffs may utilize statistical means to estimate antitrust injury across the class. The apportionment of damages to individual class members is not required. *See In re Glumetza Antitrust Litig.*, 336 F.R.D. at 479 ("'[a]ntitrust plaintiffs may satisfy the predominance requirement by using a model that estimates the damages attributable to the antitrust injury, even if more individualized determinations are needed later to allocate damages among class members.'") (quoting *In re Suboxone (Buprenorphine Hydrochlorine and Naloxone) Antitrust Litig.*, 967 F.3d 264, 269 (3d Cir. 2020)). Said another way, "[t]he need for individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016).

c. <u>The statute of limitations for antitrust claims does not defeat predominance.</u>

Finally, Valve suggests that, because the antitrust statute of limitations is

four years, and the proposed class period extends beyond that to January 28, 2017, individualized inquiry is required to establish when each putative class member was first harmed by Valve's alleged conduct. *See* Dkt. No. 319 at 24–27 (citing 15 U.S.C. § 15b). Valve contends that individualized inquiries would be required to determine when each class member first heard of the PMFN. *Id.* at 25. This is because the continuing violation doctrine would not apply if premised on the "'passive receipt'" of revenue derived from Valve's alleged anticompetitive conduct, rather than an "'overt act of enforcement.'" *Id.* at 26 (quoting *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989)). But Plaintiffs point to common proof of Valve's overt acts occurring within the proposed class period. *See* Dkt. No. 347 at 20–21 (citing Dkt. No. 343 ¶¶186 n.503, 187 n.505, 191). The anticompetitive effect of these acts present common issues that predominate. Moreover, even if the statute did present individualized issues, this alone would not be enough to defeat predominance. *See Williams v. Sinclair*, 529 F.2d 1383, 1388 (9th Cir. 1975); *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 308 (N.D. Cal. 2016).

In summary, none of Valve's commonality and predominance attacks defeat class certification.

### 3.3    Plaintiffs' Request for the Appointment of Class Counsel.

The Court previously appointed numerous attorneys as Interim Co-Lead Class Counsel in this matter. *See* Dkt. No. 92. Plaintiffs now ask that those same attorneys be appointed Co-Lead Class Counsel for the rest of the case (through trial). *See* Dkt. No. 256 at 35. In considering this request, the Court must consider:

(1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class[.]" FED. R. CIV. P. 23(g)(1)(A). To date, interim class counsel have pursued the putative class's claims in an effective, collaborative, and well-resourced manner. This matches their collective performance in other large class actions. *See* Dkt. Nos. 204-80, 204-81, 204-82, 204-83. The Court sees no reason that, if reappointed, interim class counsel's performance would not continue just like it has to date.

## 4.  CONCLUSION

In sum, the Court GRANTS Plaintiffs' motion for class certification and the appointment of co-lead class counsel, Dkt. No. 256, DENIES Valve's motion to exclude, Dkt. No. 321, and ORDERS as follows:

1.  The following class is certified:

> All persons or entities who, directly or through an agent, paid a commission to Valve in connection with the sale or use of a game on the Steam platform on or after January 28, 2017, and continuing through the present until the effects of its scheme are eliminated (the "Class Period"), and where either (1) the person or entity was based in the United States and its territories or (2) the game was purchased or acquired by a United States-based consumer during the Class Period. Excluded from the Class are (a) Defendant, its parents, subsidiaries, affiliate entities, and employees, and (b) the Court and its personnel.

2.  Wolfire and Dark Catt are appointed class representatives; and

3.  The firms below are appointed Co-Lead Class Counsel:

Quinn Emanuel Urquhart & Sullivan, LLP; Constantine Cannon LLP; Lockridge Grindal Nauen P.L.L.P.; and Wilson Sonsini Goodrich & Rosati, P.C.

The case management schedule, which the Court previously adopted, Dkt. No. 98, remains in force. The Court will defer setting a schedule beyond summary judgment until it disposes of such motions, currently due 180 days from today. *See id.* at 2.

This ruling has no bearing on a putative consumer class, as described in this and related cases. *See* Dkt. No. 370; *Elliott*, Case No. 2:24-cv-1218-JNW, Dkt. No. 1; *Drake*, No. 2:24-cv-01743-JNW, Dkt. No. 1; *Hepler*, No. 2:24-cv-01735-JNW, Dkt. No. 1.

Dated this 25th day of November, 2024.

Jamal N. Whitehead
United States District Judge