THE HONORABLE JAMAL N WHITEHEAD

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

| IN RE VALVE ANTITRUST LITIGATION | Case No. 2:21-cv-00563-JNW |
|---|---|
| | ***ELLIOTT* PLAINTIFFS' OMNIBUS RESPONSE IN SUPPORT OF AMENDED MOTION TO APPOINT HAGENS BERMAN SOBOL SHAPIRO LLP AND BUCHER LAW PLLC AS INTERIM CO-LEAD CLASS COUNSEL** |
| This Filing Relates to:<br><br>[ALL ACTIONS] | **NOTE FOR MOTION CALENDAR**: January 17, 2025 |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**HAGENS BERMAN**

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ........................................................................1

II.   ARGUMENT ...................................................................................................3

    A.    *Hepler* Counsel support *Elliott* Counsel's appointment as co-lead counsel to the proposed Consumer Class ...................................................3

    B.    All applicable Rule 23(g) factors favor *Elliott* Counsel's application over competing leadership bids submitted by *Colvin* and *Drake* Counsel.............................................................................3

        1.    *Colvin* Counsel has a disqualifying conflict of interest that their own co-counsel acknowledge. ...........................................4

        2.    While *Elliott* Counsel's efforts made this consumer class case possible, *Colvin* and *Drake* Counsel have not meaningfully advanced the consumer case................................10

        3.    *Elliott Counsel* have a superior track record developing and prevailing on the antitrust theories presented in this litigation. ....................................................................................12

        4.    Bucher Law's arbitration efforts on behalf of consumers compliment the class case and create no conflict of interest. ...................14

        5.    Other applicable considerations support *Elliott* Counsel's appointment....................................................................................18

III.  CONCLUSION................................................................................................20



1

## TABLE OF AUTHORITIES

2

__Page(s)__

3

### CASES

4

5

*Apple Inc. v. Pepper*,
    587 U.S. 273 (2019) ..................................................................................................4, 9

6

*Baker v. Saint-Gobain Performance Plastics Corp.*,
    2016 WL 4028974 (N.D.N.Y. July 27, 2016) ...............................................................19

7

8

*Bell v. Disner*,
    2018 WL 296035 (W.D.N.C. Jan. 4, 2018) ...................................................................16

9

*Bolding v. Banner Bank*,
    2021 WL 1171988 (W.D. Wash. Mar. 29, 2021) .........................................................16

10

11

*Giuliano v. Sandisk Corp.*,
    2015 WL 10890654 (N.D. Cal. May 14, 2015) ..............................................................4

12

*In re Google Play Store Antitrust Litig.*,
    2022 WL 17252587 (N.D. Cal. Nov. 28, 2022) ..............................................................4

13

14

*In re Google Play Store Antitrust Litig.*,
    2024 WL 4438249 (N.D. Cal. Oct. 7, 2024)..................................................................13

15

16

*Gutierrez-Bejar v. SOS Int'l, LLC*,
    2019 WL 5683901 (C.D. Cal. Nov. 1, 2019) ................................................................16

17

*In re HIV Antitrust Litig.*,
    2023 WL 3011624 (N.D. Cal. Apr. 18, 2023) .................................................................5

18

19

*Lowery v. Spotify USA Inc.*,
    2016 WL 6818756 (C.D. Cal. May 23, 2016) ...............................................................14

20

21

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) .....................................................................................6, 9

22

*In re Meta Pixel Healthcare Litig.*,
    2022 WL 18399978 (N.D. Cal. Dec. 21, 2022)..............................................................20

23

24

*Mongue v. Wheatleigh Corp.*,
    2023 WL 5435918 (D. Mass. Aug. 23, 2023) ...............................................................17

25

26

*Napoleon v. Amazon.com, Inc.*,
    2024 WL 3652873 (W.D. Wash. Aug. 5, 2024)......................................................14, 18

27

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ...................................................................................9, 10

28

*Oliver v. Am. Express Co.*,
    2024 WL 100848 (E.D.N.Y. Jan. 9, 2024) ..................................................6

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    827 F.3d 223 (2d Cir. 2016) ..................................................................7

*In re Pfizer Inc. Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ...........................................................15

*Rhodes v. Robinson*,
    621 F.3d 1002 (9th Cir. 2010) ............................................................11

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ...............................................................18

*Ruderman ex rel. Schwartz v. Wash. Nat'l Ins. Co.*,
    263 F.R.D. 670 (S.D. Fla. 2010) .........................................................18

*Stott v. Cap. Fin. Servs., Inc.*,
    277 F.R.D. 316 (N.D. Tex. 2011) ........................................................17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010) ..........................................................4

*Unified Sewerage Agency v. Jelco Inc.*,
    646 F.2d 1339 (9th Cir. 1981) ............................................................10

*Uschold v. Carriage Servs., Inc.*,
    2020 WL 1466172 (N.D. Cal. Mar. 6, 2020) .......................................18

*Wallace v. Powell*,
    No. 2013 WL 2042369 (M.D. Pa. May 14, 2013) ...............................16

## OTHER AUTHORITIES

Washington Rule of Professional Conduct 1.7 .................................7, 10, 16



Plaintiffs John Elliott, Ricardo Camargo, Javier Rovira, and Bradley Smith (together *Elliott* Plaintiffs) and their counsel, Hagens Berman Sobol Shapiro LLP and Bucher Law PLLC (*Elliott* Counsel), submit this Omnibus Response in Support of Motion to Appoint Hagens Berman Sobol Shapiro LLP and Bucher Law PLLC as Interim Co-Lead Class Counsel for Consumers, responding to the separate leadership applications submitted by counsel to the *Hepler*, *Colvin*, and *Drake* Plaintiffs.

## I.    PRELIMINARY STATEMENT

This class case is only possible because *Elliott* Counsel—specifically Bucher Law—did the hard and innovative work necessary to defeat Valve's arbitration provision.  Beyond that, Bucher Law has done more substantive legal work on behalf of consumers than any firm in the country, having now *tried* consumer claims in arbitration while devoting thousands of hours to developing evidence and expert analysis supporting their claims.  This unyielding commitment to consumers, coupled with Hagens Berman's unparalleled experience litigating big-tech antitrust cases, makes *Elliott* Counsel the most qualified to represent consumers, and the counsel Valve would least like to face.

The Court has received three additional leadership bids, specifically proposals submitted by counsel to the *Hepler*, *Colvin*, and *Drake* Plaintiffs.  Respectfully, these proposals confirm that *Elliott* Counsel is best situated and qualified to represent Consumers.

*Hepler* Counsel recognize *Elliott* Counsel's "compelling" case to be appointed lead counsel, acknowledging that *Elliott* Counsel have done more to advance the consumer cause than any firm.  *See* ECF No. 407 at 10.  *Hepler* Counsel request only to be appointed co-lead alongside *Elliott* Counsel, a request that *Elliott* Counsel support to build consensus and fortify the resources the Consumer class can draw upon.

*Colvin* Counsel's competing leadership bid should be rejected due to, among other things, a conflict of interest its own co-counsel acknowledge.  When arbitration of consumers was compelled, *Colvin* Counsel dropped consumers from their case to secure a more remunerative role representing publishers, which they have done for more than three years now.  As court-appointed counsel for publishers only, *Colvin* Counsel took discovery on publishers' behalf and sponsored a

1   model that assigns publishers almost the entirety of the overcharges available in this case (75-
2   80%), at consumers' expense.

3       Now that Bucher Law has unexpectedly relaunched the consumer ship, *Colvin* Counsel
4   opportunistically seek to command it, notwithstanding their concurrent representation of
5   publishers.  No Court has permitted this type of dual representation, and it would handicap
6   Consumers by tethering them to a model that privileges competing claimants to whom *Colvin*
7   Counsel owe a duty of loyalty.  Consumers should not be saddled with counsel laboring under
8   divided (and shifting) loyalties.  Conflicts aside, *Colvin* Counsel have virtually no leadership
9   experience in plaintiff-side class actions.  If the Court put itself in the shoes of the Consumer Class,
10   would it hire *Colvin* Counsel or lawyers that have *Elliott* Counsel's track record of success and
11   freedom to advance Consumers' interests without any conflicting loyalties to publishers?

12       *Drake* Counsel have likewise done little to advance the consumer case beyond filing a
13   complaint fifteen months after Bucher Law initiated arbitrations on consumers' behalf.  *Drake*
14   Counsel claim to have been biding their time to file a class action if/when one was ever authorized.
15   But this is precisely why their request to lead the Consumer case should be rejected.  The reason
16   class litigation is possible is because Bucher Law did the hard work *Drake* Counsel declined to
17   undertake—most likely because arbitration clauses are rarely challenged successfully.  Where, as
18   here, a court delegates issues of arbitrability, lawyers should not be rewarded with leadership roles
19   when they stand idle and rely on other firms to initiate the arbitrations needed to contest
20   arbitrability.  Again, we ask the Court to put itself in the Class's shoes.  If given the option, would
21   the Court hire lawyers who have been championing consumers' cause for years (and securing
22   remarkable results) or lawyers who parachuted into the case in the last minute to capitalize on the
23   efforts of others?

24       If appointed to lead (or co-lead) the Consumer case, *Elliott* Counsel will continue their
25   efforts on behalf of the Consumers to maximize their recovery and inject competition into the PC
26   gaming market.  *Elliott* Counsel appreciate the Court's consideration of their application.

27

28

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

## II.     ARGUMENT

**A.     *Hepler* Counsel support *Elliott* Counsel's appointment as co-lead counsel to the proposed Consumer Class.**

*Hepler* Counsel openly recognize that the "Hagens Berman/Bucher Law team have a compelling argument that their efforts have done more to advance consumer plaintiffs' interests in this litigation than any other proposed lead counsel." ECF No. 407 at 10. This is because "it was only due to Bucher Law's successful arbitration strategy that Valve removed the arbitration clause and the class action waiver from its terms of service, clearing the way for this litigation to proceed." *Id.* As *Hepler* Counsel acknowledge, without *Elliott* Counsel's "initiative, no applications for leadership from any firm would be pending before this Court." *Id.*

*Hepler* Counsel request to be appointed co-lead serving Consumers alongside *Elliott* Counsel. *See id.* at 1. In an effort to build consensus, *Elliott* Counsel support *Hepler* Counsel's participation as a co-lead. The class would be well-served by *Hepler* Counsel's addition to the leadership slate. Additional counsel are not necessary to mitigate any conflicts of interest—as addressed *infra*, *Elliott* Counsel have none. But this is a sizable case that promises enough substantive work for anothepr law firm to be included in the leadership structure. While *Elliott* Counsel have the resources to litigate the case effectively through trial, *Hepler* Counsel's inclusion would add further resources and antitrust experience to the class's benefit. *Elliott* Counsel have also coordinated successfully with *Hepler* Counsel in a range of antitrust matters against well-resourced defendants, recovering hundreds of millions for consumers. *See* ECF No. 407 at 8-9, 11 (summarizing prior matters). *Elliott* and *Hepler* Counsel have proven their ability to collaborate efficiently and would do so for Consumers in this case as well.

**B.     All applicable Rule 23(g) factors favor *Elliott* Counsel's application over competing leadership bids submitted by *Colvin* and *Drake* Counsel.**

*Colvin* and *Drake* Counsel have submitted competing applications to be appointed lead counsel to the Consumer class. As set forth below, however, all Rule 23(g) factors tip against these applications and favor *Elliott* Counsel.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1.    *Colvin* **Counsel has a disqualifying conflict of interest that their own co-counsel acknowledge.**

This litigation involves two groups of plaintiffs competing over overcharges that must, under the theories presented, be allocated between them.  The game publishers (also called "developers") contend that Valve's anticompetitive conduct allows Valve to charge them supracompetitive commissions on the sale of PC games through Valve's online store, *see* ECF No. 127 at ¶¶ 4, 154-163.  Consumers, in turn, contend that these supracompetitive commissions are not absorbed entirely by publishers but instead get baked into the prices that consumers pay for PC games and in-game content. *See Elliott*, ECF No. 1 at ¶ 3.

Under the overcharge model presented by *Colvin* Counsel, this is a zero-sum game in which some portion of the overcharge is incurred by publishers and the remainder by consumers.  *See* ECF No. 203 at 29.  Specifically, in moving for class certification on publishers' behalf, *Colvin* Counsel and their economic expert calculated publisher damages as the amount of the "overcharge by Valve" that was *not* "pass[ed]-through" to consumers.  *See* ECF No. 343 at ¶ 402 (Schwartz Report).  Under this methodology, damages must be divvied up between publishers and consumers based on the rate of "pass-through." *Id.*[1]  Unsurprisingly, *Colvin* Counsel and the publishers they represent have estimated a low rate of pass-through (just 20-25%), meaning publishers get the lion's share (75-80%) of damages.  *See id.*  But if the rate of pass-through were higher, consumers would get a substantially larger share of damages.  Pass-through rates are routinely disputed in antitrust litigation.[2]

*Colvin* Counsel's co-counsel—specifically Lockridge Grindel Nauen PLLP ("LGN") and Wilson Sonsini Goodrich & Rosati PC ("WSGR")—have recognized, as they must, that basic duties of loyalty prevent attorneys from representing both publishers and consumers given this

---

[1] While *Colvin* Counsel have adopted the language of "pass-through" to discuss this allocation, that terminology is normally associated with indirect purchaser litigation, which this is not. Consumers are direct purchasers from Valve. *Apple Inc. v. Pepper*, 587 U.S. 273, 287 (2019); *see also In re Google Play Store Antitrust Litig.*, 2022 WL 17252587, at *10 (N.D. Cal. Nov. 28, 2022).

[2] *See, e.g.*, *Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *9 (N.D. Cal. May 14, 2015) (addressing expert dispute on pass-through rate); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 601-06 (N.D. Cal. 2010) (same).

allocation problem.  These firms forcefully opposed *Colvin* Counsel's initial attempt in 2021 to undertake this dual representation, observing that it presented a "fundamental conflict" because publishers and consumers have competing incentives.  *See* ECF No. 46 at 6.  The conflict is unavoidable because, as LGN and WSGR observed, consumers will "seek to show that a large amount of the overcharges Developers paid to Valve would have flowed to them," whereas developers (or publishers) will contend the opposite.  *See id.* at 11.  As LGN and WSGR noted, this "divergence in best interests carries through nearly every stage of the litigation—discovery, class certification, experts, and trial—and precludes the same lead counsel from representing both groups."  *Id.* at 12; *see also* ECF No. 58.  Judge Coughenour deferred ruling on this conflicts issue once Valve sought to compel arbitration of consumer claims, but he noted the potential problem. *See* ECF No. 63 at 4 ("The closer issue, though, is whether counsel could adequately and fairly represent the interests of those publishers, if also representing game purchasers (or vice versa).").

LGN and WSGR were right to oppose joint representation of publishers and consumers.  It is unprecedented and contrary to well-established practice in antitrust litigation, in which separate counsel is generally appointed for different market participants to safeguard against the mere *risk* that interests diverge.  For example, separate counsel are routinely appointed for direct purchasers alleging an overcharge, and indirect purchasers contending that the overcharge was "passed through" to them in the form of higher retail prices.[3]  Separate counsel are routine in this circumstance even though there is *no* allocation problem, as under controlling law, direct purchasers are entitled to the full amount the overcharge (without reduction for indirect purchasers), and indirect purchasers can recover under state laws the portion of the overcharge passed through.[4]

---

[3] *See, e.g.*, *In re Auto. Wire Harness Sys. Antitrust Litig.*, No. 2:12-md-2311, Dkt. 60, 64, 65 (E.D. Mich. Mar. 2012) (separate counsel for different market participants); *In re Aluminum Warehousing Antitrust Litig.*, No. 1:13-md-2481, Dkt. 216 (S.D.N.Y. Mar. 6, 2014) (same); *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 1:14-md-2508, Dkt. 67 (E.D. Tenn. May 20, 2014) (same); *In re Vehicle Carriers Servs. Antitrust Litig.*, No. 13-cv-3306, Dkt. 106 (D.N.J. Mar. 3, 2014) (same); *In re Chocolate Confectionary Antitrust Litig.*, No. 1:08-md-1935, Dkt. 387 (M.D. Pa. Sept. 14, 2008) (same).

[4] *See, e.g.*, *In re HIV Antitrust Litig.*, 2023 WL 3011624, at *3 (N.D. Cal. Apr. 18, 2023).

1    The conflict here is much starker, reinforcing the need for separate representation.  Here,

2    *Colvin* Counsel's own theory of damages requires allocating a fixed pool of overcharges between

3    publishers and consumers.  Worse, when representing publishers only, *Colvin* Counsel sponsored

4    a model that performs the allocation and assigns almost all of the overcharge to publishers.  As

5    noted, it does this by estimating a remarkably low 20-25% rate of pass-through, far below the 90%

6    rate that empirical modelling in most industries shows.[5]  This low pass-through rate was not pre-

7    ordained, but rather the product of modelling decisions *Colvin* Counsel and their expert pursued.

8    For example, according to Valve's own expert, by using a "median" rate of pass-through, *Colvin*

9    Counsel's model excludes from consideration "[t]he 23 percent of games with 100 percent or more

10   pass-through." ECF No. 345 at ¶ 114.  Had *Colvin* Counsel used the mode, rather than the median,

11   the pass-through rate would have been approximately 60%, basically tripling the overcharge

12   allocated to consumers.  *See id.* (chart showing mode in 60% range).

13   Consumer plaintiffs are entitled to have their own counsel and experts evaluate this

14   fundamental allocation issue on a clean slate without any conflicting loyalties to publishers.  The

15   stakes could not be more significant given the substantial overcharges at stake in this litigation—

16   even modest adjustments in the allocation could yield hundreds of millions of additional dollars to

17   consumers.  Consumers should not be tethered to a model that was developed on behalf of

18   publishers by counsel laboring under a duty of loyalty and competing incentives (both financial

19   and ethical) to maximize the publishers' recovery at consumers' expense.  *See, e.g.*, 1 Newberg

20   and Rubenstein on Class Actions § 3:75 (6th ed.) (observing that class counsel cannot represent

21   two groups when "recovery of one set will cut directly into those of another"); *see also In re Mego*

22   *Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (recognizing that a  "conflict between

23   class members regarding the most favorable measure of damages can create a potential conflict of

24   interest between members of the class").

---

26   [5] *See, e.g.*, *Oliver v. Am. Express Co.*, 2024 WL 100848, at *23 (E.D.N.Y. Jan. 9, 2024)
27   (discussing empirical studies showing 90% to be the midpoint of "pass-through rates of industry-
     wide costs changes in various industries").

**HAGENS BERMAN**

1    In seeking dual representation of publishers and consumers, *Colvin* Counsel admit that they

2    "contributed to qualifying Dr. Schwartz as an expert" and vouch again for his methodologies.  *See*

3    ECF No. 409.  According to *Colvin* Counsel, this is no problem because having one model on

4    behalf of publishers and consumers will avoid "inconsistent theories." *See id.* at 11.  But the same

5    could be said for any litigation strategy that compromises one group's interests in favor of another.

6    "Divided loyalties are rarely divided down the middle." *In re Payment Card Interchange Fee &*

7    *Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 233 (2d Cir. 2016).  More fundamentally, the whole

8    point of having separate representation is to ensure that no party's interests are disserved by

9    counsel who, with divided loyalties, are incentivized to compromise their clients' competing

10   interests to avoid inconsistency.  All parties are entitled to *uncompromised* representation, even if

11   that generates disputes that require resolution by the fact finder.  This is a feature, not a bug, of our

12   judicial system.  It is how we ensure that all parties receive adequate and effective representation.

13   The dual representation *Colvin* Counsel are contemplating would also violate basic norms

14   of professional conduct, as set forth in the accompanying report of legal ethics expert, Merri

15   Baldwin Esq.  *See* Updated Expert Report of Merri Baldwin ("Baldwin Rep.").[6]  Ms. Baldwin

16   observes that representing publishers and consumers in these proceedings is not compatible with

17   Washington Rule of Professional Conduct 1.7, which prohibits lawyers from representing clients

18   that are "directly adverse" or where there "is a significant risk that the representation of one or

19   more clients will be materially limited by the lawyer's representation to another client."  *See*

20   Baldwin Rep. ¶ 16.  Ms. Baldwin considers *Colvin* Counsel's contemplated dual representation to

21   be a "clear violation of the duty of loyalty, and thus a conflict of interest, with serious ramifications

22   for the law firm's handling of the matter from establishing the elements of liability (including

23

24

---

25   [6] Ms. Baldwin is a Washington and California-barred attorney who teaches professional
26   responsibility at Berkeley School of Law.  She is a member of the California Lawyers Association
     Legal Ethics Committee and the former chair of the State Bar of California Standing Committee
27   on Professional Responsibility and Conduct.  She regularly advises law firms on professional
     responsibility and testifies as an expert on legal ethics.  *See* Baldwin Rep. ¶¶ 4-7.

28

**HAGENS BERMAN**

1    antitrust impact), class certification, discovery and more." *Id.* Ms. Baldwin is not aware of any

2    similar case where a similar concurrent representation was permitted. *See id.*

3         Ms. Baldwin's views align with an ethics opinion submitted in *In re Broiler Chicken*

4    *Antitrust Litigation*, 16-cv-8637 (N.D. Ill.), which likewise involved attorneys seeking to

5    concurrently represent two antitrust classes pursuing recovery from a common overcharge that

6    required allocation. The ethics expert in that case similarly opined that "it is not reasonable under

7    the circumstances presented here to believe that the same lawyer can provide competent and

8    diligent representation to each affected class." *See* Supplemental Declaration of Steve W. Berman

9    ("Supp. Berman Decl."), Ex. 1 at 5. The court agreed and appointed separate counsel. *See id.*, Ex.

10   2.

11        Although these ethics opinions have been in the record for months, *Colvin* Counsel do not

12   address them. Instead, *Colvin* Counsel argue that, in cases involving a two-sided platform like

13   Steam, plaintiffs must evaluate harm on the "'two-sided market . . . *as a whole.*'" ECF No. 409 at

14   10-11 (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 546-47 (2018)). This is a non sequitur.

15   Nothing about the market can relieve *Colvin* Counsel's conflict of interest. This is because,

16   whatever the overcharge is "as a whole," it must ultimately be allocated between publishers and

17   consumers to determine who was harmed and by how much. *Amex* nowhere suggests that the same

18   counsel can represent both sides of these critical issues. *Amex* does not address conflicts issues at

19   all.

20        *Colvin* Counsel also neglect to note that, in cases involving two-sided markets, separate

21   counsel are routinely appointed to represent the two sides of the platform. The most analogous

22   cases are recent class actions involving Apple and Google's app stores, which (similar to Steam)

23   function as online digital storefronts through which app developers (or publishers) offer apps and

24   in-app content to consumers. In these cases, as here, app developers alleged that the platform

25   imposed supracompetitive commissions, and platform consumers alleged that those

26   supracompetitive commissions were baked into the prices they paid for apps and app-content. In

27   both cases, Hagens Berman represented the app developer classes, and separate counsel were

28

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

appointed to represent consumers.[7]  *Elliott* Counsel are not aware of a single case in which the same counsel was appointed to represent both sides of a two-sided market, and the only time something comparable was even requested, the dual representation was summarily denied.[8]

*Colvin* Counsel also attempt to minimize their conflict as mere "speculation" that publishers and developers' interests "may eventually conflict" on damages.  *See* ECF No. 409 at 11.  The conflict, however, is plain as day from the allocation model *Colvin* Counsel have already sponsored.  And again, the Court need not take *Elliott* Plaintiffs' word for it—*Colvin* Counsel's own co-counsel have argued that the conflict precludes joint representation of publishers and consumers.  This is, accordingly, nothing like the cases *Colvin* Counsel cite (*id.* at 11-12) in which mere speculation of future conflicts was not disqualifying.  Here, we have a bona fide conflict that has already manifested.

To the extent *Colvin* Counsel are asserting that the conflict can be ignored (or perhaps deferred) because it only concerns damages allocation, they are likewise mistaken.  For one, fundamental conflicts over damages are disqualifying.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 462.  Second, the conflict here is not only about damages, as *Colvin* Counsel's co-counsel have again stressed.  *See* ECF No. 46 at 12 (conflict will affect "nearly every stage of the litigation—discovery, class certification, experts, and trial—and precludes the same lead counsel from representing both groups").  Ms. Baldwin concurs.  *See* Baldwin Rep. ¶ 16.  To establish *liability* under the Sherman Act, consumers must demonstrate an antitrust impact—*i.e.*, that they were harmed by the alleged anticompetitive conduct. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022).  This is a critical showing on both the

---

[7] *See In re Apple iPhone Antitrust Litig.*, No. 11-cv-6714 (N.D. Cal. Apr. 9, 2012) (remand from *Apple v. Pepper* appointing separate counsel for consumers); *Cameron v. Apple, Inc.*, No. 3:19-cv-3074 (N.D. Cal. Oct. 10, 2019) (appointing Hagens Berman as separate lead counsel for app developers in related action); *In re Google Play Consumer Antitrust Litig.*, No. 3:20-cv-5761, Dkt. 128 (N.D. Cal. Dec. 16, 2020) (appointing separate lead firms for consumers); *In re Google Play Developer Antitrust Litig.*, No. 3:20-cv-5792, Dkt. 79 (N.D. Cal. Dec. 11, 2020) (appointing separate firms, including Hagens Berman, as counsel for developers in related action).

[8] *In re Google Digital Advert. Antitrust Litig.*, No. 5:20-cv-3556-BLF, (N.D. Cal. Apr. 26, 2021), Dkt. No. 102 (request to serve as lead counsel representing both advertiser and publisher plaintiffs challenging Google monopolization conduct); *id.*, Dkt. No. 133 (order rejecting dual representation).

1    merits, and also at class certification where plaintiffs generally must put forth a methodology for

2    demonstrating impact across the class. *See, e.g., id.* at 670.  An overcharge model is central to

3    these merits and class-certification showings, and consumers will be severely handicapped at both

4    stages if they are shackled to *Colvin* Counsel's approach, which minimizes harm to consumers in

5    favor of the publishers *Colvin* Counsel represent (and represented when the approach was created).

6         Last, *Colvin* Counsel implies that the conflict should be disregarded because it serves on

7    the "executive committee" for publisher plaintiffs, rather than as a "co-lead."  ECF No. 409 at 12.

8    As court-appointed counsel of record for publishers, *Colvin* Counsel owe publishers an undivided

9    duty of loyalty, regardless of what committee they sit on within the publisher-counsel leadership

10   structure. *See Unified Sewerage Agency v. Jelco Inc.*, 646 F.2d 1339, 1345 (9th Cir. 1981).  *Colvin*

11   Counsel identifies no authority indicating that different conflicts rules apply to members of an

12   "executive committee."  Whatever label is affixed to *Colvin* Counsel's role, they have signed

13   virtually all (if not all) pleadings in the *Wolfire* action on behalf of publishers, taken depositions

14   for them, and developed publishers' impact and damages model.  *See* ECF No. 409 at 4, 11.  *Colvin*

15   Counsel also has not sought to withdraw as counsel to publishers, (which would require Court

16   approval under LCR 83.2(b), nor would this cure the conflict given that *Colvin* Counsel is already

17   on record supporting a damages model that short-changes consumers and privileges publishers.

18   *See* Washington Rule Prof. Conduct 1.7 (lawyer may not represent a client if there is "a significant

19   risk that the representation will be materially limited," including by responsibilities to "a former

20   client").

### 2.    While *Elliott* Counsel's efforts made this consumer class case possible, *Colvin* and *Drake* Counsel have not meaningfully advanced the consumer case.

23        The history of this litigation also demonstrates that *Colvin* Counsel has not loyally served

24   the consumers they now seek to represent.  After arbitration of consumer claims was compelled,

25   *Colvin* Counsel had a strategic decision to make.  Their ability to represent both consumers and

26   publishers was being challenged by LGN and WSGR as a conflict of interest and, with consumer

27   claims banished to arbitration, the publisher case was (at that juncture) the more financially

28   appealing piece of litigation. *Colvin* Counsel chose the publishers over consumers, agreeing to

1  consolidate their action with LGN and WSGR's case and bring "a single consolidated complaint

2  in the consolidated action *on behalf of game publishers*." ECF No. 88 at 2 (emphasis added).

3  Thereafter, *Colvin* Counsel dropped all consumer claims from their operative complaint, first by

4  amendment in August 2022 (ECF No. 99), and then with a further amendment in March 2023

5  (ECF No. 127).[9]  In addition to dropping consumers from their complaint, *Colvin* Counsel has

6  done nothing to advance the consumer cause in arbitrations.

7        In short, when *Colvin* Counsel touts its ongoing participation in this case, what *Colvin*

8  Counsel is referring to is work performed almost entirely on behalf of game *publishers*, whose

9  interests do not align with the Consumer class they now seek to represent. In reality, *Colvin*

10 Counsel abandoned Consumers years ago, and only seek to revive their consumer claims now that

11 Bucher Law made a class case possible.

12       *Drake* Counsel's bid is equally opportunistic. *Drake* Counsel did not file any claims on

13 behalf of consumers (anywhere) until October 2024, roughly fifteen months after Bucher Law had

14 brought consumer arbitrations against Valve, and roughly three months after Bucher Law

15 successfully challenged Valve's arbitration clause. *Drake* Counsel spin their inaction as a strategic

16 decision to wait until class litigation was possible, because a class action is "the best mechanism

17 to vindicate consumers' interests." ECF No. 411 at 6. But Valve's arbitration clause, and its class

18 action waiver, did not collapse under its own weight. Someone had to challenge it. And once

19 Judge Coughenour held that any challenge to Valve's arbitration clause needed to be decided by

20 an arbitrator (under its delegation clause), *see* ECF No. 66, the challenge needed to be mounted in

21 an arbitration. *Drake* Counsel elected not to do that work. Bucher Law did.

22       It would be enormously unfair, and set a dangerous precedent, for onlookers like *Drake*

23 Counsel to be awarded leadership in these circumstances. Arbitration provisions are rarely

24

---

25 [9] *Colvin* Counsel has previously asserted that they were required to drop their consumer claims
    due to the arbitration stay. *See* Dkt. No. 36 n.1. This is not correct. A stayed claim must be
26 preserved like any other. *Rhodes v. Robinson*, 621 F.3d 1002, 1005 (9th Cir. 2010) ("As a general
    rule, when a plaintiff files an amended complaint, '[t]he amended complaint supercedes the
27 original, the latter being treated thereafter as non-existent.'" (alteration in original) (citation
    omitted)). *Colvin* Counsel also included consumer claims in their first post-stay amendment. *See*
28 ECF No. 68. They only dropped consumers later to secure appointment as counsel to publishers.
    *See* ECF No. 378 at 4-5.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

successfully challenged in arbitral proceedings.  It takes innovation, skill and determination, with nothing approaching a guarantee of success or renumeration for the plaintiff or counsel.  Plaintiffs who undertake this extraordinary effort should not be deprived of their chosen class counsel if, against all odds, they manage to prevail and set an arbitration provision aside.  Moreover, counsel will have little incentive to challenge arbitration clauses in an arbitration if they can be readily displaced as class counsel once their challenge is successful, as *Drake* and *Colvin* Counsel here propose.  This would discourage attorneys from initiating arbitrations to challenge even the most rankly unconscionable arbitration provisions.

In addition to enabling class litigation on behalf of consumers, *Elliott* Counsel have done more actual litigation for consumers than either *Colvin* or *Drake* Counsel.  All told, Bucher Law has spent more than 8,000 hours litigating consumer claims in arbitration, developing unparalleled experience on consumers behalf.  *See* ECF No. 412-2, Bucher Decl. ¶¶ 6-8.  Of note, Bucher law successfully moved to compel massive productions from Valve and has analyzed a document set comprising more than 2 million documents. *Id*. at ¶¶ 15-16. Bucher Law has retained an economic expert to evaluate the consumer-side impacts of Valve's restraints.  And Bucher Law has now tried 23 arbitrations (in a combined proceeding) against Valve on these claims, examining 19 witnesses and putting on affirmative evidence.  *See id.*  All of this work is work performed on behalf of consumers, with undivided loyalty to their interests.  Neither *Colvin* Counsel nor *Drake* Counsel have done anything comparable to advance the consumer cause.

### 3.    *Elliott Counsel* have a superior track record developing and prevailing on the antitrust theories presented in this litigation.

*Elliott* Counsel offer consumers not just Bucher Law's experience in Valve arbitrations, but also Hagens Berman's experience at the forefront of "big tech" antitrust litigation.  In ongoing litigation against Amazon (initiated in 2020), Hagens Berman pioneered the antitrust theory on which this case is proceeding—namely, that PMFNs can restrict price competition in violation of the Sherman Act.  *See* Supp. Berman Decl. Ex. 3 (*Frame-Wilson v. Amazon.com*) ¶ 42 ("PMFN clauses typically result in noncompetitive fees, because they discourage the entry of new platforms who would otherwise challenge the incumbents by offering sellers lower fees."); ¶ 57 (alleging

that PMFNs "soften price competition[] and lead to higher prices").  This thesis has since been widely embraced by other litigants, including the FTC[10] and all Plaintiffs in this matter.

Hagens Berman also successfully litigated comparable antitrust claims against both Google and Apple concerning their monopolization of app distribution markets.  *See* Supp. Berman Decl. ¶ 2.  These matters generated $190 million in recovery for app developers. *Id*. Hagens Berman's innovative work in the Apple case garnered the American Antitrust Institute's "Outstanding Litigation Achievement" recognition, an award Hagens Berman has received on multiple occasions, including again in 2024.[11]  Hagens Berman is leading more "big tech" antitrust cases than any firm in the country, including groundbreaking matters involving Amazon's platform,[12] digital wallets markets[13], cloud storage,[14] and smartphones.[15] *See* ECF No. 412-1, Berman Decl. ¶¶ 2-3.

Leveraging this experience, *Elliott* Counsel did not "piggyback" into this case as *Colvin* Counsel assert.  Quite the opposite, *Elliott* Counsel investigated the industry and developed innovative theories of recovery *Colvin* Counsel overlooked—including a distinct antitrust market (for PC In-Game Payment Processing) that Valve monopolizes through tying and other anticompetitive conduct.  *Elliott*, ECF No. 1, ¶¶ 104-107, 233-245.  Similar claims were successful in a recent trial against Google,[16] and their omission from *Colvin* Counsel's compliant is material.  They could yield hundreds of millions in additional recovery for Consumers.  Notably in this regard, both the *Hepler* and *Drake* Plaintiffs have embraced and repleaded the distinct

---

[10] *See FTC v. Amazon.com, Inc.*, 23-cv-1495 (W.D. Wash. Nov. 2, 2023).

[11]  *See AAI Announces 2024 Antitrust Enforcement Award Honorees*, available at: https://www.antitrustinstitute.org/aai-announces-2024-antitrust-enforcement-award-honorees/.

[12] *De Coster et al. v. Amazon.com Inc.*, 2:21-cv-00693 (W.D. Wash.); *Frame-Wilson et al. v. Amazon.com Inc.*, 2:20-cv-00424 (W.D. Wash.); *Brown et al. v. Amazon.com Inc.*, 2:22-cv-00965 (W.D. Wash.), *Floyd v. Amazon & Apple*, 22-cv-1599 (W.D. Wash.); *Taylor v. Amazon.com, Inc.*, 2:24-cv-00169 (W.D. Wash.).

[13] *Affinity Credit Union v. Apple Inc.*, 4:22-cv-04174 (N.D. Cal.).

[14] *Gamboa v. Apple Inc.*, 5:24-cv-01270 (N.D. Cal.).

[15] *In Re Apple Inc. Smartphone Antitrust Litig.*, 2:24-md-03113 (D.N.J.); *Floyd v. Amazon & Apple*, 22-cv-1599 (W.D. Wash.).

[16] *In re Google Play Store Antitrust Litig.*, 2024 WL 4438249, at *9 (N.D. Cal. Oct. 7, 2024) (granting permanent injunction).

**HAGENS BERMAN**

monopolization and tying claims *Elliott* Counsel innovated.  *See Hepler*, ECF No. 1, ¶¶ 199-203; *Drake*, ECF No. 1, ¶¶ 82-88.

Competing counsel cannot boast the same track record of applicable success.  *Drake* Counsel, for example, do not have the same experience litigating comparable big-tech cases.  They did not innovate the antitrust theories in this matter, and were not involved in comparable cases involving Apple and Google's app stores.  *Colvin* Counsel have significantly less experience.  The materials submitted indicate that *Colvin* Counsel has been involved in some opt-out antitrust litigation and *defense*-side antitrust representations.  *See* ECF No. 410 at ¶¶ 8-11.  *Colvin* Counsel has not identified any significant experience representing antitrust classes, nor any recoveries earned on their behalf.  *See, e.g.*, *Napoleon v. Amazon.com, Inc.*, 2024 WL 3652873, at *3 (W.D. Wash. Aug. 5, 2024) (appointing counsel with experience advantage); *Lowery v. Spotify USA Inc.*, 2016 WL 6818756, at *4 (C.D. Cal. May 23, 2016) (appointing counsel with the most "plaintiffs-side experience").  Given the size and stakes of this case, *Elliott* Counsel respectfully submit that Consumers will be best served by more experienced class-action counsel with a resume of results achieved for antitrust class plaintiffs.

*Colvin* Counsel mainly touts opt-out litigation it has pursued in one two-sided markets case initiated by other firms.  *See* ECF No. 409.  Hagens Berman, by contrast, has led more two-sided market cases than potentially any firm in the country, including the aforementioned actions against Amazon, Apple, and Google, as well as a protracted litigation against Visa, MasterCard and its member banks concerning ATM surcharge fees.  *Mackmin v. Visa Inc.*, 1:11-cv-01831 (D.D.C.).  Through these matters, and others, Hagens Berman has generated billions in recovery for consumers and other two-sided market participants.  *See* Supp. Berman Decl. ¶¶ 2-3.  Accordingly, even on the legal doctrines *Colvin* Counsel highlights, *Elliott* Counsel's experience is superior.

### 4. Bucher Law's arbitration efforts on behalf of consumers compliment the class case and create no conflict of interest.

Valve initially challenged *Elliott* Counsel's efforts to lead the class case on the ground that Bucher Law's continued representation of consumers in arbitration somehow creates a conflict of interest.  As *Elliott* Counsel demonstrated, these types of arguments are treated with great

1    skepticism, because defendants are always incentivized to "object to class counsel who are, in fact,

2    *best* suited to protect the class and represent its interests." *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D.

3    38, 47 (S.D.N.Y. 2012); *Elliott*, ECF No. 41 at 6.  *Drake* Counsel now adopt Valve's arguments

4    and contend they could create a "distraction," ECF No. 411 at 10, an assertion that should be

5    approached with the same degree of skepticism, if not more, given that it now comes from a firm

6    competing to displace *Elliott* Counsel.

7        Regardless, Bucher Law has no conflict because there is no conflict in representing

8    different consumers pursuing the same legal theories in two fora.  Nor has Bucher Law taken

9    inconsistent positions on arbitrability in doing so.  Bucher Law's position is simply that, having

10   compelled consumers to arbitrate under its original terms of use, Valve is precluded by estoppel

11   and other applicable doctrines from unilaterally divesting arbitrators of jurisdiction over pending

12   arbitrations.  *See* Supp. Bucher Decl. Ex 1 at § IV.  In short, Bucher Law's position is that

13   consumers can no longer be *required* to arbitrate, but if they were privy to Valve's prior consumer

14   agreements, they can elect to arbitrate.  Some of Bucher Law's clients have made that election.

15   Notably, Bucher Law is not alone in these views.  *Colvin* Counsel, too, have questioned Valve's

16   ability to unilaterally enforce its modified terms of use retroactively on consumers who have

17   elected to arbitrate, and one of its clients (or former clients) is purportedly involved in arbitration

18   with Valve.  *See* ECF No. 370 at nn.1, 2.[17]

19        This does not create a conflict.  Both the class and arbitration plaintiffs share the same

20   objective—holding Valve accountable for its anticompetitive conduct.  Their theories of impact,

21   liability, and damages are the same.  Any consumer that elects to arbitrate would not become part

22   of a certified class, just like in any opt-out class action where plaintiffs retain the option to pursue

23   their claims on an individual basis.  Far from conflicting, the arbitrations and class case

24   complement one another.  As ethics expert Merri Baldwin concludes in her accompanying report:

25

26   _____

     [17] Similarly, Bucher Law's recognition that consumers can often secure higher individual
     recoveries in arbitration, *see Elliott*, ECF No. 27, at 1, in no way conflicts with the notion that a
27   class action is a superior means of resolving claims of class members who do not wish to undertake
     the risk, burden, and expense of litigating individual actions.  This is true in virtually every class
28   action.

**HAGENS BERMAN**

1   "the fact that Bucher Law jointly represents plaintiffs who have chosen to arbitrate claims as well

2   as the proposed consumer class should not create a conflict under Rule 1.7." Baldwin Rep. ¶ 23.

3   This is because representing claimants in arbitration "does not create any obvious risk of

4   negatively impacting counsel's representation of the class," and all Valve (and now *Drake*

5   Counsel) have identified is the "hypothetical possibility" of conflicts "that exists whenever counsel

6   represents more than one client." *Id.*

7       These are mainstream opinions well-supported in the case law. The leading class action

8   treatise recognizes that "counsel may seek to represent another party or class, or the same class, in

9   a separate proceeding in a different forum based on the same facts and legal theory." Newberg

10  and Rubenstein on Class Actions § 3:75 (6th ed.); *Bolding v. Banner Bank*, 2021 WL 1171988, at

11  *3 (W.D. Wash. Mar. 29, 2021) (rejecting notion that "there is some sort of bar preventing class

12  counsel from simultaneously representing a class and prosecuting an individual claim against the

13  same defendant in a different proceeding"); *Bell v. Disner*, 2018 WL 296035, at *3 (W.D.N.C.

14  Jan. 4, 2018) ("Courts have generally held that the mere existence of parallel representation does

15  not create an insurmountable conflict of interest."), *aff'd sub nom. Bell v. Brockett*, 922 F.3d 502

16  (4th Cir. 2019).[18]

17      Far from hindering the class, this type of concurrent representation is *advantageous*

18  because it can "enable counsel to leverage a better settlement for both sets of plaintiffs due to a

19  defendant's desire to obtain a global resolution." Newberg § 3:75. It can also "benefit the class

20  to the extent that class counsel gain useful legal and factual knowledge in pursuing the concurrent

21  action." *Id.* That is certainly the case here. Bucher Law has now tried arbitrations against Valve,

22  and can leverage that expertise (and lessons learned) to best position the class for success.

23      As the Newberg treatise points out, only a "few courts" have denied "simultaneous

24  representation of multiple sets of litigants," and they have done so "only when the recovery of one

25

26  _____

    [18] *Wallace v. Powell*, No. 2013 WL 2042369, at *9 (M.D. Pa. May 14, 2013) (allowing
    concurrent representation of class and individual plaintiffs because they "pursue the same goal");

27  *Gutierrez-Bejar v. SOS Int'l, LLC*, 2019 WL 5683901, at *12 (C.D. Cal. Nov. 1, 2019) ("[B]ecause
    each action concerned the assertion of similar rights, there was no conflict of interest for Class

28  Counsel.").

group or in one forum inherently conflicts with the other." *Id.*  The prime example is a "limited fund situation[]," *id.*, where through insolvency or otherwise a fund has been set aside to "satisfy all claims."  *Mongue v. Wheatleigh Corp.*, 2023 WL 5435918, at *6 (D. Mass. Aug. 23, 2023); *Stott v. Cap. Fin. Servs., Inc.*, 277 F.R.D. 316, 326 (N.D. Tex. 2011) (noting that "limited fund" cases involve claims to a "tangible fund, such as a bank account, trust, insurance policy or proceeds from a sale of an asset").  Class and arbitration plaintiffs are not competing over a limited fund here.  Valve is a going concern, and any judgments against Valve will run against Valve, not a discrete fund set aside to satisfy claims.

Notably, *Drake* Counsel have not identified any authority questioning (much less precluding) joint representation of a class and individual claimants in arbitration.[19]  Instead, *Drake* Counsel simply parrot Valve's attacks on the counsel Valve would rather not face, including baseless claims Valve has asserted in collateral proceedings.  *See* ECF No. 411 at 12.  Valve's opposition to *Elliott* Counsel's appointment is not a "distraction" but a further sign that *Elliott* Counsel are Consumers most capable champions.  Indeed, Valve has a track record of slinging mud at opposing counsel that stand up for consumers, including by initiating collateral proceedings.  *See Valve Corp. v. Zaiger, LLC*, No. 2:23-CV-01819-JHC, Dkts. 1–3 (W.D. Wash.) (dismissal of tortious interference and abuse-of process lawsuit against other counsel).  That Valve has mounted such attacks on Bucher Law does not make Bucher Law (or *Elliott* Counsel) unqualified to lead consumers.  Valve's substantive allegations, including as to Bucher Law's client relationships, are also unfounded.  They should not be credited, much less when blindly advanced by a competing group of lawyers that know nothing about the underlying facts and aim only to secure a leadership role in the case.

To the extent there were any conflict arising from Bucher Law's arbitrations, it would not be disqualifying in any event because Hagens Berman is not participating in the arbitrations.  *See*

---

[19] The only cases Valve managed to identify involved easily distinguishable circumstances—specifically cases where counsel sought to pursue parallel *class actions*, or represent the same named plaintiffs in two separate proceedings.  *See Elliott*, ECF No. 41 at 8.  That is not the situation here.  Bucher Law is pursing just one class case, on behalf of plaintiffs who are not arbitrating.

Supp. Berman Decl. at ¶ 4.[20]   It is widely recognized that, where as here, a class has joint representation, and one attorney group is not subject to the asserted conflict, this effectively "assuages any additional concerns that a conflict . . . may . . . adversely affect[] the adequacy of representation." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009); *Uschold v. Carriage Servs., Inc.*, 2020 WL 1466172, at *15 n.16, (N.D. Cal. Mar. 6, 2020) (when determining whether a conflict of interest exists, courts looks to "whether the class has co-counsel uninvolved in the other case or otherwise affected by the conflict"); *Ruderman ex rel. Schwartz v. Wash. Nat'l Ins. Co.*, 263 F.R.D. 670, 685 (S.D. Fla. 2010) (noting that class counsel not involved in concurrent representation will "not allow their colleague to put the interests of his individual cases before the interests of the class").   Accordingly, while the arbitration claimants and class are aligned in their objectives, Hagens Berman—and now, additionally, *Hepler* counsel—provide further structural assurance of adequate representation.  *See* Baldwin Rep. ¶¶ 24-25.[21]

### 5.    Other applicable considerations support *Elliott* Counsel's appointment.

The competing leadership proposals address other considerations that, in the final analysis, favor *Elliott* Counsel's appointment as well.

*First*, Colvin Counsel's application relies heavily on the notion that they were "first to file" on behalf of consumers.  *See* ECF 409 at 8.  This is not a weighty consideration here.  To begin with, "[b]eing the first to the file bears no relationship to the quality of representation a law firm will provide, which is the Court's primary concern."  *Napoleon*, 2024 WL 3652873, at *3.  But more applicably, *Colvin* Counsel *dropped* their consumer plaintiffs once arbitration was compelled and these claims appeared unlikely to generate significant returns for *Colvin* Counsel.  Thus, while first-to-file status can be an indicator of counsel's loyalty to a class, that is not the case here.  The more appropriate measure would be how long counsel have been actively litigating on behalf of the Consumers they seek to lead.  And here, again, *Elliott* Counsel have the upper hand.  Bucher

---

[20] If *Hepler* Counsel were appointed as a co-lead, the class would be represented by a second established firm without any involvement in the arbitrations.

[21] *Drake* Counsel assert opaquely in a footnote that Hagens Berman and Bucher Law may have shared "client confidences," but without any explanation of what "client confidences" might generate a conflict of interest in these circumstances.  Regardless, *Drake* Counsel disregard the abundance of authority refusing to impute conflicts in precisely the circumstances presented here.

OMNIBUS RESPONSE RE MOT. TO APPOINT LEADERSHIP- 18
Case No. 2:21-cv-00563-JNW
011258-11/2938430 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1  Law initiated its first arbitrations for consumers in July 2023, and has actively pursued consumers

2  claims ever since, including through arbitrations tried just last month.

3      *Second*, *Elliott* Counsel have a more significant track record working with both Valve's

4  counsel and Co-Lead Counsel to publishers. *See Baker v. Saint-Gobain Performance Plastics*

5  *Corp.*, 2016 WL 4028974, at *4 (N.D.N.Y. July 27, 2016) (interim counsel's "ability 'to command

6  the respect of their colleagues and work cooperatively with opposing counsel and the court'" are

7  important considerations (quoting Manual § 10.224)).  This includes, as previously noted,

8  negotiating a recent groundbreaking settlement with Valve's counsel that will transform collegiate

9  athletics.  *See* ECF No. 412.  It also includes dozens of matters in which *Elliott* Counsel have

10 worked collegially both alongside, and adverse to, Co-Lead counsel for publishers.[22]  More than

11 any other group vying to lead the Consumer class, *Elliott* Counsel have demonstrated an ability to

12 work effectively with other case participants to achieve impactful results.

13     *Third*, *Elliott* Counsel are best situated to represent Consumers because they are the only

14 counsel with clients who have obtained rulings authorizing them to proceed in litigation in federal

15 court.  This means that *Elliott* Plaintiffs are the only Plaintiffs insulated from a future change to

16 Valve's terms of service, including one that reinstates the arbitration clause most recently removed

17 from Valve's terms of use.  Such a modification is far from foreclosed.  Perhaps the only constant

18 in this case is Valve's shifting positions on arbitrability, and Valve has asserted that it can

19 unilaterally impose modifications to its arbitration and venue-selection clauses retroactively to

20 divest tribunals of jurisdiction already exercised over pending consumer claims. *See* ECF No. 362,

21 Ex. A ("Valve may amend this Agreement (including any Subscription Terms or Rules of Use)

22 unilaterally at any time in its sole discretion.").  If Valve were to change positions on arbitrability

23 once again, this could imperil the justiciability of claims asserted by other plaintiffs who—unlike

24 the *Elliott* Plaintiffs—have not secured any arbitrator ruling foreclosing such a maneuver.

25

26     [22] *See, e.g.*, *Mackmin v. Visa Inc.*, 1:11-cv-01831 (D.D.C.) (co-lead with Quinn Emanuel); *In Re Cattle And Beef Antitrust Litig.*, 0:20-cv-1319 (D. Minn.) (co-lead with Lockridge); *Brown v.*

27 *JBS USA Food Co.*, 22-cv-2946 (D. Colo.) (co-counsel with Lockridge); *De Coster v. Amazon*, 21-cv-0693 (W.D. Wash.) (co-counsel with Quinn Emanuel); *In re Visa Check/Mastermoney*

28 *Antitrust Litig.*, No. 96-cv-05238 (E.D.N.Y.) (co-lead with Constantine Cannon).

*Last*, but not least, competing firms tout their diversity, but *Elliott* Counsel offer a slate of attorneys that is as diverse (if not more so) than any competitor, considering race, gender, and age. *See* ECF No. 412-1, Berman Decl. ¶¶ 6, 8; Supp. Bucher Decl. ¶¶ 4-7.  *Elliott* Counsel have a steadfast commitment to advance diversity in the legal profession while developing opportunities for junior and historically underrepresented attorneys to flourish.  *In re Meta Pixel Healthcare Litig.*, 2022 WL 18399978, at *4 (N.D. Cal. Dec. 21, 2022) ("Diversity is also a factor that I weigh carefully, as do my colleagues in this District and across the nation") (collecting cases).  *Elliott* Counsel recently demonstrated their commitment to these principles in this Court, where lead counsel Steve Berman shared oral argument with a junior female attorney on a motion to dismiss a very important case, while defendants were all represented by seasoned counsel.  *See Codoni v. Port of Seattle, et al.*, 2:23-cv-795 (W.D. Wash.) (Whitehead, J.).

While Hagens Berman counsel are known to this Court, they will be joined by a diverse Bucher Law team.  *See* Supp. Bucher Decl. ¶¶ 4-7.  Bucher Law is committed to offering opportunities for underrepresented groups, including through hiring practices designed to eliminate implicit bias.  This is demonstrated by Bucher Law's staffing of this case, which features Hispanic, Black, and Asian attorneys of varying experience levels.  *See id.*

## III.    CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court appoint *Elliott* Counsel as interim co-lead class counsel to represent the proposed Consumer Class.  *Elliott* Counsel also support *Hepler* Counsel's appointment as a co-lead.

OMNIBUS RESPONSE RE MOT. TO APPOINT LEADERSHIP- 20
Case No. 2:21-cv-00563-JNW
011258-11/2938430 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

DATED: January 10, 2025                Respectfully submitted,

                                       HAGENS BERMAN SOBOL SHAPIRO LLP

                                       /s/ *Steve W. Berman*
                                       Steve W. Berman (WSBA No. 12536)

                                       /s/ *Xiaoyi Fan*
                                       Xiaoyi Fan (WSBA No. 56703)
                                       1301 Second Avenue, Suite 2000
                                       Seattle, WA 98101
                                       Telephone: (206) 623-7292
                                       Facsimile:  (206) 623-0594
                                       Email:  steve@hbsslaw.com
                                       Email:  kellyf@hbsslaw.com

                                       Ben M. Harrington (*pro hac vice*)
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                       715 Hearst Avenue, Suite 300
                                       Berkeley, CA 94710
                                       Telephone: (510) 725-3034
                                       Facsimile:  (510) 725-3001
                                       Email: benh@hbsslaw.com

                                       William Ward Bucher IV (*pro hac vice*)
                                       BUCHER LAW PLLC
                                       350 Northern Blvd, Ste. 324-1519
                                       Albany, NY 12204-1000
                                       Telephone: (202) 997-3029
                                       Email: will@bucherlawfirm.com

                                       *Attorneys for Plaintiffs*



1

2

3    **CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to all CM/ECF

recipients.

DATED this 10th day of January, 2025.

_s/ Steve W. Berman_
Steve W. Berman


**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

I hereby certify that this memorandum contains 7,609 words, excluding the caption, table

of contents, table of authorities, signature blocks, and certificate of service, in compliance with the

Local Civil Rules.

DATED this 10th day of January, 2025

_s/ Steve W. Berman_
Steve W. Berman

