# EXHIBIT 1

# BUCHER LAW PLLC

_____ Mass Arbitrations. Individual Service. Real Compensation. _____

**Via Email**

Arbitrator John E. Ohashi
22 N. Sepulveda Blvd., 20th Floor
El Segundo, CA 90245
john@ohashiadr.com

       Re:    25 Individual Claimants v. Valve Corporation d/b/a/ Steam: Claimant's
              Objection to Valve's Second Motion to Dismiss for Lack of Jurisdiction

Arbitrator Ohashi,

The 25 cases before you were filed on October 2, 2023—over a year ago. A few months after that, but before any arbitrator had been appointed, Respondent filed a motion to dismiss for "LACK OF JURISDICTION." _Valve's Dec. 26, 2023 Motion to Dismiss, p. 1._ Valve then attempted to further delay these proceedings by moving for a stay in these proceedings. The motion to stay was premised upon Valve's contention that the filing of a class action complaint by different claimants required all arbitrations filed by alleged members of the putative class to be frozen for the duration of the class lawsuit. Both of Valve's motions were filed without requesting leave of the arbitrator as required by AAA Consumer Rule 23. This tribunal denied Valve's first Motion to Dismiss on July 31, 2024, and denied Valve's Motion to Stay on September 10, 2024.

Evidently dissatisfied with the prospect of having to resolve these cases on the merits, Valve submitted, by letters dated September 27th, October 4th, and October 7th, yet another Motion to Dismiss for lack of jurisdiction. As with its previous two motions, Valve did not bother to seek leave before filing this one. This current motion is premised upon a recent attempt by Respondent to unilaterally amend its contract with the 25 claimants before you (with no notice to their counsel) in an effort to deprive this tribunal of jurisdiction by deleting the arbitration provision under which this case was filed.

Valve argues _Coinbase, Inc. v. Suski_,[1] requires any dispute over the arbitrability of these cases to be resolved by a court. Valve's attempt to use _Coinbase_ as material to manufacture a jurisdictional crisis is as desperate as it is transparent. For the third time, Valve asks this tribunal to summarily dispose of these 25 cases at the pleading stage. And for the third time, Valve's Motion must be denied.

## I.    _Coinbase_ is Easily Distinguishable from the Issues in this Case

In _Coinbase,_ the consumers and Coinbase entered into a contract containing an arbitration clause governing their general relationship. Coinbase later ran a sweepstakes, to which the consumers and Coinbase entered into a second contract, which specified that sweepstakes disputes would be adjudicated in California courts. Following the execution of the second agreement, Coinbase was sued in court based on claims arising from its sweepstakes. Coinbase

---

[1] 144 S. Ct. 1186 (2024)

attempted to compel arbitration under the earlier, generally applicable user agreement, arguing that the question of arbitrability had been delegated to the arbitrator. The consumers opposed, arguing that the later, sweepstakes specific, contract governed the forum for their claims related to the sweepstakes. The District Court agreed with the consumers and declined to compel arbitration. This ruling was affirmed by the Ninth Circuit. The U.S. Supreme Court then took the case to answer the question "What happens when (as in this case) the parties have two contracts, one with a delegation clause, a second without, and a dispute later arises?" 144 S. Ct. at 1195 (Gorsuch, J., concurring). The U.S. Supreme Court upheld the decision of the District and Circuit courts, holding that the sweepstakes agreement governed the sweepstakes dispute that followed both contracts' formation.

The present dispute is distinguishable from *Coinbase* in numerous ways, including that the consumers here do not concede that they entered into a second, enforceable agreement at all. But the most salient difference is timing. As noted in the question presented and answered by the U.S. Supreme Court, (1) first a contract with an arbitration clause was formed, (2) then a second agreement was made containing a contradictory claims adjudication provision, and then (3) "a dispute later ar[ose]." In the present dispute, the order of operations is flipped. First a contract with an arbitration clause was formed, then this dispute arose, was filed, and is currently being arbitrated, and then Valve Corporation unilaterally modified its terms which it purports form a second agreement. The dispute here, unlike in *Coinbase*, did not arise or commence when there were two competing potential agreements. This dispute *is already* being adjudicated in Valve's chosen forum, not awaiting a motion to compel in Federal Court.

"[T]he Ninth Circuit has stated that a district court's authority is generally limited to decisions that bookend the arbitration itself. Before arbitration begins, the district court has the authority to determine whether there is a valid arbitration agreement between the parties, and if so, whether the current dispute is within its scope. The Act does not suggest that a court could otherwise intervene before a final award is made, at which point, the parties may petition the district court to affirm the award, or to vacate, modify, or correct it." *Priest v. Neiman Marcus Grp., Inc.*, 2020 U.S. Dist. LEXIS 19208, at *7 n.1 (N.D. Cal. Feb. 5, 2020) (internal citations omitted). "To allow a party to bring an independent suit to enjoin the arbitration is inconsistent with fundamental procedural principles that apply with even greater force to arbitration than to conventional litigation." *Smith v. American Arbitration Ass'n,* 233 F.3d 502, 506, 2000 U.S. App. LEXIS 30172 (7th Cir. 2000).

In *Coinbase*, there was no pending arbitration to interfere with at all—defendants were seeking to compel it. Adjudicating the question of which contract governs in the court where the case was filed made both practical sense and conformed with the FAA's structure enabling court intervention "before an arbitration begins." Valve's position here, that the arbitration must be *interrupted* so that a court to decide a jurisdictional question that Valve Corporation created, has no basis in the FAA, the caselaw, or common sense. This tribunal is already adjudicating these issues and has been for over a year. Nothing in the *Coinbase* decision suggests this tribunal should stop doing so.

The present situation is also distinguishable from *Coinbase* because Valve Corporation has already voluntarily submitted itself to the jurisdiction of this tribunal for answering questions of arbitrability. Valve Corporation itself has already submitted a Motion to Dismiss for " Lack of Jurisdiction Under R-14" in these proceedings on December 26, 2023. This tribunal already denied Valve's Motion to Dismiss. Once a party submits a question to an arbitrator to

adjudicate, they cannot then turn around and claim the arbitrator lacks authority to resolve that same question.

## II.    Jurisdiction was Established at the Time of Filing

The difference in timing between this dispute and *Coinbase* also matters because jurisdictional facts are established as of the time of filing. "It has long been the case that the jurisdiction of the Court depends upon the state of things at the time of the action brought." *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004). At the time this action commenced, there was no asserted second agreement, contested or otherwise. Because this tribunal had jurisdiction at the time of filing, it retains it now. Just as a court would not reconsider diversity jurisdiction when a party moves, post-filing, to the defendants' home state, this tribunal should not consider this alleged new agreement.

In fact, Valve's position that a court should decide whether or not questions of arbitrability should be arbitrated ignores the glaring fact that a court already decided questions of arbitrability should be arbitrated. In compelling these consumer antitrust claims to arbitration, Judge Coughenour held:

> "the question is whether Plaintiffs' unconscionability challenge should be determined by the Court or by an arbitrator. According to the SSA, the arbitrator must resolve any "disputes" regarding "this agreement" in conformity with AAA rules (*See* Dkt. No. 36-4 at 12, 65, 78, 92, 106, 120.) AAA rules give an arbitrator "'the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'" *Oracle Am., Inc. v. Myriad Group A.G.,* 724 F.3d 1069, 1074 n.1 (9th Cir. 2013) (citing AAA Commercial Arbitration Rule 7(a)). Therefore, unless Plaintiffs challenge the SSA's delegation provision, specifically, as unconscionable, the Court must enforce the parties' agreement to have an arbitrator decide the broader question of whether the arbitration clause itself is unconscionable."

*In re: Valve Antitrust Litigation*, CASE NO. C21-0563-JCC (10/25/2021).  Thus, even under Valve Corporation's theory that *Coinbase* necessitates a court ruling on the delegation of arbitrability of disputes before a claim can be adjudicated in arbitration, that requirement has already been met.

## III.    *Coinbase* does not Automatically Strip this Tribunal of Jurisdiction

Even if a court had not already compelled these antitrust claims to arbitration, Claimants are not asking this tribunal to adjudicate the question of which contract governs.  Indeed, Claimants contend the unilateral amendment to the SSA is not enforceable against the claimants before you, and do not see any reason to adjudicate or even consider those purported amendments in these proceedings.  Claimants are asserting antitrust and unfair competition claims against Valve Corporation that are firmly in this tribunal's purview and have nothing to do with adjudicating conflicting contracts with differing forum selection clauses.  Because claimants are not asking this tribunal to make any determination that any reading of *Coinbase* would prohibit, there is no reason to stop claimants from proceeding.

Valve Corporation asserts an impact of *Coinbase* far broader than its holding could be read to suggest. Valve Corporation—not claimants—contends there is an enforceable, superseding agreement Valve Corporation unilaterally imposed on the claimants before you. Valve Corporation—not claimants—contends only a court can make that determination. If Valve Corporation is correct, and Valve Corporation wants to adjudicate a question that only a court can adjudicate, then *Coinbase* would enable Valve Corporation to go to a court to adjudicate it.

Valve Corporation's assertion isn't that it *can* go to court to contend that its unilateral amendment dissolves this pending arbitration, it's that claimants *must* go to court to argue that Valve's unilateral amendment doesn't dissolve these proceedings, and even more astoundingly, that these arbitrations *must* be dissolved until such time, if ever, claimants do so. But *Coinbase* said nothing of the sort. The *Coinbase* court didn't stop an arbitration midway through adjudication, it declined to compel arbitration when asked to do so at the outset of the case. Nothing in that holding suggests that a pending arbitration must be disrupted when a party argues that the claim should no longer be arbitrated.

### IV.   Numerous Legal Doctrines Preclude Valve Corporation from Unilaterally Withdrawing from Arbitration

Numerous legal doctrines prevent the outcome Valve Corporation seeks to manufacture here.

#### 1.   Jurisdiction is Established at the Time of Filing

As noted above, jurisdiction is established at the time of filing. Because this tribunal had jurisdiction when these claims were filed, it retains it now.

#### 2.   Valve's Objections to Jurisdiction Were Waived Months Ago

"An objection to the arbitrability of a claim must be made on a timely basis, or it is waived." *ConnTech Dev. Co. v. Univ. of Conn. Educ. Props.*, 102 F.3d 677, 685 (2d Cir. 1996); *see also Fortune, Alsweet & Eldridge, Inc. v. Daniel*, 724 F.2d 1355, 1357 (9th Cir. 1983) (finding that it was unjust to permit an appellant to challenge arbitration after the appellant's voluntary participation for several months). This old and uncontroversial rule is incorporated into AAA Consumer Rule R-14(c): "A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection."

Valve had the opportunity to present any objections to jurisdiction, because that is precisely what it did when it filed its First Motion to Dismiss for Lack of Jurisdiction. Valve chose not to argue that its arbitration agreement was unenforceable at that time. On the contrary, Valve persistently argued in these cases (as well as dozens of others) that the arbitration agreement was enforceable. By failing to raise this argument in its responsive pleading, Valve waived any objections to the AAA's jurisdiction.

#### 3.   Judicial Estoppel

These 25 claimants commenced these cases in arbitration rather than court because Valve represented to a court that they had to. In *In re: Valve Antitrust Litigation*, Valve sought—and successfully obtained—a ruling from the U.S. District Court that the consumer claimants were

bound to arbitrate their claims individually. "Judicial estoppel is an equitable doctrine that precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position." *Bartley-Williams v. Kendall,* 134 Wash.App. 95, 98, 138 P.3d 1103 (2006). The doctrine seeks "to preserve respect for judicial proceedings," and "to avoid inconsistency, duplicity, and ... waste of time." *Cunningham v. Reliable Concrete Pumping, Inc.,* 126 Wash. App. 222, 225, 108 P.3d 147 (2005) (alteration in original) (internal quotation marks omitted) (quoting *Johnson v. Si-Cor, Inc.,* 107 Wash.App. 902, 906, 28 P.3d 832 (2001)). *Arkison v. Ethan Allen, Inc.*, 160 P. 3d 13 (Wash. 2007).

"Three core factors guide a trial court's determination of whether to apply the judicial estoppel doctrine: (1) whether "a party's later position" is "clearly inconsistent with its earlier position"; (2) whether "judicial acceptance of an inconsistent position in a later proceeding would create `the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.*, at 15.

Here, Valve's current position ("our own arbitration agreement is unenforceable") is clearly inconsistent with its earlier position ("all consumer signatories of the SSA must assert their claims individually in arbitration"). In order for you to rule in Valve's favor, you would necessarily have to determine that Judge Coughenour was mistaken or misled. And if you dismiss these cases, you will impose a significant disadvantage on the claimants: they have retained counsel, filed arbitration demands, and done all that was required to them to proceed with litigating their cases for over a year, only to be summarily sent back to the proverbial "square one," and required to start the entire process over again. If you allow this, what will prevent Valve from doing the same thing in whatever forum their claims are brought next?

When federal court was inconvenient, Valve insisted upon arbitration. Now that thousands of its customers have taken up Valve's invitation to arbitrate these claims, Valve has decided that arbitration is inconvenient. Valve does not have the right to simply declare that this tribunal—Valve's chosen tribunal—has no jurisdiction.

### 4. The Covenant of Good Faith and Fair Dealing

"[E]very contract has an implied covenant of good faith and fair dealing providing that neither party shall do anything, which will have the effect of destroying or injuring the right of the other party, to receive the fruits of the contract." *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163 (N.Y. 1933). "A complete catalogue of types of bad faith is impossible but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, . . . abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Restatement (Second) of Contracts* § 205, Comment D. (1981). "[T]he implied covenant of good faith and fair dealing limits the [drafter]'s authority to unilaterally modify the arbitration agreement." *Serpa v. Cal. Sur. Investigations, Inc.* , 215 Cal.App.4th 695, 706, 155 Cal.Rptr.3d 506 (2013) "[T]he benefit of the implied covenant [is] to rein in and restrict the [drafter]'s otherwise unilateral right to modify the agreement to include unfiled claims [in a later revised arbitration provision]." *Id.*

Valve Corporation's ability, if any, to unilaterally modify the terms of the SSA is restrained by the doctrine of good faith and fair dealing. Valve Corporation's purported modification of the SSA to disrupt these pending arbitrations is not enforceable.

Valve misleadingly states that "courts routinely hold that a dispute resolution provision in an updated agreement is enforceable with respect to accrued and already asserted claims so long as the provision provides for retroactive effect." *Respondent's Letter Brief*, p. 4. In support of this assertion, Valve fails to cite any case where a party unilaterally modifies an agreement to arbitrate to remove claims from ongoing arbitrations, let alone one where that same party previously compelled arbitration itself.

Valve Corporation's cited cases are easily distinguishable. For example, in *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, various procedural motions and appeals meant that, while DirectTV moved to compel arbitration immediately at the outset of the case, that motion was not briefed until two years later. 2021 WL 2350814, at *4 (C.D. Cal. Apr. 20, 2021). The court in that case compared the pre- and post-litigation contracts, which *both* contained arbitration agreements. The court applied the principle of good faith and fair dealing to determine whether it could compel arbitration under the newer agreement. After concluding that the arbitration provisions did not materially differ and that the consumers had other ways to view NFL games without agreeing to the new terms, it concluded the covenant of good faith and fair dealing was not violated and therefore applied the new arbitration terms.

Valve's change of terms here looks nothing like that seen in *In re: NFL Sunday Ticket Antitrust Litigation.* Valve made the change while these cases were firmly under way, materially changed the forum for the consumers' claims, and purports to completely undo over a year of litigation and force the consumers to start anew. This is precisely the type of bad faith and unfair terms that the *Serpa* identified as being prohibited.

### 5. Irrevocability of the Arbitration Agreement Pursuant to the FAA

The FAA makes arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." FAA § 2. The Federal Arbitration Act's mandate that arbitration agreements are "irrevocable" prevents Valve Corporation from unilaterally revoking their arbitration agreement once the arbitration procedure in the agreement has commenced.

### 6. Survival of Terms

The 2022 SSA, under which the Claimants here brought their claims, has a "Survival of Terms" clause that ensures the arbitration provision survives termination of the agreement by either party. *See Feb. 2022 SSA, "Survival of Terms."* The Washington Court of Appeals recently reaffirmed the survivability of arbitration clauses, even in cases where there is no "Survival of Terms" clause, when it stated: "Considering the presumption in favor of arbitration, and without any express contract provision or clear implication to the contrary, we conclude the arbitration clause survives termination of the agreement." *Anwar v. Exam Master*, 2023 Wash. App. LEXIS 2185, 6. Even if this tribunal were to find the 2022 SSA was terminated, this arbitration still survives.

### 7. Equitable Estoppel

Even assuming *arguendo* that the original SSA's agreement to arbitrate *could* validly be amended unilaterally, Valve's *ex post facto* effort to reconstruct its arbitration agreement with the Claimants should be equitably estopped so as to avoid injustice to the Claimants. "Equitable

estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Mundi v. Union Sec. Life Ins. Co*., 555 F.3d 1042 (9th Cir. 2009). Equitable estoppel has three elements:

> "(1) an admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act."

*Saunders v. Lloyd's of London*, 779 P. 2d 249 (Wash. 1989). In this case, all three elements are clearly established.

<ol type="a"><li>Valve Corporation Repeatedly and Consistently Asserted That These Claimants' *Only* Avenue for Relief was Arbitration</li></ol>

Years before these arbitrations were even initiated, Valve's words and actions were diametrically opposed to its newfound position. First: the Steam Subscriber Agreement. Valve has made much in these proceedings of the clarity and prominence of its SSA, which for at least a decade, clearly told every one of its millions of customers—including the 25 Claimants before you—that it intended "TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL BINDING ARBITRATION." *SSA, §11*.

Then, in the *Wolfire Games* lawsuit, Valve moved to compel arbitration of Steam purchasers asserting antitrust claims premised upon the same facts as those of the Claimants before you. It submitted multiple briefs, all of which exhibited Valve's now-familiar length and redundancy, all of which boldly and repeatedly insisted that individual arbitrations were the sole lawful avenue for resolution of these claims. *See, inter alia, Doc. 35, Wolfire Games and William Herbert et al. v. Valve Corporation*, 2:21-cv-563-JCC. The pro-arbitration representations Valve made to Judge Coughenour bore their intended fruit, an order compelling those plaintiffs' claims to arbitration.

Valve continued to make these representations after these proceedings began Valve's counsel sent the Claimants' counsel a letter on July 25, 2023, stating that "Valve is fully prepared to resolve the dispute in arbitration" and "Valve will arbitrate the dispute individually if the subscriber wishes." *7.25.23 Ltr. from C. Casper to W. Bucher*. After Valve refused to offer any of the Claimants any relief and they brought their claims in arbitration, Valve again reiterated its devotion to the SSA's arbitration agreement: "When subscribers agree to the SSA, they and Valve agree to submit disputes to individual arbitration." *12.23.24 Valve Mtn. to Dism. for Lack of Jurisdiction, p. 4*. In its written submissions as well as its oral arguments, Valve's position remained steadfast and clear: these cases belonged in arbitration.

<ol type="b" start="2"><li>Claimants reasonably relied upon Valve's statements, paying AAA filing fees and spending significant time litigating these arbitrations</li></ol>

In reliance on Valve's numerous acts and statements as to the arbitrability of these claims, the Claimants filed claims under SSA §11 which Valve had championed for years, submitted their claims to Valve in an effort to resolve them prior to arbitration, and litigated these claims. These Claimants' reliance upon Valve's stated position was not only reasonable at the time, but proven correct by Valve's actions during the first 14 months of these cases.

c.   Dismissal of Their Cases Will Severely and Unjustly Injure the Claimants

Now, over a year after the Claimants retained counsel, filed their claims, began gathering and exchanging information, and in some cases, preparing to attend trials, Valve has abruptly reversed course and purports to have repudiated its agreement to arbitrate. The prejudice to the Claimants is stark: more than a year into litigation, they would be forced to start anew. They would be forced to incur new costs simply to file their suits. They would lack the SSA's fee shifting provision, which guaranteed attorneys' fees *for* consumers but severely limited Valve Corporation's ability to collect them *against* the consumer. They would be again required to spend countless hours fighting Valve's motions to dismiss, or stay, or otherwise delay their cases. That outcome is not fair, speedy, or efficient. It does not advance any policy or fundamental justice between the parties. And it is prohibited under the doctrine of equitable estoppel.

## V.    Valve's Position Depends Upon Assumptions Not Supported by Evidence

Even if Valve's actions to deprive this forum of jurisdiction were theoretically lawful, this tribunal would first have to find that the factual allegations supporting its motion were supported by evidence. Embarking on this inquiry would also be the type of fact-intensive side-track analysis arbitration dispenses with in favor of speed and economy. Valve Corporation presents its terms update as a clear and voluntary choice to claimants. It is not. Some Claimants never accepted the update or even received the pop-up notice. Other consumers have had their hardware disrupted or shutdown down until they clicked the agree button. Some did not get a clear or meaningful display of terms at all.

In a court filing on October 18, Valve Corporation conceded that even by its own measure of what constitutes assent, many of the claimants before you have not assented to the new terms. Valve's attempt to evade and disrupt these arbitrations is impermissible as a matter of law, but even if it were not, the next step would not be dismissal, but information exchange to determine which claimants, if any, effectively assented to Valve Corporation's new terms.

## VI.    Arbitrators Have Been Swift in Rejecting Valve's Arguments

Multiple arbitrators have dispatched with Valve's arguments without even the need for briefing. Arbitrator Gilman held:

> Respondent's position that it unilaterally destroyed AAA jurisdiction by removing the arbitration provision from its SSA is also without merit. Put simply, this is not how arbitration agreements (or contracts generally) work. Respondent required its customers to enter into the SSA, including its arbitration provision. Claimant did so. He submitted his dispute to this arbitration under the SSA. And both parties participated in this proceeding in reliance upon the SSA's terms. Indeed, Respondent previously sought to affirmatively enforce the SSA's provisions against Claimant by a motion to dismiss that contended (but failed to prove) that Claimant ostensibly had not abided strictly enough by the requirements of the SSA's arbitration provision. Respondent also voluntarily availed itself of the arbitration process in other respects, including by pursuing discovery from Claimant, participating in hearings, and requesting relief from the Arbitrator. Against this record, Respondent cannot now, midstream, unilaterally amend the agreement to revoke

its arbitration provision. As Claimant's submission suggests, any number of well-established doctrines, including basic tenets of contract formation, bilateral performance, waiver, and estoppel, prevent this result. *See* October 7, 2024 letter from William Bucher to AAA at 3; see also FAA § 2 (arbitration agreements are "valid, **irrevocable**, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.") (emphasis supplied).

Respondent's reliance on *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 218 L. Ed. 2d 615 (2024) is misplaced. As aptly framed by Justice Gorsuch's concurrence, Coinbase addressed the question "What happens when . . . the parties have two contracts, one with a delegation clause, a second without, and a dispute later arises?" *Coinbase, Inc.*, 144 S. Ct. at 1195. But that question is not relevant here. In this case, the parties have only one contract: an SSA that calls for this arbitration proceeding, of which both sides have availed themselves. Respondent's unilateral declaration that it "removed the arbitration agreement from the SSA" does not create a second contract. To the contrary, Claimant explicitly opposes and disagrees with Respondent's position on this issue. As such, there is no second contract and *Coinbase* cannot apply to strip this tribunal of its authority to decide the issues addressed herein, and to proceed with this arbitration.

Arbitrator Badal was similarly direct:

As Respondent has repeatedly stated, and as the Supreme Court only recently confirmed in *Coinbase v. Suski*, 602 U.S. (2024), Slip Opinion at 4 (Coinbase), arbitration is a matter of contract and consent. The record shows that Respondent itself invoked the arbitration clause in the original SSA to send these 25 cases to AAA arbitration and the 25 Claimants have, accordingly, filed—and proceeded with—their claims before the AAA. There is no indication in the record that the 25 Claimants have withdrawn their consent to arbitrate before the AAA. Equally as problematic, Respondent has cited no authority for the proposition that it can either unilaterally change the parties' contract terms or apply those terms retroactively without mutual assent. Such assent is lacking here. As with Respondent's earlier stay motion, there are no grounds to ignore the parties' contractual election to arbitrate these 25 claims.

This tribunal should join the chorus of arbitrators moving past Valve Corporation's repeated attempts to disrupt these proceedings and on to the merits of the consumers' illegal monopoly claims.

BUCHER LAW PLLC

By: /s/ Will Bucher

Will Bucher
350 Northern Blvd
STE 324 -1519
Albany, NY 12204-1000

202-997-3029
will@bucherlawfirm.com

cc: all counsel of record (*via email*)