# EXHIBIT 23

Hon. Andrea Robertson
Hearing Date: March 15, 2024
Hearing Time: 9:00 a.m.
With Oral Argument

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

VALVE CORPORATION,

                    Plaintiff,

     v.

BUCHER LAW PLLC, AFN LAW,
PLLC, and JOHN DOE CORPORATION,

                 Defendants.

No. 23-2-20447-6 SEA

DEFENDANTS' MOTION TO
DISMISS OR FOR SUMMARY
JUDGMENT

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT

LAW OFFICES OF
MCNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

## **TABLE OF CONTENTS**

I.  INTRODUCTION & RELIEF REQUESTED ........................................................1

II. FACTS ....................................................................................................................3

    A. The Decline of Class Actions and Rise of Mass Arbitration ......................3

    B. Valve Follows the Same Playbook as Other Companies Seeking to Avoid Class Actions ....................................................................................5

    C. Valve Uses Its Market Dominance to Harm Consumers and Competitors ...............................................................................................6

    D. The Law Firms Enter Into Relationships with Individual Consumers to Begin Individual Arbitrations. .................................................................7

    E. The Law Firms Notify Valve of Their Clients' Claims ...............................8

    F. The Law Firms Send Valve Individualized Notices on Behalf of Each Client .........................................................................................................9

    G. Valve Sues the Law Firms .........................................................................10

    H. Valve Seeks Collective Dismissal Of All Arbitration Demands. ..............10

III. ISSUES PRESENTED ........................................................................................11

IV. EVIDENCE RELIED UPON ..............................................................................11

V.  ARGUMENT ......................................................................................................11

    A. All Claims Should Be Dismissed Under Rule 12(b)(6) for Failure to State a Claim .........................................................................................12

        1. The Litigation Privilege Bars All of Valve's Claims.....................12

            a. The Litigation Privilege Absolutely Immunizes Attorneys for Claims Arising Out of Words or Conduct Pertinent to a Proceeding ....................................13

            b. Contemplated or Filed Arbitration Is a "Proceeding" Within the Privilege's Reach ................................................14

        2. Valve Fails to State a Claim for Tortious Interference for Several Additional and Independent Reasons.................................16

            a. Valve's Tortious Interference Claim Fails Because Attorneys Have No Duty to Their Clients' Adversaries for Acts Not Amounting to Fraud. .....................................17

LAW OFFICES OF
McNaul Ebel Nawrot & Helgren pllc
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

　　　　　　　　　　b.　　Attorneys Cannot Tortiously Interfere With Their
　　　　　　　　　　　　　　Own Clients' Contracts If They Are Acting Within
　　　　　　　　　　　　　　the Scope of Their Representation .......................................19

　　　　　　3.　　Valve Fails to State a Claim for Abuse of Process for the
　　　　　　　　　　Additional and Independent Reason That There Was No
　　　　　　　　　　Judicial Act Constituting "Process" ...................................22

　　　B.　　The Law Firms Are Entitled to the Procedural Protections of UPEPA ......23

　　　　　　1.　　UPEPA Procedures .........................................................................23

　　　　　　2.　　UPEPA Applies to Valve's Claims .................................................24

　　　　　　3.　　Because UPEPA Applies, All of Valve's Claims May Alternatively
　　　　　　　　　　Be Dismissed Pursuant to CR 56. ...................................................26

VI.　　CONCLUSION ...........................................................................................................28

LAW OFFICES OF
McNaul Ebel Nawrot & Helgren pllc
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

## TABLE OF AUTHORITIES

### CASES

*Abernathy v. Doordash,*
  438 F. Supp. 3d 1062 (N.D. Cal. 2020) ..................................................................2, 5

*Am. Exp. Co. v. Italian Colors Rest.,*
  570 U.S. 228, 133 S. Ct. 2304, 186 L. Ed. 2d 417 (2013) ............................................4

*Am. LifeCare, Inc. v. Wood,*
  826 So. 2d 646 (La. Ct. App. 2002) ..........................................................................15

*American Family Muual. Ins. Co. v. Zavala,*
  302 F. Supp. 2d 1108 (D. Ariz. 2003) .................................................................17, 20

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011) ............................................3

*Deatherage v. State, Examining Bd. of Psychology,*
  134 Wn.2d 131, 948 P.2d 828 (1997) .......................................................................15

*DeLoach v. Bevers,*
  922 F.2d 618 (10th Cir.1990) ..................................................................................25

*Denius v. Dunlap,*
  209 F.3d 944 (7th Cir. 2000) ...................................................................................25

*Garcia v. Rodney, Dickason, Sloan, Akin & Robb, P.A.,*
  106 N.M. 757 P.2d 118 (1988) ................................................................................18

*Greensun Grp., LLC v. City of Bellevue,*
  7 Wn. App. 2d 754, 436 P.3d 397 (2019) .................................................................21

*Grimes v. Grimes,*
  No. 8346-6-I, 27 Wn. App. 2d 1015, 2023 WL 4174352 (June 26, 2023)....................18

*Healy v. Seattle Rugby, LLC,* 1
  5 Wn. App. 2d 539, 476 P.3d 583 (2020) .................................................................15

*Jackson v. Quality Loan Serv. Corp.,*
  186 Wn. App. 838, 347 P.3d 487 (2015).................................................................12

*Jeckle v. Crotty,*
  120 Wn. App. 374, 85 P.2d 931 (2004) ..............................................................14, 18

*Koch v. Mutual of Enumclaw,*
  108 Wn. App. 500, 31 P.3d 698 (2001) ....................................................................21

*L&H Airco, Inc. v. Rapistan Corp.,*
  446 N.W.2d 372 (Minn. 1989).................................................................................18

LAW OFFICES OF
MCNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

*Lacher v. Engel,*
33 A.D.3d 10. 817 N.Y.S.2d 37 (N.Y. App. Div. 2006) ................................................15

*Legal v. Monroe Sch. Dist.,*
4 Wn. App. 2d 776, 423 P.3d 915 (2018) ....................................................................21

*Leingang v. Pierce Cty. Med. Bureau, Inc.,*
131 Wn.2d 133, 930 P.2d 288 (1997)..........................................................................17

*Loeffelholz v. C.L.E.A.N.,*
119 Wn. App. 665, 82 P.3d 1199 (2004) ................................................................22, 23

*Los Angeles Airways, Inc. v. Davis,*
687 F.2d 321 (9th Cir. 1982) ................................................................................20, 21

*Montecito Estates, LLC, v. Himsl,*
177 Wn. App. 1017, 2013 WL 5758860 (Wash. Ct. App. Oct. 22, 2013) ...................13

*Moore v. Conliffe,*
7 Cal. 4th 634, 871 P.2d 204 (1994) ...........................................................................15

*Mothershed v. Justices of Supreme Ct.,*
410 F.3d 602 (9th Cir. 2005) .......................................................................................25

*Odyniec v. Schneider,*
322 Md. 520 A.2d 786 (1991) ......................................................................................15

*Olympic Fish Prods., Inc. v. Lloyd,*
93 Wn.2d 596, 611 P.2d 737 (1980) ............................................................................21

*Postmates Inc. v. 10,356 Individuals,*
No. CV20-2783 PSG (JEMX), 2020 WL 1908302 (C.D. Cal. Apr. 15, 2020) ...............4

*Schott v. Glover,*
109 Ill. App. 3d 230, 440 N.E.2d 376 (1982) ..............................................................20

*Scott v. Am. Express Nat'l Bank,*
22 Wn. App. 2d 258, 514 P.3d 695 (2022) ..................................................................13

*Sea-Pac Co., Inc. v. United Food & Commercial Workers Local Union 44,*
103 Wn.2d 800, 699 P.2d 217 (1985)..........................................................................22

*Shenandoah Assocs. Ltd. v. Tirana,*
322 F. Supp. 2d. 6 (D.D.C. 2004) ...............................................................................20

*Sherman v. Pfizer, Inc.,*
8 Wn. App. 2d 686, 440 P.3d 1016 (2019) ..................................................................27

*Taco Bell Corp. v. John R.W. Cracken,*
939 F. Supp. 528 (N.D. Tex. 1996) .............................................................................18

LAW OFFICES OF
McNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

*Trask v. Butler,*
    123 Wn.2d 835, 872 P.2d 1080 (1994)................................................18, 19

*Twelker v. Shannon & Wilson,*
    88 Wn.2d 473, 564 P.2d 1131 (1977) .......................................................15

*Uber Techs., Inc. v. Am. Arb. Ass'n, Inc.,*
    204 A.D.3d 506, 167 N.Y.S.3d 66 (2022)...............................................2, 4

*United Mine Workers of Am. v. Ill. State Bar Ass'n,*
    389 U.S. 217, 88 S. Ct. 353, 19 L. Ed. 2d 426 (1967)...........................25, 26

*W. Mass. Blasting Corp. v. Metro Prop. & Cas. Ins. Co.,*
    783 A.2d 398 (R.I. 2001)...........................................................................15

*Wallrich v. Samsung Elecs. Am., Inc.,*
    No. 22 C 5506, 2023 WL 5935024 (N.D. Ill. Sept. 12, 2023)...................2, 5

*Yakima Cty. v. Yakima Cty. Law Enf't Officers Guild,*
    157 Wn. App. 304, 237 P.3d 316 (2010) ..................................................15

*Yeung v. Maric,*
    224 Ariz. 499, 232 P.3d 1281, 232 P.3d 1281 (2010) ..............................14

*Young v. Key Pharmaceuticals, Inc.,*
    112 Wn.2d 216, 770 P.2d 182 (1989)........................................................27

*Young v. Rayan,*
    27 Wn. App. 2d 500, 533 P.3d 123 (2023) ...............................................13

## STATUTES

9 U.S.C. § 7..................................................................................................15

chapter 4.105 RCW........................................................................................3

RCW 4.105.010 ..............................................................................23, 25, 26

RCW 4.105.030 ...................................................................................24, 27

RCW 4.105.040 .......................................................................................24

RCW 4.105.050 .......................................................................................24

RCW 4.105.060 ...............................................................................23, 24

RCW 4.105.090 .......................................................................................24

RCW 4.106.901 .......................................................................................23

RCW 7.04A.170..........................................................................................15

LAW OFFICES OF
MCNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

RCW 9A.72.010 ................................................................................................16

RCW 9A.72.020 ................................................................................................16

**OTHER AUTHORITIES**

J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. (2022) ...........................3, 4

Ronald E. Mallen, *Legal Malpractice* § 33.23 (2024) ......................................19

**RULES**

*AAA Consumer Arbitration Rules* R-31 ...........................................................15

CR 12 ...................................................................................................11, 12, 23

CR 56 ............................................................................................................3, 11, 12

CR 9 ....................................................................................................................12

RPC 1.0A ...........................................................................................................16

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page vi

LAW OFFICES OF
MCNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

# I. INTRODUCTION & RELIEF REQUESTED

Valve Corporation ("**Valve**"), a video game company, has exploited its market dominance to extract billions of dollars from consumers, in violation of the antitrust laws. Thousands of Valve's customers seeking to hold Valve accountable have hired counsel to pursue arbitrations against Valve. As a litigation tactic, Valve has now sued, in multiple courts, several of the law firms representing Valve's customers, including Defendants Bucher Law and AFN Law (the "**Law Firms**"). Valve's lawsuits against opposing parties' counsel are an attempt to interfere with the attorney-client relationship, to increase expense, and to intimidate any lawyer who might consider litigation against Valve. This tactic is not only legally baseless, it is dangerous, and it must be swiftly rejected by the courts.

As background, Valve's online game distribution platform, Steam, has over 132 million monthly customers and controls most personal computer video game downloads. Valve is currently facing an antitrust class action from developers and competitors, alleging that its conduct has inflated prices for video games and suppressed competition in the game distribution industry.

Tens of thousands of Valve's individual customers are also seeking redress against Valve for its conduct. The claims that Valve's customers seek to bring are the sort typically litigated by class action, since the harm to each consumer is relatively modest. Valve (like many other large corporations) therefore assumed that if it could avoid class action lawsuits, few, if any, consumers would be able to bring suit: individual customers would not pay a lawyer by the hour to pursue the claims, and lawyers would not take such representations for a contingent fee. Bolstered by recent U.S. Supreme Court precedent enforcing class action waivers, various large companies, including Valve, followed a common playbook: make customers agree to arbitration provisions containing a prohibition on class actions.

LAW OFFICES OF
McNaul Ebel Nawrot & Helgren pllc
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

1    When certain consumers sued Valve for its anticompetitive conduct in a class

2    action in the Western District of Washington, Valve successfully argued that its class

3    action waivers must be enforced and compelled the consumers to arbitrate their claims

4    individually. Valve then assumed the playbook had worked and that Valve could continue

5    its unlawful conduct with impunity.

6    But several law firms—including the Law Firms here—turned that assumption on

7    its head. Bucher Law PLLC used technology—for client outreach, intake, claims analysis,

8    retention, and communication—to efficiently provide tens of thousands of clients with the

9    opportunity to individually pursue antitrust claims against Valve. Because Valve's

10   customers were able to find lawyers to enforce their legal rights, the playbook—which is

11   failing other corporate defendants across the country—has also failed Valve. Many tens of

12   thousands of consumers, now with access to counsel, have chosen to arbitrate to obtain

13   damages for Valve's unlawful conduct.

14   This, in turn, has caused Valve (like the others using this playbook) to face

15   millions of dollars in arbitration filing fees and to balk at the cost of defending tens of

16   thousands of individual arbitrations. In short, it is the idiomatic "dog who caught the car,"

17   and courts around the country—in enforcing the very arbitration agreements the

18   corporations forced on consumers—have not missed the irony. *See, e.g., Abernathy v.*

19   *Doordash*, 438 F. Supp. 3d 1062, 1068 (N.D. Cal. 2020) (noting the "irony upon irony" of

20   DoorDash's attempt to avoid individual arbitrations and stating "[t]his hypocrisy will not

21   be blessed … ."); *Wallrich v. Samsung Elecs. Am., Inc.*, No. 22 C 5506, 2023 WL

22   5935024, at *13 (N.D. Ill. Sept. 12, 2023) (ordering Samsung to pay millions of dollars in

23   AAA filing fees and noting that "Samsung was hoist with its own petard"); *Uber Techs.,*

24   *Inc. v. Am. Arb. Ass'n, Inc.,* 204 A.D.3d 506, 510, 167 N.Y.S.3d 66 (2022) (requiring

25   Uber to pay $100 million in AAA filing fees and noting that Uber made the business

26   decision that caused its liability for such fees).

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 2

LAW OFFICES OF
MᶜNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

Valve has watched courts refuse to release other corporations from the exact same self-inflicted predicaments. So Valve is trying a new approach: **suing the law firms representing Valve's customers**.

Valve's claims against the Law Firms must be dismissed as a matter of law. **First**, Valve's suit falls squarely within the litigation privilege, which absolutely immunizes attorneys for statements they make pertinent to litigation. **Second**, the allegations in the complaint, taken as true, fail to state a claim as a matter of law on numerous independent bases described in detail below. **Third**, to the extent the Court finds any factual issues requiring resolution, the Law Firms are entitled to the protections of the Uniform Public Expression Protection Act ("UPEPA"), chapter 4.105 RCW, including expedited resolution of the claims under CR 56 and an award of reasonable attorneys' fees and costs.

Valve is scrambling to avoid the consequences of its own legal strategy. But, in the American legal system, suing an adversary's lawyer is not a permissible weapon in the arsenal. For the reasons set forth below, the Court should summarily dismiss Valve's claims and award fees and costs.

## II. FACTS

**A.    The Decline of Class Actions and Rise of Mass Arbitration**

This case arises within the context of companies avoiding consumer claims through class action waivers. The class action device was designed to allow individuals with low-value but potentially meritorious claims to bring those claims economically. In response, corporate defendants have waged a decades-long campaign to destroy the class action device. *See* J. Maria Glover, Mass Arbitration, 74 Stan. L. Rev. 1283, 1299-1303 (2022). These efforts culminated in the U.S. Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011), blessing arbitration provisions prohibiting class actions for state law claims. The U.S. Supreme Court subsequently found, in an antitrust matter, that arbitration provisions with class

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 3

LAW OFFICES OF
MᴄNᴀᴜʟ Eʙᴇʟ Nᴀᴡʀᴏᴛ & Hᴇʟɢʀᴇɴ ᴘʟʟᴄ
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

action waivers were enforceable even if they effectively barred the plaintiffs from vindicating their claims. *See Am. Exp. Co. v. Italian Colors Rest*., 570 U.S. 228, 236, 133 S. Ct. 2304, 186 L. Ed. 2d 417 (2013). Justice Kagan, in dissent, wrote that the majority's decision "would make pursuit of the antitrust claim a fool's errand. . . The monopolist gets to use its monopoly power to insist on a contract effectively depriving its victims of all legal recourse." *Id*. at 240. Today, "forced arbitration agreements with class action waivers . . . are ubiquitous." Glover, 74 Stan. L. Rev. at 1303.

As a result, plaintiffs' attorneys turned to mass arbitration. Mass arbitrations, unlike class actions, do not have representative plaintiffs. Instead, large numbers of plaintiffs who "suffered a common harm by a common defendant" prosecute their cases in their own names. *Id*. at 1322. Such mass arbitrations comport with arbitration contracts prohibiting class or representative actions, as they are not actions in which a named plaintiff represents a class of unnamed and absent members. *Id.* at 1350.

These mass arbitrations, involving the filing of thousands of individual claims, created significant problems for defendants: including large arbitration fees to arbitrators and of having to defend numerous individual cases serially. Defendants like Valve are now scrambling to avoid the dispute resolution systems they forced on consumers.

Courts have not looked kindly upon companies' efforts to avoid the mass arbitrations they brought upon themselves. *See, e.g., Postmates Inc. v. 10,356 Individuals*, No. CV20-2783 PSG (JEMX), 2020 WL 1908302, at *7 (C.D. Cal. Apr. 15, 2020) ("While Plaintiff likens the efforts by Defendants' counsel to class arbitration by emphasizing that Defendants are represented by the same counsel and filed many demands at the same time with similar allegations, here, Defendants have filed individual demands in their own names, and are thus not raising serious due process concerns by adjudicating the rights of absent class members of the plaintiff class.") (citations and internal quotations omitted); *Uber Techs, 204 A.D.3d at 510* (requiring Uber to pay $100

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 4

LAW OFFICES OF
MᴄNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

Million in AAA filing fees because Uber "made the business decision to preclude class, collective, or representative claims in its arbitration agreement with its consumers, and AAA's fees are directly attributable to that decision"); *Abernathy*, 438 F. Supp. 3d at 1068 (criticizing Doordash's attempt to avoid millions of dollars in arbitration fees: "[I]n irony upon irony, DoorDash now wishes to resort to a class-wide lawsuit, the very device it denied to the workers, to avoid its duty to arbitrate. This hypocrisy will not be blessed...."); *Wallrich*, 2023 WL 5935024, at *13 (ordering Samsung to pay over $4 million in filing fees to the AAA: "[a]las, Samsung was hoist with its own petard").

Companies who wish to avoid mass arbitration can, of course, opt for the far more efficient alternative of eliminating the class action waiver from their dispute resolution agreements. Some companies have done just that. In 2021, Amazon removed its mandatory arbitration provision and class action waiver from its terms of service. Sara Randazzo, "Amazon Faced 75,000 Arbitration Demands. Now It Says: Fine, Sue Us," WALL STREET JOURNAL, June 1, 2021.[1]

## B.    Valve Follows the Same Playbook as Other Companies Seeking to Avoid Class Actions

Valve operates Steam, which is "an online service through which video game makers can sell and distribute their games to Steam users" who access the games through Steam. Dkt. 1 at ¶ 12. In 2021, Steam reported 132 million monthly active users.[2]

Like the companies described above, Valve took steps to avoid class actions and force individual arbitrations. Valve requires all Steam users to agree to the Steam Subscriber Agreement ("SSA"), which provides that disputes under the SSA must be arbitrated. Dkt. 1, Ex. A ¶ 11.A. The SSA provides that arbitration is governed by the

---

[1] *Available at* https://www.wsj.com/articles/amazon-faced-75-000-arbitration-demands-now-it-says-fine-sue-us-11622547000?reflink=desktopwebshare_permalink.

[2] Steam -2021 Year In Review, dated March 8, 2022, *available at* https://store.steampowered.com/news/group/4145017/view/3133946090937137590.

LAW OFFICES OF
MCNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

Consumer Arbitration Rules of the American Arbitration Association (AAA). *Id*. ¶ 11.C. Valve promised to pay the arbitration filing fees and costs for claims seeking up to $10,000. *Id*. The SSA specifically precludes filing a class action or proceeding by "class, collective, or representative arbitration, even if AAA's rules would otherwise allow one." *Id*. ¶ 11.D.

The SSA also provides for a 30-day pre-filing notification of the intent to arbitrate. *Id*. ¶ 11.B. That process requires the user to contact Valve with "a written notice that describes the nature and basis of the claim or dispute and sets forth the relief sought." *Id*. If the consumer "and Valve do not reach an agreement to resolve that claim or dispute within thirty (30) calendar days after the notice is received," the consumer or Valve "may commence an arbitration." *Id*.

**C.      Valve Uses Its Market Dominance to Harm Consumers and Competitors**

In 2021, a putative class action was filed in the U.S. District Court for the Western District of Washington captioned *Wolfire Games, LLC v. Valve Corp.,* Case No. 2:21-cv-00563-JCC.

Wolfire Games, a video game publisher, was joined by seven individual named consumer plaintiffs who had purchased games through the Steam Store, asserting antitrust claims that Valve's anticompetitive practices unlawfully increased the pricing for PC desktop video games. Ex-1, 4-7. The plaintiffs brought the action on behalf of themselves and on behalf of the class of persons who purchased or sold a PC game through the Steam Store. Ex-85 ¶ 302. The plaintiffs alleged, among other things, that Valve, which controls 75 percent of the $30 billion market for PC games, "uses its dominance over PC game distribution to impose a 30% commission on nearly every sale made through its store," a commission which "far exceeds what would prevail in a competitive market and yields Valve billions of dollars in annual profits," and which "makes games more expensive for consumers to buy." Ex-4 ¶¶ 1-2.

LAW OFFICES OF
MᴄNᴀᴜʟ Eʙᴇʟ Nᴀᴡʀᴏᴛ & Hᴇʟɢʀᴇɴ ᴘʟʟᴄ
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

Valve moved to compel the consumers to arbitration, noting that the SSA "includes a conspicuous class action waiver and agreement to arbitrate claims individually." Ex-101, 107. In granting the motion, Judge Coughenour observed that the consumer plaintiffs were all bound by the SSA, which required arbitration. Ex-122, 125-26.

The claims asserted by Wolfire proceeded. *See generally* Ex-135-249. In May 2022, Judge Coughenour denied Valve's motion to dismiss the Wolfire' plaintiffs' claims, finding that Wolfire had plausibly alleged that Valve had taken actions to prevent competition from rival game distribution systems, resulting in higher prices for games and less competition in the industry. Ex-127, 132-33. Those claims remain pending.

The consumer plaintiffs' putative class action, however, has been "stayed" pending arbitration. Ex-126.

### D.    The Law Firms Enter Into Relationships with Individual Consumers to Begin Individual Arbitrations.

The *Wolfire* ruling created the circumstances for a mass arbitration: many thousands of individual Valve customers have antitrust claims; those claims have been found plausible by a federal court; yet that same federal court has held that these claims must be arbitrated individually and not as a class.

William Bucher, principal of Bucher Law PLLC, has significant experience litigating mass arbitrations. Dkt. 1, Ex. D ¶¶ 5-6. While at his prior law firm, Zaiger LLC ("Zaiger"), Bucher set up a system to recruit individual clients interested in pursuing claims against Valve. *Id*. ¶ 20. Bucher identified needed software service providers to set up and integrate various online systems, and ultimately came to be retained by tens of thousands of Valve customers seeking to pursue antitrust claims. *Id*. ¶¶ 20-21. Among other functions, Bucher's system allowed him to effectively advertise, screen clients for eligibility, send customized engagement agreements based on the preferences the client expressed at intake, and digitally sign the engagement letters. *Id.* To enable effective

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 7

communication, Bucher set up a web portal through which the clients could ask questions and contact their attorneys. *Id.* ¶ 21. As of February 2023, Bucher had spent over a thousand hours communicating with clients individually. *Id.*

When Bucher departed Zaiger, he provided his clients with the opportunity to continue their cases with him at Bucher Law. Declaration of William Bucher in Support of Defendants' Motion to Dismiss or for Summary Judgment ("Bucher Decl.") ¶ 3. More than 12,000 clients chose to do so. *Id.* Bucher Law secured funding to support his clients' claims, entered into a co-counsel relationship with AFN Law, and continued using technology to perform individualized client intake, evaluate each clients' individualized damages request, and allow for attorney-client communications. *Id.* Including the 12,000 clients that chose to follow him from Zaiger, over 63,000 Valve customers have now retained Bucher Law to bring claims against Valve. *Id.* ¶¶ 3-4.

**E.    The Law Firms Notify Valve of Their Clients' Claims**

On July 12, 2023, the Law Firms sent a written letter and email to Valve indicating their clients' intent to arbitrate the antitrust claims that had been compelled to arbitration. Dkt. 1, Ex. G. The letter laid out the consumers' antitrust theory of the case—namely, that Valve's antitrust violations have resulted in higher prices for PC games. *Id.* The Law Firms provided the names of all claimants through an Excel spreadsheet conveyed via flash drive. *Id.* at n.1. The Law Firms proposed a comprehensive settlement structure and amount that could resolve all the claims and noted that they were "prepared to engage in good faith discussions for 30-days to attempt to resolve [their] clients' claims before … initiat[ing] arbitration against you under the mandatory arbitration provisions in the Steam Subscriber Agreements." *Id.* at 2.

As soon as Valve received notice of the customers' intent to arbitrate, Valve began taking to steps to frustrate the Law Firms' ability to prosecute those claims. Valve responded two weeks later on July 25, 2023, arguing, among other things, by engaging the

LAW OFFICES OF
MᴄNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

same firms to write one demand, the Law Firms' clients had violated the prohibition on "class, collective, or representative" actions in the SSA. Dkt. 1, Ex. H at 3.

Valve insisted that, before it would entertain engaging in the SSA-mandated 30-day period of informal negotiations, the Law Firms had to provide "a written notice that identifies each individual subscriber, and that subscriber's Steam account, gives the subscriber's location, describes the nature and basis of that subscriber's claim or dispute, and sets forth the relief that subscriber seeks." *Id*. at 5. Valve also insisted that it would only engage with each claimant individually. *Id.* at 3.

**F.     The Law Firms Send Valve Individualized Notices on Behalf of Each Client**

The Law Firms tried to comply with Valve's request for individualized notice, but it soon became clear that Valve would continue making excuse after excuse to prevent the arbitrations from proceeding, no matter what the Law Firms did.

First, to comply with Valve's request for individualized notice, between August 30 and September 15, 2023, the Law Firms sent Valve individual email notices identifying each individual customer's (i) name, (ii) account, (iii) state and city of residence, (iv) description of the claim, and (v) the individualized compensation that customer would be willing to accept to settle with Valve. Bucher Decl. ¶ 5; *see also* Dkt. 1, Ex. J.

According to Valve's July 25, 2023, letter, such notices were sufficient to "commence the 30-day informal dispute resolution period" under the SSA. Dkt. 1, Ex. H at 5. Valve's attorneys reached out on September 20, 2023, stating that they "anticipate[d] … respond[ing] to each of the letters on or before October 31." Dkt. 1, Ex. J. While some consumers were willing to wait for Valve's response, 1,021 others opted to file their cases on October 2nd—82 days after Valve was first notified of their claims and at least 31 days after each of their individualized written notices. Bucher Decl. ¶¶ 6-7.

Valve sent a letter to the Law Firms on October 10, 2023, in which its intent to frustrate rather than negotiate was clear. Dkt. 1, Ex. I. For example:

LAW OFFICES OF
McNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

- Valve acknowledged that over 21,000 clients made individual settlement offers for "specific amounts" that were reasonable in light of those clients' spending, but still alleged the consumers "refuse[d] to provide amounts to settle their individual claims alone." *Id*. at 2, 3.

- Valve claimed that the SSA contained a "mutual promise" to engage only in "individualized negotiations," (*Id*. at 3) but no such requirement exists in the SSAs.

- Valve concluded the October 10 letter by taking back its September 20 promise to respond to the individualized claim notices by October 31. *Id*. at 3.

## G.  Valve Sues the Law Firms

Valve's attempt to create ever increasing hurdles was not working, so Valve took a different approach: Valve filed a complaint against Bucher Law, AFN Law, and their unknown litigation funder for their purported "attempt[] to weaponize the terms of Valve's dispute resolution agreement with Steam users to line their own pockets." Dkt. 1 ¶ 1. Valve brought claims for tortious interference and abuse of process, alleging:

- The Law Firms were pursuing a mass arbitration strategy. *Id*. ¶¶ 27–51.

- The Law Firms did not "meaningfully evaluat[e] the legal merits or factual underpinnings of their clients' claims." *Id*. ¶ 48.

- The Law Firms induced Valve customers to breach the SSA. *Id*. ¶¶ 52-81.

- The Law Firms and a litigation funder hoped to financially benefit by representing their clients against Valve. *Id*. passim.

As will be discussed further below, ***even if all of these allegations are true***, this suit must still be dismissed under numerous legal doctrines.[3]

## H.  Valve Seeks Collective Dismissal Of All Arbitration Demands.

---

[3] For the record, the Law Firms dispute Valve's allegations, which are often both inaccurate and incomprehensible. To provide one example, Valve repeatedly claims the Law Firms somehow acted improperly by following a "copycat" legal theory developed in the *Wolfire* case. Dkt. 1. ¶¶ 38, 40, 48. As previously stated, in the *Wolfire* case, Western District of Washington court found plausible antitrust claims and, on Valve's own motion, compelled the individual customers to raise their antitrust claims against Valve, individually, in arbitration. Ex-124-25, 132-33. It is not improper or unethical to bring claims in arbitration that a ***federal court ordered should be brought in arbitration***. When evaluating Valve's complaint, this Court should look past Valve's histrionic and exaggerated language and consider the well-pleaded factual allegations. Those allegations fail to state a claim for relief.

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 10

LAW OFFICES OF
McNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

1    In December 2023, after commencing this lawsuit, Valve filed a single motion

2    before the AAA asking it to dismiss all individual arbitrations. Bucher Decl. ¶ 8. Valve

3    contended that the AAA lacked jurisdiction because Bucher Law purportedly equated

4    "good faith discussions" to resolve each case with "collective negotiation," which Valve

5    characterized as "a blatant violation of the SSA." *Id.* (Valve's attack on alleged "collective

6    negotiation" was deeply ironic in light of its decision to file a single motion to collectively

7    dismiss all arbitrations.)

8    Furthermore, reflecting an apparent belief that the relief it seeks here can be

9    obtained before the AAA in arbitration, Valve sought an order reimbursing Valve for all

10   AAA fees as well as its attorney's fees under the SSA, on the purported basis that the

11   claims "are frivolous or filed for harassment." *Id.*

**III. ISSUES PRESENTED**

13   1.    Should the case be dismissed under CR 12(b)(6) where the claims

14   necessarily fail as a matter of law?

15   2.    Does UPEPA apply, thereby entitling the Law Firms to expedited

16   resolution of these issues and fees and costs?

17   3.    If UPEPA applies, and this Court does not dismiss this case under CR

18   12(b)(6), should this case alternatively be dismissed under CR 56 where Valve cannot

19   adduce evidence of any facts that would support the alleged claims?

**IV. EVIDENCE RELIED UPON**

21   Defendants rely upon the Declaration William Bucher, the Declaration of Claire

22   Martirosian, the exhibits attached thereto, and the records on file herein.

**V. ARGUMENT**

24   Valve's claims are based on its contention that the Law Firms tortiously interfered

25   with Valve's SSA by representing customers against Valve, and that the Law Firms

26   abused process by attempting to "extort a settlement" out of Valve for their clients, which

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 11

LAW OFFICES OF
MᴄNᴀᴜʟ Eʙᴇʟ Nᴀᴡʀᴏᴛ & Hᴇʟɢʀᴇɴ ᴘʟʟᴄ
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

would in turn benefit the Law Firms in the form of a fee. *See* Dkt. 1 ¶¶ 90–100. As described further below:

- All claims should be dismissed pursuant to CR 12(b)(6) because the Law Firms' actions are absolutely privileged. *See* **Section V.A(1)**.

- Independently, the claims should be dismissed pursuant to CR 12(b)(6) because Valve's allegations, even if true, fail to state a legally viable claim. *See* **Section V.A(2)** (failure to state a claim for tortious interference) & **Section V.A(3)** (failure to state a claim for abuse of process).

- The Law Firms are entitled to the procedural protections of UPEPA, including expedited procedures for resolving the case under CR 56 and an award of attorneys' fees and costs. *See* **Section V.B(1), (2)**.

- Finally, if UPEPA applies, and this Court does not dismiss pursuant to CR 12(b)(6), dismissal pursuant to CR 56 is appropriate in the alternative. If Valve claims targeted discovery could uncover material evidence, the Court should require expedited discovery under UPEPA and then grant summary judgment. Summary judgment is appropriate because Valve cannot adduce evidence that could support its claims. *See* **Section V.B(3)**.

## A.    All Claims Should Be Dismissed Under Rule 12(b)(6) for Failure to State a Claim

Dismissal is warranted under CR 12(b)(6) "where the plaintiff cannot prove any set of facts consistent with the complaint that would entitle the plaintiff to relief." *Jackson v. Quality Loan Serv. Corp.*, 186 Wn. App. 838, 843, 347 P.3d 487 (2015).[4] Here, even if all the allegations in the complaint are presumed to be true, dismissal is still warranted for numerous independent reasons.

### 1.    The Litigation Privilege Bars All of Valve's Claims

Valve has sued lawyers for litigating on behalf of clients against Valve. That is not an acceptable defense strategy, as the Law Firms' conduct falls squarely within the

---

[4] Bucher Law is a New York firm, and its clients are spread across the nation, so there may be colorable arguments that the law of other jurisdictions should apply to certain claims, though the application of another state's law was not pleaded in the complaint. *See* CR 9(k). As it does not appear that there is any material conflict in the law of other jurisdictions—a requirement for a choice of law analysis to apply—it is presumed for purposes of this motion that Washington law applies. Should the case not be dismissed on this motion, Defendants reserve their rights to argue another jurisdiction's law may apply if warranted by the facts and law.

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 12

LAW OFFICES OF
MCNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

protections of the litigation privilege. The Court need not go beyond this argument Section V.A(1) to determine that this case must be dismissed in full.

### a. The Litigation Privilege Absolutely Immunizes Attorneys for Claims Arising Out of Words or Conduct Pertinent to a Proceeding

Valve's claims for tortious interference and abuse of process concern the Law Firms' activities in soliciting clients, communicating with their clients, notifying Valve about client claims, attempting to negotiate a settlement, and filing for arbitration. These activities break down into two categories: (i) conducted related to solicitation and engagement of clients; (ii) acts subsequently taken on clients' behalf against Valve. As set forth below, both are protected by the litigation privilege.

Generally, the litigation privilege absolutely immunizes attorneys from civil liability for statements and actions pertinent to a proceeding. *Scott v. Am. Express Nat'l Bank*, 22 Wn. App. 2d 258, 265, 514 P.3d 695 (2022). "Though [litigation privilege] often arises in the context of defamation suits, the courts have rejected the notion that litigation privilege applies only to that claim." *Young v. Rayan*, 27 Wn. App. 2d 500, 510, 533 P.3d 123 (2023). Instead, as our Supreme Court has reflected, "the chilling effect of subsequent litigation 'is the same regardless of the theory on which that subsequent litigation is based.'" *Id.* (*quoting Bruce v. Byrne-Stevens & Assocs. Eng'rs, Inc.*, 113 Wn.2d 123, 131–32, 776 P.2d 666 (1989)).

***Acts taken on behalf of clients:*** consistent with the privilege, Washington courts have recognized that "an attorney is immune from litigation by an opposing party for actions taken on behalf of a client against that party." *Montecito Estates, LLC, v. Himsl*, 177 Wn. App. 1017, 2013 WL 5758860, at *3 (Wash. Ct. App. Oct. 22, 2013) (cited under GR 14.1 as persuasive, non-binding authority). Granting attorneys absolute immunity "furthers a public policy of securing to [counsel] . . . the utmost freedom in their efforts to secure justice for their clients." *Young*, 27 Wn. App. 2d at 509 (internal quotation marks

LAW OFFICES OF
MᶜNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

removed; alterations in original). As such, the Law Firms have absolute immunity for all acts taken on their clients' behalf with respect to the dispute between their clients and Valve.

**Solicitation of clients**: the privilege also applies to claims alleging damage for attorneys' actions in soliciting clients, as evidenced by *Jeckle v. Crotty*, 120 Wn. App. 374, 385, 85 P.2d 931 (2004) (concluding that attorneys' actions in soliciting new clients to join a pending class action "relate to both the legal aspects and the business aspects of the defendants' law practice" and that "[g]iven the potential for affecting the existing attorney/client relationship," a "CPA action does not lie under these facts").

In *Jeckle*, a physician sued attorneys and law firms, raising tort and statutory claims based on the defendants' alleged use of patient records from an investigation by Washington's Medical Quality Assurance Commission to solicit patients to join lawsuits against the physician. *Id.* The *Jeckle* court dismissed the case, concluding that the complained-of acts could not form the basis for liability, citing with approval to a Minnesota case concluding "a letter sent by an attorney to solicit additional plaintiffs for his client's potential lawsuit was protected by the judicial action privilege and could not form the basis for a defamation action." *Id.* at 386 (citing *Kittler v. Eckberg, Lammers, Briggs, Wolff & Vierling*, 535 N.W.2d 653, 657–58 (Minn. App. 1995)). *Jeckle* applies here to bar any claims relating to soliciting the Law Firms' clients in addition to acts undertaken by the Law Firms on their clients' behalf.

### b. Contemplated or Filed Arbitration Is a "Proceeding" Within the Privilege's Reach

Courts have repeatedly concluded that arbitration proceedings fall within the scope of absolute immunity. *E.g.*, *Yeung v. Maric*, 224 Ariz. 499, 232 P.3d 1281, 1286, 232 P.3d 1281 (2010) (observing that "Arizona public policy favors arbitration as a means of disposing of controversies" and that available "safeguards" such as notice, presentation of evidence, an oath, and the issuance of subpoenas "make arbitration sufficiently analogous

LAW OFFICES OF
MᴄNᴀᴜʟ Eʙᴇʟ Nᴀᴡʀᴏᴛ & Hᴇʟɢʀᴇɴ ᴘʟʟᴄ
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

to judicial litigation to warrant application of the privilege"); *Moore v. Conliffe*, 7 Cal. 4th 634, 643, 871 P.2d 204 (1994) (contractual arbitration proceeding falls within immunity); *Am. LifeCare, Inc. v. Wood*, 826 So. 2d 646, 649–50 (La. Ct. App. 2002) (applying witness immunity to arbitration proceeding); *Odyniec v. Schneider*, 322 Md. 520, 588 A.2d 786, 789–93 (1991) ("we conclude that the absolute privilege may safely be extended to statements of potential witnesses made during the pendency of [health care malpractice arbitration] proceedings"); *Lacher v. Engel*, 33 A.D.3d 10. 817 N.Y.S.2d 37, 42 (N.Y. App. Div. 2006); *W. Mass. Blasting Corp. v. Metro Prop. & Cas. Ins. Co.*, 783 A.2d 398, 403 (R.I. 2001); *see also Healy v. Seattle Rugby, LLC*, 15 Wn. App. 2d 539, 546–547, 476 P.3d 583 (2020) ("[M]any jurisdictions have recognized that the so-called 'litigation privilege' includes statements made in arbitration.") (citing cases).

Public policy supports the application of litigation privilege to arbitration in Washington. The policy underlying absolute litigation immunity for attorneys representing their clients is the need to promote zealous advocacy, safeguarding the "administration of justice." *Twelker v. Shannon & Wilson*, 88 Wn.2d 473, 476, 564 P.2d 1131 (1977). Courts recognize that the application of absolute immunity is balanced by other safeguards inherent in the judicial system to protect against misconduct in litigation, such as an oath, cross-examination, and the threat of perjury prosecution. *Deatherage v. State, Examining Bd. of Psychology*, 134 Wn.2d 131, 138, 948 P.2d 828 (1997).

The same policies apply in arbitration. Washington has a public policy supporting arbitration for the final resolution of disputes. *E.g., Yakima Cty. v. Yakima Cty. Law Enf't Officers Guild*, 157 Wn. App. 304, 317, 237 P.3d 316 (2010). That policy necessarily requires arbitration to allow for zealous advocacy and the effective administration of justice in arbitration. Arbitration contains all the same safeguards for misconduct that are available in court. An arbitrator may issue a subpoena or summons and may administer oaths. RCW 7.04A.170; 9 U.S.C. § 7; *see AAA Consumer Arbitration Rules* R-31 (AAA

LAW OFFICES OF
MCNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

rule allowing arbitrator to require witnesses to testify under oath). A perjury prosecution can arise out of arbitration. RCW 9A.72.010 (definition of an oath "required or authorized by law"); RCW 9A.72.020. An attorney is always subject to professional discipline for conduct in an arbitration. RPC 1.0A(m) ("'Tribunal' denotes a court, an arbitrator in a binding arbitration proceeding or legislative body, administrative agency or other body acting in an adjudicative capacity."). As in other jurisdictions, the litigation privilege applies to all words and actions pertinent to an arbitration proceeding in Washington.

Indeed, as set forth above, in making a motion seeking reimbursement of all costs and attorneys' fees on the basis of "frivolous ... harassment" (*see* Bucher Decl ¶ 8), Valve has already invoked the sanction power of the AAA and its arbitrators. This demonstrates why the litigation privilege is both necessary and applicable: permitting Valve's claims to proceed would not only invade the Law Firms' relationship with their clients, but it would also provide Valve with a second bite at the apple to obtain relief it is already seeking from the American Arbitration Association.

In sum, the Law Firms' conduct related to contemplated or filed arbitration under the SSA. Thus, their conduct is immunized under the litigation privilege, and this Court should dismiss the claims for this reason. If the Court finds that litigation privilege applies, the Court may grant the Law Firms' motion on that basis alone and need not consider any of the alternative bases for dismissal discussed below.

### 2. Valve Fails to State a Claim for Tortious Interference for Several Additional and Independent Reasons

If the Court finds that litigation privilege does not apply, the Court should still grant the Law Firms' motion to dismiss Valve's tortious interference claim for failure to state a claim. A claim for tortious interference with a contract involves five elements: (1) the existence of a valid contract; (2) defendants' knowledge of the contractual relationship; (3) intentional interference causing a breach of contract; (4) that defendants

1 | interfered for an improper purpose or used improper means; and (5) resultant damages.

2 | *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997).

3 |       Valve contends that the Law Firms are liable for tortious interference because they

4 | "intentionally induced and/or caused Steam users to breach [the SSA]," and the

5 | "interference was for an improper purpose by improper means." Dkt 1 ¶¶ 94-95. However,

6 | overlapping legal doctrines bar Valve from pursuing this claim against the Law Firms. As

7 | discussed below, (a) a party may not sue his litigation adversary's attorney in tort for acts

8 | undertaken in connection with that representation not amounting to actual fraud; and (b)

9 | attorneys cannot tortiously interfere with their clients' contracts when they are acting

10 | within the scope of their agency and in the best interests of their client.

11 |      **a.**    **Valve's Tortious Interference Claim Fails Because Attorneys Have No Duty to Their Clients' Adversaries for Acts Not**

12 |           **Amounting to Fraud.**

13 |       Absent a claim of fraud, a party may not sue his adversary's attorney in tort for

14 | acts undertaken in connection with that representation because an attorney does not owe

15 | its litigation adversary a duty. Finding that an attorney owes a legal duty to a litigation

16 | adversary would interfere with the attorney-client relationship, require the attorney to

17 | reveal protected communications to secure a defense, and risk chilling the attorney's

18 | vigorous representation of the client. This Court should similarly conclude the Law Firms

19 | had no duty to Valve here.

20 |       Numerous courts have reached this conclusion. For example, in *American Family*

21 | *Muual. Ins. Co. v. Zavala*, 302 F. Supp. 2d 1108, 1120 (D. Ariz. 2003), the Court

22 | dismissed a tortious interference claim brought by a party against opposing counsel,

23 | reasoning: "It would be dangerous precedent to hold that lawyers must consider the

24 | interests of opposing parties when acting for their clients—that they may be held

25 | personally liable if their actions frustrate the opponents' interests. Such a precedent would

26 | create an immediate conflict of interest for lawyers." *See also Taco Bell Corp. v. John*

LAW OFFICES OF
McNaul Ebel Nawrot & Helgren pllc
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

1    *R.W. Cracken*, 939 F. Supp. 528, 532 (N.D. Tex. 1996) (rejecting claims against attorneys

2    on various tort theories, reasoning that "the knowledge of an attorney for one party that he

3    may be sued by the other party would exacerbate the risk of tentative representation");

4    *Garcia v. Rodney, Dickason, Sloan, Akin & Robb, P.A.*, 106 N.M. 757, 750 P.2d 118, 124

5    (1988) (rejecting tort claims against attorneys on the grounds that there is "no duty

6    running from trial counsel to his adversary"); *L&H Airco, Inc. v. Rapistan Corp.*, 446

7    N.W.2d 372, 379 (Minn. 1989) (same; collecting cases from California, Massachusetts,

8    Michigan, and Oregon).

9           While the Washington courts have not squarely ruled on this issue, numerous cases

10   indicate that the same rule exists in Washington. The Court of Appeals recently affirmed

11   sanctions against a party who sued his adversary's attorneys, concluding that "no

12   Washington case law supported the 'claim that they may bring a civil suit for damages

13   individually against [the adversary's] lawyers, *in their capacity as his lawyers*, for the

14   alleged wrongdoing of their client." *Grimes v. Grimes*, No. 8346-6-I, 27 Wn. App. 2d

15   1015, 2023 WL 4174352, at *5 & n.10 (June 26, 2023) (unpublished non-binding

16   authority cited per GR 14.1).

17          In *Jeckle*, the Court of Appeals observed that allowing a plaintiff to sue their

18   adversary's attorney under a consumer theory infringes on the attorney-client relationship.

19   *Jeckle*, 120 Wn. App. at 384 (citing *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480,

20   496, 656 A.2d 1009 (1995)). Similarly, permitting an action to be brought against

21   attorneys by their adversary in a pending litigation unduly interferes with and weaponizes

22   the attorney-client relationship.

23          The lack of a duty to a litigation adversary is further confirmed by the Supreme

24   Court's decision in *Trask v. Butler*, 123 Wn.2d 835, 843, 872 P.2d 1080 (1994). There,

25   the plaintiff brought a claim for legal malpractice against an attorney who had represented

26   the personal representative of an estate in which the plaintiff was a beneficiary. The Court

LAW OFFICES OF
MCNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

set forth a balancing test to consider whether an attorney can be sued for professional negligence by a non-client, with the critical element of the test being "the extent to which the transaction was intended to benefit the plaintiff." *Id*. Under this threshold question, "no further inquiry need be made unless such an intent [to benefit the plaintiff] exists." *Id*. When applied to a client's adversary, this first factor is dispositive. As the *Trask* court observed, "***in no instance has a court found liability to a third party adversary***." *Id.* at 844 (emphasis added).

These authorities strongly argue against imposing any duty in the circumstances here. As one treatise observed, "[a] special consideration for the litigation attorney is that often the purpose of his or her retention is to disadvantage or cause injury to the client's adversary." Ronald E. Mallen, Legal Malpractice § 33.23 (2024) (emphasis added). While "few and rare" exceptions to this rule may exist—such as where conduct amounts to fraud, *see id.*—no such circumstances are present here. Valve seeks to impose liability on firms who, in representing their clients, brought Valve to the negotiating table, then to the arbitration institution Valve contracted for, all strictly in adherence to the SSA. The Law Firms have no duty to avoid harm to Valve in this context. In fact, they have the opposite duty—to vigorously represent their clients. The tortious interference claim should be dismissed on this independent basis.

        **b.**      **Attorneys Cannot Tortiously Interfere With Their Own Clients' Contracts If They Are Acting Within the Scope of Their Representation**

As discussed above, Valve's tortious interference claim is based on allegations that the Law Firms "intentionally induced and/or caused Steam users to breach [the SSA]" and the "interference was for an improper purpose by improper means." Dkt 1. ¶¶ 94-95. But courts in multiple jurisdictions have held that, as a matter of law, attorneys cannot be liable for tortious interference with their own clients' contracts so long as they are acting within the scope of their agency, *i.e.*, lawfully working to advance their clients' interests.

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 19

LAW OFFICES OF
McNaul Ebel Nawrot & Helgren pllc
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

1    The fact that an attorney seeks compensation for their work is insufficient to support a

2    claim for tortious interference as long as the attorney intended to benefit their client.

3    Courts have used a variety of legal justifications to reject tortious interference

4    claims against opposing attorneys. Some courts have found that these types of allegations

5    fail to meet the elements of tortious interference. For example, in *Zavala*, 302 F. Supp. 2d

6    at 1118, the Court granted summary judgment on a tortious interference claim brought by

7    a party against opposing counsel, reasoning that "lawyers act as their clients' agents, their

8    alter-egos, and therefore generally are not capable of interfering with their contractual

9    relations." The court also concluded that the attorneys' alleged interference was not

10   "improper" because the attorneys' actions had "achieved the entirely proper purpose of

11   advancing the interests of their clients." *Id*. at 1120; *see also Shenandoah Assocs. Ltd. v.*

12   *Tirana*, 322 F. Supp. 2d. 6, 10 (D.D.C. 2004) (same).

13   Some courts have justified the dismissal as a result of a privilege governing

14   attorney advice. The Ninth Circuit concluded that no liability could be imposed on an

15   attorney who assisted his client in breaching a contract to purchase the assets of the

16   plaintiff's company. *Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321, 328 (9th Cir.

17   1982). While the plaintiff had contended there was a triable issue on whether the attorney

18   had "improper intent" because the attorney acted to enrich his own position and obtain the

19   plaintiff's company at a distress price, the court held that so long as the attorney was

20   motivated, *at least in part*, by a desire to benefit the client, the conduct was privileged

21   even if he intended to also benefit himself. *Id.* ("We believe that advice by an agent to a

22   principal is rarely, if ever, motivated purely by a desire to benefit only the principal.").

23   Courts recognizing this privilege have found that the privilege can only be overcome if the

24   complaint includes allegations that the attorney acted with "a desire to harm, which is

25   *independent of and unrelated to* the attorney's desire to protect his client." *Schott v.*

26   *Glover*, 109 Ill. App. 3d 230, 440 N.E.2d 376, 380 (1982) (emphasis added).

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 20

LAW OFFICES OF
McNaul Ebel Nawrot & Helgren pllc
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

1    Washington has not explicitly ruled on whether a litigation adversary's claim for

2    tortious interference against opposing counsel may be dismissed as a matter of law.

3    However, Washington law is consistent with the existence of such a rule. Washington

4    courts have ruled that "[g]ood faith may privilege an interferor's actions and thereby serve

5    as an affirmative defense to a tortious interference claim." *Greensun Grp., LLC v. City of*

6    *Bellevue*, 7 Wn. App. 2d 754, 777, 436 P.3d 397 (2019). Because an attorney acts as his

7    client's agent, *see, e.g.*, *Legal v. Monroe Sch. Dist.*, 4 Wn. App. 2d 776, 782, 423 P.3d

8    915 (2018), the "good faith" defense shields the attorney under principles of agency.

9    Consistent with such principles, Washington courts have concluded that a

10   corporate officer is not liable for inducing the corporation's breach of contract "provided

11   the officer or director acts in good faith." *Olympic Fish Prods., Inc. v. Lloyd*, 93 Wn.2d

12   596, 599, 611 P.2d 737 (1980). A corporate office acts in "good faith" so long as he is not

13   "pursuing purely personal goals with no intent to benefit the corporation." *Id.* at 599–600.

14   Under *Olympic Fish*, a desire to achieve personal goals does not negate the good faith

15   defense unless there is no intent to benefit the principal. Thus, in *Koch v. Mutual of*

16   *Enumclaw*, the court reasoned a good faith defense "would be illusory if the fact that the

17   advisor was paid for the advice automatically raised an inference of dishonesty or bad

18   faith." 108 Wn. App. 500, 508, 31 P.3d 698 (2001) (applying Restatement (Second) of

19   Torts § 772, which provides that "one. . . does not interfere improperly with the other's

20   contractual relation, by giving the third person (a) truthful information, or (b) honest

21   advice within the scope of a request for the advice"). *Koch* also quoted comment c to §

22   772, stating that if the conditions for applying that section are met, "it is immaterial that

23   the actor also profits by the advice or that he dislikes the third person and takes pleasure in

24   the harm caused to him by that advice." *Id*.

25   This is essentially the same rule as the one espoused by the courts in *Los Angeles*

26   *Airways* and *Schott*, in which courts found that attorneys could not be liable for tortious

LAW OFFICES OF
McNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

interference so long as they acted in part with intent to benefit their clients, whether or not they also sought some personal benefit.

Here, Valve cannot overcome the Law Firms' good faith defense, which the Court should find applies even more strongly in the attorney-client context given the sacrosanct nature of the attorney-client relationship. Even if the attorneys were partially motivated by a desire to obtain a fee, that fails to show an improper purpose or improper means for purposes of tortious interference. After all, attorneys practice law to earn a living, and they are motivated to secure compensation. In the contingent fee arena, those motives are necessarily aligned with a motive to benefit the client because the attorney is paid only if the client recovers. Acting to secure that end is consistent with good faith advice, and the attorney-agent cannot be liable for the breach. This Court should also dismiss the tortious interference claims against the defendants for this reason, too.

### 3. Valve Fails to State a Claim for Abuse of Process for the Additional and Independent Reason That There Was No Judicial Act Constituting "Process"

The abuse of process claim (like the tortious interference claim) also independently fails as a matter of law. Valve's abuse of process claim fails for the additional reason that Valve has not alleged any abuse of process other than the mere filing of an arbitration. As the Supreme Court has recognized, "the mere institution of a legal proceeding even with a malicious motive does not constitute abuse of process." *Sea-Pac Co., Inc. v. United Food & Commercial Workers Local Union 44*, 103 Wn.2d 800, 806, 699 P.2d 217 (1985) (quoting *Fite*, 11 Wn. App at 27–28); *see also Loeffelholz v. C.L.E.A.N.*, 119 Wn. App. 665, 82 P.3d 1199 (2004). Rather, Valve must allege "an ***act after filing suit*** using legal process empowered by that suit to accomplish an end not within the purview of the suit." *Id.* (quoting *Batten v. Abrams*, 28 Wn. App. 737, 748, 626 P.2d 984 (1981)). (emphasis added).

LAW OFFICES OF
McNaul Ebel Nawrot & Helgren pllc
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

Here, assuming that arbitration constitutes "process" within the meaning of the "abuse of process" tort, the complaint fails to allege "the misuse or misapplication of the process, *after* it has once been issued, for an end other than that which it was designed to accomplish." *Loeffelholz*, 119 Wn. App. at 699–700 (citations omitted, emphasis adeed). Instead, Valve is alleging that the filing of arbitrations *it compelled* is inherently abusive. This does not state a claim.

**B.      The Law Firms Are Entitled to the Procedural Protections of UPEPA**

UPEPA, Washington's anti-SLAPP Act, is designed to safeguard First Amendment rights. *See* RCW 4.106.901. For the reasons discussed below, UPEPA applies here. The procedural protections of UPEPA, also discussed below, confer substantial advantages on the Law Firms. There are two ways UPEPA could apply:

*First*, if the Court finds that dismissal pursuant to CR 12(b)(6) is appropriate, the Court must determine whether UPEPA applies, as the Law Firms would be entitled to their fees and costs on this motion if UPEPA applies.

*Second*, if the Court finds that dismissal under CR 12(b)(6) is not appropriate, but finds that UPEPA applies, the Court may dismiss under CR 56 either (1) without discovery or (2) with only a limited period of court-ordered targeted discovery into the underlying claims.

**1.      UPEPA Procedures**

Under UPEPA, the Court must dismiss the case in whole or in part if three elements are met: (1) "the moving party establishes under RCW 4.105.010(2) that" UPEPA applies, (2) the responding party fails to establish under RCW 4.105.010(3) that UPEPA does not apply, and (3) either (i) "the responding party fails to establish a prima facie case as to each essential element of the cause of action" or (ii) the standard for dismissal under CR 12(b)(6) or CR 56 is met. *See* RCW 4.105.060.

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 23

LAW OFFICES OF
MCNAUL EBEL NAWROT & HELGREN PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

UPEPA does not vary the standards applicable under CR 12 or CR 56. Instead, UPEPA provides certain procedural safeguards when a case involves activity protected by the First Amendment, namely: (1) expedited discovery and early resolution under CR 56, (2) fee-shifting, and (3) a stay on all other aspects of the proceeding, including discovery. RCW 4.105.030(1)(a).

In ruling on the motion, the court considers the pleadings, motion papers, and "any evidence that could be considered in ruling on a motion for summary judgment." RCW 4.105.050. The court may allow limited discovery if a party shows that specific information is necessary to establish whether a party has satisfied or failed to satisfy a burden under RCW 4.105.060(1) and the information is not reasonably available unless discovery is allowed. RCW 4.105.030. Unless there is good cause for a later hearing, the Court must hear the motion within sixty days of (1) when the motion is filed; or (2) if applicable, the court order allowing discovery. RCW 4.105.040. If the Law Firms prevail on a UPEPA motion, they are entitled to "court costs, reasonable attorneys' fees, and reasonable litigation expenses related to the motion." RCW 4.105.090.

### 2.    UPEPA Applies to Valve's Claims

To show that UPEPA applies, the Law Firms must meet the requirements of RCW 4.105.060. For the reasons discussed above, the Law Firms have already demonstrated that RCW 4.105.060(1)(c)(ii) has been met, as the Law Firms have shown that "the responding party failed to state a claim upon which relief can be granted" under CR 12(b)(6), and that there is "no genuine issue of material fact" under CR 56. To establish that the cause of action falls within UPEPA, the Law Firms can demonstrate that Valve's "cause of action [is] asserted" against them based on their:

> (b) Communication on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding;

LAW OFFICES OF
McNaul Ebel Nawrot & Helgren pllc
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

(c) Exercise of the right of freedom of speech or of the press, the right to assemble or petition, or the right of association, guaranteed by the United States Constitution or Washington state Constitution, on a matter of public concern.

RCW 4.105.010(2)(b)–(c). The Law Firms meet both criteria.

*First,* the Law Firms' communications regarding settlement and arbitration, to which Valve so strenuously objects, involved "communication on an issue under consideration or review" in a judicial forum, specifically, the *Wolfire* case. As discussed above (*see* Section II.C, *supra*), Judge Coughenour stayed the putative consumer class action pending arbitration (Ex-122-26) while also ruling that similar antitrust claims brought by a video game publisher were plausible. (Ex-132-33) The Law Firms' actions in pursuing the consumer claims are "communications" on the antitrust claims under review in *Wolfire*. *See* Dkt. 1 ¶ 40 (acknowledging the Law Firms are following the legal theories in *Wolfire*). Also, the putative consumers raised an unconscionability challenge to the arbitration agreement, which Judge Coughenour expressly found needed to be resolved in the arbitration proceedings (Ex-124)—but if the arbitrator did find the arbitration agreement to be unconscionable, then the consumers would be able return to federal court and resume the stayed action. Therefore, the communications Valve complains of concern and arise from Judge Coughenour's order in the *Wolfire* judicial proceeding.

*Second*, the Law Firms' conduct involves the exercise of First Amendment rights under RCW 4.105.010(2)(c). First, the "right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition." *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000); *see also United Mine Workers of Am. v. Ill. State Bar Ass'n*, 389 U.S. 217, 221–22, 88 S. Ct. 353, 19 L. Ed. 2d 426 (1967) (holding that a union had a First Amendment right to employ a salaried attorney to represent members pursuing workers' compensation claims); *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir.1990) ("The right to retain and consult an attorney ... implicates ... clearly established First Amendment rights of association and free speech."); *Mothershed*

LAW OFFICES OF
McNaul Ebel Nawrot & Helgren pllc
600 University Street, Suite 2700
Seattle, Washington 98101-3143
(206) 467-1816

*v. Justices of Supreme Ct.*, 410 F.3d 602, 611 (9th Cir. 2005). The right to obtain legal advice does not depend on the purpose for which the advice is sought, and this right applies equally to a legal representation intended to advocate a political or social belief or to recover damages in a personal injury suit. *See United Mine Workers*, 389 U.S. at 223. The Law Firms' conduct thus falls squarely within the ambit of protected First Amendment conduct.

The attorneys' exercise of these First Amendment rights was on a "matter of public concern" within the meaning of RCW 4.105.010(2)(c). By seeking to hold Valve accountable for its anticompetitive conduct and asserting claims based on that anticompetitive conduct on behalf of their clients, the Law Firms necessarily spoke on and acted on issues of public concern.

In sum, this case falls within RCW 4.105.010(2)(b) and (c). And, as discussed above and below, the complaint "fail[s] to state a cause of action upon which relief can be granted," and "there is no genuine issue as to any material fact and [the Law Firms are] entitled to judgment as a matter of law."

Because UPEPA applies, expedited discovery procedures are applicable and a hearing will be held within 60 days. If the Court finds that the claims are not subject to dismissal pursuant to CR 12(b)(6), pursuant to UPEPA, the Court may dismiss under CR 56 because, as will be discussed below, no material dispute of fact exists. So long as UPEPA applies, the Law Firms are entitled an award of costs and fees regardless of the basis for dismissal.

### 3.    Because UPEPA Applies, All of Valve's Claims May Alternatively Be Dismissed Pursuant to CR 56.

As UPEPA applies, the Law Firms are able to access expedited resolution under CR 56. Summary judgment dismissal should be granted under CR 56 where, viewing "the evidence and all reasonable inferences therefrom . . . in the light most favorable to the

1   plaintiff," there is "no genuine issue as to any material fact." *Young v. Key*

2   *Pharmaceuticals*, *Inc.*, 112 Wn.2d 216, 225–26, 770 P.2d 182 (1989). "A defendant can

3   move for summary judgment based on the contention that there is an absence of evidence

4   to support the plaintiff's claim." *Sherman v. Pfizer, Inc.*, 8 Wn. App. 2d 686, 694, 440

5   P.3d 1016 (2019). "The burden then shifts to the plaintiff to present specific facts that

6   rebut the defendant's contention and show a genuine issue of material fact." *Id.* "Summary

7   judgment is appropriate if a plaintiff fails to present sufficient evidence on all essential

8   elements of the claim." *Id.* (citations omitted).

9           Here, Valve cannot put forth evidence supporting every element of its claims. So,

10  even if Valve can identify some hypothetical scenario that would give rise to a claim

11  sufficient to overcome CR 12(b)(6) dismissal, Valve cannot put forth evidence that such a

12  hypothetical scenario actually exists or that discovery would uncover evidence supporting

13  such a scenario. Valve cannot identify any issues of material fact warranting a trial, and

14  this Court should also dismiss for this reason.

15          If Valve believes it needs any discovery to show that the Law Firms have "failed

16  to satisfy [their] burden" under CR 56 (*see* RCW 4.105.030), Valve is, of course, free to

17  request it. If that evidence is relevant and material on the questions in front of the Court,

18  the Court may order such discovery to take place on an expedited basis under UPEPA.

19  However, given the clear Washington case law cited above, there is no discovery that

20  would affect the proper result here.

21  ///

22

23

24

25

26

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 27

1

## VI. CONCLUSION

2      Defendants respectfully request that the Court dismiss the complaint and award the

3   Law Firms' costs and fees under UPEPA.

4                                    * * *

5      I certify that this memorandum contains 9,042 words, in compliance with the

6   Local Civil Rules.

7      DATED this 6th day of February, 2024.

8                              McNAUL EBEL NAWROT & HELGREN PLLC

9                              By: _s/ Claire Martirosian_____
10                                   Daniel M. Weiskopf, WSBA No. 44941
                                     Theresa M. DeMonte, WSBA No. 43994
11                                   Claire Martirosian, WSBA No. 49528

12                              600 University Street, Suite 2700
                               Seattle, Washington 98101
13                             (206) 467-1816
14                             dweiskopf@mcnaul.com
                               tdemonte@mcnaul.com
15                             cmartirosian@mcnaul.com

16                             *Attorneys for Defendants*

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 28

**DECLARATION OF SERVICE**

On February 6, 2024, I caused to be served a true and correct copy of the foregoing document upon counsel of record, at the address stated below, via the method of service indicated:

Blake Marks-Dias, WSBA No. 28169
Jeff Bone, WSBA No. 43965
Corr Cronin LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104
(206) 625-8600
bmarksdias@corrcronin.com
jbone@corrcronin.com
msullivan@corrcronin.com
lbrown@corrcronin.com
*Attorneys for Plaintiff*

☐  Via Messenger
☐  Via U.S. Mail
☐  Via Overnight Delivery
☑  Via e-Service / Email

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Dated this 6th day of February, 2024, at Seattle, Washington.

By: s/ Thao Do
Thao Do, *Legal Assistant*
tdo@mcnaul.com

DEFENDANTS' MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT – Page 29