1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CONNOR HEPLER, AARON LANCASTER, and SEAN COLVIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>VALVE CORPORATION,<br><br>Defendant. | Case No.<br><br>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**I.    CONTENTS**

I.      OVERVIEW OF THE ACTION ................................................................. 1

II.     PARTIES ................................................................................................... 4

III.    JURISDICTION AND VENUE ................................................................. 5

IV.     FACTUAL ALLEGATIONS ...................................................................... 6

    A. Background ......................................................................................... 6

        1.  Valve Establishes Its Dominant Position in Digital PC Game Distribution. ............. 8

        2.  Publishers Must Have Access to Steam and Steam Keys to Meaningfully Participate in the Market. ................. 12

    B. Valve Propagates Its Anticompetitive PMFN Through Its Contracts with Publishers and Associated Rules. ............... 14

    C. Steam Uses Its Control over Steam Keys to Suppress Competition............................ 19

V.      RELEVANT MARKETS .......................................................................... 22

    A. Relevant Product Market ................................................................. 22

        1.  The Relevant Product Market Is Limited to PC Games. ........................................ 23

        2.  Digital PC Game Distribution Is a Relevant Market. ............................................ 27

    B. The Relevant Geographic Market Is at Least as Broad as the United States................ 29

VI.     Valve Possesses Monopoly and/or Market Power in the Relevant Market. .................. 30

    A. Valve's Steam Platform Dominates Digital PC Game Distribution. ............................ 30

    B. There are High Barriers to Entry. ................................................... 31

    C. Major, Well-Resourced Rivals Have Been Unable to Compete with Steam................. 34

    D. There is Direct Proof of Valve's Monopoly and/or Market Power. ............................. 40

VII.    Valve Has Unlawfully Restrained Trade and Monopolized the Digital PC Game Distribution Market.................................................................... 42

VIII.   ANTICOMPETITIVE EFFECTS.............................................................. 43

    A. Valve's PMFN Prevents Game Publishers from Offering Lower Prices on Other Platforms. ..................... 44

    B. Because Valve's PMFN Prevents Publishers from Offering Lower Prices on Other Platforms, Competitor Platforms Cannot Break Steam's Monopoly, Harming Consumers.................................. 45

    C. Valve's PMFN Prevents Competitors from Forcing Down Valve's Commission, Harming Consumers. ......................... 48

        1.  Competition Drives Prices Toward Marginal Costs. ........................................... 48

        2.  Valve's Marginal Costs Are Far Below 30%. ....................................................... 48

i

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

D.  Economic Theory and Modeling Support Plaintiffs' Allegations of Consumer Harm.  50

IX.    CLASS ACTION ALLEGATIONS ................................................................. 50

X.    FRAUDULENT CONCEALMENT ................................................................. 52

XI.    CAUSES OF ACTION ................................................................................... 53

XII.    PRAYER FOR RELIEF ................................................................................. 56

XIII.    JURY DEMAND ............................................................................................ 57

Plaintiffs Connor Hepler, Aaron Lancaster, and Sean Colvin, individually and on behalf of all others similarly situated ("Plaintiffs"), bring this action against Valve Corporation under federal antitrust laws and state unfair competition laws, seeking public injunctive relief and damages, and allege as follows:

## I.    OVERVIEW OF THE ACTION

1.    Over the last two decades, the personal computer ("PC") video game industry has grown to a staggering size, collectively generating tens of billions in revenue annually.

2.    As the PC gaming industry has exploded, one company—Defendant Valve, Corp.—has used an unlawful monopoly position to capture a disproportionate share of this growth. In 2005, Valve launched the Steam Store, an online platform that enabled consumers to purchase and download PC games from their home computers, and quickly became the dominant player in the industry. Valve maintains this dominance today: Steam now has more than 1 billion user accounts and sells more than 100,000 game titles, including games published by thousands of third-party publishers and tens of thousands of game developers. Of the billions of dollars in annual digital PC game sales, roughly three quarters are sold in the Steam Store, making Steam—by far—the largest online game store both domestically and globally.

3.    Due to Valve's controlling position, publishers have little choice but to list their games on the Steam Store if they hope to reach a sufficiently widespread audience. This leverage allows Valve, despite its limited role as a middleman, to extract a commission of *30%* on every game sold. This massive commission is untethered to Valve's costs, and it is far higher than the rate that would prevail in a competitive market. Consumers must pay these supracompetitive commissions, and publishers must set higher game prices to make a viable economic return on their investments.

4.    Valve has not acquired or maintained its monopoly over game distribution—and the ability to charge supracompetitive prices—by running a more efficient or effective game store than its competitors. To the contrary, Valve has used its monopoly position to stifle competition, imposing anticompetitive restraints to ensure that cheaper, high-quality, consumer-friendly alternatives cannot get off the ground.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

5.      Valve restrains competition through the Platform Most Favored Nation clause ("PMFN") that it imposes on any publisher selling its games on the Steam Store, as well as through its policies, practices, and mandates to enforce that contractual clause. Valve's PMFN forbids publishers from offering their games on any competing platform for a cheaper price, or with superior features, than it offers on the Steam Store. That is, even if a different store attempts to compete with Valve by offering a commission lower than Valve's exorbitant 30% commission, publishers cannot offer a game to consumers on that store at any lower a price than consumers receive on Steam. Moreover, publishers cannot offer consumers superior features on alternative platforms. The result is that competing stores have almost no ability to gain market share from Valve—and the significant network effects that come with its dominant position—by offering superior price or quality. As Valve itself told one game publisher, Valve "can't afford" to let competing platforms sell games more cheaply than Steam because "[t]hat would only lead to our audience and the public thinking we are overpriced and there are better alternatives to find games."

6.      In other words, competing platforms *could* charge lower commissions than Steam charges. Indeed, competing platforms historically *have* charged lower commissions—much lower, on the order of 10-12%. Competing platforms could also, and historically have tried to, offer consumers better products by encouraging publishers to offer unique content off Steam. In a competitive market, these strategies would motivate publishers to steer consumers to non-Steam platforms by offering lower prices and better content on platforms that charge lower commissions. But Steam has specifically prohibited publishers from offering these benefits to consumers with its PMFN as a condition of accessing Steam's existing customer base. And when a competing platform cannot offer better prices or content to consumers, it withers on the vine, cementing Steam's position as the dominant store.

7.      The predictable result of shutting down competition is that Valve has enjoyed, and continues to enjoy, monopoly profits at the expense of consumers. Due to the Steam Store's limited, middleman role in the market, it requires only a few dozen full-time Valve employees to operate. Indeed, though Valve's 30% commission was set at the Steam Store's founding based on the

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

standard sales commission at brick-and-mortar games stores, the Steam Store—as an online marketplace—pays almost *none* of the fixed costs (such as rent, utilities, and logistics) that justified that cut. Steam's 30% commission generates billions of dollars annually in almost pure profit for only a small number of employees—rendering it, on a per-employee basis, one of the most profitable companies in the world.

8.    Basic economics indicates how a competitive market would respond to such exorbitant profits: Competitors would flood in, offering innovative products at more affordable prices and siphoning Valve's market share until its supracompetitive profits were no longer feasible. But Valve's PMFN—and its continued anticompetitive steps to impose, enforce, and punish attempts to avoid its PMFN—have rendered competition on the merits impossible. As a result, two decades after its founding, Valve continues to enjoy its monopoly position and profits without any viable competition on the horizon. Consumers, meanwhile, are left holding the bag, in the form of higher prices and decreased output and quality.

9.    Indeed, Valve's dominance comes not for competitors' lack of trying. Many large, well-resourced tech companies and game developers—including Epic Games, Electronic Arts, Microsoft, Amazon, and Discord—have attempted to launch viable competitor platforms. These stores, moreover, have sought to bring commissions down to competitive levels; as Discord stated when launching its store: "Turns out, it does not cost 30% to distribute games in 2018." But due to Valve's anticompetitive conduct, none of these stores was permitted to compete with the Steam Store on price or quality; as a result, each has been unable to take significant market share from Valve. Most have since capitulated and folded their platforms or agreed to sell their games on Steam.

10.    Furthermore, Valve has extended its anticompetitive playbook—and its monopoly power—beyond the sale of standalone PC games to the sale of PC game downloadable content ("DLC") and in-game purchases. Valve extracts its exorbitant 30% commission on PC game DLC sold through the Steam Store. And in 2012, Valve launched the Steam Wallet, which allows users to upload funds, pay for, and process so-called "microtransactions" for add-ons, perks, and gear

within games they have already purchased ("in-app purchases" or "IAP"). As with the games themselves, Valve takes a 30% cut of every microtransaction purchased with a Steam Wallet.

11.     In sum, Valve has used its PMFN and other anticompetitive tactics to leverage its monopoly power across the distribution of PC games and subsequent DLC and in-game purchases. The result is a supracompetitive "tax" on the PC gaming industry, which leads to higher prices for fewer and lower-quality PC games and PC game transaction platforms. Meanwhile, Valve's profits continue to grow, and consumers continue to pay the price.

12.     This lawsuit is brought by plaintiffs on behalf of themselves and a proposed class of consumers seeking to address Valve's abuse of its market power. The objective is to redress Valve's efforts to restrain trade, monopolize, and maintain its monopoly in the digital PC game distribution market. Valve's practices outlined here violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and the Washington State Consumer Protection Act, Wash. Rev. Code Ann. § 19.86.010 (2024).[1]

## II.     PARTIES

13.     Plaintiff Connor Hepler is a resident of Connecticut. Mr. Hepler has been a Steam customer for at least four years and has purchased PC games and DLC through the Steam Store during this time. Mr. Hepler has also purchased in-game purchases using his Steam Wallet during his time as a Steam customer. As a result of Valve's anticompetitive practices, Mr. Hepler has paid supracompetitive commissions to Valve for each sale of its PC games, DLC, and IAP through the Steam Store and Steam Wallet, and is likely to continue to pay supracompetitive commissions until Steam's unlawful conduct ceases.

---

[1] In *Wolfire Games, LLC v. Valve Corp.*, this Court compelled arbitration of consumer antitrust claims against Valve based on the Steam Subscriber Agreement ("SSA"). *See* Order, *Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-00563 (W.D. Wash. Oct. 25, 2021), ECF No. 66. On September 26, 2024, Valve updated the SSA to remove the arbitration agreement and class action waiver, and to require that any action be commenced in state or federal court. The updated SSA states: "You and Valve agree that all disputes and claims between you and Valve (*including any dispute or claim that arose before the existence of this or any prior agreement*) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction." (emphasis added).

14.    Plaintiff Aaron Lancaster is a resident of the District of Columbia. Mr. Lancaster has been a Steam customer for at least six years and has purchased PC games through the Steam Store during this time. As a result of Valve's anticompetitive practices, Mr. Lancaster has paid supracompetitive commissions to Valve for each sale of its PC games through the Steam Store and is likely to continue to pay supracompetitive commissions until Steam's unlawful conduct ceases.

15.    Plaintiff Sean Colvin is a resident of Utah. Mr. Colvin has been a Steam customer since 2003 and has purchased PC games through the Steam Store during this time. As a result of Valve's anticompetitive practices, Mr. Colvin has paid supracompetitive commissions to Valve for each sale of its of its PC games through the Steam Store and is likely to continue to pay supracompetitive commissions until Steam's unlawful conduct ceases.

16.    Defendant Valve Corporation is the largest distributor of PC games in the world. Incorporated in the State of Washington, Valve's headquarters are located at 10900 NE 4th Street, Suite 500, Bellevue, Washington 98004. It operates the Steam Store, a platform, through which it distributes PC games, PC game DLC, and in-game purchases online.

## III.    JURISDICTION AND VENUE

17.    Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of suit, including reasonable attorneys' fees, against Valve for the injuries to Plaintiffs and the Class, as alleged herein, arising from Valve's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Plaintiffs also assert a claim under Washington's Consumer Protection Act, Wash. Rev. Code Ann. § 19.86, seeking treble damages and injunctive relief under Wash. Rev. Code Ann. § 19.86.010.

18.    The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court has supplemental jurisdiction for the California and Washington state law claims under 28 U.S.C. § 1367.

19.    This Court has personal jurisdiction over Valve as Valve's headquarters are located in Bellevue, Washington. Valve has engaged in sufficient minimum contacts with the United States

and Washington and has purposefully availed itself of the benefits and protections of both United States and Washington law such that the exercise of jurisdiction over Valve would comport with due process. Valve has (a) transacted business throughout the United States, including in the Western District of Washington; (b) contracted with publishers, developers, and consumers within the United States, including in the Western District of Washington; (c) had substantial contacts within the United States, including in the Western District of Washington; and/or (d) was engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in the Western District of Washington.

20.    Valve also is subject to personal jurisdiction because, either directly or through its agents or affiliates, Valve transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action.

21.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 because Valve is found in and transacts business in this District.

22.    Venue also is proper pursuant to 28 U.S.C. § 1391(b), (c), and (d) because, during the relevant period, Valve resided, transacted business, was found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District, as provided in 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d). Further, Valve selected courts located in King County, Washington, as the venue for disputes arising under, in connection with, or incident to the Steam Subscriber Agreement.

## IV.    FACTUAL ALLEGATIONS

### A.    Background

23.    A video game is an electronic game designed to be played on a computing device, such as a PC, gaming console, smartphone, or tablet. As of 2021, there were an estimated three billion people worldwide who engage in video gaming.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

24.     Video games are typically classified based on the type of device they are played on, including PC games (*e.g.*, games for personal computers), console games (*e.g.*, games for PlayStation, Xbox, or Nintendo Switch), and mobile games (*e.g.*, games primarily played on smartphones or tablets). Due to technological limitations, including operating system and game engine interoperability, video games are created to be compatible only with their designated device type, such as a PC game being playable only on PCs. Furthermore, distinct versions of PC games are often produced for specific platforms, such as Steam.

25.     PC games are video games that users download and install onto their PCs. These games can vary in size, scope, genre, and features, but they all function directly from the computer where they are installed. They require installation on the PC for operation, and all necessary data, including game progress or user preferences (*e.g.*, control configurations, audio-visual settings), is saved on the PC.

26.     PC games have been around nearly as long as PCs themselves. The rise of PCs in the 1980s brought with it an increase in games designed for this new type of computing device. As personal computers became more popular, so too did PC games.

27.     In the early days of the PC gaming industry, technological limitations meant that most gamers purchased their games from brick-and-mortar stores. These games were sold on physical media like CD-ROMs (*i.e.*, compact discs used as read-only optical memory devices), which could be taken home and installed on the user's computer.

28.     Brick-and-mortar retailers incur significant costs that digital retailers avoid, such as expenses related to real estate, shipping, inventory management, and staffing. These retailers typically operate with very thin profit margins. For example, Walmart's net margin—the ratio of net profit to revenue—has averaged just 1.4% over the past decade. In other words, for every $100 in products sold, Walmart retains only $1.40 as profit, with the rest going toward operational expenses like employee wages and real estate.

29.     In contrast, digital distributors of PC games operate at a fraction of the cost incurred by physical stores. Significantly lower operating expenses, combined with the convenience of

downloading large PC games directly at home thanks to high-speed internet, paved the way for digital distribution to disrupt traditional retail models. Digital distributors do not face the same overhead as brick-and-mortar stores, allowing them to make more profit on game sales. In a competitive market, without Valve's restrictions, these advantages would have naturally led to reduced commissions and lower prices.

30.    Today, most PC games are sold digitally, with Valve's Steam Store as the dominant digital distributor in this space.

### 1.    Valve Establishes Its Dominant Position in Digital PC Game Distribution.

31.    Originally established in 1996 by former Microsoft employees, Valve started as a video game development company. The company's first major release came in 1998 with the launch of *Half-Life*, a critically acclaimed PC game. Valve then expanded its portfolio with other successful game franchises, such as *Portal* and *Counter-Strike*.

32.    Before Valve introduced Steam, its games that supported online multiplayer, including *Half-Life* and *Counter-Strike*, utilized a third-party network known as the World Opponent Network (WON). Created by Sierra, the initial publisher of *Half-Life* and several other PC games, WON was later acquired by Valve in 2001. With this acquisition, Valve took control of WON's user base, which numbered 1.5 million players. As Valve worked on developing the Steam platform, it continued to run WON, offering support for *Half-Life*, *Counter-Strike*, and other Sierra-published games.

33.    Valve's business strategy underwent a significant change in 2003 with the introduction of Steam. The platform initially focused on providing a way to patch and update Valve-developed games. Patches addressed software flaws, or "bugs," while updates often introduced new in-game features or content. Prior to Steam, Valve struggled with delivering patches and updates, particularly since its games frequently included an online multiplayer component that required synchronization across various game versions owned by different users. Because users frequently had different game versions (*e.g.*, v1, v1.1, v1.2), compatibility issues often arose, preventing players

from gaming together. Steam addressed this by offering a centralized location for users to receive software updates, ensuring their games were kept up to date.

34.    In November 2004, Steam transitioned from being solely a patching and version-control platform to including a storefront component when Valve released *Half-Life 2*. This marked the first-time consumers could purchase a digital copy of a game through Steam. However, Valve made it mandatory for players—even ones who bought the game in stores—to use the Steam platform to play *Half-Life 2*. Customers needed to create a Steam account and install the platform on their PC. Traditional distribution channels provided customers with codes that could be submitted to Steam to add *Half-Life 2* to their libraries.

35.    By requiring players to use Steam to play *Half-Life 2*, Valve began to establish what was later described as a "stranglehold on PC gaming."[2] Consumers were left with no option but to use Valve's new platform to access the blockbuster hit *Half-Life 2* and other popular Valve titles. Rather than relying on the platform's merits, Valve effectively compelled consumers to adopt Steam as a prerequisite to play its marquee games.

36.    In 2004, Valve took an additional step by shutting down WON, forcing all its users to download and install Steam for multiplayer features—even those who had purchased *Half-Life* and *Counter-Strike* years before Steam existed. By leveraging a popular game and controlling a major multiplayer network, Valve accomplished what smaller publishers like Stardock and non-publishers such as GameStop and Direct2Drive could not: It succeeded in pushing its digital gaming platform into the market.

37.    Valve soon began partnering with third-party game developers, allowing them to distribute their games digitally on Steam in exchange for a commission. This extended Valve's reach and forced customers of non-Valve games to also install the Steam platform. Currently, Steam hosts at least 50,000 games, the vast majority of which are from third-party developers.

---

[2] Zachariah Kelly, *Why Valve's Stranglehold on PC Gaming Might Finally Be Coming to an End*, AU Review (Dec. 10, 2018), https://www.theaureview.com/games/why-valves-stranglehold-on-pc-gaming-might-finally-be-coming-to-an-end/.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

38.     Unlike other distributors that sell multiple versions of games compatible with different platforms, Valve does not offer games designed for other gaming platforms in the Steam Store. For instance, when Electronic Arts ("EA") launched its own PC gaming platform, Origin, Valve declined to sell Origin-enabled versions of games through its store. EA noted at the time: "At present, there is only one download service [*i.e.*, Steam] that will not allow this relationship. . . . [The Steam Store] has imposed a set of business terms for developers hoping to sell content on that service—many of which are not imposed by other online game services."[3]

39.     The growth of Valve as a company has closely followed the success of Steam. In 2005, *Forbes* estimated Valve's gross revenue to be around $70 million. By 2012, the company's value had exceeded $3 billion, with Steam's sales having doubled each year for the previous seven years. *Forbes* attributed Valve's dominant position—capturing up to 70% of the market—to a lack of competition. In 2011, Valve's CEO, Gabe Newell, described the company as "tremendously profitable." With just 250 employees, Valve was more profitable per employee than either Google or Apple. At that point, the company's estimated value ranged between $2 billion and $4 billion, holding a market share of anywhere from 50% to 70%.

40.     Indeed, on a per-employee basis, it is among the most profitable companies in the world, reportedly earning profit margins consistently near 40% with revenue per employee of approximately $19 million. Internally, Valve has recognized that Steam's profitability is an "outlier" compared to other powerful tech companies like Apple, Alphabet, and Netflix. These profits far exceed competitive levels and are maintained only through Valve's anticompetitive conduct, at the expense of consumers.

41.     Valve's market capitalization soared to $10 billion by 2019. In 2017, Steam generated over $4.3 billion in sales, a figure that does not even include revenue from in-game purchases and DLC, both of which are also significant income sources. The platform remains the company's largest

---

[3] Wesley Yin-Poole, *Why You Can't Buy Crysis 2 From Steam*, Eurogamer (July 7, 2011), https://www.eurogamer.net/articles/2011-07-07-why-you-cant-buy-crysis-2-from-steam.

source of revenue, supplemented by relatively minor revenue streams from Valve's own games and its hardware devices.

42.     Valve is now the world's largest distributor of PC games, holding an estimated 75% of the global market. According to Valve's own reports and industry research firm Video Game Insights, Steam grossed more than $10 billion in revenue in 2024, with nearly 2 billion user accounts and up to 39 million concurrent users.

43.     In comparison, the Epic Games Store ("EGS"), Steam's most significant competitor, sold approximately $265 million worth of third-party games in 2020—a small fraction of the billions sold on Steam. It achieved modest growth through 2022, selling $355 million in third-party games, but by 2024, those sales decreased to approximately $250 million.

44.     Since 2017, Valve has developed and released only a handful of PC games, instead relying heavily on the substantial revenue generated by Steam. Despite this, Valve's investment in Steam has remained minimal, as its anticompetitive practices have allowed it to retain dominance without needing to focus on the platform's quality. Only 79 of Valve's approximately 350 employees are dedicated to work on Steam.

45.     The lack of investment in the Steam platform has allowed cybersecurity vulnerabilities to persist, posing risks to both consumers and publishers. For example, in 2011, hackers stole "information about Steam transactions between 2004 and 2008," which included "names, email addresses, encrypted billing addresses, and encrypted credit card information," prompting Valve CEO Gabe Newell to advise Steam users to "watch your credit activity and statements." By 2015, approximately 77,000 Steam user accounts were "hijacked and pillaged each month." In 2016, a "Steam Stealer" malware industry emerged, allowing criminals to defraud Steam users, turning the platform into "the devil's playground." In 2019, Valve agreed to fix a "zero-day" security flaw that had potentially exposed millions of Steam users to hackers, but only after being publicly pressured to do so. Later that same year, Valve stopped the trading and selling of digital items for a game due to concerns that "nearly all key purchases that end up being traded or sold on

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

the marketplace are believed to be fraud-sourced" by global fraud networks engaging in money laundering.

46.     In addition to the substantial profits it generates, Valve's Steam platform provides it with direct access to private business information from nearly all competing development studios. This data includes insights into customer demographics, gameplay habits, player interactions, communications, geographic locations, and financial information from publishers. Through the Steam Keys program, which is discussed in more detail below, Valve also has acquired extensive internal data on its competing storefronts' operations.

47.     For its early development of a digital distribution system capable of supporting third-party applications, Valve has enjoyed substantial rewards already. As outlined below, the company now employs various anticompetitive strategies to enhance and sustain its market power, ensuring that publishers and consumers remain dependent on Steam while blocking potential competitors from entering the digital PC game distribution market.

> **2.    Publishers Must Have Access to Steam and Steam Keys to Meaningfully Participate in the Market.**

48.     A Steam Key is essentially a product authorization code generated by Valve, allowing access to a game hosted on the Steam platform. These keys are alphanumeric codes that authenticate users and grant Steam licenses to verified purchasers.

49.     Due to Steam's dominance and its exclusion of potential competitors, publishers must have their games listed on Steam to adequately access the market and earn revenue. Access to Steam Keys is also essential for publishers in order for their games to succeed. As such, the vast majority of publishers that offer games on Steam have requested and received Steam Keys.

50.     Publishers must request Steam Keys from Valve, which has the sole discretion to approve these requests. Once a request is granted, Valve provides a text file filled with 15-character text strings, each representing a unique Steam Key. Publishers can then forward this file to other stores for selling the keys to customers, who can later use these keys to enable their purchased games on Steam.

51.     Publishers utilize Steam Keys in various ways: to provide promotional access to media and industry insiders, to conduct small-scale beta tests of games in development, to offer access to developers working on the game, and even to sell copies of Steam-compatible games through other stores.

52.     Publishers rely on Steam Keys to promote their games, including by offering free access to media or marketing their game to larger publishers that might invest in it. Investors, distributors, and publishers in the PC gaming industry require Steam Keys to evaluate a game for potential funding, marketing support, or distribution. Industry media also require publishers to provide Steam Keys when testing and reviewing games before they are released to the general public. These entities will only accept Steam Keys, not an alternative like an .exe file, as they seek to protect themselves from alleged breaches of nondisclosure agreements or intellectual property violations.

53.     Thus, publishers effectively *must* use Steam Keys, because foregoing them would interfere with publishers' ability to generate media and consumer interest in their games.

54.     Both digital and physical stores sell games through Steam Keys. Reflecting the shift to digital distribution, brick-and-mortar retailers now typically sell product boxes containing digital download codes instead of physical discs. With distribution of PC games on physical media being minimal today, publishers must sell games online to reach consumers. Most digital stores also sell Steam Keys rather than versions of the game designed for a different client.

55.     Thus, publishers must use Steam Keys or forego revenue from diminishing but still relevant brick-and-mortar sales channels.

56.     Steam Keys allow Valve to cement its position as the industry standard game client and authorization system, keeping publishers dependent on it for any meaningful market access in PC game distribution. They force publishers to accept the rules attached to Steam Keys, and effectively place non-Steam distribution channels under Valve's control.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**B.      Valve Propagates Its Anticompetitive PMFN Through Its Contracts with Publishers and Associated Rules.**

57.      Steamworks is "a set of tools that enable you to distribute your product to Steam customers and a set of features you can use in your product." To publish a game on Steam, a publisher needs to become a "Steamworks Partner" with Valve and create a Steamworks developer account. To become a Steamworks Partner, publishers must contract with Valve through the Steam Distribution Agreement ("SDA") and pay a $100 fee. Valve supplements its SDA with extensive rules embedded throughout the Steamworks Documentation, collectively referred to as the "Steamworks Rules," which are binding on publishers. The SDA obliges publishers to comply with the Steamworks Rules, and it also references and incorporates these rules.

58.      The Steamworks Rules carry the same weight as the terms in the SDA but provide Valve the flexibility to modify the terms without the need to amend the contract itself. For instance, in April 2018, Valve adjusted its Steam Key request process to increase its control over Steam Keys by simply updating the relevant Steamworks Documentation.

59.      After becoming a Steamworks Partner, the publisher can download the Steamworks Software Development Kit ("SDK"), which provides "all the scripts and templates for building and uploading your product to Steam." Publishers are then required to make their Steam-enabled games available for sale on the Steam Store. The tools provided by the SDK ensure a game is compatible with Steam, and using the SDK is necessary for any game that a publisher wants to list on Steam. One key component, SteamPipe, is required to upload content to the Steam platform, making Steamworks essential for any publisher aiming to publish and sell their game on Steam. Therefore, all publishers must become Steamworks Partners and follow the Steamworks Documentation rules, in addition to adhering to the terms of the SDA, or forego access to Steam's dominant customer base entirely.

60. Under the SDA, Valve takes between 20% and 30% of every sales transaction.[4] Consumers pay Valve directly for all transactions on the platform, after which Valve takes its commission (along with any other fees or holdbacks) and remitting the remainder to publishers. While publishers set their own pricing for games sold on Steam, Valve's commission remains fixed.

61. Together, the SDA and Steamworks Rules constitute the written element of the Valve PMFN. Valve's interpretation and strict enforcement of these provisions reveal the full extent of the competitive restraint imposed by the PMFN.

62. One of Valve's rules explicitly states: "You should use keys to sell your game on other stores in a similar way to how you sell your game on Steam. It is important that you don't give Steam customers a worse deal than Steam Key purchasers."

63. While these rules appear to focus on Steam Keys, Valve has made it known to publishers that the same requirements apply to all sales. As Valve told one game publisher: "We basically see any selling of the game on PC, Steam key or not, as a part of the same shared PC market—so even if you weren't using Steam keys, we'd just choose to stop selling a game if it was always running discounts of 75% off on one store but 50% off on ours . . . ." To another publisher, Valve summarized its policy as follows: "Do-able: Sell the same content and make sure the price on Steam is competitive with where it's being sold anywhere else (using keys or not, in a bundle or

---

[4] Before October 1, 2018, Valve's revenue share for all sales on Steam was 30%, meaning Valve received 30% of the purchase price for any sale of a PC game on Steam, after adjusting for returns, discounts, refunds, fraud, chargebacks, and taxes. Effective October 1, 2018, Valve modified the revenue share agreement depending on the revenue generation of any game: Valve takes 30% on all of a game's earnings under $10 million; 25% on all of a game's earnings between $10 million and $50 million; and 20% on all of a game's earnings over $50 million. *See* Valve Corp., *New Revenue Share Tiers and Other Updates to the Steam Distribution Agreement* (Nov. 30, 2018), https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

This graduated commission structure applies not only to sales of PC games but also to sales of game packages, DLC, in-game sales, subscription fees, Workshop Contributions, and Community Marketplace game fees. *See id.* The vast majority of sales to consumers through the Steam Store nevertheless remain at the 30% commission rate. For example, in 2023 only 157 games out of more than 14,000 releases earned more than $10 million in revenues, and only 20 made over $50 million. Of course, the tiered system is progressive, so of the handful of games that reach the $10 million tier, most earn lowered commissions on only a small portion of their sales (*i.e.*, those sales that surpass $10 million).

not). Not doable: Sell the content to another store at a better price than Steam customers get (using keys or not, in a bundle or not)." A Microsoft employee similarly responded to an inquiry into whether Steam "require[s] pricing parity": "Yes—they absolutely do. . . . Its [sic] not formally listed in documentation in Steamworks, but always addressed in-person."

64.    Likewise, a previous version of Valve's guidelines stated: "You are welcome to generate keys for resale with other retailers, including your own website. However, your product must also be available for sale on Steam. If you are hoping to receive exposure to Steam customers, the price on Steam will have to match prices elsewhere."

65.    Valve used this guidance to threaten developers with losing access to Steam's customer base if they offered discounts on rival platforms, even when those platforms provided more favorable terms for publishers. In an internal email, a member of the Steam Business Team summarized Steam's playbook when developers attempt to offer more favorable prices elsewhere—often due to a sale subsidized by the competing platform:



66.    Whenever publishers request Steam Keys, Valve reminds them of these restrictions through online prompts. Publishers must agree that "I understand that I need to sell my game on other stores in a similar way to how I am selling my game on Steam," and "I agree that I am not giving Steam customers a worse deal."

67.    Publishers are also required to agree that "while it's OK to run a discount on different stores at different times, I agree to give the same offer to Steam customers within a reasonable amount of time." Valve enforces these rules not just for Steam Key games, but for all games.

68.    Valve makes it clear to publishers that these restrictions are in place to "avoid a situation where customers get a worse offer on the Steam store." Essentially, the PMFN prevents gamers from getting better prices on competing platforms, ensuring Valve's dominance.

69.    Valve also enforces the PMFN through informal communications. For example, in a July 2, 2017 thread on the Steamworks Development forum titled "Patreon and Steam [K]eys," a publisher inquired into the "rules regarding distributing/selling a game outside of [S]team." A Valve employee, "TomG," explained: "The biggest takeaway is, don't disadvantage Steam customers. For instance, it wouldn't be fair to sell your DLC for $10 on Steam if you're selling it for $5 elsewhere or giving it as a reward for $5 donations. We would ask that Steam customers get that lower $5 price as well."

70.    This response highlights the duplicitous rationale Valve offers for its PMFN. While it frames its restrictions as protecting consumers, the real goal is to prevent consumers from benefiting from discounts that publishers might offer, thus maintaining Valve's 30% fee and its dominance in the market.

71.    In another example, the same Valve representative, TomG, advised a game publisher to "[t]hink critically about how your decisions might affect Steam customers, and Valve. If the offer you're making fundamentally disadvantages someone who bought your game on Steam, it's probably not a great thing for us or our customers." In the same thread, TomG explained that Valve would not generally sell a game on Steam if it was available at a lower price on another platform, stating, "we'd want to get that lower base price as well, or not sell the game at all."

72.    There are numerous examples of Valve enforcing its PMFN. For instance, on December 3, 2018, Steam account manager Tom Giardino (presumably, the TomG cited above) reportedly told publisher Wolfire Games that Steam would delist any games available for a lower price elsewhere, regardless of whether Steam Keys were involved. Similarly, another Valve employee informed a developer that a standalone version of their game, even if it didn't use Steam technology, would have to be priced the same as the Steam version. Likewise, in 2018, Valve emailed a publisher to "discuss your game's relationship with Steam and other platforms," and

warned the publisher: "If you can't offer Steam customers the same deal as customers on other platforms, then we're not going to be able to continue selling and promoting the game." In another example, Giardino noticed, on a trip to Japan, that certain PC games were sold at retail outlets more cheaply than on Steam. Giardino then circulated a chart of games that could be found at a lower price, which he stated would provide "good ammunition for partner conversations."

73.    Valve has gone even further by prohibiting publishers from informing consumers about its 30% commission. While publishers are allowed to promote other storefronts, they are not permitted to disclose the amount Valve collects in commission, further limiting the ability of publishers to steer consumers toward better, more affordable platforms.

74.    Valve also uses the SDA to suppress competition through the DLC/IAP clause, which governs "any online content, features or software specific to an Application that is made available by [publishers] for purchase, download or online access separately from the Application, whether through in-application purchase transactions or otherwise (for example, but without limiting the foregoing, Application-themed virtual items, expansion packs, additional filters, codecs, stock multimedia, game scenarios or levels, added functionality, etc.)" and "any services provided with respect to an Application in exchange for a subscription payment."

75.    The DLC/IAP clause provides: "If [publisher] distributes the Application through any other (non-Steam) distribution channel, and if [publisher] distributes any material DLC for the Application through that other channel, it will deliver the DLC to Valve at the same time such that Steam Account Owners will receive comparable DLC with customers acquiring the Application through other channels." Thus, Valve prohibits publishers from offering exclusive DLC or earlier release dates for DLC to attract consumers to a distribution platform other than Steam that does not extract Valve's 30% commission from publishers.

76.    In addition, the DLC/IAP clause prevents publishers from offering DLC or IAP on another digital PC game distribution platform at a price lower than that offered on Steam, locking in the DLC's retail prices throughout the market. Valve enforces this "material parity" requirement to ensure that publishers provide their DLC and IAP content on other stores on the same terms as on

Steam, even though Steam takes a higher proportion of the revenue from PC game sales through its storefront.

77.     Valve's insistence on and enforcement of the DLC/IAP clause is significant because DLC and IAP represent a sizeable source of consumer spending on video games. Based on a 2023 study, 87% of gamers direct some of their spending toward in-game purchases and DLC. For example, gamers who played Valve's *Counter-Strike* spent $70 on average on DLC.

78.     When the prices and availability of DLC and IAP (and their underlying base PC games) are uniform throughout market, due to Valve's restrictions, publishers cannot incentivize consumers to purchase games or DLC/IAP through a digital PC game distribution platform other than Steam through providing lower prices. Through these means, Steam preserves its market power, and Valve's competitors cannot gain a foothold by attracting publishers with more favorable distribution terms or by enticing customers with lower prices or exclusive offerings.

79.     Valve also ensures that publishers are subject to its exorbitant commissions on in-game purchases by forcing developers to use its Steam Wallet microtransaction system. PC in-game transactions afford publishers the opportunity to provide additional monetized content in their games. Through in-game transactions, publishers can sell virtual goods for real money, including unique abilities, character outfits, access to additional features or levels, and other in-game content.

80.     Valve requires publishers and consumers to carry out in-game transactions through Valve's in-game payment processing system, the Steam Wallet. By doing so, Valve ensures that its baseline 30% fee is extracted from all in-game purchases, allowing Valve to profit from high fees both at the initial purchase of the game and with every subsequent in-game transaction that are ultimately borne by users. It prevents publishers from enabling in-app purchases using other, less expensive processing mechanisms, such as PayPal.

**C.      Steam Uses Its Control over Steam Keys to Suppress Competition.**

81.     Most competitors attempting to challenge Steam in the digital PC game distribution market—including Amazon, GameStop, Walmart, Target, Green Man Gaming, Humble Bundle, and GOG—generally sell Steam Keys, because so many users have their game libraries already on

Steam's dominant platform. Despite these sales involving games compatible with Steam, these PC game distribution competitors constitute a small share of the overall market.

82.    Thus, these alternative outlets do not offer publishers a distribution channel for PC games independent of Steam and free from Valve's influence. Nor do they significantly constrain Valve's market power. In 2018, Green Man Gaming disclosed an annual revenue of £47.5 million (about $60 million) for 2017, with 4.7 million registered users and one million active customers, estimating its market share at less than 1%. Similarly, Humble Bundle's annual revenue is also a fraction of the market, estimated between $10 and $50 million.

83.    This is in large part because Valve limits the number of Steam Keys issued at its discretion and polices the use of Steam Keys to ensure that they are not sold at lower prices than are available on Steam, even when other platforms charge lower commissions.

84.    Valve further ensures that Steam Keys are distributed using a low-quality and insecure method, which hinders meaningful competition even on non-price dimensions.

85.    As previously mentioned, Steam Keys are generally distributed via text files containing 15-character codes. A bad actor with access to these simple text files at any point in the distribution chain can copy or remove some or all of the Steam Keys and resell them without compensating the publisher. Additionally, the same key can be sold multiple times, but it will only work for the first player who adds it to their Steam account, thereby defrauding other consumers. Publishers also risk selling a key to a reseller outside of their control, who can defraud consumers and damage the publisher's reputation because the game may not run on Steam. Similarly, a purchaser of a Steam Key risks buying a fraudulent code that does not add the game to their Steam library.

86.    Certain third-party stores like Green Man Gaming and Humble Bundle are authorized retailers of Steam Keys and have implemented measures to prevent such fraud. However, the security flaws within the Steam Key system have given rise to a "grey" market where Steam Key resellers or fraudsters sell Steam-enabled games without publisher permission. For example, keys may be sold by an individual who illegally purchased them using stolen credit card information,

bought them in bulk during a Steam sale to later resell for profit (in violation of Steam's terms of service), or posed as a member of the press to obtain a free promotional key.

87.    There is no valid reason or justification for maintaining this insecure, fraud-prone system for distributing Steam Keys. This became evident when the third-party store Humble Bundle attempted to introduce reforms and transparency in the distribution process.

88.    Humble Bundle initially offered game "bundles" where customers could pay any price they wished to acquire multiple games. Users could choose how their payment was divided among the publishers or donated to a charity. This model proved popular with both consumers and publishers. Following the initial "Humble Indie Bundle" event in 2010, Humble Bundle continued organizing similar events on an increasingly larger scale. These events sold hundreds of thousands of bundles, transferring millions of dollars to publishers and charities. In total, Humble Bundle's charitable donations have amounted to over $197 million.

89.    Due to Steam's prominence, customers requested that Humble Bundle include Steam Keys in their events for convenience, and Humble Bundle agreed. However, the security flaws in the Steam Key system led to problems. Customers often only added some of the keys in the bundle to their personal Steam accounts, leaving the others unused. Since these keys were merely text strings, they could be easily resold, fueling the grey market. This made publishers hesitant to participate in Humble Bundle events, as they lost control over the price and distribution of their Steam Keys, diminishing the value of their products.

90.    Humble Bundle addressed this issue by collaborating with Valve to create a direct integration between its store and the Steam platform. Customers who purchased a bundle could choose either to download the games directly or to link them to a specific Steam account. If they selected the latter, the integration would automatically add all the games to the customer's Steam account for use on Steam.

91.    This method ensured that sales were legitimate because Valve directly added the games to the player's Steam account. With the direct integration eliminating the exposure of Steam

Keys, the system was more secure. Consequently, Humble Bundle's sales grew, as publishers were no longer concerned about their Steam Keys ending up in the grey market.

92.     However, once Humble Bundle's distribution of Steam-enabled games started to grow, Valve abruptly ended the secure integration with the Steam platform. This forced Humble Bundle to return to selling insecure Steam Keys. The removal of the direct integration led to a decline in Humble Bundle's sales growth.

93.     Valve's decision to cut off Humble Bundle's keyless integration has no legitimate justification—technical or otherwise. The termination of this integration can only be explained as an anticompetitive move—Valve acted because Steam was facing increased competition. This reversal caused significant harm to both publishers and consumers.

94.     More secure, reliable systems for distributing games off-platform are available. For example, Valve's competitors, Ubisoft and Epic Games, offer "keyless" distribution programs, solving the security issues inherent in Steam Keys. For example, the Epic Games Store ("EGS") began providing keyless integration with third-party stores so that an EGS-enabled game purchased elsewhere is instantly added to a gamer's EGS library, allowing publishers to avoid the risks of key-based models. The only reason to maintain Steam's insecure Key system is to make other distribution channels less attractive than Steam Store sales and make it harder for competitors to gain market share.

## V.    RELEVANT MARKETS

### A.    Relevant Product Market

95.     Valve leveraged its monopoly and/or market power in several anticompetitive ways to maintain and enhance its monopoly and/or market power. To the extent that Plaintiffs must prove monopoly and/or market power circumstantially by first defining a relevant product market, Valve competes in at least one distinct relevant product market: the market for digital PC game distribution.

1          **1.      The Relevant Product Market Is Limited to PC Games.**

2          96.    The term "PC games," as used in this complaint, refers specifically to games that are

3   installed directly on a user's personal computer ("PC"). This definition excludes web browser

4   games, as discussed further below, even though they may be played on a PC.

5          97.    PC games are not reasonably interchangeable with other types of games, such as

6   console games (*e.g.*, gaming consoles like Microsoft Xbox or Sony PlayStation) or mobile games

7   (*e.g.*, game played on a cellular device). PC games can be played only on PCs and are incompatible

8   with gaming consoles and mobile devices.

9          98.    Games designed for consoles or mobile devices do not serve as economic substitutes

10  for PC games. The contexts in which PC, console, and mobile games are used makes different kinds

11  of games appropriate for different platforms, and even games that are released cross-platform

12  provide different experiences on different devices. Various factors influence consumers'

13  preferences. The differences in user experiences and gaming functionalities between PC, console,

14  and mobile platforms play a significant role in determining whether a consumer will purchase a PC

15  game. Furthermore, PCs, consoles, and mobile devices each have additional non-gaming uses that

16  influence their cost and perceived value to the user.

17         99.    PC, console, and mobile gaming are generally seen as complements rather than

18  substitutes because they serve different purposes. A PC game can handle more sophisticated graphics

19  and larger memory requirements than a console or mobile game. Consoles and, especially, mobile

20  devices often have processing constraints that make it impossible to match the complexity of

21  animation, audio, and graphics that PC games offer. Moreover, the generally superior processing

22  power of PCs allows players to run games while also running third-party chat services like Discord;

23  music players like Spotify; web browsers; or other programs on the same device. Running games

24  and other programs simultaneously is often difficult on consoles or mobile.

25         100.   Along with superior visual effects, PCs also provide more immersive and

26  customizable control options for gamers. While PC users have the flexibility to use keyboards, mice,

27  joysticks, or a variety of console-like controllers, console gamers are limited to the manufacturer's

28

controllers or a few authorized third-party alternatives. Particularly for the segment of gamers who play competitive multiplayer games, keyboard and mouse inputs are often significantly faster and more responsive than console controllers, creating a major advantage for PC users. This is not a trivial difference; for example, the global esports (competitive video gaming) industry, estimated to generate revenues of about $2 billion annually, is dominated by PC games requiring fast inputs. This flexibility in control options is a major reason many gamers prefer PC gaming over console gaming.

101. Playing games on PCs allows gamers to update hardware component-by-component on their own schedule, rather than all at once according to the development cycles of console manufacturers.

102. Most game titles are not uniformly available across PC, console, and mobile platforms due to differences in gameplay experiences and hardware capabilities.

103. Consumers make intentional decisions about the hardware systems they use and tend to stay on that platform due to lock-in effects. For example, a player who owns an Xbox and has invested in various Xbox accessories, such as controllers, cannot simply switch to a PlayStation version of a game without repurchasing all of their hardware. Similarly, a PC gamer with investments in a PC gaming system and accessories cannot port this functionality over to a console or mobile gaming platform. This creates a barrier to switching between platforms.

104. Even for those gamers who own multiple hardware systems—such as both a PC and an Xbox—the versions of games across these systems are not interchangeable. This is because each system offers unique functionalities and features, as mentioned earlier. An Xbox-compatible game cannot run on a PC, and vice versa.

105. Consumers also build extensive game libraries and social networks on their chosen platforms, which makes it less likely they will switch to a different system. For example, a consumer with a large Steam library and many friends on Steam is unlikely to buy the Xbox version of a game available on both platforms, even if they own an Xbox, unless there is a particular gameplay reason to prefer the Xbox version (for example, the user expects to play a multiplayer game with members of their household in front of a TV).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

106.    Similarly, consumers who play multiplayer games often develop large social networks on specific gaming platforms, and switching platforms may cause them to lose the ability to play those games with their friends. Not all games that offer online multiplayer options allow cross-platform play. For example, a game available on both PC and PlayStation may not permit PC gamers to play with PlayStation gamers. Where cross-platform play is available, as noted above, console players may be at a competitive disadvantage.

107.    Additionally, there are significantly more games available for PCs than for consoles. For example, Steam offers over 100,000 games, while platforms like Xbox Series X|S, PlayStation 5, and Nintendo Switch have approximately 4,250, 3,750, and 12,750 games, respectively. Consoles also depend on exclusive titles to drive sales, and many console owners own games on PC by default and use consoles primarily for games not available on PC.

108.    These differences lead to a low cross-elasticity of demand between PC games and console games. As a result, consumers are unlikely to switch to console games if the price of PC games increase.

109.    The cross-elasticity of demand between PC games and mobile games is even lower, as most mobile games are offered free of charge and rely on ads or in-game purchases for revenue. When mobile games do have a price, it is usually much lower than the price of PC games. Unlike PC games, the vast majority of mobile gaming revenue comes from in-game transactions rather than the purchase price of the mobile game.

110.    In addition, consumers typically do not replace PC games with mobile games designed for shorter, on-the-go play in response to an increase in PC game prices. Similarly, consumers of PC games will not switch to mobile games when there are output reductions in PC gaming.

111.    The differences between PC games, console games, and mobile games also result in unique distribution models for each category, which contributes to the distinct nature of their respective distribution markets. While PC games transitioned to digital distribution early, console

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

games still rely heavily on physical distribution. In contrast, mobile games are exclusively distributed digitally through app stores optimized for mobile devices.

112. Mobile app stores do not sell PC games, and PC game stores do not carry mobile apps, although sometimes different versions of a game title might be available for both PC and mobile platforms. Similarly, consoles have their own exclusive digital storefronts specific to the console brand, such as PlayStation or Xbox, that do not sell PC games, and vice versa. Since these games are downloaded to the specific device after purchase, they must be accessed by compatible hardware—whether it's a PC, console, or mobile device. A publisher cannot sell a PC game on the PlayStation Store or the Apple App Store to counter Valve's high revenue-sharing requirements.

113. Valve itself acknowledges that PC games do not compete with mobile games. Valve has stated: "Valve does not make or sell phones, tablets, or video games for mobile devices, nor does it operate in the mobile market. Valve runs Steam, an online platform that allows users to purchase and play PC games on their laptops and desktops. Steam users cannot buy or use mobile apps on Steam." Valve has further clarified that it "does not compete in the mobile market or sell 'apps.'"

114. Furthermore, the size of game files highlights why games on different platforms—PC, console, and mobile—are complements rather than substitutes, and why their distribution channels cannot be reasonably interchanged. Factors like rich graphics, textures, audio, and maps significantly increase a game's data volume. For example, in 2020, the average size of an iOS mobile game was 465 MB, compared to 264 MB in 2016. Even the most basic PC games are usually larger, featuring more advanced graphics and higher-resolution textures. For example, a recent hit PC game, *Baldur's Gate 3*, requires approximately 122 GB of hard disk space for installation—some 200 times more data than the average iOS game. Consoles often have limited external storage capacity and options, whereas PCs do not. The Nintendo Switch, for instance, has only up to 64 GB of internal storage and uses expensive SDXC cards for external storage, limited to 2 TB of storage at a cost of nearly $200. On a PC, additional storage is unlimited and cheaper than on a console or mobile device, allowing users to maintain large catalogs of installed games.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

115.    Industry experts and analysts acknowledge that PC games, console games, and mobile games are distinct categories, each with their own metrics. Market research often separates data on these categories to reflect their unique characteristics.

116.    Non-desktop PC games—such as browser-based games playable on platforms like Facebook—are not considered interchangeable with PC desktop games. These browser-based games represent the lower end of the gaming spectrum. Before the rise of mobile gaming, browser-based games were a common way to enjoy casual gaming experiences. However, given the limitations of web browsers, these games were constrained in terms of quality and performance. As mobile gaming gained popularity, developers increasingly shifted resources from web browser games to mobile platforms. Today, although web browser games still exist, they have become less prevalent and now primarily compete with mobile games.[5]

117.    For all of these reasons, PC games are not reasonable substitutes for other types of games, and consumers will not simply pivot to mobile or console games as a result of a price increase for PC games.

### 2.    Digital PC Game Distribution Is a Relevant Market.

118.    Valve competes in the market for digital PC game distribution. Digital distributors of PC games compete with each other to attract both game publishers and consumers to their online storefronts, where they facilitate the sale and purchase of PC games, PC game DLC, and other in-game content.

119.    A digital distributor of PC games can succeed only if it has sufficient scale on both the publisher and consumer sides of the market: A distributor will appeal to publishers only if it has a sufficient user base of consumers waiting to purchase its games; likewise, it will appeal to consumers only if it has a sufficient library of games from publishers.

120.    Valve competes in the market for digital PC game distribution by operating the Steam Store. As described above, PC games and other video games are not reasonably interchangeable. As

---

[5] Therefore, for purposes of this Complaint, "PC games" refers to those games installed on a user's machine, *i.e.*, PC desktop games. This definition excludes PC web browser games, *i.e.*, PC non-desktop games.

a result, digital distribution of PC games is not reasonably interchangeable with distribution of other categories of games (*e.g.*, console games, mobile games). In economic terms, there is not a significant positive cross-elasticity of demand between digital PC game distribution and the distribution of other types of games. A hypothetical monopolist in the market could impose a small but significant, non-transitory increase above competitive prices for digital PC game distribution services without causing such a significant loss of sales such as to make the increase unprofitable.

121.    Brick-and-mortar PC game sales are also not interchangeable with digital distribution. As noted above, almost all brick-and-mortar sales of PC games are actually sales of Steam Keys, and Steam provides the digital distribution services for these games; the sale of physical tokens representing the right to download a game is effectively a different product sold alongside Steam's digital distribution service. Brick-and-mortar stores provide a different experience from digital storefronts, exchanging the convenience of shopping at home from digital storefronts for the convenience of purchasing games while, *e.g.*, picking up a gallon of milk (*e.g.*, Target), hardware (*e.g.*, Best Buy), or socializing with game enthusiasts (*e.g.*, GameStop). These sales channels also allow non-enthusiast consumers to buy games as gifts.

122.    In the past, Steam did compete with brick-and-mortar stores. But its business model proved much more efficient and successful than the previous brick-and-mortar model, and brick-and-mortar sales entered a precipitous decline. Today, brick-and-mortar outlets are not in direct competition with Steam and merely serve to meet the needs of the few customers who value the conveniences listed above. There is not a significant positive cross-elasticity of demand between digital PC game distribution and brick-and-mortar PC game distribution.

123.    Nor does the relevant market include "cloud gaming" or multi-game subscription services. "Cloud gaming"—sometimes called game streaming (because games are stored and executed on the service provider's remote hardware, with the resulting video feed streamed to the client's computer)—is a very different product than PC gaming; it "sells" the ability to stream games without taking space on a client device, enabling clients to use devices that might otherwise not be able to run advanced computer programs like smartphones and tablets. The experience of cloud

gaming is substantively different for this reason and also comes with attendant drawbacks that make cloud games incomparable to PC games. For example, because inputs must be sent over the internet to a remote server, the fast-reaction problems that console games have are compounded in cloud gaming. There is not a significant positive cross-elasticity of demand between digital PC game distribution and cloud gaming.

124.    Multi-game subscription packages do not sell PC games; rather, most sell time-limited access to a curated selection of PC games, which rotate in and out of the available catalog. Consumers must play available games while they are in the catalog, and they lose access once the games rotate out. Consumers have no control over which games are available to them, and they risk a game rotating out-of-catalog even if a user has spent hundreds of hours playing a game or is minutes from a climactic ending sequence. Other multi-game subscriptions like Humble Bundle do sell effectively permanent access to games, but their offerings are much more limited, and their services are effectively game-curation services rather than substitutes for a consumer's purchase of PC games a la carte from a digital storefront. There is not a significant positive cross-elasticity of demand between digital PC game distribution and game subscription services.

**B.     The Relevant Geographic Market Is at Least as Broad as the United States.**

125.    The market for digital PC game distribution extends across at least the entire United States, and is effectively global, with consumers and publishers worldwide transacting on Steam and other digital storefronts. Valve sells games through the internet and, thus, Steam is accessible throughout the United States and globally to anyone with an internet connection.

126.    Valve advertises Steam as a tool for publishers to "reach a global audience." Further promoting its global reach, Valve states: "Steam is a global platform with official support for 26 languages across many platform features. Supporting as many languages, currencies, and payment methods as possible enables Steam to provide the best experience possible to customers around the world." Most other PC game distribution channels besides Steam also operate digitally and globally, with few or no geographic limitations. Valve's competitors include U.S. companies like Epic Games, with its Epic Games Store, and foreign companies such as Green Man Gaming and GOG—

companies that also sell in the United States. This further emphasizes that the relevant geographic market is at least as broad as the United States and is effectively worldwide.

## VI.    VALVE POSSESSES MONOPOLY AND/OR MARKET POWER IN THE RELEVANT MARKET.

### A.    Valve's Steam Platform Dominates Digital PC Game Distribution.

127.    Valve's Steam has an unrivaled position as the leading digital distribution platform for PC games.

128.    Steam is the top PC game platform in the United States and the world. According to a 2023 tweet from CEO Tim Sweeney of Epic Games, one of Valve's primary competitors in digital PC game distribution, Valve enjoys 85% market share by revenue. Other recent estimates place Valve's share at 75% in the United States and worldwide. As of June 2025, for example, Steam had more than 37 million users online at its peak, and 31 million online on an ordinary June Wednesday afternoon EDT.

129.    Industry participants recognize Valve's dominance over the market for PC game sales:

- A 2015 handbook about small-developer games observed that "[t]he portal of choice is most definitely Steam. In every indie sales report I've seen, Steam sales eclipse all other portals by a large margin, often selling several times more than on other portal sites."

- By 2018, an article from PC World declared: "Amazon, GOG, Humble, and Microsoft have tried to take on PC gaming's 800-pound gorilla and all largely failed to shake up the status quo."

- Another 2020 publication found that "[a]s of today, Valve holds the monopoly on indie game sales for the PC market." For "[s]maller stores" such as GOG and Itch.io, "neither come close to Steam" "in terms of users or sales volume."

- A 2019 Epic Games Store board presentation stated that Steam had a 94% market share in 2018.

130.    Publishers face significant difficulty avoiding Steam while still reaching consumers. As discussed elsewhere herein, many other outlets for PC games rely on Steam Keys, digital "keys" that enable consumers to download a PC game through Steam, meaning they still sell Valve's product.

131.    Most consumers and publishers are unable to avoid using Steam. For example, publishers cannot avoid using Steam by self-publishing their games because they lack the resources to establish and maintain their own digital storefronts. Even if publishers could surpass the financial and other barriers to entry, building a user base would be nearly impossible due to Valve's dominance and its anticompetitive actions to prevent new entrants and change.

132.    Due to its extensive market share and user base, consumers and publishers view Steam as a platform they must do business with. As explained by an Electronic Arts executive, PC game publishers "want to be where the players are," which means Steam. Although some developers have expressed concern with this fact, stating, "[a]s a developer, it's scary to have one entrenched company dominating all of PC games since we are completely at Valve's mercy."

133.    A long-time Valve employee remarked, "Valve was really all about controlling the flow of an entertaining experience. Having your hand on that knob, deciding when to turn it up, turn it down." The company's name, "Valve," aptly serves as a "compelling metaphor."

134.    For at least the entire class period, Valve has consistently held monopoly and/or market power in the digital PC game distribution market.

**B.      There are High Barriers to Entry.**

135.    The digital PC game distribution market features numerous barriers to entry, reinforcing Valve's monopoly and/or market power.

136.    These barriers are typical for technology platforms. The Congressional "Digital Markets Report" outlines typical barriers for such platforms, including network effects, switching

costs, data accumulation, and economies of scale and scope.[6] Each of these obstacles is present in the digital PC game distribution market, and Steam in particular.

137.    A former Valve employee once observed, "[i]n the Internet age, software has close to zero cost of replication and massive network effects, so there's a positive feedback spiral that means that the first mover dominates." Steam serves as a link connecting consumer gamers to other gamers and publishers. As more consumers engage with the platform, its value increases for both consumer gamers (through direct network effects, enabling them to find others to play with and building a more robust social network) and publishers (via indirect network effects, providing access to a larger audience). Similarly, as more publishers use Steam, its value further increases for gamers (via indirect network effects flowing the other way, providing gamers with a greater selection of games they can purchase and play on the platform).

138.    Steam's platform incorporates social networking features, communities of game "modders"—users who modify one or more aspects of a game—and an achievement system that tracks gamers' progress. Users with Steam accounts can create a network of friends and teammates that is accessible across any game on Steam. This allows gamers to easily find friends to play with, without needing to search for them each time they purchase or play a new game.

139.    Many large technology firms maintain their market power because it's difficult for users to switch away from their platforms. Although PC gamers can technically "multi-home" by installing various gaming platforms, Steam creates strong lock-in effects through a user's game library and data, including achievements and social connections.

140.    Valve collects detailed data on game usage, preferences, social networks, and other activities on its platform, and uses this information to enhance its monopoly and/or market power. The accumulation of such data "can serve as another powerful barrier to entry for firms in the digital economy" and is "self-reinforcing." According to the American Bar Association's Antitrust Law Section:

---

[6] Majority Staff Report and Recommendations, Subcommittee on Antitrust, Com. and Admin. Law of the Committee on the Judiciary, *Investigation of Competition in Digital Markets*, H.R. Doc. No. 47-832, at 30-35 (2022).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Big data and data analytics can create and amplify feedback effects. For example, more people using a product can mean that more data, and more diverse data, will be collected, allowing the company to both improve its products as well as potentially identify and offer new ones. This in turn can attract more customers, leading to a positive feedback loop, helping a company to grow and potentially dominate the market. Indeed, data-driven markets may 'tip towards one or two products or platforms.

141.    Valve also has access to detailed information about its competitors' operations. For example, as discussed below, several platforms competing with Steam have been started by major game publishers—on whose games Steam has a wealth of prior data. Similarly, because competitors like Green Man Gaming and Humble Bundle sell Steam Keys, Steam knows when one of these channels is gaining ground on a game and can throttle the availability of Steam Keys to prevent competition. As the gatekeeper of the Steam platform, Valve sets the terms under which game publishers, including its rivals, can access it. This allows Valve to favor or punish specific games or publishers, and to alter the rules whenever it feels threatened by particular publishers or competitors in the market.

142.    Valve's gatekeeping ability distorts competition. As owner of the Steam Store, which serves as the primary avenue for publishers to reach PC gaming consumers, Valve has an overarching power over the entire industry. Valve can promote its own games within the store and demote others, add demonstration versions of its games directly to every user's library, and ensure its products are prioritized in sales queues presented to users. Valve also monitors competitors' point-of-sale transactions and microtransactions. Even without cutting off the availability of Steam Keys or removing a publisher's access to Steam, Valve can effectively destroy a game or a publisher merely by changing the way it advertises to consumers. This power prevents publishers from cooperating with Steam competitors.

143.    The anticompetitive effects detailed throughout this complaint further illustrate Valve's monopoly and/or market power. Valve's conduct has resulted in supracompetitive prices in the digital PC game distribution market, reducing market-wide output in terms of quality, innovation, and consumer choice. Because of Valve's restrictive practices, consumer gamers do not benefit from seeking out alternative distributors, explaining why Valve's market share remains above 75%, despite the presence of potential competitors.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**C.      Major, Well-Resourced Rivals Have Been Unable to Compete with Steam.**

144.     Even the most prominent publishers view Steam as an essential platform, illustrating the difficulty of creating a rival PC gaming platform given Valve's dominance and anticompetitive behavior. Major publishers—including Epic Games ("Epic"), EA, Microsoft, Ubisoft, Discord, and Humble Publishing—have attempted to avoid Steam and launch viable competitor platforms. Each has failed to establish a strong commercial presence due to Valve's dominance and anticompetitive conduct.

145.     Epic, known for the massive success of *Fortnite*, which generated over $4 billion between 2017 and mid-2019, launched its store partly because, as its CEO noted, "[s]tores extract an enormous portion of game industry profits and are ripe for disruption." Epic, as a leading game publisher, aimed to avoid excessive commissions and promote a low-commission model for the industry. To attract publishers, Epic offered a much lower 12% revenue share and waived the usual 5% royalty for developers using its Unreal Engine after a revenue threshold. Epic determined that a 12% commission was sufficient to cover store costs in a competitive market. It also invested hundreds of millions of dollars to secure exclusivity deals, spending $444 million in 2020 alone, compared to $265 million in third-party game sales that year.

146.     The Epic Games Store also attempts to compete with Valve by securing timed exclusives from publishers through various incentives, including minimum revenue guarantees and upfront payments. These arrangements enable publishers to sell games at potentially lower prices due to a more favorable revenue share, which can boost sales or improve game quality, thereby increasing sales.

147.     According to a 2020 report by The New York Times, Epic Games claimed that even with its 12% commission, it still made a profit margin of 5% to 7%, demonstrating that platforms can operate profitably with significantly lower commission rates than Valve charges. But despite its aggressive tactics, the Epic Games Store has not significantly cut into Valve's market share. For instance, even though Epic secured exclusivity for high-profile games like *Borderlands 3*, the game was later released on Steam, where it achieved commercial success. Analysis of 2019 figures

indicates that despite its efforts, Epic's store likely captured only "a little above 2%" of the market. To acquire this market share, Epic spent $880 million while earning $680 million in revenue.

148.    In 2020, the Epic Games Store continued a similar pattern, with PC gamers spending a total of $700 million on the platform, which included around $435 million from sales of Epic's proprietary games. Epic also gave away products valued at $2.4 billion while generating only $700 million in revenue through its storefront.

149.    One industry analyst explained, "[t]wo years and four months after its inception on December 4, 2018, the Epic Games Store hasn't done much for its parent company aside from being one of its biggest money losers." According to court documents, Epic Games Store resulted in approximately $181 million in losses in 2019 and $273 million in losses in 2020. Epic has asserted that its 12% commission covers the costs of running the store, indicating that these losses stem from heavy promotional spending aimed at challenging Valve's market dominance, rather than from an inadequate revenue share.

150.    According to Epic Vice President and General Manager Steve Allison, as of 2023—nearly five years after its launch—the Epic Games Store remains unprofitable. In September 2023, Epic laid off 830 employees—roughly 16% of its workforce.

151.    The Epic Games Store exemplifies how even a well-funded publisher with a vast user base struggles to dent Steam's market share. Valve's anticompetitive conduct plays a significant role in the Epic Store's difficulties. Due to Valve's PMFN, other publishers on the Epic Store cannot price their games lower than on Steam, restricting Epic's ability to attract users and build market share. Publishers can avoid the PMFN only by completely withdrawing from Steam, a strategy that is not economically feasible. As a result, publishers are forced to comply with the PMFN, leaving Epic's lower commission structure unable to threaten Valve's supracompetitive 30% rate.

152.    Other potential Steam competitors do not possess the financial resources and influence of Epic and are therefore unable to offer exclusives attractive enough to publishers. As a result, exclusive deals are a rare promotional strategy in the digital PC game distribution market,

1  unlike in console gaming. For instance, Sony PlayStation offers around 300 games exclusive to its

2  platform as a way to entice consumers to choose PlayStation over competing consoles like Xbox.

3      153.    EA, an American video game company and the second-largest gaming company in

4  the Americas and Europe, attempted to enter the digital PC game distribution market but failed. EA

5  currently has a market capitalization of approximately $39.58 billion.

6      154.    EA launched its Origin store and game launcher on June 3, 2011, as a "direct-to-

7  consumer gaming platform," allowing gamers to buy, download, and play games directly from EA,

8  bypassing Valve's commission. Initially, Origin featured only EA-developed games but soon

9  expanded to include releases from other major publishers such as Warner Bros., THQ, and Capcom

10  Entertainment, Inc.

11      155.    News articles at the time described Origin as "the biggest threat to Steam's

12  dominance yet." Origin quickly gained a user base of over 50 million registered users, leveraging

13  EA's high-profile franchises, including *SimCity*, *The Sims*, and *Battlefield 3*.

14      156.    To jumpstart Origin's success, EA initially mandated that all EA games use the

15  Origin platform, even if purchased through other distributors. This decision resulted in EA

16  withdrawing its games from the Steam Store, as Steam does not permit publishers to sell versions of

17  games tailored for other platforms. While other distributors like GameStop were willing to sell

18  Origin-enabled versions, Valve would not permit this on the Steam Store. EA explained, "[a]t

19  present, there is only one download service [Steam] that will not allow this relationship. . . . Steam

20  has imposed a set of business terms for developers hoping to sell content on that service—many of

21  which are not imposed by other game services."

22      157.    Despite the appeal of its popular franchises like *FIFA*, *The Sims*, and *Battlefield*, EA

23  could not overcome Valve's anticompetitive practices in the PC game distribution market and

24  eventually returned its games to Steam in 2020 to "be where the players are." As one article put it:

25  "It has been a long and largely fruitless road for Origin, EA's PC gaming client that it had planned

26  on building into a rival of Valve's Steam. What was originally supposed to have been the chief

27

28

antagonist to Steam in the ongoing PC gaming platform wars instead is best described as a failure to launch."

158.    Due to Valve's conduct, EA found itself forced into becoming another publisher subject to the 30% commission imposed on most games sold through the Steam Store. EA has folded its Origin brand and limps along today with the "EA App," which has a storefront but captures only a small portion of game sales.

159.    Microsoft, today the second-largest company in the world by market capitalization, also attempted to challenge Valve's position in the market using its popular games and the Windows operating system to attract users to its store. In 2012, Microsoft launched the Microsoft Store (previously known as Windows Store) as its digital distribution platform for PC games. Unlike other stores, Microsoft merged its distribution channels into a single storefront, including games that operated on both Windows and its Xbox console. This integration later enabled cross-platform capabilities between PC and Xbox, allowing users to switch between consoles without purchasing the game separately for each device. The Windows Store was positioned to become a "near-omnipresent digital storefront," providing Microsoft with a captive audience for its software library and offering a potential challenge to Steam's market dominance. Microsoft also leveraged its Windows operating system by pre-installing its store on Windows-based PCs.

160.    To grow its market share in digital PC game distribution, Microsoft distributed many of its PC games exclusively through the Microsoft Store. This included popular titles such as *Sea of Thieves*, *Age of Empires*, and *Microsoft Flight Simulator*.

161.    Despite these efforts, Microsoft was unable to establish a commercially viable market share in digital PC game distribution. Consequently, Microsoft retreated from this strategy and began selling its PC games on Steam in 2019. One insider remarked that Microsoft "has given up entirely on that vision . . . to dethrone Steam."

162.    Ubisoft, the publisher behind major franchises like *Assassin's Creed*, *Tom Clancy's Rainbow Six Siege*, and *Anno*, launched its Uplay gaming client and online store in 2009. Like EA, Ubisoft's store failed to gain traction largely because of Valve's anticompetitive practices, and

Ubisoft has folded its ambitious Uplay branding and replaced it with "Ubisoft Connect PC," another storefront with negligible market share.

163.    Amazon tried to enter the market through the Twitch Store, launching a joint platform/storefront in April 2017. It was hailed as "one of the biggest challenges yet to Steam." However, the Twitch Store was shut down just 18 months later.

164.    Google also introduced a competitive offering called Google Stadia, which was intended to be "the future of gaming." Yet, by February 26, 2021, reports indicated that Stadia had "absolutely crumbled under expectations."

165.    Discord provides another example of a failed attempt to compete against Steam in the market. Discord is an application that offers text messaging, voice, and video calling services for gamers to communicate with friends during gameplay. Since its launch, Discord has grown rapidly, with 8.9 million daily users in 2017 and some 26.5 million daily active users and over 200 million accounts by 2025. With millions of active PC gamers already using the platform, Discord offered a potentially formidable challenge to Steam.

166.    In August 2018, Discord made a move to enter the market through a vertically integrated offering. At the time, a media intelligence company reportedly called Discord the "biggest threat [Steam has] faced in years." With a large, existing user base registered on Discord for voice communication and social networking, the platform appeared well-positioned to challenge Valve. Discord initially attracted gamers and publishers by offering exclusive periods during which curated games would be available for free. Just a few months after the initial launch, Discord further enticed developers by announcing that all developers, regardless of size, could self-publish their games.

167.    More significantly, Discord introduced a 10% commission—one-third of Valve's fee, with 90% of revenue directed to publishers. When Discord announced this new model, it questioned: "Why does it cost 30% to distribute games?" Discord argued that it "[t]urns out, it does not cost 30% to distribute games in 2018." The company settled on the 10% rate because it "covers [its] operating costs," and even suggested it might consider lowering the rate further by optimizing its technology.[7]

---

[7] Discord, *Why not 90/10?* (Dec. 14, 2018), https://blog.discord.com/why-not-90-10- 3761ebef4eab.

168.    Despite its massive user base and pro-developer, pro-consumer approach, Discord failed to gain traction. By early 2019, Discord began to "downscale" its efforts, shifting towards a model where gamers would gain access to a pool of games for a monthly fee, a service known as Nitro. By October 2019, Discord announced that it would discontinue the Nitro gaming service to focus on Nitro's subscription services for enhancing the platform's core communication and instant messaging functions.

169.    As noted earlier, Discord's failure was largely due to Valve's anticompetitive behavior. In their related suit, game publishers alleged that when game developers released their products on Discord to take advantage of its lower commission structure, Valve contacted those developers, enforcing its parity pricing requirements. This intervention limited the developers' ability to conduct business with Discord. Discord's low-commission strategy could not attract enough volume because publishers were unable to direct gamers to the Discord store.

170.    As a result, Discord failed to achieve the necessary scale in game distribution to challenge Valve's market dominance and pressure its supracompetitive prices. Without the ability to lure publishers with higher profits and attract gamers with lower prices, Discord's efforts ultimately fell short, leaving Valve's 30% commission unchallenged.

171.    Despite Discord's inability to enter the market successfully, Valve perceived the platform as a potential threat. As Discord gained popularity as a communication tool for gamers, Valve began to copy Discord's features in Steam. For instance, Valve introduced "Steam Chat," offering a friends list, secure voice chat, and group channels. A reporter for Business Insider noted that "[t]he update takes many cues from Discord, including a suspiciously similar user interface" that looks "almost exactly the same."

172.    Only a select few PC games have managed success outside of Steam, and these are typically games with a long history of recognition. For example, *League of Legends*, released in 2009, managed to bypass Valve's dominance due to its extensive and dedicated user base, gathered in Steam's relative infancy. However, such cases are the exception, as Steam hosts over 50,000

games, while the number of major game franchises that can avoid using Steam entirely can be counted on two hands.

173.    Valve has expanded its market power through ancillary services offered on Steam. One such example is the "Steam Workshop," described as a hub for player-created content and tools that facilitate the publishing, organization, and downloading of content into games. This marketplace provides additional revenue for Valve. Steam's terms in the Workshop are even more exploitative— when digital goods are sold through the Steam Workshop, Valve takes 75% of the sale price, leaving only 25% for the content creator.

174.    Valve has publicly highlighted the payments it has made to creators of digital goods, claiming to have paid over $57 million to Steam Workshop contributors. However, this amount implies that Valve earned approximately $171 million in revenue by simply acting as an intermediary between creators and their customers. This demonstrates Valve's ability to generate substantial profits through its market dominance.

175.    The anticompetitive effects detailed throughout this complaint further illustrate Valve's market power. Valve's conduct has resulted in supracompetitive prices in the digital PC game distribution market, reducing market-wide output in terms of quality, innovation, and consumer choice. Because of Valve's restrictive practices, gamers do not benefit from seeking out alternative distributors, explaining why Valve's market share remains approximately 75%, despite the presence of potential competitors in the distribution market.

**D.     There is Direct Proof of Valve's Monopoly and/or Market Power.**

176.    Due to the conduct challenged herein, Valve has charged supracompetitive fees well in excess of marginal costs and in excess of the competitive price and has enjoyed high profit margins. Valve's 30% fee on PC games, DLC, and in-app purchases is supracompetitive because it is substantially above Valve's marginal costs.

177.    In markets free from Valve's anticompetitive conduct, Steam's fee would be lower than 30% because it would be driven down closer to Steam's marginal costs.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

178.   For example, Epic Games has acknowledged in court filings that "Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS." Epic's CEO, Tim Sweeney, has further confirmed that "[f]ixed costs of developing and supporting the platform become negligible at a large scale. In our analysis, stores charging 30 per cent are marking up their costs by 300 to 400 per cent."[8]

179.   Gaming platform Discord likewise observed that "it does not cost 30% to distribute games" and that a platform could "build amazing developer tools [and] run them" through a 10% fee. Discord went on to note that "10% covers our operating costs, and we'll explore lowering it by optimizing our tech and making things more efficient."

180.   As one trade news source reported in 2018, Steam's "30-percent revenue cut is *steep*, especially given how little Valve does to earn it nowadays."[9]

181.   In addition, Valve employees have internally recognized that its 30% commission is significantly greater than the value of the services it provides. Valve employees candidly acknowledged in internal 2018 emails that "[p]retty much everyone agreed that Steam wasn't worth 30%" and that "Steam hasn't had to compete, and thus has gotten lazy and hasn't had to change revenue share." Another 2018 internal email acknowledged "a drumbeat from developers that 30% is too big of a cut for what we provide."

182.   Due to the conduct challenged herein, Valve has been able to charge its 30% fee, which ultimately raises prices to consumers and hampers innovation by restricting the potential earnings of publishers.

---

[8] Mr. Sweeney broke down the costs that informed this analysis. He explained that payment processing for major payment methods costs around 2.5-3.5%, content delivery network (CDN) expenses are less than 1.5%, and other variable operating and customer support costs are between 1% and 2%. Moreover, once a platform reaches a large scale, fixed costs for developing and supporting the platform become negligible.

[9] Hayden Dingman, Opinion: *Bethesda.net is Broken: Why Game Makers Who Abandon Steam Need to Get the Basics Right*, PC World (Nov. 30, 2018), https://www.pcworld.com/article/402909/bethesda-net-fallout-76-no-steam.html.

183.    Valve's excessive and supracompetitive fees serve as direct evidence of its monopoly and/or market power.

## VII.    VALVE HAS UNLAWFULLY RESTRAINED TRADE AND MONOPOLIZED THE DIGITAL PC GAME DISTRIBUTION MARKET

184.    Valve maintains its dominance in the digital PC game distribution market not by competing on the merits but by using anticompetitive constraints to establish and sustain its monopoly power.

185.    Valve protects itself from competition by imposing a PMFN on game publishers who list their games on the Steam Store. As with other PMFNs, Valve's PMFN forces publishers to maintain the same or higher prices for their games across all distribution channels, even those not linked to Steam, and even when those channels offer more competitive fees, substantially lower than Valve's 30% cut.

186.    Valve's PMFN has been expressed through various forms, both written and informal, over time. It has never been removed and remains in effect to this day. Regardless of the iteration, the PMFN always serves to suppress price competition that would challenge Valve's market control. Epic Games' CEO remarked that "Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then: 1.) Valve can simply say 'no.'"

187.    Valve monitors prices closely. Steam's guidelines stipulate that publishers' "[i]nitial pricing as well as proposed pricing adjustments will be reviewed by Valve and are usually processed within one or two business days." This allows Valve to keep a close watch on prices and ensure compliance with its PMFN by overseeing any changes in pricing.

188.    Through the PMFN, Valve maintains control over publishers, using threats and penalties to ensure they do not offer discounts to draw customers to other distribution channels. Any publisher that fails to comply with Valve's rules risks losing access to the Steam platform entirely, a blow that could be disastrous given that the majority of PC gamers use Steam.

189.    The reach of Valve's PMFN is especially damaging because it affects not just Steam-enabled versions of PC games but also all other versions of those games developed for other platforms. In this way, the PMFN warps competition for all PC games, not just those sold on Steam.

190.    The PMFN also hampers competition from other distribution channels. In order to compete with Valve, rival platforms need to attract a significant number of gamers and publishers, leveraging the network effects inherent in platform-based economics. The most straightforward way for a competing platform to achieve this is by reducing publisher fees. In a competitive market, this would encourage publishers to participate in the platform and, without the PMFN, would enable publishers to offer lower prices that would steer customers away from Steam.

191.    However, because of Valve's PMFN, Valve essentially controls the retail prices publishers can offer, setting a price floor across the market. Even if a competing platform offers publishers lower commissions than Valve's 30%, publishers are unable to attract gamers to the rival platform through better pricing or content. They must charge the same price across all platforms and offer the same content, leaving gamers little reason to move away from Steam and its incumbent advantages.

192.    Valve has repeatedly used its PMFN to prevent potential competition. For instance, Valve invoked the PMFN to shut down competition from the Discord Store. Discord tried to compete by introducing a store that charged only a 10% commission—one-third of Valve's rate. Publishers saw this as an opportunity to increase their share of revenues and tried to attract gamers to Discord with better pricing. But Valve blocked this by enforcing its PMFN, preventing publishers from offering discounts on Discord.

193.    No purported procompetitive benefits justify this all-out assault on competition in the market.

## VIII.   ANTICOMPETITIVE EFFECTS

194.    Consumers buy games directly from Steam. Valve extracts its supracompetitive commission from the purchase price before delivering the remainder to publishers. In other words,

consumers pay Valve's commissions directly, even though the portion representing the commission is hidden in the game's purchase price.

195.    As explained above, Valve uses its restrictive contracts, PMFN, and other limitations to block competition in the digital PC game distribution market. Because of these anticompetitive practices, consumers who buy games on Steam suffer direct harm in the form of higher prices for games, lower quality of games and game platforms, and reduced output of games and game platforms.

### A.    Valve's PMFN Prevents Game Publishers from Offering Lower Prices on Other Platforms.

196.    Publishers selling their games on Steam must seek to turn a profit. Accordingly, they must—and do—build Valve's supracompetitive commissions into the prices they set for games, DLC, and in-app purchases sold on Steam.

197.    As discussed above, Valve's enforcement of its PMFN prevents publishers from offering lower prices off Steam. Absent Valve's anticompetitive conduct, consumers would have the opportunity to buy games at lower prices on lower cost platforms. Instead, they must buy games at prices that reflect Steam's supracompetitive commissions, even on platforms that charge *lower* commissions.

198.    Instead of seeking out competitor platforms, however, most consumers simply buy their games at supracompetitive prices *on Steam*, because of the network effects flowing from the legacy features that brought consumers to digital PC game distribution in the first place. Consumers buy games on Steam because their games, and their friends, are already there, and because Steam prevents publishers from offering price or quality incentives to shop elsewhere.

199.    On lower-commission platforms, the profit-maximizing price for game publishers is lower, because publishers' marginal costs are lower. Absent Valve's anticompetitive PMFN, publishers could earn more revenue per game even at lower prices than they set on Steam. They could also sell more games, because some customers unwilling to buy a game at Steam prices would be willing to buy games at competitive prices.

200.    If not for Valve's challenged conduct, competition would lead to lower platform fees across the market (on Steam and on competitor digital PC game distribution platforms), and publishers would lower their prices to sell more games and earn more revenue. As a result, consumers would pay less, publishers would earn more, and PC game output would increase to competitive levels.

201.    For example, in 2019, game publisher Deep Silver sold its game *Metro Exodus* on Steam for $60. Later, it entered into an exclusive contract with Epic, pricing the game at $50 through the Epic Games Store (EGS) because of EGS's lower commissions and withdrawing the Steam-enabled version from the Steam Store. At least on a per-unit basis, this strategy benefited Deep Silver, as it received 88% of $50 ($44) from sales through the EGS, compared to 70% of $60 ($42) on Steam. Consumers also benefited, paying $50 instead of $60. And basic economic theory suggests Deep Silver also sold more units on EGS than it would have if it had priced the game at $60.[10] But because of Steam's anticompetitive conduct, in order to sell its games at this competitive price on EGS Deep Silver had to forego all further sales from Steam's dominant customer base. Because of this Hobson's choice, few publishers have followed Deep Silver's lead.

**B.    Because Valve's PMFN Prevents Publishers from Offering Lower Prices on Other Platforms, Competitor Platforms Cannot Break Steam's Monopoly, Harming Consumers.**

202.    The only way for publishers to avoid Valve's restrictive practices is to completely bypass using Steam. But Valve's anticompetitive conduct has foreclosed economically viable alternatives, leaving the vast majority of publishers stuck with Steam and the terms it chooses to impose. Publishers thus have no choice but to subject themselves—and consumers—to Valve's high commissions that would not prevail in a more competitive environment.

203.    Valve's 30% commission rate charged on most sales is higher than the competitive rate for PC game distribution services. Valve originally set this rate based on commissions charged

---

[10] Moreover, Epic, at a 12% commission, still made a profit of at least 5% on each sale, as discussed in Section VI.C.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

by large media companies decades ago for physical media distribution, such as VHS tapes sold through brick-and-mortar stores. However, as a digital distributor, Valve does not bear the costs associated with physical distribution, such as manufacturing tapes or disks, packaging, shipping, real estate, or employing sales personnel.

204.    In economic terms, a supracompetitive price is one that significantly exceeds marginal cost. Physical retailers maintained a 30% commission at the time Steam launched because it reflected the high costs of running brick-and-mortar stores, including real estate expenses. Valve, as a digital retailer, does not face such costs. Its variable costs for digital distribution are nearly zero, meaning that the 30% commission is almost entirely profit.

205.    Basic economic theory suggests that Valve's persistent monopoly profits should draw competition from competitors seeking to undercut Valve's prices or offer better experiences to gain market share—and profits—for themselves.

206.    This phenomenon is similar to what happens when generic pharmaceuticals are introduced. In the United States, the first generic entrant that successfully files an abbreviated new drug application ("ANDA") with the FDA enjoys a monopoly for six months. During this period, the initial generic monopolist can set prices 20-30% above long-term marginal costs, but as more producers enter the market, prices steadily decline.

207.    More broadly, it is typical for new industries to go through an initial phase where a small number of firms earn significant profits, followed by a phase where rapid entry of new firms leads to increased competition and a reduction in profits. In a competitive market, prices are pushed over time towards a firm's marginal costs—and consumers benefit as a result.

208.    Indeed, as discussed above, Valve *has* drawn an unusually well-capitalized set of serious competitors with established positions in the PC game market and non-PC video game, software, and digital content distribution markets, including Epic, EA, Microsoft, Amazon, Discord, Ubisoft, Humble, GOG, and Green Man Gaming. These competitors have both undercut Steam on price—charging commissions in the 10-15% range—and on quality—offering exclusive games, equivalent or better platform experiences, and more.

209.    As discussed above, lower commissions in particular would, absent Steam's PMFN, allow publishers to charge lower prices for their games—while still reaping greater profits—on the competitor's storefront than on the Steam Store. Publishers would respond to these strong financial incentives by lowering prices and steering customers to competitors' storefronts where possible, *e.g.*, with unique content. This would draw customers away from Steam, allowing competitors to gain market share, earn competitive profits, and prosper in the game distribution market.

210.    Likewise, competing platforms could work with publishers to offer additional, superior gaming features to Valve, exclusive deals, etc., drawing in customers with superior product quality. Competitor platforms could also offer better platform experiences. This too would allow competing platforms to gain share and earn profits. [11]

211.    As consumers adopted competing platforms in response to financial and quality incentives, Steam's market power would erode. The network effects unique to Steam would weaken, and competitor platforms would build their own network effects. [12] Steam would lose the power to impose anticompetitive contract restrictions on publishers—power that comes from Steam being "where the players are."

212.    However, due to Valve's PMFN, if publishers list their PC games on Steam—as they effectively must to reach Steam's customer base—they must charge the *same* supracompetitive price on the competitor's platform even if the competitor offers a lower commission. This hampers the competitor's ability to present an appealing offer to customers and "suppress[es] competition on the crucial dimension of price." [13] Nor, due to the "material parity" requirement of Valve's PMFN, can

---

[11] Absent this pressure, Valve has no incentive to—and does not—improve Steam's quality to the level that would be necessary if it faced genuine market pressure. Valve does not need to innovate or address persistent publisher and customer concerns, such as harassment, hate speech, and review bombing, to maintain its market position. Additionally, Valve has neglected basic cybersecurity protections, leaving users and publishers vulnerable to hacking, identity theft, fraud, and money-laundering schemes.

[12] Notably, one of the strongest elements of Steam's historical network effects—its social networking and social gaming features—have eroded substantially since the advent of Discord, a service that began as a way for gamers to communicate and coordinate with each other while playing games.

[13] Benjamin Edelman & Julian Wright, *Price Restrictions in Multi-sided Platforms: Practices and Responses*, 10 Competition Pol'y Int'l 86 (2015).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

competitors compete on the dimension of game quality, leaving competing storefronts without a clear avenue to battle Valve's dominance.

213.    Because competing platforms are prevented from succeeding by Valve's anticompetitive conduct, publishers cannot break free from its PMFN, and cannot offer consumers lower prices. The market cannot evolve beyond its current status quo of charging Steam customers supracompetitive prices.

## C.    Valve's PMFN Prevents Competitors from Forcing Down Valve's Commission, Harming Consumers.

### 1.    Competition Drives Prices Toward Marginal Costs.

214.    In a market free of Valve's PMFN and other restrictive practices, lower prices and higher quality on other stores would force Valve to lower its commission rates to a level that reflects its actual costs plus a reasonable profit, rather than rates inflated by its anticompetitive behavior. This would result in lower prices to consumers, as reducing Valve's commission—already baked into the price consumers pay for games on the Steam Store—would reduce game prices as well.

215.    As described above, absent Valve's restrictions, publishers would be free to offer games more cheaply and with superior features on competitor platforms, attracting customers and boosting game sales in the process. Valve would lose market share to its competitors. Valve would then have to compete with these other stores in negotiations—offering genuinely competitive pricing and services in order to avoid losing market share and revenue. Over time, basic economic theory suggests that Valve and its competitors would converge toward a competitive price for a competitive product roughly reflecting firms' marginal costs.

### 2.    Valve's Marginal Costs Are Far Below 30%.

216.    As noted above, Valve set its 30% commission in the early days of digital distribution to compete with brick-and-mortar stores, who charged similar commissions but had much higher costs including real estate, shipping, inventory management, and staffing across hundreds or thousands of retail stores. Valve has much, much lower costs, employing only around 350 individuals, only 79 of whom are dedicated to Steam.

217.    Valve's unilateral adjustment of the commission rate for top-grossing games evinces that Valve could continue to profit on much lower commissions. Moreover, it demonstrates that under significant competitive pressure, Valve could and would lower its commissions. When Valve adjusted its commission rate structure, it explained: "It's always been apparent that successful games and their large audiences have a material impact on [the platform's] network effects[,] so making sure Steam recognizes and continues to be an attractive platform for those games is an important goal for all participants in the network." In other words, Valve lowered its commission rate for high-selling games to reduce their publishers' financial incentive to defect from Steam to other platforms. Valve recognized that losing these large publishers would risk the migration of their extensive fan bases to competitors like the Epic Games Store, which offers more favorable terms—including commission rates—to publishers.[14]

218.    But even these reduced commissions for a handful of games do not reflect competitive pricing. Rather, these are supracompetitive commissions adjusted slightly lower to fend off competitors who are already hamstrung by Steam's anticompetitive PMFN. In other words, Steam's universal 30% commission was *so* high that *despite* its anticompetitive practices, it was *still* worried its biggest games might abandon Steam's dominant customer base to seek better deals elsewhere. But because of its anticompetitive conduct, it can still extract 20% commissions even for games that have imbedded audiences of 50 million users or more.

219.    To meaningfully compete in a market free from Valve's anticompetitive conduct, Valve would be forced to provide even more favorable commission rates, on the order of the 10-15% offered by competitors today and in the recent past. And over time, commissions would drop

---

[14] This incentive system is the reverse of what other platforms typically offer. Most app distribution platforms provide reduced commissions to small developers for sales under an initial threshold, acknowledging their thinner profit margins and aiming to attract their participation. For instance, both Apple and Google apply a reduced 15% fee tier for smaller developers with annual revenues below a specified threshold. In contrast, Valve adopts the opposite approach, essentially refunding fees solely to its largest publishers. Indeed, in Valve's own announcement about this pricing scheme, it stated that the aim of these incentives was to reward "developers of big games" by "aligning their interests with Steam."

further as competitors innovated to find new efficiencies, undercut their rivals, and gain market share.

220.    Essentially, Valve's current 30% commission rate—imposed on the majority of purchases on the Steam Store—would be significantly reduced under genuine market competition. As a result, consumers would pay lower commissions to Valve and lower prices overall.

**D.    Economic Theory and Modeling Support Plaintiffs' Allegations of Consumer Harm.**

221.    The allegations above are not just conjecture; the rise of PMFNs on two-sided e-commerce platforms in particular has sparked a considerable economic literature that demonstrates how injurious PMFNs are to competition and to consumers.

222.    Economic models indicate that when a dominant platform like Steam enforces a PMFN, several outcomes occur: (a) platform fees increase; (b) retail prices rise; and (c) low-cost business models are disincentivized from entering or persisting in the market. For instance, the Boik & Corts model demonstrates that a lower-priced entrant, such as Discord, cannot successfully enter the market because Valve's PMFN prevents it from reducing prices to attract both publishers and consumers.[15]

223.    As a result, Valve's PMFN leads to several negative effects: (a) it raises consumer prices and lowers game quality, (b) it prevents rival platforms from engaging in price and quality competition, (c) it discourages new entry by platforms that charge lower commissions, and (d) it suppresses output from game developers. These effects directly harm consumers.

**IX.    CLASS ACTION ALLEGATIONS**

224.    Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), as representatives of a Class defined as follows:

> All persons and entities who, directly or through an agent, purchased a PC game or DLC on the Steam Store or purchased an in-game

---

[15] *See* Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & Econ. 105, 113–29 (2016); *see also* Benjamin Edelman & Julian Wright, *Price Restrictions in Multi-sided Platforms: Practices and Responses*, 10 Competition Pol'y Int'l 86 (2015).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

product from a game distributed on the Steam Store on or after January 28, 2017, and continuing until the effects of Valve's unlawful conduct are eliminated. Excluded from the Class are (a) Defendant's officers, directors, and employees; and (b) Judges assigned to this case, their chambers' staff, and any members of the judges' or chambers' staff's immediate family.

225.    When a consumer purchases a game from the Steam Store, the consumer purchases the game from Valve and pays the full retail price to Valve directly. Likewise, when a consumer makes an in-app purchase using Steam Wallet, that gamer pays Valve to complete the transaction. In both cases, there is no intermediary in the distribution chain between Valve and the consumer. Accordingly, class members are direct purchasers from Valve, the Defendant in this antitrust case, and pay overcharges caused by inflated commissions directly to Valve.

226.    The class members are sufficiently numerous to make joinder impracticable. Millions of consumers dispersed throughout the United States have purchased PC games and/or in-game products during the class period.

227.    Plaintiffs' claims are typical of the class. Valve's anticompetitive conduct has imposed a common injury on all consumers who purchase games and in-game products on the Steam store, including Plaintiffs, in the form of artificially inflated prices paid to Valve.

228.    Plaintiffs are represented by competent counsel with extensive experience litigating antitrust class actions. Plaintiffs and their counsel have no interests that are averse to or conflict with the interests of class, and they possess the necessary resources to vigorously prosecute this action. Plaintiffs, as class representatives, will adequately represent the interests of the class.

229.    There are numerous questions of law and fact common to the class, including:

- the existence and scope of a relevant market for digital PC game distribution;

- Valve's possession of market power and/or monopoly power in the relevant market;

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

- whether Valve acquired or maintained, or attempted to acquire or maintain, monopoly power in the relevant market through anticompetitive conduct;

- whether Valve unreasonably restrained trade in the relevant market through anticompetitive conduct;

- whether Valve's anticompetitive conduct has led to increased prices, reduced quality, and/or reduced output in the relevant market;

- whether Valve's conduct has a legitimate procompetitive justification, if so, whether there are substantially less restrictive means to achieve that procompetitive purpose, and, if not, whether the procompetitive benefits are outweighed by the conduct's anticompetitive effects; and

- the existence and quantity of class members' damages.

230.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Joinder of all class members is impossible, and individual damages are small relative to the burdens of litigation such that it would be impracticable to prosecute an individual action to redress Valve's unlawful conduct.

## X.    FRAUDULENT CONCEALMENT

231.    Valve has affirmatively misled Plaintiffs and the public to conceal its unlawful conduct, including by denying and concealing the existence of its PMFN. In its Answers in the ongoing *Wolfire* litigation, *Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-0563 (W.D. Wash.), Valve denied the existence of its PMFN.

232.    Similarly, in its motion to dismiss, Valve described the existence of its as "thoroughly fanciful," and stated that "[n]o one has ever seen this shadow policy." Most recently, at class certification, Valve described the "price parity component of the alleged PMFN" as a "fantasy" that "does not exist."

233.    As described above, these representations are false and in keeping with Valve's pattern of continuously denying the existence of its PMFN, one of the core elements of its

anticompetitive conduct. Moreover, because the PMFN is—in Steam's own words—a "shadow policy" that it imposes on publishers through a combination of written rules, unwritten norms, and private communications of which customers are unaware, Valve denied Plaintiffs the opportunity to investigate and assert their claims at the time the conduct commenced.

234.    Valve's affirmative efforts to fraudulently conceal its PMFN policy toll the statute of limitations with regard to the claims asserted in this complaint.

## XI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### SHERMAN ACT SECTION 2—MONOPOLIZATION OF THE DIGITAL PC GAME DISTRIBUTION MARKET (15 U.S.C. § 2)

235.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

236.    Valve has willfully acquired and maintained monopoly power in the relevant market for digital PC game distribution through exclusionary and anticompetitive conduct, including but not limited to the market-wide price controls governed by its PMFN, its coercion of non-compliant publishers, and its obstruction of competitive strategies.

237.    Valve's actions have no procompetitive justification, as they do not enhance overall market efficiency or improve the relevant market's efficiency. Moreover, there are less restrictive alternatives to the PMFN and the other anticompetitive restraints Valve has imposed on the market.

238.    Valve's conduct has had a substantial effect on interstate commerce.

239.    Plaintiffs and others in the class have suffered or will suffer injury in their property due to Valve's conduct. The injuries they face are the type that antitrust laws are designed to prevent. Plaintiffs have been and will be injured by the harm to competition caused by Valve's conduct.

## SECOND CAUSE OF ACTION

## SHERMAN ACT SECTION 2—ATEMPTED MONOPOLIZATION OF THE DIGITAL PC GAME DISTRIBUTION MARKET (15 U.S.C. § 2)

240.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

241.    Valve has engaged in exclusionary and anticompetitive conduct in the relevant market for digital PC game distribution, including but not limited to the market-wide price controls governed by its PMFN, its coercion of non-compliant publishers, and its obstruction of competitive strategies.

242.    Valve has engaged in this anticompetitive conduct with the specific intent of monopolizing the relevant market for digital PC game distribution.

243.    Valve has engaged in this anticompetitive conduct with a dangerous probability of monopolizing the relevant market for digital PC game distribution.

244.    Valve's actions have no procompetitive justification or legitimate business purpose, as they do not enhance overall market efficiency or improve the relevant market's efficiency. Moreover, there are less restrictive alternatives to the PMFN and the other anticompetitive restraints Valve has imposed on the market.

245.    Valve's conduct has had a substantial effect on interstate commerce.

246.    Plaintiffs and others in the class have suffered or will suffer injury in their property due to Valve's conduct. The injuries they face are the type that antitrust laws are designed to prevent. Plaintiffs have been and will be injured by the harm to competition caused by Valve's unlawful conduct.

## THIRD CAUSE OF ACTION

## SHERMAN ACT SECTION 1—UNREASONABLE RESTRAINTS OF TRADE (15 U.S.C. § 1)

247.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

248.    Valve has entered into contracts with game publishers to unreasonably restrain trade, control prices, exclude competition, willfully acquire and maintain market power in the digital PC game distribution market.

249.    In order to distribute games and in-game content through the Steam Store, Valve requires that game publishers agree that the publishers will not offer better prices or superior content for any games or in-game products offered through other platforms. Valve and publishers further agree, in restraint of trade, to coordinate pricing through Valve's pricing guidance, pricing "recommendations," and "post and adhere" pricing system.

250.    These agreements in restraint of trade have had anticompetitive effects in the relevant market for digital PC game distribution.

251.    These agreements with publishers have no procompetitive justification or legitimate business purpose, as they do not enhance overall market efficiency or improve the relevant market's efficiency. Moreover, there are less restrictive alternatives to the PMFN and the other anticompetitive restraints Valve has imposed on the market.

252.    Valve's conduct has had a substantial effect on interstate commerce.

253.    Plaintiffs and others in the class have suffered or will suffer injury in their property due to Valve's conduct. The injuries they face are the type that antitrust laws are designed to prevent. Plaintiffs have been and will be injured by the harm to competition caused by Valve's conduct.

## FOURTH CAUSE OF ACTION

### Washington State Consumer Protection Act, RCW 19.86 (Nationwide Class)

254.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

255.    The claims alleged above constitute unfair methods of competition under RCW 19.86.020, 19.86.040, and 19.86.030.

256.    Valve has engaged in unfair and deceptive practices in commerce, which affect the public interest and cause injury to business and property.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

257.    Valve's contracts and agreements with game publishers are anticompetitive restraints that have the purpose and effect of fixing prices in the relevant market above the competitive level.

258.    The contracts, combinations, or conspiracies at issue are in restraint of trade.

259.    Valve's monopolization and attempted monopolization have the purpose and effect of fixing and inflating prices in the relevant market above the competitive level.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment in their favor and against Defendant and for the following relief:

A.    That the Court certify this case as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), and that it appoint Plaintiffs as class representatives and its counsel as class counsel;

B.    That the court declare, adjudge, and decree that Valve has committed the violations of the laws alleged herein;

C.    That the Court award Plaintiff and the proposed classes all appropriate forms of relief, to include, but not be limited to, injunctive relief requiring that Steam cease the abusive, unlawful, and anticompetitive practices described herein; declaratory relief, adjudging such practices unlawful; as well as monetary relief, whether by way of restitution or damages, including treble damages, or other multiple or punitive damages, or restitution, where mandated by law or equity or as otherwise available; together with recovery of the costs of suit, to include reasonable attorneys' fees, costs, and expenses, together with pre- and post-judgment interest to the maximum levels permitted by law or equity;

D.    That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices alleged herein; and

E.    That the Court order such other and further relief as the Court may deem just and proper.

1

**XIII.  JURY DEMAND**

2

Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Dated: June 27, 2025                    Respectfully submitted,


                                        /s/ Corrie Yackulic
                                        Corrie Yackulic (WSBA No. 16063)
                                        CORRIE YACKULIC LAW LLC
                                        110 Prefontaine Place S., Suite 304
                                        Seattle, WA 98104
                                        Tel: (206) 787-1915
                                        corrie@cjylaw.com

                                        *Liaison Counsel for the Proposed Consumer Class*

                                        Benjamin D. Brown (*pro hac vice*)
                                        Brent W. Johnson (*pro hac vice*)
                                        Robert W. Cobbs (*pro hac vice*)
                                        Nathaniel D. Regenold (*pro hac vice*)
                                        COHEN MILSTEIN SELLERS & TOLL PLLC
                                        1100 New York Ave. NW, Suite 800
                                        Washington, DC 20005
                                        Tel: (202) 408-4600
                                        bbrown@cohenmilstein.com
                                        bjohnson@cohenmilstein.com
                                        rcobbs@cohenmilstein.com
                                        nregenold@cohenmilstein.com

                                        Christopher J. Bateman (*pro hac vice*)
                                        Daniel Gifford (*pro hac vice*)
                                        COHEN MILSTEIN SELLERS & TOLL PLLC
                                        88 Pine St., 14th Floor
                                        New York, NY 10005
                                        Tel: (212) 838-7797
                                        cbateman@cohenmilstein.com
                                        dgifford@cohenmilstein.com

                                        *Interim Lead Class Counsel for the Proposed Consumer Class*

                                        /s/ Steve W. Berman
                                        Steve W. Berman (WSBA No. 12536)

                                        /s/ Xiaoyi Fan
                                        Xiaoyi Fan (WSBA No. 56703)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1301 Second Avenue, Suite 2000
                                        Seattle, WA 98101
                                        Tel: (206) 623-7292

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

steve@hbsslaw.com
kellyf@hbsslaw.com

Ben M. Harrington (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3034
benh@hbsslaw.com

*Additional Counsel for the Proposed Consumer Class*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT