Exhibit 2



February 14, 2025

Cheryl Florio
Director of ADR Operations
American Arbitration Association
16 Market Square
1400 16th Street, Suite 400
Denver, CO 80202
CherylFlorio@adr.org

> **Re:    Individual Claimants v. Valve Corporation**
> **Case No. 01-23-0005-8758**

Dear Ms. Florio:

We write in follow-up to Victoria Chandler's July 29, 2024 letter summarizing the July 19 administrative conference call, and AAA's request for written contentions/a written response.

We also include herein our response to Valve's February 13, 2025 letter to AAA incorrectly purporting that there is no arbitration agreement in place between Valve and Claimants, and thus no right to arbitrate.

## I.    CLAIMANTS' RESPONSE TO AAA'S JULY 29, 2024 LETTER AND AAA'S REQUEST FOR A RESPONSE:

### *Global Mediation*

As discussed on the call, Claimants were willing to engage in a global mediation and did so on February 4, 2025. The mediation concluded in an impasse.

### *Merits Arbitrator Appointment & Scheduling Processes for 14,911 Individual Demands*

It is our understanding that, on the July 19th call, the parties agreed to items (1) and (3) in Ms. Chandler's letter. Claimants agree that, after the process in item (1) to appoint arbitrators is complete, that AAA can then administratively appoint arbitrators to cases based on region as discussed in item (2). Claimants do not agree to AAA administratively appointing arbitrators without a preceding strike and rank process.

Regarding item (4), Claimants are willing to create a joint scheduling order so long as the parties can add topics—such as discovery—to the sample scheduling order template. Claimants do not believe that they will be able to agree to all dates and mechanisms in the sample scheduling order and thus believe preliminary management hearings will be necessary in front of each arbitrator.

Cheryl Florio
Director of ADR Operations
Page 2
February 14, 2025

### _Process Arbitrator Appointment Process for the 5,000 Individual Demands_

Claimants believe that the 14,911 Individual Demands should immediately move forward while the Process Arbitration procedure for the 5,000 Individual Demands plays out. There is no dispute regarding which set of rules will apply to the 14,911 Demands, and there are no other reasons that would prevent the assignment of those claims to Merits Arbitrators. There are no issues that a Process Arbitrator will decide concerning the 5,000 Demands that would delay hearing the 14,911 Demands. Because the 14,911 Individual Demands are going to move forward regardless of the decision of the Process Arbitrator, there is no need to keep their claims in abeyance pending that decision.

## II.    CLAIMANTS' RESPONSE TO VALVE'S FEBRUARY 13, 2025 LETTER TO AAA:

Rather than respond to the specific issues raised in AAA's July 29th Letter, Valve instead sought to scuttle Claimants' arbitrations entirely by changing the jurisdictional terms of the Steam Subscriber Agreement ("SSA") mid-arbitration. Valve argues that Claimants agreed to the new terms (hereafter, the "Revised SSA") which purport to prohibit Steam subscribers from pursuing— even previously accrued—claims with AAA, the forum that both parties had bargained for. As will be discussed in further detail below, Valve is wrong. Despite its cynical efforts, under the law of Valve's chosen jurisdiction, the State of Washington, the original arbitration clause still controls.

### _Plaintiffs Dispute the Forum Selection Clause of the Revised SSA Is Applicable to Claimants or that the Revised SSA Requires These Arbitrations to be Closed._

Valve falsely asserts that "[a]ll of the Claimants have agreed to the controlling SSA, which requires that all of these arbitrations be closed." **This is a bald misrepresentation at best.** Claimants, through Counsel, have unequivocally informed Valve, in no uncertain terms, that they dispute that the forum selection clause in its Revised SSA is applicable to Claimants here and does not preclude these arbitrations from moving forward. Both Claimants and Valve extensively briefed this issue for the mediation, and Claimants argued _inter alia_: that the Revised SSA is not applicable to Claimants and does not preclude Claimants from proceeding with their arbitration claims before AAA; that Valve's attempt to remove the arbitration provision through an amended SSA is procedurally and substantively unconscionable, and violates Valve's duty of good faith and fair dealing owed to Claimants; that Valve is estopped from retroactively applying the terms of the Revised SSA to Claimants here; and that the Revised SSA cannot extinguish Claimants previously accrued claims or prevent pending AAA claims from proceeding before AAA. Claimants' mediation statement containing these arguments was served on Valve on December 18, 2024.

Despite full knowledge that Claimants adamantly contest the application or enforcement of the forum selection clause in the Revised SSA to Claimants or their AAA claims, Valve nonetheless makes the false, threadbare, and conclusory claim that "All of the Claimants have agreed to the controlling SSA, which requires that all of these arbitrations be closed" which simply

Cheryl Florio
Director of ADR Operations
Page 3
February 14, 2025

is wrong. Thus, the underlying basis of Valve's request to AAA to administratively close Claimants' arbitrations is based on a demonstrably false premise.[1]

### *Vorys's Motion to Lift the Stay Was not Brought on Behalf of any of the Claimants.*

Valve improperly seeks to attribute certain statements and arguments made by the Vorys law firm in a federal court filing made on behalf of other clients of Vorys, who are not part of any AAA arbitration proceeding of any of the Claimants. Specifically, Valve states that Vorys filed a Motion to Lift the Stay of the consumer claims in one of the pending class actions and therein quoted the portion of the Revised SSA that purports to require all disputes and claims to now be brought in a court of law. But Valve selectively quotes from Vorys' Motion, ostensibly to mislead AAA to believe that Vorys was acting on behalf of Claimants, **which it was not**, and that by quoting language from the Revised SSA in its Motion was somehow an admission that the terms of the revised SSA could be applied retroactively to Claimants, **when it cannot**. In raising these arguments, Valve purposefully fails to mention two relevant footnotes contained in Vorys' Motion that clarifies that Vorys was not acting on behalf of the Claimants when filing its Motion to Lift the Stay, and, even though Vorys quoted certain language from Valve's revised SSA in its Motion, Vorys also made clear that it was not conceding in any manner that the forum selection clause of the revised SSA could be applied retroactively to Claimants here.[2]

---

[1] While Valve could have easily fleshed out its jurisdictional argument in its letter to AAA with minimal effort, as the issues Valve now raises before the AAA were extensively briefed by the parties in their respective mediation statements, Valve instead tactically chose only to make bare-boned, unsupported, conclusory arguments in its letter thereby waiving the issue. *See e.g.*, *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990):

> [...] issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. As we recently said in a closely analogous context: Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.

*Id.*

[2] For example, in n.1 of Vorys' Motion to Lift the Stay, Vorys indicates that it is bringing its Motion on behalf of Consumer Plaintiffs Sean Colvin, Susann Davis, Hope Marchionda, Everett Stephens (who are not arbitration Claimants here) but that Mr. Ryan Lally is not included in Vorys' Motion, as he commenced and is currently involved in arbitration proceedings against Valve, consistent with this Court's October 2021 Order. *See* Ex. 3 to Valve's Feb. 13, 2025 Letter at n.1. And while Vorys states that the Motion is also brought on behalf of the "putative class," no consumer class has yet been certified, thus Claimants here are not part of any class and even if a consumer class is eventually certified, Claimants will have the right to opt-out. Thus, Vorys' Motion simply cannot be attributed to any Claimants, all of whom had nothing to do with Vorys' court filing. Likewise, Valve fails to mention that Vorys specifically did not concede that Valve's Revised SSA applies retroactively to any Claimants pursuing arbitration. To the contrary, n.2 of Vorys' Motion specifically states that "[w]hether the changes [to Valve's Revised SSA] can apply retroactively to any dispute commenced by an individual consumer under the previous terms of the SSA is an open question; in any event, these movants have not commenced an arbitration proceeding and thus agree that their claims should now proceed." Thus, Vorys' Motion to Lift the Stay in the class action case was not filed on behalf of any Claimants here nor can Vorys' statements be attributed to any Claimants here, contrary to what Valve implies in its letter to AAA. Simply stated, Claimants here are not pursuing claims against Valve in multiple forums as they are currently only pursuing their individual claims against Valve in this arbitration.

Cheryl Florio
Director of ADR Operations
Page 4
February 14, 2025

### ***AAA Has Ruled that the Issue of Whether Valve's Arbitration Clause Is Enforceable Is not a Process Issue, but an Issue for the Merits Arbitrators once they are Assigned to Claimants' Arbitrations.***

Valve makes the baseless argument that:

> Current counsel for Claimants has no legitimate basis to argue that these proceedings should not be closed as they previously requested the appointment of a Process Arbitrator "to address whether the arbitration clause in the Steam Subscriber Agreement is enforceable," asserting that "a decision on this issue will affect each individual Claimant's obligation to arbitrate their disputes with Valve." (Ex. 6 at 1-2 (emphasis added).) That issue has now been resolved and as a result Valve has removed the arbitration agreement from the SSA.

Valve is wrong on all counts. The AAA previously determined that the issue of whether the arbitration clause in the subscriber agreement is enforceable or not is not an issue for the Process Arbitrator, but an issue for the Merits Arbitrator. *See* Exhibit A hereto, AAA's 05/14/2024 Letter from Meirav Werbel stating:

> In Claimants' submission, they request that a Process Arbitrator be appointed to determine the Reimbursement of AAA Filing Fees, the Enforceability of the Arbitration Agreement and the Scope of Discovery. In addition, they oppose the appointment of a Process Arbitrator to determine a prospective Motion to Dismiss by Respondent. In Respondent's submission, they oppose the appointment of a Process Arbitrator on each of the issues identified by Claimants and confirmed that they are not seeking a Process Arbitrator to rule on a prospective Motion to Dismiss.

> After careful review of the parties' submissions and MA-6 of the Mass Arbitration Supplementary Rules, effective August 1, 2023, the AAA has determined the issues submitted are not administrative issues and can be presented to Merits Arbitrators upon their appointment. Therefore, the AAA will not appoint a Process Arbitrator to hear and determine the issues submitted by the 14,911 individual claimants whose demands for arbitration were received on December 6, 2023, December 12, 2023 and December 19, 2023.

> Claimants' previous request for AAA to appoint a Process Arbitrator is not in any way inconsistent with Claimants' argument that Valve's arbitration agreement is enforceable or that the Revised SSA does not apply to Claimants. Moreover, Valve's attempt to remove the arbitration agreement from its SSA through its Amended SSA does not resolve the issue of enforceability as Valve claims, but instead merely raises additional issues relating to enforceability such as which version of Valve's SSA is applicable to Claimants, whether Valve could unilaterally withdraw the arbitration agreement after Claimants initiated arbitration, whether Valve's conduct is unconscionable as applied to Claimants, and whether Valve's unilateral modification clause is unconscionable or renders Valve's SSA illusory. Here the parties have not briefed the issue of

Cheryl Florio
Director of ADR Operations
Page 5
February 14, 2025

unconscionability and there has been no ruling by AAA regarding the enforceability of Valve's arbitration agreement with respect to any Claimants here. There simply is no merit or support for Valve's conclusory claim that the issue of enforceability of Valve's arbitration agreement has been resolved by virtue of Valve's removal of the arbitration clause from its latest version of its SSA which only raises more issues and resolves nothing.

### *Rulings Issued by Arbitrators in Four Other Individual Arbitrations that Claimants Were not Involved in Cannot be Enforced Against Claimants Here.*

Valve asserts that Valve's "arbitration agreement has been deemed unenforceable in four other individual arbitrations against Valve." But Valve fails to explain or provide any support as to why a ruling in four similar but unrelated individual arbitrations that neither Claimants nor their counsel were involved in, and have never even seen, would be applicable here, let alone dispositive of Claimants' arbitrations against Valve. It would be substantively unconscionable to impose a decision made by a single arbitrator in unrelated cases upon the arbitration claims of tens of thousands of Claimants whose claims were not before that arbitrator and who had no opportunity to be heard on the issue. By doing just that, Valve seeks to deny Claimants of their contractual right to proceed with individual binding arbitration and has violated the due process rights of those who have already filed claims with AAA or noticed Valve as required by the Valve's original SSA. As Valve admits, its decision to "update" the SSA was prompted by the decision of a single arbitrator who had been assigned four individual arbitration cases brought by counsel for a separate group of claimants.

Although this opinion has not been publicly disclosed, Valve has stated that the arbitrator held that, with respect to those four individual arbitrations, the original SSA was not enforceable. *See* Valve's Status Report, *In re Valve Antitrust Litig.*, No. 2:21-cv-00563-JNW (W.D. Wash. Sept. 27, 2024), ECF No. 362 (stating "On July 8, 2024, an arbitrator ruled that the arbitration agreement in the prior SSA was unenforceable and dismissed arbitrations brought against Valve by John Elliott and three other individuals represented by Bucher Law PLLC ("Bucher Law")). None of the Claimants here, however, have brought the issue of enforceability before a Merits Arbitrator and no decisions binding on any of them have been made. Yet, by updating the SSA, Valve has elevated a singular arbiter's decision affecting four claimants in other arbitrations represented by other counsel to the law of the case. This it cannot do. "It is black-letter law that binding litigants to the rulings of cases in which they have no right to participate – let alone case[s] [sic] of which they have no knowledge – violates basic principles of due process." *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 684 (9th Cir. 2024) (citing *Hansberry v. Lee*, 311 U.S. 32, 40–43 (1940)). The Current SSA, founded on a decision with which Claimants played no part, is fundamentally unfair and therefore substantively unconscionable.

### *Valve Failed to Disclose Other AAA Rulings Against Valve that Denied the Exact Same Jurisdictional Issues Valve Raises Here.*

Valve cherry-picks the evidence it provides to AAA to support its baseless request for AAA to administratively close Claimants' arbitrations due to a purported lack of jurisdiction. Whereas

Cheryl Florio
Director of ADR Operations
Page 6
February 14, 2025

the entire premise of Valve's challenge to AAA's jurisdiction is that it was bound to an AAA arbitrator's finding the SSA's arbitration clause unenforceable, Valve does not see fit to disclose contrary rulings by other AAA merits arbitrators that would—if binding—be dispositive on this jurisdictional question.

Claimants are generally not privy to the docket of AAA arbitrations to which they're not a party. Hence, the due process violation in binding them to such orders. But at least one AAA arbitrator has already thoroughly considered Valve's jurisdictional argument and ruled that it fails in a publicly available order. The arbitrator held that Valve's Revised SSA cannot be retroactively applied to force claimants with arbitration claims against Valve back to court to litigate their claims. *See* Arbitrator Janice L. Sperow's Nov. 13, 2024 Ruling issued in the AAA arbitration cases captioned as *24 Individual Claimants v. Valve Corp. d/b/a Steam, respondent* (denying Valve's jurisdictional motion and rejecting Valve's attempt to force claimants pursuing arbitration against Valve back to Court due to Valve's Revised SSA), attached hereto at Exhibit B.

Claimants incorporate arbitrator Sperow's ruling by reference for purposes of this letter, as if the same were fully stated herein. A summary of some of the key findings in Arbitrator Sperow's ruling, which is too lengthy to fully detail here, include:

- **<u>Judicial Estoppel</u>**

Arbitrator Sperow found that judicial estoppel prohibits Valve from reversing course and now claiming the arbitration provision from the Superseded SSA is no longer in effect and thus deprives AAA of jurisdiction to proceed with the arbitrations against Valve. *See id.* 16–17. As set forth by Arbitrator Sperow "The judicial estoppel doctrine precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position." *Id.* at 16 (citing *Bartley-Williams v. Kendall*, 134 Wash. App. 95, 98, 138 P.3d 1103 (2006)). As further noted by Arbitrator Sperow:

> [Valve] has presented inconsistent positions to the Court, the AAA, and this tribunal. First, it told the Court that claimants had to vindicate their rights in binding individual arbitration given its enforceable SSA1 arbitration agreement. The Court agreed and compelled arbitration of the consumers' claims. Claimants commenced these arbitration cases because respondent represented to the Court that they had to. Now, respondent claims its SSA1 arbitration agreement is unenforceable, a position clearly inconsistent with its earlier position that "all consumer signatories of the SSA must assert their claims individually in arbitration." [...] For this tribunal to now find that same SSA1 unenforceable seems contrary to the law of the case.

*Id*.

- **<u>Consent</u>**

Arbitrator Sperow outright rejected Valve's argument that "that the tribunal [AAA] cannot force [Valve] to arbitrate when it no longer consents to arbitration." Instead, Arbitrator Sperow

Cheryl Florio
Director of ADR Operations
Page 7
February 14, 2025

held that "while the parties may always jointly and mutually agree to litigate rather than arbitrate, [Valve] may not unilaterally and retroactively rescind its consent to arbitrate once the other party initiates the agreed upon arbitration." *Id.* at 19.

- **Unenforceable Unilateral Modification**

Arbitrator Sperow found that unilateral modification clauses contained in both the Superseded SSA and Revised SSA that purportedly allows Valve to unilaterally remove the arbitration clause from its SSA altogether is both unenforceable and unconscionable. Thus, Arbitrator Sperow refused to enforce the unilateral modification clause of the Superseded SSA retroactively against the claimants. As noted by Arbitrator Sperow:

> Most courts refuse to enforce adhesion arbitration agreements with [unilateral modification] clauses or sever their unilateral modification clauses on a variety of grounds, such as lack of consideration, illusory promise, indefiniteness, or unconscionability. *See, e.g.*, *Al-Safin v. Circuit City Stores, Inc.*, 394 F.3d 1254, 1262 (9th Cir. 2005); *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002); *Floss*, 211 F.3d at 316; *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir. 1999). The Arbitrator agrees that the retroactive application of this clause to claimants with pending arbitrations is unenforceable.

> A subscriber could only reject the SSA2's new terms if it deleted its account or discontinued its use. Neither affords a consumer a realistic option when they have already purchased licenses for games housed on the Steam platform for which respondent will not refund their fees. Under these circumstances, the Arbitrator finds the unilateral modification clause unconscionable as applied retroactively to claimants with pending arbitrations. *See Heckman v. Life Nation Entertainment Inc.*, No. 23-55770, D.C. No. 2:22-cv00047-GW-GJS, at *18-19 (9th Cir. Oct. 28, 2024) (finding retroactive unilateral modification of arbitration agreement unconscionable).

> Accordingly, the Arbitrator will not enforce SSA1 Section 8.B as to claimants.

*Id.* at 20.

- **Good Faith and Fair Dealing**

Arbitrator Sperow found that the Covenant of Good Faith and Fair Dealing also prohibits Valve from applying unilateral modifications to the SSA retroactively to Claimants. As correctly noted by Arbitrator Sperow, "All contracts, including arbitration agreements, contain an implied covenant of good faith and fair dealing prohibiting the parties from denying the other party the benefit of their agreement in bad faith." Based on her review of persuasive authority, Arbitrator Sperow, agreed that "that the implied covenant of good faith and fair dealing prohibits a party from unilaterally changing an agreement to apply retroactively to known or accrued claims because it would interfere unreasonably with the other party's expectations of how the parties would resolve

Cheryl Florio
Director of ADR Operations
Page 8
February 14, 2025

their dispute." *Id* at 20–21 (citing *Cobb v Ironwood Country Club*, 233 Cal. App. 4th 960 (2015), *Avery v Integrated Healthcare Holdings, Inc.*, 218 Cal. App. 4th 50, 61 (2013)); *Peng v First Republic Bank*, 219 Cal. App. 4th 1462, 1474 (2013); *Serpa v. Cal. Sur. Investigations, Inc.*, 215 Cal. App. 4th 695, 706 (2013); *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1465 (2012); *Kim v. Allison*, 87 F.4th 994, 1001 n.7 (9th Cir. 2023)).

Arbitrator Sperow also rejected Valve's reliance on *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, No. ML 15-2668 PSG (JEMx), 2021 WL 2350814, at *4 (C.D. Cal. Apr. 20, 2021) to support its position that courts routinely apply amended dispute resolution provisions retroactively. While Arbitrator Sperow distinguished the NFL case on numerous grounds, Arbitrator Sperow found it significant that "unlike the consumers in the *NFL* case, who had other ways to view the NFL games even if they did not agree to the revised arbitration agreement, [Valves'] subscribers have no other way to access their Steam platform, games, and wallet unless they agree to the SSA2. And, if they do not agree, they must delete or discontinue use of their accounts and all the games and licenses contained in them." *See* Arbitrator Sperow's ruling at 22. Based on these critical differences, Arbitrator Sperow ruled "that respondent would violate the implied covenant of good faith and fair dealing if it applied the SSA1's unilateral modification clause retroactively to these pending arbitrations."

- **Equitable Estoppel**

Arbitrator Sperow ruled that equitable estoppel precludes Valve from taking one position, (*i.e.*, that the claims have to be arbitrated) and then taking another position (*i.e.*, that Claimants must sue in Court) after Claimants initiated arbitrations in good faith and in reliance on Valve's position. *See Id.* at 22 (citing *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042 (9th Cir. 2009), and *Saunders v. Lloyd's of London*, 779 P. 2d 249 (Wash. 1989)).

Valve has indeed improperly taken inconsistent positions. As noted by Arbitrator Sperow, "Respondent's message to its subscribers, the District Court, the AAA, claimants' counsel, and this tribunal was singular: these cases and all subscriber disputes belong in arbitration. Now, respondent insists that the AAA has no jurisdiction over these arbitrations, and claimants must return to the District Court where they began three years ago." *See* Exhibit B at 22–23.

Arbitrator Sperow also found that the claimants before her reasonably relied on the Superseded SSA and Valve's representations in bringing their arbitration claims against Valve. Arbitrator Sperow noted that "Claimants did exactly what respondent told them to do: they filed individual arbitrations before the AAA. They submitted their filing fees, expended their resources, filed their motions, sought their discovery, and arbitrated these cases *with* respondent for 14 months. During that entire time, both parties treated the AAA as the forum for their consumer disputes." *Id*. at 23.

Thus, Arbitrator Sperow found "that claimants will suffer significant injury should [Valve] now be allowed to insist [claimants] return to Court." As noted by Arbitrator Sperow, "Claimants will essentially have wasted over a year's worth of work, attorney time, case preparation, and

Cheryl Florio
Director of ADR Operations
Page 9
February 14, 2025

arbitration strategy. Claimants would incur new court costs simply to file their suits. They would lack the SSA1's fee shifting provision, which guaranteed attorneys' fees for consumers but severely limited Valve's ability to collect them against the consumer." Thus, Arbitrator Sperow found this type of unfair and inefficient outcome is "precisely the reason Courts created the equitable estoppel doctrine in the first instance." *Id.* at 23.

Based on the forgoing, Arbitrator Sperow ruled that equitable estoppel precludes "[Valve] from retroactively applying the SSA2 to these claimants and their pending arbitrations." *Id.* at 23.

- **Valve's Attempt to Retroactively Preclude Claimants from Proceeding in Arbitration Renders Valve's SSA Illusory.**

Arbitrator Sperow held that Valve may not modify its SSA to retroactively preclude claimants from proceeding in arbitration as doing so would render Valve's agreement with Claimants to arbitrate illusory. As noted by Arbitrator Sperow:

> If [Valve] may unilaterally retroactively change its agreement to arbitrate at any time at its discretion, without regard to claimants' accrued and pending arbitration rights, then consumer contracts would become an ever shifting playing field, changeable at the drafter's whim. Under [Valve's] position, it could arguably amend the parties' arbitration agreement after the close of an arbitration merit hearing before issuance of the award if it believed it might lose and force the consumer to start anew in court. Or, respondent could arguably amend and require arbitration years into a lawsuit and then force the plaintiff to start all over again in the arbitral forum. Under respondent's position, all consumer arbitration contracts would become meaningless because the companies could simply change them at will.

*Id.* at 24.

Accordingly, Valve's attempt to unilaterally remove the arbitration requirement by revising its SSA to now instead require its subscribers to pursue their claims against Valve in Court, can only be applied prospectively, not retrospectively. While Arbitrator Sperow "upheld the SSA1's and the SSA2's unilateral modification provisions to the extent they apply prospectively; respondent offers consumers a service and remains free to offer its service to prospective customers on the terms and conditions of its choosing" (*Id.* at 25), Arbitrator Sperow "refuse[d] to enforce as illusory and unconscionable the SSA1's and/or SSA2's unilateral modification clauses and other provisions, if any, to the extent respondent seeks to enforce them retroactively to [arbitration] claims already accrued and pending." *Id.*

- **Inconsistency with the FAA**

Arbitrator Sperow found that Valve's position is inconsistent with the FAA. As noted by Arbitrator Sperow:

Cheryl Florio
Director of ADR Operations
Page 10
February 14, 2025

> Congress enacted the FAA to reverse judicial hostility toward arbitration agreements and place them upon equal footing as other contracts. *See AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). The FAA manifests "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). When a valid agreement to arbitrate exists between parties and covers the matter in dispute, the FAA commands courts to stay any ongoing judicial proceedings and compel arbitration, precisely as the District Court did here. *See* 9 U.S.C. § 3. Further, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," as a matter of federal law. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25.

Id. at 24-25.

As equally applicable here, Arbitrator Sperow, noted "Retroactive application of an unrestricted unilateral modification clause to thwart a pending arbitration does not put arbitration upon 'equal footing' with other contracts but instead allows the drafter to not just "forum shop" but to 'forum hop.'" Id. at 25. Thus, Arbitrator Sperow held that "consistent with the FAA's strong federal policy favoring arbitration, respondent's unilateral changes can only apply to claims filed after its effective date because to do otherwise would destroy arbitration envisioned by the FAA as a meaningful, genuine, and non-illusory alternative dispute resolution process." *Id.*

- **An AAA Merits Arbitrator Has Found that *Coinbase* Is Distinguishable and thus not Controlling Here.**

Valve erroneously argues that "To the extent there is any dispute over which version of the SSA applies to Claimants' underlying claims, that is for a court—and not an arbitrator—to decide under the Supreme Court's controlling decision in *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024). But Valve has failed to develop this bareboned argument thereby waiving it. *See* n.1. Moreover, Arbitrator Sperow has addressed this same issue and determined that *Coinbase* is distinguishable from the situation presented here and thus refused to apply *Coinbase* to Valve's attempts to revise its SSA.

First, Arbitrator Sperow determined that "Under the FAA, the parties thus clearly and unmistakenly delegated arbitrability issues to the arbitrator in the SSA1" and that "the District Court held that the parties' SSA1 valid delegation clause delegated these gateway issues to the arbitrator." *Id* at 10. Arbitrator Sperow also found that the District Court already held that the parties agreed to arbitrate their disputes and to delegate gateway issues to the arbitrator. As noted by Arbitrator Sperow:

> Here, the District Court already held that the parties agreed to arbitrate their disputes and to delegate gateway issues to the arbitrator: "the Court must enforce the parties' agreement to have an arbitrator decide the broader question of whether the arbitration clause itself is unconscionable." *See Wolfire*, 2021 WL 4952220, at *2. "Accordingly, the question of

Cheryl Florio
Director of ADR Operations
Page 11
February 14, 2025

unconscionability should be determined in arbitration." *Id.*  In short, the District Court already found SSA1's delegation clause enforceable. Further, the delegation clause survives the SSA1's termination or expiration. *See* SSA1 at § 9.D. Accordingly, an arbitrator must adjudicate all disputes regarding its enforceability in the first instance.

*Id.* at 12.

Next, Arbitrator Sperow considered and rejected Valve's same argument raised here "that under the United States Supreme Court's recent *Coinbase v. Suski* decision, only the court can decide the parties' jurisdictional dispute." *Id.* at 12. After reviewing the extensive factual differences between the two agreements at issue in *Coinbase* and Valve's SSAs here,[3] Arbitrator Sperow held that that *Coinbase* was distinguishable from the situation presented here and thus "conclud[ed] under *Coinbase*, an arbitrator may decide the jurisdictional dispute in a proceeding

---

[3] For example, Arbitrator Sperow noted "that *Coinbase* involved a conflict between two fundamentally different contracts governing two different relationships and two different subject matters between the parties" while "Here, these arbitrations involve a conflict between two versions, an earlier version and a later version, of the same agreement governing the same relationship and same subject matter between the same parties . . ." *See* Ex. B, Sperow Jurisdiction Order at 12. In addition, "In *Coinbase*, the parties entered two contracts covering the resolution of different disputes between the parties, whereas here, the parties entered a single contract covering the resolution of the same disputes, which respondent then updated through amendment." *Id.* In *Coinbase* "The Court held that "the parties had agreed to send sweepstakes disputes to court, not arbitration." *Id.*

> By contrast, here, the parties intended to send all disputes and claims (other than piracy, theft, and intellectual property) to arbitration to the maximum extent legally permissible. *See* SSA1 at § 11.A. The parties also intended their arbitration agreement to survive the SSA1's expiration or termination. Under *Coinbase's* logic then, "the parties agreed to arbitrate all subsequent arbitrability disputes." The Arbitrator therefore concludes that, under *Coinbase*, an arbitrator may decide the jurisdictional dispute posed by two different versions of the same agreement already before the tribunal."

*Id.* (citations omitted).

> Arbitrator Sperow also noted "Coinbase also differs procedurally and temporally from these proceedings." *Id*. In *Coinbase* the dispute between the parties arose after the parties had entered into both agreements, while here:

> Unlike in *Coinbase*, the disputes here did not commence after the parties had already entered two conflicting contracts which required the Court to ascertain whether the parties had agreed to arbitrate their sweepstakes-related as opposed to user-related disputes before compelling the matter to arbitration. Instead, respondent here already compelled arbitration of the parties' disputes; the parties have already been arbitrating them in respondent's chosen forum for over a year; and then respondent strategically manufactured the current conflict when it created new terms designed to remove the AAA's arbitral jurisdiction. The Arbitrator finds these procedural and temporal differences critical and therefore concludes that, under *Coinbase*, an arbitrator may decide the jurisdictional dispute in a proceeding already pending before the tribunal when a party alleges that the tribunal no longer has the jurisdiction it previously conferred upon it.

*Id.* at 14.

Cheryl Florio
Director of ADR Operations
Page 12
February 14, 2025

already pending before the tribunal when a party alleges that the tribunal no longer has the jurisdiction it previously conferred upon it." *See Id.* at 14.

For all of the above reasons, and the reasons in Arbitrator Sperow's ruling denying Valve's same jurisdictional arguments raised here, Valve's bare-boned conclusory request for AAA to administratively close these Arbitrations is unfounded and must be denied.

### ***Valve's Threat of an Anticipatory Breach Is not a Reason to Close Claimants Files.***

Valve telegraphs to AAA that it intends to refuse to pay any additional invoices issued by AAA, because there purportedly is no longer any arbitration agreement, as a ploy to discourage AAA from proceeding with these arbitrations and/or actually assessing arbitration fees to Valve. However, AAA should ignore Valve's threat of anticipatory breach and continue with these arbitrations including the invoicing of fees. The remedies for failure to pay fees under Rule 54 and any other remedies that Claimants could pursue against Valve won't be triggered until there is an actual failure to pay fees that have been invoiced by AAA. *See* Rule 54 of the Consumer Rule, "Remedies for Nonpayment," which indicates that the various R-54 Remedies for Nonpayment in the Consumer Rules are triggered once a party fails to pay fees that were assessed, not due to a claim of a party that it will refuse to pay future fees that haven't been assessed yet.

Specifically, Consumer Rule 54 provides that the remedies provided for in the Rule only become applicable when actual fees assessed have not been paid.  For example, the remedies provided under Rule 54(a) is applicable "[i]f arbitrator compensation or administrative charges have not been paid in full." The remedies provided under Consumer Rule 54(b) apply "[o]nce the AAA informs the parties that payments have not been received," the remedies of Consumer Rule 54(c) apply "[u]pon receipt of information from the AAA that full payments have not been received," and the remedies provided pursuant to Consumer Rule 54(d) apply "[i]f arbitrator compensation or AAA administrative fees remain unpaid after a determination to suspend an arbitration due to nonpayment."

Based on the above, AAA should continue moving these arbitrations forward as Valve's suggestion of anticipatory breach of its fee obligations is insufficient to trigger the remedies under R-54 until actual non-payments of fees occur. Moreover, it cannot be known what Valve will actually do, until it receives fee invoices from AAA.

For all of the above reasons, AAA should deny Valve's Request and continue to move forward with these arbitrations, including billing Valve for AAA fees as they become due.

Sincerely,

*/s/Gary E. Mason*
Gary E. Mason

cc:    Cheryl Florio (CherylFlorio@adr.org)
       Michael W. McTigue, Jr.

Cheryl Florio
Director of ADR Operations
Page 13
February 14, 2025

      Meredith C. Slawe
      Lauren Sheller
      Jeremy Mishkin
      John G. Papianou
      Charles B. Casper
      Benjamin Goldman
      Robert E. Day
      Christopher Schenck
      Jessica Painley
      Rachel McCardell
      John Powell
      Kendra Baisinger
      Jessica Rizzo
      Daniel Fiore
      Andrew Notaristefano
      Matthew DiMaio
      Gavin Skok
      Thomas Youngs
      Danielle L. Perry
      Theodore B. Bell
      Mari Gribble

Enclosures

# EXHIBIT A



Northeast Case Management Center
Heather Santo
Vice President
1301 Atwood Avenue, Suite 211N
Johnston, RI 02919
Telephone: (866)293-4053

May 14, 2024

Gary E. Mason, Esq.
Mason, LLP
5335 Wisconsin Avenue NorthWest, Suite 640
Washington, DC 20016
Via Email to: gmason@masonllp.com

Charles B. Casper, Esq.
Montgomery McCracken Walker & Rhoads, LLP
1735 Market Street
Philadelphia, PA 19103-7505
Via Email to: ccasper@mmwr.com

Case Number: 01-23-0005-8758

19,911 Individual Claimants[1]
-vs-
Valve Corporation

Dear Parties:

The American Arbitration Association (AAA) confirms receipt of the parties' submissions dated April 19, 2024, in which Claimants request the appointment of a Process Arbitrator, while Respondent opposes such appointment.

In Claimants' submission, they request that a Process Arbitrator be appointed to determine the Reimbursement of AAA Filing Fees, the Enforceability of the Arbitration Agreement and the Scope of Discovery. In addition, they oppose the appointment of a Process Arbitrator to determine a prospective Motion to Dismiss by Respondent. In Respondent's submission, they oppose the appointment of a Process Arbitrator on each of the issues identified by Claimants and confirmed that they are not seeking a Process Arbitrator to rule on a prospective Motion to Dismiss.

After careful review of the parties' submissions and MA-6 of the Mass Arbitration Supplementary Rules, effective August 1, 2023, the AAA has determined the issues submitted are not administrative issues and can be presented to Merits Arbitrators upon their appointment. Therefore, the AAA will not appoint a Process Arbitrator to hear and determine the issues submitted by the 14,911 individual claimants whose demands for arbitration were received on December 6, 2023, December 12, 2023 and December 19, 2023.

The next administrative step for these 14,911 individual claimants is the selection of the Merits Arbitrators. An administrative conference call is scheduled to discuss this process with the parties on **May 23, 2024** at **12:00 pm Eastern Time**. The call information is:

Telephone Number:    +1 (855) 633-2040

---

[1] In their first round of filings, Claimants filed a total of 14,911 individual demands for arbitration on December 6, 2023, December 12, 2023 and December 19, 2023. Claimants filed an additional 5,000 individual demands for arbitration on April 26, 2024.

Access Code:          2486784#

The parties should also be prepared to discuss the next administrative steps for the 5,000 additional individual demands filed by Claimants on April 26, 2024. Please note that the Mass Arbitration Supplementary Rules as effective April 1, 2024 apply to the matters received on April 26, 2024.

We encourage the parties to meet and confer prior to this call to identify any agreements between the parties that will facilitate an efficient and streamlined arbitrator selection process.

Additionally, the Case Management Fee of $1,400 for each of the 14,911 cases must be paid prior to the arbitrator selection process. An invoice will be provided separately.

I would like to remind the parties that Global Mediation is still available and the AAA has many sophisticated mediators who can help the parties resolve these cases or in the alternative, mediate the pending issues referenced above. Attached are some resumes of AAA mediators for the parties to consider.

If you have any questions, please feel free to contact me.

Sincerely,
/s/
Meirav Werbel
Senior Case Administrator
Direct Dial: (401)414-5522
Email: MeiravWerbel@adr.org

Supervisor Information: Victoria Chandler | Director of ADR Operations | e: VictoriaChandler@adr.org

cc:    Douglas Matthews
       Timothy B. McGranor
       Lauren Sheller
       Theodore B. Bell
       Kenneth J. Rubin, Esq.
       Jeremy Mishkin, Esq.
       John G. Papianou, Esq.
       Benjamin Goldman
       Kara M. Mundy, Esq.
       Danielle L. Perry, Esq.
       Robert E. Day

# EXHIBIT B



## JURISDICTION ORDER

24 individual claimants
v.
Valve Corporation d/b/a Steam, respondent

This order applies to: Case Nos. 01-23-0005-3478, 01-23-0005-3479, 01-23-0005-3480 (stayed), 01-23-0005-3481, 01-23-0005-3483, 01-23-0005-3484, 01-23-0005-3485, 01-23-0005-3487, 01-23-0005-3488, 01-23-0005-3489, 01-23-0005-3490, 01-23-0005-3491, 01-23-0005-3492, 01-23-0005-3493, 01-23-0005-3494 (stayed), 01-23-0005-3496, 01-23-0005-3498, 01-23-0005-3499, 01-23-0005-3500, 01-23-0005-3501, 01-23-0005-3502, 01-23-0005-3503, 01-23-0005-3504, and 01-23-0005-3505 before Arbitrator Janice L. Sperow.

The parties dispute the tribunal's jurisdiction. This Order adjudicates their dispute.

## PROCEDURAL HISTORY

### THE CLAIMS

Claimants assert four causes of action: (1) Monopolization of the PC Game Transaction Platforms Market in violation of the Sherman Act Section 2, 15 U.S.C. § 2; (2) Attempted Monopolization of the PC Desktop Game Transaction Platforms Market in violation of the Sherman Act Section 2, 15 U.S.C. § 2; (3) Anticompetitive Course of Conduct in violation of the Sherman Act Section 1, 15 U.S.C. § 1); and (4) violation of the Washington State Consumer Protection Act, RCW 19.86, for which they seek damages, treble damages, injunctive relief, divestiture, attorneys' fees, and costs. See 24 Amended Demands and Statement of Claims (SOC). Respondent denies the claims and asserts twenty-one affirmative defenses. See 24 Amended Answers.

### CONTROLLING AGREEMENT

The parties previously agreed that the February 24, 2022 Steam Subscriber Agreement (SSA1) constitutes their controlling arbitration agreement. See CMC1 Order, dated 06/12/24. Since then, respondent amended the SSA on September 26, 2024, removing the class action waiver and arbitration provision. See Steam Subscriber Agreement, dated 09/26/24 (SSA2). The parties now dispute which version controls.

### ORIGINAL LAWSUIT

PC game consumers and a game distributor filed a putative class action on April 27, 2021 in the United States District Court for the Western District of Washington, alleging that respondent uses anticompetitive practices and monopoly power to inflate prices on games sold and distributed through the Steam platform and store. See Wolfire Games LLC v. Valve Corp., No 2:21-cv-00563-JCC (W.D. Wash. filed Apr. 27, 2021). On June 23, 2021, respondent moved to compel the consumer plaintiffs to arbitrate their claims pursuant to the SSA1's arbitration

agreement and to stay the distributor litigation pending arbitration. Claimants objected on the grounds of the arbitration agreement's unconscionability. The District Court granted respondent's motion to compel the consumers to arbitration and denied its motion to stay the distributor litigation pending arbitration. See Wolfire Games, LLC v. Valve Corp., No. C21-0563, 2021 WL 4952220, at *1 (W.D. Wash. Oct. 25, 2021); In re Value Antitrust Litigation Order, dated 10/25/21.

The Court deferred the enforceability of SSA1's arbitration agreement to the arbitrator for adjudication, explaining "the Court must enforce the parties' agreement to have an arbitrator decide the broader question of whether the arbitration clause itself is unconscionable." See Wolfire, 2021 WL 4952220, at *2. "Accordingly, the question of unconscionability should be determined in arbitration." Id. The Court then stayed the consumer claims pending arbitration. Id. at *3. On July 22, 2022, the Court consolidated Wolfire with a related action, Dark Catt Studios et al. v. Valve Corporation, No. 2:21-cv-00872-JCC (W.D. Wash.), and recaptioned the consolidated action In re Valve Antitrust Litigation.

## ARBITRATION DEMANDS

Claimants initiated these 24 arbitrations, along with 973 others, before the American Arbitration Association (AAA) on October 2, 2023. Claimants' counsel has pending a total of approximately 5,028 arbitration demands.

## FIRST OBJECTION TO JURISDICTION & MOTION TO DISMISS

On December 23, 2023, before the appointment of merits arbitrators, respondent moved to dismiss for lack of jurisdiction to preserve its objection. See Respondent's Motion to Dismiss for Failure to Follow Filing Requirements and Lack of Jurisdiction Under Rule 14, and for Reimbursement of Costs, dated 12/23/23.

## SECOND OBJECTION TO JURISDICTION

After disclosures and an opportunity for objections, the AAA appointed the undersigned to serve as the merits arbitrator for 25 individual consumer arbitrations, one of whom has since withdrawn his demand. See Bucher Email, dated 07/02/24. The Arbitrator held a Preliminary Hearing and Initial Arbitration Case Management Conference (CMC1) via telephone conference on June 12, 2024 pursuant to Rule 21 of the AAA Consumer Arbitration Rules. See CMC1 Order, dated 06/12/24.

At the CMC1, the parties disputed, inter alia, the applicable substantive law and the forum's jurisdiction. See id. The parties continued to dispute jurisdiction even though the District Court granted respondent's motion to compel arbitration. The Arbitrator requested that the parties provide a copy of the motion to compel and corresponding order. See id. Claimants provided the briefs and order on August 8, 2024. See Bucher Email, dated 08/08/24.

Respondent agreed that the claims are arbitrable but argued that the tribunal lacks jurisdiction due to claimants' alleged failure to satisfy the contract's conditions precedent to arbitration, whereas claimants posited that they satisfied all conditions precedent but reserved the right to argue for the court's jurisdiction should respondent challenge this forum's jurisdiction. See id. During the conference, both parties confirmed that the claims are arbitrable, subject to binding

2

arbitration, and properly before the AAA. See id. The parties also agreed that the arbitration raised no gateway issues other than jurisdiction and choice of law. See id.

**SECOND MOTION TO DISMISS**

At the CMC1, the Arbitrator ruled that claimants may file their existing written oppositions and that respondent may seek leave to move to dismiss in response to claimants' SOCs. See id. After the CMC1, respondent filed a motion to dismiss to which claimants objected as premature and filed without leave.

**UNCONSCIONABILITY RULING**

On July 8, 2024, an arbitrator, in different but related proceedings between respondent and four other claimants represented by claimants' counsel, held respondent's SSA1 arbitration agreement unconscionable and dismissed those four arbitrations. See Jurisdictional Award, dated 07/08/24 (ruling arbitration clause unenforceable in violation of McGill).

**AMENDED PLEADINGS**

The Arbitrator also required claimants to file a statement of claim, setting forth their causes of action with specificity, after which respondent could respond by July 12, 2024. See CMC1 Order, dated 06/12/24. Claimants filed their amended demands on June 30, 2024, and respondent filed its amended answer on July 12, 2024. See 24 Amended Answers, dated 07/12/24. Respondent did not seek leave to move to dismiss the claims by the July 12, 2024 deadline. However, it preserved its jurisdictional challenges in its Amended Answers. See id. Therefore, the Arbitrator requested clarification from respondent by August 2, 2024 on the following issues: (1) did respondent continue to object to the tribunal's jurisdiction; and (2) if so, did respondent intend to rely on its original motion to dismiss, seek leave to file a dipositive motion by the November 1, 2024 deadline, adjudicate the issue at the merits hearing, or propose an alternative procedure for adjudication of the jurisdictional issues. See CMC2 Order, dated 07/27/24.

**THIRD OBJECTION TO JURISDICTION & DISCOVERY DISPUTES**

The Arbitrator held a second Case Management Conference (CMC2) on July 26, 2024 to resolve the parties' disputes over the initial exchange of information in these proceedings, which the parties should have completed on July 2, 2024. See id.; CMC2 Order, dated 07/27/24. At the CMC2, the parties continued to dispute, *inter alia*, jurisdiction. See id.; Goldman Letter, dated 08/02/24. After the CMC2, the Arbitrator continued to rule on discovery disputes throughout these arbitrations. See, e.g., Wishlist Discovery Order, dated 09/04/24; Second Wishlist Discovery Order, dated 09/08/24.

**FOURTH OBJECTION TO JURISDICTION**

On August 2, 2024, respondent clarified that it continued to object to jurisdiction and proposed a briefing schedule. See Letter, dated 08/02/24. The Arbitrator took the request under advisement and awaited claimants' position. See Sperow Email, dated 08/03/24. Claimants did not respond to the request within 24 hours as required by protocol. See CMC1 Order, dated 06/12/24. Claimants later objected to any continuances but never specifically addressed respondent's

3

proposed briefing schedule on its jurisdictional challenge. <u>See</u> Bucher Email, dated 08/08/24.

Claimants argued that they had assumed that respondent no longer planned to challenge jurisdiction given that it had filed amended answers on July 12, 2024 in lieu of a motion to dismiss on jurisdictional grounds. Respondent's amended answers, however, specifically reserved its jurisdictional objection and its August 2, 2024 letter requested leave to move to dismiss for lack of jurisdiction. <u>See</u> 24 Amended Answers, dated 07/12/24; Letter, dated 08/02/24.

## FIRST STAY REQUEST

Respondent appointed new lead counsel for these cases on August 6, 2024. <u>See</u> Day Email, dated 08/08/24. New counsel requested a stay or postponement of the third Case Management Conference (CMC3) scheduled for August 9, 2024 and continuation of several due dates to permit it to get up to speed on the cases. <u>See</u> McTigue Email, dated 08/08/24; Day Email, dated 08/08/24. Claimants objected to any continuance. <u>See</u> Bucher Email, dated 08/08/24. The Arbitrator denied the request to vacate the CMC3 and instead held it to discuss the schedule. The Arbitrator held the CMC3 via telephone conference on August 9, 2024. <u>See</u> CMC3 Order, dated 08/11/24. The Arbitrator set new deadlines and afforded new counsel additional time to, *inter alia*, challenge jurisdiction. <u>See</u> id.

Given the change in counsel, respondent's request of August 2, 2024, and its reservation of its objection, the Arbitrator granted new counsel until August 16, 2024 to clarify if respondent wishes to challenge jurisdiction. On August 16, 2024, respondent sought leave to move to dismiss for lack of jurisdiction. <u>See</u> CMC3 Order, dated 08/11/24; Day Letter, dated 08/16/24. The Arbitrator granted the request and ordered the parties to file simultaneous opening briefs on the jurisdictional issues on August 23, 2024 and responsive briefs on August 30, 2024. <u>See</u> Sperow Email, dated 08/19/24. The Arbitrator also permitted claimants to challenge the arbitration agreement as unconscionable, an issue the District Court had reserved to the arbitrator. <u>See</u> Sperow Email, dated 08/19/24; <u>In re Value Antitrust Litigation</u> Order, dated 10/25/21. To save costs, the Arbitrator also permitted the parties to resubmit their prior briefing on the jurisdictional issues, at their option.

## PROTECTIVE ORDER

At the CMC1, CMC2, and again at the CMC3, the Arbitrator granted respondent's request for a protective order in these cases and invited the parties to meet and confer on its terms. <u>See</u> CMC2 Order, dated 07/27/24; CMC3 Order, dated 08/11/24. When the parties could not agree on terms, each submitted their proposals to the Arbitrator for consideration. <u>See</u> Day Letter, dated 08/16/24; Goldman Email, dated 08/16/24; Bucher Email, dated 08/20/24. The Arbitrator issued a protective order on August 20, 2024. <u>See</u> PO, dated 08/20/24. Respondent thereafter produced claimant specific data; third-party aggregator data; and the standard Steam Distribution Agreement in effect during the applicable statute of limitations period, through secure online, password protected link on August 21, 2024 subject to the protective order. The Arbitrator also conducted two *in camera* reviews of disputed redactions and withheld documents. <u>See</u> Order on *In Camera* Production, dated 09/04/24; Second Order for *In Camera* Production, dated 09/07/24; *In Camera* Report, dated 09/09/24; *In Camera* Report 2, dated 10/29/24. Since the issuance of the protective order, respondent requested modifications to which claimants object. The Arbitrator has taken the issue under submission and will rule on

4

respondent's request by separate order.

## THIRD-PARTY HEARING SUBPOENAS

On August 8, 2024, claimants requested three third-party hearing subpoenas for Microsoft, Epic, and Wolfire. See Bucher Email, dated 08/08/24. The parties and the Arbitrator discussed the request at the CMC3. See CMC3 Order, dated 08/11/24. The Arbitrator set a deadline for comments and objections. Id. Pursuant to that order, respondent submitted its objections to claimants' request on August 23, 2024. See Tavakoli Email, dated 08/26/24. Claimants filed their response to respondent's objections on August 30, 2024. See Bucher Email, dated 08/30/24; Paul Response, dated 08/30/24. The parties disputed both the content of the requests and the format of the hearings. On September 4, 2024, the Arbitrator granted claimants' request for the third-party subpoenas and ordered in person hearings subject to the third-party's right to request a videoconference hearing for its convenience. See Order on Claimants' Request for Third-Party Subpoenas, dated 09/04/24; Order on Third-Party Hearing Format, dated 09/10/24. The Arbitrator issued the three requested subpoenas on October 22, 2024. See Subpoena Duces Tecum (Wolfire), dated 10/22/24; Subpoena Duces Tecum (Epic), dated 10/22/24; Subpoena Duces Tecum (Microsoft), dated 10/22/24.

## SECOND FEDERAL CLASS ACTION

On August 9, 2024, claimants' counsel filed a federal putative class action in the U.S. District Court for the Western District of Washington captioned Elliott v. Valve Corporation. See McTigue Letter, dated 08/27/24; Comp., Elliott v. Valve Corporation, No. 2:24-cv-01218 (W.D. Wash. filed Aug. 9, 2024). Claimants' counsel brought the action in the name of the four claimants whose arbitrations had been dismissed based upon the unconscionability finding but defined a proposed class of all domestic Steam users, which would include these 24 claimants. See Elliott v. Valve Corporation, No. 2:24-cv-01218.

## THIRD MOTION TO DISMISS

On August 23, 2024, respondent moved to dismiss, filing amended briefing. See Respondent's Amended Motion to Dismiss for Failure to Follow Filing Requirements and Lack of Jurisdiction under R-14, and for Reimbursement of Costs, dated 08/23/24, submitted with Ex. A-C. Claimants requested, and the Arbitrator granted, an extension to file its opposition given the amended brief. See Bucher Email, dated 08/23/24; Sperow Email, dated 08/24/24. Claimants originally requested a four-week extension, which respondent did not oppose if all deadlines slid four weeks. See Bucher Email, dated 08/23/24; Notaristefano Email, dated 08/23/24. Claimants opposed any further delay in the information exchange. See Bucher Email, dated 08/23/23. The Arbitrator granted claimants a one-week extension and respondent an optional short reply brief. See Sperow Email, dated 08/24/23.

The Arbitrator issued a tentative ruling on August 31, 2024 based solely upon respondent's motion to provide the parties with an opportunity to (1) review the preliminary analysis; (2) submit on the tentative; (3) avoid the costs of preparing an opposition, if appropriate; and (4) argue against the tentative at the CMC scheduled for September 4, 2024, if desired. After argument, the parties accepted the tentative at the CMC4 on the September 4, 2024. See CMC4 Order, dated 09/04/24. The Arbitrator thereafter denied respondent's motion, finding that, (1) the parties "clearly and unmistakenly" delegated arbitrability issues to the arbitrator when

5

they delegated "all disputes and claims" between them (except for intellectual property, piracy, and theft) to the arbitrator and incorporated the AAA rules delegating gateway issues to arbitrators to the "maximum extent permitted by applicable law," see SSA1 at § 11.A; (2) the AAA Consumer Rule 14 authorized the Arbitrator to determine jurisdiction, the contracts' validity, the contracts' scope, the contracts' enforceability, and the parties' related disputes, see AAA Con. Arb. Rules, R-14(a)-(c); see also In re Value Antitrust Litigation Order, dated 10/25/21; (3) Section 11.B of the SSA1 is non-jurisdictional and that failure to comply with its requirements does not strip the AAA or the tribunal of jurisdiction, see SSA1 at § 11.B; (4) at a minimum, claimants raised disputed issues of material fact regarding their satisfaction of Section 11.B – issues wholly inappropriate for resolution on a motion to dismiss; (5) at a maximum, claimants satisfied their contractual prerequisites; (6) claimants' original demands satisfied R-2's requirements, see 24 Demands; and that (7) the sufficiency of claimants' demands was moot as claimants had since filed their amended demands describing their claims in detail and incorporating by reference the Second Amended Consolidated Class Action Complaint in the related federal action, which claimants attached as an exhibit to their amended demands. See 24 SOC; Order on Motion to Dismiss, dated 09/04/24.

**SECOND STAY REQUEST**

On August 27, 2024, respondent moved for a stay of these arbitrations due to the overlapping federal putative class action filed by claimants' counsel in the U.S. District Court for the Western District of Washington captioned Elliott v. Valve Corporation, No. 2:24-cv-01218. See McTigue Letter, dated 08/27/24. Respondent requested all hearings and deadlines be held in abeyance, with the parties to provide a status report in thirty days. Id. Claimants opposed the motion as another delay tactic prejudicial to their rights to proceed to the merits of their cases. See Bucher Email, dated 08/28/24. Respondent renewed its request on August 29, 2024 and September 6, 2024 with supporting authorities. See McTigue Letter, dated 08/29/24; McTigue Letter, dated 09/06/24.

The Arbitrator held a fourth Case Management Conference (CMC4) via telephone conference on September 4, 2024 pursuant to Rule 21 of the AAA Consumer Arbitration Rules to resolve several outstanding discovery disputes and permit oral argument on multiple motions. During the CMC4, the parties argued at length the need for and propriety of a 30-day stay. Although normally against delay, the Arbitrator took the motion under submission to deliberate further on the best course of action to protect both sides' rights under these unique circumstances. In the meantime, the Arbitrator invited the parties to submit any argument, authorities, or position papers they wished on the issue by September 6, 2024. See CMC4 Order, dated 09/04/24.

On September 4, 2024, claimants submitted In re Par, 81 F.4th 403 (5th Cir. 2023) for consideration. Respondent submitted a letter brief on September 6, 2024 in addition to their letters of August 27 and 29, 2024. Claimants also submitted a letter brief on September 6, 2024. Thereafter, the Arbitrator denied respondent's stay request and ruled that (1) the putative consumer class action overlaps with these 24 individual arbitrations with respect to counsel, proposed claimant class, respondent, causes of action, and relief sought; (2) claimants must commit in writing under penalty of perjury by September 13, 2024 that they will not seek to recover in both fora and that nothing disclosed in these arbitrations will be disclosed in the federal action; and (3) respondent would face some judicially recognized hardship or inequity by proceeding with these arbitrations at the same time as the federal court action, but not to an extent warranting a stay when weighed against claimants' countervailing equities. See Order on

Motion for Stay, dated 09/07/24.

**CONFIRMATIONS**

Thereafter, claimants confirmed both that they will not seek to recover in both these arbitrations and the class action and that they waived their right to challenge the SSA1 as unconscionable in these 24 proceedings.

**SSA1 AMENDMENT**

On September 26, 2024, respondent amended the SSA1 to remove the arbitration agreement and the class action waiver. With certain exceptions, the SSA1 requires binding individual arbitration before the AAA. See SSA1 at § 11.A. The SSA2 provides that all claims and disputes between respondent and Steam users must proceed in court, including claims and disputes that arose before respondent amended the SSA1. See SSA2 at § 10. The SSA2 also includes an integration clause, providing that it supersedes any prior oral or written agreement. Id. at § 11. Respondent notified all its domestic users by email and an in-app pop-up notification upon opening the Steam client. Respondent also posted the SSA2 on its public website in several languages and asked users to accept the SSA2 since September 26, 2024 whenever they purchased a game on Steam or funded their Steam Wallet. The email and notice advised users that the SSA2 would become effective on November 1, 2024 unless they deleted or discontinued use of their account. Respondent also provided users with a box to check to accept the updated SSA2.

**FIFTH OBJECTION TO JURISDICTION & ADMINISTRATIVE CLOSURE REQUEST**

On September 27, 2024, respondent notified the Court that it had removed the arbitration clause from the SSA1. The same day, respondent notified the AAA and the Arbitrator that (i) an arbitrator had found the SSA1's arbitration agreement unenforceable and (ii) it had since removed the arbitration agreement from the SSA1. See McTigue Letter, dated 09/27/24 to Sperow. Respondent requested that the AAA administratively close the arbitrations for lack of jurisdiction. See McTigue Letter, dated 09/27/24 to AAA; McTigue Letter, dated 10/04/24; McTigue Letter, dated 10/07/24. Also, that same day, claimants' counsel opposed respondent's request and filed 42,000 additional consumer arbitrations with the AAA.

**THIRD STAY REQUEST**

The Arbitrator granted respondent's request for a stay pending the AAA's determination on its request for administrative closure. The Arbitrator granted a two-week stay and extended it an additional week. The stay expired October 13, 2024.

**ARBITRATIONS REMAIN ADMINISTRATIVELY OPEN**

On October 7, 2024, the AAA notified the parties that it would not administratively close the pending arbitration proceedings. The AAA explained:

> The AAA serves as a neutral administrative agency. Issues of arbitrability and disputes surrounding the applicable contract should be provided to the arbitrators for review and determination. Accordingly, in the absence of an

agreement by the parties or a court order staying or closing these matters, we will proceed with administration.

As there is no agreement between the parties regarding whether these arbitration proceedings should be closed, the parties should address their positions to the merits arbitrators for determination on the 600 individual cases where a merits arbitrator is currently appointed.

See AAA Letter, dated 10/07/24. The AAA separately declined to administer the 42,000 arbitration claims filed on September 27, 2024.

## FOURTH STAY REQUEST & SIXTH OBJECTION TO JURISDICTION

On October 14 and 21, 2024, the parties and the Arbitrator held case management conferences to revisit the outstanding issues upon the lifting of the stay. At the CMC5, respondent asserted that its amended SSA2, which eliminated the arbitration provision, strips the tribunal of jurisdiction. After argument, the Arbitrator granted respondent's request for briefing on the issue but denied its request for a stay of the proceedings pending determination of the jurisdictional issue. See CMC5 Order, dated 10/14/24. The Arbitrator held that respondent reserved all rights and did not waive its jurisdictional challenge by proceeding to comply with the deadlines and submissions in these arbitrations.

## CLAIMANTS' ELECTION

Given respondent's amended SSA2, the Arbitrator ordered claimants to confirm whether they wish to proceed with arbitration. See id. The Arbitrator ruled that any claimant who wishes not to proceed may instead elect to join the putative class action filed in federal court on behalf of other subscribers. See id. The Arbitrator further ordered claimants' counsel to report the results of claimants' election by October 28, 2024 by listing three groups of claimants: (1) claimants wishing to proceed with arbitration; (2) claimants not wishing to proceed with arbitration; and (3) claimants who did not respond by the deadline. See id. The Arbitrator ruled that she would deem non-responsive claimants to wish to proceed with the *status quo* of pending arbitration. See id. The Arbitrator ruled that she would stay the arbitration of any claimant who elected to proceed in the putative class action. See id. Thereafter, two claimants elected not to proceed with arbitration, eleven claimants elected to proceed with arbitration, and eleven claimants did not respond. See id.  The Arbitrator stayed cases 01-23-0005-3480 and 01-23-0005-3494 without objection.

## PETITION TO ENJOIN ARBITRATIONS

After the CMC5, on October 18, 2024, respondent filed a petition in the United States District Court for the Western District of Washington against all claimants in the AAA arbitrations, including these 24 claimants, to enjoin them from continuing their arbitrations given its removal of the arbitration agreement from the SSA1. See McTigue Letter, dated 10/19/24; Petition to Enjoin Arbitrations, dated 10/18/24; Memorandum of Points and Authorities in Support of Petition to Enjoin Arbitrations, dated 10/18/24.

## FIFTH STAY REQUEST & SEVENTH OBJECTION TO JURISDICTION

On October 19, 2024, respondent requested an immediate stay of these proceedings pending

court action on its petition to enjoin these arbitrations or, in the alternative, leave to brief jurisdiction. See McTigue Letter, dated 10/19/24. After argument, the Arbitrator granted respondent leave to file briefing on the issue but denied its request for a stay of the proceedings. See CMC6 Order, dated 10/21/24. The parties and the Arbitrator also addressed several outstanding discovery disputes. See id.

## EX PARTE APPLICATION

After respondent began to personally serve claimants with its summons and petition to enjoin them from continuing their arbitrations, respondent received communications from some claimants, which alternately expressed confusion, a desire to withdraw their involvement, or agreement with the SSA2 terms. Respondent did not respond to these represented claimants. Instead, on November 4, 2024, respondent filed in the Western District of Washington an emergency *Ex Parte* Motion Seeking Leave to Provide Communication to Respondents. On November 8, 2024, the Court *sua sponte* denied the motion. See Order Denying Ex Parte Motion, dated 11/08/24.

## CURRENT JURISDICTIONAL SUBMISSIONS

Respondent filed its brief challenging jurisdiction on October 21, 2024, which claimants opposed on November 4, 2024. Respondent replied on November 8, 2024.

## LEGAL ANALYSIS

## APPLICABLE LAW

The parties agreed that the Federal Arbitration Act (FAA) and the AAA Consumer Rules apply to these arbitrations in addition to the terms of the parties' arbitration agreement. See CMC1 Order, dated 06/12/24; SSA1 at § 11.C. The parties disputed the applicable choice of substantive law. Respondent maintained that the SSA1 provides for Washington law to apply, while claimants argued that the SSA1 excludes arbitration from the choice of law provision. After initial briefing on the issue and claimants' subsequent assertion of Washington claims, the Arbitrator held that Washington law applies to these arbitrations. See Choice of Law Order, dated 07/01/24; see SSA1 at § 10. Under the SSA2, Washington law still applies but without reference to the FAA and the AAA Consumer Rules applicable to the now removed arbitration clause. See SSA2 at § 10.

## DECISIONMAKER: DELEGATION

The Arbitrator must first consider who determines the current gateway arbitrability issue: the Court or the arbitrator. Pinela v. Neiman Marcus Grp., Inc., 238 Cal. App. 4th 227, 239 (2015). Under federal law, courts presumptively decide arbitrability issues unless the parties have "clearly and unmistakably" delegated them to the arbitrator. Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. _, 139 S. Ct. 524, 527, 530 (2019); First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-46 (1995); Sanquist v. Lebo Automotive Inc., 1 Cal. 5th 233, 243 (2016) (parties may delegate gateway issues to arbitrator); Tiri v. Lucky Chances, Inc., 226 Cal. App. 4th 231, 241 (2014). To determine if the parties clearly and unmistakably delegated gateway issues to the arbitrator, the tribunal must interpret the terms of the arbitration agreement according to an objective standard, focusing on the parties' objective intent, as

9

evidenced by the words of the contract, rather than the subjective intent of one of the parties. DiCarlo v. MoneyLion, Inc., 988 F.3d 1148, 1152 (9th Cir. 2021); Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC, 816 F.3d 1208, 1212 (9th Cir. 2016); B.D. v. Blizzard Entertainment, Inc., 76 Cal. App. 5th 931, 943 (2022).

Under the FAA, the parties clearly and unmistakably delegate gateway arbitrability issues to the arbitrator either by expressly so stating in their contract or by incorporating by reference into their agreement arbitral rules empowering arbitrators to adjudicate such issues. See Field Intelligence Inc. v. Xylem Dewatering Solutions Inc., 49 F.4th 351, 356 n.1 (3d Cir. 2022); Communications Workers v. AT&T Inc., 6 F.4th 1344, 1347-48 (D.C. Cir. 2021); In re Checking Acct. Overdraft Litig., 856 F. App'x 238, 243 (11th Cir. 2021); Richardson v. Coverall N. Am., Inc., 811 Fed. Appx. 100 (3d Cir. 2020), cert. denied, 141 S. Ct. 1685 (2021); Blanton v. Domino's Pizza Franchising, LLC, 962 F.3d 842, 845-46 (6th Cir. 2020); McGee v. Armstrong, 941 F.3d 859, 863, 865–66 (6th Cir. 2019); Dish Network, LLC v. Ray, 900 F.3d 1240 (10th Cir. 2018); Arnold v. Homeaway, Inc., 890 F.3d 546, 548– 49, 551–52 (5th Cir. 2018); Simply Wireless, Inc. v. T-Mobile US, Inc., 877 F.3d 522, 527-28 (4th Cir. 2017), abrogated on other grounds by Henry Schein, 139 S. Ct. 524; Mohamed v. Uber Techs, Inc., 848 F.3d 1201, 1207-09 (9th Cir. 2016); Chesapeake Appalachia, LLC v. Scott Petroleum, LLC, 809 F.3d 746, 763-64 (3d Cir. 2016); Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015); Petrofac, Inc. v. DynMcDermott Petroleum Operations Co., 687 F.3d 671, 675 (5th Cir. 2012); Green v. SuperShuttle Int'l, Inc., 653 F.3d 766, 767–69 (8th Cir. 2011); Fallo v. High-Tech Institute, 559 F.3d 874, 878 (8th Cir. 2009); Awuah v. Coverall N. Am., Inc., 554 F.3d 7, 11 (1st Cir. 2009); Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366, 1373 (Fed. Cir. 2006), abrogated on other grounds by Henry Schein, 139 S. Ct. 524; Terminix Int'l Co. v. Palmer Ranch Ltd. Partnership, 432 F.3d 1327, 1332 (11th Cir. 2005); Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005); Commonwealth Edison Co. v. Gulf Oil Corp., 541 F.2d 1263, 1272-1273 (7th Cir. 1976); Ramirez v. Electronic Arts, Inc., 2021 WL 843184, at *4 (N.D. Cal. Mar. 5, 2021); Wilcosky v. Amazon, Inc., 517 F. Supp. 3d 751, 768 (N.D. Ill. 2021); accord Blizzard, 76 Cal. App. 5th at 958; Greenspan v. LADT, LLC, 185 Cal. App. 4th 1413, 1442 (2010); Gilbert Street Developers, LLC v. La Quinta Homes, LLC, 174 Cal. App. 4th 1185, 1190, 1194 (2009); see, e.g., Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 72-75 (2010) (unconscionability threshold arbitrability question).

Here, the parties originally did both: they delegated "all disputes and claims" between them (except for intellectual property, piracy, and theft) to the arbitrator and incorporated the AAA rules delegating gateway issues to arbitrators to the "maximum extent permitted by applicable law." See SSA1 at § 11.A. Under the FAA, the parties thus clearly and unmistakenly delegated arbitrability issues to the arbitrator in the SSA1. Indeed, virtually every circuit agrees that the parties' incorporation of the AAA's arbitration rules constitutes clear and unmistakable evidence that they agreed to arbitrate arbitrability. See, e.g., Oracle Am., Inc. v. Myriad Grp. A.G., 724 F.3d 1069, 1074 (9th Cir. 2013). Further, the District Court held that the parties' SSA1 valid delegation clause delegated these gateway issues to the arbitrator. In re Value Antitrust Litigation Order, dated 10/25/21.

## DECISIONMAKER: JURISDICTION TO DETERMINE JURISDICTION

The Arbitrator finds that she has jurisdiction to determine the current jurisdictional dispute as appointed by the AAA and as accepted by the parties because Rule 14 and the parties' SSA1 vest her with the authority to rule on her own jurisdiction. See AAA Con. Arb. Rules, R-14. Rule

10

14 provides:

> R-14. Jurisdiction
> (a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court.
> (b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.
> (c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

Id. at R-14(a)-(c).

Rule 14 severs the arbitration provision from the overall contract and treats it as a separate agreement for enforcement purposes. Consequently, the Arbitrator has jurisdiction under Rule 14 to determine jurisdiction, the contracts' validity, the contracts' scope, the contracts' enforceability, and the parties' related disputes. See also In re Value Antitrust Litigation Order, dated 10/25/21.

## DECISIONMAKER: SSA2 AMENDMENT

Though the parties clearly and unmistakably delegated gateway arbitrability issues to the arbitrator in their SSA1 both by expressly so stating in their contract and by incorporating by reference the AAA's Consumer Arbitration Rules, the amended SSA2 does neither. See SSA2. It neither incorporates the AAA Arbitration Rules nor an express delegation clause. See id. On the contrary, it does not reference arbitration at all except where required by law, see id. at § 10, and in the banner advising users that all disputes will now proceed in court and not arbitration. See id. at Red-Outlined Boxed Banner.

Nonetheless, the Arbitrator concludes that the SSA1's scope encompasses the present dispute over the applicable contract version. The SSA1's arbitration clause extended to all disputes and claims in any way related to or arising out of any aspect respondent's relationship with its user, including the agreement itself. See SSA1 at § 11. The current dispute questions the SSA1's continued enforceability and viability after respondent's SSA2 amendment. Thus, the parties' jurisdictional debate over which contract version governs directly triggers the SSA1's delegation clause because the SSA1 expressly delegated to an arbitrator its own enforceability and validity. See id.; see also RCW 7.04A.060 (under Washington law, arbitrator decides enforceability of contract containing arbitration clause).

Under the FAA, if the parties formed an agreement to arbitrate containing an enforceable delegation clause, "all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance." Caremark,LLC v. Chickasaw Nation, 43

F.4th 1021, 1030 (9th Cir. 2022); see Henry Schein, 139 S. Ct. at 527. Here, the District Court already held that the parties agreed to arbitrate their disputes and to delegate gateway issues to the arbitrator: "the Court must enforce the parties' agreement to have an arbitrator decide the broader question of whether the arbitration clause itself is unconscionable." See Wolfire, 2021 WL 4952220, at *2. "Accordingly, the question of unconscionability should be determined in arbitration." Id. In short, the District Court already found SSA1's delegation clause enforceable. Further, the delegation clause survives the SSA1's termination or expiration. See SSA1 at § 9.D. Accordingly, an arbitrator must adjudicate all disputes regarding its enforceability in the first instance.

## DECISIONMAKER: COINBASE v. SUSKI

Respondent maintains that, under the United States Supreme Court's recent Coinbase v. Suski decision, only the court can decide the parties' jurisdictional dispute. According to respondent, under Coinbase, the Court, and not an arbitrator, must decide whether the SSA2 superseded the SSA1. In Coinbase, the parties entered two separate contracts. First, users agreed to Coinbase's User Agreement when they created their accounts. The User Agreement contained both an arbitration and delegation clause. Second, sweepstakes-participating users agreed to the sweepstakes' Official Rules. The Official Rules contained a forum selection clause selecting California courts as the exclusive venue for dispute resolution. The Court held that "where the parties have agreed to two contracts"—one sending arbitrability disputes to arbitration, and the other sending arbitrability disputes to the courts—"a court must decide which contract governs."

The Arbitrator agrees that Coinbase shares similarities with the parties' current dispute. Both Coinbase and the cases here have conflicting dispute resolution clauses: the SSA1, like the Coinbase User Agreement, contains both arbitration and delegation clauses; while the SSA2, like the Official Rules, contains a forum selection clause selecting the Courts in Washington as the exclusive dispute resolution venue. But the similarities end there.

## Same Contract

Coinbase involved a conflict between two fundamentally different contracts governing two different relationships and two different subject matters between the parties: Coinbase's User Agreement governed the terms and conditions for using Coinbase's services and Coinbase's Official Rules governed the terms and conditions for participating in Coinbase's sweepstakes. Here, these arbitrations involve a conflict between two versions, an earlier version and a later version, of the same agreement governing the same relationship and same subject matter between the same parties – both the SSA1 and SSA2 govern the terms and conditions for using respondent's services and both explain the "rights and obligations" of respondent's same subscribers. Compare SSA1 at first sentence with SSA2 at first sentence; see Lynch Dec. at ¶3 (when an individual creates a Steam account, the individual and Valve enter a Steam Subscriber Agreement governing the customer relationship between them). The Supreme Court held that, unlike in Coinbase where the parties entered two different contracts, in cases where parties have agreed to only one contract, and that contract contains an arbitration clause with a delegation provision, then, absent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration. The Court cautioned:

> Respondents each agreed to the User Agreement, complete with the above-quoted arbitration language. *If that were the only contract at issue*, we would

12

not be deciding this case, since the Arbitration Agreement quite clearly
sends to arbitration disputes between Coinbase and its users, including
disputes about arbitrability.

These parties, though, agreed to a second contract.

(emphasis added). Here, claimants dispute they agreed to a second contract. On a motion to
dismiss, the tribunal must accept that allegation as true. See Foley v. Wells Fargo Bank, N.A.,
772 F.3d 63, 71 (1st Cir. 2014); al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009); Keniston
v. Roberts, 717 F.2d 1295, 1301 (9th Cir. 1983). Further, even under respondent's
interpretation, the parties entered one contract – the SSA; they simply dispute which version of
that one contract applies.

**Same Subject Matter**

Respondent argues that Coinbase's logic nevertheless applies here because only a court can
decide whether a subsequent contract supersedes an earlier arbitration agreement that
contains a delegation clause. The Arbitrator agrees that courts must resolve initial contract
formation disputes to determine if the parties agreed to arbitrate. See RCW 7.04A.060(2) (court
shall decide whether an agreement to arbitrate exists). However, here, the parties
unquestionably formed a contract to arbitrate – the SSA1, which the District Court already
found. The only remaining question is whether respondent may and did properly amend that
contract when it unilaterally posted the SSA2. See id. at 7.04A.060(3) (arbitrator shall decide if a
contract containing a valid arbitration agreement is enforceable).

The contracts' subject matter illustrates the important distinction between Coinbase and these
cases because in Coinbase, the parties entered two contracts covering the resolution of
different disputes between the parties, whereas here, the parties entered a single contract
covering the resolution of the same disputes, which respondent then updated through
amendment. In Coinbase, the Court considered the subject matter of the two contracts. The
Court noted that, if the parties had intended the User Agreement "to govern all agreements
moving forward, then the parties agreed to arbitrate all subsequent arbitrability disputes." The
Court then explained that, on the other hand, "if the parties meant to send sweepstakes
disputes" to California courts, then the Official Rules superseded the User Agreement as to
those disputes. The Court had to determine "whether the parties agreed to send the *given*
dispute to arbitration." (emphasis added). The Court held that "the parties had agreed to send
sweepstakes disputes to court, not arbitration." Significantly, respondents' class action
complaint alleged that the sweepstakes violated California's False Advertising Law, Unfair
Competition Law, and Consumer Legal Remedies Act.  By including the forum selection clause,
the Official Rules evinced the parties' intent not to be governed by the User Agreement's
arbitration clause when addressing controversies about the sweepstakes. Accordingly, the
Court found the parties' "sweepstakes-related dispute" not subject to arbitration.

By contrast, here, the parties intended to send *all* disputes and claims (other than piracy, theft,
and intellectual property) to arbitration to the maximum extent legally permissible. See SSA1 at
§ 11.A. The parties also intended their arbitration agreement to survive the SSA1's expiration or
termination. See id. at § 9.D. Under Coinbase's logic then, "the parties agreed to arbitrate all
subsequent arbitrability disputes." The Arbitrator therefore concludes that, under Coinbase, an
arbitrator may decide the jurisdictional dispute posed by two different versions of the same
agreement already before the tribunal.

13

**Different Timing & Procedural Posture**

Coinbase also differs procedurally and temporally from these proceedings. In Coinbase, the plaintiffs filed a class action based upon the sweepstakes' legality. The Official Rules governed the sweepstakes and required resolution of sweepstakes-related disputes before the courts. *After* plaintiffs filed the class action, Coinbase moved to compel arbitration invoking the more general User Agreement's arbitration agreement. The District Court denied the motion, the Ninth Circuit affirmed, and then the Supreme Court granted certiorari to determine whether the court or the arbitrator should decide arbitrability when the parties agreed in their first contract to arbitrate, agreed in their second contract to litigate, and then *later* a dispute arose between them. Coinbase did not halt an arbitration two months before the merits hearing; it ruled on a motion to compel arbitration at the *litigation's* outset before any arbitration's initiation.

Here, the events unfolded in reverse: first, the parties agreed to arbitrate, then second, a dispute arose between them, which they are currently arbitrating; and then third, only after the parties have been arbitrating their dispute for over a year, did respondent unilaterally modify its service terms. Unlike in Coinbase, the disputes here did not commence *after* the parties had already entered two conflicting contracts which required the Court to ascertain whether the parties had agreed to arbitrate their sweepstakes-related as opposed to user-related disputes before compelling the matter to arbitration. Instead, respondent here already compelled arbitration of the parties' disputes; the parties have already been arbitrating them in respondent's chosen forum for over a year; and then respondent strategically manufactured the current conflict when it created new terms designed to remove the AAA's arbitral jurisdiction. The Arbitrator finds these procedural and temporal differences critical and therefore concludes that, under Coinbase, an arbitrator may decide the jurisdictional dispute in a proceeding already pending before the tribunal when a party alleges that the tribunal no longer has the jurisdiction it previously conferred upon it. Of course, the Arbitrator will defer to the Court should it disagree.

## JURISDICTION ARGUMENTS

Having determined the tribunal's ability to decide jurisdiction, the Arbitrator now turns to the heart of the parties' dispute. The parties assert a legion of grounds in support of and in opposition to the AAA's jurisdiction, including waiver, judicial estoppel, voluntary submission to arbitral jurisdiction, collateral estoppel, the Court's "bookend" authority, the timing of jurisdictional findings, consent, unenforceability, good faith and fair dealing, equitable estoppel, the FAA's mandate, and delay, among others. The Arbitrator examines each of the parties' main arguments below.

### WAIVER

### Untimeliness

Claimants argue that respondent waived its objection by failing to timely raise it. See Conn Tech Dev. Co. v. Univ. of Conn. Educ. Props., 102 F.3d 677, 685 (2d Cir. 1996) (objection must be timely raised or it is waived). The AAA Consumer Arbitration Rule 14(c) captures this principle:

> A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim no later than the filing of the answering statement to the claim or

14

counterclaim that gives rise to the objection.

AAA Con. Arb. Rules, R-14(c). Claimants maintain that respondent had several opportunities to object to jurisdiction yet failed to do so based upon the absence of a binding arbitration agreement.

The Arbitrator only partially agrees. Respondent has had many opportunities to challenge the AAA's jurisdiction and indeed availed itself of those many opportunities as detailed in the procedural history above. Respondent objected to jurisdiction before the AAA appointed the merits arbitrators to these cases. As noted in the CMC1 Order, respondent preserved its jurisdictional objections at the very first case management conference in these proceedings and continued to raise them continually thereafter. See, e.g., CMC1 Order, dated 06/12/24; CMC2 Order, dated 07/27/24; CMC3 Order, dated 08/11/24; CMC5 Order, dated 10/21/24; CMC6 Order, dated 10/21/24; 24 Amended Answers, dated 07/12/24; Letter, dated 08/02/24; Order on Motion to Dismiss, dated 09/04/24. In truth, respondent rarely missed an opportunity to reassert its jurisdictional objections. As the Arbitrator has repeatedly held throughout these proceedings, respondent has steadfastly preserved and never waived its objections to the forum's jurisdiction. The Arbitrator now reconfirms these prior rulings and holds that respondent timely objected to the forum's jurisdiction.

## Waiver by Conduct

Separately, claimants argue that respondent waived its jurisdictional challenges by availing itself of the tribunal's authority. Specifically, claimants emphasize that on October 30, 2024, respondent sought and succeed in compelling compliance with an order issued on October 21, after respondent asserted that the SSA2 deprived this tribunal of authority. See Fortune, Alsweet & Eldridge, Inc. v. Daniel, 724 F.2d 1355, 1357 (9th Cir. 1983) (finding unjust to permit arbitration challenge after voluntary participation for several months). According to claimants, if respondent believed this tribunal lacked jurisdiction to issue that order, then it should not have sought its issuance since it would be unenforceable; instead, respondent did the opposite: it affirmatively invoked this tribunal's authority to obtain information it desired by ratifying this tribunal's order— and by extension, this tribunal's jurisdiction. Having done so, claimants argue, respondent again waived its right to object to this tribunal's authority. While the Arbitrator agrees that the parties cannot simultaneously avail themselves of the benefits of a forum while shunning its burdens, the Arbitrator specifically ruled that respondent's compliance with the tribunal's orders and submissions in these proceedings after the SSA1's amendment would not operate as a waiver of its objections and that respondent reserved all rights to contest jurisdiction. In short, the Arbitrator will not hold respondent's compliance and professionalism against it.

## Waiver of Substantive Ground

Claimants also maintain that respondent waived the specific basis for its current objection by failing to raise it in its prior motions to dismiss. Claimants point out that respondent persistently asserted the enforceability of the SSA1's arbitration agreement in these cases (as well as dozens of others). In fact, in its Motion to Dismiss for Lack of Jurisdiction filed on August 23, 2024 after the unconscionability rulings by Arbitrator Dasteel and the filing of the Elliott case, respondent argued, the SSA1 governs its relationships with claimants and "should be enforced as a matter of law" and "arbitration requirements like this are enforceable." By so doing, claimants insist, respondent waived its current objection to the AAA's jurisdiction.

15

Technically, the Arbitrator agrees with claimants that respondent waived the specific basis for the lack of jurisdiction it now advances. Respondent argues that the tribunal cannot enforce the SSA1's arbitration agreement because another arbitrator found it unconscionable, thereby prompting respondent to remove it in the SSA2. Yet, Arbitrator Dasteel issued his unconscionability rulings on July 8, 2024, over a month before respondent moved to dismiss these arbitrations for lack of jurisdiction on August 23, 2024. Hence, the Arbitrator agrees that respondent could and should have raised all its objections to jurisdiction at that time. Accordingly, the Arbitrator rules that respondent waived the unconscionability rulings as basis for its objections to jurisdiction. Despite this waiver, the Arbitrator will not uphold the forum's jurisdiction on this procedural basis alone for two reasons: (1) respondent had not amended the SSA1 at the time it moved to dismiss for lack of jurisdiction on August 23, 2024; it did so on September 26, 2024, a month later; and more importantly, (2) the Arbitrator has an independent duty to assess jurisdiction, even if respondent waived its current argument. As noted at the CMC5, the Arbitrator will not proceed unless she finds that the AAA continues to have jurisdiction over these arbitrations. Accordingly, the Arbitrator finds waiver but declines to rely on waiver alone to support this forum's jurisdiction.

**JUDICIAL ESTOPPEL**

Claimants also maintain that the tribunal should judicially estop respondent from reversing course. Essentially, claimants argue, respondent repeatedly conceded the tribunal's jurisdiction and may not now contradict its judicial admission. The judicial estoppel doctrine precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position. See Bartley-Williams v. Kendall, 134 Wash. App. 95, 98, 138 P.3d 1103 (2006). The doctrine seeks "to preserve respect for judicial proceedings," and "to avoid inconsistency, duplicity, and ... waste of time." Cunningham v. Reliable Concrete Pumping, Inc., 126 Wash. App. 222, 225, 108 P.3d 147 (2005); Johnson v. Si-Cor, Inc., 107 Wash. App. 902, 906, 28 P.3d 832 (2001). Tribunals examine three core factors to determine whether to apply the judicial estoppel doctrine: (1) whether "a party's later position" is "clearly inconsistent with its earlier position"; (2) whether "judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

The Arbitrator notes the irony of claimants' counsel invoking the judicial estoppel doctrine given its own many inconsistent representations before the Court and this tribunal. Nevertheless, claimants properly recite the doctrine. Respondent has presented inconsistent positions to the Court, the AAA, and this tribunal. First, it told the Court that claimants had to vindicate their rights in binding individual arbitration given its enforceable SSA1 arbitration agreement. The Court agreed and compelled arbitration of the consumers' claims. Claimants commenced these arbitration cases because respondent represented to the Court that they had to. Now, respondent claims its SSA1 arbitration agreement is unenforceable, a position clearly inconsistent with its earlier position that "all consumer signatories of the SSA must assert their claims individually in arbitration."

The inconsistency undermines confidence in the accuracy of respondent's current position. The District Court ruled the arbitration agreement enforceable and valid. Granted, the Court reserved the unconscionability ruling to the arbitrator but it first had to find a valid agreement to arbitrate

16

the parties' disputes before it could have compelled claimants to arbitration. For this tribunal to now find that same SSA1 unenforceable seems contrary to the law of the case. The Arbitrator also finds that dismissal for lack of jurisdiction would significantly disadvantage claimants at this late date, especially with the merits hearing scheduled for January 27, 2025. In sum, the Arbitrator finds that the present dispute qualifies for judicial estoppel. But, as with waiver, the Arbitrator will not uphold the forum's jurisdiction on procedural grounds alone.

## VOLUNTARY SUBMISSION TO ARBITRAL JURISDICTION

Claimants assert that respondent already voluntarily submitted itself to this tribunal's jurisdiction on the question of arbitrability and may not now rescind its submission. Claimants correctly point out that this tribunal already denied respondent's Motion to Dismiss for lack of jurisdiction just two months ago. See Order on Motion to Dismiss, dated 09/04/24. According to claimants, once a party submits a question to an arbitrator for adjudication, it cannot later claim the arbitrator lacks authority to resolve that same question. The Arbitrator agrees buts find this argument essentially another formation of claimants' judicial estoppel theory. The Arbitrator holds that respondent submitted the question of arbitrability to this tribunal for adjudication and may not now claim it lacks such authority.

## COLLATERAL ESTOPPEL

Claimants invoke collateral estoppel because the Court already determined that the parties delegated arbitrability issues to the arbitrator for resolution. Again, the Arbitrator agrees in principle but will not rely upon this procedural argument alone. In compelling these consumer antitrust claims to arbitration, the District Court held:

> [T]he question is whether Plaintiffs' unconscionability challenge should be determined by the Court or by an arbitrator. According to the SSA, the arbitrator must resolve any "disputes" regarding "this agreement" in conformity with AAA rules (See Dkt. No. 364 at 12, 65, 78, 92, 106, 120.) AAA rules give an arbitrator "'the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'" Oracle Am., Inc. v. Myriad Group A.G., 724 F.3d 1069, 1074 n.1 (9th Cir. 2013) (citing AAA Commercial Arbitration Rule 7(a)). Therefore, unless Plaintiffs challenge the SSA's delegation provision, specifically, as unconscionable, the Court must enforce the parties' agreement to have an arbitrator decide the broader question of whether the arbitration clause itself is unconscionable.

In re Value Antitrust Litigation Order, dated 10/25/21.

According to claimants, therefore, the Court has already satisfied respondent's theory that Coinbase necessitates a court ruling on the delegation of arbitrability of disputes before a claim can be adjudicated in arbitration because it already so ruled. Put another way, the District Court's prior ruling constitutes binding law of the case, which respondent is collaterally estopped from relitigating.

The Arbitrator only partially agrees. The District Court's prior ruling certainly controls the issues before it. But the Court did not address and could not have addressed the current issues posed

17

by the later 2024 SSA2 amendment. The Court also did not have the benefit of the Supreme Court's 2024 Coinbase decision when it ruled on arbitrability in 2021. Thus, while the Arbitrator agrees that the District Court Order constitutes binding law of the case in these proceedings, it does not necessarily encompass all aspects of the parties' current dispute given the intervening events of 2024. Accordingly, the Arbitrator will uphold, enforce, and apply the District Court's Order but will not collaterally estop respondent from raising new arguments based upon later events.

## THE COURT'S "BOOKEND" AUTHORITY

Claimants assert that district courts may not interrupt an ongoing arbitration because the Ninth Circuit has ruled that their authority must "bookend" the arbitral proceeding. Generally, the District Court has authority at the beginning and at the end of the arbitral process. Under the FAA, the Court determines at the beginning of the process if the parties agreed to arbitrate, unless the parties delegated the issue to the arbitrator. Similarly, under the FAA, the Court determines at the end of the process if it should confirm, modify, or vacate the arbitral award. In this sense, the District Court's authority "bookends" the arbitral process. See Priast v. Neiman Marcus Grp., Inc., 2020 U.S. Dist. LEXIS 19208, at *7 n.1 (N.D. Cal. Feb. 5, 2020) (explaining Ninth Circuit jurisprudence). The FAA does not suggest that courts may intervene before the arbitrator renders a final award. See id. As the Seventh Circuit agreed, to allow a party to bring an independent suit to enjoin the arbitration "is inconsistent with fundamental procedural principles that apply with even greater force to arbitration than to conventional litigation." See Smith v. American Arbitration Ass'n, 233 F.3d 502, 506 (7th Cir. 2000). The Arbitrator agrees that the Courts generally assert their authority at the beginning and at the end of the arbitral process but disagrees that they may not do so at any other time. Under the FAA and federal law, the District Court will determine its own authority and jurisdiction. The Arbitrator defers to the Court's exclusive jurisdiction to rule on its own jurisdiction and declines to accept claimants' invitation to do so here.

## JURISDICTION DETERMINED AT THE TIME OF FILING

Claimants rely on diversity jurisdiction jurisprudence to aver that tribunals determine jurisdiction at the time of filing, not upon later changed circumstances and events. "It has long been the case that the jurisdiction of the Court depends upon the state of things at the time of the action brought." Grupo Dataflux v. Atlas Glob. Grp., L.P., 541 U.S. 567, 570 (2004). At the time claimants commenced these arbitrations, only one SSA existed and that SSA1 required arbitration. Indeed, respondent concedes that claimants filed these arbitrations "invoking the arbitration agreement in the SSA between Valve and Steam users" "in effect at the time."

Respondent relies on Oppenheimer & Co. v. Mitchell to support its argument that the Court can enjoin an already seated arbitration based upon later events. See Oppenheimer & Co. v. Mitchell, C23-67 MJP (W.D. Wash. Apr. 5, 2024) and 2023 WL 2428404, at *6 (W.D. Wash. Mar. 9, 2023). Yet, Oppenheimer looked to the facts controlling at the time of filing: "the Court must examine whether the FINRA proceeding was properly *commenced.*" Oppenheimer enjoined the arbitration by analyzing whether the party was a "customer," thereby conferring FINRA jurisdiction at the time the arbitration commenced. Applying this analysis, the Arbitrator agrees that the AAA properly had jurisdiction under the SSA1 at the time claimants began these arbitrations, even if subscribers could not file arbitration before the AAA under the SSA2 today.

18

As both an AAA and FINRA arbitrator, the Arbitrator finds Oppenheimer distinguishable in two crucial respects. First, unlike the AAA Consumer Arbitration Rules which explicitly delegate arbitrability and jurisdictional questions to the arbitrator, the FINRA arbitration rules do not. FINRA Rule 12206 authorizes the arbitrator or panel to determine eligibility and statute of limitations issues but not arbitrability issues, which if challenged, must be decided by the Court. Further, FINRA arbitration parties do not enter an arbitration agreement in which they can expressly delegate arbitrability to an arbitrator. Instead, they arbitrate their disputes by statutory authorization applicable to FINRA "members" (securities industry professionals) and their "customers" and employees, as overseen by the SEC which approves FINRA's rules and procedures. Thus, in Oppenheimer, unlike in these cases, the parties only had one forum in which to challenge FINRA jurisdiction – the Court. Second, in Oppenheimer, the impacted party turned out never to have been a securities industry "customer" as defined by the FINRA Rules at the time of the arbitration's filing or at any time. Thus, the SEC-approved FINRA Rules could not apply to him and FINRA had no jurisdiction to arbitrate against a non-customer as a matter of statute. Of course, the Court there enjoined the arbitration.

In contrast, here, the parties agreed to arbitrate and delegated arbitrability and jurisdiction issues to the arbitrator for resolution. The tribunal's jurisdiction stems therefore from the parties' agreement, the AAA Consumer Rules, and the FAA, not statutory authority alone. Claimants were undisputedly respondent subscribers at the time of filing. Thus, unlike in Oppenheimer, in which the FINRA arbitration was extra-jurisdictional when commenced, the arbitrations here all fell within the AAA's jurisdiction under the SSA1 at the time of filing. Accordingly, the Arbitrator rules that jurisdiction properly existed at the time claimants began these arbitrations.

## CONSENT

Respondent argues that the tribunal cannot force it to arbitrate when it no longer consents to arbitration. The Arbitrator agrees that arbitration rests upon the parties' consent, for arbitration is matter of contract between the parties. See Lamps Plus, Inc. v. Varela, 587 U. S. 176, 184 (2019); Granite Rock Co. v. Teamsters, 561 U. S. 287, 299 (2010); First Options of Chicago, Inc. v. Kaplan, 514 U. S. 938, 943 (1995). The Arbitrator disagrees, however, that respondent did not agree to arbitrate these disputes. Respondent explicitly consented to – indeed dictated – arbitration in the SSA1. The issue now is not whether respondent consented to arbitration, for it certainly did; the issue is whether it may later unilaterally revoke its consent after a subscriber commences arbitration in reliance on that consent. Claimants also assert that respondent cannot revoke the arbitration agreement because it survives termination of the SSA1. See SSA1 at § 9.D. The Arbitrator rules that, while the parties may always jointly and mutually agree to litigate rather than arbitrate, a party may not unilaterally and retroactively rescind its consent to arbitrate once the other party initiates the agreed upon arbitration. Certainly, when claimants tried to revoke their consent retroactively by initially filing their claims in the District Court in 2021, respondent did not hesitate to force them to live up to their promised consent by moving to compel those claims to arbitration. By the same logic, the Arbitrator concludes that respondent must now stand by its prior consent.

## UNENFORCEABLE UNILATERAL MODIFICATION

Unilateral-modification clauses give one party the unfettered right to amend the underlying contract without the other party's consent. See, e.g., Floss v. Ryan's Family Steak Houses, Inc., 211 F.3d 306, 310 (6th Cir. 2000) (noting that the arbitration agreement gave the employer the

unlimited right to modify the rules of arbitration without the employee's consent). Here, respondent relied upon such a unilateral modification clause in its SSA1 to amend the agreement and remove its arbitration provision. Both the SSA1 and the SSA2 permit unrestricted unilateral modification upon notice:

> B. Unilateral Amendment
>
> Furthermore, Valve may amend this Agreement (including any Subscription Terms or Rules of Use) unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/.
> Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or to any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s). Valve shall not have any obligation to refund any fees that may have accrued to your Account before cancellation of your Account or cessation of use of any Subscription, nor shall Valve have any obligation to prorate any fees in such circumstances.

See SSA1 at § 8.B; SSA2 at § 8.B.

Most courts refuse to enforce adhesion arbitration agreements with such clauses or sever their unilateral modification clauses on a variety of grounds, such as lack of consideration, illusory promise, indefiniteness, or unconscionability. See, e.g., Al-Safin v. Circuit City Stores, Inc., 394 F.3d 1254, 1262 (9th Cir. 2005); Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002); Floss, 211 F.3d at 316; Hooters of Am., Inc. v. Phillips, 173 F.3d 933, 939 (4th Cir. 1999). The Arbitrator agrees that the retroactive application of this clause to claimants with pending arbitrations is unenforceable.

A subscriber could only reject the SSA2's new terms if it deleted its account or discontinued its use. Neither affords a consumer a realistic option when they have already purchased licenses for games housed on the Steam platform for which respondent will not refund their fees. Under these circumstances, the Arbitrator finds the unilateral modification clause unconscionable as applied retroactively to claimants with pending arbitrations. See Heckman v. Life Nation Entertainment Inc., No. 23-55770, D.C. No. 2:22-cv00047-GW-GJS, at *18-19 (9th Cir. Oct. 28, 2024) (finding retroactive unilateral modification of arbitration agreement unconscionable). Accordingly, the Arbitrator will not enforce SSA1 Section 8.B as to claimants.

**GOOD FAITH & FAIR DEALING**

All contracts, including arbitration agreements, contain an implied covenant of good faith and fair dealing prohibiting the parties from denying the other party the benefit of their agreement in bad faith. The Arbitrator finds Cobb v Ironwood Country Club persuasive. See 233 Cal. App. 4th 960 (2015). In Cobb, the defendant added an arbitration provision to its bylaws four months *after* the plaintiffs filed their complaint in superior court. Id. at 962. The defendant then moved to compel arbitration based upon the new amendment. Id. at 964. Much like respondent here, the

20

defendant relied on its right to amend the contract and then apply it both prospectively and retroactively to current and former members. Id. Again like respondent, the defendant argued that the members' agreement to the original bylaw provision allowing for future amendments meant that the plaintiffs had accepted and agreed to defendant's right to amend the bylaws. Id. at 963. The Court disagreed.

The trial court denied the motion to compel arbitration, concluding that the motion represented an improper effort to apply the new bylaw retroactively to a pending case. Id. at 964. The court reasoned that the subsequent bylaws amendment did not reflect any agreement by these plaintiffs to arbitrate the already pending lawsuit. Id. at 964-65. The appellate court agreed and held that the defendant violated the implied covenant of good faith and fair dealing and exceeded its amendment power to the extent it attempted to enact an arbitration amendment to cover the pending dispute, a dispute not only accrued but actively litigated in court when the amendment became effective. Id. at 966. The Court held that the implied covenant of good faith and fair dealing prohibits a party from unilaterally changing an agreement to apply retroactively to known or accrued claims because it would interfere unreasonably with the other party's expectations of how the parties would resolve their dispute. Id.; see also Avery v Integrated Healthcare Holdings, Inc., 218 Cal. App. 4th 50, 61 (2013); Peng v First Republic Bank, 219 Cal. App. 4th 1462, 1474 (2013); Serpa v. Cal. Sur. Investigations, Inc., 215 Cal. App. 4th 695, 706 (2013); Peleg v. Neiman Marcus Grp., Inc., 204 Cal. App. 4th 1425, 1465 (2012); see generally Kim v. Allison, 87 F.4th 994, 1001 n.7 (9th Cir. 2023) (citing Cobb).

The current dispute mirrors Cobb. The Cobb defendant added an arbitration provision to its contract four months after the plaintiffs filed litigation; respondent here removed the arbitration provision more than a year after claimants initiated arbitration. See id. at 962. While the Cobb defendant hoped to use the new amendment to compel arbitration, respondent here seeks to use the new amendment to stop arbitration. See id. at 964. Under these circumstances, the Arbitrator agrees with the Cobb court that respondent would violate the implied covenant of good faith and fair dealing and unreasonably exceed its amendment power by applying the newly minted SSA2 to the pending disputes, disputes not only accrued but actively arbitrated before the AAA for over a year because the covenant of good faith and fair dealing prohibits respondent's unfettered exercise of its contractual rights in a manner that would deny claimants the benefit of their arbitration agreement. See id. at 966.

Washington law agrees. Under Washington law, every contract imposes an obligation of good faith in its performance and enforcement. RCW 64.34.090. This duty requires "the parties to cooperate with each other so that each may obtain the full benefit of performance." WPI 302.11; Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). The duty does not, however, require the party to accept a material change in the terms of the contract. WPI 302.11; Betchard-Clayton, Inc. v. King, 41 Wn.App. 887, 890, 707 P.2d 1361 (1985). Washington courts base the covenant of good faith and fair dealing on the idea that parties should be honest and faithful to the spirit of the contract and not act in a way that would harm the other party's rights or expectations. Metro. Park Dist. v. Griffith, 106 Wn.2d 425, 437, 723 P.2d 1093 (1986); Restatement (Second) of Contracts § 205 (1981). For example, in Nova Contracting, Inc. v. City of Olympia, the court rejected the defendant's argument that it could refuse the plaintiff's submissions because the contract afforded it the final decision to accept or reject a submittal. Looking to the Restatement for guidance, the court held that the defendant had to exercise its contract authority reasonably and that, even though the contract gave it the final decision, it did not have "unlimited discretion." See No. 48644-0-II (Wash. Ct. App. Apr. 18, 2017).

21

The Arbitrator finds respondent's contrary authority inapposite. For example, respondent cited In re Nat'l Football League's Sunday Ticket Antitrust Litig., 2021 WL 2350814, at *4 (C.D. Cal. Apr. 20, 2021) to support its position that courts routinely apply amended dispute resolution provisions retroactively. In the NFL case, DirectTV moved to compel arbitration immediately at the outset of the case but due to procedural motions, appeals, and other procedures, the parties did not brief the motion until two years later. In ruling on the motion at long last, the court compared the pre- and post-litigation contracts, *both* of which contained arbitration agreements. The court applied the principle of good faith and fair dealing to determine if it could compel arbitration under the newer agreement. The court concluded that the newer agreement did not violate the covenant of good faith and fair dealing because (1) the two contracts' the arbitration provisions did not materially differ; and (2) the consumers had other ways to view the NFL games they wanted to see without agreeing to the new terms.

Here, unlike in the NFL case where the parties had not moved past procedural motions for two years, respondent amended the SSA1 over a year after the claimants began their arbitrations and only a few months before the merits hearing. Also, unlike in the NFL case, respondent materially changed the terms and conditions: it removed the provisions related to arbitration, mediation, class action waiver, reimbursement of filing fees, and its agreement not to seek its fees and costs and substituted exclusive court jurisdiction over all disputes, including those pre-dating the SSA2. Compare SSA1 at § 11 with SSA1 at § 10. Significantly, unlike the consumers in the NFL case, who had other ways to view the NFL games even if they did not agree to the revised arbitration agreement, respondent's subscribers have no other way to access their Steam platform, games, and wallet unless they agree to the SSA2. And, if they do not agree, they must delete or discontinue use of their accounts and all the games and licenses contained in them. Faced with these critical differences, the Arbitrator holds that respondent would violate the implied covenant of good faith and fair dealing if it applied the SSA1's unilateral modification clause retroactively to these pending arbitrations.

## EQUITABLE ESTOPPEL

Claimants also invoke equitable estoppel. "Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." See Mundi v. Union Sec. Life Ins. Co., 555 F.3d 1042 (9th Cir. 2009). Not unlike judicial estoppel, equitable estoppel has three elements:

> (1) an admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.

See Saunders v. Lloyd's of London, 779 P. 2d 249 (Wash. 1989). The Arbitrator finds all three elements present here.

## Inconsistency

As explained above, the Arbitrator finds respondent's positions inconsistent. From 2013 to 2024, the SSA1 dictated individual binding arbitration as the exclusive dispute resolution for all domestic subscribers, with minor exceptions. See SSA1 at § 11. In the Wolfire lawsuit, relying on

the SSA1's arbitration provision, respondent moved to compel arbitration of Steam subscribers asserting the very same antitrust claims asserted by the claimants in these arbitrations. It submitted multiple briefs extolling arbitration as the sole lawful avenue for resolution of these consumer claims. See, e.g., Doc. 35, Wolfire Games and William Herbert et al. v. Valve Corporation, 2:21-cv-563-JCC. After the District Court granted respondent's motion, respondent continued to pursue arbitration. See, e.g., C. Casper Letter, dated 07/25/23 ("Valve is fully prepared to resolve the dispute in arbitration" and "Valve will arbitrate the dispute individually if the subscriber wishes"). After the claimants brought their claims in arbitration, respondent advised this tribunal that when "subscribers agree to the SSA, they and Valve agree to submit disputes to individual arbitration." See Respondent's Motion to Dismiss for Lack of Jurisdiction at 4. In its August 23, 2024 jurisdiction briefing, respondent insisted that the "SSA governs Valve's relationships with Claimants and should be enforced as a matter of law." Respondent's message to its subscribers, the District Court, the AAA, claimants' counsel, and this tribunal was singular: these cases and all subscriber disputes belong in arbitration. Now, respondent insists that the AAA has no jurisdiction over these arbitrations, and claimants must return to the District Court where they began three years ago.

**Reasonable Reliance**

The Arbitrator finds that claimants relied on the SSA1's arbitration provision and respondent's representations in bringing these claims. Claimants began their claims in Court – where respondent now wishes them to return – only to be told by respondent that they had to individually arbitrate each of their claims. Claimants did exactly what respondent told them to do: they filed individual arbitrations before the AAA. They submitted their filing fees, expended their resources, filed their motions, sought their discovery, and arbitrated these cases *with* respondent for 14 months. During that entire time, both parties treated the AAA as the forum for their consumer disputes.

**Injury**

The Arbitrator finds that claimants will suffer significant injury should respondent now be allowed to insist they return to Court. Claimants will essentially have wasted over a year's worth of work, attorney time, case preparation, and arbitration strategy. Claimants would incur new court costs simply to file their suits. They would lack the SSA1's fee shifting provision, which guaranteed attorneys' fees for consumers but severely limited Valve's ability to collect them against the consumer. They would have to relitigate all the motions and rulings already adjudicated in these proceedings, which include no less than six CMC orders, multiple stay requests, choice of law disputes, several jurisdictional challenges, at least eight discovery rulings, two *in camera* reviews, and three disputed third-party hearing subpoenas, just to list the more significant case rulings to date. The Arbitrator finds that unfair and inefficient outcome to be precisely the reason Courts created the equitable estoppel doctrine in the first instance. The Arbitrator equitably estops respondent from retroactively applying the SSA2 to these claimants and their pending arbitrations.

**FACTUAL DISPUTES**

Factual disputes preclude dismissal. The Arbitrator neither resolves facts nor weighs credibility on a motion to dismiss. Instead, the tribunal accepts the pleadings as true, including their reasonable inferences, and determines if the claimants have stated a claim as a matter of law.

See al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009); Keniston v. Roberts, 717 F.2d 1295, 1301 (9th Cir. 1983); accord Dennis v. Heggen, 35 Wn. App. 432, 667 P.2d 131 (1983); Blank v. Kirwan, 39 Cal. 3d 311, 318 (1985); Contreras v. Crown Zellerbach Corp., 88 Wn. 2d 735, 742 (Wash. 1977); Carloss v. County of Alameda, 242 Cal. App. 4th 116, 123 (2015); Czajkowski v. Haskell & White, LLP, 208 Cal. App. 4th 166, 173 (2012); Brown v. MacPherson's Inc., 86 Wash. 2d 293, 298 (1975). Indeed, Washington considers dismissal a drastic remedy to be used sparingly. Accordingly, Washington courts will only dismiss if, beyond a doubt, claimants can prove no set of facts consistent with their demands, entitling them to relief. See, e.g., Collins v. Lomas & Nettleton Co., 29 Wn. App. 415, 419 (1981); see Bravo v. Dolsen Co., 125 Wn.2d 745, 750 (1995); Orwick v. City of Seattle, 103 Wn.2d 249 (1984). For courts freely grant leave to amend when justice requires and prefer decisions on the merits over technical dismissals. See Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc). Indeed, tribunals should grant leave to amend even if the party did not request it, unless the allegation of other facts could not possibly cure the demand. Id. at 1130.

Here, the parties each have raised several factual disputes, including whether claimants have agreed to the SSA2's terms, whether claimants understand the Court and arbitral proceedings, whether claimants have been intimidated by personal service of the summons and petition against them, whether respondent properly notified claimants of the changes, whether claimants understood that they were forfeiting their arbitration claims by clicking accept or continuing to use their accounts, and whether counsel have engaged in professional and ethical behavior in communicating with claimants/their clients, just to list a few raised by the parties. Given these disputed facts, the Arbitrator separately holds that dismissal would be improper as a procedural matter.

## CONTRACTS MAY NOT BE ILLUSORY

Respondent's tactic would render arbitration agreements illusory. If respondent may unilaterally retroactively change its agreement to arbitrate at any time at its discretion, without regard to claimants' accrued and pending arbitration rights, then consumer contracts would become an ever shifting playing field, changeable at the drafter's whim. Under respondent's position, it could arguably amend the parties' arbitration agreement after the close of an arbitration merit hearing before issuance of the award if it believed it might lose and force the consumer to start anew in court. Or, respondent could arguably amend and require arbitration years into a lawsuit and then force the plaintiff to start all over again in the arbitral forum. Under respondent's position, all consumer arbitration contracts would become meaningless because the companies could simply change them at will.

Indeed, respondent's argument contradicts the very foundation of contract law. Contract law exists to enforce voluntary promises between parties to ensure predictability and fairness in every day transactions. Consumers enter them everyday when they buy a new phone, lease a car, sign up for service, or purchase a computer game. In simple terms, a contract expresses promises that justifies the parties in reasonably believing that they have committed to undertake or forgo specific action in the future – such as arbitrate their disputes. See WPI 301.02; Hansen v. Virginia Mason Med. Ctr., 113 Wn.App. 199, 207, 53 P.3d 60 (2002); see, e.g., Grovier v. N. Sound Bank, 957 P.2d 811, 815 (Wash. Ct. App. 1998) (each party's promise acts as consideration supporting the other's); Ebling v. Gove's Cove, Inc., 663 P.2d 132 (Wash. Ct. App. 1983) (same).

24

But if the contract's drafter can change its promise retroactively at will at any time, then its contractual promise means nothing, it becomes an illusion, not a promise, and certainly not a contract. An unrestricted right to remove the arbitration obligation gives respondent the freedom to choose the nature of its performance while simultaneously binding the consumer. Washington law defines an unenforceable illusory promise as "a purported promise that actually promises nothing because it leaves to the speaker the choice of performance or nonperformance." See Interchange Assocs. v. Interchange, Inc., 16 Wn.App. 359, 360–61, 557 P.2d 357 (1976). A supposed promise becomes illusory when the agreement makes performance optional or "entirely discretionary by the promisor." Goodpaster v. Pfizer, Inc., 35 Wn.App. 199, 203, 665 P.2d 414 (1983); see also Asmus v. Pacific Bell, 23 Cal. 4th 1, 15 (2000) (contract illusory and unenforceable when a party retains the unfettered right to modify it). To avoid illusory, unconscionable, or unenforceable contracts, tribunals may refuse to enforce the contract, may enforce the remainder of the contract without the unconscionable clause, or may so limit the application of any unconscionable clause as to avoid any unconscionable result. See RCW 62.A.2-302.

Here, the Arbitrator upholds the SSA1's and the SSA2's unilateral modification provisions to the extent they apply prospectively; respondent offers consumers a service and remains free to offer its service to prospective customers on the terms and conditions of its choosing. Conversely, the Arbitrator refuses to enforce as illusory and unconscionable the SSA1's and/or SSA2's unilateral modification clauses and other provisions, if any, to the extent respondent seeks to enforce them retroactively to claims already accrued and pending.

## INCONSISTENCY WITH THE FAA

In the context of a promise to arbitrate disputes, respondent's interpretation would nullify the FAA. Congress enacted the FAA to reverse judicial hostility toward arbitration agreements and place them upon equal footing as other contracts. See AT&T Mobility, LLC v. Concepcion, 563 U.S. 333, 339 (2011); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991). The FAA manifests "a liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). When a valid agreement to arbitrate exists between parties and covers the matter in dispute, the FAA commands courts to stay any ongoing judicial proceedings and compel arbitration, precisely as the District Court did here. See 9 U.S.C. § 3. Further, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," as a matter of federal law. Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25.

Although common and generally enforceable, contracts of adhesion further the federal policy favoring arbitration, when they adequately preserve consumers' substantive rights. See Gilmer, 500 U.S. at 25-26 (employment context). Retroactive application of an unrestricted unilateral modification clause to thwart a pending arbitration does not put arbitration upon "equal footing" with other contracts but instead allows the drafter to not just "forum shop" but to "forum hop." The Arbitrator therefore finds that, consistent with the FAA's strong federal policy favoring arbitration, respondent's unilateral changes can only apply to claims filed after its effective date because to do otherwise would destroy arbitration envisioned by the FAA as a meaningful, genuine, and non-illusory alternative dispute resolution process. Respondent, of course, retains the ability to unilaterally modify its arbitration agreements so long as it provides (1) adequate notice of the changes (which the record suggests it did here), (2) sufficient consideration to support the change, (3) consionable, legally valid terms, and (4) prospective application. Of

25

course, the parties may mutually agree to amend their contract at any time.

## DELAY

In addition to the substantive and procedural legal reasons set forth above, the Arbitrator considers further delay prejudicial under the facts of these cases. The individual claimants, as absentee class members, first sought relief in 2021 when named plaintiffs filed a putative class action on their behalf. By the end of that year, the District Court had compelled their claims to arbitration. See In re Value Antitrust Litigation Order, dated 10/25/21. Nearly three years later, the parties are still fighting over jurisdiction. The Arbitrator finds that further delay in these proceedings will prejudice claimants, now two months away from the merits hearing and jeopardize that date's viability. The Arbitrator has warned from this arbitration's inception, however, that she would not delay the arbitration on the merits:

> The Arbitrator will strictly enforce all deadlines and dates stated herein to avoid unnecessary delay and to ensure an expeditious and fair resolution of this matter. The deadlines in this Order are inviolate – not aspirational.

See CMC1 Order, dated 06/12/24. Despite this admonition, delays have occurred, some understandably, such as necessitated by changes in counsel, others unnecessary, caused by counsels' inability to work effectively together. Whatever the cause, whatever the tactics involved, the parties deserve to be heard on the merits of their respective claims and defenses without further delay.

Expeditious resolution is the hallmark of arbitration, one that distinguishes it from litigation. Here, the parties, through their counsel, have imported the delays, protocols, tactics, and tools from litigation into these arbitrations, threatening to turn them into thousands of individual trials in all but name. As the procedural history reveals, the Arbitrator has indulged motion upon motion, letter brief upon letter brief, discovery dispute upon discovery dispute in her effort to ensure fairness for all sides. However, at some point, justice too oft delayed becomes justice denied. That point is now: the cases will proceed to hearing.

## WASHINGTON LAW WOULD CONTINUE ARBITRATION

Finally, under Washington law, if a party to a judicial proceeding challenges the existence of an agreement to arbitrate, as respondent does here, "the arbitration proceeding may continue pending final resolution of the issue by the court, unless the court otherwise orders." RCW 7.04A.060(4). Accordingly, the Arbitrator rules that the arbitrations shall continue pursuant to Washington statute unless the Court orders otherwise.

## ORDER

The Arbitrator denies respondent's motion to dismiss or stay these proceedings for lack of jurisdiction. To the extent the Court disagrees with this analysis or to the extent it can rule on a more fulsome record, the Arbitrator defers to its greater authority and jurisdiction.

November 13, 2024
/s/ Janice L. Sperow

26

*Janice Sperow*

Janice L. Sperow, Arbitrator