THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE VALVE ANTITRUST LITIGATION

No. 2:21-cv-00563-JNW

**DEFENDANT VALVE CORPORATION'S
MOTION TO DISMISS THE CONSUMER
COMPLAINT**

**NOTE ON MOTION CALENDAR:
October 24, 2025**

**ORAL ARGUMENT REQUESTED**

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT
No. 2:21-cv-00563-JNW

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND .............................................................................................. 2

I.    VALVE AND THE EMERGENCE OF STEAM ............................................ 2

II.   THE DEVELOPER CASES ...................................................................... 3

III.  THE PLAINTIFFS' COMPLAINT ............................................................. 5

LEGAL STANDARD ........................................................................................ 7

ARGUMENT .................................................................................................. 8

I.    PLAINTIFFS HAVE FAILED TO PLEAD ANTITRUST INJURY .............................. 9

    A.    PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT VALVE'S REVENUE
           SHARE IS SUPRACOMPETITIVE. .................................................... 9

          1.    *SOMERS* IS ON POINT AND CONTROLLING. .................................... 9

          2.    PLAINTIFFS DO NOT PLEAD ANY PLAUSIBLE PATH AROUND
              *SOMERS*. ............................................................................ 12

    B.    PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT VALVE'S REVENUE
           SHARE IMPACTS OUTPUT OR PRICES FOR CONSUMERS. ...................... 14

II.   THE COURT SHOULD DISMISS ALL COUNTS WITH PREJUDICE ...................... 17

CONCLUSION ............................................................................................... 19

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>                                                                                      <u>Page(s)</u>

3

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
   141 F.3d 947 (9th Cir. 1998) ................................................................. 11

4

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,

5

   190 F.3d 1051 (9th Cir. 1999) ................................................................. 8

6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................ 7, 12

7

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,

8

   459 U.S. 519 (1983) ............................................................................... 16

9

*Atl. Richfield Co. v. USA Petroleum Co.*,

10

   495 U.S. 328 (1990) ................................................................................. 8

11

*BASF Corp. v. Old World Trading Co. Inc.*,
   1993 WL 643419 (N.D. Ill. May 21, 1992) ....................................... 2, 15

12

*BASF Corp. v. Old World Trading Co. Inc.*,

13

   41 F.3d 1081 (7th Cir. 1994) ............................................................. 2, 15

14

*Bell Atl. Corp v. Twombly*,

15

   550 U.S. 544 (2007) ............................................................................ 7, 16

16

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) ............................................................... 14

17

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,

18

   429 U.S. 477 (1977) ................................................................................. 8

19

*Cargill, Inc. v. Monfort of Colorado, Inc.*,

20

   479 U.S. 104 (1986) ............................................................................... 17

21

*City of Oakland v. Oakland Raiders*,
   20 F.4th 441 (9th Cir. 2021) .................................................................. 16

22

*Emrich v. Touche Ross & Co.*,

23

   846 F.2d 1190 (9th Cir. 1988) ........................................................... 7, 13

24

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021) ................................................... 14

25

*Epic Games, Inc. v. Apple, Inc.*,

26

   67 F.4th 946 (9th Cir. 2023) .................................................................. 14

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

*Fay v. Mortg. Elec. Registration Sys., Inc.*,
  2012 WL 993437 (W.D. Wash. Mar. 22, 2012) ...................................................................... 13

*Friedman v. AARP, Inc.*,
  2019 WL 5683465 (C.D. Cal. Nov. 1, 2019).......................................................................... 15

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ............................................................................................ 8, 14

*Gerlinger v. Amazon.com Inc.*,
  526 F.3d 1253 (9th Cir. 2008) ................................................................................... 9, 10, 11

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
  352 F.3d 367 (9th Cir. 2003) .................................................................................................. 8

*Gordon v. City of Oakland*,
  627 F.3d 1092 (9th Cir. 2010) ............................................................................................. 18

*Hotel Emps. & Rest. Emps. Local 2 v. Vista Inn Mgmt. Co.*,
  393 F. Supp. 2d 972 (N.D. Cal. 2005) .............................................................................. 7, 13

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997).......................................................................................... 8, 13

*In re Online DVD-Rental Antitrust Litigation*,
  779 F.3d 914 (9th Cir. 2015) ......................................................................................... 10, 11

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) .................................................................................................. 7

*Maxim Integrated Prods., Inc. v. Analog Devices*,
  79 F.3d 1153 (9th Cir. 1996) .............................................................................................. 15

*Metro Indus., Inc. v. Sammi Corp.*,
  82 F.3d 839 (9th Cir. 1996) ................................................................................................ 14

*Murphy Tugboat Co. v. Crowley*,
  658 F.2d 1256 (9th Cir. 1981) ............................................................................................ 15

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ............................................................................................ 17

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*,
  604 F.3d 1291 (11th Cir. 2010) .......................................................................................... 11

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
  467 F.3d 283 (2d Cir. 2006).............................................................................................. 12

*Real Est. Exch., Inc. v. Zillow Grp., Inc.*,
    2025 WL 670967 (9th Cir. 2025) ........................................................................ 18

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ........................................................... 10, 14, 17

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ............................................................. 16

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ............................................................................................ 16

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) .................................................................... passim

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ....................................................................... 7, 13

*State v. Black*,
    676 P.2d 963 (Wash. 1984) .............................................................................. 17

*Tremblay v. OpenAI, Inc.*,
    742 F. Supp. 3d 1054 (N.D. Cal. 2024) ........................................................... 18

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ......................................................................... 7, 12

*Upper Deck Co. v. Miller*,
    2024 WL 5119805 (W.D. Wash. Dec. 16, 2024) ............................................. 18

*Weber Distrib., LLC, RSUI Indem. Co.*,
    2018 WL 5274615 (C.D. Cal. Aug. 2, 2018) .................................................... 13

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*,
    810 F.2d 243 (D.C. Cir. 1987) ......................................................................... 14

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ........................................................................... 18

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1

**INTRODUCTION**

2          Plaintiffs' Consolidated Amended Class Action Complaint ("CAC") (Dkt. 473) should be

3  dismissed because it does not plausibly allege that Valve has harmed consumers in any way.

4          The CAC largely copies the *Wolfire* game developer complaint in an effort to similarly

5  avoid dismissal on the pleadings. But Plaintiffs here do not make the critical allegations that

6  allowed the *Wolfire* complaint to survive. They rely on other allegations that are unquestionably

7  false. And they fail to make allegations necessary to show injury to *consumers*, rather than the

8  developers who sued in *Wolfire*. As a result, dismissal is required for two independent reasons.

9          First, Plaintiffs' complaint fails under the Ninth Circuit's decision in *Somers v. Apple, Inc.*,

10  729 F.3d 953 (9th Cir. 2013). Plaintiffs cannot show that Valve's revenue share is

11  supracompetitive because it was adopted in a competitive market, and has only gone *down* since

12  Valve "allegedly acquired monopoly in that market." *Id.* at 964. The "stability of [Valve's]

13  pricing," irrespective of competition, refutes Plaintiffs' core allegation that its initial "prices were

14  supracompetitive." *Id.* at 966. Those "basic economic principles" doom Plaintiffs' case. *Id.* at 964.

15          Plaintiffs either omit or rephrase several key allegations that enabled the developers to

16  narrowly avoid dismissal under *Somers*, presumably because they know the developers'

17  allegations are false. And while Plaintiffs parrot *Wolfire* in alleging that Valve acquired monopoly

18  power at an early stage by acquiring and shutting down the World Opponent Network, or WON

19  (an online network for multiplayer games created by Sierra, the initial publisher of *Half-Life* and

20  other PC games), they ignore what is now beyond dispute and subject to judicial notice: Valve

21  never owned WON or shut it down. Valve repeatedly notified counsel about this issue and even

22  filed a sworn declaration with documentary support to this effect. Plaintiffs cannot use an obvious

23  falsity to survive dismissal. For all these reasons, Plaintiffs cannot sidestep *Somers*.

24          Second, dismissal is independently warranted because Plaintiffs fail to plausibly allege that

25  Valve's alleged anticompetitive conduct results in higher prices for consumers. Plaintiffs spend

26  most of their complaint alleging ways in which the claimed anticompetitive conduct purportedly

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 1
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1    harms *developers*. But they fail to plausibly allege that lower revenue shares for developers—

2    which supposedly would result if Plaintiffs prevail—will result in lower game prices for

3    *consumers*. As a case in point, much of Plaintiffs' CAC focuses on allegations that Valve insists

4    on *lower* game prices for Steam customers. Whatever the merits of that theory in the developer

5    case, it plainly is not a claim of injury to consumers, who benefit from lower game prices.

6        To the extent Plaintiffs address harm to consumers at all, their allegations do not clear the

7    plausibility threshold. Plaintiffs allege that consumers pay supracompetitive "commissions," CAC

8    ¶¶ 3, 13–15, 196–197, but that cannot be true as consumers pay no commissions at all. Plaintiffs

9    also claim that developers will respond to lower "platform fees" by "lower[ing] their prices to sell

10   more games and earn more revenue," CAC ¶ 200, but this is a textbook conclusory allegation. It

11   is also at odds with the common-sense economic reality that developers would be expected to

12   "charge the highest price the market will bear." *BASF Corp. v. Old World Trading Co. Inc.*, 1993

13   WL 643419, at *15 (N.D. Ill. May 21, 1992), *aff'd*, 41 F.3d 1081 (7th Cir. 1994). Therefore, even

14   if *Somers* did not foreclose Plaintiffs' case, their claims would still fail because they cannot show

15   any injury.

16                              **BACKGROUND**

17   **I.    VALVE AND THE EMERGENCE OF STEAM**

18       Today, Valve is a successful company that develops games, operates the Steam platform,

19   and makes hardware. CAC ¶¶ 2, 41–42. But Valve started out differently. It began as a startup

20   video game developer, selling games in retail stores like most other developers. CAC ¶¶ 31–32.

21   Valve released *Half-Life*, its first critically acclaimed PC game, within two years of its founding,

22   and subsequently released other popular games, including *Counter-Strike* and *Portal*. *Id.*

23       In 2003, Valve joined the ranks of digital game distributors by launching Steam, which

24   initially provided a way to patch and update Valve-developed games. CAC ¶¶ 33, 35. Plaintiffs

25   allege that *Half-Life 2* became the first game consumers could purchase on Steam in November

26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 2
No. 2:21-cv-00563-JNW

1  2004. CAC ¶ 34. Valve did not launch what Plaintiffs call "the Steam Store" until 2005, CAC ¶ 2,

2  when Valve began allowing other developers to sell their games on its platform, CAC ¶ 37.

3  Slowly, Valve grew Steam to provide a host of services to developers and consumers. *See*

4  CAC ¶¶ 39, 42. "In 2005, Forbes estimated Valve's gross revenue to be around $70 million," CAC

5  ¶ 39, just a small portion of "the billions of dollars in annual digital PC game sales," CAC ¶ 2.

6  Despite early signs of promise, Steam remained in its "relative infancy" as late as 2009. CAC

7  ¶ 172. Indeed, it took years for Steam to become "the top PC game platform in the United States

8  and the world." CAC ¶ 128.

9  From its inception, Valve has operated Steam with a revenue-share model, selling

10  developers' games on its platform and retaining a share of the revenue Valve receives from those

11  sales. CAC ¶¶ 60, 216. Plaintiffs allege that "Valve set its 30% commission in the early days of

12  digital distribution" (with 70% going to the developer). CAC ¶ 216. This revenue share remained

13  the same until 2018, when it decreased for certain games. CAC ¶ 60 & n.4. Valve now has a

14  revenue share of "25% on all of a game's earnings between $10 million and $50 million; and 20%

15  on all of a game's earnings over $50 million." *Id.* As a result, Valve's revenue share has only

16  decreased as Steam has grown more successful.

17  **II.    THE DEVELOPER CASES**

18  In January 2021, Plaintiff Sean Colvin and several others filed a consumer class action

19  against Valve in the Central District of California, which was subsequently transferred to this

20  District. *See* 21-CV-650. Soon after the *Colvin* case was filed, game developers filed their own

21  antitrust claims against Valve. *See* 21-CV-563 (*Wolfire* Case); 21-CV-872 (*Dark Catt* Case).

22  Judge Coughenour consolidated these cases. Dkt. 29; *see* Dkt. 441 at 2 (discussing procedural

23  history).

24  Judge Coughenour twice ruled on Valve's motions to dismiss in the *Wolfire* and *Dark Catt*

25  cases. In the first *Wolfire* order, the Court granted in part Valve's motion to dismiss for failure to

26  allege antitrust injury based on *Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013). Dkt. 56.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 3
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

Because Valve "has always charged the same fee to game publishers—30 percent," even before it allegedly became "dominant" in the market, the Court found that Wolfire's "allegations are not meaningfully different from *Somers v. Apple*." Dkt. 67 at 6. The Court also separately granted in part Valve's motion to dismiss in *Dark Catt*, though on different grounds—that Dark Catt did not sufficiently allege anticompetitive conduct. Resolving all inferences in Dark Catt's favor, Judge Coughenour declined to dismiss *Dark Catt* under *Somers* because the complaint could be read as suggesting Valve was always "the market leader for PC game delivery." 21-CV-872, Dkt. 56 at 3.

After Wolfire and Dark Catt amended their complaints, the Court allowed both cases to proceed. *See* Dkt. 80 (second *Wolfire* motion to dismiss order); 21-CV-872, Dkt. 70 (second *Dark Catt* motion to dismiss order). Judge Coughenour relied on the Wolfire Plaintiffs' new allegations that Valve instantly acquired monopoly power upon launching Steam. Specifically, Judge Coughenour relied on the allegation that Valve "acquired the World Opponent Network gaming platform in 2001 and shut it down a few years later, forcing gamers onto the Steam Platform, making Steam '*instantly . . . a must-have platform*.'" Dkt. 80 at 7 (quoting Dkt. 68 at ¶ 59) (emphasis added). He also relied upon allegations that even "in those early days," Valve "charge[d] a fee [revenue share] well above its cost structure because [its] brick-and-mortar competitors had a far higher cost structure." *Id.* (citing Dkt. 68 at ¶¶ 4, 47–48, 63–64, 306–308).

It is now clear, however, that one of the central allegations Judge Coughenour had to rely on was simply wrong: Valve never acquired, owned, or shut down WON. In opposing the developer class's certification motion in May 2024, Valve submitted a sworn declaration to the Court conclusively establishing that "Valve never acquired or owned WON." Dkt. 231, Johnson Declaration ¶ 10. Mr. Johnson, a Valve employee since 1999, spoke from his personal knowledge and attached a confirming contemporaneous agreement. *Id.* ¶¶ 1, 7 & Ex. 1. Valve filed that Declaration on the master docket for this litigation, in which Interim Consumer Class Counsel are counsel of record. Valve also repeatedly notified Plaintiffs' counsel about the falsity of the WON

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 4
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1    allegation, including as recently as this month, but Plaintiffs have steadfastly refused to amend.

2    *See* Ex. 1 (8/8/2025 – 8/18/2025 Emails), at 5; Ex. 2 (9/25/2024 R. Simins Email).

3    **III.    THE PLAINTIFFS' COMPLAINT**

4         In 2024, several consumers filed new class action complaints against Valve, including

5    Plaintiffs Connor Hepler and Aaron Lancaster. *See* 24-CV-1735; Dkt. 441 at 2. The Court

6    consolidated the consumer cases, appointed Interim Consumer Class Counsel, and set a briefing

7    schedule to file a consolidated amended complaint. Dkts. 394, 459. On June 27, 2025, Plaintiffs

8    filed their consolidated amended class action complaint against Valve. Dkt. 473.

9         The CAC copies and pastes many of the developers' allegations from the *Wolfire* and *Dark*

10   *Catt* complaints, presumably to attempt to fall within Judge Coughenour's motion to dismiss

11   decisions. But two aspects of the CAC are particularly notable. First, despite extensive time to

12   review the *Wolfire* and *Dark Catt* complaints and Judge Coughenour's rulings, Plaintiffs

13   conspicuously fail to include certain critical allegations that allowed the earlier complaints to

14   survive Defendant's motions to dismiss. They do not allege that Valve's purported acquisition of

15   WON made Steam "instantly . . . a must-have platform," Dkt. 68 at ¶ 59—which Judge

16   Coughenour found significant, Dkt. 80 at 7. And they do not allege that Valve was always "the

17   market leader for PC game delivery," 21-CV-872, Dkt. 56 at 3, or that Valve always had "market

18   power over third-party game distribution," 21-CV-872, Dkt. 70 at 4-5—both of which Judge

19   Coughenour relied upon to allow the *Dark Catt* complaint to proceed, 21-CV-872, Dkt. 56 at 3.

20   On the contrary, Plaintiffs' own allegations evidence a lack of market power by Valve, namely

21   their allegations that Valve's estimated gross revenue in 2005 was "around $70 million," CAC ¶

22   39, compared to a total alleged market sales volume of "billions of dollars in annual digital PC

23   game sales," CAC ¶ 2.

24        Second, while Plaintiffs omit the critical allegations about instant market power that were

25   before Judge Coughenour, they duplicate many of the *Wolfire* complaint's allegations of harm,

26   leading to the odd result that the allegations in the CAC are both inaccurate and not germane to

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 5
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1    the actual Plaintiffs in this case. For instance, each Plaintiff alleges that he "paid supracompetitive

2    commissions to Valve for each sale of its PC games," CAC ¶¶ 13–15; *see also* CAC ¶ 3

3    ("Consumers must pay these supracompetitive commissions . . . ."), but that makes no sense—

4    consumers do not pay commissions to Valve. If the reference to commissions is intended to refer

5    to Valve's revenue share, that is between Valve and developers, not consumers.

6        Similarly, the CAC repeatedly alleges that *developers* are being harmed by Valve's

7    allegedly supracompetitive revenue share and alleged platform-most-favored-nation policy

8    ("PMFN"), *see* CAC ¶¶ 5–11, 57–80, 176–93, 202–20 (elevated commission and PMFN), 46

9    (access to developer data), 49–56, 81–94 (Steam Keys), 135–72 (inability of developers to create

10   rival platforms), 173–75 (Steam Workshop). These allegations have no apparent relevance in a

11   case brought by *consumers*. In fact, several of the allegations are counterproductive for Plaintiffs.

12   For example, they allege that Valve's PMFN results in *lower* prices for games and in-game

13   purchases. CAC ¶ 68. They also allege several examples of Valve asking developers to reduce

14   their prices. *See* CAC ¶ 69 ("We would ask that Steam customers get that lower $5 price as well."),

15   ¶ 71 ("[W]e'd want to get that lower base price as well[.]"), ¶ 72 ("If you can't offer Steam

16   customers the same deal as customers on other platforms, then we're not going to be able to

17   continue selling and promoting the game."). But lower prices, of course, are *good* for consumers.

18   The only allegation of harm *to consumers* is the conclusory assertion that developers will respond

19   to lower "platform fees" by "lower[ing] their prices to sell more games and earn more revenue,"

20   and the example of a single game, *Metro Exodus*, that was sold for a lower price elsewhere after

21   its publisher decided to remove it from Steam and sell it exclusively on the Epic Games Store.

22   CAC ¶¶ 200–01.

23       Plaintiffs also pursue the same legal claims as the developers in *Wolfire*. Like those

24   developers, Plaintiffs' core legal allegations are that Valve's revenue share is supracompetitive,

25   and that Valve maintains it by enforcing a PMFN. CAC ¶¶ 1–11. They seek relief under the

26   Sherman Act and the Washington Consumer Protection Act. CAC ¶¶ 235–59. The parties have

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 6
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1 met and conferred regarding the defects Valve has identified in Plaintiffs' Complaint as required

2 by the Court's Chambers Procedures. Plaintiffs took the position that they need not amend their

3 Complaint in light of Valve's arguments. For the reasons explained below, this Court should

4 dismiss Plaintiffs' claims.

5 <u>**LEGAL STANDARD**</u>

6 Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint when it

7 fails to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

8 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial

9 plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

10 inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads

11 facts that are merely consistent with a defendant's liability, it stops short of the line between

12 possibility and plausibility of entitlement to relief." *Id.* (quotation marks omitted). And while well-

13 pleaded facts must be accepted as true, courts are not required "to accept as true allegations that

14 are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v.*

15 *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

16 In deciding a Rule 12(b)(6) motion, a court generally may consider "only the allegations

17 contained within the four corners of [the] complaint." *Iqbal*, 556 U.S. at 674. "A court may,

18 however, consider certain materials—documents attached to the complaint, documents

19 incorporated by reference in the complaint, or matters of judicial notice." *United States v. Ritchie*,

20 342 F.3d 903, 908 (9th Cir. 2003). A court may properly take judicial notice of, among other

21 things, "the proceedings . . . of the district and appellate courts" in related cases, *Emrich v. Touche*

22 *Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir. 1988). And "[t]he court need not . . . accept as true

23 allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell*, 266

24 F.3d at 988.

25 Documents are incorporated by reference if they are "integral to the plaintiff's complaint

26 and dispositive in the dispute, raising the spectre that plaintiff failed to incorporate them by

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 7
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1  reference in the complaint as a means of avoiding Rule 12(b)(6) dismissal." *Hotel Emps. & Rest.*

2  *Emps. Local 2 v. Vista Inn Mgmt. Co.*, 393 F. Supp. 2d 972, 979 (N.D. Cal. 2005); *see also Lee v.*

3  *City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (explaining that a court may consider

4  "extrinsic evidence" in deciding a Rule 12(b)(6) motion if the "plaintiff's complaint necessarily

5  relies" on this evidence (citation modified)). The primary concern with "looking to documents

6  outside the complaint—lack of notice to the plaintiff—is dissipated where plaintiff has actual

7  notice and has relied upon these documents in framing the complaint." *In re Burlington Coat*

8  *Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation modified).

## ARGUMENT

10      In an antitrust case like this one, the Court's "job is not to condone or punish [Valve] for

11  its success," but rather to assess whether Valve engaged in "[a]nticompetitive behavior [that] is

12  illegal under federal antitrust law." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1005 (9th Cir. 2020).

13  To make out such a claim, Plaintiffs "must prove the existence of '*antitrust* injury, which is to say

14  injury of the type the antitrust laws were intended to prevent and that flows from that which makes

15  defendants' acts unlawful.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)

16  (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)). Antitrust

17  injury requires proof of four elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff,

18  (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust

19  laws were intended to prevent." *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th

20  Cir. 2003). To establish the second element, a plaintiff must have suffered "some credible injury

21  caused by the unlawful conduct." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1056

22  (9th Cir. 1999).

23      Here, Plaintiffs fail to plausibly allege such an injury for two independent reasons: (1)

24  Under *Somers*, Plaintiffs do not plausibly allege that Valve's revenue share is supracompetitive;

25  and (2) Plaintiffs do not plausibly allege that the challenged policies result in higher game prices.

26  Those failings require dismissal because "causal antitrust injury is a substantive element of an

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 8
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1    antitrust claim, and the fact of injury or damage must be alleged at the pleading stage." *Somers*,

2    729 F.3d at 963.

3    **I.      PLAINTIFFS HAVE FAILED TO PLEAD ANTITRUST INJURY**

4        **A.      Plaintiffs Do Not Plausibly Allege That Valve's Revenue Share Is**
             **Supracompetitive.**

5

6            1.      *Somers* Is On Point And Controlling.

7        In *Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013), the Ninth Circuit held that a plaintiff

8    cannot plausibly allege that a price was supracompetitive when, as here, that price was the same

9    "*before* [the seller] obtained monopoly in the . . . market, and *after* it allegedly acquired monopoly

10   in that market." *Id.* at 964. The plaintiff in *Somers*—who sought to represent a class—sued Apple,

11   alleging that Apple had monopolized the market for downloads of music files and thereby charged

12   supracompetitive prices. *Id.* at 962–63. The Ninth Circuit affirmed the dismissal of her complaint

13   with prejudice for failure to plausibly allege antitrust injury. *Id.* Much like this case, the plaintiff

14   had alleged "in contradictory fashion" that Apple used its monopoly power to "inflate[] . . . music

15   prices," but also that "the prices [had] remained the same since Apple entered the market in 2003,"

16   *id.* at 962–63, when it did not have a monopoly and faced other "competitors," *id.* at 958, 964.

17   Because the plaintiff alleged "that the price for music downloads remained the same (99 cents)

18   since [Apple] entered the market in 2003, *before* it obtained monopoly in the audio download

19   market, and *after* it allegedly acquired monopoly in that market in 2004," her "own allegations

20   d[id] not square with her overcharge theory" and "rendered implausible" her claims. *Id.* at 964.

21   While the Ninth Circuit also observed that Apple's monopoly allegedly ended in 2008, that did

22   not undermine the core logic of the decision: "The fact that Apple continuously charged the same

23   price for its music irrespective of the absence or presence of a competitor renders implausible

24   *Somers*' conclusory assertion that Apple's [allegedly anticompetitive] software updates affected

25   music prices." *Id.*

26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 9
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1    That holding is consistent not only with "basic economic principles," *id.* at 965, but also

2    with Ninth Circuit precedent, both before and after *Somers*, that likewise rejected overcharge

3    claims. In *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253 (9th Cir. 2008), for instance, the consumer

4    plaintiff alleged that an agreement between Amazon.com and Borders was anticompetitive

5    because it resulted in higher prices for books on Amazon.com. *Id.* at 1255. The Ninth Circuit

6    affirmed the dismissal of that claim because "the prices [the plaintiff] paid . . . after the agreement

7    became effective were the same, or even lower, than the prices listed before." *Id.* Similarly, in *In

8    re Online DVD-Rental Antitrust Litigation*, 779 F.3d 914 (9th Cir. 2015), the consumer plaintiffs

9    alleged that an agreement between Netflix and Walmart was anticompetitive because it resulted in

10   higher prices for DVD rentals via Netflix. *Id.* at 918. Again, the Ninth Circuit affirmed the

11   dismissal of this claim because the "prices in fact remained the same or even went down following

12   the agreement." *Id.* at 922.

13   That reasoning fully applies here. If anything, this case presents a stronger basis for

14   dismissal than *Somers*.

15   First, both here and in *Somers*, the allegedly supracompetitive prices were set *before* the

16   defendant supposedly acquired monopoly power. Valve began selling third-party games on Steam

17   in 2005. CAC ¶ 2. By Plaintiffs' account, Valve's 30% revenue share "was set at the Steam Store's

18   founding." CAC ¶ 7; *see* CAC ¶ 216 ("Valve set its 30% commission in the early days of digital

19   distribution[.]"). In 2005, however, "Forbes estimated Valve's gross revenue to be around $70

20   million." CAC ¶ 39. That was just a small piece of "the billions of dollars in annual digital PC

21   game sales." CAC ¶ 2. Indeed, Plaintiffs concede that Steam was still in its "relative infancy" as

22   late as 2009. CAC ¶ 172. Dividing $70 million by any number in the billions yields a miniscule

23   market share inconsistent with market power, even accepting the CAC's characterizations of the

24   market. As a result, Plaintiffs' allegations show that Valve could not have had monopoly power

25   when it first set its revenue share. *See, e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438

26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 10
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1  (9th Cir. 1995) ("[N]umerous cases hold that a market share of less than 50 percent is
2  presumptively insufficient to establish market power.").

3      Second, here and in *Somers*, the revenue share remained the same *after* monopoly power
4  was purportedly obtained. It is unclear when Plaintiffs believe that Valve transitioned from
5  allegedly having "market power" to a "monopoly," CAC ¶ 134, but they allege that a monopoly
6  existed by at least 2015 and has continued until the present, CAC ¶¶ 128–29. Yet Plaintiffs also
7  allege that Steam had a 30% revenue share in 2005 and maintained that revenue share through
8  2018, CAC ¶ 60 n.4. *See Somers*, 729 F.3d at 964 (relying upon the allegations that "Apple's music
9  prices from 2004 to 2008" remained the same). The "stability of [its] pricing," irrespective of
10 competition, renders wholly implausible Plaintiffs' allegation that its initial "prices were
11 supracompetitive." *Id.* at 966.

12     Third, Valve *reduced* its revenue share in 2018, despite purportedly possessing monopoly
13 power—a critical fact absent from *Somers* that underscores the decision's salience here. CAC ¶ 60
14 & n.4. Generally, conduct that "prevents [a competitor] from competing . . . means higher prices
15 and fewer choices for consumers." *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604
16 F.3d 1291, 1303 (11th Cir. 2010). These are the types of "basic economic principles" endorsed in
17 *Somers*, 729 F.3d at 964. Plaintiffs, however, concede that Valve's revenue share only decreased
18 as it grew more successful, which provides further proof that Plaintiffs' overcharge theory is
19 implausible. *See Gerlinger*, 526 F.3d at 1255 (relying on decrease in prices to affirm finding of no
20 antitrust injury); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 922 (same). Thus, Plaintiffs'
21 claims fail because they do not "make economic sense." *Adaptive Power Sols., LLC v. Hughes*
22 *Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998).

23

24

25

26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 11
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

2.    Plaintiffs Do Not Plead Any Plausible Path Around *Somers*.

Plaintiffs' general strategy is to recycle allegations from the *Wolfire* and *Dark Catt* complaints that permitted the developers to narrowly avoid dismissal under *Somers*. Those efforts fail for several reasons.

To start, Judge Coughenour allowed the *Dark Catt* case to proceed because Plaintiff Dark Catt alleged that Valve was always "the market leader for PC game delivery," 21-CV-872, Dkt. 56 at 3, and "[n]ever lacked market power over third-party game distribution," 21-CV-872, Dkt. 70 at 4–5. Plaintiffs make no such allegations here. "That omission is fatal" because "it is improper to assume that the plaintiff can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 293 (2d Cir. 2006) (citation modified). Plaintiffs were notified of this deficiency and refused to address it—presumably because they know Valve did not possess market power when it set the 30% revenue share. *See* Ex. 1 (8/8/2025 – 8/18/2025 Emails). Any such allegations of early market power are also inconsistent with Plaintiffs' own allegations about what Valve's likely market share was at Steam's inception. *See supra* at § 1.

Plaintiffs' allegations about WON are similarly inadequate. Judge Coughenour concluded that Valve might have possessed "market power earlier on than described" because Valve "acquired the World Opponent Network gaming platform in 2001 and shut it down a few years later, forcing gamers onto the Steam Platform, making Steam 'instantly . . . a must-have platform.'" Dkt. 80 at 7 (quoting Dkt. 68 at ¶ 59). Here, Plaintiffs allege Valve acquired WON, but *do not* allege that Steam "instantly" became a "must-have platform" at that time. That alone distinguishes this case from the developer cases and renders even more implausible Plaintiffs' allegations that Valve had "market power" for "at least the entire class period," CAC ¶ 134, which are central to overcoming *Somers*.

Making matters worse for Plaintiffs, it is beyond doubt that Valve never acquired or owned WON. Over a year ago, Valve submitted a declaration to the Court establishing that "Valve never

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 12
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1    acquired or owned WON." Dkt. 231, Johnson Declaration ¶¶ 7–10 & Ex. 1. Plaintiffs also have

2    actual notice of this fact because Valve has emailed their counsel—on two occasions—to notify

3    them of the falsity of the WON allegation. *See* Ex. 1 (8/8/2025 – 8/18/2025 Emails), at 5; Ex. 2

4    (9/25/2024 R. Simins Email).

5         The Court should not allow Plaintiffs to rely upon a demonstrably false allegation to avoid

6    dismissal. Although in deciding a Rule 12(b)(6) motion, a court generally considers "only the

7    allegations contained within the four corners of [the] complaint," *Ashcroft*, 556 U.S. at 674, it may

8    also "consider . . . matters of judicial notice," *Ritchie*, 342 F.3d at 908. Moreover, a district court

9    may take judicial notice of "the proceedings . . . of the district and appellate courts" in related

10   cases, *Emrich*, 846 F.2d at 1198, such as the Johnson declaration filed on the same docket in this

11   case. *See, e.g.*, *Fay v. Mortg. Elec. Registration Sys., Inc.*, 2012 WL 993437, at *2 (W.D. Wash.

12   Mar. 22, 2012) (taking judicial notice of "previously filed declaration"); *Weber Distrib., LLC,*

13   *RSUI Indem. Co.*, 2018 WL 5274615, at *6 (C.D. Cal. Aug. 2, 2018) (same). Alternatively, the

14   Court may consider the Johnson declaration and its exhibit as a document incorporated by

15   reference because it directly refutes the WON allegations, which are "integral to the plaintiff's

16   complaint and dispositive in the dispute," *Hotel Emps.*, 393 F. Supp. 2d at 979, and Plaintiffs have

17   "actual notice" of the falsity of the WON allegations so there is no unfairness, *In re Burlington*

18   *Coat Factory Secs. Litig.*, 114 F.3d at 1426. Either way, this Court "need not . . . accept as true

19   allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell*, 266

20   F.3d at 988.

21        Last, Plaintiffs cannot avoid dismissal by alleging that "Valve set its 30% commission in

22   the early days of digital distribution to compete with brick-and-mortar stores," even though it "has

23   much, much lower costs." CAC ¶ 216; *see* Dkt. 80 at 7 (motion to dismiss order relying upon

24   similar allegation). "[U]nder basic economic principles, increased competition . . . lowers prices."

25   *Somers*, 729 F.3d at 964. If Plaintiffs' "overcharge theory were correct," then Valve's revenue

26   share should have been *even higher* when it later acquired an alleged monopoly. *See id.* The fact

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 13
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1    that Valve's prices have gone *down*, irrespective of competition, refutes Plaintiffs' allegation that

2    its initial "prices were supracompetitive." *Id.* at 966.

3         Moreover, Plaintiffs fail to plausibly allege that some alternate, and lower, revenue share

4    would have been permitted by Valve's "cost structure." Citing a New York Times article, Plaintiffs

5    argue that Valve could have set its revenue share as low as 12% because "Epic Games claimed

6    that even with its 12% commission, it still made a profit margin of 5% to 7%, demonstrating that

7    platforms can operate profitably with significantly lower commission rates." CAC ¶ 147; *see also*

8    CAC ¶ 145 ("Epic determined that a 12% commission was sufficient to cover store costs in a

9    competitive market."). In a recent published opinion, however, the Ninth Circuit recognized that

10   "Epic receives a 12% commission [for games]—*a below-cost commission* that sacrifices short-

11   term profitability to build market share." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 968 (9th

12   Cir. 2023) (emphasis added). And Epic Games itself represented that "[b]y charging 12%

13   commission, the Epic Games Store will not be profitable for at least several years." *Epic Games,*

14   *Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 934 (N.D. Cal. 2021). "[T]he goal of antitrust law is not to

15   force businesses to forego profits," *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 994 n.15

16   (9th Cir. 2020)—and certainly not to force an emerging business to operate at a loss.

17        In sum, Plaintiffs fail to plausibly allege that Valve's revenue share is supracompetitive.

18   Rather, they concede that Valve lacked market power when it first adopted its revenue share, and

19   that Valve's revenue share has only decreased as Steam has become more successful. "Thus,

20   without more, these allegations do not nudge [Plaintiff]'s claim of antitrust injury across the line

21   from conceivable to plausible." *Somers*, 729 F.3d at 964 (citation modified).

22   **B.    Plaintiffs Do Not Plausibly Allege That Valve's Revenue Share Impacts**
23   **Output Or Prices For Consumers.**

24        Plaintiffs fail to plead antitrust injury for a second, and independent, reason: they do not

25   plausibly allege that Valve's conduct results in reduced output or higher game prices for

26   consumers. As an initial matter, an allegedly supracompetitive revenue share is not, without more,

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 14
No. 2:21-cv-00563-JNW

1  evidence of an antitrust violation. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th

2  Cir. 2012) ("Reducing consumers' choices or increasing prices to consumers does not sufficiently

3  allege an injury to competition"); *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810

4  F.2d 243, 252 (D.C. Cir. 1987) ("[A]n excessive price alone does not establish a violation of the

5  antitrust laws, because imposition of a high price is not, in and of itself, an anticompetitive act.").

6  But even if conduct is anticompetitive, "reduction of competition does not invoke the Sherman

7  Act until it harms consumer welfare." *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 848 (9th

8  Cir. 1996) (quoting *Rebel Oil*, 51 F.3d at 1433). And if there is "no evidence of reduced output or

9  increased prices," a consumer cannot show antitrust injury. *Id.* at 848–49.

10     In this case, Plaintiffs do not plausibly allege either form of injury. Plaintiffs make no

11  allegation that Valve's policies reduced output. To the contrary, they acknowledge that Steam has

12  helped the PC video game industry "grow[] to a staggering size." CAC ¶ 1. Nor do they plausibly

13  allege increased game prices to consumers, because the logic of their complaint should lead to

14  lower game prices. "Antitrust generally presumes that a firm maximizes its profits in the

15  environment in which it finds itself[.]" Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*

16  ¶ 964b (2024). That means businesses "charge the highest price the market will bear." *BASF Corp.*

17  *v. Old World Trading Co. Inc.*, 1993 WL 643419, at *15 (N.D. Ill. May 21, 1992), *aff'd*, 41 F.3d

18  1081 (7th Cir. 1994). Courts should not "indulge in the assumption that a [business] would follow

19  a course of behavior other than that which it believed would maximize its profits." *Murphy*

20  *Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981).

21     Here, Plaintiffs spend most of the CAC protesting Valve's relationship with developers

22  and the revenue share Valve retains from selling their games. *See* CAC ¶¶ 5–11, 57–80, 176–93,

23  202–20 (elevated commission and PMFN), 46 (access to developer data), 49–56, 81–94 (Steam

24  Keys), 135–72 (inability of developers to create rival platforms), 173–75 (Steam Workshop). But

25  even if Valve's portion of the revenue share with *developers* would go down absent the alleged

26  conduct (and the developers' share would increase), it does not follow that prices for *consumers*

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 15
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

would decline because developers could just keep the difference. In other words, even if eliminating "Valve's challenged conduct . . . would lead to lower *platform fees*," CAC ¶ 200 (emphasis added), it would not necessarily lower *prices for consumers*. Courts have not hesitated to reject cases resting on similarly flawed economic logic. *See Friedman v. AARP, Inc.*, 2019 WL 5683465, at *6 (C.D. Cal. Nov. 1, 2019) ("Plaintiffs' creative theory that businesses must 'pass on the savings' to consumers lacks real world credibility."); *cf. Maxim Integrated Prods., Inc. v. Analog Devices*, 79 F.3d 1153, at *1 (9th Cir. 1996) (unpublished table decision) (concluding that exclusive dealing agreements were not anticompetitive because, even if "list prices" for distributors had "increased," the plaintiff "failed to produce any evidence that a higher price was actually paid by consumers").

Plaintiffs have almost nothing to say about harm to consumers. They briefly claim that "[i]f not for Valve's challenged conduct, competition would lead to lower platform fees across the market (on Steam and on competitor digital PC game distribution platforms), and publishers would lower their prices to sell more games and earn more revenue." CAC ¶ 200. That is a classic conclusory allegation that cannot be credited. *See Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions[.]" (second alteration in original)). Moreover, "the mere fact" that a complaint alleges "a causal connection between an antitrust violation and harm to the [plaintiff] . . . does not end the inquiry." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537 (1983). An allegation of harm is "insufficient as a matter of law" if the causal chain is "tenuous and speculative." *Id.* at 545; *see also City of Oakland v. Oakland Raiders*, 20 F.4th 441, 459 (9th Cir. 2021) (dismissing antitrust claim because the plaintiff's theory of causation "is too speculative to establish antitrust standing").

That rule controls here, because "Plaintiffs have failed to plausibly allege in a non-conclusory manner that they themselves have been injured." *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 997–98 (N.D. Cal. 2020). The only example Plaintiffs

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 16
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1    provide is *Metro Exodus*—a single game out of more than a hundred thousand on Steam. CAC

2    ¶¶ 2, 201.  But none of the Plaintiffs alleges that he bought *Metro Exodus*, nor can Plaintiffs cure

3    that defect as Valve does not have a record of any named plaintiff purchasing the game on Steam

4    at all, let alone at an allegedly inflated price. Consequently, Plaintiffs cannot rely upon *Metro

5    Exodus* to establish injury because "[e]ven named plaintiffs who represent a class must allege and

6    show that they personally have been injured, not that injury has been suffered by other, unidentified

7    members of the class to which they belong and which they purport to represent." *Simon v. E. Ky.

8    Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) (citation modified).  Absent any fact showing

9    antitrust injury, the Court is left with speculative and conclusory assertions of harm.

10    More broadly, the *Metro Exodus* anecdote does not show that the alleged conduct results

11    in higher game prices—as Plaintiffs' own allegations reveal. Plaintiffs repeatedly allege that Valve

12    regularly enforces its PMFN.  CAC ¶ 72. But none of these examples involves a request by Valve

13    to *raise* the price a consumer would pay on Steam.  Indeed, each of these alleged examples involves

14    a request for games to be listed for lower prices on Steam. *See* CAC ¶¶ 69, 71–72. If Plaintiffs'

15    allegations are accepted as true, that means Valve would have responded to a lower game price on

16    a rival platform by demanding that the developer reduce its price on Steam. That would benefit,

17    not harm, consumers.

18    As a result, the Court should dismiss Plaintiffs' claims because they do not plausibly allege

19    that Valve's conduct has harmed them.

20    **II.    THE COURT SHOULD DISMISS ALL COUNTS WITH PREJUDICE**

21    Given Plaintiffs' failure to allege antitrust injury, the Court should dismiss all counts. As

22    noted above, antitrust injury "is an element of all antitrust suits brought by private parties seeking

23    damages" under federal law. *Rebel Oil Co.*, 51 F.3d at 1433. Plaintiffs seeking injunctive relief

24    under federal law also must establish antitrust injury. *Cargill, Inc. v. Monfort of Colorado, Inc.*,

25    479 U.S. 104, 113 (1986). Thus, the Court should dismiss Plaintiffs' claims under the Sherman

26    Act for failure to plausibly allege antitrust injury. *See* CAC ¶¶ 235–53.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 17
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

That deficiency requires dismissal of Plaintiffs' claim under the Washington Consumer Protection Act as well. *See* CAC ¶¶ 254–59. This provision is Washington's "equivalent of section 1 of the Sherman Antitrust Act" and "[w]hen the Legislature enacted the Consumer Protection Act, it anticipated that [Washington] courts would be guided by the interpretation given by federal courts to their corresponding federal statutes." *State v. Black*, 676 P.2d 963, 967 (Wash. 1984) (en banc). Therefore, Plaintiffs' state-law claim fails for the same reasons as their federal claims. *See Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1165 n.8 (9th Cir. 1997) (explaining that "our conclusion" with respect to federal antitrust claims "disposes of these claims" under Washington state law); *Real Est. Exch., Inc. v. Zillow Grp., Inc.*, 2025 WL 670967, at *1 n.2 (9th Cir. 2025) (unpublished) (same).

The Court should also dismiss Plaintiffs' claims **with prejudice**. "Although leave to amend a deficient complaint shall be freely given when justice so requires, leave may be denied if amendment of the complaint would be futile." *Gordon v. City of Oakland*, 627 F.3d 1092, 1094 (9th Cir. 2010). "Where the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave to amend is particularly broad." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (citation modified).

Here, all three Plaintiffs had multiple opportunities to cure the defects in their consolidated complaint and failed to do so. Hepler and Lancaster each filed one prior complaint. 21-CV-1735, Dkt. 1. And Colvin filed *three* prior complaints. Dkt. 68; 21-CV-650, Dkts. 1, 34. In addition, in accordance with this Court's procedures, Valve informed Plaintiffs of the critical problems with their allegations before filing this Motion and offered to meet and confer. Among other issues, Valve specifically informed Plaintiffs—for the second time—of the false allegation regarding WON, yet Plaintiffs refused to remove that allegation from their complaint or address any of the other deficiencies. *See* Ex. 1 (8/8/2025 – 8/18/2025 Emails); Kilaru Decl. ¶ 4.

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 18
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1    Plaintiffs' decision to leave their consolidated amended complaint as is should come as no

2    surprise: their claims are "based on a flawed legal theory" that cannot be corrected with more

3    factual allegations. *Upper Deck Co. v. Miller*, 2024 WL 5119805, at *5 (W.D. Wash. Dec. 16,

4    2024) (denying leave to amend for this reason); *see also Tremblay v. OpenAI, Inc.*, 742 F. Supp.

5    3d 1054, 1059 (N.D. Cal. 2024) (same). That is precisely why the complaint in *Somers* was

6    dismissed with prejudice. 729 F.3d at 963 (explaining that leave to amend was denied because the

7    plaintiff's claim was "premised" on a faulty "presumption"). The Court should do the same here.

8    ## CONCLUSION

9    The Court should grant Valve's motion to dismiss with prejudice.

10    DATED this 22nd day of August, 2025.

11
          *I certify that this memorandum contains 6,679*
12        *words, in compliance with the Local Civil Rules.*

13    WILKINSON STEKLOFF LLP

      *s/ Rakesh Kilaru*
14    Rakesh Kilaru, *Admitted Pro Hac Vice*
      James Rosenthal, *Admitted Pro Hac Vice*
15    Max Warren, *Admitted Pro Hac Vice*
      David Friedman, *Admitted Pro Hac Vice*
16    WILKINSON STEKLOFF LLP
      2001 M Street NW, 10th Floor
17    Washington, DC 20036
      Tel: (202) 847-4000
18    Fax: (202) 847-4005
      rkilaru@wilkinsonstekloff.com
19    jrosenthal@wilkinsonstekloff.com
      mwarren@wilkinsonstekloff.com
20    dfriedman@wilkinsonstekloff.com

21    Keri L. Arnold, *Admitted Pro Hac Vice*
      Ralia E. Polechronis, *Admitted Pro Hac Vice*
22    Caroline Li, *Admitted Pro Hac Vice*
      WILKINSON STEKLOFF LLP
23    130 West 42nd Street, 24th Floor
      New York, New York 10036
24    Tel: (212) 294-8910
      Fax: (202) 847-4005
25    karnold@wilkinsonstekloff.com
      rpolechronis@wilkinsonstekloff.com
26    cli@wilkinsonstekloff.com

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 19
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*s/ Blake Marks-Dias*

Blake Marks-Dias, WSBA No. 28169
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, WA 98104
Tel: (206) 625-8600
Fax: (206) 625-0900
bmarksdias@corrcronin.com

Jessica M. Rizzo, *Admitted Pro Hac Vice*
BALLARD SPAHR LLP
1735 Market Street, Floor 51
Philadelphia, PA 19103
Tel: (215) 665-8500
Fax: (215) 864-8999
rizzoj@ballardspahr.com

Nathan M. Buchter, *Admitted Pro Hac Vice*
FOX ROTHSCHILD LLP
2000 Market Street STE 20TH FL
Philadelphia, PA 19103
Tel: (215) 299-3010
nbuchter@foxrothschild.com

Charles B. Casper, *Admitted Pro Hac Vice*
Robert E. Day, *Admitted Pro Hac Vice*
MONTGOMERY McCRACKEN WALKER &
RHOADS LLP
1735 Market Street, 20th Floor
Philadelphia, PA 19103
Tel: (215) 772-1500
ccasper@mmwr.com
rday@mmwr.com

Scott M. Danner, *Admitted Pro Hac Vice*
Priyanka Timblo, *Admitted Pro Hac Vice*
HOLWELL SCHUSTER & GOLDBERG LLP
425 Lexington Avenue
New York, NY 10017
Tel: (646) 837-5151
sdanner@hsgllp.com
ptimblo@hsgllp.com

*Attorneys for Defendant Valve Corporation*

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 20
No. 2:21-cv-00563-JNW

1

## CERTIFICATION OF CONFERRAL

2        Pursuant to Section 5.6 of the Court's Civil Chambers Procedures, Valve hereby certifies

3    that it conferred with Plaintiffs before filing this motion to dismiss. Specifically, Valve sent an

4    email to counsel for Plaintiffs on August 8, 2025, which informed them of the legal bases for this

5    motion to dismiss and offered to meet and confer via telephone. On August 18, 2025, counsel for

6    Plaintiffs responded that they do not intend to file an amended complaint. This email exchange is

7    attached as Exhibit 1 to this motion to dismiss.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT VALVE CORPORATION'S MOTION TO
DISMISS THE CONSUMER COMPLAINT - 21
No. 2:21-cv-00563-JNW