The Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE VALVE ANTITRUST LITIGATION | No. 2:21-CV-00563-JNW<br><br>**DEFENDANT VALVE CORPORATION'S NOTICE OF SUPPLEMENTAL AUTHORITY REGARDING PLAINTIFF RYAN LALLY'S MOTION FOR SANCTIONS (DKT. 467)** |

VALVE CORPORATION'S NOTICE OF
SUPPLEMENTAL AUTHORITY
(No. 2-21-CV-00563)

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## NOTICE OF SUPPLEMENTAL AUTHORITY

Pursuant to Local Civil Rule 7(n), and in connection with Ryan Lally's motion for sanctions (Dkt. 467), Defendant Valve Corporation attaches and respectfully brings to the Court's attention the following decision of the United States Court of Appeals for the Second Circuit: *Frazier v. X Corp.*, No. 24-1948, --- F.4th ----, 2025 WL 2502133 (2d Cir. Sept. 2, 2025).

Lally cited in his motion for sanctions *Frazier v. X Corp.*, 739 F. Supp. 3d 219 (S.D.N.Y. July 4, 2024). There, the district court granted a petition to compel a respondent to pay arbitration fees. The Second Circuit has now reversed the district court's decision. The Second Circuit explained that "whether a party has failed to pay arbitration fees in an ongoing arbitral proceeding is a procedural issue entrusted to the arbitrator or arbitral body – not the court – for resolution within that proceeding." *Frazier*, 2025 WL 2502133 at *1. Accordingly, the court held that, "once the parties are before their chosen arbitral body, refusal to pay ongoing fees alone is not a 'failure, neglect, or refusal . . . to arbitrate' that a district court is empowered to remedy under 9 U.S.C. § 4." *Id.*

VALVE CORPORATION'S NOTICE OF SUPPLEMENTAL AUTHORITY -1
(No. 2-21-CV-00563)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

DATED: September 3, 2025.

CORR CRONIN LLP

*s/ Blake Marks-Dias*
Blake Marks-Dias, WSBA No. 28169
1015 Second Avenue, Floor 10
Seattle, Washington 98104
(206) 625-8600 Phone
(206) 625-0900 Fax
bmarksdias@corrcronin.com

Michael W. McTigue Jr., *Admitted Pro Hac Vice*
Meredith C. Slawe, *Admitted Pro Hac Vice*
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
michael.mctigue@skadden.com
meredith.slawe@skadden.com

*Attorneys for Defendant Valve Corporation*

VALVE CORPORATION'S NOTICE OF
SUPPLEMENTAL AUTHORITY -2
(No. 2-21-CV-00563)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

# ATTACHMENT

2025 WL 2502133
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Burgious FRAZIER, Jr., Wayne Krug, Ben Perez, Vanessa Szajnberg, Nicholas Tapalansky, Shelly Yip, Yosub Kim, Petitioners-Appellees,
v.
X CORP., formerly known as Twitter, Inc., X Holdings Corp., formerly known as X Holdings I, Inc., Respondents-Appellants,

Docket No. 24-1948
|
August Term, 2024
|
Argued: May 15, 2025
|
Decided: September 2, 2025

Appeal from the United States District Court for the Southern District of New York.

**Attorneys and Law Firms**

Michael E. Kenneally, Morgan, Lewis & Bockius LLP, Washington, D.C. (Melissa D. Hill, Morgan, Lewis & Bockius LLP, New York, NY, James D. Nelson, Brendan J. Anderson, Morgan, Lewis & Bockius LLP, Washington, D.C. on the brief) for Respondents-Appellants.

Christopher M. McNerney, Outten & Golden, LLP, New York, NY (Akiva Cohen, Kamerman, Uncyk, Soniker & Klein P.C., New York, NY, on the brief) for Petitioners-Appellees.

Before: Lynch, Park, and Robinson, Circuit Judges.

**Opinion**

Gerard E. Lynch, Circuit Judge:

\*1 When Petitioners-Appellees ("Petitioners") were hired as employees of Respondent-Appellant Twitter, Inc.,[1] they signed "Dispute Resolution Agreements" ("DRAs") committing them to resolve any employment-related disputes with Twitter in binding individual arbitration.[2] After Petitioners were fired by Twitter, they brought various employment-related claims to JAMS, the arbitral organization identified in their DRAs. However, months into the proceedings, Twitter disagreed with JAMS about how the arbitral fees should be allocated between the parties. Twitter argued that the DRAs provided for a pro-rata split, while JAMS pointed to its own rules – incorporated by reference into the DRAs – that it said committed Twitter to paying all but the case initiation fees, as a precondition of JAMS's administering the arbitrations. Relying on a clause in the arbitration agreement that provided that "any disputes [over arbitration fees] w[ould] be resolved by the Arbitrator" – not JAMS – Twitter refused to pay. App'x 86, 224–25. Because JAMS refused to appoint an arbitrator without the fees, the proceedings ground to a halt. At the request of the parties, JAMS stayed the proceedings pending resolution of the fee issue.

[1] Subsequent to Petitioners' hiring, Twitter was acquired by Respondent-Appellant X Holdings Corp. and renamed "X Corp." Because the relevant agreements refer to "Twitter, Inc." – and for the sake of simplicity – we refer to X Corp. and X Holdings Corp. together as "Twitter" throughout this opinion.

[2] Petitioners each signed their own agreements; however, the parties agree that those agreements have no differences relevant to this case and, for the sake of simplicity, the parties refer to the agreement signed by lead Petitioner-Appellee Burgious Frazier, Jr. We do the same, for the same reasons.

Rather than fronting the fees themselves or asking JAMS to terminate the arbitral proceedings and pursuing other remedies, Petitioners sued to compel arbitration, arguing that by refusing to pay the fees allocated to it by JAMS, Twitter was "fail[ing], neglect[ing], or refus[ing] ... to arbitrate." 9 U.S.C. § 4. For the reasons explained below, we conclude that whether a party has failed to pay arbitration fees in an ongoing arbitral proceeding is a procedural issue entrusted to the arbitrator or arbitral body – not the court – for resolution within that proceeding. Thus, once the parties are before their chosen arbitral body, refusal to pay ongoing fees alone is not a "failure, neglect, or refusal ... to arbitrate" that a district court is empowered to remedy under 9 U.S.C. § 4. Accordingly, we REVERSE the contrary judgment of the district court and REMAND the case with instructions to enter judgment denying the petition.

BACKGROUND

**I. Factual Background**

   *A. The DRAs*

Petitioners are seven former employees of Twitter. For years, including when Petitioners were hired, Twitter required employees to execute a form arbitration agreement, the DRA, as part of its hiring process. Offerees were informed that if they did not complete that step, among others, by a listed deadline, their offer would "expire." *See, e.g.*, App'x 484. Indeed, because Twitter's onboarding process was "largely automated," it was the employee's electronic signing of the DRA, among other documents, that triggered a notification to Twitter's "People Services" team to create a payroll profile for the new employee. Appellees' Br. 9, citing App'x 477. Thus, signing the DRA was an essential step in the onboarding process.

 **\*2**  However, employees could opt out of the DRA. Indeed, the first page of the DRA noted in bold, "You can choose to opt out of this Agreement – you have 30 days to opt out." App'x 224. Section 8 further provided in bold that "[a]rbitration is not a mandatory condition of Employee's employment at the Company, and therefore an Employee may submit a form stating that the Employee wishes to opt out and not be subject to this Agreement." *Id.* 226. To opt out, an employee had to return the "signed and dated [Opt Out] Form ... to the Human Resources Department within 30 days of the Employee's receipt of [the DRA]." *Id.* If an employee did not submit the Opt Out Form within 30 days, the DRA provided that "continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company." *Id.* The opt-out provision explicitly stated that no adverse action would be taken as a result of an employee's decision to opt out and that the employee had the right to consult counsel about the DRA.

If an employee did not opt out, then the DRA provided that a broad swath of employment-related disputes, including claims related to termination, compensation, and employment discrimination, would be subject to binding *individual* – not class – arbitration. That arbitration would occur "before Judicial Arbitration and Mediation Services ('JAMS'), pursuant to the then-current JAMS Rules." *Id.* 225. [3] And fees for the arbitration would be paid in accordance with this provision:

[I]n all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law.

*Id.*

[3]  In this appeal, the parties agree that the applicable JAMS Rules are the Employment Arbitration Rules & Procedures that became effective on June 1, 2021. *See* JAMS Employment Arbitration Rules & Procedures ("JAMS's Rules" or "Rules") (June 2, 2021), *available at* https://www.jamsadr.com/rules-employment-arbitration/english**.**

The DRA clarified that "any disputes [over arbitration fees] w[ould] be resolved by the Arbitrator." *Id.* It also provided that "[d]isputes covered by [the DRA would] include, without limitation, disputes arising out of or relating to interpretation or application of this Agreement, including the enforceability, revocability or validity of the Agreement or any portion of the Agreement." *Id.* 224.

The DRA is silent on the possibility of a conflict between its terms and JAMS's Rules. However, the Rules themselves are not: under the Rules, parties can agree to arbitrate under different procedures that replace the Rules *so long as* the procedures they choose "are consistent with the applicable law and JAMS policies (including, without limitation, the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness [and other Rules])." JAMS Rule 2(a). The JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness (the "Minimum Standards") further provides that "JAMS will administer mandatory arbitrations in employment cases only if the arbitration provision complies with [the Minimum Standards]." Minimum Standards at 2, *available at* https://www.jamsadr.com/employment-minimum-standards/ (last visited Aug. 12, 2025).

As relevant here, the Minimum Standards instruct that

> [i]f an arbitration is based on a clause or agreement that is required as a condition of employment ... [t]he only fee that an employee may be required to pay is the initial JAMS Case Management Fee. All other costs must be borne by the company, including any additional JAMS Case Management Fees and all professional fees for the arbitrator's services.

Minimum Standard (B)(6). (However, "JAMS does not preclude an employee from contributing to administrative and arbitrator fees and expenses." *Id.*) In other words, JAMS's Rules include a non-waivable requirement that the employer be assigned all costs but the case initiation fee if the case is being arbitrated pursuant to an agreement that the employer required the employee to sign as a condition of employment. Where JAMS determines that requirement is not met, it will decline to arbitrate the case.

**\*3** The Rules themselves contain an identical requirement that an employer pay all but the case-initiation fee where "an Arbitration is based on a clause or agreement that is required as a condition of employment." JAMS Rule 31(c). Otherwise, Rule 31 provides a default "*pro rata*" split, "unless the Parties have agreed to a different allocation." *Id.* 31(a). That Rule also allows the arbitrator to award fees, compensation and expenses where one party "has paid more than its share of [the arbitration] fees." *Id.* 31(c).

"If, at any time, any Party has failed to pay fees or expenses in full," the Rules provide that "JAMS may order the suspension or termination of the proceedings" and "JAMS may so inform the Parties in order that one of them may advance the required payment." *Id.* 6(c). In those circumstances, "[i]f one Party advances the payment owed by a non-paying Party, the Arbitration shall proceed, and the Arbitrator may allocate the non-paying Party's share of such costs" in the final award. *Id.* The Rules do not grant JAMS the power to require an employer to pay fees in accordance with the Minimum Standards, rather than simply dismissing the arbitration.

**B. Petitioners are terminated and pursue arbitration under their DRAs.**

When Elon Musk acquired Twitter and laid off nearly 75% of its staff, Petitioners were among the casualties. Believing that they had been denied the severance they were owed and had been illegally discriminated against, among other claims, Petitioners (and thousands of other former Twitter employees) filed arbitration demands in accordance with the DRAs that they had signed as part of their onboarding processes. [4]

[4] For an overview of the rise of similar "mass arbitration" actions, in which plaintiffs have filed thousands of individual arbitration claims against the same company at once, see Cheryl Wilson, *Mass Arbitration: How the Newest Frontier of Mandatory Arbitration Jurisprudence Has Created a Brand New Private Enforcement Regime in the Gig Economy Era,* 69 UCLA L. REV. 372 (2022).

According to the Petitioners, for months, Twitter engaged with the proceedings as expected, filing answers and affirmative defenses, paying "its share" of the case fees, and participating in the selection of arbitrators. Appellees' Br. 12. However, on June 2, 2023, Twitter began objecting that the DRAs required arbitration fees to be shared equally between it and the former employees.

JAMS responded that Twitter was required to pay the ongoing costs of the arbitrations. It explained that its Rules, which were incorporated by reference in the DRAs, required employers to pay all but the case initiation fees in cases where its non-waivable Minimum Standards applied – and it had determined that the Minimum Standards applied in these employment cases against Twitter. It informed Twitter that "[w]here JAMS has determined the Minimum Standards apply and an employer declines to proceed under the Minimum Standards, JAMS will decline to administer the arbitration." App'x 83. It observed, however, that Twitter could challenge that determination before the arbitrator in each case, if it wished to do so.

Twitter replied that JAMS's position conflicted with the DRAs' express provision that any fee disputes would be resolved by the arbitrator – not JAMS – as well as with its interpretation of the DRAs' fee allocation provision, which it argued required a 50/50 split in those jurisdictions that allow fee sharing. [5] Accordingly, it "decline[d] to proceed under the Minimum Standards" for the relevant cases and demanded that JAMS "cease invoicing Twitter for any fees/costs associated with th[o]se arbitrations." *Id.* 86. However, it nevertheless maintains here that it "remains perfectly

willing ... to arbitrate on the terms specified in the DRA[s]." Appellants' Br. 4.

5  That interpretation rested on Twitter's contention that, in the fee allocation provision, the term "apportioned" alone inherently requires a 50/50 split unless "applicable law" required otherwise. *See* Amended Opposition to Petition to Compel Arbitration at 21, *Frazier v. X Corp.*, No. 24-cv-2135 (S.D.N.Y. May 30, 2024), ECF No. 22 ("[W]here the arbitration involves one claimant and one respondent, apportionment would be a 50/50 allocation ...."). We express no view on the merits of that contention.

### C. An arbitrator in an employee-funded case concludes that the Minimum Standards apply to the DRAs.

**\*4**  One former Twitter employee, Yunfeng Zhang, put up the $5,000 in fees necessary to appoint retired Magistrate Judge Frank Maas ("Arbitrator Maas") as arbitrator to adjudicate the fees issue in his case. Following extensive briefing, Arbitrator Maas agreed with JAMS and Zhang that JAMS's Minimum Standards applied and required Twitter to pay all but the case initiation fees. Specifically, he noted that

> Twitter employees evidently are required to sign the DRA electronically as a condition of employment even though they then may opt out of its applicability if they choose to do so. The DRA, which contains mandatory arbitration language in Section 1, therefore constitutes "an agreement ... required as a condition of employment" within the meaning of JAMS Rule 31(c) .... It follows that "the only fee that [Zhang] may be required to pay" in order to arbitrate his claims is "the initial JAMS Case Management Fee," even if he failed to opt out of the DRA within the thirty-day period set forth therein.

App'x 186 (emphasis omitted, first and third alterations in original).

Following Arbitrator Maas's decision, Twitter took the position that there was still "a dispute as to whether that arbitration order applies to other arbitrations which are individual arbitrations before different arbitrators." *Id.* 103. [6] Accordingly, Twitter refused to pay for more than half of the ongoing arbitration fees in the other arbitrations.

6  We express no view on the degree of deference owed by an arbitrator to other arbitrators' decisions regarding similar or identical issues. At a minimum, that would be for the arbitrator to address in the first instance. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) ("[I]ssues of procedural arbitrability, *i.e.*, whether prerequisites such as ... estoppel[ ] and other conditions precedent to an obligation to arbitrate have been met[ ] are for the arbitrators to decide."), quoting Revised Uniform Arbitration Act § 6, comment 2, 7 U.L.A. 13 (Supp. 2002) ("RUAA Comment 2") (internal quotation marks omitted).

### II. Procedural Background

On March 22, 2024, Petitioners filed a petition against Twitter in federal district court for the Southern District of New York. The Petitioners argued that, by refusing to pay the fees allocated to it by JAMS, Twitter was refusing to arbitrate as required under the Petitioners' DRAs. To address that refusal, they asked the district court to use its power under 9 U.S.C. § 4 to order arbitration "in accordance with the terms [of the DRAs]" – in other words, to order Twitter to pay. App'x 110 (alteration in original).

Twitter opposed the petition. Specifically, it argued that (1) the petitioners' fee disputes must be resolved by the arbitrators in their individual arbitrations – not by JAMS or the district court; (2) Arbitrator Maas's decision was not entitled to preclusive effect in other arbitrations or in court; and (3) the DRAs' fee-splitting provision required Twitter and the petitioners to share fees equally.

On July 11, 2024, the district court (Jed S. Rakoff, *J.*) issued an Opinion and Order granting the Petition and ordering Twitter to pay the fees. *See generally Frazier v. X Corp*, 739 F. Supp. 3d 219 (S.D.N.Y. 2024). As an initial matter, the court held that it was empowered under 9 U.S.C. § 4 to grant the relief the Petitioners sought – *i.e.*, to order Twitter to advance the arbitration fees that JAMS found Twitter owed while the arbitration was ongoing. *Id.* at 225. That was because (1) the DRAs were silent as to who could resolve fee disputes prior to the appointment of an arbitrator, while (2) JAMS's Rules and Minimum Standards incorporated into the DRAs by reference implicitly conferred on JAMS the ability to make an initial decision regarding the proper allocation of fees in this type of case. *Id.* at 225–27. The district court found that the DRAs thus provided JAMS with the initial authority to allocate fees and concluded that Twitter was bound by JAMS's initial determination. *Id.* That conclusion

was further supported by the fact that Twitter's preferred answer – that no one could make such an allocation except the as-yet-unappointed arbitrator – would allow Twitter to unilaterally forego arbitration altogether. *Id.* Accordingly, the district court determined that it *could* order Twitter to pay the fees that JAMS had allocated to Twitter under 9 U.S.C. § 4. *Id.*

**\*5**  Next, the district court held that it *would* order Twitter to pay. *Id.* at 227–231. Under its interpretation of the DRAs, JAMS had been vested with the discretion to make the initial decision on the procedural matter of who should pay. *Id.* at 227–28. The district court noted that "[p]rocedural questions relating to the rules of arbitration are generally matters for the arbitrator, and not for the court, to resolve." *Id.* at 228, citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84–85, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002). Thus, it was inclined to defer to JAMS's interpretation of its own Rules. *Id.*

Even if it were to revisit the question *de novo*, the district court opined, it would hold that the plain text of JAMS's Minimum Standards applied to even those mandatory arbitration agreements between employees and employers that included an opt-out provision. *Id.* at 229–30. Notwithstanding that the DRAs permitted employees to opt out of arbitration, the district court further ruled that, because signing the DRAs was a required step in the hiring process, the parties were subject to the Minimum Standards, and Twitter was required to pay all but the case initiation costs of arbitrating under the DRAs. *Id.* at 229–31.

The district court also determined that such an initial conclusion did not conflict with the fee provisions in the DRAs. *Id.* at 230–31. The DRAs provided no explicit fee schedule or allocation, and JAMS's decision could be revisited by the appointed arbitrator at a later time. *Id.* Enforcing the terms of the DRAs thus meant compelling Twitter to arbitrate – and accordingly, ordering it to pay the fees JAMS had initially apportioned to it on an interim basis, so that the issue could ultimately be addressed by the arbitrators as contemplated by the DRAs. *Id.*

Twitter then appealed.

## DISCUSSION

### I. Standard of Review
Appellants challenge the district court's decision ordering them to pay arbitration fees in an ongoing arbitral proceeding pursuant to its power to compel arbitration under 9 U.S.C. § 4. "We review *de novo* the grant of a motion to compel arbitration." *Cohen v. UBS Fin. Servs., Inc.*, 799 F.3d 174, 177 (2d Cir. 2015). That includes the district court's legal determination that failure or refusal to pay the fees necessary for an arbitration to proceed amounts to a "failure, neglect, or refusal ... to arbitrate" for purposes of 9 U.S.C. § 4. *Cf. Loc. Union 97, Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 112 (2d Cir. 2023) (explaining that legal determinations underlying the decision to compel arbitration are reviewed *de novo*).

### II. A party's refusal to pay ongoing fees alone is not a "failure, neglect, or refusal ... to arbitrate" under 9 U.S.C. § 4.

*A. District courts are not empowered to resolve procedural issues internal to an arbitration under 9 U.S.C. § 4.*

Under the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"), "[a] written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

"The [FAA] was enacted 'in response to widespread judicial hostility to arbitration.' " *Cedeno v. Sasson*, 100 F.4th 386, 394 (2d Cir. 2024), quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232, 133 S.Ct. 2304, 186 L.Ed.2d 417 (2013). "To correct this impulse, 'courts must rigorously enforce arbitration agreements according to their terms.' " *Id.* at 394–95, quoting *Italian Colors Rest.*, 570 U.S. at 233, 133 S.Ct. 2304. That includes " 'terms that specify with whom the parties choose to arbitrate their disputes and the rules under which that arbitration will be conducted.' " *Id.* at 395, quoting *Italian Colors Rest.*, 570 U.S. at 233, 133 S.Ct. 2304. And when the parties' contract delegates a particular question to the arbitrator, " 'the courts must respect the parties' decision as embodied in the contract' " on that front as well. *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 118 (2d Cir. 2025), quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65, 139 S.Ct. 524, 202 L.Ed.2d 480 (2019).

**\*6**  Section 4 of the FAA provides that

[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action ... of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4. In other words, "[u]nder Section 4, a party may move to compel arbitration in accordance with an arbitration agreement." *Davitashvili*, 131 F.4th at 115.

We have stressed that a court's role under the FAA is limited to that "relatively narrow category" of issues that "includes disputes about 'whether the parties are bound by a given arbitration clause' and 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.' " *Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Loc. 38*, 351 F.3d 43, 45 (2d Cir. 2003), quoting *Howsam*, 537 U.S. at 84, 123 S.Ct. 588. Where a court determines that (1) the parties have agreed to arbitrate, (2) the claims at issue fall within the scope of that agreement, and (3) none of the claims at issue are " 'nonarbitrable,' " the court's analysis under 9 U.S.C. § 4 is at an end, and the FAA " 'mandates that district courts *shall* direct the parties to proceed to arbitration.' " *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019), first quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987), and then quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (emphasis in original).

As a result, " 'procedural questions which grow out of the dispute and bear on its final disposition' are presumptively *not* for the judge, but for an arbitrator, to decide." *Howsam*, 537 U.S. at 84, 123 S.Ct. 588 (internal quotation marks omitted), quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). Those procedural questions include issues that "arise[ ] only after the question of the arbitrability of the dispute has been resolved in favor of arbitration." *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 655 (2d Cir. 2011). Within that category are "condition[s] precedent to arbitrability" like "waiver, delay, or a like defense," "forum-specific procedural gateway matters," and other issues that implicate the application of the rules under which the arbitration will proceed.[7] *Howsam*, 537 U.S. at 84–86, 123 S.Ct. 588 (internal quotation marks omitted). Thus, "[i]n the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer" that, in deciding to arbitrate, "the parties intended" to withhold those issues from the court's review. *Id.* at 85, 123 S.Ct. 588.

[7] Indeed, the Supreme Court has observed that arbitrators and arbitral bodies are "comparatively more expert about the meaning of their own rule[s]" and are thus "better able to interpret and to apply [them]." *Howsam*, 537 U.S. at 85, 123 S.Ct. 588.

**B. Whether a party has paid the ongoing fees necessary to continue an arbitral proceeding once initiated is a procedural issue left to the arbitrator or arbitral body.**

*7 To date, we have not considered whether an arbitral body's application of its own policies generally or its allocation and assessment of arbitral fees pursuant to those policies specifically is procedural in nature and thus presumptively outside our purview in a 9 U.S.C. § 4 action. However, the Supreme Court instructs that "forum-specific procedural gateway matters" and arbitral rules are presumptively "procedural" issues left to the arbitrator – suggesting that an arbitrator's or arbitral forum's conclusion regarding what fees are owed by what parties under its rules is not subject to a court's review. *See Howsam*, 537 U.S. at 84–86, 123 S.Ct. 588. And indeed, that is the conclusion reached by several of our sister circuits when they have addressed questions similar to the ones at issue here.

For example, in *Dealer Computer Services, Inc. v. Old Colony Motors, Inc.*, the Fifth Circuit held specifically in the context of an ongoing arbitral proceeding that "[p]ayment of fees is a procedural condition precedent" that the district court "should not review" under the FAA. 588 F.3d 884, 887 (5th Cir. 2009). As a result, the Fifth Circuit vacated the district court's order compelling one party to pay its share of the deposit for the final arbitration hearing. *Id.* at 886, 888-89.

The facts of that case are instructive. "Dealer Computer Services, Inc., ... sued under 9 U.S.C. § 4 to compel Old Colony Motors, Inc., to pay a deposit in the underlying arbitration." *Id.* at 885. After the parties' initial pleadings in the arbitration proceeding, the parties' chosen arbitral body,

AAA, sent a notice to Old Colony requiring a deposit of $26,900 for the final arbitration hearing. *Id.* at 886. Old Colony responded that it was unable to pay its share of the arbitral fees. *Id.* The arbitration panel then turned to Dealer Computer Services to cover the shortfall, relying on AAA's procedural rules, which "allow[ed] the arbitrators discretion to order either party to pay the fees upon the failure of payment in full." *Id.* at 888. When Dealer Computer Services declined to cover Old Colony's portion, the panel "indefinitely suspended" the arbitration. *Id.* at 886 (citation omitted). Dealer Computer Services then sought an order in federal district court compelling Old Colony to cover its share of the fees under 9 U.S.C. § 4 so that the arbitration could proceed. *Id.* The district court granted that order. *Id.*

The Fifth Circuit reversed, holding that proper resolution of the issue was reserved for the arbitrators. *Id.* at 888–89. "[P]ayment of fees" appeared to be "a procedural condition precedent set by the AAA" in its rules – by which Dealer Computer Services had "agreed to be bound." *Id.* at 887-88. And the arbitral panel had relied on the discretion granted in those rules when it asked Dealer Computer Services "to pay the entire fee, and tax the fee as part of the award," and then, after Dealer Computer Services refused, when it ultimately "suspend[ed] the arbitration." *Id.* at 887–88. Given that "Old Colony ha[d] stated multiple times in briefs and oral argument that it [was] willing to go forward with the arbitration" despite its inability to pay the fees, the Fifth Circuit concluded that "Dealer Services' remedy l[ay] with the arbitrators" – not the district court. *Id.* at 888. In short, the Fifth Circuit declined to intervene in an ongoing arbitration to review the procedural determination by the arbitrators as to who should pay ongoing fees pending completion of the arbitration.

That principle – that courts have no role under 9 U.S.C. § 4 to intervene to review arbitrators' rulings regarding the allocation of fees in the context of an ongoing arbitral proceeding – applies as well to an arbitral body's determination that a party has or has not met the conditions necessary for it to continue administering their arbitral proceeding. In different circumstances, the Third and Eleventh Circuits have considered a court's role in reviewing an arbitral body's application of its own internal policies. *See Hernandez v. MicroBilt Corp.*, 88 F.4th 215, 220 (3d Cir. 2023); *Bedgood v. Wyndham Vacation Resorts, Inc.*, 88 F.4th 1355, 1363 (11th Cir. 2023). In both *Hernandez* and *Bedgood*, (1) the plaintiffs sought arbitration, (2) AAA concluded that the underlying arbitration agreements did not meet the due process requirements imposed by its rules, and (3) the defendants declined to abide by those rules. *See Hernandez*, 88 F.4th at 217; *Bedgood*, 88 F.4th at 1363. And in both cases, AAA refused to administer the relevant arbitrations and closed its files. *See Hernandez*, 88 F.4th at 217; *Bedgood*, 88 F.4th at 1361.

**\*8** When the plaintiffs in those cases subsequently pursued their claims in court, and the defendants sought to compel arbitration under 9 U.S.C. § 4 [8] despite AAA's decision, both Circuits declined to intervene in AAA's application of its own policies. As the Eleventh Circuit explained, "whether a party has complied with the [arbitral body]'s policies is an administrative decision that can and should be made by the [arbitral body]." *Bedgood*, 88 F.4th at 1364; *see also Hernandez*, 88 F.4th at 220 ("MicroBilt does not explain how we have the authority to review the AAA's decision."). Accordingly, both Circuits declined to find that the defendants had been "aggrieved" by their counterparties' "failure, neglect, or refusal" to arbitrate after AAA declined to administer their arbitrations. *See Bedgood*, 88 F.4th at 1366–67; *Hernandez*, 88 F.4th at 220. And both allowed the plaintiffs to pursue their claims in court, notwithstanding the arbitration agreements. *Bedgood*, 88 F.4th at 1366–67; *Hernandez*, 88 F.4th at 220.

[8] The defendants-petitioners in *Bedgood* also sought to stay the plaintiffs-respondents' litigation efforts under 9 U.S.C. § 3. *See* 88 F.4th at 1361–62.

Petitioners argue that because courts have no role in deciding how to apply an arbitral body's policies regarding the ongoing payment of fees, in order to effectuate the underlying arbitration agreements under 9 U.S.C. § 4, we must *enforce* an arbitral organization's determination on such issues. They contend that by incorporating JAMS's Rules into the DRAs, Twitter agreed to be bound by JAMS's initial determination that its Minimum Standards required Twitter to take responsibility for the disputed fees. Thus, they argue, Twitter may be compelled to pay under 9 U.S.C. § 4 based on the terms "it bargained for." Appellees' Br. 29.[9]

[9] In support of this argument, Petitioners suggest that we have "previously noted that, under section 4 of the FAA, a district court may compel arbitration and direct a party to pay their share of arbitration fees." Appellees' Br. 47, citing *Brown v. Peregrine Enters., Inc.*, No. 22-2959, 2023 WL 8800728, at \*4 (2d Cir. Dec. 20, 2023). Not quite. *Brown* did involve a similar issue: whether a stay of

litigation should be lifted in light of a party's refusal to pay arbitration fees that AAA said it was required to bear under their fee schedule (which the petitioners argued conflicted with the 50/50 split provided in the parties' agreement). *Id.* at *2. There, as here, the arbitral organization declined to proceed with – but did not fully terminate – the arbitrations as a result of that nonpayment. *Id.* Because the arbitrations had not been terminated, we determined that the parties' obligations to arbitrate were not yet complete, and we vacated the district court's order lifting the stay. *Id.* at *4. In doing so, we noted that our decision did not "foreclose the district court [on remand] ... from *considering* the propriety of compelling arbitration under section 4 of the FAA and directing [each party] to pay their equal share of the arbitration fees under the [arbitration agreement] to initiate such arbitration before the AAA." *Id.* (emphasis added). In other words, we expressly withheld judgment on the very issue we decide today, allowing the district court to consider it on remand in the first instance.

That argument misunderstands the court's role in an ongoing arbitral proceeding under 9 U.S.C. § 4. That statute allows a party "aggrieved by the alleged failure, neglect, or refusal of another *to arbitrate*" to seek "an order directing that such arbitration proceed." 9 U.S.C. § 4 (emphasis added). But a party's decision not to abide by the procedural determinations of an arbitrator or arbitral body is ordinarily not a "failure, neglect, or refusal *to arbitrate*" under § 4 – it is simply an *intra*-arbitration delinquency that arbitral bodies, like JAMS here, are empowered to manage. *See, e.g., Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012–1013 (9th Cir. 2004) (finding no "failure, neglect, or refusal" by defendant to arbitrate when defendant did not pay fees that AAA required for arbitration to proceed).

**\*9** Therefore, as explained above, under 9 U.S.C. § 4, district courts are empowered to address only a "relatively narrow category" of disputes that address whether arbitration must occur between particular parties over particular issues. *Mulvaney Mech., Inc.*, 351 F.3d at 45. Once those issues have been decided in favor of arbitration, a district court is not invited to involve itself in the arbitrator or arbitral body's resolution of " 'procedural questions which grow out of the dispute and bear on its final disposition,' " unless the parties' agreement provides otherwise. *Howsam*, 537 U.S. at 84, 123 S.Ct. 588 (internal quotation marks omitted), quoting *John Wiley & Sons, Inc.*, 376 U.S. at 557, 84 S.Ct. 909. Indeed,

as we have explained in a different context, "[a] petitioner cannot use Section 4 as a vehicle to seek review of the [arbitral body's] decision about how to proceed" – or, in this case, not proceed – "with the arbitration process." *See Jacobs v. USA Track & Field*, 374 F.3d 85, 89 (2d Cir. 2004).

That proposition remains true even if a party is dissatisfied with the outcome of the arbitrator's handling of a particular issue. Suppose, for example, that a party had agreed to arbitrate under a particular set of rules, including a rule permitting the arbitrator to resolve discovery disputes. *See, e.g.*, JAMS Rule 17(d) (entrusting disputes over discovery to the arbitrator). And say too that this party firmly believed that its counterparty had failed to abide by the arbitrator's discovery order, despite that rule. (The counterparty, of course, would disagree or, at least, dispute the validity of the order.) It cannot be that the complaining party could then bring a petition under 9 U.S.C. § 4 *to compel its counterparty to provide the disputed discovery, mid-arbitration*. Rather, we would leave it to the arbitrator to use the tools available to it to resolve the issue as it saw fit.

One could of course argue that the "manner" of arbitration provided in the agreement in this scenario contemplated the parties' compliance with the rules empowering the arbitrator to issue such orders. But to adopt such a position would inevitably require the court to interpret the parties' agreement, the arbitrators' rules, or both – interpretations that would otherwise, as explained above, presumptively be reserved for the arbitrator. Thus, it is hard to see how " 'the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation' " would be served by a district court's intervention into such procedural disputes. *Landau v. Eisenberg*, 922 F.3d 495, 498 (2d Cir. 2019), quoting *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008). Accordingly, like the Third, Fifth, Ninth, and Eleventh Circuits, we see no role for a court to involve itself in a dispute in an ongoing arbitral proceeding over a party's payment of fees or compliance with arbitral policies under 9 U.S.C. § 4.

### III. The district court erred when it ordered Twitter to pay arbitral fees under 9 U.S.C. § 4.

Accordingly, the district court lacked authority under 9 U.S.C. § 4 to order Twitter to pay the arbitral fees JAMS concluded were required under its Minimum Standards. Like the arbitral rules at issue in *Dealer Computer Services, Bedgood*, and *Hernandez*, JAMS's Rules grant it the discretion to refuse, stay, or terminate the case for one party's non-payment of fees or noncompliance with its policies. The procedures

adopted by parties in its arbitrations must be "consistent with" the Minimum Standards, JAMS Rule 2(a), and "JAMS will administer mandatory arbitrations in employment cases *only if* the arbitration provision complies with [the Minimum Standards]," Minimum Standards at 2 (emphasis added). In other words, compliance with the Minimum Standards is "a procedural condition precedent set by [JAMS]" in its Rules – by which both Twitter and the Petitioners "agreed to be bound." *Dealer Computer Servs., Inc.*, 588 F.3d at 887–88.

**\*10** In turn, the Minimum Standards require that, where an employee's agreement to arbitrate is a condition of their employment, the employer must be responsible for paying all but the case initiation fees. *See* Minimum Standard (B)(6); JAMS Rule 31(c) (requiring the same fee allocation). And where a party fails to pay its fees, JAMS's Rules provide that it has discretion to "order the suspension or termination of the proceedings" if the other party declines to advance the fees. JAMS Rule 6(c). Thus, whether an employer is required to pay the lion's share of the arbitral fees under the Minimum Standards is precisely the kind of " 'procedural question[ ] which grow[s] out of the dispute and bear[s] on its final disposition' " that is "presumptively not for the judge, but for the arbitrator [or, in this case, JAMS itself], to decide." *Howsam*, 537 U.S. at 84, 123 S.Ct. 588 (internal quotation marks and emphasis omitted).

The DRAs' terms do not challenge that presumption, because nothing in the DRAs suggests that the parties agreed to invoke judicial oversight of those decisions or procedures. In fact, much to the contrary, the DRAs explicitly withhold fee disputes from our review, providing that "any disputes [over arbitration fees] w[ould] be resolved by the Arbitrator." *See* App'x 224–25. Thus, we have no authority to intervene in JAMS's interpretation of the Minimum Standards or its handling of Twitter's refusal to pay.

Further, even if we were empowered by the DRAs to review JAMS's application of its own policies here, that the DRAs bind Twitter and its (now former) employees to arbitrate before JAMS does not in turn bind JAMS to administer their arbitrations. As the Eleventh Circuit observed in *Bedgood*, the terms of a party's arbitration agreement are not binding on a third-party arbitral organization. 88 F.4th at 1365 ("[I]t 'goes without saying that a contract cannot bind a nonparty.' "), quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002). Thus, here, as in the discovery dispute example above, we leave it to JAMS to use the tools available to it to resolve the procedural Minimum Standards issue (and the attendant fee question) as it sees fit – even if that ultimately means terminating the arbitrations.

In sum, Twitter's refusal to pay the fees – and JAMS's discretionary decision to halt the arbitrations as a result – does not amount to a "failure, neglect, or refusal ... to arbitrate" by Twitter that the district court was empowered to remedy under 9 U.S.C. § 4. Twitter engaged in the arbitral proceedings and has not outright refused to continue to arbitrate: like the respondent in *Dealer Computer Services*, it "has stated multiple times in briefs ... that it is willing to go forward with the arbitration," even though it will not pay the disputed fees. 588 F.3d at 888; *see also* Appellants' Br. 2 (stating Twitter is "ready and willing to proceed with th[e] arbitrations"); Appellants' Reply Br. 14 (similar). Under these circumstances, if Petitioners wish to continue to pursue arbitration, their "remedy lies with [JAMS]"– not with us or the district court. *Dealer Computer Servs., Inc.*, 588 F.3d at 888. [10]

[10] We need not address here whether, as Twitter has repeatedly suggested, Twitter's refusal to pay the fees that JAMS requires opens the courthouse doors to the Petitioners. We do however, recognize that several of our sister circuits have suggested as much in analogous cases. *See Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 620–22 (7th Cir. 2024) (holding that, parties' obligations to arbitrate had been exhausted following AAA's termination of arbitrations due to Samsung's refusal to pay arbitral fees); *Bedgood*, 88 F.4th at 1363 (declining to stay litigation when the defendant's failure to comply with AAA's "Consumer Due Process" protocol led AAA to refuse to arbitrate the plaintiffs' claims); *Hernandez*, 88 F.4th at 220–21 (declining to compel arbitration when the arbitration agreement's failure to meet AAA's "Consumer Due Process" protocol led AAA to refuse to arbitrate the respondent's claims); *Sink v. Aden Enters., Inc.*, 352 F.3d 1197, 1201 (9th Cir. 2003) (declining to order arbitration when a prior arbitration regarding the same claim had been terminated because the party now seeking arbitration had previously refused to pay arbitral fees). Additionally, because we conclude that Twitter's refusal to pay the fees allocated to it by JAMS is not a "failure, neglect, or refusal ... to arbitrate" under 9 U.S.C. § 4, we need not address the parties' other arguments regarding the

correct interpretation of the DRAs' fee provisions or JAMS's Rules.

**CONCLUSION**

**\*11** Accordingly, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to enter judgment denying the petition.

**All Citations**

--- F.4th ----, 2025 WL 2502133

---

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.