THE HONORABLE JAMAL N WHITEHEAD

1

2

3

4

5

6

7       **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
8                    **AT SEATTLE**

9   IN RE VALVE ANTITRUST LITIGATION        Case No. 2:21-cv-00563-JNW

10                                          **CONSUMER PLAINTIFFS'**
                                            **OPPOSITION TO DEFENDANT VALVE**
11                                          **CORPORATION'S MOTION TO**
                                            **DISMISS THE CONSUMER**
12                                          **COMPLAINT**

13

14   This Filing Relates to:               **NOTE FOR MOTION CALENDAR**:
                                            October 24, 2025
15   [ALL ACTIONS]

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND .....................................................................................................3

III.   LEGAL STANDARD.............................................................................................4

IV.    ARGUMENT ..........................................................................................................5

       A.     Consumer Plaintiffs Plausibly Allege Supracompetitive
              Commissions, and *Somers* Does Not Suggest Otherwise. .........................5

              1.     *Somers* Does Not Apply Because, Unlike Apple in *Somers*,
                     Valve Still Possesses Monopoly Power...........................................6

              2.     Valve's Misreading of *Somers* Conflicts with Antitrust
                     Law's Purpose to Prevent the Unlawful Maintenance of
                     Monopoly Power.................................................................................7

              3.     Unlike Plaintiffs in *Somers*, Consumer Plaintiffs Allege
                     Numerous Facts That Support Their Allegations That
                     Valve's Commissions Are Supracompetitive. ...................................9

              4.     Valve's Arguments Concerning WON and Competitors'
                     Cost Structures are Both Wrong and Immaterial. ..........................11

                     a.     During Steam's early days, Valve did not need
                            market power to charge commissions well above its
                            cost structure. .......................................................................12

                     b.     The Court may not judicially notice the Johnson
                            Declaration or other disputed "facts" extrinsic to the
                            Complaint...............................................................................13

                     c.     Extrinsic "evidence" of Epic's purported cost
                            structure cannot be credited. ................................................14

       B.     Consumer Plaintiffs Plausibly Allege That Valve's Monopolistic
              Conduct Results in Higher Prices for Consumers.....................................16

              1.     Basic Economics Supports Consumer Plaintiffs'
                     Allegations of Harm.........................................................................17

              2.     Valve's Remaining Arguments Are Wrong......................................20

       C.     Consumer Plaintiffs' WCPA Claim Should Not Be Dismissed. ...............21

       D.     Any Dismissal Should Be Without Prejudice. ...........................................21

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - i
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

V.    CONCLUSION..................................................................................................22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - ii
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aggrenox Antitrust Litig.*,
    199 F. Supp. 3d 662 (D. Conn. 2016) ........................................................................9

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*,
    190 F.3d 1051 (9th Cir. 1999) ...................................................................................5

*Apple Inc. v. Pepper*,
    587 U.S. 273 (2019)...................................................................................................17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................................5, 17

*Balistreri v. Pacifica Police Dep't*,
    901 F.2d 696 (9th Cir. 1988) ...................................................................................22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................................5

*Bolin v. Koehn*,
    2025 U.S. Dist. LEXIS 108071 (D. Nev. June 3, 2025)...........................................22

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) .................................................................................19

*Brennan v. Concord EFS, Inc.*,
    369 F. Supp. 2d 1127 (N.D. Cal. 2005) ...................................................................14

*In re CIM-SQ Transfer Cases*,
    2022 WL 2789808 (N.D. Cal. July 15, 2022)..........................................................14

*CollegeNET, Inc. v. Common Application, Inc.*,
    711 F. App'x 405 (9th Cir. 2017) ............................................................................21

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ..............................................................................4, 17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)....................................................................................................8

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021) .....................................................................15

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ............................................................................ *passim*

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - iii
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

*Fay v. Mortg. Elec. Registration Sys., Inc.*,
   2012 WL 993437 (W.D. Wash. Mar. 22, 2012) ...................................................14

*Frame-Wilson v. Amazon.com, Inc.*,
   591 F. Supp. 3d 975 (W.D. Wash. 2022).................................................5, 19, 20, 21

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
   852 F. Supp. 2d 1171 (N.D. Cal. 2012) ..............................................................5

*Friedman v. AARP, Inc.*,
   2019 WL 5683465 (C.D. Cal. Nov. 1, 2019) ........................................................19

*Hairston v. Pac.-10 Conf.*,
   893 F. Supp. 1485 (W.D. Wash. 1994)..................................................................21

*Hotel Emps. & Rest. Emps. Local 2 v. Vista Inn Mgmt. Co.*,
   393 F. Supp. 2d 972, 978, 980 (N.D. Cal. 2005) ...................................................14

*In re Juul Labs, Inc., Antitrust Litig.*,
   555 F. Supp. 3d 932 (N.D. Cal. 2021) .................................................................11

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ......................................................................14, 15

*Lopez v. Smith*,
   203 F.3d 1122 (9th Cir. 2000) ...........................................................................22

*Maxim Integrated Prods., Inc. v. Analog Devices*,
   79 F.3d 1153 (9th Cir. 1996) .............................................................................19

*McWane, Inc. v. F.T.C.*,
   783 F.3d 814 (11th Cir. 2015) ............................................................................8

*Metro Indus. v. Sammi Corp.*,
   82 F.3d 839 (9th Cir. 1996) ..............................................................................19

*RideApp, Inc. v. Lyft, Inc.*,
   2019 WL 7834759 (N.D. Cal. Aug. 15, 2019) .......................................................14

*In re Silicon Graphics Secs. Litig.*,
   183 F.3d 970 (9th Cir. 1999) .............................................................................13

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013) .......................................................................*passim*

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005)................................................................................7

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966)..........................................................................................8

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - iv
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

1    *United States v. Microsoft Corp.*,
2        253 F.3d 34 (D.C. Cir. 2001) ..............................................................................7

3    *United States v. Ritchie*,
         342 F.3d 903 (9th Cir. 2003) ............................................................................13

4    *Williamsburg Wax Museum, Inv. v. Historic Figures, Inc.*,
5        810 F.2d 243 (D.C. Cir. 1986) ..........................................................................19

6    **Other Authorities**

7    *Administrable MFN Enforcement Policy*, 27 ANTITRUST 15 (2013),
         https://media.crai.com/sites/default/files/publications/Developing_An_
8        Administrable_MFN_Enforcement_Policy_Salop_ScottMorton_Antitrust_
9        Spring_2013.pdf ...............................................................................................18

     Congressional Research Service, *Antitrust Reform and Big Tech Firms* (Nov. 21,
10       2023), https://www.congress.gov/crs-product/R46875 .....................................18

11   Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform*
12       *MFNs*, 127 Yale L.J. 2176 (2018) .....................................................................18

13   Master IEEP, Steam Community Page: Ricochet, *How to install Ricochet version*
         *WON + expansions*, https://steamcommunity.com/sharedfiles/filedetails
14       /?id=2183431463 (last updated Jan. 30, 2023) .................................................14

15   Michael Parkin, MICROECONOMICS 304 (12th ed. 2016) ...........................................17

16   Sierra Wiki, *World Opponent Network*, http://wiki.sierrahelp.com/index.php/
17       World_Opponent_Network (last edited Feb. 16, 2025)......................................14

18

19

20

21

22

23

24

25

26

27

28

# I.    INTRODUCTION

Defendant Valve Corp. ("Valve") uses its outsized control over digital personal computer ("PC") video game distribution to lock gamers and game publishers into its distribution platform, Steam, and prevent would-be competitors from effectively competing in the digital PC game distribution market. Valve accomplishes these ends by requiring publishers that wish to sell games on Steam to agree to a Platform Most Favored Nation ("PMFN") provision, which Valve enforces to prevent publishers from selling their games for a lower price or with added features on any distribution platform other than Steam. Competitor platforms consequently cannot entice publishers (or gamers) to migrate away from Steam by offering lower-priced or higher-quality games, maintaining Valve's longstanding stranglehold over PC gaming. As a result, Valve charges publishers supracompetitive commissions on every initial game sale and every subsequent purchase of downloadable and/or "in-app" content, and these supracompetitive commissions are built into the prices consumers pay Valve for PC games.

Although this Court already considered and rejected similar arguments raised by Valve when seeking to dismiss a related case brought by PC game publishers, *see* Dkt. 80,[1] Valve now seeks to dismiss Consumer Plaintiffs' claims on just one ground—that Consumer Plaintiffs have not plausibly alleged that Valve's alleged misconduct injures consumers. Valve is wrong.

*First*, Valve argues that *Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013), requires the Court to conclude that Valve's commission, which effectively has stayed at 30% since the mid-2000s, is not supracompetitive. But *Somers* turns on facts not presented here, and Valve's broad reading of the case is incompatible with the purpose, case law, and economics of the Sherman Act. Monopoly maintenance, the core antitrust violation alleged here, involves unlawfully *protecting* monopolistic prices from being forced lower by competition. Whereas in *Somers*, Apple's stable pricing under *both* monopoly and competitive market conditions suggested that Apple's price was not supracompetitive (without further explanatory allegations), in this case Valve has *never* set

---

[1] To be sure, this Court recently certified the Publisher Class based on record evidence substantiating the same theories Valve now argues are implausible. *See* Dkt. 391; *see also id.* at 23-24 (rejecting Valve's arguments that common evidence would not drive inquiries of antitrust injury or damages—issues that interrelate with consumers' antitrust injury).

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 1
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

prices in a competitive market; for as long as the digital PC game distribution market has existed, Valve has dominated it and set prices well above competitive levels. The key factual predicate of *Somers*—and Valve's argument—is simply not what is alleged here. *See infra* Section IV.A.1-3.

*Second*, Valve argues that the plausibility of Consumer Plaintiffs' claims hinge on allegations that Valve acquired Sierra's World Opponent Network ("WON"), which Valve contests with a single affidavit. That argument fails for multiple reasons. The Court must reject Valve's extrinsic evidence, which is contrary to its public admissions, at this stage. Regardless, the Complaint does not turn on these allegations. Valve's relationship with WON, whether by acquisition or otherwise, helps explain how Valve has had monopoly power in digital PC game distribution since the beginning. But it is not the only relevant fact. Independent of WON, Valve leveraged its enormous installed user base and popular PC game franchises to force gamers onto Steam, such that when Valve began selling third-party games in 2005, it already held a monopolist position.

Valve also argues that Plaintiffs' allegation that Valve charges commissions in excess of its costs cannot plausibly support the conclusion that its commissions are supracompetitive. But that argument, a matter of fact improper to decide at the dismissal stage, is belied by economics, which teaches that competition disciplines prices toward costs; and by would-be competitors' public statements and actions, evincing that commissions of 10-12% more than adequately cover costs. *See infra* Section IV.A.4.

*Third*, Valve argues that Consumer Plaintiffs do not plausibly allege that Valve's supracompetitive commission injures consumers, as opposed to just publishers. That is bold, given Valve argued when opposing Publisher Plaintiffs' class certification motion that consumers' share of damages from supracompetitive commissions would be so great as to leave some publishers with no damages at all. *See* Dkt. 309 at 31. Regardless, Plaintiffs' allegations of consumer harm are specific, supported by PMFN-specific economics, and plausible. *See infra* Section IV.B.

At its root, this case is simple. Valve has a monopoly in the digital PC game distribution market, charges monopoly prices, and uses anticompetitive tactics to maintain its monopoly and stifle competition. Absent Valve's misconduct, competition would lead to lower, competitive PC

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 2
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

game prices, but Valve's actions perpetuate the status quo, causing harm to PC gamers. Consumer Plaintiffs are entitled to proceed beyond the pleading stage, and the Court should deny Valve's motion to dismiss in full.

## II.    BACKGROUND

Over the last two decades, the PC video game industry has grown to a staggering size, generating tens of billions in revenue annually. During that time, Valve has thwarted competition to secure and maintain an unlawful monopoly position over the digital distribution of PC games. ¶ 1.[2]

In 2005, Valve launched the Steam Store ("Steam"), an online platform that enabled consumers to purchase and download PC games digitally from their home computers, quickly becoming the dominant distributor and maintaining its dominance. Steam now has more than one billion user accounts worldwide and sells more than 100,000 third-party games (games developed and published by companies other than Valve). Of the billions of dollars in annual digital PC game sales, roughly three quarters are sold through Steam, making it the largest online game store by far. ¶¶ 1-2.

Due to Valve's monopoly control, publishers have little choice but to list their games on Steam to reach a widespread audience. This leverage allows Valve, despite its limited role as a digital middleman between gamers and publishers, to extract a commission of 30% on every game sold.[3] That massive commission is untethered to Valve's costs; indeed, although Valve's 30% commission was set at Steam's founding to compete with the standard sales commission charged by brick-and-mortar retail stores, Steam—an online marketplace—pays almost none of the operating costs that justified that commission.

Absent Valve's anticompetitive conduct, Valve's commission would be undercut by other *digital* PC game distributors, which *also* do not pay brick-and-mortar costs. Thus, Valve's commission is far higher than that which would prevail in a competitive market. Valve's

---

[2] Unless otherwise indicated, "¶" references paragraphs in the Consolidated Amended Class Action Complaint, Dkt. 473, sometimes referred to herein as the "Complaint."

[3] In recent years, Valve changed its fee structure to charge lower commissions—25% and 20%—on a handful of extremely successful games' marginal revenues exceeding $10 million and $50 million, respectively. ¶ 60 n.4.

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 3
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

1  supracompetitive commission is built into the prices charged by game publishers, and consumers
2  pay those supracompetitive prices. ¶¶ 3, 7.

3  Valve maintains its monopoly—and the ability to charge supracompetitive prices—by
4  imposing and enforcing an PMFN clause on game publishers. Valve's PMFN forbids publishers
5  from offering their games on any competing platform for a cheaper price, or with superior features,
6  than it offers on Steam. Other platforms have attempted to offer publishers a commission lower than
7  Valve's exorbitant 30%, but Valve's PMFN prevents publishers from offering their games to
8  consumers on terms better than those available on Steam. Unable to attract consumers with lower
9  prices or better content, competing platforms are prevented from breaking Steam's dominant
10  position. ¶¶ 4-6, 9, 57-94, 184-201.

11  As the digital PC game distribution market grew to include downloadable content ("DLC")
12  and in-game purchases (such as for add-ons, perks, and gear), Valve extended its monopoly to these
13  purchases as well. Valve extracts its exorbitant 30% commission on PC game DLC sold through
14  Steam as well as on every "microtransaction"/"in-app purchase" sold within games running on
15  Steam. ¶ 10.

16  Basic economics indicates how a competitive market would respond to such exorbitant
17  profits: competitors would offer innovative products at more affordable prices and reduce Valve's
18  market share until its supracompetitive profits were no longer feasible. But Valve's anticompetitive
19  PMFN has rendered competition on the merits impossible, allowing Valve to protect its monopoly
20  position, making it one of the most profitable companies in the world on a per-employee basis, and
21  causing consumers to pay higher prices for more limited choice. ¶¶ 7-8, 11-12. This case is necessary
22  to redress Valve's unlawful restraint of trade and monopolization, in violation of federal antitrust
23  and Washington consumer protection laws. ¶¶ 12, 224, 235-59.

24  ### III.    LEGAL STANDARD

25  On a motion to dismiss, the court "must accept all factual allegations in the complaint as true
26  and construe the pleadings in the light most favorable to the [plaintiff]." *Dyroff v. Ultimate Software*
27  *Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019) (internal quotation omitted). To survive dismissal,
28  a complaint need only allege "enough facts to state a claim to relief that is plausible on its face."

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 4
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), "[even] if it strikes a savvy judge that actual proof of th[e] facts alleged is improbable," *Twombly*, 550 U.S. at 556. Dismissal is improper "if there is 'any set of facts consistent with the allegations in the complaint' that would entitle the plaintiff to relief." *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 982 (W.D. Wash. 2022) (quoting *Twombly*, 550 U.S. at 563).

## IV.    ARGUMENT

To adequately plead antitrust injury a plaintiff must allege "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999). Valve focuses only on the second factor—whether Consumer Plaintiffs plausibly plead injury.

### A.    Consumer Plaintiffs Plausibly Allege Supracompetitive Commissions, and *Somers* Does Not Suggest Otherwise.

Consumer Plaintiffs allege that: Valve set its commission when it had no serious competitors in the digital PC game distribution market and has continued to effectively charge the same commission to this day, ¶¶ 34-37; Valve's commissions are significantly above cost, ¶¶ 29, 40, 216-20, and significantly above the commissions that would be charged in a competitive market without Valve's unlawful restraints, ¶¶ 196-213; Valve's supracompetitive pricing is the result of Valve's ongoing, anticompetitive enforcement of its PMFN, ¶¶ 57-94, 184-93; in a competitive market Valve's commissions would be driven down to well below Valve's current fee, ¶¶ 214-20; and such lower commissions would flow to consumers' benefit , paying lower prices for higher-quality PC games, ¶¶ 194-201, 221-23. These allegations more than suffice to plausibly plead antitrust injury. *See, e.g.*, *Frame-Wilson*, 591 F. Supp. 3d at 992-93; *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1185 (N.D. Cal. 2012).

Nonetheless, relying on *Somers*, Valve urges dismissal because Consumer Plaintiffs allege that Valve charged PC game publishers the same "revenue share" "*before* [Valve] obtained

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 5
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

monopoly in the . . . market, and *after* it allegedly acquired monopoly in that market."[4] Mot. to Dismiss ("Mot."), Dkt. 523 at 9 (emphases and alterations in original) (quoting *Somers*, 729 F.3d at 964). But Valve misconstrues *Somers* and ignores Consumer Plaintiffs' well-pleaded allegations of antitrust injury.

### 1.    *Somers* Does Not Apply Because, Unlike Apple in *Somers*, Valve Still Possesses Monopoly Power.

Contrary to Valve's framing, *Somers* did not announce a broad legal rule. Rather, construing that case's unusual facts, the Ninth Circuit concluded that plaintiffs did not plausibly allege antitrust injury because they effectively alleged that competition—contrary to plaintiffs' theory of harm—*did not drive prices down*. *See* 729 F.3d at 964. That factually driven ruling is inapplicable to this case, where Consumer Plaintiffs plead that Valve's commissions are supracompetitively priced due to Valve's ongoing monopolistic conduct.

In *Somers*, consumer plaintiffs alleged they had been injured by Apple's unlawful monopolization of two markets: (1) portable digital media players, including products like Apple's iPod; and (2) music downloads, including music downloaded from Apple's iTunes Music Store. *Id.* at 956-57. After amending their complaint several times, plaintiffs ultimately alleged that Apple unlawfully monopolized those markets by using Digital Rights Management software to "render[] iT[unes] music and the iPod compatible only with each other," *id.* at 956, "prevent[ing] competitors from entering and threatening [Apple's] monopolies," *id.* at 958. As a result, plaintiffs alleged, consumers were forced to pay supracompetitive prices for iTunes music because Apple did not have to compete with music download businesses excluded from the market. *See id.* at 959, 964.

The problem with plaintiffs' "overcharge theory," however, was that Apple's iTunes music prices stayed the same across the relevant time period: it charged 99 cents per iTunes song (1) *before* Apple allegedly obtained monopoly power in the music download market in 2003, (2) *while* Apple allegedly had monopoly power in the same market between 2004 and 2008, and (3) most importantly, "even *after* Apple's alleged monopoly ended in the beginning of 2008" when Amazon

---

[4] Notably, Valve's motion does not challenge Consumer Plaintiffs' alleged relevant antitrust market for "digital PC game distribution," ¶¶ 118-24.

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 6
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

1    entered the market. *Id.* at 964 (emphasis added).

2         Thus, contrary to plaintiffs' theory of antitrust injury, *id.*, market competition allegedly

3    failed to drive down prices *after Apple's monopolistic conduct stopped*, suggesting Apple's price

4    had never exceeded the competitive price. *Cf. Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 984

5    (9th Cir. 2023) ("A supracompetitive price is simply a price above competitive levels." (internal

6    quotations omitted)). As the Ninth Circuit observed: "[I]f Somers' overcharge theory were correct,

7    then Apple's music prices from 2004 to 2008 were supracompetitive as a result of software updates

8    that excluded competition, and the emergence of a large seller such as Amazon would have caused

9    iT[unes] music prices to fall." *Somers*, 729 F.3d at 964. But the loss of Apple's monopoly power

10   allegedly had no effect whatsoever on prices, leading the court to conclude that Somers' "conclusory

11   assertion that Apple's software updates affected music prices" was "implausible." *Id.*

12        This case bears no resemblance to those idiosyncratic facts. Whereas in *Somers*, Apple's

13   consistent pricing for iTunes songs *before*, *during*, and *after* Apple allegedly had monopoly power

14   rendered plaintiffs' overcharge theory implausible, Consumer Plaintiffs allege here that Valve has

15   never lost its monopoly power in digital PC game distribution and therefore has never priced its

16   commissions in a competitive digital market. ¶¶ 39, 42-43, 128-29. Simply put, in this case there

17   are no factual allegations of consistent pricing during a *competitive* "after period" that would render

18   Plaintiffs' allegations of supracompetitive pricing implausible. *See* 729 F.3d at 964.

19        **2.    Valve's Misreading of *Somers* Conflicts with Antitrust Law's Purpose to
20             Prevent the Unlawful Maintenance of Monopoly Power.**

21        One of the most fundamental concepts in antitrust law is that the Sherman Act protects

22   consumers from firms that originally acquired monopolies through legal means but subsequently

23   engaged in anticompetitive activity to *maintain* them. *See, e.g.*, *United States v. Microsoft Corp.*,

24   253 F.3d 34, 66-67 (D.C. Cir. 2001) (concluding Microsoft harmed competition by integrating its

25   internet browser, Internet Explorer, with its operating system, Windows 98, with no "purpose other

26   than protecting its operating system monopoly"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181,

27   187 (3d Cir. 2005) ("Unlawful maintenance of a monopoly is demonstrated by proof that a defendant

28   has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 7
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

1  maintaining monopoly power."); *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 832 (11th Cir. 2015) (noting

2  anticompetitive "arrangement[s] can be harmful when [they] allow[] a monopolist to maintain its

3  monopoly power by raising its rivals' costs sufficiently to prevent them from growing into effective

4  competitors"); *see also* Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of*

5  *Antitrust Principles and Their Application* ¶ 651f (4th & 5th ed., 2025 Cum. Supp. 2018-2023)

6  (noting the antitrust laws are "concerned with the maintenance, or prolongation o[f] monopoly as

7  well as with its creation"); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (holding

8  unlawful monopolization involves "the willful acquisition *or maintenance* of [monopoly] power as

9  distinguished from growth or development as a consequence of a superior product, business acumen,

10  or historic accident").

11      These cases reflect the well-recognized principle that unlawful monopoly maintenance

12  injures consumer welfare by preventing competition that naturally drives down prices. *See Somers*,

13  729 F.3d at 964 ("[U]nder basic economic principles, increased competition . . . generally lowers

14  prices."). Valve's position that a price, like Valve's 30% commission, cannot be supracompetitive

15  if the price remains the same before and after a firm obtains monopoly power ignores these core

16  legal and economic antitrust tenets and would insulate monopolists from challenge where they

17  maintain their supracompetitive prices by unlawfully stifling competition.

18      Illustrating its own economically unsound argument, Valve contends, "[i]f Plaintiffs'

19  'overcharge theory were correct,' then Valve's revenue share should have been *even higher* when it

20  later acquired an alleged monopoly." Mot. at 13. But Valve's monopoly dates back to the nascency

21  of the relevant market, and Valve has *never* faced competitive conditions in the relevant market.

22  Further, the Ninth Circuit explicitly rejected Valve's argument in *Epic Games* when observing that

23  no binding precedent supports the "proposition that the charging of a supracompetitive price must

24  always entail a price increase," 67 F.4th at 984, thereby underscoring that prices may be

25  supracompetitive even when no observed changes of price occur over time. *Cf. Eastman Kodak Co.*

26  *v. Image Tech. Servs., Inc.*, 504 U.S. 451, 471 (1992) ("[T]he existence of significant substitution

27  in the event of *further* price increases or even at the *current* price does not tell us whether the

28

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 8
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

defendant *already* exercises significant market power." (quoting P. Areeda & L. Kaplow, *Antitrust Analysis* ¶ 340b (4th ed. 1988))).

### 3. Unlike Plaintiffs in *Somers*, Consumer Plaintiffs Allege Numerous Facts That Support Their Allegations That Valve's Commissions Are Supracompetitive.

In *Somers*, plaintiffs failed to plead any nonconclusory, plausible *explanations* for their facially implausible theory that Apple's stable pricing nevertheless was supracompetitive. *See* 729 F.3d at 965 (rejecting plaintiffs' argument that it was "conceivable that Apple's music was not priced higher because of some other factor, such as superior product or greater efficiency"). Here, by contrast, Consumer Plaintiffs' allegations explain how Valve has charged supracompetitive commissions throughout the class period and why those commissions have stayed essentially the same since 2005.

*First*, Consumer Plaintiffs allege that Valve immediately obtained monopoly power upon entering digital PC game distribution in 2005 when it began selling third-party games on Steam. *See* ¶ 2. By tying Steam to its popular *Half-Life 2* and *Counter-Strike* games and leveraging its installed user base, Valve instantly overwhelmed nascent startups seeking to distribute games digitally, which never caught up. ¶¶ 34-37. Demonstrating Valve's "ability to control prices," *see Epic Games*, 67 F.4th at 998, Valve set its 30% commission based on the commission charged by the then-prevailing distribution channel for PC games: brick-and-mortar video game stores that sold physical copies of PC games. *See* ¶¶ 7, 203-04, 216. This commission reflected retail stores' substantial operating costs, including "real estate, shipping, inventory management, and staffing," ¶ 216; *accord* ¶¶ 27-28, but it did not reflect Valve's own operating costs, which are effectively negligible, ¶¶ 7, 29, 122, 203-04, 216, leading to Valve becoming one of the most profitable tech companies in the world with "margins consistently near 40%," ¶¶ 7, 39-40, 176. Thus, Valve's maintenance of a 30% commission, untethered to its minimal operating costs, supports Consumer Plaintiffs' theory that Valve charges supracompetitive commissions. *See* ¶¶ 176, 204; *Epic Games*, 67 F.4th at 984-85 (affirming district court's conclusion that Apple's "extract[ion] [of] a supracompetitive commission [of 30%] that was set . . . 'without regard' to its own costs," "produc[ing] 'extraordinarily high' operating margins," was direct evidence of harm to competition); *In re Aggrenox Antitrust Litig.*,

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 9
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

199 F. Supp. 3d 662, 667 (D. Conn. 2016) ("[P]rices in a competitive market will tend . . . toward marginal cost, so prices substantially above that cost are supracompetitive by definition.").

*Second*, Consumer Plaintiffs allege that Valve's would-be competitors recognize that a digital PC game distributor could be profitable in a competitive market charging significantly lower commissions than Valve does. *See, e.g.*, ¶¶ 47, 149, 178 (Epic's 12% commission "covers the cost of running [its] store," "distribution," and "further innovation and investment" in the platform); ¶ 167 (Discord's 10% commission more than "cover[ed] [Discord's] operating costs"). Rather than competing with these platforms on price or quality, Valve has snuffed out its nascent competition by enforcing its PMFN against publishers. *See* ¶¶ 150-51, 168-70. These attempts by Valve's competitors to impose lower commissions on PC game publishers—which would have been successful but for Valve's anticompetitive actions—illustrate that Valve's significantly higher commission is supracompetitive and directly rebut Valve's argument that it is "wholly implausible . . . that [Valve's] initial prices were supracompetitive."[5] Mot. at 11 (internal quotation omitted).

*Third*, Consumer Plaintiffs allege that Valve slightly *lowered* its effective commission in response to Epic's announced entry into the market—though only for the most successful games. *See* ¶¶ 60 & n.4, 145-49, 217-19. Valve's small concession, intended to prevent wholesale defection of the largest games from Steam, ensured Valve's continuing monopoly and ability to charge supracompetitive commissions. Contrary to Valve's suggestion, *see* Mot. at 11, these facts further distinguish this case from *Somers*—where Apple counterintuitively *raised* prices after it *lost* monopoly power, *see* 729 F.3d at 959, 964—and support Plaintiffs' allegation that Valve's flat 30% commission is supracompetitive.[6]

---

[5] In *Somers*, the Ninth Circuit concluded that allegations that a competitor charged a "lower introductory price" and that Apple lowered some song prices in response did not adequately explain how Apple's stable pricing was supracompetitive. 729 F.3d at 965-66. Here, however, Epic and Discord allegedly stated that 12% and 10% commissions, respectively, were long-term, sustainable commission rates, ¶¶ 145-49, 167, 179, not short-term, below-cost "teaser" rates.

[6] To be clear, Valve's price reduction—which applies only to a subset of sales through the platform—did not resolve Valve's anticompetitive conduct or achieve competitive pricing. ¶¶ 150-51 (detailing how Epic, despite its 12% commission, is unable to "attract users and build market share" because Valve's PMFN prevents publishers from "pric[ing] their games [on the Epic Store] lower than on Steam"); ¶ 218 ("[E]ven th[o]se reduced commission[s] for a handful of games do not reflect competitive pricing."). Rather, the price reduction represents merely an additional cost

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 10
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

1    In sum, *Somers* is an inapt comparator to this case.[7] *See, e.g.*, *In re Juul Labs, Inc., Antitrust*

2    *Litig.*, 555 F. Supp. 3d 932, 958-69 (N.D. Cal. 2021) (rejecting comparison to *Somers* where

3    consumers alleged "they suffered from [paying] supracompetitive prices in [a] more concentrated

4    market that was enabled by" defendants' exclusionary conduct). Whereas the unique facts alleged

5    in *Somers*—stable pricing under both monopoly then competition—led the Ninth Circuit to

6    conclude that plaintiffs' theory of antitrust injury was implausible, the facts alleged here are fully

7    consistent with Consumer Plaintiffs' theory of antitrust injury.

8    **4.    Valve's Arguments Concerning WON and Competitors' Cost Structures are**
        **Both Wrong and Immaterial.**

9
10    Valve started as a video game development company, releasing successful PC game

11    franchises such as *Half-Life* and *Counter-Strike*, both of which utilized a third-party network known

12    as WON. Consumer Plaintiffs allege that Valve began establishing its dominant position in digital

13    PC game distribution in 2001 when it acquired WON from Sierra, gaining access to WON's 1.5

14    million-strong user base. In 2003, Valve introduced the Steam digital distribution platform and

15    forced *Half-Life 2* and *Counter-Strike* players to use Steam to play those games (and other popular

16    Valve titles). Then, in 2004, Valve shuttered WON. From there, Valve built Steam into a

17    monopolistic powerhouse, distributing third-party game publishers' games on Steam in exchange

18    ─────────────────────

19    of Valve's monopoly maintenance and is consistent with Consumer Plaintiffs' theory of antitrust
       injury that, but for Valve's anticompetitive conduct, increased competition in the digital PC game

20    distribution market would force Valve to lower its supracompetitive commission to "the 10-15%
       offered by competitors today and in the recent past." ¶ 219.

21       [7] Valve's other two cases, *see* Mot. at 10, likewise are distinguishable. In *Gerlinger v.*
       *Amazon.com Inc.*, the Ninth Circuit affirmed *summary judgment* because plaintiff failed to muster

22    any evidence showing he "suffered [Article III] injury-in-fact"—not antitrust injury—particularly
       when he personally paid less for books *after* the challenged market allocation agreement went into

23    effect. 526 F.3d 1253, 1255-56 (9th Cir. 2008). In *In re Online DVD-Rental Antitrust Litig.*, the
       Ninth Circuit affirmed *summary judgment* after concluding the "undisputed [factual] record"

24    suggested Netflix would not have lowered its prices more than it did even had it not entered its
       challenged subscription-transfer/cross-marketing agreement with Walmart. 779 F.3d 914, 920, 922

25    (9th Cir. 2015). Crucially, the court concluded that Walmart—Netflix's alleged co-conspirator in a
       horizontal market allocation scheme—was not a "true competitor" to Netflix, such that even when

26    Walmart and Netflix directly competed before the challenged agreement was reached, Netflix
       *raised*, not lowered, its prices. *See id.* at 922-24. In contrast, Consumer Plaintiffs allege that Valve

27    has used its PMFN to foreclose market entry by formidable would-be competitors, ¶¶ 144-71, and
       that Valve anticipatorily *lowered* its long-standing 30% commission before Epic's entry, evincing

28    it was supracompetitive, *see* ¶ 60 n.4.

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 11
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

1  for a 30% commission and locking in publishers via Valve's PMFN to achieve its "stranglehold on

2  PC gaming." ¶¶ 31-94, 184-213.

3        Invoking these allegations, Valve contends that Publishers Plaintiffs avoided dismissal only

4  because they plausibly alleged early market power based solely on Valve's ownership of WON and,

5  in any event, Valve never bought WON. Mot. at 12-14 (citing the Johnson Declaration submitted in

6  Publisher Plaintiffs' case). Those arguments fail because: (1) Valve's ownership of WON is not

7  essential to Consumer Plaintiffs' claims, and (2) the Court may not judicially notice disputed facts

8  extrinsic to the Complaint, to wit, a debate about Valve's control of WON.

9           **a.    During Steam's early days, Valve did not need market power to charge**
                     **commissions well above its cost structure.**

10        Contrary to Valve's suggestion, Judge Coughenour's motion to dismiss opinion did not turn

11  solely on allegations that Valve "[n]ever lacked market power over third-party game distribution,"

12  Mot. at 12, whether through Valve's purchase of WON or otherwise. Rather, although it noted that

13  Valve's alleged acquisition of WON denoted "market power earl[y] on," the court *independently*

14  found that Publisher Plaintiffs' antitrust injury allegations were plausible because Valve "was [then]

15  competing against brick-and-mortar game distributors" and "*did not need market power* to charge a

16  fee well above its cost structure because those brick-and-mortar competitors had a far higher cost

17  structure." Dkt. 80 at 7 (emphasis added).

18        Likewise, Consumer Plaintiffs plausibly allege that Valve's low cost structure compared to

19  brick-and-mortar PC game retailers allowed Valve to charge commissions substantially above

20  marginal cost—the textbook definition of supracompetitive pricing—even without market power

21  when Valve principally competed with brick-and-mortar retailers. *See supra* Section IV.A.3. As an

22  online marketplace, Valve does not pay fixed costs required to operate physical stores (*e.g.*, rent,

23  utilities, logistics), consequently has "[s]ignificantly lower operating expenses" than brick-and-

24  mortar stores, and is able "to make more profit on game sales." ¶¶ 7, 28-29, 204, 216; *see also*

25  ¶¶ 176-77 (noting Valve's 30% fee is substantially above its marginal costs). In a competitive

26  market, these advantages would "naturally le[a]d to reduced commissions and lower prices," ¶ 29,

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 12
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

1    but Valve instead has maintained its supracompetitive commissions by enforcing its PMFN. In other

2    words, Valve has charged supracompetitive prices from the start.

3        Basic economics predicts that Valve's oursized profits distributing PC games digitally, while

4    competing primarily against brick-and-mortar stores, would draw competitors seeking to replicate

5    Valve's low-cost structure and lead to more robust competition in *digital* PC game distribution,

6    driving down Valve's commission to more closely approximate its marginal costs and resulting in

7    lower-priced, higher quality games. *See* ¶¶ 205-13; *see supra* Section IV.A.3. But that did not

8    happen due to Valve's exercise of its PMFN. Thus, alleging early market power through Valve's

9    ownership of WON (when there was no mature *digital* PC game distribution market) is not necessary

10   to plausibly plead price-based injury. As Judge Coughenour explained, the allegations that Valve

11   did not *need* market power to charge a fee well above its cost structure explains why Valve's *Somers*

12   argument fails. *See* Dkt. 80 at 7. Those allegations perform the same function here, providing an

13   independent reason to deny Valve's unsupported dismissal bid.

14       b.    **The Court may not judicially notice the Johnson Declaration or other disputed "facts" extrinsic to the Complaint.**

15

16       In any case, Consumers make the *same* WON allegations that Judge Coughenour relied on.

17   ¶¶ 32-36. Valve attempts to controvert these allegations with a Valve employee's declaration

18   extrinsic to the Complaint. Mot. at 12-13. But the Court may not credit Valve's self-serving

19   evidence on a contested factual issue at this stage.

20       Although courts may judicially notice material attached to or referenced in a complaint when

21   deciding a motion to dismiss, *see, e.g.*, *In re Silicon Graphics Secs. Litig.*, 183 F.3d 970, 986 (9th

22   Cir. 1999), *superseded by statute on other grounds*, they "may only take judicial notice of

23   adjudicative facts that are 'not subject to reasonable dispute,'" *i.e.*, "are either 'generally known'

24   . . . or 'capable of accurate and ready determination by resort to sources whose accuracy cannot be

25   reasonably questioned,'" *United States v. Ritchie*, 342 F.3d 903, 908-09 (9th Cir. 2003) (quoting

26   Fed. R. Evid. 201(b)); *see also id*. at 908 ("Affidavits and declarations . . . are not allowed as

27   pleading exhibits unless they form the basis of the complaint."). And although courts may take

28   "judicial notice of matters of public record," they "cannot take judicial notice of *disputed facts*

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 13
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

1    contained in such public records." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th

2    Cir. 2018) (emphasis added); *see, e.g.*, *RideApp, Inc. v. Lyft, Inc.*, 2019 WL 7834759, at *3 (N.D.

3    Cal. Aug. 15, 2019) ("[E]xtrinsic evidence," like a contested declaration discussing corporate

4    ownership and operation, "may not be considered on a motion to dismiss."); *Brennan v. Concord*

5    *EFS, Inc.*, 369 F. Supp. 2d 1127, 1133 (N.D. Cal. 2005); *In re CIM-SQ Transfer Cases*, 2022

6    WL 2789808, at *5 (N.D. Cal. July 15, 2022). If Valve wishes to contest Plaintiff's factual

7    allegations, the means for doing so is a summary judgment motion after appropriate discovery.

8         Valve's authorities are inapposite. In *Fay v. Mortg. Elec. Registration Sys., Inc.*, the court

9    judicially noticed documents *attached* to plaintiff's complaint—and thus incorporated by reference,

10   *see* Fed. R. Civ. P. 10(c)—and other documents whose authenticity "[could] []not reasonably be

11   disputed." 2012 WL 993437, at *2 (W.D. Wash. Mar. 22, 2012). Likewise, in *Weber Distrib., LLC*

12   *v. RSUI Indem. Co.*, the court judicially noticed "*undisputed* matters of public record" on a motion

13   for *summary judgment*. 2018 WL 5274615, at *6 (C.D. Cal. Aug. 2, 2018) (emphasis added). And

14   in *Hotel Emps. & Rest. Emps. Local 2 v. Vista Inn Mgmt. Co.*, the court judicially noticed property

15   deeds and recorded leases—"official record[s] of verifiable accuracy"—but not other documents of

16   questionable authenticity that were not official records. 393 F. Supp. 2d 972, 978, 980 (N.D.

17   Cal. 2005). Moreover, *Vista Inn* underscores that Valve's self-serving evidence, subject to vigorous

18   dispute[8] and not "integral" to Consumer Plaintiffs' Complaint, should not be given credence. *See*

19   *id.* (describing judicial notice of documents "necessarily relie[d]" on by a complaint).

20         c.    **Extrinsic "evidence" of Epic's purported cost structure cannot be
               credited.**

21

22         Further demonstrating that their arguments concern matters of contested fact inappropriate

23   for the dismissal stage, Valve seeks to establish via two judicial opinions that Epic's 12%

---

24   [8] The Johnson Declaration not only may not legally be relied on, it also is *insufficient* to establish
     Valve's factual claim. Johnson does not attach any corporate documents evidencing WON's

25   ownership at the relevant time, nor does he address Valve's website's admission that Valve acquired
     WON in 2001. *See* Master IEEP, Steam Community Page: Ricochet, *How to install Ricochet version*

26   *WON + expansions*, https://steamcommunity.com/sharedfiles/filedetails/?id=2183431463 (last
     updated Jan. 30, 2023) ("In 2001, Valve acquired WON from Flipside.com and began to implement

27   the Steam system in beta form. . . . Valve shut down the last of its WON servers on July 31, 2004.");
     *accord* The Sierra Wiki, *World Opponent Network*, http://wiki.sierrahelp.com/index.php/

28   World_Opponent_Network (last edited Feb. 16, 2025).

1   commission was neither profitable nor sustainable, and from there make the illogical leap to argue
2   that Valve's 30% commission could not plausibly be supracompetitive. Mot. at 14 (citing *Epic*
3   *Games*, 67 F. 4th at 968; *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 934 (N.D. Cal. 2021)).
4   But the Court cannot credit those judicial opinions over Consumer Plaintiffs' well-pleaded
5   allegations, and the opinions regardless are immaterial.

6       *First*, even though the district court observed, following a merits trial in Epic's lawsuit
7   against Apple, that Epic expected its Epic Store to become profitable by 2023 charging only a 12%
8   commission, 559 F. Supp. 3d at 934, Valve highlights the court's statement that Epic's 12%
9   commission was a below-cost commission that sought to sacrifice short-term profitability to build
10  market share. That factual finding in a separate case—litigated between different parties asserting
11  different claims—is precisely the type of extrinsic material that cannot be considered on a motion
12  dismiss.[9] *See Khoja*, 899 F.3d at 999-1001.

13      *Second*, Consumer Plaintiffs plausibly allege that Valve's would-be competitors determined
14  their 10-12% commissions were sufficient to cover the costs of operating a digital PC game
15  distribution platform in the long term. *See* ¶¶ 145, 147 ("[Epic] claimed that even with its 12%
16  commission, it still made a profit margin of 5% to 7%" in 2020); ¶ 179 (Discord's 10% commission
17  covered the platform's operating costs); *see also Epic Games*, 559 F. Supp. 3d at 978-79
18  (highlighting Microsoft's reduction of its commission from 30% to 12% on the Windows Store).
19  These allegations explain that Epic's losses during the period discussed in *Epic v. Apple* "stem[med]
20  from heavy promotional spending aimed at challenging Valve's market dominance, rather than from
21  an inadequate revenue share." ¶ 149. And finally, neither opinion sheds any light on *Valve's* break-
22  even rate or allegations that Valve's commission is priced significantly over its marginal costs. *See*
23  *supra* Section IV.A.3; *see also* ¶ 181 (noting Valve's employees acknowledge that its 30%
24  commission is priced significantly greater than the value of the services that it provides). These fact-
25  intensive disputes cannot be decided on a motion to dismiss.

26

27  ⁹ Regardless, the court's note that Epic's commission was "below cost" reflects Epic's *short-term* customer acquisition costs, which do not bear on the competitive equilibrium that would prevail
28  long-term absent Valve's monopolistic conduct. ¶ 149.

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 15
CASE NO. 2:21-CV-00563-JNW          COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

**B.    Consumer Plaintiffs Plausibly Allege That Valve's Monopolistic Conduct Results in Higher Prices for Consumers.**

Consumers "pay Valve's commissions directly, even though the portion representing the commission is hidden in the game's purchase price." ¶ 194. Consequently, Valve's supracompetitive commissions directly result in consumers paying increased prices for digital PC games. ¶¶ 195-201. Nonetheless, Valve contends that Consumer Plaintiffs do not plausibly allege that Valve's conduct impacts output or consumer prices, "hav[ing] almost nothing to say about harm to consumers." Mot. at 14-17. Nonsense. The Complaint repeatedly pleads the harm to consumers wrought by Valve's misconduct—higher PC game prices, lower quality games, and less product choice:

- "Competing platforms could also, and historically have tried to, offer consumers better products by encouraging publishers to offer unique content off Steam. In a competitive market, these strategies would motivate publishers to steer consumers to non-Steam platforms by offering lower prices and better content on platforms that charge lower commissions. But Steam has specifically prohibited publishers from offering these benefits to consumers with its PMFN as a condition of accessing Steam's existing customer base." ¶ 6.

- "Valve has used its PMFN and other anticompetitive tactics to leverage its monopoly power across the distribution of PC games and subsequent DLC and in-game purchases. The result is a supracompetitive 'tax' on the PC gaming industry, which leads to higher prices for fewer and lower-quality PC games and PC game transaction platforms." ¶ 11.

- "Valve's conduct has resulted in supracompetitive prices in the digital PC game distribution market, reducing market-wide output in terms of quality, innovation, and consumer choice." ¶ 143.

- "Valve has been able to charge its 30% fee, which ultimately raises prices to consumers and hampers innovation by restricting the potential earnings of publishers" ¶ 182.

- "Valve's enforcement of its PMFN prevents publishers from offering lower prices off Steam. Absent Valve's anticompetitive conduct, consumers would have the opportunity to buy games at lower prices on lower cost platforms. Instead, they must buy games at prices

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 16
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

that reflect Steam's supracompetitive commissions, even on platforms that charge *lower* commissions." ¶ 197.

- "In a market free of Valve's PMFN and other restrictive practices, lower prices and higher quality on other stores would force Valve to lower its commission rates to a level that reflects its actual costs plus a reasonable profit, rather than rates inflated by its anticompetitive behavior. This would result in lower prices to consumers, as reducing Valve's commission— already baked into the price consumers pay for games on the Steam Store—would reduce game prices as well." ¶ 214.

- "Valve's PMFN leads to several negative effects: (a) it raises consumer prices and lowers game quality, (b) it prevents rival platforms from engaging in price and quality competition, (c) it discourages new entry by platforms that charge lower commissions, and (d) it suppresses output from game developers. These effects directly harm consumers." ¶ 223.

### 1. Basic Economics Supports Consumer Plaintiffs' Allegations of Harm.

Ignoring the foregoing allegations, Valve argues it is implausible that PC game prices would be lower absent its monopolistic conduct because developers "could" simply keep a portion of Valve's supracompetitive commission if it were lower. Mot. at 15-16. That untested factual assertion, fiercely disputed by Consumer Plaintiffs and subject to expert analysis, cannot be credited on a motion to dismiss.[10] *See Dyroff*, 934 F.3d at 1096; *see also Apple Inc. v. Pepper*, 587 U.S. 273, 284 (2019) (rejecting Apple's posited assumption that "a monopolistic retailer who keeps a commission does not ever cause the consumer to pay a higher-than-competitive price").

The issue presented here is whether Consumer Plaintiffs' allegations of consumer harm are plausible. *Iqbal*, 556 U.S. at 678. They are. "Basic economics indicates how a competitive market would respond to . . . exorbitant profits: Competitors would flood in, offering innovative products at more affordable prices and siphoning Valve's market share until its supracompetitive profits were no longer feasible." ¶ 8; *see also* Michael Parkin, Microeconomics 304 (12th ed. 2016)

---

[10] It also would be fallacious to conclude that, if publishers *might* keep some or even all the benefit of reduced commissions, then it is implausible that consumers might benefit alongside or instead of publishers.

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 17
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

("Compared to a perfectly competitive market, a single-price monopoly produces a smaller output and charges a higher price."). "If not for Valve's challenged conduct, competition would lead to lower platform fees across the market (on Steam and on competitor digital PC game distribution platforms)," therefore "consumers would pay less, publishers would earn more, and PC game output would increase to competitive levels." ¶ 200; *see also* ¶¶ 209-11 (discussing how lower commissions would allow publishers to charge lower prices for their games and offer additional, superior gaming features in the absence of Valve's market restraints).[11] This is precisely the market effect that economic theory predicts would result from a competitive market. *See Epic Games*, 67 F.4th at 1000 ("If consumers can learn about lower app prices, which are made possible by developers' lower costs, and have the ability to substitute to the platform with those lower prices, they will do so[.]").

Academic literature recognizes that PMFNs can harm competition and consumers, particularly a PMFN (like Valve's) requiring that providers refrain from offering their products or services at lower prices on other platforms. ¶¶ 221-23. "The platform is thus guaranteed that no other internet distributor will charge a lower final price, not because the focal platform has worked to ensure that it has the lowest cost, but rather because it has contracted for competitors' prices to be no lower." Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*, 127 Yale L.J. 2176, 2178 (2018); *see also* Congressional Research Service, *Antitrust Reform and Big Tech Firms* at 63-64 (Nov. 21, 2023), https://www.congress.gov/crs-product/R46875 ("Platform MFNs may make it difficult for rivals to compete with a dominant platform by charging lower commissions, because such clauses prevent business users from passing along those savings to consumers."); *see also* Steven Salop & Fiona Scott Morton, *Developing an Administrable MFN Enforcement Policy*, 27 ANTITRUST 15, 15 (2013), https://media.crai.com/sites/default/files/publications/Developing_An_Administrable_MFN_Enforcement_Policy_Salop_ScottMorton_Antitrust_Spring_2013.pdf (discussing how MFNs "can soften price competition and thereby

---

[11] Indeed, many well-heeled tech giants and game developers, such as Microsoft, Amazon, Electronic Arts, Epic, and Discord, have spent hundreds of millions of dollars in efforts to dislodge Valve by launching competitor platforms and charging lower PC game prices, only to be stifled by Valve's anticompetitive actions. ¶¶ 9, 144-75, 201-02, 208.

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 18
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

1    allow firms to charge higher prices than they otherwise would" and also "have exclusionary effects

2    by raising the costs of rivals or entrants that attempt to compete").

3         Recent case law from this District recognizes that PMFNs can cause consumers to pay

4    supracompetitive prices. In *Frame-Wilson*, consumer plaintiffs challenged Amazon's use of a

5    PMFN that prevented sellers from reducing prices of their products on non-Amazon platforms that

6    charged lower fees, which caused consumers to pay supracompetitive prices for products sold on

7    both the Amazon platform and other e-commerce sites. 591 F. Supp. 3d at 981-82. Judge Chun

8    rejected Amazon's contentions that plaintiffs' allegations of higher market prices and restrained

9    competition did not demonstrate requisite anticompetitive harm. The court concluded that plaintiffs

10   adequately alleged antitrust injury, crediting "the injury to consumers in the form of

11   supracompetitive prices for products on platforms external to Amazon.com and reduced price

12   competition," even though plaintiffs could cite only a few, anecdotal examples. *Id.* at 992.

13        Valve's cases—overwhelmingly decided on a developed record at summary judgment—are

14   inapposite and do not suggest that Consumer Plaintiffs' allegations of consumer harm are

15   implausible. *See Williamsburg Wax Museum, Inv. v. Historic Figures, Inc.*, 810 F.2d 243, 251-53

16   (D.C. Cir. 1986) (concluding plaintiff failed to proffer evidence of monopoly power or unreasonable

17   restraint of trade); *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (concluding

18   plaintiffs failed to plead that programmers' multi-channel packages harmed competition by

19   excluding other sellers of low-demand channels or raising barriers to entry in the programming

20   market);[12] *see also Maxim Integrated Prods., Inc. v. Analog Devices*, 79 F.3d 1153, at *2 (9th Cir.

21   1996) (unpublished table decision) (granting summary judgment because competitor-plaintiff failed

22   to provide evidence of monopoly power). *Metro Indus. v. Sammi Corp.*, 82 F.3d 839, 848 (9th Cir.

23   1996), also decided on summary judgment, involved whether the defendant had market power, an

24   issue Valve does not contest here. And *Friedman v. AARP, Inc.*, 2019 WL 5683465, at *6 (C.D.

25   Cal. Nov. 1, 2019), is even further afield; it was not an antitrust case, and the court did not determine

26

27   _____

     [12] Nonetheless, dicta in *Brantley* supports Consumer Plaintiffs here, explaining that "reduced consumer choice and increased prices . . . establish an injury to competition . . . when they are the
28   result of an anticompetitive practice." 675 F.3d at 1202 n.11.

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 19
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

1    whether *antitrust injury* occurred when defendant AARP received a commission from the insured's

2    Medigap insurance policy premiums, particularly when plaintiffs failed to plead that they could not

3    have bought the same policy elsewhere for a lower price.

4        **2.    Valve's Remaining Arguments Are Wrong.**

5        Valve contends its policies are consumer friendly because Valve has never requested that a

6    publisher raise the price a consumer would pay on Steam and that, had Valve learned about a

7    publisher lowering its game price on a rival platform, Valve would have demanded that the

8    developer reduce its price on Steam. Mot. at 17. That is, again, a contested matter of fact. *See* ¶ 65

9    (internal Valve email recognizing, "[s]ometimes, the partner will talk with [redacted] and have the

10   discount [on other platforms] removed or adjusted"). Moreover, as Consumer Plaintiffs plead, this

11   is a "duplicitous rationale:" Valve's "real goal is to prevent consumers from benefitting from

12   discounts that publishers might offer, thus maintaining Valve's 30% fee and its dominance in the

13   market." ¶ 70. In other words, Valve knows publishers cannot routinely reduce their prices on Steam

14   to the prices they set on platforms where they pay less than half of Steam's commission. *See, e.g.*,

15   ¶ 182 (noting Valve's 30% commission publishers' potential earnings). When Valve enforces the

16   PMFN, it knows that publishers will almost always *raise* prices on competing platforms rather than

17   *lowering* prices on Steam.

18       The Complaint pleads a real-world example showing that, "[i]f not for Valve's challenged

19   conduct, . . . consumers would pay less." ¶ 200. In 2019, game publisher Deep Silver sold *Metro*

20   *Exodus* on Steam for $60 but later offered the game exclusively on the Epic Store for $50 because

21   of its lower commission. But to do so, Deep Silver had to forgo all further sales to Steam's customer

22   base because of Valve's anticompetitive policies. Given this "Hobson's choice," few publishers

23   took similar action. ¶ 201. Although Valve contends Consumer Plaintiffs cannot rely on this sole

24   example, Mot. at 16-17, it overlooks *Frame-Wilson*'s guidance that anecdotal examples reinforce

25   other, well-pleaded allegations of antitrust injury (in the form of supracompetitive prices on

26   platforms). *See* 591 F. Supp. 3d at 992. Indeed, the *Metro Exodus* example is consistent with other

27   examples of Valve reinforcing its anticompetitive policies, *see* ¶¶ 60-73 (documenting Valve's

28   efforts to ensure publishers do not sell their games for lower prices on other platforms, including

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 20
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

1    banning such "offending" products from being offered on Steam), and allegations regarding how

2    the market would function absent Valve's anticompetitive restraints, leading to lower consumer

3    prices. *See* ¶¶ 8, 200, 209-11, 214.

4        In any event, it is well-established that asserted procompetitive justifications cannot be

5    adjudicated on the pleadings—particularly true for Valve's claimed justification here, which is

6    predicated on fact assertions about how Valve would purportedly respond to publishers attempting

7    to price discriminate. *See Frame-Wilson*, 591 F. Supp. 3d at 992; *see also CollegeNET, Inc. v.*

8    *Common Application, Inc.*, 711 F. App'x 405, 407 (9th Cir. 2017) (reversing dismissal because,

9    "[a]t this preliminary stage," plaintiffs' allegations that defendant limited choice, decreased price

10   competition, and foreclosed rival entry, "thereby reducing overall market satisfaction by leaving

11   one dominant provider offering inferior products and services,'" were sufficient).

12       Perhaps Valve will divine evidence during discovery that its actions benefit consumers—

13   however unexpected such evidence would be, given Consumer Plaintiffs' allegations are soundly

14   based in economic theory and supported by experts in the Publisher cases. *See* Dkt. 309 at 31

15   (*Valve's expert* highlighting that reduced commissions would lead to lower prices for consumers).

16   But at this stage, its unsupported assertions must be rejected.

17   **C.    Consumer Plaintiffs' WCPA Claim Should Not Be Dismissed.**

18       As Valve recognizes, Mot. at 18, the WCPA's prohibition of unfair methods of competition

19   is equivalent to the Sherman Act's sections 1 and 2 and is guided by their interpretation. *Hairston*

20   *v. Pac.-10 Conf.*, 893 F. Supp. 1485, 1493 (W.D. Wash. 1994). Because Consumer Plaintiffs' federal

21   antitrust claims survive dismissal, so too should their WCPA claims. *See, e.g.*, *id.* (denying dismissal

22   of WCPA claims on same grounds as federal claims).

23   **D.    Any Dismissal Should Be Without Prejudice.**

24       Valve seeks dismissal with prejudice because Consumer Plaintiffs purportedly had "multiple

25   opportunities" to cure perceived pleading defects but failed to do so. Mot. at 18-19. Not so. The

26   instant motion presents the first time this Court has been asked to dismiss Consumer Plaintiffs'

27   claims. Should the Court dismiss Consumer Plaintiffs' claims, it should do so without prejudice.

28   Rule 15(a)(2) directs courts to "freely give leave [to amend] when justice so requires," and the Ninth

1   Circuit instructs that "leave to amend should be granted if it appears at all possible that the plaintiff

2   can correct the defect." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (internal quotation

3   omitted); *see Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988) ("The standard

4   for granting leave to amend [upon dismissal] is generous.").[13] Accordingly, Judge Coughenour

5   permitted Publisher Plaintiffs to amend their complaint to "address the infirmities" noted in his first

6   dismissal opinion and to make "any other changes" desired. *See* Dkt. 67 at 8 & n.6. If the Court

7   dismisses with leave to amend, Consumer Plaintiffs will supplement their Complaint with discovery

8   obtained from Publisher Plaintiffs' case. *See* Dkt. 482 at 2 (providing Interim Lead Class Counsel

9   authorization to "receive or access discovery completed by the parties as to the Publisher Class");

10  *cf. Bolin v. Koehn*, 2025 U.S. Dist. LEXIS 108071, at *4-5 (D. Nev. June 3, 2025) (granting leave

11  to amend given, *inter alia*, plaintiff's "understanding of the facts and injuries has evolved through

12  discovery").

13                          **V.    CONCLUSION**

14          For these reasons, Valve's motion to dismiss should be denied in full. In the alternative, if

15  Valve's Motion to Dismiss is granted, Consumer Plaintiffs request leave to amend the Complaint.

16

17  DATED: October 3, 2025                         Respectfully submitted,

18

19                                                  */s/ Corrie Yackulic*
                                                    Corrie Yackulic (WSBA No. 16063)
20                                                  CORRIE YACKULIC LAW LLC
                                                    110 Prefontaine Place S., Suite 304
21                                                  Seattle, WA 98104
                                                    Tel: (206) 787-1915
22                                                  corrie@cjylaw.com

23                                                  *Liaison Counsel for the Proposed Consumer
                                                    Class*
24

25                                                  Benjamin D. Brown (*pro hac vice*)
                                                    Brent W. Johnson (*pro hac vice*)
26                                                  Robert W. Cobbs (*pro hac vice*)

27      _____
        [13] Valve's sole case authority, *Zucco Partners LLC v. Digimarc Corp.*, refused amendment only
28  after—unlike here—plaintiff was given an opportunity to amend its complaint after initial dismissal.
        552 F.3d 981, 1007 (9th Cir. 2009).

OPPOSITION TO MOTION TO DISMISS                     COHEN MILSTEIN SELLERS & TOLL, PLLC
CONSUMER COMPLAINT - 22                             1100 NEW YORK AVE NW, SUITE 800
CASE NO. 2:21-CV-00563-JNW                          WASHINGTON, D.C. 20009
                                                    TEL.: (202) 408-4600

1
2
3
4
5
6

Nathaniel D. Regenold (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
bjohnson@cohenmilstein.com
rcobbs@cohenmilstein.com
nregenold@cohenmilstein.com

7
8
9
10
11

Christopher J. Bateman (*pro hac vice*)
Daniel Gifford (*pro hac vice*)
COHEN MILSTEIN SELLERS &
TOLL PLLC 88 Pine St., 14th Floor
New York, NY 10005
Tel: (212) 838-7797
cbateman@cohenmilstein.com
dgifford@cohenmilstein.com

12
13

*Interim Lead Class Counsel for the
Proposed Consumer Class*

14
15
16
17
18
19
20

/s/ Steve W. Berman
Steve W. Berman (WSBA No. 12536)
Sean R. Matt (WSBA No. 21972)
Xiaoyi Fan (WSBA No. 56703)
HAGENS BERMAN SOBOL SHAPIRO
LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
steve@hbsslaw.com
sean@hbsslaw.com
kellyf@hbsslaw.com

21
22
23
24

Ben M. Harrington (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO
LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3034
benh@hbsslaw.com

25
26

*Additional Counsel for the Proposed
Consumer Class*

27
28

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 23
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF recipients.

DATED this 3rd day of October 2025.

*/s/ Corrie Yackulic*
Corrie Yackulic

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

I hereby certify that this memorandum contains 8,223 words, excluding the caption, table of contents, table of authorities, signature blocks, and certificate of service, in compliance with the Local Civil Rules.

DATED this 3rd day of October 2025.

*/s/ Corrie Yackulic*
Corrie Yackulic

OPPOSITION TO MOTION TO DISMISS
CONSUMER COMPLAINT - 24
CASE NO. 2:21-CV-00563-JNW

COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 NEW YORK AVE NW, SUITE 800
WASHINGTON, D.C. 20009
TEL.: (202) 408-4600