# KILARU DECLARATION
# EXHIBIT 2
## Dkt No. 527-02

# REDACTED

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

---------------------------------------------X

IN RE VALVE ANTITRUST LITIGATION

Case No. 2:21-cv-00563-JNW

---------------------------------------------X

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

DATE: May 14, 2025
TIME: 9:01 a.m.

VIDEOTAPED DEPOSITION of STEVEN SCHWARTZ, pursuant to a Notice, held at the offices of Quinn Emanuel Urquhart & Sullivan, LLP, 295 5th Avenue, 9th Floor, New York, New York 10016, before Nicole Veltri, RPR, CRR, a Notary Public of the State of New York.

 5 for identification as of this date.)

Q. So, Dr. Schwartz, what I've just handed you is Attachment D1 to your Supplemental Opening Merits Expert Report. Is that fair?

A. That's what it's labeled.

Q. Okay. And it looks like Attachment D1, correct? That you prepared?

A. It does.

Q. Any reason -- I'll represent to you that we haven't changed it in any way, but any reason to doubt that this is a document that was attached to your report?

A. No.

Q. And at the title, it's described as: Steam P&Ls as produced by Valve, 2003 to 2023.

Do you see that?

A. I do.

Q. Okay. And the first kind of row in this is -- has a headline that's titled Revenue.

Do you see that?

A. I do.

Q. And right under that is Service Revenue, correct?

A. Yes.

Q. And your understanding is that Service Revenue represents the sale, revenues from the sale of third-party games on Steam, correct?

A. That is my understanding of what's represented here.

Q. Okay. And you used these revenue numbers in your market share calculations, correct?

MR. LeRAY: Object to form.

A. Yes.

Q. And just to be clear, this represents the sale of third-party games on Steam but it does not represent sales of first-party games on Steam?

A. That's correct.

Q. And just so we have a common understanding, when I say "third party" in this context, I mean a game distributed by someone or developed by someone other than

Valve, correct?

A. Correct.

Q. And when we say "first party," just for purposes of today, we're referring to games that are produced by the same company that runs a platform. Is that fair?

A. Correct, but then let's make the definition of "third party" a little bit more precise.

Q. Sure. Let's do it.

A. It is a set of games that are developed and published by someone other than the operator of the distribution outlet.

Q. Great, okay. So just to give a concrete example, in 2005, Valve had produced a game called Half-Life 2, correct?

A. It's my understanding.

Q. And revenues from Half-Life 2 would not count in the service revenue line, correct?

A. That's my understanding.

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

Q. But if, and I know this hasn't happened, but just hypothetically, Half-Life 2 had been sold on, say, the Epic Games Store, it would be in the revenues you would count on the Epic Games Store?

A. Correct. It would be a third-party game on the Epic Games Store.

Q. Great.

Now, at the very bottom of this first page, there's a -- well, the second-to-last line is a line titled: After tax net profit.

Do you see that?

A. I do.

Q. And that's Valve's accounting of its after tax net profit on the Steam platform, correct?

A. That's my understanding.

Q. And for [REDACTED] that number has a parenthesis around it. It's [REDACTED] with the parenthesis. Do you see that?

A. I do.

Q. And do you take that to mean that Valve had negative profits of [REDACTED]

[REDACTED]?

A. Yes.

Q. In other words, they lost --

A. They lost money.

MR. LeRAY: Object to form.

Q. You're a step ahead of me.

MR. LeRAY: Steve, give me a chance to object.

THE WITNESS: Sure.

MR. LeRAY: Thank you.

Q. In [REDACTED] the number for after tax net profit is [REDACTED], also with the parenthesis, correct?

A. Yes.

Q. So that would be, again, an amount that Valve lost on the Steam platform that year?

A. Yes.

Q. In [REDACTED] that number is [REDACTED], again, with the parenthesis?

A. Yes.

Q. Same question, that would be an amount that Valve lost on the Steam platform in [REDACTED]

updates, you don't know; they're just specific to a platform, but you don't know?

MR. LeRAY: Object to form.

Go ahead.

A. The updates, I don't know. I understand it's a possibility. I -- there is information in the record about different functionality on consoles versus PCs and that that has implications on features of the game play.

Q. Okay. As we talked about a minute ago, you're aware that since 2019, gamers can play a PC version of Call of Duty against a console version of Call of Duty, correct? Maybe ask a better question.

A gamer who is playing Call of Duty on PC can play against a gamer who is playing on console, correct?

A. That is my understanding.

Q. And have to imagine those gamers aren't going to be particularly happy if they're playing meaningfully different games, correct?

A. Well, I think -- I don't know whether they would be -- how unhappy they would be, but I think my prior answer was that the games are fundamentally the same but there may be differences in elements of the game, player functionality that are unique to the particular pieces of hardware.

Q. Sure. But if a player is playing on PC against a player on console, and the console version is much faster or performs better, that is going to be a disadvantage for the PC player, correct?

A. Never having played the game, I don't know for sure, but I would presume that if one console was faster than the other, that that would be something that would matter.

Q. Okay. Now, you're aware that Microsoft purchased Activision Blizzard on October 13th of 2023, correct?

A. I don't remember the exact date, but I am aware of the acquisition.

Q. I happen to know that one

pretty well.

A. I figured you might.

Q. And after October 13th of 2023, I'll represent to you that's the day the transaction closed, Microsoft owned a Call of Duty. Is that fair to say?

A. I assume so.

Q. Okay. Now, under your definition of the relevant market, on October 12th, 2023, if a consumer purchased Call of Duty on Microsoft's game store, they would be making a purchase in the relevant market in this case, correct?

A. Say that again.

Q. Sure. If a consumer purchased Call of Duty on Microsoft's game store for the PC on October 12th of 2023, they would be making a purchase in the relevant market in this case, correct?

A. Assuming The Microsoft Store was selling a PC version -- well, are they selling a key?

Q. Well, we'll make it simple. Microsoft -- I want you to assume for sake

of our discussion that Microsoft was selling Call of Duty for play through the Microsoft PC store on October 12th, 2023.

A. Okay.

Q. Any reason to doubt that that was the case?

A. I -- no reason to doubt it. No reason to agree with it.

Q. Okay.

A. But I'll accept it.

Q. So if Microsoft was selling Call of Duty for purchase on the PC store on October 12th of 2023, that purchase would be in your relevant market, correct?

A. Assuming -- assuming that they are selling the game to be played on their platform and not selling a key, yes.

Q. Okay. So if Microsoft was selling Call of Duty for play on its PC platform, that purchase would be in your relevant market on October 12th of 2023?

A. Yes.

Q. Okay. If Microsoft was selling -- and that is because on

October 12th of 2023, Call of Duty would be a third-party game for Microsoft, correct?

A. Correct. And I'm assuming in answering this question that there had been no integration of the parties before that, and that on the 12th Activision was making its own decisions and Microsoft had no influence or role in those decisions, no review or anything of that sort.

Q. Sure. But for purposes of your analysis, you would count that sale as in your market on October 12th of 2023 if Activision was operating as a separate company?

A. Right. With that distinction. So long as -- so long as it was truly acting as a third party and wasn't being influenced or meaningfully controlled or constrained in any way by Microsoft, then I would agree with the proposition in your question.

Q. Okay. So that's a yes. If Microsoft -- if Activision was operating as a separate company without control by

Microsoft on October 12th of 2023, a sale of Call of Duty would be in your relevant antitrust market?

MR. LeRAY: Object to form. Asked and answered.

A. Yeah, I think that was what I said previously.

Q. Okay. And the transaction, the announcement that Microsoft was going to purchase Activision Blizzard, I'll represent to you that that occurred in January of 2022. Any reason to doubt that?

A. Sounds about right.

Q. So in December of 2021, certainly a purchase of Call of Duty on The Microsoft Store, for play on the Microsoft platform, would be in your relevant antitrust market, correct?

A. '21, so you're talking about prior to the announcement?

Q. Exactly.

A. I have no reason to think that it wouldn't be.

Q. Okay. Well, it's your market,

so --

A. Right.

Q. It would be in your market, correct?

A. Well, yes. But here is the thing. I don't know what communications there were between Microsoft and Activision. If they announced the deal in January, I think it's probably likely they were talking in December. I don't know whether decisions were being made by Activision in anticipation of the acquisition, so to the extent that Activision was acting truly independently without influence from Microsoft or the prospect of the deal and so it was truly acting as a third party, then the answer would be it's a third-party sale.

Q. Okay. So just to make sure we have it clear, setting aside the possibility that before Microsoft announced it was purchasing Activision it was secretly controlling Activision, you would agree with me that a sale of Call of Duty

on Microsoft PC platform prior to January of 2022 would certainly be in your relevant market?

A. So secretly control was your word. I think I'm talking more about influence or reactions by Activision in order to make sure that the deal remains appealing. But with that caveat, it would be a third-party sale.

Q. Okay. Now, on October 14th of 2023, Microsoft owned Activision Blizzard, correct?

A. It's my understanding.

Q. Okay. So starting on October 14th of 2023, sales of Call of Duty are no longer in your relevant antitrust market?

MR. LeRAY: Object to form.

A. On the Microsoft PC store you're asking?

Q. Yes, that's correct. I'll ask the question again.

Starting on October 14th of 2023, sales of Call of Duty are no longer

in your relevant antitrust market. Sales of Call of Duty on the Microsoft PC platform are no longer in your relevant antitrust market, correct?

A. At that point, the Microsoft PC store would turn into a first-party distributor for Activision games so that's -- your premise is correct.

Q. Doctor, are you aware of any other market where a good goes from into and out of the market in a one-day period?

MR. LeRAY: Object to form.

A. I can imagine a similar situation in any market where, for example, something like first- or third-party control would be important where that would occur. I'm not recalling anything that I studied where that's been precisely the case, but I could certainly see an analogous situation in another technology market where the same thing could occur.

Q. Okay. As you said, you can't, sitting here today, name another market where first- or third-party control is

relevant to market definition?

MR. LeRAY: Object to form.

You've asked and answered.

A. Well, that's a slightly different question. So can you repeat that for me, please?

Q. Sure. Sitting here today, you can't name another market where -- I'm quoting you -- something like first- or third-party control would be important?

MR. LeRAY: Object to form.

A. There's nothing that I studied that comes to mind that would fit exactly into that box, but I would be surprised if that doesn't exist again in a similar type of technology-driven market.

Q. Okay. There's nothing that comes to your mind?

A. I'll stick with the previous answer.

Q. Okay. Your -- you have that list of firms that we talked about in your Appendix E1. I think it was Schwartz 6. That's your market share calculations in

discounts are offered on another platform, that the same or closely similar deal needs to be offered close in time to Steam customers for products that they purchase on the Steam platform.

Q. You said the same or closely similar deal needs to be offered -- we're going to do both pieces, but just to talk about the deal piece, the same or closely similar deal needs to be offered on the Steam platform.

How similar does it have to be?

A. There are a couple of instances where Steam -- where I recall documents where Steam is fairly precise. One where I think they -- there was a difference of 10 or 11 pounds in the price, and I think Steam's position was, if the price difference was 4 pounds, I think it was, that would be sufficiently close for them.

In other discussions and enforcement conversations, they are much more precise in saying there's an expectation that the prices would be the

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

same, but they allow themselves a bit of room to agree to something that is, they deem sufficiently close even if it's not precisely the same.

Q. Okay. But I guess I'm asking you, you said your opinion earlier is that Valve has a PMFN. Based on the evidence you've seen, how similar do the prices need to be? Is it 5 percent, 10 percent?

A. I think I would go with the same answer. I think close is whatever in its enforcement Steam determines it finds satisfactory for the deal to be fair to its customers. If you look at the responses to some of the enforcement, what you observe is that the deals that Steam customers get following the availability of a deal or a promotion on some other platform, get them to exactly the same price far more often than not; but even when they're not exactly the same, they're very close together.

But, again, I don't recall Steam ever saying close means exactly X percent or Y percent.

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

Q. Okay. So your opinion, just to make sure I understand it is, is that Valve wants the price to be very close together if not exactly the same?

A. That's -- the Valve employees use different language and different words where they're saying things like it needs to be close. It needs to be an equivalent deal. Now, equivalent doesn't necessarily mean equal. But they don't -- they're imprecise about what exactly it means.

The end result is that when we see -- when we actually look at pricing behavior, for example, we see minimum prices on a quarterly basis between Steam and some other platform on a game, we find pretty uniformly Steam prices are as low or lower than on other platforms.

So I think Valve is being deliberately vague, but what we observe in the data is equivalent deals being offered where if you look, maybe at 20 percent discount on one platform for a week and then it will be followed very closely

thereafter by the exact same discount on Steam for the same period of time or longer.

Q. So you sort of started answering my next question, which is how close in time the prices need to match. I think you said earlier in that answer that in your analysis you see minimum prices on a quarterly basis being the same between Steam and another platform. Is that right?

A. That is what I intend to say. I don't know if those were the exact words I used.

Q. And is that the standard you believe the jury should apply in determining whether there's a PMFN or not, whether there are minimum prices on a quarterly basis that are the same between Steam and another platform?

A. So not to nitpick, the standard -- I mean, the judge will tell them what the standard is.

Q. Sure, but I'm just saying you as a --

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A. I like to do lots of things but I certainly won't play lawyer. If you're asking me do I -- do I think that that is evidence the jury can look at and conclude that there is a PMFN that's enforced, I think they can. And I think I hope and believe I'll be able to persuade them of that.

Q. But that would be -- I guess I'm asking you -- I'm not asking you to opine for the judge. I'm asking you to opine for yourself as a economist. Would you tell the jury the way you can tell there's a PMFN on price is that the minimum prices on a quarterly basis are the same between Steam and another platform if not closer?

MR. LeRAY: Object to form.

A. What I would tell -- what I would say is that it is one piece of evidence that convinces me that there is an effective PMFN in place here.

Q. Okay. Let's look at your -- I think it's your Opening Report, and start

know it includes emails. It may include more than just emails. I don't recall specifically without looking at it.

Q. And is that a comprehensive list of the emails you've seen and documents that you've seen in this case that you believe are consistent with price parody or with a PMFN, I should say?

A. I think the term I would use is "representative." I don't want to sit here and say under oath that it is everything, but it is certainly a representative set.

Q. Okay. And if there were any other emails that you considered that were consistent with a PMFN being in place, they would be on those Materials Considered List that we looked at, correct?

A. That would be my expectation.

Q. Okay. You then look at, and this is Sections J through N of your report, a series of what you might call pricing studies of individual games.

Is that fair to say?

A. You can call it that.

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

Q. What would you call those appendices?

A. I would call them presentations of pricing with respect to particular games. I mean, I just never thought of them as pricing studies, so --

Q. Okay.

A. We can call them that if you'd like.

Q. No. I want to call them what you want to call them. You said you looked at them as presentations of pricing with respect to particular games.

Is that what you said?

A. Yes.

Q. And is it your view that these presentations in pricing show that a PMFN was enforced as to these particular games?

A. Yes.

Q. Okay. And we can count, but I'll represent to you that there's about 49, either 49 or 50 of these presentations that you have here. Does that sound about right?

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A. I've never counted, but let's see. That's pretty close. I count 49.

Q. Okay, great, 49.

And you didn't do additional pricing -- you didn't do pricing presentations as to any additional games in your later reports, correct? I understand you may have looked at some of these games in more detail, but you didn't look at additional games to do pricing studies, correct?

A. I don't recall that we did.

Q. And there are, you would agree, over a hundred thousand games on Steam today, correct?

A. It's a large number.

Q. You're aware there's about 32,000-plus class members of developers in this case?

A. Yes.

Q. And I'll represent to you that you have 19 different developers on this list here. Does that sound about right?

A. I don't know that I've looked

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

at that, but it wouldn't surprise me.

Q. Well, let's see. You have [redacted] in Section J. That's one, right?

A. Okay.

Q. Is that right?

A. [redacted] is Section J.

Q. Then you have [redacted] in Section K. So that would be two, correct?

A. These are platforms, not --

Q. Sure.

A. Okay. Yeah.

Q. You have [redacted] in Section L, correct?

A. Right.

Q. And by the way, you said these are platforms. When you're talking about games in Sections J, K, and L, you're talking about games that that company distributed on their platform, correct?

A. These are games that were sold on that platform.

Q. Let me ask you a slightly different version which is, all of the games that are listed in your [redacted]

section are produced by [REDACTED], correct?

A. I know that some of them are. I don't know if all of them are.

Q. Okay. Same question for [REDACTED]. All of those games are [REDACTED] games, correct?

A. Again, I know that some of them are. I don't know that all of them are.

Q. Okay. [REDACTED] is the third entity listed and that's in Section L, correct?

A. Correct.

Q. Then you have [REDACTED] in Section M, correct?

A. Correct.

Q. So that would be four going up to Section M, correct?

A. Correct.

Q. And then you have 16 small -- well, you have 16 entries in Section N. So if we assume those are all individual publishers, that would be 16 more, correct?

A. Correct.

Q. So that would be about 20?

A. Correct. Assuming that all of

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

the -- as I'm sitting here, I can't say with certainty that all of the games under [redacted] are all [redacted]-published games, but if they are, your count would be right.

Q. Okay. And maybe not to give you a specific number, but with 32,000 class members, there have to have been at least a hundred thousand games on Steam during the class period, correct?

A. That number doesn't surprise me. I think there's a precise number somewhere in the report. I just don't remember what it is.

Q. Okay. Is it your view that Valve requires price parody for every publisher on its platform?

A. Read that back, please.

Q. Is it your view that Valve requires price parody for every publisher on the platform?

A. My view is that when they communicate the requirements, they don't provide exceptions but that they don't enforce against everybody.

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

Q. So you anticipated both my question and my next question.

So it's not your view that Valve enforces price parody as to every publisher on the platform, correct?

A. Correct.

Q. And as we talked about, you have these 49 games pricing studies that you believe are represented -- I shouldn't say "pricing studies" -- pricing presentations that you believe are representative of this type of enforcement, correct?

A. I think that's the right way to describe it.

Q. Okay. And in your latest report, in the Rebuttal Report, in Paragraph 157, I'll give you a minute to get there.

A. Am I going to need this back or can I put it away?

Q. I don't think you'll need the Opening Report at this moment. Let's start at 153 on Page 83.

A. All right.

Q. And you say at the end of that paragraph: Comparing discounts on and off Steam on a quarterly basis is a more informative and robust way to compare prices at which consumers are more likely to purchase games over time.

Do you see that?

A. I do. Can I read the whole paragraph?

Q. Of course.

A. Okay (perusing). All right.

Q. And then looking at Paragraph 157, just on the next -- or I guess two more pages. You say at the end of the paragraph, and of course take time to read the whole paragraph if you like: An examination of prices across platforms on a quarterly basis better aligns with how Valve communicates and enforces its PMFN policy.

Do you see that?

A. I do. Let me just take a quick look at the whole paragraph.

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

to [REDACTED] percent?

A. It predicts that the share will go down as a result of the competition that occurs after the PMFN is turned off. One of the things that is a part of that is, and this is discussed in detail in the Opening Merits Report, that in the face of the lower fee and the ability to not have price parody and to set prices where you like, it would make sense for publishers to try and drive users away from Steam to the lower fee, lower price platform and the end result of that is that Steam's share would drop relative to the other platform.

Q. Right. So what the PCM predicts is if the price goes from 59 on both platforms to little over 61 on Steam and a little over 58 on EGS, that the shares are going to shift from a [REDACTED] split to pretty much a [REDACTED] split, correct?

A. Correct.

Q. The -- this version of the PCM in Supplemental Table 4, you would agree that it predicts that the real world

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

economic profits of Steam -- of a developer on Steam are negative, correct?

A. Okay. Say that again. And by the way, this is not a predictive model. It's a descriptive model. So frame the questions how you like, but I will push back on "predictive" because it explicitly is not a predictive model. It's just descriptive of what happens when you change one state of the world.

Q. Right. But what I described in a few questions ago about share shift, that is an output of your model, correct?

A. It is a description of how the shares will move, but it is -- it is not predictive. It is describing what happens when I change this state of the world by turning off the PMFN.

Q. So the model describes that if you turn off the PMFN, you go from ███ to █████?

A. Describes a number of things, including a share change.

Q. And that's the share change,

right?

A. Yes.

Q. In this version of the model, the profits that the game publisher earns on Steam in the real world with the PMFN are negative, correct?

A. The economic profits are negative.

Q. So economic profits, I believe, negative, is it [redacted] -- no. Negative [redacted] [redacted]?

A. Correct.

Q. Okay. You then prepared another version of this model in your most recent report that doesn't have negative profits in the baseline scenario, correct?

A. Can you show me where you're looking?

Q. Of course. Rebuttal Report. Page -- no. Paragraph 175, I believe. Nope. That's wrong. I think Page 175. Sorry about that.

And before I ask you about it, Doctor, just to be clear, following up on

something, you talked about the difference between predictive and descriptive, and I appreciate that.

You're not aware of any situation in the real world where a $1 and $3 price difference in games between two platforms caused a ██ percent-plus share shift, correct?

A. It's not something I've studied one way or the other.

Q. Okay. So then turning to Table 4 on Page 175, and you can look at the previous paragraphs obviously, but you in this chart were planning -- you were trying to set up a version of the PCM where there are not negative profits from being on Steam, correct?

A. Tried to respond to a specific criticism of Dr. Langer.

Q. And the way you did that was by setting the kind of outside option, I suppose, of publishers earning of ███ ████████ in economic profits, and what we mean by outside option, correct me if

I'm wrong, is that the publisher could make ██ ██████ if it were never on Steam at all?

A. Correct.

Q. And you say in your Footnote 691: The ██ ██████ in combined publisher profits corresponds to publisher earning as profits. 5 percent of entire market's third-party transaction value of ██ ██████ over the damages period.

And then you say: The choice of essentially -- specifically 5 percent is not significant, correct?

A. Yes.

Q. Okay. And you agree with that, from your view it's not a significant choice?

A. I do.

Q. In the version you showed in Table 4, the seller economic profits in the real world, or excuse me, not the real world but in the baseline scenario, I think that's fairer to say, are, it looks like █████ ██████, correct?

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A. Correct.

Q. Overall, though, the results are, I think it's fair to say, somewhat similar in the model, correct, in that the Steam price and the EGS price, again, just for purposes of the model, are set at $60.02 on both platforms as the input, correct?

A. Correct.

Q. They shift by ██████ up for Steam and it looks like ███████ down for EGS --

A. ███

Q. ███ there you go. The share shift from ██, roughly ████, with some rounding, to ██████ with some rounding?

A. Correct.

Q. Okay. And the fee percentage in the post -- without PMFN scenario is ██████ percent on Steam, correct?

A. Correct.

Q. Did you try to run this version of the model with other numbers for the outside option?

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A. I don't recall that we did, but it's possible that it was done and I'm just not recalling it now.

Q. Do you recall how you chose 5 percent as the value?

A. There was discussion about that, but I don't recall sitting here.

MR. KILARU: Okay. This is a two-page document which I will label as -- you know what, we'll do it separately. We'll do it Schwartz 25 and 26.

(Whereupon, Model was marked as Schwartz Exhibit 25 for identification as of this date.)

(Whereupon, Model was marked as Schwartz Exhibit 26 for identification as of this date.)

A. Can I put this away or are we coming back to this?

Q. I believe you can put it away.

So I've just handed you Schwartz 25 and 26 (handing). Okay. And what I'll represent to you is that Schwartz

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

25 is the same model that's shown in Table 4 on Page 175 of your rebuttal. It's just that the outside option is set to .625 percent instead of 5 percent. And you can verify, of course. I'm not asking you to do it on the spot. I know it's complicated, but I'll just represent to you that that's what it is. And --

A. Is it -- did they set it to .625 percent or 6.25 percent?

Q. .625 percent.

A. Okay.

Q. And you would agree that if we ran this correctly, and, again, you're sort of free to verify it, this version of this model still shows negative seller economic profits in the baseline scenario, correct?

A. It shows negative seller economic profits on Steam and larger and positive economic profits on EGS.

Q. And that would mean that the hypothetical developer in this situation is losing money on Steam, making money on EGS?

A. Not quite, because you can have

negative economic profits and positive accounting profits, so they could be earning positive accounting profits in both cases, but the point here is that they're earning sufficient economic profits across both platforms that exiting the market is not a consideration.

Q. Okay. But this version, in this version with the outside option set to a different value, the seller economic profits on Steam are negative, correct?

A. With the PMFN.

Q. Yes, correct.

A. Yes.

Q. And that's the same -- in the version of the PMFN, the original version, if you will, that was also the case that seller economic profits were negative on Steam?

A. In the original version, they were negative on Steam and exactly the same amount positive on EGS.

Q. Okay. The next document, which is Schwartz -- and you had never -- to your

knowledge, you hadn't run a test at a lower number than 5 percent of the new model?

A. Not that I recall, but it may have been.

Q. When I say "the new model," I mean the one in Table 4 of your rebuttal?

A. Right.

Q. Okay. So then Schwartz 26 is same model again, I'll represent to you, and again, you can confirm we did it right, but now instead of 5 percent we set it to 20 percent.

You see that in the title?

A. I do.

Q. Okay. And in this scenario, seller economic profits in the world with the PMFN are, it looks like, [redacted] [redacted], correct?

A. I'm sorry. Where are you looking?

Q. Seller economic profits, millions with PMFN Steam.

A. Correct. And this is -- I will -- I'm sorry. I have a comment about

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

this when you're done, but I don't want to interrupt your questions.

Q. Sure. Well, let's look at facts now and I will allow you to make the comment, but just to confirm some facts, the seller economic profits on Steam with the PMFN in this scenario are over [REDACTED], correct?

A. Correct.

Q. But the platform economic profits for Steam are negative [REDACTED], correct?

A. Correct.

Q. And what would the significance be of a platform having negative [REDACTED] in economic profits?

A. Over the long term it would shut down, but of course under the scenario that you've setup here, Steam is connected -- Valve is collecting no revenue so it's an unsurprising and somewhat meaningless result.

Q. Okay.

A. Because in this -- in this

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

scenario, Steam would exit the market.

Q. Got it. And the fee percentage that Steam is charging in this world with the PMFN, its commission rate is zero percent?

A. That's what it shows.

Q. Okay. And in the weighted fee across all games is negative [REDACTED]. Negative [REDACTED], correct?

A. Yes.

Q. Which would imply that on net, the platforms are paying the distributor extra money to put the game on the platform?

A. Right. Which is why in this -- in this scenario, which, first of all, is unrealistic because Steam would shut down. And second, doesn't match the facts of the case. The outside options are so strong that the PMFN wouldn't be effective.

But that doesn't fit this case. It doesn't fit the facts. It doesn't fit Steam. All this really shows is consistent with what economists recognize and it's no

surprise, is that if I've got a viable option that I can move to, that a PMFN isn't effective and in the limiting case I can be driven out of business to find the platform attempting to impose the PMFN.

So, I mean, I understand the arithmetic exercise here. Obviously we haven't had the opportunity to --

Q. Understood.

A. -- check what Cornerstone has done, but it's also -- it's also a bit of an absurd situation because it doesn't describe in any way, shape, or form the market that we're in.

Q. Okay. Just to kind of round it out and then we can take a little break.

In your report, you run this version of the model with 5 percent as the outside option, correct?

A. Correct.

Q. And the two documents have shown, understanding you need to check them, run the outside option at .625 percent and 20 percent, correct?

don't know -- what's unclear is, are they including, for example, online casinos, things of that sort. So I see the number. I just don't have any way to evaluate whether it's in line or not in line because I don't know what they include.

Q. Just looking at overall PC games revenues, so setting aside things like online casinos, have you looked at numbers for the overall size of the PC games market?

MR. LeRAY: Object to form.

Q. Or PC gaming revenues, I should say?

A. I've seen disaggregated numbers, seeing some data on publishers, but I don't know that I've seen an aggregate number and I don't -- I wouldn't -- wouldn't claim that what I've seen is comprehensive, and I don't remember the numbers in any event.

Q. Okay. You can put that document down.

Shifting gears. Do you know

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

who Aaron Greenberg is?

A. If I may --

Q. If you're going to look at the Materials Considered List, that's where I was going to go. I think those are somewhere in the bottom of the pile.

A. Yes.

Q. Let me ask the question a little differently just to make things a little easier on you.

You would agree with me that you don't list the deposition of Aaron Greenberg on any of your Materials Considered Lists?

A. I do not.

Q. Okay. In doing your damages model in this case, you would agree that you take the -- the damages model itself takes the existence of a PMFN as a given, correct?

A. It assumes liability.

Q. We talked a little bit earlier about self-publishing tools, and I guess what I want to ask you is this. You're

aware that when a developer sells a game on a platform like Steam, it has to pay a revenue share to Steam of course, that we've talked about. But you agree that if they use a publisher, they also have to pay a revenue share to the publisher, correct?

A. Are you talking about a situation where the game developer and the publisher are not the same --

Q. Yes.

A. -- party?

Q. Yes, thank you.

A. There is an arrangement, financial arrangement between the developer and the party, however it is structured, whether a revenue share or something else.

MR. KILARU: I'm going to give you what is actually the last document for today. And this is Schwartz 30.

(Whereupon, Humble Bundle document was marked as Schwartz Exhibit 30 for identification as of this date.)

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF SUFFOLK )

I, NICOLE VELTRI, RPR, CRR, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of May 2025.

Nicole Veltri

NICOLE VELTRI, RPR, CRR