1      THE HONORABLE JAMAL N. WHITEHEAD

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
8                              AT SEATTLE

9      IN RE VALVE ANTITRUST LITIGATION

10                                              No. 2:21-CV-00563-JNW

11                                              **DEFENDANT VALVE
                                                CORPORATION'S NOTICE OF
12                                              SUPPLEMENTAL AUTHORITY
                                                REGARDING ITS OPPOSITION TO
13                                              RYAN LALLY'S MOTION FOR
                                                SANCTIONS (DKT. 470)**
14

15

16

17

18

19

20

21

22

23

24

25

26

---

DEFENDANT VALVE CORPORATION'S
NOTICE OF SUPPLEMENTAL AUTHORITY
21-cv-00563

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## NOTICE OF SUPPLEMENTAL AUTHORITY

Pursuant to Local Civil Rule 7(n), and in connection with Defendant Valve Corporation's ("Valve") Opposition to Ryan Lally's Motion for Sanctions (Dkt. 470), Valve respectfully submits as supplemental authority two recently-issued decisions:

- the decision of the U.S. Court of Appeals for the Ninth Circuit in *Ireland-Gordy v. Tile, Inc.*, No. 25-403, 2026 WL 594859 (9th Cir. Mar. 3, 2026) ("*Tile*"), attached hereto as **Exhibit A**; and

- the decision of the U.S. District Court for the Central District of California in *Majidi-Ahy v. ClassPass, Inc.*, No. 2:25-CV-05003-KS, 2026 WL 585465 (C.D. Cal. Feb. 11, 2026) ("*ClassPass*"), attached hereto as **Exhibit B**.[1]

*Tile* and *ClassPass* are pertinent to the legal question of whether an amendment to a contractual dispute resolution provision that changes the forum for disputes and applies to pending and accrued claims is enforceable. *Tile* also addresses whether a consumer may manifest assent to an updated agreement through continued use of a service. One or both of those issues are disputed in this action and in ten other related actions before this Court.[2]

### A.    *Ireland-Gordy v. Tile, Inc.*

In *Tile*, consumer plaintiffs filed a putative class action, contending that their claims against the defendants were not arbitrable under the defendants' terms of service. The defendants

---

[1] The *ClassPass* decision was published on Westlaw on March 4, 2026.

[2] *Valve Corp. v. Abbruzzese*, No. 24-cv-1717, Dkt. 79 (W.D. Wash. filed Aug. 21, 2025); *Smith v. Valve Corp.*, No. 25-cv-01478 (W.D. Wash. filed Aug. 5, 2025); *Welty v. Valve Corp.*, No. 25-cv-02450 (W.D. Wash. filed Nov. 10, 2025); *Aaron v. Valve Corp.*, No. 25-cv-02657 (W.D. Wash. filed Dec. 22, 2025); *Valve Corp. v. Fish*, No. 25-cv-01729 (W.D. Wash. filed Sept. 8, 2025); *Valve Corp. v. Graber*, No. 25-cv-01730 (W.D. Wash. filed Sept. 8, 2025); *Valve Corp. v. Lefebvre*, No. 25-cv-01731 (W.D. Wash. filed Sept. 8, 2025); *Valve Corp. v. Lucas*, No. 25-cv-01732 (W.D. Wash. filed Sept. 8, 2025); *Valve Corp. v. Birenbaum*, No. 25-cv-01975 (W.D. Wash. filed Oct. 10, 2025); *Valve Corp. v. Vicente*, No. 25-cv-01976 (W.D. Wash. filed Oct. 11, 2025).

---

DEFENDANT VALVE CORPORATION'S
NOTICE OF SUPPLEMENTAL AUTHORITY – 1
21-cv-00563

1    thereafter updated their terms to change the forum for disputes[3] and to clarify that questions of

2    arbitrability were for the arbitrator. The Ninth Circuit enforced those updated terms with respect

3    to the plaintiffs' pending claims. *See Tile*, 2026 WL 594859, at *1-5 (enforcing agreement updated

4    in October 2023); Complaint, *Ireland-Gordy v. Tile, Inc.*, No. 23-cv-04119-RFL (N.D. Cal. filed

5    Aug. 14, 2023). The Ninth Circuit held that the plaintiffs had received notice of the updated terms

6    through an email notice, rejecting their contentions that such notice was insufficient because they

7    did not read the emails. *See Tile*, 2026 WL 594859, at *3-4. The Ninth Circuit further held that the

8    plaintiffs "unambiguously manifested assent" to the updated terms by "using" the defendants' app.

9    *Id.* at *4. The court thus enforced the updated agreement.

10        **B.    *Majidi-Ahy v. ClassPass, Inc.***

11        In *ClassPass*, a district court enforced an updated arbitration agreement that changed the

12   arbitral forum for resolution of disputes, including with respect to "ANY AND ALL

13   DISPUTES . . . WHETHER PRESENTLY IN EXISTENCE OR BASED ON ACTS OR

14   OMISSIONS IN THE PAST OR IN THE FUTURE." 2026 WL 585465, at *6-9.[4] The plaintiff

15   argued that the updated arbitration agreement was unenforceable because the agreement

16   purportedly "'allow[ed] one party to unilaterally modify it retroactively'" to "'already-accrued

17   claims,'" thus violating the implied covenant of good faith and fair dealing. 2026 WL 585465, at

18   *7. The court rejected this argument because the updated terms "were adopted by bilateral

19   agreement" of the parties where the plaintiff (i) received notice of the update through an in-

20   platform pop-up and an email notice and (ii) affirmatively assented to the terms by "clicking the

21   'I accept' button on the pop-up and her continued use of [the defendants'] services." *Id.* at *6-8.

22

---

23   [3] The earlier arbitration agreements required all disputes to be arbitrated before the American
     Arbitration Association; the updated arbitration agreement required disputes to be arbitrated before

24   JAMS for disputes in North America. *See* Declaration of Steve Klinkner, Ex. B § 25.C, Ex. E
     § XVII.B, Ex. I at 23, *Ireland-Gordy v. Tile, Inc.*, No. 3:23-cv-04119-RFL, Dkt. No. 34.

25   [4] The original arbitration agreement required disputes to be arbitrated before the American
     Arbitration Association; the updated arbitration agreement required disputes to be arbitrated before

26   JAMS. *See* Declaration of Jessica Van Meter, Ex. A § 18.c, Ex. B § 18.c, *Majidi-Ahy v. ClassPass,
     Inc.*, No. 2:25-cv-05003-KS, Dkt. No. 29-5.

---

1    Accordingly, the court held that cases applying the implied covenant of good faith and fair dealing

2    were inapposite. *Id.* at *8. The court further explained that "'[t]he Ninth Circuit consistently

3    upholds the enforceability of the retroactivity of arbitration clauses.'" *Id.* (citation omitted).

4

5    DATED: March 9, 2026

6                                          CORR CRONIN LLP

7                                          *s/ Blake Marks-Dias*
                                           Blake Marks-Dias, WSBA No. 28169
8                                          1015 Second Avenue, Floor 10
                                           Seattle, Washington 98104
9                                          (206) 625-8600 Phone
                                           (206) 625-0900 Fax
10                                         bmarksdias@corrcronin.com

11                                         Michael W. McTigue Jr., *Admitted Pro Hac Vice*
                                           Meredith C. Slawe, *Admitted Pro Hac Vice*
12                                         SKADDEN, ARPS, SLATE,
                                           MEAGHER & FLOM LLP
13                                         One Manhattan West
                                           New York, New York 10001
14                                         michael.mctigue@skadden.com
                                           meredith.slawe@skadden.com
15

16                                         *Attorneys for Defendant Valve Corporation*

17

18

19

20

21

22

23

24

25

26

DEFENDANT VALVE CORPORATION'S
NOTICE OF SUPPLEMENTAL AUTHORITY – 3
21-cv-00563

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

EXHIBIT A

2026 WL 594859
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States Court of Appeals, Ninth Circuit.

SHANNON IRELAND-GORDY; STEPHANIE
IRELAND GORDY; MELISSA BROAD;
JANE DOE, individually and on behalf of all
others similarly situated, Plaintiffs - Appellees,
v.

TILE, INC.; LIFE360 INC., Defendants - Appellants,
and

AMAZON.COM, INC., Defendant.

No. 25-403
|
Filed March 3, 2026
|
Argued and Submitted January 5,
2026 San Francisco, California

D.C. No. 3:23-cv-04119-RFL

Appeal from the United States District Court for the Northern
District of California Rita F. Lin, District Judge, Presiding

Before: GOULD, NGUYEN, and BENNETT, Circuit Judges.

MEMORANDUM [*]

**\*1** Defendant-Appellants Tile, Inc. (Tile) and Life360, Inc.
(Life360) appeal the district court's order granting in part and
denying in part their motion to compel arbitration. We have
jurisdiction under 9 U.S.C. § 16(a)(1)(B). *Bielski v. Coinbase,
Inc.*, 87 F.4th 1003, 1008 (9th Cir. 2023). Reviewing *de novo*
the district court's denial of Appellants' motion to compel
arbitration and for clear error any underlying factual findings,
*Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1000
(9th Cir. 2023), we reverse and remand.

## I.

This is a putative class action in which Plaintiffs allege
that third-party stalkers used Tile Trackers to track Plaintiffs
without their consent. Alleging representative harm based on
such stalking, Plaintiffs claim that Tile, with oversight from
its parent company Life360, designed, marketed, distributed,
and serviced the Tile Tracker in violation of California law.

1. Plaintiff-Appellees [1] Melissa Broad and Jane Doe concede
that they each agreed to an earlier version of Tile's Terms
of Service (Terms)—Broad to the January 2021 Terms (Jan.
2021 Terms) and Doe to the February 2023 Terms (Feb. 2023
Terms) (together, the "earlier Terms"). [2] Tile later introduced
the October 2023 Terms (Oct. 2023 Terms) and attempted to
notify Appellees of the update to its Terms. Unlike the earlier
Terms, which Appellants contend delegated arbitrability by
incorporating the American Arbitration Association (AAA)
rules, the Oct. 2023 Terms expressly delegated arbitrability
in plain and accessible language. Namely, under the Oct.
2023 Terms, contracting parties "agree[d] to resolve all
Disputes" (except certain small and equitable claims) "by
binding arbitration," "includ[ing] all threshold issue[s] of
arbitrability." Additionally, while the earlier Terms contained
an exclusive venue clause which potentially conflicted with
arbitrability and the delegation of arbitrability, the Oct. 2023
Terms introduced a nonexclusive venue clause which did
not create any potential conflict with arbitrability or the
delegation of arbitrability.

In October 2023, Tile sent to all accountholders the Oct.
2023 Notice—an email with the heading "Updated Terms
of Service and Privacy Policy"—advising that Tile was
updating its Terms. Sent to the email address provided by
accountholders during registration, the Oct. 2023 Notice
contained a blue-text and bolded hyperlink to the Oct. 2023
Terms. The email told accountholders that "[i]f you continue
to use any of [Life360 and Tile's] apps, or access our websites
(other than to read the new terms) on or after November 26,
2023, you are agreeing to the [Oct. 2023 Terms]."

Broad did not locate the Oct. 2023 Notice until January 2024,
when she affirmatively searched for the email and found it in
her spam folder. Broad next accessed the Tile App in January
2024. [3] Broad also sometimes opened the Tile App or asked
family and friends to do so to confirm that she was not sharing
her location through the app. Tile's records show that Broad
last used the Tile App on April 26, 2024, but she does not
recall this.

**\*2** Doe "never knew that Tile sent" the Oct. 2023 Notice and
so never "read any revised or updated Terms." In March 2024,
Doe downloaded the Tile App to use the Scan and Secure
feature to locate her alleged stalker's Tile Tracker. Doe does
not specifically recall logging into her account in March 2024,

but Tile's records show that she opened the Tile App four times in March and April 2024.

2. After Appellees joined as Plaintiffs through amendment, Appellants moved to compel arbitration against Appellees. In ruling on that motion, the district court found that Broad agreed to the Jan. 2021 Terms and Doe agreed to the Feb. 2023 Terms, but that neither had assented to the Oct. 2023 Terms. Interpreting the earlier Terms, the district court acknowledged that they "expressly incorporate[d] the AAA's rules," which generally constitutes a "clear and unmistakable" delegation of arbitrability to the arbitrator. *See Brennan v. Opus Bank,* 796 F.3d 1125, 1130–31 (9th Cir. 2015). But the district court determined that any such delegation of arbitrability was irreconcilable with a separate provision granting exclusive jurisdiction and venue to courts in the Northern District of California. The district court therefore determined that, under the earlier Terms, "the parties agreed to have 'all disputes' relating to the 'enforcement, interpretation or validity' of the Terms, including the arbitration provision, be decided exclusively by courts in this District."

In deciding arbitrability, the district court implicitly assumed without deciding that all of Appellees' claims were covered by the scope of the earlier Terms' arbitration agreement. The district court then held, under California law, that the earlier Terms' arbitration agreement was unconscionable insofar as it covered Appellees' claims concerning third parties' use of Tile's products and services, but not unconscionable in its coverage of Appellees' claims concerning their own Tile products and accounts. The district court accordingly granted in part and denied in part Appellants' motion to compel arbitration. This appeal followed.

## II.

The parties dispute whether the earlier Terms or the Oct. 2023 Terms govern. The district court held that neither Broad nor Doe assented to the Oct. 2023 Terms. Challenging that ruling, Appellants argue that, under California law, Tile provided sufficient notice of the Oct. 2023 Terms to users, and that Appellees manifested assent through continued use of the Tile App. Appellees contend that, under California law, they did not receive notice and thus did not assent to the Oct. 2023 Terms. But the parties do not dispute that the Oct. 2023 Terms delegated arbitrability. Thus, if the Oct. 2023 Terms govern, the district court erred by not sending Appellees' claims to arbitration.

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC,* 30 F.4th 849, 855 (9th Cir. 2022). "Under California law," Tile as the party seeking arbitration bears the burden "to show that it provided notice of a new [terms of service] and that there was mutual assent to the contractual agreement to arbitrate." *Jackson v. Amazon.com, Inc.,* 65 F.4th 1093, 1099 (9th Cir. 2023). "Parties traditionally manifest assent by written or spoken word, but they can also do so through conduct." *Berman,* 30 F.4th at 855. But "the conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Id.* (alteration accepted) (quoting Restatement (Second) of Contracts § 19(2) (A.L.I. 1981)). These principles "apply with equal force to contracts formed online." *Id.* at 855–56.

**\*3** In adjudicating web-based contracts, courts applying California law have "devised rules to determine whether meaningful assent has been given." *Id.* at 856. Unless the

> operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the [app or] website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.

*Id.*; *see also Keebaugh v. Warner Bros. Ent. Inc.,* 100 F.4th 1005, 1014 (9th Cir. 2024) (applying the same principles to mobile phone app operators).

1. Applying California law, we determine that Appellees received inquiry notice of the Oct. 2023 Terms. [4] In web-based contracting under California law, the test for inquiry notice asks whether, viewed cumulatively—(1) the "context of the transaction," *Keebaugh,* 100 F.4th at 1016–17; (2) the app or website's design and content; and (3) "other notices

given to users"—would have led "a reasonably prudent user" to read the provider's terms of service, *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)). Because "there is very little empirical evidence regarding" Internet users' expectations, the focus of this inquiry is "on the providers, which have complete control over the design of their [apps and] websites and can choose from myriad ways of presenting contractual terms to consumers online." *See Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 25 (Ct. App. 2021); *Weeks v. Interactive Life Forms, LLC*, 319 Cal. Rptr. 3d 666, 674 (Ct. App. 2024).[5]

Considering each factor in turn, we determine that the Oct. 2023 Notice placed Appellees on inquiry notice of the Oct. 2023 Terms. The context of the transaction favors finding inquiry notice. As Tile users, each Appellee provided an email address during account registration, and should have expected to receive relevant updates there while the account was active. *See Sellers*, 289 Cal. Rptr. 3d at 26 (recognizing that registration contemplates "some sort of continuing relationship between the putative user and [the provider]" (quotation and emphasis omitted)); *see also Keebaugh*, 100 F.4th at 1020 (downloading a mobile game anticipates ongoing access to the app). And Tile sent the Oct. 2023 Notice to all registered users, including Appellees, "at the email address users associated with their account."

**\*4** The notice email's design and content also favor finding inquiry notice. In this analysis, we look to the email's "design and content," *Nguyen*, 763 F.3d at 1177, and consider whether it is fair to "assume that a reasonably prudent Internet user would have seen [the notice of the terms and conditions]," *Berman*, 30 F.4th at 856. The design and content of the Oct. 2023 Notice provided reasonably conspicuous notice of the Oct. 2023 Terms because the email's design was "clear and legible," *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024), and it provided the updated Terms through a link with "customary design elements denoting the existence of a hyperlink," *Berman*, 30 F.4th at 857. The subject line clearly stated that Tile was updating its Terms. And the body contained a hyperlink to the Oct. 2023 Terms in bold, blue text which contrasted against the white background. Although the email did not say specifically that the arbitration agreement would be updated, reasonable notice does not require the email to discuss every revision. *See B.D. v. Blizzard Ent., Inc.*, 292 Cal. Rptr. 3d 47, 58 (Ct. App. 2022) ("If an offeree objectively manifests assent to an agreement,

the offeree cannot avoid a specific provision of that agreement on the ground the offeree did not actually read it.").

The lack of other notices given by Tile to its users weighs against finding inquiry notice. *See Weeks*, 319 Cal. Rptr. 3d at 675 (expressing "skepticism of charging parties with knowledge they do not actually possess"); *Long v. Provide Com., Inc.*, 200 Cal. Rptr. 3d 117, 127 (Ct. App. 2016) (recognizing that "the Internet-using public" encompasses a broad "range of technological savvy") (emphasis and quotation omitted). Focusing "on the provider[ ]," *Sellers*, 289 Cal. Rptr. 3d at 25, Tile could have done more to ensure that all its users were on inquiry notice of the Oct. 2023 Terms. Tile could, for example, have interrupted users' next visit to the Tile App with a clickwrap pop-up notice. *See Saeedy v. Microsoft Corp.*, 757 F. Supp. 3d 1172, 1199 (W.D. Wash. 2024); *Weeks*, 319 Cal. Rptr. 3d at 675. Because Tile should have known that at least some of its users do not closely monitor email, *see Long*, 200 Cal. Rptr. 3d at 127, and Tile should have furnished additional notices, this factor weighs against finding inquiry notice.

In sum, because the first and second factors favor finding inquiry notice while the third factor weighs against it, we determine that Appellees received inquiry notice of the Oct. 2023 Terms. Evaluating whether inquiry notice has been established is, however, always a "fact-intensive analysis," *Godun v. JustAnswer LLC*, 135 F.4th 699, 710 (9th Cir. 2025), and we do not hold that notice by mass email establishes inquiry notice in every case.

2. We determine that Appellees unambiguously manifested assent to the Oct. 2023 Terms through their continued use of the Tile App. As the party seeking arbitration, Tile must show "that there was mutual assent to the contractual agreement to arbitrate." *Jackson*, 65 F.4th at 1099. Mutual assent is analyzed "under an objective-reasonableness standard," *Oberstein*, 60 F.4th at 513, to determine "whether there is an *unambiguous* manifestation of assent," *Godun*, 135 F.4th at 713. To assent, the user must "take[ ] some action, such as clicking a button or checking a box." *Berman*, 30 F.4th at 856. We evaluate "whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

Doe unambiguously manifested assent to the Oct. 2023 Terms by downloading the Tile App in March 2024 and using the Scan and Secure feature in attempting to locate her

alleged stalker's Tile Tracker. Under the objective standard, a reasonable provider would understand a user's downloading and using an app after receiving inquiry notice of the provider's updated terms of service as an unambiguous manifestation of assent, through conduct, to the provider's updated terms.

Broad also unambiguously manifested assent to the Oct. 2023 Terms by using the Tile App in January 2024 and periodically opening the Tile App to check location-sharing settings—including, according to Tile's records, in April 2024. Under the objective standard, a reasonable provider would understand that a user on inquiry notice who opens and uses the provider's app thereby assents to the provider's updated terms of service. Broad's "unexpressed intentions or understandings" are irrelevant to this inquiry. *Sellers*, 289 Cal. Rptr. 3d at 12 (quotation omitted). Thus, we determine that both Broad and Doe unambiguously manifested assent to Tile's Oct. 2023 Terms. [6]

 **\*5** Tile, therefore, has met its burden "to show that it provided notice of a new [terms of service] and that there was mutual assent to the contractual agreement to arbitrate." *See Jackson*, 65 F.4th at 1099. In sum, under California law, the parties agreed to the Oct. 2023 Terms.

3. By agreeing to the Oct. 2023 Terms, the parties agreed to arbitrate issues of arbitrability. "[P]arties can form multiple levels of agreements concerning arbitration." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024). At the base level, parties can "agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). "[T]he FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center, W., Inc. v.*

*Jackson*, 561 U.S. 63, 70 (2010). Thus, "[w]hen deciding whether the parties agreed to arbitrate" arbitrability, we "apply ordinary state-law principles" of contract formation. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). But we do so with one federal law caveat—we do "not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* (alterations accepted) (quotation omitted).

Under the Oct. 2023 Terms, the parties agreed to arbitrate "all Disputes" (except certain small and equitable claims), "includ[ing] all threshold issue[s] of arbitrability." Appellees do not argue that any other contractual term in the Oct. 2023 Terms creates a potential conflict with this clear and unmistakable agreement to arbitrate arbitrability. Nor do they argue that the delegation provision in the Oct. 2023 Terms is unenforceable for any other reason. Thus, by agreeing to the Oct. 2023 Terms, the parties agreed to arbitrate all issues. *See Rent-A-Center*, 561 U.S. at 70.

### III.

We therefore reverse and remand with instructions to enforce the parties' arbitration agreement contained in the Oct. 2023 Terms. [7] On remand, the district court shall grant Appellants' motion to compel arbitration against Appellees and leave all issues, including arbitrability and scope, to an arbitrator.

**REVERSED and REMANDED WITH INSTRUCTIONS.**

**All Citations**

Not Reported in Fed. Rptr., 2026 WL 594859

---

### Footnotes

\*    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

1    Plaintiffs Shannon Ireland-Gordy and Stephanie Ireland-Gordy are not parties to this appeal.

2    The Jan. 2021 and Feb. 2023 Terms differed only in minor ways not relevant to this appeal.

3    Broad's declaration states that she accessed the Tile App in January 2024 "for legal reasons" but does not explain what that means.

4    In the district court, Appellants forfeited any argument that Broad agreed to arbitrate by viewing the Oct. 2023 Notice in her spam inbox in January 2024. So we do not consider Broad's viewing the Oct. 2023 Notice in January 2024.

5    Appellees argue that precedents concerning contract formation on websites do not apply because the Oct. 2023 Notice was sent by mass email. But we have made clear that the "elemental principles of contract formation apply with equal force to contracts formed online." *Berman*, 30 F.4th at 855–56. And both website-based and email offers of contract formation take place "online." *Id.* at 856. Thus, the case law on web-based contracting applies. In applying our test for inquiry notice under California law, however, we are attuned to the factual differences between website-based and email offers which may affect the application of the inquiry notice factors.

6    In arguing to the contrary, Appellees misplace reliance on language in Tile's earlier Terms which stated that "Tile will not enforce material changes to this section [concerning arbitration] in the future unless you expressly agree to them." Appellees received the Oct. 2023 Notice, which "*explicitly* advised that," *Godun*, 135 F.4th at 710 (quotation omitted), "[i]f you continue to use any of our apps ... on or after November 26, 2023, you are agreeing to the new [Oct. 2023 Terms]." By using the Tile App in 2024 after receiving inquiry notice of that explicit advisement "identify[ing] what, exactly," would constitute assent, *id.* at 711, Appellees expressly agreed to the Oct. 2023 Terms.

7    We do not decide the other issues raised by the parties because, under the Oct. 2023 Terms, all issues should be decided by an arbitrator.

---

**End of Document**                                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2026 WL 585465
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

MONDONA MAJIDI-AHY, individually and on
behalf of all others similarly situated, Plaintiff,

v.

CLASSPASS, INC. et al., Defendants.

NO. 2:25-cv-05003-KS
|
Filed 02/11/2026

**Attorneys and Law Firms**

Isaac Manoff, Mike Arias, Michael Anthony Jenkins, Arias
Sanguinetti Wang and Team LLP, Los Angeles, CA, Arnold
C. Wang, Arias Sanguinetti Stahle and Torrijos LLP, Los
Angeles, CA, for Plaintiff.

Joseph R. O'Connor, Vassi Iliadis, Hogan Lovells US
LLP, Los Angeles, CA, Samuel L. Zimmerman, Pro Hac
Vice, Hogan Lovells LLP, New York, NY, for Defendants
ClassPass, Inc., Mindbody, Inc., ClassPass USA LLC,
ClassPass LLC.

**ORDER GRANTING MOTION TO STAY
PENDING ARBITRATION [DKT. NO. 29]**

HON. KAREN L. STEVENSON CHIEF U.S.
MAGISTRATE JUDGE

**INTRODUCTION**

**\*1** Before the Court is the Motion to Stay Pending
Arbitration filed by Defendants ClassPass LLC, ClassPass
USA LLC, and Mindbody, Inc. (collectively, "ClassPass" or
"Defendants") on September 8, 2025. ("Motion," Dkt. No.
29.) Plaintiff Mondona Majidi-Ahy filed her Opposition to the
Motion on October 16, 2025. (Dkt. No. 34.) Defendants filed
a Reply on November 26, 2025. (Dkt. No. 35.)

On December 3, 2025, the Court vacated the previously set
hearing on the Motion and took the Motion under submission
for decision without oral argument. (Dkt. No. 36.) For the
reasons discussed below, Defendants' Motion is **GRANTED**.

**FACTUAL BACKGROUND**

**I. 2021 Terms of Use**

"ClassPass is a credit-based membership that grants you
access to thousands of studios, gyms, salons, [and] spas ...." [1]
On November 15, 2021, Plaintiff, a California resident, signed
up for a two-week free membership trial on the ClassPass
website. (Declaration of Karen Teng [2] ("Teng. Decl."), Dkt.
No. 29-4 ¶ 3.) To complete the sign-up process, Plaintiff had
to navigate through five webpage screens prompting her to
input the information needed to create her account. (*Id.* ¶¶ 4-8,
Exs. A-E.)

On the first screen, Plaintiff was prompted to either enter her
email address or register via her Apple or Facebook account
to proceed to the next screen. (*Id.* ¶ 4, Ex. A.) The second
screen prompted Plaintiff to input her first and last names in
the appropriate fields and then click the "Continue" button.
(*Id.* ¶ 5, Ex. B.) The third screen prompted Plaintiff to input
her phone number in the appropriate field and then click the
"Continue" button. (*Id.* ¶ 6, Ex. C.) Upon inputting her phone
number, Plaintiff was sent a four-digit code via text message.
(*Id.* ¶ 7.) On the fourth screen, Plaintiff was prompted to input
the code that she received into the appropriate fields. (*Id.*,
Ex. D.) Finally, on the fifth screen, Plaintiff was prompted to
input her credit card information and then click the blue "Start
your free trial" button. (*Id.* ¶ 8, Ex. E.) Between the payment
information fields and the "Start your free trial" button was
text that read: 'By clicking the button below, you agree to
the Terms, and your free 14 days 20-credit trial will begin.'
" (*Id.*) The word "Terms" appeared as a blue hyperlink that if
clicked, would redirect the user to the ClassPass 2021 Terms
of Use. (*Id.*)

**\*2** The second paragraph of the 2021 Terms of Use
provided: "THESE TERMS CONTAIN A BINDING
ARBITRATION AGREEMENT AND CLASS ACTION
WAIVER THAT REQUIRE YOU TO ARBITRATE ALL
DISPUTES YOU HAVE WITH CLASSPASS ON AN
INDIVIDUAL BASIS." (Declaration of Jessica Van Meter
[3] ("Van Meter Decl."), Dkt. No. 29-5 ¶ 3, Ex. A.) The
2021 Terms of Use also provided that "ClassPass may amend
the Terms from time to time"; that "all amendments will
be effective upon posting of such updated Terms"; and that
"continued access to or use of the Site or Classes after such
posting constitutes your consent to be bound by the Terms, as
amended." (*Id.*)

When Plaintiff's free trial ended on November 29, 2021, she made her first subscription fee payment and became a ClassPass member. (Teng Decl, Dkt. No. 29-4 ¶ 10.) As of September 2025, Plaintiff has remained "an active ClassPass user" and "continued to pay her monthly subscription fee, most recently paying $149.00 on August 7, 2025." (Declaration of Danielle Doremus [4] ("Doremus Decl."), Dkt. No. 29-3 ¶ 3.) Since becoming a ClassPass member, Plaintiff "has engaged in more than 200 transactions with ClassPass" and "has used ClassPass regularly in each year from when she signed up in November 2021 through 2025." (*Id.* ¶ 5.)

## II. 2024 Terms of Use
On August 9, 2024, ClassPass updated its Terms of Use. (Declaration of Ingrid Chang [5] ("Chang Decl."), Dkt. No. 29-2 ¶ 2.) On August 10, 2024, Plaintiff received an email notifying her of the updated Terms of Use and providing her with a hyperlink to the then-effective 2024 Terms of Use. (*Id.* ¶ 3.) On August 11, 2024, Plaintiff was presented with a pop-up window in the ClassPass mobile application, which also notified her of the hyperlinked updated 2024 Terms of Use and prompted her to confirm whether she agreed to the 2024 Terms of Use by clicking a blue "I agree" button. (*Id.* ¶4.) On that day, Plaintiff clicked on the "I agree" button two times. (*Id.* ¶ 6.)

**\*3** The second paragraph of the 2024 Terms of Use contained the following provision:

> UNLESS PROVIDED OTHERWISE IN THE APPLICABLE REGIONAL AMENDMENT BELOW, THESE TERMS CONTAIN A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER THAT REQUIRE YOU TO ARBITRATE ALL DISPUTES YOU HAVE WITH CLASSPASS RELEASEES ON AN INDIVIDUAL BASIS. PLEASE SEE SECTIONS 18 AND 19(J) FOR MORE INFORMATION ABOUT THE ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. YOU EXPRESSLY AGREE THAT

> DISPUTES BETWEEN YOU AND CLASSPASS RELEASEES WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION. YOU HEREBY WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS WIDE ARBITRATION.

(Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B.) The 2024 Terms of Use also contained the following provision:

> By accessing and/or using the Site and/or Offerings, either through ClassPass, your employer, or another third party; clicking any button to indicate your consent; or otherwise indicating your consent to these Terms, you accept and agree to be bound by these Terms and all terms, conditions, and limitations associated with them that are posted on the Site and the ClassPass Privacy Policy, just as if you had agreed to these Terms in writing. If you do not agree to these Terms, do not use the Site or any Offerings.

(*Id.* § 1(a).)

## III. Arbitration Agreement
Section 18(a) of the 2024 Terms of Use contained the following Arbitration Agreement:

> WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY AND ALL DISPUTES [6] ... WHETHER PRESENTLY IN EXISTENCE OR BASED ON ACTS OR OMISSIONS IN THE PAST OR IN THE FUTURE, WILL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION RATHER THAN IN COURT

IN ACCORDANCE WITH THIS ARBITRATION AGREEMENT.

(*Id.* § 18(a).) Section 18(c) mandated that "[a]ll issues shall be for the arbitrator to decide, including the scope of this Arbitration Agreement." (*Id.* § 18(c).) Section 18(e) further mandated that "[e]xcept as expressly provided herein, the arbitrator will decide the jurisdiction of the arbitrator and the rights and liabilities, if any, of you and ClassPass Releasees." (*Id.* § 18(e).)

## IV. Litigation

On June 2, 2025, Plaintiff initiated this consumer class action challenging Defendants' [7] "unlawful practice of imposing financial penalties on customers when they miss classes they had already paid for in full." (Dkt. No. 1 ¶ 1.) Plaintiff filed the operative First Amended Complaint ("FAC") on June 27, 2025 asserting five claims for relief: (1) recission under New York common law; (2) unjust enrichment under New York common law; (3) declaratory relief under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57; (4) unfair and deceptive business practices under the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; and (5) unfair competition under Cal. Bus. & Prof. Code §§ 17200 *et seq.* (FAC, Dkt. No. 14 at 13-23.)

## LEGAL STANDARDS

### I. Federal Arbitration Act

**\*4** The Federal Arbitration Act ("FAA") "sets forth procedures for enforcing arbitration agreements in federal court." *Smith v. Spizzirri*, 601 U.S. 472, 473 (2024). "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) "The court's role under the [FAA] is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citing 9 U.S.C. § 4). "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith*, 601 U.S. at 478 (citing 9 U.S.C. § 3).

## II. Choice of Law

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Here, the applicable state law would be that of either California [8] or New York [9]. However, the Court "need not decide whether to apply California or New York law as the end result will be the same." *Chabolla v. Classpass Inc.*, No. 4:23-cv-00429-YGR, 2023 U.S. Dist. LEXIS 122616, at *6-7 (N.D. Cal. June 22, 2023), *aff'd*, 129 F.4th 1147 (9th Cir. 2025) (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). This is because "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." *Berman*, 30 F.4th 855 (quotation and citation omitted).

## III. California and New York Contract Law

"Online contracts are subject to the same elemental principles of contract formation as paper contracts." *Chabolla v. Classpass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025). "To form a contract under New York or California law, the parties must manifest their mutual assent to the terms of the agreement." *Berman*, 30 F.4th at 855. Although a party may manifest assent through conduct, "[t]he conduct of a party is not effective as a manifestation of [ ] assent unless [the party] intends to engage in the conduct and knows or has reason to know that the other party may infer from [the] conduct that [the party] assents." *Berman*, 30 F.4th at 855 (quoting Restatement (Second) of Contracts § 19(2) (1981)); *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024).

## DISCUSSION

### I. Validity of the Arbitration Agreement

#### A. Notice and Assent

"Because ClassPass's website provides a link to the Terms of Use but does not require that the user actually read them before moving on to purchase a subscription, the website most closely resembles a 'sign-in wrap agreement.' " *Chabolla*, 129 F.4th at 1154 (quoting *Keebaugh*, 100 F.4th at 1014). "Like all online contracts, 'a sign-in wrap agreement may be an enforceable contract based on inquiry notice if (1) the website provides reasonably conspicuous notice of the terms

to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.' " *Id.* (quoting *Keebaugh,* 100 F.4th at 1014).

### 1. 2021 Terms of Use

**\*5** Defendants assert that ClassPass "conspicuously notified Plaintiff of the 2021 Terms when she signed up for her ClassPass free trial on November 15, 2021." (Dkt. No. 29-1 at 10.) More specifically, Defendants argue that "[t]he 2021 Terms were conspicuously presented to Plaintiff with offset, hyperlinked text where Plaintiff could review the 2021 Terms for as long as she liked before signing up for ClassPass's free trial membership." (*Id.*) Defendants also aver that the sign-up flow that Plaintiff followed to sign up for her ClassPass free trial in November 2021 meets the standard for conspicuous notice outlined by the Ninth Circuit in *Chabolla v. ClassPass Inc.* because "Plaintiff was 'explicitly advised that the act of clicking' the 'Start your free trial' button would 'constitute assent to' the 2021 Terms." (*Id.* at 11 (quoting *Chabolla,* 129 F.4th at 1152-53).) Thus, Defendants maintain that "Plaintiff first agreed to arbitrate her claims and waive her right to bring a class action in November 2021." (*Id.* at 12.)

Plaintiff counters that the free trial sign-up flow she encountered in 2021 contained several fatal defects. First, Plaintiff argues that the notice on Plaintiff's Screen 1 "explicitly limited terms acceptance to social media sign-ups, providing no notice whatsoever for email users like Ms. Majidi-Ahy." (Dkt. No. 30 at 17.) Next, Plaintiff contends that "Screens 2 through 4 failed to cure the initial lack of notice" because Screen 2 only contained "small hyperlinked text at the bottom reading 'Terms | Privacy Policy' ... [with] no indication that clicking 'Continue' would constitute agreement[,]" and "Screens 3 and 4 contained no reference to terms at all." (*Id.*) Lastly, Plaintiff asserts that on Screen 5, the "Start your free trial" button and small notice reading that "By clicking the button below you agree to the Terms ..." did not provide sufficient notice that Plaintiff would be bound by the 2021 Terms of Use and failed to cure the lack of notice in the prior four screens. (*Id.* at 18.) Thus, Plaintiffs argues that the multi-screen sign-up flow presented to her did not provide her with valid notice of the 2021 Terms of Use. (*Id.*)

"To be conspicuous, notice 'must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.' "

*Keebaugh,* 100 F.4th at 1014 (quoting *Berman,* 30 F.4th at 856). This inquiry is both context-and-fact-specific. *See Chabolla,* 129 F.4th at 1155; *Oberstein v. Live Nation Entm't, Inc.,* 60 F.4th 505, 514-16 (9th Cir. 2023); *Sellers v. JustAnswer LLC,* 73 Cal. App. 5th 444 (2021).

Here, the Court agrees that there was insufficient notice of the terms in Screens 1 through 4 of the sign-up flow because those screens were either completely silent or unclear as to whether the terms applied to those signing up for a free trial via email. (*See* Teng Decl. ¶¶ 4-7, Exs. A-D.) Nevertheless, the Court finds that the final screen *did* provide sufficient notice for Plaintiff to assent to the 2021 Terms of Use. (*See id.* ¶ 8, Ex. E.)

On the final payment screen, Plaintiff was presented with the following language above the blue "Start your free trial button": "By clicking the button below, you agree to the Terms, and your 14 days 20-credit trial will begin." (*Id.*) As the Ninth Circuit noted in *Oberstein,* such language "clearly denotes 'that continued use will act as a manifestation of the user's intent to be bound.' " *Oberstein,* 60 F.4th at 516 (quoting *Nguyen,* 763 F.3d at 1177); *see also Berman* 30 F.4th at 858 ((*Meyer v. Uber Techs., Inc.,* 868 F.3d 66, 78-80 (2d Cir. 2017)) ("[The] notice defect could easily have been remedied by including language such as, 'By clicking the Continue >> button, you agree to the Terms & Conditions.' "). Likewise, the hyperlink of the 2021 Terms of Use being "conspicuously distinguished from the surrounding text in bright blue font [made] its presence readily apparent." *Id.* at 516-17 (citing *Berman* and *Sellers*) ("In contrast with the agreements invalidated in *Berman* and *Sellers,* the Terms here were marked in bright blue font and distinguished from the rest of the text."). Furthermore, "the context of this transaction, requiring a full registration process, reflected the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship." *Id.* at 517 (quoting *Sellers,* 73 Cal. App. 5th at 477).

**\*6** For these reasons, the Court finds that the ClassPass free trial sign-up flow provided Plaintiff with adequate notice of the 2021 Terms of Use and that Plaintiff unambiguously manifested her assent to these terms, including the arbitration provisions.

### ii. 2024 Terms of Use

Next, Defendants assert that Plaintiff also assented to the 2024 Terms of Use. (Dkt. No. 29-1 at 12.) Defendants argue that "[i]n addition to the assent she provided at the conclusion of her original sign-up process, Plaintiff has repeatedly and decisively manifested her assent to be bound by the 2024 Terms through the email notification she received on August 10, 2024 and her continued use of ClassPass." (*Id.* at 13.)

Defendants further assert that Plaintiff assented to the 2024 Terms of Use because on August 11, 2024, Plaintiff twice clicked the "I agree" button on the "in-app, popup notice that informed her that ClassPass had 'updated [its] Terms of Use' and that the 'changes include[d] an updated arbitration agreement.' " (*Id.* at 14 (quoting Chang Decl., Dkt. No 29-2 ¶ 4, 6).) Defendants emphasize that the "pop-up stated, 'Please stay informed by reviewing the updated Terms of Use,' with the blue, underlined text 'Terms of Use' hyperlinked to redirect a user who clicked on it to the 2024 Terms ...." (*Id.* (quoting Chang Decl., Dkt. No. 29-2 ¶¶ 4-5).) Defendants also underscore that "Plaintiff was informed by the pop-up window that "[b]y using [her] ClassPass account, [ClassPass's] website, or mobile app, [she was] agreeing to the updated Terms of Use.' " (*Id.* (quoting Chang Decl., Dkt. No. 29-2 ¶¶ 4-5).)

Plaintiff contends that "ClassPass's August 2024 pop-up cannot save its motion because one cannot 'update' an arbitration agreement that never validly existed." (Dkt. No. 30 at 18.) Plaintiff maintains that "[e]ven assuming arguendo that ClassPass could create an arbitration agreement through unilateral modification, the August 2024 pop-up fails" because "generic notices about updated arbitration terms cannot retroactively apply to already accrued claims." (*Id.* (citing *Ash v. Axos Bank*, No. 24-cv-1157-RSH-BJC, 2024 U.S. Dist. LEXIS 165664 (S.D. Cal. Sep. 13, 2024)).

Plaintiff identifies two primary issues with the pop-up. "First, it stated only that 'Key changes include an updated arbitration agreement with more specific dispute resolution procedures' but said nothing about applying to Ms. Majidi-Ahy's existing penalty fee claims." (*Id.* at 19 (quoting Chang Decl., Dkt. No. 29-1 ¶¶ 3-6).) "Second, the pop-up stated 'By using your ClassPass account, our website, or mobile app, you are agreeing to the updated Terms'— binding users through mere continued use regardless of clicking 'I agree.' " and providing users with "no option to decline short of abandoning their accounts and forfeiting paid credits." (*Id.* (quoting Chang Decl., Dkt. No. 29-1 ¶¶ 3-6).) Thus, Plaintiff maintains she did not assent to the 2024 Terms of Use. (*Id.*)

The Court finds that Plaintiff had notice of, and unambiguously assented to, ClassPass's 2024 Terms of Use. Plaintiff received notice of the 2024 Terms of Use via the August 10, 2024 email and August 11, 2024 in-app pop-up, both of which included blue hyperlinks to the actual terms. (*See* Chang Decl., Dkt. No. 29-2 ¶¶ 3-6.) The August 11, 2024 pop-up noted that "[k]ey changes [to the terms] include an updated arbitration agreement with more specific dispute resolution procedures" and admonished users to "[p]lease stay informed by reviewing the updated Terms of Use," which were hyperlinked in blue. (*Id.* ¶ 4.) The fact that the pop-up did not outline specific modifications to the terms is of no consequence. *See Holl v. United States Dist. Court (In re Holl)*, 925 F.3d 1076, 1083 (9th Cir. 2019) ("There is no special rule, however, that an offeror of an adhesive consumer contract specifically highlight or otherwise bring an arbitration clause to the attention of the consumer to render the clause enforceable."); *Plaintiffs v. UPS Defendants*, No. 2:21-cv-08446-MCS-E, 2022 U.S. Dist. LEXIS 211640, at *13-14 (C.D. Cal. Nov. 21, 2022) ("[Plaintiffs] had inquiry notice of the updated term by virtue of their assent to the pop-up providing notice of the update. To hold otherwise would require any service provider or website host seeking to bind a consumer or user to new terms of use to publish a redline version of the terms any time an amendment is made.").

\*7  Moreover, Plaintiff demonstrated her assent to the 2024 Terms of Use through her acceptance of the terms via the pop-up in the ClassPass app on August 11, 2024. (*See* Chang Decl., Dkt. No. 29-2 ¶ 6.) *See Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011) ("Because Plaintiff was provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I accept' button and she admittedly clicked 'Accept,' ... a binding contract was created here ...."); *Perry v. MLB Advanced Media, L.P.*, No. CV 18-1548 PSG (GJSx), 2018 U.S. Dist. LEXIS 239692, at *6-7 (C.D. Cal. May 30, 2018) (collecting cases supporting the conclusion that Plaintiff accepted terms of use containing an arbitration provision by clicking a "Buy & Accept Terms" button located immediately above a hyperlink that directed Plaintiff to Defendant's Terms of Use). Likewise, Plaintiff's continued use of ClassPass's services demonstrated her assent to the 2024 Terms of Use because the pop-up specified that "[b]y using your ClassPass account, our website, or mobile app, you are agreeing to the updated Terms of Use." (*Id.* ¶ 4; *see* Doremus Decl., Dkt. No. 20-3 ¶¶ 3-5.) *See Berman*, 30 F.4th 857-58 (quoting *Nguyen*, 763 F.3d at 1177) ("The presence of 'an explicit textual notice

that continued use will act as a manifestation of the user's intent to be bound' is critical to the enforceability of any browsewrap-type agreement.")

For these reasons, the Court finds that Defendants have demonstrated Plaintiff's notice of and assent to the 2024 Terms of Use, including the Arbitration Agreement.

### B. Substantive Unconscionability

The FAA "permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.' " *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting 9 U.S.C. § 2). "This saving clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability ...." *Id.* Under California law, "[s]ubstantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 246 (2012). "The party resisting arbitration bears the burden of proving unconscionability." *Id.* at 247.

Plaintiff contests the validity of the arbitration agreement by asserting that under California law, "an arbitration agreement that allows one party to unilaterally modify it retroactively is illusory and unenforceable." (Dkt. No. 30 at 12.) Plaintiff argues that the agreement's language stating that the agreement applies to "ANY AND ALL DISPUTES ... WHETHER PRESENTLY IN EXISTENCE OR BASED ON ACTS OR OMISSIONS IN THE PAST OR IN THE FUTURE" improperly allows "retroactive modification to already-accrued claims." (*Id.* at 13 (quoting Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(a)) (citing *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425 (2012) and *Peng v. First Republic Bank*, 219 Cal. App. 4th 1462, 1473-74 (2013)).) Additionally, Plaintiff argues that the provision grants "ClassPass reserved unlimited power to 'amend the Terms from time to time' with mere continued use of the service constituting acceptance-no actual notice to users required." (*Id.* at 13-14 (quoting Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 1(b)).) Because these provisions allow ClassPass to " silently modify its arbitration agreement at any time and apply those modifications retroactively to past disputes," the Arbitration Agreement is therefore "illusory." (*Id.* at 14.)

Defendants contend that "Plaintiff's argument mischaracterizes the Terms, insisting they are 'unilateral'

" when "[t]o the contrary, the Terms are bilateral." (Dkt. No. 35 at 7 (citing *Trudeau v. Google LLC*, 816 Fed. App'x 68, 70 (9th Cir. 2020).) Defendants assert that the Terms of Use and Arbitration Agreement require bilateral agreement because "[b]oth the 2021 and 2024 Terms required affirmative acceptance," and "[i]f a ClassPass user stops using ClassPass, does not click any buttons to indicate their consent, and otherwise does not outwardly indicate their consent, they will not be bound by any further updates to the Terms." (*Id.*) Additionally, "[u]nder the Terms, ClassPass would only be able to change the Arbitration Agreement after a dispute arose if the relevant user assented to the change." (*Id.*) Lastly, Defendants maintain that "regardless of the Terms language, there was bilateral agreement here" because "Plaintiff affirmatively assented to the 2021 Terms by completing her sign-up flow and to the 2024 Terms by, among other actions, clicking 'I agree' twice when given actual notice that ClassPass had amended its Terms 'includ[ing] an updated arbitration agreement.' " (*Id.* at 7-8 (citing Teng Decl., Dkt. No. 29-4 ¶¶ 8-9, Ex. E and Chang Decl., Dkt. No. 29-2 ¶ 4-6.).)

**\*8**  In *Peleg*, the California Court of Appeal held that "in applying the FAA under California contract law, the covenant of good faith and fair dealing may save an arbitration agreement from being illusory notwithstanding the absence of an express savings clause." 140 Cal. Rptr. 3d 38, 67. The court found that "[a] unilateral modification provision that is silent as to whether contract changes apply to claims, accrued or known, is impliedly restricted by the covenant [of good faith and fair dealing] so that changes do not apply to such claims." *Id.* The court further found that "[a]n arbitration agreement that expressly exempts all claims, accrued or known, from contract changes is valid and enforceable without resort to the covenant [of good faith and fair dealing]." *Id.* at 68. Lastly, the court found that if "an arbitration agreement expressly applies a contract change to such claims, the covenant cannot vary the plain language, and the agreement is illusory." *Id.*

In *Peng*, the California Court of Appeal held that the implied covenant of good faith and fair dealing "prevents [a party] from modifying an arbitration agreement once a claim has accrued or become known to it." 219 Cal. App. 4th at 1474. Accordingly, the court concluded that the unilateral modification provision in question was not substantively unconscionable because the provision stating that defendant could only modify the agreement at will rather than terminate it was "so one-sided as to shock the conscience." *Id.* (quoting

*24 Hour Fitness, Inc. v. Superior Court,* 66 Cal. App. 4th 1199, 1204 (1998)).

Here, the Court finds that *Peleg* and *Peng* are inapposite because the 2024 Terms of Use were adopted by bilateral agreement between Plaintiff and ClassPass. Plaintiff received notice of the modified terms via email and in-app pop-up and affirmatively accepted the terms via her clicking the "I accept" button on the pop-up and her continued use of ClassPass's services. *See Trudeau v. Google LLC,* 816 F. App'x 68, 70, n.1 (9th Cir. 2020) (finding that the Terms of Service "were adopted by bilateral agreement" between Plaintiff and Google because "Google gave [Plaintiff] notice of the new terms and he affirmatively accepted them"); *Azeveda v. Comcast Cable Communs. LLC,* No. 5:19-cv-01225-EJD, 2019 U.S. Dist. LEXIS 177765, at *17 n.5 (N.D. Cal. Oct. 11, 2019) (finding *Peleg* "inapplicable" because "Defendants notified employees of the proposed changes and allowed them a reasonable opportunity to opt-out of the changes"). Therefore, *Peleg* and *Peng,* which concern the impact of *unilateral* modification provisions, are not applicable.

Moreover, the mere fact that the Arbitration Agreement applies to "ANY AND ALL DISPUTES ... WHETHER PRESENTLY IN EXISTENCE OR BASED ON ACTS OR OMISSIONS IN THE PAST OR IN THE FUTURE" does not necessarily render the agreement invalid. (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(a).) In fact, "[t]he Ninth Circuit consistently upholds the enforceability of the retroactivity of arbitration clauses." *See Saucedo v. Experian Info. Sols., Inc.,* No. 1:22-cv-01584-ADA-HBK, 2023 U.S. Dist. LEXIS 127644, at *19-20 (E.D. Cal. July 24, 2023) (collecting cases). And again, Plaintiff received notice of the 2024 Terms of Use, including the Arbitration Agreement and retroactive provision, and still affirmatively assented. Thus, the 2024 Terms of Use and included Arbitration Agreement are valid and binding on Plaintiff.

### C. Public Injunctive Relief

Next, Plaintiff argues that "[e]ven if an arbitration agreement existed ... and were enforceable ... , Ms. Majidi-Ahy's claims for public injunctive relief should remain in court" because Ms. Majidi-Ahy seeks "forward-looking, public-benefiting relief that ... cannot be waived." (Dkt. No. 30 at 25 (citing *McGill v. Citibank, N.A.,* 2 Cal. 5th 945 (2017)).) Defendants counter that "*McGill* is inapposite because "the Arbitration Agreement does not require users to waive their right to seek public injunctive relief" and "*McGill* does not prohibit

arbitrating claims for public injunctive relief." (Dkt. No. 35 at 11.)

**\*9** "A public injunction is a form of 'injunctive relief that has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public.' " *McBurnie v. RAC Acceptance E., LLC,* 95 F.4th 1188, 1191 (9th Cir. 2024) (quoting *McGill,* 2 Cal. 5th at 951). In *McGill,* the California Supreme Court held that "an agreement to waive the right to seek public injunctive relief violates California Civil Code § 3513, which provides that 'a law established for a public reason cannot be contravened by a private agreement.' " *Blair v. Rent-A-Center, Inc.,* 928 F.3d 819, 824 (9th Cir. 2019) (quoting *McGill,* 2 Cal. 5th at 961). In other words, "California's *McGill* rule invalidates contractual agreements that waive the right to seek" public injunctions. *Id.* at 1190 (citing *McGill,* 2 Cal. 5th at 961-62); *see also Patrick,* 93 F.4th at 477-78 (citing *McGill,* 2 Cal. 5th at 961-62) ("Under California law, a clause prohibiting a party from seeking public injunctive relief is invalid and unenforceable."). Notably, the "FAA does not preempt the *McGill* rule. *Blair,* 928 F.3d at 831.

Here, the Arbitration Agreement provides that "[t]he arbitrator may award on an individual basis any relief that would be available pursuant to applicable law, and will not have the power to award relief to, against or for the benefit of any person who is not a party to the proceeding." (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(d).) This provision precludes the arbitrator from awarding public injunctive relief and thus waives Plaintiff's right to seek a public injunction "in any forum." *McGill,* 2 Cal. 5th at 953. Thus, in accordance with the *McGill* rule, this provision is invalid. Nevertheless, the Court finds that the Arbitration Agreement, as a whole, is not void and unenforceable under *McGill* because of the Agreement's severability clause.

The Arbitration Agreement's severability clause provides that "[i]f any clause within this Arbitration Agreement, other than the Class Action Waiver clause [10] above, is found to be illegal or unenforceable, that clause will be severed from this Arbitration Agreement, and the remainder of this Arbitration Agreement will be given full force and effect." (*Id.* § 18(k).) On its face, this severability clause allows for the provision precluding the arbitrator from awarding public injunctive relief to be severed from the Arbitration Agreement and for the remainder of the Arbitration Agreement to remain in effect. *See Jialu Wu v. iTalk Glob. Communs., Inc.,* No. CV 20-7150 PSG (PJWx), 2020 U.S. Dist. LEXIS 250121, at *23

(C.D. Cal. Oct. 21, 2020) (finding the arbitration agreement unenforceable only "to the extent that it required [the plaintiff] to waive his right to seek a public injunction").

Therefore, even if all of Plaintiff's disputes are encompassed by the Arbitration Agreement and must be arbitrated, any claims for public injunctive relief shall remain before this Court. *See id.* (finding that because "the Agreement, as a whole, is not unenforceable under *McGill*[,] ... all of Plaintiff's claims for relief except his claim for a public injunction must be arbitrated if the Agreement encompasses the dispute at issue"); *Blair*, 928 F.3d at 832 (affirming the district court's order that referred the arbitrable claims to arbitration and declined to stay the non-arbitrable claims); *McGill*, 2 Cal. 5th at 966 (finding that when there is an invalid provision waiving the right to seek a public injunction, a court may send the arbitrable claims to arbitration while retaining jurisdiction over the public injunction claim).

## II. Scope of the Arbitration Agreement

### A. Arbitrability of Plaintiff's Claims

**\*10** With the Court finding that Plaintiff assented to the 2021 and 2024 Terms of Use, the Court must next decide whether the Court or the arbitrator should determine the threshold question of arbitrability.

Parties can agree to expressly delegate gateway issues, including whether the arbitration agreement encompasses the dispute at issue, to an arbitrator. *Morgan v. Glob. Payments Check Servs.*, No. 2:17-cv-01771-JAM-CMK, 2018 U.S. Dist. LEXIS 25335, at \*4-5 (E.D. Cal. Feb. 14, 2018). "[U]nlike the arbitrability of claims in general, whether the court or the arbitrator decides arbitrability is 'an issue for judicial determination unless the parties *clearly and unmistakably provide otherwise.*' " *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). "Clear and unmistakable evidence of an agreement to arbitrate arbitrability 'might include ... a course of conduct demonstrating assent ... or ... an express agreement to do so.' " *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (quoting *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011)).

Here, the Arbitration Agreement in the 2024 Terms of Use provides that "[a]ll issues shall be for the arbitrator to decide,

including the scope of this Arbitration Agreement." (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(c)).) "This language, as drafted, meets the requisite 'clear and unmistakable' standard, and the Court therefore may not override the parties' choice to delegate questions of arbitrability to the arbitrator." *Dickey v. Ticketmaster LLC*, No. CV 18-9052-GW(GJSx), 2019 U.S. Dist. LEXIS 231895, at \*23 (C.D. Cal. Mar. 12, 2019) (finding that a provision that "[t]he arbitrator ... shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement ..." met the clear and unmistakable standard).

Likewise, the provision in the Arbitration Agreement that "JAMS ... will arbitrate all Disputes, and the arbitration will be conducted before a single arbitrator" constitutes clear and unmistakable evidence that the parties agree to arbitrate arbitrability. (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(c)).) *See Patrick v. Running Warehouse, LLC*, No. 2:21-cv-09978-ODW (JEMx), 2022 U.S. Dist. LEXIS 190483, at \*12 (C.D. Cal. Oct. 18, 2022), *aff'd*, 93 F.4th 468, 481 (9th Cir. 2024) ("By agreeing to an arbitration provision that incorporates JAMS Rules, and particularly in light of the language of JAMS Rule 11(b), [which expressly delegates arbitrability to the arbitrator,] the Court finds that the parties clearly and unmistakably delegated the question of arbitrability to JAMS.").

For these reasons, this Court "possesses no power to decide the arbitrability issue" and "may not override" the delegation provision of the Arbitration Agreement. *Henry Schein, Inc.*, 586 U.S. at 68. The Court therefore concludes that the Arbitration Agreement, which extends broadly to "any dispute, claim, or controversy between you and ClassPass Releasees regarding any aspect of your relationship with ClassPass Releasees, ... and includes the validity, enforceability or scope of this Arbitration Agreement," covers the disputes at issue in this action, except for any claims for public injunctive relief. (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(a).) *See Brennan*, 796 F.3d at 1130. Therefore, the Court must now determine which of Plaintiff's claims, if any, seek public injunctive relief and are thus not subject to the provisions of the Arbitration Agreement.

**\*11** In the FAC, Plaintiff "seeks injunctive relief to stop ClassPass from imposing unlawful penalty fees on all future subscribers" under California's unfair competition law ("UCL"), Cal. Bus. & Prof. Code, § 17200 *et seq.* (Dkt.

Case 2:21-cv-00563-JNW    Document 581    Filed 03/09/26    Page 20 of 23
MONDONA MAJIDI-AHY, individually and on behalf of all others..., Slip Copy (2026)

2026 WL 585465

No. 30 at 25 (citing FAC, Dkt. No. 14 ¶¶ 89-95).) But "[m]erely declaring that a claim seeks a public injunction ... is not sufficient to bring that claim within the bounds of the rule set forth in *McGill*." *Blair v. Rent-A-Center, Inc.*, No. C 17-02335 WHA, 2017 U.S. Dist. LEXIS 163979, at *6 (N.D. Cal. Oct. 3, 2017), *aff'd*, 928 F.3d 819 (9th Cir. 2019). "Rather, *McGill* limited invalidity to claims which confer by statute the right to seek a public injunction." *Id.* at *6-7. To determine whether a statute provides for public injunctive relief, *McGill* considered "whether it has a public purpose, and, in turn, whether, in crafting the law, the California legislature provided that a private individual could seek an injunction that would 'by and large benefit[ ] the general public and [ ] benefit[ ] the plaintiff, if at all, only incidentally and/or as a member of the general public.' " *Id.* at *7 (quoting *McGill*, 2 Cal. 5th at 955).

In *McGill*, the California Supreme Court found that because public injunctive relief available under the UCL is primarily for the benefit of the general public, waiver of the right to seek public injunctive relief under the UCL are invalid and unenforceable under California law. *See* 2 Cal. 5th at 961. As Plaintiff's fifth claim seeks public injunctive relief under the UCL, the Court therefore concludes that the Arbitration Agreement is unenforceable as to that claim. Thus, this Court "shall retain jurisdiction over the adjudication of plaintiff's request for public injunctive relief" in her fifth claim. *Dornas v. Best Buy Co., Inc.*, No. 18-cv-04085-PJH, 2019 U.S. Dist. LEXIS 24522, at *16 (N.D. Cal. Feb. 14, 2019) ("While the remainder of plaintiff's action must be compelled to arbitration under the terms of the Agreement —including all questions of liability—the court shall retain jurisdiction over the adjudication of plaintiff's request for public injunctive relief, should defendant be found liable for the California statutory claims, which are brought on behalf of the public and for which public injunctive relief may be available.").

### B. Application of the Arbitration Agreement to Mindbody

Plaintiff argues that "[e]ven if ClassPass could establish a valid arbitration agreement ... , MINDBODY cannot enforce it" because "MINDBODY is not a party to any arbitration agreement with Ms. Majidi-Ahy. (Dkt. No. 30 at 20.) According to Plaintiff, "MINDBODY fails to establish it can compel arbitration on three independent grounds: the plain language of the Terms does not grant MINDBODY arbitration

rights, MINDBODY is not a third-party beneficiary, and equitable estoppel does not apply." (*Id.*)

First, Plaintiff argues that Defendants' reliance on *Meeks v. Experian Info. Servs., Inc.*, Nos. 21-17023, 22-15028, 2022 U.S. App. LEXIS 35650 (9th Cir. Dec. 27, 2022) is misguided because the facts in that case are distinguishable from the facts at hand. (*Id.*) Plaintiff states that "[i]n Meeks, the Ninth Circuit held that Experian could compel arbitration because 'Experian was an affiliate at the time the contract was formed and that it plays a role in the larger agreement.' " (*Id.* quoting *Meeks*, 2022 U.S. App. LEXIS 35650, at *6.) But here, "MINDBODY is never identified by name anywhere in the 2024 Terms or in any marketing materials Plaintiff can recall" and "MINDBODY plays no disclosed role in the consumer-facing relationship." (*Id.* at 21.)

Second, Plaintiff argues that Mindbody is not a third-party beneficiary because "[n]othing in the Terms disclosed MINDBODY's existence, role, or relationship to ClassPass." (*Id.* at 23.) Plaintiff asserts that "[t]he failure to identify MINDBODY by name or specific role demonstrates the absence of any motivating purpose to benefit it." (*Id.* at 22-23.) Further, Plaintiff avers that "permitting MINDBODY to enforce the arbitration provision is inconsistent with the reasonable expectations of the contracting parties." (*Id.* at 23 (quotation omitted).)

**\*12** Finally, Plaintiff argues that MINDBODY cannot invoke equitable estoppel because Plaintiff "does not rely on any provision of the Terms to establish her rights or remedies." (*Id.*) "To the contrary, she challenges the Terms as containing an unlawful penalty provision." (*Id.*)

Defendants counter that "[t]he Opposition fails to distinguish between the three ClassPass Defendant entities and refers to them collectively throughout." (Dkt. No. 35 at 11.) Thus, Defendants assert that "[i]t is left uncontested that all three ClassPass entities may enforce the Arbitration Agreement, and Plaintiff has waived any contrary argument." (*Id.*)

Nonetheless, Defendants argue that the plain language of the 2024 Terms of Use extend to Mindbody because "the Arbitration Agreement applies to both 'PARENTS' and 'AFFILIATED ENTITIES' of ClassPass USA LLC and therefore identifies Mindbody by its role." (Dkt. No. 35 at 12 (quoting Van Meter Decl., Dkt. No. 29-5, Ex. B § 9(k)).) Defendants assert that "Plaintiff cannot rewrite this language, and *Meeks* provides her with no support" because "[w]hat was

truly critical to *Meeks* was that the agreement at issue there bound the 'plaintiffs to arbitrate with ECS and define[d] ECS to include 'affiliates,' and Experian [was] an affiliate.' " (*Id.* (quoting *Meeks*, 2022 U.S. App. LEXIS 35650, at *6).)

Next, Defendants argue that Mindbody is a third-party beneficiary, and "[t]he fact that Plaintiff did not know who ClassPass's 'PARENTS' and 'AFFILIATED ENTITIES' were when agreeing to the 2024 Terms, does not negate the fact that she agreed to arbitrate her claims against ClassPass's 'PARENTS' and 'AFFILIATED ENTITIES.' " (*Id.* at 13.)

Lastly, Defendants contend that "Plaintiff's very first cause of action is for rescission and restitution under New York contract law ... [, a]nd Plaintiff's own count for rescission and restitution alleges that '[a] valid contract existed between ClassPass and each Class member'— including Plaintiff— and that 'Plaintiff and the Class fully performed their material obligations.' " (*Id.*at 13-14 ( quoting FAC, Dkt. No. 14 ¶¶ 53-54).) "Because Plaintiff's claims are intimately founded in and intertwined with the underlying contract obligations, she is equitably estopped from avoiding arbitration against Mindbody." (*Id.* at 14 (quotation omitted).)

"[A] litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009). "In California, a court may find a nonsignatory bound to an arbitration agreement under six doctrines: '(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary.' " *Faucett v. Move, Inc.*, No. 2:22-cv-04948-ODW (ASx), 2024 U.S. Dist. LEXIS 73094, at *8-9 (C.D. Cal. Apr. 18, 2024) (quoting *Benaroya v. Willis*, 23 Cal. App. 5th 462, 469 (2018).

"A third party beneficiary is someone who may enforce a contract because the contract is made expressly for his benefit." *Matthau v. Superior Ct.*, 151 Cal. App. 4th 593, 602 (2007). Under the equitable estoppel doctrine, "a signatory to an agreement with an arbitration clause cannot ... on the one hand, seek to hold [a] non-signatory liable pursuant to duties imposed by the agreement ... [while] on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 220 (2009).

**\*13** In *Meeks*, the Ninth Circuit considered whether a nonsignatory defendant, Experian, could "enforce an arbitration provision in a larger agreement that the plaintiffs entered into when they signed up for credit-monitoring services provided primarily by Experian's sister company, Experian Consumer Services (ECS)." *Meeks*, 2022 U.S. App. LEXIS 35650, at *2. The court noted that although "[t]he text of the arbitration provision binds the plaintiffs and ECS to arbitrate certain disputes and defines ECS to include affiliates, [ ] the larger agreement does not define ECS to include affiliates." *Id.*

The Ninth Circuit concluded that "there is sufficient evidence that Experian sought to be bound by the arbitration provision" because "[t]he text of the arbitration provision binds plaintiffs to arbitrate with ECS and defines ECS to include 'affiliates.' " *Id.* at *6. Because "Experian is an affiliate and was so when the plaintiffs entered into the agreement," the Ninth Circuit reversed the district court's denial of Experian's initial motion to compel arbitration and held that Experian is a party to the arbitration agreement. *Id.* at *6-7.

Here, the 2024 Terms of Use provide that "THESE TERMS CONTAIN A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER THAT REQUIRE YOU TO ARBITRATE ALL DISPUTES YOU HAVE WITH CLASSPASS RELEASEES ON AN INDIVIDUAL BASIS." (Van Meter Decl., Dkt. No. 29-5, Ex. B.) Likewise, Section 18 of the 2024 Terms of Use provides that the "Arbitration Agreement facilitates the prompt and efficient resolution of any disputes that may arise between you and ClassPass Releasees." (*Id.* § 18(a).) Releasees are defined as "CLASSPASS, ITS PARENTS, SUBSIDIARIES, AND AFFILIATED ENTITIES ...." (*Id.* § 9(k).) Notably, Mindbody acquired ClassPass and became its parent company on October 15, 2021. (*See* Dkt. No. 17; Chang Decl., Dkt. No. 29-2 ¶ 1; Teng Decl., Dkt. No. 29-4 ¶ 1; Van Meter Decl., Dkt. No. 29-5 ¶¶ 1, 6-7.)

Applying the logic of *Meeks*, the Court finds that there is sufficient evidence that the Arbitration Agreement extends to Mindbody. The text of the Arbitration Agreement binds Plaintiff to arbitrate with ClassPass and its Parents. Because Mindbody is the parent company to ClassPass and was so at the time Plaintiff first signed up for ClassPass in November 2021, the Court readily concludes that Mindbody is a party to the Arbitration Agreement. (*See* Van Meter Decl., Dkt. No. 29-5 ¶¶ 1, 6-7, Ex. B § 9(k); Chang Decl., Dkt. No. 29-2 ¶ 1; Teng Decl., Dkt. No. 29-4 ¶ 1; Dkt. No. 17.) *See Meeks*, 2022

U.S. App. LEXIS 35650, at *6. As such, Plaintiff's claims against Mindbody that do not seek public injunctive relief must proceed to arbitration.

Given the Court's conclusion that Mindbody can enforce the Arbitration Agreement as a party, the Court need not address Plaintiff's third-party-beneficiary or equitable estoppel arguments. *Meeks*, 2022 U.S. App. LEXIS 35650, at *2 n.1. Additionally, Plaintiff's request that the Court stay the arbitration until the resolution of Plaintiff's litigation against Mindbody should the Court be inclined to compel arbitration with ClassPass is denied as moot. (Dkt. No. 30 at 24.)

### III. Necessity of a Stay

"When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith*, 601 U.S. at 478 (citing 9 U.S.C. § 3). Accordingly, this case, as it pertains to Plaintiff's claims that do not seek public injunctive relief, must be stayed.

*See* 9 U.S.C. § 3. However, "[g]iven that all issues other than the potential award of public injunctive relief ... will predominate over the relatively narrow issues concerning the propriety and scope of a public injunctive relief award," the Court finds that this case should be stayed in its entirety until arbitration concludes. *Dornaus*, 2019 U.S. Dist. LEXIS 24522, at *16-17.

### CONCLUSION

**\*14** For the reasons set forth above, Defendants' Motion to Stay Pending Arbitration is **GRANTED**. This entire action is hereby **STAYED** until arbitration in accordance with the terms of the Arbitration Agreement concludes.

### All Citations

Slip Copy, 2026 WL 585465

---

### Footnotes

1   ClassPass, *What is ClassPass?*, https://classpass.com/walkthrough/edusignup.

2   Karen Teng declares that she is Vice President of Software Engineering at MINDBODY, Inc., ("Mindbody") the parent corporation of ClassPass, LLC ("ClassPass"). (Dkt. No. 29-4 ¶ 1.) Ms. Teng further declares that she "worked for ClassPass from 2015 through May 2022 as the Director of Engineering and returned as a Mindbody employee on November 29, 2022, to [her] current position." (*Id.*) Additionally, Ms. Teng declares that through her position, she has "access to the systems of record that ClassPass uses to store certain ClassPass business and user records and data in the ordinary course of ClassPass' business," including "systems that track changes with the user experience, such as the online account creation and purchase flow and the checkout page that are live on the website at a particular time." (*Id.*)

3   Jessica Van Meter declares she is Director of Compliance & Controls at Mindbody. (Dkt. No. 29-5 ¶ 1.) Ms. Van Meter further declares that she has worked for ClassPass since March 1, 2019 and for Mindbody since Mindbody acquired ClassPass on October 15, 2021. (*Id.*) Additionally, Ms. Van Meter declares that she has "access to the systems of record that ClassPass uses to store certain ClassPass business and user records and data in the ordinary course of business," including "historical records of ClassPass' Terms of Use available at www.classpass.com." (*Id.*)

4   Danielle Doremus declares she is Senior Director of Business Operations & CX at Mindbody. (Dkt. No. 29-3 ¶ 1.) Ms. Doremus further declares that she has worked for ClassPass since 2015, for Mindbody since October 15, 2021, and in her current position since August 2022. (*Id.*) Additionally, Ms. Doremus declares that she has "access to the systems of record that ClassPass uses to store certain ClassPass business and user records and data in the ordinary course of business," including "records and data on account creation such

as when a member created an account, purchase and payment data, member class reservation records, and customer support records." (*Id.*)

5    Ingrid Chang declares she is Director of Lifecycle Marketing at Mindbody. (Dkt. No. 29-2 ¶ 1.) Ms. Chang further declares that she has worked for ClassPass since September 23, 2019 and for Mindbody since Mindbody acquired ClassPass on October 15, 2021. (*Id.*) Additionally, Ms. Chang declares that she has "access to the systems that ClassPass uses to both send users pop-up mobile application communications and record data about those mobile application communications, including when those communications are delivered, opened, and interacted with by users." (*Id.*)

6    The 2024 Terms of Use define dispute as "any dispute, claim, or controversy between you and ClassPass Releasees regarding any aspect of your relationship with ClassPass Releasees, whether based in contract, statute, regulation, ordinance, tort ... , or any other legal or equitable theory, and includes the validity, enforceability or scope of this Arbitration Agreement ...." (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(a).) The 2024 Terms of Use define releasees as "CLASSPASS, ITS PARENTS, SUBSIDIARIES, AND AFFILIATED ENTITIES, AND EACH OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES, CONSULTANTS, CONTRACT EMPLOYEES, REPRESENTATIVES AND AGENTS, AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS." (*Id.* § 9(k).)

7    Plaintiff initially brought this action against ClassPass, Inc., Mindbody, Inc., Vista Equity Partners Management, LLC, ClassPass, LLC, and ClassPass USA LLC. (*See* FAC, Dkt. No. 14 ¶¶ 4-8.) "ClassPass, Inc. was terminated on October 15, 2021" and succeeded by ClassPass, LLC. (*See* Dkt. No. 17.) "ClassPass USA LLC's parent company is ClassPass, LLC" and "ClassPass, LLC's parent company is MINDBODY, Inc." (*Id.*) "MINDBODY, Inc.'s parent company is Torreys Parent, LLC, whose parent company is Torreys Topco, Inc., whose parent company is VEPF Torreys Aggregator, LLC." (*Id.*) The parties stipulated to dismiss Defendant Vista Equity Partners Management, LLC on July 17, 2025. (Dkt. No. 25.) As such, the remaining Defendants in this matter are ClassPass LLC, ClassPass USA LLC, and Mindbody, Inc.

8    "Federal courts sitting in diversity look to the law of the forum state—here, California—when making choice of law determinations." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citing *Hoffman v. Citibank, N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008) (per curiam)).

9    Both the 2021 and 2024 Terms of Use contain a choice of law provision stating that "[t]hese Terms shall be governed in all respects by the laws of the State of New York, without regard to conflict of law provisions, consistent with the Federal Arbitration Act (to the extent permitted by applicable law)." (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 19(a); Ex. B § 19(a).) But "whether the choice of law provision applies depends on whether the parties agreed to be bound by [ClassPass's] Terms of Use in the first place." *Nguyen*, 763 F.3d at 1175.

10   The Arbitration Agreement also contains a Class Action Waiver that provides: "Any Disputes ... shall be submitted individually by you and will not be subject to any class action or representative status." (Van Meter Decl., Dkt. No. 29-5 ¶ 4, Ex. B § 18(i).) That the Class Action Waiver provision is non-severable is of no consequence to Plaintiff's ability to seek public injunctive relief because under California law, "[a]n individual claim seeking a public injunctive relief remedy is not a class or representative claim." *Dornaus v. Best Buy Co., Inc.*, No. 18-cv-04085-PJH, 2019 U.S. Dist. LEXIS 24522, at *16 n.2 (N.D. Cal. Feb. 14, 2019) (*McGill*, 2 Cal. 5th at 959); *Blair*, 928 F.3d at 829 (quoting *Concepcion*, 563 U.S. at 348) ("Nothing in the *McGill* rule requires a 'switch from bilateral ... arbitration' to a multi-party action.").

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.