# EXHIBIT 1 & 11
## Report Part 1
## (Dkt No. 450.01 & 454.11)

## REDACTED



SECRETARIAT ADVISORS, LLC
858.876.9101
secretariat-intl.com

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| **IN RE: VALVE ANTITRUST LITIGATION** | Case No. 2:21-cv-00563-JNW<br><br>**REBUTTAL MERITS EXPERT REPORT OF**<br>Steven Schwartz, Ph.D. |

Steven Schwartz, Ph.D.

April 25, 2025

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# Summary of Contents

1.   Introduction ........................................................................................................................ 1

2.   Summary of Conclusions ................................................................................................. 8

3.   Market Definition ............................................................................................................ 10

4.   Monopoly Power ............................................................................................................. 50

5.   Competitive Harm .......................................................................................................... 69

6.   Steam Keys ..................................................................................................................... 118

7.   Yardstick and Empirical Approaches ......................................................................... 132

8.   Platform Competition Model ....................................................................................... 151

9.   Damages ......................................................................................................................... 180

10.  Dr. Langer Fails to Follow Her Own "Standards" ................................................... 217

# Table of Contents

1.  Introduction .................................................................................................................1
   1.1.  Assignment ..........................................................................................................1
   1.2.  Overview of Schwartz Merits Reports .........................................................4
       1.2.1.  Schwartz Opening Merits Report ......................................................4
       1.2.2.  Schwartz Supplemental Opening Merits Report ............................5
       1.2.3.  Schwartz Response Merits Report .....................................................6
2.  Summary of Conclusions ..........................................................................................8
3.  Market Definition .......................................................................................................10
   3.1.  Overview .............................................................................................................10
       3.1.1.  Schwartz market definition ................................................................10
       3.1.2.  Overview of Dr. Chiou's market definition .....................................11
   3.2.  Responses to broader critiques ....................................................................12
   3.3.  First-party platforms and distribution are not sufficiently viable substitutes for third-party distribution to broaden the relevant market ................................................16
       3.3.1.  Dr. Chiou does not present sufficient evidence of publisher substitution ............17
       3.3.2.  Dr. Chiou does not present sufficient evidence of user substitution ..................23
       3.3.3.  A market definition analysis must consider the *Cellophane* fallacy ..................24
       3.3.4.  Multihoming is not evidence of substitution .................................27
       3.3.5.  Minecraft and Roblox should be excluded from the relevant market ...................28
       3.3.6.  Evidence presented by Dr. Chiou does not demonstrate competition between firms of differing ownership structures in the video game industry ......................30
       3.3.7.  Dr. Gowrisankaran mischaracterizes my analysis of first-party distribution platforms .....................31
   3.4.  Console platforms are not viable substitutes for third-party distribution .........................32
   3.5.  Subscription services are not viable substitutes for third-party distribution ....................36
   3.6.  Cloud gaming platforms are not viable substitutes for third-party distribution .............39
   3.7.  Non-gameplay platforms and third-party key resellers are not part of the relevant market ......40
   3.8.  Physical distribution is not a viable substitute for third-party distribution .......................42
   3.9.  Dr. Chiou's market size analysis is overinclusive and unreliable ...........................43
       3.9.1.  Dr. Chiou uses inappropriate data for her market share analysis ..........................43
       3.9.2.  Dr. Chiou ignores evidence produced in this case that supports that Steam has a high market share in a properly defined relevant market ......................43
       3.9.3.  Dr. Chiou inappropriately critiques my market share analysis and calculation ...44
       3.9.4.  Dr. Gowrisankaran's critiques of my market share calculation are incorrect ........48
4.  Monopoly Power ........................................................................................................50

4.1.    Valve entered the relevant market with monopoly power.........................................................50

4.2.    Steam is a critical distribution channel for publishers..............................................................55

4.3.    Valve's innovations and quality in the real world do not preclude illegal maintenance of monopoly power...................................................................................................................60

4.4.    Mr. Schroeder's critiques have no impact on my analysis of Valve's persistent and high profitability on Steam ......................................................................................................64

5.    Competitive Harm ............................................................................................................................69

    5.1.    Valve's PMFN Policy..............................................................................................................69

    5.2.    Valve's enforcement of its PMFN Policy .............................................................................69

        5.2.1.    Selective and targeted enforcement is all that is required to have competitive impact.........................................................................................................................69

        5.2.2.    Dr. Gowrisankaran ignores Valve's own communication and enforcement of its PMFN Policy..............................................................................................................73

        5.2.3.    Dr. Gowrisankaran's enforcement analysis does not show a lack of enforcement...............................................................................................................77

    5.3.    Valve's PMFN Policy harms competition .............................................................................91

        5.3.1.    Valve's PMFN Policy is a barrier to platform entry and growth ...............................91

        5.3.2.    Dr. Gowrisankaran's pricing analysis does not show that the PMFN Policy has no effect on competition........................................................................................101

        5.3.3.    Dr. Gowrisankaran's pricing analysis relating to EGS does not provide insight into a but-for world without a PMFN Policy..................................................114

6.    Steam Keys .....................................................................................................................................118

    6.1.    Steam Keys would be provided in the but-for world .........................................................118

        6.1.1.    Steam Keys are a tool Valve uses to create stickiness that bolsters its monopoly power........................................................................................................121

        6.1.2.    Steam Keys do not and would not lead to significantly increased free riding .123

    6.2.    Claimed effective revenue share does not exist ................................................................125

        6.2.1.    Steam Keys are a feature and are unrelated to the commission rate..................127

        6.2.2.    Dr. Langer's effective commission rate analysis is flawed ................................128

7.    Yardstick and Empirical Approaches.............................................................................................132

    7.1.    Yardstick approach............................................................................................................132

        7.1.1.    The benchmarks identified in my Opening Merits Report are reasonable and appropriate..........................................................................................................132

        7.1.2.    Dr. Langer's supposed "more direct potential benchmark firms" are inappropriate benchmarks.................................................................................137

    7.2.    Empirical approach............................................................................................................140

8.    Platform Competition Model .........................................................................................................151

    8.1.    Overview...........................................................................................................................151

    8.2.    Dr. Langer misrepresents fundamentals of the PCM..........................................................153

        8.2.1.    The PCM rightly assumes a PMFN exists to assess the challenged conduct.....153

8.2.2. The PCM correctly shows that the impact of Valve's PMFN Policy is to increase platform fees irrespective of its market share, costs, or platform fee ..................159

8.2.3. I do not claim that PMFN policies can never have procompetitive effects........162

8.3. Dr. Langer sets the unreasonable standard that a model perfectly reflects the real world ..................................................................................................................167

8.3.1. Using a single publisher, a single game, and two platforms does not drive the result ....................................................................................................................168

8.3.2. Differences in quality and network effects are accounted for in the PCM .........169

8.4. Dr. Langer's criticisms of the PCM predictions are misguided ............................171

8.4.1. High marginal costs are a result of a reasonable simplification............................171

8.4.2. Dr. Langer incorrectly applies the PCM to individual publishers and to accounting profits .............................................................................................172

8.5. Dr. Langer's discussion of precision with respect to the PCM is misguided..................175

8.6. Academic literature shows that PMFN policies harm competition....................................177

9. Damages .........................................................................................................................................180

9.1. My but-for revenue share equation is based on the challenged conduct and fits the facts of the case..................................................................................................180

9.1.1. My damages model is designed to measure – not explain – but-for market power................................................................................................................180

9.1.2. My damages model is built upon and applies the facts of the case....................183

9.1.3. My damages model accurately models the video game industry ........................189

9.1.4. Dr. Langer's extrapolation is inappropriate................................................................195

9.2. The market shares used in my damages model are reliable ............................................199

9.2.1. My estimate of but-for market shares considers a world without the alleged conduct....................................................................................................................199

9.2.2. Damages are not sensitive to changes in Steam's but-for market share...........201

9.2.3. Dr. Langer's example demonstrates a lack of understanding of market definitions................................................................................................................202

9.3. Pass-through........................................................................................................................203

9.3.1. Pass-through estimates are reliable..............................................................................205

9.3.2. Variation in observed price changes does not imply extreme pass-through rates and does not impact my damages analysis.......................................214

10. Dr. Langer Fails to Follow Her Own "Standards"....................................................................217

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# Table of Rebuttal Appendices

| Section A | Weak PMFN Analysis Appendix |
|---|---|
| Rebuttal Appendix A.1 | Introduction and Overview |
| Rebuttal Appendix A.2 | Solving the Publisher's Problem |
| Rebuttal Appendix A.3 | Solving the Platforms' Problem |
| Rebuttal Appendix A.4 | Comparing to Regular PMFN Solution |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# Table of Rebuttal Attachments

Section A      Expert Materials

Rebuttal Attachment A-1      Curriculum Vitae of Steven Schwartz, Ph.D.

Rebuttal Attachment A-2      Materials Considered


Section B      Relevant Market Definition

Rebuttal Attachment B-1      Video Game Platforms from Gowrisankaran Report


Section C      Profitability Analysis

Rebuttal Attachment C-1      Adjusted Valve Operating Profits and Commissions by Year, 2009–2023


Section D      EGS Analysis Validation

Rebuttal Attachment D-1      Validation of Games Present in Dr. Gowrisankaran's Analysis of Games "Off-Steam"

Rebuttal Attachment D-2      Steam Transaction Date Range vs. EGS Price Date Ranges from Dr. Gowrisankaran's "Off-Steam" Pricing Analysis


Section E      Yardstick Approach

Rebuttal Attachment E-1      Airbnb Financials (2018–2023)

Rebuttal Attachment E-2      Etsy Financials (2018–2023)

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# 1.    Introduction

## 1.1.    Assignment

(1)    Secretariat Advisors, LLC ("Secretariat"),[1] has been retained by Plaintiffs' Counsel on behalf of Wolfire Games, LLC ("Wolfire"), Dark Catt Studios Holdings, Inc. ("DCS Holdings"), Dark Catt Studios Interactive LLC ("DCS Interactive") (together with DCS Holdings, "Dark Catt"), and a class of Plaintiffs (together, "Plaintiffs") in the above-captioned litigation against Valve Corporation ("Valve").[2]    On November 25, 2024, the Court granted Plaintiffs' motion for class certification.[3]    The class is defined as follows:[4]

> All persons or entities who, directly or through an agent, paid a commission to Valve in connection with the sale or use of a game on the Steam platform between January 28, 2017 and November 25, 2024 (the "Class Period"), and where either (1) the person or entity was based in the United States and its territories or (2) the game was purchased or acquired by a United States-based consumer during the Class Period. Excluded from the Class are (a) Defendant, its parents, subsidiaries, affiliate entities, and employees, and (b) the Court and its personnel.

(2)    On January 27, 2025, I submitted an expert report (herein referred to as my "Opening Merits Report" or the "Schwartz Opening Merits Report").[5]    Assuming the existence of the PMFN Policy

---

[1]    I was previously employed by Intensity, LLC ("Intensity"). On February 1, 2023, Intensity was acquired by Secretariat International and began operating as Intensity, a Secretariat Company. On January 1, 2024, my employment was transferred to Secretariat Advisors.

Secretariat is currently being compensated at a rate of $1,100 per hour for my work in this matter. Prior to January 2024, Intensity was compensated at an hourly rate of $1,050. Secretariat is being compensated for time spent by others on my team at rates that are lower than my hourly rate. Secretariat's compensation is not dependent on either my conclusions, the substance of my testimony, or the outcome of this matter.

[2]    As discussed in my Opening Report, the game "developer" and game "publisher" serve different functions, whether those functions are accomplished by a single entity or multiple ones, that is sometimes a single company undertakes both functions. In this report, the terms are used interchangeably (unless otherwise noted) to describe the entity that is actually paying the Steam commissions to Valve and are part of the putative class. See:

Opening Merits Report of Steven Schwartz, Ph.D. ("Schwartz Opening Merits Report"), 1/27/2025, fn. 47.

[3]    Order, 11/25/2024, at 26. ("[T]he Court GRANTS Plaintiffs' motion for class certification[.]")

[4]    On April 21, 2025, the class certification definition and period from the November 2024 order was amended. See:

Order Amending Class Period, Granting Publisher Class Plaintiffs' Motion for Order Approving Notice Of Class Certification, and Entry of Notice Schedule, 4/21/2025, at 1–2.

Order, 11/25/2024, at 26.

[5]    Schwartz Opening Merits Report, 1/27/2025.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

as alleged by Plaintiffs, I was asked to evaluate and, if called upon, to testify concerning the following issues:

- What is the relevant antitrust market and what is Valve's market power in that relevant market?
- Has there been class-wide impact from Valve's conduct on class members?
- What are class-wide damages?

(3)     On March 7, 2025, I prepared a supplemental expert report (herein referred to as my "Supplemental Opening Merits Report" or the "Schwartz Supplemental Opening Merits Report").[6]  I was asked to update the analyses affected by supplemental data produced by Valve and any calculations that are similarly affected.  On February 14, 2025, Valve produced additional profit and loss data covering 2022 and 2023 that affect various analyses set forth in my Opening Merits Report.[7]

(4)     On March 26, 2025, I prepared a responsive expert report (herein referred to as my "Response Merits Report" or the "Schwartz Response Merits Report").[8]  I was asked to evaluate and respond to the analyses set forth in the Expert Report of Gautam Gowrisankaran, Ph.D (the "Gowrisankaran Opening Report"), which was submitted on January 27, 2025 on behalf of Valve Corporation ("Valve").[9]

(5)     I prepared and submitted several reports during the class certification phase of this litigation.[10] To the extent any analysis, information, and citations are not reflected in this report, they are incorporated by reference.

---

[6]     Supplemental Opening Merits Report of Steven Schwartz, Ph.D. ("Schwartz Supplemental Opening Merits Report"), 3/7/2025.

[7]     The additional data were produced in the same format as Valve's previously produced financials.  See Section 1.2.2.

[8]     Response Merits Expert Report of Steven Schwartz, Ph.D. ("Schwartz Response Merits Report"), 3/26/2025.

[9]     Expert Report of Gautam Gowrisankaran, Ph.D. ("Gowrisankaran Opening Report"), 1/27/2025.

[10]    Class Certification Expert Report of Steven Schwartz, Ph.D. ("Schwartz Opening Class Certification Report"), 2/8/2024.

I note that on March 21, 2024 I submitted a corrected version of my Opening Class Certification Report along with errata. For purposes of my Rebuttal Report, I incorporate those edits into my originally submitted report and reference my February 8, 2024 submission throughout.  See:

Corrected Class Certification Expert Report of Steven Schwartz, Ph.D., 3/21/2024.

Reply Class Certification Expert Report of Steven Schwartz, Ph.D. ("Schwartz Reply Class Certification Report"), 7/12/2024.

Surreply Class Certification Expert Report of Steven Schwartz, Ph.D. ("Schwartz Surreply Class Certification Report"), 9/9/2024.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(6)     I have since been asked to evaluate and respond to the respective expert reports of Lesley Chiou, Ph.D. ("Chiou Rebuttal Merits Report"), Ashley Langer, Ph.D. ("Langer Rebuttal Merits Report"), Gautam Gowrisankaran, Ph.D (the "Gowrisankaran Rebuttal Merits Report"), and R. Harold Schroeder ("Schroeder Rebuttal Merits Report"), which were submitted on March 26, 2025 on behalf of Valve (collectively, the "Defendant's Expert Merits Reports"), in response to my Opening Merits Report.[11]

(7)     This rebuttal report sets forth my analysis of and conclusions about the opinions set forth in the Defendant's Expert Merits Reports, based on my analysis to date. Specifically, this report sets forth responses to critiques, adjustments, and commentary presented in the Defendant's Expert Merits Reports.

(8)     In forming the opinions expressed in this report, I relied on my education, experience, and knowledge of the subjects discussed. An updated version of my curriculum vitae and list of my prior expert testimony is set forth in Rebuttal Attachment A-1. In addition to the materials I relied on in preparation of my Opening Report, I also rely on materials which are listed in the materials considered to my previous reports and/or cited herein and/or listed in Rebuttal Attachment A-2 to this report.

(9)     My analysis is ongoing, and my conclusions are based on information currently available to me. If any additional information or testimony—including from any of the other experts in this matter—become available to me, I reserve the right to consider such information and to supplement this report and my opinions, as appropriate. I also reserve the right to supplement my report based on any additional fact discovery, analysis and opinions set forth by other experts, and/or trial testimony, and to respond to other experts and the testimony of any fact witnesses.

(10)    In addition, should I be asked to testify to my opinions at the trial of this matter, I reserve the right to prepare exhibits that summarize portions of my analysis and my opinions and to prepare demonstrative exhibits that help to explain elements of my analysis and opinions. I have yet to select any exhibits I may ultimately use. In addition, I reserve the right to use

---

[11]    Merits Expert Report of Lesley Chiou, Ph.D. ("Chiou Rebuttal Merits Report"), 3/26/2025.

Expert Report of Ashley Langer, Ph.D. ("Langer Rebuttal Merits Report"), 3/26/2025.

Expert Rebuttal Report of R. Harold Schroeder ("Schroeder Rebuttal Merits Report"), 3/26/2025.

Rebuttal Merits Expert Report of Gautam Gowrisankaran, Ph.D. ("Gowrisankaran Rebuttal Merits Report"), 3/26/2025.

animations, demonstratives, enlargements of actual attachments, and other information to help me convey my opinions.

(11)    The entirety of my Opening Merits Report, Supplemental Opening Merits Report, Response Merits Report, and this rebuttal report, including attachments, backup materials, and referenced/considered materials, supplies the basis for my analysis and conclusions to date. The organizational structure of this report is for convenience.    To the extent that facts, economic analysis, and other considerations overlap, I generally discuss such issues only once for the sake of brevity.    Neither the specific order in which each issue is addressed nor the organization of my report or attachments affects the outcome of my analysis.

## 1.2.    Overview of Schwartz Merits Reports

### 1.2.1.    Schwartz Opening Merits Report

(12)    A summary of some of my principal conclusions from my Opening Merits Report is set forth below:[12]

 a.    Plaintiffs allege that Valve's pricing and content policies function as a platform most favored nation policy ("PMFN Policy"), and I assume Plaintiffs' allegations of Valve's conduct to be true.    I have reviewed documents and testimony in the record that are consistent with Plaintiffs' allegations, making this assumption reasonable. I also conduct an analysis on the effectiveness of the alleged policy, as described by Plaintiffs.    Valve enforces the PMFN Policy on both pricing and content, including by delisting titles from Steam that do not adhere to the PMFN Policy, and my analysis of the data, documents, and testimony shows that the alleged policy is effective.

 b.    The relevant antitrust market for purposes of my analysis is a worldwide market for third-party digital personal computer ("PC") game distribution via platforms.    This is a two-sided market.

 c.    Valve has monopoly power in the relevant market, evidenced by its high and sustained market share, high and sustained profitability, and Valve-imposed barriers to entry to the market through the PMFN Policy, all of which allow Valve to charge a supracompetitive rate to publishers.

 d.    Valve's exercise of its monopoly power—through its alleged enforcement of the PMFN Policy—harms competition in the market, by enabling Valve to deter entry and/or reduce the ability of potential platforms to compete, set and sustain supracompetitive prices, reduce output, and reduce variety, choice, and innovation in the market.    The degree and

---

[12]    Schwartz Opening Merits Report, 1/27/2025, § 2.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

extent of Valve's PMFN Policy, monitoring, and enforcement efforts ensure that the alleged policy is effective at blunting competition from alternative PC game distribution platforms.

e. Valve's exercise and maintenance of its monopoly power harms class members, *i.e.*, the publishers listing their games on Steam.

f. Absent the PMFN Policy, vigorous competition would exist within the market, leading to lower, more competitive commission rates for all or virtually all class members. This conclusion is supported by analyses based on several different analytical methods, including: (1) my Platform Competition Model; (2) my yardstick analysis; and (3) my empirical analysis. My Landes and Posner model—used for estimating damages—further confirms my conclusion that all or virtually all class members are harmed.

g. Absent the PMFN Policy, the lower commission rates would result in publishers passing through some savings to consumers in the form of lower game prices. Lower fees to publishers and lower prices to users result in a net lower price across the platform.

h. Absent the PMFN Policy, the but-for commission rate would be 17.5%, resulting in class-wide damages of between $3.1 billion and $3.9 billion. Note that these values were later updated in my Supplemental Opening Merits Report to reflect additional financial information produced by Valve. See Section 1.2.3 below.

### 1.2.2.   Schwartz Supplemental Opening Merits Report

(13) On February 14, 2025, Valve produced updated profit and loss data, which covers calendar years 2022 and 2023 and supplements the data provided previously. These new documents (VALVE_ANT_2977107–10) are in the same format as the 2003 through 2021 data provided in the earlier production (VALVE_ANT_2755012–15). I understand that Valve's original and updated profit and loss data are not kept in this produced form in the ordinary course of business and that the documents provided by Valve were prepared for purposes of this litigation.

(14) While the opinions set forth in my Opening Merits Report do not change as a result of this additional profit and loss data provided by Valve, this new information affects several quantitative analyses and calculations. I provide a summary of the changes calculated in my Supplemental Opening Merits Report below:[13]

---

[13]   Schwartz Supplemental Opening Merits Report, 3/7/2025, § 1.2.

Results for my updated PCM numeric analysis using the adjusted inputs are provided in Schwartz Supplemental Opening Merits Report Section 4 and Supplemental Appendix C.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Summary of Updated Calculations from Schwartz Supplemental Opening Merits Report**

| Description | Opening Merits Report | Supplemental Merits Report |
|---|---|---|
| Valve's gross profit margin, 2017–2021/2023 | | |
| Valve's operating margin, 2017–2021/2023 | | |
| Steam's market share | | |
| Market size | | |
| Steam's quantity for PCM ($q_1^2$) | | |
| EGS's quantity for PCM ($q_2^2$) | | |
| Valve's cost percentage,[14] 2017–2021/2023 | | |
| Valve's Lerner Index | | |
| Valve's firm elasticity of demand for distribution services | | |
| But-for effective commission rate | 17.51% | 17.05% |
| Damages range – lower bound | $3.1 billion | $3.3 billion |
| Damages range – upper bound | $3.9 billion | $4.1 billion |

### 1.2.3.  Schwartz Response Merits Report

(15)   On March 26, 2025, I submitted a report (the "Schwartz Response Merits Report") in reply to the Expert Report of Gautam Gowrisankaran, Ph.D. (the "Gowrisankaran Opening Report"), which was submitted on January 27, 2025 on behalf of Valve.[15]  A summary of the principal conclusions from my Response Merits Report are provided below:

a.   Dr. Gowrisankaran's arguments concerning the procompetitive impact of Steam are flawed because: (1) he does not weigh any alleged procompetitive benefits with any anticompetitive effects;[16] (2) he ties his discussion of procompetitive benefits to an

---

[14]   As noted in my Opening Merits Report and this report, the cost percentage I use from Valve's financials is the cost of sales plus total operating expenses plus taxes as percentage of transaction value.

[15]   Schwartz Response Merits Report, 3/26/2025.

   Gowrisankaran Opening Report, 1/27/2025.

[16]   Schwartz Response Merits Report, 3/26/2025, § 2.1.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

improperly defined and overly broad market;[17] and (3) he does not consider whether the alleged procompetitive benefits were dependent on or connected to the PMFN Policy.[18]

b.  Dr. Gowrisankaran's discussion of free-riding and showrooming is flawed because (1) the literature he cites does not support his conclusions;[19] (2) he has only hypothetical opinions and so cannot prove that the PMFN Policy is necessary for Valve to maintain the Steam features he alleges it protects;[20] (3) the marketing features he claims the PMFN Policy protects would continue to exist but-for the PMFN Policy;[21] and (4) there are less restrictive measures than a PMFN Policy Valve could use to mitigate showrooming on Steam.[22]

c.  Dr. Gowrisankaran's arguments regarding Steam Keys are flawed because Steam Keys are a feature offered by Valve, are controlled/restricted by Valve, and provide benefits to Valve.[23]  Steam Keys would exist in the but-for world and offer only trivial procompetitive benefits in the real world.[24]

---

[17]    Schwartz Response Merits Report, 3/26/2025, § 2.2.

[18]    Schwartz Response Merits Report, 3/26/2025, § 2.3.

[19]    Schwartz Response Merits Report, 3/26/2025, § 3.1.

[20]    Schwartz Response Merits Report, 3/26/2025, § 3.2.

[21]    Schwartz Response Merits Report, 3/26/2025, § 3.3.

[22]    Schwartz Response Merits Report, 3/26/2025, § 3.4.

[23]    Schwartz Response Merits Report, 3/26/2025, § 4.

[24]    Schwartz Response Merits Report, 3/26/2025, § 4.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## 2.    Summary of Conclusions

(16)    A summary of some of my principal conclusions is set forth here:

a.    Dr. Chiou's suggestions that I improperly excluded first-party platforms and distribution, console games, subscription services, cloud gaming platforms, non-gameplay platforms (including third-party key resellers), physical retail distribution, and regional platforms from the relevant market are incorrect and based on a flawed, incomplete, and unreliable analysis.

b.    Dr. Chiou's critiques of my market size and market share analyses are incorrect. Dr. Chiou's own market size and market share analyses are based on inappropriate data and ignore economic evidence produced in this case. Her market size and market share estimates are improper.

c.    Dr. Gowrisankaran's argument that Valve did not and does not have monopoly power in the relevant market is incorrect. There is ample evidence of Valve's monopoly power. Further, Dr. Gowrisankaran incorrectly asserts that Steam is not a critical channel for publishers, and that Valve's innovations/quality in the real world do not preclude illegal maintenance of Valve's monopoly power using the PMFN Policy.

d.    Mr. Schroeder's criticisms are irrelevant to the analysis performed in my Opening Merits Report.

e.    Dr. Gowrisankaran's arguments that Valve's PMFN Policy has not resulted in widespread price parity are misguided. There is ample evidence both of the existence of the PMFN Policy and of Valve's enforcement of that policy. His enforcement analyses, disconnected from Valve's communication and enforcement of its PMFN Policy, are unreliable. His analysis fails to show that Valve's enforcement of the PMFN Policy has no impact on publisher pricing behavior or platform competition.

f.    Dr. Gowrisankaran's pricing analyses contain multiple flaws that render them misleading and unreliable. His assumptions underlying these analyses are not grounded in the facts of this case or in economic principles. His analysis cannot show the effect of the PMFN Policy nor its impact on competition.

g.    Valve's PMFN Policy harms competition in the marketplace. Despite Dr. Gowrisankaran's claims, the evidence shows that the PMFN Policy creates a barrier to potential competing platform entry and growth, harming competition in the relevant market.

h.    Dr. Gowrisankaran's arguments that Valve would not offer Steam Keys in the but-for world are incorrect. He ignores that Valve derives benefits from Steam Keys and would be incentivized to offer Steam Keys in the but-for world. He fails to recognize that Valve has tools to use in the face of any publisher abuse of Steam Keys that would mitigate publisher free-riding. Dr. Gowrisankaran's and Dr. Langer's effective commission rate arguments and analyses do not make economic sense and utilize unreliable assumptions.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

i. Dr. Langer's critiques of my yardstick and empirical approaches are incorrect. My yardstick and empirical approaches are well-supported analyses that demonstrate class-wide harm. Dr. Langer's critiques are based on analyses that are flawed and unreliable.

j. Dr. Langer's critiques of my Platform Competition Model ("PCM") are incorrect. Dr. Langer misrepresents the fundamentals of the PCM, leading to errors in her analysis. Dr. Langer points out instances where the PCM differs from reality as *prima facie* criticisms of the PCM. This contradicts her economic logic and own statements that models must simplify the real world. Moreover, I show these differences do not impact my conclusions.

k. Dr. Langer's critiques of my damages model are misguided and incorrect. Throughout her report, Dr. Langer routinely misapplies my model to arrive at incorrect conclusions regarding its reliability. I demonstrate that my model is in fact reliable. It accurately measures the price markup as a result of the PMFN Policy; it applies sound economic models; it relies on sound economic reasoning; and it accurately represents the PC game industry.

l. Dr. Langer misrepresents my pass-through analysis and advances the false claim that my analysis is unreliable. I demonstrate that my pass-through analysis is not only reliable, but it also reasonably accounts for data limitations resulting from the PMFN Policy and accounts for variation in observed price changes using well-established measures defined in the literature.

m. Dr. Langer's "standards" should be viewed as no more than a convenient way to try to critique my analysis. Apparently, however, these standards are not something to which Dr. Langer is beholden, as her Steam Keys effective revenue share model violates each of her standards.

# 3.    Market Definition

## 3.1.    Overview

### 3.1.1.    Schwartz market definition

(17)    In Section 4 of my Opening Merits Report, I define the relevant antitrust market in this case by focusing on the fundamental question in a market definition analysis: what is the set of products to which customers can and do readily turn as reasonable substitutes for the product at issue in response to a change in the relative price of goods?

(18)    I define the candidate market as the market for third-party digital PC game distribution via platforms. This term describes a platform that allows PC game publishers—specifically publishers other than the platform operator—to digitally distribute and sell games. It is appropriate to use the market for third-party digital PC game distribution via platforms as the candidate market because Steam provides third-party digital PC game distribution and the allegations in this matter pertain to the effects of Valve's anticompetitive conduct on third-party developers (which then also impact users of the games offered by those developers). Third-party platforms host both relevant parties (*i.e.*, developers and users) and facilitate interaction and transactions between them. Further, as discussed in my Opening Merits Report, Valve and external sources consider third-party digital PC game distribution platforms to be Steam's competitors.[25]

(19)    Next, I evaluate whether any of the distribution methods at the borders of this candidate market are a feasible and reasonable alternative for publishers *and* users, in response to a hypothetical change in prices in the candidate market relative to other distribution methods. As noted in my Opening Merits Report, "potential substitutable options for publishers and gamers must allow for the facilitation of these transactions between PC game publishers *and* PC game players."[26] This means a proper relevant market analysis must consider behavior on both sides of the market. In my analysis, I assess a combination of factors and evidence in the context of this case for each potential substitute from both sides of the market.

---

[25]    Schwartz Opening Merits Report, 1/27/2025, ¶¶ 63–64.

[26]    Schwartz Opening Merits Report, 1/27/2025, ¶ 69. (Emphasis added.)

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(20)    For publishers, the product at issue is access to the platform to distribute their games. Therefore, it is relevant and important to consider if publishers view a particular distribution method as substitutable with third-party digital PC game distribution. On the other side of the platform, users seek to acquire games (and various in-game features), and as such, it is relevant and important to consider how users may substitute between the various outlets that distribute games for user consumption and gameplay. Any hypothetical substitution, of course, would need to occur in response to a small but significant non-transitory price increase for the third-party digital PC game distribution relative to other distribution methods.[27]

(21)    I conclude that the relevant antitrust market for this case is the market for third-party digital PC game distribution via platforms.[28] Given a small but significant non-transitory increase in price on third-party platforms, other PC game distribution alternatives (*e.g.*, distribution via first-party platforms, distribution through non-gameplay platforms, physical storefronts, PC game subscriptions, or cloud gaming platforms) and non-PC game distribution options (*e.g.*, distribution through consoles or mobile devices) would not be sufficiently strong substitutes for both sides of the platform (*i.e.*, publishers and users) such that the price increase would be unprofitable.[29] As such, the relevant market is no broader than third-party digital PC game distribution. See Section 4.1.3 of my Opening Merits Report for a detailed discussion on the exclusion of each of these alternatives from the relevant market defined for this case.

### 3.1.2.    Overview of Dr. Chiou's market definition[30]

(22)    Dr. Chiou opines that Valve competes with all digital PC distribution, consoles, multi-game subscriptions, cloud gaming, and physical distribution, and that these distribution methods should be included in the relevant market.[31] To support her analyses of these distribution methods, Dr. Chiou relies on an incorrect determination of how to analyze both sides of the

---

[27]    U.S. Department of Justice and Federal Trade Commission, "Merger Guidelines," 12/18/2023, § 4.3. ("Another common method employed by courts and the Agencies is the hypothetical monopolist test. This test examines whether a proposed market is too narrow by asking whether a hypothetical monopolist over this market could profitably worsen terms significantly, for example, by raising price.")

[28]    Schwartz Opening Merits Report, 1/27/2025, § 4.1.2.

[29]    It is important to understand that this does not mean that there is *no* substitution between the candidate product and alternatives. There may be. But, in any event, whatever substitution does occur is not substantial enough to make the triggering price increase unprofitable. This important point is missed by Dr. Chiou in her market definition analysis and by Valve's experts generally.

[30]    Chiou Rebuttal Merits Report, 3/26/2025.

[31]    Chiou Rebuttal Merits Report, 3/26/2025, §§ 5–8.

---

market, incorrectly defines the product at issue, and incorrectly interprets multihoming, among other issues.[32]  I disagree with Dr. Chiou's reasoning and ultimate conclusions.  In the sections that follow, I discuss why Dr. Chiou's analysis is misguided and why the conclusions I outlined in my Opening Merits Report are correct.

## 3.2.    Responses to broader critiques

(23)    The fundamental elements of Dr. Chiou's market definition analysis are flawed and her analysis is inadequate as an economic matter.  These flaws result in an incorrect market definition that is overly broad and insufficiently connected to the facts of this case and the realities of the PC video game distribution market.

(24)    Dr. Chiou opines that "[t]he product at issue in this case is [] the match between a video game user and a publisher" and "the relevant substitutes for Steam are other distribution channels where users and publishers can match."[33]  Dr. Chiou states that "[p]roperly defining the product at issue shows that an alternative platform could be a substitute to Steam if it facilitates matches between users and publishers, regardless of the number of publishers or users that already match on that platform."[34]  This is overly simplistic.  While a two-sided platform serves to match participants on either side of the platform, that does not mean that any channel in which video games are used or sold are substitutes at all, much less sufficiently close substitutes to be in the relevant market.[35]

---

[32]    See Section 3.2 for further discussion.

[33]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 76.

[34]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 77.

[35]    By Dr. Chiou's definition of the product of issue and the relevant substitutes (which, as stated above, are incorrect), mobile gaming should also be included in her relevant market.  Mobile app stores, such as the Google Play Store and the Apple App Store, match and facilitate transactions between users and game developers.  Dr. Chiou does not evaluate whether mobile gaming is in her relevant market.

However, in a 2021 letter brief in the *Epic Games, Inc. v. Apple Inc.* matter, Valve made it clear that it does not "compete in the mobile market[,]" and "Steam users cannot buy or use mobile apps on Steam[;]" rather, "Steam [is] an online platform that lets users purchase and play PC games on their laptops and desktops."  In addition, Valve stated that "Apple, Google and Samsung compete with each other in the mobile app market.  Valve does not compete in that market."  Dr. Chiou's definitions of the product of issue and the relevant substitutes that should lead her to include mobile gaming in her relevant market directly contradict Valve's own characterization of its competitors and its recognition that there are distinctions between video game distribution platforms and the services and features that they provide to publishers and users.  Clearly, Dr. Chiou's market definition analysis is fundamentally flawed and incomplete by her own definition of her product at issue.  See:

*Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR, Joint Discovery Letter Brief Regarding Apple's Subpoena to Non-Party Valve Corporation, at 5, 6 (N.D. Cal. February 18, 2021), available at Chris Schenck, Dep. Tr., 12/8/2023, Exhibit 382.

Chiou Rebuttal Merits Report, 3/26/2025, fn. 22

(25)  Rather, a proper analysis under the Hypothetical Monopolist Test ("HMT") requires those products to be *sufficiently close substitutes* that enough purchasers, given a small but significant non-transitory increase in price, would switch away from the product to the other product such that the price increase would be unprofitable. If an insufficient number of customers make that switch, and a price increase for one of the products is profitable, the two products are not close enough substitutes to be in the same market. Simply looking at where publishers and users can match, as Dr. Chiou does, does not consider the preferences and behavior of users and publishers, observed evidence of the fact and extent of substitution in the marketplace in response to changing relative prices, or the constraints on users or publishers that can prevent substitution.

(26)  Dr. Chiou agrees with me that Steam is a two-sided platform and that the market definition analysis must consider *both* sides of the platform (*i.e.*, publishers and users).[36] However, despite incorrectly claiming that "the overwhelming majority of [my] market definition analysis considers only publishers[,]"[37] Dr. Chiou does not herself properly account for both sides of the market in her analysis. Behavior on both sides of the market is relevant and behavior on one side alone cannot determine whether a distribution method should be *included* in the relevant market. Similarly, finding that one side of the market does *not* view a distribution method as a sufficiently close substitute is sufficient to *exclude* that method from the relevant market. That is, it is impossible as an economic matter for a distribution method to be included in the market if enough users *or* publishers find it to be an unfeasible alternative.

(27)  In my analysis, I *do* discuss substitutability—sufficient substitutability in the context of an antitrust market definition analysis—for both users and publishers. However, in certain cases, a distribution avenue may be more substitutable for one side of the market and may not be a substitute at all for the other. In these cases, my analysis is sufficient to show where exclusions should be made, whether the exclusion stems from lack of sufficient substitutability on one side of the market or the other (and certainly when from both).[38]

---

See Section 4.1.3 of the Schwartz Opening Merits Report for further discussion of why mobile gaming is excluded from the relevant market.

[36]  Schwartz Opening Merits Report, 1/27/2025, ¶ 59.

Chiou Rebuttal Merits Report, 3/26/2025, ¶ 63.

[37]  Chiou Rebuttal Merits Report, 3/26/2025, ¶ 83.

[38]  Put differently, and to avoid any confusion, if Product B is not a sufficiently close substitute to render a price increase for Product A unprofitable on one side of the platform, the analysis stops there.

---

(28) As described in Section 3.1, the correct focal product at issue is access to a game distribution platform, resulting in transactions between publishers and users facilitated through the platform. It should be noted that it is not appropriate to consider *any* transaction or interaction between a publisher and a user to be in the same market, as Dr. Chiou suggests. To analyze the scope of the relevant market correctly, it is necessary to look at the full extent of offerings, services, and features provided by a platform to determine comparability and potential substitutability. For users, in assessing the strength of potential substitution relationships, it is important to consider, for example, a user's existing game library, the breadth of offerings currently provided by a platform, expected changes to those offerings, and platform features beyond the purchase of individual games. For publishers, substitutability should be viewed considering the economic feasibility of reducing engagement with one platform (and the user base and services it provides) in favor of another distribution method. It is incorrect to consider substitutability through, for example, the lens of availability of individual games, game availability on individual days, or one-off business decisions or opportunities (such as acquisitions) that change the standing of individual games. Dr. Chiou, and for that matter, Dr. Gowrisankaran, make those mistakes repeatedly in their market definition discussions throughout their reports.[39]

(29) Dr. Chiou's flawed analysis mistakenly equates multihoming with substitution and, by extension, defines a relevant market that necessarily includes the multihomed platforms. That is incorrect. Dr. Chiou states:[40]

> Multihoming by publishers and users across platforms facilitates substitution across different channels. If, for example, a publisher lists its game on both a PC and console platform, and a user interested in the game uses both platforms, then the match between the publisher and the user can happen on either platform. The same is true if the publisher lists the game on its own vertically integrated PC platform as well as another PC platform operated by a different firm.

(30) Dr. Chiou's analysis is incorrect as a matter of economics. The multihoming behavior she references cannot define a relevant market. The issue is not where a user decides to purchase an individual game or whether they use different means to acquire and play games. Rather,

---

[39]    See, for example:

Chiou Rebuttal Merits Report, 3/26/2025, ¶¶ 23, 93, 101, 151–153, 179.

Dr. Gowrisankaran also builds off Dr. Chiou's erroneous critiques of my market definition, which suffer from many of the same issues. I discuss Dr. Gowrisankaran's additional critiques in Section 3.3.7.

Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 89–90.

[40]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 85.

---

the issue is whether users view different distribution methods to be feasible economic substitutes such that, in response to a price change on one, enough users would choose to reduce engagement on the now-more-expensive platform in favor of the relatively less expensive one such that the reduced engagement makes such a price change unprofitable. From the point of view of a publisher, the issue is the same. Multihomed platforms or distribution methods are in the same relevant market *only* if multihoming reduces engagement with the relatively expensive platform to make the price increase unprofitable.

(31) Dr. Chiou repeatedly opines that popular multihomed games exert competitive pressure on Steam because they account for a substantial amount of Steam's revenue.[41] However, this does not make economic sense. The games that Dr. Chiou discusses *already are multihomed.* There is no change in price, so she cannot observe whether behavior changes in response to a change in prices or other terms and conditions that would engender a competitive response. The existence of multihoming simply means that publishers utilize multiple platforms; it does not mean that the competing platforms are substitutes (*i.e.*, using one platform allows a publisher to reduce engagement with Steam and that this is true for enough publishers to make a price increase or other anticompetitive terms and conditions on Steam unprofitable). To illustrate this point in a different way, assume that I eat apples and bananas. That alone does *not* mean that I view apples and bananas as substitutes. Until you raise, for example, the price of apples relative to bananas can my behavior reveal whether I regard them as substitutes. Further, to determine that apples and bananas are substitutes that should be included the same relevant market, you would have to observe that in response to a change in the relative prices of apples and bananas (as a result of a price increase for, say, apples), enough people switch to the alternative (in this case, bananas) to make the price increase unprofitable. *That* is the relevant question, and it is ignored by Dr. Chiou.

(32) Multihoming across distribution options *can* be consistent with these options being substitutes; for example, it may be the case that some people view apples and bananas as substitutes, even those who eat both. However, multihoming is competitively meaningful only if it results in enough publishers (or users) reducing their engagement with the first channel of distribution, affecting the profitability of that first channel and engendering a competitive response. *That* would imply a strong substitutable relationship between the options that could place them in the same relevant market. However, multihoming can also be indicative of a coexisting or symbiotic relationship, which allows publishers to capture different, distinct groups of gamers to increase reach. For example, publishers would find it particularly

---

[41]    Chiou Rebuttal Merits Report, 3/26/2025, ¶¶ 141, 203, 253, 257.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

beneficial to multihome a game if the user base for different platforms was entirely distinct. Thus, any analysis surrounding substitutability in the context of multihoming must consider changes in user and developer engagement with the distribution channels. Users and developers utilizing multiple distribution methods to access and offer games cannot alone prove substitutability. Dr. Chiou misses this basic point, and as such, her analysis is flawed and misleading.

## 3.3.   First-party platforms and distribution are not sufficiently viable substitutes for third-party distribution to broaden the relevant market

(33)    In Section 4.1.3 of my Opening Merits Report, I concluded that first-party distribution (via a first-party platform or self-distribution website) is not a viable substitute for third-party digital PC game distribution.[42] Because of the significant costs associated with developing and maintaining a platform, many (if not most) publishers would not be able to reasonably (or profitably) turn to first-party distribution given a small but significant non-transitory increase in price on Steam from the competitive price level.[43] Beyond that barrier, it is difficult for a *single publisher* to entice enough gamers to move to its standalone platform and maintain those users with a much smaller library of games (sometimes as small as a single game for certain publishers). Thus, it is unlikely that following a small but significant non-transitory increase in price on Steam, a sufficient number of publishers could feasibly and successfully turn to first-party distribution to cause a loss of engagement sufficient to render that price increase unprofitable.

(34)    Because of the limitations discussed above, few publishers could sustainably switch to first-party distribution, and the few that have attempted to do so offer a limited number of games relative to third-party distribution platforms. Given a price increase on Steam, users would not find first-party platforms to be viable substitutes—they would not be able to access the number and variety of publishers and games to significantly reduce their engagement with

---

[42]    Schwartz Opening Merits Report, 1/27/2025, § 4.1.3.

[43]    Expert Report of Professor Joost Rietveld ("Rietveld Report"), 1/27/2025, § III.

See also:

Interview with John Robb, 2/5/2024.

See discussion about *Cellophane* Fallacy in Section 3.3.3.

---

the third-party platform such that the price increase becomes unprofitable.[44]  Users may multihome, that is, access games through both types of distribution.  However, I am not aware of evidence to suggest meaningful platform *substitution in the context of a relevant antitrust market analysis* between first- and third-party platforms has or is likely to occur, nor does Dr. Chiou provide any.

### 3.3.1.    Dr. Chiou does not present sufficient evidence of publisher substitution

(35)    Dr. Chiou claims that announcements of publishers leaving Steam "generated competitive pressure on Valve" and that the "introduction of revenue share tiers [was] a direct response to competition from first-party distribution."[45]  Dr. Chiou presents evidence that describes that Valve's goal was to bring back developers that had left Steam.[46]  I acknowledged similar evidence in my Opening Merits Report.[47]  However, I do not agree with Dr. Chiou that there is a significant enough threat of demand substitution to first-party distribution to include it in the same relevant market as third-party distribution.[48]

(36)    Valve's alleged reasoning for altering its revenue share also does not negate the fact that most publishers cannot turn to first-party distribution.[49]  In response to a small but significant

---

[44]    Put differently, there would be insufficient network effects for those first-party platforms to be competitively meaningful.

[45]    Chiou Rebuttal Merits Report, 3/26/2025, ¶¶ 121, 123.

[46]    Chiou Rebuttal Merits Report, 3/26/2025, ¶¶ 123–125.

In Section 7.2, I analyze the evidence presented by Dr. Chiou and Dr. Langer relating to Valve's reasoning behind its revenue share change.

[47]    Schwartz Opening Merits Report, 1/27/2025, ¶ 382.

[48]    Chiou Rebuttal Merits Report, 3/26/2025, ¶¶ 123–127.

[49]    Dr. Chiou attempts to argue that "it is not true that self-distribution is prohibitively difficult or expensive" because publishers have the option to "maintain websites for self-distribution."  However, as stated in my Opening Merits Report, "[p]ublishers distributing via this method and switching away from third-party distribution lose access to the larger user base offered by a third-party platform."  As discussed in this section, even the largest publishers have not been able to attract a significant number of users to make first-party distribution a viable substitute, making it unlikely that any other publishers could provoke meaningful substitution from users.  In my Opening Merits Report, I also note that "[u]sers lose the ability to reach multiple publishers and a wider variety of games, store their games in one library, and interact with their friends, features that users value in a third-party digital PC platform."  These differences make it unreasonable and unlikely that in response to an increase in the price of Steam, publishers and users could sufficiently switch from Steam to this type of first-party distribution such that the price change is unprofitable.  Dr. Chiou's analysis misses that even if certain publishers find it beneficial to distribute their own games (via a platform or a self-distribute website), that doesn't necessarily imply sufficient substitutability such that it would imply competition between first- and third-party platforms.

Dr. Chiou's claims that I "do[] not consider in [my] analysis the abundance of tools available to users to discover games (such as forums and publications) and the ease with which users and publishers can multihome across PC platforms" are irrelevant.  The ability to discover games does not readily imply substitutability, and even if users are able to find small self-distribution platforms, the difference in offerings makes it unlikely that users could significantly reduce their engagement with Steam.  Further, as I discuss in Section 3.3.4, multihoming, by itself, means only that multiple platforms

---

non-transitory increase in price, almost no publishers would be willing to reduce their engagement with Steam in favor of first-party distribution or, if they attempted to do so, would be able to sustain it. Even if Valve's one price change to its platform in its two decades of existence was aimed to bring popular AAA games to its platform, a point I disagree with,[50] as well as a few developers allegedly responding to that price change, this change alone does not readily imply sufficient substitution across the board. That is, these changes do not prove that in the face of a price increase, sufficient substitution for users and publishers between first- and third-party distribution would occur to make that price increase unprofitable.

(37)     In my deposition in the class certification phase of this matter, I testified that Valve's intention to bring games distributed through first-party platforms to Steam is not indicative of competition between first- and third-party distribution platforms. I stated that Valve's behavior reflects that it "could make a lot of money if [it] could get [certain first-party publishers] to put their game on Steam[,]" but "[t]hat doesn't say anything at all about competition. . . . It doesn't mean that [Valve is] competing with them in the sense that [it is] trying to get -- [it is] trying to compete away users."[51] It also does not mean that those games being distributed on first-party platforms is consequential to Steam, that is, enough to get it to change behavior.

(38)     There is a more basic flaw in Dr. Chiou's reasoning. For substitution, even of the sort described by Dr. Chiou, to even have the possibility of being competitively meaningful, it must

---

are used and does not imply anything about the degree of user engagement on any platform or the similarities of differences in the services, reach, or effectiveness of any platform. The economic evidence indicates that neither publishers nor users can afford to significantly reduce their engagement with Steam in favor of any method of first-party distribution. See:

Chiou Rebuttal Merits Report, 3/26/2025, ¶¶ 160–164.

Schwartz Opening Merits Report, 1/27/2025, ¶ 94.

[50]     The competitive pressure Dr. Chiou describes actually arose from increased third-party distribution, not first-party distribution. As I explain in my Opening Merits Report and in Section 7.2 below, Valve was concerned about the entrance of EGS, and wanted to announce Valve's new revenue tiers "in advance" of the EGS launch. EGS is Valve's principal competitor in the market for third-party distribution of PC games via platforms. Valve's competitive reaction to these threats actually supports my proposed market definition, rather than undercutting that market definition. See:

Schwartz Opening Merits Report, 1/27/2025, ¶ 382.

See Section 7.2 for further discussion.

[51]     Steven Schwartz, Dep. Tr., 4/18/2024, 70:18–71:14. ("Q. How do you understand Mr. Lynch's testimony that he would love to have ██████████████████████ on Steam? A. I interpret it as we could make a lot of money if we could get them to put their game on Steam. That doesn't say anything at all about competition. It says it would be profitable for us to have the game. It doesn't mean that we're competing with them in the sense that we're trying to get -- we're trying to compete away users. No, they're not doing that, there's no evidence that they're doing that. No evidence that they're trying to dissuade or, you know, induce users to come to Steam. That's what competition means. Just saying hey, I'd like to have their game because it's really profitable doesn't define competition.")

be sustainable.  Dr. Chiou ignores that the publishers who tried to shift distribution away from Steam failed and ultimately returned to Steam.  Any "competition" between Valve and publishers who had left Steam was short-lived, evidence that returning to Steam was necessary to survive.[52]

(39)   Evidence outlined below and in my Opening Merits Report confirms that publishers who attempted to distribute their own games on their own platforms instead of Steam could not succeed, causing them to ultimately return to Steam.[53]  Dr. Chiou's claim that publishers' "decision[s] to return to Steam represent[] demand substitution between first- and third-party distribution"[54] does not fit with the facts.  First-party distribution is not a sufficiently viable *substitute* to third-party distribution even for the select few publishers that have the means to overcome the initial entry barriers and attempt first-party distribution, much less a large enough set of publishers to affect Steam's profitability.[55]  Consider the following:

a.   First, in 2018, Activision took *Call of Duty* off Steam and exclusively distributed the game through first-party distribution on Battle.net "in an effort to attract users to, and grow, Activision's own platform."[56]  However, in 2022, after "Battle.net's monthly active users ('MAUs') remained relatively flat during the period when it had exclusive access to digital sales of *Call of Duty* on PC, from 2018 through 2022[,]" Activision reversed course and re-released *Call of Duty* on Steam.[57]  Activision had to return to publishing on the Steam

---

[52]   Dr. Chiou states that "Dr. Schwartz makes claims that are inconsistent with his exclusion of first-party distribution from his proposed market by acknowledging the competitive pressure first-party distribution imposes on third-party distribution." Dr. Chiou states that "Dr. Schwartz assumes that success in first-party distribution can drive success in third-party distribution when he attempts to generate but-for market shares for his damages model" and "when Dr. Schwartz describes the alleged PMFN Policy, he claims that Valve imposed the alleged PMFN Policy on the prices of games offered on publishers' own platforms." See:

Chiou Rebuttal Merits Report, 3/26/2025, ¶¶ 180–184.

Dr. Chiou's claims are incorrect.  Valve's enforcement of the PMFN Policy against first-party developers and the ability of a publishers to attract users to its platform with its own games (as I discuss in Section 8.3.4 of my Opening Merits Report) does not consider substitutability from the perspective of users or publishers.  As discussed above, Valve monitoring first-party platforms and/or wanting to retain users on Steam does not negate the fact that the majority of publishers cannot turn to first-party distribution.  Similarly, a publisher using its own games to anchor its platform does not change the fact that few publishers can even attempt to create their own platform.

[53]   Schwartz Opening Merits Report, 1/27/2025, §§ 4.1.3 and 6.2.

[54]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 127.

[55]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 127.

[56]   *FTC v. Microsoft Corp. and Activision Blizzard, Inc.*, No. 3:23-cv-02880-JSC, Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law, at Proposed Findings of Fact ¶ 216 (N.D. Cal. 2023).

Schwartz Opening Merits Report, 1/27/2025, ¶ 88.

[57]   *FTC v. Microsoft Corp. and Activision Blizzard, Inc.*, No. 3:23-cv-02880-JSC, Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law, at Proposed Findings of Fact ¶ 216 (N.D. Cal. 2023).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

platform because of the lack of user engagement with its own platform; it could not give up access to Steam's extensive and growing user base and it could not attract enough of them to Battle.net. While Battle.net's userbase remained "relatively flat" from 2018 to 2022, Steam's userbase "grew by tens of millions of users, nearly doubling from 67 million MAUs in 2017 to 132 million MAUs in 2021."[58] Even with one of the most popular game franchises, Activision could not attract a sufficient number of users to successfully rely on first-party distribution alone.[59]

b.  Second, Ubisoft took its games off of Steam in early 2019 *after* Valve had already implemented its tiered revenue share system.[60] When Ubisoft returned to publishing its own games on Steam in 2022, it faced the *same* tiered commission rates that were in place when it originally left Steam.[61] When Ubisoft returned to publishing its games on Steam, it stated that it was "constantly evaluating how to bring our games to different audiences wherever they are,"[62] suggesting that Ubisoft relied on Steam's user base for success and could not sustainably compete with Steam via its own platform.

c.  Third, starting in 2011, EA offered exclusive EA-game content on Origin and pulled some of its biggest titles from Steam.[63] However, consumer adoption of EA's games on Origin

---

Eurogamer, "Five Years Later, Call of Duty Returns to Steam with Modern Warfare 2," 6/8/2022, https://www.eurogamer.net/five-years-later-call-of-duty-returns-to-steam-with-modern-warfare-2.

Schwartz Opening Merits Report, 1/27/2025, ¶ 88.

[58]  *FTC v. Microsoft Corp. and Activision Blizzard, Inc.*, No. 3:23-cv-02880-JSC, Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law, at Proposed Findings of Fact ¶ 216 (N.D. Cal. 2023).

[59]  *FTC v. Microsoft Corp. and Activision Blizzard, Inc.*, No. 3:23-cv-02880-JSC, Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law, at Proposed Findings of Fact ¶ 216 (N.D. Cal. 2023). ("Activision's attempt to take PC digital sales of *Call of Duty* exclusive to its Battle.net platform was a resounding failure.")

[60]  Schwartz Opening Merits Report, 1/27/2025, ¶ 87.

Chiou Rebuttal Merits Report, 3/26/2025, ¶ 120.

Valve changed its revenue share in late 2018.  See:

Schwartz Opening Merits Report, 1/27/2025, ¶ 45.

[61]  Schwartz Opening Merits Report, 1/27/2025, ¶¶ 45, 87.

[62]  Ars Technica, "Ubisoft Comes Crawling Back to Steam After Years on Epic Games Store," 11/22/2022, https://arstechnica.com/gaming/2022/11/Ubisoft-comes-crawling-back-to-steam-after-years-on-epic-games-store/.

[63]  CNET, "EA Launches Origin, Takes Aim at Steam," 6/3/2011, https://www.cnet.com/tech/gaming/ea-launches-origin-takes-aim-at-steam/.

Games Industry.Biz, "EA Confirms More Platform Exclusives for Origin," 6/15/2011, https://www.gamesindustry.biz/ea-confirms-more-platform-exclusives-for-origin.

Rock Paper Shotgun, "Content Wars: Origin/Steam Scuffle Unfolds," 7/7/2011, https://www.rockpapershotgun.com/origin-steam.

Techspot, "Ubisoft and EA Pair Up, Offer Each Other's Games Online," 2/22/2013, https://www.techspot.com/news/51731-ubisoft-and-ea-pair-up-offer-each-others-games-online.html.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

was minimal, forcing EA to ultimately return to distributing its games on Steam.[64]  EA's Senior Vice President commented on the return, stating that "we are game makers, and our aspiration is to connect as many people as we can to the great games that we built[,]" and thus "we want to be [on Steam] where the players are."[65]

d. Fourth, in 2016, Bethesda debuted its own launcher (Bethesda.net) "as the home for games from Bethesda and its studios, including id Software and Arkane."[66]  Between at least 2016 and 2018, Bethesda launched certain games exclusively on Bethesda.net before releasing them on Steam.[67]   Other games were launched on Steam alongside Bethesda.net.[68]  In 2022, four years after Valve's revenue share change, Bethesda decided to shut down its launcher.[69]  According to one article, Bethesda "[gave] up on the idea of having its own launcher to compete with the likes of Steam and Epic Games.  While those

---

[64]   CNET, "EA Returns to Steam with Star Wars Jedi: Fallen Order in November," 10/29/2019, https://www.cnet.com/tech/gaming/ea-returns-to-steam-with-star-wars-jedi-fallen-order-in-november/.

Kotaku, "EA Returns to Steam with Star Wars Jedi: Fallen Order, 10/29/2019, https://kotaku.com/ea-returns-to-steam-with-star-wars-jedi-fallen-order-1839440326.

Digital Trends, "EA Origin Has Been Replaced with a New, Faster PC App," 10/7/2022, https://www.digitaltrends.com/gaming/ea-origin-replaced-app/. ("Origin was EA's exclusive PC launcher for its titles first launched in 2011.  It was intended to compete with other digital PC storefronts such as Steam, though it eventually integrated with its competitor to sell their titles on that service.  Origin, however, was still required to run EA titles even if bought on Steam.  Despite accumulating over 50 million registered users, the service was heavily criticized and maligned by the PC community due to security flaws and suspicions of spying on players.")

For comparison, Steam had approximately ▮▮▮ registered Steam accounts by 2020.  See:

Valve, "Joint Business Review," 10/2020 (VALVE_ANT_0052792–2829, at VALVE_ANT_0052816).

[65]   The Verge, "EA Games Are Returning to Steam Along with the EA Access Subscription Service," 10/29/2019, https://www.theverge.com/2019/10/29/20937055/ea-games-steam-access-subscription-service-pc-storefront-jedi-fallen-order-sales.

[66]   PC Gamer, "Bethesda Is Dropping Its Launcher in Favor of a Return to Steam," 2/22/2022, https://www.pcgamer.com/bethesda-is-dropping-its-launcher-in-favor-of-a-return-to-steam/. ("The Bethesda launcher debuted in 2016 as the home for games from Bethesda and its studios, including id Software and Arkane.")

[67]   See, for example:

PC Gamer, "Fallout 76 Won't Launch on Steam," 8/6/2018, https://www.pcgamer.com/fallout-76-wont-launch-on-steam/.

Gamespot, "Fallout 76 Finally Comes To Steam In April With A Free Update," 2/7/2020, https://www.gamespot.com/articles/fallout-76-finally-comes-to-steam-in-april-with-a-/1100-6473396/.

Gamespot, "Fallout Shelter Out Now on Steam," 3/29/2017, https://www.gamespot.com/articles/fallout-shelter-out-now-on-steam/1100-6449048/. ("Fallout fans who've been pining to play Bethesda's strategy spinoff on Steam are getting their chance: Fallout Shelter has now been released on PC's biggest gaming platform. . . . It's not Shelter's first PC release (Bethesda launched the game on its own client last year), but now players will get the chance to earn Steam achievements and take advantage of Steam's cloud support.")

[68]   Tech Radar, "Doom Eternal and Rage 2 Still Headed to Steam Despite Bethesda.net," 3/26/2019, https://www.techradar.com/news/doom-eternal-and-rage-2-still-headed-to-steam-despite-bethesdanet/.  ("Doom Eternal, Rage 2 and other upcoming Bethesda PC releases will be coming to Steam, the publisher has announced in a tweet."; "Also headed to Steam will be Fallout 76, ending its Bethesda.net exclusivity, as well as Wolfenstein: Youngblood and Wolfenstein: Cyberpilot. All unreleased titles will also make their way to Bethesda.net, too.")

[69]   PC Gamer, "Bethesda Is Dropping Its Launcher in Favor of a Return to Steam," 2/22/2022, https://www.pcgamer.com/bethesda-is-dropping-its-launcher-in-favor-of-a-return-to-steam/.

---

two can offer gamers hundreds if not thousands of titles to choose from, Bethesda's own games cannot compete with such numbers, leading to the publisher announcing that it would shut down its launcher."[70]

(40)    While Dr. Chiou characterizes publishers' "decision to return to Steam [as] represent[ing] demand substitution between first-and third-party distribution[,]"[71] the evidence discussed above demonstrates that lack of user adoption was a significant driver behind those publishers' decisions to return to Steam. It also illustrates that users do not view first-party distribution as a sufficiently viable alternative to a third-party platform. Dr. Chiou's critique does not offer any reasonable economic basis for me to alter my opinion that first-party distribution should be excluded from the relevant antitrust market.

(41)    Importantly, in the face of this limited "substitution" by publishers moving off Steam and towards first-party distribution, the Steam platform has remained immensely profitable and successful for Valve. From 2018 through 2021 (even prior to the return of Ubisoft, Battle.net, and Bethesda games) transaction values on Steam ███████████████████████████ ███████████████████████.[72] During that time, Valve's profitability on Steam also ████ In 2018, Steam's operating profits were ███████████ and ███████████ ██ ████[73] While a few publishers may have attempted first-party distribution, this was heavily outweighed by the many more publishers that joined Steam's platform over this time period. In 2018, Steam had ██████ publishers with positive revenues on its platform, and by 2021, had ████████████████ that in 2018.[74] As of 2024, ██████ publishers were on Steam.[75] While this increase in publishers is not indicative of healthy competition as discussed in Section 5.3.1, it *is* indicative of first-party publishing not being a competitive substitute with third-party distribution.

(42)    In summary, publishers would not be willing to attempt first-party distribution in the face of a small but significant non-transitory price increase, and therefore, first-party distribution is not substitutable with third-party distribution because: (1) few publishers have attempted

---

[70]    Game Rant, "Bethesda Launcher Gets Official Shut Down Date," 4/25/2022, https://gamerant.com/bethesda-launcher-gets-official-shut-down-date/.

[71]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 127.

[72]    Schwartz Supplemental Opening Merits Report, 3/7/2025, Supplemental Attachment D-5.

████████████████████████████

[73]    Schwartz Supplemental Opening Merits Report, 3/7/2025, Supplemental Attachment D-5.

[74]    ████████████████

[75]    ████████████████

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

first-party distribution, (2) these publishers have been unable to succeed without at least multihoming on Steam, and (3) these short-term departures have failed to impact Steam's profitability in a substantive manner.

### 3.3.2. Dr. Chiou does not present sufficient evidence of user substitution

(43)    Dr. Chiou claims to "test [my] assertion that users do not substitute between first- and third-party distribution channels by examining how users responded to Ubisoft's decision to stop releasing new games on Steam."[76]  To do so, she presents evidence of changes in Ubisoft's revenue distribution from first- and third-party distribution that she claims is "evidence of users *substituting* from Steam to Ubisoft Connect when Ubisoft stopped releasing new games on Steam [in 2019]."[77]

(44)    Dr. Chiou does not consider that while some users may turn to Ubisoft Connect to access Ubisoft games, those users would still likely use Steam for other gaming and continue to engage with Steam and Valve.  Even more so, she does not consider that many Steam users, including those who do not play Ubisoft games, may not have interacted with Ubisoft Connect in any capacity.  That there was some user interaction with Ubisoft Connect is not enough to put first- and third-party distribution in the same relevant antitrust market.  As discussed in Section 3.2 the product at issue is access to a game distribution platform, and thus, it is insufficient to consider substitutability at the game level.

(45)    While Dr. Chiou claims that changes in Ubisoft's revenue distribution is "evidence of users substituting from Steam to Ubisoft Connect[,]"[78] it is at best, limited, transitory substitution in response to an essentially infinite price increase (as the price of Ubisoft games on Steam effectively goes to infinity, as that option is no longer available).  This is well above the appropriate standard of the HMT that considers a small but significant non-transitory increase in price.  Even so, to be evidence that first- and third-party distribution are in the same relevant market, users would have had to switch to Ubisoft or other first-party platforms with enough scale to impact Valve's profitability on Steam.  Dr. Chiou does not present any evidence that enough users stopped using Steam to have an effect on Steam's competitive behavior or profits during the period when Ubisoft's first-party revenue increased.  Despite Ubisoft's and other publishers' pauses on distributing through Steam, I show in my Opening

---

[76]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 133.

[77]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 135. (Emphasis added.)

[78]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 135.

Merits Report that Valve has consistently maintained substantial profits on Steam and its fundamental anticompetitive behavior with the PMFN Policy did not change.[79]  Further, as discussed above, Ubisoft returned to Steam in 2022, implying that Ubisoft could not consistently improve its userbase and profitability to justify continuing to reduce its engagement with third-party distribution in favor of first-party distribution.

(46)   Because of the differences in offerings and library size between Ubisoft Connect (or any other first-party platform) and Steam, it is highly unlikely, as an economic matter, that users would sufficiently switch to first-party distribution, via platforms or even more so via websites,[80] to render a small but significant non-transitory increase in price unprofitable.  I reached this conclusion in my Opening Merits Report: "First-party platforms lack the indirect network effects that are inherent in a two-sided platform.  The lack of publishers and the resulting lack of games on a first-party platform compared to third-party platforms supports the notion that _users would not readily switch to a first-party platform._"[81]  Dr. Chiou does not acknowledge this conclusion, claiming that "Dr. Schwartz virtually ignores the user side in his analysis of first-party distribution."[82]  Clearly, this is not the case.[83]

### 3.3.3.   A market definition analysis must consider the _Cellophane_ fallacy

(47)   As discussed in Section 4.2 of my Opening Merits Report, Valve has had monopoly power in the relevant market for over a decade.  Valve is a profit-maximizing firm.  And, given Valve's position in the market (both now and in the past), Valve's supracompetitive commission rate to publishers is likely at (or very close to) the profit-maximizing _monopoly price._

---

[79]   Schwartz Opening Merits Report, 1/27/2025, § 4.2.4.

[80]   As discussed in my Opening Merits Report, self-publishing through a website has fundamentally different characteristics that make it unreasonable and unlikely that either a publisher or consumer would switch from third-party digital distribution platforms to this type of self-distribution. For example: "Publishers distributing via this method and switching away from third-party distribution lose access to the larger user base offered by a third-party platform. Users lose the ability to reach multiple publishers and a wider variety of games, store their games in one library, and interact with their friends, features that users value in a third-party digital PC platform." See:

Schwartz Opening Merits Report, 1/27/2025, ¶ 94.

[81]   Schwartz Opening Merits Report, 1/27/2025, ¶ 95. (Emphasis added.)

[82]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 150.

[83]   Even if I were to ignore the user side in my discussion of first-party substitutability, which I do not, my Opening Merits Report extensively discusses why developers do not find first-party distribution to be a meaningful substitute for third-party distribution. As I also discuss in Section 3.2, because the market definition analysis for this matter must apply to _both_ sides of the platform (_i.e._, users and developers), my conclusion that developers do not find first-party distribution to be substitutable alone is sufficient to exclude first-party distribution from the relevant market. See Section 3.1.2 for further discussion.

(48)    In a case (such as this one) where the prevailing market price is the profit-maximizing monopoly price, by definition, any further price increases will necessarily lead to lower profits, as *any* increase in price will be to a non-profit maximizing price. Thus, in such a case, a market definition analysis based on the HMT/SSNIP test using the *prevailing* price (here, Valve's supracompetitive commission rate) can lead to an unwarranted expansion of the relevant market. It does not make economic sense to ask whether a firm that is believed to be exercising monopoly power—by charging monopoly prices—could *further* increase prices without losing profitability as evidence of that monopoly power. Such an inquiry misrepresents the competitive constraints the firm faces and can lead to incorrect conclusions about the relevant market and the presence or absence of monopoly power. This reflects the so-called *Cellophane* fallacy.[84]

---

[84]    *United States v. E. I. du Pont de Nemours & Co.* was a 1956 U.S. Supreme Court case centered on the accusation that E. I. du Pont de Nemours and Company ("du Pont") had monopolized the market for cellophane. In response to this accusation, du Pont argued that the relevant market was the broader market for "flexible packaging materials," and that consumers would switch to alternative flexible packaging materials such as aluminum foil or wax paper if the price of cellophane increased. Although du Pont produced almost 75% of the cellophane sold in the United States, cellophane constituted less than 20% of all "flexible packaging materials" sales. The Supreme Court ultimately sided with du Pont, concluding that the relevant market was "flexible packaging materials" and that du Pont had not monopolized interstate commerce in cellophane.

The "*Cellophane* fallacy" refers to the widely accepted criticism of the Supreme Court's reasoning and conclusion in this case. Specifically, the *Cellophane* fallacy refers to the Supreme Court's determination that the presence of a high cross-elasticity of demand between cellophane and other flexible wrappings implied that these products compete in the same market. The Supreme Court's reasoning is considered a fallacy, because the analysis focused on the market conditions at the price du Pont was actually charging and ignored the counterfactual in which at a more competitive cellophane price, cross price elasticity of demand may have been lower.

*United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 379 (1956). ("During the period that is relevant to this action, du Pont produced almost 75% of the cellophane sold in the United States, and cellophane constituted less than 20% of all 'flexible packaging material' sales. This was the designation accepted at the trial for the materials listed in Finding 280, Appendix A, this opinion, post, p. 405. The Government contends that, by so dominating cellophane production, du Pont monopolized a 'part of the trade or commerce' in violation of § 2. Respondent agrees that cellophane is a product which constitutes 'a `part' of commerce within the meaning of Section 2.' Du Pont brief, pp. 16, 79. But it contends that the prohibition of § 2 against monopolization is not violated because it does not have the power to control the price of cellophane or to exclude competitors from the market in which cellophane is sold. The court below found that the 'relevant market for determining the extent of du Pont's market control is the market for flexible packaging materials,' and that competition from those other materials prevented du Pont from possessing monopoly powers in its sales of cellophane. Finding 37.")

Network Law Review, "Thomas W. Hazlett: The FTC's Rendition of the 'Cellophane Fallacy'," 10/27/2022, https://www.networklawreview.org/hazlett-cellophane-fallacy/. ("The Supreme Court found this approach compelling, and du Pont prevailed. The Court's reasoning was: 'If a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an indication that a high cross-elasticity of demand exists between them; that the products compete in the same market.' Alas, the decision has become well-known committing the Cellophane Fallacy. In fact, price theory suggests that monopoly firms face demand curves that are necessarily *elastic*. . . . The trick that du Pont's lawyers performed was to ignore how the company had come to price its cellophane product, directing attention to the end result: at the price du Pont charged, there were many effective substitutes. Had more competitive prices been in place, a counterfactual construction, the cellophane product might have been unique, with many inferior substitutes. Lawrence J. White identifies the difficulty in producing such a hypothetical

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(49) Therefore, given that Valve has operated and priced using its monopoly power, consideration of price increases and substitution needs to be in the context of the *but-for competitive price*. It follows that the correct implementation of the HMT in this matter would consider a SSNIP to the estimated *but-for* competitive commission rate. That is, an HMT would consider a *small* increase in price, typically 5%, over the estimated *but-for* competitive commission rate of 17.05%.[85] A 5% increase over the but-for commission rate is 17.90%.[86]

(50) Valve's 30% commission rate and commission rate tiers are significantly higher starting points than the estimated *but-for* competitive commission rate, the correct starting point that would be considered by the HMT. The lowest tier commission rate of 20%, which most publishers do not reach, is 1.17 times higher than the but-for price and the 30% commission rate is 1.76 times higher than the but-for price.[87] The commission rate tiers are even considerably higher than 17.90%, the commission rate that results from the 5% SSNIP considered by the HMT. That is, the 20% and 30% commission rates are 1.12 and 1.68 times higher than 17.90%, respectively.[88]

---

market alternative as the great challenge of market delineation in monopolization cases. This price theory analysis, despite its wide acceptance since Donald Turner's 1956 critique of the du Pont opinion, yet complicates antitrust analysis.")

White, Lawrence J. (2022), "The Dead Hand of Cellophane and the Federal Google and Facebook Antitrust Cases: Market Delineation Will be Crucial," *The Antitrust Bulletin* 67(1): 113–129, at 118–119. ("There is an additional point—perhaps subtle, but important—that is worth considering: much of the legal consideration of what products are within a relevant market refers to terms such as 'inter-operability,' 'interchangeability,' 'user substitution,' and (sometimes) 'cross-elasticity of demand.' But these attributes are usually being assessed at the recently prevailing prices and thus again run afoul of the Cellophane fallacy The defendant firm should currently be charging a price where—for at least some customers (the inframarginal customers)—the product is not so unique and those customers are on the cusp of switching (or may have already switched) to buying 'something else' from 'someone else.' Instead, these characteristics assessments should be made (if market power really is being exercised) in the context of a counterfactual, but-for scenario where the defendant's alleged anticompetitive, exclusionary actions have not occurred. That but-for scenario describes the relevant market within which the defendant's alleged anticompetitive actions allowed the defendant concomitantly (or subsequently) to raise the price (or deteriorate the product, etc.) so as to bring the product to its (current) not-so-unique status.")

Turner, Donald F. (1956), "Antitrust Policy and the Cellophane Case," *Harvard Law Review* 70(20): 281–318.

[85] Schwartz Supplemental Opening Merits Report, 3/7/2025, ¶ 24.

U.S. Department of Justice and Federal Trade Commission, "Merger Guidelines," 12/18/2023, § 4.3.b available at: https://www.ftc.gov/system/files/ftc_gov/pdf/P234000-NEW-MERGER-GUIDELINES.pdf. ("What constitutes a 'small but significant' worsening of terms depends upon the nature of the industry and the merging firms' positions in it, the ways that firms compete, and the dimension of competition at issue. When considering price, the Agencies will often use a SSNIP of five percent of the price charged by firms for the products or services to which the merging firms contribute value. The Agencies, however, may consider a different term or a price increase that is larger or smaller than five percent.")

[86] $17.05\% + (17.05\% \times 5\%) = 17.90\%$.

[87] $20.00\% / 17.05\% = 1.173$.

$30.00\% / 17.05\% = 1.759$.

[88] $20.00\% / 17.90\% = 1.117$.

$30.00\% / 17.90\% = 1.676$.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(51)    Despite Valve profitably pricing at a (near) monopoly price, only a handful of publishers have attempted first-party distribution. See Section 3.3.5. Even at the supracompetitive rate, the barriers to successfully distribute through a first-party platform are significant enough to prevent meaningful substitution. Thus, an HMT considering a small increase to the 17.05% but-for commission rate would surely conclude that first-party distribution is not a viable substitute. If developers found the costs of first-party distribution to be an unfeasible tradeoff even when facing Valve's supracompetitive commission rate, it is obvious that developers would find these costs to be insurmountable in comparison to a small increase to the *but-for competitive* price and thus, they would have little to no incentive to switch to first-party distribution.

### 3.3.4.  Multihoming is not evidence of substitution

(52)    As discussed above, multihoming is not evidence of substitution. Multihoming, by itself, means *only* that multiple platforms are used and does not imply anything about the degree of user engagement on any platform or the similarities or differences in the services, reach, or effectiveness of any platform.[89] Dr. Chiou claims that "[p]ublisher and user multihoming across first- and third-party distribution facilitates substitution[.]"[90] To make this claim, Dr. Chiou simply presents examples of publishers and users multihoming between first- and third-party distribution platforms.[91] While it is correct that multihoming *might* facilitate substitution, the presence of multihoming says nothing about whether the different platforms are substitutes for one another or have some (or no) relationship to one another. Moreover, it says nothing about whether the assumed substitution is sufficient to induce a competitive response.

(53)    Dr. Chiou ignores the key economic question of whether users and publishers can feasibly and readily substitute between these alternatives in response to a small but significant non-transitory increase in price on one of the third-party platforms.[92] The issues in determining whether different platforms are sufficient substitutes for one another to be included in the same relevant antitrust market is whether (a) the different platforms are substitutes at all and (b) whether, in response to a change in price or other terms and conditions, enough publishers

---

89      See Section 3.2 for further discussion.

90      Chiou Rebuttal Merits Report, 3/26/2025, § 4.2.3.

91      Chiou Rebuttal Merits Report, 3/26/2025, § 4.2.3.

92      At the necessary risk of repeating myself (since Dr. Chiou repeatedly makes this error), multihoming and substitution are not the same.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

and users join those platforms *and* reduce engagement with the now higher-priced platform to render that price increase unprofitable. Put differently, and as outlined in my Opening Merits Report and in Section 3.2, multihoming is competitively meaningful only if it results in a publisher (or gamer) reducing their engagement with one channel of distribution such that it affects the profitability of that channel.

(54) In terms of multihoming between a first-party platform and Steam, the economic evidence indicates that neither publishers nor users can afford to significantly reduce their engagement with Steam. Evidence discussed above and in my Opening Merits Report shows that the handful of publishers who have attempted first-party distribution ultimately cannot attract enough users to their own platform and must offer their games on Steam (even if alongside their own platform).[93] Similarly, users may choose to use a first-party platform *alongside* Steam, but because of the limited offerings on first-party platforms, it is unlikely that a sufficient number of users will switch away from Steam to render a change in relative prices unprofitable.[94] Further, there could simply be different populations of users that use Steam versus a publisher-specific first-party platform; the fact that a publisher multihomes a game does not require the user to multihome. Instead, "publishers and users commonly multihom[ing] between first- and third-party video game distribution" indicates that publishers and users can find it beneficial to use these methods together.[95]

### 3.3.5. Minecraft and Roblox should be excluded from the relevant market

(55) Dr. Chiou claims that I improperly exclude Minecraft and Roblox from the relevant market.[96] Dr. Chiou argues that my "characterization of Roblox's and Minecraft's user-generated content as substantially different from third-party distribution is unfounded" and that "[g]ames offered on self-distribution platforms are often similar to many games offered on Steam."[97]

(56) Dr. Chiou's arguments miss the point. Any alleged similarities between games or the opportunities to generate user-generated content are irrelevant because Minecraft and Roblox are distinct from third-party platforms. They do not provide an avenue of distribution for publishers who have created and are already distributing PC games, but rather offer

---

[93]  Schwartz Opening Merits Report, 1/27/2025, ¶¶ 85, 87–92, 94.

[94]  Schwartz Opening Merits Report, 1/27/2025, ¶¶ 94–95.

[95]  Chiou Rebuttal Merits Report, 3/26/2025, ¶ 149.

[96]  Chiou Rebuttal Merits Report, 3/26/2025, ¶ 172.

[97]  Chiou Rebuttal Merits Report, 3/26/2025, ¶¶ 173, 175.

publishers the ability to create content that is compatible with the Minecraft/Roblox ecosystem or games specifically created for Roblox using Roblox Studio.[98]

(57)   Even Dr. Chiou notes that publishers have to make separate games for third-party platforms versus Roblox: "Some developers make fully-functional games that are distributed through Roblox and played by hundreds of millions of players, and some Roblox developers also publish popular games on Steam.  Some games on Roblox even appear to be copycats of successful games on Steam."[99]  Thus, publishers who are utilizing a third-party PC distribution platform could not even consider distributing the same games published on Steam through Minecraft or Roblox in response to a small but significant non-transitory change in relative prices.  In turn, users would not have access to comparable offerings between third-party platforms and Minecraft/Roblox.  Thus, users would not significantly reduce their engagement with a third-party platform in favor of Minecraft or Roblox to render any price change unprofitable.  Dr. Chiou's arguments place undue emphasis on any similarities between games and/or opportunities to create user-generated content on Minecraft and Roblox, suggesting that this makes them sufficiently similar to third-party platforms.  Instead, it is necessary to consider the possibility of substitution from a user's and publisher's perspective.

(58)   Dr. Chiou also claims that it is improper to exclude first-party platforms such as Minecraft and Roblox because "even games that are dissimilar from one another compete for users" and "Valve would also like to attract users who typically have played different types of video games like Minecraft and Roblox to Steam."[100]  Dr. Chiou wrongly asserts that Valve and other

---

[98]   Minecraft, Marketplace, https://www.minecraft.net/en-us/catalog (accessed 1/21/2025). (Lists add-ons, skin packs, texture packs, mash-up packs, adventure maps, mini games, and survival spawns as categories of content sold on the Minecraft Marketplace.)

Minecraft, The Minecraft Partner Program, https://www.minecraft.net/en-us/partner (accessed 4/9/2025). ("As an official partner, you'll get to sell your creations and share your imagination with an incredible audience. Craft content such as skin packs, maps, adventures, and textures, and release them on Minecraft Marketplace.")

Roblox, Marketplace, https://www.roblox.com/catalog (accessed 1/21/2025).

Roblox, Creation Overview, https://create.roblox.com/docs/creation#experiences (accessed 4/9/2025). ("Experiences are the 3D worlds that you create and publish in Roblox."; "Studio is an all-in-one IDE that lets you create on Roblox. You build projects that you can later publish as experiences to Roblox and also use Studio to create characters and accessories.")

Create & Learn, "Roblox Studio: Beginner's Guide to Download, Setup and Build Games Roblox Creator Hub," 3/17/2025, https://www.create-learn.us/blog/roblox-studio/. ("There are countless fun games on Roblox, and they are all made on Roblox Studio—a powerful game development software created by Roblox Corporation. Game developers around the world use Roblox Studio to build and publish their own interactive Roblox experiences. It is also very popular with kids and teens for learning coding and computer science because of the popularity of Roblox.")

[99]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 173.

[100]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 174.

publishers wanting to attract new users to grow its platform and/or to increase the number of users who play its games is evidence of any ability for users or publishers to substitute between a third-party platform and Minecraft or Roblox. The general ability of dissimilar games to compete for users is separate from whether in response to a change in price, publishers and users can join an alternative distribution method and reduce engagement with third-party distribution to render that price increase unprofitable. As described above and in my Opening Merits Report, I find that publishers and users could not significantly shift their engagement with a third-party platform in favor of Minecraft or Roblox.[101]

### 3.3.6.  Evidence presented by Dr. Chiou does not demonstrate competition between firms of differing ownership structures in the video game industry

(59) Dr. Chiou claims that my exclusion of first-party distributors is inappropriate because "[f]irms with different ownership structures, and in particular vertically integrated and non-integrated or partially-integrated firms, can compete with one another if consumers substitute between them, just like firms with similar ownership structures do."[102] This point is not in dispute; it is also irrelevant because it addresses the wrong economic question. The theoretical possibility of any degree of competition between first- and third-party distributors is not the relevant issue. The issue is whether there is evidence that meaningful substitution (that is, sufficient substitution to defeat a small, but significant non-transitory price increase) by users or publishers from third-party platforms to first-party platforms has or is likely to occur should relative prices change in a small, but significant and non-transitory way. Dr. Chiou claims that I am using the difference in ownership structure on its own to draw the boundaries of the market,[103] which is not the case. She ignores evidence that users and publishers do not find first-party distribution to be sufficiently close substitutes with third-party distribution to warrant a single market including both first- and third-party distribution.[104]

(60) Dr. Chiou discusses academic literature and research from various marketplaces such as the automobile, shipping and tracking, and advertising industries that are different from video

---

[101]   Schwartz Opening Merits Report, 1/27/2025, ¶ 86.

[102]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 110.

[103]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 109. ("Dr. Schwartz creates an artificial distinction between first- and third-party distribution based on the ownership structure of publishing and distributing firms.")

[104]   Schwartz Opening Merits Report, 1/27/2025, § 4.1.3.

game distribution.[105]  Dr. Chiou's review is irrelevant.  The literature she discusses does not speak to the realities of this marketplace; her critique and the "evidence" she relies on do not challenge my opinion that first-party distribution should be excluded from the relevant market.

### 3.3.7.   Dr. Gowrisankaran mischaracterizes my analysis of first-party distribution platforms

(61)    Dr. Gowrisankaran also critiques my analysis of first-party distribution platforms.[106]  Even though Dr. Gowrisankaran has "not performed a comprehensive market definition analysis[,]" he argues that my "claim that first and third-party distribution of video games are complements rather than substitutes is inconsistent with economists' definitions of these two terms."[107]  Dr. Gowrisankaran is mischaracterizing or misunderstanding my discussion of the relationship between these distribution avenues.  I do not claim that they are *economic complements*; rather, I argue that they are complementary in that they can be consumed by users and publishers.  As I note in my discussion above, publishers that choose to multihome gain the additional benefit of reaching new and distinct populations of gamers.  Similarly, gamers can enjoy various different types of gaming alongside one another to extend the value gaming may have for them.

(62)    Ultimately, however, my analysis of these distribution avenues is to determine whether or not they are close enough *substitutes* to be included in the same relevant market.  My Opening Merits Report states that "*at best*, and supported by the economic evidence, this distribution is complementary to third-party digital PC game distribution via platforms."[108]  I do not claim that they *must* be complementary; my conclusion is simply that whatever relationship that exists between first- and third-party distribution platforms is certainly *not* as competitive substitutes.

(63)    Additionally, Dr. Gowrisankaran's critique is inconsistent with his own interpretation of substitutes.  Dr. Gowrisankaran states that substitutes "are the products that a consumer would consider when trying to make a purchase to meet a specific need."[109]  The issue, of

---

105     Chiou Rebuttal Merits Report, 3/26/2025, § 4.2.1.

106     Gowrisankaran Rebuttal Merits Report, 3/26/2025, § 5.3.

107     Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 77, 84.

108     Schwartz Opening Merits Report, 1/27/2025, ¶ 95. (Emphasis added.)

109     Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 85.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

course, is whether the different distribution platforms are sufficiently close substitutes such that in response to a small but significant non-transitory increase in price from the competitive price level of one product, users and publishers could turn to the alternative to make the price change unprofitable. The mere fact that one or more consumers might switch in response to large price increases is irrelevant, and does not speak to that crucial question for defining a relevant market.

(64)    In my Opening Merits Report (and as discussed throughout this section), I demonstrate that the majority of publishers cannot feasibly consider first-party distribution, and therefore, it cannot be a reasonable substitute for third-party distribution.[110] Dr. Gowrisankaran presents no evidence or analysis to challenge that conclusion. Dr. Gowrisankaran also states that "product A is a substitute for product B if, once the consumer owns product A, they would derive less value from product B than if they didn't own A."[111] He offers no evidence that first- and third-party distribution fit this scenario, and I am unaware of any such evidence. Developers and users may find it valuable to use these distribution channels alongside one another. Indeed, Dr. Chiou's Exhibit 4 shows that █ out of the ███████████ of 2024 are distributed on both first- and third-party platforms, indicating that publishers can find it beneficial to use these platforms *together*.[112] Just as Dr. Chiou does, Dr. Gowrisankaran fails to recognize that users and publishers can derive value from using two goods simultaneously and not find them to be substitutes.

## 3.4. Console platforms are not viable substitutes for third-party distribution

(65)    Dr. Chiou's claim that "console and PC platforms are close substitutes" is fundamentally flawed.[113] Dr. Chiou begins her analysis by stating that "[t]hese distribution channels are substitutes because [] the core service of matching users and publishers can occur in either of them."[114] That statement reveals the gap in Dr. Chiou's concept of the product at issue. While a two-sided platform serves to match participants on either side of the platform, that does not mean that any platform in which video games are used or sold are substitutes at all,

---

[110]    Schwartz Opening Merits Report, 1/27/2025, ¶ 84.

[111]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 85.

[112]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 140.

[113]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 190.

[114]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 190.

much less sufficiently close substitutes to be in the relevant market. Dr. Chiou ignores the industry realities that prevent developers and users from being able to switch from a third-party distribution platform to consoles. Given a small but significant non-transitory increase in price on Steam from the competitive level, and assuming console prices remain constant, would enough users and publishers switch to consoles to render that price change unprofitable for Steam? Dr. Chiou does not address this question—the relevant question— and as such, does not change my opinion that distribution services for PCs and consoles (including handheld consoles), are not substitutes for third-party digital distribution via platforms.[115]

(66)    First, Dr. Chiou argues that "competition and substitution between PC and console platforms [is] driven by high levels of publisher and user multihoming on popular or similar games."[116] Repeating the same analytical error she made in her earlier arguments, this argument fails as well. The presence of multihoming says nothing about whether third-party distribution and gaming consoles are sufficiently close substitutes that a small but significant non-transitory increase in price on one would engender so much of a change in engagement on both platforms to render the price increase unprofitable.

(67)    Dr. Chiou misses the critical economic point, namely that the existence of different distribution channels and the fact that some publishers and consumers use them are not sufficient for these channels to be considered economic substitutes. She further attempts to support her substitutability claim with discussion of how PC/console multihomed games allegedly have enough similarities to be substitutes, such as, the same overall functionality, correlated file sizes, and similar reviews.[117] This also misses the point. Similarities in the end product (i.e., the game) do not speak to the distribution options for that end product. Evidence of multihoming between distribution channels and any similarities across the games offered is simply not sufficient for those channels to be economic substitutes in a relevant market.[118]

(68)    To infer meaningful substitution between third-party distribution platforms and consoles for a market definition analysis, Dr. Chiou would need to present evidence that users and developers significantly substitute away from third-party distribution platforms in response to a small but significant non-transitory increase in price, such that profitability of third-party

---

[115]    Schwartz Opening Merits Report, 1/27/2025, § 4.1.3.

[116]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 194.

[117]    Chiou Rebuttal Merits Report, 3/26/2025, § 5.1.2.

[118]    See Section 3.2 for further discussion.

platforms is affected.  I am not aware of any evidence that shows this, nor does Dr. Chiou provide any.  Dr. Chiou instead presents evidence that "of the top 100 games on Steam in 2024, games that are available on console platforms account for the majority of Steam revenue[,]"[119] incorrectly concluding that this is evidence of competitive pressure between consoles and PC game distribution.[120]  It is not; the economic leap she attempts cannot cover the gap in supporting evidence.  Instead, this evidence indicates that developers can be successful on Steam when offering their games on both Steam and consoles.

(69)    Next, Dr. Chiou claims that "[b]y responding to competitive pressure through efforts to make their platforms more attractive to publishers and users, PC and console platform operators reveal their belief in a strong threat of substitution between PC and console gaming devices[.]"[121]  Dr. Chiou's discussion does not focus on the relevant parties.  Valve and/or console operators making changes to their platforms to attract users to their platform does not readily imply that developers and/or users find consoles and third-party distribution platform to be substitutable.  As discussed in my Opening Merits Report, evidence indicates that in the face of a small but significant non-transitory change in the relative price of goods, developers and users using a third-party distribution platform could not feasibly turn to consoles and away from Steam.[122]

(70)    Dr. Chiou jumps to conclusions about Valve's business intentions and motivations.  Wanting to attract a new group of users does not necessarily indicate that Valve faces competitive pressure from consoles.  What can be inferred from the evidence Dr. Chiou presents is that Valve wishes to increase its user base to boost its revenues.  Internal documents show that Valve and others do not consider video game distribution services for consoles to be directly substitutable with video game distribution services for PC.[123]

---

[119]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 200, Exhibit 8.

[120]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 203. ("The analysis I presented in Exhibit 8 shows that multihoming between PC and console platforms exerts substantial competitive pressure on Valve because the games for which publishers multihome account for a substantial portion of Steam revenue.")

[121]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 228.

[122]    Schwartz Opening Merits Report, 1/27/2025, § 4.1.3.

[123]    For example, see:

Valve, Emails Regarding ▮▮▮▮ Meeting, 9/12/2013–9/13/2013 (VALVE_ANT_0164882–84, at VALVE_ANT_0164883). ("We have spent a ton of time and energy over the past two years trying to convince ▮▮▮▮ that shipping day and date on the PC won't cannibalize their console sales.")

(71)    In addition, Dr. Chiou claims that Valve's more recent development of and investment in the Steam Deck and evidence of potential similarities between the Steam Deck and handheld consoles is consistent with PC gaming platforms and consoles operating as substitutes.[124] Dr. Chiou's analysis wrongly focuses on assessing whether the Steam Deck reflects an attempt by Valve to compete with consoles.[125] The correct question is whether users and publishers of third-party distribution platforms would find the Steam Deck to be a reasonable substitute. Dr. Chiou offers no evidence—and I am not aware of any—to suggest that consumers substitute away from third-party PC platforms and to the Steam Deck in response to changes in the terms and conditions of sale, including price increases. I find this unlikely at least because of the expense associated with purchasing the Steam Deck.[126] Users may use the Steam Deck as a supplement to Steam and/or the Steam Deck may attract additional players to Valve's ecosystem, but that does not reflect meaningful substitution in which users would significantly reduce their engagement with Steam in response to a change in price. Dr. Chiou's critique is unsupported.

(72)    Publishing on consoles is substantially more challenging than publishing on PC, due to a number of factors, including the game approval process, technology and performance capabilities, and frequency of hardware updates, among others.[127] These challenges result in a large discrepancy in available content.[128] As such, it is likely that only a trivial number of

---

Valve, Emails Regarding Promotions, 2/2/2017–2/22/2017 (VALVE_ANT_1163340–43, at VALVE_ANT_1163340), available at Ricky Uy, Dep. Tr., 10/24/2023, Exhibit 173. ("These aren't competitive products – they are for entirely different platforms, so no [sales] cannibalization as they are not selling PC games and we are not selling PS4 games.")

Valve, Emails Between ▮▮▮▮ Employees and Valve Employees, 1/28/2020–2/27/2020 (VALVE_ANT_0053218–228, at VALVE_ANT_0053226). ("[R]eleasing on Steam simultaneously with console (for example) shows that the game benefits by using our own game (Team Fortress 2) as an example. Furthermore, you can see strong correlation in the spikes between PC and console. Even in places where the *discount or player event is only applied on PC*, you see a spike not just in PC sales, but also in console sales at retail. That is because of network effects. If person A is a PC player and gets excited and talks about a game with friends B (PS4 player) and C (Switch player), then B and C are still excited as long as they can also play the game on their platform of choice.")

For additional examples, see:

Schwartz Opening Merits Report, 1/27/2025, ¶ 114.

[124]    Chiou Rebuttal Merits Report, 3/26/2025, § 5.2.3.

[125]    Chiou Rebuttal Merits Report, 3/26/2025, § 5.2.3.

[126]    Steam, Steam Deck, https://store.steampowered.com/steamdeck/ (accessed 4/22/2025). (Showing that the prices for the Steam Deck range from $399 to $649.)

[127]    Schwartz Opening Merits Report, 1/27/2025, § 4.1.3.

[128]    Schwartz Opening Merits Report, 1/27/2025, § 4.1.3.

While Dr. Chiou claims that console platforms have begun allowing indie developers to self-publish on their platforms, this does not dispute my claim that there is a significant discrepancy in content availability between consoles and PCs and

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

publishers would consider switching to consoles given an increase in third-party PC platform prices, and certainly an insignificant enough number to render the price increase still profitable.  On the other side, users face a significant up-front price to either play on console or on PC.  For any users who do not multihome, a small but significant non-transitory increase in price on Steam would be insignificant relative to the price of the console and therefore not cause them to invest in an expensive console.  For users who do multihome, which Dr. Chiou claims is 29% of PC and/or console players,[129] a small but significant non-transitory increase in price would not be likely to impact a user's engagement with the third-party PC platform given the significant discrepancy in content availability between consoles and PCs, genre-specific preferences for each platform that can affect platform offerings and where users play certain games, and the use and success of different monetization strategies across platforms.[130]  As such, any small but significant non-transitory increase in price would not affect substitution for these multihoming users.

## 3.5.    Subscription services are not viable substitutes for third-party distribution

(73)    I disagree with Dr. Chiou's claim that "multi-game subscription services are close substitutes for Steam and should therefore be included in the same market as Steam in this matter."[131]  In Section 4.1.3 of my Opening Merits Report, I show that the evidence overwhelmingly demonstrates that PC game subscriptions are not substitutes for third-party digital distribution platforms.  While Dr. Chiou claims that my "exclusion of multi-game subscriptions from [my] relevant market is not supported by an appropriate analysis of substitution[,]"[132] my analysis is, in fact, guided by the *Brown Shoe* factors that provide relevant indicia to consider when defining a relevant market.[133]  In my Opening Merits Report,

---

that publishers would not readily switch from PC to console given a small but significant non-transitory price increase.  In March 2023, there were over 67,000 games available on Steam and only 12,000 games available on Nintendo Switch, 6,000 games on PlayStation, and 3,000 on Xbox.  See:

Schwartz Opening Merits Report, 1/27/2025, ¶ 110.

Chiou Rebuttal Merits Report, 3/26/2025, ¶ 238.

[129]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 205.

[130]    Schwartz Opening Merits Report, 1/27/2025, ¶¶ 110, 112–113.

[131]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 250.

[132]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 254.

[133]    For further discussion, see:

Schwartz Opening Merits Report, 1/27/2025, § 4.1.1.

I discuss that PC game subscriptions have distinct customers[134] and distinct pricing structures from third-party distribution platforms.[135] In addition to these factors, PC game subscriptions offer distribution for a comparatively limited set of developers,[136] and Valve documents indicate that PC game subscriptions are not substitutable with third-party distribution.[137] Given these distinct differences, of which Dr. Chiou has not invalidated, it is highly unlikely that users and/or publishers would consider substituting to multi-game subscriptions given a small but significant non-transitory increase of the price of third-party distribution platforms relative to the price of multi-game subscriptions.

(74)    In fact, much of the evidence used by Dr. Chiou to frame multi-game subscriptions and third-party distribution as substitutes[138] actually supports my conclusion. For example, a

---

[134]    Schwartz Opening Merits Report, 1/27/2025, ¶¶ 97–100.

[135]    Schwartz Opening Merits Report, 1/27/2025, ¶ 103.

[136]    Schwartz Opening Merits Report, 1/27/2025, ¶ 102.

[137]    Schwartz Opening Merits Report, 1/27/2025, ¶105.

Valve, Emails Between ▮▮▮▮ and Valve Employees, 4/19/2022–5/3/2022 (VALVE_ANT_1045749–753, at VALVE_ANT_1045752). ("We do see that ▮▮▮▮ subscribers still buy games on Steam. . . to keep their library consolidated. We think that even with some content outside Steam, ▮▮▮▮ would still bring more net customers into Steam who invest more time and purchases in their library. This leads to better outcomes for developers and for gamers who discover new titles.")

Valve, Steam 2020 Update Presentation, 2020 (VALVE_ANT_1554250.pptx, at Slides 18, 20). (Indicates that Valve developed ▮▮▮▮▮▮▮▮▮▮▮▮

Valve, Emails Regarding ▮▮ Returning to Steam, 3/18/2015–3/26/2015 (VALVE_ANT_0293869–870, at VALVE_ANT_0293869). ▮▮▮▮▮▮▮▮▮▮▮▮

Dr. Chiou presents evidence of "Microsoft report[ing] that adding games on its Game Pass subscription service leads to declines in regular sales of those games[.]" This evidence does not consider whether publishers can reasonably and feasibly turn to subscriptions, and therefore, on its own, it cannot imply substitutability between subscriptions and third-party distribution. My Opening Merits Report discusses multiple reasons why publishers do not find subscriptions to be substitutable with third-party distribution, including that the opportunities for distribution through subscriptions are relatively limited compared to third-party distribution.

In addition, while cannibalized sales may indicate that some users switch from a third-party distribution platform to Microsoft's Game Pass for certain games, Dr. Chiou does not contextualize this evidence in terms of the relevant question of a market definition analysis. That is, whether given a small but significant non-transitory change in relative prices, users would substitute to multi-game subscriptions in significant numbers such that the price increase becomes unprofitable. Given the discrepancies in availability and differing gameplay and financial considerations (as discussed in my Opening Merits Report), it is unlikely that a sufficient number of users would reduce their engagement with a third-party platform in favor of a multi-game subscription like Game Pass to render a price increase unprofitable. See:

Chiou Rebuttal Merits Report, 3/26/2025, ¶ 252.

Schwartz Opening Merits Report, 1/27/2025, ¶¶ 100–104.

[138]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 252.

---

document Dr. Chiou cites states that subscriptions are "fully differentiated from Steam and EGS[.]"[139] Another document she cites discusses that subscriptions provide a different pricing structure than third-party distribution.[140] As another example, Dr. Chiou notes that "[m]ulti-game subscription services generally offer new games monthly, and those games are often also available on Steam."[141] Dr. Chiou again conflates multihoming and substitutability.[142]

(75)    Dr. Chiou also cites to testimony from Adam Fossa that states that ███████████ ████████████████████████████████████████████████████ ██████████████████"[143] While Dr. Chiou considers this testimony to be an example of how industry participants view multi-game subscriptions and PC distribution to be substitutable,[144] it shows nothing more than █████████████████████ ██████████████████████████ or say anything about how Steam and/or users see this.

(76)    In the face of a small but significant non-transitory increase in price on Steam, there is no supporting evidence and thus I find it unlikely that users would substituting to multi-game subscriptions to any meaningful degree, and none of Dr. Chiou's arguments indicate otherwise. The same is true for publishers. As stated in my Opening Merits Report, "subscriptions provide distribution for a particular set of publishers, in contrast to third-party digital PC game distributors that advertise distribution services for a wide range of publishers."[145] That a limited subset (██ out of the top 50 Steam Games) is available via a subscription service as well, as stated by Dr. Chiou,[146] does not have any bearing on this conclusion for the same reasons multihoming is not sufficient evidence of substitution as discussed earlier in this report.

---

[139]    Chiou Rebuttal Merits Report, 3/26/2025, fn. 437.

[140]    Chiou Rebuttal Merits Report, 3/26/2025, fn. 440.

[141]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 253.

[142]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 253. ("[S]everal of the highest-revenue games available on Steam are also currently available on Microsoft's Game Pass. Among the top 50 Steam games by 2024 Steam revenue, ██ ██ percent) were available on Game Pass as of March 2025. The games that are available on both Microsoft's Game Pass and on Steam exert competitive pressure on Steam because they include large, popular games that account for a substantial amount of Valve's revenue from Steam.")

[143]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 252.

        Adam Fossa, Dep. Tr., 1/29/2024, 29:24–30:2.

[144]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 252.

[145]    Schwartz Opening Merits Report, 1/27/2025, ¶ 100.

[146]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 253.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## 3.6.   Cloud gaming platforms are not viable substitutes for third-party distribution

(77)   I disagree with Dr. Chiou's claim that "cloud gaming platforms are close substitutes for Steam and should therefore be included in the same market as Steam in this matter."[147]   Section 4.1.3 of my Opening Merits Report discusses that cloud gaming cannot be a viable substitute for PC game distribution platforms.   Cloud PC gaming is inherently different from traditional PC gaming, and it is a limited option for traditional PC gaming users because of the additional technical requirements.[148]   Because of these technical requirements, it is unlikely that a small increase in the price on third-party PC distribution platforms would translate to a significant enough portion of users substituting to cloud gaming.   Further, as noted in my Opening Merits Report, cloud gaming can be offered in conjunction with a third-party platform whereby users can purchase cloud gaming functionalities for games that they have already purchased through the third-party platform.[149]   Such a service would clearly not be a reasonable substitute because in response to a relative price change, users wouldn't be able to reduce their engagement with the third-party platform in favor of this cloud gaming service.   Overall, Dr. Chiou's weak attempt to describe the similarities in the gaming experiences between cloud gaming platforms and Steam does not change my opinion that these methods are not substitutable.

(78)   In fact, evidence presented by Dr. Chiou supports my conclusion that a meaningful number of users would not find cloud gaming to be substitutable with third-party distribution platforms.   An online article included by Dr. Chiou discusses the distinct pricing structure and technological limitations of cloud gaming.[150]   Another source cited to by Dr. Chiou states

---

[147]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 255.

[148]   For further discussion, see:

Schwartz Opening Merits Report, 1/27/2025, ¶¶ 123–124.

[149]   For example, NVIDIA GeForce Now is a service where you can play existing games purchased on other platforms.  See:

NVIDIA, GeForce Now, https://www.nvidia.com/en-us/geforce-now/ (accessed 1/25/2025).

Steamworks Documentation, Steam Cloud Play (Beta), https://partner.steamgames.com/doc/features/cloudgaming (accessed 4/11/2025). ("Steam Cloud Play is currently in Beta and features are being added over time. We are now accepting a limited amount of games into the service as we continue to build features and server capacity for players. The first service we are connecting to Steam to allow users to play games from their Steam Library from the Cloud is NVIDIA GeForce NOW.")

See, also: Schwartz Opening Merits Report, 1/27/2025, fn. 344.

[150]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 258, fn. 451.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

that "[w]hile cloud gaming offers convenience and flexibility, PC gaming provides unmatched control and performance. Your choice should align with your gaming priorities, budget, and how you plan to play."[151] Further, Dr. Chiou again erroneously concludes that the "substantial overlap in titles publishers offer on Steam and cloud gaming platforms" as evidence of substitution.[152] This is, as an economic matter, simply not the case and is not sufficient to prove sufficiently close substitution to warrant including cloud distribution in the same relevant market as third-party distribution via platforms.

## 3.7.  Non-gameplay platforms and third-party key resellers are not part of the relevant market

(79)   Dr. Chiou argues that "(a) Valve must compete with platforms that offer transactions regardless of whether they offer gameplay, (b) from a user perspective, buying a Steam key is a substitute to buying the game on Steam since they offer an identical product, and (c) publishers are motivated to substitute between selling games on Steam and selling Steam keys because they typically pay lower revenue shares on key reseller sites."[153] Dr. Chiou further claims that "[b]ecause Valve earns revenue for transactions that occur on Steam, Valve must compete for a transaction to occur on Steam instead of on other platforms. Otherwise, Valve would not earn revenue from the interaction, even if gameplay for those key purchases still occurred on Steam."[154]

(80)   Dr. Chiou's claims are incorrect. While publishers can sell games on Steam (or other third-party platforms) and can sell Steam Keys (or other third-party platform keys) on non-gameplay platforms, publishers cannot *substitute* third-party platforms for non-gameplay platforms. Since Steam Keys must be redeemed on Steam, a publisher selling Steam Keys must publish

---

HP, "Gaming Evolution: From PC to Cloud Gaming," 1/21/2025, https://www.hp.com/us-en/shop/tech-takes/gaming-evolution-pc-to-cloud-gaming. ("Cloud gaming primarily involves subscription fees, typically ranging from $10 to $20 per month. While users might spend close to $1,000 after five years, they won't own any hardware (which could be resold). Though the cost is spread out for premium cloud gaming services, it's not always more economical long-term relative to performance."; "While cloud gaming can be more reliable in some ways (reduced hardware failure risk), it has limitations. Most providers implement queuing systems due to limited data center resources and restrict gaming session lengths.")

[151]   Chiou Rebuttal Merits Report, 3/26/2025, fn. 451.

HP, "The Future of Gaming: Comparing PC and Cloud Gaming in Singapore," 2/12/2025, https://www.hp.com/sg-en/shop/tech-takes/post/gaming-evolution-pc-to-cloud-gaming. ("Both PC and cloud gaming have their place in Singapore's gaming ecosystem. While cloud gaming offers convenience and flexibility, PC gaming provides unmatched control and performance. Your choice should align with your gaming priorities, budget, and how you plan to play.")

[152]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 257.

[153]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 185.

[154]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 186.

its game on Steam. Similarly, to play games sold through a Steam Key, a user must have a Steam account.

(81)     Further, Valve is in control of the number of Steam Keys distributed to publishers, and given a small, non-transitory change in price on Steam, it is unlikely that the number of keys given to publishers would materially change.[155] Resultingly, only a finite number of users can purchase a given game via a Steam Key (and, again, Valve is in control of that number), and a publisher cannot simply choose to sell via a non-gameplay platform *instead* of on a third-party platform. Publishers and users must interact with both types of platforms. Non-gameplay platforms do not offer a distribution platform on which users can play the game, nor do they offer a platform that allows for continuous interaction between the player and publisher. Even Dr. Gowrisankaran states that because Humble Bundle and the Humble Store, non-gameplay platforms, "operate the majority of their business using Steam keys to distribute titles, they are light on infrastructure and offer much more limited services to publishers."[156] Dr. Gowrisankaran adds that "Humble relies on Steam and other platforms to distribute game content, provide platform features, and to continue to connect the consumer and publisher" and that, as a result, Humble Bundle and the Humble Store are "less suitable benchmarks for a platform with Steam's capabilities."[157]

(82)     Dr. Chiou further claims that "Dr. Schwartz also fails to analyze the competitive pressure that Steam key sales impose on Valve."[158] Dr. Chiou fundamentally misunderstands Steam Keys. As I will discuss later in Section 6.2.1, Steam Keys are a feature offered *by Valve* that provides value to *both* publishers and Valve. It makes no economic sense to suggest that Valve competes with its own offered feature. Valve is a profit-maximizing firm and offers Steam Keys to drive users to Steam by facilitating multihoming at a retail function rather than multihoming at a distribution level.

---

[155]     Steamworks, Steamworks Documentation: Steam Keys, https://partner.steamgames.com/doc/features/keys (accessed 1/21/2025). ("FAQ[:] Q: How many Steam Keys can I get for my game? A: Games and applications launching on Steam may receive up to 5,000 Default Release Steam Keys to support retail activities and distribution on other stores. After that, all Steam Key requests are reviewed on a case-by-case basis. . . . Q: Why was my key request denied? A: When reviewing Steam Key requests, we typically look at the level of customer interest on Steam, the total number of keys that have been issued and activated for the game and the additional number that are being requested. A request will usually get rejected if there's an imbalance that suggests the developer is not making an offer to Steam customers that is comparable to what Steam Key purchasers are offered.")

[156]     Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 279.

[157]     Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 279.

[158]     Chiou Rebuttal Merits Report, 3/26/2025, ¶ 188.

(83)    As discussed in my Opening Merits Report, non-gameplay platforms should not be included within the relevant market and my inclusion of several large non-gameplay platforms for which key sale data exists in my market share calculation was purely for the purpose of being conservative *only serves* to understate, rather than overstate, Valve's market share and market power.[159] The inclusion of these does not impact my opinions about Valve's monopoly power nor do they materially impact the market share. Removing these altogether would result in Steam's market share increasing to ▮▮▮▮ and a resulting increase in damages.[160]

## 3.8.    Physical distribution is not a viable substitute for third-party distribution

(84)    Physical distribution through brick-and-mortar outlets is not a reasonable economic substitute for digital third-party PC game distribution services. There are significant differences between digital and physical distribution for both users and developers that make them inadequate economic substitutes for antitrust purposes.[161]

(85)    Dr. Chiou's inclusion of physical distribution in the relevant market ignores the time dimension of the relevant market analysis. Digital markets continue to evolve quickly, which introduces dynamic elements to the market definition analysis. When markets evolve and a participant is no longer competitively meaningful, the relevant market analysis and definition must reflect this evolution. If one doesn't properly consider market evolution over time, markets could *only grow* in size and new markets would never form. To the extent Dr. Chiou is arguing that at some point in time physical distribution and Steam were close substitutes, that argument fails at extending the bounds of the relevant market in this case to include both methods of distribution. Her analysis is flawed and misleading. See Section 4.1 for further discussion.

---

[159]    Schwartz Opening Merits Report, 1/27/2025, ¶ 68.

[160]    Schwartz Supplemental Opening Merits Report, 3/7/2025, Supplemental Attachment E-1.

Humble Bundle, Target, Best Buy, Green Man Gaming, and GamersGate are excluded from the calculation below as they are non-gameplay platforms. See:

Schwartz Opening Merits Report, 1/27/2025, ¶ 66.

Total gameplay third-party platform market size (2017 to 2023) = ▮▮▮▮▮ (Steam) + ▮▮▮▮▮ (EGS) + ▮▮▮▮▮ (GOG Galaxy) + ▮▮▮▮▮ (Ubisoft Connect (f/k/a Uplay)) + ▮▮▮▮▮ (Microsoft Store (f/k/a Windows Store)) = ▮▮▮▮▮

Steam market share = ▮▮▮▮▮▮▮ = ▮▮▮ .

[161]    Schwartz Opening Merits Report, 1/27/2025, § 4.1.3.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## 3.9.    Dr. Chiou's market size analysis is overinclusive and unreliable

### 3.9.1.    Dr. Chiou uses inappropriate data for her market share analysis

(86)    Dr. Chiou relies on publicly available data from Newzoo to estimate the size of the market.[162] These data do not, and indeed, are not intended to reflect any relevant antitrust market. Instead, these data represent a compilation of sales across a variety of distribution channels. However, Dr. Chiou claims instead that "since the boundaries of Dr. Schwartz's proposed market are artificially drawn, he cannot accurately calculate Valve's share using reliable data from a leading market research firm like Newzoo, IDC, or Circana."[163] Even if correct, which it is not, this is irrelevant. Market share estimates should reflect the market relevant to the case at hand and should not be driven by the availability of data from some industry sources that were not collected to reflect shares in a relevant antitrust market.[164]

### 3.9.2.    Dr. Chiou ignores evidence produced in this case that supports that Steam has a high market share in a properly defined relevant market

(87)    The documentary evidence produced in this case illustrates (and thus supports my calculation of) Valve's high and sustained market share in the relevant market.[165] For example, one Epic

---

[162]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 274.

As Dr. Chiou's market is overly broad, her resulting market share calculation is misleading and unreliable for purposes of this case. Dr. Chiou inappropriately includes revenues from console distribution, which should be excluded from the relevant market. See:

Chiou Rebuttal Merits Report, 3/26/2025, ¶¶ 274–275.

Schwartz Opening Merits Report, 1/27/2025, § 4.1.3.

In addition, the Newzoo data relating to PC distribution is overinclusive as it ███████████████████ ████████████████████████████ These revenues should not be included in any market size or share calculations for the relevant market in this case. See:

Chiou Rebuttal Merits Report, 3/26/2025, ¶ 320.

Schwartz Opening Merits Report, 1/27/2025, § 4.1.3.

[163]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 282.

[164]    Dr. Chiou's characterization of my market definition as artificial is false. My market definition carefully considers the facts of the case, are related to the plaintiffs' claims, includes products that are reasonable substitutes for one another within the market, and excludes products for which there is not feasible and reasonable substitution for both publishers and users. That my market definition does not fit the constraints of publicly available data from market research firms which have done no such analysis has no bearing on whether the market is a reliable relevant market for purposes of this litigation.

[165]    Schwartz Opening Merits Report, 1/27/2025, ¶¶ 140–141.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

document states that Steam had a 95%+ market share of all third-party digital PC games sales (excluding first-party distribution platforms "Origin, [B]attle.net and Riot etc.").[166]  This evidence supports my market definition analysis, and negates Dr. Chiou's claim that I "cannot accurately calculate Valve's share" because "the boundaries of [my] proposed market are artificially drawn[.]"[167]

### 3.9.3.  Dr. Chiou inappropriately critiques my market share analysis and calculation

(88)  Dr. Chiou criticizes my use of internal documents and financials produced in this case to calculate market size and market share for Valve, arguing that I use "a variety of noncomparable and unreliable data sources to estimate [my] proposed market shares."[168]  First, Dr. Chiou misses a fundamental point: perfect market share data rarely exist, except in the rarefied air of academic discourse.  In the real world, businesses rarely, if ever, have such data.  The data on which I rely for my market share analysis reflect actual sales and/or internal company estimates of sales used in the ordinary course of business to make key business decisions.[169]  My market size and share calculation represents the relevant antitrust

---

In her report, Dr. Chiou only addresses the Epic presentation estimates, claiming that it is "unreliable" solely because "GOG's revenues from the EGS Board of Directors presentation contradict the revenues reported in GOG's financial statements."  See:

Chiou Rebuttal Merits Report, 3/26/2025, ¶ 289.

This discrepancy amounts to only $6 million in 2018 (~$40 million - $34 million) and $8 million (~$42 million - $34 million) in 2019, and is likely due to a difference in the currency conversion factor applied to my estimates and EGS's estimates. See:

Chiou Rebuttal Merits Report, 3/26/2025, fn. 507.

Schwartz Opening Merits Report, 1/27/2025, Attachment E-6.

Epic, "Presentation to the Board of Directors," 8/13/2019 (EPIC_VALVE_0000364–389, at EPIC_VALVE_0000369).

CD Projekt, Consolidated Financial Statement, 2019, at 26, 31.

[166]   Epic, Epic Games Store Presentation, c. 2019 (EPIC_VALVE_0000013–057, at EPIC_VALVE_0000021).

[167]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 282.

[168]   Chiou Rebuttal Merits Report, 3/26/2025, ¶ 289.

[169]   Dr. Chiou claims that I dismiss the "most accurate data available to measure the numerator of Valve's share in his proposed market[,]" which is through the produced transaction data.  The transaction data closely aligns with the P&L data—also produced by Valve for purposes of this litigation and thus also accurate and appropriate to use.  I also rely on other P&L data, importantly, from the Epic Games Store, in determining my market share calculation.  Dr. Chiou's attempted critique is also not aligned with her own analysis, which uses public data and estimates, rather than data produced in this matter. See:

Chiou Rebuttal Merits Report, 3/26/2025, ¶ 288.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

market in this case, unlike Dr. Chiou's calculation, and is based on the most readily identifiable and most granular data made available for the purposes of this litigation.

(89)    Dr. Chiou claims that "Dr. Schwartz relies on old revenue estimates for certain platforms and assumes these revenues stay constant over time, potentially further deflating the size of his proposed market," as this "assumes that these platforms did not experience third-party revenue growth since 2019[.]"[170]  Once again, my analysis uses the best available data to me and I do not make this assumption, nor any assumptions, without justification.  Importantly, I consider the realities of the relevant market to support the assumptions I make.  While Dr. Chiou makes this meritless critique, she provides no better alternative as she presents no updated data, nor any other evidence, that shows these platforms experienced growth since 2019, nor that any other assumption would be more reasoned and supported than mine.

(90)    Further, the assumption of no change in revenues for these platforms since 2019 *also* assumes no *decline*.  As I discuss in my Opening Merits Report, this assumption is not only justified given the realities of the market, it is conservative.  The presentation I rely upon estimated constant or even slightly declining transaction values on GOG and GamersGate from 2018 to 2019.[171]  Further, I understand that as of the date of this report, Ubisoft no longer offers third-party games on Ubisoft Connect, meaning revenues would be zero.[172]  In 2023, the Ubisoft Store ███████████ of third-party sales in the U.S. across both PC and console.[173]  Assuming constant transaction values for Ubisoft in 2020 and 2021 is likely a conservative assumption, as they were forced out of the market shortly thereafter.  Dr. Chiou's critique ignores this, and thus, her critique falls short.

(91)    Dr. Chiou further critiques my market share calculation, claiming that "Dr. Schwartz underestimates the size of his proposed market by leaving out competitors that are part of his proposed relevant market."[174]  Dr. Chiou claims that I do this through my "bottom-up" approach, thereby "exclud[ing] platforms with third-party sales."[175]  As evidence, Dr. Chiou argues that I did not include Tencent's WeGame, a platform that is targeted towards the

---

170    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 290.

171    Schwartz Supplemental Opening Merits Report, 3/7/2025, Supplemental Attachment E-7.

172    Rietveld Report, 1/27/2025, § V.C.

173    Ubisoft, Sales Data, c. 2023 (HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY Valve Subpoena data 29Nov23.xlsx, at tab 'Q1 B').

174    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 285.

175    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 285.

Chinese market.[176]  However, Dr. Chiou states that "Dr. Schwartz and I agree that the relevant antitrust market in this matter is _global_[.]"[177]  As such, her critique that I do not include Tencent WeGame (or any region-specific platform) contradicts even her own definition of the relevant market, as WeGame is not a global platform.[178]  To the extent that Dr. Chiou means to argue that any platform that sells a third-party game anywhere in the world should be considered in the relevant market, this opinion would only further highlight the flaws in her analysis.  Geographic considerations are highly important to an antitrust market analysis.  When platforms have limited geographic overlap, this is a reasonable basis to exclude region-specific platforms such as WeGame from the relevant market.

(92)    Dr. Chiou also claims that I improperly exclude various other third-party platforms who distributed third-party games, including Discord, itch.io, and EA.[179]  I mention in my Opening Merits Report that I understand that Discord, itch.io, and EA's third-party sales are _de minimis_ and thus would make a negligible impact on my calculation such that excluding would offer

---

[176]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 285.

Credit Suisse, "CAPCOM[:] Focus on Credibility of Profit Growth Prospects and New Growth Drivers in FY3/20," 11/20/2018, at 4. ("Whereas Steam is a global digital download service, WeGame is primarily for the Chinese market.")

[177]    Chiou Rebuttal Merits Report, 3/26/2025, fn. 492. (Emphasis added.)

[178]    Dr. Chiou cites to an article that claims that "Tencent has launched the global version of WeGame[.]"  See:

Chiou Rebuttal Merits Report, 3/26/2025, fn. 492.

However, while I similarly understand that Tencent allegedly "soft-launched" WeGame X, an international version of WeGame, in 2019, the WeGame X homepage (https://www.wegamex.com.hk/) does not currently load, and the latest archived version of the webpage is from April 2021.  I have not seen any public information regarding if, and to what extent, if at all, WeGame X is still operational.  See:

Game World Observer, "WeGame X Is Out Globally: Tencent Launches the International Version of its Chinese Storefront," 8/4/2019, https://gameworldobserver.com/2019/04/08/tencent-launches-wegame-x-globally.

South China Morning Post, "Tencent Quietly Launches Its WeGame Store Outside China," 4/3/2019, www.scmp.com /abacus/tech/article/3029259/tencent-quietly-launches-its-wegame-store-outside-china.

Internet Archive, WeGame X Home Page, https://web.archive.org/web/20210401000000*/https://www.wegamex.com.hk/ (accessed 6/10/2024).

One article states that WeGame X was only marked as "Early Access" on the official site and that it was "testing [the platform] to serve its global users."  At that time, WeGame X only had 30 games, "the majority of which [were] from Chinese developers."  See:

GamesIndustry.biz, Tencent Stealth Launches International Version of WeGame Storefront," 4/8/2019, https://www.gamesindustry.biz/tencent-stealth-launches-international-version-of-wegame-storefront.

[179]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 285.

Dr. Chiou also claims that I exclude Direct2Drive.  I, as does Dr. Chiou, understand that Direct2Drive is a non-gameplay platform.  See 01_Workpaper.xlsx.  See also:

Chiou Rebuttal Merits Report, 3/26/2025, ¶ 55.  ("Both Direct2Drive and GamersGate focused on distributing games published by other firms.")

---

an appropriate estimate.  For example, the Discord Store was first established in 2018 but was unable to successfully compete and exited the relevant market shortly thereafter in 2019. See Section 6.2 of my Opening Merits Report.  Further, I understand that EA was unable to succeed with their third-party offerings on their own platform and on June 13, 2022, EA stopped offering games from third-party publishers on the Origin platform.[180]  Additionally, I understand that the majority of EA's PC gaming revenues are associated with first-party games and subscription services.[181]  Itch.io, which launched in 2013, was able to create a digital platform with 200,000 games as of 2019.[182]  However, Itch.io struggled to build a significant user base.  As of 2019, Itch.io had a user base "in the tens of thousands" as opposed to the tens of millions on the Steam platform.[183]  As such, in 2021, Itch.io joined EGS in order to "widen the audience of people who can discover the diverse collection of indie works that we host."[184]

---

[180]    Electronic Arts, "Upcoming Changes to the EA Origin Catalog," c. 6/2022, https://www.ea.com/ea-pc-third-party-titles-2022.

[181]    EA's Form 10-Ks do not mention third-party sales, instead emphasizing first-party offerings on their own platform and on other third-party platforms, such as Steam.  For example, EA's Form 10-K for the fiscal year ending on March 21, 2022, which was before EA stopped selling third-party games on its platform, states that "[EA's] PC games and services can be downloaded directly through Origin, EA's digital storefront, as well as through third-party online download stores, such as Steam."  The filing further states that, "We also offer our EA Play subscription service on consoles and PC as we look to build deeper relationships with our players and offer increased choice and flexibility for our players to try new games."  EA also states that they "derive revenue principally from sales of _our_ games, and related extra content and services that can be experienced on game consoles, PCs, mobile phones and tablets."  EA lists the following as their main "product and service offerings":

"[F]ull games with both online and offline functionality ('Games with Services'), which generally includes (1) the initial game delivered digitally or via physical disc at the time of sale and typically provide access to offline core game content ('software license'); (2) updates on a when-and-if-available basis, such as software patches or updates, and/or additional free content to be delivered in the future ('future update rights'); and (3) a hosted connection for online playability ('online hosting'); full games with online-only functionality which require an Internet connection to access all gameplay and functionality ('Online-Hosted Service Games'); extra content related to Games with Services and Online-Hosted Service Games which provides access to additional in-game content; subscriptions, such as EA Play and EA Play Pro, that generally offer access to a selection of full games, in-game content, online services and other benefits typically for a recurring monthly or annual fee; and licensing to third parties to distribute and host _our_ games and content."

EA, Form 10-K, 2022, at 4–5, 28. (Emphasis added.)

See also:

EA, Form 10-K, 2021, at 4–5, 28.

[182]    Games Hub, "Itch.io: an Itch for Democratic Distribution," 8/11/2020, https://www.gameshub.com/news/features/an-itch-io-for-democratic-distribution-260888-3445/.

[183]    Games Hub, "Itch.io: an Itch for Democratic Distribution," 8/11/2020, https://www.gameshub.com/news/features/an-itch-io-for-democratic-distribution-260888-3445/.

[184]    The Gamer, "Itch.io is Joining the Epic Games Store," 4/22/2021, https://www.thegamer.com/itch-io-epic-games-store/.

(93)    Dr. Chiou claims that even though they may be *de minimis*, their exclusion "underscore[es] the deficiencies of [Dr. Schwartz's] approach to estimating alleged market size."[185]  As the basis for her claims, Dr. Chiou cites to Merger Guidelines, which states: "If the merging firm had a reasonable probability of entering a highly concentrated relevant market, this suggests benefits that would have resulted from its entry would be competitively significant, unless there is substantial direct evidence that the competitive effect would be *de minimis*."[186]  The evidence I presented in my Opening Merits Report and above are in fact substantial direct evidence that the competitive effect would be *de minimis*.

(94)    Dr. Chiou proposes 51 additional distribution channels from the Is There Any Deal ("ITAD") data that she claims I should have included or considered including in my market share calculation.[187]  I have reviewed each of these distribution channels and none of them warrant inclusion in my relevant market share calculation.[188]  Dr. Chiou provides no data for any of these platforms, and it is likely that data for these obscure platforms does not exist or is so small that it would not impact the market share calculation in any meaningful way.[189]

### 3.9.4.    Dr. Gowrisankaran's critiques of my market share calculation are incorrect

(95)    Despite not conducting a market definition analysis, Dr. Gowrisankaran critiques my market share calculation and claims that there are "glaring errors with Dr. Schwartz's analysis of

---

[185]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 285.

[186]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 285.

U.S. Department of Justice and Federal Trade Commission, "Merger Guidelines," 12/18/2023, § 2.4.a available at: https://www.ftc.gov/system/files/ftc_gov/pdf/P234000-NEW-MERGER-GUIDELINES.pdf.

[187]    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 286.

[188]    As I discussed in my Opening Merits Report and above in Section 3.7, non-gameplay platforms should not be included within the relevant market.  Again, to be conservative, I did include several large non-gameplay platforms in the market share calculation—including *additional* entities in the relevant market only serves to understate, rather than overstate, Valve's market share and market power.

Of the 51 platforms that Dr. Chiou claims I did not consider, only two appear to be third-party distribution platforms: GameJolt and Playism.  Playism closed in March 2021 and has no available third-party sales information.  Similarly, GameJolt has no available third-party sales information.  The lack of information suggests that these platforms are competitively insignificant, likely with *de minimis* sales, at best, and would have no material impact on my analysis if included.

See See 01_Workpaper.xlsx.

[189]    I have been unable to find any transaction data for any of the third-party platforms or non-gameplay platforms listed by Dr. Chiou.

---

monopoly power."[190]  Dr. Gowrisankaran relies on Dr. Chiou's flawed and incomplete "evidence in her report that that [*sic*] these alternative distribution channels are substitutes that compete with Steam and other platforms in Dr. Schwartz's proposed relevant market (*i.e.*, platforms enabling third-party digital sales for PC games)."[191]  As such, Dr. Gowrisankaran's claims are based on a flawed and improper analysis and his conclusions are unsupported.

---

[190]     Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 77.

[191]     Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 79.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## 4.    Monopoly Power

### 4.1.    Valve entered the relevant market with monopoly power

(96)    Dr. Gowrisankaran argues that Valve did not have monopoly power when Steam was first launched, as physical distribution of video games through retail stores was "by far the most prevalent distribution channel and accounted for 80 percent of video game sales."[192]  Similarly, Dr. Chiou frames the creation of Steam as "product differentiation" which "Valve successfully used [] to compete with physical distributors."[193]  Dr. Chiou concludes that "[t]he increase of digital sales at the expense of physical sales demonstrates a high degree of substitution between physical and digital games" and that "Dr. Schwartz recognizes that users and publishers have substituted from physical to digital distribution, but he fails to properly interpret this shift as historical evidence of substitution."[194]  Dr. Chiou's conclusion is simply incorrect, and she and Dr. Gowrisankaran both ignore the dynamic element of digital markets.[195]  They also miss the fundamental difference between changed consumption patterns as a result of shifting demand in response to technological change and changes in a static setting.  In short, Dr. Chiou's conclusion is incorrect as a matter of microeconomics.

(97)    Markets, especially digital ones, form and evolve quickly.  If technology changes, the relevant market analysis, and thus the resulting relevant market definition, must reflect this evolution.  By ignoring market dynamics, Dr. Gowrisankaran and Dr. Chiou's analyses imply that the formation of a new market is impossible.   Dr. Gowrisankaran's reliance on physical distribution in claiming that Valve did not enter the relevant market with monopoly power suffers from this misunderstanding.  By enabling third-party distribution through the Steam platform, Valve created a new, distinct market that did not include physical distribution.

(98)    As is the case here, customers often drive market trends.  In understanding the changes in the market environment at the time that Steam entered, one cannot look only at the competitive environment when Steam entered.  As a matter of economics, the analysis must consider market dynamics, *e.g.*, the evolution of customer behavior and substitution, as well as the responses of the relevant market participants.  The pertinent consideration is not *when*

---

192    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 64.

193    Chiou Rebuttal Merits Report, 3/26/2025, ¶ 263.

194    Chiou Rebuttal Merits Report, 3/26/2025, ¶¶ 264–265.

195    For further discussion, see Section 3.8.

a product was first offered by a market participant (here, Valve), but rather when industry customers (both gamers and publishers) changed their behavior and *market boundaries changed*.

(99)     Further, as I have discussed earlier in this report and in my Opening Merits Report, physical distribution of PC games is fundamentally different from both a user and a publisher perspective, and as a result, is not an adequate substitute for digital third-party PC game distribution services.[196]    See Section 4.1.3 of my Opening Merits Report for further discussion.[197]

(100)   Dr. Gowrisankaran also argues that because "Steam was not the first entrant into digital distribution" Valve did not enter the market with monopoly power.[198] Dr. Gowrisankaran does not identify the "market" he claims Valve entered when it first began digital distribution of PC games.   He then states that "[i]t is important to consider the proposition that Steam had monopoly power as early as 2007 in the context of the industry conditions at the time" and discusses three other digital PC game distributors who were operating at the time of Valve's entry, which include Battle.net, PlayOnline, and GameFly.[199]   His analysis of the relevant market when Valve entered is flawed and not consistent with the evidence he cites.   First, none of these platforms compete in the relevant market in this case.  Battle.net offers Blizzard and Activision games exclusively and does not and has not offered third-party games on its platform.[200]   PlayOnline is similarly a first-party platform only, as it only offers games published by Square Enix, who founded PlayOnline.[201]   GameFly is a subscription service

---

[196]    Schwartz Opening Merits Report, 1/27/2025, § 4.1.3.

[197]    For example, because the user experience in a digital shopping environment is so different from a physical environment, users are unlikely to regard digital shopping and brick-and-mortar stores as substitutes for game purchases and digital distribution implies different business considerations compared to physical distributors; those differences are material to publishers when setting pricing and making other business decisions.

[198]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 64.

[199]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 64.

[200]    PC Gamer, "Oof: Years Before Steam, a Blizzard Engineer Wanted to Turn Battle.net into a Third-party Game Store, But Was Reportedly Turned Down," 10/8/2024, https://www.pcgamer.com/gaming-industry/oof-years-before-steam-a-blizzard-engineer-wanted-to-turn-battle-net-into-a-third-party-game-store-but-was-reportedly-turned-down/.

[201]    Gamespot, "Breaking News: Square Millennium," 4/26/2000, https://www.gamespot.com/articles/breaking-news-square-millennium/1100-2455408/.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

whereby consumers rented primarily physical copies of video games.[202]  It was not until 2011 that GameFly introduced the ability to rent PC games that would be distributed digitally.[203]

(101)  Of course, I do not claim that Valve was the first entrant, and it is not a claim I need to make. Undeniably, Valve legitimized the digital distribution of third-party PC games via platforms and was in substantial part responsible for the evolution of this into a separate, distinct relevant market.  In my Opening Merits Report, I discussed how other digital distribution platforms for PC games entered the marketplace around the same time that Steam did, including Direct2Drive (2004), GamersGate (2006), Games for Windows – Live (2007), Good Old Games ("GOG") (2008), Impulse (2008), and Green Man Gaming (2009).[204]  However, Steam's platform, as opposed to any of these alternative platforms, was the catalyst for the

---

[202]  VentureBeat, "Video Game Rentals Move Online as GameFly Follows Netflix," 8/9/2011, https://venturebeat.com/business/video-game-rentals-move-online-as-gamefly-follows-netflix/

[203]  Wired, "GameFly Goes Digital With PC Game 'Rental' Service," 8/9/2011, https://www.wired.com/2011/08/gamefly-pc-game-rental/.

[204]  IGN, "IGN Entertainment Launches Direct2Drive Digital Retail Store," 9/7/2004, https://corp.ign.com/press/press/2004/ign-entertainment-launches-direct2drive-digital-retail-store.

See also:

Wolfire, Emails Regarding Overgrowth, 7/30/2009–9/11/2009 (WOLFIRE_00053558–72, at WOLFIRE_00053570). ("Launched in October 2004, D2D allows consumers to conveniently purchase and download the latest premium PC games[.]")

GamersGate, Buy and Play Games, accessed via Internet Archive (as displayed on 6/13/2006), https://web.archive.org/web/20060613001742/https://www.gamersgate.com/ (accessed 12/14/2023). (The earliest date for GamersGate website's copyright is 2006 and the website was copyrighted by Paradox Interactive, as shown by "© 2006 Paradox Interactive AB.")

Forbes, "An Interview With Paradox Interactive CEO Fred Wester On 'Indie' Publishing and the Future of the Video Game Industry," 1/16/2013, https://www.forbes.com/sites/erikkain/2013/01/16/an-interview-with-paradox-interactive-ceo-fred-wester-on-indie-publishing-and-the-future-of-the-gaming-industry/?sh=3803f32265c5.    ("What was the reasoning behind launching GamersGate? Has it been a success?  We wanted to reach gamers directly.  When I launched GamersGate in 2006, people still believed digital download was 10 years into the future.")

Microsoft, "Microsoft Unites Xbox and PC Gamers with Debut of Games for Windows — LIVE," 3/14/2007, https://news.microsoft.com/2007/03/14/microsoft-unites-xbox-and-pc-gamers-with-debut-of-games-for-windows-live/.

CD Projekt, Company History, https://www.cdprojekt.com/en/capital-group/history/ (accessed 1/21/2025).

Stardock, "Impulse to Deliver Next-Generation PC Platform," 6/14/2008, https://www.stardock.com/blog/314940/impulse-to-deliver-next-generation-pc-platform.  ("Impulse is being launched in three phases: Phase 1: The initial launch on June 17th to coincide with the release of The Political Machine 2008 (www.politicalmachine.com) will have the features described in the guided tour.")

Wolfire, "Impulse: the Next Generation Digital Platform," undated (WOLFIRE_00053407–22, at WOLFIRE_00053408). ("Launched in 2008, Impulse is a digital distribution platform for the Windows PC that has been designed to directly address many of these problems for both developers and consumers.")

Green Man Gaming, About Green Man Gaming, https://corporate.greenmangaming.com/about-us/ (accessed 12/15/2023).  ("The idea for Green Man Gaming sprung up in 2009 when our founder, Paul, was catching up with Lee, one of the founding members of the company, at the 'Green Man' pub in Riding House Street in London."  "An entrepreneur since 2001, Paul founded Green Man Gaming in 2009[.]")

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

evolution of PC game distribution and for the creation of a new market, distinct from physical distribution.   Documents and testimony from trade press support this conclusion.   For example:

a.   A Forbes article (2011) states that "ITunes, Amazon and Netflix reshaped their slices of the media business by moving people from physical stores to the Web. Valve has done the same thing with PC videogames."[205]  The article includes a quote from then GameStop President, Tony Bartel, who stated that "'[t]hey've really ridden a trend and led a trend. There are other people who have tried to get into this space, but they haven't done it with the elegance that Steam has.'"[206]

b.   An online tech column (2024) argues that "[a]lthough many still enjoyed collecting physical games, the convenience of buying, downloading, installing, and launching a PC game within an hour or two (depending on your net speed) was a marvel in the early 2000s" and that "Valve inadvertently laid the foundation for an incredible piece of kit that would quickly become the go-to storefront for millions of PC gamers worldwide."[207]

c.   An article from a gaming writer (2023) states that "[s]ince its launch on September 12, 2003, Valve's digital game distribution platform Steam has grown from a patch delivery system to the de facto way of buying PC games for millions of users."[208]  Additionally, the article adds that "while Steam has made buying digital games far more convenient, it eventually ushered in the hellscape of nested launchers and DRM we exist in today. It's made indie games more accessible to casual players while at the same time serving as a gatekeeper to limit their exposure. Steam's effect on the market for games has been, in a word, complicated."[209]

d.   A Valve new employee handbook (2012) includes a timeline of company history that states that in 2005, the "[f]irst third-party games are released on Steam."[210]  The handbook adds that this was "[a] landmark in digital distribution, Steam gives PC developers an alternative to retail for their games."[211]

---

[205]   Forbes, "The Master of Online Mayhem," 2/9/2011, https://www.forbes.com/forbes/2011/0228/technology-gabe-newell-videogames-valve-online-mayhem.html.

[206]   Forbes, "The Master of Online Mayhem," 2/9/2011, https://www.forbes.com/forbes/2011/0228/technology-gabe-newell-videogames-valve-online-mayhem.html.

[207]   XDA Developers, "Valve Changed Gaming Forever with a Single App," 4/17/2025, https://www.xda-developers.com/steam-changed-pc-gaming-forever/.

[208]   Inverse, "20 Years Ago, Valve Changed How We Play Games Forever," 9/21/2023, https://www.inverse.com/gaming/steam-20th-anniversary.

[209]   Inverse, "20 Years Ago, Valve Changed How We Play Games Forever," 9/21/2023, https://www.inverse.com/gaming/steam-20th-anniversary.

[210]   Valve, "Handbook for New Employees," 3/2012, at HFNE:05:06:07::06, available at https://media.steampowered.com/apps/valve/Valve_NewEmployeeHandbook.pdf.

[211]   Valve, "Handbook for New Employees," 3/2012, at HFNE:05:06:07::06, available at https://media.steampowered.com/apps/valve/Valve_NewEmployeeHandbook.pdf.

---

e. <u>A blog article (2011)</u> discusses Valve's role in the history of PC gaming, stating the following:[212]

> Steam has opened up an entirely new distribution channel for small and independent publishers as well as large publishing companies. Delivering games digitally is far cheaper than traditional retail channels, and it has made it realistic to sell games for $5 and still make a profit. They have enabled two very strong and unique sales points as well: Old games that may have gotten missed the first time around, and are now heavily discounted (It was $50 at launch last year, but it's on sale for $5 now), and indie games that never would have made it to retail—some of which have become extremely successful. Steam made Valve the darlings of the computer gaming industry and many have credited Valve with saving PC gaming in the face of massive console (Xbox 360, PlayStation 3, Wii) adoption. They've also made "impulse purchases" in video gaming a reality. It's hard to pass up a game that costs $4.

(102)   The evidence suggests that Valve's entry led to the development of a new and distinct market, one which Valve has dominated through the present day. Dr. Gowrisankaran continues with a red herring argument, stating that "[i]f the relevant market excludes first-party sales, it follows that, when Valve launched Steam with just its own games, it achieved zero share of the proposed relevant market of third-party PC game distribution."[213] This argument is facially flawed; if it was not distributing third-party games, it was not operating in the relevant market. Dr. Gowrisankaran concludes that my analysis suffers from the conceptual flaw "that Valve could have achieved monopoly power in Dr. Schwartz's proposed relevant market by selling no goods in that market."[214] To clarify, I do not and need not claim that Valve had monopoly power in the market for digital third-party digital PC distribution via platforms until it entered the market—when it began allowing for third-party games on its platform.

(103)   Dr. Gowrisankaran pursues this issue, claiming that "the games Valve released on Steam were not outliers in their success relative to other games being released at the time when the digital platform distribution model was nascent" and "[t]hus, they would not have enabled Steam to gain monopoly power in its early years."[215] Further, Dr. Gowrisankaran states that "[o]ther firms were well positioned to succeed in digital distribution based on the popularity of the

---

212    Icrontic, "The Madness of Valve Marketing: An Explanation for Non-Gamers," 4/17/2011, https://icrontic.com/article/the-madness-of-valve-marketing-an-explanation-for-non-gamers.

213    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 67.

214    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 67–68.

215    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 68.

games they distributed."[216]  However, what is telling is that the publishers of these other games did not create third-party digital distribution services like Steam, and resultingly, did *not* succeed in the relevant market.  When the marketplace evolved to where there was a distinct market for third-party PC game distribution, Valve had monopoly power.

(104)   Dr. Chiou similarly claims that "Valve's market share throughout Steam's history, including when Plaintiffs claim Valve engaged in anticompetitive conduct, demonstrates that Valve did not have monopoly power[.]"[217]  This conclusion follows from Dr. Chiou's flawed market definition analysis and her incorrect market share analysis.  The evidence discussed above strongly suggests that Steam has dominated the relevant market since its entry into third-party distribution.

## 4.2.   Steam is a critical distribution channel for publishers

(105)   Dr. Gowrisankaran claims that "[p]laintiffs have not demonstrated that Steam is a critical distribution channel for publishers" because "[w]hile many publishers find Steam to be an attractive channel that makes good business sense for them, they do not perceive it as a critical distribution channel in the sense that, without distributing via Steam, their games have essentially no chance of gaining popularity."[218]  Dr. Gowrisankaran cites no economic papers or legal authorities for his proposed "essentially no chance" or "critical distribution channel" tests.  Dr. Gowrisankaran's critiques are subjective and amorphous.  Nonetheless, Steam meets the criteria Dr. Gowrisankaran himself sets forth in his so-called "tests."

(106)   Dr. Gowrisankaran claims that a critical input from an economist's perspective is one that determines whether firms can operate and compete viably because the input "(a) plays a critical role in the production process of those firms, and (b) there are no substitutes of comparable quality and price to that input."[219]

(107)   Dr. Gowrisankaran's claims are unsupported, and, moreover, Steam satisfies his critical input criteria.  Documents and testimony from this case and trade press support the conclusion that Valve is a critical distribution channel for both publishers and users.  For example:

---

[216]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, at Exhibit 3.

[217]   Chiou Rebuttal Merits Report, 3/26/2025, § 9.2.

[218]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, § 5.4, ¶ 100.

[219]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 97.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

a. <u>An indie game handbook (2015)</u> states that "[t]he portal of choice is most definitely Steam. In every indie sales report I've seen, Steam sales eclipse all other portals by a large margin, often selling several times more than on other portal sites."[220]

b. <u>In email correspondence offering a publisher advice regarding Steam (2018),</u> Valve told the publisher that "[i]f, like many other publishers, you see 70-90% of your PC business via Steam, I'd prioritize making sure you're priced as competitively as possible on Steam rather than tweaking steam [*sic*] prices to accommodate a store with much lower throughput[;]" the publisher then confirmed that "[y]ou are correct that the vast majority of our business comes from Steam."[221]

c. <u>An email from publisher ▉▉▉ (2023)</u> explains "there is no doubt that Steam is the biggest PC Games Store," and also includes a link to an online source that states that "Steam dominates the market with a market-dominant number of active players daily."[222]

d. <u>An online tech column (2024)</u> explains that "[t]here's a high probability the primary PC game client of your choice is Steam. You're not alone as Valve's storefront remains king of PC gaming and has done for the past 21 years."[223] Further, the column states that "Steam has had competition too with the launch of GOG Galaxy from CD Projekt, the makers of The Witcher, as well as launchers from Ubisoft, EA, and other publishers. Epic Games even launched its store offering to challenge Valve's monopoly. All the competitors have had their fair of troubles, but it's Steam that continues to dominate the market. Competing publishers with their stores have even returned some of their games to Steam."[224]

e. <u>An article from a gaming writer (2023)</u> states that "[s]ince its launch on September 12, 2003, Valve's digital game distribution platform Steam has grown from a patch delivery system to the de facto way of buying PC games for millions of users."[225] The article adds that "[i]f you play games on PC, you almost certainly play them on Steam."[226] It also discusses potential competitors, stating the following:[227]

---

[220] Hill-Whittall, Richard (2015), *The Indie Game Developer Handbook*, Burlington, MA: Taylor & Francis Group, at 117.

[221] Valve, Emails Regarding Background and Advice, 8/16/2018–8/20/2018 (VALVE_ANT_0606204–08, at VALVE_ANT_0606204, VALVE_ANT_0606206).

[222] Valve, Emails Regarding GDC 2023, 4/19/2023 (VALVE_ANT_2925530–32, at VALVE_ANT_2925530–31), available at Augusta Butlin, Dep. Tr., 10/11/2023, Exhibit 124.

[223] XDA Developers, "Valve Changed Gaming Forever with a Single App," 4/17/2025, https://www.xda-developers.com/steam-changed-pc-gaming-forever/.

[224] XDA Developers, "Valve Changed Gaming Forever with a Single App," 4/17/2025, https://www.xda-developers.com/steam-changed-pc-gaming-forever/.

[225] Inverse, "20 Years Ago, Valve Changed How We Play Games Forever," 9/21/2023, https://www.inverse.com/gaming/steam-20th-anniversary.

[226] Inverse, "20 Years Ago, Valve Changed How We Play Games Forever," 9/21/2023, https://www.inverse.com/gaming/steam-20th-anniversary.

[227] Inverse, "20 Years Ago, Valve Changed How We Play Games Forever," 9/21/2023, https://www.inverse.com/gaming/steam-20th-anniversary.

Other services sprung up not to challenge the Steam model but to emulate it. EA and Ubisoft both pulled their games from Steam at different points and — harking back to Steam's origins — created launchers just for their own games. CD Projekt launched GOG as a DRM-free alternative to Steam, complete with its own launcher, GOG Galaxy.

Yet even as competitors sprung up, they've never come close to challenging Steam's supremacy. Even EA and Ubisoft have brought their games back to Steam, now requiring the irritating extra step of booting up their own launchers through Steam before you can actually get to the game.

f.   While the Ubisoft platform was able to overcome initial barriers to entry and amass millions of users through the release of *Assassin's Creed 2*, which was released with the Uplay platform,[228] Ubisoft eventually expanded its game offerings on Origin, Steam, and EGS.[229]  In 2019, Ubisoft reversed course and stopped releasing new games on Steam, instead focusing only on EGS and Ubisoft Store.[230]  Ubisoft claimed that Steam's business model was "unrealistic" and "doesn't reflect where the world is today in terms of games distribution."[231]  However, this strategy was unsuccessful and ultimately short-lived, as several Ubisoft exclusives were later released on Steam.[232]

g.   Following the launch of Origin, EA began offering exclusive content on Origin and pulled some of its biggest titles from Steam.[233]  However, other publishers declined to follow—they

---

228   Polygon, "Ubisoft Now Selling Third-Party Games on Uplay Shop and Its Own Games on EA's Origin," 2/19/2013, https://www.polygon.com/2013/2/19/4001836/ubisoft-uplay-shop-third-party-games-ea-origin-chris-early-interview.

229   Polygon, "Ubisoft Now Selling Third-Party Games on Uplay Shop and Its Own Games on EA's Origin," 2/19/2013, https://www.polygon.com/2013/2/19/4001836/ubisoft-uplay-shop-third-party-games-ea-origin-chris-early-interview.

Polygon, "The Division 2 Coming to Epic Games Store, Skipping Steam," 1/9/2019, https://www.polygon.com/2019/1/9/18174375/division-2-pc-epic-games-store-steam.

Engadget, "Ubisoft Shares Dark Messiah of M&M with Steam," 8/31/2006, https://www.engadget.com/2006-08-31-ubisoft-shares-dark-messiah-of-mandm-with-steam.html.

230   Game Spot, "Ubisoft Explains Why It Doesn't Release Games on Steam, 8/29/2019, https://www.gamespot.com/articles/ubisoft-explains-why-it-doesnt-release-games-on-st/1100-6469502/.

231   New York Times, "Fortnite Maker Wants to Sell More Games, and Build a Platform to Do It," 8/13/2020, https://www.nytimes.com/2019/08/27/business/steam-epic-games-store.html.

232   Valve, Emails Discussing a GameDiscoverCo Article, 11/22/2022 (VALVE_ANT_1229059–067, at VALVE_ANT1229064). ("We ran the rumors a few times, but they're true – Ubisoft is returning to Steam, initially with Assassin's Creed Valhalla (out Dec. 6th). But they told Eurogamer they'll provide a 'consistent player ecosystem through Ubisoft Connect', and will be adding titles including Anno 1800 & Roller Champions to Valve's platform soon.")

233   CNET, "EA Launches Origin, Takes Aim at Steam," 6/3/2011, https://www.cnet.com/tech/gaming/ea-launches-origin-takes-aim-at-steam/.

Games Industry.Biz, "EA Confirms More Platform Exclusives for Origin," 6/15/2011, https://www.gamesindustry.biz/ea-confirms-more-platform-exclusives-for-origin.

Rock Paper Shotgun, "Content Wars: Origin/Steam Scuffle Unfolds," 7/7/2011, https://www.rockpapershotgun.com/origin-steam.

Techspot, "Ubisoft and EA Pair Up, Offer Each Other's Games Online," 2/22/2013, https://www.techspot.com/news/51731-ubisoft-and-ea-pair-up-offer-each-others-games-online.html.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

had little incentive to use Origin, because Valve's PMFN Policy prevented publishers from offering their games for lower prices on Origin compared to Steam.[234]  Consumer adoption of Origin was also minimal.[235]  Unable to succeed on its own, EA ultimately returned to distributing their games on Steam.[236]  In 2020, EA began relisting its games on Steam, taking a more "open" approach and claiming this was "the most player-first thing [they] could] do."[237]  EA's Senior Vice President commented on the return, stating that "we are game makers, and our aspiration is to connect as many people as we can to the great games that we built[,]" thus "*we want to be [on Steam] where the players are*."[238]

---

[234] See Section 5.1.

[235] CNET, "EA Returns to Steam With Star Wars Jedi: Fallen Order In November," 10/29/2019, https://www.cnet.com/tech/gaming/ea-returns-to-steam-with-star-wars-jedi-fallen-order-in-november/.  ("EA has announced it will bring its games back to Steam in November. It'll make its return to the digital platform with one of the biggest titles of the holiday season, Star Wars Jedi: Fallen Order. 'We want to meet players where they are,' said Mike Blank, senior vice president of EA. 'Where better to offer our games and subscription service than Steam?'")

Kotaku, "EA Returns to Steam with Star Wars Jedi: Fallen Order, 10/29/2019, https://kotaku.com/ea-returns-to-steam-with-star-wars-jedi-fallen-order-1839440326.  ("EA abandoned Valve's digital game store in 2013 in favor of its own Origin digital ecosystem, a move many PC gamers considered annoying and bad, because it was.  That long nightmare finally comes to an end on November 15, with a joint Steam and Origin release of the next big *Star Wars* action game.")

Digital Trends, "EA Origin Has Been Replaced With a New, Faster PC App," 10/7/2022, https://www.digitaltrends.com/gaming/ea-origin-replaced-app/.  ("Origin was EA's exclusive PC launcher for its titles first launched in 2011.  It was intended to compete with other digital PC storefronts such as Steam, though it eventually integrated with its competitor to sell their titles on that service.  Origin, however, was still required to run EA titles even if bought on Steam.  Despite accumulating over 50 million registered users, the service was heavily criticized and maligned by the PC community due to security flaws and suspicions of spying on players.")

For comparison, Steam had approximately ▮▮▮▮ registered Steam accounts by 2020.  See:

Valve, "Joint Business Review," 10/2020 (VALVE_ANT_0052792–2829, at VALVE_ANT_0052816).

[236] Valve, Emails Regarding EA on Steam, 10/29/2019–10/30/2019 (VALVE_ANT_0058279–281, VALVE_ANT_0058280–281).

Valve, Emails Regarding Valve and EA's Partnership, 9/16/2019–9/20/2019 (VALVE_ANT_0059430–31, at VALVE_ANT_0059430–31).

See also:

Scott Lynch, Dep. Tr., 10/12/2023, at 193:23–194:4.  ("Q. There came a time that EA did bring their major titles back on Steam; right?  A. Yes, they started releasing some of their games they hadn't released on Steam and probably did some new -- new releases too.  Q. That was in September of 2019?  A. Yeah, that seems around the timeframe.")

[237] Games Industry.Biz, "EA Puts First Wave of Games Back on Steam," 6/5/2020, https://www.gamesindustry.biz/ea-puts-first-wave-of-games-back-on-steam.

Games Industry.Biz, "EA Returns to Steam," 10/29/2019, https://www.gamesindustry.biz/ea-returns-to-steam.

[238] The Verge, "EA Games Are Returning to Steam Along with the EA Access Subscription Service," 10/29/2019, https://www.theverge.com/2019/10/29/20937055/ea-games-steam-access-subscription-service-pc-storefront-jedi-fallen-order-sales. (Emphasis added.)

---

h. In 2012, Microsoft launched a digital distribution platform known then as the Windows Store.[239] However, in 2019, Microsoft decided to distribute games through Valve's Steam platform.[240]

(108) Clearly, Valve's role in PC video game distribution is critical. Further, Dr. Gowrisankaran spends a significant amount of time in his report arguing that Steam is a higher quality platform than its competitors,[241] which would address the second criterion of being a critical input, according to his definition. Even if Steam is a higher quality platform than its competitors,[242] Dr. Gowrisankaran does not consider the scale and reach of Steam compared to other platforms, a platform characteristic that publishers and consumers find important. Given Valve's influence in the relevant market (and as the gatekeeper to the highest amount of exposure for a game/publisher), Steam represents a critical third-party distribution platform.

(109) Dr. Gowrisankaran claims that my anecdotes about publishers' reliance on Steam are "cherry-picked and based on unfounded assumptions about the motivations of publishers' business decisions."[243] He also concludes that "[g]iven the many substitutes available for publishers to distribute their games, Steam is not a critical input."[244] I disagree. In fact, Dr. Gowrisankaran's evidence is selectively chosen. As evidence that Steam is not a critical distribution channel for publishers, he cites to the top-selling PC games from 2024, noting that ▮ of the top 20 games by revenue in the U.S. were not available on Steam at all and "only ▮▮▮▮ of the revenue generated by the top 20 PC games was generated on Steam versus non-Steam PC platforms."[245] Many of the games listed in Dr. Gowrisankaran's Exhibit 4 are sold on first-party platforms, which are not in the relevant market.[246] The remaining

---

[239] PCMag, "13 New Features in Windows 8 Consumer Preview," 2/29/2012, https://www.pcmag.com/archive/13-new-features-in-windows-8-consumer-preview-294819.

Tech Target, "Microsoft Store," 2/2022, https://www.techtarget.com/searchmobilecomputing/definition/Windows-Store.

[240] The Verge, "Microsoft Will Distribute More Xbox Titles Through Steam and Finally Support Win32 Games," 5/30/2019, https://www.theverge.com/2019/5/30/18645250/microsoft-xbox-game-studios-publishing-valve-steam-32-bit-windows.

[241] Gowrisankaran Rebuttal Merits Report, 3/26/2025, § 4.2.

[242] As discussed elsewhere in this report, Steam's quality in the real world answers an irrelevant question.

[243] Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 100.

[244] Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 98.

[245] Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 102.

[246] For example, Fortnite, World of Warcraft, Valorant, League of Legends, and Minecraft are all on first-party only platforms. See:

Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 4.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

games only include a small number of games able to generate meaningful revenue on other third-party platforms and represent an extremely small subset of all publishers who are able to have limited success outside of Steam. Dr. Gowrisankaran stated in his Opening Report that "[a]s of January 2025, over 90,000 game titles were available on Steam."[247] That ▬ of them were able to generate high revenues off of Steam (while still feeling the need to be on Steam) says nothing about the importance of the Steam platform for publishers and users.

## 4.3.  Valve's innovations and quality in the real world do not preclude illegal maintenance of monopoly power

(110)  Dr. Gowrisankaran presents various examples of Valve's innovations on Steam over time and presents examples of Valve introducing comparable features in response to innovations by other platforms.[248] Because of this "focus on innovating to stay ahead of its rivals,"[249] Dr. Gowrisankaran asserts that Steam is a higher quality platform than competitors' platforms.[250] This conclusion does not follow from his evidence; his evidence is not capable of supporting the conclusion he reaches.

(111)  As support, Dr. Gowrisankaran presents evidence that Steam has more consumer-facing features than the Epic Games Store.[251] This is an example of Dr. Gowrisankaran's conclusion not following from his evidence: the relative number of consumer-facing features does not, without more, say anything about whether Steam is a higher quality platform to users and/or developers. Dr. Gowrisankaran then cites to a July 2019 survey and presents examples of features that EGS did not have at the outset (and ultimately added between a few months to a few years after its entry) that had been present on Steam "for a long time" to claim that ▬▬ ▬▬▬▬▬▬ some of the features that Steam has, but EGS does not, are particularly important."[252] EGS launched in December 2018, whereas Steam was launched in September

---

First-party only platforms are not substitutes for users or publishers on third-party platforms.

247    Gowrisankaran Opening Report, 1/27/2025, ¶ 61.

248    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 41–43.

249    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 45.

250    Gowrisankaran Rebuttal Merits Report, 3/26/2025, § 4.2.

251    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 46–48, Exhibit 2.

252    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 49–50.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

2003.[253]  Dr. Gowrisankaran's comparisons are not appropriate.  Steam is and was, at the time of his comparisons, a mature competitor and EGS was a new and unsuccessful entrant in the relevant market.  Dr. Gowrisankaran further cites to Dr. Chiou's Class Certification Rebuttal Report, where she stated that "Steam is richer in features than competing platforms,"[254] as well as other industry reports to describe how Steam's platform has "higher-quality platform features and functionality" than competitors.[255]    However, for all of this discussion, Dr. Gowrisankaran misses the key question for an antitrust analysis, which is, all else equal, would Valve have greater incentive to innovate and improve quality in a but-for world without its PMFN Policy?  He does not even address that most important question.

(112)    In my Opening Merits Report, I stated that: "A comparison of Steam's innovations, features, and quality relative to those of other platforms in the *actual world* cannot serve to assess Valve's anticompetitive conduct.   The actual world is already poisoned by Valve's anticompetitive conduct that has adversely impacted platforms' ability to innovate."[256]  Dr. Gowrisankaran claims that "[t]his logic is flawed and circular" because "[Dr. Schwartz] dismisses the evidence on quality by assuming the conclusions of the economic analysis; but, to reach the correct conclusions in the economic analysis for an innovative industry, quality considerations are central."[257]  It is unclear what Dr. Gowrisankaran is talking about.  If, on the one hand, he is arguing that Valve has monopoly power, but gained that power because of its alleged higher quality, that does not speak to the issue here.  If he is suggesting that the procompetitive benefits from the Steam platform quality outweighs the anticompetitive effects of the PMFN Policy, his actual analysis does not do that.  In a real sense, the quality discussion offered by Dr. Gowrisankaran is misplaced; he fails to answer the question of whether the PMFN Policy is an anticompetitive means for Valve to maintain that monopoly power.  Regardless, his analysis is flawed.

(113)    Further, Dr. Gowrisankaran's conclusion on Steam's quality ignores contrary evidence.  He ignores evidence presented in my Opening Merits Report that Valve employees have oft

---

[253]    Epic Games, "The Epic Games Store is Now Live," 12/6/2018, https://store.epicgames.com/en-US/news/the-epic-games-store-is-now-live.

Scott Lynch, Dep. Tr., 10/12/2023, at 31:11–13. ("Q. Okay.  Steam was released in September of 2003; right?  A. Yep.")

[254]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 55.

Chiou Class Certification Rebuttal Report, 5/17/2024, ¶ 221.

[255]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 56.

[256]    Schwartz Opening Merits Report, 1/27/2025, ¶ 284.

[257]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 57.

---

recognized a lack of innovation on Steam.[258]  The lack of viable alternative platforms and a cycle of network effects, protected by the PMFN Policy, keep users and developers on the platform regardless of Steam's innovation efforts.

(114)  Central to Dr. Gowrisankaran's argument that "[i]nnovation is an important component of the analysis when evaluating competition in innovative industries," is that "[t]he central role of innovation in the competitive process also implies that firms need to take risks: they make _investments_ in innovation with uncertain returns."[259]  Dr. Gowrisankaran later cites to examples of Steam innovations that have been largely unsuccessful, claiming that these demonstrate "competition through innovation[,]" as "competitors take risks, some of which fail and some of which are successful."[260]  However, Dr. Gowrisankaran presents no evidence on the _investments_ that Valve made for these failed innovations, even though his theory here depends on the inherent risk associated with such investments.  As such, Dr. Gowrisankaran has not demonstrated that the degree of risk that Valve took was not trivial in attempting these innovations.[261]  Evidence shows that their failures have been non-consequential to Steam's market share and profitability, indicating that there was no meaningful financial or competitive risk associated with these investments.  Dr. Gowrisankaran's only claim regarding Valve's investments and associated risk is that Steam had ▮▮▮▮ operating margins until ▮▮▮▮ which is consistent with a newer firm operating in a technology industry.[262]  By 2008,

---

258    Schwartz Opening Merits Report, 1/27/2025, § 6.3.3.

259    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 59, 59.b.  (Emphasis added.)

260    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 115, 117.

Dr. Gowrisankaran argues that "Valve's quality-adjusted revenue shares are even more competitive than [its] nominal shares."

Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 282.

In this context, a quality-adjusted revenue share is not quantifiable.  Dr. Gowrisankaran does not actually calculate such a share for Valve/Steam or any other competitor/platform.  Nor does he offer a methodology for such a calculation, rendering such an argument not meaningful.

261    See discussion in Schwartz Opening Merits Report, 1/27/2025, §§ 4.2.3–4.2.4.

262    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 114.

Inc., "Why It's OK to Focus on Growth and Not Profitability in the Early Days of Your Tech Startup," 10/6/2021, https://www.inc.com/hillel-fuld/why-its-ok-to-focus-on-growth-not-profitability-in-early-days-of-your-tech-startup.html.  ("FedEx, Tesla, and Amazon, for example, were not profitable for many years. The same is true for many successful companies in the tech sector. . . . Not only is it OK for tech companies to 'lose money' as they build the business, but also it is often necessary and mandatory to go through the growth stages, which involves losing money in the beginning if they ever want to achieve profitability.")

American Affairs Journal, "Why are Start-Ups Losing So Much Money?," c. 11/2024, https://americanaffairsjournal.org/2024/11/why-are-start-ups-losing-so-much-money/.  ("[T]oday's start-ups are not becoming more profitable over time. About 85 percent of America's unicorn start-ups (those valued at more than $1 billion

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Valve realized ██ gross profit margins, which I estimate to have ██ from █ in ██ to ██ in ██ Since then, Valve's profitability on Steam has skyrocketed, with an operating profit margin of ██ since Steam's inception and of ██ between 2017 and 2023.[263]

(115)    Dr. Gowrisankaran claims that there is an inherent issue with using profit margins to assess monopoly power in such an industry with rapid innovation.[264] However, in a competitive market, Valve's profitability (which Dr. Gowrisankaran claims results from their innovations) would incentivize other firms to enter the market, who would then compete with Valve on price and features, likely reducing Valve's higher profitability. This has not happened—because the PMFN Policy limits the opportunities for effective third-party platform entry—which is evidence that Valve's PMFN Policy harms the ability of entrants to effectively compete and allows Valve to maintain its monopoly power.

(116)    Dr. Gowrisankaran further argues that "there has been plenty of innovation from other platforms in the industry, many of which have either led to or been the result of platform differentiation[.]"[265] As an initial point, innovation in the relevant market and Valve's monopoly power are not mutually exclusive. The existence of *any* innovation does not equate to effective competition in the relevant market. Evidence presented in my Opening Merits Report is consistent with Valve limiting the ability of entrants to effectively compete. The fact that "competitors" have innovated to the extent that Dr. Gowrisankaran claims but have only amassed approximately ██ of the relevant market over the period from 2017 through 2023 is evidence of the effectiveness of Valve's PMFN Policy in maintaining Valve's monopoly power.[266] Potential entrants to the relevant market cannot compete on price and content; the only competitive option is to try to innovate. Because the PMFN Policy protects the network effects of the Steam platform, these other platforms have been unable to generate the network effects needed to be an effective competitor. This effectively eliminates meaningful competition to Steam and limits the range of effective choices for both users and developers.

---

before doing IPOs) that have gone public were unprofitable in 2023, despite most having been founded more than fifteen years earlier.")

[263]    Schwartz Supplemental Opening Merits Report, 3/7/2025, Supplemental Attachment D-5.

[264]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 112. ("High profit margins are an unreliable measure of monopoly power, in particular, when there is competition in quality through innovation, which can generate high profit margins for an innovative firm while competitors catch up.")

[265]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 150.

[266]    Schwartz Supplemental Opening Merits Report, 3/7/2025, Supplemental Attachment E-1.

(117)   Putting aside whether the features he identifies are truly innovative for purposes of this discussion, Dr. Gowrisankaran's examples of innovation elsewhere in the industry did not put any competitive pressure on Valve.  For example:

a.  Dr. Gowrisankaran claims that multi-game and other subscription services offered by Microsoft Game Pass, Sony PlayStation Plus, and Humble Choice give subscribers access to large catalogs of different games.[267]  As I discussed in my Opening Merits Report and in Section 3.5 of this report, multi-game subscriptions are not part of the relevant market and do not constitute an innovation in the relevant market or represent a competitive behavior to which Valve needed to respond.

b.  Dr. Gowrisankaran cites to distributors who offer "more curated product selection" and "occupy niches that are particularly appealing to particular sets of users" including GOG and Itch.io.[268]  While these descriptions represent entry and product positioning strategies and not innovation, neither GOG or Itch.io has been able to capture a significant share of the market from Steam nor put competitive pressure on Valve to innovate.[269]

c.  Dr. Gowrisankaran claims that other platforms are "[l]everaging their pre-existing strengths into innovations as game distribution platforms."[270]  Using other strengths to join a different market is not an innovation, but rather a strategic attempt to shift or join a different marketplace.  Neither of the platforms discussed by Dr. Gowrisankaran, Discord and Twitch, have exerted any meaningful amount of competitive pressure on Valve.  Nor does he identify the meaningful innovations that allegedly impose competitive pressure on Valve.

## 4.4.    Mr. Schroeder's critiques have no impact on my analysis of Valve's persistent and high profitability on Steam

(118)   Mr. Schroeder's critiques are from an accounting perspective.  In contrast, my analysis looks at transactions *not* from a financial reporting perspective but, instead, from the perspective of someone trying to understand the underlying economics of the transaction.  As such, Mr. Schroeder's criticisms are irrelevant to the analysis performed in my Opening Merits Report.

(119)   Mr. Schroeder reaches three conclusions in his report:[271] (1) "Dr. Schwartz is incorrect in asserting that 'Steam merely operates as a distribution agent' and that his revenue adjustments ███████████

---

[267]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 150.

[268]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 150.

[269]   See discussion in Schwartz Opening Merits Report, 1/27/2025, § 4.2.3.

[270]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 150.

[271]   Schroeder Rebuttal Merits Report, 3/26/2025, ¶ 10.  (Emphasis in original.)

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

██████████████████████████ (2) "Dr. Schwartz's assertion that 'Valve's reported financials are not a fair *economic* presentation of its actual financial performance' is contrary to the objective of financial reporting[;]" and (3) "Dr. Schwartz's assertion that ████████████ ██████████████████████████ is without a basis in accounting."

(120)   Each conclusion is a straw man argument—they are inconsequential and irrelevant to my analysis. I make adjustments to Valve's financials—prepared, as I noted in my Opening Merits Report, for purposes of this litigation and not in the ordinary course of business—because the financial statements do not paint an accurate picture of the economics of the transactions on the Steam platform. They may (or may not) be appropriate from an accounting perspective. That is irrelevant. I am not making statements about the propriety of any accounting decisions made by Valve; rather, I am performing an economic analysis to answer an economic question. Moreover, adjusting financial statements to understand the economics of a transaction and the impact on any number of metrics is something economists routinely do. Such adjustments can include adjusting financial statements to capture economic profits and not accounting ones. It can include evaluating profits and losses under differing cost allocation rules or different revenue recognition rules. These types of adjustments are common in economic analysis.

(121)   In my Opening Merits Report, I stated: "I adjust Valve's financials to *reflect the underlying economics* of the transactions that take place on the Steam platform ████████████ ██████████████████████████ ██████████████████████████ ████████████"[272]   Said another way, I adjust Valve's Steam financials to reflect the economic reality of the transactions occurring on Steam; Steam is a two-sided platform that pairs publishers and gamers, facilitating gameplay and transactions between the two sides of the platform. In its role as a platform, Steam facilitates transactions, more akin to a broker than a seller. It holds no inventory and bears no risk of ownership of any third-party game. It charges no fee to the game purchaser and a fee to the publisher for the services provided to the publisher. That fee—the revenue share or commission—reflects a payment to Valve for those provided services.

(122)   Mr. Schroeder purports to enumerate the features and services provided by Steam to end consumers in an attempt to demonstrate Valve's contractual control over the specified goods

---

[272]   Schwartz Opening Merits Report, 1/27/2025, ¶ 152. (Emphasis added.)

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

and services provided. That is, from an accounting perspective, Mr. Schroeder attempts to paint Valve as a ███████████████████████████████████.[273] For example, Mr. Schroeder discusses Steam features such as microtransactions, chat, ongoing services such as customer support, and ongoing user access to Steam content.[274] Mr. Schroeder's list of features actually reflect and supply the basis for the commission Steam receives from the publisher and the economic reality is that these services on Steam should be commensurate with Valve's profitability on Steam, something that Mr. Schroeder's analysis and discussion fail to do.

(123) In making the adjustments described in my Opening Merits Report, I note the following in a footnote: "As I understand it, these adjustments also make Valve's Steam financials █████ ████████████████████████████████████████████████████████████."[275] Mr. Schroeder has seemingly based his report almost entirely on this single footnote, referencing to it 11 times throughout his 44 page report. It is important to note that *this footnote has no bearing on my analysis*. Whether or not the adjustments are ███████████████████████████████████ is irrelevant to the conclusion; it is simply an observation. Put differently, if that footnote was not included, *nothing* in my analysis would change. Mr. Schroeder's critiques based on any accounting standards are arguing a question that I do not claim to answer—and one that is, again, irrelevant to my economic analysis put forth in my Opening Merits Report. As discussed, my adjustments to Valve's financials are not rooted in the standards of accounting—indeed they are meant to determine the *economic* value, *not* the accounting value under any particular standard—and need not be.

(124) Mr. Schroeder argues that "[t]he objective of general-purpose financial reporting is to provide financial information that is useful to investors, lenders and other creditors in making decisions. To that end, financial information under U.S. GAAP and IFRS is designed to faithfully represent the economics of the underlying transactions and events."[276] Mr. Schroeder further cites to FASB Rules of Procedure, which state that "[t]o be neutral, information must report economic activity as faithfully as possible without coloring the image it communicates for the purpose of influencing behavior in any particular direction."[277] In other words, Mr. Schroeder is arguing that because Valve's presented financials are "in line"

---

[273]    Schroeder Rebuttal Merits Report, 3/26/2025, ¶ 10, § IV.C.

[274]    Schroeder Rebuttal Merits Report, 3/26/2025, ¶ 10, § IV.C.

[275]    Schwartz Opening Merits Report, 1/27/2025, fn. 408.

[276]    Schroeder Rebuttal Merits Report, 3/26/2025, ¶ 94.

[277]    Schroeder Rebuttal Merits Report, 3/26/2025, ¶ 99.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

with his view of the relevant accounting standards, then it follows that they must attempt to report economic activity as faithfully as possible. This is not necessarily true; and even if it is true, again, it does not matter. It is relevant for purposes of this matter to interpret this accounting profit from the perspective of an economist, which is precisely what I have done. Whether Valve reports the economic activity in an appropriate or "faithful" manner or if the reporting is in line with the accounting standards is irrelevant to my economic analysis of these accounting profits. My adjustments reflect the economic reality of the value of the services provided by Valve on Steam, and this is the only relevant fact of the matter.

(125)    Regardless, my adjustment only affects Valve's profit margin on Steam, not the profits themselves. The profits Valve earns associated with the economic value of the transactions that occur on Steam are high. These profits are persistent, and ▮▮▮▮▮▮ even in the face of potential competition. This is clear in my analysis. I note in my Opening Merits Report:[278]

> In a market where there is effective competition, Valve's supracompetitive profitability on Steam would attract potential entrants, leading to competition on price and a reduction in profitability for Steam. That has not happened in this market. There are significant barriers to entry that deter potential competitors, and even when competitors have entered the market, policies such as Valve's alleged PMFN Policy prevent them from being effective competitors, competing away some of Steam's profits, and eroding its margins.

(126)    Valve has sustained high profitability on Steam. See Figure 1 below.

---

[278]    Schwartz Opening Merits Report, 1/27/2025, ¶ 144.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



(127)  As discussed in my Opening Merits Report, Valve has recognized that Steam's profitability is an "outlier", even amongst other powerful and successful companies across a variety of industries, including Apple, Alphabet, and Netflix, among others.[280]

(128)  None of this discussion is impacted by how revenues and costs are recorded for an accounting purpose, nor do I need them or claim them to be.  Mr. Schroeder's critiques ignore the economic foundation for my analysis and ultimately respond to a question that is irrelevant to my conclusions and does not have a bearing on my analysis or the issues in this case.

---

[279]  See Rebuttal Attachment C-1.

[280]  Valve, Emails between Employees re: revenue / hour / employee, 11/5/2018–11/7/2018 (VALVE_ANT_0054486–490, at VALVE_ANT_0054486).

Schwartz Opening Merits Report, 1/27/2025, ¶ 157.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# 5.    Competitive Harm

## 5.1.    Valve's PMFN Policy

(129)    In my Opening Merits Report, I discuss in detail the economic evidence that demonstrates that Valve has a PMFN Policy, which has both content and price parity elements.[281]  There is also economic evidence that Valve enforces its PMFN Policy, including by contacting publishers that do not observe the PMFN Policy to implement and enforce its parity requirements.[282]  Valve's enforcement is exclusionary and restrains effective competition in the relevant market, allowing Valve to set and sustain a supracompetitive commission rate.[283]

## 5.2.    Valve's enforcement of its PMFN Policy

(130)    The evidence in this matter demonstrates that Valve enforces its PMFN Policy.[284]  Valve has enforced both its price and content parity requirements throughout its history as a third-party PC gaming platform.[285]  These parity enforcement actions have deterred effective competition among platforms and restricted the ability of publishers and competing platforms to attempt to steer customers to lower-cost alternative distribution options, much less to succeed in that effort.  The enforcement actions are also signaling devices to other publishers about Valve's willingness to enforce the PMFN Policy and the potential consequences of non-compliance.  As a result, publishers are not able to adjust prices to capitalize on a potentially lower commission rate elsewhere, and therefore Valve has insulated itself from competitive pressures that would have caused Valve to reduce its commission structure to competitive levels.

### 5.2.1.    Selective and targeted enforcement is all that is required to have competitive impact

(131)    Valve does not need to enforce its PMFN Policy against all publishers for it to be effective. Enforcement is expensive, and rather than attempt to achieve 100% compliance at a high

---

281    Schwartz Opening Merits Report, 1/27/2025, § 5.1.2.

282    Schwartz Opening Merits Report, 1/27/2025, § 5.2.

283    Schwartz Opening Merits Report, 1/27/2025, §§ 5.1.3, 6.1.

284    Schwartz Opening Merits Report, 1/27/2025, § 5.2.

285    Schwartz Opening Merits Report, 1/27/2025, § 5.2.

cost, Valve can achieve its anticompetitive objectives at a lower cost by selective and targeted enforcement of its price and content parity requirements. By focusing on the games and publishers for whom non-compliance is likely to have the largest negative impact on Steam's dominance (by potentially having other platforms represent viable distribution options), Valve can achieve its compliance goals without having to undertake massive enforcement/compliance programs. This makes economic sense. Potential competing platforms are most likely to gain a foothold in the market and threaten Valve's dominance through the sale of high-revenue games, as this would drive consumers, and in turn, additional publishers to that platform. This would allow those rival platforms to build network effects. However, if Valve can achieve substantial compliance with a limited focus on select developers, it need not spend additional resources to realize the diminishing marginal benefits of achieving the highest compliance.

(132)   My Opening Merits Report presents evidence of Valve enforcing its PMFN Policy against large publishers of popular games such as ███████████████████████████ and others.[286] By limiting the ability of high-revenue publishers to distribute games on different platforms at a variety of prices and with different versions, Valve limits meaningful choices for publishers and prevents third-party platforms from competing effectively with Steam. Valve thus harms effective platform competition. The large publishers that Valve has targeted account for a major portion of the most popular available games. Therefore, even if only these publishers were affected by the PMFN Policy, alternative platforms would be deprived of being able to compete on price and quality for an important subset of PC games.[287]

---

[286]   Schwartz Opening Merits Reports, 1/27/2025, ¶ 212.

See, for example:

Valve, Emails Between ████ and Valve, 6/6/2013–6/7/2013 (VALVE_ANT_1216044–45, at VALVE_ANT_1216044). ("[T]his presents a problem for us on Steam. We want to make sure that our price on Steam is competitive with retail and other digital stores in ████ so that we do not teach customers that Steam is always the expensive option.")

Valve, Emails Between ████ and Valve, 8/15/2014 (VALVE_ANT_2576464). (Valve tells ████ that it "[j]ust saw today that the pricing for ████ on Steam is uncompetitive with other retailers, similar to the issue we're having with ████ and ████ ... We've made the choice to take the game down until we can reach price parity.")

Valve, Emails Between ███████████ and Valve, 10/9/2017 (VALVE_ANT_2565882–84, at VALVE_ANT_2565883–84). ("Ultimately ███████████] retail strategy is yours to control in whatever way you see fit. However, it is our job as stewards of the platform is [sic] to protect Steam customers and to ensure that they are being treated fairly. We will not knowingly invite customer regret by offering your game at a premium to other retailers.")

Valve, Emails Between ████ and Valve, 9/11/2020–9/18/2020 (VALVE_ANT_1193127–132, at VALVE_ANT_1193127–29). ("Yesterday it came to our attention that ██ was also on sale in the ████ store - with a significantly better discount - so we removed it from the ██ sale page." Later in the chain, ████ added its central marketing teams "for discount parity rules and awareness" and assured Valve that "to be clear we know that discount parity is essential on both stores, from day and date launches to ports.")

[287]   Schwartz Opening Merits Reports, 1/27/2025, ¶ 212.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(133)   Many of the large publishers Valve enforced against ███████████████████ ███████████████████████ among others)[288] are among ████████████████ by revenue earned on Steam within the class period.[289] ████████████████ generated between ████████████ of revenue on Steam within each year of the class period, while the █████ publishers generated between ████████████████ .[290]

**Figure 2: Top-25 and Top-50 Publishers Share of Revenues on Steam, Excluding Valve[291]**



(134)   Moreover, when Valve enforces the PMFN Policy against some of its largest publishers, it sends a strong signal of its willingness to take significant steps to enforce the policy to all publishers. Put differently, if publishers such as ████████████████ , and others are vulnerable to punishment for violating the PMFN Policy, no publisher is safe. Because Steam is a critical distribution channel for publishers,[292] the threat of enforcement that can result in full (or even

---

[288]   Schwartz Opening Merits Reports, 1/27/2025, Attachment H-1.

[289]   ████████████████████████

[290]   ████████████████████████

[291]   ████████████████████

[292]   See Section 4.2 for further discussion.

---

selective) removal from Steam is enough to influence publisher behavior and yield compliance. This compliance manifests either as price parity or a decision by a publisher not to list games on a competing platform.

(135)    Indeed, evidence presented in my Opening Merits Report indicates that publishers are aware of Valve's PMFN Policy and enforcement actions.[293]  More generally, I discussed in my Opening Merits Report how compliance with rules and laws more generally does not have to be complete for the rules and laws to be effective.  Dr. Gowrisankaran ignores this evidence when he asserts that publishers need to be contacted by Valve to understand that they are subject to the PMFN Policy.[294]  That claimed requirement is not based on sound economic analysis.

(136)    Dr. Gowrisankaran attempts to rebut these arguments "by evaluating how common it is for average prices to differ on Steam and other platforms for the 100 highest revenue games on Steam in 2023" and "find[s] that it is common for the top revenue games to have lower average prices on other platforms than on Steam."[295]  He uses Valve's transaction data to identify the top-100 games by revenue in 2023 on Steam and matches 81 of the top-100 games to his ITAD dataset.[296]  Next, he identifies periods during which a game was listed on Steam and other platforms, and computes an average price for each game on each marketplace for the period that each package from each game is available on both platforms.[297]  Dr. Gowrisankaran then compares the pricing for each of these 81 games' packages (matched to 113 packages in the ITAD data) to identify the games that are over 5% cheaper on average on another platform during the same period they are listed on Steam.[298]  Dr. Gowrisankaran presents a chart with 18 stores—including 7 stores with at least one package available for a cheaper price off-Steam—showing the count and respective share (as a percentage of games available on both stores over any number of days) of games which are cheaper on each non-Steam store.[299]  From this analysis, Dr. Gowrisankaran concludes that "the publishers of the 100 highest

---

[293]    Schwartz Opening Merits Reports, 1/27/2025 ¶ 214.

[294]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 172. ("According to Dr. Schwartz, the emails he identified enforced the alleged PMFN such that a publisher would price consistently with the alleged PMFN after receiving the email, *i.e.*, it would not set prices off Steam that are lower than prices for the same game on Steam after receiving the email. Logically this may imply that a publisher should need to receive only one such email to understand that it is subject to a PMFN.")

[295]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 199.

[296]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 12.

[297]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 12.

[298]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 12.

[299]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 12.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

revenue games were [] behaving in ways consistent with there being no PMFN that prevents publishers from pricing lower on other platforms than on Steam."[300]

(137)    Dr. Gowrisankaran's analysis cannot (and does not) support his conclusion. The data are inadequate support for such a sweeping conclusion. Across Dr. Gowrisankaran's entire analysis, only one platform offered a majority of cross-listed games cheaper on average: Itch.io. However, Itch.io only offered 2 of the 113 top-selling packages (as taken from the ITAD data that Dr. Gowrisankaran linked to the top 100 games by revenue on Steam).[301] Similarly, the non-reselling store with the second highest share of games (Battle.net, who offered 50% of the highest-earning packages for a lower price than Steam) only offered 2 of the 113 top-selling packages.[302] Further, stores with a substantial overlap in offerings with Steam, such as the Epic Games Store or the Microsoft Store, have much lower shares of games that are cheaper off-Steam; Epic has offered 17% of 52 games at a lower price than Steam on average (9 games),[303] while Microsoft has offered 7% of 45 games at a lower price than Steam on average (a mere 3 games).[304] For all of the platforms included in Dr. Gowrisankaran's analysis of high-earning games cross-listed on Steam, the number of games offered at a lower price on average on the platform than on Steam is in the single digits.[305]

### 5.2.2.    Dr. Gowrisankaran ignores Valve's own communication and enforcement of its PMFN Policy

(138)    There is overwhelming economic evidence that Valve has a PMFN Policy. Valve documents and communications clearly recognize the existence of Valve's PMFN Policy, including the price parity requirement. For example, Valve's Steamworks Documentation regarding Steam Key Rules and Guidelines states that publishers "should use Steam Keys to sell your game on

---

[300]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 199.

[301]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 12.

[302]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 12.

[303]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 12.
         See also 03_Gowrisakaran_Exhibit_9.R

[304]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 12.
         See also 03_Gowrisakaran_Exhibit_9.R

[305]    03_Gowrisakaran_Exhibit_9.R

---

other stores in a similar way to how you sell your game on Steam.  <u>It is important that you don't give Steam customers a worse deal than Steam Key purchasers</u> [on other stores]."[306]

(139)  Valve employees have also repeatedly acknowledged that the price parity requirement applies equally to Steam Key *and* non-Steam Key transactions.  For example, Tom Giardino, a Steam Business Team member,[307] described Valve's pricing parity requirement as "a platform goal that *goes beyond Steam keys*[.]"[308]  Other examples include:[309]

    a.  <u>In an email chain (2013)</u>, Ms. Butlin states that "[Valve] do[es] have some general thoughts on pricing, such as if you're going to sell your game in more than one channel, then you should keep your pricing in parity across those channels, this way users aren't confused about prices difference meaning content differences or feel burned for buying from one channel over another."[310]

    b.  <u>In an email chain (2017)</u>, Valve summarized the policy to a publisher: "Do-able: Sell the same content and make sure the price on Steam is competitive with where it's being sold anywhere else (using keys or not, in a bundle or not). Not doable: Sell the content to another store at a better price than Steam customers get (using keys or not, in a bundle or not)."[311]  Earlier in the email chain, Mr. Giardino also stated that "[e]ven if the content isn't even being sold via Steam keys, we generally just choose not to sell games/DLC if we're not getting the same prices as other stores[.]"[312]

    c.  <u>In an email chain (2018)</u>, Mr. Giardino states that Valve "wouldn't be OK with selling games on Steam if they are available at better prices on other stores, *even if they didn't use Steam keys*. If you wanted to sell a non-Steam version of your game for $10 at retail

---

[306]  Steamworks, Steamworks Documentation: Steam Keys, https://partner.steamgames.com/doc/features/keys (accessed 1/21/2025). (Emphasis in original).

[307]  Tom Giardino, Dep. Tr., 11/2/2023, at 11:23–12:3. (Q. Okay.  What are your job duties at Valve?  A. I work on the Steam business team, Steam being our platform.  Q. Okay. And what is the Steam business team?  A. The group of people at Valve who help run the store, services and features of our platform.")

[308]  Valve, Emails Regarding Game Pricing, 7/23/2018–7/25/2018 (VALVE_ANT_0605887–89, at VALVE_ANT_0605887). (Emphasis added.)

These statements do not appear to have been made in error as I have not seen any correction of Mr. Giardino's statements about Valve's price parity policies.

[309]  For additional examples and discussion, see:

Schwartz Opening Merits Reports, 1/27/2025, §§ 5.1.2, 5.2.

[310]  Valve, Emails between Valve and ███████ ██, 12/17/2013–12/27/2013 (VALVE_ANT_0336935–37, at VALVE_ANT_0336936).

[311]  Valve, Emails Regarding ██████████, 5/18/2017–5/23/2017 (VALVE_ANT_0598921–25, at VALVE_ANT_0598921), available at DJ Powers, Dep. Tr., 9/29/2023, Exhibit 55.

DJ Powers, Dep. Tr., 9/29/2023, at 40:25–42:1. (Acknowledging statements of Mr. Giardino and agreeing that he is centrally involved in these sorts of pricing discussions.)

[312]  Valve, Emails Regarding ██████████, 5/18/2017–5/23/2017 (VALVE_ANT_0598921–25, at VALVE_ANT_0598923), available at DJ Powers, Dep. Tr., 9/29/2023, Exhibit 55.

---

and $20 on Steam, we'd ask to get that same lower price or just stop selling the game on Steam if we couldn't treat our customers fairly.")[313]

d.  <u>In an email chain (2019)</u>, Mr. Giardino states that Valve "tr[ies] not to focus too much on whether the game is being sold via Steam key or not.  It is a specific thing we ask people to respect when they sell keys, but we're also uninterested in operating a store that gives people bad offers- <u>*so we just stop selling games if we aren't able to secure the equivalent price for them.*</u>"[314]

(140)   In terms of price parity, Valve does not consistently communicate that prices across platforms need to exactly match on the exact same day, every day, nor is that necessary for Valve's PMFN Policy to have an impact on the ability of rival platforms to compete.   Internal documents indicate that in its enforcement communications, Valve has asked publishers to provide a "similar deal" across platforms and has used relative terms such as "similar" or "comparable" when asking for price parity.[315]  For example, Steamworks Documentation states that publishers can "run a discount for Steam Keys on different stores at different times as

---

[313]   Valve, Emails Regarding Steam Key Guidelines, 6/28/2018–7/3/2018 (VALVE_ANT_0605087–89, at VALVE_ANT_0605087), available at Tom Giardino, Dep. Tr., 11/2/2023, Exhibit 186. (Emphasis added.)

[314]   Valve, Emails Between ▮▮▮▮▮ and Valve, 4/12/2019–4/19/2019 (VALVE_ANT_0265435–440, at VALVE_ANT_0265438) (Emphasis added.)

[315]   See, for example:

Valve, Emails between Valve and ▮▮▮▮ 10/12/2017–10/18/2017 (VALVE_ANT_1218995–97, at VALVE_ANT_1218995–96). ("As we discussed the prices you set for Steam pre-orders for ▮▮▮▮▮▮▮▮ but ▮▮▮▮▮▮▮▮▮▮ are significantly above the market price for the identical versions of the game available elsewhere.  You know that it's important to us that Steam customers are treated fairly."; "Until the Steam price is comparable to the market price we will not be promoting these games.")

Valve, Emails between Valve and ▮▮ ▮▮▮ 11/18/2019–11/22/2019 (VALVE_ANT_2572410–414, at VALVE_ANT_2572411). ("We provide Steam keys for free as a service and we're happy to take on the costs associated with that (bandwidth, support, etc) - but in exchange devs agree to treat Steam's customers fairly and provide a similar deal to what they're getting elsewhere.  We don't provide keys for games that are clearly not intended to be sold on Steam.")

In certain instances, Valve has adopted a higher standard when enforcing its PMFN Policy by requiring exact price matching.  See, for example:

Valve, Emails between Valve and ▮▮ ▮▮▮ ▮▮▮, 2/7/2017–6/2/2017 (VALVE_ANT_0203447–49, at VALVE_ANT_0203448). ("Our recommended pricing is how Valve sells our own games, and how most of our partners sell theirs, but price is up to publishers.  If you'd like to use our suggestions, that's fine!  [I]f you have other data or reasons for using different prices, that's fine too!  Our only ask is that you treat Steam customers fairly--if you're charging 10▮ on other stores or at retail, be fair to Steam users and give them the same price.")

Valve, Emails between Valve and ▮▮▮▮▮▮▮, 4/16/2014–5/12/2015 (VALVE_ANT_0221829–831, at VALVE_ANT_0221829). ("Steam keys are free, but it's not OK to sell them unless there's an equivalent offer available on Steam.")

Valve, Emails between Valve and ▮▮▮ 1/11/2018–1/13/2018 (VALVE_ANT_0498342–44, at VALVE_ANT_0498342–43). ("[T]he rule for Steam keys is basically: if you want to use Steam keys as an incentive or marketing tool, make sure an equivalent offer is up on Steam.  If you're not yet ready/willing to sell on Steam, no worries!  But at that point please refrain from using Steam keys as a delivery method or incentive for purchasing.")

---

long as you plan to give a comparable offer to Steam customers within a reasonable amount of time."[316]  Additional examples include:

a. <u>In an email chain (2014)</u>, Valve states that "it's important to have a price that is competitive.  In instances where that's not possible, we'll wait to list the game until the pricing on Steam can be more in line with what customers have access to through other outlets."[317]

b. <u>In an email chain (2017)</u>, when discussing a giveaway on ▮▮▮ with other Valve employees, DJ Power states, "[m]atching at the same time doesn't seem necessary (or ideal from their perspective), but having the opportunity to run a similar deal in the future would be great for Steam customers."[318]

c. <u>In an email chain (2019)</u>, Valve responds to a developer asking about setting discounts: "We'd expect [the game] to be about that rate on Steam when it goes on discount too, just to make sure Steam customers get a fair shot at those super low prices[.]"[319]

d. <u>In an email chain (2019)</u>, in relation to bringing ▮ back to Steam, Valve discusses whether to "decide [if it is] comfortable being out of parity for the first couple of months as long as there is [a] plan to achieve parity shortly after launch."[320]

e. <u>In his deposition (2023),</u> when asked about Valve' policy for price parity, DJ Powers stated that "[Valve's] policy is that we would like publishers to offer customers a fair deal, a similar deal to other platforms."[321]

(141)  In addition, monitoring and enforcing compliance with the PMFN Policy is costly.  While Valve does not achieve 100% compliance with the PMFN Policy,[322] it achieves compliance sufficient

---

[316] Steamworks, Steamworks Documentation: Steam Keys, https://partner.steamgames.com/doc/features/keys (accessed 1/21/2025). ("It's OK to run a discount for Steam Keys on different stores at different times as long as you plan to give a comparable offer to Steam customers within a reasonable amount of time.")

[317] Valve, Emails Regarding ▮▮▮▮, 4/4/2014–4/8/2014 (VALVE_ANT_0046752–55, at VALVE_ANT_0046752), available at Connor Malone, Dep. Tr., 11/8/2023, Exhibit 247. ("[O]n Steam, we'll choose not to list the game in ▮▮▮ so as 'to not compete in the price war'.  We completely understand the issues presented at retail in ▮▮▮, but for us it's important to have a price that is competitive.  In instances where that's not possible, we'll wait to list the game until the pricing on Steam can be more in line with what customers have access to through other outlets.")

[318] Valve, Emails Regarding ▮▮▮ ▮▮▮ Giveaway, 11/6/2017–11/29/2017 (VALVE_ANT_0057771–72, at VALVE_ANT_0057771).

[319] Valve, Emails between Valve and ▮▮▮ ▮▮▮, 11/4/2019–11/6/2019 (VALVE_ANT_1813388–390, at VALVE_ANT_1813388–89).

[320] Valve, Emails between Valve and ▮ 2/8/2019–5/9/2019 (VALVE_ANT_0094642–644). ("We could also decide that we're comfortable being out of parity for the first couple of months as long as there is plan to achieve parity shortly after launch.")

[321] DJ Powers, Dep. Tr., 9/29/2023, at 36:23–34:6. ("Q. And my question is, is it Valve's practice of telling publishers or discussing with publishers that if they run a discount on other stores or elsewhere, that they need to run roughly the same discount in roughly the same time period on Steam?  A. Our policy is that we would like publishers to offer customers a fair deal, a similar deal to other platforms.  I'd love to have the exact words to read to you, but.")

[322] See Section 5.2.1.

---

to remove price or content differentiation as strategies that publishers and rival platform operators can use to attempt to attract customers to non-Steam platforms—thereby foreclosing non-Steam rivals from attaining sufficient scale to challenge Steam's dominance and bring down prices. Any enforcement analysis that compares pricing across platforms needs to align with the fact that Valve does not consistently communicate and cannot perfectly enforce a requirement for an exact price match on the exact same day. That is, the analysis need not require that pricing across platforms demonstrates perfect mirroring or perfect lockstep fluctuations to prove effective enforcement of the PMFN Policy sufficient to harm competition. That standard sets an unreasonable bar for several reasons, the most important of which is that information is imperfect, and it takes, under the best of circumstances, time for Valve to identify price differences, act on them, and achieve compliance.[323] Moreover, perfect mirroring across platforms is a standard that Valve does not consistently communicate to publishers.

(142) Dr. Gowrisankaran incorrectly and unreasonably asserts that the lack of consistent enforcement against all publishers and discrepancies in daily prices implies that Valve does not uphold and enforce its PMFN Policy.[324] Dr. Gowrisankaran incorrectly ignores the existence and impact of selective and targeted enforcement, and his analysis is misaligned with Valve's own communication and enforcement of its PMFN Policy. As discussed above, Valve does not consistently communicate a requirement for exact parity and cannot perfectly enforce its PMFN Policy against all publishers. Thus, because Dr. Gowrisankaran's analysis looks for constant price matching for every publisher and every game, it is meaningless—it does not screen for the PMFN Policy enforcement that Valve practices in the real world and ignores that Valve's PMFN Policy can effectively stifle competition without this extreme degree of enforcement.

### 5.2.3. Dr. Gowrisankaran's enforcement analysis does not show a lack of enforcement

(143) Dr. Gowrisankaran claims to evaluate "whether there is evidence of widespread price parity across all games on Steam and over time" and "whether the emails [I] identified [] actually

---

[323]  This also explains why it is impossible, as a practical matter, for Steam to monitor pricing across every game on every platform on every day.

[324]  Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 172.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

affected publishers' pricing behavior."[325]  In the following discussion, I show that his analyses do not support his conclusion that Valve did not enforce the PMFN Policy.

(144) Dr. Gowrisankaran also compares game pricing on the ▮▮▮▮▮▮ versus the Steam Store to support his conclusions about the existence of the PMFN Policy.[326]  However, his analyses (1) are not aligned with the fact that Valve does not consistently communicate and cannot perfectly enforce the PMFN Policy, (2) do not consider punitive action by Valve in response to non-compliance with the PMFN Policy in his analysis, and (3) are overly reliant on evidence from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Dr. Gowrisankaran's limited analyses do not show that Valve's enforcement actions are inconsistent with a PMFN Policy.

**Dr. Gowrisankaran's analysis is not aligned with Valve's inconsistent communication and enforcement of the PMFN Policy**

(145) Dr. Gowrisankaran claims that I "mak[e] no attempt to quantify the degree to which prices on and off Steam are similar, consistent with price parity, and whether the prices track each other more closely after the date of the email communication."[327]  This is incorrect; I conduct a case-by-case analysis across an array of games published by platform operators that have received at least one (and often several) enforcement emails from Valve and across games published by "small publishers" (non-platform operators) in my Opening Merits Report.[328] Dr. Gowrisankaran claims to provide several statistical analyses that "find that price parity fails to hold consistently for the games involved in the alleged enforcement events following the event."[329]  The first of these analyses presents the "difference in average daily game prices on and off Steam after alleged PMFN enforcement events,"[330] while the second analysis similarly presents "the difference between average game prices on Steam and on competing platforms over the specified period before and after alleged PMFN enforcement events."[331]

---

[325]  Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 172.

[326]  Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 222–227.

[327]  Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 212.

[328]  Schwartz Opening Merits Reports, 1/27/2025, § 5.3, Appendix A.

[329]  Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 212.

[330]  Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 13.

[331]  Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 14.