# EXHIBIT 1 & 11
## Report Part 2
## (Dkt No. 450.01 & 454.11)

## REDACTED

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(146)    Dr. Gowrisankaran's analyses fail because he relies on criteria that are inconsistent with Valve's communication and enforcement of its PMFN Policy.  As discussed in Section 5.2.2, Valve does not consistently communicate a requirement for exact parity and cannot perfectly enforce its PMFN Policy against all publishers.  The statistical analyses conducted by Dr. Gowrisankaran and presented in his report thus apply an unrealistic standard, and as a result, he makes incorrect conclusions about Valve's ability to enforce and uphold its PMFN Policy.

(147)    For many of the games for which he studies, Dr. Gowrisankaran claims "there is no price parity. . . after the publisher received the email."[332]  However, his analysis misses that there are comparable discounts available on Steam at or shortly after those discounts were available elsewhere; this is consistent with one of the ways that Valve communicates its PMFN Policy and aligns with the fact that enforcement and compliance need not take place on the exact same day in order for Valve's PMFN Policy to be effective.[333]  Because Dr. Gowrisankaran is narrowly focused on summary statistics such as average prices over time and percentage of days over time, his analyses are incapable of capturing actual pricing behavior on a case-by-case basis.

(148)    For example, ███████████ is a title that Dr. Gowrisankaran claims is "offered at [a] significantly higher price[] on Steam[.]"[334]  A visual inspection of pricing behavior between ███ ████████████████████████████████████████████ and Steam reveals that discounts are offered on Steam concurrent with or shortly following those on ████  Moreover, discounts on both ████ and Steam are of a similar magnitude during a given period.

---

[332]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 213.

[333]    See Section 5.2.2.

[334]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 13.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 3:**  **U.S. Pricing Data**[335]



(149) Pricing for ▮▮▮▮▮▮▮▮ appears to be consistent with Valve's PMFN Policy following enforcement against other ▮▮▮▮▮▮▮▮ titles (in September 2014, not shown). Games are available for sale at similar prices to consumers on both platforms within a generally narrow period. Other games which Dr. Gowrisankaran claim to be "significantly higher price[d]" display a similar trend.[336] For example, pricing for the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮)[337] exhibits a pattern that is consistent with the PMFN Policy following enforcement. ▮▮▮▮▮▮▮▮ is offered at identical discounts on Steam at, before, or shortly following discounts made on the ▮▮▮▮▮▮. This behavior complies with the PMFN Policy.

---

[335]    Schwartz Opening Merits Report, 1/27/2025, Attachment M-4.

[336]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibits 13 and 14.

[337]    Steam, ▮▮▮▮, https://store.steampowered.com/app/▮▮▮▮▮▮▮ accessed 4/4/2025).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 4:** ███████████████ **U.S. Pricing Data**[338]



(150)    Although ███████████████ had not been released on Steam at the time of Valve's enforcement, visual inspection of pricing data also reveals a price response on Steam that follows discounts offered on the ███████. Each instance of a deeper discount being offered on the ███████ is matched within a couple of months with an equal or greater discount on the Steam Store. The pricing behavior of ███████████████ on the two platforms therefore reflects ███ compliance with Valve's PMFN Policy.

---

[338]    Schwartz Opening Merits Report, 1/27/2025, Attachment J-8.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 5:**  **U.S. Pricing Data**[339]



(151) Dr. Gowrisankaran analyzes "the difference in average daily game prices on and off Steam after alleged PMFN enforcement events" and asserts that of the 50 games he tests, 24 are "offered at significantly higher prices on Steam[.]"[340] He claims that if my conclusions about the existence of the PMFN Policy were correct, then we "would expect the average price on each platform to be no lower than the average price on Steam[.]"[341]

(152) The use of average daily game prices is not appropriate. Analysis using those prices does not capture price responses on Steam to discounts on other platforms because discounts are not typically matched on a daily basis. Moreover, his approach is flawed because it requires that he make assumptions about sales patterns for games that are inconsistent with the facts of the case. He calculates averages across daily prices and thus assumes that all games are bought at equal volumes every single day. They are not, as a review of daily sales data would readily reveal. Rather, game sales typically cluster around promotional events and sales, such as Steam sales. If the volume of a game's sales is significantly greater around the time of a discount, then the magnitude of discounts offered over a period which encompasses one of

---

[339]    Schwartz Opening Merits Report, 1/27/2025, Attachment L-4.

[340]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 213–217, Exhibit 13.

[341]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 213.

---

these sales is a better reflection of discount-matching behavior than the simple average daily prices that Dr. Gowrisankaran studies.

(153)    The minimum price of a game on and off Steam within each quarter is one potential measure of large games' compliance with Valve' PMFN Policy. Such an approach is more consistent with the fact that Valve does not consistently communicate a requirement for exact price matching on every day and cannot perfectly enforce the PMFN Policy on a daily basis. Steam conducts periodic Steam sales in which a large selection of games are simultaneously discounted as a massive promotional event.[342] Sales are hosted on a seasonal basis as well as monthly sales for specific themes and genres. For example, the annual Steam Summer Sale and Steam Winter Sale are highly popular promotional events in which hundreds of games are heavily discounted.[343] These sale periods, however, do not typically correspond exactly to sale periods on other platforms such as EGS.[344] Thus, Dr. Gowrisankaran's approach of using narrow and specific time windows for sales price comparisons is not appropriate. Comparing discounts on and off Steam on a quarterly basis is a more informative and robust way to compare prices at which consumers are more likely to purchase games over time.

(154)    Figure 6 below shows the minimum quarterly price of ▇▇▇▇▇▇▇ from 2019-Q2 through 2023-Q2 on ▇▇▇ and on Steam. The price of the game and subsequent quarterly discounts match nearly exactly over the period that the game was available for sale on both platforms.[345] This indicates that for the lowest discount on ▇▇▇▇▇▇ offered on ▇▇ in a quarter, an identical discount was offered on Steam within the same quarter.

---

[342]    PCGamer, "Steam Sale Dates: When is the Next Steam Sale?" 3/20/2025, https://www.pcgamer.com/steam-sale-dates/. Valve does not set prices for publishers. See:

Steam, "Updates to Pricing Tools And Recommendations", 10/24/2022, https://steamcommunity.com/groups/steamworks/announcements/detail/3314110913449340511. ("Is Valve changing or editing my prices? No. Just like always, publishers set their own prices on Steam. Your prices won't change unless you manually submit and publish new prices.")

[343]    PCGamer, "Steam Sale Dates: When is the Next Steam Sale?" 3/20/2025, https://www.pcgamer.com/steam-sale-dates/. ("As for which Steam sale is biggest, we tend to see the steepest discounts in the Summer and Winter sales, with the Summer sales offering the choicest selection.")

[344]    The Epic Games Store has a more limited number of sales throughout the year. Notably, EGS does not host an Autumn Sale and typically hosts a few holiday-themed sales along with the Winter, Spring, and Summer Sales. These seasonal sales do not coincide with sales on Steam; for example, EGS' 2025 Summer Sale falls on July 18–August 1 while Steam's 2025 Summer Sale falls on June 26–July 10. See:

Game Watcher, "Epic Games Store Sale Dates for 2025 - When is the Spring Sale?" 3/26/2025, https://www.gamewatcher.com/news/epic-games-store-sale-2020-schedule.

[345]    The Steam price and ▇▇ price match in all 17 quarters analyzed, except for 2021-Q2 where the price on ▇▇ is $39.99 compared to $40.19 on Steam, a difference of $0.20.

See 04_Gowrisankaran_Exhibit 13_Quarters.R

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 6:** ▮▮▮▮▮▮▮▮▮ **Minimum Quarterly Price**[346]



Year - Quarter

(155) Figure 7 below shows the minimum quarterly price of ▮▮▮▮▮▮▮▮▮ from 2021-Q3 through 2025-Q1 on the ▮▮▮▮▮▮ and on Steam. The price of the game and subsequent quarterly discounts match exactly over the period that the game was available for sale on both platforms. This indicates that for the lowest discount on ▮▮▮▮▮▮▮▮▮ offered on the ▮▮▮▮ in a quarter, an identical discount was offered on Steam within the same quarter.

---

[346]    04_Gowrisankaran_Exhibit_13_Quarters.R

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 7:** ████████████    **Minimum Quarterly Price**[347]



(156)    Figure 8 below shows the minimum quarterly price of ██████████ from 2020-Q4 through 2024-Q2 on the ███████ and on Steam.  The minimum quarterly price of the game on Steam matches, or is lower in many cases, than the minimum quarterly price of the game on the ███████.  This indicates that for the lowest discount on ██████████ offered on the ███████ in a quarter, an identical or better discount was offered on Steam within the same quarter.  This contradicts Dr. Gowrisankaran's conclusion that the price of ████████ was "significantly higher" on Steam than on the ████████.[348]

---

[347]    04_Gowrisankaran_Exhibit_13_Quarters.R

[348]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 13.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



**Figure 8: ▮▮▮▮▮▮▮▮▮▮ Minimum Quarterly Price[349]**

(157) As discussed in Section 5.2.2, Valve does not consistently communicate a requirement for exact price matching every day and cannot perfectly enforce its PMFN Policy against all publishers. Dr. Gowrisankaran ignores Valve's own communication and enforcement of the PMFN Policy through his application of an overly stringent standard of parity. An examination of prices across platforms on a quarterly basis better aligns with how Valve communicates and enforces its PMFN Policy.

**Dr. Gowrisankaran's analysis is overly focused on ▮▮▮▮ a publisher that left and returned to Steam during the period used in his analysis**

(158) In an attempt to disconnect my conclusions on Valve's enforcement of the PMFN Policy from the coinciding pricing patterns, Dr. Gowrisankaran references the pricing difference between Steam and the ▮▮▮▮▮▮ for games listed on both platforms.[350] In his examination of the

---

[349]  04_Gowrisankaran_Exhibit_13_Quarters.R

[350]  Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 222.

Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 15.

average pricing difference between the two platforms, Dr. Gowrisankaran claims that "[o]ver time there is a trend towards the average difference in prices being more often positive" and "in later years it is increasingly more common for Steam to be more expensive on average that [sic] ███████████ for the games sold on both."[351] However, Dr. Gowrisankaran's analysis lacks critical context, specifically, a discussion of events relating to the relationship between ███████ and Valve, and is misleading as a result.

(159)    ███████ did not offer a major release on Steam ████████████    █████████████

████████████████ ████[352] During that period, ███████ instead released its newest, most popular titles on the ████████████ and ████.[353]    As such, in the "later years" of Dr. Gowrisankaran's analysis—the years in which he notes that "it is increasingly more common for Steam to be more expensive on average that [sic] ████████████ for the games sold on both"—he is evaluating pricing for (primarily) older ████████ games and third-party titles listed across both platforms.[354] This approach ignores the fact that newer titles, all else equal, have more of an impact on revenues and commissions than older games or smaller selling third-party games and are thus more important to platform competition.·

(160)    Dr. Gowrisankaran ignores relevant qualitative evidence on the historical relationship between Valve and ███████ His simplistic comparison of average price difference fails to consider any change in pricing behavior between the ████████████ and Steam or in ████████ PMFN Policy compliance ████████████████████████████████ ████████ has a long history of communications with Valve concerning price parity resulting in *either* a change in pricing, withholding a promotion, or even the temporary removal of games from Steam.[355]

---

Dr. Gowrisankaran displays the "Daily Average Difference" as a simple average of "the price difference for each game on each day with overlapping price data" across pricing data for the US and ████████ overlayed with the periods of enforcement events for ████████ identified in my Opening Merits report. See:

Schwartz Opening Merits Report, 1/27/2025, Attachment H-1.

[351]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 224.

[352]

Schwartz Opening Merits Report, 1/27/2025, § 5.3.1.

[353]

[354]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 224.

[355]    Schwartz Opening Merits Report, 1/27/2025, § 5.2.

Further, ███████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████[356] Without an analysis of the context in which ██████ made its pricing decisions, Dr. Gowrisankaran's overly simplistic comparison of average prices cannot support the conclusions presented in his report.

### Enforcement does not need to lead to a price response if Valve takes punitive action against a publisher

(161) In addition, Dr. Gowrisankaran's analysis of Valve's enforcement of the PMFN Policy is flawed because he ignores evidence that Valve threatened and/or took punitive action against publishers in response to price and content differences on other platforms. The outcome of Valve's enforcement of the PMFN Policy is not limited to changes in price; Valve has repeatedly taken a variety of punitive actions against publishers including delisting games, refusing to promote games, and withdrawing Steam key support from games as penalty for being sold at lower prices on websites and stores.

(162) For example, upon the release of presale for ████████████████, Valve delisted the game from ██████ Steam store due to price differences between Steam and ████████, so as "to not compete in the price war[.]"[357] In this instance, ██████ could not readily change retail prices because ████████████ were willing to reduce their own margins to discount games.[358] Valve took the same actions against other ██████ titles, including ████████ and ████████ ████████████ over the same retail pricing dispute.[359] As discussed in my Opening Merits Report, ██████ explained that it was "not responsible" for the pricing strategy of ████████

---

[356] ███████████████████████████████████████████████████████████████████ ████████

[357] Valve, Emails Regarding ████████, 4/4/2014–4/8/2014 (VALVE_ANT_0046752–55, at VALVE_ANT_0046752), available at Connor Malone, Dep. Tr., 11/8/2023, Exhibit 247.

Schwartz Opening Merits Reports, 1/27/2025, ¶ 191.

[358] Valve, Emails Regarding ████████, 3/25/2014–4/25/2014 (VALVE_ANT_2714185–87, at VALVE_ANT_2714186–87), available at Connor Malone, Dep. Tr., 11/8/2023, Exhibit 246. ("As ██████ mentioned to you the pricing in this country has been historically very aggressive and our local teams work hard to defend higher prices."; "As we mentioned during the meeting the situation in ██████ is due to retailers strategies to take on their own margin for being cheaper than their competitor. This is a Death game that will end by the bankrupt of the weakest players (like ████████ among others in the past). We are not responsible of this and we obviously understand your feeling. We share it as it has impact all ██ digital sales and not only the ones through the Steam platform.")

[359] Schwartz Opening Merits Reports, 1/27/2025, ¶ 191.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

to decrease their own margins to remain competitive.[360]  After a period of noncompliance by ████████ the publisher eventually began to abide by the PMFN Policy and match discounts offered on the ████████████ on Steam.[361]  While ████████ price response cannot be observed in the immediate period surrounding enforcement, Valve's penalization and jeopardization of ████████ major titles ultimately led to future compliance with the PMFN Policy.

(163)  In many cases, Valve has enforced its PMFN Policy by withdrawing marketing initiatives because a game was found to be listed at a lower price on another website or platform.  As shown in my Opening Merits Report, Valve threatens and penalizes publishers into compliance with the PMFN Policy by withdrawing agreed-upon marketing initiatives such as daily deals, takeovers, and promotions on Steam.[362]  These punitive actions taken by Valve can jeopardize game launches and sales; when Valve withdrew a takeover for ████████ ████████████ a member of the ████ team wrote: "Takeovers are such an important part of our launch plan, to have it removed at such late notice, as you can imagine is more than a little worrying."[363]  Following enforcement, ITAD pricing data shows that ████ offered discounts on

---

[360]    Schwartz Opening Merits Reports, 1/27/2025, ¶ 190.

Valve, Emails Regarding ████████████, 3/25/2014–4/25/2014 (VALVE_ANT_2714185–87, at VALVE_ANT_2714187), available at Connor Malone, Dep. Tr., 11/8/2023, Exhibit 246.

[361]    Schwartz Opening Merits Reports, 1/27/2025, Appendix A, Attachment K-2.

[362]    Schwartz Opening Merits Reports, 1/27/2025 § 5.2.2.

Examples of the alleged conduct include, but are not limited to:

Valve, Emails between Valve and ████████ 9/11/2020–9/18/2020 (VALVE_ANT_1193127–132 at VALVE_ANT_1193128). ("We totally understand wanting to run different promos depending on the platform — the issue for us here is that you're running a significantly better discount at the same time we were giving special promotional placement to ████████████ on Steam. To that end, we removed the ██ daily deal and removed the feature from ████████████

Valve, Emails between Valve and ████ 11/7/2017–11/8/2017 (VALVE_ANT_0062248–50, at VALVE_ANT_0062249–50). ("I wanted to reach out about the marketing for the upcoming launch of ████████████. We've come across a number of sites selling the game for significantly lower than the Steam price and we're concerned about promoting a launch while the game is easily available at better prices elsewhere. Our concern is about offering our customers a competitive market price, and unfortunately it looks like the price on Steam is out of line with the rest of the market. We will be unable to run a takeover for the game on launch given these circumstances.")

Valve, Emails between Valve and ████████████, 9/8/2022–9/9/2022 (VALVE_ANT_1167505–06). ("As you know, we just started the ██ Weekend Deal promotion on Steam, with a discount of 20%. However, we've just realized that while you're running a 20% discount for Steam customers, the game is being offered in the ████████████████ for September—with a subscription price of ████ … In this case, ████████ customers are clearly being given a much, much better offer than Steam customers (the equivalent of a huge discount), while the promotions are being run at the same time. Of course, you choose the discount you'd like to run on Steam and you're free to continue to run the discount, but we're not going to promote a significantly worse deal to Steam customers on the front page when customers can see it's much cheaper elsewhere, so we've taken down the Weekend Deal.")

[363]    Valve, Emails between Valve and ████ 11/7/2017–11/8/2017 (VALVE_ANT_0062248–50, at VALVE_ANT_0062249).

---

the ███████ on ███████████ at or near parity with Steam.[364] Thus, Valve enforces its PMFN Policy by penalizing publishers by revoking previously agreed upon marketing initiatives which harms the success of games on Steam.

(164)   Dr. Gowrisankaran's enforcement analysis ignores punitive actions taken by Valve for PMFN Policy noncompliance. His analyses (focused on the 90-day and 30-day periods surrounding enforcement events, respectively) fail to examine any non-pricing adjustment made by Valve or the publisher.[365] Several titles (those considered by Dr. Gowrisankaran to be "offered at higher prices on Steam")[366] had marketing revoked or were removed from sale in certain regions following enforcement.[367] For example, ███████ (published by ███████ ███████ a non-platform owning publisher) was removed from Steam's Winter Sale because the game was offered for free when it debuted on the ███████;[368] ███████ proceeded to offer a discount immediately following enforcement, as Valve noted that "if PublisherX wants to sell a game at 80% off on ██ and 50% off on Steam... we can't stop them! But we're not going to promote it until the Steam players get 80%, too."[369]   Dr. Gowrisankaran's statistical analyses concerning pricing prior to and following communications from Valve do not capture the influence of such punitive actions taken by Valve around the time of enforcement.

(165)   The effects of the punitive actions taken by Valve toward publishers cannot by evaluated using ITAD pricing data alone. In many of these enforcement events, publishers do not immediately adjust pricing to match that on Steam following communication with Valve. Through enforcement, Valve has repeatedly been seen to disrupt game sales and promotions to deter

---

[364]   The last discount registered was in August 2018; ███████ was superseded by ███████. See: Schwartz Opening Merits Reports, 1/27/2025, Appendix A, Attachment N-13.

███████████████████████████████████

[365]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 14.

[366]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 14.

[367]   See, for example: Valve, Emails between Valve and ██ 10/12/2017–10/18/2017 (VALVE_ANT_1218995–97, at VALVE_ANT_1218995–96).
Valve, Emails Between ██ and Valve, 8/15/2014 (VALVE_ANT_2576464).
Valve, Emails Regarding ███████, 4/4/2014–4/8/2014 (VALVE_ANT_0046752–55, at VALVE_ANT_0046752), available at Connor Malone, Dep. Tr., 11/8/2023, Exhibit 247.

[368]   Valve, Emails between Valve and ███████ ██ 12/22/2020–12/24/2020 (VALVE_ANT_2527325–28, at VALVE_ANT_2527327).

[369]   Valve, Emails between Valve and ███████ ██, 12/22/2020–12/24/2020 (VALVE_ANT_2527325–28, at VALVE_ANT_2527325–26).

future violations of the PMFN Policy. While some enforcement events may not result in an immediate price response when Valve penalizes publishers, it induces future compliance with the PMFN Policy.

## 5.3. Valve's PMFN Policy harms competition

### 5.3.1. Valve's PMFN Policy is a barrier to platform entry and growth[370]

(166)  Absent Valve's PMFN Policy, other platforms could compete for publishers to join their platforms exclusively or increase the frequency with which they multihome by using their commission structure to support price discounting by publishers. Given the prevalence of comparatively lower commission rates on alternative game distribution platforms, all else equal, publishers would be incentivized to try and steer customers towards the distribution platform with the lowest commission rate, using lower prices or differentiated content to do so.

(167)  Valve's PMFN Policy reduces publishers' ability to increase unit sales and revenues by providing different prices and/or content across platforms as a way of attracting customers to those platforms. Those customers and publishers are critical to a platform's efforts to build network effects, which are critical to competitive success. This limits the ability of competing platforms to grow and be effective competitors to Steam and is thus a barrier to platform entry and growth.

(168)  Indeed, as discussed in Section 6.2 of my Opening Merits Report, evidence shows that platforms who have attempted to enter the relevant market have been unable to compete effectively with Steam. Without the ability to compete on price and/or content, platforms have been unable to attract a sufficient number of users to the platform (and away from Steam). Without a large user base, those platforms cannot attract publishers away from Steam, even with lower commission rates. Thus, Valve's PMFN Policy hinders existing platform growth and limits the ability for platforms to enter the relevant market and be effective competitors.

---

[370]   For further discussion, see:

Schwartz Opening Merits Report, 1/27/2025, § 5.1.3.

**Competition has been foreclosed**

(169)    Dr. Gowrisankaran claims that competition in the video game industry has not been foreclosed.  He says "there has been significant entry by other platform distributors of video games both before and after Steam entered, but especially so after Steam's entry."[371]  As evidence, Dr. Gowrisankaran's Exhibit 6 shows a timeline of video game platforms that have launched since 1996.[372]  In his timeline, however, Dr. Gowrisankaran includes distribution avenues for the broader video game industry—many of which do not compete with Steam as third-party digital PC game distribution platforms.[373]  Further, he includes game distributors that have since failed and shuttered and thus are no longer in *any* market.[374]  Below in Table 1, I list all platforms from Dr. Gowrisankaran's Exhibit 6 and provide categorizations of each to show how or if they are relevant to my analysis, of which many are not.

---

[371]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 126.

[372]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 6.

[373]    The platforms that compete in the third-party digital PC game distribution via platforms market besides Steam include Ubisoft Connect, GOG, Microsoft Store, Itch.io, Origin, Discord PC Store, and Epic Games Store.

Opening Merits Report, 1/27/2025, at Table 1.

[374]    Opening Merits Report, 1/27/2025, § 4.1.

I understand that Ubisoft no longer offers third-party games on Ubisoft Connect and that EA stopped offering games from third-party publishers on the Origin platform on June 13, 2022.  See:

Opening Merits Report, 1/27/2025, fns. 192, 388.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Table 1: Gowrisankaran Rebuttal Merits Report Exhibit 6 Video Game Platforms[375]**

| Year Launched | Platform | Category |
|:---:|:---:|:---:|
| 1996 | Battle.net | First-party distribution only |
| 2000 | PlayOnline | First-party distribution only |
| 2002 | GameFly | Disc rental subscription service[376] |
| **2003** | **Steam** | **Third-party distribution platform** |

---

[375]  See Rebuttal Attachment B-1.

Bolded rows are for platforms that I include in my relevant market share calculation.

Several of these platforms are no longer in operation. For example, Games for Windows closed in August 2013. See:

PC Gamer, "Games for Windows Marketplace to Close Next Week," 8/15/2023, https://www.pcgamer.com/gfw-pc-marketplace-to-close-next-week/.

The Twitch Store shut down in November 2018, eighteen months after its launch. See:

GameRevolution, "Twitch Game Store Shutting Down After November 27," 11/16/2018, https://www.gamerevolution.com/news/458393-twitch-game-store-shutting-down.

Discord shut down its storefront in March 2019. In addition, Discord also shut down Nitro, its subscription service for access to a library of games and enhanced features, in October 2019. See:

PC Games Insider, "Discord Quietly Shelves its Storefront to Focus on Direct Sales," 3/22/2019, https://www.pcgamesinsider.biz/news/68742/discord-quietly-shelves-its-storefront-to-focus-on-direct-sales/.

PC Gamer, "Discord's Nitro Games Will be Closed in October," 9/13/2019, https://www.pcgamer.com/discords-nitro-games-will-be-closed-in-october/.

The Wii Shop Channel closed on January 30, 2019. See:

Nintendo, "Wii Shop Channel Discontinuation," https://en-americas-support.nintendo.com/app/answers/detail/a_id/27560/~/wii-shop-channel-discontinuation (accessed 4/21/2025).

The Bethesda.net Launcher shut down in May 2022. See:

Bethesda Support, "How Do I Download and Install the Bethesda Launcher on PC?," https://help.bethesda.net/#en/answer/35008 (accessed 4/21/2025).

Google Stadia shut down on January 18, 2023. See:

Google Stadia, Home Page, https://stadia.google.com/gg/ (accessed 4/23/2025).

Some of the publishers that operate the third-party platforms listed above also distribute or have distributed their own games on Steam. For example, Ubisoft stopped releasing its PC games on Steam in 2019, but ultimately returned to Steam in 2022. Similarly, following the launch of its third-party platform Origin, EA offered exclusive content on Origin and pulled certain titles from Steam. EA, however, ultimately returned to distributing its games on Steam. Microsoft, too, ultimately decided to distribute more of its titles through Steam beginning in 2019. See:

Schwartz Opening Merits Report, 1/27/2025, ¶¶ 87–90, 261.

[376]  GameFly acquired Direct2Drive in 2011 but then sold the digital storefront in August 2014 and discontinued digital distribution. See Rebuttal Attachment B-1.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

| | | |
|---|---|---|
| 2003 | Stardock Central | First-party distribution only[377] |
| 2004 | Direct2Drive | Non-gameplay digital sales platform |
| 2005 | Xbox Games Store | Digital platform for console |
| 2006 | PlayStation Store | Digital platform for console |
| 2006 | Wii Shop Channel | Digital platform for console |
| 2006 | Roblox | First-party distribution only |
| 2006 | Games for Windows | Third-party distribution platform[378] |
| **2006** | **GamersGate** | **Non-gameplay digital sales platform** |
| **2008** | **GOG** | **Third-party distribution platform** |
| **2009** | **Ubisoft Connect** | **Third-party distribution platform** |
| **2010** | **Green Man Gaming** | **Non-gameplay digital sales platform** |
| **2010** | **Humble Bundle** | **Non-gameplay digital sales platform** |
| **2011** | **Origin** | **Third-party distribution platform** |
| 2011 | Minecraft | First-party distribution only |
| **2012** | **Microsoft Store** | **Third-party distribution platform** |
| **2013** | **Humble Store**[379] | **Non-gameplay digital sales platform** |
| **2013** | **Itch.io** | **Third-party distribution platform** |
| 2014 | G2A | Non-gameplay digital sales platform |
| 2016 | Oculus Store | Third-party distribution platform for VR games |
| 2016 | Bethesda.net Launcher | First-party distribution only |
| 2017 | Twitch Store | Third-party distribution platform |

| 2017 | WeGame | Third-party distribution platform[380] |
|------|--------|----------------------------------------|
| 2017 | Microsoft Game Pass | Subscription model |
| **2018** | **Epic Games Store** | **Third-party distribution platform** |
| **2018** | **Discord PC Store** | **Third-party distribution platform** |
| 2019 | Rockstar Launcher | First-party distribution only |
| 2019 | Google Stadia | Cloud gaming platform |
| 2021 | Riot Client | First-party distribution only |
| 2022 | Amazon Luna | Cloud gaming platform |

(170)   Dr. Gowrisankaran states that the "abundant" entry by new market participants is not aligned with my analysis that the PMFN Policy creates barriers to competition in the relevant market, stating that "[i]f there were a PMFN that was well known in the industry and understood to have the effect of meaningfully blocking opportunities to compete, then entry would be successfully deterred."[381] This is not necessarily the case. The PMFN Policy need not deter initial entry, since it effectively forecloses paths to competition on the merits with Steam. The PMFN Policy reduces the paths for the entering platform to gain the scale and network effects needed to be successful in the relevant market (see Section 6.2 of my Opening Merits Report). While some of these potential competitors may have had some initial success upon entry into the relevant market, ultimately, these platforms have not been able to gain the scale needed to attain and/or maintain any meaningful share of the market. Valve's behavior (*e.g.*, the

---

[377]   Stardock Central appeared to have only distributed Stardock products and services. It was then succeeded by the third-party distribution platform Impulse, which was purchased by GameStop in 2011 and shut down in 2014. Currently, it appears that the Stardock Central application is no longer supported. The current web page for Stardock Games only sells Steam keys. See Rebuttal Attachment B-1.

[378]   Games for Windows did not offer PC game downloads until 2009, when Games for Windows Live added Games on Demand. This was subsequently relaunched as Games for Windows Marketplace in 2010. The Games for Windows Marketplace migrated to Xbox.com in 2011 and shut down in August 2013. See Rebuttal Attachment B-1.

[379]   I understand that the Humble Store is an offering of Humble Bundle and operates in the same way but for individual games instead of bundles. See:

Schwartz Opening Merits Report, 1/27/2025, ¶ 66.

See also:

Humble Bundle, What is Humble Bundle, https://www.humblebundle.com/about (accessed 1/21/2025).

[380]   The global version of the store, WeGameX, was first launched in April 2019 and described as "bare bones" because it featured just 30 games. Other information about WeGameX is scarce, with the most recent article, from July 2022, merely stating that the international version of the store "soft launched in April 2019." See Rebuttal Attachment B-1.

[381]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 128.

---

PMFN Policy) limits these platforms' ability to be meaningfully effective competitors. These failed platforms include, for example, Uplay/Ubisoft Connect, Origin, Discord, and the Windows Store.[382]

**Game variety and quality**

(171)    Dr. Gowrisankaran claims that "[i]nnovations by Steam and rival platforms have lowered entry barriers for developers and supported the expansion of game diversity and quality."[383] Dr. Gowrisankaran concludes that "[t]he result of these innovations is greater competition among developers, resulting in higher quality games available to end consumers."[384]  I do not disagree with Dr. Gowrisankaran that PC games have increased in number and variety over the past decade.  However, this fact, by itself, proves nothing about the PMFN Policy's effect on competition in the relevant market.  Dr. Gowrisankaran's reliance on a narrow set of facts means that he misses key considerations that render his conclusions inapplicable or irrelevant to this matter.

(172)    First, Dr. Gowrisankaran only considers potential procompetitive effects and does not consider any anticompetitive effects that have stemmed from Valve's control over the increased game variety and quantity.  For example, Dr. Gowrisankaran ignores that with an increase in the quantity of games offered on Steam, there is an associated decrease in game discoverability.[385]

---

[382]    Schwartz Opening Merits Report, 1/27/2025, § 6.2.

[383]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 154.

[384]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 154.

[385]    Wolfire, GamesBeat Article Regarding Steam, 2/13/2017 (WOLFIRE_00000168–73, at WOLFIRE_00000169, WOLFIRE_00000170), available at Alden Kroll, Dep. Tr., 11/16/2023, Exhibit 302.

Discoverability has been a point of dissatisfaction for publishers on Steam.  See, for example:

Valve, Emails Regarding Steam Recommendation, 3/21/2013–3/22/2019 (VALVE_ANT_2422879–83, at VALVE_ANT_2422879–81).  (In an email ██████████████████████████████████████████
████████████████████████████████████████████████████████████████████

Dark Catt, "75 Steam Statistics: 2020/2021 Facts, Market Share & Data Analysis[,] 5/15/2020 (DarkCatt_0000039–047, at DarkCatt_0000043).  ("Following the platform's success, a lot of developers have devoted their creations to satisfy Steam's built-in market, which has worked well for legacy titles.  However, indie developers have found themselves in a quagmire as the sales of smaller games have significantly dropped in 2019.  This points to the crowded space in which their games are hosted, coupled with the revenue share taken by Steam, and the possible flawed approach to pricing.  A brunt of Steam's revenue comes from only a handful of titles.")

Valve, Emails Regarding Valve Roundtable, 7/17/2020–7/21/2020 (VALVE_ANT_0537011–013, at VALVE_ANT_0537011).  (A Valve email from a game developer expresses dissatisfaction with the algorithm and how Steam recommends games: "Now that the algorithm appears to have determined that our games are not of interest to people, is there a way to

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

As such, his analysis is incomplete and cannot conclude that Valve's conduct has, on balance, resulted in sufficient procompetitive effects to outweigh anticompetitive effects. Second, Dr. Gowrisankaran does not tie the increase in game variety and quality to the proper relevant market, instead focusing on alleged benefits across not only PC, but also console games. Thus, his analysis is not generally applicable to the relevant market in this case. Third, Dr. Gowrisankaran does not consider the impact of Valve's PMFN Policy. As a result, he undertakes the wrong comparison—he compares the real-world output in the past against the real-world output today. The relevant comparison is between the real world and the *but-for world*; that is, the appropriate consideration is whether the variety and quality of games would have been *higher* absent the PMFN Policy.[386] Dr. Gowrisankaran ignores this question.

(173) Further, the only quantitative evidence Dr. Gowrisankaran provides in support of his game variety argument is game variety growth on *Steam*, stating that "[d]ata on developers on Steam reflect vibrant participation in game development, as well as growth[.]"[387] As discussed in my Opening Merits Report, because of the PMFN Policy and Steam's dominant position in the marketplace, publishers had few options other than Steam to distribute their games.[388] He provides no evidence of game variety growth on other platforms in the relevant market; as such, his analysis is incapable of addressing the competitive consequences of the game variety growth he identifies.

(174) As an example, in a series of emails, Valve employees make clear that they are aware of the impact they have on what consumers see and ultimately purchase, noting developers fear "being left at the mercy of 'The Algorithm'," while also noting that users may "fall into corner cases where [Steam doesn't] generate great results for them."[389] By controlling how games

---

'reignite' the visibility[?] What options do we have other than deleting the application and making a brand new game with the same name?")

See also:

Rietveld Report, 1/27/2025, ¶ 18. ("[P]ublishers face increasing competition on Steam as Valve has lowered entry requirements for games on the platform through the introduction of Greenlight and, subsequently, Steam Direct, thereby causing the platform to become increasingly oversupplied with games. Overcrowding has negatively impacted discoverability and the prices publishers can charge for their games on Steam, causing a dampening of game sales.")

[386] As explained in one Court opinion, "Output increasing over time does not address whether output would have increased at a greater rate in the absence of the [challenged conduct]." See:

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 115 (E.D.N.Y. 2024).

[387] Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 157.

[388] Schwartz Opening Merits Report, 1/27/2025, §§ 6.2, 6.3.

[389] Valve, Emails Regarding Review and Library, 12/10/2018–12/12/2018 (VALVE_ANT_0052615–622, at VALVE_ANT_0052616).

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

were (and are) consumed by the vast majority of consumers in the market (that is, by exercising its monopoly power), Valve essentially controlled the access and visibility of PC games and had a central role in determining which genres and games were more or less successful.  However, in a but-for world with more competitive platform alternatives, the evolution of games (both in variety and quality) would not be controlled by a single platform. This would allow publishers and users the choice of a variety of differentiated platforms to distribute and download games.

(175)   Dr. Gowrisankaran also states that "[t]he economics literature recognizes that entry by new firms and products will tend to intensify competition and place increased pressure on incumbents."[390] That is true when entry is effective, that is, when entrants are able to enter the market and compete on the merits, and the entry is sufficient to constrain prices—neither of which is true in the relevant market.  The PMFN Policy prevents effective entry and competition on the merits, thus preventing that competitive pressure (which would lead to greater choice, lower prices on both sides of the platform, and higher quality across both sides of the platform).  See Section 6 of my Opening Merits Report for further discussion.

(176)   Dr. Gowrisankaran lists various improvements in games over the evolution of the gaming industry.[391]  However, these improvements have no direct tie to Valve or its actions.  Indeed, one of the sources Dr. Gowrisankaran cites specifically states that these improvements exist across other markets beyond the relevant market: "Moreover, *both console and PC gaming markets* have been competitive, with each striving to offer the best gaming experience.  This competition has driven the adoption of higher resolutions and improved graphics in gaming hardware and software."[392]  These improvements are attributable to factors *other* than any innovations by Valve on Steam, including simply the evolution and improvement of technology at large, beyond the scope of games alone.

---

For further discussion and examples, see:

Schwartz Opening Merits Report, 1/27/2025, § 6.2.3.

[390]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 160.

[391]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 161.

[392]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 161.a.  (Emphasis added.)

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Output increasing and prices declining**

(177)    Dr. Gowrisankaran concludes that the increase in output and decline in prices in the broader video game industry "indicates healthy competition."[393]    There are several issues with Dr. Gowrisankaran's discussion and, thus, his conclusions.    First, as discussed above, Dr. Gowrisankaran is answering the wrong question for purposes of an antitrust analysis. The relevant question is not whether there is general growth in output and decreases in prices over time; rather, the question that needs to be explored is whether the benefits to output and prices would have been higher in the but-for world absent Valve's PMFN Policy.    Comparisons between the real-world past and the real-world present are not relevant.

(178)    Second, much of Dr. Gowrisankaran's discussion is about the broad video game industry, encapsulating more than just the relevant market at issue in this matter.    The changes over time across this overly broad set of products are not necessarily indicative of what is happening in the relevant market.    As such, Dr. Gowrisankaran's discussion that focuses only on the video game industry at large is not sufficient to show what is happening to the output and prices of third-party digital PC distribution platforms.

(179)    Third, Dr. Gowrisankaran argues that "video game prices have decreased, on average, since Steam launched."[394]    Dr. Gowrisankaran concludes that his analysis finds that "in terms of the 2024 price level, the average real price fell from $85 in 2004 to $40 by 2007 and to $17 by 2024."[395]    Dr. Gowrisankaran admits that this is driven "by the entry of games at lower price points[.]"[396]    I do not necessarily disagree with Dr. Gowrisankaran that the *real* initial purchase price of AAA games has decreased.    Evidence does suggest that nominal prices have been relatively constant at $59.99 since the time that Dr. Gowrisankaran claims that price point was established as the standard price for AAA games,[397] with games at this price point making up nearly ▉ of total transaction value on Steam between January 2017 and November 2024.[398]    However, there are an increasing number of games priced higher than $59.99.    Between 2006 and 2023, the share of revenues on Steam that come from games

---

[393]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, § 6.3.

[394]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 166.

[395]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 166.

[396]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 167. .

[397]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 167.

[398]    Schwartz Opening Merits Report, 1/27/2025, Attachment G-4.

priced above $59.99 rose from ███ to ████.[399] Similarly, the percentage of units sold at a price point of higher than $59.99 rose from ████ to ███.[400]

(180)   Regardless, the initial purchase price of AAA games does not tell the full story about consumer prices. Since 2005, when, according to Dr. Gowrisankaran, the nominal price of $59.99 was first adopted for AAA games,[401] in-game transactions such as microtransactions and other in game content have dramatically increased. On Steam, there were no in-app purchases until 2010, meaning that in years prior, all revenues came from the initial purchase and DLC purchases.[402] In 2010, in-app purchases represented just ████ of total transaction value on Steam.[403] This has risen to ████ in 2024, a ██████ increase.[404] As a result, the cost to play video games for consumers has shifted from being almost (if not entirely) up-front with the initial purchase of a video game. Now that cost is split amongst an initial purchase and additional add-on transactions that can occur over the lifetime of the use of the game. As such, any relevant analysis of consumer prices needs to account for total consumer spending, which Dr. Gowrisankaran's analysis does not. Ultimately, however, Dr. Gowrisankaran does not answer the question that matters: whether prices would be lower in a but-for, competitive world when compared to the real world. As a result, Dr. Gowrisankaran's conclusion that there is healthy competition as a result of a reduction in the initial purchase price of games is unsupported and unconvincing.

(181)   Fourth, one small change in pricing over nearly 20 years is not indicative of "healthy" competition. The majority of publishers are still paying a 30% commission rate on Steam and even those paying one of Valve's lower commission tiers are still paying more than they would on Steam in the but-for world.[405] None of Dr. Gowrisankaran's claims indicate that prices would not have decreased more in the but-for world. As I detailed in my Opening Report,

---

399    05_Top_sale_prices_Rebuttal.R

400    05_Top_sale_prices_Rebuttal.R

401    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 167.

402    06_IAP_Percent_Revenues.R

403    06_IAP_Percent_Revenues.R

404    06_IAP_Percent_Revenues.R

405    Schwartz Supplemental Opening Merits Report, 3/7/2025, ¶ 24.
       Schwartz Opening Merits Report, 1/27/2025, ¶ 384.

Valve is highly profitable, and there is ample room for Valve to decrease prices while covering its costs.[406]

(182)   Fifth, Dr. Gowrisankaran does not adequately analyze the number of market players over time. Given the persistent and high profits being earned by Valve on Steam, one would expect that the number of entrants (or attempts at entry) would also be persistent and high. Instead, by Dr. Gowrisankaran's own table and discussion in Section 6.1 of his report, over the past thirty years, only a few platforms have entered the proper relevant market.[407] Of those, all have failed to effectively compete against Steam, with some fully exiting the market, allowing Steam's market share to remain high.[408]

### 5.3.2.   Dr. Gowrisankaran's pricing analysis does not show that the PMFN Policy has no effect on competition

(183)   Dr. Gowrisankaran claims that "[t]here is no evidence of widespread price parity for games that are distributed through Steam[.]"[409] In support of this claim, he presents several different analyses in which he utilizes third-party pricing data from ITAD to compare on-Steam prices to prices on other platforms. In his first analysis, Dr. Gowrisankaran compares the percentage of days during which lower prices are available off Steam.[410] In his other analyses, Dr. Gowrisankaran compares average prices of games between Steam and other platforms.[411] His analyses ignore a crucial aspect of how Valve's PMFN Policy forecloses competition. That flaw leads to critical errors in his analysis that render it unreliable.

(184)   As described in Section 5.2 above, the PMFN Policy limits the ability of potential rival platforms to compete effectively with Valve via price competition or content differentiation. Rather than attempt to achieve 100% compliance at a high cost, Valve can achieve its anticompetitive

---

[406]   Schwartz Opening Merits Report, 1/27/2025, ¶¶ 154–158.

[407]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 6.

The platforms that compete in the third-party digital PC game distribution via platforms market besides Steam include Ubisoft Connect, GOG, Microsoft Store, Itch.io, Origin, Discord PC Store, and Epic Games Store.

Schwartz Opening Merits Report, 1/27/2025, at Table 1.

[408]   Schwartz Opening Merits Report, 1/27/2025, § 4.1.

I understand that Ubisoft no longer offers third-party games on Ubisoft Connect and that EA stopped offering games from third-party publishers on the Origin platform on June 13, 2022.

[409]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, § 7.1.1.

[410]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 179.

[411]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, § 7.1.1, Exhibit 9.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

objectives at a lower cost by selective and targeted enforcement of its price and content parity requirements—focusing on the games and publishers that are most likely to have the largest negative impact on Steam's dominance (See Section 5.2.1).  This behavior makes the threat of full removal from Steam credible to publishers.  Valve's selective enforcement is effective because of Valve's focus on key games and key publishers that would provide potential rival platforms with the ability to compete effectively (See Section 5.2.1).

(185)   Dr. Gowrisankaran's analysis also cannot capture non-price impacts of Valve's PMFN Policy on publishers, such as disincentivizing publishers from offering their games on other stores (multihoming).  As such, no reliable conclusions about the effects of Valve's PMFN Policy can be drawn from his pricing study.

(186)   Dr. Gowrisankaran ignores the fact that a major impact of the PMFN Policy is the disincentive it creates for publishers to multihome.[412]  However, even for the games that are multihomed, Dr. Gowrisankaran's analysis is flawed and unreliable.  His reliance on the comparison of available prices obscures important marketplace realities and his pricing threshold is arbitrary and not justified by the facts of the case or any economic principle.  Beyond that, his analysis ignores the fact that not every game affects potential rivals' ability to compete effectively against Valve in the same way or to the same extent, and that Valve is more likely to enforce the PMFN Policy on those games where multihoming presents a greater competitive threat.  His analysis weights all games (and non-games) equally, simply tallying up a count without consideration of their respective likely impacts on competition.  He fails to consider Valve's selective enforcement, and thus his analysis cannot show the effect of the PMFN Policy on competition.

**The share of games offered on multiple stores is relatively small and has decreased over time**

(187)   Dr. Gowrisankaran's pricing analysis is unreliable because it ignores the possibility that the PMFN Policy has discouraged/decreased multihoming across PC distribution platforms.  If the PMFN Policy is effective (and it is), there is little economic reason to expect significant multihoming, as doing so would confer no benefit—consumers would not get any price benefit for utilizing non-Steam platforms.  Unsurprisingly, relatively few games are available on multiple platforms, and Valve's PMFN Policy accomplishes one of its primary goals of deterring game placement on rival platforms and deterring effective competition from those platforms.  As an economic matter, Dr. Gowrisankaran's focus on his price comparisons leads him to

---

412     Schwartz Opening Merits Report, 1/27/2025, § 5.1.3.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

disregard the critical fact that the success and anticompetitive impact of the PMFN Policy is established before he begins his flawed cross-platform price comparisons. He disregards the fact that, by preventing multihoming, the PMFN Policy precludes the possibility of meaningful and effective competition from rival platforms. Put differently, Dr. Gowrisankaran's analysis cannot assess how different pricing and other competitive behaviors would be in a but-for world where there was no PMFN Policy.

(188)   To determine the extent of multihoming, I compare the number of packages in Dr. Gowrisankaran's analysis to the number of unique packages sold on Steam during the same time period. Dr. Gowrisankaran identifies 38,996 unique items (games and downloadable content ("DLC") that are multihomed; this represents only 23% of the 169,775 unique items offered on Steam during this time.[413] As displayed in Figure 9 below, the share of multihomed games has generally decreased since 2013, even with the entrance of EGS in 2018. This is, by itself, consistent with an effective PMFN Policy.

---

[413]    See 03_Gowrisakaran_Exhibit_9.R

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 9: Share of Steam Packages Multihomed Over Time by Release Year[414]**



(189)    This trend is a natural consequence of Valve's PMFN Policy, which, of course, is a critical element of Valve's effort to limit effective platform competition. In Section 6.1 of my Opening Merits Report, I established that, absent the PMFN Policy, potential rival platforms would compete with Steam by offering publishers lower commission rates. That would, in turn, lead to lower consumer prices, thus creating incentives for consumers to move to rival platforms. However, absent the ability to offer lower prices on competing platforms, publishers' ability to drive consumers to a rival platform is limited. That, in turn, minimizes the ability of rival platforms to compete. The decrease in the rate of multihoming over time reflects the effectiveness of Valve's enforcement of the PMFN Policy over time.

(190)    Dr. Gowrisankaran claims that a PMFN "can only have impact if the product is offered on another platform."[415] That statement is not correct. One of the effects of the PMFN Policy is to deter publishers from multihoming or publishing exclusively (or partially exclusively) on a

---

[414]    07_Multihoming_Rebuttal.R

ITAD pricing data is available for up to early 2025. As such, games released later in the data (*i.e.*, 2024) may have had less time to offer off-Steam than games released earlier.

[415]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 392.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

second platform. If, because of the PMFN Policy, publishers never move to a competing platform, the PMFN Policy is effective and reduces competition. Put more simply, Dr. Gowrisankaran fails to consider the possibility that the limited, declining multihoming observed in the real world is the result of Valve's PMFN Policy. Further, he overlooks that the overwhelming proportion of products on Steam that are not multihomed comply with Valve's PMFN Policy by definition. He does not model or even consider the possibility that many of those roughly 80% of Steam games would likely engage in some degree of multihoming in the but-for world, allowing rival platforms to be competitive alternatives to Steam. Thus, his analysis is incomplete and cannot support reliable economic inferences.

(191)    If singlehomed games are included in Dr. Gowrisankaran's pricing analysis, the results change dramatically and his conclusion falls apart. Such an adjustment is appropriate: Valve's PMFN Policy inhibits multihoming. To measure the impact of the PMFN Policy on price parity, games that are singlehomed should also be considered. Figure 10 below first shows Dr. Gowrisankaran's analysis of the percentage of days where games have lower prices off Steam. Next, to account for the PMFN Policy's impact on multihoming, games that are singlehomed on Steam are included with packages that have identical pricing across platforms.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 10: Dr. Gowrisankaran's Exhibit 7,**

**Corrected to Include 76.9% of Offerings on Steam[416]**



### Dr. Gowrisankaran's use of windows to compare average prices obscures key factors

(192)    There is another fundamental flaw in Dr. Gowrisankaran's pricing analysis that renders it economically and statistically unreliable.   In his pricing analysis, Dr. Gowrisankaran examines the time period in which a game is available on both Steam and another platform. He then calculates a single average price on each platform across all the games during this time window.  He compares this single average price, calculated across the time window, to determine whether a game is offered at a different price on another platform than it is on Steam.  Such an analysis oversimplifies pricing dynamics and ignores the effect enforcement may have on pricing on alternative platforms.

(193)    The majority of video game sales on Steam occur while games are on sale. Between 2017 and 2024, most units sold on Steam were sold at transaction prices below the base (listed) price. See Table 2.

---

[416]    08_Gowrisankaran_Exhibit_7_Multihoming.R

Games that are singlehomed make up 76.9% of offerings on Steam.  I have corrected Dr. Gowrisankaran's analysis to include the omitted singlehomed games on Steam.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



(194)   Dr. Gowrisankaran ignores this phenomenon entirely.   His use of a single average price weighted by the number of days ignores this critical feature of game sales.   In Dr. Gowrisankaran's analysis, he implicitly assumes that the count of games purchased on each day is equal.   For example, if a game is priced across a five-day window at prices of $1, $3, $3, $4, and $4, his method would result in an average price of $3 over that five-day window. However, the data in Table 2 indicate it is likely that a large share of purchases during that window occurred at the $1 price rather than at the median price.   He ignores the reality that consumers overwhelmingly purchase games on sale and disconnects his analysis from both the reality of the market and the facts of the case.   As such, his averaging methodology will yield skewed and misleading results.

(195)   Dr. Gowrisankaran's use of average prices for a single game also overemphasizes the duration of a discount relative to the magnitude of the discount.   For example, a $5 game priced at $5 for five days and $4 for five days on an alternative platform would have a lower average price as that same game priced at $5 for nine days and $2 for one day on Steam.   According to Dr. Gowrisankaran's analysis, the average price off Steam would be lower and this would be

---

[417]   See 09_Sales_Rebuttal.R.  Unit and transaction shares are derived from Steam units and transactions within the damages period, are exclusive of in-app purchases and hardware, and inclusive of Valve sold units and transactions.

For a breakdown of revenues, see 09_Sales_Rebuttal.R

---

Rebuttal Merits Expert Report of Steven Schwartz, Ph.D.

flagged as a violation of the PMFN Policy. However, the magnitude of a discount (particularly on Steam) is more important than the duration of discounts. Due to Steam's dominant position in the market, a substantial discount, even if it is offered for a single day, is likely to reach more potential customers and lead to more purchases than a smaller discount offered for a longer period elsewhere. Dr. Gowrisankaran's failure to separate out the impacts of discount magnitude and duration is a serious analytical flaw that, in my judgment, renders his conclusions invalid.

(196)   Moreover, while persistently and exactly matching pricing across platforms is one way that a publisher may comply with Valve's PMFN Policy, Dr. Gowrisankaran's analysis fails to account for other methods by which a publisher could comply with Valve's PMFN Policy. For example, a publisher may comply with the PMFN Policy by offering a volume-weighted average price over time for each of their games on Steam that is equal to or lower than the average price on a competing platform. Dr. Gowrisankaran's analysis does not account for this possibility. To demonstrate that Dr. Gowrisankaran's higher "average" price on Steam is out of line with the weighted average price at which a title was sold on Steam during the period the title was cross-listed across both platforms, I examine games flagged by Dr. Gowrisankaran as more than 5% cheaper on another platform than on Steam *with price changes on Steam but stable pricing off-Steam throughout the period analyzed.*[418]

(197)   One such game is ███████ (flagged as a game more expensive on Steam than ███ by Dr. Gowrisankaran, and with a constant price on ███). I first examine the daily prices on Itch.io and Steam for ██████ during the same period Dr. Gowrisankaran analyzes the game in his ITAD dataset. I use this daily pricing data to chart the blue (███ pricing data from ITAD) and black (Steam pricing data from ITAD) lines below. The price of ██████ reported on ITAD for ███ remained at $3.99 throughout the period analyzed, while the simple average price by day reported on ITAD for Steam was around $4.50.[419] Next, I calculate the weighted average price of the game's sales on Steam using Valve's transaction data. The weighted average price at which ██████ was sold within the period analyzed was $2.88, charted as

---

[418]   I do not have data on quantities sold on competing platforms, meaning that I cannot calculate a weighted average price over a time period unless the price is constant over that time period. Therefore, I analyze only games with constant pricing off-Steam in the period analyzed by Dr. Gowrisankaran. For these games during these time periods, the average price, simple or weighted, will equal the price offered across the period. Examining periods with a consistent price allows me to compare an effective price on Steam against an effective price elsewhere.

Gowrisankaran Rebuttal Merits Report, 3/26/2025, Exhibit 7.

[419]   10_Steam_Effective_Price.R

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

the red line below, almost 2 dollars lower than the average price Dr. Gowrisankaran calculates, and well below the price of the game on Itch.io.[420]



**Figure 11: ITAD Pricing Data for ███████ on █████ and Steam, Including Weighted Average Price Present in Valve Records[421]**

(198)    Further examination of units sold at each price on each day that the game was cross-listed across platforms indicates that ███████ was sold more often at a discount than at full price on Steam.

---

420     10_Steam_Effective_Price.R

421     10_Steam_Effective_Price.R

---

Rebuttal Merits Expert Report of Steven Schwartz, Ph.D.                                    Page 109

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 12:**              **Steam Sales Within Days Listed Concurrently (Base Price of $4.99)**[422]



(199)    As expected, during periods when ▮▮▮▮▮▮ was offered at a discount (days on which the game was sold for less than the base price of $4.99), the game sold more units (per day) than when the game was offered at the base price. Dr. Gowrisankaran's analysis of ITAD pricing data is unable to account for this change in volume as it relies on daily pricing alone to reach the simple averages which inform his conclusions about the effects of the PMFN Policy.

(200)    Finally, Dr. Gowrisankaran's use of one average price per game per platform means his analysis is incapable of accounting for price changes that result from Valve's enforcement of its PMFN Policy. For example, suppose that, during a twenty-five-day window, (1) a publisher commits to offer a lower price off Steam for twenty-five days; (2) Valve contacts a developer on day twenty; and (3) the publisher raises the price for the remaining five days. Dr. Gowrisankaran's analysis would not be capable of capturing this change, as he uses one price across the entire twenty-five-day window. In this instance, Dr. Gowrisankaran's analysis would identify this as a violation of the PMFN Policy when the policy's enforcement is effective during his window.

**Dr. Gowrisankaran includes non-gameplay platforms**

(201)    Dr. Gowrisankaran's pricing analyses are unreliable due to his equally weighted inclusion of non-distribution stores that predominantly sell Steam Keys. In my Opening Merits Report, I note that "[a]rguably, because these non-gameplay platforms only facilitate transactions rather than gameplay, they should not be included within the relevant market."[423] While I do

---

[422]    10_Steam_Effective_Price.R

[423]    Schwartz Opening Merits Report, 1/27/2025, ¶ 68.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

include such non-gameplay platforms in the relevant market for purposes of my market share calculation, I note in my Opening Merits Report that "including *additional* entities in the relevant market *only serves to understate, rather than overstate, Valve's market share and market power*."[424]

(202)   Dr. Gowrisankaran's analyses are highly sensitive to the inclusion of Steam Key resellers. For example, removing Steam Key resellers from Dr. Gowrisankaran's analysis of days where lower prices are offered off Steam dramatically reduces the number of games where lower prices are available off Steam. Dr. Gowrisankaran reported that "for half of games, there are better deals available off Steam than on Steam more than 25 percent of days when Steam competed with other platforms to offer that game."[425]   When Steam Key resellers are removed from his analysis, that figure falls by 40.6%.[426]

**Dr. Gowrisankaran's analyses are based on an arbitrary threshold**

(203)   In his pricing analyses, Dr. Gowrisankaran compares game prices on Steam to game prices on other platforms. In each of his analyses, Dr. Gowrisankaran utilizes a 5% price difference between Steam and other platforms and states that such an assumption is "conservative. . . as parity would require at least equal prices on Steam and a 5 percent difference is material."[427] Dr. Gowrisankaran's selection of this 5% threshold is arbitrary—he fails to provide any empirical or theoretical justification for his selection of this 5% threshold. Dr. Chiou, another Valve expert, testified that her earlier pricing analysis, which also utilized a 5% threshold, "shows 5 percent as an illustration."[428]   As explained below, Dr. Gowrisankaran's analysis is highly sensitive to alternative assumptions on the appropriate threshold. His choice of an arbitrary and unsupported threshold drives his conclusion and thus is a methodologically inappropriate choice.

(204)   Alternative assumptions on the appropriate threshold to use in comparing pricing across platforms demonstrate that Dr. Gowrisankaran's results are heavily driven by his utilization of a 5% threshold. As shown in Figures 13 and 14 below, utilizing a 10% threshold in Dr.

---

424   Schwartz Opening Merits Report, 1/27/2025, ¶ 68. (Emphasis added.)

425   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 179.

426   08_Gowrisankaran_Exhibit_7_Multihoming.R

427   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 183.

428   Lesley Chiou, Dep. Tr., 6/18/2024, at 124:22–125:21.

Gowrisankaran's analysis of average prices on and off Steam demonstrates that Dr. Gowrisankaran's conclusion is highly sensitive to his adoption of the arbitrary 5% threshold.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 13: Count of Stores With Games Cheaper in Dr. Gowrisankaran's Exhibit 9, Using a 5% Threshold:[429]**



**Figure 14: Count of Stores With Games Cheaper in Dr. Gowrisankaran's Exhibit 9, Using a 10% Threshold:[430]**



HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### 5.3.3.   Dr. Gowrisankaran's pricing analysis relating to EGS does not provide insight into a but-for world without a PMFN Policy

(205)   Dr. Gowrisankaran claims to "find evidence that setting similar prices on different platforms is also common for games that are sold on different platforms but not sold on Steam and are therefore unaffected by the alleged PMFN."[431]  In support of his claim, Dr. Gowrisankaran conducts an analysis in which he compares two price differentials: (a) the difference in price between games on EGS but not on Steam versus other platforms and (b) the difference in price between games on Steam and other platforms.[432]  He finds that "that it is more common for games on EGS to be priced the same on other platforms (46.3 percent of games) than it is for games on Steam to have the same price on other platforms (32.1 percent of games)" and concludes that "price parity is just as common, or even less so, for games that are allegedly subject to a PMFN than games that are not."[433]  Dr. Gowrisankaran's analysis is flawed in several fundamental ways that invalidate any conclusions he draws from that analysis.

**Dr. Gowrisankaran includes non-gameplay platforms**

(206)   As I note in Section 5.3.2 above, non-gameplay platforms should not be included in an analysis of pricing.   The prices they offer are less competitively relevant.   However, Dr. Gowrisankaran includes such platforms in his analysis of differences in publisher pricing behavior between Steam games and games not offered on Steam.  Removing non-gameplay platforms from his analysis limits the sample of games Dr. Gowrisankaran identifies as available on the Epic Games Store and other platforms but not available on Steam from 352 games to 232 games (or roughly 34%).[434]

**Dr. Gowrisankaran's sample of games that appeared on EGS but not Steam is incorrect**

(207)   A fundamental flaw in Dr. Gowrisankaran's analysis is that he improperly constructs his sample of "games that never appeared on Steam but were offered on EGS and at least one

---

[431]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 228.

[432]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 236.

[433]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 236.

[434]   11_Workpaper_12_Validation.R

Removing non-gameplay platforms from the sample of "games" listed on Steam and another marketplace has an even greater effect. When his sample is restricted to 15,092 "games" from 38,996, 61% of the "games" in his analysis listed on Steam are invalidated.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

other platform."[435]  Specifically, Dr. Gowrisankaran's own data indicates that many of the games he claims "never appeared on Steam" were offered on Steam during the period covered by his analysis.  Ironically, therefore, to some extent, Dr. Gowrisankaran's inability to find a sample of adequate size supports my opinion that Steam is a must-have platform with market power.

(208)   To create his sample of "games that never appeared on Steam but were offered on EGS and at least one other platform[,]"[436] Dr. Gowrisankaran attempts to limit the universe of EGS titles in his ITAD dataset to only those titles that did not appear on Steam.[437]  Specifically, Dr. Gowrisankaran restricts his sample of EGS titles to 352 titles present on Epic and one other non-Steam platform in his ITAD dataset.[438]  However, Dr. Gowrisankaran's own data indicate that 68 of the 352 games in his sample are listed on Steam.[439]  In other words, per Dr. Gowrisankaran's own dataset, these games were available on Steam.

(209)   Further, an examination of other games in Dr. Gowrisankaran's sample of 352 games that "never appeared on Steam" reveals that even more games were offered on Steam and therefore subject to the PMFN Policy.  To identify titles in the sample with base games or alternative application names on Steam, I:

a.   remove 120 titles that were only matched to non-gameplay platforms;

b.   remove an additional 42 titles shown to be on Steam in Dr. Gowrisankaran's own dataset (those described above); and

---

[435]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 236.

[436]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 236.

[437]   To limit to titles never available on Steam, Dr. Gowrisankaran creates a "flag_on_steam_in_itad" field in his U.S. ITAD pricing dataset. This field is generated by filtering the raw ITAD data to just games with a "shop_name" of Steam, thereby flagging every game that was listed on Steam at any date it was listed.  See:

Gowrisankaran Rebuttal Merits Report, 3/26/2025, Backup Materials.

Dr. Gowrisankaran then utilizes this flag to limit his analysis to unique titles of listings on the Epic Games Store that did not appear on Steam at any time in the ITAD dataset. See:

Gowrisankaran Rebuttal Merits Report, 3/26/2025, Workpaper 12.

[438]   11_Workpaper_12_Validation.R

[439]   Dr. Gowrisankaran's backup materials include a crosswalk of ITAD game names ("slug") to data fields including Steam application IDs ("app_id" or "appid"). The Steam application ID field is present in his ITAD dataset. He also uses information from that crosswalk to validate his ITAD dataset against Valve's transaction data.  See:

Gowrisankaran Rebuttal Merits Report, 3/26/2025, § A6.2.

An examination of Valve's transaction data for the 68 games that are associated with a Steam application ID reveals that 40 of those games generated revenues on Steam during the periods examined by Dr. Gowrisankaran.  See 11_Workpaper_12_Validation.R

---

c.  remove an additional 150 titles that are not identified as "games" in Dr. Gowrisankaran's ITAD dataset, such as DLC and soundtracks.[440]

This leaves me with a sample of 40 games that Dr. Gowrisankaran identified as being offered on Epic Games Store and one other platform, but not on Steam. I review these titles' presence on Steam using SteamDB, a "[d]atabase of everything on Steam", and the Steam store.[441]

(210)  I individually cross-reference items in this sample to verify whether the base game or any matching editions could be found on Steam. Of the 40 EGS games I survey, 36 base games (non-edition offerings of editions in the sample) could be found for sale on Steam.[442] For example, Dr. Gowrisankaran's "off-Steam" sample includes ███████████████████ and ████████████████████, both of which are listed on EGS *and* Steam at the time of this report and during the period covered in Dr. Gowrisankaran's analysis.[443]

---

[440]  DLC can only be purchased and played by users that already own the base game associated with the DLC title. As DLC is only available to a subset of a platforms total userbase, DLC titles are likely less important to platform competition than base game titles.

See also 11_Workpaper_12_Validation.R

[441]  SteamDB, Home, https://steamdb.info/ (accessed 4/2/2025).

[442]  See Rebuttal Attachment D-1.

32 of the 36 base games identified as present on both Steam and EGS were offered on Steam with content or a title matching with the listing on EGS.

All 36 of the base games identified as present on both Steam and EGS generated revenues within the periods analyzed by Dr. Gowrisankaran.  See 11_Workpaper_12_Validation.R

Further, all 36 base games had at transactions logged in Valve's transaction dataset in the periods analyzed by Dr. Gowrisankaran, and 35 of the 36 base games were listed on Steam before the periods analyzed by Dr. Gowrisankaran. See: RebuttalAttachment D-2 and 11_Workpaper_12_Validation.R

[443]  Epic Games Store, ████████, https://store.epicgames.com/en-US/p██████████ (accessed 4/10/2025).

Steam, ██████ https://store.steampowered.com/app/924970██████ (accessed 4/10/2025).

While the base game shares the same name, "Deluxe" and "Ultimate" editions vary slightly in name. This difference leads to ██████████████ and █████████████ inclusion in the sample of EGS titles "off-Steam", even though the same product is offered on Steam without "Edition". See Rebuttal Attachment D-1.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 15:** ██████████ **and** ████████████ **Listings, EGS and Steam**[444]



(211)  Dr. Gowrisankaran's analysis is flawed because his sample is wrong. His sample of games that never appeared on Steam but were offered on EGS contains a significant number of games that *were* offered on Steam concurrent to EGS and thus subject to the PMFN Policy. He is not comparing price differentials of games that were not subject to the PMFN Policy to price differentials of games that were subject to the PMFN Policy. As a result, his analysis cannot demonstrate that "setting similar prices on different platforms is also common for games that are sold on different platforms but not sold on Steam and are therefore unaffected by the alleged PMFN."[445]

---

[444]  The left image shows pricing on the Epic Games Store for ████████ and editions as of April 10, 2025. See: Epic Games Store, ████████ https://store.epicgames.com/en-US/p/████████ (accessed 4/10/2025). The right image shows pricing on the Steam for ████████ and editions as of April 10, 2025. See: Steam, ████████, https://store.steampowered.com/app████████ (accessed 4/10/2025). While the base game shares the same name, "Deluxe" and "Ultimate" editions vary slightly in name. This difference leads to ████████████ and ████████ inclusion in the sample of EGS titles "off-Steam", even though the same product is offered on Steam without "Edition".

[445]  Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 228.

# 6.   Steam Keys

## 6.1. Steam Keys would be provided in the but-for world

(212)   In my Opening Merits Report, I concluded that Steam Keys would be issued and utilized in the but-for world in the same manner as in the real world.[446] Valve has derived and continues to derive substantial benefits from offering Steam Keys; in particular, Steam Keys help drive users (back) to Steam, even if they actually made a purchase off of Steam. By doing that, Steam helps to build/strengthen/sustain network effects and create opportunities to receive future revenues and profits from subsequent in-game or new game purchases that are made. Those benefits create strong incentives for Valve to continue operating its Steam Key program in a market in which it faces even stronger competition.

(213)   Steam Keys produce a variety of benefits for Valve and the Steam platform. First, Steam Keys help Valve reach consumers who may not be on Steam already, giving publishers an even larger user base with which to transact.[447] In addition, a game's presence on a platform offering Steam Keys may provide that game with visibility that it does not receive on Steam that can attract additional Steam users to a game.[448] Additional customers and/or increased engagement from existing customers benefit Valve since both lead to increased revenues and

---

[446]   Schwartz Opening Merits Report, 1/27/2025, fn. 930. ("In the but-for world, I assume that Steam Keys would have been provided and used in the same manner as in the real world and focus my determination of the but-for price solely on those purchases made through Steam and thus subject to the Valve commission charge.")

[447]   Kristian Miller, Dep. Tr., 10/3/2023, at 60:1–6. ("Q. In your view, is one business objective of Steam Keys that Valve will reach customers who are not on Steam? A. In my view, the point of Steam Keys is that developers want them to reach customers who may or may not be on Steam already.")

Valve, Emails Regarding Steam Keys on ███████ 12/25/2012 (VALVE_ANT_0294967–972, at VALVE_ANT_0294967).███

Tom Giardino, Dep. Tr., 11/2/2023, at 154:24–155:7. ("Q. Based on where you're sitting, what you know today -- based on your 11 years at Valve, do you believe that is an accurate statement that you told him, that we know from Steam key activation and purchase data that they're not different customers? A. My understanding is that while some key activations might come from someone who already has a Steam account and owns games on Steam, others might be a brand new customer.")

[448]   A Steam Key seller may provide a game with increased visibility as: (a) the game may compete with fewer other games on the Steam Key seller's website, (b) the Steam Key seller may promote or provide prominent placement to the game, or (c) the Steam Key seller may have access to a different customer base than Steam. As discussed in my Opening Merits Report, Valve employees are aware of the impact Steam Keys have on what consumers see and ultimately purchase and that publishers are often frustrated with the exposure their games are receiving on Steam. See:

Schwartz Opening Merits Report, 1/27/2025, ¶ 277.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

profits from purchases made on Steam, as well as reinforcing network effects.[449]  Internal Valve documents demonstrate that █████████████████████████████████████████
████████████████████████████████████████████████████████.[450]  For example, as shown in Figure 16 below, a Valve presentation shows that ████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████

---

[449]  For a game sold via a Steam Key, Valve receives a commission on any subsequent sales of DLC and/or in-app purchases after the initial game sale.  See:

Alden Kroll, Dep. Tr., 11/16/2023, at 155:2– 7.  ("Q. Someone could buy a Steam key for a game, like Red Dead Redemption if it's offered as a Steam key, activate the game on Steam and then use their Steam Wallet to purchase DLC for that game, correct? A. That's correct.")

Valve, Emails Regarding ████████████, 8/10/2022–9/23/2022 (VALVE_ANT_0557762–791, at VALVE_ANT_0557776). ("Valve gets no royalties and charges no fees for Steam keys, full stop--but when a customer activates a Steam key, they own the game on Steam.  Which means that if they go on to make in-game transactions, they're just playing via Steam like any other user[.]")

[450]  Valve, Emails Regarding Steam Keys and Steam Sales, 4/8/2021–5/18/2021 (VALVE_ANT_0051956–57, at VALVE_ANT_0051956).███████████████████████████████

---

Rebuttal Merits Expert Report of Steven Schwartz, Ph.D.                                                    Page 119

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



(214)    Even more so, Valve's presentation shows that the increase in revenue and units is substantial compared to what was observed on all packages on Steam. Figure 17 below demonstrates that for all other packages on Steam during the same time period, revenues and units on average, only increased by ▇ and ▇ respectively.

---

451    Valve, Presentation on ▇▇▇▇▇▇▇▇▇▇▇, 5/18/2021 (VALVE_ANT_0051958.pptx, at slide 3).

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY



(215)    These benefits create strong incentives for Valve to continue offering Steam Keys in the but-for world.  In the but-for world Steam would face *increased* competition, and these incentives would remain unchanged at a minimum and perhaps become stronger.

### 6.1.1. Steam Keys are a tool Valve uses to create stickiness that bolsters its monopoly power

(216)    Dr. Gowrisankaran's arguments claiming that "Steam keys are a procompetitive tool Valve uses to support publishers" ignore that Steam Keys create stickiness and make it difficult for rival platforms to build network effects.[453]  As discussed in Sections 3.3.5 and 7.5 of my Opening Merits Report and above in Section 6.1, Steam Keys help drive users (back) to Steam, even when they make a purchase off of Steam.  By boosting engagement with Steam, Valve reinforces its monopoly power and stifles competition in the digital third-party PC game

---

[452]    Valve, Presentation on ▉▉▉▉▉▉▉▉▉▉▉, 5/18/2021 (VALVE_ANT_0051958.pptx, at slide 5).

[453]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, § 7.2.1.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

distribution market.[454]  In the but-for world where Valve would not possess the same degree of market power, its use of Steam Keys is less likely to be anticompetitive.[455]

(217)  Steam Keys allow publishers and consumers to interact across multiple non-gameplay platforms (*e.g.*, Humble, Green Man Gaming, etc.).  While Steam Keys allow publishers and consumers to multihome at the retail function (subject to Valve's grant of Steam Keys in whatever number Valve chooses), they steer/force consumers and publishers back to Steam at the distribution function.  Steam Keys therefore limit multihoming at the distribution level by facilitating multihoming at the retail function.

(218)  Economics literature discusses that tools such as Steam Keys enable "platform annexation" which "involves a dominant firm obtaining control over users' ability to multi-home[.]"[456]  The literature argues that such behavior should be presumed anticompetitive when carried out by a dominant firm (such as Steam).[457]  Platform annexation can "steer[] users to [the dominant] platform and away from platforms of rivals" which "reduces the competitiveness of the smaller platform (or deters entry by new, smaller platforms) and thus lessens the competitive pressure on [the dominant firm]."[458]  Professor Rietveld's conclusion that "Valve benefits from facilitating multi-homing at the retail function, because doing so reduces switching of both PC game

---

[454]  For discussion of Valve's monopoly power in the digital third-party PC game distribution market, see:

Schwartz Opening Merits Report, 1/27/2025, § 4.2.

[455]  Athey, Susan, and Fiona Scott Morton (2022), "Platform Annexation," *Antitrust Law Journal* 84(3): 677–703, at 680. ("Similar to other horizontal conduct, it is more likely to be anticompetitive when undertaken by firms in leading market positions or with substantial market power.")

[456]  Athey, Susan, and Fiona Scott Morton (2022), "Platform Annexation," *Antitrust Law Journal* 84(3): 677–703, at 692. ("Platform annexation involves a dominant firm obtaining control over users' ability to multi-home—perhaps through an acquisition, perhaps through 'closure' of what was previously open—and a manipulation of interoperability to form an effective strategy for excluding rivals. As we have described, the platform's behavior towards the tools, and the tool's behavior towards the platform, can be used to reinforce one another. The resulting situation deters new entry that would otherwise be attracted by user demand.")

For further discussion, see:

Schwartz Response Merits Report, 3/26/2025, § 4.3.

[457]  Athey, Susan, and Fiona Scott Morton (2022), "Platform Annexation," *Antitrust Law Journal* 84(3): 677–703, at 682, 692. ("When undertaken by a dominant firm, platform annexation should instead be presumed anticompetitive.")

[458]  Athey, Susan, and Fiona Scott Morton (2022), "Platform Annexation," *Antitrust Law Journal* 84(3): 677–703, at 679. ("Platform annexation disrupts multi-homing by steering users to its platform and away from platforms of rivals. When a large platform deprives a smaller rival of participants on either side of the market, it reduces the competitiveness of the smaller platform (or deters entry by new, smaller platforms) and thus lessens the competitive pressure on itself. This advantage is often self-reinforcing because it generates further concentration of activity in the larger platform and marginalization or exit of the small platform. This kind of feedback loop often characterizes multi-sided platforms more than 'old economy' businesses. And the feedback loop increases the efficacy of the platform's strategy, enabling it to increase its profits and reduce welfare for platform constituents in the short and long run.")

---

publishers and players at the distribution function" is consistent with these findings.[459]  Thus, by offering Steam Keys and allowing publishers to sell Steam Keys through retail outlets, Valve deprives rival digital PC game distribution platforms of volume and artificially increases the frequency of singlehoming amongst consumers and publishers at the distribution level.

(219)  Further, publishers and retailers cannot differentiate their non-Steam retail offerings on the basis of content or price due to Valve's PMFN Policy.[460]  Consequently, "players are most likely to purchase Steam Keys rather than keys for other platforms, given Steam's stronger network effects and the likelihood that players have a more significant game catalog on Steam than on rival platforms."[461]  This, in turn, further increases Steam's network effects and potentially locks players into the Steam platform as they become more reliant on Steam.

### 6.1.2.  Steam Keys do not and would not lead to significantly increased free riding[462]

(220)  Dr. Gowrisankaran states that "[i]f Valve could not take measures to mitigate free-riding on Steam keys, it would likely issue fewer Steam keys" in the but-for world.[463]  He claims that "Steam keys create an opportunity and incentive for publishers to free-ride on Steam services; if Valve could not adequately protect itself against such free-riding it would have weaker incentives to offer Steam keys and would likely issue fewer Steam keys."[464]

(221)  Dr. Gowrisankaran's arguments miss the mark, and he appears to ignore that Valve's policies regarding Steam Keys in the real world provide insight into Valve's behaviors in the but-for world.  Dr. Gowrisankaran's view of Steam Keys fails to recognize the incentives that Valve has to offer Steam Keys, both in the real world and the but-for world.  In the real world, Steam's incentives to offer Steam Keys are clear.  As discussed in Section 6.1, Steam Keys help Valve create ties to Steam, even when customers purchase a game from a different outlet.  The rationale for Steam Keys is clear: by issuing Steam Keys, Valve helps to preserve the

---

[459]    Rietveld Report, 1/27/2025, ¶ 45.

[460]    Schwartz Opening Merits Report, 1/27/2025, ¶¶ 182–183, 249.

Rietveld Report, 1/27/2025, ¶ 47

[461]    Rietveld Report, 1/27/2025, ¶ 47.

[462]    For further discussion, see:

Schwartz Response Merits Report, 3/26/2025, § 4.4.

[463]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, § 7.2.2.

[464]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 245.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

network effects associated with Steam and creates opportunities to grow those network effects. Steam Keys preserve the network effects by helping to create stickiness for existing customers—games have to be played on Steam—and creating opportunities for non-customers to sample the platform. While Valve uses the PMFN Policy to provide price protection on Steam Key sales, the incentive to offer Steam Keys does not depend on the PMFN Policy. The PMFN Policy helps to preserve the barrier to entry created by the network effects, but that is not the core benefit or the primary competitive rationale for offering Steam Keys.

(222)   Dr. Gowrisankaran fails to recognize that the same is true in the but-for world. In the but-for world, where Valve faces competitive challenges from rival platforms, even as a first mover, Valve's biggest threat is letting the network effects for the platform degrade to the point where switching to or multihoming with alternative platforms become increasingly attractive such that engagement shifts away from Steam and to other platforms. That threat has nothing to do with the PMFN Policy. In the but-for world, Valve would still want to grow the network effects, find ways to get people to try and engage with Steam, and buy and participate on the platform. Steam Keys represent a direct way to do that.

(223)   In the but-for world absent the PMFN Policy, Valve's incentives to offer Steam Keys would, at a minimum, remain the same and would likely be stronger. Valve would face competitive pressure from competing platforms and would need to respond to that competitive pressure. Because it would not enjoy the protection from competition created by the PMFN Policy, Valve would need to utilize a variety of competitive tools to retain publishers and customers and to entice new participants on both sides of the platform. Steam Keys are an obvious mechanism to accomplish that, and one that Valve controls the distribution of, including to whom and how many.[465] It is unreasonable to expect that Valve would not utilize Steam Keys—a strong competitive tool in the market—to their full extent in the but-for world.

(224)   Dr. Gowrisankaran presumes that in the but-for world, publishers would abuse Steam Keys such that Valve will issue fewer Steam Keys.[466] That conclusion is naïve. It is disconnected from the economic incentives that Valve faces and that I have discussed above. To illustrate this point, let me assume, per Dr. Gowrisankaran, that publishers take advantage of Valve by setting very low prices on a key-tailer site to avoid paying Steam's commission. Dr. Gowrisankaran assumes that Valve has no recourse but to be a passive observer to this claimed abuse; his analysis necessarily assumes that there are no limits to publishers'

---

[465]   Schwartz Opening Merits Report, 1/27/2025, § 3.3.5.

[466]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, § 7.2.2.

behavior. That is incorrect; publisher behavior is not unconstrained. In the competitive world, publishers' pricing choices for Steam Keys will be determined by the usual economic factors that affect pricing. Publishers will also account for the anticipated reaction by Valve.[467] Valve retains control over Steam Keys; which publishers receive Steam Keys and how many each receives is Valve's decision. As a matter of economics, it is clear that Valve will react to publisher behavior and publisher behavior will react to Valve.

(225)   What might that look like in the but-for world? If a publisher behaves inappropriately with respect to Steam Keys (*e.g.*, by engaging in fraudulent behavior or otherwise abusing or misusing Steam Keys), Valve has economic incentives to reduce/eliminate that publisher's access to Steam Keys and expand access to publishers who behave differently. This type of regulation allows Valve to address any publisher abuse of Steam Keys, but does not depend on or require price parity. Indeed, Epic, in a world where it does not enjoy monopoly power, is able to regulate key behavior without the use of a PMFN. Epic's current policy regarding keys states, "Epic reserves the right to limit the size of your key grants to reasonably sized batches to prevent fraud and abuse."[468] This type of regulation is a plausible model for what Valve's behavior with respect to Steam Keys could look like in the but-for world without the PMFN Policy. Valve has and would have a tool to use in the face of any publisher abuse of Steam Keys, and it does not depend on or require price parity.

## 6.2. Claimed effective revenue share does not exist

(226)   Dr. Gowrisankaran and Dr. Langer both argue that the appropriate measure of Valve's commission rate is not the rate Valve actually charged publishers, but rather an "effective" commission rate that includes both sales on the Steam platform as well as Steam Key sales, which do not occur on the Steam platform and therefore do not incur Valve's commission.[469]

---

[467]   In imperfectly competitive markets, one of the factors that affects firms' pricing decisions is the response of other market participants. Because the impact of pricing decisions is affected importantly by how others respond to competitive decisions, the "reaction function" becomes a critical part of publisher pricing decisions.

[468]   Epic Games Store, Epic Games Store Distribution Agreement, https://dev.epicgames.com/portal/en-US/distribution-agreement (accessed 4/21/2025). ("Keys: You can also enable purchases of Digital Rights in your Product by selling or giving away redeemable codes called keys. When a key is entered on the Epic Games Store, it grants Digital Rights to the User who redeemed the key. You can request that Epic issue you keys that you can then give away or sell for whatever price you wish. You don't need to report revenue on the sale of Product keys to Epic and they aren't subject to Epic's 12% Revenue Share. Epic reserves the right to limit the size of your key grants to reasonably sized batches to prevent fraud and abuse.")

[469]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 259. ("Steam keys represent a meaningful discount on the nominal revenue share: Steam keys allow publishers to earn additional Steam-enabled revenues on which they pay Valve zero revenue share. Once these revenues are accounted for, Valve's *effective* revenue shares are even lower.")

---

This argument was previously advanced by Dr. Langer and Dr. Chiou during the Class Certification phase of the case.[470]  The argument was seriously flawed then and it remains seriously flawed now.

(227)   The effective commission point is and remains a straw man.  It is a contrivance, and there is no evidence that it is a metric that anyone (neither Valve nor publishers) makes decisions over.  Under Valve's experts' construction of this effective commission rate, Valve determines that effective rate through its decisions with respect to Steam Keys.  If, contrary to the evidence, the effective commission rate was a driver of any Valve decision-making, it would still be a rate set and controlled by Valve in the real world where Valve has monopoly power and would still not be a competitive rate.

(228)   The discussion of the effective rate also misses another key point.  Valve's experts argue that (a) Valve will issue fewer Steam Keys in the but-for world; (b) the commission-lowering benefit of Steam Keys may be reduced for publishers who utilized Steam Keys; and (c) those publishers may be worse off in the but-for world.[471]  That argument presumes, first of all, that fewer Steam Keys will be issued in the but-for world.  They will not be, for all of the reasons discussed in Section 6.1.  Second, that conclusion ignores the conditions that will prevail in the but-for world, even under their flawed "reduced Steam Keys" scenario.  While the precise rate structure that would prevail for other platforms in the but-for world is unknown, we can be certain that Steam's commission rate will be lower and that the rates on other platforms may well be lower than in the real world.  We know there is more extensive use of those rival platforms in the but-for world.[472]  Valve's effective commission rate in the but-for world will necessarily be lower than in the real world for all publishers, even under the tortured scenario concocted by Valve's experts in which Steam Key issuance is reduced.

---

See Gowrisankaran Rebuttal Merits Report, 3/26/2025, § 8.3 for further discussion.

Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 209–212. ("Valve's effective revenue share rate—the fraction of revenues Valve keeps for games that users can launch from Steam—is lower for publishers who use Steam keys, which is nearly all of them.")

[470]   Chiou Class Certification Report, 5/17/2024, §§ 4.1–4.2.

Langer Class Certification Report, 5/17/2024, § 4.2.2.

[471]   Gowrisankaran Rebuttal Merits Report, 3/26/2025, § 7.2.2.

Langer Rebuttal Merits Report, 3/26/2025, § 6.5.

[472]   Schwartz Opening Merits Report, 1/27/2025, § 7.2.4.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### 6.2.1.    Steam Keys are a feature and are unrelated to the commission rate

(229)    Steam Keys are a *feature* or a *service* that Valve offers publishers; publishers can use Steam Keys to derive additional value and reach audiences that may not be on Steam.[473]  According to the Steamworks website, "Steam Keys are a free *service* we provide to developers as a convenient tool to help you sell your game on other stores and at retail[.]"[474]  Additionally, a Valve document highlights the value of Steam Keys, stating that Steam Keys are "an extremely valuable *service* that our partners expect and often rely on, and we should treat it with care[.]"[475]  When publishers utilize the Steam Keys feature that Valve offers, to whatever degree, it has no impact on the commission rate they pay for games actually sold on the Steam platform.

(230)    Valve's distribution of Steam Keys is unrelated to the supracompetitive fee that Valve charges publishers for distributing on the Steam platform.  There are two distinct transactions at play here: (1) Valve charges publishers a fee to sell games on the Steam platform, whereby each publisher abides by the same commission rate rules and (2) Valve provides publishers with Steam Keys.  The number of Steam Keys distributed to each publisher is not in any way related to the commission rate charged to a given publisher; in fact, each publisher is charged the same commission rate on sales within Steam regardless of any Steam Key distribution.

(231)    In addition, the effective revenue share analysis mischaracterizes how Valve views and operates its Steam Key offering.  Valve does not collect a revenue share from games purchased through Steam Keys, nor does it expect to do so; Valve documents make this clear, stating "Valve receives no fee, payment or revenue share" from Steam Keys as it is a "service to our partners, as part of shipping a game on Steam."[476]  Providing Steam Keys to publishers leads to increased revenues for Valve.[477]  Valve acknowledges this fact, stating, "every Steam key activated by a PC player is a Steam copy of the game that can generate *direct and indirect value* for our platform."[478]

---

[473]    See Section 6.1 for further discussion.

[474]    Steamworks, Steamworks Documentation: Steam Keys, https://partner.steamgames.com/doc/features/keys (accessed 10/18/2023). (Emphasis added.)

[475]    Valve, Steam Business: Steam Key Basics, 3/15/2021 (VALVE_ANT_2370744–45, at VALVE_ANT_2370745). (Emphasis added.)

[476]    Valve, Steam Business: Steam Key Basics, 3/15/2021 (VALVE_ANT_2370744–45, at VALVE_ANT_2370744).

[477]    See Section 6.1 for further discussion.

[478]    Valve, Steam Business: Steam Key Basics, 3/15/2021 (VALVE_ANT_2370744–45, at VALVE_ANT_2370745). (Emphasis added.)

(232)  The effective commission rate analysis is also inconsistent with how publishers offer and utilize Steam Keys.  When a publisher sells a Steam Key on a different platform, it pays a revenue share to that platform.[479]  An effective revenue share, as described by Dr. Langer and Dr. Gowrisankaran, does not account for the revenue share paid to the other platforms.  An effective commission rate also ignores the fact that publishers can use Steam Keys for purposes other than retail sales and that such uses are not tied to game sales and thus are unrelated to the commission rate.[480]

(233)  Further, the "effective rate" notion championed by Dr. Langer and Dr. Gowrisankaran is their own creation.  I am not aware of any evidence—and Valve's experts offers none—that Valve or publishers consider any sort of effective revenue share at all, much less one that takes into account Steam Keys.[481]  For all of these reasons, Steam Key sales should not be considered a subsidy on Valve's effective commission rate, and the concept of an effective commission rate is conceptually flawed.[482]

### 6.2.2.   Dr. Langer's effective commission rate analysis is flawed

(234)  Beyond the conceptual flaws inherent to the effective revenue share analysis as described by Dr. Gowrisankaran and Dr. Langer, Dr. Langer's effective commission rate analysis also uses unreliable assumptions.   Dr. Langer presents "two different approximations of publishers'

---

[479]  See, for example:

Humble Bundle, Humble Bundle Developer Resources, https://www.humblebundle.com/developer?srsltid=AfmBOorstqJOUJxmsYwbjpe9mvz0LOyCPZmDvuxclTmJoOZNyTjFF2vB (accessed 4/7/2025). ("From early access to new releases, the Humble Store features new games and discounts on a daily basis. We give developers 75% of the revenue.")

[480]  Steamworks, Steamworks Documentation: Steam Keys, https://partner.steamgames.com/doc/features/keys (accessed 1/30/2024). ("Release State Override (or beta package keys)[:] These keys are used to grant access to a product prior to its release on Steam. Release State Override keys are intended for small beta tests and press/influencer access.")

[481]  If Valve considered Steam Keys in the manner its economists claim is relevant in this case, one would expect them to be able to cite a single Valve document analyzing so-called "effective revenue share." However, neither Dr. Gowrisankaran nor Dr. Langer can point to any such evidence. Further, Dr. Langer testified in her deposition during the class certification phase of this matter that she doesn't know if Valve uses such effective revenue shares in its analyses.

Ashley Langer, Dep. Tr., 6/21/2024, at 225:20–226:2. ("Q. Okay. Well that's kind of my – my point is that there's no evidence in the record that the industry actually uses effective revenue share, correct? A. There are lots of words in my report that the industry may or may not use. I'm an economist. I use economic terms. So that's not particularly relevant to my forming my opinions.  So I don't know.")

[482]  I understand from counsel that for the purposes of damages, Courts have held that damages should be reduced by "benefits that would not have been received by the plaintiff had there been no violation[.]" As described above, Valve has not shown that Steam Keys would disappear in the but-for world, and there is no economic reason Valve would stop offering Steam Keys if compelled to cease its anticompetitive PMFN Policy. To the extent this legal offsetting standard applies in this case, Valve has not shown that it applies to the use of Steam Keys.

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1370 (9th Cir. 1986).

---

Steam key revenues[:]" 1) Dr. Langer "assumes the number of Steam keys sold is equal to the number of Steam keys redeemed on Steam" and 2) Dr. Langer "assumes the number of Steam keys sold is equal to the number of Steam keys issued to publishers[.]"[483]

(235)    Dr. Langer's use of Steam Keys issued to approximate Steam Key sales is not reasonable. The fact that Steam issues a Steam Key to a developer does not mean a non-Steam sale has occurred. A publisher must undertake additional steps before it can offer a Steam Key for sale,[484] and a sale must actually occur between a consumer and a non-Steam store.[485] Thus, an issued Steam Key does not equate to a sold Steam Key.

(236)    Second, Dr. Langer's methodology to impute Steam Key prices is also flawed. Dr. Langer first imputes prices for Steam Key redemptions based on the average prices of corresponding games sold directly on Steam and then "use[s] the average price across all days and countries of redemption from the redemption price approximation" to estimate prices for issued Steam Keys.[486] Next, "[i]f there are no same-day and same country transactions observed for that package, [Dr. Langer] use[s] a continuously broader time interval (*i.e.*, week, month, three months, six months, year, year prior to the year of redemption, and year following the redemption year) for the average price in the country of redemption."[487]

---

[483]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 212.

[484]    Publishers that wish to utilize Steam Keys must first submit a request to Valve via Steamworks. A Steam Key request requires a publisher to specify the type of key to request as well as the quantity of keys requested. Steam Key types include: (a) Default Release keys, which are the "most common type of key on Steam" and "are appropriate for retail boxes or sales on other digital stores[;]" (b) Release State Override keys, which "are used to grant access to a product prior to its release on Steam" and "are intended for small beta tests and press/influencer access[;]" and (c) Developer Autogrant keys, which are "intended for developer use only" and "used to provide developers with access to the product if their Steam account is NOT already in [their] Steamworks partner group." Once a request is either automatically or manually approved by Valve, keys are issued to the publisher as a plain text file and available for download via Steamworks. See:

Steamworks, Steamworks Documentation: Steam Keys, https://partner.steamgames.com/doc/features/keys (accessed 1/30/2024).

[485]    Once a publisher has requested and retrieved Steam Keys from Valve, they may then sell Steam Keys either directly, such as through the publisher's website, or through a third party, such as Humble Bundle. Either option requires the publisher to complete additional steps before a sale may occur. For example, a publisher wishing to utilize Humble Bundle to sell Steam Keys must complete further steps to make its Steam Keys available for sale, such as creating a game page on Humble and uploading the Steam Key file it received from Valve to Humble Bundle's content manager. See:

Humble Bundle, Humble Self-Service Tools, https://support.humblebundle.com/hc/en-us/articles/214918618-Humble-Self-Service-Tools#manage-content (accessed 6/14/2024).

[486]    Langer Rebuttal Merits Report, 3/26/2025, fn. 402. ("I use Steam transaction data to assign a price to each redemption. When Steam transactions for the associated package are observed on the same day and in the same country as the Steam key redemption, I assume that the Steam key was sold at the average price in that country on that day."; "To approximate when and where these Steam keys were distributed, I use the average price across all days and countries of redemption from the redemption price approximation described above.")

[487]    Langer Rebuttal Merits Report, 3/26/2025, fn. 402.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(237)   Dr. Langer's method fails to properly account for the large share of purchases during sale periods. Specifically, Dr. Langer averages *daily* game price over time, rather than a weighted average price that would account for units sold at various prices per day. Dr. Langer assumes there is no relationship between a game's price and its quantity purchased other than the day it is purchased. Instead, she weights each day as equivalent (rather than the total sales for that day). For example, if a game were priced at $1, $5, $5, $5, and $5 over five days, Dr. Langer would assume the Steam Key price over that period to be $4.20. However, on sale days, many more units were likely sold, bringing down the actual average price over time.

(238)   Below, I demonstrate the errors caused by Dr. Langer's simplistic and incorrect method. Dr. Langer's analysis assumes that there is a relationship between the price of a package sold on a given day in Valve's transaction data and the price of a key *redeemed* on that same day. She has not demonstrated, or even attempted to demonstrate, that such a relationship exists. Consequently, Dr. Langer's use of daily package prices from the transaction data as daily key redemption prices ignores the relationship between the price of Steam Keys and the quantity of Steam Keys sold. Figure 18 below compares the share of packages sold during sale periods relative to keys redeemed when Dr. Langer's method is used. By not accounting properly for the relationship between price and units sold, Dr. Langer's method results in overstated price and key revenue estimates.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 18: Dr. Langer's Estimation of Steam Key Sales**[488]



(239)  In addition, Dr. Langer claims that "putative harm would differ across publishers based on their individualized use of Steam keys" by relying on Dr. Gowrisankaran's incorrect conclusion that "in a but-for world where Valve could not take measures to mitigate free-riding on Steam keys, Valve would likely issue fewer Steam Keys."[489]   As discussed in Section 6.1.2, Dr. Gowrisankaran's arguments fail to recognize the incentives that Valve has to offer Steam Keys in the real world and that these incentives would remain unchanged at a minimum and could increase in the but-for world.  Further, Dr. Gowrisankaran ignores that Valve has tools to use in the face of any publisher abuse of Steam Keys, and it does not depend on or require price parity.  Therefore, Dr. Langer's conclusions dependent on Steam Key issuance declining in the but-for world are irrelevant.[490]

---

[488]    See 12_Units_keys_sale_periods.R

Sale periods are identified as records where sale prices are different from base prices. Records limited to packages with key redemptions on the same day as transactions.

[489]    Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 213–214.

[490]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 214.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# 7.    Yardstick and Empirical Approaches

## 7.1.    Yardstick approach

### 7.1.1.    The benchmarks identified in my Opening Merits Report are reasonable and appropriate

(240)    Dr. Langer argues that the benchmarks I identified in my Opening Merits Report are not appropriately comparable to Steam, "undercut[ting] their relevance for determining 'the prices that would have been charged but for the alleged anticompetitive conduct.'"[491]    Dr. Langer provides two main reasons for her determination: (1) Steam and the proposed benchmarks "differ in terms of the products that users on the platform are buying and selling" and (2) "the services provided by [my] benchmark firms end when a transaction is complete[,]" while Steam "provides ongoing services to its users after the purchase transaction[.]"[492]    I disagree with Dr. Langer's conclusion.

(241)    Moreover, I disagree with Dr. Langer's reasoning that the benchmarks I rely on are inappropriate.  As noted by Dr. Langer, "[a] yardstick approach or analysis 'typically compares the plaintiff's business to another business that is _substantially_ similar[.]'"[493]    In other words, a benchmark need not be identical to the market at-hand.  To state the obvious, no benchmark will be perfectly aligned with Steam aside from Steam itself.  _Any_ benchmark is going to differ from Steam in some way or another.  Describing some minor differences from Steam is not sufficient to assert a benchmark is not good enough.  In my Opening Merits Report, I consider a variety of criteria with which to compare the third-party digital PC game distribution market, including, but not limited to, industry timing (_i.e._, when firms first entered the marketplace), platform structure, geography, monetization structure, product characteristics, and other platform characteristics, such as network effects.[494]    I understand that courts have assessed comparability based on a variety of factors, including the "number of customers, purchase volume, product characteristics, competition, role of technology, capitalization, barriers to

---

[491]    Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 218–219.

[492]    Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 219, 221.

[493]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 216. (Emphasis added.)

[494]    Schwartz Opening Merits Report, 1/27/2025, ¶ 360.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

entry, and established history."[495]  Further, literature cited by Dr. Langer supports my approach as it explains that yardsticks can be different from the reference market while considering these other factors, stating that "yardsticks can be other product markets in the same state or country[.]"[496]  Dr. Langer's critique is not a sufficient basis to conclude that my benchmarks are inappropriate, as they are also *similar* in many of the other factors that I appropriately considered in my Opening Merits Report.[497]  As I will discuss below in Section 7.1.2, my benchmarks are more comparable than the benchmark proposed by Dr. Langer.

(242)  I acknowledge in my Opening Merits Report that these yardstick products are not the exact same as that of the relevant market.  For example, in online retail marketplaces, some platforms "sell all types of products and others operat[e] only in niche product categories[,]" but I explain how the online retail marketplace "mirrors the third-party digital PC game distribution via platforms market across several important characteristics."[498]  Specifically: both are "two-sided digital platforms, with sellers of goods on one side, buyers on the other, and transactions between the two sides [are] facilitated through the platform"; both "saw increasing popularity [starting] in the mid-1990s and 2000s"; both operate globally; and both "operate under an agency pricing model, whereby sellers set the retail price and the platform sets commissions or take rates on each sale."[499]

(243)  Similarly, in my analysis of the online vacation home rental marketplace, I acknowledge that "a vacation rental home is a physical good/service and a digital PC game is a digital good[,]" but I conclude that "the broad similarities between the marketplace characteristics outweigh that difference."[500]  Specifically, both marketplaces experienced growth in the late 1990s and

---

[495]    Ray, Amy W. and Christopher D. Wall (2017), "Antitrust," in Roman L. Weil, et al., eds., *Litigation Services Handbook: The Role of the Financial Expert*, Hoboken, NJ: John Wiley & Sons, Inc., at 19.

See also:

Schwartz Opening Merits Report, 1/27/2025, ¶ 358.

[496]    Langer Rebuttal Merits Report, 3/26/2025, at fn. 441.  Dr. Langer cites the following source:

Van Dijk, Verboven (2008), "Quantification of Damages," *Issues in Competition Law and Policy*: 2331–2348, at 2336.

[497]    Schwartz Opening Merits Report, 1/27/2025, § 7.3.

[498]    Schwartz Opening Merits Report, 1/27/2025, ¶¶ 362, 364.

[499]    Schwartz Opening Merits Report, 1/27/2025, ¶¶ 363–365.

[500]    Schwartz Opening Merits Report, 1/27/2025, ¶ 370.

2000s; both operate globally[501]; and both are two-sided digital platforms in which property owners/publishers and guests/users transact with one another as facilitated by the platform.[502] I acknowledge that "[p]latforms in the vacation rental home booking marketplace monetize by taking a service fee from hosts, the guests, or a combination of the two", which differs "from the payment model present in the market for third-party digital PC game distribution via platforms, where the platform only takes a service fee one side of the market."[503] Yet, the monetization structures are still substantively similar in that the platforms in both markets operate as distribution agents and do not set prices; rather, they collect fees from platform transactors.[504] These characteristics, all of which are substantively similar to the characteristics of the relevant market at-issue, are sufficient for the vacation home rental market to be an appropriate benchmark for purposes of this case.

(244)  Dr. Langer also claims that the "services provided by Steam create: (a) a differentiated demand structure from [my] benchmarks, where users expect updates and the ability to access services from Steam well after the initial transaction; [and] (b) a differentiated cost structure from [my] benchmarks, where Valve pays ongoing costs well after the initial transaction."[505] For example, Dr. Langer claims that microtransactions create "an element of Steam's financial model [that] differs from the benchmark firms"[506] and that "Steam users have a choice over whether or not to engage in these additional microtransactions, and publishers can similarly choose to offer microtransactions to users for games Valve continues to host on Steam. By contrast, sellers on Dr. Schwartz's benchmark platforms cannot monetize this ongoing relationship through similar transactions."[507]

---

[501]  Airbnb, About Us Page, https://news.airbnb.com/about-us/ (accessed 4/2/2025). ("Airbnb was born in 2007 when two hosts welcomed three guests to their San Francisco home, and has since grown to over 5 million hosts who have welcomed over 2 billion guest arrivals in almost every country across the globe.")

VRBO, About Us Page, https://www.vrbo.com/en-sg/lp/b/about (accessed 4/2/2025). ("We started pairing homeowners with families looking for places to stay in 1995, and Vacation Rentals By Owner (Vrbo) was born. Since then, we've grown into a trusted global holiday brand with a unique selection of 2+ million whole homes all over the world.")

[502]  Schwartz Opening Merits Report, 1/27/2025, ¶¶ 368–369.

[503]  Schwartz Opening Merits Report, 1/27/2025, ¶¶ 370–371.

[504]  Schwartz Opening Merits Report, 1/27/2025, ¶ 371.

[505]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 223.

[506]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 224.

[507]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 224.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(245)   Dr. Langer misconstrues my testimony regarding how "services provided by [my] benchmark firms end when a transaction is complete" but not for Steam.[508] In deposition, I stated that a *transaction* on a retail goods platform or a home rental platform ends when they charge you.[509] Dr. Langer then elaborates, stating that this differs from Steam, as "Steam provides ongoing services to consumers after the purchase transaction."[510] However, as I further testified, "Steam provides a platform through which the gamers who purchase the game are able to play it. That's the role that Steam plays. But those services are not transaction-dependent."[511] Thus, while the transaction ends, the services do not. Dr. Langer acknowledges that, in my Opening Merits Report, I analyzed this and concluded that my benchmarks also provide services after transaction.[512] Dr. Langer thus argues that I do "not appear to consider the difference in scale between the degree of these services."[513] I see no reason why that analysis would be relevant, and Dr. Langer offers none.

(246)   Dr. Langer's argument that sellers on my benchmark platforms cannot monetize an ongoing relationship through transactions similar to those she argues Steam offers such as further engagement, updates, platform support, and microtransactions is incorrect. For example, I understand that microtransactions refer to small, one-off in-game purchases of items such as "upgrades, coins, or cosmetic enhancements."[514] These follow-on transactions are distinct from the initial transaction in which a user acquires access to a game. In this sense, microtransactions are functionally equivalent to smaller purchases that modify or enhance a previous base purchase, which occur often on my benchmark platforms. Sellers on Amazon, for example, can and do offer smaller and cheaper accessories alongside their key products to drive future sales on the platform beyond the initial purchase. Airbnb allows users to modify

---

508     Steve Schwartz, Dep. Tr., 4/18/2024, at 244:19–245:12. ("Q. Now, are there differences in post-sale duties between Steam and a retail goods seller like Amazon or a home rental site like Airbnb and VRBO? A. I'm not sure what you have in mind. Q. Well, let me tell you. So if I buy something on Amazon, they deliver it to my door, and unless I need to send it back for a refund, I'm pretty much done with that transaction, correct, from Amazon's perspective? A. Assuming that there's no problem or nothing that would require intervention by Amazon, they charge you correctly, I would agree, the transaction is complete.")

     Langer Rebuttal Merits Report, 3/26/2025, ¶ 221.

509     Steve Schwartz, Dep. Tr., 4/18/2024, at 244:19–245:12.

510     Langer Rebuttal Merits Report, 3/26/2025, ¶ 221.

511     Steve Schwartz, Dep. Tr., 4/18/2024, at 248:6–18.

512     Langer Rebuttal Merits Report, 3/26/2025, ¶ 222.

513     Langer Rebuttal Merits Report, 3/26/2025, ¶ 222.

514     Economics Online, "The Economics of Microtransactions," 8/3/2023, https://www.economicsonline.co.uk/definitions/the-rise-of-microtransactions-in-video-games.html/.

---

their initial bookings (*e.g.*, adding an extra guest) for an additional fee set by the host.[515] This generates more revenue for the hosts and, by extension, the Airbnb platform.[516] In addition, as stated in my Opening Merits Report, both online retail marketplaces and online vacation rental platforms offer continued services after the initial transaction.[517] For example, Amazon offers ongoing services to its customers. A user (who has already completed a transaction) has the ability to leave seller feedback, contact a third-party seller, and leave comments, reviews, and feedback, as well as offering other services such as "Installation, Assembly, and Haul-Away Services[.]"[518] Similarly, eBay users can contact a seller after purchasing an item and both sellers and buyers on eBay can leave post-sale feedback for the other.[519] Etsy users are also able to leave ratings and feedback after the sale.[520] Both VRBO and Airbnb allow hosts to charge additional fees after the initial transaction for services such as adding an extra guest or a pet.[521] Additionally, both VRBO and Airbnb offer customers support services after

---

[515] Airbnb Help Center, Additional Fees, https://www.airbnb.com/help/article/2385 (accessed 4/2/2025).

Airbnb Help Center, Changing Number of Guests in a Reservation, https://www.airbnb.com/help/article/2369 (accessed 4/2/2025).

[516] Investopedia, "How Airbnb Works for Hosts, Guests, and the Company Itself," 2/28/2025, https://www.investopedia.com/articles/personal-finance/032814/pros-and-cons-using-airbnb.asp. ("Airbnb (ABNB) is part of the sharing economy and has a very profitable business model. The company makes money by facilitating the rental of properties. In particular, Airbnb takes a percentage of a booking subtotal when a property is rented. This subtotal includes the rental price and any additional fees charged by the host, such as a cleaning or pet fee.")

[517] Schwartz Opening Merits Report, 1/27/2025, ¶ 372, fn. 857.

[518] Amazon, Leave Third-Party Seller Feedback, https://www.amazon.com/gp/help/customer/display.html?nodeId=G5346HRPNJFYRA49 (accessed 1/22/2025).

Amazon, Installation, Assembly, and Haul-Away Services, https://www.amazon.com/gp/help/customer/display.html?nodeId=GRD263UR6NNUTT48 (accessed 1/22/2025).

[519] eBay, Leaving Feedback for Sellers, https://www.ebay.com/help/buying/leaving-feedback-sellers/leaving-feedback-sellers?id=4007 (accessed 4/3/2025).

eBay, Leaving Feedback for Buyers, https://www.ebay.com/help/selling/leaving-feedback-buyers/leaving-feedback-buyers?id=4078 (accessed 4/3/2025).

eBay, Contacting a Seller, https://www.ebay.com/help/buying/resolving-issues-sellers/contacting-seller?id=4021 (accessed 4/3/2025).

[520] Etsy, How to Leave a Review on Etsy, https://help.etsy.com/hc/en-us/articles/115013197687-How-to-Leave-a-Review-on-Etsy?segment=shopping (accessed 4/3/2025).

[521] VRBO, Manage Your Fees, https://help.vrbo.com/articles/How-do-I-manage-my-fees (accessed 4/15/2025). ("Fees can be applied to all dates on your rates calendar. There are two types of fees: • Standard: fees for extra guests, cleaning, and pets. • Custom: fees defined by your business that are not covered in standard fees. . . . If you've already confirmed a reservation and want to add fees, you need to send your guest an additional payment request to collect those funds before the guest completes their stay.")

Airbnb, Add Additional Fees, https://www.airbnb.com/help/article/2385 (accessed 4/15/2025). ("These additional fees aren't included in the nightly price you set, but guests will notice an increase in price if any additional fees are added. These fees include: • **Cleaning fee**: Cover cleanup costs after guests check out. • **Pet fee**: Make it easy to welcome pets

---

the initial booking of a rental.[522]  Therefore, firms in both of my benchmark marketplaces offer transactions/options to modify or supplement an original base purchase and offer continued services beyond the sale of the good.  Therefore, they are appropriate benchmarks for Steam and other third-party digital PC game distribution platforms.

### 7.1.2.  Dr. Langer's supposed "more direct potential benchmark firms" are inappropriate benchmarks

(247)  Dr. Langer also argues that I improperly exclude console platforms, which Dr. Langer states is a more direct benchmark.[523]  Dr. Langer first argues that the reasons I "provided in deposition to reject console distribution as a benchmark are not consistent with economic reasoning."[524]  Dr. Langer then claims that my testimony that console platforms are "infected" by Valve's anticompetitive behavior contradicts my conclusions that consoles are not reasonable substitutes for PC game distribution.[525]  Dr. Langer is wholly incorrect.  There is no contradiction or inconsistency.  General conduct, "through several degrees of separation,"[526] can infect another market through macro-level trends while still not being a reasonable substitute for other, more granular reasons.  More importantly, there is no economic basis for reaching Dr. Langer's conclusion that "[i]t does not follow standard economic logic that PC games are both insufficiently substitutable with console games and yet PC game distribution platform behavior also determined console platform revenue shares."[527]

(248)  Dr. Langer argues that the Nintendo, PlayStation, and Xbox digital platforms are more comparable benchmarks because they share similarities with Steam in the following categories: End User Product, Potentially Unlimited Consumer Engagement with End User Product on Platform, Potentially Unlimited Platform Support of End User Product on Platform, Product Updates After Purchase, Updated Platform Features Apply to Past Purchases,

---

by covering the cost of expected cleaning. Remember, **service animals** always stay for free. • **Extra guest fee**: Add a fee for each guest you're willing to accommodate beyond your normal limit.") (Emphasis in original).

[522]  VRBO, Travel With Confidence, https://www.vrbo.com/l/travel-with-confidence/ (accessed 1/21/2025).

   Airbnb, AirCover, https://www.airbnb.com/help/article/3227 (accessed 1/21/2025).

[523]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 226.

[524]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 227.

[525]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 227.

[526]  Steven Schwartz, Dep. Tr., 4/18/2024, at 251:10–253:3.

[527]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 227.

---

Microtransactions, Ability to Leave Reviews, and Nominal Revenue Share.[528]  However, digital console game distribution platforms are an inappropriate benchmark.[529]  As I testified in deposition, other digital gaming platforms, including those offered by consoles, "suffer from some of the same defects in that their rates are pegged to other platforms that charge a given level which, through several degrees of separation, trace back to Valve."[530]  Dr. Langer's sole rebuttal to this point is to claim that it contradicts my substitutability analysis, which, as explained above, is wholly incorrect.  Dr. Langer provides no other evidence or argument to show that these platforms are not affected by Valve's behavior.

(249)  Further, Dr. Langer ignores that console platforms have different pricing strategies and structures than digital PC game platforms.  Steam has relatively low costs, earning Valve ▮▮ gross margins in running the platform, at approximately ▮▮▮ from 2017 through 2023.[531]  As with third-party digital PC platforms like Steam, online retail marketplaces and online vacation rental sell no physical product on which the platform is operating, allowing them to maintain relatively high gross margins.  For example, from 2018 to 2023, Airbnb had a gross margin percentage of 79.8%.[532]  Similarly, over the same time frame, Etsy had a gross margin percentage of 70.8%.[533]  Conversely, console platform operators (e.g., Sony, Nintendo, and Microsoft) sell a physical product, i.e., the game console.  As such, console platform operators have a dual pricing model in which one price is set for the equipment and another for later game transactions.  Console developers may sell consoles at a much lower margin (even a loss) initially (as does at least one console platform operator, Microsoft), to attract new users and then generate profits through game sales.[534]  Therefore, as an economic matter, console

---

528  Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 226, 228 and Exhibit 20.

529  Dr. Gowrisankaran discusses how "Valve's nominal revenue shares are not outliers within the distribution rates of the industry." See:

Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 275, Exhibit 17.

Included in Dr. Gowrisankaran's Exhibit 17 are three console platforms, which as I discuss later in this section and in Section 3.4, are not appropriate benchmarks and are not in the relevant market. Also included in Dr. Gowrisankaran's Exhibit 17 are non-gameplay platforms (Green Man Gaming and Humble) and platforms that were discontinued (Twitch and Discord). This leaves, besides Steam, only GOG at 30%, Epic Games Store at 12%, the Microsoft Store at 12%, and Itch.io at 0%.

530  Steve Schwartz, Dep. Tr., 4/18/2024, at 252:1–12.

531  Schwartz Supplemental Opening Report, 3/7/2025, Supplemental Attachment D-5.

532  See Rebuttal Attachment E-1.

533  See Rebuttal Attachment E-2.

534  Note that I have been unable to find publicly available gross margin data for Xbox and PlayStation separately from Microsoft and Sony as a whole, respectively.

---

platform operators' pricing incentives and behaviors are markedly different from Valve's. With respect to the consoles themselves, the manufacturers also at least bear inventory costs, shipping costs, and risk of damage or loss until delivery, completely unlike Valve.[535] Because the underlying business structure of a console platform differs significantly from that of the third-party digital PC platform, console platforms are not sufficiently comparable to Steam, and certainly not more comparable than the benchmarks I provide in my Opening Merits Report.

(250)   Dr. Langer also ignores that the digital console platforms ecosystem differs from that of the PC gaming ecosystem. A key feature of the console gaming market has been its "walled garden" approach to game distribution. This differs from the "open" approach in PC gaming.

---

PC Mag, "Microsoft Loses Up to $200 on Every Xbox Console Sold," 11/1/2022, https://www.pcmag.com/news/microsoft-loses-up-to-200-on-every-xbox-console-sold.

Investopedia, "The Economics of Gaming Consoles," 1/29/2022, https://www.investopedia.com/articles/investing/080515/economics-gaming-consoles.asp. ("Companies might sell the consoles at a loss initially to lure customers, gaining market share from competitors. The strategy looks to make up for any lost revenue by selling games and online subscriptions.")

Business Insider, "Xbox Consoles Have Never Been Profitable On Their Own, Microsoft Admits In Court," 5/6/2021, https://www.businessinsider.com/xbox-consoles-not-profitable-microsoft-says-2021-5. ("Instead of making money on the console itself, [Microsoft] makes money from games sales through its digital storefront, from subscription services like Xbox Game Pass, and from sales of accessories like gamepads."; "'The gaming business is a profitable and high-growth business for Microsoft,' a Microsoft representative told The Verge. 'The console gaming business is traditionally a hardware subsidy model. Game companies sell consoles at a loss to attract new customers. Profits are generated in game sales and online service subscriptions.'")

Forbes, "The Nintendo Switch OLED Estimated To Cost Only $10 More Per Unit To Make," 7/15/2021, https://www.forbes.com/sites/paultassi/2021/07/15/the-nintendo-switch-oled-estimated-to-cost-only-10-more-per-unit-to-make/. ("It depends on the unit, but at times Nintendo, Sony and Microsoft have all sold systems at a loss in order to create an install base, and then make up the difference with loads of game sales or through subscription services where they really make their revenue.")

Sony initially sells its PlayStation consoles at a loss. Specifically, it took four years for the PlayStation 3, six months for the PlayStation 4, and eight months for the standard PlayStation 5 to no longer be sold at a loss (as of August 2021, the PlayStation 5 Digital Edition was still being sold at a loss). Reports estimated that Sony lost $60 per each PlayStation 5 sale.

Techspot, "Sony's Standard PS5 has Become Profitable, but the Digital Edition is Still Being Sold at a Loss," 8/4/2021, https://www.techspot.com/news/90672-sony-standard-ps5-has-become-profitable-but-digital.html.

GB Times, "How Much of a Loss does Sony Take on PS5?," 3/14/2025, https://gbtimes.com/gamepedia/how-much-of-a-loss-does-sony-take-on-ps5/.

NCESC, "How Much of a Loss does Sony Take on PS5?," 5/21/2024, https://www.ncesc.com/gaming-pedia/how-much-of-a-loss-does-sony-take-on-ps5/.

[535]   CG Magazine, "Game Over? How Tariffs On Electronics Could Raise Console Prices," 4/14/2025, https://www.cgmagonline.com/articles/tariffs-electronics-console-prices/. ("The implementation of first-wave tariffs on components such as microchips, capacitors, and printed circuit boards has a range of effects on overall production costs. A 25 percent China-originated semiconductor tariff can create an additional $30 to $50 in manufacturing costs per console unit. With each additional part affected by a tariff, the final cost increase becomes larger. After factoring in other manufacturing expenses such as shipping, packaging, assembly and retail distribution, the retail price of a $499 console may need to be raised to $549 or higher to preserve manufacturer profits.")

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

For decades, "console makers have completely controlled the licensing and sales methods available for games on their own hardware."[536] In his Rebuttal Merits Report, Dr. Gowrisankaran agrees, stating that "PC gaming ecosystem is open (compared to, for example, the one for consoles) such that any developer can easily set up its own online storefront to distribute its games."[537]

(251) Additionally, each one of Dr. Langer's suggested digital console distribution platforms is tethered to its specific, corresponding game console. For example, users and publishers who wish to transact a digital game on a PlayStation console *must* do so through the PlayStation Store; they cannot use the Nintendo eShop, Microsoft Store, or any other platform. Thus, a user would need to physically own each console platform if it wanted to purchase games through that storefront. In contrast, a user only needs one PC to purchase games across any available PC distribution platform. My benchmark firms can compete with each other on the same underlying device or application, such as a phone or laptop. As such, my benchmark marketplaces provide a more accurate yardstick for what Steam's commission rate would be in a competitive but-for environment.

## 7.2. Empirical approach

(252) One of the approaches I adopt to show injury is my empirical approach.[538] Looking at empirical evidence from the PC gaming market, I examine the impact of limited (and ultimately transitory) outbreaks of competition.[539] Specifically, I focus on EGS's entry to the relevant market and Valve's response.[540] This approach is a "natural experiment." One way a natural experiment can occur is when we can observe two time periods, one with specific conduct and

---

[536]    Ars Technica, "Microsoft Opens a Crack in Console Gaming's Decades-Old Walled Garden," 3/27/2024, https://arstechnica.com/gaming/2024/03/microsoft-opens-a-crack-in-console-gamings-decades-old-walled-garden/.

[537]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶ 129.

[538]    Schwartz Opening Merits Report, 1/27/2025, § 7.4.

[539]    Schwartz Opening Merits Report, 1/27/2025, § 7.4.

[540]    Schwartz Opening Merits Report, 1/27/2025, § 7.4.

---

one without, to determine the causal effect of that conduct.[541]  Such natural experiments are recognized in the economic literature and often used by economists.[542]

(253)   Dr. Langer asserts that my empirical approach is a "*qualitative* assessment of the period of time surrounding Valve's introduction of revenue share tiers" rather than an empirical analysis.[543]  That assertion is incorrect; an empirical approach relies on observing data and analyzing that data.  The term "empirical" designates an analysis as based on observations of what occurred in the actual world rather than theory—my empirical approach does exactly this.[544]  Empirical work, contrary to Dr. Langer's supposed belief, does not require statistical analysis.  I observe and rely on real-world evidence to conclude the following:

a.   Valve's lowering of its supracompetitive fees was the result of a limited threat of price competition associated with Epic's entry into the market for third-party PC game distribution.[545]

---

[541]   Schwartz Opening Merits Report, 1/27/2025, § 7.4.

ThoughtCo, "What Are Natural Experiments and How Do Economists Use Them?," 4/10/2019, https://www.thoughtco.com/natural-experiments-in-economics-1146134.  ("A natural experiment is an empirical or observational study in which the control and experimental variables of interest are not artificially manipulated by researchers but instead are allowed to be influenced by nature or factors outside of the researchers' control.  Unlike traditional randomized experiments, natural experiments are not controlled by researchers but rather observed and analyzed."; "In the social sciences, particularly economics, the expensive nature and limitations of traditionally controlled experiments involving human subjects has long been recognized as a limitation for the development and progress of the field.  As such, natural experiments provide a rare testing ground for economists and their colleagues.  Natural experiments are used when such controlled experimentation would be too difficult, expensive, or unethical as is the case with many human experiments.")

The Royal Swedish Academy of Sciences, "Natural Experiments Help Answer Important Questions," 2021, at 1, available at: https://www.nobelprize.org/uploads/2021/10/popular-economicsciencesprize2021-3.pdf.  ("One way of establishing causality is to use randomised experiments, where researchers allocate individuals to treatment groups by a random draw.  This method is used to investigate the efficacy of new medicines, among other things, but is not suitable for investigating many societal issues – for example, we cannot have a randomised experiment determining who gets to attend upper-secondary school and who does not.  Despite these challenges, the Laureates have demonstrated that many of society's big questions can be answered.  Their solution is to use natural experiments – situations arising in real life that resemble randomised experiments.  These natural experiments may be due to natural random variations, institutional rules or policy changes.")

The Royal Swedish Academy of Sciences, "Answering Causal Questions Using Observational Data," 10/11/2021, at 1, available at: https://www.nobelprize.org/uploads/2021/10/advanced-economicsciencesprize2021.pdf.  ("David Card began to analyze a number of core questions in labor economics using 'natural experiments', *i.e.,* a study design in which the units of analysis are exposed to as good as random variation caused by nature, institutions, or policy changes.")

[542]   Schwartz Opening Merits Report, 1/27/2025, § 7.4.

[543]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 231.  (Emphasis in original.)

[544]   Cambridge Dictionary, Empirical, https://dictionary.cambridge.org/us/dictionary/english/empirical (accessed 4/2/2025).  ("empirical: based on what is experienced or seen rather than on theory")

[545]   Schwartz Opening Merits Report, 1/27/2025, ¶¶ 382–384.

---

b.  EGS's 12% commission rate represents a sustainable and profitable commission rate for third-party PC game distribution via platforms.[546]

c.  EGS has been largely competitively unsuccessful as a result of Valve's monopoly power and PMFN Policy, rather than as a result of the chosen commission rate.[547]

---

For example, internal Valve emails regarding the communication of tiered revenue shares to developers emphasized ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  See:

Valve, Emails Regarding ▮▮▮▮▮▮▮▮▮▮▮▮, 11/26/2018–12/1/2018 (VALVE_ANT_0415674–684, at VALVE_ANT_0415674).

[546]  Schwartz Opening Merits Report, 1/27/2025, ¶¶ 388–389.

See, for example:

*Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR-TSH, Findings of Fact and Conclusions of Law Proposed by Epic Games, inc., at ¶¶ 399, 405 (N.D. Cal. 2021). ("Prior to deciding on the 12% revenue share, EGS considered its own costs and revenues and studies the revenue shares of competing distributors of PC games.[] Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS."; "EGS's 12% transaction fee is sufficient to cover the variable costs of running EGS, including payment processing, customer service and bandwidth.")

Epic, Internal Emails re: Costs of Running Diesel Business, 6/6/2018 (EPIC_VALVE_0000004–06, at EPIC_VALVE_0000004).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Epic, "Diesel Q&As for Tim from Embargoed Media Outlets," c. 12/4/2018 (EPIC_VALVE_0000058–72, at EPIC_VALVE_0000059). ("While running Fortnite we learned a lot about the cost of running a digital store on PC. The math is quite simple: we pay around 2.5% for payment processing for major payment methods, less than 1.5% for CON costs (assuming all games are updated as often as Fortnite), and between 1% and 2% for variable operating and customer support costs. Fixed costs of developing and supporting the platform become negligible at a large scale. In our analysis, stores charging 30% are marking up their costs by 300% to 400%. But with developers receiving 88% of revenue and Epic receiving 12%, this store will be a profitable business for us.")

[547]  Schwartz Opening Merits Report, 1/27/2025, ¶ 252. ("While EGS grew its userbase from 108 million users in 2019 to over 270 million users in February of 2024, it failed to attract sufficient publishers/games to offer a meaningful competitive threat.  Epic was only able to increase the number of games offered on EGS from 190 in 2019 to 917 in 2021.  In 2023, this number rose to 2,900 games.   Steam, by comparison, had approximately 1 billion registered Steam accounts in October of 2020, and had approximately 115,000 games on its platform as of early 2025.")  See:

The Verge, "Epic Games Store Users Claimed 749 Million Free Games Last Year," 1/28/2021, https://www.theverge.com/2021/1/28/22254901/epic-games-store-accounts-daily-monthly-active-concurrent-users-storefront-2020-data. ("It announced that there are over 160 million accounts now on PC, up from the 108 million users registered in 2019.")

Epic Games, "Epic Games Store 2023 Year in Review," 2/16/2024, https://store.epicgames.com/en-US/news/epic-games-store-2023-year-in-review. ("There are now over 270 million Epic Games Store PC users, an increase of 40M from 2022.")

Epic Games, "Epic Games Store 2021 Year in Review," 1/27/2022, https://store.epicgames.com/en-US/news/epic-games-store-2021-year-in-review. ("We now have 917 titles for sale on the Epic Games Store, nearly doubling what we had available to customers in 2020.")

Epic Games, "Epic Games Store 2020 Year in Review," 1/28/2021, https://store.epicgames.com/en-US/news/epic-games-store-2020-year-in-review. ("The Epic Games Store grew from 190 games in 2019 to 471 in 2020.")

Valve, "▮▮▮▮▮▮▮▮▮▮," 10/2020 (VALVE_ANT_0052792–2829, at VALVE_ANT_0052816).

Steam, Titles on Steam, https://store.steampowered.com/search/?category1=998&os=win%2Cmac%2Clinux&supportedlang=142nglish&ndl=1 (accessed 1/21/2025).

---

d. Due to the lack of alternative competitively viable distribution platforms resulting from Valve's PMFN Policy, many publishers had no choice but to distribute through Steam.[548]

(254) I conclude that Valve responded to the threat of EGS's entry into the third-party PC game distribution platform market by implementing its tiered commission rate system (albeit to levels that were still supracompetitive).[549] In the but-for world where there is no PMFN Policy,

---

See also:

Schwartz Opening Merits Report, 1/27/2025, ¶ 386. ("Because of Valve's expansive base of users, developers, and publishers, Epic has had to focus on growth as opposed to profitability, all the while accomplishing neither to a meaningful degree. Epic has been unprofitable and has failed to command a meaningful share of the relevant market. Additionally, many publishers who left Steam and signed exclusive deals with Epic did so because of Epic's advances and money guarantees that were sometimes large enough to cover the entire development cost of a game. However, these movers were quintessential "hit and run" shifts; many of these publishers have since returned to Steam after the expiration of their exclusive deals with Epic.") See:

WCCF Tech, "Epic Games Store Still Isn't Profitable Despite Promises It Would Be By 2023," 11/7/2023, https://wccftech.com/epic-games-store-not-profitable-2023/. ("Yesterday, Epic Games Store boss Steve Allison took the stand, and admitted the storefront still wasn't turning a profit. At this point, Allison says the main aim is still to grow the store's userbase, rather than turn big profits (or any profits at all).")

Scott Lynch, Dep. Tr., 10/12/2023, at 163:3–9. ("Q. Some of the money guarantees that Epic gave covered the entire cost of developing the game; right? A. I don't know exactly, you know, what their deals were and, you know, what the development costs of the game are, but I'm pretty sure that some of those deals were the entire development cost and some of those deals were even beyond that.")

[548] Schwartz Opening Merits Report, 1/27/2025, ¶¶ 256–261.

Ubisoft's strategy to stop releasing games on Steam was unsuccessful and ultimately short-lived, as several Ubisoft exclusives were later released on Steam after pulling them in 2019. See:

Valve, Emails Discussing a GameDiscoverCo Article, 11/22/2022 (VALVE_ANT_1229059–067, at VALVE_ANT1229064). ("We ran the rumors a few times, but they're true – Ubisoft is returning to Steam, initially with Assassin's Creed Valhalla (out Dec. 6th). But they told Eurogamer they'll provide a 'consistent player ecosystem through Ubisoft Connect', and will be adding titles including Anno 1800 & Roller Champions to Valve's platform soon.")

Unable to succeed on its own, EA ultimately returned to distributing their games on Steam. See:

Valve, Emails Regarding ███████, 10/29/2019–10/30/2019 (VALVE_ANT_0058279–281, VALVE_ANT_0058280–281).

Valve, Emails Regarding ██ ██ ██ ███████, 9/16/2019–9/20/2019 (VALVE_ANT_0059430–31, at VALVE_ANT_0059430–31).

See also:

Scott Lynch, Dep. Tr., 10/12/2023, at 193:23–194:4. ("Q. There came a time that ██ did bring their major titles back on Steam; right? A. Yes, they started releasing some of their games they hadn't released on Steam and probably did some new -- new releases too. Q. That was in September of 2019? A. Yeah, that seems around the timeframe.")

Microsoft also agreed to distribute games through Steam after years of not doing so. See:

The Verge, "Microsoft Will Distribute More Xbox Titles Through Steam and Finally Support Win32 Games," 5/30/2019, https://www.theverge.com/2019/5/30/18645250/microsoft-xbox-game-studios-publishing-valve-steam-32-bit-windows.

[549] Schwartz Opening Merits Report, 1/27/2025, § 7.4.

See, for example:

Valve, Emails Regarding ████████████████, 11/26/2018–12/1/2018 (VALVE_ANT_0415674–684, at VALVE_ANT_0415674, VALVE_ANT_0415679–680, VALVE_ANT_0415684).

---

Steam would have faced a more expansive competitive threat and likely much earlier than Epic's launch of EGS.[550] Steam would have faced multiple credible competitors, pushing Valve to compete by, among other things, lowering its commissions further.[551] Thus, in the but-for world, Steam's advertised commission rate would be lower than the lowest tier rate of 20% that Steam adopted for high-revenue games. Indeed, Epic's 12% commission rate would allow for Steam and other platforms to operate profitably.[552]

(255)   Dr. Langer asserts that the natural experiment outlined in my Opening Report "does not have predictive power" given that other changes were occurring in the industry at the time Valve reduced its revenue shares besides EGS's attempted entry.[553] I disagree with Dr. Langer's proposition that I do not account for these other factors and I disagree with her assertion that these factors make this "exactly the setting in which a natural experiment approach does not have predictive power."[554] Dr. Langer outlines two alternative factors, both of which are instances of publishers removing games from Steam and switching to first-party distribution.[555] While these two instances may have occurred around the time of EGS's entry to the relevant market and Valve's commission rate change, large and/or popular publishers not offering their games on Steam was not a new practice and had not impacted the commission rate change on Steam in the past, as I discuss below.

(256)   For example, Dr. Chiou presents a timeline of "Valve respond[ing] to competitive pressure from self-distribution by lowering price with the introduction of revenue share tiers."[556] The first events listed on the timeline are EA launching Origin on June 3, 2011, and EA subsequently announcing that it will stop releasing games on Steam on August 8, 2011.[557] At the time of EA's entry, EA still offered their games on Steam, including *The Sims 3* and *Battlefield: Bad*

Steam, "New Revenue Share Tiers and Other Updates to the Steam Distribution Agreement," 11/30/2018, https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

[550]   Schwartz Opening Merits Report, 1/27/2025, § 7.4.

[551]   Schwartz Opening Merits Report, 1/27/2025, § 7.4.

[552]   Schwartz Opening Merits Report, 1/27/2025, § 7.4.

[553]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 233.

[554]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 233.

[555]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 233. (The two "other factors" that Dr. Langer suggests are not constant are (1) "Ubisoft's switch to releasing games on its own platform and EGS in 2019 and subsequent reversal in 2022" and (2) "Activision's removal of Call of Duty from Steam in 2018 and subsequent reversal in 2022.")

[556]   Chiou Rebuttal Merits Report, 3/26/2025, Exhibit 2.

[557]   Chiou Rebuttal Merits Report, 3/26/2025, Exhibit 2.

*Company 2: Vietnam*, among other titles.[558]  On August 8, 2011, just months after launching their own third-party distribution channel, according to Dr. Chiou, EA announced that it would not be releasing new games on Steam, and EA stated that they would not be releasing *Battlefield 3* on Steam "until Valve changes its policies[.]"[559]  Notably, EA was not making its games exclusive to its own service; rather, it was keeping games widely available, but not on Steam.[560]  Despite the popularity and success of EA games and Valve's desire to get EA to return to Steam,[561] Valve did not change its commission rate until EGS entered the marketplace in 2018, approximately seven years *after* EA had left Steam in 2011.

(257)  Dr. Chiou's timeline conveniently leaves out other examples of publishers not offering their games on Steam between that event and 2018.[562]  In her exhibit, Dr. Chiou cites to a Valve internal email to claim that ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████[563]  In this same email thread, "notable" games and publishers not on Steam are listed, including ████████████████████████████.[564] Dr. Gowrisankaran also presents various other games that have never been on Steam,

---

[558]  CNET, "EA Launches Origin, Takes Aim at Steam," 6/3/2011, https://www.cnet.com/tech/gaming/ea-launches-origin-takes-aim-at-steam/.

[559]  Chiou Rebuttal Merits Report, 3/26/2025, Exhibit 2.

See also:

Ars Technica, Battlefield 3 Is Not Coming to Steam, But EA Has A Real Reason," 8/8/2011, https://arstechnica.com/gaming/2011/08/battlefield-3-not-coming-to-steam-ea-provides-good-reason/.

[560]  Ars Technica, Battlefield 3 Is Not Coming to Steam, But EA Has A Real Reason," 8/8/2011, https://arstechnica.com/gaming/2011/08/battlefield-3-not-coming-to-steam-ea-provides-good-reason/.

[561]  Scott Lynch, Dep. Tr., 10/12/2023, at 102:7–18, 96:10–97:12. (Q. Was one of the goals to bring back certain developers or publishers who had stopped publishing games on Steam.  A. Yes. Yeah. Q. Did some of those developers or publishers also sign exclusive deals with Epic later in time? A. I don't know. Possibly, yes. Q. Division 2, for instance, signed an exclusive deal with Epic? A. I think they did, yeah. Q. Who publishes that? A. If I remember, that was Ubisoft."; "Q. Also in late 2018, specifically November 26th, Steam is discussing a change to their revenue sharing; right?  A. We had been discussing a change for a long time, but we were also discussing it in November. ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

[562]  Chiou Rebuttal Merits Report, 3/26/2025, Exhibit 2.

[563]  Chiou Rebuttal Merits Report, 3/26/2025, Exhibit 2, Appendix 5.1.

---

including ███████ and ███████ as well as similarly referencing games from ███████, which include both ███████████ and ███████.[565]

(258) None of this negates the fact that Steam is a critical distribution channel for publishers. These examples demonstrate that big titles were not published on Steam or left Steam numerous times prior to 2018 without responsive rate changes from Valve. Instead, the only *new* consideration in 2018 was the presence of a potentially competitive third-party store, EGS, from AAA publisher Epic Games. As a counter-argument, Dr. Langer cites to Ubisoft's removal of its games from Steam's platform.[566] However, as noted by Dr. Langer, Ubisoft removed their games from Steam to focus on releasing their games on both their own platform *and on EGS*.[567] Thus, Ubisoft's threat to Valve, if any, stemmed at least in part from the introduction of EGS.

(259) The evidence indicates that the introduction of an alternative third-party PC game distribution platform from a large, well-funded potential competitor was indeed a new factor that distinguished the "after" period in my natural experiment from the "before" period. For example, DJ Powers noted in an email that "[t]he entrance of a strong competitor to the market absolutely has our attention" and that Valve is planning to react to EGS by "[t]aking a fresh look at our revenue share and re-shaping it to reward the games on Steam that provide incredible network effects to the platform."[568] As another example, on November 26, 2018, Valve had learned from multiple sources about EGS's possible launch within the following week and immediately started drafting an announcement regarding the new revenue share tiers to share with publishers.[569] Figure 19 below is a screenshot of emails between Scott Lynch and Gabe Newell in advance of announcing the commission change.[570]

---

[565]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 104–109.

[566]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 233.

[567]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 233.

See also:

Ars Technica, Ubisoft Goes Steam-less, Embraces Epic Games Store for the Division 2, 1/9/2019, https://arstechnica.com/gaming/2019/01/ubisoft-snubs-steam-brings-the-division-2-to-epics-games-store/. ("Ubisoft has announced that the PC version of The Division 2 will not be sold on Steam and will instead be available only through the Epic Games Store and Ubisoft's own UPlay service.")

[568]    Valve, Emails Regarding ███████ 1/27/2019–2/5/2019, (VALVE_ANT_0489888–890, at VALVE_ANT_0489890), available at Scott Lynch, Dep. Tr., 10/12/2023, Exhibit 137.

[569]    Valve, Emails Regarding ████████████, 11/26/2018–12/1/2018 (VALVE_ANT_0415674–684, at VALVE_ANT_0415679–680, VALVE_ANT_0415683–84).

[570]    Valve, Emails Regarding ████████████, 11/26/2018–12/1/2018 (VALVE_ANT_0415674–684, at VALVE_ANT_0415674).

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 19: Screenshot of Emails Between Scott Lynch and Gabe Newell**
**about**



(260)    Other evidence presented in my Opening Merits Report suggests that Valve viewed Epic as its biggest threat, stating that "[m]ost of the conversation, internally and externally, has revolved around Epic because they're the noisiest and most aggressive new player[.]"[571]  A 2019 Valve recap states that Valve had "[l]ots of Epic anxiety[.]"[572]

(261)    Additionally, public evidence from around the time of the EGS launch supports that the threat of third-party competition, with EGS as the biggest competitive threat, motivated Steam to adjust its revenue shares.  An article published by The Verge following the launch of EGS titled "Epic Games takes on Steam with its own fairer game store,"  stated that "Valve, seeing increased competition from other game stores, seems to understand that developers won't stick around unless the terms become more favorable."[573] Another article published by The Verge two days later stated that "Epic is certainly well-off enough to make the most significant play for Steam's business that the game distribution market has seen in quite some time."[574]

---

[571]    Valve, Competitive Landscape Analysis, undated (VALVE_ANT_1221442–44, at VALVE_ANT_1221442). ("We're seeing a lot of competing stores surface on the PC – Apple Arcade, Google Stadia, Epic Game Store, Discord, Kongregate, to say nothing of publishers running their own stores like Battlenet, Uplay and Bethesda.net. Most of the conversation, internally and externally, has revolved around Epic because they're the noisiest and most aggressive new player[.]")

[572]    Valve, "Steam Biz – 2019 Recap," 2019 (VALVE_ANT_0019719–721, at VALVE_ANT_0019719).

[573]    The Verge, "Epic Games Takes on Steam with its Own Fairer Game Store," 12/4/2018, https://www.theverge.com/2018/12/4/18124203/epic-games-fortnite-valve-steam-game-store-distribution-unreal-engine. (See also: "Regardless of how Epic's marketplace is structured, a new competitor to Steam, one from the creator of Unreal and *Fortnite* no less, is a direct threat to Valve's primary moneymaker.")

[574]    The Verge, "Epic's PC Game Store Is Live Now," 12/6/2018, https://www.theverge.com/2018/12/6/18126139/epic-store-games-pc-ashen-hades-game-awards-2018.

---

Case 2:21-cv-00563-JNW    Document 621    Filed 06/17/26    Page 71 of 92
HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(262)   Dr. Langer then characterizes EGS's entry and the market response as "evidence of competition, not evidence of monopolization."[575] This assertion is incorrect. While EGS's attempted entry induced Steam to slightly lower rates, EGS's failure to sustain success in the market has rendered any threat of competition it may have had ineffective.[576] Valve's dominant base of users, developers, and publishers has forced Epic to focus on growth as opposed to profitability[577]—while accomplishing neither to a meaningful degree. Epic has been unprofitable and has failed to command a meaningful share of the relevant market (not as a result of its 12% commission rate).[578] Epic itself estimates Valve has a 94% market share.[579] Thus, EGS is not a successful and effective competitor in the relevant market; at best, it

---

[575]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 234.

[576]   Schwartz Opening Merits Report, 1/27/2025, §§ 6.2, 7.4.

[577]   Schwartz Opening Merits Report, 1/27/2025, § 7.4.

WCCF Tech, "Epic Games Store Still Isn't Profitable Despite Promises It Would Be By 2023," 11/7/2023, https://wccftech.com/epic-games-store-not-profitable-2023/. ("Yesterday, Epic Games Store boss Steve Allison took the stand, and admitted the storefront still wasn't turning a profit. At this point, Allison says the main aim is still to grow the store's userbase, rather than turn big profits (or any profits at all).")

[578]   As discussed in Schwartz Opening Merits Report Sections 6.2 and 7.4, Epic's inability to compete is not as a result of its commission rate. In fact, Epic has indicated publicly that the 12% commission rate is profitable on an operating basis and sustainable. Epic's court documents reveal that Epic determined the 12% rate to be "competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS." Additionally, according to an internal Epic email, Epic determined that even dropping the percentage split that Epic takes on each sale to 10% would have still allowed the company to be operate that portion of the business profitably. Further, in a Q&A discussion in December 2018, Tim Sweeney stated that "with developers receiving 88% of revenue and Epic receiving 12%, this store will be a profitable business for us." See:

PC Gamer, "Most Game Devs Don't Think Steam Earns its 30% Revenue Cut," 4/28/2021, https://www.pcgamer.com/most-game-devs-dont-think-steam-earns-its-30-revenue-cut/. ("Epic maintains that its 12% cut will be enough to profit in the long term, challenging the idea that game distributors need to take 30% to be viable.")

Ars Technica, "How Long Can Epic Afford to Throw Money at the Epic Games Store," 4/12/2021, https://arstechnica.com/gaming/2021/04/how-long-can-epic-afford-to-throw-money-at-the-epic-games-store/. ("You might think Epic is incurring those losses because it only takes a 12 percent cut of third-party game revenues, compared to the industry-standard 30 percent cut on other digital storefronts. On the contrary, though—in its own court filings, Epic says that 12 percent revenue chunk has been 'sufficient to cover its costs of distribution and allow for further innovation and investment in EGS.'")

*Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR-TSH, Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc., at ¶¶ 399, 405 (N.D. Cal. 2021). ("Prior to deciding on the 12% revenue share, EGS considered its own costs and revenues and studies the revenue shares of competing distributors of PC games.[] Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS."; "EGS's 12% transaction fee is sufficient to cover the variable costs of running EGS, including payment processing, customer service and bandwidth.")

Epic, Internal Emails re: Costs of Running Diesel Business, 6/6/2018 (EPIC_ VALVE_0000004–06, at EPIC_ VALVE_0000004).

Epic, "Diesel Q&As for Tim from Embargoed Media Outlets," c. 12/4/2018 (EPIC_VALVE_0000058–72, at EPIC_VALVE_0000059).

[579]   Epic, "Presentation to the Board of Directors," 8/13/2019 (EPIC_VALVE_0000364–389, at EPIC_VALVE_0000368).

Rebuttal Merits Expert Report of Steven Schwartz, Ph.D.                                                    Page 148

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

operates around the margins of the relevant market and does not threaten Valve's dominant market position.

(263)    Importantly, many of the publishers who originally left Steam had no choice but to return to Steam because their other options were not competitively viable (largely as a result of the price and content parity requirements of the PMFN Policy).[580]    These departures did not result in competitively meaningful alternatives to Steam and did not affect Valve's PMFN Policy or the enforcement thereof.

(264)    Dr. Langer suggests that the lower commission rates on EGS and Microsoft may be the result of differentiated product competition or dynamic pricing, and these rates alone do not necessitate that Valve's fees are supracompetitive.[581]    This is pure speculation on Dr. Langer's part.    She does not provide any analysis to demonstrate whether this is the case.    Further, Valve's competitors cannot successfully compete with lower prices to publishers (i.e., lower commission rates) when any savings to publishers cannot be passed on to users in the form of lower game prices given the PMFN Policy.    A differentiation strategy in which a third-party platform could provide a product at a lower price is dependent upon the platform's ability to allow publishers to pass those lower prices to consumers.    Absent the PMFN Policy, savings through lower commission rates could be passed through to users by selling games at a lower price, while retaining sufficient profits per game.    Lower prices would attract additional users, creating network effects for the platform and allowing the platform to become a competitively viable alternative to Steam.

(265)    Similarly, a dynamic pricing strategy is also dependent upon a publisher's ability to pass through lower prices to users.    Dr. Langer states that a dynamic pricing strategy "can lead to greater competition in the long run as firms invest and gain the benefits of network effects."[582]    In order for a platform to successfully establish network effects, a platform must attract a sufficiently large number of users/publishers.[583]    Therefore, a dynamic pricing strategy can only be used to established network effects if both publishers and users would be attracted to the potential alternative—such as, through lower commission rates and lower game prices. As discussed throughout this report and my Opening Report, Valve's PMFN Policy makes this

---

[580]    Schwartz Opening Merits Report, 1/27/2025, § 6.2.

[581]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 234.

[582]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 234.

[583]    Schwartz Opening Merits Report, 1/27/2025, ¶¶ 31, 59, 142, 183.

strategy impossible.[584]   Additionally, as Dr. Langer describes in her report, dynamic pricing strategies often use "below-cost prices to first develop growth."[585]   Epic's 12% rate does not represent a below-cost price.   On the contrary, Epic determined that a 12% commission rate was "sufficient to cover its costs of distribution and allow for further innovation and investment in EGS" and sufficient to support a "profitable business."[586]

---

[584]   Schwartz Opening Merits Report, 1/27/2025, §§ 5.1.3, 6.2, 7.2.3, 7.4.

[585]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 234.iv.ii.

[586]   *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR-TSH, Findings of Fact and Conclusions of Law Proposed by Epic Games, inc., at ¶¶ 399, 405 (N.D. Cal. 2021). ("Prior to deciding on the 12% revenue share, EGS considered its own costs and revenues and studies the revenue shares of competing distributors of PC games.[] Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS."; "EGS's 12% transaction fee is sufficient to cover the variable costs of running EGS, including payment processing, customer service and bandwidth.")

Epic, "Diesel Q&As for Tim from Embargoed Media Outlets," c. 12/4/2018 (EPIC_VALVE_0000058–72, at EPIC_VALVE_0000059). ("While running Fortnite we learned a lot about the cost of running a digital store on PC. The math is quite simple: we pay around 2.5% for payment processing for major payment methods, less than 1.5% for CON costs (assuming all games are updated as often as Fortnite), and between 1 % and 2% for variable operating and customer support costs. Fixed costs of developing and supporting the platform become negligible at a large scale. In our analysis, stores charging 30% are marking up their costs by 300% to 400%. But with developers receiving 88% of revenue and Epic receiving 12%, this store will be a profitable business for us.")

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# 8.    Platform Competition Model

## 8.1.    Overview

(266)    The purpose of the Platform Competition Model ("PCM") is to evaluate if Valve's PMFN Policy harms producers via higher platform fees. The PCM is not meant to prove the existence of a PMFN. Throughout my previous reports and in this report, I have referenced case specific evidence and data to show both the existence and enforcement of an alleged PMFN Policy by Valve.[587] That is not the task of the PCM. The PCM correctly considers a scenario where a PMFN is *assumed* to exist. Its purpose is to assess the impact of a PMFN, should a PMFN exist, not to prove its existence.

(267)    The PCM does not assume PMFNs cause harm. The PCM does assume that a PMFN exists and restricts pricing behavior by publishers for retail sales to consumers. This assumption allows me to compare outcomes with and without a PMFN to understand the incremental impact of Valve's PMFN Policy on publishers. The PCM shows that Valve's PMFN Policy's price restrictions, if enforced, decrease platforms' implied demand elasticity which increases platform fees and harms publishers. This harm follows from economic reasoning and modeling, not assumptions. As Dr. Langer pointed out, this relationship seems to hold for all reasonable calibration values.[588] This is not a flaw; rather it reflects a fundamental relationship between price restrictions and diminished competition within the context of this case. Dr. Langer attempts to characterize this finding as "driven by [] assumptions"[589] and claims, erroneously, that the model would draw the same conclusion regardless of the case facts.[590] Her criticism demonstrates a lack of understanding of my analysis and misrepresents how economic models are used.

(268)    First, the PCM must be considered in the context of my entire report and the data and case facts presented within it. I showed in Section 5.2 of my Opening Merits Report that Valve enforces a PMFN Policy. I showed in Section 7.2.5 of my Opening Merits Report and in Section

---

[587]    See, for example:

Section 5.

Schwartz Opening Merits Report, 1/27/2025, §§ 5.2, 5.3.

[588]    Langer Rebuttal Merits Report, 3/26/2025, § 5.3.

[589]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 107.

[590]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 112.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

3 of my Response Merits Report that showrooming, a potential procompetitive argument for PMFNs, does not occur to any economically meaningful degree. Thus, the PCM does not include factors like showrooming because my analysis demonstrates that showrooming is not a significant factor on Steam. I do not claim, and the PCM does not show, that there is harm to sellers in every possible circumstance and market. What it does show, in combination with the rest of the evidence in my report, is harm to publishers on Steam because of Valve's PMFN Policy. If data or qualitative evidence existed to suggest that the showrooming was prevalent, for example, I would need to add additional complexities to reflect that reality. But, given the evidence in this case, such changes are not needed. Moreover, Dr. Langer provides neither evidence nor any analysis to justify those complexities.

(269)    Second, Dr. Langer claims that a model with a definitive conclusion for all circumstances that fit within the model's parameters is flawed or biased. She is wrong. As an economic statement, that is nonsensical. A model with a definitive conclusion shows that a particular conclusion holds. It is neither necessarily flawed nor biased, and it is surely not "incorrect" as a necessary matter. The key is to recognize the import of *for all circumstances that fit within the model's parameters*. This statement shows that the model does not claim the conclusion is always true, only that if the model's conditions are met, then the relationship holds. Dr. Langer's report is more notable for what she does not do. She does not argue that the model ought to consider different circumstances within the model's parameters; she does not put forth a different model with different parameters that would be more appropriate; and she does not even argue for a specific alternative theoretical framing.[591]

(270)    Dr. Langer does put forward a set of five standards for estimating a but-for world which she applies to my PCM model as well as my damages analysis.[592] These five standards are a contrived invention of Dr. Langer's for this case. They do not describe requirements for an effective analysis. Dr. Langer applies these factors incorrectly to my analysis; and, as I will show in Section 10, Dr. Langer's analysis does not pass her own standards.

(271)    Dr. Langer criticizes the PCM for not matching specific aspects of the real world but cannot connect those differences to any viable economic theory for why a PMFN would benefit

---

[591]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 85. ("Finally, I note that by discussing other economic models in the academic literature I am not putting forward an alternative theoretical model to Dr. Schwartz's PCM for examining the challenged conduct.")

Langer Rebuttal Merits Report, 3/26/2025, fn. 217. ("I do not take a stand on what the correct value for Steam's market share is.")

[592]    Langer Rebuttal Merits Report, 3/26/2025, § 4.

publishers.  Dr. Langer's unwarranted criticisms of the PCM imply that the only model that would satisfy her critique would be one that matched the real world in every possible way. That is an unreasonable economic standard and misrepresents what economic models are intended to do.[593]  Dr. Langer also criticizes the PCM for not making accurate predictions; however, these criticisms reflect either a misunderstanding or misuse of the model.

(272)   Finally, Dr. Langer criticizes the PCM because it does not contain standard errors or confidence intervals.  If she means to suggest that only statistical models (presumably structural models only) are valid models, she is completely wrong.  Such a requirement does not exist in the field of economics and would unreasonably limit the type of economic evidence that can be applied to antitrust and class action lawsuits, not to mention economics more broadly.

## 8.2.    Dr. Langer misrepresents fundamentals of the PCM

### 8.2.1.   The PCM rightly assumes a PMFN exists to assess the challenged conduct

(273)   Dr. Langer misunderstands what the PCM does.  Thus, when Dr. Langer argues that the "PCM assumes that a PMFN exists and forces the prices of games to be exactly the same across platforms[,]"[594] she completely misses the mark.  The PCM considers two scenarios, one where a PMFN is assumed to exist and one where it does not.  Dr. Langer appears to view this as a model defect; however, this is an unambiguously *desirable* feature of the model.  Any model meant to demonstrate the *impact* of a PMFN, like the PCM, *should* consider scenarios where a PMFN is assumed to be in place.  It is unclear how one could draw conclusions about the incremental impact of Valve's PMFN Policy on publishers from a model that does not consider a scenario with and without a PMFN in place.  For my numeric analysis specifically, real-world market values that reflect the existence of the PMFN Policy are applied to the PMFN scenario. This is appropriate; in my analysis I have separately used case-specific evidence and data to

---

[593]   Ashley Langer, Dep. Tr., 6/21/2024, at 67:11–68:6.  ("Q. Okay. And when you use the term 'accurately,' are you using that in a sense that it has to be 100 percent accurate?  A. No. All models are simplifications, and we always have to come up with ways to model the actual industry. It won't capture every detail. What's important -- and I have various cites through textbooks and things like that throughout my report -- what's important about models is that they capture the key forces that are affecting outcomes. It depends on your question. So to speak about the questions Dr. Schwartz is asking here that affect the decisions that the platforms, the publishers and the consumers are making in the industry that are related to the challenged conduct and then capturing the -- in this case, the alleged PMFN and understanding how removing it, if it were there, would impact your model. And so it does not have to be perfect, but it has to capture the key interactions that are relative to the question at hand.")

[594]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 72.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

show the existence and enforcement of Valve's PMFN Policy.[595]  Thus, the PMFN scenario substantially matches the real world.[596]  It is critical to understand—as Dr. Langer apparently does not—that the PCM analyzes the incremental harm to publishers from Valve's PMFN Policy.  It cannot prove the existence of a PMFN in this case; it does not need to, and it is not intended to.

(274)  Dr. Langer claims that the PCM does not "capture the central object" of my report, "the challenged conduct."[597]  This is an odd critique that makes no economic sense.  In this case, the challenged conduct is Valve's PMFN Policy.  With this critique, Dr. Langer contradicts other statements in her report; for example, she separately criticizes the PCM for assuming a PMFN (i.e., the challenged conduct) exists in the model.[598]  Yet, here, Dr. Langer is faulting the PCM for both assuming the challenged conduct is in place and yet not capturing the challenged conduct.  These statements cannot both be true, and Dr. Langer's eagerness to assert both reflects a misunderstanding of the PCM and/or the challenged conduct (or, alternatively, is a deliberate misrepresentation).

(275)  The Boik and Corts paper on which the PCM is based is specifically written to consider the impact of PMFN clauses and finds (not by assumption, but through economic analysis and modeling) that PMFNs increase platform fees.[599]  The authors state that they "study the effects

---

[595]    See, for example:

Schwartz Opening Merits Report, 1/27/2025, §§ 5.1.2, 5.2, and 5.3.

[596]    Dr. Langer points out that the PCM assumes exactly equal prices under a PMFN while, in the real world, perfect price parity is not always achieved.  This simplifying assumption is irrelevant to the finding of harm.  The PCM demonstrates the dynamics of a PMFN.  Restricting price competition, even imperfectly, will decrease Valve's elasticity of implied demand and allow them to increase their platform fees.  See:

Langer Rebuttal Merits Report, 3/26/2025, ¶ 117.

Schwartz Opening Merits Report, 1/27/2025, § 7.2.2.

Schwartz Reply Class Certification Report, 7/12/2024, § 6.

Section 8.3.

[597]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 76.

[598]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 72.  ("Dr. Schwartz's PCM assumes that a PMFN exists and forces the prices of games to be exactly the same across all platforms.  But this assumption is flawed in several respects.")

[599]    Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *Journal of Law and Economics* 59(1): 105–134, at 128.  ("We study the effects on pricing and entry of PMFN policies[.] . . . We show that PMFN agreements tend to raise fees charged by platforms and prices charged by sellers[.]")

For the authors' economic arguments and modeling deriving the fact that PMFNs increase platform fees, see also:

Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *Journal of Law and Economics* 59(1): 105–134, at 113–114.

---

on pricing and entry of PMFN policies[.] . . . We show that PMFN agreements tend to raise fees charged by platforms and prices charged by sellers[.]"[600]

(276)    Dr. Langer quotes Boik and Corts saying "[o]bviously, a full analysis of whether the encouragement, deterrence, or skewing of entry increases or decreases social welfare requires much more structure regarding both demand and costs and is beyond the scope of this paper."[601] Dr. Langer argues this is evidence that I have used the PCM improperly. Again, she is wrong, because she ignores the context in which the statement was made. Boik and Corts are making the obvious and important point that their findings cannot be applied blindly to any industry. There may be other factors specific to a given industry, like showrooming, that could result in PMFNs having different welfare impacts.[602] This is why I did not submit the entirety of the Boik and Corts paper as my entire report. A key step in my analysis, which Dr. Langer repeatedly ignores, is demonstrating that Valve's PMFN Policy fits within the scope of the model and so is affected by the fundamental mechanism proved by the model. PMFNs make platforms' transactions less responsive to changes in platform fees, which leads platforms to charge higher fees to publishers.[603] Absent some alternative mechanism by which Valve's PMFN Policy would benefit publishers (which I have not found, and no other expert has convincingly presented, if they have attempted to present one at all), the PCM proves harm to publishers.

(277)    Dr. Langer further argues that I have not performed "any empirical analysis to support [the PCM's] key assumptions: that prices are equal across platforms, and that this price parity is the consequence of an alleged PMFN."[604] Again, Dr. Langer is confused. The PCM is not meant to show that Valve's PMFN Policy and documented enforcement lead to price parity. Rather, the PCM is designed to evaluate whether there is harm from the enforcement of that price parity. Throughout my previous reports, as well as Section 5 of this report, I have presented

---

[600]    Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *Journal of Law and Economics* 59(1): 105–134, at 128. ("We study the effects on pricing and entry of PMFN policies—a type of policy not widely studied in the extant literature but one that is of increasing interest and importance in antitrust enforcement. We show that PMFN agreements tend to raise fees charged by platforms and prices charged by sellers and that these policies are adopted in equilibrium and increase platforms' profits when aggregate demand is sufficiently inelastic.")

[601]    Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *Journal of Law and Economics* 59(1): 105–134, at 128.

Langer Rebuttal Merits Report, 3/26/2025, ¶ 68.

[602]    See Section 8.6.

[603]    Schwartz Opening Merits Report, 1/27/2025, § 7.2.2.

[604]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 77.

---

evidence of Valve's PMFN Policy and its impact on pricing conduct.[605]  Dr. Langer states that the models like the PCM are "often designed to use math to highlight settings where a particular economic insight might hold rather than to prove that this insight applies in any particular industry."[606]  I agree.  What she ceaselessly ignores is the evidence that the insights from the PCM apply to this industry.

(278)   Dr. Langer critiques my normalization of a game's price to $60 in the numeric analysis.[607]  This criticism is misplaced because the normalization is inconsequential to the results.  The results can also be considered in dollars transacted, with no need to normalize to a game price, or normalized to any price.  To see this, consider a simple linear demand function $Q = mP + b$ and an alternate normalization of the price to $P'$, where $P = aP'$ for some positive $a$.  This alternate normalization could represent, for example, prices relative to a different numeraire good or currency.  It is easy to derive the demand function under $P'$ by simply substituting $P = aP'$ into the original demand function: $Q = maP' + b$.  This new demand function does not represent a change to the underlying behavior in the market; it simply represents the same behavior relative to a new normalization of price.  All my subsequent calculations could then be done relative to this alternate demand function, but because the underlying market behavior is unchanged, the results will be unchanged.[608]  The PCM shows the direction and general magnitude of harm to a representative publisher with a representative game price.  The PCM's findings demonstrate that publishers are harmed by Valve's PMFN Policy regardless of the list price of their games.  Changing this normalization does not change my finding of harm.

(279)   As an illustrative example, I instead normalize my results to a price of $50.  The fee %, share, platform economic profits (millions), seller economic profits (millions), and weighted

[605]    See also:

Schwartz Opening Merits Report, 1/26/2025, §§ 5–6.

[606]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 67.

[607]    This critique also concerns the single good setting of the Boik and Corts model, which I address in Section 8.3.1.

Langer Rebuttal Merits Report, 3/26/2025, ¶ 77. ("Dr. Schwartz does not explain how to choose this one price to input into the PCM. He rather uses a value of $60 with no explanation beyond saying that he "normalized" the price. While a price of $59.99 is common for some games of major publishers, I understand that PC games can be offered at a variety of price points.")

[608]    Similarly, a classic result in microeconomic theory shows that demand functions are independent of the choice of numeraire.  That is, they are "homogeneous of degree zero in prices and income."  See:

Nicholson, Walter (1995), *Microeconomic Theory: Basic Principles and Extensions*, 6th ed., Fort Worth, TX: The Dryden Press, at 134.

commission rate across all games are unchanged.[609] While the fees in dollar terms have changed, this reflects the same commission rate applied to $50 rather than $60. Dr. Langer cannot and does not explain why any of this would matter.

**Table 3: PCM Numeric Analysis With Price of $50**

| Metric | With PMFN | | Without PMFN | |
|---|---|---|---|---|
| | Steam | EGS | Steam | EGS |
| Fee | | | | |
| Fee % | | | | |
| Price | | | | |
| Quantity (units, millions) | | | | |
| Share | | | | |
| Platform economic profits (millions) | | | | |
| Seller economic profits (millions) | | | | |
| Seller profits per unit | | | | |
| Weighted price across all games | | | | |
| Weighted fee across all games | | | | |
| Weighted commission rate across all games | | | | |

(280)  Dr. Langer also criticizes the PCM for assuming price parity and points to analysis by Dr. Gowrisankaran showing there is not perfect price parity. I address Dr. Gowrisankaran's analysis in more detail in Section 5.2.3 of my report. More generally, however, perfect price parity is not required for the PCM to show a PMFN harms publishers. Any restriction on

---

[609]  The price is now approximately $50 while the quantity is ▮ times the original quantity, leaving the market size in dollars unchanged. For example, at $60 Steam's PMFN quantity is ▮▮▮▮, resulting in Steam's PMFN quantity at $50 being ▮▮▮▮▮▮▮▮. The total market size (at $50) is now equal to (▮▮▮▮▮▮▮) × $50 = ▮▮▮▮, which is the same, to a rounding error, as (▮▮▮▮▮▮) × $59.99 = ▮▮▮▮. For the quantities at $60, See:

Schwartz Supplemental Opening Merits Report, 3/7/2025, ¶ 20, Table 4.

pricing differentiation, even if prices at times differ, will decrease the elasticity of implied demand faced by Valve, enabling them to charge higher platform fees.[610]

(281)    While I reject Dr. Langer's so-called standards for economic models as being a creation of her own for purposes of this case and not a set of standards that are generally, much less uniformly, adhered to (even by Dr. Langer herself) the PCM does, in fact, meet Dr. Langer's Standard #1, namely that "A model should include the challenged conduct and the relevant decision-makers."[611] The PCM includes the challenged conduct, *i.e.*, Valve's PMFN Policy, and explicitly assesses its impact on publishers. The PCM also includes relevant decision-makers and models their decisions. The PCM models a situation where a platform matches buyers to sellers (here, users to a representative publisher) and charges a single price to sellers (here, Valve's commission from Steam) while the sellers set the prices that they charge to consumers (here, game prices to users).[612] The model considers a PMFN put in place by the platform requiring sellers to set their lowest price on that platform (in practice, setting prices equally across platforms).[613] The model also allows for one platform to have a demand advantage (*i.e.*, higher market share for any price when price parity holds) over other platforms.[614] This allows the model to incorporate any advantage Valve currently has from differences in platform features, as well as network effects. The model is robust, appropriate, and aligns with the facts of this case.

---

[610]    Schwartz Opening Merits Report, 1/27/2025, § 7.2.2.

I consider a modification of the PCM where the implemented PMFN is weaker in the sense that the competing platform's price is allowed to be lower by some defined amount. The bottom line is that this weaker version of a PMFN attenuates the effects of a PMFN but does not affect the qualitative results: both prices and platform fees will be higher. See:

Rebuttal Appendix Section A

[611]    Langer Rebuttal Merits Report, 3/26/2025, § 4.

[612]    Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics* 59(1): 105–134, at 105, 110–111. ("In situations in which a seller sets a price and transacts with a buyer through an intermediary platform (which may collect a fee or a commission from the seller), such contracts restrict the seller not to sell through any alternative platform at a lower price." See also the introduction of the model on pages 110–111.)

Schwartz Opening Merits Report, 1/27/2025, § 7.2.1.

[613]    Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics* 59(1): 105–134, at 111. ("However, the seller may also face a constraint imposed by the presence of one or more PMFN agreements. Therefore, this implied demand function varies with the PMFN regime.")

Schwartz Opening Merits Report, 1/27/2025, ¶¶ 306–307.

[614]    Schwartz Opening Merits Report, 1/27/2025, ¶¶ 304–305.

Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics* 59(1): 105–134, at 123, 133–134. ("We present in Appendix D the expressions for the relevant optimal pricing rules, implied demand functions, and equilibrium fees for the asymmetric case.")

---

### 8.2.2.  The PCM correctly shows that the impact of Valve's PMFN Policy is to increase platform fees irrespective of its market share, costs, or platform fee

(282)   Dr. Langer claims the PCM predicts harm when applied to any dataset and that the predictions are driven by assumptions.[615]  This criticism draws from her Standard #4, which states that "[a] model's predictions should be determined by data rather than its assumptions."[616]  Dr. Langer's application and explanation of this idea is deeply flawed.

(283)   All models have assumptions.  A regression model, which I assume even Dr. Langer would agree is a data-driven model, requires making assumptions about the real world that are typically not possible to verify with *certainty*.  For example, to interpret a regression as the expected value of the dependent variable conditional on the independent variables requires the assumption that the expectation of the unobserved error conditional on observed independent variables is zero.[617]  This assumption is often not verifiable and, without it, the result does not hold.  This does not mean the result is "by assumption" or that the model is unacceptable.   However, users of regression models must consider how accurate that assumption is likely to be.  In this way, it is impractical for a model's results *not* to be *dependent* on at least some of its assumptions.  This dependence, however, does not mean the results are *determined* by the assumption.

(284)   A key step in the correct use of a model is ensuring the model's assumptions fit the case at hand.  This almost always requires a degree of qualitative assessment, but that assessment can and should rely on evidence and data.[618]  That is exactly what I have done in this case.  I rely on case-specific evidence to show that Valve's PMFN Policy exists and is enforced.[619]  I rely on case-specific evidence to show that showrooming is not a significant concern and does not

---

[615]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 109.

Dr. Gowrisankaran makes a similar claim in his rebuttal.  See:

Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 292.

[616]   Langer Rebuttal Merits Report, 3/26/2025, § 4.

[617]   Wooldridge, Jeffery (2013), *Introductory Econometrics: A Modern Approach*, 5th ed, Canada: South-Western Cengage Learning, at 25.

[618]   In a regression model, for example, practitioners must determine if any omitted variables are biasing the result.  See:

Wooldridge, Jeffery (2013), *Introductory Econometrics: A Modern Approach*, 5th ed, Canada: South-Western Cengage Learning, at 88–93.

[619]   See, for example: Schwartz Opening Merits Report, 1/27/2025, § 5.

---

warrant inclusion in the model.[620] Data and evidence inform my model selection and support my assertion that the assumptions fit the facts of the case.

(285)    Dr. Langer also asserts, from her Standard #4, that "[i]f the model makes the same prediction no matter what data it analyzes, then this is evidence that the model's predictions are being driven by its assumptions rather than the data."[621] This is, at its core, untrue or at least misleading. The Pythagorean theorem, for example, is a "well-known geometric theorem that the sum of the squares on the legs of a right triangle is equal to the square on the hypotenuse (the side opposite the right angle)—or, in familiar algebraic notation, $a^2 + b^2 = c^2$."[622] For any side length, or data, this relationship holds so long as the assumption that the values correspond to the side lengths of a right triangle are met. It is both informative and valid for this model to show that, in all cases meeting the assumption, a particular relationship holds.

(286)    While the Pythagorean theorem provides a comparatively tractable example, the economics literature provides additional examples. Nobel Prize winning-economist Kenneth Arrow showed that "under general criteria it is impossible to justly combine individual preferences into a common choice."[623] Within the bounds defined by the model, Arrow's impossibility theorem provides a definitive answer that preferences cannot be combined under the model's assumptions. That does not mean Arrow is assuming his answer or that there is no way outside the scope of his model to justly combine individual preferences into a common choice. Nobel Prize-winning economist Amartya Sen, for example, considers cases outside the bounds of Arrow's theorem for making collective decisions.[624] Despite Sen's work, Arrow's theorem provides real and useful information. For cases within the boundaries of the model, preferences cannot be justly combined.

---

[620]    Schwartz Opening Merits Report, 1/27/2025, ¶¶ 344–348.

[621]    Langer Rebuttal Merits Report, 3/26/2025, § 4.

[622]    Britannica, Pythagorean Theorem, https://www.britannica.com/science/Pythagorean-theorem (accessed 4/3/2025).

[623]    The Nobel Prize, Kenneth J. Arrow, https://www.nobelprize.org/prizes/economic-sciences/1972/arrow/facts/ (accessed 4/2/2025).

[624]    Nobel prize winning economist Amartya Sen has, for example, considered cardinal welfare with partial to full interpersonal comparability as a means of decision aggregation outside the assumptions of Arrow's Theorem. See:

Sen, Amartya (2017), *Collective Choice and Social Welfare*, Expanded Edition, Cambridge, MA: Harvard University Press, at 153–157.

The Nobel Prize, Amartya Sen, https://www.nobelprize.org/prizes/economic-sciences/1998/sen/facts/ (accessed 4/2/2025).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(287)  Similarly, the PCM provides a definitive, or near definitive, finding that within the bounds of the model, the PCM harms publishers.  Dr. Langer objects to this result, and by extension results like that of Arrow's, stating that a reliable model would sometimes show no harm.[625] Dr. Langer tests 100 sets of calibration inputs for the PCM and all of them show harm to publishers. [626]  This is not a flaw in the model.  Rather, Dr. Langer has done additional analysis to demonstrate the robustness of the conclusion that PMFNs harm publishers. [627]  For all calibration values she tested; publishers are harmed.

(288)  Dr. Langer interprets her results incorrectly.  Her discussion, in fact, illustrates the error in her analysis.  She poses (and answers) the wrong question: "[d]oes Dr. Schwartz's PCM predict harm when applied to any dataset, regardless of whether that data is subject to a PMFN?  The answer is yes."[628]  Dr. Langer's claim that she applied data sets without a PMFN in place to the PCM is incorrect.[629]  She made a clear error in her analysis.  While she generates the 100 data sets randomly, she plugs the inputs generated into the variables *corresponding to the scenario where a PMFN is enforced*.  In this scenario, prices are restricted across platforms by the PMFN Policy and so lifting that restriction on price competition, unsurprisingly, lowers platform fees and benefits publishers in every case.  What Dr. Langer has actually shown is that *if a PMFN exists and is enforced*, it harms publishers *even* with different market shares, platform fees, or cost inputs of the PCM.  That only supports my opinions.

(289)  If Dr. Langer intended for these randomly generated calibration values to correspond to scenarios where a PMFN does not exist, she erred badly.  They cannot be used in the PCM in this way.  That is why, prior to using the PCM, I determined that Valve has and enforces a PMFN Policy.[630]  Her error seemingly stems from her misguided view that the PCM should be able to distinguish between scenarios where its assumptions fit and those where it does not; that is, where there is a PMFN and where there is not.  That is not what the model is designed to do.  Moreover, the data she generated is observationally equivalent to a scenario where a PMFN is enforced.  In it, Steam has a higher market share, higher costs, and, most

---

[625]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 112.  ("Even accepting the premise of equal pricing, a reliable model would sometimes show no harm.")

[626]  Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 110–116.

[627]  Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 110–116.

[628]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 110.

[629]  Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 110–116.

[630]  Schwartz Opening Merits Report, 1/27/2025, §§ 5.1.2, 5.2, and 5.3.

---

Rebuttal Merits Expert Report of Steven Schwartz, Ph.D.                                                      Page 161

importantly, there is price parity across the two platforms.[631]  As I have explained above, the onus of showing a model's assumptions fit a particular scenario falls on the user of the model. Dr. Langer ignores this crucial step and, as with other elements of her analysis, she thus misinterprets her own results.

(290)  Dr. Langer makes this same error again, stating that she analyzes a "dataset specific to a setting without the challenged conduct[.]"[632]  She uses the market shares, costs, and prices from the no-PMFN scenario I presented in Table 4 of my Opening Merits Report.[633]  However, she then plugs this data *into the model parameters corresponding to the scenario with a PMFN in place*.[634]  Once she does that, she is assuming a PMFN is, in fact, in place in these scenarios. In other words, to plug the no-PMFN results back into the assumed PMFN scenario, Dr. Langer would have to force price parity across the platforms, inconsistent with the no-PMFN results. Assuming she understood what she was doing—and I have no doubt she did—rather than being upfront about having to alter the no-PMFN results to fit the assumptions of the PMFN scenario in the model, Dr. Langer instead relies on a misleading characterization of her analysis that attempts to undermine the credibility of the PCM.  Thus, she undermines her own credibility while demonstrating the PCM's reliability.

### 8.2.3.  I do not claim that PMFN policies can never have procompetitive effects

(291)  In every set of calibration inputs Dr. Langer tested for the PCM and in all calibration inputs that I have considered, publishers are harmed by the PMFN Policy.  This result shows that unless an alternative mechanism is put forth that both causes a PMFN to benefit publishers and applies to this case, Valve's PMFN Policy harms publishers.[635]  Dr. Langer does not put forward an alternative theoretical model examining the challenged conduct.[636]  Dr. Langer does

---

[631]    Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 113–114.

[632]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 117.

[633]    Schwartz Opening Merits Report, 1/27/2025, Table 4.

Langer Rebuttal Merits Report, 3/26/2025, ¶ 117.

[634]    Dr. Langer even notes that she needs to average the two prices because she is plugging them into the PMFN scenario where a PMFN is enforced, and prices are equal.  This should have been an indication to her that she was making a mistake.

Langer Rebuttal Merits Report, 3/26/2025, fn. 211.

[635]    Note that even if a mechanism was put forth that caused PMFNs to benefit publishers and it did apply to Valve, this is a necessary but insufficient condition for a PMFN to have a net positive social benefit.  It would need to additionally be the case that this positive impact outweighs the direct negative impact I have identified in the PCM.  A lack of such a mechanism is a sufficient condition to show harm to publishers.

[636]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 85.

mention some potential theories for how a PMFN could be procompetitive.[637]  These theories can be addressed with case specific evidence and facts.  As I explain below, they do not apply to Valve's PMFN Policy and so do not need to be addressed within the PCM.

**Showrooming is not a significant threat to Steam**

(292)  I discussed why showrooming is not a significant threat to Steam in my Opening Class Certification Report as well as my Opening and Response Merits Reports.[638]  Dr. Langer ignores the evidence I presented and asserts, incorrectly, that the PCM must include showrooming.[639]  She also suggests that the PCM should allow platforms to invest in their quality because showrooming could threaten these investments.[640]  Showrooming is not a significant concern in this case and so would only serve to needlessly complicate the PCM while adding no analytical robustness.

(293)  I discuss showrooming extensively in my Response Merits Report.[641]  Briefly, the report discusses how the literature cited by Dr. Gowrisankaran in his opening report emphasizes the harms of PMFN policies.[642]  Baker and Scott Morton (2018), for example, state that "[w]hile the balance between harms and efficiencies may vary across markets, we are skeptical that this justification will routinely prevail."[643]  Dr. Gowrisankaran does not actually put forth an affirmative opinion that Valve's PMFN Policy exists, and so cannot claim it is procompetitive.  Rather, he only discusses these benefits as hypotheticals.[644]  Steam's marketing features do not justify a PMFN Policy because these marketing features would be implemented without

---

637    Langer Rebuttal Merits Report, 3/26/2025, fn. 142.

638    Schwartz Opening Class Certification Report, 2/8/2024, § 7.5.3.

       Schwartz Opening Merits Report, 1/27/2025, § 7.2.5.

       Schwartz Response Merits Report, 3/26/2025, § 3.

639    In fairness, Dr. Langer could not have considered the evidence in my Response Merits Report as it was submitted at the same time as her Rebuttal Merits Report.  However, she ignores all other evidence I have presented.

       Langer Rebuttal Merits Report, 3/26/2025, ¶ 83.

640    Langer Rebuttal Merits Report, 3/26/2025, ¶ 83.

641    Schwartz Response Merits Report, 3/26/2025, § 3.

       Gowrisankaran Opening Report, 1/27/2025, § 4.1.

642    Schwartz Response Merits Report, 3/26/2025, § 3.1.

643    Baker, Jonathan, and Fiona Scott Morton (2018), "Antitrust Enforcement Against Platform MFNs," *Yale Law Journal,* 127(7): 2176–2202, at 2183.

644    See my discussion in:

       Schwartz Response Merits Report, 3/26/2025, § 3.2.

---

the PMFN Policy.[645]  Additionally, in a competitive but-for world, Valve's incentive to provide marketing recommendations that benefit consumers would likely increase relative to the monopoly power/PMFN case.[646] Finally, if showrooming was an issue for Valve, which it is not, Dr. Gowrisankaran and I agree it could be addressed with less restrictive measures.[647]

(294)   Dr. Gowrisankaran also discusses the theoretical procompetitive effects of a PMFN in his Rebuttal Report, but again only as a hypothetical.[648]  He claims my argument is flawed because there is a "potential" for showrooming that "could" affect Valve's investment decisions.[649] However, Dr. Gowrisankaran still provides no evidence that any of Valve's investments are economically reasonable only if there is a PMFN, and thus that showrooming is an actuality. Dr. Gowrisankaran provides no new evidence or arguments, so, the evidence and discussion in my Response Merits Report applies equally well to his Rebuttal Merits Report.

**Other procompetitive theories mentioned by Dr. Langer**

(295)   Dr. Langer also mentions academic papers that have considered the Boik and Corts model, but she is unable to put forth any economic justification to support her assertion that Valve's PMFN Policy benefits publishers.[650]

---

[645]    Schwartz Response Merits Report, 3/26/2025, § 3.3.

[646]    In a blog post related to "Steam Discovery Update 2.0[,]" Valve claims its ultimate goal is to "maximize happy customers", but Valve measures "happy customers" by how much money and time consumers are spending on Steam.   Valve recognizes that customers buy more games if they are spending more time on the platform.   Accordingly, Steam's Discovery 2.0 system is explicitly designed to maximize spending on Steam. Valve also admits that it is not necessarily "showing the right games to the right users[.]" See:

Valve, Steam Store Updates Helping Customers Find Games, undated (VALVE_ANT_0054520–24, at VALVE_ANT_0054520, VALVE_ANT_0054524).

Schwartz Response Merits Report, 3/26/2025, § 3.3.

[647]    Schwartz Response Merits Report, 3/26/2025, § 3.4.

Gowrisankaran Opening Report, 1/27/2025, ¶ 129.  ("While MFNs are one example of a protective measure, there are other measures, potentially much less formal or restrictive, that a business may use to try to incentivize behavior by its users that will protect the value of its investments.")

[648]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 294–98.

[649]    Gowrisankaran Rebuttal Merits Report, 3/26/2025, ¶¶ 297.  ("This entire line of argument is flawed.  Valve's investments to improve the value of the platform for its publishers and consumers have continued beyond the initial investments to set up the platform, as I set out in my opening report.  Therefore, the potential for free-riding is a continued threat that could reduce Valve's incentive to invest in innovation.")

[650]    Langer Rebuttal Merits Report, 3/26/2025, fn. 142.

Langer Rebuttal Merits Report, 3/26/2025, ¶ 85. ("Finally, I note that by discussing other economic models in the academic literature I am not putting forward an alternative theoretical model to Dr. Schwartz's PCM for examining the challenged conduct.")

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(296)   More specifically, Dr. Langer claims that the model in Johansen and Vergé (2017) is "more realistic" and that they find cases where a PMFN can be procompetitive.[651]  First, I note that this paper has not been published in the over seven years since it became a working paper; it has not appeared in a peer-reviewed journal.  Second, Johansen and Vergé included additional complexities to investigate situations that do not apply to the market for third-party digital PC game distribution via platforms.   In their own words, the reason they sometimes find procompetitive impacts of a PMFN is that "when the suppliers compete fiercely," "suppliers' participation constraints then become very restrictive under price parity, which prevents the platforms from increasing their commissions too much or even forces them to reduce their commissions."[652]  That is definitely not the case with Valve.

(297)   There are two reasons publishers' participation constraints could be restrictive under price parity; neither apply to this case.  One potential reason is if publishers have a lot of leverage over the platform implementing the PMFN because they have very strong outside options.  In their model, Johansen and Vergé consider the option of first-party or direct sales.[653]  As I have discussed at length, first-party distribution is not a viable option for the class of game publishers who list on Steam.[654]  The other potential reason is that competition is so fierce among publishers that, even without a PMFN in place, publishers would be making zero or near zero economic profits.  In this case, Valve would not be able to use the PMFN Policy to raise prices and extract profits from publishers since publishers would be forced out of the market with a slight increase in price.  Dr. Langer has argued extensively that publishers make positive economic profits, even with Valve's PMFN Policy.  So, she and I agree this situation does not apply to the market for third-party digital PC game distribution via platforms.

(298)   The two other papers mentioned by Dr. Langer, Mariotto and Verdier (2020) and Gerlach and Li (2021), include additional complexities that either do not change the analysis or do not

---

Langer Rebuttal Merits Report, 3/26/2025, fn. 217.  ("I do not take a stand on what the correct value for Steam's market share is.")

[651]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 84.  ("For example, Johansen and Verge (2017) modify the Boik and Corts (2016) model in several ways to make it have more realistic assumptions.")

[652]   Johansen, Bjørn Olav, and Thibaud Vergé (2017), "Platform Price Parity Clauses with Direct Sales," University of Bergen Working Paper, 1–36, at 32.

[653]   Johansen, Bjørn Olav, and Thibaud Vergé (2017), "Platform Price Parity Clauses with Direct Sales," University of Bergen Working Paper, 1–36, at 1.

[654]   Schwartz Opening Merits Report, 1/27/2025, § 4.1.3.

Section 3.3.1.

apply to the market for third-party digital PC game distribution via platforms.[655]  In both papers, for example, there are fees charged directly to consumers to access the platforms, which is not the case with Steam or its competitors.[656]  Mariotto and Verdier (2020) also features only a single platform, making it impossible to infer the impact of platform competition.[657]  Even accepting that the modeling choices of each of these papers apply to Steam's situation, which I do not, each paper's results require a specific model parameter to lie within a narrow interval for the PMFN Policy to be procompetitive.[658]  Again, Dr. Langer provides no evidence that this would be the case for Steam.

(299)    In all three papers, publishers delisting from the main platform is a viable option for sellers. The ability to successfully delist gives the publishers leverage over the platform and lessens the impact of the PMFN, contributing to the procompetitive results in all three papers. Johansen and Vergé clearly state that if the supplier must list on the platforms, then PMFNs

---

[655]    Langer Rebuttal Merits Report, 3/26/2025, fn. 142.

Mariotto, Carlotta, and Marianne Verdier (2020), "Platform–Merchant Competition for Sales Services," *Journal of Economics & Management Strategy* 29(4): 834–853.

Gerlach, Heiko, and Junqian Li (2021), "Platform Competition, Vertical Differentiation, and Price Coherence," *Journal of Law and Economics* 64(3): 439-477.

[656]    Gerlach and Li note that without consumer fees, the high-quality platform would end up with "monopoly power and lead to higher fees and prices."

Gerlach, Heiko, and Junqian Li (2021), "Platform Competition, Vertical Differentiation, and Price Coherence," *Journal of Law and Economics* 64(3): 439-477, at 442. ("Price coherence would then imply that all consumers pick the high-quality platform, as the merchant charges the same price independent of which platform is used. Hence, price coherence would give the high-quality platform monopoly power and lead to higher fees and prices.")

Mariotto and Verdier (2020) find that a fee will always be charged to consumers in their model.

Mariotto, Carlotta, and Marianne Verdier (2020), "Platform–Merchant Competition for Sales Services," *Journal of Economics & Management Strategy* 29(4): 834–853, at 844.

[657]    Mariotto, Carlotta, and Marianne Verdier (2020), "Platform–Merchant Competition for Sales Services," *Journal of Economics & Management Strategy* 29(4): 834–853, at 834. ("In this paper, we study whether a monopolistic platform prefers to impose price parity on sellers when the latter may sell directly to consumers.")

[658]    The procompetitive result in Johansen and Vergé (2017) relies on the degree of substitutability between the different goods.  See Corallary 1:

Johansen, Bjørn Olav, and Thibaud Vergé (2017), "Platform Price Parity Clauses with Direct Sales," University of Bergen Working Paper, 1–36, at 21.

Mariotto and Verdier's (2020) results rely on a number of parameters, such as the level of heterogeneity of consumers, the level of heterogeneity of sellers, and the marginal cost of the platform.  See their discussion in Section 7:

Mariotto, Carlotta, and Marianne Verdier (2020), "Platform–Merchant Competition for Sales Services," *Journal of Economics & Management Strategy* 29(4): 834–853, at 849–580.

The results in Gerlach and Li (2021) rely on the marginal cost of the high-cost platform.  See Proposition 4:

Gerlach, Heiko, and Junqian Li (2021), "Platform Competition, Vertical Differentiation, and Price Coherence," *Journal of Law and Economics* 64(3): 439-477, at 458.

---

increase platform fees.[659]   As I have stated throughout my reports, Steam is a critical distribution channel, and delisting from Steam is not a viable option for most publishers.[660] While I allow the publisher to delist from Steam in my PCM model, the demand for the publisher drops if they choose not to list on Steam, reflecting the reality of the market.   In my numeric analysis, this drop in demand means delisting from Steam is not a viable option for the publisher.   Thus, the potential procompetitive scenarios in this paper do not apply to the market for third-party digital PC game distribution via platforms.

## 8.3.   Dr. Langer sets the unreasonable standard that a model perfectly reflects the real world

(300)   Dr. Langer stated in her class certification report that "models must be simpler than the real world" and argued only that a model must capture an industry's main characteristics and the decisions that affect economic outcomes. [661]  Here, she changes her opinion and raises the bar to an unreasonable level.[662]  She presents differences between the PCM and the real world as *prima facie* criticisms of the PCM.  She does not perform the necessary and critical additional step of explaining how the characteristics she identifies would change the relevant economic outcomes of the PCM model.[663]  In several cases, I have done the necessary work for her and show that Dr. Langer's criticisms are irrelevant to this case.  These unsubstantiated criticisms of the PCM demonstrate that only a model that matched the real world perfectly would be above her critique, an unreasonable economic and legal standard.[664]  Dr. Langer puts forth no alternative model to show how Valve's PMFN Policy could benefit publishers.[665]  Moreover,

---

[659]   Johansen, Bjørn Olav, and Thibaud Vergé (2017), "Platform Price Parity Clauses with Direct Sales," University of Bergen Working Paper, 1–36, at 14. ("Therefore, if the suppliers' participation on both platforms is taken for granted, wide price parity clauses appear to allow platforms to increase their commissions substantially, in line with the results derived by Boik and Corts (2016) in the case of a monopolistic supplier and by Johnson (2015) in the case of multiple platforms and multiple suppliers.  It is also fully consistent with the theory of harm that has been developed by several competition authorities in recent cases.")

[660]   Section 3.3.1.

[661]   Langer Class Certification Report, 5/17/2024, ¶ 16.  ("Inherently, models must be simpler than the real world, but a reliable model must capture the main characteristics of the industry and the decisions that affect economic outcomes.")

[662]   Langer Rebuttal Merits Report, 3/26/2025, § 5.1.

[663]   Langer Class Certification Report, 5/17/2024, ¶ 16.  ("Inherently, models must be simpler than the real world, but a reliable model must capture the main characteristics of the industry and the decisions that affect economic outcomes.")

[664]   Langer Class Certification Report, 5/17/2024, ¶ 16.  ("Inherently, models must be simpler than the real world, but a reliable model must capture the main characteristics of the industry and the decisions that affect economic outcomes.")

[665]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 85.  ("Finally, I note that by discussing other economic models in the academic literature I am not putting forward an alternative theoretical model to Dr. Schwartz's PCM for examining the challenged conduct.")

---

several of her analyses have critical errors and attempt to use the PCM in incorrect ways or in settings where the assumptions do not hold (as discussed in Section 8.2.2 above).

### 8.3.1.   Using a single publisher, a single game, and two platforms does not drive the result

(301)   As a general practice in economics, it is common and often a reasonable assumption to restrict a model to a limited number of representative agents, *e.g.*, firms or consumers.   See, for instance, Lucas (1972) and Kydland and Prescott (1982) in the macroeconomics literature, and Dixit and Stiglitz (1977) in the industrial organization literature.[666]   In the literature concerning the use of PMFNs, Boik and Corts is not the only paper making such simplifying assumptions.   For example, Johnson (2017), Gans (2012), and Schlütter (2024) all consider models with representative firms or consumers.[667]

(302)   Dr. Langer claims that the "PCM fails to capture important features of the video game industry" because "for example, [] there is only one publisher, only one game, [and] only two platforms[.]"[668]   Dr. Langer provides no evidence or affirmative opinion as to why, even theoretically, including more platforms would change the conclusion that Valve's PMFN Policy harms publishers.   She does reference the Johansen and Vergé (2017) paper which allows for multiple publishers and first-party distribution in addition to two platforms.[669]   By allowing more publishers, this can also be thought of as allowing more games.   While this paper does find some cases where a PMFN is procompetitive, as I discussed above in Section 8.2.3, the evidence shows that these cases do not apply to Steam.   Without a new theory for why this simplification changes the effect of the PMFN Policy on publishers, her argument is reduced to a trivial pedagogical dispute that is irrelevant here.

---

[666]   Lucas Jr, Robert E. (1972), "Expectations and the Neutrality of Money," *Journal of Economic Theory* 4(2): 103–124.

Kydland, Finn E., and Edward C. Prescott (1982), "Time to Build and Aggregate Fluctuations," *Econometrica* 50(6): 1345–1370.

Dixit, Avinash K., and Joseph E. Stiglitz (1977), "Monopolistic Competition and Optimum Product Diversity," *The American Economic Review* 67(3): 297–308.

[667]   Johnson, Justin P. (2017), "The Agency Model and MFN Clauses," *Review of Economic Studies* 84(3): 1151–1185.

Gans, Joshua S. (2012), "Mobile Application Pricing," *Information Economics and Policy* 24(1): 52–59.

Schlütter, Frank (2024), "Managing Seller Conduct in Online Marketplaces and Platform Most-Favored Nation Clauses," *Journal of Industrial Economics* 72(3): 1139–1194.

[668]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 72.

[669]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 84.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(303)   Furthermore, Valve has a standard pricing structure on Steam that applies equally to virtually all games and publishers.  Thus, using aggregate demand for a representative publisher with a representative game—rather than attempt to model every game and publisher individually—is, as a matter of economics, an appropriate way to find the overall fees set for games.

### 8.3.2.   Differences in quality and network effects are accounted for in the PCM

(304)   Dr. Langer states that the PCM has "no competition over non-price features (*e.g.*, quality)."[670] Again, Dr. Langer is wrong.  As I have explained extensively in previous reports that Dr. Langer has presumably reviewed, the $x$ term in the PCM gives Steam a demand advantage over the rival platform.[671]  This demand advantage encapsulates the relevant impact, *i.e.*, more sales, of *any* Steam advantage, whatever the source(s),  be they quality, network effects, or any other advantage leading to higher demand.   Platforms can differ in a variety of ways; those differences are only relevant to the impact of the PMFN if they impact consumer behavior in a meaningful way.  Rather than needlessly measuring the impact of every feature and potential platform difference, I determine the extent to which platform differences *collectively* impact consumer demand, which is the more relevant economic issue for purposes of addressing the issues here.   If Steam has more attractive platform features overall, Valve will see more demand overall, even at equal prices to rival platforms.  This is all captured in the PCM by Steam's demand advantage.

(305)   Dr. Langer also discusses platform quality in the context of Valve's investments in quality and the concept of showrooming.[672]  As I discussed above in Section 8.2.3 and in previous reports, showrooming is not a significant issue for Steam and, by extension, in this case.[673]  Thus the

---

[670]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 72.

See also:

Langer Rebuttal Merits Report, 3/26/2025, ¶ 75. ("Dr. Schwartz assumes that platforms compete for publishers based only on revenue share; in reality, platforms compete for publishers on a variety of dimensions, including the quality of their platform[.])

[671]   See, for example:

Schwartz Opening Merits Report, 1/27/2025, ¶ 305.

Schwartz Opening Class Certification Report, 2/8/2024, ¶ 253.

Schwartz Reply Class Certification Report, 7/12/2024, ¶¶ 123–124.

[672]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 73.  ("Dr. Schwartz could have considered how his model changes when platforms can invest in quality, and how rival platforms can free-ride on this investment.")

[673]   Schwartz Opening Class Certification Report, 2/8/2024, § 7.5.3.

---