# EXHIBIT 1 & 11
## Report Part 3
## (Dkt No. 450.01 & 454.11)

# REDACTED

PCM captures differences in quality through the demand advantage variable, but does not incorporate free-riding concerns as they are not relevant.

(306)   The PCM also incorporates Steam's demand advantage associated with network effects. While Dr. Langer claims that the PCM "does not include network effects because it does not allow for users' and publishers' preference for a platform to change based on the popularity of the platform[,]"[674] she is wrong. The advantage the Steam platform has gained from its network of consumers and publishers and the corresponding network effects are reflected in the PCM's demand advantage parameter.

(307)   The PCM accounts for network effects in a conservative way, that is, in a manner that is advantageous to Valve. I address this issue in my Opening Merits Report[675] and in my Reply Class Certification Report.[676] Network effects are accounted for in the demand disadvantage the competing platform faces relative to Steam in the PCM. Furthermore, altering the PCM to adjust the demand disadvantage in the but-for world would only show additional harm. As Steam's market share shrinks in the but-for world, the advantage they have gained from network effects would shrink, leading them to lose more sales to competitors. This result also applies to the fact that Steam's relative quality advantage over other platforms would also likely be eroded (but not eliminated) over time as competitors increase in quality absent the PMFN Policy.

(308)   Dr. Langer is not satisfied with this analysis, stating that "Dr. Schwartz's analysis in Figure 11 of his Merits Report does not fully capture network effects either. Network effect [sic] determine not only how total consumer demand is distributed across competitor platforms but also the size of this demand. However, because Dr. Schwartz assumes that total demand remains the same throughout his analysis, this is uninformative about the way network effects affect demand in the industry."[677] This is, once again, incorrect. Total demand would not shrink absent the PMFN Policy; in fact, it would increase. Holding total demand constant is a conservative measure since increasing total demand when the PMFN Policy is removed would only increase the harm suffered by publishers.

---

Schwartz Opening Merits Report, 1/27/2025, § 7.2.5.

Schwartz Response Merits Report, 3/26/2025, § 3.

[674]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 75.

[675]   Schwartz Opening Merits Report, 1/27/2025, ¶¶ 335–357.

[676]   Schwartz Reply Class Certification Report, 7/12/2024, § 6.2.3.

[677]   Langer Rebuttal Merits Report, 3/26/2025, fn. 116.

---

Rebuttal Merits Expert Report of Steven Schwartz, Ph.D.

(309)    First, any reduction in total quantity demanded from Steam's lower network effects would be minimal. The main mechanism for network effects on a third-party PC video game platform comes from having enough consumers to attract a large number of publishers and vice versa. At the ███ market share in the no-PMFN PCM scenario or the ███ market share used in my damages analysis, Steam's market share is consistent with a sustainable number of publishers and consumers.[678] Second, while the impact of network effects on total demand would be minimal, other effects which act to increase quantity demanded in the but-for world are not minimal. This is because platform fees and consumer prices would be lower absent the PMFN Policy, increasing quantity demanded. In addition, the increase in platform competition would lead to more innovation and an increase in platform quality.[679] Platform variety and choice would increase as well.[680] Having a variety of platforms that better fit consumers' (idiosyncratic) preferences means the average quality of the match between consumers and their platform will increase.[681]

## 8.4. Dr. Langer's criticisms of the PCM predictions are misguided

### 8.4.1. High marginal costs are a result of a reasonable simplification

(310)    In her rebuttal to my Class Certification Report, Dr. Langer critiques the numeric analysis of the PCM for having high publisher costs.[682] She repeats the same failed argument here.[683] First, as I explained in my Reply Class Certification Report,[684] this is only a critique of the numeric analysis. While the numeric analysis demonstrates the harm to publishers numerically, the fact of harm is established by the evidence presented in Section 7.2 of my Opening Merits Report.[685] Second, my assumption that publishers face constant average and

---

[678]    Schwartz Supplemental Opening Merits Report, 3/7/2025, ¶ 20, Table 4.

Schwartz Opening Merits Report, 1/27/2025, ¶ 440.

[679]    Schwartz Opening Merits Report, 1/27/2025, 6.3.

Schwartz Response Merits Report, 3/26/2025, § 3.3.

[680]    Schwartz Opening Merits Report, 1/27/2025, 6.3.

[681]    Removing the PMFN Policy would also increase PC game variety and choice. Increasing the quality of the match between gamers and games delivered on third party PC platforms would similarly increase the overall quantity of demand.

[682]    Langer Class Certification Report, 5/17/2024, ¶ 164.

[683]    Langer Rebuttal Merits Report, 3/26/2025, § 5.2.1.

[684]    Schwartz Reply Class Certification Report, 7/12/2024, 7/12/2024, ¶ 154.

[685]    Schwartz Opening Merits Report, 1/27/2025, §§ 7.2.1–7.2.3.

marginal costs is a reasonable simplifying assumption that does not drive the result.[686]  In light of this assumption, the high economic costs reflect competition and implicitly the fixed costs in video game publishing.  Dr. Langer provides no explanation or affirmative opinion as to why changing this assumption would change my conclusion that the PMFN Policy caused harm to publishers and I have not seen any evidentiary or theoretical reason to believe that to be the case.  It would, however, increase the complexity of the model.  While Dr. Langer may believe that complexity for the sake of complexity is a good thing, additional complexity is only worthwhile if it adds a richness to the model that changes the conclusions, which as discussed, would not be the case here.

### 8.4.2.  Dr. Langer incorrectly applies the PCM to individual publishers and to accounting profits

(311)  The PCM shows the dynamics of the impact a PMFN has on publisher fees.  It is not meant to predict accounting profits or differentiate successful from unsuccessful publishers, a question that is irrelevant to the case.  Dr. Langer's exercise of plugging in values for specific firms and testing if the value of economic profits from the PCM matches the firm's accounting profits in the real-world is, in my view, nonsense.  Because the PCM is meant to show the incremental impact of a PMFN, I use a representative publisher.  While some publishers earn large accounting profits and stay in the industry and others realize losses and exit, none of this precludes the market average economic profits from being zero.  While the zero-profit result follows from the economics of the model, I show below that adjusting the model to allow for significant positive profits does not change my conclusion.

(312)  An equilibrium outcome with zero economic profits on average, as the model predicts, is completely consistent with economic theory.[687]  Because profits cannot be known by a publisher beforehand, average economic profits being zero is reflective both of games that have high profits and games that have losses leading to publishers exiting the market.  Dr. Langer

---

[686]  Note that Boik and Corts also assume platforms and the seller—in this case, a representative publisher—all have constant marginal costs.

Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics* 59(1): 105–134, at 110.

[687]  Zero economic profits, at least in the long-run equilibrium, is a standard result in economics. See:

Mankiw, N. Gregory (2018), *Principles of Economics*, 8th ed., Boston, MA: Cengage Learning, at 280. ("If firms already in the market are profitable, then new firms will have an incentive to enter the market.  This entry will expand the number of firms, increase the quantity of the good supplied, and drive down prices and profits.  Conversely, if firms in the market are making losses, then some existing firms will exit the market.  Their exit will reduce the number of firms, decrease the quantity of the good supplied, and drive up prices and profits.  *At the end of this process of entry and exit, firms that remain in the market must be making zero economic profit*.")  (Emphasis in original.)

focuses on four large publishers, who have been in and continue to operate in the market, without taking full account of publishers who have exited the market. Thus, zero economic profits on average is neither unusual nor unexpected, and Dr. Langer is wrong in characterizing it as such. Perhaps more important is the fact that a model designed to differentiate between successful and unsuccessful game publishers would look completely different from the PCM. Some publishers are successful and better off, some are unsuccessful and worse off. All publishers are harmed by increased platform fees.

(313) Dr. Langer claims, "[t]housands of publishers choose to operate on Steam, and this would not be the case if they lost money selling games on Steam (i.e., negative profits from selling their games on Steam)."[688] As I have explained before, delisting from Steam is not a viable strategy for most publishers. Because publishers cannot operate without listing on Steam, Steam has an enormous amount of power over those publishers. The relevant condition, then, is not that publishers would exit Steam if they earned negative economic profits on Steam, as Dr. Langer asserts, because leaving Steam would force the publisher to exit the industry entirely and sacrifice their profits on other platforms. Thus, the relevant consideration for publishers is staying in the market, including listing on Steam, or exiting. This means that publishers will continue to list on both platforms so long as *their* overall economic profits are at or above zero. Economic theory does not require a seller to earn at least zero economic profit on every distribution outlet through which it sells; the theory does require the seller to earn at least zero economic profit across all the distribution outlets on which it operates. The case evidence indicates the publishers in the class cannot, in the current market, viably delist from Steam.[689]

(314) The available data here do not permit me to know the average economic profits for publishers in the industry and, thus, a reasonable assumption is needed; the assumption I made is both reasonable and, moreover, standard in economic modeling.[690] In the model, there is one publisher and perfect information, so Steam sets one fee to perfectly capture all the publisher's surplus when a PMFN is in place. This reflects the power the PMFN Policy gives to Steam. In

---

[688] Langer Rebuttal Merits Report, 3/26/2025, ¶ 95.

[689] In my numeric analysis, a publisher has the option to delist from Steam, yet it chooses not to in equilibrium. This indicates that delisting from Steam earns lower profits than selling on both platforms.

[690] The assumption is simply that a publisher will make choices to maximize its payoff coupled with normalizing the payoff of the outside option to zero. The assumption of payoff maximization is standard in game theory. Additionally, setting the profit of the outside option to zero follows from the opportunity cost being defined as the profits or benefit of the next best alternative, which is the outside option. See:

Fudenberg, Drew, and Jean Tirole (1991), *Game Theory*, Cambridge, MA: MIT Press, at 4. ("[E]ach player's objective is to maximize his own payoff function[.]")

Mankiw, N. Gregory (2018), *Principles of Economics*, 8th ed., Boston, MA: Cengage Learning, at 6.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

reality, there are multiple publishers, but Steam sets only one price (or one price for each of the three pricing tiers which each apply to many publishers within each tier). Considering multiple publishers or determining the exact economic profits in the real world would needlessly complicate the PCM and would not change the conclusion, namely that the PMFN Policy harms all publishers, regardless of whether they have positive economic profits or not.

(315)   To demonstrate the irrelevance of this criticism, I can assume the publishers have a better outside option. In the example in Table 4 below, I assume that publishers have an outside option earning them over ▮▮▮▮▮▮ in economic profits.[691] That is, publishers must earn ▮▮▮▮▮▮ or else they would exit the market. Even in this case, publishers are still harmed by the PMFN Policy. This result shows that Dr. Langer has, time and time again, made criticisms without confirming if those criticisms have any merit or bearing on the case.

---

[691]   Note that this number was chosen only as an example. The ▮▮▮▮ in combined publisher profits corresponds to publishers earning, as profits, ▮ of entire market's third-party transaction value of ▮▮▮▮ over the damages period. The choice of specifically ▮ is not significant. See:

13_PCM_corner_solution_positive_profits.R

Schwartz Supplemental Opening Merits Report, 3/7/2025, Attachment E-1.

---

Rebuttal Merits Expert Report of Steven Schwartz, Ph.D.                                                                 Page 174

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Table 4: PCM Numeric Analysis With Positive Publisher Profits**[692]

| Metric | With PMFN | | Without PMFN | |
|---|---|---|---|---|
| | Steam | EGS | Steam | EGS |
| Fee | | | | |
| Fee % | | | | |
| Price | | | | |
| Quantity (units, millions) | | | | |
| Share | | | | |
| Platform economic profits (millions) | | | | |
| Seller economic profits (millions) | | | | |
| Seller profits per unit | | | | |
| Weighted price across all games | | | | |
| Weighted fee across all games | | | | |
| Weighted commission rate across all games | | | | |

## 8.5.    Dr. Langer's discussion of precision with respect to the PCM is misguided

(316)    Dr. Langer's "Standard #5" states a model should provide means by which its precision can be evaluated. While I agree it is important to consider the accuracy and precision of a model, Dr. Langer's discussion of this principle amounts to a requirement that analyses have "standard errors and with the corresponding confidence intervals[.]"[693] In other words, a model is inappropriate if it is not a statistical model. This is simply wrong. This standard, as applied by Dr. Langer to the PCM, ignores her own analysis, misrepresents how precision works in statistical models, and inappropriately and unreasonably restricts the set of potentially acceptable analyses.

---

[692]    13_PCM_corner_solution_positive_profits.R

[693]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 65.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(317)    By Dr. Langer's own analysis, the PCM finds harm to publishers for any calibration inputs used. Thus, there is no level of uncertainty within the confines of the model, making a standard error useless for the purpose of establishing harm. Dr. Langer's discussion also misrepresents how one should properly consider precision in a statistical hypothesis test. While a standard error or confidence interval gives a specific quantification with which to gauge the precision of a model, that quantification only considers uncertainty within the confines of the model's assumptions. As I explained in Section 8.2, a regression is only valid, and by extension its standard errors only communicate precision, if the model's assumptions hold. If, for example, there is an omitted variable, which a regression model assumes there is not, the standard error will not correspond to the accuracy of the prediction.[694] Using that model will invariably lead to less precise answers than the standard error indicates and may even consistently produce incorrect results despite low standard errors.[695] As such, it is important to have a qualitative understanding of how well the model's assumptions fit reality and view standard errors within that broader context of uncertainty and precision, taking into consideration uncertainty around the model's assumptions. In the case of the PCM, there is no need for standard errors since the conclusion of harm holds for all calibration inputs that are appropriate for this market. Rather, the precision is determined by examining how well critical assumptions apply to the model, as is always the case in models, with or without standard errors.

(318)    In this case, the key assumptions are that showrooming is not a concern and that publishers do not have strong outside options compared to listing on Steam. I have shown to a high degree of certainty that these assumptions are appropriate because they reflect the reality of the market and Steam.[696]

---

[694]    Wooldridge, Jeffery (2013), *Introductory Econometrics: A Modern Approach*, 5th ed, Canada: South-Western Cengage Learning, at 88–93.

[695]    Wooldridge, Jeffery (2013), *Introductory Econometrics: A Modern Approach*, 5th ed, Canada: South-Western Cengage Learning, at 88–93.

[696]    Section 8.2.3.

Schwartz Opening Class Certification Report, 2/8/2024, § 7.5.3.

Schwartz Opening Merits Report, 1/27/2025, § 7.2.5.

Schwartz Response Merits Report, 3/26/2025, § 3.

## 8.6.    Academic literature shows that PMFN policies harm competition

(319)    The academic literature predominantly identifies anticompetitive effects from PMFN clauses. Review articles, such as Baker and Scott Morton (2018), Ezrachi (2015), and Tirole (2023), emphasize that PMFNs likely reduce price competition, raise commission fees, and deter entry.[697]  Similar to the Boik and Corts model, theoretical models often show harm from a PMFN.  For example, Johnson (2017) shows that PMFNs raise retail prices under an agency model (such as the one employed by Steam), specifically stating that "retail price-parity restrictions in the form of retail MFN contracts tend to raise industry prices" because they "kill a retailer's incentives to compete in the terms of trade that it offers suppliers."[698]  Schlütter (2024) extends this analysis to multi-seller competition, showing that PMFNs can facilitate tacit seller collusion, further weakening competition and harming social welfare.[699]

(320)    Papers suggesting potential procompetitive outcomes typically do so only under narrow conditions or in specific market structures that are not representative of platforms like Steam. For example, Gans (2012) shows that PMFNs may help platforms overcome holdout problems when consumers must commit to a platform before observing product prices, which is not the case for Steam.[700]  Wang and Wright (2023) demonstrate that PMFNs may incentivize platform investment by mitigating showrooming, though they caution that this comes at the cost of

---

[697]    Baker, Jonathan, and Fiona Scott Morton (2018), "Antitrust Enforcement Against Platform MFNs," *Yale Law Journal* 127(7): 2176–2202, at 2178. ("We conclude that platform MFNs generally harm competition, except in narrow circumstances in which freeriding concerns are especially strong.")

Ezrachi, Ariel (2015), "The Competitive Effects of Parity Clauses on Online Commerce," *European Competition Journal* 11(2–3): 488–519, at 506. ("Overall, the discussion of wide MFNs reveals a large degree of consensus as to the possible harmful effects they generate, and has led competition agencies to condemn such practices.  It is worth noting that such condemnation was not the result of an assumed illegality, but has been the result of case-by-case analysis, which took into account the market and contract characteristics, and subsequently appraised the likely effect on competition and consumer welfare.")

Tirole, Jean (2023), "Competition and the Industrial Challenge for the Digital Age," *Annual Review of Economics* 15: 573–605, at 598. ("The concern with MFN clauses is that they allow platforms to tax their competitors.  A platform that signs up a wide range of merchants on the MFN clause can impose its fees, terms, and conditions: Because the platform's customers have no incentive to look elsewhere, the platform is the unique route for the merchant to reach these unique customers[.] . . . The platform can then demand hefty fees. . . . [T]his fee is passed through to all customers purchasing from the merchant, and not only to the platform's ones. In this sense, the MFN clause enables a platform to levy a tax on its rivals.")

[698]    Johnson, Justin P. (2017), "The Agency Model and MFN Clauses," *The Review of Economic Studies* 84(3): 1151–1185, at 1153–1154.

[699]    Schlütter, Frank (2024), "Managing Seller Conduct in Online Marketplaces and Platform Most-Favored Nation Clauses," *Journal of Industrial Economics* 72(3): 1139–1194.

[700]    Gans, Joshua S. (2012), "Mobile Application Pricing," *Information Economics and Policy* 24(1): 52–59.

---

higher fees and lower consumer surplus.[701]  I discuss why showrooming is not a threat to Steam in Section 8.2.3.  Johansen and Vergé (2017) show that PMFNs may improve outcomes in markets with high product substitutability and the option of supplier exit, but even in these cases, the results are context-dependent and not universally favorable.[702]  See Section 8.2.3 for a more in depth discussion of Johansen and Vergé (2017) and other papers purporting procompetitive effects of a PMFN.

(321)  Empirical work on PMFNs is somewhat limited, primarily due to difficulties in observing market outcomes with and without PMFNs.  However, where data is available, results support theoretical concerns.  For instance, Ennis, Ivaldi, and Lagos (2023) find that hotel prices fell after the EU banned "wide" PMFNs in online travel platforms, especially among mid-level and luxury hotels—suggesting PMFNs previously had price-raising effects.[703]  While those authors find a lack of effect in some categories, in many countries they only studied the transition from wide to narrow PMFNs (not the elimination of PMFNs).  In addition, Mantovani, Piga, and Reggiani (2021) indicate that online travel platforms engaged in workarounds to the ban through the practice of "dimming," or suppressing the offers of hotels that violated parity restrictions even if there was no longer a formal ban on price parity.[704]

(322)  Based on the theoretical and empirical harm of PMFNs, regulatory authorities in multiple jurisdictions have taken increasingly critical stances on their use. In the UK, the Competition and Markets Authority recently updated its vertical agreement guidelines to categorize parity clauses, including PMFNs, as "hardcore restrictions."[705] Similarly, the EU's Digital Markets

---

[701]  Wang, Chengsi, and Julian Wright (2023), "Platform Investment and Price Parity Clauses," *The Journal of Industrial Economics* 71(2): 538–569, at 540. ("By removing platform competition and alleviating free-riding from the high-search-cost platform, wide price parity clauses help the low-search-cost platform build an advantage through charging higher fees and restore its incentive to invest.  If this advantage is large enough, the incumbent will prefer to invest more than the rival in reducing search costs and be the platform consumers prefer to start their searches on.  In this case, with the ability to use wide price parity clauses, the incumbent platform overinvests in search cost reduction to prevent the entrant from wanting to invest at all.  As a result, the welfare effects are ambiguous.  However, for the same reason as in the monopoly platform case, we find consumers are always worse off with wide price parity clauses.")

[702]  Johansen, Bjørn Olav, and Thibaud Vergé (2017), "Platform Price Parity Clauses with Direct Sales," University of Bergen Working Paper, 1–36.

[703]  Ennis, Sean, Marc Ivaldi, and Vicente Lagos (2023), "Price-Parity Clauses for Hotel Room Booking: Empirical Evidence from Regulatory Change," *Journal of Law and Economics* 66(2): 309–331.

[704]  Mantovani, Andrea, Claudio A. Piga, and Carlo Reggiani (2021), "Online Platform Price Parity Clauses: Evidence from the EU Booking.com Case," *European Economic Review* 131: 1–27.

[705]  Competition and Markets Authority, "Vertical Agreements Block Exemption Order Guidance," 7/12/2022, available at: https://assets.publishing.service.gov.uk/media/62d57d7fe90e071e7b13109f/VABEO_Guidance.pdf, ¶¶ 8.79–8.90.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Act (DMA) explicitly prohibits gatekeeper platforms from imposing PMFN clauses, recognizing their potential to entrench dominance and stifle competition.[706]

---

[706]    European Union, "Regulation (EU) 2022/1925 of the European Parliament and the Council of 14 September 2022 on Contestable and Fair Markets in the Digital Sector and Amending Directives (EU) 2019/1937 and (EU) 2020/1828 (Digital Markets Act)", *Official Journal of the European Union* L 265: 1-66, Article 5.3.

---

Rebuttal Merits Expert Report of Steven Schwartz, Ph.D.

# 9.    Damages

## 9.1.    My but-for revenue share equation is based on the challenged conduct and fits the facts of the case

(323)    In her report, Dr. Langer claims that my damages model "relies on a set of assumptions that . . . lead to harm[,]" "centers on an unreliable relationship between market shares and revenue shares[,]" "does not follow from sound economic methodology[,]" "has conceptual flaws[,]" "does not actually involve the challenged conduct[,]" "omits critical parts of the video game industry[,]" and that because of this "the model is not reliable[.]"[707]  In this section, I show that Dr. Langer is wrong.  Below, I explain that my model (a) measures the price markup *resulting from Valve's enforcement of its PMFN Policy*, (b) applies facts of the case to sound economic models and reasoning to do so, and (c) accurately models the PC game industry.  Lastly, I show how Dr. Langer inappropriately extrapolates my model to arrive at incorrect conclusions regarding its reliability.

### 9.1.1.    My damages model is designed to measure – not explain – but-for market power

(324)    Throughout my previous reports, including my Opening Merits Report, I have repeatedly offered evidence and analysis showing the existence and enforcement of a PMFN Policy by Valve in the relevant market.[708]  Additionally, I have offered evidence and analyses illustrating that absent Valve's PMFN Policy, Steam would have less market power, experience greater elasticity of demand and thus a smaller price markup and market share.[709]  Notably, none of this evidence relies on my damages analysis.  However, Dr. Langer claims that "[Dr. Schwartz's] damages model does not, and cannot, explain why Steam's market share would fall without the alleged PMFN."[710]

---

[707]    Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 22–24.

[708]    See, for example:

Schwartz Opening Merits Report, 1/27/2025, §§ 5.2, 5.3.

[709]    See, for example:

Schwartz Opening Merits Report, 1/27/2025, §§ 6, 7.2, 7.3, 7.4.

[710]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 126.

---

(325)   Dr. Langer fundamentally mistakes the purpose of my damages model (indeed, damages models generally) and ignores the extensive evidence and analyses presented throughout my reports.  The evidence I have presented proves the existence of harm that a PMFN has on publishers.  My damages model, however, is exclusively used to quantify that harm; of course, the damages analysis assumes, as it must, that liability is found.[711]

(326)   As I explained in my Opening Merits Report, I conclude from evidence (not assume) that Valve's conduct has harmed all or virtually all class members.  When a class member pays a higher commission rate in the real world relative to the but-for world, the class member is injured.  As I have shown, Valve imposes a standard pricing structure on all publishers on Steam through its Steam Distribution Agreement (SDA).[712]  Valve's PMFN Policy leads to a decrease in the implied elasticity of demand for Steam, meaning that publishers' demand is less price sensitive due to Valve's PMFN Policy, allowing Valve to increase its standard fee structure on all class members.[713]  I have also presented evidence and analyses showing

---

[711]   Perplexingly, Dr. Langer has elsewhere recognized that my approach is designed for "estimating damages" rather than proving liability or the qualitative impacts of a PMFN.

Langer Rebuttal Merits Report, 3/26/2025, ¶ 124. ("Dr. Schwartz's approach to estimating damages is flawed and his conclusions are not based on reliable economic analysis.")

See also:

Langer Class Certification Report, 5/17/2024, ¶¶ 71, 76. ("In this section, I summarize Dr. Schwartz's attempt to estimate economic damages in this matter[.]"; "Dr. Schwartz's damages model attempts to estimate but-for revenue shares for each game and each publisher[.]")

Ashley Langer, Dep. Tr., 6/21/2024, 127:24–128:6. (Regarding her class certification report, Dr. Langer testified to the following: "Q. Are -- is it -- are you opining that Steam offers a higher quality product due to the lack of competition in the real world? A. No. I am -- *my assignment is to understand whether Dr. Schwartz's models can be used to reliably estimate harm or damages* for the class in a common way.  That does not require me to form an opinion on that question.") (Emphasis added.)

[712]   SDAs outline the commission rate structure that publishers agree to when putting their games on the Steam platform. For an example of the language in an SDA, see:

Valve, Valve Corporation Steam Distribution Agreement, 10/25/2019 (VALVE_ANT_0039631–650, at VALVE_ANT_0039639, VALVE_ANT_0039641).



[713]   Schwartz Opening Merits Report, 1/27/2025, § 7.2.2.

---

Valve's PMFN Policy enforces price parity across competing platforms, deterring entry into the market and limiting game variety and platform innovation.[714] Put simply, Valve's behavior has substantially reduced the choices and options available to developers and consumers. These are liability issues.

(327) A class member that derives value from using Steam, Steam Keys, and/or the functionality available on Steam more than from the alternatives in the but-for world *will still be able to use Steam in the but-for world*.[715] However, in the but-for world, that class member would have other (perhaps more) meaningful options available to them. Valve's conduct effectively took these options off the table by consigning competitors to fringe status, effectively eliminating

---

[714] The PMFN Policy limits platform entry and so gives consumers and publishers fewer viable platform options. With fewer options and less competition, the remaining dominant platform, Steam, has less of an incentive to innovate. Moreover, platforms play a role in game promotion and discovery. With Steam being the dominant platform promoting games, publishers have an incentive to create content that will gain traction based on Steam's discovery algorithms. This limits the variety of game content relative to a world where publishers could list their games on platforms with different promotion and discoverability features and algorithms. See:

Schwartz Opening Merits Report, 1/27/2025, §§ 5–6, 7.2.3.

[715] I acknowledge that there are differences in the level of benefits that each publisher receives from features on Steam. However, this does not mean that publishers who derive either more or less benefit from various features on Steam, or prefer features offered by alternative platforms greater than features on Steam are all unharmed. Valve's PMFN Policy allows it to quash meaningful competition and to maintain supracompetitive rates. Thus, all publishers distributing games on Steam are affected negatively by the overcharge resulting from the common supracompetitive commission rate that Valve charges. That harm occurs regardless of publishers' varying use of Steam features or the value different publishers attach to the various features.

Similar to the varying use of features and the varying use of alternative distribution pathways, that publishers may and likely do varyingly use Steam Keys does not preclude class-wide harm. Instead, that impact is shown through overpayment on a single transaction. Most importantly, it is also unlikely that Steam Keys would be unavailable in the but-for world. In a world without the PMFN Policy, where Valve has to compete, Steam Keys become an even more important competitive tool to drive business (developers and gamers) to Steam.

Valve has derived and continues to derive substantial benefits from offering Steam Keys. In particular, Steam Keys help drive users (back) to Steam, even if they never actually made a purchase off of Steam. By doing that, Steam helps to build/strengthen/sustain network effects and create opportunities to receive future revenues and profits from subsequent in-game or new game purchases that are made. Those benefits create strong incentives for Valve to continue operating its Steam Key program in a market in which it faces even stronger competition. Steam Keys are a means by which Valve can draw customers (back) to the Steam platform if they purchase on another site and provide incentives for developers to remain actively engaged with Steam. For example, a March 2021 internal Valve document entitled "Steam Business: Steam Key Basics" noted that "every Steam key activated by a PC player is a Steam copy of the game that can generate direct and indirect value for our platform." See:

Valve, Steam Business: Steam Key Basics, 3/15/2021 (VALVE_ANT_2370744–45, at VALVE_ANT_2370745).

Further, Valve assessed the revenue benefits associated with Steam Keys, concluding that "*games that do bundles with external sites* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." See:

Valve, Emails Regarding Steam Keys and Steam Sales, 4/8/2021–5/18/2021 (VALVE_ANT_0051956–57, at VALVE_ANT_0051956). (Emphasis added.)

In the but-for world, with increased competition, Valve's incentives to continue operating a valuable feature such as the Steam Key program would most likely increase, or, at the very least, not change in a meaningful way. In fact, the added competition in the but-for world would incentivize Valve to increase its usage of Steam Keys, in an attempt to keep publishers and users on the platform.

---

choice (and the resulting competition on the merits) altogether. By giving class members more choice, all class members are better off.

(328)    After having established the qualitative, economic impacts from the PMFN Policy (the liability question), I am able to determine Steam's commission rate in the but-for world and calculate damages for the class and for each class member. To do this, I begin by considering first the Landes and Posner model[716] and then apply the qualitative economic impacts of the PMFN Policy and facts in this case to derive my damages model. Using the facts in this matter, my damages model empirically measures Valve's but-for market power and but-for platform fee mark-up over costs in a world in which Valve never imposed the PMFN Policy.

### 9.1.2.    My damages model is built upon and applies the facts of the case

(329)    As explained above, my damages analysis begins by first introducing the Landes and Posner model and then building on that model to derive my damages model. Dr. Langer, however, claims that my damages model "relies on an assumed mathematical relationship between Steam's market share and Valve's revenue share to calculate Valve's but-for revenue share[.]"[717] As I have explained[718] and will explain again below, both the Landes and Posner model and my damages model apply economic reasoning and straightforward mathematical calculations to derive such a relationship; the mathematical relationship is not assumed, but is a result of this sound economic reasoning. All of that is consistent with the facts of the case.

(330)    The Lerner Index and Landes & Posner are widely accepted models[719] showing the mathematical relationship between a firm's market power, price (in this case, its commission

---

[716]    Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996.

[717]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 130.

Dr. Gowrisankaran has also referred to the Lerner Index as "standard" and utilized it within his academic research. See, for example:

Gowrisankaran, Gautam, Aviv Nevo, and Robert Town (2015), "Mergers When Prices Are Negotiated: Evidence from the Hospital Industry," *American Economic Review* 105(1): 172–203, at 3, 26–27. ("Solving the first-order conditions of the Nash bargaining problem, we show that equilibrium prices can be expressed by a formula that is analogous to the standard Lerner index equation[.]")

[718]    See, for example:

Schwartz Opening Merits Report, 1/27/2025, § 8.2.

[719]    The Lerner Index is regarded by many as the "best-known measure of monopoly power." See:

rate), elasticity of demand, and market share. Landes and Posner begin with the Lerner Index, $L_i = \frac{(P_i - C_i')}{P_i} = \frac{1}{\epsilon_i^d}$ and use the equation $\epsilon_i^d = \frac{\epsilon_m^d + \epsilon_j^s (1 - S_i)}{S_i}$ to derive the mathematical relationship:[720]

$$L_i = \frac{(P_i - C_i')}{P_i} = \frac{1}{\epsilon_i^d} = \frac{S_i}{\epsilon_m^d + \epsilon_j^s (1 - S_i)}$$

(331)   Landes and Posner use further economic reasoning to draw qualitative conclusions about the application of this model to the real world, including the observation that "the greater [firm] $i$'s market share at its profit-maximizing output, the smaller the demand elasticity facing it will be and the greater, therefore, its market power will be."[721] This conclusion is widely understood among industrial organization economists who studied Landes and Posner and the original Lerner paper.[722]

### The purpose of economic models is to determine relationships between variables

(332)   Dr. Langer's "Standard #1" states that "[i]n order to reliably make predictions about a but-for world, an economic model first needs to correctly model the challenged conduct that would be missing from the but- for world, and the impact of that conduct[.]"[723]   To support this statement, she cites to Hortacsu and Joo (2023) who write:[724]

> One of the major strengths of utilizing a model in science comes from its logic of *establishing the relations among distinct variables*: build a model and test the predictions from that model using real-world data.  The main goal of building

---

Elzinga, Kenneth G. and David E. Mills (2011), "The Lerner Index of Monopoly Power: Origins and Uses," *The American Economic Review* 101(3): 558–564, at 560. ("It is the conventional practice for textbooks in microeconomics and industrial organization to describe the Lerner Index as 'the best-known' measure of monopoly power.")

[720]   Note that these formulas are derived using standard economic theory.  For more details behind the derivation and significance of the formulas, see:

Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 940, 945, 985, 986.

[721]   Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 946–947.

[722]   See, for example: Carlton, Dennis and Jeffery Perloff (2005), "Monopolies, Monopsonies, and Dominant Firms," in 4th ed., *Modern Industrial Organization*, Pearson - Addison Wesley, at 92–93. (The left-hand side of Equation 4.3 is the price-cost margin: the difference between price and marginal cost as a function of price, $[p - MC]/p$. As the equation shows, the price-cost margin depends on only the elasticity of demand the monopoly faces. The price-cost margin is also called the Lerner Index of market power (Lerner 1934). Equation 4/3 shows that the monopoly's price is close to $MC$ when demand is very elastic, and the price increasingly exceeds $MC$ as the demand becomes less elastic.")

[723]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 52.

[724]   Hortacsu, Ali and Joonhwi Joo (2023), *Structural Econometric Modeling in Industrial Organization and Quantitative Marketing*, Princeton, NJ: Princeton University Press, at 1. (Emphasis added.)

---

a model is to *specify hypothetical relationship [sic] among distinct phenomena, summarized in the form of variables*, in a testable form.

(333) This proposition well applies to empirical models that rely, for example, on statistical methods to understand the relationship. Of course, not all models are statistical models. But, even in the case of the model I present here, I meet the Langer criterion. If, according to Dr. Langer, the purpose of a mathematical, economic model is to determine a relationship between variables to draw real-world conclusions about how economic outcomes would change given changes in the input variables, my model incorporating the Lerner Index, Landes and Posner, and my model of Steam's but-for commission rate does exactly that.

(334) As I show in my Opening Merits Report, Valve's PMFN Policy has, over the years, decreased elasticity of demand for Steam's services and increased its market share. That, in turn, has increased Steam's market power.[725] Thus, the goal of my damages analysis is to quantify the relationship between the PFMN (captured through its impact on Steam's demand elasticity and market share) and Steam's market power (captured through Valve's price markup). This is precisely what the Landes and Posner model does. Thus, the Landes and Posner model fits the facts of this case and is an appropriate foundation for my damages analysis.

**I apply the PMFN Policy and facts of the case to empirically apply the model**

(335) To apply the Lerner Index and the Landes and Posner model to this litigation, I apply the facts of the case to determine numeric values for the various parameters in the model in the real-world scenario.

(336) First, I analyze data and documents to estimate Valve's real-world, effective commission rate charged to publishers at █████.[726] Next, I analyze data and documents as well as publicly produced financials to estimate Valve's real-world market share within a properly defined relevant market at ████.[727]

(337) Next, to estimate Valve's market share in the but-for world, I analyze facts about the industry regarding various publisher-platforms that have attempted to compete against Valve in the

---

[725]   See, for example: Schwartz Opening Merits Report, 1/27/2025, §§ 6–7.

[726]   Schwartz Opening Merits Report, 1/27/2025, ¶ 416, fn. 970.

[727]   Schwartz Supplemental Opening Merits Report, 3/7/2025, ¶ 15.

real world.[728]  Specifically, I conclude that successful games can drive platform adoption and ultimately platform success.[729]  Furthermore, as I have shown, in the but-for world, the newly entering or existing fringe platforms would have been better able to attract third-party PC content by offering publishers a greater share of transaction value so that such publishers could offer their games at lower prices on these platforms.  These lower prices would, in turn, help to attract gamers to these platforms.  Thus, my analysis qualitatively concludes that but for Valve's alleged anticompetitive conduct, publishers that continue to operate their distribution platforms would likely have garnered a larger share of the market, and it is likely that at least some of the publishers that stopped operating their distribution platforms in the as-is world would have continued to operate their platforms in the but-for world.[730]

(338)  To independently and quantitatively estimate Valve's and other platform operators' but-for market shares, I analyze various publisher shares of sales on Steam between 2008–2012 among publishers that ultimately entered the relevant market,[731] concluding that Valve's but-

---

[728]  Schwartz Opening Merits Report, 1/27/2025, ¶¶ 434–436.

I also analyze alternative industries such as the subscription video on demand ("SVOD") marketplace.  I conclude that "without Valve's PMFN Policy to fortify its position in the relevant market, Steam's dominance would have declined over time."

U Screen, "SVOD Explained: Why It's the Best Monetization Model for Creators," 10/18/2024, https://www.uscreen.tv/blog/avod-tvod-svod-monetization-models/. ("SVOD, or Subscription Video on Demand, is a monetization model where users pay a recurring fee, typically monthly or annually, for unlimited access to a library of content like films, TV shows, and more.")

Schwartz Opening Merits Report, 1/27/2025, ¶¶ 441–445.

Here, I am not using market in the formal, antitrust sense, as I have not done a market definition analysis of the SVOD industry.  I do not opine to whether or not there are anticompetitive implications in the SVOD marketplace.

[729]  Schwartz Opening Merits Report, 1/27/2025, ¶ 435

[730]  Schwartz Opening Merits Report, 1/27/2025, ¶ 437.

[731]  As I explain in my Opening Merits Report, successful games can drive platform adoption and ultimately platform success. Valve used its highly popular game, Half-Life 2, to attract users to Steam in the platform's early years, that is, around 2004. Similarly, Epic leveraged the success of Fortnite to accelerate consumer uptake of its Epic Game Store, which launched in late 2018.  The benefits to a game distribution platform offering exclusive, popular titles have been acknowledged by numerous industry participants.

In the but-for world, the newly entering or existing fringe platforms would have been better able to attract third-party PC content by offering publishers a greater share of transaction value so that such publishers could offer their games at lower prices on these platforms. These lower prices would, in turn, help to attract gamers to the platform. But for Valve's alleged anticompetitive conduct, publishers that continue to operate their distribution platforms would likely have garnered a larger share of the market, and it is likely that at least some of the publishers that stopped operating their distribution platforms would have continued to operate their platforms. Therefore, the but-for world would also include publishers that operate or previously operated PC game distribution platforms as competitors to Steam.

Multiple publishers—generally those with several popular titles and franchises—have attempted to transition from successful game developer and publisher to distributor of PC gaming content.  These publishers include Activision (battle.net), Bethesda (Bethesda.net), CD Projekt (GOG), EA (Origin), Epic (EGS), Microsoft (Microsoft Store), Rockstar

for market share would be approximately ███████.[732] The fact that Valve's but-for market share is lower than its as-is share aligns with my other analyses, including the PCM and other analytical approaches in my Opening Merits Report, and reflects the realities of the PMFN Policy.[733]

(339) To estimate Valve's marginal costs in the real and but-for worlds, I adopt a conservative approach and use its average total accounting costs, which I estimate to be ██████ of transaction value, to represent Valve's marginal costs.[734] Absent evidence otherwise, the most reasonable approach for modeling a but-for world is the real-world behavior or outcomes. I have no evidence or theoretical reason to conclude that Steam's marginal costs would change from the real to but-for world and Dr. Langer provides no such evidence. Rather than calculating Steam's marginal economic costs directly, this approach is conservative because for platform firms like Valve, high fixed costs and low marginal costs are common and result

---

(Rockstar Games Launcher), and Ubisoft (Uplay). However, most of these entrants in the market failed or have struggled to build their market share.

In the but-for world, the newly entering or existing fringe platforms would have been better able to attract third-party PC content by offering publishers a greater share of transaction value so that such publishers could offer their games at lower prices on these platforms. These lower prices would, in turn, help to attract gamers to the platform. But for Valve's alleged anticompetitive conduct, publishers that continue to operate their distribution platforms would likely have garnered a larger share of the market, and it is likely that at least some of the publishers that stopped operating their distribution platforms would have continued to operate their platforms. Therefore, the but-for world would also include publishers that operate or previously operated PC game distribution platforms as competitors to Steam.

Valve's ability to attract gamers to Steam through its first-party game offerings also contributed to the platform's ability to attract third-party developers. Thus, I model the but-for market shares for Valve as well as the publishers that engaged in digital PC game distribution based on the relative success of their games on Steam. To quantify the success of publishers' games, I use a given publisher's share of revenues on Steam among the publishers that have attempted to create distribution platforms as a proxy for the market share of their platforms in the but-for world. However, to the extent that these publishers also publish elsewhere, this approach would likely bias the publishers' shares downward and thus Steam's share upward. Hence, I focus on a period in which publishers likely would have begun to develop their own platforms in the but-for world, but where none had yet done so in the real world, likely generating all or most of their revenues through Steam.

Schwartz Opening Merits Report, 1/27/2025, § 8.3.4.

[732] Schwartz Opening Merits Report, 1/27/2025, ¶¶ 439–440.

For further discussion of the reliability of this estimation, see Section 9.2.

[733] Dr. Langer claims that my "damages model does not include the challenged conduct at all." See:

Langer Rebuttal Merits Report, 3/26/2025, ¶ 125.

As I have shown, this is incorrect as I include the challenged conduct (i.e., Valve's enforcement of a PMFN Policy on Publishers) in my analysis through the impact the PFMN has on Valve's market share.

[734] Schwartz Supplemental Opening Merits Report, 3/7/2025, ¶ 22, Supplemental Attachment D-7.

---

in average total costs that are higher than marginal costs.[735]  Using a higher cost as the basis for price-setting will result in a higher but-for commission rate (and thus lower damages).[736]

(340)   Finally, to determine values for real-world and but-for elasticities of demand, I model demand for Steam's services as linear, and I model demand as parallel between the as-is and but-for worlds.[737]  I determine Steam's elasticity of demand to be approximately ███ in both the real and but-for worlds.[738]   Holding Steam's elasticity of demand constant is a conservative assumption as, but-for Valve's PMFN Policy, demand for Steam would be more elastic and Valve's price markup would be less than if demand elasticity were held constant.[739]

---

[735]   Baumol, William, and Daniel Swanson (2003), "The New Economy and Ubiquitous Competitive Price Discrimination: Identifying Defensible Criteria Of Market Power," *Antitrust L.J.* 661–686, at 661. ("The industries that are the hallmark of the "new economy" are characterized by a special cost structure. From software to semiconductors, digital entertainment to biotechnology, and in innovative fields more generally, the standard cost pattern entails sunk outlays that are large and must be incurred over and over again, but the marginal cost of serving an additional customer-is virtually negligible. As economists are well aware, this is only a special case of a more general circumstance, the case of scale economies, where the prices of a firm's products, if set equal to the corresponding marginal costs, will condemn the enterprise to losses.")

[736]   Note that in cases where average total costs are higher than marginal costs, the competitive price is equal to the average total cost, because "a firm that prices at marginal cost cannot cover its fixed costs (costs that do not vary with output), such as plant and equipment or research and development ('R&D')." See:

Kirkwood, John (2018), "Market Power and Antitrust Enforcement," *Boston University Law Review* 98: 1169–1227, at 1175–1176.

While this changes the interpretation of the markup over marginal costs, it does not impact my use of the markup over marginal cost in the model, because the derivation of the Lerner Index comes from the profit maximizing condition (which is unchanged in a high fixed cost market) and not the competitive price.  See:

Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 984–985.

[737]   I note that the assumption demand is linear is a widely used and accepted simplifying assumption within the economic literature.

Schwartz Opening Merits Report, 1/27/2025, §§ 8.3.2–8.3.3.

[738]   Schwartz Supplemental Opening Merits Report, 3/7/2025, ¶ 23.

[739]   Schwartz Opening Merits Report, 1/27/2025, ¶ 430.

Note that a lower price markup in the but-for world implies Publishers experienced a greater overcharge from sales on Steam and so damages would be greater.  See:

Schwartz Opening Merits Report, 1/27/2025, § 8.5.

Furthermore, Dr. Langer claims that my "damages model does not include the challenged conduct at all." See:

Langer Rebuttal Merits Report, 3/26/2025, ¶ 125.

As I have shown, this is incorrect as I include the challenged conduct (*i.e.*, Valve's enforcement of a PMFN Policy on Publishers) in my analysis through my consideration of how the PMFN Policy impacts Steam's elasticity of demand.  That is to say, without knowing the qualitative economic impacts of the PMFN Policy, I could not model demand in this way. This step (using the PMFN to conservatively fix elasticity of demand for Steam) does not hold in general; it is the result of specifically implementing the PMFN (and its removal in the but-for world) into my damages model.  As I will explain below, Dr. Langer incorrectly applies this step outside the context of PMFN removal, which is inappropriate.  These examples, incorrectly put forth by Dr. Langer, demonstrate that my damages model is tailored to the facts of the case.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**My damages analysis concludes – rather than assumes – a relationship**

(341)   As previously stated, Dr. Langer claims that my damages model "relies on an assumed mathematical relationship between Steam's market share and Valve's revenue share to calculate Valve's but-for revenue share[.]"[740]  As I've shown, this relationship is not assumed; it builds on well-established economic models and uses case-specific evidence to derive an equation and numerical estimate for Steam's but-for platform fee.  Lastly, my model is conservative in a myriad of ways, likely understating damages by overstating the market power Valve would enjoy but-for its PMFN Policy.

### 9.1.3.  My damages model accurately models the video game industry

(342)   Dr. Langer claims that my model for Steam's but-for commission rate is "inconsistent with industry facts" and "is simply the wrong model to characterize the video game distribution industry."[741]  Below, I have included Dr. Langer's Exhibit 9 regarding her critiques:

---

Dr. Langer also claims that my damages model "relies on an assumed mathematical relationship between Steam's market share and Valve's revenue share to calculate Valve's but-for revenue share[.]" See:

Langer Rebuttal Merits Report, 3/26/2025, ¶ 130.

As I have shown in my Opening Merits Report, holding demand linear and constant in both the real and but-for worlds allows me to simplify the mathematical relationship identified by Landes and Posner in a way that allows me to empirically estimate Valve's but-for commission rate.  That is, using these conservative assumptions I can simplify the Landes and Posner model to $P^{bf} = \frac{Q^{bf}}{Q^{rw}}(P^{rw} - C') + C'$.

Schwartz Opening Merits Report, 1/27/2025, Appendix C.2.

[740]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 130.

[741]   Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 137–138.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 20: Dr. Langer's Exhibit 9**



(343)   Dr. Langer's exhibit is a distortion; she incorrectly characterizes my but-for revenue share equation and misconstrues its purpose within my damages analysis. As I explain below, a corrected version of Dr. Langer's exhibit would look like Figure 21:

**Figure 21: Dr. Langer's Exhibit 9 - Corrected**



**Valve's revenue share is determined by more than its market share**

(344)   Dr. Langer claims that my "but-for revenue share equation assumes that changes in Valve's revenue share are determined only by changes in Steam's market share."[742] Dr. Langer also states that "[a]ccording to Dr. Schwartz's but-for revenue share equation, the only factor that

---

[742]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 140.

determines Valve's but-for revenue share—that does not remain constant between the as-is and but-for worlds—is Steam's market share."[743]

(345) Dr. Langer clearly misunderstands my model. As I show in Section 9.1.2, the but-for fee on Steam is also determined by its but-for elasticity of demand relative to its real-world elasticity.[744] This also ignores the reason some values are held fixed. I hold costs fixed because there is no reason to expect Valve's marginal costs to differ significantly as a result of removing the PMFN Policy. As I explain below, Valve's market share, demand elasticity, and other parts of my damages analysis implicitly also capture other changes to competition.

**Platform quality is considered**

(346) Dr. Langer claims that my "but-for revenue share equation does not feature platform quality."[745] Dr. Langer's claim is incorrect. As I explained in my Opening Merits Report, competition improves quality, encourages innovation, and improves platform features, and the PMFN Policy prevents price competition, injuring competition generally.[746] These facts make the hypothetical scenario where platform quality declines in the but-for world irrelevant to the case. The facts of the case show that Steam would not need to cut quality in the but-for world, and, under stiffer competition, Steam would only have more incentive to innovate and improve quality. Therefore, my damages model conservatively considers platform quality by assuming that platform quality in the but-for world would be similar to quality in the real world rather than – as would likely be the case – higher in the but-for world than the real world.

(347) Dr. Langer claims that my but-for revenue share equation "does not . . . differentiate distributors by quality" and that it would "apply equally to Steam whether it were a barebones platform, with virtually no user- or publisher-enhancing features, rather than its true, feature-rich nature."[747] Dr. Langer is incorrect. As a matter of economics, a platform with a higher quality than its competitors will face a more inelastic firm-specific demand than its competitors and so will have a relatively greater price markup, all else equal. In the but-for world, I conclude that Steam would still have a higher market share and a higher price markup

---

[743]    Langer Rebuttal Merits Report, 3/26/2025, fn. 248.

[744]    See Section 9.1.2.

[745]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 141.

[746]    Schwartz Opening Merits Report, 1/27/2025, § 6.3.

[747]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 141.

than its competitors, reflecting its relatively more inelastic demand. Thus, my model does account for the competitive impact of Steam's additional platform features.

(348)  Additionally, my model incorporates the extent to which a platform includes additional features through its consideration of average total costs. My model of Steam's but-for revenue share conservatively applies Valve's average total costs rather than its marginal costs.[748] Since the costs to develop additional platform features are fixed costs rather than per-transaction (*i.e.*, marginal) costs, the investments that Steam has made in its additional features are accounted for in its average total costs.[749]

**Product-specific and distributor-specific pricing are accounted for**

(349)  Dr. Langer claims that my model "[d]oes not feature product-specific nor distributor-specific pricing"[750] and that "[i]n practice, a distributor does not need to set a single revenue share for all of the many different games distributed on their platforms."[751]  Dr. Langer, again, misapprehends my model. For both products and distributors, I base my conclusions about but-for commission rate structures on the best evidence available to me in the real world: Valve's as-is pricing.

(350)  As I explain in my Opening Merits Report, I use the model of the but-for commission rate on Steam to determine a scaling factor which I apply to the individual commission rate(s) Valve charged each specific product.[752]  In other words, while my but-for commission rate equation computes a single, *representative* but-for rate, my overcharge analysis uses this rate to determine the *individualized* but-for rates for every product. Thus, my but-for commission rate structure matches Valve's as-is commission rate structure over time. For products that passed a threshold in the real world and afterward enjoyed a lower tier of commission rate, such products would also enjoy a lower commission rate in the but-for world at the same time. Thus, my overcharge analysis appropriately accounts for product-specific pricing.

---

[748]  Schwartz Opening Merits Report, 1/27/2025, ¶¶ 417–418, 432.

[749]  Value includes product development costs as part of its operating expenses, and I include operating expenses in my calculation of Valve's average total costs.

Schwartz Opening Merits Report, 1/27/2025, Attachment D-1, Attachment D-7.

[750]  Langer Rebuttal Merits Report, 3/26/2025, Exhibit 9.

[751]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 142.

[752]  Schwartz Opening Merits Report, 1/27/2025, ¶ 478.

(351)  My model also accounts for distributor-specific pricing.  The sales on which my damages calculation is based are sales actually made on Steam in the real-world.  To measure damages, I consider the difference in the amount developers would pay as commission on those sales in a but-for world.[753]  In the but-for world, sales currently made on Steam will either stay on Steam or be made on an alternative platform.  By estimating damages using the price change on Steam, I obtain the minimum damages caused by Valve's PMFN Policy to all developers (*i.e.*, I conclude that Steam's but-for commission rate is an upper bound on the commission rate publishers would pay in the but-for world).  This approach is favorable to Valve.  If a sale stays on Steam in the but-for world, the transaction fee paid by the publisher falls.  In this case, the damage to the publisher is the change in the transaction fee Steam charges (times the pass-through rate).  As Dr. Langer has correctly pointed out previously, "in the but-for world, some publishers will sell their games on other platforms besides Steam."[754]  What Dr. Langer either ignores or misunderstands is that by using Steam's fee change for all sales, I am establishing the minimum overcharge to all publishers and likely underestimating the damages to publishers that switch platforms with but-for rates even lower than Steam's but-for rates.

(352)  Indeed, it is likely that all of Valve's competitors in the but-for world would be lower fee competitors.  As an initial matter, the real-world fees on Steam are enabled and sustained by Valve's exclusionary PMFN Policy, which would not exist in the but-for world.  Thus, an outcome in which a platform successfully implements *higher* fees than what Valve's anticompetitive conduct enables it to realize in the real world is inconsistent with the but-for world that would prevail in the absence of Valve's PMFN Policy.  More specifically, the PCM model shows that if there were high-cost competitors who wanted to charge high platform fees, the PMFN Policy would encourage them to enter in the real-world.[755]  The PMFN Policy allows platforms to maintain a higher price/higher fee equilibrium than a competitive market.  This benefits platforms that want to charge high fees.  Any potential entrants of this type would be less likely to enter the market in the but-for world than in the real world.  In the real world with the PMFN Policy in place, all competing platforms currently have equal or lower fees than Steam.  This suggests, as I said in my Opening Merits Report, that potential entrants who are encouraged to enter by the removal of the PMFN Policy would charge lower platform

---

[753]    Schwartz Opening Merits Report, 1/27/2025 ¶¶ 478–481.

[754]    Langer Class Certification Report, 5/17/2024, ¶ 139.

[755]    Schwartz Opening Merits Report, 1/27/2025, ¶ 325.

fees than Steam.[756]  While Dr. Langer considers the possibility of a higher fee platform in the but-for world, she offers no evidence to support this purely speculative hypothetical scenario, and I am unaware of any such evidence.  If a firm existed that could successfully implement a platform at a higher fee than Steam, they would not be hindered by the PMFN Policy, and *we would see them operating in the real world*.  Therefore, my damages analysis is conservative by omitting distributor-specific pricing.

**Two-sided platforms and network effects**

(353)  Dr. Langer claims that my model "does not include two-sided platforms and network effects, and it does not capture that Valve competes for both users and publishers."[757]  Once again, Dr. Langer is incorrect.  While my model includes a single, representative transaction fee charged by Valve, my model of demand incorporates preferences and behaviors from both publishers and consumers.  Demand in my damages model relates Steam's platform fee (the single fee charged to publishers) to the share of transactions completed on Steam.[758]  The relationship between platform fees and share of transactions reflects the interaction of the publisher's decision to set a game price and the consumer's decision to buy the game.  Thus, both sides are explicitly considered in the demand function even though Steam utilizes only one fee in the actual world.

(354)  My analysis of pass-through also demonstrates that I analyze the market as two-sided.[759]  I consider the share of cost savings that publishers, on one side of the market, would pass through to consumers, on the other side of the market.  The analysis I use to estimate a pass-through rate uses data reflecting behaviors on both sides of the market: pricing decisions by publishers and the corresponding purchases by consumers.[760]

(355)  Dr. Langer's comments about network effects are also not correct.  My model of the but-for world illustrates that Steam would still enjoy a larger share of the market than its competitors,

---

[756]    Schwartz Opening Merits Report, 1/27/2025, ¶¶ 323–325.

[757]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 143.

[758]    Schwartz Opening Merits Report, 1/27/2025, § 8.3.2.

[759]    Schwartz Opening Merits Report, 1/27/2025, § 8.4.

[760]    For further discussion of how the leading economic literature supports my assertion that I model Steam as a two-sided platform, see:

Schwartz Reply Class Certification Report, 7/12/2024, ¶¶ 202–207.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

but a lower share than in the as-is world.[761]  While my approach is agnostic to how this occurs, network effects built by Valve on Steam in the real world unrelated to Valve's PMFN Policy would still be present in the but-for world.  This is reflected in Valve's higher market share in the but-for world than its competitors.  Therefore, my damages model appropriately accounts for network effects on the Steam platform through the modeling of Valve's and its competitors' but-for market shares.

**Steam Keys**

(356)   Dr. Langer claims that my "but-for revenue share equation does not account for Steam Keys, nor does it reflect that Steam Keys are one way that Valve competes with other distributors."[762]  This is incorrect.  In my Opening Merits Report, I explicitly assume that Steam Keys would be issued and utilized in the but-for world in the same manner as in the real world.[763]  For a discussion of the reasons behind that assumption, see Section 6.1.

### 9.1.4.   Dr. Langer's extrapolation is inappropriate

(357)   Dr. Langer claims that my but-for revenue share equation "makes predictions that are inconsistent with industry facts of video game distribution[.]"[764]  To reach this conclusion, she claims – without evidence or support – that "[t]his but-for revenue share equation can equally be applied to other periods in Valve's history."[765]  Indeed, when Dr. Langer attempts to apply my but-for revenue share equation to year-to-year changes in commission rates on Steam, she gets estimates that deviate from actual commission rates on Steam.[766]  This is not surprising; Dr. Langer's analysis is incorrect because she ignores critical aspects of my model.  Thus, her analysis is inappropriate and says nothing about my model's reliability.

(358)   As I explain in my Opening Merits Report, to apply the Landes and Posner model to this setting and derive my but-for revenue share equation, I make the assumption that the slope of the demand curve for Steam's services would not change in the but-for world relative to the real

---

[761]    Schwartz Opening Merits Report, 1/27/2025, § 8.3.4.

[762]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 144.

[763]    Schwartz Opening Merits Report, 1/27/2025, fn. 930.  ("In the but-for world, I assume that Steam Keys would have been provided and used in the same manner as in the real world and focus my determination of the but-for price solely on those purchases made through Steam and thus subject to the Valve commission charge.")

[764]    Langer Rebuttal Merits Report, 3/26/2025, § 6.2.3.

[765]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 147.

[766]    Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 148–150, Exhibit 10.

world.[767]  This is a conservative assumption because, in reality, but for Valve's PMFN Policy, demand for Steam would be more elastic, decreasing the slope, and Valve's price markup would be lower than if the slope were held constant.[768]  Put differently, if I allowed the slopes of the demand curve to vary between the actual and but-for worlds, *damages would be higher*.

(359)   However, this conclusion does not apply in other situations.  The Landes and Posner model and my Opening Merits Report illustrate how firm $i$'s (Valve's) slope of firm demand relates to several variables including its price $P_i$ (*i.e.*, Steam's platform fee), marginal cost $C_i'$ (measured in my model as average total costs),  the market quantity $Q_i$, elasticity of firm demand $\epsilon_i^d$, market share $S_i$, the market share of fringe competitors $j$ (shown as 1 minus firm $i$'s share), the demand elasticity of the market $\epsilon_m^d$, and the supply elasticity of the fringe competitors $\epsilon_j^s$:[769]

$$L_i = \frac{(P_i - C_i')}{P_i} = \frac{1}{\epsilon_i^d} = \frac{Q_i}{m \times P_i} = \frac{S_i}{\epsilon_m^d + \epsilon_j^s(1 - S_i)}$$

(360)   From this model, it is clear that Dr. Langer's application of my but-for revenue share equation to these other contexts is inappropriate.  In her examples, she applies Steam's fee, market share, and costs for 2017–2023 to its real-world fees in 2017, 2018, and 2019 so as to reverse-engineer its "predicted" market shares in each respective year.[770]  This is an inappropriate application of my model because it assumes that Steam's average slope of demand, m, over the period 2017–2023 is the same as the slope in every individual year in 2017–2019.  In my case, economics shows that the slope from 2017–2023 would have been less absent a PMFN, giving me a conservative bound on the no-PMFN slope.  In Dr. Langer's case, there is nothing to support her assumption.  There is no reason to think that the slope from 2017–2023 with a PMFN in place is exactly the same as an individual year from 2017–2019 with a PMFN also in place, and Dr. Langer has no way to assess how the slope would differ over this time.  Because of this, no reasonable inferences can be made based on Dr. Langer's results, and no conclusions can be drawn.

---

[767]   Schwartz Opening Merits Report, 1/27/2025, § 8.3.3, ¶¶A54–A55.

[768]   Schwartz Opening Merits Report, 1/27/2025, ¶ 430.

Note that a lower price markup in the but-for world implies Publishers experienced a greater overcharge from sales on Steam and so damages would be greater. See:

Schwartz Opening Merits Report, 1/27/2025, § 8.5.

[769]   Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 940, 945.

Schwartz Opening Merits Report, 1/27/2025, ¶ 423.

[770]   Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 148–150, Exhibit 10.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(361)   Dr. Langer assumes—without evidence or support—that the responsiveness of Steam's sales to changes in its fees does not change over time. Evidence presented in my Opening Merits Report contradicts this assumption.[771] Dr. Langer did not use my model, but rather took my final equation, which relies on case specific conclusions, and applied it to situations outside the scope from which those conclusions were made. Unsurprisingly, she reaches nonsensical conclusions. This has no bearing on my analysis where the conclusions are supported by case specific facts.

(362)   Dr. Langer provides no evidence to support her assumption that Steam's slope of demand does not change over time. As the Landes and Posner model shows, changes in the market's demand elasticity are mirrored by changes in Steam's demand elasticity, all else equal.[772] Thus, to evaluate her examples, Dr. Langer makes assumptions that do not reflect the realities

---

[771]   For example, Attachment E-1 of my Opening Merits Report showed how Valve's market share varies annually between 2017–2021, and Attachment D-7 showed how Valve's average costs also vary. As the Landes and Posner model illustrates, all else equal, as market share varies, so too does Steam's demand elasticity. Put simply, if Steam's market share increases, the market and competitors will need to become more competitive or else customers (*i.e.*, publishers and gamers) will have less alternatives to turn to in the event of a price increase. Also, as Steam's costs vary so too can its demand elasticity. For example, if Steam's costs decrease (such as due to not investing as much into additional platform features) but it able to maintain the same fee to publishers, then customers would be considered less sensitive to Steam's price change than before, meaning Steam's demand would be more inelastic.

On the other hand, evidence presented in my Opening Merits Report supports my assumption that the slope of demand for Steam would be the same (or greater) *in the but-for world*. Multiple models applicable to this case show that in the but-for world, $m$ would be greater than in the real world. As I discussed above in Section 8.2 of my Opening Merits Report, in the Landes and Posner (1981) model, the fringe elasticity of supply would increase without a PMFN. That same intuition applies directly to the change in both Valve and fringe firm quantities with respect to the price. The following equation shows how, according to the Landes and Posner (1981) model, m is related to the change in market demand with respect to the price and the change in quantity supplied with respect to price.

$$m = -\frac{\partial Q_i^d}{\partial P} = -\frac{\partial Q_m^d}{\partial P} + \frac{\partial Q_j^s}{\partial P}$$

This equation demonstrates why if m were not held constant, and, instead, I calculated a but-for value $m^{bf}$ and a real-world value $m^{rw}$ it would be the case that $m^{bf} > m^{rw}$. First, without a PMFN, fringe firms will increase their quantity supplied by more for a given price change since they would be able to compete on price. This implies $\frac{\partial Q_j^s}{\partial P}$ is larger in the but-for world. Together, these two points imply m is larger in the but-for world, or $m^{bf} > m^{rw}$. My linear model with a parallel shift in demand holds m constant, which is conservative. This can be seen from the equation $P - C = \frac{Q}{m}$ in which a larger value for m implies a smaller markup over cost and so a lower price.

The Landes and Posner model is not the only model that leads me to the conclusion that $m^{bf} > m^{rw}$. In Appendix C.3 of my Opening Merits Report I show that in the Boik-Corts model, removing PMFNs more than doubles the change in Steam's quantity with respect to price ($\frac{\partial Q_i^d}{\partial P}$), which implies m would more than double in the but-for world without a PMFN in place.

Schwartz Opening Merits Report, 1/27/2025, ¶¶429–431.

[772]   Notably, holding fringe competitors' elasticity of supply constant means that as customers in the market are more (less) sensitive to changes in the market's platform fee, Steam's customers – who are a part of the market – will also be more (less) sensitive to changes in Steam's fee.

---

of the industry, violating her own "[s]tandards of economic models[.]"[773]  While she attempts to use this to critique my damages model, I hold Steam's slope of demand fixed between the real and but-for worlds *only* because it leads to a conservative measure of damages.[774]

(363)  By plugging in market shares for $Q_i$, Dr. Langer is also assuming the market quantity remains fixed, which is verifiably incorrect.  As I show in my Supplemental Opening Merits Report, the market size grew from ███████ in 2017 to ███████ in 2019, and then to over ███████ in 2023.[775] While it is appropriate for the sake of computing damages to assume that market size would not change at a given point in time between the real and but-for worlds,[776] it is incorrect to assume the same is true *over time* in the real world.

(364)  Dr. Langer also claims that in my damages model, "all of Valve's competitors—other distribution platforms—set the same prices—revenue shares—as Valve" and that this is inconsistent with industry facts.[777] Again, Dr. Langer misunderstands my model.  As I explain above, my model of Valve's but-for platform fee on Steam is derived from the Lerner Index which, first and foremost, is a relationship between a firm's individual price markup and its elasticity of demand.  I then use this index to derive a relationship between Valve's firm-specific platform fees, market shares, and costs.  Thus, there is nothing in my model that would require competitors to charge the same platform fee as Valve in the but-for world.[778]

(365)  Furthermore, while my model does trace out a but-for world where Valve would have encountered meaningful competitive threats, it is not the case that my model requires all platforms—including Steam—to be identical in the but-for world.  For example, in the but-for

---

[773]  Langer Rebuttal Merits Report, 3/26/2025, § 4. ("Standard #2: A model's assumptions should reflect the realities of the industry studied[.]"; "While all economic models must make assumptions, models whose assumptions oversimplify or *contradict the real world* cannot reliably make predictions about how economic outcomes would change in the but-for world.") (Emphasis added.)

[774]  Schwartz Opening Merits Report, 1/27/2025, ¶ 430.

[775]  Schwartz Supplemental Opening Merits Report, 3/7/2025, Supplemental Attachment E-1.

[776]  In my Opening Merits Report, I explain how the PMFN Policy has reduced market output compared to a world without Valve's PMFN Policy.  Thus, my damages analysis is conservative as, in the but-for world, market output would likely be greater than it is in the real world.  This means that the profits to publishers on these additional sales could be added to damages. See:

Schwartz Opening Merits Report, 1/27/2025, § 6.3, ¶ 487.

[777]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 151.

[778]  In other words, applying my model to other platforms would mean applying their platform-specific real-world fees, real-world and but-for market shares, and their platform-specific costs. While I have not conducted such an analysis for every possible competitor, it is therefore highly unlikely that my model would return a result where every platform charges the same fee in the but-for world.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

world, Valve's market shares would account for factors such as its first-mover advantage and industry leadership while also reflecting the effects of meaningful competition. As I explained above, my model describes a but-for world where it is likely that all competing platforms in the but-for world would be lower fee competitors. This is because, as the PCM shows, if a platform with a higher fee could meaningfully compete with Steam absent the PMFN Policy, then the PMFN Policy would only further encourage their entry into the market in the real world.[779] However, since I have seen no evidence, and Dr. Langer provides no evidence, to suggest the existence of such a platform, I reasonably conclude that platforms in the but-for world would charge different (lower) fees.

## 9.2.    The market shares used in my damages model are reliable

(366)    Dr. Langer claims that my "damages approach hinges upon [my] measure of Steam's market shares[,]" and that my as-is market share calculation and my but-for market share calculation are unreliable.[780] I disagree on both counts. My as-is market share calculation follows from my properly defined relevant market,[781] and my but-for market share is based on the facts of the case. Furthermore, the general order of magnitude of damages is not sensitive to the but-for market share used in my model.[782]

### 9.2.1.    My estimate of but-for market shares considers a world without the alleged conduct

(367)    Dr. Langer criticizes my use of data from 2008–2012 to form an estimate of the but-for world by stating, "Dr. Schwartz's methodology . . . rests on an unmodeled and empirically unsupported assumption that *publisher* market shares on Steam are sufficient for him to infer but-for *platform* market shares a decade later and absent the alleged PMFN."[783] Dr. Langer fundamentally misunderstands that the goal of a but-for analysis is not to consider a world where the alleged conduct is stopped today, but, instead, to consider a world where the alleged conduct *never took place.* As I have noted before, there is no real-world period in which Valve's

---

[779]    Schwartz Opening Merits Report, 1/27/2025, ¶ 325.

[780]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 176.

[781]    Dr. Langer relies on Dr. Chiou's assessment of the relevant market to critique my as-is market share calculation. I reply to Dr. Chiou's assessment in Section 3.

[782]    Section 9.2.2. Figure 22.

[783]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 164. (Emphasis in original.)

PMFN Policy did not exist that could be used as a benchmark for a but-for world.[784] Using data from 2008-2012 is the closest reasonable approximation of the state of the market absent the alleged conduct, which started as early as 2009.[785]

(368)  Similarly, my approach to determining a but-for market share aligns with the facts of the industry in which first-party game success is tied to platform success.[786] Publishers have often attempted to transition from successful game developer and publisher to distributor of PC gaming content, including Valve.[787] In the but-for world, newer fringe platforms would have been built off the success of their games on Steam, like in the real world, but would have been better able to compete in the third-party PC game distribution market absent Valve's PMFN Policy.[788]

(369)  In my Opening Merits Report, I examine the evolution of market shares in the subscription video on demand ("SVOD") marketplace, showing that trends in an industry that relies on first-party and/or third-party content to attract and retain end users align with the expectation of increased competition in the digital PC game distribution in the but-for world.[789] In the SVOD marketplace, Netflix initially commanded a large share of the SVOD marketplace that was eroded by competitors over time, but Netflix still retains a large market share,

---

[784]  See, for example: Schwartz Opening Merits Report, 1/27/2025, ¶ 378. ("Valve's PMFN Policy has been in place for many years and there are not pre- and post-PMFN time periods that could lead to a reasonable natural experiment.")

[785]  Dr. Langer claims that my ▆▆▆ figure is unreliable because Valve's share of revenues on Steam varied year-to-year between 2008 and 2012. Langer Rebuttal Merits Report, 3/26/2025, ¶ 169.

It is for this reason that I use a five-year period rather than a one-year period, so that any such fluctuations are leveled out.

As I explain in my Opening Merits Report, the year 2008 is used as the starting point to calculate revenues as large publishers such as EA (2008) and Ubisoft (2008) did not offer games on Steam during the platform's initial years. The year 2012 is used as the ending point to calculate revenues, as publishers such as EA began to launch new titles exclusively on their own platforms beginning in 2012. Thus, this time period represents a scenario in which multiple large publishers (who would later become publisher-platforms) compete against each other (including Valve/Steam). Also in my Opening Merits Report, I explain the relationship between the success of a publisher-platform's game(s) and its platform. Thus, this data on competition between publisher-platforms' games is a reasonable approximation for the relative competition between their platforms. For more details, see:

Schwartz Opening Merits Report, 1/27/2025, § 8.3.4.

[786]  Schwartz Opening Merits Report, 1/27/2025, ¶ 435.

[787]  Schwartz Opening Merits Report, 1/27/2025, ¶ 436.

[788]  Schwartz Opening Merits Report, 1/27/2025, ¶¶ 437–438.

The fact that the PMFN Policy impacts market shares can be seen in several analyses throughout my report, including but not limited to the PCM.

[789]  Schwartz Opening Merits Report, 1/27/2025, § 8.4.4.

---

demonstrating that its first-mover advantage has not been entirely eroded.[790]  This aligns with Steam's market share in the but-for world.  In the but-for world, Steam would still have its first-mover advantage and, thus, a higher market share than competitors.  However, this would happen without the PMFN Policy; Steam's share would reflect its industry leadership *in the presence of competing platforms*, much like Netflix's share in the SVOD marketplace.

### 9.2.2.   Damages are not sensitive to changes in Steam's but-for market share

(370)   Dr. Langer takes issue with my estimated but-for market share despite not presenting an alternative market share or affirmatively supporting any method with which to determine one.[791]  As I note above, my damages reflect a but-for world where Steam would maintain leading share of the market *and* where other platforms would meaningfully compete.  Yet, Dr. Langer claims that my analysis is "fundamentally unreliable."[792]  While I disagree with her criticism, damages are significant for a wide range of but-for market shares.  My conclusion of significant damage to developers is not sensitive to but-for market shares.

(371)   Figure 22 below shows the minimum damages (using my full sample pass-through estimate), for a range of possible but-for shares.  From the graph, it is clear that even at a but-for market share as high as ▮▮▮ damages exceed ▮▮▮▮▮▮ .

---

[790]    Schwartz Opening Merits Report, 1/27/2025, § 8.4.4.

[791]    Langer Rebuttal Merits Report, 3/26/2025, § 6.3.1.

[792]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 162.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 22: Damages as a Function of Steam's But-For Share**[793]



### 9.2.3. Dr. Langer's example demonstrates a lack of understanding of market definitions

(372)    In an attempt to paint my damages figures as unreliable, Dr. Langer applies inconsistent market definitions to spuriously show that my model leads to negative damages.[794] Dr. Langer claims to show negative damages from my model, but she uses market shares relying on different market definitions in the real world and but-for world with no explanation for the change. Specifically, she uses Dr. Chiou's real world market share of ▮ percent, which I dispute, and compares this to my but-for market share.[795] However, these shares are from two different markets, and such a comparison of apples and oranges is illogical and, more significantly, economically inappropriate. Any appropriate use of my damages model would be within the same relevant market in the real world and the but-for world, and a comparison across two different markets is meaningless.

---

[793]    Schwartz Supplemental Opening Merits Report, 3/7/2025, ¶ 26, Figure 14.

[794]    Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 176–77.

[795]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 177.

## 9.3.   Pass-through

(373)   As a matter of economics, when marginal costs change for a manufacturer or seller of a good, a portion of that cost change can be passed through to customers.  Pass-through is the dollar change in price divided by the dollar change in cost.[796]  In the context of a commission rate change, pass-through measures how much of the change in cost to a publisher from a change in the commission rate is passed on to the end consumer as a change in price charged.  The goal of my pass-through analysis is to provide a reasonable estimate of a pass-through rate for the proposed class members.  In my Opening Merits Report, I estimate a range of pass-through rates by evaluating the average and median price responses of publishers to Steam's tiered commission rate change.[797]  I also explain why, from a theoretical perspective, pass-through in the third-party digital PC game distribution market would be strictly between 0% and 100%,[798] consistent with my estimated range of pass-through rates between 30.5% and 44.0%.[799]

(374)   My analysis is agnostic to the way in which publishers achieve pass-through.[800]  For example, pass-through can be achieved through a base price decrease or use of larger or more frequent discounts.  In my Opening Merits Report, I demonstrate how my analysis is reasonable and conservative when compared to estimates I derive using less restrictive samples.[801]  I further demonstrate how my analysis is robust to data limitations (namely, those resulting from Valve's anticompetitive conduct), other factors that may influence publisher pricing decisions, and publishers' prevalent use of focal point pricing for both base and sales prices on games.[802]

(375)   In her rebuttal report, Dr. Langer offers her own version of a pass-through analysis that treats price changes for individual games as individual estimates of pass-through,[803] a mistaken,

---

[796]   Schwartz Opening Merits Report, 1/27/2025, ¶ 449.

See, also: Weyl, E. Glen and Michal Fabinger (2013), "Pass-Through as an Economic Tool: Principles of Incidence Under Imperfect Competition," *Journal of Political Economy* 121(3): 528–583, at 530–531, 551.

[797]   Schwartz Opening Merits Report, 1/27/2025, § 8.4.2.

[798]   Schwartz Opening Merits Report, 1/27/2025, § 8.4.1.

[799]   Schwartz Opening Merits Report, 1/27/2025, ¶ 461.

[800]   Schwartz Opening Merits Report, 1/27/2025, ¶ 463.

[801]   Schwartz Opening Merits Report, 1/27/2025, ¶ 462.

[802]   Schwartz Opening Merits Report, 1/27/2025, § 8.4.3.

[803]   See, *e.g.*, Langer Rebuttal Merits Report, 3/26/2025, ¶ 192. ("Dr. Schwartz discards games that have pass-through rates above +200 percent or below -200 percent.")

---

misguided, and discredited approach carried over from her class certification rebuttal report. Rather than engage with the theoretical conditions under which her proffered pass-through rates in excess of 100% (or less than 0%) could be achieved, she offers conclusory remarks that are not grounded in any discernible economic principles.

(376)   Dr. Langer claims that my analysis is unreliable for a number of reasons. First, she argues that my estimates are unreliable as my analysis relies on data from a small, non-representative sample of games.[804] Second, she argues that my methodology produces false positives, indicating positive pass-through on unaffected games when there is no observed change in the commission rate.[805] Third, Dr. Langer asserts that my methodology mechanically decreases estimated pass-through rates by discarding games with extreme price changes.[806] Fourth, Dr. Langer claims that my pass-through estimates are unreliable because they lack precision.[807]

(377)   In addition, Dr. Langer advances the nonsensical claim that variation in observed price changes in response to a commission rate reduction demonstrates that many publishers are not harmed.[808] In particular, she incorrectly claims that ▇ of the ▇ games in the pass-through sample have pass-through rates inconsistent with the claim of common impact.[809] Finally, Dr. Langer argues that variation in observed price changes in response to a commission rate change precludes assessment of damages to individual publishers.[810]

(378)   My responses to Dr. Langer's critiques are outlined in detail below. In short, my method of estimating pass-through is reliable. It reasonably accounts for data limitations resulting from the PMFN Policy. Furthermore, my analysis accounts for variation in observed price changes

---

See also:

Langer Rebuttal Merits Report, 3/26/2025, § 6.4.2.2.

[804]   Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 196–97.

[805]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 190.

[806]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 192.

[807]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 193.

[808]   Langer Rebuttal Merits Report, 3/26/2025, § 6.4.2.2.

[809]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 203.

[810]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 204. ("Second, the implied game-level pass-through rates exhibit wide variation. Beyond suggesting that Dr. Schwartz's single pass-through measure is imprecise, this has important ramifications for the apportionment of putative game-specific or publisher-specific damages. That is, even supposing he had estimated the average pass-through rate that has a reliable causal interpretation and is assessed to be reasonably precise (he has not), he has still not provided a methodology to reliably apportion damages due to the variation in pass-through that exists across games and publishers.")

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

using well-established measures defined in the literature. Lastly, because variation in price changes in response to cost changes is to be expected, my methodology estimates the expected price response of a publisher to a 5% marginal cost change and consequently produces a reliable estimate of the expected harm that publishers suffer from paying a supracompetitive commission rate.

## 9.3.1.  Pass-through estimates are reliable

**My analysis reliably estimates pass-through despite data challenges resulting from the PMFN Policy**

(379)   To evaluate pass-through related to a marginal cost change, one would ideally observe a random change in the marginal cost and evaluate the resulting change in price. While this happens regularly in most markets, Valve's enforcement of the PMFN Policy preserves a stable, supracompetitive commission rate. That rate has been modified just once, and in a very limited fashion, in 2018 when Valve introduced a tiered commission system. This tiered commission system applied only to games crossing $10 million and $50 million in revenue, respectively, and is the only uniform change to marginal costs that publishers have experienced on the Steam platform. As such, Valve's anticompetitive conduct has created a setting in which the analytical tools and sample of games available to assess pass-through are both limited.

(380)   Dr. Langer first argues that my analysis is not reliable because it does not isolate the causal impact of changes in Valve's commission rate on user prices.[811] She points out that correlation does not imply causation, acknowledging that the games in my sample all experienced a uniform marginal cost decrease to distribution on Steam. However, Dr. Langer fails to recognize the obvious analytical challenge created by the PMFN Policy, and she fails to go any deeper than recitation of this obvious trope. As explained in my Opening Merits Report, it is my opinion that conducting an analysis that would allow a causal interpretation of a commission rate reduction on game prices is not feasible in this matter.[812] Dr. Langer offers no alternative analysis suggesting otherwise, and I therefore conclude she has none.

---

[811]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 182.

[812]   Schwartz Opening Merits Report, 1/27/2025, ¶ 464. ("[A]s in virtually all cases involving real-world observational economic data (*i.e.*, data collected outside the context of a lab-controlled experiment), the data are noisy (*i.e.*, there are a variety of factors other than the commission rate change that could affect publishers' pricing decisions and are not readily observable in the data used to analyze pass-through). It is, therefore, not possible to control for all factors that could influence the pricing decision by a given publisher with respect to a single game. That means it is difficult, if not impossible, without

(381)   My approach to estimating pass-through minimizes the potential influence of other factors impacting price when publishers experience a reduction of their marginal costs through a lower commission rate.  While publishers in my sample may experience a variety of price pressures near the time of crossing the $10 million revenue threshold, it is unlikely that these price pressures are correlated across games, as games are at different points in their life cycle, face different degrees of competition, and cross the revenue threshold at different points in time.[813]  Because other factors are uncorrelated across games and because all games in my sample do experience the same marginal cost reduction, estimating pass-through by evaluating the average or median price change in response to the reduction in the commission rate provides the best analytical method available to minimize the influence of other factors on observed price changes.  More specifically, it is well known that the sample average is the unique solution that minimizes the sum of squared deviations between an estimate and the observations in the sample, and the sample median is the unique solution that minimizes the sum of absolute deviations between an estimate and the observations in the sample.[814]  In using an estimator that minimizes deviations (*e.g.*, sample mean, sample median), I effectively mitigate the impact other factors (besides the commission) change may have on publishers' pricing decisions.

(382)   Dr. Langer specifically identifies COVID-19, game age, and inflation as potential factors that could influence prices of games during the sample time period;[815] however, she makes no attempt to estimate the impact of any of these factors on game prices.  If anything, the increase in demand resulting from COVID-19 as well as higher than usual inflation during the sample time period would be expected to put upward pressure on game prices, thereby attenuating observed price decreases over the sample time period.  Moreover, one would expect game prices to fall as games reach the later stages of their lifecycle, implying that my estimates of pass-through are conservative if any of the observed price decrease reflects the effect of game age on game price over time.

(383)   Dr. Langer also argues that my analysis is not reliable because the sample on which I conduct my analysis is not a representative sample of all games on Steam.[816]  However, she ignores

---

more data than are available currently to me, to interpret a price change for any single game (*i.e.*, to determine how much of the price change is attributable to the commission rate decrease).")

[813]   Schwartz Opening Merits Report, 1/27/2025, ¶ 468.

[814]   Casella, George and Roger L. Berger (2002), *Statistical Inference*, 2nd ed., Belmont, CA: Cengage Learning, at 597.

[815]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 183.

[816]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 196.

the obvious reason why using such a sample is not possible.  I am unable to estimate pass-through using such a sample because of Valve's supracompetitive commission rate upheld by the PMFN Policy.  While the sample of games on which I can evaluate pass-through is limited to those that cross the $10 million revenue threshold, the sample of games that I use is representative of all games in terms of the price points used and set by publishers for games on the Steam platform.[817]  Furthermore, I have sought to make the sample more representative of all games by limiting the analysis to just those games that cross the lower $10 million revenue threshold and not the higher $50 million revenue threshold.[818]  In addition, I have limited the analysis to games that have more than a year of price data before and after crossing the $10 million revenue threshold.[819] These restrictions remove games that are unusually successful from my sample and thus make the sample of games on which a pass-through analysis is even possible more representative of games on the Steam platform.

**My analysis reasonably accounts for variation in observed price changes in the data**

(384)  Dr. Langer incorrectly asserts that my methodology "mechanically decreases [my] estimated pass-through rates" by discarding games with extreme price changes.[820]  This is simply not true.  My analysis of pass-through yields a *range* of estimates that includes both the price response of *all* games in the sample as well as the price response of games excluding those with more extreme observed price changes.  While I estimate a median price change of 2.20% in the full sample, I estimate a median price change of 1.52% when excluding games with observed price changes over 10% one year before and after the commission rate changed.  I then report an expected pass-through range of 30.5% to 44.0%, and I subsequently use this range to estimate damages.[821]

(385)  Economists understand that addressing outliers in data is important because they can significantly distort statistical estimates, leading to biased results and/or misleading inferences.[822]  As such, economists often employ various methods to manage outliers,

---

[817]  Schwartz Opening Merits Report, 1/27/2025, ¶¶ 472–474.

[818]  Schwartz Opening Merits Report, 1/27/2025, ¶ 457.

[819]  Schwartz Opening Merits Report, 1/27/2025, ¶ 458.

[820]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 192.

[821]  Schwartz Opening Merits Report, 1/27/2025, ¶¶ 459–461.

[822]  Aguinis, Herman, Ryan K. Gottfredson, and Harry Joo (2013), "Best Practice Recommendations for Defining, Identifying, and Handling Outliers," *Organizational Research Methods* 16(2): 270–301, at 271. ("Outliers, by virtue of being different from other cases—be it other individuals, teams, or firms—usually exert disproportionate influence on substantive conclusions regarding relationships among variables.")

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

including detection, removal, and applying robust statistical techniques.[823]  My pass-through analysis reasonably accounts for variation in observed price changes by offering different ways to account for outliers.  More specifically, I conduct the analysis removing games with different thresholds of extreme price changes.[824]  On the one hand, I estimate pass-through including all observed price changes in the data; on the other hand, I estimate pass-through excluding games that exhibited price changes greater than 10%, 15%, 20%, 25%, and 30% in absolute value around the time they crossed the $10 million revenue threshold.

(386)   Dr. Langer further argues that my pass-through estimates are unreliable because I do not report a statistical measure of precision.[825]  The issue here is not precision; this is not a statistical analysis that is readily amenable to tests of statistical significance and the like.  The issue is reasonableness.  More precisely, the issue is whether the pass-through estimates are based on reasonable assumptions, data, and methodology.   They are, for the reasons discussed herein and in my Opening Merits Report.

(387)   While my analysis does not include confidence intervals typical of a regression or other econometric analysis, it does provide a range of estimates based on evaluation of different samples and differential treatment of outliers in the data.  The results are robust to the different samples and treatment of outliers.  As stated previously, Valve's historic enforcement of the PMFN Policy has created a setting in which it is econometrically difficult to isolate the causal impact of a marginal cost change on the price of a game.  It is Valve's anticompetitive conduct that has limited the availability of data to assess pass-through, making Dr. Langer's suggestion infeasible in this case.  However, my analysis demonstrates that pass-through point-estimates exhibit similar magnitudes across a variety of different samples.  That is, the pass-through point-estimate is 44.0% when conducting the analysis on the full sample of ███ games, while it is 30.5% when excluding games with observed price changes more extreme than 10%.[826]  Moreover, I report a range of pass-through estimates based on differential treatment of outliers in the data so that my damages do not rely on a single point-estimate.

---

[823]   For more information, see:

Barnett, Vic and Toby Lewis (1978), *Outliers in Statistical Data*, 3rd edition, New York, NY: John Wiley & Sons, at 46–51.

[824]   Schwartz Opening Merits Report, 1/27/2025, ¶¶ 460–461, Figure 13.

[825]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 193.

[826]   Schwartz Opening Merits Report, 1/27/2025, ¶¶ 460–461, Figure 13.

**My methodology is robust to analytical exercises designed to test its reliability**

(388)   Dr. Langer incorrectly posits that my method of estimating pass-through yields "false positives", or a positive pass-through estimate, when no pass-through should be present.[827] In particular, she constructs a sample of games that earned over $5 million in revenue but not $10 million. She then applies what she describes as my methodology and claims to find a pass-through range of 48.2% to 62.5% for these games, when none of the games experienced a marginal cost change from a change in commission rate.[828]

(389)   The primary issue with Dr. Langer's analysis is that it is being applied to a set of games for which there has been no marginal cost change from a reduction in Steam's commission rate. Thus, despite her claims otherwise, her analysis fails as a replication of my methodology. Much like her insistence on referring to individual game price changes as individual estimates of "pass-through,"[829] she mistakenly proffers her new analysis as an estimate of "pass-through" on a sample of games for which there has been no uniform change in costs among the games in her sample. One of the basic requirements of measuring the economic effects of a treatment variable of interest (here, the marginal cost change) is that there should be observations in your sample that *actually experienced the treatment*.[830] Dr. Langer's sample has no such observations. Consequently, Dr. Langer's analysis is a meaningless mathematical exercise masked as an attempt to refute my approach. In so doing, Dr. Langer continues her approach of applying my models and methodologies to situations in which they are not intended to be applied, itself a methodological flaw.[831]

---

[827]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 190.

[828]   Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 187–191.

[829]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 203. ("Out of █ games in Dr. Schwartz's sample, █ have pass-through rates that are inconsistent with the claim of common impact because they are either above 100 or below 0.")

[830]   Wooldridge, Jeffery (2012), *Introductory Econometrics: A Modern Approach*, 5th ed., Mason, OH: South-Western, at 232, 457, 465. ("A special case of policy analysis is program evaluation, where we would like to know the effect of economic or social programs on individuals, firms, neighborhoods, cities, and so on. In the simplest case, there are two groups of subjects. The control group does not participate in the program. The experimental group or treatment group does take part in the program."; "A natural experiment always has a control group, which is not affected by the policy change, and a treatment group, which is thought to be affected by the policy change."; "Panel data sets are very useful for policy analysis and, in particular, program evaluation. In the simplest program evaluation setup, a sample of individuals, firms, cities, and so on is obtained in the first time period. Some of these units, those in the treatment group, then take part in a particular program in a later time period; the ones that do not are the control group.")

[831]   To be clear and to avoid any doubt, game prices can change without a change in marginal costs. When Dr. Langer conducts her flawed analysis, she seems to be suggesting that any price change is a pass-through, even when she cannot identify the triggering change in marginal costs. Thus, her analysis is merely arithmetic, disconnected from the relevant market behavior.

---

Rebuttal Merits Expert Report of Steven Schwartz, Ph.D.                                      Page 209

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(390)    My analytical approach does not produce false positives; in fact, a more rigorous test of the reliability of my approach than what Dr. Langer has advanced demonstrates that my analysis yields conservative estimates of pass-through. In the sample of ▮ games used to estimate pass-through, there are ▮ unique dates on which games crossed the $10 million threshold.[832] I use this fact to construct 100 random samples of ▮ games each to compare the price change of randomly sampled games to the price change of the games in the pass-through sample. More specifically, I randomly sampled games that did *not* cross the $10 million revenue threshold by the end of 2024 but otherwise met the same criteria for inclusion of games in the original pass-through sample.[833] For each of the 100 samples, a game was randomly selected without replacement on each of the ▮ identified dates. I then computed the average and median price change of the ▮ randomly sampled games in the same manner that I did for the original pass-through sample. This process was repeated 100 times, allowing me to generate a distribution of average and median price changes that the randomly sampled games experienced, which can be seen in Figures 23 and 24 below.[834] These figures illustrate the distribution of price changes of the 100 random samples that do *not* experience any marginal cost decrease but do experience the same passage of time as the games in my pass-through sample.

---

[832]    For more details, see 14_Passthrough_Rebuttal.R

[833]    Randomly sampled games were required to *not* have earned more than $10 million in revenue by the end of 2024. Like the games in the pass-through sample, randomly sampled games were required to have transaction data at least 360 days before and after the dates of interest. Furthermore, randomly sampled games were required to have pricing data for at least 50% of the days in the 720-day time window. For more details on the criteria for the randomly sampled games, see 14_Passthrough_Rebuttal.R

[834]    For more details on process and code used to conduct the analysis, see 14_Passthrough_Rebuttal.R

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 23: Average Price Decrease of Randomly Sampled Games during Pass-Through Sample Time Period**



**Figure 24: Median Price Decrease of Randomly Sampled Games during Pass-Through Sample Time Period**



HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(391)  As Figures 23 and 24 show, my approach finds a *larger* decrease in price for games that *did* experience a commission rate reduction than nearly all random samples of games that did *not* experience any such change in the commission rate. This result contrasts clearly with Exhibit 13 in Dr. Langer's rebuttal report, which gives the distribution of price changes for games after crossing a single, arbitrarily chosen revenue threshold.[835]  Not only does Dr. Langer's result fall completely out of the distribution of price changes experienced by the 100 random samples of games given by Figures 23 and 24, it also seems to suggest that games that did not experience any decrease in the commission rate dropped their prices more than those games that did, a result contrary to what economic theory would predict. In contrast, the larger decrease in price that I find for games that did experience a marginal cost reduction aligns with the predictions of economic theory, which clearly asserts that producers will pass through at least some of a marginal cost reduction to consumers in the form of lower prices.[836]

(392)  The fact that randomly sampled games generally appear to decrease in price over the sample time period demonstrates that my estimates of pass-through are in fact conservative. More specifically, if the games in the pass-through sample experienced a similar downward trend in price (not related to the commission rate) as the randomly sampled games, Figures 23 and 24 suggest that I would find a smaller (though still positive) price decrease in response to the commission rate reduction than that reported in my Opening Report. If publishers pass through a smaller portion of the cost savings to consumers, then publishers suffer greater harm from a commission rate overcharge, making my estimates of damages conservative.

(393)  Finally, my pass-through analysis is robust to the consideration of key game characteristics, such as game age and cumulative game revenue. Figures 25 and 26 below show that the size of the price changes that randomly sampled games experienced are not correlated with game age or cumulative game revenue.[837]  This further confirms that price changes experienced by games in the pass-through sample are *not* driven by differences these games might have with randomly sampled games with respect to these key game characteristics.

---

[835]  Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 187–188. ("[C]onsider the set of games that have revenues between $5 million and $10 million on Steam. . . I can apply Dr. Schwartz's approach to estimating pass-through rates to this set of games to test the reliability of his approach. In particular, I can look at how the prices for these games changed when they crossed $5 million in revenue on Steam.")

[836]  Schwartz Opening Merits Report, 1/27/2025, ¶¶ 450–451.

[837]  For more details on the code used to construct the figures, see 14_Passthrough_Rebuttal.R

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 25: Correlation between Observed Price Changes and Game Age of Randomly Sampled Games during Pass-Through Sample Time Period**



HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 26: Correlation between Observed Price Changes and Cumulative Game Revenue of Randomly Sampled Games during Pass-Through Sample Time Period**



### 9.3.2.  Variation in observed price changes does not imply extreme pass-through rates and does not impact my damages analysis

(394)  As mentioned above, Dr. Langer incorrectly interprets single price-change observations in the data as the pass-through rate of the associated publisher.  Moreover, she applies this erroneous interpretation to imply that my analysis yields pass-through estimates greater than 100% and less than 0%.[838]  This is categorically untrue.  My analysis evaluates the expected price change of a game by taking the median and average price change observed within the sample of ▮ games in response to a change in marginal cost.  More specifically, I report an estimated pass-through range of 30.5%-44.0%.[839]

(395)  In addition, Dr. Langer speciously argues that variation in observed price changes, namely price changes that are greater than 5%, implies that some publishers are not harmed from a

---

[838]  See, *e.g.*, Langer Rebuttal Merits Report, 3/26/2025, ¶ 192.  ("Dr. Schwartz discards games that have pass-through rates above +200 percent or below –200 percent.")

See also:

Langer Rebuttal Merits Report, 3/26/2025, § 6.4.2.2.

[839]  Schwartz Opening Merits Report, 1/27/2025, ¶ 461.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

supracompetitive commission rate.[840]   This defies both intuition and economic reasoning. Intuitively, a publisher is worse off when it must pay a higher commission rate on each sale, all else equal.   A review of the underlying economic principles also demonstrates why publishers suffer harm from a commission rate overcharge, even if they choose to lower prices more than the corresponding reduction in marginal cost.

(396)   When the commission rate decreases, there is a decrease in a publisher's marginal cost. Regardless of how a publisher chooses to adjust its price in light of these cost savings, lower costs (here, commission rates) benefit all publishers.   When marginal cost falls due to a commission rate change, a publisher can maintain the same game price and sales as before, all else equal, or decrease its game price to attract more customers.   In the first case, the publisher maintains the same price and sales and earns more profit per game than it did before the commission rate change, all else equal.   In other words, the publisher could do nothing to its price/output decisions and be better off simply because its costs have decreased.   That publisher is thus harmed by the overcharge.   In the second case, in response to the decrease in marginal cost, the developer lowers its game price to attract more customers (because it faces a downward sloping demand curve) and thus can earn greater profits through the cost savings *and* the increased output.   Because the publisher operates on the elastic portion of the demand curve, a decrease in price leads to a correspondingly greater increase in sales and, thus, total revenue, meaning the decrease in price increases profits.   In this scenario as well, the publisher is harmed by the overcharge.   In short, Dr. Langer's assertion that some publishers do not suffer harm from a supracompetitive commission rate is not only based on a flawed methodology (*i.e.*, estimating pass-through from a single price change observation), but it is also inconsistent with economic principles as it fails to consider the impact of a decrease in marginal cost on publisher profits.

(397)   Finally, contrary to Dr. Langer's claim, individual variation in price responses does not preclude assessment of damages to individual publishers.[841] As stated above, it is not possible, let alone advisable as a matter of economics, to estimate a publisher's specific pass-through

---

[840]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 203. ("If they pass through 100 percent or more, then publishers decrease prices by more than they would save on any revenue share changes, so they would be worse off for any sales they would have made during the class period at Dr. Schwartz's lower but-for revenue share rate.")

[841]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 204. ("Second, the implied game-level pass-through rates exhibit wide variation. Beyond suggesting that Dr. Schwartz's single pass-through measure is imprecise, this has important ramifications for the apportionment of putative game-specific or publisher-specific damages. That is, even supposing he had estimated the average pass-through rate that has a reliable causal interpretation and is assessed to be reasonably precise (he has not), he has still not provided a methodology to reliably apportion damages due to the variation in pass-through that exists across games and publishers.")

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

rate from a single price change observation. Consequently, my analysis estimates the average and median expected price change response to a 5% commission rate reduction using the full sample of games that crossed the $10 million revenue threshold as well as using samples with different treatments of outliers. My analysis yields a range of possible pass-through estimates, which can easily be used to estimate the expected harm each publisher suffers from a supracompetitive commission rate.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## 10.    Dr. Langer Fails to Follow Her Own "Standards"

(398)    In the sections above, I discussed how Dr. Langer incorrectly applies her five standards to both my PCM and damages models.  In this section, I demonstrate that Dr. Langer fails to adhere to her own standards.  Accordingly, Dr. Langer's application of these standards should be viewed as no more than a convenient way to try to critique my analysis.  Apparently, however, these standards are not something to which Dr. Langer is beholden.

(399)    As I explained in Section 6.2.2 Dr. Langer's analysis regarding Steam Keys and her calculation of a claimed "effective revenue share" is problematic and erroneous.  Below, while I explain how her analysis violates each of her own "standards," my analysis below is not an endorsement of Dr. Langer's standards.   Rather, it is intended solely to reveal the contradictory positions Dr. Langer is willing to take in her report to reach her desired opinion.  My conclusions regarding Dr. Langer's adherence to her own standards for her Steam Keys model are summarized in Figure 27 below.[842]

### Figure 27: Dr. Langer's Steam Keys Model Fails to Meet Her Own "Standards" for Reliable Modeling of the But-For World Absent the Alleged Conduct

| Standard # | Dr. Langer "Standard" for Reliable But-For Modeling | Does Dr. Langer's Steam Keys Model Meet the Standard? |
|:---:|---|:---:|
| 1 | A model should include the challenged conduct and the relevant decision-makers | NO |
| 2 | A model's assumptions should reflect the realities of the industry studied | NO |
| 3 | A model's predictions should be consistent with industry facts | NO |
| 4 | A model's predictions should be determined by data rather than its assumptions | NO |

---

[842]    For a description of Dr. Langer's standards, see:

Langer Rebuttal Merits Report, 3/26/2025, § 4.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

| 5 | A model should provide means by which its precision can be evaluated | NO |
| --- | --- | --- |

**Dr. Langer Standard #1: A model should include the challenged conduct and the relevant decision-makers**

(400)   Dr. Langer claims "to reliably make predictions about a but-for world, an economic model first needs to correctly model the challenged conduct that would be missing from the but-for world, and the impact of that conduct. This allows the model to evaluate the incentives that drive the behavior of people and firms (who I will refer collectively to as '*decision-makers*') when the challenged conduct is in place—and to then predict how their incentives, and therefore behavior, would change if the challenged conduct did not occur."[843]

(401)   Dr. Langer's model pertaining to Steam Key sales and her corresponding effective revenue share calculation is notably devoid of any reference to the challenged conduct in this matter. Nor does it model the behavior of relevant decision makers, such as platforms other than Steam where publishers may choose to distribute their games via Steam Keys, among others. Nor does it model the commissions paid on any Steam Key sales, *i.e.*, it completely ignores the price of distribution via Steam Keys. Nor does it model how distribution via Steam Keys takes place, including the various scenarios in which publishers use Steam Keys that have nothing to do with revenue generation. In fact, the only reference Dr. Langer makes to the but-for world when constructing her effective revenue share is not related to any explicit modeling of how Steam Key usage may differ in the absence of the alleged conduct, but rather to assert, with no support, that Valve would likely issue fewer Steam Keys in the but-for world.[844]

(402)   Notwithstanding Dr. Langer's failure to comply with her Standard #1), I have demonstrated using economic principles applied to the facts of this case that Valve would be incentivized to maintain Steam Key issuance in a but-for world (see Section 6.1). I have also demonstrated why, as a matter of economics, the issuance and subsequent sale of a Steam Key on an alternative platform is irrelevant for the determination of harm and the calculation of damages in this case (see Section 6.2). Nothing in Dr. Langer's erroneous Steam Keys model refutes my conclusions.

---

[843]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 52.

[844]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 213.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Dr. Langer Standard #2: A model's assumptions should reflect the realities of the industry studied**

(403)    Dr. Langer claims (citing to herself): "While all economic models must make assumptions, models whose assumptions oversimplify or contradict the real world cannot reliably make predictions about how economic outcomes would change in the but-for world."[845]  Yet, Dr. Langer's Steam Key model is premised on assumptions that are in direct contradiction to how PC game distribution through Steam Keys occurs in the real world.

(404)    First, Dr. Langer's model does not account for the various reasons for which a publisher may use Steam Keys.  Since Dr. Langer is unable to identify Steam Keys that have actually been sold,[846] she assumes that the number of Steam Keys sold by a publisher is equal to either (1) the number of Steam Keys issued to the publisher or (2) the number of the publisher's Steam Keys that have been redeemed.[847]  Yet, as Dr. Langer has acknowledged, publishers may use Steam Keys for a variety of reasons, including in ways that result in no direct revenue to the publisher.[848]

(405)    Second, Dr. Langer's effective revenue share calculation does not include any commissions paid on Steam Keys distributed on other platforms.[849]  Thus, her model implicitly assumes that no commission is paid by publishers on Steam Key sales, disregarding the fact that Steam Key sales would be subject to a revenue share on the platform on which they were sold.[850]  Dr. Langer's model ignores the costs—and therefore realities of the industry—of digital PC game distribution via Steam Keys.

(406)    Third, Dr. Langer incorrectly assumes that revenue a publisher earned through the sale of a game via a Steam Key should be treated as revenue earned on the Steam platform *despite the*

---

[845]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 55.

[846]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 211, fn. 401.  ("Valve does not have any data on the number of Steam keys sold or the prices at which those Steam keys were sold because those sales occur outside of Steam.")

[847]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 211, Appendix E.1.

[848]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 40.  ("On the publisher side of the platform, publishers and developers can ask Valve to issue Steam keys to use internally for testing the game, to provide to reviewers and influencers free copies for marketing purposes...")

I note that Dr. Langer attempts to exclude certain categories of Steam keys she believes to be unlikely to be sold, but admits that she is still unable to identify which Steam keys were actually sold by publishers.  See:

Langer Rebuttal Merits Report, 3/26/2025, Appendix E.1, ¶ 260.

[849]    Langer Rebuttal Merits Report, 3/26/2025, Appendix E.3, ¶¶ 267, 268.

[850]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 210, fn. 400.  ("As Dr. Schwartz points out, a Steam key reseller platform (such as Humble Bundle) may retain some of the revenue from the key sales. That is irrelevant for this calculation.")

---

*fact that the transaction necessarily takes place on a platform other than Steam.*[851] Dr. Langer's Steam Key model is therefore further divorced from the reality of the industry.

(407)   Dr. Langer is certainly aware of these inconvenient facts.[852] Yet, she continues to advance an incorrect and misleading effective revenue share calculation that was shown to be nonsensical during the class certification phase.[853]

**Dr. Langer Standard #3: A model's predictions should be consistent with industry facts**

(408)   Dr. Langer claims (citing to herself): "Economic models are reliable for predicting the impact of a challenged conduct if they can make predictions that are consistent with the realities of the industries they aim to capture."[854]   However, Dr. Langer's Steam Key model, and correspondingly her effective revenue share calculation, makes predictions that are inconsistent with the facts of third-party digital PC gaming distribution.  Dr. Langer's model can make predictions about a publisher's "effective revenue share" that are inaccurate and economically unsupportable.  Indeed, despite describing her calculation as "Valve's effective revenue share," Dr. Langer uses her model to draw conclusions from the point of view of *publishers* without any consideration for the actual revenue share publishers pay or without actually considering the revenue Valve receives.[855]

(409)   For example, Dr. Langer's effective revenue share model can lead to predictions, such as whether a publisher is harmed from Valve's commission rate, that ignore the economic realities publishers face in the relevant market.  This has already been illustrated in the class certification phase.  During class certification deposition, Dr. Chiou was presented with hypothetical scenarios in which, in the actual world, a publisher has equal revenue from sales on Steam and from sales of Steam Keys on another platform, with all sales (on Steam or the other platform) subject to a 30% commission.  In the hypothetical scenario, in the but-for world, Steam Keys are assumed to no longer exist, total sales on Steam and the other platform

---

[851]   Schwartz Opening Merits Report, 1/27/2025, ¶ 46.

[852]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 211, fn. 401. ("Valve does not have any data on the number of Steam keys sold or the prices at which those Steam keys were sold because those sales occur outside of Steam.")

[853]   See, *e.g.,* Lesley Chiou, Dep. Tr., 6/18/2024, 214:2–222:12, Exhibits 2, 3.

[854]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 57.

[855]   See, *e.g.,* Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 207, 214. ("In particular, I explain the role of Steam keys in providing publishers additional revenue, how to represent and approximate the value Steam keys provide to publishers, how Dr. Schwartz's but-for world may leave publishers worse off when considering Steam keys…") ("As such, even if Valve's revenue share were to decline in the but-for world or Wolfire Games were to use one of Valve's competitors to distribute and host its games, Wolfire Games may still be worse off absent the value of Valve's Steam keys.")

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

remain the same but are subject to a 20% commission.[856]  I explained in my Reply Class Certification Report that this leads to nonsensical conclusions stating:[857]

> [In the actual world], Dr. [Langer's] formula implies the "Effective Revenue Share" is 15%, even though the publisher pays 30% on all transactions—a bizarre result on its own.  When considering what happens in the but-for world, [Dr. Langer's] formula gets even more nonsensical.  In the but-for world where commissions go to 20% but Steam Keys disappear, the "Effective Revenue Share" is 20%.  [Dr. Langer's] "Effective Revenue Share" formula thus implies the class member is worse off because its "Effective Revenue Share" went up from 15% to 20%—even though the commissions actually paid for the class member decreased from 30% to 20%.  It defies economics and common sense for a publisher paying a 20% price to be worse off than a publisher paying a 30% price.

(410)  Dr. Langer is silent on such inconsistencies between her model's predictions and these industry facts.

**Dr. Langer Standard #4: A model's predictions should be determined by data rather than its assumptions**

(411)  Dr. Langer claims: "A model that makes predictions based on analyzing the data would be expected to make different predictions for different settings. If the model makes the same prediction no matter what data it analyzes, then this is evidence that the model's predictions are being driven by its assumptions rather than the data."[858]  Dr. Langer must view her Steam Key model and effective revenue share calculation as being exempt from this standard, as it certainly does not follow it.  Her model makes one unequivocal prediction: *any publisher that is assumed to have earned revenue from a Steam Key sale will have an effective revenue share that is lower than its nominal revenue share.*[859]  Thus, using Dr. Langer's own words, her model is "*not capable* of reaching different predictions."[860]  Her model, also using her own words, "essentially acts as a machine that concludes, regardless of fact or circumstance" that a publisher has a lower effective revenue share on Steam than its nominal revenue share if it is assumed to have earned *any* revenues through Steam Keys.[861]

---

[856]    Lesley Chiou, Dep. Tr., 6/18/2024, 214:2–222:12, Exhibits 2, 3.

[857]    Schwartz Reply Class Certification Report, 7/12/2024, ¶ 212.

[858]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 61.

[859]    See formulas/example calculations in Langer Rebuttal Merits Report, 3/26/2025, ¶ 210, Appendix E.3.

[860]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 108.  (Emphasis in original.)

[861]    Langer Rebuttal Merits Report, 3/26/2025, ¶ 108.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(412)   This is not a prediction "determined by data." It is purely a result of Dr. Langer's assumptions about the existence of an effective revenue share on Steam and how it should be calculated, *i.e.*, that Valve should somehow get credit for transactions occurring on platforms other than Steam while any subsequent commissions paid on those sales should be ignored. This assumption is not grounded in any economic principles. It is a mathematical fabrication, nothing more. It serves only to cast Steam's supracompetitive rates in a more favorable light by suggesting such rates are not actually what publishers pay Valve for distribution on Steam. But Dr. Langer is wrong, for at least the simple reason that Steam Key transactions necessarily take place outside of Steam. In other words, the distribution efforts associated with games sold via Steam Keys are not borne by Valve.

(413)   Dr. Langer does not even attempt to demonstrate that publishers consider her effective revenue share calculation when considering their costs for distribution on Steam. She cites no evidence suggesting that Valve or even a single publisher has considered anything resembling her effective revenue share calculation at all, much less one that considers Steam Keys. Dr. Langer is unable to show that the number of Steam Keys distributed to each publisher is in any way related to the commission rate that Valve charges to a publisher; in fact, each publisher is charged the same commission rate on sales within Steam *regardless of any Steam Key distribution.* If Dr. Langer's effective revenue share model had any merit, one would expect to see Valve and publishers making business decisions using such metrics. I am not aware of any such analysis, Dr. Langer points to no such evidence, and I conclude she has none to offer. Tellingly, the sole business decision from Valve in the evidentiary record regarding its revenue share was a potential reduction to its *nominal share* through the introduction of revenue share tiers due to anticipated competition with EGS.[862] If Valve was truly offering, and publishers believed they were truly getting, effective revenue shares of the magnitudes that Dr. Langer suggests publishers have realized,[863] it begs the question why Valve would feel compelled to offer further discounts. According to Dr. Langer's logic, Valve could simply point to the bargain it offers to publishers via Steam Key sales and demonstrate to publishers that their effective revenue shares with Valve rival the revenue shares with competing platforms like EGS. But that's not what Valve did, of course. Dr. Langer's effective revenue share is a made-up metric created by Dr. Langer in a failed attempt to present Valve's conduct in a positive light.

---

[862]   Schwartz Opening Merits Report, 1/27/2025, § 7.4.

[863]   See, for example: Langer Rebuttal Merits Report, 3/26/2025, ¶ 212 Exhibit 16.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(414)   Despite this, Dr. Langer willingly offers up a nonsensical hypothetical that Valve could, in the extreme, provide "Steam Keys to a degree where costs exceeded the revenue brought in through distribution," which, if someone were naïve enough to adopt her effective revenue share model, could result in my model predicting no harm to publishers.[864]  This hypothetical fails on multiple levels.  First, it completely disregards how Valve operates.  My understanding of Valve's business is that it's not a charity—to the contrary, it has been persistently profitable to the tune of billions of dollars.[865]  Valve is not in the business of handing out Steam Keys to a point at which it is unable to cover its costs, and its high and sustained profitability demonstrates that.

(415)   Second, Dr. Langer's hypothetical disregards Valve's economic incentives for offering Steam Keys.  As I have explained at length, Valve has derived and continues to derive substantial benefits from offering Steam Keys (see Section 6.1).  Steam Keys help drive users (back) to Steam, even if they made a purchase on another platform.  By doing that, Steam helps to build/strengthen/sustain network effects and create opportunities to receive future revenues and profits from subsequent in-game or new game purchases that are made.  Valve would not offer its Steam Key program in its current form unless it were expected to be profit-maximizing to do so.

(416)   Third, Dr. Langer's hypothetical disregards the harm publishers have experienced, *i.e.*, the harm that I have demonstrated and reasonably measured, from Valve's PMFN Policy and supracompetitive fee.  More generally, Dr. Langer's model essentially offsets the overcharge paid by a publisher (*i.e.*, harm to that publisher) with the use of Steam Keys.  I understand that regardless of the net impact of Valve's supracompetitive commission rate, a class member suffers antitrust injury if they overpay on just a single transaction.[866]  What matters is whether each class member paid an inflated commission on at least one Steam transaction, regardless of the number of Steam Key transactions that class member may or may not have executed.  That is true as a matter of economics.

---

[864]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 212, fn. 406. ("In the extreme, if Valve provided Steam keys to a degree where costs exceeded the revenue brought in through distribution, incorporating Valve's effective revenue share in the as-is world could induce Dr. Schwartz's model to estimate no harm.")

[865]   Schwartz Supplemental Opening Merits Report, 3/7/2025, Supplemental Attachment D-3.

[866]   Schwartz Opening Merits Report, 1/27/2025, ¶ 392 fn. 901.

**Dr. Langer Standard #5: A model should provide means by which its precision can be evaluated**

(417) According to Dr. Langer: "it is a best practice in economics for model estimates to be accompanied by standard errors and with the corresponding confidence intervals, which capture this uncertainty."[867] Despite her attempted admonishments of my analysis regarding this standard,[868] Dr. Langer, once again, fails to abide by her own rules. She acknowledges the inherent uncertainty in her estimates of publisher revenue earned through Steam Keys,[869] yet draws definitive conclusions based on her imprecise estimates.[870] This uncertainty is caused by, at least in part, the following issues with her estimates:

- Dr. Langer has no knowledge of which Steam Keys in her sample were sold vs., *e.g.*, given away for promotional purposes, used for testing purposes, etc.[871]

- Dr. Langer has no knowledge of the prices at which any Steam Keys in her sample were sold (if any were sold at all).[872]

- Dr. Langer has no knowledge of which platforms distributed any of the Steam Keys in her sample.[873]

---

[867]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 65.

[868]  See, *e.g.*, Langer Rebuttal Merits Report, 3/26/2025, ¶¶ 120, 121, 169, 193.

[869]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 211. ("Using data produced in this matter, it is possible to approximate—but not exactly determine—revenues that publishers receive from their use of Steam keys.")

[870]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 212. ("As the exhibit shows, Steam keys provide substantial and varying value to publishers on Steam, including the named plaintiffs. In fact, heavy Steam key use implies that the current effective revenue share for some publishers is below Dr. Schwartz's predicted *but-for* revenue share.")

[871]  Langer Rebuttal Merits Report, 3/26/2025, Appendix E.1. See, *e.g.*, ¶¶ 258, 260. ("The data produced by Valve in this matter provide information on the number of Steam keys redeemed (Steam key redemptions data) and the number of Steam keys requested by and issued to publishers (Steam key requests data). Therefore, I consider two assumptions about Steam key sales: The quantity of Steam keys sold is equal to the number of Steam keys redeemed. The quantity of Steam keys sold is equal to the number of Steam keys issued.") ("While I can make these approximations using available data, there are many reasons why these approximations may not reflect the quantity of Steam keys sold during the proposed class period. . . In instances where the name of the associated package does not indicate its purpose, my analyses may include some keys that were given away by publishers for promotional or other purposes rather than sold.")

See also:

Langer Rebuttal Merits Report, 3/26/2025, ¶ 212, fn. 406. ("...the true prices might not be well represented by the daily Steam prices I use (and differ for each publisher and each game).")

[872]  Langer Rebuttal Merits Report, 3/26/2025, Appendices E.2, E.4.1., E.4.2. See, *e.g.*, ¶¶ 262, 274, 277. ("I consider the following assumption about the prices of Steam keys sold: The prices of Steam keys sold are equal to the price of the associated package on Steam.") ("The key redemptions data does not contain information on the price at which keys were sold. As described above, my approximation of Valve's effective revenue shares involves imputing prices to Steam key redemptions based on assumptions about the prices at which publishers sold Steam keys.") ("As explained above, to approximate Valve effective revenue shares using keys issued, I impute a price for each key issued as I did for key redemptions, using assumptions about the prices at which they were sold.")

[873]  Langer Rebuttal Merits Report, 3/26/2025, ¶ 211, fn. 401. ("However, Valve does not have any data on the number of Steam keys sold or the prices at which those Steam keys were sold because those sales occur outside of Steam.")

---

(418)   Thus, to describe her estimate in her own words: "[Dr. Langer's] estimates from [her effective Steam revenue share model] are reported without *any* measure of precision typically used by economists."[874]   Yet, she is willing to conclude (despite having no reasonable degree of certainty) that "heavy Steam key use implies that the current effective revenue share for some publishers is below Dr. Schwartz's predicted *but-for* revenue share."[875]   Dr. Langer's results are riddled with uncertainty.   According to her own logic, such conclusions should not be made without a proper accounting for this uncertainty.

(419)   I reiterate that my analysis in this section of my report is neither an endorsement of any of Dr. Langer's "standards," nor an acceptance of her attempted stringent application of these standards to my analysis.   It does reveal, however, that Dr. Langer is willing to go to great lengths—including violating the standards she claims are so essential that they render my analysis meritless—to advance her own position, which is meritless and contrary to basic economics, and attempt to refute my analysis.

---

[874]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 120. (Emphasis in original.)

[875]   Langer Rebuttal Merits Report, 3/26/2025, ¶ 212. (Emphasis in original.)

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## A.    Weak PMFN Analysis Appendix

### A.1.    Introduction and overview

(A1)    In what follows, Platform 1 represents Steam and Platform 2 represents a competing platform such as EGS. Rather than assuming that a PMFN requires $p_1 \le p_2$, I instead assume that it requires $p_1 \le p_2 + K$, where $K \ge 0$ is a fixed constant. That is, the policy requires that prices be close, but not necessarily equal. I call this a weak PMFN.

(A2)    I calculate the optimal pricing rules and optimal fees when the weak PMFN binds, *i.e.*, when $p_1 = p_2 + K$.

### A.2.    Solving the publisher's problem

(A3)    Platforms 1 and 2 face the following respective demand functions.

$$\hat{q}_1(\boldsymbol{p}) = a - bp_1 + dp_2$$

$$\hat{q}_2(\boldsymbol{p}) = a - x - bp_2 + dp_1$$

#### A.2.1.    Optimal pricing rule

(A4)    Under a weak binding PMFN, I substitute in $p_1 = p_2 + K$ into the publisher's profit function.

$$\Pi_s = (p_2 + K - f_1 - c_s)(a - (b-d)p_2 - bK) + (p_2 - f_2 - c_s)(a - x - (b-d)p_2 + dK)$$

(A5)    I take the first-order condition with respect to $p_2$ and solve for the publisher's optimal pricing for both platforms given the platform fees $f_1$ and $f_2$. (In what follows, I will use a bar to denote solutions under the weak PMFN to differentiate it from solutions under the standard PMFN. Following the Boik and Corts notation, the superscript "2" denotes that this is a solution under a PMFN policy.)

$$\bar{p}_1^2(\boldsymbol{f}) = \frac{2a - x + (b-d)(2c_s + f_1 + f_2)}{4(b-d)} + \frac{K}{2}$$

$$\bar{p}_2^2(\mathbf{f}) = \frac{2a - x + (b-d)(2c_s + f_1 + f_2)}{4(b-d)} - \frac{K}{2}$$

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### A.2.2. Steam's implied demand function and elasticity

(A6)    I plug in the optimal pricing rules into Steam's demand function to get the implied demand function.

$$\bar{q}_1^2(f) = \frac{1}{4}[2a + x - (b - d)(2c_s + f_1 + f_2) - 2(b + d)K]$$

(A7)    I take the derivative with respect to $f_1$.

$$\frac{\partial \bar{q}_1^2}{\partial f_1} = -\frac{1}{4}(b - d)$$

This is the same result as under the standard PMFN, which means the elasticity of demand is the same. Thus, the PCM exhibits the same reduction of elasticity of demand under a weak PMFN as it does under a standard PMFN.

## A.3.    Solving the platforms' problems

### A.3.1.    Platforms' best response functions

(A8)    Using this implied demand function, Steam chooses $f_1$ to maximize profits.

$$\Pi_1 = \frac{1}{4}(f_1 - c_1)[2a + x - 2K(b + d) - (b - d)(2c_s + f_1 + f_2)]$$

(A9)    I solve for the best response function by taking the first-order condition with respect to $f_1$.

$$\bar{f}_1^{br} = \frac{2a + x - 2K(b + d) - (b - d)(2c_s - c_1 + f_2)}{2(b - d)}$$

(A10)   Similarly, I solve for the best response function for Platform 2.

$$\bar{f}_2^{br} = \frac{2a - 3x + 2K(b + d) - (b - d)(2c_s - c_2 + f_1)}{2(b - d)}$$

### A.3.2.    Solving for optimal fees

(A11)   Using the platforms' best response functions, I solve for the optimal fees.

$$\bar{f}_1^{2*} = \frac{2a + 5x + (b - d)(2c_1 - c_2 - 2c_s)}{3(b - d)} - \frac{2K(b + d)}{b - d}$$

$$\bar{f}_2^{2*} = \frac{2a - 7x + (b-d)(2c_2 - c_1 - 2c_s)}{3(b-d)} + \frac{2K(b+d)}{b-d}$$

## A.4.   Comparing to the standard PMFN solution

(A12)   Appendix D of Boik and Corts gives the solution under a standard PMFN.[1]

$$p_i^2(f) = \frac{2a - x + (b-d)(2c_s + f_1 + f_2)}{4(b-d)}$$

$$f_1^{2*} = \frac{2a + 5x + (b-d)(2c_1 - c_2 - 2c_s)}{3(b-d)}$$

$$f_2^{2*} = \frac{2a - 7x + (b-d)(2c_2 - c_1 - 2c_s)}{3(b-d)}$$

(A13)   Hence, the weak PMFN solution relates to the stanard PMFN solution in the following way.

$$\bar{p}_1^2(f) = p_i^2(f) + \frac{K}{2}$$

$$\bar{p}_2^2(f) = p_i^2(f) - \frac{K}{2}$$

$$\bar{f}_1^{2*} = f_1^{2*} - \frac{2K(b+d)}{b-d}$$

$$\bar{f}_2^{2*} = f_2^{2*} + \frac{2K(b+d)}{b-d}$$

(A14)   Thus, Steam's fee is lower and the competing platform's fee is higher under the weak PMFN compared to the standard PMFN.

(A15)   Note that $\bar{f}_1^{2*} + \bar{f}_2^{2*} = f_1^{2*} + f_1^{2*}$, which implies $p_i^{2*}(f_1^{2*}, f_2^{2*}) = p_i^{2*}(\bar{f}_1^{2*}, \bar{f}_2^{2*})$. This implies the following comparison to the standard PMFN prices.

$$\bar{p}_1^2(\bar{f}_1^{2*}, \bar{f}_2^{2*}) = p_i^2(\bar{f}_1^{2*}, \bar{f}_2^{2*}) + \frac{K}{2}$$

$$= p_i^2(f_1^{2*}, f_2^{2*}) + \frac{K}{2}$$

---

[1]   Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *Journal of Law and Economics* 59(1): 105–134, at 133–134.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

$$\geq p_1^2(f_1^{2*}, f_2^{2*})$$

$$\bar{p}_2^2(\bar{f}_1^{2*}, \bar{f}_2^{2*}) = p_2^2(\bar{f}_1^{2*}, \bar{f}_2^{2*}) - \frac{K}{2}$$

$$= p_2^2(f_1^{2*}, f_2^{2*}) - \frac{K}{2}$$

$$\leq p_2^2(f_1^{2*}, f_2^{2*})$$

(A16)   In other words, the Steam price is higher and the competing platform price is lower under the weak PMFN compared to the standard PMFN.

(A17)   As a comparative static exercise, consider how these results change as the weak PMFN becomes more forgiving (*i.e.*, as $K$ increases). Steam's fees and prices will steadily deviate from the competing platform's fees and prices. Eventually, $K$ will get so big that the weak PMFN will no longer bind, and then we will have arrived at the scenario where there is no PMFN.

(A18)   The bottom line is that a weak PMFN attenuates the effects of a PMFN. However, it does not affect the qualitative results: prices and fees will be higher under a binding weak PMFN.



April 2025

## Rebuttal Attachment A-1



### Steven Schwartz, Ph.D.

Managing Director

8560 Belleview Drive
Suite 210
Plano, TX 75024

Office: +1 469 257 5581
email: sschwartz@secretariat-intl.com

Dr. Steven Schwartz has extensive experience in economic consulting. He has been retained as an economic expert in numerous litigation and non-litigation matters and has provided testimony before the U.S. International Trade Commission and the U.S. Tax Court, federal and state courts.

Dr. Schwartz has over 35 years of economic consulting experience and has applied his expertise in high-stakes disputes related to commercial success, irreparable harm, lost profits, reasonable royalties, economic domestic industry considerations, and unjust enrichment.  His areas of expertise include:

- Antitrust and Competition
- Intellectual Property Damages and Valuation
- Damages Assessment in Complex Commercial Disputes
- Class Certification
- Securities and Finance Litigation

Examples of Dr. Schwartz work include:

- Analysis of liability and damages in several antitrust cases involving allegations brought under *Walker Process*.
- Analysis of liability and damages issues in a major antitrust case involving a large economic platform in which the allegations accused the platform of monopolizing the market for app distribution within its ecosystem and tying app distribution to payment processing for in app payments.
- Analysis of pricing behavior by a company that pled guilty to price fixing as a part of a larger conspiracy to determine the impact on the firm and to assess the portion of its price increases attributable to the conspiracy as opposed to non-collusive factors such as cost increases.
- Assessment to the damages suffered by a residential home builder and land developer as a result of alleged breaches of contracts and fraud by another home builder. The analysis included a determination of the number of homes the Plaintiff would have built and sold in the absence of the alleged breaches and fraud, as well as the losses the firm would incur as it attempted to re-enter the market, post-fraud.
- Analysis of the commercial success of a branded drug in the context of a Hatch-Waxman dispute; the branded drug was a late entrant into the market, i.e., after the entry of competitors selling generic versions of first and second-generation drugs, and Dr. Schwartz provided an assessment

of the drug's performance and success in the context of a market dominated by generic competitors.

- Analyzed the damages suffered by an aircraft manufacturer as a result of a patent infringement by a rival manufacturer of a component of the aircraft at issue. The royalty analysis considered the appropriate royalty in a case in which the infringing product was never sold.

Dr. Schwartz's consulting background spans many industries, such as hospitality, consumer goods, electronics, gaming, and pharmaceuticals, among others.  He has also consulted in a variety of business, valuation and strategic planning issues.

## EDUCATION

- Ph.D., Economics, University of Maryland
- M.A., Economics, University of Maryland
- B.A., Economics, Wesleyan University

## PROFESSIONAL EXPERIENCE

- Secretariat. Managing Director, 2023 to present.
- Intensity, LLC.  Managing Director, 2021 to 2023.
- Charles River Associates, Vice President, 2015 to 2020.
- Alvarez & Marsal, Global Forensic and Dispute Services, Managing Director, 2011 to 2015.
- NERA Economic Consulting, Senior Vice President (Final Position), 1984 to 2011.
- Miami University, Assistant Professor of Economics, 1980 to 1984.
- Federal Trade Commission, Economist, 1979 to 1980.

## PUBLICATIONS AND PAPERS

- "An Overview of Market Definition in the 2023 Merger Guidelines" with Jason Albert, Jessica Dutra, Richard Manning, Anushree Subramaniam, Wei Tan, Pablo Varas and Keith Waehrer, *Secretariat Client Alert* available at https://secretariat-intl.com/insights/an-overview-of-market-definition-in-the-2023-merger-guidelines/ , December 2023 (update to July 2023 version).
- "An Overview of Market Definition in the Draft Merger Guidelines" with Jason Albert, Jessica Dutra, Richard Manning, Anushree Subramaniam, Wei Tan, Pablo Varas and Keith Waehrer, *Secretariat Client Alert* available at https://secretariat-intl.com/insights/an-overview-of-market-definition-in-the-draft-merger-guidelines/ , July 2023.
- "The Use of Econometric and Statistical Analysis in Damages" with Jennifer Vanderhart, Richard Brady and Aminta Raffalovich, The Guide to Damages in International Arbitration-Fifth Edition, available at https://globalarbitrationreview.com/guide/the-guide-damages-in-international-arbitration/5th-edition , December 2022. (Update forthcoming)
- "An Overview of Trade Secret Misappropriation Damages." With Christopher Gerardi and Hong Qiao. *Trade Secret Protection: A Global Guide*, 2nd ed., edited by Trevor Cook, Globe Law and Business, June 2022.
- "Antitrust Analysis of FRAND Licensing Post-FTC v. Qualcomm," *The Journal of the Antitrust and Unfair Competition Section of the California Lawyers Association*, Volume 31, No. 1, Spring 2021 (with Aminta Raffalovich).
- "Pricing Challenges for Hotels in a Price Parity World." *The Price Point*, Volume 17, Issue 2, Spring 2017.

## SPEAKING ENGAGEMENTS

- Panelist, "Big Tech Cases" Informa Antitrust West Coast 2024, May 2024.
- "Don't Squat on Your Spurs: Ethical Issues in Class Actions Involving Injury and Experts" American Bar Association Class Action Institute, April 13, 2022.
- "What Can You Prove with Statistical Evidence, or How Do I Know if All Those Numbers Are Good or Bad", ABA Webinar Series, March 14, 2022.
- "Valuing Intellectual Property in the Case of Free-to-Consumer Goods, Webinar, April 6, 2021, and June 29, 2021.
- Panelist, "Cyber Breach Aftermath: Civil Litigation, Insurance Risks and SEC Perspective", American Bar Association Annual Meeting, Chicago, IL, August 2, 2018.
- "Dealing with a Breach's Long-Term Fallout" *Corporate Counsel*, March 2018.
- Panel Presentation "Cyber Breach Aftermath: Civil Litigation, Insurance Claims and Regulatory Perspective" Association of Corporate Counsel CLE Program, Chicago, IL, January 2018.
- Presentation to McGuire Woods LLP, Dallas, TX, August 8, 2017.
- Public Symposium, Developments in Trade Secret Protection, sponsored by United States Patent and Trademark Office, Washington, D.C., May 8, 2017.

## TESTIMONY AND AFFIDAVITS

1. Deposition Testimony in *Entri, LLC v. GoDaddy.com LLC,* United States District Court for the District of Virginia (Alexandria Division), February 2025

2. Trial Testimony in *In the Matter of an Arbitration between: SPG Dry Cooling USA, LLC and BPC Cascade, a JV of Overland Contracting Canada Inc. and PCL Industrial Management*, February 2025.

3. Deposition Testimony in *Provisur Technologies, Inc. v. Weber, Inc. and Weber Food Technology GmBH*, United States District Court for the Western District of Missouri (St. Joseph Division), Case No. 5:21-cv-06113, June 2024. [Weber parties]

4. Deposition Testimony in *In Re: Valve Antitrust Litigation*, United States District Court for the Western District of Washington at Seattle, Case No. 2:21-cv-00563-JCC, April 2024.

5. Deposition Testimony in *Gerald Hayden v. International Business Machines Corporation, Pablo Suarez and Shankar Ramamurthy*, United States District Court for the Southern District of New York, Case No, 7:210CV-02485-VB, March 2024.

6. Deposition Testimony in *Apple, Inc. v. Masimo Corporation and Sound United, LLC and Masimo Corporation and Ceracor Laboratories, Inc. v. Apple, Inc.*, United States District Court for the District of Delaware, C.A. No. 1:22-cv-01378-MN, January 2024.

7. Trial Testimony in In the Matter of *Certain Bio-Layer Interferometers and Components Thereof*, United States International Trade Commission, Inv. No. 337-TA-1344, November 2023.

8. Deposition Testimony in In the Matter of *Certain Bio-Layer Interferometers and Components Thereof*, United States International Trade Commission, Inv. No. 337-TA-1344, May 2023.

9.    Deposition Testimony in *World Champ Tech LLC v. Peloton Interactive, Inc.*, United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03202-LB, April 2023

10.   Deposition Testimony in *In Re: Google Play Store Antitrust Litigation: Match Group, LLC, Humor Rainbow, Inc., PlentyOfFish Media ULC, and People Media, Inc. v. Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific PTE. Limited, and Google Payment Corp.* United States District Court, Northern District of California, Case Nos. 3:21-md-02981 and 3:22-cv-02746, March 2023.

11.   Deposition Testimony in *Healthcare Recovery Group, LLC v. Coresource, Inc.*, In the Circuit Court of Cook County, Illinois, County Department, Law Division, Case No. 07-CH-016360, October 2022.

12.   Declaration of Steven Schwartz, *Ph.D., Barrientos et al. v. CoreCivic, Inc.,* United States District Court, Middle District of Georgia, Case No. 4:18-cv-00070, October 2022.

13.   Deposition Testimony in *PureCircle USA Inc. and PureCircle SDN BHD v. Sweegen, Inc. and Phyto Tech Corp. d/b/a Blue California*, Case No. 8:18-cv-1679 JVS (JDE), United States District Court, Central District of California, Southern Division, January 2022.

14.   Deposition Testimony in *Baxalta Incorporated and Baxalta GmbH v. Genentech Inc. and Chugai Pharmaceutical Co., Ltd.*, District of Delaware, C.A. No. 17-509-TBD, August 2021.

15.   Deposition Testimony in *Panasonic Corporation v. Getac Technology Corporation and Getac, Inc.*, Central District of California, Case No. 8:19-CV-01118-DOC-DFM, March 2021.

## Reports

16.   Response Merits Expert Report of Steven Schwartz, Ph.D., in *In Re: Valve Antitrust Litigation*, United States District Court for the Western District of Washington at Seattle, Case No. 2:21-cv-00563-JNW, March 2025.

17.   Supplemental Opening Merits Expert Report of Steven Schwartz, Ph.D. in *In Re: Valve Antitrust Litigation*, United States District Court for the Western District of Washington at Seattle, Case No. 2:21-cv-00563-JNW, March 2025.

18.   Opening Merits Expert Report of Steven Schwartz, Ph.D. in *In Re: Valve Antitrust Litigation*, United States District Court for the Western District of Washington at Seattle, Case No. 2:21-cv-00563-JNW, January 2025.

19.   Rebuttal Expert Report of Steven Schwartz, Ph.D., *Entri, LLC v. GoDaddy.com LLC,* United States District Court for the District of Virginia (Alexandria Division), January 2025.

20.   Expert Report of Steven Schwartz, Ph.D., *Entri, LLC v. GoDaddy.com LLC,* United States District Court for the District of Virginia (Alexandria Division), January 2025. (Amended)

21.   Expert Report of Steven Schwartz, Ph.D., In the Matter of an Arbitration between: SPG Dry Cooling USA, LLC and BPC Cascade, a JV of Overland Contracting Canada Inc. and PCL Industrial Management, December 2024.

22. Reply Class Certification Expert Report of Steven Schwartz, Ph.D. in *IN Re: Valve Antitrust Litigation*, United States District Court for the Western District of Washington at Seattle, Case No. 2:21-cv-00563-JCC, July 2024.

23. Expert Rebuttal Report of Steven Schwartz, Ph.D. in *Provisur Technologies, Inc. v. Weber, Inc. and Weber Food Technology GmBH*, United States District Court for the Western District of Missouri (St. Joseph Division), Case No. 5:21-cv-06113, May 2024.

24. Report of Steven Schwartz, Ph.D. in *Prevent U.S.A. Corporation v. Volkswagen, AG and Volkswagen Group of America, Inc.*, United States District Court for the Eastern District of Texas (Marshall Division), Case No. 2:22-cv-00506-JRG-RSP, May 2024.

25. Report of Steven Schwartz, Ph.D. in *Gerald Hayden v. International Business Machines Corporation, Pablo Suarez and Shankar Ramamurthy*, United States District Court for the Southern District of New York, Case No, 7:210CV-02485-VB, February 2024.

26. Class Certification Expert Report of Steven Schwartz, Ph.D. *in IN Re: Valve Antitrust Litigation*, United States District Court for the Western District of Washington at Seattle, Case No. 2:21-cv-00563-JCC, February 2024.

27. Reply Report of Steven Schwartz, Ph.D. in *Apple, Inc. v. Masimo Corporation and Sound United, LLC and Masimo Corporation and Ceracor Laboratories, Inc. v. Apple, Inc.*, United States District Court for the District of Delaware, C.A. No. 1:22-cv-01378-MN, January 2024.

28. Report of Steven Schwartz, Ph.D. in *Allergan, Inc., Allergan Pharmaceuticals Ireland Unlimited Company, and Allergan USA, Inc. v. Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*, Civil Action No. 21-1411-RGA in the United States District Court for the District of Delaware, December 2023.

29. Rebuttal Report of Steven Schwartz, Ph.D. in *Apple, Inc. v. Masimo Corporation and Sound United, LLC and Masimo Corporation and Ceracor Laboratories, Inc. v. Apple, Inc.*, United States District Court for the District of Delaware, C.A. No. 1:22-cv-01378-MN, December 2023.

30. Report of Steven Schwartz, Ph.D. in *Allergan, Inc., Allergan Pharmaceuticals Ireland Unlimited Company, and Allergan USA, Inc. v. Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*, Civil Action No. 21-1411-RGA in the United States District Court for the District of Delaware, December 2023.

31. Opening Report of Steven Schwartz, Ph.D. in *Apple, Inc. v. Masimo Corporation and Sound United, LLC and Masimo Corporation and Ceracor Laboratories, Inc. v. Apple, Inc.*, United States District Court for the District of Delaware, C.A. No. 1:22-cv-01378-MN, November 2023.

32. Supplemental Report of Steven Schwartz, Ph.D., *Barrientos et al. v. CoreCivic, Inc.* United States District Court, Middle District of Georgia, Case No. 4:18-cv-00070, July 2023.

33. Report of Steven Schwartz, Ph.D., *In the Matter of Certain Bio-Layer Interferometers and Components Thereof*, United States International Trade Commission, Inv. No. 337-TA-1344, April 2023.

34. Expert Report of Steven Schwartz, Ph.D., *World Champ Tech LLC v. Peloton Interactive, Inc.*, United States District Court, Northern District of California, San Francisco Division, Case No. 3:21-cv-03202-LB, February 2023.

35. Rebuttal Report of Steven Schwartz, Ph.D., *In Re: Google Play Store Antitrust Litigation: Match Group, LLC, Humor Rainbow, Inc., PlentyOfFish Media ULC, and People Media, Inc. v. Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific PTE. Limited, and Google Payment Corp.* United States District Court, Northern District of California, Case Nos. 3:21-md-02981 and 3:22-cv-02746. November 2022.

36. Expert Report of Steven Schwartz, Ph.D., *In Re: Google Play Store Antitrust Litigation: Match Group, LLC, Humor Rainbow, Inc., PlentyOfFish Media ULC, and People Media, Inc. v. Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific PTE. Limited, and Google Payment Corp.* United States District Court, Northern District of California, Case Nos. 3:21-md-02981 and 3:22-cv-02746. October 2022.

37. Expert Report of Steven Schwartz, Ph.D., *Healthcare Recovery Group, LLC v. Coresource, Inc.*, In the Circuit Court of Cook County, Illinois, County Department, Law Division, Case No. 07-CH-016360, August 2022.

38. Report of Steven Schwartz, Ph.D., in *Between Farmers Edge, Inc. and Precision Weather Solutions Inc., and Between Precision Weather Solutions Inc., and Farmers Edge Inc., Wade Barnes, Curtis Mackinnon, and Trevor Armitrage*, The Queen's Bench Winnipeg Center, File No. CI 15-01-99336, March 28, 2022.

39. Report of Steven Schwartz, Ph.D., *PureCircle USA Inc. and PureCircle SDN BHD v. Sweegen, Inc. and Phyto Tech Corp. d/b/a Blue California*, United States District Court, Central District of California, Southern Division, Case No. 8:18-cv-1679 JVS (JDE), December 2021.

40. Expert Report of Steven Schwartz, *Ph.D., Barrientos et al. v. CoreCivic, Inc.* United States District Court, Middle District of Georgia, Case No. 4:18-cv-00070, December 2021.

41. Rebuttal Expert Report of Steven Schwartz, Ph.D., *Baxalta Incorporated and Baxalta GmbH v. Genentech Inc. and Chugai Pharmaceutical Co., Ltd.,* District of Delaware, C.A. No. 17-509-TBD, June 2021.

42. Report of Steven Schwartz, Ph.D., *Panasonic Corporation v. Getac Technology Corporation and Getac, Inc.*, Central District of California, Case No. 8:19-CV-01118-DOC-DFM, March 2021.

43. Rebuttal Economist's Report of Steven Schwartz, Ph.D., *In re. Aetna Litigation, Central District of California*, Case No. 19-cv-04035, February 2020.

44. Economist's Report of Steven Schwartz, Ph.D., *In re. Aetna Litigation, Central District of California*, Case No. 19-cv-04035, February 2020.

45. Expert Report of Steven Schwartz, Ph.D., *Impax Laboratories, Inc. v. Zydus Pharmaceuticals (USA) Inc., et al.*, United States District Court, District of New Jersey, Civil Action No. 2:17-cv-13476 (SRC)(CLW), November 2019.

46. Expert Report of Steven Schwartz, Ph.D., in Rebuttal to the June 14, 2019 Report of Matthew Hoelle and to the July 15, 2019 Report of David W. DeRamus *Rockwell Automation, Inc., v. Radwell International, Inc.,* U.S. District Court, District of New Jersey, Case No. 1:15-cv-05246-RBK-JS, October 2019.

47. Supplement to June 14, 2019 Expert Report of Steven Schwartz, Ph.D., *Rockwell Automation, Inc., v. Radwell International, Inc.*, U.S. District Court, District of New Jersey, Case No. 1:15-cv-05246-RBK-JS, October 2019.

48. Expert Report of Steven Schwartz, Ph.D., in *Eli Lilly and Company v. Eagle Pharmaceuticals, Inc.*, United States District Court, District of Delaware, Case Mo. 17-cv-1293 (MSG), June 2019.

49. Expert Report of Steven Schwartz, Ph.D., in *Rockwell Automation, Inc., v. Radwell International, Inc.,* U.S. District Court, District of New Jersey, Case No. 1:15-cv-05246-RBK-JS, June 2019.

50. Economist's Report in Connection with Plaintiff's Motion for Class Certification in *Medbor Chavez, individually and on behalf of all others similarly situated v. FBL Financial Group, Inc., Farm Bureau Property & Casualty Ins. Co., Farm Bureau Life Insurance and Western Agricultural Insurance Company*, U.S. District Court for the District of Kansas at Kansas City, Case No. 2:17-02393-DDC-ADM, May 2019.

51. Rebuttal Expert Witness Statement and Report of Steven Schwartz, Ph.D., in Connection with *Hibernia v. Teza*, Hibernia Express (Ireland) Limited, successor to Hibernia Atlantic U.S. LLC v. Teza Technologies LLC, International Chamber of Commerce, ICC Case No. 22784/MK, June 2018.

52. Expert Witness Statement and Report of Steven Schwartz, Ph.D., in Connection with *Hibernia v. Teza*, Hibernia Express (Ireland) Limited, successor to Hibernia Atlantic U.S. LLC v. Teza Technologies LLC, International Chamber of Commerce, ICC Case No. 22784/MK, April 2018.

53. Update to Expert Report of Steven Schwartz, Ph.D., *D.R. Horton, Inc.-Huntsville; D.R. Horton, Inc. v. Breland Homes, LLC, et al. and Louis W. Breland, et al. v. D.R. Horton, Inc.-Huntsville, et al.*, In the Circuit Court of Baldwin County, Alabama, Case No.: 2014-cv-901450.00, April 2018.

54. Rebuttal Expert Report of Steven Schwartz, Ph.D., *D.R. Horton, Inc.-Huntsville; D.R. Horton, Inc. v. Breland Homes, LLC, et al. and Louis W. Breland, et al. v. D.R. Horton, Inc.-Huntsville, et al.,* In the Circuit Court of Baldwin County, Alabama, Case No.: 2014-cv-901450.00, January 2018.

55. Rebuttal Expert Report in Connection with a Confidential Arbitration in Stockholm, Sweden, December 2017.

56. Expert Report in Connection with a Confidential Arbitration in Stockholm, Sweden, November 2017.

57. Expert Report of Steven Schwartz, Ph.D., *D.R. Horton, Inc.-Huntsville; D.R. Horton, Inc. v. Breland Homes, LLC, et al. and Louis W. Breland, et al. v. D.R. Horton, Inc.-Huntsville, et al.,* In the Circuit Court of Baldwin County, Alabama, Case No.: 2014-cv-901450.00, November 2017.

58. Expert Report of Steven Schwartz, Ph.D., *Boehringer Ingelheim Pharmaceuticals, Inc. et al. v. HEC Pharm Co., Ltd et al.,* United States District Court, District of New Jersey, Civil Action No. 3:15-cv-05982-PGS-TJB (consolidated), October 2017.

59. Expert Report of Steven Schwartz, Ph.D. Regarding Validity of U.S. Patent Nos. 8,557,283; 9,089,608, 9,463,246, and 9,533,046, *Impax Laboratories, Inc. v. Actavis Laboratories FL, Inc. and Actavis Pharma Inc.,* United States District Court, District of New Jersey, Civil Action No. 15-6934 (SRC) (CLW), September 2017.

60. Supplemental Economist's Report in Connection with *Perrigo Company, Sergeant's Pet Care Products, Inc. d/b/a Perrigo Animal Health, Velcera, Inc. and FidoPharm, Inc. v. Merial Limited d/b/a Merial LLC*, United States District Court for the Northern District of Georgia (Atlanta Division), Civ. Action No.: 1:15-cv-03674 (SCJ), August 2017.

61. Economist's Report in Connection with *Perrigo Company, Sergeant's Pet Care Products, Inc. d/b/a Perrigo Animal Health, Velcera, Inc. and FidoPharm, Inc. v. Merial Limited d/b/a Merial LLC,* United States District Court for the Northern District of Georgia (Atlanta Division), Civ. Action No.: 1:15-cv-03674 (SCJ), May 2017.

62. Initial Report of Steven Schwartz, Ph.D., in Connection with *Select Comfort v. Tempur Sealy International, Inc., d/b/a Tempur-Pedic*, United States District Court, District of Minnesota, 14-CV-00245-JNE-JSM, May 2016.

63. Report of Steven Schwartz, Ph.D., in Connection with *Airbus Helicopters S.A.S. and Bell Helicopter Textron Canada Limitee*, Federal Court, Docket: T-737-08, April 2016.

64. Initial Report in Connection with *Steven C. Jacobs v. Las Vegas Sands Corp., et al.,* District Court, Clark County, Nevada, Case No; A-10-627691, Dept. No. XI., March 2016.

65. Expert Report in *Thomas Skold v. Galderma Laboratories, L.P., Galderma Laboratories, Inc., and Galderma, S.A.*, United States District Court, Eastern District of Pennsylvania, Case No. 2:14-cv-05280-TJS, October 2015.

66. Expert Report in connection with *Timberline Energy, LLC v. Waste Connections of Kansas, Inc.*, Case No. 2014CV03269, District Court, City and County of Denver, State of Colorado, August 2015.

67. Expert Report in *TrueCar, Inc. v. Sonic Automotive, Inc. and Sonic Divisional Operations, LLC*, United States District Court, Central District of California (Western Division) Case No. 2:13-cv-05812-CBM-FFM, April 2015.

68. Expert Report in *Virginia Forklift, Inc. v. Crown Equipment Corporation* in Arbitration before JAMS, January 2015.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## Rebuttal Attachment A-2
Materials Considered

### Pleadings and filings

11/25/2024    Order.

4/21/2025    Order Amending Class Period, Granting Publisher Class Plaintiffs' Motion for Order Approving Notice of Class Certification, and Entry of Notice Schedule.

### Expert reports

Class Certification Expert Report of Steven Schwartz, Ph.D., 2/8/2024.

Corrected Expert Report of Professor Joost Rietveld with Errata, 3/20/2024.

Corrected Class Certification Expert Report of Steven Schwartz, Ph.D., 3/21/2024.

Schwartz Class Certification Report Errata, 3/21/2024.

Class Certification Expert Report of Ashley Langer, Ph.D., 5/17/2024.

Class Certification Expert Report of Lesley Chiou, Ph.D., 5/17/2024.

Corrected Class Certification Expert Report of Lesley Chiou, Ph.D., 6/10/2024.

Errata to the Class Certification Expert Report of Lesley Chiou, Ph.D., 6/10/2024.

Reply Class Certification Expert Report of Steven Schwartz, Ph.D., 7/12/2024.

Reply Expert Report of Ashley Langer, Ph.D. in Support of Valve's Daubert Reply, 8/12/2024.

Surreply Class Certification Expert Report of Steven Schwartz, Ph.D., 9/9/2024.

Expert Report of Professor Joost Rietveld, 1/27/2025.

Expert Report of Gautam Gowrisankaran, Ph.D., 1/27/2025.

Opening Merits Expert Report of Steven Schwartz, Ph.D., 1/27/2025.

Supplemental Opening Merits Expert Report of Steven Schwartz, Ph.D., 3/7/2025.

Response Merits Expert Report of Steven Schwartz, Ph.D., 3/26/2025.

Merits Expert Report of Lesley Chiou, Ph.D., 3/26/2025.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Expert Rebuttal Report of R. Harold Schroeder, 3/26/2025.

Rebuttal Merits Expert Report of Gautam Gowrisankaran, Ph.D., 3/26/2025.

Expert Report of Ashley Langer, Ph.D., 3/26/2025.

## Interviews

John Robb, Dark Catt Studios, Chief Executive Officer, 2/5/2024.

## Deposition testimony

| | |
|---|---|
| Lesley Chiou | Occidental College, Professor of Economics, 6/18/2024. |
| Adam Fossa | Microsoft Corporation, Director and General Manager of the Microsoft Store, 1/29/2024. |
| Kassidy Gerber | Valve Corporation, Steam Business Team, 10/5/2023, Exhibits 97–118. |
| Tom Giardino | Valve Corporation, Steam Business Team, 11/2/2023, Exhibits 178–199. |
| Alden Kroll | Valve Corporation, Steam Business Team, 11/16/2023, Exhibits 242–304. |
| Ashley Langer | University of Arizona, Associate Professor of Economics, 6/21/2024. |
| Scott Lynch | Valve Corporation, Chief Operating Officer, 10/12/2023, Exhibits 132–144. |
| Kristian Miller | Valve Corporation, Data Science and Software Development, 10/3/2023, Exhibits 66–75. |
| DJ Powers 30(b)(6) | Valve Corporation, Steam Business Team, 9/29/2023, Exhibits 53–65. |
| Steven Schwartz | Secretariat, Managing Director, 4/18/2024. |

## Research materials

2Game Website, Home Page, https://2game.com/ (accessed 4/18/2025).

Adventure Gamers Forums, Adventure Shop Forum, 9/2014, https://adventuregamers.com/forums/viewthread/4313.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Aguinis, Herman, Ryan K. Gottfredson, and Harry Joo (2013), "Best Practice Recommendations for Defining, Identifying, and Handling Outliers," *Organizational Research Methods* 16(2): 270–301.

Airbnb Help Center, Additional Fees, https://www.airbnb.com/help/article/2385 (accessed 4/2/2025).

Airbnb Help Center, Changing Number of Guests in a Reservation, https://www.airbnb.com/help/article/2369 (accessed 4/2/2025).

Airbnb, About Us Page, https://news.airbnb.com/about-us/ (accessed 4/2/2025).

Airbnb, Add Additional Fees, https://www.airbnb.com/help/article/2385 (accessed 4/15/2025).

Airbnb, AirCover, https://www.airbnb.com/help/article/3227 (accessed 1/21/2025).

Airbnb, Form 10-K, 2020.

Airbnb, Form 10-K, 2022.

Airbnb, Form 10-K, 2023.

All You Play Website, About Us Page, https://www.allyouplay.com/topic/AboutUs?id=1 (accessed 4/18/2025).

AlternativeTo Website, Gameolith Page, https://alternativeto.net/software/gameolith/about/ (accessed 4/20/2025).

Amazon Games Support, Download and Install the Amazon Games App, https://www.amazongames.com/en-us/support/prime-gaming/articles/download-and-install-the-amazon-games-app (accessed 4/18/2025).

Amazon, "How to Get Free Games and In-Game Content with your Prime Membership," 7/3/2024, https://www.aboutamazon.com/news/entertainment/how-to-get-free-games-and-in-game-content-with-your-prime-membership.

Amazon, Installation, Assembly, and Haul-Away Services, https://www.amazon.com/gp/help/customer/display.html?nodeId=GRD263U R6NNUTT48 (accessed 1/22/2025).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Amazon, Leave Third-Party Seller Feedback, https://www.amazon.com/gp/help/customer/display.html?nodeId=G5346HRP NJFYRA49 (accessed 1/22/2025).

Amazon, Luna Page, https://www.amazon.com/luna/landing-page (accessed 4/21/2025).

American Affairs Journal, "Why are Start-Ups Losing So Much Money?," c. 11/2024, https://americanaffairsjournal.org/2024/11/why-are-start-ups-losing-so-much-money/.

Ars Technica, "How Long Can Epic Afford to Throw Money at the Epic Games Store," 4/12/2021, https://arstechnica.com/gaming/2021/04/how-long-can-epic-afford-to-throw-money-at-the-epic-games-store/.

Ars Technica, "Microsoft Opens a Crack in Console Gaming's Decades-Old Walled Garden," 3/27/2024, https://arstechnica.com/gaming/2024/03/microsoft-opens-a-crack-in-console-gamings-decades-old-walled-garden/.

Ars Technica, "Ubisoft Comes Crawling Back to Steam After Years on Epic Games Store," 11/22/2022, https://arstechnica.com/gaming/2022/11/Ubisoft-comes-crawling-back-to-steam-after-years-on-epic-games-store/.

Ars Technica, Battlefield 3 Is Not Coming to Steam, But EA Has A Real Reason," 8/8/2011, https://arstechnica.com/gaming/2011/08/battlefield-3-not-coming-to-steam-ea-provides-good-reason/.

Ars Technica, Ubisoft Goes Steam-less, Embraces Epic Games Store for the Division 2, 1/9/2019, https://arstechnica.com/gaming/2019/01/ubisoft-snubs-steam-brings-the-division-2-to-epics-games-store/.

Athey, Susan, and Fiona Scott Morton (2022), "Platform Annexation," *Antitrust Law Journal* 84(3): 677–703.

Baker, Jonathan, and Fiona Scott Morton (2018), "Antitrust Enforcement Against Platform MFNs," *Yale Law Journal* 127(7): 2176–2202.

Barnett, Vic and Toby Lewis (1978), *Outliers in Statistical Data*, 3rd edition, New York, NY: John Wiley & Sons.

Baumol, William, and Daniel Swanson (2003), "The New Economy and Ubiquitous Competitive Price Discrimination: Identifying Defensible Criteria Of Market Power," *Antitrust L.J.* 661–686.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Bethesda Support, "How Do I Download and Install the Bethesda Launcher on PC?," https://help.bethesda.net/#en/answer/35008 (accessed 4/21/2025).

BI Studio Store, Games, https://store.bistudio.com/collections/games (accessed 4/18/2025).

Bit-Tech, "Microsoft Launches Games for Windows LIVE Marketplace," 12/4/2008, accessed via Internet Archive (as displayed on 4/3/2012), https://web.archive.org/web/20120403002744/http://www.bit-tech.net/custompc/news/605295/microsoft-launches-games-for-windows-live-marketplace.html (accessed 4/21/2025).

Bohemia Interactive Website, Games Page, https://www.bohemia.net/games (accessed 4/18/2025).

Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics* 59(1): 105–134.

Britannica, Pythagorean Theorem, https://www.britannica.com/science/Pythagorean-theorem (accessed 4/3/2025).

Business Insider, "Xbox Consoles Have Never Been Profitable On Their Own, Microsoft Admits In Court," 5/6/2021, https://www.businessinsider.com/xbox-consoles-not-profitable-microsoft-says-2021-5.

Cambridge Dictionary, Empirical, https://dictionary.cambridge.org/us/dictionary/english/empirical (accessed 4/2/2025).

Carlton, Dennis and Jeffery Perloff (2005), "Monopolies, Monopsonies, and Dominant Firms," in 4th ed., *Modern Industrial Organization*, Pearson - Addison Wesley.

Casella, George and Roger L. Berger (2002), *Statistical Inference*, 2nd ed., Belmont, CA: Cengage Learning.

CD Projekt, Company History, https://www.cdprojekt.com/en/capital-group/history/ (accessed 1/21/2025).

CD Projekt, Consolidated Financial Statement, 2019.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

CG Magazine, "Game Over? How Tariffs On Electronics Could Raise Console Prices," 4/14/2025, https://www.cgmagonline.com/articles/tariffs-electronics-console-prices/.

Chrono.gg, About Us, accessed via Internet Archive (as displayed on 11/26/2018), https://web.archive.org/web/20181126210126/https://www.chrono.gg/about-us (accessed 4/18/2025).

Chrono.gg, Home Page, https://www.chrono.gg/login (accessed 4/18/2025).

CNET, "EA Launches Origin, Takes Aim at Steam," 6/3/2011, https://www.cnet.com/tech/gaming/ea-launches-origin-takes-aim-at-steam/.

CNET, "EA Returns to Steam With Star Wars Jedi: Fallen Order In November," 10/29/2019, https://www.cnet.com/tech/gaming/ea-returns-to-steam-with-star-wars-jedi-fallen-order-in-november/.

Coinplay.io, About Page, accessed via Internet Archive (as displayed on 4/21/2015), https://web.archive.org/web/20150421171413/https://coinplay.io/about (accessed 4/18/2025).

Competition and Markets Authority, "Vertical Agreements Block Exemption Order Guidance," 7/12/2022, available at: https://assets.publishing.service.gov.uk/media/62d57d7fe90e071e7b13109f/VABEO_Guidance.pdf.

Create & Learn, "Roblox Studio: Beginner's Guide to Download, Setup and Build Games Roblox Creator Hub," 3/17/2025, https://www.create-learn.us/blog/roblox-studio/.

Credit Suisse, "CAPCOM[:] Focus on Credibility of Profit Growth Prospects and New Growth Drivers in FY3/20," 11/20/2018.

Delisted Games, "DotEmu Store," 2/15/2025, https://delistedgames.com/dotemu-store/.

Delisted Games, "Playism Store," 4/23/2021, https://delistedgames.com/playism-games/.

Desura Website, Home Page, accessed via Internet Archive (as displayed on 4/12/2018),

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

https://web.archive.org/web/20180412143544/http://www.desura.com/
(accessed 4/18/2025).

Digital Trends, "EA Origin Has Been Replaced with a New, Faster PC App,"
10/7/2022, https://www.digitaltrends.com/gaming/ea-origin-replaced-app/.

Direct2Drive Website, "D2D Download Guide," 8/31/2019,
https://atgameshelp.freshdesk.com/support/solutions/articles/48000852296-
d2d-download-guide.

Direct2Drive Website, "Where to Find Your Game Key," 8/30/2019,
https://atgameshelp.freshdesk.com/support/solutions/articles/48000839579-
where-to-find-your-game-key.

Dixit, Avinash K., and Joseph E. Stiglitz (1977), "Monopolistic Competition and
Optimum Product Diversity," *The American Economic Review* 67(3): 297–308.

DLGamer Website, FAQ Page, https://www.dlgamer.com/us/faq (accessed
4/18/2025).

DreamGame Website, About Us, https://www.dreamgame.com/en/about-
us?srsltid=AfmBOopt3CZ-
Eu8yuIJFogLhNHVYaEKGOjuFZUdhxHRdiaKuYSMwLMBi (accessed
4/18/2025).

EA, Form 10-K, 2021.

EA, Form 10-K, 2022.

eBay, Contacting a Seller, https://www.ebay.com/help/buying/resolving-issues-
sellers/contacting-seller?id=4021 (accessed 4/3/2025).

eBay, Leaving Feedback for Buyers, https://www.ebay.com/help/selling/leaving-
feedback-buyers/leaving-feedback-buyers?id=4078 (accessed 4/3/2025).

eBay, Leaving Feedback for Sellers, https://www.ebay.com/help/buying/leaving-
feedback-sellers/leaving-feedback-sellers?id=4007 (accessed 4/3/2025).

Economics Online, "The Economics of Microtransactions," 8/3/2023,
https://www.economicsonline.co.uk/definitions/the-rise-of-microtransactions-
in-video-games.html/.

Electronic Arts, "Upcoming Changes to the EA Origin Catalog," c. 6/2022,
https://www.ea.com/ea-pc-third-party-titles-2022.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Elemental Games Forums, "Impulse/Gamestop PC Downloads Has Given Its Last Breath," 4/27/2014, https://forums.elementalgame.com/453823/page/1/#replies.

Elzinga, Kenneth G. and David E. Mills (2011), "The Lerner Index of Monopoly Power: Origins and Uses," *The American Economic Review* 101(3): 558–564.

Engadget, "Ubisoft Shares Dark Messiah of M&M with Steam," 8/31/2006, https://www.engadget.com/2006-08-31-ubisoft-shares-dark-messiah-of-mandm-with-steam.html.

Ennis, Sean, Marc Ivaldi, and Vicente Lagos (2023), "Price-Parity Clauses for Hotel Room Booking: Empirical Evidence from Regulatory Change," *Journal of Law and Economics* 66(2): 309–331.

Epic Bundle, Steam Key Reseller List Circa 2020, https://www.epicbundle.com/official-steam-reseller/ (accessed 4/20/2025).

Epic Games Store, Epic Games Store Distribution Agreement, https://dev.epicgames.com/portal/en-US/distribution-agreement (accessed 4/21/2025).

Epic Games Store, Back 4 Blood, https://store.epicgames.com/en-US/p/back-4-blood (accessed 4/10/2025).

Epic Games, "Epic Games Store 2020 Year in Review," 1/28/2021, https://store.epicgames.com/en-US/news/epic-games-store-2020-year-in-review.

Epic Games, "Epic Games Store 2021 Year in Review," 1/27/2022, https://store.epicgames.com/en-US/news/epic-games-store-2021-year-in-review.

Epic Games, "Epic Games Store 2023 Year in Review," 2/16/2024, https://store.epicgames.com/en-US/news/epic-games-store-2023-year-in-review.

Epic Games, "The Epic Games Store is Now Live," 12/6/2018, https://store.epicgames.com/en-US/news/the-epic-games-store-is-now-live.

*Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR, Joint Discovery Letter Brief Regarding Apple's Subpoena to Non-Party Valve Corporation.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

*Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR-TSH, Findings of Fact and Conclusions of Law Proposed by Epic Games, inc. (N.D. Cal. 2021).

eTail.Market, "What is eTail and How to Buy?," https://etail.market/what-is-etail-and-how-to-buy (accessed 4/20/2025).

Etsy, Form 10-K, 2020.

Etsy, Form 10-K, 2022.

Etsy, Form 10-K, 2023.

Etsy, How to Leave a Review on Etsy, https://help.etsy.com/hc/en-us/articles/115013197687-How-to-Leave-a-Review-on-Etsy?segment=shopping (accessed 4/3/2025).

Eurogamer, "Five Years Later, Call of Duty Returns to Steam with Modern Warfare 2," 6/8/2022, https://www.eurogamer.net/five-years-later-call-of-duty-returns-to-steam-with-modern-warfare-2.

European Union, "Regulation (EU) 2022/1925 of the European Parliament and the Council of 14 September 2022 on Contestable and Fair Markets in the Digital Sector and Amending Directives (EU) 2019/1937 and (EU) 2020/1828 (Digital Markets Act)", Official Journal of the European Union L 265: 1-66.

Ezrachi, Ariel (2015), "The Competitive Effects of Parity Clauses on Online Commerce," *European Competition Journal* 11(2–3): 488–519.

Fanatical Website, "How Does it Work?," 5/1/2024, https://support.fanatical.com/hc/en-us/articles/202325661-How-does-it-work.

FireFlower Games Website, FAQ Page, https://fireflowergames.com/pages/faq (accessed 4/18/2025).

Forbes, "An Interview With Paradox Interactive CEO Fred Wester On 'Indie' Publishing and the Future of the Video Game Industry," 1/16/2013, https://www.forbes.com/sites/erikkain/2013/01/16/an-interview-with-paradox-interactive-ceo-fred-wester-on-indie-publishing-and-the-future-of-the-gaming-industry/?sh=3803f32265c5.

Forbes, "The Master of Online Mayhem," 2/9/2011, https://www.forbes.com/forbes/2011/0228/technology-gabe-newell-videogames-valve-online-mayhem.html.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Forbes, "The Nintendo Switch OLED Estimated To Cost Only $10 More Per Unit To Make," 7/15/2021, https://www.forbes.com/sites/paultassi/2021/07/15/the-nintendo-switch-oled-estimated-to-cost-only-10-more-per-unit-to-make/.

*FTC v. Microsoft Corp. and Activision Blizzard, Inc.*, No. 3:23-cv-02880-JSC, Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law (N.D. Cal. 2023).

Fudenberg, Drew, and Jean Tirole (1991), *Game Theory*, Cambridge, MA: MIT Press.

Funstock, About Us Page, https://funstock.co.uk/pages/about-us (accessed 4/18/2025).

Funstock, Customer Support Portal, https://funstock.freshdesk.com/support/solutions (accessed 4/18/2025).

Funstock, Steam Keys Page, accessed via Internet Archive (as displayed on 6/4/2022), https://web.archive.org/web/20220604161944/https://funstock.co.uk/collections/steam-keys (accessed 4/18/2025).

Funstock, Steam Keys Page, https://funstock.co.uk/collections/steam-keys?srsltid=AfmBOopl18nPI8aw9K86vklUI5mxeRhhjRpCjDYBvnxi9ZXCVhctclHO (accessed 4/18/2025).

G2A Support, Buying FAQ Page, https://supporthub.g2a.com/marketplace/en/Buying/i-purchased-a-digital-item-how-do-i-claim-it (accessed 4/21/2025).

G2A Support, Selling Guide, https://supporthub.g2a.com/seller/en/selling-digital/a-comprehensive-guide-to-selling-digital-items-on-g2acom-marketplace-tips-for-sellers (accessed 4/21/2025).

Game Developer, "GameFly is Getting Out of the Digital Distribution Game," 8/24/2014, https://www.gamedeveloper.com/business/gamefly-is-getting-out-of-the-digital-distribution-game.

Game Developer, "Gemly is a New Online Game Storefront from Dying Light Dev Techland," 7/25/2017, https://www.gamedeveloper.com/business/gemly-is-a-new-online-game-storefront-from-i-dying-light-i-dev-techland.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Game Developer, "I Have Some Pretty Strong Evidence that the Steam Keys from the Defunct IndieGameStand are being Re-Sold," 11/6/2017, https://www.gamedeveloper.com/business/i-have-some-pretty-strong-evidence-that-the-steam-keys-from-the-defunct-indiegamestand-are-being-re-sold-.

Game Jolt Website, Downloading Games Help Page, https://gamejolt.com/help-docs/Shop/download-games (accessed 4/18/2025).

Game Jolt Website, Marketplace, https://gamejolt.com/marketplace (accessed 4/18/2025).

Game Rant, "Bethesda Launcher Gets Official Shut Down Date," 4/25/2022, https://gamerant.com/bethesda-launcher-gets-official-shut-down-date/.

Game Spot, "Ubisoft Explains Why It Doesn't Release Games on Steam, 8/29/2019, https://www.gamespot.com/articles/ubisoft-explains-why-it-doesnt-release-games-on-st/1100-6469502/.

Game Watcher, "Epic Games Store Sale Dates for 2025 - When is the Spring Sale?" 3/26/2025, https://www.gamewatcher.com/news/epic-games-store-sale-2020-schedule.

Game World Observer, "WeGame X Is Out Globally: Tencent Launches the International Version of its Chinese Storefront," 8/4/2019, https://gameworldobserver.com/2019/04/08/tencent-launches-wegame-x-globally.

GameBillet Website, About Us Page, https://www.gamebillet.com/about-us (accessed 4/18/2025).

GameFly Website, Registration Page, https://www.gamefly.com/registration (accessed 4/18/2025).

GameRevolution, "Twitch Game Store Shutting Down After November 27," 11/16/2018, https://www.gamerevolution.com/news/458393-twitch-game-store-shutting-down.

GamersGate, Buy and Play Games, accessed via Internet Archive (as displayed on 6/13/2006), https://web.archive.org/web/20060613001742/https://www.gamersgate.com/ (accessed 12/14/2023).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Gamerthor Website, About Us,
https://www.gamerthor.com/index.php?route=information/information&information_id=4 (accessed 4/20/2025).

Gamerthor Website, Steam Code Activation,
https://www.gamerthor.com/index.php?route=information/information&information_id=6 (accessed 4/20/2025).

Gamerthor Website, Terms & Conditions,
https://www.gamerthor.com/index.php?route=information/information&information_id=5 (accessed 4/20/2025).

Games Hub, "Itch.io: an Itch for Democratic Distribution," 8/11/2020,
https://www.gameshub.com/news/features/an-itch-io-for-democratic-distribution-260888-3445/.

Games Industry.Biz, "EA Confirms More Platform Exclusives for Origin,"
6/15/2011, https://www.gamesindustry.biz/ea-confirms-more-platform-exclusives-for-origin.

Games Industry.Biz, "EA Puts First Wave of Games Back on Steam," 6/5/2020,
https://www.gamesindustry.biz/ea-puts-first-wave-of-games-back-on-steam.

Games Industry.Biz, "EA Returns to Steam," 10/29/2019,
https://www.gamesindustry.biz/ea-returns-to-steam.

GamesIndustry, "Tencent to Shut Down WeGame App," 7/8/2022,
https://www.gamesindustry.biz/tencent-to-shut-down-wegame-app.

GamesIndustry.biz, "Tencent Stealth Launches International Version of WeGame
Storefront," 4/8/2019, https://www.gamesindustry.biz/tencent-stealth-launches-international-version-of-wegame-storefront.

Gamesload Website, "Borderlands The Handsome Collection" Page,
https://www.gamesload.com/games/action/borderlands-the-handsome-collection-850442.html (accessed 4/20/2025).

Gamesload Website, "Detroit: Become Human Page,"
https://www.gamesload.com/games/action/detroit-become-human-861643.html (accessed 4/20/2025).

Gamesload Website, Home Page, https://www.gamesload.com/home.html
(accessed 4/20/2025).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Gamesplanet Website, FAQ About Us Page,
https://us.gamesplanet.com/support/25-faq (accessed 4/20/2025).

Gamesplanet Website, FAQ Game Downloads Page,
https://us.gamesplanet.com/support/25-faq/195-how-does-the-game-
download-work (accessed 4/20/2025).

Gamesplanet Website, Gamesplanet Downloader,
https://us.gamesplanet.com/support/19-game-support/145-gamesplanet-
downloader (accessed 4/20/2025).

Gamespot, "Breaking News: Square Millennium," 4/26/2000,
https://www.gamespot.com/articles/breaking-news-square-millennium/1100-
2455408/.

Gamespot, "Fallout 76 Finally Comes To Steam In April With A Free Update,"
2/7/2020, https://www.gamespot.com/articles/fallout-76-finally-comes-to-
steam-in-april-with-a-/1100-6473396/.

Gamespot, "Fallout Shelter Out Now on Steam," 3/29/2017,
https://www.gamespot.com/articles/fallout-shelter-out-now-on-steam/1100-
6449048/.

Gamesrepublic Website, FAQ Page, https://gamesrepublic.com/page/faq (accessed
4/20/2025).

Gans, Joshua S. (2012), "Mobile Application Pricing," *Information Economics and
Policy* 24(1): 52–59.

GB Times, "How Much of a Loss does Sony Take on PS5?," 3/14/2025,
https://gbtimes.com/gamepedia/how-much-of-a-loss-does-sony-take-on-ps5/.

Gemly Website, FAQ Page, accessed via Internet Archive (as displayed on
2/15/2019),
https://web.archive.org/web/20190215010349/https://gemly.com/FAQ
(accessed 4/20/2025).

Gerlach, Heiko, and Junqian Li (2021), "Platform Competition, Vertical
Differentiation, and Price Coherence," *Journal of Law and Economics* 64(3): 439-
477.

GetGamesGo Website, FAQ Page, accessed via Internet Archive (as displayed on
2/6/2015),

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

https://web.archive.org/web/20150206120234/http://getgamesgo.com/FAQ (accessed 4/20/2025).

GetGamesGo Website, Gaming Page, accessed via Internet Archive (as displayed on 1/16/2017), https://web.archive.org/web/20170116182455/http://www.getgamesgo.com/category/gaming (accessed 4/20/2025).

Giant Bomb, Gameolith Page, 5/10/2021, https://www.giantbomb.com/gameolith/3015-7499/.

Giant Bomb, PlayOnline, https://www.giantbomb.com/playonline/3015-1540/ (accessed 4/20/2025).

Google Stadia, Home Page, https://stadia.google.com/gg/ (accessed 4/23/2025).

Gowrisankaran, Gautam, Aviv Nevo, and Robert Town (2015), "Mergers When Prices Are Negotiated: Evidence from the Hospital Industry," *American Economic Review* 105(1): 172–203.

Green Man Gaming, About Green Man Gaming, https://corporate.greenmangaming.com/about-us/ (accessed 12/15/2023).

Hill-Whittall, Richard (2015), The Indie Game Developer Handbook, Burlington, MA: Taylor & Francis Group.

Hortacsu, Ali and Joonhwi Joo (2023), *Structural Econometric Modeling in Industrial Organization and Quantitative Marketing*, Princeton, NJ: Princeton University Press.

HP, "Gaming Evolution: From PC to Cloud Gaming," 1/21/2025, https://www.hp.com/us-en/shop/tech-takes/gaming-evolution-pc-to-cloud-gaming.

HP, "The Future of Gaming: Comparing PC and Cloud Gaming in Singapore," 2/12/2025, https://www.hp.com/sg-en/shop/tech-takes/post/gaming-evolution-pc-to-cloud-gaming.

Humble Bundle, Humble Bundle Developer Resources, https://www.humblebundle.com/developer?srsltid=AfmBOorstqJOUJxmsYwbjpe9mvz0LOyCPZmDvuxclTmJoOZNyTjFF2vB (accessed 4/7/2025).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Humble Bundle, Humble Self-Service Tools, https://support.humblebundle.com/hc/en-us/articles/214918618-Humble-Self-Service-Tools#manage-content (accessed 6/14/2024).

Humble Bundle, What is Humble Bundle, https://www.humblebundle.com/about (accessed 1/21/2025).

Icrontic, "The Madness of Valve Marketing: An Explanation for Non-gamers," 4/17/2011, https://icrontic.com/article/the-madness-of-valve-marketing-an-explanation-for-non-gamers.

IGN, "GameFly, Inc. Acquires Direct2Drive from IGN Entertainment," 5/25/2011, accessed via Internet Archive (as displayed on 6/11/2011),https://web.archive.org/web/20110611174630/http://corp.ign.com/articles/117/1170984p1.html.

IGN, "IGN Entertainment Launches Direct2Drive Digital Retail Store," 9/7/2004, https://corp.ign.com/press/press/2004/ign-entertainment-launches-direct2drive-digital-retail-store.

IGN, "Ubisoft PC Games Returning to Steam Starting With Assassin's Creed Valhalla," 11/21/2022, https://www.ign.com/articles/ubisoft-pc-games-returning-to-steam-starting-with-assassins-creed-valhalla.

Imperial Games Website, Home/Error Page, http://imperialgames.com/ (accessed 4/20/2025).

Imperial Games, Home Page, accessed via Internet Archive (as displayed on 1/10/2015), https://web.archive.org/web/20150110010021/http://imperialgames.com/ (accessed 4/20/2025).

Imperial Games, Home Page, accessed via Internet Archive (as displayed on 7/20/2017), https://web.archive.org/web/20170720204326/http://imperialgames.com/ (accessed 4/20/2025).

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 115 (E.D.N.Y. 2024).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Inc., "Why It's OK to Focus on Growth and Not Profitability in the Early Days of Your Tech Startup," 10/6/2021, https://www.inc.com/hillel-fuld/why-its-ok-to-focus-on-growth-not-profitability-in-early-days-of-your-tech-startup.html.

IndieGala Website, FAQ Page, https://docs.indiegala.com/support/general.html (accessed 4/20/2025).

IndieGameStand Website, Home Page, accessed via Internet Archive (as displayed on 11/16/2017), https://web.archive.org/web/20171116044017/http://indiegamestand.com/ (accessed 4/20/2025).

Internet Archive, WeGame X Home Page, https://web.archive.org/web/20210401000000*/https://www.wegamex.com.hk/ (accessed 6/10/2024).

Inverse, "20 Years Ago, Valve Changed How We Play Games Forever," 9/21/2023, https://www.inverse.com/gaming/steam-20th-anniversary.

Investopedia, "How Airbnb Works for Hosts, Guests, and the Company Itself," 2/28/2025, https://www.investopedia.com/articles/personal-finance/032814/pros-and-cons-using-airbnb.asp.

Investopedia, "The Economics of Gaming Consoles," 1/29/2022, https://www.investopedia.com/articles/investing/080515/economics-gaming-consoles.asp.

Is There Any Deal, Shops Page, https://isthereanydeal.com/shops/ (accessed 4/18/2025).

Johansen, Bjørn Olav, and Thibaud Vergé (2017), "Platform Price Parity Clauses with Direct Sales," University of Bergen Working Paper, 1–36.

Johnson, Justin P. (2017), "The Agency Model and MFN Clauses," *Review of Economic Studies* 84(3): 1151–1185.

JoyBuggy Website, Terms and Conditions, https://www.joybuggy.com/en/terms-and-conditions (accessed 4/20/2025).

K4G, What Is Battle.net, https://k4g.com/blog/games/what-is-battle-net (accessed 4/20/2025).

Kirkwood, John (2018), "Market Power and Antitrust Enforcement," *Boston University Law Review* 98: 1169–1227.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Kotaku, "EA Returns to Steam with Star Wars Jedi: Fallen Order, 10/29/2019, https://kotaku.com/ea-returns-to-steam-with-star-wars-jedi-fallen-order-1839440326.

Kydland, Finn E., and Edward C. Prescott (1982), "Time to Build and Aggregate Fluctuations," *Econometrica* 50(6): 1345–1370.

Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996.

League of Legends Support, Riot Client FAQ, 5/13/2024, https://support-leagueoflegends.riotgames.com/hc/en-us/articles/4406274299411-Riot-Client-FAQ.

LinkedIn, Imperial Games Page, https://www.linkedin.com/company/imperialgames (accessed 4/20/2025).

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1370 (9th Cir. 1986).

Lucas Jr, Robert E. (1972), "Expectations and the Neutrality of Money," *Journal of Economic Theory* 4(2): 103–124.

MacGameStore Website, About Page, https://www.macgamestore.com/information/About/ (accessed 4/20/2025).

Mankiw, N. Gregory (2018), *Principles of Economics*, 8th ed., Boston, MA: Cengage Learning.

Mantovani, Andrea, Claudio A. Piga, and Carlo Reggiani (2021), "Online Platform Price Parity Clauses: Evidence from the EU Booking.com Case," *European Economic Review* 131: 1–27.

Mariotto, Carlotta, and Marianne Verdier (2020), "Platform–Merchant Competition for Sales Services," *Journal of Economics & Management Strategy* 29(4): 834–853.

Meta Horizon, "Meta Quest Virtual Reality Check (VRC) Guidelines," 12/19/2024, https://developers.meta.com/horizon/resources/publish-quest-req/.

Meta Horizon, Frequently Asked Questions - Meta Horizon Store, https://developers.meta.com/horizon/faqs/?locale=en_GB#meta-horizon-store (accessed 4/23/2025).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Meta Website, How to Download and Install Apps and Games, https://www.meta.com/help/quest/202382494824837/ (accessed 4/20/2025).

Meta, "A New Era for Mixed Reality," 4/22/2024, https://www.meta.com/blog/meta-horizon-os-open-hardware-ecosystem-asus-republic-gamers-lenovo-xbox/.

Microsoft, "Microsoft Unites Xbox and PC Gamers with Debut of Games for Windows — LIVE," 3/14/2007, https://news.microsoft.com/2007/03/14/microsoft-unites-xbox-and-pc-gamers-with-debut-of-games-for-windows-live/.

Minecraft, Marketplace, https://www.minecraft.net/en-us/catalog (accessed 1/21/2025).

Minecraft, The Minecraft Partner Program, https://www.minecraft.net/en-us/partner (accessed 4/9/2025).

NCESC, "How Much of a Loss does Sony Take on PS5?," 5/21/2024, https://www.ncesc.com/gaming-pedia/how-much-of-a-loss-does-sony-take-on-ps5/.

Network Law Review, "Thomas W. Hazlett: The FTC's Rendition of the 'Cellophane Fallacy'," 10/27/2022, https://www.networklawreview.org/hazlett-cellophane-fallacy/.

New York Times, "Fortnite Maker Wants to Sell More Games, and Build a Platform to Do It," 8/13/2020, https://www.nytimes.com/2019/08/27/business/steam-epic-games-store.html.

Newegg Website, Digital Game Sale Page, https://www.newegg.com/Digital-Games-Sale/EventSaleStore/ID-10402?srsltid=AfmBOooBC0A8pguimlGOIpYF1MXxiyFNkUODdoHwMCHixG1bWDIImaLN (accessed 4/20/2025).

Newegg Website, PC Games Page, https://www.newegg.com/PC-Games/SubCategory/ID-372?cm_sp=Tab_PC-Gaming_7-_-VisNav-_-PC-Games (accessed 4/20/2025).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Nexus Website, "What is the Purchase Flow for People Shopping in my Nexus?," https://help.nexus.gg/hc/en-us/articles/4407779329421-What-is-the-purchase-flow-for-people-shopping-in-my-Nexus (accessed 4/18/2025).

Nicholson, Walter (1995), *Microeconomic Theory: Basic Principles and Extensions*, 6th ed., Fort Worth, TX: The Dryden Press.

Nintendo, "Important Information About the Closure of the Wii Shop Channel," 9/29/2017, https://www.nintendo.com/en-gb/News/2017/September/Important-information-about-the-closure-of-the-Wii-Shop-Channel-1285994.html.

Nintendo, Wii Shop Channel Discontinuation, https://en-americas-support.nintendo.com/app/answers/detail/a_id/27560/~/wii-shop-channel-discontinuation (accessed 4/21/2025).

Noctre Website, Help and Support Page, https://www.noctre.com/help (accessed 4/20/2025).

Nuuvem Website, Redeem Key Page, https://www.nuuvem.com/us-en/activation-by-key (accessed 4/20/2025).

Nuuvem Website, Activation and Regional Restriction, https://www.nuuvem.com/us-en/support-faq-activation-regional-restriction (accessed 4/20/2025).

NVIDIA, GeForce Now, https://www.nvidia.com/en-us/geforce-now/ (accessed 1/25/2025).

Paradox Forum, Approved Re-Sellers Forum, 7/26/2017, https://forum.paradoxplaza.com/forum/threads/approved-re-sellers.1036933/.

PC Gamer, "DotEmu is Closing its Online Store, Games Will be Gone on June 1," 3/20/2017, https://www.pcgamer.com/dotemu-is-closing-its-online-store-games-will-will-be-gone-on-june-1/.

PC Gamer, "Games for Windows Marketplace to Close Next Week," 8/15/2023, https://www.pcgamer.com/gfw-pc-marketplace-to-close-next-week/.

PC Gamer, "Oof: Years Before Steam, a Blizzard Engineer Wanted to Turn Battle.net into a Third-Party Game Store, but Was Reportedly Turned Down," 10/8/2024, https://www.pcgamer.com/gaming-industry/oof-years-before-

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

steam-a-blizzard-engineer-wanted-to-turn-battle-net-into-a-third-party-game-store-but-was-reportedly-turned-down/.

PC Gamer, "Bethesda Is Dropping Its Launcher in Favor of a Return to Steam," 2/22/2022, https://www.pcgamer.com/bethesda-is-dropping-its-launcher-in-favor-of-a-return-to-steam/.

PC Gamer, "Discord's Nitro Games Will be Closed in October," 9/13/2019, https://www.pcgamer.com/discords-nitro-games-will-be-closed-in-october/.

PC Gamer, "Fallout 76 Won't Launch on Steam," 8/6/2018, https://www.pcgamer.com/fallout-76-wont-launch-on-steam/.

PC Gamer, "Most Game Devs Don't Think Steam Earns its 30% Revenue Cut," 4/28/2021, https://www.pcgamer.com/most-game-devs-dont-think-steam-earns-its-30-revenue-cut/.

PC Gamer, "Indie Publisher Playism is Closing its DRM-Free Store This Month," 3/20/2021, https://www.pcgamer.com/indie-publisher-playism-is-closing-its-store-this-month/.

PC Games Insider, "Tencent's WeGame X is Now Available Internationally," 4/8/2019, https://www.pcgamesinsider.biz/news/68813/tencents-wegame-x-is-now-available-internationally/.

PC Games Insider, "Discord Quietly Shelves its Storefront to Focus on Direct Sales," 3/22/2019, https://www.pcgamesinsider.biz/news/68742/discord-quietly-shelves-its-storefront-to-focus-on-direct-sales/.

PC Mag, "Microsoft Loses Up to $200 on Every Xbox Console Sold," 11/1/2022, https://www.pcmag.com/news/microsoft-loses-up-to-200-on-every-xbox-console-sold.

PCGamer, "Steam Sale Dates: When is the Next Steam Sale?" 3/20/2025, https://www.pcgamer.com/steam-sale-dates/.

PCGamesN, "You Can Now Buy Games Via Twitch Streams, With 5% of the Purchase Going to the Streamer,: 4/4/2017, https://www.pcgamesn.com/twitch-commerce-dlc-steam.

PCMag, "13 New Features in Windows 8 Consumer Preview," 2/29/2012, https://www.pcmag.com/archive/13-new-features-in-windows-8-consumer-preview-294819.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

PCWorld, "Games for Windows Live Adds 'Games on Demand' Downloads," 12/16/2009, accessed via Internet Archive (as displayed on 12/10/2011), https://web.archive.org/web/20111210000015/http://www.pcworld.com/article/184777/games_for_windows_live_adds_games_on_demand_downloads.html (accessed 4/21/2025).

Playfield.io, Home Page, accessed via Internet Archive (as displayed on 3/8/2017), https://web.archive.org/web/20170308140725/https://playfield.io/ (accessed 4/20/2025).

Playsum Website, FAQ Page, https://www.playsum.live/faq (accessed 4/20/2025).

Polygon, "The Division 2 Coming to Epic Games Store, Skipping Steam," 1/9/2019, https://www.polygon.com/2019/1/9/18174375/division-2-pc-epic-games-store-steam.

Polygon, "Ubisoft Now Selling Third-Party Games on Uplay Shop and Its Own Games on EA's Origin," 2/19/2013, https://www.polygon.com/2013/2/19/4001836/ubisoft-uplay-shop-third-party-games-ea-origin-chris-early-interview.

Prime Gaming, "Welcome to the Amazon Games App," https://gaming.amazon.com/amazon-games-app (accessed 4/18/2025).

Ray, Amy W. and Christopher D. Wall (2017), "Antitrust," in Roman L. Weil, et al., eds., *Litigation Services Handbook: The Role of the Financial Expert*, Hoboken, NJ: John Wiley & Sons, Inc.

Razer Game Store Website, Closure Announcement - FAQs for Purchased Games, accessed via Internet Archive (as displayed on 2/28/2019), https://web.archive.org/web/20190228113705/https://www.razer.com/gamestore/closure (accessed 4/23/2025)

Razer Game Store Website, Closure Announcement, accessed via Internet Archive (as displayed on 2/28/2019), https://web.archive.org/web/20190228113705/https://www.razer.com/gamestore/closure (accessed 4/20/2025).

Reddit, "The History of GameTap: A Failed Subscription Service for Games," https://www.reddit.com/r/Games/comments/5xomd1/the_history_of_gametap_a_failed_subscription/ (accessed 20250420).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Reddit, Funstock Digital Forum, c. March 2017, https://www.reddit.com/r/GameDealsMeta/comments/5xt4vc/any_way_to_get_old_keys_from_funstock_digital/.

Reddit, Paradox Interactive Retailers, https://www.reddit.com/r/paradoxplaza/wiki/retailers/ (accessed 4/20/2025).

Reddit, ShinyLoot Shutting Down Forum, 2/11/2016, https://www.reddit.com/r/linux_gaming/comments/45bmb4/shinyloot_is_shutting_down/.

Reddit, Sila Games Forum https://www.reddit.com/r/GameDealsMeta/comments/462x50/are_gamesrocket_and_silagames_autorized_resellers/ (accessed 4/20/2025).

Roblox, Creation Overview, https://create.roblox.com/docs/creation#experiences (accessed 4/9/2025).

Roblox, Marketplace, https://www.roblox.com/catalog (accessed 1/21/2025).

Rock Paper Shotgun, "Content Wars: Origin/Steam Scuffle Unfolds," 7/7/2011, https://www.rockpapershotgun.com/origin-steam.

Rockstar, "Download The Rockstar Games Launcher," 9/17/2019, https://www.rockstargames.com/newswire/article/89k8a554534523/Download-The-Rockstar-Games-Launcher.

Savemi Website, Terms and Conditions, accessed via Internet Archive (as displayed on 10/29/2016), https://web.archive.org/web/20161029231442/https://savemidownload.com/terms-conditions/ (accessed 4/20/2025).

Schlütter, Frank (2024), "Managing Seller Conduct in Online Marketplaces and Platform Most - Favored Nation Clauses," *Journal of Industrial Economics* 72(3): 1139-1194.

Se7en.WS, "Dying Light Builders Techland have Launched a Brand New Storefront Referred to as Gemly," 7/26/2017, https://se7en.ws/dying-light-developers-techland-have-launched-a-new-storefront-called-gemly/?lang=en.

Sen, Amartya (2017), *Collective Choice and Social Welfare, Expanded Edition*, Cambridge, MA: Harvard University Press.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Sila Games, Home Page, https://silagames.com/ (accessed 4/20/2025).

Softonic, Bethesda Launcher, https://bethesda-launcher.en.softonic.com/ (accessed 4/21/2025).

South China Morning Post, "Tencent Quietly Launches Its WeGame Store Outside China," 4/3/2019, www.scmp.com /abacus/tech/article/3029259/tencent-quietly-launches-its-wegame-store-outside-china.

Sports Interactive, Football Manager 2019, https://www.sports-interactive.com/games/football-manager-2019 (accessed 1/26/2025).

Square Enix Store, PC Video Games, https://na.store.square-enix-games.com/video-games?_bc_fsnf=1&Platform%5B%5D=Mac&Platform%5B%5D=PC+Download&Platform%5B%5D=Steam (accessed 4/20/2025).

Stardock Games, Storefront, https://www.stardock.com/games/Products/Index (accessed 4/21/2025).

Stardock, "Impulse to Deliver Next-Generation PC Platform," 6/14/2008, https://www.stardock.com/blog/314940/impulse-to-deliver-next-generation-pc-platform.

Stardock, Stardock Central, https://www.stardock.com/stardockcentral/ (accessed 4/21/2025).

Stardock, Stardock Central: A Closer Look, https://www.stardock.com/products/sdcentral/media/ (accessed 4/21/2025).

Steam, Steam Deck, https://store.steampowered.com/steamdeck/ (accessed 4/22/2025).

Steam, "New Revenue Share Tiers and Other Updates to the Steam Distribution Agreement," 11/30/2018, https://steamcommunity.com/groups/steamworks/announcements/detail/169 7191267930157838.

Steam, "Updates to Pricing Tools And Recommendations", 10/24/2022, https://steamcommunity.com/groups/steamworks/announcements/detail/33 14110913449340511.

Steam, Anno 1800, https://store.steampowered.com/app/916440/Anno_1800/ (accessed 4/24/2025).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Steam, Back 4 Blood,
https://store.steampowered.com/app/924970/Back_4_Blood/ (accessed 4/10/2025).

Steam, Back 4 Blood,
https://store.steampowered.com/app/924970/Back_4_Blood/ (accessed 4/24/2025).

Steam, Bioshock Infinite,
https://store.steampowered.com/app/8870/BioShock_Infinite/ (accessed 4/24/2025).

Steam, Call Of The Wild: The Angler™,
https://store.steampowered.com/app/1408610/Call_of_the_Wild_The_Angler/ (accessed 4/24/2025).

Steam, Cris Tales, https://store.steampowered.com/app/1079830/Cris_Tales/ (accessed 4/24/2025).

Steam, Darkest Dungeon®,
https://store.steampowered.com/app/262060/Darkest_Dungeon/ (accessed 4/24/2025).

Steam, Dead Space, https://store.steampowered.com/app/1693980/Dead_Space/ (accessed 4/24/2025).

Steam, Despot's Game: Dystopian Battle Simulator,
https://store.steampowered.com/app/1227280/Despots_Game_Dystopian_Battle_Simulator/ (accessed 4/24/2025).

Steam, Fallen Legion Revenants,
https://store.steampowered.com/app/1921340/Fallen_Legion_Revenants/ (accessed 4/24/2025).

Steam, Far Cry 2, https://store.steampowered.com/app/19900/Far_Cry_2/ (accessed 4/24/2025).

Steam, Far Cry 6, https://store.steampowered.com/app/2369390/Far_Cry_6/ (accessed 4/24/2025).

Steam, Filthy Us, https://store.steampowered.com/app/1788170/FILTHY_US/ (accessed 4/24/2025).