# EXHIBIT 11
# Report Part 1
# (Dkt No. 450.11)

# REDACTED

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| IN RE: VALVE ANTITRUST LITIGATION | Case No. 2:21-cv-00563-JNW <br><br> HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY |

**EXPERT REPORT OF ASHLEY LANGER, PH.D.**

March 26, 2025

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## Table of contents

1.   **INTRODUCTION**                                                                                          **6**

1.1.   Qualifications                                                                                          6

1.2.   Allegations                                                                                             8

1.3.   Assignment                                                                                             9

2.   **SUMMARY OF OPINIONS**                                                                                   **10**

3.   **BACKGROUND**                                                                                            **19**

3.1.   Valve and Steam                                                                                         25

3.2.   Two-sided platforms and network effects                                                                 27

4.   **STANDARDS OF ECONOMIC MODELS FOR THE RELIABLE ESTIMATION OF A BUT-FOR WORLD** 31

5.   **DR. SCHWARTZ'S PROPOSED PCM IS UNRELIABLE AND CANNOT ESTABLISH OR APPORTION CLASS-WIDE HARM THROUGH A COMMON METHODOLOGY**                                              **42**

5.1.   Dr. Schwartz's PCM is based on assumptions that contradict the real world                              45

5.1.1.   The PCM fails to capture important features of the video game industry, and fails to capture the challenged conduct                                                                                           46

5.1.2.   Because of its restrictive assumptions, Dr. Schwartz's PCM incorrectly predicts that PMFNs never have procompetitive effects                                                                                52

5.2.   Dr. Schwartz's PCM makes predictions that contradict economic realities of the video game industry    56

5.2.1.   Dr. Schwartz's PCM predicts excessively high marginal costs for publishers                           57

5.2.2.   Dr. Schwartz's PCM predicts that publishers with financial success on Steam actually lose money on the platform                                                                                             60

5.2.3.   Dr. Schwartz's PCM generates predictions about economic profits that are inconsistent with economic theory                                                                                                67

5.3.   Dr. Schwartz's PCM makes predictions about the impact of a PMFN based on the model's assumptions and not based on the data it analyzes                                                                         75

5.4.   Dr. Schwartz's PCM makes predictions but provides no means by which its statistical precision can be evaluated                                                                                               81

6.   **DR. SCHWARTZ'S PROPOSED DAMAGES ESTIMATION IS UNRELIABLE AND CANNOT ESTIMATE OR APPORTION CLASS-WIDE DAMAGES**                                                                 **83**

6.1.   Overview of Dr. Schwartz's proposed damages model                                                      85

6.2.   Dr. Schwartz's proposed damages model is fundamentally unreliable because its premises are inconsistent with the market realities of video game distribution                                             87

6.2.1.   Dr. Schwartz's but-for revenue share equation does not evaluate the impact of the alleged PMFN       88

6.2.2.   Dr. Schwartz's but-for revenue share equation is based on assumptions that are inconsistent with industry facts of video game distribution                                                              91

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

6.2.3.    Dr. Schwartz's but-for revenue share equation makes predictions that are inconsistent with industry facts of video game distribution    96

6.2.4.    Dr. Schwartz's but-for revenue share equation is based on assumptions which lead to a mechanical conclusion of harm    99

6.2.5.    Dr. Schwartz's but-for revenue share equation is incapable of accounting for competition over product or service quality    103

6.3.    The market shares used by Dr. Schwartz in his model are inconsistent with industry facts and fundamentally unreliable    105

6.3.1.    Dr. Schwartz's approach to estimating Steam's but-for market share is inconsistent with industry facts and fundamentally unreliable    106

6.3.2.    Dr. Schwartz's approach to damages hinges upon his calculation of Steam's as-is and but-for market share    115

6.4.    The pass-through rates estimated by Dr. Schwartz in his model are inconsistent with industry facts and fundamentally unreliable    116

6.4.1.    Dr. Schwartz's pass-through methodology is unreliable because it fails to account for other factors that influence games' price changes and does not show causation    117

6.4.2.    Dr. Schwartz's pass-through methodology is unreliable because it fails to account for the individualized factors that determine pass-through    127

6.5.    Dr. Schwartz's damages model ignores the substantial value Steam keys bring to some games and publishers    132

**7.    DR. SCHWARTZ'S PROPOSED "YARDSTICK APPROACH"    141**

**8.    DR. SCHWARTZ'S PROPOSED "EMPIRICAL APPROACH"    151**

**9.    APPENDICES    157**

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## Exhibit List

Exhibit 1     Estimates with high uncertainty are less precise and thus less reliable ................................ 40

Exhibit 2     Dr. Schwartz's PCM fails to meet standards for reliable modeling of the but-for world absent the challenged conduct ................................................................ 44

Exhibit 3     Dr. Schwartz's PCM makes assumptions that contradict the realities of the video game industry ...................................................................................... 48

Exhibit 4     Dr. Schwartz's PCM incorrectly predicts that highly profitable publishers lose money on Steam (2017–2023) .................................................................... 62

Exhibit 5     Dr. Schwartz's PCM incorrectly predicts that publishers should exit Steam due to economic losses, even though in reality these publishers remain on Steam ........................................ 71

Exhibit 6     Dr. Schwartz's PCM predicts implausible total economic profits ......................................... 74

Exhibit 7     Dr. Schwartz's PCM predicts that revenue shares are inflated from a "PMFN" regardless of what data is provided to it ................................................................ 78

Exhibit 8     Overview of how Dr. Schwartz calculates Valve's but-for revenue share in his damages model .................................................................................................... 87

Exhibit 9     Dr. Schwartz's but-for revenue share equation makes assumptions that contradict the realities of the video game industry ...................................................................... 92

Exhibit 10    Contrary to the premise of Dr. Schwartz's damages model, Valve's revenue share and Steam's market share do not move in a commensurate fashion .......................................... 99

Exhibit 11    Dr. Schwartz's damages model shifts its estimate of the "competitive" rate as Valve moves towards it ...................................................................................................... 102

Exhibit 12    Publishers' "market shares" on Steam varied widely between 2008 and 2012 ..................... 111

Exhibit 13    Dr. Schwartz does not isolate the impact of a change in Valve's revenue shares on user prices .................................................................................................... 123

Exhibit 14    Pass-through has important, game-specific ramifications for damages ............................. 132

Exhibit 15    Example revenue share calculation for a $10 dollar game with a 30 percent nominal revenue share ................................................................................................... 134

Exhibit 16    Steam keys effectively reduce the revenues publishers share with Valve, and the reduction varies by publisher ...................................................................................... 137

Exhibit 17    Wolfire Games Steam keys issued, Steam keys redeemed, and Steam unit sales, 2013–2024 .................................................................................................... 139

Exhibit 18    Publishers vary in their use of Steam keys ...................................................................... 141

Exhibit 19    Steam differs from Dr. Schwartz's benchmarks in many ways ......................................... 148

Exhibit 20    Steam shares similar characteristics and revenue shares with console platforms .............. 151

Exhibit 21    Realities of the video game industry ................................................................................ 185

Exhibit 22    Assumptions in Dr. Schwartz's PCM .............................................................................. 186

Exhibit 23    Data input values used by Dr. Schwartz in his "numeric analysis" of the PCM ................... 188

Exhibit 24    Data input values for analyzing ▮▮▮▮▮▮▮ in fiscal year 2017 using the PCM ............... 190

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Exhibit 25    Input values for total revenue and game price used for the PCM analysis on specific publishers and over specific time periods.................................................................................... 192

Exhibit 26    Data input values for evaluating the PCM's predictions using datasets generated by statistical simulation ............................................................................................................. 197

Exhibit 27    Example of input values of generated datasets and the PCM's estimated impact of the "PMFN" on revenue share and total profits .................................................................... 198

Exhibit 28    Dr. Schwartz's PCM predicts that total profits are lower from a "PMFN" regardless of what data is provided to it ..................................................................................................... 200

Exhibit 29    Data input values for evaluating the PCM's predictions when inputting Dr. Schwartz's predicted but-for economic outcomes ........................................................................... 202

Exhibit 30    Data input values for evaluating the PCM's predictions when inputting different values of Steam's market share............................................................................................. 204

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# 1.    Introduction

## 1.1.    Qualifications

1. I am an economist with expertise in economic modeling, empirical analysis, industrial organization, and government regulation. I received my B.A. in Economics and Mathematical Methods in the Social Sciences from Northwestern University in 2002. After working at the Brookings Institution in Washington, D.C., from 2002 to 2004, I completed my Ph.D. at the University of California, Berkeley, in 2010. My dissertation focused on industrial organization, which includes empirical analysis of firm behavior, competition, and government regulation.

2. From 2010 to 2012, I was an Assistant Professor of Public Policy at the Ford School of Public Policy at the University of Michigan ("Michigan"). At Michigan, I taught classes in microeconomics, industry structure, government regulation, cost-benefit analysis, and energy policy at the undergraduate and graduate levels.

3. I am a tenured Associate Professor of Economics at the Eller College of Management at the University of Arizona ("Arizona"), where I have worked since 2012. At Arizona, I have taught classes in principles of economics, business strategy, non-market valuation, environmental economics, and empirical methods for economic research to undergraduates, M.B.A. students, and Ph.D. students. My M.B.A.-level course covers topics in corporate strategy including pricing, investment, product differentiation, platform competition, and competition and antitrust. My Ph.D.-level course covers methods for estimating product demand and supply, pricing decisions, strategic corporate policy, and empirical valuation of non-market goods such as the value of information, health and safety, and environmental services.

4. I am a Research Associate of the National Bureau of Economic Research's ("NBER's") Industrial Organization and Environmental and Energy Economics programs. The NBER is the preeminent professional association of economists in North America, and membership is by invitation only.

5. My research spans topics in industrial organization, government regulation, consumer decision-making, firm behavior, competition, transportation economics, and energy economics. I employ a wide variety of statistical techniques in my research and contribute to advancing statistical methods as well as answering

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

questions about consumer preferences and the efficiency of regulatory design. My research articles have been published in leading peer-reviewed journals including the *American Economic Review*, the *Review of Economics and Statistics*, the *Journal of Public Economics*, and the *Journal of Industrial Economics*. I have published multiple articles on analyses of pricing, taxation, consumer demand, and firms' strategic responses to government regulation and to competitors' products. In 2019, I received the Eller College of Management's Dean's Research Award for the best research in the college by an Assistant Professor.

6. I am frequently asked to review articles for leading economics journals, including the *American Economic Review*, *Econometrica*, the *Journal of Political Economy*, the *Review of Economic Studies*, and the *Quarterly Journal of Economics*. I am also on the Board of Editors at the *American Economic Review*, an Associate Editor at the *International Journal of Industrial Organization*, and a member of the Editorial Councils of the *Journal of the Association of Environmental and Resource Economists* and the *Journal of Environmental Economics and Management*. In these contexts, I am asked to provide my expertise on industrial organization and firm behavior, the design and enforcement of regulations and subsidies, consumer decision-making, econometric and statistical methods, policy evaluation, environmental economics, and energy economics, among other topics.

7. At Arizona, I have served as a doctoral committee member for numerous Ph.D. students researching industrial organization, government regulation, competition, firm behavior, consumer decision-making, and energy economics, among many other topics. I was awarded the Kalt Prize for the best graduate student placement in the college in 2018 and 2024 and the Eller College Outstanding Economics Instructor Award in 2021 and 2024. At Michigan, I was on the Ford School's Faculty Teaching Honor Roll for each of the courses I taught.

8. I have also provided expert witness testimony in multiple cases. In this work, I have assessed issues related to class certification, liability, and damages. These cases involved various allegations, including allegations of anticompetitive business practices and deceptive business practices. **Appendix A** contains a copy of my curriculum vitae and prior testimony. **Appendix B** contains the list of the materials I relied upon in forming my opinions.

9. I am being compensated for my work on this matter at my standard rate of $1,175 per hour. I have been assisted in this matter by staff of Cornerstone Research, who

worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

## 1.2. Allegations

10. Plaintiffs allege that "Valve requires that publishers offer the best price for their products on Steam, a type of 'most favored nation' ('MFN') provision. A particular type of MFN called a Platform MFN (or 'PMFN') occurs when an online platform requires that providers using its platform not offer their products or services at a lower price on other platforms."[1] In short, Plaintiffs allege that Valve enforces a policy where video game publishers may not offer their products for lower prices on rival PC game distribution platforms. Plaintiffs further allege that "publishers cannot offer exclusive [downloadable content ('DLC')] or earlier release dates for DLC to attract users to a different store."[2]

11. Plaintiffs also allege that "Valve uses its dominance over PC game distribution to impose and anticompetitively maintain a 30% commission" on Steam,[3] dominance which is rooted in Valve's alleged platform most favored nation provision ("PMFN").[4] As a result of this allegedly supracompetitive price to publishers (called "revenue share" in Valve's terminology), Plaintiffs allege that "[c]ompetition, output, and innovation are suppressed," "[g]ame quality and choice suffers," "gamers are injured by paying higher retail prices for fewer and lower-quality games," and "Valve's scheme imposes a bloated tax on the PC gaming industry, exploiting publishers reliant on Steam."[5] Plaintiffs claim that Valve's alleged anticompetitive conduct "imposed, and threatens to continue to impose, a common antitrust injury" to class members.[6]

---

[1]   Consolidated Second Amended Class Action Complaint, *In re: Valve Antitrust Litigation*, March 23, 2023 ("Complaint"), ¶ 156.

[2]   Complaint, ¶ 175.

[3]   Complaint, ¶ 4.

[4]   Complaint, ¶ 9 ("Valve has for years maintained its dominance and thwarted effective competition by engaging in various anticompetitive acts. For example, Valve forces game publishers to agree to a Platform Most-Favored-Nations Clause (the 'Valve PMFN') as a requirement to access Steam").

[5]   Complaint, ¶ 25.

[6]   Complaint, ¶ 378.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

12. Plaintiffs define the class as "All persons or entities who, directly or through an agent, paid a commission to Valve in connection with the sale or use of a game on the Steam platform on or after January 28, 2017, and continuing through the present until the effects of its scheme are eliminated (the 'Class Period'), and where either (1) the person or entity was based in the United States and its territories or (2) the game was purchased or acquired by a United States-based consumer during the Class Period. Excluded from the Class are (a) Defendant, its parents, subsidiaries, affiliate entities, and employees, and (b) the Court and its personnel."[7] I understand the parties have agreed that the class definition should be changed such that the class period ends on November 25, 2024.

## 1.3. Assignment

13. On January 27, 2025, Plaintiffs' economic expert Dr. Steven Schwartz submitted an expert report in which he opines that Valve possesses monopoly power in the alleged market for third-party digital PC video game distribution on platforms.[8] He assumes that Valve maintains its monopoly through the enforcement of an alleged PMFN.[9] He opines that Valve charges supracompetitive prices to class members,[10] and that all class members are harmed by the alleged exercise and maintenance of Valve's alleged monopoly power.[11] He presents a "Platform Competition Model" ("PCM") that purports to show class-wide harm to class members using class-wide evidence (Schwartz Report, Section 7.2),[12] a "yardstick approach" that he claims indicates, using common evidence, that Valve charges supracompetitive fees (Schwartz Report, Section 7.3),[13] an "empirical approach" that he claims indicates, using

---

[7]    Complaint, ¶ 375.

[8]    Opening Merits Expert Report of Steven Schwartz, Ph.D., January 27, 2025 ("Schwartz Report"), ¶ 13 ("The relevant antitrust market for purposes of my analysis is a worldwide market for third-party digital personal computer ('PC') game distribution via platforms. ... Valve has monopoly power in the relevant market."). Dr. Schwartz also authored a similar class certification report. See Class Certification Expert Report of Steven Schwartz, Ph.D., February 8, 2024 ("Schwartz Class Cert Report"), ¶ 12.

[9]    Schwartz Report, ¶ 180 ("Plaintiffs allege that Valve requires publishers on Steam to abide by its PMFN Policy, which constrains publishers from pricing a game differently or providing different content across platforms. ... Assuming the foregoing, the alleged PMFN Policy reduces publishers' ability to increase both sales and revenues by providing different prices and/or content across platforms as a way of attracting customers to those platforms.").

[10]   Schwartz Report, ¶ 13 ("Valve has monopoly power in the relevant market, evidenced by its high and sustained market share, high and sustained profitability, and Valve-imposed barriers to entry to the market through the PMFN Policy, all of which allow Valve to charge a supracompetitive rate to publishers.").

[11]   Schwartz Report, ¶ 13 ("Valve's exercise and maintenance of its monopoly power harms class members, *i.e.*, the publishers listing their games on Steam").

[12]   Schwartz Report, ¶¶ 289–292.

[13]   Schwartz Report, ¶¶ 358–359, 376–377.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

common evidence, that Valve's revenue share would be lower in the but-for world (Schwartz Report, Section 7.4),[14] and a damages model that he claims allows him to calculate class-wide damages using a common methodology and evidence (Schwartz Report, Section 8).[15]

14.    I have been asked by counsel for Valve to analyze the economic validity of the claims made by Dr. Schwartz in his report with respect to his damages model, his Platform Competition Model, his "yardstick approach," and his "empirical approach." I have also been asked whether Dr. Schwartz's analyses are capable of establishing class-wide harm and estimating damages using common evidence. I have been asked to address the following specific questions:

i).    From an economics perspective, is Dr. Schwartz's analysis of platform competition reliable? Does Dr. Schwartz's PCM establish that class-wide harm can be proven using common methodology and evidence?

ii).    From an economics perspective, is Dr. Schwartz's damages analysis reliable? Does Dr. Schwartz's damages model establish that class-wide damages can be estimated through a common methodology and evidence?

iii).    From an economics perspective, is Dr. Schwartz's yardstick approach reliable? Does Dr. Schwartz's yardstick approach establish that class-wide harm can be proven using common methodology and evidence?

iv).    From an economics perspective, is Dr. Schwartz's empirical approach reliable? Does Dr. Schwartz's empirical approach establish that class-wide harm can be proven using common methodology and evidence?

## 2.    Summary of Opinions

15.    Dr. Schwartz, in his Platform Competition Model ("PCM"), his damages model, his yardstick approach and in his other "economic approaches" to assessing harm, fails to meet the standards economists should use when developing a model to reliably evaluate outcomes in the "but-for" world. Because he fails to use a reliable

---

[14]    Schwartz Report, ¶ 390.
[15]    Schwartz Report, ¶ 477.

economic framework, Dr. Schwartz's analyses—and thus his conclusions—are based on a sequence of flawed assumptions, rather than flowing from data reflecting the reality of the video game industry. These assumptions lead Dr. Schwartz to claim impact and damages without tying them to the challenged conduct, without considering relevant incentives and forms of competition within the industry, without stress-testing the ability of his models to match real-world behavior, and without testing the precision of his estimates.

16. I begin my report by describing standards for reliable modeling of the but-for world (**Section 4**). The standards I outline are widely documented in the economics literature and widely-accepted by economists who evaluate and referee academic research. In particular, I note that more reliable economic models have the following properties:

i). **First,** a model should include the challenged conduct and the relevant decision-makers.

ii). **Second,** a model's assumptions should reflect the realities of the industry studied.

iii). **Third,** a model's predictions should be consistent with industry facts.

iv). **Fourth,** a model's predictions should be determined by the data rather than its assumptions.

v). **Finally,** a model should provide means by which its precision can be evaluated.

17. I find that Dr. Schwartz's models (both his PCM and his Damages model) fail **all five basic properties**.

18. First, I consider Dr. Schwartz's PCM (**Section 5**). The model has many flaws, which I summarize below and in more detail in Section 5. I highlight two at the outset. First, the model is incapable of assessing harm because, by construction, it assumes harm. Data are irrelevant under Dr. Schwartz's model; it only works on the assumption that game prices are actually equal (which I understand that they are not in the real world), and then predicts harm *no matter what data are provided to it*. As one example, Dr. Schwartz assumes the challenged conduct exists—in the form of a PMFN that imposes price parity—and then uses the model to generate a but-for world

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

without it.  But when his model is applied to that but-for world, it once again predicts harm.  A model that predicts harm in a world without the challenged conduct cannot reliably establish that the challenged conduct is causing harm in the real world.  Second, the model does a poor job of replicating real-world data. Among other things, the model predicts that publishers lose money by selling games on Steam (i.e., that they generate negative profits on Steam). That prediction is clearly not true, because if it were, publishers would simply elect to not sell on Steam in the first place.

19.    More broadly, Schwartz's PCM fails to empirically assess the challenged conduct, and ignores industry facts by assuming away relevant competition (**Section 5.1**):

i).    In Dr. Schwartz's PCM, there is a single publisher, who sells a single product, and who sells this product on two different platforms (Steam and another platform titled "EGS" by Dr. Schwartz). Platforms compete only in prices and cannot strategically invest in quality. Publishers do not compete against one another and cannot leverage the ability to use their own distribution channels (or platforms other than "EGS"—the single competitor in the model) in negotiations with Valve. This setup alone does not match the real world and results in the exclusion of critical economic forces. **Furthermore, while Dr. Schwartz claims that he fits his model with data, he assumes, without empirical testing, that price parity exists in the as-is world that prohibits any price dispersion across platforms, and that such price parity is caused by Valve's alleged PMFN (Section 5.1.1).**

ii).    While Dr. Schwartz asserts that his simplified approach to modeling the video game industry captures all relevant economic forces, his assertion is incorrect. For example, the economic literature recognizes that PMFNs can be pro-competitive when they provide an incentive for platform operators like Steam to make quality investments. Similarly, other economic research has evaluated the effects of PMFNs in the presence of forces that Dr. Schwartz omits from his analysis (including competition between publishers, and the ability to self-distribute), and found that these forces are relevant in assessing whether a PMFN causes harm (**Section 5.1.2**). Dr. Schwartz's model does not include these types of forces and is therefore incapable of serving as a test of whether the challenged conduct in this industry is procompetitive or anticompetitive.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

20. Dr. Schwartz's PCM makes predictions that are inconsistent with industry facts (**Section 5.2**). Conducting tests that compare model predictions against the real world is a standard way for economists to test the reliability of a model, and Dr. Schwartz's model fails these tests:

   i). Dr. Schwartz's model estimates that publishers have excessively high marginal costs, which contrasts with both the literature and Dr. Schwartz's own statements that publisher marginal costs should be low (**Section 5.2.1**).

   ii). As a result of these high marginal costs, Dr. Schwartz estimates that publishers lose money when selling games on Steam, but choose to stay on Steam and release new games on Steam even despite these losses (**Section 5.2.2**). This behavior does not make economic sense; publishers would leave Steam if they were consistently unable to make money selling products on Steam. Moreover, Dr. Schwartz's model predicts the same profits for both publishers who experienced significant financial success and who suffered losses and left the industry alike. This inconsistency further underscores that something is fundamentally wrong with his model (**Section 5.2.3**).

21. Dr. Schwartz's PCM provides results that are driven by assumptions, not data (**Section 5.3**). If Dr. Schwartz's results were driven by data, rather than assumptions, it should be possible to find data where the exact same set of assumptions would not show harm. I find that this is not the case through several different efforts to pressure-test the model. I input 100 different datasets involving equal prices into Dr. Schwartz's model. There is no reason to believe a PMFN would be present in all 100 of these scenarios, yet Dr. Schwartz's model shows harm in **all of them. Dr. Schwartz's model also shows harm where it should not. For example, Dr. Schwartz uses the model to generate a but-for world without the challenged conduct. But when outputs of that but-for world are fed back into his model, it once again predicts harm**. I also find that his model finds harm even as Steam's estimated market share falls to 10 percent, which makes little sense given that a low-share player's adoption of a PMFN is unlikely to lead to market-wide harm (**Section 5.3**). These outcomes all suggest that the model is constructed to always show harm.

22. Next, I consider Dr. Schwartz's Damages Model (**Section 6**). Dr. Schwartz's damages model, much like his PCM, has many flaws. I highlight two of these flaws at the

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

outset, summarize these flaws below, and describe them in more detail in Section 6. Dr. Schwartz's model relies on a set of assumptions that, once made, lead to harm. His damages model centers on an unreliable relationship between market shares and revenue shares, in which his own estimates of Steam's real-world market share and but-for market share are the critical inputs. If either of those market share numbers is wrong, Dr. Schwartz's damages estimate is also wrong, and I explain below that his estimate of Steam's but-for market share does not follow from sound economic methodology (I understand another expert, Prof. Chiou, separately disputes Dr. Schwartz's calculation of the real-world market share).

23. Beyond the model's sensitivity to the quality of its inputs, it also has conceptual flaws and makes predictions that are inconsistent with real-world data. Conceptually, because Dr. Schwartz's model is built on the relationship between market share and revenue share, it does not actually involve the challenged conduct (**Section 6.2.1**). The model does not actually include the alleged PMFN; how platform operators, users, and publishers in the class are affected by it; or how they would be affected by its removal. Dr. Schwartz's damages model instead assumes that the elimination of a PMFN would reduce Steam's market share without reliably proving that is the case. Moreover, Dr. Schwartz's model does not reliably predict any relationship between market shares and revenue shares. Valve's revenue shares dropped in 2018. **Inputting data from this period into Dr. Schwartz's model results in a prediction of Steam having had over 120 percent market share in 2017 and 2018, an economically impossible result**.

24. These results, along with others described below and in more detail in Section 6.2, prove that the model is not reliable:

   i). Dr. Schwartz's model omits critical parts of the video game industry, such as quality competition and product differentiation. **While the video game industry features two-sided distribution platforms that compete over a wide range of differentiated products through both quality and price, Dr. Schwartz actually uses a one-sided model with uniform products that compete only on price (Section 6.2.2).**

   ii). Dr. Schwartz assumes that the but-for revenue share equation of his damages model can reliably predict the relationship between but-for market shares and revenue shares, but he fails to test whether this is true. My analysis shows that it is not **(Section 6.2.3)**. Valve lowered revenue

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

shares on Steam by introducing tiered revenue share rates in 2018, and Dr. Schwartz finds that average revenue shares fell from 30 percent in 2017 to ███ percent on average over the class period. If Dr. Schwartz's approach were reliable, his estimates of the changes in Valve's revenue shares should at least be able to generate reliable predictions of changes in Steam's market shares. But inputting these data into Dr. Schwartz's model results in it predicting that Steam's market shares would be over 120 percent in 2017 and 2018. This nonsensical (and impossible) result demonstrates that the core mathematical relationship underlying Dr. Schwartz's model is simply not true.

iii). **Dr. Schwartz's model does not predict a reliable competitive revenue share, and instead operates under a set of assumptions that revenue shares almost always need to fall further (Section 6.2.4).** Valve used a 30 percent nominal revenue share in 2017, prior to the introduction of its revenue share tiers. Dr. Schwartz's formula predicts that Valve's but-for revenue shares should instead have been ███ percent. Valve then introduced revenue share tiers and lowered its revenue shares in 2018, but Dr. Schwartz's model does not account for that and instead predicts that the but-for revenue share should be even lower in 2018. In other words, the model does not recover an estimate of the competitive revenue share in a but-for world; instead it predicts (almost always) that revenue shares need to drop further. Further, Dr. Schwartz's model does not account for competition on quality (**Section 6.2.5**). Dr. Schwartz evaluates Steam solely on the basis of Valve's revenue share, ignoring, for example, Steam's myriad features and the value of Steam keys.

25. Dr. Schwartz uses an estimate of Steam's but-for market shares to generate but-for revenue shares. I show that the approach Dr. Schwartz uses to predict but-for market shares amounts to little more than an ad-hoc conjecture and that his damages model is sensitive to its market share calculations (**Section 6.3**):

i). Dr. Schwartz assumes he can infer Steam's but-for market share as a *distributor* of third-party games during the class period from Valve's share of sales on Steam as a *publisher* a decade earlier. Specifically, he calculates but-for market shares by looking at Steam data between 2008 and 2012. He takes data from eight publishers, including Valve, and estimates Valve's share of publisher revenues on Steam during this time

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

period relative to the other seven. Dr. Schwartz then claims that Valve's share of publisher revenues during that time period represents its but-for share of platform sales in 2017–2024, a decade later. Dr. Schwartz points to no economic guidance, theory, or model that suggests this approach is reliable. When I investigate the implications of Dr. Schwartz's assumptions, both within and beyond the gaming industry, it is clear that publisher shares are not a reliable predictor of distributor shares. **Dr. Schwartz's approach to estimating but-for market shares is conjecture: it involves no assessment of the alleged PMFN, no interaction between decision-makers, no statistical or robustness testing, and Dr. Schwartz points to no sources (academic or otherwise) to justify this approach (Section 6.3.1).**

ii).    I demonstrate that Dr. Schwartz's approach, and therefore his damages estimates, are critically driven by both his as-is and but-for market share estimates (**Section 6.3.2**). Even if Dr. Schwartz's but-for market share estimate were reliable (it is not), Dr. Schwartz's damages estimates decline rapidly when using alternative estimates of Valve's as-is market shares that appear in the record. For example, **damages fall below zero when using Prof. Chiou's market share estimates. In fact, Prof. Chiou's estimates of as-is market shares would yield negative damages for most possible estimates of but-for market shares.**

26.    Dr. Schwartz also attempts to estimate pass-through rates to identify the extent to which his alleged overcharge falls on publishers instead of end users. His results are again driven by assumptions that contradict typical standards for reliable but-for modeling (**Section 6.4**):

i).    Dr. Schwartz estimates pass-through rates by summarizing price changes for games that qualified for Valve's reduced revenue share tiers starting in 2018. He does not control for any other factors that affect game prices, including increasing demand for games during COVID-19, periods of high inflation, and the tendency for individual games prices to decline over time. These factors are present in the time period of Dr. Schwartz's analysis, but Dr. Schwartz makes no effort to control for these factors, and incorrectly asserts that he does not need to. **Dr. Schwartz's approach of simply assuming (without any analysis or investigation) that these factors are uncorrelated with the time at which games qualify for**

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**additional revenue shares is a fundamental econometric error that is known to produce unreliable results (Section 6.4.1).**

ii). Dr. Schwartz's pass-through methodology generates unreliable estimates. In his class certification pass-through analysis, Dr. Schwartz estimated a pass-through range from 20 to 25 percent based on a sample of ▉ games. In his merits report, Dr. Schwartz uses the same approach and estimates a pass-through rate from 30.5 to 44 percent because he now has a sample of ▉ games. That is, the *minimum* pass-through rate Dr. Schwartz estimates today is greater than the *maximum* pass-through rate he previously estimated using the same approach. This demonstrates how Dr. Schwartz's approach is not capable of identifying pass-through in a reliable manner (**Section 6.4.1**).

iii). Dr. Schwartz further assumes that he can analyze only ▉ of the highest-selling games on Steam and use these results as a measure of pass-through rates for the over 100,000 games on Steam. These games are not representative of all games on Steam. The games Dr. Schwartz analyzes are the biggest and most successful titles with the broadest appeal; Dr. Schwartz uses these to predict pass-through rates for smaller and less successful publishers without showing that doing so is reliable (**Section 6.4.2**).

iv). By calculating a single pass-through rate and by making no effort to control for individualized circumstances, Dr. Schwartz misallocates alleged damages across publishers (**Section 6.4.2**).

27. Dr. Schwartz's damages model ignores the substantial value Steam keys bring to some games and publishers (**Section 6.5**). Steam keys are codes publishers can sell or distribute for marketing purposes that can be redeemed on Steam for a playable game. Steam gives keys away at no cost to publishers. Because Valve does not charge publishers for the use of keys, publishers actually pay a lower revenue share to Steam than the nominal revenue share Dr. Schwartz reports. There is substantial variation across publishers in their requests for and redemptions of Steam keys. Some large publishers like ▉▉▉▉ have requested very few, while other publishers like Named Plaintiffs Wolfire and Dark Catt receive Steam keys in quantifies that dwarf their total sales on Steam. While Valve has no information on the volume of sales or the price these Steam keys sell for, approximations demonstrate that **Dr. Schwartz's disregard of Steam keys results in him**

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**misallocating and misidentifying alleged damages, including for the named Plaintiffs, who received so many Steam keys that approximations of their real-world effective revenue share was lower than Dr. Schwartz's but-for revenue share.**

28. The reliability of Dr. Schwartz's yardstick approach, where a subject firm is compared to one or more benchmark or "yardstick" firms, hinges upon the closeness of the subject firm and its comparison group (**Section 7**). The benchmark firms provided by Dr. Schwartz are an inappropriate comparison group. Because the products sold and the services provided by Dr. Schwartz's benchmark firms do not resemble Steam's, Dr. Schwartz's yardstick approach does not provide any reliable economic evidence regarding the revenue share that Valve might have charged in the but-for world. If one accepts Dr. Schwartz's position that console distribution platforms are outside the relevant market, then, relative to the benchmarks chosen by Dr. Schwartz, consoles are a more appropriate yardstick comparison. Looking at those platforms shows that Valve's revenue share is not elevated but competitive.

29. Dr. Schwartz also asserts that he can identify common harm and assess the but-for revenue shares through his so-called "empirical approach" (**Section 8**). With this approach, Dr. Schwartz conducts a qualitative assessment of Epic Games Store ("EGS") entering the industry, and Steam lowering its revenue shares around the same time in response to increased competitive pressures in the industry. I have reviewed Dr. Schwartz's empirical approach and believe that it suffers from problems similar to those of his other approaches, perhaps most importantly that it assumes harm without providing any economic model of the challenged conduct or how it would affect publishers' profits. His "empirical approach" appears to be Dr. Schwartz's interpretation of events, in which he asserts—without any formal economic modelling—that, but for the challenged conduct, Valve would have lowered revenue shares further. Dr. Schwartz's interpretation hinges on the existence of price parity, but he reaches his conclusion without pointing to evidence that price parity exists in the as-is world. Furthermore, the fact that Valve lowered its revenue shares in response to competition is not evidence that Valve is a monopolist, nor is it evidence that Valve is behaving anti-competitively, nor is it evidence that Valve's revenue shares would be lower if the alleged PMFN were removed. Dr. Schwartz mentions EGS and Microsoft have lower revenue shares than Valve to purportedly show that the competitive rate should be lower, but fails to demonstrate that the fact pattern he describes is inconsistent with a competitive industry.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## 3.   Background

Video games are an interactive entertainment medium where a user—a player or a gamer—makes choices to control images on a screen. Video games have grown in complexity and market presence over time.[16] For example, 1970's *Pong* involved a player moving a simple bar to deflect a digital ball from crossing a goal line on a black-and-white screen.[17] Today, video games can exhibit rich graphics, can involve whole worlds with their own lore, and can be played with other gamers across the world. The video game industry has grown relative to other entertainment industries, and now exceeds the size of the music and theatrical film industries combined.[18]

Current industry participants can generally be broken down into four groups: end users (consumers), developers, publishers, and distributors (which include both physical and digital distributors).[19] As I will describe, these groups can be fluid, with a single firm filling multiple roles at once.

**Users: Users** are end consumers who purchase and play video games. Users have varying preferences for the types of games that they play, which creates demand in the market for firms to craft different types of games. Gamers differ in their willingness to pay for certain games or game features, and in the benefits they may

---

[16]   Edward Goh, Omar Al-Tabbaa, and Zaheer Khan, "Unravelling the Complexity of the Video Game Industry: An Integrative Framework and Future Research Directions," *Telematics and Informatics Reports*, 12:100100, 2023, pp. 1–18 at p. 1 ("However, due to its rapidly evolving nature, the [video game industry] has drastically transformed, in various ways, since its growth in the late 1990s and early 2000s due to the rise of emerging technologies ... It has become so significant that nearly 40% of the global population spends at least some of their leisure time gaming.").

[17]   Kyle MacNeill, "'No One Had Seen Anything Like It': How Video Game Pong Changed The World," *The Guardian*, November 25, 2022, available at https://www.theguardian.com/games/2022/nov/25/history-pong-video-game-atari-nolan-bushnell-al-alcorn, accessed on March 24, 2025 ("The game – a 2D version of table tennis where players control a rectangle 'paddle', moving it up and down to rally a ball ...").

[18]   Newzoo, "Global Games Market Report," July 2023, p. 23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; International Federation of the Phonographic Industry, "Global Music Report 2024: State of the Industry," available at https://www.ifpi.org/wp-content/uploads/2024/04/GMR_2024_State_of_the_Industry.pdf, accessed on March 24, 2025, p. 10 ("[T]he global recorded music market was worth US$28.6 billion in 2023."); Statista reports the size of the cinema market as $72.31 billion in 2023. See Statista, "Cinema," available at https://www.statista.com/outlook/amo/media/cinema/worldwide#revenue, accessed on March 24, 2025.

[19]   See Jennifer Mendez, "Are Distributors the New Publishers," *Game Developer*, July 27, 2017, available at https://www.gamedeveloper.com/business/are-distributors-the-new-publishers-, accessed on March 24, 2025. As I explain below, some firms can play multiple roles. For example, some developers also publish their own games, and some publishers have their own distribution platforms. Epic Games is a developer and publisher that created EGS.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

derive from certain platform features.[20] For example, some gamers prefer story-driven role-playing games and will log dozens of hours following the story of monster-slayer Geralt in *The Witcher*.[21] Others will spend 10 minutes planting crops and maintaining their digital farm in *Stardew Valley* after a stressful day at work.[22] And still others will spend hundreds of hours socializing with their friends playing ranked matches in the battle arena game *Dota 2*.[23] Users engage with video games using different hardware, including PCs, consoles, mobile phones, and tablets.[24]

33.    **Developers:** Developers are individuals or teams of individuals who write the code, craft the stories, and design the gameplay that results in video games. Developers create different types of video games. Some video games differ by the type of gameplay and/or genre—single-player, multiplayer, role-playing games, shooters, horror, action, and other sometimes overlapping types and genres—and others differ by features or complexity.[25] The scale and budget of a developer team can be small

---

[20]    In a similar context, an academic article by Robin Lee explicitly models consumers having heterogenous preferences for features provided by video game consoles. See Robin S. Lee, "Vertical Integration and Exclusivity in Platform and Two-Sided Markets," *American Economic Review*, 103(7), 2013, pp. 2960–3000 at p. 2970 ("… [A]re coefficients that reflect how intensely consumer *i* prefers console characteristics, prices for hardware and software, and software in general …"). See also Carmelo Cennamo and Juan Santalo, "Platform Competition: Strategic Trade-Offs in Platform Markets," *Strategic Management Journal*, 34(11), 2013, pp. 1331–1350 ("Cennamo and Santalo (2013)") at p. 1346 ("Distinctive features of the video game industry include the heterogeneity of consumer preferences for the type of games (i.e., gaming genre), the variety of novel games available in dedicated niches and their quality, which might induce users with different tastes to cluster around separate market niches.").

[21]    In role-playing games, players lead a character, make choices for the character, and engage in diverse adventures. Geralt is a witcher, a fictional character, and the main protagonist of the *Witcher* series, based on a series of novels by Andrzej Sapkowski. In this fantasy world, witchers are traveling hunters whose main role is to protect people from dangerous mythological monsters. The *Witcher* series was developed by CD Projekt Red and published by CD Projekt. See CD Projekt, "The Witcher," available at https://www.thewitcher.com/us/en, accessed on March 24, 2025. See also Rob Wieland, "What is a Role-Playing game? RPG Types Explained," *Forbes*, March 24, 2024, available at https://www.forbes.com/sites/technology/article/what-are-rpg-games/, accessed on March 18, 2025.

[22]    *Stardew Valley* is a farming simulation game. Players take the role of a character who inherits a rundown farm, and they spend time restoring the farm, growing crops, and exploring the farm's environs. *Stardew Valley* was developed and published by ConcernedApe. See Stardew Valley, "Stardew Valley," available at https://www.stardewvalley.net/, accessed on March 24, 2025.

[23]    *Dota 2* is a multiplayer online battle arena, wherein two teams of five players compete against one another. As a multiplayer game, *Dota 2* allows players to form premade teams with their friends or be matched up with other players online. *Dota 2* also has a professional "esports" league with an annual world championship prize pool over one million dollars. *Dota 2* was developed and published by Valve. See Dota 2, "Dota 2," available at https://www.dota2.com/home, accessed on March 24, 2025.

[24]    Entertainment Software Association, "2023 Essential Facts About the U.S. Video Game Industry," July 10, 2023, available at https://www.theesa.com/wp-content/uploads/2023/07/ESA_2023_Essential_Facts_FINAL_07092023.pdf, accessed on March 24, 2025 ("Devices Used To Play Video Games: 64% Mobile, 54% Console, 45% PC/Laptop, 24% Tablet, 10% VR Headset.").

[25]    Dwight Pavlovic, "Video Game Genres: Everything You Need to Know," *HP*, July 23, 2020, available at https://www.hp.com/us-en/shop/tech-takes/video-game-genres, accessed on March 24, 2025 ("In

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(sometimes referred to as "indie" developers) or large (sometimes referred to as "AAA" developers).[26] Developers compete with one another to develop games that will appeal to users.[27] Named Plaintiffs Wolfire Games and Dark Catt are developers.[28]

34. **Publishers:** Video game publishers have contractual marketing and distribution relationships that help bring games from developers to users.[29] Publishers differ in

---

our game genres list, we'll cover 10 of the most relevant video game categories today. 1. Sandbox, 2. Real-time strategy (RTS), 3. Shooters (FPS and TPS), 4. Multiplayer online battle arena (MOBA), 5. Role-playing (RPG, ARPG, and More), 6. Simulation and sports, 7. Puzzlers and party games, 8. Action-adventure, 9. Survival and horror, 10. Platformer. Keep in mind that many genres have some degree of overlap with each other."); Lauren Morton, "6 Game Genre Trends That We Think are Going to Define 2024," *PC Gamer*, December 25, 2023, available at https://www.pcgamer.com/6-game-genre-trends-that-are-going-to-define-2024, accessed on March 24, 2025 ("If there's one thing it's nigh impossible to predict in gaming, it's the trajectory of the major and minor genres. New genres emerge or assert themselves every year (Vampire Survivors-alike, co-op horror), and dormant ones stage dramatic comebacks. We're lucky to belong to a hobby that's this unpredictable, frankly.").

[26] Laura Parker, "The Rise of the Indie Developer," *Game Spot*, February 17, 2011, available at https://www.gamespot.com/articles/the-rise-of-the-indie-developer/1100-6298425, accessed on March 24, 2025 ("Minecraft, Super Meat Boy, Braid, and Limbo are examples of successful indie titles created by individuals or small teams that have managed to capture the attention of both the indie and mainstream space while retaining their creators' original vision."); Brittany Alva, "What Makes a AAA Game a AAA game?" *Epic Games Store*, October 10, 2023, available at https://store.epicgames.com/en-US/news/what-makes-a-aaa-game-a-aaa-game, accessed on March 24, 2025 ("Omdia Senior Games Analyst James McWhirter explained that AAA games cost the most to develop and market, likening them to blockbusters ... [o]nly studios like Activision Blizzard, Ubisoft, Square Enix, and Warner Bros. Games can afford to develop and market games of this scale.").

[27] Economists use the term "product differentiation" to describe the basic fact that products are different in the video game industry in a way that matters to users. In an industry with product differentiation such as video games, developers choose not only the price of the game, but also its characteristics. See B. Douglas Bernheim and Michael D. Whinston, *Microeconomics*, (New York, NY: McGraw-Hill/Irwin, 2008), p. 737 ("But in markets with product differentiation, we must consider a new factor: firms must decide what kind of product to produce ... firms will often try to differentiate their products from those of other firms in order to avoid intense price competition.").

[28] Complaint, ¶¶ 27–29 ("Plaintiff Wolfire Games, LLC ('Wolfire Games') is a video game publisher headquartered in San Francisco, California. ... Plaintiff Dark Catt Studios Holdings, Inc. ('DCS Holdings') is a multimedia production company and development studio with a focus on film, animation, and narrative media forms. ... Plaintiff Dark Catt Studios Interactive LLC ('DCS Interactive') is a wholly owned subsidiary of DCS Holdings and specializes in PC software, gaming, interactive content, and experiences."); Steam, "Wolfire Games," available at https://web.archive.org/web/20250113101605/https://store.steampowered.com/developer/wolfire, accessed on March 24, 2025 ("At Wolfire, we create innovative and experimental games, and share the lessons we learn to help make game development accessible to everyone.").

[29] Tomas Zegarra, "Game Developers vs Game Publishers: What's the Difference?" *HP*, July 19, 2020, available at https://www.hp.com/us-en/shop/tech-takes/game-developers-vs-game-publishers, accessed on March 24, 2025 ("Game publishers are larger companies or in some cases, the parent organization, that has the resources to put the finished game on the market for the world to play. ... This includes working with in-person retailers and online stores to ensure your product is visible to the gaming community. ... When a contract exists between a developer and publisher, they lay out who is in control of their product. The situation is difficult to navigate from the outside, but the game industry partners use the contract to clearly differentiate and delineate who does what during the creation of the game.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

terms of size and organizational structure,[30] and publishers vary in how they choose to monetize their games (e.g., through game sales, in-game purchases, or both).[31] Publishers set user prices on Steam.[32] Publishers differ in their pricing strategies, and in their use of different distributors.[33]

35.    With the advent of online distribution platforms and increased access to self-publishing, some developers no longer rely as strongly on publishers to bring their games to users.[34] Some developers bypass publishers altogether and sell their games through distributors, or directly to users on their own websites or platforms. In addition, some publishers are also video game developers. Throughout this report, I refer to any entity—a developer, an individual, or a publishing company—that lists a video game for distribution on a digital distribution platform as a "publisher."

---

[30]    For example, Electronic Arts reported $7 billion in net revenue in 2022, while Devolver Digital reported $135 million. See Electronic Arts, "Electronic Arts Reports Q4 and FY23 Results," May 9, 2023, available at https://ir.ea.com/press-releases/press-release-details/2023/Electronic-Arts-Reports-Q4-and-FY23-Results/default.aspx, accessed on March 24, 2025; Devolver Digital, "Annual Report and Consolidated Financial Statements for the Year Ended 31 December 2022," May 3, 2023, available at https://investors.devolverdigital.com/files/downloads-and-publications/DevolverDigital-Annual-Report-2022.pdf, accessed on March 24, 2025, p. 30.

[31]    See Playwire, "6 Game Monetization Models," available at https://www.playwire.com/blog/6-game-monetization-models, accessed on March 24, 2025 ("There are multiple ways to monetize a mobile app, desktop app, or web-based game, including in-game purchases, premium paid downloads, in-game advertising, ongoing subscriptions, and sponsorships.").

[32]    Steamworks, "Pricing," available at https://web.archive.org/web/20250321230935/https://partner.steamgames.com/doc/store/pricing, accessed on March 24, 2025 ("Developers on Steam have control over their own prices, in every currency.").

[33]    Rebekah Valentine, "Pay More to Play: Why Video Game Prices Could Rise in 2023," *IGN*, January 5, 2023, available at https://www.ign.com/articles/pay-more-to-play-why-video-game-prices-could-rise-in-2023, accessed on March 24, 2025 ("In the last year, Ubisoft, Take-Two, Xbox, and Sony all formally announced a bump in game prices from $60 to $70, and other AAA publishers such as Activision Blizzard, EA, Square Enix, and Warner Bros. have quietly followed suit …. Meanwhile, games increasingly get deep discounts within a year of launch. … Nintendo is the one major exception – but notably, its games are still $60 … for now. … The good news in all this is that not every game is going to be $70, in the same way that not every game now is $60. All major publishers release a number of their non-blockbuster games each year for lower price points, or using alternative business models like free-to-play, subscription services, and the like."); Jennifer Mendez, "Are Distributors the New Publishers?" *Game Developer*, July 27, 2017, available at https://www.gamedeveloper.com/business/are-distributors-the-new-publishers-, accessed on March 24, 2025 ("Distribution platforms are available to anyone, developer or publisher, and can be used as a tool.").

[34]    Jules Herd and Forbes Agency Council, "The Global Surge of Independent Games Development Studios," *Forbes*, August 21, 2023, available at https://www.forbes.com/sites/forbesagencycouncil/2023/08/21/the-global-surge-of-independent-games-development-studios/?sh=fddf28d2a502, accessed on March 24, 2025 ("The creation of digital distribution platforms has revolutionized the indie game development landscape. With a global reach and exposure to millions of gamers worldwide, these platforms have become game changers. By eliminating the need for costly physical distribution, smaller studios can now compete on a level playing field with larger game publishers.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

36. **Distributors:** Distributors provide a way for publishers to advertise and sell their games to users. They include physical distributors (retailers) and digital distribution platforms. Physical retailers (such as GameStop) sell and distribute physical media such as discs and cartridges. They also sell codes that users can redeem on a platform to access a digital copy of a game. A game box at a physical store could contain either physical media or a printed code.[35] Digital distribution platforms (such as Steam) are websites or software applications through which end users buy and/or play video games over the internet. Digital distribution platforms can sell both first-party games (i.e., the same company that runs the platform also develops and publishes its games, such as Valve, which runs the platform Steam and publishes the game *Portal*) and third-party games (i.e., the distribution platform sells titles that it does not develop or publish).[36] For third-party games, digital distribution platforms generally earn profits through charging a share of all revenues earned on sales.[37]

---

[35] It is increasingly common for physical video game discs or cards to contain validation information to download a digital game from the internet rather than containing the game's actual data. See Derek Garcia, "You're Not Buying Video Games, You're Buying IOUs," *ScreenRant*, November 13, 2022, available at https://screenrant.com/video-game-physical-disc-validation-key-digital-download/, accessed on March 24, 2025 ("Although video games have clearly evolved into a digital medium there remains a segment of consumers who still purchase physical discs, but more accurate language is needed for these products, as they are typically 'validation discs,' not true 'game discs' in the traditional sense … . Unlike the earlier generations of consoles where a game's data was entirely housed in a physical cartridge or disc, modern games are downloaded through the internet to a console's hard drive.").

[36] For example, EGS launched on December 6, 2018 as a platform for both first-party games, like *Fortnite*, and third-party games, like *Ashen*, which was developed by A44 and published by Annapurna Interactive. See Epic Games, "The Epic Games Store is Now Live," December 6, 2018, available at https://store.epicgames.com/en-US/news/the-epic-games-store-is-now-live, accessed on March 24, 2025 ("The Epic Games store is now open, featuring awesome high-quality games from other developers."); Epic Games Store, "Fortnite," available at https://store.epicgames.com/en-US/p/fortnite, accessed on March 24, 2025; Epic Games Store, "Ashen," available at https://store.epicgames.com/en-US/p/ashen, accessed on March 24, 2025.

[37] Ian Carlos Campbell and Julia Alexander, "A Guide to Platform Fees," *The Verge*, August 24, 2021, available at https://www.theverge.com/21445923/platform-fees-apps-games-business-marketplace-apple-google, accessed on March 24, 2025 ("Online marketplaces like Etsy and Apple's App Store allow businesses to flourish by connecting them to huge, global audiences. But these marketplaces are big businesses themselves, and in order to earn a profit, they take a cut of revenue from many of the other companies that use their space."); Deloitte, "Fees Applied by Distribution Platforms to Transactions by Developers and Content Providers," September 14, 2023, available at https://www.deloitte.com/content/dam/assets-zone2/fr/no-index/docs/services/financial-advisory/2024/deloitte_etude-distribution-platforms.pdf, p. 15, accessed on March 25, 2025 ("Services fees are common across all the platforms studied, reflecting this as a common business model for distribution platforms. They vary from 5% to 80% of developer and/or content provider revenues. Specific levels depend on different factors, such as the content type, developer's revenues, exclusivity of the content, the use of developer's own or third-party billing/payment systems and the developer's monetization strategy. Most platforms included in [the] benchmark (13 out of 19) apply a 30% service fee.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Some distributors earn profits through monthly subscriptions, whereas other use a wholesale model.[38]

37. Distributors vary in the features that they provide to publishers, developers, and users. For example, while digital distributors lack salespeople who can help customers find games, they may provide sophisticated visibility and search features, user reviews, automatic patches, and the ease of purchasing from home.[39] For developers and publishers, digital distributors may provide automatic currency conversions, integrated beta testing and early release capabilities, metrics on user purchases, and other valuable features.[40] Distributors compete with one another by offering different features and by charging different revenue shares for sales in their stores or on their platforms.[41]

---

[38] For example, Microsoft Gamepass charges a monthly subscription, while ▮▮▮▮▮▮▮ uses a wholesale approach. Xbox, "PC Game Pass," October 20, 2022, available at https://web.archive.org/web/20221020230423/https://www.xbox.com/en-US/xbox-game-pass/pc-game-pass, accessed on March 18, 2025 ("Subscription continues automatically at $9.99/mo."). See also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[39] Robin Valentine, "PC Gaming's Many Launchers, Reviewed for 2024: Steam Still Puts the Rest to Shame," *PC Gamer*, January 30, 2024, available at https://www.pcgamer.com/pc-gamings-many-launchers-reviewed-for-2024-steam-still-puts-the-rest-to-shame/, accessed on March 24, 2025.

[40] Deloitte, "Fees Applied by Distribution Platforms to Transactions by Developers and Content Providers," September 14, 2023, available at https://www2.deloitte.com/content/dam/Deloitte/fr/Documents/fusions-acquisitions/Publications/deloitte_etude-distribution-platforms.pdf, p. 14, accessed on March 25, 2025 ("It is also important to recognize that platforms may make different investments and offer different types and levels of service to which distribution fees are intended to contribute. Platforms usually offer at least some of the following services to developers and end-users: security, development/performance/marketing tools, technical support and billing/payment systems.").

[41] As an example from the academic literature, an article by Zhu and Iansiti focuses on quality (feature) competition in the video game console context while also acknowledging that price (revenue share) competition can be important. See Feng Zhu and Marco Iansiti, "Entry into Platform-Based Markets," *Strategic Management Journal*, 33(1), 2012, pp. 88–106 at p. 90 ("We assume that in each period, the two platforms are priced at the same level. While platform providers could strategically use prices to differentiate their platforms, this assumption allows us to focus on the interactions of indirect network effects, platform quality, and consumer expectations."). As Dr. Schwartz also acknowledges, video game distribution platforms charge different revenue shares. For example, Steam charges a headline revenue share of 30 percent, whereas EGS charges a headline revenue share of 12 percent. See Schwartz Class Cert Report, ¶ 303 ("Specifically, Epic charges developers and publishers a commission rate of 12%, compared to Valve's 30%."). PC distribution platforms specifically compete through games and features they offer, such as Steam's free Steam keys. See, e.g., Robin Valentine, "PC Gaming's Many Launchers, Reviewed for 2024: Steam Still Puts the Rest to Shame," *PC Gamer*, January 30, 2024, available at https://www.pcgamer.com/pc-gamings-many-launchers-reviewed-for-2024-steam-still-puts-the-rest-to-shame, accessed on March 24, 2025 ("The biggest and still the best, Steam offers both the widest range of games and the best suite of features of any of the available launchers. Customisable tags and folders let you keep your collection organised and easily browsable; your wishlist is easily managed and automatically lets you know about the best discounts;

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## 3.1.    Valve and Steam

38.    Valve originated as a game developer and later launched its digital platform, Steam, in 2003. Valve initially only had its own games on the platform.[42] In 2005, Valve also began distributing third-party games on Steam.[43]

39.    Steam is regarded as feature-rich compared to rival digital distribution platforms.[44] In addition to social and personalization features, for example, Steam has a "Wishlist" feature to notify interested users when a game's price is discounted.[45] On the developer and publisher side, Steam offers tools that support user-generated content, multiplayer "matchmaking," in-game purchases, achievements, and more.[46] In this way, Steam continues to provide services to users even after the completion of a transaction.

40.    One feature that Steam provides to publishers and developers for free is Steam keys. Steam keys are digital codes that allow users to download and launch a game from

---

and full social hubs for every game let players share opinions, guides, screenshots, and more. ... Steam is easily the most beloved launcher in the business, and that devotion is well-earned."); Steamworks, "Features," available at https://partner.steamgames.com/doc/features, accessed on March 24, 2025.

[42]    Tyler Wilde and Matt Sayer, "The 19-Year Evolution of Steam," *PC Gamer*, September 12, 2022, available at https://www.pcgamer.com/steam-versions/, accessed on March 24, 2025 ("2003: The beginning. On September 12, Steam began life as a way for Valve to control the patching process for games like Counter-Strike, as well as curb cheating and provide easier access to any content the developer produced ... The only games mentioned are Valve's own, and there is no way to purchase them from the site.").

[43]    Tyler Wilde and Matt Sayer, "The 19-Year Evolution of Steam," *PC Gamer*, September 12, 2022, available at https://www.pcgamer.com/steam-versions/, accessed on March 24, 2025 ("In 2005, Ragdoll Kung Fu and Darwinia become the first non-Valve games to hit Steam.").

[44]    Robin Valentine, "PC Gaming's Many Launchers, Reviewed for 2024: Steam Still Puts the Rest to Shame," *PC Gamer*, January 30, 2024, available at https://www.pcgamer.com/pc-gamings-many-launchers-reviewed-for-2024-steam-still-puts-the-rest-to-shame/, accessed on March 24, 2025 ("The biggest and still the best, Steam offers both the widest range of games and the best suite of features of any of the available launchers.").

[45]    Corbin Davenport, "10 Steam Features You Should Be Using," *How-To Geek*, March 20, 2023, available at https://www.howtogeek.com/828586/10-steam-features-you-should-be-using/, accessed on March 24, 2025 ("You might already know that Steam has a Wishlist feature, which contains games you saved for purchasing (or looking at) later. It's more than just a simple list, though. If you add an unreleased game to your Wishlist, Steam will send you a notification (and an email) when the game is available to purchase. Steam will also notify you in the same way if a game on your Wishlist ever goes on sale. Finally, depending on your profile privacy setting, your Steam friends can see games on your Wishlist. That makes gift-giving for birthdays, holidays, or other special occasions much easier -- assuming your Steam friends coordinate the gifts, anyway.").

[46]    Steam supports user-generated content and modifications (or "mods") through its Steam Workshop. Matchmaking is a process by which users are automatically matched up with other players rather than having to invite specific users to a multiplayer game. Achievements are in-game rewards or markers of progress, which players use to track their progress or compare themselves to other players. See Steamworks, "Features," available at https://partner.steamgames.com/doc/features, accessed on March 24, 2025.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Steam just as if they had bought the game on Steam.[47] On the publisher side of the platform, publishers and developers can ask Valve to issue Steam keys to use internally for testing the game, to provide to reviewers and influencers free copies for marketing purposes, or to sell their game on non-Steam locations for launch from Steam.[48] On the user side of the platform, users can buy Steam keys at stores (physical or online) if publishers have obtained Steam keys from Valve and decided to sell them there. Users can then redeem the keys on the Steam platform for a copy of the game. Once redeemed, a Steam key game works equivalently to a game purchased directly on Steam.[49] Publishers do not pay for the Steam keys Valve issues to them, whether through revenue share or in any other way.[50]

41.  Steam—along with many of its competitors—has a headline revenue share rate of 30 percent.[51] This means that for games users purchase on Steam, Valve pays 70 percent of net revenue to the publisher.[52] In 2018, Steam introduced a tiered revenue share where publishers' games with more than $10 million in Steam sales qualify for an additional revenue share, increasing the publisher's rate to 75 percent for each dollar of sales above that threshold, with a further increase to 80 percent for each dollar of sales above $50 million.[53] These additional revenue share tiers apply to

---

[47]  Steamworks, "Steam Keys," available at https://partner.steamgames.com/doc/features/keys, accessed on March 24, 2025 ("Steam Keys are single-use, unique, alphanumeric codes that customers can activate on Steam to add a product license to their account. Steam Keys are a free service we provide to developers as a convenient tool to help you sell your game on other stores and at retail, or provide for free for beta testers or press/influencers.").

[48]  Steamworks, "Steam Keys," available at https://partner.steamgames.com/doc/features/keys, accessed on March 24, 2025 ("Steam Keys are a free service we provide to developers as a convenient tool to help you sell your game on other stores and at retail, or provide for free for beta testers or press/influencers.").

[49]  Steam Support, "Retail CD Keys," available at https://web.archive.org/web/20250323030238/https://help.steampowered.com/en/faqs/view/0E71 -0971-324A-1161, accessed on March 23, 2025 ("After the key is registered to your Steam account, it acts as proof of purchase for the game as well as proof of ownership for your Steam account.").

[50]  Steamworks, "Steam Keys," available at https://partner.steamgames.com/doc/features/keys, accessed on March 24, 2025 ("Steam Keys are a free service we provide to developers as a convenient tool to help you sell your game on other stores and at retail, or provide for free for beta testers or press/influencers.").

[51]  See Tom Marks, "Report: Steam's 30% Cut is Actually the Industry Standard," IGN, January 13, 2020, available at https://www.ign.com/articles/2019/10/07/report-steams-30-cut-is-actually-the-industry-standard, accessed on March 19, 2025 ("Valve's now infamous 30% cut isn't actually out of the norm. In fact, it's pretty much the industry standard.").

[52]  See Tom Marks, "Report: Steam's 30% Cut is Actually the Industry Standard," *IGN*, January 13, 2020, available at https://www.ign.com/articles/2019/10/07/report-steams-30-cut-is-actually-the-industry-standard, accessed on March 19, 2025 ("[A] game retailer taking a 30% cut is fairly common – that means if you buy a game for $60, the retailer generally gets $18 of it.").

[53]  Nick Statt, "Valve's New Steam Revenue Agreement Gives More Money to Game Developers," *The Verge*, November 30, 2018, available at https://www.theverge.com/2018/11/30/18120577/valve-steam-game-marketplace-revenue-split-new-rules-competition, accessed on March 24, 2025 ("Normally, Valve takes around 30 percent of all game sales on Steam, with some exceptions for

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

individual games, and any publisher is eligible for them if a game generates sufficient sales.  Throughout my report, I refer to Steam's 30 percent revenue share rate as its "headline" revenue share rate. When considering the additional revenue share tiers, I refer to Steam's revenue share rates of 25 percent (75 percent for the publisher) or 20 percent (80 percent for the publisher) as its "nominal" revenue share rate. When considering the rate received by a publisher for all copies of games distributed on Steam, regardless of whether those copies were purchased on Steam—for example, through the use of Steam keys—I refer to the "effective" revenue share rate.

## 3.2.    Two-sided platforms and network effects

42.    Digital distribution platforms like Steam connect users on the one hand, and publishers on the other. Platforms become successful by providing a high-quality product for both users *and* publishers.[54] The better the features of the platform, the

---

games from smaller developers in its Steam Direct program. That will remain the case for the first $10 million in sales a game maker or publisher earns. For all sales between $10 million and $50 million, the split goes to 25 percent. And for every sale after the initial $50 million, Steam will take just a 20 percent cut.").

[54]    For example and in the context of early videogame platforms, see Jean-Charles Rochet and Jean Tirole, "Two-Sided Markets: A Progress Report," *The RAND Journal of Economics*, 37(3), 2006, pp. 645–667 ("Rochet and Tirole (2006)") at p. 645 ("Videogame platforms, such as Atari, Nintendo, Sega, Sony, Play Station, and Microsoft X-Box, need to attract gamers in order to persuade game developers to design or port games to their platform, and they need games to induce gamers to buy and use their videogame     console.");     Jules     Herd     and     Forbes     Agency     Council, "The Global Surge of Independent Games Development Studios," *Forbes*, August 21, 2023, available at              https://www.forbes.com/sites/forbesagencycouncil/2023/08/21/the-global-surge-of-independent-games-development-studios/?sh=628d60dc2a50, accessed on March 24, 2025 ("The democratization of game development through user-friendly software and engines has allowed aspiring developers to bring their visions to life without the need for extensive resources ... .By optimizing games for multiple platforms—including PC, consoles and mobile devices—studios can reach a vast audience and amplify their game's exposure."). Further, platforms design their revenue sharing structures in order to attract developers and build up their game libraries. See Doug Clinton and Steve Van Sloun, "Increasing Competition in the Game Store Space," *Deepwater Asset Management*,     December     27,     2018,     available     at     https://deepwatermgmt.com/increasing-competition-in-the-game-store-space, accessed on March 25, 2025 ("Epic Games is offering 88/12 split in favor of developers. Soon after, Discord announced that their game store (launching in 2019) would give developers an even greater share: 90% share of revenue. In response to growing competition, Steam recently revised their revenue share model. When a game makes over $10 million on Steam, revenue share is adjusted to 75/25 and at $50M+ to 80/20. Each new game store is trying to entice developers by offering a larger share of revenues."). Steam especially provides features that benefit both publishers and customers, such as publisher-chosen promotions and player access to games still in development. See Ian Birnbaum, "New Steam Tools Allow Developers to Set Their Own Discounts, Plan Sales," *PC Gamer*, February 26, 2014, available at https://www.pcgamer.com/new-steam-tools-allow-developers-to-set-their-own-discounts-plan-sales, accessed on March 25, 2025 ("Steam has announced new Steamworks tools for developers that will allow them to discount their own games when and how they like. Developers can choose to participate in weeklong deals, add custom discounts, and schedule sales up to two months in advance. ... [T]hese new discounting tools put what is arguably the biggest hallmark of the Steam storefront, the Steam sale, in the hands of developers. The traditional Valve-organized sales have often been great for devs and gamers alike."); Jacob Clarke, "6 Steam Features You May Have Missed," *Game Rant*, August 7, 2023, available at https://gamerant.com/steam-features-may-have-missed-hidden, accessed on March 25, 2025

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

more likely it is to draw in participants from both sides of the market. As more and more participants join the platform, the more the platform's value is reinforced through "network effects."

43.    Economists refer to platforms with these features as "two-sided platforms."[55] Two-sided platforms are characterized by both "direct" network effects (i.e., more users on one side of the platform creates higher value for all users on the same side) and "indirect" network effects (i.e., more users on one side of the platform create higher value for users on the other side).[56]

44.    Video game distributors like Valve and its competitors are canonical two-sided platforms. Indeed, Rochet and Tirole (2003, 2006)—important papers on the topic Dr. Schwartz cites[57]—discuss two-sided markets within the context of video games.[58] Dr. Schwartz acknowledges that Steam is a two-sided platform,[59] and that two-sided

---

("Immerse oneself in the world of game development through Steam Early Access. This unique feature grants access to games that are still in the development stage, allowing users to experience and provide valuable feedback to the developers. By participating in Early Access, players can directly contribute to shaping the final product, making it a collaborative journey between gamers and developers. ... Not only does Steam Early Access offer the chance to engage with favorite titles at an early stage, but it also fosters a sense of community and connection.").

[55]    While Rochet and Tirole would refer to Steam as a platform in a two-sided market, I use the term "two-sided platform" throughout my report so as not to indicate any implicit approval of Dr. Schwartz's proposed antitrust market. See Rochet and Tirole (2006), p. 645 ("Two-sided (or, more generally, multi-sided) markets are roughly defined as markets in which one or several platforms enable interactions between end-users and try to get the two (or multiple) sides 'on board' by appropriately charging each side. That is, platforms court each side while attempting to make, or at least not lose, money overall.").

[56]    Bruno Jullien, Alessandro Pavan, and Marc Rysman, "Two-Sided Markets, Pricing, and Network Effects," in *Handbook of Industrial Organization*, Volume 4, eds. Kate Ho, Ali Hortaçsu, and Alessandro Lizzeri (North Holland, Netherlands: Elsevier B.V., 2021), pp. 485–592 at p. 558 ("Recall that direct network effects are when the value of a product depends on other consumers purchasing or using the same product whereas indirect network effects are when the value depends on the provision of some complementary good and that provision depends on other consumers purchasing or using the product.").

[57]    See, e.g., Schwartz Class Cert Report, ¶¶ 335–338.

[58]    Jean-Charles Rochet and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, 1(4), 2003, pp. 990–1029 ("Rochet and Tirole (2003)"), pp. 990–991 ("Under multisidedness, platforms must choose a price structure and not only a price level for their service. For example, video game platforms such as Sony, Sega and Nintendo make money on game developers through per-unit royalties on games and fixed fees for development kits and treat the gamers side as a loss leader."); Rochet and Tirole (2006), p. 645 ("Examples of two-sided markets readily come to mind. Videogame platforms, such as Atari, Nintendo, Sega, Sony Play Station, and Microsoft X-Box, need to attract gamers in order to persuade game developers to design or port games to their platform, and they need games to induce gamers to buy and use their videogame console.").

[59]    Schwartz Report, ¶¶ 30 ("... [P]latforms such as Steam, that connect two or more different groups of users in a physical or virtual space are called two-sided or multi-sided platforms."), 57 ("Steam is a two-sided platform ..."), 58 ("... there are two sides to the market, married by a simultaneous purchase and sale of a good (a game).").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

platforms are characterized by both direct network effects and indirect network effects.[60]

45.   Users value many things about digital distribution platforms, including the games that a digital distribution platform brings to the market, as well as (depending on the platform) the ability to connect with other gamers, read user-generated game reviews, use search tools to find games they might be interested in, get refunds if something goes wrong or they change their minds, and receive customer support (among other things).[61] Developers and publishers value the users that purchase and play games on a digital distribution platform, as well as other features that again vary based on the platform, such as marketing features that allow users to build community interest for a game; features to monetize content, apps, and services; tools to set prices in currencies around the world (among other things); and, in the case of Steam, the ability to request free Steam keys for testers or reviewers, or to sell on other stores.[62] A successful distribution platform needs to provide value to

---

[60]   Schwartz Class Cert Report, ¶¶ 30 ("Platforms often exhibit network effects. Economists define network effects as an attribute of a product or platform, in which the product or platform's value changes as the number of users of that product or platform changes. 'Direct' or 'same-side' network effects exist if, as more users join a platform, the value of that platform increases to all users on that same side of the platform. 'Indirect' or 'cross-side' network effects exist if, as more users of a different group join a platform, the value of the platform increases to the first group of users."), 80 ("Users want access to the platforms that have the most games and other users.").

[61]   Deloitte, "Fees Applied by Distribution Platforms to Transactions by Developers and Content Providers,"          September          14,          2023,          available          at https://www2.deloitte.com/content/dam/Deloitte/fr/Documents/fusions-acquisitions/Publications/deloitte_etude-distribution-platforms.pdf, accessed on March 25, 2025 ("Benefits for end-users: They reduce transaction and research costs by allowing users to quickly and cheaply discover apps/content through a single platform, [t]hey curate / promote / rank content based on relevance, quality and other performance metrics, [t]hey promote the production of innovative, high-quality content as the presence of network effects pushes developers to innovate to attract new users, [t]hey provide a secure browsing and purchasing environment, [t]hey provide centralized customer support and purchase management, [t]hey provide content-specific information and reviews in a consistent format"). See also Jessica Clement, "Important Social Aspects of Online Gaming Interactions According to Gamers Worldwide in 2021," *Statista*, May 11, 2011, available at https://www.statista.com/statistics/1235068/online-gaming-social-aspects/, accessed on March 19, 2025 ("A 2021 survey of gaming audiences found that the social side of gaming was very important to many gamers. Overall, 84 percent respondents agreed that video games helped them connect with others who had similar interests. Additionally, 80 percent of responding gamers reported that video games helped them to meet new people.").

[62]   Antonio Miller, "How Gaming Platforms Are Driving Social Connection," *Digiday,* November 7, 2022, available at https://digiday.com/sponsored/how-gaming-platforms-are-driving-social-connection/ accessed on March 19, 2025 ("66% of all players engage with online gaming communities, which allow people to be themselves and connect with like-minded people about their favorite activity, creating further bonds through gaming. Players can use these communities to create and consume content to improve their gameplay and industry knowledge, further instilling their emotional connection to gaming ... Marketers are leaning toward communal gaming platforms to share their brand messages with audiences in engaging, authentic ways"). Deloitte, "Fees Applied by Distribution Platforms to Transactions by Developers and Content Providers," September 14, 2023, available at https://www2.deloitte.com/content/dam/Deloitte/fr/Documents/fusions-acquisitions/Publications/deloitte_etude-distribution-platforms.pdf, p. 8, accessed on March 25,

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

both sides of the market; it must balance the desires of users with the needs of developers and publishers to provide both groups with a valuable product and services.[63]

46. Users are better off when there are more users on the platform because they have access to more competitors, teammates, and user-generated content.[64] Users are also better off when there are more developers and publishers on the platform because, for example, they can store and access all their games in one place and they can better shop for new games.[65] There are similar network effects on the developer and publisher side of the platform. Developers and publishers are better off when there are more users on the platform because they have access to a larger pool of potential buyers and more users who can find their games on the platform.[66] They are also better off with more developers and publishers on the platform because it brings more users to that platform and users may be more likely to buy games from

2025 ("Benefits for developers/content providers: [t]hey facilitate purchases in multiple local forms of payment, [t]he current configuration of many platforms allows for multi-platform and multi-device distribution, [and] [t]hey enable different strategies for monetization of apps, content, and services."). See also Steamworks "Steam Keys," available at https://partner.steamgames.com/doc/features/keys, accessed on March 24, 2025.

[63] Rochet and Tirole (2006), p. 645 ("That is, platforms court each side while attempting to make, or at least not lose, money overall … . Videogame platforms, such as Atari, Nintendo, Sega, Sony Play Station, and Microsoft X-Box, need to attract gamers in order to persuade game developers to design or port games to their platform, and they need games to induce gamers to buy and use their videogame console.").

[64] Jordan Minor, "The Best Multiplayer Video Games for 2024," *PCMag*, December 22, 2022, available at https://web.archive.org/web/20240529143804/https://www.pcmag.com/picks/the-best-multiplayer-video-games, accessed on March 25, 2025 ("[S]ome of the best gaming-related experiences come from moments shared with other people. After all, an excellent multiplayer mode makes a video game endlessly replayable, and enables good times with local friends or strangers across the country"); Venkatesh Shankar and Barry L. Bayus, "Network Effects and Competition: An Empirical Analysis of the Home Video Game Industry," *Strategic Management Journal*, 24(4), 2003, pp. 375–384 at p. 377 ("The network effects associated with a large customer base of hardware users are very important in this industry since they are typically associated with increased complementary products (e.g., software titles, licensed products, television cartoon shows, videos and movies), which in turn leads to greater utility and thus greater hardware demand. There are also benefits to a large user base from the word-of-mouth discussions of game strategies and experiences that take place between users of the same hardware system, as well as from the borrowing and swapping of games.").

[65] Jordan Minor, "The Best Places to Buy and Rent PC Games Online in 2024," *PCMag*, November 15, 2023, available at https://web.archive.org/web/20240510144737/https://www.pcmag.com/picks/the-best-places-to-buy-and-rent-pc-games-online, accessed on March 25, 2025 ("Steam is by far the biggest and most important PC gaming marketplace—the store is virtually synonymous with PC gaming. Its massive library and innovative features make gaming on your computer more approachable and appealing than ever. … It has the hottest AAA releases, creative indies, and classics at discount prices.").

[66] Deloitte, "Fees Applied by Distribution Platforms to Transactions by Developers and Content Providers," September 14, 2023, pp, 1–27, p. 8 available at https://www.deloitte.com/fr/fr/services/financial-advisory/analysis/distribution-platforms.html, accessed on March 25, 2025 ("[Platforms] facilitate entrance to markets and opportunities for growth by enabling fast and inexpensive access to end-users.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

similar developers or publishers.[67] These network effects can incentivize platform operators like Valve to continue to invest in features that will improve experiences and draw more users, developers, and publishers over time.

## 4. Standards of economic models for the reliable estimation of a but-for world

47. A theme throughout my report is that Dr. Schwartz does not follow common standards economists use to assess the reliability of a model used to evaluate outcomes in the but-for worlds. In this section, I present and explain five such standards. In the remainder of my report, I assess Dr. Schwartz's models by evaluating them against these five standards.

48. Economists often use models to estimate a but-for world that helps with evaluating the impact of, or quantifying damages relating to, a specific question of interest. In this case, the question of interest is: what is the impact of, and what are the damages from, the challenged conduct? To answer this question, models aim to predict what outcomes would have been in a but-for world without the challenged conduct and compare this against the observed outcomes in the real world (i.e., the "as-is" world). [68] Economists, particularly those in the field of *industrial organization*, routinely use and refer to this type of modeling of the but-for world in their research as *counterfactual modeling*.[69]

---

[67] Cennamo and Santalo (2013), p. 1338 ("This is consistent with theory in the competitive strategy literature that conceives rivalry between two firms as the potential level of competition for underlying resources, determined by the extent to which such firms occupy the same or overlapping market segments. See Ketchen et al., 2004 for an extensive review of this literature. In these terms, competition among videogame producers will be higher in the platform console market segment that is more crowded, i.e., the one in which a larger number of producers with similar market domains are vying for consumers' attention.").

[68] According to the *Reference Manual on Scientific Evidence*, "[t]he goal of damages measurement is to find the plaintiff's loss of economic value from the defendant's harmful act." See Mark Allen, Robert Hall, and Victoria Lazear, "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, Third Edition, (Washington, DC: The National Academies Press, 2011), pp. 425–502 ("Reference Manual on Scientific Evidence") at p. 429.

[69] Counterfactual, or but-for world, modeling in economics research is often used to understand how a policy impacts a particular outcome of interest. For example, economists have for a long time tried to model the impact of sales taxes on retail prices. In these situations, economists try to measure the impact of a policy (e.g., sales taxes) on an outcome (e.g., prices) relative to a but-for world without the policy. This approach can be used to study a broader set of phenomena than a challenged conduct in a competition inquiry. See James J. Heckman, "Building Bridges between Structural and Program Evaluation Approaches to Evaluating Policy," *Journal of Economic Literature*, 48(2), 2010, pp. 356–398 at pp. 359, 361 ("Policy analysis is all about identifying counterfactual states. Counterfactual policy states are possible outcomes in different hypothetical states of the world. ... The goal of the structural

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

49.   In this matter, Dr. Schwartz has been tasked with estimating "class-wide damages" and injury arising from Valve's alleged PMFN.[70] Dr. Schwartz proposes two economic models for doing so: his Platform Competition Model (which purports to show common impact) and his damages model.[71] These models purport to predict what competition in the industry would have looked like in a but-for world without Valve's alleged PMFN, and how the differences between conditions in this but-for competitive environment and conditions in the real world would have impacted publishers' economic outcomes.

50.   Economists emphasize that it is important to critically evaluate the economic model's assumptions and predictions when using such an approach to assess competition and predict outcomes in but-for worlds.[72] Based on the economics literature and my expertise as an industrial organization economist, there are several standards that help establish the reliability with which a model can predict a but-for world. In particular, I note that more reliable economic models of a but-for world have the following properties:[73]

---

econometrics literature, like the goal of all science, is to understand the causal mechanisms producing effects so that one can use empirical versions of models to forecast the effects of interventions never previously experienced, to calculate a variety of policy counterfactuals and to use theory to guide choices of estimators to interpret evidence and to cumulate evidence across studies."). Stephen L. Morgan and Christopher Winship, *Counterfactuals and Causal Inference: Methods and Principles for Social Research*, (New York, NY: Cambridge University Press, 2007), pp. 1–57 at p. 4 ("The counterfactual model also has roots in the economics literature (Roy 1951; Quandt 1972), with important subsequent work by James Heckman (see Heckman 1974, 1978, 1979, 1989, 1992, 2000), Charles Manski (1995, 2003), and others. Here, the model is also frequently referred to as the potential outcomes framework. The model is now dominant in both statistics and economics, and it is being used with increasing frequency in sociology, psychology, and political science.").

[70]   Dr. Schwartz states that his assignment was to evaluate the following questions: (i) "What is the relevant antitrust market and what is Valve's market power in that relevant market?" (ii) "Has there been class-wide impact from Valve's conduct on class members?" and (iii) "What are class-wide damages?" See Schwartz Report, ¶ 5.

[71]   In addition to his Platform Competition Model and damages model, Dr. Schwartz also uses a "yardstick approach" and an "empirical approach." I discuss these two approaches in Sections 7 and 8 of this report.

[72]   See, e.g., Peter Kennedy, *A Guide to Econometrics*, Fifth Edition, (Cambridge, MA: MIT Press, 2003), p. 395 for a discussion of the role of assumptions ("[I]t is important to check if the empirical results are sensitive to the assumptions upon which the estimation has been based."). See also Ali Hortaçsu and Joonhwi Joo, "Introduction: Structural Econometric Modeling," in *Industrial Organization and Quantitative Marketing: Theory and Applications*, (Princeton, NJ: Princeton University Press, 2023) ("Hortacsu and Joo (2023)"), p. 7 for a discussion of the role of predictions in evaluating counterfactuals ("[A]n appropriate model validation is crucial to the credibility of the results from estimating a structural econometric model and conducting counterfactual policy experiments using the estimated structural model.").

[73]   I focus on these five standards because I consider them to be the most relevant standards for the question at hand. However, these are not the only standards that reliable models should follow. Some models may not meet all five standards, and would still be considered reliable, depending on the exact context in which the model is used. Failure to meet *all* of the five standards I list here however is a clear sign that the model is unreliable.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

i). **Standard #1:** A model should include the challenged conduct and the relevant decision-makers.

ii). **Standard #2:** A model's assumptions should reflect the salient realities of the industry studied.

iii). **Standard #3:** A model's predictions should be consistent with industry facts.

iv). **Standard #4:** A model's predictions should be determined by the data rather than its assumptions.

v). **Standard #5:** A model's predictions should provide means by which its precision can be evaluated.

51. Taken together, these standards allow researchers to assess the reliability of models. While not all of them will be perfectly met in all cases, models that meet more of these standards will tend to be more reliable, and models that meet fewer will be less reliable. I explain each of these standards in further detail below.

***Standard #1: A model should include the challenged conduct and the relevant decision-makers***

52. In order to reliably make predictions about a but-for world, an economic model first needs to correctly model the challenged conduct that would be missing from the but-for world, and the impact of that conduct.[74] This allows the model to evaluate the incentives that drive the behavior of people and firms (who I will refer collectively to as "*decision-makers*") when the challenged conduct is in place—and to then predict how their incentives, and therefore behavior, would change if the challenged conduct

---

[74] Hortacsu and Joo (2023), pp. 1–2 ("One of the major strengths of utilizing a model in science comes from its logic of establishing the relations among distinct variables: build a model and test the predictions from that model using real-world data. The main goal of building a model is to specify hypothetical relationship among distinct phenomena, summarized in the form of variables, in a testable form. Once a model is built, predictions from that model are subject to tests using statistical methods applied to real-world data. ... If the real-world data do not support the predictions from a model, the model is rejected. Models that are rejected less often are considered more reliable, and more reliable models are considered to provide more reliable predictions."). Hortacsu and Joo (2023), p. 7 ("On the other hand, a structural econometric model begins by explicitly stating the economic model specifications, such as the objective functions, the optimizing variable, the equilibrium concept, the degree of information of the agents and of the econometrician, and the possible source of endogeneity. Then, the model is solved step by step. As a result, the relations between the variables are specified in terms of the moment (in)equalities, likelihoods, or quantile restrictions. Finally, the relevant estimation methods for such specifications are used to back out the model parameters.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

did not occur. By comparing the differences between these scenarios, the model then can predict whether and how the decision-makers are impacted by the challenged conduct. Therefore, the most important features of a model are the challenged conduct and the relevant decision-makers who may respond to it.[75] A model that does not properly incorporate both these elements—either by omission (e.g., it ignores some relevant decision-makers) or by mischaracterization (e.g., it does not model important features of the challenged conduct)—will not be able to reliably identify how the challenged conduct affects the decision-makers' behavior, how this behavior would change absent the challenged conduct, and thus whether the challenged conduct causes harm.[76]

### Standard #2: A model's assumptions should reflect the realities of the industry studied

53.    According to the *Handbook of Econometrics* chapter on industrial organization models, the reliability of a model depends on "how well the economic and statistical assumptions match the economic environment being studied."[77] While models need not emulate *every* aspect of the industry they attempt to capture, they should capture enough details to be able to understand the behavior of the relevant decision-makers

---

[75]    Hortacsu and Joo (2023), p. 5 ("Conducting a counterfactual policy experiment is one of the most important goals of building and calibrating estimating an econometric model. Through counterfactual policy experiments, a researcher can answer questions related to changes in economic outcomes caused by hypothetical changes in a policy that affects economic agents. The key ingredients of an economic model explained in section 1.2, optimizing behaviors of rational agents involved and possible changes in the equilibrium, need to be accounted for during the counterfactual policy experiments; they need to be explicitly formulated in the econometric model to evaluate and quantify the causal effect of a change in policy.").

[76]    Failure to include important features in a model is similar to failure to include major explanatory variables in a regression. Omission may lead a researcher to misattribute the impact of a variable and therefore reduce the probative value of the study. See, e.g., Reference Manual on Scientific Evidence, p. 314 ("Failure to include a major explanatory variable that is correlated with the variable of interest in a regression model may cause an included variable to be credited with an effect that actually is caused by the excluded variable. In general, omitted variables that are correlated with the dependent variable reduce the probative value of the regression analysis.").

[77]    See Peter C. Reiss and Frank A. Wolak, "Structural Econometric Modeling: Rationales and Examples from Industrial Organization," in *Handbook of Econometrics*, Volume 6A, eds. James J. Heckman and Edward A. Leamer, (North Holland, Amsterdam: Elsevier B.V., 2007), pp. 4277–4415 ("Reiss and Wolak (2007)") at p. 4281 ("To be convincing, structural models minimally must be: … respectful of the economic institutions under consideration.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

and how that behavior is affected by the challenged conduct.[78] On this specific point, Dr. Schwartz and I agree.[79]

54. In this way, economic models are like maps—perfectly rendering every aspect of the geography is an impossible task, but neglecting the important details would make the map unhelpful. Which details are important to include depends, like in the case of maps, on the question that the model is being used for. For example, a driver uses a roadmap to navigate a city, which means the map she uses should accurately capture roads, but it need not capture elevation. On the other hand, a hiker uses a topographic map to navigate a trail, which means the map she uses should show elevation, but it does not need to show every detail (e.g., route number or speed limit) for roads in the area. Both a roadmap and topographic map are valid maps, but the right one to use depends on the context and what the map is being used for.

55. While all economic models must make assumptions, models whose assumptions oversimplify or contradict the real world cannot reliably make predictions about how economic outcomes would change in the but-for world.[80] This is similar to how a roadmap that fails to distinguish between different types of roads—e.g., a map that does not indicate the difference between highways, toll roads, local streets, and dirt roads—could lead drivers to make incorrect decisions about where to drive.

56. To guard against this, it is a best practice for economists to evaluate how far a model's assumptions deviate from the real world and to assess how these deviations may impact the model's predictions about the but-for world.[81] One way that

---

[78] See Reiss and Wolak (2007) at p. 4290 ("All economic theories contain assumptions that are not easily relaxed. While theorists sometimes have the luxury of being able to explore stylized models with simplifying assumptions, structural econometric modelers have to worry that when they use stylized or simplifying assumptions they will be dismissed as arbitrary, or worse: insensitive to the way the world 'really works.'").

[79] Schwartz Report, ¶ 293, ("The PCM is a robust model, but it is not a perfect reflection of every element of the market. This is, of course, to be expected. No economic model does so—economic models make simplifying assumptions that try to capture the basic economics of a scenario and focus on the elements that drive market outcomes in the real world. More pointedly, models focus on the relevant aspects that have the potential to impact the behaviors and outcomes being studied."); Schwartz Report, ¶ 341, ("[A]dded complexity [in a model] is beneficial if and only if that complexity adds explanatory power by being pertinent to the outcome being studied.").

[80] Class Certification Expert Report of Ashley Langer, Ph.D., May 17, 2024 ("Langer Class Cert Report"), ¶ 167 ("Without a model that appropriately captures relevant aspects of the real world, Dr. Schwartz cannot make reliable predictions about how changes from the as-is world to the but-for world would impact economic outcomes.").

[81] Hortacsu and Joo (2023), p. 6 ("Formulating and estimating a structural econometric model typically follow the following steps: (1) Formulate a well-defined economic model of the environment under consideration; (2) add a sufficient number of stochastic unobservables to the economic model; (3)

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

economists do this is by evaluating how a model's predictions would change if the assumptions of the model were to change to more accurately reflect the real world.[82] If the model's prediction does not change substantially, then this indicates that the assumption is a reasonable simplification of the real world. If the model's prediction changes substantially, then this indicates that a model's predictions may be unreliable because they are based on unrealistic starting assumptions.[83]

### Standard #3: A model's predictions should be consistent with industry facts

57. Economic models are reliable for predicting the impact of a challenged conduct if they can make predictions that are consistent with the realities of the industries they aim to capture.[84] This is based on the core scientific principle of falsifiability.[85] According to the scientific method, in order to test a theory, its predictions should be compared to real-world data.[86] For example, suppose an economic model of sales

---

[82] identify and estimate the model parameters; and (4) verify the adequacy of the resulting structural economic model as a description of the observed data."); Hamish Low and Costas Meghir, "The Use of Structural Models in Econometrics," *Journal of Economic Perspectives*, 31(2), 2017, pp. 33–58 ("Low and Meghir (2017)") at p. 33 ("The key features of such an approach at its best are a tight connection with a theoretical framework alongside a clear link with the data that will allow one to understand how the model is identified. The set of assumptions under which the model inferences are valid should be clear: indeed, the clarity of the assumptions is what gives value to structural models.").

[82] See Reiss and Wolak (2007), p. 4286 ("The 'structure' in a structural model is there because the researcher explicitly or implicitly chose to put it there. Although we have argued that one of the advantages of a structural econometric model is that researchers can examine the sensitivity of the structural model estimates to alternative assumptions, this is sometimes easier said than done.").

[83] This type of evaluation is referred to by economists as a "sensitivity analysis." The purpose is to see whether the model's predictions are sensitive to its assumptions or the data being analyzed. See Reiss and Wolak (2007), p. 4347 ("Questions about the role of structural assumptions such as this are very difficult to answer in complex models such as this. For this reason, Goldberg and other structural modelers must rely on sensitivity analyses to understand how their conclusions depend on their assumptions.") and p. 4373 ("Athey and Haile (2002) and others have examined the sensitivity of these results to different modeling assumptions and data sets.").

[84] See Langer Class Cert Report, ¶ 167 ("Economic models are reliable insofar as they are able to make predictions that are consistent with reality.").

[85] See Karl Popper, *The Logic of Scientific Discovery*, (New York, NY: Hutchinson & Co., 1959) at p. 4. In Popper's book, an example of a falsifiable statement is the statement "all swans are white." This is falsifiable as it can be disproven by the existence of a single non-white swan. Milton Friedman discusses the concept of falsifiability as it applies to economics in "The Methodology of Positive Economics" (Univ. of Chicago Press, 1966), p. 9 ("The hypothesis is rejected if its predictions are contradicted ("frequently" or more often than predictions from an alternative hypothesis); it is accepted if its predictions are not contradicted; great confidence is attached to it if it has survived many opportunities for contradiction.").

[86] Hortacsu and Joo (2023), pp. 1–2 ("One of the major strengths of utilizing a model in science comes from its logic of establishing the relations among distinct variables: build a model and test the predictions from that model using real-world data. ... If the real-world data do not support the predictions from a model, the model is rejected. Models that are rejected less often are considered more reliable, and more reliable models are considered to provide more reliable predictions."); Milton Friedman, *The Methodology of Positive Economics*, (Chicago, IL: Univ. of Chicago Press, 1966), p. 15 ("The relevant question to ask about the 'assumptions' of a theory is not whether they are descriptively

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

taxes predicts that the quantity of goods sold will decrease when taxes increase, but real-world historical data consistently show that changes in sales taxes did not impact the quantity of goods sold. Because real-world evidence demonstrated that the model's predictions were false, the economist must evaluate the elements that may be missing from the model and incorporate these missing elements to make its predictions more reliable.

58. Comparing a model's predictions to data is a common way economists evaluate models. To do this, the researcher compares the value of an outcome predicted by the model to other available evidence about the value of that same economic outcome in the real world.[87] For example, in this matter, one way to evaluate a model would be to ask whether the model generates estimates of publishers' profits that are reasonably similar to other estimates of video game publishers' profits available in the real world (e.g., as reported in their financial statements).[88]

59. If a model makes multiple predictions, then this provides the researcher multiple opportunities to the test the reliability of a model. Economic models typically make several predictions because there are often many economic outcomes that a researcher is interested in (i.e., prices, quantities, profits, costs of the various economic agents in the model, etc.). As a general principle, if some of the model's main predictions are inconsistent with real-world data, then this is evidence that the model is fundamentally unreliable and therefore its other predictions are likely to be inaccurate too.[89] This is a useful principle because predictions about the but-for

---

'realistic,' for they never are, but whether they are sufficiently good approximations for the purpose in hand. And this question can be answered only by seeing whether the theory works, which means whether it yields sufficiently accurate predictions.").

[87] This principle also applies to testing *parameters* that are estimated by the model. Economic outcomes are industry features such as prices and quantities, which are determined based on the interaction of decision-makers. Parameters are instead characteristics of those decision-makers (e.g., the marginal cost of a firm, the price sensitivity of consumers).

[88] For a discussion of using predictions of a model using real-world data, see Hortacsu and Joo (2023), pp. 1-2 ("One of the major strengths of utilizing a model in science comes from its logic of establishing the relations among distinct variables: build a model and test the predictions from that model using real-world data ... If the real-world data do not support the predictions from a model, the model is rejected. Models that are rejected less often are considered more reliable, and more reliable models are considered to provide more reliable predictions ... Those outcomes are tested using real-world data with appropriate econometric methods.").

[89] This means that if a researcher is most interested in one of the model's predictions (e.g., its prediction of prices), but does not have the data available to test this prediction, then they can still use the model's other predictions (e.g., its predictions of quantities) to test the reliability of the model. This general principle refers to the "core" predictions of a model, i.e., the predictions that are most relevant for answering the researcher's question. For example, a model may also have predictions about outcomes that a researcher is not interested in and therefore may not have modeled accurately (e.g., for simplicity). If these are shown to be inaccurate, that may indicate a fundamental issue with the model.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

world cannot be evaluated against "real-world" data because the but-for world is, by definition, unobserved. [90] Economists must therefore test a model's predictions about the as-is world to help assess the reliability of the model's but-for world predictions.[91]

### Standard #4: A model's predictions should be determined by data rather than its assumptions

60. The purpose of but-for modeling in this context is to understand whether the challenged conduct caused harm. For this, one would need a reliable model to determine the answer based on the available data. This means that a reliable model cannot *assume* that the conduct caused harm, but must instead reach a conclusion based on the data.[92]

61. A model that makes predictions based on analyzing the data would be expected to make different predictions for different settings. If the model makes the same

---

[90] This is known as the "fundamental problem of causal inference." See Paul W. Holland, "Statistics and Causal Inference," *Journal of the American statistical Association*, 81(396), 1986, pp. 945–960 at pp. 946 ("For the model to represent faithfully this state of affairs we need not a single variable, $Y$, to represent a response but *two* variables, $Y_t$ and $Y_c$, to represent two potential responses. The interpretation of these two values, $Y_t (u)$ and $Y_c(u)$ for a given unit $u$, is that $Y_t (u)$ is the value of the response that would be observed if the unit were exposed to $t$ and $Y_c(u)$ is the value that would be observed *on the same unit* if it were exposed to $c$."), 947 ("*Fundamental Problem of Causal Inference*. It is impossible to *observe* the value of $Y_t (u)$ and $Y_c(u)$ on the same unit and, therefore, it is impossible to *observe* the effect of $t$ on $u$. The emphasis is on the word *observe*. The impossibility of observing both $Y_t (u)$ and $Y_c(u)$ is self-evident in some examples and less clear in others. For example, if the unit $u$ is a specific fourth grader, $t$ represents a novel year-long program of study of arithmetic, $c$ represents a standard arithmetic program, and $Y$ is a score on a test at the end of the year, then it is evident that we could observe either $Y_t (u)$ or $Y_c(u)$ but not both.").

[91] If the model's predictions fit the as-is world data, this is evidence that the model has captured the relevant economic forces and can make reliable predictions about the but-for world. See C. Lanier Benkard, "A Dynamic Analysis of the Market for Wide-Bodied Commercial Aircraft, *Review of Economic Studies*, 2004 (71), pp. 581–611 ("Benkard (2004)") at p. 583 ("Since the equilibrium behaviour of firms is not used in estimation, the equilibrium predictions of the model can be used as a test of the theoretical model. If the equilibrium model fits the data well, we take that as evidence in support of the model.").

[92] Charles F. Manski, "Policy Analysis with Incredible Certitude," *The Economic Journal*, 121(554), 2011, pp. F261–F289 ("Manski (2011)") at p. F275 ("I earlier summarized the logic of inference in empirical research by the relationship: assumptions + data => conclusions. Holding fixed the available data, the scientific method supposes that the directionality of inference runs from left to right. One poses assumptions and derives conclusions. However, one can reverse the directionality, seeking assumptions that imply predetermined conclusions. The latter practice characterizes advocacy."); Dave Donaldson, "Blending Theory and Data: A Space Odyssey," *Journal of Economic Perspectives*, 36(3), 2022, pp. 185–210 at pp. 186–207 ("[R]esearchers, aiming to answer a given question, understand that theoretical assumptions will be needed to answer their question, but still do their best to minimize the need for such assumptions through the use of facts that can be extracted from the available data. ... [T]hey seek to minimize reliance on modeling assumptions by drawing on data that can resolve model ambiguities to the greatest extent possible.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

prediction no matter what data it analyzes, then this is evidence that the model's predictions are being driven by its assumptions rather than the data.[93]

62. To understand what drives a model's predictions, economists test the model by applying it to a setting where the conduct of interest could not have possibly caused harm (for example, in the years before the challenged conduct began).[94] If the model finds harm in these settings, then the model is generating a "false positive" because the model predicts harm when none could have possibly occurred.[95] False positives undermine the reliability of the model's assumptions: the data analyzed are not consistent with harm from the conduct, so the incorrect prediction of harm likely came from its assumption. If a model consistently generates "false positives" that provides evidence that its predictions are being driven by assumptions, not the data.

### Standard #5: A model should provide means by which its precision can be evaluated

63. When predicting outcomes in the but-for world, economists recognize that there is inherent uncertainty in a model's estimates. This uncertainty arises because of the variation in the data used for analyzing the model.[96] This means that a researcher should report both the value of its estimate *and* a measure of how precise that estimate is.[97] As Nobel laureate Prof. Lars Peter Hansen stated: "While we might wish

---

[93] The conclusions or predictions from a model are based on either the model's assumptions or the data it analyzes. See Manski (2011), p. F275 ("I earlier summarized the logic of inference in empirical research by the relationship: assumptions + data => conclusions.")

[94] Settings where the conduct of interest could not have possibly caused harm include settings where either the conduct was absent (e.g., before the conduct began) or did not apply (e.g., if there were decision-makers exempt from the conduct).

[95] This way of testing a model is also known as a placebo test. See, e.g., Andrew C. Eggers, Guadalupe Tuñón and Allen Dafoe, "Placebo Tests for Causal Intereference," *American Journal of Political Science*, 68(3), 2024, pp. 1106–1121 at p. 1108 ("A placebo test is a method for probing the assumptions underlying a research design (which we call the core assumptions). In a placebo test, a researcher checks for an association that is more likely to be present if those assumptions are violated than if those assumptions hold. Whether (or how often) a significant association is found thus provides evidence about the validity of the research design's assumptions; doubts about these assumptions could lead to a different design or highlight the need for sensitivity analysis.").

[96] See, for example, James H. Stock and Mark W. Watson, Introduction to Econometrics, (Upper Saddle River, NJ: Pearson, 2020) ("Stock and Watson (2020)"), p. 117 ("Because of random sampling error, it is impossible to learn the exact value of the population mean of Y using only the information of the sample."). See also Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion*, (Princeton, NJ: Princeton University Press, 2009), p. 236 ("The error term in … reflects the idiosyncratic variation in potential outcomes across people, states, and time.").

[97] As the *Reference Manual on Scientific Evidence* states, "[i]n general, the expert should provide all available information about the degree of uncertainty in an estimate of damages." See Reference Manual on Scientific Evidence, p. 462.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

that a counterfactual prediction be a simple number, this is typically not a credible ambition."[98]

64.    Understanding the precision of model's prediction is important for understanding the reliability of that prediction. Suppose that we observe many darts thrown at a dart board and want to estimate where the next dart will hit based on where the past darts landed. Consider two different patterns for the darts as shown in Exhibit 1. In the first, all the darts hit the bullseye ("Low Uncertainty"). In the second, the darts are scattered far around the bullseye, but the average distance from the bullseye is zero ("High Uncertainty"). If we predict where the next dart will land based on the past darts' average distance from the bullseye, then in both cases, the prediction is that the next dart will hit the bullseye. However, the first prediction has less uncertainty and is therefore more reliable.

**Exhibit 1**
*Estimates with high uncertainty are less precise and thus less reliable*

**Low Uncertainty**          **High Uncertainty**

---

[98]    Lars Peter Hansen, "Uncertainty in Economic Analysis and the Economic Analysis of Uncertainty," *KNOW: A Journal on the Formation of Knowledge*, 1(1), 2017, pp.171-197 at pp. 173–174.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

65.    Because knowing the precision of an estimate is important, it is a best practice in economics for model estimates to be accompanied by standard errors and with the corresponding confidence intervals, which capture this uncertainty.[99] In simple terms, a confidence interval for a model's prediction represents the range of plausible estimates according to the model.[100] By reporting a confidence interval, a researcher allows others to evaluate the model's predictions using *statistical hypothesis testing*.[101] The purpose of statistical hypothesis testing is to evaluate whether a model's predictions related to the challenged conduct is based on the actual effect of the conduct versus random variation in the data that has nothing to do with the conduct itself.[102] A model that does not report confidence intervals or

---

[99]    See Bruce E. Hansen, *Probability and Statistics for Economists*, (Princeton, NJ: Princeton University Press, 2022) ("Hansen (2022)"), pp. 293, 298 ("Confidence intervals are used as a tool to report estimation uncertainty. ... In applied economic practice, it is common to report parameter estimates $\theta$ and associated standard errors ($\theta$). Good papers also report standard errors for calculations (estimators) made from the estimated model parameters. ... Most papers do not explicitly report confidence intervals. Instead, most implicitly use the rule-of-thumb interval (14.1) when discussing parameter estimates and associated effects. The rule-of-thumb interval does not need to be explicitly reported, since it is easy to visually calculate from reported parameter estimates and standard errors."). A confidence interval is a range of values that are statistically indistinguishable from the model's predicted value (i.e., the difference is not "statistically significant") based on a given confidence level (typically 95 percent). Stock and Watson (2020), p. 81. ("Because of random sampling error, it is impossible to learn the exact value of the population mean of $Y$ using only the information of the sample. However, it is possible to use data from a random sample to construct a set of values that contains the true population mean $\mu_Y$ with a certain prespecified probability. Such a set is called a confidence set, and the prespecified probability that $\mu_Y$ is contained in this set is called the confidence level. The confidence set for $\mu_Y$ turns out to be all possible values of the mean between a lower and an upper limit, so that the confidence set is an interval, called a confidence interval."). In practice, a confidence interval is calculated using the standard error of the estimate as an input. The standard error is typically calculated as the square root of the variance of a sample's outcome of interest divided by the square root of the number of observations over which the variance is calculated; See, e.g., Jeffrey M. Wooldridge, "What is a Standard Error? (And How Should We Compute it?)," *Journal of Econometrics*, 237(2), part A, 2023, pp. 1–8.

[100]    Hansen (2022), p. 298 ("Confidence intervals should be interpreted relative to the meaning and interpretation of the parameter $\theta$. The upper and lower endpoints can be used to assess plausible ranges.").

[101]    In statistical hypothesis testing, the researcher starts with an initial hypothesis (the "null hypothesis") and uses a model to evaluate whether the data likely supports or refutes the null hypothesis. See Hansen (2022), p. 270 ("Economists make extensive use of hypothesis testing. Tests provide evidence concerning the validity of scientific hypothesis. By reporting hypothesis tests, we use statistical evidence to learn about the plausibility of models and assumptions."), pp. 270, 272 ("We call the hypothesis to be tested the 'null hypothesis'. The complement of the null hypothesis (the collection of parameter values that do not satisfy the null hypothesis) is called the 'alternative hypothesis'. ... A hypothesis test is a decision is based on data. The decision either accepts the null hypothesis or rejects the null hypothesis in favor of the alternative hypothesis.").

[102]    For example, an estimate of 0.1 may not be meaningfully different from 0 when considering statistical uncertainty due to the presence of randomness. Therefore, it is important to use statistical hypothesis testing to evaluate the precision of a model's estimate. See Hansen (2022), p. 274 ("In an ideal world, a hypothesis test would make error-free decisions. ... In the actual world, that is rarely feasible. The presence of randomness means that most decisions have a nontrivial probability of error ... Acknowledging that our test statistics are random variables, we can measure their accuracy by the probability that they make an accurate decision."); Dan Rubinfeld, "Reference Guide on Multiple Regressions," in *Reference Manual on Scientific Evidence*, Third Edition, (Washington, DC: The National Academic Press, 2011), pp. 303–357 ("Rubinfeld (2011)") at p. 316 ("The precision of the measure of the effect of a variable of interest on the dependent variable is also important.").

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

other measures of uncertainty, such as standard errors, cannot be evaluated using statistical hypothesis testing, which means it cannot demonstrate the precision of its estimate of the challenged conduct's impact.[103]

66. In the rest of my report, I use these five standards to evaluate the reliability of the Dr. Schwartz's proposed models for evaluating the impact and quantifying damages from the alleged PMFN.[104]

## 5. Dr. Schwartz's proposed PCM is unreliable and cannot establish or apportion class-wide harm through a common methodology

67. Dr. Schwartz puts forward a model of competition (what he calls his Platform Competition Model or "PCM") based on a theoretical model by Boik and Corts (2016).[105] Theoretical models such as the one developed by Boik and Corts are often designed to use math to highlight settings where a particular economic insight might hold rather than to prove that this insight applies in any particular industry. Dr. Schwartz conducts an empirical analysis based on this model in an effort to assess the impact of the challenged conduct on class members.[106] Dr. Schwartz claims his simplified model with two platforms, one publisher, and one single game can capture

---

[103] Economists will sometimes report a measure of precision (e.g., standard errors, confidence intervals) for estimates of model parameters, rather than reporting these measure for every estimate of the but-for world. The intention here is that the reader can use the standard errors for the model parameters to evaluate the validity of the but-for world estimates presented or others that the reader may be interested in. For example, see Amil Petrin, "Quantifying the Benefits of New Products: The Case of the Minivan," *Journal of Political Economy*, 110(4), 2002, pp. 705–729 at pp. 720–722, which estimates a demand model for cars, then evaluates the impact of new product entry (i.e., minivans) on consumer welfare, under a but-for world of no-entry of minivans. Petrin presents the standard errors of his model parameter estimates (see Table 4, Table 5, and Table 6), then calculates measures of the change to consumer welfare by comparing consumer welfare when including minivans in his model against welfare when excluding them (see Tables 7 and 8).

[104] In addition to his Platform Competition Model and damages model, Dr. Schwartz also uses a "yardstick approach" and an "empirical approach." I discuss these two approaches in Sections 7 and 8 of this report.

[105] Schwartz Report, ¶ 289 ("To assess the impact and competitive effects of PMFN-type provisions and behaviors, I draw on a model developed by Andre Boik and Kenneth Corts to assess the impact of PMFNs (the 'Boik-Corts model')."); Andre Boik and Kenneth S. Corts, "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics* 59(1), 2016, pp. 105–134 ("Boik and Corts (2016)").

[106] Dr. Schwartz refers to this as a "numeric analysis" of the model, or alternatively as a 'calibration'. Schwartz Report, Section 7.2.4., ¶ 329 ("Numeric analysis ... I calibrate the model outlined above to case-specific parameters.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

the competitive forces in the video game industry, i.e., that his model can 'fit' the data.[107]

68.   As an initial matter, I am unaware of any academic studies that have empirically studied the model in Boik and Corts (2016). This means that Dr. Schwartz's approach of fitting this model to data has not been evaluated or supported by any peer-reviewed articles in the economics literature. In fact, Boik and Corts (2016) themselves caveat their theoretical model's predictions by stating that "[o]bviously, a full analysis of whether the encouragement, deterrence, or skewing of entry increases or decreases social welfare requires much more structure regarding both demand and costs and is beyond the scope" of the model they propose.[108] Therefore, Dr. Schwartz's application of the PCM even contradicts the recommendations of the original paper he relies upon.

69.   In this section, I assess whether Dr. Schwartz's PCM provides a reliable methodology to empirically assess the impact of the challenged conduct in the video game industry. In order to do so, I evaluate Dr. Schwartz's PCM according to the five standards for reliable but-for modeling (outlined in Section 4). I find that his PCM fails to meet all five standards, as summarized in Exhibit 2; based on this, I conclude that Dr. Schwartz's model is unreliable for making predictions about the but-for world and thus is also unreliable in analyzing the impact of the challenged conduct.

---

[107]   Schwartz Report, ¶¶ 331, 343 ("Minimizing the sum of the squared differences ensures that the model output is close to the real-world values along every dimension ... The PCM was constructed to reflect the facts of the case."). Relatedly, Dr. Schwartz disregards one of his models (the "High ESG *[sic]* Monopoly Demand Model") because it is "not able to fit the facts of the case as well" as his main model. See Schwartz Report, ¶ A46 ("Note that the second, 'High ESG *[sic]* Monopoly Demand Model' is not able to fit the facts of the case as well. The prices, fees, and quantities are further from the real-world values. Additionally, it assumes the seller would see a large boost in demand at EGS should the seller remove their game from Steam. I have no reason to think this is reflective of the typical seller experience. As such, I present the 'Low ESG *[sic]* Monopoly Demand Model' in the report.").

[108]   Boik and Corts (2016), p. 128.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

*Exhibit 2*
*Dr. Schwartz's PCM fails to meet standards for reliable modeling of the but-for world absent the challenged conduct*

| Standard # | Standard for Reliable But-for Modeling | Does Dr. Schwartz's PCM Meet the Standard? |
|---|---|---|
| 1 | A model should include the challenged conduct and the relevant decision-makers | NO |
| 2 | A model's assumptions should reflect the realities of the industry studied | NO |
| 3 | A model's predictions should be consistent with industry facts | NO |
| 4 | A model's predictions should be determined by data rather than its assumptions | NO |
| 5 | A model should provide means by which its precision can be evaluated | NO |

70.    My evaluation of Dr. Schwartz's PCM shows that his model fails to meet these standards in the following ways. First, Dr. Schwartz's PCM assumes that prices are equal across the two platforms.[109] But his PCM does not predict or show the cause of the equal prices; this is just a price parity assumption that does not reflect the challenged conduct (Section 5.1.1). Second, more generally, Dr. Schwartz's PCM is based on faulty assumptions that do not accurately reflect the basic features of the competitive environment in which such conduct may have taken place (Section 5.1). Third, Dr. Schwartz's PCM makes predictions about the as-is world that contradict industry facts and economic theory: his PCM predicts that publishers have exceptionally high distribution costs, lose money distributing on Steam, and yet remain on Steam despite these losses (Section 5.2). Fourth, Dr. Schwartz's PCM is *incapable* of assessing whether or not a PMFN causes harm. No matter what data I input into the PCM, it always predicts that there is harm due to its assumptions about a hypothetical PMFN, even in settings where no such impact could have existed

---

[109]    Schwartz Report, ¶ 307 ("[w]hen a PMFN is in place and binding, the consumer prices will be equal across platforms.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(Section 5.3). Finally, Dr. Schwartz's PCM *does not* and *cannot* report any measure of precision typically used by economists to evaluate a model's predictions (Section 5.4). I discuss each of these in further detail below.

## 5.1. Dr. Schwartz's PCM is based on assumptions that contradict the real world

71. Key assumptions of Dr. Schwartz's PCM fail to capture important features of the video game industry. As I explained in Section 4, reliable models that aim to predict the but-for world absent the challenged conduct should reflect the relevant economic forces of the settings to which they are applied (Standards #1–2).[110] Dr. Schwartz's PCM makes assumptions that are at odds with the reality of the video game industry and it excludes relevant economic forces that shape the competitive environment in this industry. As a result, Dr. Schwartz's PCM is not suitable for studying the effects of the challenged conduct and estimating its impact on class members.

72. Dr. Schwartz's PCM fails to capture important features of the video game industry (Section 5.1.1). Dr. Schwartz assumes, for example, that there is only one publisher, only one game, only two platforms, and no competition over non-price features (e.g., quality). Dr. Schwartz's PCM assumes that a PMFN exists and forces the prices of games to be exactly the same across all platforms. But this assumption is flawed in several respects. On the one hand, publishers sometimes set equal prices for games for reasons that have nothing to do with a PMFN. On the other hand, in the real world, the price of other games often varies substantially across platforms, and many games are priced lower outside of Steam than on Steam.[111] Dr. Schwartz does not empirically test for whether price parity exists (and why it exists where it does), does not acknowledge evidence of price dispersion, and provides no assessment of whether the unrealistic assumptions of his PCM could be driving his model's

---

[110] Dr. Schwartz expresses a similar idea in his report. See Schwartz Report, ¶ 293 ("[E]conomic models make simplifying assumptions that try to capture the basic economics of a scenario and focus on the elements that drive market outcomes in the real world. More pointedly, models focus on the relevant aspects that have the potential to impact the behaviors and outcomes being studied.").

[111] See Rebuttal Merits Expert Report of Gautam Gowrisankaran, Ph.D., March 26, 2025 ("Gowrisankaran Rebuttal Report") Section 7.1.1. While evaluating prices across platforms is beyond the scope of my assignment, I understand that Prof. Gowrisankaran has conducted such an analysis and found evidence of price dispersion. I understand that Prof. Gowrisankaran finds lower prices on Steam as well as outside of Steam, which also contradicts the assumptions of Dr. Schwartz PCM. I understand that Prof. Gowrisankaran has also examined factors beyond the alleged PMFN that may cause publishers to price uniformly across platforms. I understand that Prof. Gowrisankaran finds that 46.3 percent of games on EGS and other platforms but not on Steam were priced the same relative to only 32.1 percent of games that were on Steam and other platforms. See Gowrisankaran Rebuttal Report, Section 7.1.3.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

conclusions. Thus, he fails to follow the standards economists apply to evaluate the reliability of their models for the estimation of a but-for world (Section 4, Standard #2).

73. By failing to capture important features of the video game industry, Dr. Schwartz's PCM is biased towards finding harm. The academic economics literature demonstrates that certain features of platform settings can lead to a PMFN with procompetitive effects. Dr. Schwartz's PCM omits features that are relevant in this setting and that can reverse the predictions of his model (Section 5.1.2). As an example, Dr. Schwartz could have considered how his model changes when platforms can invest in quality, and how rival platforms can free-ride on this investment. He also could have considered how his predictions change when there are multiple publishers, and publishers have access to self-distribution channels. This literature finds that these simple modifications to the PCM result in the model predicting that the *PMFN can have procompetitive effects*. Because of these types of omissions, Dr. Schwartz's PCM is therefore not a reliable way to model the but-for world—it omits relevant forces from the real world that can reverse its results.

### 5.1.1. The PCM fails to capture important features of the video game industry, and fails to capture the challenged conduct

74. According to standards in the economics literature, applying a model—such as Dr. Schwartz's PCM—to a particular industry requires a critical evaluation of whether the assumptions of that model reasonably capture the relevant economic forces in the industry being studied (Section 4, Standard #2). If a model's assumptions oversimplify or contradict the important features of the industry being studied, then the model cannot reliably make predictions about how economic outcomes would change in a but-for world. In this section, I evaluate Dr. Schwartz's PCM using this framework. Specifically, I compare how his model's assumptions deviate from the real world. I find that his model fails to capture key features of the video game industry and omits relevant economic forces.

75. In Exhibit 3, I present facts about the video game industry and contrast these with the assumptions in Dr. Schwartz's PCM.[112] This analysis reveals that Dr. Schwartz's PCM

---

[112] These are also based on my review of the reports filed by Prof. Lesley Chiou and Prof. Gautam Gowrisankaran in this matter. See Class Certification Expert Report of Lesley Chiou, Ph.D., May 17, 2024 ("Chiou Class Cert Report"); Expert Report of Gautam Gowrisankaran, Ph.D., January 27, 2025 ("Gowrisankaran Opening Merits Report").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

imposes restrictive assumptions that fail to capture several critical components of the video game industry it intends to model. I also identified and discussed these discrepancies between Dr. Schwartz's PCM and the industry it intends to model in my class certification report.[113] For example, Dr. Schwartz's PCM assumes that there is only one publisher, whereas in reality, there are tens of thousands of different publishers competing with each other on Steam and other platforms.[114] As another example, Dr. Schwartz assumes that platforms compete for publishers based only on revenue share; in reality, platforms compete for publishers on a variety of dimensions, including the quality of their platform, the support they provide to publishers, etc.[115] Dr. Schwartz's PCM also does not include network effects because it does not allow for users' and publishers' preference for a platform to change based on the popularity of the platform.[116] Dr. Schwartz acknowledges some—but not all—of these differences in his report.[117] Moreover, Dr. Schwartz asserts that his PCM incorporates "the most critical aspects" of the industry, even though he does not address or consider many of the important differences I identify in Exhibit 3.[118] Dr. Schwartz also provides little assessment (and no empirical assessment) of whether the unrealistic assumptions of his PCM could be driving his

---

[113] Langer Class Cert Report, Sections 5.2 and 5.3.

[114] Langer Class Cert Report, ¶ 178.i ("In reality, there are tens of thousands of publishers in the video game industry that compete with each other for consumers within and across platforms.").

[115] Langer Class Cert Report, ¶ 89 ("Platforms differ in the features they offer, and publishers differ in how they value those features. ... In fact, publishers care not just about a platform's revenue shares, but also about many other features—which vary across platforms—and preferences over these features differ from publisher to publisher.").

[116] Dr. Schwartz's PCM assumes away network effects despite the fact that he recognized that Steam and EGS are two-sided platforms that benefit from network effects. See Langer Class Cert Report, ¶ 177. (**"First, Dr. Schwartz's PCM does not include network effects, and thus cannot be used to model two-sided platforms like those in the video game industry.** Dr. Schwartz follows Boik and Corts in assuming away network effects—as he does in his damages model as well—despite the fact that, in other parts of his report, he recognizes that video game platforms, such as Steam and EGS, are two-sided platforms benefitting from network effects."). Dr. Schwartz's analysis in Figure 11 of his Merits Report does not fully capture network effects either. Network effect determine not only how total consumer demand is distributed across competitor platforms but also the size of this demand. However, because Dr. Schwartz assumes that total demand remains the same throughout his analysis, this is uninformative about the way network effects affect demand in the industry. See Schwartz Report, Figure 11, ¶ 355 ("Because changing x shifts the overall demand level, I must also adjust the intercept value of both demand functions so that total demand across both platforms is unchanged.").

[117] Schwartz Report, Footnote 747 ("The assumption of two platforms is a simplifying assumption that is made to make the math more tractable but does not affect the extent to which the model is applicable to a situation in which there are multiple lower cost, low demand platforms."), Footnote 750 ("In this model, there is only one good on each platform. That is, the seller lists a single game on each platform.").

[118] Schwartz Report, ¶ 293 ("My PCM incorporates the most critical aspects of the market for third-party digital PC game distribution via platforms.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

model's conclusions. Thus, he fails to follow the standards for how economists develop and evaluate models (Section 4, Standard #2).

---

*Exhibit 3*
*Dr. Schwartz's PCM makes assumptions that contradict the realities of the video game industry*

| Reality of the Video Game Industry | Dr. Schwartz's PCM Assumptions |
|---|---|
| Tens of thousands of differentiated publishers | Single monopolist publisher |
| Many differentiated games | Single game |
| Many differentiated platforms | Two platforms (an established platform and a challenger platform) |
| Prices of games vary within and across platforms, and over time | Price of games on all platforms are the same due to the hypothetical PMFN |
| Publishers compete with each other for consumers within and across platforms | Publisher faces no competition |
| Publishers compete for consumers on price and other characteristics such as quality, genre, etc. | Publishers compete for consumers solely on price |
| Platforms can make investments in their quality | Platforms cannot change their quality |
| Platforms are subject to network effects | Platforms are not subject to network effects |
| Platforms compete for publishers based on revenue shares and by investing in the quality of their services | Platforms compete for publishers solely on revenue share |
| Platforms' quality and popularity changes over time | Platforms differ by a fixed and persistent "demand disadvantage" |
| Publishers can have different pass-through rates | Publishers have the same pass-through rate |
| Revenue shares are a percentage of consumer price | Revenue shares are a fixed dollar amount |

Source: Schwartz Report; Langer Class Cert Report; Chiou Class Cert Report; Gowrisankaran Opening Merits Report.
Note: See Appendix C.

---

76.   Dr. Schwartz claims that his PCM captures "the most critical aspects" of Steam and the video game industry. This is not true. **His model fails to accurately capture the central object his report aims to analyze: the challenged conduct.** Because Dr. Schwartz interprets the challenged conduct as a PMFN that imposes price parity, his PCM requires prices of the game to be equal across platforms.[119] Dr. Schwartz makes this assumption in his model clear, stating that "[w]hen a PMFN is in place and

---

[119]   Schwartz Report, ¶ 294 ("The PCM considers a PMFN put in place by the platform requiring sellers to price the lowest on that platform (in practice, setting prices equally across platforms.)").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

binding, the consumer prices will be equal across platforms."[120] He further claims that the PCM "matches ... Valve's alleged conduct" because the PCM "considers a PMFN put in place by the platform requiring sellers to price the lowest on that platform (in practice, setting prices equally across platforms)."[121]

77. **Dr. Schwartz assumes that the hypothetical PMFN in his PCM represents the challenged conduct without performing *any* empirical analysis to support its key assumptions: that prices are equal across platforms, and that this price parity is the consequence of an alleged PMFN.** Without analyzing game prices, Dr. Schwartz's PCM makes predictions about how publishers set prices by assuming that these prices are the same across platforms and thus he sets *one* price that applies to all platforms in his model.[122] Dr. Schwartz does not explain how to choose this *one* price to input into the PCM. He rather uses a value of $60 with no explanation beyond saying that he "normalized" the price.[123] While a price of $59.99 is common for some games of major publishers,[124] I understand that PC games can be offered at a variety of price points.[125] Dr. Schwartz's analysis of games such as ██████████ ████████████ and ██████████ also shows that different games have different prices and that prices fluctuate over time.[126]

---

[120]   Schwartz Report, ¶ 307.

[121]   Schwartz Report, ¶ 294 ("PCM matches the structure of the market and the pricing conduct, as well as Valve's alleged conduct ... The PCM considers a PMFN put in place by the platform requiring sellers to price the lowest on that platform (in practice, setting prices equally across platforms).")

[122]   Even if prices across platforms were different, Dr. Schwartz's model is not designed in such a way to allow for considering such difference.

[123]   When economists normalize prices, this typically means they express all prices in their model *relative* to the price of *one* good (because relative prices are often what matter in a model). Dr. Schwartz does not do this: instead, his "normalization" makes all prices the same. See Geofrey A. Jehle and Philip J. Reny, *Advanced Microeconomic Theory*, Third Edition, (London, UK: Pearson Education Limited, 2011), p. 212, ("Because only relative prices matter, and because we know from Theorem 5.5 that there is an equilibrium in which all prices are strictly positive, we can choose a convenient normalisation to simplify calculations."); Schwartz Report, ¶ 330.a ("First, the price of a game in the presence of a PMFN, $p_1^2, p_2^2$, is normalized to $60.")

[124]   Chiou Class Cert Report, ¶ 51 ("At launch, games from major AAA publishers historically had a retail price of $59.99 since late 2005.").

[125]   Chiou Class Cert Report, ¶ 52.a ("Games are now offered at a variety of price points, including much lower prices. For example, in 2022, 74 percent of all games available on Steam had a base price of less than $10, and 11 percent had a base price of less than $1.99.").

[126]   Schwartz Report, Figures 5–6. Schwartz Report Appendix A.1 and A.2 offer further examples from both major platform-owning publishers and smaller publishers. For instance, ████████████████ ████████████████████████████████████, and ████████████████████████████████████████ all exhibit different prices and fluctuations over time. For example, Dr. Schwartz highlights that the price of ██████████ published by ██████ between 2016 and 2020, fluctuates between £0 and slightly above £25 across platforms. This game is sometimes offered at different prices across platforms and occasionally for free on the ██████████

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

78. Dr. Schwartz could have performed (but did not) empirical analyses to test his one price assumption. For example, **Dr. Schwartz could have tested whether game prices are the same on Steam and on other platforms**. If the hypothetical PMFN (and the corresponding assumption of price parity) in Dr. Schwartz's PCM was a reasonable approximation of the challenged conduct, then publishers would almost always set the same price on Steam and on other platforms. Dr. Schwartz could have tested, for example, how often games have the same prices on both Steam and other distribution channels, or whether the average game price on Steam is similar to or different from the average game price outside of Steam. Dr. Schwartz does not test his price parity assumption in his report, but I understand that the experts who have done so have found evidence of price dispersion: publishers that distribute the same game on Steam and another competing platform routinely have different prices across platforms. [127] Dr. Schwartz's own analysis of the price of games such as

---

[127] I understand that Prof. Gowrisankaran has analyzed the prices of games on Steam and other platforms. See Gowrisankaran Rebuttal Report, Section 7.1.1 and 7.1.2. For example, he studies 36,459 games on Steam and finds that only 11.1 percent of them don't have any dates with better deals outside of Steam. He also studies 61 platforms, and finds that all of them have games with average prices cheaper than Steam (Section 7.1.1). He also performs basic statistical tests of how alike the prices of games on and off Steam are in the 50 alleged enforcement events that Dr. Schwartz provided price charts for. He finds that price parity consistently does not hold for games involved in these events (Section 7.1.2). In her class certification report, Prof. Chiou has performed a similar analysis. In her report, she analyzed 25,723 games that were offered on both Steam and EGS at the same time: she found that 31 percent of games in her sample have an average price on EGS that is at least 5 percent lower than the average price on Steam (during the periods when the game was offered on both platforms at the same time). See Chiou Class Cert Report, ¶ 292, Exhibit 19. In addition, qualitative evidence from public press also indicates that prices are not always equal across platforms. See Wes Fenlon, "Black Friday Steam Sale Alternatives: Even Cheaper PC Gaming Deals," *PC Gamer*, November 29, 2024, available at https://www.pcgamer.com/gaming-industry/steam-black-friday-2024-game-deal-alternatives-to-steam-autumn-sale/, accessed on February 24, 2025 ("Many a game store is running a Black Friday sale on Steam codes, meaning you can still get a code to add a game to your Steam library while spending even less than the asking price on Steam itself."); Brian Barnett, "Steam's Autumn Sale Is Still Live, But I Found Better Deals on Metaphor, Silent Hill 2, and More on Fanatical," *IGN*, December 2, 2024, available at https://www.ign.com/articles/steams-autumn-sale-vs-fanatical-pc-game-deals, accessed on February 24, 2025 ("Strangely, the Steam Autumn sale is currently being outdone by a Cyber Monday sale going on at Fanatical, even though Fanatical is selling the exact same Steam keys. If you want to buy some games and save extra cash, check out these great deals on digital PC game codes."); Jennifer Young, "7 Best and Trusted Sites to Get Cheap Game Keys – Big Discounts, Instant delivery and Even Free Games," *Windows Central*, January 15, 2025, available at https://www.windowscentral.com/gaming/7-best-sites-to-get-cheap-game-keys, accessed on March 14, 2025 ("There are plenty of places to buy digital games, but storefronts like Steam and Xbox aren't always the cheapest, even with their generous sales. Personally, I've rarely paid full price for any game—whether it's a new release or an older title—thanks to these 7 key websites I regularly check for the best deals."); Michael Crider, "10 Alternatives to Steam for Buying Cheap PC Games," *How-To-Geek*, April 2, 2017, available at https://www.howtogeek.com/300416/10-alternatives-to-steam-for-buying-cheap-pc-games/, accessed on March 14, 2025 ("Here are 10 alternatives to Steam for PC gamers, some of which offer Steam compatibility, and which often beat it on price as well.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

█████████████████████ and ████████ shows that the price for a game on Steam can differ from the price of that same game outside of Steam.[128]

79.   **Similarly, Dr. Schwartz could have analyzed whether publishers set the same price across platforms for reasons other than the challenged conduct.** Even if Dr. Schwartz were to have done some empirical analysis showing that prices were the same across platforms, this is not evidence that a PMFN was in place. For example, industry reports, as well as witnesses in connection with this matter, have described why companies might prefer to use the same prices on Steam and elsewhere for reasons relating to transparency and customer relations, rather than because of an alleged PMFN.[129] Indeed, I understand that Prof. Gowrisankaran studies games that are published on EGS and other platforms but not on Steam and finds that price parity for these games was more common than price parity for games on Steam.[130] Dr. Schwartz's model assumes that equal prices are the result of a PMFN, even though games may have the same price for reasons that have nothing to do with a PMFN.

80.   Rather than engage with the data, Dr. Schwartz's PCM *assumes* that prices are identical across platforms and that this occurs because a hypothetical PMFN keeps it that way. The empirical evidence of prices I have seen in connection with this matter suggest that this assumption is not consistent with the facts, and Dr. Schwartz does not substantiate this assumption.

---

[128] According to Dr. Schwartz's analysis, there are periods where ███████████████ was £10 on █████████ and £50 on Steam even after the alleged "enforcement event." Similarly, the price of █████████ ranges from $0 to $40 in his analysis, including periods where the price on Steam is $5 while the price on the ████████ was $40. See Dr. Schwartz Report, Figures 5–6. I find similar patterns across other games that Dr. Schwartz analyzes, including other games by large publishers such as ██████████████████ and ██████████████████████ as well as games by smaller publishers, such as ██████████████████████████████ See also Schwartz Report, Appendix A.

[129] Deposition of ████████████████████████████ p. 45 ("When they do buy a game from us, we want that price to always be consistent. Because if we don't, we'll have quite a bit of backlash. And gamers are quite vocal on social media and what have you. So, you know, it just would not be smart for us because we think about customer sentiment in our business."). See Kyle Orland, "Steam's 'Price Parity Rule' Isn't Wreaking Havoc on Game Prices," *Ars Technica*, May 13, 2021, available at https://arstechnica.com/gaming/2021/05/why-lower-platform-fees-dont-lead-to-lower-prices-on-the-epic-games-store/, accessed on March 14, 2025. ("[P]rice parity often appears to be a commercial decision for uniformity and ease of explanation").

[130] See Gowrisankaran Rebuttal Report, Section 7.1.3. I understand that Prof. Gowrisankaran found that 46.3 percent of games on EGS and other platforms but not on Steam were priced the same relative to only 32.1 percent of games that were on Steam and other platforms.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### 5.1.2. Because of its restrictive assumptions, Dr. Schwartz's PCM incorrectly predicts that PMFNs never have procompetitive effects

81. Dr. Schwartz claims that the differences between his PCM's assumptions and the real world are innocuous simplifications to keep the model uncomplicated. [131] However, the assumptions of Dr. Schwartz's PCM oversimplify the real world in a way that makes his model's predictions unreliable. One way this can be seen is because Dr. Schwartz's PCM makes a striking prediction, as described further below: PMFNs (one of which Dr. Schwartz both assumes exists and imposes price parity for purposes of his model) *always* harm publishers. [132] This contradicts the findings from the academic literature, which show that—under many different settings—PMFNs can have procompetitive effects [133] Dr. Schwartz himself recognizes this as a finding in the economics literature. [134] But Dr. Schwartz's PCM does not allow for this recognized possibility to exist in his model.

82. Indeed, Prof. Gowrisankaran has argued that there are procompetitive effects of at least some of the challenged conduct in this case. [135] In this section, I assess some

---

[131] Schwartz Report, ¶ 293 ("The PCM is a robust model, but it is not a perfect reflection of every element of the market. This is, of course, to be expected. No economic model does so—economic models make simplifying assumptions that try to capture the basic economics of a scenario and focus on the elements that drive market outcomes in the real world."); Footnote 747 ("The assumption of two platforms is a simplifying assumption that is made to make the math more tractable.").

[132] I discuss how Dr. Schwartz's PCM always predicts harm in Section 5.3.

[133] Justin P. Johnson, "The Agency Model and MFN Clauses," *The Review of Economic Studies*, 84(3), 2017, pp. 1151–1185 at p. 1173 ("Although the analysis above indicates how MFNs may raise prices and harm consumers, it is not hard to imagine how MFNs might also be pro-competitive. For example, MFNs might encourage investments. This force seems particularly relevant for markets where the retail landscape is changing rapidly. In particular, many new online retailers have appeared in recent years, and some of them have chosen to use price-parity restrictions. Some of these retailers have faced substantial costs of developing their online platforms and it is possible that price-parity restrictions have encouraged their entry and benefitted consumers. For instance, Amazon and Apple played important roles in building the e-book market, investing not only in online stores but in hardware devices that encouraged e-book adoption. It is unclear whether Apple would have made these investments without the guarantees provided by MFNs, which possibly would have left Amazon unchecked and consumers and publishers with fewer options. In other words, it is possible that the entry-inducing effects of MFNs played a role in the e-book market."); Margherita Colangelo, "Competition Law and Most Favoured Nation Clauses in Online Markets," in *New Developments in Competition Law and Economics*, ed. Klaus Mathis and Avishalom Tor (Cham, Switzerland: Springer, 2019) pp. 295–317 ("Colangelo (2019)") at p. 299 ("[W]ithout protective measures such as MFN clauses, suppliers may use online platforms to attract customers yet subsequently switch demand to their direct or other sales channels by reducing prices. … [A]s a consequence, the platform providing e.g. high-quality services could be in danger of not recouping its investments and is not incentivized to invest in improving the quality of its services.").

[134] Schwartz Report, ¶ 135 ("PMFNs may sometimes be justified to protect a platform's investments and prevent freeriding by individual sellers.").

[135] Prof. Gowrisankaran discusses this in the context of two services that Steam offers to publishers: marketing services and platform services. For these services, Prof. Gowrisankaran concludes: "Publishers have incentives to free-ride on Steam's marketing and platform services, and this can

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

of the ways Dr. Schwartz's PCM does not capture the potential procompetitive benefits of PMFNs. I ask: **if his model's assumptions were made more realistic, could this affect the model's prediction?** (Section 4, Standard #2). I find the answer is **yes**.

83.  One example of a more realistic assumption would be if Dr. Schwartz's PCM allowed platforms to invest in their quality.[136] Findings from the economic literature have established (as Dr. Schwartz has acknowledged) that one reason PMFNs can be procompetitive is because they encourage platforms to make investments in the quality of their services even when that investment also benefits the platform's rivals.[137] In the case of Valve, this can represent, as one example, its investment in marketing services (e.g., curated marketing for games around the time of launch).[138] These services allow publishers to better market their games, which can increase demand for their game, but can also increase demand for the game on competing

---

reduce Valve's incentive to invest in these services. Measures taken by Valve to mitigate the free-riding problem can have procompetitive effects by ensuring Valve has strong incentives to invest in quality and innovation, benefiting competition across the industry". See Gowrisankaran Opening Merits Report, ¶ 159.

[136]  In Dr. Schwartz's PCM, platforms can only choose their revenue shares, but Dr. Schwartz himself recognizes that this is unrealistic. See Schwartz Report, ¶ 327 ("While this narrative treats platform characteristics as fixed, it is the case that platforms typically have at least some control over their type. That is, platforms can choose to add features that could increase demand at a given price.")

[137]  Economists refer to this as "free-riding," i.e., when someone benefits from another person's action, but does not have to fully pay for that benefit. Economists recognize that free-riding can cause inefficiencies because, in general, you are less incentivized to undertake a costly action if someone else is going to benefit from it for free. See N. Gregory Mankiw, *Principles of Economics*, Eighth Edition, (Boston: Cengage Learning, 2018) ("Mankiw (2018)"), p. 214 ("A free rider is a person who receives the benefit of a good but does not pay for it ... Because people would have an incentive to be free riders ... the market would fail to provide the efficient outcome"). Dr. Schwartz recognizes that free-riding is one reason that PMFNs can be procompetitive. See also Schwartz Report, ¶ 344 ("PMFNs may sometimes be justified to protect a platform's investments and prevent freeriding by individual sellers ... This type of freeriding by the hotel (or 'showrooming' by the platform) would reduce the incentive for the platform to invest in the valuable service of matching travelers to hotels"). This is consistent with the broader literature that PMFNs can incentivize investments. For instance, Colangelo (2019) also similarly explains that PMFNs can encourage platforms to invest in their quality. See Colangelo (2019), pp. 295–317 ("[W]ithout protective measures such as MFN clauses, suppliers may use online platforms to attract customers yet subsequently switch demand to their direct or other sales channels by reducing prices. ... [A]s a consequence, the platform providing e.g. high-quality services could be in danger of not recouping its investments and is not incentivized to invest in improving the quality of its services."). Prof. Gowrisankaran also discusses this literature in further detail. See also Gowrisankaran Opening Merits Report, Section 4.1.

[138]  See Gowrisankaran Opening Merits Report, ¶¶ 151–152 ("Valve has invested in innovations like Steam Wishlists and also provides curated marketing for games, especially around the time of launch. These investments increase awareness of games and improve the information consumers have on the distinguishing features of games as well as how other consumers value those features. This awareness and information increases the probability that consumers will purchase games. However, publishers may free-ride on those benefits and steer consumers to other sales channels, for example, by offering games at lower prices there"). Prof. Gowrisankaran discusses this investment by Valve and the potential for free-riding in further detail in his Merits Report. See also Gowrisankaran Opening Merits Report, Section 4.3.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

platforms.[139] In these settings, PMFNs can be procompetitive because they help the firm recoup the cost of its investment.[140] Dr. Schwartz's PCM cannot capture this potential channel for procompetitive effects because it does not model any form of investment by platforms.[141]

84.   Another way to see that Dr. Schwartz's PCM's assumptions drive its predictions (and that its hypothetical PMFN that imposes price parity always causes harm) is to compare it to similar models that also study platform competition, but that make more realistic assumptions. In fact, there are academic studies with models that adapt or modify the Boik and Corts (2016) model, which Dr. Schwartz's PCM is based on.[142] In these studies, the authors demonstrate how accounting for procompetitive

---

[139]   Prof. Gowrisankaran discusses the upfront and ongoing marketing investments made by Valve and their benefits to publishers. See Gowrisankaran Opening Merits Report, ¶¶ 72 ("As this timeline of innovations makes clear, Valve has continuously sought to create new ways for developers to succeed in creating and marketing content to consumers. Valve's innovations also meant more players could find, buy, and play games they like more and could engage with video game content in convenient and enjoyable ways."), 150–151 ("Valve's expected return on its marketing investments and marketing support of publishers ... Valve has invested in innovations like Steam Wishlists and also provides curated marketing for games, especially around the time of launch. These investments increase awareness of games and improve the information consumers have on the distinguishing features of games as well as how other consumers value those features. This awareness and information increases the probability that consumers will purchase games."), Section 4.3.

[140]   Schwartz Report, ¶ 344 ("If, in the presence of such showrooming or freeriding, the absence of a parity clause would preclude a platform from *at least* recouping its original investment, there may be a pro-competitive justification for such a parity clause."). See also Footnote 137.

[141]   Dr. Schwartz claims that "Valve was able to recoup the costs of implementing any valuable fixed investment costs (such as search mechanism) very quickly. For example, while Valve's reported after-tax net profit ██████ ██████ However, Prof. Gowrisankaran and Prof. Chiou have both documented Valve's ongoing investments into Steam's features, including past ███ This is instead consistent with Valve facing ongoing competition and therefore requiring ongoing investment costs. See Schwartz Report, ¶ 345; Gowrisankaran Opening Merits Report, Exhibit 1; Chiou Class Cert Report, Exhibit 13.

[142]   Three such examples are the models from Johansen and Verge (2017), Gerlach and Li (2021), and Mariotto and Verdier (2020). These academic studies all reference how their models are related to, but differ from, the Boik and Corts model. For example, Johansen and Verge (2017) differs from Boik and Corts (2016) because they allow publishers to sell directly to users and to give publishers the choice of whether to be on a platform or not. Similarly, Mariotto and Verdier (2020) differs from Boik and Corts (2016) because their model accounts for user heterogeneity and competitive pressure from the direct sales channel. Finally, Gerlach and Li (2021) differs from Boik and Corts (2016) because their model allows for vertical differentiation between the platforms and also does not assume that the sellers always sell on both platforms. See Bjørn Olav Johansen and Thibaud Verge, "Platform Price Parity Clauses with Direct Sales," *University of Bergen: Department of Economics*, no. 1/17, 2017 [Working Paper] ("Johansen and Verge (2017)"), p. 4 ("Our paper is very closely related to Boik and Corts (2016) and Johnson (2014), with two major differences: first, we allow suppliers to sell directly (through their own websites, for instance) as well as through agents; and second, we account for the suppliers' listing decisions; that is, we do not assume that suppliers are always active on all platforms."); Heiko Gerlach and Junqian Li, "Platform Competition, Vertical Differentiation, and Price Coherence," *Journal of Law and Economics*, 64(3), 2021, pp. 439–477 ("Gerlach and Li (2021)") at p. 442 ("Our work contributes to the literature on price coherence clauses (or price parity clauses or most-favored-nation rules) in platform markets ... Boik and Corts (2016) and Johnson (2017) analyze the effects of price parity clauses in an agency business model in which suppliers sell their products through two differentiated platforms ... In contrast to these recent works, our paper uses a different framework and presents a different mechanism by which price coherence can reduce platform fees

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

effects can reverse the over-simplified model's prediction regarding the impact of PMFNs. For example, Johansen and Verge (2017) modify the Boik and Corts (2016) model in several ways to make it have more realistic assumptions. First, their model features multiple competing publishers instead of a single publisher.[143] Second, they assume that the publishers can sell directly to users (e.g., via their own websites) as well as through platforms.[144] Third, they allow publishers in their model to choose whether to distribute through a given channel or not (i.e., they do not assume that the publishers always distribute their games via all available channels).[145] Based on these changes, which better mirror the realities of the video game industry, Johansen and Verge find that, unlike in Boik and Corts (2016), a PMFN can have procompetitive effects: it may lead to higher profits for publishers and higher user welfare because of the ability of publishers to leave a platform and self-distribute.[146] This demonstrates that Dr. Schwartz's PCM misses mechanisms that can reverse its findings.

85. Finally, I note that by discussing other economic models in the academic literature I am not putting forward an alternative theoretical model to Dr. Schwartz's PCM for examining the challenged conduct. Instead, my intention is to use these as examples to illustrate that the assumptions of Dr. Schwartz's PCM could have been changed to better match the realities of the video game industry, in which case the model's

---

and increase consumer surplus."); Carlotta Mariotto and Marianne Verdier, "Platform-Merchant Competition for Sales Services," *Journal of Economics & Management Strategy*, 29, 2020, pp. 834–853 ("Mariotto and Verdier (2020)") at p. 836 ("Boik and Corts (2016) are primarily concerned with platform competition, whereas we focus on competition between platform sales and direct sales ... Our results are similar to Johansen and Verge (2017), who find that PPCs may lead to lower total purchase prices and differ from several other papers of the literature (e.g., Boik & Corts, 2016; Edelman & Wright, 2015).").

[143] Johansen and Verge (2017), p. 6 ("[T]wo differentiated platforms compete by offering (per-unit) commissions to multiple differentiated suppliers.").

[144] Johansen and Verge (2017), p. 5 ("[W]e allow suppliers to sell directly (through their own websites, for instance) as well as through agents").

[145] Johansen and Verge (2017), p. 5 ("[W]e account for the suppliers' listing decisions; that is, we do not assume that suppliers are always active on all platforms.").

[146] In their model, if there were no PMFN, publishers would respond to an increase in a platform's revenue share by increasing prices on that platform. Under a PMFN, if a publisher raises its price on one platform in response to an increase in revenue shares, then it will be required to raise its prices on *all* platforms. If users are price sensitive enough, then the publisher will be unwilling to do so. This is because if it increases its prices then there will be enough user substitution away to other publishers' games that this will be unprofitable to do. This substitution occurs both to other games on the same platform as well as other games on different platforms. Johansen and Verge (2017) show that both components of substitution need to be high enough for the PMFN to be procompetitive. When that happens, publishers can instead respond to an increase in revenue shares by *exiting* the platform with higher revenue shares altogether. By exiting from that platform, publishers can then instead shift their sales to other channels, e.g., other platforms with lower revenue shares or the publisher's own direct sales channels. The threat of exiting then constraints the platforms' ability to raise revenue shares. See Johansen and Verge (2017), Section 4.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

predictions about the PMFN would also change.[147] This does not alleviate my other concerns with Dr. Schwartz's PCM.

## 5.2. Dr. Schwartz's PCM makes predictions that contradict economic realities of the video game industry

86. An important way that economists evaluate how reliable a model may be at predicting but-for world outcomes is by testing how well the model can predict as-is economic outcomes in the setting it intends to evaluate (Section 4, Standard #3). Dr. Schwartz uses the PCM to predict economic outcomes without conducting such an assessment. In this section, I compare the PCM's predictions about given economic outcomes (e.g., publishers' marginal costs, publishers' profits) under what Dr. Schwartz calls the "with PMFN" scenario—that is, the scenario in which Dr. Schwartz assumes the existence of a hypothetical PMFN that imposes price parity, and which he further assumes is consistent with the real world—against information available about those same economic outcomes in the real world.[148] If the PCM's predictions do not closely match the values of economic outcomes (e.g., publishers' profits, publishers' costs) observed in the real world, then that would be evidence against the reliability of the model.

87. I find that Dr. Schwartz's PCM makes predictions about publishers' and games' key economic outcomes that are at odds with the real world and with basic economics. I show that his PCM predicts that the cost at which publishers sell one additional unit

---

[147] These models are not appropriate for analyzing the challenged conduct because there are other aspects of the models' assumptions that are unrealistic and are inconsistent with the realities of the video game industry. For example, in Johansen and Verge (2017), as well as in Dr Schwartz's PCM, the model assumes that the degree of substitution between sales channels is symmetric. In addition both models do not account for network effects. See Johansen and Verge (2017), p. 8 ("We assume that (inverse) demand functions are linear and that the (inverse) demand for supplier $j$ on platform $i$ is given by … where $\alpha \in ]0,1[$ measures the degree of interbrand substitution (i.e., between suppliers) and $\beta \in ]0,1[$ measures the degree of intrabrand substitution (i.e., between platforms). Note that this demand specification implies that the platforms and the direct sales channel are symmetrically differentiated.").

[148] Schwartz Report, ¶¶ 302, 306–307 ("The platforms determine if they implement a PMFN, which allows for comparisons of outcomes (like consumer prices, platform fees, and entry) with and without PMFN(s) in place. … In this asymmetric demand model, a single PMFN can be binding (i.e., consumer prices on the PMFN-bearing platform set a floor on consumer prices on other platforms). This is the case when the established, high-fee platform (e.g., Steam) implements a PMFN—prices on other platforms are raised to those seen on the high-fee, PMFN-holding platform. … Thus, in the asymmetric model, the existence of a single PMFN set by the established platform forces all consumer prices to the higher prices set by the high transaction-fee platform. This is true so long as demand is 'asymmetric enough that the fee-setting equilibrium behaves as if there are two PMFN agreements.' When a PMFN is in place and binding, the consumer prices will be equal across platforms."). See also Supplemental Opening Merits Report of Steven Schwartz, Ph.D., March 7, 2025 ("Schwartz Supplemental Report"), Supplemental Table 4.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

of a game is unrealistically high (approximately ████████ of the sales price). This estimate contradicts findings in the economics literature and trade press (that Dr. Schwartz acknowledges), which suggest that costs of selling digital goods are likely to be far lower than Dr. Schwartz's estimates. Given that Dr. Schwartz's model estimates unrealistically high costs, it also estimates unrealistic profits. Specifically, Dr. Schwartz's model predicts that publishers sell games on Steam at a loss. However, in the real world, publishers that sell on Steam are profitable. If publishers earned large and sustained losses on Steam, they would make different business decisions (such as exiting Steam or even the video game industry). Dr. Schwartz's PCM thus makes predictions about industry facts and publisher behavior that are contradicted by the real world. Given that Dr. Schwartz's PCM cannot reliably predict the real world, it cannot reliably predict the but-for world.

### 5.2.1. Dr. Schwartz's PCM predicts excessively high marginal costs for publishers

88. Dr. Schwartz's PCM predicts unrealistically high publisher marginal costs for each additional copy of a game sold on Steam. This prediction is inconsistent with economic theory and intuition, and is an indication that Dr. Schwartz's PCM cannot represent the economic behavior and outcomes of the video game industry observed in reality.

89. As a matter of economics, the term marginal cost (in this context, marginal cost for publishers) refers to how much it costs a publisher to distribute one additional unit of a game to a customer.[149] Because this process typically involves the user simply downloading a digital file, the cost to the publisher is typically low.[150] Academic

---

[149] Marginal cost refers to the "increase in total cost that arises from an extra unit of production." See Mankiw (2018), p. 256. Variable costs refer to costs that "change with the level of output," as opposed to fixed costs, which "do not vary with the level of output." See Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, Fourth Edition, (Harlow, UK: Pearson Education, 2015) ("Carlton and Perloff (2015)"), pp. 53, 60. See also Mankiw (2018), pp. 254–259, Table 3, (" [A]verage variable cost is the variable cost divided by the quantity of output."). Dr. Schwartz's PCM assumes that marginal costs are constant, and thus, that the average variable cost and the marginal cost are identical. See Carlton and Perloff (2015), p. 242 ("For example, if there are no fixed costs and constant marginal costs, then average cost equals marginal cost"). Hence, I can compare a publisher's average variable costs from their annual reports to the PCM's estimated marginal cost $c_s$. See Schwartz Report, ¶ 309 ("The seller's constant marginal and average production cost is denoted $c_s$.").

[150] Joseph Politano, "Video Games, Price Architecture, and the Zero Marginal Cost Revolution," *Apricitas Economics*, August 28, 2021, available at https://www.apricitas.io/p/video-games-price-architecture-and, accessed on March 19, 2025 ("Video games are on the forefront of new pricing, production, and distribution models that are shifting the way we pay for goods and services. Digital games, in some cases, have zero marginal cost — the cost for a producer to distribute an additional game file is $0, unlike the usually positive marginal cost for physical goods. ... The marginal cost of selling an additional video game as a downloadable file is functionally zero, especially if the file is

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

economics literature and trade press have concluded that marginal costs associated with sales of digital goods on a given platform are low once they are developed and introduced to customers on that platform.[151] Dr. Schwartz himself agrees with this economic intuition, stating in his report that "the marginal cost of supplying one additional online game is low and constant for publishers."[152] These marginal costs are usually treated separately from any fees or commissions publishers may pay to a distribution channel (e.g., as Dr. Schwartz does in his model).[153] Moreover, a publisher's marginal cost is unrelated to other costs that publishers may have (e.g., costs of developing a game, costs of marketing a game, rent, etc.). This means that publishers with low *marginal* costs do not necessarily have low *total* costs.

90.    Dr. Schwartz's PCM predicts that publishers have marginal costs that are inconsistent with economic theory. Dr. Schwartz's PCM predicts that publishers'

---

hosted on a third-party service like Steam or the Google Play Store."). In an internal email thread, Valve employees discussing a public press article regarding marginal costs in the PC distribution market ████████████████████ See Brendan Sinclair, "Valve Is Pushing Price of PC Games to Free - Lovell," *GamesIndustry.biz*, March 4, 2014, available at https://www.gamesindustry.biz/valve-is-pushing-price-of-pc-games-to-free-lovell, accessed on March 19, 2025 ("In his piece, Lovell cites economist Joseph Bertrand's idea that barring outside factors, competition will drive the consumer cost of a product down to its marginal cost. And because distributing PC games digitally is cheap and falling bandwidth costs will only make it cheaper, Lovell reasons that competition will push the cost of games down to virtually nothing as well."); Email from Al Farnsworth to Iestyn Bleasdale-Shepherd and Tom Bui, "RE: 'Valve is pushing price of PC games to free,'" March 5, 2014, VALVE_ANT_0310498 – 9 ███████████████████████████████████████

151    University of Minnesota Libraries, "Understanding Media and Culture: 13.6 Globalization of Media," available at https://saylordotorg.github.io/text_understanding-media-and-culture-an-introduction-to-mass-communication/s16-05-globalization-of-media.html, accessed on March 24, 2025 ("As discussed earlier, the low marginal costs of media mean that reaching a wider market creates much larger profit margins for media companies. Because information is not a physical good, shipping costs are generally inconsequential."); Hal R. Varian, Joseph Farrell, and Carl Shapiro, *The Economics of Information Technology: An Introduction*, (Cambridge, UK: Cambridge University Press, 2004) ("Varian et al. (2004)"), p. 25 ("We have already noted that many information- and technology-related businesses have cost structures with large fixed costs and small, or even zero, marginal costs."); Yinliang Tan, Janice E. Carrillo, and Hsing Kenny Cheng, "The Agency Model for Digital Goods," *Decision Sciences*, 47(4), 2016, pp. 628–660 at p. 631 ("Unlike the physical goods market which always faces the risk of a mismatch between the random demand and supply, the demand of the digital goods can always be perfectly fulfilled. As a result, there is no inventory decision to be made in the digital goods market. Further, the marginal production cost of the digital goods is negligible."); Joseph Politano, "Video Games, Price Architecture, and the Zero Marginal Cost Revolution," *Apricitas Economics*, August 28, 2021, available at https://www.apricitas.io/p/video-games-price-architecture-and, accessed on March 19, 2025 ("Video games are on the forefront of new pricing, production, and distribution models that are shifting the way we pay for goods and services. Digital games, in some cases, have zero marginal cost — the cost for a producer to distribute an additional game file is $0, unlike the usually positive marginal cost for physical goods. … The marginal cost of selling an additional video game as a downloadable file is functionally zero, especially if the file is hosted on a third-party service like Steam or the Google Play Store.").

152    Schwartz Report, ¶ 451.

153    Schwartz Report, ¶ 309 ("The platform fees on each platform $i$ are, as before, denoted as $f_i$. The seller's constant marginal and average production cost is denoted $c_s$.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

marginal cost is equal to ██████[154] This means that, for the ██████ game price that Dr. Schwartz's model predicts, publishers' marginal costs make up ██████ percent of the game's gross revenue—even prior to considering the platform's revenue share.[155] Accounting for the revenue share on top of marginal costs leads to results that are inconsistent with economic logic. Dr. Schwartz predicts that publishers pay on a ██████ percent weighted average effective revenue share in his model.[156] As I discussed in my class certification report as well, this means that Dr. Schwartz's PCM predicts that publishers pay ██████████ = 100 percent of a game's gross revenues on marginal costs and platform revenue share.[157] In other words, Dr. Schwartz's PCM predicts that publishers' marginal costs are so high that, on average, they make no money for each copy of a game sold.[158] That is, his model predicts that publishers give up 100 percent of their revenue on every sale, which contradicts the reality of publishers in the video game industry.

91.   Dr. Schwartz provides no real-world evidence or economic rationale for why the marginal costs of distributing a digital good would be so high. In reality, video games sold on gaming platforms are digital goods and, as discussed above, selling these games to an additional customer on Steam or on other platforms involves very little marginal cost to the publisher. Therefore, the ██████ percent publisher marginal cost estimate that Dr. Schwartz's model predicts is excessively high relative to what we would expect based on prior economic research and other evidence on record.

---

[154]   Dr. Schwartz refers to this as publishers' "marginal and average production cost." However, Dr. Schwartz does not model production. Schwartz Report, ¶ 309 ("The platform fees on each platform $i$ are, as before, denoted as $f_i$. The seller's constant marginal and average production cost is denoted $c_s$."); Schwartz Supplemental Report, Supplemental Table C3.

[155]   This is calculated as ██████████████ percent. Dr. Schwartz inputs a price of $60 into his model, but his model predicts that the price in the "with PMFN" scenario is ██████. See Schwartz Supplemental Report, Supplemental Table 4.

[156]   This is the weighted average effective revenue share across the two platforms calculated by Dr. Schwartz based on the revenue shares predicted by his PCM. See Schwartz Supplemental Report, Supplemental Table 4.

[157]   Langer Class Cert Report, Footnote 240.

[158]   Dr. Schwartz's PCM also predicts that publishers pay a ██████ percent revenue share on Steam (in contrast to the ██████ percent weighted average revenue share across Steam and EGS). This means publishers pay ██████ percent of a game's gross revenues for every game sold on Steam. As I discuss next in Sections 5.2.2 and 5.2.3 below, predicting that publishers earn negative profits on Steam is inconsistent with economic theory and real-world evidence. See Schwartz Supplemental Report, Supplemental Table 4.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### 5.2.2. Dr. Schwartz's PCM predicts that publishers with financial success on Steam actually lose money on the platform

92.  Because Dr. Schwartz's PCM predicts that publishers' costs are so high, his PCM then makes another unrealistic prediction: publishers make a loss on every unit of a game sold on Steam.[159] In this section, I evaluate available evidence on reported profits from publishers who distribute games on Steam. I find that the PCM's prediction is contrary to economic intuition and industry facts.

93.  I first compare Dr. Schwartz's prediction of publishers' profits to real-world data. Due to the lack of evidence in the record on individual publishers' profits, I rely on profits reported in annual filings made by publishers that are public companies. I identify four such publishers on Steam that are among the top publishers in terms of total revenue generated on Steam between 2017 and 2023: ███████████████ ███████████████████████████.[160] For each of these publishers, I impute their net profits from sales on Steam from 2017 to 2023 via the companies' annual reports.[161] I then input data about these publishers into the PCM, including the total revenues earned and the average price of their games.[162] I follow the same steps as Dr. Schwartz and generate the PCM's prediction of the amount of profits these publishers earn on Steam in the as-is world (i.e., his "with PMFN" scenario). I then compare the amount of profit that his PCM predicts these publishers make on Steam against the real-world profit the publishers earned on Steam (imputed from their

---

[159]    Schwartz Report, ¶ 335 ("I also note that the sellers' economic profits on Steam are negative when the PMFN is in place, but seller profits across both platforms are zero."). Because Dr. Schwartz's PCM assumes that the publisher's profit is its profit margin (i.e., the price of the game minus the revenue share paid by the publisher to the platform, minus the marginal cost of the publisher) multiplied by the quantity of games sold on the platform, any excessively high marginal cost that combined with revenue share outweigh the price of the game will result in a negative profit to the publisher.

[160]    I choose these four publishers because these are top publishers for which I was able to identify information about their profits. See Appendix D.2.1 for more details on my selection of top publishers. Due to lack of availability of financial reports, I am unable to do this analysis for a large number of publishers. As Dr. Schwartz stated in his deposition, "[t]here is limited data to calculate even accounting profits." The publishers I study here are just a handful of examples, and they are not necessarily representative of all publishers or all top publishers. I expect that a reliable model would predict economically reasonable profits on Steam when inputted with data about any publisher. Showing that Dr. Schwartz's model generates unreasonable predictions when inputted with data about some publishers is further evidence against the reliability of his PCM. See Deposition of Steven Schwartz (Intensity), April 18, 2024 ("Schwartz Deposition"), pp. 267:7–267:14 ("Q. Okay. And have you done any investigation of what publishers' actual economic profits are from selling games on Steam in the real world? A. There is limited data to calculate even accounting profits, much less economic profits.").

[161]    The publishers' annual reports do not state profits via Steam, so I impute this to generate an approximate estimate of these profits. See Appendix D.2.2 for further details.

[162]    See Appendix D.2 for further details regarding my methodology.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

financial statements using, for these purposes, Dr. Schwartz's calculation of Steam market share).[163]

94.     I find that Dr. Schwartz's PCM incorrectly predicts publishers' profits on Steam: the publishers I analyze are highly successful (earning ▮▮▮▮ of dollars each year on Steam in the real world), whereas Dr. Schwartz's PCM predicts that these very same publishers are losing money on Steam. My comparison of real-world profits versus PCM-predicted profits for each publisher is summarized in Exhibit 4. If his PCM was a reliable model, these two amounts would be relatively similar for each publisher. However, I instead observe that there is wide and consistent disparity to the point that the PCM's predictions contradict the real world on the basic question of whether these publishers are even profitable at all. For example, ▮▮▮▮▮▮▮▮ (publisher of franchises such as ▮▮▮▮▮▮ and ▮▮▮▮) earned nearly ▮▮▮ in profits on Steam during 2017–2023—accepting (for these purposes) Dr. Schwartz's calculation of market share on Steam—whereas Dr. Schwartz's PCM predicts that the publisher generated a *loss* of ▮▮▮▮ on Steam during the same time period.[164] These findings show that Dr. Schwartz's PCM predicts losses on Steam for highly profitable publishers, and thus his model is unlikely to be able to make predictions about the but-for world (Section 4, Standard #3).

---

[163]    To generate an estimate of real-world profits on Steam for each publisher, I first impute each publishers' profit for digital PC game sales. Then, I multiply this statistic by the market share Dr. Schwartz calculates for Steam for 2017–2023 (i.e., ▮▮ percent). Even if the share of the publisher's digital PC game profits that is attributable to Steam is different from ▮▮ percent, this would not change my conclusions. This is because if I were to scale the digital PC game profits by any percentage between 0 to 100 percent, I would find that the publishers' real-world profit is positive, whereas Dr. Schwartz's PCM predicts that these publishers earn negative profits on Steam. For further details of this imputation, see Appendix D.2.2.

[164]    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ accessed on March 23, 2025.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Exhibit 4**
*Dr. Schwartz's PCM incorrectly predicts that highly profitable publishers lose money on Steam (2017–2023)*



| Publisher | PCM-Predicted Profit on Steam ($ millions) | Real-World Profit on Steam ($ millions) |
|---|---|---|
| | | |

Source: Schwartz Supplemental Report backup materials; Schwartz Merits Analysis Data; Publisher Annual Reports; Newzoo Game-Level Data; Currency Exchange Rate Data

Note: This exhibit shows the total profits on Steam between 2017–2023 for four publishers: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and ▮▮▮▮▮. The exhibit compares the profits predicted by Dr. Schwartz's PCM for these publishers against the real-world profits earned by these publishers (based on the publishers' annual reports). The PCM-predicted profits are obtained by inputting data about each of these publishers into the PCM and generating a prediction of publisher profit on Steam under the "with PMFN" scenario. I repeat the analysis separately using data for each publisher and for each fiscal year during 2017–2023. I calculate total profits over this period by summing the predicted annual profits across years. To predict these profits, I input the following data into the PCM. I input the game price, for which I use the average game price on Steam for these publishers. I calculate the average game price by dividing the total revenues earned on Steam by the total number of games sold on Steam for each publisher. I input the total revenue for each publisher, which I estimate by assuming that the total revenues the publisher earns on Steam represent ▮▮ percent of their total relevant sales (the Steam market share that Dr. Schwartz calculates, which I assume for the purposes of this exercise). I calculate each publisher's revenues on Steam based on Dr. Schwartz's Steam transaction data (Schwartz Merits Analysis Data). For all other inputs into the PCM, I use the same values as Dr. Schwartz. To estimate each publisher's real-world profits on Steam, I estimate the total profits from digital PC games for each publisher for the period 2017–2023 and then scale these by the the share for Steam, which for the purposes of this exercise I assume to be consistent with the share Dr. Schwartz calculates ▮ percent). To estimate total profits from digital PC games, I identify publishers' financial information for digital games from the annual reports and then impute the profits for digital PC games using the share of publishers' digital game revenues that occur via PC (according to the Newzoo Game-Level Data). I use the prevailing exchange rates in the corresponding year to convert the financial information to U.S. dollars when it is reported in a currency other than U.S. dollars. See Appendix D.2 for further details on this analysis.

95.    Beyond failing to match real world data, Dr. Schwartz's prediction about publishers' profits is inconsistent with economic intuition and other observable outcomes. The publishers I list in Exhibit 4 do not appear to be outliers. Thousands of publishers choose to operate on Steam, and this would not be the case if they lost money selling games on Steam (i.e., negative profits from selling their games on Steam).[165] In the real world, we observe that publishers do sell their games on Steam year after year, and that selling games on Steam contributes positively to publishers' financial performance.[166]

---

[165]    Langer Class Cert Report, ¶ 169.
[166]    Langer Class Cert Report, ¶ 170.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

96. While I lack systematic evidence on how much profit each publisher earns on Steam, the available evidence indicates that publishers view Steam as an important distribution channel to earn profits:

    i). Publisher Mega Crit, creator of the game *Slay the Spire*, explained that Steam made it possible for small game developers to "actually make a livable wage."[167]

    ii). A creative director at Digital Extremes, the publisher of the game *Warframe*, described Steam as "the thing that still allows me to have a job."[168]

    iii). Publisher Snail reported earning over 30 percent of its net revenues from games sold on Steam in 2022.[169]

    iv). Dwarf Fortress saw a 46,000 percent increase in earnings after release on Steam. While the developer noted that more than half of the earnings went towards taxes and paying business expenses, he expressed that the money "solved the main issues of health/retirement that are troubling for independent people" and "safeguarded the future of the game."[170]

---

[167] Langer Class Cert Report, Footnote 234; Wes Fenlon, "Game Devs Praise Steam as a 'Democratic Platform' That 'Continues to be Transformative' for PC Gaming Today," *PC Gamer*, April 26, 2024, available at https://www.pcgamer.com/gaming-industry/game-devs-praise-steam-as-a-democratic-platform-that-continues-to-be-transformative-for-pc-gaming-today/, accessed on March 14, 2025 ("Slay the Spire co-creator Casey Yano credited Steam with making it possible for tiny indie teams like his to be able to make a living off of their games. 'I made a Flash game way back when and I think I made $20,' he said. '[The store] was like 'that's not enough money, we're not even gonna send you a check.' But Steam came along and it was like, whoa, maybe some people can actually make a livable wage from this. I wouldn't even have a job'.").

[168] Langer Class Cert Report, Footnote 234; Wes Fenlon, "Game Devs Praise Steam as a 'Democratic Platform' That 'Continues to be Transformative' for PC Gaming Today," *PC Gamer*, April 26, 2024, available at https://www.pcgamer.com/gaming-industry/game-devs-praise-steam-as-a-democratic-platform-that-continues-to-be-transformative-for-pc-gaming-today/, accessed on March 14, 2025 ("Warframe creative director Rebecca Ford credits Steam as 'the thing that still allows me to have a job.' 'We launched on Steam in open beta in March 2013 ... and it was transformative for us and continues to be,' she said.").

[169] Langer Class Cert Report, Footnote 234; Snail, Inc., SEC Form 10-Q for period ended September 30, 2022, filed on December 15, 2022, p. 27 ("Our net revenues through our top platform providers as a proportion of our total net revenue for the three months ended September 30, 2022 and 2021 and the nine months ended September 30, 2022 and 2021 were as follows: Three Months ended September 30, 2022 ... (in millions) ... Valve Corporation (Steam) $5.1 ... Total $15.6 ... Nine months ended September 30, 2022 ... (in millions) ... Valve Corporation (Steam) ... $17.9 ... Total ... $59.1.").

[170] Joshua Wolens, "Dwarf Fortress Releases Sales Figures Since Steam Release Showing 46,000% Increase in Earnings," *PC Gamer*, February 2, 2023, available at https://www.pcgamer.com/dwarf-fortress-releases-sales-figures-since-steam-release-showing-46000-increase-in-earnings/,

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

v). *Stardew Valley* sold more than a million copies within two months of launch on Steam. PC Gamer reported that "[i]t's obviously been very lucrative for creator Eric Barrone" and in an interview Eric noted that "[i]f anything, this just makes it so that I can relax and create games without there being a huge amount of pressure."[171]

vi). In 2010, the managing director of Introversion, publisher of *Darwinia*, explained that sales on Steam saved the company. [172] In 2012, the commercial director of Introversion said that "Steam has made

---

accessed on March 14, 2025 ("That's around £5.9 million or €6.6 million, and it's just slightly more than the $15,635 (£12.7k/€14.2k) that Dwarf Fortress earned in the month prior to its release on Steam. That's more than a 46,000% increase ... That's a life-changing shift ... It won't all go to the creators, of course. Adams says that a 'little less than half will go to taxes,' as well as 'continuing to pay people and new business expenses and such'. He said that 'it's not all personal money, but a lot of it is,' enough that the brothers have 'solved the main issues of health/retirement that are troubling for independent people'. They also feel the money has 'safeguarded the future of the game'.").

[171] Shaun Prescott, "Stardew Valley Has Sold More Than a Million Copies," *PC Gamer*, April 14, 2016, available at https://www.pcgamer.com/stardew-valley-has-sold-more-than-a-million-copies/, accessed on March 14, 2025 ("In 2013, Stardew Valley was a Steam Greenlight project that looked pleasant enough, but seemed unlikely to reach any more than a niche audience. Fast forward three years, and the game has sold more than a million copies within two months of launching. ... It's obviously been very lucrative for creator Eric Barrone."); Tom Marks, "Interview: What's Next for Stardew Valley," *PC Gamer*, March 10, 2016, available at https://www.pcgamer.com/stardew-valley-interview/2/, accessed on March 14, 2025 ("Yeah I mean, I don't want it to affect my life in any way. My lifestyle isn't going to change. My career plans haven't changed. I love making games and I want to continue to make games. If anything, this just makes it so that I can relax and create games without there being a huge amount of pressure, you know? Not only from myself and from life events, but also people that I know, family and everything. They know now that this isn't just some crazy pipe dream that I had. It's actually a real thing. That feels good."); Allegra Frank, "Stardew Valley Tops a Million Copies Sold, Two Months After Launch," *Polygon*, April 13, 2016, available at https://www.polygon.com/2016/4/13/11423844/stardew-valley-sales-one-million-copies, accessed on March 14, 2025 ("'It's been really exciting for us to help bring this game to people's attention,' the Chucklefish representative said, 'and the success really couldn't have come to a more deserving person!'").

[172] Phil Elliott, "Introversion: Steam Sale Saved Our Company," *GamesIndustry.biz*, August 19, 2010, available at https://www.gamesindustry.biz/introversion-steam-sale-saved-our-company, accessed on March 14, 2025 ("Introversion: Steam sale saved our company ... Introversion Software, the independent UK developer behind Defcon, Darwinia and Multiwinia, nearly went out of business earlier this year following disappointing sales of its XBLA conversion Darwinia+ - and could have done so if not for an injection of revenue from a Steam sale. That's according to the company's MD, Mark Morris, who revealed to GamesIndustry.biz that he had to let all the staff go and closed the office, with the business reverting to its original line-up of the four directors. However, after they worked on implementing Steam achievements into Defcon in a bid to get some promotion from the Valve platform, they were amazed at the results. 'The Valve sale - it was just phenomenal,' Morris explained. 'A couple of statistics that I'm sure Valve won't mind me sharing: We've now sold more than $2.5 million through Steam, which is pretty good for Introversion, through life. Not all of that comes back to us, because sometimes it's been in bundle packs, and we've gotten less. But basically it equates to almost bang on £1 million, so we're really pleased'. 'The sale did in the ball park of $250,000 - so when you're back to being a team of four people, that's a lot of revenue.' By comparison he revealed that a promotion for Darwinia+ on XBLA, where the game was Deal of the Week for 'about six weeks' at a cut price of 800 points had little impact.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Introversion a commercial success and brought critical acclaim to *Darwinia*."[173]

97. Intuitively, one would expect that if a publisher is making a loss on every game sold on Steam, then they would stop selling games on Steam.[174] That does not happen in Dr. Schwartz's PCM because Dr. Schwartz designs his model to give publishers a limited number of options, and to allow platforms to behave in a way that contradicts reality. In his model, the publisher only has three choices of how to operate in the video game industry: (i) it can distribute its game only on EGS; (ii) it can distribute its games on both Steam and EGS; or (iii) it can exit the industry.[175] Dr. Schwartz rules out option (i) because he makes assumptions that result in it being unprofitable for the publisher to sell only on EGS.[176] In both options (ii) and (iii), the publisher in Dr.

---

[173] Daemon Hatfield, "Introversion Gaining Steam," *IGN*, May 17, 2012, available at https://www.ign.com/articles/2006/08/23/introversion-gaining-steam, accessed on March 19, 2025 ("'Steam has made Introversion a commercial success and brought critical acclaim to Darwinia', said Thomas Arundel, Commercial Director of Introversion Software.").

[174] In contrast, Dr. Schwartz considers this result to be "unsurprising" and "economically reasonable." See Schwartz Report, ¶¶ 335–336 ("I also note that the sellers' economic profits on Steam are negative when the PMFN is in place, but seller profits across both platforms are zero. This is unsurprising. ... So, while publishers earning zero total economic profits (and negative profits on Steam) is economically reasonable, it is not a *critical* assumption, that is, it does not drive the result.").

[175] This range of options cover what can happen in what Dr. Schwartz calls his "interior solution" and "corner solution." See Schwartz Report, ¶ A32 ("In the above scenario [the interior solution], sellers would exit the market or sell just on EGS. ... One option the seller has is to exit the market entirely and pursue their next best option, earning zero economic profits (the definition of zero economic profits is the profits at the firm's next best option). The second option is to avoid the PMFN by selling only to EGS."), ¶ A43 ("To summarize, this process gives model outputs that satisfy the corner solution condition, that is, the seller is willing to stay in the market and sell on both platforms, for a given set of inputs"). In addition, the model assumes that publishers cannot publish only on Steam, despite Dr. Schwartz acknowledging that many publishers distribute their games through Steam but not through other platforms like EGS and GOG. See Schwartz Report, ¶ 346 ("Steam also offers many more games compared to competing platforms. For example, EGS offered 2,900 games in 2023 compared to Steam offering approximately 115,000 games as of early 2025. As another example, in 2020, GOG had over 4,700 products, compared to Steam's 39,825 games.").

[176] Under the PCM, if the publisher only distributes on EGS, then EGS can charge a higher revenue share because it is the only platform left in the industry (i.e., it becomes a "monopolist"). However, there needs to be enough demand on EGS so that the game price can be high enough for both the platform and the publisher to cover their costs. If that does not occur, then this is not a viable option because the publisher will make a loss and instead choose to exit the industry (where it would earn $0). Dr. Schwartz finds this to be the case in his "numeric analysis" of the PCM. See Schwartz Report, ¶ A32 ("The second option is to avoid the PMFN by selling only to EGS. This may seem like an attractive option; however, it would mean the seller sells to the other platform as a (now) monopolist."), ¶ A36 ("Note that these solutions only work if it's possible to earn a profit. If the sum of the costs are not below the choke price, $c_s + c_2 < A/M$, the seller and platform cannot price high enough to cover their costs. So, in this case, the seller cannot sell to the second platform as a monopolist and their next best option is to exit the market. ... In this case, the seller's only option outside abiding by Steam's PMFN is to exit the market and earn zero economic profits."), ¶ 336 ("In my main model, I assume leaving Steam would lower a game's demand. This results in single-homing on EGS being no better than exiting the market."). Assuming that EGS becomes a "monopolist" if publishers exit from Steam is an unrealistic assumption, as I explained in my class certification report. In the real world there are multiple publishers and multiple platforms; as such, a single publisher delisting a single game from Steam would not result in EGS becoming a monopolist. See also Langer Class Cert Report, ¶ 179.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Schwartz's PCM earns $0.[177] This is because Dr. Schwartz assumes that Steam can set its revenue shares in such a way as to cancel out any profits the publisher makes on EGS.[178] For example, in his PCM analysis, the publisher makes ▮▮▮▮▮▮ in profits on EGS, but then Dr. Schwartz assumes that Steam chooses a revenue share so that the publisher also loses ▮▮▮▮▮▮ on Steam.[179] This means that the publisher in Dr. Schwartz's model earns $0 *in total* when it lists on both platforms. Faced with these options, the publisher stays on both platforms. If it exits the industry, it would also earn $0 (i.e., there is no better option than staying on both platforms); if it lists only on EGS, it would earn a loss.[180] So, the publisher stays on both platforms and accepts the loss it earns on Steam. This result happens not

---

[177]  The publisher earning $0 if it exits the market is an assumption of the model. The publisher earning $0 if it publishes on both platforms is not an assumption, but it is the only way that Dr. Schwartz's PCM can explain the values of economic outcomes (e.g., revenue shares, market shares, etc.) that Dr. Schwartz input into the model. I explain this in further detail next. Schwartz Report, ¶¶ 335 ("Exiting the market would result in zero economic profits (by definition) for the developer and staying in the market also results in zero profits."), A18, A32 ("First, I check for an 'interior solution' but find that seller profits are negative on Steam. This means that Steam's profit maximization problem is not solved using the interior strategy since it is based on the assumption that sellers will sell on the platform. With negative economic profits, sellers would stop selling on Steam and instead pursue their next best alternative. Thus, I also check for a 'corner solution.' Rather than maximize their profits by setting marginal revenue equal to marginal costs, Steam would need to set its price at the highest level that still keeps the seller in the market. That is, they set their price at the point where the seller is just indifferent between selling on Steam and pursuing their next best alternative. ... What their next best option is depends on the demand parameters of the model.").

[178]  Dr. Schwartz assumes that Steam increases its revenue shares to the point that the publisher considers staying on Steam as no better than any of their other options. In Dr. Schwartz's main model, the publisher's next best option is to exit (and earn $0) because it is unable to make a profit when EGS is a monopolist (as explained above). Therefore, in Dr. Schwartz's main model, Steam sets its revenue share so that the publisher earns $0 total profit, i.e., where losses on Steam exactly cancel out profits on EGS. See Schwartz Report, ¶¶ 349 ("In my numeric analysis of the PCM, Valve maximizes its profits on Steam by setting its revenue share such that publishers are indifferent between staying on Steam and leaving the platform."), 351 ("[T]he optimal fee for Valve is the highest fee such that the publishers remain in the market and on the Steam platform. This is exactly the fee where publishers are indifferent between remaining on Steam and exiting the market entirely."), 335 ("I also note that the sellers' economic profits on Steam are negative when the PMFN is in place, but seller profits across both platforms are zero. ... If Valve sets its fee on Steam too high, causing the seller's total economic profits across both platforms to be negative, the seller will exit the market. For Valve to earn profits on Steam and keep developers in the market, developers must not earn negative *total* economic profits."). This is another unrealistic assumption. In the real world, there are multiple publishers with different incentives and preferences; as such, it would not be possible for Steam to set a single revenue share that can make *all* the publishers indifferent between staying on Steam versus exiting the industry. See Langer Class Cert Report, ¶ 179.

[179]  Schwartz Supplemental Report, Supplemental Table 4.

[180]  Schwartz Report, ¶¶ A32 ("The second option is to avoid the PMFN by selling only to EGS. This may seem like an attractive option; however, it would mean the seller sells to the other platform as a (now) monopolist."), A36 ("Note that these solutions only work if it's possible to earn a profit. If the sum of the costs are not below the choke price, $c_s + c_2 < A/M$, the seller and platform cannot price high enough to cover their costs. So, in this case, the seller cannot sell to the second platform as a monopolist and their next best option is to exit the market."). This is an unrealistic assumption, as I explained in my previous report. In the real world there are multiple publishers and multiple platforms; as such, a single publisher delisting a single game from Steam would not result in EGS becoming a monopolist. See also Langer Class Cert Report, ¶ 179.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

because this is what happens in the real world, but because Dr. Schwartz makes restrictive assumptions about what publishers can do and how platforms behave.

### 5.2.3. Dr. Schwartz's PCM generates predictions about economic profits that are inconsistent with economic theory

98.   Dr. Schwartz claims that he measures publishers' economic profits, rather than accounting profits, in his PCM.[181] In this section, I show that even if that interpretation is correct, the PCM's predictions are still inconsistent with economic theory. While economic profits are not observable in the real world,[182] economists can infer whether a firm's economic profits are positive based on whether a firm decides to enter or exit an industry. Put differently: if a publisher is losing money selling games on Steam, it will choose not to sell games on Steam. I use this principle to evaluate the PCM's predictions of what Dr. Schwartz claims are economic profits.

99.   To begin, Dr. Schwartz and I agree on the definition and interpretation of economic profits. We agree that economic profits account for opportunity costs and that these opportunity costs represent the value of the next best alternative available to an economic agent.[183] Firms base their strategic decisions, such as exiting an industry, on economic profits—which include opportunity costs.[184] Firms that earn positive economic profits have an incentive to stay in the industry, firms that earn negative

---

[181]   Schwartz Report, ¶¶ 329 ("My model calibration calculates that without the PMFN Policy, the seller's economic profits would increase from $0 to approximately ███████."), 335–336 ("My PCM is consistent with this requirement since economic profits in the PC gaming market (that is, across both platforms) for developers in my model are zero. ... So, while publishers earning zero total economic profits (and negative profits on Steam) is economically reasonable, it is not a critical assumption, that is, it does not drive the result."), Footnote 802 ("Recall again that economic profits are not the same as accounting profits. Zero economic profits reflect no incentive for firms to exit or enter the market and typically correspond to positive profits in a company's books and records.").

[182]   Because economic profits are typically not observable, I cannot perform an evaluation of comparing real-world economic profits to PCM-predicted economic profits (e.g., similar to the evaluation in Section 5.2.2). Dr. Schwartz acknowledges in his deposition that there is limited data about economic profits. See Schwartz Deposition, pp. 267:7–267:14 ("Q. Okay. And have you done any investigation of what publishers' actual economic profits are from selling games on Steam in the real world? A. There is limited data to calculate even accounting profits, much less economic profits.").

[183]   This means that a firm earning positive economic profits would remain in the industry (because the accounting profits it generates while operating in this industry are greater than its next best alternative), whereas a firm earning negative economic profits would exit the industry (because the accounting profits of operating in the industry are lower than that of the next best alternative).

[184]   Langer Class Cert Report, ¶ 170.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

economic profits may have an incentive to exit the industry, while firms that earn zero economic profits are indifferent between staying and exiting.[185]

100.  Using this economic principle, I can evaluate whether Dr. Schwartz's PCM generates reasonable predictions of economic profits by looking at whether publishers decide to stay in or exit the video game industry. Specifically, I test Dr. Schwartz's model predictions, and their implications on publishers' decisions regarding exit:[186]

i).  **Losses on Steam (i.e., negative profits) imply publishers exit from Steam.** Dr. Schwartz claims that his PCM predicts that publishers incur losses (earn negative economic profits) selling games on Steam. If publishers were losing money selling games on Steam, one would expect to observe these publishers exiting Steam and instead moving to alternative distribution platforms where they could earn money (positive economic profits).[187] Dr. Schwartz acknowledges this as well, stating that: "[w]ith negative economic profits, sellers would stop selling on Steam and instead pursue their next best alternative."[188]

ii).  **Zero total economic profits implies publishers are indifferent about staying in the industry.** Dr. Schwartz claims that his PCM predicts that publishers earn zero *total* economic profits (i.e., the economic profits

---

[185]  Mankiw (2018), pp. 250–251 ("[A] firm making positive economic profit will stay in business. ... When a firm is making economic losses (that is, when economic profits are negative), the business owners are failing to earn enough revenue to cover all the costs of production. Unless conditions change, the firm owners will eventually close down the business and exit the industry."); Jeffrey M. Perloff, *Microeconomics*, Seventh Edition, (Boston, MA: Pearson Education, 2014), p. 255 ("The firms that leave make zero economic profit, and those that stay make zero economic profit, so firms are indifferent as to whether they stay or exit.").

[186]  I only focus on the PCM predictions that Dr. Schwartz reports in Table 4 of his report as these results form the basis for Dr. Schwartz's conclusions about the impact of the challenged conduct. In the appendix of his report, he refers to these as the "Low ESG [sic] Monopoly Demand Model." Dr. Schwartz also considers a variation of his PCM where he makes a different assumption about what would happen if the publisher left Steam. He calls this the "High ESG [sic] Monopoly Demand Model." I do not consider the results of the "High ESG [sic] Monopoly Demand Model" relevant for the purposes of evaluating the PCM's predictions. This is because Dr. Schwartz himself acknowledges that this model is unable to predict (what he considers) the real world. See Schwartz Report, ¶ A46 ("Note that the second, 'High ESG [sic] Monopoly Demand Model' is not able to fit the facts of the case as well. The prices, fees, and quantities are further from the real-world values. Additionally, it assumes the seller would see a large boost in demand at EGS should the seller remove their game from Steam. I have no reason to think this is reflective of the typical seller experience. As such, I present the 'Low ESG [sic] Monopoly Demand Model' in the report.").

[187]  Langer Class Cert Report, ¶ 170.

[188]  Schwartz Report, ¶ A18 ("First, I check for an 'interior solution' but find that seller profits are negative on Steam. This means that Steam's profit maximization problem is not solved using the interior strategy since it is based on the assumption that sellers will sell on the platform. With negative economic profits, sellers would stop selling on Steam and instead pursue their next best alternative.").