# EXHIBIT 2
# Report Part 1

# (Dkt No. 456.02)

# REDACTED

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| IN RE: VALVE ANTITRUST LITIGATION | Case No. 2:21-cv-00563-JNW<br><br>HIGHLY CONFIDENTIAL –<br>ATTORNEY'S EYES ONLY |
| --- | --- |

# CORRECTED REPLY MERITS EXPERT REPORT OF GAUTAM GOWRISANKARAN, PH.D.

May 5, 2025

# Table of contents

1. INTRODUCTION .................................................................................................5

1.1. Qualifications .................................................................................................. 5

1.2. Allegations ...................................................................................................... 6

1.3. Assignment ..................................................................................................... 9

1.4. Summary of opinions ..................................................................................... 10

2. PLAINTIFFS' EXPERTS REBUT THE PROCOMPETITIVE EFFECTS OUTLINED IN MY OPENING REPORT WITH ARGUMENTS THAT ARE EITHER CIRCULAR OR INCONSISTENT WITH ECONOMIC PRACTICES .......................14

2.1. Plaintiffs' experts apply circular reasoning in dismissing the procompetitive effects that I identify instead of engaging with the substance .................................................................................. 15

2.2. Plaintiffs' experts wrongly dismiss the procompetitive effects that I identify, because they claim I did not consider the harm that they alleged in their opening reports ............................ 20

    2.2.1. As a matter of economic principles, one needs to consider procompetitive benefits and weigh them against any identified harm ... 21

    2.2.2. Plaintiffs' experts fail to demonstrate their first identified harm, that price parity exists ... 23

    2.2.3. Plaintiffs' experts fail to demonstrate their second identified harm, that price parity is caused by an anticompetitive PMFN ... 25

    2.2.4. Plaintiffs' experts fail to demonstrate their third identified harm, that publishers are constrained by a content PMFN ... 30

    2.2.5. Plaintiffs' experts fail to demonstrate their fourth identified harm, that Valve's revenue shares are supracompetitive ... 33

2.3. Plaintiffs' experts fail to account for procompetitive effects that improve outcomes for class members .......................................................................................................... 35

2.4. Inconsistent with economic practices, Plaintiffs' experts improperly dismiss evidence of competition outside of their preferred market ............................................................. 41

2.5. Also inconsistent with economic practices, Plaintiffs' experts fail to consider the importance of competition prior to the class period ............................................................ 50

3. PLAINTIFFS' EXPERTS FAIL TO REBUT THE PROCOMPETITIVE EFFECTS OF STEAM'S FEATURES AND POTENTIAL FOR FREE-RIDING ........................58

3.1. Plaintiffs' experts incorrectly assert that I failed to provide evidence that Steam's features have added value and continue to add value ................................................................. 58

3.2. Empirical analysis shows that Valve's marketing features benefit publishers, rebutting assertions of both Plaintiffs' Experts ..................................................................... 63

3.3. Plaintiffs' experts' review of the academic literature takes papers out of context and hence is not informative .......................................................................................................... 73

3.4. Plaintiffs' experts ignore that users can easily find cheaper prices elsewhere .................... 79

4. PLAINTIFFS' EXPERTS FAIL TO REBUT THE PROCOMPETITIVE EFFECTS ASSOCIATED WITH STEAM KEYS .........................................................................89

4.1. Plaintiffs' experts fail to recognize that Steam keys both have procompetitive benefits and the potential for free-riding ................................................................................. 89

4.2. Plaintiffs' experts overstate the role of microtransactions and DLC revenues in Steam earnings by failing to remove sales from Free-to-Play games ............................................ 93

4.3. Plaintiffs' experts' arguments regarding Steam keys platform annexation are inconsistent with the literature which depends on platforms favoring their own games ........................... 95

4.4. Plaintiffs' experts' assertion that Steam keys generate stickiness is inconsistent with the data that show that consumers frequently multi-home ................................................... 98

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

4.5.   Plaintiffs' experts incorrectly dismiss that Steam's effective revenue shares are lower than nominal revenue shares due to Steam keys issued to publishers at no additional charge...........100

4.6.   Dr. Schwartz implicitly concedes that Steam keys would decline in the but-for world .....101

5.   PLAINTIFFS' EXPERTS FAIL TO REBUT THE WAYS IN WHICH STEAM DIRECT LEADS TO PROCOMPETITIVE OUTCOMES ......................................103

5.1.   Plaintiffs' experts' opinions on worsening conditions for publishers on Steam are driven by mathematical interpretation errors ........................................................................103

5.2.   Plaintiffs' experts confound competition between publishers with anticompetitive conduct 108

6.   PROFESSOR RIETVELD'S "THREE-FACTOR" ANALYSIS DOES NOT DEMONSTATE ECONOMIC IMPACT ................................................................110

7.   CONCLUSION ..................................................................................114

A.   APPENDIX: LITERATURE CITED IN RIETVELD APPENDIX C ................115

A.1.   Theoretical Papers ........................................................................115

A.2.   Empirical Papers ..........................................................................133

A.3.   Conceptual Analyses, Case Law, and Literature Surveys ...............................137

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# Exhibit list

Exhibit 1    Valve's self-publishing features have lowered barriers to entry for games and publishers: January 2006 — December 2024...................................................36

Exhibit 2    ███████████████ takeover for ████████████████████ ████████████ ...................................................................................65

Exhibit 3    Daily U.S. Net Sales for ████████████████████████ ████████████ ...................................................................................66

Exhibit 4    The benefits from takeover marketing are largest for smaller games ..................69

Exhibit 5    Steam interface for the game Assassin's Creed Shadows displaying a hyperlink to the publisher's website, Ubisoft .................................................................82

Exhibit 6    Daily U.S. Steam Key Redemptions for ███████████████████ ████████ ...................................................................................87

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.    Introduction

# 1. INTRODUCTION

## 1.1. Qualifications

(1) My name is Gautam Gowrisankaran. I am a tenured Professor of Economics in Columbia University's Economics Department. I earned my B.A. from Swarthmore College in 1991 and my Ph.D. in Economics from Yale University in 1995. I have previously served as a visiting or regular faculty member at the University of Arizona, Harvard University, HEC Montréal, Universidad de los Andes (Chile), the University of Chicago, the University of Michigan, the University of Minnesota, Northwestern University, Washington University in St. Louis, and Yale University. I am a Research Associate at the National Bureau of Economic Research, a Research Fellow at the Centre for Economic Policy Research, and a recipient of a Doctorate Honoris Causa from the University of Oulu (Finland).

(2) I am an expert in the field of industrial economics. I have taught courses on industrial organization, competitive strategy, microeconomic theory, and econometrics at the undergraduate and graduate levels. My research has included the study of markets with network externalities and markets undergoing new technological adoption. I have published research in leading economics journals, including the *American Economic Review*, *Econometrica*, and the *Journal of Political Economy*. I serve, or have served, on the editorial boards of five economics journals, including the *American Economic Review* and the *RAND Journal of Economics*.

(3) I have received several grants from the National Science Foundation, the Agency for Healthcare Quality and Research, and private foundations to support my research. I am frequently invited to present my work in keynote speeches, at professional conferences, and at seminars. I have served on advisory panels for the U.S. Congressional Budget Office and other governmental entities. I have provided expert witness testimony on cases involving the analysis of antitrust claims, including claims related to market definition, market power, procompetitive benefits, and competitive effects on prices. I have also provided expert witness testimony in cases involving the rigorous application of statistical techniques to data, among other topics. I have received multiple awards for my litigation consulting work, including the 2024 American Antitrust Institute's Outstanding Litigation Achievement in Economics award. I attach my curriculum vitae, which includes a list of my prior testimony during the past five years, as **Appendix B**.

(4) I am being compensated for my work on this matter at my standard rate of $1,350 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I also receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

## 1.2. Allegations

(5) Named Plaintiffs in this matter, Wolfire Games and Dark Catt Studios ("Plaintiffs"), are video game developers that have sold games on the digital distribution platform, Steam, operated by Valve Corporation ("Valve" or "Defendant").

(6) As I have described both in my opening report and in my rebuttal report, Plaintiffs allege a theory of harm with several components.[1] I describe Plaintiffs' theory briefly below:

(a) Plaintiffs claim that Steam has monopoly power in an alleged relevant market for PC game distribution.[2]

(b) Plaintiffs allege a variety of forms of interlocking anticompetitive conduct, including Platform Most Favored Nation ("PMFN") requirements as to price and content that helps Valve maintain a supracompetitive revenue share.[3]

(c) Plaintiffs claim this alleged conduct forecloses competition and raises barriers to entry.[4]

---

[1] Rebuttal Merits Expert Report of Gautam Gowrisankaran, Ph.D., March 26, 2025 ("Gowrisankaran Rebuttal Merits Report"), Section 1.2.

[2] Consolidated Second Amended Class Action Complaint, *In Re: Valve Antitrust Litigation*, March 23, 2023 ("Complaint"), ¶ 390 ("Valve, through its ownership and control of Steam, has a monopoly in the PC game distribution market").

[3] Complaint, ¶¶ 9 ("Valve thus uses its PMFN to control the prices of games sold in the Steam Store and *in other stores*. Rather than lowering prices to Steam customers, Valve's PMFN has the effect of reducing price competition and raising game prices."), 17 ("Valve uses its control over Steam keys to coerce publishers into following its anticompetitive restrictions; it will restrict or cut off access to Steam keys for violations of its rules.").

[4] Complaint, ¶ 9 ("Valve forces game publishers to agree to a Platform Most-Favored-Nations Clause (the 'Valve PMFN') as a requirement to access Steam. ... Valve *prohibits* publishers from giving consumers *a better deal* on *other* stores that compete with Steam. Valve interprets and enforces this language to encompass price parity, forcing game publishers to charge the inflated Steam Store price across the marketplace, on *all* game sales, even sales of games that are not enabled for Steam.").

(d) Plaintiffs allege that, in combination, this alleged conduct insulates Valve from competition and results in a set of unfavorable market outcomes to the detriment of developers, publishers, consumers, and the overall health of the video game industry.[5] Plaintiffs allege that revenue shares are above the competitive level and quality is also below the competitive level.[6]

(7) On January 27th, 2025, I filed an opening report that discusses procompetitive effects associated with Valve's business model and Plaintiffs' theories of harm. On March 26th, 2025, I filed a report rebutting the analysis put forward by Dr. Schwartz and Professor Rietveld in their opening reports and Plaintiffs' theories. Plaintiffs' experts Dr. Schwartz and Professor Rietveld filed rebuttal reports on March 26th, 2025 in response to my opening report.[7] In summary, Plaintiffs' experts offer the following opinions in their rebuttal reports:

(a) They opine that my opening report analysis of procompetitive effects is incomplete because it allegedly does not take into account any anticompetitive effects of Valve's conduct.[8]

(b) They opine that the procompetitive effects I identified in my opening report fall outside of Plaintiffs' experts' proposed relevant market and outside of the class period, and thus are irrelevant.[9]

---

[5]    Complaint, ¶¶ 4 ("Valve uses its dominance over PC game distribution to impose and anticompetitively maintain a 30% commission on nearly every sale made through its store. This commission far exceeds what would prevail in a competitive market"), 392 ("Valve's commission rate is substantially higher than it otherwise would be in a competitive PC game distribution market free from Valve's anticompetitive practices.").

[6]    Complaint, ¶¶ 274 ("Valve's enforcement of the PMFN prevents publishers from discounting on rivals' platforms, blocking competition for consumers that could put downward pressure on Valve's supracompetitive 30% commission to publishers and preventing new entrants from achieving the scale necessary to meaningfully challenge Valve's dominance."), 320 ("Because Valve enjoys such strategic advantages in the relevant market, it also does not provide a competitive level of quality to publishers, including Plaintiffs, in terms of the Steam Store because it does not need to do so in order to compete.").

[7]    Rebuttal Merits Expert Report of Steven Schwartz, Ph.D., March 26, 2025 ("Schwartz Rebuttal Merits Report"); Expert Rebuttal Report of Professor Joost Rietveld, March 26, 2025 ("Rietveld Rebuttal Merits Report").

[8]    Schwartz Rebuttal Merits Report, Section 2.1 ("Dr. Gowrisankaran's analysis of the competitive impact of the challenged conduct is incomplete … Dr. Gowrisankaran inappropriately conflates the concepts of conduct having some procompetitive effects or benefits with that conduct being procompetitive, on balance. His analysis thus suffers from a fundamental flaw: one cannot conclude that conduct is, on balance, procompetitive, just by looking at any alleged procompetitive benefits, as Dr. Gowrisankaran does."); Rietveld Rebuttal Merits Report, Section VI.F ("Dr. Gowrisankaran only considered purportedly procompetitive effects of Valve's parity requirements without acknowledging or addressing the anticompetitive effects that Plaintiffs and their experts have alleged and put forth, respectively.").

[9]    Schwartz Rebuttal Merits Report, Section 2.2 ("There is an even more fundamental problem with Dr. Gowrisankaran's analysis: he does not explain how any of the claimed procompetitive actions are procompetitive within the relevant market I determine or, for that matter, any other relevant market that he might believe is appropriate. … As such, his

(c) They opine that the procompetitive benefits of Valve's business model that I describe in my opening report are irrelevant because allegedly none of them are connected to the alleged conduct (which they now describe as just the alleged PMFN).[10]

(d) They opine that the opinions I offered in my opening report are allegedly "fully consistent" with Professor Rietveld's three-factor analysis of Steam's alleged anticompetitive market dominance.[11]

(e) They opine that my analysis of the academic economic literature on free-riding is incomplete because it allegedly ignores the potential anticompetitive effects of PMFNs.[12]

(f) They opine that there is not enough evidence that showrooming would justify a PMFN policy on Steam.[13]

---

conclusions are irrelevant to the question at hand in this case."); Rietveld Rebuttal Merits Report, Section IV ("Dr. Gowrisankaran's discussions are irrelevant to, and distracting from, what I understand to be the relevant issues in this matter—that is, the effects of the alleged conduct on competition among worldwide third-party PC game distribution platforms from January 28, 2017 through the present, and the harm that flows therefrom.").

[10]   Schwartz Rebuttal Merits Report, Section 2.3 ("An even more serious flaw in Dr. Gowrisankaran's analysis is that none of the claimed procompetitive benefits is connected to, flows from, or is dependent upon the alleged PMFN policy.").

[11]   Rietveld Rebuttal Merits Report, Section V ("Given that Dr. Gowrisankaran acknowledges Steam competes in the multi-sided market for third-party digital PC game distribution via platforms, I considered the various observations he made throughout his report within the same three-factor construct I employed in my January 2025 Report. In doing so, I demonstrate that Dr. Gowrisankaran's observations, while incomplete, are fully consistent with my own and therefore support the conclusion that the market for third-party digital PC game distribution via platforms *should* be characterized by multiple successful competing platforms, in the absence of anticompetitive conduct.").

[12]   Schwartz Rebuttal Merits Report, Section 3.1 ("Dr. Gowrisankaran's review of the literature focuses only on possible procompetitive benefits and ignores the anticompetitive effects."); Rietveld Rebuttal Merits Report, Section VI.B ("By ignoring most academic literature addressing PMFNs, Dr. Gowrisankaran failed to present and weigh the harmful effects of PMFNs summarized above against the purported procompetitive effects he claims Valve's parity requirements can have.").

[13]   Schwartz Rebuttal Merits Report, Sections 3.2 ("For a PMFN to have any procompetitive effect, there must be investments made on features subject to showrooming. Dr. Gowrisankaran presents a list of alleged improvements made to Steam; however, he does not analyze or present any evidence to show which of these improvements, if any, are related to marketing and potentially subject to showrooming."), 3.4 ("Valve disincentivizes showrooming by offering numerous features that can only be utilized if a game is played through Steam."); Rietveld Rebuttal Merits Report, Sections VI.C ("Dr. Gowrisankaran did not identify any instances of showrooming that were, or could have been, mitigated by Valve's parity requirements, which he claims is the reason Valve uses its parity requirements."), VI.D ("in a world without Valve's content-parity requirements, its purported concerns about showrooming on so-called Steam marketing services would be alleviated given that showrooming is more difficult where content is differentiated across competing platforms.").

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(g) They opine that Valve uses Steam keys to strengthen its market power by steering users into Steam.[14]

(h) They opine that the procompetitive benefits of Steam keys I analyze in my opening report are allegedly trivial and not related to, or justified by, the alleged PMFN.[15]

(i) They opine that Steam keys do not affect the effective revenue share publishers pay to Valve.[16]

## 1.3. Assignment

(8) I have been asked by counsel for Valve to reply to Dr. Schwartz's and Professor Rietveld's rebuttal reports. In particular, I address the following questions:

(a) Are Plaintiffs' experts' reasons to dismiss the procompetitive effects I describe in my opening report economically valid? (Section 2)

(b) Do Plaintiffs' experts appropriately analyze the procompetitive effects and potential for free-riding of Steam features and Steam keys? (Sections 3 and 4)

(c) Do Plaintiffs' experts appropriately characterize the effect of Valve's investments in Steam features on economic outcomes? (Section 5)

(d) Are the opinions I offered in my rebuttal report regarding Professor Rietveld's "three-factor analysis" changed based on Plaintiffs' experts' rebuttal reports? (Section 6)

---

[14] Schwartz Rebuttal Merits Report, Sections 4.1 ("Steam Keys help Valve reach consumers who may not be on Steam already, giving publishers an even larger user base with which to transact."), 4.3 ("Dr. Gowrisankaran ignores the fact that Steam Keys create stickiness and make it difficult for rival platforms to build network effects."); Rietveld Rebuttal Merits Report, Section VI.E ("Valve uses [Steam keys] as a strategic tool to exert control over PC game retailers and draw players and publishers to Steam.").

[15] Schwartz Rebuttal Merits Report, Sections 4.2 ("these claimed procompetitive benefits [from Steam keys] are (a) overstated and (b) in any event, not dependent on the PMFN."), 4.4 ("In the but-for world, in the absence of a PMFN, Valve could continue to limit the number of Steam Keys that are made available to publishers, just like it does in the real world. Dr. Gowrisankaran does not consider this possibility.").

[16] Schwartz Rebuttal Merits Report, Section 4.5 ("Steam Keys are a *feature* or a *service* that Valve offers publishers; publishers can use Steam Keys to derive additional value and reach audiences that may not be on Steam. As such, this service does not 'constitute a discount on the average share of the revenue that a publisher pays to Valve from what it collects from customers who go on to play their games on Steam,' as claimed by Dr. Gowrisankaran.").

(9) To answer these questions, I rely on several sources of information, including data produced by Valve in this case, deposition testimony, documents produced by Valve and others, relevant public information on the gaming industry, and academic research. I also reviewed the opening and rebuttal reports submitted by Dr. Schwartz and Professor Rietveld and relevant supporting materials, as well as the rebuttal reports submitted by Professors Lesley Chiou and Ashley Langer.

(10) **Appendix C** to this report lists the documents, datasets, and testimony upon which I rely to form my opinions.

## 1.4. Summary of opinions

(11) In their rebuttal reports, Dr. Schwartz and Professor Rietveld fail to engage with my analysis of procompetitive effects that I presented in my opening report. Instead, they rely on flawed conceptual arguments to dismiss the procompetitive benefits I identified rather than providing reliable evidence to rebut them.

(12) In **Section 2** of my report, I explain why Dr. Schwartz's and Professor Rietveld's approach to addressing the evidence on the procompetitive benefits of Valve's business model is focused on flawed and often circular conceptual arguments.

(a) They assert that the procompetitive benefits I describe are not tied to the alleged conduct, and the alleged PMFN in particular, and are therefore irrelevant. This is incorrect; the procompetitive benefits of Steam's platform features are an essential part of the analysis of key elements of their theory: the assessment of how Steam grew its market share and maintained it, the assessment of Valve's revenue shares as an alleged exercise of market power, and the assessment of Valve's emails to publishers discussing their offers on other platforms are all critical parts of their theory.

(b) They dismiss the procompetitive benefits on the basis that I do not conduct a balancing of the procompetitive benefits against the anticompetitive harms. I take no position on whether such balancing is ultimately required as a legal matter. But such balancing is not required to establish the *existence* of a procompetitive benefit. In any event, as I demonstrated in my rebuttal, I have engaged with their purported evidence of harm and have demonstrated that it is entirely unreliable. Instead, the evidence shows that price parity does not hold for games on Steam and other platforms often have lower prices for games sold on Steam; that the actions that Plaintiffs assume enforce the PMFN do not in fact result in pricing behavior consistent with a PMFN; and that Valve's revenue shares are not supracompetitive. In other words, there is no PMFN, and the alleged conduct does not result in competitive harm. Therefore, any balancing of procompetitive and anticompetitive impacts (which I am able to assess using the analyses in both my opening and rebuttal reports) would not support Plaintiffs' position. Plaintiffs' experts have not tried to conduct this analysis, despite having the opportunity to do so in their rebuttal reports.

(c) They dismiss the procompetitive benefits on the basis that those benefits fall outside the market definition set by Dr. Schwartz, even though this is narrower than other markets that have been described by the Plaintiffs, including a "PC game distribution market" described in the complaint. My own analysis suggests that Dr. Schwartz's market is overly narrow by, at a minimum, excluding first-party distribution. Regardless, Plaintiffs are incorrect in suggesting that the benefits I identified depend on rejecting Dr. Schwartz's market definition (which is, in my view, underinclusive); those benefits are present even in his alleged market. In addition, Plaintiffs' approach of dismissing competitive effects because of their market definition rather than assessing market definition based on competitive effects *demonstrates* that Dr. Schwartz's proposed market is too narrow.

(d) Plaintiffs also dismiss procompetitive effects from innovations that Valve introduced prior to the class period. Class members benefitted from the innovations I described in my opening report, and Valve's history of innovation both before and during the class period provides evidence that Valve has had to compete since its initial launch and does not charge a supracompetitive revenue share.

In **Section 3**, I explain that both Plaintiffs' experts have failed to rebut the evidence of Valve's procompetitive investments in Steam and innovation in its platform features, which provide value to developers, publishers, and consumers and lead to more vigorous competition in the industry. I provide additional evidence, building on what I presented in my opening report, that Steam's marketing features create value for publishers. I also demonstrate that Professor Rietveld's review of the academic literature, which he claims demonstrates that PMFNs are anticompetitive, is incorrect in its conclusion, especially when applied to Steam. Finally, I provide additional evidence on the ability of consumers to easily identify low-price deals across many platforms, which addresses Dr. Schwartz's claim that Steam is not vulnerable to showrooming.

In **Section 4**, I explain that Plaintiffs' experts have failed to rebut the evidence that Steam keys (a) provide a procompetitive benefit to publishers and (b) are particularly subject to free-riding. Plaintiffs' experts' approach is to focus on potential (and in many cases overstated) benefits that they claim Valve derives from issuing Steam keys. They do not engage with the fact that Steam keys create an incentive for publishers to price offers on Steam that are higher than on other channels, which reduces Valve's revenues and harms the Steam brand. That Valve derives benefits from collaborating with publishers is irrelevant to the question of whether publishers also benefit (they do, given that Steam keys are a benefit they receive at no cost). I also explain that Plaintiffs' experts rely on flawed economic logic to argue that Steam keys are anticompetitive because they draw consumers and publishers to Steam. In contrast, that is how competition works, firms offer attractive terms and benefits to users to draw users away from competitors and to their own products. Furthermore, Plaintiffs' experts fail to consider that users are not locked in to Steam, and that costs to multihoming among Steam and competing distributors are low.

In **Section 5**, I continue to highlight a theme in Plaintiffs' experts' arguments: they misinterpret procompetitive benefits and present them as anticompetitive strategies. In particular, I address Professor Rietveld's theory that Steam's self-publishing tools and the associated increase of publishers and games on Steam have harmed publishers. Consistent with my rebuttal report, I explain that Plaintiffs' experts turn basic economic principles on their head. Rather than harming publishers or reducing competition, these innovations reduce the costs of publishing games and lower entry barriers for developers and publishers, increase choice for consumers, and intensify competition over video game content. Professor Rietveld's analysis that he claims "shows" publishers have earned less revenues is mathematically incorrect and falls into the trap of confusing harm to competition with harm to competitors. The reality is that total output has increased. This procompetitive expansion is shared across a larger pool of publishers.

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.

Introduction

(16)    Finally, in **Section 6**, I reiterate that Professor Rietveld's three-factor analysis is not a standard or reliable framework to evaluate whether Valve's conduct is anticompetitive. His framework is not able to reliably answer this question. Moreover, in his rebuttal report he makes claims about direct network effects—one of his three factors—that when reliably evaluated undermine his conclusions.

## 2.  PLAINTIFFS' EXPERTS REBUT THE PROCOMPETITIVE EFFECTS OUTLINED IN MY OPENING REPORT WITH ARGUMENTS THAT ARE EITHER CIRCULAR OR INCONSISTENT WITH ECONOMIC PRACTICES

(17)    In my opening report, I identified a variety of procompetitive effects that relate to Plaintiffs' allegations, and the practices that Valve has used in developing and operating Steam. In their rebuttal reports, Plaintiffs' experts do not consider the procompetitive effects I outlined in my opening report, nor do they demonstrate that their alleged harm exceeds these procompetitive effects. Plaintiffs' experts also do not provide convincing rebuttals of the procompetitive effects I identify (and for some effects do not provide an economic rebuttal at all). Instead, Plaintiffs' experts provide a series of conditions that, in their view, rationalize their decision not to consider the procompetitive effects of Valve's innovations. These conditions do not change or undermine my analysis. Contrary to Plaintiffs' experts' claim that the procompetitive effects in my opening report are "irrelevant," they directly relate to the economics underlying the theory of harm in this case.

(18)    In this section:

(a) I discuss the underlying logic Plaintiffs' experts provide in attempting to dismiss the procompetitive effects I outlined in my opening report. I explain that Plaintiffs' experts' explanations are disconnected from the economics underlying their theory of harm and ultimately rely on circular reasoning (Section 2.1).

(b) I address Dr. Schwartz's contention that my analysis failed to weigh procompetitive benefits against his alleged anticompetitive harm. This type of weighing is not necessary to identify a procompetitive benefit. Moreover, I have assessed Dr. Schwartz's alleged economic impact and have found that none exists. On the other hand, Dr. Schwartz provides no effort to consider the procompetitive effects I outline in my opening report or show that any anticompetitive effects outweigh them (Section 2.2).

(c) I address Dr. Schwartz's contention that several of the procompetitive effects I describe in my opening report are unrelated to the alleged conduct. I explain that, to the contrary, the effects I describe undermine Plaintiffs' theory of harm, including Plaintiffs' theory that Valve has acquired and abused monopoly power to charge a supracompetitive revenue share (Section 2.3).

(d) I address Dr. Schwartz's and Professor Rietveld's apparent position that competition and procompetitive effects are only relevant when falling within the precise bounds of Dr. Schwartz's proposed market definition. Nothing in their analysis undermines my findings of procompetitive effects in this case (Section 2.4).

(e) I address Dr. Schwartz's and Professor Rietveld's apparent position that competition prior to the class period cannot inform their theory of harm. In this matter, evidence from this period is important—Dr. Schwartz and Professor Rietveld frequently cite evidence from this period in support of their own conclusions. But what the evidence from prior to the class period shows is that Valve did not have monopoly power at launch, and only lowered its prices since—behavior that is not consistent with it having acquired and abused monopoly power (Section 2.5).

## 2.1. Plaintiffs' experts apply circular reasoning in dismissing the procompetitive effects that I identify instead of engaging with the substance

(19) In my opening report, I described Steam's history of innovation, its introduction of new features, and the various ways in which these features have benefitted publishers and consumers.[17] I further discussed how these innovations and features are output-enhancing and meet the economic definition of being procompetitive.[18]

(20) The procompetitive benefits I describe in my opening report are directly relevant to Plaintiffs' theory of harm. Plaintiffs describe a theory of harm in which (a) Steam has monopoly power, (b) Valve enforces a PMFN that has led to price parity, (c) competition in the gaming industry has been foreclosed, and (d) Valve exercises market power by setting supracompetitive revenue shares and investing less in innovation than it would in the but-for world.[19]

(21) The features I analyze speak directly to economic outcomes and, in that way, they speak directly to Plaintiffs' theory of harm:

---

[17]    Expert Report of Gautam Gowrisankaran, Ph.D., January 27, 2025 ("Gowrisankaran Opening Merits Report"), Section 3.

[18]    Gowrisankaran Opening Merits Report, Section 2.1.

[19]    Gowrisankaran Rebuttal Merits Report, Section 3.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(a) My analysis of competition and innovation prior to the class period speaks to Plaintiffs' claims that Valve has monopoly power and has abused its alleged power through supracompetitive revenue shares. As I explained in my rebuttal report, Valve did not have market power at the launch of Steam, and has only decreased its nominal revenue shares since launch.[20] Furthermore, Valve's investments and innovations prior to the class period lead to a higher quality platform during the class period.[21] This rebuts Plaintiffs' experts' contention that Valve has ever acquired or abused its alleged monopoly power, or charged supracompetitive revenue shares.[22]

(b) My analysis of Steam's innovations and features speaks directly to Plaintiffs' claims that Valve has abused market power by charging supracompetitive revenue shares and by innovating less than it would in the but-for world. Assessing whether Valve's revenue shares are supracompetitive requires assessing the quality of, and value received from, Steam—including by assessing Steam's innovations and features.[23]

(c) My analysis of features related to marketing, search, and game discovery relates directly to the economics of the alleged conduct. Plaintiffs challenge Valve's conduct in sending emails to publishers who are receiving promotional benefits on Steam yet charging lower prices elsewhere.[24] I discuss the economics relating to Steam's marketing features and free-riding on them, and Plaintiffs' experts' purported rebuttal, in Section 3.

(d) My analysis of Steam keys and features that consumers are able to take advantage of when redeeming Steam keys speaks directly to the economics of the alleged conduct. Plaintiffs challenge Valve's conduct in its guidelines for requesting Steam keys, including language asking that publishers not offer more attractive terms to consumers buying games via Steam key than those buying the same game directly on Steam. I discuss the economics relating to free-riding on Steam keys, and Plaintiffs' experts' purported rebuttal, in Section 4.

---

[20] Gowrisankaran Rebuttal Merits Report, Section 8.1 ("As its customer base has grown, Valve's revenue shares have only decreased. That is, Valve's initial revenue share rates were not supracompetitive and, since they have only decreased over time, Valve cannot be exercising monopoly power today either."). As I will discuss in Section 4.5, Dr. Schwartz argues that nominal revenue shares (as opposed to effective revenue shares, that factor in discounts) are the relevant measure of for assessing Valve's allegedly supracompetitive rates.

[21] Gowrisankaran Rebuttal Merits Report, Sections 4 and 7.3. See also Section 2.5 of this report.

[22] Gowrisankaran Rebuttal Merits Report, Section 8.1.

[23] Gowrisankaran Rebuttal Merits Report, Section 8.3.

[24] Gowrisankaran Opening Merits Report, Section 4.3; Opening Merits Expert Report of Steven Schwartz, Ph.D., January 27, 2025 ("Schwartz Opening Merits Report"), Section 5.2.

(22)    In their opening reports, Plaintiffs' experts omit issues that directly relate to their theory of harm by failing to discuss or consider many of the output-enhancing features I summarized in my opening report. For example, Plaintiffs' experts conclude that Valve had and abused monopoly power but do not assess when that power was acquired or how monopoly power changed Valve's conduct. Similarly, Plaintiffs' experts conclude that Valve had and abused market power, but do not consider the value of features or innovation in making this assessment.[25]

(23)    Despite these omissions, in their rebuttal reports, Plaintiffs' experts do not update their analyses to factor in the procompetitive effects that I identify.[26] Moreover, in many instances, Plaintiffs do not rebut that class members benefitted from the procompetitive effects I described in my opening report.[27] Instead, Plaintiffs' experts argue that (a) many of the procompetitive effects I list exist outside the alleged PMFN, supposedly making them irrelevant[28] and (b) that I did not weigh the size of procompetitive effects relative to the harm from a PMFN.[29]

---

[25]    Schwartz Opening Merits Report, ¶ 284 ("A comparison of Steam's innovations, features, and quality relative to those of other platforms in the *actual world* cannot serve to assess Valve's anticompetitive conduct.").

[26]    For example, I show that Steam Direct lowered barriers to entry for publishers, but Dr. Schwartz conducts no analysis of the publishers who benefitted from Steam Direct, and Professor Rietveld incorrectly interpreted this increase in competition as anticompetitive "overcrowding." Professor Rietveld uses a mathematically flawed approach that is unsupported by basic economic reasoning. I discuss this in more detail in Section 5 of this report and in Sections 8.5.2 and Appendix A5 of my rebuttal report. See Gowrisankaran Rebuttal Merits Report, Section 8.5.2 and Appendix A5.

[27]    For example, I talk about how Valve's innovations have "Lower[ed] the cost of developing and testing new content" and "Expand[ed] game functionality and player engagement." Dr. Schwartz states that two of the features I mentioned in support of these points, Steam Cloud and Steam Families, "are only available if games are played on Steam" and "None of these features are tied to the alleged conduct" but fails to show that class members did not benefit from these features. Professor Rietveld states that Steam Families "was an extension of the Steam Family Sharing feature that was announced 11 years earlier" and that hardware devices "fall outside the market for third-party digital PC game distribution via platforms" but again, does not show that class members did not benefit from these features. See Gowrisankaran Opening Merits Report, ¶¶ 89–98; Schwartz Rebuttal Merits Report, ¶ 59; Rietveld Rebuttal Merits Report, ¶¶ 85, 90–91.

[28]    Schwartz Rebuttal Merits Report, Section 2.3 ("The claimed procompetitive benefits are unrelated to the alleged PMFN Policy").

[29]    Schwartz Rebuttal Merits Report, ¶¶ 19 ("Because he does not weigh the claimed procompetitive benefits against the anticompetitive effects of Valve's behavior, his analysis is insufficient to support any meaningful economic conclusions in the matter at issue."), 22 ("Dr. Gowrisankaran does not analyze how competition within the market for third-party digital PC game distribution platforms have been affected by Valve's claimed procompetitive actions and thus cannot show that the anticompetitive effects of Steam's alleged PMFN policy are outweighed by any claimed procompetitive benefits in the relevant market."), 43 ("Dr. Gowrisankaran's review of the literature focuses only on possible procompetitive benefits and ignores the anticompetitive effects. Further, he does not weigh one set against the other."), 45 ("Given that Dr. Gowrisankaran has no opinion

(24)    Taking the criticism on its own terms, this criticism is fundamentally circular. As I explained in my rebuttal report, Plaintiffs have not provided convincing evidence that a PMFN exists or that it caused harm. Yet, they insist that they cannot assess the procompetitive effects that I identify because they are allegedly outside the PMFN. Moreover, the challenged conduct is not limited to the alleged PMFN.

---

on whether the PMFN Policy exists or its effectiveness if it does, he cannot show that the alleged PMFN Policy is required to sustain Steam's marketing features. Thus, he has not and cannot show that any alleged procompetitive benefits outweigh the anticompetitive effects.").

(25) In a similar way, Plaintiffs argue that some of the evidence of competition, entry, and innovation I discuss in my opening report is irrelevant because it is outside of Dr. Schwartz's proposed relevant market.[30] Dr. Schwartz's proposed relevant market is not the only relevant market put forward in this matter. For example, the Complaint refers to a "PC game distribution market," and Professor Chiou defines the relevant market as "PC and console game distribution."[31] These alternative market definitions suggest that many of the examples omitted from Dr. Schwartz's market are relevant forms of competition. As I explained in my rebuttal report, Dr. Schwartz's decision to exclude self-distribution results in an overly narrow market.[32] Furthermore, even taking Dr. Schwartz's proposed market as given, this evidence on competition that is allegedly outside the market would be relevant. Comparing Steam to competitors is a useful way of benchmarking innovation and understanding how firms provide value. For instance, Dr. Schwartz makes price comparisons between Steam and firms outside of his preferred market for his yardstick approach.[33] Dr. Schwartz does not provide an explanation for why his yardstick approach is economically valid, but assessing innovation by comparing Steam to other video game platforms is not.

(26) Rather than dispute the procompetitive nature of the benefits I describe in my opening report, Plaintiffs' experts instead argue they should simply be ignored because they are allegedly not tied to their alleged PMFN, outside of their preferred market, or existed prior to the class period. Seemingly the only way for Plaintiffs' experts to agree to the existence of the procompetitive benefits I outline in my opening report, would be if they were preconditioned on Plaintiffs' market definition and Plaintiffs' allegation of harm, *even when the effects I describe directly undermine Plaintiffs' theory of harm.*

---

[30] Schwartz Rebuttal Merits Report, Section 2.2 ("There is an even more fundamental problem with Dr. Gowrisankaran's analysis: he does not explain how any of the claimed procompetitive actions are procompetitive within the relevant market I determine or, for that matter, any other relevant market that he might believe is appropriate."); Rietveld Rebuttal Merits Report, Section IV ("While the majority of Dr. Gowrisankaran's report is allocated to his discussion of Valve's purported procompetitive effect on the video game industry, little of that discussion addresses what I understand to be the relevant market (the worldwide market for third-party digital PC game distribution via platforms) during the class period in this matter (on or after January 28, 2017 and continuing through the present).").

[31] Complaint, ¶ 26; Rietveld Rebuttal Merits Report, ¶ 5.B; Merits Expert Report of Lesley Chiou, Ph.D., March 26, 2025 ("Chiou Rebuttal Merits Report"), ¶ 269 ("In a properly defined market in this matter—which, as I establish throughout my report, includes at least all global video gaming sales on PC and console distribution channels along with multi-game subscriptions, cloud gaming, and physical sales (or "global PC and console distribution" sales)—and with an accurately calculated market share, I find that Valve's market share was **on average ▇▇ percent** during the Class Period and has **never exceeded ▇ percent**.").

[32] Gowrisankaran Rebuttal Merits Report, Sections 5.2 and 5.3.

[33] Schwartz Opening Merits Report, Section 7.3.

(27)    In sum, while I disagree that there is evidence of anticompetitive harm and further disagree with Dr. Schwartz's proffered market definition, the procompetitive benefits I have identified are directly responsive to the challenged conduct in this case and are directly responsive, regardless of whether I accept Dr. Schwartz's proposed market.

## 2.2. Plaintiffs' experts wrongly dismiss the procompetitive effects that I identify, because they claim I did not consider the harm that they alleged in their opening reports

(28)    Dr. Schwartz dismisses the procompetitive effects I identified in my opening report on the basis that I did not perform a balancing of those benefits against potential harms that may arise from Valve's alleged conduct.[34] This approach to rebutting the evidence I present is problematic. First, it is of course possible to *identify* procompetitive effects prior to balancing them against anticompetitive harms. Second, even if one takes as given the harms that Plaintiffs allege, Plaintiffs' experts have not engaged in the type of balancing that they claim I omit. Third, their rejection of the competitive benefits I have identified is flawed because my analysis finds that there is no evidence of the harms they have alleged, and therefore there is no balancing required. There is no PMFN and there is no price parity: publishers are pricing in a way that is inconsistent with a policy that constrains their ability to offer lower prices off Steam than on Steam. There is also no reliable evidence that any requirements by Valve related to content offered on Steam, relative to that on other platforms, serve as a competitive constraint on what content publishers choose to offer. Finally, there is no evidence that Valve's revenue shares are supracompetitive.

---

[34]    Schwartz Rebuttal Merits Report, ¶¶ 11 ("Dr. Gowrisankaran inappropriately conflates the concepts of conduct having some procompetitive effects or benefits with that conduct *being* procompetitive, on balance."), 13 ("Dr. Gowrisankaran fails to consider whether there are, and the nature of any, anticompetitive effects. Because this balancing is critical in determining whether a given behavior is, on balance, pro- or anti-competitive, Dr. Gowrisankaran's analysis is incomplete, and his conclusions lack an adequate foundation.").

### 2.2.1. As a matter of economic principles, one needs to consider procompetitive benefits and weigh them against any identified harm

(29)   I agree with Dr. Schwartz that a complete economic analysis of any conduct requires consideration of both the potential competitive benefits and harms that arise from that conduct, though I disagree that this balancing is required to identify the existence of a procompetitive benefit in the first place.[35] However, neither Dr. Schwartz nor Professor Rietveld have incorporated consideration of the procompetitive benefits I discussed in my opening report into their assessment of impact of the alleged conduct. They had the opportunity to do this in their rebuttal reports. By neglecting to consider these effects, their analysis is necessarily incomplete.

(30)   Dr. Schwartz makes precisely this argument in relation to my analysis. In his rebuttal report, he argues that I did not establish that the procompetitive effects I have identified outweigh the competitive harms resulting from a PMFN that leads to price parity.[36] This argument fundamentally misses the bottom line of my opening report: I did not agree that the alleged conduct (the PMFN) exists and therefore did not propose that there is an offsetting effect to the alleged competitive harms it generates. Instead, I explained that all the factual evidence is consistent with a procompetitive business model in which Steam competes through the quality of its features and continuous innovation, and takes limited measures to prevent publisher free-riding which would harm its incentives to invest and innovate and therefore its ability to compete.

---

[35]   U.S. Department of Justice and the Federal Trade Commission, "Merger Guidelines," December 18, 2023, p. 21 ("If the merger raises concerns that its effect may be to entrench or extend a dominant position, then any claim that the merger also provides competitive benefits will be evaluated under the rebuttal framework in Section 3. For example, the framework of Section 3 would be used to evaluate claims that a merger would generate cost savings or quality improvements that would be passed through to make their products more competitive or would otherwise create incentives for the merged firm to offer better terms.").

[36]   Schwartz Rebuttal Merits Report, Section 2.1 ("Because he does not weigh the claimed procompetitive benefits against the anticompetitive effects of Valve's behavior, his analysis is insufficient to support any meaningful economic conclusions in the matter at issue.").

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(31)   Further, *Plaintiffs' experts have not provided convincing evidence that any such harm even exists.* As I explain in my rebuttal and in Sections 2.2.2 through 2.2.5 below, the evidence does not support that Plaintiffs' alleged harms exist. First, the evidence shows that there is not widespread price parity for games on Steam; it is instead common for games that are available on Steam to be sold by publishers at lower prices on other channels. Second, the evidence presented by Plaintiffs' experts has not established that the alleged conduct caused publishers to price as if they were subject to a PMFN. In other words, the evidence does not support that a PMFN policy existed. Third, Plaintiffs' experts failed to demonstrate that Valve's requirements for publishers to not degrade the quality of games on Steam relative to what they offer consumers on other channels impacted publishers' decisions on game quality in a way that harmed competition. Finally, Plaintiffs' experts failed to demonstrate that Valve's revenue shares were supracompetitive. Therefore, there is no balancing to be done; there is no PMFN and no competitive harm.

(32)   In Sections 3 through 5, I explain that Plaintiffs' experts have not provided evidence to counter my analysis that Valve's business practices have important procompetitive benefits (since, as I explained above, their approach is to dismiss it on principle rather than based on an assessment of the evidence). Given that I show that there is no evidence of competitive harms and given that Dr. Schwartz and Professor Rietveld fail to rebut the procompetitive effects I described in my opening report, the net effect of the economic evidence demonstrates that Valve's business practices create value for publishers and consumers and encourage more vigorous competition in the industry.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### 2.2.2. Plaintiffs' experts fail to demonstrate their first identified harm, that price parity exists

(33) If the alleged PMFN policy existed and impacted competition, then it would need to be true that price parity was being achieved for games on Steam to a large degree. In my rebuttal report, I evaluated the Plaintiffs' claims that Valve enforced price parity through an alleged PMFN, which they argue hindered rival platforms from competing on price.[37] I found compelling evidence that refutes these allegations: price parity does not hold, as games are frequently offered at deeper discounts on other platforms than Steam, and average prices for games are often lower on other platforms than on Steam. The gaming press recognizes and promotes the fact that steep discounts are available outside of Steam through channels like Humble Bundle or Fanatical.[38] Discount stores would not be able to carve out their existing niche in the market if the alleged PMFN truly caused price parity across platforms.

(34) Specifically, using publicly available pricing data from IsThereAnyDeal.com (ITAD), the same source used by Dr. Schwartz in his opening report, I conducted several analyses.[39] My analyses covered a large selection of games and platforms, from 2012 to 2024. In every case, the evidence did not support the existence of price parity for games on Steam.

(a) First, I examined whether it is common for Steam prices to be higher than the best prices off Steam on a given day. I find that it is.[40]

---

[37] Complaint, ¶ 169 ("Under the Valve PMFN, publishers cannot offer their games at lower prices elsewhere, even when they are selling non-Steam versions of games.").

[38] Toussaint Egan and Tyler Colp, "10 Great Steam Spring Sale Games to Grab at a Discount," *Polygon*, March 14, 2025, available at https://www.polygon.com/what-to-play/537879/steam-spring-sale-2025-best-games-death-stranding-directors-cut-neon-white-sifu, accessed on March 14, 2025 ("Just to note: if you're looking for discounts on *Monster Hunter Wilds, Civilization 7,* and other new games, you'll find those on Fanatical, not Steam.").

[39] Schwartz Opening Merits Report, Appendix A ("ITAD data for each relevant store is gathered from the 'History' page of each game using the 'Log' table, which reports a price change at each date for each store.").

[40] Gowrisankaran Rebuttal Merits Report, Exhibit 7. In Exhibit 7, I analyzed whether Steam prices are generally lower than the best prices across 61 competing platforms from September 4, 2012, to December 31, 2024. The analysis includes 36,459 games. For each game, I calculated the share of days when the price on Steam was at least 5 percent higher than the best price available on other platforms. The results show it is common for games to be available at lower prices off Steam.

(b) Second, I analyzed whether games are sold on Steam at higher prices on average over time than on other platforms. I found that all 61 platforms for which I had data had games offered with lower average prices than Steam. This also holds, in particular, for the subset of platforms mentioned by Plaintiffs' experts in their rebuttal reports. Overall, tens of thousands of games had higher average prices on Steam, which demonstrates the lack of price parity.[41]

(c) Third, I investigated whether Steam is less likely than the Epic Games Store ("EGS") to have games that are sold at higher prices than on competing platforms. In other words, does one observe fewer deviations from price parity for Steam than EGS? I find that such deviations are no less common for Steam than EGS.[42] I have seen no allegations of a PFMN by EGS and hence this provides an appropriate control group for pricing variation in the absence of a PMFN.

(d) Fourth, I evaluate whether discounts on Steam match those on other platforms or whether it is common for games to be offered at steeper discounts on platforms other than Steam.[43] I find that publishers often offer steeper discounts on other platforms. One specific version of a steeper discount I observe is that publishers at times offer a game for free on other platforms while never offering it for free on Steam.[44]

---

[41]    Gowrisankaran Rebuttal Merits Report, Exhibits 9 and 10.

[42]    Gowrisankaran Rebuttal Merits Report, ¶ 187 ("I find that for 47 percent of games that were sold on Steam and at least one other platform concurrently, the average price on Steam was higher than on other platforms (by more than 5 percent). For EGS, and specifically focusing on games that are not available on Steam (so as to be unaffected by the alleged conduct), the share is similar although slightly lower (43 percent). In other words, Steam appears to be beaten on price more often than EGS, which is inconsistent with it having a PMFN.").

[43]    Plaintiffs have claimed that the conduct sets a de-facto price floor. See Complaint, ¶ 161 ("The PMFN sets a price floor throughout the market"). Dr. Schwartz also claims that the PMFN causes publishers to ensure they offer the same size discounts on Steam as their discounts on other platforms. See Schwartz Opening Merits Report, ¶ 230 ("Following the enforcement event, ▮▮▮▮ generally offered discounts of the same magnitude on Steam as on the ▮▮▮▮▮▮. This is how one would expect a publisher confronted with an effective PMFN Policy to behave. ▮▮▮▮ behaved consistently with Valve pressuring the publisher to not offer greater discounts off Steam.").

[44]    Gowrisankaran Rebuttal Merits Report, Exhibit 11 and ¶ 190 ("I also find instances of games being sold at a price of zero (free) on other platforms, while never being offered free on Steam.").

---

(e) Fifth, to address the possibility that Valve could be selective in enforcing price parity by focusing on games and publishers that most impact Steam's alleged dominance, I also evaluate whether, for the top 100 highest revenue games on Steam, it is also common for average prices to be higher on Steam than other platforms.[45] I find that this is also common for these top revenue games.[46]

(35) This rich evidence consistently demonstrates that there is no widespread price parity for games distributed through Steam.[47] The conclusion I reached through these analyses is crucial as it highlights a significant gap in Plaintiffs' argument. Plaintiffs rely on price parity, allegedly imposed through a PMFN by Valve, and the inability for platforms to have differentiated prices as central to their framework for anticompetitive harm. But Plaintiffs' experts fail to establish that anticompetitive price parity exists. As my analyses demonstrate, it does not.

## 2.2.3. Plaintiffs' experts fail to demonstrate their second identified harm, that price parity is caused by an anticompetitive PMFN

(36) In my rebuttal report, I not only demonstrate the absence of price parity as an observed outcome, but I also show that the specific conduct by Valve that Plaintiffs allege amount to a PMFN *policy* did not prevent publishers from offering lower prices outside of Steam. Further, to the extent that some publishers choose to set the same price for a game on different channels, I explain that there are broader economic forces that could cause this. Factors such as consumer demand, strategic considerations, managerial inertia, among others can lead to instances of price parity even without a PMFN.[48] This further undermines the argument that Valve has a PMFN that reduces how much publishers vary pricing across channels.

---

[45]  Gowrisankaran Rebuttal Merits Report, Footnote 361 ("I examine the highest selling games from 2023 to ensure all games in the analysis appear for at least one full year in my data, which extend through 2024."). Dr. Schwartz has raised this possibility of selective enforcement. See Schwartz Opening Merits Report, ¶ 212 ("Valve can limit effective platform competition at lower costs by selective enforcement against these high-revenue games that are the most likely to lead to the cross-platform competition that Valve is trying to prevent.").

[46]  Gowrisankaran Rebuttal Merits Report, Exhibit 12.

[47]  My rebuttal report also includes additional evidence that there is no widespread price parity. For example, I show that games are often available for free on EGS while being full priced on Steam, and I show that games included in bundles are regularly priced for less than on Steam. See Gowrisankaran Rebuttal Merits Report, ¶¶ 190, 194–195.

[48]  Gowrisankaran Rebuttal Merits Report, Section 7.1.3 ("Plaintiffs ignore economic forces that lead to some price parity even in the absence of the alleged conduct.").

---

(37)    Plaintiffs claim that Valve enforces a price PMFN policy through "written and unwritten rules" for Steam and non-Steam key transactions.[49] In his opening report, Dr. Schwartz identifies 150 communications, including internal emails, where Valve discussed pricing of games on Steam and other platforms. For a subset of those communications, he provides a graphical analysis of prices for games associated with the emails on Steam and the other platform mentioned in the email. In addition, both Dr. Schwartz and Professor Rietveld state in their opening reports that the language in the Steamworks Documentation on Steam keys and in the Steam keys request form serves to inform publishers of a price PMFN. Neither of them provides any analysis to support their view that this language has the impact of a broad price PMFN that applies to all sales off Steam, particularly those not involving Steam keys.[50]

(38)    In my rebuttal report, I examine the alleged enforcement events analyzed by Dr. Schwartz. He graphed prices of games on Steam and the alternative platform. Based on a visual inspection, he concludes his graphs support a conclusion that the emails had the effect of pressuring publishers to comply with a price PMFN. Unlike Dr. Schwartz, I rely on statistical tools rather than just visual inspection to test whether the alleged enforcement events cause pricing behavior consistent with a PMFN.

---

49    Schwartz Opening Merits Report, Attachment H-1; Complaint, ¶¶ 9 ("Valve interprets and enforces this language to encompass price parity, forcing game publishers to charge the inflated Steam Store price across the marketplace, on *all* game sales, even sales of games that are not enabled for Steam."), 164 ("The specific form and language of the Valve PMFN has changed over time, and encompasses both written (including the SDA and Steamworks Rules) and unwritten rules enforced by Valve against publishers.").

50    Schwartz Opening Merits Report, Attachment H-1; Complaint, ¶¶ 166 ("The Steamworks Documentation on Steam keys requires publishers to offer games on other stores at prices no lower than on Steam"), 196 ("Publishers are reminded of these restrictions whenever they request Steam keys."), 197 ("In order to receive any Steam keys, Valve requires game publishers to affirm their agreement to certain Steam Key Rules. They must agree that '*I understand that I need to sell my game on other stores in a similar way to how I am selling my game on Steam*' and that '*I agree that I am not giving Steam customers a worse deal.*' The publisher must also agree that '*I understand that while it's OK to run a discount on different stores at different times, I agree to give the same offer to Steam customers within a reasonable amount of time.*' Again, as discussed above, Valve enforces these rules against publishers not only for Steam key sales, but for *all* sales, even if an alternative store does not sell Steam keys.").

(39)    Specifically, for the 49 games that Dr. Schwartz analyzes following an email from Valve to the publisher about off-Steam pricing, I tested whether the difference in the average price on Steam and on the other platform declined following the email.[51] For nearly half of the alleged enforcement events, I find results that are *opposite* to what one would expect if these emails were enforcing a PMFN: games became relatively cheaper off Steam (relative to prices on Steam) after receiving the email, and this difference was statistically significant.[52] The pricing patterns following these emails have a distribution of outcomes that is very similar to outcomes observed outside of the context of the alleged enforcement events, which further demonstrates that the emails did not enforce a PMFN.[53]

(40)    Plaintiffs therefore fail to present sound evidence that there is a price PMFN for games on Steam: Valve's email communications identified by Dr. Schwartz, which in any case related to a small share of the over 100,000 games available on Steam and the tens of thousands of publishers distributing through Steam, did not cause the impact of a PMFN. And neither Dr. Schwartz nor Professor Rietveld provides any evidence that the language in the Steamworks Documentation on Steam keys and in the Steam keys request form are interpreted by publishers as, and cause them to price consistently with, a broad price PMFN that includes non-Steam key sales off Steam.

---

[51]    Gowrisankaran Rebuttal Merits Report, ¶ 209. Dr. Schwartz identified 150 communications, including internal emails, where Valve conveyed a price parity requirement. He analyzed the pricing behavior of publishers for only 24 of these emails in which Valve allegedly contacted a publisher about a game being offered at lower prices on other platforms. Each game-store combination discussed in these emails is referred to as an alleged "enforcement event." His graphical analysis includes 49 games and 55 unique game-non-Steam store combinations as he frequently used one email to analyze more than one game and includes other stores. See Schwartz Opening Merits Report, ¶ 219 ("For a series of enforcement actions performed by Valve, I have analyzed pricing behavior to determine the going-forward impact on individual publisher pricing. This analysis shows that Valve's enforcement is effective in changing publisher pricing behavior, not only in the short run, but in the long run for certain publishers.").

[52]    Gowrisankaran Rebuttal Merits Report, Exhibit 13 and Appendix A3.

[53]    I examine the prices of the same games analyzed by Dr. Schwartz during the 6 months before the email in question. For these games, I conduct the same statistical test comparing average prices on and off Steam using ITAD data from 6 months prior and up to the alleged enforcement email. Essentially, I assess whether the difference between on and off Steam prices has a similar distribution months before the publisher received the email allegedly enforcing the PMFN. I find that pricing outcomes following the "placebo" enforcement event are similar to those after the alleged enforcement events. See Gowrisankaran Rebuttal Merits Report, Exhibit 15 and Appendix A3.

---

(41)   In addition, Plaintiffs fail to engage with other factors that could drive publishers to set uniform prices across their distribution channels, even if the revenue share charged by different platforms varies. I explained several of these alternative forces towards price uniformity in my rebuttal report. First, unlike commodities such as cement, video games vary in characteristics that appeal differently to consumers, including genre and production budget. Price-setting for differentiated products, such as video games, depends on a variety of factors, including the price-sensitivity of a game's audience.[54] This means that an increase in costs does not necessarily lead to a proportional increase in prices. Pricing decisions may be driven by consumer demand and competition among similar products and tend to narrow the price gap across platforms with different fees. Publishers may have reputational reasons for choosing a strategy of uniform pricing across channels, to avoid consumer disappointment from discovering a lower price after having purchased the game at a higher price. Alternatively, there could be lower costs to administering a strategy with uniform pricing. All of these forces towards reducing variability in game prices are independent of any alleged PMFN policy.

(42)   Consistent with the existence of many drivers towards setting uniform prices across channels, I find that publishers do indeed choose to set prices as equal across platforms, even in settings when no PMFN is alleged to require them to do so.[55]

---

[54]   Gowrisankaran Rebuttal Merits Report, ¶ 233 ("Prices are determined by more than just a firms' costs when firms bring products with differing features to the market, and consumers evaluate which product-match for the prices offered makes them the best off. A long academic literature makes it clear that consumer demand, not marginal costs alone, plays a critical role in pricing strategies for differentiated products. Consumer demand for one game will be heavily influenced by the competition it faces from other similar products available to consumers. This product-level competition will tend to reduce the gap between the optimal price on different platforms with different fees. Combined with other forces that disincentivize publishers from offering different prices across channels, this can drive prices toward uniformity.").

[55]   See Gowrisankaran Rebuttal Merits Report, Section 7.1.3.

(a) **For instance,**

.[57] Therefore, while the opportunity for lower pricing exists, the strategic decision to maintain price parity is influenced by broader considerations of consumer perception and market dynamics. As discussed in my rebuttal report, publishers may choose to price games similarly across channels for "uniformity and ease of explanation."[58]



[58]    Gowrisankaran Rebuttal Merits Report, ¶ 231; Kyle Orland, "Steam's 'price parity rule' isn't wreaking havoc on game prices," *Ars Technica*, May 13, 2021, available at https://arstechnica.com/gaming/2021/05/why-lower-platform-fees-dont-lead-to-lower-prices-on-the-epic-games-store/, accessed on December 8, 2023.

(b) Moreover, in my rebuttal report, I demonstrate that games not available on Steam and therefore not affected by the alleged PMFN are just as likely to have similar prices on different platforms as games on Steam are. Specifically, I identify a set of games that never appeared on Steam but were offered on EGS and at least one other platform and I estimate the average price difference for those games between EGS and the other platform. I find that 46 percent of games on EGS had similar prices (within 5 percent of each other) on EGS and the other platforms, higher than the 32 percent of games on Steam that had similar pricing on other platforms.[59] That is, to the extent Plaintiffs' experts allege that the pricing patterns of games on Steam are still consistent with an alleged PMFN (they are not), there is no reason to believe this pattern is *caused* by the alleged PMFN, because similar patterns are visible even if when there is no allegation that a PMFN exists and affects prices.[60]

(43) In sum, Plaintiffs' experts fail to provide evidence that the alleged enforcement leads to price parity and fail to consider the reasons why publishers might set prices as equal across platforms in the absence of a PMFN. In contrast, I provide empirical evidence that publishers maintain similar pricing across platforms, even when these platforms have different revenue share rates and when publishers are unaffected by Valve's alleged anticompetitive conduct because they do not distribute on Steam.

## 2.2.4. Plaintiffs' experts fail to demonstrate their third identified harm, that publishers are constrained by a content PMFN

(44) Plaintiffs' experts assert the existence of a Valve content parity requirement but fail to show evidence of harm from any such requirement. I show here why Plaintiffs' experts' assertions lack merit.

---

[59] See Gowrisankaran Rebuttal Merits Report, Section 7.1.3.

[60] I have seen no allegations of a PMFN by EGS and hence EGS thus provides an appropriate control group for pricing variation in the absence of a PMFN.

(45)   Professor Rietveld asserts that a content PMFN exists, that it inhibits publishers from creating and offering differentiated content across competing platforms, and that I ignored the alleged requirement in my opening report.[61] He asserts that publishers have a strong desire to differentiate their content and would do so but for the alleged content parity clause, which I summarize in my rebuttal report.[62]

---

[61]   Rietveld Rebuttal Merits Report, ¶ 122 ("Dr. Gowrisankaran failed to acknowledge that Valve's price- and content-parity requirements restrict heterogeneity in PC game publishers' offerings outside of Steam, thereby precluding the ability of rival platforms to accommodate heterogeneity in player preferences and compete effectively against Steam."); Expert Report of Professor Joost Rietveld, January 27, 2025 ("Rietveld Opening Merits Report"), ¶ 26 ("Valve's price- and content-parity requirements restrict heterogeneity in PC game publishers' offerings outside of Steam, which artificially limits consumers' choice and swings the PC distribution platform segment to a winner-take-all outcome more so than likely would have been the case absent these parity policies.").

[62]   Gowrisankaran Rebuttal Merits Report, ¶ 253 ("Professor Rietveld … stated that 'absent Valve's parity requirements, publishers could employ similar content differentiation strategies across PC game platforms.'") and Footnote 436 ("Rietveld Class Certification Report, ¶ 211"); Rietveld Rebuttal Merits Report, ¶¶ 122 ("Dr. Gowrisankaran failed to recognize or address the impact Valve's parity requirements have on the ability of PC game publishers to differentiate and accommodate heterogeneity in player preferences off the Steam platform. Specifically, Dr. Gowrisankaran failed to acknowledge that Valve's price- and content-parity requirements restrict heterogeneity in PC game publishers' offerings outside of Steam, thereby precluding the ability of rival platforms to accommodate heterogeneity in player preferences and compete effectively against Steam."), 161 ("PC game publishers are unable to effectively supply the diverse and heterogeneous preferences of PC game players by offering differentiated microtransactions and/or DLC across different platforms."), 172 ("I explained that PC game publishers have incentives to differentiate their game content to effectively supply the diverse and heterogeneous PC game player market. However, Valve's content-parity requirements preclude PC game publishers from pursuing content differentiation strategies.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(46)   As I noted in my opening report, I am aware of language in Valve's standard Steam Distribution Agreement ("SDA") that pertains to the timing of game update releases, and the material parity of DLC releases on Steam and other platforms.[63] That language includes the statement, "Company is free to offer special and unique promotional content through other distribution channels, provided that material parity is maintained between Steam Account Owners and users of other distribution channels who make a comparable investment in the Application and the associated DLC."[64] Valve witnesses for this matter have offered testimony that describe how that provision allows for flexibility in differentiating content across platforms, as demonstrated in internal documents.[65]

(47)   Despite the supposed interest from publishers to offer tailored content, Professor Rietveld conducted no analysis to demonstrate that publishers in fact want to differentiate content more than they currently do for games sold on Steam or that they are precluded from doing so by the PMFN policy. Demonstrating this point is essential to his analysis of impact because there are other reasons why publishers may want to maintain a similar content offering across platforms, aside from the alleged PMFN. As I explain in my opening report, publishers face the risk of reputational harm, for example, if they offer a degraded product on some channels.[66]

---

[63]   Gowrisankaran Opening Merits Report, ¶ 149 ("the language in the SDA, are consistent with the procompetitive rationales I have identified above related to preventing free-riding.") and Footnote 280 ("I am aware of language in the SDA related to the release of both game updates and material DLC").

[64]   Valve Internal Document "Valve Corporation Steam Distribution Agreement - Online Version," VALVE_ANT_0000008–015 at 009, Section 2.4.

[65]   For example, emails from Valve employees to publishers encouraging them to offer specialized sword colors for the same content sold through two off Steam distributors, and requesting a special sword color for the content version sold on Steam. See Email chain from Tom Giardino to ███████, "RE: Price and release parity question," October 27, 2021, VALVE_ANT_1200520–522 at 521. This material has also been cited by Professor Chiou in her Class Certification Report and by Professor Rietveld in his Opening Class Certification Report. See Class Certification Expert Report of Lesley Chiou, Ph.D., May 17, 2024, ¶ 346; Expert Report of Professor Joost Rietveld, February 8, 2024 ("Rietveld Class Certification Report"), ¶ 199.

[66]   Gowrisankaran Rebuttal Merits Report, ¶ 234 ("it is less common for products to be sold with limited capabilities compared to those available from other channels. As a result, publishers have a strong incentive to provide full access to updates, as well as any material downloadable content (DLC) for a game that would be expected with the given package, to all consumers who purchase their game.").

(48) Professor Rietveld could have sought to provide evidence that content differentiation is common for games offered on other channels but not on Steam, for which the alleged content PMFN would not apply. I conducted a similar analysis in my rebuttal report to examine the allegations of pricing parity, since I could leverage the ITAD data as I describe above and found no support for those similar allegations. It is notable that Professor Rietveld's single example of a publisher engaging in the type of content differentiation he says would arise absent the conduct is an example from 20 years ago.[67]

(49) Even if one were to assume that a strict content parity clause exists, as I explained in my opening report and in my rebuttal report, there could be procompetitive benefits from such a clause as it discourages the incentive to degrade quality of content offered on Steam to free-ride on Steam's marketing and platform investments and encourages Steam to continue collaborating with publishers.[68]

## 2.2.5. Plaintiffs' experts fail to demonstrate their fourth identified harm, that Valve's revenue shares are supracompetitive

(50) Plaintiffs allege that Valve's alleged PMFN prevents effective competition and allows Valve to charge a supracompetitive revenue share.[69] In the preceding sections, I explained how my analysis demonstrates that prices are not being constrained by an anticompetitive PMFN.

---

[67] Gowrisankaran Rebuttal Merits Report, ¶ 253 ("Professor Rietveld offered one example of supposed differentiation that occurred across versions of a game offered on different consoles (such as the Nintendo GameCube, PlayStation 2, and Xbox) more than 20 years ago (Namco's *Soul Calibur II*)"). I note that this example is prior to the class period as well as outside of Dr. Schwartz's proposed market.

[68] Gowrisankaran Opening Merits Report, ¶¶ 156–157 ("Measures to ensure that sellers do not degrade the quality of games on Steam and free-ride on its marketing services, again ensure higher quality for consumers, and stronger incentives to invest for Valve. If free-riding were left unchecked, Valve's investments to help developers market games, would have a lower return, and Valve would have weaker incentives to continue to invest."); Gowrisankaran Rebuttal Merits Report, ¶¶ 254–255 ("Measures to ensure that sellers do not degrade the quality of games on Steam and free-ride on its marketing services ensure higher quality for consumers and stronger incentives to invest for Valve. If free-riding were left unchecked, Valve's investments to help developers market games would have a lower return, and Valve would have weaker incentives to continue to invest in them.").

[69] Complaint, ¶¶ 9 ("Valve has for years maintained its dominance and thwarted effective competition by engaging in various anticompetitive acts. For example, Valve forces game publishers to agree to a Platform Most-Favored-Nations Clause (the 'Valve PMFN') as a requirement to access Steam."), 274 ("Valve's enforcement of the PMFN prevents publishers from discounting on rivals' platforms, blocking competition from consumers that could put downward pressure on Valve's supracompetitive 30% commission to publishers and preventing new entrants from achieving the scale necessary to meaningfully challenge Valve's dominance.").

The economics underlying Plaintiffs' theory of harm can also be tested by assessing whether Valve's revenue shares are supracompetitive.[70] In my rebuttal report, I demonstrated that Valve's revenue shares are not supracompetitive:

(a) I explained that Valve did not have market power at the launch of Steam.[71] I further showed that revenue shares on Steam have only declined since Steam's launch.[72] Given this fact pattern, Valve's revenue shares have never exceeded competitive levels.

(b) I further compare revenue shares on Steam to revenue shares on other video game distribution channels.[73] I find that Valve revenue shares are not outliers within the industry: several distributors have revenue shares that are higher, while others have revenue shares that are lower.[74]

(c) I describe how comparing Valve's nominal revenue shares to revenue shares charged by other platforms understates the value publishers receive in return on Steam for two reasons. First, Valve provides higher quality features than other platforms, and comparisons across platforms need to account for the value of platform services that publishers receive, in order to be economically comparable.[75] Second, Valve provides a net benefit (which can also be thought of as an effective discount) to publishers in the form of Steam keys.[76]

I have seen no analysis from either Dr. Schwartz or Professor Rietveld that addresses these issues or that changes my conclusions; Valve's revenue shares are not supracompetitive.

---

70    Gowrisankaran Rebuttal Merits Report, ¶ 31.d ("Under Plaintiffs' theory, Valve exercises market power by setting higher revenue shares, innovating less, and spending less effort and resources on resolving quality issues than it would in the but-for world."). See also Complaint, ¶¶ 258 ("In a competitive market, Valve would have to compete with other storefronts on price, revenue sharing rates, promotional activity, and/or other benefits for publishers. Instead, Valve imposes unlawful contract restrictions and other restraints to block competition to the detriment of publishers, PC gaming customers, and rival stores. Valve is able to collect a commission percentage greater than the rate it would be able to charge if it had not foreclosed competitors, injuring Plaintiffs."), 320 ("Because Valve enjoys such strategic advantages in the relevant market, it also does not provide a competitive level of quality to publishers, including Plaintiffs, in terms of the Steam Store because it does not need to do so in order to compete.").

71    Gowrisankaran Rebuttal Merits Report, Section 8.1.

72    Gowrisankaran Rebuttal Merits Report, Section 8.1. I summarize revenue shares on a nominal basis for the purpose of this exercise, prior to factoring in discounts from Steam keys.

73    Gowrisankaran Rebuttal Merits Report, Section 8.2. I summarize revenue shares on a nominal basis for the purpose of this exercise, prior to factoring in discounts from Steam keys.

74    Gowrisankaran Rebuttal Merits Report, Exhibit 17.

75    Gowrisankaran Rebuttal Merits Report, Section 8.3.1.

76    Gowrisankaran Rebuttal Merits Report, Section 8.3.2.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## 2.3. Plaintiffs' experts fail to account for procompetitive effects that improve outcomes for class members

(53)  In my opening report, I detail a broad range of Valve's innovations and features added to Steam since the launch of the platform. These innovations and features enhance many aspects of Steam, including:

(a)  Features that enhance publishers' ability to market games and for consumers to discover them, such as algorithmic recommendations, curated marketing efforts, wishlists, and user reviews.[77]

(b)  Innovations that make it easier and lower cost to publish video games, including self-publishing through Steam Greenlight and Steam Direct.[78]

(c)  Features that lower the cost of developing and testing new content, including the Steamworks Software Development Kit ("SDK"), Steam Workshop, Steam Playtest, Steam demos, and other features.[79]

(d)  Features that expand game functionality and player engagement, including Steam Community, Steam Cloud, Game Hubs, Steam Big Picture mode, and Steam Input, among others.[80]

(e)  Features that enable or boost value for other industry participants, including Steam Game Recording.[81]

(54)  Among others, these innovations and features continue to have a procompetitive impact by expanding output, improving quality, and reducing costs and barriers to entry for publishers.[82]

(55)  Valve's innovations have brought significant value to publishers on the Steam platform, who are unambiguously in the relevant market in this matter, regardless of the proposed relevant market. For example, as I discuss in my opening report, introducing Steam Greenlight and Steam Direct lowered barriers to entry for independent developers looking to publish and sell their titles to a wide audience, bypassing partnerships with traditional game publishers. As I show in Exhibit 1, the lowering of barriers to entry has led to significant increases in the number of titles releasing on Steam.[83]

---

[77]  Gowrisankaran Opening Merits Report, ¶¶ 75– 82.

[78]  Gowrisankaran Opening Merits Report, ¶¶ 83–88.

[79]  Gowrisankaran Opening Merits Report, ¶¶ 89–92.

[80]  Gowrisankaran Opening Merits Report, ¶¶ 93–98.

[81]  Gowrisankaran Opening Merits Report, ¶¶ 99–100.

[82]  In my opening report, I discuss these and other innovations and their procompetitive impacts at length, including innovations that expand game functionality and player engagement on Steam, and innovations that generate positive spillovers to other industry participants. See Gowrisankaran Opening Merits Report, Section 3.4.

[83]  Professor Rietveld claims that these procompetitive features reducing barriers to entry for independent developers has led to "overcrowding" on Steam. In Section 8.5 of my rebuttal report, I explain why Professor Rietveld's claim and purported evidence of overcrowding is

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.    Plaintiffs' experts rebut the procompetitive effects outlined in my opening report with arguments that are either circular or inconsistent with economic practices

---

**EXHIBIT 1**

***Valve's self-publishing features have lowered barriers to entry for games and publishers: January 2006 — December 2024***



*Source: SteamDB*

Note: This graph shows the number of new game releases on Steam by month. Steam Greenlight launched on August 30, 2012. Steam Direct launched on June 13, 2017.

---

flawed. See Rietveld Rebuttal Merits Report, ¶¶ 112 ("Direct network effects have become increasingly negative on Steam because of the overcrowding of PC games on the platform."), 114 ("Valve's introduction of Greenlight and Steam Direct effectively eliminated Steam's distribution requirements and caused overcrowding on the platform."); Gowrisankaran Rebuttal Merits Report, Section 8.5.2.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(56)    As another example of lowering barriers to entry, Steam's "Early Access" feature gives publishers the ability to release their games on Steam prior to the full completion of development for their game.[84] In addition to allowing publishers to receive feedback from users on their titles before they are fully complete, this feature allows publishers to earn revenues on a title prior to the title's full release. For many independent developers, this feature may allow them to generate revenues necessary to fund completion of their titles.[85] Steam Playtest, released in November 2020, also allows publishers to gather feedback to improve their games for free without worrying about Steam keys, user reviews, or wishlists.[86]

(57)    In my rebuttal report, I further describe how innovation has been central to Valve's approach to competition with its rivals. This approach is apparent in the relative quality of the Steam platform compared to its competitors, Valve's responses to innovations introduced by its competitors, and internal communications between Valve employees.[87] The assessment of this competition is critical to any assessment of Valve's alleged "monopoly power."[88]

---

[84]    Steam, "Steam Opens Early Access," March 20, 2013, available at https://store.steampowered.com/oldnews/10189, accessed on April 30, 2024 ("Steam Early Access titles allow the community to get involved early and play select titles during their development. The goal of Early Access is to provide gamers with the chance to 'go behind the scenes' and experience the development cycle firsthand and, more importantly, have a chance to interact with the developers by providing them feedback while the title is still being created.").

[85]    Austen Goslin, "Early access changed everything about games," *Polygon*, November 13, 2019, available at https://www.polygon.com/2019/11/13/20961896/decade-of-early-access-minecraft-star-citizen-fortnite, accessed on April 15, 2025 ("Over the last decade the advent of early access has given developers a way to fund their games while they're still in development, and a way for players to keep up with the making of the game. ... For some developers, [Minecraft's creator Markus] Persson included, early access was the difference between working on a game part-time and making development a full-time job."); Dylan Whitehall, "10 Best Open-World Games That Left Steam Early Access, Ranked," *GameRant*, March 14, 2025, available at https://gamerant.com/best-open-world-games-left-steam-early-access/, accessed on April 19, 2025 ("[Steam's Early Access] also helps smaller studios fund their games when they may not have otherwise made it to launch.").

[86]    Steamworks, "Steam Playtest," available at https://partner.steamgames.com/doc/features/playtest, accessed on April 22, 2025 ("Steam Playtest gives developers a free, low-risk way to get playtesting data for their game without stressing out about Steam keys, user reviews, or wishlists."); Rory Young, "Valve Introduces Steam Playtest Feature for Early Game Testing," *Game Rant*, November 7, 2020, available at https://gamerant.com/valve-steam-playtest-feature-november-2020/, accessed on April 22, 2025 ("A new **Steam** feature is currently rolling out for PC developers, further emboldening teams to work with their communities and improve their games.").

[87]    Gowrisankaran Rebuttal Merits Report, Section 4.1.

[88]    Gowrisankaran Rebuttal Merits Report, Section 4.3.

---

(58)    Plaintiffs' experts fail to address the procompetitive impacts of Valve's innovations and the extent to which Steam competes with rivals on innovation. Instead, Professor Rietveld and Dr. Schwartz use artificial criteria as justification to not directly engage with these arguments. Dr. Schwartz, for example, incorrectly states that many of the procompetitive benefits I describe in my opening report are "irrelevant" because, according to him, they are unconnected to the alleged PMFN policy.[89]

---

[89]    Schwartz Rebuttal Merits Report, ¶ 23. I also discuss their arguments relating to competition outside of Dr. Schwartz's proposed market definition in Section 2.4 and I discuss their arguments relating to procompetitive effects prior to the class period in Section 2.5.

(59)    Dr. Schwartz also (incorrectly) claims that many of the procompetitive benefits I describe in my report would be even greater in the but-for world.[90] In making these claims, Dr. Schwartz addresses the wrong question. Dr. Schwartz considers a but-for world without an alleged PMFN, but this comparison is not relevant because Dr. Schwartz has not provided relevant economic evidence of harm from an anticompetitive PMFN.[91] **Dr. Schwartz also fails to assess the relationship between the procompetitive benefits in my report and Valve's allegedly supracompetitive revenue shares.** For example, in my report, I describe how Steam Direct lowers barriers to entry for class members, increasing total output.[92] In expanding access to Steam, Valve uses a model with small up-front costs. Publishers pay a refundable $100 to publish a new game on Steam and have access to at least 5,000 Steam keys regardless of their total sales. Steam makes limited profits from small publishers and small games but absorbs the risk of low sales because it is able to earn additional profits when a small publisher produces a hit. Steam Direct involves operational and reputational risk to Steam, and the platform is priced accordingly. The fact that Steam takes on some of the risk for small publishers through its pricing model can add value to these firms, effectively acting as a form of insurance.[93] It also directly rebuts the economics underlying the alleged conduct and harm.[94] Dr. Schwartz does not address whether Valve would continue to support low barriers to entry for small publishers if Steam had a different pricing structure, and provides no analysis to explain how his theory of supracompetitive revenue shares is consistent with these types of procompetitive effects.[95] This dynamic can be seen across a broad range of features as well—Steam assumes the risk of developing new features, knowing that not every feature will be immediately successful, because its approach will pay off when it develops a feature that creates value for publishers and consumers. For these other features, Dr. Schwartz likewise commits the same omissions.

---

90    See, e.g., Schwartz Rebuttal Merits Report, ¶¶ 31 ("in a competitive but-for world, it is likely that output would have increased by at least as much, if not more."), 52 ("in a but-for world with vigorous platform competition, consumers would have more platform options and could select a platform that more generally meets consumer needs with respect to search and discoverability."), 56 ("Users and publishers would have more choice and influence in a but-for world with increased platform competition.").

91    See Section 2. See also Gowrisankaran Rebuttal Merits Report, Sections 7 and 8.

92    Gowrisankaran Opening Merits Report, ¶¶ 84 ("Steam Direct expanded the self-publishing offerings of Steam Greenlight, offering tools that allow developers to bring games to market for a recoupable fee of $100, by-passing the services of independent publishers, and dramatically reducing the up-front costs of publishing to developers."), 88 ("Industry reporting has attributed the expansion of titles on Steam, in part, to Steam Direct.").

93    Paul Milgrom and John Roberts, *Economics, Organization & Management*, (Upper Saddle River, N.J.: Prentice Hall, Inc., 1992) ("Milgrom and Roberts (1992)"), pp. 211–212 ("Having many policyholders, the insurance companies can spread risks very widely, enabling the companies to reduce individual risks greatly. ... Insurance companies

(60)   In making these arguments, Plaintiffs' experts fail to engage with the procompetitive benefits of Valve's investments and innovations in Steam for publishers, consumers, and the industry at large. In doing so, Plaintiffs' experts are unable to fully establish their own theory of harm. As discussed in my rebuttal report, Plaintiffs put forward an economic theory of harm that relies on four pillars.[96] One of these pillars is that Valve has exercised monopoly power by "setting higher revenue shares, innovating less, and spending less effort and resources on resolving quality issues than it would in the but-for world."[97] My analysis of the procompetitive effects of Valve's innovations demonstrates that this pillar of Plaintiffs' theory of harm is untrue.

---

specialize in evaluating individual risks and, by pooling the risk-bearing capacity of policy holders and (sometimes) shareholders, they reduce the cost of the risk bearing to negligible proportions.").

[94]   Gowrisankaran Rebuttal Merits Report, Section 5.5 ("These long-term up-front losses are consistent with the type of competition that happens through innovation; investment risks can eventually yield high returns.").

[95]   As I point out in my opening report, Valve has a more accessible platform than console publishers, and more games available on Steam. See Gowrisankaran Opening Merits Report, ¶¶ 86 ("In contrast to their experience with Steam Greenlight and Steam Direct, developers faced significant costs while bringing their games to other publishers. For example, to bring their game to PlayStation in 2012, independent developers required partnerships with publishers and access to specialized development hardware costing $2,000."), 87 ("While Steam does not impose a review process for patches, patches on some console platforms are subject to long review process that may cause delays relative to other platforms.").

[96]   I explain these conditions in detail in my rebuttal report, including why each condition does not hold in the present context. See Gowrisankaran Rebuttal Merits Report, Section 3.

[97]   Gowrisankaran Rebuttal Merits Report, ¶ 31.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(61)    Valve has innovated more than its competitors and offers a higher-quality, more feature-rich experience.[98] Additionally, this disparity in innovation between Valve and its competitors implies that Plaintiffs cannot conduct a direct comparison of revenue shares offered on Steam and rival platforms without accounting for relative quality. As I discuss in my rebuttal report, Valve's revenue share on Steam is not supracompetitive based on a comparison of fees and, once the quality of Steam and its competitors are accounted for, Valve's quality-adjusted revenue shares are even more competitive.[99] Dr. Schwartz's attempt to dismiss the relevance of procompetitive effects not "dependent upon" the alleged PMFN instead simply demonstrates that Dr. Schwartz has not developed an internally consistent theory of harm. By failing to assess these procompetitive effects, Dr. Schwartz fails to consider the value publishers receive for their revenue shares and fails to demonstrate that revenue shares on Steam are supracompetitive.

## 2.4. Inconsistent with economic practices, Plaintiffs' experts improperly dismiss evidence of competition outside of their preferred market

(62)    In my opening report, I described the overall growth and success of firms in the video game industry. This discussion included standard evidence of increased output, increased industry participants, and increased heterogeneity, among other factors.[100] This discussion of industry growth and successful outcomes followed my discussion of Steam's innovation, including competition over innovation between several industry participants.[101] Plaintiffs' experts dismiss this evidence on the grounds that it includes comparisons and data outside of Dr. Schwartz's preferred market.[102]

---

[98]    I offer a detailed discussion of Steam's quality relative to the quality of competitor platforms in Section 4.2 of my rebuttal report. See Gowrisankaran Rebuttal Merits Report, Section 4.2.

[99]    Gowrisankaran Rebuttal Merits Report, Sections 8.2–8.3.

[100]    Gowrisankaran Opening Merits Report, Section 3.6.

[101]    Gowrisankaran Opening Merits Report, Sections 3.4 and 3.5.

[102]    Schwartz Rebuttal Merits Report, Section 2.2; Rietveld Rebuttal Merits Report, Section IV. For example, Professor Rietveld states that my "numerous comparisons of Steam to physical distribution of PC games are irrelevant to the issues in this matter, because the shift from physical to predominately digital distribution of PC games had occurred prior to the beginning of the class period," my "entire analysis and opinions are in the context of the broad video game industry, rather than the market for third-party digital PC game distribution via platforms," and that Exhibit 2 of my rebuttal report "presents a misleading image of the competitive landscape in which Valve operates."

(63)    As an initial point, comparisons between Steam and other video game platforms are economically relevant for a variety of reasons, regardless of whether these platforms are in the relevant market. As examples, Dr. Schwartz compares revenue shares on Steam to revenue shares in other industries like vacation rentals and e-commerce marketplaces.[103] Professor Rietveld uses examples from console systems while discussing Valve's alleged content parity requirements.[104] Plaintiffs allege that revenue shares on Steam are supracompetitive, but assessing whether that is true requires assessing the procompetitive benefits that publishers receive from Steam's features and innovations. If Plaintiffs believe that consoles, for example, are outside of the relevant market, consoles would still form a relevant benchmark to evaluate Valve's conduct.

(64)    Additionally, class members are part of the relevant market, meaning that innovations that affect class members and produce procompetitive benefits for class members are relevant. For example, if Valve's conduct leads to more competition over VR gaming (I explain why this is true in my initial report)[105] this directly benefits class members who make VR games—including Named Plaintiff Dark Catt[106]—meaning that Valve's investments in VR, and competition resulting from these investments, are procompetitive regardless of the relevant market.

---

[103]    Schwartz Opening Merits Report, ¶ 372 ("Based on the above discussion, I conclude that e-commerce marketplaces and vacation home rental marketplaces are reasonable benchmarks for the market for third-party digital PC game distribution via platforms.").

[104]    Rietveld Class Certification Report, ¶ 210 ("Absent Valve's content-parity requirements, publishers could implement platform-exclusive features and content, such as those seen within the console segment of the video game market. For example, Namco, the publisher of the cross-platform console game *Soul Calibur II*, featured different 'guest characters' in the PlayStation 2, Xbox, and GameCube versions of the game.").

[105]    Gowrisankaran Opening Merits Report, ¶ 89.d ("SteamVR included Valve's open-source OpenVR software, which allowed developers to support a variety of VR hardware devices without having to bear the costs of targeting each device individually.").

[106]    Dark Catt Studios, "Djinni and Thaco: Trial by Spire," available at https://djinniandthaco.darkcatt.com/, accessed on April 21, 2025 ("Djinni & Thaco: Trial By Spire, is a first person VR tower defense strategy game").

(65)    Furthermore, no fewer than four different markets have been discussed in this case, including two different markets alleged by Plaintiffs. Specifically, the Plaintiffs allege in their complaint a market of "PC game distribution."[107] In his opening report, Dr. Schwartz defines a relevant market of "third-party digital PC game distribution via platforms."[108] In her rebuttal report, Professor Chiou defines a relevant market of PC and console game distribution.[109] Meanwhile, I understand that the class certification order describes a market for "digital PC game distribution."[110] Furthermore, as I described in my Rebuttal report, a market that excludes first-party distribution of PC games is too narrow.[111]

(66)    Despite the variety in markets discussed across case documents and put forward by experts, both Dr. Schwartz and Professor Rietveld criticize my use of examples for being outside the narrowest of the four described above, which is the market put forward by Dr. Schwartz.[112] However, their claims highlight several misunderstandings, made by each expert, of the underlying economics of both the procompetitive effects and their relationship to relevant antitrust markets.

(67)    Examples of Plaintiffs' experts dismissing evidence, without an economic rebuttal, include:

---

[107]    Complaint, ¶ 4.

[108]    Schwartz Opening Merits Report, ¶ 13.b.

[109]    Chiou Rebuttal Merits Report, Sections 4 and 5.

[110]    Order, *In Re: Valve Antitrust Litigation*, November 26, 2024, Section 2.1.

[111]    Gowrisankaran Rebuttal Merits Report, Section 5.3.

[112]    I point out several flaws with Dr. Schwartz's narrow market, including that he fails to recognize that "Differentiation between products and services does not preclude them from being substitutes and competing with each other," that his market "excludes distribution via the publisher's own vertically integrated platform, via platforms for non-PC devices, and distribution via vendor relationships with retailers." Further, he confuses "first and third-party distribution as complements rather than substitutes," which as I noted is a serious error in his economic analysis. See Gowrisankaran Rebuttal Merits Report, Section 5.

(a) Dr. Schwartz argues my analysis suffers a "fundamental problem" because I "[do] not explain how any of the claimed procompetitive actions are procompetitive within the relevant market [he] determine[s] … As such, [my] conclusions are irrelevant to the question at hand in this case."[113] This argument overlooks the simple point that Steam is part of the relevant market. Moreover, the benefits I describe in my opening report affect publishers on Steam, and thereby fall within the relevant market. This happens both directly (through access to features on Steam) and indirectly (through greater competition and availability of complementary products like hardware). This is true regardless of whether the source of competition is directly within Dr. Schwartz's market (for example, EGS opening publisher access to the platform to compete with Steam Direct)[114] or outside of Dr. Schwartz's market (for example, Valve developing the Steam Deck in response to growing popularity of portable gaming devices after the launch of the Nintendo Switch).[115]

(b) Professor Rietveld claims that competition over VR headsets is outside of Dr. Schwartz's relevant market.[116] He does not, however, rebut the simple fact that increased competition over VR technology improves outcomes for developers who make VR games, including class members. Nor does Professor Rietveld dispute the procompetitive benefits associated with SteamVR.

---

[113]    Schwartz Rebuttal Merits Report, ¶ 20.

[114]    Gowrisankaran Opening Merits Report, ¶ 106 ("In a substantial recent development for the industry, Epic Games followed Valve's lead and introduced features allowing developers to self-publish on the Epic Games Store in March 2023. At the time of introduction, Epic Games CEO Tim Sweeney acknowledged that these self-publishing tools will make the Epic Games Store more competitive with Steam and remarked on how the number of games released per year on Steam skyrocketed after the introduction of Steam Direct, suggesting that Valve's innovations spurred Epic Games to action on self-publishing."); Tyler Wilde, "Epic launches self-publishing tools, calls out Valve again: 'Steam has created a real problem for the industry,'" *PC Gamer*, March 9, 2023, available at https://www.pcgamer.com/epic-games-store-self-publishing/, accessed on March 5, 2025 ("The Epic Games Store is now open for self-publishing. For $100, the same fee Valve charges for Steam submissions, anyone can submit a game for inclusion in the Epic Games Store library. Epic's system is similar to Steam Direct, which Valve introduced in 2018, and will probably result in Epic's library ballooning over the next year.").

[115]    Gowrisankaran Opening Merits Report, ¶ 108.e ("The Steam Deck (2022) has given consumers a more flexible and portable way to play games. Valve did not release the Steam Deck until 5 years after the Nintendo pioneered its hybrid/handheld model with the Switch.").

[116]    Rietveld Rebuttal Merits Report, ¶ 90 ("VR headsets and handheld gaming devices are both hardware that fall outside the market for third-party digital PC game distribution via platforms.").

(c) Professor Rietveld dismisses my discussion of Valve introducing the Steam Deck out of hand, stating, "Nintendo is a console manufacturer that does not operate a digital PC game distribution platform."[117] Professor Rietveld does not rebut that it is procompetitive and output-expanding when class members have more users playing their games. As I explained in my opening report, product heterogeneity is procompetitive because it allows for better matches across products.[118]

(d) Professor Rietveld criticizes my analysis, for example, saying "Claiming that Valve and its alleged conduct have had procompetitive effects on the 'video game industry' outside of the PC game market is not probative," and he dismisses, but does not refute, that "the process of publishing a game through Steam (PC games) was easier and less costly than publishing a game through the Sony PlayStation platform."[119] Professor Rietveld fails to discuss how ease of publishing on Steam, compared to PlayStation, might inform a publisher's choice of where to publish, or improve access to a publisher who may otherwise find it difficult to distribute its games.

---

[117] Rietveld Rebuttal Merits Report, ¶ 91.

[118] Gowrisankaran Opening Merits Report, ¶ 119 ("A larger and more diverse set of products allow consumers with more heterogenous preferences to find better matches among available products."). Consistent with economic theory, several Steam Deck users appear to prefer this option when playing games. James Archer, "'The community continues to blow our minds': Valve talk the Steam Deck, one year on," *Rock Paper Shotgun*, March 7, 2023, available at https://www.rockpapershotgun.com/the-community-continues-to-blow-our-minds-valve-talk-the-steam-deck-one-year-on, accessed on April 20, 2025 ("The biggest surprise for me has been seeing how Steam Deck has changed the way people are playing their games. One thing we've learned recently is that of the people who've purchased a Steam Deck, 42% of them end up spending the majority of their Steam gaming time on Steam Deck — preferring it over their other devices.").

[119] Rietveld Rebuttal Merits Report, ¶ 31.

(68) As the antitrust guidance makes clear, relevant antitrust markets do not have precise bounds.[120] Further, competitive pressure is itself directly informative of market definition.[121] As an example, the fact that Sony launched a curated recommendation system and a written review system for the PlayStation Store, similar to Steam's, is consistent with a competitive reaction across the boundaries of Dr. Schwartz's proposed market.[122] In dismissing any discussion outside of Dr. Schwartz's proposed relevant market, Plaintiffs' experts get the underlying economic substance *backwards*: rather than the competitive effects being irrelevant because they do not fall under Dr. Schwartz's proposed market, the fact that important competitive pressure is exerted from outside of Dr. Schwartz's proposed market is economic evidence that Dr. Schwartz's market definition is incorrect.

(69) This can be seen in several places in Professor Rietveld's rebuttal report, where Professor Rietveld seemingly acknowledges that different potential markets may be relevant. For example, he describes competition between Steam and competitors outside of Dr. Schwartz's market:

(a) Professor Rietveld details a set of first-party distributors who began distributing third-party games through their own platforms "for decades prior to" Steam, i.e., "console manufacturers (i.e., Nintendo, Sony, and Microsoft) [who] operate fully integrated value chains by which they develop/publish games and own the platforms through which those games and the games of third-party publishers are distributed."[123]

---

[120] U.S. Department of Justice and the Federal Trade Commission, "Merger Guidelines," December 18, 2023, p. 40 ("Relevant markets need not have precise metes and bounds. ... There can be many places to draw that line and properly define a relevant market. The Agencies recognize that such scenarios are common, and indeed 'fuzziness would seem inherent in any attempt to delineate the relevant . . . market.'").

[121] U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010, available at https://www.justice.gov/atr/file/810276/dl, p. 7 ("Evidence of competitive effects can inform market definition, just as market definition can be informative regarding competitive effects. For example, evidence that a reduction in the number of significant rivals offering a group of products causes prices for those products to rise significantly can itself establish that those products form a relevant market.").

[122] Gowrisankaran Opening Merits Report, ¶ 105.e.

[123] Rietveld Rebuttal Merits Report, ¶ 10 ("the notion of distributing third-party games through a publisher's own platform was not innovative when Valve opened Steam to third-party PC game publishers in 2005. In fact, video game console manufacturers had been doing so for decades prior to the existence of Steam. As I explained in my Initial Report, console manufacturers (i.e., Nintendo, Sony, and Microsoft) operate fully integrated value chains by which they develop/publish games and own the platforms through which those games and the games of third-party publishers are distributed. Although the third-party distribution platform model existed as early as 1977 with the Atari 2600, it was solidified by Nintendo with the introduction of the Nintendo Entertainment System and its proprietary 'Game Paks' in 1983 in Japan, followed by its U.S. release two years later. All three of the current console manufacturers allowed distribution of third-party games for their platforms, for which the manufacturers were compensated with commissions from

(b) Professor Rietveld again compares console gaming performance with growth from PC gaming, citing discussion from an industry analyst that is consistent with an argument for the existence of substitution between console and PC gaming, specifically quoting that, "'PC is a big bright spot, adding 65% more content spend than livingroom console since 2011 and 225% more than combined console,'" and "consumer spending in the PC game market increased more than in the console game market in 2023," and a comparison of the two ecosystems, "'[t]he PC ecosystem benefits from many compounding advantages over the console ecosystem.'"[124] Professor Rietveld does not appear to consider the possibility that gaming on PCs may be growing relative to consoles because of substitution, although such a finding would be consistent with the conclusions of Professor Chiou.[125]

(c) Professor Rietveld seemingly concedes that Steam and first-party self-distribution compete with one another, citing the case of *Call of Duty* distribution on Battle.net, quoting a Microsoft legal filing, "Before 2018, Activision sold digital versions of PC *Call of Duty* titles on Valve's successful Steam platform. In 2018, Activision decided to take the game off of Steam and make it exclusively available on Battle.net—largely in an effort to attract users to, and grow, Activision's own platform."[126]

---

sales of those third-party games, before Steam existed and Valve opened the platform to third-party games in 2005.").

[124] Rietveld Rebuttal Merits Report, ¶ 35 ("Mr. Ball issued a presentation in January 2025, which I referred to in my January 2025 Report, in which he stated 'PC is a big bright spot, adding 65% more content spend than livingroom console since 2011 and 225% more than combined console...' Charts included in the presentation appear to indicate that consumer spending in the PC game market increased more than in the console game market in 2023, both of which exceeded growth of consumer spending in the mobile game market, which decreased. The same presentation included a slide listing various reasons why '[t]he PC ecosystem benefits from many compounding advantages over the console ecosystem – and its momentum is still growing.'"), in which Professor Rietveld is citing Matthew Ball, "The State of Video Gaming in 2025," *Epyllion*, v. 1/20/25, April 3, 2025, available at https://www.matthewball.co/all/stateofvideogaming2025, p. 58.

[125] Chiou Rebuttal Merits Report, Section 5.

[126] Rietveld Rebuttal Merits Report, ¶ 81 ("Thus, while Microsoft appears to have a strategy of attempting to converge its Xbox console and PC game ecosystems, it may have chosen not to compete aggressively with Steam in the third-party digital PC game distribution space, so as not to create turbulence in its relationship with Valve and disturb an important distribution channel for its large library of proprietary PC games.").

---

(70)    In my opening report, I also described procompetitive benefits arising from the transition from physical distribution to digital distribution. Professor Rietveld also dismisses these benefits, on the grounds that physical distribution is not part of Dr. Schwartz's proposed market. Professor Rietveld's reasoning is unclear, as he appears to acknowledge substitution between physical and digital distribution, noting that, at the beginning of the class period, "digital distribution had largely displaced physical distribution of PC games."[127] Since he acknowledges that digital distribution "largely displaced" physical distribution (and continued to displace, according to his own analysis), the two are necessarily substitutes by his argument.[128]

(71)    Dr. Schwartz and Professor Rietveld also argue that the evidence I present in my opening report about the indicia for healthy competition in, and broad procompetitive impact of Valve's conduct on, the video game industry is irrelevant because the evidence includes economic activity that is outside Dr. Schwartz's preferred market. For example, Professor Rietveld proposes an alternative summary of video game platform entry in the last 20 years, which excludes many of the entrants included in Exhibit 2 of my opening report. However, my conclusion that the industry shows all the signs of healthy competition is robust to this critique. Even if one were to accept that Dr Schwartz's proposed relevant market is correct and that only economic activity in his relevant market is relevant for the assessment the impact of Valve's alleged conduct, there is abundant evidence of healthy competition and increasing value creation over time.

   (a) Even under Professor Rietveld's own analysis, there have been several entrants since Steam launched, including multiple ones in recent years.[129] Furthermore, Professor Rietveld argues that I improperly include Green Man Gaming and GamersGate, despite these platforms being part of Dr. Schwartz's market share calculations.[130]

---

127    Rietveld Rebuttal Merits Report, ¶ 21 ("What matters in this case is the impact of Valve's alleged conduct on competition among third-party *digital* PC game distribution platforms after January 2017").

128    Rietveld Rebuttal Merits Report, ¶¶ 16 ("By 2017, 'Full Game Boxed' accounted for just under ▮ of the total market. In 2024, the most recent year for which Newzoo data are available, 'Full Game Boxed' accounted for ▮▮▮▮▮ of the total PC segment in the United States."), 21 ("What matters in this case is the impact of Valve's alleged conduct on competition among third-party *digital* PC game distribution platforms after January 2017, when digital distribution had largely displaced physical distribution of PC games.").

129    Epic Games Store and Discord PC Store launched in 2018; WeGame launched in 2017. See Rietveld Rebuttal Report, Exhibit 2.

130    Schwartz Opening Merits Report, Attachment E-1. In addition to these two, Professor Rietveld excludes another Steam key reseller, G2A, and three other distributors that he acknowledges distributed third-party PC games during the class period, including Stardock Central, Direct2Drive, and GameFly.

(b) The entrants listed in my original figure were not exhaustive. In addition to the entrants I list in my original report, other entrants during the class period include Twitch, which began distributing third-party PC games through its store in 2017[131] and Google Play Games, a service from Google that also distributes third-party games on PC.[132] While Google Play Games started by making Android games optimized and accessible for PC, recent reporting notes that "There are already more than 50 native PC titles on the platform" and that "later this year, Google plans to open up its native PC program to all native PC developers so they can bring over their games."[133]

(c) Even within the narrow market proposed by Dr. Schwartz there has been output expansion (Steam sales have grown rapidly,[134] EGS has experienced revenue growth,[135] GOG has grown its user base[136]). Dr. Schwartz's report also shows output expansion in his own market, and my analysis of Newzoo data shows growth across PC gaming as whole.[137]

(d) Many developers have entered, and there has been a substantial expansion of content available—that this is true even in the narrower market proposed by Dr. Schwartz is evidence given patterns observed on Steam.[138]

(e) Similarly, given prices of video games on Steam have declined, especially in real terms, this pattern holds in the narrower market proposed by Dr. Schwartz.[139]

---

[131]  Andrew Webster, "Twitch's game store is now open for business," *The Verge*, April 4, 2017, available at https://www.theverge.com/2017/4/4/15086772/twitch-game-store-launch, accessed on April 23, 2025 ("Earlier this year the streaming service announced plans to launch a digital PC games store, and today [April 4, 2017] it's open for business. Users will be able to purchase select games directly from Twitch channels and game pages, both on the site and the company's newly launched desktop app.").

[132]  Jay Peters, "Google is bringing a lot more Android games to PCs," *The Verge*, March 13, 2025, available at https://www.theverge.com/news/628323/google-play-games-android-mobile, accessed on April 23, 2025 ("Google Play Games on PC was originally launched in beta in 2022 as a way for people to play Android games on their PC, and Google has been slowly expanding its availability and building on the program since then.").

[133]  Jay Peters, "Google is bringing a lot more Android games to PCs," *The Verge*, March 13, 2025, available at https://www.theverge.com/news/628323/google-play-games-android-mobile, accessed on April 23, 2025.

[134]  Gowrisankaran Rebuttal Merits Report, Exhibit 18.

[135]  Gowrisankaran Rebuttal Merits Report, ¶ 135.a ("In its recent 2024 Year in Review report, EGS reported metrics indicating healthy performance. … total spending achieved $1.09 billion in 2024, a 15 percent increase from 2023.").

[136]  Gowrisankaran Rebuttal Merits Report, ¶ 135.b ("in 2022, GOG highlighted growth in user base, available games, and downloadable content. The platform saw 11 percent year over year growth in the number of active users.").

[137]  Schwartz Opening Merits Report, Attachment E-1; Workpaper 1.

[138]  Gowrisankaran Opening Merits Report, ¶¶ 116–117.

[139]  Gowrisankaran Opening Merits Report, ¶¶ 120–121.

(72)    In summary, none of the indicators of improving outcomes for developers, publishers, and consumers fail by limiting the focus to Dr. Schwartz's preferred market.

(73)    Taken together, the arguments given by Plaintiffs' experts appear to be unrelated to and unsupported by economic principles. The presence of competitive effects, whether procompetitive or anticompetitive, informs market definition. Using market definition to exclude competitive effects, rather than using competitive effects to inform market definition is economically backwards. In this case, the Plaintiffs' experts' exclusion of procompetitive benefits based on this rationale sidesteps the question of whether Valve's business model provided procompetitive benefits to class members. A diverse range of markets have been described in connection with this matter, including those which would include the competitive effects I describe in my opening report.[140] This evidence undermines Professor Rietveld's claims that responses from industry participants spurred by Valve—including responses from GOG, Ubisoft, handheld PC gaming device manufacturers, and Sony—are not responses from "current rival platforms."[141]

## 2.5. Also inconsistent with economic practices, Plaintiffs' experts fail to consider the importance of competition prior to the class period

(74)    In my opening report, I describe a broad range of features and innovations that have been introduced by Steam, from its initial launch through to present day.[142] This includes several individual features that Valve launched during the class period.[143] For example, in Exhibit 1 of my opening report, I describe 19 features introduced during the class period.

---

[140]    Professor Chiou has provided evidence in her March 26, 2025 report that distribution channels outside of third-party PC platforms are substitutes that compete with Steam, including distribution via publishers' own vertically integrated platforms, via platforms for non-PC devices, and distribution via vendor relationships with retailers. See, e.g., Chiou Rebuttal Merits Report, ¶¶ 22 ("The 'first party distribution' channels Dr. Schwartz excludes are close substitutes with Steam. ... the data clearly show the substitution patterns behind these competitive responses: I am able to observe that when Ubisoft stopped releasing its new games on Steam, it successfully drove users from Steam to its own distribution channel."), 25 ("[Dr. Schwartz's distinction of Steam key distributors as 'non-gameplay' platforms] overlooks, among other things, that Steam keys represent the closest possible substitute to games purchased directly on Steam. ... This makes it easy for users to choose to buy a Steam key instead of buying a game through the Steam store (that is, it makes it easy for users to substitute, and therefore for the match between users and publishers to occur somewhere other than Steam).") , 26 ("I find that users and publishers can substitute in many ways between PC and console platforms.").

[141]    Rietveld Rebuttal Merits Report, ¶ 86.

[142]    Gowrisankaran Opening Merits Report, Sections 3.2–3.4.

[143]    Examples of innovations are Steam Game Recording, Steam Playtest, and Remote Play Together, which came out in 2024, 2021, and 2019, respectively. Neither Professor

(75) Plaintiffs' experts claim that many of the procompetitive benefits I describe in my opening report are irrelevant on the grounds that they happened before the class period. For example, Professor Rietveld criticizes my discussions of physical distribution, entry by competing platforms, and competition over innovation because they occurred prior to the class period.[144] In addition, while my opening report describes a wide range of procompetitive benefits associated with the transition to digital distribution, Dr. Schwartz argues that these benefits are not relevant because Valve opened up Steam to other publishers (in 2005) before it began engaging in the alleged conduct (in 2007).[145] Dr. Schwartz's claims are flawed in multiple ways.

(a) First, Dr. Schwartz appears to assume that the procompetitive benefits associated with the industry moving to digital distribution were fully realized by 2007. But I, along with other experts in this matter, have shown that physical games still made up the majority of game sales as of 2007.[146]

(b) Second, Dr. Schwartz has not shown that Valve had the monopoly power that it would need for its alleged conduct to produce anticompetitive effects in 2007. Valve did not have monopoly power in 2007. As I showed in my rebuttal report, Valve did not have monopoly power at the launch of Steam, and it's revenue shares declined from ■ percent in 2005 to 30 percent in 2010.[147]

---

Rietveld nor Dr. Schwartz rebut the benefits associated with these features in their rebuttal merits reports. See Gowrisankaran Opening Merits Report, ¶¶ 89, 97, 99.

[144] Rietveld Rebuttal Merits Report, Sections IV.B, IV.D, IV.E. See e.g., Rietveld Rebuttal Merits Report, ¶¶ 13 ("Dr. Gowrisankaran's numerous comparisons of Steam to physical distribution of PC games are irrelevant to the issues in this matter, because the shift from physical to predominately digital distribution of PC games had occurred prior to the beginning of the class period (January 28, 2017)"), 85 ("Thus, despite touting Valve's purported 'steady investments' and 'boundary-pushing improvements,' Dr. Gowrisankaran provided relatively little discussion about features Valve introduced for Steam during the relevant period for analysis in this matter."); Section IV.D ("Several of the platforms on Dr. Gowrisankaran's timeline were short-lived with no evident operations during the class period.").

[145] Schwartz Rebuttal Merits Report, ¶ 26 ("In my Opening Merits Report, I note that the first documented instance of Valve enforcing their alleged PMFN policy was in 2007, whereas Valve opened up the Steam platform for digital distribution in 2005. These claimed benefits that Valve has provided to the industry are entirely untethered to the conduct at issue.").

[146] Gowrisankaran Opening Merits Report, ¶ 67 ("For instance, in 2009, physical media such as CDs or DVDs still accounted for approximately 80 percent of games sold in the U.S."); Chiou Rebuttal Merits Report, ¶ 264 ("physical sales accounted for 86 percent of all consumer spending on PC and console games in 2005"). Professor Rietveld also relies on reports from Entertainment Software Associate, the same source I refer to in my opening and rebuttal reports, for his digital and physical sales proportions. See Rietveld Rebuttal Merits Report, ¶¶ 13–15.

[147] Gowrisankaran Rebuttal Merits Report, Exhibit 16.

(76)   Neither Professor Rietveld nor Dr. Schwartz appear to dispute that physical games were the dominant way in which PC games were distributed at the time Steam launched.[148] While Plaintiffs' experts argue that physical games are not part of the market today, they do not rebut that they competed historically. User substitution patterns are not fixed over time, and even if Plaintiffs' experts believe a certain competitor is not in the relevant market a specific point in time, that does not mean that the never was, nor that it will not be in the future.[149]

(77)   While Dr. Schwartz and Professor Rietveld seem to provide differing rationales to ignore procompetitive events that took place prior to the class period, both experts make the same fundamental mistake: neither expert addresses my point that the procompetitive benefits I described in my opening report contributed to the success of Steam and provide value to publishers, undermining allegations related to Steam's alleged acquisition and abuse of monopoly power. Steam became popular with publishers because it introduced a distribution model with substantial benefits for publishers. Consequently, neither expert rebuts the relevant economic points.

(78)   Professor Rietveld claims that, of five examples of innovations discussed in my opening report—Steam Wishlists, the Steamworks SDK, Steam Big Picture, Family Sharing, and Steam Families—four occurred prior to the class period and therefore do not apply "during the relevant period for analysis in this matter."[150] Professor Rietveld's argument fails to recognize that innovations launched on Steam prior to the class period continue to affect the publisher and user experience during the class period. Even if I were to disregard competitive effects outside of Dr. Schwartz's proposed market, neither Professor Rietveld nor Dr. Schwartz rebuts that these features contributed to a disparity in quality between Steam and rival platforms during the class period.[151]

---

[148]   I also show this to be true in my opening report. See, Gowrisankaran Opening Merits Report, ¶ 67.

[149]   Furthermore, as I explained in my opening report, innovation by rival firms incentivizes market leaders to innovate. See, Gowrisankaran Opening Merits Report, ¶ 29. Some publishers, like Jackbox Games, who publish on Steam, note that they expect recent entrants like Netflix to be able to compete to distribute their games. See Christopher Dring, "The number of video game articles dropped by over 100,000 in Q1," *The Game Business*, April 24, 2025, available at https://www.thegamebusiness.com/p/the-number-of-video-game-articles, accessed on April 25, 2025 ("'I think Netflix is wise. One of the flaws of Stadia in the past is that it was meant to be this console killer, it was a replacement for your AAA PC rig. ... With our kind-of games, that doesn't matter. ... our games serve themselves well for that streaming 10ft experience. My guess is Netflix has identified the same thing, which is why they're chasing the category of party games.'").

[150]   Rietveld Rebuttal Merits Report, ¶ 85.

[151]   Plaintiffs' experts also fail to rebut that competitors such as EGS introduced features to keep up with Steam's history of innovation.

---

(a) For example, in my opening report I discussed Steam Wishlist notifications, and their ability to benefit publishers by providing more information to users who may wish to purchase their games. While the feature launched in 2012, it affected the quality of Steam, and the value of the platform throughout the class period.[152]

(b) Furthermore, Steam has built on features over time, so even if a feature is first released prior to the class period, Valve frequently continues to evolve and improve it during the class period. Steam launched Steam Family Sharing in 2013, which allows family members to share copies of games. This feature later grew into Steam Families, an improved version, during the class period.[153]

(79) Additionally, there are several other examples of features that were released prior to the class period that continued to provide benefits and affect competition during the class period.

---

[152]   Gowrisankaran Opening Merits Report, ¶ 103.a ("In December 2012, TNW published an article announcing the new Wishlist feature on Steam").

[153]   Gowrisankaran Opening Merits Report, ¶ 103.d–103.e ("In September 2013, TNW announced the Steam Family Sharing feature available in limited beta-testing version … The Verge announced an update to Steam Family Sharing called Steam Families in 2024").

(a) Steam Greenlight, Valve's introduction to self-publishing to Steam, was launched in 2012.[154] Steam Direct then replaced Steam Greenlight in 2017 and further simplified the self-publishing process.[155] Steam's self-publishing program has also motivated competitor platforms to follow in providing developers with lower costs of publishing—EGS launched its own self-publishing tools in a bid to compete with Steam Direct in 2023.[156]

(b) Steam Early Access, a program that allows users to play select games during development, launched in 2013 but is still receiving updates.[157] In February 2025, Valve added a warning system to flag early access games with no updates in over 12 months to help players identify games that could be abandoned.[158]

---

[154] Steam Greenlight allowed creators to submit their work for gamers to vote for their favorite games. The highest rated games would then enter Valve's approval process for Steam. See Graham Smith, "Steam Greenlight announced, will let gamers vote indie games on to Steam," *PC Gamer*, July 9, 2012, available at https://www.pcgamer.com/steam-greenlight-announced-lets-gamers-vote-indie-games-on-to-steam/, accessed on January 23, 2025 ("Valve have just announced Steam Greenlight. The new service will work like the Steam Workshop, but for indie games. Creators can submit their work, whether it's an unfinished playable build or screenshots and videos, and gamers can then vote on the games they like. The best rated games will enter Valve's approval process for inclusion in the Steam store.").

[155] Steam Direct replaced Steam Greenlight with Steam Direct and further simplified the process, allowing developers to access Steamworks and submit games with just a recoupable fee of $100. See Alissa McAloon, "Valve's Greenlight replacement, Steam Direct, launches today," *Game Developer*, June 12, 2017, available at https://www.gamedeveloper.com/business/valve-s-greenlight-replacement-steam-direct-launches-today, accessed on March 5, 2025 ("Steam Direct, Valve's new self-publishing option and Greenlight replacement, is officially up and running. Thanks to that, Valve has dropped a new blog post detailing the steps developers will now need to take if they want to release a game through Steam Direct. A full breakdown of the submission process is up on Steamworks now, but Valve says the process can more or less be summarized in three key steps: paperwork, payment, and review.").

[156] Tyler Wilde, "Epic launches self-publishing tools, calls out Valve again: 'Steam has created a real problem for the industry,'" *PC Gamer*, March 9, 2023, available at https://www.pcgamer.com/epic-games-store-self-publishing/, accessed on March 5, 2025 ("The Epic Games Store is now open for self-publishing. For $100, the same fee Valve charges for Steam submissions, anyone can submit a game for inclusion in the Epic Games Store library. Epic's system is similar to Steam Direct, which Valve introduced in 2018, and will probably result in Epic's library ballooning over the next year.").

[157] Steam, "Steam Opens Early Access," March 20, 2013, available at https://store.steampowered.com/oldnews/10189, accessed on April 30, 2024 ("Valve … today [March 20, 2013] announced the addition of an Early Access section to Steam's library of over 2,000 titles.").

[158] Joshua Wolens, "Steam now warns you if that early access game you're eyeing up has been abandoned by its devs," *PC Gamer*, February 5, 2025, available at https://www.pcgamer.com/software/platforms/steam-now-warns-you-if-that-early-access-game-youre-eyeing-up-has-been-abandoned-by-its-devs/, accessed on April 22, 2025 ("Steam will pin a notice to any game that's gone over 12 months without a build being pinned to the game's default Steamworks branch, *or* if it has been over 12 months since the devs posted an update news post.").

---

(80)    In my rebuttal report, I demonstrate that Steam did not have monopoly power at Steam's launch. Plaintiffs, in their complaint, argued that Valve acquired "dominance" in the market initially "[t]hrough [the] '[f]orced adoption' to play Half-Life 2."[159] In contrast, I describe how the idea of Valve acquiring monopoly power does not make economic sense. Steam had to compete with physical distributors. It was procompetitive because it gave less expensive and more valuable distribution options to publishers.[160]

(81)    Professor Rietveld appears to concede this point in his rebuttal report. For example, he acknowledges that competition between Steam and physical distribution was more intense prior to the class period, and describes substitution between physical and digital PC games.[161] He further acknowledges that Valve was not the first firm to distribute its games digitally, recognizing that firms had other options besides Steam even at its beginning.[162] In addition, the analysis in my rebuttal report shows that *Half-Life 2* was not sufficiently popular compared to other titles at the time to give Valve a natural advantage over competing publishers that were also trying to sell their games digitally. Taken together, Valve did not succeed in digital distribution because it was uniquely well positioned through market power, but rather because it found a way (through competition) to make digital distribution an appealing option.[163]

---

[159]    Gowrisankaran Rebuttal Merits Report, Section 5.1; Complaint, ¶¶ 21 ("Valve's anticompetitive scheme has been wildly successful. It has maintained Valve's dominance"), 50 ("Through this '[f]orced adoption' to play Half-Life 2, Valve started to build its 'stranglehold on the PC gaming market.'"). Dr. Schwartz alleged in his opening report that Steam had monopoly power in its early years. See Schwartz Opening Merits Report, Footnote 145 ("Valve initially experimented with ▮▮▮▮▮▮▮ commission rates. These commission rates were set during a period when Valve exercised market power, and likely reflect Valve's experimentation with finding the optimal monopoly price for its platform. See, for example: Valve, SDA for ▮▮▮▮, 7/15/2005").

[160]    Gowrisankaran Opening Merits Report, Section 3.3; Gowrisankaran Rebuttal Merits Report, Section 8.1.

[161]    Rietveld Rebuttal Merits Report, ¶ 15 ("Thus, based on the data reported by ESA, the transition of video game distribution, including PC game distribution, from physical formats to digital formats was underway long before the beginning of the class period in January 2017. The data presented above indicates that the balance shifted from physical to digital formats in 2013, three years prior to January 2017; and that digital formats accounted for ▮▮ of total sales in 2016—immediately prior to the beginning of the class period. By 2017, sales from physical formats accounted for only ▮▮ of total sales.").

[162]    Rietveld Rebuttal Merits Report, ¶ 9 ("Despite asserting that Valve was 'an early adopter' of digital distribution of video games, Dr. Gowrisankaran acknowledged in a footnote that 'PlayOnline pre-dated Steam [by nearly three years] with its launch in 2000.' In the same footnote, he noted that Stardock Central was another 'early digital distributor' which was launched in 2003. Additionally, in Exhibit 2 of his report, Dr. Gowrisankaran identified Battle.net as having launched in 1996, approximately six years prior to Valve's launching of Steam.").

[163]    Excerpts from PC Gamer show that users were initially resistant to switch from physical distribution to digital distribution. See, e.g., Cooper Thomas, "Download-wary," *PC*

(82) Further, Steam's revenue shares have only declined since launch. In my rebuttal report, I analyzed the change in revenue share over time. When Valve first began distributing third-party games on Steam, its revenue share was ■ percent. Shortly after, it introduced a 30 percent revenue share which was gradually applied to games, and by 2010 almost all games were subject to it. In 2018, Valve introduced a tiered revenue share system whereby games were subject to different shares based on revenue thresholds. Under this system, the average revenue share fell from 30 percent in 2017 to ■ percent in 2024.[164]

(83) These facts are critical context to assessing Plaintiffs' theory of harm. Valve did not have monopoly power at the launch of Steam and has only lowered prices in the years since. This fact pattern is inconsistent with Plaintiffs' theory of harm, in which Valve allegedly had monopoly power and abused this monopoly power by charging a supracompetitive revenue share.[165] While Plaintiffs seek to dismiss evidence of conduct and procompetitive effects that occurred prior to the class period, conduct and facts prior to the class period are directly informative to the economics at issue. Professor Rietveld appears to acknowledge this when he summarizes physical and digital distribution and notes that his description of the facts "sets the context for analysis of the issues in this matter."[166]

---

*Gamer*, Volume 13, Number 2, Issue 146, February 2006, available at https://archive.gamehistory.org/item/01232a50-71e1-4841-be55-d4bc9c9ab04c, p. 10 ("It seems that as PC games develop, the methods in which they're sold change as well. You can now download games from Steam, EA's Downloader, and even SEGA's unnamed downloading program. But is there anyone who, like me, still feels that the best way to buy a game is to actually get up, go to the store, and purchase it with money from your wallet? ... Is there anyone else who thinks that games should still be sold on store shelves, not just through online downloading programs?"); Chuck Osborn, "Downloading the Future," *PC Gamer*, Volume 13, Number 12, Issue 155, December 2006, available at https://archive.gamehistory.org/item/ec20ef30-066c-403c-a92d-f3b43b9df8cf, p. 58 ("Downloading games doesn't appeal to everyone. I *like* having a physical disc, but I'm also one of those Luddites who rips CDs to my MP3 player instead of purchasing tunes online. Ricardo Sanchez, GameTap's Vice President of Content, even admitted at the recent Austin Game Conference that 'digital is never going to kill retail.' A lack of broadband connections, online games that sell for the same price as their retail counterparts (to avoid undercutting—aka, pissing off—retailers), and a lack of goodies like physical manuals and maps limit digital distribution's appeal.").

164 Note that the revenue shares I analyze in my rebuttal report are calculated on a nominal basis. See Gowrisankaran Rebuttal Merits Report, ¶ 264 ("Valve's average revenue shares have decreased over time, starting with the ■ percent shares for early titles such as *Rag Doll Kung Fu* and *Darwinia*, and declining to ■ percent on average in 2024.").

165 Complaint, V.A ("As a Result of Valve's Conduct, Valve's Commissions Imposed on Publishers Are Inflated and Supracompetitive").

166 Rietveld Rebuttal Merits Report, ¶ 17.

---

(84)    My assessment of Steam's market power—both at launch and thereafter—makes it clear that Steam does not have and never had monopoly power.[167] Plaintiffs' experts have acknowledged that competition existed when Steam launched, but, at the same time, do not provide any evidence to show when Steam gained monopoly power over this competition. Plaintiffs' experts insist that monopoly power must exist but do not provide any evidence as to when it was acquired, or when Steam supposedly began to abuse it. While Dr. Schwartz claims that Valve began enforcing its alleged PMFN in 2007, he has provided no evidence that Valve had the market power sufficient to do so as of 2007.

(85)    More generally, Dr. Schwartz appears to agree that assessing the context and history prior to the class period is economically relevant. Dr. Schwartz claims that Valve began enforcing its alleged PMFN in 2007 and cites evidence of enforcement prior to the class period.[168] Dr. Schwartz also considers evidence of complaints about consumer support in 2014 and 2015.[169] Thus, the question is not whether evidence from prior to the class period is economically relevant, but what conclusions to draw from it. Plaintiffs' experts do not reconcile Valve's history of innovation with the allegation that Valve had monopoly power and charged supracompetitive revenue shares prior to the class period. As I discussed in my rebuttal report, the evidence demonstrates that these alleged links in Plaintiffs' theory of harm are simply not true.[170]

---

[167]  I provide a comprehensive analysis of Steam's alleged market power in Section 5 of my rebuttal report. See Gowrisankaran Rebuttal Merits Report, Section 5.

[168]  Schwartz Opening Merits Report, ¶ 186 ("I have seen documents in the record suggesting that Valve began enforcing price parity at least as early as 2007."), Attachment H-1; Schwartz Rebuttal Merits Report, ¶ 26 ("In my Opening Merits Report, I note that the first documented instance of Valve enforcing their alleged PMFN policy was in 2007, whereas Valve opened up the Steam platform for digital distribution in 2005.").

[169]  See, e.g., Schwartz Opening Merits Report, ¶ 266 ("Many users and developers are dissatisfied with the quality of Steam's platform and would prefer more choice in PC desktop game platforms."), Footnote 701 ("Valve, Emails Regarding Review System, 10/23/2014 (VALVE_ANT_2417590–597, at VALVE_ANT_2417590, VALVE_ANT_2417595). … Valve, Steam Technical Issue, 12/27/2015 (VALVE_ANT_1847812–831, at VALVE_ANT_1847812–813, VALVE_ANT_1847815, VALVE_ANT_1847818, VALVE_ANT_1847820).").

[170]  Gowrisankaran Rebuttal Merits Report, Section 8 ("the way in which Valve has adjusted revenue shares over time is fundamentally inconsistent with Valve using revenue share to exercise market power. … Steam's higher platform quality relative to other platforms means that Valve's quality-adjusted revenue shares are even more competitive.").

## 3. PLAINTIFFS' EXPERTS FAIL TO REBUT THE PROCOMPETITIVE EFFECTS OF STEAM'S FEATURES AND POTENTIAL FOR FREE-RIDING

### 3.1. Plaintiffs' experts incorrectly assert that I failed to provide evidence that Steam's features have added value and continue to add value

(86) In my opening report, I described the ways through which Steam uses algorithmic game recommendations and curated marketing to provide benefits to publishers.[171] Steam provides game recommendations to players using an algorithm based on user behavior.[172] Curated marketing provides publishers the opportunity to boost visibility in cases where Valve believes a game will have special appeal to consumers.[173] There are many other features on Steam that I describe in my opening report, such as store pages, that allow publishers to market their games to users.[174]

(87) I also show that Valve has expanded its marketing capabilities to increase the number of games that it can promote. For example, Valve added promotional slots for games that were either part of the regular "Daily," "Midweek," and "Weekend" deals or self-scheduled by publishers. Valve has improved how these slots are filled to increase the number and relevancy of games that are displayed in them.[175] I also described how Steam continuously updates its discoverability features, including through Steam Labs.[176]

---

[171] Gowrisankaran Opening Merits Report, ¶¶ 76–77.

[172] Gowrisankaran Opening Merits Report, ¶ 76 ("First, Valve's algorithmic visibility recommendations generate personalized title suggestions to users based on their own game preferences, gameplay histories, and the games to which their Steam friends have shown interest. The focus on user behavior gives Steam recommendations the ability to adjust quickly to evolving user interests and to recommend games in any stage of their lifecycles (e.g., to new release games, but also games with many years on the market).").

[173] Gowrisankaran Opening Merits Report, ¶ 77 ("In complement to algorithmic recommendations, Valve also engages in curated marketing—targeted marketing efforts to boost the visibility of games that Valve believes have special appeal to consumers").

[174] These features include personalized store pages, user reviews, Steam Wishlists, discovery queue, and friend recommendations. See Gowrisankaran Opening Merits Report, ¶¶ 79–81.

[175] Gowrisankaran Opening Merits Report, ¶ 77.

[176] Gowrisankaran Opening Merits Report, ¶ 81 ("[Steam] tests new discoverability features on the platform through Steam Labs."); Steam, "Welcome to Steam Labs," available at https://store.steampowered.com/labs/, accessed on January 24, 2025 ("Every year, we create dozens of experiments around discoverability, video, machine learning, and more.").

---

Case 2:21-cv-00563-JNW   Document 641   Filed 06/17/26   Page 60 of 71

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.   Plaintiffs' experts fail to rebut the procompetitive effects of Steam's features and potential for free-riding

(88)   In my opening report, I also discussed how the business model that Valve adopted for Steam, i.e., its revenue share model, aligns the incentives of Valve and publishers in a way that creates value and hence is procompetitive.[177] Specifically, the revenue share model creates incentives for Steam to take actions that it expects will increase the publisher's revenue, because Steam benefits when publishers increase their revenues earned on Steam. One result of this procompetitive business model is that it motivates Steam to provide publishers with effective marketing services. Marketing services are effective, in this context, if they help match publishers to consumers who are more likely to make a purchase as a result of that matching, i.e. to generate additional revenues.

(89)   While my observation is a straightforward analysis of incentives, Dr. Schwartz suggests that Steam may not provide users with search results that are useful to them.[178] Rather than present a rebuttal of my analysis of the underlying incentives, Dr. Schwartz instead discusses unrelated models and industries without showing that the same relevant economic circumstances are present in those industries. For example, Dr. Schwartz discusses music streaming services and explains how the platform algorithms for music streaming services do not maximize consumer welfare.[179] Because the music streaming services that Dr. Schwartz discusses charge users a recurring fee, i.e., their subscription, these platforms face different economic incentives from those facing Steam.[180] Dr. Schwartz's opinion, in fact, highlights this difference: these other pricing models do incentivize platforms to match listeners to music based on how the platform is paid, which is not necessarily based on the user's interests. Thus, they do not create the same incentives for the platform to market content that users would most like as Steam does. The revenue share business model selected by Valve resolves this tension, which is why I emphasize its procompetitive benefits in my opening report.

---

[177]   Gowrisankaran Opening Merits Report, ¶ 65 ("The revenue share model also aligns the incentives of publishers and Valve, since Valve does well when a game does well on Steam. This creates strong incentives for Valve to invest in features that will help games succeed").

[178]   Schwartz Rebuttal Merits Report, ¶ 46 ("When a platform controls the recommendation system, it can—and often does—design recommendations towards the overall profitability of the recommended services rather than customer retention or optimizing user experiences or usage.").

[179]   Schwartz Rebuttal Merits Report, ¶ 46 ("For example, Pandora manipulates its recommendation algorithm to increase or decrease what music title is played based on the royalties it will receive.").

[180]   Marc Bourreau and Germain Gaudin, "Streaming Platform and Strategic Recommendation Bias," *Journal of Economics & Management Strategy*, 31(1), 2022, pp. 25–47 at pp. 25 ("We focus on streaming platforms in media markets, where users pay a sub-scription fee to join the platform but no usage fee, and consume a mix of content originating from each provider."), 37 ("In this paper, we have analyzed how a streaming platform, constrained to set a uniform subscription price to all participating consumers and no usage fee, can bias its personalized recommendations to steer consumption towards its most profitable content.").

---

(90)    Consistent with this incentive structure, Valve developed algorithmic and curated marketing services to be effective in matching publishers to consumers, as I described in my previous reports.[181] Importantly, Valve's economic incentive is to provide users with information about games they most want to purchase. Steam's marketing features only generate revenue to the publisher and to Valve when consumers, having seen games through these features, make a purchase on Steam.[182] If Steam's marketing shows results to users that do not interest them, the user can simply not make a purchase and Steam then earns no revenue, because no match is made. Dr. Schwartz does not discuss this aspect of Valve's incentives, nor does he rebut that it is value-creating when consumers learn about and purchase games that they would otherwise have not discovered. As I will discuss further in the following section, the empirical evidence demonstrates that Valve's algorithmic and curated promotions both benefit a wide range of titles on Steam, not simply the biggest or most expensive.

(91)    Like in the example from Dr. Schwartz above, Professor Rietveld also has instances of faulty economic reasoning in his rebuttal report. For instance, he appears to mistakenly adopt the premise that Valve and publishers are locked in a zero-sum game, meaning that when something is good for Valve, it must be bad for publishers.

---

[181] Gowrisankaran Opening Merits Report, ¶¶ 75 ("An important function of Steam is its role as a meeting place where publishers find customers and users discover new games they might want to buy. Valve has improved and expanded this functionality through a series of features on the Steam Store offering improved game discovery and facilitating those matches."), 76 ("Valve's algorithmic visibility recommendations generate personalized title suggestions to users based on their own game preferences, gameplay histories, and the games to which their Steam friends have shown interest."), 77 ("In complement to algorithmic recommendations, Valve also engages in curated marketing—targeted marketing efforts to boost the visibility of games that Valve believes have special appeal to consumers, especially around the time a game is launched. For example, during a marketing effort called a "takeover," a large art piece for a particular video game appears at the top of Steam's front page.").

[182] Gowrisankaran Opening Merits Report, ¶ 78 ("Importantly, Valve does not sell advertisements or accept payment to adjust the placement of titles, leaving its marketing and visibility features to be driven by individual and community behavior.").

(92)    Specifically, Professor Rietveld dismisses the value of discoverability investments made by Valve on Steam by stating that "they are designed and implemented to maximize benefits for Valve, such as by recommending games from which Valve benefits the most," and that these features "give consumers incentives to purchase the games on Steam and not on another platform."[183] While Professor Rietveld provides no evidence for his claim that discovery merely maximizes benefits for Valve, he also misses the point that, even if his arguments were true, publishers still benefit when Valve benefits from those purchases. It is a procompetitive expansion of economic activity when Steam helps a consumer become aware of a game that they are interested in purchasing. Valve has an incentive to provide these types of matches because of its revenue share model. If consumers instead made these purchases elsewhere, Valve would have a reduced incentive to facilitate these types of matches—reducing economic activity.

---

[183]    Rietveld Rebuttal Merits Report, ¶ 151 ("However, he failed to note that those features give consumers incentives to purchase the games on Steam and not on another platform—conditional on discovering those games in the first place. Furthermore, none of those features are relationship-specific investments. They are designed and implemented to maximize benefits for Valve, such as by recommending games from which Valve benefits the most.").

Finally, in what appears to be a misunderstanding of the economics of free-riding, Professor Rietveld asserts that the incentive alignment of the revenue share model somehow negates the free-riding incentive on publishers' side of the relationship in regards to showrooming.[184] As explained in my earlier reports, when consumers match to content on Steam but purchase the game more cheaply off Steam, the publisher free-rides off of Valve's investments in Steam's discoverability features for that sale, potentially earning more than had the purchase occurred on Steam.[185] Neither publishers nor consumers pay for consumers on Steam to receive the recommendations generated from Steam's marketing services matches.[186] Consumers are also capable of taking those match recommendations to price comparison tools, such as ITAD, to check for lower price offers for that content off of Steam at no charge.[187] Thus, while revenue sharing pushes Valve to make successful matches of consumers with content they are likely to purchase, Valve cannot force consumers to buy the games on Steam instead of elsewhere, an obvious point that squarely contradicts Professor Rietveld's criticism.

---

[184]  Rietveld Rebuttal Merits Report, ¶¶ 134 ("Dr. Gowrisankaran's argument that Valve's parity requirements 'can have procompetitive effects' by mitigating free-riding on Steam's services is premised on the idea that Valve's incentives are not aligned with the incentives of PC game publishers that distribute their games through Steam."), 136 ("If Valve's revenue share model aligns the incentives of Valve and PC game publishers, as Dr. Gowrisankaran asserted, then, according to his own argument, there should be no circumstance giving rise to free-riding on Steam's services.").

[185]  Gowrisankaran Opening Merits Report, ¶¶ 150 ("Consistent with the literature on showrooming to which I refer in Section 4.1, publishers may have incentives to free-ride on Steam's marketing services while diverting sales to channels that provide Valve with a lower revenue share."), 151–152 ("[Marketing services] investments increase awareness of games and improve the information consumers have on the distinguishing features of games as well as how other consumers value those features. This awareness and information increases the probability that consumers will purchase games. However, publishers may free-ride on those benefits and steer consumers to other sales channels, for example, by offering games at lower prices there."); Gowrisankaran Rebuttal Merits Report, ¶ 295 ("Valve makes significant investments in platform features and marketing for games that publishers benefit from. But some publishers may have incentives to free-ride on Steam and this can reduce the value that Valve gets from those investments if a publisher uses Steam to showroom its games but tries to systematically make Steam offers less attractive than offers on other channels.").

[186]  Steamworks, "Visibility on Steam," available at https://partner.steamgames.com/doc/marketing/visibility, accessed on April 8, 2025 ("Q. Can I pay for my game to show up to more customers? A. Nope. You focus on making a compelling, interesting, and unique game, and Steam will work out the best places to feature your game based on customers' interests, preferences, and feedback."); Jeremy Laukkonen, "Steam Sign-Up: How It Works," *Lifewire*, September 28, 2023, available at https://www.lifewire.com/what-is-steam-4177380, accessed on April 19, 2025 ("Signing up for a Steam account is free, and there are no ongoing costs to use the service. ... In addition to a storefront where you can buy games and a desktop app that allows you to download and organize your games, Steam also has many community features. When you sign up for Steam, you get access to game forums, guides, reviews, the Steam Workshop where you can check out mods and new game assets, and Steam Chat.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## 3.2. Empirical analysis shows that Valve's marketing features benefit publishers, rebutting assertions of both Plaintiffs' Experts

(94)    As I discussed in my opening report, Valve uses a recommendation algorithm that is based on consumer behavior and preferences.[188] As discussed both in my initial report and above, Valve's economic incentive is to provide consumers with information about games they may wish to purchase.[189] The result is that Steam's marketing features are valuable to publishers, and increase both visibility and total purchases.[190] Valve has published many statements that discuss how its algorithm works and has improved over time. For example, in 2017, Alden Kroll, a user interface designer at Valve, published an article explaining that recent discoverability updates have focused on "providing a more personalized experience tailored to individual tastes." He explains that the algorithm uses "community activity" and "behavioral inputs" to generate recommendations. These updates led to a 46 percent increase in games shown to customers, and a 27 percent increase in purchases, which Kroll explains shows that Steam is "showing the right games to customers."[191]

---

[187]    Gowrisankaran Rebuttal Merits Report, ¶¶ 439 ("ITAD is a price comparison website that helps consumers find the best deals on games, bundles, downloadable content (DLC), and packages (which I jointly refer to as 'applications' in this appendix) from online platforms such as Steam, GOG, and Humble Store."), 176 ("the very existence of price-comparison websites like ITAD and the fact that they collect prices for games on Steam is a strong signal that prices vary across platforms, including Steam. If prices held at parity for all games on Steam, there would be no use for ITAD or other deal-finding websites like it, such as https://gg.deals, comparing prices for games on Steam.").

[188]    Gowrisankaran Opening Merits Report, ¶ 76 ("First, Valve's algorithmic visibility recommendations generate personalized title suggestions to users based on their own game preferences, gameplay histories, and the games to which their Steam friends have shown interest.").

[189]    Gowrisankaran Opening Merits Report, ¶ 65 ("The revenue share model also aligns the incentives of publishers and Valve, since Valve does well when a game does well on Steam. This creates strong incentives for Valve to invest in features that will help games succeed.").

[190]    In my opening report, I describe Steam Next Fest, a multi-day event on Steam showcasing upcoming games. Industry articles have acknowledged the positive effects of Valve's algorithmic marketing during these events. Gowrisankaran Opening Merits Report, Appendix A; Zukalous, "Steam Next Fest Feb 2025," *How to Market a Game*, March 4, 2025, available at https://howtomarketagame.com/2025/03/04/steam-next-fest-feb-2025/, accessed on April 25, 2025 ("I am very confident in the Steam algorithm and the Steam player base to find good games. ... In the week before Steam Next Fest I played a fishing game and a Idle Farming game. My recommendations on day 1 and 2 were all Farming and Fishing. I was trying a bunch of demos throughout the fest and by the end I was getting platformers and automation games. Just one data point, but it seems my Next Fest recommendations were heavily weighted by what I played recently.").

[191]    Alden Kroll, "Steam Discovery 2.0 analysis: Valve shares latest metrics," *Game Developer*, February 7, 2017, available at https://www.gamedeveloper.com/business/steam-discovery-2-0-analysis-valve-shares-latest-metrics, accessed on April 15, 2025 ("Over the

---

(95)    Given the above, algorithmic marketing features on Steam have had measurable benefits to publishers. I also discussed in my opening report that Valve uses curated marketing features in combination with algorithmic marketing. In particular, curated marketing "takeovers" provide consumers with more information about available games and promotions, which increase revenues for publishers that participate in them. As I described in my opening report, takeovers are marketing events that Steam conducts for specific publishers and games that it believes will have special appeal to consumers. During these events, large promotional banners appear on the top of Steam's front page and direct players to the games or publishers that the takeover is promoting.[192] Like algorithmic marketing, curated marketing features increase total purchases and improve visibility and discoverability for games.

---

past two years, a series of updates to the Steam store, including Discovery 1.0 and 2.0, have brought major changes to the way we highlight games for customers, providing a more personalized experience tailored to individual tastes ... the improvements of Discovery 2.0 have resulted in showcasing 46 percent more games to customers via the main product capsule ... how do we know we are showing the right games to customers? After the launch of Discovery 2.0, customer purchase conversion from the main capsule increased by 27 percent. The new main capsule algorithm has recommendations that leverage community activity (such as what your friends are playing), in addition to previous behavioral inputs (game playtime, wishlisting, etc.)"). In 2019, Valve made even more updates to its discoverability algorithm that aimed to "[show] customers a diverse set of games while keeping the games relevant to them." Valve conducted a variety of tests to determine the effectiveness of the updates, none of which measured profitability. For example, Valve measured the number of unique games visited and the average clicks per game. Valve concluded that these updates benefited customers by helping them to "[find] things they didn't know they wanted." See Steam, "Store Discovery Update," September 12, 2019, available at https://steamcommunity.com/groups/steamworks/announcements/detail/159138140865 2851752, accessed on April 15, 2025 ("We wanted to ensure that we were showing customers a diverse set of games while keeping the games relevant to them ... To get a feel for the breadth of titles that were being visited, we measured how many games members of the experiment group visited via the 'Recommended For You' section compared to a sample of customers who were not in the experiment for a few days. The results were very promising: we saw a 75% increase in the number of unique games visited, and a 48% increase in the average visits per game ... It shouldn't come as much of a surprise, but by increasing qualitative specificity and showing a wider range of titles, more customers found things they didn't know they wanted.").

[192]    Gowrisankaran Opening Merits Report, ¶ 77 ("For example, during a marketing effort called a 'takeover,' a large art piece for a particular video game appears at the top of Steam's front page. Steam uses takeovers to amplify games that it believes customers are excited about.").

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.    Plaintiffs' experts fail to rebut the procompetitive effects of Steam's features and potential for free-riding

(96)    As an example, consider the "Rockstar Games Sale" takeover that featured games from developer and publisher Rockstar Games from March 10, 2022 through March 14, 2022.[193] As a part of this sale, many of Rockstar's titles were offered at a discount, with the sale being advertised by a banner on Steam's front page. This banner appeared at the top of the Steam front page and prominently displayed the takeover name, artwork related to popular Rockstar titles, and prominent text noting that consumers could "save up to 70%."[194] In Exhibit 2, I provide a screenshot of what this takeover looked like on the Steam front page when it was active.

**EXHIBIT 2**
***Rockstar Games Sale Steam takeover for Rockstar Games titles: March 10, 2022—March 14, 2022***



*Source: Steam, "Welcome to Steam," March 12, 2022, available at*
*https://web.archive.org/web/20220312064755/https://store.steampowered.com/, accessed on April 18, 2025*

---

[193]    I analyze data collected from SteamDB providing information on Steam home page takeovers. Specifically, I collect data on takeovers promoting specific publishers. These data are available in my backup materials and are collected from SteamDB, "Steam Store Takeover Banner History," available at https://steamdb.info/sales/takeovers/, accessed on April 30, 2025 ("SteamDB Steam Takeover Data").

[194]    See Exhibit 2.

(97)   This takeover ran for 5 days. The marketing benefits from this takeover are apparent when comparing the daily net sales for Rockstar titles during the takeover relative to other times those titles went on sale for similar amounts. For example, Exhibit 3 demonstrates sharp increases in U.S. daily net sales for *Grand Theft Auto IV: The Complete Edition* during the March 2022 Rockstar Games Sale takeover. In this figure, the grey highlighted periods indicate periods for which the game was offered at similar discounts, the blue line summarizes daily net sales, and the dashed vertical lines indicate when the takeover took place.

---

**EXHIBIT 3**
***Daily U.S. Net Sales for*** ████████████████████████████████████████████

*Source: Schwartz Opening Merits Report, backup materials; SteamDB Steam Takeover Data*

Note: The dashed vertical lines indicate the start and end of the ████████████████████████ takeover event. Daily Net Sales aggregates, for each day, net sales from U.S. sales of packages containing ████████████████████████████ and excluding packages that contain the title in addition to another game app.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(98)   Exhibit 3 demonstrates that ███████████████████████████ was sold at a similar discount for 11 distinct periods during 2022, including the period of the takeover event. To demonstrate the effect of the ███████████ ███ takeover, one can examine the relative difference in sales during the takeover period as compared to periods where the title was offered for the same price. During the 10 same-price discount periods where there was not a takeover event for ███████████, U.S. daily net sales averaged only ███████ per day compared to ███████ per day during the takeover period.[195]

(99)   Critically, apart from the takeover, this title would also receive the same marketing benefits on Steam as it would have otherwise. For example, users who have added the game to their Steam Wishlist would still receive the same Steam Wishlist notification that the title is on sale.[196] This demonstrates how takeovers benefit publishers over and above other factors that may affect their sales, such as through discounts.

---

[195]   Workpaper 2.

[196]   Fraser Brown, "Steam sale dates: When is the next Steam sale?" *PC Gamer*, March 20, 2025, available at https://www.pcgamer.com/steam-sale-dates/, accessed on April 10, 2025 ("Nowadays, Valve reveals Steam Sale dates well in advance, major seasonal sales serve as reliable quarterly landmarks, and—best of all—there's no messy augury required. Still, with Steam now rolling out frequent genre-specific sales, it can be helpful to have someone keeping the calendar. That's where we come in. We're tracking all the confirmed Steam Sale dates as they're announced, so you can focus on curating your wishlist. ... Whenever you see a game you might want, add it to your wishlist. You will receive notifications when wishlisted games are on sale and having a list makes it easier to resist buying unlisted games for the sake of it on impulse.").

(100)    While I use the above example for illustrative purposes, I also more formally analyze the effect of takeovers on game sales in the U.S. by looking at all takeovers that promoted a specific publisher on Steam. In my analysis of takeovers that promoted a specific publisher, I am able to assess the effect of the takeover by looking at games sold by that particular publisher during takeovers, compared to times when they did not benefit from a takeover, after controlling for the fact that takeovers are generally accompanied by discounts. I use an econometric technique called an "event study" regression.[197] This technique is common in academic research and allows me to isolate the effect of a takeover from other factors that can affect game sales. In my case, I analyze the effect of multiple takeover events by comparing the effect of takeover events on daily net sales (i.e., revenues) for games above and beyond the effect of game discounts. I perform a regression that accounts for the discount level and factors affecting daily net sales across different months for a given game and factors that affect daily net sales for each game on a given day of the week.[198] For each game, this approach allows me to account, for example, for sales being higher on average during certain days of the week (say, on weekends) or in certain months and years (say, before the holidays, during the start of a particular sports season, or during months after the start of the COVID pandemic). I find that takeovers increase daily net sales for games from highlighted publishers in the U.S. by ▮ percent on average.[199]

---

[197]    Event study techniques are common in the economic literature. Event study methods are closely tied to the concept of fixed-effects regression that accounts for unobservable common characteristics across groups of observations, such as accounting for unobserved factors that affect daily net sales for a game across all days within a given year and month. See, e.g., Douglas Miller, "An Introductory Guide to Event Study Models," *Journal of Economic Perspectives*, 37(3), Spring 2023, pp. 203–230; Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*, Fourth Edition, (Mason, OH: Southern-Western Cengage Learning, 2009), Chapter 14; Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, (Princeton, NJ: Princeton University Press, 2010), Chapter 2, Section 2.2.3.1.

[198]    Specifically, I include regressors for each game-year-month combination and each game-day of the week combination. These fixed effects flexibly control for factors that contribute to average daily net sales for a game within a given month or on a given day of the week across weeks in the data.

[199]    See Exhibit 4.

---

(101)    In connection with this analysis, I also test whether these results differ based on the popularity of the game that benefits from the takeover *before* the takeover. That is, I analyze the effect of the takeover on all games for a publisher benefitting from a takeover, and then separately analyze the data when looking at the effect on the publisher's most popular games (where popularity is based on units sold during the year prior to the takeover). I find that, while games of all kinds benefit from takeovers, the results are actually strongest for games that had lower sales volume prior to the takeover. This pattern is visible in Exhibit 4 below, which shows my main result, and then results when I limit the analysis to more popular (and more expensive) games. When I look at games that sold over 100,000 units in the prior year, I find that takeovers increase daily net sales by ■ percent on average. When I instead look at all games associated with takeovers, I find that the takeover increases their daily net sales by ■ percent.[200] I conclude from this analysis that Steam's curated marketing promotions benefit publishers.

**EXHIBIT 4**
***The benefits from takeover marketing are largest for smaller games***

*Source: Schwartz Opening Merits Report, backup material; SteamDB Steam Takeover Data*

Note:

[1] The regression model regresses log daily net sales on whether a day was during a takeover event, controlling for the interactions between games and log daily average sale price, as well as the fixed effects of games, game-by-year-by-month pairings, and game-by-day of the week. The analysis is limited to games whose publishers had a takeover event, packages that contain only a single game application, and transactions with positive net unit sales in the U.S. from 2017 to 2024. Daily game sale prices are calculated as the net unit-weighted average sale price of packages containing a given game. "*" indicates that the estimate is statistically significant at 95% confidence level.

[2] Standard errors are clustered at the game-by-year-by-month level.

[3] Estimated percentage change in daily net sales is calculated by taking the inverse log of the coefficient estimate and subtracting 1.

[4] For each game, daily base prices are calculated as the net unit-weighted average base price of analyzed packages. Average game base price, across all included games, is calculated as the average of each individual game's average daily price.

[5] Observations for a given game-year are analyzed only if the game had over 10,000 unit sales in the prior year.

[6] Observations for a given game-year are analyzed only if the game had over 100,000 unit sales in the prior year.

---

200    I note that my results do not depend on whether I exclude new releases from the analysis to avoid any confounding effects from newer games, which often have significant launches. I also assess these results across a range of specifications and my overall finding, that takeovers substantially increase publisher sales, is consistent across all of them. See Workpaper 3.

(102)    Dr. Schwartz claims that I have "no analysis or evidence to conclude that the way Valve selects games to promote, and market on Steam is welfare enhancing for consumers or publishers."[201] The analysis above shows that publishers do benefit from promotions on Steam. Dr. Schwartz also claims that algorithmic recommendations are not welfare enhancing because Steam "design[s] recommendations and shape[s] user and publisher behavior to maximize platform profits."[202] To support his conclusion, he relies on a single document that he claims shows that Valve aims to "maximize happy customers" and that "Valve measures 'happy customers' by how much money and time consumers are spending on Steam."[203] Dr. Schwartz's conclusion relies on cherry-picked evidence from the cited document. That is, his own evidence discusses increases in customer conversion from updates made to Valve's marketing algorithms, increases in the number of different games appearing in the "Main Capsule" of Steam's front page, and how these effects are most apparent "in the exposure of smaller titles to appropriate niche audiences."[204] Valve has continually made updates to introduce players to more titles, based on the player's interest. In May 2017, Valve launched an algorithm section on game pages that tells the user why a specific game may be recommended for them, with reasons such as similarity to other games the user has played or friends owning or wanting the game.[205] In September 2019, Valve updated its recommendations algorithm to increase qualitative specificity and to show a more diverse range of titles.[206]

---

[201]    Schwartz Rebuttal Merits Report, ¶ 48.

[202]    Schwartz Rebuttal Merits Report, ¶ 52.

[203]    Schwartz Rebuttal Merits Report, ¶ 47.

[204]    Valve Internal Document, "Steam Store Updates Helping Customers Find Games," VALVE_ANT_0054520–24 at 23 ("You can see in the graph below that each time we've made changes, we've seen a dramatic increase in the number of unique titles we are able to feature (amounting to an increase in unique titles of 46% since launching Discovery 2.0). ... This is most apparent in the exposure of smaller titles to appropriate niche audiences."), 24 ("We can see that in the months prior to Discovery 2.0, customer conversion ... sees a significant jump, with the overall rate increasing 27% over the prior period.").

[205]    Steam, "The Steam Store: Our Philosophy and Next Steps," May 8, 2017, available at https://steamcommunity.com/games/593110/announcements/detail/1301948399257707 760, accessed on April 24, 2025 ("We want to show you more of what [the algorithm is] doing and why - and we have some features planned to help with this, starting with one we're launching today: an algorithm section on game pages that states why the Store thinks this game will (or will not) be interesting to you. ... Reasons you might like this game ... Similar to games you've played ... 21 friends want this game ... 51 friends already own this game").

[206]    Steam, "Store Discovery Update," September 12, 2019, available at https://steamcommunity.com/groups/steamworks/announcements/detail/159138140865 2851752, accessed on April 15, 2025 ("It shouldn't come as much of a surprise, but by increasing qualitative specificity and showing a wider range of titles, more customers found things they didn't know they wanted.").

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY