# EXHIBIT 2
# Report Part 2

# (Dkt No. 456.02)

# REDACTED

(103)    Dr. Schwartz's arguments presuppose that Valve and publishers are locked in a zero-sum game where consumers spending money and time on Steam is bad for publishers. As I explained in Section 3.1, when Steam enables consumers to find and purchase games previously unknown to them, that is a procompetitive expansion of economic activity. Valve has an incentive to provide these types of matches because of its revenue share model. Dr. Schwartz does not explain how consumers spending money is bad for publishers: the only hypothetical scenario he explores fails to acknowledge that search and discovery can facilitate purchases that would not have happened otherwise.[207]

(104)    Metrics tracking the success of new releases on Steam further disprove Dr. Schwartz's claims. For example, Valve found that "the number of games [earning at least $10,000 in the first two weeks after release] has increased pretty consistently over time" and that "in 2019, there were over 3X as many games earning $10,000 at launch compared with 2013."[208] With the launch of Steam's Discovery 2.0, Kroll also stated that "we wanted to make sure that our changes to Steam weren't just serving the same small group of highly marketed titles. A healthy ecosystem should be able to support a range of games of various scales and potential audiences."[209]

---

[207]    Schwartz Rebuttal Merits Report, ¶ 49. Dr. Schwartz also expresses concern that Valve's algorithm may match users with games that have longer playtime. See Schwartz Rebuttal Merits Report, ¶ 50 ("Steam will promote games that result in longer play times, independent of users' preferences."). Dr. Schwartz does not acknowledge that the users in the industry are widely shifting towards larger games and spending more time on those games. For example, Newzoo found that in 2023, the average PC gamer played eight games, a number abnormally lower than that of other years. Newzoo's director of consulting, Ben Porter, hypothesized that "it might be because of the titles. So you had Baldur's Gate, Hogwarts Legacy, Diablo. Elden Ring was still being played from its 2022 launch. At least three or four very big titles sucked in a lot of play time in aggregate." In a 2025 report, Newzoo also found that "Overall playtime hours are growing but concentrated in AAA and at times cannibalistic; the battle for audience hours is fierce and near zero sum." See Dave Bradley, "New titles are fighting harder for player attention in 2025: Newzoo report," *PC Games Insider*, March 20, 2025, available at https://www.pcgamesinsider.biz/feature/75052/newzoo-reports-on-the-state-of-pc-gaming-at-gdc-2025/, accessed on April 15, 2025; Newzoo, "The PC & Console Gaming Report," 2025, p. 41.

[208]    Steam, "Data Deep Dive: How are new releases on Steam performing?" April 7, 2020, available at https://steamcommunity.com/groups/steamworks/announcements/detail/2117195691992645419, accessed on April 23, 2025.

[209]    Christopher Dring, "Steam's Discovery 2.0 has seen 46% more games showcased on the homepage," *GamesIndustry.biz*, February 9, 2017, available at https://www.gamesindustry.biz/steams-discovery-2-0-has-seen-46-percent-more-games-showcased-on-the-homepage, accessed on April 22, 2025 ("[Valve] says that its Discovery 2.0 update has had a profound impact on the number of games seen and bought. [Kroll stated] 'we wanted to make sure that our changes to Steam weren't just serving the same small group of highly marketed titles. A healthy ecosystem should be able to support a range of games of various scales and potential audiences'").

(105)   Valve's marketing features provide value to publishers and players through increased discoverability and visibility. Curated marketing campaigns create valuable marketing opportunities for publishers to reach more players and increase sales. Algorithmic recommendations help players find games in which they are interested, based on their past behavior and community interactions. Valve's internal analysis and my own analysis both support these conclusions, and Plaintiffs' experts point to no evidence that affect my conclusions.

## 3.3. Plaintiffs' experts' review of the academic literature takes papers out of context and hence is not informative

(106)    In my opening report, I discussed a broad academic literature relevant to the core economic issues of this matter. For instance, I summarized the academic literature related to free-riding.[210] I also discussed how the economics of free-riding can apply to a platform where searching and matching are core functions, and that platform marketing services can be subject to free-riding.[211] For example, I explain that, "One type of free-riding that is relevant for the assessment of the at-issue conduct in this litigation is that of 'showrooming,'" and that, "In the specific case of *platform* showrooming, sellers may take advantage of the platform's large consumer audience and high-quality features—such as product search and discovery capabilities and customer reviews—to gain visibility and inform consumers about their products' features."[212] I again cite extensively to the appropriate academic literature to support these analyses.[213] In particular, given my opening report's focus on innovation, features, and procompetitive effects, I discuss the way that free-riding affects Valve's incentive to invest in procompetitive features.[214]

---

[210]    In Section 3.1 of my Opening Merits Report, I provide an extensive discussion of the economics literature regarding the issues of incentives, investments, relationships between firms, free-riding and the related issue of "hold-up." That section cites the following literature, including work by three Nobel Prize Winners (i.e., Oliver Hart, Bengt Holmstrom, and Jean Tirole): Milgrom and Roberts (1992); Jean Tirole, *The Theory of Industrial Organization*, (Cambridge, M.A.: MIT Press, 1988); Bengt Holmstrom and John Roberts, "The Boundaries of the Firm Revisited," *Journal of Economic Perspectives*, 12(4), 1998, pp. 73–94; Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, Fourth Edition, (Harlow, Essex: Pearson Education Limited, 2015); Jeffrey M. Perloff, *Microeconomics*, Seventh Edition, (Boston: Pearson Education, Inc., 2015); Oliver Hart and John Moore, "Incomplete Contracts and Ownership: Some New Thoughts," *American Economic Review*, 97(2), 2007, pp. 182–186; Oliver Hart and John Moore, "Property Rights and the Nature of the Firm," *Journal of Political Economy*, 98(6), 1990, pp. 1119–1158; Mark Armstrong and David Sappington, "Recent Developments in the Theory of Regulation," in *Handbook of Industrial Organization*, ed. M. Armstrong and R. Porter (North Holland: Elsevier, 2007), pp. 1557–1700.

[211]    Gowrisankaran Opening Merits Report, Section 4.1.

[212]    Gowrisankaran Opening Merits Report, ¶¶ 127–128.

[213]    In Section 4.1 of my Opening Merits Report, I provide a detailed discussion of the economics literature that finds the measures to address free-riding can have procompetitive effects, and how it relates to showrooming and platforms. That section cites to the following literature: Milgrom and Roberts (1992); Amit Mehra, Subodha Kumar, and Jagmohan S. Raju, "Competitive Strategies for Brick-and-Mortar Stores to Counter 'Showrooming,'" *Management Science*, 64(7), 2018, pp. 3076–3090; Jonathan B. Baker and Fiona Scott Morton, "Antitrust Enforcement Against Platform MFNs," *The Yale Law Journal*, 127(7), 2018, pp. 2176–2202 ("Baker and Scott Morton (2018)"); Margherita Colangelo, "Competition Law and Most Favoured Nation Clauses in Online Markets," in *New Developments in Competition Law and Economics*, ed. Klaus Mathis and Avishalom Tor (Switzerland AG: Springer International Publishing, 2019) pp. 295–317; Ariel Ezrachi, "The Competitive Effects of Parity Clauses on Online Commerce," *European Competition Journal*, 11(2-3), 2015, pp. 488–519; Chengsi Wang and Julian

(107)    In response, Professor Rietveld summarizes 28 papers which he "deemed directly relevant" to the conduct and allegations in this matter and which he represents to be "a review of academic articles addressing PMFNs across economics and antitrust and competition law publications."[215] Professor Rietveld concludes from his review that "the academic literature demonstrates that the circumstances" where pricing controls can be procompetitive "do not apply to Steam."[216]

(108)    Despite his claims, the papers Professor Rietveld reviews do not support his conclusions, nor do they rebut the arguments in my opening report. Professor Rietveld provides no specific academic support for his conclusion, nor does he provide a clear explanation for why he believes these papers apply to Steam. To the contrary:

   (a) **Zero** of the 28 papers examine platforms or industries that use Steam-key-like features. A paper that does not contemplate the existence of market features such as Steam keys cannot be used to rebut the possibility that Steam keys have procompetitive effects.

   (b) Only one of the 28 papers studies a case like Steam, where publishers are free to charge different prices on different platforms.[217] This one paper is an empirical study of a setting where price parity does not hold, consistent with my findings here, and it finds that banning "price parity requirements" in such a context does not lead to an observable change in firm behavior.[218]

---

Wright, "Search Platforms: Showrooming and Price Parity Clauses," *The RAND Journal of Economics*, 51(1), 2020, pp. 32–58 ("Wang and Wright (2020)").

[214]  For example, I discuss the economics of incentives to invest (Gowrisankaran Opening Merits Report Section 3.1), how free-riding can change the economic incentive to invest (Section 4.1, ¶ 131), the way free-riding on Steam keys affects Valve's incentive to invest (Section 4.2.2, ¶ 147) and the way showrooming affects Steam's incentive to invest in marketing services (Section 4.3, ¶ 150).

[215]  Rietveld Rebuttal Merits Report, ¶ 139 ("This review resulted in identification of 28 published articles I deemed directly relevant to the issue of the effects Valve's parity requirements have on competition.").

[216]  Rietveld Rebuttal Merits Report, ¶ 131.

[217]  Section 2.2.2.

[218]  Matthias Hunold et al., "Evaluation of Best Price Clauses in Online Hotel Bookings," *International Journal of Industrial Organization*, 61, 2018, pp. 542–571 ("Hunold, et al. (2018)"), pp. 570–571 ("We do not observe such a trend for independent hotels, which is consistent with the observation that independent hotels already initially had a direct channel price below the price of Booking.com much more often than chain hotels, indicating a higher non-compliance with BPCs. ... One reason could be that the effects of BPCs are limited overall. To the extent that hotels did not comply with the parity clauses or that the clauses were not binding because hotels charged higher direct prices than OTA prices, it is natural that their abolition had limited effects.").

(i) The remaining papers rely on an assumption that PMFNs impose perfect price parity and hence are not applicable to this context. A paper that draws its conclusions through price parity cannot demonstrate harm in a setting where no such parity exists.[219]

(c) Only one of the papers examines the relevant question of how PMFNs affect the incentive to invest in the presence of free-riding.[220] Papers that analyze a separate research question rather than the effects of free-riding on the incentive to invest cannot be used to address how free-riding affects Valve's incentive to invest in Steam features, nor whether those features provide procompetitive benefits.

(109) Professor Rietveld fails to provide a clear economic explanation for why the 28 papers that he put forward are the most relevant and appears to miss the point of an academic literature review altogether. Academic literature reviews can be useful to assess how academics have considered different theoretical mechanisms, or to gain a reference for the different empirical estimates that may be plausible, *as they relate to a given question*. But generating conclusions from such reviews requires evaluating the relevance of a study based on numerous factors related to the underlying economics at issue. To determine relevance the theoretical mechanism at the core of the research question, as well as the assumptions defining the model, must be considered in addition to the study's context. As just shown, Professor Rietveld fails to do this.

(110) Many of the papers cited by Professor Rietveld support my claims that assessing net harms and benefits requires an understanding of the facts and context of a given situation. For example:

(a) One of the papers cited by Professor Rietveld states that "when an MFN may create both anticompetitive effects and efficiencies, it is an empirical question whether it would be procompetitive in any particular industry."[221]

(b) Another emphasizes that a "case-by-case approach is appropriate" and that "Whether the procompetitive or anticompetitive effects will dominate in a given case depends on both the wording of the clause, and on the specifics of the industry."[222]

---

[219] Further, for papers to be relevant that use a theoretical model to analyze effects from PMFNs that impose price parity by assumption, then to assert harm based on its findings, one must show that price parity in real world, if parity indeed existed, was caused by the PMFN and did not result from unrelated factors. Dr. Schwartz fails to show this, which I discuss in Section 2.2.3.

[220] See Appendix A, for my discussion of Wang and Wright (2023).

[221] Baker and Scott Morton (2018), p. 2185.

[222] Pinar Akman, "A Competition Law Assessment of Platform Most-Favored-Customer Clauses," *Journal of Competition Law & Economics*, 12(4), 2016, pp. 781–833 at p. 794.

(c) Another noted that an empirical analysis is typically required to sort out the disagreement in the theoretical literature.[223]

(111) Despite this guidance, Plaintiffs' experts do not assess whether the alleged conduct is pro or anticompetitive as an empirical matter based on the facts specific to Valve. Professor Rietveld instead describes general findings in other contexts, without explaining why those contexts apply here. The papers in Professor Rietveld's review thus fail to rebut the analysis and conclusions in my opening report. I describe the papers in Professor Rietveld's analysis further in Appendix A.

(112) The literature cited by Professor Rietveld recommends an empirical and case-by-case approach because context and facts matter, and because different models and settings can generate different predictions. In fact, the literature cited by Professor Rietveld repeatedly pointed to research work that demonstrated procompetitive benefits from price parity. For instance, Johansen and Vergé (2017) construct a theoretical model that shares a similar framework with papers reviewed by Professor Rietveld. The authors even note the similarity of their approach to Boik and Corts (2016).[224] I understand that Professor Langer discussed this research in her rebuttal report and found that Johansen and Vergé made different assumptions about competition and this leads to different results.[225] The authors summarize their findings:[226]

> "Contrary to the theories of harm developed by competition agencies and in some of the recent literature, we show that when we account for the

---

[223]  Hunold, et al. (2018), p. 546 ("As there are different theoretical predictions on the competitive effects of [price parity clauses], it remains an empirical question as to whether and —if yes —how the wide and narrow [price parity clauses] of OTAs affect the market outcome.").

[224]  Bjørn Olav Johansen and Thibaud Vergé, "Platform Price Parity Clauses with Direct Sales," University of Bergen Working Paper, 2017, pp. 1–37 ("Johansen and Vergé (2017)"), p. 5 ("Our paper is very closely related to Boik and Corts (2016) and Johnson (2014), with two major differences: first, we allow suppliers to sell directly (through their own websites, for instance) as well as through agents; and second, we account for the suppliers' listing decisions; that is, we do not assume that suppliers are always active on all platforms.").

[225]  Expert Report of Ashley Langer, Ph.D., March 26, 2025 ("Langer Rebuttal Merits Report"), ¶ 84 ("Based on these changes, which better mirror the realities of the video game industry, Johansen and Verge find that, unlike in Boik and Corts (2016), a PMFN can have procompetitive effects: it may lead to higher profits for publishers and higher user welfare because of the ability of publishers to leave a platform and self-distribute."). See also Johansen and Vergé (2017), p. 5. ("Our paper is very closely related to Boik and Corts (2016) and Johnson (2014), with two major differences: first, we allow suppliers to sell directly (through their own websites, for instance) as well as through agents; and second, we account for the suppliers' listing decisions; that is, we do not assume that suppliers are always active on all platforms.").

[226]  Johansen and Vergé (2017), p. 1. See also Johansen and Vergé (2017), pp. 31–32 ("when the suppliers compete fiercely, we find that price parity clauses are unlikely to cause any harm and may actually increase platforms' and suppliers' profits as well as consumer surplus.").

seller's participation constraints, price parity clauses do not always lead to higher commissions and final prices. Instead, we find that they may simultaneously benefit all the actors (platforms, sellers and consumers), even in the absence of traditional efficiency arguments."

(113)    Johansen and Vergé (2017) and its procompetitive effects result is cited extensively in the literature considered by Professor Rietveld.[227] Specifically, it is cited by 15 of the 22 papers cited by Professor Rietveld that were published in 2017 or later (when the paper was released in the University of Bergen's working paper series).[228] Despite this, Professor Rietveld does not mention the paper. Two other recent papers cited by the literature in Professor Rietveld's review also find evidence for the procompetitive effect of price parity clauses, but Professor Rietveld does not mention them either.[229]

---

[227]    Justin P. Johnson, "The Agency Model and MFN Clauses," *The Review of Economic Studies*, 84(3), 2017, pp. 1151–1185 ("Johnson (2017)") at p. 1154 ("Johansen and Vergé (2016) argue such restraints may be beneficial to consumers in certain circumstances, leading to lower prices."); Hunold, et al. (2018) at pp. 545–546 ("In contrast to the contributions above, Johansen and Vergé (2017) offer a divergent view to the main theory of harm. They show that BPCs do not necessarily lead to higher commission rates and consumer prices if hotels can decide whether to be active on the OTA. Moreover, they conclude that narrow BPCs do not increase competition between intermediaries when compared to wide BPCs. These findings could explain the observation that the base commission rates of OTAs have apparently remained largely unchanged in Europe following the move of Booking.com in 2015 to use only narrow BPCs."); Wang and Wright (2020), p. 34 ("Johansen and Vergé (2017) also allow for a direct channel, but assume consumers view each of the channels (the two different platforms and the direct channel) as well as each of the firms as being exogenously differentiated. They focus on the effects of allowing firms to delist from the platforms, finding PPCs can decrease prices if suppliers are sufficiently close substitutes, and the direct channel is a sufficiently close substitute for the platform channels."); Chengsi Wang and Julian Wright, "Platform Investment and Price Parity Clauses," *The Journal of Industrial Economics*, 71(2), 2023, pp. 538–569 ("Wang and Wright (2023)") at p. 541 ("Some exceptions include Johansen and Vergé [2017] who show that given platform fees are constrained by the possible of firms delisting, the imposition of price parity clauses does not necessarily result in higher fees and lower consumer prices, and more recently (Mariotto and Verdier [2020] and Liu *et al.* [2021]) who also show possible positive effects of price parity clauses on consumers.").

[228]    I also note that Nobel Prize winner, Jean Tirole, grouped Johansen and Vergé (2017) in with his list of "a large literature on access with and without MFNs" in a recent publication, alongside several papers from Professor Rietveld's list. Jean Tirole, "Competition and the Industrial Challenge for the Digital Age," *Annual Review of Economics*, 15, 2023, pp. 573–605 at p. 599 ("There is a large literature on access with and without MFNs (e.g., Boik & Corts 2016; Edelman &Wright 2015; Foros et al. 2017; Gomes & Mantovani 2022; Johansen & Vergé 2017; Johnson 2017; Rochet & Tirole 2002; Wang & Wright 2020, 2022).").

[229]    Carlotta Mariotto and Marianne Verdier, "Platform-Merchant Competition for Sales Services," *Journal of Economics & Management Strategy*, 29, 2020, pp. 834–853 at p. 850 ("Consumers and sellers pay a lower total transaction fee under price parity than under no-restrictions and consumers may pay a lower total purchase price when they buy from sellers who receive high transaction benefits for platform sales."); Chang Liu, Fengshi Niu, and Alexander White, "Optional Intermediaries and Pricing Restraints," SSRN Working Paper, 2021, pp. 1–38 at pp. 26–27 ("Notably, we find that consumer

---

(114)  Taken together, Professor Rietveld's review fails across many dimensions.[230] The papers describe contexts that are different from Steam, particularly so because there is not price parity between Steam and other platforms. In addition, the papers Professor Rietveld studies largely do not address the key question: how free-riding diminishes (and how price controls could protect) the incentive to invest.[231] Instead, many papers in Professor Rietveld's literature review emphasize the importance of conducting an empirical investigation and assessing fact-specific circumstances. Professor Rietveld also omits discussions of papers that draw different conclusions about PMFNs and inaccurately states that I "relied on a single article" for the conclusions in my original report.[232] The academic literature acknowledges that free-riding can affect the incentive to invest, and that price controls can protect this incentive. Nothing in Professor Rietveld's report meaningfully challenges the findings in my opening report or suggests that my conclusions would not apply to Steam.

---

surplus and total surplus are often greater under price coherence [i.e., price parity]. This finding stems from a novel drawing-in effect, which is not present in standard models of price discrimination. Under this effect, the platform attracts, to the seller, a set of consumers with relatively low valuations who, in the absence of the platform, would not purchase the seller's good."); both papers are cited by, for example, Wang and Wright (2023), p. 541 ("more recently (Mariotto and Verdier [2020] and Liu *et al.* [2021]) who also show possible positive effects of price parity clauses on consumers.").

[230]  In addition, both Professor Rietveld and Dr. Schwartz misrepresent the opinions in my opening report. For example, Professor Rietveld repeatedly asserts that I analyzed and opined on "Valve's parity requirements" in my opening report. See Rietveld Rebuttal Merits Report, ¶¶ 138, 140, 142, 147. Dr. Schwartz makes a similar assertion, that I "argue[] that Valve's alleged PMFN policy protects Steam's marketing feature." See Schwartz Rebuttal Merits Report, ¶ 56. I instead state that "Free-riding poses a challenge to Valve," and that "the alleged conduct in this litigation is consistent with addressing these free-riding issues." See Gowrisankaran Opening Merits Report, ¶ 132.

[231]  In my Appendix A to this report, I discuss the papers cited by Professor Rietveld in Appendix C to his Rebuttal Merits Report. I summarize each paper's research question and describe if the paper analyzes how PMFNs address the threat free-riding can impose to platforms' incentive to invest. For example, Wang and Wright (2023) develops a model of platforms that consumers use to match to products they might purchase, to examine how PMFNs affect platform decisions to invest in reducing search costs, considering the threat from free-riding. Their model results provide evidence that without a wide PMFN in place to deter free-riding on platform investments that improve consumer search, platforms under-invest in their search features. See Appendix A.

[232]  Professor Rietveld misrepresents my argument, stating that I "relied on a single article by Chengsi Wang and Julian Wright (2020) ... to support [my] assertion that '[t]he economic literature widely recognizes that measures that prevent free-riding *may* generate stronger incentives to invest, leading to more vigorous competition on quality and improved quality for consumers.'" See Rietveld Rebuttal Merits Report, ¶ 143. As the previous footnotes in my current report make clear, my opinions on the effect of free-riding on investments are supported through extensive citation to the academic literature, with Wang and Wright (2020) used to show a direct linkage to the context of platforms in an academic paper cited in previous reports by Professor Rietveld, despite my statement applying more broadly.

## 3.4. Plaintiffs' experts ignore that users can easily find cheaper prices elsewhere

In their rebuttal reports, Plaintiffs' experts acknowledge that showrooming (consumers using one platform to identify a game but another platform or retail channel to purchase the game) can occur on platforms like Steam.[233] Yet, Dr. Schwartz argues that I have not adequately demonstrated that Steam faces a meaningful risk of showrooming.[234] As I explain in this section, Dr. Schwartz is wrong. The evidence I offered in my opening and rebuttal reports demonstrates that consumers have the information, incentive, and ability to free-ride. Users who wish to search across platforms to find the cheapest deal can still benefit from marketing features on a platform like Steam and then purchase the game from whichever distributor offers the lowest price (i.e., to free-ride via showrooming). In addition, by offering Steam keys to publishers (who can share Steam keys with game reviewers, influencers, and content creators), Valve invests in a form of discovery features that also enable freeriding. Empirical tests show that consumer behavior is, in fact, consistent with them free-riding by using Steam to showroom.

---

[233]   Schwartz Rebuttal Merits Report, ¶ 34 ("I do not dispute the theoretical possibility that showrooming exists on platforms. A platform provides a place for one side of the platform, such as hotels or game publishers, to market themselves to the other side, consumers, and for consumers to compare and discover options. It is possible consumers could search for a product on the platform but buy the product directly through the hotel's or game publisher's website.").

[234]   Schwartz Rebuttal Merits Report, ¶ 34 ("However, whether showrooming is an actual problem or merely an academic concern is a question requiring an analysis that Dr. Gowrisankaran does not do.").

Case 2:21-cv-00563-JNW   Document 642   Filed 06/17/26   Page 11 of 71

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.   Plaintiffs' experts fail to rebut the procompetitive effects of Steam's features and potential for free-riding

First, the evidence shows that consumers have the interest and ability to comparison shop across platforms when purchasing video games. For example, in my rebuttal report I discussed price aggregator and monitoring websites like IsThereAnyDeal and GG.deals.[235] These websites, which summarize for users prices across a wide variety of distributors, are consistently recommended by established industry publications as tools for consumers to stay informed about the best available deals.[236] Similarly, major gaming news outlets report when deals become available, including routinely highlighting when other distributors are offering better deals than Steam.[237] For example, Polygon, a Vox Media gaming news source, has a category dedicated to "Deals" including a "Deal Alert" tag to help readers identify all of the best deals available.[238] Offering this type of price comparison and deal information to consumers makes sense only if a consumer base exists that actively seeks out information on which distributor is offering the cheapest price for games they are considering purchasing.[239]

---

[235]   Gowrisankaran Rebuttal Merits Report, ¶ 91 ("For example, websites like GG.deals and IsThereAnyDeal summarize for users the prices across a wide variety of distributors, including both first and third-party."). Another example is the browser extension, Augmented Steam, which allows users to "See the current best price and historical lowest price from many authorized stores, directly next to the purchase box." See Augmented Steam, "Improved browsing and shopping experience for Steam," available at https://augmentedsteam.com, accessed on April 21, 2025.

[236]   Jason Cohen, "7 Easy Ways to Save Money on Video Games," *PCMag*, June 21, 2021, available at https://www.pcmag.com/how-to/play-video-games-without-going-broke, accessed on April 15, 2025 ("If you can't be bothered to scour the web, IsThereAnyDeal aggregates sales across the internet and can show you who has the cheapest price at any given moment."); Alfredo Robelo, "The 5 Best Ways to Get Free Games," *TheGamer*, August 1, 2024, available at https://www.thegamer.com/best-ways-get-free-games/, accessed on March 22, 2025 ("Searching The IsThereAnyDeal Website ... A Trusted Source Of Retailers ... The best website by far to check for free games is isthereanydeal.com, since it bundles the most trusted retailers into a single, easy to browse area ... Like with all sources, if you want a specific game right now, you will likely have to pay for it, but at least you can check IsThereAnyDeal to see if you can get it for cheap.").

[237]   For example, a recent article on Polygon about Steam Spring Sales notes: "Just to note: if you're looking for discounts on *Monster Hunter Wilds, Civilization 7*, and other new games, you'll find those on Fanatical, not Steam." See Toussaint Egan and Tyler Colp, "10 Great Steam Spring Sale Games to Grab at a Discount," *Polygon*, March 14, 2025, available at https://www.polygon.com/what-to-play/537879/steam-spring-sale-2025-best-games-death-stranding-directors-cut-neon-white-sifu, accessed on March 14, 2025.

[238]   In just the week of March 31, 2025, Polygon tagged four PC gaming deals with "Deal Alert," including a dice-rolling collection through Humble Bundle, a Green Man Gaming discount on *The Last of Us Part 2 Remastered*, a *Delta Green* Humble Bundle, and an Itch.io bundle of over 400 tabletop role-playing games. See Alice Jovanée, "Get Disco Elysium and five other dice-rolling titles for just $13 at Humble," *Polygon*, March 31, 2025, available at https://www.polygon.com/good-deals/549948/dice-destiny-disco-elysium-citizen-sleeper-humble-bundle-sale, accessed on April 11, 2025 ("A collection of six excellent story-driven titles powered by six-sided dice are currently available for just $13 on Humble. ... In addition to this collection of six other CRPGs, you'll also get a 15% off coupon to purchase *Citizen Sleeper 2* from Steam, reducing the usual $25 price to

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY                    Page 80 of 150

(117)   In addition, consumers who comparison shop have the ability to look up prices on another distributor and to make purchases from these competing distributors. Dr. Schwartz suggests otherwise, arguing based on his reading of the academic literature that it is costly to check prices on other platforms and that this attenuates any risk that consumers will free-ride off showrooming investments. Dr. Schwartz is fundamentally incorrect, for the reasons stated above. Moreover, his argument is further contradicted by a misunderstanding of features offered on Steam's user interface.[240] For example, Steam gives publishers the ability to provide links on their Steam store pages to their own websites that include links to buy the game through their online stores. This reduces the cost for a consumer to view content on Steam and then switch directly to the publisher's website to make a purchase. In Exhibit 5, I provide an example that shows the Steam store page for the Ubisoft game *Assassin's Creed Shadows* and the link that redirects the user to Ubisoft's website.

---

$21.25."); Alice Jovanée, "The Last of Us Part 2 Remastered for PC is already on sale," *Polygon*, April 1, 2025, available at https://www.polygon.com/good-deals/550557/the-last-of-us-part-2-remastered-pc-pre-order-sale, accessed on April 11, 2025 ("*The Last of Us Part 2 Remastered*, the latest PlayStation "exclusive" to make the jump to PC, doesn't arrive until April 3, but you can already get a discounted copy for Steam courtesy of Green Man Gaming."); Alice Jovanée, "Get dozens of Delta Green's Ennie-award winning stories for just $25," *Polygon*, April 1, 2025, available at https://www.polygon.com/good-deals/550686/delta-green-humble-bundle-sale, accessed on April 11, 2025 ("you can currently get everything you need to start playing Delta Green and over a dozen pieces of supplementary content for just $25 at Humble."); Alice Jovanée, "Support trans rights with this bundle of more than 400 indie TTRPGs for $5," *Polygon*, April 2, 2025, available at https://www.polygon.com/tabletop-games/551768/support-trans-rights-ohio-ttrpg-bundle-sale, accessed on April 11, 2025 ("Itch.io is providing an easy way to fight back with a bundle containing more than 400 TTRPGs from independent creators. While $5 is all you need to get everything included in this bundle, you can always donate more at at checkout to support the cause.").

239   Though not all consumers may comparison shop, the empirical evidence in my rebuttal report and in this section is consistent with a meaningful portion of consumers comparing prices. See Gowrisankaran Rebuttal Merits Report, ¶ 91.

240   Schwartz Rebuttal Merits Report, ¶ 39 ("For example, when consumer transaction costs are sufficiently high, that fact may be enough to minimize showrooming. Those transaction costs can discourage consumers from moving to a second (or multiple) website(s) to check if a good is offered at a lower price and make the purchase on that site. Platforms can strategically increase the cost of switching to another website by facilitating easy transactions.").

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.   Plaintiffs' experts fail to rebut the procompetitive effects of Steam's features and potential for free-riding

**EXHIBIT 5**

***Steam interface for the game Assassin's Creed Shadows displaying a hyperlink to the publisher's website, Ubisoft***



Source: Steam, "Assassin's Creed Shadows," available at
https://store.steampowered.com/app/3159330/Assassins_Creed_Shadows/, accessed on April 11, 2025
Note: "Visit the website" redirects viewers to Ubisoft's website at https://www.ubisoft.com/en-us/game/assassins-creed/shadows.

(118) Second, Steam keys enable free-riding in the form of showrooming. Steam keys can be a powerful marketing tool for publishers to promote and increase the visibility of their games.[241] However, there is no guarantee that this increased visibility will translate into purchases *on Steam*, especially given that games are often sold for lower prices via Steam keys through other channels. This creates considerable opportunities for free-riding given the prevalence of Steam keys.

(119) The usage of Steam keys by resellers demonstrate one way in which Steam keys can enable free-riding in the form of showrooming. Reseller sites have entered at low cost and achieved a level of success through sales of Steam keys at lower prices.[242] While some of these storefronts have also used Steam keys to attract consumers to their independent distribution functions, Steam keys still form the core of their businesses. And, as I demonstrated in my rebuttal report, these channels often use Steam keys to sell games for prices lower than what is offered on Steam.[243] Consider the following two examples:

(a) The first two game bundles sold by Humble Bundle were initially distributed only as direct downloads, with Steam keys being provided later to bundle purchasers.[244] When asked in deposition about the reasoning for beginning to distribute Steam keys alongside direct downloads, Humble Bundle founder Jeffrey Rosen noted that "customers … were really excited to have Steam keys, ███████████████████████."[245] According to Mr. Rosen, Humble "███████████████████" and approximately 95 percent of game keys distributed on Humble were distributed via Steam key.[246]

---

[241] Gowrisankaran Opening Merits Report, ¶¶ 137–138 ("Steam keys continue to be a helpful tool that allow publishers to reach consumers who want to shop in physical stores, while providing the benefits of playing the games on the platform. … Developers can also promote the game at low cost in innovative ways, for example by giving Steam keys away to influencers, game reviewers, or streamers to garner publicity and media attention. This can be particularly helpful for indie games with limited marketing budgets.").

[242] These storefronts do not have to bear the costs of operating Steam or investing in developer- and consumer-friendly features, but sell Steam-enabled titles that constitute a claim on those costs and benefit from access to such features. See Gowrisankaran Opening Merits Report, ¶ 143.

[243] Gowrisankaran Rebuttal Merits Report, Section 7.1.1.

[244] Deposition of Jeffrey Rosen (Wolfire LLC), November 17, 2023 ("Rosen Deposition"), pp. 37–38 ("A. So Humble Indie Bundle 1 … there were no Steam keys involved at that period. At some time later, maybe a month or so at some point, we did add Steam keys for all people who purchased the bundle. Humble Indie Bundle 2 launched with no Steam keys. About halfway through, we added Steam keys to the bundle and for people who purchased the bundle before that point and then after that point, they received Steam keys. … Q. What else did they receive? A. They continued to receive the DRM-free copies of the games.").

[245] Rosen Deposition, p. 39.

[246] Rosen Deposition, pp. 197 ("████████████████████████████████████

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.  Plaintiffs' experts fail to rebut the procompetitive effects of Steam's features and potential for free-riding

(b) Named Plaintiff Wolfire Games requested and received ███████ Steam keys in February 2018, around the time one of its games was featured on a Humble Monthly Bundle.[247] This $12 bundle included Wolfire's *Overgrowth*, along with several other games. At the time, the average price of *Overgrowth* alone on Steam was more than $12.[248] Over ██████ Steam keys were redeemed over the next several months, while Wolfire sold fewer than ██████ copies on Steam.[249] In addition to whatever revenues Wolfire made from selling Steam keys, Wolfire was also able to spread awareness of its games to a broader group of consumers while using Steam. Thus, Steam keys are providing the benefits of Steam features and services without requiring any payment to Steam. Dr. Schwartz does not address this form of free-riding or rebut that Steam keys provide benefits to class members.

---

224 ("Q. Aside from Steam keys, are you able to say or estimate the percentage of keys from other game platforms that were represented in Humble's game sales? … A. I would guess five percent others.").

247 Workpaper 4. *Overgrowth* was an early unlock for March's Humble Monthly. See Bill Loguidice, "Overgrowth is now an early unlock for March's Humble Monthly!" *Armchair Arcade*, February 23, 2018, available at https://armchairarcade.com/perspectives/2018/02/23/overgrowth-now-early-unlock-marchs-humble-monthly/, accessed on April 18, 2025 ("Get a copy of *Overgrowth* (a fun, action stealth adventure) right now, in addition to *DARK SOULS III* + Ashes of Ariandel DLC, with a $12 subscription to Humble Monthly—plus more games to come on Friday March 2 at 10 a.m. Pacific time.").

248 Humble Bundle, "This was the March 2018 Humble Monthly Bundle," available at https://www.humblebundle.com/monthly/p/march_2018_monthly, accessed on April 18, 2025; IsThereAnyDeal, "Overgrowth – History," available at https://isthereanydeal.com/game/overgrowth/history/, accessed on April 18, 2025.

249 Workpaper 4.

---

(120)   Steam key usage by game reviewers, influencers, and content creators further enables free-riding in the form of showrooming. I explained this in my opening report and Dr. Schwartz fails to recognize it in his rebuttal report.[250] Influencers, streamers, and crowdfunding campaigns often utilize these keys for marketing purposes. By sharing their experiences and opinions, they create organic interest and drive potential buyers, shaping public perception and trends within the gaming community.[251] Thus these keys can increase the visibility of and demand for games offered on Steam. However, as I explained above, once consumers have identified a game they are interested in purchasing, they have the incentive and information to seek out the lowest-price distributor. Thus, there is no guarantee that the increased visibility for a game created by reviewers', influencers', and content creators' use of Steam keys will result in consumers purchasing the game *from Steam*. In this way, Steam keys provided to game reviewers, influencers, and content creators also enable showrooming and increase the risk that publishers and consumers free-ride on Valve's marketing investment.

(121)   Finally, I test whether showrooming can lead to free-riding by using data on Steam key redemptions and Steam home page takeovers from SteamDB. Free-riding occurs when consumers use Steam to discover or explore content but then make their purchase from another distributor. Thus, I can test whether showrooming leads to free-riding by looking at games that were prominently marketed ("showcased") on Steam and checking if this marketing led to increased sales of those games *from other distributors*. That is, if Steam keys are redeemed (i.e., obtained off Steam then used to download the game on Steam) at higher rates during marketing events, this suggests a value stream to publishers of Steam's marketing that is separate from the value they derive from increased purchases through Steam and is consistent with free-riding.

---

[250]   Gowrisankaran Opening Merits Report, Section 4.2.2 ("the existence of Steam keys also creates the opportunity and incentive for some publishers to free-ride on Steam's platform services.").

[251]   Association of Certified Gaming Compliance Specialists, "Social Media Influencers and Responsible Gaming: Navigating a New Frontier," available at https://www.acgcs.org/articles/social-media-influencers-and-responsible-gaming-navigating-a-new-frontier, accessed on April 8, 2025 ("Social media influencers have evolved into pivotal players in shaping consumer behaviors, trends, and cultural narratives. Nowhere is this more evident than in the realm of gaming. As influencers rise in prominence, their role in the gaming ecosystem has expanded beyond mere promotion, reaching into the realms of ethics, consumer protection, and responsible gaming practices.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(122)    To illustrate, consider the "PlayStation Publisher Sale" takeover event that ran from September 15, 2022 through September 19, 2022 and featured titles from developer and publisher PlayStation Studios. Similar to the Rockstar Games Sale discussed above, this takeover ran for 5 days and featured a large banner on Steam's front page displaying artwork from popular PlayStation Studios games, the name of the sale, and text stating that users could get PlayStation Studios titles at "up to 75% off."[252] During this event, many PlayStation Studios titles experienced significant increases in Steam key redemptions. For example, Exhibit 6 shows the number of daily U.S. Steam key redemptions in 2022 for *Days Gone*, a popular PlayStation Studios title. During the full takeover period, the title was offered for sale by Steam key reseller sites more cheaply than on Steam. While the title was priced at $19.99 on Steam during this time, the lowest price available on Steam key reseller sites was $15.39 through Gamebillet. Reseller sites Green Man Gaming, Indiegala, and Fanatical also offered the title more cheaply for the duration of the takeover.[253] Consistent with free-riding, there was a ███████████ in the daily number of Steam keys redeemed during the takeover—well above the observed increases in other periods within the same calendar year.[254]

---

[252]    Steam, "Welcome to Steam," September 18, 2022, available at ████████████████████████████████ accessed on April 24, 2025. See also SteamDB Steam Takeover Data.

[253]    IsThereAnyDeal, ███████████," available ███████████████████ accessed on April 25, 2025.

[254]    This pattern is consistent with the U.S. Steam key redemptions patterns exhibited by other ███████████ titles during the same takeover, including ███████████ and ███████████ Both titles were offered more cheaply on Steam key reseller sites, including Fanatical and Indiegala, than on Steam during the takeover. See Workpaper 5; IsThereAnyDeal, ████████████████████████," available at ████████████████████████████████████████ accessed on April 25, 2025; IsThereAnyDeal, ███████████ available at ███████████████████████, accessed on April 25, 2025.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.    Plaintiffs' experts fail to rebut the procompetitive effects of Steam's features and potential for free-riding

**EXHIBIT 6**
*Daily U.S. Steam Key Redemptions for*



Source: Langer Rebuttal Merits Report, backup material; SteamDB Steam Takeover Data

Note: The dashed vertical lines indicate the start and end of the ███████████████████████ takeover event.
Daily Number of Keys Redeemed is counted as the sum of Steam key redemptions in the U.S. for all packages containing the ███████ game application.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY                    Page 87 of 150

(123)   I test this more broadly using the same approach I used to test the effects that takeovers have on sales on Steam. For this exercise, I simply change the outcome variable from daily net sales on Steam to daily Steam keys redeemed. I find that takeovers increase the rates of Steam key redemptions by ■ percent, in addition to increasing daily net sales on Steam.[255] This result is consistent with the other evidence of showrooming I discuss and suggests that users learn about games on Steam, compare prices (using resources such as IsThereAnyDeal) to find the lowest price on Steam key resellers, and then acquire games from Steam key resellers rather than on Steam. This result is also consistent with evidence that some consumers are sophisticated and regularly compare prices between Steam and other platforms.[256]

---

[255]   This result is available in my backup materials. Additionally, I show that this result is robust under various sensitivities. See Workpaper 6.

[256]   Valve Document, "Refund Help - Steam," August 30, 2017, VALVE_ANT_2587090 ("my best advice is if you do buy games do NOT buy directly from steam, they have terrible prices on games anyways. Go to Bundle stars, Greenman gaming, humble bundle or even GOG and see if they have the game there before you even think about giving steam the money. For example greenman gaming has GTA V for 20% off right now which frankly is still a bit expensive for a 2 1/2 year old game. Even when steam has sales there is almost always someone selling the game far cheaper."); Valve Document, "31.49$ for this shit?" July 3, 2018, VALVE_ANT_1998233 ("You should pretty much never take steam's prices as the only default value, shop around.").

## 4.  PLAINTIFFS' EXPERTS FAIL TO REBUT THE PROCOMPETITIVE EFFECTS ASSOCIATED WITH STEAM KEYS

## 4.1. Plaintiffs' experts fail to recognize that Steam keys both have procompetitive benefits and the potential for free-riding

(124)  Valve gives Steam keys to publishers at no cost, publishers are able to sell these Steam keys on different channels (or give them away), and consumers can redeem them on Steam and access all the platform services available when playing the game on Steam. In the previous section, I explained that Steam keys provide an outlet for showrooming and I provided empirical evidence that is consistent with this effect being present when Steam provides curated marketing for publishers. In this section, I explain that Steam keys provide procompetitive benefits to publishers and consumers, but also create an incentive for another form of free-riding in allowing publishers to benefit from Steam platform services while engaging in behavior that can harm Valve and reduce its incentives to maintain high-quality platform services.[257] Plaintiffs fail to recognize these economic effects of Steam keys.

(125)  Steam keys lower barriers to entry for publishers by expanding their options for marketing and distributing games. For example, publishers can use Steam keys to distribute their titles in brick-and-mortar stores and other digital channels, including their own direct-to-consumer websites. Steam keys expand choices for consumers, benefiting, for example, consumers that like shopping for games on those other channels. Publishers can also use Steam keys to promote their games in innovative ways such as through crowdfunding and by giving Steam keys away to influencers or streamers.[258]

---

[257]  Gowrisankaran Opening Merits Report, Section 4.2.1.

[258]  Gowrisankaran Opening Merits Report, ¶¶ 137–138 ("Developers can also promote the game at low cost in innovative ways, for example by giving Steam keys away to influencers, game reviewers, or streamers to garner publicity and media attention. … Additionally, developers can launch crowdfunding campaigns that source funding from interested consumers.").

(126)    Steam keys also have led to the entry and growth of reseller sites whose operations focus mainly on selling game keys and require minimal infrastructure to do so. Reseller sites such as Green Man Gaming and Humble Store primarily sell game keys but do not operate as gaming clients for players to play the games.[259] Steam keys enable this type of business model to exist, providing more options for consumers to buy games and intensifying competition for game distribution.[260]

(127)    Plaintiffs' experts do not recognize the benefits of Steam keys in terms of expanding choice, providing additional flexibility to developers and publishers, and enabling alternative distribution models.

(128)    As I discuss above and in my opening report, Steam keys also create an incentive for publishers to free-ride on Steam's platform services. Steam keys are granted to publishers free of cost, allowing them to sell Steam-enabled games with access to Steam's platform services while paying no fee or revenue share to Valve.[261] Dr. Schwartz and Professor Rietveld have not provided any arguments or evidence counter to the existence of this free-riding incentive.

---



259

260    Gowrisankaran Opening Merits Report, ¶ 140 ("Steam keys allow Steam publishers to distribute flexibly through offline channels and reach customers who value the services of physical stores, or through other digital channels ... Steam keys have spurred the entry and growth of re-seller sites such as Green Man Gaming and the Humble Store, which operate with minimal infrastructure, largely by selling game keys. Therefore, Steam keys contribute to more vigorous competition between developers, as well as between distributors.").

261    Gowrisankaran Opening Merits Report, Section 4.2.2.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(129) Professor Rietveld states, in his rebuttal report, that there is a contradiction between two points in my opening report: that the revenue share model aligns Valve's incentives with those of publishers to create a procompetitive incentive to invest in the platform, and that publishers have free-riding incentives.[262] This is incorrect: there is no tension. It is mathematically true that the revenue share arrangement means that Valve earns revenues when publishers earn revenues on Steam. Therefore, the revenue share model ensures that both Valve and publishers benefit from investments that boost game sales on Steam, and encourages Valve to invest in attractive platform features, games marketing, etc. At the same time, *Steam keys* introduce a different incentive dynamic, as I described above. Publishers may get to keep more revenue from a Steam key sale on another channel than a sale on Steam. Therefore, they introduce an incentive to set a higher price for the Steam sale in order to increase the probability that a sale happens through the non-Steam channel. While Valve provides Steam keys to enable flexibility and choice for publishers and consumers, these price discrepancies lead publishers and consumers to substitute sales of Steam-enabled games away from Steam, as well as harm Steam's reputation as a competitively priced store.

(130) These price discrepancies are easy to observe for many consumers given the existence of price comparison websites such as ITAD and GG.deals. Consumers use these price comparison sites to find the lowest prices on games distributed via Steam key and purchase those Steam-enabled games. Further, ITAD also supports "Augmented Steam," an open-source web browser plugin that provides instantaneous ITAD price comparison data directly on the Steam Store when used in a web browser.[263] Tools like this increase the reputational costs to Steam from publishers offering worse deals on Steam than on other channels where they sell Steam keys.

---

[262] Rietveld Rebuttal Merits Report, ¶ 136 ("If Valve's revenue share model aligns the incentives of Valve and PC game publishers, as Dr. Gowrisankaran asserted, then, according to his own argument, there should be no circumstance giving rise to free-riding on Steam's services.").

[263] Augmented Steam, "Improved browsing and shopping experience for Steam," available at https://augmentedsteam.com, accessed on April 21, 2025 ("See the current best price and historical lowest price from many authorized stores, directly next to the purchase box. Don't spend more than you have to. Easily see prices in other regions too.").

(131)   Steam key resellers like Indiegala promote games by highlighting the size of their discount relative to Steam, they allow users to sort games by the biggest discounts, and they include Steam user reviews which are embedded into their product pages.[264] Steam key bundle resellers like Humble Bundle similarly promote bundles by highlighting the value of the games in those bundles as determined by their price on Steam and leverage Steam reviews on their product pages.[265] In addition, publishers on Steam have been able to free-ride on Steam's services by offering less favorable prices on Steam than on these stores; publishers can use Steam keys to benefit from Steam's platform services while minimizing the revenue shares paid to Steam. As an example, the game ███████████████ earned ██████ in revenue while selling ████ units on Steam. The same game had had over ██████ Steam key redemptions.[266]

(132)   Price restrictions on Steam keys allow Valve to maintain the procompetitive benefits to publishers from increased flexibility and a low-cost promotional tool, while limiting the potential for free-riding on platform services.

---

[264]   Indiegala, "Yakuza: Like a Dragon Legendary Hero Edition," available at https://www.indiegala.com/store/game/yakuza-like-a-dragon-legendary-hero-edition/1235140_legendary_m, accessed on April 23, 2025 ("94% of the 32821 user reviews on Steam are positive."); Indiegala, "Browse games," available at https://www.indiegala.com/games/all, accessed on April 23, 2025 ("Sort by: Percentage off").

[265]   Humble Bundle, "id & Friends Game Bundle," available at https://www.humblebundle.com/games/id-and-friends, accessed on April 25, 2025 ("DOOM Eternal 89% Positive on Steam … $194 Value").

[266]   Workpaper 7.

---

(133)    Professor Rietveld also asserts that my opinions on Steam keys would indicate that "the solution to Valve's purported free-riding concerns in the context of Steam Keys would be for Valve to simply stop issuing Steam Keys."[267] He then argues that the fact that Valve has not stopped offering Steam keys is consistent with Valve having other incentives to maintain the program, including how Valve benefits from follow-on purchases on Steam and how Valve makes strategic use of Steam keys to lock-in consumers and publishers. This is disingenuous: I discuss Professor Rietveld's specific claims about how Valve benefits from Steam keys in Sections 4.2 and 4.3, but it is incorrect to conclude from my opinions that the optimal solution for the free-riding problem would be to eliminate Steam keys. As a two-sided platform, Steam competes for publishers. Steam keys are one benefit it offers to publishers in order to make the platform more attractive to them, just like it also invests in platform quality and tools that help publishers develop and market games more easily. This collaboration with publishers is beneficial to Valve because a larger and more engaged publisher base increases the value of Steam. Valve's strategy of continuing to offer Steam keys, a benefit valued by publishers, and taking measures to mitigate free-riding and protect the value of the platform, is entirely economically rational.

## 4.2. Plaintiffs' experts overstate the role of microtransactions and DLC revenues in Steam earnings by failing to remove sales from Free-to-Play games

(134)    In addressing the procompetitive effects of Steam keys, Dr. Schwartz and Professor Rietveld claim that customers who acquire a game via a Steam key may go on to make other purchases on Steam, for which Valve will earn a revenue share. Specifically, Dr. Schwartz states that "Valve … benefits from its Steam Key program through on-Steam sales that result from Steam keys being offered on other stores" and that "when customers acquire a game as a Steam Key and that game offers DLC and/or in-app purchases … This then leads to additional revenue for Steam."[268] Professor Rietveld similarly states that "Valve generates revenues from microtransactions and/or DLC purchased on top of base games acquired through Steam Keys."[269]

---

267    Rietveld Rebuttal Merits Report, ¶ 166.
268    Schwartz Rebuttal Merits Report, ¶¶ 62–63.
269    Rietveld Rebuttal Merits Report, ¶ 166.

(135)    As an initial matter, the fact that Valve may earn revenues from games acquired via Steam keys is irrelevant for assessing whether Steam keys place any limitation on competition or, instead, have procompetitive impact. The fact that some consumers who purchase Steam keys then go on to purchase other products on Steam, such as microtransactions for the games they bought through Steam keys, does not change the fact that publishers got a benefit from being granted Steam keys free of cost and were able to sell them on other channels or give them away for promotional efforts. These follow-on sales benefit Valve, publishers, and consumers; they do not turn a benefit for all parties into a harm.

(136)    In addition, Plaintiffs' experts overstate the extent to which DLC and microtransactions generate revenue for Valve on games that were purchased through Steam keys. First, Valve does not generate *any* revenue from DLC or microtransactions for the vast majority of games on Steam. For instance, of paid games sold on Steam in 2024 that *ever* received Steam keys, ▮▮ percent do not monetize through DLC or microtransactions and thus cannot benefit Valve via Steam keys in the way described by Plaintiffs' experts.[270]

---

[270]  Of all paid games sold on Steam in 2024, ▮▮ percent do not monetize through microtransactions. Workpaper 8.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Second, Valve data indicate that Professor Rietveld overstates Valve's ability to continue monetizing games that were initially purchased through Steam key sales. He points broadly to the relative size of Steam revenues from microtransactions and sales of downloadable content ("DLC") on the platform, noting that "Valve is still capturing these sources of increasingly large revenues when games are redeemed via Steam Keys."[271] Professor Rietveld states that revenues of microtransactions and DLC "constitute a growing majority share of total revenues on Steam," and constitute ██ percent of Steam revenues in 2024.[272] This statistic overstates the potential for follow-on revenues from publishers' sales of Steam keys. For example, Professor Rietveld's ██ percent figure includes revenues from microtransactions and DLC associated with free-to-play games, for which Valve does not issue Steam keys, and includes revenues associated with games that have not been issued Steam keys since at least 2013. In addition, Professor Rietveld's calculation misclassifies "complete edition" games that include both the base game and DLC packaged together as "DLC and microtransactions." Once revenues related to these titles are excluded, the share of Valve revenues made up by the microtransactions and DLC for remaining games, which *may* be sold through Steam keys, is only ████ percent.[273] But some of these microtransactions and DLC purchases are for games that were originally purchased on Steam, so this is still a conservatively high estimate of the potential share of Valve revenues that result from Steam key redemptions.

## 4.3. Plaintiffs' experts' arguments regarding Steam keys platform annexation are inconsistent with the literature which depends on platforms favoring their own games

Both Professor Rietveld, in his opening report, and Dr. Schwartz, in his rebuttal report, reference an academic paper about "platform annexation" and use it to argue that Steam keys are a mechanism to "limit multihoming at the distribution level."[274] They are misguided in drawing this parallel from this academic paper to the case of Steam keys: the Steam keys program provides benefits to publishers (and consumers), whereas platform annexation involves introducing an inefficient distortion that makes rival platforms less attractive to use.

---

[271]    Rietveld Rebuttal Merits Report, ¶ 166.

[272]    Rietveld Rebuttal Merits Report, ¶ 166.

[273]    Workpaper 8.

[274]    Rietveld Opening Merits Report, ¶¶ 45–48, Footnotes 59–60, 62; Schwartz Rebuttal Merits Report, Section 4.3 and Footnotes 154–158, 163.

Platform annexation refers to a situation in which a firm that owns a platform also owns a tool or service that enables customers to multi-home on multiple platforms. In the cited paper, the authors describe how the firm may have an incentive to use its control of the multi-homing tool to make it harder for consumers to multi-home and use rival platforms.[275] As an example, the authors discuss how it is common for consumers to multi-home on several ride-hailing apps and may even search for rides on more than one service at a time.[276] Thinking through this example, this is possible because consumers own smartphones with operating systems that allow them to download and simultaneously operate these apps. If a firm that owns the operating system also owned one of the ride-hailing apps, platform annexation would involve introducing frictions to multi-homing on these different apps: the firm may reduce the compatibility with rival apps, or may make them slower or less reliable compared to its own app. These frictions could then reduce the degree to which consumers multi-home, and result in more consumers defaulting to using a single app, the one owned by the firm, which is not subject to these artificial disadvantages.

Professor Rietveld claims that Steam keys are such a tool used by Valve to facilitate multi-homing at the video game retail function in order to reduce platform switching by publishers and consumers at the distribution function.[277] Dr. Schwartz echoes these claims in his rebuttal report, noting that:[278]

> "Steam Keys allow publishers and consumers to interact across multiple retail platforms (e.g., Humble, Green Man Gaming, etc.). While Steam Keys allow publishers and consumers to multi-home at the retail function (subject to Valve's grant of Steam Keys in whatever number Valve chooses), they steer/force consumers and publishers back to Steam at the distribution function."

---

[275]  Susan Athey and Fiona Scott Morton, "Platform Annexation," *Antitrust Law Journal*, 84(3), 2022, pp. 677–703 ("Athey and Scott Morton (2022)") at p. 678 ("Platform annexation refers to a practice where a platform possesses or acquires complementary multi-homing tools and operates those tools in a way that restricts or lessens efficient multi-homing by platform users.").

[276]  Athey and Scott Morton (2022), p. 677 ("For example, a ride-hailing platform that brings together buyers and sellers of an auto-transportation service may find that both sides of the platform 'multi-home,' or transact on a competing platform(s). Riders may have accounts and search for a given ride on Uber, Lyft, and Via, for example.").

[277]  Rietveld Opening Merits Report, ¶ 45 ("Specifically, Valve benefits from facilitating multi-homing at the retail function, because doing so reduces switching of both PC game publishers and players at the distribution function.").

[278]  Schwartz Rebuttal Merits Report, ¶ 70.

(141)   Plaintiffs' experts' application of the platform annexation framework to Steam keys is misguided. As I note in my opening report, Steam keys are a benefit valued by publishers and consumers.[279] Providing benefits to platform participants that make them more likely to use the platform is the essence of competition. Arguing that this benefit introduces a competitive barrier is analogous to saying that a retailer that offers coupons to consumers, which allows them to make purchases at a discount, or to get other perks from the retailer, is a barrier to competition. Offering Steam keys at no cost to publishers does not raise the cost to publishers of distributing games on other platforms. Neither do Steam keys raise the cost to a consumer of purchasing or playing some of their games on other platforms. Introducing a benefit for one option in the market is not the same thing as creating a friction or cost to other options in the market.

(142)   Dr. Schwartz and Professor Rietveld turn economics on its head when they position the benefits of Steam keys as a tool that "creates stickiness."[280] If one option in a market is particularly attractive, this can result in customers choosing it frequently, which might be interpreted as customer loyalty. But if that loyalty came from providing benefits to a user, then it is contingent on continuing to provide a good deal. This is how competition works. As I explain in the next section, Dr. Schwartz and Professor Rietveld are also wrong to claim that multi-homing is limited for PC video game distribution: Professor Rietveld's own analysis acknowledges that consumers face low barriers to multi-homing. But it is also worth bearing in mind that even if the benefits of Steam keys (and other Steam benefits) were so strong as to reduce multi-homing, this would not be anticompetitive (or consistent with the platform annexation effect) because it would be driven by competing vigorously on the benefits Steam provides, and not on the introduction of any costs to using rival platforms.

(143)   Finally, it is worth noting that while Steam keys do not introduce any multi-homing frictions for distribution, they do make it easier for publishers and consumers to multi-home at the retail function specifically for sales of Steam-enabled games, which otherwise would be available only on Steam.

---

[279]   Gowrisankaran Opening Merits Report, Section 4.2.1.
[280]   Schwartz Rebuttal Merits Report, Section 4.3.

## 4.4. Plaintiffs' experts' assertion that Steam keys generate stickiness is inconsistent with the data that show that consumers frequently multi-home

(144)   As discussed in the previous section, Dr. Schwartz claims that Steam keys "create stickiness." He also states that, by using Steam keys, Valve "artificially increases the frequency of single-homing amongst consumers and publishers at the distribution level."[281] Professor Rietveld states that Steam keys "draw PC game publishers and players to Steam and reinforce lock-in effects."[282] This argument is not only conceptually unsound, as I established above, it is also inconsistent with the facts about consumer behavior for the video game industry. Consumers often multi-home both for the purposes of purchasing games and playing games.



(a) A survey commissioned by Epic Games asked 2,000 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[283] The survey, also shows that (i) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and (ii) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. For example, out of those respondents that said ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. As another example, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[284]

---

[281]   Schwartz Rebuttal Merits Report, Section 4.3, ¶ 72.
[282]   Rietveld Rebuttal Merits Report, ¶ 167.
[283]   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ at 086.
[284]   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ at 103.

(b) Professor Chiou has provided evidence in her rebuttal report that many consumers multi-home on first and third-party platforms. For example, she identified a Newzoo survey from May 2019 that showed that ███████ of users who played either *PUBG* (at the time sold exclusively through third-party distribution on Steam) or *Fortnite* (which has only ever been available through first-party distribution from Epic, including on EGS) played both games, and therefore necessarily multi-homed.[285] She also identified many examples from forum posts in which consumers compared two games, one of which was only distributed first-party and one of which was only distributed third-party.[286]

(c) Professor Chiou also provided evidence in her rebuttal report that many consumers multi-home on PC and console platforms. For example, she referenced a Newzoo survey from 2022 which reported that ███████ of PC and/or console players played games on both PC and console.[287] She also cited the survey by the U.K.'s Competition and Markets Authority ("CMA"), conducted as part of its investigation of Microsoft's acquisition of Activision-Blizzard, which found that 29 percent of respondents surveyed who owned a PlayStation also owned a PC suitable for gaming.[288]

(145) These empirical patterns are consistent with Professor Rietveld's own conclusion that there are low costs for consumers to multi-home across platforms:[289]

> "It is not expensive for PC game players or publishers to join multiple competing PC game distribution platforms (i.e., multi-home). Players can join competing platforms such as Steam, EGS, and GOG free of charge. These PC game distribution platforms are hosted online, are not tied to dedicated hardware, and players can join and switch between as many as they like."

(146) Comments from a discussion board also show that users commonly multi-home or find the costs of multi-homing to be low:[290]

---

285 Chiou Rebuttal Merits Report, ¶ 143 ("A Newzoo survey from May 2019 showed that ██ ███ of users who played either PUBG or Fortnite played both games, effectively multihoming across the platforms on which these games are available.").

286 Chiou Rebuttal Merits Report, ¶ 146 ("Anecdotal evidence from online forums such as Reddit also indicates that users multihome between first- and third-party distribution."), Appendix Section 14.2.

287 Chiou Rebuttal Merits Report, ¶ 206 ("a Newzoo survey from 2022 reported that ██ ███ of PC and/or console players played games on both PC and console.").

288 Chiou Rebuttal Merits Report, ¶ 205 ("the CMA found that users multihome across PC and console devices. In particular, the CMA surveyed PlayStation owners and found that 29 percent of respondents also owned a PC suitable for gaming.").

289 Rietveld Opening Merits Report, ¶ 13.

290 Valve Document, "Steam vs Epic Games launcher?" July 16, 2022, VALVE_ANT_2251640–723 at 646, 658, 692, 713.

(a) "I try and buy everything I can on Steam. But a deal is a deal, and if I find something on Epic I'll buy it."

(b) "I prefer steam launcher because it's just the better one in my own opinion BUT I will not be a slave to steam and I will not stick with steam religiously like some silly fanboy. I have all launchers installed on my system and will purchase games on what launcher gives me the best deal that suits my pocket, simple as that really."

(c) "All I'm saying is that it makes no sense to stick to one platform and avoid all others, that's all. To say 'I'll only use Steam' is childish fanboy behavior. It takes 5mins or less to install a launcher, nobody gets hurt in the process."

(d) "I use both Epic and Steam, not to mention other platforms. No preference for any."

(147) Despite recognizing that multi-homing is not costly for consumers, Professor Rietveld's and Dr. Schwartz's analyses presuppose that consumers do not multi-home, which is at odds with the evidence I present here. Furthermore, as I discussed in Section 3.4, websites such as IsThereAnyDeal allow consumers to easily compare prices, and a range of evidence suggests that consumers are sophisticated and take advantage of these opportunities.

## 4.5. Plaintiffs' experts incorrectly dismiss that Steam's effective revenue shares are lower than nominal revenue shares due to Steam keys issued to publishers at no additional charge

(148) In my opening report, I discuss how Valve offers Steam keys to publishers at no additional charge, and that publishers' sales of these keys "constitute a discount on the average share of the revenue that a publisher pays to Valve from what it collects from customers who go on to play their games on Steam."[291] Dr. Schwartz dismisses this argument. He asserts that Steam keys are a "feature or a service" rather than a discount to publishers, and that Steam keys "actually serve to increase on-Steam revenues in the short run and the long run."[292]

---

[291]   Gowrisankaran Opening Merits Report, ¶ 144.
[292]   Schwartz Rebuttal Merits Report, ¶ 75.

(149)  Dr. Schwartz fails to recognize that value creation on Steam and value sharing with publishers and consumers depend on Steam's revenue share and on *the full set of benefits that it provides* to platform users on both sides. This is a point I made in my rebuttal report in discussing the evidence related to whether Valve charges a competitive revenue share.[293] When Valve issues Steam keys, it provides benefits to publishers at no cost. Even if publishers still need to potentially pay a revenue share to the firm operating the platform where they sell Steam keys, the publisher is still able to offer to consumers all the Steam platform services that come along with redeeming Steam keys, without paying anything to Valve for those services. Therefore, Steam keys provide a clear net benefit to publishers and reduce the average quality-adjusted revenue share that publishers face when operating on the Steam platform, relative to a world where there are no Steam keys.

(150)  Dr. Schwartz's assertion that Steam keys are only a feature or service offered to publishers and not an effective discount on Valve's revenue share is therefore incorrect. The fact that Valve may realize some follow-on revenues from a Steam key redemption does not change the fact that publishers obtained a benefit at no cost; and that across all the sales by the publisher of Steam-enabled games, they pay a lower revenue share to Valve than if all their sales of Steam-enabled games had to be transacted on Steam (i.e., if there were no Steam keys). In some cases, such as sales through other channels, these benefits can involve revenues earned by publishers on Steam-enabled games for which they pay no revenue share. In others, these benefits may include marketing and promotional benefits publishers get from giving away Steam keys to influencers and reviewers.[294] In any case, a proper evaluation of the competitiveness of Valve's revenue shares should account for benefits that Valve provides to publishers. Dr. Schwartz's observation that Valve can also benefit from Steam keys in addition to publishers does not rebut this key point.

## 4.6. Dr. Schwartz implicitly concedes that Steam keys would decline in the but-for world

(151)  As I note above, Plaintiffs fail to rebut that Steam keys create an incentive for free-riding. However, Dr. Schwartz concedes that Valve would have an incentive to limit Steam keys in a but-for world where Valve could not use price restrictions to mitigate the extent to which publishers may free-ride on platform services through Steam keys:[295]

> "Dr. Gowrisankaran acknowledges that Valve can use restrictions on both the number and price of Steam Keys to prevent alleged harms arising from free-riding. In the but-for world, in the absence of a PMFN,

---

[293]  Gowrisankaran Rebuttal Merits Report, Section 8.

[294]  Gowrisankaran Rebuttal Merits Report, Section 8.3.2.

[295]  Schwartz Rebuttal Merits Report, ¶ 74.

Valve could continue to limit the *number* of Steam Keys that are made available to publishers."

(152) This is directly at odds with Dr. Schwartz's opinions that Valve would increase its usage of Steam keys in the but-for world without PMFNs.[296] Steam keys are a benefit that Valve offers to publishers, but it creates a reputational risk for Steam if publishers are able to set higher prices for the games on Steam than the prices they set for Steam keys on other channels. In a but-for world where Valve could not use price restrictions to limit this type of free-riding, Valve would have the incentive to manage the free-riding issue in other ways, either by restricting the quantity of keys, as Dr. Schwartz himself recognizes, or by charging publishers for Steam keys.[297]

(153) Therefore, Dr. Schwartz's assessment of the competitive impact from the alleged conduct is necessarily flawed, since it assumes that in the absence of any pricing measures to protect Steam from free-riding, Valve would continue to issue similar or higher levels of Steam keys. Such an assumption is unrealistic and leads to an incorrect assessment of outcomes for publishers and consumers in the counterfactual.

---

[296] Schwartz Rebuttal Merits Report, ¶ 64 ("These benefits realized by Valve create strong incentives for Valve to continue operating its Steam Key program in a market in which it faces even stronger competition. Steam Keys are a means by which Valve can draw customers (back) to the Steam platform if they purchase on another site and provide incentives for developers to remain actively engaged with Steam. In the but-for world, with increased competition, Valve's incentives to continue operating a valuable feature/service such as the Steam Key program would most likely increase, or, at the very least, not change in a meaningful way. In fact, the added competition in the but-for world would incentivize Valve to increase its usage of Steam Keys.").

[297] Dr. Schwartz does not recognize that other industry participants have taken the approach of charging for access keys and directly restricting prices on other distribution channels. For example, ▬▬▬ has offered tokens to publishers for sale through other channels, for which they have historically charged publishers 30 percent of the game's listed price. Further, testifying on behalf of ▬▬▬ Adam Fossa noted that ▬▬▬ ▬▬▬ through retailers such as Amazon and Best Buy in an agency model where ▬▬▬ sets the price for the sale of these tokens. See ▬▬▬, June 2012, VALVE_ANT_0892779 at pp. 28–29; Deposition of Adam Fossa (General Manager, Microsoft), January 29, 2024, pp. 20–22 ("Q. Has Microsoft or does Microsoft issue similar keys of its own so that gamers can play on the Microsoft Store or on the Microsoft platform? A. We do, called the Microsoft tokens, yes. Q. Now, the next question: Does Microsoft charge for Microsoft tokens? A. We do. Q. How much? A. It's basically the full wholesale price -- well, it depends on who we're — we're — we're selling the — we're distributing the token to. We do offer free tokens available to the content creator to use for promotional purposes, and then we have another token model which enables the resell of tokens at Best Buy or Amazon.com. Q. And does Microsoft charge the publisher for those A. We do not charge the publisher for the free tokens and we -- well, we don't charge the publisher for the tokens that we sell at third-party retailers ... A. [When] third-party retailers resell[] Microsoft tokens ... [that is] an agency model, meaning they -- they are our agent and we set the price.").

## 5.    PLAINTIFFS' EXPERTS FAIL TO REBUT THE WAYS IN WHICH STEAM DIRECT LEADS TO PROCOMPETITIVE OUTCOMES

(154)    Dr. Schwartz claims that the procompetitive effects of Valve's features are "irrelevant to the issues here because none of them are connected to or dependent on the existence of the PMFN."[298] As I explained in Section 2.3, Dr. Schwartz's claim narrows Plaintiffs' allegations, and speaks only to claims related to the alleged PMFN (which does not exist) rather than claims related to supracompetitive revenue shares. Even ignoring this limitation, however, Dr. Schwartz's claim is still untrue: as I discussed in my opening report, and in the previous sections, Valve's marketing features and Steam keys are subject to free-riding.[299]

(155)    In this section, I discuss Steam Direct, which, as I discussed in my opening report, lowered barriers to entry for class members and expanded access for publishers.[300] In Section 5.1, I discuss the bad assumptions underlying Professor Rietveld's claims that publishers have been harmed from "overcrowding" and Dr. Schwartz's claim that Valve has "choked off competition." In Section 5.2, I discuss how Professor Rietveld's argument is backwards, confusing increased competition with anticompetitive harm.

## 5.1. Plaintiffs' experts' opinions on worsening conditions for publishers on Steam are driven by mathematical interpretation errors

(156)    In my opening report, I discussed how the introduction of features such as Steam Greenlight and Steam Direct lowered barriers to entry for developers, enhanced competition among publishers, and resulted in increased content available to consumers.[301]

---

[298]    Schwartz Rebuttal Merits Report, ¶ 23.

[299]    Furthermore, Steam keys are provided at no cost to publishers and provide access to the Steam platform; publishers who free-ride on Steam keys receive access to and benefit from most Steam features at no cost. See Gowrisankaran Opening Merits Report, Section 4.2.2.

[300]    Gowrisankaran Opening Merits Report, ¶¶ 84, 88.

[301]    Gowrisankaran Opening Merits Report, ¶¶ 83–88.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(157)   In his opening and rebuttal reports, Professor Rietveld acknowledges that the number of games offered on Steam has increased dramatically since Steam introduced Steam Greenlight and Steam Direct.[302] However, we disagree on the economic interpretation of this fact. Professor Rietveld claims that by reducing the barriers to publishing on Steam, these features led to "worsening conditions" for publishers. In particular, he argues there is "overcrowding" on Steam and an "increasingly congested landscape in which PC game publishers must compete," which he claims has harmed publishers.[303] Professor Rietveld's conclusions are based on flawed logic and analysis marred by a mathematical misinterpretation.

(158)   To support his "overcrowding" argument, Professor Rietveld conducts a series of analyses in his opening report that attempt to show that, as the number of games distributed on Steam has increased, this has caused publishers to earn less revenue on average over their games' lifetimes.[304] I addressed these analyses in my rebuttal report, and demonstrated that they were fundamentally flawed and do not support Professor Rietveld's conclusion that Steam's expansion of self-publishing has resulted in decreased revenues for publishers.[305]

---

[302]   Rietveld Opening Merits Report, ¶ 66 ("Sharp increases in the number of new games released on Steam are observed following the introduction of Greenlight (2012) and Steam Direct (2017)."); Rietveld Rebuttal Merits Report, ¶ 149 ("Dr. Gowrisankaran recognized that Valve's introduction of Greenlight and Steam Direct effectively eliminated distribution requirements to Steam resulting in large increases of the number of PC games on the platform.").

[303]   Rietveld Opening Merits Report, ¶¶ 64–65 ("Valve later introduced platform changes that led to significant increases in the number of games distributed through Steam, most notably Greenlight in August 2012 and Steam Direct in June 2017. These changes materially lowered entry requirements for PC game publishers, resulting in surges of new games released on Steam. … the number of newly released games has increased in most years and, therefore, so has the total number of games on the platform—resulting in an increasingly congested landscape in which PC game publishers must compete.").

[304]   Rietveld Opening Merits Report, Section VI.A and ¶¶ 69–70 ("For example, research—including in the context of Steam—has documented that while overall consumer spending on a multi-sided platform increases following such changes in platform governance, the average demand for individual complements decreases and becomes progressively concentrated in a relatively small number of successful complements. … These dynamics are present on Steam as well … most PC game publishers have increasingly struggled to sell games and generate revenues through Steam.").

[305]   Gowrisankaran Rebuttal Merits Report, Section 8.5.2 and Appendix A5.

(159)    In particular, by reducing the cost of publishing on Steam, self-publishing has led to an increase in smaller publishers and lower revenue games on Steam. Professor Rietveld's analyses fail to properly account for this change to the group of developers and games on Steam. That is, his approach cannot distinguish between two possible effects: (a) a reduction in revenues for publishers that would have had games on Steam even without Steam Greenlight or Steam Direct and (b) the addition of smaller, lower revenue publishers that were able to enter *because* of Steam Greenlight and Steam Direct.[306] This is important because the latter effect is a procompetitive effect of Steam's entry-inducing innovations. Although Professor Rietveld claims to address this issue, I showed in my rebuttal report that each version of his analysis fails to disentangle these two potential effects.[307] I also showed that the "overcrowding" effect he alleges does not exist: overall publishers are not earning less because of platform overcrowding.[308]

(160)    In addition, by computing average revenues that conflate lower-revenue entrants with higher revenue incumbent games and publishers, Professor Rietveld's analyses are biased, by construction, towards finding "harm" (that average lifetime revenues have decreased over time). Moreover, this bias is stronger if Steam's innovations encourage *more* entry by developers and publishers that would not have chosen to distribute on Steam if not for Steam's cost-reducing innovations like Steam Greenlight and Steam Direct. In other words, Professor Rietveld's analyses are designed such that they will find more "harm" if Steam's innovations were *more* procompetitive.

---

[306]   Gowrisankaran Rebuttal Merits Report, ¶¶ 316–318 ("This analysis and Professor Rietveld's interpretation of the results is fundamentally flawed because it fails to account for the change in the group of developers and games that were on Steam over time. ... Professor Rietveld claims to disentangle the two effects—the claimed reduction of the revenues of publishers that would have been in the distribution without the innovations, and the inclusion of lower revenues of smaller publishers that were able to enter thanks to the innovation—by conducting several different cuts of his analysis, but in every case the statistical approach continues to confound the two effects and draw the wrong conclusion."), Appendix A5.

[307]   Gowrisankaran Rebuttal Merits Report, ¶ 318 ("Professor Rietveld claims to disentangle the two effects ... but in every case the statistical approach continues to confound the two effects and draw the wrong conclusion. I provide a detailed review of his analyses of average lifetime revenue for different cuts of publishers in Appendix A5."), Appendix A5.

[308]   Gowrisankaran Rebuttal Merits Report, ¶¶ 319–320, Exhibit 18.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(161) In his rebuttal report, Professor Rietveld reiterates his overcrowding arguments but does not offer any new analysis or arguments that address the flaws in the logic and analyses he presented in his opening report.[309] In addition, he fails to respond to my point that Epic Games also launched self-publishing on EGS in March 2023 through a system similar to Steam Direct.[310] As I mentioned in my opening report, Epic Games CEO Tim Sweeney's comments suggested that the success of Steam's self-publishing tools motivated Epic Games' launch of its own system, showing that Steam's innovation motivated competitors to also offer similar improvements.[311]

(162) In my rebuttal report, I explained that an appropriate way to evaluate Plaintiffs' experts' claim that Steam innovations were leading to "worsening conditions" (that is, to reduced platform quality) is to look at overall Steam sales. I find that Steam sales experienced strong growth over the same period that Professor Rietveld claims to find declining average lifetime game revenues. If "overcrowding" on Steam were reducing platform quality I would expect to see overall revenues decrease as consumers choose to make fewer purchases. **These results show, instead, that Steam has become an increasingly effective channel for publishers to make sales and earn revenues.**[312]

---

[309] Rietveld Rebuttal Merits Report, ¶¶ 112–118.

[310] Gowrisankaran Opening Merits Report, ¶ 106 ("In a substantial recent development for the industry, Epic Games followed Valve's lead and introduced features allowing developers to self-publish on the Epic Games Store in March 2023.").

[311] Gowrisankaran Opening Merits Report, ¶¶ 106–107 ("At the time of introduction, Epic Games CEO Tim Sweeney acknowledged that these self-publishing tools will make the Epic Games Store more competitive with Steam and remarked on how the number of games released per year on Steam skyrocketed after the introduction of Steam Direct, suggesting that Valve's innovations spurred Epic Games to action on self-publishing. … By innovating and offering higher quality services, Steam has spurred its competitors to up their game and offer quality improvements themselves, creating additional welfare gains.").

[312] Gowrisankaran Rebuttal Merits Report, ¶¶ 319–320, Exhibit 18.

(163)   Dr. Schwartz, in his rebuttal report, takes issue with my approach, arguing that growth in Steam sales is instead "evidence of successful monopolization and maintenance of that monopoly power."[313] Dr. Schwartz is wrong. First, his position assumes his conclusion—that Steam is a dominant firm maintaining a high market share. As I have demonstrated, Valve has never had monopoly power, and Dr. Schwartz dramatically overstates Steam's market shares.[314] Despite this, he asserts that Valve has "choked off consumer choices." However, it defies economic logic that consumers would continue to purchase more games on Steam while, according to Dr. Schwartz's logic, facing a reduction in choices that appeal to them.

(164)   As I have explained, output expansion is commonly understood in the economics literature to be evidence of procompetitive effects. Even if I accepted Dr. Schwartz's flawed premise that growth in Steam sales were somehow consistent with Steam reducing consumer choices, his logic fails when applied to *total* games purchased on Steam and other platforms. Total sales of PC games increased over the class period.[315] Even looking within Dr. Schwartz's overly narrow proposed market for distribution of 3rd party PC games, his own analysis shows an *increase* in sales in every year within the class period.[316] These patterns of increasing sales by publishers and purchases by consumers is consistent with procompetitive market expansion and at odds with Dr. Schwartz's assumption that Steam is maintaining market power by "chok[ing] off" consumer choices.

(165)   Dr. Schwartz goes on to acknowledge that output has, in fact, increased in the market. However, he argues that it would have increased "by at least as much, if not more" if not for Valve's alleged anticompetitive conduct.[317] This argument is another instance of Dr. Schwartz starting from an assumption of harm. His logic is circular and rests critically on his assertions that the alleged PMFN (a) existed and (b) was effective in creating price parity and reduced competition. As I demonstrated in my rebuttal report, both of these assertions are incorrect.[318]

---

313   Schwartz Rebuttal Merits Report, ¶ 31.

314   Gowrisankaran Rebuttal Merits Report, ¶¶ 81–82 ("The inclusion of first and third-party digital PC sales on platforms yields a market share for Steam that is inconsistent with monopoly. I understand that Professor Chiou has estimated that Steam's share of sales out of all digital PC sales on platforms is no higher than ▮ percent. This share provides an upper bound to the correct Steam share for assessing monopoly power but even this upper bound is vastly smaller than Dr. Schwartz's estimate of Steam's share of ▮ percent.").

315   Using Newzoo data, I show that total sales on PC increase from $30.2 billion in 2017 to $37.3 billion in 2024. See Workpaper 1.

316   Schwartz Opening Merits Report, Attachment E-1.

317   Schwartz Rebuttal Merits Report, ¶ 31.

318   Gowrisankaran Rebuttal Merits Report, Sections 6.3, 7; Gowrisankaran Opening Merits Report, Section 3.6.

## 5.2. Plaintiffs' experts confound competition between publishers with anticompetitive conduct

(166)   As I have discussed, Valve has introduced numerous innovations and features that have had procompetitive effects on the video game industry. These innovations, such as Steam Greenlight and Steam Direct, have lowered barriers to entry for publishers and independent developers, which has enticed more publishers to release games into the market and expanded the set of titles available to consumers. The entry of titles that might not have been developed under higher barriers to entry enhances competition between publishers and benefits consumers.[319]

(167)   However, Plaintiffs' experts continue to misinterpret these procompetitive outcomes as evidence of Valve *reducing* competition and harming publishers. For instance, Professor Rietveld argues that the increase in games published on Steam has resulted in "overcrowding" and is evidence of worsening conditions and harm for publishers on the Steam platform. I explained in the previous section that his claim of overcrowding is wrong and based on a biased and unreliable analysis that does not support his conclusion. But even beyond this, Professor Rietveld is fundamentally missing the relevant economics. Valve's innovations allowed more developers and publishers to distribute games, including games that have lower earnings expectations that may appeal to certain subsets of consumers.[320] This also has the effect of incentivizing publishers to offer lower-cost publishing methods to compete with the low-cost self-publish option. This increased entry by developers and publishers enhances competition. Professor Rietveld seems to take the position that this entry harms the publishers who were already publishing on Steam. It is true that not *all* developers and publishers are guaranteed better outcomes when facing increased competition—some publishers may lose out to new entrants. But maintaining or improving outcomes for all individual publishers is not the bar for whether conduct is procompetitive or anticompetitive, nor does Professor Rietveld show that outcomes are worse for any individual publisher. And, as I have shown, in the aggregate publishers are earning more revenues on Steam, evidence of the procompetitive market expansion effect of Valve's innovations that reduced barriers to entry for developers and publishers.[321]

---

[319]  Gowrisankaran Rebuttal Merits Report, ¶¶ 129–131 ("Frequent entry is consistent with low entry barriers. ... These many competitors and the industry dynamics place competitive pressure on Steam. ... Entry can incentivize incumbent firms to compete more intensely through lower prices or increased innovation and quality.").

[320]  Gowrisankaran Rebuttal Merits Report, Section 8.5.

[321]  Gowrisankaran Rebuttal Merits Report, ¶¶ 319–320, Exhibit 18.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(168)    Another way in which Plaintiffs' experts misinterpret the effects of Steam's entry-inducing innovations is in their analyses that compare the number of titles available on Steam to the number of titles available on competitor platforms.[322] They observe that more games are offered on Steam and infer that this gap between Steam and other platforms is evidence that Steam must be suppressing entry and distribution on the other platforms. That is, they assume more games and more publishers would participate in other platforms but for Valve's alleged PMFN (which, as I explain in my rebuttal report, does not exist as a Valve policy and does not result in price parity).[323] They then rely on this flawed inference to conclude that Valve has foreclosed competition. For example, as I discuss in Section 6 of this report, Dr. Schwartz and Professor Rietveld claim that EGS, among other competitors, has struggled to attract publishers and consumers to the platform. However, they fail to consider that competition in quality can drive platform popularity—that Steam may have more games than EGS because it offers a higher quality service or lower barriers to entry by publishers. They fail to consider that EGS was a curated platform with comparatively high barriers to entry relative to Steam until introducing self-publishing in March 2023.[324] Instead, they attribute EGS's allegedly limited success to Valve's alleged conduct, again getting the economics of Steam's innovations backwards and failing to offer any proof substantiating their theory of harm.

(169)    In failing to consider the procompetitive impacts of Valve's innovations and feature improvements to Steam, Plaintiffs continue in their rebuttal reports to misinterpret the relevant economics and see anticompetitive harm where economic logic and reliable analysis point instead to procompetitive effects.

---

[322]    Rietveld Rebuttal Merits Report, ¶ 79 ("A cursory review of the Xbox app for Windows shows that it offered 2,418 games as of February 2025. ... Even with the considerable number of its own games, the Xbox app for Windows offers significantly fewer games than the approximate 4,000 offered through EGS, which is merely 4.4% of the over 90,000 games currently on Steam, per Dr. Gowrisankaran."); Schwartz Rebuttal Merits Report, ¶ 31 ("it is unsurprising that downloads and developers on Steam have increased over time: Valve has successfully choked off consumer choices. ... this output would be spread across various platforms rather than being concentrated almost entirely on Steam, providing consumers with just as much, if not, more, choice for games, but also more choice with regard to a platform to play those games on.").

[323]    Gowrisankaran Rebuttal Merits Report, Section 7.

[324]    Gowrisankaran Rebuttal Merits Report, ¶ 138 ("EGS was a curated platform until the introduction of self-publishing in March 2023, limiting their appeal to publishers and consumers.").

# 6. PROFESSOR RIETVELD'S "THREE-FACTOR" ANALYSIS DOES NOT DEMONSTATE ECONOMIC IMPACT

(170)    In his opening report, Professor Rietveld put forth his "three-factor" analysis that he claims establishes that Valve has engaged in conduct to foreclose competition. By inferring anticompetitive harm with this approach, Professor Rietveld effectively claims that, in the absence of anticompetitive conduct, only if three conditions all hold is it possible that a market may be "dominated" by one firm.[325] He then argues that video game distribution does not meet these conditions, and thus he concludes that Steam's allegedly high market share must be the result of anticompetitive conduct that forecloses competition and monopolizes the market.[326]

---

[325]    Rietveld Opening Merits Report, ¶ 11 ("Whether a single platform is expected to emerge as the dominant winner among rivals depends on the following three factors ... When all three of these characteristics are present in a multi-sided platform landscape, users—both sellers and buyers—are expected to join one platform only and choose the platform with the largest number of other users (i.e., installed base)."). His three conditions are: (a) "It is expensive for at least one side of the market to join multiple competing platforms (i.e., multi-homing costs are high);" (b) "Direct network effects are positive and strong for at least one side of the market (typically the side that faces high multi-homing costs);" and (c) "Users on both sides of the market have relatively low heterogeneity in preferences for special platform features or differentiated offerings by the other side of the platform."

[326]    Rietveld Opening Merits Report, ¶¶ 12 ("Thus, Steam's continued dominance of the third-party PC game distribution platform segment, despite efforts of sophisticated and well-resourced entities to compete with rival platforms, is contrary to the expected outcome indicated by research on platform competition."), 28 ("The fact that Valve continues to maintain Steam's position as the single dominant digital PC game distribution platform, despite the expectation that there should be multiple leading distribution platforms in the PC game segment, is further indication that Valve exploits Steam's dominance to entrench its position and preclude viable competition from current and would-be rival platforms.").

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(171) I responded to Professor Rietveld's three-factor analysis in my rebuttal report, explaining that it does not provide a reliable economic basis to assess whether Valve has engaged in anticompetitive conduct. First, its core premise (that Steam has dominant market share) is not true, which renders the entire analysis inapplicable and irrelevant. Second, Professor Rietveld does not provide citations to support his "three factor" framework as a test for anticompetitive conduct; it is not well-accepted in the economic literature. Third, his framework is incomplete and designed around three cherry-picked factors. There are other reasons, aside from anticompetitive conduct, that a platform could be relatively large. His analysis cannot account for these reasons and thus ignores them.[327] Fourth, Professor Rietveld's analysis does not show the economic impact of Valve's alleged conduct. He only infers impact using his flawed three-factor framework,[328] whereas in my rebuttal report, I showed that Valve has *not* foreclosed entry or competition by other distributors. In fact, there are many entrants that compete in different ways.[329] These reasons support my conclusion that Professor Rietveld's three-factor analysis is not a reliable framework for evaluating the economic impact of the alleged conduct.

(172) In his rebuttal report, Professor Rietveld makes additional claims related to his three-factor analysis that focus on one of his three conditions for a market to have a "dominant" firm without any anticompetitive conduct: "Direct network effects are positive and strong for at least one side of the market."[330] He argues that the observations I made in my opening report related to direct network effects overstated player-side effects and did not recognize reasons why publisher-side effects may be negative. Professor Rietveld is wrong:

---

[327] Gowrisankaran Rebuttal Merits Report, Section 6.1.2.

[328] Rietveld Opening Merits Report, ¶ 28 ("The fact that Valve continues to maintain Steam's position as the single dominant digital PC game distribution platform, despite the expectation that there should be multiple leading distribution platforms in the PC game segment, is further indication that Valve exploits Steam's dominance to entrench its position and preclude viable competition from current and would-be rival platforms.").

[329] Gowrisankaran Rebuttal Merits Report, Section 6.1.

[330] Rietveld Opening Merits Report, ¶ 11.B.

(a) **Player-side direct network effects.** Professor Rietveld's claims related to direct network effects for game players are not reliable. In arguing that my opening report overstated these effects and that they may be weakening, Professor Rietveld ignores Steam features I discussed in my opening report that increase the direct network effects for game players. For example, Remote Play Together, released in October 2019, allows users to launch a game, invite others directly through Steam chat, and have friends join the game from their own devices, even if the friends do not own the game. Remote Play Together also allows friends to watch through streaming.[331] In addition, Steam Families, which was introduced in September 2024, allows family members to share a game library and play separate games from the shared library concurrently.[332] These features (and others I discussed in my opening report), which Professor Rietveld ignored, make Steam increasingly valuable to players when more players join the platform and undermine his claim that I overstated player-side direct network effects.

---

[331] Gowrisankaran Rebuttal Merits Report, ¶ 51 ("Valve has released or expanded other features on Steam since Doucet's 2019 article was published, ... enabling couch co-op play between users remotely via Remote Play Together"); Steam, "Introducing Steam Remote Play Together," October 21, 2019, available at https://steamcommunity.com/games/593110/announcements/detail/3032537193879549687?snr=1_2108_group__2107, accessed on January 22, 2025 ("With Remote Play Together, you can now invite Steam Friends to join your local co-op, local multiplayer, and shared/split screen games online. Up to four players, can instantly join in the fun. Only the host needs to own and install the game, while additional players connect through Steam Remote Play streaming technology.").

[332] Gowrisankaran Opening Merits Report, ¶ 97 ("Steam Families, introduced in September 2024, allows up to six family members to share a game library and to launch and play separate games from that library at the same time."); Jay Peters, "Steam's improved family sharing is out now for everyone," *The Verge*, September 11, 2024, available at: https://www.theverge.com/2024/9/11/24242377/valve-steam-improvedfamily-sharing-out-now, accessed on January 21, 2025 ("Valve's new Steam Families feature is now available for everyone ... With Steam Families, parents are able to share games with their families, manage parental controls for their kids, and approve requests from their kids to buy Steam games. The big improvement with Steam Families over Valve's previous Family Sharing setup is that multiple people can play [different] games from a shared library at one time. ... Valve says that Steam Families are 'intended to contain your immediate family' and that they can include 'up to 6 close family members.'").

(b) **Publisher-side direct network effects**. I have already addressed the reason Professor Rietveld believes publisher direct network effects are negative. I addressed the analysis and logic he relies on for this conclusion in my rebuttal report. Professor Rietveld's argument is based on his belief that Steam is "overcrowded" and that this results in negative network effects for publishers.[333] I demonstrated in my rebuttal report, and discussed in Section 5.1 of this report, that Professor Rietveld's conclusions regarding "overcrowding" are based on flawed logic and analysis marred by a mathematical misinterpretation.[334] He has no reliable basis to support his claim of negative publisher network effects. Moreover, Professor Rietveld is fundamentally missing the relevant economics. The increased entry by publishers and developers that Professor Rietveld interprets as "overcrowding" has coincided with *increased* aggregate revenues for publishers on Steam.[335] This is evidence of procompetitive output expansion, not evidence of anticompetitive conduct.

(173) Thus, Professor Rietveld's claims regarding the strength of direct network effects on Steam, one of the factors in his three-factor analysis, are incorrect. Rather than supporting his conclusions, a reliable analysis of this factor further undermines the credibility of Professor Rietveld's three-factor analysis and his conclusions.

---

[333]  Rietveld Rebuttal Merits Report, Section V.B.

[334]  Gowrisankaran Rebuttal Merits Report, Section 8.5.2 and Appendix A5.

[335]  Gowrisankaran Rebuttal Merits Report, ¶ 319 ("As Exhibit 18 demonstrates, **Steam sales (both total and sales from third-party game sales) in fact experienced strong growth** over the years in which the decline in average lifetime game revenues occurs (2013-2020)."), Exhibit 18; Steam, "Steam Year In Review 2024," March 13, 2025, available at https://steamcommunity.com/groups/steamworks/announcements/detail/751641001553035272, accessed on March 17, 2025 ("2024 was the Steam platform's best year ever in terms of customers buying newly released games. ... • New Release revenue per year has increased almost exactly 10x since 2014.").

## 7.    CONCLUSION

(174)    Dr. Schwartz's and Professor Rietveld's responses to my opening report, which describes the ways in which Valve's business model has generated procompetitive benefits for developers, publishers, and consumers, fail to rebut the notion that Valve has had procompetitive impact. Instead, their approaches consist of dismissing the benefits off-hand based on claims that they are not balanced against harms; they are not tied to the alleged conduct; they are not focused on the proposed relevant market; or they do not take place during the class period. Each of these arguments is flawed: a balancing of procompetitive harms and benefits is not needed to initially establish benefits (and in any case, I have shown in my rebuttal report that there are no harms and that the balancing thus does not support Plaintiffs); the benefits I identify are in fact tied to the challenged conduct (even though I find that there is no PMFN and that Valve's revenue shares are not supracompetitive); my conclusions about Valve's procompetitive effect and the evidence of vigorous competition are robust to the narrower relevant markets that have been proposed by Plaintiffs and their experts and further prove that their market definition is incoherent; and the procompetitive actions in which Valve engaged prior to the class period are relevant to evaluating Steam's market position during the class period and the value it delivered during the class period and continues to deliver today.

(175)    Plaintiffs' experts have failed to rebut the existence of procompetitive effects from Valve's business model, as well as the reality that publishers can free-ride on the value of its platform, whether in the case of Steam keys or sales of games that are not Steam-enabled. Valve's actions are consistent with preserving incentives to invest and innovate. Finally, Plaintiffs' experts apply several flawed economic arguments that I already rebutted previously: Steam keys are not an instrument to reduce multi-homing by consumers and publishers (they are a publisher benefit); Steam Direct has not harmed publishers by reducing their revenues (it has encouraged developer entry and competition); and the features of the market are not such that Steam's popularity is only explained by anticompetitive conduct (its popularity is entirely consistent with offering superior quality).

Executed on the 5th day of May, 2025

Gautam Gowrisankaran

# A.    APPENDIX: LITERATURE CITED IN RIETVELD APPENDIX C

## A.1. Theoretical Papers

### A.1.1. Andre Boik and Kenneth S. Corts, "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics*, 59(1), 2016, pp. 105–134

(176) This is a theoretical model that examines the impact of PMFNs on prices and potential entry by platforms with relatively few features. The model constructed to examine their research question assumes a single seller and no direct channel for sales.

(a) P. 106 ("The policy-oriented literature conjectures that these agreements can raise prices for consumers and profits for platforms and may limit entrants with low-end business models. However, there exists little theoretical work to support or qualify these assertions. Analyzing these agreements in an explicit model, we find support for some of these claims but with important caveats.").

(b) P. 110 ("A single seller S sells its products to buyers through one or both of two platforms (or marketplaces).").

(177) The model in this paper assumes PMFNs achieve price parity across distribution channels. This assumption does not hold for Steam.

(a) P. 106 ("In this context, a PMFN clause is an agreement between a platform and a seller (for example, between a travel-booking website and an airline) that commits that seller (the airline) not to offer a lower price for the same item through any other platform (another travel-booking website).").

(b) P. 112 ("When there are two PMFN agreements in effect, the seller is constrained to set a uniform price across platforms.").

(178) This paper does not assess or discuss free-riding on search and discovery (showrooming), including how free-riding impacts the incentive to invest in procompetitive features.

### A.1.2. Joan Calzada, Ester Manna, and Andrea Mantovani, "Platform Price Parity Clauses and Market Segmentation," *Journal of Economics & Management Strategy*, 31(3), 2022, pp. 609–637

(179) This theoretical paper examines the incentive sellers have to segment the market of consumers, which influences their decision of whether to multi-home. PMFNs are examined for their effect on the segmentation decisions. Thus, the core research question of the model is not directly relevant to the context of Steam and this matter.

(a) P. 612 ("in our paper, segmentation occurs when sellers prefer to sacrifice part of their demand to reduce price competition. In fact, the presence of two platforms provides sellers an instrument to increase product differentiation. ... Another distinctive feature of our analysis is that we explicitly consider competition between agents on the same side.").

(b) P. 626 ("This paper has shown under which conditions platforms adopting an agency model gain by imposing PPCs, and how these price restrictions affect suppliers' listing choice. These issues have been partially neglected by the literature, which has mostly focused on the anticompetitive effects of PPCs, which reduces platform competition and produces an increase in commission fees usually passed through to final customers.").

(180) The model in this paper assumes PMFNs achieve price parity across alternative sales channels. This assumption does not hold for Steam.

(a) P. 609 ("Price parity clauses (PPCs) are contractual terms used by online platforms to prevent client sellers from offering their services at cheaper prices on alternative sales channels.").

(b) P. 618 ("When both OTAs adopt PPCs, hotels cannot offer their rooms at cheaper prices on the rival platform, and for this reason we have that $p_{ih} = p_{jh} = p_h$ (and $p_{ik} = p_{jk} = p_k$).").

(181) This paper does not dispute that free-riding on search and discovery can reduce a platform's incentive to invest. While the authors recognize that users may free-ride on platforms in the absence of price parity, and that higher showrooming intensity significantly impacts platforms, they do not investigate how this affects the platforms' incentives to invest.

(a) P. 623 ("This section studies the case in which a fraction of consumers can directly book their rooms from the hotels' websites after observing the offers available on the two OTAs. This extension allows us to analyze how OTAs adapt the use of PPCs in the presence of showrooming. To examine this case, we assume that there is a fraction $(1 - \gamma)$ of consumers who always book through the OTAs, without checking for potential discounts on the hotels' website. The remaining fraction $\gamma$ of consumers book directly from the hotels' websites whenever the price is lower or equal than the price on the OTA's. Therefore, parameter $\gamma$ captures the intensity of showrooming.").

(b) P. 625 ("The proposition confirms the results of our baseline model but also shows that showrooming makes PPCs more appealing for OTAs. ... In other words, the higher the intensity of showrooming, the more likely is that OTAs adopt PPCs to limit the possibility for hotels to use their direct channel.").

(182) This paper references Johansen and Vergé (2017).

(a) P. 612 ("Johansen and Vergé (2017) develop a model where there are two OTAs, several sellers, and consumers characterized by preferences à la Singh and Vives (1984), based on a representative agent and elastic demand. An important feature of their analysis is the interplay between hotels' substitutability and their possibility to delist from the OTAs and only offer the services through their direct channels; this imposes a limit to the fee OTAs can charge. They also assume the fees are secretly offered to hotels. As a consequence, each supplier does not observe the commission fee paid by its rivals. They adopt the 'contract equilibrium' approach developed by Cremer and Riordan (1987) and Horn and Wolinsky (1988), finding scenarios in which PPCs may benefit both hotels and consumers. Differently from them, we assume that hotels observe all commission fees and choose their listing strategy accordingly. This is an important aspect of our model, as we show that PPCs may induce segmentation, thereby reducing the number of hotels on each OTA.").

### A.1.3. Benjamin Edelman and Julian Wright, "Price Coherence and Excessive Intermediation," *The Quarterly Journal of Economics*, 130(3), 2015, pp. 1283–1328

(183) This paper examines whether PMFNs can lead to sellers and consumers over-using platform services, when they would be better off not joining any platform. The authors examine a model in which platforms impose PMFNs and make socially inefficient levels of (excessive) investment, with sellers and consumers choosing to transact through the platform anyways. Sellers are indifferent to selling directly or through the platform, and consumers pay for the added value they get from the platform services, but do not recoup a fixed cost of joining the platform, which can leave them worse off in the model than had they not joined any platform.

(a) P. 1285 ("We start with a model in which buyers and price-setting sellers choose whether to join a single intermediary that can add some value to transactions between them. In this environment, we obtain our key result that intermediation with price coherence is excessive and reduces consumer surplus compared to the situation without price coherence, as well as compared to the situation without intermediation. … With price coherence, each seller is willing to pay the intermediary a fee that equals the expected per-buyer benefit that buyers receive from using the intermediary to buy from a seller since this allows the seller to increase its retail price by an equivalent amount without losing any demand. … The increase in retail prices all buyers face as a result of intermediation cancels out the extra benefits they obtain. Buyers are left with the extra costs they incur in joining the intermediary in the first place, implying that they are worse off in aggregate.").

(184) The model in this paper assumes PMFNs achieve price parity across distribution channels. This assumption does not hold for Steam.

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.    Appendix A

(a) P. 1286 ("We also consider the case in which multiple intermediaries compete. Price coherence raises the price of purchasing through intermediaries that do not impose it.").

This paper acknowledges the effects of free-riding on search and discovery (i.e., showrooming), but does not assess the effects of free-riding in its model, including how free-riding affects the incentive to invest in procompetitive features.

(a) PP. 1318–1319 ("A limitation of our model is that we do not consider the possibility of buyers using an intermediary to identify or test a suitable product, then purchase through a lower-cost intermediary (or directly). Canonically, a buyer might visit a retail showroom, examine several products, then buy from a seller that avoids costly retail operations (i.e., the problem of 'showrooming'). A similar approach could undercut any intermediary that provides a search function. In principle, price coherence can reduce or eliminate the incentive for showrooming by preventing a low-cost intermediary or direct purchase from undercutting a high-cost intermediary.").

(b) P. 1319 ("To determine the net benefit of price coherence, in light of anti-showrooming benefits offset against the distortions we demonstrate, we would need a model in which an intermediary helped buyers search among sellers. We leave this for future work.").

(c) P. 1319 ("Even if price coherence is necessary to prevent showrooming, price coherence still leads to the same distortions we uncovered. More generally, our theory of harm applies equally no matter the reason for price coherence.").

## A.1.4. Øystein Foros, Hans Jarle Kind, and Greg Shaffer, "Apple's Agency Model and the Role of Most-Favored-Nation Clauses," *The RAND Journal of Economics*, 48(3), 2017, pp. 673–703

This theoretical paper examines platform adoption of the agency model. It examines the impact of MFNs, but as a mechanism that facilitates platforms to adopt the agency model, without a focus on MFNs as a response to address showrooming. The focus of the research question, and assumption that the MFN produces price parity, make the paper not directly relevant to the analysis of Steam.

(a) P. 674 ("In this article, …we ask three questions: 1. When will the agency model lead to higher prices? 2. When will the agency model be adopted? 3. What is the role of MFN clauses?").

(b) P. 675 ("we find that MFN clauses can be used to overcome this prisoners' dilemma. In particular, we find that by making adoption a weakly dominant strategy, MFN clauses can push the firms toward adoption [of the agency model], leading to higher prices in equilibrium than would otherwise have been the case. Thus, we find that industry-wide adoption can arise in conjunction with MFN clauses and need not be due to pressure from the upstream firms.").

(187) The model in this paper assumes PMFNs achieve price parity across distribution channels.

(a) P. 684 ("We model an MFN clause, when adopted by platform 1, as requiring that upstream firm u sets $p^u_1 \leqslant p^u_2$. We assume that all prices are set simultaneously, and to account for the possibility that platform 2 might set a lower price on good $u$ than upstream firm $u$ anticipates, we assume that $p^u_1$ will adjust automatically to satisfy the MFN clause in the (out-of-equilibrium) event that the constraint $p^u_1 \leqslant p^u_2$ fails to hold initially.)").

(188) This paper does not dispute that free-riding on search and discovery can reduce a platform's incentive to invest. While the authors acknowledge that users can free-ride on platforms in the absence of price parity, they do not include free-riding in their model or study the question of how that affects platforms incentives to invest.

## A.1.5. Renato Gomes and Andrea Mantovani, "Regulating Platform Fees Under Price Parity," *Journal of the European Economic Association*, 23(1), 2025, pp. 190–235

(189) This is a theoretical paper that focuses on the implications of capping platform commissions, rather than examining the effects of price parity clauses. It draws motivation from examples such as OTAs like Booking.com, marketplaces like Amazon, ride-sharing platforms, and food delivery apps. The paper acknowledges the challenge of "showrooming," where consumers find sellers on the platform but then buy directly to avoid commissions. To combat this, platforms may be motivated to introduce price parity clauses and prevent sellers from offering lower prices elsewhere. However, the paper primarily discusses the implications of capping platform commissions and thus its findings are not directly applicable to Steam or this matter, where the channel at issue is on consumer transactions rather than platform commission caps.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(a) P. 191 ("Most of these platforms operate under the agency model, according to which sellers are free to set prices, but are charged by the platform a commission per transaction. ... A crucial challenge for this business model is the possibility of *showrooming*, whereby consumers use the marketplace to find their preferred seller, but then switch to the direct channel to obtain a discount (made possible by the fact that the seller then avoids the platform's commission). To prevent this practice, many platforms adopted price parity clauses, which restrict the sellers' ability to charge lower prices on alternative sales channels. These covenants are widespread in the e-commerce and lodging sectors, but have also been applied to other industries such as entertainment, gaming, insurance, digital goods, and payments.").

(b) P. 192 ("In this paper, we investigate a natural alternative; namely, we study how to optimally cap platforms' commissions.").

(c) P. 193 ("we consider regulation capping the platform's fee per sale. ... If the regulator is utilitarian (assigning equal weights to the consumers' surplus, firms' profits, and the platform's profits), the optimal cap takes a familiar form: It equals the expected externality that the platform imposes on other market participants.").

(d) P. 195 ("Finally, we evaluate two alternatives to cap regulation: an outright ban of price parity and a relaxation of the latter under competition among platforms.").

(190) The model in this paper assumes PMFNs achieve price parity across distribution channels. This assumption does not hold for Steam.

(a) P. 191 ("To prevent this practice, many platforms adopted price parity clauses, which restrict the sellers' ability to charge lower prices on alternative sales channels.").

(b) P. 199 ("We assume in the baseline model that the platform is able to impose price parity, according to which firms cannot offer discounts in the direct-sales channel.").

(191) This paper does not dispute that free-riding on search and discovery can reduce a platform's incentive to invest. The authors acknowledge free-riding, and that it can affect the incentive to invest, but it is not important to this model.

(a) P. 191 ("A crucial challenge for [the agency model] is the possibility of *showrooming*, whereby consumers use the marketplace to find their preferred seller, but then switch to the direct channel to obtain a discount").

(b) P. 198 ("For simplicity, we assume that visiting the platform is costless to consumers, and that the platform can seamlessly transmit market information. Accordingly, all firms *listed on the platform* are added to the consideration set of *all* consumers. This captures the idea that, through the platform's search tools, consumers can learn the best match among all joining firms (which is equivalent to considering all of them).").

(c) P. 199 ("As a result, if a firm joins the platform, it steers all of its consumers to buy through the platform. By doing this, firms enjoy the convenience benefit of selling through the platform, while consumers see no gain in switching to another sales channel. More broadly, our model captures the main features of markets where showrooming is impractical, even when the platform does not contractually impose price parity.").

(d) P. 216 ("Crucially, banning price parity prevents the platform from appropriating *any* of the informational (ex-ante) benefits it generates, as consumers would use the platform only to find the relevant information and then finalize the transaction elsewhere (showrooming). Only the (ex-post) convenience benefit is recovered in equilibrium, which leads to an inefficiently low fee. This would discourage platform investment in many instances where it contributes positively to welfare.").

(192) This paper references Johansen and Vergé (2017).

(a) P. 220 ("In a more positive light, Johansen and Vergé (2017) find that price parity is welfare-enhancing in some circumstances. This paper argues that, when the participation constraint is 'sufficiently' tight, price parity renders firms more prone to delisting, which reduces average costs.").

## A.1.6. Andrei Hagiu and Julian Wright, "Marketplace Leakage," *Management Science*, 70(3), 2024, pp. 1529–1553

(193) This theoretical paper examines free-riding, referred to as "leakage" by sellers on platforms and explores various strategies a platform can implement to mitigate leakage, including price-parity clauses. The paper presents an economic model of a monopolist platform facing free-riding issues from sellers who use the platform to sell their products. It then explores the trade-offs associated with six different strategies the platform can use to prevent or limit leakage, including price-parity clauses, which require participating sellers to set their direct prices no lower than their prices on the platform. The paper concludes that imposing price parity can reduce free-riding but forces sellers to choose between conducting all transactions on the platform or none at all. This approach risks losing sellers who understand their buyers' preferences better than the platform, potentially necessitating lower fees to retain them. Thus, the paper focuses on solutions a platform can employ to address free-riding rather than the effects of price-parity clauses on platforms' incentives to invest, making it inapplicable to the context of Steam.

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.    Appendix A

(a) PP. 1529–1530 ("In this paper, we provide a simple model to study how a marketplace should optimally respond to a leakage problem. ...We then explore six different strategies the marketplace can use to avoid or limit leakage: (1) investing in transaction benefits, (2) limiting communication between buyers and sellers, (3) charging the seller for referrals instead of (or in addition to) for transactions, (4) using a price-parity clause to rule out leakage, (5) allowing a competing seller to also sell on the marketplace, and (6) allowing seller competition but also steering in favor of one or the other seller, depending on how much leakage each seller induces. For each of these strategies, we analyze the trade-off that it creates for the marketplace, and we analyze how the trade-off depends on buyers' switching costs (which capture the propensity for leakage) and other relevant parameters.").

(194) The model in this paper assumes PMFNs achieve price parity across distribution channels. This assumption does not hold for Steam.

(a) P. 1539 ("Suppose the marketplace can require that the participating seller must set its direct price no lower than its price on the marketplace. If the seller sets a lower direct price, the marketplace commits to delist the seller. This type of clause in a contract is known as a PPC.").

(b) P. 1539 ("As a result, $S$ sets $p_d = p_m = v$,...").

(195) This paper does not dispute that free-riding on search and discovery can reduce a platform's incentive to invest. Although the model incorporates free-riding and adjusts for various strategies platforms might use to mitigate it, the key takeaway is that each approach, including the price parity restriction, has both procompetitive effects and potential distortions that need to be considered.

(a) P. 1529 ("we provide a model in which there is partial leakage in equilibrium").

(b) P. 1529 ("we show that the marketplace always sets a fee that induces some (but not complete) leakage to arise in equilibrium.").

(c) P. 1539 ("How a PPC works depends on whether buyers depend on $M$ to discover $S$.").

(d) P. 1539 ("Things are less obvious when buyers do not depend on $M$ to discover S because then, $S$ has the option of rejecting $M$'s offer and still making positive profit by just selling directly.").

(e) P. 1539 ("To see how a trade-off from imposing a PPC can arise, we introduce asymmetric information about the nature of switching cost between the marketplace and the seller.").

(f) P. 1539 ("These expressions show that when $q < 1$, imposing the PPC has a downside; it forces $M$ to either set a high fee and thereby, not make any sales with probability $1-q$ or set a lower fee that ensures the seller always participates.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## A.1.7. José Ignacio Heresi, "Platform Price Parity Clauses and Consumer Obfuscation," *The Journal of Industrial Economics*, 71(1), 2023, pp. 291–322

(196) This theoretical paper explores price parity clauses (PPCs) in contexts where platforms can influence consumer search costs. It suggests that PPCs might reduce search costs, lower prices, and boost consumer surplus, challenging the usual view that PPCs raise seller prices.

(a) P. 293 ("I consider search design and obfuscation due to the widespread use of these practices in online markets. The main reason why search design affects the analysis of price parity clauses is the following. Suppose there are two platforms, A and B, and A decides to make search more complicated in its marketplace, increasing the search cost faced by consumers. In response, sellers have incentives to increase prices on that platform. However, if PPCs are in place, sellers internalize that they must also increase their price in platform B, which is not optimal. Overall, sellers increase their prices in both platforms, but the price increase in platform A is lower than it would be in the absence of PPCs. This "reduced pass-through" effect decreases platforms' incentives to increase their search costs to induce higher prices. This effect goes in the opposite direction of the standard theory of harm, whereby price parity clauses make platforms' demand inelastic with respect to prices, increasing their incentives to implement higher sellers' prices. This article's main focus is to study this trade-off and analyze how it affects the incentives to set price parity clauses.").

(197) The model in this paper assumes PMFNs achieve price parity across distribution channels. This assumption does not hold for Steam.

(a) P. 307 ("To understand the demand effect, note that consumers' participation decision and search behavior once they join a platform is the same as when PPCs are not imposed. The only difference is that they expect the same price on both platforms.").

(b) P. 308 ("the unique symmetric price equilibrium in the sellers' stage is given by sellers charging [Eq. 15]").

(198) This paper does not dispute that free-riding on search and discovery can reduce a platform's incentive to invest. The paper acknowledges the existence of showrooming but does not explicitly include it in the model, as the article focuses on platform competition.

(a) P. 314 ("While most of the literature focuses on showrooming and sellers' direct channels, in this article I focus on platform competition and assume that sellers do not sell directly to consumers.").

(199) This paper references Johansen and Vergé (2017).

    (a) P. 296 ("Johansen and Vergé [2017] study an environment with secret contracts between platforms and sellers, in which sellers' listing decisions might limit platforms' ability to raise fees. In this model, when PPCs are imposed, platforms cannot excessively increase their fees because sellers might stop selling on that platform. They show that PPCs might benefit platforms, suppliers, and consumers when interbrand competition is sufficiently strong.").

## A.1.8. Justin P. Johnson, "The Agency Model and MFN Clauses," *The Review of Economic Studies*, 84(3), 2017, pp. 1151–1185

(200) This theoretical paper examines the impact of an agency model relative to a wholesale model of platforms.

    (a) P. 1152 ("Although I am motivated by the desire to understand the consequences of a shift from the wholesale model to the agency model, my analysis is more general.").

    (b) P. 1151 ("In this article I examine two business practices that are used especially in online markets. The first of these is the 'agency model' of sales, which refers to a supply chain in which suppliers (rather than retailers) set final retail prices and in which sales revenue is split between suppliers and retailers according to endogenously determined shares. The second business practice is 'retail price-parity' restrictions such as most-favoured nation clauses (MFNs), which stipulate that the retail price set by a supplier through one retailer can be no higher than the retail price set by that supplier through a competing retailer.").

(201) The model in this paper assumes PMFNs achieve price parity across distribution channels. This assumption does not hold for Steam.

    (a) P. 1169 ("Now suppose price-parity is in effect across the industry. This retailer's profit function differs in that its supplier must charge the same price ... through both retailers it sells to.").

(202) The paper acknowledges the theoretical possibility that PMFNs could produce procompetitive effects by encouraging investments.

    (a) P. 1173 ("Although the analysis above indicates how MFNs may raise prices and harm consumers, it is not hard to imagine how MFNs might also be pro-competitive. For example, MFNs might encourage investments. This force seems particularly relevant for markets where the retail landscape is changing rapidly. In particular, many new online retailers have appeared in recent years, and some of them have chosen to use price-parity restrictions. Some of these retailers have faced substantial costs of developing their online platforms and it is possible that price-parity restrictions have encouraged their entry and benefitted consumers. ... In other words, it is possible that the entry-inducing effects of MFNs played a role.").

(203) This paper references Johansen and Vergé (2017).

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.                                    Appendix A

(a) P. 1154 ("Johansen and Vergé (2016) argue such restraints may be beneficial to consumers in certain circumstances, leading to lower prices.").

### A.1.9. Masayoshi Maruyama and Yusuke Zennyo, "Platform Most-Favored-Customer Clauses and Investment Incentives," *International Journal of Industrial Organization*, 70, 2020

(204) This paper examines how the degree of competition between sellers, relative to competition between platforms, affects the impact of PMFN clauses on platforms' incentives to invest in demand-enhancing initiatives.

(a) P. 2 ("The aim of this paper is to build a model to elucidate effects of PMFC clauses on the incentives for platforms to invest in demand-enhancing investments. … This paper studies a bilateral duopoly model that incorporates both competition between two platforms and competition between two sellers. … Our central research question is whether the industry-wide adoption of PMFC clauses encourages competing platforms to invest more. To this end, we compare the case in which both platforms use PMFC clauses with the case in which neither platform uses a PMFC clause.").

(b) P. 2 ("Our main result is that industry-wide PMFC clauses engender greater investment if platform competition (i.e. intrabrand competition) is fiercer than seller competition (i.e. interbrand competition).").

(205) The model in this paper assumes PMFNs achieve price parity across distribution channels. This assumption does not hold for Steam.

(a) P. 5 ("With (industry-wide) PMFC clauses, if a seller offers different prices on the two platforms, the higher price would be lowered to be the same as the lower one across both platforms.").

(b) P. 6 ("Consequently, letting $p^u_1 = p^u_2 = p^u$ for $u = 1, 2$, we consider the game in which seller $u$ chooses only $p^u$ as its strategic variable.").

(206) The mechanism through which PMFNs drive the results of their model is not through the protection on investments PMFNs offer from deterring free-riding.

(a) P. 2 ("Our main result is that industry-wide PMFC clauses engender greater investment if platform competition (i.e. intrabrand competition) is fiercer than seller competition (i.e. interbrand competition). We emphasize that the mechanism underlying this result is not a simple story such that the clauses resolve an underinvestment problem stemming from externalities of investments (i.e., spillover effects) that increase the demand for goods sold on the rival platform. In the present paper, by contrast, whether industry-wide PMFC clauses increase investment incentives, or not, depends on the degree of competition in the vertically related market, not on the extent of spillover effects of investments.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(207)   This paper acknowledges that free-riding on search and discovery can diminish a platform's incentive to invest. However, the impact of PMFNs in deterring free-riding and protecting the incentive to invest is not the focus of the model.

    (a) P. 2 ("There is an ongoing debate about how to assess the PMFC clause. There have been several arguments about its potential to harm competition. LEAR (2012) identified some possible *anti-competitive* effects of such across-platforms parity agreements (PMFC clauses) … By contrast, LEAR (2012) also described the possible *pro- competitive* effects of the PMFC clauses to generate efficiencies that might protect investments by platform owners.").

(208)   This paper references Johansen and Vergé (2017).

    (a) P. 3 ("Johansen and Vergé (2017) instead show that one should be more careful when evaluating the welfare effects of PMFC clauses. They present a model in which two differentiated platforms compete by offering commissions to multiple sellers, where each seller has an outside option to delist from a platform and sell directly to consumers through its own direct channel. Thus, if the platforms adopt PMFC clauses, sellers' participation constraints on platforms become restrictive, which prevents them from increasing commissions too much or which might even force them to reduce their commissions. They show that PMFC clauses do not always engender higher commissions and retail prices. Additionally, PMFC clauses might simultaneously benefit all the platforms, sellers, and consumers.").

## A.1.10. Frank Schlütter, "Managing Seller Conduct in Online Marketplaces and Platform Most-Favored Nation Clauses," *The Journal of Industrial Economics*, 72(3), 2024, pp. 1139–1194

(209)   This theoretical paper examines competition at the seller level, not between platforms, with a focus on collusion between sellers. The research question, and assumptions of the model, do not apply to Steam and are not directly relevant to the case.

    (a) P. 1139 ("This article investigates the incentive and ability of a platform to limit the extent of competition between the sellers it hosts.").

    (b) P. 1140 ("The present article contributes to this debate with a specific focus on platform most-favored nation clauses (PMFN) by formally analyzing a platform's incentive and ability to encourage competition or collusion on its own marketplace in the presence of such clauses.").

    (c) P. 1145 ("The present paper contributes to this literature by focusing on the competitive effects of PMFNs at the seller level, and their impact on the stability of seller collusion. This analysis, thus, offers a novel theory of harm regarding PMFNs that applies even in settings in which a platform does not adjust its commission after the introduction of a PMFN.").

(d) P. 1140 ("Initially, I take as given that sellers can coordinate on a collusive outcome and then focus below on how it can be sustained through tacit collusion in an infinitely-repeated game.").

(e) P. 1147 ("I analyze how the introduction of a PMFN affects the profitability of seller competition for the platform. In order to do so, I characterize the static competitive market outcome and compare it to the outcome in which sellers can coordinate on the joint profit-maximizing behavior (i.e., the best collusive prices from the sellers' point of view).").

(210) The model in this paper assumes PMFNs achieve price parity across distribution channels. This assumption does not hold for Steam.

(a) P. 1140 ("A PMFN is a contractual requirement for sellers not to offer better prices and conditions on other distribution channels.").

(b) P. 1146 ("A PMFN requires each seller to offer on the platform at least as favorable prices as on the direct channel, $p_{iM} \leq p_{iD}$.").

(211) This paper does not examine free-riding or the incentives for a platform to introduce a PMFN to avoid showrooming or protect investment incentives. Instead, the focus is on competition at the seller level, emphasizing collusion among sellers rather than competition between platforms. The research question and the model's assumptions do not address the types of protections for investments discussed in my opening report, nor do they examine free-riding, rendering the paper not directly relevant to my arguments.

(212) This paper references Johansen and Vergé (2017).

(a) P. 1140 ("I analyze a stylized model building on and extending Johansen and Vergé [2017] in which sellers have two distribution channels via which to sell to consumers. The first is a platform, which employs the *agency model*. This means the platform receives a commission for every intermediated transaction, and the sellers set the retail prices on the platform. The second distribution channel is a direct channel on which the online sellers do not pay a commission per transaction. I analyze both per-unit and revenue-sharing commissions on the platform and, for the sake of tractability, focus on a linear-demand specification.").

## A.1.11. Bo Shen and Julian Wright, "Why (Don't) Firms Free Ride on an Intermediary's Advice?" *International Journal of Industrial Organization*, 64, 2019, pp. 27–54

(213) This paper examines why some platforms do not set price parity requirements, despite the opportunity for sellers to free-ride on the platform's services matching consumers to sellers. They examine a different type of platform environment from that of Steam, one where consumers only buy if the platform recommends the product, and the seller sets both the consumer price and revenue share level with the platform.

(a) P. 28 ("In the case of insurance, financial and medical products, intermediaries do not impose any such contract restrictions, and yet firms typically do not discount prices for direct sales relative to intermediated sales. ... This paper provides a theory to make sense of these observations. It explains why when firms set commissions, firms will set their direct and intermediated prices to be equal in equilibrium even when intermediaries do not restrict the firms' pricing in any way. It also explains why when commissions are set by intermediaries, an intermediary may instead need to rely on price-parity clauses to eliminate any discounts for direct sales.").

(214) The model in this paper assumes PMFNs achieve price parity across distribution channels.

(a) P. 42 ("Suppose the intermediary actually imposes a price-party clause. Given the positive shopping cost in our model, all buyers would always want to purchase through the intermediary so that no buyer would ever want to purchase directly.").

(b) P. 45 ("Given that firms set positive discounts for direct sales when *[the intermediary]* sets commissions, in this section we consider whether *[the intermediary]* could do better imposing a price-parity clause that rules out such discounts.").

(215) This paper acknowledges the effects of free-riding on search and discovery (i.e., showrooming), but their analysis does not examine the effect of showrooming on platforms' incentive to invest.

(a) P. 29 ("The ability of firms to offset a lower discount with a lower commission, and do better, depends on the assumption that firms set commissions. If instead it is the intermediary that sets commissions, our equivalence argument between commissions and discounts breaks down, and we show firms will always want to offer positive discounts in response to high commissions. In this case, the intermediary will want to impose a price-parity restriction on firms to prevent them discounting for direct sales. This allows the intermediary to shift surplus from firms to itself."); with the footnote, ("Hunold et al. (2017) provide evidence from Booking.com in Europe. They find the abolition of Booking.com's price-parity restrictions is associated with the hotels' direct channel having the strictly lowest price more often, and hotels promoting their direct online channel more actively.").

(b) P. 32 ("However, this does not rule out consumers buying directly after obtaining advice from [the intermediary], which we call 'showrooming'. Showrooming is potentially a fundamental problem for [the intermediary]— that if firms pay positive commissions to [the intermediary], they may want to induce consumers to bypass [the intermediary] with lower direct prices after consumers have obtained the relevant advice.").

## A.1.12. Francisca Wals and Maarten Pieter Schinkel, "Platform Monopolization by Narrow-PPC-BPG Combination: Booking et al.," *International Journal of Industrial Organization*, 61, 2018, pp. 572–589

(216) This paper extends the results in Wang and Wright (2020) to allow for best price guarantees ("BPGs").

(217) The model in this paper assumes PMFNs achieve price parity across distribution channels. This assumption does not hold for Steam.

   (a) P. 573 ("A wide PPC prohibits sellers from offering a lower price on *any other* channel than on the platform in question. A narrow PPC prohibits sellers from offering a lower price on *their own* direct sales channel.").

   (b) P. 574 ("In this note, we observe that for sufficiently low hassle costs a narrow PPC combined with a price-matching BPG by a high-quality incumbent leaves only the Price Parity and Monopoly Equilibrium (PPME)").

   (c) P. 577 ("Therefore, if prices are the same between a platform and an online direct sales channel, the transaction takes place on the platform.").

(218) This paper acknowledges free-riding in the model, but, as with Wang and Wright (2020), firms do not decide whether to invest in quality.

   (a) P. 576 ("A consumer may also purchase from a seller directly, at prices that potentially are lower, since the seller forgoes the platform fee in case of a direct sale.").

(219) This paper references Johansen and Vergé (2017).

   (a) PP. 575–576 ("In a vertical relations model with competing platforms and no search costs, Johansen and Vergé (2017) find that PPCs, both wide and narrow, may benefit platforms, sellers and buyers under the threat of competing sellers switching to the lowest-fee platform.").

## A.1.13. Chengsi Wang and Julian Wright, "Search Platforms: Showrooming and Price Parity Clauses," *The RAND Journal of Economics*, 51(1), 2020, pp. 32–58

(220) This paper develops a model that examines the effect of PMFNs on consumer welfare.

(a) P. 32 ("We provide a model in which consumers search for firms directly or through platforms. Platforms lower search costs but charge firms for the transactions they facilitate. Platform fees raise the possibility of showrooming, in which consumers search on a platform but then switch and buy directly to take advantage of lower direct prices. In settings like this, search platforms like Booking.com have adopted price parity clauses, requiring firms to offer their best prices on the platform, arguing this is needed to prevent showrooming. However, despite allowing for showrooming in our model, we find that price parity clauses often harm consumers.").

(b) P. 33 ("In this article, we develop a model of search platforms that is used to explore the implications of showrooming and PPCs. Consumers search sequentially for firms either directly or through a platform. Search reveals information on a firm's match value and price. We allow for two types of consumers—regular consumers, who consider whether to use the platform or the direct channel, and direct consumers, who only search and buy on the direct channel.").

(221) The model developed in this paper assumes price parity.

(a) P. 42 ("One way *[the platform M]* can eliminate showrooming and the constraint it implies for its fee is to impose a PPC. If a firm joins $M$ and thereby accepts the PPC, its direct price must be at least as high as its price on $M$. For a given *[fee f]*, as long as all firms (including firm $i$) join $M$, an individual firm $i$ chooses $p^i_m$ and $p^i_d$ to solve... subject to $p^i_m \leq p^i_d$, with all other firms choosing the symmetric equilibrium prices.").

(222) The authors acknowledge PMFNs can protect the incentives to invest, in this case by remaining in operation, by preventing free-riding.

(a) P. 33 ("The main defense put forward for PPCs is that they are needed to prevent 'showrooming.' Consumers might use the platform to search for a suitable firm, but then complete their purchase on the firm's own website if the firm offers a lower price when it sells directly (which it may do to avoid the platform's fee). Showrooming, which is a form of free-riding, may therefore undermine a platform's ability to operate. A PPC (either narrow or wide) eliminates the restriction on the platform's fee implied by such showrooming.").

(223) The model does not incorporate the decision to invest in search. Instead, quality of platforms is assigned exogenously.

(a) P. 53 ("There are several interesting ways in which our theory can be extended. In this article, the search cost on platforms is assumed to be exogenously lower than in the direct market. It would be interesting to study what happens instead if platforms can determine how much to invest in lowering their search costs, which provides them with another way to attract more consumers to search on their particular platform.").

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(224)  This paper references Johansen and Vergé (2017).

(a) P. 34 ("Johansen and Vergé (2017) also allow for a direct channel, but assume consumers view each of the channels (the two different platforms and the direct channel) as well as each of the firms as being exogenously differentiated. They focus on the effects of allowing firms to delist from the platforms, finding PPCs can decrease prices if suppliers are sufficiently close substitutes, and the direct channel is a sufficiently close substitute for the platform channels.").

## A.1.14. Chengsi Wang and Julian Wright, "Platform Investment and Price Parity Clauses," *The Journal of Industrial Economics*, 71(2), 2023, pp. 538–569

(225)  This paper examines how PMFNs affect platform decisions to invest in reducing search costs, considering the threat from free-riding.

(a) P. 539 ("We therefore explore how platforms' investment incentives in providing search benefits are affected by price parity clauses, and whether taking into account these effects changes the economic analysis of these restrictions.").

(b) P. 561 ("This article analyzes the implications of price parity clauses for platform investment in providing search benefits, and how such platform investment may change the effects of price parity clauses.").

(226)  The model in this paper assumes PMFNs achieve price parity across distribution channels. This assumption does not hold for Steam.

(a) P. 538 ("PRICE PARITY CLAUSES (OR PLATFORM MFNS AS THEY ARE SOMETIMES ALSO KNOWN) have attracted considerable recent attention from policymakers and scholars. These clauses...require the price a firm offers on the platform is no higher than the prices the same firm offers when selling the same item through its own website (narrow price parity) or via any channel (wide price parity).").

(b) P. 551 ("One way a monopoly platform can eliminate showrooming and the constraint it implies for the platform's fee is to use PPCs, thereby requiring the price firms set on the platform be no higher than the price they set for the direct channel. If a firm joins $M$ and thereby accepts a PPC, its direct price must be at least as high as its price on the platform.").

(227)  The authors acknowledge PMFNs can protect the incentives to invest by preventing free-riding.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(a) P. 540 ("We next consider the use of price parity clauses in case there is an incumbent platform that faces potential competition from a differentiated entrant, and can first decide how much to invest in search cost reduction before the entrant does likewise. In this case, narrow price parity clauses do not solve the under-investment problem. Each platform does not want to invest in search cost reduction, given the other platform can free-ride on their lower search costs by not investing. Specifically, consumers who prefer to buy through the high-search-cost platform will search on the low-search-cost platform and then switch to complete their transaction on the high-search-cost platform. Moreover, the low-search-cost platform's fee is constrained by platform competition which prevents it from recouping its investment by charging higher fees to consumers who regard it as the preferred platform to finalize transactions. So our results support the idea that wide price parity clauses are required to incentivize investment in search cost reduction.").

(228) The authors find that the welfare effects of PMFNs are ambiguous.

(a) P. 552 ("Since there is insufficient investment without PPCs and excessive investment with PPCs, the effect of PPCs on welfare is in general ambiguous.").

(b) PP. 560–561 ("Previous research has ignored the positive role that their clauses can have in protecting the incentives of platforms to invest in search benefits, which is the most obvious defense platforms have for using these clauses.").

(c) P. 561 ("We find that for investments that improve search, there is insufficient investment without wide price parity clauses and excessive investment with wide price parity clauses. Thus, our article would seem to provide some support for platforms' arguments that wide price parity clauses are actually beneficial since they promote investment. However, the welfare effects of price parity clauses are at best ambiguous.").

(229) This paper references Johansen and Vergé (2017).

(a) P. 541 ("Some exceptions include Johansen and Vergé [2017] who show that given platform fees are constrained by the possible of firms delisting, the imposition of price parity clauses does not necessarily result in higher fees and lower consumer prices, and more recently (Mariotto and Verdier [2020] and Liu *et al.* [2021]) who also show possible positive effects of price parity clauses on consumers.").

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.　　　　　　Appendix A

## A.2. Empirical Papers

### A.2.1. Sean Ennis, Marc Ivaldi, and Vicente Lagos, "Price-Parity Clauses for Hotel Room Booking: Empirical Evidence from Regulatory Change," *The Journal of Law and Economics*, 66(2), 2023, pp. 309–331

(230) This is an empirical paper that studies the effect of removing PMFNs on average hotel prices. It finds varied effects across hotel types.

   (a) P. 309 ("This paper examines the impact of most-favored-nation (MFN) clauses on retail prices, taking advantage of two natural experiments that changed vertical contracting between hotels and major digital platforms. First, a broad EU intervention narrowed the breadth of obligations under price-parity clauses between hotels and major online travel agencies (OTAs). Second, France and Germany went further and eliminated all price-parity agreements for top OTAs.").

   (b) P. 312 ("Using proprietary hotel-level data from hotel chains around the world, we carry out reduced-form regression analyses to test whether price differentiation across channels increased after the change in regulation. ... We compare average booking sales prices from the chains on two large OTAs and on the hotels' own online direct channels, using data from the year before the regulatory change in 2015 and the year after it. We include a comparison of pricing patterns before and after the change between EU hotels and a control group of hotels from non-EU countries. Thus, we perform before-and-after (hereafter, before/after) and difference-in-differences analyses using data from multiple hotel chains.").

   (c) P. 309 ("Comparisons with hotel pricing outside the European Union confirm the relative reduction in prices for midlevel and luxury hotels and an opposite pattern for budget hotels.").

   (d) P. 313 ("Results from the before/after analysis suggest that, following the switch to narrow PPCs in the EU, average retail prices offered on direct channels are more likely to be cheaper than average prices posted on OTAs for midlevel and luxury hotels. This result is robust to the comparison with retail prices for non-EU hotels (that is, from a difference-in-differences analysis), but only for midlevel and luxury hotels. Opposite results are found for budget hotels in both before/after and difference-in-differences specifications, which suggests that different economic forces or factors may be at play.").

(231) The authors emphasize the need for an empirical approach due to the uncertain theoretical impact of PMFNs, which varies based on market specifics. Given the mixed outcomes across various hotel categories, the results of this study emphasize that effects are not even generalizable across segments within a market.

Corrected Reply Merits Expert Report of Gautam Gowrisankaran, Ph.D.    Appendix A

    (a) P. 312 ("In light of the theoretical arguments for and against PPCs, including potentially ambiguous effects, empirical evidence from real hotel bookings is of value.").

(232) The paper notes that price parity clauses can mitigate free-riding from other distribution channels and thereby encourage OTAs to invest. However, it does not empirically assess free-riding, platform investments, or incentives to invest, focusing solely on comparing prices listed on OTAs and individual booking websites.

    (a) P. 310 ("Wide PPCs can reduce free-riding behavior from other distribution channels and, in this way, would promote OTAs' investments and avoid higher direct-channel prices to final users (see Ezrachi 2015; Wang and Wright 2020). Absent the PPCs, a hotel could have an incentive to advertise its rooms via a given OTA and then offer lower prices for the same rooms on its own website and avoid paying commissions.").

(233) This paper references Johansen and Vergé (2017).

    (a) P. 312 ("Johansen and Vergé (2017) suggest that even wide PPCs can have ambiguous effects to the extent that sellers' participation constraints prevent a guaranteed high commission.").

### A.2.2. Matthias Hunold et al., "Evaluation of Best Price Clauses in Online Hotel Bookings," *International Journal of Industrial Organization*, 61, 2018, pp. 542–571

(234) This empirical paper examines the impact of bans on price parity for hotel room bookings by OTAs. It finds varied effects across hotel types. The paper finds that removing price parity clauses leads chain hotels to lower their direct online channel prices compared to other online prices. However, for independent hotels, restricting PMFNs has no effect, as price parity was not initially present. This aligns with my analysis showing no harm when price parity is absent. This paper highlights that effects vary across different hotel categories and are not universally applicable.

    (a) P. 570 ("We also find that once the BPCs had been removed in Germany, chain hotels more frequently set the direct online channel price below all other available online prices, as visible at Kayak.").

    (b) P. 570 ("We do not observe such a trend for independent hotels, which is consistent with the observation that independent hotels already initially had a direct channel price below the price of Booking.com much more often than chain hotels, indicating a higher non-compliance with BPCs.").

(235) The authors note that PMFNs can theoretically produce procompetitive effects and find evidence consistent with PMFNs having prevented showrooming. However, the paper does not explore or comment on the impact of showrooming or free-riding on platform investment incentives.

(a) P. 544 ("We find that the price of the direct channel among hotel chains is more often strictly lower than the prices on all other visible online sales channels following the abolition of Booking.com's narrow BPC in Germany. At the same time, the price at Booking.com is less often the lowest among hotel chains in Germany … consistent with free-riding in the sense that hotels might use the OTAs to show their rooms, but induce customers with lower prices to eventually book directly.").

(b) P. 545 ("BPCs prevent free-riding which would occur when consumers search on the OTA and then book on the hotel website or at another OTA if the price is lower there. Several competition authorities have accepted narrow BPCs as a compromise which only requires parity with respect to the direct online channel and, in principle, still allows for price differentiation across OTAs. According to Wang and Wright (2017), narrow BPCs may be beneficial for consumers if OTAs would leave the market otherwise.").

(236) This paper references Johansen and Vergé (2017).

(a) P. 543 ("The theoretical literature on this topic is developing rapidly and shows that BPCs can harm consumers (Boik and Corts, 2016; Edelman and Wright, 2015; Johnson, 2017; Wang and Wright, 2017), but can also be welfare-enhancing (see in particular Johansen and Vergé, 2017).").

(b) P. 545 ("In contrast to the contributions above, Johansen and Vergé (2017) offer a divergent view to the main theory of harm. They show that BPCs do not necessarily lead to higher commission rates and consumer prices if hotels can decide whether to be active on the OTA. Moreover, they conclude that narrow BPCs do not increase competition between intermediaries when compared to wide BPCs.").

## A.2.3. Matthias Hunold, Reinhold Kesler, and Ulrich Laitenberger, "Rankings of Online Travel Agents, Channel Pricing, and Consumer Protection," *Marketing Science*, 39(1), 2020, pp. 92–116

(237) This empirical paper examines hotel rankings on OTA platforms in Europe. It finds that platforms adjust rankings based on the likelihood of showrooming when price parity clauses do not apply. The paper does not study PMFNs but focuses on whether search firms adjust rankings based on relative prices.

(a) P. 92 ("We investigate whether online travel agents (OTAs) assign hotels worse positions in their search results if these set lower hotel prices at other OTAs or on their own websites.").

(b) P. 92 ("Our empirical analysis shows that the position of a hotel in the search results of OTAs is better when the prices charged by the hotel on other channels are higher.").

(c) P. 111 ("We address the question of whether OTAs rank hotels worse in their default search results if these charge lower prices at other OTAs or on their own website.").

(238) This paper does not dispute that free-riding on search and discovery can reduce a platform's incentive to invest. The paper only notes that price parity may stem from a significant concern for OTAs regarding free-riding, where consumers utilize the platform's search and comparison services but ultimately book through a cheaper channel, depriving the OTA of its commission.

　　(a) P. 94 ("A major concern for OTAs is free riding, where consumers use the platform's search and comparison service, but ultimately book through a cheaper channel, leaving the OTA without the commission. As free riding is incentivized by lower prices on other channels, many OTAs have used, and partly still use, PPCs to mitigate aggressive pricing.").

(239) This paper references Johansen and Vergé (2017).

　　(a) P. 93 ("Our work is also related to the recent theoretical literature on the (anti)competitive effects of PPCs of intermediaries, such as OTAs (Edelman and Wright 2015, Boik and Corts 2016, Johansen and Vergé 2017, Johnson 2017, Wang and Wright 2017, Ronayne and Taylor 2018, Wals and Schinkel 2018).").

## A.2.4. Andrea Mantovani, Claudio A. Piga, and Carlo Reggiani, "Online Platform Price Parity Clauses: Evidence from the EU Booking.com Case," *European Economic Review*, 131, 2021, pp. 1–27

(240) This paper investigates the effects of the 2015 "Macron Law" on hotel booking websites in France. The law banned price parity clauses on online platforms, aiming to prevent sellers from offering lower prices on other sales channels.

　　(a) P. 2 ("Our analysis considers the lodging sector and exploits a particular policy change that affected online travel agencies (OTAs) in 2015. We gather a large and detailed dataset on room level prices from hotels listed on *Booking.com*, the leading OTA in the EU. ... we perform a difference-in-differences (D-in-D) analysis based on comparing prices posted on *Booking.com* by hotels in the neighboring Mediterranean islands of Corsica (France) and Sardinia (Italy), before and after the policy intervention.").

(241) The removal of price parity clauses led to a modest reduction in short-term hotel prices, but the medium-term effects were smaller and not statistically different from zero. The paper also observed different effects depending on the type of hotel.

　　(a) P. 11 ("In the short run, the elimination of all Price Parity Clauses in France in 2015 brought about a 2.6% decline on the average hotel price on *Booking.com* in Corsica. More substantial price reductions, albeit in some cases not significant, were detected for hotels affiliated with chains, 3 and 4 star hotels, medium and large size hotels.").

(b) P. 14 ("In the medium run, the elimination of all Price Parity Clauses in France in 2015 brought about limited and not statistically significant changes on the average hotel price on *Booking.com* in Corsica. Substantial price reductions, albeit in some cases not significant, were detected for hotels affiliated with chains, 3, 4 and 5 star hotels, medium and large size hotels.").

(242) The paper's literature review briefly mentions free-riding and showrooming, noting that consumers value platform services but may free-ride if direct purchasing is allowed. It states that price parity clauses can prevent showrooming. However, the paper focuses on hotel prices listed on individual booking websites, not free-riding or the incentive to invest.

(a) P. 3 ("Edelman and Wright (2015) examine consumers' decision to either purchase directly or through platforms. Price Parity Clauses harm consumers by diverting them from direct channels, thereby increasing the final prices and leading to excessive investment in ancillary benefits provided by the platform. Wang and Wright (2020) propose a model related to Edelman and Wright (2015) in which platforms provide both search and intermediation. Consumers positively value these services, but can decide to free-ride if direct purchasing is allowed. In this context, wide Price Parity Clauses prevent a showrooming behavior but hamper competition among platforms. On the contrary, narrow Price Parity Clauses may preserve competition, while at the same time avoiding free-riding on the platforms' search services.").

(b) P. 2 ("In absence of any form of price parity, consumers would simply consult OTAs to compare prices, and then book through direct channels if these offer better deals, a phenomenon called 'showrooming'.").

(243) This paper references Johansen and Vergé (2017).

(a) P. 3 ("Johansen and Vergé (2017) consider two platforms, several suppliers and consumers with elastic demand. A key element of their analysis is the interplay between suppliers' substitutability and their possibility to also sell directly, which imposes a limit to the fees platforms can charge.").

## A.3. Conceptual Analyses, Case Law, and Literature Surveys

### A.3.1. Pinar Akman & D. Daniel Sokol, "Online RPM and MFN Under Antitrust Law and Economics," *Review of Industrial Organization*, 50, 2017, pp. 133–151

(244) This paper offers a review of the economic literature on resale price maintenance, discusses its connection to "online MFNs," and connects it to antitrust cases.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(a) P. 134 ("We distinguish issues of online RPM from traditional RPM and online RPM from online MFN. Then, we apply the economic learning on RPM and analyze the antitrust cases of online RPM and MFN to date across the United States, Europe, and Australia. The last part of this paper offers policy recommendations that reduce the confusion in current legal doctrine based on effective use of economic analysis.").

(245) The discussion in this paper assumes PMFNs achieve price parity across distribution channels. This assumption does not hold for Steam.

(a) P. 137 ("An MFN clause involves a promise by one party—for example, a seller—to treat a buyer as favorably as that seller treats its best customer (Baker 1996). In the online context, one particularly common type of MFN clause is that which involves a seller guaranteeing to a platform that the price that the seller charges for a particular product on that platform is no higher than the price that the seller charges for the same product on another platform. Online MFN clauses that are adopted by platforms are unusual MFN clauses in that they link prices for the *same customer* that purchases from *different outlets* (Akman 2016).").

(246) The paper acknowledges that PMFNs can protect the incentive to invest against free-riding.

(a) P. 139 ("The procompetitive effects of platform MFN clauses include the efficiency benefits of enabling the platforms to protect any investments that they may have made to provide pre-purchase services to buyers such as reviews or advice (LEAR 2012). An MFN clause may help a high-cost/high-quality platform to defend its quality investments by preventing other platforms from free riding on them (LEAR 2012).").

(b) P. 140 ("There is another type of free riding that constitutes a strong defense in the online context, which is not as applicable in the bricks-and-mortar context. This relates to the two-sided nature of the online businesses that adopt these clauses. Where the platform is an intermediary whose function is to enable buyers and sellers to find the most appropriate match (such as online travel agents), once a match has been found the parties do not need the intermediary to conclude the transaction. Instead, the parties can free ride on the intermediary's services by trading directly (Buccirossi 2015). This can threaten the entire business model of the intermediary which charges a transaction-based fee. If the intermediary performs a socially efficient economic activity, then preventing such free riding would constitute a valid efficiency justification (Buccirossi 2015). Such an efficiency justification was indeed accepted in several recent cases that were addressed by some national competition authorities across Europe").

(c) P. 135 ("The production of this knowledge to provide such services raises the nominal price of these products. Those retailers that lack such services (in-store or online) could charge a lower price and thereby free ride off those retailers that provide such services. If the free riding is not eliminated, there would not be an efficient presale service effort. RPM increases consumer welfare by creating incentives for retailers to invest in presale services").

(d) P. 137 ("Free riding in online sales is more significant than would be the case in traditional offline markets").

(247) Whether PMFNs lead to procompetitive effects or not depends on the context.

(a) P. 139 ("Clauses that set pricing relativities can potentially harm competition *and* generate efficiencies with the implication that whether they are good or bad for consumers will depend on several facts, such as: the characteristics of the relevant market; the specifics of the clause; and the nature of the seller that offers it (LEAR 2012). Therefore, the context for price guarantees suggests that there are justifications that are both pro-competitive and anti-competitive (Corts 1995, 1997).").

(248) This paper references Johansen and Vergé (2017).

(a) P. 134 ("The vast majority of papers on RPM have examined traditional bricks-and-mortar RPM; but there is a small but increasing literature on online RPM (Johansen and Vergé 2016; Klein 2014; Blair and Haynes 2010).").

## A.3.2. Pinar Akman, "A Competition Law Assessment of Platform Most-Favored-Customer Clauses," *Journal of Competition Law & Economics*, 12(4), 2016, pp. 781–833

(249) This paper discusses papers from the economics literature on PMFNs, and includes a discussion of anticompetitive and procompetitive benefits. It also includes a summary of antitrust cases.

(a) P. 788 ("Part II provides an explanation of the current state of economics concerning MFC clauses, as well as similar clauses where relevant. Part III examines some of the recent cases that have involved platform MFC clauses across different jurisdictions.").

(250) The discussion in this paper assumes PMFNs achieve price parity across distribution channels. This assumption does not hold for Steam.

(a) P. 782 ("When related to prices, the clause ensures that a customer whose contract contains an MFC clause will not pay a higher price than the seller's 'most-favored-customer.'").

(251) The author notes that PMFNs have procompetitive potential by preventing free-riding on relationship-specific investments, by reducing the risk of hold up problems when making investments.

(a) P. 787 ("None of this is to say that PMGs or MFC clauses are always anticompetitive. However they are categorized, contractual clauses containing promises to buyers that they will receive the best price or be treated as favorably as the seller's best customer can have both procompetitive and anticompetitive effects. At first glance, they provide assurance to buyers who might be faced with certain risks in investing in a relationship with the particular seller, and thereby facilitate trade that would not otherwise take place.").

(b) P. 790 ("As regards their procompetitive potential, MFC clauses can enable new products to enter the market and enhance competition. For example, they can be used to prevent opportunism where one of the parties makes relationship-specific investments to create a new product or improve an existing product. MFC clauses can also be used to deter rent-seeking delays and hold out problems where important market information can be discovered after some contracts are concluded. In this context, MFC clauses reduce the risks involved in making investments.").

(c) P. 792 ("A potential efficiency of such agreements is that they may help platforms to protect any investments they may have made to provide pre-purchase services to buyers (for example, reviews, advice, and the like). An across platforms parity agreement may help a high-cost, high-quality platform to defend its quality investments by preventing other platforms from free riding on them. If buyers use the high-cost, high-quality platform to search and then buy on a lower-cost, lower-quality platform, the former will not be able to obtain a return from its investments.").

(252) Whether PMFNs lead to procompetitive effects or not depends on the context.

(a) P. 793 ("The literature that has developed since the LEAR Report does not appear to propose sufficiently general results that can guide competition authorities either. Rather, it appears to suggest that much depends on the context and the operation of the MFC clauses adopted by platforms in terms of their potential effects.").

  (i) "For example, one study finds that under certain conditions, such MFC clauses may raise prices, but under other conditions, they may increase choice for consumers without increasing prices."

  (ii) "Similarly, another study finds that, depending on the substitutability between the incumbent platform and the entrant platform, these clauses may increase or decrease industry profits, as well as encourage or discourage entry."

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY