# EXHIBIT 2
# Report Part 4
# (Dkt No. 450.02 & 454.02)

# REDACTED

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

downward pressure on Steam's fees and likely further reducing the quantity sold on Steam at Steam's higher price level. In these calibrated results, Valve has more market power absent the PMFN Policy than they would in a true but-for scenario where Valve never benefited from its anticompetitive conduct. This contrasts with my analysis in Section 8, in which I analyze a but-for world not in the short run after the PMFN is eliminated, but in the long run with no PMFN ever in place. The latter scenario allows additional platforms to enter the market and prices and quantities to adjust to those entrances. In that scenario, Valve has even less market power than is shown in my PCM.

(339) By calibrating the model on the *current* market conditions, the parameters and results reflect Steam's advantage gained through years of Valve's anticompetitive conduct via its PMFN Policy. Over time, or in the but-for world where this conduct had not taken place, Steam's advantageous position gained through the wrongful conduct would decrease and the competition it faced from the competing platforms would be even more vigorous. Also, this model shows a near-term response to the removal of the PMFN Policy based on the real world (*i.e.*, one influenced by Valve's anticompetitive conduct), rather than the end-state market in the but-for world in which the PMFN Policy never existed. Thus, these estimates do not fully model the end-state impact of the absence of the PMFN Policy on all parameter values in the but-for market. To model the competitive equilibrium reached after Valve's PMFN Policy is removed—an equilibrium reached before the start of the class period—I use the Landes-Posner model, as discussed in Section 8.

(340) As shown above, when I apply my PCM to the facts and circumstances of the relevant market, it shows all class members are better off without the PMFN Policy. The commission rates publishers pay on Steam alone, and collectively across Steam and EGS (or another platform), decrease in the absence of the PMFN Policy, generating higher market-wide seller profits in the but-for world (at increased quantity). This is compelling economic evidence that Valve's PMFN Policy is harming all or virtually all members of the class.

### 7.2.5.  Model discussion

(341) Valve might claim that a richer (that is, more complicated) empirical model would capture real-world interactions better. My numeric analysis of the PCM is an empirical analysis and a "richer" (or more complicated) model is only appropriate (much less an improvement) if the additional complexities are relevant. Put differently, added complexity is beneficial if and only if that complexity adds explanatory power by being pertinent to the outcome being studied. Including additional parameters in the model that are not relevant (because they do not affect the behavior being studied or are otherwise captured) would add significant (and needless)

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

complexity, purely for the sake of complexity, and without any gain in analytical robustness. The conclusion that publishers are harmed by the PMFN is robust to a range of inputs, including those that most closely match the facts of this case.

(342) One technique economists often use to analyze the impact of eliminating anticompetitive behavior is a statistical regression model. Valve has made the use of that technique impossible. Purely empirical methods, absent any theory or "structure," generally center around comparing outcomes in real-world situations with and without a given policy or action.[807] There is no "clean" period here; there was never a period in which Valve did not behave anticompetitively through the PMFN. There is no period where Valve's conduct mirrored the conduct in the but-for world. Evidence suggests that Valve began enforcing price parity at least as early as 2007.[808] Thus, there is no real-world time period with which to make a before-and-after or difference-in-difference comparison. Attempting an approach such as this would be inappropriate as it would require using only data from time periods where the PMFN Policy is in place, and thus this data would not fit the model or accurately estimate the impact of the conduct.

### The PCM is an unbiased assessment of the impact of a PMFN

(343) The PCM was constructed to reflect the facts of the case. The conclusion of harm to publishers is a result of the model drawing on observable facts of the case and Steam's real-world action. The model shows there is harm to all publishers. Publishers' benefit from removing the PMFN is driven by the increased fee competition and the corresponding increase in the elasticity of implied demand platforms face with respect to their publisher fees. The finding of increased elasticity comes from modeling the competitive actions, driven by basic principles of profit maximization, of all the parties involved (the platforms, publisher, and consumers). In general, price competition drives down prices and so, in that sense, the result should not be surprising. The direct impact of the PMFN is to increase fees to publishers. However, this model formalizes and confirms that intuition and demonstrates the impact with a numeric analysis. I have considered potential benefits of the PMFN and have not found any that are present in this case or warrant inclusion in the model. For example, the subsection below discusses showrooming and how it can theoretically justify a PMFN. However, showrooming

---

[807] DiNardo, John (2018), "Natural Experiments and Quasi-Natural Experiments," in Durlauf, Steven, and Lawrence E. Blume, ed., *The New Palgrave Dictionary of Economics*, London: Springer Nature, at 9325–9336.

[808] See Section 5.2.1.

is not a significant factor in this case. Including it in the model would add unnecessary complication and offer no incremental explanatory value.

**Freeriding and showrooming**

(344)    While economics literature generally finds PMFN provisions to be welfare reducing,[809] PMFNs may sometimes be justified to protect a platform's investments and prevent freeriding by individual sellers.[810] For example, consider an online travel agency like Booking.com that has invested in building a platform that allows travelers to compare hotels and then book at the one that best suits their needs. If individual hotels could offer lower prices on their own websites, travelers could use Booking.com to find the best match and then book at the lowest rate on the hotel's website. This type of freeriding by the hotel (or "showrooming" by the platform) would reduce the incentive for the platform to invest in the valuable service of matching travelers to hotels.[811] If, in the presence of such showrooming or freeriding, the

---

[809]    Baker, Jonathan B. and Fiona Scott Morton (2018), "Antitrust Enforcement Against Platform MFNs," *Yale Law Journal,* 127(7): 2176–2202, at 2201. ("This Feature has explained why MFNs employed by online platforms can harm competition by keeping prices high and discouraging entry, notwithstanding the possibility that some MFNs may reduce inefficient freeriding. The prevalence of MFN contract terms on online platforms and the steadily growing share of GDP spent on such platforms suggest that greater antitrust enforcement against anticompetitive platform MFNs could have noticeable benefits for productivity and consumer welfare.")

Calzada, Joan, Ester Manna, and Andrea Mantovani (2021), "Platform Price Parity Clauses and Market Segmentation," *Journal of Economics & Management Strategy,* 31(3): 609–637, at 626. ("In general, our model confirms the general wisdom that price restrictions such as PPCs [price parity clauses] are detrimental to social welfare.")

Wang, Chengsi and Julian Wright (2020), "Search Platforms: Showrooming and Price Parity Clauses," *RAND Journal of Economics,* 51(1): 32–58, at 32. ("Platform fees raise the possibility of showrooming, in which consumers search on a platform but then switch and buy directly to take advantage of lower direct prices. In settings like this, search platforms like Booking.com have adopted price parity clauses, requiring firms to offer their best prices on the platform, arguing this is needed to prevent showrooming. However, despite allowing for showrooming in our model, we find that price parity clauses often harm consumers.")

Heresi, Jose Ignacio (2023), "Platform Price Parity Clauses and Consumer Obfuscation," *Journal of Industrial Economics,* 71(1): 291–322, at 314. ("When price parity clauses are endogenously chosen by platforms, I find that the unique equilibrium involves price parity clauses being set if and only if this leads to higher obfuscation and prices. This result supports the notion that PPCs are likely to increase prices and harm consumers.")

[810]    Wang, Chengsi and Julian Wright (2020), "Search Platforms: Showrooming and Price Parity Clauses," *RAND Journal of Economics,* 51(1): 32–58, at 33. ("The main defense put forward for PPCs is that they are needed to prevent 'showrooming.' Consumers might use the platform to search for a suitable firm, but then complete their purchase on the firm's own website if the firm offers a lower price when it sells directly (which it may do to avoid the platform's fee). Showrooming, which is a form of free-riding, may therefore undermine a platform's ability to operate. A PPC (either narrow or wide) eliminates the restriction on the platform's fee implied by such showrooming.")

[811]    Baker, Jonathan B. and Fiona Scott Morton (2018), "Antitrust Enforcement Against Platform MFNs," *Yale Law Journal,* 127(7): 2176–2202, at 2183, Fn 22. ("Online platform MFNs in particular have been justified as protecting investment incentives by preventing freeriding (or 'showrooming').'"; "Buyers 'showroom' when they visit a store to examine a product before buying online at a discount. This type of practice is a type of freeriding.")

---

absence of a parity clause would preclude a platform from *at least* recouping its original investment, there may be a pro-competitive justification for such a parity clause.

(345) This argument does not fit the facts of this case. Valve was able to recoup the costs of implementing any valuable fixed investment costs (such as a search mechanism) ███████████. For example, while Valve's reported after-tax net profit was negative in each year from ████ ████, lifetime after-tax net profits turned positive ██████████████.[812]

(346) The availability of other PC game platforms and discrepancies in the size of game libraries make it unlikely that users would choose to switch between platforms to search and then purchase a game. As discussed in Section 4.1.2, many competing platforms were established years after Steam. Therefore, for many years since Steam's launch, users would not have had a viable alternative platform to purchase a game on after finding it on Steam. Steam also offers many more games compared to competing platforms. For example, EGS offered 2,900 games in 2023[813] compared to Steam offering approximately 115,000 games as of early 2025. As another example, in 2020, GOG had over 4,700 products, compared to Steam's 39,825 games.[814] This discrepancy means that for tens of thousands of games, users could not purchase a game found on Steam on another platform and there is no free-riding risk.

(347) Users may not have the same incentive, described above, to only use Steam for its searching functionality. While users can search for games on Steam, Steam provides *other* features and functionalities that at least some users find valuable.[815] Steam's primary service is to provide

---

Wang, Chengsi and Julian Wright (2020), "Search Platforms: Showrooming and Price Parity Clauses," *RAND Journal of Economics*, 51(1): 32–58, at 33. ("Showrooming, which is a form of free-riding, may therefore undermine a platform's ability to operate.")

[812] See Attachment D-1.

[813] Epic Games, "Epic Games Store 2023 Year in Review," 2/16/2024, https://store.epicgames.com/en-US/news/epic-games-store-2023-year-in-review. ("The Epic Games Store now offers over 2900 titles, increasing the games available to our audience by 88% since 2022.")

[814] GOG.com, "Check These Facts and Numbers About GOG," 4/27/2021, https://www.gog.com/news/check_these_facts_and_numbers_about_gog.

See Attachment G-1.

[815] Steam, Store Search, https://store.steampowered.com/search/?term= (accessed 1/21/2025). (An example search on Steam.)

Steam, About, https://store.steampowered.com/about/ (accessed 1/22/2025). (Features listed on an About Steam webpage include Steam Chat, Game Hubs, Steam Broadcast, Steam Workshop, and Early Access to Games.)

Epic, "Steam User and Epic Games Store User Profile Survey July 2019," 7/2019 (EPIC_VALVE_0000073–0308, at EPIC_VALVE_0000088–89, EPIC_VALVE_0000121). (Lists the features that users find to be influential when deciding whether to purchase a game on Steam and shows that "[m]ost Steam features have high usage and all are highly rated[.]")

users with a platform to purchase and play games.[816]  As such, users who use Steam to search ultimately become integrated into the Steam platform.  In this case, the free-riding risk is ultimately mitigated, likely fully.

(348)   Further, while the potential for procompetitive effects exists theoretically, at least when a platform first launches, academic literature suggests that the harmful effects of PMFNs are more significant than the potential procompetitive effects.  Baker and Scott Morton (2018) find that "platform MFNs generally harm competition, except in narrow circumstances in which freeriding concerns are especially strong."[817]  Wang and Wright (2020) similarly conclude that "despite allowing for showrooming in [their] model, . . . price parity clauses often harm consumers."[818]  That is not the case here.

### Steam acts to maximize its profits

(349)   In my PCM, I assume that Valve acts to maximize its own profits on Steam.  This is consistent with standard economic models,[819] and I see no evidence that Valve behaves differently.  In my numeric analysis of the PCM, Valve maximizes its profits on Steam by setting its revenue share such that publishers are indifferent between staying on Steam and leaving the platform.  If Valve charges even one dollar above this price, economics predicts publishers will flock to the alternative platform or exit the market.[820]  All firms in my model, both platforms and publishers, choose fees and prices, respectively, to maximize their own profits.

---

[816]   Valve Corporation, About Us, https://www.valvesoftware.com/en/about (accessed 1/22/2025). ("We created Steam in 2003 to serve as a digital content distribution channel, before app stores existed.  It's since grown and evolved into a platform for thousands of creators and publishers to deliver content and establish direct relationships with their customers.  The Steam Community enables millions of players to do likewise, sharing entertainment and ideas, and making friends.")

Steam, About, https://store.steampowered.com/about/ (accessed 1/22/2025).  ("Steam is the ultimate destination for playing, discussing, and creating games.")

[817]   Baker, Jonathan B. and Fiona Scott Morton (2018), "Antitrust Enforcement Against Platform MFNs," *Yale Law Journal* 127(7): 2176–2202, at 2178.

[818]   Wang, Chengsi and Julian Wright (2020), "Search Platforms: Showrooming and Price Parity Clauses," *RAND Journal of Economics*, 51(1): 32–58, at 32.

[819]   Mas-Colell, Andreu, Michael D. Whinston, and Jerry R. Green (1995), Microeconomic Theory, 1st ed., New York, NY: Oxford University Press, at 135.  ("We assume throughout this chapter that the firm's objective is to maximize its profit.")

Mankiw, N. Gregory (2018), Principles of Economics, 8th ed., Boston, MA: Cengage Learning, at 270.  ("The goal of a firm is to maximize profit, which equals total revenue minus total cost.")

[820]   Whether they exit the market or switch to the alternative platform depends on the profits they can expect to make by listing on the competing platform only.  The two scenarios can be seen in the upper and lower bound estimates I present in Appendix Tables C1 and C2.  In either case, publishers are harmed by the PMFN.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(350)    To determine Valve's profit-maximizing fee on Steam in my numeric solution, I check two potential transaction fees and choose the one where Steam gets the most profit.[821] By checking both possibilities, I ensure profits earned on Steam are maximized.[822] The first potential profit-maximizing point I check is where I (a) assume that the developer can earn profits that would allow it to keep producing games and (b) find Valve's potential profit-maximizing point by setting the marginal revenue equal to marginal cost for Steam (or maximizing their profit function).[823] While this may seem like the best option for Valve, as I point out in Appendix C.1.2, it results in negative total economic profits across both platforms for developers. Developers could not and would not operate in this scenario (my assumption above is violated) and so Valve's profits for Steam would in fact be zero (*i.e.*, with no developers, no sales would occur). Given that profits in this scenario would be zero, Valve must pursue a different strategy to maximize its profits.

(351)    To earn profit, Valve needs to keep developers in the market. Now, I determine Valve's optimal fee that both maximizes Valve's profits on Steam and allows developers to stay in the market. This solution results in the most profit possible for Steam (see Table 4). Valve maximizes its profits on Steam by setting its transaction fee such that publishers are indifferent between staying on Steam or leaving Steam. My solution is an equilibrium. In my PCM, each actor maximizes its profits and behaves optimally. Neither platforms nor the publisher can take any unilateral alternative action to increase profits. First, Valve is maximizing its profits, as I explained above. For fees below its optimal fee, Valve would receive lower profits on Steam's operations. For fees above Valve's optimal fee, publishers would exit the market, and Steam's profits would be zero. Thus, the optimal fee for Valve is the highest fee such that the publishers remain in the market and on the Steam platform. This is exactly the fee where publishers are indifferent between remaining on Steam and exiting the market entirely. The competing platform is also maximizing its profits and behaving optimally, which can be modeled using a function called a "best response function."[824] In Appendix C.1.3, I calculate the best response function for the competitor platform and use it to derive its choice of platform fee.[825] This ensures that the developer is maximizing its profits.

---

[821]    See Appendix C.1.

[822]    See Appendix C.1.

[823]    See Appendix C.1.

[824]    Mas-Colell, Andreu, Michael D. Whinston, and Jerry R. Green (1995), *Microeconomic Theory*, 1st ed., New York, NY: Oxford University Press, at 242.

[825]    Appendix C.1.3.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(352)    Finally, the sellers (here, publishers) are pricing their products (here, games) optimally. The functions derived in Boik and Corts for sellers give the *optimal* prices as a function of the platform fees and demand function parameters.[826] This function tells us the optimal game prices on each platform for any set of demand parameters and platform fees.[827] I use the same demand equations as Boik and Corts and so the sellers optimization problem, and, by extension, the solution, is the same as in Boik and Corts. Moreover, this solution is the optimal choice for sellers for any platform fee (provided the seller would not exit the market) no matter how platforms come to their decision on fees. These functions describe the seller's best choice given the choices of the other actors.

### Network effects are included in the demand disadvantage

(353)    As I explain above, "direct" or "same-side" network effects exist if, as more users join a platform, the value of that platform increases to all users on that same side of the platform.[828] "Indirect" or "cross-side" network effects exist if, as more users of a *different* group join a platform, the value of the platform increases to the first group of users.[829] These effects would lead users to prefer Steam over other platforms, because Steam has a large user and developer base. That is, Steam would experience higher demand than platforms with comparable features because of its large network on both sides of the platform. This higher demand, or demand advantage, is directly accounted for in the corresponding demand *disadvantage* the competing platform faces relative to Steam in the PCM. Thus, network effects are accounted

---

[826]    Boik, Andre, and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics* 59(1): 105–134, at 133.

[827]    Boik, Andre, and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics* 59(1): 105–134, at 112, 133.

[828]    Farrell, Joseph and Paul Klemperer (2007), "Coordination and Lock-in: Competition with Switching Costs and Network Effects," in M. Armstrong and R. Porter, eds., *Handbook of Industrial Organization, Volume* 3, Elsevier B.V, at 1974. ("A good exhibits direct network effects if adoption by different users is complementary, so that each user's adoption payoff, and his incentive to adopt, increases as more others adopt. Thus users of a communications network or speakers of a language gain directly when others adopt it, because they have more opportunities for (beneficial) interactions with peers.")

[829]    Parker, Geoffrey G., Marshall W. Van Alstyne, and Sangeet Paul Choudary (2016), *Platform Revolution*, New York, NY: W. W. Norton & Company, at 29. ("... cross-side effects are network effects created by the impact of users from one side of the market on users from the other side of the market.")

    A canonical example is the Yellow Pages directory, which exhibits network effects as its value depends on the number of consumers using it. Consumers value the Yellow Pages more highly when they contain greater amounts of information and advertising, while retailers increase advertising in the Yellow Pages when there are greater numbers of consumers. See:

    Rysman, Marc (2002), "Competition Between Networks: A Study of the Market for Yellow Pages," *Boston University Industry Studies Project Working Paper #104*, 1–43, at 1–2.

---

for, along with other differences in platform features that may lead more consumers to prefer Steam over competing platforms even at comparable prices.

(354)    The demand disadvantage accounts for network effects in the real world. Suppose that in the no-PMFN scenario, other firms could increase their market share, and by extension their network, and lower their demand disadvantage in the but-for world. If one were to lower the demand disadvantage in the no-PMFN scenario to account for increased network effects of the competing platform, it would only increase the harm to developers. I demonstrate this by incorporating this effect on a range of adjustments in the model. Intuitively, increasing competition in the no-PMFN world by lowering the advantage Valve has over its competitors would only increase price competition and lower commission rates without a PMFN relative to rates with a PMFN.

(355)    To illustrate the conservative nature of not adjusting the $x$ value, the figure below shows one set of possible adjustments that could be made. I ran five models where I adjust the demand disadvantage in the no-PMFN world to be equal to 100%, 75%, 50%, 25% and 0% of the value when the PMFN is in place. Because changing $x$ shifts the overall demand level, I must also adjust the intercept value of both demand functions so that total demand across both platforms is unchanged. Specifically, adjusting the demand equations for the PCM, I set demand to the following in the no-PMFN scenario, where $\Delta x$ is the difference in $x$ between the PMFN scenario and no-PMFN scenario:[830]

$$q_1^0(P) = a - \Delta x/2 - bp_1 + dp_2$$

$$q_2^0(P) = a + \Delta x/2 - X - bp_2 + dp_1$$

(356)    I find that the lower the demand disadvantage is in the no-PMFN scenario, the lower Steam's but-for fee is (and the larger the harm to publishers would be). This can be seen in Figure 11 below.[831] A value of one on the horizontal axis represents my initial results, and moving towards zero represents shrinking the no-PMFN demand disadvantage. Thus, a lower demand disadvantage (e.g. through increased competitor network effects) would increase harm.

---

[830]    Note that demand in the PMFN scenario is the same as my PCM above. Also note that $q_2^0(P) = a - \Delta X/2 - (X - \Delta X) - bp_2 + dp_1 = a + \Delta X/2 - X - bp_2 + dp_1$. This alteration gives a total intercept (combined across both platforms) of $2a - X$, the same as the original demand equations. However, the difference between the two intercepts (and so the demand disadvantage) is now $X - \Delta X$ rather than $X$. This can be seen by comparing the above demand equations to the original demand equations used in the PCM above (which are still used for the PMFN scenario). See Section 7.2.

[831]    See: "12_PCM_changing_x_network_effects.R"

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Figure 11: Adjusting Demand Disadvantage**



(357)   I also note that the result of including other dynamics in the model (e.g., incorporating competitor platform growth strategies) would be the same as in Figure 11 above.[832] That is, the demand disadvantage would shrink in the no-PMFN scenario and the competitive injury from the PMFN would grow.

## 7.3.   Yardstick approach

(358)   A yardstick approach is a standard economic method for comparing one business/market to another business/market that is similar in important respects, often as a tool for understanding how a business may have performed "but for" certain actions or events.[833] This approach assumes that in the but-for world, the "business would have performed as the one

---

[832]   See: "12_PCM_changing_x_network_effects"

[833]   Blair, Roger D. and Amanda Kay Esquibel (1994), "Yardstick Damages in Lost Profit Cases: An Econometric Approach," *Denver University Law Review* 72(1): 113–136, at 113–114.

Evans, A. Elizabeth, Phil J. Innes, and Daniel G. Lentz (2017), "Damages Theories and Causation Issues," in Roman Weil, et al., ed., *Litigation Services Handbook: The Role of the Financial Expert*, Hoboken, NJ: John Wiley & Sons, Inc., at 23.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

to which it is being compared, thereby providing a measure (or yardstick)" of the injury.[834]  To implement a yardstick approach, a comparison is made between a focal firm and "a different firm from itself, or of a different market from its market, or both."[835]  A yardstick approach may also entail creating an index of similar firms and comparing the performance of the company at-issue with the performance of the index.[836]  Importantly, "[d]epending on the allegations and the evidence, courts sometimes seek adjustments for comparability based on the number of customers, purchase volume, product characteristics, competition, role of technology, capitalization, barriers to entry, and established history."[837]

(359)  In an antitrust analysis, a yardstick approach is one way to understand how a market would have been structured and/or the prices that would have been charged but for the alleged anticompetitive conduct.  For example, a yardstick approach may be used to estimate the but-for pricing structure.[838]  As one method of determining what Valve's take-rate would be in the but-for world, I use a yardstick approach to compare Valve's commission rate on Steam to platforms in other comparable marketplaces.

---

[834]  Blair, Roger D. and Amanda Kay Esquibel (1994), "Yardstick Damages in Lost Profit Cases: An Econometric Approach," *Denver University Law Review* 72(1): 113–136, at 114.

Blair, Roger D. and William H. Page (1995), "'Speculative' Antitrust Damages," *Washington Law Review* 70(2): 423–463, at 451.

Evans, A. Elizabeth, Phil J. Innes, and Daniel G. Lentz (2017), "Damages Theories and Causation Issues," in Roman Weil, et al., ed., *Litigation Services Handbook: The Role of the Financial Expert*, Hoboken, NJ: John Wiley & Sons, Inc., at 23.

[835]  Blair, Roger D. and William H. Page (1995), "'Speculative' Antitrust Damages," *Washington Law Review* 70(2): 423–463, at 453.  The comparison may also be based on time periods, as in before-and-after-analysis.

*Home Placement Serv., Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1206 (1st Cir. 1987). (Plaintiff must show "product, firm, and market comparability[.]')

[836]  Evans, A. Elizabeth, Phil J. Innes, and Daniel G. Lentz (2017), "Damages Theories and Causation Issues," in Roman Weil, et al., ed., *Litigation Services Handbook: The Role of the Financial Expert*, Hoboken, NJ: John Wiley & Sons, Inc., at 35.

[837]  Ray, Amy W. and Christopher D. Wall (2017), "Antitrust," in Weil, Roman L. et al. , ed., *Litigation Services Handbook*, Hoboken, New Jersey: Wiley & Sons, Inc., at 19.

[838]  McCrary, Justin and Daniel L. Rubinfeld (2014), "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods* 3(1): 63–74, at 63.  ("The two most common approaches to evaluating damages involve the use of yardsticks and benchmarks. In a typical yardstick approach, one compares prices during the period in which the antitrust violation is believed to have had an effect (the "impact period") to prices in other markets that are deemed to be reasonably comparable to the market at issue.")

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## 7.3.1.   Identification of benchmarks

(360)   The potential benchmark marketplaces I consider are primarily two-sided digital platforms.[839] I consider a variety of criteria, including but not limited to industry maturity, *i.e.*, when firms first entered the marketplace, platform structure, geography, monetization structure, product characteristics, and other platform characteristics, such as potential network effects.  Below, I discuss benchmark marketplaces that I deem comparable according to these measures.[840]

---

[839]   Here, I am not using market in the formal, antitrust sense, as I have not done a market definition analysis in any of these benchmark industries.

[840]   Note that I also considered digital ride sharing platforms and mobile app stores.  These two markets fail the comparability criteria.  For example, for ride sharing the platform facilitates transportation-as-a-service rather than digital transactions as its market product and operates under a different pricing model than an agency pricing model.  See:

Transportation-as-a-service: Lyft, Form 10-K, 2023, at 58.  ("We earn service fees and commissions from the drivers either as the difference between an amount paid by a rider based on an upfront quoted fare and the amount earned by a driver based on actual time and distance for the trip or as a fixed percentage of the fare charged to the rider.")

Pricing model: Uber, Pricing, https://www.uber.com/us/en/ride/how-it-works/upfront-pricing/ (accessed 1/22/2025). ("Many data points go into calculating an upfront price, including the estimated trip time and distance from origin to destination, as well as demand patterns for that route at that time. It also includes any applicable tolls, taxes, surcharges, and fees (with the exception of wait time fees).")

In the mobile app stores marketplace, key companies (*e.g.*, Apple, Google) are facing significant anticompetitive scrutiny, and as such, is not a reliable measure of a but-for commission rate in a competitive market.  See:

Apple App Store: *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, (N.D. Cal. 2021). ("Plaintiff Epic Games, Inc. sued Apple, Inc. alleging violations of federal and state antitrust laws and California's unfair competition law based upon Apple's operation of its App Store.")

Google Play Store: Epic, "Epic v Google Trial Verdict, a Win for All Developers," 12/11/2023, https://www.epicgames.com/site/en-US/news/epic-v-google-trial-verdict-a-win-for-all-developers.

Business of Apps, App Store Data (2025), https://www.businessofapps.com/data/app-stores/ (accessed 1/22/2025). ("Outside of China, Apple and Google control more than 95 percent of the app store market share through iOS and Android, respectively.")

Note that iOS and Android do not compete with each other at the app store level.  According to the U.S. House of Representatives Subcommittee on Antitrust, Commercial and Administrative Law, "[t]he App Store and the Play Store do not compete against one another.  Android users cannot access the Apple App Store, and iOS users cannot access the Google Play Store, so the dominance of the Play Store is not constrained by the App Store and vice versa."  Instead, each operates in its own ecosystem.  See:

U.S. House of Representatives Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, "Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations," 2020, at 95, available at: https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519.

In the iOS ecosystem, the Apple App Store is the only store available.  See:

Screen Rant, "Apple Says iOS Users are Not Limited to The App Store, But is That True," 3/26/2021, https://screenrant.com/apple-ios-app-store-alternatives-iphone-user-dev-restrictions/. ("In short, iOS app competition is limited by the Apple App Store. It's the only application storefront that iPhones can use without being jailbroken, developers can't publish iOS apps through any other medium, and there's no way for developers to go around the App Store by offering their application directly.")

In the Android ecosystem, the Google Play Store has a significant share of the market.  See:

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(361)  Note that I do not consider Apple or Google's app stores as benchmarks, even though they charge similar commission rates as Valve. There are two principal reasons for this. First, the commission rates set by Apple and Google on their app stores may well have been based on the 30% commission rate charged by Valve on the Steam platform.[841] Second, Apple's and Google's app store practices are also subject to antitrust challenges,[842] and in the case of Google, there has been at least one antitrust liability finding with respect to its app store operations, including its pricing.[843] Thus, there is a sound basis for not considering these as *competitive* benchmarks for the Steam platform.

**Online retail marketplaces**

(362)  A potentially comparable benchmark is the broad universe of online retail ("e-commerce") marketplaces. These include online retailers, some of which sell all types of products and others operating only in niche product categories.

(363)  Much like the PC game distribution market, general e-commerce marketplaces saw increasing popularity in the mid-1990s and 2000s.[844] For example, Amazon became a public company in 1997 and did not became profitable until 2003.[845] In 2000, only 22% of Americans had made purchases online, rising to 79% by 2015.[846]

---

Business of Apps, App Store Data (2025), https://www.businessofapps.com/data/app-stores/ (accessed 1/22/2025). ("Outside of China, Apple and Google control more than 95 percent of the app store market share through iOS and Android, respectively.")

[841]  Engadget, "Apple's App Store antitrust questions will be uncomfortable for Valve," 7/29/2020, https://www.engadget.com/apple-google-valve-steam-antitrust-hearings-app-store-221442066.html. ("In fact, Steam may be the reason Apple and Google launched their marketplaces with a revenue-sharing model that takes 30 percent of an app's earnings, a rate that many developers argue is unnecessarily high.")

[842]  AP News, "Google to Pay $700 Million to US States, Consumers in App Store Settlement," 12/19/2023, https://apnews.com/article/google-android-play-store-apps-antitrust-settlement-e4e2f422baa846c66deac90c7866c5fd.

Top Class Actions, "Apple App Developer $100M Calls Action Settlement," 1/20/2022, https://topclassactions.com/lawsuit-settlements/closed-settlements/apple-app-developer-antitrust-100m-class-action-settlement/.

[843]  Reuters, "Epic Games Wins Antitrust Case Against Google Over Play App Store," 12/13/2023, https://www.reuters.com/legal/google-epic-games-face-off-app-antitrust-trial-nears-end-2023-12-11/. ("'Fortnite' maker Epic Games has prevailed in its high-profile antitrust trial over Alphabet's Google, which alleged the Play app store operated as an illegal monopoly, in a ruling that if it holds could upend the entire app store economy. Jurors found for Epic on all counts, a court filing showed, after more than a month of trial in Epic's lawsuit, which accused Google of taking action to quash competitors and charge unduly high fees of up to 30% to app developers.")

[844]  BBC, "The Curious Origins of Online Shopping," 7/26/2020, https://www.bbc.com/worklife/article/20200722-the-curious-origins-of-online-shopping.

[845]  Britannica, Amazon.com, https://www.britannica.com/topic/Amazoncom (accessed 1/22/2025).

[846]  Pew Research Center, "Online Shopping and E-Commerce," 12/19/2016, https://www.pewresearch.org/internet/2016/12/19/online-shopping-and-e-commerce/.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(364)    This marketplace mirrors the third-party digital PC game distribution via platforms market across several important characteristics. Retail e-commerce marketplaces are two-sided digital platforms, with sellers of goods on one side, buyers on the other, and transactions between the two sides facilitated through the platform. Though Amazon is a significant player in the marketplace, it faces competition from other online retail stores, such as e-commerce sites for Walmart, eBay, and Etsy, among others.[847]

(365)    The online retail industry generally operates globally.[848] As with the market for third-party digital PC game distribution via platforms, these platforms also operate under an agency pricing model, whereby sellers set the retail price and the platform sets commissions or take rates on each sale.[849] Platforms in this marketplace typically receive revenue by taking a percentage of each transaction plus, in many instances, a small, fixed fee per transaction.[850] While fees often vary depending on both the platform and the product, they typically fall within the 8% to 15% range.[851]

---

[847]    Webretailer, "Online Marketplaces in the USA: Amazon is Not the Only Show in Town," 5/25/2023, https://www.webretailer.com/marketplaces-worldwide/online-marketplaces-usa/.

[848]    For example, see:

Amazon, Form 10-K, 2023, at 4. ("The worldwide marketplace in which we compete is evolving rapidly and intensely competitive, and we face a broad array of competitors from many different industry sectors around the world.")

[849]    Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics* 59(1): 105–134, at 109.

[850]    For example, see:

Amazon, Form 10-K, 2023, at 43. ("Third-party seller services - We offer programs that enable sellers to sell their products in our stores, and fulfill orders using our services. We are not the seller of record in these transactions. The commissions and any related fulfillment and shipping fees we earn from these arrangements are recognized when the services are rendered, which generally occurs upon delivery of the related products to a third-party carrier or, in the case of an Amazon delivery, to the customer.")

[851]    Etsy charges a 6.5% transaction fee with a 3% + $0.25 payment processing fee per sale and a $0.20 listing fee. See:

Etsy, Sell, Etsy.com/sell (accessed 1/22/2025).

eBay charges a 3–15% fee + $0.30–$0.40 per transaction. For the portion of a sale above a certain threshold, eBay often charges a lower commission fee. See:

eBay, Selling Fees, https://www.ebay.com/help/selling/fees-credits-invoices/selling-fees?id=4822 (accessed 1/22/2025).

Amazon charges 8–20% + either $0.99 per item sold or $39.99 per month. Amazon takes 45% for Amazon device accessories and 22% for veterinary diets pet supplies. See:

Amazon, Pricing, https://sell.amazon.com/pricing (accessed 1/26/2025).

Walmart charges 5–20% depending on the product category and type, with most categories/product types requiring a fee of either 8% or 15%. See:

Walmart, Referral Fees, https://marketplace.walmart.com/referral-fees/ (accessed 1/22/2025).

---

(366)   Thus, the e-commerce retail marketplace operates with similar product characteristics, platform characteristics, geographic scope, and monetization structure as the market for third-party digital PC game distribution via platforms.

(367)   I am aware that Amazon has been sued by the FTC. The FTC alleges violations of the antitrust laws for behaviors that are at least partially analogous to the PMFN conduct challenged here.[852] I take no position on whether the allegations against Amazon are supported by the facts or whether Amazon has violated the antitrust laws, as alleged by the FTC. To the extent the commission rate in this benchmark marketplace reflects anticompetitive conduct, it is a conservative benchmark for purposes of this case.

**Online vacation home rental**

(368)   Another potential comparable marketplace is for online vacation home rentals. This consists of two-sided digital platforms with property owners and guests on either side of the marketplace transacting with one another as facilitated by the platform. Companies that operate in this marketplace include Airbnb and VRBO, among others.

(369)   The marketplace timing and growth for online vacation home rentals accommodations in the late 1990s and 2000s also make the industry a suitable comparison to the relevant marketplace in this case.[853] The vacation home rental marketplace VRBO started in 1995, eventually followed by HomeAway and Airbnb's launches in 2005 and 2008, respectively.[854]

(370)   While a vacation rental home is a physical good/service and a digital PC game is a digital good, the broad similarities between the marketplace characteristics outweigh that difference. Platforms in the vacation rental home booking marketplace monetize by taking a service fee from hosts, the guests, or a combination of the two.

---

[852]   *See, e.g.,* JD Supra, "FTC Sues Amazon for Illegally Maintaining Monopoly Power," 9/29/2023, https://www.jdsupra.com/legalnews/ftc-sues-amazon-for-illegally-3560920/.

[853]   The Guardian, "How 25 Years of the Web Inspired the Travel Revolution," 3/12/2014, https://www.theguardian.com/travel/2014/mar/12/how-25-years-of-the-web-inspired-the-travel-revolution.

[854]   Seattle Times, "Expedia buys HomeAway for $3.9 billion," 11/4/2015, https://www.seattletimes.com/business/expedia-buys-homeaway-for-39-billion/.

The Guardian, "How 25 Years of the Web Inspired the Travel Revolution," 3/12/2014, https://www.theguardian.com/travel/2014/mar/12/how-25-years-of-the-web-inspired-the-travel-revolution.

VRBO, About Page, https://www.vrbo.com/about/ (accessed 1/22/2025).

(371)   For example, Airbnb's most common fee structure takes a 3% service fee from the property host and adds on a 14% service fee to guests.[855]  This differs slightly from the payment model present in the market for third-party digital PC game distribution via platforms, where the platform only takes a service fee one side of the market, yet still represents a monetization structure whereby the platform operates as a distribution agent and does not set the price, instead collecting a fee from platform transactors.

### 7.3.2.   But-for take rate

(372)   Based on the above discussion, I conclude that e-commerce marketplaces and vacation home rental marketplaces are reasonable benchmarks for the market for third-party digital PC game distribution via platforms.[856]   Aside from the common features discussed above, these platforms and Steam's platform also provide services after the sale of the good, adding another common element.[857]

(373)   By analyzing the take rates in these benchmark marketplaces, I can draw reasonable inferences about a competitive commission structure on the Steam platform.  The table below presents take rates for various competitors in these benchmark markets.

---

[855]   Airbnb, "How Much Does Airbnb Charge Hosts?" 9/19/2024, https://www.airbnb.com/resources/hosting-homes/a/how-much-does-airbnb-charge-hosts-288.

[856]   I do not opine to whether or not there are anticompetitive implications in these comparable marketplaces.  Should there be anticompetitive concerns in any of these comparable marketplaces, utilizing the take rates would represent an upper-bound on a competitive but-for commission.

[857]   The platform's ability to offer continued services and transactions after an initial transaction is not unique to third-party digital PC platforms, nor to Steam specifically, and instead also applies to both online retail marketplaces and online vacation rentals.  For example, Amazon offers ongoing services to its customers.  A user (who has already completed a transaction) has the ability to leave seller feedback, contact a third-party seller, and leave comments, reviews, and feedback, as well as offering other services such as "Installation, Assembly, and Haul-Away Services[.]"  See:

Amazon, Leave Third-Party Seller Feedback,
https://www.amazon.com/gp/help/customer/display.html?nodeId=G5346HRPNJFYRA49 (accessed 1/22/2025).

Amazon, Installation, Assembly, and Haul-Away Services,
https://www.amazon.com/gp/help/customer/display.html?nodeId=GRD263UR6NNUTT48 (accessed 1/22/2025).

Additionally, both VRBO and Airbnb offer customers support services after the initial booking of a rental.  See:

VRBO, Travel With Confidence, https://www.vrbo.com/l/travel-with-confidence/ (accessed 1/21/2025).

Airbnb, AirCover, https://www.airbnb.com/help/article/3227 (accessed 1/21/2025).

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Table 5: Take Rates in Benchmark Markets[858]**

| Market | Competitor | Take rate | Additional fees | Notes |
|---|---|---|---|---|
| E-commerce marketplaces | eBay | 3-15% | + $0.30–$0.40 per transaction | |
| E-commerce marketplaces | Amazon | 8-20% | + $0.99 per item or $39.99 per month | |
| E-commerce marketplaces | Walmart | 5-20% | | |
| E-commerce marketplaces | Etsy | 6.5% | 3% + $0.25 payment processing fee; $0.20 listing fee | |
| Vacation home marketplaces | Airbnb | 17% | | 3% to host, 14% to guests |
| Vacation home rental marketplaces | VRBO | 11–20% | 3% payment processing fee | 5% to host, 6–15% to guests |

---

[858] On Etsy, sellers pay a $0.20 listing fee, a 6.5% transaction fee, a 3% payment processing fee, and an added $0.25 payment processing fee per sale. See:

Etsy, Sell, Etsy.com/sell (accessed 1/22/2025).

eBay takes anywhere from 3–15%, with an additional $0.30–$0.40 per sale. For most product categories, if the sale is upwards of $7,500, the listed percentage applies to the portion of the sale up to $7,500 and there is an additional 2.35–3% for the portion of the sale above $7,500. See:

eBay, Selling Fees, https://www.ebay.com/help/selling/fees-credits-invoices/selling-fees?id=4822 (accessed 1/22/2025).

Amazon takes 8–20% + $0.99 per item sold or $39.99 per month. Amazon takes 45% for Amazon device accessories and 22% for veterinary diets pet supplies. See:

Amazon, Pricing, https://sell.amazon.com/pricing (accessed 1/26/2025).

Walmart takes 5–20%. See:

Walmart, Referral Fees, https://marketplace.walmart.com/referral-fees/ (accessed 1/22/2025).

Similarly, VRBO charges a 5% commission fee with a 6–15% service fee for guests, totaling 11%–20%. See:

Upgraded Points, "VRBO vs. Airbnb for Guests & Hosts [Comparing Fees, Listings, Cancellation Policies]," 8/22/2023, https://upgradedpoints.com/travel/vrbo-vs-airbnb-for-guests-and-hosts/.

Airbnb's most common fee structure takes a 3% service fee from the property host and adds on a 14% service fee to guests. See:

Airbnb, "How Much Does Airbnb Charge Hosts?" 9/19/2024, https://www.airbnb.com/resources/hosting-homes/a/how-much-does-airbnb-charge-hosts-288.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(374)  Some of the major industry participants in the online retail marketplace include eBay, Amazon, Etsy, and Walmart.  As evidenced in the table above, these firms monetize their platforms by charging a percentage fee of anywhere between 3% and 20% from the seller side and charge nothing directly to the buyer side, with the majority of take rates falling between 8% and 15% and select product categories such as jewelry, fine art, and gift cards at 20% on various sites.[859]

(375)  In the vacation home rental marketplace, the two principal market participants for vacation home rentals, VRBO and Airbnb, operate under a slightly different business model where they charge both sides of the market.  However, both take approximately 17–20% from both sides of the platform collectively.[860]

(376)  As the above take rates in the retail e-commerce and vacation home rental marketplaces also generally fall within the 15% to 20% range, this range of rates suggests that platforms in these marketplaces compete in part through pricing.  As such, a but-for take rate in the relevant market would likely conservatively fall somewhere between 15% and 20%.

(377)  Because a yardstick approach indicates that the market but-for commission rate would be between 15% and 20%—below Valve's 30% commission rate and effective rates from its tiered commission system—all or virtually all class members were impacted by the supracompetitive fees charged by Valve.

## 7.4.  Empirical approach

(378)  I also consider the impact of Valve's PMFN Policy via an empirical approach.  The empirical approach looks to the actual-world facts and circumstances to see if any economic insights can be gleaned from Valve's reactions and responses to real-world events.  When possible, economists turn to "natural experiments" to assess what would happen in the absence of

---

[859]  Amazon, Pricing, https://sell.amazon.com/pricing (accessed 1/26/2025).

eBay, Selling Fees, https://www.ebay.com/help/selling/fees-credits-invoices/selling-fees?id=4822 (accessed 1/22/2025).

Walmart, Referral Fees, https://marketplace.walmart.com/referral-fees/ (accessed 1/22/2025).

[860]  Airbnb takes a 3% service fee from the property owner and adds on a 14% service fee to guests, for a total of 17%.  See:

Airbnb, "How much does Airbnb charge Hosts?" 9/19/2024, https://www.airbnb.com/resources/hosting-homes/a/how-much-does-airbnb-charge-hosts-288.

Similarly, VRBO charges a 5% commission fee with a 6–15% service fee for guests, totaling 11%–20%.  See:

Upgraded Points, "VRBO vs. Airbnb for Guests & Hosts [Comparing Fees, Listings, Cancellation Policies]," 8/22/2023, https://upgradedpoints.com/travel/vrbo-vs-airbnb-for-guests-and-hosts/.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

certain conduct.[861]  One way a natural experiment can occur is when one observes two different time periods, one with specific conduct and one without.[862]  By examining the difference between the two time periods, all else equal, one can infer the impact and causal effect of the conduct.[863]  Valve's PMFN Policy has been in place for many years and there are not pre- and post-PMFN time periods that could lead to a reasonable natural experiment.  Nonetheless, some platforms did enter the marketplace during the class period, *e.g.*, EA, Ubisoft, Epic, and others.[864]  While meaningfully effective entry was ultimately rendered impossible by Valve's

---

[861]    ThoughtCo, "What Are Natural Experiments and How Do Economists Use Them?," 4/10/2019, https://www.thoughtco.com/natural-experiments-in-economics-1146134.  ("A natural experiment is an empirical or observational study in which the control and experimental variables of interest are not artificially manipulated by researchers but instead are allowed to be influenced by nature or factors outside of the researchers' control. Unlike traditional randomized experiments, natural experiments are not controlled by researchers but rather observed and analyzed."; "In the social sciences, particularly economics, the expensive nature and limitations of traditionally controlled experiments involving human subjects has long been recognized as a limitation for the development and progress of the field. As such, natural experiments provide a rare testing ground for economists and their colleagues.  Natural experiments are used when such controlled experimentation would be too difficult, expensive, or unethical as is the case with many human experiments.")

[862]    The Royal Swedish Academy of Sciences, "Natural Experiments Help Answer Important Questions," 2021, at 1, available at: https://www.nobelprize.org/uploads/2021/10/popular-economicsciencesprize2021-3.pdf.  ("One way of establishing causality is to use randomised experiments, where researchers allocate individuals to treatment groups by a random draw. This method is used to investigate the efficacy of new medicines, among other things, but is not suitable for investigating many societal issues – for example, we cannot have a randomised experiment determining who gets to attend upper-secondary school and who does not.  Despite these challenges, the Laureates have demonstrated that many of society's big questions can be answered.  Their solution is to use natural experiments – situations arising in real life that resemble randomised experiments.  These natural experiments may be due to natural random variations, institutional rules or policy changes.")

The Royal Swedish Academy of Sciences, "Answering Causal Questions Using Observational Data," 10/11/2021, at 1, available at: https://www.nobelprize.org/uploads/2021/10/advanced-economicsciencesprize2021.pdf.  ("David Card began to analyze a number of core questions in labor economics using 'natural experiments', i.e., a study design in which the units of analysis are exposed to as good as random variation caused by nature, institutions, or policy changes.")

[863]    ThoughtCo, "What Are Natural Experiments and How Do Economists Use Them?," 4/10/2019, https://www.thoughtco.com/natural-experiments-in-economics-1146134. ("Natural experiments are most effective when they mimic as closely as possible the existence of test and control groups of controlled experiments, which is to say that there is a clearly defined exposure to some condition in a clearly defined population and the absence of that exposure in another similar population for comparison.  When such groups are present, the processes behind natural experiments are said to resemble randomization even when researchers do not interfere.  Under these conditions, observed outcomes of natural experiments can feasibly be credited to the exposure meaning that there is some cause for belief in a causal relationship as opposed to simple correlation.  It is this characteristic of natural experiments — the effective comparison that makes a case for the existence of a causal relationship — that distinguishes natural experiments from purely non-experimental observational studies.")

The Royal Swedish Academy of Sciences, "Natural Experiments Help Answer Important Questions," 2021, at 3, available at: https://www.nobelprize.org/uploads/2021/10/popular-economicsciencesprize2021-3.pdf.  ("It would be easy to believe that situations which enable natural experiments are very unusual, especially those that can be used to answer important questions.  Research conducted over the past 30 years has shown that this is not the case: natural experiments occur frequently.  For example, they may arise due to policy changes in some regions of a country, admission cut-offs in higher education, or income thresholds in tax and benefit systems, which mean that some individuals are exposed to an intervention while other, similar, individuals are not.  There is thus unintended randomness that divides people into control and treatment groups, providing researchers with opportunities for uncovering causal relationships.")

[864]    See Section 4.1.2.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

conduct (see Section 6.2), studying the economic effects of these entry attempts sheds some light into what a but-for world free of Valve's anticompetitive parity enforcement may look like.

(379)   Epic launched EGS on December 6, 2018.[865]   Epic's goal in launching the platform was "to bring [gamers] great games, and to give game developers a better deal [than Valve's commission system on Steam.]"[866]   Valve documents identified Epic as a Steam competitor.[867] Epic's strategy was, and remains, to try to attract developers and publishers to EGS by offering a lower commission rate and initial free use of Epic's gaming engine.[868]   Epic charges developers and publishers a commission rate of 12%, compared to Valve's 30%.[869]   Epic also offers developers free use of Epic's Unreal Engine until the gross revenue of the product

[865]   Epic Games, "The Epic Games Store is Now Live," 12/6/2018, https://store.epicgames.com/en-US/news/the-epic-games-store-is-now-live.

[866]   Epic Games, "The Epic Games Store is Now Live," 12/6/2018, https://store.epicgames.com/en-US/news/the-epic-games-store-is-now-live. ("Our goal is to bring you great games, and to give game developers a better deal: they receive 88% of the money you spend, versus only 70% elsewhere.  This helps developers succeed and make more of the games you love.")

The Verge, "Valve's New Steam Revenue Agreement Gives More Money to Game Developers," 11/30/2018, https://www.theverge.com/2018/11/30/18120577/valve-steam-game-marketplace-revenue-split-new-rules-competition. ("Normally, Valve takes around 30 percent of all game sales on Steam, with some exceptions for games from smaller developers in its Steam Direct program.  That will remain the case for the first $10 million in sales a game maker or publisher earns.")

[867]   Valve, "Steam Biz – 2019 Recap," 2019 (VALVE_ANT_0019719–721, at VALVE_ANT_0019721).

Valve, "GDC 2020 – Competitor Analysis," 2020, (VALVE_ANT_0019400–02, at VALVE_ANT_0019400–01), available at Scott Lynch, Dep. Tr., 10/13/2023, Exhibit 156.

Valve, "2021 Competitor Analysis," 2021 (VALVE_ANT_0019716–18, at VALVE_ANT_0019717).

Valve, Competitive Landscape Analysis, undated (VALVE_ANT_1221442–44, at VALVE_ANT_1221442). ("We're seeing a lot of competing stores surface on the PC – Apple Arcade, Google Stadia, Epic Game Store, Discord, Kongregate, to say nothing of publishers running their own stores like Battlenet, Uplay and Bethesda.net.  Most of the conversation, internally and externally, has revolved around Epic because they're the noisiest and most aggressive new player[.]")

[868]   Valve, "GDC 2020 – Competitor Analysis," 2020, (VALVE_ANT_0019400–02, at VALVE_ANT_0019400–01), available at Scott Lynch, Dep. Tr., 10/13/2023, Exhibit 156.  ███████████████████████████████████████████████████████████████████████

Valve, "2021 Competitor Analysis," 2021 (VALVE_ANT_0019716–18, at VALVE_ANT_0019716).  ("Epic[:] Where are they doing great? . . . Free games are great for customers")

Game Informer, "Epic Launches Digital Games Store with 88 Percent Revenue Going to Developers," 12/4/2018, https://www.gameinformer.com/2018/12/04/epic-launches-digital-games-store-with-88-percent-revenue-going-to-developers.

Teknos Associates, The Battle for Digital Gaming Distribution, https://www.teknosassociates.com/the-battle-for-digital-gaming-distribution/ (accessed 1/21/2025).

[869]   Teknos Associates, The Battle for Digital Gaming Distribution, https://www.teknosassociates.com/the-battle-for-digital-gaming-distribution/ (accessed 1/21/2025).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

exceeds $1 million.[870]  When a product exceeds $1 million in gross revenue, Epic charges developers a 5% royalty for use of its engine.[871]  Deposition testimony from Mr. Lynch indicates that Epic's revenue share "was a selling point for some developers" and "was one of the things that piqued their interest."[872]

(380)  Because of Valve's PMFN Policy, Epic was also forced to rely principally on non-price inducements to attempt to compete against Steam.  One strategy was to implement exclusive deals with developers, cutting out Steam and its users for the initial release of a game.  These exclusive offerings include high-profile games such as *Metro Exodus*, *The Division 2*, *Red Dead Redemption 2,* and *Borderlands 3* and smaller indie-developed games such as *Ooblets, No Straight Roads, Manifold Garden, Superliminal,* and *Wattam.*[873]  According to Epic CEO Tim Sweeney, these exclusives "significantly assist developers with product funding and invest in marketing and awareness" and "these efforts bring in new customers to [the Epic Games] store."[874]

(381)  Epic has also attempted to compete with Valve's platform by acquiring other game studios, thereby shifting popular games from Steam to EGS.[875]  In 2019, Epic acquired Psyonix, the

---

[870]  Unreal Engine, Frequently Asked Questions (FAQs), https://www.unrealengine.com/en-US/faq (accessed 1/26/2025).  ("For game developers and other users distributing applications that incorporate Unreal Engine code at runtime (such as a game) and are licensed to third-party end users, a 5% royalty is due (discounts may apply) when the lifetime gross revenue from that product exceeds $1 million USD. No royalties are due on the first $1 million in lifetime gross product revenue.")

[871]  Unreal Engine, Frequently Asked Questions (FAQs), https://www.unrealengine.com/en-US/faq (accessed 1/26/2025).

[872]  Scott Lynch, Dep. Tr., 10/13/2023, at 174:18–175:5. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Q. And that was a thing that developers liked, was Epic's revenue share, right?  A. I think that one of the -- I think that was one of the things that piqued their interest.  Q. It was a selling point for some developers? A. Yeah.")

[873]  Insider, "The Creator of 'Fortnite' is Trying to Shake Up the PC Gaming Industry – Here's Why a Lot of Folks are Furious About It," 8/19/2019, https://www.businessinsider.com/epic-games-store-situation-2019-4#4-the-backlash-to-the-epic-games-store-has-stirred-criticism-of-epics-relationship-with-tencent-a-major-chinese-stakeholder-4.

Tech Radar, "Epic Games Store Snatches Up Eight Exclusive Indie Games," 8/30/2019, https://www.techradar.com/news/epic-games-store-snatches-up-eight-exclusive-indie-games.

PC Gamer, "Epic Isn't Done with Epic Games Store Exclusives, It's Just Focused on Big Ones," 3/9/2023, https://www.pcgamer.com/epic-isnt-done-with-epic-games-store-exclusives-its-just-focused-on-big-ones/.

[874]  Forbes, "Epic Games Stores Has Hit $680 Million in Revenue, 108 Million Customers," 1/14/2020, https://www.forbes.com/sites/mattperez/2020/01/14/epic-games-store-has-hit-680-million-in-revenue-108-million-customers/?sh=da7f96d4b99a. efforts bring in new customers to our store, rather than just sending more business to the incumbent.'")

[875]  Variety, "Epic Games to Acquire 'Rocket League' Developer Psyonix, Game Shifts to Epic Game Store," 5/1/2019, https://variety.com/2019/gaming/news/epic-games-to-acquire-psyonix-1203202663/.

---

developers of *Rocket League*.[876]  In 2020, *Rocket League* became free to play on EGS and was no longer available for new users to download on Steam.[877]  In 2021, Epic acquired Tonic Games Group, the developers of *Fall Guys*.[878]  As with *Rocket League*, *Fall Guys* was later offered as a free-to-play game on EGS and was no longer available for new users to download on Steam.[879]

(382)  Prior to the EGS launch, Valve held internal discussions regarding changing its revenue share.[880]  Mr. Lynch testified that the motivation for the revenue share change was both to keep publishers on Steam and to bring back publishers that had left the platform, ███████████ ██████████████.[881]  A key publisher Valve was targeting to stay on Steam was Ubisoft; however,

---

Rocket League, "Rocket League Going Free to Play This Summer," 7/21/2020, https://www.rocketleague.com/news/rocket-league-going-free-to-play-this-summer/.

IGN, "Fall Guys Has Been Removed from Steam, But Will Still Receive Full Support," 6/21/2022, https://www.ign.com/articles/fall-guys-steam-delisted-will-still-recieve-full-support.

[876]  The Verge, "Epic Buys Rocket League Developer Psyonix, Strongly Hints it Will Stop Selling the Game on Steam," 5/1/2019, https://www.theverge.com/2019/5/1/18525842/epic-games-psyonix-acquisition-rocket-league-fortnite-unreal-deal. ("Fortnite creator Epic Games announced today that it's acquired the independent game development studio Psyonix, makers of the massively popular vehicular soccer game Rocket League.")

[877]  Rocket League, "Rocket League Going Free to Play This Summer," 7/21/2020, https://www.rocketleague.com/news/rocket-league-going-free-to-play-this-summer/.

[878]  Epic Games, "Tonic Games Group, Makers of 'Fall Guys', Joins Epic Games," 3/2/2021, https://www.epicgames.com/site/en-US/news/tonic-games-group-makers-of-fall-guys-joins-epic-games.

[879]  Epic Games, "Tonic Games Group, Makers of 'Fall Guys', Joins Epic Games," 3/2/2021, https://www.epicgames.com/site/en-US/news/tonic-games-group-makers-of-fall-guys-joins-epic-games.

IGN, "Fall Guys Has Been Removed from Steam, But Will Still Receive Full Support," 6/21/2022, https://www.ign.com/articles/fall-guys-steam-delisted-will-still-recieve-full-support.

[880]  See, for example:

Scott Lynch, Dep. Tr., 10/12/2023, at 96:10–14. ("Q. Also in late 2018, specifically November 26th, Steam is discussing a change to their revenue sharing; right?  A. We had been discussing a change for a long time, but we were also discussing it in November.")

Valve, "Steam Rev Share – Group Update," c. 10/2018 (VALVE_ANT_0046076.pptx, at slide 4).

Valve, "Policy Proposal – Refresh," c. 9/2018 (VALVE_ANT_0058993.pptx, at slide 1).

[881]  Scott Lynch, Dep. Tr., 10/12/2023, at 102:7–18, 96:10–97:12. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Valve failed. In 2019, Ubisoft announced that it would stop releasing new games on Steam and put *Division 2* exclusively on EGS.[882] On November 26, 2018, Valve had learned from multiple sources about EGS's possible launch within the following week and ██████████

███████████████████████████████████████████████████████████████████████████████████

██████████.[883] Valve remarked that it███████████████████████████████████████████████

█████████████████████████████████████████████████████████████.″[884] The next day, Epic's CEO, Tim Sweeney, wrote to Valve, confirming the launch of EGS in the first week of December.[885] In the same email, Mr. Sweeney told Valve that a "timely move by Valve to improve Steam economics for all developers would make a great difference[,]" hinting at Valve's revenue share.[886]

(383)    On November 30, 2018, shortly before the launch of EGS, but after learning that EGS was coming on market with a commission rate lower than 30%,[887] Valve announced "new revenue share tiers for games that hit certain revenue levels."[888] Instead of taking 30% of all revenue for a given game, Valve announced it would take 30% of lifetime revenues up to $10 million, 25% of lifetime revenues between $10 million and $50 million, and 20% of all lifetime revenues over $50 million.[889] See discussion in Section 3.3.4.

---

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

[882]    Dark Catt, "Epic Boss Say Exclusives Policy Will Change If Steam Adjust Their Revenue Share," 4/29/2019 (DarkCatt_0001084–86, at DarkCatt_0001085). ("Ubisoft has entered into a partnership with the Epic Games Store and move most of its PC releases over from Steam to Epic, starting with The Division 2 and extending to Anno 1800 as well.")

Gamespot, "Ubisoft Explains Why It Doesn't Release Games On Steam," 8/29/2019, https://www.gamespot.com/articles/ubisoft-explains-why-it-doesn't-release-games-on-st/1100-6469502/. ("'It was a business decision to not put new releases on Steam and focus on the Epic Store and Ubisoft Store[.]'")

[883]    Valve, Emails Regarding New Revenue Share Communication, 11/26/2018–12/1/2018 (VALVE_ANT_0415674–684, at VALVE_ANT_0415679–680, VALVE_ANT_0415683–84).

[884]    Valve, Emails Regarding New Revenue Share Communication, 11/26/2018–12/1/2018 (VALVE_ANT_0415674–684, at VALVE_ANT_0415674).

[885]    Valve, Email Regarding EGS Launch, 11/27/2018 (VALVE_ANT_0059658).

Forbes, About Tim Sweeney, https://www.forbes.com/profile/tim-sweeney/?sh=7d9a03ef67b3 (accessed 1/22/2025).

[886]    Valve, Email Regarding EGS Launch, 11/27/2018 (VALVE_ANT_0059658).

[887]    Valve, Emails Regarding New Revenue Share Communication, 11/26/2018–12/1/2018 (VALVE_ANT_0415674–84, at VALVE_ANT_0415683–84).

[888]    Steam, "New Revenue Share Tiers and Other Updates to the Steam Distribution Agreement," 11/30/2018, https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

[889]    Lifetime revenue towards each commission tier includes any revenue on or after October 1, 2018. See:

Steam, "New Revenue Share Tiers and Other Updates to the Steam Distribution Agreement," 11/30/2018, https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

---

(384) Concern over Epic's entry and threat of potential competition in the third-party digital PC game distribution market via platform directly led to Valve's tiered commission rate change. Valve's tiered commission structure represents a *limited* response to the competitive challenge it perceived in 2018. The change restricted the fee reduction benefits to a relatively small number of publishers while changing nothing for the vast majority of publishers. Valve responded to the perceived competition without altering its rate structure for the overwhelming proportion of publishers. More importantly, the newly-introduced tiered structure kept commission rates at supracompetitive, albeit somewhat lower, levels. In fact, Valve's effective commission rate across all developers from November 30, 2018 through November 30, 2024 was ███████ according to Valve's transaction data, still above any potential but-for commission rate, as determined in Section 7.3 or from the more formal but-for rate analysis outlined below.[890]

(385) In the but-for world, where there was no PMFN Policy, Valve would have likely faced a more expansive competitive threat and likely much earlier than Epic's entrance. Valve would have faced multiple credible competitors, who would have sought to attract the largest games to their platforms to attract users and build network effects, as Steam did. Once those competitors had succeeded in building network effects, they would then become more attractive options for publishers of smaller games and those smaller games would in turn be more attractive to competitors. In such a competitive context, Valve would likely face pressures to both (1) further lower its commission rate for the largest games that entered Valve's tiered commission structure and (2) lower its commission rates for smaller games that did not enter Valve's tiered commission structure.[891]

(386) As I discussed above, EGS has been largely unsuccessful as a direct result of Valve's monopoly power and the PMFN Policy. See discussion in Section 6.2. In the framing of Boik and Corts, because Epic entered as a low-cost alternative, its strategy of competing on price is thwarted

---

[890] Valve Transaction Data, 11/30/2018–11/30/2024. "See: 08_Effective_rates_after_tiers.R"
A small share of revenue is associated with outlier calculated commission rates due to the timing of recorded partner payments or rounding error from small transactions. To be conservative, I calculate the above effective rate using the top 15 calculated commission rates between November 30, 2018 and November 30, 2024, which account for ██████ of revenue in Valve's transaction data over this time. The effective rate for all calculated commission rates associated with positive revenue over this time is modestly higher, at ██████.

[891] Mankiw, N. Gregory (2012), "The Market Forces of Supply and Demand," in N. Gregory Mankiw, ed., *Principles of Microeconomics*, Mason, Ohio: South-Western Cengage Learning, at 66. ("[W]e assume that markets are perfectly competitive. To reach this highest form of competition, a market must have two characteristics: (1) the goods offered for sale are all exactly the same, and (2) the buyers and sellers are so numerous that no single buyer or seller has any influence over the market price. Because buyers and sellers in perfectly competitive markets must accept the price the market determines, they are said to be price takers.")

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

by Valve's monopoly power and PMFN Policy; consumer price *has* to be equal, and thus, users want to be on Steam where there are better features, more users, more developers, and more games. Because of Valve's expansive base of users, developers, and publishers, Epic has had to focus on growth as opposed to profitability,[892] all the while accomplishing neither to a meaningful degree. As discussed in Section 6.2, Epic has been unprofitable and has failed to command a meaningful share of the relevant market. Additionally, many publishers who left Steam and signed exclusive deals with Epic did so because of Epic's advances and money guarantees that were sometimes ███████████████████████████████████████ a ████.[893] However, these movers were quintessential "hit and run" shifts; many of these publishers have since returned to Steam after the expiration of their exclusive deals with Epic. See Section 4.1.3.

(387) Epic's failure to command a meaningful share of the relevant market is not unique among entrants into this market, and the failure of alternative distribution options has affected publishers. Many publishers left Steam but had no choice but to return to Steam because their other distribution options were not competitively viable (as a result of the price and content parity requirements of the PMFN Policy) (see Section 6.2). These departures did not result in competitively meaningful alternatives to Steam and did not affect Valve's PMFN Policy or the enforcement thereof. I have noted above that the impetus for publishers' return to Steam was a failure of their own platform or the inability to compete successfully on another third-party platform. In a world without the PMFN Policy, the publishers who left Steam would likely have done so earlier and competed more successfully on alternate platforms. This would have exerted meaningful competitive pressure on Valve, leading to competitive (i.e., lower) commission rates, benefitting all publishers.

(388) While Epic has failed to meaningfully compete with Steam, its 12% commission rate represents a realistic floor on a competitive but-for commission rate that is both sustainable and profitable. As discussed above, Epic's inability to compete is not as a result of its commission rate. In fact, Epic has indicated publicly that the 12% commission rate is

---

[892] WCCF Tech, "Epic Games Store Still Isn't Profitable Despite Promises It Would Be By 2023," 11/7/2023, https://wccftech.com/epic-games-store-not-profitable-2023/. ("Yesterday, Epic Games Store boss Steve Allison took the stand, and admitted the storefront still wasn't turning a profit. At this point, Allison says the main aim is still to grow the store's userbase, rather than turn big profits (or any profits at all).")

[893] Scott Lynch, Dep. Tr., 10/12/2023, at 163:3–9. ████████████████████████████████ ████████████████████     ████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████

profitable on an operating basis and sustainable.[894]  Epic's court documents reveal that Epic determined the 12% rate to be "competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS."[895]  Additionally, according to an internal Epic email, Epic determined that even dropping the percentage split that Epic takes on each sale to 10% would have still allowed the company to be operate that portion of the business profitably.[896]  In a Q&A discussion in December 2018, Tim Sweeney stated that "[i]n [Epic's] analysis, stores charging 30% are marking up their costs by 300% to 400%. But with developers receiving 88% of revenue and Epic receiving 12%, this store will be a profitable business for us."[897]

(389)   Additional evidence indicates a 12% (or lower) take-rate would be sustainable for other platforms.  In response to the launch of the EGS, Discord announced that it would only charge a 10% commission rate, allowing developers to keep 90% of revenue from their games.[898] Discord's CEO stated that "it does not cost 30 percent to distribute games in 2018," and that "[a]fter doing some research, we discovered that we can build amazing developer tools, run them, and give developers the majority of the revenue share."[899]  Discord's response to the commission rates announced by Epic reflects the behavior of a third-party digital PC game distribution platform lowering prices in response to increased competitive pressure.  Similarly, Microsoft announced a lower commission rate following Epic's entry.  In an April 2021 post

---

[894]   PC Gamer, "Most Game Devs Don't Think Steam Earns its 30% Revenue Cut," 4/28/2021, https://www.pcgamer.com/most-game-devs-dont-think-steam-earns-its-30-revenue-cut/. ("Epic maintains that its 12% cut will be enough to profit in the long term, challenging the idea that game distributors need to take 30% to be viable.")

Ars Technica, "How Long Can Epic Afford to Throw Money at the Epic Games Store," 4/12/2021, https://arstechnica.com/gaming/2021/04/how-long-can-epic-afford-to-throw-money-at-the-epic-games-store/.   ("You might think Epic is incurring those losses because it only takes a 12 percent cut of third-party game revenues, compared to the industry-standard 30 percent cut on other digital storefronts. On the contrary, though—in its own court filings, Epic says that 12 percent revenue chunk has been 'sufficient to cover its costs of distribution and allow for further innovation and investment in EGS.'")

[895]   *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR-TSH, Findings of Fact and Conclusions of Law Proposed by Epic Games, inc., at ¶¶ 399, 405 (N.D. Cal. 2021). ("Prior to deciding on the 12% revenue share, EGS considered its own costs and revenues and studies the revenue shares of competing distributors of PC games.  Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS."; "EGS's 12% transaction fee is sufficient to cover the variable costs of running EGS, including payment processing, customer service and bandwidth.")

[896]   Epic, Internal Emails re: Costs of Running Diesel Business, 6/6/2018 (EPIC_ VALVE_0000004–06, at EPIC_ VALVE_0000004).

[897]   Epic, "Diesel Q&As for Tim from Embargoed Media Outlets," c. 12/4/2018 (EPIC_VALVE_0000058–72, at EPIC_VALVE_0000059).

[898]   GamesIndustry.biz, "Discord store offering developers a 90/10 revenue split," 12/14/2018, https://www.gamesindustry.biz/discord-store-offering-developers-a-90-10-revenue-split.

[899]   The Verge, "Discord's Game Store Tries to Top Steam and Epic by Offering Developers More Money," 12/14/2018, https://www.theverge.com/2018/12/14/18139843/discord-pc-games-store-revenue-split.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

on Xbox Wire, Microsoft stated that "the developer share of Microsoft Store PC games sales net revenue will increase to 88%, from 70%. A clear, no-strings-attached revenue share means developers can bring more games to more players and find greater commercial success from doing so."[900] Similarly to EGS, Discord and Microsoft's lack of success came because of Valve's monopoly power and PMFN Policy, as opposed to the commission rate they charged. See discussion in Section 6.2.

(390) Thus, in the but-for world, Steam's advertised commission rate would be lower than the lowest tier rate of 20% that Steam adopted for high-revenue games. The PCM approach, yardstick approach, and empirical approach conducted above suggest a but-for take rate of between 12% and 20%. Epic's 12% commission rate represents an effective floor that would still allow for Steam and other platforms to operate profitably, while the platform competition model approach and yardstick approach suggest a commission rate between 15% and 20%. Together, all three approaches provide complementary and consistent evidence that all or virtually all members of the class were injured by Valve's conduct.

## 7.5.    Assessment of impact

(391) I conclude that Valve's conduct has harmed all or virtually all class members. When a class member pays a higher commission rate in the real world relative to the but-for world, the class member is injured. As discussed above, Valve imposes a standard pricing structure on all publishers on Steam through its SDA Agreement. Given Valve's imposition of a standard pricing structure, injury to all, or virtually all, class members is clear; the analyses demonstrate that Valve's commission rate would decrease in a but-for world absent Valve's PMFN Policy.

(392) Valve's behavior has substantially reduced the choices and options available to developers and consumers. A class member that derives value from using Steam, Steam Keys and/or the functionality available on Steam more than from the alternatives in the but-for world *will still be able to use Steam in the but-for world.*[901] However, in the but-for world, that class

---

[900] Microsoft Xbox Wire, "Continuing Our PC Gaming Journey in 2021 and Beyond," 4/29/2021, https://news.xbox.com/en-us/2021/04/29/continuing-our-pc-gaming-journey-in-2021-and-beyond/.

[901] I acknowledge that there are differences in the level of benefits that each publisher receives from features on Steam. However, this does not mean that publishers who derive either more or less benefit from various features on Steam, or prefer features offered by alternative platforms greater than features on Steam are all unharmed. Valve's PMFN Policy allows it to quash meaningful competition and to maintain supracompetitive rates. Thus, all publishers distributing games on Steam are affected negatively by the overcharge resulting from the common supracompetitive commission rate that

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

member would have other (perhaps more) meaningful options available to them. Valve's conduct took these options off the table by consigning competitors to fringe status, effectively eliminating choice (and the resulting competition on the merits) altogether. By giving class members more choice, all class members are better off.

---

Valve charges. That harm occurs regardless of publishers' varying use of Steam features or the value different publishers attach to the various features.

Similar to the varying use of features and the varying use of alternative distribution pathways, that publishers may and likely do varyingly use Steam Keys does not preclude class-wide harm. Instead, that impact is shown through overpayment on a single transaction. Most importantly, it is also unlikely that Steam Keys would be unavailable in the but-for world. In a world without the PMFN Policy, where Valve has to compete, Steam Keys become an even more important competitive tool to drive business (developers and gamers) to Steam.

Valve has derived and continues to derive substantial benefits from offering Steam Keys. In particular, Steam Keys help drive users (back) to Steam, even if they actually made a purchase off of Steam. By doing that, Steam helps to build/strengthen/sustain network effects and create opportunities to receive future revenues and profits from subsequent in-game or new game purchases that are made. Those benefits create strong incentives for Valve to continue operating its Steam Key program in a market in which it faces even stronger competition. Steam Keys are a means by which Valve can draw customers (back) to the Steam platform if they purchase on another site and provide incentives for developers to remain actively engaged with Steam. For example, a March 2021 internal Valve document entitled "Steam Business: Steam Key Basics" noted that "every Steam key activated by a PC player is a Steam copy of the game that can generate direct and indirect value for our platform." See:

Valve, Steam Business: Steam Key Basics, 3/15/2021 (VALVE_ANT_2370744–45, at VALVE_ANT_2370745).

Further, Valve assessed the revenue benefits associated with Steam Keys, concluding that *games that do bundles with external sites seem to have much higher Steam revenue afterward.* See:

Valve, Emails Regarding Steam Keys and Steam Sales, 4/8/2021–5/18/2021 (VALVE_ANT_0051956–57, at VALVE_ANT_0051956). (Emphasis added.)

In the but-for world, with increased competition, Valve's incentives to continue operating a valuable feature such as the Steam Key program would most likely increase, or, at the very least, not change in a meaningful way. In fact, the added competition in the but-for world would incentivize Valve to increase its usage of Steam Keys, in an attempt to keep publishers and users on the platform.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

# 8.    Economic Quantification of Class-Wide Damages

## 8.1.    Overview

(393)    Steam is a two-sided platform facilitating transactions between publishers and users. However, it charges a positive price to only one side of the platform, charging fees to publishers, and it charges a zero price on the consumer side of the platform. This behavior allows me to apply economic models focusing only on a single price. While that *direct* price is charged only to publishers, that affects consumer prices, as discussed above and in this section. As such, Valve's pricing to publishers affects *both* sides of the market.[902]

(394)    I introduce the Landes and Posner model[903] to demonstrate how Steam's price and quantity would be lower in the but-for world. Using the intuition from Landes and Posner, I describe my model for determining the but-for price. First, I calculate real-world values that correspond to the various inputs of the model. Using these real-world input values and an estimate of the but-for market share using shares by publisher, I determine Steam's commission rate in the but-for world, and therefore can calculate damages for the class and for each class member based on the available transaction data.

(395)    My model derived from Landes and Posner confirms my conclusion that all or virtually all class members are impacted. Specifically, my model describes the but-for competitive equilibrium reached after platforms enter the market during the period of time after Valve's PMFN is eliminated. In that competitive equilibrium, Valve's but-for commission rate is substantially lower than in the real world, and lower even than the commission rate in the interim state market described by my PCM. In this way, my impact analysis and my damages analysis together describe the transition from a market dominated by Valve and in which the anticompetitive behavior occurs to one with increased competition, reduced pricing, and increased output (PCM). But for Valve's PMFN Policy, the market would have reached this end state by no later than January 28, 2017 and, most likely, earlier.

---

[902]    In its various pleadings to date, Valve asserts that my description means that I am describing Valve as a one-sided platform. So that there can be no confusion on this issue, that characterization could not be more incorrect. As I note repeatedly in the discussion above, Valve is a two-sided platform. The description of the Steam platform as two-sided is a structural description: the structure of the platform is two-sided. The characterization of Valve's pricing as one-sided, which is both undeniable and undisputed, is a *behavioral* characterization reflecting how Valve sets prices on the platform. It is absolutely incorrect to conflate the structural character of the platform (unambiguously two-sided) with the behavioral character (pricing to a single side).

[903]    Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(396)    Steam has historically only priced to the publishers' side of the market.  Steam's headline commission rate, historically set to a flat 30% and more recently tiered according to game revenues, is directly charged to publishers and is deducted by Valve from the price charged by publishers to consumers.[904]

(397)    Steam's pricing strategy is properly described as an agency model in which the publisher sets the final retail price for its game, and Steam, the online retailer, keeps a share of the revenue generated by a transaction between the publisher and a consumer.[905]  This pricing model is not unique to PC gaming.  Products such as "e-books, applications for mobile devices . . ., car insurance, and hotel reservations have been sold online using the agency model."[906]  The agency model is applied to two-sided platforms in the Boik-Corts model described above.  Boik and Corts include a single platform fee and derive implied demand for transactions as a function of a platform's fees and their competitor's fee.[907]

(398)    I model the but-for world by assuming that Steam would continue to use an agency model, setting a price to the publisher side of the market as a percentage share of the price charged to the consumer.  This allows publishers to set consumer prices for their products and decide how much (if any) of Steam's fees to pass through to consumers.  Valve's real-world, actual pricing conduct for Steam is the best indication of its likely but-for conduct.  For the entire history of the platform through today, Valve has continuously charged a fee as a percentage of revenue charged only to publishers.[908]  This provides economic evidence that Valve considers this its best pricing strategy in the actual and but for worlds.  Indeed, when faced with the option to switch to a wholesale model for a particular publisher, in which "suppliers set wholesale prices and retailers set retail prices[,]"[909] Valve rejected this option and retained its

---

[904]    While the price Valve charges to publishers may impact publisher's pricing to consumers (this is referred to as "marginal price pass through"), the only direct price charged by the platform operator (*i.e.*, Valve) is the commission rate to publishers.  For further discussion on pass through, see Section 8.4.

[905]    Johnson, Justin P. (2017), "The Agency Model and MFN Clauses," *The Review of Economic Studies*, 84(300): 1151–1185, at 1151.

[906]    Johnson, Justin P. (2017), "The Agency Model and MFN Clauses," *The Review of Economic Studies*, 84(300): 1151–1185, at 1151.

[907]    Boik, Andre and Kenneth S. Corts (2016), "The Effects of Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics* 59(1): 105–134, at 112.

[908]    See Section 3.3.4.

[909]    Johnson, Justin P. (2017), "The Agency Model and MFN Clauses," *The Review of Economic Studies*, 84(300): 1151–1185, at 1152.

---

agency pricing model.[910]   Thus, I evaluate Steam's but-for price under models with a single, direct price to one side of the platform.

(399)   Given Steam uses a fee charged only to publishers in both the real and but-for worlds, a properly constructed model need only consider this one fee (*i.e.*, the total price level).   This is true notwithstanding the fact that Steam is structurally a two-sided platform,[911] and notwithstanding the fact that I define the relevant market as a two-sided market and analyze Valve's conduct within the framework of a two-sided market.   In fact, analytically, this form of a model is identical to a model that considers the sum of the fees on both sides of the market *where the fee to consumers is zero*.

---

[910]   Valve, Emails Regarding ▇▇▇▇ Pricing, 8/15/2014–9/26/2014 (VALVE_ANT_2814337–343, at VALVE_ANT_2814341), available at Connor Malone, Dep. Tr., 11/8/2023, Exhibit 249. ("We understand that the retailers are cutting in to their own margins with their pricing based on a wholesale price.  As Steam does not operate on a wholesale model, those practices are not an option, and a different approach is needed.")

Connor Malone, Dep. Tr., 11/8/2023, at 108:7–109:23. ("Q. And at the bottom you say, 'We understand that the situation with ▇ retailers is tricky and we are encouraged by your efforts to help establish price parity.' Right? A. I did write that. Q. And that's consistent with Valve's policy seeking price parity before providing curated marketing or listing the game, right? A. I wouldn't say that it -- I wouldn't classify it in terms of a Valve policy. Q. Well, it was your practice at least here that ▇▇▇▇ needed to achieve price parity for ▇▇▇▇ or Valve will have to take the game down until that happens, right? A. In this specific case, yes, that is I think how it played out. Q. Now, if you look at page 341, at the bottom there's a reference to WSP again.  Do you see that? A. I do. Q. And then your response, you say, 'We understand that the retailers are cutting into their own margins with their pricing based on a wholesale price.' Right? A. Yes, I see that. Q. And that's indicating that WSP stands for wholesale price, right? A. Yes, I think so. Q. And you say, 'As Steam does not operate on a wholesale model, those practices are not an option.' Right? A. Correct. Q. Why was it not an option? A. It was not an option because Valve -- we were not interested in changing our revenue share model at that time. Q. When you say 'not interested,' does that mean it was impossible or just Valve didn't want to do it? A. That we were not interested in doing it at that time.")

[911]   Rochet and Tirole (2006) define a two-sided platform as:

. . . one in which the volume of transactions between end-users depends on the structure and not only on the overall level of the fees charged by the platform.  A platform's usage or variable charges impact the two sides' willingness to trade once on the platform and, thereby, their net surpluses from potential interactions; the platforms' membership or fixed charges in turn condition the end-users' presence on the platform.  The platforms' fine design of the structure of variable and fixed charges is relevant only if the two sides do not negotiate away the corresponding usage and membership externalities.

A key feature of Rochet and Tirole (2006)—and the one that makes my analytic approach appropriate for analyzing a platform such as Steam—is that the quantity of transactions depends only on price level and not price structure under certain conditions.

Consider a platform charging per-interaction charges $a^B$ and $a^S$ to the buyer and seller sides.  The market for interactions between the two sides is one-sided if the volume V of transactions realized on the platform depends only on the aggregate price level

$$a = a^B + a^S$$

*i.e.*, it is insensitive to reallocations of this total price a between the buyer and the seller.  If by contrast V varies with $a^B$ while $a$ is kept constant, the market is said to be two-sided.

Rochet, Jean-Charles and Jean Tirole (2006), "Two-Sided Markets: A Progress Report," *The RAND Journal of Economics*, 37(3): 645–667, at 646–648.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(400)   Because Valve's commission on Steam is set as a percentage of sales revenue and not a fixed amount per unit sold,[912] it qualifies as an *ad valorem* fee on the revenues generated by publishers. Rochet and Tirole note that "[t]he value-added tax is an epitome of the possibility of neutrality[,]," where neutrality means that it does not matter if the buyer or seller pays the fee since the seller can pass through the cost of the fee.[913] The value-added tax is an *ad valorem* tax just like the *ad valorem* fee Valve charges to publishers on Steam. Both are price neutral. Therefore, modeling a change in Valve's *ad valorem* fee on Steam means I only need to consider the overall level of the fee and not who it is charged to. This makes the agency model agnostic about and robust to changes in who Steam charges the *ad valorem* fee to.

(401)   Steam is a two-sided platform with a neutral pricing structure.[914] There are three conditions for price neutrality to hold.[915] The first condition for price neutrality is a lack of transaction costs. Transaction costs "refer to a broad range of frictions that make it costly for one side of the market to pass through a redistribution of charges to the other side."[916] Steam does not have transaction costs of this type. Publishers set their own prices. Setting that price to pass through savings from a drop in costs does not lead to any additional transaction costs.

(402)   The second condition is a lack of volume-insensitive costs. Volume insensitive costs are costs that "a) are influenced by the platform and b) are not proportional to the number of transactions on the platform."[917] Publishers' costs are volume sensitive, as costs (that is, the commission paid to Valve) are incurred when purchases are made.

(403)   The third and final condition for neutrality is that there are no constraints on the ability of publishers to pass-through cost increases to consumers (*i.e.*, that the platform does not "limit

---

[912]   The Economist, "Video Games: Ahead of Steam?" 3/15/2019, at 1. ("[Steam] takes a 30% cut of each game sold.")

[913]   Rochet, Jean-Charles and Jean Tirole (2003), "Platform Competition in Two-sided Markets," *Journal of the European Economic Association* 1(4): 990–1029, at 1018.

[914]   As a two-sided platform there are hypothetically other pricing structures for which prices would not be neutral and so could require a model of prices to both sides of the market. However, the pricing structure on Steam meets the criteria set forth by Rochet and Tirole for price neutrality.

Rochet, Jean-Charles and Jean Tirole (2003), "Platform Competition in Two-sided Markets," *Journal of the European Economic Association* 1(4): 990–1029, at 1019–1020.

[915]   Rochet, Jean-Charles and Jean Tirole (2003), "Platform Competition in Two-sided Markets," *Journal of the European Economic Association* 1(4): 990–1029, at 1019.

[916]   Rochet, Jean-Charles and Jean Tirole (2003), "Platform Competition in Two-sided Markets," *Journal of the European Economic Association* 1(4): 990–1029, at 1019.

[917]   Rochet, Jean-Charles and Jean Tirole (2003), "Platform Competition in Two-sided Markets," *Journal of the European Economic Association* 1(4): 990–1029, at 1019.

the extent of pass-through").[918]  Valve does not place constraints on whether, how, when, or to what extent costs are passed through to consumers.  There is no economic basis for me to conclude that this would change in the but-for world.

(404)   Thus, the real-world current pricing structure for Steam allows me to model a single platform fee for Steam in the but-for world, consistent with the economic literature.  The single fee model I adopt matches Valve's pricing behavior for Steam.

## 8.2.    The Landes and Posner (1981) model

(405)   William Landes and Richard Posner present a model that relates firm market power to the price it sets (relative to marginal cost).  Landes and Posner define market power as "the setting of price in excess of marginal cost" and formalize their measure of market power using the Lerner Index, as expressed below:[919]

$$L_i = \frac{(P_i - C_i')}{P_i} = \frac{1}{\epsilon_i^d}$$

(406)   Landes and Posner explain that the Lerner Index, $L_i$, of firm $i$ indicates the relative size of the monopoly mark-up of price, $P_i$, over marginal cost, $C_i'$, by firm $i$.[920]  The Lerner Index illustrates

[918]    Rochet, Jean-Charles and Jean Tirole (2003), "Platform Competition in Two-sided Markets," *Journal of the European Economic Association* 1(4): 990–1029, at 1020.

[919]    Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 940.

Landes and Posner (1981) explain that the "the Lerner index is a measure of a firm's market power."  See:

Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 941, fn 8.

$L_i$ is the Lerner Index for firm $i$, $P_i$ and $C_i'$ are respectively price and marginal cost at the firm's profit-maximizing output, and $\epsilon_i^d$ is the firm's elasticity of demand.  See:

Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 940.

Per the equation above, a higher firm demand elasticity means that the quantity the firm sells is more responsive to the price they set.  If the quantity reduces more in response to a price increase (demand elasticity is higher), firms that are maximizing their profits will not mark up their prices to the same extent.

Lerner, A. P. (1934), "The Concept of Monopoly and the Measurement of Monopoly Power," *The Review of Economic Studies* 1(3): 157–175.

[920]    Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 939.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

the relationship of the firm's market power to the firm's price elasticity of demand, $\epsilon_i^d$.[921] Firm $i$'s price elasticity of demand quantifies the relationship between the quantity demanded of firm $i$'s output and the price that firm $i$ charges; more formally, it is the percentage change in quantity demanded for firm $i$'s output in response to a given percentage change in firm $i$'s price.[922] Landes and Posner explain that "[s]ince the Lerner [I]ndex is a measure of a firm's market power, the relevant elasticity is the firm elasticity of demand, for it is the response of the firm's output to change in its price that determines the degree to which it has market power."[923]

(407)   The Lerner Index is regarded by many as the "best-known measure of monopoly power."[924] As discussed above, Steam is a two-sided platform with a neutral pricing structure, meaning that no matter who ultimately remits the fee to Valve, the amount the consumer ultimately pays for a game is not affected. This is because the pass-through of the fee adjusts based on who remits the payment.[925] For these reasons, using the Lerner Index based on the sum of prices on both sides of the market is appropriate here.

(408)   Landes and Posner expand on the standard Lerner Index formula by explaining that the firm elasticity of demand—and by extension the firm's market power—can be derived using firm $i$'s market share ($S_i$), the market elasticity of demand ($\epsilon_m^d$), and the supply elasticity of competing (or "fringe") firms ($\epsilon_j^s$).[926] Intuitively, this construction makes good economic sense. Elasticity—and market power—should be related to: (a) the firm's relative size (*i.e.*, market share); (b) the degree to which the firm's customers are willing to switch to competing firms;

---

[921]   Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 940–41.

[922]   Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 940–41, fn 8.

[923]   Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 940–41, fn 8.

[924]   Elzinga, Kenneth G. and David E. Mills (2011), "The Lerner Index of Monopoly Power: Origins and Uses," *The American Economic Review* 101(3): 558–564, at 560. ("It is the conventional practice for textbooks in microeconomics and industrial organization to describe the Lerner Index as 'the best-known' measure of monopoly power.")

[925]   This is analogous to the neutrality of tax remittance often covered in introductory economics textbooks. See for example, the discussion of how taxes levied on sellers are equivalent to taxes levied on buyers:

Mankiw, N. Gregory (2018), *Principles of Economics*, 8th ed., Boston, MA: Cengage Learning, at 123.

[926]   Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 944–945. (They note that "[t]his formula, like the Lerner index, has long been a part of the industrial organization literature" and derive both equations in their appendix.)

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

and (c) the ability of fringe firms to increase output in response to price increases (making it easier to meet the demand of consumers seeking to switch).

(409)   That Landes and Posner are correct is easily shown.  The supply elasticity of fringe firms is defined as the percentage increase in the quantity supplied by fringe firms in response to a one percent change in the market price.[927]  Landes and Posner derive the following equation:

$$\epsilon_i^d = \frac{\epsilon_m^d + \epsilon_j^s\,(1 - S_i)}{S_i}$$

(410)   Using the above expression, Landes and Posner rewrite the Lerner equation, demonstrating that market power is a function of firm $i$'s market share ($S_i$), the market elasticity of demand ($\epsilon_m^d$), and the supply elasticity of fringe firms ($\epsilon_j^s$).[928]

$$L_i = \frac{(P_i - C_i')}{P_i} = \frac{1}{\epsilon_i^d} = \frac{S_i}{\epsilon_m^d + \epsilon_j^s(1 - S_i)}$$

(411)   Landes and Posner observe the following, consistent with the economic intuition above:[929]

a.   Holding all else constant, higher market demand elasticity yields higher firm elasticity of demand, resulting in a lower Lerner Index and lower mark-up over cost.

b.   Holding all else constant, higher elasticity of supply of fringe firms yields higher firm elasticity of demand, resulting in a lower Lerner Index and lower mark-up over cost.

c.   Holding all else constant, higher market share yields a lower firm elasticity of demand, resulting in a higher Lerner Index and a higher mark-up over cost.

(412)   This model identifies two mechanisms that will increase Steam's firm demand elasticity and lower its but-for price.  First, remembering that the price is the commission fee charged to publishers, absent the PMFN Policy, Valve's market share, $S_i$, would be lower.  This leads to a greater firm-specific elasticity of demand and a lower fee charged to publishers.  See further discussion and calculation of the resulting but-for market share in Section 8.3.4 but-for market share.

(413)   Second, without the PMFN Policy, fringe elasticity of supply ($\epsilon_j^s$) would be higher, all else equal. In the presence of a PMFN, fringe firms have a harder time attracting new game publishers to their platforms than they would absent a PMFN.  In the real world, while fringe platforms can

927   Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 944.

928   Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 943.

929   Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 945–46.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

offer discounted commission rates relative to Steam, because of the PMFN Policy, game publishers cannot pass through savings to consumers via lower retail prices if they are also distributing through Steam. Without the ability to compete on price, fringe platforms have a harder time attracting consumers to their platforms and, in turn, this leads to difficulty in attracting publishers. In the but-for world, however, with meaningful competition possible between platforms, publishers would be able to use lower commission rates offered by fringe platforms to cut retail prices and attract customers, resulting in both an increase in profit margin and quantity sold. This would be attractive to publishers, meaning publishers would more readily supply their games to those platforms that are part of the fringe. Thus, the fringe elasticity of supply would be higher in the but-for world.

## 8.3.    Estimation of the but-for price

(414)    I combine the insights gleaned from the Landes and Posner model with assumptions regarding the demand curve for Steam's digital third-party distribution services to calculate Steam's commission rate in the but-for world. I start by evaluating the elasticity of demand for Steam's digital third-party distribution services in the real world. Using that elasticity as an input, I model Steam's demand based on a linear demand curve. Assuming that Steam's demand curve in the but-for world would be parallel to its demand curve in the real world, I then use my estimated Steam but-for market share to calculate Steam's but-for commission rate.[930]

### 8.3.1.    Steam's real-world Lerner Index

(415)    I first evaluate Steam's Lerner Index in the real world. Recall that the firm's Lerner Index is a function of its pricing and its marginal costs.

$$L_i = \frac{(P_i - C_i')}{P_i} = \frac{1}{\epsilon_i^d}$$

(416)    Valve has had a historic headline commission rate of 30% on sales of third-party PC content. From January 28, 2017 through November 30, 2024, Steam generated an effective commission rate of █████,[931] a rate that includes periods before and after the implementation

---

[930]    As discussed in Section 3.3.5, there are instances in which users gain access to a game for the Steam platform through the acquisition of a Steam Key, rather than purchasing the game directly on Steam. Those purchases are not subject to *Valve's* commission charge, but they are subject to any commissions charged by the distributer of the Steam Key. In the but-for world, I assume that Steam Keys would have been provided and used in the same manner as in the real world and focus my determination of the but-for price solely on those purchases made through Steam and thus subject to the Valve commission charge.

[931]    The calculations presented in this section use rounded values, though I use more precise values in my attachments. Thus, they may differ slightly.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

of the tiered commission rate.[932] For purposes of this analysis, I conclude that the ▮▮▮ rate is a reasonable proxy for the effective market commission rate. The relative change in the market commission rate can then be applied to individual publisher rates to determine publisher specific damages.

(417) I similarly use Valve's P&Ls over the period of 2017 through 2021 to determine Steam's costs.[933] I convert these costs to a share of transaction value to make the comparison to the commission rate set by Valve easier. Steam's total cost of sales during this time were approximately ▮▮▮ of transaction value;[934] Steam's total operating expenses during this time (including allocated administrative expenses) were approximately ▮▮▮ of transaction value.[935] Steam's total taxes (including allocated admin taxes) were ▮▮▮ of transaction value. Steam's cost of sales plus its total operating expenses plus its taxes represent approximately ▮▮▮ of transaction value from 2017 through 2021. See Attachment D-7.

(418) The Lerner Index is predicated on firms' profit maximizing behavior, that is, pricing based on marginal costs.[936] Rather than calculating Steam's marginal economic costs, I adopt a conservative approach and use all accounting costs outlined above. For platform firms like Valve, high fixed costs and low marginal costs are common and result in average total costs that are higher than marginal costs.[937] Using a higher cost as the basis for price setting will

---

932    Valve Transaction Data, 1/28/2017–11/30/2024. See: "05_Damages.R"

933    Valve's P&L data is set forth on an annual basis and is available through 2021, and this calculation and all subsequent calculations can be performed on such a basis. As noted in Section 1, I understand that Valve is expected to produce updated P&L data, but it has not done so by the date of this report. As such, I reserve the right to amend my report to incorporate the updated data once it has been produced.

934    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. See:

       Valve, Valve P&L Statements, c. 2022 (VALVE_ANT_2755012_HIGHLY CONFIDENTIAL_ATTORNEY EYES ONLY.xlsx.)

935    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. See:

       Valve, Valve P&L Statements, c. 2022 (VALVE_ANT_2755012_HIGHLY CONFIDENTIAL_ATTORNEY EYES ONLY.xlsx.)

936    The Lerner Index is derived using the equation for firm profits and by assuming firms try to maximize their profits. A firm's profit-maximizing price is established when the firm sets its marginal revenue equal to marginal cost. See:

       Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," Harvard Law Review 94(5): 937–996, at 984–985.

937    Baumol, William, and Daniel Swanson (2003), "The New Economy and Ubiquitous Competitive Price Discrimination: Identifying Defensible Criteria Of Market Power," Antitrust L.J. 661–686, at 661. ("The industries that are the hallmark of the "new economy" are characterized by a special cost structure. From software to semiconductors, digital entertainment to biotechnology, and in innovative fields more generally, the standard cost pattern entails sunk outlays that are large and must be incurred over and over again, but the marginal cost of serving an additional customer-is virtually negligible. As economists are well aware, this is only a special case of a more general circumstance, the case of scale economies, where the prices of a firm's products, if set equal to the corresponding marginal costs, will condemn the enterprise to losses.")

---

result in a higher but-for commission rate (and lower damages).[938]  Thus, this assumption is conservative and is favorable to Valve.  The Lerner Index relates price to marginal costs through a scaling factor, and thus a greater cost will result in a greater but-for price, all else equal.

(419)  Valve's Lerner Index from January 28, 2017 through November 30, 2024 is ███; Valve's firm elasticity of demand for its distribution services is approximately ███.[939]

### 8.3.2.  Linear demand modeling

(420)  I model Steam's demand as linear and use Steam's real-world firm elasticity of demand to calculate the slope of Steam's demand curve.[940]  An assumption of linear demand is standard practice in the economics literature.  For example, Boik and Corts employ a linear demand framework and show that it satisfies all the assumptions maintained in the general demand framework.[941]  Chone and Linnemer provide a detailed history of the extensive use of linear demand models in economics, noting that "[s]ome researchers find it so natural to use linear

---

[938]  Note that in cases where average total costs are higher than marginal costs, the competitive price is equal to the average total cost, because "a firm that prices at marginal cost cannot cover its fixed costs (costs that do not vary with output), such as plant and equipment or research and development ('R&D')."  See:

Kirkwood, John (2018), "Market Power and Antitrust Enforcement," *Boston University Law Review* 98: 1169–1227, at 1175–1176.

While this changes the interpretation of the markup over marginal costs, it does not impact my use of the markup over marginal cost in the model, because the derivation of the Lerner Index comes from the profit maximizing condition (which is unchanged in a high fixed cost market) and not the competitive price.  See:

Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 984–985.

[939]  Using the Lerner Index formula, I obtain a Lerner Index of ███████████████.  This gives a firm elasticity of demand of ███████████.  Note that when numbers are not rounded before the final calculation, the firm elasticity of demand rounds to ███.

[940]  Demand functions define the "relationship between the price of a good and the quantity demanded[,]"where the quantity demanded is the "amount of a good that buyers are willing and able to purchase."

Mankiw, N. Gregory (2018), *Principles of Economics*, 8th ed., Boston, MA: Cengage Learning, at 67.

[941]  Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics* 59(1): 105–134, at 111.  ("Boik and Corts (2014) shows that in fact the main results of Section 2 also hold in a more general demand model.")

Boik, Andre and Kenneth S. Corts (2014), "The Effects of Platform MFNs on Competition and Entry: General and Linear Demand," *Working Paper*, 1–31, at 6–7.  ("We analyze this model under two different scenarios for demand: 'general' and 'linear'. We first assume that an unspecified underlying general demand function induces a unique optimal pricing rule for the single multi-product seller, yielding a differentiable and well-behaved implied demand function on transaction fees, $q_i^k(f)$. We later assume that the underlying demand function is a familiar linear differentiated-products demand function, which we show satisfies all of the assumptions we maintain in the general demand case.")

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(direct or inverse) demands (and to derive them from a [Quasilinear Quadratic Utility Model]) that they do not try to give a source[.]"[942]

(421)  The standard formula for firm-specific demand elasticity for firm $i$ is as follows.[943]

$$\epsilon_i^d = -\frac{P_i}{Q_i}\frac{\partial Q}{\partial P}$$

(422)  In a linear demand model, $-\frac{\partial Q}{\partial P} = m$, where $m$ is a constant.[944]  Thus,

$$\epsilon_i^d = m\frac{P_i}{Q_i}$$

(423)  Plugging the linear elasticity of demand into the Lerner Index found above results in the following equation.

$$L_i = \frac{(P_i - C_i')}{P_i} = \frac{1}{\epsilon_i^d} = \frac{1}{m\frac{P_i}{Q_i}}$$

(424)  This can then be simplified (dropping the subscripts for readability) as follows.

$$(P - C) = \frac{Q}{m}$$

---

[942]  Chone, Philippe and Laurent Linnemer (2020), "Linear Demand Systems for Differentiated Goods: Overview and User's Guide," *International Journal of Industrial Organization* 73: 1–25, at 1. ("The usage of a Linear Demand System for differentiated goods (henceforth LDS) is widespread in oligopoly theory, especially when closed-form solutions are needed.")

Similarly, they say: "By analogy, no sane economist would look for a reference when using a linear demand like D (p) = a – bp."

[943]  Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 985.

[944]  In this case, the linear demand for firm $i$ takes the form $q_i(P) = A - mp_i + \phi(p_j)$, where $\phi(p_j)$ is a general function allowing me to be somewhat agnostic to the impact of the opposing firms' price on quantity since I only need the derivative with respect to $p_i$. This gives $\frac{\partial Q}{\partial P} = -m$. As an example, Boik and Corts use $q_i(P) = A - mp_i + dP_j$. See:

Boik, Andre and Kenneth S. Corts (2016), "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *The Journal of Law and Economics* 59(1): 105–134, at 111.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(425)    In the real world, Valve's effective commission rate on Steam is ▮▮▮▮, and its firm elasticity of demand is approximately ▮▮▮].[945] I use ▮▮▮▮ as Valve's real-world market share, as found in Attachment E-1. Therefore, $m$ is equal to approximately ▮▮▮.[946]

### 8.3.3.    Parallel shift in Steam demand

(426)    Next, I use the properties of linear demand and assume demand curves in the but-for world are parallel to demand curves in the real world. This simplifies the Landes and Posner model and enables the calculation of Steam's but-for commission rate.

(427)    To find the but-for price, I must determine $m$, the inverse slope of Steam's but-for demand curve, $C$, Steam's but-for marginal costs, and $Q$, Steam's but-for quantity.

(428)    I assume that $m$ is the same in the real and but-for worlds. This is equivalent to assuming that the absence of the PMFN shifts Steam's demand curve so that it is parallel to its real-world demand curve. Removing the PMFN would decrease the (absolute value of the) slope of the firm demand curve (e.g., a linear firm demand curve would become flatter), which implies an increase in (the absolute value of) $m$, because the quantity sold on a platform is more responsive to fees without a PMFN. By instead holding the slope (and by extension $m$) fixed, I am underestimating the but-for (absolute) value of $m$, therefore overestimating the mark-up over cost in the but-for world (and thus overestimating the but-for commission rate). That is, my estimate of the but-for commission rate is conservative.

(429)    Multiple models applicable to this case show that in the but-for world, $m$ would be greater than in the real world. As I discussed above in Section 8.2, in the Landes and Posner (1981) model, the fringe elasticity of supply would increase without a PMFN. That same intuition applies directly to the change in both Valve and fringe firm quantities with respect to the price. The following equation shows how, according to the Landes and Posner (1981) model, $m$ is

---

[945]    Dividing $Q$ by the market quantity converts it into a market share.

To see this more explicitly, let $Q^m$ be the current market quantity in dollars; the market share for Steam then is $Q_i = \frac{Q}{Q^m}$. Now let the value of m calculated with market shares be defined as $m_i = \frac{\partial Q_i}{\partial P} = \frac{\partial \frac{Q}{Q^m}}{\partial P}$. Together, this gives the following.

$$\frac{Q_i}{m_i} = \frac{\frac{Q}{Q^m}}{\frac{\partial Q_i}{\partial P}} = \frac{\frac{Q}{Q^m}}{\partial \frac{Q}{Q^m}} = \frac{\frac{1}{Q^m} Q}{\frac{1}{Q^m} \frac{\partial Q}{\partial P}} = \frac{Q}{m} = (P - C)$$

[946]    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

---

related to the change in market demand with respect to the price and the change in quantity supplied with respect to price.[947]

$$m = -\frac{\partial Q_i^d}{\partial P} = -\frac{\partial Q_m^d}{\partial P} + \frac{\partial Q_j^s}{\partial P}$$

(430)  This equation demonstrates why if $m$ were not held constant, and, instead, I calculated a but-for value $m^{bf}$ and a real-world value $m^{rw}$ it would be the case that $m^{bf} > m^{rw}$. First, without a PMFN, fringe firms will increase their quantity supplied by more for a given price change since they would be able to compete on price. This implies $\frac{\partial Q_j^s}{\partial P}$ is larger in the but-for world. Together, these two points imply $m$ is larger in the but-for world, or $m^{bf} > m^{rw}$. My linear model with a parallel shift in demand holds $m$ constant, which is conservative. This can be seen from the equation $P - C = \frac{Q}{m}$ in which a larger value for m implies a smaller markup over cost and so a lower price.

(431)  The Landes and Posner model is not the only model that leads me to the conclusion that $m^{bf} > m^{rw}$. In Appendix C.3 I show that in the Boik-Corts model, removing PMFNs more than doubles the change in Steam's quantity with respect to price $\left(\frac{\partial Q_i^d}{\partial P}\right)$, which implies $m$ would more than double in the but-for world without a PMFN in place.

(432)  I assume that Steam's costs in the but-for world as a share of transaction value are equivalent to those in the real world, that is, ▮▮▮▮▮. See Attachment D-7.

(433)  Lastly, I analyze Steam's but-for market share below in detail.

---

[947]  Landes, William M. and Richard A. Posner (1981), "Market Power in Antitrust Cases," *Harvard Law Review* 94(5): 937–996, at 985.

$$\epsilon_i^d = m\frac{P_i}{Q_i}$$
$$\Rightarrow \epsilon_i^d\frac{Q_i}{P_i} = m$$
$$\Rightarrow -\frac{P_i}{Q_i}\frac{\partial Q}{\partial P}\frac{Q_i}{P_i} = m$$
$$\Rightarrow -\frac{\partial Q}{\partial P} = m$$

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### 8.3.4.  But-for market share

**Based on PC gaming industry**

(434)  Steam's but-for market share can be evaluated using a framework based on real-world outcomes from the relevant market.  Below, I describe a method for determining Steam's but-for market share based on Steam revenues generated by Valve-published games and Steam revenues generated by other publishers that later engaged in digital PC game distribution.[948]

(435)  Successful games can drive platform adoption and ultimately platform success.  Valve used its highly popular game, *Half-Life 2*, to attract users to Steam in the platform's early years, that is, around 2004.  See Section 3.3.  Similarly, Epic leveraged the success of *Fortnite* to accelerate consumer uptake of its Epic Game Store, which launched in late 2018.  See Section 7.4.  The benefits to a game distribution platform offering exclusive, popular titles have been acknowledged by numerous industry participants.  For example, a 2022 presentation from publisher 2K—in which the company considers the business case for operating a stand-alone launcher—notes that "[e]xclusivity can be highly effective at 'drawing' users to the platform[.]"[949]  The presentation also noted that, "[w]ithout exclusivity, or other offers, our Launcher offers limited value proposition over Steam/Epic[.]"[950]  A presentation from Epic Games about  EGS listed Epic's ability to secure major timed exclusives as one of two elements of Epic's "[s]trategy to building a $1-2 billion PC games business fast[.]"[951]  A 2018 internal presentation on EGS stated that "exclusive 2nd Party titles" would be "meaningful in the long run[.]"[952]  A 2021 internal Activision-Blizzard presentation on Battle.net's platform strategy listed first- and third-party "premium, exclusive PC & mobile games" as an element of Battle.net's platform strategy.[953]  A 2015 document in which Amazon presents its plan to "build a PC game store on Twitch[,]" states that "content is the most important factor in the success

---

[948]  To demonstrate how this method generates a but-for market share for Steam, it is necessary to adopt assumptions about which publishers are included in the calculation as well as the relevant time period.  I reserve the right to alter the assumptions presented below in a subsequent report in which I evaluate the merits issues in further detail.

[949]  2K, "2K Stand-Alone Launcher Business Case," 2/2022 (TAKE2-00000066-094, at TAKE2-00000086).

[950]  2K, "2K Stand-Alone Launcher Business Case," 2/2022 (TAKE2-00000066-094, at TAKE2-00000086).

[951]  Epic, Epic Games Store Presentation, c. 2019 (EPIC_VALVE_0000013–057, at EPIC_VALVE_0000025).

[952]  Epic, Diesel Update, 6/5/2018 (EPIC_VALVE_0000338-362, at EPIC_VALVE_0000361).

[953]  Activision-Blizzard, Battle.net / Platform Strategy, 2/2021 (AB-VALVE-000072-093, at AB-VALVE-000073).

of a gaming platform" and that "exclusive games from Amazon Games Studios" would help differentiate Amazon's offering.[954]

(436)  Multiple publishers—generally those with several popular titles and franchises—have attempted to transition from successful game developer and publisher to distributor of PC gaming content.  These publishers include Activision (Battle.net), Bethesda (Bethesda.net), CD Projekt (GOG), EA (Origin), Epic (EGS), Microsoft (Microsoft Store), Rockstar (Rockstar Games Launcher), and Ubisoft (Uplay).  However, as described in Section 6.2, most of these entrants in the market failed or have struggled to build their market share.

(437)  In the but-for world, the newly entering or existing fringe platforms would have been better able to attract third-party PC content by offering publishers a greater share of transaction value so that such publishers could offer their games at lower prices on these platforms. These lower prices would, in turn, help to attract gamers to the platform.  But for Valve's alleged anticompetitive conduct, publishers that continue to operate their distribution platforms would likely have garnered a larger share of the market, and it is likely that at least some of the publishers that stopped operating their distribution platforms would have continued to operate their platforms.  Therefore, the but-for world would also include publishers that operate or previously operated PC game distribution platforms as competitors to Steam.

(438)  Valve's ability to attract gamers to Steam through its first-party game offerings also contributed to the platform's ability to attract third-party developers (that is, build network effects).  As I note above, other publishers have attempted to utilize a similar model to build their own digital PC game distribution platforms.  Thus, I model the but-for market shares for Valve as well as the publishers that engaged in digital PC game distribution based on the relative success of their games on Steam.  To quantify the success of publishers' games, I use a given publisher's share of revenues on Steam among the publishers that have attempted to create distribution platforms as a proxy for the market share of their platforms in the but-for world.  However, to the extent that these publishers also publish elsewhere, this approach would likely bias the publishers' shares downward and thus Steam's share upward.  Hence, I focus on a period in which publishers likely would have begun to develop their own platforms in the but-for world, but where none had yet done so in the real world, likely generating all or most of their revenues through Steam.

---

[954]    Amazon, Respawn, 12/2015 (AMZ00000384-403, at AMZ00000384, AMZ000000388).

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(439)   To calculate each publisher's share of revenues on Steam, I focus on the period between 2008 and 2012.   The year 2008 is used as the starting point to calculate revenues, as large publishers such as EA (2008) and Ubisoft (2008) did not offer games on Steam during the platform's initial years.  The year 2012 is used as the ending point to calculate revenues, as publishers such as EA began to launch new titles exclusively on their own platforms beginning in 2012.  Table 6 below shows the publishers' shares of revenue on Steam.

**Table 6: Share of Steam Revenues Among Selected Publishers, January 2008-December 2012**

| Publisher | Steam Revenue | Steam Revenue Share |
|---|---|---|
| Valve | | |
| Activision | | |
| EA | | |
| Bethesda | | |
| Ubisoft | | |
| Rockstar | | |
| CD Projekt | | |
| Microsoft | | |
| Total | | |

(440)   The share of revenues among publishers on Steam that operate or operated a PC game distribution platform was ▇▇▇ between January 2008 and December 2012.[955]  As I note above, the presence of successful games is a key driver of platform success.  The publishers shown in Table 6 above released ▇ of the top 50 best-selling games on Steam between January 2010 and December 2012.[956]  However, because other factors likely also contribute to platform success, e.g., the user experience, social features, discovery tools, etc., I adopt Valve's ▇▇▇ share of revenues as Steam's but-for market share.

---

[955]   Note that these shares do not consider revenue for titles by Epic Games.  My estimate for Steam's market share is necessarily conservative—meaning that it is *higher* in this but-for consideration—because it excludes Epic's position in the market.

[956]   Valve Transaction Data, 1/1/2008–11/30/2024.  See: "01_Publisher_shares.R."

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Based on alternative industries**

(441)  Examining share trends in industries similar to the digital PC distribution market supports my but-for market share analysis.  For example, Netflix's share of the subscription video on demand ("SVOD")[957] marketplace[958] over time offers one point of comparison that supports my but-for market share analysis.  It is reasonable to compare the SVOD marketplace to the market for digital PC game distribution because both industries are comprised of platforms that rely on first-party and/or third-party content to attract and retain end users.[959]  Both industries also had a first mover (Netflix and Valve, respectively) that pioneered and dominated the marketplace in its early years.[960]  In addition, the entry of new and effective competitors to the SVOD marketplace in recent years aligns with the expectation that competition would increase in the digital PC game distribution market in the but-for world.[961]

(442)  Estimates from online sources and analyst reports indicate that Netflix initially commanded a large share of the SVOD marketplace that was eroded by competitors over time.  In 2007, the year that Netflix launched its streaming service, Netflix's market share was approximately

---

[957]  U Screen, "SVOD Explained: Why It's the Best Monetization Model for Creators," 10/18/2024, https://www.uscreen.tv/blog/avod-tvod-svod-monetization-models/. ("SVOD, or Subscription Video on Demand, is a monetization model where users pay a recurring fee, typically monthly or annually, for unlimited access to a library of content like films, TV shows, and more.")

[958]  Here, I am not using market in the formal, antitrust sense, as I have not done a market definition analysis of the SVOD industry.  I do not opine to whether or not there are anticompetitive implications in the SVOD marketplace.

[959]  Alphanso Technology, "Top SVOD Platforms in 2024: Comparative Analysis," 9/13/2024, https://www.alphansotech.com/blog/top-svod-platforms-in-2024-comparative-analysis/. ("Subscription Video on Demand platforms are digital streaming services that provide users access to a vast library of video content for a recurring subscription fee. Unlike traditional cable or satellite television, SVOD platforms deliver content, allowing users to stream videos on-demand anytime and from various devices.")

U Screen, "SVOD Explained: Why It's the Best Monetization Model for Creators," 10/18/2024, https://www.uscreen.tv/blog/avod-tvod-svod-monetization-models/. (SVOD platforms "typically feature a mix of original productions and licensed content, giving subscribers a wide variety of exclusive and popular content to choose from.")

See Sections 3.3.1 and 4.1.2.

[960]  BBC, "How Netflix Went From Pioneer to Powerhouse," 7/21/2018, https://www.bbc.com/news/business-44904368. ("In the early days it hastened the demise of neighbourhood movie rental stores.  But it was in 2007 that it made the crucial move. That year it became a pioneer of online streaming, a development that would upend the media industry's traditional business models and transform Netflix into a global powerhouse.")

See Section 3.3.1.

[961]  Business Insider, "Netflix Is Still Growing Wildly, But Its Market Share Has Fallen to an Estimated 19% As New Competitors Emerge," 1/24/2020, https://www.businessinsider.com/netflix-market-share-of-global-streaming-subscribers-dropping-ampere-2020-1. ("Over time, streaming competitors have emerged to take a bite out of the market share of subscribers.")

See Sections 6.2 and 6.3.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

90%.[962]  Following its launch, estimates of Netflix's share range from 60% to 96% through 2013.[963]  Estimated shares since 2020 fall between approximately 20% and 40%.[964]

(443)   Sources discuss that Netflix's share has decreased due to the competitive entry from services such as Amazon Prime Video and Disney Plus.  For example, one source from 2023 notes that

---

[962]   Business Insider, "Netflix Is Still Growing Wildly, But Its Market Share Has Fallen to an Estimated 19% As New Competitors Emerge," 1/24/2020, https://www.businessinsider.com/netflix-market-share-of-global-streaming-subscribers-dropping-ampere-2020-1. ("Research company Ampere Analysis provided Business Insider with data that shows how Netflix's global market share of over-the-top video subscriptions has fallen from a whopping 91% in 2007 to 19% in 2019.")

Business of Apps, BBC, "How Netflix Went From Pioneer to Powerhouse," 7/21/2018, https://www.bbc.com/news/business-44904368. ("In the early days it hastened the demise of neighbourhood movie rental stores.  But it was in 2007 that it made the crucial move. That year it became a pioneer of online streaming, a development that would upend the media industry's traditional business models and transform Netflix into a global powerhouse.")

[963]   Business Insider, "Netflix Is Still Growing Wildly, But Its Market Share Has Fallen to an Estimated 19% As New Competitors Emerge," 1/24/2020, https://www.businessinsider.com/netflix-market-share-of-global-streaming-subscribers-dropping-ampere-2020-1. (Shows Netflix's market share ranging from 60% to 96% from 2008 through 2013.)

Engadget, "Netflix Still the Dominant Streaming Provider, According to Latest NPD Report," 6/4/2013, https://www.engadget.com/2013-06-04-netflix-still-dominant-streaming-provider-npd-svod-report.html. ("According to The NPD Group, a global information company, growth in watching television programming is driving subscription video-on-demand (SVOD) viewership, and Netflix continues to clearly dominate the category. According to NPD's VideoWatch VOD report, in the first quarter (Q1) of 2013 the number of viewers watching television shows using SVOD services increased 34 percent, compared to the same quarter year-ago. NPD's VideoWatch Digital tracking shows Netflix dominating the sector, with a 90 percent share of video-streaming units during Q1 2013, which was 4 percentage points lower than last year.")

Statista, "Distribution of the Subscription Video on Demand (SVoD) Market Value as of December 31, 2013, By Provider," 10/16/2014, https://www.statista.com/statistics/369231/netflix-svod-revenue/. (Lists Netflix's market share as 66% in 2013.)

[964]   UBS, "UBS TV Ratings Guide: Benchmarking NBCU SpinCo To Peers," 12/5/2024, at PDF 3. (Shows that Netflix's share within streaming has fallen from approximately 24% in November 2022 to approximately 19% in October 2024.)

Evoca.TV, "Video Streaming Statistics 2025 – Worldwide Data," 9/23/2024, https://evoca.tv/video-streaming-statistics/. ("At the same time, Netflix is also one of the most preferred video streaming platforms, with a market share of 22%[.]")

Business of Apps, "Video Streaming App Revenue and Usage Statistics (2024)," 11/7/2024, https://www.businessofapps.com/data/video-streaming-app-market. (Shows Netflix's U.S. market share ranging from 20% to 31% from 2021-Q1 through 2024-Q3.)

Statista, "Monthly Market Share of Subscription Video-on-Demand (SVOD) Services in the United States From January to September 2024," 12/13/2024, https://www.statista.com/statistics/1546548/market-share-monthly-svod-services-us. (Shows Netflix's monthly U.S. market share at approximately 21% from January through September 2024.)

Business of Apps, "Netflix Rival Streaming Apps Now Represent Combined 61% of Market Share," 4/25/2022, https://www.businessofapps.com/news/netflix-rival-streaming-apps-now-represent-combined-61-of-market-share/. (Shows Netflix's share of U.S. monthly active users decreasing from approximately 60% in 2018-Q1 to approximately 40% in 2022-Q1.)

Reuters, "Netflix Shares Slip; Five Charts That Break Down Its Earnings," 4/19/2023, https://www.reuters.com/technology/netflix-shares-slip-five-charts-that-break-down-its-earnings-2023-04-19/. ("Netflix's market share is shrinking as competition heats up. The company had 49.1% of total U.S. OTT subscription revenues in 2018, but will have just 26.3% by the end of 2023, Insider Intelligence predicted.")

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

"Netflix's market share is shrinking as competition heats up."[965]   Another source notes that "Netflix continues to cede ground in the streaming wars to rivals including Disney Plus, HBO Max, and Apple TV Plus[,]" losing 13% of its SVOD market share between January 2020 and December 2022.[966]  As another example, an online article includes Figure 12 and states, "While Netflix still commands the majority of monthly active users in the US at a 39% market share, its rivals are catching up representing a combined 61%.  As the video-on-demand market is becoming more crowded with new entrants such as Disney+, Netflix has seen its user numbers drop since 2018."[967]

### Figure 12: Netflix's Market Share, 2018-Q1 through 2022-Q1[968]



(444)   The observed trends in the SVOD marketplace align with my analysis of Valve's but-for market share.  Without Valve's PMFN Policy to fortify its position in the relevant market, Steam's dominance would have declined over time.  As seen with Netflix in the SVOD marketplace,

---

[965]   Reuters, "Netflix Shares Slip; Five Charts That Break Down Its Earnings," 4/19/2023, https://www.reuters.com/technology/netflix-shares-slip-five-charts-that-break-down-its-earnings-2023-04-19/.

[966]   Kiplinger, "Netflix Losing Streaming Dominance to Disney Plus, HBO Max, Apple TV Plus," 3/1/2023, https://www.kiplinger.com/personal-finance/netflix-keeps-losing-subscribers-to-disney-plus-hbo-max-apple-tv-plus.

[967]   Business of Apps, "Netflix Rival Streaming Apps Now Represent Combined 61% of Market Share," 4/25/2022, https://www.businessofapps.com/news/netflix-rival-streaming-apps-now-represent-combined-61-of-market-share/.

[968]   Business of Apps, "Netflix Rival Streaming Apps Now Represent Combined 61% of Market Share," 4/25/2022, https://www.businessofapps.com/news/netflix-rival-streaming-apps-now-represent-combined-61-of-market-share/.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

Valve would have encountered meaningful competitive threats and Steam's market share in the relevant market would have decreased.

(445)   This is not to say that in the but-for world, Valve's position as the first mover would be completely disregarded. Instead, Valve's market shares would reflect its industry leadership *in the presence of competing platforms.* As seen in the SVOD marketplace, Netflix's market share is still among the highest, aligning with Netflix's position as a pioneer in the industry and accounting for Netflix's long-standing commitment to develop its platform and grow its user base even in the face of competition.[969] In the but-for world, Valve's market shares would account for similar factors while also reflecting the effects of meaningful competition.

### 8.3.5.   But-for commission rate

(446)   I now have the information I need to solve for Steam's but-for commission rate. I calculate the but-for effective commission rate to be 17.5%,[970] representing a ▮▮▮ decrease from the effective Steam commission rate during the period from January 28, 2017 through November 30, 2024. In addition to the steps laid out above, the algebraic steps are detailed in Appendix C.2.[971]

(447)   The estimate of the but-for commission rate is conservative for several reasons. First, I use a conservatively high estimate for marginal costs. Steam faces high fixed costs, so its average costs are higher than its marginal costs.[972] As illustrated by the Lerner Index, higher costs imply that a smaller portion of Steam's current price is a result of its market power, leading to an artificially lower level of estimated market power. With lower estimated market power, my model shows that changes in Steam's market share would have less of an impact on the

---

[969]   Forbes, "Top Streaming Statistics In 2025," 8/15/2024, https://www.forbes.com/home-improvement/internet/streaming-stats/. ("Netflix continues to reign supreme in the world of streaming services, maintaining its position as the platform with the most subscribers. As of December 31, 2023, the service boasted an impressive 260.28 million subscribers globally. This represents a significant growth of nearly 13% year over year, solidifying Netflix's stronghold in the streaming industry. The platform's ability to consistently attract and retain a vast subscriber base amid intense competition and a rapidly evolving media landscape is a testament to its diverse content offerings, user experience and brand strength.")

[970]   $P^{bf} = \frac{Q^{bf}}{Q^{rw}}(P^{rw} - C') + C'$ . Substituting the respective values in this equation, we obtain: ▮▮▮ ▮ ▮▮▮ ▮▮▮▮ ▮▮▮. See Appendix C.2 for an explanation of the equation.

[971]   The but-for effective commission rate varies slightly according to the but-for market share used. For example, if I instead use a but-for Steam market share of 50%, the but-for effective commission rate equals 20.1%.

▮▮▮ ▮ ▮▮▮ ▮▮▮▮ ▮▮▮. See Appendix C.2 for an explanation of the equation.

I reserve the right to calculate the but-for market share through alternative methods.

[972]   Attachment D-6 shows that both gross margin and operating margin are relatively flat despite changes in Steam's commission revenue over time.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

price it charges. When considering the impact of a decrease in Steam's market share, as I am in this case, higher costs would result in a smaller change in price, and so a higher but-for price.[973] Additionally, my estimate is conservative because I hold the slope of the demand curve fixed, rather than following the Boik and Corts model which predicts that Steam's but-for quantity demanded would be more responsive to fee changes than its current demand. A more thorough analysis of this point is done in Appendix C.3.[974]

## 8.4. Pass-through

### 8.4.1. Overview

(448) Above, I present an approach for computing but-for commission rates. Game publishers in the but-for world compete against each other in the retail market in which PC games are sold. All else equal, game publishers should ordinarily respond to a decrease in the *commission rate* by decreasing their game *price*. That would result in a lower end price for the game purchaser, thus benefiting both "sides" of the Steam platform. As a preliminary matter, I understand that for purposes of assessing class-wide impact in this case, there is no need to consider the consumer "side" of the platform. Unless game publishers pass-through 100% (or more) of the commission savings, which is highly unlikely and is a proposition for which there is no evidence, game publishers will suffer *some* injury from the inflated commission rates. Thus, I understand that the matter of pass-through is relevant only to the estimation of damages.

(449) In this case, "pass-through" is the dollar change in price divided by the dollar change in cost. A seller's price is determined, in part, by the costs that the seller incurs to make and/or sell the good in question. If costs change, pass-through measures how much of that cost change is passed on to the consumer as a change in price. Consider a seller of widgets, where the price set is $10 when the cost of creating that good by the seller is $5. If the cost of the widget decreased to $4, a decrease in the price to $9 would reflect a 100% pass-through rate ($1/$1). On the other hand, if the price did not change despite the decrease in the cost, this would represent a 0% pass-through rate ($0/$1). If the price decreased by $0.50, this would represent a 50% pass-through rate ($0.50/$1).

---

[973]  This intuition can be seen by rearranging the equation for the but for price from Appendix C.2 to get $P^{bf} = \frac{Q^{bf}}{Q^{rw}} P^{rw} + C' \left( 1 - \frac{Q^{bf}}{Q^{rw}} \right)$. Since the quantity is decreasing, the term in front of the marginal costs is positive meaning that as costs increase, the but for price increases.

[974]  Appendix C.3 shows that the Boik-Corts model can illustrate how adjusting the but-for slope of demand results in a lower but-for price. In this case, a but-for price of ███████ or lower.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(450) Economic theory predicts that pass-through of a marginal cost decrease in the online PC gaming market would be greater than 0% and less than 100%. The economic literature identifies multiple factors that influence pass-through, including the level of competition in the relevant product market, the relative slopes of the demand and supply curves, as well as the shapes of the demand and supply curves.[975]  These factors are addressed briefly below.

(451) First, the marginal cost of supplying one additional online game is low and constant for publishers (*i.e.* the cost of supplying one *Call of Duty* game is equal to the cost of providing the second copy, and so forth), allowing me to simplify the model of pass-through by assuming a constant marginal cost curve.[976]  Second, when product markets are perfectly competitive, theory predicts that pass-through rates will be near 100% when the long-run supply curve is horizontal.[977]  As markets become more imperfectly competitive or monopolistic, such as the online PC gaming market, theory predicts that pass-through rates will tend to fall, especially when elasticity of supply is small and the demand curve is concave, linear, or not highly convex.[978]  In imperfectly competitive markets, firms face downward sloping demand curves and operate on the elastic part of their demand curves.[979]  In this setting, producers pass

---

[975]    For more information, see:

Weyl, E. Glen and Michal Fabinger (2013), "Pass-Through as an Economic Tool: Principles of Incidence Under Imperfect Competition," *Journal of Political Economy* 121(3): 528–583, at 551.

RBB Economics, "Cost Pass-Through: Theory, Measurement, and Potential Policy Implications," 2/2014, at 4, 5, available at: https://assets.publishing.service.gov.uk/media/5a74a3a940f0b619c86593b8/Cost_Pass-Through_Report.pdf.

[976]    This is, in fact, what many theoretical economic studies do. For example, see:

RBB Economics, "Cost Pass-Through: Theory, Measurement, and Potential Policy Implications," 2/2014, at 58, available at: https://assets.publishing.service.gov.uk/media/5a74a3a940f0b619c86593b8/Cost_Pass-Through_Report.pdf.

Assuming a constant marginal cost curve is conservative, as an upward sloping marginal cost curve reduces predicted pass-through. For more information on this, see:

RBB Economics, "Cost Pass-Through: Theory, Measurement, and Potential Policy Implications," 2/2014, at 64, available at: https://assets.publishing.service.gov.uk/media/5a74a3a940f0b619c86593b8/Cost_Pass-Through_Report.pdf.

[977]    Besley, Timothy J. and Harvey S. Rosen (1999), "Sales Taxes and Prices: An Empirical Analysis," *National Tax Journal* 52(2): 157–78, at 158.

[978]    Weyl, E. Glen and Michal Fabinger (2013), "Pass-Through as an Economic Tool: Principles of Incidence Under Imperfect Competition," *Journal of Political Economy* 121(3): 528–583, at 535, 541, 549.

[979]    Indeed, it is profit-maximizing for any firm to operate on the elastic part of its demand curve. See:

Varian, H.R. (2014), *Intermediate Microeconomics: A Modern Approach,* 9th ed., New York, NY: W. W. Norton and Company, at 282. ("Suppose that you were in charge of setting a price for some product that you were producing and that you had a good estimate of the demand curve for that product. Let us suppose that your goal is to set a price that maximizes profits—revenue minus costs. Then you would never want to set it where the elasticity of demand was less than 1—you would never want to set a price where demand was inelastic. Why? Consider what would happen if you raised your price. Then your revenues would increase—since demand was inelastic—and the quantity you were selling would decrease. But if the quantity sold decreases, then your production costs must also decrease, or at least, they can't increase. So your overall profit must rise, which shows that operating at an inelastic part of the demand curve cannot yield maximal profits.")

---

through less of a price increase to consumers when the demand curve is more elastic, as consumers are more price sensitive. Nonetheless, when firms experience a marginal cost decrease and when they operate on the elastic part of their demand curves, as they do in the online PC gaming market, firms have an incentive to pass through at least some portion of the cost decrease to consumers due to the disproportionate increase in quantity demanded in response to a price decrease.[980] This implies pass-through rates of greater than 0%.[981]

### 8.4.2.  Empirical estimate

(452)   In the economics literature, it is well documented that pass-through rates can be impacted by economic conditions such as the competitive pressures faced by firms, the presence of substitutes, and consumer demand. Other real-world effects, such as a firm's strategic desire to price at focal points—such as setting prices that end in .99—can also affect pass-through rates by reducing the number of prices a firm is willing to consider when setting prices. For example, if a firm experiences a small marginal cost decrease, the firm may be unwilling to lower its prices if doing so results in a new price that is not one of the firm's focal point prices (e.g., $5.99 to $5.74). As focal point prices may constrain a firm's decision to pass through marginal cost savings, I first consider the evidence of focal point pricing on Steam.

(453)   I first consider the possibility that video games sold on Steam are subject to industry focal pricing points, such as $59.99 for a triple-A game. Table 7 below shows the top 10 transaction prices observed on the Steam platform. The top ten sale prices are associated with ████ of revenues from the platform and ████ of transactions on the platform.[982] Furthermore, prices ending in .99 are associated with ████ of revenues and ████ of transactions on the Steam platform.[983] These results suggest that focal point pricing is likely a consideration for a substantial number of publishers on Steam, with the most popular base prices being those one cent shy of integer dollar values.

---

[980]   Varian, H.R. (2014), *Intermediate Microeconomics: A Modern Approach,* 9th ed., New York, NY: W. W. Norton and Company, at 276. ("An elastic demand curve is one for which the quantity demanded is very responsive to price: if you increase the price by 1 percent, the quantity demanded decreases by more than 1 percent.")

[981]   Negative pass-through rates are unlikely, as it is unclear why a profit-maximizing firm would increase price in response to a cost decrease, all else equal.

[982]   See Attachment G-4.

[983]   Valve Transaction Data., 3/11/2004–11/30/2024. See: "06_Top_sale_prices.R."

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Table 7: Top-10 Transaction Prices on Steam[984]**

| Price (USD) | Share of Revenue | Share of Transactions |
|---|---|---|
| 59.99 | | |
| 19.99 | | |
| 29.99 | | |
| 39.99 | | |
| 14.99 | | |
| 9.99 | | |
| 24.99 | | |
| 69.99 | | |
| 49.99 | | |
| 17.99 | | |
| All other prices | | |

(454) Applying this to the present case, video game publishers' use of focal point pricing would likely affect the pricing mechanism by which a marginal cost savings may be passed through to video game purchasers. As an illustrative example, suppose a game that has a base price of $9.99 on Steam has historically been subject to Steam's 30% commission rate, but eventually hits $10 million in sales after October 1, 2018 so that the game qualifies for a drop in the applicable commission rate to 25% on subsequent sales (see Section 3.3.4). Such a drop represents a marginal cost savings of approximately $0.50 to the game publisher. Focal point pricing *could* lead a publisher to reduce the price through promotional activities and sales as opposed to changing list prices so that the focal point price can be maintained. In other words, in response to the cost change, rather than moving from the focal point list price, the publisher could reasonably choose to maintain the list price and offer more frequent and/or larger promotions and sale prices. This would make the game available at lower prices without leading the firm to depart from focal point pricing targets.

---

[984] Shares are limited to non-Valve, U.S. transactions that are recorded in USD and took place in the US on or after January 28th, 2017. In-app purchases are not associated with native sale price fields and are excluded.

---

(455)    Steam's pricing data enable a reasonable estimate of pass-through.[985]   These data cover transactions on Steam from March 11, 2004 to November 30, 2024 and contain the following fields relevant for my analysis:



(456)    ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.[987]  I use these data to construct daily summaries, by package, that reflect the weighted average price of transactions on a given day using only data entries that reflect net positive transaction amounts and revenues.  I exclude net return transactions from this calculation since Steam's policy allows a user to seek a refund days after an initial transaction occurred; thus, net return transactions may reflect pricing that is no longer in effect.[988]

---

[985]    Valve Transaction Data., 3/11/2004–11/30/2024.  See: "04_Passthrough.R."

[986]    ████████████████████████████████████████████████

[987]    ██████████████████████████████████████████████████████████████

████████████████████████

[988]    Steam, Common Refund Questions, https://help.steampowered.com/en/faqs/view/5FDE-BA65-ACCE-A411 (accessed 1/22/2025). ("Valve will, upon request via help.steampowered.com, issue a refund for any title that is requested within 14 days of purchase and has been played for less than 2 hours (this includes online, offline and shared library playtime). Even if you fall outside of the refund rules we've described, you can submit a request and we'll take a look at it.")

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(457)    The only systematic change in Steam's commission rate I am aware of is its introduction of a tiered commission system in late 2018 (see Section 3.3.4). Accordingly, my analysis focuses on base game packages (i.e. the package associated with the game itself) that have qualified for a reduction in the applicable commission rate on Steam from 30% to 25% (i.e., base games associated with a title that has had at least $10 million in revenue since October 1, 2018). In total, ▮▮ base game packages qualified for Steam's reduced 25% commission rate.[989] This change in commission rate functions as a reduction in a publisher's marginal cost to distribute on Steam and thus is a reasonable way to assess potential pass-through by publishers. To isolate the impact from a single commission rate reduction only, I exclude from the sample base games that subsequently transitioned to the 20% commission rate tier (i.e., base games associated with a title that has had at least $50 million in revenue since October 1, 2018).[990]

(458)    To account for the use of publisher focal point pricing as a possible pass-through mechanism as well as the seasonality of Steam sale periods, my analysis focuses on effective price changes over an extended period of time. Specifically, using the daily weighted average transaction prices described above, I calculate the average effective daily price over the 360 days preceding the commission rate reduction and the first 360 days following the commission rate reduction. I remove base games from the sample that have revenues beginning less than 360 days before the commission change or revenues ending greater than 360 days after the commission change. I also remove base games from the sample that have pricing/transaction data available for less than 50% of the days in the 720-day window around the commission rate change. Note that my analysis also excludes titles that may have reached the 25% commission rate tier soon after launch (i.e., in less than 360 days).

(459)    There are ▮▮ base game packages that meet the above criteria.[991] For each base game package, I use the 360-day average daily price after the commission rate change to calculate the percentage price change from the 360-day average daily price prior to the commission rate

---

989    Valve Transaction Data, 3/11/2004–11/30/2024. See: "04_Passthrough.R."
        This excludes titles published by Valve.

990    Valve Transaction Data, 3/11/2004–11/30/2024. See: "04_Passthrough.R."

991    Valve Transaction Data, 3/11/2004–11/30/2024. See: "04_Passthrough.R."

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

change.[992]    Using the full sample, the average effective price reduction was ▮▮▮▮ and the median effective price reduction was ▮▮▮▮.[993]

(460)  To examine the potential impact of outliers, I recalculate the average and median price reductions excluding games from the sample where the magnitude of the percentage price change is at least 10% in absolute value (*i.e.*, less than or equal to -10% or greater than or equal to 10%).  I then repeat this process using threshold values of 15%, 20%, 25%, and 30%, calculating the average and median price reductions in each instance.  The results are shown in Figure 13 below.

**Figure 13: Average and Median Price Changes After Crossing the $10 Million Revenue Threshold**



(461)  As can be seen above, the median value exhibits less volatility than the average value across samples.  Consequently, I use the median as the sample statistic to estimate pass-through, as it is less susceptible to extreme outlier influence.  The median price change values in the

---

[992]    In the event that the average effective daily price increased after the commission rate change, this would be reflected by a negative percent (*i.e.*, a negative decrease).

[993]    Valve Transaction Data, 3/11/2004–11/30/2024.  See: "04_Passthrough.R."

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

samples above range from approximately ███████████ implying pass-through rates of approximately 30.5% to 44.0%.[994]

(462)    My estimate of pass-through is conservative compared to the pass-through rates ██████ from samples with fewer restrictions. For example, including games that cross the $50 million revenue threshold as part of the sample yields a median price change of ██████, implying a ██████ pass-through rate.[995] Relatedly, including games that cross the ██████████ revenue threshold one year or more after crossing the ██████████ revenue threshold yields a median price change of ██████ implying a 40.0% pass-through rate.[996] In sum, the sample that I use to compute pass-through yields a pass-through rate that is higher than that estimated using less restrictive samples. A higher pass-through rate is favorable to Valve because it implies that damages incurred by publishers are lower.

(463)    The pass-through rates of 30.5% to 44.0% on the but-for commission rate imply an approximately █████████████ consumer price reduction.[997] The models I use to estimate these values are agnostic to the process by which one would get to this average value over time. In the but-for world, Valve would face increased competition. Therefore, to consider the but-for world, one must trace out a world in which competing platforms would have offered developers lower commission rates, and developers would have passed some portion of those savings on to consumers. This would have started long ago, when Steam did not enjoy the network effects or any first-mover advantage. Thus, it is not appropriate to consider whether this change in prices would cause users *now* to switch platforms. Rather, it is more appropriate to consider whether Steam users in the but-for world would have switched earlier on in the growth of the relevant market, and whether new PC gamers would have started on a lower-cost platform rather than join Steam.

---

[994]    Recall that the pass-through rate is computed as the change in price divided by the change in cost, where the change in cost here is██

[995]    Valve Transaction Data, 3/11/2004–11/30/2024. See: "04_Passthrough.R."

[996]    Valve Transaction Data, 3/11/2004–11/30/2024. See: "04_Passthrough.R."

[997]    Calculated as:

████████████████████

████████████████████

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

### 8.4.3.  Robustness

(464)   The data available to assess pass-through are limited in three crucial ways.  First, as in virtually all cases involving real-world observational economic data (*i.e.*, data collected outside the context of a lab-controlled experiment), the data are noisy (*i.e.*, there are a variety of factors other than the commission rate change that could affect publishers' pricing decisions and are not readily observable in the data used to analyze pass-through).  It is, therefore, not possible to control for all factors that could influence the pricing decision by a given publisher with respect to a single game.  That means it is difficult, if not impossible, without more data than are available currently to me, to interpret a price change for any single game (*i.e.,* to determine how much of the price change is attributable to the commission rate decrease).  Second, the impact of the tiered price structure was relatively limited.  Steam distribution costs did not change for the overwhelming majority of games.  Thus, there are relatively few observations available where the commission rate changed.  However, the approach that I use to calculate pass-through helps to minimize biases that might occur from using other, more individualized approaches.  Third, the use of focal point pricing limits publishers' pricing options to engage in pass-through.  I explain below how my approach is robust to the pervasive use of focal point pricing in the online PC gaming market.

**My analysis of pass-through is robust given the noisy data**

(465)   Individual game pricing data available in this case are noisy, as individual publishers ordinarily experience numerous factors that influence their pricing decisions over time.  Consider, for example, demand changes.  A given game will likely experience rises and declines in popularity over time that are likely to lead to higher or lower average prices, respectively, all else equal.  These demand changes may follow from game age, the timing of updates, the introduction of new, similar games, the introduction of new DLC, and the like.  It is likely that for some games (and perhaps many of them), those demand shifts roughly coincided with the introduction of Steam's tiered commission structure.  For example, a publisher may lower a game price because of the release of a close competitor around the same time that they cross the Steam commission fee tier threshold.  Both changes are likely, all else equal, to lead to a price decrease.  If one were to assume that the entire price decrease is the result of the commission change, that assumption is likely to be wrong because it ignores the impact of other factors that, as a matter of economics, one would expect to lead to price decreases as well.

(466)   Because I am unable to disentangle the impact of the commission rate change on game price from other economic influences occurring at the same time for any individual game under

---

consideration, I do not attempt to measure pass-through on a game-by-game basis. Instead, I estimate pass-through as the median price change response derived from ▮ price-change observations.

(467)    This approach to estimating pass-through is more reliable than individualized approaches because a game-by-game analysis would lead to misguided estimates of pass-through. Consider the following: a game may have its base price change during the sample window for reasons unrelated to a change in commission. For instance, the game could be experiencing a demand decline, as described above, and the publisher may reduce its base price to increase quantity demanded. If the base price change is larger than what an equivalent 5% commission savings would represent, then the observed price change to commissions savings ratio would necessarily be greater than 100%. Estimating a pass-through rate for this single game alone would lead one to erroneously conclude that pass-through for the game is greater than 100% and that the publisher is not harmed by Valve's supracompetitive commission rate. In contrast, my approach is robust to outlier price changes that could result from changes in a game's base price that are unrelated to the commission decline.[998]

(468)    In situations where data are noisy and can reflect a variety of economic influences, economists routinely choose methods of estimating a parameter of interest (here, the impact of a commission savings) that reduce the influence these other factors have on the outcome variable (here, the observed change in price). My method of estimating pass-through, which considers the sample median, does precisely this.[999] The evidence suggests that across games, factors that may influence price (*e.g.*, demand shifts) are not correlated. Different games are at different stages in their product life cycle, face different degrees of competition, and so forth. However, in my sample, *all* games do experience a marginal cost decrease via a commission rate reduction. In that case, a preferred approach to analyzing pass-through would be to look at either average or median price changes across all games, since such measures will reflect pricing impacts that are correlated across the games in the sample (in this case, the

---

[998]    See Section 8.4.2.

[999]    It is well known that the sample average is the unique solution that minimizes the sum of squared deviations between an estimate and the observations in the sample, and the sample median is the unique solution that minimizes the sum of absolute deviations between an estimate and the observations in the sample. See:

Stavig, Gordon R. and Jean D. Gibbons (1977), "Comparing the Mean and Median as Measures of Centrality," *International Statistical Review*, 45(1); 63–70, at 63. ("It is well known that (1) the mean minimizes the sum of the squares of the deviations around any point; this is considered an advantage of the mean, and (2) the median minimizes the sum of the absolute values of the deviations around any point; this is considered an advantage of the median.")

In using an estimator that minimizes deviations (*e.g.*, sample mean, sample median), I effectively help mitigate the impact other factors besides the commission change may have on publishers' pricing decisions.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

commission reduction). While other factors that may influence price are happening, the noise they create in the data is suppressed when the data are analyzed this way because these factors are uncorrelated across games.

**My analysis of pass-through is reasonable despite limited data availability**

(469) As mentioned previously, the price change data in this case are limited because there are relatively few occurrences in which publisher commissions were reduced on Steam. This is largely due to Valve's enforcement of a PMFN and its commission structure. More specifically, Steam's tiered commission structure is more symbolic than a substantive change in commission. This structure is designed to offer no benefit to the overwhelming majority of publishers whose games sell less than $10 million and only limited benefits to the rest. Thus, publishers have realized commission rate reductions only on a relatively small number of games.[1000] Similarly, cross-platform pricing comparisons are tainted by Valve's PMFN, which precludes publishers from offering lower prices on platforms that offer lower commissions than Steam.

(470) Despite the data limitations that result from Valve's PMFN Policy, I complete a robust analysis of pass-through with the limited data available. Moreover, my analysis can easily be updated to account for any additional data that may become available to me.

**My analysis of pass-through is robust to the prevalence of focal point pricing in the online PC gaming market**

(471) As explained earlier, the use of focal point pricing (*e.g.*, prices that end in .99) constrains how a publisher may pass through a commission savings by limiting the set of prices the publisher may consider. When focal point pricing is used, publishers may wish to maintain the same base price for a game and instead opt to offer more frequent, longer-duration, and/or larger discounts to consumers. An estimate of pass-through in this context should thus account for the widespread use of focal point pricing. My approach does so by considering changes in average pricing over a relatively long duration of time so that publishers' use of promotional activities and discounting to engage in pass-through is accounted for.

(472) My pass-through analysis is also reasonable because, in important ways, the sample and the population look the same. Most importantly, price patterns and levels for the sample that I use closely align with those of the population as a whole. The price levels observed for the

---

[1000]   See Section 8.4.2.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

games in my sample—before and after the commission rate change—are in the same cluster as for the general population of publisher/game pairs. Because focal point pricing is pervasive, despite there being over 50,000 publishers and 100,000 games on Steam, over ███ ████████████████████ on Steam between 2018 and 2024 occurred at ████████████████ ████.[1001]

(473)   For the ███ games in my sample, I construct a set of base prices and sale prices associated with each of those games for the time period for which they are used in my pass-through analysis. I collect the corresponding base prices and sale prices across all games in my sample, yielding ██ base prices (the "Base Price Set") and ██ sale prices (the "Sale Price Set"). See Attachments I-2, I-3, and I-4. I compare the Base Price Set and Sale Price Set to base prices and sale prices, respectively, associated with all game transactions on Steam between 2018 and 2024. For each game purchase transaction on Steam, there is an associated base price and sale price. Thus, I can compare the pricing behavior of the publishers in my pass-through analysis.

(474)   I find that approximately ██████ of game transaction revenue on Steam between 2018 and 2024 was associated with a base price that is in the Base Price Set.[1002] Further, I find that approximately ██████ of game transaction revenue on Steam between 2018 and 2024 was associated with a sale price that is in the Sale Price Set, with the most common 25 sales prices accounting for nearly ████████ transaction revenue.[1003] In other words, the price points used by the games in my pass-through sample are highly representative of game prices on Steam more generally. Consequently, I conclude that the prices used by publishers in my sample are highly consistent with the pricing used by online PC game publishers more generally.

---

[1001]   See Attachment I-4.

[1002]   See Attachment I-4.

The prices in the Base Price Set are: $59.99, $19.99, $39.99, $29.99, $24.99, $14.99, $49.99, $9.99, $34.99, $4.99, $44.99, $69.99, $12.99, $17.99, $89.99, $6.99, $2.99, $8.99, $74.99, and $59.95.

[1003]   See Attachment I-4.

As can be seen in Attachment I-3, the sum of total game revenue associated with the top 25 sale prices is approximately ████████, and total game revenue over the 2018–2024 period was approximately ████████ as shown in Attachment I-4. As can be seen in Attachment I-3, the sum of total game revenue associated with the top 25 sale prices is approximately ████████, and total game revenue over the 2018–2024 period was approximately ████████ as shown in Attachment I-4. ████████████████

The top 25 sale prices used (in terms of game revenue) are: ████████████████████████████ ████████████████████████████

████  See Attachment I-3.

---

## 8.5.    Overcharge and damages

(475)    The total overcharge imposed on game publishers by Steam is different than class-wide damages in this matter.  Total overcharge refers to all commissions taken by Valve in excess of a competitive commission rate.  Total damages refer to the commissions taken by Valve in excess of a competitive commission rate that the publisher kept, that is, the savings due to the lower commission rate that are not passed through via price to the end user.  In other words, damages represent the overcharge multiplied by 1 minus the expected pass-through rate.

(476)    There are several points to consider when calculating total overcharge and damages.  First, some publishers who are not part of the class may be included in a calculation of total overcharge, e.g., foreign publishers who sold only to foreign customers.  To estimate class-wide damages in this matter, I exclude transactions from foreign publishers who only transacted with foreign consumers.  That is, if a publisher based in Canada had any sales recorded with U.S. customers, all revenue associated with that publisher would be included.  However, if another Canadian publisher only had charge volume within Canada, that publisher and its related sales would be excluded.  For U.S. publishers, all global sales are considered.  There are ▇▇▇▇▇ publishers meeting these criteria that also have positive net revenue over the damages period in Valve's transaction data.[1004]  Given the scope of this litigation, I limit my estimate of aggregate class-wide damages to transactions involving games, DLC, or in-app purchases.[1005]

### 8.5.1.    Overcharge and damages are calculated formulaically to estimate individual class member damages

(477)    To estimate the damages associated with an individual class member, I apply a consistent methodology to all class members.  I begin with a given publisher's dollar transaction volume (i.e., revenues) between January 28, 2017 and November 30, 2024 on the Steam platform as recorded in Valve's transaction data.  To estimate revenue for December 2024, I use revenue from December 2023.  Similarly, I use revenue from January through November 2024 to project revenue for one year after the end of the data, January through November 2025.  My

---

[1004]    Valve Transaction Data, 1/28/2017–11/30/2024.  See: "05_Damages.R."

This excludes publishers who did not have transactions on or before November 25, 2024.

[1005]    Sales associated with hardware products, undetermined product types, or Valve as a publisher are excluded from this aggregation.

methodology is replicable and can be expanded to address later years when Valve produces additional transaction records in later stages of this litigation. This assumption is likely conservative, as the transaction value on Steam has increased over time. See Attachment D-5.

**Overcharge**

(478)  To determine the overcharge associated with a given commission rate, I scale the commission rates calculated in the transaction data by a ratio of the but-for commission rate to the overall effective commission rate in the damages period.[1006] The effective commission rate from Valve's transaction data is ▮▮▮▮▮.[1007] The but-for commission rate I calculate above is 17.5% (see Section 8.3.5). Next, I multiply commissions paid to Valve by ▮▮▮▮▮ to arrive at a but-for commission for a given commission rate.[1008] Finally, to determine overcharge at a given commission rate, I subtract the scaled but-for commission rate from the calculated commission rates. This is equivalent to calculating the overcharge as ▮▮▮▮▮ of the commissions paid.

(479)  To calculate Valve's overcharge for an individual publisher, I begin by calculating the percent overcharge for that publisher. I then apply that percent overcharge to the actual associated revenues. For instance, if a publisher faced a 30% commission rate for $10 million sales and a 25% commission rate for $20 million in sales, the overcharge would be ▮▮▮▮▮▮▮



respectively. Below, I present a formula for computing the class members'

---

[1006]   The calculations presented in this section use rounded values, though I use more precise values in my attachments. Thus, they may differ slightly.

[1007]   Valve Transaction Data, 1/28/2017–11/30/2024. See: "05_Damages.R."

A small share of revenue is associated with outlier calculated commission rates due to the timing of recorded partner payments or rounding error from small transactions. To be conservative, I calculate the above effective rate using the top 15 calculated commission rates between January, 28 2017 and December 31, 2022, which account for ▮▮▮▮ of revenue in Valve's transaction data over this time. The effective rate for all calculated commission rates associated with positive revenue is modestly higher, at ▮▮▮▮

[1008]   ▮▮▮▮ is the but-for commission from the model in Section 8.3 as a percentage of Steam's effective commission. Using the full values without rounding gives: ▮▮▮▮▮▮▮▮▮

Valve Transaction Data, 1/28/2017–11/30/2024. See: "05_Damages.R."

For nearly all revenue in the transaction data, this ratio is applied to the exact rate calculated using partner payment information available in Valve's transaction data. This includes commission rates between ▮▮ and ▮▮, as well as commission calculated as ▮ and ▮▮. For the small share of revenue associated with outlier commission rates, rates below ▮▮ are floored at ▮▮, and remaining rates are replaced with the effective commission rate from the overall damages period. Rates within ▮ of ▮ and ▮▮ are set at ▮ and ▮▮, respectively.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

overcharges by Valve. The publishers' overcharge is equal to the following equation, where $i$ indicates publisher and $j$ indicates product sold:

$$Overcharge = \sum_{i,j} Revenue_{i,j} \times \left(Actual\ Commission\ Rate_{i,j} - But\text{-}For\ Commission\ Rate_{i,j}\right)$$

(480) The total overcharge for the entire class is the sum of each member's individualized overcharges, which reflect their sales volume for specific product offerings. Consequently, publishers with low sales volume are associated with low overcharge estimates. Commission rates can vary among the titles offered by an individual publisher based on Steam's actual commission structure; this calculation necessarily considers an actual and but-for rate for each product sold.

**Damages**

(481) While the overcharge describes how much more each publisher pays in commissions in the actual world relative to the but-for world, damages for each publisher in this matter will be less than their calculated overcharge, because I expect that publishers would pass between 30% and 44% of savings to consumers. See Section 8.4.2. The remaining portion of the overcharge by Valve, between 56% and 70%, reflects the actual harm to publishers.[1009] Below, I present a formula for computing the class members' damages as a result of the supracompetitive commission rate charged by Valve. Damages are equal to the following equation, where $i$ indicates publisher and $j$ indicates product sold:

$$Damages = \sum_{i,j} Overcharge_{i,j} \times (1 - Pass\text{-}Through\ Rate)$$

### 8.5.2.  Estimation of overcharge

(482) From January 28, 2017 through December 31, 2024, I estimate publishers on Steam generated ███████████ in app sales and ███████████ of in-app revenue globally.[1010] Assuming 2025 revenues are equal to those in 2024, I estimate an additional ███████████ and ███████████ in app sale and in-app revenues, respectively. At the varying individual commission rates determined using Valve's transaction data, I calculate that the overcharge

---

[1010]    See Attachment G-5.

As discussed above, I use December 2023 revenues to estimate December 2024 revenues.

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

associated with these sales total to ███████████ and ███████████, respectively.[1011]

### 8.5.3.  Estimation of damages

(483)  For all publishers who are either based in the U.S. or have any sales with U.S. customers, I estimate damages to be between $3.1 billion and $3.9 billion.[1012]  See Table 8 below.

**Table 8: Estimated Damages for All Relevant Publishers**

**and Named Plaintiffs (1/28/2017–11/30/2025)[1013]**

| Publisher | Pass-Through Rate | Estimated Damages (Package Sales) | Estimated Damages (In-App Sales) | Estimated Damages (Total) |
|---|---|---|---|---|
| US-based or Foreign with Any US Sales | 44.0% | ███████████ | ███████████ | ███████████ |
| | 30.5% | ███████████ | ███████████ | ███████████ |

### 8.5.4.  Damages are conservative and robust

(484)  The sales on which my damages calculation is based are sales actually made on Steam in the real-world.  To measure damages, I consider the difference in the amount developers would pay as commission on those sales in a but-for world.  In the but-for world, sales currently made on Steam will either stay on Steam or be made on an alternative platform.  By estimating damages using the price change on Steam multiplied by 1 minus the pass-through rate, I obtain the minimum damages caused by the PMFN to all developers (*i.e.*, I conclude that Steam's but-for commission rate is an upper bound on the commission rate publishers would pay in the but-for world).  This approach is favorable to Valve.

(485)  To explain in more detail, if a sale stays on Steam in the but-for world, the transaction fee paid by the publisher falls.  In this case, the damage to the publisher is the change in the transaction fee Steam charges times 1 minus the pass-through rate.  The change in the fee

---

[1011]    See Attachment G-5.

[1012]    See Attachment G-6.

[1013]    See Attachment G-6.

Note that results are rounded to the nearest dollar, and columns may not sum exactly.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

represents a cost reduction from which the publisher benefits, and multiplying by 1 minus the pass-through rate adjusts for any price drop implemented by publishers.

(486)   It may also happen that some publishers sell their games on other platforms besides Steam in the but-for world. In this scenario, it is likely that these publishers would pay even lower commission fees on other platforms than that charged by Valve on Steam. This is because it is likely in the but-for world that all of Valve's competitors would be lower-fee competitors. To understand why this is the case, note that the PCM shows that if there were high-cost competitors who wanted to charge high platform fees, Valve's existing PMFN Policy would encourage them to enter in the real-world.[1014] In particular, the PMFN allows platforms to maintain a higher price, higher fee equilibrium than a competitive market. This benefits platforms that want to charge high fees. Any potential entrants of this type would be less likely to enter the market in the but-for world than in the real world. Currently in the real world with the PMFN in place, all competing platforms have equal or lesser fees than Steam. This suggests that potential entrants who are encouraged to enter by the removal of the PMFN would charge lower platform fees than Valve.[1015] As a result, my calculation likely underestimates the damages to publishers that switch platforms, as these publishers would pay even lower fees in the but-for world on other platforms.

(487)   Further, my damages estimate is conservative because I only consider the direct benefit from the change in platform fees. Removing the PMFN will drive down platform fees and consumer prices.[1016] As a result of lower prices, more games overall will be sold.[1017] In addition to more games being sold, complementary goods sold by developers, e.g., in-game content, will increase in sales.[1018] The profit from these additional sales is realized in the but-for world; consequently, these profits could be added to damages that result from a commission rate overcharge. However, I do not account for potential sales increases in the computation of damages, making my estimate of damages conservative.

---

[1014]   See Section 7.2.3.

[1015]   See Section 7.2.3.

[1016]   See Section 7.2.

[1017]   Mankiw, N. Gregory (2018), *Principles of Economics*, 8th ed., Boston, MA: Cengage Learning, at 67. (See the law of demand.)

[1018]   Pindyck, Robert S. and Daniel L. Rubinfeld (2001), *Microeconomics*, 5th ed., Upper Saddle River, NJ: Prentice-Hall, Inc., at 22–23. ("Changes in the price of related goods also affect demand. . . . Goods are complements when an increase in the price of one leads to a decrease in the quantity demanded of the other. . . . [C]omputers and computer software are complementary goods. The price of computers has dropped dramatically over the past decade fueling an increase not only in purchases of computers but also purchases of software packages.")

---

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

(488)   Lastly, damages are significant for a wide range of but-for market shares. Figure 14 below shows the minimum damages (using the higher pass-through estimate), for a range of possible but-for shares. From the graph, it is clear that even at a but-for market share as high as ▇▇▇ damages exceed $1 billion. As such, my conclusion of significant damage to developers is not sensitive to but-for market shares.

**Figure 14: Damages as a Function of Steam's But-For Share[1019]**



[1019]   See: "14_Damages_market_share_sensitivity.R"