# EXHIBIT 4

# (Dkt No. 450.04)

# REDACTED

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
------------------------------------------X

IN RE VALVE ANTITRUST LITIGATION

Case No. 2:21-cv-00563-JNW
------------------------------------------X

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                    DATE: May 14, 2025
                    TIME: 9:01 a.m.




        VIDEOTAPED DEPOSITION of STEVEN
SCHWARTZ, pursuant to a Notice, held at the
offices of Quinn Emanuel Urquhart &
Sullivan, LLP, 295 5th Avenue, 9th Floor,
New York, New York 10016, before Nicole
Veltri, RPR, CRR, a Notary Public of the
State of New York.

Page 28

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO to Valve.

Q. Okay. And the first year in which Valve turned a cumulative profit on the Steam platform, you would agree is ▋▋▋?

A. I would agree that in ▋▋▋, the cumulative net profit turned positive. I would agree.

Q. And in every year before that, there's a parenthesis which means the cumulative total profit was negative?

A. Yes. I would agree with that.

Q. So on net before ▋▋▋, Valve was operating Steam at a loss?

MR. LeRAY: Object to the form.

A. I wouldn't agree with that characterization. When we use the term, or at least when I use the term "operating at a loss," it tends to refer to a specific time period, one given year, one given quarter. I would agree that cumulatively through ▋▋▋ net profits were negative. But the two years, ▋▋▋ ▋▋▋, were years in which Valve was operating the Steam

Page 29

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO platform profitably, so it's a slight difference in the characterization.

Q. Okay. I'll hand you another attachment now, and this is Attachment E1 to that same report.

MR. KILARU: And we'll mark this, I believe, as Exhibit 6.

(Whereupon, Attachment E1 to Supplemental Opening Merits Report was marked as Schwartz Exhibit 6 for identification as of this date.)

Q. Dr. Schwartz, this is Attachment E1 to your Supplemental Opening Merits Report, correct?

A. It appears to be, yes.

Q. And these are the numbers you used to collect to calculate Steam's market share in the market you've offered in this case from 2017 through 2023, correct?

A. Yes.

Q. And as we discussed a moment ago, for each company or each platform that's listed here, you're only including revenues from third-party sales?

Page 30

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A.      Correct.

Q.      So, for example, one of the platforms listed here is EGS, and that refers to the Epic Games Store, correct?

A.      Correct.

Q.      Epic makes a game called Fortnite that's very popular?

A.      Yes.

Q.      That game has never been on Steam, correct?

A.      Correct.

Q.      And no revenues from Fortnite would show up in the EGS row, correct?

A.      That would be correct.  That's my understanding.

Q.      Now, the list of platforms here, there appear to be, let's see, 13 platforms listed here.  Is that right?

A.      I didn't count.  I should have. I'm sorry.

Q.      No problem.

A.      Yes, 13.

Q.      Okay.  And those are the platforms who you view as -- well, let me

Page 31

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
ask a different question.

Those are all the platforms
that you've included in this attachment
that you used to calculate market shares,
correct?

A.    Yes.

Q.    Now, is it your view that
Humble Bundle is part of the relevant
market that you've defined in this case?

A.    It is not part of the relevant
market, but as I explained in the report,
for purposes of calculating the market
share, Humble Bundle is included in the
share calculations for purposes of being
conservative in the share, tends to reduce
Steam share, and basically to demonstrate
that whether the non-game play platforms
are included or not doesn't change the
conclusion.

Q.    I take it your answer is the
same for Green Man Gaming, which is what's
called a Steam key reseller?

A.    Yes.

Q.    And for GamersGate?

Page 32

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A.     Yes.

Q.     And when I say "key reseller," what I mean is that, make sure we agree, these platforms sell what are called Steam keys and keys for other platform but they don't allow for game play themselves, correct?

A.     Correct.  I've -- I think the term I used in the report, I refer to them as "resellers," but I also talk about them as non-game play platforms, or non-game play resellers.

Q.     So for purposes of today, if we're talking about key resellers or non-game play resellers, we're talking about this group of companies, is that fair?

A.     That's what I would understand, yes.

Q.     And a Steam key is essentially a code that you can redeem on Steam, correct, for a game?

A.     It's my understanding.

Q.     So you can buy a key, a Steam

Page 33

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

key, on say, Humble Bundle for, say, $50 for a game, and then you go and you put that code in on Steam and you can play the game on Steam, correct?

A.    Never having done it, I don't know if there are other steps involved, but my general understanding is the key gives you information that you need to provide to Steam to allow you to play the game. Whether it's just the one step that you described or there's more, I don't know.

Q.    As you said, you haven't tried to redeem a Steam key?

A.    I have not.

Q.    Okay.  And it's your understanding that once a Steam key is redeemed, a game player gets all the features on the Steam platform as if they had purchased the game directly from Steam?

A.    It's my understanding.

Q.    Okay.  Now, you would agree that there are other key resellers besides Humble Bundle, Green Man Gaming, and GamersGate, correct?

Page 34

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A.    Yes.

Q.    For example, there's a key reseller called Chrono, C-H-R-O-N-O, dot GG?

A.    I don't recall that name specifically, but I know that there are other resellers.

Q.    And you said earlier that you included Humble, Green Man, and GamersGate to be conservative, but you agree you didn't include revenues from any other key resellers in your market share calculation?

A.    I didn't include revenues for other resellers where I couldn't identify revenue and which were likely to be so small as not to materially change any of the results presented here.

Q.    You say likely to be small, but you would agree you didn't have any financial data from any other key resellers, correct?

MR. LeRAY:    Object to form.

A.    That's correct.

Q.    So you say that they are likely

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

to be so small as to not materially change any of the results presented, but you don't have financial data from any of those other key resellers?

MR. LeRAY:  Object to form.

A.    I don't have the data, but I also don't have any information in any of the trade material that I've seen, any of the internal documentation to suggest that there are other, large enough resellers of keys to have a material impact on my estimate of the total market size or of Steam share.

Q.    You don't have any information one way or another on that, correct?

MR. LeRAY:  Object to form.

A.    I would say the absence of discussion in the documents or trade press is information from which I can draw an inference that these other resellers are not meaningful players in the marketplace, meaning they're not large enough to get the kind of attention that, for example, a Humble Bundle would get.

Page 36

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

Q.    But you draw that inference without actual data from those resellers, correct?

MR. LeRAY:  Object to form.

A.    I draw the inference from the information available to me and, yes, I would agree that I didn't have financial information from those resellers.

Q.    Okay.  You include in this chart Target and Best Buy, correct?

A.    Yes.

Q.    And am I right to understand you're including digital sales of PC games on Target and Best Buys websites?

A.    Yes.

Q.    Okay.  You're aware that Wal-Mart also sells digital PC games on its website?

A.    I don't know if I knew that or not, but it would not surprise me.

Q.    Okay.  Amazon sells digital PC games on its website?

A.    Yes.

Q.    And you don't include any data

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
in your market share about sales of digital
PC games on either Wal-Mart or Amazon,
correct?

A.      Correct.

Q.      And as near as you can tell,
the things that Amazon and Wal-Mart sells
-- excuse me, the digital PC games that
Amazon and Wal-Mart sells, no material
difference in the transactions that are on
Target and Best Buy, correct?

A.      I have no way to know one way
or the other.

Q.      Well, any reason to doubt that
if you buy a digital PC game on Target,
that that's any different from buying the
same digital PC game on Amazon?

A.      Oh.  I think I misunderstood
your prior question, so repeat your prior
question.

Q.      Well, let me ask maybe the
better question.

A.      Okay.

Q.      Any reason to doubt that if you
buy a digital PC game on Target's website,

Page 38

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

that's any different from buying the same digital PC game on Amazon?

A.    Assuming you buy to play on the same platform, I would assume that the games are the same.

Q.    Okay.  There's three platforms listed here at the bottom; the EA app, Discord store and itch.io, correct?

A.    Yes.

Q.    And you would agree you had no financial data from any of those platforms on their third-party sales?

A.    So I'm looking at the notes on the second page.  And for Discord, the note says it only operated a third-party store from 2018 to 2019, and third-party sales are de minimis.  Same -- substitutely the same note for itch.io, and then there's a reference to a discussion in my Opening Merits Report.

Q.    Okay.  So let's talk about those two in material.

You would agree with me that you did not have any revenue data from

Page 39

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

Discord, correct?

A.      That is my understanding.

Q.      Same for itch.io?

A.      That is, again, my understanding.

Q.      And same for EA, which had a platform that's named Origin at times, correct?

A.      Again, that was my understanding.

Q.      Okay.  And you have listed them as N/A throughout this chart, correct?

A.      Yes.

Q.      But it is your understanding that EA sold third-party digital PC games on a platform during the class period, correct?

A.      A small amount, but my understanding is they remained in operation.

        MR. LeRAY:  I'll object to form.

Q.      Same question for Discord.  It's your understanding that they sold

Page 40

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
third-party digital PC games on a platform during the class period, correct?

MR. LeRAY:  I'll object to form.

A.    Yes.  2018 and 2019.

Q.    And the same question for itch.io, it's your understanding that they sold third-party digital PC games on a platform during the class period?

A.    Yes.

Q.    Do you have your Rebuttal Report in front of you?  I believe it's Exhibit 4.

A.    Yes.

Q.    And in that footnote, the second paragraph reads:  Of the --

A.    I'm sorry, where are we looking?

Q.    I'm sorry, Footnote 188.  I apologize.

A.    All right.

Q.    Okay.  And you see the second paragraph of the footnote reads:  Of the 51 platforms that Dr. Chiou claims I did not

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

consider, only two appear to be third-party

distribution platforms, Game Jolt and

Playism.

Do you see that?

A.    I do.

Q.    And by referring to Game Jolt

and Playism as third-party distribution

platforms, you would agree that would mean

those platforms are in the relevant market

you've defined, correct?

MR. LeRAY:  Object to form.

A.    If they were operating during

the period -- yes, they are -- as

third-party distribution platforms, yes.

Whether they have any sales information or

any sales during the class period, I don't

know.

Q.    Okay.  You say in, first:

Playism closed in March 2021 and has no

available third-party sales information.

Right?  That's the next

sentence in the footnote?

A.    Yes.

Q.    So you don't have revenue data

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

deck, Page 6 of the slide deck.  Are you

with me?

A.    Yes.

Q.    There are two pie charts on the

page, correct?

A.    There are.

Q.    And the left one is 2018.  The

right one is 2019, correct?

A.    Yes.

Q.    And the title is:  A closer

look at the market excluding Steam.

Correct?

A.    Yes.

Q.    And for 2018, it appears that

the platforms listed here are -- it's a

little hard to tell, but there's an entry

for ███ and that looks like ██ ██████,

correct?

A.    That's the way I would read it,

yes.

Q.    There's an entry for ████ ██,

which is ██ ██████?

A.    Yes.

Q.    There's an entry for

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

████████, which is ██ ████████, correct?

A.     Yes.

Q.     Okay.  And then for 2019, it says 2019E on the right pie chart, and it's fair to say that's probably 2019 estimated?

A.     That's the way I would interpret it.

Q.     Okay.  And it lists ████████ as having ████ ████████, correct?

A.     Yes.

Q.     ██ ████████ for ████████ ██?

A.     Yes.

Q.     And it's hard to say, but ███ percent of the total for ████████, correct?

A.     Yes.

Q.     Okay.  And those are the numbers that you use in your supplemental Attachment E7 for ████████, ███ -- excuse me, ████████, ████ ███ ████, and ████████, correct?

A.     That's correct.

Q.     Okay.  Now, in the Epic document that we're looking at, Exhibit 7,

Page 50

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

there is no citation for the ███ number of █ ██████, correct?

A.    Not on this page.  There may be something else within the document that says the source, but I would agree with me that on this page, there is no site.

Q.    Same thing for ██████ and ████ ██, correct, there's no citation?

A.    On this page, that is correct. There is no citation.

Q.    Okay, and Doctor, you can look through the whole document, but I'll represent to you there is no citation anywhere in this deck for the source of data for any of the three platforms we just discussed.

A.    I don't know that there is.  I can take a look if you like.

Q.    Sure.  Feel free to take a look.  My understanding is that there's no citation just for ██████ but we'll start there.

A.    I do not see a source.

Q.    Okay.  So turning back then to

Page 51

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

Attachment E1, which I believe was Exhibit 6?

A.    Yes.

Q.    Six, great.  You list revenues for Ubisoft Connect from 2017 through 2021. And as I think we've established, those numbers come from an Epic Games Store presentation, correct?

A.    That's correct.

Q.    And beyond that, you don't know how Epic game up with those numbers?

A.    I do not --

MR. LeRAY:  Form.

A.    -- know their data source or their methodology.

Q.    For Green Man Gaming between 2017 and 2021, you list revenues of 52 million each year, correct?

A.    Yes.

Q.    And those numbers come from the same Epic Games Store presentation, correct?

A.    That's correct.

Q.    And Epic Games Store

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

presentation had only a number for 2018 and an estimated number for 2019, correct?

A.    Correct.

Q.    Going back a little bit for Ubisoft, the same is true is Epic Games Store presentation only has numbers for 2018 and 2019, right?

A.    That's correct.

Q.    And the 2019, again, is an estimate?

A.    That is the way it was labeled.

Q.    Okay.  And beyond that, you don't know how Epic came up with its numbers for Green Man Gaming?

MR. LeRAY:  Object to form.

A.    I do not know their source or their methodology.

Q.    And then the last one I want to ask you about on here is GamersGate. Again, similarly, you list 8 million for 2018 and 7 -- roughly 7.5 million for 2019, correct?

A.    Yes.

Q.    And that comes from the Epic

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO document which had a 2018 number and a 2019 estimated number, correct?

A. Correct.

Q. And similar to the previous two, beyond the fact that it comes from the Epic store document, you don't know how they came up with their numbers, Epic came up with its numbers for GamersGate?

A. I do not know the source or their methodology. That is correct.

Q. Okay. Turning to Target, you see that in 2020, their sales appear to be, or their revenues appear to be $7,239,000 if I'm reading that right -- or, no, excuse me. I think I'm reading that wrong. I'll try again.

Their sales appear to be $7,239?

A. That's the way I would read it.

Q. Got it. And then it drops to 4,063 in 2021, correct?

A. Yes.

Q. And you would agree with me that for Target, your sales data ran out in

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
June of 2021, correct?

A.    I believe that is correct.  To be certain, I would have to look at Supplemental Attachment E4, but I believe that is correct.

Q.    Okay.  I'll represent to you that that's true, but it's not a huge number.

For 2023 for Best Buy, the number is ███████  See that?

A.    Yes.

Q.    And it was █████ for 2022?

A.    Yes.

Q.    Any reason to doubt that your data for Best Buy ran out in June of 2023?

A.    I don't have a recollection. We could tell by looking at Supplemental Attachment E5, but I would not be surprised that that was the month.

Q.    Okay.  And then last one, for Humble, I keep saying last one, but Humble Bundle used, record, it looks like roughly █ ████████ ████████ ███████ of revenue in 2022?

Page 82

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
is available for purchase on a number of
different PC digital stores, correct?

A.    It's my understanding.

Q.    Also available on the Xbox?

A.    That is also my understanding.

Q.    And the Xbox is Microsoft's
game console?

A.    Yes.

Q.    And Call of Duty is also
available for purchase on the Sony
PlayStation, which is Sony's console?

A.    That is my understanding.

Q.    And when a consumer is deciding
to purchase Call of Duty, if they have a
console and a PC, you would agree with me
that they'll probably make a choice as to
purchase it on one but not the other?

A.    I don't think that's
necessarily so.  I think there is some
evidence of people buying the same game on
different gaming media so that they have
the option of playing in different
circumstances, sitting around in the front
of the TV with your buddies as opposed to

Page 83

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
playing with a larger group of people on your PC.

So there is no evidence that uniquely there is a choice for those people or that they have to make a choice. They can -- and I think there's some evidence that they do by both.

Q. Let's break that down a little bit.

You've seen no evidence that consumers are likely to buy a PC game on multiple different PC platforms, correct?

A. Say that one again for me, please.

Q. Sure. You see no evidence that consumers are likely to buy a PC game on multiple different PC platforms, correct?

A. Just for clarity, you would be talking about Steam versus EGS?

Q. We can use that as an example.

A. Okay. I don't recall any evidence, as I sit here, to suggest that that happens in any meaningful way. I would not be surprised if it has happened

Page 84

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
and probably continues to happen, but there's no evidence that I'm aware of that it happens in a meaningful way.

Q.    Okay.  You're aware that, to take Call of Duty as an example, Call of Duty allows people who purchase --

A.    Can I go back just to clarify that last answer?

Q.    Sure.

A.    So long as the game remains available on multiple platforms.

Q.    Fair enough.  So if a game is available for, say, Steam and the Epic Games Store and the Microsoft PC game store, you see no evidence that there's a meaningful number of consumers who will buy that game on multiple of those platforms?

A.    I haven't seen anything to suggest that that happens in a meaningful way.

Q.    Okay.  Now, turning back to Call of Duty as an example, you're aware that Call of Duty allows people who purchase the game on console to play

Page 85

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
against people who purchase the game on PC, it's a concept called cross-play?

A.    My understanding is that that is something that is relatively recently available.

Q.    But it is available?

A.    It's my understanding.

Q.    Okay. Now, you said earlier, I believe, that you've seen evidence that there are consumers who purchase the same game on both PC and console?

A.    There is some evidence of that.

Q.    Okay. What is that evidence?

A.    I don't have a specific document in mind, but I have seen a couple of documents that talk about users who will purchase a game for play on consoles and PCs, basically because they want to preserve the option to play them under different circumstances.

Q.    Okay. Other than those couple of documents, is there any other evidence you have?

MR. LeRAY:  Object to form.

Page 86

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

You can look at your report if you want, Dr. Schwartz.

A.      Let's see if there's anything.

Q.      And Dr. Schwartz, just so we have it for the record, which report are you looking at?

A.      I'm looking at the Opening Merits Report, Exhibit 1.

Q.      Thank you.

A.      Now, there's no evidence cited in my report that speaks to that.

Q.      Okay.  Turning back to the game Call of Duty, just want to make sure I have the sort of organization right of the market.

It's your view that throughout the class period, which is 2017 through 2024, if a consumer purchased Call of Duty on Steam, let's use a specific version, a game called Call of Duty Black Ops 6.

If a consumer purchased that game on Steam, they would be making a purchase in the relevant market, correct?

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A.    Yes.

Q.    Same question for Epic.  If a consumer purchased that game on the Epic Games Store, they would be making a purchase in the relevant market, correct?

A.    Yes.

Q.    If a consumer made a purchase of that game on a website called Blizzard.net which is operated by Activision, they would not be making a purchase in the relevant market, correct?

A.    That's correct.

Q.    If a consumer purchased that game on the PlayStation, they would not be making a purchase in the relevant market?

A.    That's correct.

Q.    Same question for Xbox, if a consumer purchased that game on the Xbox, they would not be making a purchase in the relevant market?

A.    That's also correct.

Q.    Okay.  And so far we've talked about Steam, Epic, the PlayStation, and Xbox, no reason to think that game is any

Page 88

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
different on any of those platforms,
correct?

MR. LeRAY:  Object to form.

A.    I would answer you this way, so
far as I understand it, the basic game is
the same.  There may be differences in game
play associated with the particular
hardware requirements and capabilities of
consoles versus PCs.  As a non-gamer, I
can't tell you what those might be, but
that's my understanding.  But the
fundamental game would be the same.

Q.    Okay.

A.    As I understand it.  The only
difference could be if there are updates
that are made to a PC version, for example,
that wouldn't be made to a console version
until the new hardware comes out, something
of that sort.

Q.    Okay.  So as you said, the
fundamental game would be the same,
correct?

A.    Correct.

Q.    There may be some game play or

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO updates, you don't know; they're just specific to a platform, but you don't know?

MR. LeRAY:  Object to form.

Go ahead.

A.     The updates, I don't know.  I understand it's a possibility.  I -- there is information in the record about different functionality on consoles versus PCs and that that has implications on features of the game play.

Q.     Okay.  As we talked about a minute ago, you're aware that since 2019, gamers can play a PC version of Call of Duty against a console version of Call of Duty, correct?  Maybe ask a better question.

A gamer who is playing Call of Duty on PC can play against a gamer who is playing on console, correct?

A.     That is my understanding.

Q.     And have to imagine those gamers aren't going to be particularly happy if they're playing meaningfully different games, correct?

Page 90

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A.    Well, I think -- I don't know whether they would be -- how unhappy they would be, but I think my prior answer was that the games are fundamentally the same but there may be differences in elements of the game, player functionality that are unique to the particular pieces of hardware.

Q.    Sure.  But if a player is playing on PC against a player on console, and the console version is much faster or performs better, that is going to be a disadvantage for the PC player, correct?

A.    Never having played the game, I don't know for sure, but I would presume that if one console was faster than the other, that that would be something that would matter.

Q.    Okay.  Now, you're aware that Microsoft purchased Activision Blizzard on October 13th of 2023, correct?

A.    I don't remember the exact date, but I am aware of the acquisition.

Q.    I happen to know that one

Page 91

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
pretty well.

A.    I figured you might.

Q.    And after October 13th of 2023, I'll represent to you that's the day the transaction closed, Microsoft owned a Call of Duty.  Is that fair to say?

A.    I assume so.

Q.    Okay.  Now, under your definition of the relevant market, on October 12th, 2023, if a consumer purchased Call of Duty on Microsoft's game store, they would be making a purchase in the relevant market in this case, correct?

A.    Say that again.

Q.    Sure.  If a consumer purchased Call of Duty on Microsoft's game store for the PC on October 12th of 2023, they would be making a purchase in the relevant market in this case, correct?

A.    Assuming The Microsoft Store was selling a PC version -- well, are they selling a key?

Q.    Well, we'll make it simple.  Microsoft -- I want you to assume for sake

Page 92

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
of our discussion that Microsoft was
selling Call of Duty for play through the
Microsoft PC store on October 12th, 2023.

A.     Okay.

Q.     Any reason to doubt that that
was the case?

A.     I -- no reason to doubt it.  No
reason to agree with it.

Q.     Okay.

A.     But I'll accept it.

Q.     So if Microsoft was selling
Call of Duty for purchase on the PC store
on October 12th of 2023, that purchase
would be in your relevant market, correct?

A.     Assuming -- assuming that they
are selling the game to be played on their
platform and not selling a key, yes.

Q.     Okay.  So if Microsoft was
selling Call of Duty for play on its PC
platform, that purchase would be in your
relevant market on October 12th of 2023?

A.     Yes.

Q.     Okay.  If Microsoft was
selling -- and that is because on

Page 93

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
October 12th of 2023, Call of Duty would be a third-party game for Microsoft, correct?

A.    Correct.  And I'm assuming in answering this question that there had been no integration of the parties before that, and that on the 12th Activision was making its own decisions and Microsoft had no influence or role in those decisions, no review or anything of that sort.

Q.    Sure.  But for purposes of your analysis, you would count that sale as in your market on October 12th of 2023 if Activision was operating as a separate company?

A.    Right.  With that distinction. So long as -- so long as it was truly acting as a third party and wasn't being influenced or meaningfully controlled or constrained in any way by Microsoft, then I would agree with the proposition in your question.

Q.    Okay.  So that's a yes.  If Microsoft -- if Activision was operating as a separate company without control by

Page 94

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

Microsoft on October 12th of 2023, a sale of Call of Duty would be in your relevant antitrust market?

MR. LeRAY:   Object to form. Asked and answered.

A.      Yeah, I think that was what I said previously.

Q.      Okay.  And the transaction, the announcement that Microsoft was going to purchase Activision Blizzard, I'll represent to you that that occurred in January of 2022.  Any reason to doubt that?

A.      Sounds about right.

Q.      So in December of 2021, certainly a purchase of Call of Duty on The Microsoft Store, for play on the Microsoft platform, would be in your relevant antitrust market, correct?

A.      '21, so you're talking about prior to the announcement?

Q.      Exactly.

A.      I have no reason to think that it wouldn't be.

Q.      Okay.  Well, it's your market,

Page 95

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

so --

A.    Right.

Q.    It would be in your market, correct?

A.    Well, yes.  But here is the thing.  I don't know what communications there were between Microsoft and Activision.  If they announced the deal in January, I think it's probably likely they were talking in December.  I don't know whether decisions were being made by Activision in anticipation of the acquisition, so to the extent that Activision was acting truly independently without influence from Microsoft or the prospect of the deal and so it was truly acting as a third party, then the answer would be it's a third-party sale.

Q.    Okay.  So just to make sure we have it clear, setting aside the possibility that before Microsoft announced it was purchasing Activision it was secretly controlling Activision, you would agree with me that a sale of Call of Duty

Page 96

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

on Microsoft PC platform prior to January of 2022 would certainly be in your relevant market?

A.    So secretly control was your word.  I think I'm talking more about influence or reactions by Activision in order to make sure that the deal remains appealing.  But with that caveat, it would be a third-party sale.

Q.    Okay.  Now, on October 14th of 2023, Microsoft owned Activision Blizzard, correct?

A.    It's my understanding.

Q.    Okay.  So starting on October 14th of 2023, sales of Call of Duty are no longer in your relevant antitrust market?

MR. LeRAY:  Object to form.

A.    On the Microsoft PC store you're asking?

Q.    Yes, that's correct.  I'll ask the question again.

Starting on October 14th of 2023, sales of Call of Duty are no longer

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
in your relevant antitrust market.  Sales
of Call of Duty on the Microsoft PC
platform are no longer in your relevant
antitrust market, correct?

A.    At that point, the Microsoft PC
store would turn into a first-party
distributor for Activision games so
that's -- your premise is correct.

Q.    Doctor, are you aware of any
other market where a good goes from into
and out of the market in a one-day period?

MR. LeRAY:  Object to form.

A.    I can imagine a similar
situation in any market where, for example,
something like first- or third-party
control would be important where that would
occur.  I'm not recalling anything that I
studied where that's been precisely the
case, but I could certainly see an
analogous situation in another technology
market where the same thing could occur.

Q.    Okay.  As you said, you can't,
sitting here today, name another market
where first- or third-party control is

Page 98

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
relevant to market definition?

MR. LeRAY:  Object to form.
You've asked and answered.

A.    Well, that's a slightly different question.  So can you repeat that for me, please?

Q.    Sure.  Sitting here today, you can't name another market where -- I'm quoting you -- something like first- or third-party control would be important?

MR. LeRAY:  Object to form.

A.    There's nothing that I studied that comes to mind that would fit exactly into that box, but I would be surprised if that doesn't exist again in a similar type of technology-driven market.

Q.    Okay.  There's nothing that comes to your mind?

A.    I'll stick with the previous answer.

Q.    Okay.  Your -- you have that list of firms that we talked about in your Appendix E1.  I think it was Schwartz 6. That's your market share calculations in

Page 99

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

this case.  I apologize.  There's a lot of papers in front of you.  Right here (pointing), two more down.

A.    Bear with me for a second, please.  And you were asking about the market share exhibit --

Q.    Yes.  I just want to make sure I oriented you with the document.

A.    Okay.

Q.    You have a list of firms that you say are in the relevant antitrust market in this case, correct?

Let me ask a better question.

You have a list of firms that you include in the relevant antitrust market for purposes of your calculations in this case, correct?

A.    There are -- I have a list of firms that I include for purposes of the share calculation, not all of which are in the relevant market.

Q.    And if you take out the three key resellers on Exhibit 6, which is the market share calculations we've been

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
discussing, you agree that all the remaining firms are in your relevant antitrust market?

A.   Yes.  I would agree with that.

Q.   You're aware that this isn't the first case that's been litigated about video games, right, Dr. Schwartz?

A.   I'm aware that there has been other litigation.

Q.   Okay.  And sitting here today, you're not aware of any other expert who's defined a relevant antitrust market the same way you have?

A.   I'm not aware, one way or the other, of what market definitions have been advanced or the bases for the conclusions that other experts may have drawn.

Q.   Okay.  So you can't name one right here today?

MR. LeRAY:   Object to form. Asked and answered.

A.   I don't know what different experts have said or what analyses they've done.  So I'm not in a position to comment

Page 101

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
one way or the other.

Q.    Right.  But I think that's answering yes to my question, which is, you can't name an expert who has defined a market in the same way you have?

MR. LeRAY:  Object to form.  He did answer your question.

Q.    You can answer, Dr. Schwartz.

A.    I am not aware of what experts have done, so I can't say whether someone has or hasn't or come close or done something that's nuanced.  I just don't have -- I don't have information about what other experts have done.

Q.    Okay.  So if I ask you today name me a single expert who's defined a market the same way as you can, you can't do it?

MR. LeRAY:  Object to form.

A.    I would tell you I don't have enough information to be able to answer that question one way or the other.

Q.    Okay.  You would agree with me that there's not a single document in this

Page 102

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
case that includes all of the firms you've listed in Exhibit E, Exhibit E1, as in the relevant market?

A.   I'm not sure I understood the question.

Q.   Okay.  You've seen some -- we looked at one earlier, an Epic Games Store document, correct, and it included some of the entities that are listed on your Exhibit 6, correct?

A.   I do recall that, yes.

Q.   Didn't include all of them?

A.   I don't believe it did.

Q.   Okay.  So I'm asking you if you can identify an exhibit in this case that has the same list of competitors you have in the relevant market listed as competitors?

A.   There are surely documents that reference EGS, Ubisoft.  I don't recall specifically whether there are any that also would reference Origin, the EA store, or The Microsoft Store.  Certainly those are discussed in some documents, but

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO typically the documents that I recall would most specifically reference, if they're talking about third-party platforms, they would reference EGS and they would represent Ubisoft.

Q.    Okay.  So just to be clear, you can't think of a document that would list Steam, EGS, Target, Best Buy, GOG, Galaxy, Ubisoft Connect, The Microsoft Store, the EA app, the Discord store, and itch.io as competitors, correct?

MR. LeRAY:  Object to form. Asked and answered.

A.    If you're -- if you're asking for a single page of a document, there may be.  I don't know.  If you're asking are there documents that refer to these entities, certainly that is the case for all of the ones that you mentioned.  I don't recall specific mentions of Target or Best Buy, but there may well have been. But whether there's a single page, I don't know.  But there's certainly documents that talk about all of these.

Page 104

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

Q.    Well, let me ask, I think you answered a slightly different question than the one I asked.

Are you aware of a single document that lists all of the firms we just discussed as competitors to each other?

MR. LeRAY:  Object to form.

A.    I'm certainly aware of documents that talk about EGS and Ubisoft together.  There may be other documents that talk about Origin or Discord or itch.io in the same way, but the documents tend to be focused on the most important competitors and that would certainly be for Steam, EGS and Ubisoft.  And for EGS, it would be the same group.

Q.    Okay.  You listed Steam, EGS, Target, Best Buy, GOG, Ubisoft Connect, The Microsoft Store, EA, Discord, and itch.io as in your relevant antitrust market in this case, correct?

A.    Correct.

Q.    So the question I would like to

Page 105

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

get an answer to is, you're not aware of a document that lists all of the companies I just named as competitors to each other?

MR. LeRAY:  Objection.  This question has been asked ten times.

MR. KILARU:  Hasn't been answered.

Q.    You can go ahead, Dr. Schwartz.

A.    Well, I think I have answered it.  I'm not sure how to answer it any better.  I think the last answer I gave answered it.  I'm just -- I'm not sure what else I can tell you that would make the answer more complete.

Q.    Okay.  Is there a document that lists all ten of those competitors?

A.    You've asked me that -- I've given you the best answer, I can.

MR. LeRAY:  Objection.

Q.    You're aware that there's a dataset called Nuzu?

A.    I'm aware of Nuzu.

Q.    And it's -- you're aware that it's used by individuals working in the

Page 106

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
video game industry?

A.   That's my understanding.

Q.   And you're aware that courts have cited the Nuzu data as a reliable data source?

A.   I'm aware of it indirectly. I've heard people say that. I'm not aware specifically of a court that's done that.

Q.   And when Nuzu is reporting on PC game sales, you agree it does not split out first-party games from third-party games?

A.   I would agree it does not make that distinction.

Q.   Okay. There's another web dataset called IDC. You're aware of that?

A.   Yes.

Q.   That IDC data also does not make the distinction between first-party and third-party games in the PC -- as to PC?

A.   My understanding of IDC is it's a collection of data about game sales, but not along the lines of any relevant

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
antitrust market, so I would be surprised
if it actually did it that way.  But my
understanding is that it's just a listing
of sales.

Q.     Sure.  So it doesn't make a
distinction, a categorical distinction
between first- and third-party games?

A.     It does not in the data that
I've seen.

Q.     And there's another data set
called Circana that also categorizes
transactions in the PC game industry?

A.     I am aware of it.

Q.     And you're not aware of it
making a categorical distinction between
first- and third-party games?

A.     To the best of my recollection,
it does not.  But that's to the best of my
recollection.

Q.     Okay.

MR. KILARU:  Can we get Tab 35,
please.

(Whereupon, Humble Slide Deck
was marked as Schwartz Exhibit 17 for

Page 164

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A.   I like to do lots of things but I certainly won't play lawyer.  If you're asking me do I -- do I think that that is evidence the jury can look at and conclude that there is a PMFN that's enforced, I think they can.  And I think I hope and believe I'll be able to persuade them of that.

Q.   But that would be -- I guess I'm asking you -- I'm not asking you to opine for the judge.  I'm asking you to opine for yourself as a economist.  Would you tell the jury the way you can tell there's a PMFN on price is that the minimum prices on a quarterly basis are the same between Steam and another platform if not closer?

MR. LeRAY:  Object to form.

A.   What I would tell -- what I would say is that it is one piece of evidence that convinces me that there is an effective PMFN in place here.

Q.   Okay.  Let's look at your -- I think it's your Opening Report, and start

Page 165

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
with just the index and I can give you the
underlying documents if you need them, but
I want to make sure we get to the bottom of
this.

So in your Opening Report which
I believe is Exhibit 1, and let's just look
at the table of contents a minute.

A.    Give me a moment to get that.
I'm sorry, you're looking where?

Q.    In the table of contents, you
have a series of attachments and so I'm
looking at Page Roman VII.  Are you with
me?

A.    Yup.

Q.    So you have an Attachment H1
that you list that's titled:  Produced
documents consistent with Plaintiff's
allegations of Valve's alleged PMFN.

Do you see that?

A.    I do.

Q.    And that's a catalog or a list
of a bunch of different emails from the
record, correct?

A.    It's a variety of documents.  I

Page 166

S.  SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

know it includes emails.  It may include more than just emails.  I don't recall specifically without looking at it.

Q.    And is that a comprehensive list of the emails you've seen and documents that you've seen in this case that you believe are consistent with price parody or with a PMFN, I should say?

A.    I think the term I would use is "representative."  I don't want to sit here and say under oath that it is everything, but it is certainly a representative set.

Q.    Okay.  And if there were any other emails that you considered that were consistent with a PMFN being in place, they would be on those Materials Considered List that we looked at, correct?

A.    That would be my expectation.

Q.    Okay.  You then look at, and this is Sections J through N of your report, a series of what you might call pricing studies of individual games.

Is that fair to say?

A.    You can call it that.

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

Q.   What would you call those appendices?

A.   I would call them presentations of pricing with respect to particular games.  I mean, I just never thought of them as pricing studies, so --

Q.   Okay.

A.   We can call them that if you'd like.

Q.   No.  I want to call them what you want to call them.  You said you looked at them as presentations of pricing with respect to particular games.

Is that what you said?

A.   Yes.

Q.   And is it your view that these presentations in pricing show that a PMFN was enforced as to these particular games?

A.   Yes.

Q.   Okay.  And we can count, but I'll represent to you that there's about 49, either 49 or 50 of these presentations that you have here.  Does that sound about right?

S.  SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A.    I've never counted, but let's see.  That's pretty close.  I count 49.

Q.    Okay, great, 49.

And you didn't do additional pricing -- you didn't do pricing presentations as to any additional games in your later reports, correct?  I understand you may have looked at some of these games in more detail, but you didn't look at additional games to do pricing studies, correct?

A.    I don't recall that we did.

Q.    And there are, you would agree, over a hundred thousand games on Steam today, correct?

A.    It's a large number.

Q.    You're aware there's about 32,000-plus class members of developers in this case?

A.    Yes.

Q.    And I'll represent to you that you have 19 different developers on this list here.  Does that sound about right?

A.    I don't know that I've looked

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
at that, but it wouldn't surprise me.

Q.    Well, let's see.  You have Microsoft in Section J.  That's one, right?

A.    Okay.

Q.    Is that right?

A.    Microsoft is Section J.

Q.    Then you have Ubisoft in Section K.  So that would be two, correct?

A.    These are platforms, not --

Q.    Sure.

A.    Okay.  Yeah.

Q.    You have EA in Section L, correct?

A.    Right.

Q.    And by the way, you said these are platforms.  When you're talking about games in Sections J, K, and L, you're talking about games that that company distributed on their platform, correct?

A.    These are games that were sold on that platform.

Q.    Let me ask you a slightly different version which is, all of the games that are listed in your Microsoft

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

section are produced by Microsoft, correct?

    A.    I know that some of them are. I don't know if all of them are.

    Q.    Okay. Same question for Ubisoft. All of those games are Ubisoft games, correct?

    A.    Again, I know that some of them are. I don't know that all of them are.

    Q.    Okay. EA is the third entity listed and that's in Section L, correct?

    A.    Correct.

    Q.    Then you have GOG in Section M, correct?

    A.    Correct.

    Q.    So that would be four going up to Section M, correct?

    A.    Correct.

    Q.    And then you have 16 small -- well, you have 16 entries in Section N. So if we assume those are all individual publishers, that would be 16 more, correct?

    A.    Correct.

    Q.    So that would be about 20?

    A.    Correct. Assuming that all of

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

the -- as I'm sitting here, I can't say with certainty that all of the games under Ubisoft are all Ubisoft-published games, but if they are, your count would be right.

Q.    Okay.  And maybe not to give you a specific number, but with 32,000 class members, there have to have been at least a hundred thousand games on Steam during the class period, correct?

A.    That number doesn't surprise me.  I think there's a precise number somewhere in the report.  I just don't remember what it is.

Q.    Okay.  Is it your view that Valve requires price parody for every publisher on its platform?

A.    Read that back, please.

Q.    Is it your view that Valve requires price parody for every publisher on the platform?

A.    My view is that when they communicate the requirements, they don't provide exceptions but that they don't enforce against everybody.

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

Q.    So you anticipated both my question and my next question.

So it's not your view that Valve enforces price parody as to every publisher on the platform, correct?

A.    Correct.

Q.    And as we talked about, you have these 49 games pricing studies that you believe are represented -- I shouldn't say "pricing studies" -- pricing presentations that you believe are representative of this type of enforcement, correct?

A.    I think that's the right way to describe it.

Q.    Okay.  And in your latest report, in the Rebuttal Report, in Paragraph 157, I'll give you a minute to get there.

A.    Am I going to need this back or can I put it away?

Q.    I don't think you'll need the Opening Report at this moment.  Let's start at 153 on Page 83.

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A.    All right.

Q.    And you say at the end of that paragraph:  Comparing discounts on and off Steam on a quarterly basis is a more informative and robust way to compare prices at which consumers are more likely to purchase games over time.

Do you see that?

A.    I do.  Can I read the whole paragraph?

Q.    Of course.

A.    Okay (perusing).  All right.

Q.    And then looking at Paragraph 157, just on the next -- or I guess two more pages.  You say at the end of the paragraph, and of course take time to read the whole paragraph if you like:  An examination of prices across platforms on a quarterly basis better aligns with how Valve communicates and enforces its PMFN policy.

Do you see that?

A.    I do.  Let me just take a quick look at the whole paragraph.

Page 179

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

Q.    Now, you said that you don't need to conclude that every developer is aware of the existence of a PMFN.  And is that because, as I believe you said in your report, it's your view that it's sufficient for Valve to enforce the PMFN against some of the top publishers for the policy to work?

A.    Yes.

Q.    Okay.

A.    That is, in sum and substance, what I say.

Q.    And why is that sufficient?

A.    I know it's in my Opening Report.  May have repeated it in my Rebuttal Report, but one of the points that I make is that the reason for, or an important reason, I don't want to say it's the only reason for the PMFN is to make it more difficult for competing platforms to become large enough to build substantial enough that work effects to be meaningful competitors that threaten Steam, the Steam platform dominance.  And to do that, you

Page 180

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

need to be sure that the parody requirements that are part and parcel of the PMFN are applied to the games that are most likely to be competitively significant which are most likely to come from the largest publishers.

And for an individual publisher who perhaps publishes only a small number of games with an amount of sales that may be consequential to the publisher but are not so consequential to Steam, compliance with the PMFN would be wonderful, but it's not essential for the policy to have the success and the effect that Valve wants it to have.

Q. So I take it you don't undertake to show that there is widespread enforcement of the PMFN outside of, quote, the largest publishers?

A. I'm not sure I understand that.

Q. You're not trying to show -- well, you say that Valve enforces its -- needs to enforce its PMFN against, quote, the largest publishers for the policy to

Page 181

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
work.  Is that right?

A.    The largest publishers selling the most competitively significant games.

Q.    Got it.  And outside of that set, and we'll talk about who that set is, you don't have an opinion as to whether Valve enforces the PMFN against anyone?

MR. LeRAY:  Object to form.

A.    There's anecdotal evidence in some of the documents that the PMFN is enforced against other publishers other than the few largest when it becomes something that Steam knows about or when one of those publishers asks a question of Steam about what they can do, and they certainly communicate their policy.

I have not reached a conclusion that that is done systematically across large swaths of the rest of the developers, but it does happen.

Q.    So as we talked about, and we'll come back to the large publishers. But as we talked about earlier, there's over 32,000 class members.  Would it

Page 182

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

surprise you that you don't have a pricing presentation or an email for at least 30,000 of those?

A.    Would it surprise me?  No, not particularly.

Q.    Even for 31,000?

A.    No.

Q.    Now, when you say large publishers, what's the set that you're looking at?

A.    I think the set is defined by Valve and the publishers that they tend to target.  In some of the examples in the emails, it's publishers like a Microsoft. If I can look at exhibit -- that Exhibit H, I have the other names on there.

Q.    Sure.

A.    But I don't recall them specifically.

MR. KILARU:  21, I believe.

(Whereupon, Attachment H1 to Opening Report was marked as Schwartz Exhibit 21 for identification as of this date.)

Page 292

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
outliers; but there is an argument to be made for the mean and I would explain that.

I think the jury would hear my view as to what I think is the better choice, but I would present the merits of both and ultimately the jury will have two options to choose from, both options grounded in a consistent methodology and the facts of the case.

Q.    So just to then follow up on that, which is the better choice?

A.    In my view, the median.

Q.    Median, okay.  Got it.

Stepping back from pass through, you have only one estimate of the but-for world revenue share, correct?

A.    Yes.  Okay.  I'm sorry.

Q.    I know, I may have trapped you in the question so let me make sure I don't.  That's not my intent.

If you look at Page 13 of your Supplemental Report, there it is. Paragraph 24, you say:  Using the updated Lerner index discussed above, the updated

Page 293

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

but-for effective commission rate is

17.05 percent.

Correct?

A.    Correct.

Q.    And you're not offering any

number besides that?

A.    No.

Q.    And that 17.05 percent is based

just relative to market shares, I know

there are other inputs, but just relative

to market shares, it's based on

███ percent for Steam in the but-for world

and ███ percent in the real world,

correct?

A.    It's based on all the market

parameters that we've talked about and

working through Landes and Posner, the

Lerner index, the Lerner model.

Q.    So you're not offering any

damages number at a market share, a but-for

market share other than 31.1 percent?

A.    Correct.

Q.    And you're not offering any

damages number at a real world market share

Page 294

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

other than ███ percent, I believe it is?

A.    I think that's the number and no, I am not.

Q.    Discussing pass through, you, in the class certification -- the sample you looked at to estimate pass through were -- was gains that crossed the 10 percent or excuse me, the $50 million revenue tier on Steam, correct?

A.    No.

Q.    Which was it?

A.    The $10 million.

Q.    The 10 million?

A.    Yes.

Q.    Got it.  So games across the $10 million revenue tier?

A.    Correct.

Q.    So that would be games subject to, that started to be eligible for a 25 percent revenue share on incremental sales?

A.    Correct.

Q.    Got it.  And at the class cert stage, there were, I believe, ███ games in

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
that sample?

A.    Something like that.  That was the ballpark.

Q.    And I believe, though this predates me, that you had a pass-through range of 20 to 25 percent using the same methodology at that stage?

A.    Sounds about right.

Q.    So now that we're at the merit stage, there's more data about games that have crossed that threshold, right?

A.    Correct.

Q.    And now you have, I believe, ███ games in the sample?

A.    That sounds about right.  It's about a 50 percent increase over what we had at the class cert stage.

Q.    And just to make sure we have it, Paragraph 458 of your Opening Report -- 459, excuse me.

A.    Yes.

Q.    You say there are ███ base game packages that meet the above criteria and that's the set that we're talking about,

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

You did not calculate any measure of statistical significance for the pass-through rate, correct?

MR. LeRAY:  Object to form.

A.    There would be no measure of statistical significance to be calculated.

Q.    You could calculate a confidence interval for the pass-through rate, correct?

A.    You could, but that's not a measure of statistical significance.  So I'm not -- I could do it.  I'm not sure why I would, but that still isn't a measure of statistical significance.

Q.    You could calculate a confidence interval, correct?

MR. LeRAY:  Object to form.

A.    Mathematically I could.  And again, I don't know why I would.  And again, to emphasize, that's not a measure of statistical significance.

Q.    Turning to Page 382 or Paragraph, excuse me, 382 of your Rebuttal Report.

Page 318

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

A.    All right.  I'm with you.

Q.    Okay.  You start this paragraph by saying:  Dr. Langer specifically identifies COVID-19, game age and inflation as potential factors that could influence prices of games during the sample time period.

Correct?

A.    That's what it says.

Q.    And you agree that those are factors that could be alternative explanations for price moves in your data sample, correct, for pass through?

A.    I would agree that these could be factors that influence pricing, not just during the sample period, but outside of the sample period.

Q.    Understood.  But looking at, for example, a game in the sample period, it's possible that a game's price could have gone down because of age as opposed to because of the revenue share drop, correct?

MR. LeRAY:  Object to form.

A.    As a possibility, you can't

Page 319

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
rule out the possibility that game age would be a factor that could affect the price.

Q.   Same for COVID-19 and inflation, correct?

MR. LeRAY:   Object to form.

A.   Again, as a theoretical matter, it's possible.  But there's no evidence.

Q.   Okay.  I would like to turn you to what may -- never trust a lawyer when they say may, your last exhibit for the day and that's 86.  No, it's not 86.  34.  And this is Schwartz 28.

(Whereupon, Presentation to American Bar Association was marked as Schwartz Exhibit 28 for identification as of this date.)

Q.   And, Dr. Schwartz, the exhibit I just handed you is a presentation that you gave to the American Bar Association, American Bar Association, I believe, maybe this will help.  If you look at the third page, it says:  Steven, what can you prove with statistical evidence, and it has, it

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
says Steven Schwartz Ph.D., and that's you, correct?

     A.    That's me.  I recall generally the presentation.  I don't recall where I gave it.

     Q.    Got it.  But you do recall the presentation, correct?

     A.    In a general way, yes.

     Q.    And any reason -- is this something you recall presenting before?

     A.    Again, I have a general recollection of presenting it.  I don't remember where.

     Q.    Okay.  We found it, the cover page that says it was presented by the American Bar Association and ABACLE. Sounds like you don't remember that?

     A.    I don't.  My recollection, as best as I can recall, is that it was presented to a law firm and it may as a -- as part of their CLE program, I don't remember doing this at a CLE -- at an ABA event, but it's possible.

     Q.    Okay.

Page 343

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO

don't know -- what's unclear is, are they including, for example, online casinos, things of that sort. So I see the number. I just don't have any way to evaluate whether it's in line or not in line because I don't know what they include.

Q. Just looking at overall PC games revenues, so setting aside things like online casinos, have you looked at numbers for the overall size of the PC games market?

MR. LeRAY: Object to form.

Q. Or PC gaming revenues, I should say?

A. I've seen disaggregated numbers, seeing some data on publishers, but I don't know that I've seen an aggregate number and I don't -- I wouldn't -- wouldn't claim that what I've seen is comprehensive, and I don't remember the numbers in any event.

Q. Okay. You can put that document down.

Shifting gears. Do you know

Page 344

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
who Aaron Greenberg is?

A.      If I may --

Q.      If you're going to look at the
Materials Considered List, that's where I
was going to go.  I think those are
somewhere in the bottom of the pile.

A.      Yes.

Q.      Let me ask the question a
little differently just to make things a
little easier on you.

You would agree with me that
you don't list the deposition of Aaron
Greenberg on any of your Materials
Considered Lists?

A.      I do not.

Q.      Okay.  In doing your damages
model in this case, you would agree that
you take the -- the damages model itself
takes the existence of a PMFN as a given,
correct?

A.      It assumes liability.

Q.      We talked a little bit earlier
about self-publishing tools, and I guess
what I want to ask you is this.  You're

Page 345

S. SCHWARTZ - HIGHLY CONFIDENTIAL - AEO
aware that when a developer sells a game on a platform like Steam, it has to pay a revenue share to Steam of course, that we've talked about. But you agree that if they use a publisher, they also have to pay a revenue share to the publisher, correct?

A.   Are you talking about a situation where the game developer and the publisher are not the same --

Q.   Yes.

A.   -- party?

Q.   Yes, thank you.

A.   There is an arrangement, financial arrangement between the developer and the party, however it is structured, whether a revenue share or something else.

MR. KILARU:  I'm going to give you what is actually the last document for today.  And this is Schwartz 30.

(Whereupon, Humble Bundle document was marked as Schwartz Exhibit 30 for identification as of this date.)

Page 374

C E R T I F I C A T E

STATE OF NEW YORK          )

                          :   SS.:

COUNTY OF SUFFOLK          )

        I, NICOLE VELTRI, RPR, CRR, a Notary Public for and within the State of New York, do hereby certify:

        That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

        I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of May 2025.

_____
            NICOLE VELTRI, RPR, CRR