# EXHIBIT 1

# (Dkt No. 452.01)

# REDACTED

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

------------------------------------x

In Re VALVE ANTITRUST LITIGATION

Case No. 2:21-cv-00563-JNW

------------------------------------x

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Video-Recorded
DEPOSITION OF JOOST RIETVELD
New York, New York
Friday, May 16, 2025

Reported by:

Frank J. Bas, RPR, CRR

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    I also wrote two reports for the -- the class cert stage that I would consider part of the report.  I think the opinions are included and restated in the opening reports.

Q.    Fair enough.  And I saw references in your opening reports that you were incorporating by reference the work you had done at the class cert stage, correct?

A.    That's correct.

Q.    And with that incorporation, do the reports you have in front of you contain all of the opinions you intend to offer to the jury at trial?

MR. KAPOOR:  The same objection.

A.    Well, I'll continue to learn about the case, and so I might have additional insights as we move through --

Q.    Okay.

A.    -- the process.

Q.    Sitting here today, though, to the best of your knowledge do the reports that are sitting in front of you, with the incorporation of your class cert reports, contain the opinions that you intend to offer

Page 11

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

to the jury at trial?

A. Yes.

Q. Okay. Now, within those reports you included a list of materials relied upon, is that correct?

A. That's correct.

Q. Okay. And are all of the materials that you are relying on for your opinions, at least sitting here today, referenced in those reports?

A. I believe so.

Q. In other words, there isn't any evidence that you intend to rely upon for your opinions that isn't listed somewhere in those reports, is that correct?

MR. KAPOOR: Objection to form.

A. The materials that I've relied upon are referenced throughout my reports.

Q. Okay. I guess my question is, is there any evidence or materials that you're relying upon for your opinions, sitting here today, that are not listed in the reports in front of you?

A. As far as evidence in -- in this

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

particular case goes, no.

Q.    All right.    I want to take a moment and ask you some questions about your CV.

And so I'm wondering if in Exhibit 1, which is your merits report, if you could turn to Appendix A, which is I believe a current copy of your CV.

A.    I will note that the CV has been updated as I've issued these reports.

Q.    Okay.

A.    So the most recent version will be in the -- in the reply report.

Q.    Okay.    I'm happy to use that one. Would you prefer to do that?

A.    Let's do that.

Q.    Okay.    Sounds good.    All right. And so I had just had a few questions about this.

So you are currently at the University of College of London, is that correct?

MR. KAPOOR:    Objection to form.

A.    That's correct.

Q.    And you're an associate professor

Page 13

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
there, is that right?

A.    I'm an associate professor at UCL, that's right.

Q.    You were promoted to associate professor in 2022, is that correct?

A.    Yes, that's correct.

Q.    And you are associate professor within the School of Strategic Management, is that right?

A.    Not quite.  I am an associate professor in the School of Management.  We are technically a department within a faculty. Within the School of Management, we have groups, and I'm -- I'm in the strategy entrepreneurship group.

Q.    Okay.  So there is a School of Management, is that correct?

A.    Yes.

Q.    And you're part of that School of Management?

A.    Yes.

Q.    And then you're part of that smaller subgroup that you just described to me?

Page 26

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    That's right.

Q.    All right.  What kind of information or consulting did you do for them?

A.    This is a long time ago.  If I recall correctly, they -- they wanted to develop a, quote-unquote, "advergaming" proposition.  So they wanted to develop video games with the purpose of promoting or advertising a brand.

So they would work with a brand, and they would develop a game in which the brand's product feature, something to that extent.  And I helped them develop that proposition.

Q.    And did that idea ever come to fruition?

A.    I think so.

Q.    Okay.  Was it when you were involved or consulting with them?

A.    I just worked on developing that proposition for them.  So I -- I would expect that they would have taken that proposition to brands after my work with them was done.

Q.    Do you know if they ever published

Page 27

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

any video games?

        A.    Yes.

        Q.    Which ones?

        A.    I don't -- I don't recall.

        Q.    Were they -- the types of video games you just described, were the purposes to advertise for a product?

        A.    I recall that sometime after my work with them they had a fairly successful series of games around movies.  And so these games were intended to promote the movie.  I think live-action movies.  But that's -- that's as far as I can recall.

        Q.    Were those games, to the best of your knowledge, published on PC, console and/or mobile, or do you know?

        A.    I do not know where they were published.

        Q.    Did you provide Sticky Studios with any particular advice about the pricing of video games?

        A.    No.

        Q.    Did you provide them with any advice about things like how to moderate

Page 28

J. Rietveld - HIGHLY CONFIDENTIAL - AEO content on their video games?

A.    No.

Q.    Did you provide them with any advice about how to deal with customer service once they launched their video games?

A.    No.

Q.    Or advice on which platforms to publish their video games if they eventually chose to do so?

A.    No.

Q.    Why did you stop -- so you worked as a strategy guide from 2010 to 2013; that was while you were getting your Ph.D.?

A.    That's right.

Q.    What percentage of your time did you spend consulting video games during this period of time?

A.    I don't remember.  And it would be -- the time would be clustered.  If there was a project, I would spend more work on it, and otherwise would devote my time to my research.

Q.    Was most of your time from 2010 to 2013 focused on getting your Ph.D.?

Page 29

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    Yes.

Q.    And why did you stop consulting with the video game industry at that time?

A.    I think I thought it would be good if I would devote myself fully to my Ph.D. research.

Q.    And since that time have you done any consulting with companies in the video game industry?

A.    In 2023 I've worked with Microsoft.

Q.    Okay.  And I'm familiar with that work.  Besides that, is there any other consultations you've done directly with any company in the video game industry since 2011?

A.    To my -- as far as I can recall, no paid work since.

Q.    Okay.  If you think of anything else today, please let me know.

A.    Yeah.

Q.    I know that you taught a course at NYU in 2015, is that correct?

A.    That's correct.

Q.    And was that on the video game industry; that was the topic of the course?

Page 32

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
platform competition, is that correct?

A.    That is correct.

Q.    All right.  What percentage of that research on platform competition has been focused on the video game industry in particular, if you're able to quantify that?

A.    I would not be able to quantify that.  But I can do a quick count of papers?

Q.    Sure, if that's helpful.

(Pause.)

A.    Eight out of twelve published papers used data from the video game industry.

Q.    Okay.  Some are focused on industries outside the video game industry, is that correct?

A.    That is correct.  And there are some that combine datasets from different industries, sometimes including video games.

Q.    Okay.  Understood.

And so do you consider yourself to be an expert in the area of platform competition?

A.    I think it's best left to others to make that assessment.

Page 33

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    Okay.  Well, when you talk about the things that you have expertise in to your colleagues or to your students, what kinds of things do you tell them?

A.    To my colleagues I would, when I discuss research, it would often be about platforms.

Q.    Okay.  Do you consider yourself to be an expert in the video game industry?

A.    Sure.

Q.    Based on the experience that we've discussed today?

A.    Yeah.

Q.    Do you consider yourself to be an expert in the area of strategic management?

MR. KAPOOR:  I would just note an objection to the form of the question, and as well the previous two questions.  The previous question.  Not the previous two.

A.    I'm a professor in strategic management.  I would think of my expertise as being in platform competition and video games.

Q.    Okay.  Do you consider yourself to

Page 34

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
have expertise in any other areas that we haven't discussed today?

A.    Professional expertise?

Q.    Yes.

A.    I'll stick with platforms and video games.

Q.    Okay.  I saw in one of your papers that you published that you wrote that, quote, "Research on platform competition has its bedrock in economics," end quote.

Does that statement sound familiar to you?

A.    Yes.

Q.    Okay.  Do you agree with that statement, sitting here today?

A.    Yes.

Q.    Do you agree that economics has remained foundational in the area of platform competition?

A.    Economics is foundational for the development of the platform-competition academic literature.  In the last twenty years or so, many of the more impactful contributions have been made outside of

Page 35

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

economics.

Q.    But even when these impactful contributions outside of economics have been made, you would agree that that work in economics is foundational to the research that built on it?

MR. KAPOOR:  Objection to form.

A.    Many of the academic papers on platform competition that come out these days will reference work in economics.

Q.    Okay.  And you are not an economist, correct?

A.    That is correct.

Q.    You do not have a Ph.D. in economics, is that correct?

A.    That is correct.

Q.    Does the University of College of London have an economics department?

A.    It does.

Q.    Okay.  And you are not a member of that department?

A.    No.

Q.    You have not any -- you have not taught any courses in the field of economics,

Page 36

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
is that correct?

MR. KAPOOR:  Objection to form.

A.    That is not entirely correct.

Q.    Okay.

A.    I taught an introductory course in microeconomics at the London School of Management.

Q.    Okay.  And when was that?

A.    Between 2015 and 2017.

Q.    Aside from that, have you taught -- and that was for students within the School of Management, is that correct?

A.    That is correct.

Q.    Aside from that, have you taught any other courses in the field of economics specifically?

A.    No.

Q.    All right.  Have you ever served as a chair or a co-chair of an economics department at a university?

A.    No.

Q.    Have you ever served as an editor for a journal in the field of economics?

A.    I have never served as an editor

Page 37

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
for an academic journal, but I am on the
editorial board for a number of journals,
including ones that publish economics
research.

Q.    Okay.  And what is the name of that
editorial board?

A.    So I'm on the editorial board for
Strategy Science and some other journals.
Strategy Science publishes economics research.

Q.    Okay.  So you are on a board in
which some of the -- that publishes in some
journals that relate to economics, is that
correct?

A.    The board is specific to the
journal.

Q.    Okay.  Have you ever served as a
peer reviewer for papers that are going to be
published in journals relating specifically to
economics?

MR. KAPOOR:    Objection to form.

A.    I will give you the same answer
that I gave before.  I've been a reviewer for
many journals, including ones that publish
economics research.

Page 38

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    Can you give me some examples of those?

A.    Management Science would be one.

Q.    Okay.  Any other examples?

A.    Industrial and corporate change.

Q.    Can you think of anything else?

A.    Information systems research.

Q.    Any others?

A.    I think of the ones that I've reviewed for, those are the more "economicsy" journals.

Q.    Okay.  Is that a word?

A.    It is now.

Q.    Okay.  Turning to your compensation in this case, is your hourly rate still $850 per hour?

A.    Yes.

Q.    Do you have a different rate for deposition or trial?

A.    Not for deposition.  I have not negotiated a rate for trial.

Q.    Do you know how many hours you have spent working on this case in total, approximately?

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    Approximately 670 hours.

Q.    Okay.

A.    Of which, about 350 during this class cert.

Q.    So 350 hours in the class cert stage, is that right?

A.    That is right.

Q.    And about 320 in the merits stage?

A.    More or less.

Q.    Okay.  I understand those numbers are approximate.

I understand that you worked with a team called Global Business Experts to help you in this case, is that correct?

A.    That is correct.

Q.    Do you know what the hourly rate is for that team, or for individuals who work on that team?

A.    I've recently seen a rate card. But not specifically for this project.  So ...

Q.    What did the rate card say with respect to the hourly rate?

A.    The range -- it ranged between, if I recall correctly, 650 and 175 dollars

Page 55

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    And any of the public information that you are relying on for that purpose is contained or listed in your reports, is that correct?

A.    Yes, that is correct.

Q.    Aside from that, have you reached out to have any discussion with any of the class members as to whether they agree with you that conditions are worsening on Steam?

A.    I don't think so.

Q.    In your -- each of your expert reports, as we discussed, you have identified evidence that you are relying on for your opinions, correct?

A.    Correct.

Q.    You cite some documents produced by Valve in this case, correct?

A.    Correct.

Q.    You cite some depositions of Valve employees, is that correct?

A.    That is correct.

Q.    And I think on occasion you'll cite documents that have been produced by third parties in this case, such as Epic or Humble

Page 56

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Bundle, is that correct?

A.    Right.

Q.    All right.  For the depositions that are listed in your reliance materials, did you read those entire transcripts or did you just read portions of them?

A.    It will likely be a mix.

Q.    Okay.  It would depend on the transcript?

A.    Yeah.  And the person being deposed.

Q.    Did you ask to review any additional depositions that have been taken in this case that you didn't list in your reliance materials?

A.    I recall during the class cert stage that I have looked at a number of deposition transcripts.  I would not be able to tell you whether all of the ones that I have looked at are cited to in the reports.

Q.    Okay.  Well, let me ask you this:

Did you ask to review any deposition transcripts or documents or evidence that was not provided to you?

Page 57

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    Generally speaking, I think that evidence that I've requested was provided to me.

Q.    Okay.  I want to switch topics. We'll go for a few minutes and then take a break.  Is that okay with you?

A.    Sure.

Q.    Okay.  And I want to start out by making sure that we understand the opinions that you are going to offer to the jury in this case and the opinions that you are not going to offer the jury in this case.

Does that makes sense?

A.    Sure, yeah.

Q.    Okay.  Am I correct that you are not going to be offering an expert opinion to the jury in this case about the relevant market?

A.    Correct.  I rely on Schwartz for that.

Q.    Okay.  You have not been asked by plaintiffs' counsel to define the relevant market in this case, is that correct?

A.    That is correct.

Page 58

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    You would agree that defining the relevant market is an exercise that is typically performed by an economist, is that right?

A.    That is right.

Q.    Okay.  It is not something that a management expert such as yourself typically does, is that correct?

MR. KAPOOR:  I would just note an objection to the form of the -- of this question and the previous one.

Q.    You can answer.

A.    Within management there will be professors that some of them might have an economics training, some of them might have a sociology training, some of them will have another type of training.

And so within my field there will be professors who could be asked to do a market definition exercise.

Q.    Do you consider yourself to be one of those professors?

MR. KAPOOR:  Objection to form.

A.    I will repeat that I was not asked

Page 59

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
to perform a market definition in this
particular case.

Q.    Okay.  I think you testified
previously at your deposition -- at your first
deposition that the field of management is,
generally speaking, not tasked with defining
relevant markets.

Do you agree with that testimony?

A.    I agree.

Q.    Okay.  Okay.  So to be clear.  For
the definition of the relevant market you are
relying on Dr. Schwartz's opinion?

A.    That is right.  I have been asked
to look at whether there are viable
alternatives to Steam.  But I have not been
asked to define a relevant market.

Q.    Okay.  I want to ask you -- I am
going to ask about your opinions related to
viable alternatives.  But I just want to be
really clear, for purposes of this case you
are relying on Dr. Schwartz's opinion for the
definition of the relevant market?

A.    I am.

Q.    And to the extent any of your

Page 60

J. Rietveld - HIGHLY CONFIDENTIAL - AEO analysis depends on the definition of the relevant market, you are relying on Dr. Schwartz's opinion for that purpose as well?

A.    Yes.    To the extent that my analysis needs to be informed by what the relevant market is, I am relying on Dr. Schwartz for that.

Q.    You understand that one of the issues in this case is whether first-party PC game sells [sic] are part -- game sales are part of the relevant market or not, correct?

MR. KAPOOR:    Objection to form.

A.    I think whether first-party distribution platforms are part of the relevant market, as far as my understanding of the relevant market exercise go, is the more relevant question.

Q.    Okay.    So just to rephrase it in your words.

You understand that whether first-party distribution platforms are part of the relevant market is an issue in this case?

A.    That is right.

Page 61

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    You will not be offering an opinion to the jury to help them resolve that question, correct?

MR. KAPOOR:  Objection to form.

A.    Well, I am offering an opinion about whether first-party distribution platforms are a viable alternative to Steam from the perspective of publishers and consumers.  But I have not performed any calculations to determine, or analysis to determine whether they are indeed part of the relevant market.

Q.    Okay.  So just to answer my very specific question.

You will not be offering an opinion to the jury about whether first-party distribution platforms are in or out of the relevant market?

MR. KAPOOR:  Objection to form.

A.    That is correct.  But I will qualify that by saying that I will offer an opinion about whether first-party distribution platforms are viable alternatives to Steam or not.

Page 67

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

the jury about whether these retail sellers are part of the relevant market or not part of the relevant market?

A.    That is correct.  I have not been asked to define the relevant markets.

Q.    Okay.  Likewise, am I correct you are not offering an opinion about Steam's share of the relevant market?

A.    That is correct.

Q.    Or whether Steam is dominant in the relevant market?

MR. KAPOOR:  Objection to form.

A.    I believe I have on several occasions throughout my reports noted that Steam is the dominant PC distribution platform.

Q.    Okay.  Is that a different opinion than whether or not Steam is dominant in the relevant market?

MR. KAPOOR:  Objection to form.

A.    You're asking me again about the relevant market, and I'm not offering an opinion about the relevant markets.

Q.    Okay.  So focussing on the relevant

Page 68

J. Rietveld - HIGHLY CONFIDENTIAL - AEO market, am I correct you're not offering an opinion whether Steam is dominant in the relevant market?

MR. KAPOOR:  Objection to form; asked and answered.

A.    In the context of defining a relevant market I'm not offering an opinion about whether Steam is dominant or not.

Q.    You are not offering an opinion about whether Steam has a -- has monopoly power in the relevant market, correct?

A.    Correct.

Q.    All right.  You are relying on Dr. Schwartz's opinion about Steam's dominance or positions within the relevant market, correct?

MR. KAPOOR:  Objection to form. Misstates testimony, asked and answered.

A.    I am relying on Dr. Schwartz's opinion about Steam's market share, which features into an assessment of whether it's dominant or not.

Q.    You stated in your reply report that, quote, "The opinion that Steam has the

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
dominant share of the relevant market is not
my own," end quote.

Is that a correct statement?

A.   If you're -- if you're citing from
my report, then it is, yes.

Q.   I am.  But does that sound right to
you?  I am happy to show you that report.

MR. KAPOOR:  Which paragraph?

MS. ARNOLD:  Forty-six.

A.   Of which report?

Q.   Sure.  Let's take a look at it.
This is the reply report, which should be
exhibit --

A.   The merits reply report?

Q.   Yes, that's correct.

-- 4.

A.   What is the paragraph number?

Q.   Sure.  Paragraph four --
paragraph 46.

Are you at paragraph 46?

A.   Yes, I am.

Q.   About halfway through that
paragraph you write, "However, as he
acknowledges" -- and here you're referring to

Page 82

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A. I think I've stated in my report that Valve is part of the PC game industry or the game industry.

I've also opined that Steam operates in the PC video game distribution segment.

Q. Okay. You testified at your class cert deposition that the topic of what constitute an industry or who is in an industry or who is out of an industry is a hard thing for someone in the field of management to define.

Do you agree with that statement?

A. It's a hard thing for anyone to define.

Q. Is it particularly difficult for someone who is in the field of management, as you have described it?

A. No.

Q. Okay. How do you do that? How do you define an industry?

A. Industries tend to be broadly defined, and one would look at how the -- the flow of inputs to outputs within an industry,

Page 83

J. Rietveld - HIGHLY CONFIDENTIAL - AEO so which firms are part of the value chain. How do they relate to each other.

You would tend to think about who are competitors and who are substitutes.

And more recently in the field of management scholars have started thinking about which are the complements or complementors to the firms operating in an industry.

Q. Okay. And so is that the methodology that you followed to determine what firms were included in the PC game industry?

A. I was not asked to conclusively define the PC game industry.

Q. I think you told me earlier you have an opinion that Steam is part of the PC game industry.

A. Yes.

Q. Correct?

A. Yes.

Q. What firms are part of the PC game industry besides Steam?

A. Firms that are part of the PC game

Page 84

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
industry would include game developers, game
publishers, engine developers, distribution
platforms, retailers of PC games, and arguably
consumers as well.

Q.   What PC game platforms do you
include in the industry?

MR. KAPOOR:  Objection to form.

A.   I have not been asked to
conclusively define the industry.

Q.   Okay.  Have you been asked to
define whether Steam is dominant in any kind
of PC gaming industry?

A.   Can I have a look at my reports,
please?

Q.   Please.

A.   Sorry, do you have the class cert
report?

Q.   I do.

MS. ARNOLD:  We can mark that as
Rietveld 7.  I'm sorry.  We're going to
mark it as Rietveld 6.

(Rietveld Exhibit 6, Expert Report
of Professor Joost Rietveld, February 8,
2024 was marked for identification, as

Page 85

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

of this date.)

A.   I have not been specifically asked to perform an analysis to determine whether Steam is dominant or not.

Q.   Within the industry, is that right?

A.   That's right.

Q.   Okay.  So I just want to be really clear that when we get to trial you're not going to be offering an opinion to the jury that Steam is dominant in a business segment, is that correct?

MR. KAPOOR:  Objection to form. Asked and answered.

A.   That's incorrect.  It is my opinion that Steam is the dominant platform.

Q.   Within what?

A.   Within the PC gaming segment. Within the PC gaming industry.

Q.   Okay.  And do you intend to offer those opinions at trial?

A.   Yeah, if asked about it.

Q.   Okay.  Even though you weren't asked to define the industry, is that correct?

A.   That is correct.

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    And even though you weren't asked to define the business segment?

A.    I've been asked to rely on Dr. Schwartz's opinion of the relevant market.

Q.    Okay.  Will you be offering an opinion about Steam's position in a market, in an industry, or in a business segment that is your own, that is separate and apart from the work that Dr. Schwartz has done?

MR. KAPOOR:  Objection to form; asked and answered.

A.    It is my opinion that Steam is a dominant distribution platform in the PC gaming segment and in the PC video game industry.

Q.    Okay.  You said the PC gaming segment, is that right?

A.    That's right.

Q.    All right.  What entities specifically do you include within the PC gaming segment, business segment?

MR. KAPOOR:  Objection to form; asked and answered.

A.    Sorry.  Can you clarify the

J. Rietveld - HIGHLY CONFIDENTIAL - AEO question?

Q.   Sure.  You said that you have an opinion that Steam is a dominant distribution platform in the PC gaming segment.

The segment includes Steam, I'm assuming, correct?

A.   Correct.

Q.   And it includes other entities; true?

A.   True.

Q.   What other entities does it include?

MR. KAPOOR:  Objection to form; asked and answered.

A.   It includes other third-party distribution platforms.  It would also include first-party distribution platforms, key retailers, self-distribution, and broadly the distribution of PC video games.

Q.   Okay.  All right.  And so within this PC business segment, just to be clear, you include platforms that distribute first-party games; in other words, games that

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    Okay.  You know that Electronic Arts has had its own gaming distribution platform called EA App, is that correct?

MR. KAPOOR:  Objection to form.

A.    EA distributes digital PC video games.

Q.    Including video games that Electronic Arts itself creates, correct?

A.    Yes.

Q.    And you would include that within the relevant business segment?

MR. KAPOOR:  I would just object to the form of this question, the previous question as well.

Q.    You can answer.

A.    EA's distribution platform is part of the PC distribution segment.

Q.    And EA distributes its own games on that platform, correct?

A.    Correct.

Q.    You are not excluding EA's distribution of its own games from the business segment?

A.    Correct.

Page 90

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    You would include, as another example, Activision Blizzard's first-party distribution platform, correct?

A.    Correct.

Q.    You would also -- you also identified in your report a number of games that have generated sufficient content and user bases such that they have become their own platforms, like Roblox, correct?

MR. KAPOOR:    Objection to form.

A.    I believe I labeled Roblox and Fortnite as games with their own platforms.

Q.    And you include those within the business segment?

A.    Yes.

Q.    The same with Fortnite?

A.    Correct.

Q.    And would you count --

MS. ARNOLD:    Well, strike that.

BY MS. ARNOLD:

Q.    Do you have an opinion that Steam is dominant within the PC business segment?

MR. KAPOOR:    Objection to form; asked and answered.

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    Steam is a dominant third-party -- Steam is a dominant distribution platform in the PC game segment.

Q.    So your opinion is that Steam is "a" dominant distribution platform, not "the" dominant distribution platform, in the PC business segment, is that correct?

A.    I think my opinion is that it is the dominant distribution platform.

Q.    Okay.  How did you determine that?

A.    As I have stated in my previous answer, I have looked at industry sources. I've looked at market analysis reports and data.  I've looked at deposition transcripts. I've looked at Schwartz's estimation of Steam's market share.  And I base that opinion on my own assessment of the PC video game segment.

Q.    What specific data or evidence did you consider when evaluating Steam and all of these other entities in the PC business segment -- distribution business segment?

MR. KAPOOR:  Objection to form; asked and answered.

Page 92

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.   Can you repeat, please?

Q.   Sure.  For example, did you look at the number of users on each one of these platforms?

A.   Yes.  To the extent that information was available.

Q.   Okay.  Did you look at the number of games on each of these platforms?

A.   Yes, to the extent that information was available.

Q.   Did you look at the number of developers publishing games on each of these platforms?

MR. KAPOOR:  Objection to form.

A.   Yes, to the extent that information was available.

Q.   What other data specifically did you consider in reaching this opinion?

A.   Soft data.

Q.   What is "soft data"?

A.   Industry articles.  Opinions offered in depositions and elsewhere.  Broad coverage of the PC gaming industry.

Q.   Okay.  Can you point to me anything

Page 94

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    I would have to check my reports.

Q.    Okay.  Is there a place in all of your expert reports where you collect and synthesize this data as it applies to each one of the entities within the business segment?

MR. KAPOOR:  Objection to form.

A.    I don't believe there's one single place in the reports where I do this.

Q.    Did you provide data with respect to the number of games, the number of users, on Activision Blizzard?

A.    To the extent that I have, it is cited in my report.  I would have to check the reports.

Q.    Sitting here right now you don't recall that?

A.    I don't recall it.

Q.    Did you provide quantitative data for the key reseller Humble Bundle, which we mentioned before, with respect to the number of games available on that platform?

A.    I don't recall.

Q.    Did you provide any of this quantitative data for Roblox, Fortnite or

Page 95

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
Minecraft?

MR. KAPOOR:  Objection to form.

A.    I don't recall.

Q.    Can you give me a rough estimate as to the number of entities that you would include within the PC business segment, just roughly?

MR. KAPOOR:  Objection to form.

A.    Entities that are engaged in the distribution of PC video games?

Q.    My question is do you have a rough estimate as to how many entities are included in that business segment?

MR. KAPOOR:  Same objection.

A.    I've analyzed viable alternatives in my reports.  I can -- I can go through the reports and list the names of the companies that I've looked at.

Q.    Okay.  We're going to talk -- I want to talk about the viable alternatives and that analysis separately.

You have talked about a relevant business segment in the PC distribution area, correct?  That's what we've been talking

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

about?

MR. KAPOOR:  Objection to form.
Misstates the testimony.

A.    I have not been asked to define
that segment, and so I don't think there is a
section in my report that specifically says --

Q.    Okay.

A.    -- this is the segment and this is
who is in and who is not.

Q.    Have you sat down  nd methodically
determined the number of users, the number of
games, the number of developers, on each and
every entity, including third-party entities,
first-party entities, key retailers,
self-distributors, that you would include in
the business segment?  Have you sat down to
conduct that analysis with respect to each of
those firms?

MR. KAPOOR:  Objection to form.

Q.    You can answer.

A.    I've done my best to collect
information on the number of users and games
on some of these platforms that we just
discussed.  And where I could find, I've tried

J. Rietveld - HIGHLY CONFIDENTIAL - AEO to list that in my reports.

Q. So if, for example, we look in your report and we're not able to find any information for, for example, Electronic Arts, it's your testimony that you haven't reviewed that data, or you're not relying upon it for your opinions?

MR. KAPOOR: Objection to form.

A. If it is not stated in the reports, then it is likely that I have not relied on that data to form my opinions.

Q. Okay. And I'm sorry if I asked this before. There is not one place in your report where you go through this quantitative analysis for each firm that you would include in the PC business segment, is that correct?

A. That is correct.

Q. All right. You've said that you relied on deposition testimony, that that was one of the things you relied upon, to help you define the PC business segment, is that correct?

MR. KAPOOR: Objection to form. Misstates the testimony.

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    Tell me if I'm wrong.

A.    That is one of the categories of evidence that I have relied upon.

Q.    Okay.  Does that include Dr. Schwartz's deposition testimony?

MR. KAPOOR:  Objection to form.

A.    I have reviewed his deposition testimony in the class cert stage.

Q.    Okay.  And are you relying on his deposition testimony from the class cert page [sic] for your opinion about what constitutes the business segment?

A.    No.

Q.    Are you relying on any of Dr. Schwartz's opinions to inform your opinion about what constitute the -- constitutes the PC business segment?

A.    I don't believe I do.

Q.    Or whether Steam is dominant within the PC business segment?

A.    Correct.

Q.    Okay.  You have mentioned a few times that you conducted an analysis of alternatives to Steam.  Correct?

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    Correct.

Q.    Are you familiar with the terms "substitutes" and "complements" within the field of economics?

A.    I'm familiar with the terms.

Q.    Okay.  Am I correct you're not going to be offering an expert opinion to the jury about what other platforms are substitutes to Steam, economically speaking?

A.    Economically speaking, that is correct.

Q.    You will not be offering an expert [sic] to the jury about what other platforms may be complements to Steam within the context of economics?

A.    Within the context of economics, that is correct.

Q.    And within that context you don't consider yourself to be an expert on those terms?

A.    Within that context, correct.

Q.    Fair to say that you don't have a precise understanding of how economists use and rely upon those terms?

Page 100

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

MR. KAPOOR:  Objection to form.

A.    I have an understanding how economists rely and use those terms.

Q.    You wouldn't precisely know the economic interpretation of those terms, is that correct?

MR. KAPOOR:  Objection to form.

A.    I think I would be able to interpret those analysis.

Q.    Okay.  Let's just take a quick look at your prior deposition testimony.

A.    Yeah.

Q.    I just want to make sure we have this correct.

So this is exhibit number 5.  And if you could turn to page 126 for me.

And I'll ask you to read along with me, starting at line 21, page 126.

A.    Yes.

Q.    Do you see that?  So it says:

"QUESTION:  In the academic literature relevant to your report, is the word 'complementarity' a term that you encounter with the meaning that you

Page 101

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
ascribed to it?

"ANSWER: Are you asking me if the term 'complementarity' is used in the academic studies that I have reviewed in the process of writing this report?

"QUESTION: Either in the process of writing this report or in your professional experience.

"ANSWER: When I teach classes, I talk to students about complements and substitutes, but I would not consider myself an expert on those terms or claiming that I would precisely know the economic interpretation of those terms."

First of all, did I read that correctly?

A.    You did.

Q.    And do you stand by that testimony sitting here today?

A.    Yes.

Q.    Okay. All right. You have offered opinions about whether certain platforms are, you say, viable alternatives to Steam, is that correct?

Page 102

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    Correct.

Q.    When you use the term "alternatives," that is not the same thing as a substitute, as that term is used in economics?

A.    That is correct.

Q.    Okay.  In other words, a platform could be a substitute but not an alternative, is that true?

MR. KAPOOR:  Objection to form.

A.    Since I'm not offering an opinion about economic substitutability or complementarity, I would not be able to make that assessment.

Q.    Is there an accepted definition of an alternative in your specialty of management?

A.    I don't believe I've relied on a formal definition of the term "viable alternative."

Q.    Is there one?

MR. KAPOOR:  Objection to form.

A.    It's not something I've -- I've tried to ascertain as part of writing this

Page 103

J. Rietveld - HIGHLY CONFIDENTIAL - AEO report.

Q. Okay. So sitting here today you're not aware of an accepted definition of the term "alternative" in your specialty of management, is that correct?

A. "Viable alternative."

Q. "Viable alternative"?

A. Correct.

Q. Okay. Is there an accepted methodology within your field of management for defining whether a firm is an alternative or not?

A. Can you repeat the question, please?

Q. Sure. Is there an accepted methodology within your field of management for defining whether a firm is an alternative or not to another firm?

A. I'm unaware of a technical methodology to ascertain that.

Q. Okay. Did you conduct any kind of quantitative analysis to determine what firms were viable alternatives or not to Steam?

A. Not beyond stating numbers of users

J. Rietveld - HIGHLY CONFIDENTIAL - AEO and games. So no technical -- sorry. Could you repeat the question?

Q. Sure. Did you conduct any kind of quantitative analysis to determine what firms were viable alternatives or not to Steam?

MR. KAPOOR: Objection to form.

A. I did not conduct such analysis.

Q. Okay. When we were talking earlier about the business segment, you said you did consider data like the number of users, number of games, number of developers, correct?

A. Correct.

Q. Did you use that type of data in forming your opinions about whether different platforms were viable alternatives to Steam?

A. Yes. It's filtered into my opinions.

Q. Okay. And so if I looked in your report, would I find that type of data, if it is available, for each of the entities that you considered as part of your alternative analysis?

A. I think this analysis that I've

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
it's in the hundreds of thousands.  But I -- I
do not recall precisely.

MR. KAPOOR:  I would just note an
objection to the form of the previous
question.  It wasn't Professor Rietveld
who launched it.

THE WITNESS:  Right.  The game was
published by Two Tribes.

MS. ARNOLD:  Fair enough.

BY MS. ARNOLD:

Q.    Have you kept in touch with your
colleagues from Two Tribes since you left the
company?

A.    On and off, yes.

Q.    And do they update you on how
they're doing and how the business is doing?

MR. KAPOOR:  Objection to form.

A.    Two Tribes has gone out of
business.

Q.    Okay.  All right.
They still have games on Steam, is
that correct?

A.    That is correct.

Q.    Toki Tori is still on Steam, is

Page 148

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

that right?

A.    I have not checked recently, but I would assume it's still available.

Q.    Okay.  We'll take a look at that in a minute.

Do you consider Toki Tori to have been a successful game?

A.    It's been a successful game for Two Tribes, in that it was our own intellectual property, that we were able to develop different versions of it that were released with at least some, for us, commercial success.

Q.    Do you have a Steam account?

A.    I do.

Q.    And did you sign up for Steam when you were working at Two Tribes?

A.    I did.

Q.    Do you recall the name of your Steam account?

A.    No.

Q.    When is the last time that you have been on Steam?

A.    Weeks ago.

Page 149

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q. Okay. And what was the purpose of you going on Steam at that time?

A. So I -- I -- I created a Steam account again because I couldn't retrace my old account. And I went on Steam I think with a purpose of seeing what the platform looks like, what the user experience is.

I also recall doing that because one of the data sources that I and other experts rely on in this matter is SteamDB, and some of their data access requires a Steam account.

Q. Okay. So I just want to make sure I understand the chronology.

You had a Steam account when you worked for Two Tribes, is that correct?

A. That is correct. It's not an account that was tied to the company. It was my personal account.

Q. Understood.

Using that account, when was the last time you accessed Steam?

A. I don't know.

Q. Do you remember accessing Steam

Page 150

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
after you left Two Tribes, using that account?

A.   I very likely have, but I would not be able to tell you conclusively.

Q.   You don't remember doing that at all after you left Two Tribes?

A.   I don't recall doing that.

Q.   Well, do you play games on Steam?

A.   I'm more of a Nintendo gamer myself, and so I -- I played games on Steam while I was working at Two Tribes.  But I haven't done so recently.

Q.   Okay.  You then created a new Steam account for purposes of this case, I think you said a couple of weeks ago, is that correct?

A.   Correct.

Q.   Okay.  What is the name of that Steam account?

A.   I don't know.

Q.   Is there a way for you to get that information?

A.   Yeah, I could look into the account.

Q.   Okay, yeah.  If you could get that at a break, that would be great.

Page 151

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

And you went on -- that was after you had completed all of your expert reports in this case, is that correct?

A. Very likely.

Q. Well, you said it was two weeks ago, right?

A. A few weeks ago, yes.

Q. Okay. And your last report I think was the end of April, is that right?

A. Correct.

Q. Okay. And you recall setting up the Steam account after you completed your reply report?

A. I didn't say that.

Q. Okay.

A. It's likely that I did.

Q. Okay. Had you formed all of your opinions in this case as set forth in your expert reports before you created this additional Steam account?

A. Yes. Before I created this additional Steam account.

Q. And so you would not utilize this Steam account to, for example, see what the

Page 152

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

user experience was like before you formulated your opinions, is that correct?

A.    Well, a lot of that can be -- can be assessed or experienced without a Steam account.  I mean, I've been on Steam many times for the purpose of this -- of this matter without logging on to an account.

Q.    Okay.  I just want to focus on the Steam account that you just created.

You had not used or accessed Steam using that personal account to assess the user experience until after you had formed your opinions in this case, is that correct?

A.    Correct.

Q.    All right?

MR. KAPOOR:  We've been going for about I think an hour and 26.  I'm just cognizant of the court reporter.

MS. ARNOLD:  A couple of more questions and we can break for lunch.

MR. KAPOOR:  Great.

BY MS. ARNOLD:

Q.    You also said you used this new Steam account to see what the platform looks

Page 153

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
like, is that correct?

A.   Correct.  I wanted to create a
Steam account to see what that experience is
like.

Q.   And you did not do that until after
you had completed forming your opinions in
this case, is that correct?

A.   Correct.  But I would also restate
that I've been on Steam many times during my
work in this matter to browse games, to see
what's available.

Q.   Okay.

MO         MS. ARNOLD:  I'll move to strike
everything after the word "Correct."

MR. KAPOOR:  Oppose.

MS. ARNOLD:  Let's take a break for
lunch.

MR. KAPOOR:  Sure.

THE VIDEOGRAPHER:  Off the record
at 12:07.  This is the end of media unit
two.

(Lunch recess taken at 12:07 p.m.)

Page 158

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
the class cert stage?

MR. KAPOOR:  Objection to form.

A.   I did.

MR. KAPOOR:  Just to be clear, you
mean without logging into any Steam
account?

MS. ARNOLD:  I do.

A.   Yes.  The answer to your question
is yes.

Q.   Okay.  Approximately how many times
have you been onto the Steam website to do any
kind of investigation in connection with your
work in this case?

A.   Many times.

Q.   More than ten?

A.   Sure.

Q.   More than twenty?

A.   Sure.

Q.   More than a hundred?

A.   I don't know.

Q.   You can't say it's more than a
hundred?

MR. KAPOOR:  Objection to form.

A.   I have not kept track of the many

Page 159

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

times --

Q.    Okay.

A.    -- I've gone to Steam.

Q.    Okay.  Have you created any accounts in order to conduct investigation or research on any other PC platform distributors in connection with your work besides Steam?

MR. KAPOOR:  Objection to form.

A.    I do not believe I have created accounts on distribution platforms specifically with the purpose of investigating them for this matter.

Q.    Okay.  So, for example, do you have an account on the Epic Games Store?

A.    I have been on it.  I do not recall if I have an account.

Q.    You mean you've been on the website?

A.    Yes.

Q.    Okay.  But you have not created an account on the Epic Games Store for purposes of this case, or maybe even otherwise?

A.    I -- I think I said that I do not recall.  It's likely that I did not.  But I do

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
not know for sure.

Q.    You don't remember doing that, at least as far as sitting here today?

A.    That is correct.

Q.    Do you recall ever creating an account for the Activision Blizzard platform Battle.net?

A.    I believe I do not have an account for that website.

Q.    What about the Microsoft platform, Xbox platform?

MR. KAPOOR:  Objection to form.

A.    Are you asking me about the Microsoft Store or Xbox?

Q.    Xbox PC gaming platform, where you can download PC games.

A.    Because you can download PC games from the Microsoft Store as well.

I have -- I have not created an account for Game Pass.

THE COURT REPORTER:  Game ...?

THE WITNESS:  Pass.  P-A-S-S.

MS. ARNOLD:  All right.  I am going to hand you what I have marked as

Page 161

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
exhibit number 5 [sic].

(Rietveld Exhibit 8, Screenshots of Toki Tori on Steam (No Bates) was marked for identification, as of this date.)

MS. ARNOLD:  I'm sorry, it's deposition exhibit number 8.

(The witness reviews document.)

MS. ARNOLD:  And let me know when you've had a moment to look at that.

THE WITNESS:  Yeah.

BY MS. ARNOLD:

Q.   Okay.  So I will represent to you that this is the store page for the game Toki Tori that was printed off -- you can see the date -- on 5/12/25, at the top left-hand corner.

Does that look about right to you?

A.   Yes.

Q.   Okay.  And I think you said earlier you hadn't gone onto Steam to look at the Toki Tori webpage for a while, or at least in connection with your work in this case, is that correct?

A.   That is correct.

Page 187

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    I do not.

Q.    Do you know anything about the factors that Good Old Games or Epic Games Store consider when granting or denying requests for their version of keys?

A.    I am not aware of the conditions attached to those requests.

Q.    Okay.  I am going to switch topics now.  I would like to talk with you about the allegations that Steam has a PMFN.  Okay?

A.    (Nodding head affirmatively.)

Q.    You discussed -- you understand that plaintiffs are alleging that Valve has a PMFN both with respect to the price of games and the content of games, correct?

A.    That is correct.

Q.    Okay.  And you discussed aspects of these allegations in your class certification reports, correct?

A.    I do.  And I also do in my merits reports.

Q.    Okay.  You testified at your class cert deposition that you did not have an expert opinion on whether Valve has a

Page 188

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

PMFN, correct?

A.   That is correct.  With the addition that it specifically relates to its price PMFN.

Q.   Okay.  Let's take a look at your testimony, because I want to make sure we get this right.

If you could go back to Exhibit 5. And I am going to ask you to turn to page 2,010.

THE COURT REPORTER:  2000?

MS. ARNOLD:  I'm sorry.  210.  That would have been a long deposition.

A.   I have it in front of me.

Q.   Okay.  And I am going to start reading at line 23.

Do you see that?

A.   Yes.

Q.   And the question is:

"QUESTION:  Are you, Professor Rietveld, offering an expert opinion as to whether Valve has a" PFN -- "PMFN policy?"

There were some objections.  And

Page 189

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
then you answer:

             "I have not been asked to form an
     opinion on whether such policies exist."
             MR. KAPOOR:  I'll just note my
     objection to form in the previous
     deposition.
BY MS. ARNOLD:
     Q.    "QUESTION:  And are you giving an
     expert opinion on that subject today?"
             Mr. Kapoor notes an objection.
             And your answer was:  "I'm not."
             Did I read that correctly?
     A.    You did.
     Q.    Would you give the same answers to
those questions if I asked you them today?
             MR. KAPOOR:  I guess I -- objection
     to form then, I'll object to them now
     too.
     A.    I am not offering an expert opinion
about whether or not Valve has a PMFN.  I
understand that is a matter for the jury to
decide.
     Q.    You testified at your class
certification deposition, and I'm happy to

Page 190

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

look at it, that you had reviewed evidence in the record suggesting that Valve enforces its parity policies, or its PMFN, is that correct?

A.    Correct.    I have reviewed a lot of evidence that would strongly suggest that Valve indeed has a PMFN as it relates to price and content.    And I've reviewed evidence of Valve reminding developers of the existence of those requirements and suggesting that it would remove the game from its platform or revoke promotion marketing if prices or content are not brought in line with what is offered on the Steam platform.

Q.    At your deposition at the class certification stage you testified that you first learned of evidence relating to whether Valve has a PMFN and how Valve enforces the PMFN when you read Dr. Schwartz's report.

Do you recall that testimony?

MR. KAPOOR:    Objection to form.    If you would point to the testimony, that would help.

A.    I think that would indeed be helpful, if you could.

Page 191

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    Okay.  Let's do that.  If you could go to page 211.

A.    Yeah, it's in front of me.

Q.    Okay.  I am going to start at line 6 -- hold on a second.

I am going to start at line 16 of page 211.

"QUESTION:  Have you done any independent investigation to determine if Valve enforces a PMFN?"

There's an objection in the record.

"ANSWER:  I've reviewed evidence in the record that suggests Valve enforces its parity policies.

"QUESTION:  Is that evidence cited in Dr. Schwartz's report?

"ANSWER:  It is.

"QUESTION:  Was the -- is your awareness of that evidence -- is your awareness of what you describe as that evidence the result of reading Dr. Schwartz's report?

"ANSWER:  Yes, in addition to reviewing the underlying evidence.

J. Rietveld - HIGHLY CONFIDENTIAL - AEO report, is that correct?

A.    Yeah.  If we're talking about the chronology, I've reviewed a draft of Dr. Schwartz's report in which some of that evidence had been collected.  I've reviewed that evidence.  It may very well be that in between that draft report and the final version of the class cert report, and later the merits report, that more evidence has been brought to light and I was then made aware of that evidence.

Q.    Okay.  Are you aware of any evidence -- well, let me ask it differently.

Are you relying on any evidence about the PMFN that is not contained in Dr. Schwartz's reports?  And now I'm including his merits reports as well.

MR. KAPOOR:  Objection to form.

A.    I would not be able to answer that question conclusively.  There may be evidence that is cited in my reports that ultimately didn't end up in Schwartz's report.  That could be the case.  I did not a crosscheck of all the evidence that is cited to in my report

Page 194

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
and in his reports.

Q.   Okay.  Well, let me ask you this:
You know that Dr. Schwartz conducted a number of what he called I think price presentations, looking at pricing of particular games; did you read that evidence in Dr. Schwartz's reports?

MR. KAPOOR:  Objection to form.

A.   Are you referring to a particular quantitative analysis?

Q.   Yes.

A.   I've reviewed that section.

Q.   Okay.  Where he compares the price of games on Steam versus the price of the same game off Steam over a period of time; do you know what I am talking about?

A.   Yes.

Q.   And he did that I think for approximately 50 games.  It might have been 49.

A.   (Nodding head affirmatively.)

Q.   Does that sound about right?

A.   I think that sounds about right.

Q.   Okay.  Have you yourself conducted

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
any additional analysis comparing the price of games on Steam versus the price of games off Steam at the same time?

A.   I have not performed any analysis specifically related to game pricing.

Q.   If you could look back at page 213 of your class cert deposition again, which is Exhibit 5.

A.   Yes, I have it.

Q.   Do you still have that page in front of you?

A.   I do.

Q.   I want to look at your testimony starting on line 24 of page 213.

"QUESTION:  Are you offering an expert opinion that the alleged parity requirements caused any distribution platforms to exit the market?

"ANSWER:  No, I have not done any cause and effect analysis."

Did I read that correctly?

A.   You did.

Q.   And is that still true sitting here today?

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    It is true that I did not perform any cause-and-effect analysis about whether platforms have exited the market directly as a -- as a function of Valve's PMFN.  But I've conducted a lot of qualitative analysis, and I've formed opinions that those platforms not being able to differentiate based on price or content will have very likely contributed to them not having been able to compete, or struggling to compete in the case of the Epic Games Store.

Q.    So, for example, you mentioned in your -- in your expert report that Electronic Arts announced that it would no longer sell third-party games on Origin in June of 2022.

Does that sound familiar?

MR. KAPOOR:  Objection to form. Which report?

MS. ARNOLD:  Response report, paragraph 64, page 34.

MR. KAPOOR:  Response, is that 3?

BY MS. ARNOLD:

Q.    We actually don't need -- I'm happy to go to it if you would like.  My question is

Page 197

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
do you remember referencing that fact in your
report.

A.    Can you -- can you restate the
fact?

Q.    Certainly.  Electronic Arts -- or
EA -- announced that it would no longer sell
third-party games on Origin in June of 2022.

A.    That sounds familiar.

Q.    Okay.  Am I correct that you have
not done any kind of cause-and-effect analysis
that would allow you to say that the reason
that Electronic Arts made that decision or
made that announcement was due to any kind of
parity requirements on Steam?

A.    You are correct in stating that I
have not done any cause-and-effect analysis.
I will repeat again that I've done qualitative
analysis and have reviewed academic literature
that strongly suggests that, in the context of
platform markets, being able to differentiate
on the basis of price and content are very
important factors, especially for new-entrant
platforms, in their ability to compete.

Q.    So when we're talking about

Page 198

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

"cause-and-effect analysis," what does that mean to you?

A.     For example, I did not ask anyone at Electronic Arts, did you leave the market as a direct result of Valve's PMFN.  And neither did I conduct quantitative analysis. I don't know how one would do that, but ... so that's the extent to which I have not done a cause-and-effect analysis.

Q.     Okay.  Just to clarify.  You haven't done a quantitative analysis as to -- strike that.

You haven't done any kind of quantitative analysis that would allow you to say that any third-party game distribute -- game platform left the market because of Valve's alleged parity requirements?

MR. KAPOOR:  Objection to form. Asked and answered.

A.     I have not conducted any quantitative analysis that would allow me to conclusively state that EA's leaving the market as a third-party distributor is a direct result of Valve's alleged PMFN.

Page 199

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    And you have not, as I think you said, spoken with anyone at Electronic Arts to ask their view as to why they left the market?

A.    That is right.

Q.    Have you gone to look to see if Electronic Arts has made any statements in the public press or otherwise about why they decided to stop selling third-party games on Origin?

A.    There are sources cited to in my reports where -- where it's either announced or reflected on that Origin stops selling third-party -- games on -- that EA stopped selling games on Origin, and those sources are cited to in my reports.

Q.    But you haven't reviewed any sources where Electronic Arts stated that it made the decision to stop selling third-party games on Origin because of any alleged PMFN by Steam?  You haven't seen anything like that?

A.    I have not seen anything like that. But I also think that no company would ever say that, that they are doing something -- that they're -- that they have stopped doing

Page 200

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
something because of the alleged
anticompetitive effect of another firm in the
industry.

Q.    But did you look to see whether
Electronic Arts said anything about why they
made the decision to stop selling games on
Origin?

MR. KAPOOR:  Objection to form.
Asked and answered.

A.    I'm citing to various sources in my
reports where either media or platforms
directly announced that they have stopped
selling third-party games on their platform.
I do not recall if any specific reasons are
given for stopping doing that.

Q.    By Electronic Arts itself?

A.    Correct.

Q.    Okay.

A.    It might be that -- that there are
reasons given in those sources.  It's just
that I don't recall seeing them.

Q.    If you go back to your deposition
transcript, to page 214 again.  I'll give you
a minute to get there.

Page 201

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    It's in front of me.

Q.    Okay.  You were asked:

"QUESTION:  Have you done any cause and effect analysis with regard to any other adverse effects from the alleged parity requirements?"

And your answer was:

"No, I have not."

Did I read that correctly?

A.    You read that correctly.

Q.    Okay.  And with the qualifiers we discussed earlier -- in other words, what you mean by "cause-and-effect analysis" -- would you give the same answer to that question today?

MR. KAPOOR:  Objection to form.

A.    I have not personally done such analysis myself.  And I have relied on academic literature where either through economic modeling or empirical analysis those adverse effects are quantified, identified.

Q.    Okay.  I'm really focussing my question about this particular case.  Okay?  I am not talking about other literature that may

Page 202

J. Rietveld - HIGHLY CONFIDENTIAL - AEO discuss this issue in general.  We're definitely going to get into that.  But let me just ask my question again.

Have you done any cause-and-effect analysis, as you have defined it, with regard to any other adverse effects from the alleged parity requirements in this case?

MR. KAPOOR:  Objection to form. Professor Rietveld was talking about this case.  So asked and answered.

A.    I have not conducted any quantitative analysis specifically that gets at quantifying any causal evidence of adverse effect of the alleged parity requirements.

Q.    Do you have the requisite expertise to conduct that type of analysis?

A.    I've taken courses in statistics and econometrics, and a large share of my work uses econometric techniques using transaction-type data.  So if the right dataset existed, I'm sure I could come up with a robust way to perform such an analysis.

Q.    But you did not do that in this case?

Page 203

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    I did not.

Q.    Okay.  Would you agree that a competitor having a PMFN is not the only reason that a platform may decide to exit the market?

MR. KAPOOR:  Objection to form. Incomplete hypothetical.  Vague and ambiguous as well.

A.    There can be many reasons why any platform might decide to leave the market.

Q.    Would you agree that having a PMFN is not the only reason that a platform could be successful in a market?

MR. KAPOOR:  Objection to form.  It seems like a hypothetical, in which case it's incomplete.  Also vague and ambiguous.

A.    There can be many reasons why platforms can become successful.

Q.    Can you name some of them?

MR. KAPOOR:  Objection to form.

A.    So in the context of two-sided platforms -- and I know we didn't specify this in the question, but I'll -- I'll answer this

Page 204

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
from the perspective of a two-sided platform --

Q.    That's fair.

A.    -- factors would include the -- the number of products that are offered on the platform.

The extent to which exclusive content or product is offered on the platform.

The quality of the content on the platform.

First-party content is sometimes mentioned as a factor for competition between two-sided platforms.

Their ability to attract users on the other side of the platform.

In the case of competition between platforms, and specifically when there is a platform on the market that already has some of those factors in place, it would be the competing platform's ability to differentiate itself from its incumbent competitor.  And that could be on the basis of, again, exclusive content.  Lower prices.

And I will also mention that

Page 248

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

MR. KAPOOR:  I do mind.  Unless you would stipulate to not using that portion of the video at any point?

MS. ARNOLD:  Okay.

MR. KAPOOR:  Just because I shouldn't be in the video.

MS. ARNOLD:  I think we can get another copy of it printed.  We'll pause and then we'll get a copy printed, that's fine.  Let's take a break and go off the record.

MR. KAPOOR:  Sure.

THE VIDEOGRAPHER:  Off the record at 15:15.  This is the end of media unit 4A.

(Pause in proceedings.)

THE VIDEOGRAPHER:  On the record at 15:19.  This is the start of media unit 4B.

MS. ARNOLD:  I apologize for the interruption, Professor Rietveld.  We do have a copy of this.  I am going to hand you what I have marked as Exhibit 10.

(Rietveld Exhibit 10, Article,

Page 249

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

"Platform Competition: A Systematic and Interdisciplinary Review of the Literature" was marked for identification, as of this date.)

MR. KAPOOR:  And this is not highlighted.

MS. ARNOLD:  That is not highlighted.

BY MS. ARNOLD:

Q.    And if you could just take a moment to confirm that this is the article we were just talking about?

A.    Yes, this is the platform competition literature review article.

Q.    Okay.  All right.  And this was a paper that you published in the Journal of Management, correct?

A.    Correct.

Q.    Along with a colleague of yours, Melissa Schilling, is that correct?

A.    That is correct.

Q.    And if we look at the abstract for the paper, about halfway down you say:  "This article offers a systematic and

Page 250

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
interdisciplinary review of the literature on platform competition by analyzing a sample of 303 [sic] articles published between 1985 and 2019."

Did I read that correctly?

A.    333.

Q.    333.

It then says:  "The review contributes by (a) documenting how the literature on platform competition has evolved; (b) outlining four themes of shared scholarly interest, including how network effects generate 'winner-takes-all' dynamics that influence strategies, such as pricing and quality."

Did I read that correctly?

A.    Yes, you did.

Q.    And was that the purpose of your literature review, at least as of 2021, that you publish here?

A.    The purpose of the literature review was to review the academic literature on platform competition across marketing, management, information systems and economics.

Page 251

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    Now, you did -- I'm sorry.

A.    The contributions that emerged from it I don't think were necessarily objectives we had from the onset.  Those themes emerged from our literature review.

Q.    Okay.  And you did not cite the Harvard Business Review article, "Strategies For Two-Sided Markets," in this particular literature review, correct?

(The witness reviews document.)

A.    The article is not -- seems not to be directly cited in -- in this article.  But I'll put two qualifiers to that.  First, we reviewed 333 articles.  I am positive that this article is included in that list of 333. I have maintained an online repository where you can check all of these references.

And I will also note to you that I do cite the underlying article that was published in Management Science on which the HBR is based or derived from.

Q.    All right.  But if we were to look at your list references for your literature review that you conducted in 2021, we would

Page 252

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

not see that 2006 paper from the Harvard Business Review that you cited in this case; true?

A.   I don't agree entirely with what you are putting to me.  Again, there are 333 articles that we reviewed as part of this literature review.  Not all 333 are listed in references.

Q.   They're not?

A.   Well, I would have to count.  But I don't think so.  These are -- these are the articles that we cite in the paper.

Q.   Mm-hmm.  Okay.  And so how many are in the -- the articles that are cited in the paper, that's what's included in your list of references, correct?

MR. KAPOOR:  Objection to form.

A.   The articles that are directly cited to in the paper are in the reference list.

Q.   And is the Harvard Business Review article from 2006 that you cited in your expert report included on this list?

A.   It is not included in this list.

Page 253

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    Okay.

A.    But I am fairly positive that it is included in that list of 333 articles that constitute the body of work that we've reviewed.

Q.    So you did cite at the top of page 1529, which is the second page of the article, you did cite a paper by Dr. Gowrisankaran, correct?

A.    Yes.  As an example of work on two-sided markets conducted in specific empirical contexts, and specifically the paper by Professor Gowrisankaran, as it is stated here, is on electronic payments and automated teller machine networks, or ATMs, used by banks.

Q.    And you cited his paper in your reference list as well?

A.    Because it's directly referenced here in the text.

Q.    Okay.  I want to ask you just a couple of questions about the methodology that you used for your literature review.  And I think the section of that paper starts at

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
1552.  Do you see that?  It's part of Appendix A.

A.   Yes.

Q.   Okay.  You say, "A list of scholarly publications was retrieved from Clarivate's citation indexing service, Web of Science, in January of 2019."

Is that correct?

A.   That is correct.

Q.   All right.  And what is that citation indexing service?

A.   It's a website that I guess keeps track of academic publications in many academic journals across many different disciplines -- well, it's an indexing service. So I think each time a new paper is published in the journals that are being indexed by this website, it would appear in this website.

Q.   Okay.  And you state later on in that paragraph that you started with publication outlets listed in The Financial Times 50 journal list, is that right?

A.   Yeah, that was the starting point. And then we added some journals that are known

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

for publishing research on platform competition, and as well as some more recent journals that have not been recognized by the FT50 list.

Q.   Okay.  And then you -- this resulted, it says, in 434 articles being identified, is that correct?

A.   Yes.  Based on a Boolean search query.  So I think the terms to the search query are listed here.

And these terms are -- are looked for in the title of each article within that subset of journals that we identified.

Q.   Okay.  And then you reviewed the papers for relevance, is that correct?

A.   Yes.

Q.   And narrowed it down to a sample of 261 articles, correct?

A.   Correct.  There is a, um -- it included some conference proceedings apparently, commentary articles.  And then as you also stated just now, we did a check for relevance.

Q.   Okay.  And then you say that you

Page 256

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

did -- you collected data on backwards citations, is that correct?

A. Yes.

Q. It says that you essentially would review the articles that you had identified to see if there were any important studies that were missed from your initial set, is that correct?

A. Yes. I believe what we did was essentially create a list of all of the references of all those 261 articles and then see if there were any references that appeared a minimum of ten times that were not picked up on by the search query. And I believe what I did was then go through those articles again to make an assessment based on relevance.

Q. So if your initial search of articles, if more -- if ten or more of them identified a paper that you had not yet identified, you would pull that paper and check to see if it was relevant?

A. Yes. If they cited to a paper -- if ten or more of those 261 articles cited to a particular paper, the resulting set of

Page 257

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
articles enters our consideration set.

Q.   Okay.  And then if it was relevant, you would include it in the review, is that correct?

A.   That is correct.

Q.   Okay.  We can set that one aside.

A.   To the extent that it matters, I will point out that this --

Q.   There's actually not a question -- there's not a question pending right now.

A.   Okay.

MR. KAPOOR:  I think, though, if it is -- if what you were about to say, Professor, was responsive to any previous question about your paper or the Harvard Business Review paper, then you should -- you should continue.

THE WITNESS:  And it is --

BY MS. ARNOLD:

Q.   Was it responsive to a prior question?

A.   Yes, it --

Q.   Which question?

A.   Your question about whether this

Page 258

J. Rietveld - HIGHLY CONFIDENTIAL - AEO article was included in my literature search or not.

Q. Okay.

A. And I will let you know that the term "two-sided market" is part of our search query. And I will also let you know that the Harvard Business Review was one of the journals that is included in our set of journals that we valuate. And as such, it is highly likely that this article is part of the 333.

Q. Okay. There's no way for us to tell that from looking at the paper that you published, is that right?

MR. KAPOOR: Objection to form.

A. There is a -- I've created an online repository where I've created a list of the 333 articles that were part of the literature review, platformpapers.com, and you could check if this article is included in there.

Q. All right. But the references portion of this literature review article that you published does not include that HBR

Page 260

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

"QUESTION:  In the video game industry, is the situation where the platform operator decides which games get on the platform sometimes referred to as a curated model?

"ANSWER:  Well, I believe I just said that.  I'm not sure whether industry participants would use the same term.

"QUESTION:  Would you agree that Greenlight brought more games to Steam than other PC distribution platforms introduced in the years following 2012?"

Objection.

"ANSWER:  Following the introduction of Greenlight, there were more games admitted onto the Steam platform than before.

"QUESTION:  Would you regard that as a procompetitive feature of Steam?"

Objection.

"ANSWER:  I have no view on whether that was -- whether I would -- I have no opinion on whether that is regarded

Page 261

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

procompetitive or not."

"QUESTION:  And why is that?

"ANSWER:  Well, first and foremost [sic], I think that is an exercise done mostly by economists.  But second, I think we would also have to consider that from whom's perspective.

"QUESTION:  Would your answer change if I asked you to consider it from the gamers' perspective or if I asked you to consider it from the publisher's side?

"ANSWER:  Not with respect to the first part of my answer."

Did I read that correctly?

A.    You did.

Q.    Do you agree that determining whether certain features are procompetitive is an exercise that is mostly done by economists?

MR. KAPOOR:  Objection to form.

A.    It is my understanding that in antitrust matters it is typically the economist who conducts analysis to ascertain whether something or some policy is

Page 262

J. Rietveld - HIGHLY CONFIDENTIAL - AEO anticompetitive or procompetitive.

Q.    Okay.    Have you engaged in that analysis here?

MR. KAPOOR:    Objection to form.

Q.    In this case?

A.    Which analysis?

Q.    Have you made any determination that any features on Steam are procompetitive or have procompetitive benefits?

MR. KAPOOR:    Objection to form.

A.    I have not conducted analysis to show that the introduction of Greenlight or Steam Direct are procompetitive in the sense that an economist would use the term.

Q.    Okay.    And would you agree that conducting that analysis involves certain tactical -- excuse me, strike that.

Do you agree that conducting such an analysis involves certain technical abilities that you haven't been trained to conduct?

A.    I agree that I would not be able to conclusively state based on analysis whether Greenlight or Steam Direct are procompetitive

Page 263

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

in the sense of the term that an economist would use it.

Q.    Okay.  Now, Dr. Gowrisankaran, he did offer opinions about whether certain features on Steam may have procompetitive effects.  Do you remember reading his report?

MR. KAPOOR:  Objection to form. That's not a correct statement about Dr. Gowrisankaran's report.

A.    I remember reading Professor Gowrisankaran's report and in it that he offers various opinions on aspects related to Steam that are procompetitive.

Q.    Okay.  And those aspects would include certain features on the Steam platform, correct?

MR. KAPOOR:  The same objection.

A.    Can you specify what you mean by "certain features"?

Q.    Well, let me ask you this:

Do you agree that Dr. Gowrisankaran offered opinions about the possible procompetitive effects of parity policies such as preventing free-riding and showrooming?

Page 264

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

MR. KAPOOR:  Objection to the. That's not a correct statement about Dr. Gowrisankaran's report.

A.    I recall reading in his report that he offers the opinion that parity requirements can generally be considered procompetitive in some cases.

Q.    Do you agree with that?

A.    I've reviewed literature, academic literature, on PMFNs, and that literature would seem to suggest that there are certain conditions and scenarios which tend to be very narrowly defined in which PMFNs can be procompetitive.

My review of that literature strongly suggests that in most cases these requirements are actually anticompetitive.

Q.    Okay.  In responding to Dr. Gowrisankaran's opinions about procompetitive effects, I saw that you conducted a literature review that I think you just referenced in your answer.  Is that correct?

A.    I believe so.  This is specifically

Page 266

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

"Review of the Academic Literature on PMFNs."

Q.    Okay.  Who conducted this literature review?

A.    I did.

Q.    Okay.  And what did you -- did you use the Clarivate citation index that you referenced earlier?

A.    Yes.

Q.    Did you use Boolean search terms again with respect to this analysis?

A.    I did.  That was the starting point.

Q.    Okay.  And what were the terms that you used?

(The witness reviews document.)

A.    So it's not stated in the report.

Q.    Okay.

A.    And I've conducted additional checks as I've done in the platform competition literature review paper.

And so I will not be able to tell you with absolute precision which terms were included in that search term, but it would likely have included terms like "PMFN," "price

Page 267

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
parity requirement," "platform most-favored
nation," "across platform parity," "MFN."
Along those lines.

Q.    Did you consider the same set of
journals that you considered as part of your
published literature review that we looked at
earlier?

A.    I did not.  And I did not because
this is a literature that exists mostly in the
economics academic literature as well as
literature on antitrust and competition law.
And that was not part of our intention with
the platform competition review paper.

Q.    So in the platform competition
review paper you were not focused on economics
literature or literature focussing on
antitrust and competition law, is that
correct?

A.    That's not correct.  As I mentioned
to you before, the economics literature was
very much part of that literature review --

Q.    Okay.

A.    -- of the published article.  But
we did not search in competition law and

Page 268

J. Rietveld - HIGHLY CONFIDENTIAL - AEO antitrust journals.

Q. Okay. So the literature review that you did for this case was focused mostly in the economics academic literature as well as literature on antitrust and competition law, is that correct?

MR. KAPOOR: Objection to form.

A. If I recall correctly, my initial search query on Web of Science was not restricted by journal.

Q. So was your search, when you started out your search, were you focused on literature that was focused on economics and competition and antitrust?

A. No. My search was focused on those terms that I just mentioned to you. "PMFN," "MFN," "most-favored nation."

And I will -- I will note that these are very specific terms, and that there were very few articles that were returned back by Clarivate that were not relevant in that sense because they are on a completely different subject. There were some.

Q. Let me re-ask my question. I think

Page 269

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
I might have messed it up.

When you were identifying journals from which to conduct your search, were you focused mostly in the area of economics as well as literature on antitrust and competition law?

A.   When I conducted my initial search query, I believe I did not restrict to a particular set of academic journals.  That returned a set of results, and from that set of results I inferred that this literature is mostly in the economics literature and journals on competition law and antitrust.

Q.   And were the results that you got, or the positive hits, primarily within those journals that covered on those topics or focused on those topics?

A.   The articles that are part of this review in Table 3, I list the journals in which they are published.  And so this includes Review of Industrial Organization, Yale Law Journal, Journal of Economics & Management Strategy, Antitrust Law Journal, Management Science, Marketing Science, and

Page 270

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
several others, which I think can be broadly grouped as either being broadly in the field of economics or in the field of competition law and antitrust.

Q.    Okay.  If you could turn to footnote 62 of that appendix, which is page C-18.

A.    I have it in front of you.

Q.    Okay.  And you say in footnote 16 that "In their discussion of procompetitive effects, some authors cite to an article by Johansen and Vergé" -- am I pronouncing that correctly?

A.    Vergé.

Q.    Vergé, okay.
         "I have not included this article as part of my literature review because it is an unpublished working paper."
         Did I read that correctly?

A.    You did.

Q.    What is an unpublished working paper in the field of economics?

A.    I don't believe this is specific to the field of economics.

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    Okay.

A.    When researchers conduct research and they have a paper written up, they sometimes upload that paper either on a working paper repository, or I think in this case on the repository of one of the authors' universities, despite the fact that it's not been published yet.  So it's not gone through peer review.

Q.    And so you decided to not include it in your review, is that right?

A.    That is right.  I cite to it here, I acknowledge the paper, as you can see.  But I did not include it because it is unpublished.

Q.    Now you -- I'm sorry.

A.    It's also from 2017.  So it's had eight years to be published.  And typically papers would get published sooner than that.

Q.    Okay.  Now, you cite to working papers frequently in your own published literature, correct?

A.    In my own what?

Q.    Published literature -- in your own

Page 272

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
published studies.

A.    (No verbal response.)

Q.    I mean, for example, if we go back
to tab -- or Exhibit 10, this is your
literature review.

A.    Mm-hmm.

Q.    And if you go to your references
list, which starts on page -- well, it's right
after the notes.  Do you see that list?

A.    I see it, yes.

Q.    And at the very last reference at
the bottom of that page you cite a paper by
L. Aguiar, correct?

A.    Yes.

Q.    From 2015?  Is that correct?  I'm
sorry.  2018.

A.    2018.

Q.    And it is an NBER working paper, is
that right?

A.    That is correct.

Q.    Okay.  And if you turn to page
1561.

A.    I have it in front of me.

Q.    Okay.  Hold on just one second.

Page 273

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Towards the bottom of the list you cite a paper by yourself, Rietveld, J., Seamans R., and Meggiorin, K. from 2018, is that correct?

A.   Yeah.   That is -- I will note that that is a referencing mistake.   That paper was certainly published at the time of this review paper.

Q.   All right.

A.   And I'm quite positive that the -- that the Aguiar paper is also published, at least now.

Q.   It's an SSRN -- it's cited in your paper as an SSRN working paper, is that correct?

A.   That is correct.   This is one of those working paper repositories that I have mentioned to you before.

MS. ARNOLD:   I am going to hand you what I will mark as Exhibit 11.

(Rietveld Exhibit 11, Article, "Demand Heterogeneity in Platform Markets: Implications for Complementors" was marked for identification, as of this date.)

Page 274

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

BY MS. ARNOLD:

Q.   And this is a paper that you published called "Demand Heterogeneity in Platform Markets:  Implications for Complementors."

Did I read that correctly?

A.   You did.

Q.   All right.  And this was published in what year?  2017?

A.   It says it was accepted in -- on October 10, 2017 and published online on April 2, 2018.

Q.   Okay.  And this paper was published in a journal called The Organization Science, is that right?

A.   That is right.

Q.   Is that peer-reviewed?

A.   That is.

Q.   Okay.  And in this paper you cite, if you look at your references, to at least two working papers; one published by JP Eggers and one published by an A. Elberse.

A.   I see that.

Q.   Okay.  Is there any other reason

Page 275

J. Rietveld - HIGHLY CONFIDENTIAL - AEO that you didn't include the Johansen and Vergé article in your literature review in this case besides the fact that it was a working paper?

A.    I think generally authors make an assessment on whether or not to cite to a working paper, and there could be reasons for including it and for not including it.

I made a very careful assessment about whether or not to include the Johansen and Vergé paper in my literature review on PMFNs.  It is unpublished.  It has been a working paper since 2017 for a long time.

And I know that Professor Gowrisankaran in his report points out the various instances of some of these articles citing to this particular article.  And I've reviewed those sections, and I've also looked at each of these individual papers myself, and very often this is one of the few papers that finds -- or concludes based on their modeling that there are procompetitive effects.

And I think when I was going through Professor Gowrisankaran's kind of reply to my literature review, I noted that

Page 276

J. Rietveld - HIGHLY CONFIDENTIAL - AEO only one of the papers that cites to this particular Johansen and Vergé paper builds on it for the modeling assumptions.  So typically this is a paper that might be cited in passing, but it does not seem to be a paper that has been foundational in terms of the economic modeling that's followed this paper.

Q.   Did you determine that this paper is not relevant to your analysis?

A.   I did not.  I cite to it.

Q.   Okay.  So you would agree this is relevant to the question of whether a PMFN can have procompetitive effects?

A.   Well, in evaluating this specific paper I would issue caution because it's an unpublished working paper, and it's been unpublished since 2017.  And so it's not gone through the same type of vetting that many of these other papers have.

Q.   My question is just would you agree that the paper is relevant to the question of whether PMFN can have procompetitive effects?

MR. KAPOOR:  Objection to form to the extent the term "relevant" is

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
calling for a legal conclusion as to admissibility. And to the extent it's not, I think the question has been asked and answered.

A.      To the extent that someone would want to know what the academic literature on PMFNs has to say, I think one could come across this article and acknowledge its existence.

I think with regards to the economic modeling on the effects of PMFNs and the extent to which they are procompetitive or anticompetitive, I think there are other papers that are included in this review that would be more reliable.

Q.      I am not asking if it's reliable or more reliable or less reliable than any other paper. I'm asking if it's relevant to the question of whether a PMFN can have procompetitive effects.

MR. KAPOOR:  Objection; vague and ambiguous and asked and answered.

A.      (Pause.)  I think one -- if someone wants to understate -- understand the state of

Page 278

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

the literature on PMFNs, it would be -- it could potentially be helpful to have a look at this article. But the extent to which one would have to rely on this article would be caveated by the fact that it's unpublished working paper and it has been unpublished for -- since 2017.

I will also state to you that although this is not my determining factor for not including it in that list of 28 articles that I have, that one of the authors worked on the client side in the Booking case in Europe.

Q. Is that a basis for excluding it from your review?

A. I just said that it's not the basis for excluding it.

Q. Okay. That's fine.

MS. ARNOLD: I'll mark as Exhibit 12 what I think is a copy of the Johansen and Vergé paper.

(Rietveld Exhibit 12, Working Papers in Economics, No. 1/17, "Platform Price Parity Clauses With Direct Sales" was marked for identification, as of

Page 279

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

this date.)

BY MS. ARNOLD:

Q.   Is that the paper that we've been discussing?

A.   It looks like it.

Q.   Okay.  And you've read this paper, right?

A.   Yes.

Q.   Okay.  Can you just tell me, give me a number of -- how many papers did you cite in your literature review for this case, approximately?

A.   Specifically for the PMFN academic literature review?

Q.   Yes.

A.   There's a list of 28 articles.

Q.   And how many of those 28 articles cite this Johansen and Vergé paper?

A.   I believe Dr. Gowrisankaran's team has counted that.  I do not recall.

Q.   Did you count that?

A.   I -- I certainly registered when someone cited to this article.  I didn't -- I don't think I counted it.

Page 280

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.   So when you did your own literature review that was published, one of the things that you did is review the studies to see if there were any papers that you had missed based on the footnotes, right?

A.   Yes.

Q.   And you said that if there's anything that was cited ten or more times you would go back, you would look at the article and include it in your review if it was relevant, is that correct?

A.   If relevant, yes.

Q.   And so is it your testimony that you did not do that in this case, before hearing about Dr. Gowrisankaran's opinion?

A.   I -- I went through a very similar process for this PMFN literature review.  It started with a Web of Science search query --

Q.   Just --

MR. KAPOOR:  I'm sorry.  Please let the witness finish.

MS. ARNOLD:  I don't think he's answering my question.

MR. KAPOOR:  He is.

Page 281

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

MS. ARNOLD:  Go ahead and answer and I'll try again.

A.   -- that produced a list of results. I've gone through the papers that were produced by Web of Science to see which articles I've missed.  I've collected and downloaded those articles.

It's very likely that this particular paper was part of that exercise because it's likely that this particular paper is not picked up by Web of Science because it's unpublished.

And then I indeed, again, assessed for relevance.

Q.   When did you first learn that 15 of the 28 papers cited in your literature review included a reference to this Johansen and Vergé paper?

A.   I will take that from you as a fact that it is 15 times.

Q.   (Nodding head affirmatively.)

A.   I've learned that through the, I think the -- the -- what is it?  The reply report of Professor Gowrisankaran.

Page 282

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    Okay.

MS. ARNOLD:  I am going to switch topics.  Let's go ahead and take a quick break and then we can get back on.

THE VIDEOGRAPHER:  Off the record at 16:03.  This is the end of media unit 4B.

(Recess taken.)

THE VIDEOGRAPHER:  On the record at 16:19.  This is the start of media unit five.

BY MS. ARNOLD:

Q.    Professor Rietveld, you offered opinions in your opening merits reports about what you call worsening conditions on Steam.

Do you recall that?

A.    I do.

Q.    And one of the conditions that you described, you said that the number of games on Steam has caused overcrowding and has had a negative impact on game discoverability.

Am I summarizing that fairly?

A.    Yes.

Q.    Okay.  You say in your report that

Page 284

J. Rietveld - HIGHLY CONFIDENTIAL - AEO decision as to whether or not allow a game to be released on the Steam platform.

Q.   And that's how -- that's the process that Toki Tori went through, is that correct?

A.   I remember us being happy that Valve admitted the game onto Steam.

Q.   Okay.  You've said that this overcrowding has led to a decrease in the average lifetime performance of PC games distributed through Steam.

Is that correct?

A.   Average lifetime sales as measured both by unit sales and revenue sales.

Q.   Okay.  And just to be clear, you're focussing here on average lifetime sales per game, is that correct?

A.   Yes.

Q.   Okay.

A.   That is correct.

Q.   You talk also in your report about the average half-life of games distributed through Steam, correct?

A.   That is correct.

Page 285

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    That's also on a per-game basis?

A.    That's on a per-game basis.

And I'll note that in my reply report I've also looked at game sales after a fixed point in time, after a game's release.

Q.    Okay.  And you would agree that Steam Greenlight and Steam Direct, which you mentioned earlier, have, I think you said in your report, materially lowered entry requirements for PC game publishers.

Do you agree with that?

A.    The data strongly suggests that, both after Greenlight and after Steam Direct, there have been many more games released onto the platform than before those changes.

Q.    I think you have stated in your report that Steam Greenlight and Steam Direct have made it easier for PC game publishers to offer their games on Steam, correct?

A.    Do you want to point me to a specific sentence or section?

Q.    I can just ask you.  Do you agree with that statement?

A.    Yes, I would agree with that

Page 286

J. Rietveld - HIGHLY CONFIDENTIAL - AEO statement.

Q.    Do you agree that Steam Greenlight and Steam Direct have made it less expensive for PC game publishers to offer their games through Steam?

MR. KAPOOR:  Object to form.

A.    What type of costs are you referring to?

Q.    Well, if you would just go to your response report, that is Exhibit 3, paragraph 116.

A.    It's in front of me.

Q.    Okay.  And do you see right after your footnote 215 you say:  "While it is true that Greenlight and Steam Direct make it easier and less expensive for PC game publishers to offer their games through Steam ..."

That is a statement in your report, correct?  Or at least part of it?

A.    That is correct.

Q.    Do you agree with that statement?

A.    I will note that this statement is offered in response to Professor

Page 306

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    I understand he's a -- he's important to Steam.  I -- I do not recall his specific job title.

Q.    Okay.  Did you review his deposition in this case?  I didn't see it -- I'm sorry.

A.    I remember having seen his deposition report -- transcript.

Q.    Okay.  And did you cite his report -- his deposition testimony in this section of your report on customer reviews?

(Rietveld Exhibit 13, Deposition of Erik Johnson, September 26, 2023 was marked for identification, as of this date.)

(The witness reviews document.)

MR. KAPOOR:  While Professor Rietveld is looking, I'll just note that this says Rietveld 10.  Maybe resticker it.

(Pause.)

MR. KAPOOR:  Thanks.

MS. ARNOLD:  Sure.

A.    I do not believe that his

Page 307

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

deposition is cited to in this specific section of my report.

Q. Okay. I've just handed you what has been marked as exhibit number 13. And if you could just look at that.

Would you confirm that is Erik Johnson's testimony in this case from September 26, 2023?

A. It is.

Q. All right. And if you would turn to page 227 of this deposition transcript.

A. Mm-hmm.

Q. All right. He's asked --

Mr. Johnson is asked at this deposition:

"QUESTION: What, if anything, did Valve do in response to its customer service reviews to improve customer service?"

Do you see that?

A. Yes.

Q. All right. And he describes that at this time, in 2015, that -- he says:

"And that was the state we were in, where our customer support actually was

Page 308

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

bad.  And the problem was, I think we were just losing users because it was so bad."

Correct?

A.    I see that.

Q.    Okay.  And then he goes on to say:

"And I went and opened up our -- we were doing all the customer support in-house, and it was a little too opaque to the rest of the company.  And the reality is, we were trying to run customer support in the same way that we approach all of our other software development, which I talked about some today.  And that approach is a really, really poor approach to customer support, which is a more predictable kind of mountain of work kind of problem rather than an invention problem.

"And I went and looked in customer support tickets and was pretty horrified at what I saw.  I thought what we were doing was a really, really bad job at customer support, and I think that we

Page 309

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

made the decision -- well, in my head I made the decision that day that pretty sure the right thing to do was to terminate everyone at Valve doing customer support, rebuild all of the tools internally and use -- use a more traditional third-party customer support company to fix the problem.

"And I remember being terrified at how crappy we were treating so many customers, and I remember feeling at fault for allowing that to go on for a couple of years, and I know others felt the same.  But we -- we buckled down quickly on that.  We ended up laying off most of our in-house customer support. We did from scratch rebuild all of our support tools instead of using this -- beefy third-party tools.

"And now I think, you know, ██████ ████████████████████████████████ ████████████████████ and I think our reputation is actually quite good."

Did I read that correctly?

Page 310

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    You did.

Q.    Did you not cite that testimony in your expert report, is that correct?

A.    I did not cite to his testimony in this section of my report.

MS. ARNOLD:  I am going to hand you what I will mark as Exhibit 14.

BY MS. ARNOLD:

Q.    By the way, you made a comment in your report that Steam only had just over 300 employees.

Do you recall talking about that? You don't need to find it.  Do you remember talking about the number of employees that Valve has?

A.    I think there's a table in one of my reports, yes.

Q.    Okay.  And do you have the view that at some point in time Valve's customer support system was insufficient because Valve didn't have a sufficient number of employees to address that?

A.    I'm going to have to look at my report.

Page 311

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    All right.  If you don't know that sitting here today, we can look at the report.

Does that sound familiar to you?

A.    We would have to look at the report.

Q.    Okay.  You understand now, though, from reading Mr. Johnson's testimony that there are ███████████████████████ providing customer service to users of the Steam platform?

A.    That's what his deposition is.

Q.    Stationed all around the world?

A.    I didn't read that.  But ...

Q.    Do you know that one way or the other?

A.    I do not.

(Rietveld Exhibit 14, Article, "6 reasons Steam is the best PC gaming platform" was marked for identification, as of this date.)

BY MS. ARNOLD:

Q.    Okay.  If you could take a look at Exhibit 14 for me.

A.    It's in front of me.

Page 312

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.   Pardon me?

A.   I have it in front of me.

Q.   Okay.  And this is an article written by someone named Yousef A. Zain.

Do you know who that is?

A.   No.

Q.   Okay.  And it is published on XDA-developers.com.

Do you see that?

A.   I do.

Q.   Have you reviewed articles from this website in support of your opinions?

A.   I do not recall that I have.

Q.   Okay.  This article is called "6 reasons steam is the best PC gaming platform."

Do you see that?

A.   I do.

Q.   Okay.  And this article provides six reasons that it believes -- the author believes that Steam is the best PC gaming platform.

Do you see that?

A.   Yes.

Q.   Okay.  And if you turn over to

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
page 5 of that document, the number-two reason
that Mr. Zain provides for Steam being the
best PC gaming platform is that it has great
customer support.

Do you see that?

A.    I see that.

Q.    And he says on the next page,
"Customer service in the gaming industry — or,
frankly, in any industry — often leaves much
to be desired."

Do you agree with that statement?

A.    Not necessarily, no.  It's a --
it's a very general statement.

Q.    Okay.  Do you have any
experience -- do you have any personal
experience working on customer service issues
in the gaming industry?  In the video game
industry?

A.    I do not.

Q.    Have you published any -- any
papers that relate to or touch on customer
service in the video gaming industry?

A.    I have not.

Q.    Have you done a comparison of

Page 314

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Steam's customer service offerings to any other third-party PC gaming platform?

For example, have you gone onto the Epic Games Store to see how their customer service works and if you think they do a good job?

A.    I have not done so personally myself.

Q.    Okay.  Mr. Zain goes on to say: "However, Steam's support stands out as one of most reliable in gaming.  Whether you need a refund, encounter a payment issue, or, as was the case for me and many others, have your account compromised, finding help is relatively straightforward."

Did I read that correctly?

A.    You did.

Q.    Okay.  And this is from I think March 2025.  Is that correct?

A.    I see that.

Q.    All right.  And did you include any other -- did you include this article in your report, as far as you can remember?

A.    As far as I can remember I did not.

Page 315

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.   Okay.  Or any other comments about Steam's customer service in 2024 or 2025, after the change of policy?

A.   Paragraph 105 references an article from 2019 --

Q.   Okay.

A.   -- where the author, Eric Abent, stated that "Steam's customer service has been garbage for far too long."  And further goes on to state, "Steam's lack of comprehensive customer support has become a meme at this point, and with Steam being the king of the PC digital distribution hill for so long, it seemed like it was never going to change."

There's a March 2024 interview with Chandler Murch, who began working at Valve in 2009 as a customer support agent, and he -- he makes some comments that are cited to.  But it's not directly clear to what time period those comments relate directly.

Q.   Do you know when he left the company?

A.   I do not.

Q.   Okay.  I want to turn to your

Page 316

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
opinions about hate and extremism.  Okay?

MR. KAPOOR:  Objection to form.

Q.    Do you have any experience, personal experience, in the video game industry dealing with content moderation on a platform?

A.    I do not.

Q.    Have you published anything related to that topic?

A.    Not specifically, no.

Q.    All right.  In your expert report you cited four letters that members of Congress sent to Valve regarding -- regarding content moderation and a concern about hate and extremism on the platform.

Do you recall that?

A.    I recall that.

Q.    You did not cite in your report the response letters that Valve sent to Congress, is that correct?  Or do you remember citing them?

A.    I do not remember citing them.

Q.    Okay.

MS. ARNOLD:  Let's take a look at

Page 317

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

one of them.  I am going to mark this as exhibit -- I am going to mark this -- what exhibit are we on?  16.  I'll mark this as exhibit 16.

THE COURT REPORTER:  Is the next one 16?

MR. KAPOOR:  I think it's 15.

MS. ARNOLD:  Exhibit 15.  Okay, you guys are better than I am.

(Rietveld Exhibit 15, Letter dated January 20, 2023 to Representative Lori Trahan, Bates VALVE_ANT_2820987 was marked for identification, as of this date.)

BY MS. ARNOLD:

Q.    And this is a letter to Representative Trahan dated January 20, 2023. Do you see that?

A.    I see that.

Q.    And it was signed by Christopher Schenck, deputy general counsel of Valve Corporation?

A.    I see that.

Q.    And does this appear to be directly

Page 318

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
responsive to one of the letters that you
cited in your report from Congress to Valve
regarding this topic?

(The witness reviews document.)

BY MS. ARNOLD:

Q.   Are you at paragraph 118 of your
merits report?

A.   Yes, I have it in front of me.

Q.   Okay.   And that discusses a letter
from Senator [sic] Trahan?

A.   I don't see the name Trahan
mentioned in this paragraph.

Q.   Okay.   It provides -- you include
citations to certain letters.   For example,
footnote 169 you're quoting from a letter.

This is in your merits report.   Do
you have that?

A.   Yes.   What's the paragraph number?

Q.   Let me short -- let me shortchange
it this way.

You have cited in your merits
report a number of letters that Congress sent
to Valve relating to hate and extremism on
Valve, correct?

Page 319

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    Correct.

Q.    This letter that I have put in front of you, which is exhibit 16, is a letter from Mr. Schenck to Representative Trahan dealing with that very topic, correct?

A.    It's Exhibit 15.

Q.    I'm sorry.  Exhibit 15.

A.    This appears to be a response from Mr. Schenck.

Q.    Have you ever seen this before?

A.    I have not.

Q.    Okay.  He writes, "I am writing on behalf of Valve Corporation in response to your letter dated December 16, 2022 regarding player reports of harassment on Valve's gaming service, Steam."

If you go down to the fourth paragraph, he says, "Harassment of other players is very plainly against the rules on Steam.  When a user creates a Steam account, that user agrees to the Steam online conduct rules.  Among other things, the Steam online conduct rules prohibit Steam users from 'defaming, abusing, harassing, stalking,

Page 320

J. Rietveld - HIGHLY CONFIDENTIAL - AEO threatening or otherwise violating the legal rights of others' and from 'restricting or inhibiting any other user from using and enjoying Steam's services, software or other content.'"

And then he goes on in the letter to describe various steps that Valve has taken to allow players to mute or that allows Steam to deal with offending players.  Is that correct?

MR. KAPOOR:  Objection to form. Mischaracterizes the letter.

(The witness reviews document.)

A.    The letter seems to lay out the options that are available to gamers to report unwanted behavior to Valve, to Steam, and mute some of that behavior, specifically in the context of -- of one game.

And then it says:  "If a CS:GO player receives enough reports for communications abuse, for a period of time they will start each game muted by default for all other players."

Then it notes that users can report

Page 321

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

harassment by other users on Steam itself as opposed to any specific game.

And then it says: "When a user is reported for harassing on Steam, one of Valve's dedicated moderators examines ███ ██████████████████████████████████████ ████████████████████ offensive and harassing content," and then the moderator makes an assessment.

Q. And just to be clear, you were not aware of any of this information when you formed your opinions?

A. This is correct. This is the first time I am seeing this letter.

MS. ARNOLD: I am going to hand you what I have marked as exhibit 16.

(Rietveld Exhibit 16, Letter dated December 13, 2024 to Senator Mark Warner was marked for identification, as of this date.)

BY MS. ARNOLD:

Q. This is a letter dated December 13, 2024 to Senator Warner, is that correct?

A. That is correct.

Page 322

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

Q.    From Liam Lavery.   On page 8, he's legal counsel, Valve Corporation.

A.    I see that.

Q.    Mr. Lavery writes, "I write on behalf of Valve Corporation in response to your letter dated November 15, 2024 regarding moderation of content on Valve's gaming" services -- "service, Steam."

Did I read that correctly?

A.    You did.

Q.    All right.   That's the topic about which you have offered an opinion in this case?   Moderation of content on Valve?

I don't think you need to look at your report.

Do you have an opinion on that?

A.    If it's in my report, then I do.

Q.    Okay.   Great.   Have you ever seen this letter before?

A.    It's the first time I'm seeing this letter.

Q.    Okay.   Would you turn to the Bates stamp VALVE_ANT_2988235.

Do you see the little numbers on

Page 323

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
the bottom right-hand corner of the page?

A.    Yes.

Q.    Okay.  And if you go to the page where the last three numbers are 235.  And do

A.    I do.

Q.    ████████████████  Do you see that?

A.    I do.

Q.    And then ████████████████

A.    Correct.

Q.    And the number --

Did I read that correctly?

A.    You did.

Q.    And do you understand -- or would you agree that a community ban means that certain features will be restricted for a period of time for a gamer who violates -- or a developer who violates Valve's policies?  Or

Page 324

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
do you know?

A.    This is the first time I am seeing this.  I would expect that this would be specific to players.

Q.    Okay.  The next part says ███ ████    ████████████████████████ ████████████████

Did I read that correctly?

A.    You did.

Q.    And would you agree that a TOS ban includes a person who has been banned completely for using games or communities on the platform?  Or do you know?

A.    I do not know what the technical interpretation of that is.

Q.    Okay.  And if I represented to you that under TOS bans these are the number of users who have been banned from gaming and participating in the Steam community for violation of Steam's content moderation rules, would you have any reason to disagree with me?

A.    No.

Q.    You offered some opinions about money laundering in your report; do you recall

Page 325

J. Rietveld - HIGHLY CONFIDENTIAL - AEO
that?

Do you need to look at your report to remember if you offered an opinion about that topic?  It's fine if you do.

A.    It's discussed in my report, yes.

Q.    Okay.  And what is your opinion?

A.    I am going to look at my report.

Q.    Can you state it without looking at your report?

A.    I would rather look at my report.

Q.    Can you state what your opinion is about fraud and money laundering on Steam without looking at your report?

A.    I would rather look at my report, if that's okay with you.

Q.    Okay.  Go ahead.

A.    The relevant section, subsection, I think begins on page 66, and the relevant subsection is titled "Steam May Be Used to Facilitate Money Laundering."

Q.    Are you critical of the steps that Steam takes to monitor money laundering on Steam?

MR. KAPOOR:  Objection to form.

Page 326

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

A.    No.    I'm just documenting what has been written by others on this topic.

Q.    Do you think there are any steps that Steam can take to improve the way in which it deals with money laundering on Steam?

A.    I have not been asked to offer an opinion on that.

Q.    Sitting here today do you have any idea what Steam does to monitor money laundering or other fraud on Steam?

A.    No, I do not.

Q.    Have you read the testimony of Christopher Boyd, a Valve employee, regarding the steps that Steam takes to monitor money laundering and fraud on Steam?

A.    I do not recall.

Q.    Do you agree that fraud and money laundering can be a problem on any platform where exchange of money takes place?

A.    It could be.

MS. ARNOLD:    All right.    I want to take a quick break, and then we will get back on the record and finish up.

MR. KAPOOR:    Okay.

Page 327

J. Rietveld - HIGHLY CONFIDENTIAL - AEO

THE VIDEOGRAPHER:  Off the record at 17:16.  This is the end of media unit 5.

(Recess taken.)

THE VIDEOGRAPHER:  On the record at 17:31.  This is the start of media unit six.

BY MS. ARNOLD:

Q.    Professor Rietveld, would you agree that a revenue share of 30 percent is the industry norm in the video gaming industry?

MR. KAPOOR:  Objection to form.

A.    There are several third-party distribution platforms in the gaming industry that have a revenue share of 30 percent.

Q.    Would you agree that 30 percent is the industry norm?

MR. KAPOOR:  Objection to form. Vague and ambiguous.  Asked and answered.

A.    There are several third-party distribution platforms in the video gaming industry that have a 30 percent commission rates.

Page 350

C E R T I F I C A T E

STATE OF NEW YORK          )

COUNTY OF NEW YORK          )

I, FRANK J. BAS, a Certified Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness whose testimony is hereinbefore set forth, was duly sworn by me and that such testimony given by the witness was taken down stenographically by me and then transcribed.

I further certify that I am not related by blood or marriage to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

That any copy of this transcript obtained from a source other than the court reporting firm, including from co-counsel, is uncertified and may not be used at trial.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of May, 2025.

*Frank J. Bas*

_____

FRANK J. BAS, RPR, CRR