THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE VALVE ANTITRUST LITIGATION

No. 2:21-cv-00563-JNW

**DEFENDANT VALVE CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:**
**August 25, 2025**

**FILED UNDER SEAL**

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 2

I.    THE RISE OF DIGITAL DISTRIBUTION .......................................................... 3

II.   STEAM'S EMERGENCE AND GROWTH .......................................................... 4

III.  VALVE'S DECREASING REVENUE SHARE ON STEAM .............................. 6

IV.   THE CHALLENGED CONDUCT AND VALVE'S MARKET SHARE ............. 7

V.    PROCEDURAL HISTORY ................................................................................... 7

ARGUMENT ..................................................................................................................... 8

I.    PLAINTIFFS HAVE FAILED TO ESTABLISH ANTITRUST INJURY ........... 9

      A.    SOMERS FORECLOSES PLAINTIFFS' CLAIMS BECAUSE THE
            CHALLENGED CONDUCT WAS ALLEGEDLY ADOPTED WHEN VALVE
            LACKED MONOPOLY POWER. ................................................................ 9

      B.    PLAINTIFFS HAVE FAILED TO SUBSTANTIATE ANY OF THE
            ALLEGATIONS THAT ALLOWED THEM TO AVOID SOMERS. ............... 12

II.   PLAINTIFFS CANNOT ESTABLISH A RELEVANT MARKET ABSENT THEIR
      FLAWED AND INADMISSIBLE EXPERT TESTIMONY. ............................... 15

III.  THE CLAIMS OF ALL PLAINTIFFS WHO FIRST CONTRACTED WITH VALVE
      BEFORE APRIL 27, 2017 ARE UNTIMELY. .................................................... 17

CONCLUSION .................................................................................................................. 21

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - i
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abbott Labs. v. Adelphia Supply USA*,
    2017 WL 5992355 (E.D.N.Y. 2017).................................................................................. 10

*AFMS LLC v. United Parcel Serv. Co.*,
    105 F. Supp. 3d 1061 (C.D. Cal. 2015) ..................................................................... 16

*AFMS LLC v. United Parcel Serv., Inc.*,
    696 F. App'x 293 (9th Cir. 2017) ......................................................................... 9, 16

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) ................................................................................. 10

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................................................... 13

*Arcell v. Google LLC*,
    744 F. Supp. 3d 924 (N.D. Cal. 2024) ..................................................................... 11

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990).................................................................................................... 9

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962).................................................................................................... 9

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986).................................................................................................... 9

*Cedar Park Assembly of God of Kirkland, Washington v. Kreidler*,
    130 F.4th 757 (9th Cir. 2025) ................................................................................... 13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).................................................................................................... 8

*Chalmers v. National Collegiate Athletics Ass'n*,
    2025 WL 1225168 (S.D.N.Y. 2025)................................................................... 20, 21

*Choh v. Brown University*,
    753 F. Supp. 3d 117 (D. Conn. 2024)....................................................................... 20

*Cleary v. Am. Airlines, Inc.*,
    2022 WL 5320126 (N.D. Tex. 2022)......................................................................... 18

*Cleary v. News Corp.*,
    30 F.3d 1255 (9th Cir. 1994) ..................................................................................... 8

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - ii
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ............................................................................................... 16

*Epic Games, Inc. v. Apple Inc.*,
    449 F. Supp. 3d 898 (N.D. Cal. 2021) ................................................................. 14

*Epic Games, Inc. v. Apple Inc.*,
    67 F. 4th 946 (9th Cir. 2023) ............................................................................... 14

*Eichman v. Fotomat Corp.*,
    880 F.2d 149 (9th Cir. 1989) .......................................................................... 19, 20

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ............................................................................... 16

*Gen. Bus. Sys. v. N. Am. Philips Corp.*,
    699 F.2d 965 (9th Cir. 1983) .................................................................................. 9

*Gerlinger v. Amazon.com Inc.*,
    526 F.3d 1253 (9th Cir. 2008) .............................................................................. 11

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
    352 F.3d 367 (9th Cir. 2003) .................................................................................. 9

*Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*,
    2010 WL 4365807 (W.D. Wash. 2010) ............................................................... 20

*Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*,
    723 F.3d 1019 (9th Cir. 2013) .............................................................................. 20

*Grand Rapids Plastics, Inc. v. Lakian*,
    188 F.3d 401 (6th Cir. 1999) ............................................................................... 20

*Guenther v. Lockheed Martin Corp.*,
    972 F.3d 1043 (9th Cir. 2020) ................................................................................ 9

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
    822 F. Supp. 2d 1201 (N.D. Ala. 2011) ............................................................... 17

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
    721 F.3d 1281 (11th Cir. 2013) ............................................................................ 17

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) .............................................................................. 16

*In re Air Passenger Computer Rsrvs. Sys. Antitrust Litig.*,
    694 F. Supp. 1443 (C.D. Cal. 1988) .................................................................... 16

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - iii
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

*In re High Fructose Corn Syrup Antitrust Litig.,*
  295 F.3d 651 (7th Cir. 2002) .......................................................................... 15

*In re Live Concert Antitrust Litigation,*
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ........................................................... 17

*In re Online DVD-Rental Antitrust Litig.,*
  779 F.3d 914 (9th Cir. 2015) .......................................................................... 11

*It's My Party, Inc. v. Live Nat., Inc.,*
  88 F. Supp. 3d 475 (D. Md. 2015) .................................................................. 17

*It's My Party, Inc. v. Live Nat., Inc.,*
  811 F.3d 676 (4th Cir. 2016) .......................................................................... 17

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,*
  677 F.2d 1045 (5th Cir. 1982) ........................................................................ 19

*Kentucky v. Marathon Petroleum Co. LP,*
  464 F. Supp. 3d 880 (W.D. Ky. 2020).................................................... 16, 17

*Key v. Qualcomm Inc.,*
  129 F.4th 1129 (9th Cir. 2025) ......................................................................... 1

*Kentucky Speedway, LLC v. NASCAR, Inc.,*
  588 F.3d 908 (6th Cir. 2009) ...................................................................... 2, 16

*Klehr v. A.O. Smith Corp.,*
  521 U.S. 179 (1997)........................................................................................ 19

*LaSalvia v. United Dairymen of Arizona,*
  804 F.2d 1113 (9th Cir. 1986) ........................................................................ 18

*Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.,*
  39 F.3d 951 (9th Cir. 1994) .............................................................................. 9

*Martin v. Am. Kennel Club, Inc.,*
  697 F. Supp. 997 (N.D. Ill. 1988) .................................................................. 11

*Moore v. James H. Matthews & Co.,*
  550 F.2d 1207 (9th Cir. 1977) ........................................................................ 16

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,*
  924 F.2d 1484 (9th Cir. 1991) .......................................................................... 9

*Ohio v. Am. Express Co.,*
  585 U.S. 529 (2018)........................................................................................ 16

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - iv
No. 2:21-cv-00563-JNW

*Oliver v. SD-3C LLC,*
  751 F.3d 1081 (9th Cir. 2014) ................................................................. 18

*Pace Indus., Inc. v. Three Phoenix Co.,*
  813 F.2d 234 (9th Cir. 1987) ................................................................... 2

*Rebel Oil Co. v. Atl. Richfield Co.,*
  51 F.3d 1421 (9th Cir. 1995) ............................................................... 9, 12

*Samsung Elecs. Co. v. Panasonic Corp.,*
  747 F.3d 1199 (9th Cir. 2014) ................................................................ 19

*Scanlan v. Anheuser-Busch, Inc.,*
  388 F.2d 918 (9th Cir. 1968) ................................................................. 14

*Siegel v. Shell Oil Co.,*
  612 F.3d 932 (7th Cir. 2010) ................................................................... 1

*Small v. Allianz Life Ins. Co. of N. Am.,*
  2023 WL 5811903 (C.D. Cal. 2023) ....................................................... 17

*Small v. Allianz Life Ins. Co. of N. Am.,*
  122 F.4th 1182 (9th Cir. 2024) .............................................................. 18

*Somers v. Apple, Inc.,*
  729 F.3d 953 (9th Cir. 2013) ................................................... 1, 10, 11, 15

*Steen v. Myers,*
  486 F.3d 1017 (7th Cir. 2007) ............................................................... 12

*Stieberger v. Sullivan,*
  738 F. Supp. 716 (S.D.N.Y. 1990) ......................................................... 18

*Theme Promotions, Inc. v. News Am. Mktg. FSI,*
  546 F.3d 991 (9th Cir. 2008) ................................................................. 10

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.,*
  751 F. Supp. 3d 381 (D. Del. 2024) ....................................................... 17

*United States v. Aluminum Co. of America,*
  148 F.2d 416 (2d Cir. 1945) .................................................................. 12

*United States v. Syufy Enters.,*
  903 F.2d 659 (9th Cir. 1990) ................................................................... 1

*US Airways, Inc. v. Sabre Holdings Corp.,*
  938 F.3d 43 (2d Cir. 2019) .......................................................... 19, 20, 21

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - v
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

*Varner v. Peterson Farms,*
   371 F.3d 1011 (8th Cir. 2004) .................................................................................................. 20

*Williams v. Owens-Illinois, Inc.,*
   665 F.2d 918 (9th Cir. 1982) ................................................................................................... 19

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.,*
   401 U.S. 321 (1971)................................................................................................................. 18

**Statutes**

15 U.S.C. § 15b................................................................................................................................ 18

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................................................... 9

Fed. R. Evid. 702 ....................................................................................................................... 16, 17

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - vi
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

## INTRODUCTION

An antitrust case "must make economic sense." *United States v. Syufy Enters.*, 903 F.2d 659, 663–65 (9th Cir. 1990) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Plaintiffs' does not. As Judge Coughenour acknowledged earlier in this case, the Ninth Circuit's decision in *Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013), precludes liability where the conduct plaintiffs challenge was the same "*before* [the seller] obtained a monopoly in the . . . market, and *after* it allegedly acquired monopoly in that market." *See* Dkt. 67 at 6. Valve disputes that it has ever had a monopoly in a properly defined relevant market. But it is undisputed that Valve adopted its revenue-share model in 2005, and that Plaintiffs allege Valve adopted a platform most-favored-nation ("PMFN") policy to maintain an allegedly supracompetitive revenue share in 2007. After years of discovery, Valve has demonstrated that it clearly *lacked* monopoly power in 2005 and 2007, and Plaintiffs have no admissible evidence to the contrary. Plaintiffs' case thus fails under *Somers*—the alleged conduct Plaintiffs challenge (Valve's revenue-share rate and the claimed PMFN that maintains it) was adopted at a time when Valve indisputably lacked monopoly power. Indeed, this case is even stronger than *Somers* because Valve's revenue-share rate (the price it charges) has only gone *down* over time.

Plaintiffs cleared the *Somers* hurdle at the motion to dismiss stage only by amending their complaints to add specific factual allegations, including that Valve immediately had monopoly power upon entering the then-fledgling business of digital PC game distribution. But "[s]ummary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). And Plaintiffs have either wholly abandoned, or utterly failed to substantiate, the earlier allegations they used to avoid *Somers*. That should end this case.

Summary judgment is also warranted based on Plaintiffs' failure to establish a relevant antitrust market. As Valve explained in its Rule 702 motion to exclude the testimony of Plaintiff's sole economist, Dr. Schwartz, Plaintiffs failed to provide admissible evidence establishing their claimed market—a critical "threshold step" on which all their antitrust claims depend. *Key v.*

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 1
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

*Qualcomm Inc.*, 129 F.4th 1129, 1145 (9th Cir. 2025). Granting Valve's Rule 702 motion would necessarily lead to entry of summary judgment for Valve. *See, e.g., Ky. Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908, 919 (6th Cir. 2009).

Last, summary judgment is appropriate against many class members because their claims are time-barred. Plaintiffs obtained class certification by purporting to "point to common proof" of Valve's alleged supracompetitive revenue share and PMFN within the class period. Dkt. 392 (class certification order), at 25. But most class members first contracted with Valve—and were allegedly first injured by the claimed conduct—well *before* the limitations period. To pursue their claims now, these plaintiffs must identify a "new and independent" overt act during the limitations period, rather than something that is "merely a reaffirmation of a previous act." *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987). They have failed to do so.

In short, Plaintiffs claim Valve has engaged in certain specific forms of anticompetitive conduct. But they have failed to support their theory that Valve had monopoly or even market power when it allegedly began that conduct. They have failed to establish a relevant antitrust market, which is a gating element for all of their claims. And many of them have failed to rebut Valve's showing that their claims are untimely. The Court should grant summary judgment.

## STATEMENT OF FACTS

Valve began as a startup video game developer, selling games in retail stores like most other developers. In 2003, Valve joined the ranks of digital game distributors when it launched Steam to sell its own games and to take advantage of the then-new availability of broadband internet to provide a platform that updated players' games efficiently. In 2005, it began allowing other developers to offer their games on Steam and slowly grew its online store and community to provide a host of services to thousands of developers and millions of users.

As much as Steam has grown, Valve's core business model remains the same. As described below, Valve has always operated Steam with a revenue-share model, selling developers' games on its platform in exchange for a share of the revenue. It is undisputed that Steam's revenue-share

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 2
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

rate has only *decreased* over time, even as Steam became more popular. Now, roughly two decades later, Plaintiffs claim antitrust injury from Valve's longstanding practices.

## I.    The Rise of Digital Distribution

In 1998, Valve released its first video game. Ex. 1 (Gowrisankaran Opening Rpt.) ¶ 38. At that time, video games of all types—PC, console, and handheld games—were primarily sold as physical media at brick-and-mortar retail stores. *Id.* ¶ 48; Ex. 2 (Schwartz Opening Rpt.) ¶ 20. Developers had to grapple with challenges like manufacturing, distributing, and securing shelf space for their games. Ex. 3 (Lynch Dep.) 35:15–37:1. These costs cut deeply into developers' margins; as an example, Valve itself recovered only ███ percent of the sale price of its early games sold at retail. Ex. 1 (Gowrisankaran Opening Rpt.) ¶ 85.

As many forms of media slowly shifted to digital distribution, so too did video games. Many companies launched digital game marketplaces throughout the 2000s. For PC games, those outlets included PlayOnline (2000), Stardock Central (2001), Direct2Drive (2004), and GamersGate (2004). Ex. 2 (Schwartz Opening Rpt.) ¶ 20; Ex. 1 (Gowrisankaran Opening Rpt.) ¶ 53 & n.97. In the mid-2000s, the digital market became even more crowded when Microsoft and Sony launched stores for their console systems, Xbox and PlayStation. Ex. 1 (Gowrisankaran Opening Rpt.) ¶ 53 & n.98. Over time, other platforms joined the mix with varying degrees of success, including Ubisoft Connect (2009), Green Man Gaming (2010), EA Origin (later re-named EA App) (2011), Microsoft Store (2012), Itch.io (2013), WinGameStore (2014), Discord PC Store (2018), Epic Games Store (2018), and Riot Client (2021). Ex. 2 (Schwartz Opening Rpt.) ¶¶ 20, 62, 66; Ex. 1 (Gowrisankaran Opening Rpt.) ¶¶ 114–15 Ex. 2. Despite this consistent pattern of entry, digital distribution did not surpass physical sales until 2013, eight years after Valve opened Steam to third-party sales. *See* Ex. 4 (Chiou Corrected Rpt.), Ex. 13; Ex. 5 (Rietveld Rebuttal Rpt.), Fig. 1.

Today, the video game industry is among the fastest growing sectors in entertainment and media, with 3.38 billion players worldwide and on track to top $300 billion in overall revenue by

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 3
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

2028. *See* Dkt. 182-2 (Rietveld Class Rpt.) ¶ 27; Ex. 1 (Gowrisankaran Opening Rpt.) ¶ 112. Participants in the industry include:

- Multibillion dollar companies like Microsoft and Sony, which digitally distribute both console and PC games besides selling their popular consoles, *see* Ex. 2 (Schwartz Opening Rpt.) ¶¶ 16, 62 (Table 1); Ex. 6 (Gowrisankaran Rebuttal Rpt.), Ex. 6;

- Amazon, which operates a cloud gaming platform and sells digital games online, *see* Ex. 6 (Gowrisankaran Rebuttal Rpt.), Ex. 6; Ex. 7 (Schwartz Dep.) 36:22–24, 37:24–38:6;

- Google, which recently launched a PC gaming platform called Google Play Games, *see* Ex. 6 (Gowrisankaran Rebuttal Rpt.) ¶ 127;

- Game developers employing thousands of people and earning billions of dollars a year, including Riot Games, Epic Games, Activision Blizzard, Nintendo, Electronic Arts, and Roblox, *see* Ex. 2 (Schwartz Opening Rpt.) ¶ 25; Ex. 7 (Schwartz Dep.) 364:23–369:2 (not disputing, but also not knowing, anything about game revenues for other companies in the industry); Ex. 6 (Gowrisankaran Rebuttal Rpt.) ¶¶ 104–10; and

- Developers self-distributing through their own websites, like named Plaintiff Wolfire, Ex. 4 (Chiou Corrected Rpt.) ¶ 163, and Battlestate Games, developer of the hit game *Escape from Tarkov*, Ex. 6 (Gowrisankaran Rebuttal Rpt.) ¶ 29.

## II.   Steam's Emergence and Growth

In 2003, Valve entered the digital distribution fray by launching Steam, which automatically updated Valve's games, offered faster and more secure access to those games, and connected players to each other. *See* Ex. 2 (Schwartz Opening Rpt.) ¶ 33; Ex. 6 (Gowrisankaran Rebuttal Rpt.) ¶ 69. When launching *Half-Life 2* a year later, Valve made the game available for purchase on both Steam and in traditional brick-and-mortar stores but required all purchasers to create a Steam account to play, enabling them to benefit from Steam's features. *See* Ex. 2

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 4
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

(Schwartz Opening Rpt.) ¶ 34; Ex 1 (Gowrisankaran Opening Merits Rpt.) App. A, ¶ 2; Ex. 4 (Chiou Corrected Rpt.), App. D ¶ 62 & n.127. In 2005, Valve began allowing other developers to offer their games on Steam. Ex. 2 (Schwartz Opening Rpt.) ¶ 35.

In addition to providing the platform and technology for games to be purchased and played digitally with Steam, Valve continuously developed new Steam features to serve developer and consumer needs. There is no dispute that Steam has more features for developers and consumers than other platforms, including Epic Games Store—the competitor Plaintiffs focus on the most. Ex. 7 (Schwartz Dep.) 244:14–251:22 (not disputing, but also not aware of, enhanced features for Steam compared to Epic Games Store, such as the ability for users to leave detailed reviews with feedback for game developers; family sharing of games; and Remote Play Together, which improves the social experience for certain multiplayer games); Ex. 1 (Gowrisankaran Opening Rpt.) ¶¶ 71–101, 105(c) n.211, Ex. 1; Ex. 6 (Gowrisankaran Rebuttal Rpt.) ¶¶ 48–58 & Ex. 2. However, these investments came at a cost, as Steam operated at a loss in ▓▓ through at least ▓▓ and at a cumulative loss until ▓▓ *See* Ex. 8 (Schwartz Suppl. Rpt.), Attach. D-1 (Steam P&Ls, 2003–23); Ex. 6 (Gowrisankaran Rebuttal Rpt.) ¶ 114; *see also* Ex. 8 (Schwartz Suppl. Rpt.), Attach. D-5 (same result under Dr. Schwartz's adjusted Steam P&Ls, 2003–23).

Unlike some of its competitors, Valve has no exclusivity agreements with developers and does not require any developer to offer its games only on Steam. Ex. 6 (Gowrisankaran Rebuttal Rpt.) ¶ 251. On the contrary, Valve encourages developers to sell games wherever they think makes the most sense for their game. *Id.* Valve also makes Steam Keys—alphanumeric codes allowing users to redeem the developer's games on Steam—available to every developer at no cost. Ex. 2 (Schwartz Opening Rpt.) ¶ 46; Ex. 1 (Gowrisankaran Opening Rpt.) ¶ 142. Many platforms acquire these Steam Keys from developers and resell them widely, allowing developers to make additional revenue, and purchasers to redeem the Keys on Steam to access the game and the full suite of accompanying Steam features. Ex. 1 (Gowrisankaran Opening Rpt.) ¶ 140. Despite

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 5
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

earning no revenue from the distribution or redemption of Steam Keys, Valve builds the infrastructure needed to launch, update, and maintain Key-purchased games. *Id.* ¶ 142.

**III.    Valve's Decreasing Revenue Share on Steam**

Every developer distributing games on Steam enters into a Steam Distribution Agreement ("SDA"), which includes a revenue-sharing provision. *See* Ex. 2 (Schwartz Opening Rpt.) ¶ 43. In Valve's first agreements with third-party developers in 2005, it agreed to distribute those developers' games in exchange for ▮ percent of the revenue from the sale (with ▮ percent going to the developer). *Id.* ¶ 43, n.145; Ex. 7 (Schwartz Dep.) 12:19–13:11; Ex. 3 (Lynch Dep.) 29:12–16. Valve entered the ▮ of those agreements, with ▮ at a ▮ ▮ on ▮; that agreement covered distribution for the ▮ third-party game on Steam, ▮, which shipped almost three months later on ▮. Ex. 2 (Schwartz Opening Rpt.) ¶ 43, n.145. Around ▮ Valve converged on a standard 30 percent revenue share (with 70 percent going to the developer). *Id.*; Ex. 7 (Schwartz Dep.) 13:12–14:13; Ex. 4 (Chiou Corrected Rpt.), Ex. 19. A 30 percent revenue share is common in the gaming industry. *See, e.g.,* Ex. 9 (Rietveld Dep.) 327:10–16; Ex. 6 (Gowrisankaran Rebuttal Rpt.) ¶¶ 275–277. That is the headline rate for every one of the three major video game consoles (Xbox, PlayStation, and Nintendo Switch) as well as other platforms that distribute PC games, such as Good Old Games and Green Man Gaming. *See* Ex. 6 (Gowrisankaran Rebuttal Rpt.), Ex. 17; Ex. 7 (Schwartz Dep.) 17:6–20:16 (not disputing, but also not aware of, these facts).

Valve further reduced its revenue share in 2018 by adopting a tiered structure dropping the revenue share to 25 percent for all of a game's sales in excess of $10 million, and to 20 percent for all sales in excess of $50 million. *See* Ex. 2 (Schwartz Opening Rpt.) ¶ 45; Ex. 6 (Gowrisankaran Rebuttal Rpt.), Ex. 16. As a result, Valve's overall blended revenue share, according to Dr. Schwartz, has fallen to ▮ percent. Ex. 2 (Schwartz Opening Rpt.) ¶ 478.

In short, Valve's revenue share was *highest* in Steam's earliest days, when Steam had no appreciable market share, and Valve's revenue share has only *decreased* as Steam has grown more

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 6
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

successful. Ex. 7 (Schwartz Dep.) 16:9–17:5. Following from Judge Coughenour's earlier ruling in this case, this gradual decrease of Valve's revenue-share "cuts against the [Complaint]'s anti-competitive claims." Dkt. 67 at 6 n.4.

## IV.    The Challenged Conduct and Valve's Market Share

Plaintiffs' core allegations are that Valve's revenue share is supracompetitive, and that Valve maintains it by enforcing a PMFN. *See* Second Consolidated Am. Compl. ("SCAC"), Dkt. 127, ¶¶ 195–211. But these allegations cannot be squared with the undisputed facts, because all of the claimed conduct allegedly first took place when Valve clearly *lacked* market power.

As described above, Valve used a revenue-share model from the start and took a far higher share of revenue when it first opened Steam to third-party distribution in 2005. Dr. Schwartz has also opined that Valve adopted its alleged PMFN policy in 2007. *See* Ex. 2 (Schwartz Opening Rpt.), Attach. H-1; *id.* ¶ 342; Ex. 7 (Schwartz Dep.) 158:4–6. Yet Plaintiffs have *no evidence* of Valve's market share prior to 2017. Ex. 7 (Schwartz Dep.) 79:5–8. They thus have no rebuttal to Professor Chiou's calculation of Valve's historic market share in a market limited to just PC game distribution at various critical junctures:

- ▉ percent in 2005, when Valve started distributing third-party games on Steam;
- ▉ percent in 2007, when Plaintiffs allege that Valve first imposed a PMFN; and
- ▉ percent in ▉, around when Valve converged on a 30 percent revenue share.

*See* Ex. 4 (Chiou Corrected Rpt.), Ex. 19; *see also id.* Ex. 16 (even lower shares in a market that includes consoles). Nor can Plaintiffs show market power by claiming that Valve was uniquely profitable in ▉, as it was indisputably operating at a loss. Ex. 7 (Schwartz Dep.) 28:14–23.

## V.    Procedural History

This case consolidates two separate actions: Plaintiff Wolfire's Complaint, filed on April 27, 2021, *see* Dkt. 1, and Plaintiff Dark Catt's Complaint, filed on June 28, 2021, *see* 21-CV-872, Dkt. 1. Judge Coughenour twice ruled on Valve's motions to dismiss in both cases.

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 7
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

In its first *Wolfire* order, the Court granted in part Valve's motion to dismiss for failure to allege antitrust injury based on *Somers*. Because Valve "has always charged the same fee to game publishers—30 percent," even before it allegedly became "dominant" in the market, the Court found that Wolfire's "allegations are not meaningfully different from *Somers v. Apple*." Dkt. 67 at 6. The Court also separately granted in part Valve's motion in *Dark Catt*, though on different grounds—that Dark Catt did not sufficiently allege anticompetitive conduct. Resolving all inferences in Dark Catt's favor, Judge Coughenour declined to dismiss *Dark Catt* under *Somers* because the complaint could be read as suggesting Valve was always "the market leader for PC game delivery." 21-CV-872, Dkt. 56 at 3.

After Wolfire and Dark Catt amended their complaints, the Court allowed both cases to proceed. *See* Dkt. 80 (second *Wolfire* motion to dismiss order); 21-CV-872, Dkt. 70 (second *Dark Catt* motion to dismiss order). In allowing the cases to proceed notwithstanding the prior dismissal, Judge Coughenour relied on Plaintiffs' new allegations that Valve instantly acquired monopoly power upon launching Steam. Specifically, Judge Coughenour relied on the allegation that Valve "acquired the World Opponent Network gaming platform in 2001 and shut it down a few years later, forcing gamers onto the Steam Platform, making Steam 'instantly . . . a must-have platform.'" Dkt. 80, at 7 (quoting Dkt. 68, at 16–17). He was also required to accept as true the allegations in both complaints that at the beginning, Valve "charge[d] a fee [revenue share] well above its cost structure because [its] brick-and-mortar competitors had a far higher cost structure." *Id.* (citing Dkt. 68, at 5, 14, 19, 88). As explained below, those representations have been proven false through discovery.

## ARGUMENT

A court should grant summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] complete failure of proof concerning an essential element of the nonmoving party's case" entitles

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 8
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

the moving party to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Cleary v. News Corp.*, 30 F.3d 1255, 1259 (9th Cir. 1994).

Antitrust injury is just such an "essential element," and summary judgment is warranted where a plaintiff fails to establish it. *See, e.g., Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.*, 39 F.3d 951, 953–56 (9th Cir. 1994). So too when a plaintiff fails to establish a relevant market. *See, e.g., Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th Cir. 1991); *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 975 (9th Cir. 1983); *see also AFMS LLC v. United Parcel Serv., Inc.*, 696 F. App'x 293, 294 (9th Cir. 2017) ("Summary judgment in an antitrust case is appropriate where the plaintiff fails to define a cognizable market."). Last, summary judgment is appropriate where a suit is barred by the applicable statute of limitations. *See, e.g., Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1057 (9th Cir. 2020).

## I.    Plaintiffs Have Failed To Establish Antitrust Injury.

### A.    *Somers* Forecloses Plaintiffs' Claims Because The Challenged Conduct Was Allegedly Adopted When Valve Lacked Monopoly Power.

To succeed on their claims, Plaintiffs "must prove the existence of '*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)). Antitrust injury "is an element of all antitrust suits brought by private parties seeking damages under Section 4 of the Clayton Act." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). Plaintiffs seeking injunctive relief also must establish antitrust injury. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986). Limiting antitrust suits only to plaintiffs who can show antitrust injury ensures that antitrust laws protect "competition, not competitors," *Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962).

"Antitrust injury is made up of four elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 9
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

type the antitrust laws were intended to prevent." *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003). To establish the second element, a plaintiff must have suffered "some credible injury caused by the unlawful conduct." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1056 (9th Cir. 1999). To be "causally related to the antitrust violation," the alleged "harm may not be derivative and indirect or secondary, consequential, or remote." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1004 (9th Cir. 2008) (quotations omitted).

In *Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013), the Ninth Circuit fleshed out the requirements of antitrust injury based on allegedly supracompetitive pricing in a case with important similarities to this one. The plaintiff, seeking to represent a class, sued Apple, alleging among other claims that Apple had monopolized the market for downloads of music files and thereby charged supracompetitive prices. *Id.* at 962–63. The Ninth Circuit affirmed the district court's dismissal with prejudice for failure to plausibly allege antitrust injury. Because the plaintiff alleged "that the price for music downloads remained the same (99 cents) since [Apple] entered the market in 2003, *before* it obtained monopoly in the audio download market, and *after* it allegedly acquired monopoly in that market in 2004," her "own allegations d[id] not square with her overcharge theory" and "rendered implausible" her claims. *Id.* at 964. The alleged harm (inflated prices) could not be causally related to the alleged monopolization because the prices were the same before the monopoly began. *Id.* While the Ninth Circuit also observed that Apple's monopoly allegedly ended in 2008, that did not undermine the core logic of the decision: "The fact that Apple continuously charged the same price for its music irrespective of the absence or presence of a competitor renders implausible Somers' conclusory assertion that Apple's [allegedly anticompetitive] software updates affected music prices." *Id.* at 964.

*Somers* thus stands for the proposition that a plaintiff cannot establish antitrust injury if the challenged conduct began before the defendant allegedly acquired monopoly power. While *Somers* was a case about allegedly supracompetitive consumer prices, other courts have adopted similar reasoning in other contexts. *See, e.g., Abbott Labs. v. Adelphia Supply USA*, 2017 WL 5992355,

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 10
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

at *7 (E.D.N.Y. 2017) (relying on *Somers* and dismissing complaint where plaintiff's allegations showed that defendant's prices remained the same before and after the allegedly anticompetitive vertical agreement); *Arcell v. Google LLC*, 744 F. Supp. 3d 924, 932 (N.D. Cal. 2024) (relying on *Somers* and dismissing complaint where plaintiff had not offered "any factual basis for plausibly inferring that Google or other firms would offer more privacy protections, or that users would be compensated for their search data, in a search market unrestrained by the [challenged] contracts"); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 922 (9th Cir. 2015) (affirming summary judgment for defendant where the evidence established it had maintained the same pricing even in the face of competitive threats, meaning the plaintiff could not establish antitrust injury caused by the challenged anticompetitive conduct); *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1255 (9th Cir. 2008) (affirming summary judgment and concluding that antitrust plaintiff could not establish injury because "the prices [he] paid . . . after the [allegedly anticompetitive] agreement became effective were the same, or even lower, than the prices listed before"); *Martin v. Am. Kennel Club, Inc.*, 697 F. Supp. 997, 1005 (N.D. Ill. 1988) (awarding defendants summary judgment because "no evidence . . . tend[ed] to show" antitrust injury given that "[p]rices remained the same" after the allegedly anticompetitive conduct).

As noted above, Judge Coughenour found *Somers* directly applicable to Plaintiffs' case. In granting in part Valve's first motion to dismiss the *Wolfire* Plaintiffs' Consolidated Amended Complaint, Judge Coughenour concluded that "Plaintiff's allegations are not meaningfully different from" those in *Somers*. Dkt. 67, at 6. Because "the price [i.e., Valve's revenue share] remained the same throughout, even during periods of intense competition in the marketplace," Plaintiffs could not show antitrust injury. *Id.*

Now that discovery has closed, it is clear that Judge Coughenour's initial instincts were correct, because the challenged conduct was allegedly adopted before Valve could have "obtained monopoly." *Somers*, 729 F.3d at 964. Valve adopted its revenue-share model in 2005 before it

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 11
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

even entered Dr. Schwartz's proposed relevant market,[1] Ex. 7 (Schwartz Dep.) 12:14–13:11 (Valve charged ▮ percent revenue share in 2005), and Dr. Schwartz claims that Valve adopted its PMFN in 2007. *Id.* 158:4–6. There is no evidence that Valve had monopoly power at either of these points in time. The only evidence of Valve's historical market shares comes from Professor Chiou, who opines that Valve had low shares ▮ percent or lower) clearly inconsistent with monopoly power. *See supra*, at 7; *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("[A] market share of less than 50 percent is presumptively insufficient to establish market power."); *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945) (Hand, J.) ("[I]t is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three per cent is not."). Dr. Schwartz has not calculated competing historical market shares in *any* potential relevant market, Ex. 7 (Schwartz Dep.) 79:5–8, or assembled other evidence of historical market power, *see infra*, at 14. In fact, this case is stronger than *Somers* because Valve's revenue shares have *decreased* over time in the face of competition from many sources. Ex. 7 (Schwartz Dep.) 16:9–17:5. The undisputed evidence thus confirms that any injury Plaintiffs claim cannot have been caused by the challenged conduct.

**B.**     **Plaintiffs Have Failed To Substantiate Any Of The Allegations That Allowed Them To Avoid *Somers*.**

Plaintiffs evaded *Somers* on Valve's motion to dismiss only by amending to plead specific facts, namely that Valve (1) "acquired the World Opponent Network gaming platform in 2001 and shut it down a few years later, forcing gamers onto the Steam Platform" and showing instant market power, Dkt. 80 at 7; (2) charged a fee "well above its cost structure" shortly after its inception, *id.*; (3) was always "the market leader for PC game delivery," *Dark Catt*, 21-CV-872, Dkt. 56, at 3; and (4) "[n]ever lacked market power over third-party game distribution," *Dark Catt*,

---

[1] Specifically, Valve ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See supra*, at 6 (▮▮▮▮▮▮▮▮ SDA signed ▮ months before the game was listed on Steam). Valve cannot have had instant monopoly power in a market it was *not even in*.

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 12
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

21-CV-872, Dkt. 70, at 4–5. While these allegations were enough to survive motions to dismiss, summary judgment is different. What matters now is what the *admissible evidence shows*. *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007); *see also Cedar Park Assembly of God of Kirkland, Washington v. Kreidler*, 130 F.4th 757, 763 (9th Cir. 2025) (noting that "the burden to *allege* standing at the pleading stage and the burden to *demonstrate* standing at the summary judgment stage differ" and that "[s]ummary judgment presents a higher hurdle"). At this stage, mere allegations, or evidence that is "merely colorable" or "not significantly probative," are not enough; "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Plaintiffs have not come close to meeting that standard.

It is now undisputed that Valve never acquired the World Opponent Network ("WON"). Plaintiffs initially alleged that Valve acquired WON and Dr. Schwartz parroted those allegations in his class certification report. *See* Dkt. 182-1 (Schwartz Class Rpt.) ¶¶ 31–32. But Dr. Schwartz subsequently testified that he did not know what WON was, *see* Ex. 10 (Schwartz Class Dep.) 180:2–4 ("Q. What is the World Opponent Network, if you know? A. I don't know."). He then omitted *any* reference to WON in his merits reports. Beyond Dr. Schwartz's vanishing assertions, uncontroverted evidence establishes that "Valve never acquired or owned WON." Johnson Decl., Dkt. 231, ¶ 10. *See also id.* Ex. 1, Dkt. 231-1, ¶ 15 (Valve termination agreement with Sierra explicitly contemplating *Sierra*'s continued ownership and ███████ of WON).

The allegation that Valve's revenue share was only initially "a fee well above its cost structure," Dkt. 80 at 7, has also been proven false several times over. The undisputed evidence shows that Steam was *unprofitable* for several years after it started offering games from other developers. *See* Ex. 8 (Schwartz Suppl. Rpt.), Attach. D-1 (Steam P&Ls, 2003–23), D-5 (Adjusted Steam P&Ls, 2003–23); Ex. 6 (Gowrisankaran Rebuttal Rpt.), ¶ 114. When Valve started distributing third-party games on Steam in 2005, it ███████████████████████ ████████████████████████████████ *See* Ex. 8 (Schwartz Suppl. Rpt.),

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 13
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

Attach. D-1; *id.* Attach. D-5. Steam did not turn a cumulative net profit from its inception until ▮▮▮ *Id.* Attachs. D1, D-5. Even today, there are allegations but no *evidence* that a lower revenue share would be profitable or workable for a platform that offers Steam's features. For example, while Plaintiffs hold up Epic Games Store as a contrast to Steam, it indisputably has fewer features than Steam, *see supra*, at 5, and operates at a loss, *see Epic Games, Inc. v. Apple Inc.*, 449 F. Supp. 3d 898, 932–33 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded*, 67 F. 4th 946 (9th Cir. 2023) ("The evidence is also undisputed that [Epic's] 88/12 commission is a below-cost price and the store is expected to operate at a loss for many years at this rate."); Ex. 6 (Gowrisankaran Rebuttal Rpt.) ¶ 114. The notion that Valve should have a lower revenue share without proof it could profitably do so is fanciful, for "the antitrust laws do not require a business to cut its own throat." *Scanlan v. Anheuser-Busch, Inc.*, 388 F.2d 918, 921 (9th Cir. 1968) (quotations omitted).

Last, Plaintiffs have failed to show Valve was always a market leader with market power over PC game delivery. Despite their continued claim that Valve instantly had monopoly power, Ex. 11 (Schwartz Rebuttal Rpt.) ¶¶ 102–03, Plaintiffs wholly failed to establish Valve's historical market share when the challenged conduct was adopted (or, for that matter, at any time prior to 2017), or that Valve earned supracompetitive profits at that time. Moreover, their experts' admissions further undercut any such theory. Professor Rietveld prepared a chart showing that far more video game sales took place in physical retail than on digital platforms until 2013, *see* Ex. 5 (Rietveld Rebuttal Rpt.), Fig. 1, and Dr. Schwartz does not dispute that retail sales were in the relevant market at least 2007, Ex. 7 (Schwartz Dep.) 119:2–16. Dr. Schwartz likewise did not contest that Valve's total revenues from third-party PC game distribution between 2005 and 2007 constituted less than ▮▮▮ *percent* of total PC game sales. *Id.* 120:18–126:21.

Nor can Plaintiffs raise a jury issue with their passing allegation that Valve's popular game, *Half-Life 2*, provided it with instant market power at Steam's inception, SCAC ¶¶ 49–50. *Half-Life 2* was released in October of 2004, 12 months before Valve shipped any third-party games on Steam in October of 2005 (*i.e.*, before Valve entered the alleged relevant market). At his

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 14
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

deposition, Dr. Schwartz did not dispute that (1) *Half-Life 2* was only the sixth most popular game in 2005, Ex. 7 (Schwartz Dep.) 134:17–22; (2) it did not appear in the top ten most popular games in 2006, *id.* at 137:5–9; (3) almost none of the top ten most popular games in 2005 and 2006 were on Steam, *id.* at 133:2–137:9; and (4) the first 25 third-party games that actually appeared on Steam collectively earned far less in their first year than ███████████████████████ *id.* at 128:14-137:9. Dr. Schwartz also acknowledged that there were multiple other digital PC game distribution platforms in existence in 2005, or shortly thereafter, and that he has no data regarding their competitive standing vis-à-vis Steam. *Id.* at 137:10–146:10. None of these concessions are consistent with the notion that Valve had instant market power.

In short, Plaintiffs relied on a series of factual allegations to avoid *Somers* at the motion to dismiss stage. But none have proven true. In antitrust cases, "zero plus zero equals zero." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002). The undisputed facts show that Valve's revenue share *dropped*, rather than "remain[ing] the same . . . *before* it [allegedly] obtained monopoly . . . and after it allegedly acquired monopoly." *Somers*, 729 F.3d at 964. Under *Somers*, that means Plaintiffs cannot establish any genuine issue of material fact as to whether they have suffered antitrust injury—an essential element of their claims. Valve therefore is entitled to summary judgment.

## II.    Plaintiffs Cannot Establish a Relevant Market Absent Their Flawed And Inadmissible Expert Testimony.

Valve has concurrently filed motions challenging the testimony of Plaintiffs' expert witnesses, Dr. Schwartz and Professor Rietveld, under Federal Rule of Evidence 702. Those motions explain that neither expert should be allowed to testify as to the relevant market in this case. Dr. Schwartz uses an unreliable, results-driven approach to market definition that is counter to accepted economic practices, and Professor Rietveld admits that he should not be opining on the relevant market in any way. Without any reliable expert testimony, Plaintiffs have no evidence supporting their alleged market definition. That dooms their case.

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 15
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

"A threshold step in any antitrust case is to accurately define the relevant market." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). That step is critical, because "[w]ithout a proper definition of the relevant market, it is impossible to determine a party's influence over that market." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 542–47 (2018). And "[b]ecause market power is often inferred from market share, market definition generally determines the result of the case." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 n.15 (1992). The plaintiff has the burden of establishing the relevant market in both Section 1 rule-of-reason and Section 2 monopolization cases. *See Am. Express Co.*, 585 U.S. at 541; *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977).

Summary judgment is appropriate where a plaintiff fails to establish a relevant market. *See, e.g., In re Air Passenger Computer Rsrvs. Sys. Antitrust Litig.*, 694 F. Supp. 1443, 1459 (C.D. Cal. 1988); *AFMS LLC v. United Parcel Serv. Co.*, 105 F. Supp. 3d 1061, 1075–76 (C.D. Cal. 2015), *aff'd*, 696 F. App'x 293 (9th Cir. 2017) ("Plaintiff cannot survive summary judgment because it fails to provide any evidence of the existence and boundaries of a legally cognizable relevant market"). And that principle fully applies when the court excludes the plaintiff's market definition evidence under Rule 702: "Summary judgment is . . . appropriate when a court excludes the only expert testimony proposing a relevant market, since antitrust claims make no economic sense in the absence of proof of relevant markets." *Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880, 896 (W.D. Ky. 2020) (quotation marks omitted).

For example, in *Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 914–15 (6th Cir. 2009), the district court granted summary judgment after finding the plaintiff's expert testimony supporting market definition inadmissible, thus leaving the plaintiff without sufficient evidence to support its claimed relevant markets. The Sixth Circuit affirmed, agreeing that "without [the expert's] testimony," the plaintiff "lack[ed] the ability to define the relevant markets necessary to succeed on its claims." *Id.* at 919.

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 16
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

Other courts have ruled similarly. *See, e.g., In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966, 1000 (C.D. Cal. 2012) (granting summary judgment after excluding the plaintiffs' expert, because there was no "adequate evidentiary basis in the record, absent [the expert's excluded] testimony, for a jury to find that Plaintiffs have defined an economically significant product market."); *Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, 751 F. Supp. 3d 381, 390 (D. Del. 2024) (granting summary judgment after concluding that the plaintiff's expert "essentially has no methodology for defining the relevant markets" meaning that the plaintiff "fail[ed] to define the relevant product markets"); *Marathon Petroleum*, 464 F. Supp. 3d at 896 (granting summary judgment after finding "a total failure of proof of any relevant market in this case . . . because Plaintiff's expert opinions did not pass *Daubert* analysis"); *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1236 (N.D. Ala. 2011), *aff'd*, 721 F.3d 1281 (11th Cir. 2013) (granting summary judgment after finding that the plaintiff's expert opinion was "fundamentally flawed and fail[ed] to consider the relevant product market," meaning that the plaintiff "failed to present evidence that [defendant] would possess market power in the relevant product market"); *see also It's My Party, Inc. v. Live Nat., Inc.*, 88 F. Supp. 3d 475, 498 (D. Md. 2015), *aff'd*, 811 F.3d 676 (4th Cir. 2016) (similar).

So too here. Without their experts' testimony, Plaintiffs cannot create a genuine issue of material fact supporting their alleged market. Summary judgment is appropriate.

III. **The Claims of All Plaintiffs Who First Contracted With Valve Before April 27, 2017 Are Untimely.**

Summary judgment is also appropriate against a large swath of class members because the undisputed evidence shows that their claims are barred by the statute of limitations. In class actions where some class members' claims accrued outside the statutory period, courts routinely grant partial summary judgment against all time-barred members. *See, e.g., Small v. Allianz Life Ins. Co. of N. Am.*, 2023 WL 5811903, at *3 (C.D. Cal. 2023), *vacated and remanded on other grounds,*

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 17
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

122 F.4th 1182 (9th Cir. 2024); *Cleary v. Am. Airlines, Inc.*, 2022 WL 5320126, at *4 (N.D. Tex. 2022); *Stieberger v. Sullivan*, 738 F. Supp. 716, 758 (S.D.N.Y. 1990).

The Clayton Act sets a four-year statute of limitations for antitrust damages claims. While Plaintiffs' claims for injunctive relief are not subject to that statutory limitation, they "are subject to the equitable defense of laches." *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085 (9th Cir. 2014). And "in applying laches, [courts] look to the same legal rules that animate the four-year statute of limitations under section 4B." *Id.* (citations and quotation marks omitted). Plaintiffs filed their original complaints on April 27, 2021 (*Wolfire*) and June 28, 2021 (*Dark Catt*). That means the claims of any Plaintiffs who allege injury caused by Valve before April 27, 2017 are time-barred.

"Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *see also LaSalvia v. United Dairymen of Arizona*, 804 F.2d 1113, 1117 (9th Cir. 1986) (stating that the "usual rule" is that "antitrust claims accrue when the plaintiff incurs the injury"). 15 U.S.C. § 15b. The challenged conduct that allegedly injured Plaintiffs' business involves the intersection between Valve's revenue share and its alleged PMFN policy. But it is undisputed that Valve has collected a revenue share since Steam's inception. And after this Court accepted, at the class certification stage, that Plaintiffs can present their claim that a PMFN exists through common evidence, they specifically asserted that Valve implemented the PMFN in 2007. *See, e.g.*, Ex. 7 (Schwartz Dep.) 158:4–6; Ex. 2 (Schwartz Opening Rpt.) ¶ 34; Attach. H-1 (first alleged enforcement event on December 12, 2007). It follows, from Plaintiffs' own allegations, that any Plaintiff who had an SDA before December 12, 2007 was first affected by the challenged conduct on that date, and any Plaintiff who entered an SDA thereafter was immediately affected by the challenged conduct. As just one salient example, Plaintiff Wolfire's claims are untimely under Plaintiffs' theory of the case. Wolfire first signed an SDA on December 1, 2008, Ex. 12 (VALVE_ANT_0000396), *after* the challenged conduct allegedly began, but long *before* the limitations cut-off.

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 18
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

Plaintiffs' only effort to escape this straightforward logic is their claim that this case involves "continuing violations" that are an exception to and restart the statute of limitations, Dkt. 315, at 14–15. That argument is contrary to settled law. Under this narrow exception, "an overt act is required to restart the statute of limitations and the statute of limitations runs from the last overt act." *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989); *see Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). An overt act must "(1) be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (quoting *Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)). That overt act must constitute a "separate antitrust violation[]," rather than "a continuing pecuniary injury to a plaintiff." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1055 (5th Cir. 1982); *see also Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 924 (9th Cir. 1982) ("[M]ere 'continuing *impact* from past violations is not actionable. Continuing *violations* are.'" (quoting *Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 760 (9th Cir. 1980)) (emphasis added)). Put simply, a plaintiff must show some new, separate, injurious act during the limitations period.

Plaintiffs cannot satisfy this demanding exception because the only conduct they could attempt to identify—such as a developer's signing a new SDA, Valve's continued collection of revenue shares, cherry-picked statements in the Steam Key guidelines, or any further developer interaction with the alleged PMFN policy—would be simply a "reaffirmation" of practices allegedly adopted earlier. *See Klehr*, 521 U.S. at 189. The Second Circuit's decision in *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019), illustrates the point. US Airways signed a contract in 2006, outside of the limitations period, but argued that it could "recover damages suffered during the limitations period as the result of an anticompetitive contract, regardless when that contract first took effect, because conduct or forbearance from conduct pursuant to the terms of an anticompetitive contract is itself a continuing violation." *Id.* at 67. The Second Circuit rejected that proposition, concluding that "each supracompetitive price charged . . . pursuant to the

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 19
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

2006 contract was not an overt act of its own, but a manifestation of the prior overt act of entering into the 2006 contract." *Id.* at 69. The same logic applies here.

Other circuits, including the Ninth Circuit, agree. *See Eichman*, 880 F.2d at 160 ("[T]he passive receipt of profits from an illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations"); *Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004) ("Performance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period."); *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999) (even if an original contract was illegal, payments under that contract "were only a manifestation of the previous agreement," not "'new and independent act[s],'" as required to restart the statute of limitations"). So has a court in this district. *See Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 2010 WL 4365807, at *9 (W.D. Wash. 2010), *aff'd*, 723 F.3d 1019 (9th Cir. 2013) (holding a claim time-barred when an agreement formed outside the limitations period was "reaffirmed throughout the limitations period").

The law on this point is overwhelming, as two recent district court decisions illustrate. *Choh v. Brown University*, 753 F. Supp. 3d 117 (D. Conn. 2024), involved a student-athlete who challenged the Ivy League's policy of not awarding athletic scholarships. The court held that his claim was time-barred because it accrued when he "first felt the adverse impact" of the challenged agreement upon *enrollment*, more than four years before bringing suit. *Id.* at 136. Even though he continued to attend Brown during the limitations period, the University's failure to give him a scholarship throughout his college career was merely a consequence of his earlier decision to enroll. *Chalmers v. National Collegiate Athletics Ass'n*, 2025 WL 1225168 (S.D.N.Y. 2025), is similar. The plaintiffs there were former college basketball players—each of whom had graduated more than four years before filing suit—who challenged "the NCAA's use of the student-athletes' names, images, and likenesses ('NIL') in advertisements and for other commercial purposes" under the antitrust laws. *Id.* at *1. Canvassing the law on point, the court dismissed the plaintiffs' case, finding that "use of a plaintiff's NIL acquired in the 1990s or early 2000s is a continuing

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 20
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

effect—a consequence—an outgrowth of the alleged anticompetitive conduct," not a new overt act restarting the limitations period. *Id.* at *9.

Applying these well-established principles, the claims of all class members who entered contracts with Valve prior to April 27, 2017 (including Plaintiff Wolfire), are time-barred. Any allegations that Valve continued to collect supracompetitive revenue shares, or continued to enforce a PMFN, are not new overt acts restarting the limitations period. Rather, those allegations would just be the "manifestation" of conduct that allegedly previously existed. *US Airways*, 938 F.3d at 69. The Court should grant summary judgment to Valve with respect to all such claims.

## CONCLUSION

The motion for summary judgment should be granted.

DATED this 27th day of May, 2025.

*I certify that this memorandum contains 7,563 words, in compliance with the Local Civil Rules.*

WILKINSON STEKLOFF LLP

s/ *Rakesh Kilaru*
Rakesh Kilaru, *Admitted Pro Hac Vice*
James Rosenthal, *Admitted Pro Hac Vice*
Max Warren, *Admitted Pro Hac Vice*
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000
Fax: (202) 847-4005
rkilaru@wilkinsonstekloff.com
jrosenthal@wilkinsonstekloff.com
mwarren@wilkinsonstekloff.com

Keri L. Arnold, *Admitted Pro Hac Vice*
Ralia E. Polechronis, *Admitted Pro Hac Vice*
Caroline Li, *Admitted Pro Hac Vice*
WILKINSON STEKLOFF LLP
130 West 42nd Street, 24th Floor
New York, New York 10036
Tel: (212) 294-8910
Fax: (202) 847-4005
karnold@wilkinsonstekloff.com
rpolechronis@wilkinsonstekloff.com
cli@wilkinsonstekloff.com

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 21
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005

*s/ Blake Marks-Dias*
Blake Marks-Dias, WSBA No. 28169
Eric A. Lindberg, WSBA No. 43593
Todd T. Williams, WSBA No. 45032
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, WA  98104
(206) 625-8600 Phone
(206) 625-0900 Fax
bmarksdias@corrcronin.com
elindberg@corrcronin.com
twilliams@corrcronin.com

Jessica M. Rizzo, *Admitted Pro Hac Vice*
BALLARD SPAHR LLP
1735 Market Street, Floor 51
Philadelphia, PA 19103
(215) 665-8500 (Phone)
(215) 864-8999 (Fax)
rizzoj@ballardspahr.com

Nathan M. Buchter, *Admitted Pro Hac Vice*
FOX ROTHSCHILD LLP
2000 Market Street STE 20TH FL
Philadelphia, PA 19103
Telephone (215) 299-3010
nbuchter@foxrothschild.com

Charles B. Casper, *Admitted Pro Hac Vice*
Robert E. Day, *Admitted Pro Hac Vice*
MONTGOMERY McCRACKEN WALKER &
RHOADS LLP
1735 Market Street, 21st Floor
Philadelphia, PA 19103
Telephone (215) 772-1500
ccasper@mmwr.com
rday@mmwr.com

Scott M. Danner, *Admitted Pro Hac Vice*
Priyanka Timblo, *Admitted Pro Hac Vice*
HOLWELL SCHUSTER & GOLDBERG LLP
425 Lexington Avenue
New York, NY 10017
(646) 837-5151 (Phone)
sdanner@hsgllp.com
ptimblo@hsgllp.com

*Attorneys for Defendant Valve Corporation*

DEFENDANT VALVE CORPORATION'S MOTION FOR
SUMMARY JUDGMENT - 22
No. 2:21-cv-00563-JNW

WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000/Fax: (202) 847-4005