# EXHIBIT 5

# (Dkt No. 456.05)

# Using Policy Functions to Estimate Merger Impacts:

# an Application to JetBlue-Spirit[*]

Chris Bruegge [†]      Gautam Gowrisankaran [‡]      Alex Gross[§]

February 15, 2025

## Abstract

This paper develops methods to estimate the equilibrium price effects of a merger using policy functions on prices. In contexts where price can appropriately capture consumer welfare, this methodology is simpler to implement than a structural equilibrium approach. It is also robust to multiple models of competition and variation in the nature of competition across markets. We apply this methodology to the JetBlue-Spirit merger. We estimate policy functions using entry events and calculate net harm by simulating the equilibrium impact of the merger on prices, accounting for changes in JetBlue's size and the elimination of Spirit. Our preferred specification shows that the merger would cause \$2.6 billion in annual harm. Our results demonstrate the importance of allowing entry effects to vary with capacity and using price data for all competitors in calculating the impact of this merger.

JEL Codes: L41, L13, L93

Keywords: airlines, entry, antitrust

---

[*]The views expressed in this article are not purported to represent those of the U.S. Department of Justice (DOJ) or any other entity. Bruegge consulted on the proposed JetBlue-Spirit Merger and Gowrisankaran testified regarding the competitive effects of this merger, both on behalf of the DOJ. Parts of this paper and exhibits build on Gowrisankaran's expert reports and testimony in this matter. The authors thank Patricio Hernandez for excellent research assistance. The authors also thank Mark Chicu, Trisha Corcoran, Ron Drennan, Paul Grieco, and Andrew Sweeting for helpful comments.

[†]Cornerstone Research, cbruegge@cornerstone.com

[‡]Department of Economics, Columbia University, CEPR, and NBER, gautamg2@gmail.com.

[§]U.S. Department of Justice, Economic Analysis Group, alexander.gross2@usdoj.gov.

# 1  Introduction

The U.S. airline industry has become increasingly concentrated in recent years. This has been caused in part by mergers, notably Delta/Northwest in 2008, United/Continental in 2010, Southwest/AirTran in 2011, American/US Airways in 2013, and Alaska/Virgin in 2016. At the same time, the airline industry has become more segmented in product space. Low-cost carriers (LCCs) and ultra low-cost carriers (ULCCs) have provided cheaper, more unbundled service than legacy carriers. The growth in LCC and ULCC carriers has been a worldwide phenomenon, e.g., JetSmart in South America and Ryanair and Vueling in Europe.

A recent trend in the U.S. has been mergers between airlines of different product types. In 2022, JetBlue and Spirit proposed to merge. More precisely, JetBlue planned to acquire Spirit's assets and eliminate Spirit's ULCC business model, using Spirit's planes and personnel to expand JetBlue's LCC model.

Many recent airline mergers have been met by court challenges. For instance, the 2013 American/US Airways merger was initially opposed by the U.S. Department of Justice (DOJ), which later cleared the transaction after the parties agreed to divest landing slots and gates at multiple airports. In 2023, the DOJ filed suit to block the JetBlue/Spirit merger. After a bench trial in the fall of 2023, a U.S. District Court permanently enjoined this transaction as anticompetitive in 2024. A key question in the JetBlue/Spirit trial was how the proposed transaction would affect consumers by altering the pricing incentives of firms.

This paper has two goals related to analyzing the pricing impacts of mergers. First, we develop a methodology to analyze the impact of future mergers in the airline industry and other sectors where products are differentiated. Our goal is to

construct a framework that is tractable, consistent with multiple theories of differentiated product competition, and empirically applicable in the appropriate context and when relevant data and variation are available. Second, we use this methodology to analyze the impact of the proposed JetBlue/Spirit merger on prices and consumer welfare, had the deal not been permanently enjoined by the District Court. Our goal is to show the likely impact of this proposed merger and to demonstrate the usefulness of our methods in identifying merger effects in this context.

To understand the importance of developing tractable and robust methods for analyzing potential mergers, consider the empirical literature in this area. The canonical approach to analyze mergers in differentiated product industries is to start with an equilibrium model with discrete choice demand, estimate preferences and costs by imposing a model of competition such as Bertrand pricing, and use the model to simulate counterfactual outcomes (Nevo, 2000). This framework has been applied to the airline industry (Peters, 2006; Berry and Jia, 2010). Other research, including research in the airline industry, has allowed for both entry and price-setting behavior to adjust in the post-merger equilibrium (Li et al., 2022; Ciliberto et al., 2021). While these papers have added substantial value, they also impose that the nature of competition does not change after the merger. However, some studies have found that certain mergers may have changed the nature of competitive conduct (Miller and Weinberg, 2017).

To investigate this transaction, we propose a simpler method that is consistent with underlying models of competition in many cases but imposes fewer restrictions. Our method has three steps. First, we identify plausibly quasi-experimental variation in the data—in our case, entry events—that can be used to mimic the impact of the

2

proposed merger. Second, we estimate policy functions based on this variation.[1] The policy functions capture the relationship between entrant capacity and changes in prices, separately by airline. Finally, we use the estimated policy functions to predict the counterfactual impact of the proposed merger on equilibrium prices and consumer harm.[2]

By estimating policy functions that map from the state space to competitor actions, we can predict how the merger is likely to affect prices and consumer welfare without specifying the precise nature of competition between firms. Our policy function approach is conceptually related to conditional choice probability methods that have emerged over the last 15 years to study static and dynamic models of oligopolistic competition (Seim, 2006; Bajari et al., 2007; Arcidiacono and Miller, 2011). Our method is different. We leverage the plausibly quasi-experimental variation in airline presence and capacity in our setting to predict the pricing impact of this potential merger, without having to estimate the underlying structural parameters of consumer utility or firm costs. In this way, our paper is conceptually closest to Benkard et al. (2020), who also proposed estimating the impact of airline mergers using only policy functions. Benkard et al. (2020) uses policy functions to understand the dynamics of competition, specifically route entry and exit subsequent to an airline merger. We use policy functions to answer a simpler, static question: how does equilibrium airline pricing, and ultimately consumer welfare, respond to a proposed merger?

Our empirical setting uses origin-destination pairs as markets, as is standard in

---

[1]A policy function is a rule describing agents' strategic choices (in our case prices) as a function of a state variables (in our case capacity, and other observable control variables that we describe below).

[2]In our specific setting, we believe that net price changes are closely related to changes in consumer welfare. See Section 3.5 for details.

the airline literature (Berry and Jia, 2010). We let airline prices be a function of the market state. The state includes fixed characteristics of the origin-destination pair and the levels of JetBlue and Spirit capacity in the market. This formulation allows for pre-merger competition between JetBlue and Spirit to affect prices and for JetBlue and Spirit to have different impacts of lowering market prices, which is potentially important given their different business models. It is also consistent with a literature that has examined—and generally found—that ULCC and LCC presence on a route lowers prices (Morrison, 2001; Goolsbee and Syverson, 2008; Shrago, 2024; Kwoka et al., 2016; Tan, 2016; Bachwich and Wittman, 2017). Other studies have found that potential, in addition to actual, entry can lead to downward pressure on fares (Goolsbee and Syverson, 2008; Sweeting et al., 2020; Kwoka and Shumilkina, 2010). To the extent this is true for JetBlue and Spirit, our use of actual entry events will understate fare effects.

Having defined the state, we examine the data to understand whether they contain sufficient variation in capacity to allow us to plausibly simulate the post-merger world. In our context, the fact that JetBlue and Spirit entered many routes over the past decade allows us to treat these entry decisions as quasi-experimental and use them to simulate the impact of the proposed merger. Because these airlines had not exited many routes prior to the COVID pandemic, we also believe that exit decisions would be less plausibly quasi-experimental,[3] though some papers have used exit decisions in a similar context (e..g Hüschelrath and Müller, 2013). To investigate the pricing impact of the proposed merger, we then simulate the counterfactual prices that would result from the policy functions evaluated at the post-merger state for each market.

---

[3]E.g., JetBlue exited some routes from Puerto Rico following Hurricane Maria, but these exits might have been caused by the hurricane, which might have also affected market prices.

Specifically, following JetBlue's claimed post-acquisition plan, we assume that the post-merger market structure on affected routes would be similar to one where Spirit exited but where JetBlue's frequency of flights increased by Spirit's capacity.

Our approach has three notable features that differ from the traditional merger simulation approach. First, our methodology is simpler than structural merger simulation methods, making it more tractable, more transparent, and more computable in some cases. Second, it does not require us to take a stand on a particular pricing equilibrium concept, though it is consistent with standard models of competition such as Nash-Bertrand equilibrium. Given JetBlue and Spirit's differentiated business models, unobserved preference heterogeneity could be particularly salient in affecting post-merger prices but also may be difficult to identify. Finally, our approach allows for the competitive response within a market to evolve as the number and identity of competitors changes, and hence is consistent with mergers causing both unilateral and coordinated effects.

Several studies have suggested that the airline industry may be susceptible to coordination (Aryal et al., 2021; Evans and Kessides, 1994; Ciliberto and Williams, 2014; Ciliberto et al., 2019; Hazel, 2018). Other work has specifically argued that the American Airlines / US Airways merger created incentives to further coordinated behavior (Porter, 2020) and caused the merged American Airlines to stop challenging other carriers on their hub routes (Turner, 2022; Kim and Park, 2023). In addition, the legal record supports the notion that the airline industry in the past may have exhibited coordinated behavior. For instance, DOJ sued the Airline Tariff Publishing Company (ATPCO) and several major domestic airlines in 1992, alleging that the airlines had used ATPCO to coordinate pricing decisions.

**Summary of Results** Using a model of entry on market fares, we find that Spirit entry lowers market fares by about 22%, and JetBlue entry lowers market fares by about 18%. However, these are only estimates of average fare effects across all entries. We show that the amount of capacity upon entry and market size differs both within and across carriers, and that the average fare effect hides this variation. Using our preferred model which controls for these factors, we find that entries with larger capacity tend to have greater fare effects, and that the difference in fare effects between carriers varies with the capacity level.

We show how to calculate price effects due to the merger in a nonstop overlap market: Hartford, Connecticut-Miami, Florida. We find that the removal of Spirit planes would cause market fares to increase by about 26%, calling this the gross price effect. However, JetBlue asserted that it would fly Spirit planes in exactly the same markets as pre-merger Spirit. Taking this claim as given, in the case of Hartford-Miami, this expansion by JetBlue would cause fares to fall by about 9%. We therefore find a net price effect of about 15% higher fares in that market due to the merger. Our methodology allows us to model the net price effect differently in nonstop overlaps (JetBlue expansion) versus Spirit non-overlaps (JetBlue entry), which we believe is closely related to changes in consumer welfare. By applying this calculation to every market-quarter in which Spirit had nonstop presence, our preferred specification shows that the merger would result in approximately $2.6 billion in annual harm.

The rest of the article is structured as follows. Section 2 provides background about the airline industry and the JetBlue-Spirit merger, and describes our data sources. Section 3 describes our modeling approach, identification, and other model-

6

ing choices. Section 4 contains estimation results and counterfactual harm calculations. Section 5 concludes.

# 2    Industry Background and Data

## 2.1    Background on Airline Industry

The academic literature and industry participants refer to three groups of carriers based on their business models: "legacy carriers," "low-cost carriers" ("LCCs"), and "ultra-low-cost carriers" ("ULCCs").

The US legacy carriers operating today—American, Delta, and United—have route networks that span the continental United States and abroad. Legacies achieve this in part by organizing their operations through certain key airports called "hubs." Partnerships with international carriers impact service between the United States and many destinations abroad.

Having a large operation at a given airport can be advantageous to the airline. Airlines can time their flights to and from a hub to facilitate connecting itineraries, thereby increasing network size. In addition, an airline typically charges higher prices on flights in or out of its hub than competing airlines, which the academic literature refers to as a "hub premium" (see, e.g., Lederman, 2008). This premium might be driven by market power, but could also arise from the ability to offer more flights to a given destination or loyalty programs.

Legacy airlines offer a range of products that allow them to compete for both cost-conscious and high-end travelers. On one end of the spectrum, legacies offer "basic economy" tickets which unbundle ancillary fees, similar to ULCCs. On the

high end, legacies offer services catered toward business and other higher-revenue travelers (lounges, lie-flat seats, etc.) which are not offered by ULCCs and by only some LCCs. Legacy carriers also offer robust loyalty rewards programs, in which members can redeem miles earned with one of the legacy carriers for travel nearly anywhere in the world due to the carriers' global reach.

LCCs (e.g., JetBlue and Southwest) tend to have lower prices and costs relative to legacies. LCCs often focus on point-to-point flying, which results in higher aircraft utilization and therefore lower costs than legacies. Legacies may have higher costs due to enabling connecting flights at hubs, which can lead to congestion and delays at the hub as well as aircraft sitting idle. In addition, LCCs tend to operate fewer models of aircraft than the legacies. This can lower both pilot costs (fewer certifications required) and maintenance costs. LCCs also tend to have lower labor costs because they tend to hire pilots earlier in their careers.

ULCCs such as Spirit, Frontier, and Allegiant also focus on point-to-point service, but with an even greater emphasis on reducing costs and prices than LCCs. ULCCs tend to offer less legroom than legacies and LCCs in order to increase the number of seats per flight, which reduces operating costs. In addition, operating a single cabin also limits the number of staff required, further reducing the cost of the flight. By lowering costs even further than LCCs, ULCCs can profitably offer low fares in a market.

Unbundling is a key differentiating factor for ULCCs. They have unbundled many features of flying in order to keep costs low and allow passengers to choose only those amenities that they value. Examples of these amenities include the ability to choose a specific seat and the ability to store a bag in the overhead bin. The ability to buy

8

services in this way is particularly valuable to price-sensitive customers. Unbundling can also further reduce costs. For example, customers choosing not to store a carry-on bag reduces cabin weight and, consequently, fuel costs.

Consistent with its product positioning, Spirit states that it is "focused on value-conscious travelers."[4] It believes most of its customers pay for their own ticket and make travel purchase decisions primarily based on price.[5] Spirit targets these cost-conscious travelers with its unbundled base fares. The unbundled fares give cost-conscious customers the option of whether to purchase additional amenities rather than including those in a higher-priced bundle.[6].

The differences between the three models are reflected in two measures as shown in Figures 1a and 1b: revenue per available seat mile (RASM) and cost per available seat mile (CASM). The figures show a stratification of revenue and cost across models. Legacies have high unit revenue and costs; LCCs have moderate unit revenue and costs; and ULCCs have low unit revenue and costs.

---

[4]Spirit 2022 10-K, p. 7.

[5]Spirit 2022 10-K, p. 9.

[6]Spirit 2022 10-K, p. 4.

Figure 1: Average Revenue and Cost per Available Seat Mile



(a) "RASM"                                    (b) "CASM"

**Source**: Spirit, JetBlue, United, American, and Delta 2013 – 2022 SEC Filings (10-Ks).
**Note**: RASM is calculated as total operating revenue divided by total available seat miles in a given year. For Spirit and JetBlue, these figures are as reported in each airline's respective yearly financial statements for years 2013 – 2022. For Delta, these figures are shown as reported for years 2017 – 2022, and were calculated for years 2013 – 2016 because they were not reported in Delta's yearly financial statements. For American, these figures are shown as reported for years 2014 – 2022, and were calculated for 2013 because they were not reported in American's yearly financial statements. For United, these figures are shown as reported for years 2018 – 2022, and were calculated for 2013 – 2017 because they were not reported in United's yearly financial statements. CASM is calculated as total operating expenses divided by total available seat miles in a given year. For Delta, United, Spirit and JetBlue, figures are as reported in each airline's respective yearly financial statements for years 2013 – 2022. For American, these figures are shown as reported for years 2018 – 2022, and were calculated for years 2013 – 2017 because they were not reported in American's yearly financial statements.

## 2.2   JetBlue-Spirit Merger

JetBlue and Spirit agreed to merge on July 28, 2022, with an acquisition price for Spirit of $3.8 billion. JetBlue claimed that the deal was motivated by constraints to growth due to limited availability of new aircraft, in particular Airbus planes (used by both JetBlue and Spirit). Acquiring Spirit would allow JetBlue to expand its fleet with similar aircraft much faster than it could do on its own. However, Jet-

Blue planned to scrap the Spirit business model, and instead planned to retrofit all Spirit planes to match JetBlue's existing layout. On one hand, this would mean repositioning Spirit in the product space–including adding more legroom, inflight entertainment, wifi, and snacks in the ticket price–amenities that some airline consumers might value (Campisi, 2023). On the other hand, this would also include removing between 20 and 28 seats from each Spirit airplane and replacing Spirit's ultra-low-cost model with JetBlue's own higher-cost business model, and ultimately lead to higher prices. To the extent that some customers do not care about improved amenities, those customers would only face higher prices and would be harmed as a result.

JetBlue claimed that it would continue to fly Spirit's planes in the same routes Spirit flew at the time of the merger, which posed the following economic question: on a particular route, would replacing Spirit's flights with JetBlue's flights cause prices—and ultimately consumer welfare—to increase or decrease? We address this question empirically in this article.

## 2.3   Data

We use DB1B data for prices and passengers. The U.S. Bureau of Transportation Statistics publishes the Airline Origin and Destination Survey (DB1B), which forms a 10% sample of airline tickets from carriers that report. The fields in this dataset include origin and destination airports and other itinerary details of passengers, such as a trip break or surface transfer. These data are standardized and frequently employed in the academic literature.

The public version of these data contain only domestic itineraries. The U.S. Department of Transportation (DOT) gave us permission to use a version of these data

11

that includes ticket sales in international markets where at least one leg is operated by a domestic carrier. Including international markets is potentially important in analyzing this merger because both JetBlue and Spirit provide nonstop service to many destinations in Latin America and the Caribbean.[7]

We aggregate the DB1B data to a single record for every combination of year, quarter, reporting carrier, marketing carrier, operating carrier, routing, and fare, that also indicates the number of passengers. We multiply the passenger count by 10 so that our analyses reflect an estimate of the actual number of airline passengers in a quarter. Prior to any further analysis, we divide all itineraries into directional journeys using the trip break indicator. We define a journey as a single trip from an origin to a destination, which can be either nonstop or via connection. A simple round-trip itinerary would be made up of two journeys, one from A to B and another from B to A. One journey may be associated with multiple passengers. In our analyses, we report all prices as the one-way price per passenger.

We construct the fare for each segment based on the DB1B fare, which is at the itinerary level. Specifically, we divide the itinerary-level price between directional journeys based on the number of miles flown on those journeys. We drop certain itineraries (and thus all constituent journeys) for data quality reasons. These include itineraries with a journey where the price is less than $25.00 or greater than $2,750.00; itineraries where there is a surface transfer between two flights in the same leg of a journey or more than one surface transfer back-to-back at the beginning or end of a leg; itineraries that include multiple ticketing carriers, where those ticketing carriers do

---

[7]Of the 62 Spirit entries that we analyze, 18 of those entries were on international routes Central and South America or the Caribbean. Similarly, of the 19 JetBlue entries, 7 of those were on international routes. A similar proportion of nonstop overlap routes were international (21 international nonstop overlaps and 73 total nonstop overlaps.)

not belong to the same antitrust immunized alliance; and itineraries with a circuitous flight, which we define as a journey with more than double the distance of a nonstop journey.

We also use T-100 data for capacity information on scheduled passenger flights from the DOT. Specifically, we use T-100 Segment data which combines flight information reported by both U.S. and international carriers for all flight segments with at least one domestic endpoint. We use these data to provide information on carrier presence in segments and to measure flight frequency.

To create our T-100 analysis data, we start with raw T-100 data from 2009 through 2022 Q2 and adjust for mergers. This process ensures that all flights by an airline after it was acquired are attributed to the acquiring airline. We then limit flights to those that offered scheduled passenger service (class = "F" in the raw data). Next, we aggregate observations to the carrier, year, month, and nondirectional city-pair level and sum the count of seats, passengers, and departures by airline.

Importantly, we define entry as occurring when there are four or more quarters in the T-100 data with at least weekly roundtrip nonstop service by a carrier, on average, following four or more previous quarters with less than weekly roundtrip nonstop service[8]. We define entry based on nonstop service, so entry does not depend on pre-existing connecting service. I.e., an entry in a given market can occur even if a carrier already offered connecting service in that market.

---

[8]We define weekly roundtrip nonstop service as having at least 26 total flights between two endpoints over the course of a quarter. We allow for the possibility that entry in the middle of a quarter may manifest as less than weekly frequency, on average, during the quarter in which the entry actually occurred. Specifically, the entry quarter is the first quarter with non-zero weekly average frequency that either (i) immediately precedes or (ii) begins a contiguous set of at least four quarters with greater than weekly average frequency.

# 3   Model and Inference

## 3.1   Modeling Approach

Our empirical specifications are based on canonical equilibrium discrete choice models of airline competition, though they do not impose all the assumptions of these models. This literature considers airline demand and firm pricing, and it treats presence on a route as exogenous. In other words, it does not examine route entry or exit following a merger and instead assumes that unobserved product characteristics on a route do not reflect a selected sample.

We consider a world where consumers want to travel between two points at some point in time. We define a market $t$ to be an origin-destination pair in a quarter. Consumers must choose between travel on different airlines or the outside option of no travel. They are potentially differentiated on a variety of dimensions.

Following Berry and Jia (2010), suppose there are $R$ discrete consumer types. For consumer $i$, in market $t$, who is of type $r \in \{1, \ldots, R\}$, the utility from a carrier $j$ is:

$$u_{ijt} = \beta_r x_{jt} - \alpha_r p_{jt} + \xi_{jt} + \varepsilon_{ijt}. \tag{1}$$

In (1), $x_{jt}$ represents the observable product characteristics, $p_{jt}$ the ticket price, $\xi_{jt}$ the unobservable product characteristic, $\beta_r$ and $\alpha_r$ the valuations for consumer of type $r$, and $\varepsilon_{ijt}$ an idiosyncratic utility shock. The observable product characteristics include number of connections, number of daily departures by the carrier, etc. Consumer $i$ can also choose the outside option of no commercial air travel, which we normalize

14

to:

$$u_{i0t} = \varepsilon_{i0t}. \tag{2}$$

Given assumptions on the unobservable term and orthogonality restrictions between $\xi$ and variables that are assumed to be exogenous, one can estimate consumer preferences with a GMM estimator. Berry and Jia (2010) and Peters (2006) take such a modeling approach.

On the supply side, researchers typically assume that airlines set ticket prices in each market in Bertrand-Nash equilibrium. Given this assumption, one can solve for equilibrium markups (and thus marginal cost) as a function of transaction data and estimated demand parameters. To simulate a merger, one holds the estimated demand parameters and marginal cost fixed but adjusts product ownership to reflect the merger, and then solves for the new Nash-Bertrand equilibrium prices.[9]

Peters (2006) performs such a merger simulation in the context of historical airline mergers, noting that the marginal cost recovered through this process cannot capture changes in firm conduct apart from unilateral effects. In particular, the model described above cannot capture an increased likelihood of price coordination due to the merger. Given that coordinated effects are potentially important in the airline industry, a more flexible method to capture these effects may be appropriate.[10]

We adopt a different approach that follows Benkard et al. (2020). Specifically, instead of solving for an equilibrium of a new model, we use policy functions which

---

[9]One could also perform this process with another conduct assumption, such as Cournot equilibrium or coordinated strategies, so long as conduct does not change following the merger.

[10]Given that our methodology captures both unilateral and coordinated effects, then one could recover coordinated effects by estimating a standard Nash-Bertrand pricing model à la Peters (2006), simulating the unilateral price effects from the merger, and comparing harm figures between this model and our model.

we believe are valid in the counterfactual world with the merger. Under this approach, we do not need to take a stand on the model of competition or how it might change based on the number or identity of firms operating on a route. The policy function is consistent with multiple models and robust to the merger counterfactual under many of these models.

In our case, the policy functions we are interested in describe how prices adjust given the presence and scope of a particular competitor, specifically Spirit and Jet-Blue. This allows us to simulate the exit of Spirit. It also allows us to simulate the impact of a larger JetBlue—consistent with JetBlue's claimed post-merger plans— which might mitigate the negative effect of having fewer firms. To assess this net merger effect, we estimate two policy functions: one which relates Spirit's capacity to fares, and one which relates JetBlue's capacity to fares.

These policy functions are a reduced form of the canonical discrete choice equilibrium model that we describe above. Specifically, a discrete choice model could capture this capacity expansion effect by (a) including capacity by a firm on a route as a product characteristic, (b) simulating the change in capacity from the merger, and (c) simulating the new Bertrand equilibrium where prices would then adjust based on the new capacity. This would impose parametric restrictions such as Bertrand competition. Our approach instead lets the data identify the impact of extra capacity.

## 3.2   Using Entry Events to Identify Policy Functions

To estimate the policy functions, we need a source of exogenous variation which relates a carrier's capacity to prices. We propose using route entry events as a source of exogenous variation. Broadly speaking, this follows the approach of the discrete

choice literature that treats presence on a route as exogenous. Effectively, we are assuming that the increase in market price from removing Spirit would be inversely related to the decrease in market price when Sprit entered. We are further assuming that the relationship between the market price decrease and JetBlue capacity across routes where it enters is a good proxy for the impact of the extra capacity that JetBlue would get from acquiring Spirit's operations on reducing market prices.

We believe that using entry events is appropriate in our case. Our analysis uses the precise timing of entry, and the changes in outcomes around the precise timing of that entry, to identify the effect of entry on fares.[11] We believe that, although entry and capacity decisions likely depend on expected profitability, the specific timing of entry may reflect idiosyncratic factors, such as leases of facilities at airports, availability of aircraft, and availability of personnel.

If there are market-specific factors that determine the precise timing and intensity of entry, and if those factors are also correlated with competitive outcomes (e.g., if a market-specific increase in demand affects both the timing of Spirit entry and prices in the market) then this will likely bias the size of the estimated effect towards zero. The reason is that entry will most likely occur when prices are rising, and the increase in prices that would occur even absent the entry will offset the decrease in prices caused by the entry. We restrict analysis to the set of entries in which no other carrier entered

---

[11]Spirit's entry strategy focuses on high-volume routes that are flown by "price sensitive" travelers. See Spirit 2022 10-K at p. 8 (describing that "[w]e have developed a substantial network of destinations in profitable U.S. domestic niche markets, targeted growth markets in the Caribbean and Latin America and high-volume routes flown by price-sensitive travelers. In the United States, we also have grown into large markets that, due to higher fares, have priced out those more price-sensitive travelers. We seek to balance growth between large domestic markets, large leisure destinations and opportunities in the Caribbean and Latin America according to current economic and industry conditions"). Market fixed effects pick up many of these route-specific factors that are part of Spirit's entry strategy.

17

or exited in the year prior to entry, which mitigates the concern that market-specific factors were causing large price changes. If that were the case, then it is more likely that other carriers would have also entered or exited before the target entry event.[12]

In addition to the previous restriction on entries, we focus on entries with non-seasonal service (i.e., at least four consecutive quarters of service). We also focus on entries from the first quarter of 2017 to the first quarter of 2019. 2017 Q1 is sufficiently distant from the period of legacy consolidation that occurred from 2008-2013, and 2019 Q1 is the last quarter with one full year of data before the COVID pandemic. By focusing on the pre-pandemic period, we can better isolate the effect of entries from confounding changes to demand for air travel caused by the pandemic.

While exits are also a source of variation to identify the policy functions, there are relatively few Spirit exits prior to the COVID pandemic, and those exits may be more endogenous than entries. For example, Spirit may exit a route due to a decline in demand for air service on that particular route. If that were the case, the effect of Spirit's exit (higher prices) would be confounded with the effect of the reduced demand (lower prices). This is distinct from Spirit's entry decisions, which were driven by Spirit's exogenous overall expansion in this period (Reed, 2018). For these reasons, we do not rely on exit events to identify the effects of the proposed merger[13].

---

[12]To the extent that entry decisions are still endogenous, one could potentially address this by using instrumental variables. For example, a carrier having sufficient nonstop presence at both endpoints of a route might be positively correlated with entry in that route. Alternatively, entry might be positively correlated with increases in fleet size. Both of these variables are likely uncorrelated with demand conditions in the entry route, making them valid instruments.

[13]Many of the airline price effect studies discussed in the introduction use nonstop *presence* rather than entry to identify effects. This variation captures both entry and exit, and for that reason we believe is not as exogenous a source of variation as entries alone

## 3.3   Specification and Estimation Strategy

We now specify policy function equations to capture equilibrium fare effects from the nonstop presence of JetBlue or Spirit. In all cases, we use a standard difference-in-differences model which uses markets that Spirit (or JetBlue) will enter at some other point in the sample as controls for markets in which Spirit (or JetBlue) enters at a particular point in time. This is a parsimonious set of controls, but because it only includes markets that Spirit ultimately enters, it is likely to account for many time-varying factors that affect markets that Spirit enters.

As a baseline, we use a binary entry indicator as the treatment variable. This specification is standard in the airline fare effects literature. For each of Spirit and JetBlue separately, the regression equation is:

$$\log(p_{it}) = \beta \times PostEntry_{it} + \alpha_{iq} + \delta_t + \epsilon_{it} \tag{3}$$

$\log(p_{it})$ is the log of the passenger-weighted average fare across all carriers in market $i$ in year-quarter $t$. $\alpha_{iq}$ and $\delta_t$, are, respectively, market-quarter and year-quarter fixed effects. $PostEntry_{it}$ is an indicator equal to one after the target carrier enters the market. $\beta$ measures the percentage change in price after entry relative to markets which did not experience entry, and this is the key parameter in the pricing policy function. In our primary specification, we do not control for the presence of other carriers in this regression.[14] Our sample restriction ensures that there was no other entry or exit by other carriers in the year prior to entry, but we want the policy

---

[14]The "Carrier Controls" column of Figure 9 in the appendix adds indicator variables at the market-carrier-quarter level for the presence of the following carriers: American, Delta, United, Southwest, Alaska, Virgin America, Frontier, Allegiant, Sun Country, Hawaiian, and JetBlue (for Spirit entry events) and Spirit (for JetBlue entry events.)

function to capture any entry or exit by rivals in the post-entry period. As a result, $\beta$ captures the equilibrium effect of entry by the target carrier.

There are two drawbacks to the binary entry approach. First, a binary entry indicator only measures the average effect of a carrier's entry on fares, whereas each underlying entry could look quite different: the same carrier can enter different markets with different capacities, capacity choices can vary across entrants, and the magnitude of entry effects might vary with market size[15]. When calculating harm due to Spirit exit, the binary entry approach cannot distinguish between markets with different levels of Spirit capacity. Second, we need to account for the fact that JetBlue would have more capacity in routes post-merger and might be a better competitor as a result. The binary entry approach cannot measure the incremental effect of capacity additions on fares because a carrier is either present or not present.

First, we provide summary statistics on market size and entrant capacity for JetBlue and Spirit entries. Figure 2 plots the distribution of annual market passengers in the year prior to entry. Spirit tended to enter smaller markets than JetBlue in this period, meaning that Spirit potentially had more scope to lower fares than JetBlue, assuming that smaller markets have fewer competitors than larger markets. But even within carrier, each carrier enters markets of widely varying size. When Spirit enters markets, however, it also tends to do so with fewer flights per day than JetBlue. For example, the average Spirit entry in our sample is associated with 1.7 directional flights per day (half that many round trips), while the average JetBlue entry is associated with 2.7 directional flights per day. Figure 3 plots the distribution of entrant frequency in the year after entry and shows that JetBlue enters with more flights

---

[15]In particular, larger markets tend to have more competitors, so entry with a given capacity in a smaller market will tend to have a larger impact on fares than entry in a larger market.

per day, on average. These descriptive statistics illustrate that the average fare effect for a carrier potentially masks heterogeneity across markets, and that Spirit and JetBlue entries look different based on market size and capacity. For these reasons, a comparison of the average fare effect will mask these differences.

Figure 2: Distribution of market size, by market type



**Source**: DB1B; T-100; Bureau of Labor Statistics.
**Note**: "Market passengers" is calculated by taking the mean of total passengers in each market in the year prior to entry, rounded down to the nearest multiple of 0.25 million.

21

Figure 3: Distribution of entrant average daily frequency, by market type



**Source**: DB1B; T-100; Bureau of Labor Statistics.
**Note**: "Directional flights per day" is the average number of daily flights in the year after the entry.
A round trip would require two "directional flights."

To capture both entrant capacity and market size, we define the term *relative capacity* to be the ratio of the entrant's average daily nonstop frequency in the year after the entry to the average daily number of market passengers in the year before entry. This variable has a meaningful relationship with fare effects upon entry. For each Spirit and JetBlue entry, Figure 4 plots the percentage change in market-wide fare versus relative capacity. Three patterns emerge from this relationship. First, larger relative capacity is associated with larger fare effects. Second, there are dimin-

22

ishing marginal returns to relative capacity. And third, in many cases there is still a negative fare effect at the smallest levels of relative capacity.

Figure 4: Relationship between entrant relative capacity and price changes



[1] Price change is calculated as the average log fare in the post-entry period, weighted by passengers, minus the log of weighted average fare in the pre-entry period. These differences are then converted to exact percentage changes with the formula % change = exp(difference) − 1. Entry quarters are excluded from the averages.
[2] Relative capacity is average daily nonstop entrant frequency in the year after entry divided by average daily passengers in the market in the year prior to entry.

Given the patterns described above, we estimate carrier-specific policy functions which relate the natural log of price to a quadratic function of the entrant's relative capacity:

$$\log(p_{it}) = I_{ijt}\left(\beta_0^j + \beta_1^j\left(\frac{Frequency_{ij}}{MarketSize_i}\right) + \beta_2^j\left(\frac{Frequency_{ij}}{MarketSize_i}\right)^2\right) + \alpha_{iq} + \delta_t + \epsilon_{it} \quad (4)$$

.

In equation (4), $i$ indexes markets, $t$ indexes time (year-quarter), $q$ indexes quarter (takes values 1-4), and $j$ indexes carrier. The $j$ superscripts on the $\beta$ coefficients indicate that there is a different set of regression coefficients for Spirit and for JetBlue. $\log(price_{it})$ is the log of the average fare across all carriers in market $i$ in year-quarter $t$, $I_{ijt}$ is an indicator equal to one if carrier $j$ has entered market $i$ by time $t$, $Frequency$ is the average number of flights per day the entrant adds to the market in the year after the entry, $MarketSize$ is the number of passengers per day in the market in the year prior to the entry, $\alpha_{iq}$ is a market-quarter fixed effect, $\delta_t$ is a year-quarter fixed effect, and $\epsilon_{it}$ is an idiosyncratic an unobserved market-time specific factor that affects prices. The ratio of $Frequency$ and $MarketSize$ is relative capacity.

We make three notes about the specification before proceeding to estimation. First, our setting is a staggered difference-in-difference which we estimate with a standard two-way fixed effects model. A recent literature has shown that the two-way fixed effects model applied to this setting may lead to inconsistent estimates in the presence of heterogeneity in treatments across time, and proposed consistent estimators for this context (Roth et al., 2023). We do not implement these newer estimators because, to our knowledge, the standard ones can only be used for binary treatments, and our treatment in (4)—relative capacity—is continuous. Moreover, we believe that the similarity of the routes and time windows in our dataset limits

treatment heterogeneity in our context.

Second, we use a quadratic specification for relative capacity to better match the patterns in Figure 4. However, our results are not reliant on the quadratic form in particular, and we show in the appendix that similar results obtain when using a spline regression.

Third, we include an intercept term for the treatment effect. This allows us to distinguish between the effect of an incremental competitor $\beta_0^j$ and the first- and second-order effects of incremental capacity, $\beta_1^j$ and $\beta_2^j$, respectively.[16] In addition, including the intercept term allows the model to fit the data more flexibly: if there is truly no distinction between entry and expansion, then our specification can capture this.

### 3.4   Using All Fares versus Incumbent Fares

When estimating the equations described in the previous section, we will use fare data from all passengers in a market, including the entrant's passengers. While some studies in the literature limit analysis to incumbent fares (e.g., Goolsbee and Syverson (2008), Brueckner et al. (2013), Tan (2016), and Shrago (2024)), in this section we explain why it is likely not appropriate to do so in the context of our application to the JetBlue-Spirit merger.

First, ignoring the entrant's passengers and fares is missing an important aspect of entry effects, particularly in differentiated product markets. In this case, Spirit primarily appeals to cost-conscious customers, so ignoring Spirit would not fully capture

---

[16]While it is possible to apply our estimate of $(\beta_0^j)$ to predict the effect of an incremental competitor entering with no capacity, it is most appropriate to interpret $\beta_0^j$ within in the range of relative capacity observed in the sample of entry events.

benefits to this group of customers. Figure 5 shows that Spirit and JetBlue are highly differentiated in terms of average fares. This difference is particularly salient for cost-conscious customers, who are the core of Spirit's customer base (refer to discussion in Section 2). When contemplating how replacing Spirit with JetBlue affects customers, only focusing on rivals misses the importance of low fares to Spirit's cost-conscious customers.



Figure 5: Average prices on JetBlue-Spirit nonstop overlap routes, 2021Q3 - 2022 Q2

**Source**: DB1B.
**Note**: Average prices are calculated for each carrier as the passenger-weighted average price across all journeys in any JetBlue/Spirit nonstop overlap market from 2021 Q3 to 2022 Q2. JetBlue/Spirit nonstop overlap markets are defined as city pairs where both JetBlue and Spirit sold at least one nonstop ticket at some point from 2021 Q3 to 2022 Q2, as recorded in DB1B.

Second, it is not necessarily true that limiting to incumbents' passengers provides an apples-to-apples comparison of fares. Although incumbent product quality is fixed,

passenger mix (i.e., how passengers sort across carriers) is not. ULCC entry is more likely to capture cost-conscious customers from incumbents, leaving incumbents with a higher-end passenger mix post-entry. This change in passenger mix could lead to a faulty comparison of fare effects across carriers.

To see the potential for passenger mix to cause bias, consider the following hypothetical. Assume there are two types of customers who have different preferences. Some customers are insensitive to price but value other amenities ("business" customers in this example), and other customers are cost-conscious, placing little value on product attributes other than price ("leisure" customers in this example). Consider a hypothetical market that has an equal number of both business and leisure customers, and in which Delta is the only carrier. Delta offers fares targeted to business customers for $200 and fares targeted to leisure customers for $100. Delta sells 100 of each type of ticket, resulting in a market-average price of $150.

Consider entry by JetBlue into this market. JetBlue offers business- and leisure-targeted products comparable to Delta's, but cuts prices for both types of tickets by $25. Assume that Delta matches JetBlue's lower prices, and in equilibrium both JetBlue and Delta attract half of each type of customer, each selling 50 business tickets for $175 and 50 leisure tickets for $75. Both the market-average price and Delta's average price fall to $125, so the fare effect is $25 using either incumbent fares or all fares.

Now consider entry by Spirit instead of JetBlue. Suppose Spirit only offers leisure-focused fares for $50, attracting all of Delta's cost-conscious passengers. To avoid losing some of its business passengers who might prefer Spirit's $50 leisure product to Delta's $200 business product, Delta lowers the price of its business product from

27

$200 to $150 and keeps all of its business passengers. Delta's average price is now $150, and the market average price falls to $100. In this case, the incumbent-only fare effect is $0, despite Delta lowering its business fare by $50. The fare effect based on all fares is $50. In this example, one would conclude that JetBlue is the more effective competitor when only looking at incumbent fares, and that Spirit is the more effective competitor when looking at all fares. This hypothetical shows that limiting only to incumbent fares can be misleading when the entrant is positioned differently in product space from the incumbents.

Finally, using all passengers' fares is appropriate for the policy function approach. The policy function is meant to capture equilibrium outcomes from an underlying structural model of competition, and there is no justification for ignoring the entrant's passengers in a structural model. Indeed, unilateral effects arise precisely from diversion between the merging parties' products, so it is pivotal to include the merging parties' (i.e. entrants') passengers.

## 3.5   Accounting for Carrier Quality

Our methodology does not control for changes in equilibrium product quality that might occur from the merger. A potential problem when analyzing market fares (including the entrant's fares) is that carriers may vary in quality, so entry could simultaneously change both the average price and the mix of quality offered in a market. Rival quality, in contrast, could conceivably remain unchanged after entry (although as noted above the mix of passengers served by rival carriers may change after an entry event even if product quality is unchanged). In the context of airlines, individuals' valuation for quality may vary significantly across types of passengers.

28

For this reason, it is conceptually difficult to control for quality.

In the context of this particular merger, JetBlue claimed that consumers would receive value from aspects of its product, such as "free WiFi" and "most legroom in coach"[17] as a result of the merger. Therefore, a potential conceptual concern for our analysis of average market fares is that Spirit entry may decrease both average price and average quality, making it difficult to determine the impact (or even the sign) of the change in consumer surplus.

Despite JetBlue's statements, we believe that not controlling for these attributes is likely to yield little bias in our results for a couple of reasons. First, Spirit's customers' revealed preferences indicate that they have a low willingness to pay for dimensions of quality that can be purchased for an extra fee on Spirit (e.g., WiFi or extra legroom). Analysis by Spirit indicates that its customers make their purchase decision primarily based on price.[18] Ordinary course analysis by Spirit suggested that only 5-13% of its customers chose to purchase WiFi at prices starting at $3.99, and that the top reason that Spirit customers did not purchase WiFi was that they had "no need or desire" for the service.[19] Similarly, Spirit passengers have the option to pay an additional fee for extra legroom, for example by purchasing an exit row seat, or Spirit's "Big Front Seats."[20] However, Spirit's exit row seats sell for prices that are only $6-$15 more than standard economy seats, and Big Front Seats frequently do not sell out at prices

---

[17]See, e.g., https://www.jetblue.com/flying-with-us/inflight-experience (describing that "Only JetBlue offers the most legroom in coach, free brand-name snacks + drinks, and free wi-fi, live tv and movies at every seat—and award-winning service.")

[18]United States of America, et al v. JetBlue Airways Corporation, et al, 1:23-cv-10511-WGY, Day 12 Vol 1 at 53 (D. Mass. 2023).

[19]United States of America, et al v. JetBlue Airways Corporation, et al, 1:23-cv-10511-WGY, Day 12 Vol 1 at 54 (D. Mass. 2023); and https://www.spirit.com/s/wifi.

[20]Spirit describes that its Big Front Seats are "larger seats, for those who prefer more space, in the front of the plane. Wider seats with up to 11" of additional legroom." See https://customersupport.spirit.com/en-us/category/article/KA-01250

29

$34-$43 more than standard economy seats[21]. Spirit offers a number of additional ancillary services that can be purchased for extra charge (e.g., carry-on or checked bags, seat selection), but the majority of Spirit's customers decline to purchase at least one of these ancillary services, and about a third do not purchase any ancillary services.[22] This suggests that price is a sufficient statistic to measure nearly all of the consumer surplus change for Spirit travelers.

Second, there are intangible dimensions of carrier quality that may not be purchasable on Spirit, but many Spirit customers show through revealed preference that they do not view Spirit's product to be inferior in these dimensions.[23] In particular, analysis of ticket data purchases that was performed as part of the merger litigation demonstrated that many travelers chose Spirit over JetBlue's basic economy option even when Spirit tickets were more expensive.[24] This shows that airlines are not purely vertically differentiated, and that for many travelers, there are aspects of Spirit's product offering that are superior to JetBlue's.

These points indicate that for the marginal travelers who switch from an incumbent to Spirit, or who switch from the outside option (i.e., not flying) to Spirit, the change in the market price (including Spirit's own lower prices) corresponds most

---

[21]United States of America, et al v. JetBlue Airways Corporation, et al, 1:23-cv-10511-WGY, Day 12 Vol 1 at 55 (D. Mass. 2023).

[22]United States of America, et al v. JetBlue Airways Corporation, et al, 1:23-cv-10511-WGY, Day 12 Vol 1 at 54 (D. Mass. 2023). During trial, Gowrisankaran testified about additional analyses that he had performed with the produced ticket data, which included purchased amenities, and that results were similar to the baseline numbers presented from the public DB1B. See United States of America, et al v. JetBlue Airways Corporation, et al, 1:23-cv-10511-WGY, Day 13 Vol 1 at 17 (D. Mass. 2023).

[23]For example, some travelers may prefer Spirit's reliability, customer service, boarding processes, etc.

[24]United States of America, et al v. JetBlue Airways Corporation, et al, 1:23-cv-10511-WGY, Day 13 Vol 1 at 18-20 (D. Mass. 2023). This analysis looked at Spirit and JetBlue tickets for the same origin and destination that were purchased on the same day and that had the same travel date.

closely to the change in consumer surplus, and including Spirit's own prices in the analysis is likely not subject to substantial bias from quality changes.

In different merger contexts, changes to equilibrium product quality from the merger might lead to price changes not accurately measuring welfare changes. In particular, if a substantial determinant of consumer willingness to pay for the products at issue is for attributes other than price and these attributes change following the merger, then this method may not fully capture welfare changes. In this case, one might want to estimate discrete choice models and solve for counterfactual equilibria. However, these methods have as a disadvantage that the identification is less transparent and that they cannot capture changes in the nature of competition. Ultimately, researchers must consider the facts of the industry when deciding which methodology to apply.

# 4    Results

## 4.1    Policy Function Estimates

We now present estimates of the key policy function parameters. In all of following results, we use unweighted regressions[25] and standard errors are clustered at the market level. Table 1 reports parameter estimates from the binary entry model for each carrier. Spirit entry is associated with 21.9% lower fares and JetBlue entry is associated with 17.9% lower fares. As noted above, these are average entry effects

---

[25]We prefer unweighted regressions in this setting because most of the relevant variation in fares due to entry occurs at the market level, not at the individual passenger level. I.e., we do not learn any more about entry effects in large markets than we do in small markets. However, we also estimate the regressions using passenger weights, and these results are reported in the appendix.

and cannot distinguish between differently sized entries.

Table 1: The effect of Spirit and JetBlue entry on average market prices

|  | Spirit | JetBlue |
|---|---|---|
| Entry Effect | -21.9% | -17.9% |
|  | (2.3%) | (4.4%) |
| R-squared | 0.84 | 0.86 |
| Number of observations | 930 | 276 |
| Number of events | 62 | 19 |

**Source**: DB1B; T-100.
**Note**: The table shows results from unweighted regressions of the log of price (as measured by the DB1B) on market-quarter fixed effects, year-quarter fixed effects, and an indicator variable that takes a value of one after carrier entry, and zero before carrier entry. Regression coefficients and standard errors have been converted to exact percentage changes with the formula % change = exp(coefficient) – 1. Observations are at the market-year-quarter level, and the dependent variable is the log of the average fare in each market-year-quarter cell. The sample includes observations for all carriers, including the entrant, between 2016 Q1 – 2019 Q4 in all markets in which (i) entry occurred between 2017 Q1 – 2019 Q1 and (ii) there were no other changes in the set of nonstop carriers in the market in the year prior to entry. The quarter of the entry event is excluded. Standard errors are clustered at the market level and reported in parentheses.

Table 2 reports parameter estimates from the relative capacity model for each carrier. We report the change in log points in the table, which we will then convert to exact percentage changes when calculating gross and net harm from the merger in a market. The first row, labeled "Intercept," is the $\beta_0^{NK}$ and $\beta_0^{B6}$ terms, which do not depend on the size of the market.[26] In the second and third rows, we have reported normalized $\beta_1^j$ and $\beta_2^j$ coefficients, where the normalization divides by the average

---

[26]We use "NK" to refer to Spirit and "B6" to refer to JetBlue, corresponding to the IATA codes for these airlines.

32

number of daily passengers (and average number of daily passengers squared) in the Hartford, CT – Miami, FL market, an example market, in the quarter before the proposed merger announcement[27]. Notably, $\beta_0^{NK}$ is statistically significantly different from zero, which means that even small Spirit entry exerts significant downward pressure on market fares; the same is not true for JetBlue.

---

[27]Mathematically, $\beta_{1*}^j = \beta_1^j/760$, and $\beta_{2*}^j = \beta_2^j/(760)^2$. This normalization is simply for ease of presentation and interpretation. It does not affect the results.

Table 2: Effect of Spirit and JetBlue on prices, controlling for relative capacity

|  | Spirit | JetBlue |
|---|---|---|
| Intercept $(\beta_0)$ | -0.0979 | -0.0144 |
|  | (0.0269) | (0.0574) |
| Relative capacity $(\beta_1^*)$ | -0.0499 | -0.0417 |
|  | (0.0096) | (0.0103) |
| Relative capacity-squared $(\beta_2^*)$ | 0.0012 | 0.0008 |
|  | (0.0004) | (0.0002) |
| R-Squared | 0.89 | 0.90 |
| Observations | 930 | 270 |
| Number of events | 62 | 19 |

**Source**: DB1B; T-100.

**Note**: This table shows renormalized coefficients from unweighted regressions of the log of fare (as measured by DB1B) for all carriers on an indicator variable that takes a value of one after entry, and zero before entry, as well as this variable interacted with the entrant's round trip daily frequency divided by average daily market passengers in the year prior to entry, and the square of that term. The regressions also include year-quarter fixed effects and market-quarter fixed effects. The coefficients are normalized to reflect market conditions in the Hartford, CT – Miami, FL market by dividing $\beta_1$ by the average number of 2022 Q2 daily passengers in that market and dividing $\beta_2$ by the average daily passengers squared. Observations are at the market-year- quarter level. The sample includes observations between 2016 Q1 – 2019 Q4 in all markets in which (i) entry occurred between 2017 Q1 – 2019 Q1 and (ii) there were no other changes in the set of nonstop carriers in the market in the year prior to entry. The quarter of the entry event is excluded. Standard errors are clustered at the market level and reported in parentheses.

To better visualize the difference in estimated fare effect curves for each carrier, Figure 6 plots the estimated fare effect curves on top of the raw price changes from Figure 4. In the relevant range of relative capacity (most entries have relative capacity

less than 0.02), Spirit has a larger fare effect than JetBlue at every level of relative capacity. This shows that on a plane-for-plane basis, Spirit is better at lowering market-wide fares than JetBlue. In addition, the difference in fare effects between the carriers varies across relative capacity levels.

Figure 6: Estimated relative capacity policy functions

Highly Confidential – Subject to Protective Order

**Note**: Entry events are limited to markets in which (i) entry occurred between 2017 Q1 – 2019 Q1 and (ii) there were no other changes in the set of nonstop carriers in the market in the year prior to entry.

[1]: Price change is calculated as the average log fare in the post-entry period, weighted by passengers, minus the weighted average fare in the pre-entry period. These differences are then converted to exact percentage changes with the formula % change = exp(difference) – 1. Entry quarters are excluded from the averages.

[2]: Relative capacity is entrant frequency in the year after entry divided by average daily passengers in the market in the year prior to entry.

[3]: The fitted regession lines are constructed from the estimated unweighted regression coefficients in Table 2.

## 4.2    Counterfactual Impact of Proposed Merger

The relative capacity model allows us to incorporate the parties' claimed post-merger plan to continue flying Spirit planes in the same pre-merger markets[28]. We calculate a net harm figure, which is the harm from loss of Spirit plus benefit from expanded JetBlue. Loss of Spirit is modeled as losing the full Spirit effect as estimated in Equation (4). However, the incremental JetBlue effect depends on the type of market. In nonstop overlaps, JetBlue would not be a new entrant but would only be credited with additional capacity, which means that JetBlue would not be credited its intercept term when calculating change in price. In Spirit non-overlaps, JetBlue would be a new entrant and so would receive its intercept term along with the additional Spirit capacity. Therefore, inclusion of an intercept term in the marginal effect of relative capacity is pivotal for evaluating net harm.

In all markets, we first calculate the gross price effect from the merger, i.e. what would prices look like if Spirit were to exit the market. Consider the nonstop overlap market of Hartford, CT – Miami, FL. In the quarter before the proposed merger announcement, Spirit served this market with approximately 2.8 flights per day. The effect of removing Spirit's service on the log of prices in this market-quarter is the difference between the regression equation after removing Spirit's service from this market-quarter and the regression equation at Spirit's current level of service in the market-quarter:

---

[28]In the JetBlue/Spirit trial, Plaintiffs expressed skepticism of this plan based on documentary evidence and economic incentives. In particular, the transaction would strengthen JetBlue's incentive to reduce capacity on overlap routes, and potentially also on non-overlap routes to sustain higher prices. Such an incentive was consistent with JetBlue's publicy announced plans to reduce the number of seats per plane. The model presented here, and described by Gowrisankaran in trial, effectively gives the Defendants the benefit of the doubt on that argument by holding their combined capacity fixed.

$$\Delta \log(p_{it}) = (1 \cdot \beta_0^{NK} + 0 \cdot \beta_1^{NK} + 0^2 \cdot \beta_2^{NK} + \alpha_{iq} + \delta_t + \epsilon_{it})$$

$$-(1 \cdot \beta_0^{NK} + 2.8 \cdot \beta_1^{NK} + 2.8^2 \cdot \beta_2^{NK} + \alpha_{iq} + \delta_t + \epsilon_{it}) \qquad (5)$$

$$= -(\beta_0^{NK} + 2.8 \cdot \beta_1^{NK} + 2.8^2 \cdot \beta_2^{NK})$$

Using the regression coefficient estimates in Table 2, this implies a price increase of 0.23 log points or $e^{0.23} - 1 = 26\%$ change in market prices if all of Spirit's planes were removed from the market.

To calculate net harm in nonstop overlaps, we then credit JetBlue with Spirit's capacity in that market. JetBlue served this market approximately 4.1 times daily, so the price reduction that arises from JetBlue's expansion will be the expression above evaluated at 6.9 flights per day (JetBlue's 4.1 daily flights, plus Spirit's 2.8 daily flights) minus the expression evaluated at JetBlue's current 4.1 flights per day:

$$\Delta \log(p_{it}) = \left(1 \cdot \beta_0^{B6} + (4.1 + 2.8) \cdot \beta_1^{B6} + (4.1 + 2.8)^2 \cdot \beta_2^{B6} + \alpha_{iq} + \delta_t + \epsilon_{it}\right)$$

$$-(1 \cdot \beta_1^{B6} + 4.1 \cdot \beta_1^{B6} + 4.1^2 \cdot \beta_2^{B6} + \alpha_{iq} + \delta_t + \epsilon_{it}) \qquad (6)$$

$$= 2.8 \cdot \beta_1^{B6} + 31 \cdot \beta_2^{B6}$$

This implies about a 9% price decrease from JetBlue's expansion in this market. Combining the price increase that arises from the loss of Spirit (0.23 log price points), with the offsetting price decrease from the expansion of JetBlue (0.09 log price points) gives a total price increase of approximately 15% [29].

Now, suppose that Hartford-Miami was a Spirit-only nonstop market. The gross

---

[29]This is because $e^{(0.23-0.09)} - 1 \approx 15\%$.

price effect would be the same as before (26%). However, when calculating net harm, JetBlue would be credited with *de novo* entry and the JetBlue intercept term would apply. The price decrease in this case would be the following:

$$\Delta \log(p_{it}) = \left(1 \cdot \beta_0^{B6} + (0 + 2.8) \cdot \beta_1^{B6} + (0 + 2.8)^2 \cdot \beta_2^{B6} + \alpha_{iq} + \delta_t + \epsilon_{it}\right)$$
$$-(0 \cdot \beta_1^{B6} + 0 \cdot \beta_1^{B6} + 0^2 \cdot \beta_2^{B6} + \alpha_{iq} + \delta_t + \epsilon_{it}) \qquad (7)$$
$$= \beta_0^{B6} + 2.8 \cdot \beta_1^{B6} + 7.84 \cdot \beta_2^{B6}$$

This implies about a 12.5% price decrease from JetBlue's entry in this market, compared to the 9% price decrease from JetBlue expansion in the nonstop overlap scenario. The net price increase in this scenario is approximately 11%, compared to 15% in the nonstop overlap scenario. Note that this calculation relies on a plane-for-plane comparison of entry effects and on the intercept term to distinguish *de novo* entry from expansion. It is impossible to make this calculation based only on binary entry effects; the best we could say is that the average net fare effect would be about 4% (comparing Spirit's 22% average fare effect to JetBlue's 18%). However, this calculation ignores that the carriers serve markets with different amounts of capacity, and cannot differentiate between entry and expansion effects.

To calculate net harm, we multiply the net price effect by the baseline market average fare and passenger count. In the Hartford-Miami example, because average fare in this market in 2022 Q2 was $168.78, this implies a post-merger price increase of approximately $25. We multiply this $25 price change by the number of passengers in the market in 2022 Q2 (105,240) to estimate the harm in this market-quarter. This results in net harm of $2.6 million in that quarter.

38

We perform this calculation for every market-quarter with at least weekly nonstop Spirit service, including overlap markets and non-overlap markets[30]. When we aggregate net harm across market-quarters, we exclude markets which Spirit may have exited sometime during the year before the merger announcement[31]. Also, we do not apply the model to market-quarters in which Spirit has a relative capacity of less than 0.0005, or market quarters where the combined JetBlue and Spirit relative capacity is greater than 0.055[32]. In Table 3, we summarize the result of this calculation using unweighted regressions. Overall, we estimate the merger would cause \$2.6 billion in annual harm. Results using passenger-weighted regressions are in the appendix. We also report the top 50 individual market-quarters by net harm in the appendix.

---

[30]Some overlap markets have less than weekly nonstop Spirit service in certain quarters. We do not compute an estimated price change or harm in such market-quarters.

[31]Specifically, if Spirit offered less than weekly roundtrip service, on average, in 2022 Q2, we check using OAG scheduling data if they offered weekly roundtrip service after 2022 Q2. If they did not, we consider this an exit.

[32]In the estimation sample, Spirit's relative capacity was never less than 0.0005. Our estimates are most reliable when applied to markets in which Spirit's relative frequency was in the range over which the coefficients were estimated. Similarly, JetBlue never entered a market with relative capacity greater than 0.055, so we do not evaluate total harm in markets above this value.

Table 3: Estimated Annual Net Harm, by Market Type

| Market Type | N. markets | Avg. price change (per passenger) | Avg. % price change (per passenger) | Total harm (annual) |
|---|---|---|---|---|
| Nonstop Overlap | 73 | $20.02 | 11.7% | $1.1B |
| Other | 191 | $18.33 | 9.9% | $1.5B |
| Total | 264 | $19.02 | 10.7% | $2.6B |

 **Note**: This table shows the total harm from Spirit exit and JetBlue entry in market quarters where Spirit offers weekly nonstop service in 2021 Q3 – 2022 Q2. We limit the sample by dropping all markets where we presume a Spirit exit occurred in the year prior to the merger announcement. The sample is further limited to market quarters in which Spirit had a relative capacity, calculated as daily directional frequency divided by daily market passengers excluding Spirit, of at least 0.0005, which is the minimum relative capacity in the Spirit entry events. Furthermore, market quarters where the combined Spirit and JetBlue relative capacity, calculated as daily directional frequency of JetBlue plus that of Spirit divided by daily market passengers excluding Spirit, is greater than 0.055, which is the maximum relative capacity in the JetBlue entry regression sample, are dropped. The average price change is passenger-weighted average change in price across Spirit nonstop presence market quarters and is calculated using market quarter passengers, the average market quarter DB1B price, and Spirit and JetBlue's daily frequency in the same period, and the coefficients estimated in the unweighted quadratic regression shown in Figure 6. Total harm is calculated by multiplying the average price change by the number of passengers present in 2021 Q3 – 2022 Q2. Detailed results for the top 50 market-quarters are included in the Appendix.

# 5  Conclusion

In this article, we adapt the policy function approach to estimating equilibrium price effects in the context of the JetBlue/Spirit proposed merger. We use entry events by JetBlue and Spirit, and the resulting prices, to estimate the impact of this potential merger. Our methodology is more tractable and requires fewer assumptions on the form of competition as compared to standard structural models and can be applied in contexts where there is a sufficient number of entry/exit events for identification.

As a result, our model is able to capture both unilateral and coordinated effects of mergers, to the extent that the effects are present in the estimation sample.

Using a binary indicator for entry, we find that Spirit entry lowers market fares by about 22%, and JetBlue entry lowers market fares by about 18%. However, we show that the amount of capacity upon entry and market size differs both within and across carriers, and that the average fare effect hides this variation.

Our preferred relative capacity model, which controls for these factors, shows that entries with larger capacity tend to have greater fare effects, and that the difference in fare effects between carriers varies with the capacity level. Our methodology allows us to model the net price effect differently in nonstop overlaps (JetBlue expansion) versus Spirit non-overlaps (JetBlue entry). By applying this calculation to every market-quarter in which Spirit had nonstop presence, we find that the merger would result in approximately $2.6 billion in annual harm.

While our results are robust to a number of factors, our methods and results still have a number of limitations. In particular, while our entry simulation controls for coordinated effects, it only accounts for changes in coordination on a market-by-market basis and not over the whole route structure. Also, our approach does not control for differences in product quality, although as we discussed in Section 3.5, we believe that any bias from this is likely to be minor in this case.

41

# References

Arcidiacono, P. and R. A. Miller (2011). Conditional Choice Probability Estimation of Dynamic Discrete Choice Models With Unobserved Heterogeneity. *Econometrica 79*(6), 1823–1867.

Aryal, G., F. Ciliberto, and B. T. Leyden (2021, 12). Coordinated Capacity Reductions and Public Communication in the Airline Industry. *The Review of Economic Studies 89*(6), 3055–3084.

Bachwich, A. R. and M. D. Wittman (2017). The emergence and effects of the ultra-low cost carrier (ULCC) business model in the U.S. airline industry. *Journal of Air Transport Management 62*, 155–164.

Bajari, P., C. L. Benkard, and J. Levin (2007). Estimating Dynamic Models of Imperfect Competition. *Econometrica 75*(5), 1331–1370.

Benkard, C. L., A. Bodoh-Creed, and J. Lazarev (2020). Simulating the dynamic effects of horizontal mergers: U.S airlines. *Working Paper, Graduate School of Business, Stanford University*.

Berry, S. and P. Jia (2010, August). Tracing the Woes: An Empirical Analysis of the Airline Industry. *American Economic Journal: Microeconomics 2*(3), 1–43.

Brueckner, J. K., D. Lee, and E. S. Singer (2013). Airline competition and domestic US airfares: A comprehensive reappraisal. *Economics of Transportation 2*(1), 1–17.

Campisi, N. (2023). DOJ Files Lawsuit To Stop JetBlue/Spirit Merger — Here's Why You Should Care. *Forbes Advisor*. Accessed: 2024-06-03.

Ciliberto, F., C. Murry, and E. Tamer (2021). Market structure and competition in airline markets. *Journal of Political Economy 129*(11), 2995–3038.

Ciliberto, F., E. Watkins, and J. W. Williams (2019). Collusive pricing patterns in the US airline industry. *International Journal of Industrial Organization 62*, 136–157.

Ciliberto, F. and J. W. Williams (2014). Does multimarket contact facilitate tacit collusion? Inference on conduct parameters in the airline industry. *The RAND Journal of Economics 45*(4), 764–791.

Evans, W. N. and I. N. Kessides (1994). Living by the "Golden Rule": Multimarket Contact in the U.S. Airline Industry. *The Quarterly Journal of Economics 109*(2), 341–366.

Goolsbee, A. and C. Syverson (2008, 11). How Do Incumbents Respond to the Threat of Entry? Evidence from the Major Airlines*. *The Quarterly Journal of Economics 123*(4), 1611–1633.

Hazel, R. (2018). Airline capacity discipline in the U.S. domestic market. *Journal of Air Transport Management 66*, 76–86.

Hüschelrath, K. and K. Müller (2013). The competitive effects of firm exit: Evidence from the U.S. airline industry. *Economics of Transportation 2*(2), 72–85.

Kim, S. J. and Y. Park (2023). Examining the Coordinated Effects of the AA/USAir Merger. *ShanghaiTech SEM Working Paper*.

Kwoka, J., K. Hearle, and P. Alepin (2016). From the Fringe to the Forefront: Low

Cost Carriers and Airline Price Determination. *Review of Industrial Organization 48*(3), 247–268.

Kwoka, J. and E. Shumilkina (2010). The price effect of eliminating potential competition: Evidence from an airline merger. *The Journal of Industrial Economics 58*(4), 767–1793.

Lederman, M. (2008). Are frequent-flyer programs a cause of the "hub premium"? *Journal of Economics & Management Strategy 17*(1), 35–66.

Li, S., J. Mazur, Y. Park, J. Roberts, A. Sweeting, and J. Zhang (2022). Repositioning and market power after airline mergers. *The RAND Journal of Economics 53*(1), 166–199.

Miller, N. H. and M. C. Weinberg (2017). Understanding the Price Effects of the MillerCoors Joint Venture. *Econometrica 85*(6), 1763–1791.

Morrison, S. A. (2001). Actual, Adjacent, and Potential Competition: Estimating the Full Effect of Southwest Airlines. *Journal of Transport Economics and Policy 35*(2), 239–256.

Nevo, A. (2000). Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry. *The RAND Journal of Economics 31*(3), 395–421.

Peters, C. (2006). Evaluating the Performance of Merger Simulation: Evidence from the U.S. Airline Industry. *The Journal of Law & Economics 49*(2), 627–649.

Porter, R. H. (2020). Mergers and coordinated effects. *International Journal of Industrial Organization 73*, 102583.

44

Reed, T. (2018). Spirit Airlines Plans 2018 Growth Of 20% Plus, Putting Downward Pressure On Rivals' Fares. *Forbes*. Accessed: 2024-06-03.

Roth, J., P. H. Sant'Anna, A. Bilinski, and J. Poe (2023). What's trending in difference-in-differences? a synthesis of the recent econometrics literature. *Journal of Econometrics 235*(2), 2218–2244.

Seim, K. (2006). An empirical model of firm entry with endogenous product-type choices. *The RAND Journal of Economics 37*(3), 619–640.

Shrago, B. (2024). The Spirit Effect: Ultra-Low Cost Carriers and Fare Dispersion in the U.S. Airline Industry. *Review of Industrial Organization*, 1–31.

Sweeting, A., J. W. Roberts, and C. Gedge (2020). A model of dynamic limit pricing with an application to the airline industry. *Journal of Political Economy 128*(3), 1148–1193.

Tan, K. M. (2016). Incumbent Response to Entry by Low-Cost Carriers in the U.S. Airline Industry. *Southern Economic Journal 82*(3), 874–892.

Turner, D. (2022). Coordinated effects in the american airlines-us airways merger. *Available at SSRN 3917112*.

# 6    Appendix

## 6.1    Weighted Regression Sensitivities

Table 4: The effect of Spirit and JetBlue entry on average market prices, weighted

|  | Spirit | JetBlue |
|---|---|---|
| Entry Effect | -15.4% | -13.7% |
|  | (2.2%) | (4.2%) |
| R-squared | 0.90 | 0.88 |
| Number of observations | 930 | 276 |
| Number of events | 62 | 19 |

**Source**: DB1B; T-100.

**Note**: The table shows results from passenger-weighted regressions of the log of price (as measured by the DB1B) on market-quarter fixed effects, year-quarter fixed effects, and an indicator variable that takes a value of one after carrier entry, and zero before carrier entry. Regression coefficients and standard errors have been converted to exact percentage changes with the formula % change = exp(coefficient) – 1. Observations are at the market-year-quarter level, and the dependent variable is the log of the average fare in each market-year-quarter cell. The sample includes observations for all carriers, including the entrant, between 2016 Q1 – 2019 Q4 in all markets in which (i) entry occurred between 2017 Q1 – 2019 Q1 and (ii) there were no other changes in the set of nonstop carriers in the market in the year prior to entry. The quarter of the entry event is excluded. Standard errors are clustered at the market level and reported in parentheses.

Table 5: Effect of Spirit and JetBlue on prices, controlling for relative capacity, weighted

|  | Spirit | JetBlue |
|---|---|---|
| Intercept ($\beta_0$) | -0.0994 | -0.0542 |
|  | (0.0269) | (0.0319) |
| Relative capacity ($\beta_1^*$) | -0.0413 | -0.0635 |
|  | (0.0105) | (0.0175) |
| Relative capacity-squared ($\beta_2^*$) | 0.0008 | 0.0015 |
|  | (0.0005) | (0.0005) |
| R-Squared | 0.91 | 0.92 |
| Observations | 930 | 270 |
| Number of events | 62 | 19 |

**Source**: DB1B; T-100.

**Note**: This table shows re-normalized coefficients from passenger-weighted regressions of the log of fare (as measured by DB1B) for all carriers on an indicator variable that takes a value of one after entry, and zero before entry, as well as this variable interacted with the entrant's round trip daily frequency divided by average daily market passengers in the year prior to entry, and the square of that term. The regressions also include year-quarter fixed effects and market-quarter fixed effects. The coefficients are normalized to reflect market conditions in the Hartford, CT – Miami, FL market by dividing $\beta_1$ by the average number of 2022 Q2 daily passengers in that market and dividing $\beta_2$ by the average daily passengers squared. Observations are at the market-year-quarter level. The sample includes observations between 2016 Q1 – 2019 Q4 in all markets in which (i) entry occurred between 2017 Q1 – 2019 Q1 and (ii) there were no other changes in the set of nonstop carriers in the market in the year prior to entry. The quarter of the entry event is excluded. Standard errors are clustered at the market level and reported in parentheses.

47

Table 6: Estimated Annual Net Harm, by Market Type, weighted

| Market Type | N. markets | Avg. price change (per passenger) | Avg. % price change (per passenger) | Total harm (annual) |
|---|---|---|---|---|
| Nonstop Overlap | 73 | $13.76 | 7.9% | $0.8B |
| Other | 191 | $2.41 | 1.2% | $0.2B |
| Total | 264 | $7.00 | 3.9% | $0.9B |

**Note**: This table shows the total harm from Spirit exit and JetBlue entry in market quarters where Spirit offers weekly nonstop service in 2021 Q3 – 2022 Q2. We limit the sample by dropping all markets where we presume a Spirit exit occurred in the year prior to the merger announcement. The sample is further limited to market quarters in which Spirit had a relative capacity, calculated as daily directional frequency divided by daily market passengers excluding Spirit, of at least 0.0005, which is the minimum relative capacity in the Spirit entry events. Furthermore, market quarters where the combined Spirit and JetBlue relative capacity, calculated as daily directional frequency of JetBlue plus that of Spirit divided by daily market passengers excluding Spirit, is greater than 0.055, which is the maximum relative capacity in the JetBlue entry regression sample, are dropped. The average price change is passenger-weighted average change in price across Spirit nonstop presence market quarters and is calculated using market quarter passengers, the average market quarter DB1B price, and Spirit and JetBlue's daily frequency in the same period, and the coefficients estimated in the unweighted quadratic regression shown in Figure 6. Total harm is calculated by multiplying the average price change by the number of passengers present in 2021 Q3 – 2022 Q2. Detailed results for the top 50 market-quarters are included in the Appendix.

48

## 6.2   Linear Spline Regression Sensitivities

Figure 7: Estimated relative capacity policy functions using a linear spline



**Note**: Knot points are determined by calculating the unweighted median relative capacity in the regression sample for each entrant. We create two spline variables based on relative capacity. $X_1$ = min(relative capacity, knot), $X_2$ = [relative capacity > knot] × (relative capacity - knot). The fitted regression lines are constructed from unweighted and passenger-weighted regressions of the log of average market fare, as measured by DB1B, on an indicator variable that takes a value of one after entry, and zero before entry, as well as this variable interacted with spline variables of relative capacity, year-quarter fixed effects, and market-quarter fixed effects. Entry is defined as in my initial report. The fitted segments are converted to percent changes using the formula % change = exp(log change) − 1.

49

Table 7: Linear spline coefficients

|  | Spirit | JetBlue |
|---|---|---|
| Intercept | -0.028 | 0.070 |
|  | (0.051) | (0.054) |
| First Spline Segment Slope | -74.887 | -76.267 |
|  | (22.865) | (16.219) |
| Second Spline Segment Slope | -12.883 | -2.318 |
|  | 5.992 | 3.559 |
| Knot | 0.003 | 0.005 |
| R-Squared | 0.88 | 0.90 |
| Observations | 930 | 270 |
| Number of events | 62 | 18 |

**Source**: DB1B; T-100.
**Note**: This table shows the spline regression coefficients corresponding to Figure 7. Standard errors are clustered at the market level and reported in parentheses.

Table 8: Estimated Annual Net Harm, by Market Type, Spline

| Market Type | N. markets | Avg. price change (per passenger) | Avg. % price change (per passenger) | Total harm (annual) |
|---|---|---|---|---|
| Nonstop Overlap | 73 | $9.65 | 5.6% | $0.5B |
| Other | 191 | $16.71 | 9.0% | $1.3B |
| Total | 264 | $13.85 | 7.6% | $1.9B |

**Note**: [1] Net harm is calculated in the same way as in Table 3, except for the use of a spline as opposed to a quadratic model. The regression coefficients underlying the spline model are provided in Table 7, and graphically in Figure 7.

## 6.3   Additional Regression Sensitivities

Table 9: Sensitivities to the specification in Table 1

| | Baseline[1] | | Carrier Controls[2] | | One Year Window[3] | | No Exit[4] | | No 2019 Entries[5] | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Spirit | JetBlue | Spirit | JetBlue | Spirit | JetBlue | Spirit | JetBlue | Spirit | JetBlue |
| Intercept $\beta_0$ | -21.9% | -17.9% | -22.5% | -19.3% | -18.5% | -14.5% | -21.0% | -17.9% | -25.7% | -16.0% |
| | (2.3%) | (4.4%) | (2.2%) | (4.3%) | (3.1%) | (6.8%) | (2.4%) | (4.4%) | (2.3%) | (4.3%) |
| R-Squared | 0.84 | 0.86 | 0.86 | 0.88 | 0.89 | 0.86 | 0.82 | 0.86 | 0.85 | 0.86 |
| Observations | 930 | 274 | 930 | 274 | 468 | 142 | 825 | 274 | 720 | 259 |
| Number of Events | 62 | 19 | 62 | 19 | 62 | 18 | 55 | 19 | 48 | 18 |

**Note**: This table reports sensitivities to the results in Table 1.

[1]: Baseline specification as described in Table 1.

[2]: Adds indicator variables at the market-carrier-quarter level for the presence of the following carriers: American, Delta, United, Southwest, Alaska, Virgin America, Frontier, Allegiant, Sun Country, Hawaiian, and JetBlue (for Spirit entry events) and Spirit (for JetBlue entry events.).

[3]: Uses only 8 quarters of data for each entry event (4 quarters before and 4 quarters after each entry event, not including the entry quarter itself).

[4]: Excludes entry events for which the entrant subsequently exists the route before the end of 2019. Exit is defined as four or more consecutive quarters after the entry that have less than weekly nonstop service in the T-100.

[5]: Excludes entries that occurred during 2019, as these do not have a full year of post-entry data before the onset of the COVID-19 pandemic. The baseline model in Table 2 includes entries that occurred in 2019 Q1.

Table 10: Sensitivities to the specification in Table 2

|  | Baseline[1] | | Carrier Controls[2] | | One Year Window[3] | | No Exit[4] | | No 2019 Entries[5] | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Spirit | JetBlue | Spirit | JetBlue | Spirit | JetBlue | Spirit | JetBlue | Spirit | JetBlue |
| Intercept ($\beta_0$) | -0.0979 | -0.0144 | -0.1048 | -0.0092 | -0.0813 | 0.0321 | -0.0910 | -0.0144 | -0.1340 | -0.0065 |
|  | (0.0269) | (0.0574) | (0.0266) | (0.0564) | (0.0305) | (0.0931) | (0.0281) | (0.0574) | (0.0327) | (0.0604) |
| Relative Capacity ($\beta_1$) | -0.0499 | -0.0417 | -0.0507 | -0.0449 | -0.0482 | -0.0380 | -0.0473 | -0.0417 | -0.0474 | -0.0394 |
|  | (0.0096) | (0.0104) | (0.0097) | (0.0098) | (0.0101) | (0.0092) | (0.0102) | (0.0104) | (0.0107) | (0.0107) |
| Relative Capacity Squared ($\beta_2$) | 0.0012 | 0.0008 | 0.0012 | 0.0009 | 0.0011 | 0.0008 | 0.0011 | 0.0008 | 0.0011 | 0.0008 |
|  | (0.0004) | (0.0002) | (0.0004) | (0.0002) | (0.0004) | (0.0002) | (0.0005) | (0.0002) | (0.0005) | (0.0002) |
| R-Squared | 0.89 | 0.90 | 0.90 | 0.92 | 0.94 | 0.92 | 0.87 | 0.90 | 0.89 | 0.90 |
| Number of Observations | 930 | 270 | 930 | 270 | 468 | 142 | 825 | 270 | 720 | 255 |
| Number of Events | 62 | 18 | 62 | 18 | 62 | 18 | 55 | 18 | 48 | 17 |

**Note**: This table reports sensitivities to the results in Table 2.

[1]: Baseline specification as described in Table 2.

[2]: Adds indicator variables at the market-carrier-quarter level for the presence of the following carriers: American, Delta, United, Southwest, Alaska, Virgin America, Frontier, Allegiant, Sun Country, Hawaiian, and JetBlue (for Spirit entry events) and Spirit (for JetBlue entry events.).

[3]: Uses only 8 quarters of data for each entry event (4 quarters before and 4 quarters after each entry event, not including the entry quarter itself).

[4]: Excludes entry events for which the entrant subsequently exists the route before the end of 2019. Exit is defined as four or more consecutive quarters after the entry that have less than weekly nonstop service in the T-100.

[5]: Excludes entries that occurred during 2019, as these do not have a full year of post-entry data before the onset of the COVID-19 pandemic. The baseline model in Table 2 includes entries that occurred in 2019 Q1.

Figure 8: Net harm in nonstop overlap markets, sensitivities from Table 10



**Note**: This figure shows the total net harm in nonstop overlaps as described in Table 3 under various sensitivities to the regression model and sample.

[1]: Excludes entries that occurred during 2019, as these do not have a full year of post-entry data before the onset of the COVID-19 pandemic. The baseline model in Table 2 includes entries that occurred in 2019 Q1.

[2]: Adds indicator variables at the market-carrier-quarter level for the presence of the following carriers: American, Delta, United, Southwest, Alaska, Virgin America, Frontier, Allegiant, Sun Country, Hawaiian, and JetBlue (for Spirit entry events) and Spirit (for JetBlue entry events.).

[3]: Baseline specification as described in Table 2 and Table 3.

[4]: Excludes entry events for which the entrant subsequently exists the route before the end of 2019. Exit is defined as four or more consecutive quarters after the entry that have less than weekly nonstop service in the T-100.

[5]: Uses only 8 quarters of data for each entry event (4 quarters before and 4 quarters after each entry event, not including the entry quarter itself).

Figure 9: Net harm in other markets, sensitivities from Table 10



**Note**: This figure shows the total net harm in other markets as described in Table 3 under various sensitivities to the regression model and sample.

[1]: Excludes entries that occurred during 2019, as these do not have a full year of post-entry data before the onset of the COVID-19 pandemic. The baseline model in Table 2 includes entries that occurred in 2019 Q1.

[2]: Uses only 8 quarters of data for each entry event (4 quarters before and 4 quarters after each entry event, not including the entry quarter itself).

[3]: Adds indicator variables at the market-carrier-quarter level for the presence of the following carriers: American, Delta, United, Southwest, Alaska, Virgin America, Frontier, Allegiant, Sun Country, Hawaiian, and JetBlue (for Spirit entry events) and Spirit (for JetBlue entry events.).

[4]: Baseline specification as described in Table 2 and Table 3.

[5]: Excludes entry events for which the entrant subsequently exists the route before the end of 2019. Exit is defined as four or more consecutive quarters after the entry that have less than weekly nonstop service in the T-100.

**Market-year-quarter level harm in markets served nonstop by Spirit**
Based on unweighted regressions
2021 Q3 – 2022 Q2

| | Market | Quarter | Market passengers | Market average price | Harm from loss of Spirit | | Net harm | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Per passenger | Total | Per passenger | Total | Total (annual) |
| 1. | Miami, FL – New York City, NY (LGA/JFK/EWR) | 2021 Q3 | 1,478,300 | $134.37 | $19.89 | $29.4M | $15.18 | $22.4M | $119.7M |
| 2. | Miami, FL – New York City, NY (LGA/JFK/EWR) | 2021 Q4 | 1,675,470 | $150.03 | $21.79 | $36.5M | $16.87 | $28.3M | $119.7M |
| 3. | Miami, FL – New York City, NY (LGA/JFK/EWR) | 2022 Q1 | 1,814,460 | $156.97 | $23.67 | $43.0M | $17.88 | $32.4M | $119.7M |
| 4. | Miami, FL – New York City, NY (LGA/JFK/EWR) | 2022 Q2 | 1,714,140 | $186.34 | $28.70 | $49.2M | $21.32 | $36.5M | $119.7M |
| 5. | New York City, NY (LGA/JFK/EWR) – Orlando, FL | 2021 Q3 | 993,130 | $144.14 | $20.10 | $20.0M | $16.01 | $15.9M | $67.2M |
| 6. | New York City, NY (LGA/JFK/EWR) – Orlando, FL | 2021 Q4 | 934,230 | $138.99 | $19.77 | $18.5M | $15.58 | $14.6M | $67.2M |
| 7. | New York City, NY (LGA/JFK/EWR) – Orlando, FL | 2022 Q1 | 898,130 | $150.55 | $21.14 | $19.0M | $16.88 | $15.2M | $67.2M |
| 8. | New York City, NY (LGA/JFK/EWR) – Orlando, FL | 2022 Q2 | 1,006,080 | $187.93 | $27.88 | $28.0M | $21.47 | $21.6M | $67.2M |
| 9. | Las Vegas, NV – New York City, NY (LGA/JFK/EWR) | 2021 Q3 | 362,910 | $276.46 | $34.75 | $12.6M | $29.82 | $10.8M | $45.8M |
| 10. | Las Vegas, NV – New York City, NY (LGA/JFK/EWR) | 2021 Q4 | 353,180 | $271.02 | $36.07 | $12.7M | $29.60 | $10.5M | $45.8M |
| 11. | Las Vegas, NV – New York City, NY (LGA/JFK/EWR) | 2022 Q1 | 303,310 | $247.76 | $34.61 | $10.5M | $27.46 | $8.3M | $45.8M |
| 12. | Las Vegas, NV – New York City, NY (LGA/JFK/EWR) | 2022 Q2 | 413,010 | $353.71 | $49.67 | $20.5M | $39.15 | $16.2M | $45.8M |
| 13. | Miami, FL – Washington, DC | 2021 Q3 | 423,990 | $151.23 | $25.21 | $10.7M | $17.30 | $7.3M | $37.1M |
| 14. | Miami, FL – Washington, DC | 2021 Q4 | 482,360 | $154.04 | $25.14 | $12.1M | $17.67 | $8.5M | $37.1M |
| 15. | Miami, FL – Washington, DC | 2022 Q1 | 492,100 | $158.08 | $26.24 | $12.9M | $18.31 | $9.0M | $37.1M |
| 16. | Miami, FL – Washington, DC | 2022 Q2 | 570,530 | $186.24 | $30.18 | $17.2M | $21.42 | $12.2M | $37.1M |
| 17. | Los Angeles, CA – Miami, FL | 2021 Q3 | 361,530 | $223.01 | $29.36 | $10.6M | $24.39 | $8.8M | $34.7M |
| 18. | Los Angeles, CA – Miami, FL | 2022 Q1 | 360,830 | $281.32 | $35.34 | $12.8M | $30.27 | $10.9M | $34.7M |
| 19. | Los Angeles, CA – Miami, FL | 2022 Q2 | 378,410 | $367.77 | $45.83 | $17.3M | $39.56 | $15.0M | $34.7M |
| 20. | Chicago, IL – Miami, FL | 2021 Q3 | 418,900 | $113.81 | $18.11 | $7.6M | $12.79 | $5.4M | $32.8M |
| 21. | Chicago, IL – Miami, FL | 2021 Q4 | 464,010 | $137.27 | $22.71 | $10.5M | $15.54 | $7.2M | $32.8M |
| 22. | Chicago, IL – Miami, FL | 2022 Q1 | 534,860 | $158.80 | $26.46 | $14.2M | $17.97 | $9.6M | $32.8M |
| 23. | Chicago, IL – Miami, FL | 2022 Q2 | 483,450 | $192.35 | $33.61 | $16.2M | $21.96 | $10.6M | $32.8M |
| 24. | Orlando, FL – Washington, DC | 2021 Q3 | 407,190 | $130.88 | $21.59 | $8.8M | $14.84 | $6.0M | $31.3M |
| 25. | Orlando, FL – Washington, DC | 2021 Q4 | 450,350 | $141.64 | $21.11 | $9.5M | $15.78 | $7.1M | $31.3M |
| 26. | Orlando, FL – Washington, DC | 2022 Q1 | 444,460 | $146.89 | $22.60 | $10.0M | $16.62 | $7.4M | $31.3M |
| 27. | Orlando, FL – Washington, DC | 2022 Q2 | 531,120 | $182.75 | $26.72 | $14.2M | $20.36 | $10.8M | $31.3M |
| 28. | Las Vegas, NV – Los Angeles, CA | 2021 Q3 | 588,520 | $106.03 | $17.40 | $10.2M | $11.97 | $7.0M | $31.0M |
| 29. | Las Vegas, NV – Los Angeles, CA | 2021 Q4 | 596,290 | $106.53 | $17.62 | $10.5M | $12.05 | $7.2M | $31.0M |
| 30. | Las Vegas, NV – Los Angeles, CA | 2022 Q1 | 583,590 | $100.41 | $19.20 | $11.2M | $11.78 | $6.9M | $31.0M |
| 31. | Las Vegas, NV – Los Angeles, CA | 2022 Q2 | 812,540 | $104.75 | $19.28 | $15.7M | $12.16 | $9.9M | $31.0M |
| 32. | Houston, TX – New York City, NY (LGA/JFK/EWR) | 2021 Q3 | 295,550 | $212.72 | $27.71 | $8.2M | $22.97 | $6.8M | $30.9M |
| 33. | Houston, TX – New York City, NY (LGA/JFK/EWR) | 2021 Q4 | 397,680 | $183.83 | $23.92 | $9.5M | $19.78 | $7.9M | $30.9M |
| 34. | Houston, TX – New York City, NY (LGA/JFK/EWR) | 2022 Q1 | 307,420 | $163.96 | $23.84 | $7.3M | $18.08 | $5.6M | $30.9M |
| 35. | Houston, TX – New York City, NY (LGA/JFK/EWR) | 2022 Q2 | 416,310 | $235.27 | $32.46 | $13.5M | $25.61 | $10.7M | $30.9M |
| 36. | Atlanta, GA – New York City, NY (LGA/JFK/EWR) | 2021 Q3 | 591,160 | $178.74 | $22.82 | $13.5M | $19.23 | $11.4M | $30.6M |
| 37. | Atlanta, GA – New York City, NY (LGA/JFK/EWR) | 2021 Q4 | 698,490 | $156.31 | $19.60 | $13.7M | $16.73 | $11.7M | $30.6M |
| 38. | Atlanta, GA – New York City, NY (LGA/JFK/EWR) | 2022 Q1 | 530,460 | $132.62 | $16.97 | $9.0M | $14.28 | $7.6M | $30.6M |
| 39. | Boston, MA (BOS) – Miami, FL | 2021 Q3 | 346,550 | $133.25 | $19.85 | $6.9M | $15.27 | $5.3M | $30.0M |
| 40. | Boston, MA (BOS) – Miami, FL | 2021 Q4 | 371,170 | $161.43 | $25.34 | $9.4M | $18.81 | $7.0M | $30.0M |
| 41. | Boston, MA (BOS) – Miami, FL | 2022 Q1 | 414,610 | $180.09 | $27.31 | $11.3M | $20.58 | $8.5M | $30.0M |
| 42. | Boston, MA (BOS) – Miami, FL | 2022 Q2 | 388,460 | $201.36 | $34.55 | $13.4M | $23.79 | $9.2M | $30.0M |
| 43. | Atlanta, GA – Miami, FL | 2021 Q3 | 481,160 | $112.21 | $20.67 | $9.9M | $13.11 | $6.3M | $29.5M |
| 44. | Atlanta, GA – Miami, FL | 2021 Q4 | 479,500 | $122.28 | $23.42 | $11.2M | $14.43 | $6.9M | $29.5M |
| 45. | Atlanta, GA – Miami, FL | 2022 Q1 | 449,850 | $127.38 | $25.07 | $11.3M | $15.06 | $6.8M | $29.5M |
| 46. | Atlanta, GA – Miami, FL | 2022 Q2 | 549,480 | $148.13 | $27.71 | $15.2M | $17.21 | $9.5M | $29.5M |
| 47. | Orlando, FL – San Juan, PR | 2021 Q3 | 350,890 | $145.61 | $30.01 | $10.5M | $18.57 | $6.5M | $28.0M |
| 48. | Orlando, FL – San Juan, PR | 2021 Q4 | 387,000 | $147.10 | $31.34 | $12.1M | $18.79 | $7.3M | $28.0M |
| 49. | Orlando, FL – San Juan, PR | 2022 Q1 | 294,210 | $133.91 | $31.61 | $9.3M | $17.92 | $5.3M | $28.0M |
| 50. | Orlando, FL – San Juan, PR | 2022 Q2 | 408,520 | $171.95 | $36.85 | $15.1M | $21.83 | $8.9M | $28.0M |

**Note**: This table shows the top 50 market-quarters by annual harm when using the unweighted relative capacity model. "Net harm" accounts for Spirit's exit effect and any potential offsetting effect from JetBlue's entry and expansion in the same markets. Harm per passenger is the average market quarter DB1B price multiplied by the price change that will arise from the merger. The price change is computed by evaluating the coefficients estimated in the unweighted quadratic regression shown in Table 2 at the values of relative capacity in the given market quarter, as described in the text. Relative capacity is based on Spirit's and JetBlue's daily frequency, and the number of daily passengers in the market quarter, excluding Spirit's passengers. Total harm is calculated by multiplying the price change per passenger by the number of passengers present in the DB1B in 2021 Q3 – 2022 Q2.

**Market-year-quarter level harm in markets served nonstop by Spirit**
Based on passenger-weighted regressions
2021 Q3 – 2022 Q2

| Market | Quarter | Market passengers | Market average price | Harm from the loss of Spirit | | Net harm | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Per passenger | Total | Per passenger | Total | Total (annual) |
| 1. Miami, FL – New York City, NY (LGA/JFK/EWR) | 2021 Q3 | 1,478,300 | $134.37 | $19.08 | $28.2M | $12.10 | $17.9M | $94.6M |
| 2. Miami, FL – New York City, NY (LGA/JFK/EWR) | 2021 Q4 | 1,675,470 | $150.03 | $20.96 | $35.1M | $13.66 | $22.9M | $94.6M |
| 3. Miami, FL – New York City, NY (LGA/JFK/EWR) | 2022 Q1 | 1,814,460 | $156.97 | $22.65 | $41.1M | $14.09 | $25.6M | $94.6M |
| 4. Miami, FL – New York City, NY (LGA/JFK/EWR) | 2022 Q2 | 1,714,140 | $186.34 | $27.39 | $46.9M | $16.48 | $28.2M | $94.6M |
| 5. New York City, NY (LGA/JFK/EWR) – Orlando, FL | 2021 Q3 | 993,130 | $144.14 | $19.44 | $19.3M | $13.37 | $13.3M | $55.4M |
| 6. New York City, NY (LGA/JFK/EWR) – Orlando, FL | 2021 Q4 | 934,230 | $138.99 | $19.06 | $17.8M | $12.87 | $12.0M | $55.4M |
| 7. New York City, NY (LGA/JFK/EWR) – Orlando, FL | 2022 Q1 | 898,130 | $150.55 | $20.43 | $18.3M | $14.13 | $12.7M | $55.4M |
| 8. New York City, NY (LGA/JFK/EWR) – Orlando, FL | 2022 Q2 | 1,006,080 | $187.93 | $26.73 | $26.9M | $17.30 | $17.4M | $55.4M |
| 9. Las Vegas, NV – New York City, NY (LGA/JFK/EWR) | 2021 Q3 | 362,950 | $276.46 | $34.13 | $12.4M | $26.77 | $9.7M | $39.0M |
| 10. Las Vegas, NV – New York City, NY (LGA/JFK/EWR) | 2021 Q4 | 353,180 | $271.02 | $35.12 | $12.4M | $25.47 | $9.0M | $39.0M |
| 11. Las Vegas, NV – New York City, NY (LGA/JFK/EWR) | 2022 Q1 | 303,310 | $247.76 | $33.47 | $10.2M | $22.83 | $6.9M | $39.0M |
| 12. Las Vegas, NV – New York City, NY (LGA/JFK/EWR) | 2022 Q2 | 413,010 | $353.71 | $47.99 | $19.8M | $32.33 | $13.4M | $39.0M |
| 13. Los Angeles, CA – Miami, FL | 2021 Q3 | 361,530 | $223.01 | $28.63 | $10.4M | $21.23 | $7.7M | $31.0M |
| 14. Los Angeles, CA – Miami, FL | 2022 Q1 | 360,830 | $281.32 | $34.71 | $12.5M | $27.12 | $9.8M | $31.0M |
| 15. Los Angeles, CA – Miami, FL | 2022 Q2 | 378,410 | $367.77 | $45.08 | $17.1M | $35.70 | $13.5M | $31.0M |
| 16. Atlanta, GA – New York City, NY (LGA/JFK/EWR) | 2021 Q3 | 591,160 | $178.74 | $22.36 | $13.2M | $16.97 | $10.0M | $27.1M |
| 17. Atlanta, GA – New York City, NY (LGA/JFK/EWR) | 2021 Q4 | 698,490 | $156.31 | $19.26 | $13.5M | $14.95 | $10.4M | $27.1M |
| 18. Atlanta, GA – New York City, NY (LGA/JFK/EWR) | 2022 Q1 | 530,460 | $132.62 | $16.62 | $8.8M | $12.59 | $6.7M | $27.1M |
| 19. Miami, FL – Washington, DC | 2021 Q3 | 423,990 | $151.23 | $23.82 | $10.1M | $12.09 | $5.1M | $26.7M |
| 20. Miami, FL – Washington, DC | 2021 Q4 | 482,360 | $154.04 | $23.81 | $11.5M | $12.76 | $6.2M | $26.7M |
| 21. Miami, FL – Washington, DC | 2022 Q1 | 492,100 | $158.08 | $24.81 | $12.2M | $13.11 | $6.4M | $26.7M |
| 22. Miami, FL – Washington, DC | 2022 Q2 | 570,530 | $186.24 | $28.61 | $16.3M | $15.67 | $8.9M | $26.7M |
| 23. Houston, TX – New York City, NY (LGA/JFK/EWR) | 2021 Q3 | 295,550 | $212.72 | $27.07 | $8.0M | $19.95 | $5.9M | $25.9M |
| 24. Houston, TX – New York City, NY (LGA/JFK/EWR) | 2021 Q4 | 397,680 | $183.83 | $23.37 | $9.3M | $17.15 | $6.8M | $25.9M |
| 25. Houston, TX – New York City, NY (LGA/JFK/EWR) | 2022 Q1 | 307,420 | $163.96 | $22.93 | $7.0M | $14.31 | $4.4M | $25.9M |
| 26. Houston, TX – New York City, NY (LGA/JFK/EWR) | 2022 Q2 | 416,310 | $235.27 | $31.44 | $13.1M | $21.16 | $8.8M | $25.9M |
| 27. Orlando, FL – Washington, DC | 2021 Q3 | 407,190 | $130.88 | $20.42 | $8.3M | $10.40 | $4.2M | $24.0M |
| 28. Orlando, FL – Washington, DC | 2021 Q4 | 450,350 | $141.64 | $20.23 | $9.1M | $12.28 | $5.5M | $24.0M |
| 29. Orlando, FL – Washington, DC | 2022 Q1 | 444,460 | $146.89 | $21.57 | $9.6M | $12.70 | $5.6M | $24.0M |
| 30. Orlando, FL – Washington, DC | 2022 Q2 | 531,120 | $182.75 | $25.67 | $13.6M | $16.20 | $8.6M | $24.0M |
| 31. Boston, MA (BOS) – Miami, FL | 2021 Q3 | 346,550 | $133.25 | $19.02 | $6.6M | $12.29 | $4.3M | $22.9M |
| 32. Boston, MA (BOS) – Miami, FL | 2021 Q4 | 371,170 | $161.43 | $24.12 | $9.0M | $14.53 | $5.4M | $22.9M |
| 33. Boston, MA (BOS) – Miami, FL | 2022 Q1 | 414,610 | $180.09 | $26.11 | $10.8M | $16.19 | $6.7M | $22.9M |
| 34. Boston, MA (BOS) – Miami, FL | 2022 Q2 | 388,460 | $201.36 | $32.52 | $12.6M | $16.73 | $6.5M | $22.9M |
| 35. Chicago, IL – Miami, FL | 2021 Q3 | 418,900 | $113.81 | $17.21 | $7.2M | $9.29 | $3.9M | $22.5M |
| 36. Chicago, IL – Miami, FL | 2021 Q4 | 464,010 | $137.27 | $21.47 | $10.0M | $10.82 | $5.0M | $22.5M |
| 37. Chicago, IL – Miami, FL | 2022 Q1 | 534,860 | $158.80 | $25.00 | $13.4M | $12.39 | $6.6M | $22.5M |
| 38. Chicago, IL – Miami, FL | 2022 Q2 | 483,450 | $192.35 | $31.57 | $15.3M | $14.32 | $6.9M | $22.5M |
| 39. Boston, MA (BOS) – Orlando, FL | 2021 Q3 | 268,910 | $159.97 | $25.60 | $6.9M | $13.72 | $3.7M | $20.5M |
| 40. Boston, MA (BOS) – Orlando, FL | 2021 Q4 | 269,000 | $185.80 | $29.09 | $7.8M | $16.40 | $4.4M | $20.5M |
| 41. Boston, MA (BOS) – Orlando, FL | 2022 Q1 | 304,890 | $191.20 | $27.04 | $8.2M | $17.82 | $5.4M | $20.5M |
| 42. Boston, MA (BOS) – Orlando, FL | 2022 Q2 | 330,970 | $232.75 | $34.85 | $11.5M | $21.15 | $7.0M | $20.5M |
| 43. Las Vegas, NV – Los Angeles, CA | 2021 Q3 | 588,520 | $106.03 | $16.47 | $9.7M | $8.40 | $4.9M | $20.1M |
| 44. Las Vegas, NV – Los Angeles, CA | 2021 Q4 | 596,290 | $106.53 | $16.66 | $9.9M | $8.40 | $5.0M | $20.1M |
| 45. Las Vegas, NV – Los Angeles, CA | 2022 Q1 | 583,590 | $100.41 | $17.85 | $10.4M | $6.95 | $4.1M | $20.1M |
| 46. Las Vegas, NV – Los Angeles, CA | 2022 Q2 | 812,540 | $104.75 | $18.01 | $14.6M | $7.50 | $6.1M | $20.1M |
| 47. Austin, TX – New York City, NY (LGA/JFK/EWR) | 2021 Q3 | 191,590 | $214.45 | $28.18 | $5.4M | $20.15 | $3.9M | $19.2M |
| 48. Austin, TX – New York City, NY (LGA/JFK/EWR) | 2021 Q4 | 245,510 | $211.69 | $26.81 | $6.6M | $20.23 | $5.0M | $19.2M |
| 49. Austin, TX – New York City, NY (LGA/JFK/EWR) | 2022 Q1 | 183,580 | $206.34 | $29.04 | $5.3M | $18.69 | $3.4M | $19.2M |
| 50. Austin, TX – New York City, NY (LGA/JFK/EWR) | 2022 Q2 | 271,070 | $274.46 | $35.14 | $9.5M | $25.79 | $7.0M | $19.2M |

 **Note**: This table shows the top 50 market-quarters by annual harm when using the weighted relative capacity model. "Net harm" accounts for Spirit's exit effect and any potential offsetting effect from JetBlue's entry and expansion in the same markets. Harm per passenger is the average market quarter DB1B price multiplied by the price change that will arise from the merger. The price change is computed by evaluating the coefficients estimated in the weighted quadratic regression shown in Table 5 at the values of relative capacity in the given market quarter, as described in the text. Relative capacity is based on Spirit's and JetBlue's daily frequency, and the number of daily passengers in the market quarter, excluding Spirit's passengers. Total harm is calculated by multiplying the price change per passenger by the number of passengers present in the DB1B in 2021 Q3 – 2022 Q2.