Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| IN RE VALVE ANTITRUST LITIGATION, | NO. 2:21-CV-00563-JNW<br><br>DECLARATION OF NATASHA MARIE PEARMAN IN SUPPORT OF VICKI SHOTBOLT CLASS REPRESENTATIVE LIMITED'S CROSS-MOTION FOR CLARIFICATION REGARDING PROTECTIVE ORDER<br><br>**NOTE ON MOTION CALENDAR: September 4, 2026**<br><br>**ORAL ARGUMENT REQUESTED** |

Natasha Marie Pearman declares and states under penalty of perjury under the laws of Washington:

1. I am a Partner and the head of the competition litigation practice at Milberg London LLP ("**Milberg**"), the solicitors for Vicki Shotbolt Class Representative Limited (the "**CR**") in the proceedings: *1640/7/7/24 Vicki Shotbolt Class Representative v Valve* Corporation which are ongoing before the Competition Appeal Tribunal in the United Kingdom (the "**UK Proceeding**").

2. I have primary carriage of the CR's claim and in that capacity, I make this declaration in support of the CR's Cross-Motion for Clarification Regarding the Protective



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Order entered in In Re Valve Corporation Antitrust Litigation (case no 2:21-cv-00563-JNW) (the "**US Proceeding**"), pending before this Court.

3. The facts and matters set out in this declaration are within my own knowledge unless otherwise stated, and I believe them to be true. Where I refer to information supplied by others, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief. Nothing I say in this declaration is intended to waive any privilege, and I am not authorized to waive privilege.

## I. THE UK PROCEEDINGS

4. These are opt-out collective proceedings under Section 47(B) of the UK Competition Act 1998 (the "**Competition Act**") brought by Vicki Shotbolt Class Representative Limited, an English company limited by guarantee, before the Competition Appeal Tribunal (the "**Tribunal**").

5. The Tribunal is a specialist court that hears cases involving competition or economic-regulatory issues.[1] All Tribunal orders are appealable to the UK Court of Appeal. The Honorable Mr. Justice Thompsell, who chairs the Tribunal for the UK Proceeding, is a judge of the Chancery Division of the High Court of England and Wales.

### A. FACTUAL BACKGROUND

6. The factual basis for the UK Proceeding is discussed in detail in the Summary of the Claim Form and the Amended Collective Proceedings Claim Form**,** which are attached hereto as Exhibit 1 and Exhibit 2. For the purposes of this declaration, I have included a brief summary of the factual background as relevant to the UK Proceedings.

7. The CR is acting on behalf of around 14 million UK-based consumers who purchased video games designed to be played on personal computers ("**PC Games**", or

[1] *See* About the Tribunal, Competition Appeal Tribunal, https://www.catribunal.org.uk/about (last accessed Aug. 9, 2026).

"**Games**") and/or additional content (including subscriptions) for such Games such as extra storylines, characters, features or in-game currency ("**Add-on Content**") (together**,** "**the Products**") during the applicable Class Period. The Class Period means the period from June 4, 2018 to June 4, 2024 in relation to members of the Class domiciled in England, Wales and Northen Ireland; and from January 1, 2010 to June 4, 2024 in relation to members of the Class domiciled in Scotland.

8. The CR alleges that the Defendant, Valve Corporation ("**Valve**"), which operates Steam, the leading PC Game distribution platform, has committed, and continues to commit, an abuse of a dominant position, in breach of s. 18 of the Act (the "**Chapter II Prohibition**") and, for the period prior to December 31**,** 2020, Article 102 of the Treaty on the Functioning of the European Union[2]. The Amended Collective Proceedings Claim Form defines the "Relevant Period" as the period from the start of the applicable Class Period to the date of final judgment or earlier settlement of the claims.

9. Specifically, the CR alleges that Valve has committed the following three abuses (together, "**the Infringing Conduct**"):

(i) imposing Platform Parity Obligations ("PPOs") that prohibit publishers, which market PC Games, from selling Products through other distribution channels on better terms than the same Products are available on Steam;

(ii) restricting the ability of users to purchase Add-on Content for games purchased on Steam through other distribution channels (a 'tying' or 'anti-steering' infringement); and/or

(iii) charging publishers unfair and excessive commission rates for distributing the Products.

10. The CR alleges that the Infringing Conduct has increased the prices paid by class members for the Products over the Relevant Period, by an aggregate total provisionally

[2] Following the United Kingdom's withdrawal from the European Union, the Brexit transition period ended on 31 December 2020.



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

estimated to be £656 million, including interest.

## B. PROCEDURAL HISTORY

11. The CR's application for a Collective Proceedings Order ("**CPO**") was heard on October 14, 2025.[3] The Tribunal handed down its judgment granting the CPO application on January 26, 2026, and the CPO was made on March 11, 2026. A copy of the CPO Application Judgment and a copy of the CPO dated March 11, 2026 is attached hereto as Exhibit 3 and Exhibit 4.

12. A case management conference ("**CMC**") took place on June 22, 2026 following which the Tribunal directed Valve to produce by July 31, 2026 documents that had been produced by Valve to the named plaintiffs (Wolfire Games, LLC; Dark Catt Studios Holdings, Inc.; and Dark Catt Studios Interactive LLC) in the US Proceedings (the "**US Valve Documents**") and to provide descriptions of the roles of those individuals who were custodians for the purposes of the discovery exercise in the US Proceeding. A copy of the order ("**June CMC Order**") is attached hereto as Exhibit 5 and a copy of the transcript of the hearing is ("**CMC Transcript**") is attached hereto as Exhibit 6. The Tribunal confirmed that the privilege and confidentiality redactions applied in the US Proceeding could be maintained, but would remain open to later challenge by the CR. The Confidentiality Ring Order made on July 9, 2026 (the "**UK Confidentiality Order**") provides that documents or information disclosed in the US Proceedings and designated as "Confidential" or "Highly Confidential" are to be designated as Confidential Information in the UK Proceedings. A copy of the UK Confidentiality Order is attached hereto as Exhibit 7.

13. The Tribunal further directed Valve to provide:

[3] A CPO is an order of the Competition Appeal Tribunal certifying that a claim is suitable to proceed on a collective basis. If the CPO application is granted, the Tribunal authorizes the Class Representative to act on behalf of the proposed class and permits the claims to proceed as collective proceedings.



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

(i) the identities of the third parties who produced material in the US Proceedings;

(ii) how many documents each third party produced; and

(iii) information as to the categories of documents produced by the third parties.

**C. ANTICIPATED TIMELINES**

14. The parties in the UK Proceedings are undertaking the disclosure process, and the CR must consider what additional information it will seek from the Defendant by November 13, 2026 and provide it with a schedule of its requests for consideration.

15. Valve has not yet been ordered to produce the third-party materials from the US Proceedings. A case management conference is expected to be listed for the first available date from November 2, 2026 to address issues arising from the disclosure of US Valve Documents. It is anticipated that at this hearing matters relating to Third Party Materials will also be raised, as required, by the CR, at which point the Tribunal may order Valve to re-produce third-party materials.

16. A further case management conference is expected to be listed for the first convenient date after March 1, 2027, with a provisional time estimate of one day with one day in reserve, at which the Tribunal will consider, among other matters, any disputes or outstanding issues in relation to further disclosure by Valve and timetable to trial.

17. Trial on all issues is provisionally listed to commence on January 29, 2029 with a time estimate of 10 weeks.

**D. RELATION TO THE US PROCEEDINGS**

18. While the claims in the UK Proceedings are standalone claims, very similar PPO allegations are being advanced against Valve in the US Proceedings. The US Proceedings have involved extensive party and third-party discovery. Pursuant to the June CMC Order, Valve provided the CR with the US Valve Documents on 31 July 2026.



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

## II. RELEVANCE OF THIRD-PARTY DISCOVERY TO THE UK PROCEEDINGS AND EFFECT OF VALVE'S CLARIFICATION MOTION

19. On May 29, 2026, Valve filed a Motion for Clarification Regarding Protective Order (the "**Valve Motion**") (ECF No. 607). I understand that the Clarification Motion seeks this Court's guidance as to Valve's obligations under the Federal Protective Order in respect of documents that Valve received in discovery from the plaintiffs and third parties in the US Proceedings and that were designated "Confidential" or "Highly Confidential – Attorney's Eyes Only" that Valve was ordered to produce in related arbitration proceedings.

20. Valve states in its Motion that 29 third parties, many of which compete with Valve, produced documents in response to third-party discovery subpoenas. Valve describes the information produced by those third parties as including proprietary and confidential sales data, business strategy, and competitor and market discussion and analysis. Valve further states that nearly all of those third parties designated the information they produced as "Confidential" or "Highly Confidential – Attorney's Eyes Only".

21. The CR intends to seek disclosure in the UK Proceedings of at least certain documents produced by third parties in the US Proceedings (the "**Third Party Materials**"). As explained above, the June CMC Order required Valve to identify the relevant third parties, the number of documents produced by each third party, and the categories of documents produced. This was provided as a confidential schedule to the CR on the July 31, 2026, setting out (at a high level), the third-party and plaintiff document productions (the "**Schedule of Third Party Materials**").

22. Based on the limited information provided in the Schedule of Third Party Materials, it is my opinion that at least some of the Third-Party Materials are likely to be highly relevant to the UK Proceeding.

23. As explained above, the allegations concerning Valve's PPOs substantially



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

overlap with the allegations advanced in the US Proceeding. The types of materials described in the Schedule of Third Party Materials and by Valve in its Motion may bear on the manner in which Valve's PPOs operated and were enforced, their effects on competition between Steam and rival distribution platforms, publishers' pricing and distribution decisions, and the resulting effect on prices paid by consumers.

24. Valve's position in its Motion is that the Federal Protective Order prevents it from producing the protected documents at issue in the separate arbitration proceedings in the circumstances presented there. Although the Valve Motion was filed in response to an order made in those arbitration proceedings, the scope of the interpretation sought by Valve, and any ruling made by this Court, may affect the CR's ability to obtain relevant Third Party Materials from Valve if the Tribunal orders their disclosure in the UK Proceeding, as was anticipated at the June case-management conference. Without clarification from this Court, Valve may contend that the Federal Protective Order prevents it from complying with such an order, which could create uncertainty and delay in the UK Proceeding. While Valve has not yet taken that position in the UK Proceeding, it expressed concern about this issue to the Tribunal at the June 22, 2026 case-management conference.

25. The CR seeks clarification that the Federal Protective Order does not prevent Valve from complying with an order of the Tribunal requiring disclosure in the UK Proceeding, subject to appropriate confidentiality protections. As explained above, the UK Confidentiality Order provides that documents designated "Confidential" or "Highly Confidential" in the US Proceeding are to be treated as Confidential Information in the UK Proceeding.

26. Following the case management conference on June 22, 2026, at which the Tribunal contemplated the CR making an approach to the US Court, and the Tribunal's subsequent June CMC Order requiring Valve to reproduce the US Documents and provide the Schedule of Third Party Materials, the CR has acted promptly. The CR has since taken steps to



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

assess the best approach to engaging with the US Court, retain US counsel, determine the appropriate procedure for notifying that Court, and draft and file the relevant motions in a timely manner.

Executed in London, England, United Kingdom, this 14th day of August 2026.



**Natasha Marie Pearman**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of August, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system and that all participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

Respectfully submitted: August 14, 2026.

*/s/ Patti Saiden*
Patti Saiden, Legal Assistant



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

# EXHIBIT 1

COMPETITION APPEAL TRIBUNAL

**NOTICE OF AN APPLICATION TO COMMENCE COLLECTIVE PROCEEDINGS UNDER SECTION 47B OF THE COMPETITION ACT 1998**

**CASE NO. 1640/7/7/24**

Pursuant to rule 76(8) of the Competition Appeal Tribunal Rules 2015 (S.I. 2015 No. 1648) ("the Rules"), the Registrar gives notice of the receipt on 5 June 2024 of an application to commence collective proceedings, under section 47B of the Competition Act 1998 ("the Act"), by Vicki Shotbolt Class Representative Limited (the "Proposed Class Representative/PCR") against Valve Corporation (the "Respondent/Proposed Defendant/Valve"). The Proposed Class Representative is represented by Milberg London LLP, Third Floor, Sutton Yard, 65 Goswell Road, London, EC1V 7EN.

The claims which the PCR seeks to combine in these proceedings (the "Claims") are standalone claims under section 47A of the Act on behalf of around 14 million UK-based consumers who purchased video games designed to be played on personal computers ("PC Games", or "Games") and/or additional content (including subscriptions) for such Games such as extra storylines, characters, features or in-game currency ("Add-on Content"), (collectively the "Products") during the Relevant Period (the period from the Start of the Class Period to date of final judgment or earlier settlement of the Claims). The Class Period is defined in the Collective Proceedings Claim Form ("CPCF") as the period up to the date of the Collective Proceedings Order in these proceedings: (i) from 4 June 2018, in relation to members of the Class domiciled in England, Wales and Northern Ireland; and (ii) from 1 January 2010 in relation to members of the Class domiciled in Scotland.

According to the CPCF, Valve, which operates Steam, the leading PC Game distribution platform, has committed, and continues to commit, an abuse of a dominant position in breach of s. 18 of the Act (the "Chapter II Prohibition") and (for the period prior to 31 December 2020) Article 102 of the Treaty on the Functioning of the European Union ("TFEU") ("Article 102").

Specifically, the PCR contends that Valve has abused its dominant position by:

(a) imposing Platform Parity Obligations ("PPOs") that prohibit publishers, which market PC Games, from selling Products through other distribution channels on better terms than the same Products are available on Steam;

(b) restricting the ability of users to purchase Add-on Content for games purchased on Steam through other distribution channels (a 'tying' or 'anti-steering' infringement); and/or

(c) charging publishers unfair and excessive commission rates for distributing the Products (collectively the "Infringing Conduct").

The PCR contends that the three abuses constitute a single and continuous infringement, including because Valve's PPOs and tying/anti-steering restrictions are designed to reduce the competitive pressure to which Steam is subject, so as to enable it to continue charging high commission charges. Absent (i) the PPOs and/or (ii) Valve's excessive commission rates, the PCR alleges that both commission rates and Product prices would have been lower across the relevant markets, including because publishers would have been free to sell Products through other distribution channels more cheaply than on Steam, and reductions in commission rates would have been passed-on to consumers

through lower prices. It is said that the tying/anti-steering restrictions have exacerbated the effects of those two abuses.

The PCR contends that the Infringing Conduct has increased the prices paid by class members for the Products over the Relevant Period by an aggregate total of £656 million, including interest. The CPCF therefore seeks to recover damages to compensate the proposed class for the loss suffered as a result of such price increases, together with interest.

The Proposed Class comprises:

> *"All Persons who, during the Class Period, made one or more payments for the purpose of purchasing: (a) PC Games, and/or (b) Add-on Content for PC Games, including subscription payments for PC Games and/or Add-on Content (collectively "Relevant Purchases").*

The PCR provisionally estimates that there are approximately 9.3 to 14.2 million Class Members falling within the Proposed Class, and that each Proposed Class Member ("PCM") will recover between £8 and £23 in respect of the purchase of Games, between £14 and £29 in respect of the purchase of Add-on Content, and between £22 and £44 in total.

The PCR submits that it would be just and reasonable for it to act as class representative. In summary, the PCR contends it would act fairly and adequately in the interests the class member (Rule 78(2)(a) for the following reasons:

(a) Ms Shotbolt has a longstanding interest in and experience of advocating for the interests of consumers who play video games, including minors.

(b) Ms Shotbolt's experience will be complemented by an Advisory Panel which consists of individuals with specific expertise in technology, gaming and children and vulnerable consumer's rights.

(c) The PCR is supported by a legal team with extensive experience in competition litigation and specifically collective actions.

(d) The PCR has prepared a comprehensive Litigation Plan which is intended to ensure that the proposed collective proceedings will be effectively and efficiently pursued in the interests of the Proposed Class. The Litigation Plan has been developed with the assistance of the PCR's legal advisors and a specialist notice and claims management provider. Pursuant to Rule 78(3)(c), the Litigation Plan includes, *inter alia*, the way in which the PCR intends to communicate effectively with the Proposed Class, as well as how it will administer an aggregate award of damages. To this end, the Litigation Plan incorporates a Notice and Administration Plan ("NAP").

(e) The PCR will ensure that communications with PCMs will be appropriately tailored to be received/viewed by minors within the Proposed Class – e.g. using language that can be understood by individuals with all education levels.

(f) Neither the PCR nor Ms Shotbolt are members of the Proposed Class.

(g) The PCR has entered into a Litigation Funding Agreement to enable it to pay all necessary costs, fees or disbursements, as well as an ATE insurance policy which provides adverse costs cover.

(h) Ms Shotbolt is not aware of any conflict of interest which prevents her from acting as the sole director of the PCR (Rule 78(2)(b), nor is she aware of any other person seeking to act as the class representative in respect of the same claims (Rule 78(2)(b)).

The CPCF states that the claims are brought on behalf of an identifiable class of persons on the basis that individuals will be able to identify whether they made Relevant Purchases by checking email receipts and/or accounts used for the purposes of PC Gaming (e.g. their Steam or Epic Games Store Account). The PCR contends that it will be straightforward for Valve itself to determine and/or verify whether individuals fall within the Proposed Class with reference to Steam account data it holds.

The CPCF also states that the claims raise the following common issues (the "Common Issues"):

(a) The definition of the relevant product and geographic markets.

(b) Whether the Proposed Defendant has at all relevant times held, and continues to hold, a dominant position on the relevant markets.

(c) Whether the Proposed Defendant abused its dominant position on the relevant markets.

(d) Whether any abuse[s] of dominance by the Proposed Defendant has caused loss or damage to the Proposed Class Members during the Claim Period.

(e) If the Proposed Defendant's abuse of dominance has caused actionable loss, the aggregate quantum of the losses for which the Proposed Class Members should be compensated.

(f) The rate at which, and the period over which, the Proposed Class Members are entitled to pre-judgment interest.

The PCR submits that the collective proceedings are an appropriate means for the fair and efficient resolution of the Common Issues (Rule 79(2)(a)). In particular:

(a) All of the main issues in the Claims are Common Issues.

(b) Collective proceedings are a more suitable way of determining the Claims in contrast to a host of individual claims. It is also the only economically viable and practical means for individual PCMs to obtain redress for the losses they have suffered. The average PCM's claim value is estimated to be as low as £8 in respect of the purchase of Games, £14 in respect of the purchase of Add-on Content, and £22 in total. In the light of this and given the complex and costly nature of the litigation, it is inconceivable that any, or any material number of, PCMs (including a large number of minors) would bring individual claims. Nor would a traditional book-building exercise to assemble a group claim be practical or proportionate.

(c) When considered in aggregate, damages are likely to be substantial. The PCR's expert provisionally estimates that the claim may be worth £656m including interest. The claims are therefore very good examples of the type of claims that the collective proceedings regime is designed to facilitate, as they offer the only practical means of securing compensation for millions of consumers. who would otherwise be left without effective redress.

Although the costs of the proposed collective proceedings are substantial, the PCR submits that they are proportionate to the aggregate value of the claims, the size of the Proposed Class and the fact that it would be a practical impossibility for claims to be brought on an individual basis.

Further, the collective proceedings should proceed on an opt-out basis as it would not be practicable for the Proposed Proceedings to be brought on an opt-in basis in light of the size of the Proposed Class, the average amounts that each PCM is likely to recover and the fact that a substantial number of PCMs are likely to be minors and therefore unlikely to take the steps necessary to opt-in to legal proceedings at the outset.

The relief sought in the Proposed Proceedings is:

(1) Damages on behalf of the Proposed Class, to be assessed on an aggregate basis pursuant to section 47C(2) of the Act;

(2) Interest at a rate of 8% per annum (or such other rate as the Tribunal may consider appropriate);

(3) The PCR's costs; and

(4) Such further and other relief as the Tribunal may see fit.

Further details concerning the procedures of the Competition Appeal Tribunal can be found on its website at www.catribunal.org.uk. Alternatively, the Tribunal Registry can be contacted by post at Salisbury Square House, 8 Salisbury Square, London EC4Y 8AP, or by telephone (020 7979 7979) or email (registry@catribunal.org.uk). Please quote the case number mentioned above in all communications.

*Charles Dhanowa OBE, KC (Hon)*
Registrar
Published 26 September 024

# EXHIBIT 2

**IN THE COMPETITION APPEAL TRIBUNAL** **Case number: 1640/7/7/24**

**BETWEEN:**

**VICKI SHOTBOLT CLASS REPRESENTATIVE LIMITED**

Class Representative

**- and -**

**VALVE CORPORATION**

Defendant

---

# AMENDED COLLECTIVE PROCEEDINGS CLAIM FORM (CLEAN VERSION)

---

**Class Representative:** Vicki Shotbolt Class Representative Limited with address for service c/o Milberg London LLP, Third Floor, Sutton Yard, 65 Goswell Road, London, EC1V 7EN.

**Class Representative's legal representatives and address for service:** Milberg London LLP, Third Floor, Sutton Yard, 65 Goswell Road, London, EC1V 7EN (attention of Natasha Pearman and Grace Panter).

**Class Representative's counsel:** Robert Palmer KC, Julian Gregory and Will Perry of Monckton Chambers, 1-2 Raymond Buildings, Gray's Inn, London, WC1R 5NR, Tel: 0207 405 7211.

**Defendant:** Valve Corporation, 10900 NE 4th Street, Suite 500, Bellevue, Washington 98004, United States.

**I. INTRODUCTION AND SUMMARY ..... 3**

**II. THE BASIS OF THE CLAIMS (RULE 75(3)(F)-(J)) ..... 9**

A FACTUAL BACKGROUND ..... 10
*The video game industry ..... 10*
*PC Game Distribution Platforms ..... 11*
*The evolution of Valve and the Steam platform ..... 13*
*The Steam platform today ..... 14*
*Valve's pricing terms ..... 20*
*Valve's PPOs ..... 21*
*Market developments ..... 28*
B MARKET DEFINITION AND DOMINANCE ..... 31
*Market definition ..... 32*
*Dominance ..... 35*
C ABUSE ..... 40
*Applicable legal principles: general ..... 40*
*First Abuse: the Valve PPOs ..... 43*
*Second abuse: the In-game Purchasing Restrictions ..... 59*
*Third Abuse: unfair pricing ..... 64*
*Single and continuous infringement ..... 69*
*Objective justification ..... 69*
*Effect on trade ..... 69*
D CAUSATION AND LOSS ..... 70
*Applicable legal principles ..... 70*
*Causation and loss in this case ..... 71*
F JURISDICTION AND APPLICABLE LAW ..... 78
*Jurisdiction ..... 78*
*Applicable law ..... 78*
G RELIEF ..... 80

**III. THE CLASS ..... 81**

A THE CLASS ..... 81

**ANNEX 1: EVIDENCE FROM *IN RE VALVE* ..... 85**

# I. INTRODUCTION AND SUMMARY

1. These are opt-out collective proceedings under section 47B of the Competition Act 1998 (the "**Act**") brought by Vicki Shotbolt Class Representative Limited, an English company limited by guarantee (the "**Class Representative**" or "**CR**").[1]

2. The claims that the CR combines in these collective proceedings (the "**Claims**") are standalone claims under section 47A of the Act on behalf of around 14 million UK-based consumers who purchased video games designed to be played on personal computers ("**PC Games**", or "**Games**")[2] and/or additional content (including subscriptions) for such Games such as extra storylines, characters, features or in-game currency ("**Add-on Content**"), (collectively the "**Products**"), during the Relevant Period "**Relevant Period**" (the period from the start of the Class Period, defined at §243(b) below, to the date of final judgment or earlier settlement of the Claims).

3. The CR contends that the Defendant, Valve Corporation ("**Valve**"), which operates Steam, the leading PC Game distribution platform, has committed, and continues to commit, an abuse of a dominant position, in breach of s. 18 of the Act (the "**Chapter II Prohibition**") and (for the period prior to 31 December 2020) Article 102 of the Treaty on the Functioning of the European Union ("**TFEU**") ("**Article 102**"). Specifically, the CR contends that Valve has abused its dominant position by: (a) imposing Platform Parity Obligations ("**PPOs**") that prohibit publishers, which market PC Games, from selling Products through other distribution channels on better terms than the same Products are available on Steam; (b) restricting the ability of users to purchase Add-on Content for games purchased on Steam through other distribution channels (a 'tying' or 'anti-steering' infringement); and/or (c) charging publishers unfair and excessive commission rates for distributing the Products (collectively the "**Infringing Conduct**").

4. The CR contends that the Infringing Conduct has increased the prices paid by class members for the Products over the Relevant Period, by an aggregate total provisionally estimated to be £656m, including interest. The CR's expert estimates that average losses

[1] Ms Shotbolt's private address can be provided confidentially to the Tribunal on the Tribunal's request.

[2] In this Claim Form, the term "PCs" includes personal computers manufactured by Apple and/or which use the Mac Operating System.

per class member are likely to be in the region of £22 to £44. [3] Those estimates may be updated in advance of trial if appropriate, e.g. in the light of disclosure and/or further evidence.

5. The following paragraphs provide a high-level summary of the Claims, described in more detail in Section II.

6. The video game industry is the largest entertainment industry in the UK, ahead of the TV, video and music industries: in the UK, 60% of adults, and 93% of 10 to 16-year olds, regularly play video games.[4] Different devices are used to play video games, including PCs, consoles (such as PlayStation or Xbox) and mobile phones. These Claims are focused on video games played on PCs ("**PC Games**" or "**Games**"). Consistent with the approach taken by the European Commission ("**Commission**")[5], the CR's expert considers that PC Games and related services are in different markets to those for consoles and mobiles.

7. PC Games are marketed and distributed by publishers, which either develop them in-house or pay third party developers to design them. Historically, Games were distributed through physical media, e.g. CDs that consumers would buy from bricks-and-mortar stores such as HMV or Game. Today, however, virtually all Games are distributed digitally (only around 1% of Games are still distributed physically).[6] For digitally distributed Games, historically publishers generated revenue by charging users an up-front payment to download a Game ("**Pay-to-Download**"). While a considerable proportion of Games are still distributed on a Pay-to-Download basis, the majority of PC Game revenue is now generated through sales of Add-on Content for Games[7] (a significant number of which Games are "**Free-to-Download**"), such as additional storylines, characters, outfits etc.

8. Steam, owned by Valve, is the leading digital distribution platform for PC Games ("**Distribution Platform**"). Steam's two main Distribution Platform rivals are the

[3] The damages estimates that have been calculated by the CR's expert remain provisional at this stage of the Claim and are subject to final determination.

[4] See, https://www.ofcom.org.uk/__data/assets/pdf_file/0023/238361/online-nation-2022-report.pdf .

[5] See Harman 1 §4.3.12.

[6] See Harman 1 §4.3.11.

[7] See Harman 1 §5.7.2 and Appendix E.

Microsoft Store (which also sells games for Microsoft's Xbox console) and the Epic Games Store, launched in 2018. Other Distribution Platforms have very low market shares and niche offerings. Distribution Platforms provide services in two-sided markets, as they offer distribution services to publishers and retail services to consumers. The other way in which consumers can digitally download Games (and Add-on Content for them) is through direct distribution channels, operated by publishers, such as publisher websites or platforms.

9. Valve started out as a PC Game publisher. It initially launched Steam in 2003 primarily to provide patches and updates for its own games. In 2005, however, Steam began distributing the Games of third-party publishers in exchange for a percentage of sales revenues, i.e. a commission charge. From then to 2018, Valve charged all publishers a commission rate of 30%.[8] In November 2018, Valve introduced a stepped commission rate structure involving lower rates for Games with high sales volumes, but its average commission rate remains at around 27%.[9]

10. Since its launch, Steam has been the leading Distribution Platform, and remains so today. Steam hosts at least 93% of all Games.[10] It has several times more users than its rivals. Gamers spend around six times more time playing Games on Steam than on the Epic Game Store, which holds the second largest library (at just 2,900 Games, compared to the circa 74,000 games available on Steam). Steam has been described by a commentator as *"by far the biggest"* Distribution Platform.[11] For these and the other reasons detailed below, the CR contends that Valve has a dominant position on relevant consumer (retail) and publisher (distribution) markets.

11. As detailed at §82 below, several large companies have sought to compete with Steam, with limited success. A number of rival Distribution Platforms have been launched, only

---

[8] Harman 1 §3.8.2.

[9] Subject to Steam Keys sales, as discussed at §45 and §60-65 below; Harman 1 §5.6.4 and Table 5-6; and Harman 2, section 3.3. The impact of Steam Keys on Valve's average commission rate will be a matter for factual and expert evidence, and the CR reserves its right to amend its pleadings in relation to Steam Keys in due course (including in the light of such evidence). References to Steam's commission rates in this Collective Proceedings Claim Form should be read accordingly.

[10] As of 2023: Harman 1 §5.3.5 and Table 5-1

[11] See Exhibit GH-192 to Harman 1.

subsequently to close down.[12] Two leading publishers have removed their Games from Steam, in order to distribute them exclusively through direct distribution channels and/or the Epic Games Store, only subsequently to return.[13] The Epic Games Store has incurred large losses at least in part as a result of paying publishers hundreds of millions of pounds to distribute their Games exclusively through Epic. The CEO of Epic Games has stated that Steam *"can only be challenged through exclusives"*, as "S*team has veto power over prices"*.[14]

12. This appears to be a reference to the **First Abuse** alleged by the CR in these Claims, namely that Valve has entered into PPOs under which publishers are prevented from selling Products through other distribution channels more cheaply or earlier than they are available on Steam, or in differentiated form. Valve's PPOs constitute 'wide' (rather than 'narrow') parity obligations, as they impose restrictions on how publishers sell their Products through direct distribution channels as well as on rival Distribution Platforms and though online or bricks-and-mortar retailers (collectively "**Other Distribution Channels**"). Wide parity obligations are generally regarded as unlawful. Indeed, under the Competition Act 1998 (Vertical Agreements Block Exemption Order) 2022, wide PPOs are treated as 'hardcore restrictions', which the Competition and Markets Authority has stated in guidance is a category of restriction *"for which it is presumed that they generally result in harm to competition"*.[15]

13. The **Second Abuse** is that, for Games purchased on Steam, Valve imposes restrictions on the relevant publishers that mean that Add-on Content for those Games must also be purchased from Steam, e.g. rather than through Other Distribution Channels. These restrictions, imposed through tying and/or 'anti-steering' obligations, foreclose competition in the markets for the sale and distribution of Add-on Content for such Games, reserving those markets for Valve.

14. The **Third Abuse** is that Valve's commission charges to publishers (for both Games and Add-on Content) are unfair and excessive. Valve's 30% commission (which remains the rate paid in respect of the overwhelming majority of sales) has been in place since Steam

[12] See Harman 1 §3.10.2.

[13] See Harman 1 §§3.10.4 and 5.3.7.

[14] See Exhibits GH-219 and GH-232 to Harman 1.

[15] See Exhibit GH-250 to Harman 1.

started selling third-party Games in 2005, at a time when it was competing mainly against bricks-and-mortar stores, and has been retained notwithstanding the dramatic increase in PC Games sales that has taken place since then, and the fact that Valve should now be benefitting from very significant economies of scale and scope. Other operators, including Epic, have publicly stated that the costs of operating a Distribution Platform are equivalent to only around 5 to 7% of revenue.[16] 30% commission charges in adjacent markets were found to be excessive and unfair by the Tribunal in *Kent v Apple* [2025] CAT 67, and are also currently being considered in the ongoing *Coll* claim.[17]

15. The CR contends that the three abuses constitute a single and continuous infringement, including because Valve's PPOs and tying/anti-steering restrictions are designed to reduce the competitive pressure to which Steam is subject, so as to enable it to continue charging high commission charges. Those commission charges are hugely profitable for Valve: in 2011 its CEO asserted that it was more profitable per employee than Apple or Google.[18] Despite Valve's extremely high levels of profitability, the relevant markets have not experienced the sort of sustained, successful competitor entry or expansion that might have been expected, and which would likely have competed down Valve's high commission rates, in large part because of the restrictions imposed by Valve under the first two abuses.

16. The CR contends that, absent (a) the PPO and/or (b) Valve's excessive commission charges, both commission rates and Product prices would have been lower across the relevant markets, including because publishers would have been free to sell Products through Other Distribution Channels more cheaply than on Steam, and reductions in commission rates would have been passed-on to consumers through lower prices. The tying/anti-steering restrictions have exacerbated the effects of these two abuses.

17. While the Claims are standalone, very similar PPO allegations are being advanced against Valve in the US in the *In re Valve* litigation. It is apparent from the plaintiffs' motion for certification that many of the allegations advanced in those proceedings are

---

[16] See Harman 1 §§ 7.6.14-7.6.16.

[17] *Kent v Apple*, Case No 1403/7/7/21; *Coll v Alphabet*, Case No 1408/7/7/21.

[18] See, https://www.gamesradar.com/internal-valve-study-found-the-house-of-steam-was-making-more-money-per-employee-than-facebook-apple-and-microsoft-over-dollar780000-per-head-a-year/.

supported by documentary evidence.[19] Also, on 13 May 2024, the Polish competition authority launched a preliminary investigation into competition concerns which the press release stated related to "*the actions of providers of platforms such as … Steam*".[20] The concerns being investigated appear to overlap with the PPO allegations in these Claims as they were specifically stated to include "*applying restrictions on the sale of games and ancillary content on competing platforms or online stores, interfering with the pricing and discount policies of game developers and publishers, or restricting market access to competing platforms and other digital service providers*".

18. The CR reserves the right to rely on judgments and/or findings made by the US courts and/or Polish competition authority at least "*for the purpose of identifying evidence which can reasonably be expected to be available at trial … [and/or] in so far as they record evidence of relevant facts*": *Evans v Barclays* [2025] UKSC 48, §159. The extent to which such findings may be admissible for any other purpose at trial will be considered (and, if necessary, be the subject of legal submissions) at that stage, e.g. in the light of any further relevant case law. The CR's Litigation Plan envisages that relevant materials from the US proceedings and Polish investigation could be provided following certification as an initial tranche of disclosure.[21] For example, Annex 1 of this Claim Form includes passages from the pleadings in the US proceedings that appear to have been drafted in the light of evidence in those proceedings which is likely to be available to the CR.

19. *[Note: Paragraph 19 of the original as filed version of the Collective Proceedings Claim Form has been deleted in its entirety. The original paragraph numbering has been retained, however].*

20. The CR does not, at this early stage and prior to disclosure and factual and expert evidence, have all of the information and/or documentation that will ultimately be relevant to the determination of the Claims. Accordingly, the CR reserves its right to

---

[19] Document 204-4 – Motion to Certify.

[20] See Press Release, https://uokik.gov.pl/en/video-game-market-preliminary-investigation.

[21] See CR's Litigation Plan at §6.6.

amend this Claim Form in due course including in the light of disclosure, witness evidence and/or explanation.

21. The remainder of this Claim Form is structured as follows:[22]

(a) Section II sets out the basis of the Claims – i.e. the information and statements required under Rule 75(3)(f)-(j).

(b) Section III sets out the class definition for the Claims.

22. *[Note: Paragraph 22 of the original as filed version of the Collective Proceedings Claim Form has been deleted in its entirety. The original paragraph numbering has been retained, however]*.

23. Unless otherwise indicated, the defined terms used in this Claim Form and the documents appended to it should be taken to align with those used in the two expert reports by Mr Greg Harman of Berkeley Research Group ("**BRG**"), dated 3 June 2024 ("**Harman 1**") and 16 September 2025 ("**Harman 2**"), as summarised in the Glossary to Harman 1 at Appendix C.

***

## II. THE BASIS OF THE CLAIMS (RULE 75(3)(F)-(J)).

24. The Claims are brought on a standalone basis and not in respect of any infringement decision (Rule 75(3)(f)).[23]

25. The remainder of this part of the Claim Form sets out the information and statements required by Rule 75(3)(g)-(j) and in particular:

(a) The factual context for the Infringing Conduct, including the relevant regulatory framework (Rule 75(3)(g));

[22] The information and statements required under Rule 75(2) are primarily set out on the first page of this Claim Form.

[23] See, however, §17 above relating to the *In re Valve litigation* in the US and the investigation launched by the Polish competition authority.

(b) The nature of the Infringing Conduct, including the facts and contentions of law relied upon (Rule 75(3)(g)-(h));

(c) The relief sought in the proceedings (Rule 75(3)(i)); and

(d) The CR's observations on which part of the UK the proceedings are to be treated as taking place under Rule 18 (Rule 75(3)(j)).

26. These issues are addressed below under the following headings.

| | |
|---|---|
| A | Factual background |
| B | Market definition and Dominance |
| C | Abuse |
| D | Causation and Loss |
| E | *[Note: Deleted]* |
| F | Jurisdiction and applicable law |
| G | Relief |
| H | *[Note: Deleted]* |

## A FACTUAL BACKGROUND

### The video game industry

27. The video game industry is the largest entertainment industry in the UK, ahead of the TV, video and music industries, with 60% of adults regularly playing video games across consoles or mobiles phones[24], and 93% of 10 to 16-year-olds playing video games online regularly.[25]

28. Game "**developers**" create video games (i.e. design the game, and write the software to bring it into existence), while "**publishers**" market and distribute video games and often also provide funding to developers. However, there is no clear-cut distinction between publishers and developers, including because publishers sometimes contribute to video

[24] See, Online Nation 2022 Report (ofcom.org.uk), Figure 3.4 at page 84.

[25] The Rip Off Games, How the new business model of online gaming exploits children, A Parent Zone Report, 29 August 2019, PZ_The_Rip-off_Games_2019.pdf (parentzone.org.uk).

game design (as they are concerned with its marketability), and some larger companies such as Blizzard Entertainment and Epic Games operate as hybrid publishers/developers (i.e. a publisher may have an in-house development team that it uses to create video games in addition to, or instead of, commissioning games from third party developers).[26]

29. Video games are played on different devices, including PCs, games consoles (e.g. PlayStation or Xbox) and mobile devices (e.g. smartphones or tablets). A video game developed for a particular device will generally only work on that device – e.g. a video game developed for PCs will not ordinarily be playable on a PlayStation console or on an iPhone.[27] This claim is concerned with PC Games. As detailed below, different versions of PC Games may be created for different PC Game distribution platforms.

**PC Game Distribution Platforms**

30. Historically, consumers purchased physical media (such as compact disks or "**CDs**") from bricks-and-mortar shops, such as HMV or GAME, which contained Games that could then be downloaded to the PC. However, the market for the distribution of video games is now dominated by digital purchase and distribution methods, and only 1% of PC Games are now distributed through physical media. see Harman 1 §4.3.11.

31. Steam is the leading digital Distribution Platform for PC Games. Such Distribution Platforms sell, and allow gamers to launch and play, Games produced by a variety of third-party publishers, as well as Games produced by the publisher that owns the platform. For example, the Steam platform sells Games from thousands of third-party publishers, as well as Games developed by Valve itself. Today, Steam's main Distribution Platform rivals are the Epic Games Store and Microsoft Store.[28] As well as Distribution Platforms, certain larger publishers have their own direct to consumer distribution channels or storefronts where they distribute their own Games directly to consumers over the internet. In particular, Electronic Arts (**"EA"**) has its own distribution channel called Origin, on which consumers can purchase and play EA's

[26] References in this Claim Form to "publishers" includes such hybrid publishers/developers.

[27] Different versions of the same game may allow cross-platform functionality, or "cross-play", allowing a player to continue their progress in a game on different devices. Such functionality does not in itself mean that the software itself is fully interoperable across different devices. However, some games may be fully interoperable: for example, a subset of Microsoft's game library is interoperable between the Xbox console and PCs.

[28] See Harman 1 §§5.3.5 – 5.3.10 and Table 5-1.

Games. Similarly, Ubisoft owns the Ubisoft Connect distribution channel, on which consumers can purchase and play Games produced by Ubisoft.

32. There are two main ways that consumers can purchase and download digitally distributed PC Games. Consumers can either: (a) purchase and download a Game from the same store or platform (such as from Steam); or (b) purchase a download code for a Game from one location (e.g. from a digital retailer such as Amazon or eBay), and then use the code to download the Game from another platform or store (such as from Steam).

33. Traditionally, publishers generated revenue from Games by charging an up-front payment for consumers to download such Games (known as the 'Pay-to-Download' model). Over time, however, other monetisation models have emerged. In particular, consumers now frequently pay to purchase Add-on Content for PC Games - after the initial acquisition of the Game. This Add-on Content may be Downloadable Content (**"DLC")**, which is content purchased out-of-game (such as, for example, an expansion pack that provides additional storylines, characters or areas), or it may be content acquired through **"Microtransactions"** completed in-game during gameplay (which may be cosmetic, such as additional 'skins' or outfits for characters, or may aid gameplay, such as currency packs, loot boxes or time savers). Some Games, including some of the most popular Games, are based on a 'freemium' model under which the core Game can be downloaded for free, and all revenue is generated from Add-on Content. Certain publishers also offer subscription models, for example which grant consumers ongoing access to a PC Game in exchange for periodic payments. Sales of Add-on Content have grown to such an extent that they now account for the majority of spending on Games – i.e. up-front payments to download Games now account for less than half of all PC Game revenue: Harman 1, Appendix E, § E.3.1.

34. A "platform-enabled" version of a PC Game refers to a version of a Game designed to run on a specific PC gaming platform, such as Steam. In order to play video games, gamers typically launch the relevant PC gaming platform application, and then enter their login details. Once logged in, gamers can select the relevant Games from a game library, launch and then play the Games all within the PC gaming platform application.

35. Two copies of the same Game title enabled for different platforms are in essence the same Game, in the sense that they will have identical content and video gameplay,

including the same levels, story, and features. However, platform-enabled Games are typically not interoperable (fully or at all) across different platforms. While it is sometimes possible for gamers to launch and play a PC Game enabled for one platform on another platform, known as cross-platform play, the full game functionality will not normally be available.[29] In particular, it is not generally possible to port platform-specific functionality – such as social networks, or game saves, which may be important to the user experience – to another platform.[30]

**The evolution of Valve and the Steam platform**

36. Before it set up Steam, Valve was a video game developer. In 1998, it released its first Game, "Half-Life",[31] to critical and commercial success. Valve subsequently developed other successful video games, most notably the multi-player Game[32] "Counter-Strike" (first released in 2000).[33]

37. A significant shift in Valve's business model occurred in 2003 when it launched Steam. Steam was initially designed primarily to provide patches and updates for Valve-developed Games,[34] which were much easier to distribute digitally than on physical media such as CDs.

38. Steam was updated in two major ways in 2004 to coincide with the release of "Half-Life 2".

[29] See Harman 1 §§3.6.11-3.6.12.

[30] See Harman 1 § 3.6.12.

[31] Half-Life is a first-person shooter game centred on gun fighting and other weapon-based combat, which the player experiences directly through the eyes of the main character – a scientist who must escape a research facility after it is invaded by aliens following a scientific experiment that went wrong.

[32] In a multiplayer video game, more than one person can play in the same game environment at the same time, either from the same location (e.g. using the same PC), or remotely – such as over the internet. As multi-player games allow gamers to interact with one another, they provide an element of social communication absent from single player games.

[33] Counter-Strike is a multiplayer game in which teams of terrorists battle to perpetrate an act of terror while counter-terrorists try to prevent it. Counter-Strike was originally released as a modification to Half-Life. Valve subsequently acquired the intellectual property rights and turned it into a separate retail product.

[34] "Patches" fix flaws, or "bugs," in a game's software after initial release, while updates often incorporate new functionality or content into the game.

(a) First, Valve allowed users to purchase Half-Life 2 digitally from Steam itself, in addition to the option of purchasing a physical copy.

(b) Second, Valve required that, irrespective of where Half-Life 2 had been purchased from, it had to be played via Steam. Valve therefore required all customers who wanted to play Half-Life 2 to create a Steam account and install Steam on their PCs. Consumers that purchased the PC version of Half-Life 2 other than on Steam were provided with codes they could submit to Steam to add Half-Life 2 to their Steam game library. This approach was thereafter adopted in respect of other popular PC Games developed and published by Valve, such as Counter-Strike.

39. In 2005, Valve began to contract with third-party publishers to distribute their PC Games digitally through Steam in exchange for a percentage of sale revenues, i.e. a commission charge: see further §§53-55 below.

**The Steam platform today**

40. Today, Steam is the leading Distribution Platform by both revenue and volume. Steam offers over 74,000 Games, totalling 93% of all available PC Games, while the Epic Games Store and the Microsoft Store, Steam's largest Distribution Platform rivals, each offer fewer than 3,000.[35] In 2021, Steam had 120 million monthly active players with 62.6 million active daily, as well as up to 24.8 million concurrent players.[36]

41. Distribution Platforms, including Steam, operate in two-sided markets, as they offer services to both consumers and publishers.[37] In particular, Distribution Platforms offer services that allow consumers to purchase both PC Games and Add-on Content for those games, and provide publishers with distribution services for Games.[38] The following sub-sections discuss how consumers experience the Steam platform, and Valve's arrangements with publishers.

User experience of the Steam platform

---

[35] Harman 1 §5.3.5 and Table 5-1.

[36] See, Steam :: Steamworks Development :: Steam - 2020 Year in Review (steamcommunity.com).

[37] See Harman 1 §4.2.10.

[38] See Harman 1 §§3.7.9 – 3.7.15.

42. To use Steam, customers must create a user account using an email address and agree to the terms of the Steam Subscriber Agreement. Once an account has been set up, users are able to access the **"Steam Desktop App"**, that is made available for the major PC operating systems (Windows, Mac OS and Linux).[39] Users are also able to access certain functionalities via the Steam website, https://store.steampowered.com/ (**"the Website"**).

43. A screenshot of the Steam Desktop App landing page is shown below:




44. The Steam Desktop App offers,[40] *inter alia*, the following user features (listed in the top left corner of the above screenshot from left to right):

(a) The **"Steam Store"**, from which users can purchase PC Games, DLC and related content.

(b) The **"Steam Library"**, which stores Games that users have purchased from the Steam Store, as well as Games enabled for the Steam platform originally purchased through other sales channels (e.g. via Amazon.co.uk) but which can be downloaded into the Steam Library.

---

[39] Valve provides Steam mobile apps on Apple iOS and Google Android which offer similar functionalities. These apps sit in a different product market and are not the subject of this claim.

[40] The Website allows users to access the Steam Store and Community Market, but not the Steam Library.

(c) The **"Community Market"**, a virtual trading platform designed by Valve that allows users to trade game-specific items, trading cards, backgrounds and emoticons.

45. Consumers may also purchase download codes for Steam-enabled Games from other sales channels, such as digital retailers like Amazon. (Games enabled for other Distribution Platforms can often be purchased using download codes in the same way). In addition, consumers may be provided with download codes for free as part of a promotion, which they can then use to download the relevant Game into the Steam Library. Download codes for Steam-enabled Games are known as "Steam Keys". See further §§60-65 below.

46. Steam provides a functionality called the "**Steam Wallet**", a digital tool that allows users to add funds to their accounts, which can then be used to make purchases on Steam, e.g. of Games or Add-on Content (including DLC and to complete microtransactions during gameplay). The current version of the Steam Subscriber Agreement states at clause 3(C) that *"Steam may make available an account balance associated with your Account (the "Steam Wallet"). The Steam Wallet is neither a bank account nor any kind of payment instrument. It functions as a prepaid balance to order Content and Services"*. The Steam Wallet must be used for: (a) any purchases of DLC from the Community Market; and (b) any purchases of Add-On Content within Games (i.e. Microtransactions) that have been accessed via the Steam Library. The Steam Wallet may also be used to purchase Games, though users may also use other payment methods such as their credit or debit card to purchase Games from the Steam Store. Whether users are adding funds to their Steam Wallet or purchasing items using other payment methods, Valve (via its wholly owned subsidiary Valve GmbH) acts as the payment processor.

<u>Valve's contractual arrangements with publishers</u>

47. Publishers wishing to sell Games on Steam (whether by listing Games for sale on the Steam Store and/or by selling download codes through other channels which can be used to download PC Games on Steam) must become a **"Steamworks Partner"** with Valve by entering into the Steam Distribution Agreement (**"SDA"**).

48. The CR has obtained a version of the SDA disclosed in the context of litigation in the US between Epic Games and Apple.[41] As this version of the SDA refers to Valve having commission charges of 30%, the CR infers that it predates November 2018 when Valve introduced its tiered commission structure. It appears from the pleadings in the *In re Valve* litigation that this version of the SDA has subsequently been updated, including to take into account Valve's revised commission charges.[42] However, pending further disclosure, the CR provisionally assumes that, save in relation to Valve's commission charges, the same terms that are present in this version of the SDA (alternatively substantively equivalent terms) applied throughout the Relevant Period.

49. Pursuant to clause 2.2 of the SDA, the publisher (referred to as the "Company") must ensure that its Games are *"compatible with Steam and any Steamworks services"* they may choose to use.[43] "Steamworks" is defined at clause 1.14 as *"those Steam services and features described on the Steamworks partner website found at https://partner.steamgames.com/ and any other features and services that Valve decides, in its sole discretion, to make available to Steam Account Owners and/or Company as part of Steamworks"*. In practice clauses 1.1.4 and 2.2 have the effect that publishers must comply with a number of rules contained within **"Steamworks Documentation"** posted on the Steam website. Where this Claim Form refers to Steamworks Documentation, it relies on the current rules accessible via the Steam website and/or previous iterations of the rules referred to in the pleadings from the *In re Valve* litigation.

50. The SDA refers to "Applications", defined to encompass, in particular, "games" and "Application Updates", the latter of which is in turn defined, in particular, as "*any updates, corrections and enhancements"* including *"any DLC"*. DLC is defined, at clause 1.8, as *"any online content, features or software … made available by Company for purchase, download or online access separately from the Application, whether through in-application purchase transactions or otherwise"*. DLC is further stated to

---

[41] Case No. 4:20-cv-05640-YGR.

[42] E.g. see Consolidated Second Amended US Complaint, §89 and fn.29.

[43] See also SDA, clause 11. "Steamworks" is defined at clause 1.14 as "*those Steam services and features described on the Steamworks partner website found at https://partner.steamgames.com/ and any other features and services that Valve decides, in its sole discretion, to make available to Steam Account Owners and/or Company as part of Steamworks*."

include any services provided in exchange for a subscription payment.[44] Within the SDA, therefore, the term "Application Updates" encompasses the three categories of Add-on Content as defined in this Claim Form (i.e. DLC, Microtransactions and subscription payments), and the term "Applications" encompasses PC Games and Add-on Content.

51. Under the SDA, among other things:

(a) The publisher is granted a licence to use the Steamworks Software Development Kit (**"SDK"**),[45] which contains *"all the scripts and templates for building and uploading your product to Steam.*"[46]

(b) Either party to the SDA may terminate the agreement *"immediately upon written notice at any time if the other Party is in material breach of any warranty, term ... and has failed to cure that breach within thirty (30) days after written notice thereof…"*.[47]

(c) The publisher grants Valve licences to reproduce, use, modify, transmit, sell and otherwise distribute the "Applications" via Steam.[48]

(d) Pursuant to those licences, Games and Add-on Content are sold to consumers by Valve, rather than by the relevant publishers, and Valve receives the revenues from such sales.[49]

---

44 SDA, clause 1.8

45 SDA, clause 11.2. "Steamworks SDK" is defined at clause 1.18 of the SDA as *"the software development toolkit for Steamworks, the Steam Installer, and any other Valve software that is delivered to or made available to [the publisher] for its user pursuant to this Agreement"*. Use of the SDK is mandatory to ensure a game is Steam-enabled.

46 See, Getting Started (Steamworks Documentation).

47 SDA, clause 7.2.

48 SDA, clauses 3.1 and 3.2.

49 SDA, clause 6.1. See also clause 1(D) of the Steam Subscriber Agreement, which provides that *"Your order through Steam is an offer to Valve to agree on the delivery of the ordered Subscriptions, Content and Services and/or Hardware (the "Product(s)") in exchange for the listed price. ... In the case of Content and Services, we accept your offer, and conclude the agreement with you, by confirming the transaction and making the Content and Services available to you or, in the case of pre-orders, only by confirming the transaction to you and deducting the applicable price from your payment method."***.**

52. As for the payment of commission charges by publishers to Valve:

(a) As set out at clause 6.1, on a monthly basis, Valve provides the relevant publisher with various revenue reports, including a report of the "Adjusted Gross Revenue" used to calculate the amount payable to the publisher.

(b) "Adjusted Gross Revenue" is defined at clause 1.1 as "*the gross revenue actually received by Valve from Valve's exploitation of the Applications ... (including, for the sake of clarity, gross revenue generated from subscription fees paid with respect to one or more Company Applications or from distribution of any DLC*", less certain specified adjustments (including from returns and refunds). "Adjusted Gross Revenue" therefore includes revenue from Games and all types of Add-on Content.[50]

(c) Valve uses the figures contained in these reports to make monthly payments to publishers of a percentage (reflecting its commission rates) of the relevant "Adjusted Gross Revenue" figure, again pursuant to clause 6.1 of the SDA.[51] In the version of the SDA seen by the CR, the relevant commission rate is 30% for all publishers. However, as set out below, Valve updated its commission structure in 2018.

<u>Valve's commission charges</u>

53. As to Valve's commissions on revenue associated with the sale of their PC Games and the sale of Add-on Content (the "**Commission Charges**"):

(a) From 2005 to November 2018, Valve charged publishers a fee of 30%.[52] For example, for a Game sold for £50.00 on Steam, the publisher would receive £35 (i.e. 70% of the sale price), while Steam would receive £15 (i.e. 30% of the sale

---

[50] See, further, the Steamworks news item titled *"Revenue Share Tiers and other updates to the Steam Distribution Agreement"* (1 December 2018; available at https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838).

[51] SDA, clause 6.1.

[52] See Harman 1 §3.8.2.

price). Similarly, if DLC were sold within a Game for £5, the publisher would receive £3.50 and Steam £1.50.

(b) From November 2018 onwards, Valve has applied a stepped commission rate structure of:

(i) 30% for all revenue[53] below aggregate sales of USD 10 million; and

(ii) 25% for all revenue between aggregate sales of USD 10 million and USD 50 million; and

(iii) 20% for all revenue between aggregate sales above USD 50 million.[54]

54. As discussed further at §§159-160 below, Valve's Commission Charges are significantly higher than those changed by other Distribution Platforms: in particular, the Epic Games Store and Microsoft Store, Steam's two closest rivals, both have commission charges of 12% for Games and Add-On Content.

55. For DLC purchased via the Community Market, Valve charges users a "Steam Fee" of 5% of the item sell value, with some purchases attracting an additional 10% commission.[55]

**Valve's pricing terms**

56. While publishers are in principle free to set the prices at which their Games and/or Add-on Content are sold on Steam, both initial prices and pricing changes are only implemented on Steam once they have been approved by Valve. The 'Pricing' section of the Steamworks Documentation states that "*[i]nitial pricing as well as proposed pricing adjustments will be reviewed by Valve and are usually processed within one or two business day*s". It further states:

**"Q: Can I schedule my price updates to happen automatically?** `

[53] The CR understands that such revenue includes Add-On Content. See the article *"New Revenue Share Tiers and other updates to the Steam Distribution Agreement"*, posted on Steam's website on 1 December 2018, which explains that *"Revenue includes game packages, DLC, in-game sales, and Community Marketplace game fees."* Available at https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

[54] See Harman 1 §3.8.3.

[55] See Harman 1 at Table 3-2 (internal p.31).

> A: No, pricing changes cannot be scheduled to happen automatically, but you have the option to publish prices changes on your own schedule after Valve reviews them, or have Valve publish them immediately after review.
>
> If you choose to publish price changes yourself, after the price changes have been reviewed by Valve, you will be notified via email. You'll be then given an option to publish your future price change at a time that is convenient for you. Once you publish the changes, they'll immediate be live for customers" (underlining added).

57. This review and approval process effectively gives Valve the ability to veto prices proposed by publishers. As detailed further at §§60-64 below, there is evidence that Valve refuses to approve prices proposed by publishers unless they comply with its PPO terms, i.e. unless a publisher proposes a price for Games and/or Add-on Content that is the same or lower than the price at which the same content is sold through Other Distribution Channels.

**Valve's PPOs**

58. Valve's contractual documentation contains PPOs relating to the terms on which publishers must sell Products that are sold on Steam and through Other Distribution Channels ("**Multichannel Products**") that cover (at least):

(a) the price of Games sold on Steam and through Other Distribution Channels ("**Multichannel Games**") using Steam Keys. In practice, Valve applies this PPO more widely so as to encompass the price of Multichannel Games sold on Steam and through Other Distribution Channels regardless of whether or not they are distributed through those other channels using Steam Keys;

(b) the price of Add-on Content sold on Steam and through Other Distribution Channels ("**Multichannel Add-on Content**"), specifically DLC as defined in the SDA (which includes Microtransactions and subscriptions); and

(c) the nature and timing of the Multichannel Products delivered to Steam, relative to how they are delivered to Other Distribution Channels.

59. These PPOs, discussed further at §§60-74 and §§116-131 below, are referred to as the "**Valve PPOs**". The precise meaning and scope of the Valve PPOs, including which way in which they are applied, communicated to publishers and/or enforced, will be a matter for evidence in due course.

The Game PPO

60. As stated at §45 above, Steam Keys are download codes for Steam-enabled Games. Steam Keys are product authorisation codes (consisting of 15 characters)[56] that can be used to download a licensed copy of a Steam-enabled Game on Steam. A publisher must request Steam Keys from Valve, and Valve has sole discretion to approve the requests. The Steam Keys section of the Steamworks Documentation states: "*Valve reserves the right to reject Steam Key requests*". In relation to issuances and redemptions, the CR's understanding is as follows.

(a) Stage 1: Valve issues Steam Keys relating to a particular product (e.g. a PC Game, or a type of DLC such as a game extension) to a publisher, typically in response to a request.

(b) Stage 2: the publisher then transfers the Steam Key to a consumer. Valve's contractual terms prohibit publishers from selling Products through other distribution channels using Steam Keys for a lower price than they are sold on Steam: see the contractual terms set out at paragraph 64 below.

(c) Stage 3: the consumer may redeem the Steam Key on Steam – allowing them to use the relevant Product (e.g. play the game, use the extension etc).

61. Subject to the requirements of the Game PPO, discussed below, publishers provided with Steam Keys may: (a) sell them to retailers (e.g. for onward sale in bricks and mortar stores or on online digital stores) or through their own direct distribution channels – and, in respect of such sales, the publisher does not pay Steam's commission charges; and/or (b) give away Steam Keys for free, e.g. for marketing purposes.

62. However, Steam limits the number of Steam Keys that it provides to publishers. The Steam Keys section of the Steamworks Documentation indicates that Valve will ordinarily only approve up to a few thousand Steam Keys for each Game sold on Steam:[57]

**"Q: How many Steam Keys can I get for my game?**

---

[56] For example, "8YYIO-GJ6YR-4XRYH".

[57] See, Steam Keys (Steamworks Documentation).

> A: Games and applications launching on Steam may receive up to 5,000 Default Release Steam Keys to support retail activities and distribution on other stores. After that, all Steam Key requests are reviewed on a case-by-case basis."

63. Given that leading Games have sales volumes in the millions, it appears that only a limited proportion of overall sales of such Games are made using Steam Keys.[58]

64. Valve applies an express contractual PPO in respect of Multichannel Games sold using Steam Keys, which requires and/or is applied so as to require publishers selling Games through Other Distribution Channels using Steam Keys to sell the same or equivalent Steam-enabled Game on Steam for the same (or lower) price as they are selling it elsewhere using Steam Keys.

(a) The "Steam Keys" section of the Steamworks Documentation (which the CR believes was introduced in February 2023, potentially in the light of the *In re Valve* litigation) currently provides (emphasis in the original):[59]

> "You should use Steam Keys to sell your game on other stores in a similar way to how you sell your game on Steam. <u>It is important that you don't give Steam customers a worse deal than Steam Key purchasers</u>."
>
> "It's OK to run a discount for Steam Keys on different stores at different times as long as you plan to give a comparable offer to Steam customers within a reasonable amount of time."
>
> "If you request an extreme number of keys and you are not offering Steam customers a comparable deal, or if your sole business is selling Steam Keys and not offering value to Steam customers, your request may be denied and you may lose the privilege to request keys."
>
> "When reviewing Steam Key requests, some of the things we typically look at include the level of customer interest on Steam, the total number of keys that have been issued and activated for the game and the additional number that are being requested. A request will usually be rejected if there's an imbalance that suggests the developer is not making an offer to Steam customers that is comparable to what Steam Key purchasers are offered. For instance, a game with a few hundred units of lifetime sales requesting tens of thousands of keys, or more."
>
> …

---

[58] It is possible that the number of Steam Keys given away by Valve has changed over time: Harman 1 §3.7.19 and 8.3.6. This will be a matter for disclosure and/or other evidence in due course.

[59] See, Steam Keys (Steamworks Documentation).

Q: Why was my key request denied?

A: When reviewing Steam Key requests, we typically look at the level of customer interest on Steam, the total number of keys that have been issued and activated for the game and the additional number that are being requested. A request will usually get rejected if there's an imbalance that suggests the developer is not making an offer to Steam customers that is comparable to what Steam Key purchasers are offered."

(b) Until 17 December 2021, the "Steam Keys" section of the Steamworks Documentation provided (emphasis in the original):[60]

"We ask you to treat Steam customers no worse than customers buying Steam keys outside of Steam."

"You should use keys to sell your game on other stores in a similar way to how you sell your game on Steam. It is important that you don't give Steam customers a worse deal."

"Keep in mind that the perceived price in the bundle/subscription should be a price you are willing to run the game at a standalone price or discount on Steam … We want to avoid a situation where customers get a worse offer on the Steam store, so feel free to reach out to us via the Developer Support tool if you want to talk through a specific scenario."

"We reserve the right to deny requests for keys or revoke key requesting privileges for partners that are abusing them or disadvantaging Steam customers."

"We reserve the right to remove key requesting privileges from any partner whose sole business is selling Steam keys and not providing value or a fair deal to Steam customers."

(c) In the same vein, an earlier version in operation until 1 September 2017 of the "Pricing" section of the Steamworks Documentation provided that:[61]

"You are welcome to generate keys for resale with other retailers, including your own website. However, your product must also be available for sale on Steam. If you are hoping to receive exposure to Steam customers, the price on Steam will have to match prices elsewhere."

65. Whilst these contractual obligations are ostensibly concerned with Steam Keys, Valve also applies them more broadly to Multichannel Games offered for sale through all Other Distribution Channels (both online and bricks-and-mortar retail stores), regardless of

[60] See: Steam Keys (Steamworks Documentation) (archive.org); Page 43 of Document 99 - Consolidated Amended Class Action Complaint, In Re Valve Antitrust Litigation, Case 2:21 cv 000563-JCC, at §166.

[61] Ibid., at §168.

whether or not the Multichannel Games distributed through those other channels are distributed using Steam Keys (or are Steam-enabled). Consequently, where a Multichannel Game is sold on Steam, Valve requires the relevant publisher to sell it on Steam for the same (or lower) price as it is sold through Other Distribution Channels, including in particular (a) on other Distribution Platforms and (b) through direct distribution channels (the "**Game PPO**"). Valve communicates to publishers that it will delist (i.e. stop selling) any Multichannel Games that are being sold at a higher price on Steam, in breach of the Game PPO.

66. [*Note: Paragraph 66 of the original as filed version of the Collective Proceedings Claim Form has been deleted in its entirety. The original paragraph numbering has been retained, however. The original reference numbers have been noted at the end of each amended reference in the form: '[Note: Previously reference [X]'*].

The DLC PPO

67. Clause 2.4 of the SDA provides:

> "If Company distributes the Application through any other (non-Steam) distribution channel, and if Company distributes any material DLC for the Application through that other channel, it will deliver the DLC to Valve at the same time such that Steam Account Owners will receive comparable DLC with customers acquiring the Application through other channels.
>
> Company is free to offer special and unique promotional content through other distribution channels, provided that material parity is maintained between Steam Account Owners and users of other distribution channels who make a comparable investment in the Application and the associated DLC."[62]

68. The operation of the first paragraph of clause 2.4, in conjunction with clause 2.1, concerns "the Content PPO" and is discussed at §§73-74 below.

69. In relation to the second paragraph of clause 2.4, at this stage of proceedings, prior to disclosure and evidence, the CR's understanding is that Valve's requirement of "material parity" is enforced by Valve to mean the publisher must provide the DLC at the same price on the other storefront as it is priced on Steam. As noted at §50 above, and given the way in which it is defined in the SDA, DLC for these purposes includes all Add-on Content.

[62] SDA, Clause 2.4. *[Note: Previously reference [63]].*

70. Consequently, where Multichannel Add-on Content is sold on Steam, Valve requires the relevant publisher to sell it on Steam for the same (or lower) price as it is sold through Other Distribution Channels, including in particular (a) on other Distribution Platforms and (b) through direct distribution channels.

71. In support of this understanding, the CR relies on the explanation given by Valve as to how this provision operates in response to a question asked by a publisher in 2017 about the "*rules regarding distributing/selling a game outside of steam*". A Valve employee explained in response that "*The biggest takeaway is, don't disadvantage Steam customers. For instance, it wouldn't be fair to sell your DLC for $10 on Steam if you're selling it for $5 or giving it as a reward for $5 donations. We would ask that Steam customers get that lower $5 price as well.*"[63]

72. The CR refers to the restrictions set out at §§69-71 concerning the price at which publishers must sell Add-on Content as the "**DLC PPO**".

<u>The Content PPO</u>

73. For Multichannel Products distributed on Steam, Valve's contractual terms prohibit publishers from providing those Products for distribution through Other Distribution Channels: (a) with differentiated content; and/or (b) earlier than they are provided to Steam (the "**Content PPO**").

74. These prohibitions arise from the following provisions of the SDA:

   (a) Clause 2.1 requires publishers to submit Applications to Steam for release no later than the first commercial release[64] and any localised versions and Application Updates (which, as noted at §50 above, is defined, in particular, as "*any updates, corrections and enhancements*" including "*any DLC*") "when available, but in no event later than they are provided to any other third party for commercial release".[65]

   (b) The first paragraph of Clause 2.4 of the SDA, set out at §67 above.

[63] Document 99 in Case 2:21-cv-00563-JCC. *[Note: Previously reference [64]].*

[64] Or, if already commercially released as of the Effective Date of the SDA with the relevant publisher, within 30 days of the Effective Date. *[Note: Previously reference [65]].*

[65] SDA, Clause 2.1. *[Note: Previously reference [66]].*

**Tying/Anti-Steering Arrangements**

75. Valve's contractual documentation imposes the following restrictions on publishers, which limits their ability to use third party services (or self-supply such services).

76. First, clause 2.5 of the SDA states: *"The parties agree that Applications distributed via Steam will not include functionality from or links or references to any store other than Steam, or any other facility for making purchases or payments"*. This is referred to as the "**Clause 2.5 Restriction**".[66]

77. Presently, consumers typically purchase Add-on Content for Games purchased on Steam either from: (a) within the Game application, e.g. using the Game menu or in-game store; or (b) the Steam Store. In these cases, including where the Add-on Content is provided by the publishers, the relevant payment is made to Valve and is subject to Valve's Commission Charges.

78. It would be technically possible, however, for in-application purchases of Add-on Content for Games purchased on Steam to be made from entities other than Valve, e.g. for the payment to be made to the relevant publisher or a rival Distribution Platform. However, the Clause 2.5 Restriction prevents this.

79. Second, the "Microtransactions (in-game purchases)" section of the Steamworks Documentation states: *"For any in-game purchases, you'll need to use the microtransaction API so Steam customers can only make purchases from the Steam Wallet"*. Similarly, the "Microtransactions implementation guide" section of the Steamworks Documentation states: *"**In-game purchasing** This is for games that have an integrated store and the user experience will stay in-game • **Step 1** Your game needs to ship with the Steamworks API"* (emphasis in original).[67]

80. The effect of these provisions is that, if a publisher wants consumers playing its Games distributed on Steam to be able to make in-game purchases, all such purchases must be made using the Steam API, and therefore Valve's payment processing service – as a result of which the payments are subject to Valve's Commission Charges. The possibility

---

[66] SDA, Clause 2.5. *[Note: Previously reference [67]].*

[67] Microtransactions Implementation Guide, Steamworks Documentation. *[Note: Previously reference [68]].*

of the publisher using an alternative third-party payment processing service to process in-game purchases for such Games, and thereby to avoid being subject to Valve's Commission Charges, is precluded. This is referred to as the "**Steamworks API Restriction**".

81. The Clause 2.5 Restriction and the Steamworks API Restriction are collectively referred to as the "**In-game Purchasing Restrictions**". As detailed at §§134-136 below, both In-game Purchasing Restrictions tie the distribution of Add-on Content to the distribution of Games.

**Market developments**

82. Various companies have attempted – with little success - to compete with Steam since its launch. Competition was limited in the first decade of the 2000s. In the 2010s, various undertakings have sought to compete with Steam, but most have failed to gain a significant foothold in the market.[68] By way of example:

(a) Electronic Arts Inc. ("**EA**"): EA is one of the largest video game developers and publishers in the world and is responsible for best-selling titles within the Sims, FIFA and Battlefield franchises. In 2011, it launched a distribution channel for its own games called Origin. Although Origin originally offered only EA-developed games, EA later began to offer releases from other major publishers such as Warner Bros. EA did not publish Games on Steam until 2019.[69] In 2022, it ceased to offer Origin entirely, and at this point transferred all content to a Distribution Platform called "the EA app", which connects to Steam.

(b) Ubisoft Entertainment SA ("**Ubisoft**"): Ubisoft is also one of the world's largest video game developers and publishers, and is responsible for best-selling titles within the Assassin's Creed and Tom Clancy's series of games. In 2012, it launched its own distribution channel, Uplay, which was subsequently renamed Ubisoft Connect. In 2019, Ubisoft stopped publishing on Steam because of its

[68] For a more detailed list of alternative digital distribution services, see Harman 1, Section 3.10 (internal p.32). *[Note: Previously reference [69]]*.

[69] "EA games are returning to Steam along with the EA Access subscription service", The Verge (29 October 2019), available at https://www.theverge.com/2019/10/29/20937055/ea-games-steam-access-subscription-service-pc-storefront-jedi-fallen-order-sales. *[Note: Previously reference [70]]*.

unrealistically high commission rates,[70] in order to focus on distribution through Ubisoft Connect and the Epic Games Store (considered below). However, in 2022, Ubisoft returned to distributing its Games via Steam, a move that one technology news outlet stated "*suggests the size of Valve's userbase may outweigh the value of sharing a smaller portion of sales with a partner like Epic*".[71]

(c) Discord: Discord is an online communication platform that is popular in the gaming world. Discord Inc. initially launched a Discord Store in 2018. The Discord Store sought to capitalise on millions of existing users[72] and a 10% commission rate that was intended to undercut Steam.[73] Discord also provided users with novel features, subsequently adopted by Steam. For example, a 2018 Business Inside Report suggested that Valve's Steam Chat function took "*many cues from Discord, including a suspiciously similar user interface"* that looks *"almost exactly the same*".[74] The Discord Store was not able to compete effectively with Steam. In December 2021, Discord ceased selling licenses for PC games, whilst in March 2022, it shut down the Discord Store entirely.

---

[70] Ubisoft's Vice President for Partnerships and Revenue, Chris Early, told The New York Times in August 2019 that Steam's business model and commission rates were "unrealistic" and did not *"reflect where the world is today in terms of game distribution". [Note: Previously reference [71]].*

[71] Ubisoft is bringing 'Far Cry 6' and three other recent games to Steam, Engadget (22 April 2023), available at https://www.engadget.com/ubisoft-is-bringing-far-cry-6-and-three-other-recent-games-to-steam. *[Note: Previously reference [72]].*

[72] Namely 8.9 million daily users in 2017 and 100 million daily users in 2020. See "Everything you need to know about Discord, the app that over 250 million gamers around the world are using to talk to each other", Business Insider (12 October 2020), available at https://www.businessinsider.com/how-to-use-discord-the-messaging-app-for-gamers-2018-5. *[Note: Previously reference [73]].*

[73] In a blogpost at the time of the Discord Store launch, Discord stated *"Turns out, it does not cost 30% to distribute games in 2018. After doing some research, we discovered that we can build amazing developer tools, run them, and give developers the majority of the revenue share."* See "Why not 90/10?", Discord (14 December 2018), available at https://blog.discord.com/why-not-90-10-3761ebef4eab. *[Note: Previously reference [74]].*

[74] "The new and improved Steam Chat is here to take on Discord — here's how the two apps compare", Business Insider (28 July 2018), available at https://www.businessinsider.com/steam-chat-update-vs-discord-2018-7. *[Note: Previously reference [75]].*

(d) Kartridge: similarly, the publisher Kongregate launched the Kartridge Distribution Platform in 2018, but it stopped taking new games in 2020 and was shut down in September 2023.[75]

83. The Microsoft Store and the Epic Games Store are both still in operation. However, as highlighted at below and in Section 5 of Harman 1, their market shares are still well below Valve's, and they offer a very small percentage of the total number of available exclusive and non-exclusive PC Games (see in particular at §101 below and the accompanying table)

(a) Microsoft: the Microsoft Store was launched in October 2012, at which point it was known as the Windows Store. The Windows Store is a Distribution Platform for Windows-compatible games. Microsoft distributes some of its own Games on an exclusive basis. Microsoft has nonetheless been unable to capture significant market share from Steam. In 2019, Microsoft began selling PC Games on Steam. In response to this development, it was reported that Microsoft had *"given up entirely"* on its attempts to *"dethrone Steam"*, and was "*instead embracing a much more open model*".[76]

(b) Epic Games Inc. ("**Epic Games**"): Epic Games is one of the world's largest game developers and publishers and is particularly well-known for its blockbuster title Fortnite. In 2018, it launched the Epic Games Store, which has since become Steam's largest competitor. Epic has sought to grow its market share through a combination of lower commission rates (set at 12% for Games sold on its platform[77]), exclusive contracts for large titles, the provision of free Games, and by waving a 5% royalty fee[78] on sales for the use of Epic's proprietary game development engine, Unreal Engine. In relation to exclusive titles, Epic Games' CEO, Tim Sweeney has explained that *"the lock-in effect of having a large library of games on a dominant storefront is more powerful than features, and hence a*

[75] Harman 1 § 3.10.2(IX) and Table 3-3. *[Note: Previously reference [76]].*

[76] "Microsoft will distribute more Xbox titles through Steam and finally support Win32 games", The Verge (30 May 2019), available at https://www.theverge.com/2019/5/30/18645250/microsoft-xbox-game-studios-publishing-valve-steam-32-bit-windows. *[Note: Previously reference [77]].*

[77] Harman 1 §3.10.2(VII). *[Note: Previously reference [78]].*

[78] Ibid. *[Note: Previously reference [79]].*

*dominant store can only be challenged through exclusives"*.[79] Epic's expenditure on exclusivity agreements has been considerable. For example, in 2020 alone it spent at least $444m on exclusive titles and incurred losses of $273m.[80] As a result of Valve's PPOs, Epic has not been able to offer lower prices for Games that are also available on Steam. As explained by Mr Sweeney: *"Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then … Valve can simply say 'no'"*.[81] The pricing history analysis conducted in Harman 1 – that compares Epic Games Store and Steam prices for a leading title, Red Dead Redemption 2 – is consistent with Mr Sweeney's explanation: Harman 1, Figure 6.1.

84. [*Note: Paragraph 84 of the original as filed version of the Collective Proceedings Claim Form has been deleted in its entirety. The original paragraph numbering has been retained, however*].

85. [*Note: Paragraph 85 of the original as filed version of the Collective Proceedings Claim Form has been deleted in its entirety. The original paragraph numbering has been retained, however*].

## B MARKET DEFINITION AND DOMINANCE

86. Issues of market definition and dominance will be the subject of expert evidence, in the light of disclosure and other factual evidence provided throughout the proceedings, and the CR reserves its right to amend its case on these issues in due course in the light of such evidence. The CR's preliminary case on market definition and dominance for the purpose of certification was set out at Harman 1 Sections 4 and 5, on which the CR continues to rely pending further evidence and any amendments to its pleaded case. The following paragraphs merely provide a brief summary of Mr Harman's preliminary conclusions and some of the more significant elements of his preliminary analysis.

---

[79] Harman 1, Exhibit GH-219. *[Note: Previously reference [80]].*

[80] "Epic will lose over $300M on Epic Games Store exclusive, is fine with that", Pc Gamer (10 April 2021), available at https://www.pcgamer.com/epic-games-store-exclusivesapple-lawsuit/. *[Note: Previously reference [81]].*

[81] Harman 1, Exhibit GH-232. *[Note: Previously reference [82]].*

**Market definition**

87. Mr Harman has applied the standard approach to market definition in competition cases, as recently summarised by the Commission in its updated *Market Definition Notice*.[82] Steam and other Distribution Platforms provide services to both consumers and publishers, and therefore compete on 'two-sided' markets. Mr Harman has had regard to the Tribunal's explanation as to how two-sided markets should be defined in its judgment in *BGL (Holdings) Limited & Others v Competition and Markets Authority)* [2022] CAT 36 ("***Compare the Market***"*)*, and to the *Support study accompanying the evaluation of the Commission Notice* to which the Tribunal referred. Accordingly, Mr Harman has defined markets for consumers and publishers separately. See Harman 1 Section 4.2.

88. Mr Harman finds that PC Games (and Add-on Content for them) are in different markets to games (and related content) for consoles and mobiles, as they have different functionality, pricing policies, production costs, characteristics and distribution channels and both consumers and publishers view them (and their parallel distribution channels) differently. This is consistent with the approach adopted by the Commission in its decision on the merger between Activision Blizzard and King:[83] Harman 1 §4.3.12.

89. In respect of Games, Steam, like other Distribution Platforms, provides services that allow consumers to purchase: (a) Games; and (b) Add-on Content. Similarly, on the publisher side, Steam, like other Distribution Platforms, provides services under which it distributes on behalf of publishers: (a) Games; and (b) Add-on Content. The provision of services relating to Games, on the one hand, and Add-on Content, on the other hand, are distinct for the reasons set out at Harman 1 §§4.5.2-4.5.5. In particular: (a) in order to purchase Add-on Content, a consumer must already own and have installed a base Game; (b) the distribution of Games requires a digital store including for browsing Games, whereas Add-on Content can be (and often is) purchased from within the Game and distributed through the publisher's own infrastructure; (c) Games and Add-on Content are therefore marketed differently, with different audiences being targeted; and

---

[82] *Commission Notice on the definition of the relevant market for the purposes of Union competition law*, 8 February 2024, https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=OJ:C_202401645. *[Note: Previously reference [90]].*

[83] Harman 1, Exhibit GH-160, §26. *[Note: Previously reference [91]].*

(d) in respect of Games purchased and installed on their platforms, both Steam (see §§75-81 above) and other Distribution Platforms limit the ability of consumers to purchase Add-on Content for such Games through alternative distribution channels. As a result of such differences, conditions of demand and supply, and therefore competitive conditions, are very different for Games, as compared with Add-on Content. Accordingly, Mr Harman's preliminary approach to market definition starts with separate focal services offered by Steam, on both the consumer and publisher sides of the market, relating to: (a) Games; and (b) Add-on Content.

90. Consistent with standard practice, Mr Harman considers the extent to which consumers and publishers would switch away from these focal services in response to a small but significant non-transitory increase in price ("**SSNIP**"). As is commonly the case at this stage of the proceedings, Mr Harman lacks the data that would be required to perform an empirical application of the SSNIP test, but he applies the test conceptually. He also considers the extent to which the relevant markets should be broadened on account of supply side substitution, i.e. the likelihood of new competitors being able to enter the market quickly and easily in response to the SSNIP.

91. In relation to the provision of Games by Steam to **consumers**, Mr Harman concludes on a preliminary basis that, in response to a SSNIP in the price of all Games on Steam, consumers would in principle be able to switch to buying games from other Distribution Platforms and/or via **existing** direct distribution channels (e.g. from publisher websites), and that these should therefore be included in the relevant market. He does not consider that digital retailers (such as Amazon, eBay etc) or physical retailers (i.e. brick and mortar stores) should be included in the relevant market, essentially because such stores have a predominantly vertical (rather than horizontal) relationship with Distribution Platforms, as they simply sell digital product keys[84] that consumers can use to download games from Steam and other Distribution Platforms. See Harman 1 §§4.3.6-4.3.13.

92. As a result, digital and physical retailers do not compete with the services offered by Steam and other Digital Platforms, but simply provide an alternative route through which consumers can access their services. In relation to the potential for supply substitution,

[84] Digital licences that allow consumers to access the game and downstream content (see Harman 1 §3.6.7). *[Note: Previously reference [92]].*

Mr Harman concludes that the creation of a new Distribution Platform or direct distribution channel would entail substantial time and cost, such that the market should not be expanded to include publishers who do not have an existing direct distribution channel on account of this possibility. See Harman 1 §§4.3.14-4.3.15.

93. In relation to the supply by Steam of Game distribution services **to publishers**, Mr Harman concludes that the relevant market should (a) include distribution services offered by rival Distribution Platforms and existing direct distribution channels, but (b) exclude distribution through digital and physical retailers, and (c) not be expanded to include other publishers who do not have an existing direct distribution channel on account of potential supply side substitution, for broadly equivalent reasons. See Harman 1 §4.4.13.

94. Again, for broadly equivalent reasons, Mr Harman considers that the same parameters apply to the consumer and publisher markets for the purchase and distribution (respectively) of Add-on Content. Mr Harman notes that the relevant markets could either be limited to Add-on Content for (only) Steam-enabled Games, or extend to Add-on Content for all Games, whether enabled for Steam or for other Distribution Platforms: Harman 1 §§4.5.21-4.5.22. This depends in part on: (a) whether or not the relevant markets should be defined taking into account the existence of the alleged infringing conduct, including in particular the restrictive tying provision in Clause 2.5 of the SDA (Mr Harman undertakes his analysis on both alternative bases: Harman 1 §§4.5.11-4.5.12); and/or (b) the extent that consumers would consider the prices of Add-on Content when choosing the distribution channel through which to obtain the relevant (base) Game (Harman 1 §4.5.19).

95. Mr Harman finds that the geographic scope of these markets is limited to the UK, for the reasons set out at Harman 1 Section 4.7 (internal p.58). In particular, Steam (and other Distribution Platforms) have digital stores dedicated to particular countries (and, among other things, set different pricing for different countries), and only allow consumers to make purchases from the digital store for their country of domicile.

96. On the basis of these and the other considerations set out in Harman 1 Section 4, Mr Harman provisionally concludes that the following four markets (collectively the "**Relevant Markets**") are relevant to the assessment of Steam's dominance and the

abuses alleged in these proceedings: Harman 1 §4.9. All four markets encompass Distribution Platforms and direct distribution by publishers, exclude digital and physical retailers, and are geographically limited to the UK.

(a) the **Game Market**, on which consumers purchase Games;

(b) the **Game Distribution Market**, on which publishers purchase (or self-supply) services for the distribution of Games to consumers;

(c) the **Add-on Content Marke**t, on which consumers purchase Add-on Content. This market may include Add-on Content for all Games, whether enabled for Steam or other platforms (a **Wider Add-on Content Market),** or may be limited to the acquisition of Add-on Content for (only) Steam-enabled games (a **Steam Add-on Content Market**); and

(d) the **Add-on Content Distribution Market**, on which publishers purchase (or self-supply) services for the distribution of Add-on Content. Like the consumer Add-on Content Market, this market may include the distribution of Add-on Content for all Games, whether enabled for Steam or other platforms (a **Wider Add-on Content Distribution Market**), or it may be limited to the distribution of Add-on Content for Steam-enabled games (a S**team Add-on Content Distribution Market**).

97. The Game Market and the Game Distribution Market are collectively referred to as the **Game Markets** (plural), and the Add-on Content Market and the Add-on Content Distribution Market are collectively referred to as the **Add-on Content Markets** (plural). Similarly, the two markets on the consumer side, namely the Game Market and the Add-on Content Market, are collectively referred to as the **Consumer Markets** (plural), and the two markets on the publisher side, namely the Game Distribution Market and the Add-on Content Distribution Market, are collectively referred to as the **Distribution Markets** (plural).

**Dominance**

98. In Section 5 of Harman 1 (internal p.63), Mr Harman explains the basis for his preliminary view that Valve is likely to hold a dominant position (and to have held a dominant position over the Relevant Period) on: (a) both Game Markets and (b) both the

Add-on Content Markets, if these are limited to Steam-enabled games. He also considers that Valve could hold a dominant position in one or both Add-on Content Markets even if they were not limited to Steam-enabled games, i.e. in the Wider Add-on Content Market and/or the Wider Add-on Content Distribution Markets. While Valve's market shares are likely to be lower in these Wider Add-on Content Markets than in some of the other Relevant Markets, Mr Haman notes that Valve's practices allow it to leverage its dominance into the wider Add-on Content Markets, such that Valve's market shares are not a true reflection of the limited extent of competitive constraints in those markets. However, further evidence (including Valve's own internal data) is required to assess this on a more informed basis.

99. As Mr Harman notes (Harman 1 §2.4.1) Steam is a privately held company and there is limited publicly available information on its operations or financial performance, which limits the information available to estimate its market share at this stage of the proceedings. In his report, Mr Harman sets out how he will be able to refine his assessment of Steam's dominance post-certification with the benefit of additional information and/or disclosure (Harman 1 §5.10). In addition, however, he explains why he considers it likely that Valve holds dominant positions on all, or at least some of, the four Relevant Markets based on publicly available information, as briefly summarised in the following paragraphs.

100. First, Steam is routinely referred to by specialist trade press and commentators on the PC game market as being, for example, *"by far the biggest"* Distribution Platform: Harman 1 §5.3.3.

101. Second, Steam has a very large share of certain Distribution Platform 'volume' metrics that are indicative of it having large shares in the Relevant Markets: Harman 1 §§5.3.4-5.3.7.. In particular:

(a) Steam hosts 93% of all Games. In comparison, the Epic Games Store and the Microsoft Store, Steam's two biggest rivals, combined only host only around 6% of all Games. This is illustrated in Table 5-1 (internal p.68) in Harman 1, reproduced below.

Table 5-1 PC game availability

| | Games available | |
|---|---|---|
| **Distribution Channel** | **2023** | **Proxy 2017** |
| Steam | 74,197 | 17,113 |
| Epic | 2,900 | 190 |
| Microsoft Store | 1,995 | 1,995 |
| Ubisoft Store | 212 | 212 |
| EA | 199 | 199 |
| Blizzard | 26 | 26 |
| **Total** | **79,529** | **19,735** |
| Games not on Steam | 5,332 | 2,622 |
| Steam-Only games | 74,197 | 17,113 |
| **Proportion of all games that are Steam-Only** | **93.3%** | **86.7%** |

(b) In terms of the length of time that consumers spend playing Games on the different Distribution Platforms, gamers spend around six times more time playing Games on Steam than Games on the Epic Game Store, widely regarded as Steam's most significant rival: Harman 1 §5.3.9 and fn. 308.

(c) Similarly, Stream has several times more accounts and users than the Epic Games Store: Harman 1 §5.3.9.

102. As for Steam's share of the Relevant Markets by value (i.e. its share of revenue), given the fact that Valve does not itself publish relevant revenue data, Mr Harman has undertaken his preliminary analysis using various public data sources, including data published by the Association for UK Interactive Entertainment, ERA (a trade organisation), and a presentation by Microsoft on games markets. Based on various conservative assumptions, Mr Harman preliminary estimates Steam's market shares in the Relevant Markets to be as set out in Table 5-2 internal p.71 of Harman 1, reproduced below.

**Table 5-2 Steam's market shares, April 2018 – March 2024, %**

| Market | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Game | 59% | 50% | 69% | 71% | 82% | 88% | 83% |
| Game Distribution | 76% | 68% | 83% | 84% | 91% | 94% | 91% |
| Steam Downstream Content | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Steam Downstream Content Distribution | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Wider Downstream Content** | | | | | | | |
| Lower bound | 29% | 24% | 31% | 31% | 34% | 33% | 33% |
| Upper bound | 50% | 44% | 52% | 53% | 54% | 56% | 54% |
| **Wider Downstream Content Distribution** | | | | | | | |
| Lower bound | 48% | 41% | 49% | 49% | 53% | 51% | 51% |
| Upper bound | 69% | 62% | 69% | 70% | 71% | 72% | 71% |

103. These market shares support findings of dominance in the various Relevant Markets as follows.

(a) On the Game Markets, Steam has had market shares above 50% throughout the whole of the Relevant Period, which is indicative of it being dominant in both Game markets.

(b) If the Add-on Content Markets are limited to Steam-enabled Games, Steam will obviously be dominant because it has a 100% monopoly in those markets.

(c) If the Add-on Content Markets are not limited to Steam-enabled Games, based on Mr Harman's preliminary market share estimates it is not clear from market shares alone that Steam would hold a dominant position on the consumer or publisher sides of the market: Mr Harman's lower end estimates suggests market shares of between 24% and 33% on the Wider Add-on Content Market and 41% to 53% on the Wider Add-on Content Distribution Market (by contrast, Mr Harman's higher end estimates does suggest dominance). First, however, Mr Harman will be able to undertake an assessment of market shares in any such markets on a more informed basis in due course once he has access to Valve's own revenue data and internal market share assessments. Second, Valve's market shares in the Wider Add-on Content markets will not truly reflect the limited competitive constraints that it

faces in those markets, as Valve's abusive practices allow it to leverage its dominance from other Relevant Markets. Third, the considerations set out in §104 below suggest that Valve would be dominant in any Wider Add-on Content Markets notwithstanding that its market shares have not been consistently above 50%.

104. As well as having large market shares, various other considerations suggest that Steam faces only limited competitive constraints, and therefore holds a dominant position, on all of the Relevant Markets: Harman 1 §5.9.

(a) As it is by some distance the largest provider of Games, Steam benefits from significant within-group network effects, as consumers value Distribution Platforms that allow them to play multi-player games on the same platform with a large number of other users.

(b) Steam also benefits from significant across-group network effects, as consumers value Distribution Platforms that are able to offer Games from a large number of publishers; and, as noted above, Steam hosts 93% of all Games. Similarly, publishers value Distribution Platforms that provide them with access to a large number of consumers; and, as noted above, Steam has by some distance the largest number of user accounts (and gameplay hours).

(c) As it has significantly more users than any other Distribution Platform, Steam has a significant advantage over both actual and potential competitors through its ability to do more sophisticated analyses that allow it to develop targeted services for both publishers and consumers, which in turn incentives publishers and consumers to use Steam.[85]

(d) There are substantial barriers and/or costs to consumers switching away from Steam, in particular as many Steam users have a large library of Games, achievements, and social connections built up within the platform.[86] Switching to a different Distribution Platform would mean losing access to these features, as well as records of in-game progress. To obtain the same library on an alternative

[85] Harman 1 §5.9.19. *[Note: Previously reference [93]].*

[86] Harman 1 §§4.5.16 and 5.9.14. *[Note: Previously reference [94]].*

Distribution Platform, consumers would also need to purchase the Games again, as Games are not portable between Distribution Platforms.

(e) There are substantial barriers to entry as creating a distribution service for Games entails substantial time and cost.[87] Consistent with this, rates of entry have been low historically, predominantly only the largest publishers have attempted to establish such services, and several new distribution services have failed within relatively short periods of time: Harman 1§4.3.15, and §82 above.

(f) Individual consumers in the Consumer Markets obviously lack buyer power, and the evidence suggests that not even large publishers have significant buyer power vis-à-vis Steam in the Publisher Markets. Among other things, and as noted at §82 above, a number of large publishers have attempted to remove their Games from Steam, only subsequently to return.

## C ABUSE

105. The CR contends that the Defendant has abused its dominant position in breach of the Chapter II prohibition and (for the period prior to 31 December 2020) Article 102 TFEU in the following three ways, namely by imposing: (a) the Valve PPOs; (b) the In-Game Purchasing Restrictions; (c) Commission Charges that constitute unfair and excessive prices. In this Part, the CR sets out its preliminary case on abuse, but reserves the right to amend its pleadings on this issue in due course in the light of disclosure and other evidence.

106. The CR contends that these three abuses (detailed in this section): (a) are abusive when considered both individually and collectively; and (b) collectively constitute an overall anti-competitive strategy and a single and continuous infringement.

### Applicable legal principles: general

107. The Chapter II prohibition prohibits "*any conduct on the part of one or more undertakings which amounts to the abuse of a dominant position in a market*" if it may

[87] Harman 1 §4.3.15. *[Note: Previously reference [95]].*

affect trade within the UK. Article 102 TFEU likewise prohibits such conduct if it may affect trade between Member States.

108. Notwithstanding that the collective proceedings will be brought after 31 December 2020 ("**IP completion day**" for Brexit), in assessing abuse of dominance the Tribunal must seek to ensure consistency with pre-existing EU jurisprudence pursuant to s.60A(1)-(3) (subject to s.60A(4)-(7) of the Act). That jurisprudence includes extensive case law in respect of the interpretation and application of Article 102 on which the CR relies for the purpose of this Claim Form.

109. The CR relies among others on the following legal principles and authorities in relation to the general concept of an abuse.

(a) A dominant undertaking commits an abuse where, through conduct different from that which governs normal competition on the merits, it hinders the maintenance of the degree of competition that exists on the market or the growth of that competition.[88]

(b) A dominant undertaking has "*a special responsibility not to allow its conduct to impair undistorted competition*".[89]

(c) Abusive conduct is that which represents a departure from 'normal competition' or 'competition on the merits'. Whether conduct represents such a departure is a question of appreciation to be assessed by reference to the specific facts of the case.[90]

(d) Conduct can be abusive even if it is commonplace in the market,[91] and even if such conduct may lawfully be entered into by non-dominant undertakings.[92] There is no

---

[88] Case C-209/10 *Post Danmark* EU:C:2012:172, §24. *[Note: Previously reference [96]].*

[89] Case 322/81 *Michelin v Commission* EU:C:1983:313, §57. *[Note: Previously reference [97]].*

[90] *Gutmann v South Western Trains* [2021] CAT 31, §41. *[Note: Previously reference [98]].*

[91] Cases T-191/98 etc *Atlantic Container Line v Commission* EU:T:2003:245, §1124. *[Note: Previously reference [99]].*

[92] *AstraZeneca EC*, at (325). *[Note: Previously reference [100]].*

requirement that the abusive conduct can only be indulged in by virtue of dominance.[93]

(e) The categories of abuse are not closed, such that it is impossible to set out any exhaustive list of conduct that violates section 18 of the Act.[94] Further, there is no need to pigeon-hole an allegation of abuse into a particular category.[95] Among other things, while abuses are sometimes categorised as 'exclusionary' or 'exploitative', there is no clear-cut or absolute distinction between the two.[96]

(f) *"[T]he same practice may give rise to an infringement of both Article 101 TFEU and Article 102 TFEU, even if the two provisions pursue different objectives*".[97] Further, substantively Article 101/the Chapter I prohibition must be interpreted consistently with Article 102/the Chapter II prohibition.[98]

(g) Exclusionary effects arise where the effective access of actual or potential competitors to markets or their components is hampered or eliminated as a result of the conduct of the dominant undertaking.[99]

(h) The following factors in particular make foreclosure effects more likely: (i) a strong dominant position; (ii) if the undertaking benefits from economies of scale and/or scope and network effects; (iii) the conduct affects a high percentage of total sales in the relevant market; and/or (iv) the conduct has been in place for a long time.[100]

---

[93] *National Grid v GEMA* [2010] EWCA Civ 114, §39; Case C-457/10 P *AstraZeneca* EU:C:2012:770, §354. *[Note: Previously reference [101]].*

[94] C-52/09 *TeliaSonera* [2011] ECR I-527, §26. *[Note: Previously reference [102]].*

[95] *Streetmap v Google* [2016] EWHC 253 (Ch), §58. *[Note: Previously reference [103]].*

[96] T-612/17 *Google Shopping* §153; Bellamy & Child, *EU Competition Law*, 8th edition, §10.072. *[Note: Previously reference [104]].*

[97] C-307/18 *Generics (UK) v CMA*, EU:C:2020:52. *[Note: Previously reference [105]].*

[98] Case C-333/21 *European Superleague v FIFA & UEFA*, §186. This does not include the application of block exemptions, which can exempt an agreement from Article 101/the Chapter I prohibition but cannot exempt it from the operation of Article 102/the Chapter II prohibition: see *Generics v CMA* [2018] CAT 4, §427-432. *[Note: Previously reference [106]].*

[99] T-604/18 *Google Android* §281. *[Note: Previously reference [107]].*

[100] Guidance on the Commission's enforcement priorities in applying Article 82 of the EC Treaty, §20. *[Note: Previously reference [108]].*

(i) The special responsibility of dominant undertakings includes an obligation not to engage in exploitative abuses that harm customers.[101]

(j) "*Although abuse is an objective concept … intention may be taken into account in determining abuse*".[102] In other words, while an abuse may be established by reference to objective evidence such that it is not necessary to prove any anti-competitive intent, harmful intentions on the part of the dominant undertaking can support a finding of abuse.

(k) An abuse may be formed of a pattern of conduct comprising different elements and it is not necessary for the dominant undertaking to have engaged in all forms of the abusive conduct during the entirety of the period, provided that at least some elements of the pattern are conducted throughout the period of the infringement.[103]

(l) In circumstances where a dominant undertaking takes a series of actions forming part of an overall plan to distort competition, and those actions interact to contribute to the realisation of that plan, those actions can be regarded as a single and continuous infringement, even if each of the infringements in question also separately constitute an abuse.[104]

**First Abuse: the Valve PPOs**

Applicable legal principles

110. The CR relies among others on the following legal principles and authorities in relation to Steam's imposition of unlawful PPOs.

111. Under a parity obligation (also known as a "Most Favoured Nation" or "MFN" clause), a buyer/seller requires a seller/buyer to offer it terms that are no worse than those offered to other buyers/sellers. Parity obligations can refer to non-price or price terms, the latter

---

[101] *Gutmann v South Western Trains* [2021] CAT 31, at [65]. *[Note: Previously reference [109]].*

[102] *Streetmap.EU v Google* [2016] EWHC 253 (Ch), §66. *[Note: Previously reference [110]].*

[103] *AB Inbev Beer Trade Restrictions* (AT.40134) [2020] 4 C.M.L.R. 12 §§202-205. *[Note: Previously reference [111]].*

[104] Case T-286/09 *Intel v Commission* EU:T:2014:547, §§1562-3. See also Case T-604/18 *Google v Commission* EU:T:2022:54, §§1015-1031, upholding the Commission's finding that four separate abuses comprised a single and continuous infringement (see Case COMP/AT.40099, *Google Android*, Commission Decision of 18 July 2018, §§479-482). *[Note: Previously reference [112]].*

of which are sometimes referred to as 'price parity obligations'. Parity obligations can exist at any level of the supply chain. Parity obligations that apply to online platforms, such as Steam, which offer intermediation services (i.e. the online platform brings together and 'matches' buyers and sellers of the relevant good or service – in this context PC Games) may be referred to as "platform parity obligations", defined above as PPOs.

112. The entering into of retail parity obligations, including PPOs, by a dominant undertaking may have such restrictive effects that it constitutes an abuse under the Chapter II Prohibition / Article 102. Historically, such PPOs have more commonly been analysed under the Chapter 1 prohibition / Article 101 TFEU, where in several cases courts and regulators have found their effects to be sufficiently anti-competitive as to render them unlawful even where they were entered into by undertakings that were not dominant. However, the restrictive effects on competition of PPOs – in particular wide PPOs - are even more egregious where, as here, they are imposed by a dominant undertaking. Indeed, as stated by the Commission: *"[t]he restrictive effects of across-platform retail parity obligations are generally more severe where they are used by one or more leading providers of online intermediation services*".[105]

113. Thus, in 2017, following an investigation into PPOs and similar provisions in agreements between Amazon and e-book suppliers, the Commission accepted commitments from Amazon which had been offered to meet the Commission's concerns relating to clauses that, among other things, required e-book suppliers to make available to Amazon e-books, prices, promotions and commissions that they had offered to other e-book retailers. The Article 9 commitment decision stated that, on a preliminary basis, the Commission had concluded that Amazon held a dominant position in markets for the distribution of English language and German language e-books, and that the relevant MFN or parity clauses constituted an abuse of that dominant position – including because they were "*capable of deterring, or likely to deter, entry and/or expansion by E-Book Retailers competing with Amazon. This can result in a weakening of competition at the e-book distribution level and a strengthening of Amazon's already-dominant position vis-à-vis competing E-book Retailers*".[106]

---

[105] Commission Guidelines on vertical restraints §362. *[Note: Previously reference [113]].*

[106] CASE AT.40153 E-book MFNs and related matters (Amazon), 4 May 2017. *[Note: Previously reference [114]].*

114. The potential for such anti-competitive effects emerges clearly from the legislation, guidance and decisional practice on the status of parity obligations, including PPOs, under the Chapter I prohibition and Article 101. It applies *a fortiori* in the context of Article 102: see paragraph 109(f) above. In particular:

(a) Relevant legislation and guidance includes in particular: (i) the EU Vertical Block Exemption Regulation ("**VBER**")[107] and the Commission's *Guidelines on vertical restraints* ("**Commission Guidelines**");[108] and (ii) the Competition Act 1998 (Vertical Agreements Block Exemption) Order 2022 ("**VABEO**")[109] and the CMA's guidance on the VABEO ("**CMA Guidance**").[110]

(b) The Article 101 case law and guidance distinguishes between 'narrow' and 'wide' retail parity obligations. **Narrow** retail parity obligations are limited to the terms on which goods and services are sold through **direct** channels, such as a manufacturer's website. **Wide** retail parity obligations extend to the terms on which goods and services are sold through **indirect** (as well as direct) channels, such as where a platform requires a manufacturer to sell its good or service on its platform at a price no higher than it is sold on other third-party platforms.[111]

(c) Wide PPOs are not capable of benefiting from exemptions under the VBER or VABEO. Under Article 5 VBER, wide PPOs are 'excluded' restrictions that cannot benefit from the general exemption for vertical agreements under Article 2.

(d) Wide PPOs (like other wide retail parity obligations) are treated even less favourably under the VABEO, as they are deemed to be a 'hardcore' restriction under Article 8. As a result, if an agreement contains a wide PPO, the agreement as a whole (and not simply the parity clause) is incapable of benefiting from an exemption. The CMA Guidance states that "*hardcore restrictions correspond to a*

[107] Commission regulation (EU) 2022/720 of 10 May 2022 on the application of Article 101(3) of the Treaty on the Functioning of the European Union to categories of vertical agreements and concerted practices. *[Note: Previously reference [115]].*

[108] Guidelines on vertical restraints (2022/C 248/01). *[Note: Previously reference [116]].*

[109] Statutory Instrument 2022 No.516. *[Note: Previously reference [117]].*

[110] CMA 166 *Vertical Agreements Block Exemption Order: CMA Guidance*, 12 July 2022. *[Note: Previously reference [118]].*

[111] For example, see the CMA Guidance, §§8.79*ff* and 10.161*ff*. *[Note: Previously reference [119]].*

*category of restrictions under the VABEO for which it is presumed that they generally result in harm to competition so that a vertical agreement containing such a hardcore restriction cannot benefit from the block exemption provided by the VABEO*".[112]

(e) The Explanatory Notes for the VABEO explain that the UK Government took a deliberate decision to treat wide retail parity obligations less favourably in the UK than they are treated in the EU under the VBER. The UK Government is stated to have taken into account "*specific UK market conditions and the interests of UK customers and UK businesses*", in particular that the UK had seen an "*exponential growth of online sales and services, increased price transparency and monitoring … a rise in the number of online platforms acting as intermediaries"*, as well as *"the CMA's experience of scrutinising parity obligations in its casework*". The Explanatory Notes state that, as a result, *"the Government is concerned that wide retail parity obligations soften competition between horizontal competitors and reduce the incentives of intermediaries (such as online platforms) to compete on price, to innovate, or to enter markets and expand".*[113]

(f) The CMA Guidance (as well as the Commission Guidelines)[114] identifies the anti-competitive effects that the CMA considers are likely to result from wide retail parity obligations, which it states "*are more likely than other types of parity obligation to produce anti-competitive effects and are therefore hardcore restrictions under the VABEO*". In particular the CMA states that:[115]

> "Wide retail parity obligations prevent product suppliers from offering lower prices or better terms on other intermediaries. Accordingly, other intermediaries cannot gain a competitive advantage if they improve the terms of the intermediation service they supply to a product supplier (eg through lowering the commissions charged) … Similarly, the intermediary benefitting from the wide retail parity obligation is protected from competition from other intermediaries, and therefore has less incentive to improve the terms of its own intermediation service … The overall effect is that wide retail parity obligations reduce the competitive pressure on the commission rates and other terms offered by intermediaries to product suppliers. In addition to softening competition between intermediaries, wide retail parity obligations reduce the ability and incentive of intermediaries to enter and expand …Finally, wide retail parity

[112] CMA Guidance §8.5. *[Note: Previously reference [120]].*

[113] Explanatory Notes §§7.19, 7.20 and 7.36. *[Note: Previously reference [121]].*

[114] Commission Guidelines §360. *[Note: Previously reference [122]].*

[115] CMA Guidance §§8.84-8.88. *[Note: Previously reference [123]].*

obligations are also likely to soften competition between product suppliers competing on intermediaries, particularly online where there is greater price transparency."

(g) For the purpose of assessing the effects of a PPO, the Commission Guidelines state that relevant factors will include the market position of the platform that imposes the PPO – a point of key importance in the present context, where Valve is dominant – as well as the market share of the buyers of intermediation services covered by the obligation, the 'homing behaviour' of those buyers and end users (i.e. how many intermediation platforms they use), the existence of barriers to entry, the significance of direct sales channels and the ability of buyers to de-list their products from intermediation platforms.[116] All of those considerations are acutely raised in the present case, given the high market share enjoyed by Valve, and the weakness of its rivals' attempts to enter or expand, whether by direct sales or otherwise.

(h) If a parity obligation is found to restrict competition, in principle it may satisfy the requirements for individual exemption under section 9 of the Act and/or Article 101(3). The Commission Guidelines state that wide retail parity obligations are less likely than narrow parity obligations to fulfil the conditions of Article 101(3), as their restrictive effects are generally more severe.[117] The CMA Guidance states that it can be presumed that wide retail parity obligations are "*unlikely to fulfil the conditions for exemption*", and record that (as is also the case under Article 101(3)) *"[t]he burden is on the parties to substantiate any efficiencies resulting from the inclusion of wide retail parity obligations in their agreement and to demonstrate that all the conditions for individual exemption under section 9(1) are fulfilled"*.[118]

(i) While the VBER, VABEO and their accompanying guidance are relatively recent, the position adopted in them in relation to parity obligations is consistent with earlier decisional practice.

(j) In 2004, the Commission closed an investigation into MFN clauses in the contracts of the major Hollywood film studios with a number of pay television companies

[116] Commission Guidelines §361. *[Note: Previously reference [124]].*
[117] Commission Guidelines §374. *[Note: Previously reference [125]].*
[118] CMA Guidance §8.90. *[Note: Previously reference [126]].*

after the studios agreed to withdraw or waive the clauses. The Commission press release stated:[119]

> "The MFN clause gives the studios the right to enjoy the most favourable terms agreed between a pay-TV company and any one of them. According to the Commission's preliminary assessment, the cumulative effect of the clauses is an alignment of the prices paid to the Majors. This is particularly because any increase agreed with a Major triggers a right to parallel increases in the prices of the other studios. The Commission considers that under these circumstances of cumulative effect such anomalous way of setting prices is at odds with the basic principle of price competition."

(k) In 2013, the Office of Fair Trading ("**OFT**") closed on administrative priority grounds an investigation into suspected anti-competitive arrangements by Amazon after Amazon decided to end its price parity policy, which restricted its sellers from offering lower prices on other online sales channels. The OFT press release stated:[120]

> "Following numerous complaints, the OFT opened a formal investigation into Amazon's price parity policy in October 2012. It was concerned that the policy was potentially anti-competitive. In particular, such policies may raise online platform fees, curtail the entry of potential entrants, and directly affect the prices which sellers set on platforms (including their own websites), resulting in higher prices to consumers. In light of Amazon's decision, the OFT is currently minded to close its investigation on grounds of administrative priority."

(l) In 2014 and 2017, the CMA expressed concerns about the anti-competitive effects of wide MFNs in its final reports following market investigations into the private motor insurance and digital comparison tool markets. In 2020, the CMA issued an infringement decision that Compare the Market's wide MFN clauses infringed Chapter I and Article 101. [121]

---

[119] IP/04/1314 *Commission closes investigation into contracts of six Hollywood studios with European pay-TVs*, 26 October 2004. *[Note: Previously reference [127]].*

[120] 60/13 *OFT welcomes Amazon's decision to end price parity policy*, 29 August 2013. See also CE/9692/12 *Amazon online retailer: investigation into anti-competitive practices*, 1 October 2013. *[Note: Previously reference [128]].*

[121] The CMA's decision was overturned on appeal: *BRG (Compare the Market)* [2022] CAT 36. However, the Tribunal's judgment was based on various case-specific factors, in particular the CMA's flawed approach to market definition (the Tribunal concluded the CMA should have defined the market as a two-sided market) and the CMA's failure to identify anticompetitive effects. This second error arose, *inter alia*, from the CMA's decision to rely exclusively on qualitative evidence which the Tribunal considered was *"anecdotal"*, *"lack[ed] depth ... and consistency with the CMA's theory of*

115. It bears emphasis that the above analysis applies even in the absence of dominance, and the special responsibilities that it brings. In the present case, for the reasons set out below, the imposition of the Valve PPOs by a dominant undertaking amounts to an abuse, given the clear restrictions on competition which they impose, which serve only to entrench Valve's market position.

<u>The Valve PPOs</u>

116. The three Valve PPOs, namely the Game PPO, DLC PPO and Content PPO: (a) are abusive both individually and collectively; and (b) together with the second and third abuses collectively constitute an overall anti-competitive strategy. On either basis, they constitute a single and continuous infringement.

117. The Valve PPOs restrict whether, and the terms on which, publishers can provide Multichannel Products in both Consumer Markets. The Valve PPOs are abusive individually and collectively in particular because they: (a) do not constitute competition on the merits; (b) are presumed to restrict competition; and/or (c) produce anti-competitive effects.

118. The Valve PPOs do not constitute competition on the merits because, instead of seeking to enhance Steam's services on the Distribution Markets, for example by improving the quality of the distribution services provided by Steam to publishers, or by reducing its Commission Charges, the Valve PPOs prevent rival distribution channels from offering, or reduce their incentives to offer, improved distribution services and/or lower commission charges, including by preventing them from offering to consumers Games and/or Add-on Content in a differentiated form, earlier and/or at lower prices than they are offered on Steam. See further paragraphs §§124, 129, 131-132 and 133 below. In short, instead of improving Steam's own offering to publishers, increasing competitive intensity in the market, the Valve PPOs restrict the ability of rival distribution channels to improve their offering, relative to Steam's offering, thereby reducing competitive intensity in the market.

---

*harm"* and was *"untestable by both Compare The Market and the Tribunal"* (§262(2)). Also, the Tribunal did *"not consider there to be any scope for contending that Compare The Market had sufficient market power to impose* [MFNs]. *The Decision contains no such finding (which would be akin to an abuse of dominance case)…"* (§262(2)). *[Note: Previously reference [129]].*

119. The Valve PPOs should be presumed to restrict competition for the purpose of the Chapter II prohibition, and therefore effectively constitute abusive conduct 'by object', given their treatment under the Chapter I prohibition, as summarised at paragraph 114(d) to (f) above. The same approach should be adopted in relation to Article 102, insofar as the Tribunal is applying that provision to the UK market. In particular:

(a) The Valve PPOs are all wide retail parity obligations, as they constrain how publishers can distribute Games and/or Add-on Content to consumers via rival Distribution Platforms, as well as through their own direct distribution channels.

(b) Under UK legislation, namely the VABEO, wide retail parity obligations are treated as 'hardcore' restrictions because they are presumed to restrict competition. In the relevant Explanatory Notes, the UK Government explained that it had taken a deliberate decision to adopt this approach in the light of "*specific UK market conditions*" and *"the CMA's experience of scrutinising parity obligations in its casework"*.[122]

(c) Substantively Article 101 / the Chapter I Prohibition should be interpreted consistently with Article 102 / the Chapter II Prohibition. [123]

120. The individual and cumulative effects of the Valve PPOs are summarised at paragraphs §§124, 129, 131-132 and 133 below. These anti-competitive effects, which hinder the ability of actual and potential rival distribution channels to compete effectively with Steam and/or to enter and/or expand, produce significant anti-competitive effects in particular as a result of the fact that: (a) the PPOs are all wide (§§114(d)-(f) and 119 above are repeated); (b) Valve has a strong position on the Relevant Markets, including relative to its nearest rivals (§§100-104 above are repeated); (b) Steam benefits from, among other things, significant network effects (paragraphs 98-104 above are repeated), which make it difficult for actual or potential rival distribution channels to enter, expand and/or compete effectively against Steam (even absent the Valve PPOs); (c) publishers can avoid being bound by the Valve PPOs only by not selling their Multichannel Games

[122] Explanatory Notes §§7.19, 7.20 and 7.36. *[Note: Previously reference [130]].*

[123] Case C-333/21 *European Superleague v FIFA & UEFA*, §186. This does not include the application of block exemptions, which can exempt an agreement from Article 101/the Chapter I prohibition but cannot exempt it from the operation of Article 102/the Chapter II prohibition: see *Generics v CMA* [2018] CAT 4, §427-432. *[Note: Previously reference [131]].*

and/or Multichannel Add-on Content on Steam, which typically results in, or at least risks, a significant loss of revenue (Harman 1 §4.4.6); (d) by restricting the ability of actual and potential rivals to compete effectively with Steam, Valve is able to charge unfair and excessive commission charges, which result in higher prices being charged to consumers (see paragraphs §§148-161 and 169-184 below); and (e) the alignment of prices and softening of price competition in the Consumer Markets that result from the Game PPO and the DLC PPO takes place in online markets where there is high price transparency.

<u>The Game PPO</u>

121. As detailed at paragraphs 58-65 above, Valve enforces the Game PPO, which arises from: (a) express contractual provisions in the SDA and/or Steamworks Documentation; (b) the way in which those provisions are enforced by Valve; (c) communications between Valve and publishers; and/or (d) Valve's practices in relation to the delisting of Games on the Steam platform.

122. Under the Game PPO, in respect of Multilateral Games sold on Steam, Valve requires the relevant publisher to sell the relevant Multichannel Game on Steam for the same (or lower) price as it is sold through Other Distribution Channels. Valve enforces the Game PPO at least in part by delisting, and/or threatening to delist, Multichannel Games that are sold at a higher price on Steam, in breach of the Game PPO.

123. The existence of the Game PPO, its scope and terms and/or the way in which it is enforced by Valve – and also its effectiveness, in terms of its impact on pricing - will be a matter for evidence in due course, including disclosure from Valve. Evidence of these matters at this early stage of the proceedings includes the following:

(a) The Game PPO arises in part from express contractual provisions that require publishers not to sell Multichannel Games distributed using Steam Keys more cheaply through other distribution channels than they are sold on Steam: see §§64-65 above.

(b) Evidence cited in the Consolidated Second Amended US Complaint in the *In re Valve* litigation, examples of which are set out in Annex A, shows that Valve has applied these contractual obligations, which are ostensibly concerned with

Multichannel Games distributed using Steam Keys, more broadly to Multichannel Games offered for sale on Steam and distributed through Other Distribution Channels, regardless of whether or not they are distributed through those other channels using Steam Keys.

(c) Tim Sweeney, the founder and CEO of Epic Games, has explained that Valve's power to review prices is far-reaching: "*Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then ... Valve can simply say 'no.'*"[124]

(d) The existence and effectiveness of the Game PPO is supported by preliminary analysis conducted by Mr Harman and summarised in Section 6 of Harman 1 (in particular §§6.4.4-6.4.15). Specifically, Mr Harman has analysed the prices on which 33 Multichannel Games were sold over a number of years (a) on Steam and (b) through other distribution channels, including in particular where those Multichannel Games were distributed without the use of Steam Keys (i) on other Distribution Platforms and/or (ii) through direct distribution channels. For these Games (and particularly high selling Games), Mr Harman has observed a similar, distinctive pattern of pricing parallelism that is consistent over time, and is illustrated in Figure 6-1 in Harman 1 (internal p.98), reproduced below, which shows the price at which the Game Red Dead Redemption 2 was sold on both Steam and the Epic Games Store (a rival Distribution Platform) between October 2019 and October 2023. See further Harman 1 Appendix G (internal p.200), summarised at Harman 1 §§6.4.9-6.4.10.

[124] Harman 1, Exhibit GH-232. *[Note: Previously reference [132]].*

Figure 7-1: Pricing history of Red Dead Redemption 2, sold through Steam and Epic, October 2019 to December 2023, GE




(e) On both Steam and the other distribution channel, the price of the Game bounced around between a full price level and a discounted price level, reflecting the fact that sale periods during which Games are sold at a significant discount are common in the industry. Mr Harman identifies a common pattern of pricing parallelism with a number of distinctive features. In particular, on both Steam and the other distribution channel: (a) the level of the discounts and subsequent price increases (when the price rebounds to the full price level) are the same, and consistent over a long period of time; and (b) the discounts and subsequent price increases generally occur within a short time period, and are sometimes simultaneous (such that the periods of discounted prices often overlap, or quickly follow one another): Harman 1 §§6.4.7-6.4.8. Mr Harman concludes that he would not expect to see this pattern of pricing behaviour absent the Game PPO, given material differences in distributions costs that publishers face when using alternative distribution channels, and therefore infers that the existence of this distinctive pattern of price parallelism supports the existence and effective enforcement of the Game PPO: Harman 1 §6.4.9.

(f) Notwithstanding that the relevant express contractual provisions refer to Games distributed using Steam Keys, Mr Harman's preliminary pricing analysis has not

found clear evidence that Valve effectively enforces the Game PPO in respect of Multichannel Games distributed through digital retail stores (such as Amazon, e-Bay etc) using Steam Keys: Harman 1 §6.4.13. The extent to which this is in fact the case, and the reasons why (if this is indeed the case) Valve enforces the Game PPO less strictly in respect of Games distributed using Steam Keys, will be a matter of evidence in due course. Possible explanations for a lack of effective enforcement of the Game PPO in respect of Games distributed using Steam Keys include: (a) the lack of a direct contractual relationship between Steam and digital retail stores, which may limit Steam's ability to enforce the restriction effectively; and/or (b) the possibility that Steam may consider it less important effectively to enforce the Game PPO in this context, given that: (i) digital retail stores are not direct competitors of Steam (see §91 above); (ii) Steam limits the number of Games distributed using Steam Keys (see §62 above); and/or (iii) that Steam Key sales result in consumers playing the relevant Game on the Steam platform, thereby enabling Valve to charge commission on subsequent Add-on Content purchases (given the tying/anti-steering abuse set out above) and to obtain data on the relevant consumer.

124. The Game PPO is likely to cause, and has in fact caused, restrictions of competition in particular as follows.

(a) The Game PPO prevents Other Distribution Channels from gaining a competitive advantage (relative to Steam) by offering Multichannel Games more cheaply than they are available on Steam. This reduces the ability and incentive of: (i) existing rival distribution channels to expand; and (ii) potential rival distribution channels to enter the market (and subsequently expand). These effects arise on all four Relevant Markets.

(b) By limiting the ability of rival distribution channels to compete against Steam in these ways, the Game PPO reduces the competitive pressure faced by Steam, and thereby its incentive to improve the quality, or reduce the price, of its own; (i) distribution services offered to publishers in the Game Distribution Market; and (ii) retail services offered to consumers in the Game Market.

(c) Among other things, this reduction in competitive pressure on Steam allows Steam to charge higher commission rates in the Game Distribution Market than it would otherwise be able to charge, which in turn results in higher prices being charged in the Game Market. As Steam is the leading Distribution Platform with large market shares in both Game Markets, this reduces the intensity of price competition across both Game Markets, leading to higher average commission charges in the Game Distribution Market, and higher prices in the Game Market.

(d) The Content PPO results in an alignment in the prices of Multichannel Games on offer in the Game Market, thereby restricting price competition in that market.

The DLC PPO

125. As detailed at paragraphs 67-72 above, Valve enforces the DLC PPO, which arises from: (a) express contractual provisions in the SDA; (b) the way in which those provisions are enforced by Valve; (c) communications between Valve and publishers; and/or (d) Valve's practices in relation to the delisting of Games on the Steam platform.

126. Under the DLC PPO, in respect of Multichannel Games sold on Steam, Valve requires the relevant publisher to sell the relevant Add-on Content on Steam for the same (or lower) price as it is sold through other distribution channels. Valve enforces the Game PPO at least in part by delisting, and/or threatening to delist, Multichannel Games the Add-on Content for which is sold at a higher price on Steam, in breach of the DLC PPO.

127. The existence of the DLC PPO, its scope and terms and/or the way in which it is enforced by Valve – and also its effectiveness, in terms of its impact on pricing - will be a matter for evidence in due course, including disclosure from Valve.

128. In addition to the matters identified at §§67-72 above, the existence and effectiveness of the DLC PPO is supported by preliminary analysis conducted by Mr Harman and summarised in Section 6 of Harman 1 (in particular §§6.4.16-6.4.18). Specifically, Mr Harman has analysed the prices at which Add-on Content for leading Multichannel Games has been sold over a number of years (a) on Steam and (b) through other distribution channels, including in particular where Add-on Content for Multichannel Games was sold both (i) on other Distribution Platforms and/or (ii) through direct distribution channels. For such DLC, Mr Harman has found evidence of the same

distinctive pattern of pricing parallelism that he found for Multichannel Games, as summarised in paragraph 123(e) above, which he would not expect to see absent the DLC PPO.

129. The DLC PPO is likely to cause, and has in fact caused, restrictions of competition in particular as follows.

(a) The DLC PPO prevents rival distribution channels from gaining a competitive advantage (relative to Steam) by offering Add-on Content for Multichannel Games more cheaply than they are available on Steam. This reduces the ability and incentive of: (i) existing rival distribution channels to expand; and (ii) potential rival distribution channels to enter the market (and subsequently expand). These effects arise on all four Relevant Markets.

(b) By limiting the ability of rival distribution channels to compete against Steam in these ways, the DLC PPO reduces the competitive pressure faced by Steam, and thereby its incentive to improve the quality, or reduce the price, of its own; (i) distribution services offered to publishers in the Add-on Content Distribution Market; and (ii) retail services offered to consumers in the Add-on Content Market.

(c) Among other things, this reduction in competitive pressure on Steam allows Steam to charge higher commission rates in the Add-on Content Distribution Market than it would otherwise be able to charge, which in turn results in higher prices being charged in the Add-on Content Market. As Steam is the leading Distribution Platform with large market shares in both Add-on Content Markets, this reduces the intensity of price competition across both Add-on Content Markets, leading to higher average commission charges in the Add-on Content Distribution Market, and higher prices in the Add-on Content Market.

(d) The DLC PPO results in an alignment in the prices of Add-on Content for Multichannel Games on offer in the Add-on Content Market, thereby restricting price competition in that market.

<u>The Content PPO</u>

130. As detailed at paragraphs 73-74 above, Valve's contractual terms impose the Content PPO which prohibits publishers from providing Multichannel Products for distribution

through Other Distribution Channels: (a) with differentiated content; and/or; (b) earlier (alternatively materially earlier) than they are provided to Steam.

131. The Content PPO is likely to cause, and has in fact caused, restrictions of competition in particular as follows.

(a) The Content PPO limits the ability of rival distribution channels to gain a competitive advantage (relative to Steam) by offering Multichannel Products earlier (alternatively materially earlier) than they are available on Steam, or in a differentiated form. This reduces the ability and incentive of: (i) existing rival distribution channels to expand; and (ii) potential rival distribution channels to enter the market (and subsequently expand). These effects arise on both the consumer and publisher sides of the market, i.e. on all four Relevant Markets.

(b) By limiting the ability of rival distribution channels to compete against Steam in these ways, the Content PPO reduces the competitive pressure faced by Steam, and thereby its incentive to improve the quality, or reduce the price, of its own; (i) distribution services offered to publishers in the Distribution Markets; and (ii) retail services offered to consumers in the Consumer Markets.

(c) Among other things, this reduction in competitive pressure on Steam allows Steam to charge higher commission rates in the Distribution Markets than it would otherwise be able to charge, which in turn results in higher prices being charged in the Consumer Markets. As Steam is the leading Distribution Platform with large market shares in the Relevant Markets, this reduces the intensity of price competition across all four Relevant Markets, leading to higher average commission charges in the Distribution Markets, and higher prices in the Consumer Markets.

(d) The Content PPO results in an alignment in the content and release dates of Multichannel Products on offer in the Consumer Markets, thereby reducing the variety of services on offer to consumers and restricting non-price competition on those markets.

<u>Collective effects of the Valve PPOs</u>

132. The Valve PPOs are collectively likely to cause, and have in fact caused, restrictions of competition in particular as follows.

(a) The Valve PPOs prevents rival distribution channels from gaining a competitive advantage (relative to Steam) by offering Multichannel Products more cheaply or earlier than they are available on Steam, or in a differentiated form. This reduces the ability and incentive of: (i) existing rival distribution channels to expand; and (ii) potential rival distribution channels to enter the market (and subsequently expand). These effects arise on all four Relevant Markets.

(b) By limiting the ability of rival distribution channels to compete against Steam in these ways, the Valve PPOs reduces the competitive pressure faced by Steam, and thereby its incentive to improve the quality, or reduce the price, of its own; (i) distribution services offered to publishers in the Distribution Markets; and (ii) retail services offered to consumers in the Consumer Markets.

(c) Among other things, this reduction in competitive pressure on Steam allows Steam to charge higher commission rates in the Distribution Markets than it would otherwise be able to charge, which in turn results in higher prices being charged in the Consumer Markets. As Steam is the leading Distribution Platform with large shares in all of the Relevant Markets, this reduces the intensity of price and non-price competition in those markets, leading to higher average commission charges in the Distribution Markets, and higher prices in the Consumer Markets.

(d) The Valve PPOs results in an alignment in the prices, content and release dates of Multichannel Products on offer in the Consumer Markets, thereby restricting price and non-price competition in those markets.

133. Absent the Valve PPOs, the Relevant Markets would have developed differently. Among other things:

(a) Steam and rival distribution channels could have competed by offering differentiated prices, content and release dates for Multichannel Products in the Consumer Markets.

(b) More Products could have been released on a Multichannel basis and/or exclusively through distribution channels other than Steam.

(c) As more Games would likely have been available through additional channels, including at lower prices, more consumers would likely have "multi-homed", i.e. used Other Distribution Channels in addition to Steam, including rival Distribution Platforms.

(d) Steam's exposure to greater competitive pressure across the Relevant Markets would have resulted in it reducing its Commission Charges to publishers, and downward competitive pressure on commission charges would have been greater across both Distribution Markets.

(e) Lower publisher commission charges, in combination with greater competitive intensity in the Consumer Markets, would have resulted in Games and Add-on Content being sold for lower prices.

**Second abuse: the In-game Purchasing Restrictions**

134. As detailed at §§75-81 above, through its contractual arrangements with publishers, in respect of Games distributed through Steam Valve imposes: (a) the Clause 2.5 Restriction, which prevents publishers from including any links or references within Games (including from pages accessed via the game menu outside of gameplay) enabling users to purchase Add-on Content from distribution channels other than Steam; and (b) the Steamworks API Restriction, which requires any in-game purchases (i.e. Microtransactions completed during gameplay) to be made using the Steamworks API – such that the relevant payment is made to Valve and is subject to Valve's Commission Charges. These two restrictions, collectively referred to as the In-game Purchasing Restrictions, ensure that all, alternatively the overwhelming majority, of purchases of Add-on Content made by users from within Games distributed on Steam are made from Steam (and not through other distribution channels).

135. The In-game Purchasing Restrictions leverage Valve's dominant position in the Game Markets so as to enable it to secure a larger share of the Add-on Content markets, by preventing or restricting the ability of other distribution channels to supply (including self-supply) Add-on Content for Games distributed on Steam. Accordingly, both the

Clause 2.5 Restriction, and the Steamworks API Restriction, are abusive whether considered individually or collectively.

136. As stated at paragraph 109(e) above, the categories of abuse are not closed, and there is no need to pigeon-hole an allegation of abuse into a particular category. As a result, the abusive nature of Valve's In-game Purchasing Restrictions ultimately falls to be determined by reference to all the facts of the case. However, they may usefully be considered by reference to two existing categories of abuse, namely tying and the imposition of anti-steering provisions.

Applicable legal principles

137. 'Tying' usually refers to situations where customers that purchase one product (the tying product – here, Games and/or Game distribution services) are required also to purchase another product from the dominant undertaking (the tied product – here, Add-on Content and/or Add-on Content distribution services).[125]

138. The CR relies among others on the following legal principles and authorities in relation to the abuse of tying.

(a) The Chapter II prohibition and Article 102 state that conduct may, in particular, constitute an abuse of a dominant position if it consists in *"making the conclusion of contracts subject to acceptance by the other parties of supplementary obligations which, by their nature or according to commercial usage, have no connection with the subject of such contracts"*. However, UK and EU courts have found that the abuse of tying is not limited to that situation, and held that it may be an abuse to tie two products even when that is consistent with commercial usage or there is a natural link between them.[126]

(b) Tying constitutes an abuse where the following factors are present: (i) the undertaking concerned is dominant in the market for the tying product; (ii) the tying and tied products are two separate products; (iii) the undertaking concerned does

[125] Guidance on the Commission's enforcement priorities in applying Article 82 of the EC Treaty ("**Commission Article 102 Guidance**"), §51. *[Note: Previously reference [133]].*

[126] T-201/04 Microsoft v Commission ("**Microsoft**") EU:T:2007:289, §942; *Socrates v Law Society* [2017] CAT 10, §141. *[Note: Previously reference [134]].*

not give customers a choice to obtain the tying product without the tied product; (iv) the practice in question 'forecloses competition'; and (v) that practice is not objectively justified.[127]

(c) As to the second condition, whether the two products are separate products depends on customer demand.[128] The Commission has stated that "*[t]wo products are distinct if, in the absence of tying or bundling, a substantial number of customers would purchase or would have purchased the tying product without also buying the tied product from the same supplier, thereby allowing stand-alone production for both the tying and the tied product*".[129]

(d) As to the third condition, compulsion or coercion can in particular: (i) be contractual and/or technical (i.e. where the tying product only works properly with the tied product); and (ii) still exist where the party accepting the tied product is not charged a separate price for it.[130]

(e) In relation to the fourth condition, tying only constitutes an abuse if it may have an anti-competitive effect, but it is not necessary to demonstrate direct harm to customers or consumers or actual anti-competitive effects. It is sufficient to show that the conduct is reasonably likely to harm the competitive structure of the market.[131]

(f) Specifically in relation to the tying of payment processing services, on 10 June 2022, the CMA published its final report in its *Mobile ecosystems* market study. Appendix H considered the requirements imposed by Apple and Google on developers to use their proprietary payment systems to process in-app purchases made by users, including in particular within mobile games (i.e. the tying of their payment systems).[132] The CMA identified various potential anti-competitive

---

[127] *Microsoft*, §§859, 862, 864, 869; Case T-604/18 *Google Android* EU:T:2022:541, §284. *[Note: Previously reference [135]]*.

[128] *Microsoft*, §917. *[Note: Previously reference [136]]*.

[129] Guidance on the Commission's enforcement priorities in applying Article 82 of the EC Treaty, §51. *[Note: Previously reference [137]]*.

[130] Case AT.40099 *Google Android ("Google Android Decision"), §§*746-748, citing *Microsoft*, §§ 963 and 967-970. *[Note: Previously reference [138]]*.

[131] *Socrates v Law Society* [2017] CAT 10, §§147-148. *[Note: Previously reference [139]]*.

[132] Appendix H: Apple's and Google's in-app purchase rules. *[Note: Previously reference [140]]*.

effects, including that app developers could not choose alternative payment processing services that better met their needs and were 'disintermediated' from their users in certain respects, and the potential distortion of competition between Apple's and Google's own apps and rival apps. The CMA rejected Apple's and Google's attempt to justify the requirements on the basis that they were necessary for it to collect commission on the payments, finding that alternative methods (which were not prohibitively costly or difficult to implement) could be used which did not give rise to the potential anti-competitive effects that it had identified.

139. In relation to the abuse of imposing anti-steering obligations, on 4 March 2024 the European Commission took an infringement decision finding Apple more than €1.8 billion for abusing its dominant position in the market for the distribution of music streaming apps to iOS users. The Commission found that Apple had abused its dominant position in particular by imposing unfair trading conditions contrary to Article 102(a) TFEU, in the form of anti-steering provisions that required app developers to use in-app purchases to unlock features or functionality within their app, including for "*subscriptions, in-game currencies, game levels, access to premium content, or unlocking a full version*"; further, they banned app developers from including in their apps any buttons, external links or others calls to action that directed customers to purchasing mechanisms other than in-app purchase, notwithstanding that such alternative purchasing mechanisms outside the app, offering subscriptions at cheaper prices, would have been available. The Commission found that these anti-steering provisions were (i) unilaterally imposed by Apple, (ii) were detrimental to the interests of iOS users of music streaming services (as they prevented music streaming service providers from duly informing OS users about the available options to purchase music streaming subscriptions outside of the app and from enabling them to effectively exercise those options), and (iii) were not necessary for the achievement of a legitimate objective and in any event not proportionate for that purpose. As such, they amounted to an abuse of dominance.[133]

[133] Commission Decision C (2024) 1307 final, Case AT.40437 – Apple – App Store Practices (music streaming), 4 March 2024, provisional non-confidential version: see Recitals (163)-(165) for the wording of the Anti-Steering Provisions, and Recitals (825-826) for the Commission's conclusions on the abusive nature of those provisions. *[Note: Previously reference [141]]*.

Abusive conduct in this case

140. Both elements of the In-game Purchasing Restrictions satisfy the four conditions for abusive tying.

141. First, Valve is dominant in the market for the tying product. Both of the In-game Purchasing Restrictions tie the distribution of Add-on Content/Add-on Content distribution services to the distribution of Games/Game distribution services. For the reasons given at §§98-104 above, Valve has a dominant position in the Game Market and the Game Distribution Market.

142. Second, the tying and tied products are two separate products. In particular, Add-on Content and Add-on Content distribution are separate products/services from Games and Game distribution services: see §89 above, and Harman 1 §7.5.14.

143. Third, Valve does not give customers (users or publishers) a choice to obtain the tying product without the tied product.

(a) The Clause 2.5 Restriction means that, within each Game purchased on Steam, users are not provided with any choice to purchase Add-on Content from a distribution channel other than Steam.

(b) For Microtransactions completed during gameplay, users necessarily have to use Valve's payment processing service, as Valve requires that Games sold on Steam use the Steamworks API for such transactions.

(c) Publishers have no choice but to comply with these contractual requirements if they wish to distribute their Games on Steam.

144. Fourth, the In-game Purchasing Restrictions have harmed, or are reasonably likely to harm, the competitive structure of the market. In particular, absent the In-game Purchasing Restrictions, publishers would, or would reasonably likely, have included links or references so as to enable users to purchase Add-on Content for Games (including in-game purchases) sold on Steam from other distribution channels, such as the relevant publisher's website and/or other Distribution Platforms (which would have

supplied such Add-on Content). The fact that Valve imposes the In-game Purchasing Restrictions is itself evidence that such an outcome is plausible, as if it were not these provisions would be otiose. Paragraphs 78-80 above are repeated.

145. Further or alternatively, the In-game Purchasing Restrictions are anti-steering provisions which amount to the imposition of abusive and unfair trading conditions contrary to Article 102(a) TFEU: (i) they are unilaterally imposed by Valve (as the relevant terms are drafted by Valve, and publishers have no realistic choice but to agree with them if they want their Games distributed on Steam); (ii) they are detrimental to the interests of publishers and consumers (as they as they mean that consumers cannot make informed and effective choices as to where to purchase Add-on Content for Games distributed on Steam, and publishers cannot make informed and effective choices as to where to distribute such content); and (iii) they are not necessary for the achievement of a legitimate objective and in any event not proportionate for that purpose.

146. Individually and collectively, the In-game Purchasing Restrictions restrict competition in particular by restricting the ability of Other Distribution Channels to compete with Steam (on both Add-on Content Markets) for the distribution and sale of Add-on Content for Games distributed on Steam. Absent the In-game Purchasing Restrictions, Valve and its Commission Charges would be subject to greater competitive pressure in the Distribution Markets.[134]

147. The In-game Purchasing Restrictions also exacerbate the effects of the First Abuse, and facilitate Valve's unfair Commission Charges, for the reasons given at §162 below and Harman 1 section 7.7 (internal p.133).

**Third Abuse: unfair pricing**

148. The CR contends that Valve's Commission Charges are unfair and abusive.

Applicable legal principles

149. The CR relies among others on the following legal principles and authorities in relation to the abuse of unfair pricing.

---

[134] Harman 1 §8.2.4. *[Note: Previously reference [142]].*

150. The Chapter II Prohibition and Article 102 prohibit "*directly or indirectly imposing unfair purchase or selling prices*". In relation to unfair pricing, the CR relies among others on the following legal principles and authorities.

151. In its *United Brands* judgment, the CJEU stated, among other things, that one method of determining whether a price is abusive is to compare the selling price with the cost of production, to determine whether the difference is excessive (the so-called 'excessive limb'), and, if so, whether the price is unfair either in itself or when compared to competing products (the so-called 'unfair limb').[135]

152. In *Flynn / Pfizer*, the Court of Appeal reviewed the case law relating to unfair pricing (including the *United Brands* judgment) and drew the following conclusions:[136]

> "(i) The basic test for abuse, which is set out in the Chapter II prohibition and in Article 102, is whether the price is "unfair". In broad terms a price will be unfair when the dominant undertaking has reaped trading benefits which it could not have obtained in conditions of "normal and sufficiently effective competition", i.e. "workable" competition.
>
> (ii) A price which is "excessive" because it bears no "reasonable" relation to the economic value of the good or service is an example of such an unfair price.
>
> (iii) There is no single method or "way" in which abuse might be established and competition authorities have a margin of manoeuvre or appreciation in deciding which methodology to use and which evidence to rely upon.
>
> (iv) Depending upon the facts and circumstances of the case a competition authority might therefore use one or more of the alternative economic tests which are available. There is however no rule of law requiring competition authorities to use more than one test or method in all cases.
>
> (v) If a Cost-Plus test is applied the competition authority may compare the cost of production with the selling price in order to disclose the profit margin. Then the authority should determine whether the margin is "excessive". This can be done by comparing the price charged against a benchmark higher than cost such as a reasonable rate of return on sales (ROS) or to some other appropriate benchmark such as return on capital employed (ROCE). When that is performed, and if the price exceeds the selected benchmark, the authority should then compare the price charged against any other factors which might otherwise serve to justify the price charged as fair and not abusive.
>
> (vi) In analysing whether the end price is unfair a competition authority may look at a range of relevant factors including, but not limited to, evidence and data relating to the defendant undertaking itself and/or evidence of comparables drawn from competing products and/or any other relevant comparable, or all of these. There is no fixed list of categories of evidence relevant to unfairness.

---

[135] Case 27/76 *United Brands* [1978] ECR 207, §§252. *[Note: Previously reference [143]]*.

[136] *CMA v Flynn & Pfizer* [2020] EWCA Civ 339, §97. *[Note: Previously reference [144]]*.

> (vii) If a competition authority chooses one method (e.g. Cost-Plus) and one body of evidence and the defendant undertaking does not adduce other methods or evidence, the competition authority may proceed to a conclusion upon the basis of that method and evidence alone.
>
> (viii) If an undertaking relies, in its defence, upon other methods or types of evidence to that relied upon by the competition authority then the authority must fairly evaluate it."

153. The Court of Appeal cited with approval the statement, endorsed by the Tribunal in *Napp*, that in principle a price was excessive:

> "…if it is above that which would exist in a competitive market and where it is clear that high profits will not stimulate new entry within a reasonable period. Therefore, to show that prices are excessive, it must be demonstrated (i) that prices are higher than would be expected in a competitive market, and (ii) there is no effective competitive pressure to bring them down to competitive levels, nor is there likely to be."[137]

154. In its *Hydrocortisone I* judgment, the Tribunal considered the CMA's application of the 'bears no reasonable relation to the economic value' test – one of the ways in which it might be established that a price is excessive. The Tribunal rejected as unarguable the contention of the Appellants that prices must bear some relation to the economic value because customers valued the products highly and were willing to pay the prices demanded, stating that this amounted *"to an unacceptable, and wrong, elision of the case for legitimate consumer surplus … and the case of an illegitimate exercise of market power"*. Further, even *"[i]f the explanation for the producer surplus excess is <u>consistent</u> with a competitive market, then it may be that it must be asked whether the excess is too great to be justified"*. The Tribunal explained that a price above cost may be legitimate in particular where, for example through product differentiation, the seller has created a product that *"that adds value to the Buyer, in the sense that this aspect represents something that Buyers wish to purchase from that Seller in contradistinction to the offerings of other Sellers; and for which the Buyer will pay a premium"*. In this scenario, the seller is rewarded for its efforts with some producer surplus, but consumer surplus is also maximised – in contrast to a situation where prices above cost result from the seller having market power (e.g. due to barriers to market contestability), where consumer surplus is reduced. [138]

---

[137] Ibid, at [91], discussing *Napp Pharmaceutical Holdings v DGFT* [2002] CAT 1 ("Napp"). *[Note: Previously reference [145]].*

[138] *Hydrocortisone I* [2023] CAT 56, §§332, 339, 341. *[Note: Previously reference [146]].*

155. In relation to the use of comparators, the Tribunal stated:[139]

> "Comparators are of particular importance, even where they may not be clear or compelling. Comparators can include: (i) comparators on different markets; (ii) comparators on the same market at the same time; and (iii) comparators separated by time. In all cases, the critical question for the court is whether anything probative can be derived from the comparator in question. …
>
> In *Napp* itself, the Tribunal identified as "among the approaches that may reasonably be used to establish excessive prices": (i) comparing price charged with cost incurred; (ii) comparing price charged with the costs of the next most profitable competitor; (iii) comparing the prices charged by the undertaking in question with those of its competitors; and (iv) comparing the prices charged by the undertaking across different markets. As the Tribunal noted, other methods will also no doubt exist, in particular analyses of price changes overtime, where there is no corresponding change in the operation of the market itself."

<u>Unfair pricing in this case</u>

156. At present, the CR does not have access to Valve's data relating to its costs and revenues associated with the Steam platform. As a result, at §§7.6.10-7.6.35 of his report Mr Harman sets out his proposed methodology for determining whether Valve's Commission Charges are excessive and unfair. However, notwithstanding the absence of cost and revenue data at this stage, Mr Harman identifies a number of considerations which indicate that Valve's Commission Charges are likely to be abusive. However, the CR is likely to seek permission to amend its pleadings on unfair pricing once relevant evidence – including in particular data on Valve's costs and revenues – has been disclosed.

157. The CR contends that the Commission Charges are unfair and abusive given: (a) Valve has had higher levels of profit over an extended period of time than one would expect in a sufficiently competitive market; (b) these high levels of profitability have not triggered material competitive entry or expansion; rather, the evidence indicates that it has been, and remains, very difficult for actual and potential rivals to enter the market and/or expand; and/or (c) the Commission Charges are significantly higher than several relevant comparator benchmarks.

158. Mr Harman proposes to assess whether Valve's Commission Charges are abusive by applying the framework set out in the *United Brands* judgment, which includes an

[139] *Ibid*, §331. *[Note: Previously reference [147]].*

assessment of whether prices are: (a) excessive; and (b) unfair. Given that Steam provides services in two-sided markets, Mr Harman will assess the overall costs incurred and revenue earned by Steam from both sides of the platform.

159. As to whether the Commission Charges are excessive, Mr Harman proposes to compare Steam's revenues with the full economic costs of its Game and Add-on Content distribution activities: Harman 1 §§7.6.12-7.6.13. However, various public information suggests that Valve's Commission Charges are likely to be excessive:

(a) In 2011, Valve's CEO called Valve "*tremendously profitable*" and asserted that it was more profitable per employee than Google or Apple.[140] In 2018, a Valve employee undertook analysis which showed that Valve was more profitable on a net income per employee basis that numerous other Big Tech companies including Facebook, Apple, Netflix, Alphabet, Microsoft, Intel and Amazon, implying that Valve was making more than $780,000 per employee each year.[141]

(b) Mr Tim Sweeney, CEO of Epic Games, has estimated that the operating costs of operating a Distribution Platform amount to around 5 to 7% of revenue.[142] Based on this rough estimate, and the level of the Valve Commission Charges, Mr Harman estimates on a preliminary basis that Valve has been earning revenues of tens of millions of pounds each year in excess of costs, including between £98 million and £107 million in excess of cost in the 2023 financial year alone: Harman 1 §7.6.17 and Table 7-2.

160. As to whether the Commission Charges are unfair, a common and recognised approach is to compare the relevant prices with the prices of comparable products. Mr Harman's preliminary assessment of comparators is set out at Harman 1 §7.6.22 and Table 7-3. This assessment shows, in particular, that Valve's Commission Charges, which (subject to the impact of Steam Keys, as to which footnote 9 above is repeated) amount to an average commission of 27%, are dramatically higher than the commission charges of

---

[140] Oliver Chiang, The Master of Online Mayhem (forbes.com) , FORBES (Feb. 28, 2011). *[Note: Previously reference [148]].*

[141] See, https://www.gamesradar.com/internal-valve-study-found-the-house-of-steam-was-making-more-money-per-employee-than-facebook-apple-and-microsoft-over-dollar780000-per-head-a-year/ and Document 200-6 in *In re Valve Antitrust Litigation*. *[Note: Previously reference [149]].*

[142] Harman 1, Exhibit GH-275. *[Note: Previously reference [150]].*

Steam's two main rival Distribution Platforms, namely the Epic Games Store and the Microsoft Store, which both charge 12%.

161. As summarised at paragraphs §§82-83 above, the fact that Valve has had high Commission Charges and profitability over an extended period of time has not triggered successful competitor entry or expansion. Indeed, several rival distribution channels have existed the market, and a number of major publishers attempted to remove their Games from Steam only to return at a later date. In short, there appears to have been, and continues to be, no effective competitive pressure to bring Valve's Commission Charges down to competitive levels. This is likely, at least in part, to be the due to Valve's abusive conduct in imposing the Valve PPOs and In-game Payment Restrictions: see paragraphs 116-136; 140-147.

**Single and continuous infringement**

162. The various conducts falling within the scope of the three abuses described above in this Part II C all form part of an overall strategy by Valve which together form a single and continuous infringement of Chapter II/Article 102 TFEU. In particular, Valve's imposition of the Valve PPOs and In-game Purchasing Restrictions are elements of an overall strategy designed to limit the competitive pressure to which Steam is subject so as to enable it to charge its high commission charges. See further Harman 1 §§7.7.1-7.7.3.

**Objective justification**

163. The burden is on Valve to make any case for objective justification. The CR will respond to any Valve arguments on objective justification in due course.

**Effect on trade**

164. The Infringing Conduct may appreciably affect trade between Member States of the European Union and/or within the UK or a part of it. The Infringing Conduct has reinforced Valve's dominant position and/or appreciably distorted the structure of competition on the Relevant Markets, in particular in the way summarised at §§94-97 above. Among other things, the Infringing Conduct has (a) restricted the ability of actual and/or potential rival distributors to compete effectively with Steam, including by restricting their ability to enter the market and/or expand, has (b) restricted the ways in

which publishers can sell Products to consumers, and (c) has increased price levels across all four Relevant Markets – thereby preventing and/or affecting the ability of distributors and publishers to offer services within the UK and between Member States (for the period prior to 31 December 2020).

165. By way of non-exhaustive example in relation to the impact on trade between Member States, Ubisoft – which has sought to compete on the Relevant Markets through its Uplay digital distribution channel, and which has developed/published a number of leading games – is incorporated and headquartered in France.

## D CAUSATION AND LOSS

166. The relief sought in these proceedings is damages, to be assessed on an aggregate basis pursuant to section 47C(2) of CA98. The Infringing Conduct has caused loss and damage to the Class Members ("**CMs**") as defined at §§242-243 below, as it has resulted in them paying higher prices for Relevant Purchases during the Relevant Period.

167. The loss and damage suffered by the CMs is the difference during the Relevant Period between the amounts that the CMs: (i) in fact paid for Relevant Purchases; and (ii) would have paid if Valve had not engaged in the Infringing Conduct.

### Applicable legal principles

168. In relation to causation of loss, the CR relies among others on the following legal principles and authorities.

(a) In order to prove their case, competition claimants "*must establish: (a) a breach of competition law; and (b) actionable harm or damage caused by that breach … [t]hat means that the Claimants must prove that some damage was caused by the Infringement and the test for causation is on a "but for" basis. Their recovery is not limited to the "gist damage" but they must satisfy the test for causation before there can be consideration of the quantification of their actual loss*".[143]

---

[143] *Royal Mail v DAF* [2023] CAT 6, §168. *[Note: Previously reference [151]]*.

(b) "*[O]ne cannot give a commonsense answer to a question of causation for the purpose of attributing responsibility under some rule without knowing the purpose and scope of the rule*".[144]

(c) As to the purpose served by the claims: (a) the ultimate purpose of the law on abuse of dominance is to prevent consumers from being treated unfairly;[145] and (b) the rationale for collective proceedings claims is to allow the vindication of claimants' rights (in particular in circumstances where the level of individual loss would have rendered individual claims unviable) and to ensure that defendants pay damages to reflect their wrongdoing, which acts as a disincentive for future unlawful conduct.[146]

(d) The principle of effectiveness applies to domestic (as well as EU) competition law claims such that "*the rules should not be applied in such a way that the very right sought to be enforced is undermined*".[147]

(e) The principle of effectiveness applies not only to the application of principles of liability but also "*to the procedural and evidential rules by which the court determines whether and to what extent the claimant has suffered loss*".[148]

(f) "*[A] level of imperfection and simplifying assumptions are unavoidable in every competition damages estimation. To require perfection or every permutation to be accounted for would be contrary to the principle of effectiveness for such damages claims*".[149]

**Causation and loss in this case**

169. At trial, the CR will satisfy the requirements for legal causation if, having proven an infringement, it can establish that it is more likely that not that the infringement caused

[144] *Environment Agency v Empress Car Co (Abertillery) Ltd* [1999] 2 A.C. 22, per Lord Hoffman at §31. *[Note: Previously reference [152]].*

[145] *South Eastern Railway v Gutmann* [2022] EWCA Civ 1077, §93. *[Note: Previously reference [153]].*

[146] *Merricks v MasterCard* [2020] UKSC 51 at §45; *South Eastern Railway v Gutmann* [2022] EWCA Civ 1077 at §§53 and 63. *[Note: Previously reference [154]].*

[147] *NTN Corp v Stellantis* [2022] EWCA Civ 16, §29. *[Note: Previously reference [155]].*

[148] *Sainsbury's v Mastercard* [2020] UKSC 24, §189. *[Note: Previously reference [156]].*

[149] *UK Trucks Claim v Stellantis* [2022] CAT 25, §138. *[Note: Previously reference [157]].*

some ('gist') damage to the Class. That would be the case, for example, if the CR proved: (a) the Third Abuse relating to excessive Commission Charges, and that it was more likely than not that in the counterfactual some publishers would have passed-on some of the savings from reduced distribution costs to consumers through lower prices; and/or (b) the First Abuse relating to the Valve PPOs, and that it was more likely than not that absent the Valve PPOs some publishers would have priced some Games (e.g. some Multichannel Games) more cheaply. In short, to prove legal causation, it will not be necessary for the CR to succeed on all aspects of its counterfactual case. Nonetheless, in the following paragraphs the CR summarises its preliminary case on the counterfactual, given this is linked to its preliminary methodology for estimating aggregate damages. The CR reserves the right to amend its counterfactual case, and its preliminary methodology, in due course in the light of disclosure. the appropriate counterfactual is one purged of all unlawful conduct. That is, one in which Valve did not have any PPOs in place, there were no In-Game Purchasing restrictions, and Valve did not charge excessive commissions. Nor would there be any other potential violations of competition law.[150]

170. At a high-level, the CR considers that, in a counterfactual without any PPOs,[151] the In-game Purchasing Restrictions or the excessive commissions (the "**Primary Counterfactual**"), publishers would have sold Products at lower prices both through Other Distribution Channels and on Steam, for the reasons summarised below. In short:

(a) Steam Commission Charges would have been set at a lower (non-excessive) level, thereby reducing the distribution costs for publishers from selling Products on

---

[150] *Albion Water Limited v Dŵr Cymru Cyfyngedig* [2013] CAT 6 §61; *Enron Coal Services Ltd (In Liquidation) v English Welsh & Scottish Railway Ltd* [2009] CAT 36 §90; *Achilles Information Limited v Network Rail Infrastructure Limited* [2022] CAT 9 §5(7). *[Note: Previously reference [158]].*

[151] Were Valve to contend in due course that in the counterfactual it would have entered into narrow PPOs, the CR will consider and respond to any such argument (including in the light of disclosure). Nonetheless, in the circumstances of this case, the CR considers it highly unlikely that it would have been lawful for Valve to enter into narrow PPOs (i.e. which restricted the terms on which Multichannel Products could be sold through direct distribution channels, but not through rival Distribution Platforms) on terms that were otherwise the same as the Valve PPOs. First, Valve has had high market shares in the Relevant Markets over a sustained period of time, and various other competitive advantages over rivals: see 104 above. Second, many Multichannel Products are only sold through Steam and direct distribution channels (i.e. they are not also sold through rival Distribution Platforms). As a result, in a context in which Valve has very considerable market power in the Relevant Markets, narrow PPOs would have eliminated a significant source of competitive pressure. See also Harman 1 §8.2.5. *[Note: Previously reference [159]].*

Steam. As a result of these lower distribution costs, publishers would have sold Products on Steam at lower prices.

(b) Publishers would have sold Multichannel Products through Other Distribution Channels at lower prices (both because those products would have been sold at lower prices on Steam, and because absent the Valve PPOs publishers would not have been required to sell those products at or above the prices on which they were sold on Steam, and would have had an economic incentive to sell them at lower prices).

(c) Other Products – in particular Valve's own Products and Products sold through Other Distribution Channels but not on Steam - would also have been sold at lower prices, as publishers set prices in part in the light of the level of prices of similar Products, and Multichannel Products and Products sold on Steam (which would have been sold at lower prices) comprise a large proportion of all Products.

171. The CR's primary case is that Valve committed all three pleaded abuses, which constitute a single and continuous infringement, and that the counterfactual should therefore be stripped of all the conduct alleged to be abusive. The CR does not consider that it is obliged to plead separate counterfactuals in which only some of Valve's allegedly abusive conduct is stripped out (e.g. anticipating a scenario in which the CR succeeded on some of its abuse claims, but failed on others). That is in particular for the following reasons: (a) the CR has pleaded that the three abuses collectively constitute a single and continuous infringement (see paragraph 106 above); (b) the case law requires the counterfactual to be stripped of all unlawful conduct, not only some of it (see the cases cited at footnote 151 [*Note: Previously [159]*]); (c) a CR is not required to plead counterfactuals for each and every possible combination of its success or failure on different issues at trial and (d) it is unrealistic to expect the CR to plead its counterfactual case in great detail at this early stage of the proceedings given the current information asymmetries that exist as between the parties, in particular prior to disclosure.

172. Nonetheless, in the following paragraphs, the CR summarises its case (at this early stage subject to disclosure) as to the counterfactual worlds that would have existed if one removed only: (a) the Valve PPOs (but not Valve's excessive Commission Charges) (the **"PPO Counterfactual"**); and (b) Valve's excessive Commission Charges (but not the

Valve PPOs) (the **"Excessive Pricing Counterfactual"**). The CR has adopted this approach to illustrate that, even if only some of Valve's abusive conduct were to be removed from the counterfactual: (a) prices would still have been lower across the whole of the market (albeit through different mechanisms); and (b) the CMs would still have paid less for their Products in the counterfactual than they actually did. The CR's articulation of these alternative counterfactuals also illustrates that its proposed methodology for estimating aggregate damages will be appropriate, or alternatively could be adapted, so as to ensure that the Claims remain triable in the event that it did not establish each and every head of abuse at trial.

173. For the avoidance of doubt, at this preliminary stage, the CR does not contend that the CMs would have suffered losses caused by the In-Game Purchasing Restrictions considered in isolation. Specifically, in a counterfactual without the In-game Purchasing Restrictions but in which the Valve PPOs and Valve's excessive Commission Charges were still present, it is not at this stage contended that the CMs would have paid lower prices for their Products. Rather, the CR contends that the In-game Purchasing Restrictions exacerbated the anti-competitive effects of the Valve PPOs, which together caused losses. However, the CR reserves its right to amend its pleading in respect of this issue in due course, in particular in the light of disclosure.

**The PPO Counterfactual**

174. The Valve PPOs constrain the terms on which publishers can sell Multichannel Products through Other Distribution Channels. Their effects are summarised in particular at §§132-133 above. In summary:

(a) the Game PPO prevents or restricts publishers from selling Multichannel Games through Other Distribution Channels more cheaply than on Steam;

(b) the DLC PPO prevents or restricts publishers from selling Add-on Content for Multichannel Games through Other Distribution Channels more cheaply than on Steam; and

(c) the Content PPO restricts publishers from providing Multichannel Products through Other Distribution Channels: (i) with differentiated content; and/or (ii) earlier than they are provided to Steam.

175. The position in the PPO Counterfactual (in which there are no Valve PPOs but Valve's excessive Commission Charges are not removed automatically as a result of having been found to be abusive,) can usefully be analysed by reference to (i) Multichannel Products; (ii) third party Products (i.e. Games not published by Valve, and their associated Add-on Content) sold only on Steam ("**Steam-only Products**"); (ii) Games published by Valve sold only on Steam, and their associated Add-on Content ("**Valve Products**"); and (iii) Products not sold on Steam but sold through one or more Other Distribution Channels ("**Other Distribution Channel-only Products**").

Multi-channel Products and Steam-only Products

176. In the PPO Counterfactual - in which, in particular, the Game PPO and DLC PPO were not present - publishers would have offered Multichannel Products for sale through Other Distribution Channels more cheaply than on Steam. This is to be expected in particular because publishers have an economic incentive to do so given that their distribution costs are lower when selling through Other Distribution Channels compared to on Steam, as a result of Steam's high commission charges.[152]

177. To the extent that Multichannel Products were offered for sale more cheaply through Other Distribution Channels than on Steam, consumers would have made more purchases through such channels and fewer purchases on Steam, i.e. because consumers typically prefer to purchase products for lower prices.

178. In addition, absent the Valve PPOs publishers would have had a greater incentive to sell more Products through Other Distribution Channels, whether in addition to, or instead of, on Steam.

179. Absent a competitive response from Steam, this would have resulted in Valve having reduced market shares, revenues and profits. Faced with this increased competitive pressure, Valve would have reduced the level of its Commission Charges in response, which would have led publishers to reduce the prices of Products sold on Steam (both Multichannel Products sold on Steam, and Steam-only Products) (as publishers should have had an incentive to pass-on these distribution cost savings): see Harman 1 8.2.1-8.2.5.

[152] Harman 1 §8.2.3. *[Note: Previously reference [161]].*

180. The level of competitive pressure on Steam to reduce its Commission Charges (i.e. so as to limit the loss of business to Other Distribution Channels now able to sell Multichannel Products at prices lower than those on Steam) would have been further increased as a result of the following.

(a) Absent the Content PPO, publishers would have had an incentive to offer some Multichannel Products through Other Distribution Channels earlier than on Steam and/or in differentiated form (one of the ways in which distribution channels compete) to a greater extent than permitted under the Content PPO.

(b) If the In-game Purchasing Restrictions were also absent from the PPO Counterfactual, publishers would have had an incentive to provide some links or references to enable users to purchase Add-on Content for Multichannel Games downloaded from Steam from Other Distribution Channels, enabling Other Distribution Channels to compete with Steam in respect of such content (including on price)

181. As a result, in the PPO Counterfactual publishers would have sold Multichannel Products (both on Steam and through Other Distribution Channels) and Steam-only Products at lower prices than in the actual world.

<u>Valve Products and Games sold only through Other Distribution Channel</u>

182. Valve does not pay Steam's commission charges for the distribution of Valve Products, i.e. Valve's own first-party Games (and associated Add-on Content) that it produces itself and distributes on Steam. However, publishers (including Valve) set prices for Products in part in the light of the level of prices for similar Products and the intensity of price competition in the market: Harman 1 §8.5.6.

183. As a result, because in the PPO Counterfactual other categories of product would have been sold at lower prices, Valve Products would also have been sold at lower prices. Given that Valve's own Games are predominantly Free-to-Play, these lower prices would predominantly have taken the form of lower prices for Add-on Content for Valve produced Games.

184. Further, Other Distribution Channel Products would also have been sold at lower prices (notwithstanding that the Valve PPOs do not constrain the terms on which publishers sell

Products when they are sold only through Other Distribution Channels) for similar reasons, i.e. given that publishers set prices for Products, including Other Distribution Channel Products, in part in the light of the level of prices for similar Products and the intensity of price competition in the market: Harman 1 §8.5.2.

**The Excessive Pricing Counterfactual**

185. In the Excessive Pricing Counterfactual: (a) Valve's Commission Charges would be at a competitive level; but (b) the Valve PPOs and the In-game Purchasing Restrictions would remain in place.

186. In this counterfactual, all Products would have been sold at lower prices, in particular for the following reasons.

(a) All third-party Products sold on Steam would have been sold by publishers at lower prices as their distribution costs would have been lower, i.e. as publishers would have had an incentive to pass-on their distribution cost savings arising from Steam's lower Commission Charges: Harman 1 §8.2.7. This includes Multichannel Products, as well as Steam-only Products.

(b) As Multichannel Products would have been sold on Steam at lower prices, publishers would also have sold Multichannel Products through Other Distribution Channels at lower prices, reflecting the fact that, under the Games PPO and DLC PPO, they would be able to reduce their prices on Other Distribution Channels to the same (lower) level as the same products were sold on Steam, and they would have had an economic incentive to do so given the level of their distribution costs when selling through those Other Distribution Channels.

(c) As all Steam-only Products, and all Multichannel Products (on both Steam and Other Distribution Channels) – which together constitute a large proportion of the Relevant Markets - would have been sold at lower prices, other Products, namely Valve Products and Other Distribution Channel Products, would also have been sold at lower prices given that publishers set prices for Products in part in the light of the level of prices for similar Products and the intensity of price competition in the market: Harman 1 §§8.5.2-8.5.6.

187. As a result, in the Excessive Pricing Counterfactual, all categories of product would have been sold at lower prices than in the actual world.

## E PROPOSED METHODOLOGY AND CERTIFICATION ISSUES

*[Note: Section E of the original as filed version of the Collective Proceedings Claim Form (which addressed methodology and certification issues at [188]-[226]) has been deleted in its entirety, without the text being retained in struck-through form. However, the original paragraph numbering has been retained in subsequent sections. The original references for this section [162-196] have also been deleted, however the original reference numbering has been noted in each reference in the subsequent sections]*.

## F JURISDICTION AND APPLICABLE LAW

### Jurisdiction

227. Pursuant to the Collective Proceedings Order made on 11 March 2026 (the "**CPO**") the proceedings are treated as taking place in England and Wales for the purpose of Rule 18 of the Rule.

[*Note: Paragraphs [228-231] of the original as filed version of the Collective Proceedings Claim Form have been deleted in their entirety. The original paragraph numbering has been retained, however*].

### Applicable law

232. Losses sustained by CMs which predate 11pm on 31 January 2020 are governed by Regulation (EC) No 864/2007 of 11 July 2007 on the law applicable to non-contractual obligations ("**Rome II**"). Losses which postdate 11pm on 31 January 2020 are governed by the retained version of Rome II (Regulation (EC) 864/2007 on the law applicable to non-contractual obligations (Rome II) (Retained EU Legislation)) ("**Retained Rome II**"), which is in equivalent terms to Rome II. Both Rome II and Retained Rome II apply as between jurisdictions within the United Kingdom pursuant to regulation 6 of the Law Applicable to Non-Contractual Obligations (England and Wales and Northern Ireland)

Regulations 2008 (SI No. 2986/2008).[153] References below to provisions in Rome II are also to the equivalent provisions in Retained Rome II.

233. Article 4(1) of Rome II sets out the general rule that, unless otherwise provided for:

> "the law applicable to a non-contractual obligation arising out of a tort/delict shall be the law of the country in which the damage occurs irrespective of the country in which the event giving rise to the damage occurred and irrespective of the country or countries in which the indirect consequences of that event occur".

234. Article 6(3)(a) of Rome II makes specific provision for competition claims, and states that states that *"[t]he law applicable to a non-contractual obligation arising out of a restriction of competition shall be the law of the country where the market is, or is likely to be, affected*".[154]

235. Recitals (21) and (22) of Rome II explain that Article 6 is a clarification of the general rule in Article 4(1), i.e. Article 6 is intended to state a version of the principle that the applicable law is that of the country where the damage occurs, particularized for competition law.[155] Thus, in *Westover v Mastercard* [2021] CAT 12 at §50, the Tribunal stated:

> "The general rule is that the governing law is the law of the country where the damage occurs: Art 4. That is considered to strike a fair balance between the defendant and the claimant: recital (16). Thus Art 6(3)(a) can be seen as a particular application of this approach: where there is a restriction of competition then the market affected is likely to correspond to the place where the anti-competitive damage occurs."

236. The High Court has held that, where (as here) loss takes the form of an overcharge, damage is sustained where the goods are bought. The CR submits that the same approach should be taken in respect of services.

237. Accordingly, as the Claims are claims for losses incurred by UK-domiciled class members as a result of having been overcharged for goods and/or services provided to

[153] The Law Applicable to Non-Contractual Obligations (England and Wales and Northern Ireland) Regulations 2008 *[Note: Previously reference [197]]*.

[154] Regulation (EC) No 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations (Rome II) *[Note: Previously reference [198]]*.

[155] Regulation (EC) No 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations (Rome II) *[Note: Previously reference [199]]*.

them in the UK, the market affected by the alleged infringement is the UK. In this respect, the applicable law, including the appliable rules of limitation or prescription, is (a) English and Welsh law in respect of CMs domiciled in England and Wales; (b) Northern Irish law in respect of CMs domiciled in Northern Ireland; and (c) Scottish law in respect of CMs domiciled in Scotland.

238. In relation to the Scottish law principles of prescription, section 11(2) of the Prescription and Limitation (Scotland) Act 1973 applies in respect of Valve's continuing abuse of dominance, whether as part of a single and continuous infringement (see §162 above) or otherwise.[156] It follows that the prescriptive period has not yet began to run. In support of this position the CR relies by way of analogy on the Tribunal's judgment in *Merricks v Mastercard* [2023] CAT 15, where it concluded that section 11(2) applied in respect of abusive conduct that formed part of an overarching and continuing scheme (c.f. in particular §§65-66 of the CAT's judgment).[157]

## G RELIEF

239. The CR claims:

(a) damages on behalf of the Class, to be assessed on an aggregate basis pursuant to section 47(C) of the Act;

(b) simple interest thereon, at a rate of 8% per annum (or such other rate as the Tribunal may consider appropriate);

(c) the CR's costs; and

(d) such further and other relief as the Tribunal may see fit.

## H FORUM

[156] Prescription and Limitation (Scotland) Act 1973 *[Note: Previously reference [200]]*.

[157] *Merricks v Mastercard* [2023] CAT 15 *[Note: Previously reference [201]]*.

240. *[Note: Paragraph 240 of the original as filed version of the Collective Proceedings Claim Form has been deleted in its entirety. The original paragraph numbering has been retained, however].*

***

# III. THE CLASS

## A THE CLASS

241. *[Note: Paragraph 241 of the original as filed version of the Collective Proceedings Claim Form has been deleted in its entirety. The original paragraph numbering has been retained, however].*

242. The class of claimants for the purpose of the Claims (the "**Class**" and "**Class Members**" or "**CMs**") consists of:

> "All Persons who, during the Class Period, made one or more payments to purchase ("**Purchasers**"): (a) PC Games, and/or (b) Add-on Content for PC Games, including subscription payments for PC Games and/or Add-on Content (collectively "**Relevant Purchases**").

243. For the purposes of this definition of the Class ("**Class Definition**"):

(a) "Persons" are end-consumers, and do not include resellers or other non-retail customers. Persons include, in particular, people who purchase PC Games and/or Add-on Content for use by themselves or by people they know (such as friends or family members).

(aa) "Purchasers" include, for the avoidance of doubt: (a) where the payment was taken from a bank or credit card at the time of purchase (whether through the submission of card details or the use of digital wallet technologies such as Apple Pay, Google Pay or Paypal etc.), the person whose account the money was taken from; (b) where the payment was made with pre-loaded funds on a user account (e.g. Steam Wallet, Epic Wallet etc.), the user account holder; and (c) where the payment was made using a monetary gift card or voucher, the person who made the payment using that card or voucher.

(b) "Class Period" means the period: (i) from 4 June 2018 to 4 June 2024, in relation to members of the Class domiciled in England, Wales and Northern Ireland; and (ii) from 1 January 2010 to 4 June 2024 in relation to members of the Class domiciled in Scotland.

(c) "PC Games" means video games designed to be played on PCs (i.e. personal computers), as opposed to on other types of hardware such as consoles or mobiles, including PCs built by Apple and/or using a Mac operating system.

(d) "Add-on Content" means content that can be added-on to PC Games that is purchased after the initial acquisition of the game, sometimes referred to as Downloadable Content ("DLC"), and includes content acquired through Microtransactions completed during gameplay.

244. The following Persons are excluded from the class:

(a) Any directors of the CR, their parents, their spouses or civil partners or any persons with whom they cohabit, and their children.

(b) Officers, directors or employees of the Defendant, their subsidiaries and any entity in which they have a controlling interest.

(c) All members of the CR's and Defendant's respective legal teams and all experts and professional advisors instructed and retained by them and all funders or insurers involved, in connection with these collective proceedings.

(d) All members of the Tribunal assigned to these proceedings.

(e) Any judge involved in any appeal in the present collective proceedings (whether in respect of the grant of permission to appeal or the hearing of any substantive appeal).

245. All Persons who fall within the definition of the Class and, on 11 March 2026 are:

(a) domiciled in the UK, are included in the Class unless they opt-out by 11 June 2026; and

(b) not domiciled in the UK, are permitted to opt-in to the proceedings by 11 June 2026.

246. In respect of any Person who meets the Class Definition but has subsequently died, the Class shall include their lawful representatives, successors or assignees.

*[Note: The remainder of Part III of the original (as filed) version of the Collective Proceedings Claim Form (which addressed whether the authorisation and eligibility requirements were satisfied for certification) at original paragraphs [247]-[276] has been deleted, without the text being retained in struck-through form].*

**STATEMENT OF TRUTH**

I believe that the facts stated in this Amended Collective Proceedings Claim Form are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of trust without an honest belief in its truth.

**SIGNED:** Vicki Shotbolt
Vicki Shotbolt (Mar 13, 2026 11:34:56 GMT) ..............................

**NAME:** Vicki Shotbolt ..............................

**DATED:** 13/03/2026 ..............................

**STATEMENT OF CONSENT**

I agree that my electronic signature on this document is the equivalent of my handwritten signature. I further agree that my electronic signature on this document is as valid as my handwritten signature. I hereby confirm that the electronic signature has been produced with my consent.

**SIGNED:** Vicki Shotbolt
Vicki Shotbolt (Mar 13, 2026 11:34:56 GMT) ..............................

**NAME:** Vicki Shotbolt ..............................

**DATED:** 13/03/2026 ..............................

## ANNEX 1: EVIDENCE FROM *IN RE VALVE*

This annex sets out examples of Valve's conduct and statements towards developers/publishers that have been referred to in the Consolidated Second Amended US Complaint in the *In re Valve* litigation (see in particular §§17-18 of the Claim Form).

1. §200: *"In late 2018, for example, one publisher had been selling its game on the Steam Store for $5, but launched its game on the Discord Store (enabled for Discord's gaming platform) for free. Valve detected that the publisher was charging different prices on the two storefronts, and told the publisher that offering its game for a lower price on Discord violated the Valve PMFN. Valve insisted the publisher renegotiate its deal with Discord and ensure that gamers buying the Discord version pay the same price as gamers buying the Steam version"*.

2. §202: In 2021 a developer/publisher called "The Snarktopus" contacted Steam through its "Developer Support tool", querying what was meant in Steamworks Documentation where Valve refers to how *"to avoid a situation where customers get a worse offer on the Steam store"*. The developer/publisher asked: *"Regarding the pricing policy, can a non-Steam variant of a game be sold at a different price than on the Steam store page?"* Valve's response was that *"Selling the game off Steam at a lower price wouldn't be considered giving Steam users a fair deal"*.

3. §204: In Valve's "Steamworks Development" online forum, in a thread called "Patreon and steam keys", in 2017 "TomG" of Valve explained that a publisher should *"[t]hink critically about how your decisions might affect Steam customers, and Valve. If the offer you're making fundamentally disadvantages someone who bought your game on Steam, it's probably not a great thing for us or our customers (even if you don't find a specific rule describing precisely that scenario)."* In the same thread, TomG responded to another question by explaining that: *"we usually choose not to sell games if they're being sold on our store at a price notably higher than other stores. That is, we'd want to get that lower base price as well, or not sell the game at all."*

4. §205: In response to another inquiry from a game publisher, Valve explained*: "We basically see any selling of the game on PC, Steam key or not, as a part of the same shared PC market- so even if you weren't using Steam keys, we'd just choose to stop selling a game if it was always running discounts of 75% off on one store but 50% off on ours …"*.

5. §207: In response to queries raised by another developer, Valve explained that if they *"brought a particular other game of [theirs] to Steam, it would need to be equivalently priced. This was regardless of whether the non-[S]team version use Steam technology[,] [i.e.], a completely standalone version would have to be the same price as the Steam version."*

6. §208: the plaintiffs plead that *"Wolfire has been subject to Valve's threats to enforce its PMFN. On December 3, 2018, for example, a Steam account manager, Tom Giardino, told Wolfire's owner that it would delist any games available for sale at a lower price elsewhere, whether or not using Steam keys. As a result of Valve's enforcement of its PMFN, Wolfire has not offered its games for a lower price than what appears on Steam with other sellers."*

7. §209: the plaintiffs plead that *"Dark Catt has also been subject to Valve's anticompetitive conduct and PMFN. Dark Catt sold its game on Steam and offered its game for a temporary lower price on Humble Bundle. Shortly thereafter, it was banned from Steam"*.

# EXHIBIT 3

Neutral citation [2026] CAT 4

Case No: 1640/7/7/24

**IN THE COMPETITION APPEAL TRIBUNAL**

Salisbury Square House
8 Salisbury Square
London EC4Y 8AP

26 January 2026

Before:

THE HONOURABLE MR JUSTICE HILDYARD
(Chair)
PAUL LOMAS
JOHN DAVIES

Sitting as a Tribunal in England and Wales

BETWEEN:

**VICKI SHOTBOLT CLASS REPRESENTATIVE LIMITED**

Applicant/
Proposed Class Representative

- v -

**VALVE CORPORATION**

Respondent/
Proposed Defendant

Heard at Salisbury Square House on 14 October 2025

---

**JUDGMENT (CPO APPLICATION) (NON-CONFIDENTIAL)**

---

## APPEARANCES

Julian Gregory and Will Perry (instructed by Milberg London LLP) appeared on behalf of Vicki Shotbolt Class Representative Limited, the Proposed Class Representative.

Brian Kennelly KC, Tom Coates and Sean Butler (instructed by Reynolds Porter Chamberlain LLP) appeared on behalf of the Proposed Defendant.

**Note:** Excisions in this Judgment (marked "[✂]") relate to commercially confidential information: Schedule 4, paragraph 1 to the Enterprise Act 2002.

## TABLE OF CONTENTS


**A. INTRODUCTION ....4**

**B. THE PROPOSED COLLECTIVE PROCEEDINGS ....5**

- **(1) Overview of the PC Games market ....5**
- **(2) The Claim ....6**
- **(3) The PCR ....8**
- **(4) Valve ....9**
- **(5) Procedural history ....9**

**C. LEGAL FRAMEWORK ....10**

**D. THE AUTHORISATION CONDITION ....15**

**E. THE ELIGIBILITY CONDITION ....19**

- **(1) The Effective Commission Charge Issue ....20**
  - *(a) Valve's submissions ....21*
  - *(b) The PCR's submissions ....24*
  - *(c) The Tribunal's analysis ....28*
- **(2) The PPO Issue ....33**
  - *(a) Valve's submissions ....35*
  - *(b) The PCR's submissions ....37*
  - *(c) The Tribunal's analysis ....39*
- **(3) Class identification ....43**
  - *(a) Valve's submissions ....44*
  - *(b) The PCR's submissions ....45*
  - *(c) Tribunal's analysis ....46*
- **(4) Class Definition ....48**
- **(5) Conclusions on Eligibility ....49**

**F. ISSUES RAISED BY THE TRIBUNAL ....51**

- **(1) Evidence of funding on competitive terms ....51**
- **(2) Other matters ....55**

**G. CONCLUSION ON CERTIFICATION ....57**

- **(1) Opt-in/Opt-out ....57**

**H. DISPOSITION ....59**

## A. INTRODUCTION

1. By a collective proceedings claim form ("CPCF") filed on 5 June 2024, Vicki Shotbolt Class Representative Limited applied to be appointed as the Proposed Class Representative ("PCR") for a collective proceedings order ("CPO"), on an opt-out basis, to combine claims pursuant to section 47B of the Competition Act 1998 (the "Act") (the "CPO Application") against the Proposed Defendant ("Valve"). The claims arise from the pricing and terms of games sold through Valve's Steam platform.

2. The claims that the PCR seeks to combine are stand-alone, under section 47A of the Act, for loss and damage caused by Valve's alleged infringements of Article 102 of the Treaty on the Functioning of the European Union (up to 31 December 2020) and section 18 of the Act. They would be brought on behalf of up to some 14 million UK-based consumers who purchased video games designed to be played on personal computers ("PC Games" or "Games") and/or additional content (including subscriptions) for such Games ("Add-on Content") (collectively, the "Products"), during the Relevant Period[1] whether on the Steam platform or on other platforms. The aggregate damages are provisionally estimated at up to £656 million.

3. Notice was given to potential class members ("PCMs") by publication on a claims website by the PCR of the application for a CPO. No PCM has applied to make submissions objecting to the application: see rule 79(5) of the Competition Appeal Tribunal Rules 2015 ("the Tribunal Rules").[2] However, the CPO Application has been opposed by Valve.

4. The CPO Application was considered at a hearing on 14 October 2025. This is the Tribunal's judgment in relation to the CPO Application.

---

[1] "Relevant Period" is the period from the start of the Class Period (see paragraph 13(2) below) to the date of the CPO. The PCR has reserved its right (in the usual way) to apply to the Tribunal to extend this period up to the date of final judgment or earlier settlement of the Claims in due course.

[2] All references to rules in this Judgment are to the Tribunal Rules.

## B. THE PROPOSED COLLECTIVE PROCEEDINGS

### (1) Overview of the PC Games market

5. Historically, in order to play a PC game, a consumer would purchase a physical disc from a physical shop and then install the game on their PC. However, according to the PCR, today, only 1% of PC Games are distributed through physical media. Instead, the norm is that consumers purchase, and then play, their Games in an entirely digital format.

6. PC Games are marketed and distributed by publishers. Publishers may develop Games themselves or pay a third-party developer to design them. One option for publishers is to release their Game through, and to be compatible with, a third-party digital distribution platform (a "Distribution Platform"). A Distribution Platform is a service that allows consumers to purchase, download, and play Games on their PC. Steam, owned by Valve, is such a Distribution Platform. Others include the Epic Games Store. Some larger publishers have their own direct to consumers distribution channels. This includes Electronic Arts ("EA") who owns the Origin distribution channel whereby consumers can purchase and play EA's Games.

7. For consumers, there are two main ways to purchase and download digitally distributed PC Games. Consumers can either: (i) purchase and download a Game from a Distribution Platform to play on that platform; or (ii) purchase a download code for a Game (e.g. from a retailer or digital storefront such as Amazon or Humble Bundle, or from the publisher directly) and then use that code to download and then play the Game on a Distribution Platform. The download codes for use on Steam are known as Steam Keys.

8. Traditionally, publishers generated revenue from Games by charging an up-front payment from consumers to download their Games. Today, however, sales of Add-on Content have grown to such an extent that up-front payments to download Games now account for less than half of all revenue from PC Games. Add-on Content refers to Game content that is purchased after the initial

acquisition of the Game. This includes Downloadable Content ("DLC"), which is content purchased out-of-game (such as, for example, an expansion pack that provides additional storylines, characters or areas). It also includes content acquired through "Microtransactions" completed in-game during gameplay (which may include cosmetic content, such as additional "skins" or outfits for characters, or content which aids gameplay, such as currency packs, loot boxes or time savers). For Games distributed via Steam, Add-on Content can be purchased within the Game itself, within the Steam Distribution Platform, or redeemed via a Steam Key.

9. According to the PCR, publishers wishing to distribute Games on Steam must become a "Steam(works) Partner". Publishers do this by entering into the Steam Distribution Agreement ("SDA") as well as other contractual documentation with Valve. When a publisher sells a Game or Add-on Content through Steam, Steam charges a commission[3] on this revenue. Before 2018, Valve charged a single commission rate of 30%. Since 2018, Valve has operated a tiered commission rate structure under which its rate of commission varies depending on the value of sales (30% on the first $10m in title revenue, 25% on title sales between $10m and $50m, and 20% on title sales above $50m).

**(2) The Claim**

10. The PCR alleges that Steam is dominant in the following relevant markets:

(1) the "Game Market", on which consumers purchase Games;

(2) the "Game Distribution Market", on which publishers purchase (or self-supply) services for the distribution of Games to consumers;

---

[3] Valve's commercial payment arrangements with Steam Partners are described by Valve as "revenue shares". The PCR has drafted its claim by reference to the term "commission". For convenience, the Tribunal has used the term "commission" in this judgment. However, there is no finding on the nature or character of those commercial payment arrangements in this judgment (and that issue was, naturally at this stage, not the subject of substantive submissions or detailed argument before us). Accordingly, nothing substantive is implied but the use of that term which is purely for drafting consistency.

(3) the "Add-on Content Market", on which consumers purchase Add-on Content. This market may include Add-on Content for all Games, whether enabled for Steam or other platforms (a "Wider Add-on Content Market"), or may be limited to the acquisition of Add-on Content for (only) Steam-enabled Games (a "Steam Add-on Content Market"); and

(4) the "Add-on Content Distribution Market", on which publishers purchase (or self-supply) services for the distribution of Add-on Content. Like the consumer Add-on Content Market, this market may include the distribution of Add-on Content for all Games, whether enabled for Steam or other platforms (a "Wider Add-on Content Distribution Market"), or it may be limited to the distribution of Add-on Content for Steam-enabled Games (a "Steam Add-on Content Distribution Market").

11. The PCR alleges that Valve has abused this dominant position by:

(1) Imposing Platform Parity Obligations ("PPOs"), that prohibit publishers from selling Products through other distribution channels on better terms than the same Products are available on Steam. The PCR alleges that the PPOs are likely to cause, and have in fact caused, restrictions of competition.

(2) Imposing anti-steering provisions to the effect that, if a publisher wants consumers playing its Games distributed on Steam to be able to make in-game purchases, all such purchases must be made using the Steam application programming interface, and therefore Valve's payment processing service. As a result, the payments are subject to Valve's commission charges. Such anti-steering provisions leverage Valve's dominant position in the Game Markets so as to enable it to secure a larger share of the Add-on Content Markets, by preventing or restricting the ability of other distribution channels to supply (including self-supply) Add-on Content for Games distributed on Steam.

(3) Imposing excessive commission charges which amount to an unfair price which is then passed on to consumers.

12. In the CPCF as originally filed, the PCR sought to bring the proposed collective proceedings on behalf of the proposed class (the "Proposed Class") defined as:

> "All Persons who, during the Class Period, made one or more payments for the purpose of purchasing: (a) PC Games, and/or (b) Add-on Content for PC Games, including subscription payments for PC Games and/or Add-on Content (collectively **"Relevant Purchases"**)."[4]

13. For the purposes of this definition of the Proposed Class ("Class Definition"):

(1) "Persons" means, in respect of Relevant Purchases, the person who was licensed to use the acquired content, typically the account holder.

(2) "Class Period" means the period up to the date of the Collective Proceedings Order in these proceedings: (i) from 4 June 2018, in relation to members of the Class domiciled in England, Wales and Northern Ireland; and (ii) from 1 January 2010 in relation to members of the Class domiciled in Scotland.

**(3) The PCR**

14. The PCR is a company limited by guarantee without share capital, and its sole director is Ms Shotbolt. Ms Shotbolt has a background in the social welfare of children, particularly in connection with technology. She is the founder and CEO of the social enterprise Parent Zone, which specialises in understanding the impact of online services and digital technologies on families and children. She is supported by an Advisory Panel which currently consists of Dr David Zendle, a behavioural scientist and a member of the Advisory Board for Safer Gambling of the Gambling Commission and Mr Andy Burrows, the former head of child safety online policy at NSPCC.

---

[4] Paragraph 244 of the CPCF identifies Persons who are excluded from the Proposed Class but for the purpose of this Judgment it is not necessary to set them out.

15. The PCR has entered into a Litigation Funding Agreement ("LFA") with Bench Walk Guernsey PCC Limited (a member of the Association of Litigation Funders) contracting on behalf of the Steam UK Funding Cell (the "Funder"). The PCR has secured funding of up to £18,573,566 from the Funder to enable it to pay all necessary costs, fees or disbursements. In addition, the PCR has obtained after-the-event insurance (the "ATE Policy") with HDI Global Specialty SE, AXA Insurance UK PLC, Accredited Insurance (Europe) Limited, International General Insurance Co (UK) Limited, and Litica Ltd. The ATE Policy includes adverse costs cover up to £15 million. The PCR considers that this level of cover, when combined with the Funder's contractual obligation to pay unlimited adverse costs, is appropriate and adequate to cover the risk of any adverse costs award.

**(4) Valve**

16. Valve is registered in the State of Washington, United States of America. It did not apply to strike out any part of the CPCF or seek reverse summary judgment pursuant to rule 79(4). However, it has challenged the granting of a CPO on the grounds set out below.

**(5) Procedural history**

17. Alongside the CPCF, the PCR filed the first Expert Report of Mr Harman and the First Witness Statement of Ms Shotbolt.

18. Following the issuing of the claim, a case management conference ("CMC") took place on 13 May 2025. At the CMC, the Tribunal gave directions to the hearing of the CPO Application: see order dated 13 May 2025 (as amended by order dated 1 July 2025).

19. Valve filed its Response to the CPO Application on 3 July 2025. The Response was supported by: (i) the Expert Report of Dr Adrian Majumdar; (ii) the First Witness Statement of Mr Erik Peterson, an employee of Valve; and (iii) the First Witness Statement of Mr Kristian Miller, another employee of Valve.

20. The PCR filed its Reply on 16 September 2025 which was supported by a Second Expert Report of Mr Harman and the First Witness Statement of Mr Adrian Mark Chopin of Bench Walk Advisors Limited ("Bench Walk").

21. On 8 October 2025, the parties filed their respective skeleton arguments in advance of the hearing to consider the CPO Application.

## C. LEGAL FRAMEWORK

22. In order to grant an application for a CPO, the requirements set out in section 47B of the Act and rule 77 of the Tribunal Rules must be fulfilled. The Tribunal must be satisfied that: (i) the PCR can be authorised to act as the class representative in the proceedings pursuant to rule 77(1)(a) (the "Authorisation Condition"); and (ii) the claims are eligible for inclusion in collective proceedings pursuant to rule 77(1)(b) (the "Eligibility Condition").

23. The Authorisation Condition is met if the Tribunal considers that it is "just and reasonable" for the PCR to act as a representative in the proceedings (rule 78(1)(b)). Rule 78(2) of the Tribunal Rules sets out the factors relevant to determining whether it is just and reasonable for the PCR to act as the class representative. These include whether the PCR: (1) would fairly and adequately act in the interests of the class members; (2) does not have a material interest that is in conflict with the interests of the class; and (3) will be able to pay the defendant's recoverable costs if ordered to do so.

24. The Tribunal is required to take into account all of the circumstances when determining whether the PCR would act fairly and adequately in the interests of the class, including the following matters specified in rule 78(3):

> "(a) whether the proposed class representative is a member of the class, and if so, its suitability to manage the proceedings;
>
> (b) if the proposed class representative is not a member of the class, whether it is a preexisting body and the nature and functions of that body;
>
> (c) whether the proposed class representative has prepared a plan for the collective proceedings that satisfactorily includes—

(i) a method for bringing the proceedings on behalf of represented persons and for notifying represented persons of the progress of the proceedings; and

(ii) a procedure for governance and consultation which takes into account the size and nature of the class; and

(iii) any estimate of and details of arrangements as to costs, fees or disbursements which the Tribunal orders that the proposed class representative shall provide."

25. Drawing on this statutory framework, relevant authorities and guidelines, the Tribunal in *Christine Riefa Class Representative Limited v Apple* [2025] CAT 5; [2025] Bus. L.R. 417 ("*Riefa*") at [31] provided the following guidance regarding the Tribunal's consideration of the Authorisation Condition and its scrutiny of a proposed class representative's funding arrangements, an issue which arises in this case:

"(1) The Tribunal may certify a claim only where it considers that it is just and reasonable for the PCR to act as the class representative.

(2) In making that determination, the Tribunal must consider whether the PCR would fairly and adequately act in the interests of the class members.

(3) That includes consideration of the PCR's ability to pay the defendant's recoverable costs, as well as its ability to fund its own costs, such that the proceedings are conducted effectively.

(4) Class actions almost inevitably require third party funding. The interests of the funders are not the same as the interests of potential class members. This gives rise to inherent risks for the fulfilment of the policy objectives of the collective actions regime.

(5) An important protection for potential class members is that the PCR will properly act in the best interests of the class including when agreeing any funding arrangements, and in managing the proceedings going forward including ongoing interactions with funders. That requires the PCR to be sufficiently independent and robust.

(6) In forming its view as to the ability of the PCR to act fairly and adequately in the interests of potential class members the Tribunal will consider all relevant circumstances, including the question of how the PCR has satisfied itself that the funding arrangements reasonably serve and protect those interests.

(7) A further protection is that the terms of any funding agreement should be open to scrutiny, not only by the court but also by the members of the class on whose behalf the claims are brought.

> (8) The Tribunal should nevertheless exercise caution in intervening in relation to the funder's return under the funding arrangements, at the certification stage, bearing in mind the Tribunal's ability to control the return to the funder at the subsequent stage of judgment or settlement. In extreme cases, however, the Tribunal's concerns regarding the funding arrangements may lead to a refusal to certify."

26. As regards the Eligibility Condition, the Tribunal must be satisfied that the requirements in rule 79(1) have been fulfilled, having regard to all the circumstances. Specifically, the Tribunal must be persuaded that the claims: (i) are brought on behalf of an identifiable class; (ii) raise common issues; and (iii) are suitable to be brought in collective proceedings.

27. Rule 79(2) provides:

> "In determining whether the claims are suitable to be brought in collective proceedings for the purposes of paragraph (1)(c), the Tribunal shall take into account all matters it thinks fit, including—
>
> (a) whether collective proceedings are an appropriate means for the fair and efficient resolution of the common issues;
>
> (b) the costs and the benefits of continuing the collective proceedings;
>
> (c) whether any separate proceedings making claims of the same or a similar nature have already been commenced by members of the class;
>
> (d) the size and the nature of the class;
>
> (e) whether it is possible to determine in respect of any person whether that person is or is not a member of the class;
>
> (f) whether the claims are suitable for an aggregate award of damages; and
>
> (g) the availability of alternative dispute resolution and any other means of resolving the dispute, including the availability of redress through voluntary schemes whether approved by the CMA under section 49C of the 1998 Act(a) or otherwise."

28. In assessing commonality and, particularly, suitability for the purposes of rule 79, the Tribunal must be satisfied that the PCR has put forward a methodology that both identifies the issues to be resolved at trial and enables the Tribunal to properly and fairly determine these issues. This is known as the *Pro-Sys Test* (also referred to as the *Microsoft Test*).

29. That test originates from the Canadian Supreme Court decision in *Pro-Sys Consultants Ltd v Microsoft Corpn* [2013] SCC 57, where Rothstein J stated, at [118]:

> "In my view, the expert methodology must be sufficiently credible or plausible to establish some basis in fact for the commonality requirement. This means that the methodology must offer a realistic prospect of establishing loss on a class-wide basis so that, if the overcharge is eventually established at the trial of the common issues, there is a means by which to demonstrate that it is common to the class (ie that passing on has occurred). The methodology cannot be purely theoretical or hypothetical but must be grounded in the facts of the particular case in question. There must be some evidence of the availability of the data to which the methodology is to be applied."

30. The application of the *Pro-Sys Test* when certifying collective proceedings was introduced by the Tribunal in *Walter Hugh Merricks CBE v Mastercard Inc. & Others* [2017] CAT 16; [2017] 7 WLUK 516 and approved by the Supreme Court in that case: [2020] UKSC 51, [2021] 3 All ER 285 ("*Merricks SC*").

31. The approach in applying the *Pro-Sys Test* was considered by the Court of Appeal in *London & South Eastern Railway Ltd v Justin Gutmann* [2022] EWCA Civ 1077; [2022] 7 WLUK 388 ("*Gutmann CA*"). More recently, the Tribunal applied the test in the joint CPO judgment of *Hammond & Stephan v Amazon.com, Inc. & Others* [2025] CAT 42; [2025] Bus. L.R. 2281 ("*Hammond & Stephan*").

32. The following propositions can be drawn from these cases:

(1) The test is about practical justiciability. The Tribunal is to determine whether the methodology is workable at trial and whether it will advance the resolution of the issues: *Gutmann CA* at [60].

(2) The methodology is based upon a counterfactual model of how the market would have operated absent the abuse. It is therefore not a fair criticism to make of a methodology that it is hypothetical. There will need to be "some" factual basis for the assumptions and models deployed, but this requires only a minimum evidentiary basis and is not an onerous condition: *Gutmann CA* at [54] and *Merricks SC* at [41].

(3) It must be recognised that the methodology is formulated prior to disclosure and is therefore necessarily provisional and might properly identify further refinements and work to be carried out after disclosure: *Gutmann CA* at [55].

(4) The Tribunal is entitled to apply intuition and common sense in its assessment of the methodology: *Gutmann CA* at [57].

(5) The methodology is not required to achieve perfection. The Tribunal should bear in mind that it is armed with a broad axe by which it can fill gaps and plug lacunae in the methodology: *Gutmann CA* at [58].

(6) The Tribunal should avoid conducting a mini-trial. The assessment of the proposed methodology at the certification stage has to be made at a higher level to determine whether the method is plausible, coherent and workable, as opposed to purely hypothetical or unclear or impractical: *Merricks SC* at [113] and *Hammond & Stephan* at [79(1)].

33. As emphasised in *Dr Liza Lovdahl Gormsen v Meta Platforms, Inc. & Others* [2024] CAT 11; [2024] 2 WLUK 438 ("*Gormsen*") at [2], in considering whether to make a CPO, the Tribunal must consider whether the requirements of both the Authorisation and Eligibility Conditions are satisfied, irrespective of whether matters are raised by the parties.

34. Furthermore, whilst a CPO application must cover the specific requirements for a CPO as set out in the Tribunal Rules, the Tribunal has an important and ongoing role in ensuring the interests of the class members are protected. Therefore, a Tribunal should have the importance of proper case management in mind both at the CPO hearing and beyond. Likewise, a Tribunal may look at the funding arrangements in more detail at the conclusion of the proceedings whether by way of a settlement or of a judgment. Similarly, a Tribunal may require a methodology to be developed and possibly replaced in appropriate cases if circumstances change, such as following disclosure.

## D. THE AUTHORISATION CONDITION

35. In its Response to the CPO Application, Valve raised various concerns regarding the PCR's funding arrangements.

(1) It was unclear what funds the Funder had to ensure it could meet its obligations under the LFA.

(2) Clause 10.2 of the LFA entitled the Funder to withdraw funding when there was a "Material Adverse Change". This was defined to include when the proceedings would no longer reasonably be expected to earn a commercially viable return for the Funder, Solicitor or Class Representative. Valve queried the definition of "a commercially viable return" and why the Solicitors' or Class Representative's return was relevant.

(3) The Funder or the PCR's solicitors would be able to exert control over the proceedings as the PCR would, under the terms of the LFA, be unable to challenge the reasonableness of the legal advice it received, particularly regarding settlement, without voiding the LFA.

(4) Clause 12.1 of the LFA appeared to allow the Funder to transfer its obligations under the LFA to someone who, for example, is not bound by the Association of Litigation Funders Code of Conduct (the "ALF Code") or is otherwise not a suitable funder.

(5) No indemnity is provided for costs which may be incurred by Valve after the cancellation of the ATE Policy but prior to a costs order being made, and no indemnity is provided for Valve's costs of a detailed assessment of those costs. There were also inconsistencies within the ATE Policy which appeared to increase the risk that the PCR would be unable to satisfy an adverse costs award if ordered to do so.

(6) The Litigation Plan did not make provision for a sufficient number of additional days in court such as additional case management conferences or any appeals.

36. Following correspondence between the parties, the PCR took the following actions in response to these concerns. It:

(1) filed a witness statement from Mr Adrian Mark Chopin of Bench Walk explaining the Funder's source of funds and its creditworthiness;

(2) amended the LFA so that:

(i) a Material Adverse Change may only be triggered in circumstances where the Funder, rather than also the solicitors and the PCR, does not receive a commercially viable return; and

(ii) if the PCR unreasonably fails to follow the advice of the solicitors or counsel, this disagreement would be subject to the dispute resolution procedure within the LFA;

(3) confirmed that the PCR would notify Valve and the Tribunal in writing at least 10 business days in advance of any transfer of the Funder's rights and obligations under the LFA and would use reasonable endeavours to confirm that the new funder would comply with the ALF Code; and

(4) amended the ATE Policy including provisions so that cancellation would take effect after a 30-day notice period and that the policy would cover costs incurred prior to and including the date of cancellation but where the legal obligation to pay these costs only arose after cancellation of the policy.

37. Following these changes, Valve did not pursue the points raised in its Response contesting the fulfilment of the Authorisation Condition. Nevertheless, as explained in paragraphs 33 and 34 above, it is for the Tribunal itself to consider whether the criteria for certification are met.

38. As regards the Authorisation Condition, taking account of the criteria set out in rule 78 and having reviewed all the evidence filed, including the two Witness Statements from Ms Shotbolt, the sole director of the PCR, and the wider evidence submitted on its behalf, the Tribunal has concluded that it is just and reasonable for the PCR to act as the class representative in these collective proceedings.

39. As regards the specific criteria in rule 78(2) by which the just and reasonable test is to be assessed:

(1) in the light of the background and standing of Ms Shotbolt, the sole director of the PCR, the experience of the Advisory Committee, their advisers, including in relation to costs, we consider that the PCR would fairly and adequately act in the interests of class members;

(2) we can detect no material conflict of interest;

(3) the PCR would be able to pay the Defendant's anticipated costs if ordered to do so; and

(4) there is only one applicant and no application for an injunction (so the issues in rule 78(2)(c) and (e) do not arise).

40. More specifically, as regards the criteria specified in rule 78(3) (which we must consider in assessing whether the PCR would act fairly and adequately in the interest of class members), we have reached the following conclusions.

(1) As regards rule 78(3)(a), neither the PCR nor Ms Shotbolt is a member of the class.

(2) As regards rule 78(3)(b), the PCR was formed as a special purpose vehicle to fulfil the class representative role. This is a commonly adopted structure and not, by itself, a reason for refusing certification. The suite of arrangements into which it has entered are also commonly

seen and intended to, and do, enable it to meet the criteria for certification.

(3) As regards rule 78(3)(c), the PCR has: (i) prepared a Litigation Plan, a Notice and Administration Plan (which includes communications with the class members), and a Litigation Budget; (ii) formed an Advisory Panel to support Ms Shotbolt and the PCR itself; and (iii) entered into the funding arrangements and commitments described in paragraph 15 above which were then amended in response to challenges from Valve, as set out above, so that they are now in a reasonably common form and in our view, satisfactory. Our assessment at this initial stage of proceedings is that the rates of return to the Funder are not unreasonable in comparison with rates in other recent such agreements supporting CPO applications that have been granted, although we note that the reasonableness of the funder's return is a matter finally to be determined after any recovery is obtained (see *Alex Neill Class Representative Limited v Sony Interactive Entertainment Europe Limited & Others* [2023] CAT 73; [2023] 11 WLUK 585 at [171] and *Professor Barry Rodger v Alphabet Inc. & Others* [2025] CAT 45; [2025] 8 WLUK 198 at [53]). The PCR has also retained an experienced claims management specialist (Epiq Systems Limited ("Epiq")), a consumer compensation activist and communications organisation to advise and a professional website designer to support communications and the dissemination of information (which will be heavily weighted toward the website and online communications) using search optimisation and other digital techniques to increase awareness and the distribution of information.

(4) In the round, we consider that these arrangements are sufficient to satisfy sub-rules (i)-(iii) of rule 78(3)(c).

41. The Tribunal has identified no other factors outside those set out in rule 78(3) that contradict these conclusions. We note that many of these features remain subject to continuing supervision and control by the Tribunal as the case develops.

42. As regards rule 78(4), at this stage in the proceedings, there is no indication that there are any subclasses.

43. This conclusion on the Authorisation Condition and the application of rule 78 is subject to satisfactory resolution of a number of limited and specific matters on which the Tribunal sought further information or clarification at the hearing: see Sections E(4) and F below. The PCR indicated at the hearing that these would be accommodated.

## E. THE ELIGIBILITY CONDITION

44. In the CPO hearing, Valve opposed the CPO Application on three grounds, all of which relate to the Eligibility Condition, put here in the order in which they were argued before us:

(1) the PCR had not put forward an adequate methodology for determining the effective commission charge, or as Valve referred to it the effective revenue share, received by Valve on sales of Products (the "Effective Commission Charge Issue") which related to the excessive pricing allegation;

(2) the PCR had not put forward an adequate empirical method for determining the effect of the alleged PPOs (the "PPO Issue") which related to a wider abuse allegation; and

(3) the PCR's proposed Class Definition was inadequate as there was no workable methodology whereby PCMs, including a high proportion of minors, can identify themselves as being class members (the "Class Certainty Issue").

45. Rather than the sequence in which these matters were addressed in the CPO Application, we address the Effective Commission Charge Issue (the third allegation of abuse in the CPO Application) first because it was the most fully argued before us. We then address the PPO Issue, because it also relates to methodologies and raises some similar legal issues. Finally, we address the

Class Certainty Issue. We note that the second alleged abuse in the CPO Application relates to the imposition by Valve of restrictions on Steam Partners to the effect that Add-on Content for Games sold through Steam must be purchased from Steam. This has not been the subject of any challenge to the grant of a CPO; but it is relevant to note that the PCR has relied on these restrictions as having exacerbated the effect of: (i) the PPO and (ii) Valve's excessive commission, rather than as an independent and self-standing abuse.

**(1) The Effective Commission Charge Issue**

46. The third abuse alleged by the PCR is that Valve's commission charge amounts to an unfair price which imposes an illegal cost on Steam Partners which is passed on to consumers in higher prices.

47. The PCR intends to apply the classic two-limbed framework set out in Case 27/76 *United Brands v European Commission* [1978] 1 C.M.L.R. 429; [1978] ECR 207 ("*United Brands*") to assess whether the commission is: (i) excessive and (ii) unfair (unfairness can be assessed either in reference to the price itself or when compared to comparators).

48. To establish that Valve's commission has been excessive, Mr Harman proposed to compare Steam's revenues with the full economic costs of its Game and Add-on Content distribution activities. In establishing whether the commission is unfair, Mr Harman proposed to assess the economic value offered by Steam and compare Steam's commission charge with the commission charged by competitors in the relevant and analogous markets. This includes the commission charged by the Epic Game Store, which is 12% and by the Microsoft Store, which since 2021, is also 12%. In comparison, Mr Harman calculated that Steam's average commission charge range is around 27%. We note (with the caveat that Apple have announced their intention to seek the Court of Appeal's permission to appeal) that this approach is consistent with the Tribunal's approach in *Dr Rachael Kent v Apple Inc. & Another* [2025] CAT 67; [2025] 10 WLUK 406, where the comparators adopted included Steam, as well as other PC marketplaces (such as the Microsoft Store).

### *(a) Valve's submissions*

49. Valve challenges Mr Harman's methodology for establishing that Steam's commission charge amounts to an unfair price on the basis that he has failed to consider the effect of Steam Keys. Without a credible plan for taking Steam Keys into account, the PCR cannot establish Steam's actual effective commission charge, and without this, the PCR cannot establish whether the commission charge amounts to an unfair price.

50. Valve provides Steam Keys free to Steam Partners. A Steam Partner can distribute its Steam Keys itself or through other distribution channels. A consumer can then purchase a Steam Key which can be redeemed on the Steam platform (for which Valve charges no commission). Valve submitted that Steam Partners can receive a considerable number of Steam Keys.

51. Accordingly, Valve contended that the PCR cannot properly calculate Valve's effective commission charge because the use of Steam Keys reduces that commission, as a fraction of a Steam Partner's total revenue, because the Steam Partners are receiving other revenue, from the use of the Steam platform, which, in effect, reduces the commission but to an extent that is unknown and unknowable. This is because Valve has no visibility of the price at which Steam Keys are sold or, indeed, the volume that are sold. Valve alleged that Mr Harman has not shown how he would credibly estimate the impact of Steam Keys on Valve's commission.

52. Although Valve admitted that it did hold data on Steam Keys issued and redeemed, it submitted that these were inexact proxies for volume: a significant proportion of Steam Keys issued are not redeemed; redemption figures were not a good proxy as a significant number of Steam Keys are sold in bundles whereby a consumer may purchase a bundle of Steam Keys for different Games without redeeming all the keys (so that a Steam Partner earned sales revenue from a Steam Key that was not used). Valve also submitted that, since Steam Keys do not have an expiry date, there could be Steam Keys sold before the Relevant Period but redeemed during it and, conversely, Steam Keys issued during the

Relevant Period but only sold and redeemed after it, further complicating the analysis in a way that Mr Harman's methodology did not address.

53. As to the price of Steam Keys, Valve submitted that it was not safe to assume that a Steam Key would be sold for the same price as the Game as offered on Steam. Valve submitted that Steam Partners can distribute Steam Keys in different ways, across different retailers, and at prices that change regularly. Both the pricing and the volume of Steam Keys issued and redeemed would vary between Steam Partners. It was therefore not possible to gain an accurate figure for Steam Key revenue at the game or Steam Partner level.

54. Valve submitted that, for collective proceedings, while *Gutmann CA* stands for the proposition that, where an aggregate award of damages is to be made, it is not necessary to prove on a class member by class member basis that the defendant's breach of duty has caused loss to every one of those class members, *Gutmann CA* had not decided that the logically prior question of whether there has been a breach of duty can be decided on an aggregate basis. Still less, Valve submitted, did *Gutmann CA* decide that an aggregate approach could be taken to a question as foundational to an unfair pricing case as the price itself.

55. Mr Kennelly KC submitted that this information gap related to the prices and volume of Steam Keys could not be fixed using the broad axe. In response to Mr Gregory's submissions that in *Justin Le Patourel v BT Group Plc & Others* [2024] CAT 76; [2025] Bus. L.R. 808 ("*Le Patourel*") the Tribunal used averages and estimates when faced with a lack of data, Mr Kennelly KC submitted that the data gaps in *Le Patourel* concerned issues in identifying the relevant comparators and costs rather than the price itself. Mr Kennelly KC submitted that there is no previous excessive pricing case where the impugned price could not be identified with precision, even in aggregate or by average.

56. To demonstrate this, Valve's expert, Dr Majumdar produced two approximations, depending on whether issuance or redemption was used as a proxy for volume, and using the Steam platform price (a simplifying

assumption) which showed that actual commission charges varied over time and in 2018 are materially lower than Mr Harman's estimated commission charge.

57. Valve submitted that the PCR's Reply and Mr Harman's Second Expert Report offered no solution to the issues above. Valve, in particular, disagreed that the required information could be gathered by the PCR as Mr Harman had suggested. First, public information on the price of Steam Keys would not provide a reliable picture on historical prices. Secondly, price comparison sites would not be a feasible means of filling the information gap as they do not generally provide data about prices on a publisher's own website. Furthermore, this information would not identify the price of those Steam Keys that actually were sold. Public information gathered through web-scraping is not necessarily reliable with even the sample cited by Mr Harman containing errors. Likewise, for Steam Keys sold in bundles, it would not be possible to determine the price of individual Steam Keys within such a bundle. In response to Mr Harman's suggestion that information could be gathered using a survey from publishers and/or digital store fronts, Valve responded that such a proposal was not properly explained and would be unlikely to be representative given the variety both of sale channels available and how Steam Partners used Steam Keys. Similarly, Mr Harman gave no consideration to the practicalities of obtaining this information particularly given most of these entities are based outside this jurisdiction. Third, to the suggestion that data aggregators could provide the relevant information, Valve noted that this proposal was again unsubstantiated and something that Mr Harman had earlier dismissed in the context of getting information to determine the relevant markets.

58. Valve also submitted that the PCR had also failed to show a plan to determine which Steam Partners actually paid these allegedly unfair prices. Mr Kennelly KC referred to *Gutmann CA* which stated at [38] that:

> "It is common ground that quantum should be calculated so that an award of damages does not overcompensate. Section 47C(2) does not rewrite the constituents of the tort to remove liability issues; it merely permits those ingredients to be established deploying different - top down - evidence. In determining quantum, the CAT therefore necessarily ensures that it excludes from the calculation those who fail at the liability stage and the methodology

> must, at some point, include a device for winnowing out no-loss members of the class.”.

59. As the PCR had not put forward a credible methodology for establishing which Steam Partners ultimately bore the allegedly unfair commission charge, Valve submitted that the PCR had also failed to provide a plan for “winnowing out” the PCMs who had not actually suffered a loss.

60. Valve denied that these submissions would, if accepted, make it effectively immune to an unfair pricing case, because Steam Partners possess this data and could bring a case against Valve, or the Competition and Markets Authority (“CMA”) could open an investigation.

61. Accordingly, Valve submitted that the PCR failed the *Pro-Sys Test* on the basis that its proposed methodologies were inadequate and did not demonstrate a sufficiently clear route to an effective trial.

***(b) The PCR’s submissions***

62. The PCR submitted that Mr Harman and the PCR’s methodology had expressly acknowledged that Steam Keys would need to be taken into account when calculating the effective commission charge. However, it was only from Valve’s Response and Mr Peterson’s Witness Statement that the PCR learnt that Valve does not earn any commission on Steam Key sales. It was then provided with relevant transaction data, following which Mr Harman had concluded that his methodology was capable of appropriately accounting for Steam Keys.

63. The PCR resisted the notion that it needs accurately to calculate Valve’s effective commission charge at the level of each game or Steam Partner, submitting that this would entail a bottom-up approach to determining both liability and quantum. The PCR submitted that it was claiming aggregate damages on behalf of the Proposed Class. This was allowed for by the Act, with section 47C(2) stating that:

> "The Tribunal may make an award of damages in collective proceedings without undertaking an assessment of the amount of damages recoverable in respect of the claim of each represented person."

64. As to the basis on which aggregate damages are estimated in such claims, the PCR quoted the following observation made in *Merricks SC* at [58]:

> "…the compensatory principle is expressly, and radically, modified. Where aggregate damages are to be awarded, section 47C of the Act removes the ordinary requirement for the separate assessment of each claimant's loss in the plainest terms. Nothing in the provisions of the Act or the Rules in relation to the distribution of a collective award among the class puts it back again. The only requirement, implied because distribution is judicially supervised, is that it should be just, in the sense of being fair and reasonable.".

65. The PCR then submitted that determining whether there has been a breach of statutory duty in an unfair pricing claim through an aggregate approach does not create problems regarding causation, because in collective proceedings claims, causation can also be assessed on an aggregate basis. Relying on *Gutmann CA* [38] and [39], the PCR submitted that any requirement to prove a case separately in respect of each individual class member would make it excessively difficult for these members to vindicate their rights, which would be contrary both to the principle of effectiveness and the purpose of the opt-out collective proceedings regime.

66. Mr Gregory, on behalf of the PCR in the hearing, also referred to *CMA v Flynn Pharma Limited & Others* [2020] EWCA Civ 339; [2020] 4 All E.R. 934 ("*Flynn*") at [97(1)(iii)] to show that there was no single method in which an unfair pricing abuse can be established. The method that should be used to determine whether a price was excessive and unfair would "depend upon the availability of evidence and data" (at [107]). As the PCR was not required to adopt a particular method, it was certainly not required to adopt a practically unworkable one as suggested by Valve.

67. Mr Gregory further submitted that it was common for courts not to have the actual data needed to identify a price or a cost with precision. It was therefore consistent with the broad axe principle that such matters could be estimated and liability thereby established by extrapolating or making assumptions from the

data that was available. Mr Gregory referred to the following passages from *Merricks SC*:

> “50. This unavoidable requirement for quantification in order to do justice is not limited to damages. There are occasions where the court has to quantify or value some right or species of property and does not allow itself to be put off by forensic difficulties, however severe… In none of these cases does the court throw up its hands and bring the proceedings to an end before trial because the necessary evidence is exiguous, difficult to interpret or of questionable reliability.”
>
> […]
>
> 74. The incompleteness of data and the difficulties of interpreting what survives are frequent problems with which the civil courts and tribunals wrestle on a daily basis. The likely cost and burden of disclosure may well require skilled case-management. But neither justifies the denial of practicable access to justice to a litigant or class of litigants who have a triable cause of action, merely because it will make quantification of their loss very difficult and expensive. The present case may well present difficulties of those kinds on a grand scale, but they are difficulties which the CAT is probably uniquely qualified to surmount. It may be that gaps in the data will in some instances be able to be bridged by techniques of extrapolation or interpolation, and that some gaps will be unbridgeable, so that nothing is recovered in relation to particular market sectors or for parts of the Infringement Period. Nonetheless it is a task which the CAT owes a duty to the represented class to carry out, as best it can with the evidence that eventually proves to be available. Nor can it be ignored that ADR may help, either in relation to narrowing the issues, or towards an overall settlement.”.

68. Mr Gregory cited *Le Patourel* where, due to the different uptake of packages and changes over time, there was a “complex factual background to the analysis of market prices and price changes, under which it is not simple to identify a definitive ‘price per unit’ charged by BT or its rivals for the SFV products in question” (at [126]). When assessing BT’s costs, the Tribunal noted that both parties’ methodologies contained a number of problems. When going about assessing costs, what was needed was not, as the Tribunal put at [902] a “scientific calculation” but a figure based on the totality of evidence which represented the most appropriate outcome.

69. Mr Gregory also noted that *Le Patourel* at [926] indicated that an excess would be significant, under the first limb of the United Brands test, if it was 20% or more above the competitive benchmark. Applying that to this case, using an

illustrative and conveniently round example, if the Tribunal concluded that the relevant competitive benchmark was a 10% commission charge and, due to the uncertainties surrounding Steam Keys, it was only possible to estimate Valve's effective commission charge as being somewhere in the range of 20 to 25%, even without being able to precisely set the effective commission charge, the Tribunal could still be confident that the price was excessive compared to the benchmark.

70. Regarding gaps in the available data, for example in relation to the volume of Steam Keys, either issuance, redemption or an adjustment applied to one of these figures could be used to assess the effect of Steam Keys, with the most appropriate approach being a matter for trial.

71. In relation to the timing of sales, the PCR noted that due to the length of the Relevant Period, Valve's own expert admitted that there is no material timing issue. Further, the PCR submitted that using the data Valve had disclosed, it should be possible to use reasonably robust assumptions on how quickly Steam Keys were redeemed.

72. As to the price at which Steam Keys are sold, Valve's expert had shown it was possible to calculate an effective commission charge based on an assumption that Steam Keys were sold at the same price as the respective Product is sold on Steam, with such an assumption being consistent with the alleged PPOs. Mr Harman noted that while it would be possible to proceed with this assumption (which was favourable to Valve), it seemed likely that some Steam Keys were sold at prices below the Steam price. Some information could be gathered to test and, if appropriate, moderate this assumption. Mr Gregory submitted that Valve's criticisms of these data sources were premised on the incorrect basis that it would be necessary to calculate accurately an effective commission charge for individual sales or Steam Partners. In any event, if the PCR was unsuccessful in satisfying the Tribunal as to the appropriateness of these sources of data, the Tribunal would be able to assume, in Valve's favour, that the sales price was the same as that on Steam.

73. Finally, the PCR referred to *Mark McLaren Class Representative Limited v MOL (Europe Africa) & Others* [2022] EWCA Civ 1701; [2023] Bus. L.R. 318 at [41] to [48] that if a proposed class representative establishes a *prima facie* case, but there are some remaining uncertainties about the availability of data, the appropriate course is for the Tribunal to address these issues through its ongoing case management powers, rather than by refusing certification. This case management could include ordering specific disclosure from Valve which would, according to the PCR, allow Mr Harman to identify the most suitable methodology to account for Steam Keys and determine whether Valve held any internal assessment as to the effect of issuing Steam Keys.

***(c) The Tribunal's analysis***

74. The law on abuse through excessive pricing has been developing since the seminal case of *United Brands*, not least in the consideration by this Tribunal and the Court of Appeal in *Flynn* and subsequent cases. For the purpose of this CPO Application, it suffices to set out that a case for breach can, amongst other methods, be made out if *United Brands'* Limb 1 (excessive pricing) and Limb 2 (unfairness) are satisfied with Limb 2 having two possibilities (unfair by reference to comparators or unfair in itself). There is a considerable margin of appreciation given to a competition authority or a claimant as to how they satisfy that test and there is no single methodology that is required to satisfy either limb.

75. The *Pro-Sys Test* is considered above at paragraph 28 (et seq). This does not require the Tribunal, at the certification stage, to conduct a "mini-trial" or to have the actual evidence before it to be able to validate that a specific analysis can be done. Rather, what is required, in essence, is for the Tribunal to conclude that there is a sufficiently well considered and feasible: (i) theory as to how a case can be proved; and (ii) route to producing the evidence required so that a trial can be expected to be effective in fairly determining the issues the case raises.

76. Although Mr Kennelly KC did not accept that the PCR satisfied Limb 1 either, the essence of Valve's challenge is that the PCR's case is predicated on applying

the "unfairness limb", to the differential between the commission taken by Valve for sales on Steam and comparators in similar markets. Valve's point is that the existence of Steam Keys, with uncertainties around the revenue that they raise, prevents that comparison being done to a sufficient degree of precision with the consequence that there cannot be a proper evaluation of whether any differential is abusive.

77. This is because the commission notionally charged by Valve needs to be reduced to take account of the free issuance by Valve of Steam Keys to Steam Partners. The difficulty is that although Valve knows the number of Steam Keys issued to Steam Partners (because Valve is the issuer) and the number of those issued that are redeemed (because they are redeemed through the Steam platform), the number of Steam Keys sold and the price at which they are sold is not information that is (or can, practically, be) available to the PCR, (and Valve does not have it) and the volumes to which those prices are to be applied to generate the total Steam Key revenue are inherently uncertain. This means that the true share of the revenue from the distribution of a game on Steam that is taken by Valve cannot be calculated because, although Valve's direct take is clear, there is an unresolvable uncertainty as to the total revenue generated, and hence the fraction that Valve retains, because the Steam Key element is unknown and unknowable. Accordingly, Valve argued: (i) it is not possible to determine whether Valve's commission was abusive and (ii) it would not be possible to calculate any damages due if it were.

78. To support this, Valve relies on the diverse nature of the Steam Key distribution arrangements, including that Steam Keys can be sold as part of a bundled package with other Games making it even more difficult to calculate the Steam Key associated revenue and the variable pricing strategies deployed.

79. We accept that there are non-trivial evidential issues for the PCR to resolve in relation to accounting for Steam Keys. However, we do not consider that the application for a CPO fails on this ground. We have concluded that the PCR has done enough for present purposes to demonstrate an understanding of the legal test that is required to be met, the theoretical approach to meeting that test

and a variety of possible routes by which sufficient evidence can be obtained to properly apply the relevant test. Our reasons for this conclusion are as follows.

80. Steam Keys (i) issued and (ii) redeemed represent respectively [✂] and [✂] of sales of Products world-wide and [✂] (based on those redeemed) in the UK across, roughly, the Class Period. The effect of Steam Keys is therefore limited.

81. In practice, the relative impact of this issue and the uncertainty that it creates, is likely to be reduced by the following factors which operate to reduce the (calculation distorting) revenue that Steam Partners receive from Steam Keys.

(1) Despite the PPOs (considered below), there are suggestions that Steam Keys were sold at a discount to the Steam price (it is difficult to see how they could be sold at a premium on a sustained basis).

(2) In many of the distribution channels, the distributor will also take a fee (the equivalent of the Valve Commission).

(3) It is rather more likely that the number of Steam Keys sold is closer to the (smaller) number redeemed than those issued; it is not likely that there are widespread and material payments for Steam Keys that are not used (redeemed).

(4) We understand that Steam Keys may be bundled with packages of other Products and not redeemed (because the purchaser was primarily interested in other Products in the package and never bothered to redeem the Steam Key); but it is not credible that a party bundling Products would have been paying the Steam Partner a price close to the Steam price for only one element of a bundled package that it recognised consumers might not want.

82. Further, the CPCF, the evidence of Mr Harman and the submissions at the hearing made it clear the PCR proposes to demonstrate that Limb 1 of the United Brands test (that the pricing is excessive) is satisfied by using a cost plus analysis (of Valve's total costs in operating the Steam platform, including its

cost of capital) compared with revenue Steam generates to demonstrate that the pricing is excessive. This critical initial calculation is independent of the Steam Key issue.

83. The Steam Key issue could be relevant to Limb 2 (unfairness). However, that Limb has two variants (unfair by reference to "comparators" and unfair "in itself"). The PCR would only need to succeed on one variant. The Steam Key issue is clearly relevant to the "comparator" test, and might, depending on how matters developed at trial, be relevant to the "in itself" test. However, for the reasons set out above, the Steam Key issue only distorts the calculation of commissions; it does not render it impossible. The PCR may be able to establish unfairness using reasonable assumptions, or, particularly, assumptions favourable to Valve as discussed below. More generally, the unfairness assessment is inherently a judgement taken in the round rather than one subject to a precise numerical assessment. There are, therefore, limits to the weight that can be given to the challenges, however valid analytically, that are predicated on a degree of precision that is not presently required in the wider assessment that the Tribunal has to make.

84. It would have assisted us had Mr Harman been more specific in his evidence as to what relevant market evidence would be obtained and how, Valve having fairly raised questions as to the amount and quality of data that would be available. However, the pricing of Products on Steam, the volumes of Steam Keys issued and redeemed are hard numbers that should be available from Valve. Moreover, evidence, to some degree, should be available from a variety of sources, including web-scraping and other aggregated sources of information, Valve's own internal assessments of how Steam Partners were, in fact, using the Steam Keys that Valve issued to them (a topic about which Valve would have views because it was taking individual commercial decisions on what number of Steam Keys to issue to which Steam Partners) and, possibly, experts on the distribution of Products through Steam Keys and, also possibly, some third party information. This should enable, with the benefit of reasonable and prudent assumptions, a sufficient estimate to be made of the, likely relatively limited, impact of Steam Keys on Valve's share of the income that a Steam

Partner receives from the distribution of a Product for the purpose of applying the rather general assessments required by Limb 2 of the *United Brands* test.

85. This conclusion is supported by the submission made on behalf of the PCR at the hearing to the effect that the PCR was content for the impact of the Steam Key issue to be assessed at trial with the benefit of any reasonable doubt being given to Valve on such issues – i.e. the PCR's position would be that Valve's commission charge was abusive even with the maximum reasonable reductions in the net commission resulting from the uncertainties in any assumptions on Steam Key revenues. We note, however, that this submission is, in effect, broadly consistent with the burden of proof that the PCR inevitably carries.

86. As Mr Gregory submitted at the hearing:

> "… even if it was only possible to estimate effective commission rates in a range, it is still plainly possible that it would demonstrate that Valve's rate is excessive, even based on the lower end of the range."

87. We were not persuaded by Valve's attempt to position the Steam Keys issue by reference to individual Steam Partners (or Games). That would render any such abusive pricing claim next to impossible to bring. Moreover, as is clear from the authorities, there is no single way to establish such an abuse. If the PCR wishes to try to prove a case of abusive pricing on a top down, in the round, basis, as regards liability and loss, it is entitled to do so. The Tribunal does not consider that this case falls outside of the scope of *Gutmann CA* on these issues, nor that there could not be appropriate prospects for the "winnowing out" of any non-qualifying claims if necessary in due course.

88. Valve raised a further issue in relation to Steam Keys: that Steam Keys do not have an expiry date and, hence some redeemed in the Relevant Period would have been sold before hand; and some sold in the Relevant Period would not feature in redemptions until after the end of the Relevant Period. This, it was submitted, further rendered the calculation of the true Valve commission rate impossible. Dr Majumdar identified one example where the apparent explanation for a perverse calculation of Valve's commission level was this timing effect.

89. Whilst there is a valid analytical issue in relation to this timing point, Dr Majumdar was reluctant to give it much weight particularly over a data period as long as six years (as is the case here). The purpose of the CPO hearing, applying the *Pro-Sys Test*, is not to establish the detailed methodology for resolving each challenge to the PCR's case. No persuasive evidence was submitted to us that this potential effect was sufficiently large in the round that, by making prudent assumptions, this feature could not reasonably be taken into account at trial, particularly for the purpose of the Limb 2 test which, as discussed above, has inherent limits as to the mathematical precision with which it can be applied. This is particularly so given that this timing effect is an adjustment to the size of something which is itself an adjustment (the impact of Steam Keys). Furthermore, one would expect that, to an extent, those Steam Keys issued during the Relevant Period but redeemed afterwards would tend to compensate those issued before but redeemed during the Relevant Period. We consider that this is something that can be addressed by reasonable assumptions based on the data that is available and, on this basis, is not a factor that is likely to be determinative in applying the Limb 2 test.

90. Accordingly, whilst the Tribunal accepts that it is a slightly unusual feature of this case that this issue could result in uncertainty in the price alleged to be unfair rather than the prices of comparators, and that the PCR will have an evidential burden to discharge at trial, it considers that the *Pro-Sys Test* is met and that the collective proceedings can be effectively tried as regards this issue.

91. Insofar as the Steam Keys issue impacts on the calculation of damages, if the claim is successful, the Tribunal sees no reason why the "broad axe principle" should not be available to assist in what will clearly, in any event, be an aggregated damages assessment.

**(2) The PPO Issue**

92. The first abuse alleged in the CPCF is that Valve has entered into the PPOs. By virtue of the PPOs, Steam Partners are allegedly prevented from selling Products: (i) through other distribution channels more cheaply, or earlier, than

on Steam; or (ii) in a differentiated form. The PCR alleges that the PPOs are likely to cause and have in fact caused a restriction of competition. For this, the PCR relied on the Expert Reports of Mr Harman. Under the heading of "Approach to Assessing the PPOs" Mr Harman's First Expert Report stated the following:

> "7.4.29 In the merits phase, subject to the claim being certified, to assess the effects of the PPOs on competition and consumers, I will need evidence on the precise nature and scope of the PPOs in force throughout the Relevant Period.
>
> 7.4.30 **First**, I will assess the terms of the PPOs by reference to documentary evidence, such as: (i) contracts or agreements between Valve and game developers/publishers that include PPO clauses, particularly those affecting multichannel games; and (ii) correspondence or other documents in which Valve explains to publishers (or other parties), the interpretation and application of the relevant contractual terms which give effect to the PPOs.
>
> 7.4.31 **Second**, I will review evidence on the implementation and enforcement of the PPOs, which may include: (i) correspondence between Valve and publishers relating to the enforcement of the PPOs, the intention to enforce the PPOs, or the consequences of failing to comply with the PPOs; and (ii) documents produced by Valve that monitor compliance with the PPOs.
>
> 7.4.32 **Third**, I will assess the likely effects of the PPOs on prices and other outcomes in the Relevant Markets. Given that Steam is likely to have been dominant in the Relevant Markets throughout the Relevant Period, and the PPOs appear to have been in force throughout the Relevant Period, there may be limited direct evidence on outcomes absent the PPOs. In Section 8, I set out in more detail my approach to assessing market outcomes for the purpose of assessing aggregate damages. In summary, my approach comprises:
>
> (I) performing a further literature review to assess the empirical effects of removing PPO-like clauses in other markets;
>
> (II) assessing the effects of the PPOs on the prices of Steam Only Products and Multichannel Products (e.g., the likely commission rates that may have prevailed absent the PPOs and the likely rate of pass-on of any lower commission rates; and
>
> (III) assessing the indirect effects of the PPOs on the prices of other Products, including Products not sold on Steam and Valve's own games. I will review the role of benchmarking in the market to set and update prices.
>
> (IV) information prepared by Valve in the normal course of business showing: (i) Valve's view on showrooming; (ii) planned investments to innovate and to improve the platform; and (iii)

> discussion of the likely costs and actual costs of undertaking these innovations."

93. When quantifying the loss caused by the PPOs, the PCR stated that the premise would be that, in the counterfactual without the PPOs, economic theory suggests that incentives and competitive forces would increase competition in the market and push prices, and Valve's commission, down. In calculating the counterfactual commission charge, Mr Harman explained that his methodology for calculating this charge will overlap heavily with his excessive pricing methodology. For the indirect effect of the PPOs on Products not also sold on Steam (and hence not subject to the PPOs) or Valve's own Products, Mr Harman would gather evidence regarding the level of substitution between Products. This could come from Valve, including Valve's internal analysis and its communication with publishers, from academic studies on the video game market and from an industry expert.

### *(a) Valve's submissions*

94. Valve criticised Mr Harman's methodology for assessing the effect of the alleged PPOs on the grounds that it was based on: (i) economic theory; (ii) the effects of PPOs in other markets according to a literature review; and did not provide a proper basis for a likely counterfactual commission rate.

95. Valve submitted this was insufficient for the *Pro-Sys Test* (as discussed above) as Mr Harman had not set out a methodology for empirically assessing the effect of the alleged PPOs.

96. Valve submitted that reliance on economic theory alone could not sustain a breach of competition law. Mr Kennelly KC referred to *BGL (Holdings) Limited v Competition and Markets Authority* [2022] CAT 36; [2022] 8 WLUK 71 ("*BGL*"). In *BGL*, the Tribunal found that the CMA had failed to show the relevant 'most favoured nation clauses' restricted competition and criticised the CMA's analysis in attempting to show anti-competitive effects. The Tribunal stated that:

> "224(2). A great deal of the analysis operates at the level of theory or (less helpfully) bare assertion. Thus, Decision/§9.8 states:
>
> > "The CMA finds that during the Relevant Period, by preventing the relevant providers from offering lower prices on [Compare The Market's] rival [price comparison websites], [Compare The Market's] network of [wMFNs] restricted the ability of and reduced the incentives on providers subject to [Compare The Market's] [wMFNs] to compete on price by differentiating their prices across [price comparison websites]…"
>
> With great respect, statements like this are not only once again repetitive of the findings in Section 7, but also either bare assertion or statements operating at the level of theory. This is not, as we have discussed, a "by object" infringement case – and rightly so.
>
> […]
>
> 243. Conversely, however, the mere fact that these clauses were effective – in the sense that they were complied with – is not sufficient to demonstrate an anti-competitive effect. The CMA must show – and the burden is on it – that there was such an effect…"
>
> (Emphasis in the original)

97. Valve submitted that it was not sufficient to show a particular PPO was in force or that it was complied with. Rather, the PCR had to show prices would actually have fallen if the relevant clauses had been removed.

98. Valve further submitted that Mr Harman's reliance on economic theory and the absence of a robust empirical methodology for establishing the effects of the alleged PPOs was all the more acute in circumstances where: (i) there is no consensus that all PPOs inevitably produce harmful effects, as pointed out by Dr Majumdar; and (ii) on the PCR's own case, the PPOs are not universally enforced.

99. Valve contended that Mr Harman's proposal to undertake a comparison with other markets where PPOs have been banned or restricted was inadequate. The other markets referred to by Mr Harman included digital comparison tools, online travel agencies, goods sold on Amazon, and e-books. Valve submitted that these comparisons as to the effect of PPOs would be valid only to the extent that the markets were relevantly similar. Valve submitted that these markets were similar to Steam only at the entirely superficial level of being online platforms operating in two-sided markets. They were not similar in respect of:

(i) the services they provide; (ii) their demand characteristics; and/or (iii) their costs. That the empirical evidence gathered from such other markets was, in any event, mixed, only underlined the need for a robust empirical assessment of effects in the market relevant to these proceedings. While Mr Harman's Second Expert Report stated that these comparisons would be used just as a "cross check", this left the question of what the cross-check was checking in the first place.

100. On Valve's submissions, this left Mr Harman's estimation of the counterfactual commission charge as the only means advanced of conducting an empirical assessment of the effect of the PPOs. However, this would assume what would need to be shown: that the alleged PPOs do in fact have an impact on Valve's commission charge, and that removing them would produce a lower commission charge in the counterfactual. In any event, Mr Harman's methodology for establishing the effective commission charge was also flawed due to the Steam Key issue discussed above.

101. Finally, the PCR had not explained how disclosure would solve this problem. Although the PCR stated that it would seek disclosure as to the terms and enforcement of the PPOs, referring to *BGL*, evidence as to the compliance with the PPOs would not show what would happen if the PPOs were lifted. It was perfectly possible, Mr Kennelly KC submitted, that even if the PPOs were lifted, assuming they existed, that publishers would not react as Mr Harman predicted. As the PCR had offered no methodology as to how it would explore that question, the PCR had failed to satisfy the *Pro-Sys Test.*

***(b) The PCR's submissions***

102. The PCR submitted that Valve's challenges were based on a misunderstanding of Mr Harman's methodology. In assessing the effects of the PPOs, Mr Harman provisionally planned to take into account, among other things: (i) evidence about the terms of the Valve PPOs and how they are enforced; (ii) likely direct and indirect effects; (iii) the level of cost-reflective commission rates; (iv) considerations of economic theory, including the likely incentives of different

parties; (v) factual evidence relating to how prices are set in the market (e.g. the extent to which benchmarking is used); (vi) Valve's disclosure, as well as empirical market data and industry expert input; (vii) the impacts of PPOs in comparator markets; and (viii) likely pass-on rates (themselves assessed through a combination of economic theory and empirical analysis).

103. This approach, the PCR submitted, comfortably satisfies the low bar of the *Pro-Sys Test* not least when one has regard to two key obstacles that Mr Harman faces, especially at this stage.

104. First, there is likely to be limited direct evidence on what the market position would have been absent the PPOs if Valve were dominant throughout the Relevant Period and had imposed the PPOs to suppress competition. As a result, there is no choice but to rely more heavily on the predictions of (entirely orthodox) economic theory when assessing the effects of the PPOs.

105. Second, Mr Harman's methodology has been developed in the absence of any disclosure from Valve (or relevant third parties) about the terms and enforcement of the PPOs. The PCR submitted that the terms of the PPOs and the way they have been enforced will, obviously, be the starting point for any analysis of their effects. As to disclosure requests, Mr Harman's First Expert Report had set out the evidence the PCR would request, including the terms of the PPOs, Valve's internal assessments of the effects of the PPOs, and Valve's enforcement of the PPOs. In the hearing, Mr Gregory also referred to the CPCF, which noted evidence disclosed in similar US proceedings against Valve where Valve had threatened to delist publishers if they did not increase their prices on other distribution channels.

106. Mr Gregory also noted that Mr Harman had already analysed the pricing patterns of 37 Games which found empirical evidence that the PPOs were affecting prices, and showed pricing consistency across platforms for most titles with sales exceeding 100,000 units. To the extent that the analysis was to show some variation on the impact on prices across Games, this would actually

evidence the effect of the PPOs as the different pricing patterns could be explained by the extent to which the PPOs were actively enforced.

107. In response to Valve's criticisms regarding Mr Harman's reliance on comparator markets, the PCR stated that Mr Harman had not proceeded on a simple assumption that PPOs in different markets are directly comparable. Mr Harman's Second Expert Report had given further clarification that, in principle, it is necessary to consider differences in market features when comparing the effects of PPOs across different markets. However, the PCR submitted that Mr Harman's approach in using comparators was entirely orthodox in competition law and to the extent Dr Majumdar disagreed with Mr Harman's choice of comparators, this would be a matter for trial rather than certification.

108. Mr Gregory further submitted that if the PCR established that the PPOs had some effect on prices, then the Tribunal would be in "broad axe territory" for assessing the level of prices in the counterfactual for the purposes of aggregate damages. Within this analysis, the PCR accepted that Mr Harman would be relying on economic theory more heavily than in other cases for the reasons given above. However, such an approach is common in competition law proceedings as discussed in the European Commission's *Practical Guide: Quantifying Harm in Actions for Damages Based on Breaches of Article 101 or 102 of the Treaty on the Functioning of the European Union* at [16] and [17], as referred to and endorsed in *Merricks SC* at [52].

***(c) The Tribunal's analysis***

109. The PPOs alleged by the PCR are of a wide nature, affecting not only direct sales by Steam Partners themselves but also sales through non-Steam distribution channels.

110. Such wide PPOs, if operated by a dominant undertaking, are widely accepted in competition law as likely to have adverse competition effects (although the size of those effects will depend on the specific circumstances). This is seen in the

treatment of such clauses in the European Commission's Vertical Block Exemption Regulation (EU) 2022/270 and in the Competition Act 1998 (Vertical Agreements Block Exemption) Order 2022 in the UK.

111. It is against this background that Valve's submission that the *Pro-Sys Test* is not met in relation to the PPO allegations needs to be considered. Valve is over simplifying the PCR's case in its attack on the CPCF when it asserts that "a claim for breach of competition law cannot be proven by reference to economic theory alone". That is not what the PCR seeks to do. However, wide clauses of this nature are recognised by competition law to raise competition issues; it is not simply a matter of abstract (or novel) economic theory. Moreover, in this case, Mr Harman does not seek to rely only on theory but also on evidence.

112. Valve placed some reliance on the *BGL* (Compare the Market) case. Although an important case, the circumstances were a little different there. The case was on the basis that: whatever the market power of Compare the Market, it was a Chapter I (effects) assessment; it was an appeal of a CMA Decision, the CMA having based its assessment very heavily on economic theory and evidence described as anecdotal (and seemingly exonerating in some cases); the CMA did not take into account evidence that Compare the Market's wide MFN clauses had not affected commissions in fact; and the CMA did not present a case that Compare the Market was able to test (because it was too based on theory). Although a useful reference point, it is therefore not directly comparable with this case where there would be a rather different factual matrix, adversarial procedure and specific process for testing the evidential material against the background of economic theory and competition law expectations in the context of an (alleged) dominant party.

113. Valve's argument that the PPOs are not (perhaps effectively) enforced and therefore did not constitute an abuse (and the resulting inherent tension with the PCR's case on the price of Steam Keys) is clearly rather one for trial, and not for certification where the issue that is being considered is, rather, the *Pro-Sys* criterion of a workable methodology and availability of evidence to enable a fair trial.

114. Although raised as a criticism by Dr Majumdar (on instructions), in effect, it is common ground between Valve and the PCR that PPO effects in other markets are only relevant to the extent that there are sufficient similarities in the market concerned. Mr Harman's position is that these markets would be used as a cross-check on the estimates of the effect that he proposed, rather than simply reading across effects in one market as a basis for effects in another. This would only be one part of the evidential picture and does not seem an unreasonable approach. Indeed, if Mr Harman's assessment of the impact of the PPOs were to be wildly higher than the impact on other markets, it is likely that Valve would refer to that comparison when criticising his conclusion.

115. Valve is correct in its challenge that the PCR cannot simply calculate, on a cost-plus basis, what a cost reflective counterfactual commission charge would be and assume that the difference between that and the actual rate is a result of the PPOs. It will be necessary to demonstrate a sufficient causal link through a range of evidence consistent with accepted economic theories. However, the details of establishing that causation are for trial.

116. Moreover, we note that, although not the subject of comment by Dr Majumdar, in Section 6 and Appendix G of Mr Harman's First Expert Report, Mr Harman presents an illustrative analysis of the pricing and timing of price moves on some 37 Games to support an empirical assessment that PPOs are having an impact on competition. Disclosure might enable the PCR to tie the correlation in price moves on different platforms to Valve's PPOs or their operation. We make no evaluation of the cogency of that evidence (including whether it is, rather, reflective of an efficient market) nor of whether it would help in establishing the counterfactual PPO-free price. Rather the point is that Mr Harman is actually proposing to produce empirical evidence, to be tested at trial, in support of the PCR's case and not simply to rely on theory.

117. Valve also raises, in essence, the Steam Key data argument discussed above to challenge Mr Harman's proposed approach to calculating the PPO-free counterfactual. We have considered that argument already. For similar reasons, we consider, for certification purposes, that it is sufficiently likely that, with

reasonable approximations, based on the data that is available, it will be possible to obtain a sufficiently good assessment of prices in the counterfactual for an effective trial to take place. That remains a burden of proof that the PCR will need to discharge at trial.

118. We do not underestimate the challenge of demonstrating, at trial, that the PPOs had an effect on the competitive structure of the market such as to constitute an abuse of a dominant position or of attributing a price impact to that effect, even with a broad axe, to estimate the damages due. However, we are at the certification stage. Wide PPOs of this nature are treated by competition law generally as raising issues of considerable competition concern when adopted by dominant undertakings. Whilst more detail would always be welcome at a certification stage, we do not consider that the PCR has failed to meet the *Pro-Sys Test*. It has identified the legal approach that it would take to establishing an abuse, the elements of the arguments that it intends to develop and the sources of evidence for those arguments (which one would reasonably expect to be available); the approach does not simply rely on nebulous economic theory but rather on a mixture of evidence to support and evaluate a harm that competition law conventionally considers to occur. In particular, Mr Harman has undertaken some preliminary analysis on some 37 Games which, in his opinion, suggests that there is some empirical support for prices being affected as a consequence of the PPOs. If substantiated at trial, this would be precisely the kind of detailed and specific evidence that would support the claim.

119. As mentioned in paragraph 45, Valve does not object to certification in relation to the second head of challenge (tying/steering clauses, though as noted above, this appears to us to be relied on by the PCR as exacerbating the other abuses rather than as an independent or self-standing abuse). We have concluded that certification should be granted to the third head, excessive pricing in relation to commissions. In practice, at trial, we can anticipate that the impact of the PPOs on the price of Products and whether they were part of the commercial structure that supported the alleged excessive commissions will almost certainly arise in the consideration of heads 2 and 3. We are, therefore, concerned, that to allow the case to proceed on heads 2 and 3, but not head 1, would, in practice lead to

very considerable practical difficulties which would not be in the interest of an effective and fair trial (the prospects of which are at the heart of the *Pro-Sys* Test).

120. For the above reasons, we conclude that the *Pro-Sys Test* is met and that the collective proceedings can be effectively tried as regards the PPO Issue.

### (3) Class identification

121. Rule 79(1)(a) provides that the Tribunal may certify claims as eligible for inclusion in collective proceedings provided it is satisfied that such claims "are brought on behalf of an identifiable class of persons", having regard to all the circumstances.

122. Rule 79(2) provides, so far as is relevant to class identification:

> "In determining whether the claims are suitable to be brought in collective proceedings for the purposes of paragraph (1)(c), the Tribunal shall take into account all matters it thinks fit, including—
>
> [...]
>
> (e) whether it is possible to determine in respect of any person whether that person is or is not a member of the class...".

123. The Tribunal considered the interplay of rules 79(1)(a) and 79(2)(e) in its judgment in *Commercial and Interregional Card Claims I Limited v Mastercard Incorporated* [2023] CAT 38; [2023] Bus. L.R. 1218 ("*CICC I*"), at [62]:

> "We make the following observations about the interplay of rules 79(1)(a) and 79(2)(e):
>
> (1) In our view, these rules, while overlapping, perform distinct functions. As is clear from *Merricks SC* (by analogy with the test for common issues), *Trucks CPO* and *FX*, rule 79(1)(a) is a hurdle to bringing a collective action, while rule 79(2)(e) is a factor to consider among other factors when considering suitability.
>
> (2) Rule 79(1)(a) asks whether an objective and clear class definition has been proposed (see *Trucks CPO* at [188]). It is about the design of the proposed class definition and whether, on its face, it is capable of sensibly identifying a class. This underpins important features of the collective proceedings regime, such as the assessment of common

issues and the ability to identify those who are bound by the result of those proceedings.

(3) While rule 79(1)(a) is identified as a hurdle, we note the importance, as summarised in *Le Patourel CA* at [29], of collective actions facilitating access to justice. It should not easily be assumed that the existence of a hurdle, in the form of rule 79(1) generally, requires an overly prescriptive approach. There may well be some ambiguity or uncertainty permitted in a class definition and reasonable assumptions based on common sense might be required. In doing so, the Tribunal is required to "have regard to all the circumstances".

(4) Rule 79(2)(e) is dealing with the mechanics of a particular person verifying whether or not they are included in the class. That is a question of methodology and seems important in relation to issues such as registration of class members and the distribution of any award of damages.

(5) Rule 79(2)(e) is one of a number of factors relating to suitability under rule 79(2) (in order to meet the requirement in rule 79(1)(c)). Each factor is to be weighed along with the others and an overall judgment reached about suitability (see *Merricks SC* at [61] and [62]).

(6) Despite having distinct functions, rules 79(1)(a) and 79(2)(e) are inherently linked. A poor class definition will make it more difficult to reach a reasonably evidenced conclusion about class membership of a person, while a well-thought-out one will likely lead to ease of verification of a person's membership of the class."

124. In *Commercial and Interregional Card Claims I Limited v Mastercard Incorporated* [2024] CAT 39; [2024] 6 WLUK 181 ("*CICC 2*") the Tribunal further stated at [72]:

> "When one comes to consider rule 79(2), the question becomes much more about practicality, and the Tribunal will exercise its judgment in broad terms at the CPO stage, provided it is satisfied that there is going to be a workable methodology (or, possibly, methodologies) which will allow the mechanics of registration, distribution and the like to be given effect. That requires, in practice, at least a credible suggestion about how merchants might be able to identify themselves."

***(a) Valve's submissions***

125. The PCR's Class Definition (as at the hearing) is set out at paragraph 12 above. The Class Definition includes both purchasers on Steam itself and purchasers of Games and Add-on Content through other channels. Valve alleged that the PCR's original proposals as to how PCMs could identify themselves relied heavily on disclosure of "transaction data" from Valve with a view to

minimising the burden on PCMs. Following confirmation from Valve that it does not hold data on purchases made through channels other than its own, Valve alleged that the PCR pivoted to relying primarily or exclusively on PCMs identifying themselves through their own records, such as bank statements or emails.

126. Valve considered that the PCR's proposals remained inadequate considering the PCR stated that the PCMs include a "high number of minors". Such minors will be class members where they are account holders even though they may use a parent or guardian's card for purchases. These PCMs are unlikely to hold the key financial records and, as minors, are unlikely to have had effective document retention for emails and the like. Account transaction histories are themselves unlikely to provide the answer because little or no personal information is required to set up accounts (on Steam at least) such that accounts cannot be obviously linked to natural persons.

127. Valve submitted that the PCR's failure to provide a workable methodology whereby PCMs, including a high proportion of minors, can identify themselves is a factor weighing against certification of the proceedings absent any more realistic proposals by the PCR, pursuant to rule 79(2)(e).

***(b) The PCR's submissions***

128. The PCR submitted that it has never relied on Valve's data for the purposes of determining class membership and distributing damages. The CPCF, Litigation Plan, and Notice and Administration Plan indicated that (i) other methods of proof would need to be relied on in respect of non-Steam purchases, and (ii) for Steam purchases, it may not be necessary to rely on Valve data at all. In particular, PCMs will be able to provide their own proof of purchases (e.g. account records, bank statements or email receipts). This approach is in line with other collective proceedings: see *Consumers' Association v Qualcomm Incorporated* [2022] CAT 20; [2022] 5 WLUK 318, at [107]. The PCR stated it rightly raised the possibility that the Valve data might be used to validate claims, to reduce the administrative burden on the class members and increase the

likelihood of take-up. However, this has always been proposed as an alternative approach and the claim was not dependent on it.

129. The PCR submitted, that in any event, the point is premature as there is no need for any proof of class membership at the stage where people seek to opt-out of the class. These matters are appropriately left until the distribution stage later in the proceedings, given that the amount of aggregate damages would be known, members of the class may wish to be heard at this point, relevant information may have come to light in the course of disclosure, and the Tribunal would be able to consider the effectiveness of approaches to distribution in other collective claims. It is not appropriate to take final decisions on these matters now: see *Merricks SC* at [77].

***(c) Tribunal's analysis***

130. Valve's third argument relates to a very specific aspect of the Class Definition.

131. Under rule 79(1)(a), before granting a CPO, the Tribunal has to be satisfied that the claims are brought on behalf of "an identifiable class of persons". Under rule 79(1)(c) the Tribunal needs to be satisfied that the claims are suitable to be brought in collective proceedings. Under rule 79(2), when determining that suitability, the Tribunal has a wide discretion and can take into account "all matters it thinks fit including" (at rule 79(2)(e)) "whether it is possible to determine in respect of any person whether that person is or is not a member of the class". As Valve submitted, rule 79(2)(e) is concerned with the practicality of such matters as registration of PCMs, the organisation of distribution of any damages and whether there can be a viable methodology for the operation of the class.

132. Valve confirmed at the hearing that it was raising no issue as to rule 79(1)(a) and accepted that the class was technically defined clearly enough for that purpose. Its challenge was only as to the Tribunal's exercise of discretion under rule 79(2).

133. Valve submitted that the rule 79(2)(e) criterion is failed and submits that this militates against certification. By the time of the hearing, the remaining concern was that the PCMs are expected by the PCR to contain a high number of minors who may not have the necessary records of transactions to be able to establish class membership, particularly when payments were being made by adults on their behalf (for example on their credit cards) in the circumstances of the market. This, it was submitted, meant that the approach taken by the Tribunal in *CICC 1*, that the methodology had to "*allow the mechanics of registration, distribution and the like to be given effect*.", could not be followed in this case.

134. First, it is worth noting that *CICC 1* involves a subtly different issue. That case concerned the multilateral interchange fee arrangements for Visa and Mastercard with a claim being made, by merchants, for compensation in relation to both commercial card and inter-regional transactions. The relevant problem in that case, was that many (particularly smaller) merchants were not provided with sufficient information by their acquiring banks to ascertain whether they had accepted a transaction the subject of the claim, and therefore fell within the class (and it was not practical for the card companies to provide that data). This was a matter that could not be solved by assumptions, given the differing businesses in the class, creating a fundamental issue, for class identification, of whether membership was technically capable of being established by any workable means. The CPO Application was rejected both under rule 79(1) (the class was not adequately defined) and for the purpose of the discretion under rule 79(2)(e) as to suitability. However, in this case, the question is, rather, one of whether at the time of any distribution of damages, the evidence that would have been available at the time of the alleged cause of action accrued is still available, to the potential class members, to support a distribution of damages (where Valve admits that the Class Definition meets the requirements of rule 79(1)).

135. We do not think that there is anything sufficient in Valve's challenge to this one aspect of the various factors relevant to the discretion that we have to exercise under rule 79(2) to deny a CPO. Proof of class membership and a right to damages will be a matter of evidence. The Litigation Plan proposes a

methodology for establishing a right to damages; it is not dependent on Valve having data about purchases. In essence, if the PCR were successful at trial, if a class member can prove a qualifying purchase using receipts and other records, they would be entitled to damages; and if they could not they would not be able to pursue a claim. This is a matter that can be addressed in more detail after the hearing if the PCR were to succeed.

136. Moreover, the position is strengthened in this respect by a revision to the Class Definition, in the light of issues raised by the Tribunal at the hearing. That revision very substantially diminishes Valve's concerns by tying the class tightly to the party who has suffered the loss, reducing the potential concern of the record keeping of minors. In the light of that development, we have no hesitation in rejecting Valve's challenge in this respect.

**(4) Class Definition**

137. During the hearing, the Tribunal raised the question of whether there might be an issue in that the Class Definition, as then proposed, seemed to include parties who would not have suffered any loss and would not include parties who had suffered a loss (if an overcharge was made out). This would be because the payment for the Product would have been made by a third party not in the class as defined. For example, a minor might be the account holder (and within the definition) but a parent might be the purchasing party, or the person whose credit card was associated with the account, who actually would suffer the loss from any overcharge that was proved (but who was not within the definition). The PCR had submitted, based on the presumption of advancement, that even if the money is provided by the parents, the loss was suffered by the child.

138. Mr Gregory, on behalf of the PCR, recognised the Tribunal's concern and requested permission to respond in writing, which the Tribunal granted.

139. Following an exchange of correspondence between the parties to the stage where Valve raised no further drafting points which we considered were likely to change materially the position at trial, the Class Definition was amended to:

> "All Persons who, during the Class Period, made one or more payments to purchase ("**Purchasers**"): (a) PC Games, and/or (b) Add-on Content for PC Games, including subscription payments for PC Games and/or Add-on Content (collectively "**Relevant Purchases**").
>
> "Persons" are end-consumers, and do not include resellers or other non-retail customers. Persons include, in particular, people who purchase PC Games and/or Add-on Content for use by themselves or by people they know (such as friends or family members).
>
> "Purchasers" include, for the avoidance of doubt: (a) where the payment was taken from a bank or credit card at the time of purchase (whether through the submission of card details or the use of digital wallet technologies such as Apple Pay, Google Pay or PayPal etc), the person whose account the money was taken from; (b) where the payment was made with pre-loaded funds on a user account (e.g. Steam Wallet, Epic Wallet etc), the user account holder; and (c) where the payment was made using a monetary gift card or voucher, the person who made the payment using that card or voucher."

140. The Tribunal considers that, to the extent that there might have been a problem, these drafting changes address the concerns raised during the hearing. If the PCR is content to proceed on the basis of this definition, it does not present any reason for not granting a CPO.

**(5) Conclusions on Eligibility**

141. As with the Authorisation criteria under rule 78, irrespective of the arguments of the parties, the Tribunal has to consider for itself whether the requirements of rule 79, relating to Eligibility, are satisfied.

142. The principal requirements of rule 79(1) are set out in paragraphs 26 and 27 above. The Tribunal needs to consider the issue of suitability taking account of all matters that it sees fit but with particular reference to the criteria in rule 79(2).

143. The Tribunal considers that:

(1) the claims are brought on behalf of an identifiable class of persons (particularly, although this criterion was not challenged, with the benefit of the changes to the Class Definition);

(2) the claims do raise common issues; and

(3) having taken account of the factors set out in rule 79(2) and considered the position more widely on the evidence before it, the claims are suitable to be brought in collective proceedings. We have taken account of the *Pro-Sys Test* and discussion above in reaching this conclusion.

(i) These collective proceedings are an appropriate means for the fair and efficient resolution of the common issues.

(ii) The costs and benefits of bringing these proceedings are appropriate for this kind of litigation.

(iii) There are no relevant other proceedings in this jurisdiction.

(iv) The size and nature of the class is such that collective proceedings are the only realistically available process by which these claims are capable of being judicially determined.

(v) As discussed above, and particularly with the benefit of the change in Class Definition, it should be possible, on the evidence available in any given case, to determine whether a given person is, or is not, a member of the class.

(vi) A large number of small claims of this nature is clearly suitable for an award of aggregate damages and we were taken to no evidence that showed that the aggregate damages approach was not appropriate in this case.

(vii) Other than any settlement or mediation discussions that might take place between the parties in this case, as with any other litigation, we are not aware of any alternative dispute resolution procedure that might be available to the parties in this dispute.

## F. ISSUES RAISED BY THE TRIBUNAL

144. During the hearing, the Tribunal raised four matters with the PCR, in addition to the proposed Class Definition referred to at paragraph 137 above.

### (1) Evidence of funding on competitive terms

145. In *Hammond & Stephan*, the Tribunal considered what information in relation to funding should be provided at the certification stage. The Tribunal said, at [67(1)]:

> "The Tribunal at certification wishes to be satisfied that the PCR has made proper efforts to secure favourable funding terms. Here, we were told that the amended LFA which introduced the current basis for the Funder's Fee was negotiated soon after the PACCAR judgment and that the existence at that time of a competing application for certification (i.e. the Hunter action) made it harder to secure funding. At the request of the Tribunal, Mr Hammond provided during the hearing a further witness statement which gave much more information of the evolution of the final form of the LFA. We consider that it should be standard practice for the PCR to address in their evidence the steps they took to secure an LFA on appropriate terms." (Emphasis added).

146. Having regard to this statement in *Hammond & Stephan*, the Tribunal considered the PCR should provide evidence that recorded the steps taken to secure funding on appropriate and competitive terms.

147. On 24 October 2025, Ms Natasha Pearman (a partner in Milberg London LLP ("Milberg"), solicitors for the PCR) provided her Second Witness Statement in the proceedings addressing the chronology and material facts relating to the origin and the development of the LFA. That evidence covered, reasonably extensively, the origin of the funding and the discussions that had taken place.

148. Valve criticised the PCR's position essentially on the bases that:

(1) the funding arrangements were prepared (but not finalised) before the PCR was involved, although it was admitted that Ms Shotbolt had been briefed on it subsequently by Milberg;

(2) when briefing Ms Shotbolt, Milberg had a conflict of interest given it had put together the LFA;

(3) there was no evidence that Ms Shotbolt had taken steps to satisfy herself independently that the terms were reasonable in market conditions or to improve the terms;

(4) there had been no competitive tender;

(5) the commercial circumstances were such that the PCR could have sought better terms; and

(6) certification should be refused on the basis of the criteria set out in *Riefa*.

149. By a letter dated 31 October 2025, the PCR's solicitors stated that the facts of *Riefa* were highly unusual (leading the Tribunal to refuse certification on the basis that the proposed representative appeared to have fundamentally misunderstood her obligations) and a long way from the circumstances of the present case. The same letter also made the point that any specific requirements articulated in the *Riefa* judgment as to the way in which funding agreements should be negotiated were articulated long after the appointment of Ms Shotbolt and should not be applied retrospectively to the circumstances of this case. They argued:

(1) Valve was attempting to elevate *Riefa* into a further set of independent legal tests or rules (despite the Tribunal itself having made clear that such an approach was not appropriate);

(2) In *Riefa* itself at [101], the Tribunal has stated (also reflected in what was said in *Hammond & Stephan*) that it "agree[d] that the Tribunal should be reluctant to venture into an assessment of the commercial terms of the LFA unless they are sufficiently extreme to warrant calling out".

(3) In the present case, the Tribunal should be satisfied for present purposes that the LFA, far from being "sufficiently extreme to warrant calling out", are competitive and neither Milberg nor the PCR should be criticised for not insisting on a competitive tender or a further round of discussions simply for the sake of ticking a "process box". By the time the PCR was appointed, the Supreme Court had handed down its judgment in *R (PACCAR) v Competition Appeal Tribunal* [2023] UKSC 28; [2023] 4 All E.R. 675, which created significant additional risk for funders and created uncertainty in the funding market; the PCR had been fortunate to find funding on terms as good as those in this case.

150. The Tribunal accepts the PCR's points as adumbrated above, and notes that: (i) the multiples of return to the Funder (an important criterion by which to assess the financing) were less than in other CPOs that have been granted; and (ii) no evidence was presented to it that suggested that the LFA in these proceedings was materially "out of the market".

151. However, the Tribunal considered that the suitability of the funding was a matter for which the PCR should take responsibility personally, even if many of the arrangements had been negotiated to Term Sheet level before the PCR came into existence. It therefore suggested that the PCR, rather than its solicitor, should file evidence confirming that it was confident that the current funding arrangements were appropriate in their terms, in the light of market conditions, and in the interests of the PCMs.

152. On 13 November 2025, Ms Shotbolt filed her Second Witness Statement in which she explained that:

(1) although not having conducted the negotiations, she was aware of them prior to the Term Sheet being signed, met the funder subsequently to discuss the funding, was briefed on further discussions and reviewed the LFA and other financial arrangements (including considerations of conflict of interest and her freedom to settle the case) in a page-by-page review before LFA signature;

(2) she was advised at the time by Milberg that the terms were competitive in the marketplace and felt satisfied that was the case when she signed the LFA on 13 October 2023;

(3) she had been personally involved in, and considered, all subsequent amendments to the LFA and had access to an independent costs specialist King's Counsel;

(4) in the light of the further enquiry from the Tribunal, she had reviewed the funding arrangements with the benefit of that King's Counsel and advice from a broker in the litigation funding market; and

(5) with the benefit of that advice, she concluded that the terms and pricing of the LFA were competitive in the litigation funding market, were appropriate and in the best interests of the PCMs.

153. On 19 November 2025, Valve raised various questions on Ms Shotbolt's Second Witness Statement, to the effect that there were some issues that it did not cover (such as the instructions given to the costs counsel and the broker, what information they had about the negotiations and possible linkage to the finance of related proceedings in the USA). The Tribunal does not consider that these questions detract from the clear statement on behalf of the PCR by Ms Shotbolt that, with the benefit of appropriate independent advice, it is satisfied as to the appropriateness of the funding and it is in the best interests of the class. The Tribunal notes, as mentioned above, that there is no evidence before it that suggests that the terms in the LFA are inappropriate in the market conditions in which they were agreed.

154. The Tribunal is, therefore, satisfied that the approach recommended in *Hammond & Stephan* has been satisfied and this is not a ground for refusing the CPO.

**(2) Other matters**

155. During the hearing, having regard to the likely number of minors within the proposed class, the Tribunal raised whether the addition of a senior lawyer to the Advisory Panel would be appropriate for extra protection given the legal issues that might arise (there otherwise being no independent lawyer on the Advisory Panel). Mr Gregory confirmed the PCR would be prepared to add a lawyer to the Advisory Panel.

156. The Tribunal also suggested that it might be appropriate to receive reports from Epiq in relation to the progress, outcomes and future steps of communications with the relevant stakeholders. This would permit directions as to more active measures to be taken if the notices, communications and online contact arrangements were not effective in practice. Mr Gregory confirmed that the PCR was content for Epiq to provide periodic reports on communications with the class members which summarise the communications sent and the level of engagement with these communications.

157. The Tribunal was concerned about cost control and raised the question of continuing reporting obligations as regards costs budgeting and costs incurred to ensure visibility of expenditure related to the proceedings. Mr Gregory confirmed during the hearing that the PCR would be content to provide costs reporting at future case management conferences, having regard to recent CPO judgments of the Tribunal: for example, see *Bulk Mail Claim Limited v International Distribution Services Plc (formerly Royal Mail Plc)* [2025] CAT 19; [2025] Bus. L.R. 571 ("*Bulk Mail*") at [39]. In the light of *Bulk Mail* and the recommendation made at [45] of *Hammond & Stephan*, the Tribunal considers that: (i) progress of costs against the Litigation Budget should be subject to quarterly reporting to the Tribunal and (ii) the legal team should only submit a request of funding/payment from the funder when that request had been reviewed and approved by an appropriate cost counsel or cost draughtsman.

158. The Tribunal considers that the PCR's agreement to these three points should be recited in the CPO, and the Tribunal will expect to be updated at the next

case management conference about the implementation of what has been agreed.

159. Finally, the Tribunal notes that the Priorities Agreement, which determines how payments, whether as damages following a success at trial or from a settlement, from Valve to the Class Members, provides that the funders, insurers and legal team should be paid in preference to the Class Members and not paid out of unallocated recoveries. This arrangement is expressed to be subject to any order of the Tribunal. Clearly, this issue raises a direct conflict of interest between the class members and others involved, including the legal advisers, although not the PCR. This is particularly sensitive, in this case, given the likely large number of minors in this class. A similar, although slightly less severe, prioritisation was the subject of recent comment by the Tribunal in *Hammond & Stephan* although ultimately accepted in that case. More widely, this kind of arrangement was subject to detailed scrutiny by the Court of Appeal in *Justin Gutmann v Apple Inc. & Others* [2025] EWCA Civ 459; [2025] All E.R. (Comm) 934 ("*Gutmann v Apple CA*") (and then, in practical detail, by the Tribunal in the *Justin Gutmann v Stagecoach South Western Trains Limited* [2025] CAT 72). It was stressed in the judgment of Sir Julian Flaux (with which Lord Justice Green and Lord Justice Birss agreed) that, since the Tribunal has jurisdiction to distribute to funders and lawyers in priority to the distribution to the class, a contractual provision for such prioritisation is unobjectionable, subject always to the Tribunal's overriding supervisory jurisdiction to order otherwise if in the event there is an award of damages in favour of the class (see *Gutmann v Apple CA* at [75] and [97] to [98]). In essence, the financing arrangements set out parameters to which the Tribunal, at the appropriate time, will give appropriate weight when balancing the interests of all stakeholders in a just and fair resolution of the proceedings in the context of the collective proceedings regime.

160. We do not seek to adjust this arrangement, which we anticipate would be delicate commercially for all involved, at the CPO stage. However, we thought it appropriate to emphasise that, depending on the outcome of the proceedings, the Tribunal will be alert to exercise its powers to ensure that the interests of the

class members are properly respected in the distribution of any funds that may be payable by Valve.

## G. CONCLUSION ON CERTIFICATION

161. For the reasons set out above, the Tribunal has concluded that it is appropriate to make a CPO in these proceedings and invites the parties to agree and provide an order which also incorporates the recitals which it has described in paragraph 157 above.

### (1) Opt-in/Opt-out

162. When the Tribunal makes a CPO, the order must specify whether the collective proceedings will be opt-in or opt-out taking account of all the matters it thinks fit including, in addition to the matters in rule 79(2) the strength of the claims and whether it is practicable for them to be brought as opt-in collective proceedings, having regard to all the circumstances including the estimated amount of damages that the claimants may recover: rule 79(3) of the Tribunal Rules.

163. The question whether a CPO should be granted on an opt-out basis, and the relevance of the strength of the case and the robustness of the methodology suggested for its proof, have been considered very recently by the Supreme Court in *Evans v Barclays Bank and Others* [2025] UKSC 48; [2025] 12 WLUK 363 (*"Evans"*). That decision was handed down on 18 December 2025 (and thus after the conclusion of the CPO Hearing before us); and the Tribunal considered that the parties should be given permission to provide short additional submissions as to its potential relevance to the matters now in issue in this case.

164. In the submissions provided to us accordingly, Valve submits that although *Evans* principally concerned the relevance of the strength of the claim in deciding whether to certify a claim as opt-in or opt out proceedings, the emphasis in the Supreme Court's single judgment on the need to scrutinise the

merits of a claim and the adequacy of any methodology for its proof even at the certification stage, so as to guard against the potential for exploitation of the collective proceedings regime through its guard against the *"enormous leveraging effect"* of collective proceedings to extract a settlement out of defendants even where the claims against them are very weak, fortifies its position that the CPO application should be dismissed. Valve has taken the opportunity to emphasise again its point that it was for the PCR to demonstrate at this stage a plausible theory of harm and how it is to be proved, and that it has not done so *"in particular by reason of the inadequacy of the methodology which the PCR has advanced."*

165. Against this, the PCR submits that *Evans* concerned very different facts and circumstances; but that, especially once the material differences are taken into account, the Supreme Court's reasoning tends to confirm that the present claim should indeed be certified on an opt-out basis. The PCR emphasises that there is no *"fundamental weakness"* in the PCR's pleaded case or theory of harm (including causation) such as the expert evidence revealed there to be in *Evans.* Valve had not submitted that the claim should not be certified because its merits were weak (its objections being based rather on the *Pro-Sys* ground on which we have found against it). Nor has Valve submitted that the claim should only be certified (if at all) on an opt-in rather than an opt-out basis; and the PCR's submissions contrast the claim in these proceedings, brought on behalf of a large class of consumers each of which has suffered small individual losses, such that individual claims would not be economically viable, with the claims in *Evans*, where the proposed class included a group of sophisticated and large financial institutions alleging individual losses large enough to make it financially viable to contemplate bringing proceedings independently.

166. Having carefully considered the Supreme Court decision and the parties' additional written submissions, we consider that there is nothing in the *Evans* case which undermines the analysis we have set out or is such as to cause us to refuse to certify on an opt-out basis. We have not been persuaded by Valve that the decision in *Evans* enunciates principles which fortify its position that the PCR's CPO application should be dismissed or alternatively certified only

as opt-in proceedings. This is not a case where the PCR has resorted to economic theory to plug a hole or gap in its case on causation (contrast paragraphs [106] and [107] in *Evans*). There is nothing evident in the perceived strength of the claims, on the evidence before us and at this very early stage of the proceedings, to cause us to refuse certification. As to the basis of certification, the Tribunal considers that this is the kind of case described in [116] of *Evans* as a "paradigm" of where an opt-out certification is appropriate, as in *Merricks SC*, where there "is a large class of consumers affected by an [alleged] breach of competition law resulting in their having to pay more for goods or services, but involving small sums for each individual which would make each individual case economically unviable". Opt-in collective proceedings would simply not be practicable for a Proposed Class estimated to include up to 14 million individuals, many of them minors, with the average losses estimated to be in the region of £22 to £44 per class member. In short, the Tribunal considers that this is a clear case where the CPO should be on an opt-out basis.

## H. DISPOSITION

167. For the reasons set out above, the Tribunal finds that the Authorisation and Eligibility Conditions have been satisfied and grants the CPO on an opt-out basis.

168. This Judgment is unanimous.

| | | |
|---|---|---|
| The Hon Mr Justice Hildyard<br>Chair | Paul Lomas | John Davies |

| | |
|---|---|
| Charles Dhanowa, CBE., KC (Hon)<br>Registrar | Date: 26 January 2026 |

# EXHIBIT 4

**IN THE COMPETITION APPEAL TRIBUNAL**

Case No: 1640/7/7/24

BETWEEN:

**VICKI SHOTBOLT CLASS REPRESENTATIVE LIMITED**

Class Representative

\- v -

**VALVE CORPORATION**

Defendant

---

**COLLECTIVE PROCEEDINGS ORDER**

---

**UPON** the Class Representative's application for a collective proceedings order (the "**CPO Application**") pursuant to section 47B of the Competition Act 1998 (the "**Act**") and Rule 75 of the Competition Appeal Tribunal Rules 2015 (S.I. No. 1648 of 2015) (the "**Tribunal Rules**")

**AND UPON** receipt of a **"Collective Proceedings Claim Form"** dated 4 June 2024, which combines claims in respect of losses alleged to have been caused by the Defendant's unlawful conduct in breach of the prohibition in Chapter II of the Act and Article 102 of the Treaty on the Functioning of the European Union (the proposed "**Collective Proceedings**")

**AND UPON** receipt of a Draft Amended Collective Proceedings Claim Form on 16 September 2025, amending the proposed class definition

**AND UPON** hearing counsel for all parties at the certification hearing on 14 October 2025

**AND UPON** the Class Representative agreeing to:

1. Appoint a senior lawyer to its Advisory Panel with the specific role of promoting the interests of class members who are minors;

2. Provide quarterly periodic reports on communications with class members which summarise the communications sent and the level of engagement with those communications;

3. Update the Tribunal every 3 months in relation to its expenditure on the Collective Proceedings against the amounts in the budget for the Collective Proceedings; and

4. Only permit its legal representatives to submit requests of funding/payment from its funder after that request has been reviewed and approved by an appropriate cost counsel or cost draughtsman.

**AND UPON** the Class Representative providing evidence (a) recording the steps taken to secure funding for the Collective Proceedings; and (b) confirming that it was confident that those funding arrangements were appropriate in their terms, in the light of market conditions, and in the interests of members of the class

**AND UPON** correspondence between the Tribunal and parties following the certification hearing, in the course of which the Class Representative proposed further amendments to the proposed class definition

**AND UPON** the Tribunal's CPO judgment of 26 January 2026 in which it held that: (i) in accordance with Rule 78 of the Tribunal Rules that it would be just and reasonable for the Class Representative to act as a class representative in the Collective Proceedings; and (ii) in accordance with Rule 79 of the Tribunal Rules that the claims as described in the Application are eligible for inclusion in collective proceedings

**IT IS ORDERED THAT:**

**Authorisation of Class Representative**

1. Pursuant to section 47B of the Act and Rules 77 and 80 of the Tribunal Rules, Vicki Shotbolt Class Representative Limited is authorised to act as the Class Representative and to continue the Collective Proceedings on an opt-out basis claiming damages for loss suffered by members of the Class (as defined below).

2. The remedy sought is an award of aggregate damages pursuant to section 47C(2) of the Act together with interest, costs and/or such further or other relief as the Tribunal may see fit to provide.

3. The Class Representative's address for service is c/o Milberg London LLP, Third Floor, Sutton Yard, 65 Goswell Road, London, EC1V 7EN.

**Class Definition**

4. **"The Class"** is defined as follows (**"Class Definition"**):

"All Persons who, during the Class Period, made one or more payments to purchase (**"Purchasers"**): (a) PC Games, and/or (b) Add-on Content for PC Games, including subscription payments for PC Games and/or Add-on Content (collectively **"Relevant Purchases"**).

5. For the purposes of the Class Definition:

(a) **"Persons"** are end-consumers, and do not include resellers or other non-retail customers. Persons include, in particular, people who purchase PC Games and/or Add-on Content for use by themselves or by people they know (such as friends or family members).

(b) **"Purchasers"** include, for the avoidance of doubt: (a) where the payment was taken from a bank or credit card at the time of purchase (whether through the submission of card details or the use of digital wallet technologies such as Apple Pay, Google Pay or Paypal etc.), the person whose account the money was taken from; (b) where the payment was made with pre-loaded funds on a user account (e.g. Steam Wallet, Epic Wallet etc.), the user account holder; and (c) where the payment was made using a monetary gift card or voucher, the person who made the payment using that card or voucher.

(c) **"Class Period"** means the period: (i) from 4 June 2018 to 4 June 2024, in relation to members of the Class domiciled in England, Wales and Northern Ireland; and (ii) from 1 January 2010 to 4 June 2024 in relation to members of the Class domiciled in Scotland.

(d) **"PC Games"** means video games designed to be played on PCs (i.e. personal computers), as opposed to on other types of hardware such as consoles or mobiles, including PCs built by Apple and/or using a Mac operating system.

(e) **"Add-on Content"** means content that can be added-on to PC Games that is purchased after the initial acquisition of the game, sometimes referred to as Downloadable Content ("DLC"), and includes content acquired through Microtransactions completed during gameplay.

6. The following Persons are excluded from the Class:

(a) Any directors of the Class Representative, their parents, their spouses or civil partners or any persons with whom they cohabit, and their children.

(b) Officers, directors or employees of the Defendant, their subsidiaries and any entity in which they have a controlling interest.

(c) All members of the Class Representative's and Defendant's respective legal teams and all experts and professional advisors instructed and retained by them, and all funders or insurers involved, in connection with these Collective Proceedings.

(d) All members of the Tribunal assigned to these proceedings.

(e) Any judge involved in any appeal in the present Collective Proceedings (whether in respect of the grant of permission to appeal or the hearing of any substantive appeal).

7. In respect of any Person who meets the Class Definition but has subsequently died, the Class shall include their lawful representatives, successors or assignees.

**Forum**

8. The Collective Proceedings shall be treated as taking place in England and Wales.

**Notification**

9. The Class Representative shall publish a Notice of the Collective Proceedings (the **"Notice"**) in the form attached to this Order, in accordance with Rule 81 of the Tribunal Rules.

**Opting-out and Opting-in**

10. Every member of the Class who is domiciled within the United Kingdom on 11 March 2026 (the **"Domicile Date"**) shall be included in these Collective Proceedings.

11. Any member of the Class who is domiciled in the United Kingdom on the Domicile Date may opt-out of the Collective Proceedings by giving the Class Representative notice in writing of their decision to opt out by 11 June 2026, in accordance with the Notice.

12. Every member of the Class who is not domiciled in the United Kington on the Domicile Date may opt-in to the Collective Proceedings by giving the Class Representative notice in writing of their decision to opt-in by 11 June 2026, in accordance with the Notice.

**Pleadings**

13. By 4pm on 24 February 2026, the Class Representative shall provide the Defendant with a draft Amended Collective Proceedings Claim Form that makes appropriate amendments to reflect the fact that the proceedings have been certified.

14. By 4pm on 26 February 2026, the Defendant shall confirm whether it consents to the proposed amendments.

15. If the Defendant has consented to the proposed amendments pursuant to paragraph 14, by 4pm on 27 February 2026, the Class Representative shall file and serve an Amended Collective Proceedings Claim Form in the form provided to the Defendant pursuant to paragraph 13.

16. By 4pm on 10 April 2026, the Defendant shall file and serve their Defence to the Amended Collective Proceedings Claim Form.

17. By 4pm on 15 May 2026, the Class Representative shall file and serve a Reply to the Defence (if so advised).

**General**

18. There be liberty to apply.

**The Honourable Mr Justice Hildyard**
Chair of the Competition Appeal Tribunal

Made: 11 March 2026
Drawn: 11 March 2026

# EXHIBIT 5

**IN THE COMPETITION APPEAL TRIBUNAL**

**Case No: 1640/7/7/24**

**BETWEEN:**

**VICKI SHOTBOLT CLASS REPRESENTATIVE LIMITED**

**Class Representative**

**and**

**VALVE CORPORATION**

**Defendant**

---

**ORDER**

---

**UPON** hearing counsel for the Class Representative (the "**CR**") and the Defendant at a case management conference held on 22 June 2026

**IT IS ORDERED THAT:**

**US disclosure**

1. By 5pm on 31 July 2026, the Defendant shall:

1.1. by way of disclosure, and with simultaneous inspection, produce the documents that were produced by the Defendant to the named Plaintiffs, Wolfire Games, LLC, Dark Catt Studios Holdings, Inc., and Dark Catt Studios Interactive LLC in the current proceedings taking place before the United States District Court in the *In Re Valve Corporation Antitrust Litigation* (case no 2.21-cv-00563-JCC) (the "**US Proceedings**") (the "**US Valve Documents**");

1.2. provide descriptions of the roles of those individuals who were custodians for the purposes of the discovery exercise in the US Proceedings.

2. US Valve Documents withheld or produced subject to redactions in the US Proceedings for reasons of privilege shall be treated as privileged in these proceedings and may be withheld or reproduced with the same redactions (as applicable) without further review (but the CR reserves its position as to whether those redactions are appropriate in these proceedings and has liberty to apply).

3. US Valve Documents produced subject to redactions in the US Proceedings for reasons of confidentiality or data privacy may be reproduced with the same redactions. The CR may request reasons as to why certain documents or information have been redacted on the grounds of confidentiality under the provisions of the Confidentiality Ring Order dated 9 July 2026. Valve may respond to any such requests by reference, where appropriate, to categories of documents.

4. US Valve Documents designated as "Confidential" or "Highly Confidential – Attorney's Eyes Only" shall be disclosed into the Confidentiality Ring in accordance with the terms of the Confidentiality Ring Order dated 9 July 2026.

5. US Valve Documents shall be produced in the same format and using the same Bates Numbering as in the US Proceedings. In the event that a US Valve Document is not reasonably useable in such format (including in relation to artificial intelligence disclosure review tools), the CR may subsequently request that Valve produce certain documents or categories of document in native format (accompanied by an explanation of why the request is being made), and any such requests may not be unreasonably refused by Valve.

6. By 5pm on 31 July 2026, the Defendant shall provide:

   6.1. the identities of the third parties who produced material in the US Proceedings;

   6.2. how many documents each third party produced; and

   6.3. information as to the categories of documents produced by the third parties.

**Autumn CMC**

7. A case management conference, with a provisional time estimate of one day, shall be listed for the first available date on or after 2 November 2026 to address, if needed, any issues arising out of the US Disclosure.

**Further disclosure**

8. Further disclosure by Valve ("**Further Disclosure**") shall be relevant, reasonably necessary and proportionate to the pleaded issues in these proceedings. Further disclosure shall be determined according to the following process.

    8.1. By 5pm on 31 July 2026, the Defendant shall serve and file (i) a disclosure report (as defined in Rule 60(1)(b) of the Tribunal Rules) and (ii) a completed Electronic Documents Questionnaire (in the form of the questionnaire in the Schedule to Practice Direction 31B of the Civil Procedure Rules 1998).

    8.2. By 5pm on 13 November 2026, the Class Representative shall serve and file a Redfern Schedule setting out any requests for Further Disclosure and justifications for the same.

    8.3. By 5pm on 15 January 2027, the Defendant shall respond to the Class Representative's Redfern Schedule requests.

    8.4. By 5pm on 5 February 2027, the Class Representative shall reply to the Defendant's responses to its Redfern Schedule requests.

    8.5. The Defendant shall give any Further Disclosure by the time and date ordered by the Tribunal at the case management conference directed by paragraph 12 below.

**Expert Evidence**

9. By 5pm on 5 February 2027, the Class Representative and the Defendant shall each serve notice of:

    9.1. the number of expert witnesses it proposes to call; and

    9.2. those experts' respective fields of expertise.

10. By 5pm on 19 February 2027, the Class Representative and the Defendant shall seek to agree the matters set out in paragraph 9 above and the issues it is proposed that each of the proposed experts will address, if permitted by the Tribunal.

11. The Tribunal shall give directions at the case management conference directed by paragraph 12 below in relation to the expert evidence that will be permitted to be adduced at trial.

**Further case management conference**

12. There shall be a further case management conference listed for the first convenient date after 1 March 2027, with a provisional time estimate of one day with one day in reserve, at which the Tribunal will consider the following issues:

    12.1. any disputes or outstanding issues in relation to any Further Disclosure and the time and date for provision of any Further Disclosure;

    12.2. the expert evidence each party will be permitted to adduce at trial;

    12.3. the timetable to trial; and

    12.4. any other relevant case management issues.

**Opt-out and opt-in period**

13. The period for class members to opt-out of or opt-in to these proceedings at paragraphs 11 and 12 of the Collective Proceedings Order dated 11 March 2026 is extended by three months from the date on which the extension is first advertised (and any application for opting in or out made between (i) the end of the period specified in that Order and (ii) the beginning of this three month extension shall be treated as within the period) .

14. The Class Representative shall advertise the re-opening of the opt-out and opt-in period by way of an email blast notification and advertisement on the claim website before 31 July 2026.

**Trial listing**

15. A Trial on all issues is listed to commence on 22 January 2029, with a time estimate of 10 weeks. This listing may be subject to further consideration at the Autumn CMC.

**General**

16. By agreement the parties may vary without further order any deadline in this Order for a period or periods of up to 28 days in total without reference to the Tribunal, provided that they inform the Tribunal of such agreement in advance of the expiry of the relevant deadline and the extension does not affect the date of any listed hearings.

17. Costs shall be costs in the case.

18. There shall be liberty to apply.

**The Honourable Mr Justice Thompsell**
Chair of the Competition Appeal Tribunal

Made: 22 June 2026
Drawn: 9 July 2026

# EXHIBIT 6

**This Transcript has not been proof read or corrected. It is a working tool for the Tribunal for use in preparing its judgment. It will be placed on the Tribunal Website for readers to see how matters were conducted at the public hearing of these proceedings and is not to be relied on or cited in the context of any other proceedings. The Tribunal's judgment in this matter will be the final and definitive record.**

**IN THE COMPETITION APPEAL TRIBUNAL**

CaseNo: 1640/7/7/24

Salisbury Square House
8 Salisbury Square
London EC4Y 8AP

Monday 22nd June 2026

Before:

The Honourable Mr Justice Thompsell
John Davies
Paul Lomas

(Sitting as a Tribunal in England and Wales)

BETWEEN:

# Vicki Shotbolt Class Representative

**Class Representative**

And

# Valve Corporation

**Defendant**

## A P P E A R A N C E S

Julian Gregory and Will Perry on behalf of Vicki Shotbolt Class Representative (Instructed by Milberg London LLP)

Brian Kennelly KC, Tom Coates and Sean Butler on behalf of Valve Corporation (Instructed by RPC)

Digital Transcription by Epiq Europe Ltd
Lower Ground, 46 Chancery Lane, London, WC2A 1JE
Tel No: 020 7404 1400
Email: ukclient@epiqglobal.co.uk

Monday, 22 June 2026

(10.32 am)

Housekeeping

THE CHAIR: Good morning. I need to start with an announcement. Some of you are joining us on livestream on our website, so I must start with the customary warning. An official recording is made and an authorised transcript will be produced, but it is strictly prohibited for anyone else to make an unauthorised recording, whether audio or visual, of the proceedings. Breach of that provision is punishable as a contempt of court. You have been warned.

MR GREGORY: Good morning. Sir, members of the Tribunal. I am representing the Class Representative in these proceedings, along with Mr Perry. To my right, the defendant, Valve, is represented by Mr Kennelly, Mr Coates and Mr Butler. Housekeeping: You should have got a set of bundles which comprise a core bundle, which includes the agenda and draft orders and other key documents, a short supplementary bundle, a correspondence bundle and an authorities bundle.

THE CHAIR: Yes.

MR GREGORY: On Friday, my solicitors wrote to the Tribunal setting out some information on the Class Representative's budget and providing an update on the position. You've also received certain information regarding communications with the class. I was proposing to come back to those materials later on, once I've addressed you on some of the other agenda items.

The agenda is in the core bundle, tab 1 at page 3. I'd be grateful if you could turn that up.

THE CHAIR: Yes.

MR GREGORY: Several of the agenda items are agreed or substantially agreed between the parties, and it should be possible to deal with most of them fairly swiftly. In several instances, agreement was only reached over the first half of last week, and we're grateful that the Tribunal allowed us to submit our skeleton arguments on Thursday rather than Tuesday, which allowed them to reflect the current up-to-date position, but I'm sorry if that made preparations for this hearing more difficult for you.

Before I make submissions on the individual agenda items, I thought I'd start with a high-level overview in terms of where we've got to, starting with disclosure.

We've agreed the overall structure for the disclosure process, including a timetable for the further disclosure process, which is agenda item 1(c). The plan is to have initial disclosure at the end of July, comprised of Valve's disclosure from the *In re Valve* proceedings in the United States. At the same time, Valve will provide a disclosure report and EDQ that will provide the basis for a Redfern schedule process between November and February, to determine the extent to which it should provide further disclosure. And we propose that a CMC should be listed for probably April, May, next year for you to determine any outstanding disclosure issues.

However, as you'll have noticed in our skeleton, the Class Representative considers that issues relating to disclosure of third-party materials, which are in Valve's possession, need to be progressed separately in order to avoid a significant delay to the timetable, and I'll come back to that.

Valve's US disclosure comprised around 2.6 million documents. That is obviously a lot of documents. It was not provided in a form that would generally be accepted by English courts. The documents were withheld on the basis of US law principles of legal privilege, which are not necessarily the same as under English law, although there are some similarities. Entire categories of document were classified as confidential without any justificatory reasons being provided, and the documents were

generally disclosed as TIFF image files, whereas the English courts generally require documents to disclose the native file format. Valve has maintained that it should be entitled to reproduce all of the US disclosure in exactly the same form as it was produced in the US, without having to re-review those materials. That was said to be based on considerations of cost proportionality.

The Class Representative has agreed that Valve should be able to do that in the first instance, but wanted there to be some sort of mechanism under which you could challenge that approach in respect of documents or categories of documents; for example, whether it was really right to redact certain information on the basis of US law principles of privilege. That has now been agreed, and is reflected in the draft order, subject to some fairly minor points on the precise wording, which I hope will only take a few minutes to address.

There is one further point concerning the initial disclosure, which is that the Class Representative has asked that Valve provides an organogram or some similar material, that identifies the individuals within Valve that were involved in the relevant activities and their roles within the company - just because that makes it a lot easier and faster to understand what's going on when you're reviewing the documents. That's resisted by Valve, but I will come back to it.

Agenda item 2 concerns how issues of confidentiality should be addressed in the context of further disclosure. There is relevant provision in the confidentiality ring order, the draft order, which is in the bundle. Again, that draft order is almost entirely agreed, subject to some minor points on the precise wording.

Agenda item 3(b), directions in the draft order. They largely fall out of the timetable that we've agreed for disclosure between the parties, although we're obviously aware that the Tribunal in correspondence has raised the question of whether there could be a split trial and how long it's likely to take to bring the proceedings to trial, and I can

address you on that. At a high level, the parties agree that a split trial is probably not viable, because issues of liability and quantum are closely connected, and also issues of dominance and market definition are closely connected to issues of abuse. We're also more or less at one in terms of when it's likely to bring on a trial, which is early 2029. We say it might be possible to bring it on slightly faster, but that would only be the case if the issues of disclosure can be progressed very efficiently.

We then come to what we consider to be the most significant issues for this CMC. First, how the Tribunal should deal with the third-party materials which are in Valve's possession from other proceedings. Issues in relation to that have come to the fore, in particular, in recent correspondence. That is item 1(b) on the agenda.

Second, and relatedly, whether the Tribunal should list a CMC for this autumn term, in particular in order to address those third-party materials issues, but also to address any other issues that arise in relation to the initial disclosure: for example, debates about whether US legal privilege applies, given that they were initially withheld on the basis of US principles.

The essence of the third-party materials issue is this: that Valve's conduct in relation to PC game distribution is now under scrutiny in a number of different proceedings around the world, which we summarised in one of the earlier sections to our skeleton. Valve therefore has in its possession a substantial volume of documents which have been disclosed by third parties in those proceedings, which are likely to be highly relevant to this claim. In competition proceedings, it is common for defendants to be ordered to disclose such third-party materials. It most commonly arises where a private damages claim is brought in relation to issues that have also been the subject of an investigation by the European commission, or the CMA within the UK, and disclosure is sought of materials from the investigation file which have been provided to the defendant. There is a reasonably standard process for dealing with that, in

which the defendant is ordered to provide those materials into a confidentiality ring, subject to the relevant third parties being notified of the disclosure order and given an opportunity to comment on it.

A similar process has in fact been put in place, you may have noticed, by the US courts in the *In re Valve* proceedings in clause 7 of the US Protective Order which is discussed in the skeletons. Indeed, just over a year ago, Valve told this Tribunal that it was necessary to put in place a confidentiality ring precisely so that it could disclose third-party materials in these proceedings, in line with the requirements of clause 7. But you will have seen that over the last few days, Valve has reversed its position on that. It now says that clause 7 does not apply, with the implication that it would be precluded by the US order from disclosing those materials in these proceedings. I'm not going to pre-empt my submissions on that in any detail, but in summary, the Class Representative's position is those third-party materials constitute a large tranche of highly relevant materials, which will be necessary to be disclosed in these proceedings if justice is to be done.

On its face, the US Order would appear to allow for that under the provisions in clause 7. But the concern is that Valve has chosen to make an application in the US that is urging the US court to adopt a particularly narrow construction of clause 7, which would effectively place an impediment in the way to disclosure of those materials in these proceedings. As I will come on to, it would not prevent a bar to disclosure, because disclosure is governed by English law principles, and the court should take into account the implications for foreign law orders, but they are not determinative. But even --

MR LOMAS: If I may, as I understood from the papers, the reason Valve had done that is because of an application made in separate arbitration proceedings in the United States, so they were responding to a separate application. Is that correct?

Secondly, do we know when that issue of interpretation is likely to be determined by the US courts?

MR GREGORY: Well, Mr Kennelly may be able to give you more precise information, but what they've said in correspondence is that it may take several months for that application to be resolved, and Valve's position is that all of these issues should therefore be parked until as and when the court has determined that application.

We say there runs a real risk of very significant delay if that happens, because once the issue has come back to the Tribunal, it will very likely have to make a determination on it. This is not a point that's likely to be agreed between the parties. Were the Tribunal to order Valve to disclose materials, which the US order is said to prevent Valve from doing, there's a real risk that such an order could be appealed.

If the Tribunal did take that approach, there would then be a likelihood that the Class Representative would have to bring numerous applications for third-party disclosure, which could take many months to resolve and would obviously involve considerable expense as well. Even if the Tribunal said, "Well, actually, we think we are going to order these materials, notwithstanding the terms of the US Order", very likely you would put in the sort of arrangements which are standard, both in English courts and as reflected in clause 7, under which third parties would be notified of a disclosure order and given an opportunity to comment, and then those comments would need to be taken into account by the parties and the Tribunal in due course. So again, even in that situation, there would be a process that's likely to take several months. That's why we are urging the Tribunal to try to progress these issues relating to the disclosure of third-party materials more quickly, and not simply leave them, as I think Valve suggests, that they be left to the CMC that takes place in April or May next year, ten or 11 months away.

I should note, for completeness, that a parallel set of issues regarding third-party

disclosure arise in relation to materials from the investigation that's been carried out by the Polish competition authority. Those third-party materials issues then feed into the question of whether there should be an autumn CMC.

The other items on the agenda are items 4 and 5, which relate to class communications and the updated Class Representative's budget. I was proposing to make my submissions on those agenda items in the order that I've just run through them, starting with the high-level approach to disclosure. I was also proposing to make all of my submissions in one go and then let Mr Kennelly respond, rather than try to do it issue by issue, and that's mainly because some of the issues are interrelated.

For example, the issue of the extent to which we may reasonably ask Valve to disclose documents in native file format is closely related to the position on the budget. In order to see the context of that, you need to understand what the Class Representative's budget is for the disclosure process in these proceedings and where we are with that.

Similarly, whether you should order an autumn CMC is likely to be related to how likely it is you think issues are going to arise, for example, in relation to disputes about legal privilege and so on.

If I take that approach, I imagine I might be on my feet for around an hour and a half, at which point Mr Kennelly will be able to respond. In the light of that, I very much doubt we're going to go for the full day. It's customary to take a break for the transcribers mid-morning, so I'll try to stop at an appropriate moment, but if I don't then feel free to interrupt me.

Submissions by MR GREGORY

MR GREGORY: The first topic to address you on, therefore, is that the parties have agreed a two-stage disclosure process. It's evident from the draft CMC order, which is in the core bundle -- I'd be grateful if you could turn that up. It's core bundle, tab 15,

page 391.

Just to note while you're going there, there is a further updated draft CMC order in the supplemental bundle that contains some additional language proposed by Valve in relation to the opt-out period, but the two orders are otherwise identical. So we can obviously refer to that when we get to the opt-out period issue, but otherwise I'm going to use the core bundle version.

Any wording that is not agreed is in colour. Wording proposed by the Class Representative that's not agreed is in purple, and Valve's preferred wording is in orange. You can see from paragraph 1.1 that Valve has there agreed to provide the US Valve disclosure at the end of July.

If you turn over to the next page, page 392, the next few paragraphs concern points of detail about that tranche of disclosure that I'll come back to: the legal privilege and the file format and so on.

If you turn to page 393, paragraph 8 sets out the agreed process for what the Class Representative refers to as "further disclosure", and Valve refers to as "supplemental UK disclosure". I'm going to come back to that difference in language, because it's not just a drafting point. But just for the time being, focused on the proposed structure and the timetable, Valve will serve a disclosure report and EDQ at the end of July. There'll then be the Redfern schedule process at the end of the year and the beginning of next year. In March, the parties should exchange expert evidence proposals. Then at 394:

We shall try to agree issues of further disclosure, but we propose that a CMC should be listed for the first available date after 12 April next year to determine outstanding disclosure issues." [as read]

As I've said, we are content for that process, save that we think the third-party materials issues need to be progressed separately.

So we're turning to the different language used by the parties at paragraph 8. You'll see the Class Representative's preferred wording is neutral. It simply describes the additional disclosure as further disclosure, and says that it should be determined according to the process that is set out in that paragraph.

That's not true of the language proposed by Valve. Valve is asking the Tribunal to make an order that limits the scope of the disclosure process and the Tribunal's powers to order disclosure, a form of self-denying ordinance, in two key respects.

First:

Valve proposes that the process should be exclusively concerned with additional documents, the disclosure of which is necessary ... a departure from the standard approach under which the Tribunal has broad discretion as to the scope of disclosure without being constrained by any necessity test.

Second:

Valve further proposes that the process should be limited to materials that concern 'UK-specific issues'.

The meaning of that phrase is unclear and could preclude the disclosure of documents relevant to Valve's activities in the UK, which are also relevant to its activities in other countries, such as the US and Poland.

The context is that the Class Representative's understanding is that Valve's activities are at the centre of this claim, including its commission rates and its approach to its contractual arrangements regarding the PPOs and its policies regarding unfair pricing, or not UK-specific. As we understand it, the same or similar policies and approach are in place across different countries, including in the US and the UK, and potentially also in Poland.

Valve's rationale for taking the approach that you see here is set out at paragraph 22 of its skeleton. I'd be grateful if you could turn that up. That is in the core bundle,

tab 3 at page 35. (Pause)

When you get there, I'd be grateful if you could please read paragraph 22, which starts right at the bottom of page 35. Valve says there that it should only have to disclose relevant documents, but that goes without saying; the Class Representative is obviously not seeking the disclosure of irrelevant documents. For the avoidance of doubt, the Class Representative would have no objection to the CMC order saying that a further disclosure of materials relevant to the issues in the claim shall be determined according to the specified process, even though such wording would be entirely redundant.

But what seems to underlie Valve's approach is the belief that the further disclosure process should not encompass materials from proceedings other than the *In re Valve* proceedings in the US. I'm going to spend a few minutes on this, because it's not simply a drafting point; this point will potentially govern how Valve goes about producing its disclosure report and EDQ, and if that process gets off on the wrong foot, then that's going to create problems for the timetable and work further down the line. Given that, it's helpful just to understand how these issues have developed. I'm going to spend a couple of minutes showing you the correspondence, which highlights that Valve has consistently been extremely reluctant to countenance disclosing some of these other materials. I'd be grateful if you could go to the correspondence bundle at tab 27, page 73. (Pause)

So this letter sets out the Class Representative's initial disclosure proposals. You can see if you look at paragraph 4, we proposed a two-stage approach to disclosure. Over the page, we originally proposed that initial disclosure should encompass off-the-shelf materials from *In re Valve*, but also other sets of proceedings where there had been overlapping issues. Those other sets of proceedings, or the ones we're aware of, were listed in paragraph 6, and that includes paragraph 6(b), the investigation by the Polish

competition authority.

Publicly available information suggested that the other proceedings that are listed related to issues which overlapped with specific points in these proceedings. Though unlike the Polish investigation, they didn't seem to be generally relevant, but they concerned points about, for example, market definition or the extent to which Valve monitors the redemption of Steam keys.

Paragraph 7 in the letter, we noted that Valve --

MR LOMAS: Sorry to interrupt. I think one of the blinds is blowing here. It's creating this rattling noise, which certainly from here is immensely distracting. Is it possible to do anything about it or not? It may just be a matter of taking off the fire extinguishers or something, but ...

UNIDENTIFIED SPEAKER: That's probably enough to --

MR LOMAS: Thank you. Yes, thank you.

MR GREGORY: There's a very hot sun outside, so we perhaps shouldn't put it up too much. Great, hopefully that solves the problem.

MR LOMAS: Perfect, thank you.

MR GREGORY: So our thinking was set out in paragraph 7: that these are pre-existing materials that Valve has in its possession, and we hope that these could be disclosed quickly and easily to help move the disclosure process along. But of course, we don't know the details about these proceedings because we're not involved in them, and Valve obviously does. So paragraph 8 asks Valve to provide certain summary information relating to them.

Just note in particular paragraph 8.4. We ask Valve to identify any constraints on its ability to disclose material from the other proceedings that were disclosed or produced by other parties. That's obviously the third-party material issue.

In relation to the In re Valve and Polish proceedings, Valve's position on that only

became clear last Monday evening, a few hours before the skeletons were originally due to be served. I'd be grateful if you could just read paragraph 11 on page 75. (Pause)

Once you've read that, I'd be grateful if you could turn forward in the same bundle to tab 33, page 147. (Pause)

THE CHAIR: Sorry, which tab was that?

MR GREGORY: It is tab 33 of the correspondence bundle. (Pause)

So this is Valve's response from a couple of weeks later. If we turn over the page to page 148, in paragraph 5, that's where Valve says it will provide its own disclosure from the In re Valve proceedings, but only in exactly the same form that they were disclosed in the US. So that's the genesis of the issues at agenda item 1(a).

Except, just note paragraph 5.2. At this point, Valve was suggesting that it would re-review some of the materials for the purpose of considering whether further redactions may be required to comply with UK data protection law. This letter is entirely silent as to the third-party materials issue and does not respond to the Class Representative's points about them.

Over the page to page 149. Paragraph 9 concerns these other proceedings. I'd be grateful if you could read paragraph 9.1. (Pause)

The other subparagraphs -- can I just ask if you could read paragraph 9.2 as well? (Pause)

So the other paragraphs here explain that Valve did not participate in some of the other proceedings, or that materials from those proceedings were included in the In re Valve disclosure, or asserted that some of the proceedings were not relevant to the present claim either.

Valve has largely relented on that latter point. It's been agreed that Valve will include in its disclosure report and EDQ materials from these other proceedings in relation to

issues which are relevant to specific points in this claim, such as market definition, the monitoring of Steam keys and so on. However, the investigation by the Polish competition authority appears to be generally relevant to the issues in the present claim, as the overlap is much more substantial. I'd be grateful if you could go to the supplementary bundle at tab 3 on page 25. (Pause)

This is the press release accompanying the launch of the Polish investigation. I'd be grateful if you could read the opening paragraph that starts "Warsaw, 13 May", and then the third paragraph starting, "The UOKiK inspection". (Pause)

So the investigation is looking into agreements or abusive practices of Valve in relation to game distribution, including in particular, abusive conduct that might result in higher prices for consumers, which presumably might include unfair pricing, and arrangements that might restrict the ability of publishers to sell games through competing channels, or which interfere with their pricing and discounting, such as the PPOs alleged by the Class Representative in these proceedings.

Those issues appear to directly overlap with all three of the alleged abuses in the present claim. We are obviously not involved in those proceedings, but based on the press release, it sounds very difficult to understand how the Polish investigation is simply irrelevant to the proceedings here.

As I said, the context of this is that Valve's relevant activities appear to be standard across different countries; so there's not one approach, for example, in relation to the US publishers and a completely different approach to commission charging and PPOs and so on, in relation to publishers in the UK and Poland. It all seems to be of a piece. In fact, that has been Valve's own approach to disclosure in the different proceedings. Here, Valve is saying that its own disclosure in America is highly relevant to the issues in this claim, even though this claim is obviously focused on UK publishers and UK consumers, presumably on the basis that it takes the same approach in the US, and

Valve has told us that in the Polish investigation, it has disclosed around 27,000 documents from the American disclosure exercise; again, presumably on the basis that the approach that it takes in America is relevant to the position that it takes in Poland. If that is right, then any materials gathered in the Polish investigation -- and they were including from inspections which were carried out at the offices of publishers -- are likely to be relevant to the issues in front of this Tribunal.

As well as not wanting to include materials from the Polish investigation in the further disclosure process, it appears that Valve also does not want to include any materials relating to the claim that has recently been filed in the US against Microsoft, alleging that Valve and Microsoft have entered into a price parity -- price fixing -- agreement relating to the price at which PC games are sold on their respective game stores. The claim was only filed at the end of May, and it is correct to note that Valve is not a defendant. The claim has been brought against Microsoft. But even if Valve is not brought in, which I presume it could be, it may have had or could have some involvement in relation to disclosure.

I'd be grateful if you would turn again to the correspondence bundle at tab 40, page 192. On page 192, I'd be grateful if you could read paragraph 36. (Pause)

Valve's response to that is in the supplementary bundle, so I'd be grateful if you could go to that once more, at tab 12, page 69. I would be grateful if you could read paragraph 27. (Pause)

That's fine as far as it goes, but the key point concerns not the initial disclosure, but the process for further disclosure. Valve has been somewhat coy about its involvement in these proceedings, but if the Rockman complaint refers to any documents that were not included in the *In re Valve* disclosure, but are in Valve's possession, they are likely to be highly relevant to the issues in the present claim, and should be included in Valve's disclosure report and EDQ.

THE CHAIR: If they're in Valve's possession, why wouldn't Valve be disclosing them anyway?

MR GREGORY: Well, we think --

THE CHAIR: We're not talking about third-party disclosure here, because they're not a party to anything where they get the third-party disclosure.

MR GREGORY: Well, sir, I think that's right, and that is certainly our position. If Valve has documents that are relevant to these issues, they should be included in the disclosure report and EDQ. The only reason I'm raising it is Valve seems to be kicking back against that a bit and suggesting that documents from some of these other proceedings are somehow not relevant to the issues in this claim. In our submission, given the nature of the Rockman complaint, issues that arise in that claim will be highly relevant to the issues in these proceedings.

THE CHAIR: But if they're Valve's own documents and they're relevant, why aren't they disclosed anyway?

MR GREGORY: Yes. Well, if Mr Kennelly is content with that, then there's no point on it. But what we took from their correspondence and the skeleton was that they're somehow suggesting that they should not have to disclose documents which may be referred to in the complaint, if they were not included in the initial *In re Valve* disclosure. If Valve accepted all these issues obviously overlap with the issues in these claims, and they will include any relevant documents -- for example, relating to communications between Valve and Microsoft relating to pricing on their respective game platforms -- then that's fine. We say that's what should happen.

I'd be grateful if you could now turn to the draft order, which is back in the core bundle at tab 15, page 393. (Pause)

Just very briefly, we say our wording should be preferred, because you have a broad discretion as to the scope of disclosure. It's not appropriate to limit it by reference to

some higher necessity test, nor is it appropriate to limit the disclosure to material that is limited to UK-specific issues, i.e. issues which only relate to the UK and don't also relate to what may be going on in other countries. Obviously, Valve is free to make whatever submissions it wants to down the line, but we say the test is simply relevance. If the material is relevant, it should be included in the disclosure report and the EDQ. That's where my submissions --

THE CHAIR: I think you were suggesting you might, so you're going for the purple wording?

MR GREGORY: Yes. That's correct.

THE CHAIR: And you suggested you would be prepared to include within the purple wording something along the lines of "Relevant to issues in the claim".

MR GREGORY: Of course. We don't think that needs stating; it's obvious. But of course, if that gives Valve some comfort, then the relevance wording can be included.

THE CHAIR: Right.

MR GREGORY: I'm now going to turn to the issues at agenda item 1(a). This relates to the form in which Valve should disclose its own In re Valve disclosure on 31 July. As I've shown you, Valve's position was originally it was just going to disclose it in the same form as in the US, and that was that. We wanted there to be some sort of challenge process in respect of specific documents or categories of documents: for example, querying whether it was appropriate to withhold documents on the ground of US legal privilege.

Our concerns about that were summarised at paragraph 23 of our skeleton. I would be grateful if we just turned to that. It's in the core bundle at tab 2, page 12. The sub-paragraph there, part of paragraph 23. You may have read this recently, but if you just refresh your memory of the points that we were concerned about. (Pause)

A process to address those concerns has now been agreed, subject to some minor

points on the drafting. The agenda item 1(a)(i), concerning the legal privilege redactions, is entirely agreed. I'd be grateful if you could just again refresh your memories of paragraphs 25 to 28 of the skeleton. (Pause)

THE CHAIR: To 28?

MR GREGORY: Yes, up to 28. That is all agreed, and we are content with it, subject to the point that's been made in paragraph 29, which is that Valve has withheld some documents entirely on the grounds of US legal privilege. We obviously need to know that those documents exist and have been withheld, in order potentially to be able to challenge their withholding. We are content for those documents to be provided in the form of a list by Valve. This hasn't been completely resolved. I'd be very grateful if, when he stands up, Mr Kennelly can confirm that they are willing to do that, just so we know if documents have been withheld in their entirety.

MR KENNELLY: Yes. They will be disclosed by list, but per category, in the ordinary way, as under the CPR and in this Tribunal. There will be a list, but by category; category level descriptions.

MR GREGORY: Will we know the number?

MR KENNELLY: The total number? Yes.

MR GREGORY: In each category?

MR KENNELLY: No. The total number of all documents withheld, which is more than the Tribunal normally orders and more than the CPR requires, but we will give the total number of documents entirely withheld on the grounds of US privilege.

MR GREGORY: Right. Well, I will obviously take instructions on that. It may be that's what we get in the first instance, and then we have to rely on the process which has been agreed if we want more details about it. That's legal privilege.

Agenda item 1(a)(ii), regarding confidentiality designations, is also broadly agreed, subject to some minor points on the wording. 350,000 of Valve's US disclosed

documents have been designated as confidential in their entirety.

Just stepping back, there are two different sets of implications here. There are practical implications for us, for the Class Representative, and then there are implications for the principle of open justice. Taking those in turn, it's obviously necessary to mark-up documents that are produced in these proceedings -- witness statement, expert reports, skeleton arguments, pleadings and so on -- to identify confidential information, to redact it for public versions and to highlight it for the purposes of court hearings. The default position is that each party would normally be responsible for marking up their own documents, and I'm told that what my solicitor would normally do is attempt to track the use of information which has been designated as confidential through to those documents, so that when they have to mark it up, they know which bits of information are and are not confidential.

That process will be impossible in practice here, because 350,000 documents have been designated as confidential in their entirety, without any indication of the specific pieces of information which are actually confidential. Some of the contracts, for example, contain standard terms which are available online, which are plainly not confidential, but there may be specific numbers in it; for example, relating to commission rates or something similar. In reality, it will be just those numbers which have triggered the confidentiality designation.

The practical solution to this may be that Valve takes responsibility for identifying the confidential material in the documents which the Class Representative produces, so that they can produce in redacted form, or the material can be highlighted, and that would address some of the practical concerns from the Class Representative side. It would be helpful if when he stands up, Mr Kennelly can give an indication of whether he may be willing to do that.

The other set of implications are for open justice. If vast swathes of information has

been designated as confidential, that will limit the extent to which interested parties and the public in whole can be provided with full or relatively full versions of the documents in these proceedings, and the context is that it is of some wider interest. In a way, that's more of an issue for the Tribunal than for us, but we've tried to be a good citizen and to push back a little bit on Valve's approach that just simply says, "350,000 documents have to be designated in their entirety without any sort of challenge mechanism".

MR LOMAS: I was slightly confused by this, actually, because if I've understood it correctly -- and correct me if I'm wrong -- within the confidentiality ring order are essentially all of the legal team and the Class Representatives. They will have complete visibility of the material that is deemed confidential, so in no way does it inhibit their preparation of case or arguments.

The issue on public justice and so forth: is that not one that can be addressed some considerable way down the line, when it's much clearer what's going to be argued and whether in reality we're left with a trial process that's almost unworkable, because 50 per cent of it is confidential? You know, on any view of the timetable, we're some way away from that. I was trying to understand what really the substance of this point was for today.

MR GREGORY: Well, sir, I think the extent to which you're concerned about open justice throughout the proceedings is as much an issue for the Tribunal as for us. It may not be exclusively about the materials that are available for the final trial, because it's possible people can have access to documents throughout the proceedings as you go along, pleadings and witness evidence and reports and so.

MR LOMAS: But more limited, traditionally.

MR GREGORY: Yes, but of course more limited. A practical solution to that is that obviously the relevant material is marked up and redacted as you go along, so that

you can get access to at least redacted versions of the documents throughout the proceedings. I said I think the practical solution, the practical reality, is that in this situation it is going to be have to be done by Valve, both for its own documents and for the documents that we produce, because it's not possible in practice for us to identify which specific pieces of information are, in fact, confidential. But as I said, I'm not --

THE CHAIR: But there is something to be said for dealing with this down the line, on the basis that you're not affected by it, as Mr Lomas has said, and the public won't be affected unless it is produced in court; but it's unlikely that all 350,000 documents are going to be produced in court, so we can just deal with it with the ones that are produced in court.

MR GREGORY: I think if the Tribunal's concerns are limited to what happens at the end -- I think that's probably right; we're not pushing the point. We do have a challenge mechanism in place that can be used at an earlier stage. Actually, what's left is a fairly minor disagreement about the precise wording, so I don't want to take up too much time on it now.

MR LOMAS: To take the Chair's point further, suppose at a CMC next spring in relation to expert evidence, you wanted to say, "This expert is required for the following reasons, and that's material; look at these documents", and Valve leap up and down and say, "That contains confidential material". It'll be quite straightforward to redact some prices or commissions or client details for the purpose of that expert or that hearing which is determining which experts and which topics. So it becomes a pretty manageable issue at that stage, I would have thought.

MR GREGORY: Yes, as I've said, subject to all that being done by Valve, even in respect of our documents.

MR LOMAS: Yes, or setting the parameters. You know, prices that are within the last

ten years, client identities. You know, things of that nature which I'm sure can be descriptively defined.

MR GREGORY: Yes, I agree with that.

MR KENNELLY: Just to reassure my friend, if they produce a document and they're not sure which bits are confidential, we will do that job and we will, in a collaborative way, indicate the parts that ought to be redacted for the purposes of further use.

MR GREGORY: That's a helpful indication.

I would just then show you the disputed wording. I'm not going to take up much time on it. In the order, it is core bundle, tab 15, page 392. If you look at paragraph 3. So you can see the orange sentence at the end: that generally, Valve can respond in relation to categories. We just included the word, "where appropriate", which we didn't think was going to be particularly contentious.

Then I'll just show you the draft confidentiality ring order. That's in tab 16 of the core bundle at page 397. If you turn forward to page 402.

THE CHAIR: Do you have a paragraph number?

MR GREGORY: Yes, I'd be grateful if you could read paragraph 5.3 to start off with.

(Pause)

That's the paragraph that deals with the sort of challenge process for the *In re Valve* initial disclosure. Once you've read that, perhaps you can just jump back to paragraph 5.2. That's the equivalent paragraph that will apply to further disclosure, and you can see there's similar coloured wording at the end. (Pause)

THE CHAIR: So again, is that front loading it so that every document has to be done, whether or not there becomes a public disclosure issue in relation to that document?

MR GREGORY: Yes. Obviously the traditional approach to disclosure is if you're seeking confidentiality designation, you have to provide some sort of reasons for that at the time of disclosure. The history to this is that confidentiality rings were quite

unusual in English litigation until, say, around ten years ago. Over several years, they became increasingly common in competition proceedings to such an extent that just massive swathes of documents were being dropped into them almost by default.

You will be aware that the Tribunal has issued a practice direction on the treatment of confidential disclosure that is basically attempting to turn the tide on that a little bit. I think almost all of the confidentiality ring orders that have been put in place in new proceedings since then have included this sort of provision that requires some sort of reasons to be given at the time of disclosure, justifying the confidential treatment.

As I said, we're not pushing back against the idea that in general it's satisfactory for those reasons to be provided at a category level; it is simply that we may request an explanation, say, for an individual document or an individual bit of text, where obviously a category level explanation wouldn't be desperately responsive. It's not a major point, so I'm not going to take any more time on it.

The next agenda item I'll address you on is at item 1(a)(iii), which concerns the format in which Valve provides the documents, and whether the extent to which and basis on which we may ask Valve to provide documents in native format. I'd be grateful if you could turn to our skeleton argument, which is core bundle, tab 2, page 15. (Pause)

I'd be grateful if you could please read paragraphs 33 and 34. (Pause)

THE CHAIR: Does native format of its nature include the metadata for the document?

MR GREGORY: Yes, and that is one of the points.

So I think Valve has agreed to provide -- the primary documents have generally been provided in TIFF image format - I think it's agreed to provide metadata in certain instances, but I think, as I understand it from my conversations, that is sometimes in a separate document: a spreadsheet, for example.

So you can see the drafting dispute is really very minor. But perhaps I'll just take a moment just to talk about the broader context, because it does have some

significance, in particular the costs.

I'm going to take you through the updated budget in a few moments, but one of the points is that there's a real risk that there will be an overrun in the Class Representative's costs for the purpose of disclosure review. That's because the original cost estimates were put together at a time before the Class Representative knew that Valve was going to disclose 2.6 million documents.

The original estimates were broadly in line, I understand, with the costs incurred in a case where around 300,000 documents had been disclosed. So the disclosure here could be nine times larger than that. And yes, there will be some economies of scale that will be possible, but nonetheless, our disclosure review costs are likely to be substantially bigger than expected. It's therefore important that we should be able to review the disclosure as efficiently as possible.

One of the ways in which we're going to try and achieve efficiencies is through the use of an AI disclosure review platform. However, we will only know the extent to which that can work effectively with Valve's TIFF file documents once we've got our hands on them and once we've started using it. At this stage, it's quite difficult to know what issues will arise. It is possible that while an individual document may be reasonably usable when considered in isolation, actually, the time and costs that are incurred in dealing with a large category of TIFF file documents could be much greater than the time and costs required to work with documents in native format.

THE CHAIR: Is this just a simple matter of whether the TIFF documents are machine readable by the AI?

MR GREGORY: I think it's partly that, yes. Yes.

THE CHAIR: You know, I see this all the time in bundles: that some bundles, I can select the text and dump it into my judgment, and in other bundles you can't do that, so presumably that means it's because my machine can't read that as text --

MR GREGORY: Yes.
THE CHAIR: -- (overspeaking) as an image.
MR GREGORY: Given the volume of materials which have been disclosed and the fact that the disclosure review costs are going to run into the hundreds of thousands of pounds, you can see that the ability to use an AI disclosure review platform efficiently could actually produce very significant cost savings. So that's the context in which we might be asking Valve to disclose some of the documents in native --
THE CHAIR: Right, but are you just --
MR GREGORY: They have confirmed their costs.
THE CHAIR: Perhaps a point from Mr Kennelly to deal with in reply, but is that then just putting the same sort of exercise on the defendant on the basis that they can't just use their oven-ready documents; they've got to go back and find which computer those documents were on and find it in native format, and there is the question as to whether that is an even greater imposition on them than the ability not to use machine reading is for you.
MR GREGORY: Yes, well, the key words there I think are the "greater imposition".
THE CHAIR: Yes.
MR GREGORY: There's obviously a question of proportionality here. So you can see that, for example, we ask for a load of documents. Valve says: well, we're going to have to review them, say, for legal privilege, and it's going to cost us £50,000. But having those native file documents might allow us to make savings of £100,000 in terms of our disclosure review costs.
I suppose one issue just to flag is: considering the costs on both sides is obviously the right approach, but I can see that it may not be possible for the parties to agree all of these requests between themselves, and some of them may come back to the Tribunal for determination. Obviously, that is one category of issues which we say may require

resolution. It's one of the reasons why we think an autumn CMC may be helpful, just because it's a big disclosure exercise: a lot of disclosure issues may well come up, and it may well be necessary to have the Tribunal's timely determination of them.

MR KENNELLY: Sorry, can I just maybe save my friend some time? Because this is the first -- we've actually not heard this point before about the need to use AI and the potential problems they expect with TIFF documents.

We will be disclosing with the TIFF documents a searchable text file. The TIFF document will be accompanied by a searchable text file in respect of the 2.6 million documents. That means they will be able to use standard AI technology on those searchable text files.

THE CHAIR: Well, it does seem relevant. Thank you.

MR GREGORY: What I'm hearing is that may work, it may not, and we will only find out when we actually start undertaking the review exercise.

THE CHAIR: Well, I'm struggling to see why an AI could read an email in native form and a Word document in native form, but can't read a -- well, presumably these text files are Word documents.

MR KENNELLY: It's a .note file.

THE CHAIR: A .note file, right. A .note file.

MR GREGORY: I think we've hit the limits of my technical expertise, so I think probably the best thing to do is for me to have another conversation with my instructing solicitors, perhaps when we take a break.

THE CHAIR: Yes.

MR GREGORY: The final issue regarding the *In re Valve* disclosure concerns the fact that we've requested that Valve produce an organogram or something similar, just identifying the key individuals within Valve who are involved in the relevant activities and their role within the company. This is just reflected in the draft CMC order. That's

in core bundle, tab 15, page 392. (Pause)

I'd be grateful if you could read subparagraph 1.2. It's the purple text at the top of the page.

So the practical reason for this is that when you're reviewing disclosure, the documents are a lot easier to understand if you know the identities of the individuals who had responsibility for the relevant activities, their roles within Valve, the teams in which they work, and so on. Obviously, you can start to piece that together over time as you're going throughout the disclosure process, but if you have that information at the outset, it can make things a lot quicker and therefore cheaper.

In its skeleton, Valve says that its understanding is that no organograms exist in the disclosure itself, and it strongly resists creating one on the basis that that would require it to review all 2.6 million documents and to do it. For the avoidance of doubt, that is not what we are asking Valve to do. There's no need for any organogram to be completely perfect and to cover everyone referred to in this massive tranche of disclosure. But Valve must know or be able to identify many of the key individuals who are involved in these activities without re-reviewing all the disclosure.

It's already reviewed the disclosure itself, so I presume it must have created notes on what happened that referred to the relevant individuals. It's already given factual evidence in the US, and will have had to identify individuals with the relevant responsibilities for the purpose of doing that, and those individuals will know what their roles were at the time and the more significant members of their teams that were involved.

So, yes, it might require some costs to be incurred by Valve. But again, we're back to the proportionality issue. We say this is a situation where at relatively little cost, Valve could provide some information which could produce really quite significant cost savings on our side in terms of the disclosure exercise.

MR LOMAS: Wouldn't the normal way of dealing with that problem, which is kind of inherent in most disclosure exercises, is to look at the disclosure you receive and then raise a part 18 request or the equivalent, saying, "Who is Mr Smith? What does he do? Who does Mr Jones report to?" or whatever, to which the answer may be an organogram as a way of doing it, or it may a written answer. Why would that process not apply here, as it usually would? (Pause)

MR GREGORY: The answer I've just been given is that the AI review platform is likely to be much more efficient if it can be given that information at the start of the exercise. I think the answer is we could go through that process, but it will just result in delay, because we'll have to make the request; Valve will then have to go away and spend some time producing the information, which it will then give us, and we can then plug it in. But it would be much more efficient if Valve can go and get that information now and give it to us on 31 July, and then we can get cracking in an efficient way. Again, the context is that this disclosure review exercise is going to be very big indeed. 2.6 million documents is a lot of documents.

THE CHAIR: Thank you. Is there any way you can identify up front the categories of individuals whose job descriptions are needed?

MR GREGORY: I think the answer to that is no. Not without having seen the disclosure. Valve, I think, itself has said that lots of their people don't have very detailed job descriptions.

THE CHAIR: I mean, your wording does seem rather -- "the individuals involved in relevant activities referred to in the US Valve documents". Why only the US Valve documents? Don't you want to know what people were doing in the UK?

MR GREGORY: Well, the initial disclosure comprises disclosure from the US, which we envisage will be focused on, what was being done in Valve's head office in the US and its relationships with publishers in the US. As I've said, our understanding is that

Valve's approach is not US-specific. It takes broadly the same approach in other countries as it does in the US. So the whole premise is that --

THE CHAIR: What are relevant activities?

MR GREGORY: Well, if the issue is that the request needs to be more precisely defined, we can do that. As I said, it doesn't have to be perfect. For the reasons we've given, having as much of this sort of information as can reasonably and proportionately be provided on 31 July would be very helpful, and could produce very significant cost savings. We're not saying it has to be perfect, and we're not saying they have to re-review all the disclosures to do it, but they must have some information that they could give us fairly quickly and easily.

THE CHAIR: And are relevant activities the persons who had involvement in setting the policy or terms (overspeaking)?

MR GREGORY: Yes. Things like the commission rates, the PPO terms, what Valve sometimes referred to as its policy that Steam customers have to be treated fairly; things like that. These are the core activities which are at the centre of the claim. I said, if it's a case of being more precise in the wording, we can obviously do that.

MR LOMAS: I think perhaps we should not be distracted by it now, but when Mr Kennelly is making his submissions, it would be interesting if he was able to give an idea of the size of the headcount and team within Valve and Steam, because these things scale very rapidly. I don't know if we're talking about ten people, 100 people, 10,000 people, and that would have quite an impact on the size of the exercise.

MR GREGORY: I would be very grateful for him to do that.

That, I think, is all my submissions on agenda item 1(a), which concerns the initial disclosure.

I'm now going to turn to what we consider to be the most significant item on the agenda, namely the issues relating to disclosure of third-party materials in Valve's

possession that have emerged in recent correspondence. You have seen that when we initially proposed the two-stage process, we proposed that Valve should include these third-party materials at the same time, because they're basically off-the-shelf. They are existing documents and have presumably been reviewed for confidentiality and legal privilege and so on.

On 8 May, we specifically asked them to flag if there are any constraints on the disclosure of third-party documents, and Valve has only very recently provided a clear explanation of what it says those constraints are. It's previously explained that the US disclosure includes third-party materials from 29 different entities, in addition to Valve. As I said, it's common ground that there's a very substantial overlap between the issues in the US proceedings and the issues here. The documents, which have been disclosed in the US proceedings, including by third parties, are highly likely to be relevant to the issues before the Tribunal. I mean, in reality, a lot of these materials have been disclosed by the plaintiffs in the US proceedings, so it's not unreasonable to suppose that they may contain some materials which are adverse to Valve's position.

The context, of course, is that Valve itself has disclosed a vast quantity of its own evidence from the US proceedings, and indeed, that seems to be the main evidence on which it's intending to rely here, and it has obviously had sight of all the third-party materials, and the Class Representative has not. So we say that the disclosure of these third-party materials will be necessary to ensure that the Tribunal has before it the evidence necessary fairly to determine the issues in dispute, and to ensure equality of arms.

Until a few days ago, Valve's position was that these materials could be disclosed in these proceedings, under the terms of the US order governing confidential materials which have been disclosed in the US. In particular, the first CMC in May 2025 was

concerned with the confidentiality arrangements that should be put in place. Ahead of the CMC, Valve served the first witness statement of Mr Ross, a partner at RPC. I would be grateful if you could turn that up. It's in the core bundle, tab 18, page 481.

(Pause)

Please turn forward to page 483, and I'd be grateful if you could read paragraphs 7 to 10. (Pause)

When you have read that, I would be grateful if you could go to page 486 and read paragraph 21. (Pause)

Finally in this document, go to page 487 and read paragraph 25, including the various subparagraphs of that paragraph. (Pause)

I'm just looking at the time. I don't know if now might be a good time for a short break, but I'm happy to keep going if you'd rather --

THE CHAIR: It depends how long it's going to take you to finish (overspeaking).

MR GREGORY: Yes, I think it will take me over the when we should probably break for the transcribers.

THE CHAIR: Okay, well, let's break now then. We'll come back at 11.53 am.

MR GREGORY: I'm grateful.

(11.42 am)

(A short break)

(11.54 am)

MR GREGORY: Three miscellaneous points, based on the discussions I've been able to have with those behind me.

Our understanding, I think from an earlier public statement, is that Valve only has around 300 or so employees, but Valve is obviously going to be in a position to confirm what the current number is. The context is that Valve used to be involved in developing its own games, but over time has moved towards being a seller of other people's

games on its platform. We will to try and get some more information over lunch, given it looks like we'll be coming back after lunch, about the issues that we may encounter with the AI disclosure platform, and if we can provide any more information after lunch, then I will do.

THE CHAIR: Yes. Has anybody tested the AI platform with TIFFs or with text files?

MR GREGORY: Well, the people who run the AI disclosure review platform will obviously have experience of this. We are contacting them, and if I can give you more information based on what they tell us after lunch, then I will do. It would obviously, on the other side, be helpful just to have as much understanding as possible about the contents of the text files that Valve says we disclosed. Our understanding is those text files will include the metadata, but not the full text of the document. The full text of the document can't be disclosed, because it would have required Valve to have done the review exercise, to mark-up specific information and so on. But again, I don't know if Mr Kennelly wants to clarify.

MR KENNELLY: I will take instructions. I must say, it would have been helpful if we'd been given some notice of this issue about the use of AI to do specific document review. Had we been told even yesterday, I could have taken instructions. I'll do my best in the time.

MR GREGORY: All of this is by way of background context, because we obviously do have a mechanism, subject to the minor point about the wording, for us to request disclosure of the native format files and for Valve to respond and so on. But given that some of these issues may be coming to the Tribunal in due course, it's probably helpful just to understand them as best we can.

THE CHAIR: But if the issue is the whittling down the millions of documents to the level where you can do individual requests, then we need to deal with it up front.

MR GREGORY: Yes, it would certainly be helpful.

The only other point was one more question which Mr Kennelly may be able to take instructions on over lunch, which is he said that in relation to legal privilege, they would be able to tell us the number of documents which have been withheld and the categories, but not the number of documents within each category. It would be helpful to understand why they can't tell us the number of documents within each category. Again, I'm happy for him to provide information on that later.

THE CHAIR: Do we have any general understanding of the difference between US law on privilege and privilege as we understand it in the UK?

MR GREGORY: Well, at a very high level, they have the same sort of background concepts, but their application can differ. There have been cases including the judgment which was referred to in the skeleton, where what was being discussed with documents which had been redacted on the grounds of US legal privilege. Mr Justice Hildyard, who was responsible for the CPO hearing, held that those documents did not fall within the scope of UK legal privilege. Basically, they are broadly aligned, but the overlap isn't complete.

To return to where I was before the short break, I've shown you Ross 1. The US Protective Order itself was exhibited and was in the bundles. I'd be grateful if you could go to that. It's in the core bundle tab 19, at page 494. (Pause)

Just turning the pages on 495 to 496, you see the definition of confidential material. At the bottom of page 496, there is a provision regarding the scope of the order. I would be grateful if you could read that section 3 at the bottom of page 496. (Pause)

We have proposed that Valve should disclose a list of the third-party documents that were disclosed in In re Valve, so that we and also you, the Tribunal, can consider the third-party materials issues on a more informed basis. Valve has suggested that it cannot do that, on the basis that even providing a list of documents would be contrary to the US Protective Order. I presume it has the scope provision in mind, but on our

side, we cannot understand how even providing a list of documents would contravene the order.

Clause 4.1 on page 497; that sets out the central prohibition on collateral use. (Pause)

Then after you've read that, I'd be grateful if you could turn forward to page 502, and please read clause 7. (Pause)

We are not US lawyers, but we can all read English. The point I make is that that on its face, the plain meaning of this provision would appear to cover a disclosure order made by this Tribunal in these proceedings. There's nothing expressed that limits the word "court" to a US court, and nor would there appear to be any obvious policy reason why --

THE CHAIR: Well, the term is "the court," isn't it, rather than "a court"?

MR GREGORY: Yes. "The court" is the --

THE CHAIR: So the "the" may suggest that it is whichever -- I'm not sure if this is a state proceeding or a federal proceeding, but presumably the federal court.

MR GREGORY: Yes, well, it says:

"... if a party is served with a subpoena or a court order issued in other litigation." [as read]

THE CHAIR: Where are you reading from?

MR GREGORY: Sorry, I'm looking at clause 7 at the top of page 502. This is the clause that governs where orders for disclosure are made in other proceedings.

THE CHAIR: I see.

MR LOMAS: But it's really about meaning of the word "litigation", isn't it?

MR GREGORY: It's really ...?

MR LOMAS: About the meaning of the word litigation.

MR GREGORY: Yes, possibly. I thought this was litigation.

MR LOMAS: Yes. I think the question is whether the American judge making it

thought this was litigation.

MR GREGORY: Well, certainly Valve's own understanding of this order was that this provision applied in these proceedings. As you've seen in Ross 1, there was also a similar statement in Valve's skeleton for the May 2025 CMC. Just for your notes, that's in the supplementary bundle, tab 2, page 22. The relevant paragraph is 24.5.

At that stage, Valve's submissions were that, were the Tribunal to order Valve to disclose materials from the In re Valve proceedings that had originated from third parties and had been designated as confidential, that clause 7 would apply, and that if Valve disclosed such materials in these proceedings, other than into a confidentiality ring, it would be in breach of clause 7. But Valve could disclose such materials in line with the requirements of clause 7 if they were disclosed into the sort of confidentiality ring which Valve proposed at the time, and that such a confidentiality ring should therefore be put in place for that reason.

In part, on the basis of those submissions, an interim confidentiality order was put in place. Again, just for your notes, that's in core bundle, tab 12.

That remained Valve's position until a few days ago. I'd be grateful if you could turn to the correspondence bundle at tab 38, page 176. (Pause)

So this is Valve's letter of 9 June. I'd be grateful if you could go over the page to page 177 and read paragraphs 4 to 7. (Pause)

THE CHAIR: So the key passage is the one in paragraph 7?

MR GREGORY: Yes. (Pause)

So at this point --

THE CHAIR: Is there an additional difficulty that even if this does apply to other courts, we're a Tribunal, not a court?

MR GREGORY: Well, I'll let Mr Kennelly make submissions on that. I mean, I don't think this -- there's no policy reason to regard that these proceedings before this

Tribunal should fall outside the scope of the order. I mean, that would be an extremely literal reading of the order.

The policy concern is obviously that there needs to be a balance struck between the interests of justice in other litigation and the legitimate right of third parties to have their confidential information protected, for example, by disclosure into a confidentiality ring.

We are proposing to comply with the substance, the requirements of the order, and there does not seem to be any policy reason not to do that.

At this point in time, when you've read the letter, this is ten days after Valve has filed its US application. Valve then is still saying that it considers the terms of the US Protective Order to be clear and that the position is as set out in Ross 1.

As to what happened next, that's set out in our skeleton. I'd be grateful if you could go back to that. Core bundle, tab 2, page 19. I'd be grateful if you could just read paragraphs 47 to 52. (Pause)

THE CHAIR: Sorry, what was the paragraph again, please?

MR GREGORY: Our skeleton, paragraphs 47 to 52. (pause)

On the final point at paragraph 52(b), even if Valve were prohibited by the US order from disclosing the third-party materials, that would not prevent this Tribunal from ordering their disclosure. The issues of disclosure are governed by the lex fori English law, and there is case law saying that English courts can order the disclosure of materials, even where their disclosure would place the disclosing party in breach of a foreign law, even including a foreign criminal law. The fact that there would be such a breach is obviously irrelevant consideration, but it is not determinative.

The leading case is a judgment of the Court of Appeal in a case called *Bank Mellat*. The court must take into account all of the circumstances and consider what is appropriate to do justice. That would obviously include how things have developed on the facts of this case.

It would be one thing if Valve had simply sought clarification of the position from the US courts. It could have made an application asking the court to clarify the position, noting that the materials were likely to be relevant in these proceedings, and submitting that clause 7 should cover any disclosure ordered by this Tribunal in the interests of achieving justice, and to avoid Valve potentially being put in a position where it has to breach the terms of the US order.

But that is not what Valve has done; it has chosen to positively advance the opposite argument, and it is trying to persuade the US courts to construe clause 7 narrowly, contrary to what I would suggest is its plain meaning and Valve's own previous interpretation, such that it would not apply to the present proceedings.

It is very difficult to avoid the conclusion that Valve is deliberately trying to put in place an impediment to the disclosure of the third-party materials that you, the Tribunal, are able to order. If Valve was successful in the strategy, it would presumably only be possible for the Class Representative to get these materials by making applications for third-party disclosure from the 29 third parties who provided the documents. That would be a hugely expensive and time-consuming exercise, and the governing principles before the Tribunal mirror the overriding objective under the CPR. Both the parties are under an obligation to act in a way that ensures the parties are on an equal footing and saves expense and ensures the proceedings can be dealt with expeditiously and fairly. In the Class Representative's submission, in taking the course that it has, Valve has acted in breach of those general principles.

As to the implications for these proceedings, you are not being asked to determine any disclosure application today or all of the issues which are raised. The point for today is that what has happened has raised issues of considerable complexity. The disclosure of the third-party materials is going to be highly significant for these proceedings, and it is important that those issues are progressed efficiently.

Realistically, unless Mr Kennelly stands up and says that Valve has recanted its position, this point is not going to be agreed between the parties; it is going to require you to determine it. One procedural issue which is an issue for you is whether this Tribunal might write to the US courts to notify of these proceedings and the possibility that a disclosure order may be made. That is a matter for you.

But whatever happens in the US, you are likely to have to determine at some point an application for disclosure of the third-party materials in these proceedings. In our submission, it's important that that is progressed as quickly as possible, because it could be a source of significant delay.

Any decision you make could potentially be appealed. That is a realistic prospect, because there have been appeals against orders made in equivalent situations in other cases. If disclosure is granted, there will need to be a process for notification of third parties. If it's not granted, there may well then follow applications for third-party disclosure, which could take many months to determine.

The *In re Valve* materials are the most significant third-party materials. But for completeness, some of the same issues may arise in relation to third-party materials in the Polish investigation. In relation to that, I'd be grateful if you could just read paragraphs 56 to 57 of our skeleton.

MR LOMAS: Mr Gregory, before you move on, would it be possible for the Class Representative to make submissions to the American court on interpretation against the background of this case?

MR GREGORY: Well, it may be that Valve is in a position to give us some information about that. These developments have only occurred in the last few days. It is obviously something that we could look into, and it may well be possible for us to make such representations. If we can, we will consider doing that.

MR LOMAS: The American court is presumably going to look at it from the perspective

of the request coming from an arbitration process. The issue that you're raising is a slightly different one.

MR GREGORY: Yes, I certainly think it would be helpful for the US court to be made aware of these proceedings and the relevance of the materials for these issues in this claim, and the possibility that a disclosure order may be made. Whether that communication is better coming from us or the Tribunal is one question. But I think one way or another, it would be helpful for one of us to put that information before --

MR LOMAS: It was your comment that provoked the question.

MR GREGORY: Yes.

Just for completeness, I was just going to ask you to read paragraphs 56 and 57 in our skeleton: core bundle, tab 2, page 21. (Pause)

So that takes me on to the agenda item 3(a), which concerns whether the Tribunal should list an autumn CMC. We obviously say that it would. We think there were some very significant issues regarding the third-party materials that are likely to require determination. Valve's suggestion seems to be that these issues should simply be parked until the next CMC, which would otherwise be in April/May next year. Valve I think says that's appropriate because we need to wait for the ruling of the US court on its application.

As I've said, it doesn't necessarily follow that that's the case, because even if the court rules that clause 7 does not apply, that does not preclude this Tribunal from ordering disclosure. In fact, it is possible to look at things the other way round, which is that it may be helpful for the US court to know what views this Tribunal has reached on an application for disclosure of those materials in these proceedings. It may well be relevant in its construction of clause 7 that on one construction, it would place Valve in breach of the US order, and another construction would not.

However you look at it, there are clearly some very significant issues here, and we

think parking them for 10 or 11 months, as Valve seems to suppose, is just a recipe for very significant delays to the proceedings. I've already flagged there may well be a number of other issues which may come before you relating to legal privilege and the form of which documents are disclosed.

Finally, in relation to the timetable, you asked for the party's views on whether there could be a split trial and the likely timetable to trial. I briefly covered in opening that neither of the parties consider that a split trial would be viable, because the various issues are closely interrelated. We actually also broadly agree as to when a trial may be possible. I think we probably are looking at early 2029. We say it could be brought earlier, but that obviously depends on disclosure issues being progressed quite quickly.

The last two agenda items concern communications with the class and updating the Tribunal on the Class Representative's budget.

If you just turn back to the agenda, core bundle tab 1. We're now at agenda item 4, "Communications with the class".

You can see that are three different points there. They arise from two sources. First on 15 June, the Tribunal asked for an update on the number of class members who have opted out. And in correspondence and in its skeleton, Valve has proposed that the three-month opt-out period should be extended by a further six months.

Just dealing with the factual matter first: during the CPO hearing, the Class Representative agreed to provide quarterly reports on its communications with the class and the level of engagement, and that that commitment was recorded in the recitals to the CPO order. The first report was provided by the Class Representative on 30 April of this year, covering quarter 1, 1 January to 31 March. That is at correspondence bundle tab 1, page 4. I'd be grateful if you could turn that up. (Pause)

You can see the first few pages provide some information about the claims websites

and the emails that were sent out on 12 and 13 March. If you turn forward to page 7, there you can see the data. If you look at the top few rows, the claim websites rows, the number of individuals visiting the claim websites and signing up to the mailing list are set out. For the first quarter, the numbers were 33,560 and 1,644. This is obviously only Q1. I'm told that as of last Friday, there are now 4,678 people signed up to the mailing list.

The next two sets of rows provide data on the emails that were sent out on 12 March and 13 March. The email on 12 March went to people who had signed up to receive emails on the claim website. It went to 3,962 people. It had an open rate of about 50 per cent, which I'm told is pretty high for these sorts of things.

The next set of rows cover the email on 13 March. That email was sent out because a number of people had spontaneously contacted Milberg directly, not through signing up on the claims website, so those people were also contacted. Again, the open rate is quite high.

Then you can also see that there are various FAQ emails that were sent to or from class members. That's covered in the final section.

The next report similar to this is due to be provided by mid-July. (Pause)

That will cover quarter 2 of 2026. The Class Representatives' communications with class members have all been carried out pursuant to the post-CPO engagement strategy, which is set out at section 8 of the NAP. That document was considered by the Tribunal as part of the CPO process, and their issues are raised by Valve in relation to it. Just for your notes, that document is at core bundle tab 8.

In relation to the number of opt-outs, the opt-out period ran from 12 March to 11 June. It's a three-month period that's become fairly standard in collective proceedings claims. Over that period, 3,815 class members opted out of the claim. 98 people opted in. Everyone who opted out is domiciled in the UK. Everyone who opted in is

non-UK domiciled, and we know that because the forms require you to enter your address when you complete the form.

Paragraph 29 of Valve's skeleton suggests that further opt outs have been received but have not been validated. I'm not sure where that comes from. It appears to be a misunderstanding. Epic and the Class Representatives seek to validate certain class communications data. For example, quite a lot of the website signups come from bots rather than real people. But there's no need to validate the opt-out numbers. That opt-out number is accurate and is not going to change.

Just to put the number of opt-outs in context, the estimated class size is 14 million. 3,815 opt-outs therefore amounts to about 0.03 per cent of the class members. That's about 1 in every 3,500 people have opted out.

THE CHAIR: But it's about 10 per cent of those who engaged with the website.

MR GREGORY: Yes. Oh, I see. Well, that, I think, is a slight misunderstanding on Valve's part as well, which has drawn an inference from a number of opt-outs of the number of people who clicked on the advertising, including the banner advertising. So there's various routes by which people can get to the claims website. There has obviously been a lot of media coverage, including articles in the general press and so on, associated with the launch of the claim and the CPO. I think it's estimated that that media coverage might have reached about 64 million people. (Pause)

Mr Kennelly is asking where that's from. I'll try to get him that figure over lunch.

THE CHAIR: 164 million people?

MR GREGORY: Yes. I presume that includes people in the US as well.

So anyone who becomes aware of the claim can obviously choose to go to the claim website. There are obviously also people who just have gone to the claim website through other routes who sign up to receive the emails. Then also there is the internet advertising which is put out, where you get a pop-up banner ad and people can click

on it, and that then takes them to the claim website and they can get in that way. So there is a number of different routes by which people can get to claim website and opt out.

THE CHAIR: But in the period to 31 March, only 33,000 got to the claims website; is that right?

MR GREGORY: Sorry, (inaudible) --

THE CHAIR: I'm looking at page 7, going back to those numbers.

MR GREGORY: Yes. Just to note, this quarter 1 period which is covered by this report is not the same as the opt-out period.

THE CHAIR: No, no, I've got that. Yes, so it's apples and pears.

MR GREGORY: Yes, it's apples and pears a little bit.

MR DAVIES: Just for clarity, is the only way to opt out to go to the claims website?

MR GREGORY: Well, I think you can see you people have received emails if they have signed up on the claims website. I'll just check whether those are --

MR DAVIES: But if you want to opt out --

MR GREGORY: Yes.

MR DAVIES: -- is the only way to do it to go to the claims website? Is your point that they might have heard about it through the general media and then gone to the claims website specifically to opt out? Maybe that's a slightly different question. The interesting question is just about the claim. Does that mean they know they have to?

MR GREGORY: Yes. You can go to the claim website and opt out through the claim websites. Another route which still involves going to the claim website is you go to the claim website, sign up to receive the emails, and then you receive an email which gives you a link which you can click through to opt out. It's technically possible for people just to write directly to my solicitors.

THE CHAIR: And you mentioned there was general awareness through the media. Did that general awareness through the media include the awareness that if you didn't want to be in and you're within the UK, you needed to opt out?

MR GREGORY: A lot of the original media was at the time the claim was launched, so that was before the opt-out process. (Pause)

There was a lot of media at the outset of the claim. There was another wave of media at the time the certification judgment came out, so there was some media at this point. Also, the details of the claim websites and the possibilities to opt out have also been shared on various online fora which are used by PC gamers. Our understanding is that knowledge of the opt-out process has been spread partly that way. It seems to be common ground that PC gamers can be quite an animated lot. Some of them feel very strongly about their gaming and their preferred platform, and you may have seen attached to some of the correspondence some pages from a Reddit noticeboard. On those sorts of notice boards, there have been links to the claim website, which have provided details for people to opt out.

Then finally on the class communications, Valve has suggested that the opt-out period should be extended. It proceeds on the basis, that we say is wrong, that the Class Representative has achieved very low levels of engagement with the class members, but where the class members have engaged, Valve says that a significant portion have chosen to opt out. Largely, because this is Mr Kennelly's application, I'm going to let him make his positive arguments, and then I can respond to it later, subject to two initial points.

They have suggested or inferred that 25 per cent of people who clicked on the online ads have opted out, but that's not correct, for the reasons that I gave earlier. There has been wide press coverage, and then people will have got to the claim website through that, and many of the opt-outs will have come through that process rather than

through the online advertising.

THE CHAIR: Well, you can't really tell until we've got the communications report that covers the whole period.

MR GREGORY: Yes. Well, that will certainly --

THE CHAIR: Because that would tell us how many people responded to the press interest or the Reddit posts and went to the website and weighed it up, and then decided whether to opt out or to opt in if they needed to.

MR GREGORY: Yes. We will give you some insight into that.

MR DAVIES: I mean, even that wouldn't quite do it, would it? Because I think what you're saying is that Valve's contention is that the people going to the website is almost a random slice through the 14 million, and of those, quite a large proportion opted out. Whereas you're saying anybody who opted out, even if they've just seen it in the media, has gone to the website specifically to do that. So that's not a representative percentage of the broader population of the potential claim.

MR GREGORY: Yes, focusing on the click-through numbers is not an appropriate way, because there's all sorts of ways that people may choose to go through to the website, including the press articles and so on.

I said Valve has also included these internet chat discussions in some of its correspondence, and you can see that some people do feel very strongly. We suspect that a lot of those people are based in the US, but they are not class members anyway.

I said our impression is that because the claim has generated a lot of publicity, both generally and within the specific gaming community, we think that a large number of people will be aware of it and aware of the possibility of opting out, or had the chance to go to the claim website to find out about it. The reality is that only a tiny proportion of them, the total class, have opted out to date.

THE CHAIR: If we were to extend the period, would that have any implications for the

timetable?

MR GREGORY: I think the main implications would be cost implications. I don't think it would necessarily --

THE CHAIR: Could you explain that, please?

MR GREGORY: Well, I think presumably because there would be -- hang on, let me just check. (Pause)

Simply extending the periods in itself without doing anything else should not generate significant cost consequences. If it had to be accompanied by a fresh wave of PR activities and paid advertising and so on, that obviously would have cost consequences.

Those are my submissions on the --

MR LOMAS: Sorry, on that topic, and it closed on 11 June, at the moment -- so a couple of weeks later -- are there further requests that have been made to opt out that have been made after the deadline, which would otherwise come to the Tribunal, or is there a zero for the past couple of weeks?

MR GREGORY: The form shut at the end of the opt-out period.

MR LOMAS: Oh, I see. So you wouldn't know.

MR GREGORY: Yes. The only way we'd know is if someone had spontaneously written directly.

MR LOMAS: I see.

MR GREGORY: I understand there's been no, or no material number of, people doing that after the opt-out period.

MR LOMAS: Just pursuing this line of thought further. I don't think this came up at the hearing last year. It would presumably be possible to leave that form open on the website and say, "If you wish to opt out, please sign your name here so that we have a record", and you make an application to the Tribunal. So it's a relatively limited

amendment to what is on the website, rather than just shutting down the route.
(Pause)
MR GREGORY: I recognise it would be technically possible to do that. I'll take instructions over lunch, perhaps, as to the wider implications of it; whether it would be possible.
MR LOMAS: Thank you.
MR GREGORY: The final item that I was going to address concerns the update to the Class Representative's budget. That information was provided to the Tribunal on Friday. You'll note that a couple of cells in this spreadsheet are confidential vis-à-vis Valve, because they would allow them to back out the level of ATE insurance which has been taken out. But other than that, Valve has the spreadsheet.
I was only proposing to make a couple of high-level points. One is that in very broad terms, we are sort of more or less on track in relation to the overall budgets. The main point to flag is the one that I've already flagged up, which is that there is a very real risk of a significant overrun on the costs relating to disclosure review, because the original budget estimates were put in place before we knew the size of the disclosure that would be coming: 2.6 million documents.
So obviously there is a contingency fund, but nonetheless, that's the main area of risk in the budget. If you've got specific questions about the update, then I'm happy to answer them as best I can, or failing that, I can take instructions on them over lunch.
Finally, the only other point to flag is that Mr Kennelly said it would be helpful to have known that we were proposing to use the AI disclosure platform to review the materials -- and that was a point relevant to the document format issue -- that was actually flagged in our skeleton argument. Unless you had any questions for me, those are my submissions.
THE CHAIR: Thank you very much. (Overspeaking).

MR LOMAS: I've got one point on a completely different issue which we were talking about at the end of last week, which is: one of the points taken in the CPO judgment was that given the number of minors in the class, a lawyer should be added to the advisory committee, to the Class Representative -- and I don't think we knew whether that had happened. I just wondered if there was any update on that.
MR GREGORY: It has happened. If I get more details over lunch, I'll give you some more specifics.
MR LOMAS: Thank you.
THE CHAIR: We can carry on now, or we could take our lunch break earlier. We've got a good 35 minutes, so no particular reason why we should take our lunch break earlier, but I offer that if that would be more helpful.

Submissions by MR KENNELLY
MR KENNELLY: I'm obliged. I think I can just get stuck in straight away --
THE CHAIR: Right; good.
MR KENNELLY: -- if it's convenient for Tribunal.
I will, if the Tribunal is content, track the order in the agenda, which isn't exactly how my learned friend took the points, but I'll approach it that way, subject to the Tribunal.
The very first item on the agenda in relation to disclosure was the question of legal privilege. I'm just going to check with my friend to see if that's -- I think that's now on the basis of the discussion we had in the course of the hearing.
MR GREGORY: I think it's fully agreed -- you said you were able to identify categories of document which have been withheld on the ground of legal privilege. The overall number, we've asked if you could find out whether it's possible to provide the number of documents within each category.
The other outstanding point on legal privilege is that -- oh, I think actually you're going

to provide a list of the materials which have been held in their entirety, so I think that point is agreed.

MR KENNELLY: So on the question of privilege, we will, when we produce the initial disclosure, as I said, produce a list of the categories of documents which are withheld in their entirety. There's no dispute about the documents which are redacted, in part for US privilege. The description by category will track the approach which this Tribunal takes and the High Court takes in relation to the treatment of privilege. In that approach, it is not normally required that the party disclosing the documents gives the number of documents, either by category or in total. The standard approach is to do so simply by description of the category for which privilege is claimed. In this instance, we have agreed to give the total number of US documents which are withheld in their entirety for privilege, but we are not in a position to give the number by category. In my submission --

THE CHAIR: Would it be arduous to find those numbers?

MR KENNELLY: Yes, it would. It would. Because just to step back for a second, the whole approach to disclosure, which we've agreed, is that we are giving the US disclosure as is. In order to maintain control over costs and to approach this in a proportionate way, our approach -- and I understood, for a large part, the Class Representative's approach -- is simply to take Valve's disclosure as it is and deliver it to the Class Representative. That is how we managed to produce 2.6 million documents as quickly as we can. Anything that requires us to do further work requires a review of those documents, obviously increases delay and cost.

So to give numbers by category would be a fresh exercise, which is why we don't propose it and it's not normally required. The key question is what prejudice might be suffered by the Class Representative. Of course, there is a mechanism in the order where if they wish to challenge the claim for privilege, they can do so in the first

instance to RPC directly.

Again, by way of overall theme to all of the issues we've been discussing, the Tribunal requires the parties to work in a spirit of collaboration. Where queries are raised, it isn't even necessary to make a formal request for information; we are expected by you to collaborate. So if there's a question about a particular privilege claim, the appropriate thing is to write and for the parties to engage in a collaborative way, and if we don't, then we'll suffer the consequences at your hands in due course.

So in the first instance, as I think my learned friend suggested, we should take that approach to privilege, which again doesn't apply to -- we're not talking here about the limited privilege reductions. We're talking only about the set of documents which are withheld in their entirety for privilege.

The next issue was the question of confidentiality redactions in the US document set, in that 2.6 million document set. To take you back to the confidentiality ring order, so that you can see what's between us. It's in the supplemental bundle. I'm using the supplemental bundle. You have it in the core bundle. I'll give you both page numbers if that helps.

THE CHAIR: I've got it printed as well.

MR KENNELLY: Oh, I'm very grateful. It's paragraph 5.3 in the CRO. The confidentiality ring order, sorry. So it's core bundle, tab 16.

THE CHAIR: Sorry, page number?

MR KENNELLY: Page 402.

THE CHAIR: Thank you.

MR KENNELLY: Paragraph 5.3 begins there. I'll take it quickly, because you've seen this already with my learned friend. It deals with the explanations that are given by the defendant when a confidentiality designation is challenged.

Over the page at 403, the parties are agreed that the reasons that the defendant will

give will be by reference to the categories of documents. The reason why we propose explaining the redactions by category is that in the United States, the redactions, the confidentiality redactions, were done by category. There is no list of document-by-document explanation of confidentiality redactions.

So in order to do something more specific, it would require a fresh review, which is the thing that we're all trying to avoid.

Now, what the Class Representative wants to add are those words, "where appropriate", but we say that's unnecessary and it risks wasting costs because --

THE CHAIR: I suspect what was wanted with that was an ability to ask something more particular about an individual document if that arises. So perhaps it's not quite the right wording to do that, because then in every case you have to consider, "Well, is this appropriate?", and you'd say it is because of the point you've made about: that's what you've done in the US. But I wonder if there's some wording that just allows an exceptional case to be asked about.

MR KENNELLY: That's a helpful intervention, if I may say so. In my respectful submission, the word "may" that's already there provides the flexibility -- because we're not required to explain justification by reference to categories of documents. When the query comes in, RPC for Valve may decide that in order to deal with the query effectively, in order to head off a dispute that might ultimately end up here, we could give something more specific.

There's not an obligation to give an explanation by reference to categories of documents. It is better, in my respectful submission, to assume that the parties will work in a collaborative way, with the expectation that in general, the explanations will be given by reference to categories of documents. The words, "where appropriate", really don’t add anything to that. Really, what it's suggesting is that the parties need to work in a collaborative way, but that's implicit in the rules and in the guide to

proceedings in any event. So the language that, "such reasons may be provided by reference to categories of documents ..."

THE CHAIR: Well, "may" gives a blanket permission, doesn't it? So you can say if you've done that, you're always within the permission?

MR KENNELLY: Well, except that if -- it allows flexibility as to how it's done, with an expectation that it will be done (overspeaking).

THE CHAIR: Well, it allows flexibility on your side: you can decide you want to be more specific, but it doesn't require you to be more specific.

MR KENNELLY: I see that, sir, but the real risk of prejudice is really non-existent, because the Class Representative, her lawyers and her economists are all within the confidentiality ring. They will all see the unredacted document. So they will see the unredacted text, and they will see instantly if our justification by category is adequate or not.

THE CHAIR: But would there be any problem in deleting those words, "where appropriate", and putting in some other sentence that just opens the possibility for individual questions in appropriate cases to be asked by the Class Representative?

MR KENNELLY: Sir, if it helps, I'm sure I'm happy to adopt that on the record of the Tribunal's transcript. It doesn't require anything in the order, but I'm happy to endorse the precise wording which you have outlined, sir, and that seems to me to be implicit in the rules anyway. Because in a challenge mechanism --

THE CHAIR: So you delete, "where appropriate", and you don't need anything else, because that's what everybody needs to do anyway.

MR KENNELLY: Absolutely. Then the challenge mechanism at 5.8, that's the mechanism which allows the Class Representative to challenge the explanation we've given. They will do that with the benefit of having the unredacted text, as well as our explanation. Really, that covers off any possible problem that they might be worried

about.

THE CHAIR: Right, so it's already there.

MR KENNELLY: Yes. Then I suppose the bigger question is open justice. This is all very well between ourselves, but what about the principle of open justice? As again the Tribunal has seen, there is a particular requirement in the same order between 5.4 and 5.5: that when documents are filed with the Tribunal, when they go into a hearing bundle or when they're going to be referred to a hearing, they will be specifically reviewed for confidentiality. So when it comes to anything that might go into the hearing, then, recognising the importance of open justice, we will specifically test whether the redaction needs to be reduced or dropped entirely.

I'll move on, then, to document format.

Just to be clear about the technical nature of what will be provided in July, the documents are going to be given in the TIFF format but also in a fully readable file and accompanied by a metadata load file. Those documents can be given on the relativity or --

THE CHAIR: So is the metadata load file itself a readable file or a TIFF file?

MR KENNELLY: I will check that, sir.

It's readable by the disclosure platform.

THE CHAIR: By the disclosure platform.

MR KENNELLY: Indeed. That is useful because we are happy to provide these documents through a disclosure platform, such as Relativity. And if they are using AI tools, then it's likely to be Relativity or Concordance or some other platform. This can be provided in a way that will allow them to use the AI tools that they've mentioned. They will have the readable file and the metadata load file.

THE CHAIR: If, for example, they wanted to search for all emails on 26 July 2022, the metadata would give them that.

MR KENNELLY: Yes.

Just to step back for a second about the unreality, if I may say so, of the concerns raised by my learned friends. As this Tribunal knows, we agreed to provide voluntary disclosure last year. We'll come to this when we look at the question of third-party disclosure. We provided the Class Representative in September 2025 with about 3,000 documents in this form, the TIFF form with the accompanying readable text file and the metadata load file. They've had them since September, and I would imagine they should have tested them since then, and if any problems had arisen with the format in which the documents were provided, we and the Tribunal would have been told. They've actually had thousands of documents already in this form, which would allow them to test the utility of them for the purposes of any AI platform they wish to use.

But coming back to the order itself, I'm now looking at paragraph 5 of the CMC order, not the confidentiality ring order. It's on page 84 of the supplemental bundle, page 392 of the core bundle.

The concern is that notwithstanding what I've told the Tribunal, the documents may still not be reasonably usable in the format in which we provide them. We agreed that where the US Valve documents are not reasonably usable in that format that we're providing, the Class Representative may subsequently request that we provide documents or categories of documents in native format. We've agreed that.

The Class Representative -- in the purple lettering -- which is simply to say that where reasonable, they may request documents or categories of documents in native format. We're concerned about that language, because again, the idea is that we provide everything in the form which we have it from the United States. If it's not reasonably usable, then we'll do the extra additional work of producing it in native format. But what we suggest is not appropriate is to have a general open question of

reasonableness in relation to further requests.

THE CHAIR: So your wording in the red colour, "US Valve Document is not reasonably usable".

MR KENNELLY: Yes.

THE CHAIR: You would mean by that, "including by AI search engines" or something like that.

MR KENNELLY: Yes, exactly. So if in the circumstances that was an appropriate way and if there was a problem, yes. I mean, "reasonably usable" provides a broad test for the effectiveness of the forum in which we're providing the documents. It is still more precise, even in that broad form, than simply the words "where reasonable". We're concerned about that because it lacks direction and specificity, and is potentially a cause for costly satellite disputes, which we are all seeking to avoid.

The Tribunal will be aware that in circumstances where we're talking about at least 2.6 million documents. It's incumbent upon us all to do our utmost to try and limit the scope for further additional or wasteful work in relation to disputes that might arise out of those, because even if only a few thousand documents need to be converted to native format, that is going to be costly and generate delay.

MR LOMAS: The 2.6 million: that's documents rather than pages. That's individual documents. A document could have 20 pages, or whatever.

MR KENNELLY: Yes. That's my understanding. In fact, many of them will be a lot larger than that.

MR LOMAS: Yes.

MR KENNELLY: I'm grateful to Mr Lomas. It gives you a flavour of the volume of what is going to be provided at the end of July.

I see it's 12.55. That's probably an appropriate time to finish this part of my submission. I'm moving on to the question of third-party documents and the US

Protective Order. I can take that up.

THE CHAIR: Okay. Well, it sounds like we're doing reasonably well, so I won't try and claw back for five minutes. We'll come back at 2.00 pm.

(12.52 pm)

(The short adjournment)

(2.00 pm)

MR KENNELLY: I was moving on then to the question of third-party documents.

To begin, it's important not to exaggerate the significance of this issue, because my learned friend said that it was highly significant. But of course, we are concerned with about 50,000 documents. That's about 2 per cent of the 2.6 million documents which are being provided in July.

The documents, as you've seen, were disclosed to Valve by third parties in the United States proceedings, and many of them are highly confidential. Obviously, they weren't obtained by Valve in the ordinary course of business. They came to Valve only through the litigation, and to a large extent they are held only by Valve's external lawyers. They're not held by Valve itself.

To be clear, and to address one of the main points my learned friend made, we are not saying that the Tribunal is prohibited from ordering their disclosure. When it comes, we will consider the issue. It is a matter for the Tribunal, even in the face of a risk of penal sanctions, to decide to order the production of these documents. It's a matter for the forum, and we are subject to the Tribunal's jurisdiction.

But in deciding whether to order the disclosure, the United States Protective Order is relevant. As you see now -- we shan't take it up again -- clause 4 prohibits Valve from using the documents received in the litigation for any purpose other than the United States litigation itself and clause 7 provides a mechanism for notifying third parties concerned when a court in other litigation orders a party to produce third-party

documents. As you have seen, clause 7 doesn't positively permit disclosure of the documents in other litigation, but that appears to be what's contemplated in clause 7. If I may just explain our reading of clause 7 in May --

THE CHAIR: Can we have it in front of us as we do that?

MR KENNELLY: Yes. It's in the core bundle, tab 19, page 502. (Pause)

I'm afraid I shan't be doing careful textual analysis, partly for the reason that I'll go into now, because the issue in May 2025 was whether there should be an interim confidentiality ring order, because Valve had agreed to provide early disclosure voluntarily, and we asked that a confidentiality ring order be put in place, which the Class Representative unfortunately opposed, even though such a confidentiality ring order was obviously necessary because it wasn't in dispute that the documents that we were disclosing contained confidential information. We relied on clause 7 --

MR LOMAS: (Overspeaking) confidential information subject to the US Protective Order.

MR KENNELLY: Sorry, sir. You mean at that stage, the documents we sought to disclose --

MR LOMAS: Into the ring --

MR KENNELLY: Into the ring?

MR LOMAS: -- but not one subject to the US Protective Order.

MR KENNELLY: At that stage?

MR LOMAS: Yes, at that stage.

MR KENNELLY: I will check. Sorry.

MR LOMAS: That was my assumption.

MR KENNELLY: I'm sure you're right, but -- yes, that's right, because it ... (Pause)

MR LOMAS: Because otherwise the issue would be not whether you would be in breach, but whether you were already in breach.

MR KENNELLY: Already in breach. No, you're quite right, sir. Yes. That's right, because they weren't then covered by the order. We were relying on the order as an example of the kind of protection that would be necessary when they were covered by the order.

MR LOMAS: Thank you.

MR KENNELLY: We relied on clause 7, since your recollection is better than mine, sir, as one of the reasons why confidentiality ring order was appropriate, because that was the protection that the US court would expect to be given to third-party documents, which would be covered by the Protective Order.

MR GREGORY: I just wanted to check one point. My recollection is it's certainly true that Valve at that stage wasn't proposing to disclose documents which had originated from third parties, only documents originating from Valve. My recollection, however, is that Valve said that some of those documents contained information which was confidential vis a vis third parties. So the main category of documents which it disclosed were the Steam distribution agreements. I think one of the points that Valve was making is some of this information is confidential to third parties, even though they were Valve's own documents.

MR KENNELLY: That's quite right. It was --

MR LOMAS: I also recall that, yes.

MR KENNELLY: Exactly. It was the agreements, and they were confidential. They contained confidential information belonging to third parties. We were relying on clause 7 as one of the reasons why a confidentiality ring order ought to be in place. But even if clause 7 didn't exist, we would have been arguing, in any event, at that hearing for the need for confidentiality ring order for the purpose of the documents we were producing. Clause 7 was an additional but not necessary reason for the order that we sought. But we did read it at the time as appearing to cover foreign courts.

There was no need to be certain of that fact, or to get a ruling from the US court, because the only issue in May 2025 was whether there should be a confidentiality ring order or not. But that explains the point that Mr Ross made in his statement and the point that was suggested in the skeleton argument.

But since May 2025, the issue has arisen in a much more direct way in the United States, because there, as you've heard, Valve is sued in a number -- a large number -- of arbitrations, in addition to the federal developer class action. There is disagreement as to whether clause 7 applies outside of US federal and state courts. If you take up the motion -- may I show you that? The motion is in the supplemental bundle behind tab 4, and go, please, to page 29.

So first, at page 29 you see in footnote 4 the fact that the third parties themselves sought the sealing of these documents. The context here, of course, is that these third parties are very anxious to ensure that their documents and confidential information is properly protected. You see at footnote 4, Microsoft and Humble Bundle make themselves issuing motions to seal and ensure the confidentiality of their own documents and information contained in expert reports in the Valve proceedings. So they actively oppose wider production of their documents and information.

If you go over the page to page 30, you get a flavour of the disagreement that's arising between arbitrators between lines 13 and 17.

The motion refers in particular to one arbitrator, Mainland, who has ordered Valve to disclose documents which were sealed by the court in the In re Valve proceedings. But then Valve points out to the court, other arbitrators who've considered the very same issue, the proper interpretation of clause 7, have agreed with Valve's interpretation, which was that it applies only to US federal and state courts, and those are the arbitrators who have followed that view.

So what is sought is the guidance of the federal court as to whether clause 7 is

restricted in that way. As you heard, the motion was issued in May and the ruling is expected -- of course, these are estimates, but having asked the question of the US lawyers, the ruling is expected well within the year, so several months is what we're told.

If clause 7 is restricted to federal or state courts in the US, Valve would then appear to be prohibited under US federal law from disclosing these third-party documents in these proceedings, and if it is ordered to do so by this Tribunal, Valve may be exposed to penal sanctions in the United States.

Now, the authorities say, as you've heard, that is not an absolute bar to disclosure, but it must be weighed in the balance against the importance of the documents in question and the proportionality of the disclosure. We say the appropriate time to make that assessment, to weigh that in the balance, is when we know whether such disclosure in these proceedings places Valve at risk of such penal sanctions. We say that is likely to be before the next CMC in April or May 2027. It is certainly not likely to be clear before the so-called autumn CMC in November 2026. So scheduling a CMC for this issue in the autumn of this year is not likely to be useful for the resolution of this issue. It seems to be just this issue which is of concern. The issues arising out of the Redfern schedule and the processing of the 2.6 million documents, no one is suggesting that that's a matter for an autumn CMC. On the Class Representative's own assessment, they'll still be examining the initial disclosure by November 2026, and that's when the Redfern process begins.

So for the purpose of the US third-party disclosure issue, an autumn CMC is not likely to be useful. The issues will not have crystallised.

The extra or the further reason why it's proportionate to deal with the third-party disclosure issue in April or May 2027 and not November 2026, is it should cause no disruption to the trial timetable. As I've said, there's about 50,000 third-party

documents. When the Class Representative is examining the 2.6 million documents, it will, in that process, be better able to understand the third-party documents, if and when it receives them, following the April or May CMC.

The real concern that the Class Representative has is that this issue may disrupt the trial timetable. The trial timetable may not be able to accommodate delaying this issue until the US federal court ruling. We say that concern is misplaced; there's enough space in the timetable to deal with this question. You can see that from the Class Representative's trial timetable itself.

If you go, in that same supplemental bundle, behind tab 1, to page -- this is the original proposed litigation timetable. If you go, please, to page 6, it brings it up to what will be a CMC in April or May. So the third CMC is the fourth row down. You see, "Tribunal to hold third CMC". We all agree that there should be CMC in April or May 2027, and then that allows -- you see that says "25 to 29 months", and then the factual witness statements to be exchanged, "34 months", so seven to nine months later depending on when the spring 2027 CMC is held. There's a gap of seven to nine months between that and the suggested factual witness statement exchange stage.

Then following that, there's a further three-month period for the reply witness statements a year from now, and then about three months after that, expert reports.

So in parallel to the question of the US third-party disclosure, we will progress with the review of the 2.6 million documents and the agreed follow-up Redfern process. That all takes place as planned. None of that is delayed by this question of third-party US documents. In my submission, when this Tribunal is able to rule in April or May 2027 on the question of third-party documents, the steps can be relatively tight. At that point, you will take a decision and based on your decision, if you decide to order disclosure, third parties can be notified. The deadlines given to them to respond can be relatively tight again, depending on the extent to which they have notice of this

issue. They obviously are aware of the US motion. Their documents are in issue in the US motion, and I understand they have already intervened in the US motion to make submissions on the question.

So they're already aware of the broader issue, if not the question in our Tribunal. There is no need for this process, for the process of the Tribunal deciding what to do and ordering notification of third parties and then disclosure by us.

THE CHAIR: Are we talking about 2026?

MR KENNELLY: 2027.

THE CHAIR: 2027. Why don't we just write to them now?

MR KENNELLY: Write to the third parties now?

THE CHAIR: Yes.

MR KENNELLY: Yes. I mean, pausing there, since we're just dealing with solutions.

THE CHAIR: Yes.

MR KENNELLY: Yes, obviously that can be done. The question of notifying the US court -- it's the question I think Mr Lomas picked up, or perhaps it was also the chair -- the US court isn't, as far as I'm aware, sighted of our particular issue. Could the Class Representative write to the US court pointing out its interest in the outcome of the motion before the US federal court? The answer is yes, of course they can do that. They can intervene via written submissions to the US court, in the same way that the third parties have communicated with the US court to say that they have an interest and they wish to make a submission in relation to the issue which the US court is considering.

Of course, the Class Representative's solicitors, Milberg, are part of a US firm, and from our reading of the costs budget, they seem to be working alongside US attorneys concerned with these cases, not the *In re Valve* litigation; they're involved in these issues in the US in some way. So they're well-placed, in my respectful submission, to

file an intervention before the US court, pointing out their interest in the outcome of that ruling. We have no objection to that.

THE CHAIR: What I was wondering was whether you need the court's permission at all if you write to the third parties and they say, "We're fine for this to be used in this litigation".

MR KENNELLY: They could do that. I don't want to send them on a wild goose chase, because certainly our understanding of the position of the third parties is that they are very reluctant. That's why they've intervened in the US court.

THE CHAIR: (Overspeaking) be explained to them the confidentiality arrangements that are here.

MR KENNELLY: Yes.

THE CHAIR: But am I right in thinking that the third parties are generally against your client in the US litigation?

MR KENNELLY: No -- well, yes. I mean, the plaintiffs are -- obviously of the 50,000 documents, about 44,000 of those belong to the plaintiffs who are against us in the US litigation.

THE CHAIR: Right.

MR KENNELLY: But 4,000 documents then belong to the 29 or so third parties. Whether they are against us or not, I do not know; I'll have to take instructions. But the extent to which we can expect them to resist disclosing even into a ring in this jurisdiction, again I don't know. Perhaps if you give me a moment, sir, I'll just check, because it may be that I can be told that (inaudible). (Pause)

So as I suspected -- obviously we can't speak for the third parties, but we expect them to resist the disclosure of documents, even into a confidentiality ring. Many of these third parties are our direct competitors, and even with the protection of the confidentiality ring, we understand that from the position of the United States, they are

unlikely to support the disclosure into the ring voluntarily. But we don't suggest for a moment that the Class Representative shouldn't try, but it may not be a worthwhile exercise. But if the US court --

THE CHAIR: So are you saying the only way we're likely to be able to get these documents is if the US court allows it?

MR KENNELLY: Not so. The US court can say that there's a prohibition on disclosure, but you still have the power to -- notwithstanding that, notwithstanding the fact that it would expose Valve to sanction, you could still order us to produce the documents. You have that jurisdiction.

THE CHAIR: No, I've understood that point.

MR KENNELLY: But it would obviously have to be weighed against the degree of the risk that we would face in terms of those sanctions against the utility of the documents themselves. That would require a proper relevance review of those documents in order to conduct that balancing exercise. But that would happen in any event, because this 50,000 document set will require a relevance review. That's a necessary but unfeasible task, because it's a much smaller set of documents than the 2.6 million that we've been discussing until now.

My simple point is this: at some point, the Tribunal is going to have to do that assessment, that weighing of the risk to the third parties, the risk to Valve and the utility of the documents. The best time to do it is when you know the outcome of the US proceeding. It may be that the US court, with the benefit of submissions will say, "We're perfectly content from our perspective", and then all that remains is a relevance review and a discussion before this Tribunal as to whether the documents should be disclosed in full or not. But the time to do that --

THE CHAIR: In your submission to the US court, you were comparing the order with arbitrations. Did your submission deal with the question of foreign court procedures,

or court or Tribunal procedures? Because it seems to me, it's one thing for a US court to say, "I'm not going to allow arbitrators to deal with that. That's a matter of private contract", another thing for the US court to -- no, I won't use a pejorative phrase -- to not act with comity in relation to a foreign court.

MR KENNELLY: Yes. I'll be corrected, but I don't believe that we have raised -- no, we've not raised in a motion before the US court anything about comity and the possibility that a foreign court, a United Kingdom court, which this is, would order disclosure with the protection of the confidentiality ring. That has not been raised before the US court.

THE CHAIR: Would it be open to you to put in a further submission to the court to say: while you're considering this, please consider the fact that there are proceedings in the United Kingdom. The Tribunal in the United Kingdom has indicated an interest in seeing these documents, and could they rule on that at the same time?

Because it's going to be very useless if we wait, as you suggest we do, and they come out with a decision about arbitrations in the US and still leave us hanging about what they say about foreign court procedures or Tribunal procedures, which I think are very similar to court procedures.

MR KENNELLY: Yes. I'll pause while those who instruct me reflect on that, because of course, I don't know about the deadlines for making submissions in terms of the timetable that the parties are subject to in relation to the US motion, but I'll be told. Obviously, the Class Representative is free to inform the US court of the matters which the Tribunal has outlined.

But of course, normally, one doesn't even have a ruling of a foreign court in these matters. One normally has to rely on a letter from a foreign law expert, not even a part 35 expert report, explaining the risk of breach and sanctions, and the Tribunal makes up its mind. So even if all we have from the court is a ruling that deals with

arbitration, that will at least assist the Tribunal and whichever experts the parties instruct to take that further step and say, "In view of that ruling ..."

THE CHAIR: Well, then we have to weigh now whether that level of assistance is a good enough reason to wait to deal with the point.

MR KENNELLY: Indeed, and here I have the answer.

Ah, sorry. Yes, I thought -- we'd have to make a new motion. The existing motion has been briefed. So the written submissions are in on the existing motion, and we have no right to file further submissions. But we would have to issue a new motion before the same judge, raising this point. But it is open to the Class Representative, I'm instructed.

THE CHAIR: And to the Tribunal.

MR KENNELLY: And to the Tribunal to contact them. In my respectful submission, even if all we get from the US court is a decision that arbitral Tribunals may receive the documents, that would be of immense assistance to this Tribunal in deciding whether we would likely be subject to sanctions, in my submission. Obviously, if the US court says clause 7 only means US federal and state courts, well, then again, we have a form of clarity, and that will assist you in making your decision about whether to order.

THE CHAIR: Well, it would be a minor form of clarity in that the argument about foreign courts wouldn't have been before them.

MR KENNELLY: That's correct. Yes. They would have had heard part of the argument.

Subject to those points, and notwithstanding those points, it would still make sense to deal with them, in April or May 2027, because even if the steps are taken which the Tribunal has outlined, even if the Class Representative were to contact the court, if the Tribunal did so, realistically the resolution of the issues will not take place until on or

about the April or May CMC. On no view will we get an answer on anything by November 2026. So….

THE CHAIR: What about January 2027?

MR KENNELLY: It depends on --

THE CHAIR: I thought you said several months from --

MR KENNELLY: Several months from May 2026.

THE CHAIR: Right.

MR KENNELLY: January 2027, possibly, but it just seems less likely. Several months; apparently that means within the year. It could be January, but we may get the ruling in January. Keeping April or May 2027 seems, in my submission, to be preferable, because in that CMC, we will already need to deal with the outcome of the Redfern process and any outstanding disclosure issues from the 2.6 million documents. That hearing is going ahead anyway, and it would be easy to deal with, at that hearing, the outcome of the US third-party disclosure issue also. By then, hopefully we'll not just have the ruling, but also time to reflect on it and to do submissions in relation to it. If we were to list a separate hearing in January 2027 just for the US third-party issue, it's highly likely that it wouldn't be effective.

Those are my submissions on the third-party documents, and really, it comes down ultimately to timing, and the timing of the next hearing, at which this would be resolved. But we are anxious to assist in any way we can in order to make sure that the ruling of the US court is helpful. We obviously don't oppose the Class Representative contacting the US court.

The next issue on the agenda -- well, actually this wasn't on the agenda, but it probably fits here -- is the request for organograms and organisational charts that the Class Representative raised. My learned friend very helpfully clarified that in fact the request wasn't as broad as it appeared in the draft order. What they really want is a list of key

individuals to assist them in their document review exercise.

THE CHAIR: I think with the broad areas of responsibility of those individuals over the period.

MR KENNELLY: Indeed. As we explained in correspondence, Steam isn't run like a regular US or UK PLC. It is a very relatively small and tight operation. It has a total number of employees, total headcount, of only about 350, notwithstanding its very significant commercial strength.

What we can provide to help the Class Representative is a list of the custodians. There are 24 custodians, and --

MR LOMAS: Those are the equivalent of a board of directors.

MR KENNELLY: I hesitate to agree. What I've been instructed to say is that the people who run Steam are known as the Steam business team, but even that gives them a level of formality which they don't have in the organisation. At any one time, there are about 12 to 15 people running Steam and save for the CEO and the COO, Mr Newell and Mr Lynch, their roles are interchangeable. They don't have the typical corporate titles that one would expect in a PLC, but they are the -- I'm so sorry. I'm talking about the part of the business with which the case is concerned, the Steam business team who work with Steam partners, and they are the ones responsible for the matters which are an issue in this litigation. And they.

THE CHAIR: Would they be the people, for example, who set the amount of revenue share that Steam obtained?

MR KENNELLY: That's my understanding, yes. As I say, these are the individuals --

MR LOMAS: Or decided whether Steam keys should be granted, how many and so forth.

MR KENNELLY: Precisely. It's for this reason that these members of the Steam business team were the custodians in In re Valve, because these are the ones who

are who the US court determined would be the ones likely to have relevant documents, where the analogous issues.

THE CHAIR: Can you explain the term "custodians", then? What is a custodian?

MR KENNELLY: A custodian, meaning it's an individual whose mailbox, whose document retention platform in his or her name would have held relevant documents. It's really a custodian in the English disclosure sense.

THE CHAIR: Right. (Overspeaking) service, almost.

MR KENNELLY: It's more when one does a disclosure exercise, one has to identify the holders of the relevant documents; who is responsible for them; whose email box has to be searched.

THE CHAIR: Right, so it may have no bearing whatsoever on whether they were the controlling mind of the business practices.

MR KENNELLY: It's unlikely that there would be -- that's an unlikely outcome in this scenario, because the teams are so tight and so small. The Steam business team that deal with Steam partners, as I said -- these are senior people -- are between 12 and 15 in number, and over the entire period, that group of 24 custodians catches the Steam business team more or less over the whole of the period.

MR LOMAS: Just to take that further forward, and perhaps not up to us to find solutions, but in terms of what the claimants were looking for, if you're talking about 24 custodians -- and maybe expanding that slightly, that's including maybe hypothetically another ten people in their orbit, even if they weren't custodians -- you're only talking about descriptions of the job roles of 35 people in broad terms over a relatively short period, without necessarily being precise as to months or job titles, and accepting that they will have covered for each other and moved and changed. Describing the roles of 35 people over a relatively short period is not a terribly big exercise, I would have thought, in terms of its potential savings in relation to

configuring the AI tool. I'm not sure you need reporting lines and levels of authority and that type of stuff, as you might see in an organogram. You're almost talking about dramatis personae.

MR KENNELLY: Yes. I'll quickly check. If I can have a moment. (Pause) Sorry. I appreciate when one looks at the business of this size, it seems hard to imagine, but I am instructed -- and this is not the first time I've heard this -- that there really is no broader group of ten around this 24. The 24 are the key people who make the decisions, and they have --

MR LOMAS: Right, in which case, simplify it to the 24.

MR KENNELLY: Indeed, it makes Mr Lomas's point a fortiori. So yes, we can for those 24 give -- it will be a relatively generic description because of the way in which they operate; but yes, a description of the work, a description of their responsibility over the relevant period for each of those 24 custodians can be provided.

I should say that the extent to which this will help the Class Representative or not remains to be seen. We have no clarity as to the tool they're using or how this will help them. But if it isn't helpful, if they do need more help, there is no need to file a formal request for information. Again, in the spirit of collaboration, they can contact us and they can ask for such help as they need. We've approached the situation --

THE CHAIR: If, for example, they find an individual has written various emails that seem to be making business decisions and isn't in your 24, they can come back to you and say, "This person seems to be having a significant role. What was his role within the business?"

MR KENNELLY: Absolutely. That's what I've been trying to say really throughout, which is that much of this discussion really is answered by the same point, which is: they can ask; we will answer. If we don't answer in a collaborative way, we will be in

breach of the guide to proceedings, and the Tribunal will deal with us in due course. So really, we invite them to do that, to take the documents we're giving them and review them. If they have queries, they should arise out of those documents, and that should be the focus of the Class Representative.

With that in mind, I move on to the next question, which is a question of further disclosure. Here, there's a dispute about the wording of the --

MR LOMAS: Sorry, Mr Kennelly. Before you go on, have you dealt with paragraph 6? The specific request for the list of documents in the context of the Protective Order.

MR KENNELLY: Sorry, no. I think my learned friend made my point for me when he looked at the order. Should we take it up, and I'll show you the problem. We're looking at the US Protective Order, behind tab 19 on page 496. (Pause)

It's in the core bundle, page 496. She says, "Why can't we produce a list of the third-party documents?". Our concern, as he pointed out to the Tribunal, is in clause 3 of the Protective Order. It's not just the material as defined above that is protected, but also subparagraph 1:

"Any information extracted from confidential material [and 2] all summaries of the material". [as read]

A list of the documents which contains really any useful information, any summary of what's contained in them or who produced them, their dates and so forth, would seem to us to be in breach. Sorry. Of course it's not a matter for me. This is a matter for the US lawyers who are responsible for this.

THE CHAIR: I don't quite get there by reading the definition of confidential material, because the confidential material isn't defined as "the documents containing confidential material", but the bits in the documents that are confidential. So it seems to me to say, "There was an agreement between A and B, dated this and no more", would not include any of the matters that are defined as confidential material.

MR KENNELLY: Sir, the definition of confidential material on page 495 is very broad --

THE CHAIR: Yes.

MR KENNELLY: -- because it includes information of non-public product use, business plans, research and so forth, and then any proprietary commercial or client information. So even commercial or client information is caught by confidential material.

THE CHAIR: Which is defined as ...?

MR KENNELLY: Which it is defined as, but again, research development --

THE CHAIR: Search development. It's not the name and address of the client.

MR KENNELLY: No. Well, not on the face of clause 2(a). No, sir. But --

THE CHAIR: It has to be of a competitively sensitive nature.

MR GREGORY: Could I just simply ask the Tribunal just to read clause 5.1 in relation to this issue as well? It's on page 499. (Pause)

THE CHAIR: You draw my attention to:

"The designating party must designate for protection only those parts of material documents, items [et cetera] that qualify, so other parts for which protection is not warranted are not swept unjustifiably into the ambit of this agreement." [as read]

MR KENNELLY: Well, I'm grateful for that. That seems to assist the point I'm making, which is that to be covered by this order at all, in order to have the protection of it, it is necessary for the designating party to be careful only to designate material that is genuinely covered, and not to include communications and information for which protection is not warranted. We're only concerned here with documents which are covered by the Protective Order, bearing in mind --

THE CHAIR: Well, parts of documents, this is dealing with. So if the parts of the document was the title of the document and the parties to it and the date of the document, wouldn't that be parts of the document that do not qualify as confidential

within the definition of confidentiality we've just looked at?

MR KENNELLY: If the document has redacted such or covered such so that only part of it is covered by the Protective Order, the --

THE CHAIR: But we're dealing here with a list with just the names and dates and the title of the document. Obviously, I'm assuming it doesn't include summarising the contents; that clearly would get you into (inaudible). But if it was just name, date and title of the document, how would that be a breach of this?

MR KENNELLY: Well, the title and date of the document could well be highly confidential. For example, if there's a document from Microsoft and there's a particular date and a particular title, the combination of the title of the document and the date could reveal something highly sensitive as to when a certain thing was happening within that company, when a certain event, certain business plan was being considered or a strategy was being discussed. The date and the title alone, one could see straight away without any further information, could well be highly sensitive.

THE CHAIR: Well, within the definition -- do you want to bring it within the definition of confidential information that we've got here?

MR KENNELLY: Yes, it would be competitively sensitive commercial information, because it could be of relevance to its competitors to know when a certain thing was being discussed on a certain day. Remember, sir, members of the Tribunal, the matters which are in issue between the parties concern their most sensitive commercial and business strategies, and their product strategies. Presumably, that's why the US court made this Protective Order and why my clients are very anxious not to breach it by disclosing extracts or parts taken from material which third parties have produced.

Of course, without taking instructions, I'd be reluctant to offer to produce a list which might reveal third-party information without those third parties having any right to

comment on it.

MR LOMAS: Without wishing to salami slice this too far, I can understand your point that you can hypothesise an agreement whereby the title might reveal commercially sensitive or competitive information, but it's far more likely that the majority of documents in that class won't. So would a solution to the problem be to say, yes, produce that list, but with the right to withhold any document whereby its very title could credibly regard it as a breach of the Protective Order? That's not a --

THE CHAIR: Or withhold the title.

MR LOMAS: Sorry?

THE CHAIR: Or withhold the title.

MR LOMAS: Or withhold the title. Which would not be a complete solution, but would enable progress to be made.

MR KENNELLY: So Mr Coates reminds me of what we have actually agreed to produce in relation to this. This may actually go some way to reassure the Tribunal. Could I ask you to turn up our skeleton argument? Our skeleton argument, paragraph 20. (Pause)

So page 10 of the internal document numbering. Paragraph 20 explains what we will provide. This will be provided in the disclosure report and EDQ or in correspondence, but all(?) -- this is at the end of July this year. So the identities of the third parties who produce the material, how many each produced and information as to the categories of documents produced by those third parties. Of course, that will allow the Class Representative to contact the third parties directly if they wish to ask them if they're willing to --

THE CHAIR: Sorry, can I just see where you're reading from there?

MR KENNELLY: Paragraph 20. Sir.

THE CHAIR: Oh, 20. Sorry. That's right, yes.

"Identities of the third parties who produced", so if this was a -- let's say this is the most embarrassing thing you could possibly have: anti-competition agreement with Microsoft, dated July 2023. The identities the parties produce might be Steam or Valve.

MR KENNELLY: It would be a --

THE CHAIR: How many documents they produce: three. The categories of the documents, what would that say? Commercial agreement with a counterparty?

MR KENNELLY: Yes.

THE CHAIR: I can't see how that's going to help anybody.

MR KENNELLY: Well, first of all, just based on what is going to be provided, the identities of third parties is of assistance to the Class Representative because that allows them to know --

THE CHAIR: Well, that might name the law firm.

MR KENNELLY: No, it will name the third parties. It will name the companies who produce the material. It's not suggested --

THE CHAIR: Right, but that company might in most cases be Valve.

MR KENNELLY: No, it's the identities of the third parties who produce the material.

THE CHAIR: But if they didn't produce the material, Valve produced it and they signed it. That wouldn't be caught by this wording.

MR KENNELLY: This is the material which the third parties produced under subpoena. This material --

THE CHAIR: Oh, you mean who produced it under subpoena --

MR KENNELLY: Yes.

THE CHAIR: -- not who created it?

MR KENNELLY: Forgive me. No. I mean, under subpoena, this is definitely material produced by third parties, under subpoena into the US case.

THE CHAIR: I see. I'm sorry, I misunderstood.

MR KENNELLY: No, I could have been clearer. This will allow the Class Representative to know exactly who the third parties are, and they can approach the third parties if they think that they can get the documents or get their consent to produce the documents into these proceedings with the protection of the confidentiality ring.

Again, the numbers will give the Class Representative an idea of the size of the task and the categories of documents information will tell them what kinds of documents are in play. Giving the titles of the documents is problematic for two reasons. First of all, it requires Valve to examine each of the documents and work out what summary or what title can be given in respect of each of them. We know we're dealing with approximately 50,000 documents.

THE CHAIR: How is that any different to producing the category of the document?

MR KENNELLY: Because Valve already has -- we already have --

THE CHAIR: You've already done that for US courts.

MR KENNELLY: Exactly.

THE CHAIR: I see.

MR KENNELLY: We have descriptions of the categories of documents already.

THE CHAIR: Right, but would those categories be things like the commercial agreements?

MR KENNELLY: Yes, and that's why we can give that information. If we have to go through the 50,000 documents and work out what title should be given for each one, that will be a costly and time-consuming exercise. It may ultimately --

THE CHAIR: By the titles, I wasn't thinking of the one that you gave it, but one that it had, on the face of it, you know, software distribution agreement or something like that.

MR KENNELLY: Some documents may have titles like that, others may have an email, or (overspeaking) --

THE CHAIR: Or it may just say "Agreement" or "email".

MR KENNELLY: Or it may say nothing. It could be a note without any title. It will require a document-by-document analysis to work out how it is to be described, and then a separate analysis of whether that description or that title discloses competitively sensitive or commercially sensitive information, which again, Valve is badly placed to judge when it is the competitively sensitive information or commercially sensitive information of a third party. In fact, it'd be for Valve a very dangerous position to be deciding whether something is commercially or competitively sensitive for a completely different company, which is presumably why the companies themselves are -- the third parties are intervening in the US case to clarify the degree of protection their information will receive.

So I entirely understand why the Tribunal wants to assist the Class Representative here and to give as much clarity as possible, but it's not practicable to expect Valve to go through 50,000 documents, which are documents produced by completely different competing companies, and then work out what title they should be given or whether the title that's going to be given will reveal something sensitive to that company.

MR LOMAS: Which it would presumably also say would not be necessary if clause 7 was interpreted in a broad fashion. So if litigation in court included stuff outside the US, then it wouldn't be necessary.

MR KENNELLY: Exactly, which is why we say please wait for the US court to rule and we'll deal with this in --

MR LOMAS: Just to clarify, the documents that you're offering to provide in paragraph 20, would that be part of the 31 July disclosure set?

MR KENNELLY: Yes.

MR LOMAS: So on 1 August, some of this is going to become clearer, if not completely clear.

MR KENNELLY: Yes.

MR LOMAS: Thank you. (Pause)

MR KENNELLY: So I'll move on, if I may, to the question of further UK-specific disclosure. This requires us to look at the CMC order, which is in both the core and the supplemental bundle, paragraph 8. (Pause)

The purple text is the text which is agreed, and the orange or red text is what Valve has suggested and to which the Class Representative objects. Our concern here is to ensure that the Redfern schedule stage of the disclosure process, the further disclosure process, is confined to the issues in this case. Because we have been concerned by the approach in the correspondence, some of which you saw today, about the risk that this Class Representative will cast the net wider than it ought to be cast in a disproportionate way.

Now, just to appreciate where the language is coming from, the fact that the further disclosure should only be given if it's necessary, perhaps it should be "necessary and proportionate", because that language is taken from a judgment of this Tribunal in the *Ryder* case. Can I show that to you, please? It's one of the important rulings on the proper approach disclosure in this Tribunal. It's in the authorities bundle behind tab 8 on page 103. (Pause)

At paragraph 35, the then president deals with the proper approach disclosure in the Tribunal. Much of this will be very familiar to you. I wish to draw the Tribunal's attention to paragraph 7, just below F:

"Disclosure will only be ordered and the order will be framed to ensure that it is limited to what is reasonably necessary and proportionate, bearing in mind the factors that follow, including the cost and burden of providing such disclosure." [as read]

So when we ask the order to include that the supplemental disclosure shall be specified as necessary, that is reflecting the language of the Tribunal in the *Ryder v MAN* case:

"[That] The US documents shall be supplemented as necessary by the defendant by supplemental disclosure ... [and then we write] solely in respect of any UK-specific issues." [as read]

Now pausing there, we're not suggesting for a moment that if the document is also relevant to issues in the United States or anywhere else, that's a bar to disclosure. The purpose of that is simply to say that the disclosure should be in respect of the issues in these proceedings. It's perfectly possible that the documents that are relevant to the issues in these proceedings may be relevant in other jurisdictions where similar issues are raised.

MR LOMAS: Wouldn't that be the case in any event? I mean, you're only giving disclosure relevant to issues in these proceedings.

MR KENNELLY: Absolutely. The "necessary and proportionate" part, or "as necessary", is more important. That's to ensure that the parties understand the proper approach to disclosure in this (overspeaking).

MR LOMAS: Well, I think the point that was taken against you, if I understood it properly, was not just the reference to *Ryder* and the president's comments there on "necessary and proportional", but it was supplemented as necessary, which I think gave rise to a concern that the phrase might be interpreted quite narrowly, reading the two together. So I'm not sure the issue that's being taken is quite the same as in the *Ryder* case.

MR KENNELLY: Well, I think we all agree that the purpose of the further disclosure is to supplement, in the ordinary sense of that word, the initial disclosure that Valve is giving; that having reviewed the 2.6 million, and having considered the EDQ and the

disclosure report, the Class Representative will consider what further documents it needs for the purposes of litigating the issues in the case. By definition, such further disclosure will be supplementing the disclosure given at the initial stage. Now, the extent to which it is necessary will depend on the adequacy of what's already been given. So we may have a debate, when we come back before you in April or May, whether the particular further disclosure they seek is necessary and proportionate in view of what they already have. That's really what this additional wording says.

THE CHAIR: We get to the same result if you just say reasonably necessary and proportionate, having regard to the matters dealt in this paragraph of *Ryder*.

MR KENNELLY: Yes.

THE CHAIR: You would be happy with that, and I suspect the other side might be happy with that.

MR GREGORY: Just to clarify, I think we might be slightly at cross purposes. The *Ryder* judgment is about the scope of disclosure that will ultimately be ordered by the Tribunal when it's asked to make a disclosure order. Our concern is that certain material should not be excluded from the process that gets us there - if they are relevant. Any relevant documents should be referred to in the disclosure reports and the EDQ, so that we --

THE CHAIR: Even if they are unnecessary and disproportionate?

MR GREGORY: Well, I mean, it's a question then about the basis on which Valve is going to be exercising that sort of judgment. We think if they might reasonably be considered to be relevant, and the Tribunal may wish to disclose them, then they should be included. We want the disclosure report to take a reasonably broad approach. If Valve wants to come to the Tribunal and say, "Well, we've included these documents which are potentially relevant; we don't think they should be disclosed because we don't think it's necessary, or in the light of the materials that have already

been provided", then it can do that.

But our concern, on the basis of the correspondence and to some extent the skeleton, was that Valve was just going with a mindset where if these materials originated, say, in the Polish investigation, they're not relevant, because they're just to do with Poland. For the reasons I explained, because Valve's practices seem to be general and not country-specific, I don't think that's right. Our concern is more that Valve is not taking an unduly narrow approach to what it includes.

THE CHAIR: (Overspeaking) you say the test is relevant and not a test of "reasonably necessary and proportionate".

MR GREGORY: Yes. I think we would have a concern if Valve was only including materials in the disclosure report which it thought, from its point of view, were necessary, because we would say that's unduly narrow. That narrowing can happen later down the line, if the Tribunal is persuaded of that by Valve, but it shouldn't happen right at the outset.

THE CHAIR: Well, the test would be an objective one, wouldn't it? Reasonably necessary, not what Valve considers to be necessary, or even what Valve considers to be reasonably necessary.

MR GREGORY: Yes. If you don't know about the documents, then you won't be able to exercise that objective judgment.

MR LOMAS: Well, this may be relevant to the role of the word "supplemented", but you're using the disclosure of the US Valve documents, not because it's logically or intellectually a way of addressing disclosure for this case. You're doing it because it already exists, and it's an off-the-shelf disclosure, so it's the logical, easy, cheap, efficient place to start, even if it's 2.6.

So, supplement, I would have thought in terms of general principle of disclosure, shouldn't be by reference to something that happened to be convenient, and therefore

is it necessary. The test should be applied almost de novo of: are the documents that are not in the US Valve documents, which would meet the test in Ryder, on a standalone basis, because in which case they ought to be part of the litigation process?

MR KENNELLY: Well, it's a question of what is effective and proportionate, and what has already been agreed by people in the parties. The parties agree that the most effective and proportionate way of doing this is to take the US disclosure, the 2.6 million documents, as the base level of disclosure, and what is very likely to be the vast majority of disclosure in this case. That is both convenient but also true, because it represents the very considerable disclosure given in very closely analogous proceedings. No one is suggesting that Valve then conduct separately a de novo standard disclosure exercise. That would be time consuming and wasteful.

What's been agreed is that when the Class Representative has the benefit of the 2.6 million documents and the EDQ and disclosure report, they will then produce targeted requests -- and this is consistent with the practice of the Tribunal -- targeted requests for further documents. Whether it's called supplemental or something else doesn't matter. It's just a question of the next stage, which is a targeted stage. The wording that we've inserted here is solely intended to focus minds on the issues in our case.

If, for example, the Class Representative says in the Redfern request, "We have seen reference to a document in a different case -- the Polish investigation, for example -- and we think that document is necessary and proportionate, we want it to be produced to us, and/or it fills a gap which we've noticed in the US case, because the US case was not concerned with an EU issue", that would be something we have to consider. We're not saying that documents produced in other cases or other jurisdictions are excluded. We simply don't want this process to become a general

sweep-up of every dispute in which Valve is engaged throughout the world. We want to make sure that it remains focused on the issues in the UK. But the documents that go to issues in the UK may well be produced in other countries, and they may well overlap with the issues in other countries, and we have that well in mind. We should be trusted to deal, when we get the Redfern requests, we understand precisely what's required. The extra wording here is designed simply to ensure that such searches as are required should be necessary and proportionate by reference to the issues in this case. That's it. The reason --

THE CHAIR: So are you envisaging that this would be a request for specific documents, or would it be all documents dealing with a specific issue or issue-based disclosure? How would you see it working?

MR KENNELLY: Well, we both see it working the same way, which is that it would be by reference to documents, or it could be categories of documents. No one is suggesting issue-based disclosure, as one would have in a standard disclosure process. As you saw in Mr Roth's judgment, that's not normally the order made. We will respond to requests for specific documents or categories of documents, and if they're necessary and proportionate, then they should be given, and in determining whether things are necessary and proportionate, we say reference ought to be made to documents which the Class Representative has already seen.

For example, if the Class Representative isn't bothering to review the 2.6 million documents they have, and fires out requests for other documents from other jurisdictions, we will, I would say, legitimately respond to the effect that, "You ought to review what you have before asking us to search for and incur costs in relation to categories of other documents from other jurisdictions".

THE CHAIR: So what you're envisaging is that this disclosure doesn't happen, as this wording on either wording seems to suggest, kind of in the round automatically. This

happens because the claimant says, "There are these further documents or categories of documents which we consider ought to be disclosed, and if you agree that that's reasonable and proportionate, you'll do so; and if you don't, you'll object to it".

MR KENNELLY: Yes. Then the Tribunal will decide.

THE CHAIR: And the Tribunal will decide.

MR KENNELLY: Exactly.

On the process, my learned friend said that he thought that this wording was going to be somehow what we would be revealing to them. That's not how it works, with respect. On the basis of the 2.6 million documents, the claimants will have an extraordinarily detailed view of the issues in the case and the documents which are available, and the documents which they may not have, but which the documents they do have prompt them to seek. With the benefit of that, they can make very targeted requests, we will say. It's to that that this extra language goes. The process is what follows, in the rest of paragraph 8.

I think Mr Gregory wants to speak, and I'll give you a moment.

MR GREGORY: Sorry. One brief point. I think Mr Kennelly's submissions have highlighted our concern, actually, because I think his position is if the Class Representative is aware of documents, say, from the Polish investigation that have not been included, then they can just ask for them. The problem with that is we're not involved in the Polish investigation, so we don't know what documents are there and we won't know unless they are set out in the disclosure reports. What's happened in correspondence is we asked very early, "Please can you give a summary of the materials from these Polish investigations", for example, and the response came back, "No, those proceedings are not relevant". It seems obvious that they are highly relevant, and in fact, Valve has disclosed many of the same documents that it's proposing to disclose here from the In re Valve. But the situation is that we are very

concerned we're just not going to be aware about the documents that exist which could be relevant, which Valve knows about but we don't.

MR KENNELLY: When they receive our disclosure report in EDQ, we will be referring to, among other things, the Polish proceeding. But the relevance of that is that the documents -- because we're concerned here with the documents -- the documents produced in the Polish proceedings overlap largely with the documents produced in the US proceedings, as you would expect when Valve as a US company run out of the United States, and where the very same issues have been litigated or are being litigated in the United States.

This focus on Poland is surprising, because the Class Representative has told the Tribunal today that they are struggling to deal with the 2.6 million documents. They expected 300,000, they said, and now they have to deal with 2.6 million. Put to one side how realistic it was that everybody had just 300,000 documents in a case of this type. But really, they should focus on the 2.6 million documents of highly relevant material they're getting in July, and then decide, when they've reviewed that, the extent to which they need other documents from other investigations which are much more marginal.

But of course, it's open to them to make targeted requests in relation to documents or categories of documents arising out of the Polish case. We will be dealing with the Polish case, as I said in the disclosure report in EDQ; but by reference to the documents which are generated in that case, because the object of the exercise is to identify the documents that ought to be disclosed to the Class Representative to assist it in litigating the issues in this case.

THE CHAIR: I'm having difficulty envisaging in my mind what you might put in about the Polish -- could you give me a line item that might be in there?

MR KENNELLY: A description of what it involves, and, well, actually I'll quickly check,

because I think it may be something which is already in train. (Pause) Okay. It's as you'd expect in a standard disclosure report. We will deal with the Polish litigation in the context of whether it is a repository of relevant documents in these proceedings. We will explain the extent to which the Polish case throws up -- by reference to the issues in the Polish case, we have identified repositories of documents which we will agree to search for relevant documents in this litigation, as you would expect in a regular disclosure report. That will then allow them to decide whether they should follow up with further requests about the relevance that Polish repository.

THE CHAIR: Mr Gregory's concern that he won't know what documents are there to ask for is answered, that you're going to give him a list of those documents.

MR KENNELLY: Yes.

MR LOMAS: I think, hope, I expect to know the answer to this question, but in this process it's not envisaged that to take this example, documents falling within the Polish sphere, which are specific to the Polish sphere and new to the US Valve documents, will not be disclosed because the issue has already been addressed by evidence in the US Valve documents.

MR KENNELLY: No. The extent that the Polish repository contains relevant documents, that will include documents in the repository at the time of the disclosure report. I think that answers your --

MR LOMAS: Exactly. There would be, as envisaged, no process of filtering out of, in this terminology, "Polish documents", because the issue to which they related had already been clarified or illuminated by the US Valve disclosure.

MR KENNELLY: No.

MR LOMAS: Right. That was my expectation. Thank you.

MR KENNELLY: That's the Polish example. More strange was the case against

Microsoft. It's points like this that prompted us to seek more focused language in the order, because it was suggested that we also need to produce documents in relation to a case brought against a different company, where Valve has no involvement in the litigation at all. Our response is, well, obviously if there are documents in Valve's possession -- I think the exchange was had with Mr Lomas -- we will produce them in the ordinary way, either through the *In re Valve* disclosure or by a supplemental disclosure. But that's it. Beyond that, it's hard to see what the incremental value is of focusing on this Microsoft case to which we are not a party.

THE CHAIR: If, for example, there was a witness statement by one of the Valve executives for the purpose of the Microsoft litigation, which touched on its business practices in a way that was relevant to this, that is something that would be on your initial list?

MR KENNELLY: It wouldn't be on our initial list, because the Microsoft case has just been issued.

THE CHAIR: Right, I'm saying if there was one.

MR KENNELLY: (Overspeaking).

THE CHAIR: But it might come up on your further list, then.

MR KENNELLY: Depending on the progress in that case, possibly. But down the line, one of the issues the Tribunal will have to consider is the extent to which you order disclosure in respect of material which has been created for the purpose of other litigation in the United States in a year's time or in two years' time. That's a common concern, which has arisen in other multi-jurisdictional antitrust cases, but that's not for today. That's something which you will have to consider either in the April/May CMC, or at a later CMC.

But again, the Tribunal's practice is: yes, subject to confidentiality protections, to order the production of that kind of material that's of assistance to the experts and the

Tribunal at trial.

The discussion we've been having, in my submission, shows why it's necessary to keep the parties focused. The Class Representative cannot on the one hand complain about the excessive documentation and the risk of cost overruns, and at the same time seek extensive further disclosure before they've even considered the 2.6 million documents that are about to land on their desktops.

I'm turning to the confidentiality designations for the non-US documents. That was the next thing on the agenda. I've actually addressed that the submissions I would make are the very same ones I made in relation to the confidentiality designations for the US documents. I've already addressed paragraph 5.3 of the confidentiality ring order. This is 5.2. But my submissions are the same. There's no prejudice to the Class Representative. They have the unredacted documents, and no concern about open justice, because we have a mechanism for re-reviewing documents before they go before the Tribunal or in any bundle.

The next issue on the agenda was timetabling. I hopefully made my submissions about why an autumn CMC would likely be too early effectively to resolve the US third-party disclosure issue, and that is the only reason my learned friend identified today as -- well, it was the main reason he identified for why there should be a CMC in the autumn. We say that just is too early, for the purpose of the US third-party issue. The Tribunal mustn't be, or shouldn't be, concerned that a CMC then is needed to chivvy us along. We have a very detailed, agreed process, and the discussion which has taken much of today shouldn't discourage the Tribunal. There is a huge amount of agreement between us, and that really will drive this process forward until we get to April or May next year, when a major CMC will have to be held.

The next issue was class communications. This is something that does concern us, because there are three features that are unusual in this case compared to the other

collective proceedings which this Tribunal has heard, in which we have some experience.

The first is that the Class Representative's advertisements and communications with class members appear to have reached a very small proportion of the class.

The second unusual feature is that an unusually large number of class members have opted out. 3,815, we were told on Friday. Mr Gregory, my learned friend, says, well, that's not a big number compared to the size of the class, which is 14 million. But it is a large number when you compare it to the level of engagement with class members. My learned friend pointed out the fact that 4,000 people had signed up to the website. That's almost the same number as the peak number who have opted out, positively opted out --

THE CHAIR: (Inaudible) not only in the first three months.

MR KENNELLY: Yes.

THE CHAIR: I don't know how many months were not covered then by the -- but I think it was another two months at least, wasn't it?

MR KENNELLY: Yes. So it's possible that more have signed up. I don't seek to make an exact comparison. I fully appreciate that we have the opt-out number as of Friday, whereas the level of engagement numbers are up to 31 March. I fully accept that, but it's still very odd. This is the second of the three odd features, that there should be such a high number of opt-outs, which is close to the number of people who have actually signed up to the website.

MR DAVIES: Signed up, but not the number who visited, which was about ten times that.

MR KENNELLY: Indeed. But even so, sir, in your experience, you would have seen no other case where full 10 per cent of the visitors of the website -- I don't mean of the number of visitors, 10 per cent have opted out -- I just mean, because we can't know

exactly how it came to pass, but to have 31,000 visiting the website and 4,000 odd opting out, that that suggests a relatively high level of willingness not to be involved in the litigation on the part of the class members.

MR DAVIES: Quite possibly. But I mean, it is relevant to the intervention I made earlier when Mr Gregory was speaking, that if you're assuming that the people visiting the website are a sort of random selection of the customer base, and then 10 per cent of them choose to opt out, that's a very high number. But if you assume that 160 million people, or whatever it is, were contacted and then everyone who wanted to opt out went to the website, then it's not surprising that, you know, quite so many of the people who went to the website are opt-outs, because that's why they're on the website.

MR KENNELLY: Yes.

MR DAVIES: I mean, there are two interpretations (overspeaking).

MR KENNELLY: There is, but I'm afraid we cannot place any weight on the idea that 160 million people became aware of this litigation. As I said to Mr Gregory, I don't know where that number has come from, but even if -- I think this is a point actually in our favour -- even if there's a relatively high level of awareness, to take up the chairman's point, that is not the same as awareness that you need to positively opt out if you don't want to be represented in this claim. The level of awareness is about the claim generally. The question is: how many of those class members who are aware of the claim are aware of the need positively to opt out if you don't support it? That depends on the manner in which the claim is being advertised by the Class Representative, because the Class Representative has an obligation to be transparent and to direct class members to the parts of the website which do identify their right to opt out if they don't support the claim.

The high levels -- it actually is a concern. It should concern the Tribunal. There may

be high levels of awareness, a relatively high level of dissent on class members' part from the claim, and low levels of positive engagement with the Class Representative itself. Our concern is that because the Class Representative has not done a good enough job in promoting or advertising the claim and drawing attention to the information that identifies the opt-out option, there is a high number of class members who would opt out if they knew that was positively required in order to not be involved in the claim itself. That's the problem.

So the high-level of awareness is actually a concern where there's no suggestion that that awareness is linked to an awareness about the right to opt out. The figures, if I may show you in the correspondence bundle; if you look at the correspondence bundle behind tab 28 is sent in May 2026. Page 76. (Pause)

Correspondence bundle, please, sir.

You've seen the reference to visits to the claim website, but the CPO notice was, in May 2026, opened by just over 2,000. We're now told it's closer to 4,000. But again, the number of people opening the CPO notice is about the same as -- sorry. That is an up-to-date number. The number that opened the CPO notice is, again, very similar to the number who have positively opted out. CPO notice is important, because it identifies the need positively to opt out if you don't support the claim.

If you go on, please, in the same correspondence bundle to page 183, behind tab 39, and go to paragraph 5, we make the point that having got information from the Class Representative, there's very little conversion from the advertising to engagement. In fact, we suggest to the Class Representative that there are problems with the way in which they have been engaging with class members.

To give you one example of that: if you go back, please to page 163 and 164 of the correspondence bundle, and start on page 164, please. This the click-through rate. The Class Representative is advertising, and this is the percentage of clicks per

impression. The ad flashes up on your screen. You either click on it, or you don't click on it, and of the impressions, for example, you see that for YouTube, only 0.2 per cent results in a click. But for Twitch.tv, there appears to be a better click-through rate. You see 0.18 per cent of people are clicking on the impression. But then when you go across to page 163, you see how the Class Representative is organised.

THE CHAIR: Sorry, what was the sponsored search? It seems to have done rather better.

MR KENNELLY: Oh, sorry. The sponsored search is where someone has positively typed into the search box a question about the --

THE CHAIR: Yes, I see.

MR KENNELLY: Obviously, that's why the figure is better there. But what's interesting is when you go to page 163, you see for Twitch.tv, the Class Representative has only planned or had planned 250,000 impressions, despite its good click-through or better click-through rate; it's not great. But for YouTube, 2.5 million impressions, but a very bad click-through rate. We have concerns that the Class Representative has not organised the engagement in an effective way. The problem there, from our perspective, is that there may be thousands -- or higher -- hundreds of thousands of class members who are unhappy with the claim being brought in their name, but unaware of the fact they have to positively opt out.

THE CHAIR: Can we hold that thought, then, over the next ten minutes while we take the transcriber break?

MR KENNELLY: Yes, I'm grateful.

(3.20 pm)

(A short break)

(3.40 pm)

MR KENNELLY: I'm very, very near the end of my submissions.

On this question of class communications, for the reasons that I gave before our break, Valve seeks, as you've seen, a six-month extension to the opt-out period, because we are concerned that there appears to be a high level of interest, a high level of unhappiness among class members with being represented in this way, but a lack of understanding of the need to opt out, owing to poor engagement.

THE CHAIR: What level of advertising would be needed, then, to deal with that?

MR KENNELLY: So at the very least, the Class Representative should send a message -- I think they call it a "blast" -- using their own communications lists to those who have expressed interest to notify them of this extension. The website obviously needs to have that made clear.

We are happy to discuss better ways in which they can advertise that fact. We don't seek a specific order in relation to a particular form of advertising, because really that's a matter for the Class Representative and the Tribunal.

In terms of advertising the fact that it's been extended for a further six months -- and this is the only point I'm going to make about the budget -- there appears to be some money spare for this purpose. If you can take up the revised budget that was sent to the Tribunal on Friday. I'm afraid if your eyesight is like mine, you'll need to zoom in because the figures are tiny. But in the bottom main row, under the across from the heading "Other", you'll see in the very far left column there's a reference under "Other" to media notices, advertising and so forth. That's in the far left column.

As you track across to the right, you will see the budgeted figure on the left and the spend on the right. So for media notices, notification plan and so forth, the Class Representative appears to have spent, most recently, only £29,000 out of a budget of £130,000. So there appears to be an underspend in their budget for this purpose, and the money would be well spent in a more targeted, effective way of notifying class members not only of the claim, but also of the availability of the opt-out process.

THE CHAIR: Is six months really the right number of months? It's tripling the original allowance. Would not three months be more proportionate?

MR KENNELLY: In view of the unusual circumstances in this case, our submission is that six months is appropriate. As I said when I opened my submissions on this point, we have an unusually high level of opt-out. We have an unusual high level of disaffection among class members with the claim. My solicitors, Milberg, even myself, we've all received unsolicited emails from class members expressing unhappiness with the claim being brought in their names, but not always, and in fact rarely, focusing on the opt-out process.

THE CHAIR: There was a suggestion from Mr Gregory that some of these might be not class members, but American gamesters.

MR KENNELLY: There are many, many gamesters in this jurisdiction too. I mean, Mr Gregory doesn't know -- and neither do I -- precisely where these people are coming from, but if they are expressing concern with the fact that a claim is brought in the United Kingdom, it stands to reason they're more likely to be from here. It's more likely to excite the interest of a UK resident than it is to excite the interest of somebody in Seattle or Washington.

So we were inferring from the deluge of material that we've seen and received that there's an unusually high level of unhappiness among class members with the claim being brought in their names. This is not the first collective proceeding; it is very odd to see so many complaints from class members, but not necessarily focusing on the need to opt out. They don't seem to be aware that that's something that they can do if they want to act on their unhappiness.

So for the high level of opt-outs, the high level of unhappiness that we've undeniably evidenced, and the poor level of engagement that we see in the figures given to us by the Class Representative, six months seems to us to be the appropriate time. It's my

final point, not least because, as Mr Gregory acknowledged, it doesn't prejudice the progress of the rest of the case. None of this interferes with the steps that will be taken in relation to disclosure and the Redfern-EDQ process that will progress in any event. So for that reason, six months, in our submission, is the right figure on.

That leaves costs budgeting. We have no specific submissions to make in relation to the revised costs budget that the Class Representative has submitted. Happy to answer questions if the Tribunal has any, but we have no particular points to make in relation to it.

The next issue is the split trial and trial listing. We agree with the Class Representative that having, again, reviewed the possibility for preliminary issues or a split trial, we agree with them that it's not appropriate, in our submission, to have a split trial; it doesn't admit of a neat split that is necessary if a split trial is to work in these proceedings. I'm happy again to answer any questions relating to that, but you have our written submissions (overspeaking).

THE CHAIR: Well, we do have some thoughts about the end date for the trial timetable, having found out that this building can't accommodate a trial of this length in the autumn of 2028. So that does seem to either tip us into 2029, which we have some concerns about, given that the longer this goes on, the more costs there'll be, which is not good for anybody. We do wonder whether there's any possibility of putting it earlier on the other side of the summer holidays in 2028, but we would like both of your reactions to that, really.

MR KENNELLY: I understand the concern. We have reflected independently of the Class Representative on the trial timetable. Unfortunately, having given it careful consideration, we don't believe there's any possibility of having the ten-week trial -- we both agree it's about a ten-week trial -- earlier than the end of 2028.

In fact, autumn 2028 was itself ambitious, because of the need to take -- when one

tracks through the steps, as I'm sure the Tribunal has done, to force the trial on sooner removes any flexibility in those deadlines, in circumstances where we don't know what will emerge from the April and May CMC in 2027. It creates a risk that the trial will be forced on too soon, which will ultimately generate increased costs overall, because the parties be forced to do disorganised and unsynchronised work. Our experience in other cases is that when trials are forced on quickly, it can lead to extra spend, and the Tribunal is not ultimately assisted because the natural process whereby issues are narrowed doesn't take place.

So certainly it seems to be the Class Representative's position also that it wouldn't be possible to have an orderly trial brought on before the autumn of 2028. I can expand on that, but --

THE CHAIR: No, I think that's enough.

Mr Gregory, have you got anything brief in reply, perhaps starting with that point?

Reply submissions by MR GREGORY

MR GREGORY: Yes, of course. So I think we would obviously like the trial to come on as soon as possible. I've explained that the longer it goes on, the greater the costs, and it has particular implications for collective proceedings claims such as these.

It's very difficult for us to say with confidence that it will be possible to have a trial before the summer of 2028, particularly in circumstances where we've not yet received the 2.6 million documents from Valve and started to review them. I think once we've engaged with that process, we'll be in a better position to say when we think the earliest possible date for a trial would be. But not having done that, I can't really stand here and say, "Well, yes, of course we can aim for it right now for before the summer of 2028".

There were two additional points that I said I would revert on at various points.

Mr Lomas asked whether we'd added someone to the advisory panel to deal with the fact that a number of the class members are minors. We have. They're called Aswini Weereratne KC, a silk at Doughty Street. They're an expert in the rights of vulnerable people, including children. We've also added someone who's a costs expert. I think probably the best thing for us to do is just to write to the Tribunal with the details and fully update you.

One miscellaneous point was Mr Kennelly noted that we'd had about 3,000 documents disclosed to us pre-certification and suggested, well, you must have had some experience of how your disclosure review platform was going with that. It's true, we have had those documents, but I think they were almost exclusively Steam distribution agreements, so the contracts that Steam enter into with its publishing partners. They're basically pure Word documents.

So, yes, we haven't had loads of problems with that, but we also haven't had any experience of dealing with the sort of files that normally have metadata or hidden data: PowerPoint presentations, Excel spreadsheets, and that sort of thing. We're just going to have to wait and see, basically, when we start reviewing the data, the extent to which problems come up.

Very brief reply submissions on the other points, just starting with the third-party materials issue. These issues are not for determination today, of course. The issue is when they should be progressed, and in particular whether we should have a CMC before April/May next year to deal with them, and also whether there should be some form of communication with the US court about the position that we are in over here.

On that, we think there certainly should be some communication with the US courts. A letter from the Tribunal would carry particular weight, given that you are obviously objective in these matters and there are issues of comity at play. I've been involved in other cases where the parties have produced a draft letter for consideration by the

Tribunal to be sent to, for example, the European Commission or other overseas courts. We could try that approach here and send you a draft letter, and you consider whether you could send it. If you didn't want to, then we would investigate the possibility of making submissions on our own part to highlight these proceedings to the US court and the fact that you may wish to disclose these and have these materials disclosed over here.

THE CHAIR: To let you know how we're leaning on this point, subject to any final representations. We don't think it's appropriate for the Tribunal to be writing on this. There are various difficulties with that. We do think it's appropriate for you to be seeking to intervene in whatever way is possible within the US courts, and I think we would be happy to say that you're intervening at the suggestion of this court (inaudible) any more comity weight.

On that basis, I think we're also leaning towards keeping the November CMC at least pencilled in the diary. But if it becomes apparent that that's not going to achieve anything, we should be prepared to abandon it. We are also thinking, though, that it does seem to us very likely that earlier next year, it should be possible to know what the court -- has happened -- and that we might move forward the other CMC on the basis that that would give more time elsewhere in the timetable, particularly if it turns out that an interaction is needed with the third parties.

So that's generally how we're thinking about this, but we'll of course listen to any further representations.

MR GREGORY: Those indications are very helpful, Sir. It's also been suggested that we might contact the third parties now. We're grateful for that suggestion. We think there could be some benefit in doing that. Mr Kennelly noted that many of the third parties may have concerns about the disclosure of their documents in these proceedings, based on the position they've taken in the US.

Of course, at least in some of the US proceedings, the plaintiffs are active in the market: they're developers and publishers. Whereas here, the claimant is a Class Representative who is not present in the market and we wouldn't have thought the third parties would have confidentiality concerns about the disclosure of their documents to us.

There is Valve, of course, but Valve will have had these materials disclosed in the context of the US Valve proceedings already. To the extent the third parties would not wish the materials to be seen by in-house personnel within Valve, that is of course possible by making appropriate provisions within the confidentiality order. That's quite common. If we wrote to the third party sooner rather than later, that would provide some clarity, even prior to a ruling by the US courts.

THE CHAIR: I suppose November might be a chance to review what came out of that; whether an order was needed for some sort of confidentiality ring on the other side.

MR GREGORY: Yes. I mean, in terms of the timing, the indication I'm getting is that you're quite keen to not simply let things drift for 10 or 11 months and to try and put some sort of CMC.

THE CHAIR: That's certainly right.

MR GREGORY: We obviously fully endorse that. Hopefully, we might not be completely in the dark as to the timing of the US proceedings. I hope that Valve will keep both us and the Tribunal updated if it becomes aware of a sort of timeline. Perhaps if we write the US court, the US court will also notify us of the speed at which it's proposing to determine Valve's application.

One point that Mr Kennelly touched on is we've obviously asked that it provide a list of the third-party documents from the In re Valve proceedings, and you had a number of exchanges with him about that. Mr Kennelly has volunteered a list of categories of documents. Our position on that is that it would be much less informative than actually

a list of the materials that are provided.

Mr Kennelly suggested that even a document list might contain confidential information, and then you had an exchange with him about the document titles and so on. He suggested that even removing the document titles would require it to review the underlying documents. I'm not sure that's right. I mean, yes, there are 50,000 documents, but it probably requires reviewing 50,000 lines on a spreadsheet. You're only concerned with what the document title is. Yes, it might take a day or two's work, but it's not, weeks, months of work, of reviewing the underlying documents themselves.

THE CHAIR: Well, I assume quite a lot of these documents will be emails. There, I suspect the document title can only be "email".

MR GREGORY: It may well be, yes.

In relation to further disclosure, Mr Kennelly kindly suggested we might just want to focus on Valve's disclosure from the *In re Valve* proceedings and not worry about getting any additional documents. No doubt most parties in litigation would like the proceedings to be determined solely on the basis of their own disclosure. He accepted that the third-party materials are likely to be unfavourable to Valve and more favourable to the Class Representative. That's obviously why we've got a particular interest in getting them, effectively to sort of balance out the very large quantity of documents that Valve will be producing itself.

In relation to the Polish investigation, Mr Kennelly stated that if there are relevant materials, they will be included in the disclosure report. I welcome that clarification which was not clear from the correspondence.

One point of information --

MR KENNELLY: I'm so sorry. I don't want my friend to be misled. I said that we'd identify repositories in the Polish document.

THE CHAIR: Repositories?

MR KENNELLY: Repositories.

THE CHAIR: Repositories.

MR KENNELLY: So sources of documents that we would then search, but we're not listing all the potential documents in the Polish proceedings.

THE CHAIR: I'm not sure I understand what that means.

MR KENNELLY: So what we're doing is we'll say -- as you often see in a disclosure report -- we'll say sources of potential relevant documents. The Polish proceeding: for these issues, we identified these repositories. That is a source where documents can be obtained. It could be -- I mean, I'm speculating -- the inbox of a particular executive.

That's not the case here because, in fact, as they will find out, the documents are generally coming from the US and overlap with US disclosure. But it's about identifying sources of documents which will then be searched according to search terms that will be agreed with the Class Representative. That's the normal approach one uses in a disclosure report and an EDQ.

MR GREGORY: You also had various exchanges in relation to the organogram, which were helpful and we're grateful for what Mr Kennelly said on that.

Then the last subject I was going to address you on is Mr Kennelly's submissions on extending the opt-out period. What underlies this is Valve's submission that there haven't been high levels of engagement with the media campaign and communications. As I said earlier, the reach of the campaign has been very significant. There's been widespread coverage in the news; 14.4 million impressions on the media advertisements. We've also seen it being promoted in online chat rooms of the sort(?), which are --

THE CHAIR: Sorry, 14.4 million ...?

MR GREGORY: Impressions from the display adverts.
THE CHAIR: So do you mean that 14.4 million people have clicked on a display --
MR GREGORY: No, (overspeaking) --
THE CHAIR: 14.4 million people have had an advert in (overspeaking).
MR GREGORY: Yes. For example, I don't know if you use LinkedIn, but if you open LinkedIn and scroll down, every time you see a post, that's an impression. You may not click on it, so you might just keep scrolling, but it's just someone's eyeballs have rested on it, however momentarily.
THE CHAIR: But might this also be that I've done a search for computer games or a particular computer game and an advert pops up on that?
MR GREGORY: I think it depends where the adverts have been placed. Obviously, if you do a Google Search advertising - I don't know the extent to which that's been used - but it's just that people have seen the advert --
THE CHAIR: Anyway, 14.4 million people have had a display saying that this process is going on.
MR GREGORY: Yes.
THE CHAIR: Did that display tell them that they needed to come to your website if they wanted to opt out?
MR GREGORY: Yes, I think generally the advert's referred to the claim website, and so if you clicked on it --
THE CHAIR: But did it just say, "Claim happening. Go to the website to see more"?
MR GREGORY: I think basically what you said, "Claim happening. Click to see more".
THE CHAIR: Right.
MR GREGORY: More or less.
Yes, only 1 per cent of the people who've seen the impression have clicked on the link, but that is completely standard, both generally for this sort of advertising and in

particular for advertising related to collective proceedings claims.

In terms of the application that Valve has made for extending the period, the context for this is that a three-month opt-out period is now standard in collective proceedings cases. It was signed off by the Tribunal and Valve raised no objections to it at the outset. In that context, we say there'd have to be a good reason to justify taking a different approach in extending the period.

Yes, the data that's been provided on the campaign may show that, with the benefit of hindsight, certain types of advertising have been more effective than others. But the mix of advertising was identified by a reputable claims administrator with considerable experience, and again, no objection was raised to them at the time. The low click-through rates overall are completely standard.

As to the level of spend, Mr Kennelly showed you some parts of the updated budget, suggesting that there had been an underspend. That's slightly misleading, because some of the claims administration has in fact been carried out by my solicitors in-house. They're involved in certain claims where they carry out the claims administration in-house, and they've done some of the claims administration for this claim in-house as well. So some of those costs have been incurred in a different bit of the budget. So just looking at the sort of spend on third-party activities is to understate the amount of spend on the campaign.

Another point just to note is we have asked Valve what communications it has had with the class, and we haven't had an answer to that. It may have had direct communications. Our understanding is that Valve communicates both directly and indirectly. So, for example, it has relationships with influencers who may be posting online, and it may be that Valve has been messaging indirectly about the claims through that way.

We don't know. We have asked that information and we've not received it. But having

that information would allow us to form, and you to form, a more rounded view about whether, in fact, there has been adequate publicity around the claim.

In terms of a potential extension to the opt-out period, we would also like to know what, if any, communications Valve will be intending to make itself during that period. We say that because large numbers of people have contacted both my solicitors and the Class Representative directly, and dealing with those direct communications -- so they're not simply going on to the opt-out form on the website -- actually imposes quite significant costs.

So if we're going to go through a new period where those sorts of communications become possible or likely because there's some sort of new wave of publicity, we would like to understand what's going to be happening on Valve's side, if anything.

The opt-out period has obviously closed, but it may be that this is an issue that could be revisited on a more informed basis at the next CMC.

Those submissions that I had in reply, unless you have any questions. (Pause)

THE CHAIR: Yes, well, we'll take five minutes. Then what I'm going to suggest we do is we go through the two orders with the alternative wording. We're going to tell you how we're leaning on those points and hope that we can get a position, based on how we're leaning, that you can agree on in the wording.

Thank you.

(4.06 pm)

(A short break)

(4.12 pm)

Discussion re alternative wording

THE CHAIR: Very good. Well, as I suggested, I suspect, rather than giving you a lengthy judgment at this point, what we're going to do is run through the orders that

are before us, and hopefully as we do that, deal with each of the points that are between you.

Let's start with the CMC draft order. So I think there's nothing on page 1 that we need to deal with.

Paragraph 1.2 at the top of page -- I think we have a good understanding of what's being offered there, which is a description of the roles of the senior people within the organisation and an ability to ask further questions about other people, if that becomes necessary. So I think we can leave it to you to craft the wording on that, but hopefully we've reached a reasonable position on that.

Paragraph 3: do we have anything outstanding there? Valve may where appropriate respond to that. (Pause)

I thought we'd lost the --

MR LOMAS: Because of the "may", we lose the word "appropriate".

THE CHAIR: Yes, I didn't like that because I thought it gave Valve the entire choice within that. So I think -- well, I think it's either "Valve may respond" or "Valve shall, where appropriate, respond". I think I prefer, "Valve, where appropriate, shall respond".

Does anyone have a difficulty with that? (Pause)

That deals with that.

In 5, I think, having understood the point, the red wording is the wording that should stand rather than "where reasonable", but where we talk about "reasonably usable", we mean including in relation to your AI, however you describe it: search engines or litigation support document, whatever it is. (Pause)

Did we need any further wording? I've written something about "not specific" on the "Valve produce certain documents or categories of document in native format". No, I think that deals with the point, doesn't it?

6, where did we get to on 6? (Pause)

Yes, yes. So I think the discussion on 6 leads us to a position where there is a list of documents, but what you put in that list shouldn't include anything at this stage that requires you to breach your US order.

MR KENNELLY: Just to be clear, sir. What we've suggested in relation to that was, paragraph 20 of our skeleton, that in relation to the 50,000-odd documents, we would give the identities of the third parties producing them, the number of documents each one produced, and descriptions by category (overspeaking).

THE CHAIR: Yes, that was it. We had a discussion about what we meant by "produced", but you meant "produced to the US court".

MR KENNELLY: Paragraph 20 of our skeleton. I made clear it's the third-party document.

THE CHAIR: Yes. I think we are happy with that approach.

We would like to retain the case management conference listing. We acknowledge now -- I don't know if it needs to be in the order -- that that might be vacated if there's nothing for it to do, but we suspect there will be something for it to do.

As regards paragraph 8, I think generally we prefer the approach of the claimant here, that further disclosure will be determined in accordance with the usual rules. Happy to see how that is, but we think the wording in red, even if we augment it to say "as reasonably necessary", is just going to add some confusion to it. So I think some blander wording. If there's some wording you want to agree between you that describes the usual rules, we will be very happy to see that, but we hope you can agree something with that approach.

Coming on to 8.1, we think certainly from 8.2, the dates could be slightly more ambitious. We're going to suggest shaving two weeks off each of the dates. 8.5 doesn't have a date, but 8.2 to 8.4, just to give a little bit more give later in the

timetable. We think those dates look quite leisurely.

I should have dealt with the question of supplemental UK approach or further disclosure, but I think I've already said in relation to paragraph 8, we prefer the claimant's wording, so I think we're going to use the term "further disclosure" at 8.5.

Expert evidence. We think that this is certainly a case where there's really no need to wait for everything else to happen before we start dealing with the steps at paragraph 9, so we would suggest a date in January or February 2027, and by February -- I think we probably mean in the first half of February -- for dealing with the steps mentioned in paragraph 9. That means that when we get to 10, we can be talking about a date in February.

Then paragraph 12; would we adjust that date as well?

MR LOMAS: I think (inaudible) would be to bring that date forward, to the beginning of March.

THE CHAIR: That date goes forward towards the beginning of March. However, at this stage, we don't think we can amend the trial date from this suggestion of January 2019(sic), because of the court's availability. Obviously, that point can be revisited at any further CMC, but the way the court's schedule is piling up, we doubt whether we can bring that forward; but we still think that these steps should be advanced to give a little bit more give towards the end of the timetable.

MR GREGORY: We've obviously discussed the possibility of a trial date. There's no reference to a trial date listing in the draft order as it stands. I just wanted to check that you were content with that.

THE CHAIR: Yes, I think there should be, and we should take best available date suiting counsel's availability in January ...

MR LOMAS: 2029.

THE CHAIR: 2029, yes.

MR KENNELLY: Sorry, sir. May I, since we're just interrupting you; on the dates you suggested for the, further disclosure process, as we now must call it --

THE CHAIR: Yes.

MR KENNELLY: -- the 8.3. That has to be brought forward, I think by two weeks, you said. Would that be 8 January?

THE CHAIR: I've written 7 January, but you're right. It's the 8th.

MR KENNELLY: Could we add a week to that, just because it comes straight after Christmas? That could be a squeeze, because that's when we're responding to their Redfern schedule requests.

THE CHAIR: Yes, I think that's fair. Yes, that 8.4 probably comes back a week as well.

Good. Well, that deals with that one, I think. Then we come on to the confidentiality ring order.

MR KENNELLY: I'm sorry, sir. The opt-out period extension is at paragraph 13 in that order.

THE CHAIR: Is it paragraph 13? Sorry.

MR GREGORY: I think Mr Kennelly is referring to the version of the order in the supplemental bundle, which is tab --

MR KENNELLY: In the supplemental bundle, tab 16.

THE CHAIR: Oh, right. Okay.

MR KENNELLY: Tab 16 of the supplemental bundle, page 86.

THE CHAIR: Well, I can answer the general -- we do think that there should be a further opportunity for people to opt out, but we think that opportunity should be limited to three months, probably from the date on which it is first advertised. We are not going to ask for any further publicity beyond an e-blast and publicity on the website, and at this time in the afternoon, we're not going to ask you what the defendant is

going to do about publicity, although that might be a question you're entitled to ask them at the next CMC, what they have done.

MR KENNELLY: On that subject we have already agreed. We've offered to agree a communication. We are not communicating without having (inaudible) the Class Representative.

THE CHAIR: Well, that's very helpful. If you want to put that in the order, that can go in, but no need for it.

Does that then bring us on to the confidentiality order, which I don't think has anything before 5.2? I'm not sure we discussed the words subject to paragraph 5.3 below, but I don't see any problem with them.

MR GREGORY: No, I think it's just saying that 5.2 sets out the position generally, and 5.3 is a slightly different regime for the In re Valve disclosure. So I don't think either of us has any issue with that wording.

MR KENNELLY: That's correct.

THE CHAIR: Should it be without prejudice to 5.3 below? I think we didn't like the words "where appropriate" at the end of 5.2, but we thought that there should be something to make it clearer that there could be requests for specific documents.

MR GREGORY: Could I just check the consistency of that with what you said about paragraph 3 of the draft CMC order, because you had an exchange with Mr Lomas, and I thought you said that your preferred wording was, "Valve, where appropriate, shall respond". I think this is the equivalent.

MR KENNELLY: Yes. We're content that the wording, sir, that you outlined for paragraph 3 in the CMC order, we're happy for it to be carried across.

THE CHAIR: Okay. Let's do that then.

Similarly, at the end of 5.3.

MR KENNELLY: Yes.

THE CHAIR: Was there anything on 5.5 that we needed to deal with? I've written "specific review" next to it, but I think that was probably just my notes of what it said. That, then, I think has dealt with those orders. Do we need to do anything else about noting a revised costs schedule?

MR GREGORY: One point I was going to make on costs is the Tribunal asked whether the defendant should be asked to provide updated cost budgets.

THE CHAIR: Yes. I've seen the defendants' representations about that, and I think it's our view that there's no need to require the defendant to do that.

Have we dealt with everything?

MR KENNELLY: I think so, yes. Thank you.

THE CHAIR: Right.

Well, thank you very much for your very clear representations. I'd also commend the amount of cooperation that has gone into this, very clearly, to limit this to so few a number of things. That augurs well for the rest of this. Thank you for that.

MR GREGORY: Sorry, I (inaudible).

THE CHAIR: Yes.

MR GREGORY: My junior has just reminded me. When we introduced the new opt-out period, ordinarily you would also have an equivalent opt-in period, so I just wanted to check that both the Tribunal and Valve is content with that. That is the normal approach, that people from inside the UK can choose to opt out, and people from outside the UK can choose to opt in during that period.

MR KENNELLY: I see no objection to both being extended.

THE CHAIR: Very good.

Well, we're happy with that and I should leave it there. Thank you.

(4.27 pm)

(The court adjourned)

# EXHIBIT 7

**IN THE COMPETITION APPEAL TRIBUNAL**

**Case No: 1640/7/7/24**

BETWEEN:

**VICKI SHOTBOLT CLASS REPRESENTATIVE LIMITED**

Class Representative

- v -

**VALVE CORPORATION**

Defendant

---

**CONFIDENTIALITY RING ORDER**

---

**UPON** the Class Representative (the "**CR**") and the Defendant (together, the "**Parties**") to the above-named proceedings (the "**Proceedings**") having agreed that it is necessary for a confidentiality ring to be established for the purpose of protecting the confidentiality of certain documents that will fall to be disclosed during the Proceedings

**AND UPON** the Tribunal Order made on 3 July 2025 establishing an Interim Confidentiality Ring (the "**ICRO**")

**AND UPON** the Collective Proceedings Order made on 11 March 2026 authorising the Class Representative to continue the Proceedings

**AND UPON** the parties having agreed that the Interim Confidentiality Ring Members shall become Confidentiality Ring Members

**AND UPON** the Parties having agreed to the terms of this Order

**IT IS ORDERED BY CONSENT THAT**:

1. **DEFINITIONS**

1.1 For the purposes of this Order:

1.1.1 "***Confidential Information***" means:

(a) Documents or information provided by a Party to this Order, including any part of those Documents and any information contained within those Documents which:

(i) the Disclosing Party has designated as Confidential Information in accordance with paragraph 5 of this Order or the ICRO; or

(ii) are designated as Confidential Information by the Tribunal; and

(iii) have not subsequently been re-designated not Confidential Information, either by consent or by order of the Tribunal; and

(b) Without prejudice to the generality of paragraph 1.1.1(a) above, Documents insofar as they contain information or refer to the content of the Documents/information provided under 1.1.1(a), including:

(i) working Documents created by a Party, its advisers or experts;

(ii) *inter partes* correspondence;

(iii) Documents filed at the Tribunal, such as pleadings, witness evidence, expert reports, skeleton arguments, applications and draft orders; and

(iv) transcripts prepared by a third-party service provider, which contain, reproduce or refer to the content of the Documents described at paragraph 1.1.1(a) above; but

(c) not versions of the Documents described at paragraph 1.1.1(b) above which have been redacted so that they no longer contain or refer to the content of the Documents described at paragraph 1.1.1(a) above.

1.1.2 "***Confidentiality Ring Members***" are:

(a) those persons listed in part A of the schedule to this Order, as amended from time to time in accordance with the provisions of paragraph 4 below or by an order of the Tribunal, who have given a signed undertaking in the terms of part B of the schedule to this Order or part B of the schedule to the ICRO and (in the case of those persons who are added as Confidential Ring Members in accordance with the provisions of paragraph 4) where the Proposing Party (as defined) has complied with paragraph 4.1.1;

(b) necessary secretarial and other support personnel including internal providers of electronic disclosure or litigation support services (not including trainee solicitors or paralegals), IT staff, reprographics staff, and clerks, acting under the supervision of those persons identified in paragraph 1.1.2(a) above for the purpose of the Proceedings, provided that such personnel have been informed of the confidential nature of the Confidential Information and the terms of part B of the schedule to this Order;

(c) the Tribunal and its personnel (and any appeal court of competent jurisdiction and its personnel); and

(d) any external electronic disclosure or litigation support provider engaged by any Party for the purpose of the Proceedings to provide electronic disclosure or similar services in support of those persons identified in paragraph 1.1.2(a) above, who may have access to

Confidential Information as a necessary consequence of the provision of their services, and whose identity is notified to the other Parties in writing at least three (3) working days in advance of the Confidential Information being provided to them, provided that such providers have been informed of the confidential nature of the Confidential Information and the terms of part B of the schedule to this Order.

1.1.3 "***Confidentiality Terms***" means the terms contained in this Order (including the schedule thereto).

1.1.4 "***Disclosing Party***" means, in relation to a particular Document, the Party who has disclosed that Document.

1.1.5 "***Document***" means anything in which information of any description (including electronic data) is recorded.

1.1.6 "***Guide***" means the Tribunal's 2015 Guide to Proceedings.

1.1.7 "***Receiving Party***" means a Party that has received one or more Documents in these Proceedings.

2. **CONFIDENTIALITY RING INFORMATION**

2.1 Confidential Information provided in the context of the Proceedings is to be provided or made available solely to the Confidentiality Ring Members, to be held by them on the terms set out in part B of the schedule to this Order, subject to the following paragraphs of this Order.

3. **SCOPE OF THE ORDER**

3.1 Nothing in this Order or the schedule thereto applies to documents and/or information received by a Party other than via the Proceedings under the Confidentiality Terms.

4. **ADDITIONS TO OR REMOVAL FROM THE CONFIDENTIALITY RING**

4.1 If a Party (the "***Proposing Party***") wishes to add an additional person to the Confidentiality Ring:

4.1.1 The Proposing Party shall notify and request the express written consent of the other Party (the "***Notified Party***"), specifying the name and role of the proposed additional person and providing an explanation of why the addition is reasonable and necessary.

4.1.2 Following receipt of a notice pursuant to paragraph 4.1.1 above, the Notified Party shall not unreasonably withhold or delay its consent; if the Notified Party objects to the proposed addition to the Confidentiality Ring, it shall notify the Proposing Party in writing within three (3) working days that it so objects along with a statement of the reason(s) for the objection.

4.1.3 If express consent is given by the Notified Party, or the Notified Party fails to object within the three (3) working day period specified in paragraph 4.1.2 above:

(a) the additional person will be required to give the written undertaking in the terms of part B of the schedule to this Order; and

(b) the Proposing Party will provide the written undertaking referred to in paragraph 4.1.3(a) above and an amended version of part A of the schedule to this Order to the Notified Party and the Tribunal.

4.1.4 Upon completion of the steps in paragraph 4.1.3, the additional person becomes a Confidentiality Ring Member.

4.1.5 If an objection referred to in paragraph 4.1.2 above is received within the three (3) working day period there referred to, the Proposing Party may apply to the Tribunal, provided it gives prior written notice (of ten (10) working days) to the Notified Party. The additional person will become a Confidentiality Ring Member if the Tribunal so orders, and upon that additional person giving the written undertaking in the terms of part B of the schedule to this Order.

4.2 If a Party wishes to remove a Confidentiality Ring Member, that Party will notify the other Party and provide an amended version of part A of the schedule to this Order to the other Party and the Tribunal. The Party must also comply with paragraph 7 including (subject to paragraphs 7.1 and 7.2) by notifying the person to be removed from the

Confidentiality Ring that such person must immediately destroy or make inaccessible all Confidential Information in their control or possession. For the avoidance of any doubt, a Party may only remove a person whom it had (initially or by following the process in paragraph 4.1) proposed as a Confidentiality Ring Member.

4.3 A record of the Confidentiality Ring Members shall be kept and updated by the Parties upon the addition or removal of such persons. Such record shall be provided to the Tribunal upon request by the Tribunal. For the avoidance of doubt, there shall be no requirement to amend this Order upon the addition or removal of Confidentiality Ring Members.

5. **DESIGNATION OF DOCUMENTS OR INFORMATION**

5.1 A Party providing a Document in connection with the Proceedings may designate specified information contained within it is Confidential Information, or designate an entire Document as Confidential Information. If a Document is not so designated, such information will still be subject to the protections of Rule 102.

5.2 Without prejudice to paragraph 5.3 below, each Document that is designated as containing Confidential Information must be clearly labelled as such at the time of disclosure, or as soon as reasonably practicable thereafter if additional time is required for that purpose. For any Document or specified information that a Party seeks to designate as Confidential Information, the designating party should provide reasons explaining the basis on which it considers such designation to be justified. Such reasons shall be provided at the time of disclosure, or as soon as reasonably practicable and in any event by no later than 10 business days. Such reasons may be provided by reference, where appropriate. to categories of documents.

5.3 To the extent that the Defendant discloses documents or information in the Proceedings that have been disclosed in the In re Valve Corporation Antitrust Litigation (case no. 2.21-cv-00563-JMH) in the US and designated as "Confidential" or "Highly Confidential" (or versions of such documents that are similar but not identical to such documents), such documents or information shall be designated as Confidential Information pursuant to the terms of this Order. The Receiving Party may reasonably request that the Defendant provide reasons explaining the basis on which it considers the confidential designation to be justified in respect of certain specified information,

documents or categories of document. Any such requests are not to be unreasonably refused by the Defendant. The reasons should be provided as soon as reasonably practicable and in any event generally by no later than 10 business days. Such reasons where appropriate shall be provided by reference to categories of documents.

5.4 The Disclosing Party will review specific text within a Document for confidentiality if the Document is:

5.4.1 filed with the Tribunal by a Party;

5.4.2 included in any hearing bundle in the Proceedings following agreement between the Parties; or

5.4.3 to be referred to at a hearing in the Proceedings following notification from the Receiving Party to the Disclosing Party in writing and in good faith that it may refer to the Document at such a hearing.

5.5 Following a manual review by the Disclosing Party pursuant to paragraph 5.4 above, if the Document contains Confidential Information but is not confidential in its entirety, then the reviewing Party shall provide highlighted confidential copies of any such Document(s) to the other Party as soon as practically available and no later than 20 working days (subject to any requested extension, which is not to be unreasonably withheld) after:

(a) filing or receipt of a Document referred to in paragraph 5.4.1 or 5.4.2 above; or

(b) receipt of notice that the Document(s) will be relied upon in a manner set out in paragraphs 5.4.3 above or (if later) receipt of the Document(s) in question.

5.6 In the circumstances set out at paragraphs 5.4.1-5.4.3 above, to the extent not already provided, the Party asserting Documents or information are designated as Confidential Information shall provide a highlighted confidential copy of each such Document containing its Confidential Information:

5.6.1 at least three (3) working days before the deadline to file electronic and hard copy bundles for a hearing; or

5.6.2 to the extent Documents are produced after such deadline, in sufficient time in advance of the commencement of a hearing, such that any non-confidential information within a Document may be referred to in open court.

5.7 Failure to provide a designation for a Document or information at the time it is disclosed shall be deemed to be a designation that the Document in question or information is not confidential. A Disclosing Party may correct any erroneous designation by giving written notice to the Receiving Party, subject to the challenge procedure set out below at paragraph 5.8.

5.8 A Receiving Party may request that the Disclosing Party amend the designation of a Document or information that it has provided (including any designation of not confidential) as follows:

5.8.1 The requesting Party (the "**Challenging Party**") shall provide a written request to the Disclosing Party specifying:

(a) the relevant Document or information concerned;

(b) the designation the Challenging Party considers to be appropriate; and

(c) why it is reasonable and necessary for the designation of the Document or information to be amended.

5.8.2 A Disclosing Party may consent in writing to amend the designation of any Document or information.

5.8.3 Should the consent referred to in paragraph 5.8.2 above not be provided by the Disclosing Party within ten (10) working days, the Challenging Party may apply to the Tribunal for an order pursuant to Rule 101(2) that the Document or information should be designated as either Confidential Information or not confidential, provided that ten (10) working days prior written notice is given

of that application to the other Party. In responding to such application, a Disclosing Party shall comply with Rule 101(1) and paragraphs 7.46 and 7.47 of the Guide. Save where there are reasons to justify a hearing, applications under this paragraph are generally to be dealt with on paper by the Tribunal.

5.8.4 Where an application is made by a Party in accordance with paragraph 5.8.3 above, the Document or information which is subject to the application shall be designated as Confidential Information until the challenge is determined by the Tribunal.

5.8.5 A Disclosing Party shall if directed by the Registrar provide a non-confidential version of the relevant Document(s) in accordance with Rule 101(1) and paragraphs 7.48 to 7.50 of the Guide.

5.8.6 Should the confidentiality of any Document added to the bundle during any hearing be in issue, a challenge will be dealt with in accordance with any directions the Tribunal may give.

5.8.7 The deadlines in this paragraph 5.8 above may be extended by agreement between the Challenging Party and Disclosing Party. Consent to a request for an extension shall not be unreasonably withheld.

5.9 Each Party shall be responsible, in respect of any Document containing Confidential Information to be introduced at any hearing in the Proceedings, for labelling Confidential Information in the following ways:

5.9.1 Any bundle index will state which Documents are or contain Confidential Information and identify the Party to which the Confidential Information relates.

5.9.2 The Parties will prepare separate confidential and non-confidential hearing bundles where appropriate.

5.9.3 Any text and/or extract which contains Confidential Information will be highlighted with appropriate colour coding.

5.9.4 Where possible and appropriate in view of the Document's format, each page of the Document must include the relevant header 'CONTAINS CONFIDENTIAL INFORMATION'.

5.10 Each Party wishing to refer to Confidential Information shall indicate to the Tribunal that the Document is or contains Confidential Information prior to disclosing the content of the Confidential Information. Following such an indication to the Tribunal, and subject to any decision of the Tribunal, Rule 99 shall apply.

6. **PROVISION OF CONFIDENTIAL INFORMATION TO PERSONS OUTSIDE THE CONFIDENTIALITY RING**

6.1 Nothing in this Order prevents a Party from sharing (or from consenting to the sharing of) Confidential Information provided by that Party in the Proceedings.

6.2 A Receiving Party that receives Confidential Information in the Proceedings may request that certain Confidential Information is to be provided or made available to one or more persons who are not Confidentiality Ring Members.

6.3 If a Receiving Party wishes such Confidential Information to be provided or made available to such persons:

6.3.1 it shall notify and request the express written consent of the other Party, specifying the name and role of the proposed person(s), the specific Confidential Information that is to be provided or made available to such person(s) (by reference to the relevant Document(s) insofar as practicable) and provide an explanation of why it is reasonable and necessary for the Confidential Information to be provided or made available to such person(s);

6.3.2 following receipt of a notice pursuant to paragraph 6.3.1 above, if the recipient of such notice objects to the Confidential Information being provided or made available to the proposed person(s), they shall notify the requesting Party in writing within ten (10) working days of receipt of the notice that they so object, save that the requesting Party shall not unreasonably withhold consent to an extension of time for this purpose where it is reasonably required in view of the nature and/or number of Documents which are the subject of the request; and

6.3.3 if the recipient required to be provided with notice under paragraph 6.3.1 above gives express consent:

(a) the additional person will be required to give the written undertaking in the terms of part B of the schedule to this Order, amended to list the specific Documents that are to be provided or made available to them;

(b) the Party requesting that the Confidential Information be made available to the person who is not a Confidentiality Ring Member will provide the written undertaking referred to in paragraph 6.3.3(a) above to the other Party; and

(c) on the completion of those steps, the additional person may be provided with the Documents and/or information.

6.4 If (i) any objection referred to in paragraph 6.3.2 above is received or (ii) no objection is received within the 10-working-day period specified (or within any extended time period the Parties have agreed), the requesting Party may apply to the Tribunal for an order that the Confidential Information may be disclosed to the additional person(s), provided that prior written notice (of ten (10) working days) is given of such application to the other Party. The additional person may be provided with the Documents if the Tribunal so orders.

7. **COPIES OF CONFIDENTIAL INFORMATION**

7.1 Subject to the exceptions in paragraph 7.2 below, a Receiving Party must destroy copies of Confidential Information provided to it pursuant to this Order (in both hard and soft copy) or make them inaccessible at the conclusion of the Proceedings (including any appeal), or when that Party ceases to be involved in the Proceedings, and at such time that Party shall notify its Confidentiality Ring Member(s) that they must destroy (insofar as technically feasible) or make inaccessible all Confidential Information in their possession. In such circumstances, each Party concerned shall notify the other Party within a reasonable time that the Confidential Information has been destroyed (insofar as technically feasible) or made inaccessible (as appropriate).

7.2 The obligation in paragraph 7.1 above is subject to the following exceptions:

7.2.1 Paragraph 7.1 above does not apply to solicitors' or counsel's notes subject to continued compliance with all other Confidentiality Terms.

7.2.2 Paragraph 7.1 above does not create an obligation to search for transitory or deeply stored soft copies of Confidential Information which may exist on the computer system of the Receiving Party and which cannot be recovered without special measures, provided that such Documents and/or information will be promptly deleted in the event of the restoration of such copies.

7.2.3 Paragraph 7.1 above does not apply to a Party's copies of pleadings, evidence, skeleton arguments, transcripts, applications, draft orders, correspondence referred to at trial or in a hearing or submitted in the Proceedings, or to legally privileged work product referring to Confidential Information, subject to continued compliance with the Confidentiality Terms in respect of the Confidential Information contained within such Documents.

7.2.4 Paragraph 7.1 above does not apply to a Party in respect of the Confidential Information it provided.

7.3 The production of copies of the Confidential Information shall be limited to those required by the Confidentiality Ring Members to whom they are disclosed.

8. **DEFENDANT'S TRANSACTIONAL DATA**

8.1 The following additional conditions apply to (i) transactional data which has been disclosed by the Defendant; and (ii) any further transactional data disclosed by the Defendant in future, in each case being data retrieved from a database reflecting transactions made through Steam and other original data linked to that transaction data (the "**Data**"):

8.1.1 prior to the disclosure of the Data, the Defendant will inform the Class Representative that the Data to be disclosed is subject to the conditions of this paragraph 8 and the Class Representative will confirm its agreement that this paragraph applies;

8.1.2 the Data will only be downloaded to, and stored by a Party receiving Data (the "**Data Recipient**"), in a single secure location, protected by commercially

reputable firewall software, that ensures that access is limited only to Confidentiality Ring Members who will be performing data analysis in this case and have given a signed undertaking in the terms of part B of the schedule to this order and the necessary secretarial and other support personnel, as defined at paragraph 1.1.2(b), of those Confidentiality Ring Members;

8.1.3 the Data will be accessible (only with password and/or biometric authentication) by only Confidentiality Ring Members who will be performing data analysis in this case and the necessary secretarial and other support personnel, as defined at paragraph 1.1.2(b), of those Confidentiality Ring Members;

8.1.4 the Data will also be accessible by the legal representatives of the Class Representative (only with password and/or biometric authentication) who have given a signed undertaking in the terms of part B of the schedule to this order;

8.1.5 the Data will not be transferred by a Data Recipient to portable data storage or portable data transfer devices;

8.1.6 within 30 days of the final disposition of the Proceedings, the Class Representative will ensure that any person or organization provided with the Data has destroyed (i) the Data; (ii) any copies of the Data; and (iii) any summaries or descriptions of the Data; and

8.1.7 the Class Representative will notify the Defendant within 45 days of the final disposition of proceedings that paragraph 8.1.6 above has been complied with.

8.2 Nothing in this paragraph 8 will prevent Confidentiality Ring Members from using and discussing information derived from the Data in the Proceedings, provided that this information is treated as Confidential Information in accordance with the terms of this Order.

## 9. DISCLOSURE OF CONFIDENTIAL INFORMATION

9.1 In the event of any disclosure of Confidential Information other than in a manner authorised by this Order, including any unintentional or inadvertent disclosure,

solicitors for the improperly Disclosing Party shall immediately notify the improper recipient(s) and the solicitors for the Party which provided the Confidential Information in the Proceedings, and the improperly Disclosing Party shall use all reasonable endeavours to further prevent unauthorised disclosure including using all reasonable endeavours to retrieve all copies of the Confidential Information from the improper recipient(s) thereof and seeking to secure the agreement of such recipient(s) not to further disseminate the Confidential Information in any form.

9.2 Nothing in these Confidentiality Terms shall prevent or prohibit a Receiving Party from taking any action (including in particular disclosing Confidential Information to a person who is not a Confidentiality Ring Member and/or referring to such Documents or information in open Tribunal) which has been authorised in writing by the Party which provided the Confidential Information.

9.3 If at any time any Confidential Information is made the subject of a court or tribunal disclosure or discovery order (or similar) anywhere in the world, the person bound by or subject to the order shall immediately give written notice to the solicitors of the Party which produced the Confidential Information. If the Party which provided the Confidential Information in the Proceedings does not take steps to prevent the further disclosure of such Confidential Information within ten (10) working days of the date on which such written notice was given, the Party bound by or subject to the order which was made may produce such Confidential Information but shall take all reasonable measures to have the Confidential Information treated in accordance with the Confidentiality Terms. For the avoidance of doubt, this paragraph 9.3 only applies to a Party who is the recipient of Confidential Information provided in the Proceedings and does not apply to the Party which provides the Confidential Information in the Proceedings.

## 10. ENFORCEMENT OF THE ORDER, LIBERTY TO APPLY AND COSTS

10.1 The Confidentiality Terms are intended to apply unless or until superseded by a subsequent order of the Tribunal.

10.2 In the event of any anticipated or actual breach of this Order, any Party may seek to enforce the Confidentiality Terms.

10.3 This Order (including the schedule thereto) and any undertakings given pursuant to it are governed by and shall be construed in accordance with English law and each Party hereby irrevocably submits to the exclusive jurisdiction of the courts of England and Wales.

10.4 Nothing in this Order or the schedules thereto shall prevent or prohibit any Confidentiality Ring Member from acting in other proceedings.

10.5 The costs of compliance with and of drafting this Order shall be costs in the case in the Proceedings.

10.6 There shall be liberty to apply to vary the terms of this Order.

11. **NOTICES**

11.1 Any notice, consent or objection to be given under or in connection with this Order (each a "***Notice***" for the purposes of this paragraph) shall be in writing.

11.2 Service of a Notice must be effected by email.

11.3 Notices shall be addressed as follows:

11.3.1 Notices for the Class Representative shall be marked for the attention of Milberg London LLP and sent to:

Email addresses: Natasha Pearman <npearman@milberg.co.uk>
Grace Panter <gpanter@milberg.co.uk>
Milberg Collective Proceedings team
<SteamTeam@milberg.co.uk>
Reference: NP/GP/00085

11.3.2 Notices for the Defendant shall be marked for the attention of Reynolds Porter Chamberlain LLP and sent to:

Email addresses: David Cran < David.Cran@rpclegal.com>
Chris Ross < Chris.Ross@rpclegal.com>
RPC Valve Collective Proceedings Team
<RPCSteam@rpclegal.com>

Reference: BP03/DMC/VAL62.2

**The Honourable Mr Justice Thompsell**
Chair of the Competition Appeal Tribunal

Made: 9 July 2026
Drawn: 9 July 2026

# SCHEDULE

## PART A Confidentiality Ring Members

### Class Representative

| *Milberg London LLP* |
|---|
| 1. Natasha Pearman, Partner |
| 2. Polly Blenkin, Partner |
| 3. Zena Prodromou, Partner |
| 4. Steen Cooper, Of Counsel |
| 5. Alicia Clark, Senior Associate |
| 6. Hadley Zielonka, Senior Associate |
| 7. Grace Panter, Associate |
| 8. Joel Mitchell, Associate |
| 9. Maya Ffrench-Adam, Associate |
| 10. Dwight Wilson, Trainee Solicitor |
| 11. Fabian Ziermann, Trainee Solicitor |
| 12. Isaba Moazzem, Trainee Solicitor |
| 13. Claudia Chan, Trainee Solicitor |
| 14. Amelia Hall, Paralegal |

| *Class Representative* |
|---|
| 15. Vicki Shotbolt |

| *Counsel* |
|---|
| 16. Robert Palmer KC, Barrister |
| 17. Julian Gregory, Barrister |
| 18. William Perry, Barrister |

| *Berkeley Research Group (BRG)* |
|---|
| 19. Greg Harman, Managing Director |
| 20. Mark Bosley, Director |
| 21. Robert Scherf, Associate Director |
| 22. Daniel Louw, Consultant |
| 23. Vivian Keung, Consultant |
| 24. Matthew Wood, Associate Consultant |

| *Bench Walk Advisors* |
|---|
| 25. Chris Williams, Vice President |
| 26. Stuart Grant, Co-Founder & Managing Director |
| 27. Adrian Chopin, Co-Founder & Managing Director |

**Defendant**

| *Defendant (Valve Corporation)* |
| --- |
| 1. Christopher Schenck, Legal Counsel |
| 2. Gavin Skok, Legal Counsel |
| 3. Jessica Painley, Paralegal |

| *Reynolds Porter Chamberlain LLP (RPC)* |
| --- |
| 4. David Cran, Partner |
| 5. Chris Ross, Partner |
| 6. Alexandra Shearer, Senior Associate |
| 7. Ben Powell, Senior Associate |
| 8. Michael Miles, Associate |
| 9. Daniel Goh, Trainee |

| *Counsel (Blackstone Chambers)* |
| --- |
| 10. Brian Kennelly KC, Barrister |
| 11. Tom Coates, Barrister |
| 12. Sean Butler, Barrister |

| *RBB Economics* |
| --- |
| 13. Adrian Majumdar, Managing Partner |
| 14. Katie Curry, Partner |
| 15. Owen O'Leary, Senior Associate |
| 16. Alastair Carr, Associate Principal |
| 17. Linn Rustad, Associate Competition Economist |

## PART B

## UNDERTAKING (TO BE PROVIDED BY CONFIDENTIALITY RING MEMBERS)

In respect of any Confidential Information disclosed to them pursuant to this Order, each Confidentiality Ring Member undertakes that they will comply with the following requirements, to the extent applicable to them, in the terms below. The defined terms in this Order are used in this part B.

I, [**name**], of [**company**] being [**legal or other qualification or position**] undertake to the Tribunal and to the Parties as follows:

1. I have read a copy of the Tribunal's Order of [**date**] and understand the terms of that order and the implications of giving this undertaking.

2. I have read Rules 101 and 102 and Civil Procedure Rule 31.22 and am aware of and will comply with the obligations imposed by those provisions.

3. I will treat all Confidential Information made available to me for the purpose of the Proceedings as confidential.

4. Except as expressly contemplated by the Confidentiality Terms, I will not disclose, refer, use, copy, reproduce or otherwise distribute or disseminate Confidential Information to any person who is not a Confidentiality Ring Member, including by reading it out in open proceedings (except to the extent that I am aware of the same information from another document that does not constitute "Confidential Information" and that was not obtained in breach of this undertaking or of the Tribunal's Order).

5. I will use the Confidential Information only for the purpose of the Proceedings and for the purpose of no other current or future proceedings or proposed proceedings, dispute, complaint, or other use whatsoever in any jurisdiction (except to the extent that I am aware of the same information from another document that does not constitute "Confidential Information" and that was not obtained in breach of this undertaking or of the Tribunal's Order).

6. Documents containing any Confidential Information will remain in my custody or the custody of another Confidentiality Ring Member at all times and be held in a manner appropriate to the circumstances so as to prevent unauthorised access.

7. The production of further copies by me of the Documents containing Confidential Information shall be limited to those reasonably required for the use of the Confidentiality Ring Members for the purposes of the Proceedings only and such copies shall be held in accordance with paragraphs 3 to 6 of this undertaking.

8. Subject to the exceptions in paragraph 7.2 of the Order, and to the extent permitted by law, any and all copies of Confidential Information which are within my control will be securely disposed or rendered inaccessible from any computer systems, disk or device, so that the Confidential Information is not readily available to any person at the conclusion of the Proceedings or upon receiving a notice in accordance with paragraph 7.1 of the Order.

9. I will continue to comply with these undertakings after the conclusion of the Proceedings, in respect of any Confidential Information that I do not destroy and continue to hold.

10. Nothing in these undertakings shall prevent or prohibit the owner of the Confidential Information from taking any action in relation to that information, which they would otherwise be entitled to take.

11. Nothing in these undertakings shall prevent or prohibit me from taking any action that is permitted in this Order, or has been authorised in writing by the relevant Disclosing Party, or subject to the conditions in paragraph 9.3 of the Order that I am required to take by applicable law or by a court of competent jurisdiction.

Signed:

Name:

Date: