THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE VALVE ANTITRUST LITIGATION

This Document Relates To:
Publisher Plaintiffs

Case No. 2:21-cv-00563-JNW

**DECLARATION OF MICHAEL ARMITAGE IN SUPPORT OF PUBLISHER PLAINTIFFS' RESPONSE TO INTERVENOR VICKI SHOTBOLT'S CROSS-MOTION FOR CLARIFICATION REGARDING PROTECTIVE ORDER**



QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

I, Michael Armitage, am a barrister at Monckton Chambers in London and have been in full-time practise as a barrister for more than a dozen years. I offer my opinions on certain issues relating to the UK proceedings relevant to Intervenor Vicki Shotbolt's cross-motion for clarification regarding the Court's Protective Order in this litigation. I am being compensated for my time at a rate of £425 per hour. I confirm that I do not have a financial interest in the outcome of this matter.

## I. QUALIFICATIONS

1. I graduated from Oxford University (Balliol College) in 2007 with a First Class Honours degree in Philosophy, Politics and Economics. I subsequently undertook a Graduate Diploma in Law (GDL) at the City Law School (part of the University of London) in 2010. The GDL is a mandatory postgraduate qualification for those seeking to enter legal practice in England but whose undergraduate degree is not in Law, and is equivalent to an undergraduate degree (LLB) in Law. I then undertook the Bar Professional Training Course (BPTC), again at City Law School, graduating in 2011. The BPTC was, at the time, the mandatory professional qualification for law graduates wishing to become practising barristers in England.

2. Thereafter, I undertook a pupillage at Monckton Chambers, a barristers' chambers specialising *inter alia* in competition law, with offices in Gray's Inn, London. Pupillage is a mandatory period of training under the supervision of experienced barristers which is the final step to becoming a fully qualified barrister in England. Following the successful completion of my pupillage, I accepted an offer of tenancy from Monckton Chambers (a tenancy being full-time membership of Chambers as a practising barrister).

3. Since 2013, I have been in continuous full-time practice as a barrister at Monckton Chambers. I principally specialise in competition law, representing claimants, defendants and regulators in a range of private litigation and public enforcement contexts, in both the English High Court and the specialist UK Competition Appeal Tribunal, as well as the appellate courts. Since the enactment of legislation introducing an 'opt-out' class action regime for competition law cases in the UK in 2015, I have developed a particular specialism in this field, acting in cases such as *Le*

*Patourel v BT* (the first opt-out class action to come to trial under the new regime) and *Kent v Apple* (in which I acted for the successful class representative in the first claim under the regime to result in a judgment in a class representative's favour following trial).

4. While members of a barristers' Chambers in England share offices, staff and administrative expenses, they are fully independent, self-employed practitioners. It is very common, for instance, for members of the same Chambers to appear on the opposite sides in litigation. The opinions I express below are my own and should not be taken to reflect the views of Monckton Chambers.

## II. SUMMARY OF OPINIONS

5. I have been asked by Publisher Plaintiffs to provide an opinion on certain issues concerning the procedure for discovery (more commonly referred to as 'disclosure' in English litigation, which is the word I use below) in proceedings before the UK Competition Appeal Tribunal that may be pertinent to Intervenor Vicki Shotbolt Class Representative Limited's Motion to Intervene for Limited Purpose of Clarifying the Protective Order. In particular, I have been asked to: (i) summarise the principles underlying non-party disclosure and their application in proceedings before the Competition Appeal Tribunal; (ii) summarise the Competition Appeal Tribunal's practices for the management of confidential information (including non-party confidential information), and how those practices are balanced against the requirements for open justice; and (iii) comment on the existing Confidentiality Ring Order that has been made in the proceedings brought by Intervenor before the Competition Appeal Tribunal (the '*Shotbolt* CRO'), and the extent to which that order addresses the position of non-parties.

6. To formulate my opinions, I reviewed the following case documents by way of background: Publisher Plaintiffs' Consolidated Amended Class Action Complaint (Dkt. No. 99); Stipulated Protective Order (Dkt. No. 95); Intervenor Vicki Shotbolt Class Representative Limited's Motion to Intervene for Limited Purpose of Clarifying the Protective Order (Dkt. No. 686); Intervenor Vicki Shotbolt Class Representative Limited's Cross-Motion for Clarification Regarding the Protective Order (Dkt. No. 687); and Declaration of Natasha Marie Pearman in

Support of Vicki Shotbolt Class Representative Limited's Cross-Motion for Clarification Regarding Protective Order (Dkt. No. 688). The *Shotbolt* CRO appears as Exhibit 7 to Ms Pearman's declaration.

7. To summarise, my primary opinions are:

a. The Competition Appeal Tribunal applies a discrete test for non-party disclosure which is more exacting than the test which applies to ordinary *inter partes* disclosure. The Competition Appeal Tribunal is very unlikely to consider that it has jurisdiction to order disclosure against a non-party that is domiciled outside the UK.

b. The Competition Appeal Tribunal has a range of mechanisms for balancing open justice and the need to protect legitimate confidentiality claims. In appropriate cases it will confine disclosure to named members of a 'confidentiality ring', and, where applicable, it may give non-parties a reasonable opportunity to comment on the treatment of their own confidential information.

c. The *Shotbolt* CRO provides a single layer of confidentiality, and the named members of the confidentiality ring appear to include a number of external advisers as well as three individuals who appear to be in-house lawyers at Valve Corporation and Ms Shotbolt herself.

d. The *Shotbolt* CRO does not contain any express provision enabling non-parties to make representations on the membership of the confidentiality ring or the confidential treatment of non-parties' sensitive information.

## III. <u>THE COMPETITION APPEAL TRIBUNAL</u>

8. The Competition Appeal Tribunal (which I refer to below using the conventional abbreviation, CAT) is a specialist statutory tribunal which hears a broad range of competition law cases and other cases raising economic regulatory issues in the UK. Since its establishment in 2003, the CAT's jurisdiction has significantly expanded and it is now the primary forum for private

competition law claims in the UK. In 2015, it was afforded the exclusive jurisdiction to hear collective competition law proceedings on an 'opt-out' basis, which I understand to be the UK equivalent of antitrust class actions in the United States. Opt-out collective proceedings have become a major part of the CAT's caseload.

9. The CAT has its own bespoke procedural rules, the Competition Appeal Tribunal Rules 2015 (the 'CAT Rules'). The CAT has also published various practice directions, including, relevantly, **Exhibit 1** Practice Direction 2/2026 on *Disclosure: Management of Confidential Information* (the 'CAT Confidentiality PD'). I refer to these materials where relevant below.

## IV. THE CAT'S APPROACH TO NON-PARTY DISCLOSURE

10. The CAT has the power to grant an order for disclosure by a party who is not a party to the proceedings before it. Under Rule 63 of the CAT Rules (**Exhibit 2**), the CAT may only make such an order where (a) the documents of which disclosure is sought are likely to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings; and (b) disclosure is necessary in order to dispose fairly of the claim or to save costs. Where these two jurisdictional requirements are satisfied, the CAT has broad discretion as to whether or not non-party disclosure should be ordered (as indicated by the word 'may' in Rule 63(3)).

11. In my experience, non-party disclosure orders are relatively rare in cases before the Tribunal (although they are certainly not unheard of), and I am not aware of any detailed discussion in the CAT's case law of the manner in which the CAT's discretion is to be exercised, which may be because applications for non-party disclosure have tended to be resolved by consent. In determining an application for non-party disclosure in a case in which the two jurisdictional threshold criteria are satisfied, I would expect the CAT to have regard to its 'governing principles', which include seeking to ensure that each case is dealt with justly and at proportionate cost: see CAT Rules, r. 4(1). In my experience, the CAT is particularly astute to ensure that disclosure-related costs are carefully controlled in collective proceedings given the tendency for substantial costs to be incurred on both sides in such cases.

12. I note that the threshold for an order for disclosure against a non-party is higher than the threshold for an order for *inter partes* disclosure (*inter partes* disclosure is addressed in Rule 60 of the CAT Rules). The CAT typically exercises close control over *inter partes* disclosure, and it will frame any order to ensure that such disclosure is limited to what is 'reasonably necessary and proportionate': see **Exhibit 3** *Ryder Limited & Another v MAN Se & Ors* [2020] CAT 3 at §35(7). However, in contrast with non-party disclosure under Rule 63 of the CAT Rules, there is no jurisdictional requirement that *inter partes* disclosure may only be ordered where it is 'likely' to support or adversely affect a party's case.

13. It is also very unlikely that the CAT would be prepared to make an order for disclosure against a non-party that is domiciled outside the UK. The CAT has expressed doubt as to whether it even has the jurisdiction to make such an order: see **Exhibit 4** *Suez Group SAS & Ors v Stellantis NV & Ors* [2021] CAT 6 at §31. In a recent case before the CAT in which I am instructed for the claimant (Case No: 1702/5/7/25 *Lenzing AG & Ors v Westlake Vinnolit GmbH & Co KG & Ors*), it has been necessary to apply for disclosure against a non-party in the United States using the procedure in 28 U.S.C. § 1782, rather than seeking an order for non-party disclosure in the CAT under Rule 63 of the CAT Rules, precisely because the non-party in question has no relevant presence in the UK.

## V. <u>THE CAT'S APPROACH TO THE MANAGEMENT OF CONFIDENTIAL INFORMATION</u>

14. Proceedings in the CAT are ordinarily conducted in public: CAT Rules, r. 99(1). In my experience, judges in the CAT take the principle of open justice very seriously, and regard it as crucial that proceedings before them should be as transparent and intelligible to the public as possible.

15. On the other hand, it is in the nature of proceedings before the CAT that they often involve the disclosure and subsequent discussion of information that may be commercially sensitive. There is a range of procedural mechanisms by which the CAT routinely addresses the need to balance the principle of open justice with the need to protect legitimate claims for

confidentiality. I refer below to some pertinent examples of these mechanisms, so far as the present case is concerned.

16. *First*, Rule 102 of the CAT Rules provides that a party to whom a document has been provided in the proceedings (including by way of non-party disclosure under Rule 63 of the CAT Rules: see above) may use that document *only* for the purpose of the proceedings. However, the CAT recognises that this restriction on the collateral use of disclosed documents is only a 'starting point', and that additional measures may be required in order to protect the confidentiality of information the disclosure of which can be shown to have direct and material adverse consequences to legitimate business interests: see CAT Confidentiality PD, §§3-4.

17. *Second*, therefore, the CAT will in appropriate cases consider the establishment of a 'confidentiality ring' - indeed, in my experience, confidentiality rings are almost invariably established in private litigation before the CAT. In very broad terms, two possible approaches can be discerned. In some cases a confidentiality ring order (CRO) will provide for the establishment of an 'inner confidentiality ring', typically comprising only the parties' external advisers (i.e. external lawyers, and often also the parties' instructed expert advisers), and an 'outer confidentiality ring', comprising a limited number of named individuals, who may be officers or employees of the party concerned. The CRO will then provide that the disclosing party may elect to designate documents as 'inner ring only', and lay down a mechanism whereby the receiving party may challenge that designation, by seeking to have an 'inner ring only' document re-designated as 'outer ring confidential' (or as non-confidential), with the CAT resolving any disputes. The CRO will typically also provide for a detailed series of obligations concerning the handling of information designated as confidential (e.g. requirements to the destruction of documents at the conclusion of the litigation), with individuals required to sign appropriate undertakings before their admission to the inner or outer ring.

18. In other cases, a CRO may provide for a single 'layer' of confidentiality only, with a schedule comprising a list of named individuals who are permitted to see information designated as confidential under the Order. Those named individuals will, as under the first

approach, be required to sign, prior to their admission to the confidentiality ring, detailed undertakings governing the handling of confidential information. In my experience, the named individuals in CROs following this second approach are likely to be limited to external advisers, and potentially also a limited number of in-house counsel. On this approach, the CRO will typically also provide a mechanism whereby, in relation to particular documents, the receiving party may request that documents designated as confidential may be shown to a particular named individual who is not a member of the confidentiality ring (e.g. to allow a party's employee to comment on the significance of the document), with that named individual being required to provide signed undertakings as a condition of their receipt of the document concerned. Again, the CRO will provide a mechanism whereby the CAT will resolve any disputes about the designation of information as confidential, or about whether it is appropriate for an individual who is not a member of the confidentiality ring to be shown a document

19. In referring to these two broad approaches, I am not intending to suggest that other approaches are not taken by the CAT, and indeed a given CRO may blend elements of the two approaches to which I have referred.

20. *Third*, particular issues may arise where it is anticipated that the *inter partes* disclosure to be given in proceedings before the CAT may include confidential information from *non*-parties. An example of this situation is a case in which the defendant has previously been a party to public enforcement proceedings brought by a competition authority (either in the UK or overseas) and has, in the course of those proceedings, been provided with access to documents submitted to the competition authority by non-parties. In such cases, it is commonplace for the claimant to seek disclosure from the defendant of documents originating from non-parties that are in the defendant's control as a result of the defendant's involvement in the prior regulatory proceedings. In my experience, a CRO in such a case may include express provision to ensure that affected non-parties are able to take steps to ensure that their own legitimate claims to confidentiality can be made and appropriately considered.

21. While there is no 'one size fits all' approach in the CAT, an example may be found in the CRO made on 21 June 2023 by the CAT in Case No: 1382/7/7/21 *Consumer's Association v Qualcomm Incorporated* (**Exhibit 5**). These were collective proceedings (in which I was instructed by the class representative) brought against a US corporation which had previously been the subject of a complaint by the United States Federal Trade Commission in respect of the same alleged anti-competitive conduct. A large quantity of documents and evidence had been provided by non-parties in the US proceedings and were consequently in Qualcomm's control, and it was necessary for the CAT to consider how such materials should be handled in the course of *inter partes* disclosure in the CAT proceedings. I note that §5.7 of the CAT's CRO in that case provided for a process whereby a non-party had to be provided with 'reasonable notice' prior to any intended disclosure of any documents originating from that non-party, with that non-party being provided with 10 days to respond to any such notice. A number of other provisions in the *Qualcomm* CRO make express provision for the involvement of non-parties in relation to confidentiality issues: see e.g. §8.1, §11.6, §11.7.

22. The reason why the CAT typically regards it as necessary for non-parties to be given a reasonable opportunity to comment on the confidential treatment of their own information in such cases is self-evident. Without such an opportunity being afforded, the non-party in question is reliant on *the parties* (and, failing that, the Tribunal) to take appropriate steps to protect its confidential information. The parties, however, may have no particular incentive to do so; indeed, they may have the oppositive incentive, for example where the non-party in question is a competitor, customer or supplier of one of the parties. As for the Tribunal, it applies certain 'rules of thumb' in relation to confidentiality claims. In that regard, the CAT Confidentiality PD provides, by way of guidance, that the CAT would not normally expect documents containing information with certain specified characteristics to be subject to claims for confidentiality, for example data which are more than five years old: see §9. However, that is *only* a rule of thumb, and there will be cases in which it will be necessary for non-parties to be given the opportunity to explain why the rule of thumb should not apply to its own information.



QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

This issue arose in the *Qualcomm* litigation to which I refer above, in which the Tribunal made specific provision enabling non-parties to file submissions and evidence explaining why the five-year rule of thumb should not apply in respect of non-party documents to which the parties had indicated that they may refer at trial: see **Exhibit 6** Order made on 29 July 2025, §20(b).

## VI. ANALYSIS OF THE *SHOTBOLT* CRO

23. The *Shotbolt* CRO is an example of a CRO which provides for a single 'layer' of confidentiality: it does not distinguish between a separate inner and outer ring. I note that the named members of the confidentiality ring at Part A of the Schedule to the *Shotbolt* CRO include a number of external advisers, as well as three individuals who appear to be in-house lawyers at Valve Corporation, and Ms Shotbolt herself.

24. The *Shotbolt* CRO contains a range of mechanisms allowing a party to: (i) request the other party's consent to the addition of a new member of the confidentiality ring (at Section 4); (ii) challenge the other party's designation of disclosed material as Confidential Information (at Section 5); and (iii) request that a document designated as containing Confidential Information be shown to a person who is not a member of the confidentiality ring (at Section 6). As is conventional, the *Shotbolt* CRO also includes certain provisions concerning the handling of confidential information (see Sections 7-9).

25. As far as I can ascertain, the *Shotbolt* CRO does not contain any express mechanism for non-parties to make representations as regards the treatment of their own confidential information, where such information falls to be disclosed by Valve and/or where such information has been disclosed into the confidentiality ring but is then the subject of a request for de-designation. In that regard:

a. §5.3 of the *Shotbolt* CRO provides that where the defendant Valve Corporation ('Valve') discloses documents or information that have been disclosed in the *In re Valve Antitrust Litigation* and designated as 'Confidential' or 'Highly Confidential' (I understand that such documents may include documents originating from non-parties such as the Publisher

Plaintiffs), such documents shall be designated as 'Confidential Information' pursuant to the terms of the *Shotbolt CRO*. §5.3 goes on to provide that the Receiving Party (i.e. the Intervenor in the present motion) may reasonably request that *the Defendant* (i.e. Valve Corporation) shall provide reasons justifying any claim for confidentiality. However, there is no provision for any *non-party* such as the Publisher Plaintiffs to provide such reasons.

b. The consequence of material being designated as 'Confidential Information' under the *Shotbolt CRO* is that its circulation is limited to the individuals named in Part A of the Schedule. As noted above, it appears that those named individuals are not limited to external advisers. Further, while Section 4 of the *Shotbolt* CRO provides a process whereby individuals may be added to the Confidentiality Ring (meaning that such individuals will then be permitted to see information that has been designated as Confidential Information), there is no mechanism whereby non-parties such as the Publisher Plaintiffs may object to the addition of further individuals to the Confidentiality Ring.

c. More generally, the *Shotbolt* CRO contains no mechanism equivalent to that discussed above in relation to the *Qualcomm* CRO whereby non-parties such as the Publisher Plaintiffs are required to be given a reasonable advance opportunity to comment on any intended disclosure of documents originating from that non-party. Nor is there any provision whereby non-parties are required to be given the opportunity to comment on a party's request for a non-party to show a document designated as containing Confidential Information to an individual who is not a member of the confidentiality ring.

26. In describing the provisions of the *Shotbolt* CRO, I am not expressing any opinion on whether and to what extent the CAT may need to take steps to protect non-parties' interests in the course of the *Shotbolt* collective proceedings where such interests are engaged (e.g. by any future disclosure encompassing non-parties' information that the class representative may seek

against Valve Corporation), or whether the CAT would in fact take any such steps. I am simply commenting, as I have been asked to do, on the extent to which the *existing* CRO contains provision for non-parties to comment on matters relating to their own confidential information.



QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

London, United Kingdom

August 31, 2026

Michael Armitage

Michael Armitage



QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000