# EXHIBIT 3

Neutral citation [2020] CAT 3

**IN THE COMPETITION APPEAL TRIBUNAL**

Case Nos: 1291-1294-1295/5/7/18 (T)

Salisbury Square House
8 Salisbury Square
London EC4Y 8AP

15 January 2020

Before:

THE HON MR JUSTICE ROTH
(President)
HODGE MALEK QC

Sitting as a Tribunal in England and Wales

BETWEEN:

**RYDER LIMITED & ANOTHER v MAN SE & OTHERS**

**WOLSELEY UK LIMITED & OTHERS v FIAT CHRYSLER AUTOMOBILES N.V. & OTHERS**

**DAWSONGROUP PLC & OTHERS v DAF TRUCKS N.V. & OTHERS**

Heard at Victoria House on 19-20 September 2019

---

**RULING (DISCLOSURE)**

---

APPEARANCES

Mr Tim Ward QC, Mr Ben Lask and Ms Anneliese Blackwood (instructed by Bryan Cave Leighton Paisner LLP) appeared on behalf of the Claimants in the Dawsongroup Plc actions.

Mr Mark Brealey QC, Mr Derek Spitz and Ms Fiona Banks (instructed by Ashurst LLP) appeared on behalf of the Claimants in the Ryder Limited action.

Mr Tristan Jones (instructed by Hausfeld & Co. LLP) appeared on behalf of the Claimants in the Wolseley UK Limited actions.

Mr Meredith Pickford QC, Mr Rob Williams, and Mr David Gregory (instructed by Travers Smith LLP) appeared on behalf of the DAF Defendants.

Mr Paul Harris QC, Mr Ben Rayment, Mr Michael Armitage and Ms Alexandra Littlewood (instructed by Quinn Emanuel Urquhart & Sullivan UK LLP) appeared on behalf of the Daimler Defendants.

Mr Tony Singla and Mr Matthew Kennedy (instructed by Herbert Smith Freehills LLP) appeared on behalf of the Iveco Defendants.

Mr Daniel Jowell QC and Mr David Bailey (instructed by Slaughter and May) appeared on behalf of the MAN Defendants.

Mr Mark Hoskins QC and Mr Hugo Leith (instructed by Freshfields Bruckhaus Deringer LLP) appeared on behalf of the Volvo/Renault Defendants.

## A. INTRODUCTION

1. By its decision in Case 39824 - Trucks, adopted on 19 July 2016 ("the Decision"), the European Commission ("the Commission") found that five major European truck manufacturing groups had carried out a single continuous infringement of Article 101 of the Treaty on the Functioning of the European Union ("TFEU") over a period of some 14 years between 1997 and 2011 (the "Infringement"). Seven actions claiming damages against addressees of the Decision and related companies have been transferred from the High Court to the Tribunal and are currently being case managed together. For the purpose of this Ruling, the addressees of the Decision may be referred to simply by the corporate name of the group to which they belong: DAF, Daimler, Iveco, Volvo/Renault and MAN; and together they are referred to as the "OEMs" (original equipment manufacturers).

2. Two joint case management conferences ("CMCs") have already taken place in the Tribunal, on 21-22 November 2018 (the "November 2018 CMC") and on 2-3 May 2019 (the May 2019 CMC"). At the May 2019 CMC, the Tribunal gave directions in respect of quantum disclosure in the Ryder, Dawsongroup and Suez-Veolia-Wolseley ("VSW") actions, including for the filing of Redfern schedules and witness evidence. A hearing of the quantum disclosure issues in dispute was listed for 19-20 September 2019 (the "Disclosure Hearing"). By the time of the Disclosure Hearing, the only applications being pursued in the VSW actions were by the Wolseley Claimants and Daimler (which is a Part 20 Defendant only in the Wolseley action). The other Defendants and/or Part 20 Defendants in the VSW actions (DAF, Iveco, Volvo/Renault, MAN and Scania[1]) had agreed consent orders with the VSW Claimants which were made on 6 September 2019.

3. In the course of the Disclosure Hearing, the Tribunal gave guidance to the parties as to the general approach it intends to take to disclosure in these actions. The purpose of this Ruling is to summarise, and to expand on, certain broad principles in relation to disclosure set out by the Tribunal. Although the Disclosure Hearing concerned only three actions, it may be expected that the Tribunal will seek to adopt a broadly similar

---

[1] Companies in the Scania group are addressees of a separate Commission decision issued on 27 September 2017 (the "Scania Decision") which is on appeal to the EU General Court: Case T-799/17.

approach to all damages claims arising from the Infringement that come before it. The Disclosure Hearing was conducted by two members of the Tribunal, but the third member, Mr Justice Fancourt, has seen this ruling in draft and concurs in the observations set out.

## B. DISCLOSURE TO DATE

4. The extent to which disclosure had already taken place across the seven actions prior to the Disclosure Hearing may be summarised as follows.

### (1) Cases 1284T: *Royal Mail*; and 1290T: *BT*

5. At the November 2018 CMC it was ordered that the Royal Mail and BT claims be heard together, with evidence in one to stand as evidence in the other.

#### *(a) Royal Mail*

6. The Claimant, Royal Mail Group Ltd, which operates across the UK, has sued only DAF entities (including non-addressees), and is claiming damages for losses suffered in the UK. It purchased and/or leased trucks directly from DAF for the purpose of carrying out its business as a postal operator. There are no Part 20 Defendants.

7. Two case management conferences were heard in the High Court (before Rose J on 8 December 2017 and Roth J on 13 June 2018) before the action was transferred to the CAT. At and following the 8 December 2017 CMC, Rose J made orders for disclosure of the confidential version of the Decision and documents on the Commission's administrative file, with the exception of certain excluded categories of documents and leniency/privileged material. Orders for economic disclosure were also made.

8. At the CMC on 13 June 2018, Roth J made an order for further economic disclosure, including the provision of information for the economic experts' analyses. Further economic disclosure was again ordered at the November 2018 CMC.

#### *(b) BT*

9. The three Claimants, all UK-based companies in the BT group, have sued only DAF entities (including a non-addressee), and are claiming damages for losses suffered in

the UK. They are principally engaged in the sale of telecommunications products and services, and purchased trucks directly from DAF. There are no Part 20 Defendants.

10. Following the November 2018 CMC, the confidential version of the Decision, the version of the Commission file disclosed in the Royal Mail claim and existing economic disclosure in the Royal Mail claim were deemed to be disclosed in the BT claim. The parties subsequently reached agreement on certain outstanding economic disclosure applications and communications disclosure.

**(2) Case 1291T: *Ryder***

11. The two Claimants, Ryder Ltd and Hill Hire Ltd (together, "Ryder"), have sued entities in the DAF, Daimler, Iveco, MAN and Volvo/Renault groups (all the addressees as well as non-addressees). Ryder is engaged in the provision of commercial vehicle rental, leasing, maintenance, and delivery solutions, primarily in the UK, and is claiming damages for losses suffered in the UK. It purchased trucks from entities within each of the Defendant manufacturer groups, through their networks of authorised distributors and/or directly. DAF and Iveco have each brought Part 20 Claims against the existing Defendants in the other manufacturer groups.

12. Ryder, in common with the Claimants in the VSW cases, made an application in the High Court, prior to the close of pleadings, for disclosure by DAF of the same documents on the Commission's administrative file that DAF was ordered to disclose in the Royal Mail case. Those applications were contested by DAF and Iveco, on the basis that the disclosure requests did not comply with Directive 2014/104/EU (the "Damages Directive") and Practice Direction 31C. The applications were heard by Roth J on 16 July 2018, who gave an unreserved judgment granting the disclosure sought subject to a limited review for relevance.[2]

13. At the November 2018 CMC, disclosure of certain additional categories of documents on the Commission file which had previously been withheld, as well as the index to the file and parent document data, was ordered. Ryder subsequently made a specific disclosure application which was heard on 11 March 2019 by the President sitting alone. The President dismissed the application which essentially sought disclosure of

[2] [2018] EWHC 1994 (Ch).

a potentially large volume of documents which could have founded an extension of the temporal, geographic and subject matter scope of Ryder's claim. The Defendants agreed separately to provide additional information regarding requests for information made by the Commission/Office of Fair Trading and the Defendants' responses to those requests; and to lift redactions from the disclosed Commission file documents which had been applied on grounds of confidentiality or business secrets.

**(3) Case 1292T: *Suez*, Case 1293T: *Veolia*, Case 1294T: *Wolseley*; together, "*VSW*"**

14. At the November 2018 CMC it was ordered that the VSW claims be heard together, with evidence in one to stand as evidence in the other. It was also ordered that the main claims and the Part 20 claims be case managed together, with the Part 20 Defendants permitted to participate in the trial of the main claims.

***(a) Suez***

15. The 178 Claimants, all companies in the Suez group based in the UK, France, Luxembourg, Poland, Czech Republic, Germany, Belgium, the Netherlands, Spain and Sweden, have sued entities in the DAF and Iveco groups (three addressees and one non-addressee).[3] The Claimants' core business activity is the provision of water treatment and waste management services, and they (and entities whose causes of action have accrued to the Claimants) purchased and/or leased trucks manufactured by the Defendants (though not necessarily directly from the Defendants), Scania and other suppliers not party to the Infringement. DAF and Iveco have each brought Part 20 Claims against (i) each other as existing Defendants, and (ii) entities in the MAN, Volvo/Renault and Scania groups as well as additional entities in the DAF/Iveco groups who have been brought in as third parties[4]. The MAN Part 20 Defendants have also brought rule 39 (Part 20) claims against Scania.

16. Suez made an early application for disclosure in the High Court: see para 12 above. At the November 2018 CMC, disclosure of certain additional categories of documents on the Commission file which had previously been withheld was ordered. The Claimants' application for disclosure of translations was dismissed.[5] At the May 2019 CMC, the

[3] A substantial number of Claimants were removed by consent by Order of the President of 13 December 2019.
[4] DAF and Iveco's Part 20 claims against Daimler have been discontinued.
[5] [2018] CAT 19.

Claimants' application for disclosure of certain "Trucks Delivery Database Project" ("TDDB") minutes was granted[6]. Scania was separately ordered to disclose a non-confidential version of the Scania Decision into the confidentiality ring.

***(b) Veolia***

17. The 135 Claimants, all companies in the Veolia group[7] based in the UK, France, Germany, Czech Republic, Slovakia and Sweden, have sued entities in the DAF, Iveco, MAN and Volvo/Renault groups (addressees and non-addressees).[8] The Claimants (and entities whose causes of action have accrued to the Claimants) purchased and/or leased trucks manufactured and/or supplied by entities within the manufacturing groups that were party to the Infringement and other suppliers not party to the Infringement. DAF and Iveco have each brought Part 20 Claims against (i) the existing Defendants in the other manufacturing groups, and (ii) entities in the Scania group and (in the case of the Iveco Part 20 Claim) an additional entity in the DAF group[9]. The MAN Part 20 Defendants have also brought rule 39 (Part 20) claims against Scania.

18. Veolia made an early application for disclosure in the High Court: see para 12 above. At the November 2018 CMC, disclosure of certain additional categories of documents on the Commission file which had previously been withheld was ordered. The Claimants' application for disclosure of translations was dismissed.[10] At the May 2019 CMC, the Claimants' application for disclosure of certain TDDB minutes was granted[11]. Scania was separately ordered to disclose a non-confidential version of the Scania Decision into the confidentiality ring.

***(c) Wolseley***

19. The 138 Claimants are companies within the following groups: (i) Wolseley, whose core business activity is plumbing and heating supplies and distribution, and whose companies are based in the UK; (ii) Brakes, which supplies food, drink and other products to the food service industries in the UK and Europe, and whose companies are

---

[6] [2019] CAT 18.
[7] According to its website, the Veolia group designs and provides water, waste and energy management solutions.
[8] A number of Claimants were removed by consent by Order of the President of 13 December 2019.
[9] DAF and Iveco's Part 20 claims against Daimler have been discontinued.
[10] See footnote 5 above.
[11] See footnote 6 above.

based in the UK, Ireland, France and Sweden; (iii) C.M. Downton, a UK-based company which provides haulage and logistics in the UK; (iv) Dairy Crest, which produces and sells branded dairy products and ingredients in the UK and globally, and whose companies are based in the UK; (v) Metro, which is a global diversified wholesale/cash & carry and retail group whose companies are based in Germany, Austria, France and the Netherlands; and (vi) NWF, whose core business activity is the delivery of food, feed and fuel in the UK's agricultural sector, and whose companies are based in the UK.[12] The Claimants have sued entities in the DAF and Iveco groups (three Addressees and one non-Addressee). DAF and Iveco have each brought Part 20 Claims against (i) each other as existing Defendants, and (ii) entities in the Daimler, MAN, Volvo/Renault and Scania groups as well as additional entities in the DAF/Iveco groups who have been brought in as third parties. The MAN Part 20 Defendants have also brought rule 39 (Part 20) claims against Scania.

20. Wolseley made an early application for disclosure in the High Court: see para 12 above. At the November 2018 CMC, disclosure of certain additional categories of documents on the Commission file which had previously been withheld was ordered. The Claimants' application for disclosure of translations was dismissed.[13] At the May 2019 CMC, the Claimants' application for disclosure of certain TDDB minutes was granted[14]. Scania was separately ordered to disclose a non-confidential version of the Scania Decision into the confidentiality ring.

**(4) Case 1295T: *Dawsongroup***

21. The five Claimants, all UK-based companies in the Dawsongroup, have sued entities in the DAF, Daimler and Volvo/Renault groups (addressees and non-addressees), and are claiming damages for losses suffered in the UK. The Claimants are engaged in a commercial asset rental business, which includes the rental of trucks to customers, and purchased trucks directly from DAF, Daimler and Volvo/Renault entities as well as indirectly from dealerships and/or distributors authorised and/or owned by DAF and

---

[12] Following the transfer to the CAT, a separate claim by Kent Frozen Foods Limited (part of the Brakes group) (Case 1327T) was consolidated with the Wolseley proceedings by Order of the President of 1 July 2019. A number of Claimants were removed by consent by Order of the President of 27 November 2019.
[13] See footnote 5 above.
[14] See footnote 6 above.

Daimler. DAF has brought a Part 20 claim against the existing Defendants in the other manufacturer groups.

22. Following the November 2018 CMC, the redacted version of the Settlement Decision and the version of the Commission file disclosed in the Ryder claim were disclosed in the Dawsongroup claim, and certain quantum disclosure was given by DAF.

## C. GENERAL APPROACH TO DISCLOSURE BEFORE THE CAT

23. Disclosure before the CAT is governed by rules 60 to 65 of the Competition Appeal Tribunal Rules 2015 ("the CAT Rules").[15] Rule 60 provides:

> "Disclosure by parties to the proceedings
>
> 60(1) In this rule, and in rules 61 to 65 –
>
> (a) a party discloses a document by stating that the document exists or has existed;
>
> (b) a "disclosure report" means a report verified by a statement of truth, which –
>
> (i) describes briefly what documents exist or may exist that are or may be relevant to the matters in issues in the case;
>
> (ii) describes where and with whom those documents are or may be located;
>
> (iii) in the case of electronic documents, describes how those documents are stored;
>
> (iv) estimates the broad range of costs that could be involved in giving disclosure in the case, including the costs of searching for and disclosing any electronically stored documents; and
>
> (v) states which directions are to be sought regarding disclosure;
>
> (c) an "Electronic Documents Questionnaire" means a questionnaire in the form of the questionnaire in the Schedule to Practice Direction 31B of the CPR.
>
> (2) Subject to paragraph (3) and unless the Tribunal otherwise thinks fit –
>
> (a) at the first case management conference, the Tribunal shall decide whether and when the disclosure report and a completed Electronic Documents Questionnaire should be filed; and
>
> (b) at a subsequent case management conference, the Tribunal shall decide, having regard to the governing principles and the need to limit disclosure to that which is necessary to deal with the case justly, what orders to make in relation to disclosure.

---

[15] All references to rules are to the CAT Rules unless otherwise stated.

(3) The Tribunal may at any point give directions as to how disclosure is to be given, and in particular –

(a) what searches are to be undertaken, of where, for what, in respect of which times periods and by whom and the extent of any search for electronically stored documents;

(b) whether lists of documents are required;

(c) in what format documents are to be disclosed (and whether any identification is required);

(d) what is required in relation to documents that once existed but no longer exist; and

(e) whether disclosure is to take place in stages.

(4) A party's duty to disclose documents is limited to documents which are or have been in its control; and for this purpose, a party has or has had a document in its control if –

(a) the document is or was in its physical possession;

(b) it has or has had a right to possession of the document; or

(c) it has or has had a right to inspect or take copies of the document.

(5) A party need not disclose more than one copy of a document, and for that purpose a copy of a document that contains a modification, obliteration or other marking or feature is to be treated as a separate document.

(6) Any duty of disclosure continues until the proceedings are concluded.

(7) If documents to which such a duty extends come to a party's notice at any time during the proceedings, it shall immediately notify every other party."

24. The governing principles in relation to the CAT are set out in rule 4. So far as is relevant to disclosure and how the CAT will manage these and other cases, rule 4 provides:

"Governing principles

4.— (1) The Tribunal shall seek to ensure that each case is dealt with justly and at proportionate cost.

(2) Dealing with a case justly and at proportionate cost includes, so far as is practicable—

(a) ensuring that the parties are on an equal footing;

(b) saving expense;

(c) dealing with the case in ways which are proportionate—

(i) to the amount of money involved;

(ii) to the importance of the case;

(iii) to the complexity of the issues; and

(iv) to the financial position of each party;

(d) ensuring that it is dealt with expeditiously and fairly;

(e) allotting to it an appropriate share of the Tribunal's resources, while taking into account the need to allot resources to other cases; and

(f) enforcing compliance with these Rules, any practice direction issued under rule 115, and any order or direction of the Tribunal.

…

(4) The Tribunal shall actively manage cases.

(5) Active case management includes—

(a) encouraging the parties to co-operate with each other in the conduct of the proceedings;

(b) identification of and concentration on the main issues as early as possible;

(c) fixing a target date for the main hearing as early as possible together with a timetable for the proceedings up to the main hearing, taking into account the nature of the case;

(d) adopting fact-finding procedures that are most effective and appropriate for the case;

(e) planning the structure of the main hearing in advance with a view to avoiding unnecessary oral evidence and argument; and

(f) ensuring that the main hearing is conducted within defined time-limits.

…

(7) The parties (together with their representatives and any experts) are required to co-operate with the Tribunal to give effect to the principles in this rule."

25. Rule 53 which deals with directions as part of case management provides, so far as is relevant to disclosure:

"Directions

53-(1) The Tribunal may at any time, on the request or of its own initiative, at a case management conference, pre-hearing review or otherwise, give such directions as are provided for in paragraph (2) or such other directions as it thinks fit to secure that the proceedings are dealt with justly and at proportionate cost.

(2) The Tribunal may give directions –

…

(l) for the disclosure and production by a party or third party of documents or classes of documents;

…

(3) The Tribunal may also, of its own initiative –

…

(c) ask for documents or any papers relating to the case to be produced;

…".

26. Rule 54 sets out the matters to be dealt with at case management conferences, when in practice almost invariably disclosure is raised, even if only in some cases to decide that it is unnecessary or unnecessary at the stage the particular case has reached. So far as is material it provides:

"Case management conference etc.

54.-(1) Where it appears to the Tribunal that any proceedings would be facilitated by holding a case management conference or pre-hearing review the Tribunal may, on the request of a party or of its own initiative, give directions for such a conference or review to be held.

(2) Unless the Tribunal otherwise directs, a case management conference is to be held as soon as practicable after the service of the reply or the expiry of the time for the filing of the reply if none is served.

(3) The purpose of a first case management conference or pre-hearing review is to give directions for the efficient conduct of the proceedings including –

…

(e) to consider any issues relating to disclosure and the provision of a disclosure report and completed Electronic Documents Questionnaire in accordance with rule 60;

…

(4) Where it appears to the Tribunal that any proceedings would be facilitated by holding a subsequent case management conference, the Tribunal may, on the request of a party or of its own initiative, give directions for such a conference to be held.

(5) The Tribunal may authorise the President or a chairman to carry out on its behalf a case management conference, pre-hearing review or any other preparatory measure relating to the organisation or disposal of the proceedings."

27. The Practice Direction, "Disclosure and Inspection of Evidence in Claims Made Pursuant to Parts 4 and 5 of the Competition Appeal Tribunal Rules 2015" (the "Disclosure PD") was introduced in 2017 in order to ensure that the practice and

procedure of the CAT with regard to disclosure and inspection of evidence is aligned with the relevant requirements of the Damages Directive. Paragraph 2 provides:

> "2. General approach of the Tribunal with regard to disclosure or inspection of evidence
>
> 2.1. This Practice Direction applies in addition to other requirements of the Rules (and other practice directions issued pursuant to Rule 115(3) of the Rules) relating to applications for disclosure or inspection of evidence.
>
> 2.2. The application must include a description of the evidence that is sought that is as precise and narrow as possible on the basis of a reasoned justification.
>
> 2.3. The Tribunal will limit disclosure or inspection of evidence to that which is proportionate.
>
> 2.4. In determining whether any application for disclosure or inspection of evidence is proportionate, the Tribunal will consider the legitimate interests of all parties and third parties concerned and will, in particular, consider the factors set out in article 5(3) of the Damages Directive.[16]"

28. Disclosure in civil proceedings in the High Court is governed by CPR Part 31 and ancillary Practice Directions. These are not directly applicable to proceedings before the Tribunal, which has its own rules. As made clear in paragraph 3 of the Competition Appeal Tribunal Guide to Proceedings 2015 ("the Guide"):

> "3.1 The 2015 Rules seek to achieve the general objective of enabling the Tribunal to deal with cases justly and at proportionate cost, in particular by ensuring that the parties are on an equal footing, that expense is saved and that appeals are dealt with expeditiously and fairly. This is set out in the governing principles in Rule 4. The Rules will be interpreted in accordance with those principles: Rule 2(2).
>
> 3.2 The Rules pursue the same philosophy as the CPR of the High Court and many of the rules are modelled on the CPR. Where, in particular as regards private actions, a rule mirrors the CPR, the Tribunal would generally expect to interpret that rule in the same way as the High Court or Court of Appeal. However, the Tribunal's Rules are different in various respects and parties should not assume that the approach of the CPR applies to a particular procedural issue. Furthermore, the Tribunal is a United Kingdom, not an English, tribunal and it may therefore also have regard to the procedural rules that apply in Scotland or Northern Ireland, in particular in a case where the proceedings are to be treated as proceedings in either of those jurisdictions: see Rule 18.
>
> 3.3 A particular feature of all proceedings before the Tribunal is active case management: Rule 4(4). Rule 4(5) sets out what is meant by active case management. Essentially the concept involves the Tribunal and the parties working together to ensure

---

[16] Those factors are: (a) the extent to which the claim or defence is supported by available facts and evidence justifying the request to disclose evidence; (b) the scope and cost of disclosure, especially for any third parties concerned, including preventing non-specific searches for information which is unlikely to be of relevance for the parties in the procedure; (c) whether the evidence the disclosure of which is sought contains confidential information, especially concerning any third parties, and what arrangements are in place for protecting such confidential information.

that the case proceeds in the quickest and most efficient manner possible. Rule 4(1) places a duty on the parties to co-operate with the Tribunal to give effect to that aim and the governing principles as a whole."

29. However, it should be noted that Practice Direction 31B (*Disclosure of Electronic Documents*) and 31C (*Disclosure and Inspection in Relation to Competition Claims*) are useful guidance for cases before the CAT and where relevant are taken into account when dealing with disclosure. Further, pursuant to Practice Direction 51U a distinct disclosure pilot regime has applied in place of CPR Part 31 since 1 January 2019 to actions in the Business and Property Courts (including actions commenced before that date). Although not applicable to actions in the Competition List that are governed by PD 31C, the approach of the Disclosure Pilot Practice Direction is also valuable in guiding a reasonable and proportionate approach.

30. In the High Court, the default position had been for many years been to order 'standard disclosure', although for good reason litigants and courts are encouraged not to use it as such but to tailor the type of disclosure order to the specific needs of the individual case (*Positec Power Tools v. Husqvarna AB* [2016] EWHC 1061 (Pat) at [21]). Standard disclosure is defined in CPR, r.31.6.

> "Standard disclosure – what documents are to be disclosed
>
> 31.6 Standard disclosure requires a party to disclose only–
>
> (a) the documents on which he relies; and
>
> (b) the documents which –
>
> (i) adversely affect his own case;
>
> (ii) adversely affect another party's case; or
>
> (iii) support another party's case; and
>
> (c) the documents which he is required to disclose by a relevant practice direction."

31. CPR, r.31.5, which is the general disclosure provision in the CPR, was amended in 2013 to reflect a tailored approach which applies to all multi-track claims. CPR r.31.5(7) and (8) is useful as setting out a range of options in deciding the form of order. CPR, r.31.5(7) provides:

> "31.5(7) At the first or any subsequent case management conference, the court will decide, having regard to the overriding objective and the need to limit disclosure to that

> which is necessary to deal with the case justly, which of the following orders to make in relation to disclosure –
>
> (a) an order dispensing with disclosure;
>
> (b) an order that a party disclose the documents on which it relies, and at the same time request any specific disclosure it requires from any other party;
>
> (c) an order that directs, where practicable, the disclosure to be given by each party on an issue by issue basis;
>
> (d) an order that each party disclose any documents which it is reasonable to suppose may contain information which enables that party to advance its own case or to damage that of any other party, or which leads to an enquiry which has either of those consequences;
>
> (e) an order that a party give standard disclosure;
>
> (f) any other order in relation to disclosure that the court considers appropriate.

32. CPR, r.31.5(8) mirrors rule 60(3) in providing that:

> (8) The court may at any point give directions as to how disclosure is to be given, and in particular –
>
> (a) what searches are to be undertaken, of where, for what, in respect of which time periods and by whom and the extent of any search for electronically stored documents;
>
> (b) whether lists of documents are required;
>
> (c) how and when the disclosure statement is to be given;
>
> (d) in what format documents are to be disclosed (and whether any identification is required);
>
> (e) what is required in relation to documents that once existed but no longer exist; and
>
> (f) whether disclosure shall take place in stages."

33. The disclosure pilot regime dispenses with standard disclosure altogether and introduced the concepts of Initial Disclosure and Extended Disclosure. It is unnecessary in this judgment to summarise the alternative "Disclosure Models" set out in PD 51U but it is significant that para 6.3 states that "[t]he court will only make an order for Extended Disclosure where it is persuaded that it is appropriate to do so in order fairly to resolve one or more of the Issues for Disclosure." And para 6.4 provides:

> "6.4 In all cases, an order for Extended Disclosure must be reasonable and proportionate having regard to the overriding objective including the following factors–
>
> (1) the nature and complexity of the issues in the proceedings;

(2) the importance of the case, including any non-monetary relief sought;

(3) the likelihood of documents existing that will have probative value in supporting or undermining a party's claim or defence;

(4) the number of documents involved;

(5) the ease and expense of searching for and retrieval of any particular document (taking into account any limitations on the information available and on the likely accuracy of any costs estimates);

(6) the financial position of each party; and

(7) the need to ensure the case is dealt with expeditiously, fairly and at a proportionate cost."

34. The CAT does not usually make orders for standard disclosure. Instead orders are tailored to what is proportionate in the individual case. In a case subject to the fast-track procedure under rule 58, there may be disclosure only of specific documents. In a damages claim, such as the present, disclosure can be extensive, and may give rise to dispute between the parties, but remains subject to close case management by the CAT.

35. Even in cases where broad disclosure is required, it is possible to lay down some broad principles that are applied by the CAT. These are:

(1) Orders for standard disclosure will not in general be made.

(2) Disclosure will be confined to relevant documents. Relevance is determined by the issues in the case, derived in general by reference to the pleadings, although in appropriate cases disclosure can be in relation to matters not specifically pleaded.

(3) A strong justification would be required to make any order along the lines of the 'train of enquiry' test in the classic formulation of the test for disclosure enunciated by Brett LJ in *Compagnie Financière du Pacifique v. Peruvian Guano Co.* (1882) 11 QBD 55 at 63. An example where train of enquiry disclosure may be justified is a case alleging a cartel infringement where the underlying facts are unknown to the claimants but are in the hands of the defendants.

(4) Disclosure cannot be ordered in respect of a settlement submission which has not been withdrawn or a cartel leniency statement (whether or not it has been

withdrawn). This does not preclude a party which made such a submission or statement providing it by way of voluntary disclosure.

(5) Disclosure will not be ordered in respect of a competition authority's investigation materials before the day on which the authority closes the investigation to which those materials relate.

(6) Ordinarily disclosure will be by reference to specific pleaded issues and specific categories of documents.

(7) Disclosure will only be ordered and the order will be framed to ensure that it is limited to what is reasonably necessary and proportionate bearing in mind a number of aspects, the most important of which are:

(a) the nature of the proceedings and the issues at stake;

(b) the manner in which the party bearing the burden of proof is likely to advance its case on those issues;

(c) the cost and burden of providing such disclosure;

(d) whether the information sought can be obtained by alternative means or be admitted; and

(e) the specific factors listed in r. 4(2)(c).

36. The search required will be a reasonable and proportionate search and it will be for the disclosing party to specify what search it has carried out and why it contends any particular search would be unreasonable when it complies with the order. In appropriate cases, the Tribunal may rule on what would be required by way of a reasonable search prior to disclosure being provided. The factors relevant in deciding the reasonableness of a search include (cf. CPR r.31.7):

(a) the number of documents involved;

(b) the nature and complexity of the proceedings;

(c) the costs of retrieval of any particular document which is likely to be located during the search;

(d) the significance of any document which is likely to be located during the search;

(e) the location of material, and the type and nature of databases and storage involved; and

(f) the resources available to the disclosing party.

37. The present applications are made in proceedings where damages are sought for breaches of competition law, following a finding of infringement by the Commission. The issues in the proceedings, while complex, largely concern causation and quantum. In assessing what disclosure is to be ordered the nature of these proceedings must be borne in mind. In its Communication on quantifying harm in actions for damages based on breaches of Article 101 or 102 TFEU (2013/C 167/07), the Commission states at para 9:

> "9. One consequence of the principle of effectiveness is that applicable national legal rules and their interpretation should reflect the difficulties and limits inherent to quantifying harm in competition cases. The quantification of such harm requires comparing the actual position of the injured party with the position this party would have been without infringement. This is something that cannot be observed in reality; it is impossible to know with certainty how market conditions and the interactions between market participants would have evolved in the absence of the infringement. All that is possible is an estimate of the scenario likely to have existed without the infringement. Quantification of harm in competition cases has always, by its very nature, been characterised by considerable limits to the degree of certainty and precision that can be expected. Sometimes only approximate estimates are possible."

38. Further, in its Guidelines for national courts on how to estimate the share of overcharge which has been passed on to an indirect purchaser (2019/C 267/07), the Commission states:

> "(5) … the manner in which a national court would wish to approach the assessment and estimation of passing-on is likely to be influenced by the nature and size of the claim, the merits of the submission and the availability of data. When assessing the proportionality of an order to disclose information, such a court could take into account the choice of economic method and approach from among the different options explained in the guidelines. What may be appropriate in terms of the scope of data required and cost of expert analysis for a claim of EUR 20 million may not be proportionate for a claim of EUR 200 000.
>
> …
>
> (40) The Damages Directive aims to ensure the effective exercise of rights and equality of arms by stipulating rules to request the disclosure of evidence. Such rules apply in both passing-on scenarios mentioned above. As regards the scenario in which passing-

on is used as a defence, Article 13 of the Damages Directive specifically mentions that the defendant may reasonably require disclosure from the claimant or from third parties. In a scenario in which an indirect purchaser seeks compensation, Article 14(1) of the Damages Directive stipulates that this indirect purchaser may reasonably require disclosure from the defendant or third parties.

(41) These rules of the Damages Directive limit disclosure of evidence in the sense that the party bearing the burden of proving the existence and scope of passing-on may only reasonably require disclosure. In line with the general rules on disclosure stipulated in Article 5 Damages Directive, the national court may require that the requesting party has made a plausible assertion that the overcharge harm has been passed on by the direct purchaser onto the indirect purchaser. The requesting party must also use the facts which are already reasonably available to it. In the context of passing-on, this may include information gathered during the course of business with the other party or information reasonably available from third parties, such as market intelligence providers.

(42) The first sentence of Article 5(3) of the Damages Directive establishes a general principle of proportionality in the sense that it requires national courts to 'limit the disclosure of evidence to that which is proportionate'. This principle is important for case management in damages actions resulting from infringements of Article 101 or 102 TFEU. As mentioned above, judges apply national procedural rules and must pay particular attention to the principles of effectiveness and equivalence. However, within the scope of these legal rules, national courts may take into account the costs and benefits of ordering the requested disclosure. For example, this means that national courts may come to the conclusion that the evidence presented by the parties already allows them to estimate the share of the overcharge that was passed on instead of gathering further data.

(43) Evidence may be requested from the other party or third parties through and under the strict control of the national court. The request must concern specific items or categories of evidence ...

[…]

(47) National courts estimate passing-on based on the circumstances of the specific case. However, a general understanding of the economic theory of passing-on and the associated effects may be important for the court for several reasons. Firstly, predictions from economic theory may serve as one of several factors relevant for assessing whether the required standard of proof is met in a specific case. For instance, economic theory provides the court with a framework within which quantitative and qualitative evidence could be evaluated. Secondly, particularly at an early stage of the litigation, economic theory may assist judges when making decisions in relation to the disclosure of data or information by assessing its relevance...."

## D. OVERARCHING APPROACH IN THE TRUCKS ACTIONS

39. At the outset of the Disclosure Hearing, we emphasised that there is no single right answer in these damages claims. No one can ever know what prices, both for new trucks and resale of used trucks, would have been charged in the absence of the Infringement since that is a hypothetical world that never was. Further, the President made clear during the Hearing that in a case of this nature it is necessary to consider

early on what method or methods will be used to determine the issues of causation and quantum so that disclosure can be tailored accordingly.

40. In light of that, we set out the following broad principles as to the general approach the Tribunal will take that affects disclosure.

(1) The initial burden of proof is on the Claimants to satisfy the Tribunal on the balance of probabilities that the Infringement had an effect on prices.

(2) If that hurdle is passed, the Tribunal will seek to arrive at a reasonable estimate of what the effect might have been and what any pass-on (within the relevant legal principles) might have been, again on the balance of probabilities.

(3) A reasonable estimate in this context means an estimate that is arrived at in a proportionate manner. We recognise of course that these are very large damages claims. However, any estimate will still be reached through averages, extrapolations and aggregates. It does not mean that every logical avenue that might be relevant can be explored, or that all data which is arguably relevant must be provided. As observed by Birss J in *Vodafone v Infineon Technologies AG* [2017] EWHC 1383 (Ch), at [31]:

> "while of course more [disclosure] can be better …it is relevant to ask how much more would it be and how much better would it make the result."

The decision as to what disclosure to order is appropriate is informed by the views of the economic experts but it is not determined by what data they would like to have or what method they would like to use. It is for the Tribunal to decide.

(4) In reaching that decision, the Tribunal has regard to the principles of effectiveness, that cases should not be unreasonably difficult to bring, and of proportionality as set out in rule 60(2) read with the governing principles in rule 4 and also the Disclosure PD.

(5) It is not therefore simply a question of relevance, as some of the skeleton arguments we received seemed to suggest. Disclosure will only be ordered in relation to a specific category of documents if the Tribunal is satisfied the documents sought are relevant <u>and</u> that disclosure would be necessary and

proportionate. The Tribunal will not make an order merely because it determines that the documents are relevant to the issues.

(6) These actions seek damages for loss on many hundreds of transactions, involving a very large number of vehicles, carried out over an extensive period, and in some of the cases by a very large number of claimants. Further, the Infringement involved contacts and communications between the participants over a 14 year period, with different involvement on the particular occasions. The approach to proof of causation and quantification, both as regards any overcharge and as regards pass-on, will therefore be very different from that which can apply where the claim is for loss on one or two very large transactions concluded following extensive negotiation: cp. *BritNed Development Ltd v ABB AB* [2018] EWHC 2913 (Ch). It is unlikely to be realistic in these cases for the issues to be approached by examining each price charged for each transaction subject to the claim and seeking to ascertain how any antecedent exchange of information or coordination between the OEMs may have influenced that price (whether directly or by reference to a gross price). Similarly, as regards pass-on, it would appear to be disproportionate even if it were possible to consider the resale or disposal of each truck that is subject to the claim. Accordingly, it is important to establish how in practice the issues at trial will be approached, and to do so before and not after vast time, effort and expense is devoted to yet further disclosure.

41. We would wish to hear submissions on this at the next CMC but our present view is that we doubt that the issues can be approached from the 'bottom up' on the traditional evidential basis of witness statements from the various key employees regarding the numerous contemporary emails, notes of meetings and telephone conversations, and so forth, on which they would then be cross-examined: see in that regard the observations of Rose J (as she then was) in the air freight cartel litigation: *Emerald Supplies Ltd v British Airways PLC* [2015] EWHC 2904 (Ch). Instead, it seems to us that the issues will probably have to be approached by the analysis of large amounts of pricing and market data, using established economic techniques to determine what, if any, was the effect of the infringement on prices and any pass-on through the relevant period. That is not to say that evidence of witnesses of fact would be irrelevant but we anticipate it

will be of a more general nature, for example explaining how the OEMs priced their trucks and the nature of the relationship between gross and net prices, the significance of configurators, and so forth. The same approach would apply to the prices charged by the claimants in the context of pass-on. This has significant implications for the nature of the disclosure to be ordered.

42. In addition, as the President stated at the Disclosure Hearing, echoing the approach of Rose J in *Emerald*, we wish to consider what methods of analysis are to be used by the experts for this purpose. The description of the Infringement in the Decision, supplemented by the disclosure provided to date, gives the parties' experts ample indication of the nature of the collusion between competitors that was involved. We would hope that the experienced experts can therefore agree on the methodology which is appropriate, although they may end up with differing conclusions. If very different methods were to be used, requiring vast amounts of different data, only for one or other method then to be challenged at trial as unsound or unreliable with an invitation to the Tribunal to reject it entirely, that would be conducive to a massive and hugely expensive waste of effort on disclosure.

43. We of course appreciate that there are several different actions and that the same issues of overcharge and pass-on need not necessarily be approached the same way in all of them. However, the Tribunal made clear at the outset the importance of ensuring consistency as between the various claims arising out of the Infringement. Our present view is that there would have to be very strong reasons to justify the Tribunal accepting different methods of analysis of the same issues as between the different actions.

44. In their witness statements filed in early September 2019, most of the experts indicated the approach they wished to adopt, in several cases in some detail. We think it would be helpful if, in the light of this Ruling, each claimant filed by 24 January a short statement (of no more than 3 pages) setting out its response to the observations in paras 41to 43 above and summarising the method favoured by its expert to the estimation of the alleged overcharge. Each defendant should similarly file by 31 January a short statement (maximum 3 pages) in response and summarising the method favoured by its expert to the estimation of alleged pass-on. The Tribunal can then hear further oral submissions on these matters at the next CMC.

## E. PRACTICALITIES OF DISCLOSURE

45. It was on the basis of the principles set out above that the Tribunal made the orders it did at the Disclosure Hearing.[17] Having now been given guidance by the Tribunal and subject to determination of the overarching approach and economic methods that will be adopted, we expect that the parties collectively should be in a better position to agree between them more details of the disclosure exercises across the various actions.

46. Further disclosure will proceed by stages and not all at once. That does not mean that the Tribunal sets stages now and orders what will be in stage 2, what will be in stage 3 and so on. It means that after each stage, the party receiving disclosure should assess those documents and data, with assistance as appropriate from its economic expert, and then frame a subsequent request in the light of, and informed by, the analysis of that material. The benefits of a staged approach to disclosure were described by the Tribunal in *Peugeot S.A. and Others v NSK Ltd and Others* [2017] CAT 2 ("*Peugeot")* at [7]:

> "…In the light of the results of the first stage exercise the parties (and the Tribunal if called upon) will then be far better placed to know whether it is proportionate to proceed to a second and more extensive disclosure stage and, if it would be proportionate to proceed, what further searches might yield relevant documents."

47. In these cases, any disclosure should be accompanied by a disclosure statement by an appropriate person which shall (a) set out the extent of the search that has been made in order to locate the documents ordered to be disclosed, (b) specify the manner in which the search has been limited on reasonableness and proportionality grounds and why, and (c) certify to the best of their knowledge and belief that the disclosure ordered has been provided.

48. Where a party has stated that it has no documents in a particular category which the Tribunal considers is relevant and in principle proportionate to the issues in the case, then that party should where appropriate specify what searches have been done or are possible. If the Tribunal is satisfied that there are no such documents, then at this stage the request for disclosure will be refused. If the Tribunal is not satisfied that there are no such documents, then disclosure will be ordered and the disclosing party will need

---

[17] See the Order of Mr Malek QC drawn on 26 November 2019 in Ryder and the Order of Mr Malek QC drawn on 25 November 2019 in Dawsongroup.

to state in its disclosure statement what searches have been made and why it would be unreasonable and disproportionate to conduct any further searches.

49. We also draw the parties' attention to rule 60(5) which essentially provides that a party need not disclose more than one copy of a document unless it has been modified or annotated in some way. To the extent that the searches across the various disclosure categories result in numerous documents effectively containing the same information, the requirements of reasonableness and proportionality will be satisfied by disclosing the relevant information, rather than each document separately.

**Friday Applications**

50. To address any concerns the parties may have that there is insufficient time at a disclosure hearing and/or CMC to deal with all the disclosure issues in dispute, either the President or Mr Malek QC will be available in principle on one Friday each month to hear further disclosure applications, either matters that have been held over or new matters that may arise ("Friday Applications"). It is envisaged that any such hearings would deal with discrete issues between individual claimants and individual defendants. Outstanding issues in dispute between individual claimants and individual defendants may also be resolved on the papers if appropriate.[18]

51. Before making any Friday Applications, the parties should engage with each other in a co-operative manner, in accordance with the governing principles, to seek to agree, as far as possible, any of the matters in dispute. As observed by Green J in *Peugeot,* "the efficacy of this process involves close and sensible cooperation between the parties and the experts". Failure to do so may result in a costs order being made against the relevant party should a misconceived application be brought before the Tribunal.

52. The timetable for any Friday Applications is as follows:

(5) No later than two weeks before the hearing date: the relevant party is to file its application with supporting evidence and an updated extract from the relevant Redfern schedule. Supporting evidence is limited to a maximum of two witness

[18] See, for example, the Order of Mr Malek QC made on 4 November 2019 in Wolseley.

statements (including one from an expert) and an exhibit of no more than 25 pages.

(6) The Tribunal will confirm in writing to the parties whether the application is of a nature that is suitable for determination at a Friday hearing.

(7) No later than one week before the hearing date: the respondent(s) to the application are to file any responsive evidence, which is subject to the same limits set out at (5) above.

(8) Short skeleton arguments and a hearing bundle are to be filed two clear days before the hearing date.

53. As to the stage at which a particular disclosure application should be made, the Tribunal will adopt a common sense approach with a view to maximising the most efficient use of the Tribunal's time and avoiding potentially inconsistent rulings on the same point. Therefore, if there are, for example, four defendants to a claim, and only three wish to pursue a disclosure application at a particular juncture, the Tribunal could well decide to proceed with hearing the application in which case the fourth defendant would need to be prepared to make submissions. Conversely, if a single defendant wishes to proceed with a disclosure application when the other defendants wish to defer it until a later stage, the Tribunal may defer consideration of the application until it can hear all defendants together.

54. Separately, if a party wishes to resist a disclosure order on the basis that disclosure will be too expensive, that party should endeavour to quantify the likely cost of the exercise.

The Hon Mr Justice Roth
President

Hodge Malek QC

Charles Dhanowa OBE, QC (*Hon*)
Registrar

Date: 15 January 2020