# EXHIBIT 4

Neutral citation [2021] CAT 6

**IN THE COMPETITION APPEAL TRIBUNAL**

Case Nos: 1292/5/7/18 (T)
1293/5/7/18 (T)
1294/5/7/18 (T)

Salisbury Square House
8 Salisbury Square
London EC4Y 8AP

4 March 2021

Before:

HODGE MALEK QC
(Chairman)

Sitting as a Tribunal in England and Wales

BETWEEN:

**SUEZ GROUPE SAS & OTHERS v STELLANTIS N.V. (FORMERLY FIAT CHRYSLER AUTOMOBILES N.V.) & OTHERS**

**VEOLIA ENVIRONNEMENT S.A. & OTHERS v STELLANTIS N.V. (FORMERLY FIAT CHRYSLER AUTOMOBILES N.V.) & OTHERS**

**WOLSELEY UK LIMITED & OTHERS v STELLANTIS N.V. (FORMERLY FIAT CHRYSLER AUTOMOBILES N.V.) & OTHERS**

Heard remotely on 4 March 2021

---

**RULING: SPECIFIC DISCLOSURE APPLICATION**

---

**APPEARANCES**

Mr Tristan Jones (instructed by Hausfeld & Co. LLP) appeared on behalf of the Claimants in the Suez Groupe SAS, Veolia Environnement S.A. and Wolseley UK Limited actions.

Mr Tony Singla (instructed by Herbert Smith Freehills LLP) appeared on behalf of the Iveco Defendants.

## A. INTRODUCTION

1. By its decision in case 39824 - Trucks, adopted on 19 July 2016 ("the Decision") the European Commission ("the Commission") found that five major European truck manufacturing groups had carried out a single continuous infringement of Article 101 of the Treaty on the Functioning of the European Union ("TFEU") over a period of some 14 years between 1997 and 2011 ("the Infringement"). Companies in the Scania Group are also found to be parties to the infringement by way of a separate decision of the Commission adopted on 27 September 2017, which is the subject of an appeal currently pending before the EU General Court in Case T-799/17.

2. Seven actions claiming damages against the addressees of the Decision and related companies have been transferred from the High Court to the Tribunal and are currently being case managed together. For the purposes of this ruling, the addressees of the Decision and defendants to these actions may be referred to simply by the corporate name of the group to which they belong, DAF, Daimler, Iveco Volvo/Renault and MAN, and together they are referred to as the "OEMs", the original equipment manufacturers.

3. Four case management conferences ("CMCs") have taken place in the Tribunal, on 21 to 22 November 2018, 2 to 3 May 2019, 6 February 2020 and 29 to 30 October 2020, and further CMCs have been fixed for May and October 2021.

4. Disclosure has featured heavily in each of the CMCs and this aspect is being closely managed by both the parties and the Tribunal given the complexities, importance and costs of the exercise. On 15 January 2020, the Tribunal issued a detailed ruling on the Tribunal's approach to disclosure in the Trucks proceedings, [2020] CAT 3 ("the Disclosure Ruling").

5. The seven actions for the purposes of the trial are being split into three. The first group is Royal Mail and BT. These proceedings concern the sale of trucks in the UK and only against one OEM, which is DAF. These are due to be tried starting on 26 April 2022.

6. The second group are the Ryder and Dawsongroup proceedings, which concern the sale of trucks in the UK, and against multiple OEMs. These are due to be tried starting on 13 March 2023.

7. The third set of proceedings are the Veolia, Suez and Wolseley proceedings (the "VSW proceedings"), which each involve numerous claimants and concern the sale of trucks in the UK and Europe, including for current purposes France and Germany. These proceedings are due to be tried, at least in relation to the UK, France and Germany, sometime starting no earlier than late 2023.

8. The Suez proceedings are brought by 339 claimants against DAF and Fiat, who brought in the other OEMs, including Scania, as third parties. The Veolia proceedings are brought by 139 claimants against all five OEMs, the subject of the Decision, who in turn had brought third party proceedings against DAF and Scania. The Wolseley proceedings are brought by 154 claimants against DAF and Fiat, who had brought in the other OEMs, including Scania, as third parties. These are not the only truck actions before the Tribunal. A second wave of claims have been brought, but in the main these are all at a relatively early stage.

## B. THE APPLICATION

9. This is a specific disclosure application in the VSW proceedings. The claimants are all represented by the same solicitors, Hausfeld. The application letter dated 5 February 2021 from Hausfeld seeks disclosure against Iveco in relation to quantum. In particular, they seek an order that within four months of the date of the order Iveco shall conduct proportionate and reasonable searches for and disclose and provide inspection of the Iveco-owned dealers' data responsive to the categories listed in Annex 2 to the order made on 6 September 2019 ("the Iveco Disclosure Order"), in respect of the UK, France and Germany, in the 20-year period from 1 January 1997 to 30 September 2017. The application in relation to the UK is no longer being pursued.

10. Any disclosure will largely be from databases, hence at paragraph 2 of the draft order, it is also sought that:

> "If the data/documents to be disclosed pursuant to paragraph 1 above is contained in the form of an electronic database or extract therefrom, Iveco shall provide it in their native electronic format or electronic excel format, together with (i) a statement setting out how the relevant information has been compiled for the database (including details of any data cleaning exercise conducted before disclosing the data), (ii) if appropriate, guidance on how the data is to be examined or any other explanatory notes or material which would assist the Claimants' expert economists in analysing the disclosed information."

11. The application is supported by the sixth and seventh statements of Mr Bolster of Hausfeld dated 5 and 12 February 2021 respectively and the third witness statement of Mr von Hinten-Reed, the managing director of CEG, and the economic expert appointed by Hausfeld for these proceedings. The application is opposed by Iveco, who have filed evidence of their own in the form of a statement from James Farrell of Herbert Smith Freehills and the second statement of Michele Avagliano, a senior economist at Compass Lexecon and part of a team from that firm engaged by Iveco to assist with data identification and extraction. Reply evidence has been filed by VSW, which is largely submissions in the form of the eighth witness statement from Mr Bolster and the fourth witness statement from Mr von Hinten-Reed.

## C. THE BACKGROUND

12. The approach to disclosure in the Trucks actions has been considered in the Disclosure Ruling which provides a general framework as to how disclosure is to be dealt with in these various actions. Whilst that sets out the general principles and approach, it is appreciated that disclosure for each individual party requires separate consideration as to what disclosure is to be provided and its scope.

13. This application for specific disclosure is being made pursuant to paragraphs [50] to [53] of the Disclosure Ruling:

> "**Friday Applications**
>
> 50. To address any concerns the parties may have that there is insufficient time at a disclosure hearing and/or CMC to deal with all the disclosure issues in dispute, either The President or Mr Malek QC will be available in principle on one Friday each month to hear further disclosure applications, either matters that have been held over or new matters that may arise ("Friday Applications"). It is envisaged that any such hearings would deal with discrete issues between individual claimants and individual defendants. Outstanding issues in dispute between individual claimants and individual defendants may also be resolved on the papers if appropriate.

51. Before making any Friday Applications, the parties should engage with each other in a co-operative manner, in accordance with the governing principles, to seek to agree, as far as possible, any of the matters in dispute. As observed by Green J in *Peugeot*, 'the efficacy of this process involves close and sensible cooperation between the parties and the experts'. Failure to do so may result in a costs order being made against the relevant party should a misconceived application be brought before the Tribunal.

52. The timetable for any Friday Applications is as follows:

(5) No later than two weeks before the hearing date: the relevant party is to file its application with supporting evidence and an updated extract from the relevant Redfern schedule. Supporting evidence is limited to a maximum of two witness statements (including one from an expert) and an exhibit of no more than 25 pages.

(6) The Tribunal will confirm in writing to the parties whether the application is of a nature that is suitable for determination at a Friday hearing.

(7) No later than one week before the hearing date: the respondent(s) to the application are to file any responsive evidence, which is subject to the same limits set out at (5) above.

(8) Short skeleton arguments and a hearing bundle are to be filed two clear days before the hearing date.

53. As to the stage at which a particular disclosure application should be made, the Tribunal will adopt a common sense approach with a view to maximising the most efficient use of the Tribunal's time and avoiding potentially inconsistent rulings on the same point. Therefore, if there are, for example, four defendants to a claim, and only three wish to pursue a disclosure application at a particular juncture, the Tribunal could well decide to proceed with hearing the application in which case the fourth defendant would need to be prepared to make submissions. Conversely, if a single defendant wishes to proceed with a disclosure application when the other defendants wish to defer it until a later stage, the Tribunal may defer consideration of the application until it can hear all defendants together."

14. As regards evidence in support of the Friday Application, it was envisaged that any reply evidence would be short and limited to new points not previously canvassed or envisaged in the correspondence and discussions between the parties prior to any application being made. It is extremely important that the parties do discuss issues of disclosure and all the main arguments are canvassed, prior to any application being made. Only once a dispute has crystallised between the parties and efforts have been made to narrow the issues, should the application be issued. In the present case the reply evidence is more extensive than I would expect from such an application. I appreciate this Tribunal should not be too prescriptive, as sometimes new points or facts emerge which need to be responded to. In the present case, Mr Jones has pointed out the reasoning for the further evidence, which was in part to deal with a new point that was being raised, the claimants say for the first time, by Iveco in its evidence.

15. The idea of the Friday Application is generally to deal with issues which are specific to one particular action and between specific parties. If the application is going to relate to multiple actions and multiple defendants, they are probably better to be dealt with by way of a normal application where more court time could be given. The amount of court time for these applications typically is one afternoon or one morning, so it is two and a half hours. This gives the Tribunal the opportunity to take up to five hours maximum pre-reading, and that way decisions can be given orally at the end of each hearing in the ordinary way.

16. In the present case, reliance has been placed on the significance of the disclosure sought for other parties and other actions. Mr Singla argued that the Tribunal should either not rely on such a consideration for the present application or the application should be an ordinary application, where other parties can be present and participate. The fact that the present ruling may be considered relevant in relation to disclosure by other parties and in other actions is not a ground for not dealing with the current action today. The extent to which the OEMs should provide disclosure of quantum documents from their dealers will depend on what records they have already disclosed, the mix of direct, dependent dealer and independent dealers sales, availability of records, the live issues in the actions, and the costs and burden of disclosure. I make no criticism against VSW for making the present application even though it has been pointed out that this decision may have some significance to other parties in other actions and, indeed, other actions which possibly could be brought against Iveco.

17. Whilst the Decision made findings as to the Infringement, it was on the basis of an infringement by object and not effect and there are thus substantial issues between the parties as to whether or not the Infringement had an effect on trucks prices. The claimants contend that the effect of the Infringement is that they paid more for the trucks purchased from the defendants than they otherwise would have done, and this is described as the "Overcharge".

18. The defendant OEMs in the VSW proceedings, as well as in the other proceedings, and the third parties, all strenuously deny that there was any overcharge arising from the Infringement. They contend there was no impact on prices paid for trucks by the Infringement and, in addition, they state if there was any overcharge, the quantum of

the claims should be reduced, if not eliminated, by mitigation and the passing on of any increase either to the claimants' customers or on resale of used trucks.

19. As noted in paragraph [41] of the Disclosure Ruling:

> "41. We would wish to hear submissions on this at the next CMC but our present view is that we doubt that the issues can be approached from the 'bottom up' on the traditional evidential basis of witness statements from the various key employees regarding the numerous contemporary emails, notes of meetings and telephone conversations, and so forth, on which they would then be cross-examined: see in that regard the observations of Rose J (as she then was) in the air freight cartel litigation: *Emerald Supplies Ltd v British Airways PLC* [2015] EWHC 2904 (Ch). Instead, it seems to us that the issues will probably have to be approached by the analysis of large amounts of pricing and market data, using established economic techniques to determine what, if any, was the effect of the infringement on prices and any pass-on through the relevant period. That is not to say that evidence of witnesses of fact would be irrelevant but we anticipate it will be of a more general nature, for example explaining how the OEMs priced their trucks and the nature of the relationship between gross and net prices, the significance of configurators, and so forth. The same approach would apply to the prices charged by the claimants in the context of pass-on. This has significant implications for the nature of the disclosure to be ordered."

20. The challenges a disclosure exercise will entail are set out in the Disclosure Ruling and summarised in paragraph [7] of the Tribunal's ruling in the Wolseley action on 19 June 2020: *Wolseley UK Limited and others v Fiat Chrysler Automobiles N.V. and others* [2020] CAT 15:

> "7. Disclosure in this case was always going to be a challenge for a number of reasons:
>
> (1) The Infringement spanned 14 years, 1997 to 2011.
>
> (2) To assess the impact of the Infringement one would likely need to examine data both before and after the Infringement period.
>
> (3) Systems would have changed over time and numerous databases would need to be examined in a number of jurisdictions and different people in different countries would need to be approached.
>
> (4) There are inherent limitations in the databases and the data contained within them. They are not perfect and certainly they have not been designed for the purposes of the exercises which Wolseley's experts seek to carry out in the present case, so there will be gaps.
>
> (5) Relevant employees who would have been familiar with the operation of the databases may no longer be available or at least difficult to trace.
>
> (6) What may be obvious to someone familiar with a particular database may not be to someone in the position of the Claimants or their experts, indeed without clear explanations of the databases and the various fields there is a significant risk of confusion, misunderstandings and blind alleys."

21. These comments apply equally in relation to the challenges faced by Iveco in these proceedings.

22. In dealing with this application, I am following the approach set out in the Disclosure Ruling. Of particular relevance for the current purposes are paragraphs [35(7)] and [36], which state:

> "35(7) Disclosure will only be ordered and the order will be framed to ensure that it is limited to what is reasonably necessary and proportionate bearing in mind a number of aspects, the most important of which are:
>
> (a) the nature of the proceedings and the issues at stake;
>
> (b) the manner in which the party bearing the burden of proof is likely to advance its case on those issues;
>
> (c) the cost and burden of providing such disclosure;
>
> (d) whether the information sought can be obtained by alternative means or be admitted; and
>
> (e) the specific factors listed in r. 4(2)(c).
>
> 36. The search required will be a reasonable and proportionate search and it will be for the disclosing party to specify what search it has carried out and why it contends any particular search would be unreasonable when it complies with the order. In appropriate cases, the Tribunal may rule on what would be required by way of a reasonable search prior to disclosure being provided. The factors relevant in deciding the reasonableness of a search include (cf. CPR r.31.7):
>
> (a) the number of documents involved;
>
> (b) the nature and complexity of the proceedings;
>
> (c) the costs of retrieval of any particular document which is likely to be located during the search;
>
> (d) the significance of any document which is likely to be located during the search;
>
> (e) the location of material, and the type and nature of databases and storage involved; and
>
> (f) the resources available to the disclosing party."

23. As regards the specific factors listed in Rule 4(2)(c) of the Competition Appeal Tribunal Rules 2015, these provide as follows:

> "4(2)(c) dealing with the case in ways which are proportionate—
>
> (i) to the amount of money involved;

(ii) to the importance of the case;

(iii) to the complexity of the issues; and

(iv) to the financial position of each party…"

24. Further, as stated in paragraph [40] of the Disclosure Ruling:

> "40. In light of that, we set out the following broad principles as to the general approach the Tribunal will take that affects disclosure.
>
> (1) The initial burden of proof is on the Claimants to satisfy the Tribunal on the balance of probabilities that the Infringement had an effect on prices.
>
> (2) If that hurdle is passed, the Tribunal will seek to arrive at a reasonable estimate of what the effect might have been and what any pass-on (within the relevant legal principles) might have been, again on the balance of probabilities.
>
> (3) A reasonable estimate in this context means an estimate that is arrived at in a proportionate manner. We recognise of course that these are very large damages claims. However, any estimate will still be reached through averages, extrapolations and aggregates. It does not mean that every logical avenue that might be relevant can be explored, or that all data which is arguably relevant must be provided. As observed by Birss J in Vodafone v Infineon Technologies AG [2017] EWHC 1383 (Ch), at [31]:
>
> 'While of course more [disclosure] can be better …it is relevant to ask how much more would it be and how much better would it make the result.'
>
> The decision as to what disclosure to order is appropriate is informed by the views of the economic experts but it is not determined by what data they would like to have or what method they would like to use. It is for the Tribunal to decide.
>
> (4) In reaching that decision, the Tribunal has regard to the principles of effectiveness, that cases should not be unreasonably difficult to bring, and of proportionality as set out in rule 60(2) read with the governing principles in rule 4 and also the Disclosure PD.
>
> (5) It is not therefore simply a question of relevance, as some of the skeleton arguments we received seemed to suggest. Disclosure will only be ordered in relation to a specific category of documents if the Tribunal is satisfied the documents sought are relevant and that disclosure would be necessary and proportionate. The Tribunal will not make an order merely because it determines that the documents are relevant to the issues."

## D. DISCLOSURE IN THE VSW PROCEEDINGS

25. As between the VSW claimants and Iveco, quantum disclosure has been pursuant to the Iveco Disclosure Order made by consent on 6 September 2019. The order appends two annexes, Annex 1 relates to the claimants and Annex 2 relates to Iveco. Both the VSW claimants and Iveco have produced very substantial volumes of data pursuant to the order and at not inconsiderable cost. So far as is relevant to the current application, it is

the disclosure by both parties which would enable the price paid for trucks by the end customers, both those sold to the VSW claimants and the market more widely, to be determined or at least estimated ("the Net End-Customer Price").

26. The Net End- Customer Price can be an important component in estimating the level of Overcharge by the experts retained and ultimately the Tribunal. Simply knowing the Net End-Customer Price is not sufficient without knowing how it has been broken down and costed; the price may be affected by discounts or part exchanges, for example. In addition, any final invoice would generally be for more than simply the truck. It may include other expensive items such as the body or a trailer.

27. The data held by the VSW claimants is limited in the sense that it will only cover the sales of trucks to the claimants, and hence a relatively small proportion of all sales of trucks by Iveco in the period. In many cases the records of the sales may not have been retained or at least have been found to be inaccessible. This is no surprise given how long ago that the relevant period extends, and also being in mind that the trucks would only be one component of the costs base of each of the claimants.

28. Iveco, typically, has three routes of sales for trucks. The first is direct sale of trucks by Iveco itself to the end customer. The second is sale of trucks to and through dealers owned by Iveco, called in the evidence "Dealers of Property" ("DOP Dealers"). The DOP Dealers in turn would sell on to the end customers. Thirdly, sales of trucks to independent dealers ("the Independent Dealers"), who would sell on the trucks to end customers. Iveco has given extensive disclosure of data in relation to its own direct sales in category 1. These give the Net End-Customer Price for the sale of trucks to the VSW claimants and others in the market during the relevant period.

29. As regards sales to or through dealers, that is categories 2 and 3, Iveco has given disclosure of the price paid to it by the DOP Dealers and the Independent Dealers, but not End Customer Prices. The significance of this is that the Net End-Customer Price will need to be inferred or estimated in respect of sales through dealers in the absence of further disclosure.

30. VSW accepts that the records of the Independent Dealers are not in the control of Iveco. VSW have written to the Independent Dealers seeking voluntary disclosure but, perhaps not surprisingly, they have all declined to assist. It would be burdensome and costly for Independent Dealers to produce the materials sought, and they appear to not have any interest in the Trucks actions.

31. A non-party disclosure application would also be impracticable, not least because the relevant Independent Dealers are based in France and Germany, thus raising the question of whether or not there is even jurisdiction to serve an application out of the jurisdiction for non-party disclosure. For my part, I doubt there is such jurisdiction: Matthews and Malek, *Disclosure* (5th ed., 2017), para.4.60; Hollander, *Documentary Evidence* (13th ed., 2018), para. 3-22 (which holds the view that there is no such power in relation to non-party disclosure under CPR, r.31.17). Whilst in theory the letter of request procedure may be available to request the courts in the relevant countries abroad to provide judicial assistance and obtain documents from the Independent Dealers in France and Germany, such a procedure may too be impracticable. Letters of request often take a long time to execute and courts abroad may be reluctant to provide disclosure unless the categories sought are specified in detail and a real need is shown. Courts in civilian law jurisdictions tend to only order disclosure of a limited number of specific and important documents, hence a request for extensive disclosure under a letter of request may be cut down or refused altogether. Challenges to an order made abroad giving effect to a letter of request may need to go through an appeal process, and in effect there will be satellite litigation.

32. The application seeks to extend the quantum disclosure already provided to include documents and data held by the DOP Dealers. There are 10 relevant DOP dealers, five for France and five for Germany. A large proportion of Iveco's truck sales in the relevant period was through a combination of DOP Dealers and Independent Dealers. The precise split as well as other relevant information as to truck sales is the subject of a confidentiality ring, hence it is not appropriate to include such information in this public ruling. To date no disclosure has been provided by Iveco from the records of the DOP Dealers themselves.

33. Iveco accepts that, for disclosure purposes, the records of the DOP Dealers are in its control. Prior to the Iveco Disclosure Order, their solicitors quite properly flagged that Iveco may not be providing disclosure from the DOP Dealers. Hence no breach of the Iveco Disclosure Order has been alleged in that respect. There is no dispute before me that the disclosure sought in respect of the records of the DOP Dealers ("the DOP Dealer data"), is relevant to the issues in the present case. The disclosure would go to ascertaining in a direct way the Net End-Customer Price and its breakdown for sales by DOP Dealers. The dispute between the parties focuses on the necessity for such disclosure, which requires something more than relevance (albeit relevance must be shown) as well as its proportionality.

34. As at 30 September 2020, Iveco had estimated it had incurred or would shortly incur some £3.8 million in providing disclosure under the Iveco Disclosure Order. Mr Farrell has estimated that it would cost at least €1 million and take five months to provide disclosure of the DOP Dealer data. I appreciate that that figure is not accepted by the VSW claimants but, in my view and my experience of disclosure exercises of a similar scale, a figure of €1 million is not at all surprising and appears to me realistic. I would not be surprised if that figure is exceeded.

35. The form this hearing took is that prior to the hearing I read all the papers and I took into consideration the skeleton arguments of both parties. At the beginning of the hearing, I indicated my provisional view that the disclosure sought in the form of the order sought would be disproportionate. However, it was not simply a question of either only database disclosure or no disclosure at all of the DOP Dealers data, but that a practical way forward was appropriate. As a result, the parties discussed matters further between them in the light of my indication and the terms of DOP Dealer disclosure were largely agreed, subject to my resolving outstanding issues between them. In this ruling I set out what my final view is in the light of the agreement by the parties.

## E. THE PARTIES' SUBMISSIONS

36. For the claimants, Mr Jones submitted that the disclosure sought was proportionate. He said that the costs of the disclosure exercise had been exaggerated, but in any event the

cost would be justified given the size of the action and the amount of any award if the Tribunal ultimately finds that there was an Overcharge.

37. As regards necessity, Mr Jones stated that for any overcharge analysis, the Net End-Customer price is central. Whilst they have been provided that for the direct non-dealer sales, this is only for a proportion of the actual sales; for the dealer sales, on the basis of the current sales data provided, this price can only be inferred in the absence of further disclosure. Dealer sales represent the majority of all sales.

38. Mr von Hinten-Reed intends to conduct a market-wide analysis of prices using data on Iveco's sales across the market rather than just sales to the VSW claimants. He says the types of customers for direct sales by Iveco are characteristically different from the types of customers for dealer sales. He also aims to use the data for the Net End-Customer price for the DOP Dealer sales to estimate or infer that price for the Independent Dealer sales; at least he is leaving that possibility as being open, depending on how this application is determined and any disclosure provided is reviewed..

39. There are at least two potential routes for estimating the Overcharge. The first route is by analysing the Overcharge directly at the level of the end customer - that is the direct route. The second is estimating the Overcharge at the dealer level and inferring how any overcharge is passed through to the customer. There is a dispute between the parties as to the relative strengths and weaknesses of either approach. Indeed, they may not be mutually exclusive, as one may be able to work from both angles depending on the data, or a combination of them.

40. Mr Jones contended that the disclosure application will also be of relevance to other claims involving Iveco but, as I have already indicated, I am concentrating on the relevance of this data to the current claim rather than other claims.

41. Mr Singla for Iveco contended that disclosure of the DOP Dealer data is not necessary, and it would be disproportionate to disclose the material. He also pointed out that the DOP Dealers have differing record-keeping systems and for much of the period no data is available. As regards France, three dealers have data available from 2010 only, one dealer has data from 2004 only and one dealer has data commencing from 2015 only.

As regards Germany, three have data commencing 2003 and two have data commencing 2008. Mr Singla points out that the two-stage approach, which has been referred to extensively in the evidence before me, has its advantages, although there is a dispute as to that.

## F. THE TRIBUNAL'S ANALYSIS

42. At this stage of the proceedings, the Tribunal is not going to rule on whether or not the one-stage or the two-stage approach must be followed. In reality, a lot may turn on the reliability and availability of the data and what can sensibly be drawn from it. As a starting point, if the Net End-Customer price can be determined, then it could be an important factor in any assessment of the Overcharge. I accept it may be possible to estimate the Overcharge in relation to dealer sales by looking at the Overcharge at that level and then looking at the extent it has been passed on. Nevertheless, whichever route is followed, broad estimations and inferences will be necessary.

43. I consider, in the scheme of things, that the disclosure sought is relevant and reasonably necessary to the extent that information which may assist in determining the Net End-Customer Price can be made available at proportionate cost. Looking at both reasonable necessity and proportionality is often a balancing and intuitive exercise. If the Overcharge could not be estimated in the absence of the disclosure sought, then an objection based on proportionality in the sense of high cost is unlikely to succeed. On the other hand if the Overcharge could be estimated in the absence of such disclosure, then arguments as to proportionality may carry more weight.

44. At the beginning of the hearing, I indicated that I did not find disclosure in the terms of the disclosure sought would be proportionate, but I did consider that the information sought should be provided, or at least some of it, in a different way. The reason why I did not consider it to be proportionate is really threefold. First, €1 million is a lot in the context of the £3.8 million already incurred and the value of this claim. Secondly, the material sought will not be conclusive, the parties and the Tribunal will still lack the Independent Dealer figures for the end customer sales prices and in respect of DOP Dealer data it is only available for more recent periods. Thirdly, it is possible that

Overcharge can still be estimated using a two-stage approach or a combination of approaches.

45. That said, I do consider that some form of disclosure should be provided that will assist the parties and the experts. Having given my provisional view, the parties went away and they considered what would be appropriate. They have agreed that Iveco will provide pricing statements for each country, one for France and one for Germany, and that will be from one DOP Dealer each. As regards data, they will disclose the data for the DOP Dealers which have been selected. This is an appropriate and proportionate position and such disclosure in my view is reasonably necessary.

46. I have been asked to give, or not give, depending on whether I accept the submission of Mr Jones or Mr Singla, guidance as to how that one DOP Dealer should be identified for each country. I am not going to be prescriptive at this stage. What needs to be looked at and explored by the parties is what is the most practicable and useful disclosure that could be obtained from the specific DOP Dealer identified. It may be that there is a DOP Dealer in each country that has a longer time span of evidence; it may be that a DOP Dealer has more accessible data than the others. What the Tribunal is looking for is a pragmatic approach taken by both parties, whereby they cooperate with each other in order to ascertain which is the most appropriate DOP Dealer to select for France and Germany.

47. I will give the parties four weeks from the date of this ruling to reach agreement on the identity of the DOP Dealers for France and Germany who are to provide pricing statements and data disclosure. The pricing statements should deal with margins and discounts. It would be helpful if they could include some worked examples. I can see it is not going to be easy to select the appropriate DOP Dealers because Mr Singla's clients will need to do some research of their own into each of the 10 DOPs. They should provide the results of that research to Mr Jones' clients and then the parties should endeavour to agree which is the relevant one for each jurisdiction. If they cannot agree, then I will deal with it on paper with one submission each from counsel, and with no correspondence being exhibited. Iveco may in addition submit a table of their research into each of the DOP Dealers dealing with the availability of records and other relevant factors.

48. If the parties cannot reach agreement, they can write to the Tribunal saying which one they say is appropriate and I will rule on it.

49. Once the DOP Dealers have been selected, Iveco can then start the process of obtaining pricing statements and preparing data disclosure. Iveco should have three months after the selection of the correct DOP Dealers to produce the pricing statements and underlying disclosure of records from each of the two selected DOP Dealers.

50. The pricing statements should enable VSW to ascertain how the Net End-Customer Prices have been reached from the prices paid by the DOP Dealers to Iveco. This will have the benefit of avoiding costs of full database disclosure and give an understanding of how prices are being reached. It should permit an expert to estimate or infer the Net End-Customer Prices from prices paid by other DOP Dealers and Independent Dealers to Iveco. Iveco has already given disclosure of the prices it charged to both types of dealers. There will be a disclosure statement and explanation of the data provided in the forms that I have directed in previous cases. That explanation will enable the database material to be understood by the experts for both parties.

51. I would like to say one thing about the preparation of the case. The bundle has been set out extremely well and it has been very helpful. The skeleton arguments have been well argued and are of an appropriate length. This had enabled me to at least form a provisional view prior to the hearing.

## G. CONCLUSION

52. In all the circumstances I have decided to make the following order.

53. By 4pm on 1 April 2021 the parties shall agree on the selection of one Iveco-Owned Dealer in each of France and Germany (the "Relevant Iveco-Owned Dealers"). In the absence of agreement, the parties shall file written submissions and the Tribunal will select the Relevant Iveco-Owned Dealers.

54. By 4pm on the date falling three months after the agreement or determination of the selection of Relevant Iveco-Owned Dealers, Iveco shall file and serve, by way of further

information supported by a statement of truth, a statement setting out, on a best endeavours basis, in respect of the Relevant Iveco-Owned Dealers in the period from 1 January 1997 to 30 September 2017:

(a) a general description of how Truck models were priced, including any increases in price (which, for the avoidance of doubt, excludes a granular description of how each individual Truck model was priced);

(b) which body or employee within each Relevant Iveco-Owned Dealer took such decisions to set the price and at what level the decisions were taken (that is, Relevant Iveco-Owned Dealer or Iveco level); and

(c) the information on which that body and/or employee relied (in general terms) in taking such decisions.

55. By 4pm on the date falling three months after the agreement or determination of the selection of Relevant Iveco-Owned Dealers, Iveco shall:

(a) conduct proportionate and reasonable searches for and disclose and provide inspection of the Relevant Iveco-Owned Dealers' data/documents responsive to the categories listed in Annex 2 to the Iveco Order in relation to domestic sales of new Iveco Trucks in the period from 1 January 1997 to 30 September 2017; and

(b) serve a disclosure statement by an appropriate person which shall (i) set out the extent of the search that has been made in order to locate the documents ordered to be disclosed, (ii) specify the manner in which the search has been limited on reasonableness and proportionality grounds and why, and (iii) certify to the best of their knowledge and belief that the disclosure ordered has been provided.

56. If the data/documents to be disclosed above is contained in the form of an electronic database or extract therefrom, Iveco shall provide it in their native electronic format or electronic excel format, together with (i) a statement setting out how the relevant

information has been compiled for the database (including details of any data cleaning exercise conducted before disclosing the data), (ii) if appropriate, guidance on how the data is to be examined or any other explanatory notes or material which would assist the Claimants' expert economists in analysing the disclosed information.

57. Costs in the case.

58. The parties have liberty to apply.

Hodge Malek QC
Chairman

Charles Dhanowa OBE, QC (*Hon*)
Registrar

Date: 4 March 2021