# Exhibit A

BUCHER LAW, PLLC
Ryan Bailey (SBN 303925)
1000 Brickell Ave
STE 715 – Mailbox 1004
Miami, FL 33131
Email: *ryan@bucherlawfirm.com*
Phone: (650) 881-2201

Attorneys for Plaintiffs and Proposed Classes

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

ALEXANDER SHIMOTA, an individual; RICARDO CAMARGO, an individual; JOHN ELLIOTT, an individual; and all others similarly situated;

Plaintiffs,

vs.

ACTIVISION BLIZZARD, INC.; ANNAPURNA GAMES; CAPCOM U.S.A. INC.; ELECTRONIC ARTS INC.; HUMBLE BUNDLE, INC.; SEGA OF AMERICA, INC.; SONY INTERACTIVE ENTERTAINMENT LLC; SQUARE ENIX OF AMERICA HOLDINGS, INC.; UBISOFT, INC.; VALVE CORPORATION; WARNER BROS. INTERNATIONAL ENTERPRISES INC.; and DOES 1-10;

Defendants.

Case No.

**CLASS ACTION COMPLAINT**

**(1) Price Fixing Conspiracy (Bus. & Prof. § 16700)**
**(2) Unlawful & Unfair Competition (Bus. & Prof. § 17200)**

Plaintiffs ALEXANDER SHIMOTA, RICARDO CAMARGO, and JOHN ELLIOTT (collectively, the "Plaintiffs") individually and on behalf of all others similarly situated (the "Class Members"), by and through their undersigned counsel, bring this action against the above-captioned Defendants ACTIVISION BLIZZARD, INC. ("Activision Blizzard"), ANNAPURNA GAMES ("Annapurna"), CAPCOM U.S.A. INC. ("Capcom"), ELECTRONIC ARTS INC. ("EA"), HUMBLE BUNDLE, INC. ("Humble"), SEGA OF AMERICA, INC. ("Sega"), SONY INTERACTIVE ENTERTAINMENT LLC ("Sony"), SQUARE ENIX OF AMERICA HOLDINGS, INC. ("Square Enix"), UBISOFT, INC. ("Ubisoft"), WARNER BROS. INTERNATIONAL ENTERPRISES INC. ("Warner Bros."), (collectively, "Developer Defendants") and Defendant VALVE CORPORATION ("Valve") under state antitrust laws and state unfair competition laws, seeking public injunctive relief and damages, and allege as follows.

## INTRODUCTION

1. This case is about price-fixing in the PC games market.

2. Defendant Valve operates Steam, the largest PC game distribution platform in the world. In the United States and specifically in California, Steam's share of the PC game distribution market is at least 70 percent. It is the highest-grossing corporation per employee in the world, having collected over $17 billion[1] in revenue in 2025 alone.

3. The Developer Defendants all use Steam to distribute the PC games they make.

4. Steam has few competitors in the market for PC game distribution, all of which are only a tiny fraction of Steam's size or profitability.

5. One reason that Steam has no meaningful competition is that Valve and the Developer Defendants have conspired with Valve to fix the prices, content, and availability of PC games across the market, in return for free marketing, promotional space, and in some cases, direct payment through Steam Keys.[2]

[1] "Valve makes almost $50 million per employee, raking in more cash per person than Google, Amazon, or Microsoft — gaming giant's 350 employees on track to generate $17 billion this year," Nov. 23, 2025, https://finance.yahoo.com/news/valve-makes-almost-50-million-165500871.html, (accessed Apr. 24, 2026).

[2] Steam Keys are vouchers that entitle the bearer to one copy of a given PC game product. They can be sold individually or in bulk. Essentially, they are a form of payment that Valve gives to game developers who promise not to undercut Steam's prices, which the developers can sell or give away. Keys are granted solely at Valve's discretion.

6. The Developer Defendants made agreements with Valve not to allow their games to be sold at lower prices on non-Steam stores, even those that charge much lower distribution fees than Steam.

7. Price fixing is "any combination which tampers with price structures constitutes an unlawful activity. . . . The test is whether the agreement, or conduct, interferes with the freedom of sellers or traders in such a manner as to prohibit or restrain their ability to sell in accordance with their own judgment, and not what the particular effect the agreement or conduct, has on the actual prices."[3]

8. Where the Defendants agreed with *other distributors* to fix consumer prices of PC games on their own sales channels, they engaged in horizontal price-fixing.

9. Where Developer Defendants agreed with Steam (or another Defendant) *as their distributor* to fix consumer prices of PC games, they engaged in vertical price-fixing.

10. Under the Cartwright Act's stringent prohibitions against collusive interference with market forces, all forms of price-fixing are banned, whether vertical or horizontal.

11. Under California law, the Defendants' price-fixing conspiracy is illegal *per se*.[4]

12. "The public interest requires free competition so that prices be not dependent upon an understanding among suppliers of any given commodity, but upon the interplay of the economic forces of supply and demand."[5]

13. Defendants' price-fixing conspiracy has harmed consumers and the broader economy by preventing free and fair competition from driving down prices.

14. To remedy that harm and prevent it in the future, Plaintiffs now seek compensation and injunctive relief for themselves and a class of consumers defined below.

## PARTIES

### Plaintiffs

15. Plaintiff ALEXANDER SHIMOTA is an individual residing in San Mateo County,

---

[3] *Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 710–11.
[4] *Mailand v. Burckle* (1978) 20 Cal.3d 367 ("These rules apply whether the price-fixing scheme is horizontal or vertical.").
[5] *Speegle v. Board of Fire Underwriters* (1946) 29 Cal.2d 34, 44.

California. He purchased PC games subject to the price fixing agreements between Valve and the Developer Defendants, and between Valve and other developers. As a result of the Defendants' conduct, he paid supracompetitive prices for his PC game purchases.

16. Plaintiff RICARDO CAMARGO is an individual residing in Orange County, California. He purchased PC games subject to the price fixing agreements between Valve and the Developer Defendants, and between Valve and other developers. As a result of the Defendants' conduct, he paid supracompetitive prices for his PC game purchases.

17. Plaintiff JOHN ELLIOTT is an individual residing in San Bernardino County, California. He purchased PC games subject to the price fixing agreements between Valve and the Developer Defendants, and between Valve and other developers. As a result of the Defendants' conduct, he paid supracompetitive prices for his PC game purchases.

**Conspirators**

18. Defendant Activision Blizzard is a Delaware corporation with headquarters in Santa Monica, California. It is one of the largest developers and publishers of PC games in the world. Activision Blizzard also runs an online platform, Battle.net, selling the PC games that it publishes itself, hosting 39 games at time of writing. Activision Blizzard participated in the price-fixing conspiracy and took affirmative actions in furtherance of the conspiracy to the detriment of all California PC game consumers.

19. Defendant Annapurna is a Delaware corporation with headquarters in West Hollywood, California. It is a developer and publisher of PC games. Annapurna participated in the price-fixing conspiracy and took affirmative actions in furtherance of the conspiracy to the detriment of all California PC game consumers.

20. Defendant Capcom is a California corporation with headquarters in San Francisco, California. It is a developer and publisher of PC games. Capcom participated in the price-fixing conspiracy and took affirmative actions in furtherance of the conspiracy to the detriment of all California PC game consumers.

21. Defendant EA is a Delaware corporation with headquarters in Redwood City, California. EA is one of the largest developers and publishers of video games in the world, including

PC games. EA runs the EA App, which hosts 179 purchasable PC games at the time of writing. EA participated in the price-fixing conspiracy and took affirmative actions in furtherance of the conspiracy to the detriment of all California PC game consumers.

22. Defendant Humble is a Delaware corporation with headquarters in San Francisco, California. Until recently, Humble was a PC game publisher, but is primarily known for Humble Bundle, its online storefront where it sells a curated monthly selection of games and gives a portion of the proceeds to charity. Substantially all these games are sold as Steam Keys. Humble participated in the price-fixing conspiracy and took affirmative actions in furtherance of the conspiracy to the detriment of all California PC game consumers.

23. Defendant Sega is a California corporation with headquarters in Irvine, California. It is a developer and publisher of PC games. Sega participated in the price-fixing conspiracy and took affirmative actions in furtherance of the conspiracy to the detriment of all California PC game consumers.

24. Defendant Sony is a California corporation with headquarters in San Mateo, California. Sony participated in the price-fixing conspiracy and took affirmative actions in furtherance of the conspiracy to the detriment of all California PC game consumers.

25. Defendant Square Enix is a Delaware corporation with headquarters in El Segundo, California. It is a developer and publisher of PC games. Square Enix participated in the price-fixing conspiracy and took affirmative actions in furtherance of the conspiracy to the detriment of all California PC game consumers.

26. Defendant Ubisoft is a California corporation with headquarters in San Francisco, California. It is a major developer of PC games and operates Ubisoft Connect, which hosts 323 PC games at the time of writing. Most of Ubisoft's PC game sales flow through Steam. Ubisoft participated in the price-fixing conspiracy and took affirmative actions in furtherance of the conspiracy to the detriment of all California PC game consumers.

27. Defendant Valve Corporation is a Washington corporation with headquarters in Bellevue, Washington. Through its Steam platform, Valve has a functional monopoly on PC game distribution in the United States and California. Steam offers over 120,000 PC games for sale. Valve

obtained and maintained its dominant status with the assistance of its co-conspirators, the Developer Defendants. For years, Valve has done business in California with at least two million California residents and has conspired with the Developer Defendants in California. Valve participated in the price-fixing conspiracy and took affirmative actions in furtherance of the conspiracy to the detriment of all California PC game consumers. Valve's conspiracy with the Developer Defendants has impacted millions of Californians by depriving them of their right to free and fair competition, in violation of California law.

28. Defendant Warner Bros. is a Delaware corporation with headquarters in Burbank, California. It is one of the largest developers and publishers of PC games in the world. It is owned by Warner Bros. Discovery Global Consumer Products, also headquartered in Burbank. Warner Bros. participated in the price-fixing conspiracy and took affirmative actions in furtherance of the conspiracy to the detriment of all California PC game consumers.

29. The true names and capacities, whether individual, corporate, or otherwise, of the parties sued as DOES 1 through 10 are presently unknown to Plaintiff, who sues them by such fictitious names under Code of Civil Procedure section 474. Each of the fictitiously named Defendants is responsible for the conduct herein alleged, and proximately caused the harm to the Plaintiffs and Class Members.

## JURISDICTION AND VENUE

30. This Court has general jurisdiction over all of the Plaintiffs' claims under the Cartwright Act and the Unfair Competition Law ("UCL"). Plaintiffs' claims arise under the laws of the State of California, are not preempted by federal law, and are not assigned to any other trial court.

31. This Class Action Complaint seeks to prosecute the only California state law claims that are being asserted in any court on behalf of California consumers against these Defendants for these price-fixing agreements.

32. This Court has personal jurisdiction over the Defendants because each Defendant transacts business in California; because each Defendant is registered to do business in California; because each Defendant maintains an office, place of business or agency for transacting business in

California; because each Defendant has contracted with California residents and businesses; or because, in the case of Valve, the Defendant sold and distributed the PC games, purposely availed itself of the benefits of and profited from distributing games in California, and conspired with Developer Defendants in California to violate the laws of the State of California. The claims in this Complaint all arose from contacts or conduct of each of the Defendants, individually, collectively, or through agents. The conduct complained of was intended to and did substantially affect business and commerce within the State.

33. This Court is the proper venue under Code of Civil Procedure sections 395 and 395.5 because Defendants Sony and EA are headquartered and keep their primary place of business in the County of San Mateo, because all Defendants conduct substantial business in the County of San Mateo, and because the harm resulting from the Defendants' illegal conduct occurred in part in the County of San Mateo.

## FACTS PERTINENT TO ALL CAUSES OF ACTION

34. In order to reach customers, PC game developers[6] must either sell through Steam, through a vastly smaller competing distributor like the Epic Games Store, or through its own website and hope for good luck.

35. Almost all developers, including those with their own sales channel, sell their games through Steam, where the vast majority of PC game consumers buy their games.

36. No PC game distribution platform makes more money than Steam.

37. No PC game distribution platform sells more games to California consumers than Steam.

38. Beginning at a time unknown to the Plaintiffs, but encompassing the past four years, Developer Defendants combined, conspired, or agreed to fix prices of PC games sold to consumers in the State of California.

[6] A "developer" is a person or group who creates a video game. A "publisher" is a company that finances, markets, or distributes the video game. Many developers act as their own publishers. As the term "developer" is used in this Class Action Complaint, it is intended to encompass both developers and publishers insofar as they are responsible for delivering a PC game to consumers and would thus interact with digital delivery platforms like Steam or the platforms run by the other Defendants.

39. In exchange for access, favorable treatment, and/or free promotional visibility to Steam's massive user base, Valve demands developers refrain from pricing their games lower on competing stores than it does on Steam ("Price Parity"), from offering unique game content on another platform unless equivalent content is available on Steam ("Content Parity"), from releasing games earlier on competing platforms ("Release Date Parity"), and from allowing any in-game buttons or links to other stores, even the developers' own websites ("Anti-Steering").

40. In return for the access, favorable treatment, and/or promotional visibility on Steam, the Developer Defendants agreed to Valve's demands for market-wide parity.

41. The purpose of these agreements was to standardize PC game prices, content, and availability across the market, ensuring that customers never have meaningful choices about where to shop for PC games.

42. The effect of these agreements was to reduce competition, reduce product diversity and availability, and increase prices for consumers.

43. These practices are unfair, harmful to consumers, and illegal under California's UCL and the Cartwright Act.

44. The relevant product market is the market for retail distribution of PC games. For purposes of this Complaint, use of the term "PC games" includes not only base games, but also Downloadable Content ("DLC") for PC games, expansions or add-ons to PC games, and in-game transactions or microtransactions purchased for use within a PC game.

45. PC games are distinct products from other forms of gaming, including consoles[7] like the Nintendo Switch, and mobile games[8] which are played on a smartphone or tablet.

---

[7] *FTC v. Microsoft Corp.* (N.D. Cal. 2023) 681 F.Supp.3d 1069, 1087 (quoting *FTC v. Whole Foods Mkt., Inc*. (D.C. Cir. 2008) 548 F.3d 1028, 1040, 1043) ("The FTC insists, and the Court agrees, the console market does not include PCs. [redacted] That customers may 'cross-shop' between consoles and PCs does not demonstrate 'reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'")

[8] *In re Valve Antitrust Litigation*, Dkt. 391, p.17 (Order Granting Class Certification) ("As Plaintiffs' experts make clear, downloaded PC games are materially distinct from other forms. This is based on the purchase and game play experience[.] This matches both the regulatory view and even Valve's, as it has outlined in other venues." "To be sure, Valve presents countervailing evidence, . . . but it is simply not convincing.") https://www.courtlistener.com/docket/59859024/391/in-re-valve-antitrust-litigation/ (accessed June 17, 2026).

46. Valve's Steam platform is a store where consumers shop for PC games. Steam processes the payments and the download. Purchased games are added to that account's Steam "library" of PC games. The consumer can then download the game and install it onto their PC.

47. Steam also functions as a gatekeeper for all games purchased through Steam. Even though the consumer has paid for their games and installed them on their own computer, those games may not be played without being logged in to Steam. When a game purchased through Steam (or via Steam Key) is played, the Steam application simultaneously launches and runs in the background, monitoring the customer and collecting data. If a customer decides to close their Steam account, they lose access to all of the games they have purchased through Steam.

48. The relevant geographic market is the United States of America, because the Defendants use technical and legal barriers to prevent consumers like the Plaintiffs from purchasing PC games from foreign versions of their online stores or with currencies other than U.S. Dollars.

49. Combined, the Defendants enjoy approximately 90 percent of the PC game sales in the United States, and in California.

50. Steam alone accounts for at least 70 percent of PC game sales in the United States, and in California.

**Illegal Conduct**

51. Valve's Price Parity agreements with the Defendants constitute price-fixing, which is *per se* illegal under the Cartwright Act.

52. The Developer Defendants agreed with Valve to fix the prices of PC games across the market.

53. In addition to eliminating competition on price, the Developer Defendants agreed with Valve to standardize PC game content and availability across the market, and agreed not to allow games to provide information about non-Steam distribution channels.

54. Though a written agreement is not required to sustain a claim under the Cartwright Act, a portion of the Price Parity regime was written into the standard Steam Distribution Agreement ("SDA") which established the relationship between Valve and developers who sold games through Steam.

55. The written agreements between Valve and the Developer Defendants contained a provision either identical to or substantially equivalent to the following:

> If Company distributes the Application through any other (non-Steam) distribution channel, and if Company distributes any material DLC for the Application through that other channel, it will deliver the DLC to Valve at the **same time** such that Steam Account Owners will receive comparable DLC with customers acquiring the Application through other channels. Company is free to offer special and unique promotional content through other distribution channels, provided that **material parity** is maintained between Steam Account Owners and users of **other distribution channels** who make a **comparable investment** in the Application and the associated DLC.[9]

56. In other words, the Developer Defendants agreed to offer Steam materially equal products ("material parity") at the same time ("same time") for a comparable price ("comparable investment") as they did for any of Steam's competitors ("other distribution channels").

57. The written portion of the Developer Defendants' agreement with Valve contained four provisions that were explicitly anticompetitive and harmful to consumers:

a. Price Parity ("comparable investment") – meaning no better deals off of Steam;

b. Content Parity ("material parity") – meaning no special content off of Steam;

c. Release Date Parity ("same time") – meaning developers agreed not to launch games earlier on competing stores, even their own;

d. Anti-Steering – meaning that developers agreed not to provide links or information about alternative purchase options to Steam customers.[10]

58. The Release Date Parity and Content Parity restrictions operate to support Price Parity. Without them, developers could use non-price incentives to drive fans of their games to more cost-efficient stores.

59. Valve and the Developer Defendants agreed with Valve to maintain Price Parity, Content Parity, and Release Date Parity across the PC game retail distribution market.

---

[9] Steam Distribution Agreement § 2.4 (emphasis added), image tweeted by Megan Fox, Sept. 8, 2019, https://x.com/glassbottommeg/status/1170756792449585153 (accessed Aug. 6, 2026).

[10] Steam Distribution Agreement, § 2.5. Image tweeted by Megan Fox, Sept. 8, 2019, https://x.com/glassbottommeg/status/1170756792449585153 (accessed Aug. 6, 2026).

60. In practice, the price-fixing agreements between Valve and the Developer Defendants was even broader in scope than the written agreements. If developers violated the agreement with Valve by offering better deals on competing stores, they were punished by Valve with threats of delisting or other punishments.[11]

61. On the other hand, developers who cooperated with Valve's demands for standardized pricing, content, and release timing across the market were rewarded with free advertisement, favorable visibility in major sales, and free Steam Keys.

62. The Developer Defendants have each obtained some form(s) of consideration from Valve in return for agreeing to Valve's demands.

63. Developer Defendants who obtained Steam Keys also agreed to follow Valve's Steam Key Guidelines, which, like the SDA, require parity with all competing platforms:

> "I understand that I need to sell my game on other stores in a similar way to how I am selling my game on Steam. I agree that I am not giving Steam customers a worse deal," "I understand that while it's OK to run a discount on different stores at different times, I agree to give the same offer to Steam customers within a reasonable amount of time."[12]

64. Upon information and belief, all Developer Defendants agreed to and obeyed the Price Parity terms in Valve's Steam Key Guidelines.

65. As with the SDA, Valve enforced the price-matching provision in the Steam Key Guidelines by threatening removal of major promotions for the developer's games, or delisting of the game from Steam altogether.

66. Valve has followed through and ended promotions or delisted games.[13]

---

[11] "Does Steam 'price fix', and does that make them an unfair monopoly?" Simon Carless, July 1, 2024 (Image of an email from Valve executive Tom Giardino telling one developer, "So if you wanted to disadvantage Steam customers by charging them a higher price, we would opt to not sell your game on our store. We want to make sure Steam users aren't getting a worse deal.") https://newsletter.gamediscover.co/p/does-steam-price-fix-and-does-that (accessed May 26, 2026).

[12] *In re Valve Antitrust Litigation* (W.D.Wash.) Case No. 2:21-cv-00563 Doc. 348-7, p.107 (Aug. 23, 2024) (available online at https://www.scribd.com/document/1046023617/Expert-report).

[13] *In re Valve Antitrust Litigation* (W.D.Wash.) Case No. 2:21-cv-00563 Doc. 348-7, p.108 (Aug. 23, 2024) ("If your long term strategy is to sell the game super cheap, that's fine. But constantly offering your products at way better prices on other stores isn't OK, whether you use Steam keys or not. We just opt to stop selling games if partners don't treat our customers fairly.") (available online at https://www.scribd.com/document/1046023617/Expert-report).

67. Though Valve may have had leverage over the Developer Defendants, they are each equally liable for their participation in the price-fixing conspiracy.

68. Developer Defendants' agreements with Valve served to prevent natural market forces from governing prices of PC games.

69. In addition, every or nearly every SDA between Valve and Developer Defendants contained an Anti-Steering provision: "No Other In-Application Stores. The parties agree that Applications distributed via Steam will not include functionality from or links or references to any store other than Steam, or any other facility for making purchases or payments."[14]

70. That provision prohibits developers from advertising or even mentioning to consumers that their favorite games and related content could be found for less money elsewhere, including with links or references to the developer's own websites.

71. The Northern District of California found that an anti-steering provision *less* onerous than Steam's was illegal under the Unfair Competition Law. That Court found that anti-steering restrictions are harmful because "[r]estrictions on price information 'serve to increase the difficulty of discovering the lowest cost seller . . . and [reduce] the incentive to price competitively[.]'"[15]

72. That decision was recently upheld by the Ninth Circuit.[16]

73. The Developer Defendants agreed to Valve's terms, knowing that the purpose of them was to harm competition.

74. Because Valve charges a higher distribution tax on PC game sales than most of its competitors, the result of Defendants' anti-competitive agreements was to ensure that the vast majority of PC game sales flowed through the most expensive distribution channel.

75. By funneling the vast majority of PC game sales through the most expensive sales channel, in defiance of natural market forces, the Defendants' conspiracy caused prices to become and remain inflated for consumers like the Plaintiffs.

---

[14] Steam Distribution Agreement, § 2.5. Image tweeted by Megan Fox, Sept. 8, 2019, https://x.com/glassbottommeg/status/1170756792449585153 (accessed Aug. 6, 2026).

[15] *Epic Games, Inc. v. Apple Inc.* (N.D. Cal. 2021) 559 F.Supp.3d 898.

[16] *Epic Games, Inc. v. Apple Inc.* (9th Cir. 2025) 161 F.4th 1162.

76. The Developer Defendants each agreed to Valve's anticompetitive constraints, and adhered to the terms of those agreements.

77. Each time any Defendant followed its agreement to standardize prices, content, and/or release dates for PC games across competing distribution channels, it took new steps in furtherance of the conspiracy.

78. Each time a Valve executive asked a Developer Defendant to match the pricing, content, and/or release date of any PC game on any distribution channel, Valve took new steps in furtherance of the conspiracy.

79. Each new step in furtherance of the conspiracy injured each of the Plaintiffs and Class Members anew by intentionally suppressing natural competition and ensuring that prices remained higher than they would have been in a competitive market, profiting all the Defendants.

80. The effect of the agreements between Valve and the Developer Defendants was to prevent competition on price, content, and game release timing and availability.

81. The agreements between Valve and the Developer Defendants did, in fact, harm competition in the market for PC game distribution.

82. Competition benefits consumers like the Plaintiffs with lower prices, more choice, and better content.

83. By entering into agreements not to allow competition on price, content, or release dates, Valve and Developer Defendants deprived the Plaintiffs, Class Members, and the economy of the benefits of competition.

84. As a result of the Defendants' anticompetitive agreements, the Plaintiffs and millions of other Californian gamers in the Class suffered harm in the form of increased prices, less choice, and less quality.

## CLASS ACTION ALLEGATIONS

85. The Plaintiffs bring this action pursuant to Code of Civil Procedure section 382 on behalf of themselves and the following class ("Class"):

Consumers who purchased PC games[17] from any of the Defendants while residing in California. Excluded from the class are the Defendants and their employees, parent entities, or subsidiary entities, legal counsel for any named party, the judges and all other court personnel to whom this case is assigned, their immediate families, and those who purchased the PC games for the purpose of resale. The Class also excludes any person who has fully litigated or is currently litigating Cartwright Act or UCL claims based upon the conduct described in this Complaint.

86. The Plaintiffs seek certification of the above Class.

87. This action is brought and may properly be maintained as a class action pursuant to section 382 because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable from the Defendants' business records.

88. This action presents questions of common interest and satisfies the numerosity, commonality, predominance, typicality, superiority, and adequacy of representation requirements of section 382.

Numerosity:

89. The size of the proposed Class makes individual joinder of all Members impracticable. Plaintiffs do not presently know the exact number of Class Members; but, based on Valve's public data, there are a minimum of two million[18] PC game consumers in California who have made purchases at supracompetitive prices through the Steam platform alone.

---

[17] Once again: for purposes of this Class Action Complaint, use of the term "PC games" shall be intended to encompass PC games, Downloadable Content ("DLC") for PC games, expansions or add-ons to PC games, and in-game transactions or microtransactions purchased for use within a PC game.

[18] In 2021, Steam reported having had 132 million active monthly users of the Steam platform worldwide: https://store.steampowered.com/news/group/4145017/view/3133946090937137590.
That number has continued to grow—earlier this year, Steam hit a new record of nearly 42 million concurrent users playing games on the platform at the same time: https://www.gamespot.com/articles/steam-smashes-new-concurrent-user-record-with-more-than-41-million-online/1100-6537183/.
Compare with Steam's current statistics here, https://store.steampowered.com/stats/content/ and toggling "Show US States," reflecting that more than 2 percent of Steam's global traffic currently comes solely from California.
Each person playing a game on Steam represents a purchase of that game, either directly from Steam or from a Steam Key Reseller.

90. Since Valve and several other Defendants track the billing addresses of the credit cards used to make each purchase, the identities of every Class Member could be easily and quickly generated from Defendants' internal data.

Commonality:

91. Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class. These common questions of law and fact include, without limitation:

a. Whether Valve and Developer Defendants combined, conspired, or agreed to pricing, content, release date, and/or anti-steering restraints;

b. Whether Valve provided consideration to Developer Defendants in exchange for acquiescence in Valve's restraints against competition;

c. Whether Defendants' pricing, content, release date, and anti-steering agreements constitute unlawful combinations under the Cartwright Act;

d. Whether Defendants' Price Parity agreements constitute price-fixing agreements, combinations, or conspiracies between the Defendants, in violation of California law;

e. Whether the Defendants' business practices, as described herein, constitute unlawful or unfair business practices, in violation of California law;

f. Whether consumers were harmed by the above conduct;

g. With regard to any conduct that was not *per se* illegal, whether Defendants' agreements, combinations, or conspiracies in restraint of trade generated any genuine benefits to competition, and whether those benefits outweighed their harm to competition.

Predominance:

92. Damages for each Class Member can be calculated as a ratio of their total purchases of PC games from Defendants, so individual damages do not require or justify millions of trials.

93. Thus, questions of law and fact common to the Class Members will predominate over any questions that may only affect individual members.

<u>Typicality</u>:

94. Plaintiffs' claims are typical of the claims of the other Class Members. Plaintiffs and Class Members made PC games purchases from Defendants subject to the same policies and practices of Defendants, which resulted in identical harm to each Plaintiff and Class Member proportional to each purchaser's total expenditures on PC games.

95. Proof of Defendants' illegal conduct, of which Plaintiffs are representative consumers, will establish the right of the Class to recover on the causes of action alleged herein.

<u>Superiority</u>:

96. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual in-court litigation of the claims of all Class Members is impracticable.

97. It would be unduly burdensome to courts across the entire state in which individual lawsuits would have to proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system.

98. Individual actions by Class Members may establish inconsistent standards of conduct for Defendants.

99. By contrast, the conduct of this action as a class action presents fewer management difficulties, conserves the resources of the parties and the court system, and protects the rights of each Class Member.

<u>Adequacy of Representation</u>:

100. Plaintiffs are adequate class representatives. Plaintiffs will take all necessary steps to adequately and fairly represent and protect the interests of the Class.

101. Plaintiffs are represented by attorneys who have substantial experience prosecuting, defending, litigating, and winning consumer protection and antitrust claims for large numbers of consumers in state courts, federal courts, and arbitration.

**FIRST CAUSE OF ACTION: CARTWRIGHT ACT (Bus. & Prof. § 16700, *et. seq*.)**

**(As to all Defendants)**

102. Plaintiffs reallege and incorporate by reference all of the above paragraphs as though fully set forth herein.

103. The Cartwright Act "'generally outlaws any combinations or agreements which restrain trade or competition or which fix or control prices,' and declares that, with certain exceptions, 'every trust is unlawful, against public policy and void.'"[19]

104. Plaintiffs bring this claim individually and on behalf of the Class.

105. The Act affords a private right of action.[20]

106. The Cartwright Act is California's principal antitrust statute, and declares unlawful every trust, defined as "a combination of capital, skill or acts by two or more persons . . . to create or carry out any restrictions in trade or commerce."[21]

107. These unlawful combinations are often restrictions on price, but can also include combinations that fix other aspects of price structures such as costs, discounts, credits, financing, warranty, and delivery terms.

108. The Cartwright Act enumerates several categories of conduct which are explicitly barred, including:

a. "To limit or reduce the production, or increase the price of merchandise or of any commodity."[22]

b. "To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity."[23]

---

[19] *In re Cipro Cases I & II,* (2015) 61 Cal.4th 116, 136 (quoting *Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1147).
[20] Bus. & Prof. Code § 16750, subd. (a).
[21] Bus. & Prof. Code § 16720, subd. (a).
[22] Bus. & Prof. Code § 16720, subd. (b).
[23] Bus. & Prof. Code § 16720, subd. (c).

c. "To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State."[24]

109. The Cartwright Act is especially concerned with agreements relating to price, and enumerates several types of price-related agreements which are explicitly banned, including any agreements:

a. "not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure, or fixed value."[25]

b. "to keep the price of such article, commodity or transportation at a fixed or graduated figure."[26]

c. to "**[e]stablish or settle the price of any article**, commodity or transportation between them or themselves and others, **so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers** in the sale or transportation of any such article or commodity."[27]

d. "to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, **that its price might in any manner be affected.**"[28]

110. Under the Cartwright Act, all forms of price-fixing are *per se* illegal.[29]

111. Defendants' agreements to maintain Price Parity constitute price-fixing in violation of Business & Professions Code section 16720(a), (b), (c), and (d).

112. Defendants' agreements to maintain Price Parity, Content Parity, and Release Date Parity constituted combinations "to prevent competition in manufacturing, making, transportation, sale or purchase of merchandise" in violation of Business & Professions Code section 16720(c).

---

[24] Bus. & Prof. Code § 16720, subd. (d).
[25] Bus. & Prof. Code § 16720, subd. (e)(1).
[26] Bus. & Prof. Code § 16720, subd. (e)(2).
[27] Bus. & Prof. Code § 16720, subd. (e)(3) (emphasis added).
[28] Bus. & Prof. Code § 16720, subd. (e)(4) (emphasis added).
[29] *Mailand v. Burckle* (1978) 20 Cal.3d 367, 377–78.

113. Defendants' agreements to maintain Price Parity, Content Parity, and Release Date Parity constituted combinations "to limit or reduce the production, or increase the price of merchandise or of any commodity" in violation of Business & Professions Code section 16720(b).

114. Defendants' agreements to maintain Price Parity, Content Parity, and Release Date Parity constituted agreements "to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected" in violation of Business & Professions Code section 16720(e)(4).

115. Defendants' agreements to maintain Price Parity, Content Parity, and Release Date Parity were intended to harm, and did in fact harm competition in the market for PC games.

116. Such price-fixing agreements are *per se* unlawful under the Cartwright Act, requiring no showing of market power or actual harm.

117. Defendants' agreements to maintain Price Parity, Content Parity, and Release Date Parity produced no beneficial effects on competition in the relevant market.

118. Defendants' agreements to maintain Price Parity, Content Parity, and Release Date Parity constitute the very conduct the Cartwright Act was designed to prevent: "At its heart is a prohibition against agreements that prevent the growth of healthy, competitive markets for goods and services and the establishment of prices through market forces."[30]

119. The Cartwright Act provides that "[a]ny person who is injured in his or her business or property" may sue for violating the Act.[31]

120. As a direct and proximate result of Defendants' unlawful combinations to unreasonably restrain trade, Plaintiffs and Class Members have been injured in their property in that, *inter alia*, they have paid more and continue to pay more for PC games than they would have paid in a free and open competitive market.

121. For their violations of the Cartwright Act, Defendants are liable to Plaintiffs and Class Members for "three times the damages sustained by him or her, interest on his or her actual damages pursuant to section 16761, and preliminary or permanent injunctive relief . . . , and shall be

[30] *In re Cipro Cases I & II, supra,* 61 Cal.4th at 136.
[31] Bus. & Prof. Code § 16750, subd. (a).

awarded a reasonable attorneys' fee together with the costs of the suit."[32]

**SECOND CAUSE OF ACTION: UNFAIR COMPETITION LAW (Bus. & Prof. § 17200)**

**(As to all Defendants)**

122. Plaintiffs reallege and incorporate by reference all of the above paragraphs as though fully set forth herein.

123. Plaintiffs bring this claim individually and on behalf of the Class.

124. The Defendants have engaged in unlawful, unfair, and fraudulent business acts and practices in violation of Business & Professions Code sections 17200 and 17203 (the "Unfair Competition Law" or "UCL").

125. According to the California Supreme Court, "a practice may be deemed unfair even if not specifically proscribed by some other law."[33]

Unlawful Business Practices

126. The Defendants have engaged in unlawful practices by violating multiple statutes, including at least the Cartwright Act and Business & Professions Code section 16700, as above.

127. Defendants have entered into price fixing agreements to eliminate meaningful competition in the market for retail distribution of PC games, in violation of the Cartwright Act.

128. The Defendants have engaged in market allocation by making express arrangements about which products will be produced, where products will be available, when and how products will be priced, and when sales will occur, on Steam and other retail distribution channels.

129. The Defendants have engaged in exclusive dealing by making agreements to restrict developers' and other distribution platforms' ability to buy, sell, or trade with others, where performance of the agreement forecloses competition in a substantial share of the affected market.

Unfair Business Practices

130. Defendants' agreements on Price Parity, Content Parity, and Release Date Parity requirements ensured that competing platforms or new platforms were unable to compete with Steam by offering lower prices, unique content, and/or early access to PC games.

---

[32] Bus. & Prof. Code § 16750, subd. (a).
[33] *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.* (1997) 20 Cal.4th 163.

131. Defendants Sony, Humble, Capcom, Square Enix, and Warner Bros. are also Steam Key Resellers, which funnels PC gamers into the Steam ecosystem, bolstering Steam's dominance.

132. Defendants' Anti-Steering agreements—barring not only buttons, links, or other functionalities to alternative PC game distribution platforms, but also any "references" to them—work to limit the flow of information between gamers and developers, and keeps consumers like the Plaintiffs unaware of better offers on competing distribution channels.

133. Defendants agreed to and followed these provisions to limit their customers' ability to discover better deals on non-Steam sales channels.

134. Regardless of whether Defendants' Anti-Steering agreements violate another law, they are unfair under the Unfair Competition Law, because as one court reviewing a very similar provision stated, "information costs may create 'lock-in' for platforms as users lack information about the lifetime costs of an ecosystem. Users may also lack the ability to attribute costs to the platform versus the developer, which further prevents them from making informed choices."[34]

135. Defendants' Steam Key agreements and Anti-Steering agreements impose information costs on consumers like the Plaintiffs, create "lock-in" to the Steam platform, and cripple consumers' ability to make informed choices.

136. Defendants' Steam Key and Anti-Steering agreements are thus unlawful and unfair to consumers, and harmful to competition.

137. Plaintiffs and Class Members have been harmed informationally and financially as a direct result of Defendants' unfair and unlawful practices, precisely the harm predicted in *Epic v. Apple*, including higher prices, less selection, and less availability than without these restraints.

138. As a result of their unlawful and unfair business practices, Defendants have reaped and continue to reap unfair and illegal profits at the expense of the Plaintiffs and Class Members.

139. The Defendants should be required to disgorge their illegal profits, and to pay the Plaintiffs and Class Members restitution.

[34] *Epic Games, Inc. v. Apple Inc*. (N.D. Cal. 2021) 559 F. Supp. 3d 898, 1055.

140. Pursuant to Business & Professions Code section 17200 *et seq*., Plaintiffs and Class Members are entitled to equitable relief including (i) restitution of supra-competitive profits Defendants wrongfully acquired; (ii) an award of reasonable attorney fees pursuant to Code of Civil Procedure section 1021.5 and other applicable law; (iii) an award of costs; and (iv) public injunctive relief preventing the unlawful and unfair business practices described herein.

141. All remedies are cumulative pursuant to Business & Professions Code section 17205.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs request the following relief:

A. That the Court determine that this action may be maintained as a class action under Code of Civil Procedure section 382;

B. Certification of the proposed class;

C. Appointment of the Plaintiffs as Class representatives;

D. Appointment of Plaintiffs' counsel as Class Counsel;

E. Provision of Notice to all Class Members;

F. Declaratory judgment that the Defendants have violated Business & Professions Code section 16750 by forcing a combination to unreasonably restrain trade through price fixing, setting a price floor, market allocation, and other conduct to prevent competition;

G. Declaratory judgment that the Defendants have violated Business & Professions Code section 17200 by violating the Cartwright Act and through unfair business practices;

H. Declaratory judgment that the agreements between Valve and the Developer Defendants are void and unenforceable pursuant to Business & Professions Code section 16722;

I. Injunctive relief benefiting the Class and the public, including a permanent injunction barring Defendants' unlawful restraints;

J. Damages in an amount to be determined at trial;

K. Restitution;

L. Treble damages;

M. Attorney fees;

N. Costs of suit;

O. Pre-judgment and post-judgment interest at the maximum rate permitted under the law;

P. An award of other and further relief as the Court deems just and proper.

**JURY DEMAND**

The Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

Dated: August 27, 2026

Respectfully submitted,

*By: /s/ Ryan S. Bailey*

BUCHER LAW PLLC
Ryan S. Bailey (SBN 303925)
1000 Brickell Ave
STE 715 - Mailbox 1004
Miami, FL 33131
+1 (650) 881-2201
ryan@bucherlawfirm.com

*Attorneys for Plaintiffs*