Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

IN RE VALVE ANTITRUST LITIGATION,

NO. 2:21-CV-00563-JNW

SECOND DECLARATION OF NATASHA MARIE PEARMAN IN SUPPORT OF VICKI SHOTBOLT CLASS REPRESENTATIVE LIMITED'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR CLARIFICATION REGARDING PROTECTIVE ORDER

**NOTE ON MOTION CALENDAR: September 4, 2026**

**ORAL ARGUMENT REQUESTED**

Natasha Marie Pearman, declares and states under penalty of perjury under the laws of Washington:

1. I am a Partner and the head of the competition litigation practice at Milberg London LLP ("**Milberg**"), the solicitors for Vicki Shotbolt Class Representative Limited (the "**CR**") in the proceedings: *1640/7/7/24 Vicki Shotbolt Class Representative v Valve* Corporation which are ongoing before the Competition Appeal Tribunal[1] (the "**Tribunal**" or the "**CAT**") in

[1] The Competition Appeal Tribunal is a specialist court that hears cases involving competition or economic-regulatory issues. All Tribunal orders are appealable to the UK Court of Appeal. See About the Tribunal, Competition Appeal Tribunal, https://www.catribunal.org.uk/about (last accessed Sept. 4, 2026).

the United Kingdom (the "**UK Proceeding**"). I have primary carriage of the CR's claim in the UK Proceeding.

2. On 14 August 2026, I made a declaration, ECF No. 688 (my "**First Declaration**") in support of the CR's Cross-Motion for Clarification Regarding the Protective Order (the "**Cross-Motion**") in *In Re Valve Corporation Antitrust Litigation* (case no 2:21-cv-00563-JNW) (the "**US Proceeding**"), pending before this Court. I make this further declaration in response to certain matters addressed in the declaration of Mr Michael Armitage dated 31 August 2026, ECF No. 696 (the "**Armitage Declaration**"), made in support of the Publisher Plaintiffs' Response to the Cross-Motion, ECF No. 695.

3. The facts and matters set out in this further declaration are within my own knowledge unless otherwise stated, and I believe them to be true. Where I refer to information supplied by others, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief. Nothing I say in this declaration is intended to waive any privilege, and I am not authorized to waive privilege.

## I. RULE 63 AND THE CONTEMPLATED ROUTE FOR DISCLOSURE

4. As I explained at paragraph 15 of my First Declaration, Valve has not yet been ordered to produce the third-party materials in the UK Proceeding. A further case management conference is expected to take place in November or December 2026, at which matters relating to the third-party materials may be raised by the CR and the Tribunal may order Valve to produce some or all of those materials.

5. The third-party materials to which I referred in my First Declaration are documents that third parties, including the Publisher Plaintiffs, have already produced to Valve in discovery in the US Proceeding (the "**Third-Party Materials**"). As explained at paragraph 21 of my First Declaration, Valve has provided the CR with a schedule identifying the relevant third parties, the number of documents produced by each, and information concerning the



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

categories of documents produced. Based on that information, the CR intends, if appropriate, to seek disclosure of relevant Third-Party Materials from Valve in the UK Proceeding. It does not currently contemplate seeking an order requiring the Publisher Plaintiffs or any other US third parties themselves to provide disclosure to the CR.

6. At paragraphs 10–13 of the Armitage Declaration, Mr Armitage addresses the Tribunal's power under Rule 63 of the Competition Appeal Tribunal Rules 2015[2] (the "**CAT Rules**") to order disclosure from a person who is not a party to the proceedings. In particular, he addresses the threshold applicable to such an application, the circumstances in which the Tribunal may exercise that power, and the position where the non-party is domiciled outside the United Kingdom. At paragraph 13, he also refers to proceedings in which an application under 28 U.S.C. § 1782 was made to obtain disclosure from a US non-party rather than an application being made against that non-party under Rule 63.

7. That is a different procedure from the one described at paragraph 5 above. The CR would seek disclosure from Valve, which is a party to the UK Proceeding, of documents which Valve has already received in discovery in the US Proceeding. The fact that those documents originated from the Publisher Plaintiffs or other third parties does not change the identity of the party from whom the CR would seek disclosure in the UK Proceeding.

8. That distinction is also reflected in Mr Armitage's own evidence. At paragraph 12 of the Armitage Declaration, he distinguishes between disclosure against a non-party under Rule 63, and "*inter-partes disclosure*" under Rule 60 of the CAT Rules[3]. At paragraph 20, he describes as "commonplace" a situation in which a claimant seeks disclosure from a defendant of documents originating from non-parties which are already within the defendant's control as a result of prior proceedings. At paragraph 21, Mr Armitage refers to the *Qualcomm*

[2] Armitage Declaration Exhibit 2, page 39.

[3] Armitage Declaration Exhibit 2, pages 37–38.



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

proceedings[4], in which documents originating from third parties were already in Qualcomm's control and their disclosure was added in the course of *inter partes* disclosure before the Tribunal[5]. The approach in *Qualcomm* is same that the CR seeks to adopt in the UK Proceeding.

9. The potential disclosure of the Third-Party Materials from Valve has also already been raised before the Tribunal. At the case management conference on 22 June 2026, in the course of the discussion concerning those materials, the Chair positively described the Tribunal as having "*indicated an interest in seeing these documents* . . ."[6]. As explained in my First Declaration at paragraph 21, the Tribunal also directed Valve to provide information concerning the third parties that had produced materials in the US Proceeding, including the number and categories of documents produced. That direction was therefore made in the context of the Tribunal's expressed interest in seeing the Third-Party Materials.

## II. THIRD-PARTY CONFIDENTIALITY AND PRACTICE DIRECTION 2/2026

10. At paragraphs 14–22 of the Armitage Declaration, Mr Armitage addresses the Tribunal's approach to the management of confidential information, including information originating from non-parties. At paragraphs 23–26, he considers the provisions of the confidentiality ring order ("**CRO**") in the UK Proceeding (the "***Shotbolt* CRO**")[7]. Mr Armitage also exhibits and refers to Practice Direction 2/2026, "Disclosure: Management of Confidential Information", dated 10 August 2026[8] (the "**CAT Confidentiality PD**").

11. I agree with Mr Armitage's description of the *Shotbolt* CRO to the extent that it does not itself contain an express mechanism requiring a non-party whose information is

---

[4] CAT Case No: 1382/7/7/21 *Consumer's Association v Qualcomm Incorporated.*

[5] A copy of the Fourth Case Management Conference Order has been attached hereto as Exhibit 1. *See* Exhibit 1, paragraphs 10–11.

[6] First Declaration, Exhibit 6, page 238, lines 12–13.

[7] First Declaration, Exhibit 7.

[8] Armitage Declaration, Exhibit 1.



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

disclosed by Valve to be notified of, or given an opportunity to participate in, a subsequent challenge to the confidentiality designation of that information. As he notes at paragraph 25 of the Armitage Declaration, paragraph 5.3 of the *Shotbolt* CRO provides that documents or information disclosed in the US Proceeding and designated "Confidential" or "Highly Confidential" are to be designated as Confidential Information in the UK Proceeding. The *Shotbolt* CRO also permits the CR subsequently to challenge such a designation.

12. That description of the *Shotbolt* CRO does not, however, describe the entirety of the procedural framework by which the Tribunal manages third-party confidential information and, indeed, as Mr Armitage highlights with the *Qualcomm* case, the Tribunal is well-equipped to manage non-party confidential information through an adaptable CRO process. The *Qualcomm* proceedings themselves illustrate that confidentiality arrangements of this kind are not static. The confidentiality ring established in those proceedings in December 2021 was subsequently amended in October 2022, replaced by a revised CRO in March 2023, and revised again in June 2023 as the disclosure process developed. The Tribunal subsequently made further confidentiality arrangements to address particular categories of material, including a separate confidentiality ring in July 2025 for material obtained pursuant to applications under 28 U.S.C. § 1782.[9]

13. Separately, the CAT Confidentiality PD that was issued on 10 August 2026 now sets out the Tribunal's general approach to the management of confidential information. Although the CAT Confidentiality PD does not amend the terms of the *Shotbolt* CRO, it forms part of the current procedural framework relevant to the Tribunal's management of confidentiality issues arising in the UK Proceeding. Paragraph 11 of the CAT Confidentiality

[9] *See* 1382/7/7/21 *Consumers' Association v Qualcomm Incorporated*, Competition Appeal Tribunal, accessible at https://www.catribunal.org.uk/cases/13827721-consumers-association.



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

PD[10] specifically addresses third-party interests. It provides that, in managing the disclosure of sensitive information, the Tribunal will balance the interests of the receiving party in having the fullest possible access to relevant documents against the interests of the disclosing party, expressly including third parties, in preserving the confidentiality of sensitive information.

14. Paragraph 16 of the CAT Confidentiality PD[11] addresses the position of third parties more specifically. It recognises that many cases before the Tribunal involve significant third-party sensitive information and states that such situations will often require the third party to be notified of the disclosure and given an opportunity to consent or object. It further provides that procedural and practical issues regarding third-party confidentiality should be brought to the Tribunal's attention at the earliest opportunity, with proposals as to how those issues should be resolved in sufficient time before trial.

15. The CAT Confidentiality PD therefore explicitly contemplates the situation potentially arising in the UK Proceeding: disclosure by a party of material containing sensitive information originating from third parties, followed by the Tribunal's management of the confidentiality issues associated with that material. The absence from the existing *Shotbolt* CRO of a mechanism for third-party participation does not, in itself, determine how the Tribunal would manage such issues if and when they arise. If deemed necessary by the Tribunal, the *Shotbolt* CRO could be amended to accommodate the types of notice provision that were used in the *Qualcomm* proceedings.

16. At the time the *Shotbolt* CRO was made, Valve had only been asked to disclose its own documents; it had not been ordered by the Tribunal to disclose the Third-Party Materials. As explained in my First Declaration at paragraph 15, no such order has yet been made. If the CR subsequently seeks, and the Tribunal orders, disclosure by Valve of the Third-

[10] Armitage Declaration, Exhibit 1, page 3.

[11] Armitage Declaration, Exhibit 1, pages 4–5.



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Party Materials, the confidentiality arrangements applicable to those materials can be considered at that stage. The CR would have no objection in principle to the *Shotbolt* CRO being amended, if appropriate, so as to provide an affected third party with a reasonable opportunity to make representations concerning the confidential treatment of its information.

17. Mr Armitage himself leaves that issue open at paragraph 26 of the Armitage Declaration. He expressly does not offer an opinion as to whether, or to what extent, the Tribunal may need to take steps to protect non-party interests if the CR seeks disclosure from Valve of information originating from non-parties, or whether the Tribunal would in fact take any such steps. Accordingly, his analysis does not express any view on how third-party confidential information would in fact be treated in the UK Proceeding, including in light of the subsequently issued CAT Confidentiality PD.

I declare under a penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in London, England, United Kingdom, this 4th day of September, 2026.

**Natasha Marie Pearman**



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of September, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system and that all participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

Respectfully submitted: September 4, 2026.

*/s/ Patti Saiden*
Patti Saiden, Legal Assistant



**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

# EXHIBIT 1

**IN THE COMPETITION APPEAL TRIBUNAL**

Case No: 1382/7/7/21

BETWEEN:

**CONSUMERS' ASSOCIATION**

Class Representative

- v -

**QUALCOMM INCORPORATED**

Defendant

# ORDER (FOURTH CASE MANAGEMENT CONFERENCE)

**UPON** the Class Representative having served a statement of expert methodology on 22 September 2023 as subsequently updated on 8 December 2023

**AND UPON** Qualcomm having served a statement of expert methodology on 20 October 2023 which, at paragraphs 4.6–4.8, described an analysis of the likely or actual effects of the so-called "NLNC Policy" which Qualcomm's proposed expert economist intends to carry out (the "Leveraging Analysis")

**AND UPON** the Class Representative having on 10 November 2023 filed and served Rule 63 Applications against Apple Retail UK Limited, Apple (UK) Limited and Apple Europe Limited (together, "Apple UK") and Samsung Electronics (UK) Ltd ("SEUK") (the "Rule 63 Applications")

**AND UPON** the Class Representative's applications dated 7 December 2023 for disclosure of documents by Apple Inc., Samsung Semiconductor Inc. and Samsung Electronics America Inc. via §1782 of Title 28 of the United States Code ("Section 1782") (the "Extra-Territorial Disclosure Applications")

**AND UPON** the Defendant having served the First Witness Statement of Michael Brenton Byars on 28 June 2023, which is intended to explain how relevant U.S. protective orders govern confidential material produced by third parties in the FTC Litigation (the "U.S. Protective Orders")

**AND UPON** the Class Representative's applications to the Tribunal dated 7 December 2023 and the Defendant's applications of the same date

**AND UPON** consideration of the parties' written submissions and hearing Leading Counsel for both parties and Junior Counsel for the Class Representative at a case management conference held on 9 and 10 January 2024

**AND UPON** the Tribunal having directed the parties to agree a proposed timetable to a first trial, to commence on the first available date after 1 October 2025, and the parties having done so

**AND UPON** the Tribunal having listed a further case management conference ("CMC5") on 29 and 30 July 2024

**AND UPON** the following definitions applying for the purposes of this Order:

- "Case AT.40220 Decision" means the European Commission's Decision in Case AT.40220 - *Qualcomm (Exclusivity Payments)* dated 24 January 2018;

- "KFTC" means the Korea Fair Trade Commission;

- "KFTC Decision" means the KFTC's Decision No. 2017-0-25, In re Alleged Abuse of Market Dominance of Qualcomm Incorporated, dated 20 January 2017;

- "KFTC Proceedings" means the regulatory proceedings which culminated in the KFTC Decision;

- "Case AT.39711 Decision" means the decision of the European Commission Decision in Case AT.39711 – *Qualcomm (Predation)* dated 18 July 2019;

- "Revised Confidentiality Ring Order" means the Tribunal Order made by consent on 21 June 2023;

- "SCK" means the Supreme Court of Korea;

- "SCK Proceedings" means the proceedings before the SCK which culminated in Decision No. 2022Du31897 of the Supreme Court of Korea dated 13 April 2023;

- "SHC" means the Seoul High Court;

- "SHC Decision" means Decision No. 2017Nu48 of the Seoul High Court dated 4 December 2019;

- "SHC Proceedings" means the proceedings before the SHC which culminated in the SHC Decision

**AND HAVING REGARD TO** the Tribunal's powers under the Competition Appeal Tribunal Rules 2015

**IT IS ORDERED THAT:**

**Split Trial**

1. There shall be a split trial of these proceedings.

2. At the first trial ("Trial 1"), the Tribunal shall determine Issues 1 to 13 of the List of Issues appended to this Order.

3. As the second trial ("Trial 2"), the Tribunal shall determine Issues 14 to 19 of the same List of Issues.

**Expert Evidence**

4. The Class Representative is permitted to appoint and instruct the following individuals to give expert evidence at Trial 1 in the following fields of expertise:

   (a) Expert evidence in the field of competition economics from Mr Robin Noble;

   (b) Industry expert evidence from Dr Matthias Schneider; and

   (c) Technical expert evidence from Dr Joakim Ingers.

5. The Defendant is permitted to appoint and instruct the following individuals to give expert evidence at Trial 1 in the following fields of expertise:

   (a) Expert evidence in the field of competition economics from Dr Jorge Padilla;

   (b) Industry expert evidence from Mr Paul Melin; and

   (c) Technical expert evidence from Professor Jeffrey Andrews and Dr Tim Williams.

6. By 26 January 2024:

   (a) The Class Representative shall provide, in respect of each of Dr Schneider and Dr Ingers, an explanation of their academic and professional background and their connection (if any) to either party.

   (b) The Defendant shall provide, in respect of each of Mr Melin, Professor Andrews and Dr Williams, an explanation of their academic and professional background and their connection (if any) to either party.

7. If the Class Representative wishes to make any objection to the instruction of Mr Melin, Professor Andrews or Dr Williams on grounds related to their independence or expertise, or if the Defendant wishes to make any objection to the instruction of Dr Schneider or Dr Ingers on such grounds, such objection must be raised by 9 February 2024.

8. In relation to paragraphs 4(a) and 5(a) above:

   (a) if the Class Representative wishes to appoint and instruct an alternative expert in competition economics rather than Mr Noble, the Class Representative must, by 4pm on 29 February 2024, provide the Defendant and the Tribunal with:

      (i) Notice of its intention to appoint and instruct an alternative expert and of the identity of that alternative expert, and

      (ii) A short statement of the expert methodology which that alternative expert intends to adopt.

   (b) if the Defendant wishes to appoint and instruct an alternative expert in competition economics rather than Dr Padilla, the Defendant must, by 4pm on 29 February 2024, provide the Class Representative and the Tribunal with:

      (i) Notice of its intention to appoint and instruct an alternative expert and of the identity of that alternative expert, and

(ii) A short statement of the expert methodology which that alternative expert intends to adopt.

(c) As regards paragraph 8(a) and (b) above, if the Class Representative or the Defendant wishes to make any objection to the instruction of any alternative expert, on grounds related to their independence or expertise, such objection must be raised by 14 March 2024.

9. It is provisionally directed that expert evidence for Trial 1 is to be exchanged as follows, on the dates set out in the Trial Timetable appended to this Order:

(a) As to the evidence of Mr Noble and Dr Padilla (or any alternative expert competition economists appointed pursuant to paragraph 8 above):

(i) In relation to the Leveraging Analysis, sequential exchange with the report of Dr Padilla (or any alternative competition economist appointed by Qualcomm) being served first;

(ii) In relation to all other matters, sequential exchange with the report of Mr Noble (or any alternative competition economist appointed by the Class Representative) being served first;

(b) The evidence of Professor Andrews, Dr Williams and Dr Ingers is to be exchanged sequentially with the evidence of Professor Andrews and Dr Williams served first; and

(c) The evidence of Mr Melin and Dr Schneider is to be exchanged simultaneously.

**The Class Representative's Applications for Third Party Disclosure**

10. The Rule 63 Applications shall be heard on a date to be fixed after judgment is handed down in Trial 1.

11. The Class Representative shall disclose to the Defendant all relevant documents, including adverse documents, obtained by it from third parties in relation to

these proceedings ("Third Party Documents"), whether obtained pursuant to the Rule 63 Applications or the Extra-Territorial Disclosure Applications, or provided voluntarily by third parties, in accordance with the following provisions:

(a) Insofar as the Class Representative has obtained Third Party Documents prior to the date of this Order which have not yet been provided to the Defendant, the Class Representative shall disclose those Third Party Documents to the Defendant within 21 days of the date of this Order.

(b) Insofar as the Class Representative obtains Third Party Documents on a date which falls after the date of this Order but more than 3 months before the start of Trial 1, the Class Representative shall disclose those Third Party Documents to the Defendant within 21 days of the date on which the Class Representative obtains them.

(c) Insofar as the Class Representative obtains Third Party Documents on a date which falls less than 3 months before the start of Trial 1, the Class Representative shall disclose those Third Party Documents to the Defendant within 7 days of the date on which the Class Representative obtains them.

12. When the Class Representative discloses documents to Qualcomm pursuant to paragraph 11 above, it shall also, at the same time as providing the disclosure, provide a description of the nature and contents of the documents being disclosed.

**The Class Representative's Applications for Disclosure from Qualcomm**

13. The Defendant shall give disclosure of:

(a) Unredacted copies of all exhibits filed by the KFTC and third parties during the KFTC and SHC Proceedings. This shall include any such documents or parts of documents which (i) fall within the scope of paragraphs 1(d)–(e) of the Tribunal's Order dated 24 July 2023; but (ii) have been withheld or redacted pursuant to paragraph 5 of that Order, or

otherwise on the basis that they contained information confidential to a third party.

(b) Copies of any documents or parts of documents which: (i) fall within the scope of paragraphs 7(g)–(h) of the Tribunal's Order dated 13 January 2023; but (ii) have been withheld or redacted on the basis that such documents are not within the Defendant's control.

(c) In carrying out the searches and in providing the disclosure referred to at paragraph 13(a)–(b) above, the Defendant shall not be obliged to take any action that would require it to breach the terms of any U.S. Protective Order.

(d) In relation to the Case AT.39711 Decision, complete versions of:

(i) Documents referred to in sections 10 and 11 of that Decision;

(ii) Insofar as not covered by paragraph 13(d)(i) above, the Defendant's submissions to the European Commission in relation to market definition and dominance; and

(iii) Insofar as not covered by paragraph 13(d)(i) above, any documents provided (by the Defendant or third parties) alongside the documents or submissions referred to in paragraphs 13(d)(i) and (ii) above.

(e) The documents referred to above at paragraphs 13(a)–(d) shall be designated as "Outer-Ring Confidential Information" in accordance with the terms of the Revised Confidentiality Ring Order, subject to any applications by third parties in accordance with the procedure set out below at paragraph 18(c).

(f) The data on which the market share and handset sales figures quoted in paragraphs 102A.1(c) and 102B of Qualcomm's Re-Amended Defence are based.

(g) The data on which the plea in paragraph 102B.3(b)(i) of Qualcomm's Re-Amended Defence is based.

14. The Defendant shall be permitted to redact information contained in the documents to be disclosed pursuant to paragraph 13(d) above on grounds of privilege only.

15. Qualcomm shall conduct reasonable and proportionate searches for documents relating to the Defendant's alleged market power in the supply of 5G baseband chipsets including but not limited to:

(a) internal documents referring to the importance of the supply of 5G baseband chipsets when negotiating LTE SEP licensing terms with Apple (or their contract manufacturers) or Samsung;

(b) internal documents referring to the Defendant's alleged market power in the supply of 5G baseband chipsets; and

(c) all documents relating to the Defendant's alleged market power in the supply of 5G chipsets which are referred to in the confidential version of the Case AT.40220 Decision.

16. In respect of the Defendant's searches for the documents referred to in paragraphs 15(a) and (b) above:

(a) Such searches shall relate to the period from 1 April 2018 onwards.

(b) The parties shall liaise in relation to the appropriate search terms, as follows:

(i) By 4pm on 26 January 2024, the Defendant will provide a list of proposed search terms.

(ii) To the extent necessary, the parties shall meet to discuss the proposed search terms by 2 February 2024.

(iii) To the extent necessary, the parties shall seek to agree the final search terms by 4pm on 9 February 2024.

(iv) In the event that agreement on the final search terms cannot be reached, the parties shall submit any points in dispute by 4pm on 16 February 2024 to the Tribunal for determination.

17. The Defendant shall provide disclosure pursuant to paragraphs 13 and 15 above in the following tranches:

(a) Subject to paragraph 18 below, the Defendant shall provide disclosure pursuant to paragraphs 13 and 15(c) above by 11 March 2024.

(b) The Defendant shall provide disclosure pursuant to paragraphs 15(a)–(b) by 19 April 2024.

18. In respect of the disclosure referred to in paragraphs 13(a)–(d) and 15(c) above:

(a) By 4pm on 31 January 2024, the Defendant shall write to all third parties whose documents fall to be disclosed pursuant to paragraphs 13(a)–(d) and 15(c) above providing each of them with a copy of this Order and the Revised Confidentiality Ring Order and giving notice that:

(i) The Defendant has been ordered to give the disclosure referred to in paragraphs 13(a)–(d) and 15(c) above; and

(ii) If any of the third parties have concerns that the Revised Confidentiality Ring Order does not provide adequate protection for their confidential information (as defined in paragraph 2.1.1 of that Order), they may object to the disclosure of documents containing that information by making an application to the Tribunal as provided for in paragraph 18(c) of this Order.

(b) The Class Representative shall be copied into the notifications referred to in paragraph 18(a) above, and any subsequent correspondence sent by the Defendant to a third party in relation to the disclosure referred to at

paragraphs 13(a)–(d) and 15(c) above (which subsequent correspondence may be redacted only to the extent necessary to protect the confidentiality of the information of the third party in question). The Defendant will also invite the third parties to copy the Class Representative into their responses to such notification and/or correspondence (which responses may also be redacted to the extent necessary to protect the confidentiality of the information of the third party in question).

(c) Any of the third parties may apply to the Tribunal to vary (to the extent necessary) this Order and/or the Revised Confidentiality Ring Order with a view to protecting their confidential information. Such application(s) will be:

(i) Made on at least 5 working days' notice to the Class Representative and the Defendant, which notice shall explain the nature of the third party's confidentiality concerns;

(ii) Filed with the Tribunal Registry by 4pm on 19 February 2024;

(iii) Served at the same time on the Class Representative and the Defendant;

(iv) Accompanied by a reasoned explanation of the application to vary (to the extent necessary) this Order or the Revised Confidentiality Ring Order together with any evidence relied on; and

(v) At the applicant's risk as to costs if the application is unsuccessful.

**Directions to Trial 1**

19. Trial 1 is to be listed to commence on the first available date after 1 October 2025, with a provisional time estimate of 5 weeks (plus 1 week pre-reading).

20. The parties are to comply with the Trial Timetable appended to this order, subject to any amendments made to that timetable at CMC5.

21. Oral evidence in relation to the Leveraging Analysis is to occupy no more than one day of trial time at Trial 1.

**Pre-trial review**

22. There shall be a pre-trial review hearing listed, with a time estimate of 1 day, on the first available date on or after 25 July 2025.

**Further hearings**

23. Any applications (and supporting evidence) for determination at CMC5 shall be filed and served by 5pm on 10 July 2024.

24. Any responsive evidence in respect of applications for determination at CMC5 shall be filed and served by 5pm on 17 July 2024.

25. The Tribunal's permission is required before any party files evidence for CMC5 otherwise in accordance with paragraphs 16 and 17 above. Any such request for permission should be made to the Tribunal by 10am on 22 July 2024.

26. An agreed core bundle and CMC bundle for CMC5 shall be filed by 10am on 23 July 2024.

27. Skeleton arguments for CMC5 containing cross-references to the CMC5 bundle shall be filed and served by 4pm on 24 July 2024.

28. An agreed authorities bundle for CMC5 shall be filed by 6pm on 25 July 2024.

**Costs**

29. Costs in the case.

**Other**

30. There shall be liberty to apply.

**The Hon Mrs Justice Bacon**
Chair of the Competition Appeal Tribunal

Made: 29 January 2024
Drawn: 29 January 2024

# APPENDIX A
# LIST OF ISSUES FOR DETERMINATION

This List of Issues is a working tool for the Tribunal and the parties, for the purpose of delineating the Issues to be determined at each stage of the proceedings. In the case of conflict with the pleadings, the pleadings prevail. This List of Issues adopts the defined terms and abbreviations used in the pleadings.

**ISSUES FOR FIRST TRIAL**

**A. MARKET DEFINITION**

1. What is the relevant product market, or what are the relevant product markets, for the supply of baseband chipsets supporting relevant cellular standards ("Chipset Markets")? In particular, which if any of the following are relevant Chipset Markets:

   (a) The LTE Chipsets Markets, 3G CDMA Chipsets Market and 5G Chipset Market pleaded by the CR; or

   (b) The Baseband Chipsets Market pleaded by Qualcomm; or

   (c) The Apple Chipsets Market and Samsung Chipsets Market pleaded in the alternative by Qualcomm.

2. What is the relevant technology market, or what are the relevant technology markets, for the licensing of LTE SEPs ("SEP Markets")? In particular, which if any of the following are relevant SEP Markets:

   (a) The LTE SEP Markets pleaded by the CR; or the SEP Portfolio Markets pleaded by Qualcomm; or

   (b) Qualcomm's SEP Portfolio Market pleaded in the alternative by Qualcomm.

3. What is the geographic and temporal scope of the relevant Chipset Market(s) and SEP Market(s)?

## B. DOMINANCE AND MARKET POWER

4. Did Qualcomm hold a dominant position on any relevant Chipset Market(s) at any material time?

5. Did Qualcomm hold a dominant position on any relevant SEP Market(s) at any material time?

6. If the answer to Questions 4 or 5 is Yes, were Apple and Samsung able to exert countervailing buyer power on the relevant Chipset Market(s) and/or the relevant SEP Market(s)?

## C. ALLEGED ABUSE

7. Is the alleged NLNC Policy, alone or in combination with the alleged RTL Policy, capable of constituting an abuse of a dominant position in law?

8. In the light of the factual and economic evidence:

   (a) Does the alleged "NLNC Policy" depart from competition on the merits?

   (b) Was the alleged "NLNC Policy" capable of having, or likely to have had, an anti-competitive effect by increasing the LTE SEP royalties agreed between Qualcomm and Apple (or its CMs) and between Qualcomm and Samsung in relation to the sale of certain multi-mode UMTS/LTE-enabled mobile phones (the alleged "Affected Products")?

   (c) Is the alleged RTL Policy capable of having (and/or is it likely to have had) any (independently non-abusive) exclusionary or foreclosure effects on competing chipset suppliers?

(d) In the light of the answer to (c) above, does the alleged "RTL Policy" buttress any abusive effects of the alleged "NLNC Policy"?

(e) has Qualcomm taken additional steps to sustain and reinforce the effects of the alleged NLNC and RTL Policies by exerting pressure on other industry parties including Apple and/or Samsung, who allegedly depend on Qualcomm for chipset supply, not to seek third-party determinations of whether its royalties are FRAND, not to challenge Qualcomm's patent licensing practices under any competition or similar laws, and not to take part in any proceedings by third parties against Qualcomm in respect of its patent licensing practices save only to the extent required by law?

9. Is the alleged "NLNC Policy" (alone or buttressed by the "RTL Policy" and/or any steps as described in Question 8(e) above) objectively justified and/or justified by efficiencies?

10. Is Qualcomm's argument correct that, if it is able to show that the royalties paid by Apple (and its CMs) and Samsung have been FRAND, this constitutes a valid defence to the allegations of abuse of dominance, even if they are higher than they would have been in the absence of the conduct referred to in Questions 8 - 9 above?

11. In the light of the answers to Questions 8 – 10 above, is the Tribunal in a position to determine whether Qualcomm's contested practices are abusive, and if so what is the answer?

## D. EFFECT ON TRADE AND TERRITORIALITY

12. Did any allegedly abusive conduct by Qualcomm, or any part of any such conduct, fall outside the territorial scope of United Kingdom competition law?

13. Did any allegedly abusive conduct by Qualcomm affect trade within the United Kingdom and/or between EU member states?

**ISSUES FOR SECOND TRIAL**

14. What was the actual effect of Qualcomm's contested practices on the level of royalties paid to Qualcomm by Apple and Samsung? In particular, what conclusions fall to be drawn from (i) the CR's proposed expert analysis comparing the level of royalties paid by Apple and Samsung to Qualcomm against the level of royalties paid by Apple and Samsung to licensors of allegedly comparable SEP portfolios? (ii) the CR's proposed top- down analysis?

15. If at the first trial the Tribunal has determined Question 11 above in the affirmative (i.e. Qualcomm is entitled to argue that its royalties were FRAND as a defence to the allegations of abuse), were the relevant royalties agreed between Apple (and its CMs) and Qualcomm, and Samsung and Qualcomm, FRAND?

16. Having regard to the answers to Questions 14 and 15 above, if necessary, were Qualcomm's contested practices abusive?

**Quantification of loss passed-through to class members**

17. What is the total value and volume of Affected Products sold in the claim period?

18. To what extent has any overcharge identified been passed on to UK consumers forming part of the represented class?

19. What interest on damages is due?

**APPENDIX B**

**TRIAL TIMETABLE**

| **Proposed Step in Proceedings** | **Date** |
|---|---|
| Parties to provide, in respect of technical and industry expert, an explanation of their background and their connection (if any) to either party | 26 January 2024 |
| Any objection by Class Representative or Qualcomm to the other party's technical or industry expert(s) on grounds related to their independence or expertise | 9 February 2024 |
| If a party wishes to appoint and instruct an alternative expert in competition economics, provision of (i) notice of its intention to appoint and instruct an alternative expert and of the identity of that alternative expert, and (ii) a short statement of the expert methodology which that alternative expert intends to adopt | 29 February 2024 |
| Class Representative to set out all 'matters of fact' from any decisions or opinions in foreign proceedings that it intends to rely on at trial | 29 February 2024 |
| Any objection by Class Representative or Defendant to the instruction of any alternative expert, on grounds related to their independence or expertise | 14 March 2024 |
| Qualcomm's disclosure to be completed | 3G CDMA disclosure: 11 March 2024<br>Korean disclosure: 11 March 2024<br>5G chipset disclosure: 19 April 2024 |
| Parties should notify each another of any hearsay evidence that they intend to rely upon at trial, such as trial transcripts, deposition transcripts, or witness statements (or equivalent) given in foreign proceedings, akin to the process for hearsay notices set out in CPR | 1 July 2024 |

| Proposed Step in Proceedings | Date |
|---|---|
| Part 33. The parties have liberty to apply to update the notice no later than three months prior to the trial date | |
| CMC5 with a provisional time estimate of two days, to consider: (a) any further or consequential disclosure applications; and (b) any other issues arising (paragraph 19 of Directions Order and letter of the Tribunal dated 9 November) | 29–30 July 2024 |
| Without prejudice meetings between the parties' technical and industry experts | By no later than 15 March 2024 |
| Andrews and Williams technical reports | 28 June 2024 |
| Melin and Schneider industry reports | 6 September 2024 |
| Padilla leveraging analysis | 6 September 2024 |
| Ingers technical report | 18 October 2024 |
| Melin and Schneider reply reports | 1 November 2024 |
| WP meetings of technical and industry experts | Williams/Ingers: by 8 November 2024<br>Andrews/Ingers and Melin/Schneider by 15 November 2024 |
| Statements of witnesses of fact | 8 November 2024 |
| Class Representative reply expert report in relation to Padilla leveraging analysis | 6 December 2024 |
| Joint statements of matters agreed and not agreed as between technical and industry experts | 20 December 2024 |
| Class Representative competition economics report | 17 January 2025 |
| Qualcomm competition economics report (including their positive case) | 4 April 2025 |
| Class representative reply expert report | 6 June 2025 |

| **Proposed Step in Proceedings** | **Date** |
|---|---|
| Meetings of competition economics experts | By 4 July 2025 |
| Supplemental witness statements of fact (to the extent necessary on completion of third party disclosure) | 11 July 2025 |
| Joint statement of matters agreed and not agreed as between competition economics experts | By 18 July 2025 |
| Pre-trial review | 29 or 30 July 2025 |
| Skeleton arguments (exchange) | 23 September 2025, 4pm |
| Tribunal pre-reading week | 29 September – 3 October 2025 |
| Trial Date | 7 October 2025 (5 weeks maximum), sitting Tuesday to Friday each week; Mondays non-sitting days |